George A. Zelcs (*pro hac vice forthcoming*)
  gzelcs@koreintillery.com
Robert E. Litan (*pro hac vice forthcoming*)
Randall P. Ewing, Jr. (*pro hac vice forthcoming*)
  rewing@koreintillery.com
Jonathon D. Byrer (*pro hac vice forthcoming*)
  jbyrer@koreintillery.com
**KOREIN TILLERY, LLC**
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Stephen M. Tillery (*pro hac vice forthcoming*)
  stillery@koreintillery.com
Jamie Boyer (*pro hac vice forthcoming*)
  jboyer@koreintillery.com
Michael E. Klenov, CA Bar #277028
  mklenov@koreintillery.com
Carol O'Keefe (*pro hac vice forthcoming*)
  cokeefe@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

Karma M. Giulianelli, CA Bar #184175
  karma.giulianelli@bartlitbeck.com
Glen E. Summers
  glen.summers@bartlitbeck.com
**BARTLIT BECK LLP**
1801 Wewetta St. Suite 1200,
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Ann Ravel
  aravel@mcmanisfaulkner.com
**MCMANIS FAULKNER**
Fairmont Plaza, 10th Floor, 50 West San Fernando Street
San Jose, CA 95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| MARY CARR, individually and on behalf of all others similarly situated;<br><br>      Plaintiffs,<br><br>      vs.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.;<br><br>      Defendants. | CASE NO. 5:20-CV-5761<br><br>**COMPLAINT (CLASS ACTION)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mary Carr, on behalf of herself and all others similarly situated, brings this class action against Defendants Google LLC; Google Ireland Ltd.; Google Commerce Ltd.; Google Asia Pacific Pte. Ltd; and Google Payment Corp. (collectively, "Google"), and alleges as follows:

## INTRODUCTION

1.      Consumers and businesses worldwide rely on smart mobile devices such as smartphones and tablets for work, news, entertainment and communication.  These devices are enhanced through software products known as mobile applications or "apps."  Apps allow a user to personalize their device to meet their specific needs and interests.  Consequently, a mobile device that provides seamless access to and use of a wide variety of apps is valuable to consumers across the globe.

2.      Like personal computers, smart mobile devices use an operating system or "OS" to provide core device functionality and enable the operation of compatible apps. The commercial viability of an OS for mobile devices (a "mobile OS") depends in large part on the availability, number, and variety of compatible apps that cater to the preferences and needs of users.

3.      Google controls the most pervasive mobile OS: the Android OS. Android OS is used by billions of users around the world, and boasts nearly 3 million compatible apps.  For companies that design and sell smart mobile devices, known as original equipment manufacturers ("OEMs"), Android is the only commercially viable OS that is widely available to license. Stated simply, OEMs have a single mobile OS option: Google's Android OS. Consequently, Google enjoys monopoly power over the market for mobile OS that are available for license by OEMs.

4.      Google is not, however, satisfied with its control of the market for Android OS. To further strengthen its monopoly power, Google erected contractual and technological barriers that foreclose Android users' ability to utilize app distribution platforms other than Google Play Store. This ensures that the Google Play Store accounts for nearly all the app downloads from app stores

1    on Android devices. Google thus maintains a monopoly over the market for distributing mobile apps

2    to Android users (hereafter, the "Android App Distribution Market").

3          5.      For example, Google bundles the Google Play Store with other Google services that

4    Android OEMs must provide on their devices (such as Gmail, Google Search, Google Maps, and

5    YouTube).  Then, as a condition to license those services, Google requires an OEM to pre-install

6    the Google Play Store and prominently display it, while at the same time interfering with an OEM's

7    ability to make third-party app stores or apps available on their devices. These restrictions

8    effectively foreclose competing app stores—and even single apps—from a primary distribution

9    channel.

10         6.      But the OEMs are not Google's only avenue of implementing its anticompetitive

11   scheme. Google also enforces anticompetitive restrictions against app developers. Specifically,

12   Google contractually prohibits app developers from offering an app through the Google Play Store

13   that is, in turn, used to download other apps. Additionally, Google forces app developers to distribute

14   their apps through the Google Play Store to take advantage of advertising channels controlled by

15   Google, such as ad placements on Google Search or YouTube that are specially optimized to

16   advertise mobile apps.  Because Google also has a monopoly in internet searches, app developers

17   have no choice but to acquiesce to Google's anticompetitive restrictions on Google Play.

18         7.      Finally, Google stifles or blocks consumers' ability to download alternative app

19   stores and apps directly from developers' websites. Downloading apps on an Android device outside

20   of Google Play requires multiple steps that require the user to, among other things, change default

21   settings and click through multiple warnings. Even if a user runs this gauntlet and manages to install

22   a competing app store, Google protects the Play Store's competitive advantage by blocking the

23   alternative store from offering basic functions, such as automatic "background" updates of the kind

24   seamlessly available for apps downloaded from the Google Play Store.

8.     Through its behavior, Google intends to eliminate consumer choice, foreclosing competition in mobile app distribution. There is no legitimate procompetitive justification for Google's conduct and restrictions.

9.     Google also imposes anticompetitive restrictions in the separate market for Android In-app Payment Processing. App developers frequently sell digital content for consumption within an app itself (also known as an "in-app purchase").  These in-app purchases require seamless payment processing tools.  An app developer may create its own payment mechanism or utilize a payment processing tool offered by third parties.

10.     Google, however, conditions the right to distribute an app through Google Play Store on a developer's agreement to exclusively use Google's own payment processing tool, Google Play Billing, to process in-app purchases. App developers cannot even offer users other payment processing options alongside Google Play Billing. This essentially forces app developers to use both Google Play Store and Google Play Billing because Google's monopoly over the Android App Distribution Market means developers cannot circumvent this anticompetitive tie by distributing their content through a channel other than the Google Play Store.

11.     Google's decision to tie app distribution to in-app purchase billing means that for every in-app purchase, just as for the initial app purchase, it is Google, not the app developer, that first collects payment. Google then taxes the transaction at an exorbitant 30% supra-competitive rate, remitting the remaining 70% to the developer. This 30% commission is up to ten times higher than the toll charged by other electronic payment options.

12.     Further, by interposing itself as an intermediary in every digital content purchase conducted within an Android-distributed app, Google is able to collect user's personal information, which Google then uses to give an anticompetitive edge to its own advertising services and mobile app development business.

13.     But for Google's monopolistic conduct, competitors could offer consumers and developers choice in distribution and payment processing. Entities wishing to distribute apps through a competing store could offer developers greater innovation and enhanced choices, including in-app payment processing. With other viable options, app developers would not have to pay Google's supra-competitive tax of 30%.   Rather, the price of distribution and payment processing alike would be set by market forces.  Further, users and developers—not Google—would decide how (or even whether) user data was used for other purposes.

## PARTIES

14.     Plaintiff Mary Carr is a natural person who resides in the State of Illinois ("Plaintiff").  Plaintiff purchased an app through the Google Play store and also purchased in-app digital content through an app purchased from the Google Play store within the last four years.

15.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California. Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

16.     Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

17.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

18.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and is a subsidiary of Google LLC. Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

19.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and is a subsidiary of Google LLC. Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

### JURISDICTION & VENUE

20.     This Court has subject-matter jurisdiction over Plaintiff's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over the Defendants. Google LLC and Google Payment are headquartered in this District. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them

would comport with due process requirements. Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

**FACTUAL ALLEGATIONS**

**I.    GOOGLE DOMINATES THE MERCHANT MARKET FOR MOBILE OPERATING SYSTEMS.**

  **A.    The Merchant Market For Mobile Operating Systems.**

23.     Smart mobile devices such as smartphones and tablets are handheld, portable electronic devices that can connect wirelessly to the internet and perform multi-purpose computing functions, including, among other things, Internet browsing, using social media, streaming video, listening to music, or playing games. Many consumers own only a smart mobile device and no other computer. Such consumers are particularly hard-hit by Google's unlawful conduct in mobile-related markets.

