Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

Christine A. Varney (*pro hac vice pending*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice pending*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice pending*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice pending*)
yeven@cravath.com
M. Brent Byars (*pro hac vice pending*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC., a Maryland Corporation,<br><br>                                        Plaintiff,<br><br>                    v.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>                                        Defendants. | Case No. _____<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

PARTIES ............................................................................................................... 10

JURISDICTION AND VENUE ............................................................................. 11

INTRADISTRICT ASSIGNMENT ....................................................................... 13

RELEVANT FACTS ............................................................................................. 13

I.   Google Dominates the Merchant Market for Mobile Operating Systems. ......... 13

    A.   The Merchant Market for Mobile Operating Systems ............................ 14

        i.   Product Market Definition ................................................. 14

        ii.   Geographic Market Definition ........................................... 16

    B.   Google's Monopoly Power in the Merchant Market for Mobile OSs ...... 16

II.   Google Unlawfully Maintains a Monopoly in the Android Mobile App

Distribution Market. ......................................................................................... 19

    A.   The Android App Distribution Market ................................................... 20

        i.   Product Market Definition ................................................. 20

        ii.   Geographic Market Definition ........................................... 22

    B.   Google's Monopoly Power in the Android App Distribution Market ...... 22

    C.   Google's Anti-Competitive Conduct Concerning the Android App

Distribution Market ............................................................................... 26

        i.   Google's Conduct Toward OEMs ..................................... 26

        ii.   Google's Conduct Toward App Distributors and Developers ........ 28

        iii.   Google's Conduct Toward Consumers ............................... 30

    D.   Anti-Competitive Effects in the Android App Distribution Market ......... 35

III.   Google Unlawfully Acquired and Maintains a Monopoly in the Android In-

App Payment Processing Market. ...................................................................... 36

    A.   The Android In-App Payment Processing Market ................................... 37

        i.   Product Market Definition ................................................. 37

        ii.   Geographic Market Definition ........................................... 39

B. Google's Monopoly Power in the Android In-App Payment Processing Market ................................................. 39

C. Google's Anti-Competitive Conduct Concerning the Android In-App Payment Processing Market ................................................. 40

D. Anti-Competitive Effects in the Android In-App Payment Processing Market ................................................. 41

COUNT 1: Sherman Act § 2 (Unlawful Monopoly Maintenance in the Android App Distribution Market) ................................................. 43

COUNT 2: Sherman Act § 1 (Unreasonable restraints of trade concerning Android App Distribution Market: OEMs) ................................................. 44

COUNT 3: Sherman Act § 1 (Unreasonable restraints of trade concerning Android App Distribution Market: DDA) ................................................. 45

COUNT 4: Sherman Act § 2 (Unlawful Monopolization and Monopoly Maintenance in the Android In-App Payment Processing Market) ................................................. 46

COUNT 5: Sherman Act § 1 (Unreasonable restraints of trade concerning Android In-App Payment Processing Market) ................................................. 47

COUNT 6: Sherman Act § 1 (Tying Google Play Store to Google Play Billing) ................................................. 49

COUNT 7: California Cartwright Act (Unreasonable restraints of trade in Android App Distribution Market) ................................................. 50

COUNT 8: California Cartwright Act (Unreasonable restraints of trade in Android App Distribution Market) ................................................. 51

COUNT 9: California Cartwright Act (Unreasonable restraints of trade in Android In-App Payment Processing Market) ................................................. 53

COUNT 10: California Cartwright Act (Tying Google Play Store to Google Play Billing) ................................................. 55

COUNT 11: California Unfair Competition Law ................................................. 58

PRAYER FOR RELIEF ................................................. 59

Plaintiff Epic Games, Inc. ("Epic"), by its undersigned counsel, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.     In 1998, Google was founded as an exciting young company with a unique motto: "Don't Be Evil".  Google's Code of Conduct explained that this admonishment was about "how we serve our users" and "much more than that . . . it's also about doing the right thing more generally".[1]  Twenty-two years later, Google has relegated its motto to nearly an afterthought, and is using its size to do evil upon competitors, innovators, customers, and users in a slew of markets it has grown to monopolize.  This case is about doing the right thing in one important area, the Android mobile ecosystem, where Google unlawfully maintains monopolies in multiple related markets, denying consumers the freedom to enjoy their mobile devices—freedom that Google always promised Android users would have.

2.     Google acquired the Android mobile operating system more than a decade ago, promising repeatedly over time that Android would be the basis for an "open" ecosystem in which industry participants could freely innovate and compete without unnecessary restrictions.[2]  Google's CEO, Sundar Pichai, represented in 2014

---

[1] Kate Conger, *Google Removes 'Don't Be Evil' Clause from Its Code of Conduct*, Gizmodo (May 18, 2018), https://gizmodo.com/google-removes-nearly-all-mentions-of-dont-be-evil-from-1826153393.

[2] Google Blog, News and notes from Android team, *The Benefits & Importance of Compatibility*, (Sept. 14, 2012), https://android.googleblog.com/2012/09/the-benefits-importance-of-compatibility.html ("We built Android to be an open source mobile platform freely available to anyone wishing to use it . . . . This openness allows device manufacturers to customize Android and enable new user experiences, driving innovation and consumer choice."); Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw ("Android is one of the most open systems that I've ever seen"); Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog ("At its core, Android has always been about openness").

that Android "is one of the most open systems that I've ever seen".[3]  And Andy Rubin, an Android founder who is described by some as the "Father of Android", said when he departed Google in 2013 that "at its core, Android has always been about openness".[4] Since then, Google has deliberately and systematically closed the Android ecosystem to competition, breaking the promises it made.  Google's anti-competitive conduct has now been condemned by regulators the world over.

3.     Epic brings claims under Sections 1 and 2 of the Sherman Act and under California law to end Google's unlawful monopolization and anti-competitive restraints in two separate markets:  (1) the market for the distribution of mobile apps to Android users and (2) the market for processing payments for digital content within Android mobile apps.  Epic seeks to end Google's unfair, monopolistic and anti-competitive actions in each of these markets, which harm device makers, app developers, app distributors, payment processors, and consumers.

4.     **Epic does not seek monetary compensation from this Court for the injuries it has suffered**.  Epic likewise does not seek a side deal or favorable treatment from Google for itself.  Instead, Epic seeks injunctive relief that would deliver Google's broken promise:  an open, competitive Android ecosystem for all users and industry participants.  Such injunctive relief is sorely needed.

5.     Google has eliminated competition in the distribution of Android apps using myriad contractual and technical barriers.  Google's actions force app developers and consumers into Google's own monopolized "app store"—the Google Play Store.  Google has thus installed itself as an unavoidable middleman for app developers who wish to reach Android users and vice versa.  Google uses this monopoly power to impose a tax that siphons monopoly profits for itself every time an app

---

[3] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.

[4] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

1   developer transacts with a consumer for the sale of an app or in-app digital content.

2   And Google further siphons off all user data exchanged in such transactions, to benefit

3   its own app designs and advertising business.

4         6.    If not for Google's anti-competitive behavior, the Android

5   ecosystem could live up to Google's promise of open competition, providing Android

6   users and developers with competing app stores that offer more innovation, significantly

7   lower prices and a choice of payment processors.  Such an open system is not hard to

8   imagine.  Two decades ago, through the actions of courts and regulators, Microsoft was

9   forced to open up the Windows for PC ecosystem.  As a result, PC users have multiple

10   options for downloading software unto their computers, either directly from developers'

11   websites or from several competing stores.  No single entity controls the ecosystem or

12   imposes a tax on all transactions.  And Google, as the developer of software such as the

13   Chrome browser, is a direct beneficiary of this competitive landscape.  Android users

14   and developers likewise deserve free and fair competition.

15                   *     *     *

16         7.    In today's world, virtually all consumers and businesses stay

17   connected, informed, and entertained through smart mobile computing devices such as

18   smartphones and tablets.  Mobile applications ("apps") are innovative software products

19   that greatly contribute to those devices' value.  Consumers the world over use smart

20   mobile devices and mobile apps to video chat with friends, pay bills, stay current with

21   the news, listen to music, watch videos, play games, and more.

22         8.    Epic develops and distributes entertainment apps for personal

23   computers, gaming consoles, and smart mobile devices.  The most popular game Epic

24   currently makes is *Fortnite*, which has connected hundreds of millions of people in a

25   colorful virtual world where they meet, play, talk, compete, dance, and even attend

26   concerts and other cultural events.

27

28

Complaint for Injunctive Relief             3



9.    *Fortnite* is free for everyone to download and play.  To generate revenue, Epic offers users various in-app purchases of content for use within the app, such as digital avatars, costumes, dances, or other cosmetic enhancements.



10.    In the first year after *Fortnite* was released in 2017, the game attracted over 125 million players; in the years since, *Fortnite* has topped 350 million players and has become a global cultural phenomenon.

