# EXHIBIT D

1  Bonny E. Sweeney (SBN 176174)
   Samantha J. Stein (SBN 302034)
2  HAUSFELD LLP
   600 Montgomery Street, Suite 3200
3  San Francisco, CA 94104
   Telephone: (415) 633-1908
4  Facsimile: (415) 358-4980
   bsweeney@hausfeld.com
5  sstein@hausfeld.com

6
   *Counsel for Plaintiff Peekya Services, Inc.*
7  *and the Proposed Class*

8  [Additional Counsel Listed on Signature Page]

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13 | **PEEKYA SERVICES, INC.,** *on behalf of itself* | Case No. |
14 | *and the proposed class*, |
15 | | **ANTITRUST CLASS ACTION** |
   | Plaintiff, | **COMPLAINT PURSUANT TO THE** |
16 | | **SHERMAN AND CLAYTON ACTS** |
   | v. | **(15 U.S.C. §§ 1, 2, 3, 15, 26),** |
17 | **GOOGLE LLC, GOOGLE IRELAND** | **CARTWRIGHT ACT (CAL. BUS. &** |
   | **LIMITED; GOOGLE COMMERCE** | **PROF. CODE §§ 16700 ET SEQ.) AND** |
18 | **LIMITED; AND GOOGLE ASIA PACIFIC** | **UNFAIR COMPETITION LAW (CAL.** |
   | **PTE. LIMITED,** | **BUS. & PROF. CODE §§ 17200 ET** |
19 | | **SEQ.)** |
20 | Defendants. |
   | | **DEMAND FOR JURY TRIAL** |
21

22

23

24

25

26

27

28

                                          ANTITRUST CLASS ACTION COMPLAINT

1.      Plaintiff Peekya Services, Inc. ("Peekya" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint for damages and injunctive relief against Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, and Google Asia Pacific PTE. Ltd. (collectively, "Google") for violations of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§1, 2 and 3), California's Cartwright Act, (Cal. Bus. & Prof. Code §§ 16700 et seq). and California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq). All allegations other than those concerning the Plaintiff are based on information and belief.

## I.      INTRODUCTION

2.      Just 12 years after its launch, the Google Play Store — Google's applications store for mobile phones and tablets using the Android operating system — is now home to 2.96 million apps, making it the biggest app store in the world.  While Google developed some of those apps itself, the vast majority were created by independent app developers.

3.      Although Google touts its role in creating a marketplace for software developers, those developers in fact have no choice.  Google has a monopoly in the market for Android app stores, which it has unlawfully maintained through anticompetitive conduct.  As a result of its monopoly power and the anticompetitive restraints it has imposed on device manufacturers, app developers and consumers, Google has been able to extract from developers a supracompetitive 30% tax on paid apps downloaded from the Play Store as well as in-app purchases for products and services.

4.      Google's anticompetitive conduct has harmed competition in the market for Android app stores.  It has reduced competition by deterring entry by would-be competitors, stifled innovation by controlling the manner in which Android apps are distributed, increased prices to app developers and consumers who bear the 30% tax, and reduced output by reducing app developers' capital and incentives for creating new apps.

5.      Google's conduct has also injured Plaintiff and members of the Class, who have paid a supracompetitive 30% tax on every paid download of their apps from the Play Store and in-app purchases.

ANTITRUST CLASS ACTION COMPLAINT

6.      In this action, Plaintiff seeks to recover the damages caused by Google's unlawful anticompetitive conduct and an order enjoining its unlawful practices.

## II.      JURISDICTION AND VENUE

7.      Plaintiff brings this action on its own behalf as well as that of the Class to recover damages, including treble damages, restitution, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Sections 1, 2 and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, 3), California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700 et seq.), and California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.), as well as any and all equitable relief afforded them under federal and California law.

8.      Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in or emanated from this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Google's principal place of business is in this District. The anticompetitive conduct alleged in this complaint has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States and its territories, including in this District.

## III.      INTRA-DISTRICT ASSIGNMENT

9.      Pursuant to N.D. Cal. Civil Local Rule 3.2 and General Order 44, this antitrust class action shall be assigned on a district-wide basis and is not subject to reassignment on the basis of intra-district venue.

## IV.      PARTIES

10.     Plaintiff Peekya App Services, Inc. ("Peekya" or "Plaintiff") is a Florida corporation with its principal place of business in Sarasota, Florida.  Plaintiff is a party to and has complied with the Google-developer contracts that are described in this Complaint.  Plaintiff developed and maintains an app called "*Peekya*" that has been and currently is distributed through the Play Store.  Within the four years preceding the filing of this Complaint, users of Android

1    mobile device users have purchased and downloaded *Peekya*.  For each such download, Google

2    has taken a 30% commission from the payment remitted to Plaintiff.

3           11.     Google LLC is a Delaware limited liability company with its principal place of

4    business in Mountain View, California.  It is the primary operating subsidiary of the holding

5    company Alphabet, Inc.  Google LLC is a technology company that provides internet-related

6    services and products, including online advertising technologies and a search engine.  Google LLC

7    contracts with all app developers that distribute their apps through the Play Store.

8           12.     Defendant Google Ireland Limited ("Google Ireland") is an Irish limited company

9    with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google

10   Ireland contracts with all app developers that distribute their apps through the Play Store and is

11   therefore a party to the anticompetitive contractual restrictions at issue in this Complaint.

12          13.     Defendant Google Commerce Limited ("Google Commerce") is an Irish limited

13   company with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC.

