# EXHIBIT E

David Azar (State Bar No. 218319)
dazar@milberg.com
**MILBERG PHILLIPS GROSSMAN LLP**
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone:  212-594-5300
Facsimile:  212-868-1229

Peggy J. Wedgworth (*pro hac vice forthcoming*)
pwedgworth@milberg.com
Robert A. Wallner (*pro hac vice forthcoming*)
rwallner@milberg.com
Elizabeth McKenna (*pro hac vice forthcoming*)
emckenna@milberg.com
Blake Yagman (*pro hac vice forthcoming*)
byagman@milberg.com
Michael Acciavatti (*pro hac forthcoming*)*
macciavatti@milberg.com
*admitted only in Pennsylvania
**MILBERG PHILLIPS GROSSMAN LLP**
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANNE BENTLEY, JENNIFER GRACE, ADAN MOYA, CORESA TRIMBLE, and ROBERT WING, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC, GOOGLE IRELAND LIMITED, GOOGLE COMMERCE LIMITED, GOOGLE ASIA PACIFIC PTE. LIMITED, and GOOGLE PAYMENT CORP., <br><br> Defendants. | CASE NO. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................. 1

II.    JURISDICTION AND VENUE .......................................................................... 1

III.   INTRA-DISTRICT ASSIGNMENT .................................................................. 2

IV.   PARTIES ............................................................................................................. 3

V.    RELEVANT FACTUAL ALLEGATIONS ...................................................... 4

     A.  Google's Domination Of The Market For Licensable Smart Mobile Operating Systems ................................................................................. 4

     B.  Google Unlawfully Maintains A Monopoly In The Android App Store Market ..... 8

        1.  Android App Stores Constitute a Relevant Product Market ....................................... 8

        2.  Google Monopolizes the Android App Stores Market ................................................ 10

        3.  Google's Anticompetitive Conduct in the Android App Store Market .................. 15

           a.  *Google's Contracts with OEMs* ................................................................. 15

           b.  *Google's Contracts with App Developers* ................................................ 16

           c.  *Google's Restraints on Consumers* ........................................................... 18

           d.  *Anticompetitive Effects in the Android App Store Market* ...................... 21

     C.  Google Unlawfully Maintains A Monopoly In The Android In-App Payment Processing Market ................................................................. 23

        1.  Android In-App Payment Processing Constitutes a Relevant Product Market ........ 23

        2.  Google's Monopoly Power In The Android In-App Payment Processing Market .. 24

        3.  Google's Anticompetitive Conduct in the Android In-App Payment Processing Market ................................................................................. 25

        4.  Anticompetitive Effects in the Android In-App Payment Processing .................... 26

VI.   ANTITRUST INJURY ...................................................................................... 27

VII.  CLASS ALLEGATIONS ................................................................................. 27

VIII. CAUSES OF ACTION ...................................................................................... 30

IX.   PRAYER FOR RELIEF .................................................................................... 54

X.    JURY TRIAL DEMANDED ............................................................................. 55

Plaintiffs Dianne Bentley, Jennifer Grace, Adan Moya, Coresa Trimble, and Robert Wing (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action against Defendants Google LLC, Google Ireland Ltd., Google Commerce Ltd., Google Asia Pacific Pte. Ltd., and Google Payment Corp. (collectively, "Google"), and allege the following based upon information and belief, except as to those allegations that are based on Plaintiffs' personal knowledge.

## I.   **INTRODUCTION**

1.      This is an antitrust class action arising out of Google's unlawful conduct concerning the Google Play Store, Google's store for the distribution and sale of billions of applications ("apps") and in-app purchases running on Android smartphones and other mobile devices utilizing the Android operating system. Through its acquisition and maintenance of an unlawful monopoly, and its anticompetitive contractual restrictions imposed on app developers, Google has forced consumers to pay supra-competitive prices for apps and in-app purchases on the Google Play Store. Although Google has publicly acknowledged "that developers should have a choice in how they distribute their apps and that stores should compete for the consumer's and the developer's business,"[1] its unlawful conduct has prevented such choices and foreclosed competition, to the enormous detriment of consumers throughout the United States. By this action, Plaintiffs, on behalf of themselves and other consumers, seek monetary damages for injuries sustained from Google's unlawful conduct, and injunctive relief enjoining Google from continuing its anticompetitive conduct.

## II.   **JURISDICTION AND VENUE**

2.      This Court has subject-matter jurisdiction over Plaintiffs' federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

---

[1] Sameer Samat, *Listening to Developer Feedback to Improve Google Play*, ANDROID DEVELOPERS BLOG (Sept. 28, 2020), https://android-developers.googleblog.com/2020/09/listening-to-developer-feedback-to.html.

CLASS ACTION COMPLAINT

3. This Court also has subject-matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the Plaintiffs and of Defendants, and the amount in controversy exceeds $75,000.

4. Alternatively, this Court has subject-matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount-in-controversy, exclusive of costs and interests, exceeds the sum of $5,000,000, in the aggregate, there are well over 100 members of the proposed Class, and a Plaintiff and a Defendant are citizens of different states. Plaintiff Grace is a citizen of Pennsylvania and Defendants Google LLC and Google Payment are citizens of California, where they maintain their principal places of business.

5. This Court has personal jurisdiction over the Defendants. Google LLC and Google Payment are headquartered in this District. All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

### III.    **INTRA-DISTRICT ASSIGNMENT**

7. Pursuant to N.D. Cal. Civil Local Rule 3.2 and General Order 44, this antitrust class action shall not be assigned to a particular Division of this District but shall be assigned on a District-wide basis.

CLASS ACTION COMPLAINT

## IV.    **PARTIES**

8.    Plaintiff Dianne Bentley is an individual residing in North Carolina who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

9.    Plaintiff Jennifer Grace is an individual residing in Pennsylvania who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

10.    Plaintiff Adan Moya is an individual residing in Colorado who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

11.    Plaintiff Coresa Trimble is an individual residing in Missouri who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

12.    Plaintiff Robert Wing is an individual residing in Florida who purchased an application(s) and/or made an in-app purchase(s) through the Google Play Store during the relevant statutory period.

13.    Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California. Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

14.    Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

15.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and is a subsidiary of Google LLC. Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

16.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and is a subsidiary of Google LLC. Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anticompetitive contractual restrictions at issue in this suit.

17.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and is a subsidiary of Google LLC. Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

## V.     RELEVANT FACTUAL ALLEGATIONS

### A.     Google's Domination Of The Market For Licensable Smart Mobile Operating Systems

18.     Google's monopolization of the markets at issue in this case, the Android App Store Market and the Android In-App Payment Processing Market, as described in Sections V(B) and (C), are better understood through a discussion of smart mobile devices and Google's domination and control of the Android operating system of the related market for licensable smart mobile operating systems ("OSs").

19.     Smart mobile devices, including smartphones and tablets, are handheld, portable electronic devices that enable the user to connect wirelessly to the Internet and perform multi-purpose computing functions, including, but not limited to, internet browsing, shopping, accessing social media,

CLASS ACTION COMPLAINT

streaming videos and music, and playing games. Many consumers now rely solely on their smart mobile device and have no other personal computer system.

20.     Mobile devices require an operating system ("OS") to provide basic multi-purpose computing functionality, including the installation and operation of compatible mobile apps; button, touch, and motion commands; and a graphical user interface consisting of icons. A mobile operating system ("mobile OS") is an OS that is built exclusively for a mobile device, such as a smart phone or tablet.

21.     Companies that design and sell smart mobile devices are referred to as original equipment manufacturers ("OEMs"). Android is the only commercially viable OS that is widely available to license; thus, OEMs have a single mobile OS option: Google's Android OS. Accordingly, Google has monopoly power over the market for mobile OSs that are available for license by OEMs.

22.     Prior to sale, an OEM must pre-install an OS on each mobile device in order to provide purchasers with access to basic functions, including those described above. OEMs design mobile devices to ensure compatibility with whatever OS is selected for that device. Implementation of a mobile OS requires significant time and investment from OEMs, and switching to another mobile OS, as discussed in Section V(B)(2), is disruptive, expensive, and time-consuming.

23.     The vast majority of OEMs do not develop their own OS, so they must choose and license an OS for their devices. There is therefore a relevant market for licensable smart mobile OSs consisting of mobile OSs that OEMs can license for their smart mobile devices. The market does not include: (1) proprietary OSs that are unavailable for licensing, such as Apple's mobile OS, called iOS which is used on Apple's iPhone and iPad products; (2) mobile devices that lack the multi-computing functions of smart mobile devices and tablets (*e.g.*, "flip phones"); or (3) electronic devices whose OS are not compatible with mobile device OS (*e.g.*, desktop computers or gaming systems like Xbox). Historically, the market for smart mobile OSs included the Android OS, developed by Google, the Tizen mobile OS, a partially open-source mobile OS that was developed by the Linux Foundation and Samsung, and the Windows Phone OS developed by Microsoft.

