# EXHIBIT A

Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
Amanda M. Karl (SBN 301088)
Alexander J. Bukac (SBN 305491)
ehg@classlawgroup.com
amm@classlawgroup.com
amk@classlawgroup.com
ajb@classlawgroup.com
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ZACHARIA GAMBLE and NICHOLAS HESS**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**GOOGLE LLC and ALPHABET INC.**,<br><br>Defendants. | Case No. 3:20-cv-7984<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1. **MONOPOLIZATION UNDER THE SHERMAN ACT (15 U.S.C. § 2);**<br><br>2. **ATTEMPTED MONOPOLIZATION UNDER THE SHERMAN ACT (15 U.S.C. § 2); and**<br><br>3. **CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*).**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   PARTIES .......................................................................................................... 2

    A.   Plaintiffs ................................................................................................. 2

    B.   Defendants ............................................................................................. 2

III.  JURISDICTION AND VENUE ........................................................................ 3

IV.   INTRA-DISTRICT ASSIGNMENT ................................................................ 3

V.    FACTUAL ALLEGATIONS ............................................................................ 4

    A.   Google's Rise to Prominence ................................................................. 4

    B.   Android and the Mobile App Market ...................................................... 5

    C.   Google Maintains a Monopoly in the Android Mobile App Market ........ 8

VI.   RELEVANT MARKET .................................................................................... 9

VII.  ANTITRUST INJURY ..................................................................................... 9

VIII. STATUTE OF LIMITATIONS TOLLING ...................................................... 9

IX.   CLASS ACTION ALLEGATIONS ................................................................ 11

X.    CAUSES OF ACTION ................................................................................... 14

    FIRST CAUSE OF ACTION .................................................................... 14
    Monopolization Under the Sherman Act (15 U.S.C. § 2)

    SECOND CAUSE OF ACTION ............................................................... 16
    Attempted Monopolization Under the Sherman Act (15 U.S.C. § 2)

    THIRD CAUSE OF ACTION .................................................................... 18
    Violation of the California Unfair Competition Law(Cal. Bus. and Prof. Code §§ 17200, et seq.)

XI.   PRAYER FOR RELIEF ................................................................................. 18

XII.  DEMAND FOR JURY TRIAL ....................................................................... 20

Plaintiffs, individually and on behalf of all others similarly situated, allege the following against Defendants Google LLC and Alphabet Inc. (collectively "Google" or "Defendants").

## I.  **INTRODUCTION**

1.     Since the dawn of the internet age, few companies have enjoyed such a prolific rise as Google.  What started as an upstart online search engine has grown into a ubiquitous tech giant.  For much of the past decade, Google has reported profit margins that are nearly triple the average of other U.S.-based firms.  Google's platform has continued to grow to encompass dozens of products, nine of which enjoy more than a billion users each.

2.     Amid technological advances, as increasing numbers of people took web connectivity on the go with mobile devices and tablets, Google identified exploitation and monopolization of the mobile app market as necessary to maintain its search engine dominance.  Google acquired its own mobile operating system—Android—and released it as a free, open-source code to encourage dissemination.  Despite the appeal of a royalty-free operating system, in practice Google requires device manufacturers and distributors to enter into onerous agreements mandating Google applications be pre-installed and prominently displayed on devices, and preventing customization (or "forking") of the Android operating system.

3.     For mobile device users running the Android operating system, content is most accessible through apps—specially optimized software which allows users to access and share content, play games, and make in-app transactions for goods and services—which may be pre-installed on a device, downloaded from an app store, or accessed directly from the web through a process called sideloading.  Google takes significant, anticompetitive steps to ensure that its app store—the Play Store—enjoys virtually unfettered power to control software distribution on the Android platform.

4.     The Play Store comes pre-installed on all Android devices.  To access competitor content, users must manually download alternative app stores through a complicated, multistep sideloading process requiring users to voluntarily bypass warnings that the process poses a security risk.  Even if third-party apps are successfully downloaded, Google impairs their functionality by making it more difficult for developers and consumers to update those apps on Android devices.  As

consumer demand for the Android operating system grew, Google leveraged increasing interest in development and distribution of compatible apps to eviscerate competitive constraints on the Android mobile app market.

