Paul J. Riehle
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH
LLP**
Four Embarcadero Center
San Francisco, CA 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

Christine A. Varney (pro hac vice)
cvarney@cravath.com
Katherine B. Forrest (pro hac vice)
kforrest@cravath.com
Gary A. Bornstein (pro hac vice)
gbornstein@cravath.com
J. Wesley Earnhardt (pro hac vice)
wearnhardt@cravath.com
Yonatan Even (pro hac vice)
yeven@cravath.com
Lauren A. Moskowitz (pro hac vice)
lmoskowitz@cravath.com
M. Brent Byars (pro hac vice)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff
Epic Games, Inc.*

Steve W. Berman (pro hac vice)
steve@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Eamon P. Kelly (pro hac vice)
ekelly@sperling-law.com
**SPERLING & SLATER, P.C**.
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile: (312) 641-6492

*Co-Lead Interim Class Counsel for the Developer
Class and Attorneys for Plaintiff
Pure Sweat Basketball, Inc.*

Bonny E. Sweeney (SBN 176174)
bsweeney@hausfeld.com
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980

*Co-Lead Interim Class Counsel for the Developer
Class and Attorneys for Plaintiff
Peekya App Services, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br>                    Plaintiff,<br><br>                    vs.<br><br>GOOGLE LLC, *et al.*,<br>                    Defendants. | Case No. 3:20-CV-05671-JD |

| | |
|---|---|
| IN RE GOOGLE PLAY DEVELOPER ANTITRUST LITIGATION | Case No. 3:20-CV-05792-JD<br><br>**JOINT OPPOSITION BY PLAINTIFF EPIC GAMES, INC. AND DEVELOPER CLASS PLAINTIFFS TO DEFENDANTS' MOTION TO DISMISS** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

2

3   PRELIMINARY STATEMENT ........................................................................................1

4   I.       ISSUES TO BE DECIDED ...............................................................................3

5   II.      FACTUAL BACKGROUND ..............................................................................4

6            A.       Google's Conduct in the Merchant Market for Mobile OSs........................4

7            B.       Google's Conduct in the Android App Distribution Market. ......................5

8                     1.       Restrictions on Android OEMs........................................5

9                     2.       Restrictions on Direct Distribution ..................................7

10                    3.       Restrictions on Android App Stores .................................7

11                    4.       Restrictions on Android App Developers ..........................8

12           C.       Google's Conduct in the Android In-App Payment Processing Market............................9

13  III.     LEGAL STANDARDS ...................................................................................10

14  IV.      ARGUMENT ..................................................................................................11

15           A.       ANTITRUST VIOLATIONS IN THE APP DISTRIBUTION MARKET......................11

16                    1.       Plaintiffs' Claims Do Not Depend on Any Duty To Deal. ...................12

17                    2.       Google's Agreements with Developers Violate Section 1 of the Sherman
18                             Act..........................................................................15

19                    3.       Google Substantially Forecloses Competition in the Android App
                               Distribution Market........................................................17

20           B.       ANTITRUST VIOLATIONS IN THE IN-APP PAYMENT PROCESSING
21                    MARKET..........................................................................................20

22                    1.       Plaintiffs Allege an Illegal Tying Arrangement, Not a Refusal to Deal. ..............20

23                    2.       Google Substantially Forecloses Competition in the Android In-app
                               Payment Processing Market..............................................22

24                    3.       Google Play and Google Billing Are Separate Products. .....................23

25           C.       GOOGLE'S CONDUCT ALSO VIOLATES CALIFORNIA LAW..............................24

26  CONCLUSION........................................................................................................25

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ......................................................................................................16

*Beaver v. Tarsadia Hotels, Corp.*,
   816 F.3d 1170 (9th Cir. 2016) ....................................................................................................25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................................................10

*Blix Inc. v. Apple, Inc.*,
   2020 WL 7027494 (D. Del. Nov. 30, 2020) ..............................................................................15

*Cargill Inc. v. Budine*,
   No. CV-F-07-349-LJO-SMS, 2007 WL 4207908 (E.D. Cal. Nov. 27, 2007)....................15

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008) ...............................................................................................21, 23

*Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*,
   878 F. Supp. 1389 (W.D. Wash. 1993), *aff'd*, 37 F.3d 1504 (9th Cir. 1994)....................21

*Church & Dwight Co. v. Mayer Labs., Inc.*,
   868 F. Supp. 2d 876 (N.D. Cal. 2012) .......................................................................................23

*Church & Dwight Co. v. Mayer Labs., Inc.*,
   No. C-10-4429 EMC, 2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ...........................13, 18

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) ....................................................................................................13

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)....................................................................................................................13

*Datagate, Inc. v. Hewlett-Packard Co.*,
   60 F.3d 1421 (9th Cir. 1995) ...............................................................................15, 16, 17, 22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)..........................................................................................3, 17, 20, 21

*eBay, Inc. v. Bidder's Edge Inc.*,
   2000 WL 1863564 (N.D. Cal. July 25, 2000)............................................................................18

*Fisherman's Wharf Bay Cruise Corp. v. Superior Court of San Francisco*,
   114 Cal. App. 4th 309 (2003) .....................................................................................................24

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...............................................................................10, 14, 22

*Greyhound Computer Corp. v. IBM*,
   559 F.2d 488 (9th Cir. 1977) ............................................................................................18

*Hill v. HD Supply Facilities Maint., Ltd.*,
   2020 WL 4365878 (D. Ariz. July 29, 2020) ..............................................................20, 21

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ............................................................................................................21

*Kaufman v. Time Warner*,
   836 F.3d 137 (2d Cir. 2016) ............................................................................................23

*Kickflip, Inc. v. Facebook, Inc.*,
   999 F. Supp. 2d 677 (D. Del. 2013) ................................................................................23

*Kwan v. SanMedica Int'l*,
   854 F.3d 1088 (9th Cir. 2017) ..........................................................................................4

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ............................................................................................13

*McWane, Inc. v. F.T.C.*,
   783 F.3d 814 (11th Cir. 2015) ........................................................................................17

*Moore v. Mars Petcare US, Inc.*,
   966 F.3d 1007 (9th Cir. 2020) ........................................................................................10

*Morrison v. Viacom, Inc.*,
   66 Cal. App. 4th 534 (1998) ............................................................................................25

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) ........................................................................................10

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   990 F. Supp. 2d 996 (N.D. Cal. 2013) ......................................................................20, 21

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ........................................................................................22

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
   555 U.S. 438 (2009) ........................................................................................................14

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
   268 F. Supp. 3d 1071 (C.D. Cal. 2017) ..........................................................................15

*Paladin Associates, Inc. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) ........................................................................................20

*Pecover v. Electronic Arts Inc.*,
   633 F. Supp. 2d 976 (N.D. Cal. 2009) ............................................................................24

*R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
   199 F. Supp. 2d 362 (M.D.N.C. 2002) (34%) ................................................................23

*RealPage, Inc. v. Yardi Sys., Inc.*,
   852 F. Supp. 2d 1215 (C.D. Cal. 2012) ....................................................................18, 19

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
    532 F.3d 963 (9th Cir. 2008) ..........................................................................................23

*Smith v. eBay Corp.,*
    2012 WL 1951971 (N.D. Cal. May 29, 2012) ...............................................................23

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.,*
    608 F. Supp. 2d 1166 (N.D. Cal. 2009) .........................................................................15

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961) ......................................................................................................18

*Teradata Corp. v. SAP SE,*
    2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ...............................................................23

*The Jeanery, Inc. v. James Jeans, Inc.,*
    849 F.2d 1148 (9th Cir. 1988) ......................................................................................15

*United States v. Dentsply Int'l, Inc.,*
    399 F.3d 181 (3d Cir. 2005)...........................................................................................17

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ............................................................................. passim

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004).......................................................................................................14

1

**PRELIMINARY STATEMENT**

2

Plaintiffs allege a set of anticompetitive practices through which Google unlawfully destroys

3

competition in markets for the distribution of mobile apps and for the processing of in-app payments on

4

the Android operating system.  Like Microsoft two decades ago, Google uses restrictions in its

5

agreements with original equipment manufacturers ("OEMs") and developers, as well as "technological

6

shackles" in its Android operating system, to protect and maintain its monopolies.  *See United States v.*

7

*Microsoft Corp.*, 253 F.3d 34, 60-65 (D.C. Cir. 2001).  Plaintiffs detail how Google's practices

8

effectively foreclose competing app distributors and payment processors from these markets, securing

9

for Google durable monopolies with market shares of greater than 90%.  Plaintiffs also identify the

10

various forms of anticompetitive harm inflicted on OEMs, app distributors, app developers, payment

11

processors, and consumers.

12

Google's Motion to Dismiss fails to engage with the scope of Plaintiffs' monopolization claims.

