Brian C. Rocca, Bar No. 221576
brian.rocca@morganlewis.com
Sujal J. Shah, Bar No. 215230
sujal.shah@morganlewis.com
Michelle Park Chiu, Bar No. 248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, Bar No. 259005
minna.naranjo@morganlewis.com
Rishi P. Satia, Bar No. 301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY  10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Willard K. Tom, *pro hac vice*
willard.tom@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C.  20004-2541
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>    Plaintiff,<br><br>vs.<br><br>GOOGLE LLC et al.,<br><br>    Defendants.<br><br>IN RE GOOGLE PLAY DEVELOPER ANTITRUST LITIGATION | Case No. 3:20-cv-05671-JD<br><br><br><br><br><br><br>Case No. 3:20-cv-05792-JD<br><br>**REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Judge:  Hon. James Donato<br>Courtroom: 11, 19th Floor<br>Date:   February 18, 2021<br>Time:   10:00 am |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1

**TABLE OF CONTENTS**

2
Page

3

I. INTRODUCTION ................................................................................. 1

II. PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM IN CONNECTION
WITH THE ALLEGED ANDROID APP DISTRIBUTION MARKET ......................... 2

  A. Google Is Under No Obligation To Deal With Plaintiffs On Plaintiffs'
  Preferred Terms or at All ................................................................. 2

    1. Plaintiffs Seek to Require Google to Deal with Competitors and
    Customers on Terms Plaintiffs Prefer ......................................... 2

    2. Plaintiffs Fail to Distinguish Controlling Law that Bars Their
    Refusal to Deal Claims................................................................ 5

    3. Plaintiffs Mischaracterize Unilateral Policies as "Concerted Action"........ 6

  B. Plaintiffs Have Alleged No Anticompetitive Harm ............................ 8

    1. Plaintiffs Ignore Controlling Ninth Circuit Law On Substantial
    Foreclosure .................................................................................. 8

    2. Plaintiffs' Own Allegations Negate Any Inference of Foreclosure ............ 9

    3. Plaintiffs' Reliance on the D.C. Circuit's Microsoft Decision is
    Misplaced .................................................................................. 11

    4. Even Considering All Challenged Conduct Together, Plaintiffs Still
    Do Not Plead Harm to Competition............................................. 11

III. PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM IN CONNECTION
WITH THE ALLEGED ANDROID IAP PROCESSING MARKET ........................... 12

  A. Plaintiffs Do Not Allege A "Garden-Variety Illegal Tie" .................. 12

  B. Plaintiffs' Tying Claim Fails For Lack of Competitive Harm ............ 14

  C. IAP Billing Is Functionally Integrated Into Play ........................... 14

IV. PLAINTIFFS' STATE LAW CLAIMS FAIL FOR THE SAME REASONS................. 15

V. CONCLUSION ................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*,
No. C 08-01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ...................................9, 11

*Aerotec Int'l, Inc. v. Honeywell, Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016)...............................................................................................12

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., LP*,
592 F.3d 991 (9th Cir. 2010)...........................................................................................4, 8, 14

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008)..................................................................................................10

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001)...................................................................................................15

*Church & Dwight Co. v. Mayer Labs., Inc.*,
No. C-10-4429 EMC, 2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ..........................................9

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)...............................................................................................................11

*Cty. of Anaheim v. S. Cal. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992)...........................................................................................11, 12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)...............................................................................................................13

*Fisherman's Wharf Bay Cruise Corp. v. Superior Court of San Francisco*,
114 Cal. App. 4th 309 (2003)..................................................................................................15

*FTC v. Qualcomm, Inc.*,
969 F.3d 974 (9th Cir. 2020)...................................................................................5, 6, 10, 14

*hiQ Labs Inc. v. LinkedIn Corp.*,
No. 17-cv-03301-EMC, 2020 WL 5408210 (N.D. Cal. Sept. 9, 2020) ......................................7

*McWane, Inc. v. F.T.C.*,
783 F.3d 814 (11th Cir. 2015)........................................................................................8, 9, 10

*Omega Env't., Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997).......................................................................................2, 9, 10, 11

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
    555 U.S. 438 (2009) ....................................................................................2, 5, 12, 14

*Pecover v. Electronic Arts Inc.,*
    633 F. Supp. 2d 976 (N.D. Cal. 2009) ...............................................................15

*PNY Techs., Inc. v. SanDisk Corp.,*
    No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014) .........................9, 10, 11

*RealPage, Inc. v. Yardi Sys., Inc.,*
    852 F.Supp.2d 1215 (C.D. Cal. 2012)...................................................................9

*Rick-Mik Enters. v. Equilon Enters. LLC,*
    532 F.3d 963 (9th Cir. 2008)...............................................................................14, 15

*Sambreel Holdings LLC v. Facebook, Inc.,*
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) ..............................................................7, 13

*Schneider v. Cal. Dept. of Corr.,*
    151 F.3d 1194 (9th Cir. 1998)..............................................................................3

*Toscano v. Prof'l. Golfers Ass'n.,*
    258 F.3d 978 (9th Cir. 2001)................................................................................6, 7

*U.S. v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ..............................................................................1, 8, 11

