Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

Christine A. Varney (*pro hac vice pending*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice pending*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice pending*)
gbornstein@cravath.com
**Timothy G. Cameron (*pro hac vice*)**
**tcameron@cravath.com**
Yonatan Even (*pro hac vice pending*)
yeven@cravath.com
**Lauren A. Moskowitz (*pro hac vice*)**
**lmoskowitz@cravath.com**
**Justin C. Clarke (*pro hac vice*)**
**jcclarke@cravath.com**
M. Brent Byars (*pro hac vice pending*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC., a Maryland Corporation,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>Defendants. | Case No.<br><br>~~3:20-CV-05671-JD~~ **3:20-CV-05671-JD**<br><br>**FIRST AMENDED** COMPLAINT **FOR INJUNCTIVE RELIEF** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

PARTIES .................................................................................................... ~~10~~13

JURISDICTION AND VENUE ........................................................................ ~~11~~15

INTRADISTRICT ASSIGNMENT .................................................................. ~~13~~17

RELEVANT FACTS ..................................................................................... ~~13~~17

I.    Google Dominates the Merchant Market for Mobile Operating Systems.
.................................................................................................... ~~13~~17

    A.    The Merchant Market for Mobile Operating Systems ............. ~~14~~17

        i.    Product Market Definition ............................................. ~~14~~17

        ii.    Geographic Market Definition ...................................... ~~16~~19

    B.    Google's Monopoly Power in the Merchant Market for Mobile OSs
.................................................................................................... ~~16~~20

II.    Google Unlawfully Maintains a Monopoly in the Android ~~Mobile~~ App
Distribution Market. ....................................................................... ~~19~~23

    A.    The Android App Distribution Market ................................... ~~20~~25

        i.    Product Market Definition ............................................. ~~20~~25

        ii.    Geographic Market Definition ...................................... ~~22~~26

    B.    Google's Monopoly Power in the Android App Distribution Market
.................................................................................................... ~~22~~27

    C.    Google's Anti-Competitive Conduct Concerning the Android App
Distribution Market ............................................................... ~~26~~33

        i.    Google's Conduct Toward OEMs ~~26~~ **and Mobile Network
Operators** .................................................................. **33**

        ii.    Google's Conduct Toward App Distributors and Developers
.................................................................................. ~~28~~47

        iii.    Google's Conduct Toward Consumers ......................... ~~30~~50

D.    Anti-Competitive Effects in the Android App Distribution Market
      ~~35~~**55**

III.  Google Unlawfully Acquired and Maintains a Monopoly in the Android
      In-App Payment Processing Market. ......................................... ~~36~~**57**

      A.    The Android In-App Payment Processing Market ............... ~~37~~**57**

            i.    Product Market Definition ..................................... ~~37~~**57**

            ii.   Geographic Market Definition ............................... ~~39~~**59**

      B.    Google's Monopoly Power in the Android In-App Payment
            Processing Market ............................................................... ~~39~~**59**

      C.    Google's Anti-Competitive Conduct Concerning the Android
            In-App Payment Processing Market ..................................... ~~40~~**60**

      D.    Anti-Competitive Effects in the Android In-App Payment
            Processing Market ............................................................... ~~41~~**62**

COUNT 1:  Sherman Act § 2 (Unlawful Monopoly Maintenance in the  Android
          App Distribution Market) ....................................................... ~~43~~**63**

COUNT 2:  Sherman Act § 1  (Unreasonable restraints of trade concerning
          Android App Distribution Market:  OEMs) .......................... ~~44~~**64**

COUNT 3:  Sherman Act § 1  (Unreasonable restraints of trade concerning
          Android App Distribution Market:  ~~DDA~~**Developer Distribution**
          **Agreement**) ........................................................................... ~~45~~**66**

COUNT 4:  Sherman Act § 2 (Unlawful Monopolization and Monopoly
          Maintenance in the  Android In-App Payment Processing Market) .... ~~46~~**67**

COUNT 5:  Sherman Act § 1  (Unreasonable restraints of trade concerning
          Android In-App Payment Processing Market**: Developer Distribution**
          **Agreement**) ........................................................................... ~~47~~**68**

COUNT 6:  Sherman Act § 1  (Tying Google Play Store to Google Play Billing)
          ~~49~~**70**

COUNT 7:  California Cartwright Act (Unreasonable restraints of trade in Android App Distribution Market**: OEMs**) ........................................... ~~50~~**71**

COUNT 8:  California Cartwright Act (Unreasonable restraints of trade in Android App Distribution Market**: Developer Distribution Agreement**) ........................................... ~~51~~**73**

COUNT 9:  California Cartwright Act (Unreasonable restraints of trade in Android In-App Payment Processing Market**: Developer Distribution Agreement**) ........................................... ~~53~~**75**

COUNT 10:  California Cartwright Act (Tying Google Play Store to Google Play Billing) ........................................... ~~55~~**77**

COUNT 11:  California Unfair Competition Law ........................................... ~~58~~**79**

PRAYER FOR RELIEF ........................................... ~~59~~**80**

**On the basis of documents produced to date by Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, and Google Payment Corp. (collectively, "Google"), it is clear that very carefully phrased arguments in Google's pending motion to dismiss give a misleading picture of the full scope of Google's anticompetitive conduct. Accordingly, although** Plaintiff Epic Games, Inc. ("Epic") **believes its initial Complaint was more than sufficient, it hereby alleges**, by its undersigned counsel, ~~alleges~~**as a First Amended Complaint**, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.      In 1998, Google was founded as an exciting young company with a unique motto: "Don't Be Evil".  Google's Code of Conduct explained that this admonishment was about "how we serve our users" and "much more than that . . . it's

also about doing the right thing more generally".[1]  Twenty-two years later, Google has relegated its motto to nearly an afterthought, and is using its size to do evil upon competitors, innovators, customers, and users in a slew of markets it has grown to monopolize.  This case is about doing the right thing in one important area, the Android mobile ecosystem, where Google unlawfully maintains monopolies in multiple related markets **and engages in unlawful restraints of trade**, denying consumers the freedom to enjoy their mobile devices—freedom that Google always promised Android users would have.

2.      Google acquired the Android mobile operating system more than a decade ago, promising repeatedly over time that Android would be the basis for an "open" ecosystem in which industry participants could freely innovate and compete without unnecessary restrictions.[2]  Google's CEO, Sundar Pichai, represented in 2014 that Android "is one of the most open systems that I've ever seen".[3]  And Andy Rubin, an Android founder who is described by some as the "Father of Android", said when he departed Google in 2013 that "at its core, Android has always been about openness".[4] Since then, Google has **changed its course of conduct,** deliberately and systematically

---

[1] Kate Conger, *Google Removes 'Don't Be Evil' Clause from Its Code of Conduct*, Gizmodo (May 18, 2018), https://gizmodo.com/google-removes-nearly-all-mentions-of-dont-be-evil-from-1826153393.

[2] *See, e.g.,* Google Blog, News and notes from Android team, *The Benefits & Importance of Compatibility*,  (Sept. 14, 2012), https://android.googleblog.com/2012/09/the-benefits-importance-of-compatibility.html ("We built Android to be an open source mobile platform freely available to anyone wishing to use it . . . .  This openness allows device manufacturers to customize Android and enable new user experiences, driving innovation and consumer choice."); Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw ("Android is one of the most open systems that I've ever seen"); Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog ("At its core, Android has always been about openness").

[3] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.

[4] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

1    ~~closed~~**closing** the Android ecosystem to competition, breaking the promises it made.

2    Google's anti-competitive conduct has now been condemned by regulators the world

3    over.

4           3.      Epic brings claims under Sections 1 and 2 of the Sherman Act and

5    under California law to end Google's unlawful monopolization and anti-competitive

6    restraints in two separate markets:  (1) the market for the distribution of mobile apps to

7    Android users and (2) the market for **payment** processing ~~payments~~**solutions** for digital

8    content within Android mobile apps.  Epic seeks to end Google's unfair, monopolistic

9    and anti-competitive actions in each of these markets, which harm device makers, app

10   developers, app distributors, payment processors, and consumers.

11          4.      **Epic does not seek monetary compensation from this Court for**

12   **the injuries it has suffered**.  Epic likewise does not seek a side deal or favorable

13   treatment from Google for itself.  Instead, Epic seeks injunctive relief that would

14   ~~deliver~~**make good on** Google's broken promise:  an open, competitive Android

15   ecosystem for all users and industry participants.  Such injunctive relief is sorely

16   needed.

17          5.      Google has eliminated competition in the distribution of Android

18   apps using myriad contractual and technical barriers.  Google's actions force app

19   developers and consumers into Google's own monopolized "app store"—the Google

20   Play Store.  Google has thus installed itself as an unavoidable middleman for app

21   developers who wish to reach Android users and vice versa.  Google uses this

22   monopoly power to impose a tax that siphons monopoly profits for itself every time an

23   app developer transacts with a consumer for the sale of an app or in-app digital content.

24   ~~And~~ Google further siphons off all user data exchanged in such transactions~~,~~ to benefit

25   its own app designs and advertising business**.**

26          **6.      The conduct described below shows that Google's persistent**

27   **monopoly is the result of deliberate efforts by Google to achieve and maintain it.**

28   **Not content with the contractual and technical barriers it has carefully**

**constructed to eliminate competition, Google uses its size, influence, power, and money to induce third parties into anticompetitive agreements that further entrench its monopolies.  For example,** ████████████████████

████████████████████

████████████████████████

████████████████████████

████████████████████████████

████████

      **7.**   6. If not for Google's anti-competitive behavior, the Android ecosystem could live up to Google's promise of open competition, providing Android users and developers with competing app stores that offer more innovation, significantly lower prices**,** and a choice of payment processors.  Such an open system is not hard to imagine.  Two decades ago, through the actions of courts and regulators, Microsoft was forced to open up the Windows for PC ecosystem.  As a result, PC users have multiple options for downloading software ~~unto~~**onto** their computers, either directly from developers' websites or from several competing stores.  No single entity controls ~~the~~**that** ecosystem or imposes a tax on all transactions.  And Google, as the developer of software such as the Chrome browser, is a direct beneficiary of this competitive landscape.  Android users and developers likewise deserve free and fair competition.

                            *      *      *

      **8.**   7. In today's world, virtually all consumers and businesses stay connected, informed, and entertained through smart mobile computing devices such as smartphones and tablets.  Mobile applications ("apps") are innovative software products that greatly contribute to those devices' value.  Consumers the world over use smart mobile devices and mobile apps to video chat with friends, pay bills, stay current with the news, listen to music, watch videos, play games, and more.

      **9.**   8. Epic develops and distributes entertainment ~~apps~~**, social networking and utility applications** for personal computers, gaming consoles, and

1   smart mobile devices. ~~The most popular game~~ Epic ~~currently makes is *Fortnite*, which~~

2   ~~has connected~~**operates a store for the distribution of personal computer apps,**

3   **which it would have expanded to distribute Android apps but for Google's**

4   **conduct.  Epic also develops and licenses** *Unreal Engine,* **a powerful software suite**

5   **available to third-party developers that allows them to create and distribute**

6   **three-dimensional and immersive digital content and apps, including Android**

7   **apps, movies, and other three-dimensional environments.  Google's practices have**

8   **impacted each of Epic's lines of business.**

9            **10.    App Development:  Epic develops multiple applications,**

10  **including** *Fortnite, Fall Guys* **and** *Rocket League,* **the social networking app**

11  *Houseparty,* **and apps that support Epic's** *Unreal Engine,* **such as** *Live Link Face,*

12  **which enables users to capture facial animation with their mobile phones.**

13           **11.    *Fortnite* is a massive virtual world where** hundreds of millions of

14  people ~~in a colorful virtual world where they~~**connect,** meet, play, talk, compete, dance,

15  **or attend concerts** and ~~even~~**cultural events.  *Fortnite Battle Royale* offers users**

16  **competitive gameplay as well as the opportunity to mingle, watch movies,** attend

17  concerts ~~and other~~**or participate in** cultural events **with friends and other users.**

18  *Fortnite Creative Mode* **allows users to design and build their own experiences**

19  **within the** *Fortnite* **universe**.

20

21

22

23

24

25

26

27

28

       **a.**    9. *Fortnite* is free for everyone to download and ~~play~~**experience, including by playing games, attending events, socializing with friends or creating new content**.  To generate revenue, Epic offers users various in-app purchases of content for use within the app, such as digital avatars, costumes, dances, **concert or movie-themed items,** or other cosmetic enhancements.



**b.** ~~10.~~ In the first year after *Fortnite* was released in 2017, ~~the game~~**it** attracted over 125 million ~~players~~**users**; in the years since, *Fortnite* has topped ~~350~~**400** million ~~players~~**users** and has become a global cultural phenomenon.

**12. App Distribution: Epic operates an online app store, the Epic Games Store, which it launched in 2018. Titles available on the Epic Games Store include popular gaming apps (*e.g.*, the *Grand Theft Auto* franchise) and non-gaming apps (*e.g.*, Spotify, iHeartRadio). The Epic Games Store also distributes at least one third-party app store, itch.io. It offers developers an 88/12 revenue share arrangement for all revenues from the sale of a developer's games through the Epic Games Store. For in-app purchases, the Epic Games Store provides developers the choice of using the developer's own payment processor (at no fee) or Epic's own payment solution, Epic Direct Payment (for a fee equal to a 12% share of sales revenue).**

**13. Unreal Engine: First launched in 1998, Epic's *Unreal Engine* is a powerful, three dimensional environment graphics engine used to build digital three-dimensional environments for multiple uses including architecture projects, film & television production, medical training, and more. *Unreal Engine* is used to**

1   create software applications on all major platforms (PC, Mac, Android, iOS,

2   major gaming consoles and more) and for use in films, television and other fields.

3           a.      The *Unreal Engine*'s source code is free to use.  For developers

4   who use *Unreal Engine* to develop and sell their games or other projects

5   commercially, Epic typically collects a 5% royalty after the developer reaches $1

6   million in gross sales.  Alternatively, developers can negotiate custom or

7   royalty-free licenses with Epic.

8           b.      *Unreal Engine* powers some of the world's most popular digital

9   games, including (in addition to *Fortnite*) PlayerUnknown's Battlegrounds (known

10  as "PUBG"), ARK, Gears of War, Borderlands, and Batman:  Arkham City.

11          c.      The *Unreal Engine* is also used far beyond the realm of video

12  games.  *Unreal Engine* received its first Emmy in 2018 for its contribution to

13  televised broadcasts such as the 2018 Winter Olympics, Super Bowl LII, and

14  numerous e-sports tournaments.  Since 2016, *Unreal Engine* has been used in more

15  than 100 film and television productions.  For example, *The*

16  *Mandalorian*—Disney's television series in the *Star Wars* franchise—was filmed on

17  a stage set within a huge oval LED display.  The exteriors and interiors—virtually

18  every background and set—were created in *Unreal Engine* and displayed in real

19  time behind the actors.  Similarly, the popular HBO series *Westworld* turned to

20  *Unreal Engine* to develop many of its visual effects.  Car makers, including Audi

21  and Ford, have used *Unreal Engine* for a variety of uses including automotive

22  design and engineering, as well as developing digital showrooms in which

23  customers can configure their vehicles with high-fidelity visuals.  In aviation,

24  Gulfstream visualizes its jets for its employees and clients.  *Unreal Engine* has even

25  helped brain surgeons train for and perform some of the most intricate and

26  challenging aspects of brain surgeries by allowing for detailed real-time digital

27  anatomy simulations.  In total, *Unreal Engine* boasts a community of 11 million

28  users.

**d.    As noted above, utility apps designed for use with *Unreal Engine* are available in the Google Play Store, including, *Unreal Match 3* and *Action RPG Game Sample*, both of which help developers learn how to use *Unreal Engine* to develop their own mobile games.**

**14.**    ~~11.~~Similar to a PC or a Mac personal computer, smart mobile devices use an "operating system" or "OS" to provide core device functionality and to enable the operation of compatible programs.  As with PCs, the commercial viability of an OS for mobile devices (a "mobile OS") depends on the availability of a large number of compatible apps that cater to the preferences and needs of users.

**15.**    ~~12.~~Google controls the most ubiquitous OS ~~used~~ in mobile devices, the Android OS.  Android OS is used by billions of users the world over, and boasts nearly 3 million compatible apps.

**16.**    ~~13.~~Android is the only commercially viable OS that is widely available to license by companies that design and sell smart mobile devices, known as original equipment manufacturers ("OEMs").  Accordingly, when OEMs select a mobile OS to install on their devices, they have only one option:  Google's Android OS.  Google therefore has monopoly power in the market for mobile operating systems that are available for ~~license~~**licensing** by OEMs (the Merchant Market for Mobile Operating Systems (*infra* Part I)).

**17.**    ~~14.~~Google has not been satisfied with its control of the Android OS.  Notwithstanding its promises to make Android devices open to competition, Google has ~~erected~~**deliberately changed its course of conduct, erecting** contractual and technological barriers that foreclose competing ways of distributing apps to Android users, ensuring that the Google Play Store accounts for nearly all the downloads of apps from app stores on Android devices.  Google thus maintains a monopoly over the market for distributing mobile apps to Android users, referred to herein as the "Android App Distribution Market" (*infra* Part II).

1        **18.**    ~~15.~~ For example, **through a series of revenue-sharing and**

2  **licensing agreements with OEMs,** Google bundles the Google Play Store with a set of

3  other Google services that Android OEMs must have on their devices (such as Gmail,

4  Google Search, Google Maps, and YouTube) and conditions the licensing of those

5  services on an OEM's agreement to pre-install the Google Play Store and to

6  prominently display it.  Google then interferes with OEMs' ability to make third-party

7  app stores or apps available on the devices they make**, including through its so-called**

8  **"Anti-Fragmentation Agreements" ("AFAs") that foreclose OEMs from modifying**

9  **Android to offer fast and simple (or "frictionless") downloading of apps in the**

10  **same way they are offered through Google Play**.  These restrictions effectively

11  foreclose competing app stores—and even single apps—from what could be a primary

12  distribution channel.  **Google's documents show that it** ██████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ███████████████████████████████████ **Google's**

16  **documents further show that Google has** ████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████

21        **19.**    ~~16.~~ Epic's experience with one OEM, OnePlus, is illustrative.  Epic

22  struck a deal with OnePlus to make Epic games available on its phones through an Epic

23  Games app.  The Epic Games app would have allowed users to seamlessly install and

24  update Epic games, including *Fortnite*, without obstacles imposed by Google's Android

25  OS.  But Google forced OnePlus to renege on the deal, citing Google's "particular[]"

26  concern" about Epic having the ability to install and update mobile games while

27  "bypassing the Google Play Store".

28

**20.** ~~17.~~ Another OEM, LG, told Epic that its contract with Google did not allow it to enable the direct distribution of apps, and that the OEM could not offer any functionality that would install and update Epic ~~games~~ **apps** except through the Google Play Store.

**21.** ~~18.~~ Google also enforces anti-competitive restrictions against app developers **and distributors**.  Specifically, Google contractually prohibits app developers **and would-be distributors** from offering on the Google Play Store any app that could be used to download other apps, *i.e.*, any app that could compete with the Google Play Store in app distribution.  And Google further requires app developers to distribute ~~their~~ apps through the Google Play Store if they wish to advertise ~~their~~**those** apps through valuable advertising channels controlled by Google, such as ad placements on Google Search or on YouTube that are specially optimized to advertise mobile apps.

**22.** ~~19.~~ Finally, Google stifles or blocks consumers' ability to download app stores and apps directly from developers' websites.  As anyone who has tried to download directly on an Android device knows, it is significantly different than the simple process available on a personal computer:  directly downloading *Fortnite* on an Android device can involve a dozen steps, requiring the user to change default settings and bravely click through multiple dire warnings.  ████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████ And even if a persistent user manages to install a competing app store, Google ~~prevents~~**has prevented** such stores from competing on equal footing with the Google Play Store by ~~blocking~~**restricting** them from offering basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play Store.

**23.** ~~20.~~ Google engages in these anticompetitive acts to eliminate consumer choice and competition in mobile app distribution.  Google has no legitimate

justification for these restrictions.  Google therefore has ~~broken~~**changed** its ~~promises~~**course of conduct, breaking its promise** that Android would be an "open" ecosystem in which other participants could participate fairly.

**24.** ~~21.~~But Google does not stop at app distribution.  Google also imposes anti-competitive restrictions in the separate Market for Android In-~~app~~**App** Payment Processing (*infra* Part III).

**25.** ~~22.~~App developers who sell digital content for consumption within ~~the app itself~~**apps** require seamless payment processing ~~tools~~**solutions** to execute purchases.  App developers, including Epic, ~~may develop such~~**have developed** payment processing ~~tools~~**solutions** internally ~~or~~**.  Others may** use a host of payment processing ~~tools~~**solutions** offered by multiple competing third parties.

**26.** ~~23.~~Google, however, ties distribution through its Google Play Store with  developers' exclusive use of Google's own payment processing ~~tool~~**solution**, called Google Play Billing, to process in-app purchases of digital content.  Indeed, app developers that distribute through the Google Play Store are even prohibited from offering Android users the *choice* of additional payment processing options alongside Google's for digital content.  And because Google has a monopoly in the Android App Distribution Market, app developers cannot practically avoid this anti-competitive tie by electing app distribution through an alternative channel.

**27.** ~~24.~~The result is that in every in-app transaction for digital content, it is Google, not the app developer, that collects the payment in the first instance.  Google then taxes the transaction at **up to** an exorbitant 30% rate, remitting the remaining 70% to the developer who actually made the sale.  This 30% commission is often *ten times* higher than the price typically paid for the use of other electronic payment solutions.

**28.** ~~25.~~Moreover, through this tie, Google inserts itself as an intermediary between each seller and each buyer for every purchase of digital content within the Android ecosystem, collecting for itself the personal information of users,

1  which Google then uses to give an anti-competitive edge to its own advertising services
2  and mobile app development business.

3      **29.**  ~~26.~~ ~~But for~~ Google's ~~monopolistic~~**anticompetitive** conduct~~,~~ **has**
4  **substantially foreclosed** competing stores ~~could offer~~**from offering** consumers and
5  developers choice in distribution and payment processing.  Indeed, Epic, which
6  distributes ~~gaming~~ apps through its own store to users of personal computers, would
7  open a store to compete with Google's and offer developers more innovation**, better**
8  **security,** and more choice, including **for** in**-app** payment processing.  App developers
9  would not have to pay Google's supra-competitive tax of 30%, as the price of
10  distribution and payment processing alike would be set by market forces rather than ~~by~~
11  Google's fiat.  Developers could address any payment-related issues (such as refunds)
12  directly with their own customers**,** rather than through Google.  And users and
13  developers, jointly, would get to decide whether users' data should be utilized for other
14  purposes.

15      **30.**  ~~27.~~ Google's anti-competitive conduct has injured Epic, both as an
16  app developer and as a potential competitor in app distribution and payment processing.
17  Epic ~~has~~ repeatedly approached Google and asked to negotiate relief that would stop
18  Google's unlawful and anti-competitive restrictions on app developers and consumers.
19  But Google would not budge.

20      **31.**  ~~28.~~ Because of Google's refusal to stop its ongoing anti-competitive
21  and unlawful conduct, on August 13, 2020, Epic began providing *Fortnite* ~~players~~**users**
22  the choice of using Epic's own direct payment tool as an alternative to Google's



**Fi**

1    overpriced ~~Billing~~**billing** tool, sharing with ~~players~~**users** who chose to use Epic's

2    payment tool the resulting savings.



14    **32.** ~~29.~~ In retribution, Google removed *Fortnite* from Google Play Store

15    listings, preventing new ~~players~~**users** from obtaining the game.  Google also prevented

16    Android users who acquired *Fortnite* from the Google Play Store from obtaining app

17    updates they ~~will need~~**needed** to continue playing with their friends and family.

18    **33.** ~~30.~~ Epic has publicly advocated for years that Google cease the

19    anti-competitive conduct addressed in this **First Amended** Complaint.  Google refused

20    to change its industry-impacting conduct.  Instead, Google offered to placate Epic by

21    offering it preferential terms on side deals, such as YouTube sponsorships and cloud

22    services, if Epic agreed to distribute *Fortnite* in the Google Play Store and acceded to

23    Google's 30% tax.  Google has reached ~~at least one~~ preferential ~~deal~~**deals** with

24    ~~another~~**major** mobile ~~game developer.~~**app developers, such as** Activision Blizzard,

25    ~~and Epic believes that Google is using similar~~ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27    ▮▮▮▮▮ **These** deals ~~with other companies to~~ allow Google to keep its monopolistic

28    behavior publicly unchallenged.  But Epic is not interested in any side deals that might

1  benefit Epic alone while leaving Google's anti-competitive restraints intact; instead,

2  Epic is focused on opening up the Android ecosystem for the benefit of ***all*** developers

3  and consumers.

4        **34.**  ~~31.~~ Accordingly, Epic seeks injunctive relief in court.  Google's

5  conduct has caused and continues to cause Epic financial harm, but Epic is ***not*** bringing

6  this case to recover these damages; Epic is not seeking any monetary relief, but rather

7  only an order enjoining Google from continuing to impose its anti-competitive conduct

8  on the Android ecosystem.

9                                    **PARTIES**

10        **35.**  ~~32.~~ Plaintiff Epic Games, Inc. is a Maryland corporation with its

11  principal place of business in Cary, North Carolina.  ~~Epic's mission is "to create fun~~

12  ~~games we want to play and to build the art and tools needed to bring those games to~~

13  ~~life".~~ Epic was founded in 1991 by a college student named Tim Sweeney.  Mr.

14  Sweeney ran Epic out of his parents' basement and distributed, by mail, Epic's first

15  commercial personal computer software, a game named *ZZT*.  Since then, Epic has

16  developed several popular entertainment software products that can be ~~played~~**used** on

17  an array of platforms—such as personal computers, gaming consoles, and smart mobile

18  devices.  Epic also creates and distributes ~~the~~ *Unreal Engine*, a powerful software suite

19  that allows competing ~~game~~ developers and others to create realistic three-dimensional

20  content, including video games, architectural recreations, television shows, and movies.

21  An Epic subsidiary also develops and distributes the popular *Houseparty* app, which

22  enables video chatting and social gaming on smart mobile devices and personal

23  computers.  Worldwide, approximately 400 million users have signed up to ~~play~~**use**

24  Epic ~~games~~**'s apps and services**, and each day 30 to 40 million individuals log into an

25  Epic ~~game~~**app, such as *Fortnite, Rocket League, Houseparty,* or the Epic Games**

26  **Store**.

27        **36.**  ~~33.~~ Defendant Google LLC is a Delaware limited liability company

28  with its principal place of business in Mountain View, California.  Google LLC is the

primary operating subsidiary of the publicly traded holding company Alphabet Inc. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

**37.** 34. Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.  Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

**38.** 35. Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.  Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

**39.** 36. Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and a subsidiary of Google LLC.  Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

**40.** 37. Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and a subsidiary of Google LLC.  Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission

1    on many types of processed payments, including payments for apps sold through the

2    Google Play Store and in-app purchases made within such apps.

3    ## JURISDICTION AND VENUE

4    **41.**    38. This Court has subject-matter jurisdiction over Epic's federal

5    antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§

6    1331 and 1337.  The Court has supplemental jurisdiction over Epic's state law claims

7    pursuant to 28 U.S.C. § 1367.  The Court also has subject-matter jurisdiction over the

8    state-law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenships of

9    Plaintiff, on the one hand, and of Defendants, on the other, and the amount in

10    controversy exceeding $75,000.

11    **42.**    39. This Court has personal jurisdiction over the Defendants.

12    Google LLC and Google Payment are headquartered in this District.  All Defendants

13    have engaged in sufficient minimum contacts with the United States and have

14    purposefully availed themselves of the benefits and protections of United States and

15    California law, such that the exercise of jurisdiction over them would comport with due

16    process requirements.  Further, the Defendants have consented to the exercise of

17    personal jurisdiction by this Court.

18    **43.**    40. Each of the Defendants except Google Payment is party to a

19    Google Play Developer Distribution Agreement (the "DDA") with Epic.  Section 16.8

20    of the DDA provides that the parties "agree to submit to the exclusive jurisdiction of

21    the federal or state courts located within the county of Santa Clara, California, to

22    resolve any legal matter arising from or relating to this Agreement".  Section 16.8

23    further provides that "[a]ll claims arising out of or relating to this Agreement or Your

24    relationship with Google under this Agreement will be governed by the laws of the

25    State of California, excluding California's conflict of laws provisions."  The claims

26    addressed in this Complaint relate to the DDA or to Epic's relationship with Google

27    under the DDA, or in the alternative such claims arise out of the same nucleus of

28    operative facts as other claims as to which the Court may exercise personal jurisdiction

1    over each Defendant, so that the exercise of pendent personal jurisdiction would be

2    proper.

3          **44.**   ~~41.~~ Google Payment is party to a Google Payments—Terms of

4    Service—Seller Agreement with Epic.  Section 11.3 of that Agreement provides that

5    "[t]he exclusive venue for any dispute related to this Agreement will be the state or

6    federal courts located in Santa Clara County, California, and each party consents to

7    personal jurisdiction in these courts."  Section 11.3 further provides that "The laws of

8    California, excluding California's choice of law rules, and applicable federal United

9    States laws will govern this Agreement."  The dispute between Google Payment and

10   Epic relates to the parties' Agreement, or in the alternative Epic's claims arise out of

11   the same nucleus of operative facts as other claims as to which the Court may exercise

12   personal jurisdiction over Google Payment, so that the exercise of pendent personal

13   jurisdiction would be proper.

14         **45.**   ~~42.~~ Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)

15   because Google LLC and Google Payment maintain their principal places of business in

16   the State of California and in this District, because a substantial part of the events or

17   omissions giving rise to Epic's claims occurred in this District, and because, pursuant to

18   28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in

19   any judicial district and their joinder with others shall be disregarded in determining

20   proper venue.  In the alternative, personal jurisdiction and venue also may be deemed

21   proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because

22   Defendants may be found in or transact business in this District.

23                        **INTRADISTRICT ASSIGNMENT**

24         **46.**   ~~43.~~ Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not

25   be assigned to a particular Division of this District, but shall be assigned on a

26   District-wide basis.

27

28

**RELEVANT FACTS**

**I.    Google Dominates the Merchant Market for Mobile Operating Systems.**

**47.** 44. To understand how Google effectively monopolizes the Android App Distribution and Android In-App Payment Processing Markets, as described below in Parts II and III, it is helpful to understand the background of smart mobile devices and how Google effectively dominates the related Merchant Market for Mobile Operating Systems through its control over the Android operating system.

**A.    The Merchant Market for Mobile Operating Systems**

> i.    Product Market Definition

**48.** 45. Smart mobile devices are handheld, portable electronic devices that can connect wirelessly to the internet and are capable of multi-purpose computing functions, including, among other things, Internet browsing, using social media, streaming video, listening to music, or playing games.  Smart mobile devices include smartphones and tablet computers.  Many consumers may *only* have a smart mobile device and no other computer.  Such consumers are particularly hard-hit by Google's unlawful conduct in mobile-related markets.

**49.** 46. Like laptop and desktop personal computers, mobile devices require an operating system —or "OS" — that enables multi-purpose computing functionality.  A mobile OS, just like the OS of any computer, is a piece of software that provides basic functionality to users of mobile devices such as button controls, touch commands, motion commands, and the basic "graphical user interface", which includes "icons" and other visual elements representing actions that the user can take.  A mobile OS also manages the basic operations of a smart mobile device, such as cellular or WiFi connectivity, GPS positioning, camera and video recording, speech recognition, and other features.  In addition, a mobile OS permits the installation and operation of mobile apps that are compatible with the particular OS and facilitates their use of the device's OS-managed core functionality.

**50.** 47. To ensure that every user can access the basic functions of a mobile device "out of the box", that is at the time he/she purchases the device, an OEM must pre-install an OS on each device prior to its sale.  This is similar to a personal computer that comes pre-installed with Microsoft Windows for PC or Apple's macOS for a Mac computer.  OEMs design mobile devices to ensure the device's compatibility with a particular OS the OEM chooses for a particular model of mobile device, so that the device may utilize the capabilities of that OS.  For OEMs, the process of implementing a mobile OS requires significant time and investment, making switching to another mobile OS difficult, expensive, and time-consuming.

**51.** 48. The vast majority of OEMs do not develop their own OS and must choose an OS that can be licensed for installation on smart mobile devices they design.  There is therefore a relevant Merchant Market for Mobile OSs comprising mobile OSs that OEMs can license for installation on the smart mobile devices they manufacture.  The market does not include proprietary OSs that are not available for licensing, such as Apple's mobile OS, called iOS.  Historically, the Merchant Market for Mobile OSs has included the Android OS, **acquired and further** developed by Google; the Tizen mobile OS, a partially open-source mobile OS that is developed by the Linux Foundation and Samsung; and the Windows Phone OS developed by Microsoft.

**52.** 49. Some consumers continue to use cellular phones that do not have multi-purpose, computing functions.  These simple phones resemble older "flip phones", for example; they are not part of the smart mobile device category.  These phones do not support mobile apps such as *Fortnite* **or *Houseparty*** and are instead typically limited to basic cellular functionality like voice calls and texting.  The simple operating systems on these phones, to the extent they exist, cannot support the wide array of features supplied by the OSs on smart mobile devices and are not part of the Merchant Market for Mobile OSs defined herein.

**53.** 50. To the extent that electronic devices other than smart mobile devices use operating systems, those OSs are not compatible with mobile devices, and therefore are not included in the Merchant Market for Mobile OSs defined herein. For example, computing devices that are not handheld and portable, that are not capable of multi-purpose computing functions and/or that lack cellular connectivity—such as desktop computers, laptops, or gaming consoles—are not considered to be "smart mobile devices". Gaming devices like Sony's PlayStation 4 ("PS4") and Microsoft's Xbox are physically difficult to transport, require a stable WiFi or wired connection to operate smoothly, and require an external screen for the user to engage in game play. Thus, even **for games,** if a gamer owns, for example, a dedicated, non-portable gaming console such as a PS4, which connects to and enables gaming via his/her TV, he/she will**would** not consider that PS4 a reasonable substitute for a mobile device like a smartphone **(and therefore would not consider the OS for the PS4 a reasonable substitute for a mobile OS)**, nor would he/she consider the version of any game created for his/her PS4 to substitute for the mobile app version of such a game. That is because the portability (and typically for smartphones the cellular connectivity) of the mobile devices enable the consumer to play mobile games away from home or anywhere in the home. Indeed, for this reason, game developers often distribute multiple versions of a game**an app**, each of which is programmed for compatibility with a particular type of device and its operating system.

        ii.    <u>Geographic Market Definition</u>

**54.** 51. OEMs license mobile OSs for installation on mobile devices globally, excluding China. Google's operations in China are limited, and it does not make available many of its products for mobile devices sold within China. This is based in part on legal and regulatory barriers to the distribution of mobile OS-related software imposed by China. Further, while Google contractually requires OEMs licensing Android outside of China not to sell any devices with competing Android-compatible mobile OSs, it imposes no such restriction on devices sold within

1  China.  Because the OEMs that sell Android mobile devices both within and outside

2  China have committed to this contractual restriction, such OEMs must sell, outside of

3  China, devices with Google's Android OS.  The geographic scope of the relevant

4  Merchant Market for Mobile OSs is therefore worldwide, excluding China.

5    **B.**  **Google's Monopoly Power in the Merchant Market for Mobile OSs**

6     **55.** 52. Google has monopoly power in the Merchant Market for Mobile

7  OSs through its Android OS.  As determined by the European Commission during the

8  course of its investigation of Android, the Android OS, licensed to OEMs in relevant

9  respects by Google, is installed on over 95% of all mobile devices sold by OEMs

10  utilizing a merchant mobile OS.  Indeed, Android OS is installed on nearly 75% of all

11  smart mobile devices sold by *all* OEMs, including even those OEMs that use a

12  proprietary mobile OS they developed exclusively for their own use (such as Apple's

13  iOS).

14     **56.** 53. A mobile ecosystem typically develops around ~~one or more~~**a**

15  mobile ~~OSs~~**OS**, such as the Android OS.  The "Android ecosystem" is a system of

16  mobile products (such as devices, apps and accessories) designed to be inter-dependent

17  and compatible with each other and the Android OS.  Ecosystem participants include an

18  array of participating stakeholders, such as Google, OEMs that make

19  Android-compatible devices, developers of Android-compatible apps, Android app

20  distribution platforms, including app stores, the makers of ancillary hardware such as

21  headphones or speakers, cellular carriers, and others.

22     **57.** 54. Mobile ecosystems benefit from substantial network

23  effects—that is, the more developers that design useful apps for a specific mobile OS,

24  the more consumers will be drawn to use the relevant OS for which those apps are

25  designed; the more consumers that use an OS, the more developers want to develop

26  even more apps for that OS.  As determined in *United States v. Microsoft* **_Corp._**, ~~*Inc.,*~~

27  ~~No. 98-1232~~**87 F. Supp. 2d 30** (D.D.C. **2000**), new entrants into an operating system

28  market thus face an "applications barrier to entry".  An applications barrier to entry

1   arises because a new operating system will be desirable to consumers only if a broad

2   array of software applications can run on it, but software developers will find it

3   profitable to create applications that run on an operating system only if there is a large

4   existing base of users.

5          **58.** ~~55.~~ To overcome this challenge and to attract app developers and

6   users, Google has continuously represented that Android is an "open" ecosystem and

7   that any ecosystem participant could create Android-compatible products without

8   unnecessary restrictions.  Indeed, Google LLC's CEO, Sundar Pichai, represented in

9   2014 that Android "is one of the most open systems that I've ever seen".[5]  And Andy

10  Rubin, an Android founder who is described by some as the "Father of Android", said

11  when he departed Google in 2013 that "at its core, Android has always been about

12  openness".[6]

13         **59.** ~~56.~~ But the **current** reality is quite different.  Despite these claims of

14  openness, Google has now effectively closed the Android ecosystem through its tight

15  control of the Android OS.  And, as the dominant OS licensor, Google ~~now~~ benefits

16  from ~~these~~ substantial network effects which makes participation on its platform a

17  "must-have" market for developers.

18         **60.** ~~57.~~ As further described below, Google uses the Android OS to

19  restrict ~~which~~**the** apps and app stores OEMs are permitted to pre-install on the devices

20  they make and to impose deterrents to the direct distribution of competing app stores

21  and apps to Android users, all at the expense of competition in the Android ecosystem.

22         **61.** ~~58.~~ Because of Google's monopoly power in the Merchant Market

23  for Mobile OSs, OEMs, developers and users cannot avoid such effects by choosing

24  another mobile OS.  OEMs such as ZTE and Nokia have stated that other

25

26  _____

    [5] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The
27     Guardian (Mar. 9, 2014),
       https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.
28  [6] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013),
       *available at*
       https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

non-proprietary OSs are poor substitutes for the Android OS and are not a reasonable alternative to licensing the Android OS. One important reason is that other mobile OSs presently do not support many high-quality and successful mobile apps, which consumers find essential or valuable when choosing a mobile device. These circumstances have biased consumers against the purchase of mobile devices with non-proprietary mobile OSs other than Android OS. OEMs thus have no choice but to agree to Google's demands because it is critical that they be able to offer a popular mobile OS and corresponding ecosystem to consumers who are choosing which mobile device to purchase.

62.     The Android OS was designed to be, and advertised as, "open source", in that OEMs and others may use portions of the OS without a license from Google, or even create customized versions of the OS for their own purposes, called Android "forks". But in reality, the Android OS is "open source" in name only. Google has entered into so-called Anti-Fragmentation Agreements ("AFAs") with Android mobile OEMs that have prevented them from creating Android forks for mobile devices and which prevent OEMs from modifying Android to offer competing app stores without restrictions. Among other things, the AFAs prohibit OEMs from taking "any actions that may cause or result in the fragmentation of Android", which is determined in Google's "sole discretion". Further, Android OEMs agree only to distribute "Android Compatible Devices", meaning that they may not ship *any* devices running an Android fork. Android Compatible Devices also must comply with the "Android Compatibility Definition" document and pass the "Android Compatibility Test Suite", both of which are maintained by Google. Among other things, the Android Compatibility Definition document requires OEMs to prompt users explicitly for permission to allow direct downloading of apps outside Google Play. The AFAs also prohibit Android OEMs from distributing certain software on devices that are not Android Compatible Devices, and bar OEMs from distributing, creating or promoting

1  ███████████████████████████████████████████

2  ██████████████████████████

3           63.    More recently, after the European Commission began

investigating Google's Android-related practices, including the AFAs, Google

transitioned to a new form of agreement with Android OEMs called the Android

Compatibility Commitment ("ACC").  But the ACC terms are only marginally less

restrictive than the AFA terms in that they allow OEMs to manufacture

non-Android Compatible Devices on behalf of a third party and that are marketed

under a third-party brand.  However, they still substantially foreclose OEMs from

distributing and marketing their own devices, including Android forks.  Entering

into an AFA or ACC is a precondition to an OEM being able to enter into a

Mobile Application Distribution Agreement ("MADA") and Revenue Sharing

Agreement ("RSA"), which are described below.  As a result, all or almost all

commercially significant mobile Android OEMs are bound by an AFA or ACC,

which helps Google ensure that mobile OEMs do not develop an Android fork that

could compete with Google's own version of the Android OS or provide features

that would support third-party app stores that compete with Google Play.

          64.    Google's conduct described herein creates a further barrier to

entry into the Merchant Market for Mobile OSs by, among other things,

restricting the ability of OEMs to support alternatives to Google's version of

Android and making it more difficult for consumers to switch to other mobile OSs.

## II.    Google Unlawfully Maintains a Monopoly in the Android ~~Mobile~~ App Distribution Market.

          65.    ~~59.~~ Mobile apps make mobile devices more useful and valuable

because they add functionality to the mobile device that caters to the specific interests

of each mobile device user.  For example, they facilitate video chats with friends and

family, banking online, shopping, job hunting, photo editing, reading digital news

sources, editing documents, or playing a game like *Fortnite Battle Royale*.  Many

workers use their smart mobile device to check work schedules, access company email, or use other employer software while outside the workplace.  For many consumers, a smartphone or tablet is the only way to access these functions, because the consumer does not own a personal computer or because the consumer can only access the Internet using a cellular connection.  But even when a consumer can perform the same or similar functions on a personal computer, the ability to access apps "on the go" using a handheld, portable device remains valuable and, important, and distinct.

**66.** 60. Whereas some apps may be pre-installed by OEMs, OEMs cannot anticipate all the various apps a specific consumer may desire to use.  Moreover, many consumers have different preferences as to which apps they want, and it would be undesirable for OEMs to load the devices they sell with unwanted apps that take up valuable space on the mobile device.  And many apps that consumers may ultimately use on their device will be developed after they buy the device.  Accordingly, consumers who seek to add new functionalities to a mobile device and customize the device for their own use need to obtain and install mobile apps themselves after purchasing their device.  Currently, on Android devices, this is done most often through the Google Play Store, Google's own "app store".  The Google Play Store is a digital portal set up by Google and through which mobile apps can be browsed, searched for, purchased (if necessary), and downloaded by a consumer.  App stores such as the Google Play Store, alongside several other ways by which apps can be distributed to the hundreds of millions of consumers using Android-based mobile devices, comprise**constitute** the Android App Distribution Market, defined below.

**67.** 61. Through various anti-competitive acts and unlawful restraints on competition, Google has **substantially foreclosed competition and** maintained a monopoly in the Android Mobile App Distribution market, causing ongoing harm to competition and injury to OEMs, app distributors, app developers, and consumers.  Google's restraints of trade belie representations Google currently makes to developers that "as an open platform, Android is about choice" and that app developers "can

1   distribute [their] Android apps to users in any way [they] want, using any distribution

2   approach or combination of approaches that meets [their] needs", including by allowing

3   users to directly download apps "from a website" or even by "emailing them directly to

4   consumers".[7]

5   **A.    The Android App Distribution Market**

6       i.    Product Market Definition

7   **68.**   ~~62.~~ There is a relevant market for the distribution of apps compatible

8   with the Android OS to users of mobile devices (the "Android App Distribution

9   Market").  This Market ~~is comprised of~~**includes** all the channels by which mobile apps

10  may be distributed to the hundreds of millions of users of mobile devices running the

11  Android OS.  The Market primarily includes Google's dominant Google Play Store,

12  with smaller stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind.

13  Nominally only, the direct downloading of apps without using an app store (which

14  Google pejoratively describes as "sideloading") is also within this market.

15  **69.**   ~~63.~~ App stores allow consumers to easily browse, search for, access

16  reviews on, purchase (if necessary), download, and install mobile apps, using the

17  mobile device itself and an Internet connection.  OEMs find it commercially

18  unreasonable to ship a smart mobile device to a consumer without at least one app store

19  installed, as a consumer's ability to obtain new mobile apps is an important part of the

20  value provided by smart mobile devices.

21  **70.**   ~~64.~~ App stores **selling mobile apps** are **currently** OS-specific,

22  meaning they distribute only apps that are compatible with the specific mobile OS on

23  which the app store is used.  A consumer who has a mobile device running the Android

24  OS cannot use apps created for a different mobile operating system.  An owner of an

25  Android OS device will use an Android compatible app store, and such app stores

26  distribute only Android-compatible mobile apps.  That consumer may not substitute an

27

28  ---
[7] Google Play Developers Page, *Alternative ~~distribution options~~**Distribution Options***, https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed ~~June 7~~**July 20**, ~~2020~~**2021**).

**First Amended** Complaint for Injunctive Relief      27

Android app store with, for example, Apple's App Store, as that app store is not available on Android devices, is not compatible with the Android OS, and does not offer apps that are compatible with the Android OS.  Non-Android mobile app distribution platforms—such as the Windows Mobile Store used on Microsoft's Windows Mobile OS or the Apple App Store used on Apple iOS devices—cannot substitute for Android-specific app distribution platforms, and they are therefore not part of the Android App Distribution Market defined herein.

**71.**    65. Likewise, stores distributing personal computer or gaming console software are not **currently** compatible with the Android OS and do not offer Android-compatible apps:  the Epic Games Store distributes software compatible with personal computers, the Microsoft Store for Xbox distributes software compatible with the Xbox game consoles, and the PlayStation Store distributes software compatible with the PlayStation game consoles.  A user cannot download mobile apps for use on his/her Android device by using such non-Android OS, non-mobile software distribution platforms.  They therefore are not part of the Android App Distribution Market.

**72.**    66. The same is true even when an app or game, like *Fortnite*, is available for different types of platforms running different operating systems, because only the OS-compatible version of that software can run on a specific type of device or computer.  Accordingly, as a commercial reality, an app developer that wishes to distribute mobile apps for Android mobile devices must develop an Android-specific version of the app and avail itself of the Android App Distribution Market.

**73.**    67. In the alternative only, the Android App Distribution Market is a relevant, economically distinct sub-market of a hypothetical broader antitrust market for the distribution of mobile apps to users of all mobile devices, whether Android or Apple's iOS.

ii.    Geographic Market Definition

**74.**    68. The geographic scope of the Android App Distribution Market is worldwide, excluding China.  Outside of China, app distribution channels, including

app stores, are developed and distributed on a global basis; OEMs, in turn, make app stores, such as the Google Play Store, available on Android devices on a worldwide basis (except in China).  China is excluded from the relevant market because legal and regulatory barriers prevent the operation of many global app stores, including the Google Play Store, within China.  Additionally, app stores prevalent in China are not available, or have little presence, outside of China.

**B.    Google's Monopoly Power in the Android App Distribution Market**

**75.**  69. Google has monopoly power in the Android App Distribution Market.

**76.**  70. Google's monopoly power can be demonstrated by, among other things, Google's massive market share in terms of apps downloaded.  The European Commission determined that, within the Market, more than 90% of **Android** app downloads through app stores have been done through the Google Play Store.  Indeed, although app stores for merchant mobile OSs other than Android are not included in the Android App Distribution Market, the European Commission found that the only such app store with any appreciable presence was the Windows Mobile Store, which was compatible with the Windows Mobile OS.  The Commission determined that even if the Windows Mobile Store share was included in the market, the Google Play Store would still have had a market share greater than 90%.

**77.**  71. Other existing Android mobile app stores do not discipline Google's exercise of monopoly power in the Android App Distribution Market.  No other app store is able to reach nearly as many Android users as the Google Play Store.  According to the European Commission, the Google Play Store is pre-installed by

OEMs on practically all Android mobile devices sold outside of China. As a result, no other Android app store comes close to that number of pre-installed users. With the exception of app stores designed for and installed only on mobile devices sold by those respective OEMs, such as Samsung Galaxy Apps and the LG Electronics App Store, no other Android app store is pre-installed on more than 10% of Android devices, and many have no appreciable market penetration at all. Aptoide, for example, is an Android app store that claims to be the largest "independent" app store outside of China, but it comes pre-installed on no more than 5% of Android mobile devices.

**78.** ~~72.~~ Because of Google's success in maintaining its monopoly in Android app distribution, there is no viable substitute to distributing Android apps through the Google Play Store. As a result, the Google Play Store offers over 3 million apps, including all of the most popular Android apps, compared to just 700,000 apps offered by Aptoide, the Android app store with the next largest listing. The Google Play Store thereby benefits from ongoing network effects based on the large number of participating app developers and users. The large number of apps attracts large numbers of users, who value access to a broad range of apps, and the large number of users attract app developers who wish to access more Android users. Android OEMs ~~too~~ find it commercially unreasonable to make and sell phones without the Google Play Store, and they view other app stores as poor substitutes for the Google Play Store because of the lower number and lesser quality of apps they offer.

**79.** ~~73.~~ As further proof of its monopoly power, Google imposes a supra-competitive commission of 30% on the price of apps purchased through the Google Play Store, which is a far higher commission than would exist under competitive conditions.

**80.** ~~74.~~ Furthermore, Google's monopoly power in app distribution is not constrained by competition at the smart mobile device level ~~because~~**. Before a consumer can even consider purchasing an app, she must purchase a device on which to install and run apps. There are currently only two smartphone operating**

**systems with significant market share, each at the core of a separate, differentiated ecosystem of devices, accessories, apps and services:  Apple's iOS and Google's Android OS.  When a consumer wishes to purchase a smartphone, the first choice she must make therefore is which operating system she wants the device to run and which mobile ecosystem she wants to participate in.**  Android device users face significant switching costs and lock-in to the Android ecosystems that serves to protect Google's monopoly power, and consumers are unable to account for Google's anticompetitive conduct when they purchase a smart mobile device.

**81.**   ~~75.~~ *First*, consumers are deterred from leaving the Android ecosystem due to the difficulty and costs of switching.  Consumers choose a smartphone based in part on the OS that comes pre-installed on that device and the ecosystem in which the device participates (in addition to a bundle of other features, such as price, battery life, design, storage space, and the range of available apps and accessories).  Once a consumer has selected a smartphone, the consumer cannot replace the mobile OS that comes pre-installed on it with an alternative mobile OS.  Rather, a consumer who wishes to change the OS must purchase a new smartphone entirely**, which is an investment that most consumers do not make more often than every two or three years.  Many Android phones are cheaper than non-Android (*i.e.*, Apple) phones; for those users, a comparably-priced non-Android alternative simply isn't available**.  In addition, mobile OSs have different designs, controls, and functions that consumers must learn to navigate.  Over time, consumers who use Android devices learn to operate efficiently on the Android OS.  For example, the Android OS layout differs from iOS in a wide range of functions, including key features such as searching and installing "widgets" on the phone, organizing and searching the phone's digital content, configuring control center settings, and organizing photos.  The cost of learning to use a different mobile OS is part of consumers' switching costs.

**82.**   ~~76.~~ *Second*, switching from Android devices may also result in a significant loss of personal and financial investment that consumers put into the

Android ecosystem.  Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data.  Even if versions of such apps and products are available within the new ecosystem chosen by the consumer, the consumer would have to go through the process of downloading them again onto the new devices and may have to purchase them anew.  As a result, the consumer may be forced to abandon his or her investment in at least some of those apps, along with any purchased in-app content and consumer-generated data on those apps.  **Because apps and device functionalities may not synchronize or operate efficiently across operating systems, existing Android users also face costs associated with "mixing and matching" different operating systems if they attempt to purchase a non-Android device.  Whether across a consumer's own set of personal devices (*e.g.*, a phone and a tablet), or across the consumer's family or business, "mixing and matching" operating systems can significantly diminish the utility of applications, which raises an additional and significant barrier to switching.**

**83.**  ~~77.~~ *Third*, consumers are not able to avoid the switching costs and lock-in to the Android OS ecosystem by acquiring more information prior to the purchase of the Android device.  The vast majority of mobile device consumers have no reason to inquire, and therefore do not know about, Google's anticompetitive contractual restraints and policies.  Furthermore, these consumers rationally do not give much weight to Google's anticompetitive conduct and anticompetitive fees when deciding whether to ~~switch from~~**purchase** an Android device.  Consumers consider many features when deciding which smartphone or tablet to purchase, including design, brand, processing power, battery life, functionality**,** and cellular plan.  These features are likely to play a substantially larger role in a consumer's decision as to which smart mobile device to purchase than Google's anticompetitive conduct in the relevant markets, particularly given that a consumer may consider the direct monetary cost of

Google's conduct to be small relative to the price of smart mobile devices, if the consumer is even aware of the conduct or assigns it such a cost at all. For example, over time a typical Android user may make multiple small purchases of paid apps and in-app digital content—accumulating to $100 or less annually—but may spend several hundreds of dollars at once to purchase an Android smart mobile device.

**84.** ~~78.~~ Consumers are also unable to determine the "lifecycle price" of devices—*i.e.*, to accurately assess at the point of purchase how much they will end up spending in total (including on the device and all apps and in-app purchases) for the duration of their ownership of the device. Consumers cannot know in advance of purchasing a device all of the apps or in-app content that they may want to purchase during the usable lifetime of the device. Consumers' circumstances may change. Consumers may develop new interests. They may learn about new apps or in-app content that becomes available only after purchasing a device. New apps and in-app content will continue to be developed and marketed after a consumer purchases a smartphone or tablet. All of these factors may influence the amount of consumers' app and in-app purchases. Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

**85.** ~~79.~~ Because consumers face substantial switching costs and lock-in to the Android OS, developers can only gain access to these users by also participating in the Android ecosystem. Thus, developers face an even greater cost in not participating in the Android ecosystem—loss of access to hundreds of millions of Android OS users.

**86. Google's anticompetitive restraints and policies serve to maintain and increase the switching costs described above. For example, by restricting the manner in which consumers can discover, download and install app stores that compete with the Google Play Store and by restricting the functionality**

of such competing stores (*see* paragraphs 122-141 below), Google blocks the emergence of competing multiplatform app stores that could lower switching costs by cataloguing or tracking a user's apps and purchases across different OSs. These various restrictions that increase switching costs impede the adoption of competing OSs, and thereby help perpetuate and strengthen Google's monopoly.

87.   Moreover, the close relationship that Google maintains with Apple further reduces Google's incentive to compete, innovate, and invest in app distribution because Google benefits by cooperating with its "competitor" Apple.
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████   For example, for over 15 years, Google has maintained an agreement with Apple whereby Google pays Apple a significant percentage of revenue derived from searches run on iOS devices—an estimated *$8-12 billion per year* in recent years, according to the U.S. Department of Justice—in exchange for Apple making Google Search the default search engine on the Safari browser, Siri voice command searches, and other search access points on Apple's devices.  Default status on Apple devices is valuable to Google because Google search advertising is Google's main revenue source.  And, through its agreements with Apple, Google ensures that its own search (and therefore search advertising) will be used on virtually *all* mobile devices, whether iOS or Android, as most consumers are unlikely to change these settings on their phone and will become Google Search users by default.  Because Android and iOS account for over 99% of smartphone OSs installed on mobile devices, Google's agreement with Apple guarantees that Google will generate revenue from virtually all smartphone OS users, regardless of whether they choose to purchase iOS or Android devices.

88.   Because Google reaps considerable profits from iOS users through its search arrangements with Apple, Google is not incentivized to compete

1  **more with Apple at the smartphone OS level and expend more resources**

2  **attracting users from iOS to Android than it currently does.  If it did not profit**

3  **significantly from searches on iOS devices, Google might be more incentivized to,**

4  **among other things, differentiate its Android platform from Apple with respect to**

5  **the commissions it charges on app transactions.  If Android competed with iOS on**

6  **app transactions, the market competition would make Android apps cheaper for**

7  **users and attract developers to launch their apps first (or even only) on Android.**

8  **Instead, Google and Apple are cozy duopolists, offering virtually the same terms to**

9  **developers and changing those terms in tandem (if at all).** ██████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████

13  **C.    Google's Anti-Competitive Conduct Concerning the Android App Distribution Market**

14  **89.**  ~~80.~~ Google has willfully and unlawfully maintained its monopoly in

15  the Android App Distribution Market through a series of related anti-competitive acts

16  that have **substantially** foreclosed competing ways of distributing apps to Android

17  users.

18       i.    Google's Conduct Toward OEMs **and Mobile Network Operators**

19  **90.**  ~~81.~~ Google imposes anti-competitive constraints on Android OEMs

20  based on their need for access to a viable Android app store and other important

21  services provided by Google.

22  **91.**  ~~82.~~ *First*, Google conditions OEMs' licensing of the Google Play

23  Store, as well as other essential Google services and the Android trademark, on OEMs'

24  agreements to provide the Google Play Store with preferential treatment compared to

25  any other competing app store.  Specifically, to access the Google Play Store, Android

26  OEMs (which, as noted above, ~~comprise~~**include** virtually all OEMs that obtain an OS

27  on the merchant market) have signed a Mobile Application Distribution Agreement

28  ("MADA") with Google.  A MADA confers a license to a bundle of products

comprising proprietary Google apps, Google-supplied services necessary for functioning of mobile apps, and the Android trademark.  Through its MADAs with Android OEMs, Google requires OEMs to locate the Google Play Store on the "home screen"[8] of each mobile device.  Android OEMs must further pre-install up to 30 Google mandatory apps and must locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services.  These requirements ensure that the Google Play Store is the most visible app store any user encounters and place any other app store at a significant disadvantage.

**92.**   83. Absent this restraint, OEMs could pre-install and prominently display alternative app stores to the purchasers of some or all of their mobile devices, allowing competing app stores the ability to vie for prominent placement on Android devices, increased exposure to consumers and, as a result, increased ability to attract app developers to their store.  As an app distributor, Epic could and would negotiate with OEMs to offer **consumers more choice with** a prominently displayed app store containing *Fortnite* and other games, allowing Epic to reach more mobile users**.  This would increase the distribution opportunities for Epic's own apps, as well as a variety of apps developed by third parties**.

84.   *Second*, Google interferes with OEMs

**93.**   ***Second,* Google's AFA and ACC compatibility standards require OEMs to implement Google's restrictions and foreclose OEMs from modifying Android to offer frictionless direct downloading of apps outside Google Play.**

**94.**   ***Third,* Google forecloses developers**' ability to **effectively** distribute Android app stores and apps directly to consumers outside the Google Play Store**, █████████████████████████████ ensuring that Google Play is the *only* app store that may be pre-installed on the devices the OEMs sell**.

---

[8] The default "home screen" is the default display, prior to any changes made by users, that appears without scrolling when the device is in active idle mode (*i.e.*, is not turned off or in sleep mode).

**95.    As Google's own documents recognize, pre-installation of apps and app stores by an OEM presents a unique and particularly important opportunity for competing app distributors and app developers to reach Android users outside Google Play, especially new distributors seeking a foothold in Android app distribution.  An OEMs' pre-installation of** an icon corresponding to an app **or app store on the device provides users of those devices convenient, trusted access to apps or app stores, without requiring consumers to seek out and acquire such apps or app stores on their own.**  Some OEMs may ~~choose to~~**even** compete for **device** buyers by offering mobile devices that provide **such** easy access to ~~additional mobile~~**desirable apps and** app stores ~~and apps~~.  For example, **as described below, Epic invested substantial resources in optimizing a special, state-of-the-art version of *Fortnite* for OnePlus,** an **Android** OEM ~~may pre-install~~ an icon corresponding to an app ~~store or app on the device before it is sold to consumers.  Even when an OEM would want to make mobile apps available to consumers in this way, Google imposes unjustified and pretextual warnings about the security of installing the app, even though the consumer is choosing to install the app in full awareness of its source.~~ **, in exchange for OnePlus's agreement to enable a "one-touch" installation of *Fortnite* on its devices—only for that agreement to be blocked by Google's anti-competitive conduct.**

**96.    Fearful that Epic and others would successfully begin distributing competing app stores in this way, Google designed and undertook coercive steps to foreclose this possibility.  Specifically,** ███████

███████

███████

███████

███████

███████

███████

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

97.     In 2018, Epic decided to launch *Fortnite* on Android—but not on Google Play.  Epic developed and made available a *Fortnite Launcher* app (which later became *Epic Games Launcher*) that could be directly downloaded from its website and then used to install *Fortnite* (and, later, other Epic apps) on Android devices.  Epic also entered into a Collaboration Agreement with Samsung pursuant to which Samsung would make available *Fortnite* to users of Samsung devices via the Samsung Galaxy Store.  ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  But Epic's partnership with Samsung and determination to bypass Google Play for distribution of *Fortnite* ▮▮▮▮▮▮▮▮ meant the loss of 30% of revenues that would be generated by the Android version of one of the most popular apps in the world, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

98.     In particular, documents that Google's ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮  Google feared that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1     ▮▮▮▮▮▮▮▮ **And finally, Google**

2 **even identified** ▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮**.  Google also recognized that**

6 **the** ▮▮▮▮▮▮▮▮

7 ▮▮▮▮ **facing its monopoly position in Android app distribution.  Google was**

8 **determined not to let this happen.**

9     **99.    The first step Google took to prevent this** ▮▮▮▮ **was its**

10 **decision to offer Epic a special deal to launch *Fortnite* on Google Play.** ▮▮▮▮

11 ▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮ **The rationale for the deal also**

21 **included the** ▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮



1

2

**100.    As part of these efforts, senior Google Play managers began reaching out to Epic.  One manager contacted Epic's Vice President and Co-Founder to gauge Epic's interest in a special deal and, among other things,**

6

7

8

9

**101.    Google recognized that Epic might not accept its offer.**

11

12

13

14

15

16

17

18

19

**102.    Epic rejected Google's special deal, opting instead to distribute *Fortnite* for Android via Epic's website and through a partnership with the large Android OEM, Samsung.  In the immediate wake of that decision,**

23

24

25

26

27

28

1       **103.**   **More broadly, Epic's decision to launch *Fortnite* for Android off**

2 **Google Play** ████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ███████████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 █████████████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ██████████████████████████████████████████████

9 █████████████████████████████████████████████████

10 █████████████████████████████████████████████████

11 █████████████████████████████████████████████████

12 █████████████████████████████████████████████████

13 █████████████████████████████████ **Indeed, Google**

14 **recognized that** ███████████████████████████████████

15 ███████████████████████████████████████████

16 ███████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████

20 ██████████████████████████████████████████████

21 ██████████████████████████████████████████████

22 ███████████████████████████████████████████████████

23 ██████████████████████████████████████████████████

24 █████████████████████████████████████████████████

25 ██████████████████████████████████████████████████

26 ███████████████████

27       **104.**   **Recognizing the threat that preinstalled app stores could pose to**

28 **Google Play's dominance,** ███████████████████████████████



Less than a year after having been found by the European Commission to have monopoly power in an Android app distribution market,

105. Google's anticompetitive conduct proceeded in this way:

1   **106.** ███████████████████████████ **to take one**
2   **illustrative example,** ████████████████████
3   ██████████████████████████████
4   ██████████████
5   **107.** ██████████████████████████
6   █████████████████████████
7   ████████████████████████████
8   ██████████████████████████
9   ██████████████████████████████
10  █████████████████████████████
11  ████████████
12  **108.   Moreover,** ██████████████████
13  █████████████████████████ **Epic**
14  **believes based on** ████████████████████
15  ██████████████████████
16  ████████████████████ **that this**
17  **document is likely to contain further anticompetitive requirements.** ████████
18  ██████████████████████████████
19  ██████████████████████████████
20  ████████████████████████████
21  █████████████████████████████
22  ████████████████████████████
23  ██████████████████████████
24  ███████████████████████████
25  ████████████████ **Google further** ████████
26  ███████████████████████████████
27  █████████████████ **Google also**
28  █████████████████████████████

109.   **As a further restriction,**

110.   **In addition,**

111.   **More recently,**



**112.   Google's efforts to foreclose competition in this way were a resounding success.**

**113.**  ~~85.~~  ~~Epic~~

**Indeed, Epic had** reached an agreement with OnePlus, ~~an OEM~~**one of the brands**

1  **owned by BBK**, to allow users of OnePlus mobile devices to seamlessly install

2  *Fortnite* and other Epic ~~games~~**apps** by touching an Epic Games app on their

3  devices—without encountering any obstacles **typically** imposed by the Android OS **on**

4  **apps directly downloaded from developers**.  In conjunction with this agreement, Epic

5  designed a version of *Fortnite* for certain OnePlus devices that delivers a

6  state-of-the-art framerate (the frequency at which consecutive images appear on the

7  device's screen), providing an even better ~~gameplay~~**user** experience for *Fortnite*

8  ~~players~~.  Although the original agreement between Epic and OnePlus contemplated

9  making this installation method available worldwide, Google demanded that OnePlus

10  not implement its agreement with Epic with the limited exception of mobile devices

11  sold in India.  OnePlus informed Epic that Google was "particularly concerned that the

12  Epic Games app would have ability to potentially install and update multiple games

13  with a silent install bypassing the Google Play Store".[9]  Further, **OnePlus advised that**

14  any waiver of Google's restriction "would be rejected due to the Epic Games app

15  serving as a potential portfolio of games and game updates".  As a result, OnePlus

16  mobile device users in India can install Epic ~~games~~**apps** seamlessly without using the

17  Google Play Store, while users outside India cannot.

18         **114.**  ~~86.~~Another OEM, ███████████████████, LG, also

19  told Epic that it had a contract with Google "to block side downloading off Google Play

20  Store this year", but that the OEM could "surely" make Epic ~~games~~**apps** available to

21  consumers if the Google Play Store were used.  Google prevented LG from

22  pre-installing the Epic Games app on LG devices.

23         **115.**  ████████████████████ **was not publicly known, and**

24  **was not known to Epic, before Google recently began producing relevant**

25  **documents in this litigation.  Google has sought to conceal its most restrictive**

26  **anticompetitive conduct by, among other things,** █████████████-

27

28  ---

[9]  A "silent install" is an installation process free of the dire security warnings that Google triggers
    when apps are directly downloaded, such as the "one touch" process on which Epic and OnePlus had
    agreed.

1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 **Google then used the confidentiality it imposed on OEMs to argue, in its Motion to**

4 **Dismiss, that Android OEMs are *not* prohibited from "pre-installing alternative**

5 **app stores", and that Epic failed to sufficiently allege the exclusivity agreements it**

6 **concealed.  (Dkt. 91 at 9 ("OEMs retain the ability under the MADAs to pre-install**

7 **. . . competing app stores"); *see also id.* at 8 ("Plaintiffs also challenge Google's**

8 **agreements with OEMs, which they claim 'discourage'—but do not claim**

9 **prohibit—OEMs from pre-installing alternative app stores"); *id.* at 15 ("Plaintiffs'**

10 **allegations fall short of alleging actual foreclosure or exclusivity, and Plaintiffs do**

11 **not allege the MADAs prohibit OEMs from pre-installing rival app stores"**

12 **(emphasis in original)); *id.* at 17 ("Nor is there any allegation that MADAs prevent**

13 **rival app stores from being pre-installed elsewhere on a device.").)  Google's**

14 **representations also obscured its efforts to ensure that Google Play would retain**

15 **exclusivity on the default screen through other OEM agreements.  (Dkt. 91 at 17**

16 **("There is no allegation that MADAs prevent rival app stores from also being**

17 **pre-installed on the home screen . . .").)  The revelations in Google's recent**

18 **document productions (which are thus far incomplete) make clear that the**

19 **exceedingly carefully phrased arguments and representations Google made in**

20 **connection with its Motion to Dismiss are inconsistent with Google's own**

21 **documents.**

22          **116.**   ~~87.~~ In the absence of this conduct, Epic could and would negotiate

23 with OEMs to make *Fortnite* and other Epic ~~games~~**apps** directly available to

24 consumers, free from Google's anti-competitive restraints.  OEMs could then compete

25 for the sale of mobile devices based in part on the set of apps offered on the OEMs'

26 devices.  But Google **substantially** forecloses alternative ways of distributing Android

27 apps other than through its own monopolized app store, harming competition among

28 OEMs and among app developers, to the detriment of consumers.

**117.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ **Many consumers contract with an MNO to enable their devices to communicate and access the Internet over cellular networks.  Prominent MNOs in the United States include AT&T Mobility, T-Mobile, and Verizon Wireless.** ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

**118.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ **Beginning in 2009, Google entered into revenue share agreements with various MNOs that split Android Market revenue between app developers, MNOs, and Google.  Under these arrangements, app developers typically received** ▮▮▮▮▮▮▮▮▮▮ **and Google received the remaining** ▮▮▮▮▮▮ **Google understood that this** ▮▮▮ **revenue share for MNOs** ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**119.   In its Motion to Dismiss, Google has argued that the existence of Samsung's Galaxy Store—which exists only on devices that Samsung sells—is somehow "fatal to Plaintiffs' claim of actual foreclosure".  But** ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



*First*, Google

***Second,***



120.

121.

However, the Complaint filed by 36 States and the District of Columbia in *State of Utah, et al. v. Google LLC, et al.*, alleges that Google then sought "a different implementation toward the same anticompetitive goal" as part of a new effort, "Project Agave". Epic does not have the details of any deal Google reached with Samsung as part of Project Agave because Google has not yet produced many underlying documents to Epic, and Google has maintained redactions over the States' relevant allegations when Google produced the States' Complaint to Epic. But documents that Google has produced to Epic reveal that

ii.   Google's Conduct Toward App Distributors and Developers

**122.** 88. Google imposes anti-competitive restrictions on competing app distributors and developers that further entrench its monopoly in Android App Distribution.

**123.** 89. *First*, Google prevents app distributors from providing Android users ready access to competing app stores.  Specifically, even though competitive app stores themselves are mobile apps that could easily be distributed through the Google Play Store, Google prohibits the distribution of any competing app store through the Google Play Store, without any technological or other justification.

**124.** 90. Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Google Play Store. Each of the Defendants, except Google Payment, is a party to the DDA.

**125.** 91. Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement.  The DDA is non-negotiable, and developers that seek access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

**126.** 92. In the absence of these unlawful restraints, competing app distributors could allow users to replace or supplement the Google Play Store on their devices with competing app stores, which users could easily download and install through the Google Play Store.  App stores could compete and benefit consumers by offering lower prices and innovative app store models, such as app stores that are curated to specific consumers' interests—*e.g.*, an app store that specializes in games or an app store that only offers apps that increase productivity.  Without Google's unlawful restraints, additional app stores would provide additional platforms on which

more apps could be featured, and thereby, discovered by consumers. Epic has been damaged through its inability to provide a competing app store (as it does on personal computers) and by the loss of the opportunity to reach more Android users directly in the ways that personal computers allow developers to reach consumers without artificial constraints.

**127.** 93. *Second,* Google conditions app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store. Specifically, Google markets an App Campaigns program that, as Google says, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest properties". This includes certain ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and**as well as** with Google's "search partners", that are specially optimized for the advertising of mobile apps. However, in order to access this valuable advertising space through the App Campaigns program, Google requires that app developers list their app in either the Google Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users). This conduct further entrenches Google's monopoly in Android App Distribution by coercing Android app developers to list their apps in the Google Play Store or risk losing access to a great many Android users they could otherwise advertise to but for Google's restrictions.

**128.** *Third,*



**Google**



iii.   Google's Conduct Toward Consumers

**129.** ~~94.~~ Google directly and anti-competitively restricts the manner in which consumers can discover, download and install mobile apps and app stores. Although Google nominally allows consumers to directly download and install Android apps and app stores—a process that Google pejoratively describes as "sideloading"—Google has ensured, through a series of technological impediments imposed by the Android OS, that direct downloading remains untenable for most consumers.

**130.** ~~95.~~ But for Google's anticompetitive acts, Android users could freely download apps from developers' websites, rather than through an app store, just as they might do on a personal computer.  There is no reason that downloading and installing an app on a mobile device should differ from downloading and installing software on a personal computer.  Millions of personal computer users download and

install software directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader. Personal computer users do this easily and safely.

**131.** ~~96.~~ Direct downloading on Android mobile devices, however, differs dramatically. Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process. **Google understands this, and** ████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████ For example, depending on the version of Android running on a mobile device, downloading and installing *Fortnite* **or any other Epic app** on an Android device could take as many as 16 steps or more, including requiring the user to make changes to the device's default settings and manually granting various permissions while being warned that doing so is dangerous. Below are the myriad steps an average Android user has to go through in order to download and install *Fortnite* directly from Epic's secure servers.



**132.** ~~97.~~ Below are two of the intimidating messages and warnings about the supposed danger of directly downloading and installing apps that consumers encounter during this process.

**First Amended** Complaint for Injunctive Relief     54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





**133.** 98. As if this slog through warnings and threats were not enough to ensure the inferiority of direct downloading as a distribution method for Android apps, Google denies downloaded apps the permissions necessary to be seamlessly updated in the background—instead**, Google** allows such updates only for apps downloaded via Google Play Store.  The result is that consumers **in most instances** must manually approve every update of a "sideloaded" app.  In addition, depending on the OS version and selected settings, such updates may require users to go through many of the steps in the downloading process repeatedly, again triggering many of the same warnings.  This imposes onerous obstacles on consumers who wish to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading and toward Google's monopolized app store.

**134.** 99. Further, Google further restricts direct downloading under the guise of offering protection from malware, Google further restricts direct downloading. When Google deems an app "harmful", Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the app from a consumer's device.  And

direct downloading has been prevented entirely on the Android devices that are part of Google's so-called Advanced Protection Program ("APP").  Consumers who have enrolled in APP are unable to directly download apps; their Android device can only download apps distributed in the Google Play Store or in **the rare instance of** another pre-installed app store that Google has pre-approved for an OEM to offer on its devices. App developers therefore cannot reach APP users unless they first agree to distribute their apps through the Google Play Store or through a separate Google-approved, OEM-offered app store, where available.  Google's invocation of security is an excuse to further strangle an app developer's ability to reach Android users, as shown by a comparison to personal computers, where users can securely purchase and download new software without being limited to a single software store owned or approved by the user's anti-virus software vendor.

**135.**  ~~100.~~Direct downloading is also nominally available to competing app distributors who seek to distribute competing Android app stores directly to consumers.  However, the same restrictions Google imposes on the direct downloading of apps apply to the direct downloading of app stores.  Indeed, Google Play Protect has flagged at least one competing Android app store, Aptoide, as "harmful", further hindering consumers' ability to access a competing app store.

**136.**  ~~101. And~~**Google prohibits** apps downloaded from "sideloaded" app stores, like apps directly downloaded from a developer's website, ~~may not be~~**from being** automatically ~~uploaded~~**updated** in the background.[10]  Thus, direct downloading is not a viable way for app stores to reach Android users, any more than it is a viable alternative for single apps; the only difference is that the former do not have *any* alternative, ensuring the latter are forced into the Google Play Store.

---

[10] **In the latest announced, but as of yet unreleased, version of Android (which was announced after this lawsuit was filed), Google vaguely promised to "make third-party app stores easier to use on Android 12"; however, the details of any improvements remain unclear.  Sameer Samat, *Android 12 Beta: Designed for you*, May 18, 2021, https://blog.google/products/android/android-12-beta/.**

**137.** 

**138.** ~~102.~~ But for Google's restrictions on direct downloading, Epic and other app distributors and developers could ~~try to~~ directly distribute their stores and apps to those consumers who would be open to a process outside an established app store.  But as explained above, Google makes direct downloading substantially and unnecessarily difficult, and in some cases prevents it entirely, further narrowing this already narrow alternative distribution channel.

**139.** ~~103.~~ There is no legitimate reason for Google's conduct.  Indeed, for decades the users of personal computers have been able to install software acquired from various sources without being deterred by anything like the obstacles erected by Google.  ~~Now~~**For many years**, a user ~~can~~**has been able to** navigate to the Internet webpage sponsored by the developer of software he/she desires, click once or twice to download and install an application, and be up and running, often in a matter of minutes.  The operating systems used by personal computers efficiently facilitate this download and installation (unlike Android), and security screening is conducted by a neutral security software operating in the background, allowing users to download software from any source they choose (unlike Android).

**First Amended** Complaint for Injunctive Relief      58

**140.** 104. Google's anti-competitive and unjustified restrictions on distributing apps through any means other than its own app store contradict its own claims that Android app developers can "us[e] any distribution approach or combination of approaches that meets your needs", and that developers can even provide consumers "apps from a website or [by] emailing them directly to users."[10][11]  In reality, Google specifically prevents app developers from effectively availing themselves of alternative distribution channels that it**Google** touts today**as available**.

**141.** 105. Through these anti-competitive acts, including contractual provisions and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly over Android mobile app distribution.  Google Play Store downloads have accounted for more than 90% of downloads through Android app stores, dwarfing other available distribution channels.

### D.   Anti-Competitive Effects in the Android App Distribution Market

**142.** 106. Google's anti-competitive conduct forecloses**has substantially foreclosed** competition in the Android App Distribution Market, affects**affecting** a substantial volume of commerce in this Market and causes**causing** anti-competitive harms to OEMs, competing mobile app distributors, mobile app developers, and consumers.

**143.** 107. Google's conduct harms OEMs by forcing them to dedicate to the Google Play Store and other mandatory Google applications valuable space on their devices' "home screen", even if they would rather use that real estate for other purposes, including to offer alternative app stores.  Individually and together, these requirements limit OEMs' ability to innovate and compete with each other by offering innovative and more appealing (in terms of price and quality) distribution platforms for mobile apps.  Google's restrictions also interfere with OEMs' ability to compete with

---

[10][11] Google Play Developers Page, *Alternative distribution options**Distribution Options*, https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed June 7**July 20**, 2020**2021**).

each other by offering Android devices with tailored combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers.

**144.** 108. Google's conduct harms would-be competitor app distributors, such as Epic, which could otherwise innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's own app store.

**145.** 109. Google's anti-competitive conduct harms app developers, such as Epic, which are forced to agree to Google's anti-competitive terms and conditions if they wish to reach many Android users, such as through advertising on Google's valuable advertising properties.  Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps.  By restricting developers in such a way, Google ensures that the developer's apps will be distributed on the Google Play Store, and that Google is then able to monitor and collect a variety of information on the apps' usage, which it can then use to develop and offer its own competing apps that are, of course, not subject to Google's supra-competitive taxes.

**146.** 110. Both developers and consumers are harmed by Google's supra-competitive taxes of 30% on the purchase price of apps distributed through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market.  Google's supra-competitive taxes raise prices for app developers and consumers and reduce the output of mobile apps and related content by depriving app developers incentive and capital to develop new apps and content.

**147.** 111. Consumers are further harmed because Google's control of app distribution reduces developers' ability and incentive to distribute apps to consumers in different and innovative ways—for example, through genre-specific app stores. Google, by**By** restraining the distribution market and eliminating the ability and incentive for competing app stores, **Google** also limits consumers' ability to discover

new apps of interest to them.  More competing app stores would permit additional platforms to feature diverse collections of apps.  Instead, consumers are left to sift through millions of apps in one monopolized app store, where Google controls which apps are featured and ~~which apps are~~ identified or prioritized in user searches.

III.  **Google Unlawfully Acquired and Maintains a Monopoly in the Android In-App Payment Processing Market.**

**148.**  ~~112.~~ By selling digital content within a mobile app rather than (or in addition to) charging a price for the app itself, app developers can make an app widely accessible to all users, then charge users for additional digital content or features, thus still generating revenue from their investment in developing new apps and content. This is especially true for mobile game developers.  By allowing users to play without up-front costs, developers permit more players **to** try a game "risk free" and only pay for what they want to access.  *Fortnite*, for example, is free to download and play, but makes additional content available for in-app purchasing on an à la carte basis or via a subscription-based Battle Pass.  App developers who sell digital content rely on in-app payment processing ~~tools~~**solutions** to process consumers' purchases in a seamless and efficient manner.

**149.**  ~~113.~~ When selling digital content, Android app developers are unable to utilize the multitude of electronic payment processing solutions generally available on the market to process other types of transactions.  Instead, through contractual restrictions and its monopoly in app distribution, Google coerces developers into using its own in-app payment processing **solution** by conditioning developers' use of Google's dominant Google Play Store on the use of Google's payment processor~~, Google Play Billing,~~ for digital content, thereby acquiring and maintaining monopoly power in the Android In-App Payment Processing Market.  Google thus ties its Google Play Store to its own proprietary payment processing ~~tool~~**solution, Google Play Billing, substantially foreclosing competition**.

1

   A.    **The Android In-App Payment Processing Market**

2

      i.    Product Market Definition

3      **150.** ~~114.~~ There is a relevant antitrust market for ~~the~~**payment** processing
4 ~~of payments~~**solutions** for the purchase of digital content, including virtual gaming
5 products, that is consumed within Android apps (the "Android In-App Payment
6 Processing Market").  The Android In-App Payment Processing Market ~~is comprised~~
7 ~~of~~**includes** the payment processing solutions that Android developers could ~~turn to and~~
8 integrate into their Android apps to process the purchase of such in-app digital content.

9      **151.** ~~115.~~ Absent Google's unlawful conduct, app developers could
10 integrate **a** compatible payment processor into their apps to facilitate the purchase of
11 in-app digital content.  Developers also would have the capability to develop their own
12 in-app payment processing functionality.  And developers could offer users a choice
13 among multiple payment processors ~~for each purchase~~, just like a website or
14 brick-and-mortar store can offer a customer the option of using Visa, MasterCard,
15 Amex, Google Pay, and more.

16      **152.** ~~116.~~ Google offers separate payment solutions for the purchase of
17 digital content ~~than it does~~**and** for other types of purchases~~,~~ even within mobile apps.
18 Google Play Billing can be used for the purchase of digital content and virtual gaming
19 products, while Google offers a separate tool, Google Pay, to facilitate the purchase of
20 physical products and services within apps.

21      **153.** ~~117.~~ It is particularly important that app developers who sell in-app
22 digital content be able to offer in-app transactions that are seamless, engrossing, quick,
23 and fun.  For example, a gamer who encounters a desirable "skin" within *Fortnite*, such
24 as a Marvel superhero, may purchase it nearly instantly for a small price without
25 leaving the app.  Although *Fortnite* does not offer content that extends gameplay or
26 gives players competitive advantages, other game developers offer such products—for
27 example, "boosts" and "extra lives"—that extend and enhance gameplay.  It is critical
28 that such purchases can be made during gameplay itself, rather than in another manner.

If a player were required to purchase game-extending extra lives outside of the app, the player may simply stop playing instead.

154. 118. As another example, if a user of a mobile dating app encounters a particularly desirable potential dating partner, he/she can do more than "swipe right" or "like" that person, but can also purchase a digital item that increases the likelihood that the potential partner will notice his/her profile. If the user could not make that purchase quickly and seamlessly, he/she would likely abandon the purchase and may even stop "swiping" in the app altogether.

155. 119. It is therefore essential that developers who offer digital content be able to seamlessly integrate a payment processing solution into the app, rather than requiring a consumer to go elsewhere, such as to a separate website, to process a transaction. Indeed, if an app user were directed to process a purchase of digital content outside of a mobile app, the user might abandon the purchase or stop interacting with the mobile app altogether.

156. 120. Mobile game developers particularly value the ability to allow users to make purchases that extend or enhance gameplay without disrupting or delaying that gameplay or a gamer's engagement with the mobile app. For these reasons, and in the alternative, there is a relevant antitrust sub-market for the **payment** processing of payments **solutions** for the purchase of virtual gaming products within mobile Android games (the "Android Games Payment Processing Market").

      ii.   Geographic Market Definition

157. 121. The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools **solutions**, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools **solutions** available in China are not available outside of China, including because Google prevents the use of non-Google payment processing tools **solutions** for all apps distributed through the Google Play Store, which as noted above dominates distribution of apps outside of China.

**B.    Google's Monopoly Power in the Android In-App Payment Processing Market**

**158.**    ~~122.~~ Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

**159.**    ~~123.~~ For apps distributed through the Google Play Store, Google requires that the apps use *only* its own in-app payment processor, Google Play Billing, to process in-app purchases of digital content and for all purchases within Android games.  And because 90% or more of Android-compatible mobile app downloads conducted through an app ~~stores~~**store** have been done through the Google Play Store, Google has a monopoly in these Markets. ~~.~~

**160.**    ~~124.~~ **For the vast majority of transactions,** Google charges a 30% commission for Google Play Billing.**[12]**  This rate reflects Google's market power, which allows it to charge supra-competitive prices for payment processing within the market.  Indeed, the cost of alternative electronic payment processing ~~tools~~**solutions**, which Google does not permit to be used for the purchase of in-app digital content or within Android games, can be *one tenth* of the 30% cost of Google Play Billing.

| **Electronic Payment Processing ~~Tool~~Solution** | **Base U.S. Rate[13]** |
|---|---|
| PayPal | 2.9% |
| Stripe | 2.9% |
| Square | 2.6%-3.5% |
| Braintree | 2.9% |

---

**[12]** **Seven months after this lawsuit was filed, Google instituted a new policy reducing the Play Store commission to 15% for a developer's first $1 million in annual revenue.  Sameer Samat,** *Boosting Developer Success on Google Play, Android Developers Blog* **(Mar. 16, 2021), https://android-developers.googleblog.com/2021/03/boosting-dev-success.html.**

**[13]** **The base U.S. rates in these examples include an additional fixed fee per transaction of $0.30 or less in addition to the listed percentage.**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.    **Google's Anti-Competitive Conduct Concerning the Android In-App Payment Processing Market**

**161.**   ~~125.~~ Through provisions of the DDA that Google imposes on all developers who seek to access Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Distribution Market, to its own in-app payment processing ~~tool~~**solution**, Google Play Billing.  Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and in-app digital content.

**162.**   ~~126.~~ Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require in relevant part that:

•    Developers offering ~~products within a game downloaded on Google Play or providing access to game content~~**"Play-distributed apps** must use **[**Google Play ~~In app~~ Billing**]** as the method of payment **if they require or accept payment for access to features or services, including any app functionality, digital content or goods"**.

•    Developers offering products within ~~another~~**any** category of app downloaded on Google Play must use Google Play ~~In app~~ Billing as the method of payment, except for the following cases:

o    Payment is ~~solely~~**primarily** for physical products **or services**,

o    Payment is for digital content that may be consumed outside of the app itself (*e.g.*, songs that can be played on other music players).

**163.**   ~~127.~~ Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their mobile apps, depriving app developers and consumers alike a choice of competing payment processors.  For example, Epic offers its own in-app payment processing ~~tool~~**solution** that it could integrate, alongside Google's and others, into Epic mobile ~~games~~**apps**.  Epic consumers could then choose to process their payment using

Google's ~~tool~~**solution**, Epic's ~~tool~~**solution**, or another ~~tool~~**solution** altogether.  **These restraints result in a substantial foreclosure of competition.**

**164.**  ~~128.~~ In December of 2019, Epic submitted a build of *Fortnite* to Google Play that enabled users to make in-app purchases through Epic's own payment processor.  Upon review of the submission, Google Play rejected the application, citing its violation of Google's Payments policy as well as an unrelated issue raised by Google.  In January 2020, Epic again submitted a *Fortnite* build that resolved the unrelated issue but ~~again~~**still** enabled users to use Epic's own payment processor.  Google again rejected Epic's submission.

**165.**  ~~129.~~ Epic was prevented from offering *Fortnite* on the Google Play Store, and therefore unable to reach many Android users, until it submitted a new version of *Fortnite* that only offered Google Play Billing.  Google has damaged Epic by foreclosing it from the Android in-app payment processing market.

**166.**  ~~130.~~ Google has no legitimate justifications for its tie.  If it were concerned, for example, about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app.  But Google does allow alternative payment processing ~~tools~~**solutions** in that context, with no diminution in security.

**D.  Anti-Competitive Effects in the Android In-App Payment Processing Market**

**167.**  ~~131.~~ Google's conduct harms competition in the Android In-~~app~~**App** Payment Processing Market (and, in the alternative, in the Android Games Payment Processing Market) and injures app developers, consumers, and competing in-app payment processors.  **Google's conduct substantially forecloses competition.**

**168.**  ~~132.~~ Google's conduct harms would-be competitor in-app payment processors, who would otherwise have the ability to innovate and offer consumers alternative payment processing ~~tools~~**solutions** that offer better functionality, lower prices, and better security.  For example, in the absence of Google's Developer Program

Policies, Epic could offer consumers a choice of in-app payment processor for each purchase made by the consumer, including a choice of Epic's own payment processor at a lower cost and with better customer service.

**169.** ~~133.~~ Google also harms app developers and consumers by inserting itself as a mandatory middleman in every in-app transaction. When Google acts as payment processor, Epic is unable to provide users comprehensive customer service relating to in-app payments ~~without Google's involvement~~. Google has little incentive to compete through improved customer service because Google faces no competition and consumers often blame Epic for payment-related problems. In addition, Google is able to obtain information concerning Epic's transactions with its own customers, which ~~it~~**Google** could use to give its ads and Search businesses an anti-competitive edge, even when Epic and its own customers would prefer not to share their information with Google. In these ways and in others, Google directly harms app developers' relationships with the users of their apps.

**170.** ~~134.~~ Finally, Google raises app developers' costs and consumer prices through its supra-competitive 30% tax on in-app purchases, a price it could not maintain if it had not foreclosed competition for such transactions. The resulting increase in prices for in-app content likely deters some consumers from making purchases and deprives app developers of resources they could use to develop new apps and content. The supra-competitive tax rate also reduces developers' incentive to invest in and create additional apps and related in-app content.

**COUNT 1:  Sherman Act § 2**
**(Unlawful Monopoly Maintenance in the**
**Android App Distribution Market)**
**(against all Defendants except Google Payment)**

**171.** ~~135.~~ Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**172.** ~~136.~~ Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2.

1    **173.** ~~137.~~ The Android App Distribution Market is a valid antitrust

2    market.

3    **174.** ~~138.~~ Google holds monopoly power in the Android App Distribution

4    Market.

5    **175.** ~~139.~~ Google has unlawfully maintained monopoly power in the

6    Android App Distribution Market through the anti-competitive acts described herein,

7    including conditioning the licensing of the Google Play Store, as well as other essential

8    Google services and the Android trademark, on OEMs' agreement to provide the

9    Google Play Store with preferential treatment~~,~~**.  Google has done this by** ████████

10   ███████████████████████████████████████████████████████

11   ███████████████████████████████████████████

12   ████████████████████████**, by restricting OEMs from**

13   **offering frictionless downloading of apps outside of Google Play through**

14   **compatibility standards in the AFA and ACC, by** imposing technical restrictions and

15   obstacles on both OEMs and developers~~,~~ which prevent the distribution of Android

16   apps through means other than the Google Play Store, and **by** conditioning app

17   developers' ability to effectively advertise their apps to Android users on being listed in

18   the Google Play Store.

19   **176.** ~~140.~~ Google's conduct affects a substantial volume of interstate as

20   well as foreign commerce.

21   **177.** ~~141.~~ Google's conduct has substantial anti-competitive effects,

22   including increased prices and costs, reduced innovation and quality of service, and

23   lowered output.

24   **178.** ~~142.~~ As a potential competing app distributor and as an app

25   developer, Epic has been harmed by Defendants' anti-competitive conduct in a manner

26   that the antitrust laws were intended to prevent.  Epic has suffered and continues to

27   suffer damages and irreparable injury, and such damages and injury will not abate until

28   an injunction ending Google's anti-competitive conduct issues.

**COUNT 2:  Sherman Act § 1**
**(Unreasonable restraints of trade concerning**
**Android App Distribution Market:  OEMs)**
**(against all Defendants except Google Payment)**

**179.**  143. Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**180.**  144. Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".

15 U.S.C. § 1.

**181.**  145. Google has entered into agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market.  These include MADAs with OEMs that condition their access to the Google Play Store and other "must have" Google services on the OEM offering the Google Play Store as the primary and often the only viable app store on Android mobile devices.

**182.** ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████

**183.  Through the AFA and ACC compatibility standards, Google restricts OEMs from offering frictionless downloading of apps outside of Google Play.**

**184.**  146. These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects, and thus unreasonably restrain **and substantially foreclose** competition in the Android App Distribution Market.

**185.**  147. Google's conduct affects a substantial volume of interstate as well as foreign commerce.

**186.** ~~148.~~ Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

**187.** ~~149.~~ As a potential competing app distributor and as an app developer that consumes app distribution services, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Epic **has been foreclosed from the market and** has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 3:  Sherman Act § 1**
**(Unreasonable restraints of trade concerning**
**Android App Distribution Market:  ~~DDA~~Developer Distribution Agreement)**
**(against all Defendants except Google P**ayment**)**

**188.** ~~150.~~ Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**189.** ~~151.~~ Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".

15 U.S.C. § 1.

**190.** ~~152.~~ Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of being distributed through Google's app store, the Google Play Store.  The relevant provisions of these agreements unreasonably restrain **and substantially foreclose** competition in the Android App Distribution Market.

**191.** ~~153.~~ Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play".  Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies.  Under the guise of its so-called

"Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play".  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

**192.** ~~154.~~ These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects, and thus unreasonably restrain **and substantially foreclose** competition in the Android App Distribution Market.

**193.** ~~155.~~ Google's conduct affects a substantial volume of interstate as well as foreign commerce.

**194.** ~~156.~~ Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

**195.** ~~157.~~ As a potential competing app distributor and as an app developer that consumes app distribution services, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic **has been substantially foreclosed from the market and** has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 4:  Sherman Act § 2
### (Unlawful Monopolization and Monopoly Maintenance in the Android In-App Payment Processing Market)
### (against all Defendants)

**196.** ~~158.~~ Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

1    **197.**  ~~159.~~ Google's conduct violates Section 2 of the Sherman Act, which

2    prohibits the "monopoliz[ation of] any part of the trade or commerce among the several

3    States, or with foreign nations".  15 U.S.C. § 2.

4    **198.**  ~~160.~~ The Android In-App Payment Processing Market is a valid

5    antitrust market.  In the alternative, the Android Games Payment Processing Market is a

6    valid antitrust market.

7    **199.**  ~~161.~~ Google holds monopoly power in the Android In-App Payment

8    Processing Market and, in the alternative, in the Android Games Payment Processing

9    Market.

10   **200.**  ~~162.~~ Google has unlawfully acquired monopoly power in these

11   Markets, including through the anti-competitive acts described herein.  And however

12   Google initially acquired its monopoly, it has unlawfully maintained its monopoly,

13   including through the anti-competitive acts described herein.

14   **201.**  ~~163.~~ Google's conduct affects a substantial volume of interstate as

15   well as foreign commerce.

16   **202.**  ~~164.~~ Google's conduct has substantial anti-competitive effects,

17   including increased prices and costs, reduced innovation and quality of service, and

18   lowered output.

19   **203.**  ~~165.~~ As an app developer and as the developer of a competing

20   in-app payment processing ~~tool~~**solution**, Epic has been harmed by Defendants'

21   anti-competitive conduct in a manner that the antitrust laws were intended to prevent.

22   Epic has suffered and continues to suffer damages and irreparable injury, and such

23   damages and injury will not abate until an injunction ending Google's anti-competitive

24   conduct issues.

25   **COUNT 5:  Sherman Act § 1**
     **(Unreasonable restraints of trade concerning**
26   **Android In-App Payment Processing Market: Developer Distribution Agreement)**
27   **(against all Defendants)**

28   **204.**  ~~166.~~ Epic restates, re-alleges, and incorporates by reference each of

the allegations set forth in the rest of this Complaint as if fully set forth herein.

1    **205.**   167. Defendants' conduct violates Section 1 of the Sherman Act,

2    which prohibits "[e]very contract, combination in the form of trust or otherwise, or

3    conspiracy, in restraint of trade or commerce among the several States, or with foreign

4    nations".

5    15 U.S.C. § 1.

6    **206.**   168. Google, except Google Payment, forces app developers to enter

7    its standardized DDA, including Developer Program Policies integrated into that

8    Agreement, as a condition of having their apps distributed through Google's

9    monopolized app store, Google Play Store.  The relevant provisions of these

10   agreements unreasonably restrain **and substantially foreclose** competition in the

11   Android In-App Payment Processing Market.

12   **207.**   169. Section 3.2 of the DDA requires that Android app developers

13   enter into a separate agreement with Google's payment processor, Defendant Google

14   Payment, in order to receive payment for apps and content distributed through the

15   Google Play Store.  This includes payments related to in-app purchases of digital

16   content.  Further, Google's Developer Program Policies, compliance with which

17   Section 4.1 of the DDA makes obligatory, require that apps distributed through the

18   Google Play Store "must use **[**Google Play In-app Billing, **[**offered by Google Payment]

19   as the method of payment" for such in-app purchases.  While Google's Policies exclude

20   certain types of transactions from this requirement, such as the purchase of

21   "solely**primarily . . .** physical products" **goods and services** or of "digital content that

22   may be consumed outside of the app itself", Google expressly applies its

23   anti-competitive mandate to every**all** "game downloaded on Google Play" and to all

24   purchased "game**Play-distributed apps . . . if they require or accept payment for**

25   **access to features or services, including any app functionality, digital** content **or**

26   **goods**", such as purchases made within**which includes** *Fortnite*.

27   **208.**   170. The challenged provisions serve no sufficient legitimate or

28   pro-competitive purpose and unreasonably restrain **and substantially foreclose**

competition in the Android In-App Payment Processing Market and, in the alternative, the Android Games Payment Processing Market.

**209.** ~~171.~~ Defendants' conduct affects a substantial volume of interstate as well as foreign commerce.

**210.** ~~172.~~ Defendants' conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

**211.** ~~173.~~ As an app developer and as the developer of a competing in-app payment processing ~~tool~~**solution**, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Epic **has been substantially foreclosed from the market and** has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 6:  Sherman Act § 1
#### (Tying Google Play Store to Google Play Billing)
#### (against all Defendants)

**212.** ~~174.~~ Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**213.** ~~175.~~ Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

**214.** ~~176.~~ Google has unlawfully tied ~~the Google Play Store to~~ its in-app payment processor, Google Play Billing, **to the Google Play Store** through its DDAs with app developers and its Developer Program Policies.

**215.** ~~177.~~ Google has sufficient economic power in the tying market, the Android App Distribution Market.  With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being

performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

**216.** ~~178.~~ The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing ~~services~~**solution**.  Google's foreclosure of alternative app distribution channels forces developers like Epic to use Google's in-app payment processing ~~services~~**solution**, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

**217.** ~~179.~~ The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers such as Epic have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed.  Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

**218.** ~~180.~~ Google's conduct **substantially** forecloses competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

**219.** ~~181.~~ Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

**220.** ~~182.~~ In the alternative only, even if Google's conduct does not constitute a *per se* illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

**221.** ~~183.~~ As an app developer which ~~consumes~~**uses** in-app payment processing ~~services~~**solutions** and as the developer of a competing in-app payment processing ~~tool~~**solution**, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered

and continues to suffer damages and irreparable injury, and such damages and injury

will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 7:  California Cartwright Act
### (Unreasonable restraints of trade in Android App Distribution Market: OEMs)
### (against all Defendants except Google Payment)

**222.**  184. Epic restates, re-alleges and incorporates by reference each of

the allegations set forth in the rest of this Complaint as if fully set forth herein.

**223.**  185. Google's acts and practices detailed above violate the

Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the

combination of resources by two or more persons to restrain trade or commerce or to

prevent market competition.  *See* §§ 16720, 16726.

**224.**  186. Under the Cartwright Act, a "combination" is formed when the

anti-competitive conduct of a single firm coerces other market participants to

involuntarily adhere to the anti-competitive scheme.

**225.**  187. The Android App Distribution Market is a valid antitrust

market.

**226.**  188. Google has executed agreements with OEMs that unreasonably

restrict competition in the Android App Distribution Market.  Namely, Google has

entered into MADAs with OEMs that require OEMs to offer the Google Play Store as

the primary—and practically the only—app store on Android mobile devices.  These

agreements further prevent OEMs from offering alternative app stores on Android

mobile devices in any prominent visual positioning.

**227.**

**228.   Through the AFA and ACC compatibility standards, Google restricts OEMs from offering frictionless downloading of apps outside of Google Play.**

**229.** ~~189.~~ Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

**230.** ~~190.~~ Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

**231.** ~~191.~~ It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

**232.** ~~192.~~ Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 8:  California Cartwright Act**
**(Unreasonable restraints of trade in Android App Distribution Market: Developer Distribution Agreement)**
**(against all Defendants except Google Payment)**

**233.** ~~193.~~ Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**234.** ~~194.~~ Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

**235.** ~~195.~~ Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

**236.** ~~196.~~ The Android App Distribution Market is a valid antitrust market.

**237.** ~~197.~~ Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Distribution Market.

**238.** ~~198.~~ Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies.  Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play."  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

**239.** ~~199.~~ These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android App Distribution Market.

**240.** ~~200.~~ Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service, and lowered output.

**241.** ~~201.~~ Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

**242.** ~~202.~~ It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

**243.** ~~203.~~ Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 9:  California Cartwright Act
**(Unreasonable restraints of trade in Android In-App Payment Processing Market:  Developer Distribution Agreement)**
**(against all Defendants)**

**244.** ~~204.~~ Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**245.** ~~205.~~ Google's ~~acts~~**actps** and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

**246.** ~~206.~~ Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

**247.** ~~207.~~ The Android App Distribution Market and Android In-App Payment Processing Market, and, in the alternative, the Android Games Payment Processing Market, are valid antitrust markets.

**248.** ~~208.~~ Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

**249.** ~~209.~~ Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android In-App Payment Processing Market.

**250.** ~~210.~~ Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store.  This includes payments related to in-app purchases.  Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases.  While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "~~solely~~**primarily . . .** physical ~~products~~" **goods and services** or of "digital content that may be consumed outside of the app itself", Google expressly and discriminatorily applies its anti-competitive mandate to ~~every~~**all** "~~game downloaded on Google Play" and to all purchased "game~~**Play-distributed apps . . . if they require or accept payment for access to features or services, including any app functionality, digital** content **or goods**", ~~such as purchases made within~~**which includes** *Fortnite*.

**251.** ~~211.~~ These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android In-App Payment

Processing Market, and, in the alternative, in the Android Games Payment Processing Market.

**252.** 212. Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

**253.** 213. Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute and use its own in-app payment processor.

**254.** 214. It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

**255.** 215. Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 10:  California Cartwright Act
### (Tying Google Play Store to Google Play Billing)
### (against all Defendants)

**256.** 216. Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

**257.** 217. Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia,*  the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition.  *See* §§ 16720, 16726.

**258.** 218. Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

**259.** 219. The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." § 16727.

**260.** 220. As detailed above, Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

**261.** 221. Google has sufficient economic power in the tying market, the Android App Distribution Market, to affect competition in the tied market, the Android In-App Payment Distribution Market.  With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

**262.** 222. The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services**solution**.  Google's **substantial** foreclosure of alternative app distribution channels forces developers like Epic to use Google's in-app payment processing services**solution**, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

**263.** 223. The tying product, Android app distribution, is separate and distinct from the tied product, Android in-app payment processing, because app developers such as Epic have alternative in-app payment processing options and would

prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

**264.** ~~224.~~ Google's conduct **substantially** forecloses competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

**265.** ~~225.~~ Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

**266.** ~~226.~~ Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act, and therefore, illegal.

**267.** ~~227.~~ Google's acts and practices detailed above unreasonably restrain competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

**268.** ~~228.~~ Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is paying a supra-competitive commission rate on in-app purchases processed through Google's payment processor and has forgone commission revenue it would be able to generate if its own in-app payment processor were not unreasonably restricted from the market.

**269.** ~~229.~~ As an app developer which ~~consumes~~**uses** in-app payment processing ~~services~~**solutions** and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.

**270.** ~~230.~~ It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has

its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

271. ~~231.~~ Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 11:  California Unfair Competition Law
### (against all Defendants)

272. ~~232.~~ Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

273. ~~233.~~ Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

274. ~~234.~~ Epic has standing to bring this claim because it has suffered injury in fact and lost money as a result of Google's unfair competition.  Specifically, it develops and distributes apps for the Android mobile platform, and has developed and distributes a processor for in-app purchases, and Google's conduct has unreasonably restricted Epic's ability to fairly compete in the relevant markets with these products.

275. ~~235.~~ Google's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

276. ~~236.~~ Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

277. ~~237.~~ Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is unreasonably prevented from freely distributing mobile apps or its in-app payment processing tool, and forfeits a higher commission rate on the in-app purchases than it would pay absent Google's conduct.

278. ~~238.~~ Epic seeks injunctive relief under the Unfair Competition Law.

1

**PRAYER FOR RELIEF**

2       WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in

3  favor of Epic and against Defendants:

4       A.    Issuing an injunction prohibiting Google's anti-competitive and unfair

5             conduct and mandating that Google take all necessary steps to cease such

6             conduct and to restore competition;

7       B.    Awarding a declaration that the contractual restraints complained of herein

8             are unlawful and unenforceable;

9       C.    Awarding any other equitable relief necessary to prevent and remedy

10            Google's anti-competitive conduct; and

11      D.    Granting such other and further relief as the Court deems just and proper.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: ~~August~~**July** ~~13, 2020~~**21, 2021**

Respectfully submitted,

By:     /s/ Paul J. Riehle

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice ~~pending~~*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice ~~pending~~*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice ~~pending~~*)
gbornstein@cravath.com
**Timothy G. Cameron (*pro hac vice*)**
**tcameron@cravath.com**
Yonatan Even (*pro hac vice ~~pending~~*)
yeven@cravath.com
**Lauren A. Moskowitz (*pro hac vice*)**
**lmoskowitz@cravath.com**
**Justin C. Clarke (*pro hac vice*)**
**jcclarke@cravath.com**
M. Brent Byars (*pro hac vice ~~pending~~*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700