Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000

*Counsel for Defendants Google LLC et al.*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>This Document Relates To:<br><br>*Epic Games Inc. v. Google LLC et al.*,<br>Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**DEFENDANTS' ANSWER, DEFENSES, AND COUNTERCLAIMS TO EPIC GAMES INC.'S SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge:  Hon. James Donato |

## INTRODUCTION

Android, Google's open-source mobile operating system ("OS"), is a critical source of competition against other operating systems, such as Apple's iOS. This competition has brought tremendous benefits to developers and users. By providing Android to smartphone manufacturers for free, Google has expanded access to smartphones and the marketplace for mobile apps, creating enormous incentives for developers to invest in apps that make virtually every sector of the American economy more efficient, affordable, and accessible for users. These benefits have typically come at little or no cost to manufacturers, developers, or users.

Google also offers an app store, Google Play, which works on Android. But unlike competitors like Apple, Google does not require Android users or developers to use Google Play in order to download, install, or distribute apps on Android. Rather, Google gives app developers and smartphone consumers more openness and choice than any other major competitor. Most Android phones in and outside the United States come preloaded with more than one app store, and consumers can download apps directly from a developer's website if they choose via sideloading. Consumers and developers don't **have** to use Google Play, they **choose** to use it when given a choice among Android app stores and distribution channels. Google supports that choice through Android itself, Google Play's policies, and Google's agreements with developers and device manufacturers.

Ironically, Epic's own experience distributing its games on Android demonstrates that competition and choice exist today. In 2018, Epic launched its popular *Fortnite* game on Android without distributing it through Google Play. Instead, Epic struck a deal with the largest Android handset manufacturer, Samsung, to have *Fortnite* distributed through the Samsung Galaxy Store. Samsung's Galaxy app store comes preloaded on Samsung's Android devices; approximately 50 percent of Android phones in the United States are manufactured by Samsung (and approximately 40 percent worldwide). Beyond the Galaxy Store, Android users could also download *Fortnite* from Epic's website, bypassing Android app stores altogether; over 15 million Android device users did so in the first 21 days after *Fortnite's* launch. And Epic's documents confirm that it has negotiated preloading agreements with other original equipment manufacturers ("OEMs"), which

-1-

also enables Epic to distribute its apps without using Google Play. These facts belie Epic's claim that it has been foreclosed from reaching Android users in any material way.

Far from generating anticompetitive harm, Android and Google Play bring enormous benefits to developers and users—and they do so at zero cost to users and minimal cost to developers in the vast majority of cases. Epic's suit threatens to undermine, rather than enhance, the very competition that has brought these benefits.

## <u>RESPONSES TO NUMBERED PARAGRAPHS</u>

The section headings in the Second Amended Complaint do not require a response.  To the extent that the section headings contain allegations requiring a response, Google denies all such allegations.

1.      Defendants Google LLC, Google Ireland Limited, Google Commerce Ltd., Google Asia Pacific Pte. Limited, and Google Payment Corp. (collectively "Google") deny the allegations in Paragraph 1, except admit that Google LLC was founded in 1998 as an exciting young company. Google refers the Court to the cited documents for a complete and accurate statement of their contents.

2.      Google admits that Google LLC acquired the Android mobile operating system in 2005 and that Android is an open ecosystem that, at its core, has always been about openness. Google denies the remaining allegations in Paragraph 2, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

3.      Google denies the allegations in Paragraph 3, except admits that Epic purports to bring claims under Sections 1 and 2 of the Sherman Act and under California law.

4.      Google denies the allegations in Paragraph 4, except admits that Epic does not seek monetary compensation from this Court and purports only to seek injunctive relief.

5.      Google denies the allegations in Paragraph 5, except avers that Google provides benefits to developers, including Epic, including discoverability made possible by distribution, e-learning opportunities, free tools for developers to effectively build apps for Android devices, testing and monitoring tools, and a global digital payment infrastructure to enable developers to transact with users using the most effective payment methods regardless of where the developers

DEFENDANTS' ANSWER TO EPIC'S SECOND AMENDED COMPLAINT AND COUNTERCLAIMS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD

or users are located. Google further avers that Google has enabled developers to create revenue streams for themselves.

6.     Google denies the allegations in Paragraph 6.

7.     Google denies the allegations in Paragraph 7, except avers that Android users and developers already have access to its open ecosystem, and further avers that Android users multihome. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 about the PC ecosystem.

8.     Google admits the allegations in Paragraph 8.

9.     Google denies the allegations in Paragraph 9, except admits, on information and belief, that Epic develops and distributes applications, operates a store for the distribution of apps, and develops and licenses *Unreal Engine*, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9 about Epic's products and operations.

10.    Google admits that Epic develops multiple apps, including Fortnite and others, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 10.

11.    Google admits that *Fortnite* offers multiple modes and is free to download and experience, and avers that *Fortnite* has open to it, and uses, an array of monetization strategies, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11, including the number of *Fortnite* users.

12.    Google admits that Epic operates the Epic Games Store, which makes available for download certain popular gaming and non-gaming applications, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12 about the operations of the Epic Games Store.

13.    Google admits that Epic's *Unreal Engine* is a graphics engine that, on information and belief, has been used by game developers and in television productions, and that *Unreal Match 3* and *Action RPG Game Sample* are available in the Google Play Store, but is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 13.

14.     Google denies the allegations in Paragraph 14, except admits that smart mobile devices generally use an operating system to provide core device functionality and to enable the operation of programs.

15.     Google denies the allegations in Paragraph 15, and avers that Android OS is used by billions of users the world over, and provides access to over 3 million compatible apps.

16.     Google denies the allegations in Paragraph 16, except admits that companies that design and sell smart mobile devices are known as OEMs.

17.     Google denies the allegations in Paragraph 17.

18.     Google denies the allegations in Paragraph 18, except admits that one or more of the defendants have agreements with OEM partners, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

19.     Google denies the allegations in Paragraph 19, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 regarding what OnePlus told Epic.

20.     Google denies the allegations of Paragraph 20 insofar as it purports to represent the content of any Google license agreement with LG, and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20.

21.     Google denies the allegations in Paragraph 21, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

22.     Google denies the allegations in Paragraph 22, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

23.     Google denies the allegations in Paragraph 23.

24.     Google denies the allegations in Paragraph 24.

25.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25.

26.     Google denies the allegations in Paragraph 26, and avers that, during the time period when Epic distributed Fortnite through Google Play, Android Fortnite users had the choice whether to make purchases using Google Play's billing system ("Google Play Billing") or another mechanism because it was possible to purchase *Fortnite* virtual currency outside of Google Play for use in the version of *Fortnite* available on Google Play.

27.     Google denies the allegations in Paragraph 27, except admits that one or more defendants receive a payment for in-app purchases with respect to apps distributed through Google Play, and charge up to 30% as a service fee. Google avers that beginning on January 1, 2018, the service fee on subscriptions was reduced from 30% to 15% in the second year. Google further avers that beginning on July 1, 2021, the service fee was reduced to 15% for the first $1 million of revenue on digital goods or services every developer earns each year.

28.     Google denies the allegations in Paragraph 28.

29.     Google denies the allegations in Paragraph 29, except avers that when Epic launched *Fortnite* on Android outside of the Google Play Store, a security vulnerability was discovered in the *Fortnite* installer.

30.     Google denies the allegations in Paragraph 30, except admits that Epic met with one or more of the defendants to discuss launching *Fortnite* on Google Play.

31.     Google denies the allegations in Paragraph 31, except admits that on August 13, 2020, Epic breached the Google Play Developer Distribution Agreement ("DDA") between Epic and Google LLC, Google Ireland Limited, Google Commerce Ltd., and Google Asia Pacific Pte., dated June 12, 2020, by allowing *Fortnite* users who downloaded the app through Google Play to use Epic's own payment processing tool instead of Google Play Billing. Google further avers that for *Fortnite* transactions processed through Epic's own payment processing tool, Google is paid nothing for its intellectual property or for app distribution.

32.     Google denies the allegations in Paragraph 32, except admits that *Fortnite* was removed from Google Play on August 13, 2020 as a result of Epic's breach of the terms of its contract with Google LLC, Google Ireland Limited, Google Commerce Ltd., and Google Asia Pacific Pte., and avers that Epic's deception and fraud were planned and executed over a period of

many months. Google further avers that *Fortnite* users can continue accessing *Fortnite* using their existing accounts through channels other than Google Play.

33.     Google denies the allegations in Paragraph 33.

34.     Google denies the allegations in Paragraph 34, except admits that Epic seeks injunctive relief, but denies that such relief is appropriate.

35.     Google admits that Epic is a Maryland corporation and purports to maintain its principal place of business in Cary, North Carolina, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35.

36.     Google denies the allegations in Paragraph 36, except admits that Google LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Mountain View, California, and that Google LLC is a party to the DDA. Google further admits that Google LLC is a subsidiary of XXVI Holdings Inc., which is a Delaware corporation and a subsidiary of Alphabet Inc. Google further admits that Alphabet Inc. is a publicly traded company that is incorporated and existing under the laws of the State of Delaware and that maintains its principal executive offices in Mountain View, California.

37.     Google denies the allegations in Paragraph 37, except admits that Google Ireland Limited is organized under the laws of Ireland with its principal place of business in Dublin, Ireland, is a subsidiary of Google LLC, and is a party to the DDA.

38.     Google denies the allegations in Paragraph 38, except admits that Google Commerce Ltd. is organized under the laws of Ireland with its principal place of business in Dublin, Ireland and is a party to the DDA.

39.     Google denies the allegations in Paragraph 39, except admits that Google Asia Pacific Pte. Ltd. is organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore and is a party to the DDA.

40.     Google denies the allegations in Paragraph 40, except admits that Google Payment Corp. is a Delaware corporation with its principal place of business in Mountain View, California and is a subsidiary of Google LLC.

41.     The allegations in Paragraph 41 are legal conclusions not subject to admission or denial. To the extent a response is required, Google does not dispute subject matter jurisdiction.

42.     The allegations in Paragraph 42 are legal conclusions not subject to admission or denial. To the extent a response is required, Google does not dispute—for purposes of this action only—the personal jurisdiction of this Court, but Google otherwise denies the allegations in Paragraph 42.

43.     Google denies the allegations in Paragraph 43, except admits that each of the defendants, except Google Payment Corp., is a party to the DDA, to which document Google respectfully refers the Court for a complete and accurate statement of its contents. Google further avers that the allegations in the fourth sentence are legal conclusions not subject to admission or denial, and to the extent a response is required, Google does not dispute—for purposes of this action only—personal jurisdiction of this Court.

44.     Google denies the allegations in Paragraph 44, except admits that Google Payment Corp. is party to a Google Payments—Terms of Service—Seller Agreement with Epic, and Google respectfully refers the Court to the cited document for a complete and accurate statement of its contents. Google further avers that the allegations in the fourth sentence are legal conclusions not subject to admission or denial, and to the extent a response is required, Google does not dispute—for purposes of this action only—personal jurisdiction of this Court.

45.     The allegations in Paragraph 45 are legal conclusions not subject to admission or denial. To the extent a response is required, Google does not dispute—for purposes of this action only—the venue of this action, and respectfully refers the Court to the quoted document for a complete and accurate statement of its contents.

46.     The allegations in Paragraph 46 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 46.

47.     Google denies the allegations in Paragraph 47.

48.     Google denies the allegations in Paragraph 48, except admits that smart mobile devices are handheld, portable electronic devices that can connect wirelessly to the Internet and are capable of multi-purpose computing functions

49.     Google admits the allegations in Paragraph 49.

50.     Google denies the allegations in Paragraph 50, except admits that OEMs may select an OS for devices they manufacture and ensuring compatibility between mobile devices and an OS may require some time and investment.

51.     Google denies the allegations in paragraph 51, except admits that most mobile device manufacturers do not develop their own OSs. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 about Apple.

52.     Google denies the allegations in Paragraph 52.

53.     Google denies the allegations in Paragraph 53.

54.     Google denies the allegations in Paragraph 54.

55.     Google denies the allegations in Paragraph 55.

56.     Google admits the allegations in Paragraph 56.

57.     Google denies the allegations in Paragraph 57, except admits that mobile ecosystems benefit from substantial network effects and avers that both developers and users can and do multi-home—*i.e.*, use multiple channels for distributing and accessing apps.

58.     Google admits the allegations in Paragraph 58.

59.     Google denies the allegations in Paragraph 59.

60.     Google denies the allegations in Paragraph 60.

61.     Google denies the allegations in Paragraph 61.

62.     Google denies the allegations in Paragraph 62, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

63.     Google denies the allegations in Paragraph 63, except admits that one or more of the defendants have agreements called Mobile Application and Distribution Agreements ("MADAs") and optional revenue sharing agreements with some OEM partners, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

64.     Google denies the allegations in Paragraph 64.

65.     Google admits that mobile apps expand the usefulness and value of mobile devices but is without knowledge or information sufficient to form a belief as to whether "a smartphone or tablet is the only way to access [certain] functions" for "many consumers."

66.     Google denies the allegations in Paragraph 66, except admits that Android users download and install Android-compatible mobile apps through the Google Play Store and it would be undesirable for OEMs to load their devices with unwanted apps.

67.     Google denies the allegations in Paragraph 67, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

68.     Google denies the allegations in Paragraph 68, except admits that the "direct downloading of apps" is sometimes called "sideloading" and avers that multiple app stores and access points to apps exist, as users can and do multi-home in accessing apps.

69.     Google denies the allegations of Paragraph 69 except admits that "[a]pp stores allow consumers to easily browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps, using the mobile device itself and an Internet connection."

70.     Google denies the allegations of Paragraph 70.

71.     Google denies the allegations in Paragraph 71.

72.     Google denies the allegations of Paragraph 72.

73.     Google denies the allegations in Paragraph 73.

74.     Google denies the allegations in Paragraph 74.

75.     Google denies the allegations in Paragraph 75.

76.     Google denies the allegations in Paragraph 76, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

77.     Google denies the allegations in Paragraph 77.

78.     Google denies the allegations in Paragraph 78, except admits that Google Play offers over 3 million apps, and that the large number of apps available through Google Play attracts users, as well as developers who choose to offer apps on Google Play because of the benefit of free distribution and discoverability that Google Play provides.

79.     Google denies the allegations in Paragraph 79.

80.     Google denies the allegations in Paragraph 80, and avers that users have the option of using different platforms to access their apps, and that Apple and Google compete vigorously in the mobile operating system environment on multiple dimensions, including innovation, price, privacy, and security.

81.     Google denies the allegations in Paragraph 81, and avers that users select their mobile device for many reasons, including that users prefer a mobile device with an app store preinstalled, and that users want a secure mobile device. Google also avers that evidence shows that users can and do switch and multi-home among and between mobile and nonmobile ecosystems, including between Android and iOS.

82.     Google denies the allegations in Paragraph 82.

83.     Google denies the allegations in Paragraph 83.

84.     Google denies the allegations in Paragraph 84.

85.     Google denies the allegations in Paragraph 85.

86.     Google denies the allegations in Paragraph 86.

87.     Google denies the allegations in Paragraph 87, except admits that one or more of the defendants have an agreement with Apple in which Apple agrees to distribute Google products and earns revenue from that agreement; Google respectfully refers the Court to the cited documents for a complete and accurate statement of their contents. Google avers that: (1) Google competes vigorously with Apple across numerous dimensions of competition; and (2) Google has an interest in its partners selling more Android phones in order to better compete with Apple.

88.     Google denies the allegations in Paragraph 88, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

89.     Google denies the allegations in Paragraph 89.

90.     Google denies the allegations in Paragraph 90.

91.     Google denies the allegations in Paragraph 91, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents. Google admits that mobile manufacturers have a choice whether to enter into a MADA to distribute devices with proprietary Google apps, including the Google Play Store, and that these agreements contain

1   various provisions regarding placement of certain Google apps for the initial out-of-the-box
2   settings, though the specific terms have changed over time.

3        92.      Google denies the allegations in Paragraph 92.

4        93.      Google denies the allegations in Paragraph 93, and respectfully refers the Court to
5   the cited documents for a complete and accurate statement of their contents.

6        94.      Google denies the allegations in Paragraph 94, and respectfully refers the Court to
7   the cited documents for a complete and accurate statement of their contents.

8        95.      Google denies the allegations in Paragraph 95.

9        96.      Google denies the allegations in Paragraph 96, and respectfully refers the Court to
10  the cited documents for a complete and accurate statement of their contents.

11       97.      Google denies the allegations in Paragraph 97, except admits that in 2018, Epic
12  decided to launch *Fortnite* on Android outside of Google Play, and respectfully refers the Court to
13  the cited documents for a complete and accurate statement of their contents. Google is without
14  knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph
15  97 about Epic's agreement with Samsung.

16       98.      Google denies the allegations in Paragraph 98, and respectfully refers the Court to
17  the cited documents for a complete and accurate statement of their contents.

18       99.      Google denies the allegations in Paragraph 99, and respectfully refers the Court to
19  the cited documents for a complete and accurate statement of their contents.

20       100.     Google denies the allegations in Paragraph 100, and respectfully refers the Court to
21  the cited documents for a complete and accurate statement of their contents.

22       101.     Google denies the allegations in Paragraph 101, and respectfully refers the Court to
23  the cited documents for a complete and accurate statement of their contents.

24       102.      Google denies the allegations in Paragraph 102, and respectfully refers the Court
25  to the cited documents for a complete and accurate statement of their contents. Google is without
26  knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph
27  102 regarding Epic's deal with Samsung.

28

103.    Google denies the allegations in Paragraph 103, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

104.    Google denies the allegations in Paragraph 104.

105.    Google denies the allegations in Paragraph 105, except admits that one or more of the defendants offer a Premier Device Program. Google respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

106.    Google admits that one or more of the defendants executed an RSA with HMD Global, effective December 1, 2019, and respectfully refers the Court to the agreement for a complete and accurate statement of its contents.

107.    Google denies the allegations in Paragraph 107, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

108.     Google denies the allegations in Paragraph 108, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

109.    Google denies the allegations in Paragraph 109, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

110.    Google denies the allegations in Paragraph 110, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

111.    Google denies the allegations in Paragraph 111, except admits that one or more of the defendants offer Mobile Incentive Agreements, but avers that participation in the Foundation Tier Device program is optional, that enrollment is on a device-by-device basis, and that only a very small percentage of active devices are covered by the Foundation Tier Device program. Google respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

112.    Google denies the allegations in Paragraph 112, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

113.    Google denies the allegations in Paragraph 113, respectfully refers the Court to the cited documents for a complete and accurate statement of their contents, and is without knowledge

or information sufficient to form a belief as to the truth of the allegations in Paragraph 113 regarding what OnePlus told Epic.

114.    Google denies the allegations in Paragraph 114, and is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 regarding what LG told Epic.

115.    Google denies the allegations in Paragraph 115, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents. Google also avers that participation in the Premier Device Program is optional, and that only a very small percentage of active devices are covered by the Premier Device Program.

116.    Google denies the allegations in Paragraph 116.

117.    Google denies the allegations in Paragraph 117, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

118.    Google denies the allegations in Paragraph 118, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

119.    Google denies the allegations in Paragraph 119, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

120.    Google denies the allegations in Paragraph 120, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

121.    Google denies the allegations in Paragraph 121, except admits that it did not pursue Project Banyan. Google respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

122.    Google denies the allegations in Paragraph 122.

123.    Google denies the allegations in Paragraph 123, except admits that DDA, Section 4.5 states, "You may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Google respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

1     124.     Google denies the allegations in Paragraph 124, except admits that each of the

Defendants, except Google Payment Corp., is a party to the DDA and that DDA, Section 4.5

states, "You may not use Google Play to distribute or make available any Product that has a

purpose that facilitates the distribution of software applications and games for use on Android

devices outside of Google Play." Google respectfully refers the Court to the cited documents for a

complete and accurate statement of their contents.

125.     Google denies the allegations in Paragraph 125, except admits that DDA, Section

4.5 states, "You may not use Google Play to distribute or make available any Product that has a

purpose that facilitates the distribution of software applications and games for use on Android

devices outside of Google Play." Google respectfully refers the Court to the cited documents for a

complete and accurate statement of their contents.

126.     Google denies the allegations in Paragraph 126.

127.     Google denies the allegations in Paragraph 127, except admits that one or more of

the defendants offer an App Campaigns program, and respectfully refers the Court to the cited

documents for a complete and accurate statement of their contents.

128.     Google denies the allegations in Paragraph 128, and respectfully refers the Court to

the cited documents for a complete and accurate statement of their contents.

129.     Google denies the allegations in Paragraph 129.

130.     Google denies the allegations in Paragraph 130.

131.     Google denies the allegations in Paragraph 131, and respectfully refers the Court to

the cited documents for a complete and accurate statement of their contents. Google further avers

that many of the alleged "16 steps" occur within the *Fortnite* app itself.

132.     Google denies the allegations in Paragraph 132.

133.     Google denies the allegations in Paragraph 133, except admits that in certain

instances sideloaded apps do not automatically update in the background on the Android operating

system.

1        134.    Google denies the allegations in Paragraph 134, except admits that one or more of

2   the defendants offer an Advanced Protection Program, but avers that the Advanced Protection

3   Program is optional and that users can choose whether to enroll in it.

4        135.    Google denies the allegations in Paragraph 135, except admits that users can

5   sideload other apps and app stores, that those app stores are subject to the same notifications

6   regarding sideloading, and that Aptoide was flagged as "harmful."

7        136.    Google denies the allegations in Paragraph 136.

8        137.    Google denies the allegations in Paragraph 137, and respectfully refers the Court to

9   the cited document for a complete and accurate statement of its contents.

10       138.    Google denies the allegations in Paragraph 138.

11       139.    Google denies the allegations in Paragraph 139.

12       140.    Google denies the allegations in Paragraph 140, and respectfully refers the Court to

13  the cited documents for a complete and accurate statement of their contents.

14       141.    Google denies the allegations in Paragraph 141.

15       142.    Google denies the allegations in Paragraph 142.

16       143.    Google denies the allegations in Paragraph 143.

17       144.    Google denies the allegations in Paragraph 144.

18       145.    Google denies the allegations in Paragraph 145.

19       146.    Google denies the allegations in Paragraph 146.

20       147.    Google denies the allegations in Paragraph 147.

21       148.    Google admits the allegations in Paragraph 148 except as to the last sentence.

22  Google avers that app developers who sell digital content have available to them a variety of

23  options to process consumers' purchases.

24       149.    Google denies the allegations in Paragraph 149.

25       150.    Google denies the allegations in Paragraph 150.

26       151.    Google denies the allegations in Paragraph 151.

27

28

152.    Google admits that one or more of the defendants offer Google Play Billing for the purchase of digital purchases within mobile and one or more of the defendants offer Google Pay for the purchase of physical products and services within apps.

153.    Google denies the allegations in Paragraph 153. Google further avers that Epic and other developers benefit from the "freemium" model, which Google Play facilitates.

154.    Google denies the allegations in Paragraph 154.

155.    Google denies the allegations in Paragraph 155.

156.    Google denies the allegations in Paragraph 156.

157.    Google denies the allegations in Paragraph 157.

158.    Google denies the allegations in Paragraph 158.

159.    Google denies the allegations in Paragraph 159, except admits that Google users use Google Play Billing for purchases through Google Play with some exceptions, including purchasing physical goods and purchasing digital content elsewhere that is consumed within the app.

160.    Google denies the allegations in Paragraph 160.

161.    Google denies the allegations in Paragraph 161, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

162.    Google admits the existence of a document containing the quoted language, and respectfully refers the Court to it for a complete and accurate statement of its contents.

163.    Google denies the allegations in Paragraph 163, except avers that Epic offers a payment system for purchases through Epic's app store. Google respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

164.    Google admits the allegations in Paragraph 164, except avers that Epic's reference to a payment processor is a reference to a payment system.

165.    Google denies the allegations in Paragraph 165.

166.    Google denies the allegations in Paragraph 166, except admits that Google Play Billing is not used for certain transactions, including for purchasing physical goods.

167.    Google denies the allegations in Paragraph 167.

168.   Google denies the allegations in Paragraph 168.

169.   Google denies the allegations in Paragraph 169.

170.   Google denies the allegations in Paragraph 170.

171.   Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

172.   Google denies the allegations in Paragraph 172.

173.   Google denies the allegations in Paragraph 173.

174.   Google denies the allegations in Paragraph 174.

175.   Google denies the allegations in Paragraph 175.

176.   Google denies the allegations in Paragraph 176, except admits that it engages in interstate and foreign commerce.

177.   Google denies the allegations in Paragraph 177.

178.   Google denies the allegations in Paragraph 178.

179.   Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

180.   Google denies the allegations in Paragraph 180.

181.   Google denies the allegations in Paragraph 181, except admits that one or more of the defendants have entered into agreements with OEMs.

182.   Google denies the allegations in Paragraph 182.

183.   Google denies the allegations in Paragraph 183.

184.   Google denies the allegations in Paragraph 184.

185.   Google denies the allegations in Paragraph 185, except admits that it engages in interstate and foreign commerce.

186.   Google denies the allegations in Paragraph 186.

187.   Google denies the allegations in Paragraph 187.

188.   Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

189.   Google denies the allegations in Paragraph 189.

190.    Google denies the allegations in Paragraph 190, except admits that developers are generally required to enter into the DDA to distribute apps through Google Play. Google respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

191.    Google denies the allegations in Paragraph 191, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

192.    Google denies the allegations in Paragraph 192.

193.    Google denies the allegations in Paragraph 193, except admits that it engages in interstate and foreign commerce.

194.    Google denies the allegations in Paragraph 194.

195.    Google denies the allegations in Paragraph 195.

196.     Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint as though fully set forth herein.

197.    Google denies the allegations in Paragraph 197.

198.    Google denies the allegations in Paragraph 198, except admits that it entered agreements with some developers as part of the Games Velocity Program and respectfully refers the Court to those agreements for a complete and accurate statement of their contents.

199.    Google admits that an individual with the specified job title sent an internal email containing the language quoted in Paragraph 199 and directs the Court to the email for a complete and accurate statement of its contents. Google admits that it entered into a three-year agreement with ABK and respectfully refers the Court to that agreement for a complete and accurate statement of its contents. Google denies that its agreement with ABK "depended" on ABK not "starting its own competing Android app store," and further denies the allegations in Paragraph 199 in all other respects.

200.    Google denies the allegations in Paragraph 200.

201.    Google denies the allegations in Paragraph 201, except admits that it entered into an agreement with Riot Games, Inc. ("Riot") that was signed on the specified date.

202.     Google denies the allegations in Paragraph 202, except admits that the specified deponent testified that Google entered into an agreement with Supercell.

203.     Google denies the allegations in Paragraph 203, except admits that it engages in interstate and foreign commerce.

204.     Google denies the allegations in Paragraph 204.

205.     Google denies the allegations in Paragraph 205.

206.     Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint as though fully set forth herein.

207.     Google denies the allegations in Paragraph 207.

208.     Google denies the allegations in Paragraph 208, except admits that it entered into certain agreements with the developers specified in the letter cited in Paragraph 208.

209.     Google denies the allegations in Paragraph 209, except admits that it entered agreements with some developers as part of the Games Velocity Program and Apps Velocity Program, and respectfully refers the Court to those agreements for a complete and accurate statement of their contents.

210.     Google denies the allegations in Paragraph 210, except admits that it engages in interstate and foreign commerce.

211.     Google denies the allegations in Paragraph 211.

212.     Google denies the allegations in Paragraph 212.

213.     Google denies the allegations in Paragraph 213.

214.     Google denies the allegations in Paragraph 214.

215.     Google denies the allegations in Paragraph 215.

216.     Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

217.     Google denies the allegations in Paragraph 217.

218.     Google denies the allegations in Paragraph 218.

219.     Google denies the allegations in Paragraph 219.

220.     Google denies the allegations in Paragraph 220.

1       221.    Google denies the allegations in Paragraph 221, except admits that it engages in

2  interstate and foreign commerce.

3       222.    Google denies the allegations in Paragraph 222.

4       223.    Google denies the allegations in Paragraph 223.

5       224.    Google reasserts and hereby incorporates by reference its responses to each

6  Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

7       225.    Google denies the allegations in Paragraph 225.

8       226.    Google denies the allegations in Paragraph 226.

9       227.    Google denies the allegations in Paragraph 227, and respectfully refers the Court to

10  the cited documents for a complete and accurate statement of their contents.

11       228.    Google denies the allegations in Paragraph 228.

12       229.    Google denies the allegations in Paragraph 229, except admits that it engages in

13  interstate and foreign commerce.

14       230.    Google denies the allegations in Paragraph 230.

15       231.    Google denies the allegations in Paragraph 231.

16       232.    Google reasserts and hereby incorporates by reference its responses to each

17  Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

18       233.    Google denies the allegations in Paragraph 233.

19       234.    Google denies the allegations in Paragraph 234.

20       235.    Google denies the allegations in Paragraph 235.

21       236.    Google denies the allegations in Paragraph 236.

22       237.    Google denies the allegations in Paragraph 237.

23       238.    Google denies the allegations in Paragraph 238.

24       239.    Google denies the allegations in Paragraph 239.

25       240.    Google denies the allegations in Paragraph 240.

26       241.    Google denies the allegations in Paragraph 241.

27       242.    Google reasserts and hereby incorporates by reference its responses to each

28  Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

243.    Google denies the allegations in Paragraph 243.

244.    The allegations in Paragraph 244 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 244.

245.    Google denies the allegations in Paragraph 245.

246.    Google denies the allegations in Paragraph 246.

247.    Google denies the allegations in Paragraph 247.

248.    Google denies the allegations in Paragraph 248.

249.    Google denies the allegations in Paragraph 249.

250.    Google denies the allegations in Paragraph 250.

251.    Google denies the allegations in Paragraph 251, except admits that Google LLC's and Google Payment Corp.'s principal place of business is in California.

252.    Google denies the allegations in Paragraph 252.

253.    Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

254.    Google denies the allegations in Paragraph 254.

255.    The allegations in Paragraph 255 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 255.

256.    Google denies the allegations in Paragraph 256.

257.    Google denies the allegations in Paragraph 257.

258.    Google denies the allegations in Paragraph 258, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

259.    Google denies the allegations in Paragraph 259.

260.    Google denies the allegations in Paragraph 260.

261.    Google denies the allegations in Paragraph 261.

262.    Google denies the allegations in Paragraph 262, except admits that Google LLC's and Google Payment Corp.'s principal place of business is in California.

263.    Google denies the allegations in Paragraph 263.

264. Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

265. Google denies the allegations in Paragraph 265.

266. The allegations in Paragraph 266 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 266.

267. Google denies the allegations in Paragraph 267.

268. Google denies the allegations in Paragraph 268.

269. Google denies the allegations in Paragraph 269.

270. Google denies the allegations in Paragraph 270, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

271. Google denies the allegations in Paragraph 271.

272. Google denies the allegations in Paragraph 272.

273. Google denies the allegations in Paragraph 273.

274. Google denies the allegations in Paragraph 274, except admits that Google LLC's and Google Payment Corp.'s principal place of business is in California.

275. Google denies the allegations in Paragraph 275.

276. Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

277. Google denies the allegations in Paragraph 277.

278. The allegations in Paragraph 278 are legal conclusions not subject to admission or denial.  To the extent a response is required, Google denies the allegations in Paragraph 278.

279. The allegations in Paragraph 279 are legal conclusions not subject to admission or denial.  To the extent a response is required, Google denies the allegations in Paragraph 279.

280. Google denies the allegations in Paragraph 280.

281. Google denies the allegations in Paragraph 281.

282. Google denies the allegations in Paragraph 282.

283. Google denies the allegations in Paragraph 283.

284. Google denies the allegations in Paragraph 284.

285.    Google denies the allegations in Paragraph 285.

286.    Google denies the allegations in Paragraph 286.

287.    Google denies the allegations in Paragraph 287.

288.    Google denies the allegations in Paragraph 288.

289.    Google denies the allegations in Paragraph 289.

290.    Google denies the allegations in Paragraph 290, except admits that Google LLC's and Google Payment Corp.'s principal place of business is in California.

291.    Google denies the allegations in Paragraph 291.

292.    Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

293.    Google denies the allegations in Paragraph 293.

294.    Google denies the allegations in Paragraph 294.

295.    Google denies the allegations in Paragraph 295.

296.    Google denies the allegations in Paragraph 296.

297.    Google denies the allegations in Paragraph 297.

298.    Google denies the allegations in Paragraph 298.

**Answer to Plaintiff's Prayer for Relief:**  To the extent that an answer is required to the Prayer for Relief, Google denies the allegations contained therein.  Google further states that Plaintiff is not entitled to any remedies sought in the Second Amended Complaint.

## <u>AFFIRMATIVE OR ALTERNATIVE DEFENSES</u>

In addition to the reasons stated above, Plaintiff is not entitled to relief, and Google is entitled to judgment in its favor and against Plaintiff, on the basis of the following Affirmative or Alternative Defenses, pleaded in the alternative to the extent they may be found to be inconsistent. Google further states that Epic is not entitled to injunctive relief, including any injunctive relief that is worldwide in scope or that would extend beyond Epic. In asserting these defenses, Google does not assume the burden of proof on any issue that would otherwise rest on Plaintiff. Further, Google reserves all affirmative defenses under Federal Rule of Civil Procedure 8(c) and any other

defenses, at law or in equity, that may now exist or in the future be available based on discovery and further factual investigation in this case.

## First Defense

### (Failure to State a Cause of Action)

The Second Amended Complaint fails to state a claim upon which relief can be granted.

## Second Defense

### (Legitimate Business Justifications)

Any and all of Google's actions alleged by Plaintiff were lawful, justified, procompetitive, and carried out in Google's legitimate business interests and constitute bona fide competitive activity, the benefits of which significantly outweigh any alleged anticompetitive effects.

## Third Defense

### (Relief Contrary to Public Interest, Inequitable, Impractical, and Unworkable)

The relief sought by Plaintiff would be contrary to the public interest, harm consumers, and is otherwise inequitable, impractical, and unworkable.

## Fourth Defense

### (International Comity)

Plaintiff's claims are barred, in whole or in part, by the doctrine of international comity, insofar as Plaintiff seeks injunctive relief affecting transactions and conduct occurring outside U.S. jurisdiction.

## Fifth Defense

### (Failure to Join an Indispensable Party)

The Second Amended Complaint fails to join necessary and indispensable parties, including, but not limited to, consumers and developers of apps distributed for free on Google Play.

**Sixth Defense**

**(Foreign Trade Antitrust Improvements Act)**

Plaintiff's claims are barred, in whole or in part, by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, insofar as Plaintiff makes claims concerning transactions or alleged conduct involving trade or commerce with foreign nations outside U.S. jurisdiction.

**Seventh Defense**

**(*Noerr-Pennington* Doctrine)**

Plaintiff's causes of action are barred, in whole or in part, by the *Noerr-Pennington* doctrine.

**Eighth Defense**

**(Unclean Hands)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands for the reasons asserted below in Google's Counterclaims.

**Ninth Defense**

**(*In Pari Delicto*)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of *in pari delicto* and/or Plaintiff's equal involvement in the alleged antitrust violation.

**Tenth Defense**

**(Estoppel)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

**Eleventh Defense**

**(Collateral Estoppel)**

Plaintiff is collaterally estopped based on the Rule 52 Order After Trial on the Merits in *Epic v. Apple* (N.D. Cal. Case No. 4:20-cv-05640-YGR), Dkt. 812, from asserting, among other things, an Android App Distribution Market.

**Twelfth Defense**

**(Dormant Commerce Clause)**

Plaintiffs' claims are barred in whole or in part by the Dormant Commerce Clause.

### **RESERVATION OF DEFENSES**

Google reserves the right to assert additional defenses when it determines the particulars of Epic's claims, which are not apparent on the face of the Second Amended Complaint. Google reserves the right to amend this Answer to add, delete, or modify defenses based upon legal theories that may be or will be divulged through clarification of Epic's Second Amended Complaint, through discovery, or through further legal analysis of Epic's position in this litigation.

### **JURY DEMAND**

Google demands a trial by jury on all issues so triable.

### **GOOGLE'S COUNTERCLAIMS IN REPLY**

Defendants and Counter-plaintiffs Google LLC, Google Ireland Limited, Google Commerce Ltd., and Google Asia Pacific Pte. Ltd., (collectively, "Google"), on personal knowledge as to their own acts, and on information and belief as to all others based on their own and their attorneys' investigation, allege the following Counterclaims against Plaintiff and Counter-defendant Epic Games, Inc. ("Epic").

Epic, a multibillion dollar company backed by two of the world's largest video game developers, has profited immensely from the safe, secure platform provided by Google Play, a platform for which it pays a fee equivalent or less than that charged by other major platform providers. Not satisfied with those immense profits, it entered into a legal agreement with Google with which it never intended to comply, deceiving Google and concealing its true intentions to provoke a legal and public relations confrontation that continues to this day. Its actions have put its own users at risk, have harmed Google, and are deserving of relief from this Court.

### I.   **JURISDICTIONAL STATEMENT**

**A.   Jurisdiction**

1.   The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship between Epic and Google. The amount in controversy exceeds $75,000. The Court also has jurisdiction over Google's counterclaims pursuant to 28 U.S.C. § 1367, because each of Google's counterclaims arises out of the same factual nucleus as Epic's claims brought under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337.

2.     Epic has subjected itself to personal jurisdiction by filing its Second Amended Complaint in the Northern District of California. In any event, Epic has subjected itself to personal jurisdiction in this District because it has engaged in minimum sufficient contacts with this District and has purposefully availed itself of the benefits and protections of both United States and California law such that the exercise of jurisdiction over Epic would comport with due process requirements.

**B.      Venue**

3.     Venue is proper in this District because Epic brought this action and thereby consented to venue. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Epic's claims occurred in this District.

## II.      THE PARTIES

4.     Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, and has its principal place of business in Mountain View, California.

5.     Google Ireland Limited is a company incorporated in Ireland with its principal place of business in Dublin, Ireland.

6.     Google Commerce Ltd. is a company incorporated in Ireland with its principal place of business in Dublin, Ireland.

7.     Google Asia Pacific Pte. Ltd. is a company incorporated in Singapore with its principal place of business in Mapletree Business City, Singapore.

8.     Epic Games, Inc. is a Maryland corporation with its principal place of business in Cary, North Carolina.

## III.      BACKGROUND

**A.      Android App Distribution and Google Play**

9.     Started in a Silicon Valley garage in 1998, Google is one of the most innovative technology companies on the planet. In 2008, Google introduced the open-source Android operating system. To this day, Google licenses Android for free.

10.     Google also operates Google Play, an online store where people go to find and enjoy their favorite apps, games, movies, TV shows, books, and more on their Android devices.

11.     Google Play is not the only Android app store—developers and users enjoy a wide array of options for distributing, downloading, and installing apps on Android devices, including third-party app stores, direct downloads, and web apps—but many developers and users prefer Google Play because of its discoverability features, wide selection, and security and privacy protections.

12.     For a developer to distribute apps through Google Play, it must enter into the Google Play Developer Distribution Agreement (the "DDA"), which is a "legally binding contract between [a developer] and Google in relation to [that developer's] use of Google Play to distribute [that developer's] Product."  DDA § 2.1. The DDA also incorporates Google's Developer Program Policies.  *See* DDA § 4.1.

13.     The DDA "covers both Products that users can access for free and Products that users pay a fee to access." DDA § 3.2. Under the DDA, Google does not collect a service fee unless a developer chooses to monetize an app distributed on Google Play—and even then only if the developer charges for downloads, in-app purchases, or subscriptions. As the DDA states, "You may also choose to make Products available for free. If the Product is free, You will not be charged a Service Fee." DDA § 3.7. Approximately 97% of apps available on Google Play are free, meaning that Google does not collect any service fee on those apps. In other words, Google Play allows developers of free apps to reach a worldwide audience of *billions*, all without having to pay Google a penny (other than a nominal, one-time fee of $25 to set up a Google Play developer account).

14.     Under the DDA, developers who choose to monetize apps distributed through Google Play are not required to choose any particular monetization strategy. They have a variety of monetization options at their disposal, including paid distribution (i.e., charging a price to download the app), sale of in-app products, subscriptions, and advertisements.

15.     When a developer chooses to charge for app downloads, in-app purchases, or subscriptions for content distributed on Google Play, Google charges a service fee of up to 30% of

the price charged by the developer. At present, the vast majority of developers are eligible for a reduced service fee of 15% or less. What this means is that, under the DDA, Google is paid for the extensive services it provides developers and the sizable investment it makes in Google Play's tools, software, and technology, *only* if and when a user pays for an app, in-app product, or subscription.

16.     Google Play's Payment Policy (which is incorporated into Section 4.1 of the DDA) provides that when a developer charges for downloads, certain in-app purchases, or subscriptions in apps distributed on Google Play, the developer must use Google Play Billing.  Relatedly, apps distributed through Google Play "may not lead users to a payment method other than Google Play's billing system." Google Play's Payment Policy ¶ 3.

17.     The DDA also provides that developers may "not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." DDA § 4.5. What this means is that a developer cannot use Google Play to distribute apps that, in turn, facilitate the download of other apps.

18.     Under the DDA and its incorporated policies, developers must also submit their apps and app updates to Google for review and approval before that content is made available on Google Play. To be approved, an app must comply with Google's Restricted Content, Malware, and Mobile Unwanted Software policies. Complying with these policies ensures the safety and integrity of Android and provides valuable security screening and safeguards to protect the user experience.

19.     Developers who sign the DDA agree to "use Google Play only for purposes that are permitted by this Agreement and any applicable law, regulation, or generally accepted practices or guidelines in the relevant jurisdictions (including any laws regarding the export of data or software to and from the United States or other relevant countries)." DDA § 4.6. The DDA grants Google the right to "reject, remove, suspend, limit the visibility of a Product on Google Play" if "a Product or any portion thereof . . . violates this Agreement, applicable policies, or other terms of service." DDA §§ 8.3, 10.3.

20.     Of course, a developer does not have to agree to the DDA to distribute an app on Android. The DDA only applies to apps distributed on Google Play. *See* DDA § 2.1. Neither the DDA, nor Google's policies, nor Android itself precludes developers from distributing Android apps through competing app stores, direct distribution from a website, or otherwise. Google does not collect service fees from apps distributed through these competing channels. And Google collects no service fees when developers use the tools provided to them for free by Google to develop their apps that in turn are distributed on stores that compete with Google Play.

**B.      Epic Games, Inc.**

21.      Epic is a video game developer that was recently valued at $28.7 billion. It was founded in 1991 by Tim Sweeney, Epic's controlling shareholder, CEO, and chairman of the board of directors. Epic has several powerful gaming-industry shareholders, including Tencent Holdings, Ltd., a Chinese video game company, and Sony Corporation, a gaming console company.

22.     With respect to Epic's primary business of app development, Epic's flagship video game product is *Fortnite*. *Fortnite* uses the "freemium" business model, under which a game is free to download and play, but is monetized through in-app purchases or through purchases directly from Epic's website. *Fortnite* has over 400 million registered players worldwide and features "cross-play," which allows players of different platforms (like Sony's and Microsoft's) to play with one another. In connection with this cross-play capability, Epic agreed to pay the same 30% commission rate across most platforms. In fact, with respect to Sony, in particular, Epic has agreed to extra payments above and beyond the standard 30% commission rate.

23.     In addition to gaming software development, Epic also licenses two products to other developers: *Unreal Engine* and Epic Online Services. *Unreal Engine* is a software suite used by developers to create three-dimensional and other immersive digital content. In order to protect Epic's intellectual property rights, Epic's subsidiary licenses the *Unreal Engine* software to developers.

24.     Epic has reaped economic benefit from its relationship with Google and all of the services that Google provided to Epic. For virtually no cost to it, but at a cost to Google, Epic

received benefits from Google's services and technology which allowed Epic to bring its games, including *Fortnite*, to Android devices and to market and distribute its games through Google Play to tens of millions of customers.

25.     Epic first began distributing *Fortnite* on the Google Play Store in April 2020. As a condition for distributing *Fortnite* on Google Play, Epic entered into the DDA with Google. As Epic acknowledged in an email to Google in June 2020, "Epic is also required to comply with Google's [] standard documents . . . like Google's Developer Program Policies."

26.     Under the DDA, Epic agreed that it would pay Google a "Service Fee" on certain in-app products sold through *Fortnite* and any other Epic apps distributed on Google Play. *See* DDA § 3.4; Play Console Help, "Service Fees." As Epic well knows, developers can choose how to monetize their apps, and Epic chose to use the "freemium" model for *Fortnite*. This "freemium" business model—which depends on free distribution services like those offered by Google Play— has been tremendously lucrative to many developers, including Epic. Epic did not pay Google anything for the millions of times Android users downloaded *Fortnite* from Google Play.  Google collected a service fee only if and when *Fortnite* players bought in-app content in the version of *Fortnite* downloaded from Google Play.

27.     As Epic knows, it did not have to agree to the DDA to distribute an app on Android. The DDA only applies to apps distributed on Google Play. *See* DDA § 2.1. Neither the DDA, nor Google's policies, nor Android itself precluded Epic from distributing *Fortnite* through competing app stores, direct distribution from a website, or otherwise.

28.     Epic benefited from these alternative distribution options. In fact, when Epic first launched the Android version of *Fortnite* in August 2018, it did not rely on Google Play. Epic instead launched *Fortnite* through Samsung's Galaxy Store and as a direct download from Epic's website. As Epic boasted in a blog post that Epic has since deleted, "[i]n the first 21 days since the Fortnite's launch on Android, interest has been extremely high, with over 23 million players entering our Android beta and over 15 million players installing our APK."

29.     But launching outside of Google Play ended up putting Epic's own users at risk, because of the need to enable the ability to install from "unknown sources." Epic employees

recognized internally that enabling unknown sources and the exposure to malware could "become an issue when we launch our Launcher outside of the Google Play Store system." For example, Epic knew enabling downloads from "unknown sources" could expose users to "hacky drivers" and "malicious webpages that say there's a fortnite update." Sure enough, when Epic first made its Android version of *Fortnite* available for download, the app included an "extremely serious security flaw in the first Fortnite installer for Android that could allow other apps installed on the targeted devices to manipulate installation process and load malware." It was Google that identified the security flaw and notified Epic of the problem so that it could be fixed, with no compensation to Google for the service. And, upon receiving Google's notice of the problem, Epic acknowledged internally that it "look[ed] like a real vulnerability." Epic urgently worked to fix the security issue, knowing that an app that could not be trusted by users was a "huge business risk." In addition, when Epic first launched *Fortnite* outside of Google Play through sideloading, it also included a pop-up warning for "Application Installation Safety," telling users that "Your browser required special permissions to install the Fortnite Installer. To make your device as secure as possible, tap here to start disabling these permissions now."

30.     Epic also benefited from the fact that Google's DDA permits users to purchase digital content outside of an app and then consume that content within an app downloaded from Google Play. When that happens, Google does not collect any service fee on those transactions. *Fortnite* players could purchase "V-Bucks," the digital currency that is used to obtain items within the app, from a variety of sources, including (1) on other game platforms such as Microsoft's Xbox or Apple's iPhone, each of which charged a 30% service fee; (2) online through Epic's website or retail sources such as Amazon.com; or (3) through gift cards sold in traditional retail outlets. *Fortnite* players could then spend those V-Bucks on digital content in the Android *Fortnite* app, and Google did not receive anything from Epic or users for these transactions.

31.     Epic did not have to agree to the DDA, but it did so with full knowledge of the agreement's terms. Despite taking advantage of Google's development tools, the alternate app distribution and sales channels that Android facilitates, and Google Play's free distribution services—all with no payment to Google—Epic schemed willfully to violate the terms of the

DDA to avoid paying Google *anything* at all on the fraction of transactions that would be subject to Google's service fee.

### C. Epic Sets the Stage for Its Intentional Breach

32.    After lackluster sales in early 2019, Epic began planning its intentional breach of the terms of the DDA in order to "draw Google into a legal battle over anti-trust" and "get[] around [Google's] 30% revshare cut" as part of a campaign internally known as "Project Liberty." Project Liberty was a highly choreographed attack on Apple and Google with two purposes: (1) Epic sought a systematic change which would result in tremendous monetary gain and wealth, and (2) Epic sought to challenge the policies and practices of Apple and Google which are an impediment to Mr. Sweeney's vision of an oncoming metaverse.

33.    Internally, Epic also hoped to revive and reinvigorate *Fortnite* by pivoting its business whereby player-developers could create new content and Epic could share a majority of profit with those creators. Although Epic had initially launched *Fortnite* on Android outside of Google Play, Epic decided that "once we are ready to submit, Epic will announce publicly that we are going to Google Play." But Epic had no intention of actually complying with its agreement with Google and paying Google its service fee, as provided for under DDA § 3.4. According to Epic's own documents, the plan was simple: "[i]f we are rejected for only offering Epic's payment solution. The battle begins. It's going to be fun!"

34.    The plan for Project Liberty originated in late 2019 and planning began in earnest in the first quarter of 2020.  On December 5, 2019, Mr. Sweeney announced to Google that "[e]arly next week, Epic will submit Fortnite to Google Play using Epic's own payment systems for in-app purchase[s]." Mr. Sweeney warned Google that the "future is going to come about one way or another," and, in furtherance of the desire to draw Google into a legal battle, "ask[ed] that any discussion on the topic be in email."

35.    Epic submitted *Fortnite* to Google Play using Epic's own direct payment system and without Google Play Billing, but the submission was rejected for, among other things, failure to comply with the Google Play Billing Policy.

1          **D.       Epic's Breach of Its Contractual Obligations**

2          36.       In April 2020, Epic eventually submitted a compliant version of *Fortnite* to Google

3    Play. In connection with the *Fortnite* launch, Google provided Epic with valuable support

4    throughout the process. Indeed, Google was actively engaged in the partnership with Epic,

5    supplying Epic with data analytics and reporting tools as well as technology support throughout

6    the launch. Epic acknowledged internally Google team members' tireless work on the partnership,

7    getting *Fortnite* in the position where it could launch on Google Play. Epic acknowledged that

8    Google employees worked straight through weekends in advance of the launch, and Hans Stolfus,

9    Epic's Global Partnerships Lead (Mobile), told Google that the launch would not have been

10   possible without this "24 hour support" from Google.

11         37.       But Epic's purported launch on Google Play was an act of deception designed to

12   provoke litigation—Epic had been working for months on a way to conceal Epic's payment

13   system in an update on both Google Play and the Apple App Store. This undetected update would

14   be accomplished through a "hotfix," a method of app updating without Google's knowledge that

15   would allow the *Fortnite* app to import data directly from the Epic server. As Mr. Sweeney

16   described in his *Epic v. Apple* trial testimony, the hotfix was a server side configuration change

17   which enabled Epic's direct payment system to become available without submitting a new

18   version through the app review process. This hotfix was designed for the sole purpose of allowing

19   users to bypass Google Play Billing in violation of the DDA. By May 11, 2020, the key

20   components of Epic's strategy were in place: "We submit a build to Google and Apple with the

21   ability to hotfix on our payment method . . . . We flip the switch when we know we can get by

22   without having to update the client for 3 weeks or so."

23         38.       Project Liberty required extensive planning and testing. Specialized engineers and

24   an in-house information security team attempted to hack the code to ensure that Google (and

25   Apple) could not "reveal the intent" of the hotfix when it was submitted. Epic also used analytics

26   to determine the number of players that would receive the hotfix once triggered.

27         39.       Recognizing that "Epic is not sympathetic," Epic also began planning a coordinated

28   public relations campaign to help with its image in the wake of the hotfix update.  Epic

-34-

implemented its plan throughout the summer of 2020 by creating the Coalition for App Fairness (the "Coalition"), and charged it with generating continuous media and campaign tactic pressure on Google and Apple. Epic hired a consultant to help establish a reason for the Coalition to exist (either organic or manufactured) and then concealed the Coalition's existence until after the hotfix was triggered. In fact, Epic had retained a public relations firm to further this scheme by getting players, media, and industry on Epic's side and by creating a narrative that Epic is benevolent.

40.     Epic was not concerned about foreclosure or Google's agreements or the gaming industry; rather, Epic wanted to force Google to lower its fees. In a May 11, 2020 internal email, Epic's team crafted a public relations strategy in the event Google and Apple removed *Fortnite* from their respective app stores. Epic's communications team strategized "how to best drive narrative for Epic if we are removed from the mobile stores and a realistic assessment of how we'll be perceived by players. A central question is whether a public outcry will lead Apple or Google to allow us to remain in their stores *with our pricing plan*?" Notably, the May 11, 2020 public relations strategy email did not justify Epic's campaign on the grounds of supposed exclusive dealing by Google and foreclosure. Epic noted in a strategy deck from the same time period that "Apple/Google will not break immediately: we must assume that the defensive response from Apple/Google will be a multi-month or year effort."

41.     In a July 27, 2020 presentation to Epic's Board of Directors, Epic outlined its plan to implement the hotfix and its aggressive and sustained legal and media campaign.

42.     On August 5, 2020, Epic's Tim Sweeney emailed Microsoft to announce that "Epic has certain plans for August . . . ," and later noted that Microsoft would "enjoy the upcoming fireworks show." Mr. Sweeney conceded during his trial testimony in *Epic v. Apple* that these emails were referring to Epic's launch of Project Liberty.

43.     On August 13, 2020, Epic finally did "flip the switch," launching its scheme to breach the DDA with Google and avoid paying Google a service fee. On the morning of August 13, Mr. Sweeney informed Google that "Epic will no longer adhere to Google's payment processing restrictions." Epic also informed Google that Epic was launching Epic direct payments not only on Android, but also on iOS, and was expecting "to soon be in the midst of a major legal

1  and creative conflict with Apple" and Google. Mr. Sweeney also threatened that "Epic's trigger

2  for legal conflict with Google is blocking Fortnite or future updates"—precisely the agreed-upon

3  remedy to which Google was entitled under the DDA.

4       44.     Once the hotfix was launched later that day, the *Fortnite* app offered both Google

5  Play Billing and Epic's direct payment system as payment options. This unapproved version of

6  *Fortnite* allowed Epic to offer its users a way to pay Epic directly, while bypassing Google Play

7  Billing. Epic knew that this violated the DDA: Epic assumed its breach would result in the

8  removal of *Fortnite* from the iOS and Android platforms. In fact, Mark Rein, Epic's co-founder,

9  predicted "there's a better than 50% chance Apple and Google will immediately remove the games

10 from their stores the minute we do this," and Daniel Vogel, the Chief Operating Officer, predicted

11 "Google and Apple will immediately pull the build for new players."

12      45.     Epic willfully breached the DDA by submitting a version of *Fortnite* for

13 publication on Google Play with a payment method other than Google Play Billing for purchases

14 of in-app content. By doing this, Epic denied Google its service fee under the DDA for any

15 purchases made through the app outside of Google Play Billing.

16      **E.    *Fortnite* Is Removed from Google Play, But Millions of Android Users**

17           **Continue to Have Access to the App**

18      46.     On the same day Epic launched the hotfix and breached the DDA, Google notified

19 Epic that *Fortnite* was in violation of the DDA, Google's Malicious Behavior Policy, and the

20 Google Play Billing Policy, and removed the *Fortnite* app from Google Play. Google did not

21 disable Epic's developer account and indicated that Epic could publish a new, compliant version

22 of *Fortnite*.

23      47.     Android *Fortnite* players who downloaded the app from Google Play continued to

24 have access to the app and to any available in-app purchase products on their devices, even after

25 Google removed *Fortnite* from Google Play.

26      48.     The users that downloaded the non-compliant version of *Fortnite* before its

27 removal from Google Play are still able to use Epic's hotfixed external payment mechanism to

28

make in-app purchases—allowing Epic to evade its contractually agreed service fee to Google for those purchases.

### F. Epic's Public Campaign Against Google

49. Epic sued Google on the same day that it launched its external payment system in violation of the DDA, immediately after Google removed *Fortnite* from Google Play. Epic also began a campaign to combat negative consumer reactions that Epic knew were coming because of its conduct. For example, Epic knew that users would rightly see Epic as acting out of greed, so Epic told users "[w]hen you choose to use Epic direct payments, you save up to 20% as Epic passes along payment processing savings to you." Epic further told consumers that if Google dropped its service fee, Epic would pass on those cost reductions to users. These statements were intended to villainize and harm Google, while distracting from Epic's breach.

## IV. CLAIMS AND PRAYER FOR RELIEF

### COUNT I

### Breach of Contract

50. Google realleges and incorporates by reference each of the allegations set forth above.

51. Epic entered into express and/or implied contracts with Google, including the DDA. The DDA is a valid and enforceable contract.

52. Google performed all of its obligations under the DDA.

53. The DDA, among other things, expressly required that Epic use Google Play Billing for in-app purchases in apps downloaded through Google Play and that Google be paid a service fee on such in-app purchases. DDA §§ 3.4, 4.1. Google Play's Billing Policy required that apps distributed through Google Play "may not lead users to a payment method other than Google Play's billing system."

54. Epic breached these provisions of the DDA on August 13, 2020 by activating its own external payment system through a hotfix in *Fortnite* designed to bypass Google Play Billing. By sidestepping the contractual provisions relating to Google Play's billing system and by failing

to pay Google's agreed-to service fees on its in-app sales through *Fortnite*, Epic breached the DDA §§ 3.4, 4.1, and Google Play's Payments Policy.

55.     The DDA also requires that Epic not "misrepresent or conceal its primary purpose" and that Epic "use Google Play only for purposes that are permitted by this Agreement and any applicable law, regulation, or generally accepted practices or guidelines in the relevant jurisdictions (including any laws regarding the export of data or software to and from the United States or other relevant countries)." DDA § 4.6; Misrepresentation Policy.

56.     Epic also breached the DDA and its incorporated policies by concealing from Google its changes to the *Fortnite* app.

57.     As a direct result of Epic's breach of contract, Google has suffered injury, including the loss of the DDA's "service fee" on a global basis, and the Google Play ecosystem has suffered injury because the hotfix potentially exposed a security vulnerability that could be exploited for even more nefarious purposes.

58.     Epic's breaches of its contractual obligations are ongoing. Users who downloaded the version of *Fortnite* containing Epic's hotfix can still make in-app purchases using Epic's own external payment system.

59.     Epic's breaches of its contractual obligations also threaten Google's reputation and goodwill with its users.

## COUNT II

### Breach of Implied Covenant of Good Faith and Fair Dealing

60.     Google realleges and incorporates by reference each of the allegations set forth above.

61.     Epic entered into valid contracts with Google, including the DDA.

62.     The DDA and incorporated policies prohibit Epic from making sales to users outside of Google Play Billing in order to avoid Google's service fee.

63.     Not only did Epic's actions, which were undertaken in bad faith, breach the express terms of the DDA, but Epic also frustrated Google's rights under the DDA, including by

publishing the hotfix to avoid Google's contractually agreed-upon service fees, and by otherwise undermining Google's ability to operate Google Play.

64.     As a direct result of Epic's breach of its covenant of good faith and fair dealing, Google has suffered damages on a global basis, including the loss of the DDA's service fee.

## COUNT III

### Quasi-Contract / Unjust Enrichment

65.     Google realleges and incorporates by reference each of the allegations set forth above.

66.     Epic has alternatively been unjustly enriched at Google's expense through the conduct described in the preceding paragraphs, including by diverting to itself through the hotfix service fees that Google was entitled to as compensation under the DDA for app distribution, and other services provided to Epic.

67.     Epic has unjustly retained these benefits, and continues to do so, without compensating Google.

68.     Google seeks restitution of any such amounts by which Epic has been unjustly enriched at Google's expense.

## COUNT IV

### Declaratory Judgment

69.     Google realleges and incorporates by reference each of the allegations set forth above.

70.     There is an actual, substantial, continuing, and justiciable controversy between Google and Epic regarding their respective rights under the DDA.

71.     Google has the right to terminate Epic as a registered Google Developer and to remove an app from Google Play.

72.     In light of Epic's breach of its contractual obligations (and its express acknowledgment that it would "no longer adhere" to the parties' contract), Google made clear that Epic could not distribute *Fortnite* on Google Play if Epic did not cure its breaches.

73. Google therefore has standing to seek declaratory judgment of its rights under its contracts with Epic, including the DDA.

74. Google seeks and is entitled to a declaratory judgment that: (a) the DDA is a valid, lawful, and enforceable contract; (b) Epic breached that agreement; and (c) Google has the contractual right under the DDA to remove *Fortnite* from Google Play and terminate Epic as a registered Google Developer due to its breach.

## V. JURY DEMAND

75. Google demands a trial by jury on all issues so triable.

## VI. PRAYER

Wherefore, Counterclaimant Google respectfully requests that the Court:

A. Decree that Epic is liable for breach of its contractual obligations under the DDA;

B. Decree that Epic is liable for breach of its implied covenant of good faith and fair dealing;

C. Decree that Epic was unjustly enriched;

D. Award Google compensatory damages, punitive damages, attorney's fees, and interest;

E. Award restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Epic as a result of its conduct;

F. Enter a permanent injunction enjoining Epic, and all persons and entities in active concert or participation with Epic, from facilitating, assisting, or participating in (a) the continued operation of Epic's unauthorized external payment mechanism in its apps, including *Fortnite*; (b) the introduction of any further unauthorized external payment mechanisms into any apps, including *Fortnite*, on Google Play; and (c) the removal of Epic's payment system as an available

payment mechanism for in-app purchases through any Google Play

apps, including *Fortnite*;

G.   Award such other and further relief as the Court deems just and

proper.

`

DEFENDANTS' ANSWER TO EPIC'S SECOND AMENDED COMPLAINT AND COUNTERCLAIMS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD

Respectfully submitted,

Dated:  December 1, 2022

MUNGER, TOLLES & OLSON LLP
Glenn D. Pomerantz
Kuruvilla Olasa
Emily C. Curran-Huberty
Jonathan I. Kravis
Justin P. Raphael
Kyle W. Mach
Dane P. Shikman
Nicholas R. Sidney

By:   /s/ Glenn Pomerantz
Glenn D. Pomerantz

*Counsel for Defendants Google LLC et al.*

Dated:  December 1, 2022

MORGAN, LEWIS & BOCKIUS LLP
Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna L. Naranjo
Rishi P. Satia

By:     /s/ Brian Rocca
Brian C. Rocca

*Counsel for Defendants Google LLC et al.*

-42-

DEFENDANTS' ANSWER TO EPIC'S SECOND AMENDED COMPLAINT AND COUNTERCLAIMS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD

1

## **E-FILING ATTESTATION**

2

I, Glenn Pomerantz, am the ECF User whose ID and password are being used to

3

file this document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that each of the

4

signatories identified above has concurred in this filing.

5

6

_/s/ Glenn Pomerantz_

Glenn Pomerantz

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' ANSWER TO EPIC'S SECOND AMENDED COMPLAINT AND COUNTERCLAIMS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD