Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000

*Counsel for Defendants Google LLC et al*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
Nicholas R. Sidney, S.B. #308080
nick.sidney@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Dane P. Shikman, S.B. #313656
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA,

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| This Document Relates To: | **DECLARATION OF BRIAN C. ROCCA IN SUPPORT OF DEFENDANTS' BRIEF IN RESPONSE TO THE COURT'S QUESTIONS REGARDING PRESERVATION OF CHAT MESSAGES** |
| *Epic Games, Inc. v. Google LLC et al., Case No. 3:20-cv-05671-JD* | |
| *In re Google Play Consumer Antitrust Litigation, Case No. 3:20-cv-05761-JD* | |
| *State of Utah et al. v. Google LLC et al., Case No. 3:21-cv-05227-JD* | Judge:     Hon. James Donato |
| *Match Group, LLC et al. v. Google LLC et al., Case No. 3:22-cv-02746-JD* | |

1.     I, Brian C. Rocca, am a partner at Morgan, Lewis & Bockius LLP, counsel of record for the Google Defendants ("Google") in the above-captioned matter ("Litigation").  In my capacity as outside counsel for Google, I have personal knowledge of the facts set forth in this declaration, unless otherwise stated, and I could and would testify competently thereto if called upon to do so.

2.     I have reviewed and am familiar with the January 13, 2023 Order ("January 13 Order") issued by the Court regarding Plaintiffs' Notice of Motion and Motion for Sanctions ("Motion"), and am providing the information herein to provide information responsive to the Court's questions contained in the January 13 Order, along with the declarations of Duy Ho, Gregory Johnson, and Devin Chen, submitted herewith.  Specifically, I will be addressing the Court's third, fourth and fifth questions in the January 13 Order.

**Question 3:  When did this issue first come up in this case and how?**

3.     In mid-October 2020, after the initial conference before the Court, the parties started to discuss discovery planning generally, and discussed the preservation of chat messages as one component of the overall negotiations regarding the proposed stipulated order regarding electronically stored information ("ESI").

    a.  On October 13, 2020, Google proposed a draft stipulation that identified "instant messaging and chat messaging data" as one of the data categories that were "not reasonably accessible," consistent with the Northern District of California's model ESI order, and therefore proposed not collecting and producing chats.  *See* Northern District of California's Model Stipulated Order re: Discovery of Electronically Stored Information for Standard Litigation ("the "Model ESI Order") (attached hereto as Ex. 1), at Par. 4(e) (identifying in the model protocol that "instant messaging" is among the "sources of data that parties agree are not reasonably accessible").

    b.  On October 18, 2020, counsel for Epic sent their revisions to the draft ESI protocol, which deleted Google's proposed language that included "instant

1

DECLARATION OF BRIAN C. ROCCA ISO DEFENDANTS' BRIEF RE
COURT'S QUESTIONS RE PRESERVATION OF CHATS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

messaging and chat application data" as a source that was not reasonably accessible.

    c.    On October 20, 2020, counsel for the Developer Plaintiffs sent their further revisions to the draft ESI protocol, which accepted the revision noted above that was made by Epic's counsel.

    d.    On October 21, 2020, the parties engaged in a telephonic meet and confer to discuss various issues, including the negotiation of the ESI protocol.  It is my recollection that during that meet and confer discussion, counsel for Epic stated their position that chats and instant messages should not be excluded from the categories of ESI that should be preserved.

    e.    After the October 21, 2020 meet and confer discussion, the parties continued to exchange drafts of the ESI protocol.

    f.    The final version of the ESI Protocol that was entered in this case ultimately did not include any explicit reference to the preservation of chats or instant messaging.  (*Epic Games, Inc. v. Google LLC et al*, 3:20-cv-05671-JD ("Epic Action") (Dkt. No. 75)) (filed Oct. 22, 2020).  Beginning as early as September 3, 2020, and continuing after the entry of the ESI Order as individuals were added to the legal hold, Google began retaining all History On chats for the 363 Google employees who received a legal hold notice in this Litigation.

    4.    The issue of chat preservation did not arise again until April 22, 2021, when Plaintiffs sent Google a discovery letter addressing various topics, one of which inquired about the status of Google's production of chat messages.  That letter initiated a series of meet-and-confer discussions and additional correspondence.  I am attaching here true and correct copies of correspondence that contained discussions about chats.  *See* Ex. 2 (April 22, 2021 letter); Ex. 3 (April 30, 2021 letter); Ex. 4 (July 6, 2021 letter); Ex. 5 (July 13, 2021 letter); Ex. 6 (July 14, 2021 letter); Ex. 7 (August 2, 2021 letter); Ex. 8 (August 13, 2021 letter); Ex. 9 (August 30, 2021 letter); Ex. 10 (September 17, 2021 letter); Ex. 11 (October 6, 2021 letter); Ex. 12 (October 18,

2021 letter); Ex. 13 (October 29, 2021 letter); Ex. 14 (November 11, 2021 letter); Ex. 15 (November 29, 2021 letter); Ex. 16 (December 3, 2021 letter).

5.    Following these meet and confer efforts, the parties attended a status conference on December 16, 2021.  During that conference, the Court ordered the parties to mutually respond to interrogatories related to document preservation.  The parties each responded to such interrogatories in mid-January 2022.  The parties attended another status conference in May 2022.  The Court thereafter ordered the parties to submit a joint statement regarding the parties' dispute on chat preservation on May 27, 2022.

**Question 4:  Did Google take "appropriate steps to preserve all evidence relevant to the issues reasonably evident in this action" as it represented to the Court in a case management statement on October 1, 2020?** *See* **Case No. 20-5761, Dkt. No. 45 at 11?**

6.    Google made this representation to the Court as part of its case management statement on October 1, 2020 (*In re Google Play Consumer Antitrust Litigation*, 3:20-cv-05761-JD ("Consumer Action") (Dkt. No. 45)) and October 2, 2020 (Epic Action (Dkt. No. 55)).

7.    As reflected in the case management statements, as of October 1, 2020, the parties had not yet participated in a Rule 26(f) conference.  Thus, by the time of the parties' submissions, they had not yet engaged in a meaningful discussion of their ESI preservation proposals.  They also could not confirm, as set forth in the Standing Order for All Judges of the Northern District of California, that they had "met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action."  In lieu of that confirmation, and to assure the Court in the interim that preservation measures were being taken, all parties (including Google) stated they had taken appropriate "steps to preserve all evidence relevant to issues reasonably evident in this action."

8.    As of October 1, 2020, I understood that Google had followed its standard practices for implementing legal holds for litigation matters in this Litigation, and I believe that Google had taken appropriate steps to preserve "all evidence relevant to the issues reasonably

evident in this action," and its representations in its case management statements on October 1, 2020 (Consumer Action (Dkt. No. 45)) and October 2, 2020 (Epic Action (Dkt. No. 55)) reflected that belief.  This is for several reasons:

    a.  **Date of First Lawsuit.**  Google's obligation to preserve evidence for purposes of this Litigation materialized after the first complaint was filed on August 13, 2020. Working with Google's internal and external counsel, Google's immediate aim was to take reasonable steps to preserve evidence that may have existed as of August 13, 2020, and to distribute as soon as possible a legal hold notice to employees who may potentially possess relevant information.  That legal hold notice was first distributed on September 11, 2020.

    b.  **Back-End Legal Hold.**  As of September 3, 2020, although the parties had not yet engaged in a Rule 26(f) conference, Google had already taken steps to preserve potentially relevant information through the implementation of a comprehensive "back-end" legal hold, which would immediately preserve any existing data or new data created during the entire pendency of the legal hold for certain categories of ESI that typically contain the most relevant business information, such as emails, documents saved in an employee's Google Drive account (e.g., Google Docs, Sheets, Slides, other file types such as PDFs, etc.), and History On chats.  History On chats include those in chat conversations where users manually turned History On and all chat messages in "threaded rooms/spaces."  With respect to threaded rooms/spaces, it is my understanding that Google believes those messages are more likely to contain information that has business or archival value.  *See* January 12, 2023 Transcript of Proceedings In Re: Evidentiary Hearing on Chat Preservation ("Hearing Tr.") at 31:14-32:21.

    c.  **Distribution of Legal Hold Notice.**  I assisted with the drafting of a comprehensive initial legal hold that included chat preservation instructions, which was distributed on September 11, 2020 to Google employees believed to

4

DECLARATION OF BRIAN C. ROCCA ISO DEFENDANTS' BRIEF RE
COURT'S QUESTIONS RE PRESERVATION OF CHATS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

have potentially relevant information.  As Genaro Lopez testified on January 12, 2023, the recipients of the legal hold notice "are asked not to use the [chat] product to discuss any topics that are related to their legal hold," and instructed that "if they do find themselves in a conversation that strays into a topic related to the legal hold" they should "turn history on at that point to make sure that those messages are properly preserved."  Hearing Tr. at 43:13-20 (Lopez)).

9.     Google continued to take reasonable steps to preserve potentially relevant chat messages after its representations in the October 1, 2020 case management statement.  I am aware that Google issued numerous, regular reminders to employees that were subject to the legal hold for this Litigation about their preservation obligations, including reiterating specific instructions regarding their obligation to preserve chats.

10.     I am aware that multiple Google employees testified that chats are less likely to contain information that has business or archival value as compared to emails, spreadsheets, slide presentations, or other document formats.  *See, e.g.,* Exhibit 17 (Deposition of T. Lim at 442:16-22 ("[W]e call them pings to various members of our team to coordinate meetings, quickly check in on the status of something. But it's typically quite logistics – logistical in nature."); Deposition of M. Marchak at 32:18-21 ("[c]hats are generally used for like quick updates for a meeting or need to reschedule or something like that."); Deposition of S. Samat at 33:3-11 ("the conversations that I have in chat are generally administrative and whenever we have any important conversation generally speaking, my way of operating is to move that into the right forums, make decisions, communicate those decisions through other means."); Hearing Tr. 32:7-33:2 (Lopez).

11.     It is my belief that the vast majority of evidence relevant to the issues "reasonably evident in this action" was created prior to the filing of the first complaint in this Litigation.  As part of the discovery process, my team conducted extensive negotiations with Plaintiffs regarding the appropriate scope of discovery.  As a result of those discussions, the parties agreed that Google would produce custodial documents for 44 custodians in this Litigation.  Consistent

5

DECLARATION OF BRIAN C. ROCCA ISO DEFENDANTS' BRIEF RE
COURT'S QUESTIONS RE PRESERVATION OF CHATS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

with the issues in dispute in this Litigation, the primary focus of such discovery was on documents that were created prior to Plaintiffs' filing of their complaints.

    a.   For 23 of the 44 custodians, the parties ultimately agreed that Google would only collect and search their custodial files through August 13, 2020.

    b.  As the Litigation progressed, the parties met and conferred regarding Plaintiffs' supplemental requests for documents created after August 13, 2020.  Most of these requests related to recent developments that post-dated the filing of the complaint.  For these supplemental requests, the parties negotiated specific post-August 13, 2020 time periods, the applicable custodians, and narrow search terms.  In total, Google agreed to produce documents dated after August 13, 2020 for 21 custodians (out of 44).  Thus, there are only 21 custodians for whom Google agreed to collect and potentially produce any post-August 13, 2020 chat messages.[1]  Attached as Exhibit 18 is a chart that reflects the post-complaint document production time periods for these 21 custodians.

**Question 5: Did Google plainly advise plaintiffs' counsel or the Court that it was choosing an approach to the preservation of Google Chats that could lead to the loss of potentially relevant evidence if an individual employee decided not to preserve a relevant chat?**

    12.    The parties did not discuss or exchange information regarding the specific retention behavior for any electronically stored information for any party, including chats, until August 2021.

    a.  On August 13, 2021, I sent a letter to Plaintiffs stating that "Chats are kept by default for only 24 hours in the usual course of business."  *See* Exhibit 8.

    b.  On October 18, 2021, I sent a letter to Plaintiffs stating that "As Google has consistently represented, Google issued a hold notice in connection with this

---

[1] Google also made limited supplemental productions, for a small group of custodians, using a narrowed subset of search terms from the overall agreed-upon set, and within defined time periods after August 2020.  These custodians are included in the 21 custodians described herein.

litigation that requires custodians to preserve all relevant instant messages." *See* Exhibit 12.

c. During an October 21, 2021 meet and confer, I am informed and believe that a member of my team informed Plaintiffs that Google had not suspended the 24-hour retention policy for "history off" chats.

d. On November 11, 2021, I sent a letter to Plaintiffs that repeated that "the technological settings on Google's chat retention policy . . . did not change" following the legal hold.  I also attached a copy of the Google Chat Retention Policy and the Google Workspace Admin Help page titled "Turn chat history on or off for users."  *See* Exhibit 14.

13.     As discussed above, it is my belief that Google took appropriate steps to preserve potentially relevant information contained in chat messages.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 24th day of January 2023 in San Francisco, California.

_____
Brian C. Rocca

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| | ) Case Number: C xx-xxxx |
| | ) |
| | ) [MODEL] STIPULATED ORDER RE: |
| | ) DISCOVERY OF ELECTRONICALLY |
| Plaintiff(s), | ) STORED INFORMATION FOR |
| | ) STANDARD LITIGATION |
| vs. | ) |
| | ) |
| | ) |
| | ) |
| Defendant(s). | ) |
| | ) |

## 1. PURPOSE

This Order will govern discovery of electronically stored information ("ESI") in this case as a supplement to the Federal Rules of Civil Procedure, this Court's Guidelines for the Discovery of Electronically Stored Information, and any other applicable orders and rules.

## 2. COOPERATION

The parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the matter consistent with this Court's Guidelines for the Discovery of ESI.

## 3. LIAISON

The parties have identified liaisons to each other who are and will be knowledgeable about and responsible for discussing their respective ESI.  Each e-discovery liaison will be, or have access to those who are, knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

**4. PRESERVATION**

The parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable and proportionate. To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the parties agree that:

a) Only ESI created or received between _____ and _____ will be preserved;

b) The parties have exchanged a list of the types of ESI they believe should be preserved and the custodians, or general job titles or descriptions of custodians, for whom they believe ESI should be preserved, e.g., "HR head," "scientist," and "marketing manager." The parties shall add or remove custodians as reasonably necessary;

c) The parties have agreed/will agree on the number of custodians per party for whom ESI will be preserved;

d) These data sources are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B) and ESI from these sources will be preserved but not searched, reviewed, or produced: [e.g., backup media of [named] system, systems no longer in use that cannot be accessed];

e) Among the sources of data the parties agree are not reasonably accessible, the parties agree not to preserve the following: [e.g., backup media created before _____, digital voicemail, instant messaging, automatically saved versions of documents];

f) In addition to the agreements above, the parties agree data from these sources (a) could contain relevant information but (b) under the proportionality factors, should not be preserved: _____.

**5. SEARCH**

The parties agree that in responding to an initial Fed. R. Civ. P. 34 request, or earlier if appropriate, they will meet and confer about methods to search ESI in order to identify ESI that is subject to production in discovery and filter out ESI that is not subject to discovery.

**6. PRODUCTION FORMATS**

The parties agree to produce documents in ☐ PDF, ☐TIFF, ☐native and/or ☐paper or a combination thereof (check all that apply)] file formats. If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents. The parties agree not to degrade the searchability of documents as part of the document production process.

2

**7. PHASING**

When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to phase the production of ESI and the initial production will be from the following sources and custodians: _____. Following the initial production, the parties will continue to prioritize the order of subsequent productions.

**8. DOCUMENTS PROTECTED FROM DISCOVERY**

a) Pursuant to Fed. R. Evid. 502(d), the production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

b) The parties have agreed upon a "quick peek" process pursuant to Fed. R. Civ. P. 26(b)(5) and reserve rights to assert privilege as follows _____ _____.

c) Communications involving trial counsel that post-date the filing of the complaint need not be placed on a privilege log. Communications may be identified on a privilege log by category, rather than individually, if appropriate.

**9. MODIFICATION**

This Stipulated Order may be modified by a Stipulated Order of the parties or by the Court for good cause shown.

**IT IS SO STIPULATED**, through Counsel of Record.

Dated:                         _____

Counsel for Plaintiff

Dated:                         _____

Counsel for Defendant

**IT IS ORDERED** that the forgoing Agreement is approved.

Dated:                         _____

UNITED STATES DISTRICT/MAGISTRATE JUDGE

# EXHIBIT 2



MELINDA R. COOLIDGE   888 16th Street, N.W.
                            Partner   Suite 300
                                      Washington, DC 20006

                                      202-540-7144 Direct
                                      202-540-7200 Main
                                      202-540-7201 Fax
                                      mcoolidge@hausfeld.com

April 22, 2021

**VIA E-MAIL**

Minna Lo Naranjo, Esq.
Morgan, Lewis & Bockius
One Market, Spear Street Tower
San Francisco, CA 94105
minna.naranjo@morganlewis.com

       **Re:** *In re Google Play Antitrust Litigation*, **3:21-md-02981-JD (N.D. Cal.);**
       *Epic Games, Inc. v. Google LLC*, **No. 3:20-cv-05671-JD (N.D. Cal.);**
       *In re Google Play Consumer Antitrust Litigation*, **No. 3:20-cv-05761-JD (N.D. Cal.);**
       *In re Google Play Developer Antitrust Litigation*, **No. 3:20-cv-05792-JD (N.D. Cal.)**

Dear Minna:

       I write on behalf of Plaintiffs in the above-referenced matters concerning the following issues:

       **Hyperlinks Not Responded to by Google**

       We have received your April 2, 2021 letter responding to certain of our requests for hyperlinked documents from March 1 and 8, 2021. We note that your letter does not address certain requests. *See* Appendix A (identifying those documents requested by Plaintiffs but not addressed by Google). We assume that you will respond to these requests shortly.

       **Hyperlinks Deemed "Non-Responsive"**

       Thank you for identifying the Bates numbers for many of the hyperlinked documents and identifying those other documents that Google intends to withhold on grounds of privilege. Plaintiffs are concerned, however, that Google appears to be withholding numerous hyperlinked documents on the grounds that such documents are non-responsive.

       When the Parties negotiated the ESI Protocol in this case, Google agreed to Plaintiffs' proposal that all document family members must be produced if any member of a family is responsive.[1] This is standard ESI practice, and it is rooted in the well accepted principle that a

---

[1] *See* Order Re: Disc. of Electronically Stored Information ("ESI Protocol"), App. 1 Produc. Format and Metadata ¶ 19.



document family cannot be understood in context without the other members of the family.[2] On the other hand, Google rejected Plaintiffs' proposal that "[h]yperlinked files must be produced as child documents to the parent containing the hyperlink,"[3] arguing that there was no automated way to enable production of all hyperlinked documents. Google subsequently agreed to produce the linked documents in the production when requested.

At the time of those discussions, Google knew (and Plaintiffs did not) that Google employees regularly use hyperlinked documents (including within emails) in lieu of the standard practice of using file attachments. Plaintiffs had every reason to expect that hyperlinked documents are the exception to the rule, as they typically are, and that this provision would apply sparingly, primarily where the author of a document embeds a hyperlink to an external (i.e., non-Google) document (as is common practice elsewhere). Plaintiffs had no reason to believe—and no way to know—that at Google, the standard practice for employees is to create document families using hyperlinks rather than the more common (outside of Google) use of attachments.

If Plaintiffs had known about this practice prior to signing the ESI Protocol, we would have insisted upon negotiating a different approach. The sheer number of relevant documents that include hyperlinks to unproduced documents frustrates Plaintiffs' ability to adequately evaluate and assess the relevant materials produced.[4] As you are aware, some Google departments prepare documents (like Weekly Updates) that consist almost entirely of code words and hyperlinks.

Moreover, it is standard practice to produce relevant documents in their entirety.[5] Producing responsive parent documents while withholding child documents to which the parent links impermissibly strips these documents of the context that is necessary for Plaintiffs to

---

[2] *See, e.g.*, *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, No. 08-7508-SAS, 2011 WL 3738979, at *5 (S.D.N.Y. Aug. 18, 2011) ("*Abu Dhabi*") ("[P]revailing practice, absent party agreement or court order to the contrary, is for parties to produce any non-privileged attachment to an e-mail if the e-mail is determined to be relevant, and to produce the e-mail if any of the attachments are determined to be relevant."), *report and recommendation adopted*, No. 08-7508-SAS, 2011 WL 3734236 (S.D.N.Y. Aug. 24, 2011).

[3] Email from M. Coolidge to B. Rocca *et al*. (Oct. 20, 2020), Proposed Stipulated ESI Order, Appendix 1, ¶ 9.

[4] *See Abu Dhabi*, 2011 WL 3738979, at *5 (applying the rule of completeness, Fed. R. Evid. 106, in the discovery context: "if something was attached to a relevant e-mail, it is likely also relevant to the context of the communication. In addition, harkening back to the days of paper discovery, communications and documents that were attached contemporaneously (as with a staple through all pages) were often treated as a single object for relevance assessments.").

[5] Indeed, the Parties have agreed to redact documents only for "(1) privilege, work-product, or any other legally recognized privilege, or (2) protected personal information (e.g., credit card numbers." Stipulation re: Privilege Logs at 2-3 (January 8, 2021); *see also* ESI Protocol (no allowance for relevance redactions).



perform an adequate review.[6]

In light of the above, Plaintiffs expect that Google will produce all non-privileged embedded hyperlinked documents that Plaintiffs have requested to date, and that, going forward, Google will produce all non-privileged embedded hyperlinked documents that Plaintiffs identify and request Google to produce, without Google objecting on the grounds that the documents are not responsive. Please confirm whether you are willing to agree to this reasonable proposal.

## Embedded Documents

Plaintiffs are also concerned by Google's production of embedded documents in a manner that fails to comply with the ESI Protocol. Specifically, there are *thousands* of documents in the production that include non-image embedded files (*i.e.*, Google Docs, Google Slides, and Google Sheets, among others) that are not grouped as "Families." *See e.g.*, GOOG-PLAY-000226616; GOOG-PLAY-000746489; GOOG-PLAY-000957745; GOOG-PLAY-000555660; GOOG-PLAY-000511107; GOOG-PLAY-000404653.

As set forth in the ESI Protocol, Google is required to treat such documents as "Family Groups" and produce the embedded documents in a "continuous BATES range."

> 7. **Embedded Objects**. Non-image objects embedded in documents shall, when possible, be extracted and produced as separate documents. The producing party will make reasonable and good faith efforts to treat such extracted embedded documents like attachments to the document. Embedded documents will be produced following the parent with a continuous Bates range.
>
> . . .
>
> 19. **Family Groups.** An email, instant message, or document with non-image embedded objects and its attachments constitute a family

---

[6] *See, e.g., IDC Fin. Publ'g, Inc. v. Bonddesk Grp., LLC*, No. 15-1085-PP, 2017 WL 4863202, at *2 (E.D. Wis. Oct. 26, 2017) ("Parties making [relevance] redactions unilaterally decide that information within a discoverable document need not be disclosed to their opponents, thereby depriving their opponents of the opportunity to see information in its full context and fueling mistrust about the redactions' propriety. . . . because these types of redactions find no support in the Rules and are fraught with the potential for abuse, the Court will not permit them unless the circumstances provide an exceedingly justification to do so.") (cleaned up); *see also* Redactions, Electronic Discovery and Records and Information Management Guide § 15:16 ("The practice of redacting material for nonresponsiveness or irrelevance finds no explicit support in the Federal Rules of Civil Procedure. The only bases for prohibiting a party from seeing a portion of a document in the Federal Rules of Civil Procedure are claims of privilege and work-product protections.").



group. Parent-child relationships (the association between an email, instant message, or document with non-image embedded objects and its attachments) will be preserved through the production of an appropriate metadata field. If any member of a family group is determined to be responsive to a party's document requests, then all members of that group must also be considered as responsive.

*See* App. 1, Produc. Format and Metadata, ¶¶ 7, 19.

Please promptly advise Plaintiffs how Google will correct this production issue for previously produced documents. Please also confirm that Google will comply with the ESI Protocol's provision concerning embedded documents in all future productions.

### Production of Instant Messaging and Text Messages

As a final matter, Plaintiffs are growing increasingly worried that, to date, Plaintiffs have seen no Instant Messages,[7] in Google's productions. Please confirm Google is collecting and will be producing such documents, as is required under the ESI order.[8]

\*             \*             \*

We are available to meet and confer to discuss these issues further.

Sincerely,

*/s/ Melinda R. Coolidge*
Melinda R. Coolidge
Partner

cc:    Brian C. Rocca
       Michelle P. Chiu
       Rishi P. Satia
       MORGAN, LEWIS & BOCKIUS LLP

---

[7] ESI Protocol at App. 1 Produc. Format and Metadata ¶ 20 (defining "Instant Messages").
[8] *Id.*



Bonny E. Sweeney
Katie R. Beran
Yelena W. Dewald
Daniel Kees
HAUSFELD LLP

Steve W. Berman
Rob F. Lopez
Ben J. Siegel
HAGENS BERMAN SOBOL SHAPIRO LLP

Eamon P. Kelly
Alberto Rodriguez
SPERLING & SLATER PC

Karma M. Giulianelli
Glen E. Summers
Jameson R. Jones
BARTLIT BECK LLP

Hae Sung Nam
Laurence D. King
Mario M. Choi
KAPLAN FOX & KILSHEIMER, LLP

Elizabeth C. Pritzker
Jonathan K. Levine
PRITZKER LEVINE LLP

George A. Zelcs
Jamie L. Boyer
Stephen M. Tillery
KOREIN TILLERY, LLC

Peggy J. Wedgworth
MILBERG PHILLIPS GROSSMAN LLP



PAGE 6
April 22, 2021

Nanci E. Nishimura
Mark C. Molumphy
Adam J. Zapala
COTCHETT PITRE & MCCARTHY LLP

Yonatan Even
Justin C. Clarke
Eric Zepp
CRAVATH, SWAINE & MOORE LLP



### Appendix A

The following documents were identified by Plaintiffs in our correspondence on March 1 and 8, 2021 but were not subsequently responded to by Defendants in its correspondence on April 2, 2021.

| Bates Number | Requested Links | Date Requested |
|---|---|---|
| GOOG-PLAY-000001472 | (link: "data and derivations here") | March 1, 2021 |
| GOOG-PLAY-000002869 | (link: Play FP&A Global) | March 1, 2021 |
| GOOG-PLAY-000001332 | (link: Play DR ROI Dashboard) | March 1, 2021 |
| GOOG-PLAY-000003251 | (link: "DEPRECATED") | March 1, 2021 |
| GOOG-PLAY-000000925 | (links: "P&E Quarterly Dashboard," "Chromebooks Performance Dashboard," and "P&E Partnership Deal & PO Training Deck") | March 1, 2021 |
| GOOG-PLAY-000001368 | (links: for "ROAS targets" and "ROI Dashboard") | March 1, 2021 |
| GOOG-PLAY-000221310 | (link: http://b/16462896) | March 1, 2021 |
| GOOG-PLAY-000004316 | (links: "2018 Q2 Hiroshi QER link," "Play LT forecast (summary of working exhibits) link," "2018 Annual Plan Strategic Review for Hiroshi link [Sep'17]," "5 Year Revenue Overview for Carlos link [Aug'17]," "Longer, WIP version presented to Kristin Reinke link [Nov'16]," "2016-Q1 QBR for Kristin Reinke link [May'16]") | March 1, 2021 |
| GOOG-PLAY-000225958 | (need link "https://simba.corp.google.com/dealFolder.do?cmd=view&dealId=626714") | March 8, 2021 |
| GOOG-PLAY-000225996 | (need link at "https://simba.corp.google.com/dealFolder.do?cmd=view&dealId=629505") | March 8, 2021 |
| GOOG-PLAY-000226617 | (need link "https://simba.corp.google.com/dealFolder.do?cmd=view&dealId=643367") | March 8, 2021 |
| GOOG-PLAY-000226704 | (need linked "Draft email for Don_re ABK 17Dec2019 - PRIVELEGED") | March 8, 2021 |
| GOOG-PLAY- | (links: "here" and "disclosure policy") | March 8, 2021 |



| | | |
|---|---|---|
| 000268105 | | |
| GOOG-PLAY-000268259 | (link: "(deck)") | March 8, 2021 |
| GOOG-PLAY-000268293 | (link/attachment at GOOG-PLAY-000268294 above "Have a Direct Relationship With Players") | March 8, 2021 |
| GOOG-PLAY-000284648 | (links: "Total Revenue Last 15 Days," "Top 100 subscription apps," "Top 100 paid apps," "Monthly Installs by Country," "App Value - Analysis," "go/play-dashboard") | March 8, 2021 |
| GOOG-PLAY-000226704 | (need linked "Draft email for Don_re ABK 17Dec2019 - PRIVELEGED") | March 8, 2021 |
| GOOG-PLAY-000268488 | (link: Games Velocity Program) | March 8, 2021 |
| GOOG-PLAY-000004396 | (Google Drive link at GOOG-PLAY-000004399) | March 8, 2021 |

# EXHIBIT 3

# Morgan Lewis

**Minna Lo Naranjo**
Partner
+1.415.442.1192
minna.naranjo@morganlewis.com

April 30, 2021

**VIA E-MAIL**

Melinda R. Coolidge
Hausfeld
888 16th Street, N.W.
Suite 300
Washington, DC 20006

Re:     *In re Google Play Antitrust Litigation*, 3:21-md-02981-JD (N.D. Cal.)
         *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.)
         *In re Google Play Consumer Antitrust Litigation,* No. 3:20-cv-05761-JD (N.D. Cal.)
         *In re Google Play Developer Antitrust Litigation,* No. 3:20-cv-05792-JD (N.D. Cal.)

Dear Melinda:

We write in response to your April 22 letter re: various ESI issues.

**Hyperlinks Not Responded to by Google**

We confirm that we are aware that we did not address certain of Plaintiffs' requests from your March 1 and 8, 2021 requests. We are continuing to work on these requests and will either produce the linked document or provide additional information when available.

**Hyperlinks Deemed "Not-Responsive"**

Google does not treat links as part of a document family, nor does it treat hyperlinks as "embedded" objects. The operative ESI protocol in this case aligns. See Case No. 3:20-cv-05671, Dkt. No. 88, Appendix 1 (delineating separate rules of production for Hyperlinked Files in Paragraph 9, for Embedded Objects in Paragraph 7, and for Family Groups in Paragraph 19). Paragraph 9 relating to Hyperlinked Files clearly states:

> If a Receiving Party identifies a hyperlinked file that it reasonably believes to be responsive and seeks its production, that Party shall identify by Bates number the document in which the hyperlinked file appears and the Producing Party will produce such file ***if responsive*** and to the extent not unduly burdensome.

The provision is reasonable and grounded in the baseline limitation Fed. R. Civ. P. 26 b(1) imposes that only relevant documents need be produced. As acknowledged in your letter, Parties

**Morgan, Lewis & Bockius** LLP

One Market
Spear Street Tower
San Francisco, CA  94105-1596        **T** +1.415.442.1000
United States                        **F** +1.415.442.1001

M. Coolidge
April 30, 2021
Page 2

negotiated the hyperlinks provision of the ESI protocol and to the extent Plaintiffs disagreed with the proposed protocol, such issues should have been raised during negotiations and before the protocol was entered by the Court.

**Embedded Documents**

Google believes Plaintiffs may be conflating non-image embedded objects with hyperlinked files or images.  The examples cited all have hyperlinked files, not embedded or attached content.  In five of the six examples that you provide in your April 22 letter, the emails are Google Doc notifications that collaborators have left comments or made suggestions within a document.  These hyperlinked documents are not "embedded" within the email and instead are standard web hyperlinks to an entirely external Google Doc.  Accord Nichols et al. v. Noom, Inc., No. 20-cv-3677 (S.D.N.Y. Mar. 11, 2021).("the Court does not agree that a hyperlinked document is an attachment.")  In accordance with Paragraph 9 of the ESI protocol governing hyperlinked files, Google remains committed to producing responsive documents upon Plaintiffs' reasonable individualized requests.

The remaining example, GOOG-PLAY-000404653, also does not contain any embedded objects. That email contained hyperlinked, web-based graphics that are not embedded or attached within the email, but rather solely hyperlinked.  This hyperlinking to external images is a common practice in html-based emails, and examples, with similar rendering, abound in Plaintiffs' productions as well, e.g. EPIC_GOOGLE_02499728, EPIC_GOOGLE_00302573, EPIC_GOOGLE_00019105, EPIC_GOOGLE_04490808.  This document was processed and produced in accordance with our ESI protocol.

**Instant Messaging and Text Messages**

Google confirms that it is collecting and will produce existing, responsive instant messages and text messages.

Sincerely,

Minna Lo Naranjo

cc:     brian.rocca@morganlewis.com
        sujal.shah@morganlewis.com
        michelle.chiu@morganlewis.com
        rishi.satia@morganlewis.com
        hnam@kaplanfox.com
        ezepp@cravath.com
        karma.giulianelli@bartlitbeck.com
        glen.summers@bartlitbeck.com
        jameson.jones@bartlitbeck.com
        DevelopersvGoogle@hausfeld.com

M. Coolidge
April 30, 2021
Page 3

kberan@hausfeld.com
dkees@hausfeld.com
pwedgworth@milberg.com
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
lking@kaplanfox.com
mchoi@kaplanfox.com
nnishimura@cpmlegal.com
mmolumphy@cpmlegal.com
azapala@cpmlegal.com
nrahman@cpmlegal.com
aschwartz@kaplanfox.com
GArenson@kaplanfox.com
jboyer@koreintillery.com
GZelcs@KoreinTillery.com
STillery@KoreinTillery.com
YEven@cravath.com
dottaunick@cravath.com
MByars@cravath.com
jcclarke@cravath.com
zjarrett@cravath.com

# EXHIBIT 4

**BartlitBeck** LLP

Karma Giulianelli
Karma.Giulianelli@BartlitBeck.com

1801 Wewatta Street Place
Suite 1200
Denver, CO 80202
main: (303) 592-3100
direct: (303) 592-3165

BartlitBeck.com

July 6, 2021

**Via Electronic Mail**

Brian C. Rocca
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105
brian.rocca@morganlewis.com

     Re: *In re Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD (N.D. Cal.); *In re Google Play Consumer Antitrust Litigation,* Case No. 3:20-cv-05761-JD (N.D. Cal.); *In re Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal); *In re Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792 (N.D. Cal)

Dear Brian:

    I write on behalf of Plaintiffs in the above-referenced matters to address several discovery items related to Plaintiffs' requests for production.

    **Organizational Charts**: In your letter dated December 10, 2020, you informed Plaintiffs that "Google does not keep traditional organization charts in its regular course of business." Yet, our review of the documents suggests that Google does in fact keep certain organizational "maps" and "subteam structure[s]" of its business which are squarely within our initial requests. GOOG-PLAY-004100651 at 4100661; *see also* GOOG-PLAY-003577695. Plaintiffs therefore renew their request to Google to immediately produce the organizational information which it keeps in the ordinary course of business in certain centralized repositories. To be clear, Plaintiffs' request herein includes, but is not limited to, the information contained in GOOG-PLAY-004100651.

    **Glossaries and Code Names**: In Plaintiffs' letter dated February 22, 2021, we requested Google provide information responsive to RFP 14 concerning "acronym definitions, glossaries, definitions OR other DOCUMENTS defining OR Explaining acronyms, abbreviations, OR specialized OR other terms YOU use OR that otherwise RELATE TO GOOGLE PLAY, OTHER APP MARKETPLACES, ANDROID DEVELOPERS, DIGITAL PRODUCTS,

# BartlitBeck LLP

Brian C. Rocca
July 6, 2021
Page 2 of 4

GOOGLE PLAY BILLING, OR IN-APP PURCHASES." On March 4, 2021, you responded to that letter, informing Plaintiffs that you were "unaware of any official centralized files containing the information requested in RFP 14 but continue to investigate . . . and [will] produce responsive documents identifying 'code names,' to the extent they exist in centralized files."

Several weeks later, on April 7, 2021, Plaintiffs expressed appreciation that Google continued to "search for a repository of code names, but wanted to make clear that Google is also obligated to explain any code names or other Google-specific terminology whose meaning may remain unclear outside of the Google organization that appear in Google's production." You responded on April 19, 2021, that "Google will produce any responsive documents that identify code names or explain acronyms, abbreviations, or other specialized terms."

Plaintiffs have subsequently identified GOOG-PLAY-004100651, which refers to a document that concerns Google's "jargon." Plaintiffs request that Google (i) immediately produce this document and (ii) continue to search non-custodial databases for other "jargon" that falls within the scope of RFP 14. In addition, please produce all documents that are hyperlinked to GOOG-PLAY-004100651.

Finally, Google asserted in its May 25, 2021 letter that it is "evaluating Search Query No. 95 as proposed and will follow-up as soon as possible". Google has not followed up, despite Plaintiffs raising this issue again in their June 21, 2021 letter that requested a response no later than June 23, 2021. The deadline for substantial completion has now passed, and these documents are responsive to Plaintiffs' RFPs. Please promptly run String No. 95, as modified below with the addition of the code names "Honeycrisp" and "GDAF", and produce all responsive documents.

- Cupcake OR Detox OR "Gabby" OR "Ivan" OR "Magical Bridge" OR Nikkei OR Paragon OR Purell OR Ringo OR Runway OR Soren OR "Project Soy" OR "Sun-Mool" OR "Sun Mool" OR "Project Switch" OR "Project Dynasty" OR "Emu" OR "Free Willy" OR Lowball OR "Project Mission" OR "Project Napa" OR Nikkei OR "Project Plaid" OR "RePlay" OR "Project Starburst" OR Tomcat OR "Zeus" OR "Off- Play Installs" or "Orphaned Apps" or "Honeycrisp" and "GDAF."

**PowerPoint Presentations**: Plaintiffs have identified a recurring quality issue in Google's production of PowerPoint presentations wherein many presentations were produced in a low-resolution black-and-white format that renders slides unreadable and, in some cases, unsearchable. As Google knows, "[t]he parties agree not to degrade the searchability of documents as part of the document production process." Dkt. 57 ("ESI Order") ¶ 6. The low quality of these documents has interfered with Plaintiffs' ability to meaningfully review them. To efficiently resolve this pervasive issue, Plaintiffs request Google reproduce the native versions of all .pptx

BartlitBeck LLP

Brian C. Rocca
July 6, 2021
Page 3 of 4

files pursuant to ¶ 6 of the ESI order. Plaintiffs also request that Google produce the native files for all .pptx files in any forthcoming productions.

**Non-Aggression Pact with Microsoft**: Plaintiffs' RFPs explicitly seek the production of agreements that Google has entered with OEMs, developers, or other third-parties that have had an impact on the market for Android, Android apps, or Android app stores. *See e.g.*, RFPs 1, 23, 32, 35, 37, 57, 58, 86, 87. On June 29, 2021, it was reported that Google and Microsoft's respective CEOs had entered a written non-aggression pact in 2016 that "enabled Microsoft to partner more effectively [with Google]." *See* D. Bass & N. Grant, *Google and Microsoft End Their Five-Year Cease-Fire*, BLOOMBERG (June 29, 2021) *available at*: https://www.bloomberg.com/news/articles/2021-06-30/google-microsoft-truce-crumbles-amid-feud-over-cloud-ad-tech. That agreement then expired in April 2021.

The non-aggression pact appears to have had an impact on the market for Android, Android apps, and/or Android app stores as "Microsoft avoiding lodging public complaints about Google even as it put Apple's App Store on blast. In May 2020, when Smith said European and U.S. regulators should examine app stores in a public appearance in Washington, Microsoft spokespeople took pains to note to Bloomberg later that Smith was referring to Apple only." Moreover, while the agreement was still in force, Microsoft began to sell "a phone called Duo that uses Google Android as its operating system," and began to release "Office apps for rival operating systems, which included Google's Android."

Plaintiffs therefore request that Google promptly produce the 2016 non-aggression pact and any communications (with Microsoft or internally) related thereto.

**Instant Messages**:  In Plaintiffs' letter dated May 22, 2021, Plaintiffs noted that Google has yet to produce any Instant Messages (including Slack, Jabber, Google Chat, SMS or iMessage) and text messages.  The substantial completion deadline has now passed, and to Plaintiffs' knowledge, Google has not yet produced these Instant Messages and text messages. Please promptly produce them.

**Revenue Share Agreements**:  In Google's letter dated June 18, 2021, Google stated it would produce non-OEM, non-wireless carrier revenue share agreements to the extent they appear in Google's custodial files.  Plaintiffs maintain that Google is required to conduct a search of its central repositories for such contracts in response to Plaintiffs' RFP No. 1.  Please confirm that Google will conduct this search, and indicate when Google will produce these agreements.

\*          \*          \*

**BartlitBeck** LLP

Brian C. Rocca
July 6, 2021
Page 4 of 4

We are available to meet and confer concerning these requests, if necessary.

Sincerely,

Karma Giulianelli

Cc:     epic-mobileapps@cravath.com
        Jamie L. Boyer (jboyer@koreintillery.com)
        Stephen M. Tillery (stillery@koreintillery.com)
        Glen E. Summers (glen.summers@bartlitbeck.com)
        Jameson R. Jones (Jameson.jones@bartlitbeck.com)
        Steve W. Berman (steve@hbsslaw.com)
        Rob F. Lopez (robl@hbsslaw.com)
        Ben J. Siegel (bens@hbsslaw.com)
        Bonny E. Sweeney (bsweeney@hausfeld.com)
        Melinda R. Coolidge (mcoolidge@hausfeld.com)
        Katie R. Beran (kberan@hausfeld.com)
        DevelopersvGoogle@hausfeld.com
        Peggy J. Wedgworth (pwedgworth@milberg.com)
        Elizabeth C. Pritzker (ecp@pritzkerlevine.com)
        Jonathan K. Levine (jkl@pritzkerlevine.com)
        Hae Sung Nam (hnam@kaplanfox.com)
        Laurence D. King (lking@kaplanfox.com)
        Mario M. Choi (mchoi@kaplanfox.com)
        Hae Sung Nam (hnam@kaplanfox.com)
        Mark C. Molumphy (mmolumphy@cpmlegal.com)
        Adam J. Zapala (azapala@cpmlegal.com)
        Noorjahan Rahman (nrahman@cpmlegal.com)
        Eric H. Gibbs (ehg@classlawgroup.com)
        Andre M. Mura (amm@classlawgroup.com)

# EXHIBIT 5

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700
———
CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

JOHN W. WHITE
EVAN R. CHESLER
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN

GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ

DAVID J. PERKINS
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
DAVID L. PORTILLA
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN

EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG
MICHAEL L. ARNOLD
HEATHER A. BENJAMIN
MATTHEW J. BOBBY
DANIEL J. CERQUEIRA
ALEXANDRA C. DENNING
HELAM GEBREMARIAM
MATTHEW G. JONES
MATTHEW M. KELLY
DAVID H. KORN
BRITTANY L. SUKIENNIK
ANDREW M. WARK

PARTNER EMERITUS
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY
KIMBERLEY S. DREXLER
NICOLE F. FOSTER
LILLIAN S. GROSSBARD
KIMBERLY A. GROUSSET
ANDREI HARASYMIAK

+1-212-474-1120

TCameron@cravath.com

July 13, 2021

*In re: Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD (N.D. Cal.);
*Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
*In re Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal.);
*In re Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792-JD (N.D. Cal.)

Dear Brian:

I write on behalf of Plaintiffs in the above-referenced actions concerning a number of outstanding discovery items that require a prompt response from Google. Plaintiffs have raised several of these items more than once and Google has repeatedly ignored them. Plaintiffs reserve the right to bring these items to the Court's attention in the Joint Statement due to the Court this Thursday, July 15, and at the July 22 case management conference. Please respond on each of the below items no later than 5 p.m. PT on Wednesday, July 14, so that Plaintiffs have time to consider whether to include these items in the Joint Statement and to work with Google to reach agreement on that filing.

1.    **Overall Volume of Google's Production**

● As of today, Google has made non-data productions totaling 1.4 million documents. By comparison, Epic has produced more than 2 million documents. In Plaintiffs' June 11 email, Plaintiffs asked Google to confirm that it would substantially complete its document discovery by the June 30 deadline. Google's June 22 email response did not provide a clear answer. Given Google's refusal to provide a direct response, and in light of Google's representation in its April 23 email that there were an estimated 5.6 million documents in Google's review queue, Plaintiffs are concerned that there remains a significant volume of documents yet to be produced by Google. With the June 30 deadline now passed, Plaintiffs need clarity on that point.

1

Confidential

- Specifically, Plaintiffs need to know the total expected volume of Google's remaining document productions, as well as the date by which any remaining productions will be complete, in order to plan and prepare for the next phase of discovery.  Please let us know when Google intends to make any further document productions, how many documents Google expects to produce (including the total estimated volume of documents yet to be produced), what categories of documents are outstanding, and the date by which Google will complete those productions.  This request is independent of any additional documents that may be produced as a result of the Parties' ongoing negotiations regarding additional custodians.

## 2.     Volume of Documents for Particular Custodians

- Plaintiffs are concerned by the relatively low number of documents that Google has produced to date for certain Google custodians, including Christian Cramer, Cliff Samaniego, Sundar Pichai and Suzanne Frey.  Please let us know whether Google intends to produce further documents from those custodians, the estimated volume of documents to be produced, the reason for the delay in the production of such documents, and when Google intends to complete the production of documents from those custodians' files.

## 3.     Revenue Sharing Agreements ("RSAs")

- On July 8, Plaintiffs requested that Google produce (or identify in its existing productions) Google's "Go-To-Market Incentive Payments Pool Agreement" and "Google Mobile Services Incentive Agreement" with Samsung.  Please do so without further delay.

- In Plaintiffs' July 6 letter, Plaintiffs requested that Google conduct a search of central repositories for RSAs with third parties other than OEMs or wireless carriers and that Google produce any non-OEM, non-wireless carrier RSAs, to the extent they exist.  Please confirm that Google is undertaking such a search and when Plaintiffs can expect to receive these agreements, if any.

## 4.     State Attorneys General Complaint

- On July 7, a group of State Attorneys General filed a complaint against Google concerning Google's conduct relating to Android app distribution (Case No. 3:21-cv-05227).  Given the relevance of the issues in the States' case to the instant litigations, and the likelihood that the cases will be related and therefore subject to the Stipulation and Order Regarding Coordination of Discovery which provides for sharing discovery between all related cases, Epic and Class Plaintiffs asked on July 8 for Google's consent to receive the complaint in unredacted form from the plaintiffs in that action, as well as the underlying documents cited in the complaint.

Confidential

Google has yet to respond.  Please let us know Google's position on these issues.

**5.    Instant Messages and Text Messages**

- In Plaintiffs' July 6 letter, Plaintiffs reiterated our repeated requests that Google produce all text messages and instant messages (including WhatsApp, Slack, Jabber, Microsoft Teams, Google Chat, SMS or iMessage) that are responsive to Plaintiffs' requests for production. Although Google confirmed in an April 30 letter that it "is collecting and will produce existing, responsive instant messages and text messages", Google has not responded to our inquiries regarding the status of those materials.  Please confirm:

  a) Whether Google has already produced any of these messages, and, if so, please identify a representative group of them by Bates number;

  b) Whether there are instant and text messages that Google intends to produce in the future, and, if so, when Google will make that production; and

  c) Whether Google refrained from collecting or otherwise withheld text and instant messages from any custodians and the reasons for Google doing so.

**6.    Data Requests**

- As of today, Google has produced only two hard drives containing certain non-transactional data, one of which was received on June 30 and the other on July 1.  Plaintiffs have yet to receive *any* transactional data from Google.  As Google is well aware, both transactional and non-transactional data are urgently needed so that Plaintiffs can begin working with experts to analyze and understand the data in advance of deposing Google witnesses.  This is particularly true given the enormous volume of data that Google is expected to produce in these actions.

- Please identify the categories or types of non-transactional data contained on the two hard drives produced to date, and whether Google's production of non-transactional data is now complete.  If it is not complete, please confirm when Google will produce the remaining non-transactional data responsive to Plaintiffs' RFPs, and describe what is outstanding.

- With regard to transactional data, Plaintiffs previously agreed to accept Google's production through Google Cloud or via hard drive.  Please confirm that Plaintiffs will receive Google's transactional data, family-share data, and any other categories of transactional data that remain outstanding, and the format by which Google will be producing that data.

Confidential

Google previously represented in its June 22 email that it anticipated producing an estimated 100 terabytes of transactional data in the first two weeks of July.  Please confirm that Google will produce that volume of transactional data to Plaintiffs by Wednesday, July 14, and when Google intends to produce the remaining outstanding transactional data, if any.

**7.     Individualized Contracts with App Developers**

- Plaintiffs request that Google confirm whether it has produced individualized agreements or contracts with all "Project Hug" developers identified in certain internal presentations such as GOOG-PLAY-002650998.  If so, please provide the Bates number identifying such documents.  If Google has not yet produced these materials, please confirm that it intends to produce them and when it will do so.

- Plaintiffs also request that Google confirm whether it has produced individualized agreements or contracts with all developers that participate in Google's App Velocity Program, Living Room Accelerator Program (both LiveTV and Video), Audio Accelerator Program or ADAP, and Subscribe w/ Google.  If so, please provide the Bates number identifying such documents.  If Google has not yet produced these materials, please confirm that it intends to produce them and when it will do so.

**8.     Contracts with Smaller OEMs**

- In Plaintiffs' May 22 letter, Plaintiffs identified certain smaller OEMs among those listed in Appendix G to Google's April 19 letter whose contracts with Google Plaintiffs requested that Google produce.  These OEMs include:  Afrifone Ltd.; Cisco Systems, Inc.; IBRITECH DMCC; Landis, LLC; MetroPCS Wireless; Nokia USA, Inc.; OnePlus Technology (Shenzhen) Co., Ltd.; and Reliance Communications, LLC.  Please confirm whether Google has produced these agreements, and, if so, please identify them by Bates number.  If Google's agreements with these OEMs have not yet been produced, please confirm that Google will be producing them and the date by which Google will do so.

**9.     Non-Standard OEM Contracts**

- In Google's May 25 letter, Google represented that it "is still in the process of investigating whether additional non-standard contracts with OEMs, containing unique negotiated terms, exist and we are willing to meet and confer with Plaintiffs to determine a reasonable compromise once that investigation is complete."  Please confirm whether Google has completed its investigation of non-standard OEM contracts and whether any such contracts have already been produced.  Please also confirm whether Google intends to produce any additional non-standard OEM contracts.

Confidential

10.  **Non-Aggression Pacts**

- In Plaintiffs' July 6 letter, Plaintiffs requested that Google promptly produce the 2016 non-aggression pact between Google and Microsoft and any communications (with Microsoft or internally) related thereto. Plaintiffs also requested that Google produce any agreements that Google has entered with OEMs, developers, or other third-parties that have had an impact on the market for Android, Android apps, or Android app stores. Please confirm that Google will produce both the Microsoft non-aggression pact and other such agreements and when it will do so.

11.  **Communications with Apple**

- Plaintiffs are concerned by the low number of documents Google has produced thus far that contain the domain name "@apple.com". Please confirm that Google will be producing all relevant communications with Apple and when Google will produce those remaining documents.

12.  *Callsome* **Litigation**

- In Google's June 18 letter, Google stated it "is in the process" of "producing the entirety of its *Callsome* document production". Please confirm whether Google has produced to Plaintiffs <u>any</u> of its *Callsome* document production thus far, and if so, please identify those documents by Bates number. In addition, Google's May 25 letter indicated it would "follow up with the *Callsome* production volume in the near term." Plaintiffs have not heard back from Google on that point. Please promptly provide a timeline for when Google will produce these materials. Finally, please confirm when Plaintiffs will receive the deposition transcripts from the *Callsome* litigation, which the Court ordered Google to produce approximately two months ago.

13.  **Regulatory Investigation Documents**

- In Plaintiffs' June 21 letter, Plaintiffs requested materials from the European Commission's 2018 investigation into Google's anticompetitive behavior within the mobile device space (the "EC Investigation") and materials from the Korean Fair Trade Commission ("KFTC") investigation into allegations that Google restricts competition in the mobile operating system market and at the app distribution level. In Plaintiffs' July 6 email, Plaintiffs renewed this request and asked Google to respond by July 7. Google has not responded. Please confirm immediately that Google intends to produce these materials and when it will make the production.

### 14. Miscellaneous Deficiencies

- In Plaintiffs' July 6 letter, Plaintiffs identified a recurring quality issue related to the unreadability of certain PowerPoint presentations in Google's productions.  Plaintiffs requested that Google reproduce the native versions of all .pptx files.  Please confirm that Google intends to do so and when it will do so.

- In Plaintiffs' July 6 letter, Plaintiffs requested that Google produce a particular "jargon" document referenced in Google's productions and that Google "continue to search non-custodial databases for other 'jargon' that falls within the scope of" Plaintiffs' requests.  Please confirm that Google will produce this document and will continue its investigation as to whether other similar documents exist.

- In Plaintiffs' July 6 letter, Plaintiffs requested that Google "immediately produce the organizational information which it keeps in the ordinary course of business in certain centralized repositories".  Please confirm that Google will produce such materials and when it will do so.

### 15. Search Strings

- Google asserted in its May 25 letter that it is "evaluating Search Query No. 95 as proposed and will follow-up as soon as possible".  Plaintiffs have not received a response, despite raising this issue again in a June 21 letter that requested a response no later than June 23.  Plaintiffs raised the issue yet again in a July 6 letter, and still have no response.

- Please confirm that Google will promptly run String No. 95, as modified below with the addition of the code names "Honeycrisp", "GDAF" and "Basecamp", and produce all responsive documents as requested.

  > Cupcake OR Detox OR "Gabby" OR "Ivan" OR "Magical Bridge" OR Nikkei OR Paragon OR Purell OR Ringo OR Runway OR Soren OR "Project Soy" OR "Sun-Mool" OR "Sun Mool" OR "Project Switch" OR "Project Dynasty" OR "Emu" OR "Free Willy" OR Lowball OR "Project Mission" OR "Project Napa" OR Nikkei OR "Project Plaid" OR "RePlay" OR "Project Starburst" OR Tomcat OR "Zeus" OR "Off- Play Installs" OR "Orphaned Apps" OR "Honeycrisp" OR "GDAF" OR "Basecamp"

### 16. Chrome Web Store Developer Agreements

- Plaintiffs requested on June 21 that Google produce certain Chrome Web Store Developer Agreements.  Plaintiffs request that Google confirm whether it has produced such agreements, and if so, please provide the Bates number identifying such documents.  If Google has not yet produced

Confidential

these materials, please confirm that it intends to produce them and when it will do so.

*       *       *

Sincerely,


*/s/  Timothy G. Cameron*
Timothy G. Cameron


Brian C. Rocca
Sujal J. Shah
Michelle P. Chiu
Minna L. Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
brian.rocca@morganlewis.com
    sujal.shah@morganlewis.com
        michelle.chiu@morganlewis.com
            minna.naranjo@morganlewis.com
                rishi.satia@morganlewis.com

Daniel M. Petrocelli
Ian Simmons
Benjamin G. Bradshaw
E. Clay Marquez
Stephen J. McIntyre
O'MELVENY & MYERS LLP
dpetrocelli@omm.com
    isimmons@omm.com
        bbradshaw@omm.com
            cmarquez@omm.com
                smcintyre@omm.com

7

Confidential

Karma M. Giulianelli
Glen E. Summers
Jameson R. Jones
BARTLIT BECK LLP
karma.giulianelli@bartlitbeck.com
  glen.summers@bartlitbeck.com
    jameson.jones@bartlitbeck.com

Hae Sung Nam
Laurence D. King
KAPLAN FOX & KILSHEIMER, LLP
hnam@kaplanfox.com
  lking@kaplanfox.com

George Zelcs
Jamie L. Boyer
Stephen M. Tillery
KOREIN TILLERY LLC
gzelcs@koreintillery.com
  jboyer@koreintillery.com
    stillery@koreintillery.com
      AppConsumersDiscovery@KoreinTillery.com

Peggy J. Wedgworth
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
pwedgworth@milberg.com

Confidential

Elizabeth C. Pritzker
Jonathan K. Levine
PRITZKER LEVINE LLP
ecp@pritzkerlevine.com
  jkl@pritzkerlevine.com

Nanci E. Nishimura
Mark C. Molumphy
Adam J. Zapala
Noorjahan Rahman
Elizabeth Tran Castillo
COTCHETT, PITRE & MCCARTHY, LLP
nnishimura@cpmlegal.com
  mmolumphy@cpmlegal.com
    azapala@cpmlegal.com
      nrahman@cpmlegal.com
        ecastillo@cpmlegal.com

Steve W. Berman
Robert F. Lopez
Benjamin J. Siegel
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com
  robl@hbsslaw.com
    bens@hbsslaw.com

Confidential

Joseph Vanek
Eamon P. Kelly
Alberto Rodriguez
SPERLING & SLATER, P.C.
jvanek@sperling-law.com
    ekelly@sperling-law.com
        arodriguez@sperling-law.com

Bonny E. Sweeney
Melinda R. Coolidge
Katie R. Beran
Scott A. Martin
Irving Scher
HAUSFELD LLP
bsweeney@hausfeld.com
  mcoolidge@hausfeld.com
    kberan@hausfeld.com
        smartin@hausfeld.com
          ischer@hausfeld.com
              DevelopersvGoogle@hausfeld.com

BY EMAIL

# EXHIBIT 6

# Morgan Lewis

**Brian C. Rocca**
Partner
+1.415.442.1432
brian.rocca@morganlewis.com

July 14, 2021

**VIA E-MAIL**

Karma Giulianelli
Bartlit Beck LLP
1801 Wewatta Street Place
Suite 1200
Denver, CO 80202

Timothy Cameron
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Re:     *In re Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD (N.D. Cal.)
        *Epic Games, Inc. v. Google LLC et al.*, No. 3:20-cv-05671-JD (N.D. Cal.)
        *In re Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal.)
        *In re Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792-JD (N.D. Cal.)

Dear Karma and Timothy:

I write in response to a number of the issues you raised in your letters sent on behalf of Plaintiffs on June 21, July 6, and July 13.  Given the number of issues raised by Plaintiffs, and also those raised by Google about Plaintiffs' discovery responses, we propose an omnibus meet and confer (or a series of omnibus meet and confers, as needed) to address outstanding discovery issues on both sides.  We propose Tuesday, July 20, Wednesday, July 21, or Friday July 23.  To that end, please propose a few times next week that work for counsel for Plaintiffs.

As a preliminary point, we write to confirm that Google has completed its primary review of custodian documents based on the agreed upon custodians, search terms, and date ranges. Google has produced nearly 1.5 million documents and is not withholding responsive information, except as indicated herein.  As we advised all throughout the discovery process, Plaintiffs' search queries are overbroad, so it should be no surprise that the production volume is smaller than the overall universe, after accounting for responsiveness, date restrictions, and de-duplicating pursuant to the ESI order.  As can be anticipated post-substantial completion, Google will continue to proceed with supplemental productions based on any additional custodians, document categories and refresh productions agreed to by the parties, and will also make additional productions following our ongoing privilege review and clearance of NDA issues.

**Morgan, Lewis & Bockius** LLP

One Market
Spear Street Tower
San Francisco, CA  94105-1596        ☏ +1.415.442.1000
United States                        🖷 +1.415.442.1001

Karma Giulianelli
Timothy Cameron
July 14, 2021
Page 2

With respect to productions from individual custodians, which you raised for the first time this week, we are willing to look into this issue.  We also have several questions about individual custodian productions for Epic and Developer Plaintiffs (and to a lesser extent, Consumer Plaintiffs).  In the meantime, we can confirm that Google applied the same process for reviewing and producing documents for the four custodians you indicate, including applying agreed upon search terms and date ranges.  We believe we've produced the responsive documents as part of our substantial completion effort but will investigate further and confirm.

Turning to several issues you raised:

**Revenue Share Agreements**

Google has already produced the "Go-To-Market Incentive Payments Pool Agreement" (GOOG-PLAY-005706515) and the "Google Mobile Services Incentive Agreement" (GOOG-PLAY-005706485).

As to Plaintiffs' request for Google to conduct a search of central repositories, Plaintiffs' July 6, 2021 letter relies on Plaintiffs' RFP No. 1, arguing that Google is required to conduct a search of centralized repositories for non-OEM and non-carrier revenue share agreements.  But, by its own terms, Plaintiffs' RFP No. 1 seeks only agreements between Google, on the one hand, and OEMs and wireless service providers, on the other.  As explained in our June 18, 2021 letter, none of the other overbroad and unduly burdensome RFPs Plaintiffs previously cited (RFP Nos. 29, 55, and 87) actually seek revenue share agreements between Google and non-OEMs.  In response to all three of these requests, Google agreed to search custodial files for relevant documents.  Google does not believe that its responses are insufficient nor that any searching of centralized files is required to satisfy Google's discovery obligations based on Plaintiffs' served requests.  Notwithstanding the foregoing, and without waiving any objections, in an effort to resolve the parties' dispute, Google will conduct a reasonable search of relevant centralized repositories for revenue share agreements relating to Google Play and Google Play Billing with non-OEMs and non-wireless carriers.

**State Attorneys General Complaint**

As explained during yesterday's meet and confer, last week we asked counsel for the States to identify (and produce to me) the underlying documents cited in the complaint, as well as the basis for redaction.  After our meet and confer, I sent a follow-up request.  We note that our client (Google) itself has not even seen the unredacted version of the State AG complaint because we simply do not know the source of the information cited and redacted by the States.  Because we are unaware of any investigation into Google Play by the States, we can only assume that the States received documents in the context of another proceeding, or from third parties.  However, we don't know what that information is, nor do we know whether and how it is restricted (e.g., subject to protective orders or other commitments on confidentiality).  Assuming the information is from Google's files, we do not know whether that information reflects third party information.

We do not anticipate making any objection to other outside counsel in the MDL having access to the redacted information, subject to a Protective Order.  As a first step, however, we need basic information from the States, and we need to see the documents.  As noted, I have reached out to counsel for the States again regarding our pending request and we anticipate hearing more information today.

Karma Giulianelli
Timothy Cameron
July 14, 2021
Page 3

**Instant Messages and Text Messages**

In response to Plaintiffs' discovery requests relating to instant messages, Google has produced responsive, non-privileged chat files from the agreed upon custodians.  See, e.g., GOOG-PLAY-003575587; GOOG-PLAY-003605164; GOOG-PLAY-003666392.  For ease of identifying additional chats, most Document Titles for chats contain the language "Outlook Express Mail Message" or "Chat with [name or email address]".

With respect to Plaintiffs' discovery requests relating to text messages, Google made reasonable inquiries into various means of communications custodians used for business purposes relating to the relevant issues, including text messages, and based on that reasonable inquiry, we do not believe there are text messages responsive to Plaintiffs' requests.  This is not surprising, as Google employees are instructed to not communicate confidential company information via text.  We also note that no plaintiff has produced SMS/iMessage content.

**Data Requests**

Google has completed its collection of transactional data and will be producing it via hard drive to Plaintiffs, as indicated in our June 22 email.  The collection and finalization of this data set—a massive engineering effort—involved performing a quality check of the data to confirm its accuracy and completeness.  This quality check, a necessary part of any data set finalization, added time to our initial delivery estimate.  Additionally, copying two hard drive sets per Plaintiff group requires substantial processing time due to the massive size of the data set.  Google's updated estimated delivery time is July 26 for the first hard drive set and August 9 for the second set.

Regarding non-transactional data, Google will be producing YouTube financial data and app usage data the week of July 19.  At that point, Google believes it will have completed its production of non-transactional data responsive to Plaintiffs' requests.  The data included on the non-transactional data hard drives is the following: app catalog data (GOOG-PLAY-001507601 - GOOG-PLAY-001507602), app ratings data (GOOG-PLAY-005535890), AdMob data (globally and by top 12 countries) (GOOG-PLAY-005535889 and GOOG-PLAY-005535888, respectively), monthly app-level app revenue for U.S. developers (GOOG-PLAY-005535885), monthly app-level app revenue for U.S. consumers (GOOG-PLAY-005535886), and monthly app-level app revenue for top 100 global apps (GOOG-PLAY-005535887).

With respect to family sharing data, we anticipate producing that data the week of July 19 via a standard secure file transfer.

**Individualized Contracts with App Developers**

Plaintiffs ask Google to confirm whether it has produced or will produce individualized agreements with developers participating in the following programs:  (1) "Project Hug" (Games Velocity Program); (2) App Velocity Program; (3) Living Room Accelerator Program; (4) Audio Accelerator Program; and (5) Subscribe w/ Google.  Google has collected agreements with developers concerning these programs and is in the process of giving notice of production to hundreds of participating developers.  Google intends to include these agreements in upcoming supplemental productions as the NDA issues are cleared.  Google is in the process of investigating additional

Karma Giulianelli
Timothy Cameron
July 14, 2021
Page 4

developer programs and, to the extent any of these programs are determined to be relevant to the issues in the case, will produce additional developer agreements.

**Contracts with Smaller OEMs**

Google has already produced agreements with OnePlus Technology (Shenzhen) Co., Ltd. (*see, e.g.*, GOOG-PLAY-000416323; GOOG-PLAY-00416327; GOOG-PLAY-000416398; GOOG-PLAY-000416498; GOOG-PLAY-000416604).  Google recently cleared outstanding NDA issues with the remaining smaller OEMs identified in Plaintiffs May 22 letter and will be producing the relevant agreements next week.

**Non-Standard OEM Contracts**

Based on its investigation, Google believes a number of RSAs with OEMs are non-standard contracts.  Accordingly, in an effort to provide Plaintiffs with an adequate sample without unnecessarily burdening Google with the time-consuming process of providing notice to counterparties, Google has produced RSAs with the top 20 OEMs, covering 90% of device activations worldwide (excluding China).  Google believes this production represents a reasonable compromise in light of the number of OEMs, the probative value of agreements with long tail OEMs, and the burdens associated with providing notice to these OEMs.  Upon the production of agreements with the smaller OEMs referred to above, Google does not intend to produce any additional OEM contracts.

**Agreements with Microsoft**

Plaintiffs first raised this issue on July 6 and Google is looking into the "2016 non-aggression pact" referenced in your letter.  We will respond to Plaintiffs with additional information and our position.

**Communications with Apple**

Google has completed its review and production of documents that hit on terms that contained the domain name @apple.com (i.e., Search Query Nos. 63-65).

*Callsome*

Google produced the entirety of its *Callsome* document production (not including deposition transcripts) on June 28, 2021 in PROD020.  The Bates range for these documents is GOOG-PLAY3-000000001 - GOOG-PLAY3-000012352.  Google produced the *Callsome* deposition transcripts and exhibits on June 30, 2021 in PROD023.  The Bates range for these documents is GOOG-PLAY-5697549 - GOOG-PLAY-5703000; GOOG-PLAY-5705103 - GOOG-PLAY-5705105; GOOG-PLAY-5705140 - GOOG-PLAY-5705147; and GOOG-PLAY-5955675 - GOOG-PLAY-5970525.

**House Judiciary Committee Productions**

Google already identified the Bates numbers for all documents produced pursuant to Judge Donato's April 2 order (MDL ECF No. 18) in the transmittal letters attached to productions PROD010, PROD011, PROD012, PROD13, and PROD015.  To summarize, those Bates ranges are listed below:

Karma Giulianelli
Timothy Cameron
July 14, 2021
Page 5

- PROD010:  GOOG-PLAY-001316130 - GOOG-PLAY-001496066
- PROD011:  GOOG-PLAY-001496067 - GOOG-PLAY-001507600
- PROD012:  GOOG-PLAY-001507603 - GOOG-PLAY-001521534
- PROD013:  GOOG-PLAY-001521535 - GOOG-PLAY-001521745
- PROD015:  GOOG-PLAY2-000000001 - GOOG-PLAY2-000013098

While Google has produced the vast majority of relevant documents from those that were previously produced to the House Judiciary Committee in response to its Investigation of Competition in the Digital Markets, a subset of the relevant documents require Google to navigate a third-party notification process, and we anticipate making a further production of those documents tied up in that process in the near term.

**Cloned Discovery**

Your requests for discovery into the European Commission's (EC) 2018 investigation and the alleged Korean Fair Trade Commission (KFTC) investigation—completely foreign processes involving other counsel and legal obligations (including foreign sovereign confidentiality constraints)—are relitigating issues that Judge Donato already resolved.  Judge Donato was clear at the April 1 Status Conference when he limited the scope of his order to Google's documents produced in response to the House Judiciary Committee's investigation.  With respect to the EC's investigation, Judge Donato stated that "[o]n the EU side . . . the competition regimes are different" and that "Europe sounds . . . maybe a couple kilometers too far away from this case." April 1, 2021 Status Conference Tr. 19:16-10; 23:7-10.  Google has fully complied with the terms of Judge Donato's limited order to produce documents in the House Judiciary Committee investigation.  Google notes that during the House Judiciary Committee's investigation, it produced the relevant documents from the EC investigation to the House.  We do not believe there are any additional relevant documents to search for and produce beyond what has already been produced to Plaintiffs in the House Judiciary Committee productions identified above.

As to the KFTC investigation, if Europe is "a couple of kilometers too far away from this case," then the alleged KFTC investigation is even further afield and irrelevant to this litigation as it is predominantly Korean-based.  The single article Plaintiffs cite in their letter is not sufficient to provide an appropriate basis for their request.

While Plaintiffs continue to push for discovery on unrelated investigations, Plaintiffs have still not explained why Google's voluminous productions to date aren't enough.  In response to Plaintiffs' 95 Search Queries, Google has already produced and Plaintiffs now have access to nearly 1.5 million documents and millions of rows of data.  Plaintiffs' previous attempts to justify their "cloned discovery" by arguing that it is "a low-hanging fruit" and that "it would actually be a way to minimize the burden on Google and expedite the discovery at the same time" was unpersuasive then and is completely moot now.  April 1, 2021 Status Conference Tr. 17:7-17.  Google has produced over 6 million pages of documents, and has already undergone significant burden and cost in responding to Plaintiffs' sweeping discovery requests.  Even if these requests were proper or relevant, there is no efficiency to be obtained through cloned discovery.

Karma Giulianelli
Timothy Cameron
July 14, 2021
Page 6

**PowerPoint Presentations**

Please provide Bates numbers for examples of documents that have the quality issue you describe in your letter.  We will review those examples and determine what, if any, additional steps need to be taken.

**Glossaries and Code Names / Search Query No. 95**

Google's position as to Plaintiffs' request remains unchanged.  Google is unaware of, and has yet to identify, any centralized files containing documents defining "code names" or otherwise explaining acronyms, abbreviations, or other specialized terms.  Google, however, remains committed to producing responsive documents that identify code names or explain acronyms, abbreviations, or other specialized terms.

We identified the document hyperlinked in the "Jargon" section of GOOG-PLAY-004100651 which you cite in your letter and will include it in our next production.  However, Plaintiffs' request for *all* hyperlinks referenced in this document is unreasonable and unduly burdensome.  This document includes over 100 hyperlinks and, as indicated in our prior correspondence in response to Plaintiffs' requests for hyperlinks, identifying and collecting each link is a manual and time-consuming process.  To that end, please provide us with a list of the subset of links referenced in GOOG-PLAY-004100651 that you are interested in and we will consider your request.

Google agrees to Search Query No. 95 as originally proposed by Plaintiffs on May 22, 2021, and we can confirm that we already ran it across documents for all agreed upon search periods for each custodian and produced responsive materials on or before June 30.  With respect to the two new terms added to Search Query No. 95 in Plaintiffs' letters dated July 6, 2021 and the one term added in your letter dated July 13, 2021, Google agrees to review these terms subject to agreed upon date restrictions.

**Organizational Charts**

We provided Plaintiffs with detailed information about the roles and responsibilities of the agreed upon custodians as well as details about how custodians relate to one another across the Android and Play organizations in our narrative sent on January 28, 2021.  As the example you cite in your letter shows, to the extent organizational information exists in any of the relevant documents produced in this case, Plaintiffs have access to them.  Further, Plaintiffs now have nearly 1.5 million documents to help you understand how the custodians relate to each other and communicate.

**Chrome Web Store Developer Agreements**

In response to RFP No. 34, Google previously agreed to produce exemplars of agreements between Google and Chrome Web Store developers between January 1, 2014 and August 13, 2020.  Google has been working to collect a set of exemplar agreements and will be producing them in an upcoming production.

\*       \*       \*

Karma Giulianelli
Timothy Cameron
July 14, 2021
Page 7

We look forward to discussing these issues, and the many issues we have with Plaintiffs' productions, in the coming weeks as the parties work together to complete document and data discovery.


Sincerely,


Brian C. Rocca

cc:    Yonatan Even (yeven@cravath.com)
        Eric Zepp (ezepp@cravath.com)
        Lauren Moskowitz (lmoskowitz@cravath.com)
        Jamie L. Boyer (jboyer@koreintillery.com)
        Stephen M. Tillery (stillery@koreintillery.com)
        Karma M. Giulianelli (karma.giulianelli@bartlitbeck.com)
        Glen E. Summers (glen.summers@bartlitbeck.com)
        Jameson R. Jones (Jameson.jones@bartlitbeck.com)
        Steve W. Berman (steve@hbsslaw.com)
        Rob F. Lopez (robl@hbsslaw.com)
        Ben J. Siegel (bens@hbsslaw.com)
        Bonny E. Sweeney (bsweeney@hausfeld.com)
        Melinda R. Coolidge (mcoolidge@hausfeld.com)
        Katie R. Beran (kberan@hausfeld.com)
        DevelopersvGoogle@hausfeld.com
        Peggy J. Wedgworth (pwedgworth@milberg.com)
        Elizabeth C. Pritzker (ecp@pritzkerlevine.com)
        Jonathan K. Levine (jkl@pritzkerlevine.com)
        Laurence D. King (lking@kaplanfox.com)
        Mario M. Choi (mchoi@kaplanfox.com)
        Hae Sung Nam (hnam@kaplanfox.com)
        Mark C. Molumphy (mmolumphy@cpmlegal.com)
        Adam J. Zapala (azapala@cpmlegal.com)
        Noorjahan Rahman (nrahman@cpmlegal.com)
        Eric H. Gibbs (ehg@classlawgroup.com)
        Andre M. Mura (amm@classlawgroup.com)

# EXHIBIT 7

# Cravath, Swaine & Moore llp

JOHN W. WHITE
EVAN R. CHESLER
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN

GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ

DAVID J. PERKINS
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
DAVID L. PORTILLA
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN

EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG
MICHAEL L. ARNOLD
HEATHER A. BENJAMIN
MATTHEW J. BOBBY
DANIEL J. CERQUEIRA
ALEXANDRA C. DENNING
HELAM GEBREMARIAM
MATTHEW G. JONES
MATTHEW M. KELLY
DAVID H. KORN
BRITTANY L. SUKIENNIK
ANDREW M. WARK

PARTNER EMERITUS
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY
KATHERINE S. DREXLER
NICOLE F. FOSTER
LILLIAN S. GROSSBARD
KIMBERLY A. GROUSSET
ANDREI HARASYMIAK

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700
———
CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1648

WRITER'S EMAIL ADDRESS
LMoskowitz@cravath.com

August 2, 2021

> *In re: Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD (N.D. Cal.);
> *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
> *In re Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal.);
> *In re Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792-JD (N.D. Cal.);
> *State of Utah et al. v. Google LLC et al.*, No. 3:21-cv-05227-JD (N.D. Cal.)

Dear Brian:

I write on behalf of Epic Games, Inc., Consumer Plaintiffs and Developer Plaintiffs in the above-referenced matters concerning a number of discovery items that remain outstanding after your correspondence of July 14, 2021, and our meet and confer on July 21.

**1. Instant Messages and Text Messages**

In Plaintiffs' letters of July 6 and July 13, Plaintiffs repeatedly requested that Google produce all text messages and instant messages (including WhatsApp, Slack, Jabber, Microsoft Teams, Google Chat, SMS or iMessage) that are responsive to Plaintiffs' requests for production. In the parties' July 21 meet and confer, Google represented that it had produced certain of these messages and that it would provide guidance that Plaintiffs could use to locate these already existing instant messages and text messages in Google's production. Even using Google's guidance, Plaintiffs have been able to identify fewer than 900 possible instant message files. Many of these files are in fact emails, and files from custodians from the early days of Android are heavily overrepresented: 268 of these files include Mr. Eric Chu, 84 include Mr. Hiroshi Lockheimer, and 71 include Mr. Andy Rubin. To take just one example of a clear deficiency, only a handful of instant messages identified using Google's guidance include Ms. Purnima Kochikar, despite the fact that she has sent numerous emails referencing discussions of responsive topics with other custodians "over ping". *See, e.g.*, GOOG-PLAY-001567477 ("please clarify the stats shared by Fortnite, as discussed over ping");

1

GOOG-PLAY-000351375 (referring to a quote from a developer regarding Google Play "as discussed over ping"); *see also, e.g.*, GOOG-PLAY-000433079 (email from Google employee to Mr. Jamie Rosenberg referencing an exception to Huawei's Mobile Application Distribution Agreement "[a]s discussed on ping just now").  It also appears that Google employees are more open in discussing "sensitive" topics over instant message than over email, a fact that underscores Google's obligation to adequately produce instant message files.  *See* GOOG-PLAY-000475242 (instant message in which Google employee discusses Epic's release of Fortnite on Samsung's app store and then notes the topic is "a bit sensitive hence best not to discuss on email thread").

Please identify the Bates numbers of the instant messages described in the documents referenced above, or explain why Google has not produced them.  Please also explain how Google collected instant messages from its custodians; provide a full list of the custodians whose instant messages Google searched and produced; and identify the instant messaging software(s) from which Google produced instant messages (*e.g.*, Google Chat, Google Hangouts, WhatsApp, Slack, Jabber, Microsoft Teams), as well as any instant messaging software(s) used by Google employees to discuss work-related matters from which Google did not produce instant messages.

Google further represented that it would conduct a full inquiry into whether additional text messages responsive to Plaintiffs' requests for production exist and if so, would produce them promptly.  Indeed, Plaintiffs have previously pointed out to Google, its production is rife with examples of employees texting third parties (as well as internally) regarding highly relevant issues related to this litigation.  Additional examples include: GOOG-PLAY-001825000 (September 2019 email thread wherein Hiroshi Lockheimer noted that he had received a "text" from a T-Mobile employee regarding ongoing "term sheet" negotiations); GOOG-PLAY-001826072 (March 2020 email thread wherein Jamie Rosenberg instructs Hiroshi Lockheimer to send AT&T representatives "a quick note" regarding "our MOU" to which Lockheimer responds that he had "texted" them"); GOOG-PLAY-000964351 (December 2020 email thread wherein Sagar Kamdar writes that in a meeting to discuss Play approval process for developers, "Aurash texted both Debajit and [him] during the meeting and he's not so sure this is a big concern"); GOOG-PLAY-000964351 (March 2020 email wherein Roblox notifies Google that it was removed from the South Korean Google Play Store and Roblox representatives had "texted" Jenna Hanlon to "follow up" on what happened).

Please advise whether Google has completed its inquiry and will provide the results of that inquiry to Plaintiffs.  And if there are additional text messages yet to be produced, please indicate when they will be produced to Plaintiffs.

## 2.  Data Requests

In Google's July 14 letter, Google stated that it had "completed its collection of transactional data" and would be producing such data in two sets of hard drives—the first on July 26 and the second on August 9.  In Google's July 26 and 27 emails, Google confirmed that it would send a first set of data to Consumer and

Developer Plaintiffs this week and to Epic no later than August 2.  Google also indicated that it would "continue to copy drives and ship additional completed drives as they are ready."  Please provide an expected number of shipments and timeline by which Google will produce all of its transactional data.

In Google's July 14 letter, Google represented that it would produce "YouTube financial data and app usage data the week of July 19".  Google also stated that it would produce family sharing data via a standard secure file transfer the week of July 14.  Plaintiffs have still not received these data.  Please provide an expected date on which Google will produce these data, or, if already produced, provide the Bates numbers of these files.

### 3.  Revenue Sharing Agreements ("RSAs")

Plaintiffs' letter of May 22 asked Google to confirm that it will produce "relevant OEM, wireless carrier, and third-party agreements".  Google's response letter of May 25 addressed OEM and wireless carrier contracts, but failed to address other types of third-party agreements.  Plaintiffs' June 9 letter raised that deficiency, asking Google to "confirm whether Google has revenue sharing agreements between any non-OEM third parties other than wireless carriers that relate to Google Play, Google Play Billing, or Android OS."  On June 18, Google claimed that it would be unduly burdensome to search for and produce revenue share agreements between Google and other non-OEM third parties, but that Google would search custodial files for documents responsive to this topic.  On July 6, Plaintiffs once again pressed Google to "conduct a search of central repositories" for RSAs with third parties other than OEMs or wireless carriers and to produce any non-OEM, non-wireless carrier RSAs, to the extent any exist.  Plaintiffs raised the issue yet again in their letter of July 13.

In Google's July 14 response, almost two months after Plaintiffs first raised the subject, Google finally confirmed that it would "conduct a reasonable search of relevant centralized repositories for revenue share agreements relating to Google Play and Google Play Billing with non-OEMs and non-wireless carriers."  Please confirm whether Google has completed its search for these documents and, if not, when it expects to complete this search.  If Google has completed the search and located such agreements, please identify the third parties with whom Google maintains RSAs and confirm that Google will produce the agreements forthwith (and identify a date by when they will be received).  Given the date on which this issue was first raised, any further delay is unacceptable.

### 4.  Individualized Contracts with App Developers, including Facebook

In Plaintiffs' July 13 letter, Plaintiffs requested that Google confirm whether it has produced or will produce individualized agreements or contracts with all developers participating in (1) "Project Hug" (Games Velocity Program); (2) App Velocity Program; (3) Living Room Accelerator Program (both LiveTV and Video); (4) Audio Accelerator Program; and (5) Subscribe w/ Google.  In Google's July 14 letter, Google indicated that it was working through "NDA issues" with developers in these

programs and would provide Plaintiffs with the documents in "upcoming supplemental productions".  Google also confirmed that it would investigate whether there are "additional developer programs . . . determined to be relevant to the issues" in this litigation.  Please confirm whether Google has completed its investigation into additional developer programs and provide a date on which the documents will be produced.

Relatedly, Consumer and Developer Plaintiffs wrote Google on July 16, 2021 concerning the production of all contracts or agreements with Facebook.  Consumer Plaintiffs followed-up on this request in an email dated July 26, 2021, noting that it was clear from Google's documents that such agreements exist. *See, e.g.*, GOOG-PLAY-001593726.  Please confirm whether you intend to produce such relevant agreements and provide a date on which the documents will be produced.

## 5. Contracts with OEMs

In Google's letter of December 10, 2020, Google indicated that it had begun the process of collecting Mobile Application Distribution Agreements ("MADAs") with "relevant" OEMs, beginning with the largest OEMs.  Plaintiffs' letter of December 20, 2020, explained that while Plaintiffs were amenable to Google beginning with the large OEMs and with the MADAs, Plaintiffs' RFPs called for the production of *all* types of contracts with *all* OEMs, a point Plaintiffs reiterated in their letter of February 22, 2021.  Over the course of the next several months, the parties exchanged numerous letters touching on this issue.  Ultimately, Plaintiffs agreed to accept all contracts with the larger OEMs, as well as any non-standard OEM agreements and a subset of standardized agreements with smaller OEMs, as described in Plaintiffs' letter of March 11.  Four months have passed, as has the deadline for substantial completion of document production, and it remains unclear to Plaintiffs what Google has produced with respect to OEM contracts.

In Plaintiffs' July 13 letter, Plaintiffs identified certain smaller OEMs among those listed in Appendix G to Google's April 19 letter whose contracts with Google Plaintiffs requested that Google produce.  Google's letter of July 14 indicated that Google had produced agreements with OnePlus Technology (Shenzhen) Co., Ltd. and would be producing the rest of the agreements with the smaller OEMs "next week".  Please confirm whether Google has finished producing the requested agreements with smaller OEMs, and identify them by Bates number.

Also in Plaintiffs' July 13 letter, Plaintiffs asked Google to confirm whether it had completed its investigation into the existence of "additional non-standard contracts with OEMs, containing unique negotiated terms".  Google represented that it had "produced RSAs with the top 20 OEMs, covering 90% of device activations worldwide (excluding China)", and that this "represents a reasonable compromise" in light of the burden of providing notice and the "probative value of agreements with long tail OEMs".  Although Plaintiffs are entitled to all OEM contracts and have requested in particular any non-standard agreements with OEMs that were specially negotiated, Plaintiffs are nevertheless willing to accept this compromise, provided that Google confirm in writing that it will not argue that any conclusions Plaintiffs draw from the

produced contracts are inaccurate because they do not take into account the full universe of OEM contracts. Plaintiffs further request a list of all OEMs with non-standard agreements whose contracts Google has not produced in this litigation. As with the smaller OEMs, Plaintiffs reserve the right to request a sample of OEM contracts from that list.

Finally, Plaintiffs request a full list of all OEMs for whom Google has produced agreements to date. If Google has produced only some of the agreements with a particular OEM but intends to produce other agreements with that OEM, Plaintiffs also ask that Google indicate as much in your response, and indicate a firm date by which Plaintiffs can expect to receive those contracts.

**6. Non-Aggression Pacts**

In Plaintiffs' letters of July 6 and July 13, Plaintiffs requested that Google promptly produce the 2016 non-aggression pact between Google and Microsoft and any communications (with Microsoft or internally) related thereto. Plaintiffs also requested that Google produce any agreements that Google has entered with OEMs, developers, or other third parties that have had an impact on the market for Android, Android apps, or Android app stores. On July 14, Google indicated that it would "respond . . . with additional information". Google has not done so. Plaintiffs again ask that Google produce the Microsoft non-aggression pact, the other agreements described above, and any communications related thereto. Please confirm Google will do so and when that will occur.

**7. Search String No. 95**

Plaintiffs have yet to receive a response to Consumer Plaintiffs' email of July 22 requesting that Google extend the search period for Search String No. 95, clarify whether it intends to run three of the code names identified by Plaintiffs thus far— "Honeycrisp" OR "GDAF" OR "Basecamp", and whether Google agrees to run the additional code name "Agave". Please promptly respond to that communication.

**8. Chrome Web Store Agreements**

In Plaintiffs' July 13 letter, Plaintiffs reiterated their requests that Google produce certain Chrome Web Store Developer Agreements. Google's July 14 letter represented that Google would produce "exemplars of agreements between Google and Chrome Web store developers between January 1, 2014 and August 13, 2020 . . . in an upcoming production." Please provide a firm date on which Google will produce these agreements. If these documents have already been produced, please identify the documents by Bates number.

**9. House Judiciary Committee Productions**

In Plaintiffs' letter of December 10, 2020, Plaintiffs specifically requested that Google produce relevant documents from the U.S. House Judiciary Committee's Investigation of Competition in the Digital Markets. Google resisted, and Plaintiffs

ultimately were forced to bring this issue before the Court.  On April 1, 2021, the Court ordered Google to "produce to plaintiffs all relevant documents that were produced by Google to the House Judiciary Committee".  (Case No. 3:21-md-02981, ECF 18.)  Four months have passed, but Google still has not produced all of these documents.

Google's July 14 letter stated that "Google has produced the vast majority of relevant documents from those that were previously produced to the House Judiciary Committee", but that "a subset of the relevant documents" have not been produced as a result of third-party confidentiality issues.  Google also stated that it "anticipat[ed] making a further production . . . in the near term".

Please confirm whether the remaining documents responsive to this request were included in Google's most recent production, or whether Plaintiffs can expect to receive further productions of House Judiciary Committee documents.  If Google intends to make further productions, please provide a firm date when Plaintiffs can expect to receive them.  Any further delay in complying with the Court's order is unacceptable.

## 10.   Communications Between Apple and Google

In Plaintiffs' July 13 letter, Plaintiffs expressed concern regarding the low number of documents Google has produced thus far that contain the domain name "@apple.com".  During the parties' meet and confer on July 16, Google confirmed that it would investigate the issue.  Please confirm whether Google has completed its investigation and provide the results and, if not, advise when it expects to complete that investigation.

## 11. Native PowerPoint Files

In Plaintiffs' July 13 letter, Plaintiffs requested that Google reproduce the native versions of all .pptx files.  Plaintiffs informed Google during the parties' July 16 meet and confer that they would provide a list of PowerPoints with a .pptx extension.  The following non-exhaustive list should illustrate the problem: GOOG-PLAY-000017271; GOOG-PLAY-000002815; GOOG-PLAY-006814475; GOOG-PLAY-004904016.  Please confirm that Google intends to correct this issue by reproducing all PowerPoints, and when Plaintiffs can expect to receive those reproductions.

## 12. Organization Information

As early as Plaintiffs' letter of December 20, 2020, Plaintiffs have been requesting that Google produce relevant organizational charts.  Plaintiffs understand that Google does not keep traditional organizational charts in its regular course of business, but, as previously explained, Plaintiffs' RFP No. 5 is not limited to "traditional" organizational charts.  As Plaintiffs explained in their December 20 letter and as Plaintiffs reiterated most recently in their July 13, 2021, letter, Plaintiffs are prepared to accept organizational, reporting and job title information—the sort of information that is commonly displayed in an organizational chart—in whatever format it exists.  In Google's July 14 letter, Google responded unsatisfactorily that "to the extent

6

organizational information exists in any of the relevant documents produced in this case, Plaintiffs have access to them." Plaintiffs therefore request that to the extent Google is aware of any organizational charts or documents that contain organizational information in Google's productions to date, Google please identify those documents by Bates number. Plaintiffs require this information to navigate Google's complex organizational structure and to prepare for depositions. Plaintiffs reserve the right to raise this issue further, including with the Court, if Google does not provide this information promptly.

**13. Source Code**

In a July 16 letter, Consumer and Developer Plaintiffs requested that Google produce certain source code that is relevant to the investigation and prosecution of this matter. On July 26, Consumer Plaintiffs reiterated its request that Google produce such material and, recognizing the sensitivity of this material, invited Google to offer a procedure that would allow for the appropriate level of protection to be accorded to that code. Please confirm that Google intends to produce such material and, if necessary, a date by which Google intends to propose a protocol related to the viewing of that material.

*        *        *

Plaintiffs are available to meet and confer on any or all of the above issues.

Sincerely,

*/s/  Lauren Moskowitz*
Lauren A. Moskowitz

Brian C. Rocca
Sujal J. Shah
Michelle P. Chiu
Minna L. Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
brian.rocca@morganlewis.com
    sujal.shah@morganlewis.com
        michelle.chiu@morganlewis.com
            minna.naranjo@morganlewis.com
                rishi.satia@morganlewis.com

7

Daniel M. Petrocelli
Ian Simmons
Benjamin G. Bradshaw
E. Clay Marquez
Stephen J. McIntyre
O'MELVENY & MYERS LLP
dpetrocelli@omm.com
  isimmons@omm.com
    bbradshaw@omm.com
      cmarquez@omm.com
        smcintyre@omm.com


Karma M. Giulianelli
Glen E. Summers
Jameson R. Jones
BARTLIT BECK LLP
karma.giulianelli@bartlitbeck.com
  glen.summers@bartlitbeck.com
    jameson.jones@bartlitbeck.com

Hae Sung Nam
Laurence D. King
KAPLAN FOX & KILSHEIMER, LLP
hnam@kaplanfox.com
 lking@kaplanfox.com


George Zelcs
Jamie L. Boyer
Stephen M. Tillery
KOREIN TILLERY LLC
gzelcs@koreintillery.com
 jboyer@koreintillery.com
  stillery@koreintillery.com
    AppConsumersDiscovery@KoreinTillery.com


Peggy J. Wedgworth
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
pwedgworth@milberg.com


Elizabeth C. Pritzker
Jonathan K. Levine
PRITZKER LEVINE LLP
ecp@pritzkerlevine.com
 jkl@pritzkerlevine.com


Nanci E. Nishimura
Mark C. Molumphy
Adam J. Zapala
Noorjahan Rahman
Elizabeth Tran Castillo
COTCHETT, PITRE & MCCARTHY, LLP
nnishimura@cpmlegal.com
 mmolumphy@cpmlegal.com
  azapala@cpmlegal.com
   nrahman@cpmlegal.com
     ecastillo@cpmlegal.com


Steve W. Berman
Robert F. Lopez
Benjamin J. Siegel
HAGENS BERMAN SOBOL SHAPIRO LLP

steve@hbsslaw.com
  robl@hbsslaw.com
    bens@hbsslaw.com


Joseph Vanek
Eamon P. Kelly
Alberto Rodriguez
SPERLING & SLATER, P.C.
jvanek@sperling-law.com
    ekelly@sperling-law.com
        arodriguez@sperling-law.com


Bonny E. Sweeney
Melinda R. Coolidge
Katie R. Beran
Scott A. Martin
Irving Scher
HAUSFELD LLP
bsweeney@hausfeld.com
  mcoolidge@hausfeld.com
    kberan@hausfeld.com
        smartin@hausfeld.com
            ischer@hausfeld.com
                DevelopersvGoogle@hausfeld.com


David N. Sonnenreich
Brian Christensen
UTAH OFFICE OF THE ATTORNEY GENERAL
dsonnenreich@agutah.gov
  bchristensen1@agutah.gov


Bryan L. Bloom
NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
Bryan.Bloom@ag.ny.gov


Diane R. Hazel
COLORADO OFFICE OF THE ATTORNEY GENERAL
Diane.Hazel@coag.gov

Jessica V. Sutton
NORTH CAROLINA DEPARTMENT OF JUSTICE
jsutton2@ncdoj.gov


Brian Wang
Paula Blizzard
OFFICE OF THE ATTORNEY GENERAL
CALIFORNIA DEPARTMENT OF JUSTICE
Brian.Wang@doj.ca.gov
   paula.blizzard@doj.ca.gov


BY EMAIL

# EXHIBIT 8

# Morgan Lewis

**Brian C. Rocca**
Partner
+1.415.442.1432
brian.rocca@morganlewis.com

August 13, 2021

**VIA E-MAIL**

Lauren Moskowitz
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

John D. Byars
Barlit Beck LLP
Courthouse Place
54 West Hubbard Street
Chicago, IL 60654

Re:     *In re Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD (N.D. Cal.)
        *Epic Games, Inc. v. Google LLC et al.*, No. 3:20-cv-05671-JD (N.D. Cal.)
        *In re Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal.)
        *In re Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792-JD (N.D. Cal.)

Dear Lauren and John:

I write in response to the issues that you both raised in your letters sent on behalf of Plaintiffs on August 2 and August 10, and as follow-up on issues discussed during our August 3 meet and confer.

**PowerPoint Quality**

Thank you for sending examples of the PowerPoint quality and readability issue Plaintiffs are encountering. Google assessed the issue and proposes reproducing all PowerPoint files affected by this issue as color JPEG files, which we believe will address the quality and readability concerns raised by Plaintiffs. Please confirm whether Plaintiffs agree to this proposal.

**Additional Custodians and Refresh Collections**

On the August 3 meet and confer, Plaintiffs stated that they had a proposal related to our ongoing discussions relating to additional custodians. We have not yet seen that proposal. Please share it with us as soon as possible.

**Morgan, Lewis & Bockius** LLP

One Market
Spear Street Tower
San Francisco, CA  94105-1596        **T** +1.415.442.1000
United States                         **F** +1.415.442.1001

Lauren Moskowitz
John D. Byars
August 13, 2021
Page 2

Plaintiffs also have resisted discussions related to refreshing the collections of certain custodians and centralized documents and data, so that the court can assess evidence of current conditions in an injunction case.  We agreed to revisit this issue on a per-custodian basis after the substantial completion date.  That date has now passed.  We'd like to begin discussions of the specific categories of documents and data that Parties will pursue in this case, particularly given our understanding of Epic's position of restricted refresh collections with respect to Tim Sweeney.

**Search Query No. 95**

Google confirms that it will add "Agave" as a term to Search Query No. 95.  In addition, Google agrees to extend the search period for Search Query No. 95 to January 1, 2010 through August 13, 2020 for all agreed upon custodians.  Google further agrees to extend the search period to March 31, 2021 for the six agreed-upon refresh custodians (i.e., Sundar Pichai, Hiroshi Lockheimer, Paul Bankhead, Tian Lim, Michael Marchak, and Sameer Samat).

**Chrome Web Store Agreements**

Google has searched for and collected exemplar Chrome Web Store agreements between January 1, 2014 and August 13, 2020 and expects to produce them by the end of next week.

**House Judiciary Committee Productions**

As stated in our prior letters, Google already produced—and for months, Plaintiffs have had access to—the vast majority of relevant documents that Google previously produced to the House Judiciary Committee in response to its Investigation of Competition in the Digital Markets.  A subset of the relevant documents, however, require Google to navigate a third-party notification process, and thus a small universe of these documents are still in that process.  As the remaining documents clear the third-party notification process, Google produces them on a rolling basis.  Indeed, most recently, on July 28, 2021 in PROD028A and PROD028B (GOOG-PLAY2-000331636 - GOOG-PLAY2-000339654), Google produced an additional set of HJC documents that were previously withheld pending completion of the third-party notification process.  There are currently fewer than one hundred relevant HJC documents that are in the third-party notification process, and Google will produce those remaining relevant documents in the near term.

**Data Requests**

Google has produced and delivered one hard drive containing transactional data to counsel for Consumer Plaintiffs, Developer Plaintiffs, and Epic as of August 13, 2021.  Google anticipates delivering a second copy of this data as requested to each group of Plaintiffs the week of August 30.

With respect to YouTube financial data, Google is in the process of finalizing this data, which required several custom and complex pulls.  We anticipate producing this data the week of August 16.  With respect to family sharing data, this data has been produced as GOOG-PLAY-007203252.

Lauren Moskowitz
John D. Byars
August 13, 2021
Page 3

**Revenue Sharing Agreements ("RSAs")**

In Plaintiffs' May 22, 2021 letter, Plaintiffs asked that Google confirm whether it has RSAs with non-OEM third parties.  On May 25, 2021 we explained that Google also has RSAs with certain wireless carriers, which Google agreed to, and has now, produced.  Plaintiffs then raised the issue of RSAs again on June 9, 2021, asking whether Google has any RSAs with any non-OEMs *other than* wireless carriers.  In our June 18, 2021 response, Google explained that it had already agreed to produce certain OEM and wireless carrier RSAs in response to RFP No. 1 consistent with the parties' discussions.  Google further explained that it agreed to search custodial files, including through the use of search terms, for documents responsive to RFP Nos. 29. 55, and 87, the overly broad, unduly burdensome, and inapposite RFPs Plaintiffs apparently relied on in seeking further documents concerning RSAs.  Plaintiffs were not satisfied with Google's response and, on July 6, 2021, requested that Google search non-custodial files for RSAs with third parties other than OEMs and carriers, citing to RFP No. 1, which by its plain terms, applies only to OEMs and carriers.  We further note the operative complaints only challenge RSAs with OEMs.  Nevertheless, on July 13, 2021, Google agreed to conduct a reasonable search of centralized repositories for RSAs relating to Google Play and Google Play Billing with non-OEMs and non-wireless carriers.  Google has completed that search and was unable to locate any revenue share agreements related to Google Play and Google Play Billing other than those with OEMs and carriers.

**Contracts with OEMs**

While Plaintiffs are amenable to Google's proposal of producing RSAs with the top 20 OEMs, which covers 90% of device activations, Plaintiffs ask that Google (1) "confirm in writing that it will not argue that any conclusions Plaintiffs draw from the produced contracts are inaccurate because they do not take into account the full universe of OEM contracts"; and (2) provide a list of all OEMs with non-standard agreements whose contracts Google has not produced in this litigation.  As for the latter request, Google will provide a list of OEMs with RSAs with Google, many of which (based on Google's investigation), will contain bespoke terms.  Google will also agree to produce a reasonable sample of RSAs with OEMs from this list.  As for the former request, Google will agree not to argue that any conclusions drawn from the produced RSAs between Google, on the one hand, and carriers and OEMs, on the other, that contain terms that restrict pre-installation of app stores and other apps with installation rights are inaccurate because they do not take into account the full universe of OEM contracts, provided that Google is permitted to rebut Plaintiffs' conclusions with fact witness and expert testimony and produced data.  Put another way, with produced data, documentary evidence, and witness testimony, Google reserves its right to show and quantify the small fraction of phones and activations that are subject to an RSA.

**Agreement with Microsoft**

We understand that the Google-Microsoft agreement to be an agreement to settle legal disputes and to disengage from advocacy activities related to legal disputes related to many different business lines.  While Plaintiffs have stated that this agreement "had an impact on the market for Android", we do not understand how Microsoft's avoidance of lodging public complaints about Google are relevant to the claims in this litigation.  Please explain.

Lauren Moskowitz
John D. Byars
August 13, 2021
Page 4

**Organization Information**

In response to Plaintiffs' request for Google to identify information or documents that contain organizational information in Google's productions to date, Google directs Plaintiffs to the following non-exhaustive list of examples:  GOOG-PLAY-000759981, GOOG-PLAY-000910948, GOOG-PLAY-004728186, GOOG-PLAY-001831248, GOOG-PLAY-002442883, GOOG-PLAY-003691843, and GOOG-PLAY-004541554.

**Source Code**

As requested in the August 3 meet and confer, Plaintiffs provided their explanation for why they are seeking source code.  While we appreciate that information, the explanation is incomplete on many levels.  We list several examples:

First, while Plaintiffs have noted that they allege that Google used "technical barriers" to foreclose competition, it's still unclear what types of technical barriers Plaintiffs believe require the review of source code.  For example, Plaintiffs request "any source code that implements any processes that a user must go through to install apps or app stores outside of Google Play, including the 'unknown sources' process."  As Plaintiffs know, users allow their devices to download from unknown sources by adjusting their user settings; we do not believe this is a technical barrier or one that requires an analysis of source code to understand.  Simply put, source code written to implement Google's business decisions contain numerous trade secrets and Plaintiffs have failed to establish why they need access to those trade secrets.  Google requests that Plaintiffs explain for each source code request, the "technical barriers" it wishes to understand and why source code is the probative source of information, so that we can consider each of Plaintiffs' specific source code requests and whether there is a less burdensome source of information that Google can provide.

Second, Plaintiffs include requests for source code that do not appear to even relate to "technical barriers".  For example, Plaintiffs request source code "that implements in-app purchase functionality within Android devices." Please explain how this analysis of this code is relevant to your claims in this case.

Third, beyond source code, Plaintiffs request "training data related to ML-based models or other heuristics" used for detecting malware.  This request is overly broad and unduly intrusive.  Please explain how Google's proprietary training data is relevant to your claims in this case.

Google also notes that for some of these requests, the responsive source code may not be in Google's possession, custody, or control.  Modifications to the process of sideloading applications, or that override the functionality within AOSP, should be sought from third parties, i.e., OEMs.  Code related to warnings given by individual apps should be sought from the developer of such apps.

**Instant Messages**

As previously explained on meet and confer calls, without disclosing  information protected by the attorney-client privilege and/or attorney work product doctrine, we can confirm that chats are subject to the litigation hold and that Google has collected and produced relevant chats for custodians that are responsive to Plaintiffs' discovery requests.  As requested on the August 3

Lauren Moskowitz
John D. Byars
August 13, 2021
Page 5

meet and confer, Google is providing non-exhaustive Bates numbers of examples of chats to the extent helpful for Plaintiffs to locate them:  GOOG-PLAY-000326905, GOOG-PLAY-000353866, GOOG-PLAY-000087767, GOOG-PLAY-000807392, GOOG-PLAY-002343851, and GOOG-PLAY-002044243.  Unfortunately, we do not have a metadata field that can be used to easily identify chats within the production.

Plaintiffs have articulated what they say are deficiencies in Google's production of chats.  However, we disagree.  Like many companies, Google's chats are not retained in the normal course of business.  Chats are kept by default for only 24 hours in the usual course of business.  To the extent a custodian was using chats before these lawsuits were filed, Google had no obligation to preserve those chats.  Thus, we do not expect that we would have records of "pings" discussed in emails that were dated prior to this lawsuit, as identified in your August 2 letter.

We understand that Google custodians use Google Chats and Google Hangouts as their primary chat tools.  Google does not believe that there are responsive chats on other messaging software, including WhatsApp, Slack, Jabber, or Microsoft Teams, but will agree to confirm and produce any responsive chats from other messaging software, to the extent they exist.

**Text Messages**

Google previously conducted a reasonable and diligent inquiry to determine whether it was likely that its custodians would possess responsive information in the form of SMS text messages or other messaging apps.  Without disclosing information protected by the attorney-client privilege and/or attorney work product doctrine, Google determined that it was unlikely that responsive information would exist in these formats and it was not proportionate to the needs of the case to undertake the burden to collect such information given that determination.  In response to Plaintiffs' July 15 inquiry, as you are aware, Google undertook additional analysis to investigate this issue.  Our conclusion remains the same.  Of the examples that Plaintiffs shared with Google, many references to the use of texts were from many years ago, and certainly before this litigation was filed.  Moreover, the references to the use of texts appear to be largely logistical or administrative, such as availability for scheduling meetings.  These limited examples are not sufficient to warrant the burden of collecting and searching individual users' text messages on their personal devices.  Nevertheless, in the interest of moving forward on this issue, Google will agree to  review text messages sent and/or received by custodians who used such messaging to communicate about information that is otherwise responsive, and, to the extent Google is able to identify any relevant communications within the search period after a reasonable and diligent search, Google will produce those messages.

**Individualized Contracts with App Developers, including Facebook**

As mentioned in our prior correspondence, Google is obligated to provide notice to developers whose agreements would be produced in light of Google's commitment to produce contracts relating to the developer programs cited in our July 14, 2021 letter.  Google anticipates that it will begin producing these contracts next week.  Google also investigated the existence of additional, relevant developer programs, and will be producing exemplars of Play Points and NBO/Play Pass agreements.

Lauren Moskowitz
John D. Byars
August 13, 2021
Page 6

As for agreements with Facebook, as discussed on our August 2, 2021 meet and confer, the Free Basics 2.0 agreement Plaintiffs previously identified relates not to Play but to Search, and Google does not believe it is relevant.  Nor does it appear that Facebook is a part of any of the developer programs for which Google has agreed to produce agreements.  Plaintiffs' August 10, 2021 letter raises again the issue of Facebook agreements, claiming that public news reports, the Texas AG complaint, and documents in Google's production show that there exist relevant agreements with Facebook, yet Plaintiffs appear to describe potential agreements relating to advertising and Facebook's "app ad" distribution business.[1]  Google does not see how these agreements bear on the issues in this case, which is about Google Play and the app distribution market, not advertising.  Plaintiffs also make reference to preinstallation of Facebook apps on certain Android devices.  Any agreements to preinstall Facebook apps on devices would be between Facebook and the relevant OEMs.  Finally, Plaintiffs refer to potential agreements that would give Facebook a share of Google advertising revenues to disincentivize Facebook from "v[ying] for a prominent position for competing application distribution services."  While Plaintiffs do not specify what Facebook app distribution services they contend competes with Google Play, Google is investigating the existence of joint marketing or revenue share agreements with Facebook related to app distribution.

**Agreement related to Search on iOS devices**

Google's position remains that its agreement with Apple related to Search on iOS devices is irrelevant and simply not probative of any of Plaintiffs' claims regarding Google Play and Android app distribution.  However, to avoid burdening the Court, Google is considering a compromise position to resolve this discovery issue, which may include certain redactions.  Google is working through these issues with Apple.  Any production of the agreement would be with a Non-Party Highly Confidential – Outside Counsel Eyes Only designation.  Google requests an additional week to work through the specifics with Apple regarding this potential compromise production.

**Communications Between Apple and Google**

Google confirms that it had applied all of the agreed upon search queries to all of the agreed upon custodians and has produced relevant communications with Apple.  As noted above, Google is undertaking to  reach a compromise position relating to the agreement related to Search on iOS devices.  If that compromise is acceptable, Google may also be willing to arrive at an agreement relating to review and produce some additional, limited communications related to this agreement.

\*       \*       \*

---

[1] Google believes that Plaintiffs' citation in the August 2, 2021 to GOOG-PLAY-001593726 was in error, as that Bates number does not appear at the beginning of any document in Google's production.  To the extent Plaintiffs believe specific documents in Google's production demonstrate the relevance of specific agreements with Facebook to the issues in this litigation, Google will consider them.

Lauren Moskowitz
John D. Byars
August 13, 2021
Page 7


We look forward to discussing these issues further on our omnibus meet and confer scheduled for
August 17.


Sincerely,


Brian C. Rocca

cc:     Yonatan Even (yeven@cravath.com)
        Eric Zepp (ezepp@cravath.com)
        Timothy Cameron (tcameron@cravath.com)
        Jamie L. Boyer (jboyer@koreintillery.com)
        Stephen M. Tillery (stillery@koreintillery.com)
        Karma M. Giulianelli (karma.giulianelli@bartlitbeck.com)
        Glen E. Summers (glen.summers@bartlitbeck.com)
        Jameson R. Jones (Jameson.jones@bartlitbeck.com)
        Steve W. Berman (steve@hbsslaw.com)
        Rob F. Lopez (robl@hbsslaw.com)
        Ben J. Siegel (bens@hbsslaw.com)
        Bonny E. Sweeney (bsweeney@hausfeld.com)
        Melinda R. Coolidge (mcoolidge@hausfeld.com)
        Katie R. Beran (kberan@hausfeld.com)
        DevelopersvGoogle@hausfeld.com
        Peggy J. Wedgworth (pwedgworth@milberg.com)
        Elizabeth C. Pritzker (ecp@pritzkerlevine.com)
        Jonathan K. Levine (jkl@pritzkerlevine.com)
        Laurence D. King (lking@kaplanfox.com)
        Mario M. Choi (mchoi@kaplanfox.com)
        Hae Sung Nam (hnam@kaplanfox.com)
        Mark C. Molumphy (mmolumphy@cpmlegal.com)
        Adam J. Zapala (azapala@cpmlegal.com)
        Noorjahan Rahman (nrahman@cpmlegal.com)
        Eric H. Gibbs (ehg@classlawgroup.com)
        Andre M. Mura (amm@classlawgroup.com)

# EXHIBIT 9



Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Phone: 212.687.1980
Fax: 212.687.7714
Email: mail@kaplanfox.com
www.kaplanfox.com

August 30, 2021

**By Email**

Brian C. Rocca
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105-1596
brian.rocca@morganlewis.com

Re:     *In re: Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.);
        *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
        *In re Google Play Consumer Antitrust Litig.*, No. 3:20-cv-05761-JD (N.D. Cal.);
        *In re Google Play Developer Antitrust Litig.*, No. 3:20-cv-05792-JD (N.D. Cal.)

Dear Brian:

Plaintiffs write to further address several important discovery issues that, due to time constraints, were not discussed during our August 24 meet-and-confer.

**Texts and Instant Messages**: In our August 17 meet-and-confer, Google stated that it was continuing to investigate whether custodians have relevant text messages and would confirm that the devices at issue were company devices. Google also stated that it was double checking other non-custodial databases, such as other litigation-related repositories, where relevant texts or instant messages may have been maintained for the relevant custodians. In its August 13 letter, Google said it would confirm whether there are responsive chats on other messaging software, such as WhatsApp, Slack, Jabber and Microsoft Teams. Please provide Plaintiffs with an update on these investigations in our upcoming meet-and-confer, scheduled for Tuesday, August 31.

To the extent that Google claims that there are no relevant, additional instant messages or texts to produce, Plaintiffs request that Google provide, in writing, details regarding the steps taken to identify relevant materials, including but not limited to: the non-custodial databases searched, the custodians whose texts and instant messages were searched, the relevant time period applied to those searches, and the search terms applied.

In our August 17 meet-and-confer, Plaintiffs raised the issue of missing dates in Google's instant message production, and Google requested we share examples of the issue. On August 18, Plaintiffs sent Google a list of the Bates numbers corresponding to these documents. Please confirm that Google intends to produce date information for all instant messages and provide an expected date on which Google expects to correct this deficiency.



B. Rocca
August 30, 2021
Page 2

**Revenue Share Agreements**: In Plaintiffs' June 9 letter, Plaintiffs asked Google to "confirm whether Google has revenue sharing agreements between any non-OEM third parties other than wireless carriers that relate to Google Play, Google Play Billing, **or Android OS**" (emphasis added). In its June 18 letter, Google committed to produce "revenue share agreements with any non-OEMs other than wireless carriers relating to Google Play, Google Play Billing, or Android OS". Plaintiffs' August 2 letter asked Google whether it had completed its search of central repositories for non-OEM and non-carrier RSAs. On August 13, Google stated that it "ha[d] completed that search and was unable to locate any revenue share agreements related to Google Play and Google Play Billing other than those with OEMs and carriers." Please confirm whether Google's search included non-OEM and non-carrier revenue share agreements that relate to Android OS, in addition to Google Play and Google Play Billing.

**Source Code**: On August 17, 2021, Consumer and Developer Plaintiffs responded to Google's August 13 letter by providing a detailed response as to why we need to inspect Google's source code. Please provide a date by which you will respond to that letter so that we may constructively resolve this issue.

**Microsoft Non-Aggression Pact**: Plaintiffs have previously requested that Google produce the Google-Microsoft 'non-aggression pact' agreement. Google responded on August 13 that it did not understand how "Microsoft's avoidance of lodging public complaints about Google are relevant to the claims in this litigation." In further support of that position, Google has further stated that the Google-Microsoft pact was a settlement agreement that regarded ongoing patent and other legal disputes between the parties. But emails by the former Head of Google Business Development for Android across Europe, the Middle East and Africa from the period shortly before the agreement may have been entered into seems to undercut Google's argument. Specifically, that employee noted that Microsoft's had lodged public complaints about Google as "part of a broader MSFT effort—that as you know includes patent threats and litigation against Android partners—to discourage or impede their use of Android." GOOG-PLAY-001361681. If the non-aggression pact was entered into by Google because of threats by Microsoft to impede the "use of Android" then the agreement, and non-privileged communications related thereto, would be squarely relevant to this litigation. Plaintiffs therefore reiterate our request that Google promptly produce this agreement. Please advise whether you will do so.

**Organizational Charts**: As early as December 20, 2020, Plaintiffs requested that Google produce certain relevant organizational chart information. Google has consistently stated in response that it does not keep traditional organizational charts in its regular course. Plaintiffs then noted that RFP No 5 is not limited to "traditional" organizational charts. As Plaintiffs explained in their December 20 letter and reiterated in their July 13 and August 8, 2021 letters, Plaintiffs are prepared to accept organizational reporting and job title information—the sort of information that is commonly displayed in an organizational chart—in whatever format it exists. In response to that request, Google responded unsatisfactorily that "to the extent organizational information exists in any of the relevant documents produced in this case, Plaintiffs have access to them." Plaintiffs followed-up by requesting that Google identify by Bates number any organizational charts or documents that contain organizational information in Google's productions to date. Plaintiffs



require this information to navigate Google's complex organizational structure and to prepare for depositions.

Google's August 13 response identified a "non-exhaustive list of examples" including GOOG-PLAY-000759981, GOOG-PLAY-000910948, GOOG-PLAY-004728186, GOOG-PLAY-001831248, GOOG-PLAY-002442883, GOOG-PLAY-003691843, and GOOG-PLAY-004541554. Google's list is rife with deficiencies such as charts or lists without relevant dates and containing a miniscule number of employees, or documents which concern areas of Google's business structure not at issue in this litigation. Additionally, GOOG-PLAY-000759981 is unreadable in its current form. Plaintiffs renew our request that Google continue to search through its productions to identify relevant organizational charts or documents that contain organizational information in Google's productions to date.

In addition, Plaintiffs recently discovered that Google may have an "official 'org chart'" for at least the Play Organization known as the "Teams tool", which at the very least, contains all the reporting relationships within that organization. GOOG-PLAY-004716793. We therefore request that Google immediately produce the information contained in the "Teams tool" or otherwise provide sufficient information to ascertain that the "Teams tool" is not responsive to our request for organizational chart information. Consumer Plaintiffs further request that Google treat this as a priority request.

**Individualized Contracts with App Developers, including Facebook Agreements and NDAs**: In Plaintiffs' August 2 letter, Plaintiffs requested that Google provide an update on its productions of individualized agreements or contracts with all developers participating in (1) "Project Hug" (Games Velocity Program); (2) App Velocity Program; (3) Living Room Accelerator Program (both LiveTV and Video); (4) Audio Accelerator Program; and (5) Subscribe w/ Google. Plaintiffs also requested an update on Google's commitment to "investigate whether there are additional developer programs . . . determined to be relevant to the issues in this litigation." Google's August 13 letter confirmed that "it will begin producing these contracts next week". Google further confirmed that it had "investigated the existence of additional, relevant developer programs, and will be producing exemplars of Play Points and NBO/Play Pass agreements."

Plaintiffs request that, in addition to exemplars, Google provide individualized agreements or contracts with **all** developers participating in the "Play Points and NBO/Play Pass agreements." Alternatively, Plaintiffs would be willing to accept a list of developers with whom Google maintains such agreements, accompanied by Google's commitment to produce agreements with specific developers upon request from Plaintiffs. Please confirm when Plaintiffs will receive the exemplar agreements and the approach Google prefers to take with respect to the remaining Play Points and NBO/Pass Play agreements. Please also confirm that Google has identified no other relevant developer programs other than those described above.

Furthermore, on July 16, 2021, Plaintiffs requested that Google produce relevant agreements with Facebook. Plaintiffs again reiterated our request on several occasions, including most recently, on August 10, 2021. Google stated in its letter on August 13 that it was investigating



certain "joint marketing or revenue share agreements with Facebook related to app distribution." Please advise whether Google has completed that investigation, and whether Google expects to produce any relevant documents.

Relatedly, it has come to our attention that Google may have entered into various, distinct non-disclosure agreements related to issues material to this litigation, including but not limited to the Play Store and app updates. GOOG-PLAY-001785799. Please confirm that your investigation into (and production of) the various agreements requested in this litigation includes any separate NDA that Google may have entered related to the issue in this litigation, as well as any communications made to or "under NDA." *Id.* To be clear, this request encompasses **any** NDA Google may have entered with any third-party that is relevant to this litigation, including but not limited to any developer, OEM, or carriers.

**Contracts with OEMs**: Plaintiffs' August 2 letter requested that Google confirm whether it "has finished producing" the subset of "certain smaller OEMs among those listed in Appendix G to Google's April 19 letter" that Plaintiffs have requested and to "identify them by Bates number." Google's August 13 letter did not respond to this request. Please promptly respond to this inquiry.

Plaintiffs' August 2 letter accepted Google's compromise that it "produce[] RSAs with the top 20 OEMs, covering 90% of device activations worldwide (excluding China)" provided that "Google confirm in writing that it will not argue that any conclusions Plaintiffs draw from the produced contracts are inaccurate because they do not take into account the full universe of OEM contracts". Google's August 13 letter stated that "Google will agree not to argue that any conclusions drawn from the produced RSAs between Google . . . and carriers and OEMs . . . that contain terms that restrict pre-installation of app stores and other apps with installation rights are inaccurate because they do not take into account the full universe of OEM contracts, provided that Google is permitted to rebut Plaintiffs' conclusions". Google further stated that it "reserves its right to show and quantify the small fraction of phones and activations that are subject to an RSA." This is inconsistent with Google's representation that the "produced RSAs with the top 20 OEMs, cover[] 90% of device activations worldwide (excluding China)". Please explain how Google intends to reconcile these two contradictory positions. Considering these representations, Plaintiffs reserve their rights to request the full universe of RSAs Google has entered into with OEMs.

Additionally, Plaintiffs requested in our August 2 letter that Google produce "a list of all OEMs with non-standard agreements whose contracts Google has not produced in this litigation". Google's August 13 letter stated that it will produce such a list. Please provide Plaintiffs with an expected date on which we can expect this list. Plaintiffs reiterate that they reserve the right to request a sample of OEM contracts from that list and note Google's response that it "will agree to produce a reasonable sample of RSAs with OEMs from this list."

Finally, Plaintiffs' August 2 letter also requested that Google provide a "a full list of all OEMs for whom Google has produced agreements to date" and that Google note in its response "[i]f Google has produced only some of the agreements with a particular OEM but intends to produce other agreements with that OEM". Google's August 13 letter did not respond to this



request. Please promptly respond to this inquiry and provide Plaintiffs with a date on which we can expect to receive this list.

**House Judiciary Committee ("HJC") Productions**: In Plaintiffs' August 2 letter, Plaintiffs requested that Google "confirm whether the remaining documents responsive to this request were included in Google's most recent production, or whether Plaintiffs can expect to receive further productions of House Judiciary Committee documents". Google's August 13 response represented that there were "fewer than one hundred relevant HJC documents that are in the third-party notification process" and that Google would produce "those remaining relevant documents in the near term." Please provide Plaintiffs with a date on which Plaintiffs can expect to receive these remaining documents, and confirm that Google will inform Plaintiffs in its production letter when the HJC productions are complete.

**KFTC Investigation**: Plaintiffs' June 21 letter requested that Google produce certain relevant materials from the KFTC investigation. Plaintiffs reiterated this request in our July 13 letter, in our meet-and-confer on July 21, and then again in our August 17 meet and confer. Google promised—on both the July 21 and August 17 meet-and-confer—to provide a direct response to this request, but to date, has failed to do so.

To be clear, this is not a "clone discovery" request. We are narrowly seeking documents related to: (1) allegations that Google blocked local smartphone makers such as Samsung Electronics from using other operating systems; (2) allegations that Google forced developers to publish their games only to Google's Play Store; and (3) "any market studies or reports that the KFTC or Google may have prepared or exchanged in response to this investigation."

Please advise whether you agree to produce the documents requested.

**Native Power Point Files**: In Plaintiffs' August 2 letter, Plaintiffs requested that Google reproduce the native versions of all .pptx files and in response to a request from Google produced a non-exhaustive list of .pptx files affected by Google's deficient production. Google's August 13 letter proposed "reproducing all PowerPoint files affected by this issue as color JPEG files". Plaintiffs have identified color PowerPoint JPEG files in Google's productions that present the same issues relating to legibility such as "GOOG-PLAY-007209362" and "GOOG-PLAY-007207518". Therefore, Plaintiffs reject this offer and renew our request for the reproduction of all PowerPoints in their native .pptx format.

Relatedly, on August 17, during our meet-and-confer, Google agreed to provide an overlay production for certain PowerPoint presentations that were not legible. Please advise when Google expects to make this overlay production.

**YouTube Data**: In Google's July 14 letter, Google stated that it "will be producing YouTube financial data **and app usage data** the week of July 19" (emphasis added). However, Google did not produce these data during the week of July 19, and later in Google's August 13 letter, represented that it would produce "YouTube financial data" the week of August 16. Please confirm that Google has, in fact, produced the YouTube financial data. If so, please provide the Bates number(s) associated with these data.



Moreover, while Google represented that it would also be producing YouTube app usage data in its July 14th letter, in its August 13 letter it did not reference such data. Please confirm whether Google has already produced these data, and if produced, please provide the Bates number(s) associated with these data. If, however, the YouTube app usage data have not been produced, please provide a date certain by which it will be produced.

**Transactional Data**: In Google's August 13 letters, Google represented that it "anticipates delivering a second copy of [the transactional] data as requested to each group of Plaintiffs the week of August 30". Plaintiffs understand that this hard drive will contain exact duplicates of the transactional data that were previously produced via hard drive the weeks of July 26 and August 2. Please confirm whether Plaintiffs' understanding is correct, and whether Google has completed its production of transactional data in response to Plaintiffs' Requests for Production. If Google's transactional data production is incomplete, please confirm which transactional data have yet to be produced and a date by which Google will produce these data.

Google also stated in the August 24 meet-and-confer that it would respond to certain non-transactional data questions posed by Melinda Coolidge by the end of next week—or September 3, 2021. Please confirm that you are on track to respond by then. Relatedly, Developer Plaintiffs emailed Google on August 19 requesting Google produce a data dictionary and JSON schema. Please promptly respond to this request.

Sincerely,

/s/ Hae Sung Nam

Hae Sung Nam



Brian C. Rocca
Sujal J. Shah
Michelle P. Chiu
Minna L. Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
brian.rocca@morganlewis.com
sujal.shah@morganlewis.com
michelle.chiu@morganlewis.com
minna.naranjo@morganlewis.com
rishi.satia@morganlewis.com

Daniel M. Petrocelli
Ian Simmons
Benjamin G. Bradshaw
E. Clay Marquez
Stephen J. McIntyre
O'MELVENY & MYERS LLP
dpetrocelli@omm.com
isimmons@omm.com
bbradshaw@omm.com
cmarquez@omm.com
smcintyre@omm.com

Yonatan Evans
Timothy Cameron
Lauren Moskowitz
Eric Zepp
Zachary Jarrett
CRAVATH, SWAINE & MOORE LLP
yevans@cravath.com
tcameron@cravath.com
lmoskowitz@cravath.com
ezepp@cravath.com
zjarrett@cravath.com

Steve W. Berman
Robert F. Lopez
Benjamin J. Siegel
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com
robl@hbsslaw.com
bens@hbsslaw.com

Joseph Vanek
Eamon P. Kelly
Alberto Rodriguez
SPERLING & SLATER, P.C.
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

Bonny E. Sweeney
Melinda R. Coolidge
Katie R. Beran
Scott A. Martin
Irving Scher
HAUSFELD LLP
bsweeney@hausfeld.com
mcoolidge@hausfeld.com
kberan@hausfeld.com
smartin@hausfeld.com
ischer@hausfeld.com
DevelopersvGoogle@hausfeld.com

BY EMAIL

# EXHIBIT 10

# Morgan Lewis

**Brian C. Rocca**
Partner
+1.415.442.1432
brian.rocca@morganlewis.com

<span style="color:red">**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**</span>

September 17, 2021

**VIA E-MAIL**

Hae Sung Nam
Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, NY 10022

Re:     *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.);
        *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
        *In re Google Play Consumer Antitrust Litig.*, No. 3:20-cv-05761-JD (N.D. Cal.);
        *In re Google Play Developer Antitrust Litig.*, No. 3:20-cv-05792-JD (N.D. Cal.)

Dear Hae:

We write in response to your August 30 letter regarding a number of discovery issues.

**Text and Instant Messages**

Google continues to investigate whether custodians have relevant text messages.  That investigation is still underway, and we are assessing device collection on a custodian-by-custodian basis.  To the extent Google has identified responsive text messages based on its investigation to date, such messages will be included in forthcoming productions.

With respect to the missing dates in certain instant messages produced by Google.  As explained in our August 31 meet and confer, Google does not have date metadata for any chats prior to 2012.  As a workaround for this issue, we included all chats that hit on search terms for custodians that have starting date ranges earlier than 2012.  In other words, we deferred on the side of being overinclusive and may have produced chats dated earlier than our agreed-upon date ranges.

**Revenue Share Agreements**

Plaintiffs' August 30, 2021 letter misstates the parties' prior correspondence.  In our June 18, 2021 letter, Google did not "commit[] to produce 'revenue share agreements with any non-OEMs other than wireless carriers relating to Google Play, Google Play Billing, or Android OS.'"  Rather, Google noted that in response to Plaintiffs' RFP Nos. 29, 55, and 87--the RFPs relied on in requesting that Google confirm whether it had any revenue share agreements with any non-OEMs other than carriers relating to Google Play, Google Play Billing, and Android OS--Google agreed to search

Hae Sung Nam
September 17, 2021
Page 2

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

custodial files for responsive documents including through the use of search terms.[1]  To the extent responsive documents were located in custodial files, Google committed to producing them. Plaintiffs then asked Google in their July 6, 2021 letter to search centralized repositories for non-OEM and non-carrier revenue share agreements, relying on Plaintiffs' RFP No. 1.  As Google explained in our July 14, 2021 letter, RFP No. 1, by its own terms, seeks only agreements between Google and OEMs and wireless carriers, so non-OEM and non-carrier agreements are not responsive to that request.  Nevertheless, in an effort to resolve the parties' dispute over the issue, Google agreed to "conduct a reasonable search of relevant centralized repositories for revenue share agreements relating to Google Play and Google Play billing with non-OEMs and non-wireless carriers."  Plaintiffs did not object to Google's offer, and Google undertook the search it said it would conduct.  Google does not believe that any further investigation into revenue share agreements with non-OEMs and non-carriers relating to Android OS is necessary or proportional to the needs of the case.  Nor does Google understand exactly what other revenue share agreements Plaintiffs have in mind.  That said, Google can confirm that it has searched for and is producing, subject to the parties' agreements through the meet-and-confer process, revenue share agreements relevant to the issues in this case—that is revenue share agreements with app store or installer preinstallation restrictions.

**Source Code**

In light of the Court's comments at the September 9, 2021 case management conference and as discussed on the September 14 meet and confer, Google will be proposing a supplemental protective order relating to source code for Plaintiffs' review under a separate cover letter and will provide a proposal for responsive source code for Plaintiffs' review.

**Microsoft Non-Aggression Pact**

As we previously explained to Plaintiffs, we do not believe the Microsoft agreement is relevant, as the document is merely an agreement to settle legal disputes and to disengage from advocacy activities related to legal disputes related to many business lines.  The document cited in Plaintiffs' latest letter merely confirms our previous explanation.  Your continued claim that the agreement is "squarely related" to this litigation is unsupported and you have yet to explain how it could possibly be related to any of your claims, which focus on app distribution on Android.  Again, we ask that Plaintiffs explain how such a settlement agreement is relevant to this litigation.

**Organizational Charts**

In response to Plaintiffs' request for organizational charts, Google informed Plaintiffs that it does not keep such charts in the ordinary course, but any such charts that appear in custodial files would be produced.  Google did so, and even pointed out examples in its production.  While Plaintiffs may be unsatisfied with claimed "deficiencies" of such organizational charts, and requests that Google "continue to search through its production to identify relevant organizational charts that contain organizational information in Google's productions to date," Plaintiffs have the same

---

[1] Google also noted that RFP Nos. 29, 55, and 87 are overbroad and unduly burdensome, and do not even appear to seek revenue share agreements between Google and non-OEM third parties.

Hae Sung Nam
September 17, 2021
Page 3

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

ability to search the production for organizational charts as Google.  Google will not undertake to do Plaintiffs' work for them.

As for Plaintiffs' broader request for employee information that contains "organizational reporting and job title information," Plaintiffs point to a "Teams" tool.  The Teams tool is an employee directory that includes reporting relationships for employees.  Google is willing to query and produce reporting information for all agreed upon custodians.

**Individualized Contracts with App Developers, including Facebook Agreements and NDAs**

Plaintiffs ask for updates concerning the production of exemplars of Play Points and NBO/Play Pass agreements, and requests that Google also produce any individualized contracts with any developers in these programs.  Google anticipates producing exemplar Play Points agreements next week and exemplar NBO/Play Points agreements once notice has been provided to relevant third parties.  Google will also provide a list of developers in these programs, so that Plaintiffs can identify a reasonable sample of developers for which Google would produce the relevant Play Pass or Play Points agreements, after providing notice to the developers.  Google is unaware of any additional developer agreements relevant to the issues in this case.

Plaintiffs also ask for an update on Google's investigation into Facebook agreements.  As an initial matter, Plaintiffs say that Google "stated in its letter on August 13 that it was investigating certain 'joint marketing or revenue share agreements with Facebook related to app distribution.'"  To be clear, Google never represented that any such agreements existed and stated only that it was investigating whether any such agreements did exist.  After a reasonable search, Google did not locate any joint marketing or revenue share agreements with Facebook related to app distribution.

Plaintiffs ask that Google confirm its investigation of agreements including investigation into "any NDA that Google may have entered related to the issue[s] in this litigation, as well as any communications made to or 'under NDA.'"  Plaintiffs fail to cite any discovery request that NDAs would be responsive to.  And the document cited in Plaintiffs' letter does not suggest that the NDA mentioned between Google and Facebook is relevant to any issues in this case, nor do Plaintiffs explain how it would be relevant.  Finally, and most importantly, Google has produced communications from custodial files hitting on relevant search terms, including communications made with third parties under NDAs, and is working to resolve NDA issues prior to producing additional documents.

**Contracts with OEMs**

Google has completed producing the agreements with the subset of smaller OEMs.  Attached here as **Exhibit A** is an appendix of the agreements and Bates numbers.

As for the RSAs with OEMs, Plaintiffs ask Google to explain the apparent contradiction between Google's production of RSAs with the top 20 OEMs which cover 90% of device activations worldwide (excluding China) and Google's reservation of rights to show and quantify the small fraction of phones and activations that are subject to an RSA.  To clarify, Google reserves its right to show and quantify the small fraction of phones and activations that are subject to the Premier Device Program.

Hae Sung Nam
September 17, 2021
Page 4

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

Plaintiffs ask for an update on when Google will provide a list of OEMs with RSAs.  Google is working on preparing a list of OEMs with which it has entered into an RSA.

Finally, Plaintiffs ask for a full list of all OEMs for whom Google has produced agreements to date. Google is willing to meet and confer regarding Plaintiffs' need for such a list.

### House Judiciary Committee ("HJC") Productions

A very small subset of the relevant HJC documents are still in the NDA notice process and Google continues to work with third-parties pursuant to operative confidentiality agreements to resolve all open issues.  Google continues to produce these documents on a rolling basis as these documents clear the third-party notification process and will inform Plaintiffs in its production letter when the HJC productions are complete.

### Cloned Discovery

Plaintiffs' cloned discovery request for discovery into discovery in the Korean Fair Trade Commission (KFTC) investigation is an inappropriate expansion of the scope of discovery into completely foreign investigations and an apparent attempt to relitigate issues that Judge Donato already resolved.  Judge Donato was clear at the April 1 Status Conference when he limited the scope of his order to Google's documents produced in response to the House Judiciary Committee's investigation. With respect to investigations on *foreign soil*, for example, Judge Donato stated that "[o]n the EU side . . . the competition regimes are different" and that "Europe sounds . . . maybe a couple kilometers too far away from this case." April 1, 2021 Status Conference Tr. 19:16-10; 23:7-10.  Thus, if, according to Judge Donato, Europe is "a couple of kilometers too far away from this case," then the alleged KFTC investigation is even further afield and irrelevant to this litigation as it is predominantly Korea-based.

Moreover, beyond citing a single news article in one of your letters, Plaintiffs have not provided an appropriate basis for this request nor have Plaintiffs explained why Google's voluminous productions to date aren't enough. Google has already produced, and Plaintiffs have access to nearly 1.5 million documents and millions of rows of data. Plaintiffs' previous attempts to justify their "cloned discovery" by arguing that it is "a low-hanging fruit" and that "it would actually be a way to minimize the burden on Google and expedite the discovery at the same time" was unpersuasive then and is completely moot now.  April 1, 2021 Status Conference Tr. 17:7-17. Google has produced over 6 million pages of documents and has already undergone significant burden and cost in responding to Plaintiffs' sweeping discovery requests.  Even if these requests were proper or relevant, there is no efficiency to be obtained through cloned discovery.

### Native PowerPoint Files

Google has already agreed to reproduce all PowerPoints as color JPEG files to address the legibility issues raised by Plaintiffs.  Plaintiffs provide two examples of JPEG files for which there are legibility issues, one Bates number "GOOG-PLAY-007209362" that appears to have been transcribed incorrectly and "GOOG-PLAY-007207518".  Google is willing to provide GOOG-PLAY-007207518 in native .pptx format and would be open to discussing the production of a discrete set of documents that may continue to have legibility issues.  However, based on a review of the examples previously provided by Plaintiffs in their August 2 letter, we believe the vast majority of

Hae Sung Nam
September 17, 2021
Page 5

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

presentations will be cured by Google's offer to produce color JPEG files.  Producing replacement native files for the nearly ~42,000 produced PowerPoint presentations would exponentially increase the size of Google's productions and require Google to review and strip the hyperlinks to internal documents to prevent the possibility of inadvertent communications between opposing counsel and Google's business teams.  The burden and cost of doing so outweighs Plaintiffs' needs, particularly when Google believes the less burdensome proposed fix will cure the issue for the vast majority of documents.

**YouTube Data**

Google has produced app usage data, including for YouTube, as GOOG-PLAY-007125806.  Google has collected YouTube financial data and it was produced on September 10th as GOOG-PLAY-007280509 and GOOG-PLAY-007280510.

**Transactional Data**

Google has completed its production of transactional data.  The second copies were delivered to each group of plaintiffs on August 25, 2021.  As for Plaintiffs' request for a data dictionary, Google already produced the data schema in proto format, which is the closest thing Google has to a data dictionary.  *See* GOOG-PLAY-000000001, GOOG-PLAY-000000033, GOOG-PLAY-000000039, GOOG-PLAY-000000041, and GOOG-PLAY-000000087.

\*       \*       \*

We are available to discuss these issues at the next scheduled meet and confer.

 Sincerely,

Brian C. Rocca

cc:     Yonatan Even (YEven@cravath.com)
        Lauren Moskowitz (lmoskowitz@cravath.com)
        Justin C. Clarke (jcclarke@cravath.com)
        Eric Zepp (ezepp@cravath.com)
        Zachary Jarrett (zjarrett@cravath.com)
        Daniel Ottaunick (dottaunick@cravath.com)
        Bonny E. Sweeney (bsweeney@hausfeld.com)
        Melinda R. Coolidge (mcoolidge@hausfeld.com)
        Katie R. Beran (kberan@hausfeld.com)
        Alberto Rodriguez (arodriguez@sperling-law.com)
        Steve W. Berman (steve@hbsslaw.com)
        Rob F. Lopez (robl@hbsslaw.com)
        Ben J. Siegel (bens@hbsslaw.com)
        Karma M. Giulianelli (karma.giulianelli@bartlitbeck.com)

Hae Sung Nam
September 17, 2021
Page 6

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

Jamie L. Boyer (jboyer@koreintillery.com)
Aaron Schwartz (ASchwartz@kaplanfox.com)

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Exhibit A

| Production::Begin Bates | Production::End Bates | Partner Name |
|---|---|---|
| GOOG-PLAY-000416323 | GOOG-PLAY-000416326 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416327 | GOOG-PLAY-000416341 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416369 | GOOG-PLAY-000416372 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416398 | GOOG-PLAY-000416418 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416420 | GOOG-PLAY-000416420 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416441 | GOOG-PLAY-000416441 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416447 | GOOG-PLAY-000416447 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416477 | GOOG-PLAY-000416497 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416498 | GOOG-PLAY-000416502 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000808141 | GOOG-PLAY-000808142 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000808149 | GOOG-PLAY-000808152 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416537 | GOOG-PLAY-000416561 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416594 | GOOG-PLAY-000416594 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416595 | GOOG-PLAY-000416599 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416604 | GOOG-PLAY-000416650 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416651 | GOOG-PLAY-000416697 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416698 | GOOG-PLAY-000416702 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000808282 | GOOG-PLAY-000808286 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-000416753 | GOOG-PLAY-000416756 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-007125502 | GOOG-PLAY-007125506 | Landis, LLC |
| GOOG-PLAY-007125507 | GOOG-PLAY-007125529 | Landis, LLC |
| GOOG-PLAY-007125394 | GOOG-PLAY-007125409 | MetroPCS Wireless |
| GOOG-PLAY-007125562 | GOOG-PLAY-007125579 | Reliance Communications, LLC |
| GOOG-PLAY-007125410 | GOOG-PLAY-007125427 | Landis, LLC |
| GOOG-PLAY-007125580 | GOOG-PLAY-007125584 | Reliance Communications, LLC |
| GOOG-PLAY-007125428 | GOOG-PLAY-007125450 | Landis, LLC |
| GOOG-PLAY-003604713 | GOOG-PLAY-003604713 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-007125489 | GOOG-PLAY-007125492 | Cisco Systems, Inc. |
| GOOG-PLAY-007125493 | GOOG-PLAY-007125496 | Landis, LLC |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Exhibit A

| Production::Begin Bates | Production::End Bates | Partner Name |
| --- | --- | --- |
| GOOG-PLAY-007125651 | GOOG-PLAY-007125670 | Landis, LLC |
| GOOG-PLAY-007125671 | GOOG-PLAY-007125675 | IBRITECH DMCC |
| GOOG-PLAY-007125676 | GOOG-PLAY-007125698 | Reliance Communications, LLC |
| GOOG-PLAY-007125585 | GOOG-PLAY-007125588 | Nokia USA Inc. |
| GOOG-PLAY-007125451 | GOOG-PLAY-007125455 | Reliance Communications, LLC |
| GOOG-PLAY-007125456 | GOOG-PLAY-007125459 | Reliance Communications, LLC |
| GOOG-PLAY-007125589 | GOOG-PLAY-007125608 | Reliance Communications, LLC |
| GOOG-PLAY-007125609 | GOOG-PLAY-007125626 | Landis, LLC |
| GOOG-PLAY-003604919 | GOOG-PLAY-003604936 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-007125627 | GOOG-PLAY-007125650 | Landis, LLC |
| GOOG-PLAY-007125497 | GOOG-PLAY-007125501 | Afrifone Ltd |
| GOOG-PLAY-001090162 | GOOG-PLAY-001090166 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-001090193 | GOOG-PLAY-001090216 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-007125778 | GOOG-PLAY-007125780 | Cisco Systems, Inc. |
| GOOG-PLAY-007125781 | GOOG-PLAY-007125804 | OnePlus Technology (Shenzhen) Co., Ltd. |
| GOOG-PLAY-007125805 | GOOG-PLAY-007125805 | OnePlus Technology (Shenzhen) Co., Ltd. |

# EXHIBIT 11



Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Phone: 212.687.1980
Fax: 212.687.7714
Email: mail@kaplanfox.com
www.kaplanfox.com

October 6, 2021

**By Email**

Brian C. Rocca
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105-1596
brian.rocca@morganlewis.com

Re:    *In re: Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.);
        *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
        *In re Google Play Consumer Antitrust Litig.*, No. 3:20-cv-05761-JD (N.D. Cal.);
        *In re Google Play Developer Antitrust Litig.*, No. 3:20-cv-05792-JD (N.D. Cal.)

Dear Brian:

Plaintiffs in the above-captioned actions (the "Actions") write in response to Google's letter correspondence of September 17 and to further address several important discovery issues that, due to time constraints, were not discussed during our September 30 meet-and-confer.

**Issues Previously Raised**

**Text Messages**: In the August 17 meet-and-confer, your September 17 letter, and the September 24 meet-and-confer, Google stated that it was continuing to investigate whether the custodians in this litigation have relevant text messages that need to be produced. Your September 17 letter did not address the status of Google's review of non-custodial databases where relevant texts or instant messages may have been maintained. Please provide Plaintiffs with an update on the status of this investigation. Please also advise whether Google will disclose which custodians had their text messages searched and produced and which did not. As we explained on the September 24 meet-and-confer, such information is relevant to the orderly and efficient prioritization and sequencing of depositions.

**Instant Messages**: In your August 13 letter, you represented that Google would confirm whether there are responsive chats on messaging software such as WhatsApp, Slack, Jabber and Microsoft Teams. Yet, Google has not responded to Plaintiffs' repeated requests for this information. If Google has determined that none of the agreed custodians used the above instant messaging software, please confirm as much in writing, and describe the steps Google took to reach that conclusion. However, if Google has determined that there are responsive instant messages on software platforms other than Google Chat and Google Hangouts, please identify the relevant additional instant messaging software program(s) and confirm when Google will begin producing such messages.



B. Rocca
October 6, 2021
Page 2

Your September 17 letter represented that Google has produced all responsive instant messages from all custodial files in its possession, custody, or control. We understand Google's explanation as to why so few messages were produced—despite widespread custodial use of various messaging platforms over the years in the ordinary course—is that Google's corporate policy is to automatically delete instant messages within twenty-four (24) hours. We also understand that Google's corporate policy was then suspended pursuant to counsel's issuance of a preservation letter in connection with this litigation. Please confirm our understanding and promptly provide an "instant message" refresh production for all custodians in this litigation covering the period between August 14, 2020 and March 31, 2021.

**Apple Contracts & Communications**: Plaintiffs' March 4 letter requested that Google produce agreements between Google and Apple, Inc. ("Apple"), as detailed in RFP Nos. 156 and 157. Plaintiffs have repeated this request over the course of the past six months. During the parties' September 24 meet-and-confer, Google finally made a proposal to produce certain materials in response to these RFPs. On September 29, Plaintiffs followed up with a memorialization of that offer and some follow-up questions. On September 30, Google committed in writing to produce the following materials:

> (a) the revenue sharing agreement ("RSA") relating to the use of Google Search as the default search engine on Apple devices as part of Google's reproduction of documents produced to the Plaintiff States (the "CID production");
>
> (b) any other agreement(s) between Google and Apple that is part of the CID production that hits on the agreed-upon search terms; and
>
> (c) custodial documents in the Actions that hit on the agreed-to Apple-related search terms related to the RSA described above.

But Google's September 30 email failed to address two questions raised in Plaintiffs' September 29 email, namely: (1) whether the agreed custodians in the Actions include the key Google decisionmakers involved in negotiating the Google Search RSA with Apple; and (2) whether there are other *relevant* agreements between Apple and Google. Plaintiffs subsequently raised these issues during the September 30 meet-and-confer, and Google was again unable to provide a meaningful response. Instead, Google suggested there had been a lack of clarity regarding the additional agreements with Apple that had been requested by Plaintiffs pursuant to RFP Nos. 156 and 157.

Plaintiffs have explained to Google multiple times over the course of several months the various types of agreements requested pursuant to RFP Nos. 156 and 157. In Plaintiffs' April 7 letter, for example, Plaintiffs specified that the requests included agreements with Apple "relating to either the iPhone or any of the GMS apps (*e.g.*, Google Search), or any of Google's advertising products", a description which Plaintiffs repeated as recently as September 29. On the September 30 meet-and-confer, Google suggested that it would consider investigating whether there are additional RSAs with Apple. That is unacceptable. Google must search for and produce all relevant agreements with Apple, including, but not limited to, RSAs. Plaintiffs have adequately



and repeatedly described the requested agreements at a level of detail customary for discovery requests of this type, particularly given the information asymmetry between the parties. Only Google knows the extent and form of its economic relationship with Apple.  Google is obligated to conduct a reasonable search and has sufficient information to do so.

Nevertheless, to provide additional clarity, Plaintiffs reiterate that the requests seek any material economic agreement between Google and Apple related to the iPhone or GMS apps, including but not limited to Google Search, Google Chrome, Google Maps, Gmail, and YouTube. Plaintiffs are not requesting that Google search for and produce every agreement that exists between Apple and Google.  Rather, Plaintiffs' request is limited to agreements that are significant to the economic relationship between Apple and Google and that meaningfully impact revenue generation or incentives for these companies to compete against each other at the smartphone OS level.  For example, GOOG-PLAY-003758047 contains a list of Google objectives for its partnership with Apple that impact Google's revenue, and GOOG-PLAY-004122592 contains additional information about Google's financial relationship with Apple.  Based on GOOG-PLAY-003758047 and GOOG-PLAY-004122592, Plaintiffs expect that Google maintains agreements with Apple beyond the Google Search RSA that facilitate the objectives listed in these two documents.

Accordingly, Plaintiffs again request that Google further investigate agreements between it and Apple of the nature specified above, and promptly produce any such agreements.  Plaintiffs further request that Google promptly produce communications that hit upon the agreed search terms.  In addition, and consistent with Plaintiffs' September 29 email and Plaintiffs' request during the September 30 meet-and-confer, please promptly confirm whether the agreed custodians in these Actions and/or the custodians used for the CID production collectively include the key Google decisionmakers involved in negotiating the Google Search RSA with Apple.

**Microsoft Non-Aggression Pact**: In the September 24 meet-and-confer, the parties discussed whether they were at an impasse concerning the production of Google and Microsoft's alleged Non-Aggression Pact.  Prior to declaring an impasse, Google asked whether Plaintiffs' request was, at this point, limited to the agreement itself.  We confirmed that we are only seeking the agreement at this point; however, we reserved all rights to seek additional information should it later become apparent that, despite Google's repeated suggestions otherwise, the agreement is relevant to the litigation.  Please promptly provide a final answer as to whether you are willing to produce the agreement.

**Organizational Charts**: In your September 17 letter, you agreed to produce "reporting information for all agreed upon custodians" that is available through the "Teams tool", which is "an employee directory that includes reporting relationships for employees."  Please advise when you expect this information to be produced.  Upon production, please identify the responsive document(s) by Bates number(s).



**Individualized Contracts with App Developers, including Facebook Agreements and NDAs**: Plaintiffs requested that Google confirm whether it has produced (or will produce) individualized agreements or contracts with all developers participating in (1) Project Hug (the Games Velocity Program), (2) the App Velocity Program, (3) the Living Room Accelerator Program (both LiveTV and Video), (4) the Audio Accelerator Program, and (5) Subscribe w/ Google.  Plaintiffs also asked Google to provide the Bates numbers for any such agreements it has already produced, and to confirm that it intends to produce any remaining agreements that have not yet been produced.

In your July 14 letter, you acknowledged Plaintiffs' request and stated that "Google intends to include these agreements in upcoming supplemental productions as the NDA issues are cleared".  When Google subsequently failed to produce those agreements, we reiterated this request in Plaintiffs' August 2 and August 30 letters.  In your September 17 letter, you purported to respond to Plaintiffs' requests for individualized developer agreements but failed to address the specific categories of agreements described in Plaintiffs' correspondence.

Over two months have passed since Google's representation that NDA issues were being cleared, but Plaintiffs still have not received the promised supplemental productions.  Additionally, your September 17 letter stated that Google "anticipates producing exemplar Play Points agreements next week and exemplar NBO/Play Points agreements once notice has been provided to relevant third parties" and that it will "provide a list of developers in these programs, so that Plaintiffs can identify a reasonable sample of developers for which Google would produce the relevant Play Pass or Play Points agreements".  Google did not provide the exemplar Play Points agreements the week of September 20, and Plaintiffs still have not received these agreements.

In the September 24 meet-and-confer, Google initially suggested that it had already produced all the Project Hug developer agreements.  But as Plaintiffs informed Google during the call, Google's own documents belie that assertion.  Google's documents reveal that Google entered into no fewer than 20 Project Hug agreements (*e.g.*, GOOG-PLAY-004146689, '701), but Plaintiffs are unable to locate many of them in Google's productions.  These agreements are highly relevant and responsive to our November 9, 2020 requests for production, and Google has not contended otherwise.

In the September 24 meet-and-confer, Google stated that it would check the status of the production of the developer program.  No later than October 22, 2021, please (a) identify the Bates numbers of all final, signed versions of the agreements related to (1) Project Hug (the Games Velocity Program), (2) the App Velocity Program, (3) the Living Room Accelerator Program (both LiveTV and Video), (4) the Audio Accelerator Program, and (5) Subscribe w/ Google     ; (b) identify all agreements related to those five programs that Google has not yet produced; and (c) provide a date certain by which Google will produce the remaining agreements.  Please also provide a date certain by which Google will produce the exemplar Play Points and NBO/Play Points agreements and the list of developers for which Google will produce those agreements and identify the number of documents that you continue to withhold due to NDA issues and when you expect to produce the entirety of those documents.



B. Rocca
October 6, 2021
Page 5

Regarding the NDAs, if the NDAs concern issues related to this litigation, for example, GOOG-PLAY-001785799, then the NDAs themselves would be responsive to numerous RFPs that explicitly request the production of all relevant "agreements".  *See, e.g.*, RFPs No. 1, 23, 31-36, 37, 39, 40, 42, 46, 47, 49, 51-58, 86, 147, 156, 157.  Please confirm that you will expeditiously produce all relevant NDAs, including but not limited to the Facebook NDA.

Thank you for confirming in your September 17 letter that Google has not entered into any joint marketing or revenue share agreements with Facebook related to app distribution.

**House Judiciary Committee ("HJC") Productions**: In Google's September 17 letter, you note that there are still documents that have not been produced related to the HJC investigation due to "the NDA notice process".  Please identify the number of documents that Google continues to withhold from the HJC Productions and when you expect to produce the remainder of these documents.

**Native Power Point Files**: In our August 2 letter, Plaintiffs requested that Google reproduce the native versions of all .pptx files due to legibility issues affecting a substantial number of those documents.   Google's August 13 letter responded by proposing to "reproduce[e] all PowerPoint files affected by this issue as color JPEG files."  In our August 30 letter, we expressed concern that Google's proposed solution would be insufficient because there are several PowerPoint JPEG files in Google's productions to date that present the same legibility issues Plaintiffs previously described.  *See, e.g.*, GOOG-PLAY-007209362, GOOG-PLAY-007207518.  In your September 17 letter, you stated that Google would reproduce all PowerPoints as color JPEG files, which you represented would likely cure the vast majority of legibility problems.  You further indicated that you would reproduce in native .pptx format the two JPEG PowerPoints cited as examples of deficient JPEG files in our August 30 letter, and that you "would be open to discussing the production of a discrete set of documents that may continue to have legibility issues" in native .pptx format.  However, Google was unwilling to produce all native .pptx files due to an alleged additional, associated burden.  This issue was further discussed in our September 24 meet-and-confer, wherein Plaintiffs noted our twin concerns with Google's proposal, namely: (1) the ability to place legible documents before the Court and witnesses; and (2) not "sharing" those documents in advance of depositions or hearings.

To expeditiously resolve this issue, Plaintiffs are amenable to accepting Google's offer, subject to the following conditions:

- Google agrees to reproduce all PowerPoint files with the associated speaker notes, comments and metadata, as color JPEG files by October 19, using the same Bates number as the original productions; and

- For any PowerPoint JPEG file(s) that remains illegible, Plaintiffs may identify such file(s) to a previously determined individual on Google's team who: (1) is not a member of the litigation team; (2) agrees to keep the identity of the document(s) identified confidential; (3) has the necessary access and authority to provide Plaintiffs with  a reproduction of the file(s) in native .pptx format, using the same



Bates number as the original production; and (4) will use best efforts to do so within twenty-four (24) hours of the request, subject to reasonable extensions based on the timing or the number of requests.

In addition, Plaintiffs reserve the right to request a complete reproduction of all PowerPoints in native .pptx format should Google's representation that its proposed JPEG reproduction will cure the vast majority of legibility issues prove incorrect. The burden to produce legible documents is on Google, and Plaintiffs are not willing to request native .pptx reproductions on an individualized basis if it turns out that such reproductions are necessary for a substantial number of JPEG files.

This issue *must* be resolved in short order as the parties expect depositions to start this month. Therefore, please advise if you agree to this proposal at the next meet-and-confer between the parties. Absent prompt compromise, Plaintiffs reserve our right to seek the production of all native .pptx files.

**Hyperlinks**: In our September 8 meet-and-confer, Plaintiffs requested that Google identify all hyperlinked documents that had to be produced for the first time pursuant to Plaintiffs' identification request as compared to hyperlinked documents that had previously been produced. Plaintiffs contemplate that this could be accomplished by placing an asterisk next to all newly produced materials in the hyperlink letter. Google stated it would discuss this request internally. In our September 14 meet-and-confer, Plaintiffs reiterated this request. Google responded that accomplishing this task would be overly burdensome with respect to previous letters. Plaintiffs, acknowledging that burden, requested that Google begin to institute this policy for all new hyperlink letters. You inquired why Plaintiffs were requesting this information, and we explained that such information was necessary to identify whether any gaps in the production exist. Namely, if substantial numbers of hyperlinked documents are being produced for the first time in response to Plaintiffs' requests, it may suggest a deficiency in the search terms or custodians otherwise agreed to. Google stated it would take this request back. Please confirm that in all future hyperlink letters Google will note by asterisk the documents that had to be produced for the first time in response to our request.

**Revenue Share Agreements**: Plaintiffs appreciate Google's confirmation in its September 17 letter that it will search relevant centralized repositories and produce RSAs with third parties other than OEMs and wireless carriers that relate to Google Play and Google Play Billing. Google insisted in its September 17 letter, however, that "Google does not believe that any further investigation into revenue share agreements with non-OEMs and non-carriers relating to Android OS is necessary or proportional to the needs of the case", "[n]or does Google understand exactly what other revenue share agreements Plaintiffs have in mind". Google also suggested that Plaintiffs did not object to Google's offer, which failed to include Android OS, and that Google undertook the search Plaintiffs presented and will not re-review these databases for other, Android OS-related RSAs.



Plaintiffs disagree with Google's account of the parties' exchange and with Google's suggestion that Plaintiffs' position with respect to RSAs related to Android OS is contrary to the parties' previous understanding.  On June 9 Plaintiffs specified that Google should produce non-OEM and non-wireless carrier RSAs "that relate to Google Play, Google Play Billing, or Android OS".  After several further exchanges, on July 14, Google stated that it would "conduct a reasonable search of relevant centralized repositories for revenue share agreements relating to Google Play and Google Play Billing with non-OEMs and non-wireless carriers".  While Android OS was not expressly included in that statement, Google did not purport to limit or exclude Android OS    agreements.  Your September 17 letter was the first time Google revealed that its omission of "Android OS" from its previous correspondence was a rejection of Plaintiffs' repeated requests that Google produce RSAs with third parties related to that topic.

Plaintiffs are willing at this time to accept Google's offer to produce RSAs for the specified third parties related to Google Play and Google Play Billing but reserve the right to seek additional third-party RSAs related to Android OS.

**Contracts with OEMs**: In Plaintiffs' August 2 letter, Plaintiffs requested a list of all OEMs for whom Google has produced agreements to date.  A month and a half later, in your September 17 letter, Google stated that it is "willing to meet and confer regarding Plaintiffs' need for such a list."  Plaintiffs' request is straightforward.  Without a list of this nature, Plaintiffs are unable to evaluate whether Google has complied with its obligation to produce all relevant and responsive agreements with these OEMs.  Please confirm that Google will promptly produce the requested list.

**Data Requests**: Plaintiffs appreciate Google's confirmation in its September 17 letter that it completed production of transactional data on August 25 and the production of YouTube usage and financial data on September 10.

In Google's September 17 letter, Google stated that the following documents are the "closest thing Google has to a data dictionary" for interpretation of Google's transactional data production, or PROD026:  GOOG-PLAY-000000001, GOOG-PLAY-000000033, GOOG-PLAY-000000039, GOOG-PLAY-000000041, and GOOG-PLAY-000000087.  Plaintiffs understand that these files are instructions for developers regarding how to code apps and are neither data dictionaries nor schema to interpret PROD026.  Please confirm whether a data dictionary exists for the data in PROD026 and, if so, please promptly produce it.  In addition, please confirm whether Google will produce a JSON schema for these data, as requested in Plaintiffs' August 19 email and Plaintiffs' September 14 letter.

In the September 30 meet-and-confer, Google stated that it had already collected certain responses to questions set forth in Plaintiffs' September 14 letter, and that it would consider sending responses on a rolling basis.  Please confirm whether Google will send rolling responses to Plaintiffs' questions, and, in either case, please provide a date certain by which Plaintiffs will receive responses.



B. Rocca
October 6, 2021
Page 8

<u>**New Issues**</u>

**Modifications to Search Term 95**: Plaintiffs propose modifying Search Term 95 to include additional relevant code names, identified below in red text, that have only recently been uncovered.  Please confirm that you agree to Plaintiffs' proposal.

**Search Term 95**: Cupcake OR Detox OR "Gabby" OR "Ivan" OR "Magical Bridge" OR Nikkei OR Paragon OR Purell OR Ringo OR Runway OR Soren OR "Project Soy" OR "Sun-Mool" OR "Sun Mool" OR "Project Switch" OR "Project Dynasty" OR "Emu" OR "Free Willy" OR Lowball OR "Project Mission" OR "Project Napa" OR Nikkei OR "Project Plaid" OR "RePlay" OR "Project Starburst" OR Tomcat OR "Zeus" OR "Off-Play Installs" OR "Orphaned Apps" OR "Honeycrisp" OR "GDAF" OR "Basecamp" OR "Agave" OR <span style="color:red">"Marmot" OR "Wichita" OR "Pacific" OR "Robinson" OR "Argon" OR "Acacia" OR "Project Playful" OR "Cake"</span>

**App Store Reports**: Based on our review of the documents, Google maintained certain "App Store Reports" in the ordinary course.  *See, e.g.*, GOOG-PLAY-001167043.  However, it does not appear that all such relevant reports have been produced.  We request that Google expeditiously produce all App Store Monthly Reports and inform Plaintiffs of the months and years for which such Reports were created.

Sincerely,

/s/ Hae Sung Nam

Hae Sung Nam



B. Rocca
October 6, 2021
Page 9

Brian C. Rocca
Sujal J. Shah
Michelle P. Chiu
Minna L. Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
brian.rocca@morganlewis.com
sujal.shah@morganlewis.com
michelle.chiu@morganlewis.com
minna.naranjo@morganlewis.com
rishi.satia@morganlewis.com

Daniel M. Petrocelli
Ian Simmons
Benjamin G. Bradshaw
E. Clay Marquez
Stephen J. McIntyre
O'MELVENY & MYERS LLP
dpetrocelli@omm.com
isimmons@omm.com
bbradshaw@omm.com
cmarquez@omm.com
smcintyre@omm.com

Yonatan Even
Timothy Cameron
Lauren Moskowitz
CRAVATH, SWAINE & MOORE LLP
yevans@cravath.com
tcameron@cravath.com
lmoskowitz@cravath.com

Steve W. Berman
Robert F. Lopez
Benjamin J. Siegel
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com
robl@hbsslaw.com
bens@hbsslaw.com

Joseph Vanek
Eamon P. Kelly
Alberto Rodriguez
SPERLING & SLATER, P.C.
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

Bonny E. Sweeney
Melinda R. Coolidge
Katie R. Beran
Scott A. Martin
Irving Scher
HAUSFELD LLP
bsweeney@hausfeld.com
mcoolidge@hausfeld.com
kberan@hausfeld.com
smartin@hausfeld.com
ischer@hausfeld.com
DevelopersvGoogle@hausfeld.com

BY EMAIL

# EXHIBIT 12

# Morgan Lewis

**Brian C. Rocca**
Partner
+1.415.442.1432
brian.rocca@morganlewis.com

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

October 18, 2021

**VIA E-MAIL**

Hae Sung Nam
Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, NY 10022

Re:     *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.);
         *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
         *In re Google Play Consumer Antitrust Litig.*, No. 3:20-cv-05761-JD (N.D. Cal.);
         *In re Google Play Developer Antitrust Litig.*, No. 3:20-cv-05792-JD (N.D. Cal.);
         *State of Utah, et al. v. Google LLC et al.*, No. 3:21-cv-05227-JD (N.D. Cal.)

Dear Hae Sung:

We write in response to your letter of October 6 regarding outstanding discovery issues.

**House Judiciary Committee ("HJC") Productions**

Google will be producing the remaining 31 documents from the HJC production that were tied up in the NDA notice process in its next document productions.  Consistent with our prior commitments, we will also inform Plaintiffs when the HJC productions are complete.

**Native PowerPoint Files**

As discussed on our October 12 meet and confer, Google continues to work diligently to reimage PowerPoint files as color JPEGs and anticipates reproducing these files by November 1.  Given system processing limitations, Google had prioritized the processing and reproduction of its MDL productions to the State Attorneys General and its CID productions to the non-State Plaintiffs last week.  With both of those processes and productions now complete, we have instructed our vendor to complete the reprocessing and production of color JPEGs as soon as possible.

To the extent Plaintiffs determine that any of the PowerPoint files reproduced as color JPEGs are still are not legible, Google agrees to Plaintiffs' protocol set forth in your letter of October 6, with reasonable and practical modifications:

1.  Google will designate a Senior Manager at Conduent, our eDiscovery vendor for these
    cases, as Plaintiffs point of contact for reasonable requests for copies of native PowerPoint

**Morgan, Lewis & Bockius** LLP

One Market
Spear Street Tower
San Francisco, CA  94105-1596          📞 +1.415.442.1000
United States                          📠 +1.415.442.1001

Hae Sung Nam
October 18, 2021
Page 2

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

files for documents that Plaintiffs determine are not sufficiently legible as color JPEGs.

2. If Plaintiffs request a native PowerPoint for a document that Google produced with redactions, the Senior Manager at Conduent will share a copy of that native file with a designated Google Legal Ops contact, who manages e-discovery issues and is not involved in the substantive defense of this litigation. The Google Legal Ops contact will perform a quality assurance check to confirm that the native file accurately reflects all necessary redactions in order to preserve privilege and will not identify the documents requested by Plaintiffs to the litigation team members involved in the substantive defense of these cases.

3. Plaintiffs may only submit one consolidated request for native PowerPoint files per week and must limit their request to a reasonable number of documents. Plaintiffs must also simultaneously notify Google's external counsel with the number of native PowerPoint files it is requesting.

## Hyperlinks

Based on our understanding that Plaintiffs' reason for requesting that Google identify the hyperlinked documents that are being produced for the first time is to determine whether there are deficiencies in search terms or custodians, we do not agree to Plaintiffs' request. An identification of the hyperlinked documents that are being produced for the "first time" will not identify any purported deficiencies in agreed-upon search terms or custodians. As Plaintiffs are aware, Google is still performing NDA notice and QC privilege analysis and has recently agreed to Plaintiffs' requests to implement new search terms and add custodians. Due to the size of the database and the ongoing NDA notice process, privilege QC review, and the collection of more documents based on Plaintiffs' new requests for custodians and additional search terms, there is no easy way for us to track the population of documents Plaintiffs are seeking. To attempt to do so, would require a many-step process and will be unduly burdensome.

## Text Messages

Google's efforts to identify and collect any responsive text messages from its agreed-upon custodians is ongoing. There are only a handful of originally-agreed upon custodians who are still subject to further analysis for this issue. Moreover, to the extent Google previously collected text messages from its agreed-upon custodians for purposes other than this specific litigation, Google is evaluating and determining if any of those previously collected text messages are responsive to this litigation. If they are, Google will produce them (and in some cases, has already produced them). We are not aware of what you are referring to by "non-custodial databases where relevant texts or instant messages may have been maintained."

We decline to provide information regarding which custodians possessed responsive text messages or not; such an inquiry is "discovery about discovery" and is not warranted here. Plaintiffs will receive custodian information for any text messages that are produced.

Hae Sung Nam
October 18, 2021
Page 3

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

**Instant Messages**

In addition to investigating whether custodians used text messages, Google also evaluated whether they used third-party communication software, such as WhatsApp, Slack and other platforms.  If any custodians did use such platforms as part of their Google responsibilities, that information will be evaluated and if responsive, non-privileged communications exist from such software platforms, Google will produce them.

With respect to your characterizations of Google's retention policy, we disagree.  As Google has consistently represented, Google issued a hold notice in connection with this litigation that requires custodians to preserve all relevant instant messages.  We have no reason to believe that Google's production of relevant instant messages for all agreed-upon custodians for the agreed-upon time periods is in any way deficient and, thus, this should put an end to this discovery-on-discovery discussion.  As you know, not all custodians are refresh custodians and Plaintiffs fail to articulate any reason for an "instant message refresh production of all custodians in this litigation" for the August 14, 2020 through March 31, 2021 time period.  This request deviates from the parties' agreement relating to search terms and relevant periods.

**Organizational Charts**

We are in the process of querying and collecting reporting information from the Teams tool for all agreed upon custodians as of the date of this letter.  We will produce this information and identify responsive documents by Bates number in the near term.

**Apple Contracts & Communications**

In your letter, you ask Google to confirm that the MDL and/or the CID custodians include "key Google decision-makers involved in negotiating the Google Search RSA with Apple."  We can so confirm.

As for other Apple agreements, you clarify that Plaintiffs are requesting "any material economic agreement between Google and Apple related to the iPhone or GMS apps."  You note that Plaintiffs are "not requesting that Google search for and produce every agreement that exists between Apple and Google," but that your request is "limited to agreements that are significant to the economic relationship between Apple and Google and that meaningfully impact revenue generation or incentives for these companies to compete against each other at the smartphone OS level."  As we have discussed on multiple calls, Plaintiffs' request is vague and ambiguous, and it is impossible for Google to intuit what Plaintiffs might mean by "material economic agreement," "significant to the economic relationship," or "meaningfully impact revenue generation."  As for your last qualifier—i.e., agreements that "meaningfully impact … the incentives for these companies to compete against each other"—Google fundamentally disagrees with Plaintiffs' premise that Google's agreements with Apple, including the Apple RSA, lessen competition between Google and Apple at the smartphone OS level.

Nor do the documents you cite in your letter support the claim that "Google maintains agreements with Apple beyond the Google Search RSA," "related to the iPhone or GMS apps" that are "material" or "significant to the economic relationship."  Indeed, GOOG-PLAY-004122592 should give comfort to Plaintiffs that there are no other such agreements.  However, in the spirit of

Hae Sung Nam
October 18, 2021
Page 4

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

compromise and *only* if it will allow the parties to close this issue out, Google will agree to produce communications that concern any agreement with Apple in its re-review of the MDL documents. Google notes that Plaintiffs will already receive all communications that hit on search terms from the CID production.  We think this is more than fair given Google's position that these agreements are not relevant to Plaintiffs' claims.  Please let us know if we can resolve this issue.

**Microsoft Agreement**

You still have not explained the relevance of this agreement to Plaintiffs' claims, and Google still objects to Plaintiffs' request for Google to produce it in this litigation.  Nevertheless, because Plaintiffs current request is only for the agreement, and to close out this issue, Google is willing to produce the agreement.  But our willingness to do so is not a concession that it is relevant and Google will continue to object to any future discovery requests regarding this issue.

**Individual Contracts with App Developers**

Plaintiffs' letter raises several issues related to the production of Google's individualized agreements with developers, which Google addresses in turn below.

*Play Pass and Play Points Agreements*.  Contrary to Plaintiffs' assertion, Google already produced several exemplar Play Points agreements in Production Vol. 35.  Google also anticipates releasing for production exemplar Play Pass / NBO agreements next week.  Additionally, attached to this letter as Exhibit A is a list of developers in these programs, from which Google will agree to produce a reasonable sample of agreements identified by Plaintiffs.

*Additional Games Velocity Program Agreements*.  During our September 24 meet-and-confer, Google stated that it believed that it had produced all of the Games Velocity Program agreements it had collected, but would follow up to confirm whether there were any that had not yet been produced.  Upon further review, Google has identified additional Games Velocity Program agreements, which it anticipates releasing for production next week.

*Produced and To-be-Produced Agreements*.  Plaintiffs additionally ask that Google provide by October 22, 2021, an update on the status of the production of agreements with developers participating in the (1) Games Velocity Program; (2) Apps Velocity Program, (3) Living Room Accelerator Program, (4) Audio Accelerator Program, and (5) Subscribe with Google, including a list of Bates numbers for all produced agreements, a list of agreements not yet produced, and a date certain for the production of remaining agreements.  As noted above, the outstanding Play Pass exemplar agreements will be released for production this week, and Google will be producing the additional GVP agreements it has identified, as Plaintiffs have requested.  However, Plaintiffs have the information necessary to identify for themselves the developer agreements in Google's production—namely the names of the relevant deal programs.  Google will endeavor to provide an update as to the anticipated date of production for any remaining developer agreements next week.

**NDAs**

Plaintiffs again request that Google search for and produce NDAs.  But Plaintiffs fail to meaningfully respond to Google's prior objections to this demand.  First, Google previously pointed

Hae Sung Nam
October 18, 2021
Page 5

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

out that Plaintiffs failed to cite a single discovery request seeking the production of NDAs.  In response, Plaintiffs assert that NDAs "concern[ing] issues related to this litigation" would be responsive to "numerous RFPs" that "explicitly request the production of all relevant 'agreements.'" It is unclear why Plaintiffs think the 27 RFPs identified call for NDAs.  Many expressly call for agreements that are *not* NDAs.  For example, RFP No. 31 seeks exemplars of agreements that developers must enter into to offer in-app purchases.  In response, Google offered to produce exemplars of Developer Distribution Agreements, Terms of Service, and Android SDK License Agreements.  RFP No. 39 seeks contracts related to licenses for digital products, such as Google Play, Google Maps, Google Search, and Chrome for use on an Android device.  In response, Google agreed to produce agreements governing the use of Android mobile devices with several OEMs. Other RFPs seek documents and agreements relating to conduct alleged in the complaints completed unrelated to the disclosure of information.  For example, RFP No. 58 seeks documents or agreements that "discourage," "prevent," or "hinders" consumers from using a channel or distribution method other than Google Play to download apps and other digital products.  Plaintiffs make no effort to explain how any of these RFPs directly call for the production of NDAs, or what kinds of NDAs they might call for.

Second, Plaintiffs do not even address Google's main objection, which is that any relevant communications that were made pursuant to any NDAs—whether the NDA itself is directly relevant to the issues in the case or not—would have been produced from custodial files.  For example, the very document Plaintiffs cite as demonstrating the existence of NDAs that "concern issues related to this litigation" (GOOG-PLAY-001785799) is an email concerning app updates that alludes to an NDA with Facebook.  That email was produced because it was identified using agreed upon search terms and tagged as responsive to the issues in the case.  Contrary to Plaintiffs' unsupported claim, nothing in the email suggests that the referenced NDA is directly relevant to the issues in this litigation.  But in any event, the substantive communications made pursuant to that NDA were produced.

## Search Query No. 95

Plaintiffs are yet again requesting to add terms to Search Query No. 95.  Plaintiffs, however, provide no explanation about why these additional terms which significantly expand the scope of the query are justified, particularly when Plaintiffs have consistently acknowledged that the 95 agreed-upon queries are "specifically designed" to capture responsive documents.  *See* 10/8/2021 Letter from L. Moskowitz to B. Rocca.  The requested additional terms—a number of which are common words that are frequently used in non-relevant contexts—generate an unreasonable number of hits and thus are necessarily overbroad and inappropriate.  For example, Plaintiffs' request to add the term "Pacific" generates 1.4 million hits and "Marmot", "Robinson", and "Cake" each generate well over 100,000 hits.  These are unacceptable.  Nevertheless, to finalize these search terms, as a compromise, Google is willing to run the terms that Plaintiffs requested that Google add to Search Query No. 95, except for "Pacific", "Marmot", "Robinson", and "Cake". Google reserves rights to object to this request to the extent Plaintiffs do not accept this proposal.

## Revenue Share Agreements

As Plaintiffs' letter acknowledges, on July 14, 2021, in an effort to resolve the parties dispute over Plaintiffs' repeated requests for RSAs with non-OEMs and non-wireless carriers, Google agreed to search centralized repositories for revenue share agreements relating to Google Play and Google

Hae Sung Nam
October 18, 2021
Page 6

<span style="color:red">**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**</span>

Play Billing.  On September 17, 2021, in response to yet another request concerning RSAs, Google confirmed that it had searched for and is producing, subject to the parties' prior agreements, revenue share agreements relevant to the cases; namely, those with app store or installer preinstallation restrictions.  While Plaintiffs seem to take issue with Google's recounting of the prior correspondence on the issues, which Google believes speaks for itself, Google notes Plaintiffs' acceptance of Google's prior offer.

**Contracts with OEMs**

When Plaintiffs asked for a list of OEMs for whom Google has produced agreements, Google offered to meet and confer with Plaintiffs regarding the need for such a list.  Rather than explain their need, Plaintiffs simply state that their request is straightforward.  Plaintiffs are aware of the types of agreements Google has with OEMs and should be able to identify such agreements within Google's production.  If Plaintiffs believe they are unable to do so, Google remains willing to meet and confer.

**Data Requests**

Google has responded to Plaintiffs' September 14 letter regarding transactional data, which addresses Plaintiffs' request for a JSON schema.  As explained in our October 12 letter, Google's systems have evolved over time, certain concepts have been deprecated, and relevant SMEs are no longer with the team responsible for pulling the data.  Because of these system constraints, a comprehensive schema does not exist.  Our understanding is that Plaintiffs can generate a JSON schema manually.  With respect to a data dictionary, we note that our October 11 letter addresses most of Plaintiffs' field-specific questions, which may obviate the need for such a data dictionary. Regardless, to Google's knowledge, the previously produced proto comments are the most accurate and complete documentation available and closest thing it has to a "data dictionary." Whether it is a JSON schema or data dictionary, Google is not required to create documents not maintained in the normal course of business for purposes of assisting Plaintiffs in this litigation. To the extent the proto documentation is insufficient, we will continue to answer field-specific questions.

**App Store Reports**

Google is investigating the App Store Reports identified in Plaintiffs' letter, including the existence of other reports and the months and years for which the reports were created.

*       *       *

We are available to discuss these issues at the next scheduled meet and confer.

Sincerely,

Brian C. Rocca

Hae Sung Nam
October 18, 2021
Page 7

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

cc:    Yonatan Even (YEven@cravath.com)
       Lauren Moskowitz (lmoskowitz@cravath.com)
       Justin C. Clarke (jcclarke@cravath.com)
       Eric Zepp (ezepp@cravath.com)
       Zachary Jarrett (zjarrett@cravath.com)
       Daniel Ottaunick (dottaunick@cravath.com)
       Bonny E. Sweeney (bsweeney@hausfeld.com)
       Melinda R. Coolidge (mcoolidge@hausfeld.com)
       Katie R. Beran (kberan@hausfeld.com)
       Alberto Rodriguez (arodriguez@sperling-law.com)
       Steve W. Berman (steve@hbsslaw.com)
       Rob F. Lopez (robl@hbsslaw.com)
       Ben J. Siegel (bens@hbsslaw.com)
       Karma M. Giulianelli (karma.giulianelli@bartlitbeck.com)
       Jamie L. Boyer (jboyer@koreintillery.com)
       Aaron Schwartz (ASchwartz@kaplanfox.com)
       Brendan Glackin (bglackin@agutah.gov)
       Brian Christensen (bchristensen1@agutah.gov)
       Sarah Boyce (sboyce@ncdoj.gov)

# EXHIBIT A

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| Play Pass Partners | Play Points Partners |
| --- | --- |
| 100 Pi Labs | 111PERCENT INC. |
| 10tons Oy | 337 Technology Limited |
| 11 bit studios S.A. | 4399 Korea Co., Ltd |
| 1C Wireless | 4399 NET LIMITED |
| 2 Monkeys | Accenture International Limited |
| 22LEARN, LLC | Activision Publishing Inc. |
| 505 Games SpA | AD(x) Inc. |
| 77SPARX Studio, Inc. | AN Games Co. Ltd |
| 7th Gear, LLC | April7 Inc. |
| A-Life Software | Ateam Inc. |
| About Fun s.r.o. | BANDAI NAMCO Entertainment Inc. |
| Abuzz FZE | BANDAI NAMCO Online Inc. |
| Abyte Entertainment Srls | Big Fish Games, Inc. |
| AccuWeather Intl., LLC | BluePotion Games Co., Ltd |
| Aceviral.com Ltd | Camel Games,inc |
| Adriaan de Jongh | ChangYou.com Korea LLC |
| ADVA Soft GmbH | CINAMON GAMES |
| Aeria Canada Studio Inc. | cocone corporation |
| AffinityBlue | Colondee |
| Afterburn Lukasz Spierewka | COLOPL, Inc. |
| AGaming | Com2us Corporation |
| AI Factory Limited | Contract Template Approval |
| ai.type LTD | Craft Egg Inc. |
| Aimbity AS | Cupist Inc. |
| Akupara Games, LLC | D&C of Storm |
| Alawar Entertainment, Inc. | DAERISOFT |
| Alejandro Castagnolo Martínez | Dataverse.co.,limited |
| Alexei Anoshenko | Day 1 Entertainment Co.,Ltd |
| Alexey Shibkov | DeNA Co.,Ltd. |
| Alictus Yazılım A.S. | DeNA HONG KONG LIMITED |
| Alien Shooter limited liability company | Devsisters Corporation |
| Amanita Design s.r.o. | DHGames Limited |
| AMANOTES PTE. LTD. | diandian interactive holding |
| AMT Games Limited | DMM Games LLC |
| Anahoret, Inc. (D.B.A Intellijoy) | DREAM PLUS GAMES LIMITED |
| Andev | Dreamotion Inc. |
| Andrey Shcherbakov | Efun Company Limited |
| androidslide | ekkorr games corporation |
| Animoca Brands Limited | Electronic Arts, Inc. |
| Anna Walis MTOY | Far EasTone Telecommunications Co., Ltd |
| ANTON NIKITIN | Fedeen Games Limited |
| Anton Vazhinsky | FLERO Games Co., LTD |

| | |
|---|---|
| Apex Creative | Flyingbird Technology Limited |
| App Business Ventures LLC | ForwardWorks Corporation |
| App Family AB | Fourdesire Co., Ltd. |
| Appgeneration, Software technologies, Lda | FoxNext Games LLC |
| Appgenix Software UG (haftungsbeschränkt) | Funstage GmbH |
| AppHouze Co | G-Mei Network Technology Co., Ltd. |
| AppQuiz | Gamania Digital Entertainment Co. Ltd. |
| AQUIRIS GAME STUDIO S.A. | GAME4FUN Technology Limited |
| AR LABS di Lear Cabrini | GameBeans Entertainment Co., Limited |
| Arclite Systems Ltd, | GAMELAND(HK)CO. ,LIMITED |
| Arnold Rauers | Gameloft SE |
| ARTE FRANCE | GAMENOW TECHNOLOGY LIMITED |
| Artifex Mundi | GAMESWORD Co., Limited |
| AsgardSoft GmbH | Garena Online Private Limited |
| Asmodee Digital SASU | Glu Mobile Inc. |
| Aspyr Media, Inc. | Grande Games Limited |
| Avelog | Gravity communications Inc. |
| AZAMATIKA | gumi,Inc |
| b-interaktive GmbH | GungHo Online Entertainment Inc. |
| Baby Manager Ltd. | HABBY PTE. LTD. |
| backdrops | Halfbrick Studios Pty Ltd |
| Bad Potion PTY LTD | Happy Elements K.K |
| Bardia Golriz | HEYYO GAME HK LIMITED |
| Barnstorm Games Limited | HK FOREVER9 TECHNOLOGY CO., LIMITED |
| Bart Bonte | Hong Kong Chuang Cool Interactive Entertainment C |
| Baviux Apps & Games S.L. | HONG KONG FOTOABLE TECHNOLOGY LIMITED |
| Bearbit Studios B.V. | HONG KONG LEITING INFORMATION TECHNOLC |
| Bedtime Digital Games ApS | HONG KONG NETEASE INTERACTIVE ENTERTAI |
| Bennett Racing Simulations, LLC | HOTCOOL TECHNOLOGY CO., LTD |
| Berni Mobile SLU | Huuuge Global Limited |
| Big Blue Bubble, Inc. | HYPERCONNECT |
| Big Blue Clip, LLC | IGG SINGAPORE PTE LTD |
| Big Duck Games LLC | International Games System CO., LTD. |
| Bimi Boo Kids - Games for Boys and Girls LLC | IWPLAY World Interactive Entertainment Technology |
| Bini Bambini OU | Jam City, Inc. |
| Bit By Bit Studios, LLC | JOYCITY Corporation |
| Black Shell Media, LLC | Joymax Co., Ltd. |
| Black Shift Studio | JUN HAI NETWORK LIMITED |
| Blindflug Studios AG | Kabam, Inc. |
| Blue Brain Games, s.r.o. | Kakao Games Corp |
| BLUE OX FAMILY GAMES, INC. | King.com Limited |
| Blyts LLC | KingsGroup Holdings |
| Bravolol | KLab Inc. |

| | |
|---|---|
| BRETON FABRICE / COWCAT EIRL | Kolibri Games GmbH |
| Brew Studio Litmited | Kongregate, Inc. |
| Broken Rules Interactive Media GmbH | Krafton Inc. |
| Brownmonster Limited | KRAFTON, Inc. (f/k/a PUBG Corporation) |
| Bruno Piovan | Left Field Labs LLC |
| Budge Studios | LEVEL-5 Inc. |
| Buff Studio Co.,Ltd. | Lezhin Entertainment, Inc. |
| Burak Şendağ | Lilith Technology Hong Kong Limited |
| Burakgon Bilisim Teknoloji Reklam Sanayi Ticaret | LONG CHENG Network Co., Ltd |
| Butterscotch Shenanigans Inc. | LONG E CO., LTD |
| BYCODEC TEKNOLOJI LTD. STI. | Look Look Creative Co Ltd 瞧瞧創意有限公司 |
| Bytestorm Software - Bartlomiej Janusz | Ludia Inc. |
| Cabbiegames | Machine Zone, Inc. |
| Camouflaj, LLC | Mad Head Limited |
| Candy Mobile Inc. | Malang Inc. |
| CARECON GmbH | Memoriki Limited |
| Cartoon Interactive Group, Inc. | miHoYo Ltd. |
| Cateater llc | Miniclip SA |
| CGE digital s.r.o. | Mirrativ, Inc. |
| ChengDu LongYou Tech Ltd | mixi, Inc. |
| Chengdu PinGuo Technology Co., Ltd. | Mobirix corp. ((주)모비릭스) |
| Chess Prince | Mozzet |
| CHORRUS GAMES S.L. | MPLANNERS INC |
| Clapfoot Inc. | N3TWORK LLC |
| Classic Arcade Games | NATRIS Corporation |
| ClockStone Softwareentwicklung GmbH | NC Taiwan Co., LTD. |
| Cloud Macaca, Inc. | NCSOFT Corporation |
| Codebrew Games Inc. | Neocraft Limited |
| Color Switch Phoenix LLC | Neowiz |
| Concrete Software, Inc. | Netmarble Corporation |
| CoolMobileSolution | Netmarble Joybomb Inc. |
| Crescent Moon Games, LLC | Nexon Korea Corporation |
| Cristian Mihailescu | NGELGAMES Co.,Ltd. |
| Crypto Lab | NHN BIGFOOT CORPORATION |
| CYMPL Games | NHN Corp |
| D.S LONG &amp; SOUNDWAVE CONCEPTS PT | NHN Pixelcube Corp |
| Delight Room | NHN Starfish Corp |
| Devolver Digital | Niantic, Inc. |
| Dictionary.com, LLC | Nintendo Co.,Ltd. |
| Digipom Inc. | Noyesrun |
| DIGIT GROVE PRIVATE LIMITED | Npixel Corporation Limited |
| Digit Leaf LLC | NRISE, Inc. |
| Digitalchemy, LLC | Nyou Inc. |

| | |
|---|---|
| Dinosaur Polo Club | OASIS GAMES LIMITED |
| Direlight Oy | ORIGINAL ENTERTAINMENT CO LTD |
| Djinnworks GmbH | PeopleFun, Inc. |
| Dmitry Karymov | Pixelberry Studios |
| Dmitry Skornyakov | Pixonic Games Ltd |
| Dogbyte Games Kft. | Plarium Global LTD |
| Dot to Dot s.r.o. | Playstudios, Inc. |
| DotEmu | PLAYWITH Inc. |
| DoubleMoose Games AB | PLAYWITH Taiwan Co.,Ltd. |
| Douglas Cowley | PLR Worldwide Sales Limited |
| Drilly Apps Ltd | Pocket Gems |
| Dustin Auxier | PONOS Corporation |
| DWP | Product Madness Inc. |
| Easybrain Ltd | PROXIMA BETA PTE. LIMITED |
| EclipSim Bt. | Rayark International Limited |
| EdMobile Labs Private Limited | RED CANDLE GAMES CO., LTD. |
| Edoki Academy | SAMBON ELECTRONICS CO.,LTD |
| Education Mobile | Samfinaco Ltd. (Belka Games TM) |
| EDUJOY ENTERTAINMENT | Samsung Electronics (UK) Ltd |
| EliyanPro Inc | SciPlay Corporation |
| English Checkers | Scopely, Inc |
| Enpass technologies Inc | Sega Corporation |
| Enteriosoft | Seriously Digital Entertainment Ltd. |
| Etrality GmbH | Shogakukan Inc. |
| EXAMOBILE S.A. | SIGONO INC. |
| Exovoid sàrl | Six Waves Inc |
| Eyedeal Vision Center | SMG Studio |
| Farlex | Smilegate Megaport Inc |
| Fatih Odunc | Sony Mobile Communications |
| FDG Entertainment GmbH & Co KG | Special Gamez |
| FifthSource AB | SQUARE ENIX CO., LTD. |
| Filimundus AB | Sticky Hands Inc. |
| Filippo Bottonelli | Sumzap, Inc. |
| Firecracker Software LLC | Sunborn Japan Co., Ltd |
| Float32, Inc. | Super Awesome Inc. |
| FOP Yakovliev I.O. | Super Planet corp. |
| Fourchars | Supercell OY |
| Fox & Sheep GmbH | Tap4fun (Hongkong) Limited |
| FREEHOLD GAMES, LLC | Tap4fun Co.,Ltd. |
| Friendly App Studio LLC | ThumbAge Co., Ltd. |
| Funlab Software | United Daily News Co., LTD |
| FuzeBits Inc. | USERJOY Technology Co., Ltd. |
| G5 Entertainment AB | Verizon Wireless |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| | |
|---|---|
| GABBLE MOBILE TEKNOLOJİ ANONİM ŞİRKETİ | Vespa Inc. |
| Game Dev Team | VOLTAGE Inc. |
| GAMEBRAIN YAZILIM TEKNOLOJILERI LTD STI | Webzen Inc. |
| GAMEFOX | Wildlife Studios Limited |
| Gameloft | wooga GmbH |
| Games2win India Pvt. Ltd. | X-Legend Entertainment |
| Games4All | X.D. Global Limited |
| Gameverse Paulina Pabis | YOSTAR (HONG KONG) LIMITED |
| Gamma Play Limited | Yostar Inc. |
| Gazeus Games Serviços de Internet S.A. | YOTTA GAMES LIMITED |
| genina.com | YOUZU (SINGAPORE) PTE. LTD |
| GIANT INTERACTIVE (HK) LIMITED | ZILONG GAME LIMITED |
| GOBIT, INC | Zynga Inc. |
| good indie apps | 주식회사 펄어비스 (English name: Pearl Abyss Corp |
| GordonEdwards.net LLC | クローバーラボ株式会社 |
| Greenheart Games Pty. Ltd. | 株式会社Amazia |
| Gro Play Digital AB | 株式会社Cygames (Cygames, Inc.) |
| GST GoodSoftTech s.c. Jacek Nowosielski Daniel | 株式会社講談社 (Kodansha Ltd.) |
| Gunia UG (haftungsbeschränkt) | DGN Games LLC |
| Hamster On Coke Games Michal Pawlowski | Game Focus Network Limited |
| Haze Games | IPSOS LIMITED |
| HeadCode | Long Tech Network Limited |
| Headup GmbH | Rovio Entertainment Corporation |
| Heartbit Interactive Srl | SUNDAYTOZ |
| Heisen Games | |
| Henry Smith | |
| HeroCraft Ltd. | |
| Hexage s.r.o. | |
| HGames-ArtWorks s.r.o. | |
| Highbrow Interactive Private Limited | |
| HinKhoj Infolabs LLP | |
| Hitcents.com, Inc. | |
| Hohng LLC | |
| i273 LLC | |
| IAC SEARCH & MEDIA EUROPE LIMITED | |
| Ian MacLarty | |
| Illusion Labs | |
| IMA TECH INNOVATION | |
| Infinite Dreams sp. z o.o. | |
| inkle Ltd | |
| INOVE, s.r.o. | |
| InstantBits Inc | |
| Intelligems | |

| | |
|---|---|
| Interactive Games Entertainment B.V. | |
| IP Kovalishin Andrey Nikolaevich | |
| IP Li En Chan | |
| IRONHIDE S.A. | |
| J2 Interactive | |
| j4velin development | |
| Jae Ook Jeong | |
| Jakyl Ltd | |
| Jindřich Houska | |
| JL Soft | |
| Joel McDonald | |
| Joshua & Company Inc. | |
| Juan Andrés Bentel | |
| Jundroo, LLC | |
| Just4Fun Mobile Sp. z o.o. | |
| Kairosoft Co., Ltd. | |
| kamibox e. K. | |
| Karim Abou Zeid Software | |
| Karin Bente Cornelia Malmberg | |
| Karta Software Technologies - GPS Navigation | |
| Kaufcom GmbH | |
| Keren Software LLC | |
| KIA ORA GAMES PTY LIMITED | |
| KickBack | |
| KILLHOUSE GAMES SRL | |
| kinkajoo Ltd | |
| KITXOO, UNIPESSOAL LDA | |
| Kiwiwalks | |
| Klinker Apps, Inc | |
| kng team | |
| Kolb Sistemas Eireli - ME | |
| Kooapps Philippines Corp. | |
| Kotobuki Solution Co., Ltd. | |
| Kotov Artem Valerevich IP | |
| KreoSoft Krzysztof Rodzik | |
| Kristanix AS | |
| Kumobius Pty Ltd | |
| Kurechii Sdn. Bhd. | |
| Kuznetsov Nikolay Andreevich | |
| KVADGroup, LLC | |
| Kyrylo Kuzyk | |
| L'Escapadou | |
| Learny Land SI | |

| | |
|---|---|
| Lezigame SAS | |
| LisbonLabs | |
| LiveATC | |
| LLC "Stellio Soft" | |
| Loju Ltd | |
| Łukasz Oktaba | |
| Lyrebird Studio | |
| MADFINGER Games, a.s. | |
| MAGIX Software GmbH | |
| Magma Mobile | |
| MAPFACTOR, s.r.o. | |
| Marc Fortin - Osaris Games (Sole proprietorship registered in France under SIRET: 520 319 260 00060 | |
| Marcin Lewandowski | |
| Mariola Marekwica (self-employed) | |
| Markus Wiederkehr | |
| Marshmallow Games SRL | |
| Mateusz Kaflowski (Sanity Audio Apps) | |
| MATHIS EMMANUEL MARTIN DÉSIRÉ | |
| Maxim Urusov | |
| Maysalward | |
| ME2ZEN Limited | |
| Melchionna Michele | |
| METAJOY LIMITED | |
| Metro Trains Melbourne Pty Ltd | |
| MG soft Inc. | |
| MH RILEY LTD | |
| Michael Diener - Software e.K. | |
| Michal Srb | |
| Michał Stachyra Bizo Mobile-Aplikacje Mobilne | |
| Midjiwan AB | |
| Midnight Adventures LLC | |
| Mighty Kingdom Pty Ltd | |
| MINDBOX SOFTWARE SRL | |
| Mindware Consulting, Inc | |
| Minibuu | |
| Mixvibes | |
| Mobile Tower | |
| MobilityWare, LLC | |
| Mobimi Games LTD | |
| mobirix | |
| Mobobi Limited | |
| MojoTouch-Liron Barzilai | |
| Moon Reader Limited (HK) | |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| | |
|---|---|
| Moroyna Ltd. | |
| MRs Shantiben Sanjaykumar Modhawadiya | |
| MSIT Mateusz Seifert (Splend Apps) | |
| Mum Not Proud S.A.P.I. de C.V. | |
| Muranov Vladislav Andreevich | |
| Murtha Design Inc. | |
| MushTrip s.r.o. | |
| My Holiday Diary Limited | |
| My Town Games Ltd | |
| myrApps s.r.o. | |
| Nanali Inc. | |
| Nekki Limited | |
| Netigen Kluzowicz Sp. J. | |
| Next Tech Games Studios | |
| Nicolas Lehovetzki | |
| Night School Studio, LLC | |
| NK Aviation Ab | |
| No Signal Productions | |
| Noodlecake Studios Inc | |
| Northway Games Corp | |
| Novvia LLC | |
| NRS Magic LTD | |
| Oceanhouse Media, Inc. | |
| Oddrobo Software AB | |
| OhNoo Studio Łukasz Rutkowski | |
| Omni Calculator Sp. z o.o. | |
| OOO BYRIL | |
| Opala Studios Soluções Tecnológicas Ltda | |
| Orbital Nine Games Inc. | |
| Outbox S.R.L. | |
| Outfit7 Limited | |
| Over the Top Games SL | |
| OWL GAMES LTD | |
| Ozgur Cubuk | |
| pamsys | |
| Pandamonium Software Ltd | |
| Paul Lammertsma | |
| Pavel Dobryakov | |
| Peak Pocket Studios CB | |
| Pepi Play | |
| Pink Pointer - Desenvolvimento de Software LTDA | |
| Pixel Crater Ltd. | |
| Pixelbite AB | |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| | |
|---|---|
| PIYUSH PATEL | |
| PlayDate Digital | |
| Playdead ApS | |
| Playdigious SAS | |
| PlayHome Software Ltd | |
| Playmous, Inc. | |
| Plug In Digital SAS | |
| PocketLand (Comercial Leo de Sol SW Limitada) | |
| Private entrepreneur USHKEVICH DZMITRY ALEKSEEVICH | |
| Promedia Studio SRL | |
| Psym Mobile Pty Ltd | |
| Pt Inovidea Magna Global | |
| PYOPYO Studio | |
| Qaibo Games | |
| QUARZO APLICACIONES Y JUEGOS SL | |
| Rafael Garcia Moreno | |
| Raw Fury AB | |
| Rayark International Limited | |
| RayTron Lab FZE | |
| Raz Games Pty Ltd | |
| Realbyte Inc. | |
| RED BEAN LTDA - ME | |
| Relaxio s.r.o. | |
| Rendered Ideas Softgame Private Limited | |
| Renown Entertainment Incorporated | |
| Revontulet Soft Inc | |
| Rhythm Software | |
| Rikudo SASU | |
| Robert Ehrhardt | |
| Robot Circus pty ltd | |
| Robot Gentleman sp. z o.o. | |
| Rogue Games, Inc. | |
| RORTOS SRL | |
| Rottz Mobile Games LLC | |
| Rubicon Mobile, Ltd. | |
| RunaR | |
| Sago Mini | |
| Sam Barlow | |
| Sam Ruston | |
| SAMUEL BERGMAN CAVALCANTI SOUZA ME (APPS BERGMAN) | |
| Seabaa | |
| Sean Brakefield LLC | |
| SEEKRTECH CO., LTD. | |

| | |
|---|---|
| Sega of America, Inc. | |
| Sesame Workshop | |
| Share It Again | |
| SIGONO INC. | |
| SimpleHat Software, LLC | |
| Sinew Software Systems Private Limited | |
| Sirvo LLC | |
| Sixjoy Hong Kong Limited | |
| Slim Cricket | |
| Slothwerks | |
| Smart Study, Co., Ltd. | |
| Smart Tools co. | |
| Smartmob LLC | |
| Smellymoo | |
| SMG Studio | |
| smuttlewerk interactive UG (haftungsbeschränkt) | |
| Sofe Sunrise | |
| Sohomob Limited | |
| SONNORI CORP | |
| Soodex Labs S.A.S. | |
| SoundHound | |
| Sp. z o. o."Ranok-creative" | |
| Springloaded Pte. Ltd | |
| STANGA AD | |
| Stanislav Svistunov | |
| Star Music Studio | |
| Stéphane Marques | |
| StoryToys Limited | |
| Stratos Karafotis | |
| Studio Pango SAS | |
| Swiitt Computing Inc. | |
| Synpet | |
| Syntaxity Inc. | |
| Szép Roland ev. | |
| TabTale | |
| talZz (זלט) | |
| Tasmanic Editions SAS | |
| Tastypill, LLC | |
| TEACH & DRAW LTD | |
| Team17 Digital Ltd | |
| TegTap | |
| Tellmewow Studios | |
| Terrible Toybox | |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| | |
|---|---|
| test otherparty | |
| test123 | |
| The Angry Kraken S.L. | |
| The Label Limited | |
| The Secret Police Limited | |
| The Usborne Foundation | |
| The Voxel Agents Pty. Ltd. | |
| THINK WORLD | |
| Threye Interactive Pvt Ltd | |
| Thup Games | |
| Timuz | |
| tinyBuild LLC | |
| Tivola Publishing GmbH | |
| TMSOFT | |
| Toca Boca AB | |
| Top Line Solutions PTE. LTD. | |
| TOPRAK NET Bilisim Teknolojileri Limited Sirketi | |
| Tortuga Team Ltd | |
| TOWER OF HANOI SOFTWARE COMPANY LIMITED | |
| Treebit Technologies SL | |
| Triada Studio Games Inc. | |
| True Axis Pty Ltd | |
| Turbo Chilli Pty Ltd | |
| TutoTOONS Ltd. | |
| Udell Enterprises, Inc. | |
| Unified Intents AB | |
| United Soft Media Verlag GmbH | |
| USNaviguide LLC | |
| ustwo games ltd | |
| Vector Unit Inc | |
| Veewo Games Co., Ltd | |
| Venkatramanan Ramasubramanian | |
| Vertigo Gaming Inc. | |
| Ville Mäkynen | |
| Vilya Bt. | |
| Visover Software Technologies Limited | |
| Visual Blasters, LLC | |
| Vitaliy Gorlov | |
| Vito Technology | |
| VKL Apps | |
| Want2B, S.L. | |
| Wave Light Games Inc. | |
| WB Media Ltd | |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| | |
|---|---|
| We like games | |
| Weather Creative Inc. | |
| WebAvenue Unipessoal Lda | |
| webbfarbror AB | |
| Webelinx d.o.o | |
| Whiture Applications | |
| WiFi Map | |
| Winterlight Enterprises Pty. Ltd. | |
| Winterveil Studios Oy | |
| www.handy-games.com GmbH | |
| X-Flow Ltd | |
| Xiaobo Luo | |
| Yak & Co | |
| Zavasoft S.N.C. di Francesco Colferai e Martina Valenziano | |
| Zen Studios Ltd. | |
| Zeng Zhi Bo | |
| Zepni Ltd. | |
| ZeptoLab UK Limited | |
| 上海影卓信息科技有限公司 | |
| 個人事業主 | |
| 北京乐信圣文科技有限责任公司 | |
| 北京易言科技有限公司 | |
| 宝宝巴士(福建)网络科技有限公司 | |
| 杭州趣维科技有限公司 | |
| 深圳市油桃科技有限公司 | |
| genina.com | |
| Phosphor Studios, LLC | |
| The Irregular Corporation Limited | |

# EXHIBIT 13

## Cravath, Swaine & Moore llp

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1648

WRITER'S EMAIL ADDRESS
LMoskowitz@cravath.com

JOHN W. WHITE
EVAN R. CHESLER
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
RONALD E. CREAMER JR.
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS

ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ

DAVID J. PERKINS
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
DAVID L. PORTILLA
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MINH-VU H. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN

EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG
MICHAEL L. ARNOLD
HEATHER A. BENJAMIN
MATTHEW J. BOBBY
DANIEL J. CERQUEIRA
ALEXANDRA C. DENNING
HELAM GEBREMARIAM
MATTHEW G. JONES
MATTHEW M. KELLY
DAVID H. KORN
BRITTANY L. SUKIENNIK
ANDREW M. WARK

PARTNER EMERITUS
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY
KIMBERLEY S. DREXLER
NICOLE F. FOSTER
LILLIAN S. GROSSBARD
KIMBERLY A. GROUSSET
ANDREI HARASYMIAK

October 29, 2021

*In re: Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD (N.D. Cal.);
*Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
*In re: Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD (N.D. Cal.);
*In re: Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792-JD (N.D. Cal.);
*State of Utah et al. v. Google LLC et al.*, No. 3:21-cv-05227-JD (N.D. Cal.)

Dear Brian:

I write on behalf of Plaintiffs in the above-captioned matters ("the Actions") in response to Google's October 18, 2021 letter concerning discovery items that remain outstanding, and further to the meet and confers of October 21, 2021 and October 26, 2021.

1. **Instant Messages**

As discussed at length in previous letter correspondence and in the parties' October 21, 2021 meet and confer, Plaintiffs have concerns about deficiencies in Google's production of instant messages to date. During that same meet and confer, Google indicated that it would respond to Plaintiffs' questions in writing. Please promptly confirm or describe:

  i.   Google's preservation policy (absent a litigation hold) for Google Chats and Google Hangouts;

  ii.  The date that Google issued a hold notice in connection with each of the above-cited actions;

  iii. The step-by-step technological processes required to be taken by individuals who received litigation hold notices to preserve instant messages and whether those processes are dynamic (e.g., needing

to be serially performed) or static (e.g., performed once and then "set" until the litigation hold is withdrawn). Your response should include, but not be limited to, identifying:

(1)     The default settings for any new instant message regarding preservation of that message;

(2)     Whether those settings are applied on a chat-by-chat basis, or across all chats; and

(3)     Whether those settings are controlled by the individual custodian.

iv.     The specific actions Google has taken, if any, to verify that individuals subject to the litigation hold in this matter are complying with the obligations of the hold notices issued to preserve instant messages; and

v.     Whether Google has produced (or intends to produce) any instant messages from third-party chat platforms; and if so, the standard retention policy for those platforms, as well as how, if at all, that retention policy changes following a litigation hold notice.

As discussed during our October 21, 2021 meet and confer, Google did not disclose that it has a 24-hour purge policy for instant messages when the parties initially negotiated the collection periods for Google custodians. Had Plaintiffs been made aware of this policy, Plaintiffs would have requested that Google collect instant messages for all custodians throughout the extended collection period. While Plaintiffs do not have confirmation of the precise dates that hold notices were issued in these actions, Google's productions to date make clear that many Google custodians outside the expanded collection period sent responsive chats throughout 2020 and 2021. *See, e.g.*, GOOG-PLAY-003008683 (June 25, 2020 email from Hiroshi Lockheimer to Jamie Rosenberg discussing a future meeting between Samsung and Google "as discussed over chat"); GOOG-PLAY-002429892 (July 24, 2020 email from Purnima Kochikar requesting verification of "the stats shared by Fortnite, as discussed over ping"); GOOG-PLAY-003968354 (July 10, 2020 email from Purnima Kochikar discussing a meeting with product leadership across Android Pixel as originally discussed "over ping"); GOOG-PLAY-000965933 (April 27, 2020 email thread between Purnima Kochikar and Michael Marchak referencing "the last ping you sent me with a few of the key trends you wanted to mention re: Play Developer Trends"); GOOG-PLAY-005525960 (Tian Lim referencing a "chat discussion" with the Play BD/T&S working group).

As requested in Plaintiffs' October 6, 2021 letter, please promptly provide an "instant message" refresh production for all custodians using the full set of agreed upon search terms in this litigation covering the period between August 14, 2020 and March 31, 2021. Indeed, FRCP 26(e) requires such supplemental productions "in a timely manner if the party learns that in some material respect the disclosure or response

is incomplete . . . and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process in writing."  Fed. R. Civ. P. 26(e).

### 2.   Text Messages

Despite Google's promise to produce text messages on a rolling basis, Plaintiffs have been unable to locate any text messages in Google's productions to date. In the parties' October 21, 2021 meet and confer, Google represented that it had produced text messages and promised to identify representative examples of text messages by Bates number.

On that same meet and confer, Google argued that Plaintiffs had failed to provide present-day examples of communications by Google employees indicating that there are likely to be relevant text messages responsive to Plaintiffs' discovery requests. To the contrary, the examples provided in Plaintiffs' August 2, 2021 letter make clear that Google's production is replete with recent evidence that Google employees communicate using text messages regarding issues highly relevant to this litigation. *See, e.g.*, GOOG-PLAY-001825000 (September 2019 email thread wherein Hiroshi Lockheimer noted that he had received a "text" from a T-Mobile employee regarding ongoing "term sheet" negotiations); GOOG-PLAY-001826072 (March 2020 email thread wherein Jamie Rosenberg instructs Hiroshi Lockheimer to send AT&T representatives "a quick note" regarding "our MOU" to which Lockheimer responds that he had "texted" them").

To expeditiously resolve this issue, please provide the requested Bates numbers for already-produced text messages by Wednesday, November 3, 2021.  If there are additional text messages yet to be produced, please indicate when they will be produced to Plaintiffs.  Given that Plaintiffs have been pressing Google on this issue for months, Plaintiffs expect that any additional text messages will be produced promptly and well in advance of any depositions for witnesses known (or that should have been known) to have relevant text messages.

### 3.   Apple Contracts

After nearly six months of negotiations regarding Plaintiffs' request for agreements between Google and Apple, Inc. ("Apple") (RFP Nos. 156 and 157), Google finally agreed on September 30, 2021 to produce:

> i.    the revenue sharing agreement ("RSA") relating to the use of Google Search as the default search engine on Apple devices as part of Google's reproduction of documents produced to the Plaintiff States (the "CID production");

> ii.   any agreement with Apple in the CID production that hits on the agreed-upon search terms; and

iii.    custodial documents in the Actions that hit upon the agreed-to Apple-related search terms related to the RSA described above.

As Plaintiffs pointed out in their October 6, 2021 letter, however, Google failed to address whether there are other relevant agreements between Google and Apple. Despite Plaintiffs' repeated attempts to obtain this information (*see, e.g.*, Ltr. From H. Nam to B. Rocca 2-3 (Oct. 6, 2021)), Google continues to refuse to answer whether there are other agreements between Apple and Google that pertain to the iPhone or any of the GMS apps (*e.g.*, Google Chrome), or any of Google's advertising products, instead claiming that Plaintiffs' request is "vague and ambiguous". (Ltr. From B. Rocca to H. Nam 3 (Oct. 18, 2021)). In any event, Google offered to produce "communications that concern any agreement with Apple in its re-review of the MDL documents." (Ltr. From B. Rocca to H. Nam 3 (Oct. 18, 2021)). Google also confirmed during the October 26, 2021 meet and confer that all the individuals who were principally responsible for negotiating the Apple RSA are custodians in this case. In the interest of compromise, Plaintiffs accept Google's proposal. However, to the extent the produced communications indicate the existence of other relevant contracts or custodians who were principally responsible for negotiating the RSA (or other relevant agreements), Plaintiffs reserve the right to ask Google to produce them.

### 4. Data Requests

Google responded to Plaintiffs' September 14, 2021 letter regarding transactional data questions on October 11, 2021, which Google believes may obviate the need for Plaintiff's requested data dictionary. (Ltr. From B. Rocca to H. Nam (Oct. 18, 2021).) Plaintiffs will respond to Google's October 11, 2021 letter under separate cover and reserve the right to ask additional questions about Google's transactional data to the extent necessary.

### 5. RSAs

In their October 6, 2021 letter, Plaintiffs agreed to accept Google's offer to produce RSAs for the specified third parties related to Google Play and Google Play Billing, but reserved the right to seek additional third-party RSAs related to Android OS. Google acknowledged Plaintiffs' acceptance of Google's offer in its October 18, 2021 letter. Please confirm when they will be produced.

### 6. Individualized Contracts with App Developers

#### a. Play Pass and Play Points Agreements

In their October 18, 2021 letter, Google stated that it would produce a set of exemplar Play Pass/NBO agreements during the week of October 25, 2021. (Ltr. From B. Rocca to H. Nam 4 (Oct. 18, 2021).) Plaintiffs have not yet received it. Please confirm when they will be produced and identify them by bates number (or range).

### b. Identification of Produced and To-be-Produced Agreements

In their October 6, 2021 letter, Plaintiffs requested that Google confirm whether it had produced individualized agreements or contracts with all developers participating in (1) Project Hug (the Games Velocity Program), (2) the App Velocity Program, (3) the Living Room Accelerator Program (both LiveTV and Video), (4) the Audio Accelerator Program, and (5) Subscribe w/ Google.   Google stated in its October 18, 2021 letter that it anticipates producing additional Games Velocity Program agreements during the week of October 25, 2021.  (Ltr. From B. Rocca to H. Nam 4 (Oct. 18, 2021).)  Plaintiffs have not yet received them.  Please confirm when they will be produced and identify them by bates number (or range).  In addition, please confirm that Google has not identified any additional agreements related to the App Velocity Program, the Living Room Accelerator Program, the Audio Accelerator Program or Subscribe w/ Google that have not been produced.  To the extent additional agreements relating to these programs exist that have not been produced, please produce these documents immediately and identify them by bates number (or range).

In their October 6, 2021 letter, Plaintiffs also requested that Google identify the Bates numbers of all final, signed versions of any agreements relating to these five programs.  Google has refused to do so, arguing that "Plaintiffs have the information necessary to identify for themselves the developer agreements in Google's production."  (Ltr. From B. Rocca to H. Nam 4 (Oct. 18, 2021).)  As Google is aware, and as Plaintiffs explained at length during the October 26, 2021 meet and confer, there are many types of developer agreements in Google's production and many versions of each agreement, some executed and others not.  Google is best situated to identify final, signed versions of each of these agreements.  Please confirm whether Google is willing to do so.

Google further stated in its October 18, 2021 letter that it will endeavor to provide an update as to the anticipated date of production for any remaining developer agreements during the week of October 25, 2021.  (Ltr. From B. Rocca to H. Nam 4 (Oct. 18, 2021).)  Please provide Plaintiffs with this update no later than November 5, 2021.

### 7. Contracts with OEMs

Plaintiffs' August 2, 2021 letter requested a list of all OEMs for whom Google has produced agreements to date.  (Ltr. from L. Moskowitz to B. Rocca 4-5 (Aug. 2, 2021).)  A month-and-a-half later, in its September 17, 2021 letter, Google stated that Google is "willing to meet and confer regarding Plaintiffs' need for such a list."  (Ltr. from B. Rocca to H. Nam 4-5 (Sept. 17, 2021).)  In their October 6, 2021 letter, Plaintiffs explained their need for such a list, but Google simply reiterated its willingness to meet and confer.  (Ltr. From B. Rocca to H. Nam 6 (Oct. 18, 2021).)  Plaintiffs do not understand Google's resistance to providing this simple list.  As explained during the October 26, 2021 meet and confer, it is difficult for Plaintiffs to confirm whether they have received all final, executed versions of OEM contracts during the relevant time period.  There are multiple types of agreements for each OEM.  Further, there are multiple versions of many of the agreements, some executed and others not.

Without a list of all OEMs for whom Google has produced agreements to date, it is extremely difficult to determine whether Plaintiffs have received all final, executed contracts for the relevant period for each OEM.  Google is much better situated to provide this information.  Google indicated during the October 26, 2021 meet and confer that it would consider this request.  Please promptly confirm whether Google is willing to provide the requested list.

In addition, Plaintiffs request the below information regarding contracts with OEMs.

### a. Contracts with Larger OEMs

With respect to its contracts with larger OEMs, Google represented in its May 25, 2021 letter that it had "already produced OEM contracts for Oppo, Alcatel, and Motorola" and that it was "working through Non-Disclosure Agreement issues with Samsung".  (Ltr. from B. Rocca to Y. Even (May 25, 2021).)  Plaintiffs have received a number of draft and executed agreements and amendments for the larger OEMs. However, for some of the larger OEMs, Plaintiffs have received only certain types of agreements or amendments to agreements without the underlying agreement that is being amended.  For example, based on a search of Google's productions to date, Plaintiffs have received only amendments to Google's Mobile Application Distribution Agreements ("MADAs") with Alcatel (*see* GOOG-PLAY-000808133 and GOOG-PLAY-000808270), but have not received the underlying MADAs themselves.  Given that Plaintiffs have been requesting these agreements since December 2020, Plaintiffs request that Google promptly produce any remaining agreements with the larger OEMs as soon as possible, and that Google also provide the Bates numbers of the final, executed agreements and amendments with the larger OEMs, for the reasons described above.

### b. Contracts with Smaller OEMs

Google's September 17, 2021 letter confirmed that it had completed production of agreements with a subset of smaller OEMs that were identified in Plaintiffs' May 22, 2021 letter, and provided an "Exhibit A" listing the Bates numbers of these agreements.  (*See* Ltr. from B. Rocca to H. Nam (Sept. 17, 2021).)  The list included in Exhibit A provided by Google purports to identify all of the agreements with the subset of OEMs that Google has produced.  For certain OEMs, however, such as IBRITECH DMCC, there is only one executed agreement identified in the Exhibit, despite the numerous types of agreements that Google enters with OEMs.  Plaintiffs request that Google confirm that the agreements listed in Exhibit A to Google's September 17, 2021 letter represent *all* of the agreements, including but not limited to MADAs and Anti-Fragmentation Agreements, that Google has entered with the subset of smaller OEMs that Plaintiffs identified.  If the agreements listed in Exhibit A do not represent all of the agreements with this smaller subset of OEMs, please promptly update Exhibit A to Google's September 17, 2021 letter to include all such agreements, promptly produce all of the agreements and provide a date certain by which production will be complete.

### 8.   Wireless Carrier Agreements

Google's March 22, 2021 letter stated that "Google has taken steps to collect and prepare for production the final revenue sharing ("RSAs") and direct carrier billing agreements ("DCBs") for the top four U.S. carriers (AT&T, Verizon, Sprint, and T-Mobile) in effect between January 1, 2014 through August 13, 2020."  (Ltr. from B. Rocca to Y. Even (Mar. 22, 2021).)  Google's April 19, 2021 letter stated that Google expected to "produce the contracts with the top four U.S. wireless carriers in the near term." (Ltr. from B. Rocca to Y. Even  (Apr. 19, 2021).)  Google then asserted in its May 25, 2021 letter that it had "already included the bulk of the relevant contracts with the top four U.S. wireless carriers in its prior productions and will complete its production of the remaining agreements in its upcoming productions," and that "Google will conduct a reasonable search for and, to the extent located, will produce revenue sharing agreements with the top four U.S. wireless carriers." (Ltr. from B. Rocca to Y. Even (May 25, 2021).)  Google subsequently represented that, as of August 13, 2021, Google had completed its production of RSAs with the wireless carriers identified above.  (*See* Ltr. from B. Rocca to L. Moskowitz (Aug. 13, 2021).)

Despite Google's assertions, Plaintiffs have been unable to locate in Google's productions RSAs and DCBs for <u>each</u> of the top U.S. wireless carriers.  Plaintiffs therefore request that Google promptly provide all of the final, executed RSAs and DCBs for the top U.S. wireless carriers and the corresponding Bates numbers for those agreements immediately.

### 9.   House Judiciary Committee ("HJC") Productions

In its October 18, 2021 letter, Google agreed to produce the remaining 31 documents from the HJC production in its next document productions and to inform Plaintiffs when the HJC productions are complete.  (Ltr. From B. Rocca to H. Nam 1 (Oct. 18, 2021).)  Please confirm that Google's October 28, 2021 production completes its HJC productions.

### 10.   PowerPoint Files

Google stated in its October 18, 2021 letter that it anticipates reproducing color JPEG versions of all .pptx files by November 1, 2021.  (Ltr. from B. Rocca to H. Nam 1 (Oct. 18, 2021).)  To the extent that any of the PowerPoint files reproduced as color JPEGs are still not legible, Google proposed producing the files in native .pptx format pursuant to the protocol set forth in its October 18, 2021 letter.

Plaintiffs are generally amenable to Google's proposal.  However, Plaintiffs will not agree to submit only one consolidated request for native .pptx files per week.  Given that deposition dates for Google witnesses remain outstanding, and that Plaintiffs cannot know at this time the extent to which legibility issues will continue to exist following the JPEG reproduction, Plaintiffs require the flexibility to submit multiple requests per week if needed.  Further and to that end, Google's proposal also fails to include any time frame by which Google will respond to Plaintiffs' requests for native

.pptx files.  Therefore, Plaintiffs propose the following modified protocol, which is based on the one set forth in Google's October 18, 2021 letter:

      i.     Google will designate a Senior Manager at Conduent, our eDiscovery vendor for these cases, as Plaintiffs point of contact for reasonable requests for copies of native PowerPoint files for documents that Plaintiffs determine are not sufficiently legible as color JPEGs.

      ii.    If Plaintiffs request a native PowerPoint for a document that Google produced with redactions, the Senior Manager at Conduent will share a copy of that native file with a designated Google Legal Ops contact, who manages e-discovery issues and is not involved in the substantive defense of this litigation. The Google Legal Ops contact will perform a quality assurance check to confirm that the native file accurately reflects all necessary redactions in order to preserve privilege and will not identify the documents requested by Plaintiffs to the litigation team members involved in the substantive defense of these cases.

      iii.   Plaintiffs will endeavor to consolidate Plaintiffs' collective requests for native .pptx files to one request per week to the extent possible, but reserve the right to submit multiple requests for native .pptx files as reasonably necessary. Plaintiffs must also simultaneously notify Google's external counsel with the number of native PowerPoint files it is requesting;

      iv.   Google will use best efforts to provide Plaintiffs with a reproduction of the file(s) in native .pptx format within forty-eight (48) hours of the request, subject to reasonable extensions based on the timing or the number of requests.

Please promptly confirm whether Google is amenable to Plaintiffs' proposed protocol.

## 11. App Store Requests

Google stated that it is investigating the App Store Reports identified in Plaintiffs' October 6, 2021 letter, including the existence of other reports and the months and years for which the reports were created.  (Ltr. From B. Rocca to H. Nam 6 (Oct. 18, 2021).)  Please advise when Google expects to complete this investigation and confirm that Google will produce all App Store Monthly Reports and inform Plaintiffs of the months and years for which such reports were created.

## 12. Organizational Charts

Google agreed to collect and produce reporting information for all agreed-upon custodians and provide the Bates numbers of responsive documents in the near

term.  (Ltr. From B. Rocca to H. Nam 3 (Oct. 18, 2021)).  Please advise when Google will be making this production and identify them by bates number (or range).

### 13. Microsoft Non-Aggression Pact

Google agreed to produce the Microsoft Non-Aggression Pact. (Ltr. From B. Rocca to H. Nam 3 (Oct. 18, 2021).)  Please advise when Google will be making this production and identify it by Bates number.

### 14. NDAs

Google confirmed that it was producing "any relevant communications that were made pursuant to any NDAs—whether the NDA itself is directly relevant to the issues in the case or not." (Ltr. From B. Rocca to H. Nam 3 (Oct. 18, 2021).) Regarding the NDAs themselves, however, Google states that "Plaintiffs failed to cite a single discovery request seeking the production of NDAs." (Ltr. From B. Rocca to H. Nam 3 (Oct. 18, 2021).)  To the contrary, Plaintiffs' October 6, 2021 letter identified numerous RFPs that specifically call for Google to produce *all* final contracts or agreements between Google and third parties, including:

> i.    RFP 1: "Please produce all final contracts OR agreements in effect during the RELEVANT PERIOD between YOU AND each: (i) OEM; AND (ii) each WIRELESS SERVICE PROVIDER that YOU have entered into".

> ii.   RFP 32: "Please produce all contracts OR agreements in effect during the RELEVANT PERIOD between YOU AND ANY APP DEVELOPER to the extent they are not identical to one of YOUR exemplar agreements produced in response to REQUEST No. 31".

> iii.  RFP 37: "Please produce all contracts OR agreements between YOU and ANY third-party ANDROID DEVELOPER or other entity that operates ANY OTHER APP MARKETPLACE OR SOFTWARE STORE RELATING TO such OTHER APP MARKETPLACE, SOFTWARE STORE, OR GOOGLE PLAY".

Because these RFPs seek all agreements between Google and OEMs, carriers, and developers, and because NDAs are a type of agreement, please confirm that Google will promptly produce all NDAs responsive to Request Nos. 1, 32 and 37.

### 15. Search String No. 95

Google confirmed that it agreed to modify Search Term 95 to include "Wichita", "Argon", "Acacia", and "Project Playful." (Ltr. From B. Rocca to H. Nam 3 (Oct. 18, 2021).)  But Google then rejected Plaintiffs' proposal to also include "Pacific", "Marmot", "Robinson", and "Cake" based on hit reports that suggested those terms were too broad and captured many irrelevant materials.  (*Id.*)  At the October 26, 2021 meet and confer, Plaintiffs proposed modifying these terms to be more targeted, and then

followed up with a written proposal.  (E-mail From A. Schwartz to R. Satia (Oct. 26, 2021).)  That communication proposed to modify the rejected terms as follows:  ("Marmot" /25 "app*"), "Project Pacific", "Project Robinson", and "Project Cake".  Please confirm whether Google accepts Plaintiffs' modified proposal, which for completeness, is reflected in blue, below.

        Since Plaintiffs' October 6, 2021 letter, additional relevant code names have been identified that Plaintiffs propose to also add to Search Term 95, as set forth below in red.  Please confirm that you agree to Plaintiffs' proposal.

> Search Term 95: Cupcake OR Detox OR "Gabby" OR "Ivan" OR "Magical Bridge" OR Nikkei OR Paragon OR Purell OR Ringo OR Runway OR Soren OR "Project Soy" OR "Sun-Mool" OR "Sun Mool" OR "Project Switch" OR "Project Dynasty" OR "Emu" OR "Free Willy" OR Lowball OR "Project Mission" OR "Project Napa" OR Nikkei OR "Project Plaid" OR "RePlay" OR "Project Starburst" OR Tomcat OR "Zeus" OR "Off-Play Installs" OR "Orphaned Apps" OR "Honeycrisp" OR "GDAF" OR "Basecamp" OR "Agave" OR "Wichita" OR "Argon" OR "Acacia" OR "Project Playful" OR ("Marmot" /25 "app*") OR "Project Pacific" OR "Project Robinson" OR "Project Cake" OR "Starburst" OR "Clover" OR "Lion Force"

## 16. Metadata

        As previewed on the October 26, 2021 meet and confer, it has come to Plaintiffs' attention that Google is missing certain metadata in its productions.  In particular, there are 399 documents in Google's production that lack data in the AllCustodians field, and there are 17,555 documents in Google's production that lack data in the Document Type field.  Plaintiffs have identified the Bates numbers for these documents in the attached Exhibits A and B, respectively.  Please promptly provide Plaintiffs with an overlay file that includes the missing metadata.

## 17. Chrome Web Store Agreements

        Google agreed to produce certain exemplar Chrome Web Store agreements between January 1, 2014 and August 13, 2020.  (Ltr. From B. Rocca to L. Moskowitz and J. Byars (Aug. 13, 2021).)  Google further stated that the production of those documents would be completed by August 20, 2021.  *Id.*  Plaintiffs, however, are only able to identify approximately 20 such agreements in the production, many of which are drafts, and not final versions.  Please confirm whether Google has completed its production of exemplar web store agreements and, if so, please identify them by Bates number (or

range).  If Google has not completed its production of these agreements, please do so promptly and then identify them by Bates number (or range).

Sincerely,

*/s/  Lauren A. Moskowitz*
Lauren A. Moskowitz

Encls.

Brian C. Rocca
Sujal J. Shah
Michelle P. Chiu
Minna L. Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
brian.rocca@morganlewis.com
    sujal.shah@morganlewis.com
        michelle.chiu@morganlewis.com
            minna.naranjo@morganlewis.com
                rishi.satia@morganlewis.com

Daniel M. Petrocelli
Ian Simmons
Benjamin G. Bradshaw
E. Clay Marquez
Stephen J. McIntyre
O'MELVENY & MYERS LLP
dpetrocelli@omm.com
    isimmons@omm.com
        bbradshaw@omm.com
            cmarquez@omm.com
                smcintyre@omm.com

Karma M. Giulianelli
Glen E. Summers
Jameson R. Jones
BARTLIT BECK LLP
karma.giulianelli@bartlitbeck.com
    glen.summers@bartlitbeck.com
        jameson.jones@bartlitbeck.com
            GoogleAppConsumerCounsel@bartlitbeck.com

Hae Sung Nam
Laurence D. King
Mario M. Choi
KAPLAN FOX & KILSHEIMER, LLP
hnam@kaplanfox.com
   lking@kaplanfox.com
      mchoi@kaplanfox.com

George Zelcs
Jamie L. Boyer
Stephen M. Tillery
KOREIN TILLERYLLC
gzelcs@koreintillery.com
   jboyer@koreintillery.com
      stillery@koreintillery.com
         AppConsumersDiscovery@KoreinTillery.com

Peggy J. Wedgworth
MILBERG PHILLIPS GROSSMAN LLP
pwedgworth@milberg.com

Elizabeth C. Pritzker
Jonathan K. Levine
PRITZKER LEVINE LLP
ecp@pritzkerlevine.com
   jkl@pritzkerlevine.com

Nanci E. Nishimura
Mark C. Molumphy
Adam J. Zapala
Noorjahan Rahman
Elizabeth Tran Castillo
COTCHETT, PITRE & MCCARTHY, LLP
nnishimura@cpmlegal.com
   mmolumphy@cpmlegal.com
      azapala@cpmlegal.com
        nrahman@cpmlegal.com
           ecastillo@cpmlegal.com

Steve W. Berman
Robert F. Lopez
Benjamin J. Siegel
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com
   robl@hbsslaw.com

bens@hbsslaw.com

Joseph Vanek
Eamon P. Kelly
Alberto Rodriguez
SPERLING & SLATER, P.C.
jvanek@sperling-law.com
   ekelly@sperling-law.com
      arodriguez@sperling-law.com

Bonny E. Sweeney
Melinda R. Coolidge
Katie R. Beran
Scott A. Martin
Irving Scher
HAUSFELD LLP
bsweeney@hausfeld.com
   mcoolidge@hausfeld.com
     kberan@hausfeld.com
       smartin@hausfeld.com
        ischer@hausfeld.com
          DevelopersvGoogle@hausfeld.com

Brendan P. Glackin
OFFICE OF THE UTAH ATTORNEY GENERAL

BY EMAIL

# EXHIBIT 14

# Morgan Lewis

**Brian C. Rocca**
Partner
+1.415.442.1432
brian.rocca@morganlewis.com

<span style="color:red">**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**</span>

November 11, 2021

**VIA E-MAIL**

Lauren A. Moskowitz
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Re:     *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.);
        *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
        *In re Google Play Consumer Antitrust Litig.*, No. 3:20-cv-05761-JD (N.D. Cal.);
        *In re Google Play Developer Antitrust Litig.*, No. 3:20-cv-05792-JD (N.D. Cal.);
        *State of Utah, et al. v. Google LLC et al.*, No. 3:21-cv-05227-JD (N.D. Cal.)

Dear Lauren:

We write in response to your letter of October 29 regarding outstanding discovery issues.

**<u>Native PowerPoint Files</u>**

Google reimaged PowerPoint files as color JPEGs and reproduced those files to Plaintiffs on November 1, 2021 in production volume PROD048.  To the extent Plaintiffs determine that any of the PowerPoint files reproduced as color JPEGs are still not legible, Google agrees to Plaintiffs' protocol set forth in your letter of October 29, 2021 with one modification to provision (iv). As discussed on our prior meet and confers, given the potential volume, system processing time, and quality control measures that will be required to complete each request, Google is unable to commit to providing Plaintiffs with a reproduction of files in native format within forty-eight hours. Thus, Google proposes the following modification to provision (iv):

> (iv) Google will use best efforts to provide Plaintiffs with a reproduction of the file(s) in native .pptx format within ~~forty-eight (48)~~ <span style="color:red">seventy-two (72)</span> hours of the request, subject to reasonable extensions based on the timing or the number of requests.

**<u>Metadata</u>**

We are looking into Plaintiffs' inquiry regarding Google's production of certain metadata fields and will follow up with additional information in due course.

**Morgan, Lewis & Bockius** LLP

One Market
Spear Street Tower
San Francisco, CA  94105-1596          ☏ +1.415.442.1000
United States                          ℻ +1.415.442.1001

Lauren A. Moskowitz
November 11, 2021
Page 2

<span style="color:red">**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**</span>

**<u>Search Query No. 95</u>**

Google agrees to add the following terms to Search Query No. 95:

> (Marmot w/25 (app or apps or application*)) OR "Project Cake" OR "Project Robinson" OR "Project Pacific"

We understand that Plaintiffs are now requesting that Google add "Starburst", "Clover", and "Lion Force" as terms to Search Query No. 95.  The query already includes "Project Starburst", so Google objects to Plaintiffs' duplicative request to add "Starburst".  With respect to "Clover" and "Lion Force", Google requests that Plaintiffs explain the basis for their request to add each of these terms.

**<u>Text Messages</u>**

As Google has explained multiple times on several occasions, the vast majority of Google's custodians do not use text messages to conduct business.  For that reason, it is not surprising that there are relatively few text messages in Google's production.  Google is diligently evaluating whether its custodians possess responsive text messages that should be collected and produced.  We provided an example of such a responsive text message in Google's production in our November 3, 2021 correspondence.  Moreover, as we also explained previously, the mere fact that an individual refers to a "text" does not necessarily mean the use of an SMS text message, and can refer to other means of communication, including an email.  Moreover, Plaintiffs' examples in its October 29 letter do not suggest that responsive text messages should exist in Google's production.  The dates of both examples identified pre-date the filing of the complaint in this litigation; thus, even if those emails did actually refer to SMS text messages, the fact that they were no longer available after the filing of this lawsuit is entirely expected and does not support Plaintiffs' implication that Google's collection of text message is somehow incomplete.

**<u>Instant Messages / Chats</u>**

Plaintiffs' contention that if they had known that there was a "24-hour purge policy for instant messages when the parties initially negotiated the collection periods for Google custodians", they would have requested collection of instant messages for all custodians for the entire refresh period is nonsensical.  Negotiations relating to refresh collections were based on individuals' roles and relevant responsibilities and should not be affected by Google's usual course of business retention policy.  Google's obligation to preserve is independent of those negotiations and there is no reason to change the Parties' agreement as to which custodians require a refresh production.

Plaintiffs have made no showing that Google's production of instant messages and chats is incomplete or deficient aside from baseless assumptions.  The examples Plaintiffs identify in their October 29 letter to purport to show that there are "responsive chats throughout 2020 and 2021" are actually emails dated between January 2020 and July 2020, which pre-date the filing of the earliest complaint and fall within the period when the ordinary course 24-hour retention policy period was in place.  As we previously stated, to the extent Plaintiffs identify any information that suggests that instant messages or chat messages for the refresh custodians are incomplete, we will further investigate.  However, to date, Plaintiffs have not done so, and Google continues to believe that its productions of responsive chats and instant messages are comprehensive.

Lauren A. Moskowitz
November 11, 2021
Page 3

<span style="color:red">**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**</span>

In the interest of closing out this issue, Google provides the following information in response to Plaintiffs' request for information relating to Google's preservation of chats and instant messages:

    i.    Google's current chat retention policy is attached as Exhibit A to this letter.

    ii.    Google provided litigation hold notices to the vast majority of custodians on September 11, 2020.  To the extent any custodians were not initially identified as having relevant information, hold notices were issued immediately upon notice of their relevance.

    iii.    With respect to the technological processes required to be taken by individuals to preserve chats or instant messages following their receipt of litigation holds, Google responds that the technological settings on Google's chat retention policy (see Exhibit A) did not change, as Google does not have the ability to change default settings for individual custodians with respect to the chat history setting.  See Exhibit B, Google Workspace Admin Help page re: chat history.  Specifically:

        1.    Google's default settings for chat history for the entire organization is set to off;

        2.    Google employees need to apply the "history on" setting on a chat-by-chat basis; and

        3.    Settings for chat history are set by each individual custodian.

    iv.    To the extent the question asks for information that is covered by attorney-client privilege and work product, we decline to answer.  However, without divulging the content of attorney-client communications, Google states that it actively manages its litigation hold, including regular reminders to custodians about their preservation obligations.

    v.    Google generally encourages Google employees to use Google corporate services for chat and other communications.  The use of third-party chat platforms is strongly discouraged. However, to the extent any such platforms have been used for business purposes and contain messages relevant to this litigation and are within the possession, custody and control of Google, such messages are subject to the litigation hold and Google will produce relevant messages from those third-party chat platforms.

## Organizational Charts

We are preparing a production of reporting information from the Teams tool for all agreed upon custodians as of October 18, 2021. We will produce this information in the near term and will identify responsive documents by Bates number.

## House Judiciary Committee ("HJC") Productions

Google produced the remaining 31 documents from the HJC production that were tied up in the NDA notice process on October 28, 2021 in production volumes PROD046A and PROD046B.

Lauren A. Moskowitz
November 11, 2021
Page 4

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

**Apple Contracts**

As an initial matter, Google confirmed during the October 26, 2021 meet and confer that it would likely produce all of the "relevant" agreements between Google and Apple, because the individuals who were principally responsible for negotiating the Apple RSA are custodians in either the MDL or in the CID.  Given that Google offered to re-review and produce communications relating to Google-Apple agreements that were collected during discovery in the MDL, and given that the CID materials were being produced without a relevance review, we continue to believe that our offer should be sufficient.  Google agrees that Plaintiffs reserve their rights to request additional relevant contracts or custodians responsible for negotiating agreements between Apple and Google.  Google also reserves rights to object to such requests to the extent Google does not believe such agreements or custodians are relevant to the claims in this litigation.

**Microsoft Agreement**

Google has produced this agreement.  *See* GOOG-PLAY-007335679 - GOOG-PLAY-007335696.

**Individual Contracts with App Developers**

**Play Pass and Play Points Agreements.**  As previously noted, Google produced several exemplar Play Points agreements in Production Vol. 35.  Exemplar Play Pass / NBO agreements were included in Production Vol. 41.  This completes Google's production of these agreements.

**Updates Concerning Developer Deal Program Agreements.**  Plaintiffs request an update on the status of the production of agreements with developers participating in (1) the Games Velocity Program, (2) the App Velocity Program, (3) the Living Room Accelerator Program, (4) the Audio Accelerator Program, and (5) Subscribe with Google, and reiterate the request "that Google identify the Bates numbers of all final, singed versions of any agreements relating these five programs."  As discussed during the October 26, 2021 meet and confer, and again during the November 4, 2021 meet and confer, we are presently working to ensure we have identified all relevant agreements through a reasonable search, providing notice to additional third parties, and collecting additional agreements for production.  Based on the information available at this time, Google provides below an update for each deal program.  As for the identification of agreements by Bates number, as discussed during the October 26, 2021 meet and confer, identifying all deal program agreements by Bates number is an exercise Plaintiffs can perform just as easily as Google, as Plaintiffs have the deal program names and can search the production with those terms.  That said, in an effort to assist Plaintiffs in the identification of the relevant agreements, Google has identified sample agreements by Bates number, which should enable Plaintiffs to readily ascertain additional agreements from each program.

*Hug/Games Velocity Program Agreements.*  As stated during the October 26, 2021 meet and confer, Google anticipated the additional Games Velocity Program agreements would be produced the following week.  Google confirms that those agreements were included in Production Volume 49.  This completes Google's production of these agreements.  Games Velocity Program agreements were included in Production Vols. 31 and 49.  Examples of Games Velocity Program agreements and related addenda include GOOG-PLAY-007273051; GOOG-PLAY-007273234; GOOG-PLAY-007273255; GOOG-PLAY-007273839; GOOG-PLAY-007335462; GOOG-PLAY-007273439.

Lauren A. Moskowitz
November 11, 2021
Page 5

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

*Apps Velocity Program.*  Google has identified previously unproduced Apps Velocity Program agreements with two developers.  Notice will be provided to the developers and we anticipate that the agreements will be produced by the end of the month.  No AVP agreements have been produced.

*Audio Accelerator Program (ADAP).*  Google has identified previously unproduced ADAP agreements with three developers.  Notice will be provided to these developers and we anticipate that the agreements will be produced by the end of the month.  ADAP agreements were included in Production Vol. 31.  Examples of produced ADAP agreements include GOOG-PLAY-007317084; GOOG-PLAY-007272061; GOOG-PLAY-007272068.

*Living Room Accelerator Program (LRAP).*  Google has identified previously unproduced LRAP agreements with seventeen developers.  Agreements with five of those developers were included in Production Vol. 49.  Google is continuing to work through notice issues with the remaining twelve, though we expect all of the remaining agreements will be produced by the end of the month.  LRAP agreements were included in Production Vols. 31, 35 and 49.  Examples of produced LRAP agreements include GOOG-PLAY-007272399; GOOG-PLAY-007272002; GOOG-PLAY-007272857; GOOG-PLAY-007272245; GOOG-PLAY-007273263; GOOG-PLAY-007274202.

*Subscribe with Google.*  To date, Google has produced Subscribe with Google agreements with more than a hundred developers.  Those agreements were included in Production Vols. 31, 35, and 49.  Examples of produced Subscribe with Google agreements include GOOG-PLAY-007272335; GOOG-PLAY-007335327; GOOG-PLAY-007272640.  While Google has located Subscribe with Google agreements with roughly 30 additional developers, Google has faced difficulty providing notice to some of these partners.  Rather than go through the time-consuming process of giving notice to each of these developers, Google has attached here as Exhibit C a list of Subscribe with Google developers for whom an agreement has not yet been produced.  To the extent Plaintiffs would like Google to produce any particular agreements from this list, up to a reasonable number, Google will agree to attempt to notify the developer and produce the agreement.

**NDAs**

Plaintiffs continue to ask Google to undertake a search for NDAs, but fail to address Google's objection to this request as irrelevant and unproportional to the case in light of the fact that relevant substantive communications made pursuant to any NDA would be produced--and have been, as evidenced by Plaintiffs own example of an email referencing a Facebook NDA.  Nor do Plaintiffs explain what an NDA "concern[ing] issues related to this litigation" even looks like or identify any documents demonstrating that such NDAs might exist.  *See* 2021.10.08 H. Nam Letter to B. Rocca.  For example, is the "Confidentiality" clause contained in many of the agreements Google has produced a "NDA" by Plaintiffs definition?  If so, then Plaintiffs already have access to NDAs "concern[ing] issues related to this litigation," in MADAs for instance.

In Plaintiffs' October 29, 2021 letter, Plaintiffs cite RFPs to which NDAs would be responsive, as they had not previously even attempted to do so.  These requests do not support Plaintiffs position.  RFP No. 1 requests all agreements between Google, on the one hand, and OEMs and wireless carriers, on the other.  But in response to that request Google only agreed to produce MADAs and RSAs for certain OEMs and wireless carriers, which it has done, and more, subject to the parties' subsequent meet and confer negotiations.  RFP No. 32 seeks agreements between

Lauren A. Moskowitz
November 11, 2021
Page 6

<span style="color:red">**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**</span>

Google and developers deviating from exemplars of agreements developers must enter into as called for in RFP No. 31.  Google has produced agreements with developers that modify the terms of the standard DDA.  And RFP No. 37 seeks agreements with developers that operate other app marketplaces or software stores, and Google agreed to produce exemplars of DDAs, terms of service, and Android SDK License Agreements.  None of these RFPs necessarily seek either directly or indirectly NDAs.  That said, to the extent Plaintiffs identify any particular documents from the custodial productions that refer to the existence of an NDA between Google and OEM, developer, or carrier directly relevant to the issues in the case, Google is willing to consider a particularized request to search for the underlying NDA.

**Revenue Share Agreements**

As noted in Plaintiffs' October 29, 2021 letter, Plaintiffs agreed to Google's offer to search centralized repositories for RSAs with non-OEMs and non-wireless carriers for revenue share agreements relating to Google Play and Google Play Billing.  Plaintiffs ask for an update on the production of additional agreements, but as Google represented in its August 13, 2021 letter, Google conducted that search and was unable to locate any revenue share agreements related to Google Play and Google Play Billing other than those with OEMs and carriers.  As Google explained in its October 18, 2021 letter, Google is searching for and producing revenue share agreements relevant to the cases--that is, revenue share agreements with app store or installer preinstallation restrictions.  Those revenue share agreements with such restrictions are found between Google and OEMs and wireless carriers, which Google has produced pursuant to the parties' various agreements through the meet and confer process.

**Contracts with OEMs**

Plaintiffs request a list of OEMs for whom Google has produced agreements to date, in order to enable Plaintiffs to determine what agreements Google has produced for each OEM.  While Google believes Plaintiffs are able to find all relevant agreements by searching for agreement types, Google has attached as Exhibit D the requested list of OEMs.

*Contracts with Larger OEMs.*  Plaintiffs contend that "for some of the larger OEMs, Plaintiffs have received only certain types of agreements or amendments to agreements without the underlying agreement" for a number of OEMs.  As an initial matter, Google believes it has collected and produced all available contracts, per the parties' agreements, for each of the larger OEMs.  That said, the one example cited by Plaintiffs is Alcatel, for whom Plaintiffs state they have received MADA amendments without receiving the underlying MADAs themselves.  Based on the documents cited in Plaintiffs' letter, it appears Plaintiffs are aware that the signing party for Alcatel agreements is TCT Mobile Limited.  At least one MADA has been produced for TCT Mobile Limited.  *See* GOOG-PLAY-000617393.

*Contracts Smaller OEMs.*  Plaintiffs ask Google to confirm that the agreements listed in Exhibit A to Google's September 17, 2021 letter represent all agreements with the subset of smaller OEMs that Plaintiffs identified.  Based on a reasonable search, Google can confirm that the agreements produced for the smaller OEMs constitute all of the relevant agreements identified for those OEMs.

Lauren A. Moskowitz
November 11, 2021
Page 7

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

**Wireless Carrier Agreements**

Plaintiffs contend that they are unable to locate revenue share agreements and direct carrier billing agreements for the top four U.S. carriers in Google's production.  Google believes, as it has previously represented, that these agreements have already been produced and the production of U.S. carrier agreements is complete.  While Plaintiffs do not specify which agreements they believe they do not have, to assist Plaintiffs with identifying the relevant carrier agreements, Google provides the following examples by Bates number:

(1) AT&T (GOOG-PLAY-003604531; GOOG-PLAY-003604606; GOOG-PLAY-001507837);

(2) Sprint (GOOG-PLAY-003604546; GOOG-PLAY-003604937; GOOG-PLAY-001507921);

(3) T-Mobile (GOOG-PLAY-003604627; GOOG-PLAY-003604732; GOOG-PLAY-003604574 GOOG-PLAY-001507814); and

(4) Verizon (GOOG-PLAY-3604808; GOOG-PLAY-003604862).

**Chrome Web Store Agreements**

Google produced the current version of the chrome web store agreement, GOOG-PLAY-007274442, as well as historical versions of that agreement, *see, e.g.* GOOG-PLAY-007274481 and GOOG-PLAY007274462

**App Store Reports**

Plaintiffs asked in their October 6, 2021 letter that Google produce all "App Store Reports," as found at GOOG-PLAY-001167043.  Based on a reasonable investigation, the App Store Reports document Plaintiffs identified contains not only the final App Store Report for March 2018, but all prior iterations of the App Store Report, dating back to the first report covering November 2017.

*        *        *

We are available to discuss these issues at the next scheduled meet and confer.

 Sincerely,

Brian C. Rocca


cc:     Yonatan Even (YEven@cravath.com)
         Justin C. Clarke (jcclarke@cravath.com)
         Eric Zepp (ezepp@cravath.com)
         Zachary Jarrett (zjarrett@cravath.com)
         Daniel Ottaunick (dottaunick@cravath.com)

Lauren A. Moskowitz
November 11, 2021
Page 8

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

Bonny E. Sweeney (bsweeney@hausfeld.com)
Melinda R. Coolidge (mcoolidge@hausfeld.com)
Katie R. Beran (kberan@hausfeld.com)
Alberto Rodriguez (arodriguez@sperling-law.com)
Steve W. Berman (steve@hbsslaw.com)
Rob F. Lopez (robl@hbsslaw.com)
Ben J. Siegel (bens@hbsslaw.com)
Karma M. Giulianelli (karma.giulianelli@bartlitbeck.com)
Jamie L. Boyer (jboyer@koreintillery.com)
Hae Sung Nam (hnam@kaplanfox.com)
Aaron Schwartz (ASchwartz@kaplanfox.com)
Brendan Glackin (bglackin@agutah.gov)
Brian Christensen (bchristensen1@agutah.gov)
Sarah Boyce (sboyce@ncdoj.gov)

# EXHIBIT A

# Google Chat Retention Policy

Policy Last modified: November 18, 2020

Page last modified:  February 26, 2021

Our Google Chat retention policy aims to reduce redundant, obsolete, and trivial information in corporate chats. By helping us all focus on our most meaningful and useful messages, we can reduce time spent sifting through irrelevant old messages and reduce storage costs.

## Retention Periods

- **24 hours** if history is off

- **30 days** for history-on chats with just one one other person

- Currently **18 months** for history-on chats in a group conversation or flat (non-threaded) room
  - Exception: 30 days if the history-on flat room was created from within classic Hangouts before 11/18/20
  - **Please be aware:** You may have noticed that your group chats created in classic Hangouts are also reflected as flat rooms in Google Chat (and vice versa). Historically, both had a retention period of 30 days. The current 18-month retention of flat rooms is a technical interim step and will be brought back to the initial **30 days** earliest H1 2021 (we'll be sure to announce when this is happening!). If you need 18-month-long retention, please consider a threaded room instead.

- **18 months** for chats in a threaded room (history is always on and can't be turned off)

  NOTE:  Turning history "on" or "off" applies only to messages sent after that change. For example, if you send or receive messages while history is "off" and then you turn it "on," the pre-existing messages will only be retained for 24 hours.

  NOTE: Once a chat's retention period expires and it's removed from your view, it can't be recovered back into your view.

## Business Records

If your role involves data that is potentially subject to different or longer retention periods (for example, private user data or tax records), consider taking information like this off of Chat into Gmail (Gmail Retention Policy), Google Docs, or another storage system. If you aren't sure whether the data you're handling should be stored outside of Chat for a different retention period, reach out to your manager or product counsel (go/whichlawyer).
   Otherwise, feel free to reach out to us at records-retention@google.com     for more general data retention questions.

## Legal Holds

**CONFIDENTIAL**

If you've been notified that you're subject to a "legal hold": To comply with our preservation obligations, your Google Chats described below will be preserved automatically (all retention periods are paused) while the relevant matter is pending. Still, don't manually delete any chats relevant to the matter at issue under any circumstances.

- On-the-record 1:1s, Group DMs, and Flat Rooms you've sent or received

- Threaded Rooms conversations in which you've participated (i.e., sent a message, not just received)

Once all applicable legal holds have been lifted, the retention periods will take effect again and remove expired messages.

## Policy Scope

This policy applies to corporate Google Chat only. It applies to all employees and our extended workforce (temporary workers/vendors/contractors) across Alphabet (minus Calico and Sidewalk Labs).

## Approvals & Changes

This policy periodically will be reviewed by Google Legal to ensure alignment and compliance with our legal and regulatory obligations. Any changes to this retention policy will be approved by Google Legal.

## Questions/Feedback

If you have any questions about this policy, you can send us an email at records-retention@google.com.

Chat Retention FAQs

**CONFIDENTIAL**

# EXHIBIT B

11/10/21, 2:58 PM
Case 3:20-cv-05671-JD   Document 374-1   Filed 01/24/23   Page 145 of 184
Turn chat history on or off for users - Google Chat and classic Hangouts Admin Help

# Turn chat history on or off for users

As an administrator, you can control whether to keep chat history for users in your organization. You can set the default and also let users change their history setting for each conversation.

The chat history settings for Google Chat and classic Hangouts are combined in the Google Admin console. There's now one setting to control chat history for your organization. Learn more

1. Your current account, maryfer.mendoza@morganlewis.com, doesn't have permission to perform these steps. To continue, switch to a *super administrator account*. This will open the Google Admin console.

   Switch to super administrator account (signs you out)     or Learn more.

2. From the Admin console Home page, go to **Apps** > **Google Workspace** > **Google Chat and classic Hangouts**.
3. Click **History for chats**.
4. Under **Organizational Units**, select the domain or organizational unit you want to apply settings to.
5. Turn history **On** or **Off**.

   - If you turn history **On**, you can use Vault to control how long messages are retained     . Messages will disappear after the Vault retention period (if you set one).

   - If you turn history **Off**, messages are deleted after 24 hours. Vault     can't hold, retain, or search direct messages that are sent with history turned off.

     Turning history off does not hide content from scans to detect sensitive data or abuse. See "History details" below for more information.

6. To let users change their history setting, check **Allow users to change their history setting**.

   **Note:** If your organization uses both Chat and classic Hangouts, and you don't allow users to change their history setting, there may be times users can't join or stay in a Chat space. To learn more, visit Set a space history option for users     .

7. Click **Save**.

# History details

- Chat history settings apply to direct messages and group messages. If your organization has both Chat and classic Hangouts (that is, your chat setting is "Chat preferred" or "Chat and classic Hangouts"), then **Allow users to change their history setting** also applies to unthreaded spaces. History is always on in spaces with threaded conversations and can never be changed.
- History changes apply only to new messages. For example, If you turn chat history on, only new messages will be saved. If you turn chat history off, old messages that were previously saved are still saved.
- If history is forced on, people in different data regions can't chat. (History is forced on if **History for chats** is **On** and **Allow users to change their history setting** is not selected.) If you allow users to

change their history setting, history will automatically be turned off when people from different data regions chat.

- When history is off, data is not reported in the Audit report for direct messages except when messages are associated with Data Loss Prevention (DLP) incidents. (Chat DLP is now in beta.) Chat DLP incidents are logged in the Audit report for all messages, including those sent with history off. The DLP incident log points to the message, and admins can view the message until it's deleted in 24 hours. After that point, the incident log remains with a record that the message was deleted.

- When history is off, a message with external participants may be preserved longer than 24 hours if a user flags it for abuse or the message is reported to Google for spam, phishing, or malware.

    Even if chat history is turned off, it's possible that a separate copy of the conversation can be saved. For example, the message might be forwarded to Gmail or saved using a 3rd-party client.

## Related topics

- Set a space history option for users

- History settings and classic Hangouts

---

## Need more help?

Try these next steps:

### Ask the Help Community

Get answers from community experts

### Contact us

Tell us more and we'll help you get there

# EXHIBIT C

| |
|---|
| A Gazeta do Espirito Santo Radio e TV Ltda |
| Advance Magazine Publishers |
| Arte Gráfico Editorial Argentino S.A |
| BRASIL/MN MANCHETE EDITORA -EIRELI |
| Common Wealth Magazine Ltd (天下雜誌股份有限公司) |
| COMMUNITAINMENT LP |
| Conde Nast India Pvt Ltd |
| CUP Interactive SAS |
| DIRCOMFIDENCIAL MEDIOS S.L. |
| Editora e Gráfica Paraná Press S/A |
| EDITORA O DIA LTDA |
| El Diario de Prensa Digital SL |
| EL LEÓN DE EL ESPAÑOL PUBLICACIONES S.A. |
| Empresa Folha da Manhã S.A. |
| FP Newspapers Inc. |
| Global Notícias - Media Group. S.A. |
| Golem Media GmbH |
| Grupo Nacion GN S.A. |
| Harrison Daily Times |
| Hearst Communications Inc |
| Hearst Netherlands |
| IE Online Media Services Private Limited |
| Insider, Inc. |
| Japan Business Press Co., Ltd. |
| Nine Entertainment Co. PTY LTD |
| PT Kompas Media Nusantara |
| RBS - Zero Hora Editora Jornalística SA |
| Rhein-Neckar-Fernsehen und TV-Produktion GmbH |
| S.A. "O ESTADO DE SÃO PAULO |
| S/A Estado de Minas |
| SEIF Spa |
| Telegraph Media Group Ltd |
| Titania Compañía Editorial, S.L. |

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| |
|---|
| Volksfreund Druckerei Nikolaus Koch GmbH |
| Wordsmithie, Inc. |

NON-PARTY HIGHLY CONFIDENTIAL -
OUTSIDE COUNSEL EYES ONLY

# EXHIBIT D

| |
|---|
| Afrifone Ltd |
| ARCHOS S.A. |
| ASUSTek Computer Inc. |
| Beijing Xiaomi Mobile Software Co.,Ltd |
| BLU Products, Inc. |
| Cisco Systems, Inc. |
| Essential Products, Inc. |
| Fly Mobile DMCC |
| General Motors LLC |
| GuangDong OPPO Mobile Telecommunications Corp ., LTD |
| Guangdong vivo Software Technology Co., Ltd. |
| Guangzhou Xiaomi Information Service Co., Ltd |
| Hewlett-Packard Company |
| Hisense International Co., Ltd |
| HMD Global Oy |
| HTC Corporation |
| Huawei Device Co. Ltd. |
| Huawei Software Technologies Co., Ltd. |
| Ibritech DMCC |
| Interactive Trading 266 Pty Ltd |
| Jaina India Private Limited |
| KYOCERA Corporation |
| Landis, LLC |
| LAVA International Limited |
| Lenovo (Beijing) Ltd |
| Lenovo / Motorola |
| Lenovo Group Limited |
| Lenovo Mobile Communication Technology Ltd. |
| LG CNS Co., Ltd. |
| LG Electronics, Inc. |
| MetroPCS Wireless |
| Micromax Informatics Ltd. |
| Motorola Mobility Inc |

1

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| |
|---|
| Motorola Mobility LLC |
| Motorola Solutions, Inc |
| MUNDO READER SL |
| NEC Casio Mobile Communications |
| NEC Corporation |
| NEC Mobile Communications, Ltd. |
| Nokia USA Inc. |
| OnePlus Technology (Shenzhen) Co., Ltd. |
| OPPO Mobile Communication Corp |
| Optus Mobile Pty Limited |
| Palm Ventures Group, Inc. |
| Positivo Informatica S.A. |
| Positivo Tecnologia S.A |
| Reliance Communications, LLC |
| Samsung Electronics Co. Ltd (Global) |
| Samsung Group |
| Semp TCL Mobilidade LTDA |
| Sharp Corporation |
| Shenzhen Huawei Communication Technologies Co., Ltd |
| Shenzhen Tinno Wireless Technology Co., Ltd. |
| Sony Corporation |
| Sony Home Entertainment & Sound Products Inc. |
| Sony Mobile Communications |
| TCL Communication Technology Holdings Limited |
| TCL Corporation Technology Center |
| TCL Technology Electronics (Huizhou) Co., Ltd. |
| TCT Mobile International Limited |
| TCT Mobile Limited (Alcatel) |
| Transsion Communication Limited |
| Transsion Investment Limited |
| VinSmart |
| Vivo Mobile Communication Co., Ltd. |
| Xiaomi Inc. |

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| |
|---|
| ZTE Corporation |
| ZTEODM International (HK) Limited |

NON-PARTY HIGHLY CONFIDENTIAL -
OUTSIDE COUNSEL EYES ONLY

# EXHIBIT 15

# CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
RONALD E. CREAMER JR.
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS

ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700
————
CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1120

WRITER'S EMAIL ADDRESS
TCameron@cravath.com

DAVID J. PERKINS
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
DAVID L. PORTILLA
RORY A. LERARIS
MARGARET T. SEGALL
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS

LAUREN M. ROSENBERG
MICHAEL L. ARNOLD
HEATHER A. BENJAMIN
MATTHEW J. BOBBY
DANIEL J. CERQUEIRA
ALEXANDRA C. DENNING
HELAM GEBREMARIAM
MATTHEW G. JONES
MATTHEW M. KELLY
DAVID H. KORN
BRITTANY L. SUKIENNIK
ANDREW M. WARK

————
PARTNER EMERITUS
SAMUEL C. BUTLER
————
OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY
KIMBERLEY S. DREXLER
NICOLE F. FOSTER
LILLIAN S. GROSSBARD
KIMBERLY A. GROUSSET
ANDREI HARASYMIAK

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

November 29, 2021

<u>*In re: Google Play Store Antitrust Litigation*</u>, No. 3:21-md-02981-JD (N.D. Cal.);
<u>*Epic Games, Inc. v. Google LLC*</u>, No. 3:20-cv-05671-JD (N.D. Cal.);
<u>*In re: Google Play Consumer Antitrust Litigation*</u>, No. 3:20-cv-05761-JD (N.D. Cal.);
<u>*In re: Google Play Developer Antitrust Litigation*</u>, No. 3:20-cv-05792-JD (N.D. Cal.);
<u>*State of Utah et al. v. Google LLC et al.*</u>, No. 3:21-cv-05227-JD (N.D. Cal.)

Dear Brian:

I write on behalf of Plaintiffs in the above-captioned matters ("the Actions") in response to Google's November 11, 2021 letter concerning discovery items that remain outstanding, and further to the meet and confers of November 4, 2021, November 11, 2021 and November 18, 2021.

## 1. Instant Messages

Far from "closing out this issue", Google's letter of November 11, 2021 perpetuates serious concerns with Google's productions to date with respect to instant messages. Plaintiffs' primary concerns are twofold.

*First*, Plaintiffs are concerned that potentially responsive instant messages were not preserved in this litigation. We fail to understand why Google waited until September 11, 2020—nearly one month after Epic filed its August 13, 2020 complaint—to issue a litigation hold notice. We would also appreciate clarification as to whether Google had a separate hold notice in place following its receipt of the civil investigative demands that were served by USDOJ, Nebraska, and Utah. If Google had no such hold notice in place, please explain why Google did not believe that preservation was warranted following service of those CIDs.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Relatedly, Google has represented that, on September 11, its litigation hold was circulated "to the vast majority of custodians"—a phrase that suggests that certain of the currently agreed-upon custodians did not receive a hold notice even at that late date.  Google's belated circulation of a hold notice, combined with the company's default 24-hour purge policy for instant messages—which was not disclosed to Plaintiffs until recently—create a significant risk that responsive documents were not preserved.  It seems highly likely that (1) any instant messages that were sent before September 11, 2020—including instant messages that were sent *up to one month after the initiation of this litigation*—were destroyed and (2) instant messages continued to be destroyed well beyond that date unless individual employees adjusted the default automatic-deletion settings on all of the chat strings in which they participate.  That is not proper preservation.  Please let us know when *all* of the agreed-upon custodians received a hold notice, when they took steps to disable this automatic deletion function, and what steps Google took in order to verify or ensure that each custodian did in fact begin preserving his or her instant messages.  Plaintiffs reserve all rights with respect to this deficiency.

*Second*, Google has confirmed that it believes its productions of relevant instant message conversations on Google Hangouts and Google Chat are now complete.  But Plaintiffs are entitled to all relevant instant message conversations, irrespective of the chat platform that is used.  Despite representing in Google's April 30, 2021 letter that "Google confirms that it is collecting and will produce existing, responsive instant messages and text messages" (Ltr. from B. Rocca to M. Coolidge 2 (Apr. 30, 2021)), Google's November 11 letter suggests Google is still looking into whether messages on third-party platforms exist.  That, too, is unacceptable.

Given that depositions begin this week, Google's remaining instant message collections and productions must be completed promptly.  Please therefore confirm in writing no later than December 6, 2021:

    i.    which Google custodians use chat platforms other than Google Hangouts and Google Chat for business purposes;

    ii.    whether Google identified these custodians by collecting employees' devices or simply by asking custodians whether they use chat platforms for business purposes;

    iii.    when Google will complete its collection of instant messages for those custodians; and

    iv.    when Google will complete its production of instant messages for those custodians.

Plaintiffs request that all remaining instant message productions be completed prior to the start of depositions.  To the extent Google's previous delay in responding to Plaintiffs' requests makes it impossible for Google to produce all remaining instant messages before depositions begin, please confirm that Google will prioritize the production of instant messages for requested deponents and will produce

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

them at least 7 days before each individual's deposition and notify Plaintiffs that such a production has occurred.

*Third*, the Google Chat Retention Policy Google shared is dated November 18, 2020 and was last modified on February 26, 2021, but Google's letter states that Google issued a litigation hold on September 11, 2020. Please share the Google Chat Retention Policy that was in place as of September 11, 2020.

*Fourth*, Plaintiffs are confused by what appears to be an inconsistency between the statements in Google's November 11 letter and the Google Chat Retention Policy. Google's November 11 letter states that "[s]ettings for chat history are set by each individual custodian", "Google does not have the ability to change default settings for individual custodians with respect to the chat history setting" and "following receipt of litigation holds", "the technological settings on Google's chat retention policy (see Exhibit A) did not change". Yet, the Google Chat Retention Policy states under a header titled "Legal Holds" that, "[*i*]*f you've been notified that you're subject to a 'legal hold'*", "*your Google chats described below will be preserved automatically* (all retention periods are paused) while the relevant matter is pending". Please explain whether the "Google Chats" described in the Google Chat Retention Policy were preserved pursuant to the "Legal Holds" portion of that policy. Please also identify any types of instant messages created using Google's chat programs (*e.g.*, Google Chat and Google Hangouts) that are not "Google Chats" subject to the "Litigation Hold" portion of the Google Chat Retention Policy.

*Fifth*, Exhibit B to your November 11 letter refers to "an administrator" who "can control whether to keep chat history for users in your organization". Please identify any administrators who have such control with respect to each custodian in this matter. Please also inform us whether the administrators ever turned on *or* off the chat history and the dates that any such changes occurred.

*Sixth*, please explain the differences between each of the various types of "chats" available to the custodians in this matter, including, but not limited to: "on-the-record" chats, "1:1s", "Group DMs", "Flat Rooms", and "Threaded Rooms".

## 2. Text Messages

Plaintiffs similarly have serious concerns about Google's failure to preserve relevant and responsive text messages. Google represented in its April 30, 2021 letter that it "is collecting and will produce existing, responsive instant messages and text messages" (Ltr. from B. Rocca to M. Coolidge 2 (Apr. 30, 2021)). Notwithstanding that assurance, Google conceded in its November 11, 2021 letter—more than six months later—that it is only now "diligently evaluating whether its custodians possess responsive text messages that should be collected and produced". In addition, and as counsel for Google also conceded during our November 4, 2021 meet and confer, Google has to date produced only *a single text message* thread for Sundar Pichai, and no text messages for any other custodian, despite Google's acknowledgment that some of the agreed-upon custodians used texts for business purposes. That, too, is unacceptable. And it is

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

similarly unacceptable that Google has not begun collecting text messages from one custodian simply because that individual has been out on leave.

Given that depositions begin this week, Google's production of text messages must be completed promptly.  Therefore, please promptly produce Google's text message retention policy.  Please also confirm in writing no later than December 6, 2021:

i.    which Google custodians use text messages for business purposes;

ii.   how Google identified which custodians use text messages for business purposes;

iii.  when Google will complete its collection of text messages for those custodians; and

iv.   when Google will complete its production of text messages for those custodians.

Plaintiffs request that all remaining text message productions be completed prior to the start of depositions.  To the extent Google's previous delay in responding to Plaintiffs' requests makes it impossible for Google to produce all remaining text messages before depositions begin, please confirm that Google will prioritize the production of text messages for requested deponents and will produce them at least 7 days before each individual's deposition and notify Plaintiffs that such a production has occurred.

### 3.  Individualized Contracts with App Developers

Plaintiffs are concerned by Google's failure to produce dozens of relevant agreements from its developer deal programs.  While Google claims it has or is resolving these deficiencies in Google's productions, these problems should have been resolved months ago.  As to the specific categories of agreements, Plaintiffs respond as follows:

#### a.  Play Pass and Play Points Agreements

Plaintiffs thank Google for producing "several exemplar Play Points agreements" and "[e]xemplar Play Pass / NBO agreements".  Please confirm that these exemplars are representative of all agreements in these respective categories.

#### b.  Project Hug

Plaintiffs thank Google for its recent production of some of the missing Project Hug agreements in Production Vol. 49.  However, these newly produced agreements are only a small fraction of the total number of agreements that appear to be missing from Google's productions.  Plaintiffs are unable to locate any Project Hug agreements involving Tencent, Supercell or The Pokemon Company.  And while Google has produced a "Games Velocity Program Addendum" for the other Project Hug

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

developers, Plaintiffs are unable to locate dozens of signed and executed addenda to these agreements that are referenced in the Games Velocity Program Addenda, such as Ads Credits Addenda and Google Cloud Credits Addenda. These separate addenda contain key terms of the Project Hug agreements, such as the monetary value of the incentives Google provided the Project Hug developers.

While Google claims in its November 11, 2021 letter that "identifying all deal program agreements by Bates number is an exercise Plaintiffs can perform just as easily as Google", that is not true with respect to the agreements Google has failed to produce. Nevertheless, in the interest of resolving this issue prior to the start of depositions, Plaintiffs have identified (a) 47 agreements that are referenced in Google's documents (primarily signed and executed versions of the Games Velocity Program Addenda) that Plaintiffs cannot locate in Google's productions (*see* **Appendix A**), and (b) 12 expired agreements for which Plaintiffs cannot locate a version currently in effect in Google's productions (*see* **Appendix B**). For each of the agreements described in **Appendix A**, please: (i) identify the Bates number of the signed and executed version of the agreement, if Google has already produced it; (ii) promptly produce the agreement, if Google has not produced it; or (iii) confirm that the referenced agreement does not exist, if in fact Google never entered into the agreement. For each of the agreements described in **Appendix B**, please: (i) identify the Bates number of the signed and executed version of any subsequent or superseding agreement, or any amendment to the agreement, if Google has already produced such agreements; (ii) promptly produce the agreement, if Google has not produced it; or (iii) confirm that the referenced agreement does not exist, if in fact Google allowed the original agreement to expire without renewing it in any manner.

If in fact Google has failed to produce a material number of the agreements described in Appendix A and Appendix B, this failure would be a significant deficiency in Google's productions and would raise serious questions about Google's claim in Google's most recent letter that Production Vol. 49 "completes Google's production of these agreements". Accordingly, to the extent any agreements related to Project Hug are not described in Appendix A or Appendix B, please promptly identify or produce such agreements.

### c. Apps Velocity Program / Audio Accelerator Program / Living Room Accelerator Program

Plaintiffs look forward to receiving the agreements Google previously stated it "anticipate[d] releasing for production [by the end of October]". (Ltr. from B. Rocca to H. Nam 4 (Oct. 18, 2021).) Please confirm that Google's production will be for all agreements relevant to these programs, including all addenda to these agreements.

### d. Subscribe with Google

Plaintiffs understand that Google "has faced difficulty providing notice" to roughly 30 counterparties to these agreements, but depositions are rapidly approaching and Plaintiffs expect to receive these agreements in the near future. Please promptly

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

produce the agreements with all the developers identified in Exhibit C to Google's November 11, 2021 letter.

### 4.   Search String No. 95

Plaintiffs disagree with Google's representation that "Project Starburst" is duplicative of "Starburst".  Google employees frequently omit the phrase "Project" when describing their codenamed initiatives, and the more specific phrase "Project Starburst" is unlikely to capture all relevant and responsive documents describing this program.  The phrase "Starburst" is not common and is unlikely to generate a burdensome number of false hits.  Please agree to run the term "Starburst", or otherwise promptly provide a hit count for the phrase "Starburst" to demonstrate that this search term would generate an unreasonably burdensome number of documents for Google to review.

With respect to Plaintiffs' request that Google apply the search terms "Clover" and "Lion Force", Plaintiffs note that Project Clover appears to be the code name for a 2021 effort to engage Microsoft to bring Google Play to Windows devices (*see* GOOG-PLAY-002650789.C), while Project Lion Force appears to be a code name for Google Gaming Strategy in 2018, including as it relates to game distribution of those games through Google Play and across ecosystems (*see* GOOG-PLAY-000375525).  As both of these projects concern cross-platform application efforts by Google, they may be relevant questions of market definition.  Please confirm that you will add each of these terms to String No. 95.

Moreover, Plaintiffs also request that Google add "Everest" and "Secret Carrots" to String No. 95.  Plaintiffs understand that "Everest" is the code name for Google's October 2021 announcement regarding "Evolving our business model to address developer needs", while "Project Secret Carrots" appears to be the code name for Google's Accelerator Programs 2.0.  (*See* GOOG-PLAY-007329063.)

In light of the above, Plaintiffs request that Google modify and run String No. 95 as follows:

> Cupcake OR Detox OR Gabby OR Ivan OR "Magical Bridge" OR Nikkei OR Paragon OR Purell OR Ringo OR Runway OR Soren OR "Project Soy" OR "Sun-Mool" OR "Sun Mool" OR "Project Switch" OR "Project Dynasty" OR Emu OR "Free Willy" OR Lowball OR "Project Mission" OR "Project Napa" OR Nikkei OR "Project Plaid" OR RePlay OR "Project Starburst" OR Tomcat OR Zeus OR "Off-Play Installs" OR "Orphaned Apps" OR Honeycrisp OR GDAF OR Basecamp OR Agave OR Wichita OR Argon OR Acacia OR "Project Playful" OR ("Marmot" /25 "app*") OR "Project Pacific" OR "Project Robinson" OR "Project Cake" OR Starburst OR Clover OR "Lion Force" OR "Secret Carrots" OR Everest

### 5.   Project Basecamp

"Project Basecamp" appears to be Google's "longer-term effort around model change" (GOOG-PLAY-006997284), with "model" referring to Google Play's

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

business model, and "change" referring to ways that Google could monetize Google Play without requiring developers to use Google Billing for in-app purchases.  This topic is of central importance to Plaintiffs' claims in this MDL, and documents pertaining to Project Basecamp are responsive, at minimum, to Plaintiffs' RFP Nos. 26, 63, 66 and 198.

In Google's October 18, 2021 letter, Google confirmed that it would modify Search String No. 95 to include the term "Basecamp".  However, Plaintiffs understand that Google does not intend to run Search String No. 95 across the refresh custodial files, and it will therefore be run only through August 13, 2020.  Plaintiffs believe that Project Basecamp began during the refresh period, and that the term "Basecamp" will therefore not produce any documents as things now stand.  Plaintiffs also believe that Project Basecamp may be ongoing, as suggested by the fact that Google employed one of the alternative business models suggested in a Project Basecamp slide deck on November 4, 2021 as part of Google's response to the South Korean Telecommunications Business Act.  (*Compare* GOOG-PLAY-006829073, '9082 (suggesting that if a "User can choose" whether to use Google Billing or "partner billing", and a user "Chooses partner billing", Google could provide a "Partner discount" of "30-x%"), *with* Wilson White*, Enabling Alternative Billing Systems for Users in South Korea* (Nov. 4, 2021), https://developers-kr.googleblog.com/2021/11/enabling-alternative-billing-in-korea-en.html (noting that in response to the South Korean Telecommunications Business Act, Google will employ a similar business model in South Korea).)

Plaintiffs' RFP No. 224 requested that Google produce "ALL DOCUMENTS AND COMMUNICATIONS RELATING TO (a) the 2021 amendment to the South Korean Telecommunications Business Act, (b) YOUR response to that legislation, AND (c) YOUR consideration of OR determination regarding ANY plans for complying with that legislation".  Because documents related to Project Basecamp are responsive to RFP No. 224, among others, Plaintiffs request that Google apply the search term "Basecamp" across the files of all refresh custodians for the period spanning August 14, 2020 through November 4, 2021 and produce all responsive and non-privileged documents.

## 6.  Metadata

While Plaintiffs appreciate that Google is evaluating Plaintiffs' request that Google correct the deficiencies in its metadata, this issue must be resolved before depositions begin.  Please correct these errors and provide Plaintiffs with an overlay file that includes the missing metadata no later than December 6, 2021.

## 7.  PowerPoint Files

Plaintiffs acknowledge receipt of and thank Google for its November 15, 2021 production.  Plaintiffs are in the process of evaluating the Native PowerPoint documents and, assuming the production contains all PowerPoints as Google indicated at our November 18, 2021 meet and confer, hope this will resolve the issue.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Plaintiffs accept Google's proposed modification to provision (iv) of the protocol Plaintiffs shared in Plaintiffs' October 29, 2021 letter, namely, that "Google will use best efforts to provide Plaintiffs with a reproduction of the file(s) in native .pptx format within seventy-two (72) hours of the request, subject to reasonable extensions based on the timing or the number of requests."  If Google's November 15, 2021 production included all PowerPoints in native format, however, this should moot the need for a protocol.

### 8.   Organizational Charts

Thank you for confirming that Google is preparing a production of reporting information from the Teams tool for all agreed-upon custodians, and is pulling information as of October 18, 2021.  Plaintiffs look forward to promptly receiving this production, as well as the identification of "responsive documents by Bates number".

### 9.   Resolved Issues

Plaintiffs thank Google for producing the below documents.  Pending Plaintiffs' review of Google's productions, these issues appear to be closed out:

- House Judiciary Committee Productions

- App Store Monthly Reports

- Apple Contracts

- Chrome Web Store Agreements

- Bates numbers of Contracts with OEMs

- Microsoft Non-Aggression Pact

- Play Pass and Play Points Agreements

- Revenue Share Agreements

- Wireless Carrier Agreements

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

\* \* \*

We are available to discuss these matters at your convenience.


Sincerely,


*/s/  Timothy Cameron*

Timothy G. Cameron


Encls.

Brian C. Rocca
Sujal J. Shah
Michelle P. Chiu
Minna L. Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
brian.rocca@morganlewis.com
    sujal.shah@morganlewis.com
        michelle.chiu@morganlewis.com
            minna.naranjo@morganlewis.com
                rishi.satia@morganlewis.com


Daniel M. Petrocelli
Ian Simmons
Benjamin G. Bradshaw
E. Clay Marquez
Stephen J. McIntyre
O'MELVENY & MYERS LLP
dpetrocelli@omm.com
    isimmons@omm.com
        bbradshaw@omm.com
            cmarquez@omm.com
                smcintyre@omm.com


Karma M. Giulianelli
Glen E. Summers
Jameson R. Jones
BARTLIT BECK LLP
karma.giulianelli@bartlitbeck.com
    glen.summers@bartlitbeck.com
        jameson.jones@bartlitbeck.com
            GoogleAppConsumerCounsel@bartlitbeck.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Hae Sung Nam
Laurence D. King
Mario M. Choi
KAPLAN FOX & KILSHEIMER, LLP
hnam@kaplanfox.com
   lking@kaplanfox.com
      mchoi@kaplanfox.com

George Zelcs
Jamie L. Boyer
Stephen M. Tillery
KOREIN TILLERYLLC
gzelcs@koreintillery.com
   jboyer@koreintillery.com
      stillery@koreintillery.com
         AppConsumersDiscovery@KoreinTillery.com

Peggy J. Wedgworth
MILBERG PHILLIPS GROSSMAN LLP
pwedgworth@milberg.com

Elizabeth C. Pritzker
Jonathan K. Levine
PRITZKER LEVINE LLP
ecp@pritzkerlevine.com
   jkl@pritzkerlevine.com

Nanci E. Nishimura
Mark C. Molumphy
Adam J. Zapala
Noorjahan Rahman
Elizabeth Tran Castillo
COTCHETT, PITRE & MCCARTHY, LLP
nnishimura@cpmlegal.com
   mmolumphy@cpmlegal.com
      azapala@cpmlegal.com
         nrahman@cpmlegal.com
            ecastillo@cpmlegal.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Steve W. Berman
Robert F. Lopez
Benjamin J. Siegel
HAGENS BERMAN SOBOL SHAPIRO LLP
steve@hbsslaw.com
   robl@hbsslaw.com
      bens@hbsslaw.com

Joseph Vanek
Eamon P. Kelly
Alberto Rodriguez
SPERLING & SLATER, P.C.
jvanek@sperling-law.com
   ekelly@sperling-law.com
      arodriguez@sperling-law.com

Bonny E. Sweeney
Melinda R. Coolidge
Katie R. Beran
Scott A. Martin
Irving Scher
HAUSFELD LLP
bsweeney@hausfeld.com
   mcoolidge@hausfeld.com
     kberan@hausfeld.com
      smartin@hausfeld.com
       ischer@hausfeld.com
         DevelopersvGoogle@hausfeld.com

Brendan P. Glackin
OFFICE OF THE UTAH ATTORNEY GENERAL

BY EMAIL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appendix A**
**Project Hug Agreements – Plaintiffs Unable to Locate**

| Developer | Agreement | Bates Number |
|---|---|---|
| Activision-Blizzard-King | Terms for Strategic Partnership Between Google LLC and Activision Blizzard King | GOOG-PLAY-000927702 |
| Activision-Blizzard-King | YT Term Sheets | Referenced in GOOG-PLAY-007273439 |
| Activision-Blizzard-King | Google Ads Credits Addendum | Draft: GOOG-PLAY-003188672 |
| Activision-Blizzard-King | Google Cloud Platform Addendum | Draft: GOOG-PLAY-000927729 |
| Aniplex | Ads Mobile Capability Fund Addendum | Referenced in GOOG-PLAY-007335447 |
| Aniplex | Cloud Addendum | Referenced in GOOG-PLAY-007335447 |
| Bandai Namco Entertainment | Ads Mobile Capability Fund Addendum | Referenced in GOOG-PLAY-000227267 |
| Bandai Namco Entertainment | YouTube Addendum | Referenced in GOOG-PLAY-000227267 |
| Bandai Namco Entertainment | Gaming Incentive Agreement | Draft: GOOG-PLAY-002251499 |
| Com2Us | Games Velocity Program Addendum | Referenced in GOOG-PLAY-007038208 |
| Com2Us | YouTube Addendum | Referenced in GOOG-PLAY-007038208 |
| Com2Us | DMF Addendum | Referenced in GOOG-PLAY-007038208 |
| Com2Us | eSports Sponsorship Agreement | Referenced in GOOG-PLAY-007038208 |
| Electronic Arts Inc. | Co-Marketing Agreement | Referenced in GOOG-PLAY-007335625 |
| Electronic Arts Inc. | Google Cloud Platform Addendum | Referenced in GOOG-PLAY-007335625 |
| Mixi Inc. | YouTube Addendum | Referenced in GOOG-PLAY-007273259 |
| Mixi Inc. | eSports Sponsorship Agreement | Referenced in GOOG-PLAY-007273259 |
| NCSOFT Corporation | Ads Mobile Capability Fund Addendum | Referenced in GOOG-PLAY-007273160 |
| NCSOFT Corporation | Co-Marketing Agreement | Referenced in GOOG-PLAY-007273160 |

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Developer | Agreement | Bates Number |
|---|---|---|
| NCSOFT Corporation | YouTube Addendum | Referenced in GOOG-PLAY-007273160 |
| NCSOFT Corporation | Google Cloud Platform Addendum | Referenced in GOOG-PLAY-007273160 |
| Netmarble Games Corp. | Ad Addendum | Referenced in GOOG-PLAY-007273168 |
| Netmarble Games Corp. | Cloud Addendum | Referenced in GOOG-PLAY-007273168 |
| Netmarble Games Corp. | YouTube Addendum | Referenced in GOOG-PLAY-007273168 |
| NEXON Company | Cloud Addendum | Referenced in GOOG-PLAY-007273309 |
| NEXON Company | YouTube Addendum | Referenced in GOOG-PLAY-007273309 |
| Niantic | YouTube Plan | Referenced in GOOG-PLAY-007273234 |
| Nintendo | YouTube Addendum | Referenced in GOOG-PLAY-007273358 |
| Pearl Abyss | Games Velocity Program Addendum | Referenced in GOOG-PLAY-007038207 |
| Pearl Abyss | Ads Credits Addendum | Referenced in GOOG-PLAY-007038207 |
| Pearl Abyss | Ads Service Addendum | Referenced in GOOG-PLAY-007038207 |
| Pearl Abyss | Ads Mobile Capability Fund Addendum | Referenced in GOOG-PLAY-007038207 |
| Pearl Abyss | YouTube Addendum | Referenced in GOOG-PLAY-007038207 |
| Proxima Beta Pte. Limited | YouTube Addendum | Referenced in GOOG-PLAY-007335585 |
| Proxima Beta Pte. Limited | Co-Marketing Agreement | Referenced in GOOG-PLAY-007335585 |
| Proxima Beta Pte. Limited | eSports Sponsorship Agreement | Referenced in GOOG-PLAY-007335585 |
| Proxima Beta Pte. Limited | Custom Campaigns Agreement | Referenced in GOOG-PLAY-007335585 |
| Riot Games, Inc. | Games Velocity Program Addendum | GOOG-PLAY-000929031 |
| Riot Games, Inc. | Google Cloud Platform Addendum | GOOG-PLAY-000929031 |
| Riot Games, Inc. | Co-Marketing Agreement | GOOG-PLAY-004239649 |
| Square Enix  Co. | YouTube Addendum | Referenced in GOOG-PLAY-007335471 |
| Square Enix  Co. | Ads Mobile Capability Fund Addendum | Referenced in GOOG-PLAY-007335471 |

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Developer | Agreement | Bates Number |
|---|---|---|
| Square Enix  Co. | Co-Marketing Agreement | Referenced in GOOG-PLAY-007335471 |
| Supercell | Missing all Project Hug agreements | N/A |
| Tencent | Missing all Project Hug agreements | N/A |
| The Pokemon Company | Missing all Project Hug Agreements | N/A |
| Ubisoft Entertainment | Co-Marketing Agreement | Referenced in GOOG-PLAY-007273404 |
| Ubisoft Entertainment | Google Cloud Platform Addendum | Draft:  GOOG-PLAY-007147194 |

15
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Appendix B**
**Project Hug Agreements – Expired**

| Developer | Agreement | Bates Number | Expiration Date |
|---|---|---|---|
| Aniplex | Google Ads Credits Addendum | GOOG-PLAY-007335451 | 12/31/2020 |
| Bandai Namco Entertainment | Google Ads Credit Addendum | GOOG-PLAY-000227273 | 3/31/2021 |
| Mixi Inc. | Gaming Incentive Agreement | GOOG-PLAY-007273802 | 6/30/2021 |
| NCSOFT Corporation | Gaming Cooperation Agreement | GOOG-PLAY-007273522 | 4/2/2021 |
| NCSOFT Corporation | Google Ads Credits Addendum | GOOG-PLAY-007273165 | 10/31/2020 |
| NetEase | Google Ads Credits Addendum | GOOG-PLAY-007335482 | 12/31/2020 |
| NetEase | Ads Mobile Capability Fund Addendum | GOOG-PLAY-007335489 | 12/31/2020 |
| Netmarble Games Corp. | Gaming Cooperation Agreement | GOOG-PLAY-007335508 | 3/23/2021 |
| Netmarble Games Corp. | Mobile Game Capability Fund Addendum | GOOG-PLAY-007335534 | 12/31/2020 |
| Niantic | Google Ads Credits Addendum | GOOG-PLAY-007273229 | 11/1/2020 |
| Riot Games, Inc. | Google Ads Credits Addendum | GOOG-PLAY-007335499 | 12/31/2020 |
| Square Enix Co. | Games Velocity Program Addendum | GOOG-PLAY-007335471 | 9/20/2021 |

# EXHIBIT 16

**BartlitBeck** LLP

John D. Byars
john.byars@bartlitbeck.com

Courthouse Place
54 West Hubbard Street
Chicago, IL 60654
main: (312) 494-4400
direct: (312) 494-4443

BartlitBeck.com

December 3, 2021

*VIA EMAIL*

Brian C. Rocca
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, CA 94105-1596
brian.rocca@morganlewis.com

Re:   *In re: Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.);
*Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
*In re Google Play Consumer Antitrust Litig.*, No. 3:20-cv-05761-JD (N.D. Cal.);
*In re Google Play Developer Antitrust Litig.*, No. 3:20-cv-05792-JD (N.D. Cal.)
*State of Utah et al. v. Google LLC et al.*, No. 3:21-cv-05227-JD (N.D. Cal.)

Dear Brian:

I write on behalf of Plaintiffs in the above-captioned matters ("the Actions") to expand upon the serious concerns outlined in Topic 1 of our November 29, 2021 letter regarding the production of Instant Messages by Google.

Yesterday, December 2, 2021, Tian Lim, a Vice President of User Experience (UX) and Product Management within the Google Play organization, testified that Google employees use Google Chat "extensively" to communicate about business matters. (Lim Tr. at 446:20-23). Mr. Lim further acknowledged that he "typically use[s] Chat *every day*" to "communicate with many people across the org". (*Id*. at 447:7-448:20) (emphasis added). By way of example, Mr. Lim referenced having used Google Chat just "yesterday", in a meeting with Sameer Samat, after Mr. Samat asked him a "question about a very very specific feature of the Play Store that [he] did not have any current details on. And so so [Mr. Lim] quickly chatted the person that [he] thought would know the – would have some update on that feature area." (*Id.* at 444:2-24). Mr. Lim's testimony is concerning because it demonstrates that Mr. Lim—and other custodians in this matter—engaged in daily, routine use of Google Chat for pertinent business purposes. Notwithstanding that regular usage, Google has produced only one Google Chat file from Mr. Lim's custodial files and approximately 200 total Google Chat files from among all custodians.

Mr. Lim's description of his preservation efforts during his time as a Google employee were even more concerning. Mr. Lim testified that, since joining Google in 2017, he has been the subject of 10 distinct litigation holds, the earliest of which was put into place just a few months after he started working there. (Lim Tr. at 452:1-14). Despite these litigation holds, Mr. Lim

BartlitBeck LLP

B. Rocca
December 3, 2021
Page 2

testified that "[b]y default" the contents of his daily one-on-one or small group chats would "disappear after 24 hours" *unless* he—or another member of that specific Google Chat group— happened to decide that some or all the contents of that chat concerned any one of the numerous, ongoing litigations that were subject to a hold. (Lim Tr. at 454:2-455:23). If one of the conversation participants happened to make such a determination, the individual was then responsible for "cut[ting] and past[ing]" the relevant portion of the Google Chat "into a document", which was then provided to counsel. (*Id*. at 454:2-24). Alternatively, a Google Chat file might also have been preserved if a member of that chat manually "enable[d] Chat history". (*Id*. at 455:25-456:13, 458:25-459:7). But Mr. Lim testified that he does not recall *ever* having turned on the Chat history function despite also acknowledging that he discussed business matters in various chats. (*Id*.)  Mr. Lim further testified that "I believe that there were definitely messages that were work related that were deleted" including "most likely" during the time of this litigation. (*Id*. at 462:1-17).

Mr. Lim then went on to testify that preservation worked differently for certain large group chats, such as, for example, "a very large chat room called Play PM Chat where most of Play's product managers are in the room" and where "[h]istory is on by default." (Lim Tr. at 458:13-19). Mr. Lim also recalled that Google Chat rooms were created for various events, trainings, or other such business purposes to coordinate "the distribution of documents and so forth." (*Id*. at 464:18-465:14). And while such chat rooms "cease[d] to be technically active" following the event, training, or other such business purpose, Mr. Lim could "still go through and see messages" and access relevant documents. (*Id*.) Mr. Lim, however, conceded that not every topic is "appropriate" to discuss in such large forums. (*Id*. at 460:3-9). Therefore, it was highly likely that there were "many Chat messages" that "definitely . . . were work related that were deleted" during his time at Google, including during this litigation. (*Id*. at 461:15-462:13).

Much of this testimony would seem to contradict the "Chat Retention Policy" that Google provided to Plaintiffs. That document states that once a legal hold has been put in place, Google automatically preserves—"(all retention periods are paused)"—on-the-record 1:1 chats, Group DMs, Flat Rooms, and Threaded Rooms "while the relevant matter is pending." (Letter from B. Rocca to L. Moskowitz (Nov. 11, 2021) at Ex. A). This representation is irreconcilable with Mr. Lim's testimony, and it raises serious questions as to whether Google employees have been properly instructed about the affirmative steps that are necessary to preserve relevant and responsive documents in compliance with litigation holds. Consequently, Plaintiffs hereby request that by December 8, 2021, Google:

1. Identify when and to whom the litigation hold notices in this case were given, the categories of information and data employees were instructed to preserve and collect, and the specific actions they were instructed to take to that end;

2. Identify, for each custodian in this litigation, whether they used Google Chat for business purposes and how Google made that determination;

BartlitBeck LLP

B. Rocca
December 3, 2021
Page 3

3.   Identify, for each custodian in this litigation, the start and end date, if applicable, of each litigation hold in place during the relevant time period;

4.   Identify, for each custodian in this litigation, whether any Google Chats were manually preserved during the relevant litigation hold periods through enabling Chat history;

5.   Identify, for each custodian in this litigation, whether any Google Chats were manually preserved during the relevant litigation hold periods by a custodian who provided relevant portions of Google Chats to counsel, the counsel to whom such chats were provided, and the corresponding bates number of the produced Google Chat files;

6.   For each custodian, identify whether any of the custodian's Google Chat files were destroyed or otherwise automatically deleted during the pendency of the litigation holds, and if so, whether all the custodian's Google Chat files were destroyed or otherwise deleted during the pendency of the litigation holds;

7.   Confirm it will promptly produce any relevant Google Chat files that still exist for each custodian in this litigation;

8.   Confirm it will promptly produce the full contents of all relevant "large chat rooms" where "[h]istory is on by default", including but not limited to the "Play p.m. chat", as well as each relevant document distributed through such rooms;

9.   Identify all "large chat rooms" and produce the full contents of all relevant chat rooms created for various events, trainings, or other such business purposes, including, where applicable, the documents distributed through such rooms;

10.  Ascertain whether Google has *any* database within its possession, custody, or control that may provide a mechanism to access deleted Google Chat files, and if one is so identified, produce all relevant material. For clarity, this request includes but is not limited to those data sources identified in 4(a) of the ESI Protocol entered in this case. *See* Dkt. 14; and

11.  Confirm whether you are standing on your instruction for the witness to not answer the question regarding whether Mr. Lim "provided those cut and paste relevant chats to your counsel" (Lim Real Time Tr. at 417:17-418:10).

Absent a fulsome response to the aforementioned requests by December 8, 2021, as well as the questions raised in Issue 1 of our related November 29, 2021 letter, Plaintiffs intend to raise this issue with the Court in our forthcoming Joint Case Management Statement.

BartlitBeck LLP

B. Rocca
December 3, 2021
Page 4

Sincerely,

John D. Byars

BartlitBeck LLP

B. Rocca
December 3, 2021
Page 5

Brian C. Rocca
Sujal J. Shah
Michelle P. Chiu
Minna L. Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
brian.rocca@morganlewis.com
sujal.shah@morganlewis.com
michelle.chiu@morganlewis.com
minna.naranjo@morganlewis.com
rishi.satia@morganlewis.com

Daniel M. Petrocelli
Ian Simmons
Benjamin G. Bradshaw
E. Clay Marquez
Stephen J. McIntyre
O'MELVENY & MYERS LLP
dpetrocelli@omm.com
isimmons@omm.com
bbradshaw@omm.com
cmarquez@omm.com
smcintyre@omm.com

Brendan Glackin
Fred Norton
UTAH OFFICE OF THE ATTORNEY
GENERAL
bglackin@agutah.gov
fnorton@agutah.gov
StatesGooglePlayLeads@agutah.gov

Yonatan Even
Timothy Cameron
Lauren Moskowitz
CRAVATH, SWAINE & MOORE LLP
yevans@cravath.com
tcameron@cravath.com
lmoskowitz@cravath.com

Steve W. Berman
Robert F. Lopez
Benjamin J. Siegel
HAGENS BERMAN SOBOL SHAPIRO
LLP
steve@hbsslaw.com
robl@hbsslaw.com
bens@hbsslaw.com

Joseph Vanek
Eamon P. Kelly
Alberto Rodriguez
SPERLING & SLATER, P.C.
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

Bonny E. Sweeney
Melinda R. Coolidge
Katie R. Beran
Scott A. Martin
Irving Scher
HAUSFELD LLP
bsweeney@hausfeld.com
mcoolidge@hausfeld.com
kberan@hausfeld.com
smartin@hausfeld.com
ischer@hausfeld.com
DevelopersvGoogle@hausfeld.com

# EXHIBIT 17

HIGHLY CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO DIVISION
 4   ---------------------------------------------x
 5   IN RE GOOGLE PLAY STORE        Case No.
     ANTITRUST LITIGATION           3:21-md-02981-JD
 6
 7   THIS DOCUMENT RELATES TO:
 8   Epic Games Inc. v Google LLC, et al.,
     Case No: 3:20-cv-05671-JD
 9
     In re Google Play Consumer
10   Antitrust Litigation,
     Case No: 3:20-cv-05761-JD
11
     In re Google Play Developer
12   Litigation,
     Case No: 3:20-cv-05792-JD
13
14   State of Utah, et al.,
     v Google LLC, et al.,
15   Case No: 3:21-cv-05227-JD
16   ---------------------------------------------x
17
18    *HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER*
19
20     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
21                    TIAN LIM
22            Thursday, December 2, 2021
23
24
25   Reported By: Lynne Ledanois, CSR 6811
```

HIGHLY CONFIDENTIAL

```
 1        A     My specific recollections of
 2     any chats with Lawrence or Mr. Koh.
 3        Q     So who do you recall, as you
 4     sit here today, using instant
 5     messaging for business communications
 6     with?
 7              MS. CHIU:  Object to form.
 8              MR. JOHN BYARS:  Strike
 9        that.
10        Q     As you sit here today, who
11     do you recall using Google Chat to
12     communicate with for business
13     purposes?
14              MS. CHIU:  Object to form.
15              THE WITNESS:  There are lots
16        of little quick -- we call them
17        pings to various members of our
18        team to coordinate meetings,
19        quickly check in on the status of
20        something.  But it's typically
21        quite logistics -- logistical in
22        nature.
23   BY MR. JOHN BYARS:
24        Q     Would you say that sitting
25     here today, those are the only types
```

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

----------------------------------------------x

IN RE GOOGLE PLAY STORE          Case No.
ANTITRUST LITIGATION             3:21-md-02981-JD


THIS DOCUMENT RELATES TO:

Epic Games Inc. v. Google LLC, et al.,
Case No: 3:20-cv-05671-JD

In re Google Play Consumer
Antitrust Litigation,
Case No: 3:20-cv-05761-JD

In re Google Play Developer
Litigation,
Case No: 3:20-cv-05792-JD


State of Utah, et al.,
v. Google LLC, et al.,
Case No: 3:21-cv-05227-JD

----------------------------------------------x

   *HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER*



   REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

MICHAEL MARCHAK

Wednesday, January 12, 2022

Volume 1 (Pages 1-358)



Reported By: Lynne Ledanois, CSR 6811

1   BY MS. SWEENEY:

2        Q     So do you know whether chats

3   have been produced from your files in

4   connection with this litigation?

5              MS. CHIU:  Object to form.

6              THE WITNESS:  In the prep

7         sessions that we did, I reviewed a

8         chat document.  So I think -- I

9         believe they have been, but I

10        don't know.

11  BY MS. SWEENEY:

12        Q     And what proportion of your

13  communication would you say is via

14  chat as opposed to email?

15             MS. CHIU:  Object to form.

16             THE WITNESS:  I would say

17        it's hard for me to give a

18        percentage.  Chats are generally

19        used for like quick updates for a

20        meeting or need to reschedule or

21        something like that.

22             And emails are more like --

23        generally more like lengthy

24        topic-related things.  So like the

25        percentage, it depends on the day.

HIGHLY CONFIDENTIAL

```
                                             Page 1

 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
 4    ---------------------------------------------x
 5    IN RE GOOGLE PLAY STORE         Case No.
      ANTITRUST LITIGATION            3:21-md-02981-JD
 6
 7    THIS DOCUMENT RELATES TO:
 8    Epic Games Inc. v. Google LLC, et al.,
      Case No: 3:20-cv-05671-JD
 9
      In re Google Play Consumer
10    Antitrust Litigation,
      Case No: 3:20-cv-05761-JD
11
      In re Google Play Developer
12    Antitrust Litigation,
      Case No: 3:20-cv-05792-JD
13
14    State of Utah, et al.,
      v. Google LLC, et al.,
15    Case No: 3:21-cv-05227-JD
16    ---------------------------------------------x
17
18      *HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER*
19
20     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
21                    SAMEER SAMAT
22            Wednesday, February 2, 2022
23
24    Reported By: Lynne Ledanois, CSR 6811
25
```

HIGHLY CONFIDENTIAL

Page 33

1           THE WITNESS:  I would have
2      to refresh my memory.
3           But as I said before, the
4      conversations that I have in chat
5      are generally administrative and
6      whenever we have any important
7      conversation generally speaking,
8      my way of operating is to move
9      that into the right forums, make
10     decisions, communicate those
11     decisions through other means.
12          MR. SUMMERS:  Motion to
13     strike.
14          Mr. Rocca, I'm going to be
15     asking for additional time if this
16     continues.
17     Q     I need an answer to my
18     question, Mr. Samat.
19          My question is whether the
20     scenario I presented was possible,
21     whether you could do that?
22          I didn't ask you what you
23     typically do or what you want to say
24     on the record.  I asked you whether it
25     was possible.

# EXHIBIT 18

| Custodian | Agreed-Upon Post-Complaint Relevant Time Periods |
|---|---|
| Paul Bankhead | 8/14/2020-5/18/2021 |
| Christian Cramer | 8/14/2020-3/23/2022 |
| Paul Feng | 4/1/2021-7/12/2022 |
| Donald Harrison | 8/14/2020-5/9/2022 |
| Greg Hartrell | 4/29/2021-7/31/2021 9/14/2021-10/31/2021 |
| Dave Kleidermacher | 8/14/2020-5/18/2021 |
| Purnima Kochikar | 8/14/2020-7/12/2022 |
| Tian Lim | 8/14/2020-5/9/2022 |
| Hiroshi Lockheimer | 8/14/2020-7/12/2022 |
| Michael Marchak | 8/14/2020-10/21/2021 11/1/2021-7/12/2022 |
| Sundar Pichai | 8/14/2020-5/18/2021 |
| Ruth Porat | 8/14/2020-5/18/2021 |
| Jamie Rosenberg | 8/14/2020-6/30/2021 |
| Sameer Samat | 8/14/2020-7/12/2022 |
| Hal Varian | 8/14/2020-5/18/2021 |
| Brandon Barras | 8/14/2020-5/9/2022 |
| Gohar Galyan | 10/1/2020-5/9/2022 |
| Diana Garcia Rios | 8/14/2020-5/9/2022 |
| Sarah Karam | 8/14/2020-5/9/2022 |
| Shanna Velez | 8/14/2020-4/28/2022 |
| Sarah Carberry | 8/14/2020-4/28/2022 |