# Exhibit B1
# Public Redacted Version

Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000

*Counsel for Defendants Google LLC, et al.*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
Nicholas R. Sidney, S.B. #308080
nick.sidney@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>This Document Relates To:<br><br>*Match Group, LLC et al. v. Google LLC et al.*, Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD<br><br>**FILED UNDER SEAL**<br><br>**DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:     Hon. James Donato |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................................1

II. STATEMENT OF ADDITIONAL FACTS ..........................................................................3

    A.    The Google Play Store ...............................................................................................3

    B.    Google Policies Have Always Required Match to Use Google's Billing System. ......................................................................................................................3

    C.    Google's September 2020 Policy Clarification Made It More Explicit That Match and Other Developers Selling Digital Goods Must Use GPB. ......................7

    D.    Google Expended Time and Engineering Resources at Match's Request. ...............8

    E.    Google Extended the Deadline to Comply with Its Payments Policy Only for Developers like Match That Indicated They Needed More Time to Comply. ...........9

    F.    Match Affirmatively Misrepresented to Google That It Intended to Comply. .........9

III. ARGUMENT ......................................................................................................................11

    A.    Summary Judgment is Inappropriate for Google's Breach of Contract Claim. .......11

            1.    Match Cannot Dispose of Google's Breach of Contract Claims for the Period Between October 1, 2021 and March 31, 2022. ........................11

                  (a)    Match's Modification Theory Ignores Disputes of Material Fact. ..................................................................................................12

                  (b)    Match's Waiver Theory Ignores Disputes of Material Fact............14

    B.    Summary Judgment is Inappropriate for Google's False Promise Claim. ...............16

            1.    A Jury Could Find That Match Made a "Material Misrepresentation." .......................................................................................16

            2.    Match Admits That Its Representations Were False. ...................................19

             3.    A Jury Could Find That Google Relied on Match's Misrepresentations. ...................................................................................20

            4.    The Facts Support Google's Claim for Damages and Punitive Damages. ......................................................................................................22

    C.    Summary Judgment is Inappropriate for Google's Claim That Match Breached the Implied Covenant of Good Faith.........................................................23

    D.    Summary Judgment is Inappropriate for Google's Unjust Enrichment Claims....................................................................................................................25

IV. CONCLUSION ..................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Astiana v. Hain Celestial Group, Inc.*,
  783 F.3d 753 (9th Cir. 2015)..............................................................................................25

*Auntie Anne's, Inc. v. Wang*,
  No. CV 14-01049 MMM (Ex), 2014 WL 11728722 (C.D. Cal. July 16, 2014).......................14

*Cottle v. Plaid Inc.*,
  536 F. Supp. 3d 461 (N.D. Cal. 2021) ...................................................................................19

*Curley v. Wells Fargo & Co.*,
  No. 13–cv–03805 NC, 2014 WL 988618 (N.D. Cal. Mar. 10, 2014).......................................24

*Frlekin v. Apple, Inc.*,
  979 F.3d 639 (9th Cir. 2020).................................................................................................11

*Glen Holly Entertainment Inc. v. Tektronix Inc.*,
  343 F.3d 1000 (9th Cir. 2003).........................................................................................16, 17

*N. Cal. Collection Services Inc. of Sacramento v. Central Sierra Construction, Inc.*,
  No. 2:06-CV-01899 JAM DAD, 2008 WL 3876266 (E.D. Cal. Aug. 20, 2008) ....................22

*Phillips v. JP Morgan Chase Bank, N.A.*,
  No. 11-CV-1404 W (MDD), 2011 WL 13101726 (S.D. Cal. Nov. 14, 2011)...........................17

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996)...............................................................................................12

*Public Storage v. Sprint Corp.*,
  No. CV 14-2594-GW, 2015 WL 1057923 (C.D. Cal. Mar. 9, 2015) .................................14, 15

*Rincon Center Associates v. Chrysler MacNally Corp.*,
  No. C 97-2840 CRB, 1998 WL 410886 (N.D. Cal. July 16, 1998) ....................................14, 15

*Ryan-Beedy v. Bank of N.Y. Mellon*,
  293 F. Supp. 3d 1101 (E.D. Cal. 2018) ..................................................................................16

*Wood v. Apodaca*,
  375 F. Supp. 2d 942 (N.D. Cal. 2005) ...................................................................................20

**TABLE OF AUTHORITIES**
(Cont'd)

**Page(s)**

STATE CASES

*Bailey v. Breetwor*,
  206 Cal. App. 2d 287 (1962)................................................................13, 14

*Barrett v. Bank of America*,
  183 Cal. App. 3d 1362 (1986)....................................................................12

*Craig v. White*,
  187 Cal. 489 (1921)..................................................................................15

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.*,
  30 Cal. App. 4th 54 (1994)........................................................................14

*Gould v. Corinthian Colleges, Inc.*,
  192 Cal. App. 4th 1176 (2011)..................................................................14

*Granadino v. Wells Fargo Bank, N.A.*,
  236 Cal. App. 4th 411 (2015)....................................................................17

*Guzman v. Visalia Community Bank*,
  71 Cal. App. 4th 1370 (1999)...............................................................12, 18

*Hill Transportation Co v. Southwest Forest Industries, Inc.*,
  266 Cal. App. 2d 702 (1968)......................................................................17

*Hoffman v. 162 North Wolfe LLC*,
  228 Cal. App. 4th 1178 (2014)..................................................................16

*Huy Fong Foods, Inc. v. Underwood Ranches, LP*,
  66 Cal. App. 5th 1112 (2021)....................................................................19

*Major v. Western Home Insurance Co.*,
  169 Cal. App. 4th 1197 (2009)..............................................................13, 14

*Monster Energy Co. v. Schechter*,
  7 Cal. 5th 781 (2019)................................................................................12

*Moore v. Wells Fargo Bank, N.A.*,
  39 Cal. App. 5th 280 (2019)......................................................................24

*Motown Record Corp. v. Brockert*,
  160 Cal. App. 3d 123 (1984)......................................................................13

*Panagotacos v. Bank of America*,
  60 Cal. App. 4th 851 (1998)..................................................................12, 13

# TABLE OF AUTHORITIES
## (Cont'd)

**Page(s)**

*Spinks v. Equity Residential Briarwood Apartments,*
    171 Cal. App. 4th 1004 (2009) .................................................................23

*Wade v. Diamond A Cattle Co.,*
    44 Cal. App. 3d 453 (1975) .................................................................12

*Warner Construction Co. v. City of Los Angeles,*
    2 Cal. 3d 285 (1970) .................................................................16, 17, 19

**STATE STATUTES**

Cal. Civ. Code § 1698(c) .................................................................14

Cal. Civ. Code § 1710 .................................................................16

Cal. Civ. Code § 3294 .................................................................23

**TREATISES**

55 Cal. Jur. 3d § 2 .................................................................25

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.     INTRODUCTION

In their motion for summary judgment, Match Plaintiffs (hereinafter "Match Group" or "Match") simply offer their own view of the facts and insist that all of their claims are undisputed. Along the way, Match casts aside or ignores evidence that contradicts its story—including statements it made to Google *in writing*, assurances from Match's own CEO, and contract terms that directly contradict Match's narrative.

The Court need not and should not decide these disputed facts at this stage. The bottom line is that Match has not made a serious effort to establish a right to summary judgment. Nor could it; there are myriad genuine issues of material fact in connection with each of the Counterclaims that Match now seeks to dismiss.

Google's app store, Google Play, provides extensive benefits to developers like Match—it offers Match access to billions of users, and as a result, tens of millions of users have opted to download Match's apps using Google Play's safe and secure platform. For the millions of users who download Match for free and do not make any in-app purchases, Match does not pay Google *anything* for the services Google Play provides.

In exchange for these services, Match agreed to comply with Google's Developer Distribution Agreement ("DDA"). Under the DDA and the Payments Policy it incorporates, when Match opts to monetize its apps through in-app purchases and subscriptions, it must use Google Play's billing service ("GPB") and pay Google a service fee (today, typically 15% of each purchase). This has always been the case, but Match maintained that it fell into an exception that allowed it to use Google Play entirely for free even as Match charged its customers millions of dollars directly through Google Play-distributed apps. In 2020, Google announced a clarification that made the existing policy even more explicit: apps like Match's that sell digital goods must use GPB if they want to distribute through Google's (otherwise virtually free) Play store. This requirement allows Google to earn money on the Google Play store for all the services it provides.

But Match does not comply with Google's policies. The record reveals two key reasons. First, Match wants to reap immense benefits from Google Play, including access to its billions of users, for free. Second, Match dislikes certain pro-consumer features of GPB, such as its

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

transparent cancellation policies. *See* Declaration of Kyle W. Mach ("Mach Decl.") Ex. 1, Swidler Dep. 155:25-157:3 (acknowledging the FTC was investigating Match's subscription and cancellation practices). Those features help Match's customers, but hurt Match's bottom line.

Google worked hard and in good faith to bring Match into compliance with the DDA. In return, Match engaged in subterfuge and delay tactics. Those tactics included misrepresentations about its intention to comply with Google's policies by March 31, 2022. Match's promises proved false, and Match is in breach of its obligations under the DDA even today. Google's counterclaims target Match's breach of the DDA and the harm caused by its repeated false statements that it would comply with the DDA when, as it now admits, it never intended to do so.

Regarding Google's breach of contract claim, Match admits that it does not have a basis to dismiss Google's claim in full. Instead, Match asks the Court to slice certain discrete periods from the claim, primarily on theories of waiver. Yet Match ignores evidence that undermines those waiver theories, including language in Google's contract with Match that provides that conduct "will not be taken to be a formal waiver of Google's rights." Dkt.[1] No. 486-4 (Reiter Ex. 3).

Regarding Google's false promise claim, Match insists that it did not make an actionable misrepresentation because Match did not make a "clear and unequivocal" promise to "exclusively" use GPB. Dkt. No. 488-1 (Match Mot. for Partial Summ. J. ("Mot.")) at 15. But the law does not require the exactitude Match demands. Even if it did, contrary to Match's assertions, Google does not contend that Match promised to "use GPB exclusively," (*id*. at 15-21), but rather that Match promised that it would "comply" with its agreement with Google. *Id*. at 7-8, 11-12. Match could have complied in a number of ways, some requiring the use of GPB and others not. And there can be no doubt that sufficient evidence of this promise exists; among other things, Match made the promise in writing and its CEO confirmed it in statements to Google. Match's arguments seeking to dismiss the implied covenant and unjust enrichment claims fail for most of the same reasons.

The material facts are disputed and Google has every right to present its evidence to a jury. Match can try to provide contrary evidence, but there is no serious basis for summary judgment.

[1] All "Dkt. Nos." reference the MDL docket, Case No. 3:21-md-02981, unless otherwise specified.

## II.     STATEMENT OF ADDITIONAL FACTS

### A.     The Google Play Store

Google Play provides extensive benefits to developers, including Match. Google Play allows developers to distribute their apps to billions of users in 190 countries. It provides app store search tools to help users discover relevant apps. Dkt. Nos. 480-7 & 480-8 (Google MSJ Exs. 6, 7). It offers services like app testing and monitoring. And it offers a secure digital payments system, GPB, that allows developers to transact with users around the world. Dkt. No. 483 (Google's MSJ at 5, citing MSJ Ex. 2, Ex. 4, Ex. 5, and Ex. 6). For over a decade, the Google Play store has enabled developers to reach billions of customers and earn billions of dollars in revenue. Ex. 2, GOOG-PLAY-0009909081 at -101; *see also* Dkt. No. 380 (Match First Amended Complaint ("Match FAC")) ¶¶ 1, 4.

Users expect a safe, secure, and seamless experience on Google Play and GPB is a cornerstone of how Google meets those expectations. Dkt. No. 480-8 (Google MSJ Ex. 7). GBP uses one of the world's most advanced security systems to protect consumers' information. *Id*. It gives users one clear point of contact for customer support and refunds, and offers easy-to-use subscription management tools, like renewal notices and cancellation tools that make it as easy for users to cancel subscriptions as it is to buy them in the first place. Dkt. No. 480-10 (Google MSJ Ex. 9). GPB also offers users financial safety tools like budgeting features, parental controls, and the option to authenticate every purchase. *See, e.g.*, Ex. 3, GOOG-PLAY-000064735.

Google Play is also a business. It charges service fees on Google Play transactions that support its investment in the Google Play store, the Android operating system, and the tools and technology Google provides developers. Google earns virtually nothing on these investments until developers sell apps or in-app digital content through GPB. Dkt. No. 480-8 (Google MSJ Ex. 7).

### B.     Google Policies Have Always Required Match to Use Google's Billing System.

Google requires developers wishing to distribute apps through Google Play to adhere to the DDA. The DDA sets the terms and conditions that developers must follow if they want to take advantage of Google Play's services. Dkt. No. 486-4 (Reiter Ex. 3). If a developer violates the DDA, Google has the right to remove, reject, or suspend that developer's applications. *Id*., Section

8.3. Match does not dispute that it agreed to the terms of the DDA. *See* Dkt. No. 394 ¶ 40.

The DDA also contains a non-waiver provision, Section 16.2, that states that the developer "agree[s] that if Google does not exercise or enforce any legal right or remedy contained in [the DDA] … this will not be taken to be a formal waiver of Google's rights and that those rights or remedies will still be available to Google." Dkt. No. 486-4 (Reiter Ex. 3). This means that if a developer violates the DDA Google could remove that developer's application from Google Play. But choosing not to does not waive Google's right to seek remedies for the breach. *Id.*

The DDA requires developers to adhere to Google's Developer Program Policies, which includes its Payments Policy. Dkt. No. 486-4 (Reiter Ex. 3, Section 4.1); Dkt. No. 486-5 (Reiter Ex. 4). Developers have choices about how (and whether) to monetize their apps under the Payments Policy. Most of those choices do not require the use of GPB. And most do not require developers to pay service fees: apart from a one-time $25 registration fee, developers do not pay Google anything for using Google Play unless they make money through paid app downloads, or by selling subscriptions or digital goods in apps downloaded from the Google Play store. Because more than 90% of apps in the Google Play store are free, the vast majority of developers pay Google nothing to distribute their apps. Dkt. No. 480-8 (Google MSJ Ex. 7); Dkt. No. 480-9 (Google MSJ Ex. 8). Developers who monetize their apps in other ways—including through advertising, or by allowing users to purchase the content they access in the app elsewhere ("consumption only")—also do not pay service fees under the Payments Policy. For example, in 2021 Match received ███████████ for its popular Tinder app via its website. Dkt. No. 388-1 ("Google's Answer and Counterclaims") ¶ 33. Users could access the content they purchased on Tinder's website via its app and Match paid Google nothing for those transactions.

Only developers who choose to monetize their apps through paid downloads or in-app purchases ("IAPs") of digital goods are required to use Google Play Billing under the Payments Policy. Since 2011, when Google first launched support for IAP, the Payments Policy has required developers who sell paid apps or IAPs to exclusively use GPB. Dkt. No. 488-5 (Reiter Ex. 5) at 24–25, 29. Specifically, the policy stated that developers offering in-app purchases must use GPB with two exceptions, when the payment: (1) is "solely for physical products" or (2) "is for digital

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

content that may be consumed outside the app itself (e.g. songs that can be played on other music players.)" Dkt. No. 486-5 (Reiter Ex. 4) at GOOG-PLAY-000064254.

This latter exception (the "outside the app" exception) addressed a narrow use case: it allowed apps to sell content (such as mp3s or ebooks) that could be used in other applications or transferred between devices. *See* Ex. 4, Rasanen Dep. 257:9-18, 258:4-17, Aug. 17, 2022 (the exception was a "cross-app or content ownership based exception" designed for things like "an MP3 that could be downloaded from, you know, a music service, and then played in another music player … Or an e-book that could be purchased and downloaded from one provider and used in another reader application"); Ex. 5, Kochikar Dep. 278:24-25, Aug. 31, 2022 (the exception was "meant for a very narrow use case like music").

Dating apps like those offered by Match, which sell digital content largely consumed within its apps, did not qualify for the "outside the app" exception and were thus required to exclusively use GPB for in-app purchases.[2] *See* Ex. 5, Kochikar Dep. 278:20-22; *see also* Ex. 4, Rasanen Dep. 244:11-14 ("[I]n our view, the Match apps, the ones that were not using Google Play Billing were not in compliance with our policies[.]"). However, some developers like Match construed the exception to apply when they offered a website that allowed users to access their digital content. *See* Ex. 4, Rasanen Dep. 260:14-261:13 (testifying that Match interpreted the exception to not require GPB for purchases of digital content that could be consumed on the web).

Google did not agree with this interpretation. *See* Ex. 4, Rasanen Dep. 259:20-24 ("[O]utside of the app itself was meant to mean outside of the service that it was purchased on."). On many occasions, Google informed Match that its apps were subject to the billing policy. *See* Ex. 4, Rasanen Dep. 355:10-24; *see also* Ex. 7, MATCHGOOGLE00080723 (2018 Match email exchange stating that Match was "out of compliance as claimed by several people from [the Google] team and as discussed when we first met"). Match's own damages expert, Steven

---

[2] Where Google's fee applies, it is 15% for subscriptions—applicable to the majority of Match's revenue—and for the first $1 million of a developer's earnings each year. For non-subscription products after the first $1 million, the fee is generally 30%. Google offers a number of programs at a fee of less than 15%. Approximately 3% of developers are subject to any service fee, Dkt. No. 488-3 (Reiter Ex. 1), and 99% qualify for 15% or less, Ex. 6, GOOG-PLAY-005955080.

Schwartz, testified that his understanding was that since 2011 Google has required all developers to use Google Play billing for in-app purchases. Ex. 8, Schwartz Dep. 71:13-20, Mar. 28, 2023.

It is undisputed that Match's apps continued to violate the policy. *See* Mot. at 2, 10 (not disputing that Match refused to comply with the DDA after March 31, 2022). Google chose not to remove Match's apps from Google Play for noncompliance. It recognized that the "outside the app" exception was open to misinterpretation, and that developers could interpret the language as ambiguous. Ex. 5, Kochikar Dep. 278:20-279:13. Google instead chose to work with Match and other developers to explore new features within GPB to try to bring them into compliance. *See* Ex. 9, Barras Dep. 68:5-12, Sept. 13, 2022 ("[W]e would much prefer to work closely with these developers to understand where those gaps or needs were versus just blatantly enforcing the policy and removing it from the store …"); *see also* Ex. 5, Kochikar Dep. 280:1-13.

Despite Google's efforts, Match did not bring its apps into compliance with the Payments Policy, and Google became increasingly concerned that developer non-compliance was eroding user trust and safety on Android. *See* Dkt. No. 488-6 (Reiter Ex. 6, GOOG-PLAY-011114937) at -942; Ex. 10, GOOG-PLAY-009206383 at -385. In addition to allowing Google to collect service fees, GPB provides a trusted user experience that gives users control and transparency. For subscriptions, for example, it allows users to manage and cancel subscriptions all in one place. *See* Dkt. No. 488-66 (Reiter Ex. 6, GOOG-PLAY-011114937) at -942; *see also* Ex. 11, Karam Dep. 48:3-5, Sept. 28, 2022 (GPB is "a way for users to purchase with a sense of security and safety that they can get refunds as needed."). Apps that sold digital content but did not use GPB could provide a negative user experience by making it hard to cancel subscriptions or get refunds. For example, Match's app Tinder previously used GPB exclusively but began to offer other forms of payment in April 2019. Dkt. No. 486-36 (Reiter Ex. 35, Foster Decl.) ¶ 37). It then became harder for users to cancel subscriptions, leading to poor user experiences and reviews. *See* Dkt. No. 488-66 (Reiter Ex. 6, GOOG-PLAY-011114937) at -942 (user review: "[t]here is no option in app to cancel your subscription" and Tinder did not reply to emails regarding cancellation). Google had "concerns about the user experience … it was hard to cancel a Tinder subscription. Often you had to call a human being instead of being able to do it in the app. … [T]hey wouldn't be an

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

example of a best-in-class user experience that was very transparent, easy to use, offered all the right payment features, etc." Ex. 11, Karam Dep. 154:1-15. Google was not alone in its concerns: the Federal Trade Commission investigated Match's cancellation practices and alleged they were "misleading, unclear, and not properly done." *See* Ex. 1, Swidler Dep. 155:25-157:3.

Indeed, when Match conducted an experiment comparing its own payment system to GPB, it found a "negative revenue impact" that Match suspected was due to the fact that GPB "makes it much easier to cancel a subscription—which is positive from a customer experience perspective but will clearly have negative LTV impact across most, if not, all of our brands." Ex. 12, DX928. In other words, Match was concerned Google's pro-consumer features would harm Match's bottom line. *See* Ex. 13, GOOG-PLAY-001214668. This is among the reasons Google requires GPB for digital goods and subscriptions: to ensure that its users can feel confident they'll be treated fairly when making a purchase on Google's platform.

>      **C.     Google's September 2020 Policy Clarification Made It More Explicit That Match and Other Developers Selling Digital Goods Must Use GPB.**

After several years of communicating with developers about the importance of GPB and working to improve GPB's reach and features, Google decided to clarify its policy. *See* Ex. 14, Samat Dep. 105:7-14, Nov. 8, 2022 (Google first privately tried to clarify the intent of the policy and "because of [some developers'] continual insistence that that's what the language really meant, we decided to clarify."). Google gave Match advance warning of the clarification and Match responded favorably regarding their partnership. *See* Ex. 15, MATCHGOOGLE00053644.

On September 28, 2020, Google announced it was updating the language of its Payments Policy in response to "feedback that our policy language could be more clear regarding which types of transactions require the use of Google Play's billing system[.]" Ex. 28, PX2053. Google stated that "[w]e've always required developers who distribute their apps on Google Play to use Google Play's billing system if they offer in-app purchases of digital goods" but Google was responding to feedback that its current language "was causing confusion" and so Google had "clarified the language in our Payments Policy to be more explicit[.]" *Id.* It noted that the requirement "isn't new" and it had "always been the intention of this long standing policy." *Id.*

1    The updated Payments Policy emphasized that "Google Play's billing system is required

2    for developers offering in-app purchases of digital goods and services distributed on Google

3    Play," Ex. 27, PX2640, including digital items and subscription services (including related to

4    dating). Google gave apps "a year (until September 30, 2021) to complete any needed updates."

5    Dkt. No, 480-8 (Google MSJ Ex. 7). Developers could comply with the Payments Policy in a

6    number of ways—including by adopting GPB, or by moving to a consumption-only model. *See*

7    Ex. 2, GOOG-PLAY-0009909081 at -105.

8    In an effort to ease the transition to GPB for some of its most important partners, Google

9    created an Apps Velocity Program ("AVP") that offered cross-Google "service packs" providing

10   promotions, advertising, and other support to developers. *See* Ex. 10, GOOG-PLAY-009206383 at

11   -389. AVP delivered significant █████████████████████████████████

12   ████████████████████████████████████████████████████████████████████

13   ████████████████████████████████ *See id.* at -391 (one of AVP's goals was to "[b]oost

14   Play Billing adoption (less consumption only)"); Ex. 16, GOOG-PLAY-004684227 at -231 (AVP

15   required interested partners to integrate GPB in Q1 2021, before the September deadline). In

16   recognition of the importance of their partnership, ████████████████████████████████

17   ████████████████████████████████████████████████████████████████████

18   *See* Ex. 17, GOOG-PLAY-011456496 at -496. Although Match did not join AVP, Google

19   expected Match to comply by the public deadline. *See* Ex. 18, GOOG-PLAY-007759245 at -252.

20   **D.    Google Expended Time and Engineering Resources at Match's Request.**

21   Based on conversations it had with Match, Google believed that Match was working to

22   bring its apps into compliance by the September 30, 2021 deadline. Declaration of Sarah Karam

23   ("Karam Decl.") ¶ 5; *see also* Ex. 18, GOOG-PLAY-007759245 at -251 (Match "signaled intent

24   to comply by public deadlines"). Match employees confirmed that they, too, understood the

25   deadline was approaching. *See* Ex. 19, MATCHGOOGLE00054280 (October 2020 email from

26   Tinder and Match confirming that Tinder's deadline to comply was September 30, 2021). Match

27   gave every impression that it was working toward compliance, even presenting Google with

28   mock-ups of a Match payment flow that would use GPB. *See* Ex. 11, Karam Dep. 231:3-20.

Match requested Google add several features to GPB, and Google worked with Match and invested resources to add them. Google engaged in "extensive discussions with the Match Group at the group and individual brand level to understand their product requirements," (Ex. 20, GOOG-PLAY-011456562) including "weekly discussions around integrations, feature gaps & proposed solutions." Dkt. No. 488-13 (Reiter Ex. 13); Ex. 21, MATCHGOOGLE00022843 (Match and Google's working document tracking integration plans for multiple Match apps). Match-specific features for GPB included large-value SKUs and 2-, 4-, and 8-month subscription periods. *See* Karam Decl. ¶ 7; Ex. 20, GOOG-PLAY-011456562 at -568.

Google prioritized many of the features that Match requested and expended resources to build them because it understood that doing so would assist Match in complying with Google's policy. Karam Decl. ¶ 7; Ex. 11, Karam Dep. 249:14-19. This included solutions for at least seven different features Match requested. *See* Ex. 20, GOOG-PLAY-011456562 at -563. Google built them because it believed, based on Match's statements and conduct, that Match intended to comply. If Match had not requested some of these features, like large-value SKUs and 2-, 4-, and 8-month subscriptions, Google would not have prioritized them. Karam Decl. ¶ 7.

**E.   Google Extended the Deadline to Comply with Its Payments Policy Only for Developers like Match That Indicated They Needed More Time to Comply.**

Google announced on July 16, 2021 that it was giving developers that needed more time to comply with the Payments Policy the option to request a 6-month extension. Dkt. No. 486-37 (Reiter Ex. 36). Google published a blog post titled "Allowing developers to apply for more time to comply with Play Payments Policy." *Id.* It noted that partners had "been making steady progress toward the September 30[, 2021] deadline" but that Google had heard from "developers all over the world that the past year has been particularly difficult, especially for those with engineering teams in regions that continue to be hard hit by the effects of the global pandemic. . . ." *Id.* Google thus decided to give developers "an option to request a 6-month extension, which will give them until March 31, 2022 to comply with our Payments policy." *Id.*

**F.   Match Affirmatively Misrepresented to Google That It Intended to Comply.**

Shortly after that announcement, in August 2021, Peter Foster (Match) emailed Brandon

Barras (Google) that "I am reaching out regarding Google's announcement that it is granting extensions to its September 30, 2021 deadline for apps to use Google Play's billing system exclusively. In light of this extension, Match will continue to use its bespoke payment system to process payments." Dkt. No. 486-22 (Reiter Ex. 21) at 5. Mr. Barras clarified that Match could not merely refuse to comply, but instead needed to formally appeal for an extension for each of its apps, using an application that required an answer to "why [Match] need[s] more time." *Id.* at 4.

On August 19, 2021, Match submitted that form, which was titled "Requesting Additional Time to Comply with Google Play Payments Policy." Dkt. No. 488-3 (Reiter Ex. 1). In it, Match represented that it would comply. The form asked: "This extension is intended to aid developers that need more time to comply with Google Play's Payments policy. Do you need more time to comply with Google Play's Payments policy?" Match answered "Yes." *Id.* The form also asked Match to "Please explain why you need additional time to comply with Google Play's Payments policy." Match answered that "[o]ur bespoke payment system is critical to our user experience. Due to significant feature gaps (payment/subs/discounts), Google's system is not a suitable substitute and exclusive use of Google's systems will meaningfully harm our users (inflate prices) & undermine our business." *Id.* Google sent a response acknowledging Match's "request for additional time to bring [its] app into compliance with the Google Play Billing policy." *Id.* Google confirmed two days later, thanking Match for requesting additional time, and granting an extension to March 31, 2022 "to come into compliance with Google Play's Payments policy." *Id.*

When Match requested this extension, Google believed that Match intended to comply by that extended deadline, given that Match had affirmed that, "Yes," it needed more time to comply. Karam Decl. ¶ 6. Google only granted extensions to developers like Match who filled out the form agreeing they needed more time to comply. *Id.* ¶ 9. Absent that extension, Google could have enforced its policies on October 1, 2021. *Cf. id.* ("Developers who did not answer 'yes' to that question or otherwise did not submit the extension request were not granted extension past the then-applicable September 30, 2021 compliance deadline.").

Based on Match's application affirming that it sought the extension specifically to comply, Google continued to invest resources to build GPB features Match requested. *See* Ex. 22, GOOG-

PLAY-011270112 at -115 (slide summarizing technical engagement with Match, noting that in Q3 2021 Google "buil[t] blocking features"). As the March deadline approached, Match continued to represent to Google that it intended to comply. Its CEO, Sharmistha Dubey, stated that Match intended to come into compliance and abide by the DDA. Ex. 11, Karam Dep. 269:24-270:3.

Google's trust in its partner developers and the representations they made on the forms submitted to Google proved to be reasonable and appropriate. Of all of the large developers that requested an extension for compliance, only Match Group has not complied. Karam Decl. ¶ 8.

## III.    ARGUMENT

Summary judgment is appropriate only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (citation omitted). All evidence is viewed "in the light most favorable to the non-moving party." *Id.* (citation omitted).

### A.    Summary Judgment Is Inappropriate for Google's Breach of Contract Claim.

Match asks the Court to break Google's breach of contract claim into three periods— before October 1, 2021, between October 1, 2021 and March 31, 2022, and after March 31, 2022—and to evaluate each as a separate claim. Match concedes that it has no argument to dispose of Google's claims for the last period. *See* Mot. at 12 n.6. Match also recognizes that Google has *already* conceded that it is not seeking any damages for the first period, making further analysis by the Court unnecessary.[3] Mot. at 11-12 (citing Reiter Decl. ¶ 31, Ex. 29). That leaves only the middle period, between October 1, 2021 and March 31, 2022, in dispute.

#### 1.    Match Cannot Dispose of Google's Breach of Contract Claims for the Period Between October 1, 2021 and March 31, 2022.

---

[3] Google does not seek any damages for Match's breach prior to September 2021 and believes it would be a waste of judicial resources to litigate declaratory judgment for this period. Google, however, reserves rights to present evidence from prior to September 2021, including the existence of express non-waiver language in the DDA, as relevant to any breach of contract and false promise claims that remain in the litigation (Dkt. No. 388-1, Google's Answer and Counterclaims ¶¶ 55-62, 68-76), as well as to defend itself against any claim based on the theory that the 2020 clarification was a material change from its previous policy. *See, e.g.,* Match FAC ¶¶196-214, 298-305, 311-312, 326-332, 338-339.

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    Match argues that Google either (1) modified its rights under the DDA such that Match

2    was no longer required to comply with the Payments Policy during this period, or (2) waived its

3    right to enforce compliance until March 31, 2022. Mot. at 13-14. Both arguments ignore disputed

4    facts that preclude summary judgment.

5                    **(a)      Match's Modification Theory Ignores Disputes of Material Fact.**

6    Match argues that, by granting an extension from October 1, 2021 to March 31, 2022,

7    Google modified the DDA to permanently excuse Match's breach during the extension period.

8    Mot. at 14. This is incorrect. "Modification" is a change to the underlying agreement that requires

9    mutual assent. *Wade v. Diamond A Cattle Co.*, 44 Cal. App. 3d 453, 457 (1975). Assent is not

10   mutual "unless the parties all agree upon the same thing in the same sense." *Monster Energy Co.*

11   *v. Schechter*, 7 Cal. 5th 781, 789 (2019) (citation omitted). "[T]erms proposed in an offer must be

12   met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding

13   contract." *Panagotacos v. Bank of America*, 60 Cal. App. 4th 851, 855-56 (1998) (citation

14   omitted). "The interpretation of the purported acceptance or rejection of an offer is a question of

15   fact." *Guzman v. Visalia Cmty. Bank*, 71 Cal. App. 4th 1370, 1376 (1999). Match, as the party

16   claiming a modification, has the burden to prove the elements of the asserted modification. *Barrett*

17   *v. Bank of America*, 183 Cal. App. 3d 1362, 1370 (1986).

18   Match offers no discussion of the law or its application to the facts. Match fails even to

19   provide the specific terms of its alleged modification. It rests instead on the generic proclamation

20   that "Google's written extensions modified the DDA such that the Match Plaintiffs were not

21   required to exclusively use GPB until after March 31, 2022." Mot. at 14. This failure to identify

22   the supposedly modified terms of the DDA is fatal to Match's argument; Match cannot meet its

23   burden of proving the elements of modification without even identifying the supposed terms of the

24   modification.[4] Google, moreover, cannot fully respond to Match's claims without these elements.

25   Match's position appears to be that the parties agreed that Match could continue to violate

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [4] Match, having failed to assert the elements of its argument in its Motion, should not be able to
     fix this deficiency in reply once Google no longer has an opportunity to respond. *See Provenz v.*

28   *Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

                                                                    -12-        Case Nos. 3:21-md-02981-JD; 3:22-cv-02746-JD

the Payments Policy for an additional six months with no further obligations from Match—not even a commitment by Match to comply at the *end* of the six-month extension. But Match cannot show that Google agreed to that entirely one-sided modification. First, Google's offer of an extension stated that it was only available and intended to aid developers that needed more time to comply with the Payments Policy. *See, e.g.*, Dkt. No. 488-3 (Reiter Ex. 1) (application form title: "Requesting Additional Time to Comply with Google Play's Payments Policy").[5] Match now asserts that it never intended to comply, despite its false statement that it would do so. Mot. at 14. There is no evidence that Google assented to an extension without Match's concomitant intent to comply, and Match presents no evidence of any such assent. *See Panagotacos*, 60 Cal. App. 4th at 855-56 (no mutual assent if acceptance is not unqualified and unconditional).

Second, Match fails to show that Google assented to forego damages for the six-month extension period in the event Match failed to meet even the extended deadline. Even if Match could show that "the DDA was modified to prohibit enforcement of the DDA until after March 31, 2022," Mot. at 14, Match points to no evidence suggesting that Google was agreeing to not seek damages for non-compliance prior to that date in the event that Match failed to comply by the extended deadline. Match cannot present proof of the contract modification at all, let alone evidence that would entitle it to summary judgment.

Match's claim of a "modification" fails for an independent reason: modification of a written contract requires new consideration. *See, e.g.*, *Motown Rec. Corp. v. Brockert*, 160 Cal. App. 3d 123, 133 (1984) ("[M]odification must be supported by new consideration.") (citations omitted). Match shows none. The DDA already required compliance with the Payments Policy, and to obtain the extension, developers merely had to submit a form stating they would comply— as they were already bound to do. *See* Dkt. No. 486-22 (Reiter Ex. 21).[6] *See Bailey v. Breetwor*,

---

[5] Google's response to Match's request likewise indicated that the extension was specifically to *comply*. Dkt. No. 488-3 (Reiter Ex. 1) ("your app is eligible for an extension until March 31, 2022 *to come into compliance with Google Play's Payments policy*.") (emphasis added).

[6] Match cites *Major v. W. Home Ins. Co.*, 169 Cal. App. 4th 1197, 1210-11 (2009), as modified on denial of reh'g (Jan. 30, 2009), presumably to suggest that no consideration is required when the original contract provides for modification. But the DDA offers none of the specificity of the

1   206 Cal. App. 2d 287, 292 (1962) (modification not valid where a party offers new consideration

2   and the other promises the performance due under the prior contract); Cal. Civ. Code §1698(c).

3                   **(b)       Match's Waiver Theory Ignores Disputes of Material Fact.**

4           Match alternatively argues that Google waived its claims for the 6-month period in which

5   it granted Match an extension to comply. Mot. at 14. Waiver requires a "clear expression" of

6   intent to relinquish a right and full knowledge of the facts. *Rincon Ctr. Assocs. v. Chrysler*

7   *MacNally Corp.*, No. C 97-2840 CRB, 1998 WL 410886, at *4 (N.D. Cal. July 16, 1998). The

8   party claiming waiver must prove it by clear and convincing evidence. *DRG/Beverly Hills, Ltd. v.*

9   *Chopstix Dim Sum Cafe & Takeout III, Ltd.*, 30 Cal. App. 4th 54, 60 (1994). Because it hinges on

10  intent, waiver nearly always presents a fact issue for the jury. *Cf., e.g.*, *Pub. Storage v. Sprint*

11  *Corp.*, No. CV 14-2594-GW (PLAx), 2015 WL 1057923, at *18 (C.D. Cal. Mar. 9, 2015).

12          Here, disputed issues of fact preclude summary judgment on waiver. For example, Match

13  ignores non-waiver language in the DDA. Section 16.2 provides that:

14          "You agree that if Google does not exercise or enforce any legal right or remedy
            contained in this Agreement (or which Google has the benefit of under any applicable
15          law), this will not be taken to be a formal waiver of Google's rights and that those rights
            or remedies will still be available to Google." Dkt. No. 486-4 (Reiter Ex. 3) § 16.2).
16
    Only *written* intent to waive enforcement can overcome such a non-waiver provision. *See Gould v.*
17
    *Corinthian Colls., Inc.*, 192 Cal. App. 4th 1176, 1180 (2011) (non-waiver provisions "militate
18
    against a finding of waiver under most circumstances"). "[T]he existence of such a clause supports
19
    a reasonable inference" that Google "did not intend to waive any provision of [the] agreement[]
20
    unless it expressed such an intent in writing." *Auntie Anne's, Inc. v. Wang*, No. CV 14-01049
21
    MMM (Ex), 2014 WL 11728722, at *14 (C.D. Cal. July 16, 2014). There is no such written
22
    waiver or any evidence, let alone undisputed evidence, that overcomes this language. Although the
23

24  ─────────────────────

25  contract in *Major*. *See id*. at 1211 (modification was merely "to comply with the original terms of
    the policy," and thus was "no alteration" at all). The clause Match points to, Mot. at 14, merely
26  acknowledges that separate addenda *could* exist. *See* Dkt. No. 486-4 (Reiter Ex. 3 (DDA)) § 16.1
    ("This Agreement, including any addenda You may have agreed to separately, constitutes the
27  entire legal agreement between You and Google and governs Your use of Google Play and
    completely replaces any prior agreements between You and Google in relation to Google Play.").
28

extension form and related communications gave Match additional time to comply with the Payments Policy, none stated that Google waived its right to seek damages *after* the extended deadline. *Cf.* Dkt. No. 488-3 (Reiter Ex. 1) (offering no assurance that Google would not seek damages from developers who sought an extension but failed to comply by the deadline).

Google, moreover, could not have waived rights because it acted without full knowledge of the relevant facts. *See Craig v. White*, 187 Cal. 489, 498 (1921); *see also Rincon Ctr. Assocs.*, 1998 WL 410886, at *4. As Match concedes, the form to secure an extension required Match to affirm that it needed more time *to comply. See* Mot. at 7 ("In response to the form's question, '[t]his extension is intended to aid developers that need more time to comply with Google Play's Payments policy. Do you need more time to comply with Google Play's Payments policy?', a drop-down menu offered a 'Yes' or 'No' response, and the Match Plaintiffs selected 'Yes'").[7] Google testimony confirms the plain meaning that the extension was only for purposes of coming into compliance. *See* Ex. 9, Barras Dep. 249:18-250:4 ("The form was meant as an extension, as you see by the questions, for apps who need more time to integrate, not for a justification of why they weren't utilizing that system."). Match cannot show that Google provided the extension with full knowledge of Match's intention to not ultimately comply with the DDA—as waiver requires. *See, e.g.*, *Pub. Storage*, 2015 WL 1057923, at *19 (party arguing waiver at summary judgment "must show, despite a clear and convincing standard and antiwaiver provision . . . that there are no disputed facts"). Disputed material facts preclude summary judgment on Match's assertions of

---

[7] Match suggests that it was not promising to comply when it submitted the extension form, which Match concedes bore the title "Requesting Additional Time to Comply with Google Play Payments Policy." Dkt. No. 488-3 (Reiter Ex. 1). According to Match, its submission simply agreed Match was unready to comply *at that time*, and never indicated Match intended to comply on any timeframe. *Cf.* Mot. at 8 ("Google's standard form did not ask if a developer planned to comply or when."). The record indicates that Google took submission of the extension forms as a declaration by the developers that they intended to comply—in line with the purpose of the extension described on the forms. *See* Mot. at 7 ("[t]his extension is intended to aid developers that need more time to comply with Google Play's Payments policy."); Ex. 11, Karam Dep. 263:6-12 ("This form was intended to record and it was used to grant extensions for those who were working in good faith to come into compliance with our policies. It was not intended to be a partnerships back-and-forth or a product feedback form."); Karam Decl. ¶ 10.

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    "waiver"—for which Match bears the burden of presenting clear and convincing proof.

2         **B.    Summary Judgment Is Inappropriate for Google's False Promise Claim.**

3         A false promise is a "subspecies of fraud." *Ryan-Beedy v. Bank of N.Y. Mellon*, 293 F.

4    Supp. 3d 1101, 1109 (E.D. Cal. 2018) (citation omitted). To prevail on its claim, Google will

5    ultimately need to prove, "(1) a material misrepresentation; (2) knowledge of falsity; (3) intent to

6    defraud or induce reliance; (4) justifiable reliance; and (5) resulting damage. *Id.* Because disputes

7    of material fact exist for each of these elements, summary judgment on this claim must be denied.

8         **1.    A Jury Could Find That Match Made a "Material Misrepresentation."**

9         Match argues that Google's claim should be dismissed because "the Match Plaintiffs never

10   promised to exclusively use GPB." Mot. at 15. Its position is based on a misreading of the legal

11   standard and a misunderstanding of Google's claim.

12        Match claims that "[a]n alleged false promise must be 'clear and unequivocal'" in order to

13   be actionable. Mot. at 15. This is incorrect. In false promise cases, the nature of the "promise" is

14   variable: actionable deceits include "[t]he *suggestion*, as a fact, of that which is not true, by one

15   who does not believe it to be true" and "[t]he *suppression* of a fact, by one who is bound to

16   disclose it, or who gives information of other facts which are likely to mislead for want of

17   communication of that fact." *See* Cal. Civ. Code § 1710 (emphasis added). Even "nondisclosure or

18   concealment may constitute actionable fraud . . . when the defendant had exclusive knowledge of

19   material facts not known to the plaintiff . . . or when the defendant actively conceals a material

20   fact from the plaintiff . . . or when the defendant makes partial representations but also suppresses

21   some material facts." *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1187 (2014). No

22   fiduciary obligation is necessary for these standards to apply; a sufficient "relationship between

23   the parties is present if there is some sort of transaction between the parties." *Id.* (citations

24   omitted). The California Supreme Court has held that "misleading half truths" can be a sufficient

25   basis for liability. *Warner Contr. Co. v. City of Los Angeles*, 2 Cal. 3d 285, 294 (1970).

26        Match incorrectly relies on cases involving promissory estoppel rather than false promise.

27   *Glen Holly Ent. Inc. v. Tektronix Inc.* involved both claims for fraud/misrepresentation and for

28   promissory estoppel. 343 F.3d 1000, 1017 (9th Cir. 2003). Match assumes that the standards are

1  the same, but the *Glen Holly* Court assessed the two claims under different standards—and Match

2  cites the promissory estoppel standard, not the fraud standard. Match further relies on *Granadino*

3  *v. Wells Fargo Bank*, a case that required a "clear and unambiguous" promise for a promissory

4  estoppel claim, but involved no false promise claim. 236 Cal. App. 4th 411, 417 (2015).[8]

5        Match also misstates the nature of its false promise. Match denies that it "promised to

6  exclusively use GPB," but that is irrelevant. Google does not contend that Match made that

7  promise but rather a more general one—to "*comply*" with Google's policies. Dkt. No. 388-1,

8  Google's Answer and Counterclaims ¶¶ 69-71. Match could have complied with Google's policy

9  in a number of ways, only some of which required using GPB. Dkt. No. 486-19, Reiter Ex. 18.

10  Indeed, the vast majority of apps on Google Play comply *without* GPB, Dkt. No. 480-8 (Google

11  MSJ Ex. 7) (only 3% of apps paid fees to Google Play in preceding twelve months), a path open to

12  Match as well. *See* Ex. 20, GOOG-PLAY-011456562 at -564 (noting Match could choose to use

13  GPB or go consumption only); Ex. 23, MATCHGOOGLE00105403 at -404 (Match presentation

14  listing options for responding to the Payments Policy, including web-based checkouts).

15        The real nature of Match's false promise is straightforward and clear enough to meet even

16  the heightened standard Match applies—and certainly demonstrates a dispute of a material fact. In

17  September 2020, Google informed developers that those out of compliance with Google's policies

18  would be required to comply. Dkt. No. 480-8 (Google MSJ Ex. 7). Match then communicated to

19  Google that it intended to comply with Google's policies. *See* Ex. 18, GOOG-PLAY-007759245

20

21  _____

22  [8] Match also cites *Phillips v. JP Morgan Chase Bank, N.A.*, No. 11–CV–1404 W (MDD), 2011
WL 13101726, at *9 (S.D. Cal. Nov. 14, 2011)—an unpublished decision that stated that

23  "[p]romises in promissory fraud or promissory estoppel claims must be clear and unequivocal." *Id.*
at *9. *Phillips*, however, recognized that the legal standards for the two claims are <u>not</u> the same:

24  "JP Morgan argues that, in the promissory estoppel context, the Phillipses failed to plead a definite
promise, reliance, or injury . . . Assessing those arguments instead in the promissory fraud context,

25  the Court disagrees." *Id.* (internal citation omitted). Moreover, *Philips* relied on a state court
decision that does not reach the conclusion for which it is cited. *See Hill Transp. Co. v. Sw. Forest*

26  *Indus., Inc.*, 266 Cal. App. 2d 702, 708 (1968) (holding that a false promise requires a clear
"intention not to perform," not a clear promise). In any case, *Philips* does not control this issue of

27  state law, which the California Supreme Court has spoken to, *Warner*, 2 Cal. 3d at 294, and

28  Match's statements were clear enough to satisfy even the high bar Match applies.

1   at -251 (noting that Match had "signaled intent to comply by public deadlines"); *see also* Karam

2   Decl. ¶ 5 (stating that Google understood Match was working to bring its apps into compliance by

3   the original compliance deadline of September 30, 2021). It engaged in extensive discussions and

4   weekly meetings with Google over features that it requested Google add to GPB. *See* Dkt. No.

5   488-13 (Reiter Ex. 13) at -916 (Google was "[d]eeply engaged in Match Group brands on billing

6   integrations including weekly discussions around integrations, feature gaps & proposed

7   solutions"). Google then invested in those features, believing that it was working in partnership

8   with Match to bring Match into compliance with Google's Payment Policy. *See* Karam Decl. ¶ 7.

9        Match subsequently gave Google multiple, express indications that it intended to comply

10  with Google's policies. After Google announced in July 2021 that it was allowing developers

11  more time to comply, Match indicated that it would continue to use its own billing system not

12  because it did not intend to comply, but because Google was "granting extensions." Dkt. No. 486-

13  22 (Reiter Ex. 21) at 5. Google informed Match that such extensions were not automatic, but

14  required the submission of a request to Google about why Match needed more time. *Id.* at 4. On

15  that form, Match stated its intention to comply. The form emphasized that an extension was

16  "intended to aid developers that need more time to comply with Google Play's Payments policy."

17  Dkt. Nos. 488-3 & 488-4 (Reiter Exs. 1, 2). In response to the question "Do you need more time to

18  comply with Google Play's Payments policy?" Match answered with an unequivocal "Yes." Dkt.

19  No. 488-3 (Reiter Ex. 1). This is an express false representation that it would comply—or, at the

20  very least, a jury could so find. Match again indicated it would comply when its CEO told Google

21  that it planned to comply and abide by the DDA. Ex. 11, Karam Dep. 269:24-270:3.

22       Match argues that it disclosed its preference for its own payment system to Google. But

23  nowhere does it assert that it ever informed Google that it did not intend to comply during the

24  extension period. That is because Match never did so. Match's complaints about GPB also did not

25  reverse its promise to comply—particularly here, where compliance did not necessarily require

26  Match to adopt GPB. *See Guzman*, 71 Cal. App. 4th at 1376 ("[A]n acceptance is not invalidated

27  by the fact that it is 'grumbling,' or that the offeree makes some simultaneous 'request.'").

28

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Even if Match's construction of the exchange were credited, its complaints are irrelevant. "Where the implied promise is certain enough to cause reasonable reliance, there is no reason it cannot be a proper basis for fraud. *Parties may not avoid liability for fraud simply because they leave to implication what they clearly intend to communicate*." *Huy Fong Foods, Inc. v. Underwood Ranches, LP*, 66 Cal. App. 5th 1112, 1124 (2021) (emphasis added). A jury could find that Match's statement that it "need[ed] more time to comply" at least implied that Match would comply with the DDA, as that conclusion is consistent with the natural interpretation of that phrase. *See Warner*, 2 Cal. 3d at 294 (fraud arises where "the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead"); *see also* Karam Decl. ¶ 10 ("Google granted extensions to every developer that submitted an extension form validating that they intended to use the extension to comply" because "Google treated submission of the form as a promise that developers understood that Google was granting extensions to allow developers more time to comply."). Such an implication establishes a false promise under the law. *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461 (N.D. Cal. 2021), is informative. There, the court held that where the defendant "displayed screens that made it appear as if Plaintiffs were providing information to their financial institutions," but did not disclose that Plaintiffs were "actually providing their login information to" the defendant itself, the defendant could be liable for false promise. *Id*. at 494. Plaintiffs were not required to show the defendant explicitly stated users were providing information to their financial institutions, because the circumstances naturally implied it. *See id.* The same is true here; the natural inference from Match's request for more time to comply is that it intended to comply.

### 2.    Match Admits That Its Representations Were False.

There is no dispute that Match's representations were false. Match readily admits that it never had any intention of using the extension to bring its apps into compliance with the DDA and Payments Policy, notwithstanding that this was the extension's sole purpose. Mot. at 7:20-8:7. Even without that admission, it is undisputed that Match did not comply with the Payments Policy during the extension period or to the present, and "[i]n promissory fraud claims where the aspect to which fraud is alleged is within the defendant's control at all times, an allegation that defendant

1    did not fulfill their obligation is sufficient to create an inference that they never intended to do so."

2    *Wood v. Apodaca*, 375 F. Supp. 2d 942, 949 (N.D. Cal. 2005).

3          **3.**      **A Jury Could Find That Google Relied on Match's Misrepresentations.**

4          When Match requested Google extend its compliance deadline to March 31, 2022, Google

5    believed Match was promising to comply by that date. Karam Decl. ¶ 6. A jury could find this

6    reliance reasonable in light of Match's prior course of conduct and its explicit statements that it

7    needed "more time to comply." Mot. at 7. If Google knew that Match did not intend to comply,

8    Google could have enforced its policies starting on October 1, 2021. *Cf.* Karam Decl. ¶¶ 6, 9.

9    Google also would not have continued investing resources to build GPB features Match requested,

10   which Google invested in based on its belief that Match would comply with its policies. *See* Ex.

11   22, GOOG-PLAY-011270112 at -115; Karam Decl. ¶7. Notably, Match has no explanation for

12   Google's conduct other than reliance on Match's words and actions. Match's four arguments to

13   the contrary are all incorrect, and each raises factual issues that preclude summary judgment.

14         *First*, Match contends that Google could not have relied on its statements that it intended

15   to "comply" because, according to Match, other evidence makes that promise ambiguous. Mot. at

16   20-21. As discussed above, Match's promise was more than sufficient under the law. And

17   although Match points to evidence that it expressed doubt about its commitment to comply, Mot.

18   at 20-21, this does nothing more than *confirm* that a dispute of material fact exists. For example,

19   Match's CEO told Google that Match intended to comply. Ex. 11, Karam Dep. 269:24-270:3.

20   Even if, as Match contends, it sent mixed messages to Google about its intentions, a jury could

21   reasonably conclude that Match's course of conduct, its written statement that it intended to

22   comply, and Match's CEO's assurance that it was working toward compliance support liability.

23         *Second*, Match argues there can be no reliance because Google admitted it did not rely on

24   Mr. Foster's August 5, 2021 letter—*before* the false promise on which Google bases its claim—

25   when considering whether to grant an extension, or on Match's form when considering how to

26   allocate resources. Mot. at 21. Match is correct that Google did not rely on Mr. Foster's letter.

27   Rather, Google told Match it needed to formally apply for an extension, and Google relied on

28   Match's affirmative representations in that request when deciding to grant an extension. Google's

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

reliance on Match's extension request is evident by Google's decision not to enforce its policies against Match starting October 1, 2021, and Match's citation to Ms. Karam's testimony about Google's allocation of resources is inapposite, incomplete, and ambiguous. *See* Ex. 11, Karam Dep. 264:5-19 (Q: "Did Google rely on Mr. Daniell's email, say, for deciding how to allocate, I don't know, internal resources or anything like that?" A: "Our – the way Google viewed Mr. Daniell's statement and then subsequent grant of the extension and the way we interpreted that was to continue working with Match toward compliance."); Ex. 22, GOOG-PLAY-011270112 at -115 (Google continued to invest resources to build Match-requested GPB features after Match's extension). Because a reasonable jury could infer that Google relied on Match's representations, summary judgment is inappropriate.

   *Third*, Match claims that Google could not have relied on Match's representations that it "need[ed] more time to comply" because Google uniformly granted such requests. This is a *non sequitur* at best. Google granted extensions because, as the form itself explains, the "extension[s were] intended to aid developers that need[ed] more time to comply with Google Play's Payments policy," Dkt. No. 488-3 (Reiter Ex. 1), and Google "treated submission of the form as a promise that developers understood that Google was granting extensions to allow developers more time to comply." Karam Decl. ¶ 10. Google's reliance on developers' representations proved reasonable: every other large developer fulfilled its promise to comply and, apparently, understood the application language in the same manner as Google. *Id.* at ¶ 8.

   Match's final contention—that Google did "nothing to confirm" its understanding of Match's statements that it intended to comply—is also wrong. After Google announced it would offer developers extra time to comply, Match informally indicated that it would continue to use its own billing system because Google was "granting extensions." Dkt. No. 486-22 (Reiter Ex. 21) at 5. This suggested Match was seeking an "extension" with the intention to comply, but Google followed up to inform Match that such extensions required a formal request, *see id.* at 4. When Match submitted that form, it doubled down, responding "Yes" to the written question, "Do you need more time to comply with Google Play's Payments policy?" Mot. at 7. Match's CEO then again told Google Match would comply and abide by the DDA. Ex. 11, Karam Dep. 269:24-

270:3.[9] It is difficult to discern what more Google *could* have done to verify Match's undisclosed intention not to comply, or why it would have been necessary for Google to demand more assurance. The jury could find that Google reasonably relied on Match's multiple written statements, especially when coupled with its CEO's assurance that Match would comply.

### 4. The Facts Support Google's Claim for Damages and Punitive Damages.

Google can prove damages for Match's false promise in two ways: the service fees Match would have owed and the resources Google expended to build Match's requested GPB features. First, as a direct result of Match's course of dealing with Google and express indication that it planned to comply with Google's policies, Google did not enforce its policies against Match starting October 1, 2021 (the deadline for apps that did not seek an extension). Had Match not misrepresented its intentions, Google could have sought a service fee on purchases within Match's apps beginning October 1, 2021. *See* Dkt. No. 488-26 (Reiter Ex. 30, Oct. 3, 2022 Expert Report of Dr. Gregory Leonard) ¶¶ 36-37. Match's motion does not address these damages, even though Google's expert quantified them. *See id.* This alone satisfies the damages element.

Second, Google invested resources to develop GPB features Match requested. Prior to seeking more time to comply, Match asked Google to build features for GPB, Ex. 20, GOOG-PLAY-011456562 at -568, which Google prioritized based on Match signaling it intended to comply. Ex. 18, GOOG-PLAY-007759245 at -251. After Match expressly represented that it planned to comply but needed more time, Google continued to invest. Ex. 22, GOOG-PLAY-011270112 at -115. Google would not have continued to prioritize some of these builds absent Match's misrepresentation. Karam Decl. ¶ 7.

Match argues that Google cannot prove this second category of damages because its

---

[9] Match cites to *N. Cal. Collection Servs. Inc. of Sacramento v. Central Sierra Constr., Inc.*, No. 2:06-CV-01899 JAM DAD, 2008 WL 3876266 (E.D. Cal. Aug. 20, 2008), but that decision does not support the proposition that a defendant can escape liability because the recipient of a false promise did not double- and triple-check if the defendant continued to stand by the falsehood. The court simply held that a "sophisticated Nevada construction company with experience conducting out-of-state operations" could not reasonably rely on its insurer to determine obligations owed under another state's workers' compensation laws without some inquiry verifying them. *Id.* at *5.

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

30(b)(6) deponent, Sarah Karam, stated that Google did not rely on the extension-request forms when deciding how to allocate resources. Mot. at 22. But Ms. Karam simply noted that "that wasn't an expectation of[] any – any submission of these forms," and clarified that Google interpreted Match's application for more time to comply as a reason "to continue working with Match towards compliance." Ex. 11, Karam Dep. 265:1-3, 264:12-19. A jury could thus find that Google incurred harm by continuing to invest because of Match's false promise.

Match also incorrectly disputes Google's right to claim punitive damages. First, Match argues that punitive damages are not available for Google's breach of contract, unjust enrichment, or breach of the implied covenant of good faith and fair dealing claims. Mot. at 24-25. But this is not in dispute: Google seeks punitive damages only on its false promise claim. Next, Match argues that Google cannot recover punitive damages on its false promise claim because Match did not state that it would use GPB exclusively. Mot. at 25. Match once again misstates Google's claim. Google contends that Match falsely promised to bring its apps into compliance with Google's policy, either by using GPB, by going consumption only, or by using another compliance method.

A party, like Match, that has engaged in a subspecies of fraud can be liable for punitive damages. Cal. Civ. Code § 3294 (punitive damages recoverable "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice"); *see also Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1052 (2009) ("With respect to the clear and convincing standard for punitive damages, it is not plaintiff's obligation to prove her claim in opposing a motion for summary adjudication. It is only necessary to provide a prima facie showing of facts to sustain a favorable decision if the evidence submitted is believed."). Match promised to comply with Google's Payment Policy (a promise it did not intend to keep and did not keep); Google relied on that promise and suffered damages in the form of lost revenue and investment. A jury could thus find that Google is entitled to punitive damages.

## C.     Summary Judgment Is Inappropriate for Google's Claim That Match Breached the Implied Covenant of Good Faith.

Match's challenge to Google's claim that it breached the implied covenant of good faith is derivative of its arguments regarding Google's false promise claim, and fails for the same reason.

As Match states, a defendant is liable for breach of the implied covenant of good faith where the "defendant deprived the plaintiff of a benefit conferred by the contract in violation of the parties' expectations at the time of contracting." *Curley v. Wells Fargo & Co.*, No. 13–cv–03805 NC, 2014 WL 988618, at *5 (N.D. Cal. Mar. 10, 2014). "The failure to deal fairly or in good faith gives rise to an action for damages." *Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280, 291 (2019). "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable," and "[t]he issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily a question of fact unless only one inference [can] be drawn from the evidence." *Id.* at 292 (cleaned up).

Match intentionally and in bad faith misled Google to believe that Match would comply with the DDA's Payments Policy, which induced Google to allow Match's apps to remain on Google Play. First, Match's extension forms—which required Match affirm that, "Yes," it was seeking an extension for more time *to comply* with Google's billing policy—secured a billing enforcement extension from Google on false terms. *See* discussion, *supra*, at pp. 16-21. Second, Match participated in negotiations with Google premised on the idea that Match was working to comply. *See, e.g.*, Karam Decl. ¶ 7. Match's CEO, Sharmistha Dubey, also personally assured Google that Match planned to comply. *See* Ex. 11, Karam Dep. 269:24-271:3.

While Google held weekly meetings with Match and invested in features it requested, *see* Ex. 24, DX938, *supra*, Match internally took actions inconsistent with any intention to comply. Match, for instance, privately discussed a plan to submit non-compliant apps at the deadline, without notifying Google that Match had not integrated GPB as promised. *See, e.g.*, Ex. 25, Purves Dep. 267:18-268:13. Match did not inform Google about those plans, despite continuing to discuss compliance and feature-requests with Google's teams. *Id.* Evidence from years prior suggests Match saw negotiations with Google about GPB features as an effective way to string Google along. *See* Ex. 26, DX0885 ("Every time we've met with Kirsten [GPB] has come up, we typically try to come [up] with reasons why we can't move to IAP that are founded on requiring them to do more work. The main argument we've been successful with so far, is they do not offer recurring subscriptions for all the plans we offer (2,4,8 month packages). . . . The above may not

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   be a long term solution, but will certainly buy some time . . . ."). A jury could find Match sought

2   an extension and negotiated about GPB with no intent to deliver on its promise, but merely to

3   "buy some time" to avoid its contractual obligations. *Id.*

4       **D.**    **Summary Judgment Is Inappropriate for Google's Unjust Enrichment Claims.**

5         Match's challenge to Google's quasi-contract claim is largely derivative of its points as to

6   Google's false promise claim, and fails for the same reasons. Unjust enrichment is a viable claim

7   for relief in California where a "defendant has been unjustly conferred a benefit 'through mistake,

8   fraud, coercion, or request.' The return of that benefit is the remedy 'typically sought in a quasi-

9   contract cause of action.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)

10  (quoting 55 Cal. Jur. 3d § 2). Match argues that Google's quasi-contract claim fails because the

11  DDA defines the rights of the parties. This is wrong. Google's quasi-contract claim is based on

12  Google's delivery of distribution services to Match at no cost based on Match's false

13  representation that it intended to comply with the Payments Policy by March 31, 2022. Nowhere

14  in the DDA is Google obligated to provide distribution services at no charge while a developer

15  uses its own billing system. Indeed, Match concedes that when Google clarified its policy in

16  September 28, 2020, it made clear that "'dating' apps would be required to use GPB exclusively

17  for in-app purchases" by September 30, 2021. *See* Mot. at 6-7.

18        Match thus asked Google to provide distribution and other services without any service fee

19  during the extension period, understanding that Google was forgoing its fee to assist Match Group

20  in complying with the DDA.[10] *See* Ex. 11, Karam Dep. 269:24-270:3. And Google indeed did not

21  collect service fees for that period. *Cf.*, e.g., Dkt. No. 486-36 (Reiter Ex. 35, Foster Decl.) ¶ 62.

22  Google's expenditures to provide Match distribution during the extension are recoverable.

23  **IV.**    **CONCLUSION**

24        The Court should deny Match's motion for partial summary judgment.

25

26

---

27  [10] Match also requested that Google invest in new GPB features during this period—investments Google prioritized based on Match's requests. *See* Karam Decl. ¶ 7. Although Google would be

28  entitled to restitution for these investments, it is not seeking restitution for its development costs.

**DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1     DATED: May 18, 2023        Respectfully submitted,

2

3                                  By:       */s/ Kyle W. Mach*

4                                        Kyle W. Mach

5                                      Glenn D. Pomerantz, S.B. #112503
                                     glenn.pomerantz@mto.com

6                                      Kuruvilla Olasa, S.B. #281509
                                     kuruvilla.olasa@mto.com

7                                      Nicholas R. Sidney, S.B. #308080
                                     nick.sidney@mto.com

8                                      **MUNGER, TOLLES & OLSON LLP**
                                     350 South Grand Avenue, Fiftieth Floor

9                                      Los Angeles, California 90071
                                     Telephone: (213) 683-9100

10                                    Kyle W. Mach, S.B. #282090

11                                    kyle.mach@mto.com
                                   Justin P. Raphael, S.B. #292380

12                                    justin.raphael@mto.com
                                   Emily C. Curran-Huberty, S.B. #293065

13                                    emily.curran-huberty@mto.com
                                   Dane P. Shikman, S.B. #313656

14                                    dane.shikman@mto.com
                                   **MUNGER TOLLES & OLSON LLP**

15                                    560 Mission St., Suite 2700
                                   San Francisco, CA 94105

16                                    Telephone: (415) 512-4000
                                   Facsimile: (415) 512-4077

17                                    Jonathan I. Kravis, *pro hac vice*

18                                    jonathan.kravis@mto.com
                                   **MUNGER, TOLLES & OLSON LLP**

19                                    601 Massachusetts Avenue NW, Suite 500E
                                   Washington, D.C. 20001

20                                    Telephone: (202) 220-1100

21

22

23

24

25

26

27

28

**DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Counsel for Defendants Google LLC, et al.*

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>E-FILING ATTESTATION</u>**

I, Kyle W. Mach, am the ECF User whose ID and password are being used to file this

document. In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that counsel for

Defendants have concurred in this filing.


<u>/s/ Kyle W. Mach</u>
Kyle W. Mach

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# Exhibit B2
# Public Redacted Version

# EXHIBIT 2
## FILED UNDER SEAL

Google Government Affairs & Public Policy

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

# Google Play

Payments policy update

Wilson White, Kareem Ghanem

July 2020

**PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED**

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-009909081

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

## HIGHLY CONFIDENTIAL; DO NOT SHARE EXTERNALLY

Google

Confidential + Proprietary

GOOG-PLAY-009909082

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

# TL;DR

- Google Play will clarify its payments policy on Aug. 6

- The clarification addresses longstanding confusion about which kinds of in-app sales must use Google Play for payments, confusion that is undermining the long-term viability of an important Google business

- Our strategy for landing this announcement includes a defense of our basic business model, plus key factors that differentiate us from Apple

G | GAPP

Confidential + Proprietary

Here is the agenda for our review today, please feel free to add questions to the Dory linked on the calendar invite or ping melmabry@ your questions.



Here is the agenda for our review today, please feel free to add questions to the Dory linked on the calendar invite or ping melmabry@ your questions.



GOOG-PLAY-009909085

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

Google Play will clarify its payments policy on Aug. 6

The clarification addresses longstanding confusion about which kinds
of in-app sales must use Google Play for payments

G | GAPP

Confidential + Proprietary

GOOG-PLAY-009909086

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

## Current language

"In-app purchases:

- Developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment.

- Developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except for the following cases:

  ○ Payment is solely for physical products

  ○ Payment is for digital content that may be consumed outside of the app itself (eg, songs that can be played on other music players)"

G | GAPP

Confidential + Proprietary

GOOG-PLAY-009909087

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

## New language

"Play-distributed apps must use Google Play's billing system as the method of payment if they require or accept payment for access to features or services, including any app functionality, digital content or goods.

(i)      Examples of app features or services requiring use of Google Play's billing system include, but are not limited to, in-app purchases of:

- Items (such as virtual currencies, extra lives, additional playtime, add-on items, characters and avatars);

- subscription services (such as fitness, game, dating, education, music, video, and other content subscription services);

- app functionality or content (such as an ad-free version of an app or new features not available in the free version); and

- cloud software and services (such as data storage services, business productivity software, and financial management software)."

G | GAPP

Confidential + Proprietary

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

What this is not about:

- The percentage we charge for our service fee

- Integration of GPay

- Growing Google Play revenue through a policy change

G | GAPP

Confidential + Proprietary



First, some background on Play..

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-009909090

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

Like any business, we charge for our services

But the ambiguity in our policy, coupled with broader regulatory trends, threatens to undermine our business model

Note -- this is not about growing our revenue through a policy change

G | GAPP

Confidential + Proprietary



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

# FINANCIAL TIMES

EU tech regulation   ( + Add to myFT )

## Apple faces twin antitrust probes in Brussels

App Store and Apple Pay face scrutiny amid competition concerns

The EU said that, following a preliminary investigation, "the commission has concerns that Apple's restrictions may distort competition for music streaming services on Apple's devices".

It added that by forcing companies to sell to customers through Apple's own in-app payments system, Apple seemed to have "full control over the relationship with customers of its competitors".

G | GAPP

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED



APPLE \ TECH \

## Hey.com exec says Apple is acting like 'gangsters,' rejecting App Store updates and demanding cut of sales

*Apple suggests the rejection is not a mistake*

By Jacob Kastrenakes | @jake_k | Jun 16, 2020, 6:05pm EDT

Apple is threatening to remove Hey.com from the App Store if the ambitious new email service doesn't begin offering an in-app subscription and sharing a cut of its revenue, according to an executive at Basecamp, which makes Hey.

G | GAPP

Confidential + Proprietary

GOOG-PLAY-009909094

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED



APPLE \ GAMING \ ENTERTAINMENT

# Epic Games and Match Group join Spotify in protesting Apple's App Store fees

*Following the EU's launch of an investigation into the practice*

By Ashley Carman | @ashleyrcarman | Jun 17, 2020, 11:52am EDT

More companies are vocalizing their support for an antitrust case against Apple filed in the EU yesterday. Both Match Group, the owner of dating apps like Tinder and Hinge, as well as Epic Games, which created *Fortnite*, issued statements last night in support.

G | GAPP

Confidential + Proprietary

GOOG-PLAY-009909095



PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

"The Google tax"

Unfair rent seeking by a platform that app developers are required to use

Foreclosing rivals through bundling

Another example of Google preferencing its own products over those of rivals – - why not let other payment services compete with Google's payment services?

Harming national champions

Google is a foreign giant that is constraining homegrown growth, innovation, and success

G | GAPP

Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



GOOG-PLAY-009909098

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

## Key messages

- This clarification to our payments policy addresses longstanding developer confusion
- Like any business, we charge for our services and our service fee fuels the development of the platform
- The services we provide to developers are substantial and go far beyond payment processing
- Our approach is different from Apple in important ways
- Because we know this may require work for some developers, we won't begin enforcement for 14 months

G | GAPP

Confidential + Proprietary



PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

We connect developers with an avid global consumer base

- Google Play is available in 190+ countries
- 2+ billion active monthly Play users
- More than 116 billion downloads from Google Play last year

We connect developers with a consumer base that trusts the platform

- Google Play Protect scans over 100 billion apps on users' devices each day to make sure these apps aren't behaving in harmful ways
- Last year, Google Play Protect stopped 1.9 billion malware installs

G | GAPP

Confidential + Proprietary

GOOG-PLAY-009909100

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

We connect developers with a consumer base that can transact seamlessly

- Carrier billing on 172 carriers across 64 countries covering 1.3+ billion active devices
- Google Play gift cards available in 35 countries at more than 800,000 retail locations
- We added seller support to 31 new markets in 2019
- Our improvements to the subscription platform meant that subscription developers earned 4x more in 2018 than in 2016

We connect developers with free tools we've built that make app development easier and let developers focus on innovating

- New Google Play Console tools reduced crash rates by 70%
- Android App Bundle & Dynamic Delivery helped reduce app sizes by up to 65%, leading to more downloads and fewer uninstalls
- In 2018, the Android Security Improvement Program helped over 30,000 developers fix over 75,000 apps

G | GAPP

Confidential + Proprietary

**DEVELOPER NOTES**

**We built:**
**Available in 190 countries**
**2+ billion active monthly users**
**116 billion downloads in the last year**

████████████████████████████████████████

██████████

████████████████████ ██ ████████████████

**Trusts the platform**
**Google Play Protect scans over 100 billion apps on users' devices**

████████████████████████████████

**Can transact seamlessly**
**Carrier billing on 172 carriers in 64 countries covering 1.3+ billion active devices**
**Google Play gift cards available in 35 countries at more than 800,000 retail locations**
**Added seller support to 31 new markets in 2019**
**Improvements to subscriptions platform → devs earned 4x more in 2018 than 2019**

GOOG-PLAY-009909101

**Focus on innovating**

**Play Console tools reduced crash rates by 70%**

**App Bundle & Dynamic Delivery reduced app sizes by 65% → more downloads, fewer uninstalls**

**Android Security Improvement Program helped 30,000 devs fix over 75k apps**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

**Our business model aligns our success with positive consumer experiences and developer business outcomes**

Google doesn't receive payment unless and until the developer starts making money, which means that the customer has received something they feel is worth paying for.

We don't succeed unless consumers are happy and developers succeed.

G | GAPP

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

With this change, it will be easier for consumers to consistently and securely make purchases and manage their spending

- **Better consumer information.** Purchase flow and receipts that explain, in a consistent format across all apps and games, what the user is purchasing, how much they're paying for it

- **Better spending and budgeting controls.** Monitor all purchases within Google Play, use Google Play's budget tools, use Google Play family payment method to supervise family purchases

- **Better security and safety.** Secure payment method, password authentication, protection from subscription fraud, subscription cancellation, reminders about free trials and recurring charges

 GAPP

Confidential + Proprietary

## How we're different from Apple

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

- Android is open. Most Android devices come preloaded with more than one app store.

- Google Play lets developers communicate with their users. We're an app developer too, and we know how important it is not to restrict developers' ability to communicate with their users.

- Our policies apply equally to Google's own apps. All apps will need to comply with the Google Play billing policy, including Google's first-party apps.

- No price parity requirements. We do not require app experience, feature, price parity, etc across platforms.

- Consumption-only apps are permitted. If an app developer sells a subscription outside of Google Play, users can still sign into their app and Google Play won't charge a service fee

G | GAPP

Confidential + Proprietary



How we're different from Apple

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

| | | ▶ | 🍎 |
|---|---|---|---|
| **Platform Openness** | | | |
| | Permits other app stores, preloads, sideloading | Yes | No |
| | Requires platform's login | No | Yes |
| **Dev Flexibility** | | | |
| | Freedom to communicate w/ users | Emails OK | Does not allow |
| | SKU Parity | Not required | Required for some (Hey.com vs. Netflix) |
| | Want to use own systems / billing | "Modular" Billing EAP for Spotify, Netflix | Does not allow |
| **Fair Treatment for 3rd Parties** | | | |
| | Preferencing on Platform | No store bias, fair platform access | Recent changes to improve |
| | | YouTube, 1Ps to use Play Billing and account for Play's service fee | Some 1P-only features used by Apple Music... rev share unclear |
| **Economics** | | | |
| | 30% Unfair | Accelerators / Programs for key verticals | Video Partner Program |

G | GAPP

Confidential + Proprietary

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

## We're providing 14 months for devs to adjust

- We consistently hear that devs want more time to adjust to policy changes, and we're responding to that
- We'll work closely with devs who aren't already on Google Play billing

## This will only impact new purchasers/subscribers transacting through Google Play

- Doesn't impact existing subscribers
- Doesn't impact non-Play purchases (such as through the web or on alternative app stores)

G | GAPP

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



GOOG-PLAY-009909108

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

## External briefings so far

- Japan
  - Heads up to METI and JFTC given pending inquiries into Play billing
  - Generally neutral reaction, requests to follow up post-announcement
- South Korea
  - Announcement leaked to media (probably ███████████)
  - KFTC reached out; briefing scheduled for next week
  - Media also reported that we offered Cloud credits to offset Play fees (not true)

G | GAPP

Confidential & Proprietary

PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

## Action items

- Reach out to regional Comms, Partnerships, and Legal counterparts to align on an outreach strategy
- Get familiar with the overall messaging plan
- Track your outreach plans here

## gapp-all updates

- One week before → We will send a note to the org, which will include this deck, the broader plan, and a buddy email.
- Day of announcement → We will follow up that the policy has been launched externally.

G | GAPP

Confidential + Proprietary



PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

Questions from APAC

# Redacted - Privilege

emaeda@ — "We have received complaints from consumer agencies, that consumers complain they want to cancel certain payments due to fraud or other reasons. My understanding is that we answered it's between developers and consumers, and Google cannot involve. Would this approach change with this policy change?"
A: In some respects, yes. In many jurisdictions where we've seen escalations about fraud occurring, they may not be using our payment system and so we have limited oversight but with this change, we should have more leeway to act.

marimatthews@ — How does our position differ wrt small/medium/large businesses in JP?
A: This is not a revenue play -- the local teams are thinking through how best to land this and hope the 14m window will give more flexibility for devs to make the right choice for their business.

dionisia@ — Any data around security has been jeopardized because of this ambiguity? Does allowing billing discussions off platform mean we are willing to sacrifice consumer security?
A: If having these stories helps our advocacy, we can get it ... Clarification of policy

tnorbhu@ — "Will the BD team be able to share more granular data for Vietnam on developers, revenues/ spend on Play vs outside of platform?  Government is revising a law and is targeting app stores.  They want stricter measures to ensure that only government approved apps are made available and want platforms to pay fair taxes for revenue made in the country.  VN developers  have been using off platform means to collect payments.  to avoid the 30% fee."
A: BD team should have data but we have to check how much can be shared externally.

G | GAPP

Confidential + Proprietary





PRIVILEGED & CONFIDENTIAL / LEGAL GUIDANCE REQUESTED

Questions from EM/EU/NA

# Redacted - Privilege

garethe: On the customer service point – does this mean we'll be investing more in a better customer service/trust & safety experience for Play users after this change? thinking about things like refunds & friendly fraud which cause the comms team some pain
*Short answer – yes.*
**Feedback: Don't anchor just on dev benefits but users too.**

telejko: How will Spotify react?
*We've been working to address the concerns Spotify has made wrt Apple and are in bilateral mtgs with them on custom integrations.*

jkottman: Is Spotify an exception?
*Yes but not publicly so.*

G | GAPP

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit B3
# Public Redacted Version

# EXHIBIT 7
## FILED UNDER SEAL

| | |
|---|---|
| **Date:** | Tuesday, May 29 2018 05:41 PM |
| **Subject:** | RE: Follow up from our discussion |
| **From:** | Adrian Ong <Adrian.Ong@match.com> |
| **To:** | Purnima Kochikar <kochikar@google.com>; |

Thanks Purnima.

You mentioned at the end of the call that the separate category option (given our episodic nature and inability to take advantage of the 15%) was an interesting option and that you'd discuss with your legal and compliance teams – did you make any traction there?

Also on user safety/experience, per my question below – for the categories you exclude from using GPB such as retail, ticketing and P2P transfers, if you're not enforcing GPB for them, then isn't that inconsistent for the ecosystem?

Thanks
-AO

**From:** Purnima Kochikar [mailto:kochikar@google.com]
**Sent:** Tuesday, May 29, 2018 12:01 AM
**To:** Adrian Ong <Adrian.Ong@match.com>
**Subject:** Re: Follow up from our discussion

Thanks Adrian. Your feedback is appreciated.

As discussed, we will be as thoughtful and partner focused as possible without compromising on user safety and experience and consistent application of policy across the ecosystem.

P

On Thu, May 24, 2018 at 9:33 AM Adrian Ong <Adrian.Ong@match.com> wrote:

> Hi Purnima
>
> Thanks for a productive catch up last week – I'm glad we can have an open dialogue as partners and I am all for supporting a closer and tighter relationship between our companies but we have some hurdles to cross, although I am sure between the two of us we can find a solution.
>
> As discussed:
>
> - Claims of being out of compliance with Google Play Billing requirements
>
>     o Per your documentation (https://play.google.com/about/monetization-ads/payments/ ), we believed that since our brands had subscription features and premium content that could be consumed on other platforms outside of Android (except Tinder – which did not have a web product until late last year and thus they exclusively used GPB), I did not see our other brands as being out of compliance as claimed by several people from your team and as discussed when we first met.
>
>     o The documentation further speaks to subscription features that Google Play Billing supports, however it never states that it is compulsory that we use it as the exclusive payment method.
>
> - Growth engagement

MATCHGOOGLE00080723

○ Purnima, what was the game you mentioned that was 3 years old and where you drove a significant revenue increase?

○ I followed up on the Tinder growth meeting

    i.    Please ensure your team loops Ian and myself in to these meetings so that we're aware they're happening.  We have asked the brands to do the same.

    ii.    After touching base with the Tinder team, sounds like the agenda was quite general and there weren't any significant or obvious opportunities that arose from it.  This is why I'm curious as to what exercises you went through with the gaming app you mentioned.

- Dating is an episodic category + Rev share

○ As discussed, while we understand Google and Apple provide platforms, when we look at YoY growth we know that on both platforms, we see strong growth but the fact is a very small % of that YoY growth is driven by discovery based on the efforts of any platform and/or your product offerings.  Therefore the majority of our continued YoY growth is driven by our efforts (e.g. new subscription features, etc) while Google and Apple look to reap the benefits.

○ The 30% feels both like an arbitrary figure (e.g. ticketing and many other industries are not charged this and we know that the cost of processing a payment is <3-5%) and when looking at channel / platform mix, brands are hesitant to drive traffic or use GPB due to the high barrier just to break even (i.e. we'd have to gain 30% via conversion and retention which is a real stretch).  Web and mobile web (incl. via paid marketing via search or social) therefore become extremely attractive platforms from an ROI perspective and users can always download the apps post-conversion.  This is also a new world for Tinder who now has a web product, whereas previously they were always reliant on app platforms.  I believe economics should not be the deterrent that prevents brands from testing and using your platforms.  In fact, in the spirit of a true partnership, our brands should want to use Google Play Billing and be willing to get onboard because it makes business sense - rather than being forced to do so via a policy change.

○ As one of your top grossing partners, we are furthermore unable to take advantage of the 15% due to the episodic nature of our category.  It would be in fact, a poor customer experience if our users stayed longer (on average they only stay ████████).  ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.

○ While I understand that you have an ecosystem-wide approach to billing, I'd point out two things:

    i.    You still have exclusions lists (such as ticketing, P2P payments, physical goods) that would result in apps still hosting their own payment solutions.  Are you planning on changing this also and forcing these apps to use GPB but at a different / lower rev share?  If not, this seems to go against the idea you mentioned that Google is trying to control all aspects of the platform incl. payments.

    ii.    You currently and in the past have created category specific rules around Google Play billing – e.g. developers offering Games are specifically outlined as having to use Google Play Billing, while those categories in the exclusions

list do not (same link I mentioned at the beginning of my email)

o Proposals to drive a true partnership and get MG brands onboard with GPB sooner (note: I am already having similar discussions with other platforms):

   A.  Since our subscribers are only paying us (and we're collecting revenue) for such a short period as it stands (an average for ███████), define our category (dating specifically or if you would prefer to define a list of episodic categories) to be included in the exclusion list, move all MG brands onto GPB for their Android apps, and have those in the exclusion list utilize GPB commission-free or at cost (i.e. < sub 15% rev share).  Since an exclusion list already exists today this may be a simple option and obviously you would yield ecosystem benefits with more brands on board and customers with payment on file given our scale as a top partner and global presence.

   B.  The dating category (and/or other episodic categories) is setup to take advantage of the 15% immediately, again, due to our shorter subscription length and the fact that in our business models, we are actual incentivized to keep this as short as possible.

o By achieving options A or B, I believe this would take our partnership to a new level – brands would be more willing to engage and get onboard with Google Play Billing, and be willing to engage in growth engagements as you proposed, etc.  Once brands are on Google Play Billing, you'd obviously benefit from the ecosystem perspective with more brands on board + users with payment on file.  We would also be incentivized to help you improve conversion and retention with our payments expertise (we are finding opportunities every month and we have experts in payments in all our respective markets) as we would be using your payment system

o I'd still need to get sign off on the above proposal but I feel strongly that I could get confirmed business buy in, a renewed partnership and an accelerated GPB integration (even prior to any announcement) if we made this happen

Let me know what your legal and compliance teams come back with.  I think it would be a huge win for both sides if we could achieve some middle ground on this topic, which I'd hope to achieve vs. the current tooth-and-nail situation we seem to be in.  It would help make both our jobs easier and get us moving forward with GPB faster and with less hesitance.

Best,
-AO


--
Purnima Kochikar
Google Play, Apps & Games
kochikar@google.com
+17813548147

Confidential

# Exhibit B4
# Public Redacted Version

# EXHIBIT 10
## FILED UNDER SEAL

**CONFIDENTIAL & INTERNAL ONLY**

# Apps Velocity Program

Extend Hug program to strategic app developers to ease transition
to Play Billing and enhance x-Google value delivered

April, 2019

**Sponsors: Sarah Karam, Mike Marchak**
Strategy Team: Samer Sayigh, Sam Tolomei, Danielle Stein
Program Managers: Vic Ho, Danielle Martinak, Karan Gambhir

dmartinak@

ATTORNEY CLIENT PRIVILEGED AND CONFIDENTIAL / REFLECTS LEGAL ADVICE

GOOG-PLAY-009206383

Please keep confidential and don't discuss externally at this time!



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-009206385

What we're doing about it

**Proposal**

**Play plans to clarify payment policy and enforce consistently.**

To help land the policy change and mitigate new risks (e.g. agitation from impacted devs)

**Extend Hug Program to ~20 strategic app** developers **to ease transition to Play Billing and enhance x-Google value delivered**

Our proposal mitigates the following risks for Google:

**Redacted - Privilege**

**Improve User Trust & Safety**
on Android via increased Play billing adoption

xx PRIVILEGED :: REFLECTS LEGAL ADVICE



**Impact Partners:** Only <u>non-compliant apps</u> selling <u>digital</u> goods are impacted by policy change

<u>**NOT**</u> **Impacted by Play Policy Change**

| GAMES | |
| APPS selling **physical** goods (e.g. retail, transport) | |
| APPS selling **digital goods – Already Compliant** | |

**IMPACTED by Play Policy Change**

| APPS selling digital goods – **Non-Compliant** | |

Attorney Client Privileged – Seeking Advice of Counsel



Living Room Acc PgM (LRAP) -- adopt Android TV/chromecast ▓▓▓▓
Audio Distribution Acc PgM (ADAP) -- agreeable rev share terms ▓▓
SWIG -- agreeable rev share terms & adopt subscribe with Google

yeah, like where LRAP, ADAP, Hug, Hug for Apps are all Play/Android led
SwG is more lead by GPP/LPS/other teams
and the 15% rev share is more of a side-show



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Boost Play Billing adoption (less consumption-only)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





Dating: Match (Tinder, Match, Pairs, Plentyoffish, okCupid, Hinge, Meetic),

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





Linked slides from go/app-acc

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-009206394



GOOG-PLAY-009206395



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





Want to land with news big and small in terms of pricing; keep simple and understandable; technical integration it is what it is, but economics

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-009206398



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Version B forecast
Includes both Tier 1 & Tier 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Exhibit B5
# Public Redacted Version

# EXHIBIT 11
## FILED UNDER SEAL

Page 1

1          UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4  -------------------------------------------------x

5  IN RE GOOGLE PLAY STORE          Case No.

   ANTITRUST LITIGATION             3:21-md-02981-JD

6

7  THIS DOCUMENT RELATES TO:

8  Match Group, LLC et al. v. Google LLC et al.,

   Case No. 3:22-cv-02746-JD

9

   Epic Games Inc. v. Google LLC et al.,

10 Case No. 3:20-cv-05671-JD

11

   In re Google Play Consumer Antitrust

12 Litigation, Case No. 3:20-cv-05761-JD

13

   In re Google Play Developer Antitrust

14 Litigation, Case No. 3:20-cv-05792-JD

15

   State of Utah et al. v. Google LLC et al.,

16 Case No. 3:21-cv-05227-JD

   -------------------------------------------------x

17

18   ** HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER ***

19

20          REMOTE VIDEOTAPED DEPOSITION OF

21                  SARAH KARAM

22          Wednesday, September 28, 2022

23

24 REPORTED BY:

25 RENEE HARRIS, CA CSR 14168, NJ CCR, RPR

HIGHLY CONFIDENTIAL

```
                                           Page 2
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4     -------------------------------------------------x
 5     IN RE GOOGLE PLAY STORE          Case No.
       ANTITRUST LITIGATION             3:21-md-02981-JD
 6
 7     THIS DOCUMENT RELATES TO:
 8     Match Group, LLC et al. v. Google LLC et al.,
       Case No. 3:22-cv-02746-JD
 9
       Epic Games Inc. v. Google LLC et al.,
10     Case No. 3:20-cv-05671-JD
11
       In re Google Play Consumer Antitrust
12     Litigation, Case No. 3:20-cv-05761-JD
13
       In re Google Play Developer Antitrust
14     Litigation, Case No. 3:20-cv-05792-JD
15
       State of Utah et al. v. Google LLC et al.,
16     Case No. 3:21-cv-05227-JD
       -------------------------------------------------x
17
        ** HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER ***
18
19           Remote Videotaped Deposition of SARAH
20     KARAM, appearing from Palo Alto, California, at
21     9:07 a.m. PDT, on Wednesday, Palo Alto, 2022,
22     before Renee Harris, California Certified
23     Shorthand Reporter No. 14168, New Jersey Certified
24     Court Reporter No. 30XI00241200, and Registered
25     Professional Reporter.
```

HIGHLY CONFIDENTIAL

```
                                        Page 3
 1   APPEARANCES OF COUNSEL:

 2   Counsel for Plaintiffs Match Group, LLC; Humor

 3   Rainbow, Inc.; PlentyofFish Media ULC; and People

 4   Media:

 5               HUESTON HENNIGAN

 6               BY:  DOUGLAS J. DIXON, ESQ.

 7                    WILL LARSEN, ESQ.

 8               620 Newport Center Drive, Suite 1300

 9               Newport Beach, California 92660

10               ddixon@hueston.com

11               wlarsen@hueston.com

12

13   Counsel for the Proposed Class In re: Google Play

14   Consumer Antitrust Litigation:

15               KOREIN TILLERY LAW OFFICE

16               BY: DAVID WALCHAK, ESQ.

17               205 North Michigan Avenue, Suite 1950

18               Chicago, Illinois 60601

19               dwalchak@koreintillery.com

20

21

22

23

24

25
```

```
                                           Page 4
```

1    APPEARANCES OF COUNSEL:   (CONTINUED)

2    On Behalf of Plaintiff Epic Games, Inc. in:

3    Epic Games, Inc. v. Google LLC, et al:

4                CRAVATH SWAINE & MOORE

5                BY:  ASHLEY ULRICH, ESQ.

6                    MALIKAH WILLIAMS, ESQ.

7                825 Eighth Avenue

8                New York, New York 10019

9                aulrich@cravath.com

10               miwilliams@cravath.com

11

12   Counsel for Google LLC, et al:

13               MORGAN LEWIS & BOCKIUS LLP

14               BY: MINNA LO NARANJO, ESQ.

15                   NINA DUTTA, ESQ.

16               One Market, Spear Street Tower,

17               28th Floor

18               San Francisco, California 94105-1596

19               minna.naranjo@morganlewis.com

20               nina.dutta@morganlewis.com

21   Also Present:

22        Kathlyn Querubin, Google

23        Jeanette Tekman, Match Group

24        Stephen Myers, Match Group

25        Steven Togami, Videographer

HIGHLY CONFIDENTIAL

Page 8

1                Wednesday, September 28, 2022

2                       9:07 a.m.

3     _____

4          THE VIDEOGRAPHER:  We are on the record

5     at 9:07 a.m. on September 28, 2022.

6          Please note that this deposition is being

7     conducted virtually.  Quality of recording

8     depends on the quality of camera and Internet

9     connection of participants.  What is seen

10    from the witness and heard on screen is what

11    will be recorded.  Audio and video recording

12    will continue to take place unless all

13    parties agree to go off the record.

14         This is Media Unit No. 1 of the

15    video-recorded deposition of Sarah Karam

16    taken by counsel for the plaintiffs in the

17    matter of Match Group LLC et al. v. Google

18    LLC, et al., filed in the United States

19    District Court for the Northern District of

20    California, Case Number Case No.

21    3:22-cv-02746-JD.

22         This deposition is being conducted

23    remotely using virtual technology.  My name

24    is Steven Togami representing the firm

25    Veritext Legal Solutions; I am the

Page 9

1       videographer.  The court reporter is Renée

2       Harris from the firm Veritext Legal

3       Solutions.

4            I am not related to any party in this

5       action, nor am I financially interested in

6       the outcome.

7            If there are any objections to

8       proceeding, please state them at the time of

9       your appearance.

10           At this time, will counsel and all

11      present please state their appearances and

12      affiliations for the record, starting with

13      the noticing party.

14           MR. DIXON:  Doug Dixon of Hueston

15      Hennigan for the Match Plaintiffs, and I'm

16      joined by my colleague, Will Larsen.

17           MS. NARANJO:  Do all the plaintiffs want

18      to go?

19           MR. WALCHAK:  This is David Walchak for

20      the consumer plaintiffs from Korein Tillery.

21           MS. ULRICH:  Ashley Ulrich, Cravath

22      Swaine & Moore for Epic Games, and with me is

23      my colleague, Malikah Williams.

24           MS. NARANJO:  This is Minna Naranjo from

25      Morgan Lewis & Bockius, joined by Nina Dutta,

HIGHLY CONFIDENTIAL

Page 10

```
 1       also from Morgan Lewis & Bockius, and Kathlyn
 2       Querubin from Google representing the Google
 3       Defendants and the witness.
 4
 5                      SARAH KARAM,
 6   called as a witness and having been first duly
 7   sworn by the Certified Shorthand Reporter, was
 8   examined and testified as follows:
 9
10                      EXAMINATION
11
12    BY MR. DIXON:
13       Q.  Good morning, Ms. Karam.  How are you?
14       A.  Good morning.  I'm doing well.  How are
15   you?
16       Q.  I'm doing well, thanks.
17           So my name is Doug Dixon as you just
18   heard.  I represent the Match Plaintiffs which own
19   and operate several dating apps which I believe
20   you are most likely familiar with; Tinder,
21   Match.com, PlentyofFish, OkCupid and OurTime.  I
22   may refer to those brands individually today or I
23   may refer to the Match Plaintiffs.
24           Would that be okay?
25       A.  Yes.
```

HIGHLY CONFIDENTIAL

Page 48

```
1    an end-to-end platform for users, whether it's for
2    subscriptions or in a one-time in-app purchases
3    and it's a way for users to purchase with a sense
4    of security and safety that they can get refunds
5    as needed.
6           They can easily cancel subscriptions, if
7    they have them running, and this works in hundreds
8    of countries over hundreds of forms of payments,
9    including local forms of payments, carrier
10   billing.
11          So it's a suite of services both for
12   developers and for users.
13       Q.   Now, many app developers use the Google
14   Play Store without using Google Play Billing;
15   correct?
16       A.   Correct.  If a developer doesn't sell
17   digital goods and services, they would not be
18   using Google Play Billing.
19       Q.   And is it correct to say that less than
20   5 percent of developers offer digital goods and
21   services --
22       A.   Correct.
23       Q.   -- on the -- and so you can use the
24   Google Play Store without using Google Play
25   Billing and, in fact, the vast majority of
```

HIGHLY CONFIDENTIAL

Page 154

1        have such a thing.  They -- we did have

2        concerns about the user experience.  We had

3        heard and it was true in their ratings and it

4        became truer after they de-integrated, that

5        it was hard to cancel a Tinder subscription.

6        Often you had to call a human being instead

7        of being able to do it in the app.

8             So there were some reasons why, not just

9        for Tinder, but for really any app that used

10       their own billing or -- you know, therefore,

11       was violating our policy, that they -- they

12       wouldn't be an example of a best-in-class

13       user experience that was very transparent,

14       easy to use, offered all the right payment

15       features, etc.

16    BY MR. DIXON:

17       Q.  And that's solely because they offered an

18    alternative payment system to Google Play Billing?

19       A.  I'm sorry, what is "solely"?  That they

20    weren't merchandized?  What --

21       Q.  Correct.

22       A.  I am not aware of the full picture of

23    what else -- because we looked at lots of

24    variables to -- to determine a high-quality app.

25    I'm not sure if Tinder would have been eligible

HIGHLY CONFIDENTIAL

Page 229

1    at the meeting?

2         A.   Correct.

3         Q.   And then you're right, if you turn to the

4    second page of Exhibit 1596, there's reference to

5    another meeting, March 12, 2021, that was just

6    between you and Peter Foster; right?

7         A.   Correct.

8         Q.   And listed there is AVP discussion;

9    correct?

10        A.   Yes.

11        Q.   And is this Exhibit 1596 a document that

12   was created in the ordinary course of Google's

13   business?

14        A.   Yes.

15        Q.   And if you turn to page 3, which is the

16   one ending in 916, midway down, there's a bullet

17   point, "Integration Status."

18

19            Do you see that?

20        A.   I do.

21        Q.   And so if this was a meeting between you

22   and Peter, fair to say that you are the one that

23   created these notes since Peter wouldn't have had

24   access to it?

25        A.   I'm just reading through that section.

HIGHLY CONFIDENTIAL

```
 1    Definitely Google created.  I might have -- some
 2    of this information might have been sourced from
 3    others, not just me.
 4         Q.  But these were your talking points for
 5    your meeting with Peter on March 12, 2021,
 6    reflected here on the page ending in Bates 916?
 7         A.  Yes, there's a section below that says
 8    "proposed talking points" which was created by
 9    Google.
10         Q.  And these were the talking points you
11    relied upon in connection with your conversation
12    with Peter on March 12th, 2021; correct?
13         A.  Yes.
14         Q.  And one of the topics you and Peter
15    discussed was integration status; right?
16         A.  I think so.
17         Q.  At least according to Exhibit 1596, that
18    was one of the topics; right?
19         A.  That was one of the intended topics to
20    talk about, yes.
21         Q.  Any reason to believe you did not discuss
22    integration status with Peter during your meeting
23    on March 12th, 2021?
24         A.  I don't remember the exact meeting.  We
25    would have a lot to talk about in those meetings,
```

HIGHLY CONFIDENTIAL

Page 231

1   so I'm not sure the depth in which we went to in

2   each of these topics.

3        Q.  If you look under integration status,

4   there are two top-level bullet points, focusing on

5   the second top-level bullet point and then the

6   first sub-bullet, it says, [as read]: "Match.com

7   has submitted user interface mocks for feedback

8   (in progress) and have setup PBL and Alpha."

9        Do you see that?

10       A.  I do.

11       Q.  Does that mean that Google and Match were

12  working together on integrating billing

13  integrations?

14       A.  My understanding of that bullet point is

15  that Match had submitted mocks to exemplify how

16  they would integrate Google Play Billing and was

17  looking for feedback from us and they have

18  setup -- PBL stands for the Play Billing Library,

19  so that they had set that up in their Alpha

20  channel.

21       Q.  Was there any reason for you to believe

22  that Match was acting in anything other than good

23  faith when it created and submitted these user

24  interface mocks?

25       A.  I think you'll see from earlier in the

HIGHLY CONFIDENTIAL

Page 232

1    doc, there's ████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

██████████████████████ .

6            And I think the other bullet that you

7    referenced highlights that the working teams

8    were -- at Match across various apps were sharing

9    progress and, you know, sharing feedback with us

10   on integrating Google Play Billing.

11           So those things didn't quite always align

12   but there certainly efforts by our teams and the

13   Match teams to collaborate on Google Play Billing

14   at this point in time.

15       Q.  And you had no reason to question Match's

16   good faith in preparing those mocks and working

17   towards integration with Google?

18       A.  At this point in time in this specific

19   meeting?

20       Q.  Correct.

21       A.  Not in this specific meeting and for

22   these specific notes, no.

23       Q.  And if you'll turn to the next page

24   ending in Bates 917, you'll see there's a

25   reference to feature adds; right?

HIGHLY CONFIDENTIAL

1      A.   I do.

2      Q.   And that's listed as "best effort"?

3      A.   Yes.

4      Q.   Do you know what that meant?

5      A.   What best effort meant?

6      Q.   Correct.

7      A.   I believe in this context, in this

8  document, that it refers to -- that would be

9  something Google invested in and rolled out based

10 on a number of factors and we would use our best

11 effort to roll it out, that we were not

12 guaranteeing one way or another whether it would

13 be rolled out or if it would not be invested in.

14     Q.   Are there any features on -- listed on

15 Column B that Google was investing development

16 time on solely because of Match?

17     A.   There were features that we prioritized

18 and built primarily because of the feedback from

19 Match, yes.

20     Q.   And which of the features listed on

21 Column B of Exhibit 1995 was Google working on

22 solely as a request from Match?

23     A.   The two, four, eight-month subscription

24 packages that's in Row 11, Match was one of the

25 most vocal advocates for us launching that based

Page 262

1   be unable to adopt Google Play Billing

2   exclusively; right?

3           MS. NARANJO:   Object to form.

4           THE WITNESS:   You mean Match would be

5       unable to adopt Google Play Billing?

6    BY MR. DIXON:

7       Q.   Let me clarify the record.

8       A.   Sure.

9       Q.   Mr. Daniell made very clear in his

10   response to the last question, that due to feature

11   gaps, that Match and Google had long been

12   discussing, Match would not be -- Google Play

13   Billing was not a suitable substitute for Match's

14   own payment system; right?

15       A.   That's the statement Mr. Daniell's makes

16   here.  That does not align with previous feedback

17   and some of the exhibits that you showed me on

18   Match's intent and good faith to integrate Google

19   Play Billing, and it was surprising to read and

20   might lead me to assume that the app experience

21   for Match apps on Apple's App Store is unsafe for

22   users and harmful for users, based on that

23   language.

24           I don't believe Match validated when we

25   asked them about that.

Page 263

1            So yes, I read this statement.  I don't
2    think it reflects other conversations and feedback
3    that we heard from Match previously.
4        Q.  Google didn't ask for any clarification
5    in response to that statement, did it?
6        A.  This form was intended to record and it
7    was used to grant extensions for those who were
8    working in good faith to come into compliance with
9    our policies.  It was not intended to be a
10   partnerships back-and-forth or a product feedback
11   form.  That wasn't the purpose of the form.  It
12   was for our policy team.
13       Q.  My question was a little different,
14   respectfully.  I simply said:  Google didn't ask
15   for clarification in response to Mr. Daniell's
16   submission; correct?
17       A.  Not in this form, no.
18       Q.  And Casey did get a specific response
19   from Danmar; right?
20       A.  Correct.
21       Q.  And Danmar is somebody who works for
22   Google?
23       A.  I believe Danmar is on our policy --
24   policy vendor team.
25       Q.  So now let's turn back -- actually,

 1   before we go there, so I think you testified that

 2   Google relied upon Mr. Daniell's statement in

 3   granting an extension to Match.com LLC; correct?

 4        A.   Correct.

 5        Q.   Did Google rely on Mr. Daniell's

 6   statement in making any other decisions?

 7             MS. NARANJO:   Object to form.

 8             THE WITNESS:   Can you please be more

 9        specific on what decisions you're referring

10        to?

11    BY MR. DIXON:

12        Q.   Yeah, did Google rely on Mr. Daniell's

13   e-mail, say, for deciding how to allocate, I don't

14   know, internal resources or anything like that?

15        A.   Our -- the way Google viewed

16   Mr. Daniell's statement and then subsequent grant

17   of the extension and the way we interpreted that

18   was to continue working with Match towards

19   compliance.

20        Q.   I'm not sure that quite answered my

21   question.

22             I guess, again, did Google rely on

23   Mr. Daniell's request in the e-mail or the

24   submission deciding how to allocate internal

25   resources?

HIGHLY CONFIDENTIAL

Page 265

1      A.  No, because that wasn't -- that wasn't an

2   expectation off any -- any submission of these

3   forms.

4      Q.  All right.  If you'll turn back to

5   Exhibit 1994, which is Google's Answer.

6      A.  Yeah.

7      Q.  And I want to look at page, on the bottom

8   footer, No. 46.  And there's a section about a

9   third from the top saying, "Count III, False

10  Promise."

11         Do you see that?

12     A.  I do.

13     Q.  And if you look at the paragraph No. 70,

14  it says, [as read]:  "Match Group's specific

15  misrepresentations regarding its intention to

16  comply with the DDA include the August 2021

17  request of Peter Foster for an extension."

18         Do you see that?

19     A.  I do.

20     Q.  And the reference there to that August

21  2021 request of Peter Foster is Exhibit 1603;

22  right?

23     A.  The e-mail from Peter to Brandon?

24     Q.  Correct.

25     A.  Yes.  I believe so.

HIGHLY CONFIDENTIAL

Page 269

1   of Sameer Samat, Don Harrison, and sometimes, Gary

2   was in those calls.  So that's what I mean when I

3   say, I'm not sure which of those communications.

4   There was more than one.  But I -- I know there

5   were several and this is referring to one of them.

6        Q.  And when did those communications take

7   place?

8        A.  Throughout a time period ranging maybe

9   February, March, roughly, of 2022.

10       Q.  And do you know the specific day that any

11  of those communications being referred to in the

12  last sentence of paragraph 74 were made?

13       A.  I do not know the specific day.

14       Q.  And you're just guessing that it could

15  have been one of the conversations with Sameer

16  Samat?

17            MS. NARANJO:  Object to form.

18            THE WITNESS:  I'm not guessing.  Like I

19       mentioned, there were several conversations

20       between Shar Dubey, the CEO of Match and

21       Sameer Samat, the VP of Google Play and

22       Android product and this is in reference to

23       one of those conversations.

24            There may have -- it could be in

25       reference to a conversation with both the CEO

HIGHLY CONFIDENTIAL

Page 270

```
 1         and the CFO, where Shar, the CEO, stated the
 2         intent to come into compliance and abide by
 3         the DDA.
 4              I'm not sure what days those were on.
 5    BY MR. DIXON:
 6         Q.  And what did Ms. Dubey say specifically?
 7         A.  I wasn't in those -- pardon me, I'm
 8    sorry, I didn't mean to interrupt you.
 9         Q.  I was just going to say -- let me start
10    over.
11              So what did Ms. Dubey say specifically
12    that gave rise to the allegation contained in the
13    last sentence of paragraph 74?
14         A.  I wasn't in those meetings directly.  So
15    I can't speak to the -- the exact words used, but
16    from my memory of hearing summaries of the
17    meetings from our Google attendees, I think what
18    this is referring to is an intention to comply
19    with our policy and work together to comply with
20    our policies.
21         Q.  And I'm not -- really not asking for your
22    best memory or anything like that.  It's not meant
23    to be a memory test.
24              I'm asking as Google's corporate
25    representative:  What specifically did Ms. Dubey
```

Page 271

1   say that is alleged in paragraph 74?

2       A.   That Match intends to comply with

3   Google's policies.

4       Q.   She used those exact words?

5       A.   I was not in the meeting and there was --

6   there was no recorded transcript of the meeting.

7   So I do not know the exact words used.

8       Q.   In preparation to testify on behalf of

9   Google with respect to Topic No. 2, did you speak

10  to anyone who participated in those meetings with

11  Ms. Dubey to ask what Ms. Dubey allegedly said?

12      A.   We had briefings after these meetings to

13  go over some of the statements made and next

14  steps.  None of these meetings included

15  transcripting [sic], the exact words used, and

16  that's not typically the approach we use at

17  Google.  Our partnerships, we don't scrutinize

18  word-for-word and record what people say.

19          So no, I do -- I do not -- despite having

20  very strong familiarity with these conversations,

21  I was never told the exact words used because

22  that's not really an approach we take.

23      Q.   And the answer to my question is:  You

24  did not go speak with Mr. Harrison or Mr. Samat in

25  connection with your obligations to testify on

HIGHLY CONFIDENTIAL

Page 299

1        A.   I think e-mails, e-mail threads,

2   potentially a Google Doc, or at least one Google

3   Doc.

4        Q.   Let's start with the Google Doc.

5             Which Google Doc did you review in

6   connection with your preparation to testify as

7   Google's corporate representative with respect to

8   Topic No. 1?

9        A.   A meeting notes docs regarding Match

10  regarding AVP.

11       Q.   And have we reviewed during today's

12  deposition the Meeting Notes doc regarding AVP

13  that you reviewed in preparation for testifying as

14  Google's corporate representative on Topic No. 1?

15       A.   No.

16            MR. DIXON:  We're going to introduce

17       Exhibit No. 1997.  And that will be Tab 24

18       which is a document Bates GOOG-PLAY-011540724

19       through 0779.

20            (Exhibit 1997 was received and marked

21            for identification on this date and is

22            attached hereto.)

23   BY MR. DIXON:

24       Q.   Do you have Exhibit 1997 open?

25       A.   I do.

HIGHLY CONFIDENTIAL

Page 323

1    STATE OF CALIFORNIA      )

2                             )      ss.

3    COUNTY OF LOS ANGELES   )

4            I, RENEE HARRIS, do hereby certify that I

5    am a licensed Certified Shorthand Reporter, duly

6    qualified and certified as such by the State of

7    California;

8        That prior to being examined, the witness named

9    in the foregoing deposition was by me duly sworn

10   to testify to tell the truth, the whole truth, and

11   nothing but the truth;

12       That the said deposition was by me recorded

13   stenographically;

14       And the foregoing pages constitute a full,

15   true, complete and correct record of the testimony

16   given by the said witness;

17           That I am a disinterested person, not

18   being in any way interested in the outcome of said

19   action, or connected with, nor related to any of

20   the parties in said action, or to their respective

21   counsel, in any manner whatsoever.

22   DATED: September 29, 2022

23

24                    Renee Harris, CSR, CCR, RPR

                      CA CSR No. 14168,

25                    NJ CRR No. 30XI00241200

Errata Sheet - Deposition of Sarah Karam

**Case**:   *In re Google Play Store Antitrust Litigation*, Case No. 3:21-md-02981-JD
        *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD
        *Epic Games Inc. v. Google LLC*, Case No. 3:20-cv-05671-JD
        *In re Google Play Developer Antitrust Litigation, Case No. 3:20-cv-05792-JD*
        *State of Utah v. Google LLC*, Case No. 3:21-cv-05227-JD
        *Match Group LLC, v. Google LLC*, Case No. 3:22-cv-02746-JD
        ---------------------------------------------------

**Date of Deposition**:  September 28, 2022

| Page # | Line # | Currently Reads | Correction | Reason for Correction |
|--------|--------|-----------------|------------|-----------------------|
| 31 | 7 | team | teams | Transcription error |
| 35 | 8 | AVP | ABP | Transcription error |
| 39 | 17 | a list of | them as | Transcription error |
| 48 | 2 | in a one-time | one-time | Clarification |
| 53 | 24 | profitability. | for profitability. | Transcription error |
| 56 | 7 | developers | users | Clarification |
| 70 | 8 | avail | available | Transcription error |
| 80 | 18-19 | app in that -- policy compliant version | app, meaning the existing, policy compliant version, | Clarification |
| 86 | 22 | this | as | Transcription error |
| 93 | 13 | best-in-class class | best-in-class | Transcription error |
| 93 | 21 | steeper | deeper | Transcription error |
| 96 | 5 | asset | assert | Transcription error |
| 100 | 12-14 | that's resulting in consumers not purchasing using Google Play Billing almost never. | resulting in consumers almost never purchasing using Google Play Billing. | Clarification |
| 120 | 12 | L-O-O-V-O | L-O-V-O-O | Transcription error |
| 125 | 9 | thi | this | Transcription error |
| 126 | 16 | GOOG-PLAY-40224810 | GOOG-PLAY-011224810 | Transcription error |
| 130 | 3 | GOOG-PLAY-0011224866 | GOOG-PLAY-011224866 | Transcription error |

| Page # | Line # | Currently Reads | Correction | Reason for Correction |
|--------|--------|-----------------|------------|------------------------|
| 136 | 4 | -- if I read | Farid | Transcription error |
| 137 | 16 | 1998 | 1988 | Transcription error |
| 155 | 3 | features | featured | Transcription error |
| 161 | 22 | G-up | gUp | Transcription error |
| 167 | 6 | claimant's | payments | Transcription error |
| 173 | 25 | outrage | outage | Transcription error |
| 181 | 18 | have discussions | have some discussions | Transcription error |
| 182 | 10 | it's | its | Transcription error |
| 185 | 1-2 | ways as individuals | ways, as in individuals | Transcription error |
| 205 | 2 | funds | plans | Transcription error |
| 210 | 3 | center deep | center via deep | Clarification |
| 213 | 5 | know -- if | know, if | Transcription error |
| 213 | 6 | App, my | App, but my | Clarification |
| 221 | 16 | 1094 | 1994 | Transcription error |
| 225 | 2 | -- that some | -- some | Transcription error |
| 227 | 7 | 1996. | 1596. | Transcription error |
| 228 | 10 | 1506? | 1596? | Transcription error |
| 232 | 25 | adds; | gaps; | Transcription error |
| 240 | 1 | value. | value? | Punctuation error |
| 247 | 7 | PIK or PIK Play | Pix or PicPay | Transcription error |
| 248 | 8 | PIKs | Pix | Transcription error |
| 248 | 24 | PS2-d | PSD-2 | Clarification |
| 256 | 21 | app | an | Transcription error |
| 257 | 13 | 21st | 31st | Transcription error |
| 258 | 11 | 22 | 2022 | Clarification |

DocuSign Envelope ID: A40BE77D-3299-4BB3-AD5A-EDB9C9C51D2D

| Page # | Line # | Currently Reads | Correction | Reason for Correction |
|---|---|---|---|---|
| 259 | 9 | 2021 | 2022 | Clarification |
| 261 | 21 | 21st | 31st | Transcription error |
| 268 | 6 | Matches | Match's | Transcription error |
| 280 | 12 | of instance. | of an instance. | Transcription error |
| 285 | 12 | about rev share | about acceptable rev share | Transcription error |
| 288 | 3-5 | it wasn't -- it would be nice if you charged 15 or 18 percent. That's better than 30 percent. | it wasn't "it would be nice if you charged 15 or 18 percent. That's better than 30 percent." | Punctuation error |
| 289 | 2-4 | I think the analogy here would be working with the robber back to -- work with them, you know, because this is not -- | I think the analogy here is not -- | Clarification |
| 295 | 25 | that | but | Transcription error |
| 298 | 6 | No. | I met with Deniz Macoura as described earlier. | Clarification |
| 300 | 11 | distant | doesn't | Transcription error |
| 312 | 22 | service. | service fee. | Transcription error |
| 313 | 25 | apps? | gaps? | Transcription error |
| 316 | 8-9 | the integration | de-integration | Transcription error |

DocuSign Envelope ID: A40BE77D-7299-4BB3-AD5A-EDB9C9C51D2D

I, the undersigned, declare under penalty of perjury, that I have read the above-referenced deposition transcripts and have made corrections, additions, or deletions that I desired to make; and that the transcripts contain my true and correct testimony.

EXECUTED this __27__ day of October at ___Mountain View_____, California.

DocuSigned by:

*Sarah Karam*

89B917C0BDDA460...

Sarah Karam

# Exhibit B6
# Public Redacted Version

# EXHIBIT 13
## FILED UNDER SEAL

Message
_____

**From:**      Brandon Barras [bbarras@google.com]
**Sent:**      7/9/2019 1:32:44 PM
**To:**        Purnima Kochikar [kochikar@google.com]
**CC:**        Alyssa Ablao [aablao@google.com]; Sarah Karam [skaram@google.com]; Mike Marchak [marchak@google.com]
**Subject:**   Re: Exec meeting

Great, thanks so much!

Cheers,

BB

On Tue, Jul 9, 2019 at 9:30 AM Purnima Kochikar <kochikar@google.com> wrote:
Hi Brandon,

Sorry I missed your previous email while I was in the road. I will email Shar today.

P

On Tue, Jul 9, 2019, 6:09 AM Brandon Barras <bbarras@google.com> wrote:
Hi Purnima,

Hope you had a great holiday. Wanted to bump this back to the top of your inbox and see if you could reach out to Shar per the note below. I have two emails on file for her and can also reach out to my Tinder contact to see which is most recent, though I'd imagine it would be the Match email.

Sharmistha Dubey <sharmistha.dubey@gotinder.com>
Sharmistha Dubey <Sharmistha.Dubey@match.com>

Cheers,

Brado

On Thu, Jun 27, 2019 at 2:21 PM Brandon Barras <bbarras@google.com> wrote:
Hi All,

Connected with Tinder today and based on their feedback, I think the next step should be for @Purnima Kochikar to reach out to Shar for a frank conversation before we move forward with an in-person.

• Per Tinder, Match Group is viewing the in-person meeting in late August (date being finalized) as a "full renegotiation" and are expecting Google to "present a new rev-share" to Match for consideration

• I've clarified with Tinder a number of times our agreed upon agenda, but they've noted there is a disconnect with Match leadership and encouraged us to reach out to Shar directly to set expectations (though asked we did not mention that ;)

• Tinder's leadership says they see no value in openly sharing data during what they feel is a full negotiation

@Purnima Kochikar I know we discussed this in Mexico and this will help ensure we're aligned with Match before a broader exec meeting.  Key discussion points to Shar:

- Openly sharing data on the test is the only way we can better understand gaps in product/performance and consider rev-share discussions prior to an in person meeting

- There is a genuine desire to gain Tinder/Match's perspective on the value exchange with the Play platform/partnership and the economics involved

- Reaffirm to Match that they are currently in violation of policy and our approach is to partner with them vs. removing them from the Store

Happy to join the meeting as well and pull together any additional information needed.

-Brandon

On Tue, Jun 18, 2019 at 11:53 AM Brandon Barras <bbarras@google.com> wrote:
Sounds good, thanks Sarah.

@Alyssa Ablao sounds good as well. From our end, we should work to prioritize Don/Sameer/Purnima. Would be great to have Tian/Paul/Mike join as well, but let's ensure we work around those 3 as a baseline.

On Mon, Jun 17, 2019 at 7:56 PM Alyssa Ablao <aablao@google.com> wrote:
Sounds good. @Brandon - let's restart the thread with Erin and Greg to get times for Sameer/Tian for August. I'll do my best to match times for P.

On Tue, Jun 18, 2019 at 9:23 AM Sarah Karam <skaram@google.com> wrote:
Hi Brandon,

Yes I'm supportive of working with Tinder on product feedback in parallel and getting that in advance of a Match C-level discussion. My 2 cents would be to get the latter on the calendar (even if it's far out) ASAP so it doesn't drag on. And then updating the thread with the 2 pronged approach.

Thanks for driving this,

Sarah

On Mon, Jun 17, 2019 at 7:44 AM Brandon Barras <bbarras@google.com> wrote:
Hi All,

Update for the group: Match is not available for a call in June. They've asked to work towards the in person for early August, but noted they're available to connect with Sameer/Tian over a call before hand in July if we'd like.

Separately, I connected with Tinder and re-communicated the genuine desire from our product team to understand how the experiment is being run, what is being tested for and if there are any immediate product/FOP gaps that we can work together to solve before the in-person. AJ understands the value of working together on this and is rallying internally for an open discussion with our team to review the experiment data/approach over the next few weeks. He

noted this will most likely be contingent on Match approval, but that there has also recently been quite a bit of tension between Match/Tinder and feels he can leverage this to drive a more open form of dialogue between Tinder/Play.

If we are able to work directly with Tinder on the data, I'm open to feedback from the group if we'd still like to give Match an audience with our execs knowing their general disposition. **@Sarah Karam** it sounded like Sameer still had a desire to connect, but wanted to confirm.

I'm also working with Sarah to send an update to the larger thread with Sameer/Don/Tian etc to summarize where everything currently stands.

-BB


On Wed, Jun 12, 2019 at 9:34 AM Brandon Barras <bbarras@google.com> wrote:
Difficult partners keep us young, right? Is that a saying ?;)

Aligned that the call will only be impactful if they come with useful info/insights. I'm working with AJ (Tinder) on a separate thread to see what data they are able/willing to share with us in the near term, but the call and in-person are being driven by Adrian (Match). Ultimately, Match will be the gate keeper and Tinder will toe the line for larger/exec engagements.

Circling back with Match today on all fronts and will keep everyone posted. Mike, very much so look forward to you getting to meet Adrian ;)

On Tue, Jun 11, 2019 at 11:39 PM Purnima Kochikar <kochikar@google.com> wrote:
Thanks Brandon. I know they aren't the easiest partner to work with. That said, I would only do the call if we are certain that they would come with useful information/insights. Could we work with the Tinder team to ensure that they are prepping for the meeting? Or are they toeing the Corp line?

P

On Tue, Jun 11, 2019, 2:06 PM Brandon Barras <bbarras@google.com> wrote:
Hi P,

Mike and team have pulled the analysis and we've been working with Sarah on how to best condense/present the info.

My sense is this call is a 50/50 chance to happen. Match has already pushed back on the call, asking to focus on an in-person end of July/August. Given I believe there is still a desire (and value) to have Sameer/Tian hear directly from Match in the near term, I'm working to push this forward. Open to feedback otherwise though.

If they do agree to move forward with the call, I concur you should connect with Adrian and reinforce who is joining and the importance of coming prepared. I'm hesitant to believe they will come with any sort of meaningful analysis and try to keep it high level until July/August unless pushed given our history with their team.

-BB

  GOOG-PLAY-001214670

On Tue, Jun 11, 2019 at 4:14 PM Purnima Kochikar <kochikar@google.com> wrote:
Thanks.  Clarifying a few things -

On this call, Match will come prepared to discuss how they see value exchange, the results of their experiment with their own payments flow etc?  All the things we discussed with the Tinder team?  (In parallel, it will be useful to get an assessment of the value we provide to their portfolio companies, especially Tinder, so we can set context for our execs.  +Mike Marchak and team can help here).

Since Sameer and Tian are joining, I would strongly emphasize on getting very clear product feedback since we have product leadership on the call.

Given how mercurial they can be, would it make sense for me to reach out to Adrian for a quick check in before we have Sameer and Tian join the call?

P

On Tue, Jun 11, 2019 at 1:07 PM Brandon Barras <bbarras@google.com> wrote:
Update: Working to secure a 1hr call with Match on 6/28 - Sameer & Tian can join and will circle back once confirmed. Match has initially pushed back on the call, but will keep everyone posted on next steps.


On Fri, Jun 7, 2019 at 3:50 PM Brandon Barras <bbarras@google.com> wrote:
Hi SK,

Circling back based on our conversation yesterday. Let's work to setup a call with Match/Tinder and include Sameer/Tian/Marchak before a larger engagement in July. I'll work with Alyssa for availability.

Cheers,

BB

On Wed, Jun 5, 2019 at 1:51 PM Sarah Karam <skaram@google.com> wrote:
Thanks for the update, BB. If it's possible to organize a frank call end of June with a small senior audience, I think that would be useful. But in person will be much more effective (also with a small group). If we do that mid/end July, I would suggest that we don't rush that one and instead collaborate closely with some other leads in Don's org on the agenda and make it more holistic than just GPB (i.e. how can we make this more of a give & get partnership vs. disconnected x-google). Would be good to have a similar convo like we did with ▮▮▮▮ (with a smaller group if possible) and push the Match team with the goal of maximizing the mutual value of the relationship.

On Wed, Jun 5, 2019 at 9:13 AM Brandon Barras <bbarras@google.com> wrote:
Update: Confirmed Match only plans to have the 3 attendees originally noted (Shar, Elie, Adrian and possibly one additional PM). I've pushed for a June meeting, but Adrian has asked for times in July due to Match Group travel - I'd also imagine they're in no rush to have this conversation.

If we're keen to collect additional feedback from Match prior to July (are we still working towards some sort of announcement in July?), I'd suggest we ask Match to setup a call with a smaller group on our side, and still work towards a large in person engagement in July if we still feel its relevant. Otherwise, we can work towards post 4th of July meeting.

@Sarah Karam & @Purnima Kochikar let me know your thoughts.

-BB

On Mon, Jun 3, 2019 at 6:44 PM Brandon Barras <bbarras@google.com> wrote:
Great, thanks so much Alyssa!

On Mon, Jun 3, 2019 at 5:58 PM Alyssa Ablao <aablao@google.com> wrote:
I can help with getting times aligned. I'll start a separate thread with Tian, Paul and Sameer's ABPs to get their availability and we can go from there. I'll keep you cc'd, Brandon.

On Mon, Jun 3, 2019 at 12:19 PM Brandon Barras <bbarras@google.com> wrote:
Per Gary's note, it looks like they will be keeping it tight as of now, but I'll confirm with Adrian if they plan on any additional attendees.

*Gary: I think Brandon should coordinate the meeting with Adrian on our end. The attendees on our end should include Elie, Adrian and Shar Dubey, our President.*

On Mon, Jun 3, 2019 at 3:03 PM Sarah Karam <skaram@google.com> wrote:
+1 to Paul F and Mrinalini might be good to have as she is great at toeing the line between dev empathy and championing product.

I would actually love to have Chetan or Adam C / Marchak join if possible as I don't think they hear enough from more challenging apps partners and could maybe even bring some analysis to have in the back pocket on the opportunity cost.

To keep the meeting tight, would be good to have 1 PM lead (Tian/Paul/ Mrinalini), one insights lead (Adam / Mike / Chetan), and BD. Sameer would be great to have if he's interested and able to join.

Has Match shared who they are bringing? If they can keep it tight (they usually don't) would be great to do the same.

On Mon, Jun 3, 2019 at 11:43 AM Purnima Kochikar <kochikar@google.com> wrote:
Sarah, please also weigh in.
P

On Mon, Jun 3, 2019 at 8:28 AM Brandon Barras <bbarras@google.com> wrote:
Sounds good, thanks P.

@Alyssa Ablao would you be able to assist in terms of scheduling or looping in the right folks who can assist with Tian, Paul and possibly Sameer?

Appreciate your help!

Cheers,

BB

On Mon, Jun 3, 2019 at 11:15 AM Purnima Kochikar <kochikar@google.com> wrote:
I would include folks from Play Product - Tian ideally. Perhaps also Paul Feng. I would be good to have product in the room when they express concerns about efficacy of our solutions.

We could make Sameer optional. He has been very involved in the policy and new business models, so he may be interested.

P

On Mon, Jun 3, 2019 at 8:11 AM Brandon Barras <bbarras@google.com> wrote:
-Match/Tinder
+Alyssa Ablao
+Sarah Karam

Hi P and SK,

Hope you had a good weekend. In terms of Google attendance, wanted to confirm we'd like to invite Don to attend. Is there anyone else from our side we'd like to add?

Per Elie's note, I'll work to find time in MTV for an in-person unless folks have thoughts otherwise.

Cheers,

BB

On Fri, May 31, 2019 at 3:30 PM Elie Seidman <elie.seidman@gotinder.com> wrote:
Adrian will help coordinate both agenda and schedule logistics. Let's have this conversation face to face.

Thanks and looking forward,

Elie

On Sat, Jun 1, 2019 at 1:55 AM Purnima Kochikar <kochikar@google.com> wrote:
Thanks Gary and Adrian.

Brandon - the agenda looks good from my perspective. Elie, is there anything you would like to add/modify?

P

On Fri, May 31, 2019 at 9:23 AM Brandon Barras <bbarras@google.com> wrote:

Thanks Gary. Adrian, I'll start a new thread and we can work on coordinating this moving forward. Below are the initial topics we'd like to discuss based on our conversation with Elie.

- Tinder to share any data points or findings from the initial test: conversion, FOP gaps, country performance, etc

- Gain Tinder/Match's perspective on the value exchange with the Play platform/partnership and the economics involved

- Discuss how to best partner over the next 5-10yrs

Elie/Purnima, feel free to include any additional topics as well.

- Brandon

On Thu, May 30, 2019 at 5:47 PM Gary Swidler <Gary.Swidler@match.com> wrote:

I think Brandon should coordinate the meeting with Adrian on our end. The attendees on our end should include Elie, Adrian and Shar Dubey, our President.

If you have any problems or if I can help further, just let me know.

Hope you are doing well.

Gary

**From:** Purnima Kochikar <kochikar@google.com>
**Sent:** Thursday, May 30, 2019 5:04 PM
**To:** Gary Swidler <Gary.Swidler@match.com>; Elie Seidman <elie.seidman@gotinder.com>; Brandon Barras <bbarras@google.com>
**Subject:** Exec meeting

Hi Gary,

Trust this finds you well. I am writing to request your help in bringing together the leadership teams of the Match Group and Google (thanks Elie for the recommendation).

We had a productive call with Elie and team on their decision to switching their default billing away from Google Play Billing to the native flow. Needless to say, we were very disappointed to see this. We agreed that it would be productive for both teams to meet to understand your strategic and economic rationale for moving away from Google Play Billing and explore opportunities to be better aligned.

+Brandon Barras will run point on our end. I appreciate your help here.

Thank you.

P

GOOG-PLAY-001214674

--

Purnima Kochikar

Google Play, Apps & Games

kochikar@google.com

+17813548147

--

| Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477 |

--

Purnima Kochikar
Google Play, Apps & Games
kochikar@google.com
+17813548147

--

**Elie Seidman**
CEO, Tinder
elie@tinder.com | 917-612-

--

| Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477 |

--

Purnima Kochikar
Google Play, Apps & Games

kochikar@google.com
+17813548147


--

Brandon Barras | Google Play Partnerships | **bbarras@google.com** | 212-565-7477


--

Purnima Kochikar
Google Play, Apps & Games
kochikar@google.com
+17813548147


--

Sarah Karam | Global Head, Play & Android Apps BD
| **skaram@google.com** | (650) 283-9028


--

Brandon Barras | Google Play Partnerships | **bbarras@google.com** | 212-565-7477


--

- **Alyssa Ablao**
- Administrative Business
- **aablao@google.com**
- +1 650-448-4063


--

Brandon Barras | Google Play Partnerships | **bbarras@google.com** | 212-565-7477

CONFIDENTIAL

--

Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477

--

Sarah Karam | Global Head, Play & Android Apps BD | skaram@google.com | (650) 283-9028

--

Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477

--

Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477

--

Purnima Kochikar
Google Play, Apps & Games
kochikar@google.com
+17813548147

--

Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477

CONFIDENTIAL

--

| Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477 |

--

| Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477 |

--

| Sarah Karam | Global Head, Play & Android Apps BD | skaram@google.com | (650) 283-9028 |

--

- **Alyssa Ablao**
- Administrative Business Partner
- **aablao@google.com**
- +1 650-448-4063

--

| Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477 |

--

| Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477 |

--

| Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477 |

--

| Brandon Barras | Google Play Partnerships | bbarras@google.com | 212-565-7477 |