# Exhibit C1
# Public Redacted Version

# EXHIBIT 12
## FILED UNDER SEAL

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   PAUL J. RIEHLE (SBN 115199)
2   paul.riehle@faegredrinker.com
    **FAEGRE DRINKER BIDDLE & REATH LLP**
3   Four Embarcadero Center, 27th Floor
    San Francisco, CA 94111
4   Telephone: (415) 591-7500
    Facsimile: (415) 591-7510
5

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

[Additional counsel appear on signature page]

6

7

8

9

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                      SAN FRANCISCO DIVISION

14

| | |
|---|---|
| 15 **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| 16 | Case No. 3:20-cv-05671-JD |
| 17 THIS DOCUMENT RELATES TO: | |
| 18 EPIC GAMES, INC., a Maryland Corporation, | **EPIC GAMES, INC.'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF INTERROGATORIES** |
| Plaintiff, | |
| 19 v. | |
| 20 GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LTD.; and GOOGLE PAYMENT CORP., | |
| 21 | |
| 22 | |
| 23 Defendants. | |
| 24 | |

25

26

27

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rule 33 of the Civil Local Rules of the United States District Court for the Northern District of California, Plaintiff Epic Games, Inc. ("Epic") hereby submits these responses and objections (the "Responses") to Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Ltd., and Google Payment Corp.'s (collectively, "Google") Amended Fifth Set of Interrogatories, dated January 5, 2023 (the "Interrogatories"), without waiving any claims or defenses that Epic has or hereafter may assert in the above-captioned individual and multi-district actions (collectively, the "Action").

## GENERAL OBJECTIONS AND RESPONSES

The General Objections set forth below apply to the Interrogatories generally and to the Definitions and the individual Interrogatories set forth therein. Unless otherwise stated, the General Objections shall have the same force and effect as if set forth in full in response to each Definition and Interrogatory.  Any undertaking to search for, or provide information in response to, any Interrogatory remains subject to the General Objections.

1. Epic objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they seek to impose burdens or obligations on Epic that are broader than, inconsistent with, or not authorized under the Federal Rules of Civil Procedure, the Civil Local Rules of the United States District Court for the Northern District of California, other applicable rules or law, or any order entered by the Court in, or applicable to, the Action ("Applicable Rules").  Subject to and without waiving any Objections, in responding to the Interrogatories, Epic will construe the Interrogatories in accordance with the Applicable Rules.

2. Epic objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they call for the disclosure of confidential information, including, without limitation, trade secrets, information that is confidential, proprietary, commercially sensitive, competitively significant or personal

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to Epic and its employees, customers or counterparts, and that constitutes information that is subject to other protective orders, nondisclosure agreements or other confidentiality undertakings.  To the extent that such information is responsive, relevant and not privileged, Epic will provide information or documents, if any, in response to the Interrogatories only subject to the terms and conditions of the Stipulated Protective Order entered on October 22, 2021 in Case No. 3:20-cv-05671-JD (ECF Nos. 189, 190) and Case No. 3:21-md-02981-JD (ECF Nos. 123, 124).

3. Epic objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they are vague and ambiguous, overly broad, unduly burdensome, lacking in particularity, unreasonable or seek the discovery of information that is neither relevant to the claims or defenses of any party to the pending Action nor reasonably calculated to lead to the discovery of admissible evidence, as well as to the extent that they are unduly burdensome because they impose a significant expense and inconvenience on Epic.

4. Epic objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they seek information that is cumulative or duplicative of Google's First Set of Requests for Production, dated December 8, 2020; Google's Second Set of Requests for Production, dated March 19, 2021; Google's Third Set of Requests for Production, dated September 3, 2021; or Google's Fourth Set of Requests for Production, dated June 16, 2022 ("Google's Requests for Production") or of Google's First Set of Interrogatories, dated April 2, 2021, Google's Second Set of Interrogatories, dated September 28, 2021, Google's Third Set of Interrogatories, dated June 16, 2022 and Google's Fourth Set of Interrogatories, dated July 8, 2022 ("Google's Interrogatories").

5. Epic objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they purport to seek the discovery of information that is not in the possession, custody or control of Epic Games, Inc.

6. Epic objects generally to the Interrogatories, including the Definitions

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and Instructions set forth therein, on the grounds and to the extent that they purport to require identification and disclosure of information that was prepared in anticipation of litigation, constitutes attorney work product, reveals privileged attorney-client communications or otherwise is protected from disclosure under applicable privileges, laws or rules.

7. Epic objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they purport to require Epic to draw subjective or legal conclusions or are predicated on subjective or legal conclusions or arguments.  Subject to and without waiving any objections, Epic states that any Response, production of documents or provision of information in response to the Interrogatories is not intended to provide, and shall not constitute or be construed as providing an admission concerning any of the terms used in the Interrogatories.

8. Epic objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they contain inaccurate, incomplete or misleading descriptions of facts, persons, relationships and/or events underlying the Action.  Epic further objects to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place.  Any Response, production of documents or provision of information in response to the Interrogatories is not intended to provide, and shall not constitute or be construed as providing an admission that any factual predicate stated in the Interrogatories is accurate.

9. Epic objects generally to the Definition of "Epic" as including "all predecessors, successors, subsidiaries, divisions, parents, and/or affiliates thereof, past or present, and all past or present officers, directors, affiliates, agents, employees, consultants, representatives, and any other person acting on behalf of any of the foregoing entities".  Epic's Responses are limited to Epic Games, Inc. only and not any subsidiary or affiliate, or any other person or entity.

10. Epic objects generally to the Interrogatories, including the

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Definitions and Instructions set forth therein, and, in particular, Instruction No. 1, in that it purports to require information from 2015 to the present and therefore to seek information that is not relevant to any party's claim or defense or proportional to the needs of the case.  Unless otherwise stated, Epic responds to the Interrogatories with respect to the time period January 1, 2017 through and including August 13, 2020 ("Relevant Period").

11.  Epic objects generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent they seek information that was or could have been obtained during the discovery period, including because they pertain to allegations made in Epic's First Amended Complaint, filed July 21, 2021. Epic's Responses are limited to its contentions regarding Counts 4 and 5 of its Second Amended Complaint.

12. Epic's Responses are based on its current knowledge.  Further investigation may reveal additional facts or information that could lead to additions to, changes in, and/or variations from the Responses herein.  Without in any way obligating itself to do so, Epic expressly reserves the right to supplement, amend, correct, clarify, or modify the Responses as further information becomes available.  Epic also reserves the right to use or rely on, at any time, subsequently discovered information or information omitted from these objections and Responses as a result of mistake, error, oversight or inadvertence.  The Responses provided herein are based on a reasonable search for responsive information.  Epic reserves the right at any time to revise, correct, add to, clarify or supplement its Responses.

13. Epic provides these Responses without waiver of or prejudice to (a) its right at any later time to raise objections as to the competence, relevance, materiality, privilege, work product character and admissibility as evidence, for any purpose, of (i) the Interrogatories or any part thereof, or (ii) statements made in these Responses or any part thereof; or (b) the right to object to the use of any of the information disclosed hereunder in any subsequent proceedings or the trial of this or

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

any other action; or (c) the right to object on any ground at any time to a demand for further Response to these or other discovery requests in the Action.  Any Response or objection to an individual Interrogatory is not an acknowledgement that the information requested therein exists or is in Epic's possession, custody or control.

## SPECIFIC OBJECTIONS AND RESPONSES

The General Objections set forth above are made with respect to the below Interrogatories and are incorporated into the Specific Objections below.  Any failure to repeat any General Objection in the Specific Objections shall not be deemed a waiver.  In addition to the foregoing General Objections, which apply to each Interrogatory as if set forth fully with each Specific Objection and Response below, Epic submits the following Specific Objections and limitations.  To the extent that Specific Objections and limitations are set forth in responding to the individual Interrogatories, those Specific Objections and limitations are set forth because they are believed to be particularly appropriate to that Interrogatory and do not constitute a waiver or limitation of any other objection's application to that Interrogatory.  The absence of a Specific Objection to an Interrogatory is not an admission that information responsive to that Interrogatory exists or that the Interrogatory is appropriate.

### Interrogatory No. 26:

IDENTIFY ALL APP DEVELOPERS or other entities whom YOU contend GOOGLE approached "with an offer of an agreement designed to prevent the developer from opening a competing store or otherwise distributing its apps outside of the Google Play Store" as alleged in ¶ 198 of YOUR First Amended Complaint.

### Response to Interrogatory No. 26:

Epic hereby incorporates General Objection Nos. 1-13 into this Interrogatory as if stated fully herein.  Epic objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks identification of any developer to whom Google "approached 'with an offer of an agreement designed to prevent the developer form opening a competing store or

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   otherwise distributing its apps outside of the Google Play Store,'" regardless of the

2   allegations in Paragraph 198.  Epic will limit its Response to app developers referenced

3   in Paragraph 198 of its Second Amended Complaint.  Epic further objects to this

4   Interrogatory to the extent it requests information already in Google's possession,

5   custody, or control.  Epic further objects to this Interrogatory to the extent that it

6   mistakenly refers to Epic's First Amended Complaint.  For purposes of its response,

7   Epic will interpret this Interrogatory to relate to Epic's Second Amended Complaint.

8   Epic reserves the right to amend or supplement this Response upon further investigation

9   and analysis.

10          Subject to and without waiving the foregoing General and Specific

11   Objections, Epic responds as follows:

12          Paragraph 198 of Epic's Second Amended Complaint relates to Epic's

13   *per se* claims; specifically, it relates to "horizontal agreements among potential app

14   store competitors that had the actual and intended effect of inducing the developer not

15   to launch an app store that would compete with Google in the Android App Distribution

16   Market."  *See* Epic's Second Amended Complaint ¶ 198.  As such, Epic incorporates by

17   reference the parties' December 13, 2022 Stipulation regarding Claims of Epic Games,

18   Inc. and Match Group, LLC which states "With respect to Count 4 of Epic's Second

19   Amended Complaint . . . Epic's . . . *per se* claims are limited to Google's agreements

20   with the following developers: Activision Blizzard, Inc., Riot Games, Inc., and

21   Supercell."  (*See* 2022.12.13 Email from C. Kozikowski to D. Shikman.)  Epic contends

22   that Google approached Activision Blizzard, Inc. ("Activision"), Riot Games, Inc.

23   ("Riot") and Supercell Oy ("Supercell") with offers of agreements designed to prevent

24   those developers from opening competing app stores or otherwise distributing their apps

25   outside of Google Play.  (*See, e.g.*, GOOG-PLAY-003332817.R, 830.R (listing Project

26   Hug "target" developers as Riot, Activision and Supercell, among others); 2022.09.23

27   Letter from B. Rocca to Y. Even (confirming that Google entered into Games Velocity

28   Program ("GVP") agreements with Activision and Riot, among others); Kochikar Dep.

7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Tr. 177:21-178:2, 179:5-7) (confirming that Google entered into an "emerging markets"

2   deal with Supercell).)

3                      **Interrogatory No. 27:**

4            IDENTIFY all APP DEVELOPERS or other entities that promised or

5   committed to Google that the APP DEVELOPER or other entity would not launch an

6   ANDROID APP STORE.

7                 **Response to Interrogatory No. 27:**

8            Epic hereby incorporates General Objection Nos. 1-13 into this

9   Interrogatory as if stated fully herein.  Epic objects to this Interrogatory as overbroad,

10  unduly burdensome, and not proportional to the needs of the case to the extent it seeks

11  identification of "all app developers or other entities that promised or committed to

12  Google that the app developer or other entity would not launch an Android App Store",

13  regardless of Epic's new contentions in its Second Amended Complaint.  Epic further

14  objects to this Interrogatory to the extent it requests information already in Google's

15  possession, custody, or control.  Epic further objects to this Interrogatory to the extent

16  that it is cumulative or duplicative of Interrogatory No. 26.  Epic reserves the right to

17  amend or supplement this Response upon further investigation and analysis.

18           Subject to and without waiving the foregoing General and Specific

19  Objections, Epic responds as follows:

20           According to Google, the following entities had entered into GVP or

21  Apps Velocity Program ("AVP") agreements with Google as of July 2022, by which

22  they agreed to certain obligations that had the actual and intended effect of preventing

23  them from launching an Android app store: ███████████; Age of Learning;

24  Aniplex, Inc.; Bandai Namco Entertainment Inc.; Calm; Com2uS; Electronic Arts Inc.;

25  Garena (Garena Online Private Limited); ████; Lilith Games (Lilith Network HK

26  Limited); mixi, Inc.; NCSOFT; NetEase Games (Hong Kong NetEase Interactive

27  Entertainment); Netmarble; Nexon Company; Niantic, Inc.; Nintendo Co., Ltd.; Pearl

28  Abyss; Playrix (PLR Worldwide); Riot Games, Inc., Smule.; Square Enix Co. Ltd.;

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Tencent Games (Proxima); and Ubisoft Entertainment.  (*See* 2022.09.23 Letter from B.

2  Rocca to Y. Even.)  In addition, Google entered into an "emerging markets" agreement

3  with Supercell in mid-2022 because Supercell "informed Google that it was working on

4  launching a web store" that was "going to offer digital items for purchase that could be

5  used in game on Android" and "Google was concerned that Supercell's decision  . . .

6  could attract the attention of other large developers to follow suit[.]"  (Kochikar Dep.

7  Tr. 176:24-25, 177:21-178:10, 179:5-7.)  ████████, Riot and Supercell ███████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████  *See* Epic's Response to Interrogatory No. 30.

10  **Interrogatory No. 28:**

11          For EACH of the APP DEVELOPERS or other entities IDENTIFIED in

12  YOUR responses to Interrogatory Nos. 26 or 27, IDENTIFY all terms of each promise

13  or commitment not to launch an ANDROID APP STORE and state all facts in support

14  of YOUR response.

15          **Response to Interrogatory No. 28:**

16          Epic hereby incorporates General Objection Nos. 1-13 into this

17  Interrogatory as if stated fully herein.  Epic objects to this Interrogatory as overbroad,

18  unduly burdensome, and not proportional to the needs of the case to the extent it seeks

19  "all terms of each promise or commitment not to launch an Android App Store"

20  regardless of Epic's new contentions in its Second Amended Complaint, and "*all* facts

21  in support of your response" (emphasis added).  For purposes of its Response, Epic will

22  identify only the central facts sufficient for Google to understand Epic's allegations.

23  Epic further objects to this Interrogatory to the extent it requests information already in

24  Google's possession, custody, or control.  Epic further objects to this Interrogatory to

25  the extent that it is cumulative or duplicative of Interrogatory Nos. 26 and 27.  Epic

26  reserves the right to amend or supplement this Response upon further investigation and

27  analysis.

28          Subject to and without waiving the foregoing General and Specific

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF
INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Objections, Epic responds as follows:

2          The terms known to Epic of each promise or commitment not to launch

3  an Android app store are set forth in the agreements that Google has entered with the

4  developers identified in Epic's Responses to Interrogatory Nos. 26 and 27.  Epic refers

5  Google to these agreements, which are already in Google's possession.  (*See, e.g.*,

6  GOOG-PLAY-007273439; GOOG-PLAY-000929031; GOOG-PLAY-007335585;

7  GOOG-PLAY-007273404.)  Epic further refers Google to its Response to Interrogatory

8  No. 30.

9                    **Interrogatory No. 29:**

10         For EACH of the APP DEVELOPERS or other entities IDENTIFIED in

11  YOUR responses to Interrogatory Nos. 26 or 27, IDENTIFY all individuals involved in

12  negotiating or agreeing to each promise or commitment not to launch an ANDROID

13  APP STORE and state all facts in support of YOUR response.

14              **Response to Interrogatory No. 29:**

15         Epic hereby incorporates General Objection Nos. 1-13 into this

16  Interrogatory as if stated fully herein.  Epic objects to this Interrogatory as overbroad,

17  unduly burdensome, and not proportional to the needs of the case to the extent it seeks

18  "all individuals involved in negotiating or agreeing to each promise or commitment not

19  to launch an Android App Store" regardless of Epic's new contentions in its Second

20  Amended Complaint, and "*all* facts in support of your response" (emphasis added).

21  For purposes of its Response, Epic will identify only the central facts sufficient for

22  Google to understand Epic's allegations.   Epic further objects to this Interrogatory to

23  the extent it seeks information outside of its possession, custody or control.  Epic further

24  objects to this Interrogatory to the extent it requests information already in Google's

25  possession, custody, or control.  Epic further objects to this Interrogatory to the extent

26  that it is cumulative or duplicative of Interrogatory Nos. 26-28.  Epic reserves the right

27  to amend or supplement this Response upon further investigation and analysis.

28         Subject to and without waiving the foregoing General and Specific

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF
INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Objections, Epic responds as follows:

2   ████████████████████████████████████

3   ████████████████████████████████████████████

4   ██████████████████████████████████████

5   ████████████████████████████ Supercell and Riot, Epic

6   contends that at least the following individuals were involved in negotiations:

7   • ████████████████████████████████

8   ████████████████████████████████████████

9   ████████████████████████████████████

10  ████████████████████████

11  • <u>Supercell</u>: Purnima Kochikar, Hiroshi Lockheimer and Ilkka Paananen.

12  (Kochikar Dep. Tr. 130: 6-11; GOOG-PLAY-000782270.)

13  • <u>Riot</u>:  Lawrence Koh, George Yousling, Meg Tucker, Brian Cho, ████

14  ████████████████ (GOOG-PLAY-000226939; Koh Dep. Tr. 284:23-

15  285:3.)

16  With respect to the remaining developers identified in Epic's Responses

17  to Interrogatory Nos. 26 and 27, Epic reasserts that Google is more knowledgeable

18  about the individuals involved in negotiating the agreements and thus in a better

19  position to identify the relevant individuals called for by this Interrogatory.

20  **Interrogatory No. 30:**

21  FOR every APP DEVELOPER that you contend had an agreement with

22  Google not to launch an app store or that had the effect of preventing the developer

23  from launching an ANDROID APP STORE, IDENTIFY whether, in the absence of the

24  alleged agreement, the developer would have launched an ANDROID APP STORE that

25  offered apps developed or sold by YOU or any other third parties and state all facts in

26  support of YOUR response.

27

28

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF
INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1    **Response to Interrogatory No. 30:**

2          Epic hereby incorporates General Objection Nos. 1-13 into this

3    Interrogatory as if stated fully herein.  Epic objects to this Interrogatory as overbroad,

4    unduly burdensome, and not proportional to the needs of the case to the extent it seeks

5    "whether, in the absence of the alleged agreement, the developer would have launched

6    an Android App Store" regardless of Epic's new contentions in its Second Amended

7    Complaint, and in its request to identify "*all* facts in support of your response"

8    (emphasis added).  For purposes of its Response, Epic will identify only the central

9    facts sufficient for Google to understand Epic's allegations.  Epic further objects to this

10   Interrogatory to the extent it seeks information outside of its possession, custody or

11   control.  Epic further objects to this Interrogatory to the extent that it is cumulative or

12   duplicative of Interrogatory Nos. 26-29.  Epic reserves the right to amend or supplement

13   this Response upon further investigation and analysis.

14          Subject to and without waiving the foregoing General and Specific

15   Objections, Epic responds as follows:

16          "[A]ll of [the 22 targeted] Project Hug developers had capabilities to,

17   quote, 'go-it-alone' on Android" and "these were large enough and established enough

18   major developers that they could, in fact, come up with the infrastructure needed to

19   actually establish and launch their own app store on Android."  (Koh Dep. Tr. 172:10-

20   22.)  However, "some of the Project Hug developers specifically told Google that they

21   were considering starting their own competing Android app stores."  (Koh Dep. Tr.

22   200:4-8.)  Epic contends that there are at least three developers that would have

23   launched an Android app store in the absence of an agreement with Google: Activision,

24   Riot and Supercell.

25          Activision:  In March 2019, Activision CEO Armin Zerza approached

26   Epic CEO Tim Sweeney regarding collaborating on an Android app store.  (*See* Zerza

27   Tr. 46:8-47:24; 49:15-50:5.)  In October 2019, Activision told Google that it was

28   considering starting its own competing Android app store.  (GOOG-PLAY-007415527;

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Koh Dep. Tr. 200:11-20; 256:9-14.)  Activision got so far as to build an interface for its

2   competing Android app store and was negotiating with carriers to preinstall the store on

3   Android devices.  (AB-GOOG-000492.)  Google was concerned that "if ABK launched

4   an alternative Android app store, that could lead to other developers either launching

5   their own app store or launching their titles through ABK's alternative app store".

6   (Kochikar Dep. Tr. 139:8-14.)  But Google knew that if it could secure Activision's

7   launch on Play, Activision "would not spend their time and money investing on an

8   alternative app store".  (Kochikar Dep. Tr. 139:24-140:5.)  Activision's decision on

9   whether to launch its alternative Android app store depended on whether it could "find

10  the right deal/solution with Google".  (GOOG-PLAY-007415527.)  Activision

11  executive Armin Zerza made clear that if the deal with Google fell through, Activision

12  would launch its mobile distribution platform.  (GOOG-PLAY-007280918.)  Google

13  believed Activision would do so by "partnering with another 'major mobile company'"

14  and presumed it would be Epic.  (*Id.*)  Ultimately, Google entered into its "bespoke"

15  Project Hug agreement with Activision, paying Activision $360 million over three

16  years.  (Kochikar Dep. Tr. 134:5-23.)  As a result, Activision did not launch an app

17  store on Android.  (AB-GOOG-000432 at -0441; Zerza Tr. 71:25-72:7.)  While

18  Activision "continue[s] to evaluate every single year" whether to launch a mobile app

19  store on Android, it decided not to in 2020, 2021 and 2022—i.e., the term of its

20  agreement with Google— "because the economics of the app store for us are not

21  attractive".  (*See* Zerza Dep Tr. 160:19-162:23.)  Activision will reevaluate in 2023,

22  when its current agreement with Google will have expired.  (*Id.*)

23          Riot:  Riot told Google in early 2019 that it was planning to launch its

24  own Android app store.  (Koh Dep. Tr. 200:4-10; 285:4-16; Kochikar Dep. Tr. 149:5-

25  13.)  "Riot was on the verge of becoming the next major game company to follow Epic

26  in moving forward with an off-Play Android distribution strategy."  (GOOG-PLAY-

27  007035840.)  To "have Riot choose Play vs launching their own Android store", Google

28  paid Riot ███████████████████ (GOOG-PLAY-000928690) as part of "a

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   Hug-like deal to convince Riot to change that strategy" (Koh Dep. Tr. 286:21-24).  As a

2   result of this deal with Google, Riot "agreed to put aside their off-Play distribution

3   platform and launch on Play."  (GOOG-PLAY-007035840.)  Then, in 2020, Google

4   offered Riot a "vastly imbalanced" $30 million Project Hug deal for a "year of

5   security", meaning an agreement that would "assist in stopping Riot from starting its

6   own Android app store and getting launches on Play for one year".  (Koh Dep.

7   Tr. 294:13-24.)  Riot did not launch an app store on Android.  (Kochikar Dep. Tr.

8   150:20-23.)

9           Supercell:  Supercell informed Google that it was working on launching

10  a web store that was going to offer "digital items for purchase that could be used in

11  game on Android", from which "Google would not make money".  (Kochikar Dep.

12  Tr. 177:21-178:5.)  "Google was concerned that Supercell's decision . . . could attract

13  the attention of other large developers to follow suit[.]"  (Kochikar Dep. Tr. 178:6-10.)

14  As a result, Google entered into an "emerging markets" deal with Supercell around mid-

15  2022.  (Kochikar Dep. Tr. 179:5-7.)  Among other things, the deal offered Supercell "up

16  to ███████ in cash incentives" in exchange for Supercell agreeing to release its

17  mobile titles on Google Play at the same time as other app stores.  (Kochikar Dep. Tr.

18  179:10-13; 181:24-182:6.)  Supercell has not launched an app store on Android.

19          With respect to the remaining developers identified in Epic's Responses

20  to Interrogatory Nos. 26 and 27, Epic contends that the agreements that they entered

21  with Google had the effect of preventing them from opening a competing store or

22  otherwise distributing apps outside of Google Play.  (*See, e.g.*, Koh Dep. Tr. 172:17-22

23  ("[T]hese were large enough and established enough major developers that they could,

24  in fact, come up with the infrastructure needed to actually establish and launch their

25  own app store on Android").)

26

27

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1      **Interrogatory No. 31:**

2              FOR every APP DEVELOPER that you contend had an agreement with

3      Google not to launch an ANDROID APP STORE or that had the effect of preventing

4      the developer from launching an ANDROID APP STORE, IDENTIFY the service fees

5      or revenue sharing terms applicable to payments to DEVELOPERS for APP purchases

6      or IN-APP PAYMENTS that the developer's ANDROID APP STORE would have had

7      in the absence of the alleged agreement and state all facts in support of YOUR response.

8              **Response to Interrogatory No. 31:**

9              Epic hereby incorporates General Objection Nos. 1-13 into this

10     Interrogatory as if stated fully herein.  Epic objects to this Interrogatory as overbroad,

11     unduly burdensome, and not proportional to the needs of the case to the extent it seeks

12     "the service fees or revenue sharing terms applicable to payments to developers for app

13     purchases or in-app payments that the developer's Android app store would have had in

14     the absence of the alleged agreement" regardless of Epic's new contentions in its

15     Second Amended Complaint, and "*all* facts in support of your response" (emphasis

16     added).  Epic further objects to this Interrogatory to the extent it seeks information

17     outside of its possession, custody or control.  Epic further objects to this Interrogatory to

18     the extent that it is cumulative or duplicative of Interrogatory Nos. 26-30.  Epic reserves

19     the right to amend or supplement this Response upon further investigation and analysis.

20             Subject to and without waiving the foregoing General and Specific

21     Objections, Epic responds as follows:

22             Epic is unable, due to Google's successful efforts to prevent the

23     developers identified in Epic's Responses to Interrogatory Nos. 26 and 27 from opening

24     competing Android app stores, to identify the service fees or revenue sharing terms

25     applicable to payments to specific developers for app purchases or in-app payments that

26     any developer's Android app store would have had in the absence of an agreement with

27     Google.  However, in the but-for world where Google's anticompetitive conduct did not

28     occur, service fees applicable to payments for apps or in-app purchases would have

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF
INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  reflected a more competitive environment which would have resulted in lower,

2  competitive fees.  (*See* Bernheim Report § VII.)

3  <u>**Interrogatory No. 32:**</u>

4  IDENTIFY ALL APP DEVELOPERS or other entities with whom YOU

5  contend GOOGLE entered into "horizontal agreements among potential app store

6  competitors that had the actual and intended effect of inducing the developer not to

7  launch an ANDROID APP STORE that would compete with Google in the Android

8  App Distribution Market" as alleged in ¶ 198 of YOUR First Amended Complaint and

9  state all facts in support of YOUR contention.

10  <u>**Response to Interrogatory No. 32:**</u>

11  Epic hereby incorporates General Objection Nos. 1-13 into this

12  Interrogatory as if stated fully herein.  Epic objects to this Interrogatory as overbroad,

13  unduly burdensome, and not proportional to the needs of the case to the extent it seeks

14  identification of all "horizontal agreements among potential app store competitors that

15  had the actual and intended effect of inducing the developer not to launch an Android

16  App Store that would compete with Google in the Android App Distribution Market"

17  regardless of the allegations in Paragraph 198.  Epic will limit its Response to app

18  developers referenced in Paragraph 198 of its Second Amended Complaint.  Epic

19  further objects to this Interrogatory as overbroad, unduly burdensome, and not

20  proportional to the needs of the case to the extent it requests to identify "*all* facts in

21  support of your contention" (emphasis added).  For purposes of its Response, Epic will

22  identify only the central facts sufficient for Google to understand Epic's allegations.

23  Epic further objects to this Interrogatory to the extent it seeks information that is already

24  in Google's possession, custody or control.  Epic further objects to this Interrogatory to

25  the extent that it mistakenly refers to Epic's First Amended Complaint.  For purposes of

26  its response, Epic will interpret this Interrogatory to relate to Epic's Second Amended

27  Complaint.  Epic further objects to this Interrogatory to the extent that it is cumulative

28  or duplicative of Interrogatory Nos. 26-31.  Epic reserves the right to amend or

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF
INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  supplement this Response upon further investigation and analysis.

2  Subject to and without waiving the foregoing General and Specific

3  Objections, Epic responds as follows:

4  Epic incorporates by reference the parties' December 13, 2022

5  Stipulation regarding Claims of Epic Games, Inc. and Match Group, LLC, which states

6  "With respect to Count 4 of Epic's Second Amended Complaint . . . Epic's . . . *per se*

7  claims are limited to Google's agreements with the following developers: Activision

8  Blizzard, Inc., Riot Games, Inc., and Supercell."  (See 2022.12.13 Email from C.

9  Kozikowski to D. Shikman.)  Epic further incorporates its Responses to Interrogatory

10  Nos. 26-31.

11  **Interrogatory No. 33:**

12  For EACH of the agreements IDENTIFIED in YOUR responses to

13  Interrogatory No. 26, 27, or 32, please provide ALL facts regarding whether, and how,

14  the agreement foreclosed competition or otherwise harmed competition or the

15  competitive process.

16  **Response to Interrogatory No. 33:**

17  Epic hereby incorporates General Objection Nos. 1-13 into this

18  Interrogatory as if stated fully herein.  Epic objects to this Interrogatory as overbroad,

19  unduly burdensome, and not proportional to the needs of the case to the extent it seeks

20  information regarding "whether, and how, the agreement[s] foreclosed competition or

21  otherwise harmed competition of the competitive process" regardless of Epic's new

22  contentions in its Second Amended Complaint, and in its request to identify "*all* facts"

23  in support thereof (emphasis added).  For purposes of its Response, Epic will identify

24  only the central facts sufficient for Google to understand Epic's allegations.  Epic

25  further objects to this Interrogatory to the extent that it is cumulative or duplicative of

26  Interrogatory Nos. 26-32.  Epic reserves the right to amend or supplement this Response

27  upon further investigation and analysis.

28  Subject to and without waiving the foregoing General and Specific

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Objections, Epic responds as follows:

2          Epic incorporates by reference the expert report of Dr. Douglas

3  Bernheim.  (*See* Bernheim Report § V.B.)  Project Hug was driven by Google's concern

4  that the "[t]he loss of top developers, either to competitors or by 'going-it-alone' on

5  Android, would significantly impact Play's business."  (GOOG-PLAY-003332817.R.)

6  Specifically, "Google was concerned that unhappiness that a developer might have

7  would lead them to distribute their apps, their games, through a competing Android app

8  store in lieu of Google Play".  (Koh Dep. Tr. 143:1-143:22.)  To prevent developers

9  from competing with Google Play or distributing their titles through Google Play's

10  competitors, Google paid them via the agreements identified in Epic's Responses to

11  Interrogatory Nos. 26, 27 and 32 imposed obligations on developers to "sim ship" their

12  mobile titles on Google Play.  This means that "all of the titles that were launched by

13  [the] . . . developers were launched on Google Play earlier than or on the same date as

14  launching anywhere else on Android".  (Kochikar Dep. Tr. 155:20-24.)  This

15  requirement prevents developers from releasing their mobile titles exclusively on

16  competing Android app stores, or even earlier on competing Android app stores than

17  Google Play.  Google was aware that this requirement would substantially reduce the

18  incentive for developers to create their own Android app store or partner with

19  third-party app stores.  (*See* Kochikar Dep. Tr. 139:24-140:5 (agreeing that if Google

20  could secure ABK's launch on Play, "Activision Blizzard King would not spend their

21  time and money investing on an alternative app store"); 142:5-12.)  The agreements also

22  require developers not to remove their titles from Google Play and to maintain content

23  and feature parity between the apps they release on Google Play and those they release

24  on other mobile app stores.  These requirements prevent developers from differentiating

25  their offerings on alternative app stores in order to compete with Google Play and, like

26  the sim-ship requirement, significantly reduce the incentive for developers to launch

27  their own stores or to launch their titles on third-party stores.  Further, the agreements

28  require that developers refrain from promoting their apps more aggressively on other

18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

mobile app stores than they do on Google Play and thereby threatening Google Play's dominance.  Google's agreements with the developers identified in Epic's Responses to Interrogatory Nos. 26, 27 and 32 have helped Google maintain its monopolies in the Android App Distribution Market and the Android In-App Payment Solutions Market. In particular, with respect to Activision, Riot and Supercell, each of which intended to launch an Android app store in the absence of an agreement with Google, the agreements had the actual and intended effect of eliminating potential competition in these markets.

Dated: January 19, 2023

Respectfully submitted,

By */s/ Lauren A. Moskowitz*

Lauren A. Moskowitz

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney *(pro hac vice)*
cvarney@cravath.com
Gary A. Bornstein *(pro hac vice)*
gbornstein@cravath.com
Timothy G. Cameron *(pro hac vice)*
tcameron@cravath.com
Yonatan Even *(pro hac vice)*
yeven@cravath.com
Lauren A. Moskowitz *(pro hac vice)*
lmoskowitz@cravath.com
Justin C. Clarke *(pro hac vice)*
jcclarke@cravath.com
Michael J. Zaken *(pro hac vice)*
mzaken@cravath.com
M. Brent Byars *(pro hac vice)*
mbyars@cravath.com
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

**Attorneys for Plaintiff
EPIC GAMES, INC.**

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF
INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2023, I served true and correct copies of

Plaintiff Epic Games, Inc.'s Responses and Objections to Defendants' Amended Fifth Set

of Interrogatories via electronic mail, pursuant to an agreement among the parties for

electronic service, to the following counsel of record in this action and the related

actions:

Brian C. Rocca
Sujal J. Shah
Michelle P. Chui
Minna Naranjo
Rishi Satia
**MORGAN, LEWIS & BOCKIUS LLP**
brian.rocca@morganlewis.com
sujal.shah@morganlewis.com
michelle.chiu@morganlewis.com
minna.naranjo@morganlewis.com
rishi.satia@morganlewis.com

Glenn Pomerantz
Kuruvilla Olasa
Emily Curran-Huberty
Kyle Mach
Justin Raphael
**MUNGER, TOLLES & OLSON LLP**
glenn.pomerantz@mto.com
kuruvilla.olasa@mto.com
emily.curran-huberty@mto.com
kyle.mach@mto.com
justin.raphael@mto.com

*Counsel for Defendants Google LLC et al.*

Karma M. Giulianelli
Glen E. Summers
Jameson R. Jones
**BARTLIT BECK LLP**
karma.giulianelli@bartlitbeck.com
glen.summers@bartlitbeck.com
jameson.jones@bartlitbeck.com

Hae Sung Nam
Laurence D. King
Mario M. Choi

Elizabeth C. Pritzker
**PRITZKER LEVINE LLP**
ecp@pritzkerlevine.com

*Liaison Counsel for the Class in In re
Google Play Consumer Antitrust
Litigation*

Brendan Glackin
**OFFICE OF THE UTAH ATTORNEY
GENERAL**
bglackin@agutah.gov
*Counsel for Utah and the Plaintiff States*

21

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF
INTERROGATORIES CASE NO. 3:20-cv-05671-JD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**KAPLAN FOX & KILSHEIMER, LLP**
hnam@kaplanfox.com
lking@kaplanfox.com
mchoi@kaplanfox.com

*Co-Lead Counsel for the Class in In re*
*Google Play Consumer Antitrust*
*Litigation*

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC,*
*et al.*

        I certify under penalty of perjury that the foregoing is true and correct.  Executed

on January 19, 2023 at New York, New York.

                                                    */s/ Colleen M. Kozikowski*
                                              _____

                                                    Colleen M. Kozikowski

EPIC'S RESPONSES AND OBJECTIONS TO DEFENDANTS' AMENDED FIFTH SET OF
INTERROGATORIES CASE NO. 3:20-cv-05671-JD

# Exhibit C2
# Public Redacted Version

# EXHIBIT 13
## FILED UNDER SEAL

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HUESTON HENNIGAN LLP
John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Douglas J. Dixon, State Bar No. 275389
ddixon@hueston.com
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone:    (949) 229-8640

HUESTON HENNIGAN LLP
Joseph A. Reiter, State Bar No. 294976
jreiter@hueston.com
Christine Woodin, State Bar No. 295023
cwoodin@hueston.com
Michael K. Acquah, State Bar No. 313955
macquah@hueston.com
William M. Larsen, State Bar No. 314091
wlarsen@hueston.com
Julia L. Haines, State Bar No. 321607
jhaines@hueston.com
Karen L. Ding, State Bar No. 325215
kding@hueston.com
Tate E. Harshbarger, State Bar No. 328622
tharshbarger@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:    (213) 788-4340

Attorneys for Plaintiffs Match Group, LLC;
Humor Rainbow, Inc.; PlentyofFish Media ULC;
and People Media, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITLIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Match Group, LLC, et al., v. Google LLC, et al.*, Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD<br><br>PLAINTIFFS MATCH GROUP, LLC'S, ET AL.'S RESPONSES AND OBJECTIONS TO DEFENDANTS' CONTENTION INTERROGATORIES<br><br>Judge:   Honorable James Donato |

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1       Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules")

2 and the Civil Local Rules of the United States District Court for the Northern District of California

3 (the "Local Rules"), Plaintiffs Match Group, LLC, Humor Rainbow, Inc., PlentyofFish Media ULC,

4 and People Media, Inc. (collectively, "the Match Plaintiffs"), by and through their undersigned

5 counsel, hereby submit the following responses and objections ("Responses" and each, a

6 "Response") to Defendants Google LLC, Google Ireland Limited, Google Commerce Limited,

7 Google Asia Pacific Pte. Limited, and Google Payment Corp.'s (collectively, "Google")

8 Interrogatories (the "Interrogatories" and each, an "Interrogatory"), dated January 5, 2023, in the

9 above-captioned action (the "Action").

10       The Match Plaintiffs provide these Responses without waiver of or prejudice to (1) their rights

11 at any later time to raise objections, including, but not limited to, the competence, relevance,

12 materiality, privilege, work-product character and/or admissibility as evidence, for any purpose, of

13 (a) the Interrogatories or any part thereof, (b) statements made in these responses to the

14 Interrogatories or any part thereof, or (c) any information disclosed and/or any documents produced

15 as part of the Match Plaintiffs' Responses to the Interrogatories or any part thereof; (2) their rights

16 to object to the use of any of the information and/or documents produced in any subsequent

17 proceedings or the trial of the Action or any other action; or (3) their rights to object on any ground

18 at any time to a demand for further response to the Interrogatories or any other interrogatory or

19 request in the Action.

20       Any response or objection in response to an individual Interrogatory is not an

21 acknowledgement or concession that the information sought exists, is relevant to the claims in the

22 Action, is proportional to the needs of the Action, or is in the Match Plaintiffs' possession, custody

23 or control.

24       The Match Plaintiffs reserve the right to amend or supplement their responses and objections

25 to the Interrogatories from time to time as appropriate.

26       **GENERAL OBJECTIONS**

27       Each of these General Objections is incorporated by reference in each of the specific

28 objections and responses below as if fully set forth therein. For particular emphasis, one or more of

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1  these General Objections may be reiterated in a specific response. The absence or inclusion or any

2  reiteration in a specific response is neither intended as, nor shall be construed as, a limitation or

3  waiver of any general objection or any other specific objection made herein. The Match Plaintiffs

4  reserve the right to make such additional objections as may be appropriate, and nothing contained

5  herein shall be in any way construed as a waiver of any such objection.

6        1.     The Match Plaintiffs object to each Interrogatory to the extent it is overly broad,

7  unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

8        2.     The Match Plaintiffs object to each Interrogatory, definition, and instruction, to the

9  extent that it is inconsistent with, seeks to impose obligations not required by, or seeks to expand the

10  scope of permissible discovery under the Federal Rules of Civil Procedure, the Federal Rules of

11  Evidence, the Local Rules of the Northern District of California, any Order of the Court, or any

12  agreement between the parties. The Match Plaintiffs likewise object to the instructions as purporting

13  to impose obligations beyond those required by the Federal Rules of Civil Procedure, the Federal

14  Rules of Evidence, the Local Rules of the Northern District of California, any Order of the Court, or

15  any agreement between the parties.

16        3.     The Match Plaintiffs object to each Interrogatory, definition, and instruction to the

17  extent that it seeks information that falls within the scope of the attorney-client privilege, the work-

18  product doctrine, the common interest or joint defense privilege or any other applicable privilege or

19  immunity, including any other protections under the U.S. Constitution (including, but not limited to,

20  the First Amendment Privilege), federal law, the Constitution of the State of California, California

21  law, or that otherwise are exempted from disclosure. Should any such disclosure by the Match

22  Plaintiffs occur, it is inadvertent and shall not constitute a waiver of any privilege.

23        4.     The Match Plaintiffs object to each Interrogatory, definition, and instruction, to the

24  extent that it expressly or impliedly seeks information that is confidential, personal, or proprietary in

25  nature, or that constitutes protected commercial, financial, and/or trade secret information of the

26  Match Plaintiffs or third parties. The Match Plaintiffs will provide relevant and responsive

27  commercial, financial, or trade secret information only pursuant to a confidentiality agreement and

28  under an appropriate designation.

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

5.      The Match Plaintiffs object generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they contain inaccurate, incomplete, or misleading descriptions of facts, persons, relationships and/or events underlying the Action. The Match Plaintiffs further object to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they assume the existence of facts that do not exist or the occurrence of events that did not take place. Any Response, production of documents, or provision of information in response to the Interrogatories is not intended to provide an admission, and shall not constitute or be construed as providing an admission, that any factual or legal predicate stated in the Interrogatories is accurate.

6.      The Match Plaintiffs object to the definitions "Match Group Plaintiffs," "You," and "Your" to the extent that they purport to impose duties beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, or any order or ruling by the Court in this action, or seek information beyond the possession, custody, or control of the Match Plaintiffs. The Match Plaintiffs further object to these definitions as unduly burdensome, harassing, oppressive and overbroad to the extent they purport to include entities other than the Match Plaintiffs. For purposes of their responses, the Match Plaintiffs will construe "Match Group Plaintiffs," "You," and "Your" to mean only the four named plaintiffs reflected on the caption page of the First Amended Complaint.

7.      The Match Plaintiffs' Responses are based on their current knowledge. Further investigation may reveal additional facts or information that could lead to additions to, changes in, and/or variations from the Responses herein. Without in any way obligating themselves to do so, the Match Plaintiffs expressly reserve the right to supplement, amend, correct, clarify, or modify the Responses as further information becomes available. The Match Plaintiffs also reserve the right to use or rely on, at any time, subsequently discovered information or information omitted from these objections and Responses as a result of mistake, error, oversight or inadvertence. The Responses provided herein are based on a reasonable search for responsive information. The Match Plaintiffs reserve the right at any time to revise, correct, add to, clarify or supplement their Responses.

8.      The Match Plaintiffs object generally to the extent these contention interrogatories require responses before Google has served its supplemental expert report relating to the Match

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Plaintiffs' added claims in their Amended Complaint, before the completion of third-party depositions relating to the Match Plaintiffs' added claims in their Amended Complaint, and before the completion of expert discovery.

9.     The Match Plaintiffs object generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they purport to require the Match Plaintiffs to draw subjective or legal conclusions or are predicated on subjective or legal conclusions or arguments. Subject to and without waiving any objections, the Match Plaintiffs state that any Response, production of documents or provision of information in response to the Interrogatories is not intended to provide, and shall not constitute or be construed as providing, an admission concerning any of the terms used in the Interrogatories, or an admission that any factual or legal predicate stated in the Interrogatory is accurate.

10.    The Match Plaintiffs object generally to the Interrogatories to the extent they fail to present any geographic limitations or reasonable limitations as to time.

11.    The Match Plaintiffs object to each Interrogatory to the extent it purports to require the Match Plaintiffs to analyze the application of legal arguments to facts of which the Match Plaintiffs were purportedly aware. The Match Plaintiffs therefore object to the extent that each Interrogatory invades the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity.

12.    As set forth below, for certain of the Interrogatories, the Match Plaintiffs invoke Rule 33(d) of the Federal Rules of Civil Procedure to the extent that information sought in the Interrogatories may be derived or ascertained from documents that the Match Plaintiffs has produced or anticipates producing in response to Google's Requests for Production, or from an examination, audit, or inspection of such documents, or that is equally obtainable from public sources or from some other source or through some other means of discovery that is more convenient, less burdensome, or less expensive.

13.    By referencing the information and/or contents of any documents referenced in an Interrogatory, the Match Plaintiffs do not admit their authenticity, relevance, or admissibility at trial,

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

and the Match Plaintiffs reserve their rights to object to the introduction of and/or other use of such information and/or documents at trial or any other proceeding.

14.     The Match Plaintiffs object generally to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they purport to seek the discovery of information that is not in the possession, custody, or control of the Match Plaintiffs.

15.     The Match Plaintiffs also object on the ground that Google has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure. On May 27, 2022, Google served 13 interrogatories on the Match Plaintiffs, and on July 1, 2022, the Match Plaintiffs served their responses and objections to those interrogatories. On July 8, 2022, Google then served an additional 23 interrogatories. Google contended that the first 13 interrogatories served on May 27, 2022 did not count towards its interrogatory limit. Without waiving their rights and without agreeing that Google had not exceeded the interrogatory limit, the Match Plaintiffs agreed to respond to Google's additional 23 interrogatories. On December 14, 2022, Google again exceeded the 25-interrogatory limit by serving 17 additional interrogatories on the Match Plaintiffs, totaling 53 interrogatories. Federal Rule of Civil Procedure 33(a)(1) states "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts. Leave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(1) and (2)." The Match Plaintiffs, Epic, and Google submitted a proposed schedule that would have allowed Google to serve additional contention interrogatories, *see* MDL Dkt. 392, but the Court has not yet entered a schedule that allows Google to serve additional contention interrogatories, and Google has not obtained leave to serve more than 25 interrogatories on the Match Plaintiffs. The Match Plaintiffs and Epic met and conferred with Google regarding this issue, including to identify the particular interrogatories to which Google seeks responses, and Google served a narrowed set of Interrogatories from its set of 17 interrogatories on January 5, 2023. The Match Plaintiffs maintain their objections that Google's narrowed set of Interrogatories continues to exceed the interrogatory limit established by Federal Rule of Civil Procedure 33(a)(1) and any agreement by the parties to respond to additional contention interrogatories, and reserve all rights.

- 6 -

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

**OBJECTIONS TO DEFINITIONS**

**DEFINITION NO. 3: "ANDROID APP STORE"** shall mean any online storefront where APPS are offered for DOWNLOAD on an ANDROID DEVICE.

   **OBJECTION TO DEFINITION NO. 3:** The Match Plaintiffs object to the Definition of "App" as overly broad, unduly burdensome, and vague and ambiguous, and to the extent it purports to bring in information not relevant to and disproportionate to the needs of this litigation. For example, it purports to encompass any "DOWNLOAD" on an "ANDROID DEVICE," which are undefined terms. The Match Plaintiffs further object to this Definition to the extent it seeks information not within their possession, custody, or control, and/or which is not reasonably accessible by the Match Plaintiffs without undue burden and/or cost.

**DEFINITION NO. 4: "APP"** means a software application for a HANDHELD DEVICE or other Platform. For the avoidance of doubt, the phrase "YOUR APP" shall mean any App developed and/or published by You, including Tinder, Pairs, Hinge, Match, Plenty of Fish, and OK Cupid.

   **OBJECTION TO DEFINITION NO. 4:** The Match Plaintiffs object to the Definition of "App" as overly broad, unduly burdensome, and vague and ambiguous, and to the extent it purports to bring in information not relevant to and disproportionate to the needs of this litigation. For example, it purports to encompass software applications for any "HANDHELD DEVICE or other Platform," which are undefined terms, whereas the Match Plaintiffs' mobile applications are only available on Android OS devices and iOS devices. The Match Plaintiffs further object to this Definition to the extent it seeks information not within their possession, custody, or control, and/or which is not reasonably accessible by the Match Plaintiffs without undue burden and/or cost. The Match Plaintiffs further object to this Definition as suggesting that "Your App" includes any App developed and/or published by "You," whereas the only relevant Apps published by the Match Plaintiffs are limited to Match, Tinder, PlentyofFish, OkCupid, and OurTime. Neither Pairs nor Hinge are developed nor published by the Match Plaintiffs. The Match Plaintiffs will respond to interrogatories seeking information about their "Apps" or "Your Apps" only for Match, Tinder, PlentyofFish, and OkCupid.

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Case 3:20-cv-05671-JD   Document 419-7   Filed 07/14/23   Page 34 of 73

**DEFINITION NO. 5: "APP DEVELOPER"** means any PERSON who Developed one or more APPS.

 **OBJECTION TO DEFINITION NO. 5:** The Match Plaintiffs object to the Definition of "App Developer" as vague and ambiguous, including "Person who Developed," as overbroad, unduly burdensome, and to the extent it purports to bring in information not relevant to and disproportionate to the needs of this litigation. The Match Plaintiffs further object to this Definition to the extent it seeks information not within their possession, custody, or control, and/or which is not reasonably accessible by the Match Plaintiffs without undue burden and/or cost.

**DEFINITION NO. 6: "APP STORE"** shall mean any online storefront where Apps are offered for DOWNLOAD.

 **OBJECTION TO DEFINITION NO. 6:** The Match Plaintiffs object to the Definition of "App Store" as overly broad, unduly burdensome, and vague and ambiguous, including as to "online storefront" and "DOWNLOAD," which is an undefined term. The Match Plaintiffs further object to this definition to the extent it purports to bring in information not relevant to and disproportionate to the needs of this litigation. The Match Plaintiffs further object to this Definition to the extent it seeks information not within their possession, custody, or control, and/or which is not reasonably accessible by the Match Plaintiffs without undue burden and/or cost.

**DEFINITION NO. 8: "DOCUMENT"** has the same full meaning as construed by Fed. R. Civ. P. 34 and is subject to the "ESI" as referenced in the Order Re: Discovery of Electronically Stored Information as well, and includes, but is not limited to, all originals, non-identical copies and copies with marginal notations or interlineations of any writing, sworn statement, electronic mail or other item containing information of any kind or nature.

 **OBJECTION TO DEFINITION NO. 8:** The Match Plaintiffs object to the Definition of "Document" as overly broad, unduly burdensome, and vague and ambiguous. The Match Plaintiffs also object to this Definition to the extent it purports to seek documents and information not relevant and disproportionate to the needs of this litigation. The Match Plaintiffs further object to this Definition to the extent it seeks documents and information not within their possession, custody, or

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Case 3:20-cv-05671-JD  Document 419-7  Filed 07/14/23  Page 35 of 73

control, and/or which are not reasonably accessible by the Match Plaintiffs without undue burden and/or cost.

**DEFINITION NO. 13: "IN-APP PRODUCTS"** shall mean products and services that an App Developer makes available for purchase for Use within an App. This term shall include, without limitation, subscriptions and any virtual currency.

**OBJECTION TO DEFINITION NO. 13:** The Match Plaintiffs object to the Definition of "In-App Products" to the extent it misconstrues the services for purchase that the Match Plaintiffs provide within their Apps as being exclusively available within an App and not also available to users who access their Match, Tinder, PlentyofFish, OkCupid, and/or OurTime accounts through their respective websites. The Match Plaintiffs further object to this Definition to the extent it fails to specifically limit In-App Products to products available for purchase in exclusively Match, Tinder, PlentyofFish, OkCupid, and OurTime, which are the only Apps developed by the Match Plaintiffs about which the Match Plaintiffs will respond (unless specifically noted). The Match Plaintiffs further object to the extent this Definition mischaracterizes or misconstrues the type of In-App products available for purchase within the Match Plaintiffs' Apps. The Match Plaintiffs also object to this Definition to the extent it purports to seek information not relevant and disproportionate to the needs of this litigation. The Match Plaintiffs further object to this Definition to the extent it seeks information not within their possession, custody, or control, and/or which is not reasonably accessible by the Match Plaintiffs without undue burden and/or cost.

**DEFINITION NO. 15: "MATCH GROUP PLAINTIFFS"** shall mean the named Plaintiffs Match Group, LLC, Humor Rainbow, Inc., PlentyofFish Media ULC, and People Media, Inc., and all predecessors, successors, subsidiaries, divisions, parents, and/or affiliates thereof, past or present, and all past or present officers, directors, affiliates, agents, employees, consultants, representatives, and any other person acting on behalf of any of the foregoing entities.

**OBJECTION TO DEFINITION NO. 15:** The Match Plaintiffs object to the Definition of "Match Group Plaintiffs" as overly broad, unduly burdensome, and vague and ambiguous, particularly to the extent it purports to incorporate legally distinct entities, including entities whose information is not within the Match Plaintiffs' possession, custody, or control. The Match Plaintiffs

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Case 3:20-cv-05671-JD   Document 419-7   Filed 07/14/23   Page 36 of 73

also object to the Definition to the extent it seeks to refer to any entity other than Match Group, LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc. The Match Plaintiffs will respond on behalf of Match Group, LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc., only and not any subsidiary or affiliate, or any other person or entity. The Match Plaintiffs also object to this Definition to the extent it purports to seek information not relevant and disproportionate to the needs of this litigation. The Match Plaintiffs further object to this Definition to the extent it seeks information not within their possession, custody, or control, and/or which is not reasonably accessible by the Match Plaintiffs without undue burden and/or cost.

**DEFINITION NO. 16: "PERSON"** includes without limitation any natural person, corporation, partnership, government entity, business trust, association, and any other form of legal or business entity, and any officer, director, employee, partner, corporate parent, subsidiary, affiliate, agent, representative, or principal thereof.

 **OBJECTION TO DEFINITION NO. 16:** The Match Plaintiffs object to the Definition of "Person" as overly broad, unduly burdensome, and vague and ambiguous. The Match Plaintiffs also object to this Definition to the extent it purports to seek information not relevant and disproportionate to the needs of this litigation. The Match Plaintiffs further object to this Definition to the extent it seeks information not within their possession, custody, or control, and/or which is not reasonably accessible by the Match Plaintiffs without undue burden and/or cost.

**DEFINITION NO. 17: "YOU" OR "YOUR"** shall refer to MATCH GROUP PLAINTIFFS and any of their subsidiaries, affiliates, officers, directors, employees, representatives, consultants, agents, or any other person acting on their behalf, or any PERSON or entity that served in any such role at any time.

 **OBJECTION TO DEFINITION NO. 17:** The Match Plaintiffs object to the Definitions of "You" and "Your" as overly broad, unduly burdensome, and vague and ambiguous. The Match Plaintiffs also object to these Definitions to the extent they purport to seek information not relevant and disproportionate to the needs of this litigation. The Match Plaintiffs further object to these Definitions to the extent they seek information not within the Match Plaintiffs' possession, custody, or control, and/or which is not reasonably accessible by the Match Plaintiffs without undue burden

1  and/or cost, particularly to the extent they purport to incorporate legally distinct entities whose

2  information would not be within the Match Plaintiffs' possession, custody, or control. The Match

3  Plaintiffs also object to these Definitions to the extent they seek to refer to any entity other than

4  Match Group, LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc. The

5  Match Plaintiffs will respond on behalf of Match Group, LLC; Humor Rainbow, Inc.; PlentyofFish

6  Media ULC; and People Media, Inc., only and not any subsidiary or affiliate, or any other person or

7  entity.

8  **OBJECTIONS TO INSTRUCTIONS**

9      1.    The Match Plaintiffs object to the Instructions to the extent they purport to require the

10  Match Plaintiffs to produce (i) privileged information, (ii) confidential, proprietary, or highly

11  sensitive information regarding competitive business practices, and/or (iii) information that is

12  protected by privacy laws and generally requires the production of information beyond that required

13  by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the

14  Northern District of California, any Order of the Court, any agreement between the parties, or any

15  other applicable rules.

16      2.    The Match Plaintiffs object to Instruction No. 1 to the extent it purports to require the

17  Match Plaintiffs to produce information from January 1, 2015—a seemingly arbitrary date that would

18  incorporate a more than eight-year time period—to the "present" and therefore to seek information

19  that is not relevant to any party's claim or defense or proportional to the needs of the case. The Match

20  Plaintiffs further object to the extent that the "present" is meant for any time continuing perpetually

21  beyond January 5, 2023, which is the date on which the Interrogatories were served on the Match

22  Plaintiffs.

23      3.    The Match Plaintiffs object to Instruction No. 2 to the extent it purports to require the

24  Match Plaintiffs to produce information or documents outside of their possession, custody, or control.

25  The Match Plaintiffs will only produce responsive, non-privileged information as indicated below

26  that are in the possession, custody, or control of Match Group, LLC; Humor Rainbow, Inc.;

27  PlentyofFish Media ULC; or People Media, Inc. The Match Plaintiffs also object to this Instruction

28  as overly broad and unduly burdensome, particularly to the extent it seeks information "possessed

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

by any PERSON." The Match Plaintiffs also object to this Instruction to the extent it seeks information that is not relevant to any party's claim or defense in this litigation.

4. The Match Plaintiffs object to Instruction Nos. 3, 4, 5, 6, 7, 8, and 9 to the extent any purports to impose upon the Match Plaintiffs obligations in excess of those required by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of the Northern District of California, any Order of the Court, any agreement between the parties, or any other applicable rules. The Match Plaintiffs further object to these Instructions as overly broad and unduly burdensome

## OBJECTIONS AND RESPONSES

The Match Plaintiffs submit the following Specific Objections and Responses to the Interrogatories. Neither a Specific Objection nor the absence of a Specific Objection to an Interrogatory is an admission that documents or information responsive to the Interrogatory exists. The Match Plaintiffs further incorporate their General Objections, Objections to Definitions, and Objections to Instructions into the Responses set forth below.

**INTERROGATORY NO. 24:**

IDENTIFY ALL APP DEVELOPERS or other entities whom YOU contend GOOGLE approached "with an offer of an agreement designed to prevent the developer from opening a competing store or otherwise distributing its apps outside of the Google Play Store" as alleged in ¶ 273 of YOUR First Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 24:**

The Match Plaintiffs reassert and incorporate each of the General Objections, Objections to Definitions, and Objections to Instructions set forth above. The Match Plaintiffs also object to this Interrogatory on the ground that, as explained in the Match Plaintiffs' General Objections, Google has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure. The Match Plaintiffs also object that this Interrogatory is overly broad, unduly burdensome, and not reasonably proportionate to the needs of the case, including to the extent it seeks information on "ALL APP DEVELOPERS or other entities," for an arbitrary time period of more than seven years. The Match Plaintiffs further object that this Interrogatory seeks information that is in Google's possession, custody, or control or otherwise equally available to Google or obtainable from less

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1   burdensome sources, including from publicly available sources or from third parties. The Match

2   Plaintiffs also object to this Interrogatory as vague and ambiguous, particularly with respect to the

3   phrase "ALL APP DEVELOPERS or other entities." The Match Plaintiffs further object to this

4   Interrogatory as premature to the extent expert discovery is still ongoing and to the extent oral

5   depositions under Rule 30 may be better suited to respond to the information sought by this

6   Interrogatory. The Match Plaintiffs reserve the right to amend or supplement this Response upon

7   further investigation and analysis. The Match Plaintiffs object to this Interrogatory on the ground

8   that it seeks information that is exempt from discovery pursuant to the attorney-client communication

9   privilege, the work product doctrine, joint defense and/or common-interest privilege, third-party

10  confidentiality, the right of privacy, trade secret protection, proprietary business information,

11  confidential financial information, or any other privilege or immunity available under the United

12  States Constitution, the Constitution of the State of California, any federal or state statute, or common

13  law.

14          Subject to, and without waiving the foregoing objections, and based on currently available

15  knowledge, the Match Plaintiffs respond as follows:

16          Paragraph 273 of the Match Plaintiffs' First Amended Complaint relates to the Match

17  Plaintiffs' *per se* claims; specifically, it relates to "horizontal agreements among potential app store

18  competitors that had the actual and intended effect of inducing the developer not to launch an app

19  store that would compete with Google in the Android App Distribution Market." *See* Match

20  Plaintiffs' First Amended Complaint ¶ 273. As such, the Match Plaintiffs incorporate by reference

21  the parties' December 13, 2022 Stipulation regarding Claims of Epic Games, Inc. and Match Group,

22  LLC which states "With respect to . . . Count 6 of Match's First Amended Complaint . . . Match's

23  *per se* claims are limited to Google's agreements with the following developers: Activision Blizzard,

24  Inc., Riot Games, Inc., and Supercell." *See* Email from C. Kozikowski to D. Shikman (Dec. 13, 2022

25  at 3:21 p.m.). The Match Plaintiffs contend that Google approached Activision Blizzard, Inc.

26  ("Activision"), Riot Games, Inc. ("Riot") and Supercell Oy ("Supercell") with an offer of an

27  agreement designed to prevent these developers from opening a competing app store or otherwise

28  distributing their apps outside of Google Play. *See, e.g.*, GOOG-PLAY-003332817.R, at 830.R

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1  (listing Project Hug "target" developers as Riot, Activision, and Supercell, among others); Letter

2  from B. Rocca to Y. Even (Sept. 23, 2022) (confirming that Google entered into Games Velocity

3  Program ("GVP") agreements with Activision and Riot, among others); Kochikar Dep. Tr. at 177:21–

4  178:2, 179:5–7) (confirming that Google entered into an "emerging markets" deal with Supercell).

5  **INTERROGATORY NO. 25**:

6       IDENTIFY all APP DEVELOPERS or other entities that promised or committed to Google

7  that the APP DEVELOPER or other entity would not launch an ANDROID APP STORE.

8  **RESPONSE TO INTERROGATORY NO. 25**:

9       The Match Plaintiffs reassert and incorporate each of the General Objections, Objections to

10  Definitions, and Objections to Instructions set forth above. The Match Plaintiffs also object to this

11  Interrogatory on the ground that, as explained in the Match Plaintiffs' General Objections, Google

12  has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure.

13  The Match Plaintiffs also object that this Interrogatory is overly broad, unduly burdensome, and not

14  reasonably proportionate to the needs of the case, including to the extent it seeks information on "all

15  APP DEVELOPERS or other entities," for an arbitrary time period of more than seven years. The

16  Match Plaintiffs further object that this Interrogatory seeks information that is in Google's

17  possession, custody, or control or otherwise equally available to Google or obtainable from less

18  burdensome sources, including from publicly available sources or from third parties. The Match

19  Plaintiffs also object to this Interrogatory as vague and ambiguous, particularly with respect to the

20  phrases "all APP DEVELOPERS or other entities" and "promised or committed to Google that the

21  APP DEVELOPER or other entity would not launch an ANDROID APP STORE." The Match

22  Plaintiffs further object to this Interrogatory as premature to the extent expert discovery is still

23  ongoing and to the extent oral depositions under Rule 30 may be better suited to respond to the

24  information sought by this Interrogatory. The Match Plaintiffs further object to this Interrogatory to

25  the extent that it is cumulative or duplicative of Interrogatory No. 24. The Match Plaintiffs reserve

26  the right to amend or supplement this Response upon further investigation and analysis.

27       Subject to, and without waiving the foregoing objections, the Match Plaintiffs respond as

28  follows:

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1    According to Google, the following entities had entered into GVP or Apps Velocity

2  Program ("AVP") agreements with Google as of July 2022, by which they agreed to certain

3  obligations that had the actual and intended effect of preventing them from launching an Android

4  app store: Activision Blizzard; Age of Learning; Aniplex Inc.; Bandai Namco Entertainment Inc.;

5  Calm; Com2uS; Electronic Arts Inc.; Garena (Garena Online Private Limited); King; Lilith Games

6  (Lilith Network HK Limited; mixi, Inc.; NCSoft; NetEase Games (Hong Kong NetEase Interactive

7  Entertainment); Netmarble; Nexon Company; Niantic, Inc.; Nintendo Co., Ltd.; Pearl Abyss;

8  Playrix (PLR Worldwide); Riot Games, Inc., Smule; Square Enix Co. Ltd.; Tencent Games

9  (Proxima); and Ubisoft Entertainment. *See* Letter from B. Rocca to Y. Even (Sept. 23, 2022). In

10  addition, Google entered into an "emerging markets" agreement with Supercell in mid-2022

11  because Supercell "informed Google that it was working on launching a web store" that was "going

12  to offer digital items for purchase that could be used in game on Android" and "Google was

13  concerned that Supercell's decision  . . . could attract the attention of other large developers to

14  follow suit[.]" Kochikar Dep. Tr. at 176:24–25; 177:21–178:10, 179:5–7. Activision, Riot and

15  Supercell had concrete plans to launch a competing Android app store and ceased their plans upon

16  entering their agreements with Google. *See* Match Plaintiffs' Response to Interrogatory No. 28.

17    Additionally, at various times, █████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████

20  **INTERROGATORY NO. 26**:

21    For EACH of the APP DEVELOPERS or other entities IDENTIFIED in YOUR responses to

22  Interrogatory Nos. 24 or 25, IDENTIFY all terms of each promise or commitment not to launch an

23  ANDROID APP STORE and state all facts in support of YOUR response.

24  ///

25  ///

26

27  [1] Herein, ██████████████████████████████████████  and all
predecessors, successors, subsidiaries, divisions, parents, an/or affiliates thereof, past or present, and

28  all past or present officers, directors, affiliates, agents, employees, consultants, representatives, and
any other person acting on behalf of any of the foregoing entities.

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

**RESPONSE TO INTERROGATORY NO. 26**:

The Match Plaintiffs reassert and incorporate each of the General Objections, Objections to Definitions, and Objections to Instructions set forth above. The Match Plaintiffs also object to this Interrogatory on the ground that, as explained in the Match Plaintiffs' General Objections, Google has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure. The Match Plaintiffs also object that this Interrogatory is overly broad, unduly burdensome, and not reasonably proportionate to the needs of the case, including to the extent it seeks information on "all terms" and "all facts," for an arbitrary time period of more than seven years. For purposes of their Response, the Match Plaintiffs will identify only the central facts sufficient for Google to understand the Match Plaintiffs' allegations. The Match Plaintiffs further object that this Interrogatory seeks information that is in Google's possession, custody, or control or otherwise equally available to Google or obtainable from less burdensome sources, including from publicly available sources or from third parties. The Match Plaintiffs also invoke Rule 33(d) of the Federal Rules of Civil Procedure to the extent that information sought in the Interrogatories may be derived or ascertained from documents that have been produced or will be produced, or from an examination, audit, or inspection of such documents, or that is equally obtainable from Google, public sources, or from some other source or through some other means of discovery that is more convenient, less burdensome, or less expensive. The Match Plaintiffs also object to this Interrogatory as vague and ambiguous, particularly with respect to the phrases "APP DEVELOPERS or other entities" and "all terms of each promise or commitment not to launch an ANDROID APP STORE." The Match Plaintiffs further object to this Interrogatory as premature to the extent expert discovery is still ongoing and to the extent oral depositions under Rule 30 may be better suited to respond to the information sought by this Interrogatory. The Match Plaintiffs further object to this Interrogatory to the extent that it is cumulative or duplicative of Interrogatory Nos. 24 and 25. The Match Plaintiffs reserve the right to amend or supplement this Response upon further investigation and analysis.

Subject to, and without waiving the foregoing objections, the Match Plaintiffs respond as follows:

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Case 3:20-cv-05671-JD   Document 419-7   Filed 07/14/23   Page 43 of 73

1   The terms known to the Match Plaintiffs of each promise or commitment not to launch an

2   Android app store are set forth in the agreements that Google has entered with the developers

3   identified in the Match Plaintiffs' Responses to Interrogatory Nos. 24 and 25. The Match Plaintiffs

4   refer Google to these agreements, which are already in Google's possession. *See, e.g.*, GOOG-

5   PLAY-007273439; GOOG-PLAY-000929031; GOOG-PLAY-007335585; GOOG-PLAY-

6   007273404; GOOG-PLAY4-007453555; Karam Dep. Tr. at 204:14–19; 205:13-17; Lockheimer

7   Dep. Tr. at 380:17–381:23; GOOG-PLAY-000785364; METAEPIC_000020882;

8   METAEPIC_000015003; GOOG-PLAY-009579485.R; Kochikar Dep. Tr. at 428:8–13. The Match

9   Plaintiffs further refer Google to their Response to Interrogatory No. 28.

10  **INTERROGATORY NO. 27**:

11  For EACH of the APP DEVELOPERS or other entities IDENTIFIED in YOUR responses to

12  Interrogatory Nos. 24 or 25, IDENTIFY all individuals involved in negotiating or agreeing to each

13  promise or commitment not to launch an ANDROID APP STORE and state all facts in support of

14  YOUR response.

15  **RESPONSE TO INTERROGATORY NO. 27**:

16  The Match Plaintiffs reassert and incorporate each of the General Objections, Objections to

17  Definitions, and Objections to Instructions set forth above. The Match Plaintiffs also object to this

18  Interrogatory on the ground that, as explained in the Match Plaintiffs' General Objections, Google

19  has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure.

20  The Match Plaintiffs also object that this Interrogatory is overly broad, unduly burdensome, and not

21  reasonably proportionate to the needs of the case, including to the extent it seeks information on "all

22  individuals" and "all facts," for an arbitrary time period of more than seven years. For purposes of

23  their Response, the Match Plaintiffs will identify only the central facts sufficient for Google to

24  understand the Match Plaintiffs' allegations. The Match Plaintiffs further object that this

25  Interrogatory seeks information that is in Google's possession, custody, or control or otherwise

26  equally available to Google or obtainable from less burdensome sources, including from publicly

27  available sources or from third parties. The Match Plaintiffs also object to this Interrogatory as vague

28  and ambiguous, particularly with respect to the phrases "APP DEVELOPERS or other entities," "all

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1  individuals involved in negotiating or agreeing," and "each promise or commitment not to launch an

2  ANDROID APP STORE." The Match Plaintiffs further object to this Interrogatory as premature to

3  the extent expert discovery is still ongoing and to the extent oral depositions under Rule 30 may be

4  better suited to respond to the information sought by this Interrogatory. The Match Plaintiffs further

5  object to this Interrogatory to the extent that it is cumulative or duplicative of Interrogatory Nos. 24–

6  26. The Match Plaintiffs reserve the right to amend or supplement this Response upon further

7  investigation and analysis.

8         Subject to, and without waiving the foregoing objections, the Match Plaintiffs respond as

9  follows:

10  ███████████████████████████████████████

11  ███████████████████████████████████████

12  ███████████████████████████████████████

13  ███████████████  Supercell, and Riot, the Match Plaintiffs contend that at least the

14  following individuals were involved in negotiations:

15     ● ████████████████████████████

16        ███████████████████████████████

17        ████████████████████████████████

18        ████████████████

19     ● <u>Supercell</u>: Purnima Kochikar, Hiroshi Lockheimer, and Ilkka Paananen. Kochikar

20        Dep. Tr. at 130:6–11; GOOG-PLAY-000782270.

21     ● <u>Riot</u>: Lawrence Koh, George Yousling, Meg Tucker, Brian Cho, Kimberly Master,

22        and Chris Enock. GOOG-PLAY-000226939; Koh Dep. Tr. at 284:23–285:3.

23  With respect to the remaining developers identified in the Match Plaintiffs' Responses to

24  Interrogatory Nos. 24 and 25, the Match Plaintiffs reassert that Google is more knowledgeable

25  about the individuals involved in negotiating the agreements and thus in a better position to identify

26  the relevant individuals called for by this Interrogatory.

27  ///

28

- 18 -

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

**INTERROGATORY NO. 28**:

FOR every APP DEVELOPER that you contend had an agreement with Google not to launch an app store or that had the effect of preventing the developer from launching an ANDROID APP STORE, IDENTIFY whether, in the absence of the alleged agreement, the developer would have launched an ANDROID APP STORE that offered apps developed or sold by YOU or any other third parties and state all facts in support of YOUR response.

**RESPONSE TO INTERROGATORY NO. 28**:

The Match Plaintiffs reassert and incorporate each of the General Objections, Objections to Definitions, and Objections to Instructions set forth above. The Match Plaintiffs also object to this Interrogatory on the ground that, as explained in the Match Plaintiffs' General Objections, Google has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure. The Match Plaintiffs also object to the extent this Interrogatory seeks information not relevant to the parties' claims or defenses. The Match Plaintiffs also object that this Interrogatory is overly broad, unduly burdensome, and not reasonably proportionate to the needs of the case, including to the extent it seeks information on "every APP DEVELOPER" and "all facts," for an arbitrary time period of more than seven years. For purposes of their Response, the Match Plaintiffs will identify only the central facts sufficient for Google to understand the Match Plaintiffs' allegations. The Match Plaintiffs further object that this Interrogatory seeks information that is in Google's possession, custody, or control or otherwise equally available to Google or obtainable from less burdensome sources, including from publicly available sources or from third parties. The Match Plaintiffs further object to this Interrogatory to the extent it seeks information regarding apps beyond those identified in the Complaint and apps not owned or operated by the Match Plaintiffs. The Match Plaintiffs also object to this Interrogatory as vague and ambiguous, particularly with respect to the phrases "APP DEVELOPER," "agreement with Google not to launch an app store or that had the effect of preventing the developer from launching an ANDROID APP STORE," and "offered apps developed or sold by YOU or any other third parties." The Match Plaintiffs further object to this Interrogatory as premature to the extent expert discovery is still ongoing and to the extent oral depositions under Rule 30 may be better suited to respond to the information sought by this Interrogatory. The Match

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1   Plaintiffs further object to this Interrogatory to the extent that it is cumulative or duplicative of

2   Interrogatory Nos. 24–27. The Match Plaintiffs reserve the right to amend or supplement this

3   Response upon further investigation and analysis. The Match Plaintiffs object to this Interrogatory

4   on the ground that it seeks information that is exempt from discovery pursuant to the attorney-client

5   communication privilege, the work product doctrine, joint defense and/or common-interest privilege,

6   third-party confidentiality, the right of privacy, trade secret protection, proprietary business

7   information, confidential financial information, or any other privilege or immunity available under

8   the United States Constitution, the Constitution of the State of California, any federal or state statute,

9   or common law.

10          Subject to, and without waiving the foregoing objections, the Match Plaintiffs respond as

11   follows:

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   Riot, and Supercell.

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   was concerned that "if ABK launched an alternative Android app store, that could lead to other

27   developers either launching their own app store or launching their titles through ABK's alternative

28   app store". Kochikar Dep. Tr. at 139:8–14. But Google knew that if it could secure Activision's

- 20 -

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1    launch on Play, Activision "would not spend their time and money investing on an alternative app

2    store". Kochikar Dep. Tr. at 139:24–140:5; *id.* at 142:5–12. Activision's decision on whether to

3    launch its alternative Android app store depended on whether it could "find the right deal/solution

4    with [Google]". GOOG-PLAY-007415527. █████████████████████████████████

5    █████████████████████████████████████████████████████████████████

6    ████████████ Google believed Activision would do so by "partnering with another 'major

7    mobile company'" and presumed it would be Epic. *Id.* ██████████████████████

8    █████████████████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████████████████

10   █████████████████████████████████████████████████████████████████

11   █████████████████████████████████████████████████████████████████

12   █████████████████████████████████████████████████████████████████

13   █████████████████████████████████████████████████████████████████

14   ██████████████████████████████████████

15   <u>Riot:</u> Riot told Google in early 2019 that it was planning to launch its own Android app

16   store. Koh Dep. Tr. at 200:4–10, 285:4–16; Kochikar Dep. Tr. at 149:5–13. "Riot was on the verge

17   of becoming the next major game company to follow Epic in moving forward with an off-Play

18   Android distribution strategy." GOOG-PLAY-007035840. To "have Riot choose Play vs launching

19   their own Android store", Google paid Riot ████████████████████████ (GOOG-PLAY-

20   000928690) as part of "a Hug-like deal to convince Riot to change that strategy" (Koh Dep. Tr. at

21   286:21–24). As a result of this deal with Google, Riot "agreed to put aside their off-Play distribution

22   platform and launch on Play." GOOG-PLAY-007035840. Then, in 2020, Google offered Riot a

23   "vastly imbalanced" $30 million Project Hug deal for a "year of security", meaning an agreement

24   that would "assist in stopping Riot from starting its own Android app store and getting launches on

25   Play for one year". Koh Dep. Tr. at 294:13–24. Riot did not launch an app store on Android.

26   Kochikar Dep. Tr. at 150:20–23.

27   ///

28   ///

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1    <u>Supercell:</u> Supercell informed Google that it was working on launching a web store that was

2    going to offer "digital items for purchase that could be used in game on Android", from which

3    "Google would not make money". Kochikar Dep. Tr. at 177:21–178:5. "Google was concerned that

4    Supercell's decision . . . could attract the attention of other large developers to follow suit[.]"

5    Kochikar Dep. Tr. at 178:6–10. As a result, Google entered into an "emerging markets" deal with

6    Supercell around mid-2022. *Id.* at 179:5–7. Among other things, the deal offered Supercell "up to

7    ████████ in cash incentives" in exchange for Supercell agreeing to release its mobile titles on

8    Google Play at the same time as other app stores. Kochikar Dep. Tr. at 179:10–13, 181:24–182:6.

9    Supercell has not launched an app store on Android.

10    With respect to the remaining developers identified in the Match Plaintiffs' Responses to

11    Interrogatory Nos. 24 and 25, the Match Plaintiffs contend that the agreements that they entered

12    with Google had the effect of preventing them from opening a competing store or otherwise

13    distributing apps outside of Google Play. *See, e.g.*, Koh Dep. Tr. at 172:17–22 ("[T]hese were large

14    enough and established enough major developers that they could, in fact, come up with the

15    infrastructure needed to actually establish and launch their own app store on Android").

16    **INTERROGATORY NO. 29**:

17    FOR every APP DEVELOPER that you contend had an agreement with Google not to launch

18    an ANDROID APP STORE or that had the effect of preventing the developer from launching an

19    ANDROID APP STORE, IDENTIFY the service fees or revenue sharing terms applicable to

20    payments to DEVELOPERS for APP purchases or IN-APP PAYMENTS that the developer's

21    ANDROID APP STORE would have had in the absence of the alleged agreement and state all facts

22    in support of YOUR response.

23    **RESPONSE TO INTERROGATORY NO. 29**:

24    The Match Plaintiffs reassert and incorporate each of the General Objections, Objections to

25    Definitions, and Objections to Instructions set forth above. The Match Plaintiffs also object to this

26    Interrogatory on the ground that, as explained in the Match Plaintiffs' General Objections, Google

27    has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure.

28    The Match Plaintiffs also object to the extent this Interrogatory seeks information not relevant to the

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1    parties' claims or defenses. The Match Plaintiffs also object that this Interrogatory is overly broad,

2    unduly burdensome, and not reasonably proportionate to the needs of the case, including to the extent

3    it seeks information on "every APP DEVELOPER" and "all facts," for an arbitrary time period of

4    more than seven years. The Match Plaintiffs also object to this Interrogatory as vague and ambiguous,

5    particularly with respect to the phrases "an agreement with Google not to launch an ANDROID APP

6    STORE or that had the effect of preventing the developer from launching an ANDROID APP

7    STORE," "service fees or revenue sharing terms applicable to payments," "DEVELOPERS," and

8    "APP." The Match Plaintiffs further object to this Interrogatory as premature to the extent expert

9    discovery is still ongoing and to the extent oral depositions under Rule 30 may be better suited to

10   respond to the information sought by this Interrogatory. The Match Plaintiffs reserve the right to

11   amend or supplement this Response upon further investigation and analysis. The Match Plaintiffs

12   object to this Interrogatory on the ground that it seeks information that is exempt from discovery

13   pursuant to the attorney-client communication privilege, the work product doctrine, joint defense

14   and/or common-interest privilege, third-party confidentiality, the right of privacy, trade secret

15   protection, proprietary business information, confidential financial information, or any other

16   privilege or immunity available under the United States Constitution, the Constitution of the State of

17   California, any federal or state statute, or common law.

18          Subject to, and without waiving the foregoing objections, the Match Plaintiffs respond as

19   follows:

20          The Match Plaintiffs are unable, due to Google's successful efforts to prevent the developers

21   identified in the Match Plaintiffs' Responses to Interrogatory Nos. 24 and 25 from opening

22   competing Android app stores, to identify the service fees or revenue sharing terms applicable to

23   payments to specific developers for app purchases or in-app payments that any developer's Android

24   app store would have had in the absence of an agreement with Google. However, in the but-for

25   world where Google's anticompetitive conduct did not occur, service fees applicable to payments

26   for apps or in-app purchases would have reflected a more competitive environment which would

27   have resulted in lower, competitive fees. *See* Schwartz Report § 13; Schwartz Rebuttal Report §

28   7.2.2.

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

**INTERROGATORY NO. 30**:

IDENTIFY ALL APP DEVELOPERS or other entities with whom YOU contend GOOGLE entered into "horizontal agreements among potential app store competitors that had the actual and intended effect of inducing the developer not to launch an ANDROID APP STORE that would compete with Google in the Android App Distribution Market" as alleged in ¶ 273 of YOUR First Amended Complaint and state all facts in support of YOUR contention[.]

**RESPONSE TO INTERROGATORY NO. 30**:

The Match Plaintiffs reassert and incorporate each of the General Objections, Objections to Definitions, and Objections to Instructions set forth above. The Match Plaintiffs also object to this Interrogatory on the ground that, as explained in the Match Plaintiffs' General Objections, Google has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure. The Match Plaintiffs also object that this Interrogatory is overly broad, unduly burdensome, and not reasonably proportionate to the needs of the case, including to the extent it seeks information on "ALL APP DEVELOPERS or other entities" and "all facts," for an arbitrary time period of more than seven years. For purposes of their Response, the Match Plaintiffs will identify only the central facts sufficient for Google to understand the Match Plaintiffs' allegations. The Match Plaintiffs further object that this Interrogatory seeks information that is in Google's possession, custody, or control or otherwise equally available to Google or obtainable from less burdensome sources, including from publicly available sources or from third parties. The Match Plaintiffs also object to this Interrogatory as vague and ambiguous, particularly with respect to the phrase "APP DEVELOPERS or other entities." The Match Plaintiffs further object to this Interrogatory as premature to the extent expert discovery is still ongoing and to the extent oral depositions under Rule 30 may be better suited to respond to the information sought by this Interrogatory. The Match Plaintiffs further object to this Interrogatory to the extent that it is cumulative or duplicative of Interrogatory Nos. 24–29. The Match Plaintiffs reserve the right to amend or supplement this Response upon further investigation and analysis. The Match Plaintiffs object to this Interrogatory on the ground that it seeks information that is exempt from discovery pursuant to the attorney-client communication privilege, the work product doctrine, joint defense and/or common-interest privilege,

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Case 3:20-cv-05671-JD   Document 419-7   Filed 07/14/23   Page 51 of 73

third-party confidentiality, the right of privacy, trade secret protection, proprietary business information, confidential financial information, or any other privilege or immunity available under the United States Constitution, the Constitution of the State of California, any federal or state statute, or common law.

Subject to, and without waiving the foregoing objections, the Match Plaintiffs respond as follows:

The Match Plaintiffs incorporate by reference the parties' December 13, 2022 Stipulation regarding Claims of Epic Games, Inc. and Match Group, LLC, which states "With respect to . . . Count 6 of Match's First Amended Complaint . . . Match's *per se* claims are limited to Google's agreements with the following developers: Activision Blizzard, Inc., Riot Games, Inc., and Supercell." *See* Email from C. Kozikowski to D. Shikman (Dec. 13, 2022). The Match Plaintiffs further incorporate their Responses to Interrogatory Nos. 24–29.

**INTERROGATORY NO. 31**:

For EACH of the agreements IDENTIFIED in YOUR responses to Interrogatory No. 24, 25, or 30, please provide ALL facts regarding whether, and how, the agreement foreclosed competition or otherwise harmed competition or the competitive process.

**RESPONSE TO INTERROGATORY NO. 31**:

The Match Plaintiffs reassert and incorporate each of the General Objections, Objections to Definitions, and Objections to Instructions set forth above. The Match Plaintiffs also object to this Interrogatory on the ground that, as explained in the Match Plaintiffs' General Objections, Google has exceeded the 25-interrogatory limit set by Rule 33(a)(1) of the Federal Rules of Civil Procedure. The Match Plaintiffs also object to the extent this Interrogatory seeks information not relevant to the parties' claims or defenses. The Match Plaintiffs also object that this Interrogatory is overly broad, unduly burdensome, and not reasonably proportionate to the needs of the case, including to the extent it seeks information on "ALL facts," for an arbitrary time period of more than seven years. For purposes of their Response, the Match Plaintiffs will identify only the central facts sufficient for Google to understand the Match Plaintiffs' allegations. The Match Plaintiffs further object that this Interrogatory seeks information that is in Google's possession, custody, or control or otherwise

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

equally available to Google or obtainable from less burdensome sources, including from publicly available sources or from third parties. The Match Plaintiffs also object to this Interrogatory as vague and ambiguous, particularly with respect to the phrases "agreements" and "whether, and how, the agreement foreclosed competition or otherwise harmed competition or the competitive process." The Match Plaintiffs further object to this Interrogatory as premature to the extent expert discovery is still ongoing and to the extent oral depositions under Rule 30 may be better suited to respond to the information sought by this Interrogatory. The Match Plaintiffs further object to this Interrogatory to the extent that it is cumulative or duplicative of Interrogatory Nos. 24–30. The Match Plaintiffs reserve the right to amend or supplement this Response upon further investigation and analysis.

Subject to, and without waiving the foregoing objections, the Match Plaintiffs respond as follows:

The Match Plaintiffs incorporate by reference the expert reports of Dr. Steven Schwartz. *See* Schwartz Report §§ 4.2, 10.3.3, 10.3.4, 15.2.1 and Schwartz Rebuttal Report §§ 4.2, 6.1.2; *see also* Bernheim Report §§ V.B, VI.D. Project Hug was driven by Google's concern that the "[t]he loss of top developers, either to competitors or by 'going-it-alone' on Android, would significantly impact Play's business." GOOG-PLAY-003332817.R. Specifically, "Google was concerned that unhappiness that a developer might have would lead them to distribute their apps, their games, through a competing Android app store in lieu of Google Play". Koh Dep. Tr. at 143:1–22. To prevent developers from competing with Google Play or distributing their titles through Google Play's competitors, Google paid them via the agreements identified in the Match Plaintiffs' Responses to Interrogatory Nos. 24, 25 and 30, and Google imposed obligations on developers to "sim ship" their mobile titles on Google Play. This means that "all of the titles that were launched by [the] . . . developers were launched on Google Play earlier than or on the same date as launching anywhere else on Android". Kochikar Dep. Tr. at 155:20–24. This requirement prevents developers from releasing their mobile titles exclusively on competing Android app stores, or even earlier on competing Android app stores than Google Play. Google was aware that this requirement would substantially reduce the incentive for developers to create their own Android app store or partner with third-party app stores. *See* Kochikar Dep. Tr. at 139:24–140:5 (agreeing that if Google could

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

secure ABK's launch on Play, "Activision Blizzard King would not spend their time and money investing on an alternative app store"); *id.* at 142:5–12. The agreements also require developers not to remove their titles from Google Play and to maintain content and feature parity between the apps they release on Google Play and those they release on other mobile app stores. These requirements prevent developers from differentiating their offerings on alternative app stores in order to compete with Google Play and, like the sim-ship requirement, significantly reduce the incentive for developers to launch their own stores or to launch their titles on third-party stores. Further, the agreements require that developers refrain from promoting their apps more aggressively on other mobile app stores than they do on Google Play and thereby threatening Google Play's dominance. Google's agreements with the developers identified in the Match Plaintiffs' Responses to Interrogatory Nos. 24, 25, and 30 have helped Google maintain its monopolies in the Android App Distribution Market and the Android In-App Payment Processing Market. In particular, with respect to Activision, Riot, and Supercell, each of which intended to launch an Android app store in the absence of an agreement with Google, the agreements had the actual and intended effect of eliminating potential competition in these markets. With respect to Meta, Meta's commitments not to distribute third-party Android apps or to develop a standalone Android app store harmed competition by preventing Meta's own distribution of Android apps discovered through Meta's social media app, which would have competed with Google Play in the Android App Distribution Market.

DATED: January 19, 2023                    HUESTON HENNIGAN LLP


                                           By:  */s/ Douglas J. Dixon*
                                               Douglas J. Dixon
                                               Attorneys for Plaintiffs Match Group, LLC,
                                               Humor Rainbow, Inc., PlentyofFish Media
                                               ULC, and People Media, Inc.

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1

## **VERIFICATION**

2   I, Peter Foster, declare:

3         I am the General Manager, Global Advertising and Brand Solutions, for Match Group,

4   LLC. I verify that I have read the foregoing Plaintiffs Match Group, LLC et al.'s Responses and

5   Objections to Defendants' Contention Interrogatories, excluding information designated Highly-

6   Confidential Attorneys' Eyes Only or Non-Party Highly Confidential – Outside Counsel Eyes

7   Only, and verify that I believe it to be true to the best of my knowledge, information, and belief. As

8   to matters stated therein that are not within my personal knowledge, I have relied on information

9   that has been prepared by persons whom I believe to be reliable. I declare under the penalty of

10  perjury that the foregoing is true and correct.

11

12        Executed on this 19th day of January 2023, in Lafayette, California.

13

14        *Peter Foster*

15                                               Peter Foster

16

17

18

19

20

21

22

23

24

25

26

27

28

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

## CERTIFICATE OF SERVICE

I am employed in the City of Los Angeles, California. I am over the age of 18 years and not a party to this action. My business address is Hueston Hennigan LLP, 523 West 6th Street, Ste. 400, Los Angeles, California 90014.

On January 19, 2023, I served the following document(s):

**PLAINTIFFS MATCH GROUP, LLC'S, ET AL.'S RESPONSES AND OBJECTIONS TO DEFENDANTS' CONTENTION INTERROGATORIES**

by transmitting true and correct copies via electronic mail to the following parties:

| | |
|---|---|
| Christine A. Varney (pro hac vice)<br>Gary A. Bornstein (pro hac vice)<br>Yonatan Even (pro hac vice)<br>Lauren A. Moskowitz (pro hac vice)<br>M. Brent Byars (pro hac vice)<br>Eric Zepp (pro hac vice)<br>**CRAVATH, SWAINE & MOORE LLP**<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019<br>epic-mobileapps@cravath.com<br>cvarney@cravath.com<br>gbornstein@cravath.com<br>yeven@cravath.com<br>lmoskowitz@cravath.com<br>mbyars@cravath.com<br>ezepp@cravath.com<br><br><br>Paul J. Riehle<br>**FAGRE DRINKER BIDDLE & REATH LLP**<br>Four Embarcadero Center<br>San Francisco, California 94111<br>paul.riehle@faegredrinker.com<br><br>*Counsel for Plaintiff in Epic Games, Inc. v. Google LLC, et al.* | Eamon P. Kelly<br>Alberto Rodriguez<br>Martin Amaro<br>**SPERLING & SLATER, P.C.**<br>55 W. Monroe Street, Suite 3200<br>Chicago, IL 60603<br>ekelly@sperling-law.com<br>arodriguez@sperling-law.com<br>mamaro@sperling-law.com<br><br>Steve W. Berman<br>Robert F. Lopez<br>Ted Wojcik<br>1301 Second Ave., Suite 2000<br>Seattle, WA 98101<br>**HAGENS BERMAN SOBOL SHAPIRO LLP**<br>steve@hbsslaw.com<br>robl@hbsslaw.com<br>tedw@hbsslaw.com<br><br>Benjamin J. Siegel<br>**HAGENS BERMAN SOBOL SHAPIRO LLP**<br>715 Hearst Avenue, Suite 202<br>Berkeley, CA 94710<br>bens@hbsslaw.com<br><br>*Counsel for Plaintiff Pure Sweat Basketball, Inc. and the Proposed Class in Pure Sweat Basketball, Inc. v. Google LLC, et al.* |

Case Nos. 3:21-md-02981-JD and 3:22-cv-02746-JD
MATCH PLAINTIFFS' REPONSES TO DEFENDANTS' INTERROGATORIES

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

| | |
|---|---|
| Hae Sung Nam<br>**KAPLAN FOX & KILSHEIMER LLP**<br>850 Third Avenue, 14th Floor<br>New York, NY 10022<br>hnam@kaplanfox.com<br><br>Karma M. Giulianelli<br>**BARTLIT BECK LLP**<br>1801 Wewetta St., Suite 1200<br>Denver, CO 80202<br>karma.giulianelli@bartlitbeck.com<br><br>*Co-Lead Class Counsel for the Class in In re Google Play Consumer Antitrust Litigation* | Elizabeth Pritzker<br>**PRITZKER LEVINE LLP**<br>1900 Powell Street, Suite 450<br>Emeryville, CA 94608<br>ecp@pritzkerlevine.com<br><br>*Liaison Counsel for the Class in In re Google Play Consumer Antitrust Litigation* |
| Peggy J. Wedgworth<br>**MILBERG PHILLIPS GROSSMAN LLP**<br>One Penn Plaza, Suite 1920<br>New York, New York 10119<br>pwedgworth@milberg.com<br><br>George A. Zelcs<br>**KOREIN TILLERY, LLC**<br>205 North Michigan, Suite 1950<br>Chicago, IL 60601<br>gzelcs@koreintillery.com<br><br>Nanci Eiko Nishimura<br>**COTCHETT PITRE & MCCARTHY LLP**<br>840 Malcolm Road, Suite 200<br>Burlingame, CA 94010<br>nnishimura@cpmlegal.com<br><br>*Interim Steering Committee Members for Plaintiffs and the Proposed Class in In re Google Play Consumer Antitrust Litigation* | Bonny E. Sweeney<br>Samantha J. Stein<br>**HAUSFELD LLP**<br>600 Montgomery Street, Suite 3200<br>San Francisco, CA 94104<br>DevelopersvGoogle@hausfeld.com<br>bsweeney@hausfeld.com<br>sstein@hausfeld.com<br><br>Melinda R. Coolidge (pro hac vice)<br>1700 K Street, NW, Suite 650<br>Washington, DC 20006<br>mcoolidge@hausfeld.com<br><br>Katie R. Beran (pro hac vice<br>325 Chestnut Street, Suite 900<br>Philadelphia, PA 19106<br>kberan@hausfeld.com<br><br>Scott A. Martin (pro hac vice)<br>Irving Scher (pro hac vice)<br>33 Whitehall Street, 14th Floor<br>New York, NY 10004<br>smartin@hausfeld.com<br>ischer@hausfeld.com<br><br>*Counsel for Plaintiff Peekya App Services, Inc. and the Proposed Class in Pure Sweat Basketball, Inc. v. Google LLC, et al.* |

Case Nos. 3:21-md-02981-JD and 3:22-cv-02746-JD
MATCH PLAINTIFFS' REPONSES TO DEFENDANTS' INTERROGATORIES

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Brendan P. Glackin
Fred Norton
David N. Sonnenreich (*pro hac vice*)
Scott R. Ryther (*pro hac vice*)
**UTAH OFFICE OF THE ATTORNEY GENERAL**
160 East 300 South, 5th Floor
P.O. Box 140872
Salt Lake City, UT 84114-0872
bglackin@agutah.gov
fnorton@agutah.gov
dsonnenreich@agutah.gov
sryther@agutah.gov
*Counsel for the State of Utah*

Sarah G. Boyce (*pro hac vice*)
Jonathan Marx (*pro hac vice*)
Jessica V. Sutton (*pro hac vice*)
**NORTH CAROLINA DEPARTMENT OF JUSTICE**
P.O. Box 628
Raleigh, NC 27602
sboyce@ncdoj.gov
jmarx@ncdoj.gov
Jsutton2@ncdoj.gov
*Counsel for the State of North Carolina*

Bryan L. Bloom (*pro hac vice*)
**NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL**
28 Liberty Street
New York, NY 10005
Bryan.Bloom@ag.ny.gov

*Counsel for the State of New York*

S. Ethan Bower (*pro hac vice*)
**TENNESSEE OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 20207
Nashville, TN 37202
Ethan.Bowers@ag.tn.gov

*Counsel for the State of Tennessee*

Brian C. Rocca, S.B #221576
Sujal J. Shah, S.B #215230
Michele Park Chiu, S.B #248421
Minna Lo Naranjo, S.B #259005
Rishi P. Satia, S.B #301958
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001
brian.rocca@morganlewis.com
sujal.shah@morganlewis.com
michelle.chiu@morganlewis.com
minna.naranjo@morganlewis.com
rishi.satia@morganlewis.com

Richard S. Taffet, *pro hac vice*
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue New York,
NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
richard.taffet@morganlewis.com

*Attorneys for Defendants*

Glenn Pomerantz
Kuruvilla Olasa
Emily Curran-Huberty
Kyle Mach
Justin Raphael
Jonathan Kravis
Dane Shikman
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
glenn.pomerantz@mto.com
kuruvilla.olasa@mto.com
emily.curran-huberty@mto.com
kyle.mach@mto.com
justin.raphael@mto.com
jonathan.kravis@mto.com
dane.shikman@mto.com
~PLAY_MTO@mto.com

*Counsel for Defendants Google LLC et al.*

6310275

INCLUDES INFORMATION DESIGNATED HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
AND NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Case 3:20-cv-05671-JD   Document 419-7   Filed 07/14/23   Page 58 of 73

Executed on January 19, 2023, in Los Angeles, California.

_/s/ Tate Harshbarger_
Tate Harshbarger

6310275

# Exhibit C3
# Public Redacted Version

# EXHIBIT 17
## FILED UNDER SEAL

EXECUTABLE

## ANDROID MARKET REVENUE SHARE AGREEMENT

### (ANDROID MARKET for MOBILE OPERATORS)



| | Google Inc. | Google SPD Rep: |
| | 1600 Amphitheatre Parkway | Google SPD Director: |
| | Mountain View, CA 94043 | Google Sales Engineer: |
| | | Google Legal Contact: |

| **COMPANY:** | | | |
| --- | --- | --- | --- |
| | **Company Contact Information:** | **Company Technical Contact:** | **Company Legal Notices to:** |
| **Attention:** | ▇▇▇ | | **Legal Department** |
| **Title:** | V.P.- Planning & Research | | **General Counsel** |
| **Address, City, State, Postal Code, Country:** | ▇▇▇ | | ▇▇▇ |
| **Phone:** | ▇▇▇ | | ▇▇▇ |
| **Fax:** | ▇▇▇ | | ▇▇▇ |
| **Email:** | ▇▇▇ | | |

**Effective Date:** February 1, 2010 (must be start of calendar month)
**Term:** Starting on the Effective Date and continuing through December 31, 2011 (inclusive)
**Renewal Term:** None.

This Android Market Revenue Share Agreement, including all exhibits hereto (collectively referred to as the "**Agreement**"), effective as of the date noted above (the "**Effective Date**"), is made by and between ▇▇▇ for itself and its subsidiaries and Affiliates, a Delaware corporation with offices at the address noted above ("**Company**"), and Google Inc., for itself and its subsidiaries and Affiliates, with offices at the address noted above (which, with its Affiliates, shall be referred to herein as "**Google**"). For purposes of this Agreement, "**Affiliate(s)**" means any current or future company controlling, controlled by or under common control with either party, where "control" shall mean ownership, directly or indirectly, of the shares of a company representing fifty percent (50%) or more of the voting rights in this company.

**1.     Definitions.** The following capitalized terms shall have the meanings set forth below:

**1.1     "Android Market"** means the marketplace Google has created and operates which allows registered Developers in certain countries to distribute Android Products. Authorized Developers will be the merchant of record. Such Developers may and will be able to sell Android products directly to End Users through Android Market on Devices.

**1.2     "Android Market Client"** means the machine-readable binary code of the software application required to access and use the Android Market that is provided by Google to Authorized OEMs in connection with this Agreement, and any modifications or updates thereto that Google may make available to Authorized OEMs hereunder from time to time in its sole discretion.

**1.3     "Android Products"** means Android-based products that can be downloaded by any mobile handset device with access to Android Market.

**1.4     "Authorized OEM"** means a wireless mobile handset device manufacturer that has a license from Google to distribute Android Market Client.

1

**1.5** "**Client ID**" means unique alphanumeric code(s) provided by Google to Company to be used to identify Android Market Client usage on Company Devices and to track valid purchases for payment purposes, as such Client IDs may be modified by Google from time to time in its sole discretion upon reasonable notice to Company.  Google shall not use the Client ID to capture personally identifiable information from any End User of a Device.

**1.6** "**Developer**" means a developer that distributes Android Products on the Android Market.

**1.7** "**Device**" means each wireless mobile handset device(s) sold or otherwise distributed by Company that (a) is purchased from an Authorized OEM, (b) complies with the published Android Compatibility Definition document for the applicable Android platform version which can be found at the Android compatibility website (http://compatibility.android.com) and successfully passes the published Android Compatibility Test Suite (CTS) for the applicable Android platform version, and (c) is pre-loaded by Authorized OEM with Android Market Client.

**1.8** "**End User(s)**" means an end user of a Device.

**1.9** "**Final Embed Date**" means eight (8) weeks prior to the final technical acceptance of the Device.

**1.10** "**Google Mobile Branding Guidelines**" means Google's brand treatment guidelines for mobile in effect from time to time (and any content contained or referenced therein), which are located at http://www.google.com/wssynd/mobile_guidelines.html and http://www.google.com/permissions/guidelines.html (or such other URLs as may be provided by Google from time to time), together with such additional brand treatment guidelines for mobile as Google may make available to Company from time to time.

**1.11** "**GTV**" is the gross transaction value of valid payment transactions settled to an Android Market Developer through Google Checkout (or third party payment processor), subject to adjustment for refunds, chargebacks reversals, or charges similar and related to such refunds, chargebacks or reversals.  GTV is attributed to the initial one-time download of Android Products to Devices by End Users via the Android Market Client, which, for the avoidance of doubt, does not include any revenue generated by the Android Products after downloading, whether payable to Google or a third party.  GTV is limited to payments from Company's End Users purchasing Android Products from Devices, and does not include tax that Google may collect on the Developer's behalf.

**1.12** "**Intellectual Property Rights**" means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, unfair competition law, publicity rights law, privacy rights law, and any and all other proprietary rights, as well as, any and all applications, renewals, extensions, restorations and re-instatements thereof, now or hereafter in force and effect worldwide.

**1.13** "**Net GTV**" means GTV minus seventy percent (70%) of GTV for the applicable developer minus five percent (5%) of GTV for Google's operating and transaction costs. Company will receive twenty-five (25%) of the GTV.

**1.14** "**Service**" means the wireless wide area network communications service owned and/or operated by Company that allows End Users using a Device to access the Internet.

**1.15** "**Territories**" means the country or countries in which distribution and operation of the Android Market Client is permitted as set forth at http://www.google.com/support/androidmarket/bin/answer.py?hl=en&answer=138294, which Google reserves the right to amend from time to time.  Distribution and operation of the Android Market Client, products or services outside of the Territories is prohibited.

**1.16** "**Trademarks**" means the trade names, trademarks, service marks, logos, domain names and other distinctive brand features of each party as owned by such party from time to time.

**2.** **Revenue Share Eligibility**.

**2.1** **Revenue Share Requirements.** Company shall receive Net GTV for Devices if Company has obtained Google's prior written approval based on the terms and conditions of this Agreement, including but not limited to the Google Mobile Branding Guidelines in each individual Territory in effect at the time of Final Embed Date, and the appearance and implementation of Android Market Client as specified in Section 2.  Additionally, where Google specifies a specific version of the Android Market Client to be distributed in a certain Territory, Company shall distribute only such version within such Territory. Company shall have the right to include its own application store (e.g. ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ on any Device.  Company may dictate the location of any Company Application Store on the Device in Company's sole discretion, so long as placement of Android Market on the Device is no less prominent than

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

placement of the Company Application Store.

**2.2     Territories.**  Company understands and agrees that it shall not Actively Promote, and shall use its best efforts to prevent any third party (including its affiliates, resellers, distributors and OEMs) from Actively Promoting, Android Market Client or any Google services except in those Territories in which Android Market Client or services are expressly authorized by Google in this Agreement.  For purposes of this Agreement, "**Actively Promote**" or "**Actively Promoting**" means the proactive promotion of the Android Market Client on any Device as a key value proposition of the Device, including point of sale promotion, media advertising, and general consumer-focused promotion of Android Market Client or Google services on any Device.

**2.3     Restrictions**.  Company shall not, and shall not allow any third party to: (a) disassemble, de-compile or otherwise reverse engineer Android Market Client or otherwise attempt to learn the source code or algorithms underlying Android Market Client; (b) create derivative works from or based on Android Market Client; (c) except as expressly set forth in this Agreement, provide, sell, license, distribute, lease, lend, or disclose Android Market Client to any third party; (d) use Android Market Client for timeshare, service bureau, or other unauthorized purposes; (e) exceed the scope of any license granted to Company hereunder; (f) ship, divert, transship, transfer, export or re-export Android Market Client, or any component thereof, into any country or use it in any manner prohibited by any export control laws, restrictions, or regulations administered by the U.S. Commerce Department's Bureau of Export Administration, the U.S. Department of Treasury's Office of Foreign Assets Control or any other applicable government agency; (g) preload, install or launch Android Market Client (or otherwise act or fail to act) such that an End User is denied the opportunity to review and accept (or reject) the relevant Android Market terms of service; or (h) use any portions of the Android Market Client or information gained from Android Market Client, or from Google, to assist or encourage any third parties to use Android Market Client on devices other than Devices.  For purposes of clarity, Company will only use Android Market Client on Devices.

**2.4     Form of Android Market Offering**.  During the Term, upon Google's approval which shall not be unreasonably withheld, Company shall make the Android Market Client available to End Users on the Device as described in this Agreement.  The form of any such offering on any particular Device shall be as set forth in this Agreement, and shall adhere to the Google Mobile Branding Guidelines in place at the time of Final Embed Date of such Device. Additionally, Company shall provide information, equipment and/or assistance that are commercially reasonably necessary to allow Google to deliver the Android Market Client and make the Android Market Client (including over-the-air updates thereto) available on Devices operating on the Service. Company shall not, and shall not allow any third party to: (i) serve or otherwise place any advertisements during the launch process of the Android Market Client; or (ii) offer, download or install, or allow any third party to offer, download or install, any additional products during the launch process of the Android Market Client.

**2.5     Test Devices.** Company will ensure that the Authorized OEM will, subject to appropriate confidentiality agreements, deliver to Google no less than two (2) Devices representative of Devices used by End Users for Google's approval.  Google may use such Devices to test the operation and presentation of relevant Google products, services and sites.  If at any time the Devices provided hereunder are no longer capable of displaying the current implementation of relevant Google products, services or sites, Company will ensure that the Authorized OEM provide Google with replacement Devices as required

**2.6     Open Devices**. The parties will create an open environment for Devices by making Android Market and Android Application Programming Interfaces available and open on Devices.  In the event that Company limits or restricts access to Android Market and Android Application Programming Interfaces, then Google shall have the right to escalate the issue, including, if necessary, to the Chief Executive Officers of the respective companies. If the escalation fails to resolve this issue to Google's satisfaction, Google may terminate this Agreement pursuant to Section 6.2(c) (Early Termination Provision).

**2.7     Testing.** Google may, from time to time, request that Company conduct certain reasonable testing by providing Company with Android-based applications and tests to run on Devices (which may represent families of Devices) on which such applications will be loaded to assure the operation and presentation of such application.  If mutually agreed at the time of request by Google, Company will load such applications on Devices and run such test in a reasonable manner to help assess the operation and presentation of such applications and provide the test results to Google.

**2.8     Open Internet Access.**  Company will use commercially reasonable efforts to ensure that End Users, Android Market Client, and all Android Products downloaded from Android Market have access to the Internet through the Service consistent with Company's Terms of Service with its End Users and Company's reasonable discretion in managing its Network and supporting Service to its End Users.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

In the event that Google believes Company's efforts to manage its Network and supporting Service have intentionally blocked or degraded the Android Market or any Android Market Product in preference for any third party service provider, then Google shall have the right to escalate the issue including, if necessary, to the Chief Executive Officers of the respective companies.  If the escalation fails to resolve this issue to Google's satisfaction, Google may terminate this Agreement pursuant to Section 6.2(c) (Early Termination).   For the avoidance of doubt, Company's actions to the extent reasonably necessary to manage its network, enforce its terms of service, or offer different classes or quality of service shall not be considered intentional blocking or degradation.

**2.9     Over-the-Air Updates**.  Google may auto-update Android Market Client and related Android Market software over-the-air at Google's discretion.  However, if such auto update exceeds five (5) MB in file size, the parties will mutually agree as to the means and methods for the distribution of such auto-update.  .

**2.10     Data Collection and Reporting**.  Each party's applicable privacy and security policies shall apply with respect to the user information collected by it. The parties will provide each other reasonable aggregate information about usage of the Devices and Android Market during the Term, in order to help each party improve End User's experience with the Device, consistent with each party's privacy policies. Such information will not involve any personal information.

   2.10.1  If Google materially changes the Google Privacy Policy or the manner in which End Users are given notice of such policy in effect on the Effective Date in a way reasonably deemed by ▮▮▮ to be materially inconsistent with its privacy policy or its notice provisions, ▮▮▮ may terminate this Agreement pursuant to Section 6.2(c) (Early Termination).

**2.11     Points of Contact**.  Company and Google shall each appoint a partner manager (the "**Partner Manager**") who shall be the point of contact for all business and operational activities associated with Android Market and shall notify the other of the name and contact details for such Partner Manager (name and contact information subject to change, upon notice, from time to time).

**2.12     Android Compatibility**.  Company must obtain proof of compatibility from Authorized OEM before Company distributes Devices.  Google will not unreasonably withhold proof of compatibility if a device successfully passes the published CTS for the applicable Android platform version.  For the avoidance of doubt, the parties agree that the published version of CTS as of the Effective Date of this Agreement is an acceptable version of the published CTS for the Android platform version 1.6 and compliance with it shall constitute compliance with this Agreement for devices on Android Platform version 1.6.

**2.13     Client ID**.  Company must ensure that the appropriate Client ID as provided by Google is included on the Devices prior to distribution of the Devices.

**2.14     Support**.  Company will act as the primary and direct contact with the End User for all Android Market service issues and will request support from Google, if necessary.  Google will provide End User support for Android Market as is made generally available to users of Android Market.  For issues related to Android Products Company will direct End Users to the applicable Android Product developer for all Android Product-related support.  Company will provide support services to End Users for Company's data services at its own expense.

**2.15     Carrier Channel**.  By execution of this Agreement, Google will enable Company to promote applications via a Carrier Channel as provided for and defined in Exhibit B.

**2.16     Problematic Android Products.**  In the event an Android Product obtained through Android Market causes network harm (as reasonably defined by Company), violates Google's Developer Distribution Agreement, violates Company's Terms of Service, or violates Google's Content Policy, pursuant to a mutually agreed process Company shall notify Google and Google shall promptly review such incident(s) and communicate to Company about such review and its findings.  The parties will work together (if necessary, along with the Developer of such Android Product) to pinpoint and resolve any issues and will mutually agree on a planned course of action that may include removal of the ability to download an Android Product through Android Market on Company's Service ("Takedown") or removal by Google of an Android Product downloaded from Android Market from an End User's Device on the Service ("Revocation").  If Company and Google cannot come to an agreement on a proposed course of action, then Company shall have the right to immediately escalate the issue including, if necessary, to the Chief Executive Officers of the respective companies.  If the escalation fails to resolve the issue to Company's satisfaction within five (5) business days, Company may terminate this Agreement pursuant to 6.2(c) (Early Termination) and/or Company may limit network functionality to ensure that such Android Product does not harm Company's End Users or Company's network. Any such action undertaken by Company pursuant to this Section shall not constitute a violation or breach of

any term of this Agreement.

**2.17    Android Product File Size.**  The Parties shall use commercially reasonable efforts to implement within twelve (12) months of the Effective Date a solution to limit or manage the download of Android Market Products over Company's Service that are greater than ten (10) MB in file size.

**3.    Reports**.  The parties shall provide the following reports to one another as specified.  Each report set forth below shall be provided in sufficient detail to support the financial information contained therein.  Each report provided herein will be deemed final and binding unless Google or Company, as applicable, provides notice of its specific objections thereto to the other Party within one (1) year of the date on which such report was delivered.

**3.1    Company Reports**

(a)    Company must provide reports that prove Android Market Client is compatible with the Service.

(b)    Within fifteen (15) days of the end of each calendar month during the Term, Company shall provide the total number of Devices distributed with a preloaded version of Android Market Client during such calendar month (by country and Device model within each country).

**3.2    Google Reports.** Within fifteen (15) days of the end of each calendar month during the Term, Google shall provide Company, without undue delay and on a monthly basis in relation to the Android Market: the GTV, refund amounts, chargebacks, one-off adjustments (manual debit or credit for a transaction), and number of Android Products sold, grouped by price point ranges.  If Google makes a report(s) generally available to other carriers, including but not limited to report(s) on (1) network traffic or network usage by Android Products; (2) capabilities of Android Products; (3) end user usage of Android Market and Android Products; or (4) the total downloads from Android Market, including all premium and free downloads, regardless of payment method, Google will also make such report(s) available to Company.

In addition, Google and Company shall agree, within sixty (60) days of the Effective Date, on a common issue tracking tool that can be viewed by incident response teams at both companies.

**4.    Payments**.

4.1    Google will select a payment processor to pay Company Net GTV.  Google reserves the right to change the payment processor or add new payment processors at any time.  Google shall provide Company with reasonable notice of any change and in any event in sufficient time for Company to make any operational changes if required.  If the selected payment processors have specific requirements in order to pay Company Net GTV, such requirements will be listed in the attached Exhibit A, which Google reserves the right to change from time to time.  Google will provide Company written notice of any such changes in sufficient time for Company to make any operational changes if required.

4.2    For each calendar quarter during the Term, for sales of content and applications via the Android Market Client Google shall pay Company Net GTV on at least a quarterly basis and in the currencies as notified to Company by Google.  Payments made to Company by Google under this Agreement will be made no later than the last day of the month following the calendar quarter in which the applicable revenue was generated.

4.3    In addition to other rights and remedies Google may have, Google may offset any payment obligations to Company that Google may incur under this Agreement against any product or service fees owed to Google and not yet paid by Company under this Agreement.  Google may also withhold and offset against its payment obligations under this Agreement, or require Company to pay to Google within thirty (30) days of any invoice, any amounts Google may have overpaid to Company in prior periods under this Agreement.  The party receiving payment will be responsible for any bank charges assessed by the recipient's bank.

4.4    The Parties agree to negotiate a Carrier Billing Addendum to this Agreement within thirty (30) days of the Effective Date.

4.5    The parties agree to negotiate on revenue share for future billing models including monthly recurring billing models from Android Market if and when such billing models are enabled on Android Market.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**5.      Taxes and Other Charges**.

5.1      When specified by the Developer, Google will collect on Developer's behalf, and Developer will pay, any applicable, indirect taxes, including sales and value-added taxes, excise, customs fees, import duties or stamp duties or other taxes and duties imposed by governmental entities of whatever kind and imposed with respect to the transactions under this Agreement.  Net GTV shall be paid by Google exclusive of any applicable taxes.

5.2      All payments under this Agreement are exclusive of taxes imposed by any governmental entity.  Company is responsible for any taxes in connection with payments made by Google to Company other than any VAT that is recoverable by Google.  If Google is legally required to withhold taxes from its payments to Company and remit such taxes to the local taxing jurisdiction, then Google shall pay to the Company the remaining net amount after the taxes have been withheld.  Google shall promptly provide Company a copy of an official tax receipt or other appropriate evidence of any taxes imposed on payments made under this Agreement.  When Company has the legal obligation to collect any applicable taxes, the appropriate amount shall be invoiced to and paid by Google unless Google provides Company with a valid tax exemption certificate authorized by the appropriate taxing authority.

**6.      Term and Termination**.

**6.1      Term**.  The term of this Agreement will be the "Term" set forth on the cover page of this Agreement, unless earlier terminated as provided in this Agreement.

**6.2      Termination**.

(a) Either party may suspend performance or terminate this Agreement if (i) the other party is in material breach of the Agreement and fails to cure that breach within thirty (30) days after written notice; or (ii) the other party ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within ninety (90) days.

(b) Notwithstanding the foregoing, either party may terminate this Agreement immediately upon written notice upon a breach of Section 2.1 (Revenue Share Eligibility), Section 2.3 (Restrictions), Section 7 (Confidentiality) or Section 8 (Trademarks), or as set forth in Section 12.4 (Change of Control).

(c)      Notwithstanding anything in Sections 6.2(a) or 6.2(b), Company may terminate this Agreement immediately upon written notice as specified by Sections 2.10.1 (Privacy Policy), 2.16 (Problematic Android Products), and Sections 9.1(a)-(c) (Breach of Representations and Warranties), 11.4 (Third Party Application Indemnification) without any claim by Google of breach or other violation or penalty.  Google may terminate this Agreement immediately upon written notice as specified in Section 2.6 (Open Devices) or Section 2.8 (Open Internet Access) without any claim by Company of breach or other violation or penalty.

(d) Notwithstanding anything to the contrary, in the event that the government or controlling body of any country or territory in which Android Market Client is distributed or made available imposes any law, restriction or regulation that makes it illegal to distribute or make available Android Market Client, or any portion thereof, into such country or territory, or if any such law, restriction or regulation places a substantial burden on Google, where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment (such substantial burden, a "**Substantial Burden**") then Google shall have the right to suspend the distribution and/or availability of Android Market Client in such country or territory until such time as such law, restriction or regulation is repealed or nullified or modified such that there is no longer illegal or a Substantial Burden, as applicable, for Android Market Client to be distributed or made available in such country or territory ("**Special Suspension**").  In the event that the government or controlling body of any country or territory in which Company provides the Service imposes any law, restriction or regulation that makes it illegal to distribute or make available the Service, or if any such law, restriction or regulation places a substantial burden on Company, where substantial is measured with respect to Company's economic benefit under this Agreement, as determined by Company in its reasonable and good faith judgment (such substantial burden, a "Company Substantial Burden") then Company shall have the right to modify or, if necessary, terminate, this Agreement.

**6.3      Effect of Termination**.  Upon expiration or termination of this Agreement: (a) all rights and licenses granted hereunder shall immediately cease, except as otherwise specified herein; (b) Company may distribute new models of Devices but such new Devices will not be eligible for Net GTV; and (c) each Party shall upon request of the other Party return or destroy (and a duly appointed officer shall certify to such destruction) all copies of Confidential Information in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY4-006402395

its possession which it is aware and to which it has access and is reasonably able to destroy or delete (which, for the avoidance of doubt, does not include archived back up copies which are not in live working use and which are no longer easily accessible or retrievable), including from all hard disks and memory.  Neither party shall be liable to the other for any damages resulting solely from termination (as opposed to breach of this Agreement for which damages may apply as set forth in this Agreement) of this Agreement as permitted for under this Agreement.

**6.4     Ramp-Down**.  For a period of eighteen (18) months following expiration or termination of this Agreement ("**Ramp-Down Period**"), Company may continue to distribute all models of Devices being distributed as at the date of termination that have been approved by Google and that contain Android Market Client ("**Inventory**") in accordance with the terms and conditions of this Agreement, and Company shall have the right to use the Google Trademarks in accordance with this Agreement in connection with such Inventory.  Both Parties shall comply with all provisions of this Agreement during the Ramp-Down Period, including, but not limited to, Google's obligation to pay Company Net GTV.  Company must make available and maintain Android Market Client for End Users during the Ramp-Down Period, including existing End Users.  Google will provide access to Android Market and Android Market Client for Company End Users in the same manner as provided by Google generally during the Ramp-Down Period.  During the Ramp-Down Period, Google will pay Company in accordance with Section 4.2.  After the Ramp-Down Period, Company is obligated to pay Google refunds, chargebacks and reversals related to transactions during the Ramp-Down Period for six (6) months after the Ramp-Down Period.  The Parties may cease the Ramp-Down Period at any time upon mutual agreement.

6.4.1    At any time during the Ramp-Down Period, Company may choose to forego Net GTV.

**6.5     Survival**.  The provisions of Sections 1 (Definitions), 2.3 (Restrictions), 2.16 (Problematic Android Products), 6.3 (Effect of Termination), 6.4 (Ramp-Down), 6.5 (Survival), 7.1 (Confidentiality), 8.4 (Proprietary Rights), 9.2 (Disclaimer), 10 (Limitation of Liability), 11.1-11.4 (Indemnification) and 12 (Miscellaneous) shall survive expiration or termination of this Agreement.

**7.       Confidentiality and PR**.

**7.1     Confidentiality**.  (a) Definition.  "**Confidential Information**" is information disclosed by one party to the other party under this Agreement that is marked as confidential or would normally under the circumstances be considered confidential information of the disclosing party.  Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another party.  (b) Confidentiality Obligations.  The recipient will not disclose the Confidential Information, except to affiliates, employees, and agents who need to know it and who have agreed in writing to keep it confidential.  The recipient, its affiliates, employees, and agents may use Confidential Information only to exercise rights and fulfill obligations under this Agreement, while using reasonable care to protect it.  The recipient may also disclose Confidential Information when required by law after giving reasonable notice to discloser.

**7.2     Publicity**.  Neither party may make any public statement regarding the relationship contemplated by this Agreement without the other's prior written approval.

**8.       Trademarks**.

**8.1     General**.  Each party shall own all right, title and interest, including without limitation all Intellectual Property Rights, relating to its Trademarks.  Some, but not all examples of Google Trademarks are located at: http://www.google.com/permissions/trademarks.html (or such other URLs Google may provide from time to time).  Except to the limited extent expressly provided in this Agreement, neither party grants, and the other party shall not acquire, any right, title or interest (including, without limitation, any implied license) in or to any Trademarks of the other party; and all rights not expressly granted herein are deemed withheld.  Further, Google does not grant, and Company shall not acquire, any right, title or interest (including, without limitation, any implied license) in or to any trademarks of Android Market developers.  All use by Google of Company Trademarks (including any goodwill associated therewith) shall inure to the benefit of Company and all use by Company of Google Trademarks (including any goodwill associated therewith) shall inure to the benefit of Google.  No party shall challenge or assist others to challenge the Trademarks of the other party (except to protect such party's rights with respect to its own Trademarks) or the registration thereof by the other party, nor shall either party attempt to register any Trademarks or domain names that are confusingly similar to those of the other party.

**8.2     License to Google Trademarks**.  Subject to Google's written approval prior to each use of a Google

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY4-006402396

Trademark and to the terms and conditions of this Agreement, Google grants to Company a limited, nonexclusive and non-sublicensable license during the Term to display those Google Trademarks expressly authorized for use in this Agreement, solely for the purposes expressly set forth herein.  Notwithstanding anything to the contrary, Google may revoke the license granted herein to use Google's Trademarks upon providing Company with written notice thereof and a reasonable period of time to cease such usage.  Furthermore, in its use of any Google Trademarks, Company agrees to adhere to the Google Mobile Branding Guidelines.

Company shall not, and shall not allow any third party to, produce any consumer packaging or materials for the Device that identifies or suggests that Google is the manufacturer of the Device. In this regard, Company shall ensure that any Device packaging or user guide produced by the Company identifies Authorized OEM as the manufacturer of the Device and provides contact details in the applicable Territories in which the Device is distributed.

**8.3     License to Company Trademarks.**  Subject to Company's written approval prior to each use of a Company Trademark and to the terms and conditions of this Agreement, Company grants to Google a limited, nonexclusive and non-sublicensable license during the Term to display a Company Trademark expressly authorized for use in this Agreement, solely for the purposes expressly set forth herein.  Notwithstanding anything to the contrary, Company may revoke the license granted herein to use Company's Trademarks upon providing Google with written notice thereof and a reasonable period of time to cease such usage.  Furthermore, in its use of any Company Trademark, Google agrees to adhere to any supplied Company Branding Guidelines.

**8.4     Proprietary Rights**.  (a) Company acknowledges that, as between the parties, Google (and/or its licensors) retains all their right, title and interest, including without limitation all their rights in copyrights, trademarks, trade secrets, patents and know-how, in and to Android Market Client and the Google Trademarks.  Google does not grant, assign or license Company  any rights in the foregoing except  as expressly granted by this Agreement.  This Agreement does not grant Company a right to restrict Google from selling, licensing, modifying, or otherwise distributing Android Market Client and/or the Google Trademarks to any third party.  (b) Google acknowledges that, as between the parties, Company (and/or its licensors) retains all their right, title and interest, including without limitation all their rights in copyrights, trademarks, trade secrets, patents and know-how, in and to the Service and the Company Trademarks.  Google has, and shall acquire, no rights in the foregoing except those expressly granted by this Agreement.  This Agreement does not grant Google any right to restrict Company  from selling, licensing, modifying, or otherwise distributing the Service and/or the Company Trademarks to any third party.  In addition, Company grants Google no right, title, or interest in or to any of Company's Intellectual Property Rights (including, without limitation, copyright, patent, trade secret, or know how) or any materials or information disclosed to Google, nor grants Google any license thereto.

**9.     Representations, Warranties and Disclaimer**.

**9.1     Representations and Warranties**.  Each party represents and warrants to the other that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its affiliates are a party or violate any rights of any third parties arising therefrom. Company represents and warrants that it has and will maintain throughout the Term all rights, authorizations and licenses that are required with respect to the Service, and that the Service, and its  distribution, sale and license, does and shall continue to comply with all applicable federal, state, and local laws, rules and regulations.

(a) Google represents and warrants that it will take commercially reasonable steps to ensure that the Google Content Guidelines remain consistent with generally acceptable industry standard guidelines (e.g. MMA Consumer Best Practices Guidelines for Mobile Content Services), and the parties agree that the Google Content Guidelines are consistent with such industry standard guidelines as of the Effective Date of this Agreement.

(b)      Google represents and warrants that it will take commercially reasonable steps to ensure that the Android Market Developer Distribution Agreement (or any successor agreement between Google and an Application Developer) will not materially change with regard to the following for the Term of this Agreement: (i) protection of End User privacy through use of Products and (ii) prohibited Developer actions with regard to the Products.

(c) Google represents and warrants that it will not materially change the provisions in the Android Market

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

EXECUTABLE

Developer Distribution Agreement (or any successor agreement between Google and an Application Developer), regarding Product takedowns or revocation by Google for all of the grounds set forth in the Developer Agreement on the Effective Date including, but not limited to, the creation of liability for Authorized Carriers or an act that has an adverse impact on an Authorized Carrier's network for the Term of the Agreement.

In the event of an alleged breach of Subsections 9.1(a) through (c) above, the parties agree that Company's sole remedy is termination of this Agreement pursuant to Section 6.2(c) (Early Termination).

**9.2     Disclaimer**.  OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 9.1, ANDROID MARKET CLIENT AND THE ANDROID PLATFORM ARE PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND AND GOOGLE EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.  GOOGLE DOES NOT WARRANT THAT ANDROID MARKET CLIENT AND/OR ANY OTHER GOOGLE PRODUCTS OR SERVICES PROVIDED HEREUNDER WILL MEET ALL OF COMPANY'S REQUIREMENTS OR THAT PERFORMANCE OF SUCH SERVICES WILL BE UNINTERRUPTED, VIRUS-FREE, SECURE OR ERROR-FREE.  OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 9.1, COMPANY MAKES NO WARRANTY OF ANY KIND TO GOOGLE WITH RESPECT TO THE DEVICES OR THE SERVICE, AND EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. COMPANY SUPPLIES A SERVICE, NOT GOODS. ■■■ DOES NOT GUARANTEE GOOGLE OR ANY END USER UNINTERRUPTED SERVICE.  THE SERVICE IS NOT GUARANTEED AGAINST HACKERS, VIRUSES, OR INTERCEPTORS AND COMPANY HAS NO RESPONSIBILITY TO GOOGLE OR END USERS FOR LACK OF SECURITY.

**10.     Limitation of Liability**.

**10.1     Limitations**.  Subject to Section 10.2: (a) Limitation on Indirect Liability. NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR ANY DAMAGES OTHER THAN DIRECT DAMAGES,  EVEN IF THE PARTY IS AWARE OR SHOULD KNOW THAT SUCH DAMAGES ARE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY.  (b) Limitation on Amount of Liability.  NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR MORE THAN THE GREATER OF TWELVE MONTHS OF NET GTV TO ■■■ FROM ANDROID MARKET OR ONE HUNDRED THOUSAND U.S. DOLLARS ($100,000.00 USD).

**10.2     Exceptions to Limitations.**  These limitations of liability do not apply to: (a) breaches of confidentiality obligations, violations of Intellectual Property Rights (including without limitation a breach of the license to use Trademarks under Section 8), or indemnification obligations.

**10.3     Allocation of Risk**.  The parties agree that (a) the mutual agreements made in this Section 10 reflect a reasonable allocation of risk, and (b) that each party would not enter into the Agreement without these limitations on liability.

**11.     Indemnification and Financial Reporting**.

**11.1     By Google**.  Google will defend, indemnify and hold harmless Company and its directors, officers and employees against all losses, costs, and damages (including reasonable attorneys' fees and expenses) from  any third party lawsuit or proceeding brought against Company based upon or otherwise arising out of: (a) any breach or claimed breach of the first sentence of Section 9.1; (b) any claim that Android Market Client, Android Market (excluding third-party content), or the combination of either with the Service, or Google Trademarks infringe any U.S. Patent, copyright, trade secret or trademark of such third party; or (c) Google's improper or unauthorized marketing about Company, including claims based on misrepresentations about Company made by Google.  Notwithstanding the foregoing, in no event shall Google have any obligations or liability under this Section 11.1 arising from: (i) modifications of Android Market Client or the Google Trademarks by any party other than Google, but, with regard to an infringement claim under Section 11.1(b) only if and to the extent that absent such modifications, such claim would be avoided; and (ii) unauthorized combination of Android Market Client or the Google Trademarks with any other software or products or any other materials.  Google, in its sole and reasonable discretion, reserves the right to terminate Company's continued distribution of or access to Android Market Client or the Google Trademarks which are alleged or believed by Google to infringe the rights of a third party.  Google shall have no obligations under this Section 11.1 regarding the Android platform or any third party products distributed through the Android Market.

9

EXECUTABLE

**11.2     By Company**.  Company will defend, any third party lawsuit or proceeding brought against Google based upon or otherwise arising out of: (a) any breach or claimed breach of the first two sentences of Section 9.1; (b) Company's improper or unauthorized marketing about Android Market, including claims based on misrepresentations about Android Market by Company; (c) ███████ explicit direction to block End User access to Google Terms of Service;  or (d) any claim that any Company Trademark infringes any copyright, trade secret or trademark of a third party.    Notwithstanding the foregoing, in no event shall Company have any obligations or liability under this Section 11.2 arising from: (i) modifications of Company Trademarks by any party other than Company; and (ii) unauthorized combination of Company Trademarks with any other software or products or any other materials.  Company, in its sole and reasonable discretion, reserves the right to terminate distribution of or access to Android Market Client or the Company Trademarks which are alleged or believed by Company to infringe the rights of a third party.  Company shall have no obligations under this Section 11.2 regarding the Service, the Android platform or any third party products distributed through the Android Market.

**11.3     Conditions of Indemnification**.  The party seeking indemnification must .promptly notify the other party of the claim and cooperate with the other party in defending the claim.  The indemnifying party has full control and authority over the defense, but the other party may join in the defense with its own counsel at its own expense provided that the indemnifying party represents and warrants that it will not, after assuming control of the defense, seek to avoid its indemnification obligations.

**11.4     Third-party Application Indemnification.**  Within twenty-two (22) days of the Effective Date, Google shall communicate to Company its decision of whether or not to update its Developer Distribution Agreement ("DDA") (or successor agreement between Google and developers) to include an indemnification of Company by Developer(s) for all claims arising out of the Developer's Android Product made available through Android Market and when such update, if any, would occur.  If Google decides at that time not to update the DDA, Company shall have the option to terminate this Agreement pursuant to Section 6.2 (Early Termination Provision).

**11.5     SAS 70 Reporting.**

Statement of Auditing Standards No. 70 ("SAS 70") Report.  Once available and upon written request during the Term, Google will make available to Company a SAS70 report from a reputable, independent certified public accounting firm covering the key controls and validation mechanisms in place to meet the revenue reporting and payment obligations under this Agreement relating to the services for which Google has obtained a SAS70 report within 30 days of Company's written request for such report.  If such SAS70 report fails to resolve Company's concerns or questions about Google's revenue reporting and payment obligations under this Agreement, then Company will provide written notice to Google specifying such concerns and will work with Google's Finance organization to resolve such issues.

**12.     Miscellaneous**

**12.1     Notices**.  All notices must be in writing and addressed to the attention of the other party's Legal Department and primary point of contact.  Notice will be deemed given (a) when verified by written receipt if sent by personal courier, overnight courier, or mail; or (b) when verified by automated receipt or electronic logs if sent by facsimile or email.

**12.2     Force Majeure**.  Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.

**12.3     Assignment**. Neither party may assign or transfer any part of this Agreement without the written consent of the other party, except to an affiliate but only if (a) the assignee agrees in writing to be bound by the terms of this Agreement and (b) the assigning party remains liable for obligations under the Agreement.  Any other attempt to transfer or assign is void.

**12.4     Change of Control**.  Upon a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction), (a) the party experiencing the change of control will provide written notice to the other party within 30 days after the change of control, and (b) the other party may immediately terminate this Agreement any time between the change of control and 30 days after it receives the written notice in subsection (a) of this Section 12.4.

**12.5     No Waiver; Severability; No Agency; No Third-Party Beneficiaries**.  Failure to enforce any provision will not constitute a waiver.  If any provision is found unenforceable, it and any related provisions will be interpreted to best accomplish the unenforceable provision's essential purpose.  The parties are independent contractors, and this

10

GOOG-PLAY4-006402399

EXECUTABLE

Agreement does not create an agency, partnership or joint venture.  There are no third-party beneficiaries to this Agreement.

**12.6     Controlling Law**. This Agreement, and all matters arising out of or relating to this Agreement, shall be governed by the laws of the State of New York.  Any legal action or proceeding relating to this Agreement shall be instituted in a state or federal court in New York.  Google and Company agree to submit to the jurisdiction of, and agree that venue is proper in, these courts in any such legal action or proceeding. Nothing in this Agreement will limit either party's ability to seek equitable relief.

**12.7     Entire Agreement; Amendments; Counterparts**.  This Agreement is the parties' entire agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject.  Any amendment must be in writing and expressly state that it is amending this Agreement.   The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

**IN WITNESS WHEREOF**, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

COMPANY:

GOOGLE INC.

By _____

Name    A. Rubin

Title     VP

Date    1|5|10

1/5/10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY4-006402400

**EXHIBIT A**

**Google Checkout-Specific Payment Terms**

1.  Except as set forth in Section 4 of the Agreement, Company and Google shall each retain any and all revenue generated from provision of their respective products or services.  For the sake of clarity, except as expressly set forth in this Agreement, neither party shall be required to account to the other or otherwise make any payment to the other regarding the Android Market Client or any revenue generated therefrom.

2.  In order to comply with applicable law and regulations, Google operates multiple local Affiliates to process transactions.  Developers who sell Android Products may enter contracts with these Affiliates and payments from Google to Company may be made by one or more of these Google Affiliates (for example, Google Payment Limited in the United Kingdom).

3.  For payment and tax purposes, Company must provide information including, but not be limited to, Bank account number, Bank account address, Bank account ABA/Routing/SWIFT Number, Beneficiary name, and Company Tax ID Number. Failure to provide this information in a timely fashion will result in delays of any payments due.  Company will not receive Net GTV for any transactions prior to Google's receipt of the above information.  Company must ensure that its bank account is set up to receive multiple currencies.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY4-006402401

EXECUTABLE

**Exhibit B**

**Carrier Channel**

Google will enable Company to promote up to one hundred (100) software applications that are Android Products comprised of the following three (3) categories (the "**Carrier Channel**").

**1.      Strategic Applications (Up to 25)**

a.    "**Strategic Applications**" are applications owned and uploaded by Company.  They must be published under Company's name.  Products in this category must relate directly to Company's core network and product offerings including, but not limited to, Billing Account Manager, SMS counter, Wifi Hotspot application, Network address book or special dialing application.  Applications or Games created for Company by third party Developers with functions and capabilities that are largely similar to other titles that are currently available in Android Market for all users are not qualified to be classified as "**Strategic Applications**".  Google reserves the right to review applications that are being promoted in this category and take down applications that do not meet the definition of Strategic Applications.

b.      Strategic     Applications     have     no     maximum     time     limit     for     inclusion     in     the     Carrier     Channel.

**2.      Promotional Applications (Up to 25)**

a.    "**Promotional Applications**" are "new" applications that are created by Developers for exclusive inclusion in the Carrier Channel (in a single country) for a period of time of up to 90 days (the "**Promotional Period**").  New Application Exemption:  Any existing paid application may qualify as a Promotional Application for the Carrier Channel if it is offered for free during the Promotional Period (even if it is identical in name or functionality as long as the paid version of the identical application is left in the Android Market general population.  A derivative of an existing application with a new name may be included in the Carrier Channel as a Promotional Application as long as the original application on which the derivative is based is left in the Android Market general population.  Google reserves the right to remove a Promotional Application if the developer of that application removes the "original" application from the Market at any time prior to or during the Promotional Period.

b.    When Company activates a Promotional Application that has been uploaded by the Developer, the application will be promoted on the Carrier Channel during the Promotional Period for up to a maximum of 90 days.

c.    Promotional Applications cannot be included in the Carrier Channel more than once, even if the application was promoted for less than the maximum-allowed Promotional Period.

**3.      Non Exclusive Applications (Up to 100)**

a.    "**Non-Exclusive Applications**" are applications that have previously been loaded by third-party developers in the Android Market.

b.    Company may "tag" any Non-Exclusive Application for inclusion in the Carrier Channel with up to the 100 maximum allowed.

c.    The maximum number of Non Exclusives Apps shown in the Carrier Channel is determined by subtracting the number of Promotional Applications and the number of Strategic Applications from the number 100.  For example, if Company had 20 Promo Applications and 20 Strategic Applications, it would be able to tag a total of 60 Non Exclusive apps for inclusion in its channel (100 - 20 - 20 = 60).

**Presentation of Applications in the Carrier Channel**

1.    Android Products promoted on the Carrier Channel will be presented in the same manner as the general Android Market population.

2.    The Carrier Channel will be presented to End Users of Carrier's Devices with access to the Service.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY4-006402402