Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc. in Epic Games, Inc. v. Google LLC et al.*

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC, et al.*

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD<br><br>*Match Group, LLC et al. v. Google LLC et al.*, Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD<br><br>**TRIAL BRIEF OF EPIC GAMES, INC. AND THE MATCH PLAINTIFFS**<br><br>Judge: Hon. James Donato |

Google is a monopolist. It has maintained durable monopolies in the markets for Android App Distribution and Android In-App Payment Solutions for Digital Goods and Services for over a decade, not by competing on the merits, but by paying off its rivals and using its monopoly power and vast resources to snuff out all competition. Google unlawfully restrains trade through a web of secretive, anticompetitive agreements with original equipment manufacturers ("OEMs"), wireless network operators, and app developers. And it further prevents competition by imposing artificial technical restraints on the distribution of Android apps and competing app stores and flatly prohibiting competition from other in-app payment solutions for "digital content". Indeed, in the few years since these lawsuits were filed, Google flexed its monopoly power by raising prices for many developers, including Match and Epic's Bandcamp, through a change to its payments policy. Through this conduct, which is described more fully below, Google extracts billions in monopoly profits and suppresses innovation and choice in multiple markets. Plaintiffs brought these lawsuits to end Google's ongoing anticompetitive practices.

Plaintiffs will prove at trial that Google's unlawful conduct causes widespread harm to Android developers and consumers, including supracompetitive prices and a reduction in the output and quality of app distribution and in-app payment services. Google's unlawful conduct includes the following:

- Agreements with OEMs that prohibit nearly all major OEMs from preinstalling competing app stores on their devices, ensure that the Google Play Store is preinstalled on the home screen of virtually all Android devices, and impede developers' ability to distribute Android apps (including other app stores) directly to users.

- Agreements with competitors and "agitators" through "Project Hug", whereby Google paid over $1 billion to dozens of major developers, including to secure agreement from Activision Blizzard, Riot Games and Supercell not to launch competing Android app stores.

- Agreements with app developers, whereby Google uses its market power over Android app distribution to tie Google Play Billing ("GPB")—its in-app payment solution for "digital goods and services"—to the Google Play Store, thereby forcing developers selling "digital goods and services" to pay Google a supracompetitive fee of up to 30% on all in-app sales of digital content, and preventing developers from communicating to their consumers other ways of making purchases and obtaining lower prices outside the app.

- Arbitrary technical restraints making it commercially unviable for developers to distribute Android apps directly to users, including pretextual security warnings and requirements that users modify device settings to download apps outside the Google Play Store.

As a result of its anticompetitive acts, Google faces no meaningful competition or threat of competition. Its share of the relevant markets has exceeded 85% for years and years. Due to Google's contractual and technological restraints, the only effective way for developers to distribute their apps to the more than three billion Android users on their smartphones is through the Google Play Store.

To make matters worse, Google engaged in a multi-year campaign to conceal its conduct and deprive Plaintiffs and this Court of relevant evidence. Indeed, the full record of Google's unlawful conduct will never be seen. As this Court has already found, "Google intended to subvert the discovery process" by funneling sensitive communications into "history off" Chats that it then destroyed. That intentional conduct "certainly" prejudiced Plaintiffs. (Dkt. 469 at 18.) Plaintiffs will show that Google's Chat destruction was not an oversight or mistake, but the intended result of a corporate culture of attempting to sanitize, conceal, and destroy evidence, which is itself evidence of Google's knowing violation of the antitrust laws.

Pursuant to Sections 1 and 2 of the Sherman Act, as well as California law, all Plaintiffs seek injunctive relief, and all except Epic seek damages. The evidence at trial will show that Plaintiffs are entitled to relief on each of their claims and that Google's counterclaims are meritless.

## PLAINTIFFS' CASE

### I. Plaintiffs' Claims Against Google

#### A. Section 2 of the Sherman Act:  Unlawful Monopolization[1]

Section 2 prohibits persons from "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 2. A claim for unlawful monopolization requires that a plaintiff show: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury". *FTC v. Qualcomm Inc.*, 969 F.3d 974, 989-90 (9th Cir. 2020) (quotation marks omitted). Monopoly power is "the power to control prices or exclude competition". *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quotation marks omitted). "The relevant market is the field in which meaningful competition is said to exist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202

---

[1] Epic Compl. Counts 1, 6; Match Compl. Counts 2, 8.

1  (9th Cir. 1997).  The market "must encompass the product at issue as well as all economic substitutes
2  for the product." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  "The
3  consumers do not define the boundaries of the market; the products or producers do." *Id.*

4  Monopolization claims are assessed under the rule of reason, which "requires courts to conduct
5  a fact-specific assessment of market power and market structure . . . to assess the [restraint]'s actual
6  effect on competition". *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018) (citations omitted).
7  This assessment is done under "a multi-step burden-shifting framework". *Epic Games, Inc. v. Apple,
8  Inc.*, 67 F.4th 946, 974 (9th Cir. 2023).  "At step one, 'the plaintiff has the initial burden to prove that
9  the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant
10 market.'" *Id.* at 983 (quoting *Amex*, 138 S. Ct. at 2284).  At step two, "the burden then 'shifts to the
11 defendant to show a procompetitive rationale for the restraint.'" *NCAA v. Alston*, 141 S. Ct. 2141,
12 2160 (2021) (quoting *Amex*, 138 S. Ct. at 2284).  At step three, "[i]f the defendant can make that
13 showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies
14 could be reasonably achieved through less anticompetitive means." *Id.*  "[W]here a plaintiff's case
15 comes up short at step three, the district court must proceed to step four and balance the restriction's
16 anticompetitive harms against its procompetitive benefits." *Epic*, 67 F.4th at 994.

17 The evidence will show that, through numerous anticompetitive acts, including those described
18 above, Google has unlawfully maintained monopolies in the Android App Distribution and Android
19 In-App Payment Solutions Markets.  Google's conduct cannot withstand scrutiny under the rule of
20 reason, and judgment must be entered for Plaintiffs.

21 **B.    Section 2 of the Sherman Act:  Attempted Monopolization**[2]

22 Attempted monopolization requires "(1) a specific intent to control prices or destroy
23 competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a
24 dangerous probability of achieving 'monopoly power,' and (4) causal antitrust injury." *Kodak*, 125
25 F.3d at 1202 (citations omitted).  Specific intent may be shown through "direct evidence of 'unlawful
26 design' or circumstantial evidence 'principally of illegal conduct.'  This inference [of specific intent]
27 may be drawn from conduct with an unreasonable restraint of trade in violation of section 1."

---

[2] Match Compl. Count 9.

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Inc.*, 20 F.4th 466, 483 (9th Cir. 2021).

The evidence will show that, through its numerous anticompetitive acts, including those described above, Google specifically intends to control prices and eliminate competition in the Android In-App Payment Solutions Market. Google's attempted monopolization is unlawful, and judgment must be entered for Match.

### C. Section 1 of the Sherman Act: Unreasonable Restraints of Trade[3]

Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1. "To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016). "[E]*very contract*", including "a non-negotiated contract of adhesion", falls within the scope of Section 1. *Epic*, 67 F.4th at 982 (emphasis in original). "Restraints that are not unreasonable *per se* are judged under the 'rule of reason'." *Qualcomm*, 969 F.3d at 989 (citation omitted). (*See* Section I.A.) For restraints that are not unreasonable *per se*, the anticompetitive-conduct analysis is "essentially the same" under Sections 1 and 2. *Id.* at 991.

The evidence will show that through its OEM agreements, Google unreasonably restrained trade by, among other things, conditioning OEMs' access to essential Android services on their agreement to preinstall the Google Play Store on the default home screen of their smartphones; paying OEMs not to preinstall competing app stores; and restricting OEMs from offering frictionless downloading of apps outside the Google Play Store. Through its Developer Distribution Agreement ("DDA"), Google unreasonably restrained trade by, among other things, forcing developers to agree to terms that prevent them from offering competing app stores, and requiring that they use GPB for in-app "digital content" transactions. Through its Project Hug and Apps Velocity Program agreements, Google unreasonably restrained trade by, among other things, preventing competing app stores from offering differentiated content (through simultaneous shipment and parity clauses) that is critical for their success. And Google leveraged revenue share agreements with wireless carriers to discourage them from creating competing app stores and, once it succeeded in boxing carriers out, reduced their

---

[3] Epic Compl. Counts 2, 3, 5, 7; Match Compl. Counts 3, 4, 7.

revenue shares to keep the monopoly rents to itself. Google's conduct cannot withstand scrutiny under the rule of reason, and judgment must be entered for Plaintiffs.

### D. Section 1 of the Sherman Act: *Per Se* Restraints of Trade[4]

"[U]nder the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*." *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)). Agreements not to compete between actual or would-be competitors are "[o]ne of the classic examples of a *per se* violation." *Id.* at 49. "[T]he agreement can be tacit as well as express." *Moore v. James H. Matthews & Co.*, 473 F.2d 328, 330 (9th Cir. 1972). "When a *per se* prohibition applies, we deem a restraint unlawful without any 'elaborate study of the industry' in which it occurs." *Epic*, 67 F.4th at 974 (citation omitted).

The evidence will show that through its Project Hug and Apps Velocity Program agreements, Google committed *per se* restraints of trade by, among other things, paying potential competitors to agree not to launch app stores on Android that would compete with the Google Play Store. Google's conduct is *per se* unlawful under Section 1, and judgment must be entered for Plaintiffs.

### E. Section 1 of the Sherman Act: Unlawful Tying[5]

Tying involves the use of market power over one product to coerce customers into purchasing a separate product. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006). "[T]he existence of separate products is inferred from more readily observed facts. These include consumer requests to offer the products separately, disentangling of the products by competitors, analogous practices in related markets, and the defendant's historical practice." *Epic*, 67 F.4th at 995.

Tying may be condemned as *per se* unlawful or under the rule of reason. *Jefferson Parish*, 466 U.S. at 29. "For a tying claim to suffer *per se* condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied

---

[4] Epic Compl. Count 4; Match Compl. Count 6.
[5] Epic Compl. Count 8; Match Compl. Count 1.

product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Cascade Health Sols. v. PeaceHealth*, 15 F.3d 883, 913 (9th Cir. 2008) (citation omitted); *see also Jefferson Parish*, 466 U.S. at 12-18; *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461-62 (1992). When assessing tying claims under the rule of reason, courts apply the same four-step framework outlined above. (*See* Section I.A.)

The evidence will show that through its DDA and incorporated Developer Program Policies ("DPP"), Google unlawfully ties GPB to the Google Play Store, extracting supracompetitive fees on billions of dollars of transactions, eliminating user and developer choice of payment solutions, and increasing consumer prices. The evidence will further show that Google has sufficient economic power in the Android App Distribution Market to force this tie on developers, and that the tying product (the Google Play Store) is distinct from the tied product (GPB). Google's conduct is *per se* unlawful under Section 1, and in the alternative cannot withstand scrutiny under the rule of reason, and judgment must be entered for Plaintiffs.

### F. Cal. Cartwright Act: Unreasonable Restraints of Trade; Unlawful Tying[6]

Under the Cartwright Act "every trust" is "unlawful, against public policy and void". Cal. Bus. & Prof. Code § 16726. A "trust" is defined as "a combination of capital, skill, or acts by two or more persons . . . [t]o create or carry out restrictions in trade or commerce". *Id.* § 16720. The evidence will show that the same conduct by Google that violates the Sherman Act violates the Cartwright Act.

### G. Cal. Unfair Competition Law ("UCL")[7]

The UCL "prohibits 'any [1] unlawful, [2] unfair or [3] fraudulent business act or practice.'" *Epic*, 67 F.4th at 1000 (brackets in original) (quoting Cal. Bus. & Prof. Code § 17200). Under the "unlawful" prong, "[v]irtually any law—federal, state or local—can serve as a predicate" unlawful act. *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1361 (2010) (citation omitted). Under the "unfair" prong, "a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" *Epic*, 67 F.4th at 1000 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999)). "[T]o support 'any finding of unfairness to

---

[6] Epic Compl. Counts 9, 10, 11, 12; Match Compl. Counts 10, 11, 12.
[7] Epic Compl. Count 13; Match Compl. Count 13.

*competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Id.* (quoting *Cel-Tech*, 973 P.2d at 544).  "[T]o support a finding of unfairness to *consumers*, a court uses the balancing test, which weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id.* (quotation marks omitted). "These tests are not mutually exclusive." *Id.*  The Ninth Circuit recently affirmed a decision permanently enjoining under the UCL the anti-steering clause in Apple's App Store developer agreements. *Id.* at 999.[8]

The evidence will show that Google's conduct, including foreclosing competition, paying off competitors, charging supracompetitive prices, and reducing output and innovation, is both unlawful and unfair under the UCL.  Judgment must be entered for Plaintiffs.

### H.   Interference with Contractual and Prospective Economic Relations[9]

The elements of "intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022).  In contrast, "interference with prospective advantage does not require proof of a legally binding contract." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).  An independently wrongful act is required for interference with prospective economic relations. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158 (2003).  "[A]n act is independently wrongful . . . if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1159.

The evidence will show that Google's anticompetitive and wrongful acts—including leveraging its dominance, preventing app updates for Match's apps, and taking steps to remove them from the

---

[8] Apple's clause states that developers "may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1013 (N.D. Cal. 2021).  A parallel clause in Google's DPP states that "apps may not lead users to a payment method other than Google Play's billing system." *Payments*, Play Console, https://support.google.com/googleplay/android-developer/answer/9858738.

[9] Match Compl. Counts 14, 15.

Google Play Store—tortiously interfere (and if successful, will interfere) with Match's contracts and relationships with their users. Judgment must be entered for Match.

## II. Google's Defenses

In its answers to Plaintiffs' complaints, Google asserted 19 affirmative defenses. The sole defense where Google is seeking a jury instruction, however, is a business justification defense.[10] That defense is a component of the rule of reason framework discussed above. (*See* Section I.A.)[11]

## GOOGLE'S CASE

## III. Google's Claims Against Epic and Match

***Breach of Contract.***[12] Under California law, "the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff". *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011); *see* CACI No. 303 (2020). "The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract." *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899).

***Breach of Implied Covenant of Good Faith and Fair Dealing.***[13] "In California, the factual elements necessary to establish a breach of the covenant of good faith and fair dealing are: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (citing CACI No. 325 (2020)). Such a claim may not lie where the terms of the challenged agreement are unlawful. *Toce v. Rentch*, 2018 WL 5994598, at *12 (S.D. Cal. Nov. 15, 2018).

***Quasi-Contract / Unjust Enrichment.***[14] "[T]here is no cause of action in California for unjust

---

[10] Google also seeks a statute of limitations instruction, but it pertains to the apportionment of damages, not liability.

[11] To the extent Google intends to pursue its remaining defenses at trial, Plaintiffs oppose each of them, and the evidence will show they are meritless.

[12] Google Counterclaim (Epic) Count 1; Google Counterclaim (Match) Count 1.

[13] Google Counterclaim (Epic) Count 2; Google Counterclaim (Match) Count 2.

[14] Google Counterclaim (Epic) Count 3; Google Counterclaim (Match) Count 4.

enrichment." *Levine v. Blue Shield of California*, 189 Cal. App. 4th 1117, 1138 (2010) (citation and quotation omitted). Parties may seek restitution under a quasi-contract theory, but may not "pursue or recover on a quasi-contract claim if the parties have an enforceable agreement regarding a particular subject matter." *Klein v. Chevron U.S.A., Inc.*, 202 Cal.App.4th 1342, 1388 (2012). "The elements of unjust enrichment are receipt of a benefit and unjust retention of the benefit at the expense of another." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014). "[E]quity does not create a duty to pay for a benefit one neither sought nor had the opportunity to decline, and over which one had no control." *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 353 P.3d 319, 327 (Cal. 2015). "When a person acts simply as she would have done in any event, out of duty or self-interest, she cannot equitably claim compensation from anyone who merely happens to benefit as a result." *Id.* The law "precludes recovery on principles of quasi-contract for benefits conferred under an illegal bargain, as well as an action on the bargain itself." *Owens v. Haslett*, 98 Cal. App. 2d 829, 833 (1950).

**Declaratory Judgment.**[15] Google asserts a "Count" for a declaratory judgment, but a declaratory judgment is not a claim but a form of relief. "[T]he Declaratory Judgment Act does not provide an affirmative cause of action where none otherwise exists." *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022). Google's declaratory judgment "claims" are coextensive with its claims for breach of contract: Google seeks a declaration that the DDA is valid, that it was breached by Epic and Match, and that Google has the right to remove Epic's and Match's apps from the Google Play Store and terminate their developer accounts. The declaratory judgment claims must fail because Google's contracts are illegal and unenforceable. (*See* Section IV.)

**False Promise.**[16] "Under California law, a cause of action for fraud based on a false promise must allege: (1) a material promise, (2) knowledge of its falsity, (3) intent to defraud or induce reliance, (4) justifiable reliance, and (5) resulting damage." *First Advantage Background Servs. Corp. v. Priv. Eyes, Inc.*, 2007 WL 2572191, at *4 (N.D. Cal. Sept. 5, 2007). A false promise must be "clear and unequivocal." *Phillips v. JP Morgan Chase Bank, N.A.*, 2011 WL 1301726, at *9 (S.D. Cal. Nov. 14, 2011). "[A] promise that is 'vague, general or of indeterminate application' is not

---

[15] Google Counterclaim (Epic) Count 4; Google Counterclaim (Match) Count 5.
[16] Google Counterclaim (Match) Count 3.

enforceable." *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1017 (9th Cir. 2003). Google seeks to show that Match promised to comply with Google's Payments Policy by March 31, 2022. This claim fails because the Payments Policy is illegal. The evidence will also show that Match made no promise to comply, that it repeatedly and explicitly told Google why it could not comply, that it had no intent to deceive, that Google did not actually and justifiably rely on any alleged false promise, and that Google suffered no resulting damages.

### IV. Epic's and Match's Defenses

Epic and Match discuss here the defenses they intend to focus on at trial, while reserving all rights with respect to their remaining defenses, including those for which they seek jury instructions.

**Google's Contracts Are Illegal and Unenforceable.**[17] "[N]o court will lend its assistance in any way towards carrying out the terms of an illegal contract." *McMullen*, 174 U.S. at 654. Courts will not enforce a contract that violates the Sherman Act if "the judgment of the Court would itself be enforcing the precise conduct made unlawful by [the antitrust laws]". *Kelly v. Kosuga*, 358 U.S. 516, 520 (1959); *see also Tri-Q, Inc. v. Sta-Hi Corp.*, 63 Cal. 2d 199, 218 (1965). Plaintiffs will establish that Google's Payments Policy and other terms that form the basis of its counterclaims are unlawful, because they are part of Google's unlawful anticompetitive conduct in the relevant markets.

**Google Modified or Otherwise Waived the Payments Policy.**[18] "A contract in writing may be modified by a contract in writing." Cal. Civ. Code § 1698(a). No new consideration is required where "[t]he modification is in accordance with the terms of the contract." *Major v. Western Home Ins. Co.*, 169 Cal. App. 4th 1197, 1211 (2009). "[P]arties may, by their words or conduct, waive contractual rights" expressly or impliedly. *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78 (2017). Match will establish that Google modified or otherwise waived its Payments Policy such that Match had no obligation to exclusively use GPB before March 31, 2022.

### CONCLUSION

The evidence at trial will show that judgment should be entered for Plaintiffs on all their claims, and for Epic and Match on all Google's counterclaims.

---

[17] Epic's Answer Defenses 1-2, 5; Match's Answer Defenses 2-3, 6.
[18] Match's Answer Defense 18.

Dated: October 5, 2023

CRAVATH, SWAINE & MOORE LLP
   Christine Varney *(pro hac vice)*
   Gary A. Bornstein *(pro hac vice)*
   Timothy G. Cameron *(pro hac vice)*
   Yonatan Even *(pro hac vice)*
   Lauren A. Moskowitz *(pro hac vice)*
   Justin C. Clarke *(pro hac vice)*
   Michael J. Zaken *(pro hac vice)*
   M. Brent Byars *(pro hac vice)*

FAEGRE DRINKER BIDDLE & REATH LLP
   Paul J. Riehle (SBN 115199)

Respectfully submitted,

By: */s/ Gary A. Bornstein*
   Gary A. Bornstein

*Counsel for Plaintiff Epic Games, Inc.*

Dated: October 5, 2023

HUESTON HENNIGAN LLP
   Douglas J. Dixon
   Christine Woodin
   Joseph A. Reiter

Respectfully submitted,

By: */s/ Douglas J. Dixon*
   Douglas J. Dixon

*Counsel for Plaintiffs Match Group, LLC et al.*

**E-FILING ATTESTATION**

I, Gary A. Bornstein, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Gary A. Bornstein*
Gary A. Bornstein