**Volume 3**

**Pages 323 - 578**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION, | ) )<br>)  **NO. 21-md-02981-JD**<br>) |
| _____ THIS DOCUMENT RELATES TO: | )<br>)<br>) |
| EPIC GAMES, INC., | )<br>) |
| Plaintiff, | )<br>) |
| VS. | )  **NO. 3:20-cv-05671-JD**<br>) |
| GOOGLE, LLC., et al., | )<br>) |
| Defendants. _____ | )<br>)<br>) |

San Francisco, California
Tuesday, November 7, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**<u>APPEARANCES</u>**:

For Plaintiff:

        CRAVATH, SWAINE & MOORE LLP
        825 Eighth Avenue
        New York, New York  10019
BY: **GARY BORNSTEIN, ATTORNEY AT LAW**
     **YONATAN EVEN, ATTORNEY AT LAW**
     **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
     **MICHAEL ZAKEN, ATTORNEY AT LAW**
     **MICHAEL BYARS, ATTORNEY AT LAW**
     **ANDREW WIKTOR, ATTORNEY AT LAW**
     **DANIEL OTTAUNICK, ATTORNEY AT LAW**

For Defendants:

        MUNGER, TOLLES & OLSON LLP
        350 South Grand Avenue - 50th Floor
        Los Angeles, California  90071
BY: **GLENN POMERANTZ, ATTORNEY AT LAW**
     **JAMIE LUGURI, ATTORNEY AT LAW**

        MUNGER, TOLLES & OLSON LLP
        601 Massachusetts Avenue NW
        Suite 500 East
        Washington, DC  20001
BY: **JONATHAN KRAVIS, ATTORNEY AT LAW**
     **LAUREN BELL, ATTORNEY AT LAW**

        MORGAN, LEWIS & BOCKIUS LLP
        One Market - Spear Street Tower
        San Francisco, California  94105
BY: **MICHELLE PARK CHIU, ATTORNEY AT LAW**

# <u>I N D E X</u>

Tuesday, November 7, 2023 - Volume 3

**<u>PLAINTIFF'S WITNESSES</u>**                                **<u>PAGE</u>**   **<u>VOL.</u>**

**<u>LOPEZ, GENARO</u>**
(SWORN)                                                343     3
Direct Examination by Ms. Moskowitz                    344     3
Cross-Examination by Mr. Kravis                        390     3
Redirect Examination by Ms. Moskowitz                  401     3

**<u>KOH, LAWRENCE</u>**
(SWORN)                                                408     3
Direct Examination by Ms. Moskowitz                    409     3
Cross-Examination by Ms. Chiu                          489     3
Redirect Examination by Ms. Moskowitz                  532     3

**<u>MARCHAK, MICHAEL R.</u>**
(SWORN)                                                554     3
Direct Examination by Mr. Even                         555     3

# <u>E X H I B I T S</u>

**<u>TRIAL EXHIBITS</u>**                          **<u>IDEN</u>**   **<u>EVID</u>**   **<u>VOL.</u>**

1                                                       357     3

136                                                     412     3

142                                                     511     3

148                                                     448     3

149                                                     537     3

150                                                     455     3

151                                                     460     3

153                                                     467     3

154                                                     471     3

155                                                     475     3

156                                                     477     3

## **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 162 | | 482 | 3 |
| 163 | | 484 | 3 |
| 355 | | 568 | 3 |
| 360 | | 558 | 3 |
| 5921 | | 547 | 3 |
| 6056 | | 345 | 3 |
| 6461 | | 373 | 3 |
| 10002 | | 383 | 3 |
| 10018 | | 523 | 3 |
| 10020 | | 529 | 3 |
| 10104 | | 365 | 3 |

```
 1    Tuesday - November 7, 2023                    9:10 a.m.

 2                      P R O C E E D I N G S

 3                          ---000---

 4         (Proceedings were heard out of the presence of the jury:)

 5         THE CLERK:  Calling Civil 20-5671, Epic Games, Inc.

 6    vs. LLC, and Multidistrict Litigation 21-2981, In re Google

 7    Play Store Antitrust Litigation.

 8         Counsel?

 9         MR. BORNSTEIN:  Good morning, Your Honor.  Gary

10    Bornstein for Epic Games.  Today with me I have with me at

11    counsel table Dan Ottaunick, Michael Zaken, Andrew Wiktor,

12    Lauren Moskowitz, and Yonatan Even.

13         MR. POMERANTZ:  Good morning, Your Honor.Glenn

14    Pomerantz on behalf of Google.  With me are Jamie Luguri,

15    Lauren Bell, Kate Smith, Michelle Park-Chiu, and Jonathan

16    Kravis.

17         THE COURT:  Okay.  We're going to start a little field

18    trip.

19       So who are the tech people?

20         TECH PERSONNEL:  Right here.

21         THE COURT:  Okay.  I want you to do something for me.

22    That monitor is in the wrong space.  Okay?

23               (Discussion held off the record.)

24         THE COURT:  Let's talk about the sealing requests:

25    Amazon, Activision, Nintendo, and something from Google.
```

**PROCEEDINGS**

 1      So who is talking to these third parties on the

 2 plaintiff's side?

 3          **MR. OTTAUNICK:**  I am, Your Honor.  Daniel Ottaunick

 4 for the plaintiff Epic Games.

 5          **THE COURT:**  Okay.

 6          **MR. OTTAUNICK:**  And I'm here to address Activision,

 7 Google, and Nintendo; and my colleague Michael Zaken will

 8 address Amazon's request.

 9          **THE COURT:**  All right.  What's happening?

10          **MR. OTTAUNICK:**  So, Your Honor, you've made clear that

11 sealing at this trial will be limited, and you've made clear

12 that information that could be sealed would be PII and ongoing

13 business negotiations and information --

14          **THE COURT:**  Well, actually, let me put a finer point

15 on my question.  What are you doing to solve this with whoever

16 you're -- who are you handling?

17          **MR. OTTAUNICK:**  For Nintendo, Google, and Activision.

18          **THE COURT:**  All right.  What are you doing to talk

19 with those three people?

20          **MR. OTTAUNICK:**  We're opposing their request to seal

21 the information.

22          **THE COURT:**  I know that, but what are you doing to

23 talk with them to get a deal done so we can get this finished?

24          **MR. OTTAUNICK:**  Sure.  We've spoken with Google.  We

25 have not spoken with Activision and Nintendo.

**PROCEEDINGS**

1          **THE COURT:**  Anybody here for Activision, Nintendo

2    or --

3          **MS. PARSIGIAN:**  I am, Your Honor.  Jeanifer Parsigian

4    for Amazon.

5          **THE COURT:**  Wait till you get to the microphone.

6      Are you here for Amazon?  Nintendo?  Wait.

7          **MS. PARSIGIAN:**  We're here for Amazon.

8          **THE COURT:**  Amazon, all right.

9      Who are we missing?

10          **MR. OTTAUNICK:**  We have been speaking with Amazon,

11    Your Honor.

12          **THE COURT:**  Do I have to open it for you?  Come in.

13    That's what this (indicating) means.  Come in.

14          **THE CLERK:**  Use the microphone.

15          **THE COURT:**  Okay.  Just stand around a microphone.

16          **MS. HEMMENDINGER:**  Hi.  Sarah Hemmendinger for Amazon,

17    Your Honor, and with me is Ben Mundel.

18          **THE COURT:**  Okay.  Amazon?

19          **MS. PARSIGIAN:**  And Jeanifer Parsigian for Activision

20    from Winston Strawn.

21          **THE COURT:**  How about Nintendo?  Is anybody here from

22    Nintendo?

23                          (No response.)

24          **THE COURT:**  All right.  You-all need to work this out.

25    Okay?

1      Here is the guideline:  For those of you who are third

2   parties, you need to read the order I entered a long time ago

3   in this case about the standards for sealing.

4      The public has a right of access.  That is particularly

5   true in antitrust cases which affect our economy and the daily

6   lives of people and their pocketbooks.

7      We are not going to have a shroud of secrecy in this case.

8   So you read that order.  You negotiate with whoever on -- I

9   guess the plaintiff's; right?  You're the -- Defendants, you're

10  agnostic on the sealing requests?

11      **MR. KRAVIS:**  Correct, Your Honor.

12      **THE COURT:**  All right.  So you talk with the

13  plaintiffs and get that worked out.

14      Now, how is this going to work for scheduling, Plaintiffs?

15  When do you need to do all this?

16      **MR. OTTAUNICK:**  Well, Your Honor, some of this

17  information is for witnesses who we intend to call as soon as

18  today.

19      **THE COURT:**  All right.  Then you better get on it

20  because the jury is -- you know, we're waiting for one person.

21  All right?

22      **MR. OTTAUNICK:**  Understood, Your Honor.

23      **THE COURT:**  So you're going to go out in the hallway

24  and get this worked out.  Now, in the meantime, before you do

25  that, though, you take 10 minutes and download that order from

1   Westlaw, or whatever your preferred service vendor is, and read

2   it because that's what I'm going to hold you to.  All right?

3        I'm going to be crystal clear as I have been from day one

4   in this case and from day one of all of my cases, this is a

5   courtroom of the people of the United States.  There is no

6   trial in secret.  So if you have something you want to be

7   sealed, you're going to -- you have a high burden to meet under

8   the standards that govern sealing in this district.  Okay?

9        All right.  I'll see you in a few minutes.

10            **MR. POMERANTZ:**  Your Honor?

11            **THE COURT:**  Yes?  Oh, is there something else?  Yeah.

12   Thank you for moving that.

13            **MR. POMERANTZ:**  Separate from the third parties,

14   there's also an issue raised in a motion by Google, which I

15   believe --

16            **THE COURT:**  Oh.  For sealing?

17            **MR. POMERANTZ:**  Yes, Your Honor.

18        These are in connection with two different exhibits that

19   the plaintiffs have said they want to use with Mr. Marchak who

20   is testifying, I think, later today.

21        And we're really looking for a very limited redaction --

22   or not even a redaction actually, just so that the jury but not

23   the public sees one line.

24        I'll give you an example.  It's Exhibit 384.  On page 11

25   it lists the deal terms of, it looks like, seven or eight deals

**PROCEEDINGS**

```
1    between Google and various game developers.  Seven of them,

2    those deals have expired.  We're not asking for that to be not

3    shown publicly or discussed publicly.

4            THE COURT:  Okay.

5            MR. POMERANTZ:  But the eighth one, which involves one

6    particular game developer, it is an active deal; and as

7    Your Honor heard yesterday, you know, we are competing with

8    Apple and others for that business.

9            THE COURT:  Well, when you say it's an active deal,

10   you mean you're negotiating that right now?

11           MR. POMERANTZ:  No.  I think it's an active deal.  I

12   mean it's currently in force.

13           THE COURT:  Oh.

14           MR. POMERANTZ:  A different page here lists particular

15   game developers that are potential candidates for new deals

16   that Google was considering, and we would not want Apple or

17   others to know who we might be thinking about approaching for a

18   deal.

19           MR. OTTAUNICK:  Your Honor, may I be heard?

20           THE COURT:  Just a moment.  Let Mr. Pomerantz finish.

21   Okay?

22           MR. POMERANTZ:  And so this concerns the Project Hug

23   kinds of deals.  This document is dated December 2020.

24           THE COURT:  Let me ask you this:  I have the motion.

25   I have the papers in my chambers, but you're talking about 384
```

 1  now; right?  Exhibit --

 2          **MR. POMERANTZ:**  Yeah.  It really concerns just two

 3  exhibits, 384 and 8011.  And all we were going to ask is that

 4  the full --

 5          **THE COURT:**  Before you -- so I see the reference to

 6  page 11, but there are also references to page 25, 42, 43, and

 7  58.

 8          **MR. POMERANTZ:**  Correct.  They all concern exactly the

 9  issue I just raised.

10          **THE COURT:**  It's the same one person?

11          **MR. POMERANTZ:**  It's -- the particular current deal is

12  the same one deal.

13          **THE COURT:**  All right.  So you just want to take that

14  one person off all those pages?

15          **MR. POMERANTZ:**  Well, what we actually were proposing

16  is we could either take that off or what we could do is hand

17  the jury a hard copy of the whole thing, including that one.

18          **THE COURT:**  But for 384 it's that one name on those

19  five pages?

20          **MR. POMERANTZ:**  It's that one name and the related

21  information for that one name.

22          **THE COURT:**  Okay.  All right.

23          **MR. POMERANTZ:**  And then separately there are a list

24  of, you know, other game developers who we don't have deals

25  with, or we didn't at the time of this document, who remain

1  candidates as deal -- as people --

2      **THE COURT:**  Well, I can kind of see the candidates.

3  That's usually, you know, an opportunity for people to exploit

4  things; but for an existing contract, I mean, what's the issue?

5      **MR. POMERANTZ:**  The issue is that it would allow our

6  competitors to know the current deal terms so that when they're

7  trying to compete against us for that business of that

8  developer, they know what our current deal is as compared to

9  the other seven where the deal --

10     **THE COURT:**  When you say "deal terms," what are you

11  talking about?  I mean, there's a fixed rate of commission

12  fees.  Is there something else that you're --

13     **MR. POMERANTZ:**  Oh, no.  These are much different.

14  The whole notion of these kinds of deals is that they have many

15  economic terms other than -- in fact, they don't really deal

16  with the issue you're talking about, which is the service fee,

17  but it's other consideration that is exchanged, and it varies

18  from developer to developer depending on what their business

19  needs are.

20      And so what we don't want is our competitors to know the

21  current deal term so that when that deal expires, they know

22  what they're negotiating against when we compete against Apple

23  and others for that business.

24     **THE COURT:**  All right.  Plaintiff?

25     **MR. OTTAUNICK:**  Your Honor, these are not deal terms.

1  These are documents that Google created in 2019 and 2020 about

2  offers it was contemplating at the time and may have ultimately

3  made.

4      The fact that Google entered into agreements with these

5  developers is already public.  Your Honor has declined to seal

6  it in the past.  And these are offers through Project Hug to

7  prevent competition that are playing a central role in Epic's

8  case.

9      The example Your Honor gave last week of what would not be

10  sealed are offers by Google to pay money not to compete, and

11  that is exactly what Google is asking to seal.

12      **THE COURT:**  Well, just for this one company.  Do you

13  know which one Mr. Pomerantz is referring to?

14      **MR. OTTAUNICK:**  I do, Your Honor.

15      **THE COURT:**  All right.  Are you planning to rely on

16  that contract as part of the Project Hug allegations?

17      **MR. OTTAUNICK:**  We are.  All of the Project Hug

18  agreements are part of our case.  I don't know that we're

19  planning to draw specific attention to that developer compared

20  to others, but the identity of that developer is already

21  public.

22      **MR. POMERANTZ:**  Your Honor, just looking at the page

23  that we're talking about, there's seven contracts:  ABK,

24  Niantic, Nintendo, Riot, Netmarble, and this one.  All of the

25  others have more consideration than this one.

PROCEEDINGS

1      I don't believe they're really seriously thinking that

2   this is the one that they want to focus on, and we're just

3   trying to protect the confidentiality of an existing deal so

4   that it doesn't affect future competition for that company's

5   business.

6           THE COURT:  Here's the problem:  I'm sympathetic to

7   the ongoing negotiations now.  I get that and that makes some

8   sense to me.  You know, you've got a million contracts with

9   developers, and I can't -- if each one has its own unique terms

10  and that's the hook for sealing, you know, I can't -- I can't

11  do that.  It's just going to be too much sealing.

12      So I'll take a look at it, but I'm inclined to let you do

13  the ones that are currently actively being negotiated but not

14  the ones that are already on the page and signed.

15      Now what about 8011?

16          MR. POMERANTZ:  I think it's same issue, Your Honor.

17          THE COURT:  Same issue?

18          MR. POMERANTZ:  I think your ruling on that would be

19  it guides 8012, I believe, unless counsel thinks otherwise.

20          THE COURT:  Okay.  All right.  Let me take a look at

21  that.

22      I think we're still waiting for one juror.  That person

23  might be here now.

24      But are you planning to do this this morning, these two

25  exhibits?

PROCEEDINGS

1          **MS. MOSKOWITZ:**  Not this morning, Your Honor.  For

2    those two, those are later on today.  We do have, I think --

3          **THE COURT:**  Later on today?

4          **MS. MOSKOWITZ:**  Yes.  It's a witness for this

5    afternoon.

6          **THE COURT:**  All right.  Well, in that case, why don't

7    you start the redactions on the active negotiation ones.

8        How do you want to do that, Mr. Pomerantz?  You're going

9    to hand the names to the jury?

10         **MR. POMERANTZ:**  We'll work with them on the other

11   side.  We could either let the full document go to the jury,

12   we'll just do it in hard copy form, so they --

13         **THE COURT:**  What are the witnesses going to say,

14   though, when you have --

15         **MR. POMERANTZ:**  Well, they're not going to ask them

16   questions probably anyway about that line I assume.

17         **THE COURT:**  Oh.  Is this a nonevent?  You're not even

18   going to ask them?

19         **MR. POMERANTZ:**  Well, they're going to show the page.

20   They're just not going to ask them about that one line,

21   Your Honor.

22         **MR. OTTAUNICK:**  Well, Your Honor, we're not sure which

23   agreements Google is referring to is active negotiation because

24   these documents are over three years old.  So I would like to

25   know that information.  We can discuss that with Google's

1  counsel.

2       THE COURT:  All right.  Why don't you and your

3  counterpart just sort of work on that while we're...

4     What's happening this morning?  What are we starting with?

5       MS. MOSKOWITZ:  The first witness is Mr. Lopez.  This

6  is not -- none of this relates to him.

7     The next witness is Lawrence Koh.  One of the sealing

8  issues with Activision's counsel is going to implicate a couple

9  documents there.  And there's one document that we are

10  objecting to that Google intends to introduce with Mr. Koh

11  that.  We assume Your Honor would like to resolve that before

12  he takes the stand so we can --

13       THE COURT:  Wait.  Who is Mr. Koh?

14       MS. MOSKOWITZ:  Mr. Koh is a Project Hug Google --

15  former Google employee.

16       THE COURT:  Oh, all right.  You better get it worked

17  out soon.  All right?

18       MS. MOSKOWITZ:  Yes, but there was an objection to an

19  exhibit on evidentiary grounds that we --

20       THE COURT:  Outside of this filing?

21       MS. MOSKOWITZ:  Outside of that filing.

22       THE COURT:  Well, let's just do that right now.

23  What's the -- can you hand it to me?

24       MS. MOSKOWITZ:  Yes.

25     May I approach, Your Honor?

1          **THE COURT:**  Hand it to Ms. Clark, please.

2      Okay.  Who's objecting?  Google?

3          **MS. MOSKOWITZ:**  We are, actually, Your Honor.

4          **THE COURT:**  Oh, you are.

5          **MS. MOSKOWITZ:**  Yes.

6          **THE COURT:**  Exhibit 142.

7          **MS. MOSKOWITZ:**  Google is intending to introduce this

8  during their second examination of Mr. Koh and we object.

9          **THE COURT:**  Let's talk to the proponent.

10     Who -- what is this thing?  It's long and it's single

11 spaced, and I --

12         **MS. CHIU:**  Yes, it's an e-mail string, Your Honor,

13 involving some Google employees, including Mr. Koh who's now a

14 former employee.

15     The portion that we intend to use during the examination

16 is Mr. Koh's e-mail that appears on page 142001.  We understand

17 that Epic has objected this is hearsay.  We believe it's a

18 present-sense impression of Mr. Koh.

19     The rest of the document we don't intend to introduce for

20 the truth of the matter.

21         **THE COURT:**  Okay.  So you just want -- which one do

22 you -- you want to use the one that's at the top of the page?

23         **MS. CHIU:**  No.  On the first page there's an e-mail

24 that appears on the second half.  So it's dated March 26, 2019.

25         **THE COURT:**  It says "Thank you for sharing, Lawrence"?

1          **MS. CHIU:**  Yes.  And then if you look, the third and

2    fourth paragraphs of this document have in bold fonts the text

3    "LK" colon and then some text after that.  Those are Mr. Koh's

4    findings.

5          **THE COURT:**  Oh, I see.  It's written by -- it's not

6    written by Mr. Koh, but these are his comments?

7          **MS. CHIU:**  Those are his comments that are -- that

8    were in line in an e-mail, yes, Your Honor.

9          **THE COURT:**  All right.  And you want to use just those

10   comments?

11         **MS. CHIU:**  For -- yes, as his present-sense

12   impression.  The rest of the e-mail we would not offer for the

13   truth of the matter but simply to provide some context to

14   understand his comments.

15         **THE COURT:**  What's the problem?

16         **MS. MOSKOWITZ:**  We're concerned that this whole

17   document is hearsay.  It's being used by Google for their own

18   purposes, which is --

19         **THE COURT:**  This is a statement by the witness.

20         **MS. MOSKOWITZ:**  Yes, Your Honor.

21         **THE COURT:**  What's wrong with that?

22         **MS. MOSKOWITZ:**  It's hearsay.

23         **THE COURT:**  You can certainly ask him that.

24         **MS. MOSKOWITZ:**  Well, the document's hearsay,

25   Your Honor.  They can ask him testimony about how he felt at

1  that time, but offering a document for that is hearsay.

2       **THE COURT:**  Well, that's overruled.  You can do that.

3   But why do we need the rest of this?  Can't you just --

4       **MS. CHIU:**  We thought it would be important for the

5  jury to se the whole -- like the e-mail as it was.  That is an

6  actual e-mail.

7       **THE COURT:**  Well, you can't just hand the jury

8  background documents.  You have to have sponsoring witnesses

9  and everything else.  So if you want to examine Mr. Koh about

10  this, that's fine, but you should just, you know, use that one

11  exchange.

12       **MS. CHIU:**  Yes.

13       **THE COURT:**  That's it.  Nothing else.  Okay?

14       **MS. CHIU:**  That's correct, Your Honor.

15       **THE COURT:**  All right.  But not the rest of this is

16  what I'm saying.

17       **MS. CHIU:**  Yes.

18       **THE COURT:**  Just filet that little exchange out of the

19  string.

20       **MS. CHIU:**  We will do that, Your Honor.

21       **THE COURT:**  Okay.  All right.

22       **MS. MOSKOWITZ:**  Your Honor, I believe we also have one

23  additional document that we have an objection to, and this is

24  Trial Exhibit Number 386, and we will get a copy for

25  Your Honor.

1      But we have an objection based on the witness, there's

2  lack of foundation.  He testified in his deposition he had

3  never seen it, and we understand that Epic intends to use it

4  with Mr. Marchak.

5          THE COURT:  Well, is the witness going to be here in

6  court?

7          MS. CHIU:  Yes, he will be.

8          THE COURT:  Well, then just lay a foundation.

9          MR. EVEN:  Thank you, Your Honor.

10          THE COURT:  I mean, that's the benefit of a live

11  witness.  You can lay a foundation, and then they can impeach

12  him if that's the issue.  Okay?

13      All right.

14          MS. CHIU:  Thank you, Your Honor.

15          THE COURT:  Okay.  I'll see you soon.

16                    (Recess taken at 9:27 a.m)

17                    (Proceedings resumed at 9:43 a.m)

18      (Proceedings were heard in the presence of the jury:)

19          THE CLERK:  Calling Civil 20-5671, Epic Games, Inc.

20  vs. Google LLC, and Multidistrict Litigation 21-2981, In re

21  Google Play Store Antitrust Litigation.

22      Counsel?

23          MR. BORNSTEIN:  Good morning, Your Honor.  Gary

24  Bornstein for Epic Games.  I'm joined at counsel table today by

25  Dan Ottaunick, Michael Zaken, Andrew Wiktor, Lauren Moskowitz,

1    and Yonatan Even.

2           **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn

3    Pomerantz, and with me are Lauren Bell, Kate Smith, Michelle

4    Park Chiu, and Jonathan Kravis; and I think Jamie Luguri just

5    left and will be back in a minute and she'll be sitting right

6    there.

7           **THE COURT:**  Okay.  Who do we have next?

8           **MR. BORNSTEIN:**  I'm going to cede the floor to

9    Ms. Moskowitz, Your Honor.

10          **MS. MOSKOWITZ:**  Good morning, Your Honor.  Epic calls

11   Genaro Lopez.

12          **THE CLERK:**  Will you please raise your right hand?

13                          **<u>GENARO LOPEZ</u>**,

14   called as a witness for the Plaintiff, having been duly sworn,

15   testified as follows:

16          **THE WITNESS:**  I do.

17          **THE CLERK:**  Thank you.  Please be seated.

18      Please state your full name for Court and spell your last

19   name.

20          **THE WITNESS:**  Genaro Lopez, L-O-P-E-Z.

21          **THE CLERK:**  Thank you.

22          **MS. MOSKOWITZ:**  Your Honor, may I proceed?

23          **THE COURT:**  Yes, please.

24          **MS. MOSKOWITZ:**  Thank you.

25   \\\

1    <u>DIRECT EXAMINATION</u>

2    BY MS. MOSKOWITZ:

3    **Q.**   Good morning, Mr. Lopez.

4    **A.**   Good morning.

5    **Q.**   My name's Lauren Moskowitz and I represent Epic.

6         You have a binder in front of you that we will be

7    referring to.  Do you have access to that?

8    **A.**   Yes.

9    **Q.**   Thank you.

10        You are the information governance lead at Google;

11   correct?

12   **A.**   That's right.

13   **Q.**   And you manage a team that's responsible for ensuring that

14   data from Google's corporate records is secured and stored?

15   **A.**   Yes, that's right.

16   **Q.**   And as information governance lead, you are involved in

17   setting the retention period for documents that are created at

18   Google?

19   **A.**   Yes, that's right.

20   **Q.**   And by retention period, just so we understand, that just

21   means how long Google keeps documents that are created by its

22   employees in the ordinary course of business?

23   **A.**   Yes, that's right.

24        **THE COURT:**  Can you pull that a little closer to you?

25   Just -- yeah.

 1              THE WITNESS:  Sure.

 2    BY MS. MOSKOWITZ:

 3    Q.   You graduated from law school?

 4    A.   Yes.

 5    Q.   But you are not currently practicing law in your role at

 6    Google; correct?

 7    A.   That's right.

 8    Q.   Fair to say you do find yourself working with lawyers in

 9    the course of your job?

10    A.   Yes.

11    Q.   Please turn to your binder.  It is Exhibit 6056.

12    A.   (Witness examines document.)

13    Q.   Are you there?

14    A.   Yes.

15    Q.   This is a printout of an interactive click-through

16    training that Google employees receive on how to communicate

17    with a carrier; correct?

18    A.   Yes, I believe so.

19              MS. MOSKOWITZ:  Your Honor, I move Exhibit 6056 into

20    evidence.

21              MR. KRAVIS:  No objection.

22              THE COURT:  It is admitted.

23         (Trial Exhibit 6056 received in evidence.)

24    BY MS. MOSKOWITZ:

25    Q.   All right.  So that's the first page on the screen here,

1    Mr. Lopez?

2    **A.**   Yes.

3    **Q.**   Thank you.

4        If you could turn to the second page, this is the name of

5    the training "You said what?!  10 things to ensure you are

6    communicating with care."  Do you see that?

7    **A.**   Yes.

8    **Q.**   And during your time at Google, you've heard that phrase

9    "communicate with care," have you not?

10   **A.**   Yes, I have.

11   **Q.**   And that's a phrase that is used as a reminder to Google

12   employees to be careful about what sort of things they put in

13   written communications; correct?

14   **A.**   Yeah.  I interpret it as just a general reminder that we

15   should all be reasonable, you know, friendly folks with each

16   other.

17   **Q.**   Well, it's more than that; right?  It's a reminder to

18   employees to be careful about what they put down in writing

19   because it can be used against Google in a court of law;

20   correct?

21   **A.**   That's not my role to say.

22   **Q.**   All right.  Let's look at the page ending 003.

23       This says (as read):

24           "At Google we are constantly in the public eye... and

25       the courthouse."

1        Do you see that?

2   A.   Yes.

3   Q.   And it also goes on to say (as read):

4        "We often have to produce employee communications as

5        evidence, which means your communications can be public at

6        any time."

7        Correct?

8   A.   Yes, that's what it says.

9   Q.   This is in the training called "Communicate With Care";

10  right?

11  A.   That's right.

12  Q.   So what this is telling employees is that:  Be careful

13  what you put in writing, that writing may be produced as

14  evidence in litigation; correct?

15  A.   That's what it says, yep.

16  Q.   Now please turn to page 042.

17       This slide is called "Kick it Old School"; right?

18  A.   Should I flip here or should I --

19  Q.   It's on the screen.  Whatever is easiest for you,

20  Mr. Lopez.

21  A.   Yes, that's what it says.

22  Q.   Okay.  This training slide tells employees that sometimes

23  the best way to communicate something super sensitive is to not

24  write it down; right?

25  A.   Right, that's what it says.

1  **Q.**   And just to be clear, they're talking about sensitive

2  business discussions that are happening in the course of Google

3  employees' jobs; correct?

4  **A.**   Well, to me it applies to all the communications,

5  including personal topics or business topics.  It's everything.

6  **Q.**   Yes.  And it includes sensitive business communications?

7  **A.**   Oh, yeah, for sure.

8  **Q.**   All right.  And it continues on to say (as read):

9         "Reduce the risk of your communication being

10        misconstrued or disclosed by having an old-fashioned phone

11        call or a face-to-face meeting."

12        Right?

13 **A.**   Yes, that's what it says.

14 **Q.**   All right.  Let's turn to 44, please.

15        This slide is called "Think" -- another dot dot dot --

16 "then speak."  Do you see that?

17 **A.**   Yes.

18 **Q.**   At the top here right under that title it says (as read):

19        "Your communications can have unintended consequences

20        for you and the company."

21        Right?

22 **A.**   Yes, that's what it says.

23 **Q.**   All right.  Now let's put that down, please, and let's

24 look at the bottom of the right-hand side of that slide, same

25 page, 44.

1        You see this "Avoid legalese and uninformed fault

2   finding"?  Do you see that?

3   A.   Uh-huh, yes.

4   Q.   All right.  Right here it says (as read):

5            "Avoid communications that conclude or appear to

6        conclude that Google or Googlers are acting illegally or

7        negligently have violated the law, et cetera."

8        Do you see that?

9   A.   Yes.

10  Q.   It says (as read):

11           "Your conclusions could be incorrect and could hurt

12       us."

13       Right?

14  A.   Yes, that's what it says.

15  Q.   And there's a click for like risky words that they

16  should -- if they need to understand what types of words could

17  implicate this; right?

18  A.   Yes.

19  Q.   All right.  So this is discussing that if they use certain

20  phrases or terms in writing, that those documents might be

21  retained and could be produced in litigation and be used

22  against Google; right?

23  A.   I don't know what the relationship between retention and

24  these words are, so I wouldn't want to speculate on that.

25  Q.   It's saying that these documents may ultimately appear in

1   court and be used against Google; isn't that what this is

2   saying, sir?

3   **A.**   Yes, that's the tone, sure.

4   **Q.**   All right.  Let's -- a couple pages down, 46, the same

5   screen here you see this pop-up "See you in court" in these

6   colorful gavel images.  Do you see that?

7   **A.**   Yes.

8   **Q.**   All right.  And, again, there's some risk -- I think these

9   are some of these risky words.  Do you agree?

10  **A.**   I actually don't know what the risky words are.

11  **Q.**   Okay.  Like unfair -- you see that? -- liable, negligent,

12  those are some of the ones that we just looked at?

13  **A.**   Yes, I see the words that are there.

14  **Q.**   All right.  And this is again reminding Google about the

15  legal consequences that could arise if sensitive business

16  communications have to ultimately be produced by Google in

17  legal proceedings; right?

18  **A.**   I think that's right.

19  **Q.**   All right.  You can take that down.

20       Fair to say that Google employees create a large amount of

21  written information every single day in their roles?

22  **A.**   Yes.

23  **Q.**   And in the normal course of business, Google has to decide

24  how long to retain different types of communications; right?

25  **A.**   That's right.

**LOPEZ - DIRECT / MOSKOWITZ**

1   **Q.**   And Google has policies that determine how long it will

2   keep different categories of documents?

3   **A.**   Yes, that's right.

4   **Q.**   Separate and apart from the normal document retention

5   policies, companies may be faced with what's called a legal

6   hold; correct, sir?

7   **A.**   Yes, that's right.

8   **Q.**   And when a company is placed on a legal hold, it means

9   that it is under a legal obligation to preserve evidence

10   relevant to the issues in a legal case; correct?

11   **A.**   Yes, that's right.

12   **Q.**   And you have an understanding in the course of your job of

13   Google's policies and procedures for implementing legal holds;

14   correct?

15   **A.**   That's right.

16   **Q.**   And so placing a document or a person on a legal hold is

17   supposed to mean that those documents will not be deleted while

18   the case is pending; correct?

19   **A.**   Right.  All potentially relevant information should be

20   placed on holds.

21   **Q.**   All potentially relevant documents or evidence may not be

22   deleted for the entirety of the case; right?

23   **A.**   So long as it relates to the case, that's right.

24   **Q.**   Right.  It may or may or may not -- it may be relevant, so

25   anything that even may be relevant must be preserved; correct?

**LOPEZ - DIRECT / MOSKOWITZ**

1  **A.**   Yes, potentially, correct.

2  **Q.**   Not potentially.  Must be retained; right?

3  **A.**   Sorry.  I was saying potentially relevant information.

4  **Q.**   Okay.  Anything potentially relevant must be retained and

5  not deleted?

6  **A.**   That's correct.

7  **Q.**   All right.  So, in other words, legal hold -- being on a

8  legal hold trumps any business decisions that Google may make

9  about how to retain documents; right?

10  **A.**   That's right.

11  **Q.**   Now, Google was on a legal hold obligation in this case no

12  later than August 13th, 2020; correct?

13  **A.**   I believe that's right.

14  **Q.**   And, again, that means that as of that date, Google was

15  under an obligation to preserve any documents that may be

16  relevant to this litigation?

17  **A.**   That's right.

18  **Q.**   And the way that works, just trying to explain some of the

19  mechanics here, in a lawsuit Google's required to turn over

20  evidence to Epic; right?

21  **A.**   Yes.  That's part of the process, yep.

22  **Q.**   It's called discovery.  You've heard that term?

23  **A.**   Yep.

24  **Q.**   And so that evidence gets produced to Epic during the case

25  over a period of time.  It doesn't happen in one day; right?

1   **A.**   That's right.

2   **Q.**   And in this case Google was required to turn over

3   documents to Epic all the way through the end of 2022; right?

4   **A.**   I believe that's right.

5   **Q.**   And Google was required to preserve documents under that

6   legal obligation the entire period of that time?

7   **A.**   Right.  Those things that are related to the lawsuit,

8   that's right.

9   **Q.**   Those things that may even potentially be relevant to this

10  lawsuit must be retained by Google that entire period of time;

11  correct?

12  **A.**   That's right.

13  **Q.**   All right.  Let's talk about one specific category of

14  Chats.  Sorry.  Documents.  I did not bury the lead there.

15       We're going to talk about a specific category of

16  documents.  Those are Chats.  You're familiar with those?

17  **A.**   Yes.

18  **Q.**   All right.  And that is one of the categories of documents

19  that Google employees create in the ordinary course of their

20  business?

21  **A.**   That's right.

22  **Q.**   And Chats are an instant messaging tool; right?

23  **A.**   Yes.

24  **Q.**   And Google -- that's called Google Chat or Chats; is that

25  fair?

1  **A.**   Yeah.  It's had a few names over the years.  Currently

2  Google Chat.

3  **Q.**   And one of the names it used to have is Hangouts?

4  **A.**   Yeah, that's right.

5  **Q.**   All right.  Now, Hangouts and now Google Chat, that is a

6  tool that Google itself designed and developed; right?

7  **A.**   That's right.

8  **Q.**   And there are different types of Google Chats that

9  employees can engage in; right?

10  **A.**   Yes.  There's different conversation types, yeah.

11  **Q.**   All right.  One of the conversation types is one-on-one

12  chats; right?

13  **A.**   That's right.

14  **Q.**   And another is group chats?

15  **A.**   That's right.

16  **Q.**   And a third category is what I'll refer to as rooms or

17  spaces; right?

18  **A.**   That's right.

19  **Q.**   And a one-on-one chat, just to be very I think probably

20  obvious, two people talking to each other one on one?

21  **A.**   Correct.

22  **Q.**   And a group chat is that same thing but three or more

23  people?

24  **A.**   That's right.

25  **Q.**   And a thread -- a room or space is a specific thread that

1    was set up for people to collaborate on a business project?

2    **A.**    Yeah.  I mean, I think about it more persistent kind of

3    space to have a kind of project or specific conversation about

4    something, you know, in particular, that's right.

5    **Q.**    Right.  So, for example, in advance of a new product

6    launch, you might have the engineers and the marketing folks

7    all in a room or a space together collaborating in real time

8    about that business project?

9    **A.**    Right.  Those conversations would happen in the same

10   space.  It would just be more useful for everybody that was on

11   the project team at the time.

12   **Q.**    Now, there's no limitation on what topic a Google Chat can

13   cover?

14   **A.**    That's right.

15   **Q.**    There are no character limits in Google Chat?

16   **A.**    No.

17   **Q.**    You can put links to other websites in a Google Chat?

18   **A.**    That's right.

19   **Q.**    You can attach documents to a Google Chat?

20   **A.**    Yes, that's right.

21   **Q.**    In fact, it's quite easy.  You just drag and drop it in?

22   **A.**    That's right.

23   **Q.**    Now, employees at Google can use Google Chat to convey

24   important business information; correct?

25   **A.**    Yes.  Like any other information that's going on in their

1    lives, that's right.

2    **Q.**    Right, but I'm focused today on what business information.

3         So they can actually communicate business information over

4    Chat; right?

5    **A.**    Very true.

6    **Q.**    And employees can convey sensitive business information

7    over Chat?

8    **A.**    Yes, absolutely.

9    **Q.**    And Google employees do, in fact, use Google Chat to

10   conduct substantive business communications; correct?

11   **A.**    Yes, along with all of our personal conversations as well.

12   **Q.**    Sir, your counsel will have a chance to talk to you about

13   that.  I'm just focusing here on business communications.

14   Okay?

15   **A.**    Yep.

16   **Q.**    All right.  So, in fact, you, yourself, have seen examples

17   of substantive business communications occurring over

18   Google Chat; correct?

19   **A.**    Yes.

20   **Q.**    Now, Google has what we talked to you about retention

21   policies, specifically for Google Chat; correct?

22   **A.**    That's right.

23   **Q.**    And Google's Chat retention policy is made available to

24   all of its employees?

25   **A.**    Yes.  It's on an internal site that's available 24/7 for

1  employees.

2  **Q.**   All right.  If you could, please, turn your binder to

3  Exhibit 1, please, sir.

4       That will face the other direction for you so you

5  shouldn't have to deal with it.

6       Are you there, sir?

7  **A.**   Yes.

8  **Q.**   This is Google's policy for retention of Google Chats;

9  correct?

10  **A.**   Correct.

11       **MS. MOSKOWITZ:**  Your Honor, I move that Exhibit 1 be

12  into evidence.

13       **MR. KRAVIS:**  No objection.

14       **THE COURT:**  It is admitted.

15       (Trial Exhibit 1 received in evidence.)

16  **BY MS. MOSKOWITZ:**

17  **Q.**   All right.  So this is the Google Chat retention policy,

18  sir?

19  **A.**   Yes.

20  **Q.**   And you're familiar with a setting within Google Chat

21  called history; is that right?

22  **A.**   That's right.

23  **Q.**   And, in fact, that word "history" is all over this

24  document; right?

25  **A.**   Right.

1  **Q.**   All right.  And, now, history can either be on or off;

2  right?

3  **A.**   Correct.

4  **Q.**   And chats sent while history is on are referred to

5  on-the-record chats; right?

6  **A.**   Yeah.  The product uses the term "synonymously."

7  **Q.**   And Google Chats sent while history is off are referred to

8  as off-the-record chats; right?

9  **A.**   Right.  They're just synonymous terms for that state.

10 **Q.**   Right.  So "off-the-record chat" is a term used within

11 Google to describe history off?

12 **A.**   Correct.

13 **Q.**   Now, Google chooses to retain Google Chats for different

14 periods of time depending on what that history setting is set

15 to; correct?

16 **A.**   That's right.

17 **Q.**   Now, if history is on, and you see here a few examples,

18 the retention period depends on the number of people in the

19 chat; right?

20 **A.**   That's right.

21 **Q.**   So, for example, one-on-one Google Chat sent while history

22 is on are retained for 30 days; correct?

23 **A.**   That's right.

24 **Q.**   Now, a history on Chats that are in three or more people,

25 group chats, are retained for 18 months?

1  A.   That's right.

2  Q.   And that same is true for those rooms and spaces,

3  18 months; right?

4  A.   Yeah.  And actually those rooms don't actually have a

5  history toggle so they were always history on and you can't

6  turn it off.

7  Q.   That's right.  Employees cannot do anything to get those

8  chats off the record; right?

9  A.   Right.

10  Q.   All right.  So history off means that the chat is not

11  going to be retained by Google; correct?

12  A.   It's going to be there for 24 hours; correct.

13  Q.   And after those 24 hours, it is going to be permanently

14  destroyed; correct?

15  A.   Right.

16  Q.   And that's what that says here in that first line of this

17  exhibit?

18  A.   That's right.

19  Q.   That's literally why they're called off the record; right?

20  A.   I don't know what the history of that -- using that

21  term --

22  Q.   Yeah.

23  A.   -- is meant to refer to.

24  Q.   The term is also used in life; right?

25  A.   Sure.

1  Q.  Right.  And you say "off the record," meaning don't keep

2  this; right?

3  A.  Well, meaning it will be gone in 24 hours is the way that

4  I've taken it to mean.

5  Q.  Right.  It will be gone in 24 hours forever?

6  A.  True.

7  Q.  All right.  There is no way, just to be clear, to recover

8  an off-the-record chat after 24 hours has passed?

9  A.  That's right.

10  Q.  And the same goes for any documents that may have been

11  dragged and dropped in that chat unless it happens to be saved

12  somewhere else?

13  A.  Right.  And that's the more common case, is that the

14  document lives somewhere elsewhere where we are actually able

15  to preserve it.

16  Q.  You have no basis to make that conclusion; correct, sir?

17  A.  Which -- which part?

18  Q.  You have no idea what documents anyone is dragging and

19  dropping into Chats; right?

20  A.  Well, I know the documents that I drag and drop into

21  Chat --

22  Q.  Okay.

23  A.  -- and I know that they live in my drive and they're

24  preserved if I was under a legal hold.

25  Q.  Okay.  So for you, you can tell me what type -- your

1    practices are for what types of documents you drag and drop,

2    but you cannot tell me the business practices of any of the

3    other people at Google; correct?

4    **A.**   No.  I'm just sharing my personal experience as a Googler.

5    **Q.**   Okay.  But I just want to make sure the jury understands

6    you cannot tell us anything about what any other Googler does

7    in terms of what documents they drag and drop and whether those

8    documents are or are not retained anywhere else.

9    **A.**   That's true.

10   **Q.**   So we are going to talk more about the legal hold, and you

11   just referenced it as well, and we'll talk about what happens

12   in a moment, but I just want to set the stage a bit.

13        So when Google employee is placed on a legal hold, Google

14   automatically preserves all of their e-mails for the entire

15   period that they're on the hold; right?

16   **A.**   That's right.

17   **Q.**   And Google also automatically preserves the on-the-record

18   chats for individuals covered by a legal hold; right?

19   **A.**   That's right.

20   **Q.**   But that's not what Google did for off-the-record chats;

21   right?

22   **A.**   That's right.

23   **Q.**   And so just to be clear, and we'll come back to it, even

24   when someone was on a legal hold, Google permanently deleted

25   all of their off-the-record chats every 24 hours?

1   **A.**   If they were off the record, correct.

2   **Q.**   So let's talk a little bit more about this setting that's

3   actually used by folks at Google.

4        For all one-on-one chats or group chats, the default

5   setting for those chats is history off; right?

6   **A.**   Right.  We leave it up to individuals to decide.

7   **Q.**   Well, you leave it up to individuals to decide to turn

8   history on, but it is off by default?

9   **A.**   That's right.

10  **Q.**   Okay.  And Google employees are well aware that the

11  default for their Chats is off the record?

12  **A.**   That's right.

13  **Q.**   And so just to be clear, what that means, a default is

14  when someone opens up a new chat and starts a communication,

15  that chat will be off the record unless and until that

16  individual or someone else takes action to turn history on?

17  **A.**   That's right.

18  **Q.**   All right.  Let's put Exhibit 10104 on the screen please.

19       This is, once it appears, a screenshot of what a

20  one-on-one Google Chat looks like to a user; right?

21  **A.**   Yes, that's right.

22  **Q.**   And you see here at the top there's like the -- I don't

23  know, it kind of looks like a no smoking sign to me but there's

24  no cigarette.  It's like the circle with a slash next to it and

25  it says "HISTORY TURNED OFF."  Do you see that on the top?

LOPEZ - DIRECT / MOSKOWITZ

1   **A.**   Yes.

2   **Q.**   And it's in all caps, all capital letters?

3   **A.**   Yeah.  And I think that's -- I think that's intended to be

4   a clock.  So it's --

5   **Q.**   Ah.

6   **A.**   -- to let people know that in 24 hours they're not going

7   to have as much time as they might have with other history

8   settings.

9   **Q.**   Yeah.  It's telling them after 24 hours -- it's right

10  underneath, will be deleted after 24 hours; right?

11  **A.**   Yeah.  It's a reminder to make sure that if they do want

12  to have access to their conversations longer than 24 hours,

13  they should take other steps to preserve it.

14  **Q.**   Or it could be sending the message "Don't worry.  This

15  message is going away in 24 hours."  That's also a message it

16  can be conveying; right?

17  **A.**   I wouldn't want to speculate on that.

18  **Q.**   But you speculated on one of them; right?

19  **A.**   No, no, no.  That was actually specifically -- we support

20  Googlers who have questions about the product.  So one of the

21  questions that often comes up is:  Oh, how do I get messages

22  that I didn't intend to disappear after 24 hours?  And we have

23  to help them understand how the product works, an so that's

24  what I was describing in that.

25  **Q.**   Well, we can make our conclusions.

1      On the chat below there, you see that bar where the person

2  types in their text?

3  **A.**   Yes.

4  **Q.**   And that also says history is off; right?

5  **A.**   That's right.  Another reminder that they should be aware:

6  Here's the length of time that your messages will be available.

7  **Q.**   Sir, I'd just appreciate if you answer my questions yes or

8  no when they can be answered in that way.

9  **A.**   Sure.

10 **Q.**   Thank you.

11     So just as a Googler, Google employees are very clear when

12 sending chats that they are communicating off the record;

13 right?

14 **A.**   Yes.  It's in the product in multiple places, that's

15 right.

16 **Q.**   And Google employees also --

17     **THE COURT:**  We should probably -- do you want this in

18 evidence?

19     **MS. MOSKOWITZ:**  No.  It's just a demonstrative.

20     **THE COURT:**  Are you sure?

21     All right.  This is a just a demonstrative for

22 illustration purposes.  You won't see it again at the end of

23 the case.

24     Go ahead.

25 \\\

1    BY MS. MOSKOWITZ:

2    Q.   Google employees --

3         MS. MOSKOWITZ:  I don't know.  I might disagree with

4    myself there, Your Honor.  I am going to admit it.  Offer it

5    in.

6         THE COURT:  Any objection?

7         MR. KRAVIS:  No objection.

8         THE COURT:  All right.  It's admitted.

9         (Trial Exhibit 10104 received in evidence.)

10        MS. MOSKOWITZ:  You convinced me.

11        THE COURT:  Always the safer thing to do.

12   Go ahead.

13        MS. MOSKOWITZ:  Thank you.

14   BY MS. MOSKOWITZ:

15   Q.   So Google employees also know, and we looked at it here,

16   that their off-the-record chats will be permanently deleted

17   after 24 hours?

18   A.   That's right.

19   Q.   All right.  Employees are able to use off-the-record chats

20   for discussions that they may not want to put in e-mails;

21   right?

22   A.   Yeah, for any discussion, that's right.

23   Q.   Right.  Including one that they don't want to put in an

24   e-mail?

25   A.   I assume so, yeah.

1   Q.   And they can use off-the-record chats for things that they

2   may want to avoid having a record of after 24 hours?

3   A.   I wouldn't want to speculate on what was the mindset of

4   that person doing that.

5   Q.   Yeah, I'm not talking about a specific person.  I'm just

6   saying, if a person did not want something kept after 24 hours,

7   this is a tool that they could use for that?

8   A.   Sure.  Yeah.  In the same way as you can preserve things

9   for 30 days or 18 months, that's right.

10  Q.   Let's -- I'm just going to ask it again, and just stick

11  with me please.

12       Employees, if they want something to disappear after

13  24 hours that they want to communicate in writing to someone,

14  this is their tool?

15  A.   This is the way the product works, that's right.

16  Q.   All right.  Let's look at the "You said what?!

17  Communicate with care" training we looked at earlier that's in

18  evidence, 6056, and I'll ask you to turn to page 9, please.

19       This page, which is on the screen, is part of the

20  training; right?

21  A.   Yes.

22  Q.   And this is positing, this is putting a scenario in front

23  of the trainee that presents a frustrated employee named Echo

24  about to send an e-mail and the trainees are asked:  Should he

25  go ahead and send that e-mail or should he do something

1  different; right?

2  **A.**   That's right.

3  **Q.**   And the four potential answers of what do you think you

4  should tell Echo to do are:  Go ahead and send the e-mail,

5  revisit the e-mail in the morning, have an in-person

6  conversation in the morning, or chat off the record instead of

7  sending the e-mail; right?

8  **A.**   That's what it says, yep.

9  **Q.**   All right.  And so there's a walk-through in this training

10  of what happens if you click some of the wrong answers and some

11  of the right answers; right?

12  **A.**   Yes.

13  **Q.**   All right.  Now let's look at page 13, please.

14       This slide shows what happens if the employee clicks the

15  fourth option, chat off the record; right?

16  **A.**   Yes.

17  **Q.**   On the -- do you see that?

18  **A.**   Yep.

19  **Q.**   And that's the Hangouts thing that we mentioned?  That was

20  the name of the chat tool before?

21  **A.**   That's right.

22  **Q.**   All right.  The pop-out explains when someone clicks on

23  that "Better than sending the e-mail for sure"; right?  Do you

24  see that?

25  **A.**   Yes, that's what it says.

1    Q.    "But not without risk."  Do you see that?

2    A.    Yes.

3    Q.    Now, the risk that's being communicated here is that this

4    training is saying that even an off-the-record chat may still

5    not be good enough because someone could still keep a record of

6    it somehow.

7    A.    That's -- yeah, that's what it says.

8    Q.    And that is a negative?  That is a wrong answer; right?

9    A.    Yeah, absolutely.

10   Q.    All right.

11   A.    And I'm looking at the HR as well, and that feels like the

12   real risk there is, you know, sending something in anger that

13   you don't --

14   Q.    Sir, sir, you will have a chance to give your perspective

15   on this.  I'm not asking about HR at all.

16         Okay.  I'm just asking that this training is telling

17   people that there's still a risk that their record -- their

18   off-the-record chat still might end up in court, which is this

19   training is talking about because someone unbeknownst to that

20   user might screenshot that chat.  Yes?

21   A.    Yes, I agree.

22   Q.    All right.  Let's look at page 12, please.

23         This is what happens when you select the option "Talk to

24   the team lead in the morning."  Do you see that?

25   A.    Yes.

1  **Q.**   And it says "Awesome"; right?  A-plus; right?

2  **A.**   It says "Awesome," that's right.

3  **Q.**   Yeah.  That's a good answer?  It's green; right?

4  **A.**   Mm-hmm.

5  **Q.**   And in the first paragraph in this pop-out message the

6  employee sees, that if they really want to delve into the

7  problems that they're having with a product, a Google product

8  in this hypothetical -- right?

9  **A.**   Yes.

10  **Q.**   -- it says "That may become a pretty sensitive

11  discussion"; right?

12  **A.**   That's right.

13  **Q.**   This is saying this might be a pretty sensitive business

14  discussion that might come up here; right?

15  **A.**   It says "pretty sensitive discussion," that's right.

16  **Q.**   Right.  And it's talking about a business discussion here;

17  correct?

18  **A.**   True.

19  **Q.**   And this training is telling people that it is -- in the

20  second paragraph here -- it's less likely that a record of the

21  conversation could be discovered by an adversary and used

22  against you and Google in ways you didn't imagine; right?

23  **A.**   That's what it says, yep.

24  **Q.**   Saying "Pick up the phone.  Don't make a record"; right?

25  **A.**   That's what it says, yep.

1   **Q.**   All right.  So now users get this training, and I think

2   you referenced this earlier, users notwithstanding all that can

3   still turn history on for Chats; right?

4   **A.**   That's right.

5   **Q.**   All right.  And following the steps to do that, though,

6   only turns history on for the specific conversation that that

7   employee is engaged in at that time; right?

8   **A.**   Right.  For the messages going forward from that point,

9   that's right.

10  **Q.**   Right.  Next message they open, it's going to be back to

11  the default, history off?

12  **A.**   No.  So the history setting will stay for a conversation.

13  So if you and I are having a one-on-one and we set history on,

14  it will stay on for all the future conversations that you and I

15  might have.

16  **Q.**   Until one of us turns history off?

17  **A.**   That's right.

18  **Q.**   Right.  And now a new conversation you open up to talk to

19  the next person, that's back to history off by default?

20  **A.**   Right, assuming that we hadn't already turned history on

21  for our conversation.  It's a conversation between the

22  individuals involved.

23  **Q.**   Okay.  I don't think this is complicated, but I just want

24  to make sure I understand.

25       You and I are having a conversation.  It is off the record

1   until one of us turns history on; right?

2   **A.**   That's right.

3   **Q.**   And then after that, the messages are kept unless and

4   until one of us turns it back off; right?

5   **A.**   That's right.

6   **Q.**   Now, when I want to talk to my colleague here, I open up a

7   new chat, that is history off again by default?

8   **A.**   Yes, assuming that you never talked to that person before

9   and you hadn't already turned history on for that conversation.

10  Just because there can sometimes be gaps in months where you

11  might not chat with somebody; and, you know, whatever the

12  setting was the last time you chatted with them, that's what it

13  will be when you start a new conversation with them.

14  **Q.**   And the default setting that is used at Google is off the

15  record?

16  **A.**   Right, for new conversations --

17  **Q.**   Right.

18  **A.**   -- assuming you haven't done it previously, you can turn

19  history on.

20  **Q.**   And if no one turned history on, it's off the record

21  forever?

22  **A.**   That's right.

23  **Q.**   All right.  And I think you just mentioned this, when a

24  user turns history on, that only affects going-forward

25  messages; everything else is getting deleted?

1   **A.**   Right, unless you take some steps to preserve those other

2   messages.

3   **Q.**   Like screenshot or copy and pasting?

4   **A.**   Yeah, and there's a feature in the product called "Forward

5   to in-box" where you can also send up to four earlier messages

6   to your in-box so they get the 18-month e-mail retention.

7   **Q.**   You remember -- you and I talked before; right?

8   **A.**   Yeah.

9   **Q.**   Yeah.  In testimony?

10  **A.**   Yes.

11  **Q.**   All right.  And you remember me asking you about

12  forwarding e-mail, that function?

13  **A.**   Mm-hmm.

14  **Q.**   And do you remember, have you seen a single instance in

15  all of the documents produced in this case that that ever

16  happened?

17  **A.**   I haven't reviewed the documents produced in this case.

18  **Q.**   All right.  You've seen zero examples of that; correct?

19         **MR. KRAVIS:**  Objection.  Lack of foundation.

20         **THE COURT:**  Overruled.

21         **THE WITNESS:**  So just like I said, I don't know what

22  has been produced in this case, so I can't say.

23  **BY MS. MOSKOWITZ:**

24  **Q.**   Sir, I'm going to ask you one more time.  You have seen

25  zero examples in any of the documents produced in this case

1   where a user forwarded a chat to e-mail?

2   **A.**   Yes, I haven't seen any examples of that.

3   **Q.**   All right.  Let's look at an example.  We looked at what

4   the user sees in that 10104.  Let's look at a chat of how we in

5   this case see the chats.  If you could turn your binder to

6   6461, please.

7   **A.**   (Witness examines document.)  Okay.

8   **Q.**   This is a Google Chat between two Google employees dated

9   December 8, 2022; correct?

10   **A.**   That's right.

11        **MS. MOSKOWITZ:**  Your Honor, I move 6461 into evidence.

12        **MR. KRAVIS:**  No objection.

13        **THE COURT:**  It's admitted.

14   (Trial Exhibit 6461 received in evidence.)

15   **BY MS. MOSKOWITZ:**

16   **Q.**   All right.  So let's look at this on the screen.

17        This is exactly what a Google Chat looks like as they were

18   retained by Google and produced to Epic based on history being

19   turned on; right?

20   **A.**   Yes.

21   **Q.**   All right.  Now let's just look at this for a moment.

22        And -- well, withdrawn.

23        Google was on a legal hold at the time of this chat,

24   December of 2022; correct?

25   **A.**   I believe so, yep.

1    **Q.**   All right.  And we talked about it earlier.  August 13th,

2    2020, was the date that Google was legally obligated to begin

3    preserving evidence for this case?

4    **A.**   That's right.

5    **Q.**   All right.  So fair to say this was while the preserving

6    obligation was underway?

7    **A.**   I assume so, yeah.

8    **Q.**   You agree that Google was on a legal hold on December 8th,

9    2022?

10   **A.**   Yes.

11   **Q.**   Okay.  Now, this chat is the full chat that was produced;

12   correct?

13   **A.**   Correct.

14   **Q.**   And it starts with "Sounds good."  Do you see that?

15   **A.**   Yes.

16   **Q.**   So it appears that this chat is starting in the middle of

17   a conversation that was ongoing.  Do you agree with me?

18   **A.**   I don't know what the previous conversations would have

19   been.

20   **Q.**   Yeah.  Me neither.  I'm just saying that if there were

21   communications before, we wouldn't see them; right?

22   **A.**   Yes, I assume.

23   **Q.**   And just using your common sense, if you're looking at

24   this document -- and we can just take that "Sounds good" down.

25   Just look at this document.

**LOPEZ - DIRECT / MOSKOWITZ**

1    Do you agree with me that the most logical interpretation

2   of this is that someone turned history on in the middle of a

3   conversation?

4   **A.**   Yes, I think that's likely.

5   **Q.**   Okay.  And, in fact, I think we have a clue.  If you look

6   a few lines down, it says "Making a note via turning on

7   history."  That's the fourth message there.  Do you see that?

8   **A.**   Yes.

9   **Q.**   So that's someone communicating "I'm turning on history

10  FYI"; right?

11  **A.**   Yep, I think that's right.

12  **Q.**   All right.  So if that's what happened, history on was

13  turned on in the middle of the conversation, that's all we

14  would see, it was just where it went history on, "Sounds good";

15  right?

16  **A.**   That's right.

17  **Q.**   We don't see any indication in here of history on, history

18  off?  None of that; right?

19  **A.**   That's right.

20  **Q.**   And so what happens after this, after this gets turned on,

21  is the third message.  It says -- this individual says "I am on

22  a legal hold."  Do you see that?

23  **A.**   Yes.

24  **Q.**   So they then say under that "Prefer to keep chat history

25  off."  Do you see that?

**LOPEZ - DIRECT / MOSKOWITZ**

1   **A.**   Yes.

2   **Q.**   All right.  So the Google employee who apparently just

3   turned on history says "I'll turn it off."  Do you see that?

4   **A.**   Yes.

5   **Q.**   And the conversation after that, as it was produced to us,

6   immediately ends.  Yes?

7   **A.**   That's right.

8   **Q.**   Do you agree with me that what happened here is they

9   turned history off and the rest of the communications were

10  deleted?

11  **A.**   Yes.  That's the way the product works, that's right.

12  **Q.**   And that's what happened here?

13  **A.**   It appears to be, you're right.

14  **Q.**   We can put that away.

15       Let's go back to the legal hold.  We talked about that a

16  bit earlier?

17  **A.**   Yes.

18  **Q.**   Google sought to comply with its preservation obligations

19  by subjecting certain employees' communications to that legal

20  hold; right?

21  **A.**   That's right.

22  **Q.**   And those are individuals, I think we've covered this, but

23  those are individuals who may possess or may create documents

24  that are relevant to the issues in this case?

25  **A.**   That's right.

**LOPEZ - DIRECT / MOSKOWITZ**

1  **Q.**  So let's walk through what Google did and, again, let's

2  start with e-mail.

3      As you already testified, Google preserved all e-mails

4  from those employees who were added to the legal hold; right?

5  **A.**  That's right.

6  **Q.**  Employees did not have to do anything to make sure their

7  e-mails were being preserved; right?

8  **A.**  That's right.

9  **Q.**  And employees could not override the automated

10  preservation of their e-mails; right?

11  **A.**  That's right.

12  **Q.**  Google did not leave it up to those individuals to make

13  any decisions about what e-mails were going to be kept?

14  **A.**  That's right.

15  **Q.**  So if an employee had bad intentions and wanted to hide an

16  e-mail that they had sent that showed something bad, they could

17  not have deleted that document; right?

18  **A.**  That's the way the product works, that's right.

19  **Q.**  And if an employee had tried to do that, click "trashcan"

20  or "delete," whatever the button is, that e-mail would still be

21  kept; right?

22  **A.**  That's right.

23  **Q.**  Would it show an indication that it had been manually

24  deleted in the back-end system?

25  **A.**  No, I don't believe so.

1  **Q.**   Okay.

2       All right.  Let's talk about Chats.

3       There's that legal hold section in Exhibit 1 we were just

4  looking at.  Let's pull that back up for us.

5       Do you see where I am?

6  **A.**   Yes.

7  **Q.**   And that's the section that specifically describes what's

8  going to happen to Chats when a legal hold is implemented?

9  **A.**   That's right.

10 **Q.**   All right.  So like e-mails, on-the-record chats were also

11 automatically retained for individuals under a legal hold;

12 right?

13 **A.**   That's right.

14 **Q.**   That's right there in the first bullet.  Do you see that?

15 **A.**   Yes.

16 **Q.**   And those were kept indefinitely; right?

17 **A.**   That's right.

18 **Q.**   So instead of being retained for 30 days or 18 months,

19 forever, as long as they were under a legal hold?

20 **A.**   Exactly.

21 **Q.**   All right.  So, once again, employees subject to a legal

22 hold did not have to do anything to make sure their

23 on-the-record chats were automatically preserved?

24 **A.**   That's right.

25 **Q.**   So same as the e-mail, even if a person had the wrong

1    intent, a bad intent, and tried to delete a history-on chat

2    that had been sent while history was on, they couldn't do it;

3    right?

4    **A.**    That's right.

5    **Q.**    It was going to get preserved anyway?

6    **A.**    That's right.

7    **Q.**    All right.  Let's talk about what happened with

8    off-the-record chats for a moment.

9         Google did not take those same steps to automatically

10   preserve off-the-record chats?

11   **A.**    I don't think there's a technical capability to preserve,

12   yep.

13   **Q.**    Are you sure you want to say that?

14   **A.**    Well, I would just say in the normal course of business,

15   that's right.

16   **Q.**    Okay.  Well, we're going to come back to that.

17   **A.**    Okay.

18   **Q.**    All right.  Google did not take steps to automatically

19   preserve off-the-record chats; correct?

20   **A.**    That's right.

21   **Q.**    So all chats sent with history off continued to be

22   destroyed every 24 hours even though employees were on a hold?

23   **A.**    That's right.  The normal retention period applied, that's

24   right.

25   **Q.**    Right.  Google did not change its normal retention policy

1  for off-the-record chats even when it was on a legal hold to do

2  so?

3  **A.**   That's right.

4  **Q.**   All right.  Google could have changed the default setting

5  for all employees subject to a legal hold to have chat history

6  turned on; correct?

7  **A.**   That's right.

8  **Q.**   That is a technical capability that Google had to make

9  sure that all chats would be preserved; right?

10  **A.**   Right.  And if I can explain, the previous comment --

11  **Q.**   You will have a chance to explain.

12  **A.**   Okay.

13  **Q.**   I just want to make sure that we are all clear that Google

14  could have taken a step to change the default setting to

15  history on for every single employee subject to a legal hold;

16  correct?

17  **A.**   That's right.

18  **Q.**   And Google could have prevented anyone from ever removing

19  that to history off, from ever being able to switch it; right?

20  **A.**   That's right.

21  **Q.**   In fact, that's exactly what you do for those rooms and

22  spaces as you mentioned earlier?

23  **A.**   That's just the way the product works, that's right.

24  **Q.**   Sir, Google technically can stop users from being able to

25  move from history on to history off; correct?

1   **A.**   Yes.

2   **Q.**   And that is exactly technically what is done in rooms and

3   spaces?

4   **A.**   That's right.  It doesn't have a history toggle, that's

5   right.

6   **Q.**   Users are prevented by Google from being able to turn

7   history off for every chat sent in rooms and spaces?

8   **A.**   Yes, you cannot turn history off, that's right.

9   **Q.**   Right.  And that is a technical capability Google has that

10  it could have used for history on chats that were not rooms and

11  spaces?

12  **A.**   That's right.

13  **Q.**   And if Google had made those changes, history on by

14  default, no one can change it, that would have ensured that

15  every single chat sent from that moment forward would have been

16  preserved for every single employee subject to a legal hold?

17  **A.**   That's right.  All work and personal chats, that's right.

18  **Q.**   I hear you saying "personal chats."  I have zero interest

19  in them and this case has zero interest in them.  So please

20  just focus on substantive business communications that we all

21  agree are happening over chat; right?

22  **A.**   Yes, that's right.

23  **Q.**   Okay.  So when Google put all of these employees on a

24  legal hold, Google did not switch that default history to on

25  for any of those employees; correct?

1  **A.**   That's right.

2  **Q.**   And Google did not make that change at any point in time

3  for the entire period up to that end of 2022, end of discovery;

4  right?

5  **A.**   That's right.

6  **Q.**   That wasn't an oversight; correct?

7  **A.**   That was our policy, that's correct.

8  **Q.**   That was an intentional decision made by Google; right?

9  **A.**   That's right.

10  **Q.**   Now, Google could have instructed all employees who were

11  subject to a legal hold to change their personal default

12  setting to history on so that every conversation they started

13  would have history on; right?

14  **A.**   That's right.

15  **Q.**   And Google intentionally chose not to do that either?

16  **A.**   That's right.

17  **Q.**   And, in fact, Google dissuades employees from changing

18  their personal default setting to history on; isn't that right?

19  **A.**   I don't know if I'd agree with that.

20  **Q.**   All right.  Let's look at a document.

21       So there's a frequently asked questions that is associated

22  with the chat retention policy.  Are you familiar with that?

23  **A.**   Yes.

24  **Q.**   All right.  Why don't you please turn in your binder to

25  Exhibit 10002.  It's probably pretty close to the back.

**LOPEZ - DIRECT / MOSKOWITZ**

1    **A.**   (Witness examines document.)

2    **Q.**   Are you there?

3    **A.**   Yes.

4    **Q.**   This is Google's frequently asked questions or FAQ page on

5    Google Chat retention?

6    **A.**   Yes.

7    **Q.**   I heard it referred to as a FAQ yesterday, which is the

8    first time I've heard that, but F-A-Q is how I'm going to refer

9    to it, if that's okay.

10   **A.**   That sounds good.

11   **Q.**   All right.

12       **MS. MOSKOWITZ:**  Your Honor, I move 10002 into

13   evidence.

14       **MR. KRAVIS:**  No objection.

15       **THE COURT:**  It is admitted.

16   (Trial Exhibit 10002 received in evidence.)

17       **MS. MOSKOWITZ:**  All right.  Let's put that up on the

18   screen, please.

19   **BY MS. MOSKOWITZ:**

20   **Q.**   If you could turn -- sorry.  Just before we go, this is

21   the Google Chat retention FAQ page?  Yes?

22   **A.**   Yes.

23   **Q.**   Thank you.  Sorry.

24       Turn to the second page of the document, please.

25       The last question on this page is (as read):

1              "Can I change my history defaults?"

2       Do you see that?

3  **A.**   That's right.

4  **Q.**   And the answer is (as read):

5              "Yes, but be mindful about the risk of overretaining

6       chat conversations."

7       Do you see that?

8  **A.**   Yes.

9  **Q.**   All right.  And then it goes on (as read):

10             "If you still wish to change your default setting..."

11      It then explains how you can do that; right?

12 **A.**   That's right.

13 **Q.**   All right.  You can put that away.

14      To be clear, Google never did anything to ensure that the

15 custodians in this case, the people who were subject to the

16 legal hold, did that action; right?

17 **A.**   That's right.

18 **Q.**   And you don't know whether any of them did take that

19 action?

20 **A.**   I don't.

21 **Q.**   So what we are left with are people who were under a legal

22 hold who remained with history off as a default; right?

23 **A.**   That's right.

24 **Q.**   And, again, if history was off when a chat was sent, even

25 when under a legal hold, that chat was deleted after 24 hours?

1    **A.**    That's right.

2    **Q.**    So instead of taking affirmative steps to prevent deletion

3    of Chats for people on legal hold, Google left it up to the

4    individual employee to decide on a chat-by-chat basis what to

5    preserve?

6    **A.**    Right.  After being instructed, that's right.

7    **Q.**    They were instructed to make the call themselves; right?

8    **A.**    Right.  They were given instructions on how to use Chat

9    while they were under a legal hold.

10   **Q.**    And we'll get back to that.

11        But the instructions you're referring to are:  Don't use

12   Chat to talk about business; and if you do, turn history on.

13   That's what you're referring to?

14   **A.**    Yeah.  So it says:  Don't use Chat to talk about any

15   matters related to the legal hold.  So -- and, also, if a

16   conversation strays into a topic that's related to the hold,

17   they are instructed to immediately turn history on to make sure

18   those messages are preserved.

19   **Q.**    Right.  And let's just talk about that for a second.

20        So you have no basis to testify that any individual has

21   any idea about what issues may or may not be relevant to a

22   legal hold that they're under; right?

23   **A.**    No.

24   **Q.**    And in that second scenario, if the conversation strays

25   into something, even assuming they have a clue that it has

1    strayed, if they turn history on, the first time it strayed is

2    deleted; right?

3    **A.**    That's right, unless they take the steps that we already

4    talked about.

5    **Q.**    Right.  That screenshot or the forward that we've never

6    seen any examples of?

7    **A.**    That's right.

8    **Q.**    All right.  So Google relied entirely on individual

9    employees to decide which of their off-the-record chats would

10   be preserved and which ones would be destroyed; right?

11   **A.**    That's right.

12   **Q.**    And those employees include some of the business people

13   that are going to come testify to the jury in this case; right?

14   **A.**    That's right.  It applied to the whole company, that's

15   right.

16   **Q.**    Yeah.  So business people who are going to come testify in

17   this trial were put in charge of deciding which of their Chat

18   communications would be kept as evidence and which would be

19   destroyed?

20   **A.**    Right.  They were given explicit instructions, and then

21   they were expected to fulfill their obligations, that's right.

22   **Q.**    Right.  But you don't know if they did?

23   **A.**    Oh, no, I don't.

24   **Q.**    You have no idea?

25   **A.**    No.  I'm not involved in those conversations.

1   Q.   All right.  So let's just talk about that don't use Chats

2   instruction again.  You don't know if they complied with that;

3   right?

4   A.   No.  We don't track individual employees, that's right.

5   Q.   And you didn't, like, disable Chats for them?  You didn't

6   say, "You know what?  I'm not going to leave it up to them.

7   I'm just going to not let them use Chats at all."  Right?  You

8   didn't do that?

9   A.   No.

10  Q.   Okay.  So, in fact, you understand that business people

11  use Chats everyday to conduct their business?

12  A.   We all use Chat every day, that's right.

13  Q.   Right.  And all the witnesses who are going to come

14  through here use Chats every day conduct business?

15  A.   That's right.

16  Q.   And no one in your department ever audited the relevant

17  employees' Google Chats to make sure nothing relevant to this

18  litigation was getting missed; right?

19  A.   Not that I'm aware of.

20  Q.   There was never any check to make sure relevant evidence

21  was not being deleted; correct?

22  A.   Not that I'm aware of, nope.

23  Q.   It's not just not that you're aware.  You know the answer

24  is no, do you not, sir?

25  A.   I believe that's right, yep.

1  **Q.**   Because you don't even have a way to do it; right?

2  **A.**   That's right.

3  **Q.**   All right.  So the answer is, no, nothing was done;

4  correct?

5  **A.**   Correct.

6  **Q.**   You concede that while Google was on a legal hold, a legal

7  obligation to preserve evidence for this case, that Chats were

8  destroyed?

9  **A.**   The normal policy was in effect, that's right.

10  **Q.**   So the answer is a yes.  You concede that while Google was

11  under a legal obligation to preserve evidence, Chats were

12  destroyed?

13  **A.**   Chats on any topic.  And that's the thing.  We actually

14  don't know what those Chats were about.

15  **Q.**   Yeah, I understand.  That is part of our frustration.

16       I just want to understand --

17          **MR. KRAVIS:**  Objection.

18  **BY MS. MOSKOWITZ:**

19  **Q.**   -- your testimony?

20          **THE COURT:**  Overruled.

21  **BY MS. MOSKOWITZ:**

22  **Q.**   You concede that business Chats were destroyed while

23  Google was under a legal obligation to preserve evidence?  Yes

24  or no.

25  **A.**   I don't know what the substance of those Chats were.

1   **Q.**   Can you tell me that not a single substantive business

2   communication was deleted?

3   **A.**   I don't know.   That's the challenge.

4   **Q.**   Yeah.   Google has not done any analysis to understand how

5   many Google Chats are sent on a daily basis; right?

6   **A.**   That's right.

7   **Q.**   Google intentionally chooses not to monitor the contents

8   of Chats; right?

9   **A.**   That's right.

10  **Q.**   Google cannot tell us how many Google Chats from these

11  employees were deleted?

12  **A.**   That's right.

13  **Q.**   And you cannot tell me anything -- you just said it -- you

14  cannot tell me anything about what was in those Chats that were

15  deleted?

16  **A.**   That's right.

17  **Q.**   And you agree, though, that it's quite possible that those

18  deleted Chats contained substantive business communication;

19  right?

20  **A.**   I don't know the substance of those Chats.

21  **Q.**   You can't even tell me that it's possible?

22  **A.**   I wouldn't want to speculate.

23          **MS. MOSKOWITZ:**   All right.   Your Honor, I pass the

24  witness.

25          **THE COURT:**   Okay.

1          <u>CROSS-EXAMINATION</u>

2     **BY MR. KRAVIS:**

3     **Q.**   Good morning, Mr. Lopez.

4     **A.**   Good morning.

5     **Q.**   Let me start here:  At the time that this lawsuit was

6     filed, were Google employees who might have relevant

7     information given instructions about Chats?

8     **A.**   Yes.

9     **Q.**   What were those instructions?

10    **A.**   Yeah, so like we just talked about, they were instructed

11    to avoid using Chat if it was any topic related to the legal

12    hold; or because conversations are fluid and you switch back

13    and forth between topics, if a chat became about or related to

14    the legal hold, they were instructed to immediately turn

15    history on at that point to make sure that those messages were

16    preserved.

17    **Q.**   Okay.  Let me take a step back.

18        You said you're employed at Google; right?

19    **A.**   Correct.

20    **Q.**   How long have you been working at Google?

21    **A.**   I just passed four years at Google.

22    **Q.**   And what is your title at Google?

23    **A.**   I am the information governance lead.

24    **Q.**   And what are your responsibilities in that job?

25    **A.**   Yeah, so I manage a team that's responsible for ensuring

1  that Google's corporate data is appropriately retained and

2  secured.  We create and maintain policies about that corporate

3  data and we communicate those to employees, and then we help

4  support disposal of data after its useful life.

5  **Q.**  I want to ask you about the Chats product in just a

6  second; but before I do that, I have just a few questions for

7  you on the slide deck that my colleague showed you during her

8  examination.

9      So could I ask you to pull up again Exhibit Number 6056,

10  please?

11      Mr. Lopez --

12  **A.**  (Witness examines document.)  I got it.

13  **Q.**  Mr. Lopez, this is the training document that you were

14  asked about in the examination a few minutes ago; right?

15  **A.**  That's right.

16  **Q.**  Could you turn for me, please, to page 3 of the document?

17  **A.**  Yep, I can see it.

18  **Q.**  Now, I think my colleague during her examination asked you

19  about the first paragraph of this slide.  I was wondering if

20  you could read for us, please, the text in the second paragraph

21  of the slide.

22  **A.**  Sure.  So it says (as read):

23          "This is not about hiding stuff or not pointing out

24      something that may need fixing.  Speaking up is a core

25      company value.  This is about being thoughtful in your

1          communication in order to reduce the risk of unintended

2          harm to Google and/or you."

3   **Q.**   Now, on -- in this deck you were also shown a hypothetical

4   or a training exercise involving an employee named Echo.  Do

5   you remember that?

6   **A.**   Yes.

7   **Q.**   Okay.  Can you look at that for me, please?  That started,

8   I think, on page 9 of the exhibit.

9   **A.**   Great.  Yep.  I can see it.

10  **Q.**   And this is the training exercise about the late-night

11  e-mail that you were asked about in the last examination;

12  right?

13  **A.**   That's right.

14  **Q.**   And under the activity, you see it says "What do you think

15  you should tell Echo to do" and then there's four choices?

16  **A.**   Yes.

17  **Q.**   And if you flip ahead to Slide 11, so just a couple

18  slides, two of the options -- the choices are red and two of

19  them are green.  Do you see that?

20  **A.**   Yes.

21  **Q.**   And I think you testified in your earlier examination that

22  the red answers are like the wrong answers and the green ones

23  are like the right answers?

24  **A.**   That's right.

25  **Q.**   The one that says "Don't send the e-mail chat off the

1  record via Hangouts instead," is that in the training a right

2  answer or a wrong answer?

3  **A.**   That appears to be a wrong answer.

4  **Q.**   Now if you look at the slide that discusses that answer

5  specifically, that's Slide Number 13, I think you were asked in

6  the last examination about the text in that sort of call-out

7  box.  Do you see that there?

8  **A.**   Yes.

9  **Q.**   And I think you were pointing to something here about the

10  HR concern.  Can you explain for me what you meant by that?

11  **A.**   Yeah.  So the way I interpret this is, you know, we're all

12  familiar with rage responding if you get a frustrating

13  situation at work, and the advice is always to cool off.  Some

14  people actually schedule e-mails to send at a later time just

15  in case you have a chance to rethink your response.

16       So here -- I'm interpreting that here as:  Hey, you might

17  say something in a personal nature that you might regret, so

18  maybe just like take a break for the night and then, you know,

19  revisit it in the morning.

20  **Q.**   Okay.  That's all I have for you in the deck.

21       Let me ask you about Chats.

22       We can pull that down.  Thank you.

23       Now, Mr. Lopez, I think you were asked in the last

24  examination about Google employees using Chats to communicate

25  about I think the language was important business information.

1   Do you remember that?

2   **A.**   Yes.

3   **Q.**   And I believe you testified that the Chats tool allows

4   employees to chat about substantive business information.  Did

5   I hear that testimony correctly?

6   **A.**   That's right.

7   **Q.**   Based on your own experience at Google, is important

8   business information the only thing that Google employees use

9   Chats for?

10   **A.**   No.  It's a really interesting mix of personal and

11   professional basically at all times.

12   **Q.**   And based on, again, just your own personal experience

13   with the product, can you give me an example of group chats

14   that you're familiar with at Google on nonbusiness --

15   nonimportant business information topics?

16   **A.**   Yeah.  So, I mean, I'm personally in a group chat with

17   some coworkers that we've been friends for years now, and we

18   use chat to share birth announcements, someone gets a

19   promotion.  Super exciting stuff, but it's personal and it's

20   private.  So, yeah, we're always thoughtful about, you know,

21   kind of -- yeah, we might be more kind of transparent there on

22   a personal level than we might be with, like, with regular

23   coworkers.

24   **Q.**   And are you also familiar -- again, your own personal

25   experience -- with sensitive personal topics discussed at

1   Google using the group chat tool?

2          **MS. MOSKOWITZ:**  Objection.  Relevance.

3          **THE COURT:**  Oh, you can go ahead.

4          **THE WITNESS:**  Yeah.  So at Google we have, like,

5   employee resource groups, which are just, you know, on specific

6   topics.  Some of them that I'm personally aware of are on

7   topics like substance abuse recovery.  Those group chats,

8   again, are places where folks are incredibly vulnerable.  They

9   share incredibly sensitive information about themselves.  And

10  part of the reason why we feel comfortable doing that is

11  because we know it's only going to be there for a short period

12  of time and it's not going to be around, you know, any longer

13  than we want it to.

14  **BY MR. KRAVIS:**

15  **Q.**   So let me now ask you about the policy that my colleague

16  was asking you about.  I think this is Exhibit 1 in the binder

17  that you have in front of you.

18          And could -- great.  Thanks.

19          Now, Mr. Lopez, I want to ask you about Google's policies

20  with respect to the retention of Chats, and I want to start by

21  asking about how the policy works when there is no lawsuit or

22  legal hold pending.  So I'd like to start there.  Okay?

23  **A.**   Okay.

24  **Q.**   Now, what is the preservation policy for threaded rooms or

25  spaces in that scenario when there is no lawsuit or no legal

1   hold pending?

2   **A.**    Yeah, so I think we talked about this before, but these

3   are project or kind of team-based rooms so their history is

4   always on, it can't be turned off, and those are retained for

5   18 months.

6   **Q.**    And do you see in the document you have in front of you,

7   Exhibit 1, the heading that says "Retention Periods"?

8   **A.**    Yes.

9   **Q.**    This is -- is this the portion of the document that's

10  describing the policy that exists when there's no lawsuit, no

11  legal hold?

12  **A.**    Right.  Exactly.

13  **Q.**    And the policy that you just described, threaded rooms

14  preserved for 18 months, do you see that in this portion of the

15  document?

16  **A.**    Yes.

17  **Q.**    Where is that?

18  **A.**    That's the fourth bullet down.

19  **Q.**    And can you remind us again, please, what is a threaded

20  room or a space?

21  **A.**    Yeah.  It's just another conversation type, but it's

22  specific for teams or project-based where the same topic is

23  going to be coming up over and over again, and it's just a way

24  to kind of keep the topics kind of easy and convenient for

25  folks on the team.

1  **Q.**   And what about the one-on-one chats and the group chats?

2  Again, when there is no lawsuit or legal hold pending, what is

3  the preservation policy for those conversation types?

4  **A.**   Yeah, so if the history is off, 24 hours is how long those

5  are retained, and then -- oh, sorry.  Go ahead.

6  **Q.**   No, no.  That's fine.

7       Let me ask you now -- I want to ask you now about the

8  policy -- the preservation policies in place when a legal hold

9  is pending.

10      I think you mentioned this in the prior examination, but

11 just to remind us, what is a legal hold?

12 **A.**   Yeah, so a legal hold is a process that an organization

13 uses to preserve any potentially relevant forms of information

14 when litigation is pending or it's reasonably anticipated.

15 **Q.**   And what are the circumstances under which the company

16 might issue a legal hold?

17 **A.**   When we believe that an individual Google employee might

18 have potentially relevant information and litigation is pending

19 or anticipated.

20 **Q.**   So let me direct you to the bottom of the first page of

21 Exhibit 1.  Do you see the heading there that says "Legal

22 Holds"?

23 **A.**   Yes.

24 **Q.**   And then carrying over to the next page of the exhibit, is

25 this the section that describes what Google's policy -- what

**LOPEZ - CROSS / KRAVIS**

1  the policy says about the preservation of Chats when there is a

2  legal hold pending?

3  **A.**   That's right.

4  **Q.**   Okay.  So for threaded rooms or spaces, how does the

5  preservation work under this policy when there is a legal hold

6  pending?

7  **A.**   So it just means that all messages within that space or

8  that room will be retained for the entire length of the legal

9  hold.

10  **Q.**   And just to make sure it's clear, when there's no legal

11  hold pending, it's 18 months; when there is a legal hold

12  pending, it's the duration of the litigation?

13  **A.**   That's right.

14  **Q.**   And what about on-the-record or history on one-on-one

15  group chats?

16  **A.**   Yeah, so it seems -- it works the same way.  If you're on

17  legal hold and your history is on, those will also be preserved

18  for the entire length of the legal hold.

19  **Q.**   Now, I think that my colleague asked you about the

20  practice of dragging and dropping documents into a chat.  Do

21  you remember those questions?

22  **A.**   That's right.

23  **Q.**   And I think what I heard you say was the Chat tool has

24  that capability; you can drag and drop a document into it, and

25  then it gets shared in the chat.  Do I have that right?

**LOPEZ - CROSS / KRAVIS**

1   **A.**   That's right.

2   **Q.**   And I think what I heard you say is that even for an

3   off-the-record or a history-off chat, the dragged-and-dropped

4   document would still be preserved if it was saved somewhere

5   else.  Did I hear that correctly?

6   **A.**   That's right.

7   **Q.**   Can you explain what you meant by that?

8   **A.**   Yeah.  So basically in a conversation stream, you'll have

9   messages.  Someone might say, "Hey, take a look at this

10  presentation I created."  They'll drag it and drop it.  So what

11  you see in the conversation is, you know, the, icon to the

12  file, but the file lives elsewhere.  So if it's on legal hold,

13  it's preserved there for the entire length of the lawsuit.

14       In the conversation stream, it will eventually be removed

15  by the retention period, but that doesn't mean that the actual

16  underlying document or file isn't still preserved, because it

17  is.

18  **Q.**   And the last set of questions I have for you is about the

19  F-A-Q, or I guess we're calling it the FAQ now -- we're not

20  calling it FAQ.

21  **A.**   F-A-Q.

22  **Q.**   Okay.  It's Exhibit 10002.  Can you find that in the

23  binder, please?

24  **A.**   Yep.

25  **Q.**   I think my colleague asked you about the -- this is the

1    FAQ on Chats; right?

2    **A.**    That's right.

3    **Q.**    I think my colleague asked you about the paragraph on the

4    second page.  I want to direct your attention to the second

5    question in the FAQ on the first page, please.

6    **A.**    (Witness examines document.)  Yep.

7    **Q.**    Can you read the question and answer for us, please?

8    **A.**    Sure.  So the question is (as read):

9         "What if I am subject to a legal hold?"

10    And the answer is (as read):

11         "Please see the guidance in the legal holds section

12    on the Google Chat retention policy page."

13    **Q.**    And is that the legal hold section that we were just

14    looking at all the way back on Exhibit 1?

15    **A.**    Yes, exactly.

16    **Q.**    All right.  Now, my colleague also asked you about the

17    Chats in this case and whether there were any -- well, let me

18    start another way.

19         What are the different ways that a Google employee can

20    preserve a chat?

21    **A.**    So you can take a screenshot.  You can copy and paste the

22    text into a Google doc or some other -- like an e-mail.  We

23    talked about forward to in-box.  You can actually forward

24    messages to your e-mail in-box, or you can just turn history on

25    if you decide going forward that you want to have that setting.

LOPEZ - REDIRECT / MOSKOWITZ

1  **Q.**   And how exactly would a Google employee go about turning

2  history on?

3  **A.**   Yeah, it's really straightforward.  So in the -- in the

4  tool there's just a three kind of dot menu, you just click it,

5  and one of the options in the next menu is history on or

6  history off depending on whichever the setting is at the time.

7  **Q.**   Now, I think my colleague asked you some questions about

8  whether the forward-to-in-box feature was in any of the

9  materials produced in this case.  I just want to make sure I'm

10  clear about your role.

11      Did you review the documents that were produced in this

12  case?

13  **A.**   No.

14  **Q.**   Not your job?

15  **A.**   Not my job.

16  **Q.**   Thank you, Mr. Lopez.

17         **MR. KRAVIS:**  No further questions.

18         **THE COURT:**  Redirect?

19         **MS. MOSKOWITZ:**  Thank you, Your Honor.  May I proceed

20  once I get my microphone fixed?

21                    <u>**REDIRECT EXAMINATION**</u>

22  **BY MS. MOSKOWITZ:**

23  **Q.**   Mr. Lopez, your counsel asked you a bunch of questions

24  about your personal use of Chat; right?

25  **A.**   That's right.

1  **Q.**   And I just want to be clear.  You also know that Google

2  employees use Chat for substantive business communications;

3  right?

4  **A.**   That's right.

5  **Q.**   You -- I showed you a number of them when we were last

6  talking; right?

7  **A.**   That's right.

8  **Q.**   That was a prior testimony under oath?

9  **A.**   Yes.

10  **Q.**   Do we need to go through those again?

11  **A.**   No.  I remember them well.

12  **Q.**   Okay.  So you concede that there are many instances of

13  Google employees conducting substantive business communications

14  over Chat?

15  **A.**   Oh, yeah, absolutely.

16  **Q.**   And they do so off the record as well?

17  **A.**   Yes.

18  **Q.**   All right.  You were asked or you said, I think, something

19  along the lines of your job is to set these retention policies

20  to determine when to dispose of documents after they've reached

21  the end of their useful life, or something along those lines?

22  **A.**   That's right.

23  **Q.**   And when a document is at the end of its useful life is a

24  decision that Google's making as a business matter; right?

25  **A.**    That's right.  It's based on the substantive business

1   value of that item.

2   **Q.**   To be clear, when a Google is subject -- Google employee

3   or Google itself is subject to a legal hold, that completely

4   overrides any business determination of the value of a

5   document; right?

6   **A.**   Right.  As long as it's relevant to the legal hold, that's

7   right.

8   **Q.**   The business value of whether a document has ended its

9   useful life has absolutely no bearing on whether that document

10  needs to be preserved; correct?

11  **A.**   That's right.

12  **Q.**   The instructions that Google employees received to comply

13  with the legal hold left it up to that employee to take

14  affirmative steps to save off-the-record chats; right?

15  **A.**   That's right.

16  **Q.**   And you did not do anything to confirm that they, in fact,

17  did so?

18  **A.**   I didn't personally, no.

19  **Q.**   No one at Google did; right?

20  **A.**   That's right.

21  **Q.**   Even a well-meaning employee -- we talked about some

22  bad-intending employees.  Even a well-meaning employee could

23  forget to turn history on?

24  **A.**   That's right.

25  **Q.**   And if they forgot, those chats are deleted forever?

**LOPEZ - REDIRECT / MOSKOWITZ**

1   **A.**   That's right.

2   **Q.**   And an employee might not even realize that the topic is

3   subject to a legal hold or possibly at issue in a litigation;

4   right?

5   **A.**   That's possible.

6   **Q.**   And those chats are going to get deleted; right?

7   **A.**   That's right.

8   **Q.**   And, of course, if the employee is not well-intentioned,

9   they can intentionally leave history off and conduct

10  communications on issues relevant to this case; right?

11  **A.**   I wouldn't want to speculate on that.

12  **Q.**   They can do it; right?

13  **A.**   The tool is like all other technologies; it can be used

14  for both good and bad.

15  **Q.**   And Google has no way to know whether it was used for good

16  or for bad here?

17  **A.**   That's right.

18  **Q.**   And, again, you cannot speak to what the actual content

19  was, whether it was personal or whether it was, in fact,

20  business communications, that was happening in the chats that

21  were destroyed in this case; right?

22  **A.**   That's right.

23  **Q.**   You cannot guarantee to this jury that the evidence that

24  was in the destroyed chats would not have contradicted the

25  documents that Google actually produced; right?

**PROCEEDINGS**

1   **A.**   I don't know.  That's right.

2   **Q.**   You cannot guarantee to this jury that the documents that

3   were destroyed wouldn't have contained evidence that is going

4   to contradict the witness testimony the jury's going to hear;

5   right?

6   **A.**   I don't know the answer to that.

7   **Q.**   We'll never know the answer to that; right?

8   **A.**   That's right.

9           **MS. MOSKOWITZ:**  No further questions, Your Honor.

10          **THE COURT:**  Okay.  Any questions from the jury?

11                          (No response.)

12          **THE COURT:**  All right.  You may step down.  Careful on

13   the way down.

14                          (Witness excused.)

15          **THE COURT:**  Let's take our morning break, and we'll be

16   back a little bit after 11:10.

17          **THE CLERK:**  All rise.

18                      (Recess taken at 10:53 a.m)

19                  (Proceedings resumed at 11:11 a.m)

20      (Proceedings were heard out of the presence of the jury:)

21          **THE COURT:**  Which one?

22          **MS. MOSKOWITZ:**  I'm hopeful that maybe we can resolve

23   it, but it's Exhibit 148.

24          **THE COURT:**  In this binder?

25          **MS. MOSKOWITZ:**  Sorry?

1        **THE COURT:**  In this binder?

2        **MS. MOSKOWITZ:**  No -- actually, yes.  Except that --

3        **THE COURT:**  This is the one we already talked about

4    it, isn't it?

5        **MS. MOSKOWITZ:**  We did, in part.  This was the subject

6    of the motion that was discussed this morning.

7      I am prepared -- in terms of what Activision has concerns

8    about, I am prepared to, for purposes of just what goes on the

9    screen right now, cover only one chunk of this thing, and I've

10   shown it to Activision's counsel.  I don't know if she's had an

11   opportunity to discuss it with her client.

12       **MS. PARSIGIAN:**  Your Honor, I'm just conferring with

13   my client.  If -- the document in whole we still have overall

14   concerns about confidentiality unsealing; but if -- counsel has

15   informed me that she's able to limit what she shows for the

16   moment to this portion, and I'm just waiting for confirmation

17   of whether we view that as creating a confidentiality concern.

18       **THE COURT:**  Well --

19       **MS. MOSKOWITZ:**  Alternatively, Your Honor --

20       **MS. PARSIGIAN:**  I apologize.  She just -- she just let

21   me know that this was what she would limit it to.

22       **MS. MOSKOWITZ:**  Alternatively, Your Honor, you can

23   just rule on that paragraph.

24       **THE COURT:**  That's not an alternative.  We're not

25   waiting on Activision to decide the issue.

1      So what is it you want -- what is the point here that's --
2   where's the objection located?
3           MS. MOSKOWITZ:  Page 003 is the snippet that I'm
4   planning to show, and it starts "YouTube" on the bottom of that
5   page.
6           THE COURT:  "YouTube."
7           MS. MOSKOWITZ:  Down to the rest of that page,
8   Your Honor.
9           THE COURT:  Where is the reference to Activision?
10          MS. PARSIGIAN:  The ABK reference is Activision.  This
11  full document recounts negotiations between --
12          THE COURT:  A 2019 e-mail?
13          MS. PARSIGIAN:  Yes.  This is negotiations for a deal,
14  Your Honor, that is still in place.  We reviewed your orders,
15  and I discussed them with my client.  One of the items that you
16  noted was that there is an ongoing business relationship.  This
17  is negotiations for --
18          THE COURT:  No, that's -- if you're reading my order
19  that way, you're reading it far too broadly.
20      This is a 2019 e-mail saying Activision wanted something
21  to happen in 2019.  So that's perfectly fine.
22      What else in here is objectionable?
23          MS. PARSIGIAN:  The document as a whole recounts
24  potential deal terms for across business units with a lot of
25  detail about a deal that was signed in 2020 and still is in

PROCEEDINGS

 1   place, Your Honor.

 2          THE COURT:  Ms. Moskowitz, you want to use -- what

 3   else do you want to use besides this YouTube section on page 3.

 4          MS. MOSKOWITZ:  Your Honor, I intend to do much more,

 5   but the rest of the document is not -- is Google's information

 6   and not Activision.

 7          THE COURT:  Okay.

 8          MS. MOSKOWITZ:  So there's a lot more in the document.

 9          THE COURT:  All right.  That's perfectly fine.  You

10   can do that.

11          MS. MOSKOWITZ:  Thank you, Your Honor.

12          THE COURT:  Anything else?

13          MS. MOSKOWITZ:  No.

14          MS. PARSIGIAN:  No.

15          THE COURT:  Okay.  Let's bring the jury in.

16      (Proceedings were heard in the presence of the jury:)

17          THE COURT:  Okay.  Who do we have next?

18          MS. MOSKOWITZ:  Your Honor, Epic calls Lawrence Koh.

19          THE COURT:  All right.

20          THE CLERK:  Please stand and raise your right hand.

21                      **LAWRENCE KOH**,

22   called as a witness for the Plaintiff, having been duly sworn,

23   testified as follows:

24          THE WITNESS:  Yes, I do.

25          THE CLERK:  Thank you.  Please be seated.

1    Please state your full name for the Court and spell your

2  last name.

3        THE WITNESS:  My name is Lawrence Koh, K-O-H.

4        THE CLERK:  Thank you.

5        MS. MOSKOWITZ:  May I proceed, Your Honor?

6        THE COURT:  Yes, please.

7        MS. MOSKOWITZ:  Thank you.

8                    <u>**DIRECT EXAMINATION**</u>

9  BY MS. MOSKOWITZ:

10  Q.   Good morning, Mr. Koh.

11  A.   Good morning.

12  Q.   My name is Lauren Moskowitz.  I represent Epic.

13    You have a binder in front of you.  Do you have access to

14  that?

15  A.   Yes, I do see it.

16  Q.   Okay.  Thank you.

17    You joined Google in January of 2019; right?

18  A.   That is correct.

19  Q.   And you left Google in the end of 2020?

20  A.   That is correct.

21  Q.   And the entire time you were at Google, you were a

22  director and the global head of games business development;

23  right?

24  A.   That is correct.

25  Q.   And in that capacity you led a team of about 10 to 12

1  business managers; right?

2  **A.**   That is correct.

3  **Q.**   And your team's primary responsibility was to manage

4  Google's relationships with game developers; right?

5  **A.**   That was one of the responsibilities.

6  **Q.**   Was that the primary responsibility?

7  **A.**   Yes, you can say that.

8  **Q.**   You're familiar with something called Project Hug; right?

9  **A.**   Yes, I am.

10 **Q.**   And you learned about Project Hug during your first month

11 at Google; is that correct?

12 **A.**   Around that time, yes.

13 **Q.**   Project Hug was later renamed the Games Velocity Program;

14 is that right?

15 **A.**   That is correct.

16 **Q.**   And it was given a different name because there was a

17 general consensus that Project Hug was not a name that was

18 going to be appropriate to go forward with externally?

19 **A.**   We had always assumed that was an internal code name.

20 **Q.**   And that code name was given to the effort within Google

21 to enter into agreements with a specific list of large game

22 developers; right?

23 **A.**   That is correct.

24 **Q.**   And during your time at Google, Project Hug was one of

25 your top priorities; right?

1    **A.**    Yes, it was.

2    **Q.**    And you were one of the business leads on actually getting

3    individual Project Hug deals executed?

4    **A.**    That is correct.

5    **Q.**    You're familiar with the Business Council at Google?

6    **A.**    Yes, I am.

7    **Q.**    And the Business Council at Google is a group of Google

8    executives who approve certain projects that require

9    substantial spending; right?

10   **A.**    Yes, that's correct.

11   **Q.**    And as of April of 2019, that Business Council even

12   included the CFO of Google, Ruth Porat; correct?

13   **A.**    Yes, that was my understanding.

14   **Q.**    And Project Hug was presented to the Business Council in

15   April of 2019; correct?

16   **A.**    Yes, that is correct.

17   **Q.**    And you were part of the group that reviewed and provided

18   feedback on the presentation that was actually presented to the

19   Business Council at that meeting?

20   **A.**    Yes, that is correct.

21   **Q.**    If you could please turn your binder to Exhibit 136.  And

22   let me know when you're there, please.

23   **A.**    (Witness examines document.)  I see it now.

24   **Q.**    This is the presentation, the slide deck, that you worked

25   on that was presented to the Business Council in connection

 1  with Project Hug; right?

 2  **A.**   I contributed some of the content to this presentation

 3  deck.

 4  **Q.**   And you're familiar with that?

 5  **A.**   Yes, I am.

 6          **MS. MOSKOWITZ:**  Your Honor, I move Exhibit 136 into

 7  evidence.

 8          **MS. CHIU:**  No objections.

 9          **THE COURT:**  It is admitted.

10      (Trial Exhibit 136 received in evidence.)

11          **MS. MOSKOWITZ:**  All right.  Thank you.

12  **BY MS. MOSKOWITZ:**

13  **Q.**   And we see here on the screen what you're looking at,

14  Exhibit 136, is the presentation that was presented to the

15  Business Council in April of 2019?

16  **A.**   Yes, I do see it.

17  **Q.**   All right.  If we could turn to the executive summary

18  Slide 003.  You'll see that on the screen here, sir, if that's

19  easier for you, or you're welcome to use the hard copy.

20  Whatever you prefer.

21  **A.**   Okay.

22  **Q.**   Are you with me?

23  **A.**   Yes, I am.

24  **Q.**   All right.  This slide is an executive summary of the

25  presentation that was made to the Business Council; right?

1    **A.**    Yes, that is correct.

2    **Q.**    And the idea here is to present the issues that Google is

3    facing and how the relevant Google team is proposing to address

4    those issues; is that fair?

5    **A.**    That's fair.

6    **Q.**    And the executive summary here identifies two types of

7    risks that Google Play's growth and business model face.  Do

8    you see that?

9    **A.**    Yes, I do see it.

10   **Q.**    And the first risk here is, quote, "Increasing

11   competition."  Do you see that?

12   **A.**    Yes, I do.

13   **Q.**    And there are two sources of competition that are listed

14   right next to it.  Do you see that?

15   **A.**    Yes, I do.

16   **Q.**    The first says "OEMs."  Do you see that?

17   **A.**    Yes, I do.

18   **Q.**    And OEMs refers to Android phone manufacturers; right?

19   **A.**    That is correct.

20   **Q.**    And the competition from OEMs that's referenced here

21   refers to app stores created by those Android manufacturers or

22   preinstallations of apps by those Android manufacturers;

23   correct?

24   **A.**    Yes, that is correct.

25   **Q.**    And one example of an OEM app store is the Samsung Galaxy

1    Store; fair?

2    **A.**    Yes, that is correct.

3    **Q.**    And Google was concerned that Samsung might incentivize

4    developers to launch their new game exclusively on the Samsung

5    Galaxy Store; right?

6    **A.**    That was one of our concerns, yes.

7    **Q.**    And that would mean that the Galaxy Store would have

8    certain games that were not on the Google Play Store; right?

9    **A.**    Yes.

10   **Q.**    And having that exclusive content was one of the ways in

11   which Samsung might have competed with the Google Play Store;

12   right?

13   **A.**    Yes.

14   **Q.**    The second source of competition on this slide is 3P

15   stores.  Do you see that?

16   **A.**    Yes, I do.

17   **Q.**    And 3P stores means third-party stores?

18   **A.**    Yes.

19   **Q.**    And third-party Android app stores; right?

20   **A.**    Yes, that is correct.

21   **Q.**    So that means here Android app stores developed by

22   companies other than Google or Android phone manufacturers?

23   **A.**    Yes.

24   **Q.**    And an example for that for the jury is an Amazon app

25   store; right?

1    **A.**    That is a good example.

2    **Q.**    And directly beneath that increasing competition bullet

3    there is a reference to the risk of top developer churn.  Do

4    you see that?

5    **A.**    Yes, I do.

6    **Q.**    And churn is another word for loss to Google Play, meaning

7    Google Play would lose these developers; right?

8    **A.**    These developers and the content they were shipping on our

9    platform.

10   **Q.**    So the risk being identified here by this churn statement

11   is the risk that top developers would choose competing Android

12   app stores to distribute their apps instead of Google Play?

13   **A.**    That is correct.

14   **Q.**    If you could please turn -- we're going to jump around a

15   lot on this document, so if at any point you're lost, just let

16   me know and I'll try to orient us.

17       But let's jump to page 007 please.

18       This is a slide that's titled "Recent Ecosystem Trends."

19   Do you see that?

20   **A.**    Yes, I do see it.

21   **Q.**    All right.  And there's a reference on the left here to

22   "Competitors aggressively pursuing gaming."  Do you see that?

23   **A.**    Yes, I do.

24   **Q.**    What Google was concerned about was that emerging

25   alternative Android app stores were trying to compete against

1    Google Play in a number of different ways; right?

2    **A.**   Yes.

3    **Q.**   For example, some competing Android app stores were trying

4    to offer or could offer a lower fee than Google Play was

5    offering for in-app purchases; right?

6    **A.**   Yes.

7    **Q.**   And we see a few examples here of Samsung.  There's in red

8    20 percent rev share.  Do you see that?

9    **A.**   Yes, I do see it.

10   **Q.**   And Google was projecting at Epic Games, if it launched on

11   Android, might charge a 12 percent revenue share.  Do you see

12   that?

13   **A.**   Yes, I do see it.

14   **Q.**   And they were guessing that based on what Epic was

15   offering on the PC Epic Game Store; right?

16   **A.**   That was the assumption.

17   **Q.**   And Google also stated in this slide that the Samsung

18   Galaxy Store was also pursuing deals to exclusively distribute

19   popular games; right?

20   **A.**   That was our understanding.

21   **Q.**   And that was the risk we were just talking about of a way

22   Samsung might try to compete with Google Play?

23   **A.**   That is correct.

24   **Q.**   Now, Google also said here about Amazon's app store that

25   it was funding in-app purchase discounts of up to 20 percent to

1    attract users; right?

2    **A.**    Yes.

3    **Q.**    Funding discounts to users is another way that an Android

4    app store might try to compete with the Google Play Store?

5    **A.**    That is correct.

6    **Q.**    The One Store is also mentioned on this slide.  Do you see

7    that?

8    **A.**    Yes, I do see it.

9    **Q.**    That store was allowing developers to use third-party

10   payment processers for in-app purchases and was charging only a

11   5 percent fee for those purchases; right?

12   **A.**    Yes, I do see that on this slide here.

13   **Q.**    And offering developers of the choice of using alternative

14   payment solutions is another way an Android app store could try

15   to compete with Google Play; right?

16   **A.**    That was one, yes.

17   **Q.**    All right.  Let's go back to that executive summary slide,

18   page 3, again, please.

19       Now, let's look at the second risk to Google Play that is

20   stated here, "The emerging" -- excuse me -- "emerging app store

21   tax meme."  Do you see that?

22   **A.**    Yes, I do.

23   **Q.**    So that refers to the public sentiment and pressure that

24   Google's 30 percent fee on in-app purchases made on apps

25   distributed through Google Play was too high; right?

1   **A.**   There were concerns that some developers would want to

2   renegotiate our service fees, yes.

3   **Q.**   The 30 percent fee was not just complained about by

4   developers, but it was widely criticized; right?

5   **A.**   We knew there were complaints from developers wanting to

6   discuss it, but I don't -- I can't speak on how wide that

7   audience is.

8   **Q.**   You had seen it referred to in public blogs as "highway

9   robbery"; right?

10  **A.**   That one I have not seen.

11  **Q.**   Okay.  Let's turn to page 7, please, briefly.

12         This is the slide we were just looking at, "Recent

13  ecosystem trends"; right?

14  **A.**   Yes.

15  **Q.**   And you see on the right here there's more detail on the

16  app store tax meme risk we were just discussing?

17  **A.**   Yes.

18  **Q.**   Do you see the quote here "Opinion:  Google's 30 percent

19  cut of Play Store app sales is nothing short of highway

20  robbery"?

21  **A.**   Yes, I do see it.

22  **Q.**   All right.  And that was presented to the

23  Business Council?

24  **A.**   If it was in this document, yes.

25  **Q.**   And you mentioned, though, that you were aware that

1  developers had expressed concern to Google that Google's fee

2  was too high; right?

3  **A.**   Yes.

4  **Q.**   And you're familiar with the term "agitator" from your

5  time at Google?

6  **A.**   I am familiar with that term.

7  **Q.**   And developers who expressed concerns over the 30 percent

8  fee were considered agitators; right?

9  **A.**   We had used that term in that way, yes.

10 **Q.**   Now, Google was concerned that developer unhappiness or

11 agitation over the 30 percent fee would lead them to distribute

12 their apps through a competing Android app store in lieu of

13 Google Play; right?

14 **A.**   Yes, we had concerns that they would take their content

15 off of our shelves and put it on another distribution platform.

16 **Q.**   And if an app were distributed through a source other than

17 the Google Play Store, Google would not collect its 30 percent

18 fee for that content; right?

19 **A.**   That is correct.

20 **Q.**   And, in fact, all of the Project Hug developers that we're

21 going to talk about today had either been a vocal agitator

22 about the fee or had asked for ways to explore potential

23 opportunities for changes to the Google Play business model;

24 right?

25 **A.**   That is a fair statement.

1  Q.   So one of the risks that Project Hug was solving for, as

2  we're discussing in this slide deck presented to the

3  Business Council, was the risk that competing Android app

4  stores would attract more developers and more users; right?

5  A.   Actually, I would reframe that as the primary objective of

6  Project Hug was to ensure that our top developers were going to

7  continue to ship their games on Google Play.

8  Q.   Do you disagree that one of the key considerations for

9  Project Hug was competition attracting more developers and more

10  users?

11  A.   Our only objective with Project Hug was to ensure that our

12  catalog of games that were available on Google Play continued

13  to remain one of the best catalog of games.

14         MS. MOSKOWITZ:  Your Honor, page 130 -- 177, please,

15  in Tab A of your binder.

16         THE COURT:  Which lines?

17         MS. MOSKOWITZ:  Lines 13 through 21, please.

18         THE COURT:  177?

19         MS. MOSKOWITZ:  Page 177, lines 13 through --

20         THE COURT:  Oh, okay.  That's fine.

21         MS. MOSKOWITZ:  Am I wrong?

22         THE COURT:  Go ahead.

23         MS. MOSKOWITZ:  Okay.

24  BY MS. MOSKOWITZ:

25  Q.   Mr. Koh, you took a deposition in this case?

1    **A.**    Yes, I did.

2    **Q.**    I guess I took the deposition of you in this case is a

3    better way to say it?

4    **A.**    Yes.

5    **Q.**    You were sworn in?

6    **A.**    Yes.

7    **Q.**    You testified under oath?

8    **A.**    Yes, I did.

9    **Q.**    And you told the truth at that deposition?

10   **A.**    Yes, I did at that time.

11   **Q.**    Do you recall being asked the following question and

12   giving the following answer?  (as read):

13        **"QUESTION:**  In reading all of that sort of next to each

14        other, do you understand that to be conveying the risk of

15        competitor Android app stores gaining traction both in

16        titles and user base over time?

17        **"ANSWER:**  Competition attracting more developers and more

18        users was a risk that was -- it's a -- one of the key

19        considerations for Project Hug."

20        Do you recall giving that question and giving -- asking

21   that question and giving that answer?

22   **A.**    I don't recall that specific question from two years ago.

23   **Q.**    Let's put it on the screen, please.  You can take a look

24   (as read):

25        **"QUESTION:**  And in reading all of that sort of next to

1        each other, do you understand that to be conveying the

2        risk of competitor Android app stores gaining traction

3        both in titles and user base over time?

4        **"ANSWER:**  Competition attracting more developers and more

5        users was a risk" -- et cetera -- "was one of the key

6        considerations for Project Hug?"

7        Do you see that?

8    **A.**   Yes, I do see it.

9    **Q.**   Did I read it correctly?

10   **A.**   You read it correctly.

11   **Q.**   Google was concerned not only that major developers would

12   leave Google Play, but that their doing so would lead to other

13   Android developers leaving Google Play; right?

14   **A.**   We had concerns that once top developers took their gaming

15   content off of Google Play, that other developers would

16   potentially follow suit.

17   **Q.**   And that was known as contagion risk; right?

18   **A.**   That is correct.

19   **Q.**   All right.  Let's go to page -- back to 136, please,

20   page 128.

21       This is a slide that's demonstrating the contagion risk to

22   Google for competing Android app stores; right?

23   **A.**   Yes, that's what this slide says.

24   **Q.**   And there's some speaker notes on the bottom; is that what

25   that text is underneath the picture of the slide?

1    **A.**   I see the speaker notes.

2    **Q.**   And the speaker notes has a reference to the Epic Game

3    Store launching in the end of 2019.  Do you see that?

4    **A.**   Yes, I do see that.

5    **Q.**   And right under that there's a note that there's a risk

6    from Samsung and Amazon store already under way; right?

7    **A.**   Yes, I do see that.

8    **Q.**   So what's being reflected in this page here is that the

9    concern was that Epic, Samsung, and Android app stores could,

10   in fact, expand their reach over time; right?

11   **A.**   I was not the creator of this content, but that's an

12   assumption you can make.

13   **Q.**   That's your understanding of that slide; right?

14   **A.**   My understanding of that slide is with those different

15   initiatives happening and assumptions in place, that these

16   other distribution stores would get better content offerings

17   available for the consumers that would disadvantage Google Play

18   and the customers of Google Play.

19          **MS. MOSKOWITZ:**  Your Honor, page 178, 20 to 23,

20   please.

21          **THE COURT:**  20?

22          **MS. MOSKOWITZ:**  Sorry?

23          **THE COURT:**  20?

24          **MS. MOSKOWITZ:**  Lines 20 to 23, please.

25          **THE COURT:**  Okay.

1    BY MS. MOSKOWITZ:

2    Q.   Do you recall being asked at your deposition the following

3    question and giving the following answer?  (as read):

4         "QUESTION:  So basically the concern here is that Epic and

5         Samsung and Amazon could, in fact, expand their reach over

6         time; right?

7         "ANSWER:  Correct."

8         Do you recall that testimony?

9    A.   I don't recall the testimony with my response just

10   "Correct."

11   Q.   Put it on the screen.  Let's just do that from now on.

12        Do you see that question and answer?  And did I read it

13   correctly?

14   A.   (Witness examines document.)  You read it correctly.

15   Q.   Thank you.

16        Let's turn to the slide ending four zero, please, page 40.

17        This is a slide about Epic and Fortnite; right?

18   A.   Yes, I do see that.

19   Q.   And the second sentence on this slide says (as read):

20             "We estimate Fortnite would have been substantially

21        more successful had they launched on Play."

22        Right?

23   A.   Yes, I do see that.

24   Q.   And this is a reference having Epic launched Fortnite, its

25   game, outside of Google Play?

1  A.   Yes, that is correct.

2  Q.   And what this is conveying is that Epic didn't do as great

3  as maybe they had hoped; right?

4  A.   I think what this is saying is that it could have done a

5  lot better --

6  Q.   If they had been on --

7  A.   -- with the support of Google Play.

8  Q.   Sorry.  I didn't mean to interrupt you.

9  A.   It's all right.

10 Q.   You're saying that this is conveying that their off

11 Google Play distribution strategy was not as successful as

12 Google thought it would have been if it had launched through

13 Google Play?

14 A.   We felt pretty confident that we had a lot of services and

15 capabilities that could have helped Fortnite reach more gaming

16 consumers.

17 Q.   But Epic didn't want to use Google Play; right?

18 A.   They made the decision not to use Google Play at that

19 time.

20 Q.   And what this is talking about here is maybe Epic didn't

21 do that great, but Epic eased the way for other developers to

22 follow in its path; right?

23 A.   I wouldn't say -- I can't make a statement on whether or

24 not Epic thought it was great or not great.  We just felt

25 confident that we could have helped Epic reach more players

1  with Fortnite.

2  **Q.**  I think you may have misheard my question.

3  So what I'm asking is what this slide is conveying in the

4  "however" and everything after it.

5  While Epic may not have been successful, Epic's efforts

6  eased the way for other developers to follow in its path and

7  launch outside of Google Play; right?

8  **A.**  That's what this slide is, yes, talking about.

9  **Q.**  Specifically in the line here it talks about the risk that

10  other developers might follow Epic's path; right?

11  **A.**  Yes, that's what this is stating.

12  **Q.**  And the deal team told the Business Council that every

13  developer that follows Epic's path and launches on the Epic

14  store will have less friction and a larger addressable user

15  base than the title before it; right?

16  **A.**  That's what that bullet point says, yes.

17  **Q.**  And that's actually describing this snowballing or

18  contagion effect; right?

19  **A.**  That is correct.

20  **Q.**  And the deal team told the Business Council that, in fact,

21  developers could afford to make a little bit less money because

22  of a lower rev share that it would face by going to Epic;

23  right?

24  **A.**  Yes.

25  **Q.**  And so developers may, in fact, decide that they should

1  follow Epic's lead and launch on what might become an Epic Game

2  Store and make significantly less money and still not be worse

3  off than if they had launched on Google Play?

4  **A.**   Yes, that can become one of the options for developers.

5  **Q.**   And the third bullet here under this "however" says (as

6  read):

7        "Developers place value on owning the entire customer

8     relationship."

9     Do you see that?

10  **A.**   Yes, I do see that.

11  **Q.**   And you were aware that developers had aspired to own the

12  entire customer relationship; right?

13  **A.**   Yes, I do.

14  **Q.**   But working with Google Play does not allow developers to

15  own the entire relationship; right?

16  **A.**   That is a fair statement.

17  **Q.**   Let's turn to page 28 again, and lets just dig into this

18  more.  And I think we can just look at the slide itself for

19  ease of review, but maybe I'm wrong and we'll zoom back out.

20     This is basically a timeline that starts in 2019 and goes

21  to 2022; right?

22  **A.**   Yes.

23  **Q.**   And, again, the intended content of this slide is to

24  convey the risk of loss of revenue to Google Play over time as

25  developers stopped distributing their Android apps through

1    Google Play; right?

2    **A.**   I apologize.  I'm just not the author of this slide and

3    this is a slide I'm just not very familiar with.  I recognize

4    what the content is trying to speak to.

5    **Q.**   Okay.  Let me just ask for your understanding then.  Okay?

6    **A.**   Okay.

7    **Q.**   All right.  So do you understand this slide -- as part of

8    the deal team that was responsible for Project Hug and as part

9    of the team that reviewed and contributed to this presentation,

10   do you understand that the intended message of this slide, at

11   least on the top blue part, was to convey the risk of loss of

12   revenue to Google Play over time as developers stopped

13   distributing their Android apps through Google Play and go

14   off -- outside of Google Play on Android?

15   **A.**   Yes, that's what this slide on the header says.

16   **Q.**   Right.  The header I think you're referring to is (as

17   read):

18           "Risk builds over time.  Losses start out small but

19       can grow quickly once competitors gain traction."

20   **A.**   Yes, that's what I see.

21   **Q.**   And these orange boxes on the bottom, that describes how

22   the competing Android app distribution platforms would grow

23   that contagion effect over time?  That's how you understand

24   this slide?

25   **A.**   That's how I can read this slide, yes.

1   **Q.**   And, in fact, there's these two boxes I've highlighted in

2   red here where the contagion effect really starts to get hold

3   and where it spreads.  Do you see that?

4   **A.**   I do see it.

5   **Q.**   And the risk -- going back up to the blue bars here (as

6   read):

7           "The risk for 2019 alone, which was described as

8        small, was envisioned to be potentially $160 million."

9        Right?

10  **A.**   That's what I see on the slide.

11  **Q.**   And the cumulative risk presented to the Google Play

12  revenue over the four years discussed in this slide you see is

13  conveyed as $2.5 billion; right?

14  **A.**   That's what it says.

15  **Q.**   And you understand the slide to be conveying that if this

16  traction is gained, if this contagion effect takes hold,

17  Google Play can lose $2.5 billion just over four years?

18  **A.**   That's what I'm assuming the output of this analysis was.

19  **Q.**   Let's turn back to that executive summary again, page 3,

20  please.

21      Now we're going to get to the proposal.  So the top right

22  side of this document presents how Google plans to address

23  these problems we've just been discussing; right?

24  **A.**   Yes.

25  **Q.**   And the proposal here identifies two programs to be

1  deployed together; right?

2  A.   Yes, that's what it says.

3  Q.   And the first bullet under there, this "Unify and boost

4  Google support of top game developers," that's Project Hug;

5  right?

6  A.   Yes, that's what it's alluding to.

7  Q.   Yeah.  And the second program right below it says (as

8  read):

9        "Secure and enhance play distribution on Samsung."

10  Do you see that?

11  A.   Yes, I do see it.

12  Q.   And you understand that to be a reference to

13  Project Banyan; correct?

14  A.   Yes, that is correct.

15  Q.   But Project Banyan was outside your scope of work; right?

16  A.   That is correct.

17  Q.   So I need to ask someone else at Google about that one?

18  A.   That would be much better.

19  Q.   But you understood in the context of how this was being

20  presented that Project Hug and Project Banyan were presented as

21  two prongs of attack to address the risks that we just went

22  through?

23  A.   Those are two strategies to mitigate the risk that was

24  shared on the other half of that slide.

25  Q.   That work together to mitigate those risks?

1   **A.**   I didn't experience it being jointly attached.  I knew

2   there were two initiatives that were flying -- that were in

3   flight at the same time.

4   **Q.**   But you understood that both programs were needed;

5   correct?

6   **A.**   I didn't -- that was never sort of clearly communicated to

7   me that it was dependent on both.

8   **Q.**   All right.  Let's look at Slide 4, please.

9        Do you see "Both programs are needed" under there in the

10   speaker notes?

11   **A.**   I can see that that's what's written.

12   **Q.**   Okay.  And that was what was written as a speaker note for

13   the Business Council presentation presenting Project Hug and

14   Project Banyan; correct?

15   **A.**   That's what -- I was not a contributor to this slide.

16   **Q.**   All right.  But you can see that it says that; right?

17   **A.**   I can see that's what it says.

18   **Q.**   Okay.  Let's go back to that executive summary, page 3,

19   again.  Still going with that.

20        And now there's an ask in that blue box.  Do you see that?

21   **A.**   Yes, I do.

22   **Q.**   And the ask means:  What are we asking the

23   Business Council for in connection with these proposals to

24   solve the problems we've identified; right?

25   **A.**   Yes, that is correct.

1   Q.   And, again, there's two bullets.  The top one refers to

2   the ask for the Business Council in connection with the

3   Project Hug portion of this; right?

4   A.   Yes.

5   Q.   And the ask to the Business Council for Project Hug was to

6   approve $575 million through 2022; right?

7   A.   Yes.

8   Q.   By the way, you see right after that there's a plus 59 HC?

9   Do you see that?

10  A.   Uh-huh, I do see it.

11  Q.   That's headcount?

12  A.   Yes, that is correct.

13  Q.   So also being asked were 59 employees to be assigned to

14  Project Hug?  Is that what that is saying?

15  A.   That was the ask.

16  Q.   Let's turn to the next slide, please, page 4, which we

17  just jumped over to for a moment before.

18       This is talking about two programs deployed in

19  conjunction; right?  This is Project Hug and Banyan; right?

20  A.   Yes, that's what this slide says.

21  Q.   I pointed you a moment ago to the "Both programs are

22  needed," but I want to talk about the second sentence now.

23       It says that Google needed to invest in top developers now

24  to ensure imminent launches happen on Play and reduce noise.

25  Do you see that?

1   **A.**   Yes, I do see it.

2   **Q.**   And the reference to "ensure imminent launches happen on

3   Play" referred to making sure that developers launched their

4   new games, their new content, on Google Play as opposed to

5   going to competing Android app distribution platforms; right?

6   **A.**   There was concerns that developers would no longer launch

7   their new games on Google Play, and we were trying to mitigate

8   that risk.

9   **Q.**   Right.  You were concerned that they were -- in lieu of

10  launching on Google Play, they were going to launch on

11  competing Android app distribution platforms?

12  **A.**   Competing Android distribution platforms or even just

13  exclusivity on Apple App Store.

14         **MS. MOSKOWITZ:**  All right.  Your Honor, page 147,

15  please, lines 12 through 18.

16         **THE COURT:**  That's fine.

17  **BY MS. MOSKOWITZ:**

18  **Q.**   All right.  Mr. Koh, at your deposition do you recall

19  being asked the following question and giving the following

20  answer?  (as read):

21         "**QUESTION:**  And the, quote, 'ensure imminent launches

22         happen on Play,' end quote, that's a reference to making

23         sure that developers launch new games on Google Play as

24         opposed to an alternative Android distribution platform;

25         right?

1    **"ANSWER:**  Yes, that's correct."

2    Did I read that correctly?

3    **A.**   You read that correctly.

4    **Q.**   And the reduced noise -- we can go back to where we were,

5    which was Slide 4 of 136, please.

6    You remember I read the "reduced noise" piece of that

7    speaker note?  Do you see that there?

8    **A.**   Yes, I do.

9    **Q.**   And, again, that referred to reducing agitation by

10   developers; right?

11   **A.**   Yes.

12   **Q.**   So let's turn to page 6, please.

13   At the top of this slide it says (as read):

14       "Play's business is concentrated among top developers

15   and on Samsung devices."

16   Do you see that?

17   **A.**   Yes, I do.

18   **Q.**   And with respect to there's a bar chart on the left that

19   is focusing on this top developers' piece, Samsung's on the

20   right; right?

21   **A.**   Yes.

22   **Q.**   All right.  So just focusing on the developers, which is

23   the Project Hug aspect of this slide -- would you agree with

24   me?

25   **A.**   Uh-huh, yes, that is correct.

1  **Q.**  All right.  So this bar chart here that we're looking at

2  on the screen says that 22 developers, only 22 developers are

3  projected to account for 31 percent of the entire consumer

4  spend in the year of 2019 on Google Play; right?

5  **A.**  That's what it says.

6  **Q.**  And the deal team told -- and let's go back to that full

7  slide on the screen, please.

8      And you see this red box?  Are you with me?

9  **A.**  Yes, I am.

10  **Q.**  And the deal team told the Business Council in this red

11  box that the loss of these developers either to competitors or

12  by going it alone on Android would significantly impact

13  Google Play's business; right?

14  **A.**  That's what it says.

15  **Q.**  So these 22 developers are the developers that Google

16  targeted through Project Hug; right?

17  **A.**  That is correct.

18  **Q.**  So let's please turn to page 14, if you would.

19      Let's talk about those targeted developers.  That's on the

20  screen here describing who these target developers are.  Do you

21  see that?

22  **A.**  Yes, I do see it.

23  **Q.**  And there's a few bullet points about aspects about who

24  those developers are and what they could do; right?

25  **A.**  Yes.

1  Q.   I'm going to go a little out of order.  Let's start with

2  that third bullet (as read):

3          "Expressed discontent over Play rev share and lack of

4      unified support from Google."

5      Do you see that?

6  A.   Yes, I do see it.

7  Q.   And, again, that's a reference to the fact that these

8  targeted 22 Project Hug developers were all considered being

9  agitators in some way?

10  A.   Yes, that is correct.

11  Q.   And agitation was about the Google Play's fee model?

12  A.   That was what -- yes, the thing that they were expressing

13  interest in wanting to renegotiate.

14  Q.   And the second sentence right above it says (as read):

15          "Beacons of the ecosystem."

16      Do you see that?

17  A.   Yes, I do.

18  Q.   And that's a -- "ecosystem" means the Android ecosystem;

19  right?

20  A.   The video games Android ecosystem, yes.

21  Q.   And that's referring to the fact that if those developers

22  left Google Play and distributed their Android apps to users

23  another way, other developers would follow their lead?

24  A.   That was a potential concern, yes.

25  Q.   And that's that, again, contagion effect that we talked

1   about earlier?

2   **A.**   Yes, that is correct.

3   **Q.**   And the fourth sentence here says (as read):

4           "May forego Play."

5       Do you see that?

6   **A.**   Yes, I do see it.

7   **Q.**   And that refers to that same risk we just discussed, that

8   developers might be the next to follow in Epic's path and make

9   their games available for download outside of Google Play?

10  **A.**   That is correct.

11  **Q.**   The first bullet under that "May forego Play" -- there's

12  three bullets there.  Do you see that?

13  **A.**   Yes, I do.

14  **Q.**   So this refers to upcoming major new title launches.  Do

15  you see that?

16  **A.**   Yes, I do.

17  **Q.**   And that's referring to the fact that each of these

18  targeted developers was expecting to release a new game on

19  mobile shortly.  That was expected to be popular; right?

20  **A.**   That was our assumption, yes.

21  **Q.**   And the third bullet under there says (as read):

22          "Capabilities to 'go it alone' on Android."

23      Do you see that?

24  **A.**   I do see it.

25  **Q.**   And that is a reference to the fact that these target --

1  22 targeted developers were large enough and established enough

2  that they could actually come up with the infrastructure needed

3  to establish and launch their own app store on Android?

4  **A.**   That was an assumption, yes.  Assumption, yes.

5  **Q.**   And, in fact, some of the Project Hug developers,

6  including ones on this slide, specifically told Google that

7  they were considering starting their own competing Android app

8  store; right?

9  **A.**   We knew developers were exploring various different

10  distribution options.

11  **Q.**   Some of the Project Hug developers specifically told

12  Google that they were considering starting their own competing

13  Android app stores; right?

14  **A.**   There were some mentions of distribution platform

15  strategies other than Google Play.

16  **Q.**   I'm just going to try it one more time.  I don't know if

17  we're disagreeing on something, so I just want to be clear.

18       Some of the Project Hug developers actually told Google

19  that they were considering starting their own competing Android

20  app store; right?

21  **A.**   I think it might be just definitions here, but Google Play

22  was a platform that had a wide, wide category of apps that

23  makes it -- considered it a store.  Some developers had

24  expressed interest in coming up with their own technology

25  solutions or coming out with a distribution mechanism to go

1    direct to consumer on Android.

2    **Q.**   All right.

3            **MS. MOSKOWITZ:**   Let's -- your Honor, page 200, lines 4

4    through 8, please.

5            **THE COURT:**   200?

6            **MS. MOSKOWITZ:**   200, please, lines 4 through 8.

7            **THE COURT:**   That's fine, yes.

8    **BY MS. MOSKOWITZ:**

9    **Q.**   Mr. Koh, you see here that you were asked the following

10   question and gave the following answer?   (as read):

11           **"QUESTION:**   And some of the Project Hug developers

12           specifically told Google that they were considering

13           starting their own competing Android app stores; right?

14           **"ANSWER:**   That is correct."

15           Did I read that correctly?

16   **A.**   You read that correctly.

17   **Q.**   Activision Blizzard King was one of the developers who

18   told Google that; right?

19   **A.**   They did signal that they were looking into exploring

20   other distribution tactics.

21   **Q.**   They told you they were doing so.   They didn't just signal

22   it; right?

23   **A.**   That's what I had been communicated, yes.

24   **Q.**   So Activision Blizzard King was one of the developers who

25   told Google that they were considering opening up a competing

1    Android app store; correct?

2    **A.**    Yes, that is correct.

3    **Q.**    And Riot did the same.  They told Google that they were

4    considering opening up a competing Android app store; correct?

5    **A.**    Riot let us know they were looking into various -- all

6    different options.

7    **Q.**    Including competing Android app store launch; right?

8    **A.**    I can't recall if they were specifically mentioning

9    Android app store, but we knew they were looking into

10   capabilities to distribute content directly to consumers on

11   Android.

12          **MS. MOSKOWITZ:**  Your Honor, if you could stay on

13   page 200 and just keep reading onto line 10, please.  So 4 to

14   10, please.

15          **THE COURT:**  4 to 10?

16          **MS. MOSKOWITZ:**  4 through 10, please.

17          **THE COURT:**  Yes, that's fine.

18          **MS. MOSKOWITZ:**  Let's put that on the screen.

19   BY MS. MOSKOWITZ:

20   **Q.**    So you may look -- it may look familiar.  Lines 4 through

21   8 I just read to you, so I'm just going to do it again.

22          You were asked the following questions and gave the

23   following answers at your deposition (as read):

24          "**QUESTION:**  And some of the Project Hug developers

25          specifically told Google that they were considering

1          starting their own competing Android app stores; right?

2          ▪**ANSWER:**  That is correct.

3          ▪**QUESTION:**  Riot was one of those?

4          ▪**ANSWER:**  That is correct."

5          Did I read that correctly?

6     **A.**  You read that correctly.

7     **Q.**  As to the other developers targeted by Project Hug, Google

8     speculated internally that they too could have capabilities to

9     build out an infrastructure to launch their own store; right?

10    **A.**  Yes, we had assumed that.

11    **Q.**  All right.  And we talked about this ask, this

12    $575 million for Project Hug through the end of 2022.  Do you

13    recall that?

14    **A.**  Yes, I do.

15    **Q.**  And the goal of Project Hug was to use that money, to use

16    those funds to make sure that developers were prioritizing

17    Google Play over competing Android app stores when they were

18    thinking about launching that new game, that new content;

19    right?

20    **A.**  Yes, that is correct.

21    **Q.**  And that was accomplished by entering into individual

22    agreements with those target developers; right?

23    **A.**  That is correct.

24    **Q.**  And each of those individual deals had certain standard

25    obligations that were imposed on the Project Hug developers;

1   right?

2   **A.**    That is correct.

3   **Q.**    And one obligation that Google required for Project Hug

4   developers was called a sim ship requirement; right?

5   **A.**    That is correct.

6   **Q.**    And since I had to learn this for the first time -- I

7   think the jury might know what it is -- the sim in sim ship

8   refers to simultaneous; is that right?

9   **A.**    That is correct.

10  **Q.**    And ship, just the process of releasing an app, like

11  shipping it out to the users; right?

12  **A.**    That is correct.

13  **Q.**    So the sim ship requirement, to bring that together, meant

14  that the developer would commit to launch any new titles on

15  Google Play at the same time it launched on any other mobile

16  platform; right?

17  **A.**    Yes, that is correct.

18  **Q.**    So the sim ship requirement prevented Project Hug

19  developers from launching their apps on other Android app

20  stores before launching on Google Play; right?

21  **A.**    Or launching exclusively even outside of Android mobile

22  platforms.

23  **Q.**    Right.  But just focusing on Android, the developer who

24  signed a Project Hug agreement could not launch either first or

25  exclusively on any competing Android distribution platform;

1  right?

2  **A.**   Yes.  If they agreed to Project Hug, yes.

3  **Q.**   Okay.  And an implication of that, as you just said, is no

4  store could offer a Project Hug developer who would sign the

5  agreement an exclusivity deal to get that content exclusively

6  on their competing app store?

7  **A.**   That was the agreement, yes.

8  **Q.**   But we talked about this a little bit earlier.  Having

9  exclusive titles would be advantageous to a competing app store

10 trying to compete with Google Play; right?

11 **A.**   It is, yes.

12 **Q.**   It could have given that store a leg up on Google Play to

13 have an exclusive popular game; right?

14 **A.**   Yes, and we could have lost -- Google Play could have lost

15 a lot of consumers by not having that content available.

16 **Q.**   Right.  Because an app store that's missing critical

17 content will not be as competitive?

18 **A.**   Yes, you can say that.

19 **Q.**   Now, we talked about Samsung being one of those stores

20 that might incentivize developers to exclusively launch their

21 content on the Samsung store.  Do you remember that testimony?

22 **A.**   Yes.

23 **Q.**   And, in fact, you had seen Fortnite being launched

24 exclusively on the Samsung Galaxy Store and, of course, direct

25 downloading but not on Google Play; right?

1  **A.**   Yes, I did.

2  **Q.**   And that would not have been allowed if Epic had signed a

3  Project Hug deal; right?

4  **A.**   Yes, that is correct.

5  **Q.**   So we talked about sim ship.  I'm going to switch to

6  another obligation that Project Hug developers had to agree to

7  if they signed up for this deal.

8       Feature parity, have you heard of that?

9  **A.**   Yes, I did.

10  **Q.**   And feature parity, that obligation in these agreements

11  means that developers who agreed to Project Hug would not be

12  able to launch a materially different version of the game that

13  it had on Google Play on a competing Android app distribution

14  platform; right?

15  **A.**   That is correct.

16  **Q.**   And so that, similarly, mitigated Google's risk of losing

17  out to other Android app stores; right?

18  **A.**   That is correct.

19  **Q.**   You're familiar with the company Activision Blizzard King,

20  sometimes known as ABK?

21  **A.**   Yes, I am.

22  **Q.**   And ABK is actually a combination of three companies:

23  Activision, Blizzard, and King; right?

24  **A.**   That is correct.

25  **Q.**   And ABK is a large game developer with a number of popular

**KOH - DIRECT / MOSKOWITZ**

1  games; right?

2  **A.**   That is correct.

3  **Q.**   Including mobile games?

4  **A.**   That is correct.

5  **Q.**   And one of ABK's popular games is Candy Crush; right?

6  **A.**   That is correct.

7  **Q.**   And for other people who may not find Candy that exciting,

8  Call of Duty: Mobile is another big game published by ABK on

9  mobile devices; right?

10  **A.**   That is correct.

11  **Q.**   And ABK had the highest estimated spend by users of all of

12  the Project Hug developers; right?

13  **A.**   Yes, that was correct.

14  **Q.**   And you were aware, you had heard that ABK's CEO Bobby

15  Kotick had historically been quite vocal and complaining about

16  Google Play's 30 percent fee; right?

17  **A.**   That's what I had heard, yes.

18  **Q.**   And ABK had told Google, we established, that one option

19  ABK could pursue is to start its own Android app store; right?

20  **A.**   That's what I had been communicated, yes.

21  **Q.**   That's what had been communicated to you; right?

22  **A.**   That's correct.

23  **Q.**   And, in fact, you were aware that ABK had already

24  developed an online game store, battle.net?

25  **A.**   That's correct.

1   **Q.**   And ABK also said that another option it could pursue was

2   to distribute its apps outside of Google Play?

3   **A.**   Yes.  That was one of the considerations that I was aware

4   of, yes.

5   **Q.**   So before Project Hug actually was officially launched,

6   Google had been already working on a similar type of agreement

7   with King, part of ABK; right?

8   **A.**   Yes, there were some discussions prior to Project Hug

9   getting approved.

10   **Q.**   And, again, King is part of that bigger ABK; right?

11   **A.**   That is correct.

12   **Q.**   And you were involved with the discussions -- in the

13   discussions with King about that potential deal before

14   Project Hug was officially launched?

15   **A.**   Yes, that is correct.

16   **Q.**   And King and Google did, in fact, reach a signed agreement

17   in August of 2019; correct?

18   **A.**   That timeline sounds about right, yes.

19   **Q.**   And if I refer to that as pre-Hug, do you understand that

20   to mean before Hug was officially blessed by the Business

21   Council?

22   **A.**   I don't recall how the Hug timeline worked around that

23   time, but I do know that that King conversation started off as

24   a separate one-off conversation.

25   **Q.**   Okay.  Fair enough.

1       So under that agreement between Google and King, Google

2   agreed to provide King $20 million in advertising credits over

3   the course of one year; right?

4   **A.**   It could earn up to $20 million of ad credits.

5   **Q.**   And $20 million was actually 20 percent of the overall ad

6   credits' budget that the Business Council ultimately approved

7   for all of the Project Hug developers; right?

8   **A.**   I don't recall the exact number, but that sounds about

9   roughly right.

10  **Q.**   In exchange King agreed to certain obligations; right?

11  **A.**   That is correct.

12  **Q.**   And one of those obligations was the sim ship obligation

13  we discussed; right?

14  **A.**   That was correct, yep.

15  **Q.**   And another obligation King agreed to was that feature

16  parity obligation we talked about; right?

17  **A.**   That is correct.

18  **Q.**   So separate from that Google-King agreement, Google also

19  negotiated a Project Hug agreement with ABK as a whole; right?

20  **A.**   Yes, that is correct.

21  **Q.**   And that deal was actually signed in January of 2020; is

22  that right?

23  **A.**   That timeline sounds about right, yes.

24  **Q.**   All right.  I'm going to show you a few documents, and I'm

25  going to try to be a little careful about what gets shown on

 1   the screen, but you have that full document in your binder.

 2   It's Exhibit 148.

 3        And so I'll ask you to take a look at that before we put

 4   anything on the screen.  Let me know when you're there, please.

 5   **A.**   148?

 6   **Q.**   Yes, please.

 7   **A.**   (Witness examines document.)  I can see it now.

 8   **Q.**   Okay.  This is an e-mail thread from November 2019 that

 9   you participated in at Google?

10   **A.**   Yes, I see it.

11        **MS. MOSKOWITZ:**  Your Honor, I move to admit

12   Exhibit 148 into evidence.

13        **MS. CHIU:**  No objections.

14        **THE COURT:**  It is admitted.

15      (Trial Exhibit 148 received in evidence.)

16        **MS. MOSKOWITZ:**  All right.  Maybe we can just show the

17   top part of this slide for now.

18   **BY MS. MOSKOWITZ:**

19   **Q.**   And you see I've blacked out the actual e-mail addresses.

20   The parties have agreed to do that, so that's why you see black

21   on there.  But you see names of folks involved.

22   **A.**   Yes, I do see it.

23   **Q.**   Okay.  And the subject line is on there.  It says "ABK

24   Update Armin Meeting 11/26."  Do you see that?

25   **A.**   Yes, I see it.

1   Q.   And Armin is a reference to Armin Zerza, ABK's chief

2   officer at the time?

3   A.   That is correct.

4   Q.   Okay.  Now let's turn to the page 003, and there's an

5   e-mail -- maybe let's not publish anything at the moment --

6   there's an e-mail from Ms. Beatty at Google.  Do you see that

7   at 3:23 p.m.?

8   A.   Yes, I see it.

9   Q.   And Karen Beatty was the Google lead with respect to the

10  ABK Project Hug deal; right?

11  A.   That is correct.

12  Q.   Okay.  And she's reporting in this e-mail -- maybe we can

13  just show that first couple sentences of that e-mail -- she

14  says (as read):

15         "I just spoke with Armin.  He didn't send me a term

16      sheet in writing, but he did walk me through their

17      counterproposal over the phone."

18  Do you see that?

19  A.   Yes, I do see it.

20  Q.   Okay.  I'm going to show a specific portion of this e-mail

21  reporting Mr. Zerza's comments on the YouTube's aspect of the

22  deal.  Okay?

23  A.   Okay.

24  Q.   All right.  So let's show that portion of the e-mail.

25  It's on the bottom of page 3.

1        It says "YouTube."  Do you see that?

2        I know.

3        All right.  So this is part of -- okay.  Let's take this

4   off the screen, and we can just -- we actually can show the

5   whole document.  I was mistaken.

6        So let's just publish the whole document and let the jury

7   know what we're seeing.

8        So at the top there, no call-outs, "I just spoke with

9   Armin" is right at the top of the page.  Do you see that?

10  **A.**   Yes, I do.

11  **Q.**   And he just refers -- there's referring here Ms. Beatty to

12  the feedback on different aspects of the deal; right?

13          **THE COURT:**  Can you make this a little more focused?

14          **MS. MOSKOWITZ:**  Maybe.

15          **THE COURT:**  You can't improve the focus on this?

16          **MS. MOSKOWITZ:**  This might be how it was produced.

17  But maybe does the blow up help?

18          **THE COURT:**  I don't know about the jury, but mine is

19  unfocused.  I don't know if you can -- is it clearer on your

20  screen?  Can you read it?

21          **MS. MOSKOWITZ:**  Let's just try the YouTube portion and

22  see if it's better.

23          **THE COURT:**  If you're going to look at things, you're

24  going to have to make them clear.

25          **MS. MOSKOWITZ:**  Is that okay?

1          **THE COURT:**  That's better.

2     **BY MS. MOSKOWITZ:**

3     **Q.**   This is the part I really want to talk about.  So this is

4     the portion where Ms. Beatty is talking about Mr. Zerza's

5     feedback and counterproposal as to one of the aspects of the

6     Project Hug deal; right?

7     **A.**   Yes, that is correct.

8     **Q.**   And specifically this is talking about YouTube and

9     Esports; right?

10    **A.**   Yes, that's what I see here.

11    **Q.**   All right.  And for those of us who may not be totally

12    familiar with what Esports means, can you give us a high-level

13    description of what Esports means and what reference to an

14    Esports portfolio is?

15    **A.**   Esports, it's a video game competition between

16    professional video game players.

17    **Q.**   So having an exclusive Esports portfolio on YouTube, is

18    that kind of like ESPN being the exclusive place to watch Major

19    League Baseball or something like that?

20    **A.**   That is a good analogy.

21    **Q.**   Okay.  I wasn't sure that it was, but I'm glad that it

22    was.

23          Okay.  Thank you.

24          So the negotiations here are talking about an exclusive

25    licensing agreement for YouTube to be broadcasting the

1    competitions on ABK's game portfolio; right?

2    A.    That is correct.

3    Q.    And for these exclusive rights, ABK was asking for

4    payments of $50 million in year one and $60 million in year

5    two.  Do you see that?

6    A.    Yes, I do see it.

7    Q.    And it was asking for an option of a year three at around

8    $70 million.  Do you see that?

9    A.    Yes, I do see it.

10   Q.    All right.  Let's go to that prior page 2.  There is an

11   e-mail response from Ryan -- Ryan Wyatt.

12         And let's just blow that whole thing up there.

13         Can you see that on the screen?  Is that readable?

14   A.    I can see it, yes.

15   Q.    Okay.  So this is a response to that e-mail from Ryan

16   Wyatt specifically about the YouTube aspect of the Hug deal?

17   A.    Yes, I do see that.

18   Q.    And Mr. Wyatt was the head of gaming for YouTube?

19   A.    That was correct, yes.

20   Q.    So three paragraphs down in the first sentence you see

21   that he says (as read):

22             "I have to say, this commitment to three years for

23         ABK's Esports is not something I'd ever do in isolation."

24         Do you see that?

25   A.    Yes, I do see that.

1   Q.   So what Mr. Wyatt was communicating was that standing

2   alone, 50- to $60 million a year or more for the rights to

3   ABK's Esports portfolio would have been a significant

4   overpayment; right?

5   A.   That is what Ryan is saying here, yes.

6   Q.   And so he continues on in the second half of this same

7   paragraph that (as read):

8           "The precedent we're setting in the market for these

9       media rights will have a negative ripple effect through

10      Esports."

11      Right?

12  A.   That is what Ryan is saying here.

13  Q.   In fact, he's worried that Riot will look at this and say,

14  "Well, I want it too"; right?

15  A.   That's -- yeah, that's a safe assumption, yes.

16  Q.   That's kind of like a different contagion effect?

17  A.   That is correct.

18  Q.   Now, ultimately the final deal that was reached with

19  respect to YouTube and Esports was $160 million over

20  three years; correct?

21  A.   That's what I recall for the YouTube portion of the Google

22  ABK deal, yes.

23  Q.   And so doing the math on that, that is more than

24  $50 million a year; right?

25  A.   Yes.

 1   **Q.**   Sorry?  I didn't hear you.

 2   **A.**   Yes.

 3   **Q.**   Thank you.

 4        All right.  Thank you.  We can put that away.

 5        Let's turn --

 6            **THE COURT:**  Okay.  We're going to break for lunch now.

 7   We'll come back at a little bit after 12:40.  Okay?

 8            **THE CLERK:**  All rise.

 9              (Luncheon recess was taken at 12:08 p.m.)

10   **AFTERNOON SESSION**                                **12:48 p.m.**

11        (Proceedings were heard in the presence of the jury:)

12            **THE CLERK:**  We're back on the record in Civil 20-5671,

13   Epic Games, Inc. vs. Google LLC, and Multidistrict Litigation,

14   21-2981, In re Google Play Store Antitrust Litigation.

15            **THE COURT:**  Go ahead.

16            **MS. MOSKOWITZ:**  Thank you, Your Honor.

17   **BY MS. MOSKOWITZ:**

18   **Q.**   We were talking before lunch about the Activision Blizzard

19   King-Google Project Hug negotiations; right?

20   **A.**   That was correct.

21   **Q.**   Please turn in your binder to Exhibit 150, please.

22        This is an e-mail chain from December 11 and 12, 2019,

23   that you participated in; correct?

24   **A.**   That is correct.

25            **MS. MOSKOWITZ:**  Your Honor, I move Exhibit 150 into

 1    evidence.

 2              **MS. CHIU:**  No objection.

 3              **THE COURT:**  It is admitted.

 4         (Trial Exhibit 150 received in evidence.)

 5    **BY MS. MOSKOWITZ:**

 6    **Q.**   This e-mail chain takes place about two weeks after the

 7    e-mail we looked at before lunch, Exhibit 148; correct?

 8    **A.**   That is correct.

 9    **Q.**   I'm glad you remembered that.

10         Ms. Beatty in here is providing an update on the ABK

11    Project Hug negotiations; right?

12    **A.**   That is correct.

13    **Q.**   And specifically she's providing an update based on

14    another call she had with Armin Zerza, ABK's chief commercial

15    officer, on December 11th, 2019; right?

16    **A.**   That is correct.

17    **Q.**   Great.  You can take off that.

18         Now, the second page of this document there's a section

19    labeled "Other Comments from Armin."  That's on page 2.

20         All right.  Do you see the "Other Comments from Armin"

21    followed by some hash bullets?

22    **A.**   Yes, I do, but my screen is no longer working.

23    **Q.**   Ah, okay.  You can use your document.  Is that okay?

24    **A.**   That's okay.

25    **Q.**   Okay.  Great.

1          **THE COURT:**  Are your screens on, Jury?

2     Okay.  Go ahead.

3  **BY MS. MOSKOWITZ:**

4  **Q.**  So in here there are a few remarks, and I want to go down

5  to five bullets down that starts out "Another Option."  Do you

6  see where I am?

7  **A.**  Yes, I do.

8  **Q.**  Okay.  Your screen's back on, sir?

9  **A.**  Yes.

10 **Q.**  Wonderful.

11     Okay.  So that bullet says (as read):

12          "Another option we have is to remove the Esports

13      licensing altogether."

14     Do you see that?

15 **A.**  Yes, I do see that.

16 **Q.**  All right.  Is it fair to say that this summary of

17 Mr. Zerza's comments is that he's pushing back on a lot of

18 aspects of Project Hug?

19 **A.**  Yes, that is a fair assessment of this all being feedback

20 from Mr. Armin Zerza.

21 **Q.**  He wants more from Google in exchange for the obligations

22 Google was asking for?

23 **A.**  That's a fair assessment.

24 **Q.**  All right.  So on the Esports here, this is a reference

25 again to the Esports licensing aspect of Project Hug that we

1    were discussing before lunch; right?

2    A.    That is correct.

3    Q.    And the bullet continues on, it says (as read):

4            "If this deal falls through, he claims" --

5          And that's Mr. Zerza claims; right?

6    A.    That is correct.

7    Q.    (as read):

8            "If the deal falls through, Mr. Zerza claims that

9          they will launch their own mobile distribution

10         platform..."

11         Do you see that?

12   A.    Yes, I do see that.

13   Q.    And he -- she says here (as read):

14         "... partnering with another 'major mobile company,'

15         presume Epic."

16         Do you see that?

17   A.    Yes, I do see that.

18   Q.    So ABK communicated to Google that if Google backed out of

19   the YouTube Esports licensing aspect of Project Hug, that ABK

20   will partner with Epic or another major mobile company to

21   launch a competing Android app distribution platform; right?

22   A.    That is what Karen reported back.

23   Q.    She reported back from a conversation she had with ABK;

24   correct?

25   A.    Yes, that is correct.

1    Q.   And the last bullet she has here is (as read):

2         "All this being said, I do think they really want to

3    do this deal with Google versus competition."

4    Do you see that?

5    A.   Yes, I do see that.

6    Q.   So the point Ms. Beatty is communicating is that she

7    believes ABK prefers to enter into this Project Hug with

8    Google -- Project Hug deal with Google rather than actually

9    have to compete with Google; right?

10   A.   This deal that was in discussion was something that was

11   bigger than a Project Hug standard deal.

12   Q.   Let me just try it again because I'm not sure I could

13   hear.

14        So what Ms. Beatty's communicating is that her belief,

15   after communicating with Mr. Zerza at ABK, was that ABK

16   preferred to enter into a Project Hug deal with Google rather

17   than having to compete with Google Play through an alternative

18   Android app store; right?

19   A.   Yes.  This was -- the scope of this deal that was in

20   discussion was something that was bigger than a Project Hug

21   deal.

22   Q.   Okay.  So I see -- I think I see --

23   A.   Project Hug --

24   Q.   -- what you're doing.

25   A.   Okay.

1  **Q.**   So let's -- the Project Hug, including the aspect of the

2  deal that related to the YouTube Esports licensing, you think

3  that that might not be part of Project Hug; is that the issue?

4  **A.**   Yes, that's what I'm alluding to.

5  **Q.**   Okay.  So let's come back to that.

6       I think we can talk about that, but the deal --

7  **A.**   The deal, yes.

8  **Q.**   -- that ABK was negotiating with Google, Ms. Beatty was

9  reporting that ABK preferred to enter into that deal with

10 Google rather than compete with Google by launching an

11 alternative app distribution platform; right?

12 **A.**   Yes, that was one of the assumptions that Ms. Karen Beatty

13 reported back.

14 **Q.**   So the terms that ABK was asking for in these negotiations

15 exceeded the money that the deal team was authorized to provide

16 under Project Hug; right?

17 **A.**   Yes, it was beyond the scope of Project Hug.

18 **Q.**   Not just what was covered, the amount was beyond the scope

19 of what had been authorized to be spent for Project Hug;

20 correct?

21 **A.**   That is fair.

22 **Q.**   And so in December 2019, the deal team had to go back to

23 the Business Council to get authorization for more money;

24 right?

25 **A.**   Yes, that did happen.

1   **Q.**   All right.  Please turn your binder to Exhibit 151,

2   please, sir.

3       Do you see where I am?

4   **A.**   Yes.

5   **Q.**   This is a presentation dated December 2019 titled "Google

6   Strategic Partnership with Activision Blizzard King."  Do you

7   see that?

8   **A.**   Yes, I do see it.

9   **Q.**   That's the slide deck that was used for the presentation

10  to the Business Council to get more money to enter into the ABK

11  deal?

12  **A.**   That is correct.

13          **MS. MOSKOWITZ:**  All right.  Your Honor, I move 151

14  into evidence, please.

15          **MS. CHIU:**  No objections.

16          **THE COURT:**  It's admitted.

17      (Trial Exhibit 151 received in evidence.)

18  **BY MS. MOSKOWITZ:**

19  **Q.**   All right.  So that's the cover page for the Business

20  Council presentation in December 2019, sir?

21  **A.**   Yes.

22  **Q.**   Let's turn to page 2, please.

23      This states that this document was presented to the

24  Business Council on December 18th, 2019.  Do you see that?

25  **A.**   Yes, I do.

1    **Q.**   So this presentation was given one week after Ms. Beatty's

2    e-mail, the update about her conversation that we just looked

3    at in Exhibit 150; right?

4    **A.**   That is correct.

5    **Q.**   All right.   If you can turn to the Slide 7, please.

6         This is titled "Credits and Licensing Costs."  Do you see

7    where I am?

8    **A.**   Yes, I do.

9    **Q.**   This slide is showing that the Project Hug deal team had

10   to seek authority from the Business Council to provide payments

11   and credits of $360 million over the course of three years for

12   entering into a deal with ABK; right?

13   **A.**   Yes, that's what this slide says.

14   **Q.**   Okay.   And the initial budget listed here on the top, you

15   see there's this 115 million?  Do you see that?

16   **A.**   Yes, I do.

17   **Q.**   And that's a reference to the amount of money that was

18   already approved for the business -- by the Business Council

19   for the team to spend on a Project Hug deal with ABK; right?

20   **A.**   That is correct.

21   **Q.**   And what this red number -- excuse me -- 245 million is

22   how much additional funding was being requested of the Business

23   Council in this presentation for an ultimate deal with ABK;

24   right?

25   **A.**   Yes, for a new type of deal with ABK.

**KOH - DIRECT / MOSKOWITZ**

1  **Q.**   For a Project Hug plus deal with ABK?

2  **A.**   Project Hug was a component of this new commercial deal.

3  **Q.**   And let's turn to the Slide 9 here.

4      So this slide is presenting goals and risks for the

5  Activision deal.  Do you see that?

6  **A.**   Yes, I do.

7  **Q.**   And the XPA is talking about goals and risks across

8  multiple Google product areas; right?

9  **A.**   That is correct.

10  **Q.**   The first product area, PA, is Google Play.  Do you see

11  that?

12  **A.**   Yes, I do.

13  **Q.**   And we see that this icon on the left and everything in

14  the row is about Google Play; right?

15  **A.**   That is correct.

16  **Q.**   All right.  So the ask for more money from the Business

17  Council includes a risk to Google Play in this chart here.  Do

18  you see that?

19  **A.**   Yes, I do.

20  **Q.**   All right.  And, in fact, I think it is a little blurry.

21  If we could blow up just the Play row, I think that might help

22  us, if that's possible.  See if that helps.

23      Actually, the whole row would be great, but let's see if

24  it works.  I don't know.  It's a little blurry.  These are how

25  they were produced.  Unfortunately, I think it's the best we

1   can do.

2        Can you see it on the screen, sir?

3   **A.**   Yes, I can see it.

4   **Q.**   Okay.  Wonderful.

5        So the risk to Google Play stated here is, quote (as

6   read):

7             "Activision has told us that they will build their

8        own mobile store."

9        Do you see that?

10  **A.**   Yes, I see it.

11  **Q.**   And that's a risk to Google Play that is being addressed

12  by the ask that's being made to the Business Council for the

13  deal with ABK; right?

14  **A.**   Yes, that was the risk that was being flagged.  The

15  additional context that's missing here is that --

16  **Q.**   Sir, you will get a chance --

17  **A.**   Okay.

18  **Q.**   -- to give missing context.

19        That is presented in this slide; right?

20  **A.**   Yes, that is correct.

21  **Q.**   Okay.  So then the potential revenue per year at risk is

22  also stated on this slide; right?

23  **A.**   Yes.

24  **Q.**   And what's being presented to the Business Council is that

25  the risk if Activision makes and builds their own store is

1    estimated to be $243 million per year.  Do you see that?

2    **A.**   Yes.  If they no longer -- if Activision Blizzard King no

3    longer launches their title on Google Play, that was the risk

4    that was estimated.

5    **Q.**   So that was just the risk if ABK's own titles launched

6    outside of Google Play, not even if ABK was able to attract

7    additional games on a competing app store; right?

8    **A.**   That was a risk if ABK pulled their content off of the

9    Google Play shelves.

10   **Q.**   Right.  And if they launched it on a competing app store,

11   they could have attracted more developers who could have put

12   more money at risk to Google?

13   **A.**   I'm not sure if that consideration was calculated in the

14   dollar risk here, but that would have been what we discussed in

15   terms of what the contagion risk could have been.

16   **Q.**   Right.  So what I'm saying, and I think you're saying the

17   same thing, is:  The 243 was just Activision's own content

18   being launched on a competing Android app platform.  It could

19   have been more if they attracted more content from other

20   developers; right?

21   **A.**   Yes, if more content was pulled off of the Google Play

22   shelves.

23   **Q.**   And put on a competing Android app store shelf?

24   **A.**   That is correct.

25   **Q.**   So even for a company the size of Google, you agree that

1  this is considered to be a big investment by Google; right?

2  **A.**   Yes, that is correct.

3  **Q.**   And Google made this investment to protect Google Play;

4  right?

5  **A.**   Yes.

6  **Q.**   And Google made this investment to prevent the contagion

7  risk that would arise if ABK opened its own app store on

8  Android?

9  **A.**   We put in this investment so that we can maintain the high

10  quality of games catalog on the Google Play Store.

11  **Q.**   Google made this investment to prevent the contagion risk

12  that would arise if ABK opened its own Android app store;

13  right?

14  **A.**   We put in this investment to secure those titles on the

15  Google Play Play Store.

16  **Q.**   So that they wouldn't launch them on a competing app store

17  that could then compete with Google Play; right?

18  **A.**   They were free to do whatever they wanted to as long as

19  they were launching their games on Google Play.

20  **Q.**   I understand.  I'm just trying to confirm that one of the

21  reasons Google made this $360 million investment that it had to

22  go to the Business Council to get after telling the Google

23  council that Activision was threatening to open their own

24  mobile store, that they made that investment to prevent

25  Activision Blizzard King's competing Android app store from

1  actually successfully attracting content away from the Google

2  Play Store; right?

3  **A.**   The intent here was really just to secure the titles.

4  Activision Blizzard was free to do whatever they wanted to, and

5  that was never really the consideration or the conversation.

6  The investment we were making was to have the commitment from

7  Activision Blizzard King that they will continue to launch

8  their titles at a high-quality manner on Google Play.

9  **Q.**   You did not have any communications over the break with

10 anyone; right?

11 **A.**   Excuse me?

12 **Q.**   Did you have any communications with anyone over the

13 break?

14 **A.**   I just had lunch.

15 **Q.**   That's -- you're allowed to eat.  I'm just making sure,

16 did you have any communications with anyone during lunch?

17 **A.**   Yes.

18 **Q.**   Did you talk about your testimony?

19 **A.**   No, we did not.

20 **Q.**   All right.  So understanding what you just said, I just

21 want to make sure, we're looking at the slide as it was

22 presented to the Business Council; agree?

23 **A.**   Yes.

24 **Q.**   All right.  And the risk that was presented to the

25 Business Council as the reason to enter into the agreement with

1   ABK was that "Activision has told us that they will build their

2   own mobile store"; right?

3   **A.**   Yes, that's the risk that's stated here.

4   **Q.**   And the spend, the $360 million, was to address that risk;

5   right?

6   **A.**   It was to address that risk of the titles potentially

7   launching off of Play and launching on -- solely on this new

8   distribution platform.

9   **Q.**   Let's turn to 153, please.  This is -- sorry.  Get their

10  first, please.

11       Are you there?

12  **A.**   Yes, I am.

13  **Q.**   This is the signed and executed Project Hug agreement

14  between Google and ABK; right?

15  **A.**   Yes, that is correct.

16       **MS. MOSKOWITZ:**  Your Honor, we move Exhibit 153 into

17  evidence.

18       **MS. CHIU:**  No objections.

19       **THE COURT:**  Okay.  It's admitted.

20       (Trial Exhibit 153 received in evidence.)

21  **BY MS. MOSKOWITZ:**

22  **Q.**   This is the final agreement that you executed -- that

23  Google executed with Activision Blizzard King that we've been

24  talking about under Project Hug?

25  **A.**   Yes, that's correct.

1   Q.   And it was signed in January 2020; is that right?

2   A.   That sounds about right.

3   Q.   Please turn to Section 3.  There's a section that's called

4   "Developer Obligations" on page 3.  Do you see where I am?

5   A.   Yes, I do.

6   Q.   All right.  And obligation A, I just want to come back to

7   some of those obligations we talked about earlier, obligation A

8   under 3 is the sim ship obligation we were talking about

9   earlier; right?

10  A.   Yes.

11  Q.   And, again, that means that if you sign this agreement, so

12  ABK, as a signatory to this agreement, promises and is required

13  not to launch any content anywhere else unless they are also

14  launching it at the same time on Google Play; right?

15  A.   That is correct.

16  Q.   All right.  And then the next obligation B is the feature

17  parity obligation we were talking about earlier; right?

18  A.   That is correct.

19  Q.   And that's in that first sentence there?

20  A.   Yes, that is correct.

21  Q.   There's another obligation E on page 4 that I want to

22  pause on for a moment.

23       So this says (as read):

24           "Developer will not remove any of the participating

25       titles from distribution on Google Play during the term."

1       Do you see that?

2   **A.**   Yes, I do see it.

3   **Q.**   So the thinking there was that Google wanted to prevent

4   ABK from getting all of the Project Hug benefits but then

5   turning around and pulling all their games off the Google Play

6   Store right away after; right?

7   **A.**   That's what this is alluding to, yes.

8   **Q.**   So this provision that ABK agreed to actually forced them

9   to keep their games on Google Play for the duration of the

10  agreement; right?

11  **A.**   It required them to keep the games on Google Play to

12  continue to unlock the incentives that we were providing.

13  **Q.**   Right.   If they wanted to get the money, they had to keep

14  their games on Google Play, not just the first day but for the

15  rest of the agreement?

16  **A.**   Throughout this term, yes.

17  **Q.**   Riot is another major game developer; right?

18  **A.**   Yes, they are.

19  **Q.**   In early 2019 Riot was developing two new mobile games and

20  was going to be deciding on a distribution strategy within a

21  few weeks; right?

22  **A.**   Yes, that sounds about right.

23  **Q.**   One of the games it was developing was the mobile version

24  of a game called League of Legends; is that right?

25  **A.**   Yes, that is correct.

 1   **Q.**   And it was well understood that the League of Legends

 2   mobile game had significant mass market potential; right?

 3   **A.**   Yes.

 4   **Q.**   Now, when Google initially engaged with Riot in early

 5   2019, Riot told Google that it was planning on launching its

 6   own Android app store; correct?

 7   **A.**   They let us know they were considering all options, and

 8   that being one of the options they were considering exploring.

 9   **Q.**   So when Google first engaged with Riot, at that time Riot

10   told Google that it was planning on launching its own Android

11   app store; right?

12   **A.**   They just let us know they were considering all options,

13   and they listed that as one of the options.

14         **MS. MOSKOWITZ:**   285, Your Honor, please, lines 4

15   through 9.

16         **THE COURT:**   Go ahead.

17   BY MS. MOSKOWITZ:

18   **Q.**   At your deposition you were asked the following question

19   and gave the following answer (as read):

20         **"QUESTION:**   And as we discussed earlier, Riot was, in

21         fact, planning and told you it was planning to launch its

22         own Android app store?

23         **"ANSWER:**   Yes, they did tell us that when we initially

24         engaged with them."

25         Did I read that correctly?

1   **A.**   Yes, you read it correctly.

2   **Q.**   Riot told Google that it had already put some investment

3   into an Android distribution platform; correct?

4   **A.**   They had mentioned something like that.

5   **Q.**   Let's turn to 154, please, Exhibit 154 in your binder.

6        This is an e-mail that you participated in in

7   February 2020 and earlier in 2019?

8   **A.**   Yes.

9        **MS. MOSKOWITZ:**  Your Honor, I move Exhibit 154 into

10  evidence.

11       **MS. CHIU:**  No objections.

12       **THE COURT:**  It is admitted.

13       (Trial Exhibit 154 received in evidence.)

14  **BY MS. MOSKOWITZ:**

15  **Q.**   So this top e-mail -- this is a little confusing.  So this

16  top e-mail is from February 2020; right?

17  **A.**   Yes.

18  **Q.**   And if we pull that down for a moment, you'll see it's

19  actually forwarding earlier conversations from back in

20  March 2019.  Do you see that?

21  **A.**   Yes, I do.

22  **Q.**   All right.  So let's talk about the February 2020 e-mail

23  for now.  So let's blow that up.

24       In the second paragraph of this e-mail, there is a TLDR.

25  Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    And that's too long, didn't read; you're trying to

3    summarize the upshot?  Is that fair?

4    **A.**    That is fair.

5    **Q.**    Okay.  So the upshot here was you were saying that Riot

6    was on the verge of becoming the next major game company to

7    follow Epic in moving forward with an off-Play Android

8    distribution strategy.  Do you see that?

9    **A.**    Yes, I do.

10   **Q.**    And the negotiations you're describing are what you

11   forwarded and summarized from March 2019; right?

12   **A.**    Yes, that is correct.

13   **Q.**    And March 2019 was about seven months after Epic had

14   launched Fortnite outside of Google Play.  Does that sound

15   about right?

16   **A.**    That sounds about right.

17   **Q.**    And it was one month before Project Hug was presented to

18   the Business Council; right?

19   **A.**    That is correct.

20   **Q.**    So at the time Google wanted to make sure that Riot did

21   not move forward with launching its new game outside of

22   Google Play like Epic had done; right?

23   **A.**    Yes.  We really wanted to secure the next Riot mobile game

24   on Google Play.

25   **Q.**    And in the next sentence here you say that to convince

1   Riot and their board of directors to change their strategy, you

2   offered some -- a deal to Riot; right?

3   A.   That's what it says, yes.

4   Q.   And so Google gave Riot $17 million in incentives as part

5   of that deal; right?

6   A.   Yes, that is correct.

7   Q.   And in exchange for the $17 million, which are summarized,

8   you can sort of add it up in those bullets; is that the right

9   way of reading that?

10   A.   Yes, that is correct.

11   Q.   All right.  So in exchange for that $17 million, in the

12   paragraph right underneath that, this document states that,

13   quote (as read):

14         "Once Riot agreed to put aside their off-Play

15       distribution platform and launch on Play in April..."

16       And it goes on.  Do you see that?

17   A.   Yes, I do see it.

18   Q.   So this is reporting that Riot told Google at that time

19   that it was going to go forward with Google Play instead of

20   launching a competing Android distribution method; correct?

21   A.   The main message here was really Riot letting us know that

22   they're choosing to launch their game on Google Play.

23   Q.   And that they are not going forward with an off-Play

24   distribution platform on Android?

25   A.   I don't recall any sort of direct conversations about that

1  with Riot, but the main thing was their commitment to launch

2  their games on Google Play.

3  **Q.**   Okay.  But we can read this together --

4  **A.**   Yes.

5  **Q.**   -- right?

6       It says (as read):

7            "Riot agreed to put aside their off-Play distribution

8       platform."  Do you see that?

9  **A.**   I do see that.

10 **Q.**   And you wrote that?

11 **A.**   I wrote it, yes.

12 **Q.**   After Project Hug was approved by the Business Council,

13 Google approached Riot again to enter into a formal Project Hug

14 agreement; right?

15 **A.**   That is correct.

16 **Q.**   And negotiation on that continued into early 2020?

17 **A.**   Yes, that is correct.

18 **Q.**   Can you turn to Exhibit 155 in your binder, please?

19 **A.**   I see it.

20 **Q.**   This is an e-mail chain from January 2020 that you

21 participated in at Google, sir?

22 **A.**   That is correct.

23       **MS. MOSKOWITZ:**  Your Honor, I move Exhibit 155 into

24 evidence.

25       **MS. CHIU:**  No objections.

1          **THE COURT:**  It's admitted.

2       (Trial Exhibit 155 received in evidence.)

3          **MS. MOSKOWITZ:**  Let's put that on the screen, please.

4    BY MS. MOSKOWITZ:

5    **Q.**   And I'm going to ask you to pronounce the "from" so that I

6    don't mess it up.

7    **A.**   Karan Gambhir.

8    **Q.**   Karan Gambhir?

9    **A.**   That is correct.

10   **Q.**   Mr. Gambhir?

11   **A.**   Mr. Gambhir.

12   **Q.**   Thank you.

13       So Mr. Gambhir was an operations lead that you worked with

14   at Google?

15   **A.**   That's correct.

16   **Q.**   And he was involved in Project Hug with you?

17   **A.**   Yes, he was.

18   **Q.**   And in the first bullet of this e-mail Mr. Gambhir --

19   **A.**   Yes.

20   **Q.**   Did I already mess it up?

21   **A.**   You did well.

22   **Q.**   -- Mr. Gambhir noted that Riot was getting more than what

23   most developers had gotten; right?

24   **A.**   Yes, that's what he says.

25   **Q.**   And at the bottom of his e-mail there's a net-net

1  paragraph where he says the Riot deal was getting vastly

2  imbalanced and that it was providing only one year of security

3  for Google.

4      Do you see that that net-net paragraph there?

5  **A.**  Yes, I do see it.

6  **Q.**  All right.  And do you see what I just read?

7  **A.**  Yes, I do see what you read.

8  **Q.**  All right.  So Mr. Gambhir's reference to "security" meant

9  that the Project Hug agreement would only stop Riot from

10 launching its own Android app store for one year; right?

11 **A.**  I believe the other key message here was having those

12 titles available on Google Play and the security of having

13 those titles available on Google Play for one year.

14 **Q.**  All right.  So it was both.  So I'll ask it again and I'll

15 include that second piece, but I want to make sure you agree

16 with the first piece.

17     So by "security," Mr. Gambhir meant the Project Hug

18 agreement would only assist in stopping Riot from starting its

19 own Android app store and getting the launches on Play for one

20 year; right?

21 **A.**  We never really entered into any type of agreements about

22 Riot's intent or interest in other distribution strategies.

23         **MS. MOSKOWITZ:**  Page 294, please, Your Honor, lines 18

24 to 24.

25         **THE COURT:**  Okay.

1  BY MS. MOSKOWITZ:

2  **Q.**   Mr. Koh, you were asked the following question and gave

3  the following answer at your sworn deposition (as read):

4       **"QUESTION:**  And by 'security,' Mr. Gambhir meant that the

5       Project Hug agreement would only assist in stopping Riot

6       from starting its own Android app store and getting

7       launches on Play for one year; right?

8       **"ANSWER:**  Yes."

9       Did I read that correctly?

10  **A.**   Yes, you read that correctly.

11  **Q.**   You can take that down.

12       Let's turn to 156, please, in your binder.

13       This is an e-mail chain from February 2020 that you

14  participated in at Google, sir?

15  **A.**   Yes, that is correct.

16       **MS. MOSKOWITZ:**  Your Honor, I move Exhibit 156 into

17  evidence.

18       **MS. CHIU:**  No objections.

19       **THE COURT:**  It's admitted.

20       (Trial Exhibit 156 received in evidence.)

21  BY MS. MOSKOWITZ:

22  **Q.**   The subject line of this e-mail is "Action Needed Riot and

23  GVP."  Do you see that?

24  **A.**   I do.

25  **Q.**   GVP again is Project Hug?

1   **A.**   That is correct.

2   **Q.**   This is an e-mail thread discussing the Project Hug deal

3   negotiations between Google and Riot; right?

4   **A.**   That's correct.

5   **Q.**   And take a moment to look at it.  You have the full one in

6   your binder.

7        Some of the same concerns we were just discussing that

8   were expressed by Mr. Gambhir in Exhibit 155 are under

9   discussion again here; right?

10  **A.**   That is correct.

11  **Q.**   The overpayment concerns?

12  **A.**   That is part of the conversation here, yes.

13  **Q.**   All right.  So let's turn to Mr. Gambhir's e-mail on

14  February 12, 2020, at the bottom of the second page, please.

15       This -- do you see where I am?  And it's on the screen as

16  well.

17  **A.**   I see it on screen.

18  **Q.**   Okay.  That e-mail refers to some new projections that

19  Google had made for the Riot-Hug deal coming into approximately

20  15 percent overall projected spend by Riot consumers?

21  **A.**   Yes, I see it.

22  **Q.**   And 15 percent was higher than what Google was generally

23  offering for Project Hug deals; right?

24  **A.**   That is correct.

25  **Q.**   Now let's look at your response e-mail from the same day,

1    which starts at the bottom of the first page of this document,

2    page 1, and continues onto the top of page 2.

3         Do you see where I am?

4    A.   Yes, I do.

5    Q.   All right.  So the e-mail itself other than from Mr. Koh

6    is all on page 2; right?

7    A.   Yes.

8    Q.   All right.  So let's look at that.

9         You start off by responding (as read):

10             "The finance team raises a valid concern, but I

11        wonder if we're properly calculating this by considering

12        all the factors on why we came up with this package."

13        Do you see that?

14   A.   Yes, I do.

15   Q.   All right.  So you go on in this e-mail to provide the

16   business justification from your perspective on the package

17   offered to Riot; right?

18   A.   Yes.

19   Q.   And you explain that the deal on the table for Riot was

20   motivated by two objectives; correct?

21   A.   That's what it says here, yes.

22   Q.   And the first objective was, one, have Riot choose Play

23   versus launching their own Android store.  Do you see that?

24   A.   Yes, I do.

25   Q.   That's also a concern that Riot was going to attract more

1   developers if they had opened that competing Android app store;

2   right?

3   **A.**   I think the real concern here was Riot deciding not to

4   launch their new mobile titles on Google Play and launching it

5   on their own distribution platform.

6   **Q.**   Right.  So it wasn't just about getting it on Google Play,

7   it was about not having Riot launch their popular content on a

8   competing Android app store that they were going to launch;

9   correct?

10  **A.**   It was really just about getting Riot's next mobile games

11  on Google Play.

12  **Q.**   Okay.  So in your view, when I read "Have Riot choose Play

13  versus launching their own Android store," is it your testimony

14  that it had nothing to do with Riot launching their own Android

15  store?

16  **A.**   I think the concern would have been if they launched their

17  own Android store and they did not launch their games on the

18  Google Play Store, that would have been a concern.

19  **Q.**   Okay.  So "versus" means instead of; right?  That's how

20  you use that word?

21  **A.**   Yes.

22  **Q.**   Okay.  So you were concerned that Riot would -- you wanted

23  to make sure Riot would choose play instead of launching their

24  own Android store; correct?

25  **A.**   Instead of launching their own Android store and also

1    exclusively launching their new mobile games.

2    **Q.**   In your view, that objective number one, making sure Riot

3    did not launch their own Android app store, that Google was

4    paying a higher premium in the first year as Riot builds up

5    their business, that that investment was money well spent;

6    correct?

7    **A.**   Yes.  We believed getting Riot's titles on Google Play was

8    worth the investment that is stated there.

9    **Q.**   Your view was that making sure Riot did not launch their

10   own Android app store was money well spent; right?

11   **A.**   As I said, getting their games on Google Play was the

12   investment that we thought was all worth the dollars.

13           **MS. MOSKOWITZ:**   Page 299, Your Honor, please, lines 13

14   through 20.

15           **THE COURT:**   Go ahead.

16   **BY MS. MOSKOWITZ:**

17   **Q.**   Mr. Koh, you were asked the following question and gave

18   the following answer at your deposition (as read):

19           **"QUESTION:**   And your view was that, objective number one,

20           making sure that Riot did not launch their own Android app

21           store, that Google was paying a higher premium in the

22           first year as Riot builds up their business, that that was

23           an investment that was money well spent?

24           **"ANSWER:**   Yes, that is correct."

25           Did I read that correctly?

 1   **A.**    You read that correctly.

 2   **Q.**    We can put that away.

 3        Google signed a formal Project Hug agreement with Riot in

 4   2020; correct?

 5   **A.**    That is correct.

 6   **Q.**    And you were personally involved in the negotiation of

 7   that deal?

 8   **A.**    Yes, I was.

 9   **Q.**    Please turn to 162, please, in your binder, sir.

10        This is the final Project Hug agreement between Google and

11   Riot that was signed in March 2020?

12   **A.**    Yes, that is correct.

13             **MS. MOSKOWITZ:**  Your Honor, move Exhibit 162 into

14   evidence.

15             **MS. CHIU:**  No objections.

16             **THE COURT:**  It's admitted.

17        (Trial Exhibit 162 received in evidence.)

18   **BY MS. MOSKOWITZ:**

19   **Q.**    This document describes Google's agreement to invest

20   $18 million in various forms; is that fair?

21   **A.**    That sounds about right, yes.

22   **Q.**    And, again, just like we did with the ABK final agreement,

23   just briefly, if you turn to page 2, there's another Section 3,

24   "Developer Obligations."  Do you see that?

25   **A.**    Yes, I do.

1   Q.   And, again, 3(a) is that sim ship obligation Riot agreed

2   to?

3   A.   Yes, it is.

4   Q.   And then on the top of the next page, the 3(b)(i) one is

5   the feature parity obligation Riot agreed to?

6   A.   Yes, that's correct.

7   Q.   And 3(c) required Riot to keep all of its titles on

8   Google Play for the entire duration of the agreement; right?

9   A.   That is correct.

10  Q.   Now if you could turn to the first page of the document,

11  there's a Section 2(a) that has Google's obligations.  Do you

12  see where I am?

13  A.   Yes, I do.

14  Q.   And there's a reference to an ad addendum that they would

15  enter into with Google subsequently?

16  A.   Yes, I see it.

17  Q.   All right.  You could put that away and please turn your

18  binder to 163.

19       And I'll ask you if this is, in fact, the ad credits

20  addendum that was just referenced in that section.

21  A.   Yes, that is correct.

22            MS. MOSKOWITZ:  Your Honor, I move Exhibit 163 into

23  evidence.

24            MS. CHIU:  No objections.

25            THE COURT:  It's admitted.

1          (Trial Exhibit 163 received in evidence.)

2    **BY MS. MOSKOWITZ:**

3    **Q.**   All right.  So in this ad addendum, Riot could earn up to

4    an additional $10 million in investment from Google?

5    **A.**   That is correct.

6    **Q.**   So that $10 million is in addition to the $18 million from

7    the agreement we just looked at?

8    **A.**   I have to refresh my memory about what the 18 million was,

9    but this was a $10 million ad credits.

10   **Q.**   Okay.  And it's in addition to the amount of money in the

11   prior agreement?

12   **A.**   That should be correct.

13   **Q.**   All right.  Well, we can -- let's look back at 156, maybe

14   that will help you without having to pour through a contract,

15   which I believe is in evidence.

16        It is in evidence so we can put it on.  Thank you.

17        So if you look on page 3 of that, you see here Mr. Gambhir

18   was summarizing the package that totaled 28 million plus some

19   cloud credits?  Do you see that?

20   **A.**   Yes, I do.

21   **Q.**   All right.  And that's a reference to the 10 million from

22   the ad addendum and 18 from the other agreement?

23   **A.**   That is correct.

24   **Q.**   All right.  You can put that away.

25        During your time at Google, you were not aware of any

1  developer who entered into a Project Hug agreement that still

2  pursued a new Android distribution platform; correct?

3  **A.**   I don't have any direct knowledge of it.

4  **Q.**   You don't believe it happened, do you?

5  **A.**   I have no knowledge of it.

6  **Q.**   Right.  So as far as you know, no one did that; right?

7  **A.**   As far as I know.  I don't know anything about it.

8  **Q.**   And by the time you left Google, Project Hug was working

9  in the sense that all developers who had agreed to those deals

10  were meeting the sim ship and the feature parity and the

11  keeping titles on Google Play obligations from their agreement;

12  right?

13  **A.**   Yes, they were.

14  **Q.**   Today Google Play is the largest distribution platform on

15  Android; right?

16  **A.**   That is correct.

17  **Q.**   And there's no Android distribution platform that can

18  reach as many users as Google Play can reach; right?

19  **A.**   I don't know who the second closest is.

20  **Q.**   You don't know what?

21  **A.**   I don't know who's closest to Google Play.

22  **Q.**   Okay.  But there's no one who can reach as many volume of

23  users as Google Play has; right?

24  **A.**   I know Google Play has a pretty significant scale of

25  users.

1   Q.   So the contagion risk that Project Hug was presenting to

2   the Business Council and trying to solve never came to pass;

3   right?

4   A.   Yes, that risk was mitigated.

5   Q.   You've used Google Chat to discuss your work with Google

6   colleagues; right?

7   A.   Yes, I did.

8   Q.   And you did that on your computer and your Android device?

9   You used it all the time; right?

10  A.   Yes.

11  Q.   Everyone on your team at Google used Google Chat on a

12  daily basis; right?

13  A.   Yes, we did.

14  Q.   And that was including to discuss business communications

15  about Project Hug; right?

16  A.   We never really got into specifics, but we would

17  occasionally discuss Project Hug-related matters, yes.

18  Q.   Over Chat?

19  A.   Just like high-level matters, yes.

20  Q.   Everything you were doing in the course of your business,

21  you could use Chat to discuss it; right?

22  A.   Anything substantial was done on like the Google

23  documents.

24  Q.   Sir, do you know that you never discussed any real

25  information about Project Hug over Chat?  Can you swear to

1    that?

2    **A.**    I believe -- I mean, I'm sure I probably chatted about

3    Project Hug-related matters, but any of these analysis or

4    reviewing charts or actually specific deal terms, we had sort

5    of like shared documents that we were using so that everyone

6    that was involved in it had visibility into what was being

7    explored.

8    **Q.**    So you think that every time you had any discussion about

9    a business term for Project Hug, you never used Chat to

10   communicate about that?

11   **A.**    I imagine, again, we probably had -- probably discussed

12   just probably some asking some questions or answering some

13   questions; but any of the substantial materials given the

14   number of parties that were involved in reviewing and approving

15   Google Docs were a much better platform to use than Chat.

16   **Q.**    So in terms of the negotiations of the contracts and going

17   to the Business Council, those were in Google Docs and slide

18   presentations; right?

19   **A.**    That was a much more effective, efficient way to go about

20   it.

21   **Q.**    Right.  But if you didn't want to do it in that

22   environment, if you wanted to have a side conversation with

23   someone about anything related to those topics, Chat was a tool

24   that you could use for that; right?

25   **A.**    It was an effective one-on-one chat to just validate an

1  answer or ask questions.

2  **Q.**   And Project Hug was going on the entire time you were at

3  Google; right?

4  **A.**   Yes, that is correct.

5  **Q.**   Including from August 2020 until the time you left later

6  that year?

7  **A.**   That is correct.

8  **Q.**   You were placed on a legal hold related to this case;

9  right?

10  **A.**   Yes, I was.

11  **Q.**   And you understood that being on a legal hold meant you

12  couldn't destroy any documents; right?

13  **A.**   That is correct.

14  **Q.**   And you knew that there was an option within Google Chat

15  that allows you to preserve your message history on that

16  platform; right?

17  **A.**   Yes.

18  **Q.**   And you knew that you could turn off the auto delete

19  function within Google Chat; right?

20  **A.**   I knew that functionality was available, yes.

21  **Q.**   And you don't recall performing that step; right?

22  **A.**   I don't recall that, yes.

23  **Q.**   And you have no recollection of having ever turned history

24  on for your Google Chats; right?

25  **A.**   I don't have -- I don't recall.

1   **Q.**   You don't recall or you don't believe you did?

2   **A.**   I don't -- I don't remember honestly.

3   **Q.**   Okay.  So you don't recall one way or the other?

4   **A.**   Yeah.

5   **Q.**   All right.  Are you aware that Google produced only 26

6   chats in which you were a participant in the entire pile of

7   documents we got in this case?

8   **A.**   I am not aware of that.

9   **Q.**   And you can't tell me how many chats you actually

10  participated in about any of the business that you were

11  involved in over that period of time; right?

12  **A.**   I can't tell you how many chats there were.

13  **Q.**   All right.

14          **MS. MOSKOWITZ:**  Pass the witness.

15          **THE COURT:**  Okay.

16          **MS. SCIARRINO:**  Your Honor, may I approach the

17  witness?

18          **THE COURT:**  Yes.

19          **MS. CHIU:**  May I proceed, Your Honor?

20          **THE COURT:**  Please.

21                      <u>**CROSS-EXAMINATION**</u>

22  BY MS. CHIU:

23  **Q.**   Good afternoon, Mr. Koh.

24          Now, counsel just asked you about your use of Chats while

25  you were at Google.

1          I just wanted to clarify.  When was the last time that you

2     were employed at Google?

3     **A.**   It was either November 2020 or the first of December of

4     2020.  I don't remember exactly.

5     **Q.**   And counsel asked you when you received the litigation

6     hold, and I think you said it was around September 2020; is

7     that right?

8               **MS. MOSKOWITZ:**  Objection.  Facts not in evidence.

9               **MS. CHIU:**  Let me reask.

10              **THE COURT:**  Just try it again.

11    **BY MS. CHIU:**

12    **Q.**   Mr. Koh, do you recall receiving a litigation hold for

13    this litigation?

14    **A.**   Yes, I do.

15    **Q.**   About when did you receive it?

16    **A.**   It was near my departure date.

17    **Q.**   And when you say "near," do you mean a matter of weeks or

18    a matter of months?

19    **A.**   I don't really recall, but it was -- I just remember it

20    was near my -- end of my time at Google.

21    **Q.**   So you received the litigation hold at the very end of --

22    near the end of your employment with Google; is that fair?

23    **A.**   That is fair.

24    **Q.**   Now, Mr. Koh, counsel asked you some questions about the

25    games developer Riot Games.  Do you remember that?

KOH - CROSS / CHIU

1    **A.**    Yes, I do.

2    **Q.**    And you were personally involved in negotiating the Games

3    Velocity Program deal with Riot Games; is that right?

4    **A.**    That is correct.

5    **Q.**    Mr. Koh, did you ever bribe Riot Games so they would not

6    open their own store?

7    **A.**    No, never.

8    **Q.**    And are you aware of anyone at Google ever bribing Riot so

9    they would not open their own store?

10   **A.**    No, I was not aware of any of that.

11   **Q.**    Now, I have some more questions for you about the Games

12   Velocity Program generally.

13        Could you explain to the jury exactly how the Games

14   Velocity Program, also known as Project Hug, operated?

15   **A.**    The Games Velocity Program was a new program that was put

16   together to work with our top developers to get their games

17   onto Google Play, and in exchange for that commitment we

18   offered incentives to our top game developers.

19   **Q.**    And, Mr. Koh, why was it important for Google Play to get

20   game developers to choose to put their content on Google Play?

21   **A.**    Our mission at Google Play, at least on the game side of

22   the business, was to ensure that the games catalog would be

23   just as good as any other games -- mobile games catalog that

24   was out there in the world.

25        We wanted to make sure that the quality of games that the

1  users can get through Google Play could be just as good as the

2  games they would -- you know, their friends would get on Apple

3  App Store or on any other distribution platforms.

4  **Q.**   Now, counsel asked you some questions about what you

5  called off-Play distribution options.  Do you remember that?

6  **A.**   Yes, I do.

7  **Q.**   Could you explain to the jury what you mean by off-Play

8  distribution?

9  **A.**   Off-Play distribution is allowing a developer -- when a

10  developer decides to distribute their games to consumers

11  through channels other than Google Play.  And so an example is

12  allowing a user to download the actual game from, like, their

13  home page website through a browser.

14  **Q.**   And is that practice known as sideloading, Mr. Koh?

15  **A.**   That is one of the names used.

16  **Q.**   And what also would be included in off-Play distribution

17  options?

18  **A.**   Basically any other channels that is not Google Play.  And

19  so as we discussed earlier, third-party app stores or app

20  stores or distribution platforms developed by hardware

21  manufacturers, like the Samsung Galaxy Store that was mentioned

22  earlier.

23  **Q.**   Now, in addition to additional Android distribution

24  options, were there other platforms where game developers could

25  launch their content?

**A.**   There were some new emerging technologies like streaming

that was becoming available, and developers could also choose

to launch their games on other gaming devices, whether it's

handheld, PCs, consoles.

**Q.**   And you mentioned Apple.  Is that another choice that

developers of games have to launch their content?

**A.**   Yes, it is.

**Q.**   And so you mentioned the Games Velocity Program was a new

initiative when you were working on it.  Exactly what were the

benefits provided to developers in exchange for what they gave

to Google?

**A.**   The four, I would say, main category of benefits were

around sort of like jointly invest in marketing activations.

     And the second was sort of a similar sort of -- sort of

category of benefit, which was helping a developer scale up

their performance marketing or what we call ads or, you know,

fully utilizing our ads technology platform.

     And then we offered some benefits around using YouTube to

drive an increase engagement, and then also some benefits

around helping developers strengthen their tech infrastructure

by utilizing Google Cloud's tech platform.

**Q.**   In exchange for these benefits, if a games developer

signed a Games Velocity Program deal, what did they commit to

do?

**A.**   Their commitments were -- our asks were primarily around

1    making sure that they stuck to their commitment of launching

2    their games at the same time on Google Play as they would

3    across any other mobile platform, and then also ensure that

4    those games were at equal quality as the games that they were

5    making available on other platforms.

6    **Q.**   And that was referred to as feature parity earlier; is

7    that right?

8    **A.**   That is correct.

9    **Q.**   And, Mr. Koh, why is it important that games sim ship

10   launch on Google Play at the same time as other platforms?

11   **A.**   As a consumer, if you're an Android user and you see that

12   a new game that has launched but that game is only available

13   for, let's say, an iPhone user, that consumer will

14   immediately feel disadvantaged; and we were concerned that

15   would hurt our ambition of becoming known for being a great

16   destination where consumers can find great gaming content.

17   **Q.**   And, Mr. Koh, can you also explain to the jury why it was

18   also a concern for Google Play if games developers launched on

19   another Android option other than Google Play?

20   **A.**   It would be the same thing; where if they launched on any

21   other sort of Android platforms, we -- it would sort of -- we

22   would not accomplish our, you know, platform ambitions of

23   having the greatest catalog of games on Google Play.

24   **Q.**   Now, are you aware if consumers find that game content is

25   not available in Google Play, what were the risks that Google

1  was worried about?  What would happen?

2  **A.**   If the best games were not available on Google Play, we

3  were worried that those gaming consumers would move away to

4  other platforms to look for that great games content.

5  **Q.**   And what kinds of other platforms were you concerned

6  about?

7  **A.**   The platforms we discussed earlier.  Anything ranging from

8  side -- you know, the third-party app stores, stores put

9  together by the OEM manufacturers, or new technology platforms

10  like streaming of games content.

11  **Q.**   Were you also worried that they might choose a different

12  type of phone entirely?

13  **A.**   That was certainly a concern, yes.

14  **Q.**   And by another type of phone, was that Apple?

15  **A.**   That was the one that we --

16       **MS. MOSKOWITZ:**  Objection.  We're getting into leading

17  here.

18       **THE COURT:**  It's fine.  Just move it along.  Go ahead.

19  **BY MS. CHIU:**

20  **Q.**   Now, Mr. Koh, what was your specific role with Games

21  Velocity Program?

22  **A.**   I was mainly in charge of working with our partners to

23  pitch them and help them understand this new program that we

24  were putting together; and then responsible for executing that

25  program, meaning getting our developer -- our top developer

1    partners to commit to the structure of that program.

2    **Q.**   And as part of the Games Velocity Program discussions with

3    developers, did you ever ask any of those developers not to

4    distribute their games through other stores or methods?

5    **A.**   No.  That was never an ask.

6    **Q.**   So I'd like to turn to Exhibit 136, and that's actually

7    going to be in the large binder that counsel handed to you

8    originally.  And I'm looking at page 3, 136, page 3.

9    **A.**   (Witness examines document.)

10   **Q.**   And if you recall, counsel was asking you some questions

11   about the executive summary slide.  Do you remember that?

12   **A.**   Yes, I do.

13   **Q.**   And on the left side of the slide are the challenges and

14   opportunities.  Do you see that?

15   **A.**   Yes, I do.

16   **Q.**   And counsel asked you about the -- and this described some

17   of the Project Hug or Games Velocity Program components; is

18   that right?

19   **A.**   That is correct.

20   **Q.**   And this was presented to the Business Council; is that

21   correct?

22   **A.**   That is correct.

23   **Q.**   So on the impact box on the bottom left-hand side of the

24   slide, do you see that?

25   **A.**   Yes, I do.

1   Q.   Can you look at the second bullet point, "Android to IOS

2   churn"?

3   A.   Yes, I see it.

4   Q.   Can you read that bullet point out to the jury, please?

5   A.   (as read):

6           "Android to IOS churn due to fractured app

7        distribution and security risks on Android."

8   Q.   What did you understand that to mean?

9   A.   We were concerned that if Android users didn't have a very

10  reliable way of getting access to games content, that could

11  cause consumer sentiment and consumer experience risk.

12  Q.   I'd like to turn your attention to page 14 of the same

13  document.

14  A.   (Witness examines document.)

15  Q.   Do you see that?

16       Now, counsel asked you about this slide previously on

17  page 14, and there was a section titled "May Forego Play and

18  Android."  Do you see that?

19  A.   Yes, I do.

20  Q.   Can you explain to the jury what you understand that to

21  mean?

22  A.   This was meant to imply that these top developers had the

23  option to not launch their games on Google Play.

24  Q.   And what does the "Android" signify there to you?

25  A.   They also had the option, if they chose to, to solely

1   focus on a platform like the Apple iPhone platform.

2   **Q.**   So, Mr. Koh, you were asked some questions about

3   Riot Games specifically.  I wanted to ask you a couple more

4   questions about that.

5       Why was Google interested in achieving a Games Velocity

6   Program deal with Riot Games?

7   **A.**   Riot was and still is considered one of the best game

8   developers in the world; and when they had approached us that

9   they were looking to expand beyond their massive game League of

10  Legends and bring that League of Legends experience and that

11  universe to mobile, we all got very, very excited about what

12  that can do in terms of driving excitement for our Google Play

13  consumers; and also just the opportunities that we felt working

14  together to make that into the next big gaming phenomenon.

15  **Q.**   You mentioned this was their first introduction of their

16  titles to mobile.  Where could people play Riot Games before?

17  **A.**   It was solely just on the PC.

18  **Q.**   And were you involved in those discussions with Riot?

19  **A.**   Yes, I was.

20  **Q.**   And what were those discussions?  What did you talk about

21  with Riot in those discussions?

22  **A.**   I was initially just letting them know how we had a deep

23  appreciation for the craft they built and the game -- the

24  quality of games they have; and then letting them know how we

25  can help with their journey into expanding beyond PC and

**KOH - CROSS / CHIU**

1  getting their games available on mobile.

2  **Q.**   And could you explain to the jury some of the things that

3  you thought Google Play could do to help Riot be successful on

4  mobile?

5  **A.**   The -- it was everything ranging from how to market games

6  on mobile devices, how to reach players in all different

7  markets where mobile devices are readily available and are the

8  preferred form of gaming, and ranged from how to also localize

9  for all these new markets that they could enter.

10     And then also just even like how to think about technology

11  strategies so that their games could work on mobile devices

12  versus PCs.

13  **Q.**   Now, counsel asked you if you were aware at the time of

14  these discussions whether Riot had told you they were planning

15  on opening their own store.  Do you remember that?

16  **A.**   Yes, I do.

17  **Q.**   I just want to talk to you a little bit about that.

18     So you mentioned that was one of the options that Riot

19  might have been pursuing; is that correct?

20  **A.**   That is correct.

21  **Q.**   And were you aware of what other options Riot might have

22  been considering for their mobile distribution launch during

23  the time you were discussing with them?

24  **A.**   I was not.

25  **Q.**   Did you have a sense or did you have thoughts about what

1  they might be interested in pursuing?

2  A.   I could have speculated, but our only interest was really

3  on getting their games available on Google Play.

4  Q.   Now, you mentioned that they might be interested in

5  developing their own store.  Why did you think that?

6  A.   They had the capabilities and expertise to do that as

7  shown on what they've done on the PC platform.  They have the

8  technology infrastructure to be able to distribute their League

9  of Legends PC game to millions and millions of players around

10  the world.  And so we had speculated that that expertise, which

11  is very unique, could potentially transfer over to building

12  something similar for mobile.

13  Q.   Now, Mr. Koh, are you aware if Riot's PC distribution

14  platform sells or distributes content other than what is made

15  by Riot Games itself?

16  A.   I'm not aware of any other games that they sell or

17  distribute.

18  Q.   So it's only Riot content?

19  A.   That is my understanding, yes.

20  Q.   Now, why did you think it was important for Riot to launch

21  their games on Google Play?

22  A.   We felt really confident that we gave them the best chance

23  of succeeding with their first attempt at launching a mobile

24  game.

25  Q.   So I want to direct your attention to document

KOH - CROSS / CHIU

1  Exhibit 154, which counsel asked you about earlier.

2       Do you remember this e-mail exchange, Mr. Koh?

3  **A.**  Yes, I do.

4  **Q.**  So I'm going to direct your attention to the last

5  paragraph of the first -- or the last-in-time e-mail that

6  begins "At this time."  Do you see that?

7  **A.**  Yes, I do.

8  **Q.**  And you wrote (as read):

9           "At this time we didn't ask for contractual

10          commitments to sim ship in requiring feature parity..."

11      Do you see that?

12 **A.**  Yes, I do.

13 **Q.**  And you go on to say (as read):

14          "... since the focus was getting Riot to shift their

15          focus away from launching their off-Play distribution

16          platform."

17      Do you see that?

18 **A.**  Yes, I do see it.

19 **Q.**  Could you explain what you meant when you wrote that?

20 **A.**  As I mentioned, we were aware that Riot had many options

21 to consider as they were thinking about their strategies for

22 launching their first mobile games, and we really wanted to

23 focus our conversations around having Riot believe in the

24 benefits that Google Play can offer as they were thinking about

25 their decisions to launch their mobile games.

1  Q.  And you go on in your e-mail to say (as read):

2         "Once Riot agreed to put aside their off-Play

3      distribution platform and launch on Play in April, we

4      decided to move to the next phase of leveling up."

5      Do you see that in the e-mail?

6  A.  Yes, I do.

7  Q.  Could you explain to the jury what you meant by that?

8  A.  So when Riot once let us know that they were choosing to

9  launch their mobile games on Google Play, the conversation

10  shifted towards:  How can we work together to ensure that they

11  launch their games on Google Play at the same time as, for

12  instance, the Apple App Store?

13  Q.  Now, Mr. Koh, did you ever ask Riot not to launch their

14  own store as part of your discussions with them?

15  A.  I never asked them that.

16  Q.  And are you aware of anyone at Google ever asking Riot not

17  to launch their own store as part of these discussions?

18  A.  I'm not aware of anyone asking Riot that question.

19  Q.  So let's take a look at Exhibit Number 155 also that

20  counsel looked at earlier with you.

21      Do you see it?

22  A.  Yes, I do.

23  Q.  Okay.  Now, counsel asked you some questions about the

24  size of the deal that Riot Games was being offered as part of

25  the Games Velocity Program negotiations.  Do you remember that?

1    **A.**    Yes, I do.

2    **Q.**    Can you tell me why exactly Riot was getting more benefits

3    than some of the other developers that were being approached in

4    the Games Velocity Program?

5    **A.**    Me personally, but along with a few of our colleagues, we

6    were very, very excited about the potential of what the mobile

7    games from Riot could be.

8    **Q.**    And why was that?

9    **A.**    They had one of the biggest gaming properties in the world

10   called League of Legends, and bringing that universe and that

11   development expertise onto mobile, we felt that it could be the

12   next big mega hit on mobile devices.

13   **Q.**    So let's look at another document, which is Exhibit

14   Number 156.  This is another e-mail that counsel showed you

15   earlier.

16       I want to turn your attention to the first-in-time e-mail,

17   which starts on the bottom of page 2, from Mr. Gambhir at

18   5:08 p.m. on February 12th, 2020.  Do you see that?

19   **A.**    Yes, I do.

20   **Q.**    And his e-mail starts on the bottom of that page and moves

21   over onto page 3; is that right?

22   **A.**    That is correct.

23   **Q.**    So at the bottom -- near the bottom of this e-mail there

24   are a couple of bullet points.  The first one starting "Riot is

25   a dev we believe."  Do you see that?  On page 3.

1    **A.**   On page 3.

2         (Witness examines document.)  Oh, yes, I see it.

3    **Q.**   So could you read that bullet point out to the jury,

4    please?

5    **A.**   The bullet point says (as read):

6              "Riot is a dev we believe could drive a

7         billion-dollar business for us given the strength of their

8         IP.  Also" --

9    **Q.**   Go ahead.

10        Mr. Koh, what did you understand Mr. Gambhir to be telling

11   you and your colleagues here?

12   **A.**   As I mentioned earlier, everyone that was aware of this

13   Riot opportunity had strong conviction that they were on to

14   building the potentially next mega hit title on mobile.

15   **Q.**   Now, Mr. Koh, as part of the Games Velocity Program deal

16   that Riot Games signed, were they allowed to develop or open

17   their own app store?

18   **A.**   If they chose to do so, they were free to do so.

19   **Q.**   And as part of the Games Velocity Program deal with

20   Riot Games, could they have launched their titles on platforms

21   other than Google Play?

22   **A.**   Yes, they were free to do so as long as they were

23   launching their games on Google Play.

24   **Q.**   And so as long as Riot sim shipped their titles on

25   Google Play, they could have pursued other distribution

**KOH - CROSS / CHIU**

1    platforms on mobile; is that right?

2    **A.**   That is correct.

3    **Q.**   So counsel showed you some of the agreements that were

4    signed with Riot Games, including Exhibit Number 162.  Do you

5    remember that?

6    **A.**   Yes, I do.

7    **Q.**   And it also includes the ads addendum at Exhibit 163.  Do

8    you recall seeing that?

9    **A.**   Yes, I do.

10   **Q.**   Now, Mr. Koh, is there anything in either of those

11   agreements that prohibits Riot from developing its own app

12   store?

13   **A.**   No, there isn't.

14   **Q.**   Is there anything in those agreements that prohibits Riot

15   from sideloading it or offering its games via sideloading?

16   **A.**   No, there isn't.

17   **Q.**   Is there anything in those agreements that prohibits Riot

18   from pursuing any other distribution platform other than

19   Google Play?

20   **A.**   No, there isn't.

21   **Q.**   So counsel also asked you about Activision Blizzard or

22   ABK.  Do you remember that?

23   **A.**   Yes, I do.

24   **Q.**   Now, could you explain to the jury why Google was

25   interested in pursuing a Games Velocity Program agreement with

1    ABK?

2    **A.**    ABK at that time was considered the world's largest

3    independent games publisher and developer and also considered

4    one of the biggest mobile games developer in the world.

5    **Q.**    And what are some of the titles that ABK is responsible

6    for producing?

7    **A.**    On mobile devices the most popular ones are Candy Crush

8    and Call of Duty: Mobile.

9    **Q.**    Now, you mentioned earlier during counsel's questioning

10   that this was more than just a Games Velocity Program deal.  Do

11   you remember that?

12   **A.**    Yes, I do.

13   **Q.**    What exactly did you mean by that?

14   **A.**    The commercial conversations with ABK evolved into not

15   just a Google Play-Activision Blizzard King negotiation and

16   discussion; it evolved into different parts of Google coming

17   together to explore a commercial business opportunity with the

18   entirety of the ABK business.

19   **Q.**    And there are several components of that agreement with

20   ABK; is that right?

21   **A.**    That is correct.

22   **Q.**    And counsel asked you about the YouTube component of that

23   agreement.  Do you remember that?

24   **A.**    Yes, I do.

25   **Q.**    Okay.  So I just wanted to ask you about Exhibit

KOH - CROSS / CHIU

1    Number 148, which counsel showed you earlier.

2    **A.**   (Witness examines document.)  Yes, I see it.

3    **Q.**   Okay.  And I'm going to turn your attention to page 002 of

4    this exhibit, and that's the e-mail from a Mr. Ryan Wyatt on

5    November 26, 2019, at 10:11 p.m.  Do you see that?

6    **A.**   Yes, I do.

7    **Q.**   Now, counsel asked you some questions and I believe you

8    said that Mr. Wyatt believed that there was a little bit of

9    overpayment for the YouTube component of this deal that was

10   being discussed.  Is that -- did I get that right?

11   **A.**   That's what Ryan says here, yes.

12   **Q.**   Okay.  So I'd like to direct your attention to the

13   paragraph that starts "As much as I appreciate."  Do you see

14   that?

15   **A.**   Yes, I do see it.

16   **Q.**   Okay.  Could you read that full first sentence for me,

17   please?

18   **A.**   (as read):

19          "As much as I appreciate Google broadly subsidizing

20      this YouTube content acquisition, I have to say this

21      commitment to three years for their Esports is not

22      something I'd ever do in isolation."

23   **Q.**   What did you understand him to mean about "in isolation"?

24   **A.**   Just doing this as a standalone, just YouTube-only type of

25   deal.

1  Q.   And was the ABK Games Velocity Program agreement a

2  standalone YouTube deal?

3  A.   No, it was not.

4  Q.   Okay.  So I believe you testified earlier that you had

5  heard from some of your colleagues that ABK was interested or

6  thinking about developing its own app store; is that right?

7  A.   That is correct.

8  Q.   And was that something that you ever heard Activision tell

9  you directly?

10 A.   No.  I heard it from my colleagues at Google.

11 Q.   And let's look at Exhibit Number 150, which is another

12 document that counsel showed you earlier this afternoon.  And

13 I'm going to look at page 2.

14      So, again, Mr. Koh, this was a report from your colleague

15 Karen Beatty at Google; is that right?

16 A.   That is correct.

17 Q.   And I'm looking at the section "Other Comments from

18 Armin," which is, I believe you testified, her report of a

19 conversation with Mr. Zerza from Activision; is that right?

20 A.   That is right.

21 Q.   And I'd like to direct your attention to the fifth bullet

22 point that counsel asked you about earlier where she says "If

23 this deal falls through."  Do you see that?

24 A.   Yes, I see it.

25 Q.   What was your understanding of what Ms. Beatty was

KOH - CROSS / CHIU

1  communicating to you?

2  **A.**   If the deal didn't go through, that Activision Blizzard

3  King would consider potentially launching their own mobile

4  distribution platform.  And then the way I interpreted this is

5  as their mobile games content also not being available on

6  Google Play.

7  **Q.**   And she says "He claims that they will launch their own

8  mobile distribution platform."  Do you see that?

9  **A.**   Yes, I do.

10  **Q.**   So you didn't have any understanding or any information

11  that they were going to do that?  Is that fair?

12         **MS. MOSKOWITZ:**  Objection.

13         **THE COURT:**  Overruled.

14     Go ahead.

15         **THE WITNESS:**  I did not have any direct understanding

16  of that.

17  **BY MS. CHIU:**

18  **Q.**   So in the next bullet point counsel asked you about the

19  line where Ms. Beatty says "I do think they really want to do

20  this deal with Google versus competition."  Do you see that?

21  **A.**   Yes, I do.

22  **Q.**   Can you explain to the jury what you meant by versus --

23  or, excuse me -- what you understood Ms. Beatty to be reporting

24  about "versus competition" there?

25  **A.**   My understanding of this was that Activision Blizzard King

1  valued all the different services and features and products

2  that we can offer to help their business grow.

3  **Q.**   Now, Mr. Koh, you just mentioned that you weren't aware

4  what ABK's actual plans were regarding other distribution

5  plans; is that right?

6  **A.**   That is correct.

7  **Q.**   I'd like to direct you to Exhibit Number 142.

8        And, Mr. Koh, I'll just explain to you that this has

9  been -- some parts of it have been removed just to make it a

10 little simpler for the jury to focus on the language that we're

11 going to talk about today.

12        So I'm going to be focusing my questions on the e-mail

13 that shows on the page on the screen in front of you, if you

14 can see it on the screen?

15 **A.**   Actually, my screen is not working again.

16 **Q.**   Oh, I'm sorry.

17        Okay.  So if you're looking at the binder, I'm looking at

18 the e-mail -- so let's just talk about the -- we can put it

19 back on the screen.  I'm sorry.

20        This is an e-mail chain.  I'm looking at the section that

21 says "On Tuesday March 26, 2019."  Do you see that?

22        **MS. MOSKOWITZ:**  Your Honor, objection to redactions on

23 this document.  I don't understand what they are or why they're

24 there.

25        **MS. CHIU:**  Yes, Your Honor.  I believe that this

 1   morning you advised us to show just the relevant --

 2           **THE COURT:**  Ignore the black boxes.  Just forget about

 3   it.

 4        Okay.  Go ahead.

 5        Don't worry about the black part.  Nothing to do with you.

 6        All right.  Go ahead.

 7   **BY MS. CHIU:**

 8   **Q.**   Mr. Koh, this is an e-mail string that you received when

 9   you were employed at Google; is that right?

10   **A.**   That is correct.

11   **Q.**   And the e-mails are from March 26, 2019; is that right?

12   **A.**   Yes, that is correct.

13   **Q.**   And this is an e-mail that you would have received in the

14   normal course of your business responsibilities at Google?

15   **A.**   That is correct.

16           **MS. CHIU:**  Your Honor, at this time we move this

17   document into evidence.

18           **MS. MOSKOWITZ:**  No objection.

19           **THE COURT:**  It's admitted.

20        (Trial Exhibit 142 received in evidence.)

21           **THE COURT:**  Go ahead.

22   **BY MS. CHIU:**

23   **Q.**   So, Mr. Koh, this is an e-mail that you were having with

24   your colleague Mr. Johan Heurlin; is that right?

25   **A.**   That is correct.

**KOH - CROSS / CHIU**

1   Q.   And just to understand or explain to the jury what this

2   e-mail is, at the top of the section on the screen it's an

3   e-mail from Mr. Heurlin dated March 26, 2019; is that right?

4   A.   That is correct.

5   Q.   I'm sorry.  I misspoke.  I think we need to go up to one

6   e-mail.  So on Tuesday, March 26, 2019, from Mr. Koh.

7        So that is an e-mail that you wrote; is that right?

8   A.   That is correct.

9   Q.   Okay.  And you say (as read):

10           "Good questions.  Responses in line."

11       Is that right?

12  A.   That is correct.

13  Q.   And what do you mean by "in line"?

14  A.   It meant that I was going to write -- put my comments over

15  his e-mail comments -- e-mail message.

16  Q.   So let's look at the e-mail where you provided those

17  responses.

18       That's an e-mail that Mr. Heurlin originally wrote to you

19  at 12:53 p.m. on March 26, 2019; is that correct?

20  A.   That is correct.

21  Q.   And can you point out where you would have provided your

22  responses in line in this document?

23  A.   It is where my initials LK are in bold font.

24  Q.   And so this is where you would have added your comments in

25  line to texts that he had sent to you?

1    **A.**   That is correct.

2    **Q.**   Okay.  So I think I'd like to direct your attention to the

3    last paragraph of this e-mail.

4         Do you see the section where he read -- he writes "It

5    would be helpful to better understand"?

6    **A.**   Yes, I do see it.

7    **Q.**   Can you tell the jury what Mr. Heurlin was asking you in

8    this section of the e-mail?

9    **A.**   Would you like just me to read it or --

10   **Q.**   Whichever you prefer, Mr. Koh.

11   **A.**   I will just read it because I. -- (as read):

12            "It would be helpful to better understand what it

13        means when Jamie said 'Bobby Kotick agitated over Play rev

14        share.'  A lot of developers agitated over this, but is

15        there a threat that ABK will go off Play despite what they

16        have to lose via King's revenue?"

17   **Q.**   What did you understand Mr. Heurlin to be asking?

18   **A.**   I understood this to be where my colleague Johan was

19   asking whether or not ABK would actually consider launching

20   their games off of Google Play through a different distribution

21   strategy.

22   **Q.**   Now, Mr. Koh, can you read what your in-line response was

23   on March 26, 2019?

24   **A.**   Yes.  My response is (as read):

25            "It's not clear how real of a risk this is.

1          Apparently ABK in the past mentioned that they can build

2          their own platform and generate higher cash flow.  Again,

3          not sure how realistic this is.  They do have battle.net

4          and a large audience network with their King titles."

5    **Q.**   Mr. Koh, what is battle.net?

6    **A.**   Battle.net is Blizzard's PC games content distribution

7    platform.

8    **Q.**   And do you know whose content they distribute on

9    battle.net?

10   **A.**   It is my understanding that it is solely just games

11   content developed by Activision Blizzard King.

12   **Q.**   You can set that document aside.

13         Mr. Koh, why would it have been a concern for you if ABK

14   had decided to launch their titles outside of Play?

15   **A.**   Specifically the King titles and also Call of Duty: Mobile

16   were considered, you know, one of the biggest games, mobile

17   games, in the world and not having those marquee titles on the

18   Google Play shelves would have significantly impacted our

19   ability to position ourselves as a destination where gamers can

20   find great games content.

21   **Q.**   Now, Mr. Koh, counsel showed you the agreement with ABK,

22   the Games Velocity Program, with additional components

23   agreements.  Do you remember that?

24   **A.**   Yes, I do.

25   **Q.**   I believe that was Exhibit Number 153.

1          Do you have that in front of you?

2   **A.**   Yes, I do.

3   **Q.**   Now, counsel looked at the developer obligation section of

4   this contract, which started at Number 3, which is on page 3 of

5   the document.  Do you see that?

6   **A.**   Yes, I do.

7   **Q.**   And you mentioned that this included feature parity and

8   sim ship and other components of the requirements of this

9   agreement; is that correct?

10  **A.**   That is correct.

11  **Q.**   Mr. Koh, is there anything in this agreement that

12  prohibits ABK from pursuing their own store during the term of

13  this agreement?

14  **A.**   No, there isn't.

15  **Q.**   Is there anything in this agreement that prevents ABK from

16  pursuing any other mobile distribution platform other than

17  Google Play during the term of this agreement?

18  **A.**   No, there isn't.

19  **Q.**   You can set that aside.

20          And, Mr. Koh, you're not currently employed at Google; is

21  that right?

22  **A.**   That is correct.

23  **Q.**   And you left in late 2020, if I remember correctly; is

24  that right?

25  **A.**   That is correct.

KOH - CROSS / CHIU

1    Q.   Where are you currently employed?

2    A.   I'm at a video game company called Electronic Arts.

3    Q.   And what are you currently working on at Electronic Arts?

4    A.   I currently work on their soccer title.

5    Q.   And when you were at Google, what was your title?

6    A.   My title was director and head of business games --

7    business development for games.

8    Q.   And can you just remind the jury exactly what that

9    entailed?

10   A.   My responsibilities were primarily to work with the game

11   development community and to help launch their games on

12   Google Play, and to help the existing game developers that were

13   using Google Play to fully utilize all the features and

14   services that were available.

15   Q.   Now, during your employment at Google, did you ever have

16   occasion to work with Epic Games?

17   A.   Yes, I did.

18   Q.   And what was your role in working with Epic Games?

19   A.   Initially it was to see and explore if there was an

20   opportunity to bring Fortnite onto the Google Play Store.

21   Q.   And why were you interested in bringing Fortnite to

22   Google Play?

23   A.   Fortnite at that time was considered one of the biggest

24   multiplatform games available in the world, and it is still

25   considered today, and it was -- it was not available on

**KOH - CROSS / CHIU**

1    Google Play.  So we felt like it was a really important,

2    popular game content that was missing and not available for our

3    games -- I mean, our games consumers.

4    **Q.**   Now, you joined Google in about 2019; is that right?

5    **A.**   That is correct.

6    **Q.**   And when you joined Google, was Fortnite available at all

7    on Android?

8    **A.**   It was available off-Play through sideloading as we

9    discussed that tactic before, and I believe it was available

10   through some other distribution platforms.

11   **Q.**   Was it available on Apple?

12   **A.**   It was available on Apple.

13   **Q.**   And so what did you do to try and see if you could get

14   Fortnite to be distributed in the Google Play Store?

15   **A.**   By the time I joined Google, there were already some

16   conversations that had happened between Epic and Google which

17   led to Epic choosing a different sort of distribution strategy

18   than going on Google Play.

19        And about five or six months into my tenure at Google, I

20   was connected to a senior executive at Epic, and that's where

21   we engaged in a conversation about the possibility of Epic

22   reconsidering their option for Google Play.

23   **Q.**   And what did you learn from that conversation?

24   **A.**   That Epic was not interested in exploring any further

25   conversations with Google Play, and they were going to stick

**KOH - CROSS / CHIU**

1   with their decision to keep Fortnite available off of

2   Google Play.

3   **Q.**   And did anyone from Epic tell you why they were going to

4   stick to their plan not to launch through Google Play?

5   **A.**   They just had let me know that there were already previous

6   conversations that had happened between Epic and the Google

7   executives; and if Google wasn't willing to change our

8   policies, they were not interested in bringing Fortnite to

9   Google Play.

10   **Q.**   And what were the policies, if you know, that they wanted

11   Google to change?

12   **A.**   At that point they made public statements about our

13   payments platform end-of-service fees, and they wanted to see

14   those requirements to change.

15   **Q.**   And could you explain to the jury what you mean by the

16   payments policy?

17   **A.**   So the Google Play Store payments policy requires every

18   developer that launches their games content on Google Play and

19   has monetization enabled use Google Play payment platform.

20   **Q.**   And so was it your understanding that Epic did not want to

21   use Google's payment platform or billing platform?

22   **A.**   That is correct.

23   **Q.**   So after your conversations at that time, did Fortnite

24   come to Google Play?

25   **A.**   Not after that conversation.

1   Q.   Did you ever have discussions with Epic at all again after

2   those conversations?

3   A.   Yes, I did.

4   Q.   And how did those discussions come about?

5   A.   So a few months after that conversation happened, they

6   just reached out and expressed interest in wanting to launch

7   Fortnite on Google Play and had requested whether or not they

8   could submit the Google -- the Fortnite build to the

9   Google Play review system for consideration for distribution on

10  Google Play.

11  Q.   And did Epic submit a version of Fortnite to the

12  Google Play Store?

13  A.   Yes, they did.

14  Q.   And was Fortnite put onto the Play Store at that time?

15  A.   No, it was not.

16  Q.   Why not?

17  A.   Their build that they submitted was reviewed by our

18  submissions policy team, and it was considered to be in

19  violation of our policies.

20  Q.   And which policies, if you recall, did the build violate?

21  A.   There were a few, but the most notable one was that they

22  violated the policy around the requirement to integrate the

23  Google Play payment platform.

24  Q.   And was that the policy that you had discussed with the

25  Epic executive when you first game to Google?

KOH - CROSS / CHIU

1   A.   Yes, that is correct.

2   Q.   And so what happened after that?

3   A.   Our review -- our submissions review team sent Epic a note

4   letting them know that the build was rejected for being in

5   violation; and then Epic received that note, and they requested

6   another chance at submitting a -- what they claim to have been

7   a fixed build that addressed the violations.

8   Q.   And did Google permit Epic to submit another build?

9   A.   Yes, we did.

10  Q.   And did that build get launched onto the Play Store?

11  A.   No, it did not.

12  Q.   Why not?

13  A.   It violated the same requirements that were communicated

14  in the first time around.

15  Q.   And that was the payments policy; is that right?

16  A.   That is correct.

17  Q.   So what was your reaction after receiving the Fortnite

18  build or seeing the Fortnite build come in twice, that it did

19  not comply with Google's policies?

20  A.   I started off being hopeful when they first expressed

21  interest in wanting to submit Fortnite to Google Play because

22  it was just the most popular -- one of the most popular games

23  in the world; but through that process, it was disappointing,

24  but I also certainly recognized what Epic's position was.  So

25  it was just a disappointing process, but then we just decided

1    to move on.

2    **Q.**   And what do you mean --

3          **THE COURT:**   Okay.   We're going to take our afternoon

4    break and we'll be back at about 2:25.

5          **THE CLERK:**   All rise.

6                    (Recess taken at 2:09 p.m.)

7               (Proceedings resumed at 2:25 p.m.)

8        (Proceedings were heard in the presence of the jury:)

9          **THE CLERK:**   We're back on the record in Civil 20-5671,

10   Epic Games, Inc. vs. Google LLC, and Multidistrict Litigation

11   21-2981, In re Google Play Store Antitrust Litigation.

12         **MS. CHIU:**   May I proceed, Your Honor?

13         **THE COURT:**   Yes.

14   **BY MS. CHIU:**

15   **Q.**   Mr. Koh, we were just talking about Epic's submissions of

16   Fortnite to the Google Play Store.   You mentioned that they had

17   submitted a few times and it was rejected.   Do you remember

18   that?

19   **A.**   Yes, I do.

20   **Q.**   Did you work with Epic Games again after they submitted

21   that Fortnite build?

22   **A.**   Yes, I did.

23   **Q.**   And how did that come about?

24   **A.**   A few months after the events what we just described, they

25   reached out again wanting to see if they could submit Fortnite

1   again for consideration for distribution on Google Play.

2   Q.   How did you react to that outreach?

3   A.   I was very, very surprised given what just -- had just

4   happened, and so I didn't know how to react and so escalated it

5   to our leadership team to sort of get a line on what we should

6   do.

7   Q.   And what was the decision by Google?

8   A.   After conversations at the leadership level, the decision

9   was made that we were going to give it another try at working

10  with Epic to see if we can review and support Epic's request to

11  launch Fortnite on Google Play.

12  Q.   And why was that decision made to see if you could work

13  with Epic?

14  A.   There were several conversations that happened at the

15  leadership team level.  My understanding was there was also a

16  conversation between leadership at Google and also with

17  leadership at Epic to see if Epic's intentions were really to

18  launch Fortnite in a compliant way on Google Play.

19       And after those conversations had happened, the leadership

20  team decided that we were going to trust Epic's words that they

21  were going to launch a compliant version, and we were going to

22  give them what I assume to be sort of another last shot at

23  launching Fortnite on Google Play.

24  Q.   And why did you want to continue -- why did you still want

25  to put Fortnite on the Google Play Store?

1  **A.**   Because it continued to be at that time one of the biggest

2  multiplatform games in the world.

3  **Q.**   Mr. Koh, I'd like to direct your attention to the smaller

4  set of documents that we provided for you.  I'm looking at

5  Exhibit 10018.

6       And this is an e-mail string dated April 11th, 2022,

7  between an Ed Zobrist at epicgames.com and yourself.  Do you

8  recall receiving this e-mail?

9  **A.**   Yes, I do.

10 **Q.**   And you received this e-mail in the normal course of your

11 responsibilities at Google?

12 **A.**   Yes, I did.

13      **MS. CHIU:**  Your Honor, at this time we move this

14 exhibit into evidence.

15      **MS. MOSKOWITZ:**  No objection.

16      **THE COURT:**  Okay.  It's admitted.

17      (Trial Exhibit 10018 received in evidence.)

18 **BY MS. CHIU:**

19 **Q.**   So, Mr. Koh, I'd like to direct your attention to the

20 e-mail that appears on the second half of the first page dated

21 April 9th, 2020.  Do you see that?

22 **A.**   Yes, I do.

23 **Q.**   Who is this e-mail from?

24 **A.**   This e-mail is from Mr. Ed Zobrist.

25 **Q.**   And it's directed to you and someone named Purnima; is

1   that right?

2   **A.**   That is correct.

3   **Q.**   And who is Purnima?

4   **A.**   Purnima was my direct manager.

5   **Q.**   And what did Mr. Zobrist tell you in this e-mail?

6   **A.**   In this e-mail, this was Mr. Ed Zobrist letting us know

7   that they were going to submit a compliant build.  And my

8   understanding is he listed out some specific -- the specific

9   instances that caused the rejection and what actions he -- they

10  were going to take to address the issues that were being

11  flagged by Google.

12  **Q.**   So if you look at the e-mail, there's a paragraph with a

13  number one.  Do you see that?

14  **A.**   Yes, I do.

15  **Q.**   Could you read that out loud for us?

16  **A.**   (as read):

17          "As we discussed, Epic will submit an updated build

18          that fully complies with Google's policies and

19          restrictions.  To that end, the new build will differ from

20          past rejected build in these ways:"

21  **Q.**   And what was the build that was identified -- that

22  Mr. Zobrist identified to you that they were going to comply

23  with this time in this e-mail?

24  **A.**   Mr. Ed Zobrist is referring to the builds that were

25  rejected that were submitted a few months before this e-mail,

1   and they were -- and he was mentioning how they were going to

2   take action on addressing those issues in this new build that

3   they were going to submit to us.

4   **Q.**   And so can you read the paragraph that says -- starts with

5   "Old build issue"?

6   **A.**   Yes.  (as read):

7           "Old Build Issue:  Violation of Google's payments

8        policy due to providing a payment other than Google Play

9        Billing for purchases.

10          "New Build Fix:  Google payment platform integrated

11       and all other payment platforms removed."

12  **Q.**   So, Mr. Koh, what did Google do after receiving this

13  e-mail from Mr. Zobrist?

14  **A.**   Once we received this confirmation that Epic was going to

15  fully comply with our policies, we had an internal conversation

16  at the Google team to figure out how we can actually proceed

17  and go forward with supporting Epic's request to launch

18  Fortnite on Google Play.

19  **Q.**   And did Epic communicate to you a date by when they were

20  hoping that Fortnite would be available in the Google Play

21  Store?

22  **A.**   Yes, they did.

23  **Q.**   And what was that date?

24  **A.**   It was a very short time period after this e-mail was sent

25  to us.

1   Q.   So this e-mail you received on April 9th, 2020; is that

2   right?

3   A.   That is correct.

4   Q.   So I'd like to direct your attention to the very

5   last-in-time e-mail from Mr. Zobrist at the top of this e-mail.

6        Can you read that e-mail out loud to the jury?

7   A.   Yes, I can.  (as read):

8            "Hey, Lawrence.  Yep, Tim said he's replied to Don.

9        Let me know if there's anything else we need to get

10       unblocked.  The April 23rd concert is going to be huge and

11       we're all going to benefit if we are live on Google Play

12       in advance of it."

13  Q.   What is the April 23rd concert that Mr. Zobrist is

14  referencing?

15  A.   Epic was going to run this in-game concert featuring a

16  music performer by the name of Travis Scott.

17  Q.   And that was the date by when they hoped Fortnite would be

18  available in the Play Store?

19  A.   They wanted it to be a live -- they wanted Fortnite to be

20  live ideally a few days before the actual event start date of

21  April 23rd.

22  Q.   So how much time was there for you and your team to get

23  Fortnite ready to be available in the Play Store for this

24  April 23rd concert?

25  A.   Like about two weeks or so.

**KOH - CROSS / CHIU**

1  Q.   So what did you do to try and get ready -- Fortnite ready

2  to be available by that date?

3  A.   I let our internal leadership team know that this was a

4  very, very tight time window to make this launch happen, and I

5  was able to get the support of our leadership team to put

6  together a task force team specifically focused on supporting

7  Epic launching Fortnite on Google Play.

8  Q.   And can you describe to the jury the kinds of work the

9  task force had to do to be able to get Fortnite ready in time

10 for the April 23rd concert?

11 A.   Yes.  So we also recognized that this was a massive

12 marketing moment, first of all.  We thought there was an

13 opportunity to partner together with Epic closely to promote

14 this new event that was happening on April 23rd that year.

15     And so we had to get our marketing teams all lined up and

16 aligned with Epic's marketing plans.  We also had to put

17 together a technical team to work with Epic closely to ensure

18 that they were integrating with all of our services in a

19 compliant manner; but, more importantly, in a way where it was

20 going to be stable, but we also had to do this in a way where

21 we didn't have any -- much room for error.  And so it had to

22 have been done correctly on one shot because of the limited

23 time we had.

24     So we also had a team of dedicated testers as well too to

25 ensure the quality of all the integrations.

KOH - CROSS / CHIU

1   Q.   Mr. Koh, have you ever worked on a launch like this that

2   took place in this short amount of time?

3   A.   I have not.

4   Q.   How long does it usually take to have a launch of a game

5   like this?

6   A.   Based on my personal experience, a game of this scale

7   would have taken a couple months of collaborating,

8   coordinating, and executing all the tasks.

9   Q.   And you were being asked to do it in two weeks?

10  A.   That is correct.

11  Q.   Did you have meetings with Epic during this time while

12  you're trying to get Fortnite launched?

13  A.   Yes.  We had many.

14  Q.   And by "many," what do you mean?

15  A.   We let Epic know that this was going to require a lot of

16  work on both sides.  Epic acknowledged that as well, and they

17  also put together their own task force team with points of

18  contacts on their end that we could reach out to regularly to

19  coordinate all the efforts of launching Fortnite on

20  Google Play.

21  Q.   Did you talk to them daily?

22  A.   It started off daily, yes.

23  Q.   Now, was Fortnite actually launched on Google Play in time

24  for the April 23rd Travis Scott concert?

25  A.   Yes, it did.

1   **Q.**   Did you believe that it was a successful launch?

2   **A.**   Yes, everyone that worked on it did so.

3   **Q.**   And did Epic tell you anything about what they thought the

4   launch -- how it went?

5   **A.**   They expressed to us that they were very appreciative and

6   they also seemed to have been very happy about the outcome.

7   **Q.**   So I'd like to direct your attention to Exhibit 10020 in

8   your binder.

9       Now, this is an e-mail string between yourself, a Hans

10   Stolfus at Epic Games and Dan Song at Google dated April 21st,

11   2020.  Do you see that?

12   **A.**   Yes, I do.

13   **Q.**   Do you recall receiving this e-mail?

14   **A.**   Yes, I do.

15   **Q.**   And did you receive this e-mail in the normal course of

16   your responsibilities at Google?

17   **A.**   Yes, I did.

18       **MS. CHIU:**  Your Honor, at this time we move

19   Exhibit 10020 into evidence.

20       **MS. MOSKOWITZ:**  No objection.

21       **THE COURT:**  It's admitted.

22    (Trial Exhibit 10020 received in evidence.)

23   **BY MS. CHIU:**

24   **Q.**   Mr. Koh, what exactly is this e-mail string?

25   **A.**   This e-mail is right after we successfully launched

1  Fortnite on Google Play, Mr. Hans Stolfus from Epic reached out

2  to us letting us know how appreciative he was of all the

3  support that went into launching Fortnite on Google Play.

4  **Q.**   Now, let's look at Mr. Stolfus' e-mail that's at the

5  bottom of this page.

6      Could you read the first paragraph of his e-mail to you?

7  **A.**   (as read):

8          "Sorry I had to drop from our call.  Thanks again for

9          all the time and energy spent on getting Fortnite live on

10         the Google Play Store.  Wouldn't have happened without

11         24-hour support, so we recognize and appreciate it."

12  **Q.**   Mr. Koh, how did you feel when you received this e-mail

13  from Mr. Stolfus?

14  **A.**   I think I can speak to everyone that worked on this, and

15  that everyone was very, very proud and excited about getting

16  this launch out the door successfully.

17  **Q.**   Now, Mr. Koh, did there come a time when Fortnite was

18  removed from the Google Play Store?

19  **A.**   Yes.

20  **Q.**   And do you know why that happened?

21  **A.**   Several months after we successfully launched Fortnite on

22  Google Play, Epic without any heads-up or any notice bypassed

23  our standard submission process for any updates and introduced

24  a code update directly into the game that introduced a

25  violation of our payments policies.

KOH - CROSS / CHIU

1  Q.   And when you say they introduced -- they sent the update

2  bypassing Google's review, what exactly do you mean by that?

3  Can you explain it to the jury?

4  A.   So for any major update to the game, developers will

5  typically submit an updated set of art assets, creative assets,

6  code through our build review submission process.  But this one

7  was small enough in terms of the size of the update where Epic

8  was able to completely bypass that review process and just

9  directly update the code that was available on users' phones.

10  Q.   Is that kind of an update referred to as a Hotfix?

11  A.   That is correct.

12  Q.   And, Mr. Koh, what did the Hotfix do?

13  A.   My recollection is that the Hotfix introduced a way for

14  users of Fortnite to use a payment platform that was not the

15  Google Play payment platform.

16  Q.   And did this violate Google Play's policies?

17  A.   Yes, it did.

18  Q.   And which policy was that?

19  A.   This is the payments policy that they had previously

20  violated.

21  Q.   So that was the same policy that the prior submission of

22  Fortnite to Google build did not comply with?

23  A.   That is correct.

24  Q.   Mr. Koh, can you tell the jury what your reaction was when

25  you learned that Fortnite had been removed from the Play Store

1   for violating the payments policy?

2   **A.**   Yes.  It was a lot of emotions.  You know, being very

3   disappointed that we were used in a way.  So that feeling of

4   being used for whatever motivations that Epic had did not feel

5   really good.

6       And then also throughout the course of that whole

7   engagement, we really trusted Epic's words in that they were

8   committed to launching and supporting Fortnite on Google Play;

9   and the way that Epic handled that whole introduction of the

10   Hotfix, I think I can, again, on behalf of the Google -- the

11   entire Google Play team and myself, there was a significant

12   sense of feeling betrayed.

13       **MS. CHIU:**  Thank you, Your Honor.  I have no further

14   questions at this time.

15       **THE COURT:**  Okay.  Any brief redirect?

16       **MS. MOSKOWITZ:**  Yes, Your Honor.

17   May I proceed?  Thank you.

18                      <u>**REDIRECT EXAMINATION**</u>

19   BY MS. MOSKOWITZ:

20   **Q.**   I'm going to jump around a bit and try to do this as

21   efficiently as I can.  So bear with me, please.

22   **A.**   Okay.

23   **Q.**   Let's start with Riot.

24       You testified to Google's counsel that you speculated that

25   Riot had the capability and the audience that would enable them

1  to create and launch a competing app store.  Do you remember

2  that testimony?

3  **A.**   Yes, I do.

4  **Q.**   It wasn't just speculation, though; right?  They told you

5  they were going to do it; right?

6  **A.**   They had mentioned it, yes.

7  **Q.**   Right.  And they not only mentioned that they were going

8  to do it, they told you they had already started investing in

9  building their own distribution platform; right?

10 **A.**   They had just loosely mentioned it, but we had no detail

11 on how much investment they made.

12 **Q.**   Right.  But they told you they had started making

13 investment in building their own competing Android app

14 distribution platform; yes?

15 **A.**   Again, it was like one of those passing comments that were

16 made.  So, again, it was hard for me to tell.

17 **Q.**   Right.  But the comments were made to you; right?

18 **A.**   Yes, they alluded to it.

19 **Q.**   Okay.  Pulling up Exhibit 154 in evidence, please.

20       We're still on Riot.  You were shown this document I

21 believe by Google's counsel; is that right?

22 **A.**   Yes.

23 **Q.**   So you were shown some comments that were made.  I think

24 we're still back in this TLDR paragraph on this first e-mail on

25 the top there.  Do you see where I am?

1  **A.**   Yes, I do.

2  **Q.**   All right.  What is written here is that "Riot was on the

3  verge of moving forward with an off-Play Android distribution

4  strategy"; right?

5  **A.**   That is what's written, yes.

6  **Q.**   Okay.  And the two paragraphs down, "At this time," you

7  were asked about that paragraph; right?

8  **A.**   Yes.

9  **Q.**   All right.  I hadn't asked you about this first sentence,

10  but Google's counsel did.  It was talking about "The focus was

11  getting Riot to shift their focus away from launching their

12  off-Play distribution platform"; right?

13  **A.**   That is what's written.

14  **Q.**   Yeah.  And the next sentence again says "Riot agreed to

15  put aside their off-Play distribution platform"; right?

16  **A.**   Yes, and it says "launch on Play."

17  **Q.**   Right.  But it's not just talking about launching their

18  games somewhere off Play; it's talking about launching an

19  alternative app store on Android or an alternative app

20  distribution platform on Android.  Right?

21  **A.**   That's what we were talking about, but the context around

22  this was we were --

23  **Q.**   Sir, yes, is that what this e-mail is saying?

24  **A.**   The intent of all these messages were really around

25  getting Riot to commit to choosing Google Play as their

1  platform for launching their mobile.

2  **Q.**   Okay.  But the words on the page, are they not talking

3  about shifting Riot away from launching an Android distribution

4  platform?

5  **A.**   Yep.

6  **Q.**   Right?

7  **A.**   Yes, because we had assumed if they pursue that, they

8  would not launch their games on Google Play.

9  **Q.**   Right.  But it wasn't just about launching their stuff on

10  someone else's store.  It was about them starting their own

11  store; right?

12  **A.**   Yes.

13  **Q.**   Now, there's no mention of them in this e-mail foregoing

14  Android altogether and just launching their games on IOS; is

15  there?

16  **A.**   Not in this e-mail.

17  **Q.**   And, in fact, for Riot to do exclusively on IOS, they

18  would have been giving up access to billions of Android users;

19  right?

20  **A.**   Yes, but it also requires significant investment on their

21  development team to make the game work on Android.

22  **Q.**   To forego Android altogether --

23  **A.**   Yes.

24  **Q.**   -- and just go to IOS, they would have been foregoing

25  access to billions of customers; right?

1   **A.**   That is correct.

2   **Q.**   We talked a bit about -- you talked a bit about Activision

3   Blizzard King in the questioning from your counsel; is that

4   right?

5   **A.**   Yes.

6   **Q.**   There was some time spent on YouTube being separate from

7   Project Hug.  Do you remember that?

8   **A.**   Yes.

9   **Q.**   And I think you even mentioned it when I was questioning

10  you; is that right?

11  **A.**   Yes.

12  **Q.**   But YouTube -- the YouTube Esports licensing was expressly

13  a component of Google's Project Hug agreement with ABK;

14  correct?

15  **A.**   Acquiring media rights was not in the scope of

16  Project Hug.

17  **Q.**   I couldn't understand the words.  I'm sorry.

18  **A.**   Acquiring media rights for Esports was not within the

19  scope of Project Hug.

20  **Q.**   It was expressly part of Project Hug agreement between

21  Google and ABK that you would, in fact, be entering into that

22  agreement on the YouTube Esports licensing; right?

23  **A.**   Yes.  So in that broader commercial deal, yes.

24  **Q.**   And ABK was not threatening to go just to IOS; right?

25  **A.**   No, they were not.

1  **Q.**  And they would also have given up billions of users to do

2  so; right?

3  **A.**  Yes.

4  **Q.**  Now back to the YouTube for one moment.

5  I think you were asked if Mr. Wyatt, the YouTube gaming

6  head, thought it was a bit of an overpayment going with this

7  Esports licensing payment.  Do you recall that question?

8  **A.**  Yes, I recall that.

9  **Q.**  It was an extremely aggressive deal what Google was

10  agreeing to with YouTube; agreed?

11  **A.**  I can't comment on that.  I'm not a subject matter expert.

12  **Q.**  All right.  Let's look at Exhibit 149, which should be in

13  your binder.

14  This one is not yet in evidence, but I'm going to point

15  you to -- well, I guess I'll just offer it.

16  This is an e-mail you participated in on December 4th,

17  2019?

18  **A.**  Yep, I see it.

19  **MS. MOSKOWITZ:**  Offer 149 in, Your Honor.

20  **MS. CHIU:**  No objection.

21  **THE COURT:**  It's admitted.

22  (Trial Exhibit 149 received in evidence.)

23  **BY MS. MOSKOWITZ:**

24  **Q.**  If you go to the second page, please, we see some "LK" in

25  bold.  These are your comments in an e-mail; right?

1    **A.**    Yes, I do see it.

2    **Q.**    And in number three it's talking about the YouTube

3    document -- sorry -- the YouTube deal again; right?

4    **A.**    Yes, I do see it.

5    **Q.**    Do you see here it says (as read):

6             "I chatted about this extensively with Ryan W., and

7          we both agree that the $50 million price is extremely

8          aggressive and will open up other issues for the

9          ecosystem."

10         Do you see that?

11   **A.**    Yes, I do.

12   **Q.**    You were shown Exhibit 142 by Google's counsel.  Do you

13   recall that?

14         We'll put that up here on the screen for you.  Do you

15   remember that document?

16   **A.**    Yes, I do.

17   **Q.**    Okay.  This e-mail is from March 27; 2019; right?

18   **A.**    Yes.

19   **Q.**    That was about two months after you started at Google?

20   **A.**    That is correct.

21   **Q.**    And this was a couple of weeks before the presentation

22   before -- sorry -- the presentation regarding Project Hug that

23   was made to the Business Council in April; is that right?

24   **A.**    That is correct.

25   **Q.**    It was 10 months before Google signed the Project Hug

1  agreement with ABK, right, in January of 2020?

2  **A.**    That is correct.

3  **Q.**    And in your e-mail that your counsel asked you about, you

4  said that you were not sure how realistic it was for ABK to

5  build their own platform.  Do you remember that testimony?

6  **A.**    Yes, I do.

7  **Q.**    But you did mention they had battle.net and a large

8  audience network; right?

9  **A.**    Yes, I did.

10  **Q.**    Having a pre-established store like battle.net would make

11  it easier for ABK to build their own app distribution platform;

12  right?

13  **A.**    I can assume so, yes.

14  **Q.**    And having a large audience network through King and big

15  titles would also make it easier for them to build their own

16  competing Android app distribution platform; right?

17  **A.**    You can assume so.

18  **Q.**    And you assumed so; right?

19  **A.**    Yes.

20  **Q.**    Now, by December of 2019, it was realistic that ABK was

21  going to build their own competing Android app distribution

22  platform; correct?

23  **A.**    I had no real knowledge of how realistic that was.

24  **Q.**    They had told you by then that they will launch an Android

25  app distribution platform if the deal falls through on

1  Project Hug; right?

2  **A.**   They had told members of the Google team that they

3  intended on doing that; but, again, it was hard to know how

4  realistic of a possibility it was.

5  **Q.**   It was realistic enough to present to the Business Council

6  $360 million spend to stop it; right?

7  **A.**   That was one of the -- you know, one of the things that we

8  wanted to go for, but there were other commercial opportunities

9  I think the team identified that gave them reason to pursue

10 that commercial deal with ABK.

11 **Q.**   The Business Council wouldn't have approved -- would not

12 have approved $360 million spend for an unrealistic risk, would

13 they?

14         **MS. CHIU:**  Objection, Your Honor.

15         **THE COURT:**  Overruled.

16         **THE WITNESS:**  Yes.  I mean, I know they would consider

17 all the risks and opportunities; and my understanding is that

18 that whole deal had a lot of compelling opportunities for

19 Google and for ABK that made it interesting and to consider and

20 approve.

21 **BY MS. MOSKOWITZ:**

22 **Q.**   The risk, though, that was presented on Google Play -- we

23 saw it earlier and we can pull it back if we need to -- was

24 that ABK will -- has told Google that they will launch an

25 alternative app store on Android; right?

1  A.   Yes, and then take their games off of Google Play.

2  Q.   We talked a bit about -- I guess it wasn't we.  You spoke

3  with your counsel about the types of benefits that Google

4  provided under the Project Hug agreements.  Do you remember

5  that?

6  A.   Yes, I do.

7  Q.   Project Hug was pitched to the Business Council asking for

8  $575 million to spend on those benefits; right?

9  A.   Yes.

10 Q.   That was presented in dollars and cents; right?

11 A.   Yes, it was.

12 Q.   And, in fact, some of the benefits were, in fact, cash

13 payments; correct?

14 A.   I don't recall any straight cash payments.

15 Q.   You don't remember any direct cash payments for use in

16 advertising campaigns by certain developers?

17 A.   Those were co-investment funds.

18 Q.   Money spent by Google, though; right?

19 A.   Yes, money invested by Google.

20 Q.   Right.  Cash spent by Google as part of the agreement;

21 right?

22 A.   That is correct.

23 Q.   Now -- all right.  Let's move on.

24      Okay.  So we will talk about Apple a bit.  You talked

25 about Apple with your counsel; right?

1  **A.**   Yes, I did.

2  **Q.**   Let's look back at our Business Council deck that we spent

3  a bit of time on all day.

4      Exhibit 136, and we'll pull that on the screen, and we'll

5  start on page 5.

6      This is a context slide.  This is the slide where you are

7  presenting to the Business Council -- Google is presenting to

8  the Business Council the context for Project Hug; right?

9  **A.**   Yes.

10  **Q.**   All right.  So that next slide is one we spent time on

11  earlier.  Do you remember that?

12  **A.**   Yes, I do.

13  **Q.**   All right.  Apple is not mentioned anywhere whatsoever on

14  this slide; correct?

15  **A.**   No, it's not.

16  **Q.**   And the next slide, 7, let's open this.

17      Apple does appear on the app store tax meme emerging;

18  right?

19  **A.**   Yes, it does.

20  **Q.**   The complaining about the 30 percent?

21  **A.**   Yes, I see it.

22  **Q.**   All right.  But setting that meme one aside, when you're

23  talking about competitors aggressively pursuing gaming, the

24  entire left-hand side of the screen Apple is nowhere mentioned

25  anywhere on that; right?

1  **A.**   That is correct.

2  **Q.**   Let's turn to the next slide.

3       This is talking about major developers increasingly

4  considering distribution off Play; right?

5  **A.**   Yes.

6  **Q.**   Apple is not mentioned anywhere on this slide either?

7  **A.**   No, it's not.

8  **Q.**   All right.  Let's go again to 8, and then I will move on,

9  but I'm just trying to make sure we're on the same page here.

10      The -- actually I think I have the wrong page.  I think it

11 might be 28, but I'll skip it.

12      If you need to take time, I want to just make sure,

13 competition with Apple is not what's being discussed when we're

14 talking about contagion risk; right?  It's talking about

15 alternative Android app distribution; right?

16 **A.**   A contagion risk, yes, was talking about developers

17 getting their content off of Google Play.

18 **Q.**   And, in fact, you may recall there was those speaker notes

19 talking about the Epic store and the Samsung and Amazon store

20 already sort of getting off the ground.  Do you remember that?

21 **A.**   Yes, I do.

22 **Q.**   And Epic store, Amazon store, Samsung's app stores, those

23 are not an option to distribute games or apps on IOS; right?

24 **A.**   I don't believe so.

25 **Q.**   You testified earlier a bit about what you thought in

1    terms of IOS might happen if you couldn't -- if users couldn't

2    go to one store, a Google Play Store.  Do you remember that

3    testimony?

4    **A.**    I believe I think I know what you're alluding to.

5    **Q.**    Okay.  Have you heard the term "fragmentation" in the

6    context of that?

7    **A.**    In the context of Apple?

8    **Q.**    In the context of multiple stores on Android.

9    **A.**    Yes.

10   **Q.**    That concern, though, is about certain OEM stores may only

11   be available on their devices; right?

12   **A.**    Yes.

13   **Q.**    But the Amazon store could be available on all Android

14   devices; right?

15   **A.**    Yes.

16   **Q.**    And if Epic were to launch the Epic Game Store on Android,

17   that could be available on all the devices; right?

18   **A.**    Yes.

19   **Q.**    So there is no risk that it would only be on some but not

20   others; right?

21   **A.**    That is correct.

22   **Q.**    We talked about streaming and consoles.  Do you remember

23   that?

24   **A.**    Yes, I did.

25   **Q.**    All right.  Let's go back to this 136, page 7, please.

1       I think you mentioned those in the context of game

2   developers have other places they can also reach users.  Was

3   that the context of your reference to that?

4   **A.**   Yes, it was.

5   **Q.**   All right.  But, again, when you're talking about

6   competitors in your presentation to the Business Council,

7   nowhere mentioned is streaming or consoles; right?

8   **A.**   Not in this presentation.

9   **Q.**   Those are not Android app store competitors; right?

10  **A.**   That was not presented in this presentation.

11  **Q.**   You talked a bit with Google's counsel about Epic and the

12  launch of Fortnite through Google Play and the events leading

13  up to that.  Do you recall that testimony?

14  **A.**   Yes, I do.

15  **Q.**   And you testified to Google's counsel that you were

16  disappointed by that; right?

17  **A.**   Yes, I did.

18  **Q.**   When Epic activated the Hotfix and made side-by-side

19  payment options available to Google Play users, you weren't

20  surprised by that, were you?

21  **A.**   I can't say I was 100 percent surprised because they had

22  done that before.

23  **Q.**   Right.  And you knew Mr. Sweeney was a vocal opponent,

24  agitator even, of Google's distribution payment policies and

25  restrictions; right?

1   **A.**   That is correct.

2   **Q.**   And you were aware, you testified just a moment ago, that

3   Epic previously tried to get that exact build of Fortnite onto

4   the Google Play with that side-by-side payment option; right?

5   **A.**   Yes, I did.

6   **Q.**   And they told you that they were doing it; right?

7   **A.**   They told -- not with that Hotfix, though.

8   **Q.**   Not the Hotfix, but back in December they said, "I'm

9   launching -- I'm submitting a build with side-by-side payment.

10  Will you please accept it?"  Right?

11  **A.**   I don't recall that communication.

12  **Q.**   Okay.  Let's look at it.  Let's look at 5921 in your

13  binder, please.  It's my binder, I think.

14      Do you have that?

15  **A.**   Yes, I do.

16  **Q.**   Great.

17      This is an e-mail thread from December 2019 that you

18  participated in?

19  **A.**   Yes.

20      **MS. MOSKOWITZ:**  Your Honor, I move 5921 into evidence.

21      **MS. CHIU:**  No objections, Your Honor.

22      **MS. MOSKOWITZ:**  Is it in.

23      **THE COURT:**  Any objections?

24      **MS. CHIU:**  No objections, Your Honor.

25      **THE COURT:**  All right.  It's admitted.

1          (Trial Exhibit 5921 received in evidence.)

2          **MS. MOSKOWITZ:**  Thank you.

3    **BY MS. MOSKOWITZ:**

4    **Q.**   Let's start on page 3.

5          This is an e-mail from Tim Sweeney on December 5th, 2019.

6    Do you see that?

7    **A.**   Yes, I do.

8    **Q.**   (as read):

9               "Early next week Epic will submit Fortnite to

10        Google Play using Epic's own payment systems for in-app

11        purchase."

12        Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   That was before it submitted the build in December 2019;

15   right?

16   **A.**   Yes.

17   **Q.**   He asked and he hoped that Google will accept Fortnite and

18   untie the Google Play distribution platform from Google Play

19   in-app billing so game developers and payment services can

20   compete on a level playing field with each of Google's own

21   services.  Do you see that?

22   **A.**   Yes, I do see it.

23   **Q.**   So in advance of submitting a build in December 2019 in

24   which Epic was trying to offer side-by-side payment choice to

25   users, he told you in advance; right?

1  **A.**   In this e-mail, yes.

2  **Q.**   Yeah.  And Google rejected the build; right?

3  **A.**   I don't have the full context on this e-mail.  I don't

4  recall this e-mail, but I would be personally surprised if just

5  off of this e-mail alone we still allowed Epic to submit the

6  Fortnite build.

7  **Q.**   Epic was permitted to submit a Fortnite build in

8  December 2019; right?

9  **A.**   They were.

10  **Q.**   And you understand it was after the date of this e-mail?

11  **A.**   Yes, that's about right.

12  **Q.**   And Google, in fact, saw side-by-side payment in the

13  build; right?

14  **A.**   In the build they submitted, yes.

15  **Q.**   Yeah.  And Google rejected it; right?

16  **A.**   That is correct.

17  **Q.**   They rejected it because side-by-side consumer choice of

18  payment systems is against Google's billing policies; right?

19  **A.**   That is correct.

20  **Q.**   And later on in this chain there's an e-mail from

21  Ms. Kochikar all the way at the top.  Do you see that?

22  **A.**   Yes, I do.

23  **Q.**   And this is after the build was rejected; right?

24  **A.**   I can't tell if that's the exact timing of it, but...

25  **Q.**   Okay.  You just don't remember?

1   **A.**   Yeah, I don't remember.

2   **Q.**   That's all right.

3       So Ms. Kochikar is providing Mr. Harrison and you a

4   briefing on what's been going on between Epic and Google; is

5   that fair?

6   **A.**   Yeah.  I can see the context of some of this e-mail right

7   now.

8   **Q.**   Yeah, and Ms. Kochikar says (as read):

9           "You're going to see two patterns emerge from the

10      dealings between Epic and Google."

11      Do you see that?

12  **A.**   I do see that.

13  **Q.**   The first one is Tim.  That's Tim Sweeney; right?

14  **A.**   Yes, that is correct.

15  **Q.**   (as read):

16          "Mr. Sweeney's strong desire to make Android more

17      open and his singular focus on finding ways to distribute

18      his own store on Android at scale."

19      Do you see that?

20  **A.**   Yes, I do see it.

21  **Q.**   And you understood that to be the case at the time; right?

22  **A.**   They were -- they made a lot of public statements on it,

23  yes.

24  **Q.**   And Ms. Kochikar further states that his team had proposed

25  many different covert solutions to accomplish those goals, and

1   she said one of them was bizarre.  It was some sort of chat

2   launcher; right?

3   A.   Yes.

4   Q.   So Google understood that Epic was trying by lots of means

5   to try to get Android more open and try to show consumers

6   choice; right?

7   A.   We understood that Epic wanted to find ways to bypass our

8   payments policy.

9   Q.   And you reported to Ms. Kochikar at that time?

10  A.   Yes, I did.

11  Q.   And she was involved in these discussions?

12  A.   Yes, she was.

13  Q.   Now, you mentioned earlier how successful Fortnite had

14  been getting and had gotten by the time of 2020?

15  A.   Yes.

16  Q.   And you thought personally that having Fortnite get onto

17  Google Play would have helped Google with its goal of having

18  the best games in the best catalog on Google Play; right?

19  A.   Yes.

20  Q.   You felt it was a missed opportunity to Google to not have

21  Fortnite on the Play Store; right?

22  A.   Yes.

23  Q.   And, of course, you were also missing out on some money;

24  right?

25  A.   Just more as a fan of the game, I just thought it was a

1   missed opportunity not to have the biggest game available on

2   Google Play.

3   **Q.**   But also as a business person at Google, Google Play was

4   missing out on quite a few dollars from the 30 percent fee it

5   was not collecting; right?

6   **A.**   Yes, I guess there was a business opportunity that was

7   missed as well too.

8   **Q.**   And you mentioned when Google's counsel was questioning

9   you about the steps taken to get a compliant Fortnite build

10  onto Google Play.  Do you remember that?

11  **A.**   Yes, I do.

12  **Q.**   And the build that was submitted was, in fact, compliant.

13  You don't dispute that; right?

14  **A.**   That is correct.

15  **Q.**   All right.  So the code properly integrated Google Play

16  Billing; right?

17  **A.**   Yes.

18  **Q.**   And Epic removed text from its website that would have

19  instructed users how to sideload that; right?

20  **A.**   That is correct.

21  **Q.**   That's not allowed under Google's policies; right?

22  **A.**   That is correct.

23  **Q.**   Google developers are not allowed to tell their consumers

24  that there's another way outside of Google Play to get their

25  apps; right?

1   **A.**   Inside their apps they can't communicate that.

2   **Q.**   And the app once downloaded as submitted would not have

3   included the Epic Games payment system; right?

4   **A.**   That is correct.

5   **Q.**   So Google helped launch for this April 23rd big concert;

6   right?

7   **A.**   Yes, we did.

8   **Q.**   And Google thought that was going to be a good opportunity

9   for Google too; right?

10   **A.**   Yes, we did.

11   **Q.**   And Google collected a 30 percent fee on every single

12   in-app purchase from the date of launch on April 1st until it

13   was removed from the store in August 13th, 2020; right?

14   **A.**   Yes, that's correct.

15   **Q.**   In fact, Google made millions of dollars off of that time;

16   right?

17   **A.**   I don't recall the exact dollar amount but, yes, there was

18   new revenue generated from Fortnite being available on

19   Google Play.

20   **Q.**   Does $10 million sound like in the ballpark?

21   **A.**   I forget.

22   **Q.**   It wouldn't surprise you, though, if it were around that?

23   **A.**   It's something around that, yes.

24   **Q.**   If Epic had told Google in April 2020 that it planned to

25   launch a side-by-side payment option like it did in December of

1   2019, or tried to, Google would have rejected that; right?

2   **A.**    That is right.

3   **Q.**    Google would not have ever let consumers see the choice

4   Epic wanted to make and did make through this Hotfix by

5   breaking Google's rules?  Never would have let them see that;

6   right?

7   **A.**    That's correct.

8                **MS. MOSKOWITZ:**  No further questions, Your Honor.

9                **THE COURT:**  Okay.  Any questions from the jury?

10                           (No response.)

11                **THE COURT:**  All right.  You can step down.  Be careful

12   on the way down.

13                           (Witness excused.)

14                **THE COURT:**  Who do we have next?

15                **MR. EVEN:**  Your Honor, Epic calls Mr. Michael Marchak.

16                **THE COURT:**  Okay.  Where's the witness?

17                **MS. CHIU:**  Your Honor, I think counsel went to get

18   Mr. Marchak.

19                **THE COURT:**  Okay.  We're not supposed to be doing

20   this.  Where's the witness?

21                **MR. EVEN:**  This is a Google witness, Your Honor, so

22   I --

23                **THE COURT:**  Where is the witness, Google?

24                **MS. CHIU:**  He was supposed to be right outside,

25   Your Honor.  I don't know --

**PROCEEDINGS**

1          **THE COURT:** Why don't you get him, okay?  We're not

2    going to wait.

3       What is the hold up?

4          **UNIDENTIFED SPEAKER:** He's coming from the conference

5    room, Your Honor.

6          **THE CLERK:** Please come forward and take the witness

7    stand.

8          **THE COURT:** I want to avoid this going forward.  Is

9    that clear, everyone?  Google?

10         **MS. CHIU:** Yes, Your Honor.

11         **THE COURT:** Also, if I see a phone being used on this

12   side of the bar, I am going to keep the phone.  That goes for

13   anyone on this side of the bar.  If I see the phone, it is

14   mine.

15      Tell that person who was sitting over there that.  I had

16   to send Ms. Clark over to tell her to get off the phone.  It's

17   completely inappropriate.

18      All right.  Go ahead.

19         **MR. EVEN:** Thank you, Your Honor.

20         **THE CLERK:** Please raise your right hand.

21                    **MICHAEL R. MARCHAK**,

22   called as a witness for the Plaintiff, having been duly sworn,

23   testified as follows:

24         **THE WITNESS:** I do.

25         **THE CLERK:** Please be seated.

1          Please state your full name for the Court and spell your

2     last name.

3               THE WITNESS:  Michael R. Marchak, M-A-R-C-H-A-K.

4               THE CLERK:  Thank you.

5               MR. EVEN:  May I proceed, Your Honor?

6               THE COURT:  Please.

7               MR. EVEN:  Thank you.

8                        **DIRECT EXAMINATION**

9     BY MR. EVEN:

10    **Q.**   Good afternoon, Mr. Marchak.

11    **A.**   Good afternoon.

12    **Q.**   My name is Yonatan Evan, and I represent Epic Games.

13         I hope you have a binder before you that we've left there.

14    **A.**   I do.

15    **Q.**   Mr. Marchak, you joined Google in 2008; is that right?

16    **A.**   That's right.

17    **Q.**   And you are currently the director of Play partnership

18    strategy and operations; is that correct?

19    **A.**   Correct.

20    **Q.**   And you've held that position since 2015?

21    **A.**   That sounds right.

22    **Q.**   And you report to Ms. Purnima Kochikar; is that right?

23    **A.**   That was right about a little over a year ago.  I

24    currently report to Jonathan Wong.

25    **Q.**   Understood.

1      You were aware that Google collects a fee from developers

2  that sell in-app digital items through apps downloaded from

3  Google Play; is that right?

4  **A.**   Yes.

5  **Q.**   And the fee that Google charges is calculated as a revenue

6  share and sometimes referred to as rev share; right?

7  **A.**   Service fee rev share, yes.

8  **Q.**   And as of the time this litigation began back in the

9  summer of 2020, Google's fee on most in-app sales of digital

10  goods were typically 30 percent; correct?

11  **A.**   What was the date you referenced?

12  **Q.**   August 2020.

13  **A.**   I guess I'd have to think back.  We launched a program

14  called Runway, which reduced the service fee -- internally

15  called Runway, which reduced the service fee to 15 percent; and

16  I'm --

17  **Q.**   That was post this litigation, sir.

18  **A.**   Oh, okay.  Okay.  I don't remember the exact date.  It was

19  around that time frame.

20  **Q.**   Okay.  So -- but when this litigation started, most in-app

21  purchases were 30 percent; right?

22  **A.**   I'm going to trust your dates if you're looking at them.

23  I don't recall exactly when that program launched.  It was

24  around late 2020, early 2021, I think.

25  **Q.**   And, therefore, in the summer of 2020, most transactions,

1   most sales in-app were subject to a 30 percent fee; correct?

2   **A.**   Again, I'm not remembering that timeline; but if that

3   timeline is correct, yes.

4   **Q.**   Now, in August of 2018, shortly after Epic launched on

5   Android outside of Google Play, Google employees were beginning

6   to wonder whether Google was really earning the 30 percent fee

7   that it imposed on developers; is that correct?

8   **A.**   You mentioned Google employees.  There's a lot of Google

9   employees, so I'm sure some people -- yeah, I'm aware of people

10  asking questions around service fees and starting to

11  investigate that more.

12  **Q.**   And one of those people were you; correct?

13  **A.**   Yeah.  We did -- I did some analysis and things like that.

14  **Q.**   And you then took on a project to analyze and quantify the

15  value that Google Play provides to developers; correct?

16  **A.**   I believe you're referring to a Play value model that my

17  team worked on, yes.

18  **Q.**   Can you please turn in your binder to Exhibit 360?

19  **A.**   Okay.

20  **Q.**   And that is a document that is titled "Play value Model,

21  Play BD StratOps, August 8th, 2019"; correct?

22  **A.**   Correct.

23  **Q.**   And you participated in preparing this slide deck in or

24  around August of 2019; correct?

25  **A.**   Correct.

1   Q.   And if you turn to Slide 4, you see that the deck is

2   intended to explain "What is Play value and what are we trying

3   to accomplish with it"; correct?

4   A.   Yeah, that's what the slide says.

5   Q.   And if you turn to Slide 5 -- sorry.

6          MR. EVEN:  Let me move Exhibit 360 into evidence.

7          MS. CHIU:  No objections.

8          THE COURT:  It's admitted.

9        (Trial Exhibit 360 received in evidence.)

10          MR. EVEN:  Can we look at Slide 5.

11  BY MR. EVEN:

12  Q.   And in this slide you describe (as read):

13          "The Play value model as measuring the quantifiable

14   value provided to developers for the games apps that they

15   have on Play."

16   Correct?

17  A.   That's what the slide says, yes.

18  Q.   And if you turn to the following slide, Slide 6.

19   And as this slide shows (as read):

20          "The Play value model set out to quantify the value

21   provided to developers converted into dollar value and

22   then compare it to what developers were paying Google as

23   fees."

24   Is that correct?

25  A.   Yeah, that's what the slide refers to.

1    Q.   And in the last step, at step number three on the

2    right-hand side, by comparing the value provided by Play to the

3    fees collected from the developer, you sought to arrive at what

4    you refer to in this slide deck as net play value; correct?

5    A.   I'm forgetting the net Play value, but we were looking --

6    we -- we --

7    Q.   Sir, do you see on the right-hand side that it says

8    "Compare to rev share net Play value"?

9    A.   Yes.

10   Q.   Just as an example, if a game developer paid Google $100

11   in fees and under steps one and two of this Play value model,

12   the value that this developer received from Google was $105 and

13   under this Play value model that developer would have a net

14   value of positive $5; right?  A surplus of $5?

15   A.   Yes.

16   Q.   And if a developer paid Google $100 in fees and steps one

17   and two showed that Google provided developer only $95 in

18   value, then we could say that the net value was negative $5 or

19   a deficit of $5; correct?

20   A.   Correct.  It's important to note that this was a very

21   early --

22   Q.   I'm sorry.  You will have a chance with your counsel to

23   explain everything later.  Right now to please answer my

24   questions.

25        This concept of net value is -- was sometimes referred to

1   also as value exchanged; is that right?

2   **A.**   It could have been.

3   **Q.**   It was, in fact, by you; right?  You were talking in

4   e-mails, et cetera, about value exchange between developers and

5   Google; correct?

6   **A.**   I don't recall that exactly, but --

7   **Q.**   Okay.  We'll see something later.

8         Now, the explanation I gave earlier, that's why we have

9   the scales here on the right, because the idea was in this

10   project to determine whether developers obtained value that

11   justifies their fees or, rather, are overpaying for what Google

12   is providing them; right?

13   **A.**   Yes, but I'd still like to --

14   **Q.**   Thank you.

15   **A.**   -- explain.

16   **Q.**   The net value model reflected in this deck -- sorry, sir.

17   I'm going to have to ask you to give me -- allow me to ask the

18   questions.

19         The Play value model reflected in this quantified the

20   value of three separate services or value drivers; correct?

21   **A.**   Are you referring to a specific slide?

22   **Q.**   You can go to Slide 26, for instance.

23   **A.**   Okay.

24   **Q.**   Do you see that the Play value model reflected in these

25   slides quantify the value of three separate services provided

1   by Google; correct?

2   **A.**   Correct.

3   **Q.**   And Google believed at the time that these three drivers

4   counted for the majority of quantifiable value; correct?

5   **A.**   That was the belief at the time based on the headline, but

6   I was --

7   **Q.**   So -- I'm sorry.

8        According to this slide, the first driver of value is

9   discovery value; correct?

10  **A.**   Correct.

11  **Q.**   And discovery value is what's the -- is the matchmaking

12  value that the store provides by introducing an app to a user

13  who might be interested in downloading it; correct?

14  **A.**   Yeah, I think that's a fair description.

15  **Q.**   And that is sometimes referred to as user acquisition?

16  **A.**   Correct.

17  **Q.**   The second source of value is FOP value; correct?

18  **A.**   Correct.

19  **Q.**   Now, FOP is an acronym that stands for form of payment; is

20  that right?

21  **A.**   Correct.

22  **Q.**   And FOP value refers to the value that -- of the payment

23  services that Google provides through what's known as

24  Google Play Billing; right?

25  **A.**   Correct.

1  **Q.**   Now, the third source of value this model quantified is

2  delivery value; correct?

3  **A.**   Correct.

4  **Q.**   And delivery value refers to the value developers obtained

5  from the physical hosting of apps on Google Play's servers and

6  then distributing them through downloads to people's phones;

7  right?

8  **A.**   Correct.

9  **Q.**   Let's talk a little bit about the first of these value

10  drivers, which is discovery value.  And if you go to Slide 11.

11       And what we see here is that, according to this slide

12  deck, discovery value is Play's primary driver of value;

13  correct?

14  **A.**   According to the slide deck; but, again, this was an early

15  model.  I'm not sure that --

16  **Q.**   I understand.  You'll have time to explain it.

17       But according to this slide deck, according to this model,

18  at the time of this model back in August of 2019, you believed

19  that discovery value was the primary value driver for the

20  Play Store; correct?

21  **A.**   Correct.

22  **Q.**   And discovery value, as it says on this slide, is

23  essentially install count times the install value; right?

24  **A.**   Correct.

25  **Q.**   And the formula you used simply tried to quantify the

1  value of each install and then multiply it by the overall

2  number of installs that the Play provides; correct?

3  **A.**   Yeah, roughly.

4  **Q.**   Now, if you go to Slide 24, and there you can see we are

5  talking about the second value.  Do you see that that's FOP

6  value?

7  **A.**   Yes.

8  **Q.**   Now, this slide addresses Google's methodology for

9  estimating the value delivered to developers through

10 Google Play's payment services; right?

11 **A.**   I would say this was an early attempt at doing that.  I

12 think there was a lot of additional value or payment

13 services --

14 **Q.**   Sir, just answer my question.

15     This slide reflects August 2019 your best effort to value

16 what Google provides in terms of payment services; correct?

17 **A.**   This was an early effort to value payment services.

18 **Q.**   This was the only effort back in August of 2019, which was

19 my question; correct?

20 **A.**   I don't know that.

21 **Q.**   You know that back in 2019 this was your effort; correct?

22 **A.**   This was my effort in 2019, yes.

23 **Q.**   Now, to measure the value of payments as we see on this

24 slide, you began by estimating Google's own costs to deliver

25 payment services to developers; correct?

1    **A.**    Yes.

2    **Q.**    And what we see in the top row on this slide are estimates

3    of Google's own costs of handling payments, which vary based on

4    the form of payment that the user chooses to use; correct?

5    **A.**    Yes, but --

6    **Q.**    And so, for instance, on the left-hand side we can see

7    that if the user chose to pay for an in-app payment with a

8    credit card, then the cost to Google of handling that

9    transaction was 3 percent; correct?

10   **A.**    I would say this was -- I just want to note this was a

11   very simple early model.  It doesn't take into account any --

12   **Q.**    Sir, you'll have time to explain --

13   **A.**    -- details.

14   **Q.**    -- everything to your counsel.  Right now you need to

15   answer my questions.

16   **A.**    I was.

17   **Q.**    My question was not about the timing of anything.  My

18   question was whether on the left-hand side we can see that as

19   of August 2019, Google believed that the cost to Google of

20   handling an in-app transaction where the user chose to use a

21   credit card was 3 percent.

22   **A.**    I don't agree with that.  That was an estimate created by

23   my team.  My team is not a payments team or anything like that.

24   **Q.**    All right.

25   **A.**    So it wouldn't be an accurate assessment of costs.

1   **Q.**   Do you understand that this slide reflects an estimate of

2   3 percent for handling a transaction with a credit card?

3   **A.**   That is what the slide says.

4   **Q.**   And you see, for instance, for something called DCB the

5   estimate is 13.5 percent?

6   **A.**   That's what the slide says.

7   **Q.**   And DCB is direct carrier billing; right?

8   **A.**   Correct.

9   **Q.**   And that essentially means that the user bills the

10  transaction directly to its phone bill with its carrier;

11  correct?

12  **A.**   Correct.

13  **Q.**   And by "carrier" I mean an AT&T or Verizon; correct?

14  **A.**   Correct.

15  **Q.**   Now, the -- Google then went on to calculate the blended

16  average of 6 percent; correct?  You see that all the way on the

17  right, the weighted average, blended average?

18  **A.**   I'm not 100 percent sure what the blended average reflects

19  because I'm seeing the numbers at the bottom widely varying by

20  developer.

21  **Q.**   Sir, all the way on the right do you see that there's

22  something that says cost on the left, it gives costs for

23  various payment options, and then at the end it said the

24  blended average is 6 percent; correct?

25  **A.**   I see that, yes.

1    **Q.**   And this value is a figure your team worked to confirm

2    with Google's internal finance team at the time; correct?

3    **A.**   Can you repeat the question?

4    **Q.**   The 6 percent blended average, which presents the blended

5    average cost of handling payment transactions to Google, was a

6    number that your team checked and confirmed with Google's

7    internal finance team; correct?

8    **A.**   I don't recall that.

9    **Q.**   Can you turn to your -- sorry.

10       **MR. EVEN:**   Your Honor, let's get the transcript at

11   page 100.

12       **THE COURT:**   100?

13       **MR. EVEN:**   100, lines -- sorry.   101, lines 1

14   through 8.

15       **THE COURT:**   Yes, that's fine.

16       **MR. EVEN:**   Can we see this, please?

17     Can we start with maybe 100 at line 25 for me.

18     Let's just look at 100 -- 101.   Sorry.

19   **BY MR. EVEN:**

20    **Q.**   So you see there that it says (as read):

21       "At least at this point in time the finance group had

22      established that 6 percent was the break-even cost of FOP

23      for Google?"

24     And you say (as read):

25       "From this e-mail, it seems like that was what was

1        being communicated, yes."

2        Do you see that?

3   **A.**   I see that, but I'm not recalling --

4   **Q.**   And that's testimony you provided under oath back in 2022;

5   correct?

6   **A.**   I believe so, but I'm not recalling that e-mail that's

7   being referenced right now.

8   **Q.**   Okay.

9   **A.**   I think you're asking in relation to this slide --

10  **Q.**   So, sir --

11  **A.**   -- and the Play value analysis.

12  **Q.**   -- just answer the question.

13          **THE COURT:**  Let's just -- you need to focus on the

14  question, please.

15          **THE WITNESS:**  Okay.

16          **THE COURT:**  The question was:  Did you give this

17  testimony?  Not whether you agree with it or whether you

18  remember it.  Did you give this testimony?  And the answer is?

19          **THE WITNESS:**  Yes.

20          **THE COURT:**  Okay.  Let's just focus on that so we can

21  get you done.  Okay?

22          **THE WITNESS:**  Okay.

23          **THE COURT:**  Go ahead.

24  **BY MR. EVEN:**

25  **Q.**   Now, if you can open to Exhibit 355 that's in your binder.

1       You see this is an e-mail between yourself and others on

2  your team back in April 2019?

3  **A.**   Yes.

4  **Q.**   Do you see all the way at the bottom it says "Costs:

5  Finance established that 6 percent is a break-even point for

6  Google"?

7  **A.**   Yes, I see that line.

8  **Q.**   Thank you.

9       Now, can we go back to the slide we were on, Slide 24 of

10  360?

11          **THE COURT:**   Is this -- did you get this in evidence?

12          **MR. EVEN:**   I don't have it in evidence, Your Honor.

13  This was just further impeachment.

14          **THE COURT:**   If you can rely on it, you need to get it

15  in evidence.

16          **MR. EVEN:**   Well, I'm happy to get it in evidence,

17  Your Honor, but he already answered in the deposition.

18          **THE COURT:**   It's up to you.  It's your case.

19          **MR. EVEN:**   Then I will please put it in evidence.

20  This is 355.

21          **THE COURT:**   All right.  Is there any objection to 355?

22          **MS. CHIU:**   No objection, Your Honor.

23          **THE COURT:**   All right.  355 is admitted.

24      (Trial Exhibit 355 received in evidence.)

25          **MR. EVEN:**   Thank you.

BY MR. EVEN:

**Q.**   Now, for the purposes of this model that we see in this slide deck, you assumed that the value Google delivered to developers from payment services would be more than the cost to Google because it would be difficult for a developer to replicate payment at Play's costs; correct?

**A.**   Yeah, I think with our scale in the Northern markets we operate in, its hard to replicate that.

**Q.**   And so your assumption was that it would cost more to someone else than it would to Google to deliver the same payment services; correct?

**A.**   That was our assumption at the time for an individual developer.

**Q.**   And on the right-hand side we see that your assumption was that even though payment services cost Google 6 percent, for purposes of your value model, you assumed that the services you provided would be worth -- would represent a value of 10 percent; right?

**A.**   Based on this early model, yes.

**Q.**   Now, before you decided to ascribe a value of 10 percent, you did not actually do any work to try to determine whether some developers at least could, in fact, replicate Google's payment solution at a cost of 6 percent; correct?

**A.**   Like I said, this was an early model that we made --

**Q.**   Sir, it's a yes-or-no question.

1          Prior to ascribing a value of 10 percent, you did not

2    undertake any work to try to determine whether some developers

3    could, in fact, replicate Google's payment solution at a cost

4    of 6 percent rather than 10 percent; correct?

5    **A.**   We made a lot of assumptions in creating this model.  That

6    was one of the assumptions made there.

7    **Q.**   Sir, it's a simple question.  Did you or did you not do

8    any work to try and determine whether other developers,

9    especially large developers, could, in fact, obtain services,

10   payment services, at 6 percent or something close to 6 percent

11   rather than 10 percent?

12   **A.**   I don't recall doing any work on -- on that topic.

13   **Q.**   You don't recall?

14   **A.**   No.

15   **Q.**   Okay.

16           **MR. EVEN:**  Can we look at, Your Honor, 426, lines 6 to

17   10?

18           **THE COURT:**  Which line?

19           **MR. EVEN:**  Deposition at page 426, lines 6 to 10.

20           **THE COURT:**  6 to 10.

21       Okay.  Yes, that's fine.

22           **MR. EVEN:**  Can we put that up?

23   BY MR. EVEN:

24   **Q.**   Mr. Marchak, do you have this on the screen?

25   **A.**   Yes.

1    **Q.**   Do you see it?

2       Did you, in fact, testify -- were you asked the following

3    question (as read):

4       **"QUESTION:**  Have you done any work to try and determine

5       whether some developers could replicate payment solutions

6       at Play's costs?

7       **"ANSWER:**  I have not done that work."

8       Did you give this testimony under oath?

9    **A.**   Yes.

10   **Q.**   Thank you.

11      Now, you understand that some developers like Microsoft or

12   Activision or Epic already have their own payment solutions

13   that they use on various platforms; correct?

14   **A.**   I don't have the details on that, but I recall something

15   of those effects.

16          **THE COURT:**  Okay.  It sounds like we're -- this is

17   another avenue now that you're about to go down?

18          **MR. EVEN:**  I am early in my examination, Your Honor.

19          **THE COURT:**  Okay.  How about we break now.  All right?

20      All right.  It's the end of day two.  We're making

21   fantastic progress.

22      So here's your daily admonition.  Consider it a daily

23   meditation.  At the end of the case, you're going to clear your

24   mind, you're going to put all of this behind you.  You're going

25   to go back to whatever you need to think about, want to enjoy,

1    have to deal with, whatever your evening has.

2        No research.  No communications.  Please stay away from

3    media.  There's been a lot of media coverage.  Don't look at

4    anything.  Don't read anything.  Don't let anybody tell you

5    about it.  Enjoy your supper.

6        We'll see you tomorrow morning at 9:00 a.m.?  Okay.

7            **THE CLERK:**  All rise.

8        (Proceedings were heard out of the presence of the jury:)

9            **THE COURT:**  All right.  I'm sorry, is it Mr. Marchak?

10           **THE WITNESS:**  Yes.

11           **THE COURT:**  Okay.  You're discharged for the night.

12   Because you are remaining under oath, you may not have any

13   communications whatsoever about your testimony, about your

14   manner of testimony, about the content of your testimony, about

15   anything to do with this case.  None whatsoever.  All right?

16       And don't do any research.  Don't do any documents.  You

17   are basically under oath on hold till you come back tomorrow

18   morning.  All right?

19       Careful on the way down.  It's a bit steep.

20           **THE WITNESS:**  Okay.

21           **THE COURT:**  I have a question for you as soon as the

22   witness leaves.

23                        (Pause in proceedings.)

24           **THE COURT:**  So looking at that 355 and that 6 percent

25   number, what do you think that means?

1          **MR. EVEN:**  I think that just means that is -- if
2    you're asking about the substance of it, that just reflects the
3    cost to Google on average systemwide across the Play store of
4    handling payments for in-app purchases.

5          **THE COURT:**  So Google's work costs, so to speak, labor
6    costs, all in you believe is 6 percent for the billing services
7    that it provides?

8          **MR. EVEN:**  I believe that's correct, Your Honor, based
9    on this and based on other documents, and this is consistent
10   with what Mr. Allison testified to you yesterday.  So, yeah.

11         **THE COURT:**  Okay.  I just wanted to understand where
12   you're coming from.

13         Okay.  Who do we have tomorrow?  We're going to finish
14   with this fellow and then what?

15         **MR. BORNSTEIN:**  Tomorrow, Your Honor, the live
16   witnesses that we have planned include Purnima Kochikar, who we
17   heard about today, who's a Google witness; and someone named
18   Christian Owens, who is a third-party who's actually made
19   arrangements to come in from London, so we're very much hoping
20   to get him on and off the stand tomorrow.

21         **THE COURT:**  Why don't you put him on first?

22         **MR. BORNSTEIN:**  That's not a bad idea.

23         **THE COURT:**  It's up to you.

24         **MR. BORNSTEIN:**  No, I understand.  We'll have to talk
25   to Mr. Owens and confirm his availability.  I don't think he

1   was expecting to be here in the morning, but it's a good idea.

2       And then we may -- if we have time, we may have

3   Ms. Garber, who is another Google witness.  We also have

4   depositions we may choose to play instead just depending where

5   we are in the day and the convenience of both the Court and the

6   rest of us.

7           THE COURT:  All right.  Let me ask you, when are the

8   experts starting to come in?  And I asked you to do back to

9   back, so where are we on all that?

10          MR. BORNSTEIN:  Yeah, so we've worked out an agreement

11  with Google.  The plan is for us to have the economists come at

12  the very end of Epic's case, and then the Google economists

13  would testify at the very beginning of Google's case just back

14  to back.

15          THE COURT:  Okay.

16          MR. BORNSTEIN:  And then we would bring our economists

17  back for rebuttal at the conclusion of Google's case.

18          THE COURT:  All right.  And you've worked all those

19  out?

20          MR. POMERANTZ:  Yes, Your Honor.

21      And just to be clear, that's with respect to the

22  economists.  They have two.  We have two.  So their two will go

23  first at the end of their case.  Our two will go immediately

24  following.  They can rebut at the end of our case.

25          There are other --

1        **THE COURT:**  Can I just say, why are there two

2    economists?  You're not asking for damages, so...

3        **MR. BORNSTEIN:**  No, Your Honor.  I think we discussed

4    at a prior hearing, we have one economist, Professor Bernheim,

5    who is speaking primarily about the app distribution side of

6    things and some of the setup to that; and the other economist,

7    Professor Tadelis, who is focusing on the payments issues.  So

8    they are two completely separate universes in that sense.

9        **THE COURT:**  Okay.  And then you have other experts?

10       **MR. BORNSTEIN:**  We have two other experts, one very

11   brief.  He is an accountant who is going to speak to the profit

12   margin issues.  He should be on and off very quickly.  And the

13   other one is a computer scientist who will address some of the

14   security-type arguments that Google has presented as a pro

15   competitive justification.

16       **THE COURT:**  You've got responsive witnesses?

17       **MR. POMERANTZ:**  Yes.

18       **THE COURT:**  Okay.

19       **MR. POMERANTZ:**  But we have not agreed to do those

20   back to back.  So they'll call them whenever they want to call

21   them in their case, and then we will call our responsive --

22       **THE COURT:**  I'm not -- you're going to call them back

23   to back.  That's the MO.  Okay?  So just make it happen.  I

24   want them back to back.  Every expert I want to be in a matched

25   set.  It's much easier for the jury to get it.  Okay?

1          So let's do that.  Make sure all that happens.

2          Let's see, what else was I going to say?

3          Oh, what about all the third-party things we talked about

4     this morning?

5              MR. BORNSTEIN:  My understanding is we have all of the

6     sealing issues wrapped up.

7              THE COURT:  Oh, good.  Okay.  So I don't need to do

8     anything?

9              MR. BORNSTEIN:  No.  Just so Your Honor is aware, one

10    of the ways we have wrapped them up is by kicking the can a

11    little bit so that down the line when there is the requirement

12    to file exhibits after the jury verdict, I understand that one

13    or two of the third parties may be then requesting sealing, and

14    we're just not going to take a position on that.  That's their

15    issue.

16             THE COURT:  After it's been shown in open court?

17             MR. BORNSTEIN:  Well, our intent as part of this

18    agreement is to show in court the portions of the document that

19    we care about that we intend to use with the witness.  If the

20    document is then being filed, we assume the full document would

21    be filed, and they'll be seeking to seal portions of the

22    document that were not used in the courtroom.

23             THE COURT:  You don't have to file the whole document.

24    Just file -- file whatever you use.  That's fine.

25             MR. BORNSTEIN:  That's certainly fine with us if

PROCEEDINGS

```
1    that's consistent with the practice.
2          MR. POMERANTZ:  And that's good with us too.  That's
3    good with us, Your Honor .
4          THE COURT:  Just file whatever you need.  Let's not
5    have the pages and pages of blackout, though.  Okay?  Just
6    excerpt it.  Make it look nice.  You don't have to have
7    everything blacked out.
8          MR. POMERANTZ:  We'll work that out.
9          Your Honor, one thing that I think Mr. Bornstein requested
10   yesterday and it happened to me this morning, so -- which is we
11   see the jurors and we sort of don't engage with them, and I
12   don't want them to think we're being rude.  It's happening to
13   both of us.  If you would just remember tomorrow --
14         THE COURT:  Just, can you remind me tomorrow morning?
15         MR. POMERANTZ:  All right.
16         THE COURT:  Okay?  Just one of you remind me in the
17   morning, and I'll say something.
18         You know, this APEC thing is happening next week, so it's
19   going to be very complicated.  We just have to be a little bit
20   flexible on people coming in from other parts of the Bay Area
21   to get here.  All right?
22         Okay.  Anything else for today?
23         MR. BORNSTEIN:  I don't think so, Your Honor, no.
24         THE COURT:  Mr. Pomerantz?
25         MR. POMERANTZ:  I don't think so.
```

PROCEEDINGS

1          **THE COURT:**  All right.  I'll see you in the morning.

2          **MR. BORNSTEIN:**  Thank you, Your Honor.

3          **THE CLERK:**  All rise.  Court's in recess.

4               (Proceedings adjourned at 3:38 p.m.)

5                         ---oOo---

6

7               **CERTIFICATE OF REPORTER**

8          I certify that the foregoing is a correct transcript

9     from the record of proceedings in the above-entitled matter.

10

11    DATE:   Tuesday, November 7, 2023

12

13

14

15    _____

16        Kelly Shainline, CSR No. 13476, RPR, CRR
                U.S. Court Reporter

17

18

19

20

21

22

23

24

25