24.     Mobile devices require an OS that enables multi-purpose computing functionality, including, but not limited to: (1) button, touch, and motion commands; (2) a "graphical user interface" made up of icons indicating actions a user may take; (3) basic operations such as cellular or WiFi connectivity, GPS positioning, camera and video recording, and speech recognition; and (4) the installation and operation of compatible mobile apps.

25.     An OEM must pre-install an OS on each device prior to its sale so that purchasers immediately have access to basic functions like the ones described above. OEMs design mobile devices to ensure compatibility with whatever OS was selected for that device. For OEMs, the process of implementing a mobile OS requires significant time and investment, making switching to another mobile OS difficult, expensive, and time-consuming.

26.     The vast majority of OEMs do not develop their own OS, so they must choose and license an OS for their devices. There is therefore a relevant Merchant Market for Mobile OS that is comprised of mobile OS that OEMs can license for their smart mobile devices.[1] Historically, the Merchant Market for Mobile OS included the Android OS, developed by Google, the Tizen mobile OS, a partially open-source mobile OS that was developed by the Linux Foundation and Samsung, and the Windows Phone OS developed by Microsoft.

27.     OEMs license mobile OSs for installation on mobile devices globally, excluding China.[2]   The geographic scope of the relevant Merchant Market for Mobile OSs is therefore worldwide, excluding China.  Notably, OEMs outside of China must all contractually consent that if their device licenses the Android OS that they will not sell devices preloaded with a competing, Android-compatible mobile OS.

28.     The geographic scope of the Merchant Market for Mobile OSs includes a separate market within the United States.  The U.S. Merchant Market for Mobile OSs operates as described throughout this Complaint.

---

[1] The market does not include: (1) proprietary OSs that are not available for licensing, such as Apple's mobile OS, called iOS; (2) mobile devices that lack the multi-computing functions of smart mobile devices and tablets (*i.e.,* "flip phones"); or (3) electronic devices whose OS are not compatible with mobile device OS (*i.e.,* desktop computers or gaming systems like Xbox).

[2] Google's operations in China are limited for legal and regulatory reasons, and Google does not make available many of its products for mobile devices sold within China.  Further, while Google contractually requires OEMs licensing Android outside of China not to sell devices with competing Android-compatible mobile OSs, it imposes no such restriction on devices sold within China.

**B.    Google's Monopoly Power In The Merchant Market For Mobile Operating Systems.**

29.    Google enjoys monopoly power in the Merchant Market for Mobile OS through its Android OS. For instance, the European Commission determined the Android OS, licensed to OEMs in relevant respects by Google, is installed on over 95% of all mobile devices sold by OEMs utilizing a merchant mobile OS. Indeed, Android OS is installed on nearly 75% of all smart mobile devices sold by OEMs, including OEMs that use a proprietary mobile OS developed exclusively for their own use (such as Apple's iOS).

30.    A mobile ecosystem of products like apps, devices, and accessories typically develops around one or more mobile OSs, such as the Android OS. The "Android ecosystem" is, therefore, a system of mobile products that are inter-dependent and compatible with each other and the Android OS. Ecosystem participants include Google, OEMs of Android-compatible devices, developers of Android-compatible apps, Android app distribution platforms, the makers of ancillary hardware such as headphones or speakers, cellular carriers, and others.

31.    Mobile ecosystems benefit from substantial network effects—as more developers design useful, compatible apps for a specific mobile OS, the more consumers will be drawn to use that OS, and the more consumers using an OS, the more developers want to develop apps for it. As a result, new entrants to the OS market face significant barriers to entry. A new OS is only as desirable as the number of software applications running on it, and software developers are not incentivized to create apps for an OS that lacks a large existing base of users.

32.    To attract app developers and users, Google represents that Android is an "open" ecosystem where any participant may create Android-compatible products without unnecessary restrictions.

33.    In fact, Google uses its Android OS to keep its ecosystem closed to any competition. As the dominant OS licensor, Google recognizes that participation on its platform is a "must-have"

1  market for developers.  Google only unlocks the door to its ecosystem for participants willing to

2  play by Google's rules.

3      34.    Moreover, Google uses the Android OS to restrict which apps and app stores OEMs

4  pre-install on their devices and to deter the direct distribution of competing app stores and apps to

5  Android users, all at the expense of competition in the Android ecosystem.

6      35.    Because of Google's monopoly power in the Merchant Market for Mobile OS,

7  OEMs, developers and users cannot choose another mobile OS. OEMs such as ZTE and Nokia

8  acknowledge that other, non-proprietary OS are poor substitutes for and not a reasonable alternative

9  to the Android OS, not least because other mobile OS do not presently support many high-quality

10  and successful mobile apps deemed essential and/or valuable by consumers. Google, therefore, has

11  constructed a market that biases consumers against devices with non-proprietary mobile OS other

12  than Android OS, while putting OEMs at Google's mercy because their devices must offer a popular

13  mobile OS and corresponding ecosystem to consumers.

14
15  **II.  GOOGLE UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID MOBILE APP DISTRIBUTION MARKET.**

16      36.    Mobile apps make mobile devices more useful and valuable because they add user-

17  specific functionality like working, video chatting, banking, shopping, job hunting, photo editing,

18  reading digital news sources, editing documents, or playing a game like Hearthstone or Pokémon

19  Go.  Many consumers do not even own a traditional computer. But even when a consumer can

20  perform the same or similar functions on a personal computer, the ability to access apps "on the go"

21  using a handheld, portable device remains valuable and important.

22      37.    Some apps are pre-installed by OEMs.  However, OEMs cannot anticipate the

23  various apps a specific consumer may want, nor should they try since that may result in a device

overloaded with pre-installed apps of no interest to a given consumer. Moreover, apps developed after a user buys his or her mobile device cannot, as a practical matter, be pre-installed.

38. Consequently, mobile devices must provide a way for users to download and/or buy apps post-purchase. On Android devices, this is primarily done through the Google Play Store, a digital portal set up by Google. Through this Store, mobile apps can be browsed, purchased (if necessary), and downloaded by a consumer. App stores such as the Google Play Store, alongside other distribution platforms available to the hundreds of millions of consumers using Android-based mobile devices, comprise the Android App Distribution Market, defined below.

39. Through various anticompetitive acts and unlawful restraints on competition, Google maintains a monopoly in the Android Mobile App Distribution market, causing ongoing harm to competition and injury to OEMs, app distributors, app developers, and consumers. Google's restraints of trade undermine representations that "as an open platform, Android is about choice," and that app developers "can distribute [their] Android apps to users in any way [they] want, using any distribution approach or combination of approaches that meets [their] needs," including by allowing users to directly download apps "from a website" or even by "emailing them directly to consumers." None of this is true, and Google has used anticompetitive means to ensure that this is the case.

**A. The Android App Distribution Market.**

40. There is a relevant market for the distribution of apps compatible with the Android OS to mobile device users (the "Android App Distribution Market"). This Market is comprised of all the channels by which mobile apps may be distributed to the hundreds of millions of mobile Android OS users. The Market primarily includes Google's dominant Google Play Store, with smaller stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind. Nominally only,

the direct downloading of apps without using an app store (which Google pejoratively describes as "sideloading") is also part of this market.

41.     App stores allow consumers to use their mobile device to browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps. It would be commercially unreasonable for an OEM to sell a smart mobile device without an app store since the ability to find, purchase and/or download apps is one of the primary benefits of such devices.

42.     App stores are OS-specific and therefore only distribute apps compatible with a specific mobile OS. An Android OS owner will use an Android-compatible app store that distributes only Android-compatible mobile apps. That consumer may not, for example, substitute Apple's App Store because it is not available on Android devices, not compatible with the Android OS, and does not offer Android-compatible apps. Consequently, non-Android mobile app distribution platforms are not part of the Android App Distribution Market.[3]

43.     Notably, even if an app or game is available for different types of platforms running different operating systems, only the OS-compatible version of that software can run on a specific device, console, or computer. Accordingly, as a commercial reality, any app developer that wishes to distribute apps for Android mobile devices must develop an Android-specific version of the app that is distributed through the Android App Distribution Market.

44.     In the alternative only, the Android App Distribution Market is a relevant, economically distinct sub-market of a hypothetical broader antitrust market for the distribution of mobile apps to users of all mobile devices, whether Android or Apple's iOS.

---

[3] These non-Android platforms would include, for example, the Windows Mobile Store used on Microsoft's Windows Mobile OS, the Apple App Store used on Apple iOS devices, and gaming stores for specific consoles like the Sony PlayStation and/or Nintendo.

45.     The geographic scope of the Android App Distribution Market is worldwide, excluding China.[4] Outside of China, app distribution channels like app stores, are globally developed and distributed, and OEMs, in turn, make app stores like the Google Play Store globally available on Android devices.

46.     The geographic scope of the Android App Distribution Market includes a separate market within the United States.  The U.S. Android App Distribution Market operates as described throughout this Complaint.

**B.  Google's Monopoly Power In The Android App Distribution Market.**

47.     Google has monopoly power in the Android App Distribution Market.

48.     Google's monopoly power is demonstrated by its massive market share in terms of apps downloaded. The European Commission determined that, within the Market, more than 90% of app store downloads were processed through the Google Play Store. The European Commission found the only other app store with any appreciable presence was the Windows Mobile Store, which is compatible with the Windows Mobile OS (and therefore excluded from the Android App Distribution Market). The Commission determined that even if the Windows Mobile Store share was included in the market, the Google Play Store would still possess a market share greater than 90%.

49.     Other existing Android mobile app stores cannot thwart Google's monopoly power in the Android App Distribution Market because no other app store reaches nearly as many Android users as the Google Play Store. The European Commission found the Google Play Store is pre-installed by OEMs on practically all Android mobile devices sold outside of China. No other

---

[4] China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China. Additionally, app stores prevalent in China are not available, or have little presence, outside of China.

Android app store comes close to that number of pre-installed users. With the exception of app stores designed for and installed only on mobile devices sold by particular OEMs (for example, Samsung Galaxy Apps and the LG Electronics App Store), no other Android app store is pre-installed on more than 10% of Android devices, and many have no appreciable market penetration at all. Aptoide, for example, is an Android app store that claims to be the largest "independent" app store outside of China, but it comes pre-installed on no more than 5% of Android mobile devices.

50.     Because of Google's monopoly over Android app distribution, there is no viable substitute to distribution through the Google Play Store. As a result, the Google Play Store offers over 3 million apps, including all of the most popular Android apps, compared to just 700,000 apps offered by Aptoide, the Android app store with the next largest listing. The Google Play Store benefits from the large number of participating app developers and users. The ever-growing variety of apps attracts more and more users, and, in turn, the audience attracts app developers who wish to access Android users.  The system feeds itself. Consequently, Android OEMs find it commercially unreasonable to make and sell phones without the Google Play Store, and they view other app stores as poor substitutes because they offer fewer and less impressive apps.

51.     As further proof of its monopoly power, Google imposes a supra-competitive commission of 30% on the price of apps purchased through the Google Play Store, which is a far higher commission than would exist under competitive conditions.

52.     Google's monopoly power in app distribution is not constrained by competition at the smart mobile device level, whether the relevant market is defined as the Android App Distribution Market or, in the alternative, as the App Distribution Market in general.

53.     First, consumers are deterred from leaving the Android ecosystem due to the difficulty and costs of switching. Consumers choose a smartphone based in part on the pre-installed OS and its ecosystem. Once a consumer selects a smartphone, the consumer cannot replace the pre-

installed mobile OS with an alternative.  If they want to switch OS, that consumer must purchase a new mobile device. In addition, mobile OSs have different designs, controls, and functions that consumers learn to navigate over time.  The cost of learning to use a different mobile OS is part of consumers' switching costs.

54.     Second, switching from Android devices may result in a significant loss of personal and financial investment that consumers put into the Android ecosystem. Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data, even if such apps and products are available within the new ecosystem.  A consumer switching OS would, consequently, lose their investment in the Android-specifics apps previously purchased and/or used.

55.     Third, consumers have no reason to inquire, and therefore do not know about, Google's anticompetitive contractual restraints and policies.  Mobile device purchasers are focused on design, brand, processing power, battery life, functionality and cellular plan. These features are likely to play a substantially larger role in a consumer's decision as to which smart mobile device to purchase than Google's anticompetitive conduct in the relevant markets.

56.     Consumers are also unable to determine the "lifecycle price" of devices—*i.e.,* to accurately assess at the point of purchase how much they will ultimately spend (including on the device and all apps and in-app purchases) for the duration of their device ownership. Consumers cannot predict all of the apps or in-app content they may eventually purchase.  Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

57.     Given consumers' essentially unavoidable "lock-in" to the Android OS, developers must participate in the Android ecosystem. The alternative is losing access to millions of Android users.

**C. Google's Anticompetitive Conduct Concerning The Android App Distribution Market.**

58.     Google has willfully and unlawfully maintained its monopoly in the Android App Distribution Market through a series of related anticompetitive acts designed to foreclose alternative and competing Android app distribution channels.

59.     Google imposes anticompetitive restrictions on OEMs.

60.     First, Google conditions OEM licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on an OEM's agreement to provide the Google Play Store with preferential treatment compared to any other competing app store.

61.     Specifically, Android OEMs (which, as noted above, comprise virtually all OEMs that obtain an OS on the merchant market) must sign a Mobile Application Distribution Agreement ("MADA") with Google. A MADA confers a license to a product bundle comprised of proprietary Google apps, Google-supplied services necessary for mobile app functionality, and the Android trademark. The MADA requires OEMs to locate the Google Play Store on the "home screen" of each mobile device. Android OEMs must further pre-install up to 30 Google mandatory apps and locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services. These requirements ensure that the Google Play Store is the most visible app store any user encounters. All other app stores are, therefore, at a significant disadvantage.

62.     Absent this restraint, OEMs could pre-install and prominently display alternative app stores.  This would allow competing app stores to vie for prominent placement on Android devices,

increase exposure to consumers and, as a result, increase their ability to attract app developers to their store. An app distributor could and would negotiate with OEMs to offer a prominently displayed app store containing its apps, allowing it to reach more mobile users.

63.     Second, Google interferes with OEMs' ability to distribute Android app stores and apps directly to consumers outside the Google Play Store. Some OEMs might compete for buyers by offering mobile devices with easy access to additional mobile app stores and apps through, for instance, pre-installed and/or prominently placed icons. Even when an OEM wants to make mobile apps available to consumers in this way, Google imposes unjustified and pretextual warnings about the security of installing the app, even though the consumer is choosing to install the app in full awareness of its source. This conduct dissuades users from downloading apps outside of the Google Play Store.

64.     Google also imposes anticompetitive restrictions on competing app distributors and developers to further entrench its monopoly in Android App Distribution.

65.     First, Google prevents app distributors from providing Android users ready access to competing app stores. In other words, Google prevents developers from providing an app that, when downloaded from the Google Play Store, would operate as a competing mobile storefront for other app purchases. Google prohibits the distribution of any competing app store through the Google Play Store, without any technological or other justification.

66.     Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Google Play Store. Each of the Defendants, except Google Payment, is a party to the DDA.

67.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of

software applications and games for use on Android devices outside of Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement. The DDA is non-negotiable, so developers seeking access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

68. In the absence of these unlawful restraints, competing app distributors could allow users to replace or supplement the Google Play Store on their devices with competing app stores, easily downloaded and installed through the Google Play Store. App stores could compete and benefit consumers by offering lower prices and innovative app store models, such as app stores that are curated to specific consumers' interests—*e.g.,* an app store that specializes in games. Without Google's unlawful restraints, these app stores would provide additional platforms on which more apps could be featured, and thereby, discovered by consumers.

69. Second, Google conditions app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store. Specifically, Google markets an App Campaigns program that, as Google says, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest properties." This includes certain ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners," that are specially optimized for the advertising of mobile apps. However, to access the App Campaigns program, Google requires that app developers list their app in either the Google Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users). This conduct further entrenches Google's monopoly in Android App Distribution by coercing Android app developers to list their apps in the Google Play Store or risk losing access to a great many Android users they could otherwise advertise to, including through Google's monopoly search engine, but for Google's restrictions.

70.     Google directly and anticompetitively restricts how consumers discover, download and install mobile apps and app stores. Although Google nominally allows consumers to directly download and install Android apps and app stores—a process that Google pejoratively describes as "sideloading"—Google uses the Android OS to impose a series of technological impediments designed to dissuade users from direct downloads.

71.     But for Google's anticompetitive acts, Android users could freely download apps from developers' websites, rather than through an app store, just as they might do on a personal computer. There is no reason that downloading and installing an app on a mobile device should be different. Millions of personal computer users easily and safely download and install software directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader.

72.     Direct downloading on Android mobile devices, however, differs dramatically. Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process.

73.     Even after a user runs the gauntlet of warnings and threats, Google denies directly downloaded apps the permissions necessary to be seamlessly updated in the background—a benefit reserved solely for apps downloaded via the Google Play Store.  Instead, users must manually trigger these updates, which may even require revisiting the original download process, complete with its hurdles and warnings. This imposes onerous obstacles on consumers who wish to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading and toward Google's monopolized app store.

74.     Google further restricts direct downloading under the guise of offering protection from malware. When Google deems an app "harmful," Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the app from a consumer's device. Direct downloading is entirely prevented on Android devices that are part of Google's so-called Advanced

Protection Program ("APP"). Consumers who enroll in APP cannot directly download apps; their Android device can only download apps distributed in the Google Play Store or in another pre-installed app store that Google pre-approved an OEM to offer on its devices. App developers therefore cannot reach APP users unless they first agree to distribute their apps through the Google Play Store or through a separate Google-approved, OEM-offered app store, where available. Google's invocation of security is an excuse to further strangle an app developer's ability to reach Android users, as shown by a comparison to personal computers, where users can securely purchase and download new software without being limited to a single software store owned or approved by the user's anti-virus software vendor. This comparison shows that Google's multiple technical barriers to direct downloading from alternative sources go far beyond what is necessary to achieve any legitimate security objections. Put differently, Google has not adopted the least restrictive means necessary for achieving any legitimate security objectives.

75.     Direct downloading is also nominally available to competing app distributors who seek to distribute competing Android app stores directly to consumers. However, the same restrictions Google imposes on the direct downloading of apps apply to the direct downloading of app stores. Indeed, Google Play Protect has flagged at least one competing Android app store, Aptoide, as "harmful," further hindering consumers' ability to access a competing app store.

76.     Additionally, apps downloaded from "sideloaded" app stores, like apps directly downloaded from a developer's website, may not be automatically uploaded in the background. Thus, direct downloading is not a viable way for app stores to reach Android users, any more than it is a viable alternative for single apps. The only difference is that the former do not have any alternative, ensuring the latter are forced into the Google Play Store. Google's barriers erected against competing app distributors also are not the least restrictive means necessary to achieve any legitimate security objectives.

77.    But for Google's restrictions on direct downloading, app distributors and developers could try to directly distribute their stores and apps to consumers. As explained above, Google makes direct downloading substantially and unnecessarily difficult, and in some cases prevents it entirely, further narrowing this already narrow alternative distribution channel.

78.    There is no legitimate reason for Google's conduct, and even if there were, Google has not adopted the least restrictive means for achieving it.  For decades, PC users have installed software acquired from various sources without being deterred by anything like the obstacles erected by Google. A PC user can navigate to an internet webpage, click to download and install an application, and be up and running, often in a matter of minutes. Security screening is conducted by a neutral security software operating in the background, allowing users to download software from any source they choose (unlike Android).

79.    Through these anticompetitive acts, including contractual provisions and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly over Android mobile app distribution. Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

**D.    Anticompetitive Effects In The Android App Distribution Market.**

80.    Google's anticompetitive conduct forecloses competition in the Android App Distribution Market, affects a substantial volume of commerce in this Market and causes anticompetitive harms to OEMs, competing mobile app distributors, mobile app developers, and consumers.

81.    As described above, Google's anticompetitive conduct harms OEMs by forcing them to dedicate valuable "home screen" real estate to the Google Play Store and other mandatory Google applications, regardless of the OEM's preferences, which might include allowing other app stores or developers to place an icon there. Individually and together, these requirements limit OEMs'

ability to differentiate themselves and compete with each other by offering innovative and more appealing (in terms of price and quality) distribution platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers.

82.     Google's anticompetitive conduct harms would-be competitor app distributors, which could otherwise innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's own app store.

83.     Google's anticompetitive conduct harms app developers, who must agree to Google's anticompetitive terms and conditions to reach many Android users, through downloads or Google's advertising platforms. Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps. By restricting developers, Google ensures that the developer's apps will be distributed on the Google Play Store, which empowers Google to monitor the apps' usage.  This information can, in turn, be used by Google to develop and offer its own competing apps that are, of course, not subject to Google's supra-competitive taxes.

84.     Both developers and consumers are harmed by Google's supra- competitive taxes of 30% on the purchase price of apps distributed through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market unimpaired by Google's anticompetitive conduct. Google's supra-competitive taxes raise prices for app developers and consumers and reduce the output of mobile apps and related content by depriving app developers of incentive and capital to develop new apps and content.

85.     Consumers are further harmed because Google's control of app distribution reduces developers' ability and incentive to distribute apps in different and innovative ways—for example, through genre-specific app stores. Google, by restraining the distribution market and eliminating the ability and incentive for competing app stores, also limits consumers' ability to discover new apps of interest to them. More competing app stores would permit additional platforms to feature diverse collections of apps. Instead, consumers are left to sift through millions of apps in one monopolized app store, where Google controls which apps are featured, identified or prioritized in user searches.

## III.     GOOGLE UNLAWFULLY MAINTAINS A MONOPOLY IN THE ANDROID IN-APP PAYMENT PROCESSING MARKET

86.     By selling digital content within a mobile app rather than charging for the app itself, app developers can make an app widely accessible to all users, then generate revenue to use in developing new games. This is especially true for mobile game developers. By allowing users to play without up-front costs, developers permit more players try a game "risk free" and only pay for what they want to access. Many games are free to download and play, but make additional content available for in-app purchasing on an à la carte basis or via a subscription-based service. App developers who sell digital content rely on in-app payment processing tools to process consumers' purchases in a seamless and efficient manner.

87.     Google has pursued a strategy of anticompetitive conduct, however, to ensure that Android app developers are not free to utilize any one of the multitude of electronic payment processing solutions available to process in-app purchases and other transactions. Instead, Google conditions developers' access to the dominant Google Play Store on an agreement to use Google Play Billing to process in-app purchases of digital content.  Google thus ties its Google Play Store to its own proprietary payment processing tool and uses that tie to maintain its monopoly over the Android In-App Payment Processing Market, as defined below.

88.    Absent Google's unlawful conduct, app developers could integrate compatible payment processors into their apps to facilitate in-app digital content purchases or develop such functionality themselves.  Developers could even offer users a choice among multiple payment processors for each purchase, just like a website or brick-and-mortar store can offer a customer the option of using Visa, MasterCard, Amex, Google Pay, and more. This would, in turn, result in lower prices for consumers.

**A.  Google's Monopoly Power In The Android In-App Payment Processing Market**

89.    There is a relevant antitrust market for processing payment for digital content, including virtual gaming products, within Android apps (the "Android In-App Payment Processing Market"). The Android In-App Payment Processing Market is comprised of the payment processing solutions that Android developers could integrate into their Android apps to process the purchase of in-app digital content.

90.    App developers selling in-app digital content must offer transactions that are seamless, engrossing, quick, and fun. It is critical that such purchases can be made during gameplay itself.

91.    Mobile game developers particularly value seamless in-app purchases that extend or enhance gameplay without disrupting or delaying that gameplay or a gamer's engagement with the mobile app. For these reasons, and in the alternative, there is a relevant antitrust sub-market for the processing of payments for the purchase of virtual gaming products within mobile Android games (the "Android Games Payment Processing Market").

92.    The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools available in China are not available outside of China, including because Google prevents the use of non-

1  Google payment processing tools for all apps distributed through the Google Play Store, which as

2  noted above dominates distribution of apps outside of China.

3       93.    The geographic scope of the Android In-App Payment Processing Market includes a

4  separate market within the United States.  The U.S. Android In-App Payment Processing Market

5  operates as described throughout this Complaint.

6       94.    Google has monopoly power in the Android In-App Payment Processing Market and,

7  in the alternative, in the Android Games Payment Processing Market.

8
9  **B. Google's Anticompetitive Conduct in the Android In-App Payment Processing Market**

10       95.    For apps distributed through the Google Play Store, Google requires use of Google

11  Play Billing to process in-app purchases of digital content and for all purchases within Android

12  games. Because 90% or more of Android-compatible mobile app downloads through an app store

13  are conducted in the Google Play Store, Google has a monopoly in these Markets.

14       96.    Google charges a 30% commission for Google Play Billing. This rate reflects

15  Google's market power, which allows it to charge supra-competitive prices for payment processing

16  within the market. Indeed, the cost of alternative electronic payment processing tools, which are

17  prohibited by Google for apps purchased through the Google Play Store, can be one tenth of the

18  30% cost of Google Play Billing.

19       97.    Through provisions of Google's DDA imposed on all developers seeking access to

20  Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in

21  the Android App Distribution Market, to its own in-app payment processing tool, Google Play

22  Billing.  Section 3.2 of the DDA requires that Android app developers enter into a separate

23  agreement with Google's payment processor, Google Payment, to receive payment for and from

24  apps and in-app digital content.

98.     Further, § 4.1 of the DDA makes compliance with Google's Developer Program Policies mandatory and those Policies require in relevant part that (1) Developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment and (2) Developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except when the payment is solely for physical products or is for digital content that may be consumed outside of the app itself *(e.g.,* songs that can be played on other music players).

99.     Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their mobile apps, depriving app developers and consumers alike a choice of competing payment processors.

100.    Google has no legitimate justifications for its tie. If it were concerned, for example, about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app. But Google does allow alternative payment processing tools in that context, with no diminution in security.

**C. Anticompetitive Effects In The Android In-App Payment Processing.**

101.    Google's conduct harms competition in the Android In-app Payment Processing Market (and, in the alternative, in the Android Games Payment Processing Market) and injures app developers, consumers, and competing in-app payment processors.

102.    Google's conduct harms would-be competitor in-app payment processors who would otherwise be free to innovate and offer Android consumers alternative payment processing tools with better functionality, lower prices, and tighter security.  Absent Google's Developer Program Policies, for example, app designers could offer consumers a choice of in-app payment processors

for each purchase made by the consumer, including payment processers at a lower cost and with better customer service.

103.    Google also harms app developers and consumers by inserting itself as a mandatory middleman in every in-app transaction. This prevents app developers from providing users comprehensive customer service relating to in-app payments without Google's involvement. Google has little incentive to compete through improved customer service because it faces no competition.  Google *does*, however, have an incentive to obtain information concerning developers' transactions with their customers, which Google could use to give its ads and search businesses an anticompetitive edge.  This is true regardless of whether the developer and or the app's users would prefer not to share their information with Google.  In these ways and others, Google directly harms app developers' relationships with the users of their apps.

104.    Finally, Google raises app developers' costs and consumer prices through its supra-competitive 30% tax on in-app purchases, a price it could not maintain in a competitive payment processing market. The resulting increase in prices for in-app content likely deters some consumers from making purchases and deprives app developers of resources they could use to develop new apps and content. The supra-competitive tax rate also reduces developers' incentive to invest in and create additional apps and related in-app content.

## IV.    ANTITRUST INJURY

105.    Plaintiff and class members have suffered antitrust injury as a direct result of Google's unlawful conduct.

106.    By impairing competition in the Android App Distribution Market, Google's unlawful conduct has enabled it to charge supra-competitive prices for Android Apps.

107.    By impairing competition in the Android In-App Payment Processing Market, Google's unlawful conduct has enabled it to charge supra-competitive prices for in-app digital content.

108.    Plaintiff and the Class are the direct purchasers of Android Apps and in-game digital content. When Plaintiff and the Class purchased Android apps, they did so directly on Google Play and paid Google directly, using their credit card or other payment sources. When Plaintiff and the Class purchased in-game digital content, they did so through Google Play, using the pre-established payment streams set up when purchasing that app or other apps on Google Play. When Plaintiff and the Class purchased the in-game digital content, they paid Google directly.

## V.    CLASS ALLEGATIONS

109.    Plaintiff brings this action for herself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

All persons in the United States who paid for an app on Google Play, subscribed to an app obtained on Google Play, or paid for in-app digital content on an app obtained on Google Play within the relevant statute of limitations (the "Class Period").

110.    Specifically excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

111.    The Class is readily ascertainable and the records for the Class should exist, including, specifically, within Defendants' own records and transaction data.

112.    Due to the nature of the trade and commerce involved, there are tens of millions of geographically dispersed members in the Class, the exact number and their identities being known to Defendants.

113.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein.  The damages and injuries of each member of the Class were directly caused by Defendants' wrongful conduct.

114.    There are questions of law and fact common to the Class, and those questions predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

- whether Google has monopoly power in the Android App Distribution Market;

- whether Google has market power in the alternatively defined App Distribution Market;

- whether Google has monopoly power in the Android In-App Payment Processing Market;

- whether Google's contractual restrictions for Google Play further Google's attempt to monopolize the Android App Distribution Market;

- whether Google's restriction on side-loading apps is an attempt to, and does in fact further, Google's monopoly over the Android App Distribution Market;

- whether Google's tie of its Google Play and Google Billing products furthers Google's attempt to monopolize the Android In-App Payment Processing Market;

- whether Google's conduct with respect to the Android In-App Payment Processing Market has attempted to monopolize that market;

- whether Google's conduct results in supra-competitive prices for Android Apps and for in-game purchases of Android Apps;

- whether Google's conduct has harmed or at least not benefited consumers; and

- the appropriate Class-wide measures of damages.

115.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the Class members to seek redress for the violations of law alleged herein.

## CAUSES OF ACTION

### COUNT 1: Sherman Act § 2 Unlawful Monopoly Maintenance in the Android App Distribution Market
### (Against all Defendants except Google Payment)

116.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

117.    Google's conduct violates §2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

118.    The Android App Distribution Market is a valid antitrust market.

119.    Google holds monopoly power in the Android App Distribution Market.

120.     Google has unlawfully maintained monopoly power in the Android App Distribution Market through the anticompetitive acts described herein, including, but not limited to: (1) conditioning licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement give the Google Play Store preferential placement and treatment; (2) imposing technical restrictions and obstacles on both OEMs and developers that prevent the distribution of Android apps through means other than the Google Play Store; and (3) conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

121.     Google's conduct affects a substantial volume of interstate as well as foreign commerce.

122.     Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

123.     Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Additionally, Plaintiff was injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 2: Sherman Act § 1 Unreasonable Restraints of Trade Concerning The Android App Distribution Market: OEMs**
**(Against all Defendants except Google Payment)**

124.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

125.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

126.    Google entered into agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market. These include MADA with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary (and often the only) viable app store on Android mobile devices.

127.    These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

128.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

129.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

130.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was

further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and will continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 3: Sherman Act § 1 Unreasonable Restraints of Trade Concerning The Android App Distribution Market: DDA**
**(Against all Defendants except Google Payment)**

131.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

132.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

133.    Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of their apps being distributed through the Google Play Store. The relevant provisions of these agreements unreasonably restrain competition in the Android App Distribution Market.

134.    Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and

to terminate the app on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

135.    These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

136.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

137.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

138.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 4: Sherman Act § 2 Unlawful Monopolization and Monopoly Maintenance in the Android In-App Payment Processing Market**
**(Against all Defendants)**

139.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

140.    Google's conduct violates §2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

141.    The Android In-App Payment Processing Market is a valid antitrust market. In the alternative, the Android Games Payment Processing Market is a valid antitrust market.

142.    Google holds monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

143.    Google has unlawfully acquired monopoly power in these Markets, including through the anticompetitive acts described herein. However Google initially acquired its monopoly, it has unlawfully maintained its monopoly through the anticompetitive acts described herein.

144.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

145.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

146.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was

further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 5: Sherman Act § 1 Unreasonable Restraints of Trade Concerning Android In-App Payment Processing Market
### (Against all Defendants)

147.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

148.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

149.    Google, except Google Payment, forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, Google Play Store. The relevant provisions of these agreements unreasonably restrain competition in the Android In-App Payment Processing Market.

150.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases of digital content. Further, compliance with Google's Developer Program Policies, which § 4.1 of the DDA makes obligatory, requires that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of

transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

151.    The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the Android In-App Payment Processing Market and, in the alternative, the Android Games Payment Processing Market.

152.    Defendants' conduct affects a substantial volume of interstate as well as foreign commerce.

153.    Defendants' conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

154.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 6: Sherman Act § 1 Tying Google Play Store to Google Play Billing**
**(Against all Defendants)**

155.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

156.    Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

157.    Google has unlawfully tied the Google Play Store to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

158.    Google wields significant economic power in the tying market, the Android App Distribution Market. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

159.    Google only makes the Google Play Store available to those app developers who agree to exclusively process all app-related payments (including in-app purchases) through Google Billing. This tie is especially powerful and effective because Google simultaneously forecloses a developer's ability to use alternative app distribution channels, as described above. Taken together, Google's conduct effectively forces developers to use Google Billing.

160.    The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of distribution. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

161.    Google's conduct forecloses competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

162.    Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

163.    In the alternative only, even if Google's conduct does not constitute a *per se* illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

164.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff was also injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was further injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 7: California Cartwright Act Unreasonable Restraints of Trade in Android App Distribution Market**
**(Against all Defendants except Google Payment)**

165.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

166.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See id.* §§ 16720, 16726.

167.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

168.    The Android App Distribution Market is a valid antitrust market.

169.    Google has executed agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market. Namely, Google entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices. These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

170.    Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service and lowered output.

171.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

172.    Plaintiff was harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff was

1   also injured because Google's establishment and maintenance of monopoly pricing has caused a

2   reduction in the output and supply of Android apps and in-app purchases, which would have been

3   more abundantly available in a competitive market. Plaintiff has suffered and continue to suffer

4   damages and irreparable injury, and such damages and injury will not abate until an injunction

5   ending Google's anticompetitive conduct issues.

**COUNT 8: California Cartwright Act Unreasonable Restraints of Trade in Android App Distribution Market
(Against all Defendants except Google Payment)**

10  173.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

11  forth in the rest of this Complaint as if fully set forth herein.

12  174.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

13  Prof. Code § 16700 *et seq*., which prohibits, *inter alia*, the combination of resources by two or more

14  persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

15  175.    Under the Cartwright Act, a "combination" is formed when the anti- competitive

16  conduct of a single firm coerces other market participants to involuntarily adhere to the

17  anticompetitive scheme.

18  176.    The Android App Distribution Market is a valid antitrust market.

19  177.    Google conditions distribution through the Google Play Store on entering into the

20  standardized DDA described above, including the Developer Program Policies integrated therein.

21  Through certain provisions in these agreements, Google forces app developers to submit to

22  conditions that unreasonably restrain competition in the Android App Distribution Market.

23  178.    Section 4.5 of the DDA provides that developers "may not use Google Play to

24  distribute or make available any Product that has a purpose that facilitates the distribution of

25  software applications and games for use on Android devices outside of Google Play." Section 4.1

26  of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under

the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

179.    These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android App Distribution Market.

180.    Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

181.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

182.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been

1  more abundantly available in a competitive market. Plaintiff has suffered and continue to suffer

2  damages and irreparable injury, and such damages and injury will not abate until an injunction

3  ending Google's anticompetitive conduct issues.

4  **COUNT 9: California Cartwright Act Unreasonable Restraints of Trade in Android In-App**
5  **Payment Processing Market**
6  **(Against all Defendants)**
7

8  183.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

9  forth in the rest of this Complaint as if fully set forth herein.

10  184.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

11  Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more

12  persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

13  185.    Under the Cartwright Act, a "combination" is formed when the anticompetitive

14  conduct of a single firm coerces other market participants to involuntarily adhere to the

15  anticompetitive scheme.

16  186.    The Android App Distribution Market and Android In-App Payment Processing

17  Market, and, in the alternative, the Android Games Payment Processing Market, are valid antitrust

18  markets.

19  187.    Google has monopoly power in the Android In-App Payment Processing Market and,

20  in the alternative, in the Android Games Payment Processing Market.

21  188.    Google conditions distribution through the Google Play Store on entering into the

22  standardized DDA described above, including the Developer Program Policies integrated therein.

23  Through certain provisions in these agreements, Google forces app developers to submit to

24  conditions that unreasonably restrain competition in the Android In-App Payment Processing

25  Market.

189.   Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly and discriminatorily applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

190.   These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market.

191.   Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer customer service and lowered output.

192.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

193.   Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market

1    alternatives that would have been available had Google not monopolized the market. Plaintiff has

2    also been injured because Google's establishment and maintenance of monopoly pricing has caused

3    a reduction in the output and supply of Android apps and in-app purchases, which would have been

4    more abundantly available in a competitive market.  Plaintiff has suffered and continue to suffer

5    damages and irreparable injury, and such damages and injury will not abate until an injunction

6    ending Google's anticompetitive conduct issues.

7    **COUNT 10: California Cartwright Act Tying Google Play Store to Google Play Billing**

8    **(Against all Defendants)**

9    194.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

10   forth in the rest of this Complaint as if fully set forth herein.

11   195.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

12   Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more

13   persons to restrain trade or commerce, or to prevent market competition. *See id.* §§ 16720, 16726.

14   196.    Under the Cartwright Act, a "combination" is formed when the anticompetitive

15   conduct of a single firm coerces other market participants to involuntarily adhere to the

16   anticompetitive scheme.

17   197.    The Cartwright Act also makes it "unlawful for any person to lease or make a sale or

18   contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the

19   State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the

20   condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in

21   the goods, merchandise, machinery, supplies, commodities, or services of a competitor or

22   competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such

23   condition, agreement or understanding may be to substantially lessen competition or tend to create

24   a monopoly in any line of trade or commerce in any section of the State." *Id.* § 16727.

198.     As detailed above, Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

199.     Google has sufficient economic power in the tying market, the Android App Distribution Market, to affect competition in the tied market, the Android In-App Payment Distribution Market. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

200.     The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services. Google's foreclosure of alternative app distribution channels forces developers to use Google's in-app payment processing services, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

201.     The tying product, Android app distribution, is separate and distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

202.     Google's conduct forecloses competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

203. Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anticompetitive effects of Google's conduct or its purported justifications.

204. Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act, and therefore, illegal.

205. Google's acts and practices detailed above unreasonably restrained competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

206. It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

207. Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 11: Arizona Uniform State Antitrust Act (Against all Defendants)**

208.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

209.    Google's acts and practices detailed above violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 44-1402, and monopolization or attempted monopolization of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 44-1403.

210.    Google's conduct and practices have substantial anticompetitive effects in Arizona, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

211.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Arizona Uniform State Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 12: District of Columbia Antitrust Act (Against all Defendants)**

212.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

213.     Google's acts and practices detailed above violate the District of Columbia Antitrust Act, D.C. Code § 28-4501, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 28-4502, and monopolization or attempted monopolization over any part of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 28-4503.

214.     Google's conduct and practices have substantial anticompetitive effects in the District of Columbia, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

215.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the District of Columbia Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 13: Hawaii Antitrust Laws (Against all Defendants)**

216.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

217.    Google's acts and practices detailed above violate Hawaii's antitrust laws, Haw. Rev. Stat. § 480-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 480-4, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 480-9.

218.    Google's conduct and practices have substantial anticompetitive effects in Hawaii, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

219.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Hawaii's antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 14: Iowa Competition Law (Against all Defendants)**

220.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

221.    Google's acts and practices detailed above violate the Iowa Competition Law, Iowa Code § 553.1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce, *id.* § 553.4, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 553.5.

222.    Google's conduct and practices have substantial anticompetitive effects in Iowa, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

223.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Iowa Competition Law was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 15: Kansas Restraint of Trade Act (Against all Defendants)**

224.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

225.    Google's acts and practices detailed above violate the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, *et seq.*, which prohibits, *inter alia*, combinations to create or carry out

1  restrictions in trade or commerce, increase the price of merchandise, or prevent competition in the

2  sale of merchandise, *id.*

3        226.    Google's conduct and practices have substantial anticompetitive effects in Kansas,

4  including increased prices and costs, reduced innovation, poorer customer service, and lowered

5  output.

6        227.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that

7  the Kansas Restraint of Trade Act was intended to prevent. For example, she paid more for Android

8  apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also

9  been injured because Google's unlawful monopolization of the Android apps and in-app purchases

10  aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower

11  cost market alternatives that would have been available had Google not monopolized the market.

12  Plaintiff has also been injured because Google's establishment and maintenance of monopoly

13  pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

14  would have been more abundantly available in a competitive market.  Plaintiff has suffered and

15  continues to suffer damages and irreparable injury, and such damages and injury will not abate until

16  an injunction ending Google's anticompetitive conduct issues.

17        **COUNT 16: Maine Monopoly & Profiteering Laws (Against all Defendants)**

18        228.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

19  forth in the rest of this Complaint as if fully set forth herein.

20        229.    Google's acts and practices detailed above violate Maine's monopoly and

21  profiteering laws, Me. Rev. Stat. tit. 10, § 1101, *et seq.*, which prohibit, *inter alia*, combinations in

22  restraint of trade or commerce, *id.*, and the monopolization or attempted monopolization of any part

23  of trade or commerce, *id.* § 1102.

230.    Google's conduct and practices have substantial anticompetitive effects in Maine, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

231.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Maine's monopoly and profiteering laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### **COUNT 17: Maryland Antitrust Laws (Against all Defendants)**

232.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

233.    Google's acts and practices detailed above violate Maryland's antitrust laws, Md. Code, Com. Law § 11-201, *et seq.*, which prohibit, *inter alia*, combinations that unreasonably restrain trade or commerce, *id.* § 11-204, and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce, *id.*

234.     Google's conduct and practices have substantial anticompetitive effects in Maryland, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

235.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Maryland antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 18: Massachusetts consumer protection laws (Against all Defendants)**

236.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

237.     Google's acts and practices detailed above violate Massachusetts' consumer protection laws, Mass. Gen. Laws ch. 93A, § 1, *et seq.*, which prohibit, *inter alia*, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, *id.* § 2.

238.     Google's conduct and practices have substantial anticompetitive effects in Massachusetts, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

239. Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Massachusetts consumer protection laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 19: Michigan Antitrust Reform Act (Against all Defendants)

240. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

241. Google's acts and practices detailed above violate the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 445.772, and the establishment or attempted establishment of a monopoly of trade or commerce for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, *id.* § 445.773.

242. Google's conduct and practices have substantial anticompetitive effects in Michigan, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

243. Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Michigan Antitrust Reform Act was intended to prevent. For example, she paid more for Android

apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### **COUNT 20: Minnesota Antitrust Law of 1971 (Against all Defendants)**

244.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

245.    Google's acts and practices detailed above violate the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, which prohibits, *inter alia*, combinations in unreasonable restraint of trade or commerce, *id.* § 325D.51, and the establishment or attempted establishment of a monopoly over any part of trade or commerce for the purpose of affecting competition or controlling, fixing, or maintaining prices, *id.* § 325D.52.

246.    Google's conduct and practices have substantial anticompetitive effects in Minnesota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

247.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Minnesota Antitrust Law of 1971 was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases

aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### **COUNT 21: Mississippi Antitrust Laws (Against all Defendants)**

248.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

249.     Google's acts and practices detailed above violate Mississippi's antitrust laws, Miss. Code. § 75-21-1, *et seq.*, which prohibit, *inter alia*, combinations inimical to the public welfare that restrain trade, increase the price of a commodity, or reduce the production of a commodity, *id.*

250.     Google's conduct and practices have substantial anticompetitive effects in Mississippi, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

251.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Mississippi's antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 22: Nebraska Junkin Act (Against all Defendants)

252.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

253.     Google's acts and practices detailed above violate the Junkin Act, Neb. Rev. Stat. § 59-802, *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, *id.* § 59-802, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 16726.

254.     Google's conduct and practices have substantial anticompetitive effects in Nebraska, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

255.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that Nebraska's Junkin Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

1

**COUNT 23: Nevada Unfair Trade Practices Act (Against all Defendants)**

2      256.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

3   forth in the rest of this Complaint as if fully set forth herein.

4      257.    Google's acts and practices detailed above violate the Nevada Unfair Trade Practices

5   Act, Nev. Rev. Stat. § 598A.010, et seq., which prohibits, *inter alia*, the monopolization or attempted

6   monopolization of any part of trade or commerce, *id.* § 598A.060, and tying arrangements,

7   consisting of contracts in which the seller or lessor conditions the sale or lease of commodities or

8   services on the purchase or leasing of another commodity or service, *id.*

9      258.    Google's conduct and practices have substantial anticompetitive effects in Nevada,

10  including increased prices and costs, reduced innovation, poorer customer service, and lowered

11  output.

12     259.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that

13  Nevada's Unfair Trade Practices Act was intended to prevent. For example, she paid more for

14  Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff

15  has also been injured because Google's unlawful monopolization of the Android apps and in-app

16  purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store

17  and lower cost market alternatives that would have been available had Google not monopolized the

18  market. Plaintiff has also been injured because Google's establishment and maintenance of

19  monopoly pricing has caused a reduction in the output and supply of Android apps and in-app

20  purchases, which would have been more abundantly available in a competitive market. Plaintiff has

21  suffered and continues to suffer damages and irreparable injury, and such damages and injury will

22  not abate until an injunction ending Google's anticompetitive conduct issues.

23

24

**COUNT 24: New Hampshire Consumer Protection Act (Against all Defendants)**

260. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

261. Google's acts and practices detailed above violate the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, which prohibits, *inter alia*, the pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, *id.* § 358-A:2.

262. Google's conduct and practices have substantial anticompetitive effects in New Hampshire, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

263. Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that the New Hampshire Consumer Protection Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 25: New Mexico Antitrust Act (Against all Defendants)**

264. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

265.     Google's acts and practices detailed above violate the New Mexico Antitrust Act, N.M. Stat. § 57-1-1, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 57-1-2, and combinations in restraint of trade or commerce, *id.* § 57-1-1.

266.     Google's conduct and practices have substantial anticompetitive effects in New Mexico, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

267.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the New Mexico Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 26: New York Donnelly Act (Against all Defendants)**

268.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

269.     Google's acts and practices detailed above violate New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq*., which prohibits, *inter alia*, monopoly in the conduct of any business, trade or commerce or in the furnishing of any service, *id.* § 340.

270. Google's conduct and practices have substantial anticompetitive effects in New York, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

271. Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that New York's Donnelly Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## **COUNT 27: North Carolina Antitrust Laws (Against all Defendants)**

272. Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

273. Google's acts and practices detailed above violate North Carolina's antitrust laws, N.C. Gen. Stat. § 75-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 75-1, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 75-2.1

274.     Google's conduct and practices have substantial anticompetitive effects in North Carolina, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

275.     Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner that the North Carolina antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiffs have also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiffs have also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market.  Plaintiffs have suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 28: North Dakota Uniform State Antitrust Act (Against all Defendants)

276.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

277.     Google's acts and practices detailed above violate the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 51-08.1-02, and the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, *id.* § 51-08.1-03.

278.     Google's conduct and practices have substantial anticompetitive effects in North Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

279.     Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the North Dakota Uniform State Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## **COUNT 29: Oregon Antitrust Law (Against all Defendants)**

280.     Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

281.     Google's acts and practices detailed above violate the Oregon Antitrust Law, Or. Rev. Stat. § 646.705, *et seq.*, which prohibits, *inter alia*, combinations in restraint of trade or commerce, *id.* § 646.725, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 646.730.

282.     Google's conduct and practices have substantial anticompetitive effects in Oregon, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

283.    Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that the Oregon Antitrust Law was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 30: South Dakota Antitrust Laws (Against all Defendants)

284.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

285.    Google's acts and practices detailed above violate South Dakota's antitrust laws, .S.D. Codified Laws § 37-1-3.1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and monopolization or attempted monopolization of trade or commerce, *id.* § 37-1-3.2.

286.    Google's conduct and practices have substantial anticompetitive effects in South Dakota, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

287.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that South Dakota's antitrust laws were intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also

been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market. Plaintiff has also been injured because Google's establishment and maintenance of monopoly pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which would have been more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

### COUNT 31: Tennessee Trade Practices Act (Against all Defendants)

288.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

289.    Google's acts and practices detailed above violate the Tennessee Trade Practices Act, Tenn. Code § 47-25-101, *et seq.*, which prohibits, *inter alia*, combinations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, *id.*

290.    Google's conduct and practices have substantial anticompetitive effect in Tennessee, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

291.    Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the Tennessee Trade Practices Act was intended to prevent. For example, she paid more for Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not monopolized the market.

1    Plaintiff has also been injured because Google's establishment and maintenance of monopoly

2    pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

3    would have been more abundantly available in a competitive market. Plaintiff has suffered and

4    continues to suffer damages and irreparable injury, and such damages and injury will not abate until

5    an injunction ending Google's anticompetitive conduct issues.

6                  **COUNT 32: Utah Antitrust Act (Against all Defendants)**

7            292.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

8    forth in the rest of this Complaint as if fully set forth herein.

9            293.    Google's acts and practices detailed above violate the Utah Antitrust Act, Utah Code

10   § 76-10-3101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*

11   § 76-10-3104, and monopolization or attempted monopolization of any part of trade or commerce,

12   *id.*

13           294.    Google's conduct and practices have substantial anticompetitive effect in Utah,

14   including increased prices and costs, reduced innovation, poorer customer service, and lowered

15   output.

16           295.    Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that

17   the Utah Antitrust Act was intended to prevent. For example, she paid more for Android apps and/or

18   in-app purchases than she would have paid in a competitive market. Plaintiff has also been injured

19   because Google's unlawful monopolization of the Android apps and in-app purchases aftermarket

20   has extinguished Plaintiff's freedom to choose between the Google Play Store and lower cost market

21   alternatives that would have been available had Google not monopolized the market. Plaintiff has

22   also been injured because Google's establishment and maintenance of monopoly pricing has caused

23   a reduction in the output and supply of Android apps and in-app purchases, which would have been

24   more abundantly available in a competitive market. Plaintiff has suffered and continues to suffer

1    damages and irreparable injury, and such damages and injury will not abate until an injunction

2    ending Google's anti-competitive conduct issues.

3               **COUNT 33: Vermont Consumer Protection Laws (Against all Defendants)**

4        296.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

5    forth in the rest of this Complaint as if fully set forth herein.

6        297.    Google's acts and practices detailed above violate Vermont's consumer protection

7    laws, Vt. Stat. tit. 9, § 2451, *et seq.*, which prohibit, *inter alia*, all unfair methods of competition in

8    commerce, *id.* § 2453.

9        298.    Google's conduct and practices have substantial anticompetitive effects in Vermont,

10   including increased prices and costs, reduced innovation, poorer customer service, and lowered

11   output.

12       299.    Plaintiff has been harmed by Defendants' anti-competitive conduct in a manner that

13   the Vermont consumer protection laws were intended to prevent. For example, she paid more for

14   Android apps and/or in-app purchases than she would have paid in a competitive market. Plaintiff

15   has also been injured because Google's unlawful monopolization of the Android apps and in-app

16   purchases aftermarket has extinguished Plaintiff's freedom to choose between the Google Play Store

17   and lower cost market alternatives that would have been available had Google not monopolized the

18   market. Plaintiff has also been injured because Google's establishment and maintenance of

19   monopoly pricing has caused a reduction in the output and supply of Android apps and in-app

20   purchases, which would have been more abundantly available in a competitive market.  Plaintiff has

21   suffered and continues to suffer damages and irreparable injury, and such damages and injury will

22   not abate until an injunction ending Google's anti-competitive conduct issues.

23

1

**COUNT 34: Wisconsin Trade Regulations (Against all Defendants)**

2      300.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set

3 forth in the rest of this Complaint as if fully set forth herein.

4      301.    Google's acts and practices detailed above violate Wisconsin's trade regulations,

5 Wis. Stat. Ann. § 133.01, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or

6 commerce, *id.* § 133.03, and monopolization or attempted monopolization of any part of trade or

7 commerce, *id.*

8      302.    Google's conduct and practices have substantial effects in Wisconsin, including

9 increased prices and costs, reduced innovation, poorer customer service, and lowered output.

10      303.    Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner

11 that Wisconsin's trade regulations were intended to prevent. For example, she paid more for Android

12 apps and/or in-app purchases than she would have paid in a competitive market. Plaintiffs have also

13 been injured because Google's unlawful monopolization of the Android apps and in-app purchases

14 aftermarket has extinguished Plaintiffs' freedom to choose between the Google Play Store and lower

15 cost market alternatives that would have been available had Google not monopolized the market.

16 Plaintiffs have also been injured because Google's establishment and maintenance of monopoly

17 pricing has caused a reduction in the output and supply of Android apps and in-app purchases, which

18 would have been more abundantly available in a competitive market.  Plaintiffs have suffered and

19 continues to suffer damages and irreparable injury, and such damages and injury will not abate until

20 an injunction ending Google's anti-competitive conduct issues.

21

22

23

24

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants:

A.      Permanently enjoining Defendants from monopolizing or attempting to monopolize the Android applications aftermarket;

B.      Awarding Plaintiffs and the Class treble damages for injuries caused by Defendants' violations of the federal antitrust laws, California's Cartwright Act, the Arizona Uniform State Antitrust Act, the District of Columbia Antitrust Act, the Hawaii antitrust laws, the Iowa Competition Law, the Kansas Restraint of Trade Act, Maine's monopoly and profiteering laws, Maryland's antitrust laws, Massachusetts' consumer protection laws, the Michigan Antitrust Reform Act, the Minnesota Antitrust Law of 1971, the Mississippi antitrust laws, Nebraska's Junkin Act, the Nevada Unfair Trade Practices Act, the New Hampshire Consumer Protection Act, the New Mexico Antitrust Act, New York's Donnelly Act, North Carolina's antitrust laws, the North Dakota Uniform State Antitrust Act, the Oregon Antitrust Law, South Dakota's antitrust laws, the Tennessee Trade Practices Act, the Utah Antitrust Act, Vermont's consumer protection laws, and Wisconsin's trade regulations;

C.      Awarding Plaintiff and the Class reasonable attorneys' fees and costs; and

D.      Granting such other and further relief as the Court may deem just and proper.

# Jury Trial Demand

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demand a jury trial of all issues so triable.

Dated: August 16, 2020                          s/ Michael E. Klenov                          

George A. Zelcs *(pro hac vice forthcoming)*
Robert E. Litan *(pro hac vice forthcoming)*
Randall P. Ewing *(pro hac vice forthcoming)*
Jonathon D. Byrer *(pro hac vice forthcoming)*
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile:  (312) 641-9751

Stephen M. Tillery *(pro hac vice forthcoming)*
Jamie L. Boyer *(pro hac vice forthcoming)*
Michael E. Klenov, CA Bar #277028
Carol L. O'Keefe *(pro hac vice forthcoming)*
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile:  (314) 241-3525

Karma M. Giulianelli, CA Bar #184175
Glen E. Summers
BARTLIT BECK LLP
1801 Wewetta St. Suite 1200,
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile:  (303) 592-3140

Ann Ravel
MCMANIS FAULKNER
Fairmont Plaza, 10th Floor, 50 West San
Fernando Street
San Jose, CA  95113
Telephone: (408) 279-8700
Facsimile: (408) 279-3244