Complaint for Injunctive Relief                    4

11.     Similar to a PC or a Mac personal computer, smart mobile devices use an "operating system" or "OS" to provide core device functionality and to enable the operation of compatible programs.  As with PCs, the commercial viability of an OS for mobile devices (a "mobile OS") depends on the availability of a large number of compatible apps that cater to the preferences and needs of users.

12.     Google controls the most ubiquitous OS used in mobile devices, the Android OS.  Android OS is used by billions of users the world over, and boasts nearly 3 million compatible apps.

13.     Android is the only commercially viable OS that is widely available to license by companies that design and sell smart mobile devices, known as original equipment manufacturers ("OEMs").  Accordingly, when OEMs select a mobile OS to install on their devices, they have only one option:  Google's Android OS.  Google therefore has monopoly power in the market for mobile operating systems that are available for license by OEMs (the Merchant Market for Mobile Operating Systems (*infra* Part I)).

14.     Google has not been satisfied with its control of the Android OS.  Notwithstanding its promises to make Android devices open to competition, Google has erected contractual and technological barriers that foreclose competing ways of distributing apps to Android users, ensuring that the Google Play Store accounts for nearly all the downloads of apps from app stores on Android devices.  Google thus maintains a monopoly over the market for distributing mobile apps to Android users, referred to herein as the "Android App Distribution Market" (*infra* Part II).

15.     For example, Google bundles the Google Play Store with a set of other Google services that Android OEMs must have on their devices (such as Gmail, Google Search, Google Maps, and YouTube) and conditions the licensing of those services on an OEM's agreement to pre-install the Google Play Store and to prominently display it.  Google then interferes with OEMs' ability to make third-party app stores or apps available on the devices they make.  These restrictions effectively

foreclose competing app stores—and even single apps—from what could be a primary distribution channel.

16.    Epic's experience with one OEM, OnePlus, is illustrative.  Epic struck a deal with OnePlus to make Epic games available on its phones through an Epic Games app.  The Epic Games app would have allowed users to seamlessly install and update Epic games, including *Fortnite*, without obstacles imposed by Google's Android OS.  But Google forced OnePlus to renege on the deal, citing Google's "particular[] concern" about Epic having the ability to install and update mobile games while "bypassing the Google Play Store".

17.    Another OEM, LG, told Epic that its contract with Google did not allow it to enable the direct distribution of apps, and that the OEM could not offer any functionality that would install and update Epic games except through the Google Play Store.

18.    Google also enforces anti-competitive restrictions against app developers.  Specifically, Google contractually prohibits app developers from offering on the Google Play Store any app that could be used to download other apps, *i.e.*, any app that could compete with the Google Play Store in app distribution.  And Google further requires app developers to distribute their apps through the Google Play Store if they wish to advertise their apps through valuable advertising channels controlled by Google, such as ad placements on Google Search or on YouTube that are specially optimized to advertise mobile apps.

19.    Finally, Google stifles or blocks consumers' ability to download app stores and apps directly from developers' websites.  As anyone who has tried to download directly on an Android device knows, it is significantly different than the simple process available on a personal computer:  directly downloading *Fortnite* on an Android device can involve a dozen steps, requiring the user to change default settings and bravely click through multiple dire warnings.  And even if a persistent user manages to install a competing app store, Google prevents such stores from competing on equal

footing with the Google Play Store by blocking them from offering basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play Store.

20.     Google engages in these anticompetitive acts to eliminate consumer choice and competition in mobile app distribution.  Google has no legitimate justification for these restrictions.  Google therefore has broken its promises that Android would be an "open" ecosystem in which other participants could participate fairly.

21.     But Google does not stop at app distribution.  Google also imposes anti-competitive restrictions in the separate Market for Android In-app Payment Processing (*infra* Part III).

22.     App developers who sell digital content for consumption within the app itself require seamless payment processing tools to execute purchases.  App developers, including Epic, may develop such payment processing tools internally or use a host of payment processing tools offered by multiple competing third parties.

23.     Google, however, ties distribution through its Google Play Store with  developers' exclusive use of Google's own payment processing tool, called Google Play Billing, to process in-app purchases of digital content.  Indeed, app developers that distribute through the Google Play Store are even prohibited from offering Android users the *choice* of additional payment processing options alongside Google's for digital content.  And because Google has a monopoly in the Android App Distribution Market, app developers cannot practically avoid this anti-competitive tie by electing app distribution through an alternative channel.

24.     The result is that in every in-app transaction for digital content, it is Google, not the app developer, that collects the payment in the first instance.  Google then taxes the transaction at an exorbitant 30% rate, remitting the remaining 70% to the developer who actually made the sale.  This 30% commission is often ***ten times*** higher than the price typically paid for the use of other electronic payment solutions.

25.     Moreover, through this tie, Google inserts itself as an intermediary between each seller and each buyer for every purchase of digital content within the Android ecosystem, collecting for itself the personal information of users, which Google then uses to give an anti-competitive edge to its own advertising services and mobile app development business.

26.     But for Google's monopolistic conduct, competing stores could offer consumers and developers choice in distribution and payment processing.  Indeed, Epic, which distributes gaming apps through its own store to users of personal computers, would open a store to compete with Google's and offer developers more innovation and more choice, including in payment processing.  App developers would not have to pay Google's supra-competitive tax of 30%, as the price of distribution and payment processing alike would be set by market forces rather than by Google's fiat.  Developers could address any payment-related issues (such as refunds) directly with their own customers rather than through Google.  And users and developers, jointly, would get to decide whether users' data should be utilized for other purposes.

27.     Google's anti-competitive conduct has injured Epic, both as an app developer and as a potential competitor in app distribution and payment processing.  Epic has repeatedly approached Google and asked to negotiate relief that would stop Google's unlawful and anti-competitive restrictions on app developers and consumers.  But Google would not budge.

28.     Because of Google's refusal to stop its ongoing anti-competitive and unlawful conduct, on August 13, 2020, Epic began providing *Fortnite* players the choice of using Epic's own direct payment tool as an alternative to Google's overpriced Billing tool, sharing with players who chose to use Epic's payment tool the resulting savings.



29.     In retribution, Google removed *Fortnite* from Google Play Store listings, preventing new players from obtaining the game.  Google also prevented Android users who acquired *Fortnite* from the Google Play Store from obtaining app updates they will need to continue playing with their friends and family.

30.     Epic has publicly advocated for years that Google cease the anti-competitive conduct addressed in this Complaint.  Google refused to change its industry-impacting conduct.  Instead, Google offered to placate Epic by offering it preferential terms on side deals, such as YouTube sponsorships and cloud services, if Epic agreed to distribute *Fortnite* in the Google Play Store and acceded to Google's 30% tax.  Google has reached at least one preferential deal with another mobile game developer, Activision Blizzard, and Epic believes that Google is using similar deals with other companies to allow Google to keep its monopolistic behavior publicly unchallenged.  But Epic is not interested in any side deals that might benefit Epic alone while leaving Google's anti-competitive restraints intact; instead, Epic is focused on opening up the Android ecosystem for the benefit of *all* developers and consumers.

31.     Accordingly, Epic seeks injunctive relief in court.  Google's conduct has caused and continues to cause Epic financial harm, but Epic is ***not*** bringing this case to recover these damages; Epic is not seeking any monetary relief, but rather only an order enjoining Google from continuing to impose its anti-competitive conduct on the Android ecosystem.

## **PARTIES**

32.     Plaintiff Epic Games, Inc. is a Maryland corporation with its principal place of business in Cary, North Carolina.  Epic's mission is "to create fun games we want to play and to build the art and tools needed to bring those games to life".  Epic was founded in 1991 by a college student named Tim Sweeney.  Mr. Sweeney ran Epic out of his parents' basement and distributed, by mail, Epic's first commercial personal computer software, a game named *ZZT*.  Since then, Epic has developed several popular entertainment software products that can be played on an array of platforms—such as personal computers, gaming consoles, and smart mobile devices.  Epic also creates and distributes the *Unreal Engine*, a powerful software suite that allows competing game developers and others to create realistic three-dimensional content, including video games, architectural recreations, television shows, and movies. An Epic subsidiary also develops and distributes the popular *Houseparty* app, which enables video chatting and social gaming on smart mobile devices and personal computers.  Worldwide, approximately 400 million users have signed up to play Epic games, and each day 30 to 40 million individuals log into an Epic game.

33.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California.  Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is

1    therefore a party to the anti-competitive contractual restrictions at issue in this

2    Complaint.

3         34.   Defendant Google Ireland Limited ("Google Ireland") is a limited

4    company organized under the laws of Ireland with its principal place of business in

5    Dublin, Ireland, and a subsidiary of Google LLC.  Google Ireland contracts with all app

6    developers that distribute their apps through the Google Play Store and is therefore a

7    party to the anti-competitive contractual restrictions at issue in this Complaint.

8         35.   Defendant Google Commerce Limited ("Google Commerce") is a

9    limited company organized under the laws of Ireland with its principal place of business

10   in Dublin, Ireland, and a subsidiary of Google LLC.  Google Commerce contracts with

11   all app developers that distribute their apps through the Google Play Store and is

12   therefore a party to the anti-competitive contractual restrictions at issue in this

13   Complaint.

14        36.   Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific")

15   is a private limited company organized under the laws of Singapore with its principal

16   place of business in Mapletree Business City, Singapore, and a subsidiary of Google

17   LLC.  Google Asia Pacific contracts with all app developers that distribute their apps

18   through the Google Play Store and is therefore a party to the anti-competitive

19   contractual restrictions at issue in this Complaint.

20        37.   Defendant Google Payment Corp. ("Google Payment") is a

21   Delaware corporation with its principal place of business in Mountain View, California,

22   and a subsidiary of Google LLC.  Google Payment provides in-app payment processing

23   services to Android app developers and Android users and collects a 30% commission

24   on many types of processed payments, including payments for apps sold through the

25   Google Play Store and in-app purchases made within such apps.

26                    **JURISDICTION AND VENUE**

27        38.   This Court has subject-matter jurisdiction over Epic's federal

28   antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C.

§§ 1331 and 1337.  The Court has supplemental jurisdiction over Epic's state law claims pursuant to 28 U.S.C. § 1367.  The Court also has subject-matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenships of Plaintiff, on the one hand, and of Defendants, on the other, and the amount in controversy exceeding $75,000.

39.     This Court has personal jurisdiction over the Defendants.  Google LLC and Google Payment are headquartered in this District.  All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements.  Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

40.     Each of the Defendants except Google Payment is party to a Google Play Developer Distribution Agreement (the "DDA") with Epic.  Section 16.8 of the DDA provides that the parties "agree to submit to the exclusive jurisdiction of the federal or state courts located within the county of Santa Clara, California, to resolve any legal matter arising from or relating to this Agreement".  Section 16.8 further provides that "[a]ll claims arising out of or relating to this Agreement or Your relationship with Google under this Agreement will be governed by the laws of the State of California, excluding California's conflict of laws provisions."  The claims addressed in this Complaint relate to the DDA or to Epic's relationship with Google under the DDA, or in the alternative such claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over each Defendant, so that the exercise of pendent personal jurisdiction would be proper.

41.     Google Payment is party to a Google Payments—Terms of Service—Seller Agreement with Epic.  Section 11.3 of that Agreement provides that "[t]he exclusive venue for any dispute related to this Agreement will be the state or federal courts located in Santa Clara County, California, and each party consents to

personal jurisdiction in these courts." Section 11.3 further provides that "The laws of California, excluding California's choice of law rules, and applicable federal United States laws will govern this Agreement." The dispute between Google Payment and Epic relates to the parties' Agreement, or in the alternative Epic's claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over Google Payment, so that the exercise of pendent personal jurisdiction would be proper.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Epic's claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

## INTRADISTRICT ASSIGNMENT

43. Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a particular Division of this District, but shall be assigned on a District-wide basis.

## RELEVANT FACTS

### I. Google Dominates the Merchant Market for Mobile Operating Systems.

44. To understand how Google effectively monopolizes the Android App Distribution and Android In-App Payment Processing Markets, as described below in Parts II and III, it is helpful to understand the background of smart mobile devices and how Google effectively dominates the related Merchant Market for Mobile Operating Systems through its control over the Android operating system.

**A. The Merchant Market for Mobile Operating Systems**

i. Product Market Definition

45.     Smart mobile devices are handheld, portable electronic devices that can connect wirelessly to the internet and are capable of multi-purpose computing functions, including, among other things, Internet browsing, using social media, streaming video, listening to music, or playing games. Smart mobile devices include smartphones and tablet computers. Many consumers may *only* have a smart mobile device and no other computer. Such consumers are particularly hard-hit by Google's unlawful conduct in mobile-related markets.

46.     Like laptop and desktop personal computers, mobile devices require an operating system or "OS" that enables multi-purpose computing functionality. A mobile OS, just like the OS of any computer, is a piece of software that provides basic functionality to users of mobile devices such as button controls, touch commands, motion commands, and the basic "graphical user interface", which includes "icons" and other visual elements representing actions that the user can take. A mobile OS also manages the basic operations of a smart mobile device, such as cellular or WiFi connectivity, GPS positioning, camera and video recording, speech recognition, and other features. In addition, a mobile OS permits the installation and operation of mobile apps that are compatible with the particular OS and facilitates their use of the device's OS-managed core functionality.

47.     To ensure that every user can access the basic functions of a mobile device "out of the box", that is at the time he/she purchases the device, an OEM must pre-install an OS on each device prior to its sale. This is similar to a personal computer that comes pre-installed with Microsoft Windows for PC or Apple's macOS for a Mac computer. OEMs design mobile devices to ensure the device's compatibility with a particular OS the OEM chooses for a particular model of mobile device, so that the device may utilize the capabilities of that OS. For OEMs, the process of implementing

a mobile OS requires significant time and investment, making switching to another mobile OS difficult, expensive, and time-consuming.

48.     The vast majority of OEMs do not develop their own OS and must choose an OS that can be licensed for installation on smart mobile devices they design. There is therefore a relevant <u>Merchant Market for Mobile OSs</u> comprising mobile OSs that OEMs can license for installation on the smart mobile devices they manufacture. The market does not include proprietary OSs that are not available for licensing, such as Apple's mobile OS, called iOS.  Historically, the Merchant Market for Mobile OSs has included the Android OS, developed by Google; the Tizen mobile OS, a partially open-source mobile OS that is developed by the Linux Foundation and Samsung; and the Windows Phone OS developed by Microsoft.

49.     Some consumers continue to use cellular phones that do not have multi-purpose, computing functions.  These simple phones resemble older "flip phones", for example; they are not part of the smart mobile device category.  These phones do not support mobile apps such as *Fortnite* and are instead typically limited to basic cellular functionality like voice calls and texting.  The simple operating systems on these phones, to the extent they exist, cannot support the wide array of features supplied by the OSs on smart mobile devices and are not part of the Merchant Market for Mobile OSs defined herein.

50.     To the extent that electronic devices other than smart mobile devices use operating systems, those OSs are not compatible with mobile devices, and therefore are not included in the Merchant Market for Mobile OSs defined herein.  For example, computing devices that are not handheld and portable, that are not capable of multi-purpose computing functions and/or that lack cellular connectivity—such as desktop computers, laptops, or gaming consoles—are not considered to be "smart mobile devices".  Gaming devices like Sony's PlayStation 4 ("PS4") and Microsoft's Xbox are physically difficult to transport, require a stable WiFi or wired connection to operate smoothly, and require an external screen for the user to engage in game play.  Thus,

even if a gamer owns, for example, a dedicated, non-portable gaming console such as a PS4, which connects to and enables gaming via his/her TV, he/she will not consider that PS4 a reasonable substitute for a mobile device like a smartphone, nor would he/she consider the version of any game created for his/her PS4 to substitute for the mobile app version of such a game. That is because the portability (and typically for smartphones the cellular connectivity) of the mobile devices enable the consumer to play mobile games away from home or anywhere in the home. Indeed, for this reason, game developers often distribute multiple versions of a game, each of which is programmed for compatibility with a particular type of device and its operating system.

ii. Geographic Market Definition

51. OEMs license mobile OSs for installation on mobile devices globally, excluding China. Google's operations in China are limited, and it does not make available many of its products for mobile devices sold within China. This is based in part on legal and regulatory barriers to the distribution of mobile OS-related software imposed by China. Further, while Google contractually requires OEMs licensing Android outside of China not to sell any devices with competing Android-compatible mobile OSs, it imposes no such restriction on devices sold within China. Because the OEMs that sell Android mobile devices both within and outside China have committed to this contractual restriction, such OEMs must sell, outside of China, devices with Google's Android OS. The geographic scope of the relevant Merchant Market for Mobile OSs is therefore worldwide, excluding China.

**B.    Google's Monopoly Power in the Merchant Market for Mobile OSs**

52. Google has monopoly power in the Merchant Market for Mobile OSs through its Android OS. As determined by the European Commission during the course of its investigation of Android, the Android OS, licensed to OEMs in relevant respects by Google, is installed on over 95% of all mobile devices sold by OEMs utilizing a merchant mobile OS. Indeed, Android OS is installed on nearly 75% of all smart mobile devices sold by *all* OEMs, including even those OEMs that use a

proprietary mobile OS they developed exclusively for their own use (such as Apple's iOS).

53.    A mobile ecosystem typically develops around one or more mobile OSs, such as the Android OS.  The "Android ecosystem" is a system of mobile products (such as devices, apps and accessories) designed to be inter-dependent and compatible with each other and the Android OS.  Ecosystem participants include an array of participating stakeholders, such as Google, OEMs that make Android-compatible devices, developers of Android-compatible apps, Android app distribution platforms, including app stores, the makers of ancillary hardware such as headphones or speakers, cellular carriers, and others.

54.    Mobile ecosystems benefit from substantial network effects—that is, the more developers that design useful apps for a specific mobile OS, the more consumers will be drawn to use the relevant OS for which those apps are designed; the more consumers that use an OS, the more developers want to develop even more apps for that OS.  As determined in *United States v. Microsoft, Inc.*, No. 98-1232 (D.D.C.), new entrants into an operating system market thus face an "applications barrier to entry".  An applications barrier to entry arises because a new operating system will be desirable to consumers only if a broad array of software applications can run on it, but software developers will find it profitable to create applications that run on an operating system only if there is a large existing base of users.

55.    To overcome this challenge and to attract app developers and users, Google has continuously represented that Android is an "open" ecosystem and that any ecosystem participant could create Android-compatible products without unnecessary restrictions.  Indeed, Google LLC's CEO, Sundar Pichai, represented in 2014 that Android "is one of the most open systems that I've ever seen".[5]  And Andy Rubin, an

---

[5] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.

Android founder who is described by some as the "Father of Android", said when he departed Google in 2013 that "at its core, Android has always been about openness".[6]

56.     But the reality is quite different.  Despite these claims of openness, Google has now effectively closed the Android ecosystem through its tight control of the Android OS.  And, as the dominant OS licensor, Google now benefits from these substantial network effects which makes participation on its platform a "must-have" market for developers.

57.     As further described below, Google uses the Android OS to restrict which apps and app stores OEMs are permitted to pre-install on the devices they make and to impose deterrents to the direct distribution of competing app stores and apps to Android users, all at the expense of competition in the Android ecosystem.

58.     Because of Google's monopoly power in the Merchant Market for Mobile OSs, OEMs, developers and users cannot avoid such effects by choosing another mobile OS.  OEMs such as ZTE and Nokia have stated that other non-proprietary OSs are poor substitutes for the Android OS and are not a reasonable alternative to licensing the Android OS.  One important reason is that other mobile OSs presently do not support many high-quality and successful mobile apps, which consumers find essential or valuable when choosing a mobile device.  These circumstances have biased consumers against the purchase of mobile devices with non-proprietary mobile OSs other than Android OS.  OEMs thus have no choice but to agree to Google's demands because it is critical that they be able to offer a popular mobile OS and corresponding ecosystem to consumers who are choosing which mobile device to purchase.

---

[6] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

## II. Google Unlawfully Maintains a Monopoly in the Android Mobile App Distribution Market.

59.     Mobile apps make mobile devices more useful and valuable because they add functionality to the mobile device that caters to the specific interests of each mobile device user.  For example, they facilitate video chats with friends and family, banking online, shopping, job hunting, photo editing, reading digital news sources, editing documents, or playing a game like *Fortnite*.  Many workers use their smart mobile device to check work schedules, access company email, or use other employer software while outside the workplace.  For many consumers, a smartphone or tablet is the only way to access these functions, because the consumer does not own a personal computer or because the consumer can only access the Internet using a cellular connection.  But even when a consumer can perform the same or similar functions on a personal computer, the ability to access apps "on the go" using a handheld, portable device remains valuable and important.

60.     Whereas some apps may be pre-installed by OEMs, OEMs cannot anticipate all the various apps a specific consumer may desire to use.  Moreover, many consumers have different preferences as to which apps they want, and it would be undesirable for OEMs to load the devices they sell with unwanted apps that take up valuable space on the mobile device.  And many apps that consumers may ultimately use on their device will be developed after they buy the device.  Accordingly, consumers who seek to add new functionalities to a mobile device and customize the device for their own use need to obtain and install mobile apps themselves after purchasing their device.  Currently, on Android devices, this is done most often through the Google Play Store, Google's own "app store".  The Google Play Store is a digital portal set up by Google and through which mobile apps can be browsed, searched for, purchased (if necessary), and downloaded by a consumer.  App stores such as the Google Play Store, alongside several other ways by which apps can be distributed to the hundreds of millions of consumers using Android-based mobile devices, comprise the Android App Distribution Market, defined below.

61.     Through various anti-competitive acts and unlawful restraints on competition, Google has maintained a monopoly in the Android Mobile App Distribution market, causing ongoing harm to competition and injury to OEMs, app distributors, app developers, and consumers.  Google's restraints of trade belie representations Google currently makes to developers that "as an open platform, Android is about choice" and that app developers "can distribute [their] Android apps to users in any way [they] want, using any distribution approach or combination of approaches that meets [their] needs", including by allowing users to directly download apps "from a website" or even by "emailing them directly to consumers".[7]

**A.      The Android App Distribution Market**

      i.      <u>Product Market Definition</u>

62.     There is a relevant market for the distribution of apps compatible with the Android OS to users of mobile devices (the "<u>Android App Distribution Market</u>").  This Market is comprised of all the channels by which mobile apps may be distributed to the hundreds of millions of users of mobile devices running the Android OS.  The Market primarily includes Google's dominant Google Play Store, with smaller stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind.  Nominally only, the direct downloading of apps without using an app store (which Google pejoratively describes as "sideloading") is also within this market.

63.     App stores allow consumers to easily browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps, using the mobile device itself and an Internet connection.  OEMs find it commercially unreasonable to ship a smart mobile device to a consumer without at least one app store installed, as a consumer's ability to obtain new mobile apps is an important part of the value provided by smart mobile devices.

---

[7] Google Play Developers Page, *Alternative distribution options*, https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed June 7, 2020).

64.     App stores are OS-specific, meaning they distribute only apps that are compatible with the specific mobile OS on which the app store is used.  A consumer who has a mobile device running the Android OS cannot use apps created for a different mobile operating system.  An owner of an Android OS device will use an Android compatible app store, and such app stores distribute only Android-compatible mobile apps.  That consumer may not substitute an Android app store with, for example, Apple's App Store, as that app store is not available on Android devices, is not compatible with the Android OS, and does not offer apps that are compatible with the Android OS.  Non-Android mobile app distribution platforms—such as the Windows Mobile Store used on Microsoft's Windows Mobile OS or the Apple App Store used on Apple iOS devices—cannot substitute for Android-specific app distribution platforms, and they are therefore not part of the Android App Distribution Market defined herein.

65.     Likewise, stores distributing personal computer or gaming console software are not compatible with the Android OS and do not offer Android-compatible apps:  the Epic Games Store distributes software compatible with personal computers, the Microsoft Store for Xbox distributes software compatible with the Xbox game consoles, and the PlayStation Store distributes software compatible with the PlayStation game consoles.  A user cannot download mobile apps for use on his/her Android device by using such non-Android OS, non-mobile software distribution platforms.  They therefore are not part of the Android App Distribution Market.

66.     The same is true even when an app or game, like *Fortnite*, is available for different types of platforms running different operating systems, because only the OS-compatible version of that software can run on a specific type of device or computer.  Accordingly, as a commercial reality, an app developer that wishes to distribute mobile apps for Android mobile devices must develop an Android-specific version of the app and avail itself of the Android App Distribution Market.

67.     In the alternative only, the Android App Distribution Market is a relevant, economically distinct sub-market of a hypothetical broader antitrust market for

the distribution of mobile apps to users of all mobile devices, whether Android or Apple's iOS.

## ii. Geographic Market Definition

68.     The geographic scope of the Android App Distribution Market is worldwide, excluding China.  Outside of China, app distribution channels, including app stores, are developed and distributed on a global basis; OEMs, in turn, make app stores, such as the Google Play Store, available on Android devices on a worldwide basis (except in China).  China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China.  Additionally, app stores prevalent in China are not available, or have little presence, outside of China.

## B.     Google's Monopoly Power in the Android App Distribution Market

69.     Google has monopoly power in the Android App Distribution Market.

70.     Google's monopoly power can be demonstrated by, among other things, Google's massive market share in terms of apps downloaded.  The European Commission determined that, within the Market, more than 90% of app downloads through app stores have been done through the Google Play Store.  Indeed, although app stores for merchant mobile OSs other than Android are not included in the Android App Distribution Market, the European Commission found that the only such app store with any appreciable presence was the Windows Mobile Store, which was compatible with the Windows Mobile OS.  The Commission determined that even if the Windows Mobile Store share was included in the market, the Google Play Store would still have had a market share greater than 90%.

71.     Other existing Android mobile app stores do not discipline Google's exercise of monopoly power in the Android App Distribution Market.  No other app store is able to reach nearly as many Android users as the Google Play Store.  According to the European Commission, the Google Play Store is pre-installed by

1   OEMs on practically all Android mobile devices sold outside of China.  As a result, no

2   other Android app store comes close to that number of pre-installed users.  With the

3   exception of app stores designed for and installed only on mobile devices sold by those

4   respective OEMs, such as Samsung Galaxy Apps and the LG Electronics App Store, no

5   other Android app store is pre-installed on more than 10% of Android devices, and

6   many have no appreciable market penetration at all.  Aptoide, for example, is an

7   Android app store that claims to be the largest "independent" app store outside of China,

8   but it comes pre-installed on no more than 5% of Android mobile devices.

9          72.    Because of Google's success in maintaining its monopoly in Android

10  app distribution, there is no viable substitute to distributing Android apps through the

11  Google Play Store.  As a result, the Google Play Store offers over 3 million apps,

12  including all of the most popular Android apps, compared to just 700,000 apps offered

13  by Aptoide, the Android app store with the next largest listing.  The Google Play Store

14  thereby benefits from ongoing network effects based on the large number of

15  participating app developers and users.  The large number of apps attracts large numbers

16  of users, who value access to a broad range of apps, and the large number of users

17  attract app developers who wish to access more Android users.  Android OEMs too find

18  it commercially unreasonable to make and sell phones without the Google Play Store,

19  and they view other app stores as poor substitutes for the Google Play Store because of

20  the lower number and lesser quality of apps they offer.

21         73.    As further proof of its monopoly power, Google imposes a supra-

22  competitive commission of 30% on the price of apps purchased through the Google Play

23  Store, which is a far higher commission than would exist under competitive conditions.

24         74.    Furthermore, Google's monopoly power in app distribution is not

25  constrained by competition at the smart mobile device level because Android device

26  users face significant switching costs and lock-in to the Android ecosystems that serves

27  to protect Google's monopoly power, and consumers are unable to account for Google's

28  anticompetitive conduct when they purchase a smart mobile device.

75.     *First*, consumers are deterred from leaving the Android ecosystem due to the difficulty and costs of switching.  Consumers choose a smartphone based in part on the OS that comes pre-installed on that device and the ecosystem in which the device participates (in addition to a bundle of other features, such as price, battery life, design, storage space, and the range of available apps and accessories).  Once a consumer has selected a smartphone, the consumer cannot replace the mobile OS that comes pre-installed on it with an alternative mobile OS.  Rather, a consumer who wishes to change the OS must purchase a new smartphone entirely.  In addition, mobile OSs have different designs, controls, and functions that consumers must learn to navigate.  Over time, consumers who use Android devices learn to operate efficiently on the Android OS.  For example, the Android OS layout differs from iOS in a wide range of functions, including key features such as searching and installing "widgets" on the phone, organizing and searching the phone's digital content, configuring control center settings, and organizing photos.  The cost of learning to use a different mobile OS is part of consumers' switching costs.

76.     *Second*, switching from Android devices may also result in a significant loss of personal and financial investment that consumers put into the Android ecosystem.  Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data.  Even if versions of such apps and products are available within the new ecosystem chosen by the consumer, the consumer would have to go through the process of downloading them again onto the new devices and may have to purchase them anew.  As a result, the consumer may be forced to abandon his or her investment in at least some of those apps, along with any purchased in-app content and consumer-generated data on those apps.

77.     *Third*, consumers are not able to avoid the switching costs and lock-in to the Android OS ecosystem by acquiring more information prior to the purchase of the Android device.  The vast majority of mobile device consumers have no reason to

1  inquire, and therefore do not know about, Google's anticompetitive contractual

2  restraints and policies.  Furthermore, these consumers rationally do not give much

3  weight to Google's anticompetitive conduct and anticompetitive fees when deciding

4  whether to switch from an Android device.  Consumers consider many features when

5  deciding which smartphone or tablet to purchase, including design, brand, processing

6  power, battery life, functionality and cellular plan.  These features are likely to play a

7  substantially larger role in a consumer's decision as to which smart mobile device to

8  purchase than Google's anticompetitive conduct in the relevant markets, particularly

9  given that a consumer may consider the direct monetary cost of Google's conduct to be

10  small relative to the price of smart mobile devices, if the consumer is even aware of the

11  conduct or assigns it such a cost at all.  For example, over time a typical Android user

12  may make multiple small purchases of paid apps and in-app digital content—

13  accumulating to $100 or less annually—but may spend several hundreds of dollars at

14  once to purchase an Android smart mobile device.

15      78.    Consumers are also unable to determine the "lifecycle price" of

16  devices—*i.e.*, to accurately assess at the point of purchase how much they will end up

17  spending in total (including on the device and all apps and in-app purchases) for the

18  duration of their ownership of the device.  Consumers cannot know in advance of

19  purchasing a device all of the apps or in-app content that they may want to purchase

20  during the usable lifetime of the device.  Consumers' circumstances may change.

21  Consumers may develop new interests.  They may learn about new apps or in-app

22  content that becomes available only after purchasing a device.  New apps and in-app

23  content will continue to be developed and marketed after a consumer purchases a

24  smartphone or tablet.  All of these factors may influence the amount of consumers' app

25  and in-app purchases.  Because they cannot know or predict all such factors when

26  purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the

27  devices.  This prevents consumers from effectively taking Google's anticompetitive

28  conduct into account when making mobile device purchasing decisions.

79.     Because consumers face substantial switching costs and lock-in to the Android OS, developers can only gain access to these users by also participating in the Android ecosystem.  Thus, developers face an even greater cost in not participating in the Android ecosystem—loss of access to hundreds of millions of Android OS users.

**C.     Google's Anti-Competitive Conduct Concerning the Android App Distribution Market**

80.     Google has willfully and unlawfully maintained its monopoly in the Android App Distribution Market through a series of related anti-competitive acts that have foreclosed competing ways of distributing apps to Android users.

    i.     Google's Conduct Toward OEMs

81.     Google imposes anti-competitive constraints on Android OEMs based on their need for access to a viable Android app store and other important services provided by Google.

82.     *First*, Google conditions OEMs' licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreements to provide the Google Play Store with preferential treatment compared to any other competing app store.  Specifically, to access the Google Play Store, Android OEMs (which, as noted above, comprise virtually all OEMs that obtain an OS on the merchant market) have signed a Mobile Application Distribution Agreement ("MADA") with Google.  A MADA confers a license to a bundle of products comprising proprietary Google apps, Google-supplied services necessary for functioning of mobile apps, and the Android trademark.  Through its MADAs with Android OEMs, Google requires OEMs to locate the Google Play Store on the "home screen"[8] of each mobile device.  Android OEMs must further pre-install up to 30 Google mandatory apps and must locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services.  These requirements ensure that

---

[8] The default "home screen" is the default display, prior to any changes made by users, that appears without scrolling when the device is in active idle mode (*i.e.*, is not turned off or in sleep mode).

the Google Play Store is the most visible app store any user encounters and place any other app store at a significant disadvantage.

83.     Absent this restraint, OEMs could pre-install and prominently display alternative app stores to the purchasers of some or all of their mobile devices, allowing competing app stores the ability to vie for prominent placement on Android devices, increased exposure to consumers and, as a result, increased ability to attract app developers to their store.  As an app distributor, Epic could and would negotiate with OEMs to offer a prominently displayed app store containing *Fortnite* and other games, allowing Epic to reach more mobile users.

84.     *Second*, Google interferes with OEMs' ability to distribute Android app stores and apps directly to consumers outside the Google Play Store.  Some OEMs may choose to compete for buyers by offering mobile devices that provide easy access to additional mobile app stores and apps.  For example, an OEM may pre-install an icon corresponding to an app store or app on the device before it is sold to consumers.  Even when an OEM would want to make mobile apps available to consumers in this way, Google imposes unjustified and pretextual warnings about the security of installing the app, even though the consumer is choosing to install the app in full awareness of its source.

85.     Epic recently reached an agreement with OnePlus, an OEM, to allow users of OnePlus mobile devices to seamlessly install *Fortnite* and other Epic games by touching an Epic Games app on their devices—without encountering any obstacles imposed by the Android OS.  In conjunction with this agreement, Epic designed a version of *Fortnite* for certain OnePlus devices that delivers a state-of-the-art framerate (the frequency at which consecutive images appear on the device's screen), providing an even better gameplay experience for *Fortnite* players.  Although the original agreement between Epic and OnePlus contemplated making this installation method available worldwide, Google demanded that OnePlus not implement its agreement with Epic with the limited exception of mobile devices sold in India.  OnePlus informed Epic that

Google was "particularly concerned that the Epic Games app would have ability to potentially install and update multiple games with a silent install bypassing the Google Play Store".[9]  Further, any waiver of Google's restriction "would be rejected due to the Epic Games app serving as a potential portfolio of games and game updates".  As a result, OnePlus mobile device users in India can install Epic games seamlessly without using the Google Play Store, while users outside India cannot.

86.     Another OEM, LG, also told Epic that it had a contract with Google "to block side downloading off Google Play Store this year", but that the OEM could "surely" make Epic games available to consumers if the Google Play Store were used. Google prevented LG from pre-installing the Epic Games app on LG devices.

87.     In the absence of this conduct, Epic could and would negotiate with OEMs to make *Fortnite* and other Epic games directly available to consumers, free from Google's anti-competitive restraints.  OEMs could then compete for the sale of mobile devices based in part on the set of apps offered on the OEMs' devices.  But Google forecloses alternative ways of distributing Android apps other than through its own monopolized app store, harming competition among OEMs and among app developers, to the detriment of consumers.

ii.     Google's Conduct Toward App Distributors and Developers

88.     Google imposes anti-competitive restrictions on competing app distributors and developers that further entrench its monopoly in Android App Distribution.

89.     *First*, Google prevents app distributors from providing Android users ready access to competing app stores.  Specifically, even though competitive app stores themselves are mobile apps that could easily be distributed through the Google Play Store, Google prohibits the distribution of any competing app store through the Google Play Store, without any technological or other justification.

---

[9]  A "silent install" is an installation process free of the dire security warnings that Google triggers when apps are directly downloaded, such as the "one touch" process on which Epic and OnePlus had agreed.

90.     Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Google Play Store.  Each of the Defendants, except Google Payment, is a party to the DDA.

91.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement.  The DDA is non-negotiable, and developers that seek access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

92.     In the absence of these unlawful restraints, competing app distributors could allow users to replace or supplement the Google Play Store on their devices with competing app stores, which users could easily download and install through the Google Play Store.  App stores could compete and benefit consumers by offering lower prices and innovative app store models, such as app stores that are curated to specific consumers' interests—*e.g.*, an app store that specializes in games or an app store that only offers apps that increase productivity.  Without Google's unlawful restraints, additional app stores would provide additional platforms on which more apps could be featured, and thereby, discovered by consumers.  Epic has been damaged through its inability to provide a competing app store (as it does on personal computers) and by the loss of the opportunity to reach more Android users directly in the ways that personal computers allow developers to reach consumers without artificial constraints.

93.     *Second,* Google conditions app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.  Specifically, Google markets an App Campaigns program that, as Google says, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest

properties". This includes certain ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners", that are specially optimized for the advertising of mobile apps. However, in order to access this valuable advertising space through the App Campaigns program, Google requires that app developers list their app in either the Google Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users). This conduct further entrenches Google's monopoly in Android App Distribution by coercing Android app developers to list their apps in the Google Play Store or risk losing access to a great many Android users they could otherwise advertise to but for Google's restrictions.

### iii. Google's Conduct Toward Consumers

94. Google directly and anti-competitively restricts the manner in which consumers can discover, download and install mobile apps and app stores. Although Google nominally allows consumers to directly download and install Android apps and app stores—a process that Google pejoratively describes as "sideloading"—Google has ensured, through a series of technological impediments imposed by the Android OS, that direct downloading remains untenable for most consumers.

95. But for Google's anticompetitive acts, Android users could freely download apps from developers' websites, rather than through an app store, just as they might do on a personal computer. There is no reason that downloading and installing an app on a mobile device should differ from downloading and installing software on a personal computer. Millions of personal computer users download and install software directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader. Personal computer users do this easily and safely.

96. Direct downloading on Android mobile devices, however, differs dramatically. Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process. For example, depending on the version of Android

running on a mobile device, downloading and installing *Fortnite* on an Android device could take as many as 16 steps or more, including requiring the user to make changes to the device's default settings and manually granting various permissions while being warned that doing so is dangerous.  Below are the myriad steps an average Android user has to go through in order to download and install *Fortnite* directly from Epic's secure servers.



97.      Below are two of the intimidating messages and warnings about the supposed danger of directly downloading and installing apps that consumers encounter during this process.




98.     As if this slog through warnings and threats were not enough to ensure the inferiority of direct downloading as a distribution method for Android apps, Google denies downloaded apps the permissions necessary to be seamlessly updated in the background—instead allows such updates only for apps downloaded via Google Play Store.  The result is that consumers must manually approve every update of a "sideloaded" app.  In addition, depending on the OS version and selected settings, such updates may require users to go through many of the steps in the downloading process repeatedly, again triggering many of the same warnings.  This imposes onerous obstacles on consumers who wish to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading and toward Google's monopolized app store.

99.     Further, under the guise of offering protection from malware, Google further restricts direct downloading.  When Google deems an app "harmful", Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the

1   app from a consumer's device. And direct downloading has been prevented entirely on

2   the Android devices that are part of Google's so-called Advanced Protection Program

3   ("APP"). Consumers who have enrolled in APP are unable to directly download apps;

4   their Android device can only download apps distributed in the Google Play Store or in

5   another pre-installed app store that Google has pre-approved for an OEM to offer on its

6   devices. App developers therefore cannot reach APP users unless they first agree to

7   distribute their apps through the Google Play Store or through a separate Google-

8   approved, OEM-offered app store, where available. Google's invocation of security is

9   an excuse to further strangle an app developer's ability to reach Android users, as shown

10   by a comparison to personal computers, where users can securely purchase and

11   download new software without being limited to a single software store owned or

12   approved by the user's anti-virus software vendor.

13         100. Direct downloading is also nominally available to competing app

14   distributors who seek to distribute competing Android app stores directly to consumers.

15   However, the same restrictions Google imposes on the direct downloading of apps apply

16   to the direct downloading of app stores. Indeed, Google Play Protect has flagged at

17   least one competing Android app store, Aptoide, as "harmful", further hindering

18   consumers' ability to access a competing app store.

19         101. And apps downloaded from "sideloaded" app stores, like apps

20   directly downloaded from a developer's website, may not be automatically uploaded in

21   the background. Thus, direct downloading is not a viable way for app stores to reach

22   Android users, any more than it is a viable alternative for single apps; the only

23   difference is that the former do not have *any* alternative, ensuring the latter are forced

24   into the Google Play Store.

25         102. But for Google's restrictions on direct downloading, Epic and other

26   app distributors and developers could try to directly distribute their stores and apps to

27   those consumers who would be open to a process outside an established app store. But

28   as explained above, Google makes direct downloading substantially and unnecessarily

difficult, and in some cases prevents it entirely, further narrowing this already narrow alternative distribution channel.

103.    There is no legitimate reason for Google's conduct.  Indeed, for decades the users of personal computers have been able to install software acquired from various sources without being deterred by anything like the obstacles erected by Google.  Now, a user can navigate to the Internet webpage sponsored by the developer of software he/she desires, click once or twice to download and install an application, and be up and running, often in a matter of minutes.  The operating systems used by personal computers efficiently facilitate this download and installation (unlike Android), and security screening is conducted by a neutral security software operating in the background, allowing users to download software from any source they choose (unlike Android).

104.    Google's anti-competitive and unjustified restrictions on distributing apps through any means other than its own app store contradict its own claims that Android app developers can "us[e] any distribution approach or combination of approaches that meets your needs", and that developers can even provide consumers "apps from a website or [by] emailing them directly to users."[10]  In reality, Google specifically prevents app developers from effectively availing themselves of alternative distribution channels that it touts today.

105.    Through these anti-competitive acts, including contractual provisions and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly over Android mobile app distribution.  Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

---

[10] Google Play Developers Page, *Alternative distribution options,*
https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed June 7, 2020).

## D.     Anti-Competitive Effects in the Android App Distribution Market

106.   Google's anti-competitive conduct forecloses competition in the Android App Distribution Market, affects a substantial volume of commerce in this Market and causes anti-competitive harms to OEMs, competing mobile app distributors, mobile app developers, and consumers.

107.   Google's conduct harms OEMs by forcing them to dedicate to the Google Play Store and other mandatory Google applications valuable space on their devices' "home screen", even if they would rather use that real estate for other purposes, including to offer alternative app stores.  Individually and together, these requirements limit OEMs' ability to innovate and compete with each other by offering innovative and more appealing (in terms of price and quality) distribution platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers.

108.   Google's conduct harms would-be competitor app distributors, such as Epic, which could otherwise innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's own app store.

109.   Google's anti-competitive conduct harms app developers, such as Epic, which are forced to agree to Google's anti-competitive terms and conditions if they wish to reach many Android users, such as through advertising on Google's valuable advertising properties.  Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps.  By restricting developers in such a way, Google ensures that the developer's apps will be distributed on the Google Play Store, and that Google is then able to monitor and collect a variety of information on the apps' usage, which it can then use to develop and offer

1  its own competing apps that are, of course, not subject to Google's supra-competitive

2  taxes.

3        110.  Both developers and consumers are harmed by Google's supra-

4  competitive taxes of 30% on the purchase price of apps distributed through the Google

5  Play Store, which is a much higher transaction fee than would exist in a competitive

6  market.  Google's supra-competitive taxes raise prices for app developers and

7  consumers and reduce the output of mobile apps and related content by depriving app

8  developers incentive and capital to develop new apps and content.

9        111.  Consumers are further harmed because Google's control of app

10  distribution reduces developers' ability and incentive to distribute apps to consumers in

11  different and innovative ways—for example, through genre-specific app stores.  Google,

12  by restraining the distribution market and eliminating the ability and incentive for

13  competing app stores, also limits consumers' ability to discover new apps of interest to

14  them.  More competing app stores would permit additional platforms to feature diverse

15  collections of apps.  Instead, consumers are left to sift through millions of apps in one

16  monopolized app store, where Google controls which apps are featured and which apps

17  are identified or prioritized in user searches.

## III.  Google Unlawfully Acquired and Maintains a Monopoly in the Android In-App Payment Processing Market.

19       112.  By selling digital content within a mobile app rather than (or in

20  addition to) charging a price for the app itself, app developers can make an app widely

21  accessible to all users, then charge users for additional digital content or features, thus

22  still generating revenue from their investment in developing new apps and content.  This

23  is especially true for mobile game developers.  By allowing users to play without up-

24  front costs, developers permit more players try a game "risk free" and only pay for what

25  they want to access.  *Fortnite*, for example, is free to download and play, but makes

26  additional content available for in-app purchasing on an à la carte basis or via a

27  subscription-based Battle Pass.  App developers who sell digital content rely on in-app

28

1    payment processing tools to process consumers' purchases in a seamless and efficient

2    manner.

3           113.   When selling digital content, Android app developers are unable to

4    utilize the multitude of electronic payment processing solutions generally available on

5    the market to process other types of transactions.  Instead, through contractual

6    restrictions and its monopoly in app distribution, Google coerces developers into using

7    its own in-app payment processing by conditioning developers' use of Google's

8    dominant Google Play Store on the use of Google's payment processor, Google Play

9    Billing, for digital content, thereby acquiring and maintaining monopoly power in the

10   Android In-App Payment Processing Market.  Google thus ties its Google Play Store to

11   its own proprietary payment processing tool.

12       **A.   The Android In-App Payment Processing Market**

13           i.   <u>Product Market Definition</u>

14           114.   There is a relevant antitrust market for the processing of payments

15   for the purchase of digital content, including virtual gaming products, that is consumed

16   within Android apps (the "<u>Android In-App Payment Processing Market</u>").  The Android

17   In-App Payment Processing Market is comprised of the payment processing solutions

18   that Android developers could turn to and integrate into their Android apps to process

19   the purchase of such in-app digital content.

20           115.   Absent Google's unlawful conduct, app developers could integrate

21   compatible payment processor into their apps to facilitate the purchase of in-app digital

22   content.  Developers also would have the capability to develop their own in-app

23   payment processing functionality.  And developers could offer users a choice among

24   multiple payment processors for each purchase, just like a website or brick-and-mortar

25   store can offer a customer the option of using Visa, MasterCard, Amex, Google Pay,

26   and more.

27           116.   Google offers separate payment solutions for the purchase of digital

28   content than it does for other types of purchases, even within mobile apps.  Google Play

Billing can be used for the purchase of digital content and virtual gaming products, while Google offers a separate tool, Google Pay, to facilitate the purchase of physical products and services within apps.

117.   It is particularly important that app developers who sell in-app digital content be able to offer in-app transactions that are seamless, engrossing, quick, and fun. For example, a gamer who encounters a desirable "skin" within *Fortnite*, such as a Marvel superhero, may purchase it nearly instantly for a small price without leaving the app.  Although *Fortnite* does not offer content that extends gameplay or gives players competitive advantages, other game developers offer such products—for example, "boosts" and "extra lives"—that extend and enhance gameplay.  It is critical that such purchases can be made during gameplay itself, rather than in another manner.  If a player were required to purchase game-extending extra lives outside of the app, the player may simply stop playing instead.

118.   As another example, if a user of a mobile dating app encounters a particularly desirable potential dating partner, he/she can do more than "swipe right" or "like" that person, but can also purchase a digital item that increases the likelihood that the potential partner will notice his/her profile.  If the user could not make that purchase quickly and seamlessly, he/she would likely abandon the purchase and may even stop "swiping" in the app altogether.

119.   It is therefore essential that developers who offer digital content be able to seamlessly integrate a payment processing solution into the app, rather than requiring a consumer to go elsewhere, such as to a separate website, to process a transaction.  Indeed, if an app user were directed to process a purchase of digital content outside of a mobile app, the user might abandon the purchase or stop interacting with the mobile app altogether.

120.   Mobile game developers particularly value the ability to allow users to make purchases that extend or enhance gameplay without disrupting or delaying that gameplay or a gamer's engagement with the mobile app.  For these reasons, and in the

1    alternative, there is a relevant antitrust sub-market for the processing of payments for

2    the purchase of virtual gaming products within mobile Android games (the "Android

3    Games Payment Processing Market").

4              ii.    Geographic Market Definition

5              121.    The geographic scope of the Android In-App Payment Processing

6    Market is worldwide, excluding China.  Outside China, in-app payment processing

7    tools, such as Google Play Billing, are available on a worldwide basis.  By contrast, in-

8    app payment processing tools available in China are not available outside of China,

9    including because Google prevents the use of non-Google payment processing tools for

10   all apps distributed through the Google Play Store, which as noted above dominates

11   distribution of apps outside of China.

12   **B.    Google's Monopoly Power in the Android In-App Payment Processing**
     **Market**

13             122.    Google has monopoly power in the Android In-App Payment

14   Processing Market and, in the alternative, in the Android Games Payment Processing

15   Market.

16             123.    For apps distributed through the Google Play Store, Google requires

17   that the apps use *only* its own in-app payment processor, Google Play Billing, to process

18   in-app purchases of digital content and for all purchases within Android games.  And

19   because 90% or more of Android-compatible mobile app downloads conducted through

20   an app stores have been done through the Google Play Store, Google has a monopoly in

21   these Markets.  .

22             124.    Google charges a 30% commission for Google Play Billing.  This

23   rate reflects Google's market power, which allows it to charge supra-competitive prices

24   for payment processing within the market.  Indeed, the cost of alternative electronic

25   payment processing tools, which Google does not permit to be used for the purchase of

26   in-app digital content or within Android games, can be ***one tenth*** of the 30% cost of

27   Google Play Billing.

28

| **Electronic Payment Processing Tool** | **Base U.S. Rate** |
| --- | --- |
| PayPal | 2.9% |
| Stripe | 2.9% |
| Square | 2.6%-3.5% |
| Braintree | 2.9% |

## C. Google's Anti-Competitive Conduct Concerning the Android In-App Payment Processing Market

125. Through provisions of the DDA that Google imposes on all developers who seek to access Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Distribution Market, to its own in-app payment processing tool, Google Play Billing. Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and in-app digital content.

126. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require in relevant part that:

- Developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment.
- Developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except for the following cases:
  - Payment is solely for physical products,
  - Payment is for digital content that may be consumed outside of the app itself (*e.g.*, songs that can be played on other music players).

127. Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their

mobile apps, depriving app developers and consumers alike a choice of competing payment processors.  For example, Epic offers its own in-app payment processing tool that it could integrate, alongside Google's and others, into Epic mobile games.  Epic consumers could then choose to process their payment using Google's tool, Epic's tool, or another tool altogether.

128.   In December of 2019, Epic submitted a build of *Fortnite* to Google Play that enabled users to make in-app purchases through Epic's own payment processor.  Upon review of the submission, Google Play rejected the application, citing its violation of Google's Payments policy as well as an unrelated issue raised by Google.  In January 2020, Epic again submitted a *Fortnite* build that resolved the unrelated issue but again enabled users to use Epic's own payment processor.  Google again rejected Epic's submission.

129.   Epic was prevented from offering *Fortnite* on the Google Play Store, and therefore unable to reach many Android users, until it submitted a new version of *Fortnite* that only offered Google Play Billing.  Google has damaged Epic by foreclosing it from the Android in-app payment processing market.

130.   Google has no legitimate justifications for its tie.  If it were concerned, for example, about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app.  But Google does allow alternative payment processing tools in that context, with no diminution in security.

### D.    Anti-Competitive Effects in the Android In-App Payment Processing Market

131.   Google's conduct harms competition in the Android In-app Payment Processing Market (and, in the alternative, in the Android Games Payment Processing Market) and injures app developers, consumers, and competing in-app payment processors.

132.    Google's conduct harms would-be competitor in-app payment processors, who would otherwise have the ability to innovate and offer consumers alternative payment processing tools that offer better functionality, lower prices, and better security.  For example, in the absence of Google's Developer Program Policies, Epic could offer consumers a choice of in-app payment processor for each purchase made by the consumer, including a choice of Epic's own payment processor at a lower cost and with better customer service.

133.    Google also harms app developers and consumers by inserting itself as a mandatory middleman in every in-app transaction.  When Google acts as payment processor, Epic is unable to provide users comprehensive customer service relating to in-app payments without Google's involvement.  Google has little incentive to compete through improved customer service because Google faces no competition and consumers often blame Epic for payment-related problems.  In addition, Google is able to obtain information concerning Epic's transactions with its own customers, which it could use to give its ads and Search businesses an anti-competitive edge, even when Epic and its own customers would prefer not to share their information with Google.  In these ways and in others, Google directly harms app developers' relationships with the users of their apps.

134.    Finally, Google raises app developers' costs and consumer prices through its supra-competitive 30% tax on in-app purchases, a price it could not maintain if it had not foreclosed competition for such transactions.  The resulting increase in prices for in-app content likely deters some consumers from making purchases and deprives app developers of resources they could use to develop new apps and content.  The supra-competitive tax rate also reduces developers' incentive to invest in and create additional apps and related in-app content.

### COUNT 1:  Sherman Act § 2
### (Unlawful Monopoly Maintenance in the
### Android App Distribution Market)
### (against all Defendants except Google Payment)

135.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

136.   Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

137.   The Android App Distribution Market is a valid antitrust market.

138.   Google holds monopoly power in the Android App Distribution Market.

139.   Google has unlawfully maintained monopoly power in the Android App Distribution Market through the anti-competitive acts described herein, including conditioning the licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement to provide the Google Play Store with preferential treatment, imposing technical restrictions and obstacles on both OEMs and developers, which prevent the distribution of Android apps through means other than the Google Play Store, and conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

140.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

141.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

142.   As a potential competing app distributor and as an app developer, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer

damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 2: Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android App Distribution Market: OEMs)
### (against all Defendants except Google Payment)

143. Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

144. Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

145. Google has entered into agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market. These include MADAs with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary and often the only viable app store on Android mobile devices.

146. These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

147. Google's conduct affects a substantial volume of interstate as well as foreign commerce.

148. Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

149. As a potential competing app distributor and as an app developer that consumes app distribution services, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Epic has suffered and continues to suffer damages and irreparable injury, and such damages

and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 3:  Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android App Distribution Market:  DDA)
### (against all Defendants except Google Payment)

150.  Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

151.  Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

152.  Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of being distributed through Google's app store, the Google Play Store.  The relevant provisions of these agreements unreasonably restrain competition in the Android App Distribution Market.

153.  Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play".  Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies.  Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play".  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These provisions prevent app developers from offering competing app stores through the

Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

154.   These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects, and thus unreasonably restrain competition in the Android App Distribution Market.

155.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

156.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

157.   As a potential competing app distributor and as an app developer that consumes app distribution services, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 4:  Sherman Act § 2
### (Unlawful Monopolization and Monopoly Maintenance in the Android In-App Payment Processing Market)
### (against all Defendants)

158.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

159.   Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

160.   The Android In-App Payment Processing Market is a valid antitrust market.  In the alternative, the Android Games Payment Processing Market is a valid antitrust market.

161.  Google holds monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

162.  Google has unlawfully acquired monopoly power in these Markets, including through the anti-competitive acts described herein.  And however Google initially acquired its monopoly, it has unlawfully maintained its monopoly, including through the anti-competitive acts described herein.

163.  Google's conduct affects a substantial volume of interstate as well as foreign commerce.

164.  Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

165.  As an app developer and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 5:  Sherman Act § 1**
**(Unreasonable restraints of trade concerning**
**Android In-App Payment Processing Market)**
**(against all Defendants)**

166.  Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

167.  Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

168.  Google, except Google Payment, forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that

1   Agreement, as a condition of having their apps distributed through Google's

2   monopolized app store, Google Play Store.  The relevant provisions of these agreements

3   unreasonably restrain competition in the Android In-App Payment Processing Market.

4         169.   Section 3.2 of the DDA requires that Android app developers enter

5   into a separate agreement with Google's payment processor, Defendant Google

6   Payment, in order to receive payment for apps and content distributed through the

7   Google Play Store.  This includes payments related to in-app purchases of digital

8   content.  Further, Google's Developer Program Policies, compliance with which Section

9   4.1 of the DDA makes obligatory, require that apps distributed through the Google Play

10  Store "must use Google Play In-app Billing [offered by Google Payment] as the method

11  of payment" for such in-app purchases.  While Google's Policies exclude certain types

12  of transactions from this requirement, such as the purchase of "solely physical products"

13  or of "digital content that may be consumed outside of the app itself", Google expressly

14  applies its anti-competitive mandate to every "game downloaded on Google Play" and

15  to all purchased "game content", such as purchases made within *Fortnite*.

16        170.   The challenged provisions serve no sufficient legitimate or pro-

17  competitive purpose and unreasonably restrain competition in the Android In-App

18  Payment Processing Market and, in the alternative, the Android Games Payment

19  Processing Market.

20        171.   Defendants' conduct affects a substantial volume of interstate as well

21  as foreign commerce.

22        172.   Defendants' conduct has substantial anti-competitive effects,

23  including increased prices and costs, reduced innovation and quality of service, and

24  lowered output.

25        173.   As an app developer and as the developer of a competing in-app

26  payment processing tool, Epic has been harmed by Defendants' anti-competitive

27  conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered

28

and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 6:  Sherman Act § 1
### (Tying Google Play Store to Google Play Billing)
### (against all Defendants)

174.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

175.   Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

176.   Google has unlawfully tied the Google Play Store to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

177.   Google has sufficient economic power in the tying market, the Android App Distribution Market.  With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

178.   The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services.  Google's foreclosure of alternative app distribution channels forces developers like Epic to use Google's in-app payment processing services, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

179.   The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers such as Epic have alternative in-app payment processing options and would prefer to choose among them

independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

180. Google's conduct forecloses competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

181. Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

182. In the alternative only, even if Google's conduct does not constitute a *per se* illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

183. As an app developer which consumes in-app payment processing services and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 7: California Cartwright Act
### (Unreasonable restraints of trade in Android App Distribution Market)
### (against all Defendants except Google Payment)

184. Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

185. Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

186. Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

187.   The Android App Distribution Market is a valid antitrust market.

188.   Google has executed agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market.  Namely, Google has entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices.  These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

189.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

190.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

191.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

192.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 8:  California Cartwright Act
### (Unreasonable restraints of trade in Android App Distribution Market)
### (against all Defendants except Google Payment)

193.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

194.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the

combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

195.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

196.    The Android App Distribution Market is a valid antitrust market.

197.    Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Distribution Market.

198.    Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies.  Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play."  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

199.    These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android App Distribution Market.

200.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service, and lowered output.

201.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

202.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

203.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 9:  California Cartwright Act**
**(Unreasonable restraints of trade in Android In-App Payment Processing Market)**
**(against all Defendants)**

204.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

205.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

206.   Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

207.   The Android App Distribution Market and Android In-App Payment Processing Market, and, in the alternative, the Android Games Payment Processing Market, are valid antitrust markets.

208.   Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

209.   Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android In-App Payment Processing Market.

210.   Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store.  This includes payments related to in-app purchases.  Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases.  While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself", Google expressly and discriminatorily applies its anti-competitive mandate to every "game downloaded on Google Play" and to all purchased "game content", such as purchases made within *Fortnite*.

211.   These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market.

212.    Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

213.    Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute and use its own in-app payment processor.

214.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

215.    Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 10:  California Cartwright Act
### (Tying Google Play Store to Google Play Billing)
### (against all Defendants)

216.    Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

217.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition.  *See* §§ 16720, 16726.

218.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

219.    The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount

from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." § 16727.

220.    As detailed above, Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

221.    Google has sufficient economic power in the tying market, the Android App Distribution Market, to affect competition in the tied market, the Android In-App Payment Distribution Market.  With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

222.    The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services.  Google's foreclosure of alternative app distribution channels forces developers like Epic to use Google's in-app payment processing services, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

223.    The tying product, Android app distribution, is separate and distinct from the tied product, Android in-app payment processing, because app developers such as Epic have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed.  Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

224. Google's conduct forecloses competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

225. Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

226. Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act, and therefore, illegal.

227. Google's acts and practices detailed above unreasonably restrain competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

228. Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is paying a supra-competitive commission rate on in-app purchases processed through Google's payment processor and has forgone commission revenue it would be able to generate if its own in-app payment processor were not unreasonably restricted from the market.

229. As an app developer which consumes in-app payment processing services and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.

230. It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

231. Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 11:  California Unfair Competition Law
### (against all Defendants)

232. Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

233. Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

234. Epic has standing to bring this claim because it has suffered injury in fact and lost money as a result of Google's unfair competition.  Specifically, it develops and distributes apps for the Android mobile platform, and has developed and distributes a processor for in-app purchases, and Google's conduct has unreasonably restricted Epic's ability to fairly compete in the relevant markets with these products.

235. Google's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

236. Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

237. Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is unreasonably prevented from freely distributing mobile apps or its in-app payment processing tool, and forfeits a higher commission rate on the in-app purchases than it would pay absent Google's conduct.

238. Epic seeks injunctive relief under the Unfair Competition Law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Epic and against Defendants:

A.  Issuing an injunction prohibiting Google's anti-competitive and unfair conduct and mandating that Google take all necessary steps to cease such conduct and to restore competition;

B.  Awarding a declaration that the contractual restraints complained of herein are unlawful and unenforceable;

C.  Awarding any other equitable relief necessary to prevent and remedy Google's anti-competitive conduct; and

D.  Granting such other and further relief as the Court deems just and proper.

Dated:  August 13, 2020

Respectfully submitted,

By:     /s/ Paul J. Riehle

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice pending*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice pending*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice pending*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice pending*)
yeven@cravath.com
M. Brent Byars (*pro hac vice pending*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700