14   Google Commerce contracts with all app developers that distribute their apps through the Play

15   Store and is therefore a party to the anticompetitive contractual restrictions at issue in this

16   Complaint.

17          14.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a Singapore

18   private limited company organized with its principal place of business in Mapletree Business City,

19   Singapore, and is a subsidiary of Google LLC. Google Asia Pacific contracts with all app

20   developers that distribute their apps through the Play Store and is therefore a party to the

21   anticompetitive contractual restrictions at issue in this Complaint.

22         Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its

23   principal place of business in Mountain View, California, and is a subsidiary of Google LLC.

24   Google Payment provides in-app payment processing services to Android app developers and

25   Android users and collects a 30% commission on many types of processed payments, including

26   payments for apps sold through the Play Store and in-app purchases made within such apps.

27

28

3

## V.    RELEVANT FACTS

### A.    The Market for Licensable Smart Mobile Operating Systems

15.    Smart mobile devices are handheld, portable electronic devices that enable the user to connect wirelessly to the Internet and perform many of the functions traditionally associated with desktop and laptop computers.  They include smart phones and tablets.  Consumers use smart mobile devices to browse the Internet, shop, access social media, stream music and videos, read books, and play games.

16.    Like desktop and laptop computers, smart mobile devices require an operating system, or OS.  OSs are software products that control the basic functions of a computer.  Without an OS, the user cannot operate the computer or run software on it.  OSs designed for smart mobile devices are "smart mobile OSs."

17.    In addition to the features typically found in a desktop or laptop computer OS, smart mobile OSs include features such as a touchscreen, cellular, Bluetooth, and WiFi capabilities, GPS mobile navigation, cameras, video cameras, speech recognition capability, voice recorders, music players, personal digital assistants and other features.

### 1.    Licensable Smart Mobile OSs Constitute a Relevant Product Market

18.    Licensable smart mobile OSs constitute a distinct product market.  Although desktop and laptop computers, early mobile phones (like flip phones) and game consoles also use OSs, those OSs are not compatible with smart mobile devices and are not included in the relevant market.  From the demand side, makers of smart mobile devices — original equipment manufacturers or "device manufacturers" — cannot use the OSs found in computers, older flip phones or game consoles to power their smart mobile devices.  From the supply side, any OS developer that switched from a computer, flip phone or game console-compatible OS to a smart mobile OS would have to invest substantial time and money in re-designing the OS to account for the specific functionalities of smart mobile devices.

19.    Following a years-long investigation, the European Commission ("EC" or

4

"Commission") concluded in a July 18, 2018 decision that Google abused its dominant power in the Android app store market by tying Google Search to the Play Store, and by tying Google Chrome to the Play Store and Google Search. The Commission ordered Google to pay a $5.1 billion fine and to change its practices. Google is currently appealing the decision but asserts that it has complied with the Commission's conduct remedies by changing its contracts with manufacturers that ship phones and tablets into the European Economic Area.

20.     In the European Commission's Google Android case, Google did not contest the Commission's conclusion that smart mobile OSs constitute a distinct product market.

21.     Smart phone OSs and tablet OSs make up the smart mobile OS product market. From the demand side, the same OS, or similar versions of it, power both smart phones and tablets. From the supply side, all of the principal OS developers use the same OS to power both smartphones and tablets. Apple, for example, which makes both the OS and the hardware for its smartphones and tablets, has confirmed that it uses a single OS for its iPhone and iPad. In the EC Google Android case, Google did not contest the Commission's conclusion that smart phone and tablet OSs belong in the same product market.

22.     Manufacturers of smart mobile devices ("device manufacturers") pre-install smart mobile OSs on devices before selling them to retailers and end users. Most device manufacturers do not develop their own OSs but instead license Google's Android OS. The most widely-used mobile non-Android OS outside of China is Apple's iOS. But because Apple does not license its operating system to device manufacturers, instead manufacturing its own smart phones and tablets, Apple's iOS is not an option for device manufacturers.

23.     Non-licensable smart mobile OSs such as Apple's iOS do not belong to the same product market as licensable smart mobile OSs. From the demand side, device manufacturers cannot obtain a license to pre-install iOS because Apple does not license iOS to competing device manufacturers. As even Google has conceded, device manufacturers cannot switch to non-licensable OSs such as iOS.

24.     From the supply side, even assuming Apple decided to license iOS to competing

ANTITRUST CLASS ACTION COMPLAINT

device manufacturers, it would probably take device manufacturers at least two years to make all the changes necessary to migrate to iOS, according to market participants.  And the likelihood that Apple would decide voluntarily to license iOS to competing device manufacturers is pretty much nil.  Apple's legendary strategy of remaining vertically integrated within its "walled garden" and selling luxury products to loyal customers has been wildly successful.  What other company has exceeded a market capitalization of $2 trillion?  As device manufacturer Nokia put it:  "Apple has no incentives to enter the market for licensable OS[s] by starting to license iOS to third party device manufacturers. This is because Apple currently holds a monopoly over the supply of iOS compatible devices. Apple makes most of its mobile profits with device sales and opening the system for third party device manufacturer competition would be likely to erode Apple's device profits. […] Apple does not need to expand its ecosystem in order to attract developers*".

25.    The European Commission concluded that Apple's iOS "exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs," confirming that iOS should not be included in the relevant market for licensable smart mobile OSs.

**2.    The Geographic Scope of the Licensable Smart Mobile OSs Market is Worldwide, Excluding China**

26.    The geographic scope of the licensable smart mobile OS market is worldwide, excluding China.  Agreements between device manufacturers and OS developers are typically worldwide in scope, and mobile devices are often sold on a worldwide basis.  The competitive conditions in China differ from other regions due to limitations on Google's activities in China and the wide availability and popularity of "forked", *i.e.*, non-Google, Android devices.  In the European Commission's Google Android case, Google did not contest the Commission's conclusion that the market for the licensing of smart mobile OSs is worldwide in scope, excluding China.

**3.    Google Monopolizes the Market for Licensable Smart Mobile OSs**

27.    Google possesses monopoly power in the market for licensable smart mobile OSs.

This monopoly power is demonstrated by Google's market share, the existence of high barriers to entry and expansion, the lack of countervailing buyer power, and the lack of constraint posed by non-licensable smart mobile OSs such as Apple's iOS.

28.     The EC found in its 2018 Google Android decision that Android OS is installed on more than 95% of smart mobile devices with licensed mobile OSs worldwide, excluding China. In the United States, that percentage currently appears to be even higher.  As of July 2020, 98.85% of smartphones with licensed mobile OSs were powered by Android, compared to just .15% for other licensed mobile OSs (Samsung's share was .11%; Windows was .02%, and "unknown" was .02%).  For that same period, Windows, Linux and "unknown" licensable mobile OSs collectively powered only .17% of tablets, leaving the remaining 98.83% to Google. There also has been very little competitor entry.  The only other licensable smart mobile OSs that have entered the market since 2011 have not made a dent in Google's market share.  The most prominent competitor — Microsoft — dropped below 2% market share in 2016, and exited the market shortly thereafter. The other providers, including Firefox OS, Tizen and Sailfish, have been unable to gain more than .2% market share.

29.     The market for licensable smart mobile OSs is characterized by high barriers to entry and expansion.  First, development of a smart mobile OS requires an enormous investment of time and money in research and development.  Google claims, for example, that it subsidized the development of Android through advertising revenue derived from Google Search and Chrome.

30.     Equally important, network effects make entry less attractive to would-be competitors.  App developers, who earn revenue through app downloads, in-app purchases, and ads, want to develop apps for mobile OSs that have a large user base.  Google's giant installed base of consumers who download apps creates strong incentives for developers to focus their efforts on developing for Google Android, rather than developing for multiple OSs.  Google itself submitted evidence in its appeal of the Commission's decision which confirmed this network effect:  "As the Google App Store is preinstalled on most android devices, developers reach most

7

users by publishing their App through the App store, which makes the Google App Store the Store with the highest number of apps. Users prefer the store with the highest number of Apps which makes this a self-enforcing effect."

31.     According to findings by the EC, Google's monopoly power is also supported by the lack of countervailing buyer power.  There are numerous device manufacturers that license Android OS for pre-installation in smart mobile devices.  Of these, only Samsung had more than a 10% market share, demonstrating the diffusion of buyer power.  This lack of buyer power is further evidenced by the apparently limited nature of the negotiations that occur between Google and device manufacturers when device manufacturers enter into licensing agreements with Google.  The agreements are signed online, with the device manufacturer representative merely providing contact information and clicking in the relevant box accepting the terms and conditions of the agreement.

32.     Nor does Apple's non-licensable iOS impose sufficient indirect constraints to undermine Google's monopoly power in the market for licensable smart mobile OSs.  As the EC has concluded, there are several reasons why Apple's iOS does not inhibit Google's monopoly power.  First, there are significant price differences between Google Android and iOS devices.  In the United States, the latest iPhone costs $1099, compared to the latest Samsung Android phone, which costs $899.  This disparate pricing reflects Apple's and Google's different commercial strategies.  Apple's vertically-integrated approach is aimed at keeping its affluent, loyal customers in Apple's ecosystem, and purchasing its hardware and services, which generates the bulk of Apple's revenue. Of Apple's revenue for the third quarter of 2020, 78% was based in hardware such as iPhones, Macbooks, iPads and wearables.   Google, on the other hand, wants to put Google Android devices in as many hands as possible in order to ensure its continued domination of search advertising, which generates the bulk of Google's revenue.   In the first quarter of 2018, for example, 82% of Google's revenue came from advertising.  As the Netherlands Authority for

Consumers & Markets put it in a recent study[1]:  "In contrast to Apple and Microsoft, Android was not developed by Google to generate revenues through the sale of software or hardware.  Android, apps, and the Play Store are only means to an end to become embedded everywhere on the internet, and to increase the audience for its services so it can create more advertising space."[2]

33.     Second, Android users would face substantial costs if they switched to iOS devices. They would need to re-download and re-purchase existing apps for the new device (if they exist for that OS), transfer their data, and learn how to use the new device.  The Netherlands Market Study confirmed that smartphone users are locked into their OS.  The study observed that 88% of Dutch consumers who purchased a new smartphone in 2018 purchased a phone with the same OS as their old phone.  Of those who bought a smartphone with a different OS, five percent did so because their old smartphone's OS was no longer available (BlackBerry's RIM or Windows Phone), meaning that only seven percent of consumers voluntarily switched to a smartphone with a different OS.

**B.     Google Unlawfully Maintains a Monopoly in the Android App Store Market**

34.     A pre-installed app store is a virtual necessity on any smart mobile device. Consumers locate and download apps that they want to use through the app store, rely on the app store for reviews and rankings, and pay for the app (if necessary) through the app store.  Device manufacturers pre-install app stores on their smart mobile devices because an app store is an important part of value of a smart mobile device.

35.     The device manufacturers that submitted evidence in the EC proceeding confirm that it does not make sense to sell a smart mobile device without first pre-installing at least one app store.  Lenovo, for example, stated: "Devices must have a pre-installed app store with a competitive catalog of apps in order to be relevant. It is not commercially viable to sell a smart phone without an app store."  Microsoft also stated: "We believe that it is impossible to compete

---

[1] The Netherlands Authority for Consumers & Markets, "Market Study into Mobile App Stores" (April 11, 2019) ("Market Study").
[2] Market Study at 28.

without an appstore, and device manufacturers find it very important to include an appstore on their mobile devices." According to Nokia: "A pre-installed app store is an absolute requirement for any device marketed as a mobile device. While technically there are other ways to get apps on mobile devices, such as via certain websites, most consumers are not aware of this and would likely find the device close to unusable without a pre-loaded app store that offered quick access to their personal favorites (apps)."

### C.     Android App Stores Constitute a Relevant Product Market

36.     The market for Android app stores constitutes a relevant product market. This market includes the Play Store, other app stores for Google Android devices, such as Samsung's Galaxy Apps store and the Amazon AppStore, and independent app stores, such as Aptoide. It also includes app stores for non-Google ("forked") Android devices, such as the app store Amazon developed for its own Android OS (Fire OS). The direct downloading of apps without using an app store is not within the market. In the European Commission's Google Android case, Google did not contest these conclusions.

37.     The relevant market does not include app stores for non-Android smart mobile OSs such as the (now defunct) Windows Mobile Store (compatible only with Microsoft's Windows Mobile OS) or Apple's App Store (compatible only with iOS), because app stores are OS-specific. A consumer who owns an Android smartphone cannot use an app store developed for a non-Android OS, and a device manufacturer that pre-installs an app store on an Android device cannot install an app store that runs on a non-Android OS.

38.     Apple's App Store is not part of the relevant product market for the same reasons that Apple's iOS operating system is not in the same market as licensable smart mobile OSs. From a demand perspective, the App Store was developed for iOS (which is not licensable to device manufacturers) and cannot run on Android. From the supply side, Apple has never announced an intention to develop and license an app store for Android, and its success in and devotion to its vertically integrated business model makes it unlikely to do so.

39.     The relevant geographic market for Android app stores is worldwide, excluding

China.

### D.   Google Monopolizes the Android App Stores Market

40.     Google possesses monopoly power in the market for Android app stores.  This monopoly power is demonstrated by Google's market share, the existence of high barriers to entry and expansion, and the lack of countervailing buyer power.  Apple's App Store, which is not in the relevant product market, does not exercise an indirect restraint sufficient to undermine Google's monopoly power.

41.     Google's share of the Android App Stores market exceeds 90%, whether measured by the number of devices sold with the Play Store pre-installed, or the number of apps downloaded from app stores onto Android smart mobile devices.  The EC found that the Play Store is pre-installed by device manufacturers on nearly all — more than 90% — of Android mobile devices sold outside of China.  No other Android app store comes close to that number of pre-installed users. Samsung's Galaxy Apps Store, which is a distant second to the Play Store, is the only app store that has come pre-installed on more than 10% of smart mobile devices outside of China, according to the EC.  And even Samsung pre-installs its own app store alongside the Play Store. According to Samsung, it would "not be commercially feasible for an OEM to ship Android devices without Google Play preinstalled due to the variety and number of apps and contents available to users uniquely through the Google Play Store."  The other app stores have even smaller installed user bases.

42.     The Play Store also demonstrates its dominance by the number of apps downloaded from the store, and by the sheer number of apps available.  Since 2011, more than 90% of apps on Android devices have been downloaded via the Play Store.  In October of 2018, according to the Dutch ACM, the Play Store offered 3.3 million apps, compared to less than one million for Aptoide.  As Amazon said in the EC Android case, its own app store "lags behind the Play Store. . . . it has become increasingly difficult over time to obtain and retain a competitive selection of apps because, as the Play Store continues to grow by virtue of being pre-installed on all licensed Android devices, more and more app developers have focused their development efforts on

developing apps that use [Google Play Services]."

43.     Because of their small shares of the user base, other existing Android mobile app stores cannot discipline Google's exercise of monopoly power in the Android App Stores Market.

44.     Google's monopoly power is further reinforced by its bundling of the Play Store with Google Play Services.  Google Play Services is a proprietary software layer that runs in the background on Android.  It provides application programming interfaces (APIs) that enable apps to integrate with other apps and with Google services.  Many of these Google services are critical to the functioning of apps.  More than half of the apps in the Play Store, for example, use Google's cloud messaging service; nearly half use AdMob, Google's mobile advertising service.  Apps cannot access these functionalities without Google Play Services.  As the European Commission concluded, without Google Play Services, "many apps would either crash, or lack important functions."

45.     Market participants agree that access to Google Play Services is critical.  According to one mobile network operator, "without [Google Play Services] the Android OS would be more like a feature phone OS than a smartphone OS."  Because many Google and third party apps are "intimately tied with Google Play Services," according to one device manufacturer, many apps "do not function" without access to Google Play Services.

46.     Google does not license the Play Store and Google Play Services separately.  They can only be licensed together, thus further entrenching the Play Store as the number one pre-installed app store.

47.     The most dramatic proof of Google's monopoly power is its ability to impose a supracompetitive 30% commission on every app, and every in-app product or service, sold through the Play Store.  Google justifies this extortionate tax by pointing to Apple's identical commission — essentially using a grownup version of "they did it first."  But pricing by Apple — which also faces monopolization allegations —is not the most relevant comparison.  As David Heinemeir Hansson, CTO and Cofounder of Basecamp, a small internet software company, testified recently before Congress, businesses should not be required to "hand over 30% of their revenue for the

ANTITRUST CLASS ACTION COMPLAINT

privilege" of selling software through the Play Store or the App Store. "Most mobsters would not be so brazen as to ask for such an exorbitant cut. . . ." Hansson contrasted Google's 30% cut to the fees it pays to transact in the credit card processing market, where "we basically pay around 2% . . . and there are countless competitors constantly trying to win our business by offering lower rates. . . . Credit card processing is a competitive market, and the rates show. Mobile application stores are not a competitive market, and the rates show."

48. In the absence of Google's entrenched monopoly, rivals could establish app stores which compete, among other dimensions, on price. The CEO of Epic Games, for example, has suggested that "they could run a store with as little as an 8% cut while remaining profitable."

49. The only independent app store with a market share greater than 1-2% is Aptoide, which has historically offered app developers a higher percentage of sales revenue than the Play Store. Currently, the developer/app store split is 25/75%. Despite its more attractive pricing, Aptoide has not been able to attract sufficient numbers of developers to inhibit Google's monopoly power, due to Google's entrenched monopoly.

50. Nor, as discussed above, is Google's monopoly power constrained by competition at the smart mobile device level. Android device users cannot purchase apps from Apple's App Store without switching to an Apple iOS device, because Apple has not developed or licensed an app store for Android, and it does not license its OS. And Android users are unlikely to switch to an Apple phone because of the price differences between Google Android and Apple devices, the significant switching costs they would incur, and loyalty to their existing device. Locked into the Android ecosystem, users are unable to constrain Google's monopoly power.

51. Furthermore, most users of smart mobile devices cannot avoid switching costs and lock-in by acquiring more information prior to the purchase of the Android device. First, most consumers are unaware of Google's anticompetitive contractual restraints and policies. Second, consumers considering whether to switch from an Android to an Apple device are much more likely to consider features such as the price of the device, design, brand, processing power, battery life, functionality and cellular plan than they are to consider the range, quality or price of apps

13

available on the app Store.  This is especially likely when considering the cost of apps compared to the cost of a smart mobile device.

52.     Users are also unable to determine accurately the "lifecycle price" of devices at the time of purchase — *i.e.*, how much they will spend in total (including on the device and all apps and in-app purchases) during the time they own the device, because new apps will be developed, their tastes may change, and their circumstances may change.  Because users are unable to calculate the lifecycle prices of the devices at the time of purchase, they are unable to take into account Google's anticompetitive conduct when they decide which device to buy.

53.     Because Android mobile smart device users face substantial switching costs and lock-in, developers who want access to that enormous user base must also participate in the Android ecosystem.  The Play Store has by far the largest numbers of developers.  As Samsung stated in the European Commission's Google Android case: "Another important factor for developers is the fact that Google Play is the indisputable market leader for Android apps, in both number of apps and number of users.  Developers of Android apps therefore target distribution through Google Play, and have no reason to exclude Google Play as a distribution channel for their apps."

54.     There are significant barriers to entry and expansion in the market for Android app stores.  First, the cost of developing an app store that is relevant and able to compete with Google is, according to Sony, "prohibitive."  Amazon, whose app store has barely made a dent in Google's market share, has dedicated hundreds of employees and spent tens of millions of dollars annually over several years to develop and commercialize its app store.  In addition, the cost of commercializing the store would be enormous because the app store would need to convince users to try a new Android app store despite the established position of the Play Store.

55.     Other significant barriers to entry and expansion have been erected by Google, which has excluded competition through its restrictive contracts with device manufacturers and app developers and through its warning and threats to end users.

    **E.**    **Google Unlawfully Acquired and Unlawfully Maintains its Monopoly in the Android App Stores Market through Contractual Restrictions and Consumer Warnings that Unreasonably Restrain Competition**

56.    Google unlawfully acquired and has unlawfully maintained its monopoly in the Android App Stores Market through anticompetitive acts that have excluded potential competitors.

    **1.**    **Google's Contracts with Device Manufacturers**

57.    Google unreasonably restricts competition in the App Store Market by including in its contracts with device manufacturers terms and conditions that (1) require device manufacturers to accept a bundle of apps and services that include the Play Store, and (2) disadvantage other app stores by requiring device manufacturers to give preferential location to the Play Store and other Google apps on the device's home screen.

58.    The EC concluded in its Google Android decision that an app store is unlikely to succeed if device manufacturers do not pre-install the store on devices: "[P]re-installation is a key requirement for an app store in order to achieve a sufficient scale. . . ."  As one device manufacturer said: "App stores' owners try as much as possible to have their shop pre-installed in the devices as end users usually use the store which is directly available on the device."  Even Google has admitted that "[p]reloading remains valuable to users, and hence device manufacturers, despite full unbundling because most users just use what comes on the device.  People rarely change defaults."  And while Google does not outright prohibit its licensees from pre-installing app stores that could potentially compete with the Play Store, its contractual restrictions make it extremely unlikely.

59.    First, Google requires a device manufacturer that wants to pre-install Google Search or one of Google's must-have apps — such as You Tube, Google Maps or Gmail — on its devices to pre-install the entire suite of applications and services that comprises Google Mobile Services, including the Play Store.  At the time of the EC's Google Android decision, Google Mobile Services included 30 apps.

60.    Not content with requiring device manufacturers to accept the entire bundle of apps and services included in Google Mobile Services, Google also dictates the location of those apps.

The licensing contracts require device manufacturers to put the Play Store on the home screen of all devices they manufacture, and to put the additional Google apps (up to 30) either on the device's home screen or on the next page. Google thus ensures that the Play Store will be the most visible app store, making it unlikely that a user will continue scrolling until it finds a competing store.

61. In addition, Google will not license Google Play Services separately from the Play Store. As discussed above, the majority of apps on the Play Store do not function at all or cannot perform all of their intended functions without access to the services included in Google Play Services.

62. Absent these contractual restrictions, competing app stores could contract with device manufacturers to have their app store icons pre-installed and prominently displayed on smart mobile devices, increasing their exposure to consumers and app developers.

63. According to allegations by Epic, Inc., the maker of the popular game Fortnite, in its antitrust complaint against Google, Google has gone even further to prevent users from accessing competing app stores on their smart mobile devices. Epic allegedly had entered into agreements with two device manufacturers for the pre-installation of an Epic games app on Google Android devices, but Google caused the device manufacturers to cancel those agreements.

### 2. Google's Contracts with App Developers

64. Google restricts competition in the App Store Market by including terms and conditions in its contracts with app developers that limit consumers' access to competing app stores.

65. *First*, Google prohibits any app developer that wants to distribute its apps through the Play Store from also distributing any competing *app store* through the Store. Although this would be a logical and effective way to distribute app stores — which are themselves mobile apps — Google prohibits this distribution method to maintain its monopoly in the App Store Market.

66. Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Play Store. Each of the Defendants is a party to the DDA.

ANTITRUST CLASS ACTION COMPLAINT

67.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement. The DDA is non-negotiable, and developers that seek access to Android users through the Play Store must accept Google's standardized contract of adhesion.

68.     As discussed above, Google's anticompetitive restrictions in its contracts with device manufacturers discourage device manufacturers and app developers from pre-installing any competing app stores on Google Android smart mobile devices.  Further, Google discourages mobile device users from installing app stores or even apps through misleading warnings and cumbersome processes (see discussion below).  Thus, by prohibiting app developers from distributing app store apps through the Play Store, Google has effectively foreclosed any alternative.  Without these restrictions, users could download competing app stores, which would lead to increased competition, more choice, and lower prices.

69.     *Second,* Google binds app developers to the Play Store by closing off critical advertising venues to app developers that do not publish their Android apps in the Play Store. Google markets an app advertising program that includes placement on must-have advertising space, including Google Search and YouTube.  But this advertising is accessible only to app developers that publish their app in the Play Store (or, for iOS developers, in Apple's App Store). This limitation restricts competition by discouraging app developers from developing apps that are not distributed through the Play Store.

### 3.     Google's Restraints on Consumers

70.     Google further restricts competition in the App Store Market by restricting consumers' ability to download and install mobile apps and app stores. Because Google does not allow users to download other Android app stores from the Play Store, and (through its contractual restrictions on device manufacturers) makes pre-installation of competing app stores very unlikely, direct downloading by users is the only remaining avenue for app stores to attempt to compete

17

with the Play Store. However, although Google purportedly allows consumers to download and install Android apps and app stores directly, it discourages downloading by making the process difficult and by misleadingly warning users of the dangers of direct downloading, which it calls "sideloading."

71.     Consumers download apps onto their personal computers every day, easily and without incident. But a consumer who wants to download an app or an app store onto her Google Android phone or tablet without using the Play Store faces extraordinary obstacles. Google makes this process technically complex, confusing and threatening. In the EC's Google Android case, Amazon described the process as follows: "[E]ven for consumers who discover and download an alternate store outside of the Play Store, Google has configured Android to block the installation of that store. Consumers are unable to install downloadable app stores unless the consumer first navigates to and changes Android's obscure "Unknown Sources" setting to allow installation of apps from sources other than the Play Store. When consumers attempt to change this setting, Google displays a message warning that "your [tablet or phone] and personal data are more vulnerable to attack by apps from unknown sources. You agree that you are solely responsible for any damage to your tablet or loss of data that may result from using these apps."

72.     Epic's experience demonstrates the challenges faced by app developers who attempt to market their Android apps outside of the Play Store and users who attempt to sideload apps onto their Google Android devices. Before the present dispute that led to litigation before this Court, Epic had tried to stay out of the Play Store, relying instead on sideloading of its apps. Yet despite Epic's well-known brand and the enormous success of its games, Epic could not afford this strategy over the long term. In April 2020, Epic issued this statement: "After 18 months of operating Fortnite on Android outside of the Google Play Store, we've come to a basic realization. Google puts software downloadable outside of Google Play at a disadvantage, through technical and business measures such as scary, repetitive security pop-ups for downloaded and updated software, restrictive manufacturer and carrier agreements and dealings, Google public relations characterizing third party software sources as malware, and new efforts such as Google Play

Protect to outright block software obtained outside the google Play Store."

73.     And for the hardy few brave enough to download an app or app store despite Google's dire warnings of loss and damage, direct downloading is inferior to downloading an app from the Play Store, because Google bars downloaded apps from updating in the background.  As a result, the user must manually approve every update of a sideloaded app or app store, thus further discouraging consumers from using alternatives to the Play Store.

74.     Google also discourages users from downloading apps and app stores from other sources by preventing installation of or even removing apps that it deems "harmful."  While Google describes this as a way of protecting users from malware, it has blocked or removed well-known app stores used by millions of consumers, including Aptoide, the largest independent app store in the world.  Currently, Aptoide boasts more than 300 million users, seven billion downloads, one million apps, and "one of the best malware detection systems in the market."  Yet Google repeatedly removed Aptoide from users' mobile phones without their knowledge, forcing Aptoide to obtain a court order enjoining the practice.

75.     In the absence of Google's restrictions on direct downloading, app developers and distributors could at least access those consumers who are aware that Android apps exist outside the Play Store.  (As the European Commission and the Netherlands Authority for Consumers & Markets noted, most consumers are not even aware that these alternatives are available.)  By deliberately and misleadingly discouraging users from downloading apps and app stores, Google has closed off the last remaining alternative access point, cementing its monopoly position.

**F.      Google's Anticompetitive Conduct in the Android App Store Market Harms Competition**

76.     Google's anticompetitive conduct in the Android App Store Market forecloses competition in that Market and harms Android app developers and consumers.

77.     As a result of its anticompetitive conduct, which has foreclosed competition in the Android App Store Market, Google has stifled innovation, limited choice, and extracted a supracompetitive 30% tax on every paid app and many in-app purchases of products and services

19

purchased through the Play Store. But for Google's anticompetitive restrictions, app developers would be able to distribute their apps through alternative methods, including by providing apps directly to consumers, selling apps through independent app stores, creating their own competing app stores, or forming business relationships with device manufacturers which can pre-install apps.

78.     Google's conduct harms both developers and consumers by enabling Google to levy a supracompetitive 30% tax on every app and many in-app purchases of products and services purchased through the Play Store. In a competitive market the transaction fee would be lower and the output would be higher, as app developers would have more incentive and more capital to develop new apps. More competition in the market would benefit consumers through lower prices, more apps, and more innovation in how apps are distributed. Currently, consumers must search for apps in one monopolized store. In the absence of Google's anticompetitive restrictions, consumers could find apps they are interested in through other means, for example, app stores organized by subject matter.

## VI.   CLASS ALLEGATIONS

79.     Plaintiff brings this action for damages and injunctive relief on its own behalf and, pursuant to Federal Rules of Civil Procedure Rules 23(a), (b)(2) and (b)(3), on behalf of all U.S. developers of any Android OS app distributed through the Play Store.

80.     This definition excludes the defendants; defendants' affiliates and subsidiaries; defendants' current or former officers, directors, employees, agents, and representatives; the district judge or magistrate judge to whom this case is assigned, as well as those judges' chambers staff and immediate family members; and all governmental entities.

81.     Plaintiff does not know the exact number of Class members, because this information is in the exclusive control of Defendants and is not currently available to the Plaintiff. Plaintiff is informed and believes that the Class will consist of many thousands of members such that individual joinder is impracticable.

82.     Numerous questions of law and fact are common to the claims of Plaintiff and members of the proposed Class. These include, but are not limited to:

A.  Whether there is a relevant product market comprised of licensable smart mobile OSs and a relevant geographic market of the world, except for China;

B.  Whether there is a relevant product market comprised of Android App Stores and a relevant geographic market of the world, except for China;

C.  Whether Google unlawfully obtained and/or maintained monopoly power in the market for Android App Stores;

D.  Whether Google unlawfully has conditioned the contractual right of any device manufacturer to pre-install desired Google applications such as the YouTube or Google Maps apps on the device manufacturer's agreement also to install the Play Store;

E.  Whether competition in the Android App Store Market has been restrained and harmed by Google's monopolization and anticompetitive restrictions;

F.  Whether Google has imposed contractual restrictions on Plaintiff and Class members that unreasonably restrain trade;

G.  Whether Plaintiff and Class members have been harmed by Google's unlawful practices;

H.  Whether Plaintiff and Class members are entitled to declaratory or injunctive relief;

I.  Whether Plaintiff and Class members are entitled to any damages or restitution; and

J.  Whether Plaintiff and Class members are entitled to their attorney fees, costs, and expenses related to injunctive or monetary relief.

83.  Plaintiff's claims are typical of the claims of the members of the proposed Class. The factual and legal bases of Google's liability are the same and resulted in injury to Plaintiff and all the other members of the proposed classes.

84.  Plaintiff will represent and protect the interests of the proposed Class both fairly and adequately. It has retained counsel competent and experienced in complex antitrust class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed Class.

85.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86.  The defendants have acted on grounds that apply generally to the proposed Class, making final injunctive relief appropriate with respect to the Class as a whole.

87.  This class action is superior to other alternatives for the fair and efficient

adjudication of this controversy.  Prosecuting the claims as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

**VII.      CLAIMS FOR RELIEF**

**COUNT 1:**

**Sherman Act § 2**

**(Unlawful Monopoly Acquisition and/or Maintenance in the Android App Store Market)**

88.      Plaintiff restates, re-alleges, and incorporates by reference each preceding and succeeding allegation as though fully set forth herein.

89.      Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2.

90.      The Android App Store Market is a valid antitrust market.

91.      Google holds monopoly power in the Android App Store Market.

92.      Google has unlawfully acquired and/or maintained monopoly power in the Android App Store Market through the anticompetitive acts described in this Complaint, including conditioning the licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on device manufacturers' agreement to grant preferential treatment to the Google Play Store; imposing technical restrictions and obstacles for both device manufacturers and app developers, which prevent the distribution of Android apps through means other than the Google Play Store; and conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

93.      Google's conduct affects a substantial volume of interstate as well as foreign commerce.

94.      Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

95.      As an app developer, Plaintiff has been harmed by Defendants' anticompetitive

conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer damages, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 2:

### Sherman Act §§ 1 and 3
### (Unreasonable Restraints of Trade in the Android App Store Market: Device Manufacturers)

96.     Plaintiff restates, re-alleges and incorporates by reference each preceding and succeeding allegation as though fully set forth herein.

97.     Defendants' conduct violates Sections 1 and 3 of the Sherman Act, which prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ." 15 U.S.C. §§ 1, 3.

98.     Google has entered into agreements with device manufacturers that unreasonably restrict competition in the Android App Store Market. These include contracts with device manufacturers that condition their access to the Google Play Store and other "must have" Google services on the device manufacturer offering the Google Play Store as the primary and often the only viable app store on Android mobile devices.

99.     These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Store Market.

100.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

101.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

102.    As an app developer that distributes its app through the Google Play Store, Plaintiff has been harmed by Google's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer damages and such damages and

injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 3:

## Sherman Act §§ 1 and 3

## (Unreasonable Restraints of Trade in the Android App Store Market: App Developers)

103.    Plaintiff restates, re-alleges, and incorporates by reference each preceding and succeeding allegation as though fully set forth herein.

104.    Defendants' conduct violates Sections 1 and 3 of the Sherman Act, which prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ."  15 U.S.C. §§ 1, 3.

105.    Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition to having apps distributed through the Google Play Store.   The relevant provisions of these agreements unreasonably restrain competition in the Android App Store Market.

106.    Section 4.5 of the DDA prohibits developers from using the Play Store to "distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Section 4.1 of the DDA requires all developers to "adhere" to Google's Developer Program Policies.   Under the ominous heading "Device and Network Abuse," Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

107.    These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain competition in the Android App Store

Market.

108.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

109.   Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

110.   As an app developer that consumes app distribution services, Plaintiff has been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiff has suffered and continues to suffer damages, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

## COUNT 4:

## California Cartwright Act

## (Unreasonable Restraints of Trade in Android App Store Market)

111.   Plaintiff restates, re-alleges and incorporates by reference each of the preceding and succeeding allegations as though fully set forth herein.

112.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

113.   Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

114.   The Android App Store Market is a valid antitrust market.

115.   Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Store Market.

116.   Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of

25

software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play."  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

117.    These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android App Store Market.

118.    Google's conduct and practices have substantial anticompetitive effects, including increased prices and costs, reduced innovation, poorer quality customer service, and lowered output.

119.    Google's conduct harms Plaintiff which, as a direct result of Google's anticompetitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Peekya*.

120.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anticompetitive scheme took place in California.

121.    Plaintiff has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anticompetitive conduct issues.

**COUNT 5:**

**California Unfair Competition Law**

122.    Plaintiff restates, re-alleges and incorporates by reference each preceding and succeeding allegation as though fully set forth herein.

123.    Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

124.    Plaintiff has standing to bring this claim because it has suffered injury in fact and lost money as a result of Google's unfair competition. Specifically, it develops and distributes apps for the Android mobile platform, and Google's conduct has unreasonably restricted Plaintiff's ability to fairly compete in the relevant markets with these products.

125.    Google's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

126.    Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

127.    Google's conduct harms Plaintiff which, as a direct result of Google's anticompetitive conduct, is unreasonably prevented from freely distributing mobile apps, and pays a higher commission rate on downloaded apps than it would pay absent Google's conduct.

128.    Plaintiff seeks injunctive relief and restitution under the Unfair Competition Law.

129.    WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff serving as the Class Representative, and with Plaintiff's counsel as Class Counsel;

B.    Google has unlawfully acquired and unlawfully maintained a monopoly in the market for Android app stores in violation of Section 2 of the Sherman Act (15 U.S.C. § 2);

C.    Google has unreasonably restrained trade in violation of Sections 1, 2, and 3 of the

Sherman Act and the Cartwright Act;

D.     Google has engaged in unlawful, unfair or fraudulent business acts or practices in violation of California's Unfair Competition Law;

E.     Plaintiff and the Class are entitled to recover damages sustained by them, as provided by federal and state law, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15) and Section 16750 of the Cartwright Act (Cal. Bus. & Prof. Code § 16750);

F.     Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

G.     Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

    i.     A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants;

    ii.     Restitution of the fees and commissions unlawfully obtained by Defendants; and

    iii.     Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the monopolies, agreements and unlawful, unfair or fraudulent business practices alleged herein.

H.     Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class;

I.      Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

J.      Plaintiff and the Class receive such other or further relief as may be just and proper.

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint that are so triable.

Dated: September 29, 2020

Respectfully submitted,

By: */s/ Bonny E. Sweeney*
Bonny E. Sweeney (SBN 176174)
Samantha J. Stein (SBN 302034)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel.: (415) 633-1908 (main)
Tel.: (415) 633-1953 (direct)
Fax: (415) 358-4980
bsweeney@hausfeld.com
sstein@hausfeld.com

Melinda R. Coolidge (*pro hac vice forthcoming*)
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel.: (202) 540-7200 (main)
Tel.: (202) 540-7144 (direct)
Fax: (202) 540-7201
mcoolidge@hausfeld.com

Katie R. Beran (*pro hac vice forthcoming*)
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel.: (215) 985-3270 (main)
Tel.: (267) 702-3215 (direct)
Fax: (215) 985-3271
kberan@hausfeld.com

Scott A. Martin (*pro hac vice forthcoming*)
Irving Scher (*pro hac vice forthcoming*)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100 (main)

29

Tel.: (646) 357-1195 (direct)
Fax: (212) 202-4322
smartin@hausfeld.com
ischer@hausfeld.com

Michael Lewis (*pro hac vice pending*)
**The Lewis Firm PLLC**
1300 I Street NW, Suite 400E
Washington, DC 20005
Tel.: (202) 355-8895
Fax: (888) 430-6695
mlewis@lewis-firm.com

*Counsel for Plaintiff Peekya Services, Inc. and the Proposed Class*

ANTITRUST CLASS ACTION COMPLAINT