CLASS ACTION COMPLAINT

24.     The geographic scope of the market for licensable smart mobile OSs is worldwide, excluding China. Google's operations in China are limited for legal and regulatory reasons, Google does not make available many of its products for mobile devices sold within China, and non-Google, Android devices are widely available and popular there. Lastly, while Google contractually requires OEMs licensing Android not to sell devices with competing Android-compatible mobile OSs outside of China, it does not impose such restrictions on devices sold within China. Outside of China, OEMs must all contractually consent that if their device licenses the Android OS, they will not sell devices preloaded with a competing, Android-compatible mobile OS.

25.     The geographic scope of the market for licensable smart mobile operating systems includes a separate sub-market within the United States which operates as described throughout this Complaint.

26.     Google possesses monopoly power in the market for licensable smart mobile OSs through its Android OS.

27.     A mobile ecosystem of products like apps, devices, and accessories typically develops around one or more mobile OSs, such as the Android OS. The "Android ecosystem" is a system of mobile products that are inter-dependent and compatible with each other and the Android OS. Ecosystem participants include Google, OEMs of Android-compatible devices, developers of Android-compatible apps, Android app distribution platforms, the makers of ancillary hardware such as headphones or speakers, cellular carriers, and others.[2] The Android ecosystem is akin to the iOS ecosystem created by Apple, "[w]hen you combine all of Google's services with Google's hardware and its frequently updated software, recreating the same type of ecosystem that Apple claims is only possible with Apple, is, indeed, possible outside of Apple . . . . Google's ecosystem is a capable one."[3]

---

[2] Jason Cipriani, *Is there an alternative to Apple's ecosystem? Yes, but you'll have to Google it*, ZD NET (May 1, 2019), https://www.zdnet.com/article/alternatives-to-apples-ecosystem-yes-there-is-a-way-out/.

[3] *Id.*

CLASS ACTION COMPLAINT

28.     As more developers design useful, compatible apps for a specific mobile OS, the more consumers will want to use that OS. The more consumers using an OS, the more developers want to develop apps for it. Thus, significant barriers to entry arise for new entrants to the OS market. A new OS appeals to consumers only if there is a broad array of software applications running on it, and software developers are not incentivized to create applications for an OS unless there is a large existing user base.

29.     In order to attract app developers and users, Google misleadingly represents that Android is an "open" ecosystem where any participant may create Android-compatible products without unnecessary restrictions. Instead, however, Google uses its Android OS to keep its ecosystem closed to any competition. As the dominant OS licensor, Google recognizes that participation on its platform is a "must-have" market for developers. Google only unlocks the door to its ecosystem for participants willing to play by Google's rules.

30.     Moreover, Google uses the Android OS to restrict which apps and app stores OEMs pre-install on their devices and to deter the direct distribution of competing app stores and apps to Android users, all at the expense of competition in the Android ecosystem.

31.     As a result of Google's monopoly power in the market for licensable smart mobile OSs, OEMs, developers and users cannot choose another mobile OS. OEMs such as ZTE and Nokia acknowledge that other, non-proprietary OSs are inadequate substitutes for and not a reasonable alternative to licensing the Android OS.[4] Other mobile OSs do not currently support many popular mobile apps that are valued by consumers. Google, therefore, has constructed a market that biases consumers against mobile device purchases from non-proprietary mobile OS other than Android OS. OEMs are forced to concede to Google's demands because it is essential that they offer a popular mobile OS and corresponding ecosystem to consumers.

---

[4] *Google Android*, No. AT.40099, European Commission Decision (July 18, 2018) ("EC Google Android Decision") at ¶ 292,
https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf.

CLASS ACTION COMPLAINT

**B.** **Google Unlawfully Maintains A Monopoly In The Android App Store Market**

32. A pre-installed app store is a necessity for mobile device users. An app store is an online portal through which software programs are made available for procurement and download. Mobile apps make mobile devices valuable to users because they add user-specific functionality for activities such as banking, shopping, making travel arrangements, streaming music and videos, reading news sources and books, and game playing.

33. While some apps are pre-installed by OEMs, due to each consumer's specific preferences, OEMs cannot anticipate the various apps a specific consumer may utilize. Furthermore, apps developed after a user purchases his or her mobile device cannot, as a practical matter, be pre-installed. Thus, mobile devices must provide a way for users to download and/or buy apps post-purchase.

### 1. Android App Stores Constitute a Relevant Product Market

34. The market for Android App Stores constitutes a relevant product market. On Android mobile devices, Google maintains its heavily dominant Google Play Store, a pre-loaded digital portal set up by Google. On the Google Play Store, mobile apps can be reviewed, purchased (if necessary), and downloaded by a consumer.

35. The European Commission has determined there is a "relevant product market" for Android app stores. Google did not contest that determination.[5]

36. Google has offered an app store for Google Android since 2008. An early version of Google's app store was known as "Android Market", which in March 2012, was integrated into Google Play and became the Google Play Store.

37. The Play Store is part of Google Mobile Services, the bundle of Google apps and services Google licenses together.

---

[5] EC Google Android Decision at ¶¶ 217(2), 273. "From a supply-side perspective, the development of an app store requires significant time and resources, regardless of whether the developer in question has already developed other apps. In particular, developers of other apps have stated that the time and resources to develop an app store are significant. Microsoft, for example, stated: 'Using [R&D data] for fiscal years 2007 to 2014, we roughly estimate that we spent [millions of dollars] over this time period to develop appstores for Windows Phone 7, 8, and 8.1.'" *Id.* at ¶ 272 (emphasis omitted).

38. Unlike other Google apps, the Play Store is not downloadable and therefore needs to be pre-installed by OEMs so that users have access to it. App developers cannot distribute alternative apps via the Play Store.

39. In order to download an app (which is either free or available for purchase), an Android user must download that application through the Google Play Store. As described by Google, "With some apps, you can buy additional content or services within the app. We call these 'in-app purchases.' …. [S]ome examples of in-app purchases [include]:

• A sword that gives you more power in a game.

• A key that unlocks more features of a free app.

• Virtual currency that can be used for purchases."[6]

40. The Android App Store Market also includes other app stores for Android devices, such as Samsung's Galaxy Apps store and the Amazon AppStore, and independent app stores, such as GetJar.

41. The Android App Store Market does not include app stores for non-Android smart mobile OSs, such as the (now defunct) Windows Mobile Store (which is compatible only with Microsoft's Windows Mobile OS) or Apple's App Store (compatible only with iOS), because app stores are OS-specific. A consumer who owns an Android smartphone cannot use an app store developed for a non-Android OS, and an OEM that pre-installs an app store on an Android device cannot install an app store that runs on a non-Android OS. The Google Play Store does not offer apps for download onto Apple devices, and the Apple Store does not offer apps for download onto Android devices.

---

[6]Google Play Help, *Make in-app purchases in Android apps*, GOOGLE, https://support.google.com/googleplay/answer/1061913?hl=en (last visited Oct. 2, 2020). Examples of "products supported by Google Play In-app billing include: Virtual game products . . . . App functionality or content . . . . subscription services . . . . [and] Cloud software products." Examples of "products not currently supported by Google Play In-app billing [include]: [r]etail merchandise . . . . Service fees . . . . One-time membership fees or recurring dues . . . . One-time payments, including peer-to-peer payments . . . . [and] Electronic bill payment . . . ." Classic Play Console Help, *Payments*, GOOGLE, https://support.google.com/googleplay/android-developer/answer/9858738?hl=en. (last visited Oct. 6, 2020).

9

CLASS ACTION COMPLAINT

42.     The relevant geographic market for the Android App Store Market is worldwide, excluding China.[7] China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China. Additionally, app stores prevalent in China are not available, or have little presence, outside of China. Outside of China, app distribution channels like app stores, are globally developed and distributed, and OEMs, in turn, make app stores like the Google Play Store globally available on Android devices.

43.     The geographic scope of the Android App Store Market includes a separate sub-market within the United States which operates as described throughout this Complaint.

## 2.     Google Monopolizes the Android App Stores Market

44.     Through various anticompetitive acts and unlawful restraints on competition, Google possesses and maintains monopoly power in the Android App Stores Market, causing ongoing harm to competition and injury to consumers. Google's monopoly power is evidenced by its market share, the absence of countervailing buyer power, and the existence of high barriers to entry and expansion. Apple's App Store (which is not part of the relevant product market), does not exercise an indirect restraint sufficient to undermine Google's monopoly power.

45.     In the Google Android case, the European Commission concluded that Google holds a dominant position in the worldwide market (excluding China) for Android App Stores since 2011.[8]

46.     The existence of iPhone mobile devices applications and in-app products and services are not reasonably interchangeable substitutes for Android apps.

47.     In a July 18, 2018 decision, the European Commission concluded that Google abused its dominant power in the Android App Store Market. The European Commission fined Google €4.34 billion for breaching EU antitrust rules, concluding that, since 2011, Google has imposed illegal restrictions on Android device manufacturers and mobile network operators to cement its dominant position in general

---

[7] *See* EC Google Android Decision at ¶ 402: "The Commission concludes that the [Android App Stores Market] for the purpose of these proceedings are: . . . the worldwide market (excluding China) for Android app stores".

[8] *Id.* at ¶ 439(2).

CLASS ACTION COMPLAINT

internet searches. The European Commission determined that, "Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterized by high barriers to entry . . . . Google's app store dominance is not constrained by Apple's App Store, which is only available on iOS devices."[9]

48.     As determined by the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary: "Apps are not interoperable between operating systems – native apps developed for [Apple's] iOS only work on iOS devices, and native apps developed for Android only work on Android devices.  The [Apple] App Store and the Play Store do not compete against one another. Android users cannot access the Apple App Store and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa." "[10]   Additionally, "app developers and industry observers agree that Apple and Google control the app distribution market on mobile devices."[11]

49.     In the United States, iOS and Android represent approximately 99% of the market share for mobile OS as of September 2020.[12] Because iOS is not licensable, it is not part of the market that is in consideration with respect to this case, which is the market for licensable OS for mobile devices. With respect to the OS which are licensable, including Samsung and Windows, neither of them has been able to penetrate the market share held by Google's Android OS.[13]

---

[9] Press Release, Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine, EUROPEAN COMMISSION (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.

[10] *Investigation of Competition in Digital Markets*, Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary, at 95 (Oct. 6, 2020), available at
https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

[11] *Id*. at 96.

[12] *Mobile Operating System Market Share United States of America*, STATCOUNTER GLOBALSTATS, (Sept. 2020) https://gs.statcounter.com/os-market-share/mobile/united-states-of-america/#monthly-202009-202009-bar.

[13] *Id.*

50.     Currently, Google's dominance of the Android App Stores market exceeds 90%. The European Commission found that the Google Play Store is pre-installed on 90% of Android devices sold outside of China.[14] Additionally, the number of apps downloadable from the various app stores shows the disparity caused by Google's monopolistic grip: in 2019, Google Play had 2.7 million available apps for download, whereas the next four closest competitors number of apps do not even add up to the total the amount of available apps on Google Play (GetJar has 850,000 apps, Aptoide has 1,000,000 apps, Amazon AppStore has 480,000 apps, and Opera Mobile Store has 300,000 apps).[15]

51.     Google's Play Store's dominance is also shown by, among other things, the number of apps downloaded from the Store, and the enormous number of apps available on the Store. The European Commission determined that more than 90% of app store downloads were processed through the Google Play Store.[16]

52.     As further evidence of its monopoly power, Google imposes a supra-competitive commission of 30% on the price of apps, and in-app products or services, purchased through the Google Play Store: "For apps and in-app products offered through Google Play, the service fee is equivalent to 30% of the price."[17] This is a far higher fee than would exist absent Google's misconduct as described herein.

53.     Google bundles the Google Play Store with Google Play Services, further reinforcing its monopoly. Google Play Services is a proprietary software layer that runs in the background on Android;

---

[14] EC Google Android Decision at ¶ 1451. The Commission concluded that even if the Windows Mobile Store share was included in the market, the Google Play Store would still possess a market share greater than 90%. *Id.*

[15] *About Us*, APTOIDE, https://en.aptoide.com/company/about-us. (last visited Oct. 5, 2020); Artyom Dogtiev, *App Stores List (2019)*, BUSINESSOFAPPS, https://www.businessofapps.com/guide/app-stores-list/.

[16] EC Google Android Decision at ¶ 1451.

[17] Play Console Help, *Service fees*, GOOGLE, https://support.google.com/googleplay/android-developer/answer/112622?hl=en#:~:text=As%20of%20January%201%2C%202018,that%20time%20will%20be%20counted. (last visited Oct. 2. 2020). As of January 1, 2018, under certain circumstances, "the service fee for subscription products decreases to 15% for any subscribers you [app developers] retain after 12 paid months." *Id.*

Google Play provides application programming interfaces (APIs) that enable apps to integrate with other apps and with Google services.[18] These Google services are necessary to the functionality of many apps. For example, the majority of apps in the Play Store use Google's cloud messaging service; and more than a million use AdMob, Google's mobile advertising service.[19] Apps cannot access these functionalities without Google Play Services. As the European Commission concluded, without Google Play Services, "many apps would either crash, or lack important functions."[20] Google does not license the Play Store and Google Play Services separately; they can only be licensed together,[21] thus further solidifying the Play Store as the number one pre-installed app store.

54.     Substantial switching costs ensure that Google's monopoly power is not constrained by any competition in the smart mobile device arena. For example, consumers who own an Android device cannot purchase apps from Apple's App Store without moving to an Apple iOS device (*e.g.*, the iPhone) because Apple does not license its OS, nor has it developed or licensed an app store for Android. Thus, any consumers who switch from a Google Android device to an Apple device would lose the financial investment made in previously-purchased apps.

55.     Additionally, once a consumer selects a smartphone, the consumer cannot replace the pre-installed mobile OS with an alternative OS -- if a consumer wants to switch OSs, that consumer has no choice but to purchase a new mobile device. Moreover, mobile OSs have different designs, controls, and functions that consumers learn to navigate and are familiar with over time. The learning curve to navigate a different mobile OS is part of consumers' switching costs.

---

[18] *Google Play Developer API*, GOOGLE DEVELOPERS, https://developers.google.com/android-publisher. (last visited Oct. 4, 2020).

[19] EC Google Android Decision at ¶ 142; Google Play, *Get paid to show relevant ads from over a million advertisers with Google AdMob*, GOOGLE DEVELOPERS, https://developer.android.com/distribute/best-practices/earn/show-ads-admob. (last visited Oct. 4, 2020).

[20] *Id.*

[21] *Id.* at ¶ 144.

56. Android OEMs find it commercially unreasonable to make and sell phones without the Google Play Store, and they view other app stores as poor substitutes because they offer fewer and less impressive apps.[22]

57. Switching from Android devices may result in a significant loss of personal and financial investment that consumers put into the Android ecosystem. Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data, even if such apps and products are available within the new ecosystem.

58. When purchasing a mobile device, consumers have no reason to inquire about Google's anticompetitive contractual restraints and policies. Mobile device purchasers are focused on design, brand, processing power, battery life, and cellular plan. These features play a decisive role in a consumer's decision as to which smart mobile device to purchase.

59. Consumers are also unable to determine the "lifecycle price" of devices -- *i.e.*, to accurately assess at the point of purchase how much they will ultimately spend (including on the device and all apps and in-app purchases) for the duration of their device ownership. Consumers do not and cannot predict all of the apps or in-app content they may eventually purchase. Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to accurately predict the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

60. Consumers who purchase Android devices are thus "locked-in" to the Android OS and Android app stores.

---

[22] Federico Etro & Cristina Caffarra, *On the economics of the Android case*, EUROPEAN COMPETITION JOURNAL Vol. 13, Nos. 2-3, 282-313 at 286-87 (Sept. 28, 2017), https://www.tandfonline.com/doi/pdf/10.1080/17441056.2017.1386957?needAccess=true (last visited Oct. 8, 2020).

### 3. Google's Anticompetitive Conduct in the Android App Store Market

61. Google has willfully and unlawfully maintained its monopoly in the Android App Store Market through a series of related anticompetitive acts.

#### a. *Google's Contracts with OEMs*

62. Google imposes anticompetitive restrictions in the Android App Store Market on OEMs by (1) crippling other app stores by requiring OEMs to give preferential location to the Play Store and other Google apps on the device's home screen; and (2) requiring OEMs to accept a bundle of apps and services that include the Google Play Store.

63. Google conditions OEM licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on an OEM's agreement to provide the Google Play Store with preferential treatment compared to any other competing app store.

64. Android OEMs (which comprise virtually all OEMs) must sign a Mobile Application Distribution Agreement ("MADA") with Google.[23] A MADA confers a license to a product bundle comprised of proprietary Google apps, Google-supplied services necessary for mobile app functionality, and the Android trademark.[24] The MADA requires OEMs to locate the Google Play Store on the home screen of each mobile device.[25] Android OEMs must further pre-install up to 30 Google mandatory apps and locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be used for competing app stores and other services.[26] These requirements ensure that the Google Play Store is the most prominent app store viewed by users; accordingly, other app stores are at a significant disadvantage.

65. As discussed, Google will not license Google Play Services separately from the Play Store. The majority of the apps on the Play Store do not function at all or cannot perform all of their intended functions without access to the services included in Google Play Services.

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

66.    Through Google's anticompetitive restrictions in its contracts with OEMs, it is able to obstruct OEMs from pre-installing competing app stores on Google's Android mobile devices. Google also insulates itself from competition by issuing misleading warnings to Android users about the efficacy of other app stores, as well as time-consuming, multi-step processes (discussed below) to those that do choose to download, in an effort to dissuade consumers from downloading said stores. By wrongfully and unjustifiably convincing OEMs not to pre-download competing app stores, and intimidating consumers that competitors' stores are unsafe to be download, Google has foreclosed the mechanisms by which it would face competition. And, because of the absence of competition, consumers pay supra-competitive prices for apps and in-app purchases.

67.    Google interferes with OEMs' ability to distribute Android app stores and apps directly to consumers outside the Google Play Store. Even in circumstances when an OEM offers mobile devices with easy access to additional mobile app stores and apps through, for example, pre-installed and/or prominently placed icons, Google imposes unjustified and pretextual warnings about the security of installing the app in order to discourage its download from alternative sources other than the Google Play Store, even though the consumer is choosing to install the app fully aware of its source. This conduct dissuades users from downloading apps outside of the Google Play Store.

         *b.*    ***Google's Contracts with App Developers***

68.    Google also imposes anticompetitive restrictions on competing app developers to further solidify its monopoly in the Android App Store Market.

69.    First, in order to maintain its monopoly in the App Store Market, Google prohibits any app developer that wants to distribute its apps through the Google Play Store from also distributing any competing app store through the Play Store.

70.    Google enforces this restraint through Google Play's Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they are permitted to distribute their

apps via the Google Play Store.[27] All of the Defendants, other than Google Payment, are a party to the DDA.[28]

71.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."[29] The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement.[30] The DDA is non-negotiable, so developers seeking access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

72.     In the absence of these unlawful restraints, competing app distributors could allow users to replace or supplement the Google Play Store on their devices with competing app stores, easily downloaded and installed through the Google Play Store. App stores could compete and benefit consumers by offering lower prices and innovative app store models, such as app stores that cater to specific consumers' interests. Without Google's unlawful restraints, these app stores would provide additional platforms on which more apps could be featured, and thereby, discovered by consumers.

73.     Google also restricts competition in the Android App Store Market by closing off critical advertising opportunities to app developers who do not list their Android apps in the Google Play Store. Google markets an App Campaigns program that, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest properties."[31] This program includes ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners," that

---

[27] *See* Google Play, *Google Play Developer Distribution Agreement*, GOOGLE, https://play.google.com/about/developer-distribution-agreement/archive.html. (last accessed Oct. 8, 2020).

[28] *Id*.

[29] *Id*.

[30] *Id*.

[31] Google Ads Help, *About App campaigns*, GOOGLE, https://support.google.com/google-ads/answer/6247380?hl=en. (last accessed Oct. 4, 2020).

17

CLASS ACTION COMPLAINT

are specially optimized for the advertising of mobile apps.[32] But to access the App Campaigns program, Google requires that app developers list their app in either the Google Play Store to reach Android users, or in the Apple App Store to reach Apple iOS users. This conduct further solidifies Google's monopoly in Android App Distribution by forcing Android app developers to list their apps in the Google Play Store or risk losing access to many Android users they could otherwise reach through advertising, including through Google's monopoly search engine, but for Google's restrictions.

### c. *Google's Restraints on Consumers*

74.   Google directly and anticompetitively restricts how consumers discover, download and install mobile apps and app stores. Although Google claims to permit consumers to directly download and install Android apps and app stores, Google uses its monopoly power to impose a series of technological obstacles designed to prevent users from direct downloads. Google misleadingly claims users face dangers of these direct downloads, referred to by Google as "sideloading."

75.   A consumer who wants to download an app or an app store onto her Google Android phone or tablet without using the Play Store faces extreme and unwarranted obstacles. Google makes this process technically complex, and confusing. In the European Commission's Google Android case, Amazon described the process as follows: "[E]ven for consumers who discover and download an alternate store outside of the Play Store, Google has configured Android to block the installation of that store. Consumers are unable to install downloadable app stores unless the consumer first navigates to and changes Android's obscure 'Unknown Sources' setting to allow installation of apps from sources other than the Play Store. When consumers attempt to change this setting, Google displays a message warning that 'your [tablet or phone] and personal data are more vulnerable to attack by apps from unknown sources. You agree that you are solely responsible for any damage to your tablet or loss of data that may result from using these apps.'"[33]

---

[32] *Id.*

[33] EC Google Android Decision at ¶ 635 citing to n.677 in Decision: "See Amazon's non-confidential response to Question 15 of the request for information of 21 October 2015 on app stores (Doc ID 4067)."

76.     According to the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary: "Google has created significant friction for sideloading apps to Android devices. One developer explained to Subcommittee staff that sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading. Additionally, software developers that have left the Play Store to distribute software to Android users via sideloading have experienced precipitous declines in downloads and revenue and report problems updating their apps. Thus, the option for sideloading apps on mobile devices does not discipline the market power of dominant app stores."[34]

77.     Even if a user proceeds past Google's unjustified threats and warnings, direct downloading is inferior to downloading an app from the Play Store because Google prevents downloaded apps from updating in the background -- a benefit reserved solely for apps downloaded via the Google Play Store. Instead, users must *manually* approve every update of a sideloaded app or app store, which further discourages consumers from using alternatives to the Play Store.

78.     Google also unjustifiably discourages users from downloading apps and app stores from other sources by preventing installation of or even removing apps that it claims are "harmful."[35]

79.     Google has the capacity to make it nearly impossible to be able to directly download (or "sideload")[36] applications; in an interview, one app developer informed the United States Congress "sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading."[37] Downloading apps directly – bypassing the Google Play Store –

---

[34] *Investigation of Competition in Digital Markets*, *supra* n.10 at 98 (footnotes omitted). *See id*. ("There are no competitive constraints on the power Apple and Google have over the software distribution marketplace on their mobile ecosystems.").

[35] Google Play Help, Help Center, *Help protect against harmful apps with Google Play Protect*, GOOGLE, https://support.google.com/googleplay/answer/2812853?hl=en (last accessed Oct. 8, 2020); *See also Unwanted Software Policy*, GOOGLE, https://www.google.com/about/unwanted-software-policy.html (last accessed Oct. 8, 2020).

[36] With respect to mobile applications, "sideloading" is the process of "downloading apps manually from the internet (through a browser [window]" from a source other than an official application store (*i.e*., not from Apple's App Store or Google's Play Store). EC Google Android Decision at ¶ 634 citing to n.675 in Decision.

[37] *Investigation of Competition in Digital Markets*, *supra* n.10 at 98 (footnotes omitted).

19

CLASS ACTION COMPLAINT

is prevented on Android devices that are part of Google's Advanced Protection Program ("APP").[38] Consumers who enroll in APP cannot directly download apps; their Android device can only download apps distributed in the Google Play Store or in another pre-installed app store that Google pre-approved an OEM to offer on its devices.[39]

80.     According to the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary, other app stores and the sideloading of apps "do not provide meaningful alternatives to the Google Play Store," and "[t]he dual dominance of the Play Store and the Android ecosystem enable Google to exert control and engage in conduct that harms competition by exploiting, excluding, and discriminating against rivals."[40]

81.     Thus, app developers cannot reach APP users unless they agree to distribute their apps through the Google Play Store or through a separate Google-approved, OEM-offered app store. Google's security pretext is an excuse to further restrict an app developer's ability to reach Android users, in contrast to personal computers, where users can securely purchase and download new software without being limited to a single source owned by the PC's manufacturer.

82.     Additionally, apps downloaded or "sideloaded" from competing app stores, or apps directly downloaded from a developer's website, may not be automatically uploaded in the background. Thus, direct downloading is not a viable way for competing app stores to reach Android users, any more than it is a viable alternative for single apps. The only difference is that app stores do not have any alternative, ensuring that Android users have no choice but to use Google Play Store. Google's barriers erected against competing app distributors also are not the least restrictive means necessary to achieve any legitimate security objectives.

83.     But for Google's anticompetitive acts, as on a personal computer, Android users could download apps from developers' websites, rather than through an app store. There is no justification that

---

[38] Google Advanced Protection Program, GOOGLE, https://landing.google.com/advancedprotection/. (last accessed Oct. 4, 2020).

[39] *Id.*

[40] *Investigation of Competition in Digital Markets*, *supra* n.10 at 221.

downloading and installing an app on a mobile device is different. Millions of personal computer users safely download and install software directly, such as through Google's own Chrome browser or Mozilla Firefox.

84. But for Google's restrictions on direct downloading, app distributors and developers would directly distribute their stores and apps to consumers. As explained above, Google makes direct downloading substantially and unnecessarily difficult, and in some cases prevents it entirely, further restricting any distribution channel.

85. There is no legitimate justification for Google's conduct challenged herein, and even if there were, Google has not adopted the least restrictive means for achieving it. For decades, PC users have installed software acquired from various sources without being deterred by anything like the obstacles set up by Google. A PC user can access an internet webpage, download and install an application, and be up and running, often in a matter of minutes. Security screening is conducted by security software operating in the background, allowing users to download software from any source they choose, unlike Android.

86. Through these anticompetitive acts, including contractual provisions and exclusionary obstacles, Google has willfully obtained a virtual monopoly over Android mobile app distribution and in the Android App Store Market. Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

### d. *Anticompetitive Effects in the Android App Store Market*

87. Google's anticompetitive conduct forecloses competition in the Android App Store Market, affecting interstate commerce with respect to this Market, causing anticompetitive harm and antitrust injury to consumers.

88. Google's anticompetitive conduct forces OEMs to commit valuable home screen space to the Google Play Store (and other required Google applications), with no regard for the OEM's preferences, including having other app stores/developers' icons on the home page. These requirements limit OEMs' ability to compete with each other on price and quality of distribution platforms for mobile

---

CLASS ACTION COMPLAINT

apps. Google's restrictions additionally interfere with OEMs' ability to compete with each other in being able to offer consumers Android devices with customized pre-installed apps curated to specific categories of mobile device consumers.

89. Google's anticompetitive conduct harms consumers by, among other things, impeding competition among app distributors, who would otherwise innovate new models of app distribution and provide consumers choices that extend beyond Google's app store.

90. Consumers are harmed, damaged and injured by Google's supra-competitive charges of 30% on the purchase price of apps and in-app purchases sold through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market unimpaired by Google's anticompetitive conduct. Google's supra-competitive prices reduce the output of mobile apps and related content by reducing app developers' incentives and capital to develop new apps and content.

91. As explained by the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary: "Developers have . . .said that the 30% commissions charged by app stores have led them to increase prices for consumers and diminished innovation by software developers."[41]

92. Google's restraint of the Android App Store Market hinders the ability and incentive for competing app stores, limiting consumers' ability to discover new apps of interest to them. If there were more competing app stores, this would permit additional platforms to feature more and more diverse collections of apps. Instead, consumers are left to search for millions of apps in one monopolized app store, where Google controls which apps are featured, identified or prioritized in user searches.

---

[41] *Investigation of Competition in Digital Markets*, *supra* n.10 at 100.

CLASS ACTION COMPLAINT

**C.** **Google Unlawfully Maintains A Monopoly In The Android In-App Payment Processing Market**

   **1.** **Android In-App Payment Processing Constitutes a Relevant Product Market**

93.    The relevant antitrust market for processing payment for digital content, including virtual gaming products, within Android apps is the "Android In-App Payment Processing Market". The Android In-App Payment Processing Market consists of the payment processing solutions that Android developers could integrate into their Android apps to process the purchase of in-app digital content.

94.    For applications purchased through the Google Play Store, Google requires use of Google Play Billing to process in-app purchases of digital content and for all purchases within Android games[42] Because 90% or more of Android-compatible mobile app downloads through an app store occur in the Google Play Store,[43] Google has a monopoly in this the Android In-App Payment Processing Market.

95.    By selling digital content within a mobile app rather than directly charging for the app itself, app developers can make an app widely accessible to all users, then generate revenue to fund development of new apps. For example, by allowing users of gaming apps to play games without up-front costs, developers permit more players try a game "risk free" and only pay for what they want to access. Many games are free to download and play but make additional content available for in-app purchases on an à la carte basis or via a subscription-based service.

96.    Google offers separate payment solutions for the purchase of digital content than it does for other types of purchases, even within mobile apps. Google Play Billing can be used for the purchase of digital content and virtual gaming products.

97.    Google's anticompetitive conduct ensures that Android app developers cannot integrate compatible payment processors into their apps to facilitate the purchase of in-app digital content. Nor

---

[42] Play Console Help, Policy Center, Monetization and Ads, *Payments*, GOOGLE, https://support.google.com/googleplay/android-developer/answer/9858738, (last accessed Oct. 8, 2020).

[43] Press Release, Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine, *supra* n.9.

can app developers utilize any one of the many electronic payment processing options available to process in-app purchases and other transactions. Instead, Google conditions developers' access to the dominant Google Play Store on an agreement to use Google Play Billing[44] to process in-app purchases of digital content. This directly affects consumers.

98.     Absent Google's anticompetitive conduct, app developers would integrate payment processors into their apps to facilitate in-app purchases or develop such functionality themselves. App developers would be able to offer consumers a choice among multiple payment processors for each purchase, comparable to options of using different credit cards, Apple pay, etcetera at brick-and-mortar stores or on websites. This would result in lower prices for consumers.

### 2.     Google's Monopoly Power In The Android In-App Payment Processing Market

99.     Google has monopoly power in the Android In-App Payment Processing Market, including the relevant antitrust sub-market for the processing of payments for the purchase of virtual products within mobile apps games (the "Android Games Payment Processing Market").

100.     The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools available in China are not available outside of China, including because Google prevents the use of non-Google payment processing tools for all apps distributed through the Google Play Store, which dominates distribution of apps outside of China.

101.     The geographic scope of the Android In-App Payment Processing Market includes a separate sub-market within the United States which operates as described throughout this Complaint.

102.     Google charges a 30% commission for Google Play Billing. This rate reflects Google's market power, which allows it to charge consumers supra-competitive prices for payment processing within the Android In-App Payment Processing Market. The cost of alternative electronic payment

---

[44] *Payments*, *supra* n.42.

processing tools, which are prohibited by Google for apps and in-app purchases through the Google Play Store, are as little as one tenth of the 30% cost of Google Play Billing.

103. For example, the electronic processing payment rate for online payment processing company PayPal is 2.9%,[45] for Stripe it is 2.9%,[46] and for Square it ranges from 2.6%-3.5%,[47] all of which are substantially less than the supra-competitive rate that Google charges.

### 3. Google's Anticompetitive Conduct in the Android In-App Payment Processing Market

104. Through provisions of Google's DDA imposed on all app developers seeking access to Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Store Market, to its own in-app payment processing tool, Google Play Billing. Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Google Payment, to receive payment for and from apps and in-app digital content.[48]

105. Section 4.1 of the DDA makes compliance with Google's Developer Program Policies mandatory and those Policies require in relevant part that (1) app developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment; and (2) app developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except when the payment is solely for physical products or is for digital content that may be consumed outside of the app itself (*e.g.*, songs that can be played on other music players).[49]

---

[45] PayPal Editorial Staff, *Credit card processing fees: What business owners need to know*, PAYPAL, (May 15, 2020), https://www.paypal.com/us/brc/article/understanding-merchant-credit-card-processing-fees.

[46] Pricing, *Pricing built for businesses of all sizes. Always know what you'll pay.*, STRIPE, https://stripe.com/pricing. (last accessed Oct. 4, 2020).

[47] *How much does Square cost?*, SQUARE, INC., https://squareup.com/us/en/pricing?solution=pricing-in-person-payments. (last accessed Oct. 4, 2020).

[48] *See Google Play Developer Distribution Agreement*, supra n.28.

[49] *Id.*

CLASS ACTION COMPLAINT

106.    Google's unlawful restraints in the DDA prevent app developers from integrating alternative, and multiple, payment processing solutions into their mobile apps, depriving consumers the availability of competing payment processors with lower fees.

107.    Google has no legitimate justification for this conduct. If, for example Google was concerned about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app.[50] But Google *does* allow alternative payment processing tools in that context, with no compromise to security.[51]

### 4.    Anticompetitive Effects in the Android In-App Payment Processing

108.    Google's conduct harms competition in the Android In-App Payment Processing Market (including the Android Games Payment Processing Market) and injures consumers, app developers, and competing in-app payment processors.

109.    Google's conduct harms would-be competitor in-app payment processors who would otherwise be free to offer consumers alternative payment processing tools with lower prices and improved functionality.

110.    Google also harms consumers by requiring that in-app purchases are transacted through Google Play Billing, preventing app developers from providing customer service to consumers without Google's involvement. Google has minimal incentive to compete through improved customer service because it faces no competition. In obtaining information concerning app developers' transactions with their customers, Google has an anticompetitive edge in its advertising, whether or not app developers and consumers want to share their information with Google. In these ways as well as others, Google directly harms app developers' relationships with consumer who use their apps and make in-app purchases.

111.    Google raises consumer prices through its supra-competitive 30% tax on app and in-app purchases, a fee that consumers would not be paying in a competitive payment processing market. These

---

[50] *Id.*

[51] *Id.*

prices reduce app developers' incentives to invest in and create additional apps and in-app content for consumers.

## VI.   ANTITRUST INJURY

112.   Plaintiffs and Class members have suffered antitrust injury as a direct result of Google's unlawful conduct.

113.   By unlawfully restricting competition in the Android App Store Market, Google's unlawful conduct has enabled it to charge supra-competitive prices to consumers.

114.   By unlawfully impairing competition in the Android In-App Payment Processing Market, Google's unlawful conduct has enabled it to charge supra-competitive prices to consumers.

115.   Plaintiffs and Class members are the direct purchasers of Android apps and in-app purchases. When Plaintiffs and Class members purchase Android apps, they do so directly on Google Play and pay Google directly, using their credit card or other payment sources. When Plaintiffs and Class members purchase in-app digital content, they do through Google Play, using the payment source set up when purchasing that app or other apps on Google Play. When Plaintiffs and Class members purchase the in-app digital content, they pay/paid Google directly.

## VII.   CLASS ALLEGATIONS

116.   Plaintiffs bring this action on  behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> **All persons in the United States who purchased an app or in-app product or service on the Google Play Store.**

117.   Excluded from the Class are Defendants; Defendants' current or former officers, directors, employees, agents and/or representatives; Defendants' affiliates and subsidiaries; any entity in which any Defendant has a controlling interest; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action; and all governmental entities.

118.    The Class is readily ascertainable and the records for the Class should exist, including, specifically, within Defendants' own records and transaction data.

119.    Due to the nature of the trade and commerce involved, there are least one million geographically-dispersed members in the Class, the exact number and their identities being known to Defendants, such that individual joinder in this case is impracticable.

120.    Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein. The damages and injuries of each member of the Class were directly caused by Defendants' wrongful conduct.

121.    Plaintiffs and their counsel will fairly and adequately protect and represent the interests of the Class. Counsel for Plaintiffs are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert the claims of Class members. Plaintiffs will represent and protect the interests of the proposed Class both fairly and adequately. Plaintiffs have no interests that are antagonistic to those of the proposed Class, and their interests do not conflict with the interests of the proposed Class members they seek to represent.

122.    Numerous questions of law and fact are common to the claims of Plaintiffs and members of the proposed Class, and those questions predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

- Whether there is a relevant Android App Store Market;
- Whether there is a relevant worldwide geographic market, excluding China;
- Whether Google unlawfully obtained and/or maintained monopoly power in the market for Android App Stores;
- Whether competition in the Android App Store Market has been restrained and harmed by Google's monopolization and anticompetitive restrictions;
- Whether there is a relevant Android In-App Payment Processing Market;

28

CLASS ACTION COMPLAINT

- Whether Google unlawfully obtained and/or maintained monopoly power in the Android In-App Payment Processing Market;

- Whether competition in the Android In-App Payment Processing Market has been restrained and harmed by Google's monopolization and anticompetitive restrictions;

- Whether Google's contractual restrictions for Google Play further Google's attempt to monopolize the Android App Store Market;

- Whether Google's restrictions on sideloading apps is an attempt to, and does further maintain Google's monopoly over the Android App Store Market;

- Whether Google's conduct results in supra-competitive prices for Android apps, in-app purchases, and/or subscriptions to apps obtained in the Google Play Store;

- Whether Plaintiffs and Class members have been harmed by Google's unlawful practices;

- Whether Plaintiffs and Class members are entitled to injunctive relief; and

- The appropriate Class-wide measures of damages

123.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the Class members to seek redress for the violations of law alleged herein.

CLASS ACTION COMPLAINT

**VIII.    CAUSES OF ACTION**

**COUNT 1**
**SHERMAN ACT § 2**
**UNLAWFUL MONOPOLY AND/OR MAINTENANCE OF MONOPOLY**
**For Damages and Injunctive Relief**
**(Against All Defendants)**

124.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

125.    Google's conduct violates § 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

126.    The Android App Store Market and the Android In-App Payment Processing Market (including the Android Games Payment Processing Market) are valid and relevant antitrust markets.

127.    Google holds monopoly power in each of the foregoing markets.

128.    Google has unlawfully maintained monopoly power in foregoing markets through the anticompetitive acts described herein, including, but not limited to: (1) impermissibly and unjustifiably interfering with consumers' ability to purchase apps and in-app purchases outside the Google Play Store; (2) impermissibly and unjustifiably interfering with consumers' ability to use payment processing tools, other than Google Play Billing, for in-app purchases; (3) conditioning licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement, giving the Google Play Store preferential placement and treatment; (4) imposing technical restrictions and obstacles on both OEMs and app developers that prevent the distribution of Android apps to consumers through means other than the Google Play Store; and (3) conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

129.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

130.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers, reduced innovation and quality of service, and lowered output.

30
CLASS ACTION COMPLAINT

131.    Plaintiffs were injured and damaged by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost alternatives, that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 2**
**SHERMAN ACT § 1**
**UNLAWFUL RESTRAINTS OF TRADE**
**For Damages and Injunctive Relief**
**(Against All Defendants)**

132.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

133.    Defendants' conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

134.    Google entered into agreements with third parties that unreasonably restrict competition in the Android App Store Market and the Android In-App Payment Processing Market (including the Android Games Payment Processing Market).

135.    These include (i) MADA with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary (and often the only) viable app store on Android mobile devices; and (ii) agreements with app developers that restrict the use of payment processing systems other than Google Play Billing.

136.    These agreements serve no legitimate or pro-competitive purpose that justify their anticompetitive effects, and they unreasonably restrain competition in the foregoing markets.

137.    Google's conduct affects a substantial volume of interstate as well as foreign commerce.

138.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers, reduced innovation and quality of service, and lowered output.

139.    Plaintiffs were harmed and injured by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

### COUNT 3
### CALIFORNIA CARTWRIGHT ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

140.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

141.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id.* §§ 16720, 16726.

142.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

143.    The Android App Store Market and the Android In-App Payment Processing Market (including the Android Games Payment Processing Market) are relevant antitrust markets.

144.    Google has monopoly power in the foregoing markets.

145.    Google has executed agreements with OEMs that unreasonably restrict competition in the foregoing markets. Google entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices. These agreements

further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

146. Additionally, Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Store Market.

147. Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

148. Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google

expressly and discriminatorily applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

149.    Google's conduct has no legitimate or pro-competitive purpose or effect, and unreasonably restrains competition in the Android App Store Market and the Android In-App Payment Processing Market (including in the Android Games Payment Processing Market).

150.    Google's conduct and practices have substantial anticompetitive effects, including increased prices to consumers, reduced innovation, poorer customer service and lowered output.

151.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anticompetitive scheme took place in California.

152.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

### COUNT 4
### ARIZONA UNIFORM STATE ANTITRUST ACT
#### For Damages and Injunctive Relief
#### (Against all Defendants)

153.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

154.    Google's acts and practices detailed above violate the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. § 44-1401, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 44-1402, and monopolization or attempted monopolization of trade

or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 44-1403.

155.    Google's conduct and practices have substantial anticompetitive effects in Arizona, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

156.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

<u>**COUNT 5**</u>
**DISTRICT OF COLUMBIA ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

157.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

158.    Google's acts and practices detailed above violate the District of Columbia Antitrust Act, D.C. Code § 28-4501, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 28-4502, and monopolization or attempted monopolization over any part of trade or commerce for the purpose of excluding competition or controlling, fixing or maintaining prices, *id.* § 28-4503.

159.    Google's conduct and practices have substantial anticompetitive effects in the District of Columbia, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

CLASS ACTION COMPLAINT

160. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**<u>COUNT 6</u>**
**HAWAII ANTITRUST LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

161. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

162. Google's acts and practices detailed above violate Hawaii's antitrust laws, Haw. Rev. Stat. § 480-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 480-4, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 480-9.

163. Google's conduct and practices have substantial anticompetitive effects in Hawaii, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

164. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT

## COUNT 7
## ILLINOIS ANTITRUST ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

165.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in this Complaint as if fully set forth herein.

166.    Google's acts and practices detailed above violate the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 10/3.

167.    Google's conduct and practices have substantial anticompetitive effects in Illinois, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

168.    Plaintiffs have been harmed by Defendants' anticompetitive conduct in a manner that the Illinois Antitrust Act was intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 8
## IOWA COMPETITION LAW
### For Damages and Injunctive Relief
### (Against all Defendants)

169.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

170.    Google's acts and practices detailed above violate the Iowa Competition Law, Iowa Code § 553.1, *et seq.*, which prohibits, *inter alia*, combinations to restrain or monopolize trade or commerce,

*id.* § 553.4, and the monopolization or attempted monopolization of a market for the purpose of excluding competition or of controlling, fixing, or maintaining prices, *id.* § 553.5.

171. Google's conduct and practices have substantial anticompetitive effects in Iowa, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

172. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 9
## KANSAS RESTRAINT OF TRADE ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

173. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

174. Google's acts and practices detailed above violate the Kansas Restraint of Trade Act, Kan. Stat. § 50-101, *et seq.*, which prohibits, *inter alia*, combinations to create or carry out restrictions in trade or commerce, increase the price of merchandise, or prevent competition in the sale of merchandise, *id.*

175. Google's conduct and practices have substantial anticompetitive effects in Kansas, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

176. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not

engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 10**
**MAINE MONOPOLY & PROFITEERING LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

177. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

178. Google's acts and practices detailed above violate Maine's monopoly and profiteering laws, Me. Rev. Stat. tit. 10, § 1101, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 1102.

179. Google's conduct and practices have substantial anticompetitive effects in Maine, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

180. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT

**COUNT 11**
**MARYLAND ANTITRUST LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

181.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

182.   Google's acts and practices detailed above violate Maryland's antitrust laws, Md. Code, Com. Law § 11-201, *et seq.*, which prohibit, *inter alia*, combinations that unreasonably restrain trade or commerce, *id.* § 11-204, and the monopolization or attempted monopolization of any part of the trade or commerce for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce, *id.*

183.   Google's conduct and practices have substantial anticompetitive effects in Maryland, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

184.   Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 12**
**MASSACHUSETTS CONSUMER PROTECTION LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

185.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

40

CLASS ACTION COMPLAINT

186.   Google's acts and practices detailed above violate Massachusetts' consumer protection laws, Mass. Gen. Laws ch. 93A, § 1, *et seq.*, which prohibit, *inter alia*, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, *id.* § 2.

187.   Google's conduct and practices have substantial anticompetitive effects in Massachusetts, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

188.   Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 13
### MICHIGAN ANTITRUST REFORM ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

189.   Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

190.   Google's acts and practices detailed above violate the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 445.772, and the establishment or attempted establishment of a monopoly of trade or commerce for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, *id.* § 445.773.

191.   Google's conduct and practices have substantial anticompetitive effects in Michigan, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

CLASS ACTION COMPLAINT

192.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 14**
**MINNESOTA ANTITRUST LAW OF 1971**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

193.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

194.    Google's acts and practices detailed above violate the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, which prohibits, *inter alia*, combinations in unreasonable restraint of trade or commerce, *id.* § 325D.51, and the establishment or attempted establishment of a monopoly over any part of trade or commerce for the purpose of affecting competition or controlling, fixing, or maintaining prices, *id.* § 325D.52.

195.    Google's conduct and practices have substantial anticompetitive effects in Minnesota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

196.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages

and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 15
### MISSISSIPPI ANTITRUST LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

197. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

198. Google's acts and practices detailed above violate Mississippi's antitrust laws, Miss. Code. § 75-21-1, *et seq.*, which prohibit, *inter alia*, combinations inimical to the public welfare that restrain trade, increase the price of a commodity, or reduce the production of a commodity, *id.*

199. Google's conduct and practices have substantial anticompetitive effects in Mississippi, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

200. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 16
### NEBRASKA JUNKIN ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

201. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

43

CLASS ACTION COMPLAINT

202.     Google's acts and practices detailed above violate the Junkin Act, Neb. Rev. Stat. § 59-802, *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, *id.* § 59-802, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 16726.

203.     Google's conduct and practices have substantial anticompetitive effects in Nebraska, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

204.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 17
### NEVADA UNFAIR TRADE PRACTICES ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

205.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

206.     Google's acts and practices detailed above violate the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 598A.060.

207.     Google's conduct and practices have substantial anticompetitive effects in Nevada, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

208.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 18**
**NEW HAMPSHIRE CONSUMER PROTECTION ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

209.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

210.    Google's acts and practices detailed above violate the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, which prohibits, *inter alia*, the pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition, *id.* § 358-A:2.

211.    Google's conduct and practices have substantial anticompetitive effects in New Hampshire, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

212.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 19**
**NEW MEXICO ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

213.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

214.     Google's acts and practices detailed above violate the New Mexico Antitrust Act, N.M. Stat. § 57-1-1, *et seq.*, which prohibits, *inter alia*, the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 57-1-2, and combinations in restraint of trade or commerce, *id.* § 57-1-1.

215.     Google's conduct and practices have substantial anticompetitive effects in New Mexico, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

216.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 20**
**NEW YORK DONNELLY ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

217.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

218.     Google's acts and practices detailed above violate New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*, which prohibits, *inter alia*, monopoly in the conduct of any business, trade or commerce or in the furnishing of any service, *id.* § 340.

219.     Google's conduct and practices have substantial anticompetitive effects in New York, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

220.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 21
### NORTH CAROLINA ANTITRUST LAWS
**For Damages and Injunctive Relief**
**(Against all Defendants)**

221.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

222.     Google's acts and practices detailed above violate North Carolina's antitrust laws, N.C. Gen. Stat. § 75-1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.* § 75-1, and the monopolization or attempted monopolization of any part of trade or commerce, *id.* § 75-2.1.

223.     Google's conduct and practices have substantial anticompetitive effects in North Carolina, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

224.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not

CLASS ACTION COMPLAINT

engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 22**
**NORTH DAKOTA UNIFORM STATE ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

225. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

226. Google's acts and practices detailed above violate the North Dakota Uniform State Antitrust Act, N.D. Cent. Code § 51-08.1-01, *et seq.*, which prohibits, *inter alia*, combinations in restraint of, or to monopolize, trade or commerce, *id.* § 51-08.1-02, and the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, *id.* § 51-08.1-03.

227. Google's conduct and practices have substantial anticompetitive effects in North Dakota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

228. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 23
## OREGON ANTITRUST LAW
### For Damages and Injunctive Relief
### (Against all Defendants)

229.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

230.    Google's acts and practices detailed above violate the Oregon Antitrust Law, Or. Rev. Stat. § 646.705, *et seq.*, which prohibits, *inter alia*, combinations in restraint of trade or commerce, *id.* § 646.725, and monopolization or attempted monopolization of any part of trade or commerce, *id.* § 646.730.

231.    Google's conduct and practices have substantial anticompetitive effects in Oregon, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

232.    Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 24
## SOUTH DAKOTA ANTITRUST LAWS
### For Damages and Injunctive Relief
### (Against all Defendants)

233.    Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

234.     Google's acts and practices detailed above violate South Dakota's antitrust laws, S.D. Codified Laws § 37-1-3.1, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce, *id.*, and monopolization or attempted monopolization of trade or commerce, *id.* § 37-1-3.2.

235.     Google's conduct and practices have substantial anticompetitive effects in South Dakota, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

236.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

## COUNT 25
### TENNESSEE TRADE PRACTICES ACT
### For Damages and Injunctive Relief
### (Against all Defendants)

237.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

238.     Google's acts and practices detailed above violate the Tennessee Trade Practices Act, Tenn. Code § 47-25-101, *et seq.*, which prohibits, *inter alia*, combinations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, *id.*

239.     Google's conduct and practices have substantial anticompetitive effect in Tennessee, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

CLASS ACTION COMPLAINT

240. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 26**
**UTAH ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

241. Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

242. Google's acts and practices detailed above violate the Utah Antitrust Act, Utah Code § 76-10-3101, *et seq.*, which prohibit, *inter alia,* combinations in restraint of trade or commerce, *id.* § 76-10-3104, and monopolization or attempted monopolization of any part of trade or commerce, *id.*

243. Google's conduct and practices have substantial anticompetitive effect in Utah, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

244. Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

CLASS ACTION COMPLAINT

**COUNT 27**
**VERMONT CONSUMER PROTECTION LAWS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

245.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in the Complaint as if fully set forth herein.

246.     Google's acts and practices detailed above violate Vermont's consumer protection laws, Vt. Stat. tit. 9, § 2451, *et seq.*, which prohibit, *inter alia*, all unfair methods of competition in commerce, *id.* § 2453.

247.     Google's conduct and practices have substantial anticompetitive effects in Vermont, including increased prices to consumers, reduced innovation, poorer customer service, and lowered output.

248.     Plaintiffs were harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were intended to prevent. For example, Plaintiffs paid supra-competitive prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose between the Google Play Store and lower cost market alternatives that would have been available had Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction is entered ending Google's anticompetitive conduct.

**COUNT 28**
**WEST VIRGINIA ANTITRUST ACT**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

249.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding allegation in this Complaint as if fully set forth herein.

250.     Google's acts and practices detailed above violate West Virginia Antitrust Act, W. Va. Code §§ 47-18-1 – 47-18-23, which prohibits, *inter alia*, combinations in restraint of trade or commerce,

52

1     *id.* § 47-18-3, and the monopolization or attempted monopolization of any part of trade or commerce, *id.*

2     § 47-18-4.

3        251.     Google's conduct and practices have substantial anticompetitive effects in West Virginia,

4     including increased prices to consumers, reduced innovation, poorer customer service, and lowered

5     output.

6        252.     Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner that the

7     West Virginia Antitrust Act was intended to prevent. For example, Plaintiffs paid supra-competitive

8     prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose

9     between the Google Play Store and lower cost market alternatives that would have been available had

10     Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer

11     damages and irreparable injury, and such damages and injury will not abate until an injunction is entered

12     ending Google's anticompetitive conduct.

**COUNT 29**
**WISCONSIN TRADE REGULATIONS**
**For Damages and Injunctive Relief**
**(Against all Defendants)**

16        253.     Plaintiffs restate, re-allege, and incorporate by reference each preceding and succeeding

17     allegation in the Complaint as if fully set forth herein.

18        254.     Google's acts and practices detailed above violate Wisconsin's trade regulations, Wis.

19     Stat. Ann. § 133.01, *et seq.*, which prohibit, *inter alia*, combinations in restraint of trade or commerce,

20     *id.* § 133.03, and monopolization or attempted monopolization of any part of trade or commerce, *id.*

21     Google's conduct and practices have substantial effects in Wisconsin, including increased prices to

22     consumers, reduced innovation, poorer customer service, and lowered output.

23        255.     Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner that

24     Wisconsin's trade regulations were intended to prevent. For example, Plaintiffs paid supra-competitive

25     prices for apps and/or in-app purchases. Additionally, Plaintiffs were deprived of the ability to choose

26     between the Google Play Store and lower cost market alternatives that would have been available had

CLASS ACTION COMPLAINT

1  Google not engaged in the misconduct challenged herein. Plaintiffs have suffered and continue to suffer

2  damages and irreparable injury, and such damages and injury will not abate until an injunction is entered

3  ending Google's anticompetitive conduct.

4  **IX.**  **PRAYER FOR RELIEF**

5        WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs

6  and against Defendants and order the following relief:

7        A.  Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure

8  23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

9        B.  Preliminarily and permanently enjoining Defendants from engaging in the wrongful

10  conduct alleged herein;

11        C.  Declaring Defendants' conduct unlawful under the statutes and causes of action alleged

12  herein;

13        D.  Awarding Plaintiffs and the Class treble damages for injuries caused by Defendants'

14  violations of the federal antitrust laws, California's Cartwright Act, the Arizona Uniform State Antitrust

15  Act, the District of Columbia Antitrust Act, the Hawaii antitrust laws, the Illinois Antitrust Act, the Iowa

16  Competition Law, the Kansas Restraint of Trade Act, Maine's monopoly and profiteering laws,

17  Maryland's antitrust laws, Massachusetts' consumer protection laws, the Michigan Antitrust Reform Act,

18  the Minnesota Antitrust Law of 1971, the Mississippi antitrust laws, Nebraska's Junkin Act, the Nevada

19  Unfair Trade Practices Act, the New Hampshire Consumer Protection Act, the New Mexico Antitrust

20  Act, New York's Donnelly Act, North Carolina's antitrust laws, the North Dakota Uniform State

21  Antitrust Act, the Oregon Antitrust Law, South Dakota's antitrust laws, the Tennessee Trade Practices

22  Act, the Utah Antitrust Act, Vermont's consumer protection laws, the West Virginia Antitrust Act, and

23  Wisconsin's trade regulations; and other monetary relief, including prejudgment and post judgment

24  interest, to the maximum extent permitted by law;

25        E.  Awarding Plaintiffs and the Class reasonable attorneys' fees and costs; and

26        F.  Granting such other and further relief as the Court may deem just and proper.

27

28  54

## X.     JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of all issues so triable.

Dated:  October 9, 2020                              Respectfully submitted,

                                                **MILBERG PHILLIPS GROSSMAN LLP**


                                                /s/ David Azar
                                                David Azar (State Bar No. 218319)
                                                dazar@milberg.com
                                                16755 Von Karman Avenue, Suite 200
                                                Irvine, California 92606
                                                Telephone: (212) 594-5300
                                                Facsimile: (212) 868-1229

                                                Peggy J. Wedgworth (*pro hac vice forthcoming*)
                                                pwedgworth@milberg.com
                                                Robert A. Wallner (*pro hac vice forthcoming*)
                                                rwallner@milberg.com
                                                Elizabeth McKenna (*pro hac vice forthcoming*)
                                                emckenna@milberg.com
                                                Blake Yagman (*pro hac vice forthcoming*)
                                                byagman@milberg.com
                                                Michael Acciavatti (*pro hac forthcoming*)*
                                                macciavatti@milberg.com
                                                *admitted only in Pennsylvania
                                                **MILBERG PHILLIPS GROSSMAN LLP**
                                                One Penn Plaza, Suite 1920
                                                New York, New York 10119
                                                Telephone: 212-594-5300
                                                Facsimile: 212-868-1229

                                                *Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Dianne Bentley, Jennifer Grace, Adan Moya, Coresa Trimble, Robert Wing, on behalf of themselves and all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff   Cumberland County, NC
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment.

## DEFENDANTS

Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, and Google Payment Corp.

County of Residence of First Listed Defendant   Santa Clara
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1   U.S. Government Plaintiff

2   U.S. Government Defendant

3   Federal Question
    *(U.S. Government Not a Party)*

4   Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ | | | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Pharmaceutical Personal | **LABOR** | **PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | Injury Product Liability | 710 Fair Labor Standards Act | 820 Copyrights | 430 Banks and Banking |
| | 340 Marine | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit |
| 153 Recovery of Overpayment | 360 Other Personal Injury | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| of Veteran's Benefits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | **IMMIGRATION** | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 160 Stockholders' Suits | | | 462 Naturalization Application | 862 Black Lung (923) | 850 Securities/Commodities/Exchange |
| 190 Other Contract | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 195 Contract Product Liability | 440 Other Civil Rights | **HABEAS CORPUS** | | 864 SSID Title XVI | 891 Agricultural Acts |
| 196 Franchise | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 895 Freedom of Information Act |
| **REAL PROPERTY** | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 896 Arbitration |
| 210 Land Condemnation | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 220 Foreclosure | 445 Amer. w/Disabilities–Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | |
| 230 Rent Lease & Ejectment | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 240 Torts to Land | 448 Education | 540 Mandamus & Other | | | |
| 245 Tort Product Liability | | 550 Civil Rights | | | |
| 290 All Other Real Property | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

1 Original Proceeding

2 Removed from State Court

3 Remanded from Appellate Court

4 Reinstated or Reopened

5 Transferred from Another District *(specify)*

6 Multidistrict Litigation–Transfer

8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   Yes   No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE

DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*   **SAN FRANCISCO/OAKLAND**   **SAN JOSE**   **EUREKA-MCKINLEYVILLE**

DATE

SIGNATURE OF ATTORNEY OF RECORD

**Attachment to Civil Cover Sheet**

I.   PLAINTIFF'S ATTORNEYS

David Azar
**MILBERG PHILLIPS GROSSMAN LLP**
16755 Von Karman Avenue, Suite 200
Irvine, California 92606
Telephone:  212-594-5300

Peggy J. Wedgworth*
Robert A. Wallner *
Elizabeth McKenna*
Blake Yagman*
Michael Acciavatti*
**MILBERG PHILLIPS GROSSMAN LLP**
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300

* *Pro hac vice* application forthcoming

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a)  Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **b)  County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **c)  Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II.  Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

   (1)  United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

   (2)  United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

   (3)  Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

   (4)  Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.  Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.  Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.  Origin.** Place an "X" in one of the six boxes.

   (1)  Original Proceedings. Cases originating in the United States district courts.

   (2)  Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

   (3)  Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

   (4)  Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

   (5)  Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

   (6)  Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

   (8)  Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

   Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.  Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII.  Requested in Complaint.  Class Action.** Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.  Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX.  Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.