5. Google imposes on interested developers and distributors anticompetitive agreements which, among other things, require increasing use of Google's own in-app billing tool, licensing of a suite of Google products, and prohibiting competition outside Google Play. Through arbitrary enforcement of these contractual provisions and other policies, Google retains and exercises the ability to retaliate and oust any would-be competition. Acting as a middleman between consumers and app developers, Google exacts a supra-competitive 30% fee on sales of paid apps and in-app purchases. With unfettered control over the Android mobile app market, Google punishes rivals and stifles innovation—all to the detriment of competition and consumers. Plaintiffs, on behalf of the class, seek an award of damages as well as injunctive and other equitable relief.

**II.     PARTIES**

**A.     Plaintiffs**

6. Plaintiff Zacharia Gamble resides in the State of Illinois. Plaintiff Gamble purchased an app and/or in-app content from the Google Play Store during the Class Period.

7. Plaintiff Nicholas Hess resides in the State of Virginia. Plaintiff Hess purchased an app and/or in-app content from the Google Play Store during the Class Period.

**B.     Defendants**

8. Alphabet Inc. is a Delaware corporation with its principal place of business in Mountain View, California.

9. Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is a technology company providing a search engine and other web-based products, including online advertising. It is a wholly-owned subsidiary of Alphabet Inc.

10. Alphabet Inc. and Google LLC are collectively referred to herein as "Google" or "Defendants."

2

### III.   JURISDICTION AND VENUE

11.   Plaintiffs bring this action under Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26) for treble damages, other relief, and reasonable attorneys' fees and costs with respect to the injuries sustained by Plaintiffs arising from violations by Defendants of the federal antitrust laws, including Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2).

12.   This Court has jurisdiction over this action pursuant to Sections 1331, 1337(a) and 1367 of Title 28 of the United States Code (28 U.S.C. §§ 1331, 1337(a) and 1367).

13.   This Court has *in personam* jurisdiction over Defendants because each, directly and/or through its ownership or control of subsidiaries: (a) transacted business in the United States, including in this District; (b) is registered to do business in the state of California; (c) had substantial aggregate contacts with the United States, including this District; and/or (d) engaged in anticompetitive acts that were directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of injuring the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

14.   Venue is proper in this District pursuant to Sections 15 and 22 of Title 15 of the United States Code (15 U.S.C. §§ 15 and 22) and Section 1391(b) and (c) of Title 28 of the United States Code (28 U.S.C. § 1391(b) and (c)) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or is licensed to do business in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal restraint of trade throughout this District.  The anticompetitive conduct alleged herein has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

### IV.   INTRA-DISTRICT ASSIGNMENT

15.   Pursuant to Civil Local Rule 3-2 and General Order 44, this antitrust class

action shall be assigned on a district-wide basis and is not subject to reassignment on the basis of intra-district venue.

## V.    FACTUAL ALLEGATIONS

### A.    Google's Rise to Prominence

16.   Google arrived on the emerging digital scene in 1998, initially as a general internet search engine that served users web results in response to online queries.  Google's Page Rank algorithm catapulted it to the forefront.  The algorithm, which ranked the relevancy of a webpage based on the number of other pages linked to it, revolutionized internet search functionality.  As the internet rapidly grew, Google's PageRank innovation delivered users higher quality internet searches and differentiated Google from its search engine rivals. By the dawn of the new millennium, Google had become the world's largest search engine.  Later that same year, Google expanded its market footprint with the launch of Google AdWords, an online advertising service that lets businesses purchase keyword advertising to appear on Google's search results page.

17.   Google's growth has continued to scale over the past two decades—emerging as core infrastructure for ubiquitous online products and services.  Google has become the leading purveyor of digital advertising, and a major provider of digital mapping, cloud computing, email and voice assistant technology.  It maintains a leading web browser and a prevalent mobile operating system—Android. Nine of Google's products—Android, Chrome, Gmail, Google Search, Google Photos, Google Drive, Google Play, Google Maps, and YouTube—each boast more than a billion users.  Its search engine prowess, too, endures with "Googling" becoming synonymous with an online search.  These services capture vast amounts of user data enabling Google to drive revenue through online advertising and entrench dominance across markets.

18.   Google is now one of the world's major corporations.  Google has enjoyed strong and stable profits, with profit margins greater than 20% for nine out of the last 10 years, close to three times greater than the average for a U.S. firm.  For 2019, Google reported total revenues of $160.7 billion—up 45% from 2017—and more than $33 billion in net income.  Financial analysts predict that Google is well positioned to maintain its control, noting that "Alphabet has established unusually deep competitive moats around its business."

## B.   Android and the Mobile App Market

19.   In Google's early years, internet searches were performed almost exclusively using computer browsers.  Over the past two decades, however, users have increasingly turned to mobile, non-desktop devices, including phones and other devices, for access to the internet and other online content.  Google has made a conscious business decision to target manufacturers and users of mobile electronic devices to ensure those mobile devices incorporate and operate versions of Google's products, technology, and operating systems.

20.   In this regard, Google acquired Android in July 2005 for an estimated $50 million, and released the Android mobile operating system.  Google released Android as "a free, open-source mobile operating system" available to anyone to download and modify, or "fork," on a royalty-free basis.

21.   The open-source nature of the Android operating system was attractive to both device manufacturers, like LG, Motorola and Samsung, and phone carriers, like AT&T, Sprint and Verizon.  The appeal of an open-source platform, where distributors—not Google—would supposedly retain control over the device and its technical functioning, led many manufacturers and carriers to choose Android over competing operating systems.

22.   In reality, however, Google quickly looked to leverage the growing popularity of its operating system by solidifying its market position and minimizing competition.  Google requires manufacturers to enter licensing agreements to use Google's proprietary software like Gmail, YouTube, Chrome and Google Maps, or face limited functionality.  In order to make devices desirable for consumers, manufacturers have little choice but to agree.  In a direct effort to stifle competition, Google also requires manufacturers to enter into anti-forking agreements, which generally prohibit development of Android versions that do not comply with Google's arduous technical standards.  These agreements prevent distribution of devices with Android forks and marketing of forks on behalf of third parties—effectively rendering hollow Google's offer of an open-source code.

23.   Although Google elected to forego profiting directly from distribution of the operating system itself, wide dissemination of Android afforded Google greater opportunity to orchestrate,

control, and ultimately monetize, the mobile content.

24.     On mobile or tablet devices, digital content and services are easily accessible by way of mobile applications ("apps").  Popular apps allow users to share content, play games, and make "in app" sale or purchase transactions for goods and services.  Apps can be pre-installed on an electronic device by the manufacturer as a component of the operating system itself, downloaded from an app store, or otherwise loaded directly onto the electronic device from the internet using a web browser—a process that Google refers to as "sideloading."

25.     Frequently, consumers access apps through an app store, which itself may be pre-installed on the electronic device.  An app store is a centralized, curated location where users can search, review and buy apps.  Google has established the Google Play Store ("Google Play" or "the Play Store") as the predominant distribution service for users to access and download other applications available on the Android system.  Apps are operating system-specific meaning there is a separate market for apps developed for Apple iOS (which only work on Apple electronic devices) and apps developed for Android (which only work on Android electronic devices).  For this reason, Apple's App Store and the Google Play Store do not compete against one another.  Google unlawfully uses its Google Play Store to control the mobile app market for devices using the Android operating system.

26.     Google requires that manufacturers pre-install the Google Play Store on all electronic devices, knowing that users infrequently change defaults.  Google also refuses to allow any rival app store to be downloaded from Google Play.  Indeed, Google all but prohibits access to competitor content by making third-party app stores accessible only by way of "sideloading"—a complicated multi-step process where users must voluntarily proceed despite warnings that sideloading is unsafe.  Because of the hurdles Google imposes, few users succeed in accessing alternative, third-party content.

27.     For users who do persist in the sideloading process and successfully download third party apps or app stores, Google takes further steps to limit the functionality of those programs. For example, while applications downloaded from the Google Play Store update automatically on the device background without user input, Google requires users to manually update non-Play Store

apps.

28.     As Android's popularity continued rising with manufacturers and distributors, app developers looking for wide app distribution developed apps compatible with the Android operating system, in accordance with Google's incentives.  As more Android apps entered the market, the operating system became more appealing to consumers, leading to more developers interested in designing for Android in a cycle that further entrenched Google's market influence.

29.     To solidify Android's market dominance, Google "shared" its search advertising and Play Store revenues with distributers.  With an economic stake in Android's proliferation, distributors were further incentivized to relinquish control over the operating system and what apps come preinstalled on electronic devices.

30.     Because Google Play is the primary way users install applications on Android devices, it effectively functions as a gatekeeper for software distribution on all devices equipped with the Android operating system.

31.     Google exerts its gatekeeping power over third-party app developers in numerous ways.  Many, including Amazon, Spotify, Netflix, Epic Games, Tinder, and Apple have all publicly expressed concern about the substantial fees Google extracts from each transaction occurring on the Play Store, as described below.

32.     Others have been subjected to Google's arbitrary enforcement of its Play Store policies, which protect the power of Google's own services and stifles competitors.  One app, "Callsome," for example, was banned from Google Play for "Ad Policy" violations only to learn later that a fundamentally identical product was able to stay and thrive in Google Play.  Callsome believes it was banned because of its partnership with SmartApp, which at the time was widely considered to be a nascent but rising rival to Google in the Russian market.

33.     Through exercise of its gatekeeping power and monopoly conduct, Google has extracted supra-competitive prices for its Android app distribution services and in-app purchases made through Google Play, including a 30% commission on sales of paid apps and a 30% fee for in-app purchases.  Google collects and processes these commissions and fees directly from Plaintiffs and Class Members, remitting the remainder of their payment to the app developer.

34.     Google has used Android to entrench and extend its control in a variety of ways that undermine competition.  These include: (1) using contractual restrictions and exclusivity provisions to extend Google's search monopoly from desktop to mobile and to favor its own applications; and (2) devising Android Lockbox, a covert effort to track real-time data on the usage and engagement of third-party apps, some of which were Google's competitors.  Overall, Android's business practices reveal how Google has maintained its dominance through relying on various contractual restrictions that blocked competition and through exploiting information asymmetries, rather than by competing on its merits.

**C.     Google Maintains a Monopoly in the Android Mobile App Market**

35.     The Play Store's dominance over app distribution on Android devices has enabled Google to effectively become the middleman between app developers and their customers by mandating use of its own in-app payment system—Google Pay—for transactions accomplished using the Play Store.  Google's requirements in this regard have evolved over time to require more app developers to use Google's payment tool.  In 2014, for example, only certain categories of applications were required to use Google Pay.  Recently, however, Google has begun insisting that a broader category of apps will be required to use Google's in-app payment tool exclusively, no longer permitting the option of a third-party payment processor.

36.     Similarly, Google uses a series of anticompetitive covenants in agreements to maintain its monopoly in the Android Mobile App Market and charge supra-competitive prices for apps and in-app purchases.  Google's Mobile Application Distribution Agreement ("Mobile App. Agreement") requires manufacturers seeking to license the Android operating system to agree to preinstall select apps, including the Google Play Store, on the device, alongside other rotating apps to be selected by Google.  If a manufacturer refuses these restrictive terms and conditions, it loses access to the Android operating system.

37.     As a result of the Mobile App. Agreement's terms and conditions, Google has successfully prevented competition in the Android Mobile App Market, allowing it to charge supra-competitive prices for apps and in-app purchases, and harming Plaintiffs and Class Members by limiting consumer choice.

38.     Similarly, Google uses its Developer Distribution Agreement ("Distribution Agreement") to contractually restrict competition in the Android Mobile App Market.  Among other terms, the Distribution Agreement mandates that developers comply with Google's Developer Program Policies, including using Google's proprietary in-app billing for in-app game payments, as well as certain other digital in-app purchases.  The Distribution Agreement also prevents developers from "us[ing] Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Google has the power to simply eliminate any Android app it believes has violated any portion of the Distribution Agreement.

39.     Google therefore employs anticompetitive agreements and business practices to control the Play Store in an effort to protect the dominance of its own services and stifle rivals, harming Plaintiffs and Class Members.

## VI.     RELEVANT MARKET

40.     For purposes of this action, the relevant product market is the market for Android apps and in-app purchases.  The relevant geographic market for purposes for this action is the United States and its territories.  Google has substantial and long-lasting power in this market. App stores and apps are developed and distributed throughout the United States, and Google Play is available to Android users throughout the United States.

## VII.     ANTITRUST INJURY

41.     Plaintiffs and Class Members purchased Android apps and in-app digital content directly from Google through Google Play.  Without the unlawful restraints described above, Plaintiffs and Class Members would not have to pay supra-competitive prices for apps and in-app purchases.  Google's anticompetitive practices also stalled, limited or foreclosed competition and innovation in the Android Mobile App Market.

## VIII.     STATUTE OF LIMITATIONS TOLLING

42.     Plaintiffs and Class Members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the Class period and continuing thereafter, until October 2020 when the United States House of

Representatives published its Investigation of Competition in Digital Markets and provided details concerning Google and its conduct.

43.     Plaintiffs and Class Members suffered economic loss due to Google's wrongful exercise of monopoly power.  Plaintiffs interactions with Google were, however, insufficient to discover Google's wrongful conduct.

44.     Furthermore, no public information was available during the Class Period or thereafter to suggest that Google's business activities were done to monopolize the Android Mobile App Market until the House published its Investigation of Competition in Digital Markets.

45.     Moreover, it was reasonable for Plaintiffs and Class Members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior.  Plaintiffs and Class Members are simply consumers of apps.

46.     Plaintiffs allege a continuing course of unlawful conduct by Google, including conduct within the applicable limitation periods.  That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitation.

47.     For these reasons, the statutes of limitations applicable to Plaintiffs' and Class Members' claims have been tolled with respect to the claims asserted herein until the House Report about Google became public.

48.     Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitation on Plaintiffs' claims.  Plaintiffs and Class Members had no knowledge of Google's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place them on inquiry notice of their claims during the Class Period and continuing thereafter.  No information in the public domain or otherwise available to Plaintiffs and Class Members during the Class Period suggested that Google had wrongfully acquired a monopoly or was using its monopoly power to charge supra-competitive prices.

49.     In failing to disclose its wrongful monopolization, in addition to denying it was engaged in such conduct, Google was able to conceal its illegal conduct.  In fact, Google has made public denials to this effect in the United States and to foreign regulators.

50.     After it was revealed that the House was investigating Google's monopoly, Google

denied such conduct. Similarly, in response to recent news reports of impending antitrust actions against it by federal and state officials for monopolization, Google stated publicly that competition is flourishing, and publishers and marketers have enormous choice when that was not correct.

51. Further, Google's anticompetitive monopoly conduct was inherently self-concealing because, as Google knew, its disclosure likely would have led to governmental enforcement activity or civil liability. Google's conduct is subject to antitrust regulation, so it was reasonable for Plaintiffs and Class Members to presume that they were purchasing apps in a competitive market. A reasonable person under the circumstances would not have had reason to suspect that apps were being sold at supra-competitive prices at any time during the Class Period.

## IX.    CLASS ACTION ALLEGATIONS

52. Plaintiffs bring this action both individually and as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Class:

> All persons and entities in the United States that paid Google for an app on the
> Google Play Store, subscription fees for an app obtained on the Google Play Store,
> or app content from an app downloaded from the Google Play Store, during the
> relevant limitations period ("Class Period").

53. This definition specifically excludes any of the Defendants named herein, any of the Defendants' parent companies, subsidiaries, and affiliates, and any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents. Plaintiffs reserve the right to expand, modify, or alter the class definition in response to information learned during discovery.

54. This action is properly brought as a class action under Federal Rule of Civil Procedure 23(a) for the following reasons:

a.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The proposed Class is so numerous and geographically dispersed that the joinder of all Class Members is impracticable. While Plaintiffs do not know the exact number and identity of all Class Members, Plaintiffs are informed and believe that there are millions of Class Members. The precise number of Class Members can be ascertained through discovery;

b. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3)):** There are questions of law and fact common to the proposed class which predominate over any questions that may affect individual Class Members. Such common questions of law and fact include, but are not limited to:

    i.    Whether Google unlawfully acquired and maintained monopoly power in the relevant market;

    ii.    Whether Google monopolized the market for Android apps at any time during the Class Period;

    iii.    Whether Google's alleged conduct violated California's antitrust and unfair competition laws;

    iv.    Whether the alleged conduct violated the Sherman Act;

    v.    Whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the determination of the appropriate Class-wide measure of damages;

    vi.    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Class, thereby entitling Plaintiffs and the members of the Class to disgorgement of all benefits derived by Defendants;

    vii.    Whether Plaintiffs and other members of the Class are entitled to, among other things, equitable relief, and, if so, the nature and extent of such relief;

    viii.    Whether Plaintiffs and members of the Class had any reason to know or suspect the monopoly, or any means to discover the monopoly; and

    ix.    Whether the Defendants fraudulently concealed the monopoly's existence from Plaintiffs and the members of the Class;

c. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the

claims of the members of the proposed Class. Plaintiffs and the Class have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of the Class and are based on the same legal theories; and

    d.    **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interests antagonistic to those of the other members of the Class, and Plaintiffs have retained attorneys experienced in antitrust class actions and complex litigation as counsel.

55.    This action is properly brought as a class action under Federal Rule of Civil Procedure 23(b) for the following reasons:

    a.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

    b.    **Declaratory and Injunctive Relief (Fed. R. Civ. P. 23(b)(2)):** Certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

    c.    The proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same fashion.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    a.    Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would

seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b.  Without a class action, Class Members will suffer damages, and Defendants' violations of law will proceed without remedy while Defendants reaped and retained the substantial proceeds of their wrongful conduct;

c.  This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, fostering economies of time, effort and resources, and ensuring uniformity of decisions; and

d.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## X.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Monopolization Under the Sherman Act (15 U.S.C. § 2)**

57.  Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

58.  Plaintiffs bring this claim individually and on behalf of each member of the Class described above.

59.  The relevant market is the U.S. market for apps and in-app purchases sold in the Android Mobile App Market.

60.  Google has gained and maintains monopoly power in the relevant market by improper and unlawful means.  More specifically, Google has willfully acquired and maintained such power by coercing the purchase of Android apps and in-app products and services at artificially high prices and by its patently exclusionary conduct, including by refusing to allow rival app stores to be accessed through the Google Play Store and by implementing significant frictions designed to steer consumers away from sideloading third-party app stores.  Consumers must use the Android Mobile App Market to obtain Android apps and in-app purchases.

61.  For the reasons stated herein, substantial barriers to entry exist in the relevant

market.

62.     Google has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to maintain and expand its monopoly power in that market.

63.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival app stores in the U.S. market for Android mobile apps and in-app purchases.

64.     Google has attempted to obtain a monopoly in the U.S. market for Android mobile apps and in-app purchases, effectively foreclosing competition, stifling innovation, and gravely diminishing consumer choice.  Additionally, Google has abused its market power by charging supra-competitive 30% commission on sales of paid apps and a 30% fee for in-app purchases.

65.     There is no business necessity or other pro-competitive justification for Google's conduct.

66.     As a direct and proximate cause of Google's conduct, Plaintiffs and members of the Class have suffered antitrust injury.  Plaintiffs and the Class Members paid significantly higher prices for Android apps and in-app purchases than they would have but for Google's unlawful conduct.  That conduct also deprived Plaintiffs and Class Members of improved quality and innovation in the relevant markets.

67.     Plaintiffs are inclined to continue to purchase Android apps and in-app purchases in the future because of their investment in the electronic device containing the Android operating system.

68.     Plaintiffs and members of the Class are entitled to damages, including treble damages, sustained because of Google's monopolistic acts and practices.

69.     Plaintiffs and members of the Class are entitled to equitable relief as appropriate to remedy Google's monopoly conduct and restore competition in the relevant market.  Members of the Class are regular users of the Android Mobile App Market and will continue to purchase such apps and in-app products and services and suffer further injury if Google's monopoly is not terminated.

70.     Plaintiffs and the Class also are entitled to equitable relief to prevent Google from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Google from continuing to charge supra-competitive commission on sales of paid apps and a supra-competitive percent fee for in-app purchases. *See*, *e.g.*, 15 U.S.C. § 26.

### SECOND CAUSE OF ACTION

### Attempted Monopolization Under the Sherman Act (15 U.S.C. § 2)

71.     Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

72.     Plaintiffs bring this claim individually and on behalf of each member of the Class described above.

73.     The relevant market is the U.S. market for apps and in-app purchases sold in the Android Mobile App Market.

74.     Google has attempted to monopolize the U.S. market for Android apps. More specifically, Google has willfully acquired and maintained market power by its patently exclusionary conduct, including its refusal to allow rival app stores to be accessed through the Google Play Store and by implementing significant frictions designed to steer consumers away from sideloading third-party app stores.  Consumers must use the Android Mobile App Market to obtain Android apps and in-app purchases.

75.     Google's anticompetitive conduct has created a dangerous likelihood that it will attain monopoly power in the U.S. market for Android apps and in-app purchases.

76.     By virtue of the conduct alleged herein, including imposition of anti-forking provisions and coercive licensing agreements designed to prioritize Google products to the exclusion of competitors, creation of significant constraints on user access to third-party content, and enforcement of anticompetitive covenants in agreements and policies, Google has a specific intent to attain monopoly power in the U.S. market for Android mobile apps and in-app purchases. Now, and if its unlawful restraints are not checked, Google has a dangerous likelihood of success in the relevant market as defined by the Plaintiffs.

77.     Google has the power to exclude competition in the U.S. market for Android mobile apps and in-app purchases, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

78.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival app stores in the U.S. market for Android mobile apps and in-app purchases.

79.     Google has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for Android mobile apps and in-app purchases, effectively foreclosing competition, stifling innovation, and gravely diminishing consumer choice.  Additionally, Google has abused its market power by charging supra-competitive 30% commission on sales of paid apps and a 30% fee for in-app purchases.  Further, Google's actions have depressed output and stifled innovation and options for consumers as alleged herein.

80.     There is no business necessity or other pro-competitive justification for Google's conduct.

81.     Plaintiffs and the Class have been injured, and will continue to be injured, in their property as a result of Google's conduct, including by way of overpaying for Android mobile apps and in-app purchases.

82.     Plaintiffs are inclined to continue to purchase Android mobile apps and in-app purchases in the future because of their investment in the electronic device containing the Android operating system.

83.     Plaintiffs and the Class also are entitled to equitable relief to prevent Google from continuing in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Google from continuing to: charge supra-competitive commission on sales of paid apps and a supra-competitive percent fee for in-app purchases. *See*, *e.g.*, 15 U.S.C. § 26.

### THIRD CAUSE OF ACTION

### Violation of the California Unfair Competition Law

### (Cal. Bus. and Prof. Code §§ 17200, *et seq.*)

84. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

85. Google's conduct is unlawful in violation of California's Unfair Competition Law ("UCL") because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

86. Google has engaged in unfair business practices through the conduct alleged herein, which has restrained competition. Google's conduct is unfair and in violation of the UCL because it violates California's clearly established public policy forbidding monopolistic acts. *See, e.g.* Cal. Bus. & Prof. Code § 17001. Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the conduct alleged herein, including by leveraging its monopoly power in the Android Mobile App Market to coerce the purchase of Android mobile apps and in-app products and services at artificial prices.

87. Google's practices also are unlawful in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including in the form of artificially inflated prices, that greatly outweighs any possible utility from the practices. Because Google's unlawful conduct is ongoing and there is continuing risk of future harm, Plaintiffs have no adequate remedy at law.

88. Google's conduct actually and proximately caused Plaintiffs and Class Members to lose money or property. On behalf of the Class, Plaintiffs seek damages, other relief, and reasonable attorneys' fees and costs, as well as any other relief the Court may deem just or proper.

### XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing:

1.      That the Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4), that Plaintiffs be certified as Class representatives, and Plaintiffs' counsel be appointed as counsel for the Class;

2.      That the unlawful contract, combination, or conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act;

3.      That Defendants have violated the UCL by engaging in conduct that constitutes unlawful and unfair and business practices;

4.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

5.      That Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

        i.      A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendants; and

        ii.     Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

6.      That Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

7.      That Plaintiffs and the Class recover damages, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against Defendants on behalf of Plaintiffs and the Class;

8.      Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, costs, and expenses of the lawsuit, as provided by law;

9.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

10. That Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class; and

11. For such other and further relief as is just under the circumstances.

## XII. DEMAND FOR JURY TRIAL

Plaintiffs and the Class demand a trial by jury of all the claims asserted in this complaint that are so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated: November 12, 2020     Respectfully Submitted,

**GIBBS LAW GROUP LLP**

By:  s/ Eric H. Gibbs

Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
Amanda M. Karl (SBN 301088)
Alexander J. Bukac (SBN 305491)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
amk@classlawgroup.com
ajb@classlawgroup.com

*Attorneys for Plaintiffs and the Proposed Class*