13

Instead, Google asserts that the "central pillar of Plaintiffs' theory of anticompetitive harm" is Google's

14

refusal "to allow competitor app stores inside [the Google Play Store ("Google Play")]" (Mot. at 7-8),

15

and on that basis contends that Plaintiffs' claims depend on Google having a "duty to deal" with its

16

competitors.  That argument rewrites the Complaints.  Plaintiffs allege far broader and more pervasive

17

anticompetitive conduct:  Google blocks or burdens virtually *all* the ways by which a competing app

18

distributor may reach Android users, including through OEMs and directly from a website, making

19

Google Play the only practical distribution channel for app developers to reach a billion Android users

20

around the world.  (Epic ¶¶ 13, 72; PSB ¶¶ 91-92.)[1]

21

Far from invoking a "duty to deal," what Plaintiffs request is freedom *not to deal* with Google.

22

Epic seeks to establish a viable competing app store, and Epic and the Developers seek to establish

23

viable distribution of their apps through competing app stores or direct downloads and the use of

24

competing payment mechanisms.  Plaintiffs' claims are not based on any duty for Google to open

25

Google Play to competing app developers but, rather, on Google's anticompetitive conduct in

26

foreclosing all alternative distribution paths.  The exclusion of competitors from Google Play is

27

28

---

[1] All "Epic ¶" and all "PSB ¶" cites refer to the Complaints in *Epic Games, Inc. v. Apple, Inc*., Case No. 3:20-cv-05671, ECF No. 1, and *In re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792, ECF No. 56, respectively.  "Google" refers to the named Defendants collectively.

significant only because Google has excluded competing app stores from all other viable paths to consumers.

Google's efforts to foreclose competition in app distribution begin with Android OEMs, which would be, but for Google's restrictions, an important channel through which apps and app distributors could reach consumers. Plaintiffs allege that Google forces OEMs to pre-install, prominently display, and distribute Google Play (Epic ¶¶ 15, 82; PSB ¶ 94) while interfering with OEMs' ability to pre-install and distribute competing third-party app stores. For example, Google told two OEMs that they were not permitted to make Epic's app launcher directly available to consumers, preventing Epic from competing with Google in the distribution of apps and games. (Epic ¶¶ 16-17.)

Once a mobile device is manufactured and sold, Google uses its control over the Android OS to prevent all but the most tech-savvy consumers from downloading, installing, and effectively using alternative app stores and individual apps. (Epic ¶¶ 94, 96-99; PSB ¶¶ 118-121.) For example, consumers using personal computers routinely download and install software directly from a developer's website, but on Android, Google causes such downloads to be rejected, requires many more steps including a change to default settings, and triggers deterrent and pretextual user warnings. (Epic ¶ 94; PSB ¶ 8.) Even when a consumer is sufficiently tech-savvy (and determined) to download a competing app store, Google severely undermines such store's utility. Google prevents competing stores from implementing the commercially essential feature of automatically updating the apps it distributes without user intervention, and Google further deters app developers from choosing competing app stores over Google Play by withholding must-have advertising channels (like Google Search and YouTube) unless the app developer lists its apps in Google Play. (Epic ¶¶ 18, 19, 93; PSB ¶¶ 8, 105.) Google even used the Android OS to entirely block a competing app store. (Epic ¶ 100; PSB ¶ 124.)

Google's duty-to-deal argument does not address any of this anticompetitive conduct, which occurs outside the confines of Google Play. Instead, Google asks the Court to hold, *as a matter of law*, that this conduct does not result in foreclosure of "a substantial portion of the market." (Mot. 14.) But the extent of foreclosure is a question of fact, and Google's arguments are contradicted by Plaintiffs' specific factual allegations. For example, Google asserts that Plaintiffs "concede OEMs pre-install alternative app stores" (*id.*), but ignores allegations that Google has prevented OEMs from pre-installing

an Epic app launcher that would seamlessly deliver apps to consumers (Epic ¶¶ 15-17, 82-87; PSB ¶¶ 8-9, 104).  Google asserts that "any user may directly download apps or alternative app stores if they wish to do so" (Mot. 14), ignoring allegations that Google uses default settings and pretextual warning messages to deter most users from direct downloading (Epic ¶¶ 19, 94; PSB ¶ 8).  In short, Google improperly asks the Court to adopt Google's asserted facts rather than Plaintiffs' allegations.

Google also invokes the "duty-to-deal" strawman when addressing the Android in-app payment processing market.  Plaintiffs allege that Google wrongfully conditions access to Google Play on the use of Google's payment processor for sales of in-app content.  (Epic ¶¶ 125-26; PSB ¶ 193.)  Google recharacterizes those allegations, arguing that "Plaintiffs, in essence, challenge . . . Google's refusal to distribute apps through Google Play if they integrate a rival billing system for IAP," and calling this a duty-to-deal claim.  (Mot. 8.)  But the Supreme Court has rejected this line of argument, holding that sales "to third parties on condition that they buy" another product is *not* a "unilateral refusal to deal." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 n.8 (1992).  Google also asserts that Plaintiffs' tying claims are barred because Google Play and Google Play Billing ("Google Billing") are supposedly "integrated" rather than separate products, but Google ignores Plaintiffs' specific allegations to the contrary.  (Epic ¶¶ 114-16, 179; PSB ¶ 248.)  For example, where Google does not contractually tie app distribution and payment processing, such as for purchases of physical products and services within apps, developers and consumers often choose a different supplier for each.  (Epic ¶¶ 116, 124, 130; PSB ¶¶ 171, 236.)  Google's only other defense is to repeat its factual assertions about the scope of foreclosure, which have no place on a motion to dismiss.

Finally, for much the same reasons, Plaintiffs state proper claims under the California Cartwright Act and the Unfair Competition Law ("UCL").  The motion thus should be denied.

# I.   ISSUES TO BE DECIDED

1.   Whether Plaintiffs' Section 1 and 2 claims concerning Android app distribution are based on a unilateral refusal to deal:  **No**.  (Part IV.A.1.)

2.   Whether Epic's Section 1 claim concerning Google's agreements with app developers alleges concerted action:  **Yes**.  (Part IV.A.2.)

3.   Whether Plaintiffs allege substantial foreclosure of the Android app distribution market, resulting in a market share for Google of over 90%:  **Yes**.  (Part IV.A.3)

4.   Whether Plaintiffs' claims concerning Android in-app payment processing are based on a unilateral refusal to deal:  **No**.  (Part IV.B.1.)

5.   Whether Plaintiffs allege harm to competition in the Android in-app payment processing market, resulting in the substantial foreclosure of competing payment processors:  **Yes**.  (Part IV.B.2.)

6.   Whether Plaintiffs allege that the tied products, Google Play and Google Billing, are separate products:  **Yes**.  (Part IV.B.3.)

7.   Whether Plaintiffs allege violations of the California Cartwright Act and the UCL for much the same reasons they allege violations of the Sherman Act:  **Yes**.  (Part IV.C.)

## II.   FACTUAL BACKGROUND

On a motion to dismiss, Plaintiffs' allegations are accepted as true.  *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017).  Although Google professes to have "distilled" Plaintiffs' allegations and claims in its motion (*see* Mot. Part II), it fundamentally mischaracterizes them.  A summary of the relevant facts is set forth below.

### A.   Google's Conduct in the Merchant Market for Mobile OSs.

Google has monopoly power in the "Merchant Market for Mobile OSs," which comprises mobile operating systems that OEMs license for installation on the smart mobile devices they manufacture. (Epic ¶ 48; PSB ¶ 40.)  This Market does not include proprietary OSs that are not available for licensing by OEMs, such as Apple's iOS.  (Epic ¶ 48; PSB ¶ 45.)  In the relevant Market, Google is a near-total monopolist.  (Epic ¶ 44-58; PSB ¶¶ 41-42, 48-52.)  After a long investigation, the European Commission found that, as of 2018, Google's Android operating system had been "installed on over 95% of all mobile devices sold by OEMs utilizing a merchant mobile OS" worldwide, excluding China. (Epic ¶ 52; PSB ¶ 49.)  Google does not contest that this is a properly alleged antitrust market or that Google has monopoly power in it.

Because of Google's control over the Merchant Market for Mobile OSs, OEMs other than Apple (which controls iOS) cannot manufacture commercially viable phones without licensing Google's version of the Android OS.  (Epic ¶¶ 52, 81-84; PSB ¶¶ 48, 63-64.)  As set forth below, Google uses that

power over OEMs to impose a set of contractual restrictions and extra-contractual pressure that destroys competition in the downstream markets for Android app distribution and in-app payment processing.

**B.    Google's Conduct in the Android App Distribution Market.**

The "Android App Distribution Market" comprises "all the channels by which mobile apps may be distributed to the hundreds of millions of users of mobile devices running the Android OS."  (Epic ¶ 62; PSB ¶ 73.)  Google does not contest that this is a properly alleged antitrust market or that Google has monopoly power in it.  As the European Commission determined, "within the Market, more than 90% of app downloads through app stores have been done through [Google Play]."  (Epic ¶ 70; PSB ¶ 86.)  "Other existing Android mobile app stores do not discipline Google's exercise of monopoly power in the Android App Distribution Market," and "[n]o other app store is able to reach nearly as many Android users as [Google Play]."  (Epic ¶ 71; PSB ¶ 76.)

Google contends in its motion that the "central pillar of Plaintiffs' theory of anticompetitive harm is that Google unlawfully maintains its alleged monopoly in Android app distribution by refusing to allow competitor app stores inside Google Play."  (Mot. 7-8.)  Not so.  Plaintiffs allege that, but for Google's conduct, there would be several ways for a developer to distribute an app or app store outside of Google Play:  by having an OEM pre-install it, by making it available for direct download from a website, or by offering it through another app store on the user's device.  (Epic ¶ 60, 62; PSB ¶ 127.)  In other words, Plaintiffs allege that competing app stores could reach Android users without dealing with Google Play at all—but that Google systematically forecloses *all* these channels.

**1.    Restrictions on Android OEMs**

Google imposes anticompetitive restrictions on OEMs, preventing them from serving as an alternative app distribution channel.  *First*, Google bundles Google Play with other "must have" Google services, such as Google Search, Google Maps, YouTube, Gmail and more, and "conditions the licensing of those services on an OEM's agreement to pre-install Google Play and prominently display it."  (Epic ¶ 15; PSB ¶ 91.)  Specifically, to access Google Play and other services, OEMs must sign a Mobile Application Distribution Agreement ("MADA") that "confers a license to a bundle of products comprising proprietary Google apps, Google-supplied services necessary for the functioning of mobile apps, and the Android trademark."  (Epic ¶ 82; PSB ¶ 91.)  While Google asserts that "OEMs are not

1  required to ship Android devices with Google Play" (Mot. 6), forgoing Google Play means forgoing

2  Google's essential bundle of services as well.  As Plaintiffs allege, OEMs find it is not commercially

3  viable for them to ship *any* Android devices without that bundle of services and thus, under the MADAs,

4  without Google Play.  (Epic ¶ 82; PSB ¶ 91.)  The MADAs require OEMs "to locate [Google Play] on

5  the 'home screen' of each mobile device . . . ensur[ing] that [Google Play] is the most visible app store

6  any user encounters and plac[ing] any other app store at a significant disadvantage."  (Epic ¶ 82; PSB

7  ¶ 91.)  Google refers to this conduct as requiring the "convenient placement of Google Play on the

8  device's home screen" (Mot. 6), but that euphemism camouflages the requirement's effect, which is to

9  exclude alternative app stores from "convenient placement" and make them less visible to consumers,

10  thus harming competition among OEMs and competing app distributors.  (Epic ¶¶ 82-83, 107; PSB

11  ¶ 9 n.25.)

12     *Second*, "Google interferes with OEMs' ability to distribute Android app stores and apps directly

13  to consumers outside [Google Play]."  (Epic ¶ 84; PSB ¶¶ 8, 112, 122.)  But for Google's

14  anticompetitive restraints, competing app distributors could negotiate with OEMs to make their app

15  stores directly available to consumers on the devices they sell.  (Epic ¶ 83; PSB ¶ 127.)  Google prevents

16  such competition.  Indeed, after Epic reached an agreement with the OEM OnePlus "to allow users of

17  OnePlus mobile devices to seamlessly install *Fortnite* and other Epic games by touching an Epic Games

18  app on their devices," Google "demanded that OnePlus not implement its agreement with Epic with the

19  limited exception of mobile devices sold in India."  (Epic ¶ 85.)  OnePlus told Epic that Google was

20  "particularly concerned that the Epic Games app would have [the] ability to potentially install and

21  update multiple games"—*i.e.*, would function as a competing app store.  (Epic ¶ 85.)  OnePlus also

22  reported that Google would not lift its restriction due to the "Epic Games app serving as a potential

23  portfolio of games and game updates."  (Epic ¶ 85.)  In other words, by using its power over OnePlus as

24  the licensor of Android and related services, Google blocked Epic from competing with Google in the

25  distribution of apps.  (Epic ¶ 85.)

26     Google likewise "prevented LG from pre-installing the Epic Games app on LG devices."  (Epic

27  ¶ 86.)  LG told Epic "that it had a contract with Google 'to block side downloading off [Google Play]

28

1    this year', but that the OEM could 'surely' make Epic games available to consumers if [Google Play]

2    were used".  (Epic ¶ 86.)

3                  **2.      Restrictions on Direct Distribution**

4           Google also uses the Android OS to restrict the viability of directly downloading apps and app

5    stores from a developer's website, a common distribution path on other platforms.  "Although Google

6    nominally allows consumers to directly download and install Android apps and app stores—a process

7    that Google pejoratively describes as 'sideloading'—Google has ensured, through a series of

8    technological impediments imposed by the Android OS, that direct downloading remains untenable for

9    most consumers."  (Epic ¶ 94-102; PSB ¶¶ 8, 99, 109-13, 118-22.)  For example, "depending on the

10   version of Android running on a mobile device, downloading and installing *Fortnite* on an Android

11   device could take as many as 16 steps or more, including requiring the user to make changes to the

12   device's default settings and manually granting various permissions."  (Epic ¶ 96.)  Google causes the

13   Android OS to display pretextual warnings about the supposed dangers of installing alternative app

14   stores and individual apps that deter most consumers from directly downloading apps and ensure that

15   direct downloading exerts no competitive pressure on Google.  (Epic ¶¶ 96-98; PSB ¶¶ 8, 110.)

16   Google's so-called "Advanced Protection Program" disables direct downloading for some users entirely.

17   (Epic ¶ 99.)  Google improperly disputes these specific factual allegations; its assertion that "all Android

18   users are freely able to install competitive app stores" is not cognizable on a motion to dismiss.

19   (Mot. 17.)

20          Moreover, Plaintiffs allege that Google has the power to "prevent the installation of, prompt a

21   consumer to uninstall, or forcibly remove the app from a consumer's device" on the basis of Google's

22   unilateral determination that an app is "harmful."  (Epic ¶ 99.)  Google has flagged at least one

23   competing app store, Aptoide, as "harmful," disabling users' ability to access it until Aptoide obtained

24   an injunction against Google.  (Epic ¶ 100; PSB ¶ 124.)

25                  **3.      Restrictions on Android App Stores**

26          Even if a user is tech-savvy (and persistent) enough to install an alternative app store, Google

27   restricts the operation of such stores and prevents them from becoming viable competitors to Google

28   Play.  Google denies alternative app stores "the permissions necessary to be seamlessly updated in the

background," allowing such updates "only for apps downloaded via [Google Play]," and "may require users to go through many of the steps in the downloading process repeatedly, again triggering many of the same warnings" that Google imposes when apps are directly downloaded.  (Epic ¶ 98; PSB ¶¶ 123-26.)  Google's motion points to app stores operated by certain OEMs—Samsung and LG—but these app stores are available only on the devices manufactured by each respective OEM, thus offering developers a limited footprint.  (Epic ¶ 71.)  For example, Samsung's Galaxy Store runs a distant second to Google Play and is the only alternative app store pre-installed on more than 10 percent of smart mobile devices outside of China.  (PSB ¶ 74.)  Because users of other OEMs' devices cannot access the app stores of Samsung or LG, app developers still must use Google Play to reach most Android users.  (Epic ¶ 71.)

### 4.      Restrictions on Android App Developers

Plaintiffs allege that Google forces developers to agree to be listed in Google Play if they wish to effectively advertise their apps.  Specifically, Google "conditions app developers' ability to effectively advertise their apps to Android users" through Google's App Campaigns program—which controls highly desirable, specially optimized ad placements on Google properties, such as Google Search and YouTube—on the developers' agreement to "list their app in either [Google Play] (to reach Android users) or in the Apple App Store (to reach Apple iOS users)."  (Epic ¶ 93; PSB ¶ 105.)  Google does not address these allegations.

Google does repeatedly note that, through its standardized agreements with developers, called the Developer Distribution Agreement ("DDA"), Google also "prohibits the distribution of any competing app store through [Google Play], without any technological or other justification."  (Epic ¶ 89; PSB ¶ 103.)  This is just another way—and by no means the "central" way (*cf.* Mot. 7, 13)—that Google forecloses alternative paths for making app stores available to users of Android.

Through this conduct, Google has caused anticompetitive effects that harm participants in the relevant markets.  Google prevents OEMs, which are hamstrung in their ability to innovate and compete, from "offering Android devices with tailored combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers."  (Epic ¶¶ 107, 108, PSB ¶ 127.)  This forecloses would-be competing app distributors, such as Epic, which could otherwise "innovate new models of app distribution" and provide "OEMs, app developers, and consumers choice beyond Google's own app

store."  (Epic ¶ 108; PSB ¶ 104.)  Google injures developers, who are "forced to agree to Google's anti-competitive terms and conditions if they wish to reach many Android users," are prevented "from experimenting with alternative app distribution models," and are "harmed by Google's supra-competitive taxes of 30% on the purchase price of apps distributed through [Google Play]."  (Epic ¶¶ 109-10, PSB ¶¶ 127, 136, 140.)  Google's supra-competitive fees also harm consumers, who are denied innovative and superior channels for discovering and obtaining apps, and who "are left to sift through millions of apps in one monopolized app store, where Google controls which apps are featured and which apps are identified or prioritized in user searches."  (Epic ¶ 111, PSB ¶ 13.)

        **C.**     **Google's Conduct in the Android In-App Payment Processing Market.**

Google does not contest that Plaintiffs properly alleged (1) an "Android In-App Payment Processing Market," which comprises "the payment processing solutions that Android developers could turn to and integrate into their Android apps to process the purchase of . . . in-app digital content," and (2) Google's monopoly power in that market.  (Epic ¶¶ 114, 122-24; PSB ¶¶ 170-73.)

With respect to the in-app payment processing market, Plaintiffs allege a straightforward contractual tie:  "Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and in-app digital content," and Google's Developer Program Policies, which developers must obey under Section 4.1 of the DDA, require developers to use Google Billing when offering digital products in an app downloaded from Google Play.  (Epic ¶¶ 125-26; PSB ¶ 193.)  Google concedes the contractual tie: "Google will not approve an app for distribution through Google Play if a developer violates Google Play's guidelines and seeks to evade Google Play's Billing system for" in-app purchases.  (Mot. 7.)  Plaintiffs further allege that "app developers such as Epic have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed."  (Epic ¶ 179; PSB ¶ 248.)  But because "there is no viable substitute to distributing Android apps through [Google Play]" (Epic ¶ 72; PSB ¶ 104), Google's contractual tie coerces Android app developers into using Google's payment processing services as a condition of their access to the hundreds of millions of Android users (Epic ¶¶ 12, 113; PSB ¶ 247).

1    Because Google has monopoly power in Android app distribution through Google Play, and

2    Google requires all apps distributed through Google Play to use Google Billing for purchases of in-app

3    digital content, Google Billing enjoys a near-total monopoly share within the payment processing

4    market.  (Epic ¶ 122, 123; PSB ¶ 170.)  Google's market power is also manifest in its supra-competitive

5    30% fee, which "is often ten times higher than the price typically paid for the use of other electronic

6    payment solutions."  (Epic ¶¶ 24, 124; PSB ¶ 14.)  And its tying arrangement directly harms the

7    competitive process, preventing app developers "from integrating alternative, even multiple, payment

8    processing solutions into their mobile apps" and thus "depriving app developers and consumers alike a

9    choice of competing payment processors" that could "offer better functionality, lower prices, and better

10   security."  (Epic ¶¶ 127, 132; PSB ¶¶ 14, 171.)  Indeed, when Epic introduced its payment processor as

11   an option in *Fortnite*, Google "removed *Fortnite* from [Google Play] listings" and "prevented Android

12   users who acquired *Fortnite* from [Google Play] from obtaining app updates they will need to continue

13   playing with their friends and family," thereby excluding a competing payment processor within hours

14   of its entry.  (Epic ¶¶ 28-30; PSB ¶ 150.)

15   **III.    LEGAL STANDARDS**

16          To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief

17   that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "All allegations of

18   material fact in the complaint are taken as true and construed in the light most favorable to Plaintiffs."

19   *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020).

20          Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy[] in

21   restraint of trade or commerce among the several States."  15 U.S.C. § 1.  "To establish liability under

22   § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in

23   unreasonable restraint of trade."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020).

24          Section 2 of the Sherman Act prohibits the "monopoliz[ation of] any part of the trade or

25   commerce among the several States, or with foreign nations."  15 U.S.C. § 2.  To plausibly plead a

26   Section 2 claim, plaintiffs must allege:  "(a) the possession of monopoly power in the relevant market;

27   (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury."  *In re Nat'l*

28   *Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019).

IV.     ARGUMENT

   A.     ANTITRUST VIOLATIONS IN THE APP DISTRIBUTION MARKET.

   Plaintiffs have pleaded Section 1 and 2 claims concerning harm to competition and maintenance of monopoly in the Android App Distribution Market.  Google's anticompetitive practices effectively foreclose competing app distributors—including Epic—from the market, securing a durable monopoly that has resulted in Google Play providing more than 90% of Android app downloads from app stores.

   Google's conduct is reminiscent of the conduct at issue in *United States v. Microsoft*.  Like Google, Microsoft imposed contractual restrictions on OEMs and software developers, and other "technological shackles," preventing the distribution of competing browsers and constituting "anti-competitive means to maintain a monopoly."  253 F.3d at 46, 64.  Microsoft's restrictions, which were imposed as a condition of licensing the Windows operating system, included "the prohibition upon the removal of desktop icons, folders and Start menu entries" for Microsoft's web browser; restrictions on "modifying the initial boot sequence" of Windows, which the OEMs had used to "promote the services" of Internet service providers that distributed competing browsers; and restrictions that prevented "OEMs from making various alterations to the desktop."  *Id.* at 61-62.  Because these vertical restraints "reduced rivals' browser shares not by improving [Microsoft's] own product but, rather, by preventing OEMs from taking actions that could increase rivals' share of usage," they were "anticompetitive."  *Id*. at 62.

   In many ways, Google has followed Microsoft's former playbook.  It places restrictions on OEMs to prevent them from taking actions that would increase usage of competing app stores or other app distribution methods, and that are imposed as a condition of OEMs gaining access to a suite of "must have" services.  (Epic ¶¶ 84-86, 145; PSB ¶ 127.)  Just as Microsoft dictated aspects of the PC desktop, Google's MADAs require OEMs to place Google Play on the "home screen of each mobile device" and to install "up to 30 Google mandatory apps" and "locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that could otherwise be occupied by competing app stores and other services."  (Epic ¶ 82; PSB ¶ 91.)  Google also directly prevented two OEMs from pre-installing Epic's app launcher.  (Epic ¶¶ 85-86.)  And just as Microsoft coerced software developers by conditioning favorable treatment on acceding to its demands, Google

1  "conditions app developers' ability to effectively advertise their apps to Android users" on the

2  developers' agreement to distribute their apps through Google Play.  (Epic ¶ 93; PSB ¶ 105.)

3        Indeed, Google even goes further than Microsoft ever went to place obstacles in consumers'

4  way.  To obtain apps outside Google Play, users face dire warnings that downloading a common app

5  like *Fortnite* outside of Google Play "can harm your device" and render it "more vulnerable to attack by

6  unknown apps," and requirements that users "agree" that they are "responsible for any damage to your

7  phone or loss of data," even when the app is being obtained from a trusted source, such as through an

8  OEM's pre-installation.  (Epic ¶¶ 97, 98; PSB ¶¶ 123-26.)  Google has also disabled the ability of

9  developers and distributors to automatically update apps downloaded through a channel other than

10 Google Play.  (Epic ¶ 19; PSB ¶ 8.)  In *Microsoft*, lesser technological barriers were found to be

11 anticompetitive.  *Microsoft*, 253 F.3d at 65 (condemning as anticompetitive OS restrictions that made

12 using rival browsers "unpleasant . . . for users" and "deter[red] consumers from using a browser other

13 than [Microsoft's] even though they might prefer to do so, thereby reducing rival browsers' usage and

14 share").

15       Google does not dispute that it possesses monopoly power in a well-defined app distribution

16 market.  Instead, Google advances three arguments, each of which should be rejected.

17             **1.**        **Plaintiffs' Claims Do Not Depend on Any Duty To Deal.**

18       In seeking dismissal of Plaintiffs' claims relating to the app distribution market (Epic

19 Counts 1-3, PSB Counts 1-2), Google primarily argues that "a plaintiff's antitrust claim fails if, as here,

20 it is premised on the defendant's duty to help a competitor compete."  (Mot. 9.)  But Google's argument

21 is premised on a mischaracterization of Plaintiffs' claims:  namely, that "the central pillar of Plaintiffs'

22 theory of anticompetitive harm is that Google unlawfully maintains its alleged monopoly in Android app

23 distribution by refusing to allow competitor app stores inside Google Play."  (Mot. 7-8.)  What Plaintiffs

24 allege is that "Google has willfully and unlawfully maintained its monopoly in the Android App

25 Distribution Market *through a series of related anticompetitive acts* that have *foreclosed competing*

26 *ways of distributing apps* to Android users."  (Epic ¶ 80 (emphasis added); PSB ¶ 6.)  Plaintiffs allege

27 that Google has foreclosed *all* competing means for distributing apps on Android; the restrictions it

28 imposes on Google Play are meaningful (and illegal) specifically because they operate in concert with

1    Google's restrictions on all other distribution channels.  Google's duty-to-deal argument does not

2    address the other distribution channels it forecloses, which have nothing to do with Google Play.  For

3    example, Google forecloses distribution through OEMs by "restrict[ing] which apps and app stores

4    OEMs are permitted to pre-install on the devices they make," and it forecloses distribution through

5    developer websites by "impos[ing] deterrents to the direct distribution of competing app stores and apps

6    to Android users."  (Epic ¶ 57; PSB ¶ 127.)  Together, these and other restrictions foreclose competition

7    on all alternative channels and force developers to use Google Play.  (Epic ¶¶ 57, 80; PSB ¶ 104.)

8         Google's narrow focus on the restriction of competing app stores in Google Play is misguided.

9    "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the

10   various factual components and wiping the slate clean after scrutiny of each."  *Continental Ore Co. v.*

11   *Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).  An accused monopolist cannot avoid

12   antitrust scrutiny by attempting to defend aspects of its conduct in isolation.  *City of Anaheim v. S. Cal.*

13   *Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("it would not be proper to focus on specific individual

14   acts of an accused monopolist while refusing to consider their overall combined effect"); *Church &*

15   *Dwight Co. v. Mayer Labs., Inc.*, No. C-10-4429 EMC, 2011 WL 1225912, at *15-16 (N.D. Cal. Apr. 1,

16   2011) (sustaining cumulative claim "even if the additional claims viewed separately were insufficient to

17   state independent Sherman Act violations"); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir.

18   2003) ("As the Supreme Court recognized . . . the courts must look to the monopolist's conduct taken as

19   a whole rather than considering each aspect in isolation.").  Thus, the Court need not address whether

20   Plaintiffs could state a claim by alleging *only* that Google, as a monopoly distributor, refused to

21   distribute competitive stores through Google Play.  That is not the claim Plaintiffs pleaded.  They

22   pleaded that Google has substantially foreclosed all alternative channels by its anticompetitive conduct.

23        None of the duty-to-deal cases relied on by Google address anything similar to the systematic

24   restrictions that maintain Google's monopoly in app distribution.  Instead, Google's cases address

25   claims focused singularly on an alleged failure sufficiently to aid rivals.  In *Trinko*, customers who

26   received local telephone service from one of Verizon's rivals sued Verizon, alleging that it had engaged

27   in anticompetitive practices by delaying orders placed by customers of its competitors, thereby violating

28   Verizon's "duty to deal" with competitors.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*

*LLP*, 540 U.S. 398, 404 (2004).  Plaintiffs did not allege that Verizon took any affirmative steps to restrict competitors' access to customers.  The Supreme Court held that "Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents."  *Id.* at 410.  In this case, however, Plaintiffs do not allege that Google simply provides "insufficient assistance" by not carrying other app stores on Google Play but, rather, that Google has implemented a broad anticompetitive scheme involving restrictions on OEMs, direct downloading, app updates, app advertising, and more.  This scheme substantially forecloses all alternative distribution channels for Android apps and app stores.

Google also erroneously relies on *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009).  There, AT&T both competed in the retail market for DSL service to consumers and sold at inputs at wholesale to its competitors.  Plaintiffs alleged that AT&T squeezed its retail competitors out of the market by simultaneously raising the wholesale price it charged its competitors and cutting the retail price for its consumers.  *Id.* at 442.  The case did not involve any allegation that AT&T restricted retailers' access to its network or to end consumers.  Relying on *Trinko*, the Court held that the wholesale claim failed because the defendant had no antitrust duty to deal with its competitors at the wholesale level on any terms, let alone the terms its competitors would prefer.  *Id.* at 457.  But again, unlike in *linkLine*, Plaintiffs' allegations do not turn on the "prices, terms, and conditions" of agreements between Google and competing app distributors for the distribution of their stores on Google Play.  *See id.* at 448.  Rather, Epic and other potential app distributors wish to be free not to deal with Google at all.  They seek to stop Google's interference with their ability to access Android users, *without* going through Google Play, including by "distribut[ing their] Android apps to users in any way [they] want, using any distribution approach or combinations of approaches that meets [their] needs."  (Epic ¶ 61.)  Google is violating the Sherman Act by imposing restrictions that foreclose competing distributors from *all avenues* by which they could reach Android users, including through agreements with OEMs and technical restrictions that Google's argument does not address.  (Epic ¶ 80; PSB ¶ 6.)

Finally, Google cites *FTC v. Qualcomm*, which held that Qualcomm did not have an antitrust duty to license its standard-essential patents to competing chip suppliers.  969 F.3d at 993-94.  But again, Plaintiffs do not claim that Google has a standalone duty under the antitrust laws to deal with its

1    competitors.  Plaintiffs instead seek to bar Google from preventing competing app distributors from

2    reaching Android users through various channels that, in the absence of Google's anticompetitive

3    restrictions, would be freely available to them.  The barring of app stores from Google Play is just one

4    facet of Google's larger anticompetitive conduct.  (Epic Count 3; PSB Counts 1-2.)[2]

5              **2.      Google's Agreements with Developers Violate Section 1 of the Sherman Act.**

6              In Count 3 of its Complaint, Epic challenges Google's anticompetitive agreements with

7    developers as an unreasonable restraint of trade under Section 1 of the Sherman Act.  Google seeks

8    dismissal of that count on the ground that a claim of "concerted action" under Section 1 cannot be

9    predicated on agreements that are "unilaterally set by the defendant, even if a counterparty accepts or

10   acquiesces."  (Mot. 12.)  But nothing in the Sherman Act or in the precedent Google cites imposes such

11   a limitation on Section 1 claims.

12             A Section 1 claim must allege "concerted action of more than a single entity."  *The Jeanery,*

13   *Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1152 (9th Cir. 1988).  "One way of proving concerted action is

14   by express agreement."  *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166,

15   1192 (N.D. Cal. 2009).  That agreement need not advance the interests of all parties involved in it;

16   antitrust law is littered with cases in which a dominant firm coerced multiple other (typically

17   downstream) firms to accept terms that directly harmed its rivals.  Indeed, exclusive dealing

18   arrangements and tying arrangements usually involve some form of coercion yet still are considered

19   concerted action that may give rise to Section 1 liability.  *See, e.g.*, *Datagate, Inc. v. Hewlett-Packard*

20   *Co.*, 60 F.3d 1421, 1427 (9th Cir. 1995) ("A showing that the buyer of the tied product was coerced by

21   the tying arrangement into making the purchase is sufficient to show that the buyer was not merely

22   'acting independently'"); *Cargill Inc. v. Budine*, 2007 WL 4207908, at *3 (E.D. Cal. Nov. 27, 2007);

23   *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1085 (C.D. Cal. 2017).

24             Google's argument is contrary to common sense.  It would mean, for example, that even

25   coercing all developers to distribute their apps *exclusively* through Google Play would not be "concerted

26

27   _____

     [2] Another duty-to-deal decision, *Blix Inc. v. Apple, Inc.*, 2020 WL 7027494, at *7-*8 (D. Del.
     Nov. 30, 2020), was issued after Google filed its motion.  Unlike Plaintiffs here, the plaintiff in *Blix*
28   argued for a duty to deal and focused only on markets for particular types of apps—specifically, email
     apps.  *Blix* did not involve anything like Google's broad foreclosure of all competing means of app
     distribution.

1  action" in violation of Section 1 of the Sherman Act.  That is nonsensical, and it is not the law.  *See*

2  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010)

3  (exclusive dealing arrangements that substantially foreclose competition violate Section 1).  And just

4  like exclusive dealing agreements, the challenged agreements between Google and app developers

5  prohibit or substantially burden actions the developers could otherwise take (*e.g.*, distributing a

6  competing app store and forgoing distribution on Google Play) that would allow for competition against

7  Google Play in the distribution of Android apps.  Such agreements, like exclusivity or tying agreements,

8  satisfy the "concerted action" requirement even though Google has sufficient market power to force

9  developers into those agreements and dictate the terms.

10         Nothing in the decisions cited by Google supports a different conclusion.  In *Toscano v.*

11  *Professional Golfers' Association*, a pro golfer who failed to qualify for the Senior PGA Tour brought

12  Section 1 claims against firms that sponsored individual golf tournaments, because they accepted PGA

13  Tour terms that allegedly harmed competition among golfers.  258 F.3d 978, 981-83 (9th Cir. 2001).

14  The Ninth Circuit held that the defendant tournament sponsors, who "had no involvement in the

15  establishment or enforcement of the allegedly anticompetitive provisions" set by the PGA Tour, could

16  not face Section 1 liability.  *Id.* at 984-85.  But that logic does not apply to Google here; unlike the

17  tournament sponsors in *Toscano*, Google itself establishes and enforces the anticompetitive provisions.

18  As noted above, courts have entertained Section 1 claims against other firms, like Google, that set the

19  anticompetitive terms that downstream firms are forced to accept.  *See, e.g.*, *Datagate*, 60 F.3d at 1427.

20         Likewise, *Sambreel Holdings LLC v. Facebook* does not help Google.  The plaintiff in that case

21  claimed a *per se* unlawful horizontal "group boycott" to "use only the Advertising Partners that have

22  been approved by Facebook."  906 F. Supp. 2d 1070, 1076 (S.D. Cal. 2012).  The alleged competitors

23  were app developers that created apps to be accessed within Facebook.  *Id.*  In the portion of the

24  decision cited by Google, the court found that there was no agreement among the competing app

25  developers but, rather, only "independent agreements between each app developer and Facebook."  *Id.*

26  Because there were "no allegations that any of the [app developers] themselves agreed with one

27  another," no *per se* unlawful group boycott claim was stated.  *Id.*  That holding is irrelevant here because

28  Plaintiffs do not allege horizontal agreements among app developers.  And although *Sambreel* also

1    dismissed an alternative claim regarding the vertical arrangements that Facebook imposed on app

2    developers, the deficiency in that claim did not relate to the allegations about concerted action.  The

3    claim was dismissed because plaintiffs had insufficiently alleged that Facebook's restraints "caused

4    substantial actual anticompetitive effects."  *Id.*

5           Finally, Google seizes on dicta in *hiQ Labs Inc. v. LinkedIn Corp*, which stated that Section 1

6    claims "*typically* involve concerted action between multiple defendants or between a defendant and a

7    third party that harms the plaintiff—not concerted action between the defendant and the plaintiff."  2020

8    WL 5408210, at *12 (N.D. Cal. Sept. 9, 2020) (emphasis added).  But the court acknowledged that this

9    is not always so, noting that "[a] tying theory is usually brought under § 1 of the Sherman Act instead of

10   § 2," and that "a contract between a buyer and seller satisfies the concerted action element of section 1

11   of the Sherman Act where the seller coerces a buyer's acquiescence in a tying arrangement imposed by

12   the seller."  *hiQ*, 2020 WL 5408210, at *11 n.6; *see also Kodak*, 504 U.S. at 463 n.8.  The court in *hiQ*

13   thus recognized that Section 1 liability may lie when, as here, the defendant "coerces a buyer's

14   acquiescence".  Google's contention that a defendant can escape Section 1 liability by being powerful

15   enough to *coerce* an agreement's terms, rather than negotiate them, finds no support in precedent or in

16   logic.

17           **3.     Google Substantially Forecloses Competition in the Android App
                      Distribution Market.**

18

19           Plaintiffs adequately allege that Google has substantially foreclosed competition in the Android

20   app distribution market.  Google has imposed its exclusionary technical and contractual restrictions on

21   every OEM for Android devices and on virtually every Android device outside China—leading to

22   durable market shares above 90% for Google.  (Epic ¶¶ 82, 221; PSB ¶¶ 91, 246.)

23           Google's argument that *some* alternative distribution channels exist (Mot. 13-18) is unavailing.

24   The test for substantial foreclosure "is not total foreclosure, but whether the challenged practices bar a

25   substantial number of rivals or severely restrict the market's ambit."  *United States v. Dentsply Int'l,*

26   *Inc.*, 399 F.3d 181, 191 (3d Cir. 2005); *see also McWane, Inc. v. F.T.C.*, 783 F.3d 814, 840 (11th Cir.

27   2015); *Church & Dwight*, 2011 WL 1225912, at *14 (denying motion to dismiss because "extensive

28   allegations establish anticompetitive conduct and the foreclosure of competition in a substantial share"

of relevant market).  Substantial foreclosure means that 'the opportunities for other traders to enter . . . [the] market are significantly limited."  *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1230 (C.D. Cal. 2012) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).  And in assessing substantial foreclosure, courts consider "the effects of [the alleged] conduct in the aggregate, including, as appropriate, cumulative or synergistic effects."  *Church & Dwight*, 2011 WL 1225912, at *16.

Google also tries to underplay the effects of its anticompetitive conduct and overplay the availability of competitive alternatives by offering alternative facts and inviting the Court to determine that app developers "can reach the ultimate consumers of the product by employing existing or potential alternative avenues of distribution."  (Mot. 14.)  But this effort to contradict Plaintiffs' allegations is not appropriate on a motion to dismiss, and the limited alternative avenues for distribution do not undermine Plaintiffs' allegations of substantial foreclosure.  (Epic ¶ 70; PSB ¶ 75.)

For example, Google argues that "no OEM making an Android device is required to license Google Play or any other Google app."  (Mot. 15.)  That argument fails to address Plaintiffs' allegations that, as a commercial reality, OEMs have no choice but to license Google Play and the essential services that Google bundles with it, and that in fact *all* Android OEMs *have* licensed the bundle of essential Google services under the MADAs.  (Epic ¶ 15; PSB ¶¶ 63-67, 74.)  Ignoring the bundling allegations, Google argues that the "must-have" nature of Google Play means it "is the best app store available" and that Google has therefore succeeded on the merits.  (Mot. 16.)  Not only can that factual dispute *not* be resolved on a motion to dismiss, *see eBay, Inc. v. Bidder's Edge Inc.*, 2000 WL 1863564, at *3 (N.D. Cal. July 25, 2000) ("eBay's arguments regarding the merits of this [antitrust] allegation are not appropriately resolved on motion to dismiss"), but it is also irrelevant under Section 2.  Even a monopolist with a "superior product" may not "employ[] exclusionary tactics to maintain an existing monopoly."  *Greyhound Computer Corp. v. IBM*, 559 F.2d 488, 503 (9th Cir. 1977).[3]

Google tries to buttress its argument on substantial foreclosure by pointing out that two OEMs pre-install an OEM-specific app store on devices they sell.  (Mot. 15.)  This does not rebut Plaintiffs'

---

[3] Similarly, Google asks the Court to find that it "invites competition on the merits from those app stores that can allegedly offer less cluttered or easier-to-use app stores" than Google Play (Mot. 16), but Google provides no argument or citation in support, and the assertion is obviously contradicted by Plaintiffs allegations.

allegations of substantial foreclosure.  Google does not address allegations that it limits those two app

stores to devices sold by the particular OEM and, thus, prevents them from competing in the broader app

distribution market.  Google does not address allegations that other would-be distributors, such as Epic,

are completely foreclosed.  And Google does not address allegations that there is no real competitive

alternative to Google Play because any app developer that wishes to distribute apps to Android devices

from other OEMs would still need to use Google Play to reach them.  (Epic ¶¶ 71-72, 104, 108; PSB

¶¶ 5, 74, 104.)  That is why Google Play accounts for the vast majority of app downloads through app

stores on Android and lists far more apps than any competing Android store.  (Epic ¶ 70; PSB ¶ 74.)

Google's restrictions keep the usage of the two OEM-run app stores "below the critical level necessary"

for "any other rival to pose a real threat to" Google's monopoly.  *See Microsoft*, 253 F.3d at 71.  This is

more than enough to allege substantial foreclosure—which again requires that the "opportunities for

other traders to enter . . . are significantly limited or severely restricted," not completely foreclosed.

*RealPage*, 852 F. Supp. 2d at 1230.

 Google also argues that "Plaintiffs' allegations regarding Google's placement requirements fall

short of alleging actual foreclosure of rival app stores" because Plaintiffs do not allege that Google

"prevent[s] rival app stores from also being pre-installed on the home screen, or that end users are

prohibited from downloading alternative app stores and placing them on their home screen."  (Mot. 17.)

But Plaintiffs allege that Google prevents pre-installation and direct downloading almost entirely.  (Epic

¶¶ 15-16, 72, 101-02; PSB ¶ 104.)  And Google's placement requirements further "thwart[] the

distribution of a rival [platform] by preventing OEMs from removing visible means of user access to

[the defendant's platform]."  *Microsoft*, 253 F.3d at 61.

 Finally, Google argues that Plaintiffs "concede that consumers may install apps, and even

competing app stores, directly from the internet" and that "the availability of direct distribution defeats

any claim that Google has foreclosed alternative distribution paths."  (Mot. 4, 17-18.)  But what

Plaintiffs allege is that Google has ensured, through a series of technological impediments imposed by

the Android OS, "that direct downloading remains untenable for most consumers."  (Epic ¶¶ 94-102;

PSB ¶¶ 8, 99, 109-13, 118-22.)  Although Google repeatedly asserts that merely "discouraging" direct

downloading, without banning it altogether, cannot constitute foreclosure (Mot. 13), the law is to the

contrary.  Restrictions that make alternatives "unpleasant . . . for users," and therefore "deter[]
consumers from using" them, may substantially foreclose a nominally available channel of distribution.
*Microsoft*, 253 F.3d at 64-65.  And Google's suggestion that its repeated warnings to consumers are a
justified means to address concerns about "malware or other security issues" (Mot. 18) is a factual
assertion that goes far beyond the Complaints and cannot be resolved on a motion to dismiss.  *In re
NCAA Student-Athlete Name & Likeness Licensing Litig.*, 990 F. Supp. 2d 996, 1005 (N.D. Cal. 2013);
*see also, e.g.*, *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003); *Hill
v. HD Supply Facilities Maint., Ltd.*, 2020 WL 4365878, at *5 (D. Ariz. July 29, 2020).[4]

## B.   ANTITRUST VIOLATIONS IN THE IN-APP PAYMENT PROCESSING MARKET.

Google forces app developers that distribute apps through Google Play to use Google Billing to
process in-app payments for digital products.  Through this requirement, Google has unlawfully
acquired and maintained a monopoly in the unchallenged in-app payment processing market, unlawfully
restrained trade, and imposed an unlawful tie.

### 1.   Plaintiffs Allege an Illegal Tying Arrangement, Not a Refusal to Deal.

Google's primary defense, in Part V.A and Part V.C of its motion, is to contend that Plaintiffs
challenge a unilateral refusal to deal, which Google argues is generally shielded from antitrust scrutiny.
That argument conflates the rules applicable to an *unconditional* refusal to deal with the more searching
scrutiny given to a *conditional* refusal—which is what Google engages in here.  The Supreme Court
made the distinction clear in *Kodak*.  Plaintiffs there claimed that Kodak "had unlawfully tied the sale of
service for Kodak machines to the sale of parts, in violation of § 1 of the Sherman Act," and Kodak
argued that "this practice is only a unilateral refusal to deal, which does not violate the antitrust laws."
504 U.S. at 459, 463 n.8.  The Supreme Court disposed of Kodak's flawed position in a footnote, ruling
that even if "Kodak's refusal to sell parts to any company providing service can be characterized as a
unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from
Kodak is not."  *Id.* at 463 n.8; *see also, e.g.*, *Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*,

---

[4] To the extent Google touts purported benefits to the Android "ecosystem" (Mot. 3), this too is a
factual defense.  The existence and sufficiency of any pro-competitive justifications for Google's
conduct is a matter to be addressed with the benefit of a complete record.

878 F. Supp. 1389, 1396 (W.D. Wash. 1993) ("A manufacturer generally has the right to unilaterally refuse to deal.  The refusal to deal with third parties conditioned on failure to purchase other goods or services, however, is not a unilateral refusal."), *aff'd*, 37 F.3d 1504 (9th Cir. 1994).

So too here.  Google conditions the distribution of an app on the developer's agreement to use Google Billing for in-app purchases of digital content.  (Epic ¶ 125; PSB ¶ 193.)  That is a *conditional* refusal to deal, not a *unilateral* refusal subject to the precedent Google relies on.[5]  What Google is trying to pass off as a unilateral refusal to deal is actually a garden-variety illegal tie.  "A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market."  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008); *see also Kodak*, 504 U.S. at 462-63 (same).  Many ties could be recast as a conditional refusal to deal, but that does not safeguard them; "Congress expressed great concern about the anticompetitive character of tying arrangements" when enacting the antitrust laws, recognizing that they allow a seller that has dominated one market "to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 10-12 (1984).

Google tries to defend the tie by arguing that, without it, "developers could free-ride on Google's investment" and Google "would not be able to charge at all for distribution services."  (Mot. 20.)  But that argument cannot transform an illegal tie into a unilateral refusal to deal; it is merely another impermissible attempt by Google to argue, on the basis of claimed facts outside the Complaints, that Google's policy has legitimate business justifications.  That intrinsically factual argument must be rejected on a motion to dismiss.  *See In re NCAA*, 990 F. Supp. 2d at 1005 ("Whatever the merits of these [procompetitive] arguments, they are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage."); *Hill*, 2020 WL 4365878, at *3.  Indeed, Google's argument would require the Court to assume, among other things, that (1) the Google Billing commission is only a charge for "distribution services" rather than, as Plaintiffs allege, for facilitating in-app payments (Epic ¶¶ 114, 179; PSB ¶¶ 170, 248); (2) Google would be able in a competitive market

---

[5] Nor does it matter that Google Play will accept app developers who do not offer in-app purchases of digital content.  Under Google's rules, any developer with a demand for in-app payment processing that wants to be on Google Play must use Google Billing.  That is conditioning, and that is a tie.

1   to demand a 30% commission for the right to distribute Android apps, including the highly desirable and

2   popular *Fortnite* game, contrary to the allegations in the Complaints (Epic ¶¶ 108-110; PSB ¶¶ 127, 136,

3   140); and (3) Google would have no other feasible way of earning a return on its "investments" in

4   Google Play, again contrary to the allegations in the Complaints (Epic ¶¶ 89, 146, 154, 170; PSB ¶¶ 103,

5   140, 142, 197, 208).  The Court cannot make these assumptions on a motion to dismiss.

6               **2.      Google Substantially Forecloses Competition in the Android In-app Payment
                          Processing Market.**

7

8           In Parts V.B and V.C of its motion, Google contends that Plaintiffs "state no cognizable harm to

9   competition" in the market for in-app payment processing.  Google's primary argument is that

10  "alternative app stores are not foreclosed from the alleged Android App Distribution Market" and that

11  those alternative app stores need not use Google Billing.  (Mot. 20, 22.)  This argument should be

12  rejected for several reasons.

13          *First*, the argument is derivative of Google's argument about the purported lack of substantial

14  foreclosure in the app distribution market and should be rejected for the same reasons.

15          *Second*, the argument is irrelevant to Plaintiffs' allegations that Google's tie is *per se* unlawful

16  because Google uses its monopoly power to coerce developers to use a service they otherwise would not

17  use.  (Epic ¶ 113; PSB ¶ 193.)  Plaintiffs need not demonstrate substantial foreclosure to make out a *per*

18  *se* tying claim, only that a "substantial" and not "*de minimis*" volume of commerce is affected.  *See*

19  *Datagate*, 60 F.3d at 1423-24.[6]

20          *Third*, in any event, the argument should be rejected even under the rule of reason because

21  alternative payment processors have been excluded from apps accounting for 90% of all Android

22  downloads.  Google's cases involved much lower percentages of foreclosure.  *See Omega Envtl., Inc. v.*

23  *Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (38% foreclosure rate); *R. J. Reynolds Tobacco Co.*

24

25

26          [6] Google's cases do not support the argument that the tie must be "evaluated under the rule of reason"
    because it involves "platform software products."  (Mot. 22.)  Although *Microsoft* applied the rule of
27  reason, it did so for *technological* integrations between an operating system and a web browser.
    *Microsoft Corp.*, 253 F.3d at 95.  *Microsoft* did not suggest that *per se* treatment not be given to purely
28  *contractual* ties such as Google's requirement that in-app purchases of digital content be processed
    through Google Billing.  Further, *Qualcomm*'s teaching regarding "novel business practices" does not
    apply because naked contractual ties, like Google's, are not "novel."  *Qualcomm*, 969 F.3d at 990-91.

1    *v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 388-90 (M.D.N.C. 2002) (34%); *Church & Dwight Co. v.*

2    *Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 913-14 (N.D. Cal. 2012) (45-51%).

3                    **3.      Google Play and Google Billing Are Separate Products.**

4            A tying claim requires that the tying product and the tied product be separate products.  *Cascade*,

5    515 F.3d at 913.  Google argues that its "billing system is an integral part of the method of business

6    Google is offering for the subset of apps distributed through Google Play that charge for apps and in-app

7    purchases."  (Mot. 21.)  In other words, Google argues that Google Play and Google Billing are not

8    separate products.  As a threshold matter, this argument is in tension with Google's decision not to

9    contest Plaintiffs' allegations of separate *markets* for app distribution services and for in-app payment

10   processing, because tying results in foreclosure of competition for sales "in a product market distinct

11   from the market for the tying item."  *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *11-12 (N.D.

12   Cal. Dec. 12, 2018) (rejecting defendant's integrated product argument by considering whether the

13   plaintiff "sufficiently alleged a market for different products"); *see also Smith v. eBay Corp.*, 2012 WL

14   1951971, *2-4 (N.D. Cal. May 29, 2012) (eBay tied the eBay auction service to sellers' use of the

15   separate PayPal payment processor, which foreclosed competing processors—such as Google

16   Checkout); *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677 (D. Del. 2013) (sustaining claims that

17   Facebook conditioned use of its platform to the Facebook Credits virtual currency, tying social gaming

18   services to virtual currency services).  And in any event, Google fails to address the relevant law and

19   facts.  To assess whether a tying product and a tied product are separate products, a court "examines

20   direct and indirect evidence of consumer demand."  *Teradata*, 2018 WL 6528009, at *12.  Direct

21   evidence includes "whether, when given a choice, consumers purchase the tied good from the tying

22   good maker, or from other firms."  *Id.* (quoting *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d

23   963, 975 (9th Cir. 2008)).[7]

24

25

26           [7] Google's cases do not support its motion.  *Rick-Mik Enterprises* observed that credit-card
     processing services are not distinct from "franchise packages" that include such services, based on
27   plaintiffs having pled no facts "indicating the existence of a separate market for credit-card processing
     services among franchisees."  532 F.3d at 975; *see also Kaufman v. Time Warner*, 836 F.3d 137, 145 (2d
28   Cir. 2016) ("The Complaint, therefore, fails to allege facts that, if proven, would show the existence of a
     demand for bi-directional cable boxes separate from the demand for Premium Cable Services.").  As
     discussed above, Plaintiffs here have pleaded facts showing separate demand.

1   Plaintiffs allege facts demonstrating that app developers and consumers "would prefer to choose"

2   from "alternative in-app payment processing options" rather than being forced to use Google Billing.

3   (Epic ¶ 179; PSB ¶ 248.)  For example, Google does not mandate that developers use Google Billing

4   when consumers purchase physical products and services within apps (*e.g.*, Amazon, Uber), and

5   consumers making such purchases choose a variety of payment processing solutions.  (Epic ¶¶ 116, 124,

6   130; PSB ¶¶ 171, 236.)  Only Google's unlawful restrictions prevent the proliferation of alternative

7   payment processors for digital purchases on Android—which is direct evidence of demand separate

8   from Google Play.  (Epic ¶¶ 115, 127; PSB ¶ 249.)  Plaintiffs properly allege separate demand, and

9   Google offers no argument to the contrary.

10   **C.  GOOGLE'S CONDUCT ALSO VIOLATES CALIFORNIA LAW.**

11   Google argues that Plaintiffs' claims under California law "fail for the same reasons" and that

12   the analysis under the Sherman Act is "instructive" or "mirrors" analysis of the California law claims.

13   (Mot. 22.)  The Court therefore may deny Google's motion on these claims for the same reasons it

14   should deny Google's motion on claims under the Sherman Act.  In particular, like Plaintiffs' federal

15   claims, the claims under California law do not rest on a duty-to-deal theory, and thus California law

16   addressing such a theory does not apply.  (Mot. 22-23.)  Plaintiffs also adequately allege substantial

17   foreclosure under California law for the same reasons explained above concerning the federal claims.

18   Indeed, like the Sherman Act, the Cartwright Act prohibits vertical restraints that substantially

19   foreclose competition in a relevant market.  *See, e.g., Pecover v. Electronic Arts Inc*., 633 F. Supp. 2d

20   976 (N.D. Cal. 2009) (denying motion to dismiss claim that video game manufacturer's vertical

21   anticompetitive restraints on the market for football video games through exclusive rights obtained for

22   NFL, NCAA, and AFL intellectual property violated the Cartwright Act); *Fisherman's Wharf Bay*

23   *Cruise Corp. v. Superior Court of San Francisco*, 114 Cal. App. 4th 309, 334-35 (2003) (reversing grant

24   of summary judgment against Cartwright Act claim because plaintiff cruise line presented sufficient

25   evidence of substantial foreclosure of competition in market caused by dominant cruise line's vertical

26   exclusive dealing arrangements with wholesale purchasers of bay cruises).

27   Separately, Google seeks dismissal of Epic's tying claim under California law (Count 10)

28   because it refers to Section 16727 of the Cartwright Act, which prohibits tying of "tangible" goods and

1    not a "service or license."  (Mot. 23-24.)  Even assuming Google is correct, Epic also states a claim

2    under Section 16720 of the Cartwright Act.  (*See* Epic ¶ 217.)  "A tying arrangement may be condemned

3    under either or both section 16720 and section 16727."  *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534,

4    541 (1998).  Section 16720 does not contain the limitation that Google relies upon in Section 16727, and

5    Google makes no argument why Epic's claim would fail under Section 16720.

6           Finally, Plaintiffs bring claims under the "unlawful" and "unfair" theories of California's UCL.

7    They allege claims of "unlawful" conduct for the same reasons Google violated the Sherman Act and the

8    Cartwright Act.  (*See* Mot. 24 (conceding this meaning of "unlawful").)  The Court may also sustain the

9    claims on the basis that Plaintiffs adequately allege "unfair" competition.  *See, e.g.*, *Beaver v. Tarsadia*

10   *Hotels, Corp.*, 816 F.3d 1170, 1177 (9th Cir. 2016).  Google argues that California imposes liability on

11   unfair conduct only if it "threatens an incipient violation of the antitrust laws."  (Mot. 24.)  This wrongly

12   truncates the test in a case between competitors announced in *Cel-Tech Communications, Inc. v. Los*

13   *Angeles Cellular Telephone Co.*, omitting that conduct is also unfair if it "violates the policy or spirit" of

14   the antitrust laws "because its effects are comparable", or if it "otherwise significantly threatens or

15   harms competition."  20 Cal. 4th 163, 187 (1999).  With respect to its status as a competitor of Google

16   offering a competing app store and a competing payment mechanism, Epic's Complaint alleges all of

17   these.  Moreover, that test does not apply to an action "by consumers."  *Id.* at 187 n.12.  Epic as an app

18   developer and the Developer Plaintiffs are consumers of app distribution and payment-processing

19   services.  Google does not address the tests that California courts apply to such consumers' actions; nor

20   does it address the allegations supporting them in the Complaints.  The Court should deny the motion as

21   to all of these claims.[8]

22                                    **CONCLUSION**

23           For the foregoing reasons, Google's motion to dismiss should be denied in its entirety.

24

25

26   _____

27   [8] Google separately argues that its conduct does not violate the UCL because it is supposedly
     "deemed reasonable and condoned under the antitrust laws" because Google "has no duty to deal with
     competitors."  (Mot. 24-25.)  As explained above, however, antitrust law does not treat Google's

28   conduct as a mere failure "to deal with competitors," and Google has not even argued that most of its
     misconduct should be analyzed under that doctrine.  (*See, e.g.*, Mot. 13-18 (discussing allegations that
     Google "deter[s] [OEMs] from pre-installing, and users from sideloading, rival app stores").)

1

Dated:  December 21, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:   (415) 591-7510

By _____s/Gary A. Bornstein_____
            Gary A. Bornstein

**CRAVATH, SWAINE & MOORE LLP**
Christine A. Varney (pro hac vice)
cvarney@cravath.com
Katherine B. Forrest (pro hac vice)
kforrest@cravath.com
Gary A. Bornstein (pro hac vice)
gbornstein@cravath.com
Yonatan Even (pro hac vice)
yeven@cravath.com
Lauren A. Moskowitz (pro hac vice)
lmoskowitz@cravath.com
M. Brent Byars (pro hac vice)
mbyars@cravath.com
J. Wesley Earnhardt (pro hac vice)
wearnhardt@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700

***Attorneys for Plaintiff***
**Epic Games, Inc.**

Dated:  December 21, 2020

**SPERLING & SLATER, P.C.**

By _____s/Eamon P. Kelly_____
                    Eamon P. Kelly

Eamon P. Kelly (pro hac vice)
ekelly@sperling-law.com
Paul E. Slater (pro hac vice)
pes@sperling-law.com
Joseph M. Vanek (pro hac vice)
jvanek@sperling-law.com
Alberto Rodriguez (pro hac vice)
arodriguez@sperling-law.com

55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone:  (312) 676-5845
Facsimile:   (312) 641-6492

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (pro hac vice)
steve@hbsslaw.com
Robert F. Lopez (pro hac vice)
robl@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

Benjamin J. Siegel (SBN 256260)
bens@hbsslaw.com
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:   (510) 725-3001

*Co-Lead Interim Class Counsel for the*
*Developer Class and Attorneys for Plaintiff*
**Pure Sweat Basketball, Inc.**

Dated:  December 21, 2020

**HAUSFELD LLP**

By _____s/Bonny E. Sweeney_____
                     Bonny E. Sweeney

Bonny E. Sweeney (SBN 176174)
bsweeney@hausfeld.com
Samantha J. Stein (SBN 302034)
sstein@hausfeld.com
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908 (main)
Telephone: (415) 633-1953 (direct)
Facsimile:  (415) 358-4980

Melinda R. Coolidge (pro hac vice)
mcoolidge@hausfeld.com
888 16th Street, NW, Suite 300
Washington, DC 20006
Telephone: (202) 540-7200 (main)
Telephone: (202) 540-7144 (direct)
Facsimile:  (202) 540-7201

Katie R. Beran (pro hac vice)
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone:  (215) 985-3270 (main)
Telephone:  (267) 702-3215 (direct)
Facsimile:   (215) 985-3271
kberan@hausfeld.com

Scott A. Martin (pro hac vice)
smartin@hausfeld.com
Irving Scher (pro hac vice)
ischer@hausfeld.com
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone:  (646) 357-1100 (main)
Telephone:  (646) 357-1195 (direct)
Facsimile:   (212) 202-4322

*Co-Lead Interim Class Counsel for the*
*Developer Class and Attorneys for Plaintiff*
**Peekya App Services, Inc.**