*United States v. Dentsply Int'l, Inc.,*
    399 F.3d 181 (3d Cir. 2005).................................................................................8, 9, 10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)..............................................................................................5, 6, 7, 14

**STATUTES**

Cartwright Act
    § 16727...............................................................................................................15

Sherman Act.................................................................................................................14
    § 1.......................................................................................................................6, 7, 8

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## I.      INTRODUCTION

Epic Games and Developer Plaintiffs (collectively "Plaintiffs") oppose Google's Motion to Dismiss ("Opp.") by mischaracterizing their own allegations and misstating controlling law. Plaintiffs' chief argument is that their claims "are not based on any duty for Google to open Google Play to competing app developers" because they purportedly want the "freedom *not to deal* with Google." Opp. at 1. This argument runs counter to their Complaints, which make clear that any supposed "freedom not to deal" with Google would force Google to change how it operates the Android operating system ("OS") and Google Play Store in ways Plaintiffs prefer. But that is not what the antitrust laws require.

Plaintiffs argue that Google "blocks or burdens virtually *all* the ways by which a competing app distributor may reach Android users." *Id.* Their pleadings, however, identify only one act that allegedly "blocks" competing app distributors—Google's refusal to distribute competing app stores in Google Play. As a matter of law, this is not a basis for antitrust liability. Plaintiffs' Complaints otherwise challenge Google conduct that they argue only "burdens," "discourages," or "makes unpleasant"—but does not actually ***foreclose***—competition. They nonetheless argue that the antitrust laws should require Google to change its unilateral practices, including by: (1) aiding rival app stores, (2) designing products with security settings and warnings more to Plaintiffs' liking, and (3) otherwise dealing with Plaintiffs on their preferred terms (*e.g.*, removing participation requirements for Google's App Campaigns program). Again, the law rejects Plaintiffs' arguments as a basis for antitrust liability.

Plaintiffs minimize controlling Supreme Court and Ninth Circuit authority, and repeatedly invoke the D.C. Circuit's *Microsoft* decision to support their app distribution claims. But *Microsoft*, which does not bind this Court, involved markedly different conduct that actually ***foreclosed***, rather than merely "burdened," competitors.

Plaintiffs' argument that they have sufficiently pled "substantial foreclosure," or that it is a question of fact to address at a later stage, is likewise legally unsound. Where alternative routes of distribution are not only possible, but actually used, there is no foreclosure sufficient to make out an antitrust claim. Here, Plaintiffs affirmatively allege distribution alternatives, *i.e.*, OEMs

1   pre-install competing app stores (*e.g.*, the Samsung Galaxy Store), and users can directly

2   download apps from a developer's website.  Thus, competing app stores (and app developers

3   generally) "are free to [distribute] directly, to develop alternative distributors, or to compete for

4   the services of the existing [OEMs].  Antitrust laws require no more." *Omega Env't., Inc. v.*

5   *Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997).

6       Nor can Plaintiffs meet their burden of pleading foreclosure by arguing that Google's

7   conduct as a whole is anticompetitive.  As Google's motion shows, all of its conduct is lawful,

8   and viewing Plaintiffs' allegations "as a whole" cannot turn independently lawful conduct into an

9   antitrust violation.  Nothing plus nothing still equals nothing.

10      Finally, Plaintiffs' attempt to save their "tying" claims again requires them to walk away

11  from their own allegations.  The Complaints concede that developers can distribute apps through

12  Google Play without using Google Play's billing system (*e.g.*, by offering apps for free or in ways

13  that don't involve any in-app purchases ("IAP")).  They also admit that a developer can distribute

14  apps or in-app products to consumers directly or through app stores other than Google Play.  But

15  they never allege that Google requires developers, as a condition of using Play, to agree not to use

16  competing billing systems when they distribute through these other avenues.  This obviates any

17  coercion and renders Plaintiffs' tying claims deficient as a matter of law.

18      Plaintiffs' Complaints should be dismissed.

19  **II.   PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM IN CONNECTION**

20         **WITH THE ALLEGED ANDROID APP DISTRIBUTION MARKET**

21      **A.   Google Is Under No Obligation To Deal With Plaintiffs On Plaintiffs'**
            **Preferred Terms or at All**

22      Plaintiffs cannot dispute that Google has no duty to aid competitors and is "free to choose

23  the parties with whom [it] will deal, as well as the prices, terms, and conditions of that dealing."

24  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.* ("*linkLine*"), 555 U.S. 438, 448 (2009).

25  Accordingly, they attempt to recast their Complaints.

26      **1.   Plaintiffs Seek to Require Google to Deal with Competitors and**
            **Customers on Terms Plaintiffs Prefer**

27      Plaintiffs' Complaints, even as summarized in their opposition, Opp. at 5-9, make clear

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2      Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

that the crux of Google's challenged conduct—which Plaintiffs claim "effectively foreclose[s]" competing app distribution—reflects Google's **unilateral** refusal to distribute rival app stores on Google Play, and **unilateral** terms and technical decisions on how to protect Android users.

Thus, Plaintiffs' disavowal notwithstanding, Opp. at 1, a refusal to deal theory is the core of their Complaints.  Plaintiffs allege "Google prohibits any app developer that wants to distribute its apps through the Play Store from also distributing any competing app store through the Play Store."  PSB ¶101; Epic ¶89; *see also* Epic Count 3.  They also claim Google Play is the "logical and effective way to distribute app stores—which are themselves mobile apps."  PSB ¶101; *see also* Epic ¶89 ("competitive app stores … are mobile apps that could easily be distributed through the Google Play Store").  And, allegedly, "by prohibiting app developers from distributing app store apps through the Play Store, Google has effectively foreclosed any alternative."  PSB ¶104; Epic ¶92.  These allegations patently involve a refusal to deal theory that fails to state an antitrust claim as a matter of law.  *See* ECF 91 (Motion to Dismiss ("MTD")) at 9-11.

Plaintiffs attempt to diminish these allegations by arguing that Google's alleged refusal to aid rival app stores is "just another way … Google forecloses alternative paths for making app stores available to users of Android."  Opp. at 8.  Plaintiffs cannot, however, "rewrite" their own allegations to avoid their clear assertion of a refusal to deal.  *See Schneider v. Cal. Dept. of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

Nor can Plaintiffs escape their insufficient refusal to deal theory of liability based on Google's other allegedly anticompetitive conduct.  In relevant part, this additional challenged conduct also reflects Google's unilateral refusal to deal or to deal on terms it has unilaterally defined—conduct that is lawful under the antitrust laws.  MTD at 9-13.  For example, Plaintiffs aggressively challenge Google's unilateral security settings and warnings for when apps (including app stores) are directly downloaded from third-party sources.  Opp. at 7; *see also* Epic ¶97, PSB ¶119 (alleging that warnings about potential malware and security risks require users to change a setting and click "OK" before continuing).  Plaintiffs do not dispute, however, that while some app developers and some users may prefer different settings and warnings, Google **unilaterally** determines those settings and warnings.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1    The same is true for Plaintiffs' other allegations challenging Google's conduct protecting

2    users from malware.  These include Google allegedly:  (1) refusing to provide apps (or app stores)

3    installed through direct download with "permissions" to automatically update without the user's

4    approval; (2) offering an optional "Advanced Protection Program" that prevents direct

5    downloading for "[c]onsumers who have enrolled" in the service; and (3) disabling apps that pose

6    a potential security threat.  Opp. 7-8, Epic ¶¶98-99, PSB ¶124.  Plaintiffs may prefer if Google

7    adopted different security measures, but they cannot dispute they want Google to change its

8    unilateral practices to address security concerns on Android, which, in the context of product

9    design, is not a basis for antitrust liability.  *See Allied Orthopedic Appliances Inc. v. Tyco Health*

10   *Care Grp., LP*, 592 F.3d 991, 999-1000 (9th Cir. 2010); MTD at 18.

11   Plaintiffs' conclusory allegations and arguments that Google's security measures are

12   "pretextual" or unnecessary, Opp. 7-8, miss the point.  When it comes to improved product

13   design, "[t]here is no room in this analysis for balancing the benefits or worth of a product

14   improvement against its anticompetitive effects," i.e., "the resulting injuries to competitors."

15   *Allied Orthopedic*, 592 F.3d at 1000.  Plaintiffs also contend that whether Google's security

16   warnings are in response to real malware and security concerns is a factual issue that goes beyond

17   the Complaints.  Opp. at 20.  That too is wrong.  Plaintiffs' Complaints allege facts showing

18   security concerns are real.  *E.g.*, PSB ¶111, Epic ¶103 (malware and security concerns are real);

19   PSB ¶144 n.143 ("security fears [from direct downloading] could be avoided if Google Play

20   permitted the distribution of alternative game-store clients through Google Play"), PSB ¶114

21   (Google should expend resources to "scrutinize" competing app stores and, if they meet some

22   unspecified criteria, authorize distribution through Google Play).

23   Finally, Plaintiffs' argument that Google's "App Campaigns" program is anticompetitive

24   also cannot avoid that this is a refusal to deal claim.  Opp. at 8.  Plaintiffs allege that to participate

25   in App Campaigns, "Google requires that app developers list their app in either the Google Play

26   Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users)."  Epic ¶93,

27   PSB ¶105.  These allegations, again, reflect nothing more than Google's unilaterally established

28   eligibility requirements for participating in the program.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4                    Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1

2.    **Plaintiffs Fail to Distinguish Controlling Law that Bars Their Refusal to Deal Claims**

2

3    Plaintiffs' core refusal to deal theory fails under controlling precedent—*Verizon*

*Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ("*Trinko*"), *linkLine*,

4

555 F.3d 438, and *FTC v. Qualcomm, Inc.*, 969 F.3d 974 (9th Cir. 2020) ("*Qualcomm*").

5    Plaintiffs attempt to distinguish *Trinko* by arguing Verizon did not take "affirmative steps

6

to restrict competitors' access to customers" but just provided "insufficient assistance."  Opp. at

7

14.  This mischaracterizes *Trinko*, which in no way turned on any distinction between

8

"affirmative steps" and "insufficient assistance."  Indeed, "insufficient assistance" and

9

"affirmative steps" can characterize the same conduct.  For example, in *Trinko*, Verizon allegedly

10

violated a duty under the Telecommunications Act of 1996 to allow competitors to connect to its

11

telephone network by leaving orders from competitors unfulfilled or filling competitors' orders

12

on a discriminatory basis—*i.e.*, it provided insufficient assistance by failing to fulfill orders or it

13

affirmatively discriminated against rivals.  540 U.S. at 404.  The same could be said here—*i.e.*,

14

Plaintiffs allege Google provided insufficient assistance by refusing to (i) distribute competing

15

app stores in Google Play, (ii) allow direct downloading without security warnings, or (iii)

16

provide "permissions" for background updating of apps.  *Trinko* is therefore on point.

17    So is *linkLine*.  Relying on *Trinko*, *linkLine* held that charging rivals a high wholesale

18

price for DSL access and charging consumers a low retail price for DSL Internet service, which

19

"allegedly 'exclude[d] and unreasonably impede[d] competition," did not violate the antitrust

20

laws.  555 U.S. at 442-43.  The Supreme Court explained that "[a]s a general rule, businesses are

21

free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of

22

that dealing."  *Id*. at 448.  Plaintiffs argue that their allegations "do not turn on the 'prices, terms,

23

and conditions' of agreements between Google and competing app distributors."  Opp. at 14.

24

*linkLine*'s "general rule," however, is not limited to terms of agreements with *competitors*.

25

Plaintiffs cannot escape that their allegations of Google's purported "interference with

26

[competitors'] ability to access Android users," *id*., all involve the terms by which Google

27

unilaterally deals with developers and consumers who choose, at their own volition, to use and

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1   benefit from Google Play.  Here, in addition to Google's refusal to distribute rival app stores on

2   Google Play, the Complaints target Google's terms and conditions for use of its products and

3   services—for example, the terms of Google's App Campaign Program or the security warnings

4   integrated into the Android OS.

5       The Ninth Circuit's recent *Qualcomm* decision also controls.  Plaintiffs argue that

6   *Qualcomm* is inapplicable because they "do not claim that Google has a standalone duty under the

7   antitrust laws to deal with its competitors."  Opp. at 14-15.  But, *Qualcomm*'s holding does not

8   limit *Trinko* to standalone duty to deal claims.  In fact, in *Qualcomm*, the FTC alleged an

9   overarching scheme to monopolize the relevant markets, of which Qualcomm's refusal to deal

10   with competitors was but one part.  969 F.3d at 987.  The Ninth Circuit nevertheless followed

11   *Trinko* and held there was no duty to deal.  *Id*. at 1003-05.

12       **3.    Plaintiffs Mischaracterize Unilateral Policies as "Concerted Action"**

13       Controlling authority in this Circuit holds that unilaterally setting business terms and

14   conditions is not concerted action under Section 1 of the Sherman Act, and calling it "concerted

15   action" does not convert a defective refusal to deal claim into an antitrust violation.  MTD 12-13.

16   Plaintiffs' attempts to distinguish this law fails.

17       In *Toscano v. Prof'l. Golfers Ass'n.*, 258 F.3d 978, 981-82 (9th Cir. 2001), the plaintiff

18   claimed that PGA Tour contracts that required local sponsors to run tournaments in accord with

19   PGA Tour rules violated Section 1.  The Ninth Circuit rejected this theory, holding that where

20   one party "merely agreed to purchase products or provide a service under conditions set by the

21   other party," there is no "conscious commitment to a common scheme designed to achieve an

22   unlawful objective" that could give rise to a Section 1 claim.  *Id*. at 984 (quoting *Monsanto Co. v.

23   Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  Plaintiffs argue that "unlike the tournament

24   sponsors in *Toscano*, Google itself establishes and enforces the anticompetitive provisions."  Opp.

25   at 16.  That is irrelevant.  *Toscano* holds that liability for "concerted action" requires a "conscious

26   commitment" by *both* parties to the contract to implicate Section 1.  *Id*. at 983-84.  Here,

27   Plaintiffs allege no such "conscious commitment" by any counterparty and, to the contrary,

28   expressly aver that Google unilaterally sets the "non-negotiable" terms of its agreements with

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6                    Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1  developers, and thus there is no "concerted action."  MTD at 13.

2          Plaintiffs' efforts to distinguish *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp.

3  2d 1070, 1077 (S.D. Cal. 2012), likewise fall short.  Plaintiffs argue that even though the district

4  court found no horizontal conspiracy among competitors, it *did* find that Sambreel alleged

5  "'independent agreements between each app developer and Facebook.'"  Opp. at 16 (quoting

6  *Sambreel*, 906 F. Supp. 2d at 1076).  That mischaracterizes *Sambreel*'s holding.  The court first

7  dismissed plaintiff's Section 1 claim because, as here, the complaint failed to allege a "concerted

8  effort among the Application Developers and Facebook … *as opposed to unilateral action on the*

9  *part of Facebook*."  906 F. Supp. 2d at 1076 (emphasis added).  Only then, for the sake of

10  argument, did it make the statement quoted by Plaintiffs (introduced by the words "At most"—

11  words Plaintiffs conveniently omit), and dismissed the Section 1 claim anyway.  *Id.* at 1076.

12  Plaintiffs' efforts to blur *Sambreel*'s distinction between unilateral and concerted conduct fail.

13          *hiQ Labs Inc. v. LinkedIn Corp.*, No. 17-cv-03301-EMC, 2020 WL 5408210 (N.D. Cal.

14  Sept. 9, 2020), likewise disposes of Plaintiffs' claims.  There, the district court dismissed Section

15  2 claims under the *Trinko* line of cases.  *Id*. at *8-9, *13.  The plaintiff there, as here, "trie[d] to

16  get around this problem by claiming … concerted action between LinkedIn and its members

17  based on LinkedIn's User Agreement" under Section 1 of the Sherman Act.  *Id*. at *12.  This

18  district court rejected this maneuver, holding that LinkedIn's User Agreement was not "concerted

19  action" for purposes of Section 1.  *Id.* at *12.  Plaintiffs ignore this holding, and point to the

20  court's statement that "a contract between a buyer and seller" can satisfy "the concerted action

21  element of section 1 … where the seller coerces a buyer's acquiescence in a tying arrangement."

22  Opp. at 17 (quoting *hiQ*, 2020 WL 5408210, at *11 n.6).  But that observation is irrelevant here,

23  as illustrated by Count 3 of Epic's Complaint, where Epic tries to recast its claim regarding

24  Google's refusal to distribute competing app stores as a Section 1 claim based on the DDA.

25          This is not to say that bilateral agreements are never sufficient to establish concerted

26  action for purposes of Section 1.  Rather, based on Plaintiffs' allegations in these cases, Plaintiffs

27  cannot transform an otherwise lawful refusal to distribute competing app stores into an antitrust

28  violation because the concerted action element of Section 1 is not met.  Cases involving tying and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7                    Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

exclusive dealing as cited by Plaintiffs, *see, e.g.*, Opp. at 15, do not change this reality.

## B. Plaintiffs Have Alleged No Anticompetitive Harm

Plaintiffs also fall short in defending their deficient allegations of competitive harm by arguing that Google "overplay[s] the availability of competitive alternatives by offering alternative facts." Opp. at 18. Not so. *First,* Plaintiffs ignore controlling precedent and rely instead on off-point cases. *Second,* Plaintiffs cannot escape the force of their own allegations, which negate foreclosure as a matter of law. *Third*, this case is not *Microsoft*. *Fourth*, aggregating insufficient allegations does not cure a failed theory of anticompetitive harm.

### 1. Plaintiffs Ignore Controlling Ninth Circuit Law On Substantial Foreclosure

The parties agree that Plaintiffs must allege that Google has "substantially foreclosed" competition in a relevant market. Opp. at 17; *Allied Orthopedic*, 592 F.3d at 996. However, "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution," there is no "substantial foreclosure" as a matter of law, and therefore no antitrust claim. MTD at 14 (quoting *Omega*, 127 F.3d at 1163).

Plaintiffs do not engage on this critical point. Instead, they argue they have alleged enough "substantial foreclosure" to clear a pleadings challenge, citing out-of-circuit cases that involve materially different circumstances. Opp. at 18-19. For example, Plaintiffs cite *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005), and *McWane, Inc. v. F.T.C.*, 783 F.3d 814 (11th Cir. 2015). Both of those cases, unlike here, involved exclusive dealing claims where a substantial number of distribution opportunities were eliminated. In *Dentsply*, the defendant used exclusive agreements with dealers to prohibit them from buying competitors' products, and enforced its agreements by terminating dealers who did not comply. 399 F.3d at 185. Accordingly, there was no "practical or feasible" alternative route for competitors. *Id*. at 193. Similarly, in *McWane*, the defendant imposed exclusive agreements that eliminated "alternative channels of distribution" for competitors. 783 F.3d at 839. In so holding, the Eleventh Circuit, however, recognized that "[i]f firms can use other means of distribution, or sell directly to

consumers," then foreclosure is less likely.  *Id.*[1]

The Ninth Circuit's decision in *Omega* addresses a different situation—the one that exists in this case.  In *Omega*, a manufacturer of petroleum dispensing equipment sued a competitor, alleging competition was foreclosed by exclusive dealing agreements with "almost all" distributors of such equipment.  127 F.3d. at 1163.  In contrast to *Dentsply* and *McWane*, however, "[c]ompetitors [we]re free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors."  *Id.*  The Ninth Circuit held "[a]ntitrust laws require no more," even though competing through "existing or potential" alternatives was difficult because of the defendant's prior exclusivity arrangements and its "proven product and strong reputation."  *Id.* at 1163-64.  To the extent *Denstply* or *McWane* say something different, they do not control.

This Court's decision in *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689-WHO, 2014 WL 2987322, at *9 (N.D. Cal. July 2, 2014), is in accord with *Omega*.  There, the plaintiff alleged that SanDisk had exclusive contracts to sell its SD cards to 11 of the 16 major retailers, SanDisk threatened retaliation if retailers tried to terminate the arrangements, 81%-87% of SD card sales occurred through retailers, and no other major manufacturer of SD cards "had any meaningful success in building a direct sales channel" despite offering better prices.  *Id.* at *2-3.  The court dismissed the complaint for failure to allege substantial foreclosure because plaintiff failed to "plead that there are no 'potential alternative channels of distribution' by which the plaintiff can reach ultimate consumers."  *Id.* at *9 (quoting *Omega*, 127 F.3d at 1163); *see also Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, No. C 08-01035 JSW, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) (finding no foreclosure on the pleadings where there were "alternative distribution channels for the same software products").

**2.      Plaintiffs' Own Allegations Negate Any Inference of Foreclosure**

This case falls squarely within *Omega* and *PNY*, and not *Dentsply* and *McWane*, as

---

[1] Thus, *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F.Supp.2d 1215, 1230 (C.D. Cal. 2012), and *Church & Dwight Co. v. Mayer Labs., Inc.*, No. C-10-4429 EMC, 2011 WL 1225912, *14 (N.D. Cal. Apr. 1, 2011), are inapposite for the same reason.  They involved allegations that the plaintiffs were actually foreclosed from a substantial share of the market.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9                                Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs' own allegations make plain.  Plaintiffs allege that OEMs are free to—and major OEMs, in fact, do—pre-install competing app stores, expressly acknowledging that Samsung and LG do so and that other OEMs can as well.  Epic ¶71; PSB ¶74.[2]  Plaintiffs cannot credibly claim OEMs are coerced into pre-installing Google Play instead of other app stores—indeed, Plaintiffs concede that OEMs *want* Google Play on their devices in addition to their own app stores.  *See* MTD at 16; PSB ¶74 (alleging Samsung, *which has its own app store*, wants to pre-install Google Play "due to the variety and number of apps and contents available users uniquely through the Google Play Store").

There is more.  The Complaints acknowledge users' ability to directly download app stores, in addition to Google Play, in three short steps.  PSB ¶119.  Indeed, allegedly 250 million users have installed a single competing app store.  PSB ¶124.  And according to Plaintiffs, app developers also are able to reach consumers through direct app downloads from a developer's website or elsewhere.  Epic ¶95, PSB ¶122.

Plaintiffs, therefore, plead themselves into *Omega* and *PNY*, and out of *Dentsply* and *McWane*.  Likewise, Plaintiffs' allegations that "Google . . . directly prevented two OEMs from pre-installing Epic's app launcher," Opp. at 11 (citing Epic ¶¶85-86), fail to show substantial foreclosure.  At most, this shows that Epic's app launcher was not available on two OnePlus and LG models, but this does not show any harm to *competition*.  *See Qualcomm*, 969 F.3d at 992; *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008).  Moreover, Epic's allegations give no indication of any alleged volume of Android devices purportedly foreclosed to competing app stores as the result of Google's alleged conduct toward OnePlus and LG.  Nor do they explain how LG devices were foreclosed to competition when they allege elsewhere that LG has its own app store.  Epic ¶71.

---

[2] Plaintiffs try to minimize their key concession that two of the largest OEMs (Samsung and LG) pre-install their own app stores.  Plaintiffs argue that because these app stores are purportedly limited to devices by the particular OEM, that "prevents them" from competing in the alleged market.  Opp. at 19.  But Plaintiffs explicitly include such app stores in their purported market definition.  Epic ¶ 62; PSB ¶ 157.  Under Plaintiffs' own allegations, they must be included in the foreclosure analysis.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10                                   Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

In sum, the complaints plead facts establishing "existing or potential alternative channels of distribution," and under *Omega*, *PNY*, and *Abbyy*, this is fatal to Plaintiffs' generalized—and conclusory—assertions of foreclosure.

### 3. Plaintiffs' Reliance on the D.C. Circuit's *Microsoft* Decision is Misplaced

Plaintiffs' failure to plead competitive harm is also not cured by their misplaced reliance on *U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), which does not bind this court. Plaintiffs argue that "[i]n many ways, Google has followed Microsoft's former playbook" (Opp. at 11), but again their argument is belied by their own pleadings. In *Microsoft*, PC OEMs that licensed Windows were required to also install Microsoft's browser, Internet Explorer (IE), which OEMs allegedly did not want. 253 F.3d at 45. The court also found Microsoft made it impossible to remove IE by integrating the operating system and browser code. *Id*. at 66-67. This, in effect, precluded installation of a second browser because OEMs did not want the added costs of customer support for two browsers. *Id*. at 61, 64. Not so, here. Plaintiffs do not allege that OEMs that license Android (for free) are required to install Google Play. To the extent OEMs do, as noted it is because "they view other app stores as poor substitutes for the Google Play Store because of the lower number and lesser quality of apps they offer." Epic ¶72, *see also* PSB ¶74. Moreover, unlike the claims in *Microsoft*, plaintiffs here allege that (1) OEMs can, and do, pre-install a second app store, and (2) Android users can download apps and app stores directly onto their devices. PSB ¶119.

### 4. Even Considering All Challenged Conduct Together, Plaintiffs Still Do Not Plead Harm to Competition

Plaintiffs argue that Google mistakenly disaggregates each aspect of its conduct, and that when Google's conduct is considered "as a whole," Plaintiffs' allegations are sufficient to plead harm to competition. Opp. at 13 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). "[A] number of perfectly legal acts," however, do not equate to "overall wrongdoing." *Cty. of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (applying the *Continental Ore* rule). Even a finding of "slight wrongdoing in certain areas need not by itself add up to a violation." *Id*. Thus, in *Anaheim*, the Ninth Circuit rejected both

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

the alleged "price squeeze" and "essential facilities" claims and held that "the effect of combining those claims … makes no difference in our ultimate conclusion." *Id*.  *linkLine* agrees.  "[A]n amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level" cannot create an antitrust violation.  555 U.S. at 452.

So it is here.  "A number of perfectly legal acts" cannot add up to unlawful conduct.

## III.    PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM IN CONNECTION WITH THE ALLEGED ANDROID IAP PROCESSING MARKET

### A.    Plaintiffs Do Not Allege A "Garden-Variety Illegal Tie"

Plaintiffs assert that "Google conditions the distribution of an app [through Google Play] on the developer's agreement to use Google Billing for in-app purchases of digital content," which they describe as a "garden-variety illegal tie." Opp. at 21.  This is another instance where both their own allegations and controlling authority are to the contrary.

"A tie only exists where 'the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one.'" *Aerotec Int'l, Inc. v. Honeywell, Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (quoting 10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1752b (3d ed. 2011)).  In *Aerotec*, the Ninth Circuit explained a "positive tie" as one where the "sale of the desired ('tying') product is conditioned on purchase of another ('tied') product." *Id*.  By contrast, a "negative tie" occurs "when the customer promises not to take the tied product from the defendant's competitor," but "courts 'rarely encounter[]' such a situation." *Id*.

Plaintiffs' Complaints allege "Google has unlawfully tied distribution services for Google Play to its in-app payment processor, Google Play Billing."  PSB ¶245, Epic ¶176.  Plaintiffs, thus, attempt to allege a positive tie, but their own allegations undermine their ability to establish "the key issue" in a tying claim, "the coercion element"—*i.e.,* that Plaintiffs were "forced" to take the unwanted "tied" product (here, Google Play's billing services) as a condition of obtaining the "tying" product (here, distribution through Google Play).  *See Aerotec*, 836 F.3d at 1180.

Critically, a developer can distribute apps through Google Play without offering IAP, and therefore without using Google Play's billing services at all.  DDA §3.7.  As Plaintiffs

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1    acknowledge, Google only requires "Google Billing when offering digital products in an app
2    downloaded from Google Play."  Opp. at 9.  Thus, developers may distribute free or ad-supported
3    apps through Google Play without using Google Play's billing services.  And, as Plaintiffs
4    acknowledge, even developers that offer in-app content in apps distributed through Google Play
5    may avoid Google's billing system by having the user "go elsewhere, such as to a separate
6    website" to purchase content that can be used in the app.  Epic ¶119.

7         Plaintiffs do not even attempt to allege a negative tie.  Nor could they.  Google does not
8    condition distribution through Play on a developer's "promise" never to use a competitor's billing
9    service.  For example, developers can use any billing system for IAP when distributing apps
10   through alternative app stores (subject to what is allowed in those app stores) or for apps that are
11   downloaded directly from a developer website.  As discussed above, those alternatives are widely
12   available for Android developers and users, as evidenced by the alleged 250 million installations
13   of a single app store rival.  Epic ¶71, PSB ¶124.  This distinguishes *Eastman Kodak Co. v. Image*
14   *Tech. Servs., Inc.*, 504 U.S. 451 (1992)—relied upon by Plaintiffs, Opp. at 20—which involved
15   an absolute requirement that the customer refrain from buying the "tied" product from a
16   competitor in order to obtain the "tying" product, and is thus inapposite.

17        With no *facts* demonstrating coercion, the proper description of Google's conduct is that
18   Google simply refuses to accept apps in Play if they evade Google Play's billing system for IAP.
19   MTD at 19-20.  That itself is a non-actionable unilateral refusal to deal, not tying.  *Id*.
20   Developers are still able to distribute apps through Play without being forced to buy the allegedly
21   tied product. Nor are developers forced to agree to not to buy the allegedly tied product when
22   distributing outside of Play.  *See Sambreel*, 906 F. Supp. at 1080 (dismissing tying claim because
23   "Facebook has the right to determine the terms on which it will permit Application Developers to
24   use the Facebook Platform" and "there are no allegations that Facebook precluded its users from
25   maintaining Sambreel applications for use on other websites").

26        Even apps that offer IAP and are distributed through Play are not forced to use Google's
27   billing system.  Plaintiffs admit that a developer can obtain payment—without Google Play's
28   billing system—outside the app, such as through a browser or a game console, for content that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1   may be used inside the app.  Epic ¶¶117-120.  Although Plaintiffs claim developers may prefer

2   not to do so because then "the user might abandon the purchase or stop interacting with the

3   mobile app altogether," Epic ¶119, Google is not required to adopt a developer's preferred

4   business terms.  *Qualcomm*, 969 F.3d at 993.  And, *linkLine* holds that even if it is more

5   expensive for a competitor to use an alternative, no antitrust liability arises.  555 U.S. at 451.

6          Thus, absent coercion, Plaintiffs' tying claim is nothing more than a relabeled refusal to

7   deal that fails under *Trinko*, *linkLine*, *Qualcomm*, and other controlling precedent.

8          **B.      Plaintiffs' Tying Claim Fails For Lack of Competitive Harm**

9          Plaintiffs' IAP claims admittedly depend on their app distribution claims.  Opp. at 20.  As

10  such, they likewise fail because, if there is no foreclosure in the alleged app distribution market—

11  Plaintiffs allege OEMs and consumers are free to install competing app stores, and users are free

12  to directly download apps—there is necessarily no foreclosure in the alleged IAP market.  Apps

13  downloaded outside of Play need not use Google Play's billing system in any manner.  Plaintiffs

14  disagree and argue that because, they have alleged, 90% of apps are downloaded through Google

15  Play, "alternative payment processors have been excluded from apps accounting for 90% of all

16  Android downloads."  Opp. at 22.  Plaintiffs conflate alleged market share with purported

17  foreclosure.  To state a Sherman Act claim, a plaintiff must plead and prove actual foreclosure of

18  competition resulting from unlawful conduct.  *Allied Orthopedic*, 592 F.3d at 996 n.1.  Merely

19  alleging a high market share falls short; it may result from the availability of a superior product or

20  business acumen, both of which reflect competition on the merits, not unlawful conduct.

21         **C.      IAP Billing Is Functionally Integrated Into Play**

22         Plaintiffs' tying claim also fails because—as Plaintiffs do not dispute and affirmatively

23  allege—Google offers a package of services through Google Play, including consumer searches

24  and access to apps for downloading, security and compatibility screening, and billing for

25  developers who choose to monetize their apps through paid apps or IAP.  MTD at 5-6.  *Rick-Mik*

26  *Enters. v. Equilon Enters. LLC*, 532 F.3d 963, 974-75 (9th Cir. 2008) holds in such circumstances

27  that Google's billing services are a single product with Google Play.  MTD at 21.  Plaintiffs ask

28  the Court to ignore *Rick-Mik*, asserting that payment services are a separate product because

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14                    Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1    Google *could* offer them separately.  Opp. at 23.  *Rick-Mik* rejected that exact argument.  532

2    F.3d at 974-75.  There, the defendant franchisor *could* have permitted franchisees to use

3    competing payment processing services, but because "the franchisee knows the contractual

4    limitations and duties before entering into the contract," and "credit card services are an essential

5    part of its franchise," the franchise and payment processing were not separate products for

6    purposes of assessing a tying claim.  *Id*. at 974-75.  So it is here.  Developers knowingly sign up

7    for Google Play, including billing services for paid apps and IAP.  These are an essential part of

8    the Google Play package—otherwise Google Play would receive no payment at all.

9    **IV.    PLAINTIFFS' STATE LAW CLAIMS FAIL FOR THE SAME REASONS**

10         Plaintiffs concede they cannot state a claim under Section 16727 of the California

11   Business and Professions Code, which concerns only tying of "tangible" goods (Opp. at 25), and

12   thus, Count 10 of Epic's complaint based on Section 16727 must be dismissed.

13         Plaintiffs also ignore the decisions Google cites holding that no claim under the

14   Cartwright Act lies, based on tying or otherwise, where, as here, there is no duty to deal, and

15   where there is no substantial foreclosure of competition.  MTD at 22-23 (citing cases).  Plaintiffs'

16   reliance on *Pecover v. Electronic Arts Inc.*, 633 F. Supp. 2d 976 (N.D. Cal. 2009), and

17   *Fisherman's Wharf Bay Cruise Corp. v. Superior Court of San Francisco*, 114 Cal. App. 4th 309

18   (2003), Opp. at 24, is misplaced and does not save their Cartwright claims from dismissal. Unlike

19   here, both involved multiple exclusive dealing arrangements that *actually* foreclosed competitors.

20         Plaintiffs' UCL claims also must be dismissed.  Plaintiffs agree that if there is no violation

21   of antitrust laws, Google's conduct is not "unlawful" under the UCL.  Opp. at 25.  It also is not

22   "unfair" with respect to competitors, as Plaintiffs have not alleged "an incipient violation of the

23   antitrust laws," or anything comparable, *see* MTD at 24, regardless of how Plaintiffs describe the

24   test.  *See* Opp. at 25.  As for "unfairness" towards consumers, Plaintiffs ignore the cases cited by

25   Google, MTD at 24-25—*e.g.*, *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)—

26   holding that conduct reasonable under the antitrust laws cannot be "unfair" under the UCL.

27   **V.    CONCLUSION**

28         Plaintiffs' Complaints should be dismissed.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15                    Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD
REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: January 20, 2021                    MORGAN, LEWIS & BOCKIUS LLP

                                           By: */s/ Brian C. Rocca*
                                           _____

                                           Brian C. Rocca
                                           *Attorneys for Defendants*

16                    Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD

REPLY TO OPPOSITION TO DEFENDANTS' MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND
DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT