**Volume 4**

**Pages 579 - 788**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE            )
ANTITRUST LITIGATION,              )
                                   )  **NO. 21-md-02981-JD**
_____    )
THIS DOCUMENT RELATES TO:          )
                                   )
EPIC GAMES, INC.,                  )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )  **NO. 3:20-cv-05671-JD**
                                   )
GOOGLE, LLC., et al.,              )
                                   )
          Defendants.              )
_____    )

San Francisco, California
Wednesday, November 8, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Rhonda Aquilina, CSR 9956, RMR, CRR
Official United States Reporter

**APPEARANCES**:

For Plaintiff:

        CRAVATH, SWAINE & MOORE LLP
        825 Eighth Avenue
        New York, New York  10019
BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
      **YONATAN EVEN, ATTORNEY AT LAW**
      **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
      **MICHAEL ZAKEN, ATTORNEY AT LAW**
      **ANDREW WIKTOR, ATTORNEY AT LAW**

        HUESTON HENNIGAN LLP
        523 W 6th Street, Suite 400
        Los Angeles, CA 90014
BY:  **SOURABH MISHRA, ATTORNEY AT LAW**

For Defendants:

        MUNGER, TOLLES & OLSON LLP
        350 South Grand Avenue - 50th Floor
        Los Angeles, California  90071
BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**

        MUNGER, TOLLES & OLSON LLP
        601 Massachusetts Avenue NW
        Suite 500 East
        Washington, DC  20001
BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
      **LAUREN BELL, ATTORNEY AT LAW**
      **JUSTIN RAPHAEL, ATTORNEY AT LAW**

        MORGAN, LEWIS & BOCKIUS LLP
        One Market - Spear Street Tower
        San Francisco, California  94105
BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**

For Spotify USA:

        SULLIVAN AND CROMWELL LLP
        125 Broad Street
        New York, NY 10004
BY:  **SVERKER HOGBERG, ATTORNEY AT LAW**

<pre>
 1                    I N D E X

 2   Wednesday, November 8, 2023 - Volume 4

 3   PLAINTIFFS' WITNESSES                      PAGE   VOL.

 4   MARCHAK, MICHAEL (RECALLED)
     (PREVIOUSLY SWORN)                          597    4
 5   Direct Examination resumed by Mr. Even      597    4
     Cross-Examination by Ms. Chiu              633    4
 6   Redirect Examination by  Mr. Even          645    4

 7   OWENS, CHRISTIAN
     (SWORN)                                     651    4
 8   Direct Examination by Mr. Diessel          651    4
     Cross-Examination by Mr. Raphael           667    4
 9   Redirect Examination by  Mr. Diessel       675    4

10   WATTS, RICHARD
     By Video Deposition (not reported)         680   4.

11
     KOCHIKAR, PURNIMA
12   (SWORN)                                     691    4
     Direct Examination by Mr. Hueston          692    4
13
                    E X H I B I T S
14
     TRIAL EXHIBITS                     IDEN   EVID   VOL.
15
        384                                    631    4
16
        388                                    598    4
17
        704                                    697    4
18
        805                                    766    4
19
        917                                    759    4
20
        939                                    648    4
21
       1348                                    680    4
22
       1349                                    680    4
23
       1351                                    680    4
24
       1352                                    680    4
25
</pre>

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1353 | | 680 | 4 |
| 1515 | | 756 | 4 |
| 1517 | | 753 | 4 |
| 1519 | | 770 | 4 |
| 1520 | | 774 | 4 |
| 1526 | | 702 | 4 |
| 1537 | | 704 | 4 |
| 1704 | | 763 | 4 |
| 2698 | | 721 | 4 |
| 5718 | | 746 | 4 |
| 5809 | | 619 | 4 |
| 11110 | | 624 | 4 |
| 11370 | | 680 | 4 |

| | |
|---|---|
| 1 | <u>**Wednesday - November 8, 2023**</u>                    <u>**9:08 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Civil 20-5671, Epic Games Inc. |
| 5 | versus Google LLC, and Multi-District Litigation 21-2981, In Re |
| 6 | Google Play Store Antitrust Litigation. |
| 7 | Counsel? |
| 8 | **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary |
| 9 | Bornstein for Epic Games.  Today I have with me Michael Zaken, |
| 10 | Jason Koffler, Ben Diessel, Andrew Wiktor, Lauren Moskowitz, |
| 11 | and Yonathan Even. |
| 12 | **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn |
| 13 | Pomerantz on behalf of Google.  With me is Lauren Bell, Brian |
| 14 | Smith, Jonathan Kravis, Michelle Park Chiu, and Justin Raphael. |
| 15 | **THE COURT:**  Okay.  We all set? |
| 16 | **MR. BORNSTEIN:**  I just wanted to report good news, |
| 17 | Your Honor. |
| 18 | **THE COURT:**  Yes. |
| 19 | **MR. BORNSTEIN:**  We have resolved with third parties a |
| 20 | number of the sealing issues that you may have seen on the |
| 21 | docket through agreement. |
| 22 | **THE COURT:**  Okay. |
| 23 | **MR. BORNSTEIN:**  If Your Honor wants to take note, I |
| 24 | can give you the information now, or we can file something |
| 25 | indicating the resolutions, whatever would be easier. |

1         **THE COURT:**  What's the resolution?

2         **MR. BORNSTEIN:**  For the various third parties as to

3    which we have resolution, we are, for three of them, not going

4    to show the portions of the documents as to which they

5    objected.  I think they may, in the future, if we need to get

6    those portions in to the jury because they're with relevant

7    stuff on the same page, they may file a motion to seal in the

8    future, as to which we will take no position.

9         **THE COURT:**  Okay.  So there's an email, and somebody

10   has objected to it.  What are you going to do with the email?

11        **MR. BORNSTEIN:**  So if we have -- I think they're all

12   slide decks.  But if we're showing page 2, for example, and the

13   information that they care about is on page 5, we're just not

14   going to show page 5.

15        **THE COURT:**  You're not using page 5.

16        **MR. BORNSTEIN:**  Correct.

17        **THE COURT:**  That's fine.  Okay.

18        **MR. BORNSTEIN:**  Yeah.

19        **THE COURT:**  All right.

20        **MR. BORNSTEIN:**  And there may be one or two of those

21   where we're using information that's on the same page as what

22   they object to, and so they may, in the future, file a motion

23   to seal the filed exhibit.

24        **THE COURT:**  I don't want anything that says "Redacted"

25   on it.

1          **MR. BORNSTEIN:**  No.  Understood.

2          **THE COURT:**  All right.

3          **MR. BORNSTEIN:**  And then there is one sealing motion

4     that relates to information that we intend to use with a

5     witness today as to which we've been unable to reach

6     resolution.

7          **THE COURT:**  Who is the witness?

8          **MR. BORNSTEIN:**  The witness is Ms. Kochikar, Purnima

9     Kochikar.  She's a Google witness.

10         **THE COURT:**  Okay.  What's the issue?

11         **MR. POMERANTZ:**  The issue is -- concerns an agreement

12    between Google and Spotify.  Spotify's counsel is here in the

13    courtroom.

14         And we have, at least on behalf of Google -- I'll let

15    Spotify speak for itself, but we have two significant concerns.

16    One is that the agreement portions of it are still under

17    negotiation right now, and we think public disclosure would not

18    be appropriate for that.

19         And second, this particular agreement is related to a

20    pilot program that Google has recently launched called User

21    Choice Billing.  The Spotify deal was the first agreement that

22    was part of that program.  We are in active negotiations with

23    others for that same pilot program.  There are similarities and

24    differences between the other people that we are negotiating

25    with.  And disclosure of the Spotify deal would be, you know,

1    very, very detrimental to the ongoing negotiations that we are

2    having with these other third parties.

3            THE COURT:  Why is that?

4            MR. POMERANTZ:  Because it's a new pilot program and

5    people are -- it would -- you know, if you know what your

6    competitor's deal is, it would greatly affect your

7    negotiations.

8            THE COURT:  What is this called?  User Choice?

9            MR. POMERANTZ:  Yes.

10           THE COURT:  What does that mean?

11           MR. POMERANTZ:  It's a pilot program that Google has

12   started in other territories and is now launching in the United

13   States which allows the developer to have both Google Play

14   Billing and a billing system of the developer's choice on the

15   same screen for the user to choose.  And if the user chooses

16   the developer's billing system, if I have a different --

17           THE COURT:  Wait a minute.  So right now Google is

18   letting developers post their own billing systems?

19           MR. POMERANTZ:  There is a pilot program under way,

20   and Spotify was the first participant in the United States.

21           THE COURT:  What does "pilot program" mean?

22           MR. POMERANTZ:  Meaning that we're testing whether it

23   works for both the developer and for Google.

24           THE COURT:  Who are the lucky winners of the pilot

25   program?  How are they being selected?

1          **MR. POMERANTZ:**  They're selected based upon whether

2    they're interested in doing it, and then Google works with them

3    to see if they can work out an appropriate agreement that is --

4          **THE COURT:**  Do you offer that to Epic?

5          **MR. POMERANTZ:**  I don't know, Your Honor.

6          **THE COURT:**  You don't know.

7          **MR. POMERANTZ:**  I mean, I guess I would say, Your

8    Honor --

9          **THE COURT:**  Wouldn't that solve your problem with Epic

10   if Google did that?

11         **MR. MISHRA:**  Your Honor, this is Sourabh Mishra for

12   plaintiff --

13         **THE COURT:**  I want to hear from Mr. Bornstein first.

14   Thank you.

15      Wouldn't that solve your problems?

16         **MR. BORNSTEIN:**  It would not, Your Honor.  The

17   economic terms of the proposal, as well as the manner in which

18   it is implemented, based on what we are aware from public

19   information -- and I don't want to talk about non-public

20   information -- in our view, this is not a real option for

21   developers.  It's window dressing in order to try to make it

22   seem as though the concerns at issue in this matter have been

23   resolved, when it is very clear from the actual substance of

24   the proposal that it is not.

25         **MR. POMERANTZ:**  In any event, Your Honor --

1          **THE COURT:**  Well, I mean, I think that you're seeking

2     injunctive relief.  Google has opened the door to your own

3     billing.  You may not like the deal terms, but that's different

4     from anticompetitive conduct.

5          **MR. BORNSTEIN:**  I'd be happy to get into the substance

6     of it, Your Honor.  I don't know if we have a confidentiality

7     issue on that.  But our view is the terms of the deal continue

8     to be anticompetitive in a very substantial way.

9          **THE COURT:**  Anticompetitive.

10         **MR. BORNSTEIN:**  Correct, Your Honor.  I can explain if

11    you're interested in --

12         **THE COURT:**  They're lowering the bridge across the

13    moat.  What more do you want?

14         **MR. BORNSTEIN:**  They are not lowering the bridge

15    across the moat, Your Honor.  They are not.

16         **THE COURT:**  Okay.  I don't understand why this is-- I

17    know it's a pilot program, and I know it's new, but --

18         **MR. POMERANTZ:**  Well, there's two reasons.  Number

19    one, Your Honor, is we're still negotiating with Spotify.  So

20    there are aspects of the deal that are still under negotiation.

21    So that's Spotify.

22         And then also, because it's part of a new program, it

23    would greatly affect those negotiations, and we don't think

24    that is good for competition.  You don't want to have the

25    competitors of Spotify know the terms of the Spotify deal with

1  Google.  It would be very, very harmful, particularly when it's

2  a new program.

3       **THE COURT:**  It arguably sounds pro-competitive.  More

4  information, more transparency is usually pro-competitive.

5       But anyway, leaving that aside, are you planning to use --

6  do we have to deal -- can't you -- do you have to use Spotify

7  in your current thing?

8       **MR. POMERANTZ:**  Your Honor, let me tell you what we're

9  proposing, just so you know.  We have asked them to -- we have

10  a hard copy of the agreement.  They can hand the entire

11  agreement to the jurors --

12       **THE COURT:**  Before we do that, do you need to use this

13  Spotify.  Can't you use something else?

14       **MR. BORNSTEIN:**  We do, Your Honor, precisely for the

15  reasons that prompted Your Honor's question.  We need to

16  establish with the witness that the facts on the ground

17  continue to be anticompetitive, and that requires a discussion

18  of the terms of the deal.

19       **THE COURT:**  Well, are you raising the Spotify deal as

20  an example of Google's opening the door?

21       **MR. POMERANTZ:**  No.

22       **THE COURT:**  So Google is not raising it at all.

23       **MR. POMERANTZ:**  I don't believe we are -- we are not

24  offering the Spotify deal.

25       **THE COURT:**  All right.  So if they're not going to

1   tell the jury Spotify is our indicator of pro-competitive, why

2   do you even need to bring it up?

3          **MR. BORNSTEIN:**  Well, my understanding is that this is

4   going to -- it certainly has been my understanding that this is

5   going to feature in Google's case, and I do think we need to --

6          **THE COURT:**  Mr. Pomerantz just said no.

7          **MR. BORNSTEIN:**  Well, I think maybe Mr. Pomerantz and

8   I should have a discussion about exactly what "no" means.

9          **THE COURT:**  Is it the next witness?

10          **MR. BORNSTEIN:**  No.  She's coming later today.

11          **THE COURT:**  Later today.

12          **MR. BORNSTEIN:**  Yes.

13          **THE COURT:**  Well, Mr. Pomerantz is saying they're not

14   going to mention it.  So if he doesn't, I don't see why you

15   need to do it.

16          **MR. BORNSTEIN:**  I'll discuss that with Mr. Pomerantz

17   and with the team, Your Honor, and we can address it after a

18   break.

19          **THE COURT:**  That might short-circuit the problem.

20          **MR. POMERANTZ:**  It might, Your Honor.  I'll be happy

21   to have that conversation.

22          **THE COURT:**  And that's the only thing, just Spotify?

23          **MR. POMERANTZ:**  That's it.  And this is Spotify's

24   counsel.  I don't know if you want to --

25          **THE COURT:**  I don't think so.  Thank you.

 1        You're going to have to wait around.  If it persists, I

 2   may have to have a word from you.

 3        Okay?  Is that it then?

 4            MR. BORNSTEIN:  We also have an evidentiary matter

 5   with respect to that same witness, so we can save it until

 6   later as well.

 7            THE COURT:  Well, when is later?

 8            MR. BORNSTEIN:  I expect she will come either shortly

 9   before lunch or shortly after, based on the schedule.

10            THE COURT:  Well, let's just do it now.

11            MR. BORNSTEIN:  All right.  I would cede the podium to

12   Mr. Mishra.

13            THE COURT:  Okay.  Yeah.

14            MR. MISHRA:  Your Honor, this is Sourabh Mishra for

15   plaintiff Epic Games.

16        There are three exhibits that we're objecting to, Your

17   Honor.  The first exhibit is Exhibit 6278.

18            THE COURT:  Can I have them?

19            MR. MISHRA:  Yes.

20            THE COURT:  Thank you.  All right.  6278.

21            MR. MISHRA:  6278, Your Honor.  This is a long

22   presentation detailing a third party's survey results with

23   hearsay throughout the document.  The witness did not conduct

24   the survey.  The witness I don't even think is in the

25   department that conducted the survey at Google.

1          **THE COURT:**  This is for which witness?

2          **MR. MISHRA:**  Purnima Kochikar.

3          **THE COURT:**  Okay.  All right.

4          **MR. MISHRA:**  And when we asked Google's counsel how

5     this -- what hearsay exception applies, they said they're not

6     offering it for the truth.

7          And we said:  How could it get admitted when there's so

8     many hearsay statements in here, all prejudicial statements in

9     there that the witness does not have personal knowledge about?

10         They said:  We're not going to tell you.  We'll talk to

11    the Judge about it tomorrow.

12         When we went to other exhibits and we made similar

13    objections and asked, they told us:  We're not here to talk to

14    you about it.  We'll tell you tomorrow in front of the Court.

15         **MR. KRAVIS:**  I told counsel this morning, we're not

16    planning to use this one.

17         **THE COURT:**  You're not using this?

18         **MR. KRAVIS:**  No.

19         **THE COURT:**  All right.  Problem solved.

20         **MR. MISHRA:**  My understanding was they weren't using

21    the Gen-Z.

22         **THE COURT:**  You know what?  You've won, so it's

23    probably good to stop.  Okay?

24         What's next?

25         **MR. MISHRA:**  6278, Your Honor.

1          **THE COURT:**  That's the one we just did.

2          **MR. MISHRA:**  Oh, they're not using that one.  Okay.

3     5941, I believe you're not using that either.

4          **MR. KRAVIS:**  No, no.  We're using that.

5          **THE COURT:**  I only have three.

6     So 6278, Google is not going to use.

7     The next two I have are 1525 and 109 -- all right, so four

8     exhibits.  All right.  So there are four exhibits.  Okay.

9          5941.  All right.  The Gen Z effect.

10         **MR. MISHRA:**  Gen Z effect, Your Honor.

11    So the Gen Z effect --

12         **THE COURT:**  What is Gen Z?  Is that 1995?

13         **MR. MISHRA:**  My brother was born in 1997, and it

14    started right then.

15         **THE COURT:**  Gen Z?

16         **MR. MISHRA:**  I was born in 1988, so not that young.

17         **THE COURT:**  Gen Z starts in 1997?

18         **MR. MISHRA:**  That's right.

19         **THE COURT:**  So my kids are Gen Z.  That's the problem.

20                         (Laughter)

21         **THE COURT:**  Okay.  All right.  What do we have?

22         **MR. MISHRA:**  So another long presentation, surveys

23    throughout, hearsay statements.

24         **THE COURT:**  Are you going to use this one?

25         **MR. KRAVIS:**  Three slides from this deck.

1          **THE COURT:**  Oh, you are.

2      Okay.  Go ahead.

3          **MR. MISHRA:**  Your Honor, we asked last night:  What

4  parts of this are you using?

5      They said:  We're not going to preview our examination for

6  you.

7      I'm happy to meet and confer further --

8          **THE COURT:**  I want to get started.

9      What are the three pages you want to use?

10          **MR. KRAVIS:**  Yeah.  So they're Slide Number 10.

11          **THE COURT:**  10.  Okay.

12           "iPhone is an even bigger problem than you

13      think."

14      Okay.  So what are you going to do with this one?

15          **MR. KRAVIS:**  This is relevant to Google's state of

16  mind and Google's view of its competition.  It's not being

17  offered for the truth of anything asserted on the deck.  It's

18  being offered to show that Google -- Google employees consider

19  Apple and the iPhone and the Apple App Store, in particular, to

20  be a competitor and that that affects their business strategy.

21          **THE COURT:**  Well, does the witness have anything to do

22  with this document?

23          **MR. KRAVIS:**  Yes, she did.

24          **THE COURT:**  What does she do?

25          **MR. KRAVIS:**  This is a document that she considers in

 1   the course of her work.  One of her -- one of her

 2   responsibilities and one of the things that she'll be

 3   testifying about is communications and negotiations with app

 4   developers.

 5         THE COURT:  I'll think about it.  I'm disinclined, but

 6   I'll let you try with a foundation.  Okay?  But 50/50 whether

 7   that's going to get in or not.

 8         Okay.  What's the next one?

 9         Actually, you know what?  That's going to be true for all

10   the slides.  If you can lay a foundation that's adequate, I

11   will consider it.  But just saying it was in the air at Google,

12   I don't think -- you can't get a document in unless she

13   prepared it or had some other connection with it.

14         MR. KRAVIS:  Right.  I think the testimony will

15   establish that it's not just in the air at Google, but it's

16   relevant to her own consideration of these topics.

17         THE COURT:  All right.  What's next?

18         MR. MISHRA:  The next one is 10928, Your Honor.

19         THE COURT:  Yes.

20         MR. MISHRA:  This is a -- the top email here is an

21   email from a third party speculating about something relating

22   to their business.  Hearsay.

23         THE COURT:  This is to the witness, though.  It's an

24   email to the witness.

25         MR. MISHRA:  It is an email to the witness.  But what

1   they intend to use here -- again, they didn't tell us this, but

2   this is what we suspect.  What they intend to use here is the

3   third-party speculation about an issue related to that third

4   party specifically, nothing to do with Epic here.  Specifically

5   to that third party, that third-party speculation.

6           **THE COURT:**  What are you planning to do with this one?

7           **MR. KRAVIS:**  Yeah.  So, again, this is an email to --

8   it's an email chain with the witness, Purnima Kochikar.  And

9   the relevant portion here is the discussion of why the

10  developer does not want to use Google Play Billing.  And in

11  particular, the developer is telling Ms. Kochikar that they do

12  not want to use Google Play Billing because that makes it too

13  easy for customers to cancel their subscriptions.

14       This is, again, relevant to her communications with

15  developers about the Play Store and about Google Play Billing.

16  It's not being offered for the truth.  It's being offered to

17  show what developers say to Google about these things.

18          **THE COURT:**  That's fine.  It's admissible.

19       Okay.  Let's bring the jury in.

20       (Proceedings were heard in the presence of the jury:)

21          **THE CLERK:**  Please be seated.

22       Calling Civil 20-5671, Epic Games Inc. versus Google LLC

23  and Multi-District Litigation 21-2981, In Re Google Play Store

24  Antitrust Litigation.

25          **THE COURT:**  All right.  Please go ahead.

1          **MR. EVEN:**  Thank you, Your Honor.

2                          **MICHAEL MARCHAK**,

3    called as a witness for the PLAINTIFFS, having been previously

4    duly sworn, testified further as follows:

5                    **DIRECT EXAMINATION**   (resumed)

6    BY MR. EVEN:

7    **Q.**   Good morning, Mr. Marchak.  Are you ready to proceed?

8    **A.**   Yes.  Good morning.

9    **Q.**   So before we actually continue with the substance of the

10   examination, I'd like to go through a few housekeeping things.

11   So if you could first turn in your binder to Exhibit 388.

12       And do you see that that's a slide deck titled Project

13   Base functionality 4/14 Discussion?

14   **A.**   I do.

15   **Q.**   And that is a slide deck that you had received as part of

16   your work at Google at the time, correct?

17   **A.**   I believe I saw this slide deck, but it's not all that

18   familiar to me.

19   **Q.**   Sir, you had received those slide decks as we see them at

20   the time, correct?

21   **A.**   Correct, but, like I said, I receive a lot of slide decks,

22   so this one isn't one that rings a bell.

23          **MR. EVEN:**  Okay.  Thank you.

24       I'd like to move it into evidence, Your Honor.

25          **MS. CHIU:**  No objections.

 1                THE COURT:  Sorry?

 2                MR. EVEN:  I'd like to move Exhibit 388 into evidence,

 3     please.

 4                MS. CHIU:  No objections.

 5                THE COURT:  Okay.  It's admitted.

 6                          (Trial Exhibit 388 received

 7                           in evidence.)

 8     BY MR. EVEN:

 9     Q.   Please now turn in your binder to Exhibit 8000.  That is a

10     slide deck titled App Best Practices for Commerce Developers;

11     do you see that?

12     A.   I do.

13     Q.   Do you recognize it?

14     A.   I don't.

15     Q.   Well, if you take a look at the bottom right-hand, do you

16     see that there's a number there saying that ends in 942553.ARK?

17     A.   Yes.

18     Q.   And if you click to Exhibit 8514, do you see that this is

19     a metadata sheet for a document with control number ending

20     942553.ARK?

21                MS. CHIU:  Counsel, we object to showing this document

22     to Mr. Marchak.  It is not a document that was produced in this

23     litigation, and he's not going to have any understanding of

24     this material.

25                THE COURT:  Okay.  Just state your objection.  And I

 1   couldn't hear a word you said.  So --

 2           MS. CHIU:  Sorry, Your Honor.

 3           THE COURT:  -- what's the objection?

 4           MS. CHIU:  We object, lack of foundation for 8514.

 5   And personal --

 6           THE COURT:  It has his name on it.  Go ahead and lay a

 7   foundation for 8514.

 8   BY MR. EVEN:

 9   Q.   Do you see that this suggests that Exhibit 8000 came from

10   your files, Mr. Marchak?

11   A.   I don't know what this sheet is, like the sheet that

12   you're showing me right now.

13   Q.   Do you see that it says under all custodians, Michael

14   Marchak?

15   A.   Yes.

16   Q.   And do you see that it's the same control number as 8000?

17   A.   Yes.

18   Q.   Do you understand that you received Document 8000 as part

19   of your work at Google and that's how it landed in your

20   custodial file?

21           MS. CHIU:  Your Honor, we renew our objection.  This

22   document, 8514, Mr. Marchak just testified he doesn't know what

23   this information is, and the conclusions that counsel are

24   drawing has not been established through the witness.

25           THE COURT:  Just ask him -- do you want to ask him

 1   about 8000?  Just go ahead.

 2   **BY MR. EVEN:**

 3   **Q.**   Sir, let me represent to you that Document 8000 comes from

 4   your files.  Do you have any reason to believe you did not

 5   receive it as part of your work at Google at the time?

 6   **A.**   It looks like something I might have received, but it

 7   doesn't ring a bell or anything like that.

 8        **MR. EVEN:**  So, Your Honor, I'd like to move

 9   Exhibit 8000 into evidence, please.

10        **MS. CHIU:**  Your Honor, we object to the admission of

11   this evidence -- this document with Mr. Marchak.

12        **THE COURT:**  Well, you want to do a little bit more

13   foundation or do something else?

14   **BY MR. EVEN:**

15   **Q.**   Mr. Marchak, if you turn to the first slide, you see the

16   agenda for this document?

17   **A.**   This is Exhibit 8000?

18   **Q.**   Yes.

19   **A.**   Yes, I see the agenda.

20   **Q.**   And those are the kind of documents that you would have

21   received as part of your strategic -- strategy role at Play at

22   Google, correct?

23   **A.**   I may have received this document.  It doesn't ring a bell

24   at all.

25   **Q.**   Well, we received it from your files.  Does that mean that

1  you received it at the time as part of your work at Google,

2  sir?

3  **A.**   I don't know how it was filed.  I would assume so, but I

4  don't know how that process works, so...

5  **Q.**   Do you assume you received it into your files?

6  **A.**   Yeah, it wouldn't surprise me.  This looks like a deck

7  that was shared with developers or something like that, but it

8  doesn't ring a bell with me at all.

9           **MR. EVEN:**  Your Honor, I renew the request to move it

10  into evidence at this time.

11           **THE COURT:**  Well, let me ask the witness.

12      Did you prepare this document?

13           **THE WITNESS:**  No.

14           **THE COURT:**  Do you remember getting it at any time

15  until today?

16           **THE WITNESS:**  No.

17           **THE COURT:**  Well, can't let it in.  Sorry.

18  **BY MR. EVEN:**

19  **Q.**   So now let's turn back to where we were yesterday,

20  Mr. Marchak.

21      And I believe yesterday we were talking about the value

22  that Google ascribed to its payment services in the context of

23  the August 2019 Play Value Model; do you remember that?

24  **A.**   Yes.

25  **Q.**   So if you go back to slide 24 of Exhibit 360, and what the

1  slide shows us, you said yesterday, is that in this Play Value

2  Model, Google assumed that the value of its payment services to

3  developers was 10 percent, correct?

4  **A.**   It looks like there's two -- two models or two options

5  here, and yeah, one of them looks like the assumption that led

6  to an average of 10 percent.

7  **Q.**   And you see at the top it says FOP Value Using Cost Plus

8  in the Play Value Model?

9  **A.**   Yes.

10 **Q.**   And you see on the left-hand side that "Cost Plus" is the

11 row that ends in 10 percent?

12 **A.**   Yes.

13 **Q.**   So you understand that the value that Google actually

14 ascribed in this Play Value Model was 10 percent to its FOP

15 services, correct?

16 **A.**   I wouldn't say that it was the value that Google ascribed.

17 This was a small team that I was working with that created this

18 early model.  So I don't think that was --

19 **Q.**   Sir, as reflected in this slide, the team you were working

20 with on the Google Play model ascribed the value of 10 percent

21 to the pay services that Google provided as of August 2019,

22 correct?  That's what the slide says?

23 **A.**   Yeah, I -- yes.

24 **Q.**   Thank you.

25 **A.**   But I also think it varied by developer, so it wasn't like

1    one number.

2    **Q.**   Sir, I heard yesterday you want to suggest to us all kinds

3    of things about this model.  We will get there.

4         For now, the slide says that as of August 2019, you and

5    your team developed this model and ascribed a 10 percent value

6    to the paid services provided by Google, correct?

7    **A.**   I was just clarifying that that was the average, not --

8    **Q.**   Sir, it's a yes-or-no question.  As of 2019, in August,

9    you and your team developed a Play Value Model that ascribed a

10   10 percent value to Google's payment services, correct?

11   **A.**   That was the blended average.

12   **Q.**   And we discussed yesterday that in connection with this

13   Play model, you and your team did not actually do any work to

14   try to determine whether some developers could, in fact,

15   replicate Google's payment solution at a cost of 6 percent

16   rather than 10 percent, correct?

17   **A.**   I don't recall doing work to validate whether developers

18   could replicate.

19   **Q.**   And you also did not have any data to suggest that a large

20   developer like Microsoft, for instance, could not replicate the

21   cost of payment solution that Google managed to obtain,

22   correct?

23   **A.**   I don't recall ever looking at Microsoft when I was doing

24   the Play Value Model.

25   **Q.**   And you don't recall looking at any other large developer

1   either, correct?

2   **A.**   I don't recall going deep into how we got to these

3   assumptions.

4   **Q.**   Okay.  If you turn now to slide 30 on Exhibit 360.  And

5   this slide is headed Draft Total Value Based on the Model

6   Versus Our Current Billing Model.

7       Do you see that?

8   **A.**   I see the headline, yes.

9   **Q.**   And on the left-hand side, the chart breaks down the total

10  value that Google provided by type of value, correct?

11  **A.**   At this early stage of the model, yeah, those are the

12  three areas.

13  **Q.**   And what it quantified are the three value drivers we

14  discussed yesterday:  user acquisition, payments, and

15  distribution, correct?

16  **A.**   Correct.

17  **Q.**   And the smallest value here is 0.6 billion for

18  distribution, correct?

19  **A.**   That's what the model ascribed to distribution at that

20  time.

21  **Q.**   And as of August 2019, Google had not quantified any other

22  source of value beyond the three presented here that delivered

23  more than 0.6 billion, correct?

24  **A.**   I'm not certain if Google had done other work in this

25  topic.

MARCHAK - DIRECT / EVEN

1   Q.   I understand, sir.  You're not aware of anyone quantifying

2   any other driver at more than .6 billion, correct?

3   A.   Specifically for distribution?

4   Q.   For anything.  You had here the three largest value

5   drivers, the smallest of which was .6.  And you are not aware

6   of Google quantifying or identifying any other source of value

7   that provided more than .6 or it would have been here on the

8   slide, correct?

9   A.   No, I don't think that's right.

10  Q.   Sir, do you recall that yesterday we discussed the fact

11  that in your work on this model, you arrived at the fact that

12  as of August 2019, you believed that these three drivers likely

13  account for the majority of quantifiable value?  Correct?

14  A.   That's what I believed in 2019.

15  Q.   And as of 2019, these three drivers -- the smallest of

16  which provided .6 billion, correct?

17  A.   That's what the model at that time assumed for

18  distribution.

19  Q.   And at the time, if you had thought that there were

20  10 billion value that you could quantify and did quantify in

21  some other driver, that would have made it on this slide,

22  right?

23  A.   I don't agree with that.

24  Q.   Okay.  We'll let the jury decide that.

25       If we're looking at the middle chart of this same slide,

1    Google also broke out the total value provided to developers by

2    type of developer, correct?

3    **A.**    Correct.

4    **Q.**    And Google looked here at non-GPB and GPB developers,

5    correct?

6    **A.**    Correct.

7    **Q.**    And GPB stands for Google Play Billing, correct?

8    **A.**    Correct.

9    **Q.**    And GPB developers are those who sell digital content

10   using Google Play Billing and, therefore, must use -- must pay

11   Google's fees, correct?

12   **A.**    These are -- GPB would be Google Play Billing, and they

13   choose to use Google Play Billing, yes.

14   **Q.**    Sir, GPB developers are those who sell digital content

15   using Google Play?

16   **A.**    Correct.

17   **Q.**    And therefore, must use Google Play Billing and must pay

18   Google's fees, correct?

19   **A.**    These developers are using Google Play Billing.  There's

20   developers that sell digital content and go consumption only

21   and things like that.  So I'm getting hung up on the exact

22   words you're using.

23   **Q.**    Sir, the people who are using Google Play Billing --

24   **A.**    Yes.

25   **Q.**    -- are selling digital content and are paying Google's

1  fees, correct?

2  **A.**   Correct.

3  **Q.**   And on this chart, the non-GPB developers are those who do

4  not monetize by selling digital content, do not use Google Play

5  Billing, and do not pay Google Play fees, correct?

6  **A.**   Correct.

7  **Q.**   And according to Google's analysis in this deck,

8  developers that do not pay Google Play fees derive

9  significantly more value from Google Play than those who

10 actually do pay fees, correct?

11 **A.**   According to this, the non-GPB does accrue more value, but

12 it's also a much larger set of developers.

13 **Q.**   Sir, the people who do not pay the fees actually receive

14 more value than the people who do pay the fees according to

15 this slide, correct?

16 **A.**   In aggregate, but, yeah, not on a per developer basis.

17 **Q.**   Sir, it's a yes-or-no question.  The people who do not pay

18 the fees, non-GPB developers, receive more value from Google

19 under your model than the people who do pay the fees, correct?

20 **A.**   Correct.

21 **Q.**   Now, under Google's current business model, only a very

22 small percentage of Play developers pay all of the fees that

23 Google Play collects, correct?

24 **A.**   Correct.

25 **Q.**   And as we see here on the right side, that very small

1  group collects $6.7 billion in fees as of 2019, correct?

2  **A.**   Correct.

3  **Q.**   And that was roughly 80 percent of Play's overall revenue

4  at the time, correct?

5  **A.**   That sounds right.

6  **Q.**   Please turn to slide 33 of this deck.  And this slide

7  shows the net value that certain gaming developers derive from

8  Google Play according to this Play Value Model, correct?

9  **A.**   Yes, that looks right.

10  **Q.**   And the net value reflects, as we said, a comparison

11  between the value that these developers received from Google

12  and what they paid Google, correct?

13  **A.**   Yes, based on this early model.

14  **Q.**   And on the right side of the chart, we see all these bar

15  charts that point downward.  Those reflect developers who pay

16  Google more than the value they obtain from Google, according

17  to this Play Value Model, correct?

18  **A.**   Yes, according to this early model.

19  **Q.**   And so those developers have a negative net value or a

20  deficit, correct?

21  **A.**   Yes, I think based on this snapshot, which I think was

22  2018 data.

23  **Q.**   Sir, as of August of 2019, this value model estimated that

24  all these people on the right paid Google more than the value

25  that Google itself believes they received from Google, correct?

1   **A.**   Based on this limited early model for a snapshot of time.

2   **Q.**   Sir, I said based on this slide in this model in

3   August 2019 -- as I said, we'll get to your point about other

4   things.   Right now we're talking about this model that you

5   created with your team in August of 2019.

6       Based on that model, all these people on the right paid

7   Google more than what Google itself believed is the value it

8   was provided, correct?

9   **A.**   Based on that model for the year of 2018.

10  **Q.**   And as we can see, some of these people, like two of these

11  people on the far right, for instance, paid Google over a

12  hundred million dollars in fees every year more than the value

13  that they obtained, correct?

14  **A.**   Again, based on this early model for 2018.

15          **THE COURT:**   Okay.   You need to say yes or no, not just

16  a sound bite.   So when you're asked a question "Is this

17  correct," you need to say yes or no.

18      So let's ask that question again and let the witness

19  respond.

20          **THE WITNESS:**   I just want to, Judge, clarify.

21          **THE COURT:**   No, you can't.   Sorry.

22      Go ahead.   Ask the question, please.

23  **BY MR. EVEN:**

24  **Q.**   According to this Play Value Model as of August -- created

25  in August of 2019, the two people furthest on the right paid

1    Google more than a hundred million dollars per year more than

2    the value that they have obtained from Google, correct?

3    **A.**    Yes.

4    **Q.**    Now, on the right of the bar chart, this slide references

5    the top 100 most negative developers under this model; do you

6    see that?

7    **A.**    I do.

8    **Q.**    And first of all, since these are the top 100 most

9    negative, fair to assume that there were more than a hundred

10   developers with negative value overall, correct?

11   **A.**    I think that's correct.

12   **Q.**    And if we look below that, it says that the top 100 most

13   negative developers covered 58 percent of Play dollars,

14   correct?

15   **A.**    Correct.

16   **Q.**    And that meant that these top 100 most negative paid close

17   to 60 percent of all the Play fees that Google collected,

18   right?

19   **A.**    Of the fees, yeah, not the total revenue.

20   **Q.**    And for 2019, as we see on this slide that we see earlier,

21   that would mean that they are paying 60 percent or 58 percent

22   of about 6.7 billion, right?

23   **A.**    Correct.

24   **Q.**    And based on this Play Value Model, the top one hundred

25   most negative developers received an average value of only

1   19 percent from Google, correct?

2   **A.**   Correct.

3   **Q.**   And despite receiving a value equivalent to 19 percent,

4   these developers still were required to pay Google a 30 percent

5   revenue share, correct?

6   **A.**   I'm not sure that all of them paid a 30 percent share.  I

7   think we had discounts on subscriptions and things like that.

8          **MR. EVEN:**  Your Honor, I'd like to turn to Marchak

9   deposition transcript at 439 at 20 to 440 at 1.

10          **THE COURT:**  That's fine.

11          **MR. EVEN:**  Can we put this up, please?

12  **BY MR. EVEN:**

13  **Q.**   Sir, were you asked this question and gave this answer in

14  your deposition?

15          "**Q.**  But these people nonetheless paid 30 percent, not --

16          it should be 19 percent, correct?"

17          And you said:

18          "**A.**  The service fee for these developers was 30 percent."

19          Is that testimony you gave under oath?

20  **A.**   Looks like it was.

21  **Q.**   That's a "yes"?

22  **A.**   Yes.

23  **Q.**   So I'd actually like to do a little math with you.

24          **MR. EVEN:**  Your Honor, may I approach the witness and

25  provide the calculator?

1              **THE COURT:**  Yes.

2    **BY MR. EVEN:**

3    **Q.**   So we saw on slide 30 that Google paid $6.7 billion,

4    Google collected $6.7 billion, right?

5    **A.**   Correct.

6    **Q.**   And we said that these top one hundred on slide 33 covered

7    58 percent of that, right?

8    **A.**   Correct.

9    **Q.**   So can you do for me what is 58 percent of 6.7 billion?

10   **A.**   3.89.

11   **Q.**   $3.89 billion were paid by the people who were the top one

12   hundred most negative under your August 2019 model.

13         Now, these people paid 30 percent, but only received

14   19 percent.  And so we need to divide this by 30 and multiply

15   by 11 to understand how much they overpaid, correct?

16   **A.**   Sure.

17   **Q.**   Can we do that?

18   **A.**   You multiply the difference between 30 and 19, I think.

19   **Q.**   Between 30 and 19.  I did that in my head.  Sir, do you

20   understand what is the difference between 30 and 19?

21   **A.**   Yes.

22   **Q.**   I don't think you need a calculator for that one, right?

23   **A.**   Okay.

24   **Q.**   And what is the outcome of how much these people overpaid

25   Google?

1   **A.**   If I did that right, I think this is coming out to

2   $430,000,000.

3   **Q.**   I think you did that wrong, sir.  Let's try again.

4        You have 3.886, you told me, divided by 30, right?  They

5   paid 30 percent, times 19 -- times 11.  They've only received

6   19 percent.

7   **A.**   Why am I dividing by 30?

8   **Q.**   Because they paid 30 percent and they received 19, sir.

9   So divided by 30 times 11, what did we get, sir?

10  **A.**   1.43.

11  **Q.**   $1.43 billion per year these folks overpaid to Google.

12       Now, sir, if a dozen eggs is worth $5 but a supermarket is

13  charging you $10, you go to a different supermarket, right?

14  **A.**   Sorry.  Is there any way I can get one more time?

15       I was plugging in numbers that you told me.  I didn't

16  really feel like that was a fair way for me to do math.

17  **Q.**   Sir, we've moved on.

18       If a dozen egg costs -- are worth $5 and a supermarket

19  charges 10, you're going to a different supermarket, right?

20  **A.**   Sorry.  Can you ask the question again?

21  **Q.**   If you go to the supermarket, you know that eggs are worth

22  $5, that's the price, and the supermarket wants to charge $10,

23  you go to a different supermarket, don't you?

24  **A.**   It probably depends on how urgently I need those eggs and

25  where the next supermarket is.

1   **Q.**   Well, that is important.

2        What is important there is:  What are your options, right?

3   How good are your options to go to a different supermarket?

4   **A.**   Potentially.

5   **Q.**   Okay.  Now, of the one hundred most negative developers

6   that your Play Value Model showed were overpaying Google

7   $1.4 billion a year too much, you're not aware of a single one

8   that left the Google Play Store, correct?

9   **A.**   I mean, we've had launches that weren't on Google Play

10  from top developers.

11        **MR. EVEN:**  Your Honor, if we can go to transcript at

12  440:11 to 16.

13        **THE COURT:**  440?  Page 440?

14        **MR. EVEN:**  440:11 to 16.  And, Your Honor, I can

15  assure you that what the transcript --

16        **THE COURT:**  Okay.  Just let me look.  Lines 11 to 16?

17        **MR. EVEN:**  Correct.  And what it says there --

18        **THE COURT:**  Just --

19        **MR. EVEN:**  I just need to clarify because there's a

20  transcription error.

21        **THE COURT:**  I will ask if I want clarification.

22        That's fine.

23        **MR. EVEN:**  Thank you.

24        Can we show the video for that one so we don't have the

25  transcription error.

1          (video clip played:)

2          "Q.   The 100 hundred most negative developers who know the

3                values 19 based on the model, but paid 30, how many

4                of them actually left Google Play that you can recall

5                sitting here today?

6          **A.**   I don't recall any."

7     **BY MR. EVEN:**

8     **Q.**   That is testimony you gave under oath, correct?

9     **A.**   Correct.

10    **Q.**   Can you please turn to page 70 of Exhibit 360.  And this

11    slide addresses how Google plans to use the Play Value Model,

12    correct?

13    **A.**   Correct.

14    **Q.**   And what Google intended to do with this Play model, one

15    thing they intended to do was to proactively educate developers

16    on the breath and depth of Play value, correct?

17    **A.**   Yes, I see that.

18    **Q.**   But in fact, Google has never shared or communicated the

19    findings of the Play model with any developers, correct?

20    **A.**   There was some brief work where we were trying to pilot

21    some of that, but I'm not sure how much that was actually

22    shared.

23    **Q.**   Sir, if we can go to 37:14 to 19.

24          **THE COURT:**  Is this a deposition?

25          **MR. EVEN:**  Yes.

```
 1              THE COURT:  What page?

 2              MR. EVEN:  Thank you.  Sorry about that, Your Honor.

 3              THE COURT:  Which page?

 4              MR. EVEN:  Page 37.

 5              THE COURT:  Oh, 37.  Oh, okay.

 6              MR. EVEN:  Yes.

 7              THE COURT:  Lines?

 8              MR. EVEN:  Lines 14 to 19.

 9              THE COURT:  That's fine.

10              MR. EVEN:  Can we show this?

11    BY MR. EVEN:

12    Q.   Sir, this testimony you gave, you were asked:

13         "Q.  Were you involved in any of the efforts to

14         communicate the value that you ascribe to Play to

15         developers?

16         "A.  Not directly.  I don't think we ever really got to

17         that."

18         Did I read that right?

19    A.   You did.

20    Q.   Let's talk about one specific example.

21         You're familiar with Tinder?

22    A.   Yeah.

23    Q.   Tinder is a very popular dating app?

24    A.   Correct.

25    Q.   And Tinder is owned by the Match Group?
```

1  **A.**   Correct.

2  **Q.**   And in May or June 2019, Tinder was complaining about

3  Google's fees and began releasing versions of the app that did

4  not incorporate Google Billing but instead integrated its own

5  payment solution, correct?

6  **A.**   I don't remember the exact timing, but that sounds right.

7  **Q.**   And in this -- you were asked at the time to put together

8  a value exchange analysis for Tinder, correct?

9  **A.**   I recall something like -- along those lines.

10  **Q.**   And in response to a request for a value exchange, you ran

11  the Play Value Model for Tinder, correct?

12  **A.**   I believe so.

13  **Q.**   And the Play Value Model you created showed that Tinder is

14  deriving 10 percent value while paying 30 percent, correct?

15  **A.**   I -- I don't recall the exact percentages.

16  **Q.**   If you turn to -- let me try and refresh your

17  recollection.

18       If you turn to Exhibit 11110.

19  **A.**   Okay.

20  **Q.**   And on the very first page, you see there's an executive

21  summary.

22  **A.**   I do.

23  **Q.**   And if you go all the way down to the last sentence in the

24  second sub bullet --

25  **A.**   Oh, yeah, I see the 10 percent number that you referenced.

1   **Q.**   Does this refresh your recollection that at the time,

2   Tinder was deriving only 10 percent value while paying

3   30 percent?

4   **A.**   Based on that early model, yes.

5   **Q.**   And the net value for Tinder was so negative that you

6   believe Tinder was justified in its decision to adopt an

7   alternative payment solution to avoid paying Google's

8   30 percent, right?

9   **A.**   I don't -- I don't agree with that.

10          **MR. EVEN:**   Your Honor, I would like to show the

11   witness Exhibit 5809.

12          **THE COURT:**   Which page?

13          **MR. EVEN:**   5809.   It's an exhibit this time, not a

14   transcript.

15          **THE COURT:**   Oh, Exhibit 5809.

16          **MR. EVEN:**   And on 5809, I'm turning to the email at

17   1:54 p.m. all the way at the bottom of the page, the first

18   page.

19          **THE COURT:**   1:54 a.m. or p.m.?

20          **MR. EVEN:**   1:54 p.m. on the very first page, it's at

21   the bottom, and the first sentence of that email.

22          **THE COURT:**   Why are you asking me?

23          **MR. EVEN:**   I'm asking -- this is impeachment, Your

24   Honor.

25          **THE COURT:**   That's fine.   I mean, do you want to get

1    it into evidence?

2              MR. EVEN:  All right.  I'll just get it into evidence,

3    Your Honor.

4    BY MR. EVEN:

5    Q.   Mr. Marchak, why don't you turn to Exhibit 5809.

6    A.   I'm on it.

7    Q.   And do you recognize this to be an email exchange between

8    yourself and others at Google dated June 7, 2019?

9    A.   Yes.

10             MR. EVEN:  Your Honor, I would like to move

11   Exhibit 5809 into evidence.

12             MS. CHIU:  No objections.

13             THE COURT:  It's admitted.

14                            (Trial Exhibit 5809 received in

15                             evidence.)

16   BY MR. EVEN:

17   Q.   Let's go now to the 1:54 p.m. from you, and you said minus

18   others, Purnima, Sarah: "This seems to justify Tinder's

19   decision."

20        Did I read that correctly?

21   A.   You read that correctly.

22   Q.   And you also believed that in addition to justifying

23   Tinder's decision, based on the outcome of the Play Value

24   Model, Tinder's net value was so negative that the model

25   results should not be shared with Tinder but should instead be

1  used only internally, right?

2  **A.**   I may have.  I don't recall it exactly.

3  **Q.**   Okay.  You don't recall.  Then let's turn to that.

4       And if you go up to the email at 6:04 p.m.

5  **A.**   Is this the same exhibit?

6  **Q.**   This is the same exhibit.  And, sorry.  I got the wrong

7  time.  It's not 6:04.  Oh, there it is.

8       And you see you said, "In this case, I think Tinder is so

9  negative that we'd only want to use internally."

10       Do you see that?

11  **A.**   Sorry.  I'm looking for the 6:04.

12  **Q.**   Sir, it's the first page.  You can also look at it on the

13  screen.  It's available to you.  Whatever is more convenient.

14       Do you see that you say, "In this case, I think Tinder is

15  so negative that we'd only want to use internally"?

16  **A.**   Yes.

17  **Q.**   And the truth of the matter is you only wanted to use it

18  internally because you believed that the results of the Play

19  Value Model justified Tinder's position, correct?

20  **A.**   I think I was saying I understood Tinder's decision and

21  how this justifies the decision.  I didn't say I thought I was

22  agreeing with their decision.

23  **Q.**   Sir, you said this seems to justify Tinder's decision,

24  right?

25  **A.**   Tinder's decision.

MARCHAK - DIRECT / EVEN

1   Q.   Okay.   Now, in addition to saying this justifies Tinder's

2   decision, you also suggested -- and if you go to the same 6:04

3   email -- you say you want to use it internally to potentially

4   justify something closer to LRAP or better, correct?

5   A.   I see that.

6   Q.   And developers with an LRAP refers to the Living Room

7   Accelerator program, correct?

8   A.   Correct.

9   Q.   And the Living Room Accelerator program was a program that

10  Google developed for streaming services, correct?

11  A.   Media, video streaming, yes, correct.

12  Q.   And very large media video streaming, correct?

13  A.   I think there were some size requirements.   I don't know

14  what you mean by "very large" versus large.

15  Q.   Tinder was not a media streaming.

16  A.   Tinder is not media streaming.

17  Q.   Now, developers who had agreements with Google under the

18  LRAP program were not paying 30 percent at the time but,

19  instead, were offered a special deal at 15 percent, correct?

20  A.   Correct.

21  Q.   And so what you're saying here is:   I think we need --

22  this is so negative, we want to use this internally to

23  potentially justify something that would give Tinder a

24  15 percent deal or better?

25  A.   Yes.   We think about the value we're creating for

1  developers all the time.

2  **Q.**   That's what you thought at the time, right?

3  **A.**   We --

4  **Q.**   And so if Google had offered Tinder a deal that was

5  15 percent or better, that would have cost Google tens of

6  millions of dollars a year in lost fees, correct?

7  **A.**   I think that's probably correct, given the size of Tinder.

8  We've since moved our subscription pricing to 15 percent.

9  **Q.**   Sir, you have to answer my questions, and that wasn't part

10 of my question.

11 **A.**   Oh, sorry.

12 **Q.**   I move to strike that, and now we can deal with the actual

13 answer.

14     This would have -- your proposal would have cost Google

15 tens of millions of dollars per year, correct?

16 **A.**   This line in the email, I don't -- this was an informal

17 proposal, but, yes, this would have cost Google millions of

18 dollars.

19 **Q.**   And you made that proposal based on the outcome of the

20 Play Value Model that in fact precedes the Play Value Model

21 that we've seen from August by a couple of months, correct?

22 This is June of 2019.

23 **A.**   Like, this is just an email.  This wasn't a proposal.

24 **Q.**   Sir, your proposal to use the data to justify giving

25 Tinder a 50 percent or more discount was based on the model as

1    it stood back in June 2019, correct?

2    A.   Correct.

3    Q.   And by the way, in this email, I don't see you saying to

4    Ms. Kochikar, "By the way, this is a very early version that's

5    not yet developed," right?  You didn't say that?

6    A.   I think Ms. Kochikar knew that.

7    Q.   Sir, you didn't say to Ms. Kochikar, "I don't think we

8    should take these results seriously.  This is a very early

9    model that we're still refining"?

10   A.   Yeah.  The last conversation --

11   Q.   You did not say that to her, correct?  What you told her

12   was, "We need to give Tinder a 50 percent or higher discount,"

13   correct?

14   A.   I didn't say that in this email.

15   Q.   And you did say, "We need to give Tinder a 50 percent or

16   larger discount," correct?

17   A.   I -- I don't think I said 50 percent or larger.

18   Q.   You said LRAP or better, correct?

19   A.   Something closer to that.

20   Q.   Sir, you said LRAP or better, not closer.  You said LRAP

21   or better.  It's on the page and on the screen.

22   A.   The words are "Something closer to LRAP or better."

23   Q.   Okay.  And LRAP is 50 percent.  We've established that,

24   right?  It's a 50 percent discount?

25   A.   15 percent service fee.

1    Q.   15 percent service fee which is a 50 percent discount

2    compared to what Tinder was paying?

3    A.   We already had a 15 percent service fee on subscriptions

4    after one year, so often it wasn't actually a 50 percent

5    discount.

6    Q.   Sir, you said -- we just looked at that.  Do we need to

7    look at it again? -- that Tinder was paying 10 -- was paying 30

8    while deriving 10.  Do you remember we looked at that?

9    A.   Yeah, I remember.  I thought you said LRAP was a

10   50 percent discount.  And a lot of these weren't exactly

11   50 percent.

12   Q.   Sir, why don't you turn back to Exhibit 11110.  We used to

13   refresh your recollection with that earlier.  You do recognize

14   this document, correct?

15   A.   I do.

16   Q.   That's a document you participated in drafting, correct?

17   A.   Correct.

18        MR. EVEN:  Sir, I'd like to move Exhibit 11110 into

19   evidence, please.

20        MS. CHIU:  No objections.

21        THE COURT:  It is admitted.

22                      (Trial Exhibit 11110 received in

23                          evidence.)

24   BY MR. EVEN:

25   Q.   Sir, if we go to the second sub bullet on the first page,

1  the same one we looked at earlier, there is language there that

2  you seem to have highlighted at the time, correct?  It's bold,

3  you see?

4  **A.**   In the second bullet?

5  **Q.**   Sir, it's on your screen.

6  **A.**   Oh, yes.

7  **Q.**   And that was bolded, correct?

8  **A.**   Correct.

9  **Q.**   And that says, "Tinder is now deriving only 10 percent of

10  the revenue share value versus 30 percent they pay," correct?

11  **A.**   Correct.

12  **Q.**   And so LRAP was a 50 percent discount over 30 percent that

13  Tinder was paying at the time, correct?

14      Sir, it's not hard math.  15 percent is --

15  **A.**   I'm just trying to remember.

16  **Q.**   -- 50 percent discount on 30 percent, correct?

17  **A.**   If Tinder was using subscriptions, the 30 percent in bold

18  here might be inaccurate, but it's close to what you're saying.

19  Basically, I just don't remember if Tinder was using

20  subscriptions at the time.

21  **Q.**   All right.  Let's go back to slide 7 of 360.

22      Google's second intended use for Play Value Model was to

23  inform the direction of internal strategy and strategy

24  planning, correct?

25  **A.**   Yes.

MARCHAK - DIRECT / EVEN

1   Q.   And Google planned to use value model to inform major

2   strategic projects within Google, correct?

3   A.   This was a plan of how to use Play value, yeah.

4   Q.   And one of those strategic Google projects was called

5   Magical Bridge?

6   A.   Yes.

7   Q.   And Magical Bridge was a project that Google launched to

8   look at potential business model options for Google Play,

9   correct?

10  A.   Correct.

11  Q.   So it looked at all kinds of pretty radical potential

12  changes to the entire structure of Google Play, correct?

13  A.   Correct.

14  Q.   And the main problem that Magical Bridge was intended to

15  examine was how to align value paid by developers with value

16  received from Play, correct?

17  A.   I think that was definitely one of the things we

18  considered in Magical Bridge.

19  Q.   And that misalignment between value paid and value

20  received is exactly what the Play Value Model was trying to

21  ascertain, correct?

22  A.   I think the Play Value Model was just basically to

23  understand the value we were creating better, so it wasn't --

24  Q.   And the value received, correct?

25  A.   The value --

MARCHAK - DIRECT / EVEN

1   **Q.**   That's what we saw in --

2   **A.**   The value received, we always kind of know that.  It's

3   like a known service fee.

4   **Q.**   All right.  So we looked at the bar charts, and that was

5   the goal of that model, correct?

6   **A.**   Correct.

7   **Q.**   Another strategic Google project whose direction was

8   informed by the Play Value Model was called Project Hug,

9   correct?

10  **A.**   According to this slide.

11  **Q.**   And Project Hug was originally known as Project Bear Hug,

12  correct?

13  **A.**   I think that was a very early name, yes.

14  **Q.**   And you were a core member of the Google team working on

15  Project Hug?

16  **A.**   At one point.

17  **Q.**   And you participated in identifying certain developers as

18  priority developers for Project Hug?

19  **A.**   I participated.

20  **Q.**   And in selecting developers to target for Project Hug, you

21  believed that the value exchange was critical, correct?

22  **A.**   Yeah.  I always believe the value exchange for developers

23  is critical.

24  **Q.**   And the tool that you've created to measure value exchange

25  was the Play Value Model, correct?  That's what we saw on the

1    Tinder documents, right?

2    **A.**   I mean, it's one tool, but I don't think it's, like, the

3    only way we look at this.

4    **Q.**   And you told Ms. Kochikar that you believed that value

5    exchange was critical for Project Hug, correct?

6    **A.**   Wouldn't surprise me.  I don't recall saying that, but

7    that wouldn't surprise me.

8    **Q.**   And Ms. Kochikar agreed with you that value exchange is

9    critical, correct?

10   **A.**   Purnima -- Ms. Kochikar and I would both always agree that

11   developer value was critical.

12   **Q.**   And in fact, Ms. Kochikar said that one of the goals of

13   Project Hug was to make sure that Google earns its 30 percent,

14   correct?

15   **A.**   I don't recall her saying that.

16   **Q.**   If you turn to PX 381, and if you look at the last line

17   from Ms. Kochikar's email, does that refresh your recollection?

18   **A.**   I don't think I have that document.

19            **THE COURT:**  Which one is it?  381?

20            **MR. EVEN:**  381.

21            **THE COURT:**  I have it.

22            **THE WITNESS:**  Oh, you said "exhibit"?  I thought you

23   said "PX 381."

24            **MR. EVEN:**  Sorry.  Exhibit 381.

25            **THE WITNESS:**  Okay.

1              **THE COURT:**  This is just for refreshment?

2              **MR. EVEN:**  Yes, for now.

3    **BY MR. EVEN:**

4    **Q.**   Do you see that -- does this refresh your recollection

5    that Ms. Kochikar's focus was on making sure that Google is

6    earning its 30 percent?

7    **A.**   I see that, yeah.

8    **Q.**   And looking into whether Google is earning the 30 percent

9    was the very goal of the Play Value Model, correct?

10   **A.**   Yeah.  I mean, I think we always -- you know, like, we've

11   always wanted to earn our 30 and beyond.

12   **Q.**   Another criteria for selecting developers for Project Hug

13   was that Google believed these developers may forego Play,

14   correct?

15   **A.**   Yeah.

16   **Q.**   And in this context, Google focused specifically on

17   developers that Google believed had already established some

18   infrastructure to sell their apps outside of Play, correct?

19   **A.**   I don't think that was the only focus for Project Hug.

20   **Q.**   Sir, that was a threshold.  You focused on people who

21   established some infrastructure to sell their apps outside of

22   Play, correct?

23   **A.**   Yeah, I don't recall it being, like, the only threshold.

24   **Q.**   I wasn't saying it's the only threshold.  A threshold was

25   you wanted to focus on people who established some

1  infrastructure to sell their apps outside of Play?

2  **A.**   My recollection is that developers that hadn't done that

3  were also included in Project Hug.

4  **Q.**   I see.  But some of them you did think had established

5  some infrastructure, correct?

6  **A.**   Yes, correct.

7  **Q.**   And Riat was one of the app developers that considered

8  going it alone and you believed had already formed some

9  infrastructure, correct?

10  **A.**   Through some of the partner managers that worked with

11  Riat, like, I have a recollection of that, but I never talked

12  to Riat directly about that.

13  **Q.**   If you go to PX 384.  Sorry.  Exhibit 384.

14      Hold on.  We can't publish it yet, guys.

15      Do you have 384, sir?

16  **A.**   I do.

17  **Q.**   And this is a slide deck titled Games Velocity Program, et

18  cetera, correct?

19  **A.**   Correct.

20  **Q.**   And this was a slide deck that was prepared by Mr. Gambier

21  (phonetic) on your team and that you received back in

22  December 2020, correct?

23  **A.**   That sounds right.

24         **MR. EVEN:**  Your Honor, I'd like to move Exhibit 384

25  into evidence.

 1          **MS. CHIU:**  No objections.

 2          **THE COURT:**  It is admitted.

 3                              (Trial Exhibit 384 received in

 4                               evidence.)

 5     **BY MR. EVEN:**

 6     **Q.**   And if you turn to slide 17 on 384.  And this reflects

 7     financial analysis of the investment Google made in Project

 8     Hug, correct?

 9     **A.**   Correct.

10     **Q.**   And if we look at the top light green row marked Play Risk

11     Mitigation; do you see that?

12     **A.**   I do.

13     **Q.**   And do you see that Google concluded at the time that

14     Project Hug would mitigate nearly $1.7 billion in lost revenue

15     on Google Play from 2019 to 2022?

16     **A.**   I think that's what that row seems to indicate.

17     **Q.**   And if you go to the running costs for this, total cost to

18     serve, that's all the way down, do you see that that amounts to

19     $994,000,000?  Correct?

20     **A.**   Yeah, that looks right.

21     **Q.**   In other words, Google was planning, as of December 2020,

22     to spend $1 billion to prevent nearly 2 billion of business

23     from moving to other distribution channels, correct?

24     **A.**   The costs I sort of characterize as co-investing with the

25     partners, and that looks like what's in the forecast,

1   994 million of co-investment.

2   **Q.**   Okay.  And Google has since actually paid that money out,

3   correct, has spent that money?

4   **A.**   I actually don't know exactly how close that forecast is

5   because that's a big line there.

6   **Q.**   And many of the Hug companies were those that we saw at

7   the right-hand side, people who had poor value exchange under

8   your Play Value Model, correct?

9   **A.**   My -- like I said, I don't recall using the Play Value

10  Model for the selection in that way.  And my recollection just

11  from what I recall on that slide, that it was a mix of

12  developers on both sides.

13  **Q.**   Sir, you said you always believe value exchange is

14  crucial, right?

15  **A.**   Hundred percent.

16  **Q.**   And you ran the Play Value Model on Hug developers,

17  correct?

18  **A.**   We ran it on all developers.  I mean, I thought value

19  exchange was crucial before I had a Play Value Model.

20  **Q.**   And in fact, the people on the right-hand side that you

21  saw with the bars, most of them received Hug deals, correct?

22  **A.**   I think those --

23  **Q.**   NCsoft, King, Mixie, all of these folks received Hug

24  deals, correct?

25  **A.**   Yeah, but I'm also looking at --

1   **Q.**   Thank you.

2   **A.**   -- developers on the left of that who were also receiving

3   core deals.

4           **MR. EVEN:**   Thank you.   I will pass the witness.

5           **THE COURT:**   Okay.   Pass the witness.

6           **MS. CHIU:**   Chiu I proceed, Your Honor?

7                           **CROSS-EXAMINATION**

8   BY MS. CHIU:

9   **Q.**   Good morning, Mr. Marchak.

10  **A.**   Good morning.

11  **Q.**   Just to clarify something that counsel was asking you

12  about, I think there might have been a little bit of confusion.

13         You were asked some questions about Tinder; do you

14  remember that?

15  **A.**   I do.

16  **Q.**   Okay.   Could you look in your binder at Exhibit 11110.   I

17  may have left out a 1 or added too many 1s.   Towards the back

18  of your binder.

19  **A.**   I think I have it, yes.

20  **Q.**   Do you have that up?

21  **A.**   I do.

22  **Q.**   Now, counsel asked you about the line "Tinder is now

23  deriving only 10 percent of the revenue share value versus the

24  30 percent they paid"; do you see that?

25  **A.**   I do.

1   **Q.**   What did you understand that to mean?

2   **A.**   I understood that, you know, based on the early version of

3   the model, that's what the model showed.

4        I also think the model that we built was intended -- often

5   in my role, you know, as someone that represents the developers

6   system and advocates for developers, I often will, like, try to

7   show the developer perspective internally.

8        So a lot of that model was built on things that we thought

9   represented the developer perspective.  So I think that line to

10  me represented that Tinder may have the perspective of this

11  value difference, which may be some of the reason that they

12  were, you know, asking questions to our partner manager,

13  et cetera.

14  **Q.**   And in this document, there's a bullet point that counsel

15  didn't ask you about right below the language we just looked

16  at.  Do you see that?  It starts with "Note that the model does

17  not yet incorporate."

18  **A.**   Yes.

19  **Q.**   Can you describe to the jury some of things that were not

20  incorporated in the model that came to this analysis here?

21  **A.**   Yeah.  I mean, the model at the time, if I remember in

22  2019, we had like ten major components of value, and I think

23  only three of them were built into the model.

24        You know, we do all kinds of things for -- you know, tools

25  for developers so that they can publish, reach users, update

1   their -- optimize their store listings, reply to user reviews,

2   things like that.

3       We do partnerships with them, co-marketing deals, fraud

4   detection, things like that, to create privacy and trust in the

5   Play Store.  So there's a long list of things that are not even

6   close to being in that model.

7   **Q.**   And so those were not incorporated into the model that led

8   you to this 30 percent, 10 percent comparison; is that right?

9   **A.**   Correct.

10  **Q.**   Okay.  Let's look at Exhibit 5809.

11  **A.**   Okay.

12  **Q.**   This is the email stream that you were asked about just a

13  few minutes ago.

14      I'd like to direct your attention to your email at

15  1:54 p.m. on June 6, 2019.

16  **A.**   Yes.

17  **Q.**   Can you explain to the jury what you meant when you said

18  "This seems to justify Tinder's decision"?

19  **A.**   I think if I even look back, there's -- in that email

20  thread, there's different scenarios that, like, based on

21  assumptions in the model, may have created different value

22  exchanges.  So it wasn't like there was one answer.  There were

23  a lot of assumptions that went into that model.

24      And I think we chose a version of that model here that was

25  representing Tinder's point of view, and that's why I felt like

1  using that point of view seemed to justify their decision.

2  That's what I was referring to.

3  **Q.**  And you mentioned that you were looking at Tinder's

4  position.  What -- why would you do that in your role,

5  Mr. Marchak?  Can you explain that?

6  **A.**  Yeah.  I mean, to manage the Play ecosystem, you know, we

7  have to think about like there's three things:  There's the

8  Play users, Play developers, and Google, and those three things

9  have to work together in order for the ecosystem to work well.

10     If we overly focus on Google's best interest or user best

11  interest or developer best interest, it may not work for the

12  other parties.  Sometimes they all magically work.  Sometimes

13  there's trade-offs that have to be made.

14     But in my role, you know, me and my team and the broader

15  Play partnerships team that I work with represents the

16  developer interest.  So often we advocate for those developers.

17  We put ourselves in their shoes, try to understand their

18  concerns, product issues they're facing, et cetera.  It's like

19  something I do on a day-to-day basis.

20  **Q.**  I think that you said that there are various types of

21  analysis or forms of this analysis regarding Tinder

22  specifically.  Did I hear that right?

23  **A.**  Yeah.  We've gone through different permutations, making

24  different assumptions; and depending on the assumptions, it can

25  change quite a bit.

1    **Q.**   So let's look at Exhibit 360 in your binder.  I know we

2    spent a little bit of time on that already.  And I'm

3    specifically looking at slide 17.

4        And I realize that the font is quite small.  There's a

5    list of developers on the left side of this chart that's on

6    that page; is that right?

7    **A.**   Yes.

8    **Q.**   And I see that there's Tinder and some numbers next to it.

9    Can you see that?

10   **A.**   Yes.

11   **Q.**   And hopefully we can blow that up a little bit larger for

12   you to see.

13       It might take a minute.

14       Mr. Marchak, while we're doing that, can you explain what

15   the information on this slide shows?

16   **A.**   It looks to compare -- I don't know -- about 20 or so

17   developers and has what Google's rev share was -- I think this

18   is, again, 2018 -- along with the Play value output using an

19   assumption, CPI versus LTV, and then shows how big that

20   assumption changes the Play value calculation.

21   **Q.**   And what does this chart show or tell you about the value

22   regarding Tinder?

23   **A.**   I mean, the biggest takeaway is, based on whether you use

24   the CPI model or LTE model, it would change the Play value

25   calculation by $44,000,000.

1  **Q.**   And so this is different from the assumptions or the

2  analysis that we saw in Exhibit 5809; is that correct?

3  **A.**   Yeah.  It definitely looks to be a different outcome than

4  what's in that email because this seems to show, depending

5  on -- you know, using the CPI model, that the Tinder value is

6  actually quite positive, is more than the Google revenue share.

7  **Q.**   Now, Mr. Marchak, I think you were trying to explain this

8  earlier, but at the time when you were looking at those emails,

9  what service fee was Tinder paying, if you recall?

10 **A.**   I was trying to recall.  Like, we -- our previous business

11 model for subscription reduced the service fee from 30 percent

12 to 15 percent after one year.

13        I believe Tinder used subscriptions, but honestly, I don't

14 recall.  So, in which case I would -- based on my recollection,

15 I would assume that they were paying, you know, somewhat below

16 30 percent, but I wouldn't know the exact number.

17 **Q.**   And what would Tinder be paying today?

18 **A.**   Again, I don't know the exact mix of how much of their

19 business is subscription versus IP billing, but our

20 subscription rate is -- we reduced it to 15 percent.  And so I

21 think Tinder would be paying something closer to 15 percent

22 today.

23 **Q.**   So if we just make a couple of assumptions here, if Tinder

24 had a subscription in 2019, what would the service fee be then?

25 **A.**   In 2019?

MARCHAK - CROSS / CHIU

1  Q.   Yes.

2  A.   Depending on how long they were Tinder users, probably

3  29 percent, 28 percent, something in that range.

4  Q.   And what would they be paying a service fee for

5  subscriptions today?

6  A.   15 percent.

7  Q.   All right.  Now, Mr. Marchak, let's go back to the Play

8  Value Model, which we spent some time talking about already

9  today.

10      Can you explain to the jury why you decided to start this

11  analysis?

12  A.   Yeah.  We -- honestly, like, I think the idea of how much

13  value we create for developers and having a better pulse of

14  that is something that, you know, is very akin to like the work

15  that I would do on a day-to-day basis.

16      I think the -- so the first time, I think, when Play --

17  like, the service fee for app stores was announced, if you

18  recall when Steve Jobs announced it, people clapped, developers

19  clapped when they heard 30 percent because it was so different

20  than what service fees were before app stores were available.

21  They used to have to pay -- developers used to have to pay a

22  lot more.  It was very hard to get distribution on devices.

23      And so at some point around, you know, this 2018, 2019

24  frame, there was starting to get to be a few developers asking

25  questions, more questions about service fee, what we kind of

1    termed or coined internally as like an app tax meme.  And so,

2    you know, it was very natural for me to want to understand it

3    better and do more analysis of it.

4    **Q.**   And was the Play Value Model intended to be a specific

5    calculation or an exact science?

6    **A.**   No.

7    **Q.**   Okay.  And can you explain to the jury why that is?

8    **A.**   It's very complicated.  I mean, we have 10 years, or

9    15 years now, of different products and features that have been

10   built.  So -- and, like, there's new stuff being built all the

11   time.  And so all those things would adjust and tweak the

12   model.  So because of that, like, it's very hard to have it be

13   like a complete picture.

14        Also, this was started -- like, you know, a relatively

15   small team at Google that represents developers started just

16   organically to understand value.  This was never like a

17   top-down, like CC level, or anything like that, trying to

18   understand the true value that Google creates for Play.  That

19   would have been a much bigger issue than where the Play Value

20   Model started.

21   **Q.**   So, Mr. Marchak, if you could turn back to Exhibit 360 in

22   the binder, this is a document that you were being asked about

23   today.

24        I think you were mentioning that this was a version from

25   August 8th, 2019.  Can you just explain to the jury if this

1    analysis has evolved over time?

2          **THE COURT:**  These questions are calling for essay

3    answers.  You need to put a finer point on it, break it down.

4          **MS. CHIU:**  Thank you, Your Honor.

5    **BY MS. CHIU:**

6    **Q.**  Mr. Marchak, this is an August 8th, 2019, version of the

7    Play Value Model; is that right?

8    **A.**  Correct.

9    **Q.**  Has this model changed over time?

10   **A.**  Yes.

11   **Q.**  And in what way?

12   **A.**  There's been numerous evolutions of the model, most either

13   refining, improving some of the calculations, or adding some

14   areas that we didn't -- weren't able to calculate in the first

15   version in 2019.

16   **Q.**  And so I'd like to direct your attention to some of the

17   slides that you were asked about.

18         Could you look at slide 24.

19   **A.**  Yes.

20   **Q.**  And this is the FOP or form of payment value slide that

21   you looked at earlier; do you remember that?

22   **A.**  Yes, correct.

23   **Q.**  And you mentioned that the payment or the FOP value varies

24   widely by developer.  Why is that the case?

25   **A.**  Depending on, you know, the markets that the developers

1    operate in and then depending what users, what payment types

2    users use in those markets; and even just, like, even within a

3    market, developers skew different ways based on their

4    demographic of their users, et cetera.  So just, it's not like

5    a one-size-fits-all.  Some markets very highly use gift cards

6    or highly use interior billing.  Some are very credit card

7    based.  Some are very PayPal based.  So it changes by each

8    developer.

9    Q.   Now, the numbers that are reflected on this slide, I know

10   the text is sideways, but it says cost and cost plus.  Do you

11   see that?

12   A.   I do.

13   Q.   What does that mean?

14   A.   The "Cost" row is intended to represent, you know,

15   assumption on Google's costs.  And cost plus was saying that,

16   the value created for developers is likely higher, that it's

17   hard for developers to replicate, and so there's some increase

18   in that -- in the cost -- from the "Cost" row down to the cost

19   plus model.  That was -- those were assumptions made by my

20   team.  They weren't -- it wasn't a deep analysis.

21   Q.   Mr. Marchak, is cost the same thing as value?

22   A.   I would say no.

23   Q.   And why not?

24   A.   There's a difference.  Like, if we're providing a -- like,

25   if we're providing a service that costs us X amount of money

1   but for someone else to use it, they're saving them a different

2   amount of costs, it's not always the same thing.  You can

3   create more value.

4       I think that's how a lot of businesses make money because

5   they deliver things at a cost to them that is lower than the

6   value that customers receive it at.

7   **Q.**   Now, you mentioned that this was an evolving model and

8   didn't capture everything about Play value.  Can we look at

9   slide 27?

10  **A.**   Okay.

11  **Q.**   Can you read the title slide for us?

12  **A.**   "Reminder:  Value model does not account for all the ways

13  Play creates value."

14  **Q.**   And can you explain what you understood that to mean?

15  **A.**   Just that there's a lot of ways over 15 years of building

16  a pretty complex ecosystem that Play creates value for

17  developers.  This slide highlights -- the dark blue highlights,

18  the model has three of those.  Looks like ten-ish areas in

19  model.

20  **Q.**   And you mentioned the colors.  If I could direct your

21  attention to the text right under the title, it says, "Dark

22  blue included in the Play Value Model."

23      Can you just explain how you interpret that information?

24  **A.**   Yeah.  I don't know why we used dark blue and medium blue.

25      But the dark blue are the things that I was asked about

1  that were in the Play Value Model.

2      The medium blue are things we hadn't yet evaluated or

3  included in the model.

4  **Q.**   And so just to be clear, this version of the Play Value

5  Model only incorporates three of the things that are on this

6  slide; is that right, Mr. Marchak?

7  **A.**   That's correct.

8  **Q.**   And some of these other ones, were you able to quantify

9  them at all?

10  **A.**   At the time, we weren't.  I believe in future iterations,

11  they've -- teams have added some of these, but I still don't

12  think they've added all of them.

13  **Q.**   Thank you, Mr. Marchak.

14      So counsel just asked you about the Games Velocity Program

15  or Project Hug; do you remember that?

16  **A.**   Yes.

17  **Q.**   And if you direct your attention to Exhibit 384, this was

18  a presentation entitled Games Velocity Program.  And I'm going

19  to turn to slide 17.

20      Now, do you recall that counsel was asking about some of

21  the numbers that appeared on this page?

22  **A.**   I do.

23  **Q.**   So the first number that you were asked about is the

24  1.78 million on the top row in green; do you see that?

25  **A.**   I do.

1   **Q.**   Mr. Marchak, did you prepare this number?

2   **A.**   I did not.

3   **Q.**   Do you know who did?

4   **A.**   I don't recall.

5   **Q.**   So you're not sure where that number came from, are you?

6   **A.**   Not a hundred percent sure.

7   **Q.**   And then the next number that you were asked about is the

8   total cost to serve near the bottom of the chart, $994,000,000;

9   do you see that?

10  **A.**   I do.

11  **Q.**   Did you prepare or calculate that number?

12  **A.**   I did not.

13  **Q.**   Do you know who did?

14  **A.**   I would have -- I would imagine that these numbers came

15  from our finance team, but I don't -- I don't know who on our

16  finance team.

17  **Q.**   And so you don't know how that was calculated or

18  projected, do you?

19  **A.**   I don't.

20          **MS. CHIU:**  No further questions at this time.

21          **THE COURT:**  Okay.  Any brief redirect?

22          **MR. EVEN:**  Yes, Your Honor.

23                      <u>**REDIRECT EXAMINATION**</u>

24  BY MR. EVEN:

25  **Q.**   First of all, about that last slide, that was a slide deck

1    from Gumbier on your team.  Mr. Gumbier runs the day-to-day or

2    ran in 2020 the day-to-day Hug; correct?

3    **A.**   He program managed it, but he wouldn't have run these

4    financial numbers.

5    **Q.**   I understand, but he ran the program at the time?

6    **A.**   Program manager, yes.

7    **Q.**   And so if he put something in a deck about the program,

8    would you assume that he did his best to be accurate in what he

9    portrayed?

10   **A.**   Yes, I would definitely say that.

11   **Q.**   Okay.  If you go back to Exhibit 360, and let's start on

12   slide 26.  Counsel showed you all these other things that you

13   said you haven't calculated yet.

14   **A.**   Correct.

15   **Q.**   The assumption here was the three drivers you did

16   calculate account for the majority of quantifiable value,

17   correct?

18   **A.**   That's what the headline says but --

19   **Q.**   Okay.  Now, let's go back to slide 17.  And on slide 17

20   you had some different assumptions that perhaps suggested

21   flipped Tinder, correct?

22   **A.**   Yeah, I was reading the rows on Tinder on slide 17.

23   **Q.**   Okay.  But if you look at the row -- let's take from the

24   top.  NCsoft is very negative under either assumption, correct?

25   **A.**   Yeah.  This slide is focusing on --

1   **Q.**   Sir, NCsoft is very negative on either assumption,

2   correct?

3   **A.**   Correct.

4   **Q.**   And King is very negative under either assumption,

5   correct?

6   **A.**   It's negative under either assumption.

7   **Q.**   And so is Aniplex, correct?

8   **A.**   Correct.

9   **Q.**   And so is Netmarble, correct?

10  **A.**   Correct.

11  **Q.**   And so is Playrix, correct?

12  **A.**   Did you say Playrix?

13  **Q.**   I said, I'm sorry, Playrix.

14  **A.**   Correct.

15  **Q.**   Now, you talked also about the evolution of the model.

16       So you understand that on August 13 of 2020, this

17  litigation commenced, right?

18  **A.**   Okay.

19  **Q.**   Okay.  So if you now go to Exhibit 939.  And do you

20  recognize this document?

21  **A.**   I have a vague recollection of this document but --

22  **Q.**   Yes.  Do you recognize this document, sir?

23  **A.**   It's not super familiar.

24       **MR. EVEN:**  Let's please move that into evidence, Your

25  Honor.

1          MS. CHIU:  No objections.

2          THE COURT:  It's admitted.

3                    (Trial Exhibit 939 received in

4                    evidence.)

5     BY MR. EVEN:

6     Q.   And you worked on this document, correct, Mr. Marchak?

7     A.   I don't recall working on this document.

8     Q.   Well, if you turn to page 21, do you see there is a

9     notation there from you -- or to you, Michael Marchak, on

10    August 20 of 2020?

11    A.   Yeah, I do.  It looks like someone commented me into it,

12    into that.

13    Q.   Okay.  And the next message is "There is a better one.

14    I'll find it asap," correct?

15    A.   Yes.

16    Q.   And that's a message from you, right?

17    A.   This format is weird.  It looks like it, but I don't know.

18    Q.   I understand.  And if you then go to slide 18 -- slide 18

19    from this exhibit, do you recognize this?

20    A.   This looks very much like the slide from the Play value

21    deck that we looked over earlier.

22    Q.   Exactly.  So as of August 20, 2020, a week after the

23    litigation has commenced, Google was still using the same slide

24    from the same Play Value Model that we had looked at from a

25    year earlier, correct?

1    **A.**   Yeah, it looks like somebody used a slide or copied

2    materials over from that deck.

3    **Q.**   And the data has not changed here, correct?

4    **A.**   It looks the same -- rounded, but, yeah, it looks the

5    same.

6    **Q.**   And the only thing that changed is that a week after

7    litigation against Google started, somebody decided to change

8    the heading from Total Value to Thought Exercise:  Estimating

9    Developers' Perceived Value, right?

10         **MS. CHIU:**  Objection, Your Honor.  That's

11   argumentative.

12         **THE COURT:**  Overruled.

13         **THE WITNESS:**  Again, this -- I don't -- I don't recall

14   creating this deck.  So I don't know what someone did.  We

15   shared decks, and people copy/paste all the time.

16   **BY MR. EVEN:**

17   **Q.**   Sir, you worked on this deck.  We saw that already.

18        As of the date August 20, 2020, you still had not

19   quantified any other source of value that was worth more than

20   $.6 billion or it would have been on this slide, correct?

21   **A.**   I -- I don't recall the timeline or the evolution of the

22   Play Value Model versus this deck.

23   **Q.**   Well, in fact, whether you recall it or not, you're not

24   aware of any Play Value Model that was created before this

25   litigation began and that suggested different results than the

1   results that were reflected in Exhibit 360 we reviewed together

2   during your direct, correct?

3   **A.**   I'm not aware of the different models that were created.

4   **Q.**   Sir, the truth is, pretty simple, in 2018, you took on a

5   project to inquire whether Google is earning its 30 percent,

6   correct?

7   **A.**   I took on a project to understand Play value for

8   developers.

9   **Q.**   Okay.  And you did your very best to understand it,

10  correct?

11  **A.**   I think we got it to a point where there's some

12  interesting insights.

13  **Q.**   And your model showed that the answer to the question you

14  were asked, whether Google earns its 30 percent for hundreds of

15  companies, is a resounding "no," correct?

16  **A.**   No.  I mean, in fact, the model shows we created a lot

17  more value than we collected.

18  **Q.**   Sir, for hundreds of companies, the answer whether Google

19  was earning its 30 percent was "no," correct, under your model?

20  **A.**   Out of a million developer ecosystem, there were, like,

21  hundreds that were -- that that model showed a deficit.

22          **MR. EVEN:**  Thank you.

23  No further questions.

24          **THE COURT:**  Okay.  You may step down.

25  Who do you have up next?  Who do we have next?

 1          While we're sorting that out, let's rise and stretch.

 2                         (Pause in proceedings.)

 3          THE COURT:  I've asked three times.  What is the name

 4  of the person who is coming next?

 5          MR. WIKTOR:  Epic Games calls Christian Owens,

 6  Your Honor.

 7          THE COURT:  All right.  Bring him in.

 8      Okay.

 9          THE CLERK:  If you will stand and raise your right

10  hand.

11                         CHRISTIAN OWENS,

12  called as a witness for the PLAINTIFFS, having been duly sworn,

13  testified as follows:

14          THE WITNESS:  I do.

15          THE CLERK:  Thank you.  Please be seated.

16          MR. DIESSEL:  May I proceed, Your Honor?

17          THE CLERK:  Please state your full name for the Court

18  and spell your last name.

19          THE WITNESS:  Christian Owens, O-W-E-N-S.

20          THE COURT:  Pull that a little closer to you.  Thanks.

21      Okay.  Go ahead.

22                       **DIRECT EXAMINATION**

23  BY MR. DIESSEL:

24  Q.   Good morning, Mr. Owens.  Are you currently employed?

25  A.   I am.

1   **Q.**   By whom?

2   **A.**   By Paddle.com.

3   **Q.**   And what is Paddle.com?

4   **A.**   Paddle creates billing and payments infrastructure for app

5   and software developers.

6   **Q.**   And would it be okay if I referred to Paddle.com just as

7   Paddle for purposes of the examination?

8   **A.**   Oh, sure.

9   **Q.**   Where is Paddle based?

10  **A.**   Primarily in London.

11  **Q.**   And what positions have you held at Paddle?

12  **A.**   For the first 11 years of the life of the company, I

13  founded the company and was the CEO; and for the last 6 or 7

14  months, I've been the executive chairman.

15  **Q.**   Where do you live, Mr. Owens?

16  **A.**   I live in Bath, United Kingdom.

17  **Q.**   And what has brought you all the way out here this

18  morning?

19  **A.**   I was asked to be here.

20  **Q.**   And why did you decide to take the time to travel out here

21  to testify in this case?

22  **A.**   I felt it was the right thing to do.

23  **Q.**   And do you have a high level understanding of the issues

24  in this case?

25  **A.**   High level, yes.

1   **Q.**   And we'll get to this in a little bit more detail, but

2   briefly, how do those issues affect Paddle?

3   **A.**   We obviously power commerce and payments for software

4   developers.  Some of those software developers develop mobile

5   applications for Android, and we have been developing a

6   solution to enable those developers to take payments -- in-app

7   purchase payments through Paddle but are prevented from doing

8   so.

9   **Q.**   And what's preventing Paddle from doing so?

10  **A.**   Today Google Play's terms of services for developers

11  expressly prohibit the usage of a third-party payment method.

12  **Q.**   How did Paddle begin?

13  **A.**   I started my first software company when I was 16 and ran

14  into these challenges selling software internationally, and I

15  started Paddle when I was 18 to try and address some of those

16  problems and build a solution primarily for myself.

17  **Q.**   When was Paddle founded?

18  **A.**   August 2012.

19  **Q.**   And why did you found Paddle?

20  **A.**   When I was running with a previous business and ran into

21  some of these challenges of taking payments, I went in search

22  of a solution to that, something that would help us sort of

23  resolve those issues, and couldn't find anything that was both

24  satisfactory and could be used by relatively small businesses.

25  **Q.**   Could you just describe what your responsibilities have

1    been at Paddle over the years?

2    **A.**    Yeah.  When I was CEO, ultimately, everything is sort of

3    my responsibility, but primarily focused on the product that we

4    build, kind of who our customers are and our strategy.

5         And as I transitioned into this new role, it's more of the

6    same, but I think just at a higher level, more focused on

7    strategy and less day-to-day operation.

8    **Q.**    And you just mentioned the Paddle product.  What services

9    does Paddle offer?

10   **A.**    Primarily, Paddle X is a reseller or merchant of record

11   for software companies.  So software companies are effectively

12   selling their products to us, and we're reselling them on to a

13   consumer.  And as a part of that, we handle everything from

14   payment processing to taxes and compliance and enabling these

15   developers to take subscription payments or whatever it might

16   be or an --

17   **Q.**    Are billing services among the services that Paddle

18   provides to its customers?

19   **A.**    Yes.

20   **Q.**    And what are some of the billing services that Paddle

21   provides?

22   **A.**    Taking payments around the world in a variety of different

23   payment methods, dealing with currencies and currency exchange,

24   being compliant with any kind of local laws and regulations

25   with regard to taking payments, and then paying things like

1  local sales taxes in various jurisdictions on behalf of these

2  companies, as well as dealing with fraud and kind of risk and

3  customer service and things such as that.

4  **Q.**   A moment ago you referred to the term a merchant of

5  record.  Can you describe to the jury what is a merchant of

6  record?

7  **A.**   Yeah.  A merchant of record is really any party who you're

8  buying goods from.  So it's the party in a transaction who is

9  ultimately responsible for the sale.  So they're responsible

10  for things like paying sales tax.  They're responsible for kind

11  of providing customer billing related support, or if you want

12  to make a return or something like that, it's the merchant of

13  record who you go to in order to facilitate that.

14  **Q.**   Today, what are the platforms on which Paddle offers its

15  services?

16  **A.**   On the web and on to primarily desktop computers, PC and

17  Mac.

18  **Q.**   Where around the world is Paddle's solution available?

19  **A.**   We have customers in pretty much every kind of

20  non-sanctioned country in the world.

21  **Q.**   How many currencies does Paddle's solution support

22  presently?

23  **A.**   I believe it's around 30.

24  **Q.**   And can you just give some examples of the sorts of

25  payment methods that Paddle accepts for payments within its

1  solution?

2  **A.**    Yeah.  So kind of as you'd expect, credit, debit cards,

3  kind of Visa, Mastercard, things such as that; a variety of

4  wallets, like PayPal, Apple Pay, Google Play; and then a range

5  of what we call local payment methods that are kind of heavily

6  used in specific markets, so kind of ideal for benevolence and

7  things like that.

8  **Q.**    Does Paddle actually process the payments itself?

9  **A.**    No.  We partner with another payment processor and PSPs in

10  order to facilitate that.

11  **Q.**    You've spoken a little bit about some of the things

12  Paddle's solutions -- solution does.  Can you give a real-world

13  example of how a developer might use Paddle's solution to power

14  a transaction?

15  **A.**    Yeah.  So imagine you're purchasing a subscription for a

16  product that you use, a productivity tool or a note-taking app,

17  kind of.  And you're a developer and you're selling that

18  product and you do it all around the world.

19      And you go onto the website of this product and you click

20  "buy."  Really Paddle handles everything from that moment at

21  which you click "buy" to when the consumer is able to use the

22  product, and building that experience in every different

23  country that the developer may wish to sell in without them

24  necessarily having to go through the considerable amount of

25  work in order to build that infrastructure themselves.

**OWENS - DIRECT / DIESSEL**

1   **Q.**   How many employees does Paddle have today?

2   **A.**   Approximately 300, 350.

3   **Q.**   And roughly how many financial transactions has Paddle

4   processed since it was founded?

5   **A.**   I always struggle to give an accurate number, but tens

6   of -- tens of millions.

7   **Q.**   And can you explain how Paddle makes money?

8   **A.**   We take a small percentage on each transaction that we

9   process.

10  **Q.**   What amount does Paddle charge?

11  **A.**   By default, we charge 5 percent of the value of the

12  transaction and 50 cents every time a transaction occurs.

13  **Q.**   Do all Paddle customers pay the same price?

14  **A.**   No, they do not.

15  **Q.**   And can you describe the circumstances in which Paddle

16  might offer different prices?

17  **A.**   Yeah.  There tends to be two.

18       One is if the business is sufficiently large and kind of

19  pushes -- wants to push a considerable amount of transaction

20  volume through us, in order to be competitive with other

21  providers, we have to negotiate pricing with them.

22       The second instance is for what we call microtransactions.

23  So these are transactions typically below $10 in value where

24  the 50-cent portion of our fee becomes sort of somewhat

25  prohibitive for the -- if you're selling a 99-cent product, for

1   example, 50 cents each up a relatively large chunk of that.

2   **Q.**   And so how might Paddle structure the pricing for what you

3   refer to as a microtransaction?

4   **A.**   Typically, it's around 10 percent or lower.

5   **Q.**   And what efforts does Paddle undertake to ensure that its

6   solution is secure?

7   **A.**   We take numerous efforts.  Categories in two groups.

8        One is the security of the actual platform itself.  We

9   have an incredibly capable information security team who works

10  on that side of things.

11       And I'd say the second element is really the security for

12  consumers.  So for us, that means ensuring that the products

13  that we sell are what they say they are, that a customer is

14  getting what they're expecting, that the products themselves

15  are safe and free from kind of anti -- like, viruses or malware

16  or things like that.  And we have both technology and a team of

17  people who work on that side as well.

18  **Q.**   Does Paddle offer any anti-fraud protections as part of

19  its solution?

20  **A.**   We do, yes.

21  **Q.**   And can you just briefly describe those?

22  **A.**   We work with a number of third parties to do kind of

23  transaction scoring.  So we look at various sort of facets of a

24  transactions from where the customer is based versus the bank

25  account where they're paying from and a number of other

1   attributes around the transaction.  And either we or a third

2   party determines the potential risk that that transaction might

3   be fraudulent, for example, somebody using a stolen credit card

4   or the like, and we block those transactions.

5   **Q.**   And can you just briefly describe what sorts of -- sort of

6   customer support services Paddle provides to its customers?

7   **A.**   Yeah.  So every time that a -- so we have two rounds of

8   customer supports.  We have support for developers, and then we

9   have support for the kind of end consumers that are buying the

10  products as well.

11         For developers, that is a team of people that work with

12  them both from a business context and a technical context, on

13  how to really come at these solutions and kind of go to market

14  with Paddle.

15         From a consumer context, every transaction that happens

16  through Paddle, when you receive a receipt or the phone number

17  that appears on your credit card statement alongside it,

18  customers can get in touch with us and a team of people that we

19  have to get support around the transaction.

20  **Q.**   Roughly how many customers use Paddle's payment solution

21  for collecting payments today?

22  **A.**   It's in the region of about 4500 to 5,000 businesses.

23  **Q.**   And what types of businesses are Paddle's customers?

24  **A.**   It's a range.  I would say the majority, by number, are

25  B-to-B companies, so companies building products and selling

1  them to other businesses.  Kind of the next selection is kind

2  of consumer, so people selling products to consumers.  And a

3  very small sort of sliver of our business is games.

4  Q.   And would you mind just giving a couple examples of

5  current Paddle customers?

6  A.   Yeah.  I'm not sure if anybody will have heard of them.

7  So on the kind of consumer side, we have products like Nord VPN

8  or AutoTune, the thing that some people use in songs.  And then

9  on the game side, we have games like Geoguesser.

10  Q.   Mr. Owens, how many years have you been in the payments

11  industry?

12  A.   11 or 12.

13  Q.   In connection with your responsibilities at Paddle, do you

14  monitor developments within the payment industry?

15  A.   Yes.

16  Q.   And in connection with your responsibilities, do you keep

17  abreast, at a high level, of other payment solutions?

18  A.   Yes, absolutely.

19  Q.   Have you become familiar, at a high level, with what

20  developers pay for services on Google Play Billing?

21  A.   Yes.

22  Q.   And have you become familiar at a high level with the

23  billing services that Google offers as part of Google Play

24  Billing?

25  A.   Yes, I have.

**OWENS - DIRECT / DIESSEL**

1  Q.   So what amount does Google charge for transactions on

2  digital goods with Google Play Billing?

3  A.   I believe between 15 and 30 percent.

4  Q.   And what does Google charge in the scenario where Google

5  Play is used to distribute an app to a user, but the user

6  doesn't make any transaction for digital goods?

7  A.   Nothing.

8  Q.   So what's the triggering event for a developer to pay

9  Google the 15 to 30 percent fee that you described?

10 A.   Processing a transaction for a digital product or

11 purchase.

12 Q.   And for Paddle, what's the triggering event for a

13 developer to pay Paddle its service fee?

14 A.   Selling a digital product or software.

15 Q.   So how does Paddle's pricing compare to what developers

16 pay for Google Play Billing on a per transaction basis?

17 A.   Typically, it's substantially cheaper.

18 Q.   I'm sorry.  I didn't catch that.

19 A.   Typically, it's substantially cheaper than they would pay

20 on Google Play.

21 Q.   And how do Paddle services compare to the types of billing

22 services that Google offers through Google Play Billing?

23 A.   There are some minor differences around the edges, but at

24 core, I believe the products are largely comparable, and in

25 some instances, I think Paddle offers a stronger solution.

1    **Q.**   Can you give some examples of the types of billing

2    services that both Paddle and Google Play Billing perform?

3    **A.**   Kind of an array of different payment methods that people

4    can Play with, different currencies that are supported, the

5    ability to kind of take subscription payments, local compliance

6    and taxes and so forth.

7    **Q.**   Are there any areas where Paddle's solution outperforms

8    Google's?

9    **A.**   I believe there are a number.  I would say our

10   subscription management and kind of flexibility of the platform

11   with regards to kind of how developers can charge customers, I

12   would say that the Paddle is sort of a more robust solution in

13   that way.

14   **Q.**   Are you familiar with the term "cross platform support" in

15   the payments industry?

16   **A.**   Broadly, yes.

17   **Q.**   And what does cross platform support mean?

18   **A.**   A payment method or a mechanism of paying that would be

19   available across different platforms or devices.  So kind of

20   Android, Mac, PC, the web, and so forth.

21   **Q.**   And what does Paddle's solution offer with respect to

22   cross-platform support?

23   **A.**   You use the same Paddle everywhere.  So whether you're

24   developing for the web, for a Mac, for PC, for desktop devices,

25   whatever it may be, you're using the same infrastructure in

 1  order to kind of complete that transaction.

 2  **Q.**   How does that compare to Google Play Billing?

 3  **A.**   As far as I'm aware, Google Play Billing is only available

 4  for apps downloaded from the Play Store and Android.

 5  **Q.**   Does Google Play Billing offer any billing services that

 6  you think are important to your customers but that Paddle

 7  doesn't offer?

 8  **A.**   I don't believe so.

 9  **Q.**   So in the event that a customer were to ask Paddle for a

10  feature that Paddle currently doesn't support, what would

11  Paddle do?

12  **A.**   We would typically take the feedback on board.  We would

13  evaluate whether said feature is something that we believe is

14  applicable to more people than maybe just the one customer,

15  there's kind of demand for it elsewhere.  And if there was,

16  we'd probably put it on our road map and seriously consider

17  building it.

18          **THE COURT:**  Okay.  We're going to take our morning

19  break.  We're going to come back at about 11:20.

20       Careful on your way down.  It's very steep.

21          **THE WITNESS:**  Thank you.

22          (Recess 11:01 a.m.-11:23 a.m.)

23          **THE COURT:**  Okay.  Go ahead.

24  **BY MR. DIESSEL:**

25  **Q.**   Welcome back, Mr. Owens.

**OWENS - DIRECT / DIESSEL**

1          Before we broke, we were just discussing some of the

2     features of Paddle's solution.

3          What are some examples of additional features that Paddle

4     has implemented in response to requests from customers?

5     **A.**   There's pretty regular ones.  For example, adding new

6     payment methods or currencies that customers ask for.  We do

7     that relatively frequently.

8          A big example was some strong demand from customers for

9     more flexible subscription billing options, so the ability to

10    bill in different ways; and that is a product that we built

11    over the last year and launched recently, pretty much

12    exclusively kind of predicated on customer feedback.

13    **Q.**   Overall, how would you compare Paddle's solution today to

14    Google Play Billing?

15    **A.**   I'd say it's very comparable.  In some instances, more

16    competitive or better for certain customers.

17    **Q.**   Is Paddle's solution available today for use within native

18    Android apps downloaded from the Google Play Store?

19    **A.**   No.

20    **Q.**   Why not?

21    **A.**   Because we are prohibited from doing so through Google's

22    developer terms of service.

23    **Q.**   Mr. Owens, I'm going to show you a document now.

24          Could you please open the binder in front of you.  There

25    should only be one document in there.  It's Exhibit 8022.

1    **A.**    Yes.

2    **Q.**    And Exhibit 8022, that's already in evidence, but can you

3    just go ahead and turn to the page ending in 039.

4    **A.**    Yes.

5    **Q.**    I'd like to direct you to section 2 in particular.

6          Do you recognize what you're looking at?

7    **A.**    I do, yes.

8    **Q.**    And can you describe what that is?

9    **A.**    This is, I believe, Google Play Billing's or Google Play's

10   developer terms of service.  And section 2 is the section that

11   refers to payments, where it says, "Downloads from Google Play

12   must use Google Play's Billing system as the method of

13   payment."

14   **Q.**    And is that the policy that prevents Paddle's solution

15   from being used for purchase of digital goods within Android

16   apps downloaded from Google Play?

17   **A.**    Yes.

18   **Q.**    As founder and chairman of Paddle and someone who has been

19   in the payments industry for over a decade, do you like this

20   policy?

21   **A.**    I do not.

22   **Q.**    Why not?

23   **A.**    We've had a lot of demand from developers to offer our

24   services on Android and Google Play, and this expressly

25   prohibits our ability to do so.

**OWENS - DIRECT / DIESSEL**

1   **Q.**   Does Paddle want to offer a version of its solution for

2   use within native Android apps downloaded on Google Play?

3   **A.**   Absolutely, yes.

4   **Q.**   Why?

5   **A.**   I think, one, it's a great business opportunity for us;

6   and, two, we have existing customers who develop their products

7   for multiple platforms; and today, they find themselves in a

8   situation where they have to use different billing systems on

9   those different platforms and deal with the overhead and

10  infrastructure of that for relatively arbitrary reasons.

11  **Q.**   How long would it take Paddle to develop a solution for

12  use within native Android apps downloaded from the Google Play

13  Store?

14  **A.**   Given the infrastructure that we built over the last

15  decade, and the vast majority of that would be reused for this,

16  I estimate somewhere in the region of 2 to 4 weeks.

17  **Q.**   If Paddle were able to offer a solution for use in native

18  Android apps downloaded from the Play Store, what would Paddle

19  charge?

20  **A.**   Our typical standard pricing.

21  **Q.**   And can you just remind us what that is?

22  **A.**   By default, 5 percent plus 50 cents on transactions sort

23  of greater than $10, and then that microtransaction pricing of

24  10 percent or less per transactions smaller than that.

25  **Q.**   And if Paddle were able to offer a solution for use in

1   native Android apps downloaded from the Play Store, how would

2   those services compare to Paddle's existing solution available

3   today?

4   **A.**   We would aim to have complete parity with the solution

5   that we offer.  We'd offer the same solution, effectively.

6   **Q.**   So if permitted, would Paddle offer its solution in

7   Android mobile apps downloaded from the Google Play Store?

8   **A.**   Yes, we would.

9            **MR. DIESSEL:**  Thank you.  I pass the witness.

10           **THE COURT:**  All right.  The witness is passed.

11           **MR. RAPHAEL:**  May I proceed, Your Honor?

12           **THE COURT:**  Yes.

13                        **CROSS-EXAMINATION**

14   **BY MR. RAPHAEL:**

15   **Q.**   Mr. Owens, you told this jury that you're here because it

16   was the right thing to do; do you recall that?

17   **A.**   Yes.

18   **Q.**   That's not true, is it, Mr. Owens?

19   **A.**   I believe it is the right thing to do.

20   **Q.**   Well, Paddle has an interest in who wins this lawsuit,

21   doesn't it?

22   **A.**   Yes, we do.

23   **Q.**   And Paddle has a financial interest in Epic winning this

24   lawsuit, doesn't it?

25   **A.**   We have a financial interest in being able to compete in

**OWENS - CROSS / RAPHAEL**

1   the Play Store with our solution.

2   **Q.**   Well, if Epic wins this lawsuit, you think you may be able

3   to earn at Paddle tens or even hundreds of millions of dollars;

4   isn't that right?

5   **A.**   That would be my hope.  I don't necessarily know that we

6   would be successful, but I'd hope we'd be able to compete for

7   it.

8   **Q.**   In fact, Paddle is already highly profitable?

9   **A.**   No.

10  **Q.**   Hasn't Paddle's profit margin been increasing over time?

11  **A.**   Our gross margin has been increasing over time, yes.

12  **Q.**   And Paddle's average profit margin on a transaction is now

13  about 50 percent, isn't it?

14  **A.**   Can you define "profit margin"?  I'm sorry.

15  **Q.**   Well, sir, what is Paddle's average margin on a

16  transaction on the Paddle platform?  It's 50 percent, isn't it?

17  **A.**   Our gross margin, yes.

18  **Q.**   Okay.  And Paddle earns a 50 percent profit margin, even

19  though it has hundreds of competitors, right?

20  **A.**   50 percent gross margin, yes.

21  **Q.**   And it's your projection that over the next five years,

22  you expect Paddle's profit margin to get as high as 60 percent,

23  right?

24  **A.**   We hope so, yes.

25  **Q.**   And at a profit margin of 60 percent, Paddle would still

**OWENS - CROSS / RAPHAEL**

1  have substantial competition, wouldn't it?

2  **A.**   Yes.

3  **Q.**   Now, Paddle charges its customers a percentage of what its

4  customers sell using Paddle, right?

5  **A.**   Yes.

6  **Q.**   And charging a percentage of the sales that Paddle's

7  customers make aligns Paddle's incentives with its customers

8  incentives, right?

9  **A.**   Yeah, I hope so.

10  **Q.**   You might say that when Paddle -- Paddle only makes money

11  when its customers make money, right?

12  **A.**   Yes.

13  **Q.**   Now, you testified, I think, that Paddle's billing

14  solution is available on PC and Mac, right?

15  **A.**   Among other places like the web, yes.

16  **Q.**   But it's true, in fact, that today, Paddle is providing

17  in-app billing services for some in-app purchases on Android;

18  isn't that right?

19  **A.**   Not officially.  I think we have some customers who may be

20  doing that on their own.

21  **Q.**   Paddle certainly is free today to provide in-app billing

22  services for apps that have been sideloaded on Android devices;

23  isn't that right?

24  **A.**   Yes.

25  **Q.**   And you have a number of customers who use Paddle in-app

1    on sideloaded applications, right?

2    **A.**    I don't know if we do or how many specifically.

3            **MR. RAPHAEL:**  Your Honor, could -- I'd like to read

4    from page 60, line 22, to page 61, line 4.

5            **THE COURT:**  Which lines?

6            **MR. RAPHAEL:**  Page 60, line 22, to page 61, line 4.

7            **THE COURT:**  Okay.

8    BY MR. RAPHAEL:

9    **Q.**    Do you recall when you were deposed a couple weeks ago,

10   Mr. Owens?

11   **A.**    Yes.

12   **Q.**    Okay.  And if we could put those lines on the screen.

13          And I asked you at your deposition:

14          "**Q.**  Paddle is free today to provide in-app billing

15          services for apps that have been sideloaded on Android

16          devices; isn't that right?"

17          And you answered:

18          "**A.**  Yes."

19          And then I asked:

20          "**Q.**  But Paddle does not provide that service, does it?"

21          And you said:

22          "**A.**  I believe we have a number of customers who use

23          Paddle in-app on sideloaded applications, yes."

24          You were asked those questions and you gave those answers

25   under oath, correct?

**OWENS - CROSS / RAPHAEL**

1   A.   Yes.

2   Q.   Now, for businesses, PayPal is purely a payment processor,

3   right?

4   A.   I'm not sure of the full range of services, but I think

5   that's one of their primary kind of things that they do.

6   Q.   Well, in fact, Paddle has described PayPal as purely a

7   payment processor; isn't that right?

8   A.   I don't know.

9        **MR. RAPHAEL:**  Okay.  I'd like to read from page 84 of

10  the deposition, line 17 to 19, Your Honor.

11       **THE COURT:**  Okay.

12       **MR. RAPHAEL:**  Can we put that on the screen, please?

13  Q.   So I asked you at your deposition:

14       "Q.  Has Paddle ever described PayPal as purely a payment

15       processor?"

16       And you answered:

17       "A.  For businesses, yes."

18       You were asked that question and you gave that answer

19  under oath, correct?

20  A.   Yes.

21  Q.   And Stripe is a payment processor, correct?

22  A.   Among other services, yes.

23  Q.   But you wouldn't describe Paddle as a payment processor,

24  right?

25  A.   No, I wouldn't.

1  **Q.**   And I think you said that Google Play Billing and Paddle

2  are broadly similar or comparable, right?

3  **A.**   From a functionality perspective, I believe so.

4  **Q.**   And so you wouldn't describe Google Play Billing as a

5  payment processor either, would you?

6  **A.**   I believe the business model is similar to ours in that

7  it's a merchant of record.

8  **Q.**   Right.  And so the business model of Google Play Billing

9  is broader than payment processing, just like Paddle's, right?

10  **A.**   Yes.

11  **Q.**   Now, I think you testified that based on your industry

12  knowledge, you are familiar with Google Play Billing, right?

13  **A.**   Yeah.

14  **Q.**   And I think you testified that Google Play Billing doesn't

15  offer any services that you're aware of that Paddle doesn't

16  offer, does it?

17  **A.**   I'm sure -- I think I said that I'm sure there were some

18  around the edges sort of for billing services specifically, but

19  I don't know exactly what those are.

20  **Q.**   Okay.  Well, let's just take an example.  Paddle doesn't

21  offer any parental controls, does it?

22  **A.**   No.

23  **Q.**   And Paddle doesn't have a feature that enables users to

24  set spending budgets?

25  **A.**   No, we do not.

1   **Q.**   And Paddle doesn't offer the ability for users to save

2   their payment information for purchases from different

3   developers?

4   **A.**   No.

5   **Q.**   But Google Play does offer the ability for users to do

6   that, doesn't it?

7   **A.**   I believe so, yes.

8   **Q.**   Now, when Paddle charges a fee on transactions, Paddle is

9   charging for more than just payment processing; isn't that

10  right?

11  **A.**   We're charging for kind of the process of being the

12  merchant of record.

13  **Q.**   Right.  And the merchant of record service that Paddle

14  provides is broader than payment processing, correct?

15  **A.**   It's also reselling the product to a consumer, yes.

16  **Q.**   Okay.  So when Paddle charges a fee on transactions,

17  Paddle is charging for more than payment processing, isn't it?

18  **A.**   Yes.

19  **Q.**   And in some circumstances, Paddle charges higher fees than

20  PayPal, right?

21  **A.**   I believe for certain transactions, yes.

22  **Q.**   And when Paddle charges higher fees than PayPal, that's

23  because Paddle provides a broader set of services, right?

24  **A.**   Yeah.

25  **Q.**   And for some transactions, Paddle charges more than

1   Stripe, right?

2   **A.**   I think so, yes.

3   **Q.**   And where Paddle charges more than Stripe, that's because

4   Paddle is providing a broader set of services than just payment

5   processing, right?

6        When you offer more, Mr. Owens, it makes sense to charge

7   more, doesn't it?

8   **A.**   In some circumstances, yes.

9   **Q.**   Now, you said that, I think, Google Play generally charges

10  between 15 and 30 percent.

11  **A.**   For transactions, yes.

12  **Q.**   And you said that Paddle, if they would launch on Android

13  through Google Play, would charge less?

14  **A.**   Yeah, if we were allowed to.

15  **Q.**   But Paddle doesn't have a user-facing app store, does it?

16  **A.**   No.

17  **Q.**   Paddle hasn't taken any steps to build a user-facing app

18  store, has it?

19  **A.**   No, not in recent years.

20  **Q.**   But Google Play does offer an app store, doesn't it?

21  **A.**   Yes.

22  **Q.**   And Google Play does more than just process payments,

23  correct?

24  **A.**   Yes.

25        **MR. RAPHAEL:**   I have no further questions.

1          **THE COURT:**  Okay.  Any brief redirect?

2                          <u>**REDIRECT EXAMINATION**</u>

3    **BY MR. DIESSEL:**

4    **Q.**   Mr. Owens, if I could just ask you a few questions.

5          You were asked a moment ago about PayPal and what they

6    charge.  What's the most that Paddle ever charges for use of

7    its solution -- for use of its payment solution?

8    **A.**   It is the lesser of 10 percent or 5 percent and 50 cents.

9    **Q.**   So, Mr. Owens, you were asked some questions about

10   Paddle's profit margin on digital transactions, right?

11   **A.**   Yes.

12   **Q.**   And I think you said that Paddle's profit margin on its

13   transactions is around 50 percent today, is that right?

14   **A.**   Our gross margin, yes.

15   **Q.**   Right.  And so can you just explain to the jury the

16   difference between gross margin and net margin?

17   **A.**   Yeah.  So when a transaction occurs, we obviously make

18   that 5 percent and 50 cents of revenue.

19         We then pay out to those sort of payment providers, for

20   example, that we mentioned, and it costs us some money to kind

21   of deal with the taxes and things like this.

22         After we pay for all of those things, we retain about

23   50 percent of the money.  As a company as a whole, we're

24   unprofitable.

25   **Q.**   Okay.  And so just to make sure I have this right, the

1   50 percent margin figure that you talked about, is that

2   Paddle's gross margin or net margin?

3   **A.**   Gross.

4   **Q.**   And can you just ballpark Paddle's net margin, please?

5   **A.**   It's a negative number, kind of -- I don't know.

6   **Q.**   So you were also asked some questions about the

7   characteristics of Paddle's solution and how they compare to

8   Google; do you recall that?

9   **A.**   Yes.

10   **Q.**   Do you know whether Google has expressed any interest in

11   using Paddle's solution?

12   **A.**   Yes, they have.

13   **Q.**   And how did that come up?

14   **A.**   I believe that they got in touch with us, looking for a

15   merchant of record solution like Paddle for one of their

16   products within Google.

17   **Q.**   And when did that come up, Mr. Owens?

18   **A.**   I don't know the exact dates.  In the last 6 to 12 months.

19   **Q.**   And do you know how Google would be using Paddle's

20   solution in that scenario?

21   **A.**   I have a broad understanding.

22        Google, I believe, has a product that they give to

23   publishers, like the newspapers and things like this, for their

24   online versions.  And they were looking for a solution for a

25   product called Off the Wall, which is when you get that

1  relatively annoying pop-up asking you to subscribe to a

2  newspaper, the ability for a person who's reading that to

3  purchase just access to the one article they want to read

4  rather than having to sign up for a subscription.

5  **Q.**   And did Google conduct any kind of evaluation of Paddle's

6  solution?

7  **A.**   Yes.

8  **Q.**   And what was the results of -- pardon me.

9       What were the results of that evaluation?

10 **A.**   I believe that they looked at a number of kind of vendors.

11 Sort of heavily competitive space that we're in.  They looked

12 at a number of vendors.  They narrowed it down to Paddle, and

13 then are proceeding on a technical kind of implementation of

14 the solution into kind of this Google product.

15 **Q.**   So how does Paddle's solution that Google is interested in

16 compare to what Paddle wants to offer for use in Android apps

17 downloaded on Google Play Billing?

18 **A.**   The solution is identical, just where we're actually

19 giving users access to it.  In this instance, it's for on the

20 web, when you browse to a website and kind of get one of these

21 payrolls, the solution that we would kind of be providing to

22 developers would be identical.  It would just be on a native

23 Android application rather than on the web.

24 **Q.**   And do you recall being asked about Paddle's interest in

25 this litigation?

**PROCEEDINGS**

1  **A.**    Yes.

2  **Q.**    What is Paddle's interest in this litigation?

3  **A.**    Only that we wish to be able to compete on offering a

4  solution for Google Play.

5  **Q.**    And why do you think Paddle could potentially make money

6  in the scenario where Paddle is able to compete?

7  **A.**    I hope that we would be able to make money.  I think in

8  the instance that the Play Store is opened up in a way that

9  allows Paddle to compete, it allows probably a hundred other

10  companies to compete as well, I'm pretty confident in the

11  product that we built, that we spent a lot of time building

12  over the years, and I hope that we'd be able to attract kind of

13  a reasonable number of developers who decide to use Paddle in

14  their apps on Google Play rather than the kind of native Play

15  billing.

16        **MR. DIESSEL:**  Thank you, Mr. Owens.

17     I have no further questions.

18        **THE COURT:**  Any questions, jury?  No.

19     Okay.  Careful on the way down.

20                    (Witness excused.)

21        **THE COURT:**  Who is next?

22        **MR. BORNSTEIN:**  Your Honor, our next witness,

23  considering the British theme for the morning, is going to be

24  by deposition.

25        **THE COURT:**  Okay.

PROCEEDINGS

1     **MR. BORNSTEIN:**  The deposition run time is

2  approximately 50 minutes, 5-0.  And we have a number of

3  exhibits that will be used with the witness.  I understand

4  there are no objections to the exhibits.  I thought it would be

5  helpful to get them in first.

6     **THE COURT:**  Yeah.  So this is going to be our first

7  deposition witness.  It's going to be on video.  All right.  So

8  remember the instruction I gave you at the beginning:

9  Testimony has the same force and effect as if that person were

10 sitting right here with us in court.  Okay?  It's just you're

11 going to watch them on the screen.

12     Let's see.  How many exhibits are there?

13     **MR. BORNSTEIN:**  There are six, Your Honor.

14     **THE COURT:**  Just pass them out.  Okay.

15     **MR. BORNSTEIN:**  Oh, copies?  Hard copies?

16     **THE COURT:**  Yeah, you might as well.  If you have

17 them.  If you don't have them, that's fine.

18     **UNIDENTIFIED SPEAKER:**  We don't think we have enough.

19     **THE COURT:**  That's fine.

20     When I have video depositions, I like to pass out the hard

21 copies, but they don't know that because they're new to the

22 courtroom.  So you're just going to have to follow on the

23 screen.  All right?

24     **MR. BORNSTEIN:**  Your Honor, we will have the document

25 side-by-side with the witness's face.  So hopefully the jury

1  can follow along on the screen --

2          THE COURT:  That's good.

3          MR. BORNSTEIN:  -- and see the documents.

4          THE COURT:  That's why I do the hard copies.

5          MR. BORNSTEIN:  We'll take note for future

6  depositions, obviously.

7      Would you like me to offer the exhibits now so we can get

8  those in?

9          THE COURT:  Yes.  Please advise Ms. Clark.

10          MR. BORNSTEIN:  Ms. Clark has the list, Your Honor.

11          THE COURT:  Oh, okay.  Well, do you have that?

12          THE CLERK:  Yeah, I'm good.

13          THE COURT:  All right.  Go ahead.

14          MR. BORNSTEIN:  Your Honor, we would offer into

15  evidence the following six exhibits:  1348, 1349, 1351, 1352,

16  1353, and 11370.

17          THE COURT:  Okay.  Any objection?

18          MR. KRAVIS:  No objection.

19          THE COURT:  All right.  They are all admitted.

20                  (Trial Exhibits 1348, 1349, 1351, 1352, 1353,

21                  11370 received in evidence.)

22          MR. BORNSTEIN:  Thank you, Your Honor.

23      (Video deposition of Richard Watts was played but not

24  reported.)

25          THE COURT:  Let's take our lunch break.  We'll be

**WATTS - VIDEO TESTIMONY - NOT REPORTED**

1    back.

2            (Luncheon recess was taken at 12:13 p.m.)

3    **AFTERNOON SESSION**                              **12:49 p.m.**

4

5            MR. POMERANTZ:  Well, we have the Spotify issue, Your

6    Honor, and I informed Mr. Bornstein that we -- we are not

7    intending to offer it ourselves, but I think they do still want

8    to offer it, so I think the ball is in their court.

9            THE COURT:  Okay.  What is it you'd like to do, Epic?

10           MR. HUESTON:  Good afternoon, Your Honor.  John

11   Hueston for Epic Games.

12       I think the only issue here, there's been no issue as to

13   relevance brought up by the parties.  It's just a matter of

14   whether there should be sealing on the exact percentage that

15   Spotify is paying Google under the seal.  You know, we think

16   that that's something that the public ought to know about.

17   It's part of how we're going to be establishing arbitrariness

18   in the setting of prices, how there really is --

19           THE COURT:  Spotify is paying Google?

20           MR. HUESTON:  Right.  Under the deal that they have

21   for billing, there is a rate, a rate set much, much lower than

22   the rates that we've been hearing in trial, and that's an

23   important part of what we're going to be establishing here at

24   trial in terms of the arbitrariness, as was discussed in

25   opening statements and throughout of the 30/15 rate structure

**WATTS - VIDEO TESTIMONY - NOT REPORTED**

1    that Google has been charging.

2            THE COURT:  Can you just show me what do you want to

3    put into evidence?

4            MR. HUESTON:  Sure, your Honor, I can pass up a

5    demonstrative that I want to use that summarizes what I want to

6    show.

7            THE COURT:  Okay.  You want to use these two numbers;

8    is that what you're saying?

9            MR. HUESTON:  That's right, Your Honor.

10           THE COURT:  Okay.  What's the problem with that?

11           MR. POMERANTZ:  Well, Your Honor, this is actually at

12   the core of the deal.  There's obviously way more to the deal

13   than just these two numbers, and it is exactly the kind of

14   information that is part of not only our negotiation with

15   Spotify, but our negotiations with many other competitors of

16   Spotify and Google, and it's exactly the kind of information

17   that should not be public.

18       We do not have a problem with these two numbers being

19   presented to the jury.  We just ask that they point to the

20   numbers without saying them out loud so that we don't risk

21   competing competition.  While if they want to put this

22   information in front of the jury, we do not have a problem with

23   that, but we see no reason why they can't hand this piece of

24   paper to the jurors and to the witness and ask questions

25   without disclosing publicly the information, because it's

1   extremely --

2        **THE COURT:**  Why are these numbers sensitive?

3        **MR. POMERANTZ:**  Because they are at the core of

4   negotiations between first Google and Spotify and, second,

5   between Google and third parties or competitors of both Spotify

6   and Google.

7        **MR. HOGBERG:**  Your Honor, if I may, Sverker Hogberg of

8   Sullivan & Cromwell on behalf of Spotify USA.

9        We filed a sealing motion yesterday, ECF number 749, for

10  the underlying documents from which these numbers are taken.

11  And as we set forth in the motion, this is core confidential

12  business information and trade secret information that courts

13  routinely seal in the context --

14       **THE COURT:**  The contract is not trade secret.  This is

15  not a trade secret.

16       **MR. HOGBERG:**  Your Honor, this is something --

17       **THE COURT:**  A trade secret is something that has value

18  because it's not known and it can't be something in a contract,

19  so it's not a trade secret.

20       How is this possibly going to hurt Spotify?

21       **MR. HOGBERG:**  Your Honor, so the case law we cited is

22  the -- are the licensing --

23       **THE COURT:**  How is this going to hurt Spotify, is my

24  question.

25       **MR. HOGBERG:**  Sure.  So the harm to Spotify is that

1    Spotify-- the payment -- the amount it pays and percentages to

2    payment processors like Google Play are confidential

3    information that it doesn't disclose so they can negotiate --

4            **THE COURT:**  I understand you don't want people to

5    know.  How will it hurt Spotify?

6            **MR. HOGBERG:**  So in Spotify's negotiations with other

7    platforms, they can use these numbers as baselines to negotiate

8    down Spotify's -- or negotiate up fees.  They can use it as

9    leverage against Spotify.

10           **THE COURT:**  Who is going to use this as leverage

11   against Spotify?

12           **MR. HOGBERG:**  Well, potentially other platforms, Apple

13   iOS.

14           **THE COURT:**  How would Apple iOS use this number

15   against Spotify?

16           **MR. HOGBERG:**  Well, to the extent that Spotify

17   attempts to use -- tries to negotiate better terms than what it

18   has with Google, Apple can --

19           **THE COURT:**  Better than this?

20           **MR. HOGBERG:**  Your Honor, so the other aspect, the

21   other harm --

22           **THE COURT:**  I don't see much room for being better

23   than this, so I'm not hearing any reasonable explanation about

24   how this is in any way going to disadvantage Spotify.

25           **MR. HOGBERG:**  Your Honor, the second harm is the harm

1  that it allows.

2      THE COURT:  Not second.  You haven't had any yet, so

3  try again.  What's your first argument?

4      MR. HOGBERG:  Sure.  So well, since Your Honor doesn't

5  accept that, the first harm would be Spotify's competitors,

6  which would be the number of streaming platforms, Title,

7  SoundCloud, Pandora, they are in competition with Spotify, and

8  they would like to negotiate similar terms that Spotify is

9  negotiating.

10     THE COURT:  That's their problem.  If Spotify wins the

11 prize, what do they care if Pandora gets stiffed?  They're

12 competitors, so by definition I don't see how anything that

13 Pandora is going to do with this number that can in any way

14 affect Spotify other than make it feel good that it got a

15 better deal than a rival.  I'm not hearing anything from you to

16 the contrary.

17     MR. HOGBERG:  Your Honor, the harm is the exact same

18 harm that is particular in all the licensing cases where the

19 terms of licensing agreements that parties have --

20     THE COURT:  This isn't a license.

21     MR. HOGBERG:  I beg your pardon, Your Honor?

22     THE COURT:  Not a license.

23     MR. HOGBERG:  The harm is the same, Your Honor,

24 because the licensing agreements are simply what are the

25 licensing terms, what is the percentage licensing fees paid,

 1   that is the exact same type of issue as what are the --

 2        **THE COURT:**  I just don't think so.  I see licenses all

 3   day in my patent cases and in other cases.  This has none of

 4   the competitive disadvantages of a license.

 5        A license is when you have two people who are competing

 6   against each other and they both have technology from an

 7   upstream source, and if one pays less than the other, then

 8   that's an advantage.  This has nothing to do with that.  This

 9   is a deal between Spotify and Google for Spotify's fee.  It has

10   nothing to do with Spotify vis-a-vis Pandora or Apple Music or

11   anything else.

12        **MR. HOGBERG:**  Your Honor, so the reason why this is

13   similar to licensing fee is because this is not your

14   run-of-the-mill off-the-shelf agreement regarding how much

15   Spotify pays.  This was an agreement that was negotiated

16   through hundreds of hours of efforts, and it involves not just

17   the fee, it involves additional parts of the agreement related

18   to the fee regarding co-marketing, and those co-marketing

19   develop new technologies for purposes of the payment platform,

20   and those are all integrated into the numbers that are included

21   in these agreements.

22        And, furthermore, Your Honor, these are actually subject

23   to ongoing negotiations between the parties currently about the

24   implementation of these co-marketing agreements, and so on,

25   which bears --

**WATTS - VIDEO TESTIMONY - NOT REPORTED**

1          **THE COURT:**  Let me tell you this, are these numbers

2    actually in effect now in a signed agreement?

3          **MR. HOGBERG:**  Your Honor, I believe they are derived

4    from the in-effect agreement that was signed in 2022.

5          **THE COURT:**  Oh, so you already have the business

6    locked in stone.  Google can't yank it out in spite or anything

7    else, because they'd be in breach of contract.  So you're okay

8    on that.

9       Let me hear from Epic.

10         **MR. HUESTON:**  Your Honor --

11         **THE COURT:**  Why do you need this?  I mean --

12         **MR. HUESTON:**  Well, as I outlined earlier, part of our

13   case is that these -- google has argued that 15/30, that

14   structure is required, it's critical to their model.  And what

15   I'm going to show in my exam is that in fact it's not critical,

16   it's arbitrarily set in multiple ways, and one of the examples

17   illustrating that is what they did with Spotify, which shows

18   particularly in contrast with user choice, which requires the

19   equivalent of paying 30 percent anyway, which is no real

20   choice.  The deal here and the percentage point reflects what

21   their real cost is.

22         **THE COURT:**  Well, my concern is -- I mean, there's a

23   number in and of itself, as your colleague has suggested, could

24   have all sorts of things packed into it, you know:

25   Co-marketing, strategic alliances.  The numbers didn't come out

 1   of the blue because Spotify drove a good bargain, and there was

 2   a lot of negotiation.

 3       Now we're going to have to spend hours going into why, how

 4   did Spotify get this number?  And they're going to say, well,

 5   look, you can't use this as a bellwether because this was a

 6   really complicated deal with a behemoth and the online music

 7   industry, and this is *sui generis*, and have 15 different

 8   factors and four hours are going to go by on this.

 9           **MR. HUESTON:**  Your Honor, we actually have admissions

10   from the witness as to exactly why they gave this deal.  It's a

11   very efficient, you know, pathway right to the number as to why

12   they did it:  For agitation, going vocal, contagion, the same

13   sorts of issues that have already been introduced at trial.

14   It's the same thing.  It's absolutely critical as to what Epic

15   is trying to do.

16           **THE COURT:**  So you're saying -- you're telling me it's

17   a clean-shot explanation.

18           **MR. HUESTON:**  Yeah, right through the witness.

19           **MR. POMERANTZ:**  Your Honor, everything you said is

20   everything that's true about this deal.  There is many, many

21   different components that add up to the deal here, not just the

22   economic and other value exchanges, but Spotify itself and what

23   it means to people who use mobile devices.  It will be quite an

24   extended discussion with the jury no matter what he says are

25   the admissions.  We know what the deal is.  They know what the

1   deal is.  They can read it.  We've produced it to them.  There

2   are a lot of components to it, and there's a lot of things that

3   are specific to Spotify.

4        MR. HUESTON:  Your Honor, there's no dispute that this

5   is relevant.

6        THE COURT:  Well, no, look, here's what we're going.

7   Mr. Pomerantz has already agreed that you can show it to the

8   jury.  That's not the issue.  The only issue is it might be --

9   it's going to be published outside of me and the jury.

10        MR. HUESTON:  Right.  It is hard for me to ask

11   questions.  I'm going to say, and look at that, and the record

12   is going to be sort of muddy as to what I'm trying to --

13        THE COURT:  Well, I mean, how much time are you going

14   to spend on these numbers?  You're going to ask a couple

15   questions and you're going to say --

16        MR. HUESTON:  Show the demonstrative, right, try to

17   draw out the comparisons.  I can try to redact, you know, and

18   not say it on the record.  Yeah, I can do that.

19      Again, I think for the reasons that Your Honor just

20   probed, there's no reason why those numbers can't be out loud.

21   It makes, you know, important public record on this point.

22        THE COURT:  Why am I just getting this right now?  Why

23   is this, with the jury waiting?  Why is this happening now?

24        MR. HUESTON:  We didn't think --

25        THE COURT:  Why didn't it happen two days ago?  At the

1  beginning of the trial I said bring all this to me at least a

2  day in advance.  So you're just going to have to push this

3  witness.  I'm not going to decide on the fly.  So if you want

4  to do this, you're going to have to wait.  I need some time to

5  think about this and decide what I'm going to do.

6          MR. POMERANTZ:  Your Honor, may I --

7          THE COURT:  Look.  And from now on, I'm just not going

8  to take these things up, meaning you can't do it, okay?  The

9  proponent cannot do it if I don't get it in time.  And getting

10  it at the lunch break or a little bit before when the jury is

11  cooling its heels waiting to come in, and they should have been

12  in here 15 minutes ago, isn't going to fly, all right?

13          MR. HUESTON:  Your Honor, then my backup is then fine.

14  We will not publish it.  We will just proceed and we'll hand

15  out the demonstratives to the jury so as not to waste time.  We

16  did meet --

17          THE COURT:  I require at least a court day in advance.

18  So if you want to do this on Wednesday, you get it to me by

19  Monday at 5 p.m., all right?  You know this is coming up.  It's

20  all scripted out.  I know how this works, you know how it

21  works, so you tell me at least one full court day in advance,

22  all right?

23          MR. HUESTON:  Yes.

24          THE COURT:  This is too complicated and too risky for

25  me to be shooting from the hip, and I refuse to do it.

 1          All right.  So we'll do that today.  Don't slip up, okay?

 2              MR. HUESTON:  Yes, Your Honor.

 3              THE COURT:  Let's bring the jury in.

 4          And just to be clear, I am not ruling on the merits.  This

 5     is a stopgap interim measure that will not be binding in any

 6     way of what I do in the future.

 7              (Jurors enter courtroom.)

 8              (Proceedings were heard in the presence of the jury:)

 9              THE COURT:  Okay.  Fire it up.

10          (Video depo continued.)

11              THE COURT:  Is that it?  Okay.  Who is next?

12              MR. HUESTON:  Thank you, Your Honor.  Epic calls

13     Purnima Kochikar.

14              THE COURT:  Okay.

15              THE CLERK:  Can you please stand and raise your right

16     hand?

17                          PURNIMA KOCHIKAR,

18     called as a witness for the PLAINTIFFS, having been duly sworn,

19     testified as follows:

20              THE WITNESS:  I do.

21              THE CLERK:  Thank you.  Please be seated.

22          Please state your name for the Court and spell your last

23     name.

24              THE WITNESS:  Purnima Kochikar, K-O-C-H-I-K-A-R.

25              THE CLERK:  Thank you.

1       <u>**DIRECT EXAMINATION**</u>

2   **BY MR. HUESTON:**

3   **Q.**   Good afternoon, Ms. Kochikar.

4   **A.**   Good afternoon.

5   **Q.**   You work for Google, correct?

6   **A.**   Yes.

7   **Q.**   And you began working at Google more than a decade ago in

8   2012, correct?

9   **A.**   Yes.

10          **THE COURT:**  Would you mind just pulling that a little

11  bit closer to you.

12      Go ahead.

13          **THE WITNESS:**  Is this better?

14          **THE COURT:**  Yes.

15          **MR. HUESTON:**  Yes.

16          **THE WITNESS:**  Okay.  Thank you.

17  **BY MR. HUESTON:**

18  **Q.**   And your title in October 2012 when you first joined

19  Google was Director of Apps and Games at Google Play, correct?

20  **A.**   Yes.

21  **Q.**   And in 2020 you became vice-president of Google Play

22  Partnerships, right?

23  **A.**   Yes.

24  **Q.**   There's been a lot of discussion about --

25          **THE COURT:**  You're going to have to keep your voice

1    up, okay?

2                **THE WITNESS:**  I will.

3                **THE COURT:**  Just boom it out, all right?

4                **THE WITNESS:**  All right.

5                **THE COURT:**  Go ahead.

6    **BY MR. HUESTON:**

7    **Q.**   There's been discussion about Chats at this trial, so I

8    want to ask you:  During this case you had your default setting

9    to delete Chats every 24 hours, correct?

10   **A.**   That was the default.

11   **Q.**   Right.  And you didn't take any steps to change any of

12   those deletion settings for your Chat software, correct?

13   **A.**   Yes.

14   **Q.**   All right.  And you've admitted that on at least one

15   occasion Google employees added privileged language and copied

16   in a Google lawyer even though there was no legal advice being

17   sought, correct?

18   **A.**   I may have, I don't recall.

19               **MR. HUESTON:**  Okay.  Your Honor, we'd like to go to

20   deposition at page 60, tab 1, page 66 --

21               **THE COURT:**  66?

22               **MS. CHIU:**  Your Honor, we object to this line of

23   questioning.  There's been a motion --

24               **THE COURT:**  Let me see where we are.  Page 66, okay.

25               **MR. HUESTON:**  Page 66, Your Honor.

1          **THE COURT:**  And what line?

2          **MR. HUESTON:**  Starting at line 8 going into page 67 to

3     get the full context to line 18.

4          **THE COURT:**  Okay.  That's fine.

5          **MR. HUESTON:**  Let's play that, please.

6          (video clip played:)

7     **"Q.**  Before we get to that, just going back to the second

8     page with Mr. Rosenberg's original email, if you could

9     turn to that, please?

10    **"A.**  Yeah.

11    **"Q.**  So the top of his email he writes, attorney-client

12    privilege, with a parentheses (Tia, please advise.)

13    Do you see that?

14    **"A.**  Yes.

15    **"Q.**  And that's a reference to Tia Arzu; is that right?

16    **"A.**  Yes.

17    **"Q.**  Is that a yes?

18    **"A.**  Yes.

19    **"Q.**  She is an in-house lawyer at Google; is that right?

20    **"A.**  Yes.

21    **"Q.**  So Mr. Rosenberg added her to this email and said

22    please advise, and that's the only reference to her in

23    that email, right?

24    **"A.**  Yes.

25    **"Q.**  And she jumps in on the chain in the first page

1      saying that neither she nor anyone on her team had been

2      involved in this issue previously.

3      Do you see that?

4      "A.  Yes.

5      "Q.  So there had been no legal advice sought or obtained

6      from Google Legal about any of these issues before

7      Mr. Rosenberg copied her in with the 'please advise'

8      language, right?

9      "A.  It was all happening in realtime.  But Tia usually is

10     very involved in a lot of these decisions on how we think

11     about partnerships.

12     "Q.  There is no legal advice being sought in this email,

13     correct?

14     "A.  No."

15     BY MR. HUESTON:

16     Q.  And just so the record is clear, you said "no" there at

17     the end of that line of questioning, right?

18     A.  Yes, that's what I said there.

19     Q.  Okay.  Let's go to a different topic.

20          Now, Ms. Kochikar, in both of your roles, Director of Apps

21     and Games at Google Play and as Vice-President of Google Play

22     Partnerships, you were at all times trying to ensure that

23     developers were offering their apps on Google Play, correct?

24     A.  Yes.

25     Q.  For example, you're familiar with the Fortnite application

1   offered by Epic Games, right?

2   **A.**   Of course.

3   **Q.**   And it's important to Google that popular games like

4   Fortnite launch on Google Play, right?

5   **A.**   Yes.

6   **Q.**   And you want popular games like Fortnite to come to Google

7   Play in part so that Google can make money off the revenue

8   developers' collection from those games, right?

9   **A.**   Yes, and also that our users gain access to those games.

10  **Q.**   Right.  The answer is "yes," and your counsel will have a

11  chance to ask you about other talking points.

12       The answer to that is "yes," right?

13  **A.**   Yes.

14  **Q.**   Now, one of the ways that Google Play makes money is by

15  charging a service fee when users make in-app purchases from

16  certain app developers, right?

17  **A.**   Yes.

18  **Q.**   Okay.  And specifically users purchase content or services

19  provided by the app developers, right?

20  **A.**   Yes.

21  **Q.**   But Google takes for itself between 15 to 30 percent of

22  the transaction amount for games and digital bits and services,

23  right?

24  **A.**   That's our business model.

25  **Q.**   Yes.  And your own colleague at Google has called these 15

1   and 30 percent rates arbitrary, right?

2   **A.**   It could be a person's opinion.

3   **Q.**   Right.  Let's get to that.  Let's go to Exhibit 704, and

4   that's in the book there in front of you.

5   Do you have that in front of you, Ms. Kochikar?

6   **A.**   Yes, I do.

7   **Q.**   Thank you.  And you're listed as an email recipient on

8   that, right?

9   **A.**   Yes.

10       **MR. HUESTON:**  Okay.  We'd move to admit this at this

11   time, Your Honor.

12       **MS. CHIU:**  No objections.

13       **THE COURT:**  It is admitted.

14               (Trial Exhibit 704 received in

15                 evidence.)

16       **MR. HUESTON:**  All right.  Publish, please.

17   **BY MR. HUESTON:**

18   **Q.**   And, Ms. Kochikar, this is an email chain between numerous

19   Google employees, correct?

20   **A.**   Yes.

21   **Q.**   And the subject is Tinder and Google Play Billing in

22   brackets [concern], right?

23   **A.**   Yes.

24   **Q.**   Now, Tinder is a dating app on Google Play, right?

25   **A.**   Yes.

1   Q.   And let's go to the seventh page of the exhibit.  We'll

2   electronically do that, so the first email in the chain.  And

3   we're focusing on an email from Brandon Barras at Google; do

4   you see that?

5   A.   Yes.

6   Q.   All right.  And Mr. Barras wrote that "There is growing

7   concern that Tinder may add additional billing options, or move

8   away from Play billing all together, in early 2017."

9        Right?

10  A.   Yes.

11  Q.   Now, if Tinder did not use Google Play Billing, then it

12  would not pay Google's service fees, right?

13  A.   Yes.

14  Q.   All right.  So to keep Tinder using Google Play Billing,

15  Mr. Barras suggested offering Tinder a 15 percent service fee

16  instead of the 30 percent service fee that they had been

17  paying?

18  A.   There's more context to that.

19  Q.   Okay.  But you can see in the line here, let me read the

20  third sentence that's highlighted:  "We would like to discuss

21  mitigating that risk by offering 15 percent rev share to Match

22  Group."

23       That's what he said, correct?

24  A.   It's one opinion.  We actually take into account many

25  different opinions before --

KOCHIKAR - DIRECT / HUESTON

1    **Q.**   Try to focus on my question.

2    **A.**   Yes.

3    **Q.**   That's what he said there in that sentence, correct?

4    **A.**   Yes.

5    **Q.**   All right.  Now let's go to the bottom of page 2, to the

6    top of page 3 to an email from Sameer Samat.

7    **A.**   Give me a moment, please.  Yes.

8    **Q.**   It's up on the screen, too.

9    **A.**   Yes.

10   **Q.**   And let's talk a second about Mr. Samat.  He was the

11   overall leader for Android and Google Play, correct?

12   **A.**   Correct.

13   **Q.**   All right.  And he writes in the last paragraph of his

14   email, and I'm going to highlight here, middle of page 3 of the

15   Exhibit:  "I think all this 30 percent, 15 percent stuff is

16   pretty arbitrary."

17        Those were his words, right?

18   **A.**   Yes.

19   **Q.**   All right.  Now, let's go to Mr. Samat's email at the top

20   of page 2, and he writes -- are you following me there on the

21   screen?

22   **A.**   Yes.

23   **Q.**   Okay.  And he writes here, quote:  I still find 15 percent

24   number kind of random.  I understand what Paul is saying that

25   Apple set a benchmark, but it seems like a gigantic decision

1   and justifying such a huge business model impacting number, for

2   the developer too, with Apple did it, feels bad to me.

3       Those were his words, right?

4   **A.**   Yes, that's what's here.

5   **Q.**   That's what's there.  And so what we just read, that's

6   Mr. Samat, the overall leader of Android and Google Play

7   writing to you, and all the other Google employees on this

8   email, that the 30 percent and 15 percent fees are pretty

9   arbitrary and random.  Those were his words, right?

10  **A.**   His words.

11  **Q.**   Okay.  Now, let's explore -- we can take that down.

12      Let's explore some reasons why Mr. Samat, the overall

13  leader of Android and Google Play, said that these fees are

14  pretty arbitrary and random.

15      Now, Ms. Kochikar, you believe that the service fees are

16  justified by the value, the claimed value of services that

17  Google says it provides to developers, right?

18  **A.**   Yes, of course.

19  **Q.**   Okay.  And Google claims it provides services like App

20  Discovery, right?

21  **A.**   Yes, of course.

22  **Q.**   But you also know that some developers don't receive the

23  value that Google claims it provides, right?

24  **A.**   Every developer is different.

25  **Q.**   Exactly.  So, for example, a developer with brand

1   recognition on its own may benefit less from the so-called

2   discoverability that Google Play provides than a small

3   developer that's less well known, right?

4   **A.**    Depends on the market.

5   **Q.**    Okay.  Let's go to your deposition tab 1 August 31st,

6   page 302, line 21, Your Honor, to 303.  I'm sorry.

7         302, line 21 to 25.

8              **THE COURT:**  That's fine.

9              **MR. HUESTON:**  Okay.  Let's put this up, please, and

10  put it on the screen.

11        **"Q.**  For example, a developer with brand recognition may

12        benefit less from the discoverability that Google Play

13        provides than the small developer that's less well known,

14        right?"

15  And you answered:

16        **"A.**  Yes."

17        And then you add some additional stuff.  But your answer

18  there is "yes," right?

19  **A.**    Yeah, in context with the broader answer that I gave.

20  **Q.**    Yeah, the answer is "yes," correct?

21  **A.**    Yes.

22  **Q.**    Okay.  We can put that down.

23        And then based on the inputs, when Google created that

24  model, there was -- let me back up a little bit.

25        Google in fact created a model, did it not, to analyze the

1    value it provides to developers; do you remember that?

2    **A.**   We did many models.

3    **Q.**   Okay.  And based on the inputs, when Google created the

4    model, they found a gap between the value that certain

5    developers were paying Google and the value that those

6    developers got from Google, correct?

7    **A.**   Based on the vectors, certain vectors, yes, not all.

8    **Q.**   Okay.  In fact, Google itself calculated a value gap for

9    200 top developers; do you remember that?

10   **A.**   It was one model, yes.

11   **Q.**   Okay.  One model that talked about 200 top developers,

12   right?

13   **A.**   Yes.

14   **Q.**   Okay.  Let's go to Trial Exhibit 1526.

15        Take a look there, and this is an email to you, correct?

16   **A.**   1526, yes.

17        **MR. HUESTON:**  Yes.  We'd move to admit at this time,

18   Your Honor?

19        **MS. CHIU:**  No objections.

20        **THE COURT:**  It is admitted.

21                     (Trial Exhibit 1526 received in

22                      evidence.)

23        **MR. HUESTON:**  Okay.  Let's publish, please.

24   BY MR. HUESTON:

25   **Q.**   And this is an email dated September 13th, 2019, correct?

1    **A.**   Correct.

2    **Q.**   It was sent to you.  And so let's now look at your email

3    in this chain on September 13th, 2019 at 8:52 a.m.  I have it

4    up on the screen; do you see it?

5    **A.**   Yes.

6    **Q.**   And here you write:  Approximately 200 top devs have a

7    value gap?

8         Do you see that?

9    **A.**   Yes.

10   **Q.**   Devs, that's developers, right?

11   **A.**   Yes.

12   **Q.**   Okay.  And by "value gap," one thing you're referring to

13   is the value gap between the amount in value that Google Play

14   is delivering to the developer compared to the amount the

15   developer is paying in revenue share at Google Play, right?

16   **A.**   No, based on one set of calculations.

17   **Q.**   Right.  And, in fact, well-known apps like Tinder pay

18   Google much more than the value that Google provides, right?

19   **A.**   At that point Tinder grew very big on Google Play earlier.

20   **Q.**   Right.  So the answer is "yes," correct?  Well-known apps

21   like Tinder, at least during this time period, were paying

22   Google much more than the value that Google provided, right?

23   **A.**   At that point, yes.

24   **Q.**   Okay.  So let's now take this down and go to Trial

25   Exhibit 1537.

 1        Take a look at that, and you should see this as an email

 2   sent by you; do you see that?

 3   **A.**   Yes.

 4            **MR. HUESTON:**  And we'd move this into evidence at this

 5   time, Your Honor.

 6            **MS. CHIU:**  No objections.

 7            **THE COURT:**  It is admitted.

 8                            (Trial Exhibit 1537 received in

 9                             evidence.)

10   **BY MR. HUESTON:**

11   **Q.**   Okay.  Now, up at the screen, it's dated July 23rd, 2019,

12   and it's sent by you to a Sarah Karam at Google, right?

13   **A.**   Yes.

14   **Q.**   And the subject of this email is Update on Tinder/GPB.

15        That's Google Play Billing, right?

16   **A.**   Correct.

17   **Q.**   Okay.  Now, at this time -- first of all, Tinder, you know

18   that's owned by the Match Group, right?

19   **A.**   Yes.

20   **Q.**   Okay.  And at this time you recall being involved in

21   discussions to have Google perform an analysis on the value

22   that Google provided Tinder and other dating apps owned by the

23   Match Group, right?

24   **A.**   Yes.

25   **Q.**   And Google had that analysis done, right?

1   **A.**   Yes.

2   **Q.**   And so if we go to the second page to the rest of this

3   email, and I'm going to highlight it for you, about 1/4th of

4   the way down the page in the bullet that starts there, do you

5   see that one, it stays Despite...?

6        Mr. Barras writes:  "Despite generating the highest apps

7   revenue from Play, Tinder severely under indexes on the

8   percentage of installs coming from Play-driven sources, for

9   example, Prex, Related, et cetera, versus dating peers and

10  games."

11       Do you see that?

12  **A.**   That's what's written here.

13  **Q.**   Right.  And you don't disagree with Mr. Barras that Tinder

14  at this time was generating the highest revenue of any app on

15  Play, right?

16  **A.**   I don't know.  I mean, it is his email.

17  **Q.**   Right.  But as you've testified, if Mr. -- if Brandon

18  knows it, if he says it's highest, it would be, right?

19  **A.**   Yes.

20  **Q.**   Okay.  And that's valuable to Google, right?

21  **A.**   Yes.

22  **Q.**   Because if Tinder generates more revenue from in-app

23  purchases, that means Google can collect more service fees from

24  Tinder, right?

25  **A.**   Yes.

1  **Q.**   Okay.  And you believe those service fees are justified in

2  part because Google brings users to apps like Tinder, right?

3  That's what you said, correct?

4  **A.**   Yes, but we listened to Tinder.

5  **Q.**   I'm sorry.  Yes.  Thank you.

6  **A.**   Yes.

7  **Q.**   And Mr. Barras, he writes here, quote, a little further

8  down:  In 2018, only 8 percent of Tinder's installs came from

9  Play-driven sources.

10      Are you following me?

11  **A.**   Yes.

12  **Q.**   Versus 15 percent for OKC.  You know that's OK Cupid,

13  right?

14  **A.**   Yes.

15  **Q.**   One of the Match Group apps?

16  **A.**   Yes.

17  **Q.**   And 27 percent for Meetic, also a Match Group app, right?

18  **A.**   Yes.

19  **Q.**   And so compared to the other apps, Google was not driving

20  many installs on Tinder, right, compared to OKC and Meetic?

21  **A.**   At that point.  Those apps were earlier, so they were

22  getting installs.  Tinder had gotten bigger, but that's how app

23  stores provide value.

24  **Q.**   Well, right, so at that time Google Play Store providing

25  only 8 percent versus 15 and 27 percent from outside sources,

1  right?

2  **A.**    Yes.

3  **Q.**    Okay.  So fair to say Tinder itself was driving its own

4  installs of its app through its own efforts, right?

5  **A.**    On average, but not in the emerging markets.

6          **MR. HUESTON:**  Your Honor, let's go to, if I can,

7  page 308, lines 5 to 7 of the deposition.  Tab 1.

8          **THE COURT:**  308?

9          **MR. HUESTON:**  Yes.

10          **THE COURT:**  Yes, that's fine.

11          **MR. HUESTON:**  Thank you.

12  **BY MR. HUESTON:**

13  **Q.**    Let's put it up.

14          "**Q.**  Tinder itself was driving its own installs of its app

15          through its own efforts, correct?

16          "**A.**  Yes."

17          That's you, right?

18  **A.**    Yes.

19  **Q.**    Okay.  And that is probably because Tinder has excellent

20  brand recognition; you acknowledge that, right?

21  **A.**    Yes.

22  **Q.**    Okay.  Back to the document, Mr. Barras writes, back to

23  that "despite" bullet, we can pull that up, 1537.  Getting it

24  up.  All right.  There we are.

25          Okay.  So now we're at the bottom of this bullet here from

1   Mr. Barras, and he writes:  This bolsters their assertion that

2   people mostly come to Play looking for Tinder, right?

3   A.   That is the assertion.

4   Q.   Right.  And, Ms. Kochikar, you have no reason to doubt

5   that because of Tinder's brand recognition, people mostly go to

6   the Play Store already looking for Tinder, and they do a search

7   for Tinder and that's how they download the app, correct?

8   A.   Yeah.

9   Q.   That's a "yes."  Okay.

10       Now, in the next paragraph, let's go to that, Mr. Barras

11  writes:  "The relative discovery value they have been deriving

12  from Play has decreased since 2017, due to an increasing share

13  of acquisitions coming from Search and Search-driven

14  reinstalls."

15       In parallel, their revenue has been increasing Y/Y, that's

16  year over year, right?

17  A.   Yes.

18  Q.   "Thus, the team estimates that if you compare the value of

19  nonSearch-driven discovery versus revenue share paid, Tinder is

20  now deriving only 10 percent of the revenue share value versus

21  the 30 percent share they pay."

22       That's what he wrote here, right?

23  A.   Yes, he's trying to understand --

24  Q.   I just asked, that's what he wrote, right?

25  A.   Yes.

1   Q.    Okay.  Now let's go to the first page of the document, the

2   email from Mr. Feng, the bottom of the first page.  Do you see

3   that, on the screen?

4   A.    Yes.

5   Q.    Okay.  And Mr. Feng writes:  The analysis does a nice job

6   quantifying Tinder's "people mostly come to Play looking for

7   Tinder's" argument.  Right?

8   A.    Yes.

9   Q.    And he continues:  "As part of the magical bridge and

10  payment policy efforts, we're looking at ways to tier pricing -

11  we can potentially use this.  Consider a pricing tier based on

12  apps/brands that bring an inordinate number of users/FOPs/NPUs

13  to the store."

14        Do you see that?

15  A.    Yes.

16  Q.    And you understood that he was suggesting giving a price

17  break to apps like Tinder that bring a lot of users to the

18  Google Play Store, right?

19  A.    It was one vector.  We looked at many different ways.

20  Q.    Okay.  You understood that was his suggestion here, right?

21  A.    Yes, at that moment.

22  Q.    Right.  But Google didn't do that, did it?

23  A.    We didn't do it.

24  Q.    You didn't do it.  Despite Mr. Feng's suggestion here,

25  Google's 30 percent or 15 percent rate today does not take into

KOCHIKAR - DIRECT / HUESTON

1  account the relative number of users that a brand brings to

2  Google Play, correct?

3  **A.**   Yes, but we took a home much bigger approach.

4  **Q.**   Thank you.  Ms. Kochikar, your counsel will have a chance

5  to follow up as he sees fit.

6      All right.  We can take that document down.

7      Let's look at another possible reason why Mr. Samat was

8  describing the Google service fee as arbitrary.

9      Google claims it provides services to all app developers

10 but it only charges some of them for the service fee, right?

11 **A.**   Yes.

12 **Q.**   Okay.

13 **A.**   Where am I looking?

14 **Q.**   You're just looking at me.  I'm just asking you a

15 question.

16 **A.**   Okay.

17 **Q.**   Not everyone is on a document.

18     And most developers today who are monetizing their apps,

19 they're doing so not to repay downloads, but, rather, through

20 in-app purchases, right?

21 **A.**   Yes.

22 **Q.**   Yes.  And today, Google charges a 30 percent fee on all

23 in-app purchases for games after the first one million dollars

24 in sales in a calendar year, right?

25 **A.**   Yes.

1  **Q.**   Okay.  And an example, again, of a developer that offers

2  games is Epic, correct?

3  **A.**   Yes.

4  **Q.**   And even for the first million dollars of revenue, Google

5  charges game developers like Epic at least 15 percent, right?

6  **A.**   Yes.

7  **Q.**   Okay.  So let's put up -- I'm going to put up what I'm

8  calling Kochikar demonstrative number 1 to reflect what we've

9  just gone over, okay?  So let's put this up.

10      And looking at this, Ms. Kochikar, this includes the

11  percentages we just discussed for games, right?

12      **MS. CHIU:**  Your Honor, we object.  We did not see this

13  demonstrative before today.

14      **MR. HUESTON:**  Oh, it's in the front pocket of your

15  binder, and I'll pause if you want to take a look at it.

16      **THE COURT:**  Let me just tell the jury, the

17  demonstrative is just an illustration.  It's not going to come

18  into evidence, okay?  So it's not like things -- when you hear

19  me say "it's admitted," this is not being admitted, but it's

20  just helping the lawyer illustrate his or her point.

21      Okay.  Go ahead.

22      What are we waiting for?

23      **MS. CHIU:**  Your Honor, this is the first time we've

24  seen this demonstrative, so we're just --

25      **THE COURT:**  Oh, do I have it?

1          **MR. HUESTON:**  It's in your binder in the front pocket,

2     yes.

3          **THE COURT:**  You mean depos or exhibits?

4          **MR. HUESTON:**  It's the exhibit, Your Honor, front

5     pocket.

6          **THE COURT:**  Oh, this thing?

7          **MR. HUESTON:**  Yes.

8          **THE COURT:**  Just the front page is the demonstrative?

9       All right.  Okay.  What's the problem?

10         **MS. CHIU:**  We haven't had a chance to review it.  I

11    don't see anything objectionable in the first few pages, but I

12    haven't had a chance to look at all of them.  So at this point

13    if we have an objection to something, we will let counsel know.

14         **THE COURT:**  No, there are no placeholder objections.

15    Just take a minute and go through them.

16       This whole thing?

17         **MR. HUESTON:**  Well, I'm only going through a couple of

18    these pages now.  Others are going to be coming up later.

19         **THE COURT:**  Okay.  Which ones do you want to use in

20    the next, say, half hour?

21         **MR. HUESTON:**  One moment, Your Honor.

22       I think the first 11 pages.

23         **THE COURT:**  Let's do this in tranches.  Look at the

24    first 11 pages, please, Google.

25         **MS. CHIU:**  We have an objection to slide 11.

1          **THE COURT:**  Objection to slide 11.  Okay.  What's the

2     objection?

3          **MS. CHIU:**  We don't understand what it means, so we

4     don't believe it fairly represents evidence that's been

5     admitted.

6          **THE COURT:**  All right.  That's overruled.

7       Go ahead.  But just the first 12 for now, okay?

8          **MR. HUESTON:**  Yes.  Thank you, Your Honor.

9  **BY MR. HUESTON:**

10 **Q.**   Okay.  I put in front of you, Ms. Kochikar, what we're

11    saying -- what we're calling Kochikar demonstrative number 1;

12    do you see it there?

13 **A.**   Yes.

14 **Q.**   Okay.  And this includes the percentages we just

15    discussed, right?

16 **A.**   Yes.

17 **Q.**   So you can see there Google Play Billing for in-app

18    purchases, the first million dollars of revenue for games and

19    digital goods, 15 percent, right, up to the first million?

20 **A.**   Yes.

21 **Q.**   And in-app purchases after, above one million is

22    30 percent, right?

23 **A.**   Yes.

24 **Q.**   Thank you.  And now, Google's -- you can put that down for

25    now, and I just want to step back with it.

1          Google's stated philosophy is that it does not make money

2    unless developers make money, right?

3    **A.**    Yes.

4    **Q.**    Okay.  But apps that offer physical goods and services,

5    some of those make money, right?

6    **A.**    Not consumed on the store.

7    **Q.**    Okay.  But some of those apps that offer physical goods

8    and services, they make money, right?

9    **A.**    Outside the store.

10   **Q.**    Okay.  Some of them are mega developers, right?

11   **A.**    Yes.

12   **Q.**    Examples include Uber and Amazon, you consider those to be

13   very big developers, mega developers, right?

14   **A.**    Yes.

15   **Q.**    But Google doesn't charge a fee when apps from mega

16   developers like Uber and Amazon make in-app sales, right?

17   **A.**    They -- it's because of the right, they don't consume the

18   goods inside the store.

19   **Q.**    Right.  So --

20   **A.**    Uber makes money because people take rides.

21   **Q.**    Well, let's put up Kochikar demonstrative number 2.  And

22   Google Play Billing, its approaches for apps involving physical

23   goods, right, zero percent for in-app purchases up to the first

24   million in revenue and zero for in-app purchases after a

25   million in revenue, right?

KOCHIKAR - DIRECT / HUESTON

 1   **A.**   Yes.

 2   **Q.**   All right.  We can put that aside for now.

 3        And now there are also apps on Google Play that are what

 4   are known as consumption only, right?

 5   **A.**   Yes.

 6   **Q.**   And an example of a consumption-only app on Google Play is

 7   Netflix, right?

 8   **A.**   Yes.

 9   **Q.**   And you know that consumption-only apps like Netflix, they

10   also make money, right?

11   **A.**   Yes.

12   **Q.**   All right.  But Google doesn't charge a fee on

13   consumption-only apps, right?

14   **A.**   Could you repeat that, please?

15   **Q.**   Sure.  Google doesn't charge a fee for consumption-only

16   apps for in-app purchases, right?

17   **A.**   Yes.

18   **Q.**   Okay.  So now let's put up Kochikar demonstrative number 3

19   to get all this in one chart again.

20        So this is what we just covered.  For consumption-only

21   apps like Netflix, in-app purchases up to the first million,

22   zero percent, right?

23   **A.**   Yes.

24   **Q.**   And for in-app purchases after a million in revenue, zero

25   percent, right?

1   **A.**   Yes.

2   **Q.**   Okay.  And Ms. Kochikar, you agree that there are, in

3   fact, loads of apps like Amazon, Uber, and Netflix on Google

4   Play that make money and never have to pay anything to Google,

5   right?

6   **A.**   Yes.

7   **Q.**   Okay.

8   **A.**   They don't make money on Google Play.

9   **Q.**   Okay. Well, the answer is "yes," right?  They don't have

10   to pay to Google.  There's no fee to Google Play Billing,

11   right, for those apps?

12   **A.**   That's our business model, but they don't make money on

13   Google Play.

14   **Q.**   Well, they're doing in-app, they're processing in-app

15   purchases for physical goods and consumption, right, through

16   Google Play, right?

17   **A.**   The goods are outside.  They're not consumed inside the

18   app.

19   **Q.**   You can buy an Amazon product on an app, right?

20   **A.**   Yes.

21   **Q.**   Okay.

22   **A.**   And Amazon has billing for things that get consumed inside

23   the app, like Amazon Prime.

24   **Q.**   Okay.  Just try to focus on my question.

25   **A.**   Of course.

KOCHIKAR - DIRECT / HUESTON

1  **Q.**  You can buy an Amazon product with an app, right, on

2  Google Play?

3  **A.**  Yes.

4  **Q.**  And this chart reflects what happens there for physical

5  goods, for consumption, there is zero assessed for those in-app

6  transactions, right?

7  **A.**  The physical good is not consumed.

8  **Q.**  Ms. Kochikar, just an easy yes or no?

9  **A.**  Yes.

10 **Q.**  Okay.  Thank you.  And now, let me ask you, though, for a

11 small game developer who is just starting out, they still have

12 to pay 15 or 30 percent of every dollar earned in in-app

13 purchases to Google Play, right?

14 **A.**  Yes, however, 90 pers --

15 **Q.**  I'm sorry.  Yes.  Thank you.

16     And that's true even if they were operating in the red and

17 losing money, right?

18     Yeah, it's a simple formula, right?  You do an in-app

19 purchase up to a million dollars, it doesn't matter how well

20 you're doing as a company, you gotta pay the 15 percent to

21 Google, right, if you are a game or digital goods, correct?

22 **A.**  Yes, but that's not --

23 **Q.**  Yes.  Thank you.

24 **A.**  -- how this works?

25 **Q.**  I just want answers to my questions.  Thank you.

1          And if that start-up game developer was losing money or in

2     the red, they'd still have to pay those fees for in-app

3     purchases, right?

4     **A.**   Yes.

5     **Q.**   Now, let's talk about another possible reason why

6     Mr. Samat was describing service fees as arbitrary.

7          Google claims it provides services to all app

8     developers -- actually, let's jump to another item here.

9          Now, you're aware, Ms. Kochikar, that Google claims that

10    it does provide billing optionality through something it calls

11    User Choice Billing, right?

12    **A.**   Yes, in certain markets they're deploying it more broadly.

13    **Q.**   Right.  And you understand that this lawsuit, this

14    litigation began in around August of 2020, right?

15    **A.**   I suppose so, yes.

16    **Q.**   Yes.  And, but Google did not begin offering what it's

17    calling User Choice Billing until 2022, right?

18    **A.**   Yes.

19    **Q.**   Okay.  And despite the title, User Choice Billing, it's

20    not a real choice, is it?

21              **MS. CHIU:**  Objection, Your Honor, argumentative.

22              **THE COURT:**  It's cross-examination, overruled.

23         Go ahead.

24    **BY MR. HUESTON:**

25    **Q.**   Despite its name User Choice Billing, it doesn't offer a

1    real choice at all, does it?

2    **A.**   We believe it does.

3    **Q.**   Okay.  Well, let's explore that.

4        As we covered, even if a small developer is in User Choice

5    Billing -- well, if a small developer is in User Choice

6    Billing --

7            **THE COURT:**  Can I just jump in?  This may have come up

8    earlier, but can we understand a little bit about what User

9    Choice Billing is?

10           **MR. HUESTON:**  Yes.

11           **THE COURT:**  Just so we know what we're talking about?

12           **MR. HUESTON:**  Yeah, yeah, let's walk through it.

13   Thank you, Your Honor.

14   **BY MR. HUESTON:**

15   **Q.**   So the User Choice Billing program allows developers to

16   use their billing service, their billing systems alongside

17   Google Play Billing, right?

18   **A.**   Yes.

19   **Q.**   Okay.  And you agree that there are certain developers who

20   may have a form of payment or feature that could be beneficial

21   for consumers, right?

22   **A.**   Yes.

23   **Q.**   And Google agrees that developers should have a choice as

24   to which billing system they offer users, right?

25   **A.**   Yes.

1  **Q.**  And so Google claims it's offering billing optionality to

2  allow developers to meet their unique needs, right?

3  **A.**  If they choose to.

4  **Q.**  Okay.  And as of May 2023, May of this year, there were

5  about 75 or 80 developers who were taking part in this User

6  Choice Billing program, right?

7  **A.**  That sounds about right.

8  **Q.**  Right.  And even then, of the millions of developers on

9  Google Play, by that point only 75 or 80 had signed up by that

10  time, May of 2023, right?

11  **A.**  Yes.

12  **Q.**  Okay.  Now, and that's because Google designed the User

13  Choice Billing program to financially incentivize developers to

14  use Google Play Billing and not other payment options, right,

15  Ms. Kochikar?

16  **A.**  That wasn't part of the design.

17  **Q.**  Okay.  Well, let's look at Trial Exhibit 2698.

18  **A.**  Yeah.

19  **Q.**  Okay.  Do you see that?  You recognize this presentation,

20  right?

21  **A.**  Yes.

22      **MR. HUESTON:**  We'll move to admit it at this time,

23  Your Honor.

24      **MS. CHIU:**  No objections.

25      **THE COURT:**  It is admitted.

1                        (Trial Exhibit 2698 received in

2                        evidence.)

3    BY MR. HUESTON:

4    Q.   Okay.  Let's put it up, please.

5         The presentation is entitled Project Everest, Options for

6    Evolving Play's Business Model.

7         Do you see that?

8    A.   Yes.

9    Q.   Let's go to the seventh slide in the exhibit, and the

10   title of this slide is Reminder - Billing Choice and Pricing

11   Are the Primary Complaints.

12        Do you see that?

13   A.   Yes.

14   Q.   And under category 1, Billing Choice, the first complaint

15   listed there is "Devs should be able to choose their billing

16   platform."

17        Do you see that?

18   A.   That is the complaint from the desk.

19   Q.   Right, exactly.  That's a complaint that User Choice

20   Billing was supposed to be addressing, right?

21   A.   We believe it is addressing now.

22   Q.   Okay.  Just focus then.  And the second complaint is,

23   quote:  Users should know about lower prices elsewhere.

24        Do you see that?

25   A.   Yes.

 1   Q.   And, Ms. Kochikar, User Choice Billing is in fact not

 2   designed to address these concerns, right?

 3   A.   We designed --

 4   Q.   Yes or no?  User Choice Billing is not designed to address

 5   the concern that users should know about lower prices

 6   elsewhere, correct?

 7   A.   There is a different way to do it.

 8            MR. HUESTON:  Your Honor, we would ask to go to

 9   deposition page tab 3, page 44.

10            THE COURT:  Tab 3, page 44, yes.

11            MR. HUESTON:  Lines 16 to 22.  Actually, 16 to 19.

12            THE COURT:  That's fine.

13            MR. HUESTON:  Okay.  Let's put it up, please.

14       Does the user choice --

15       "Q.  Does the User Choice Billing program address that

16       concern that users should know about lower prices

17       elsewhere?

18       "A.  That's not designed for that."

19       That's what you said, right?

20   A.   Yeah, because there is another --

21   BY MR. HUESTON:

22   Q.   Okay.  No, I didn't ask about that because that's your

23   answer, right?

24   A.   Yeah.

25   Q.   Okay.  Now, let's go back to the chart.  Category 2 on the

1   right side.  We'll go back to the document, 2698, and on the

2   right side you see Pricing; do you see that?

3   **A.**   Yes.

4   **Q.**   With the complaint quoted there as 30 percent is too high,

5   right?

6   **A.**   Yes.

7   **Q.**   And you'll admit the User Choice Billing program, it's

8   also not designed to address that concern, right?

9   **A.**   We did -- we changed pricing.

10  **Q.**   Yes or no?  Sorry.  Yes or no, the billing -- the User

11  Choice Billing program is not designed to address this concern,

12  yes or no?

13  **A.**   User Choice Billing is designed to address choice.

14  Pricing has been done separately, so I don't know how to answer

15  your question.

16  **Q.**   Okay.  Well, the question is here's the complaint,

17  30 percent is too high.  User Choice Billing was not designed

18  the address that complaint, right?

19  **A.**   Pricing was a separate exercise, which we did.

20  **Q.**   Okay.  Well, let's go to page 46 of this exhibit, and this

21  is a slide that discusses proposing, you see at the top,

22  proposing a 5 percent fee adjustment as part of a User Choice

23  Billing transaction, right?

24  **A.**   Give me a moment, please.

25  **Q.**   It's right at the title of the slide.

1  **A.**   Yes.

2  **Q.**   Okay.  And in the notes there it states, and we'll

3  highlight this, quote:  Another key principle is that we don't

4  want to encourage developers to not use Play Billing.  Thus, a

5  key element of this optionality proposal is we don't want to

6  give any artificial reasons to incent -- that's incentivize,

7  right?

8  **A.**   Yes.

9  **Q.**   ... Incentivize developers to switch off Play Billing.

10     Do you see that?

11  **A.**   Yes.

12  **Q.**   And it then says, quote:  To do that, our proposal is to

13  price the service fee for developers not using Google Play

14  Billing at 5 percent less than those using Google Play Billing,

15  essentially replacement value.

16     Do you see that?

17  **A.**   Yes.

18  **Q.**   And then the last paragraph on that page states, quote:

19  Of course, as we noted, at a reduction of 5 percent, we don't

20  think this solves the problem of any developers who are

21  complaining about price.

22     Do you see that language there, right?

23  **A.**   Yes, so we changed the price.

24  **Q.**   I just asked if you see that language.

25  **A.**   Yes.  Yes.

1  **Q.**   That's a Google document, right?

2  **A.**   Yes.

3  **Q.**   Okay.  And, in fact, Ms. Kochikar, Google was concerned

4  that developers might continue to agitate, based on the revenue

5  share, even after Google implemented billing optionality,

6  correct?

7  **A.**   Oh, yes, so we also changed price.

8  **Q.**   The answer is "yes," right?

9  **A.**   We did both.

10 **Q.**   All right.  Let's go -- well, let's go to your deposition,

11 and this is tab 1, page 233, line 6 to 9, Your Honor.

12        **THE COURT:**  That's fine.

13 **BY MR. HUESTON:**

14 **Q.**   Okay.  Let's put it up, please.

15        **"Q.**  And Google's concern as articulated here was that

16        developers might agitate based on rev share even after

17        Google implemented billing optionality."

18        Your answer:

19        **"A.**  Yes."

20        Correct?  That's your answer there, right, under oath?

21 **A.**   Yes.

22 **Q.**   Okay.  Thank you.  Now, Ms. Kochikar, I want to talk

23 through the rate used as part of User Choice Billing.

24        Now, as we've just covered, the model for games, assuming

25 they're not offering subscriptions but, rather, in-app

KOCHIKAR - DIRECT / HUESTON

1   purchases, is 30 percent after the first million each year,

2   correct?

3   **A.**   Yes.

4   **Q.**   Okay.  So let's now go to what we're going to call

5   Kochikar demonstrative number 8, we'll put that up; do you see

6   it there?

7   **A.**   Yes.

8   **Q.**   That's what we just covered, right?

9        Now, Ms. Kochikar, when a developer offers their own

10  billing system and there is a transaction on that billing

11  system, Google charges its typical service fee minus 4 percent,

12  right?

13  **A.**   Yes.

14  **Q.**   All right.  And so now let's go to demonstrative number 9

15  to reflect that.

16       So in this example, Google would charge 30 percent minus

17  the 4 percent, that comes to 26 percent, right?

18  **A.**   Yes.

19  **Q.**   All right.  And you'll admit that Google decided on the

20  4 percent number because it is the weighted average cost of

21  transaction processing, right?

22  **A.**   Yes.

23  **Q.**   All right.  So now let's go to demonstrative 10 to reflect

24  that.

25       So looking at this here, if a transaction occurs through a

1   non-Google Play Billing system, under your numbers here you

2   would estimate that the developer would incur costs approximate

3   to 4 percent, right?  We've covered that, right?

4   **A.**   Oh, that's odd weighted average.

5   **Q.**   Right, based on your estimates, right?

6   **A.**   Yes.

7   **Q.**   All right.  So now let's go to Kochikar demonstrative

8   number 11.

9        So when you add those together, whether a developer uses

10  Google Play Billing on the top row or so-called Google User

11  Choice Billing down below -- are you following me there?  --

12  are you following me on the chart?

13  **A.**   I am following you on the chart.

14  **Q.**   30 percent either way, right?

15  **A.**   That's our weighted average.

16  **Q.**   That's right, under your weighted average your assessment

17  is going to be 30 percent either way for someone supposedly

18  choosing this --

19  **A.**   Developers --

20  **Q.**   -- billing choice?

21  **A.**   Can have global pricing if they're just doing credit

22  cards, for example.

23  **Q.**   Excuse me, 30 percent either way, right?

24  **A.**   The way it's laid out here.

25  **Q.**   So even if a small developer is enrolled in User Choice

1    Billing and uses their own billing system, they will

2    effectively pay through your own weighted averages here, 15 or

3    30 percent, right?  15 up to a million or 30 percent, right?

4    **A.**   It would be 15 minus 4 if you're going to be technical,

5    but, yes.

6    **Q.**   Well, they'd have to pay for the processing.  It's going

7    to come out to be either 15 or 30, right?

8    **A.**   Yes.

9    **Q.**   In short, they will continue paying the same effective

10   service fee, right?

11   **A.**   That's not our finding.

12   **Q.**   Okay.  Let's go to your deposition.  This is tab 3,

13   page 41, lines 2 to 4.  Lines 2 to 4, page 40 -- I'm sorry,

14   page 41.

15          **THE COURT:**  41 or 43?  41?  Lines 2 to 4, that's fine.

16   **BY MR. HUESTON:**

17   **Q.**   Yes.  Let's put it up.

18          "**Q.**  They will continue paying the same effective service

19          fee, right?

20          "**A.**  Yes."

21   **Q.**   That was your deposition, right?

22   **A.**   Yes.

23   **Q.**   Okay.  And so you will admit, Ms. Kochikar, with what

24   we've just gone through, they're paying the same effective

25   service fee either side.  Google has set up a payment system

1    for so-called User Choice Billing that provides you no

2    financial benefit for the developer versus going through Google

3    Play's regular billing, right?

4    **A.**   Well, I have examples to show you otherwise.

5    **Q.**   There's no financial reason under what we've just gone

6    through to move from Google Play Billing, right?  30 each way,

7    right?

8    **A.**   We believe choice was for choice, and that's the service

9    that we provide is valuable.

10   **Q.**   Right.  You're going to say choice is valuable even though

11   you've admitted they will continue paying the same effective

12   service fee.  That was your admission, right?

13   **A.**   Yes.

14   **Q.**   Okay.  Let's go on to a different topic.

15          **THE COURT:**  I'll tell you what, let's take our

16   afternoon break.  We'll come back at 2:30.  We should wrap up

17   at 3:30ish, okay?  See you then.

18          **THE CLERK:**  All rise.

19      (Proceedings were heard out of presence of the jury:)

20          **THE COURT:**  All right.  Are we all set now on the

21   other issue we talked about?

22          **MR. HUESTON:**  Yes.

23          **THE COURT:**  Okay.  All right.  I'll see you at 2:30.

24   You're under oath.  No communications about your testimony.

25              (Recess taken 2:15 p.m.- 2:32 p.m.)

1        (Proceedings were heard out of presence of the jury:)

2        **THE COURT:**  The remarks I made about demonstrative is

3  without prejudice.  You can ask to move it in later, okay?  But

4  that was just to tell the jury why it wasn't being admitted.

5        Okay.  Let's bring them in.

6        **MR. POMERANTZ:**  Your Honor, this could be off the

7  record.

8        (Discussion held off the record.)

9        (Jurors enter courtroom.)

10       (Proceedings were heard in the presence of the jury:)

11       **MR. HUESTON:**  Thank you, Your Honor.

12  **BY MR. HUESTON:**

13  **Q.**  Ms. Kochikar, let's talk about Spotify.

14       Spotify offers digital music through its app, right?

15  **A.**  Yes.

16  **Q.**  Okay.  And it offers in-app purchases of subscriptions,

17  correct?

18  **A.**  Yes.

19  **Q.**  And until 2022, just last year, Spotify did not offer

20  Google Play Billing for those purchases, correct?

21  **A.**  Yes.

22  **Q.**  And Google's position was that Spotify was not in

23  compliance with Google's billing policy, right?

24  **A.**  Yes.

25  **Q.**  And Google was aware of Spotify's noncompliance, correct?

1    A.   Yes.

2    Q.   But Google did not remove Spotify from Google Play for

3    noncompliance, correct?

4    A.   We were waiting to clarify our policy.

5    Q.   Okay.  And so it didn't remove Spotify from Google Play

6    for noncompliance, right?

7    A.   Yes.

8    Q.   Okay.  And the reason Google did not remove Spotify from

9    Google Play for noncompliance is because it was concerned that

10   Spotify would influence other companies into fighting back

11   against Google Play's policies, right?

12   A.   I wouldn't say so.

13   Q.   Okay.  Well, Spotify was a vocal agitator about app

14   stores, wasn't it?

15   A.   I -- yes.

16   Q.   And by "agitator," you mean somebody who was complaining,

17   right?

18   A.   Yeah, they had reasons to complain, but they were good

19   partners with us, extremely good partners, actually.

20   Q.   All right.  So, but, again, if you could just focus on my

21   question.

22        By "agitator," that's someone who is complaining, right?

23   A.   Yes.

24   Q.   Okay.  And Spotify is a founding member of the Coalition

25   for App Fairness, right?

1    **A.**    I believe so.

2    **Q.**    And that coalition was speaking out against Google Play's

3    App Store policies, right?

4    **A.**    I think both Apple and Google.

5    **Q.**    Okay.  And you're aware that the Coalition for App

6    Fairness is speaking out against, among other things, Google

7    Play's billing policies, right?

8    **A.**    I haven't seen it.  It looked -- we've talked to the

9    coalition about principles, which we mostly agree on.

10   **Q.**    Okay.

11   **A.**    But I don't know about that exhibit you're speaking of.  I

12   haven't followed it.

13   **Q.**    Okay.  Let's go to your deposition.

14        **MR. HUESTON:**  Tab 1, Your Honor, page 164, lines 7 to

15   11.

16        **THE COURT:**  Yes, that's fine.

17   BY MR. HUESTON:

18   **Q.**    Let's put it up, please.

19        **"Q.**  And you're aware that the Coalition for App Fairness

20        is challenging, among other things, Google Play's billing

21        policies?

22        **"A.**  Yes."

23        And then you continue, correct?

24   **A.**    That's what I said there.

25   **Q.**    Okay.  We can take that down.

1        And Spotify is also influential in working with some of

2   the smaller developers and guiding them, correct?

3   **A.**   I suppose so.  They're a very important developer.

4   **Q.**   Okay.  In short, people listen to Spotify, right?  That's

5   what you've testified to before?

6   **A.**   Yeah.

7   **Q.**   So instead of removing Spotify for noncompliance, Google

8   made a special deal with Spotify that allows Spotify to use its

9   own proprietary billing solution alongside Google Play Billing,

10  right?

11  **A.**   There was many different considerations.  That wasn't how

12  it panned out.

13  **Q.**   Let's go to your deposition.

14        **MR. HUESTON:**  Page 252, Your Honor, line 23 to 253,

15  line 1.

16        **THE COURT:**  That's fine.

17  BY MR. HUESTON:

18  **Q.**   Let's post it, please.

19        "**Q.**  In March of 2022, Google announced that Spotify would

20        be offering Google Play Billing alongside Spotify's

21        proprietary billing solution?

22        "**A.**  Yes."

23        That was your testimony, right?

24  **A.**   Yes, but not as you implied it.

25  **Q.**   Okay.  And under this deal that Google made with Spotify,

 1    when a user elects to use Google Play Billing, Spotify will pay
 2    a special rate -- let me step back a bit.
 3        There are some rules that apply to this area of testimony,
 4    and so I'm not going to be able to say some of the numbers, and
 5    I'm going to ask that you not say them either.  And the way
 6    we're going to do this is I'm going to say like special rate or
 7    blank, and then I'm going to show you documents, and you can
 8    tell me if that's the rate that you recall, okay?  Does that
 9    make sense?
10    **A.**   No.
11    **Q.**   We'll try to take this one step at a time.  But I'm going
12    to get to questions about a number, and I'm not going to say a
13    number, and I'd ask that you not say out loud a number, okay?
14    **A.**   Okay.
15        **THE COURT:**  So Members of the Jury, this is my
16    instruction to the parties, okay.  You're going to see this
17    number, but right now it's just for you and for me and for the
18    lawyers.  It's not for the general public.  It's kind of like a
19    little exception.  Don't think about that, just concentrate on
20    the testimony, okay?  All right.
21        **MR. HUESTON:**  Okay.
22        **THE COURT:**  Are we ready to pass it out?
23        **MR. HUESTON:**  Almost.
24        **THE COURT:**  Okay.  So you just tell me.
25        **MR. HUESTON:**  Thank you, Your Honor.

1  **BY MR. HUESTON:**

2  **Q.**   So now with that in mind, under this deal that Google made

3  with Spotify, when a user elects to use Google Play Billing,

4  Spotify will pay a special fee upfront to Google that will be

5  adjusted, right?

6  **A.**   Yes, but that's only part of the payment.

7  **Q.**   Let's -- okay.  So what I'm going to do is --

8         **MR. HUESTON:**  Your Honor, I'd like to read, without

9  mentioning the actual number, the deposition testimony.  It

10  will be at page 263, lines 2 to 5, and I'm just going to say

11  blank percent fee and ask -- and just get that into the record.

12         **THE COURT:**  That's fine, but I think at some point we

13  should share this with the jury.

14         **MR. HUESTON:**  Yes, I'd like to.

15         **THE COURT:**  Do you want to do that now?

16         **MR. HUESTON:**  Yes.

17         **THE COURT:**  Okay.  I'm going to hand you a little

18  form.  There's going to be a manual piece of paper, okay, old

19  school, not on the screen, just for you.  And so when you hear

20  the blank, the number on this page is the number in the blank.

21  And, in fact, every reference you hear to special rate blank,

22  and so on, will be this one number, okay, I think; is that

23  right?

24         **MR. HUESTON:**  Yes.

25         **THE COURT:**  Okay.

 1          **MR. HUESTON:**  Okay.

 2       (Demonstrative passed out to the jury.)

 3   **BY MR. HUESTON:**

 4   **Q.**   And so:

 5       **"Q.**  When a user elects to use --

 6       Can you go to your deposition, please, Ms. Kochikar, it's

 7   in the hard binder, and go to page 263, lines 2 to 5.   It

 8   should be tab 1.

 9   **A.**   Tab?

10   **Q.**   Tab 1, page 263.

11   **A.**   I see.  I was looking at the bottom, and the numbers are

12   on the top.  Yes.

13   **Q.**   Okay.

14       **"Q.**  When a user elects to use Google Play Billing,

15           Spotify will pay a [blank] percent fee upfront to Google

16           that will be adjusted, right?

17       **"A.**  Yes."

18       That was your testimony?

19   **A.**   Yes.

20   **Q.**   Okay.  And when I said "blank," you see a number there,

21   correct?

22   **A.**   Yes.

23   **Q.**   Okay.  Now I'm going to ask the jury to look at the first

24   document handed to you.  And I'll ask you to pull out the

25   copies of the demonstratives as well, which should be in your

 1   exhibit binder, and is there -- let me hand you up an extra

 2   copy.

 3        If I may approach.

 4            **THE COURT:**  She has a copy, yes, you can approach.

 5            **THE WITNESS:**  I have a copy.

 6            **MR. HUESTON:**  Do you have that in front of you?  Here

 7   you go.

 8   **BY MR. HUESTON:**

 9   **Q.**   Okay.  And so for the record, this is Kochikar

10   demonstrative number 4.  And you see a number there next to

11   Spotify when using Google Play Billing and there's a percentage

12   there; do you see it?

13   **A.**   Yes.

14   **Q.**   And that number matches what we just covered in your

15   deposition, right?

16   **A.**   Yes.

17   **Q.**   Okay.  And the jury has that before them.

18        Okay.  Now, let's talk a little more about this.

19        There would be an adjustment to that number, right, based

20   on actual out-of-pocket costs that Google paid for actual

21   processing, and the amount Spotify paid would be adjusted up or

22   down reflecting actual out-of-pocket Google costs, right?

23   **A.**   Yes.

24   **Q.**   All right.  Now, this deal also offered Spotify the

25   ability to use its own billing system alongside Google Play

1  Billing, correct?

2  **A.**   Oh, yes, but complying with some guidelines and security,

3  et cetera.

4  **Q.**   Okay.  But just to be clear, yes, they could do it

5  alongside, right?

6  **A.**   It's -- it's not that black and white, but, yes.

7  **Q.**   Okay.  When a user elects to use Spotify's billing system,

8  Spotify will also have a special rate there, right?

9  **A.**   Oh, excuse me, I don't know what happened to my throat.

10  Yes.

11  **Q.**   Yes.  And so now you have that demonstrative in front of

12  you.  Go to the next page, without saying what's in it yet, and

13  you see a column that says Spotify When Using Payment Solution,

14  there is a figure there; do you see it?

15  **A.**   Yes.

16  **Q.**   And that is in fact what they owe, right, that figure

17  right there?

18  **A.**   Yes.

19  **Q.**   Okay.

20  **A.**   But that's -- there is more, but, yes.

21  **Q.**   Okay.  And the jury has that.  Now the jury sees two

22  figures.

23          **THE COURT:**  Okay.  Let's just pause.  Do you see two

24  green numbers?  Do you see they're different, right?

25          Okay.  Go ahead.

 1            **MR. HUESTON:**  Thank you, Your Honor.

 2            **THE COURT:**  You can bring the witness some water.

 3    Just one second, please.

 4            **MR. HUESTON:**  Yes.

 5            **THE COURT:**  Okay.  Go ahead.

 6    **BY MR. HUESTON:**

 7    **Q.**  All right.  Thank you.

 8        And now turn the page to the next demonstrative.  It's 6

 9    in order, right?  So now you see some numbers that have been

10    inserted above Spotify; do you see that?

11    **A.**  Yes.

12    **Q.**  Yeah, those we can say out loud.  We've covered them

13    before.  Those are the numbers discussed earlier, that digital

14    or gaming apps have to pay, right, 15 percent or 30 percent

15    when using Google Play Billing, correct?

16    **A.**  Just for the users who pay.  Lots of people use it for

17    free.

18    **Q.**  Right.  Just the ones that I mentioned, right?

19    **A.**  Yeah.

20    **Q.**  Digital or gaming apps, digital goods or gaming apps,

21    right?

22    **A.**  Even within the digital groups and gaming apps, most

23    people play it for free.  Only a very small number pay.

24    **Q.**  And so, for instance, a small games developer, we covered

25    an example earlier, who has to pay 15 percent of any in-app

1    purchases back to Google, that small game developer has to pay

2    15 percent on their revenues up to a million dollars while

3    Spotify has very different percentages below in this chart,

4    right?

5    **A.**   There is more to this, but, yes.

6    **Q.**   Okay.  Now, in September of 2020, Google changed its

7    payment policy to require all developers selling digital goods

8    and their apps to use Google Play's billing system, right?

9    **A.**   We clarified policy that already existed to include apps.

10   It was always clear for games.

11   **Q.**   Okay.  Clarified, but at that point they were all

12   required, right?  Clarified so that all developers were on

13   notice, if you're selling digital goods in their apps, they

14   have to use Google Play's billing system, right?

15   **A.**   Yes.

16   **Q.**   All right.  So now let's go to the next page in that

17   slide.  This is demonstrative number 7.  And you see to the

18   right Games Digital Goods, and going over to the far right

19   under the column When Using Own Payment Solution; do you see

20   that?

21   **A.**   Yes.

22   **Q.**   A games developer offering digital goods does not even

23   have the option to use its own payment solution, correct?

24   **A.**   Yes, except in Korea.

25   **Q.**   Okay.  So this is -- so then this is correct?

1          **THE COURT:**  I'm sorry, except in Korea; is that what

2     you said?

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  Oh, okay.  All right.  Go ahead.

5     **BY MR. HUESTON:**

6     **Q.**   And except for Korea, then this chart is correct on 7,

7     right?  For games, digital goods, when using Google Play

8     Billing it's 15 percent or 30 percent.  And when they try to

9     use their own payment solution, there actually is no option for

10    that under the Google Play Store, right?

11    **A.**   We're starting to roll out, but, yes.

12    **Q.**   Okay.

13    **A.**   There's a longer list of countries.

14    **Q.**   And yet Spotify, a large developer offering digital goods,

15    they have very different options below, as listed out in green,

16    right?

17    **A.**   Yes, they also invest differently.

18    **Q.**   Right.  Instead of no option to use your own payment

19    solution for games and digital goods, Spotify has that option,

20    right?  Yes?

21    **A.**   Could you repeat that, please?

22    **Q.**   Sure.  Instead of the situation for games and digital

23    goods, when they have no option to use their own payment

24    solution, Spotify has the option to use their own payment

25    solution, right?

1   **A.**   All app developers do, so it's not just Spotify.

2   **Q.**   It's -- well, Spotify has a very special rate that other

3   app developers don't get, right, for when they use their own

4   payment solution, correct?

5   **A.**   Yes, Spotify is a very large developer, has a different

6   relationship.  You can go through the details.  But all app

7   developers do have the option of using their billing, which is

8   what is called UCB, the User Choice Billing.

9   **Q.**   Yeah, we already covered User Choice Billing.

10  **A.**   Yes.

11  **Q.**   Right.  Where we just show the effective rate, as you

12  admitted is 30 percent, the same as if they -- the effective

13  rate for using Google Play Billing, right?  We've covered that.

14  **A.**   For app developers we have significantly lowered the

15  price, and we can go through that as well.

16  **Q.**   I'm not going to go back into User Choice Billing.

17  **A.**   Yes.

18  **Q.**   We've covered that, and we've showed the chart of 30 and

19  30 as the effective rates, right?

20  **A.**   For games, yes, but your exhibit did not show apps.

21  **Q.**   Games, right.

22  **A.**   Yes, Spotify is an app.  We talked about games.

23  **Q.**   Games and digital goods and services.

24  **A.**   Correct.

25  **Q.**   All right.

1    **A.**    But Spotify is an app.  I was just clarifying.

2    **Q.**    Right.  Okay.  Now, other than User Choice Billing, we've

3    covered that, there has been mention at this trial that

4    there -- if a developer does not want to pay Google services

5    fees, developers have other choices.

6        Do you agree with that, they have other choices?

7    **A.**    Yes, they could go consumption only.  There are other

8    stores.  They can sideload, yes.

9    **Q.**    Right.  Let's explore those to see if those are real

10   choices, too.

11       One alternative is using a third-party app store, right?

12   **A.**    Yes.

13   **Q.**    Okay.  And Google cannot charge a fee for in-app purchases

14   if the app was downloaded from a third-party app store, right?

15   **A.**    Yes.

16   **Q.**    And Google refuses to distribute third-party app stores on

17   Google Play, right?

18   **A.**    We have real security concerns for our users, so there's a

19   policy that describes it.

20   **Q.**    That is correct, that they don't -- they refuse to

21   distribute third-party app stores on Google Play, right?  Yes

22   or no?

23   **A.**    To keep users safe, yes.

24   **Q.**    Okay.  In fact, and we're going to get to this so-called

25   safety reason.  Try to, if you can, focus on my questions.

1          In fact, it's one of the requirements that a developer

2     cannot distribute an alternative app store through Google Play,

3     correct?

4     **A.**   Yes.

5     **Q.**   Okay.  So if a user wants to obtain an alternative app

6     store that is not in their device, they need to directly

7     download it from somewhere other than Google Play, right?

8     **A.**   We do have OEM stores on all our devices.  Samsung has the

9     Galaxy Store, et cetera, and then, yes, if they have more than

10    that, yes.

11    **Q.**   Well, they have direct -- so one of these so-called

12    options is direct downloading.  You mentioned that earlier,

13    right?

14    **A.**   Yes.

15    **Q.**   Okay.  And direct downloading, so we're all on the same

16    page, that's a process by which a user downloads an app

17    directly from a developer's web site as opposed to going

18    through Google Play, right?

19    **A.**   Correct.

20    **Q.**   Okay.  So, for example, Epic has made the Fortnite app

21    available to Android users through direct downloading, right?

22    **A.**   Yes.

23    **Q.**   Okay.  But when an app is directly downloaded, Google

24    cannot collect revenue from the in-app purchases, right?

25    **A.**   Yes.

1    Q.    So Google has made the process to directly download apps

2    extremely difficult, right?

3    A.    I don't think so.

4    Q.    Well, let's walk through the steps.

5    A.    Yes.

6    Q.    Let's go to Trial Exhibit 5718.  If you can pull that up,

7    please, Ms. Kochikar, and go to the last page of the exhibit?

8    A.    5718, yes.

9    Q.    5718.

10   A.    5718, yeah.

11   Q.    And go to the last page of that exhibit, please.

12   A.    Is that 5718-016?

13   Q.    It should be Trial Exhibit 5718.

14   A.    Yes, I'm on 5718.

15   Q.    Okay.  Right.  And then in the last there should be a

16   list -- a last page there, you see "all custodians?"

17   A.    All custodians, yes.  I missed a couple of pages.

18           MS. CHIU:  Your Honor, we would object.  This is not a

19   part of the exhibit.  This has been added by counsel.

20           THE COURT:  Go ahead.

21   BY MR. HUESTON:

22   Q.    Yeah.  You're a custodian on this document, right,

23   Ms. Kochikar?  Do you see your name listed under "all

24   custodians," first one listed.

25   A.    Yes.

 1           **MR. HUESTON:**  Okay.  We move this in at this time.

 2           **THE COURT:**  It's admitted.  Go ahead.

 3                          (Trial Exhibit 5718 received in

 4                          evidence.)

 5           **MR. HUESTON:**  Okay.  Let's put it up, please.

 6  BY MR. HUESTON:

 7  **Q.**    And we'll show you the first page of this presentation.

 8  It's titled Amazon Underground User Experience.

 9           Do you see that?

10  **A.**    Yes.

11  **Q.**    And there's a Google logo there in the top left, right?

12  **A.**    Yes.

13  **Q.**    Okay.  And the date listed here is November 2015; do you

14  see it on the screen?

15  **A.**    Yes.

16  **Q.**    Okay.  Let's go to the second page.

17           And the slide says Installing the Amazon Underground App.

18           Do you see that?

19  **A.**    Yes.

20  **Q.**    And Amazon Underground App, that was the name of Amazon's

21  App Store for Android around that time, right?

22  **A.**    Oh, I think so.

23  **Q.**    Well, the Amazon App Store, that is an example -- you're

24  aware of the Amazon App Store?

25  **A.**    Yes.

1    **Q.**   Okay.  And that's an example of a large developer that

2    distributes outside of Google Play, correct?

3    **A.**   Yes, but they also have their own form -- Android platform

4    that they distribute themselves.

5    **Q.**   Yeah, but this is what I'm focusing on.

6          And to be clear, you would agree with me, Amazon is not an

7    unknown entity, right?

8    **A.**   As a company?

9    **Q.**   Sure.  We're talking about one of the best known companies

10   in the United States, right?

11   **A.**   Oh, yes.

12   **Q.**   Okay.  Let's go to the next slide here.  And let's go one

13   slide further, yeah.

14         And in the Google presentation here, it shows a number of

15   steps:  Installing the app from an android phone.

16         Do you see that?

17   **A.**   Yes.

18   **Q.**   Okay.  And it kind of goes from left to right, and let's

19   just page a couple more pages to show that this is what the

20   document is doing.  There's the next page showing additional

21   steps, and there's yet a third page.

22         Do you see that?

23   **A.**   Yes.

24   **Q.**   Now, I want to walk through those steps with you, but I

25   want to do it in a way that's easy to see, so I'm going to show

1  you Kochikar demonstrative number 1 on this.  And I'm going to

2  represent to you -- and if you want you can follow along by

3  looking at the document -- that every page I showed here is

4  coming from those steps in that document, okay?  It has the

5  same words and pictures as the document.

6  **A.**    Okay.

7            **MR. HUESTON:**  Okay.  So, Your Honor, then I'm going to

8  move through and permission to publish, then, each of these

9  pages as we go through.

10           **THE COURT:**  Yes, that's fine.

11 **BY MR. HUESTON:**

12 **Q.**    Okay.  So here, step 1 here is that a user has to search

13 for Amazon Underground.

14      Do you see that?  That's what it says on the document.

15 **A.**    Yes.

16 **Q.**    Okay.  And then if we go to step 2, Amazon.com opens, with

17 an option to download Amazon Underground.

18      Do you see that?

19 **A.**    Yes.

20 **Q.**    All right.  Then we go to a step 3.  And in step 3, Amazon

21 Underground downloads, and the user sees instructions on how to

22 install, right, according to the document?

23 **A.**    Yes.

24 **Q.**    And then we go to step 4, the user has to go to settings

25 on their phone, correct?

KOCHIKAR - DIRECT / HUESTON

 1   **A.**   Yeah, that's what it says here.

 2   **Q.**   And then in step 5, the user then has to select security,

 3   correct?

 4   **A.**   Yes.

 5   **Q.**   And then in step 6, the user needs to toggle unknown

 6   sources, has to turn it on, right?

 7   **A.**   Yes.

 8   **Q.**   Okay.  And by the way, this unknown sources setting,

 9   that's disabled by default by Google on all android devices,

10   right?

11   **A.**   Yes, to keep users safe.

12   **Q.**   Just yes or no.  So that's a "yes," right?

13   **A.**   Yes.

14   **Q.**   Okay.  And so in order to directly download Fortnite or

15   the Amazon App Store, the user would have to go in and turn on

16   unknown sources to begin the direct downloading process, right?

17   **A.**   Yes.

18   **Q.**   Okay.  So let's go back to the next step, step 6, the user

19   then gets a security warning, right?

20   **A.**   Yes.

21   **Q.**   And if we zoom in on this security warning, it says,

22   quote:  Your phone and personal data are more vulnerable to

23   attack by apps from unknown sources.  You agree that you are

24   solely responsible for any damage to your phone or loss of data

25   that may result from using these apps.

KOCHIKAR - DIRECT / HUESTON

1          That's what it says, right?

2    **A.**    Yes, that's what it says here.

3    **Q.**    Okay.  And, again, this is Amazon, it's not really an

4    unknown source, right?

5    **A.**    The phones are everywhere, and lots of people try to

6    download.  So unknown sources is a default setting.  It's not

7    for Amazon.  We have to protect users from malware or anything

8    else that is trying to be installed from other places.

9    **Q.**    Okay.  We'll get into some of the security issues later.

10   But Amazon's App Store, that's a competitor of Google Play's

11   right?

12   **A.**    Yeah, I mean, any app store is.

13   **Q.**    Okay.  I'm just asking about that, right.

14          And then let's go back to the steps.  After the user

15   clicks through that warning message, unknown sources is turned

16   on as part of the step 7, right?

17   **A.**    Yes.

18   **Q.**    And then if we go to step 8, the user has to install the

19   APK, right?

20   **A.**    Yes, that's the app.

21   **Q.**    Right.  The APK is essentially a piece of software that

22   the developer uses to make the app work correctly, right?

23   **A.**    Yeah, it is the app.

24   **Q.**    Okay.  And then in step 9, the user has to confirm they

25   want to install the app, right?

1   **A.**    That's what it says here.

2   **Q.**    And then we go to yet another step, step 10, the user gets

3   a followup Google security warning, right?

4   **A.**    That's what it says here.

5   **Q.**    And then another step, step 11, Amazon Underground app is

6   finally installed.  You can see it there, right?

7   **A.**    Yes.

8   **Q.**    And then in step 12, the user is prompted to sign-in,

9   right?

10  **A.**    Yes.

11  **Q.**    And then the next step, the user signs in, right?

12  **A.**    Yes.

13  **Q.**    And then in step 14, the Amazon App Home Page, it opens,

14  right?

15  **A.**    Yes.

16  **Q.**    And then in step 15, there's a drop-down display option to

17  open Underground apps, right, according to this Google

18  document, right?

19  **A.**    Yes.

20  **Q.**    Okay.  And then in step 16, the Underground section of the

21  store opens, right?

22  **A.**    Yes.

23  **Q.**    And we're getting there, but in step 17, the user is

24  prompted to create a home screen shortcut, right?

25  **A.**    That's Amazon's implementation.

1   **Q.**   Okay.  And then in step 18, Amazon App Store shows up on

2   the Home Page, right?

3   **A.**   Yes.

4   **Q.**   Okay.  So as this Google document describes, a user would

5   have to go through, according to this document, 18 steps to

6   have the Amazon App Store show up on the Home Page of their

7   android device, right, according to this document?

8   **A.**   According to this document at that time.

9   **Q.**   In contrast, the Google Play App Store is already on a

10   customer's phone when they first start it up, right?

11   **A.**   Yes, and the OEM's app stores.

12   **Q.**   All right.  Now, is it still your testimony, Ms. Kochikar,

13   that Google did not make it extremely difficult to directly

14   download an app or an app store?

15   **A.**   I think there's a difference between downloading apps and

16   stores, and a lot has changed.  If you look at several markets

17   around the world, people are successfully sideloading both app

18   stores as well as apps, millions of installs.

19   **Q.**   Let's try to focus on my question.

20       Let's go to Trial Exhibit 1517 and see what you were

21   saying, and we'll start with 2018.  So let's take a look at

22   that.  And if you can identify this, this is an email from you

23   to a Jamie Rosenberg, July 19, 2018.

24   **A.**   1517, you said?

25   **Q.**   Yes.

1   **A.**   Okay.  Yes.

2          **MR. HUESTON:**  Okay.  We'd move to admit it at this

3   time, Your Honor.

4          **MS. CHIU:**  No objections.

5          **THE COURT:**  It's admitted.

6                              (Trial Exhibit 1517 received in

7                              evidence.)

8   **BY MR. HUESTON:**

9   **Q.**   Okay.  So let's go to your email down at the bottom of the

10  first page sent on July 18th.

11  **A.**   Yes.

12  **Q.**   And it's up there on the screen.

13  **A.**   Yes.

14  **Q.**   And in this email you're sending a draft script to this

15  group, right?

16  **A.**   Yes.

17  **Q.**   And the draft script is in anticipation of a call that

18  Google would be having with Mark Rein at Epic, right?

19  **A.**   Yes.

20  **Q.**   So let's go to the second page, third paragraph?

21  **A.**   Yes.

22  **Q.**   And you write there, quote:  We also have a responsibility

23  towards our users.  Frankly, the experience of getting Fortnite

24  on Android from the links Tim sent is frankly abysmal.

25          Those are your words, right?

1   **A.**   Yes.

2   **Q.**   And the reference to links that Tim sent was the process

3   that was proposed for directly downloading Fortnite from Epic's

4   web site, correct?

5   **A.**   Fortnite plus the launcher, we were surprised by that

6   approach.  It was a very particular approach.

7   **Q.**   Okay.  Let's go to your deposition.

8         **MR. HUESTON:**  Your Honor, page -- tab 1, page 84,

9   lines 1 through 5.

10        **THE COURT:**  That's fine.

11        **MR. HUESTON:**  Let's put it up, please.

12  **BY MR. HUESTON:**

13      **"Q.**  And the reference to the links Tim sent was sort of

14      going through the process that was proposed for directly

15      downloading Fortnite from Epic's web site."

16      Your answer:

17      **"A.**  Yes."

18      Correct?

19  **A.**   Yes, that's what I said there.

20  **Q.**   Now, going back to the paragraph here, the last question

21  in that paragraph that you wrote is:  Do you worry that most

22  will not go through the 15 plus steps?

23      That's what you wrote, right?

24  **A.**   Yes.

25  **Q.**   Okay.  And you actually saw someone try to follow that 15

1  plus step process, right?

2  **A.**   Yes.

3  **Q.**   And you thought this process was abysmal, at least in

4  part, because it included those 15 plus steps, right?

5  **A.**   Yes, that approach that was taken at the time.

6  **Q.**   Right.  And we can take that exhibit down.

7       And, Ms. Kochikar, due to all those steps that were

8  implemented by Google for direct downloading, developers in

9  competing app stores, they faced large hurdles to distribute

10 their products if they were not using the Google Play Store,

11 right?

12 **A.**   There are OEM stores as well as apps can be downloaded

13 very easily.

14 **Q.**   Okay.  Well, the process I just showed you 15, where you

15 talked about 15 plus steps, that wasn't an easy process.  That

16 was an abysmal process by what you described, right?

17 **A.**   Because it included the face -- the Fortnite launcher.

18 **Q.**   Okay.  Actually, your testimony was it was abysmal because

19 it just included the 15 plus steps, right?

20 **A.**   Yeah, there is context in the email.

21       **MR. HUESTON:**  Okay.  Let's --Your Honor, if we can go

22 to deposition testimony page 84, lines 9 to 11.

23       **THE COURT:**  That's fine.

24       **MR. HUESTON:**  Let's put it up.

25     "**Q.**  And you thought it was abysmal, at least in part

1        because it included 15 plus steps, right?

2        "A.  Yes."

3   A.   Yeah.

4   BY MR. HUESTON:

5   Q.   We can put that down.

6        Let's go to trial Exhibit 1515.  If you could turn to

7   that.  There should be an email from you to other Google

8   employees dated June 23rd, 2018.

9        Do you see that?

10  A.   Yes.

11           MR. HUESTON:  We'd move to admit at this time, Your

12  Honor.

13           MS. CHIU:  No objections.

14           THE COURT:  It's admitted.

15                        (Trial Exhibit 1515 received in

16                         evidence.)

17  BY MR. HUESTON:

18  Q.   Okay.  Let's put this up.

19       The subject of this email is Next Steps, right?

20  A.   Yes.

21  Q.   Now, let's go to Mr. Gennai's email at the bottom of the

22  first page, top of the second page.

23  A.   Yeah.

24  Q.   And by the way, Mr. Gennai is a colleague of yours at

25  Google, right?

1    **A.**   Yes.

2    **Q.**   All right.  And he writes, quote:  Even if we can't share

3    partner-specific data, it would be useful to get some data

4    points on how many installs even the large players get when

5    they choose to distribute off of Play.  The Amazon App Store

6    would be a good example, and Venkatesh's team under Mat K

7    should be able to get numbers, penetration of devices by

8    country would be ideal.

9         That's what the email says, right?

10   **A.**   Yes.

11   **Q.**   Okay.  And distribute, as it's used here, that refers to

12   how to get apps or app stores onto users' phones to use, right?

13   **A.**   Yes.

14   **Q.**   He then states, in the next paragraph, quote:  Also would

15   be good to get the latest numbers on how, what percentage of

16   devices have unknown sources turned off by country.

17        Do you see that?

18   **A.**   Yes.

19   **Q.**   And a user, we covered this, I believe, would need to have

20   unknown sources turned off in order to directly download an app

21   like Fortnite outside of the Play store, right?

22   **A.**   Yes.

23   **Q.**   Okay.  So then later in the paragraph he writes, quote:

24   Again, to highlight that there will be large hurdles for

25   distribution --

1        Those were his words, right; do you see that?

2   **A.**   Yeah, those are his words.

3   **Q.**   ... unless they were to get preloaded, which is a very

4   long game.

5        That's what he wrote, right?

6   **A.**   Yes, that's what he wrote.

7   **Q.**   And the outcome of the data here was expected to show that

8   the penetration among users would be limited even for a large

9   developer like Amazon if it was directly downloaded, right?

10  **A.**   The outcome was to convince Epic to choose Play because we

11  really wanted them on Play.

12          **MR. HUESTON:**  Your Honor, if we can go to page 63,

13  line 1 -- lines 3 through 9.

14          **THE COURT:**  That's fine.

15  BY MR. HUESTON:

16  **Q.**   Let's put it up, please.

17          "**Q.**   Regardless of the reason, the outcome of the data

18          would show, as expected to show, that the penetration

19          among users would be limited even for a large developer

20          like Amazon if it downloaded off of Play?

21          "**A.**   Yes."

22        That was your testimony, right?

23  **A.**   That's what I said.

24  **Q.**   Okay.  And so the assumption here is that the developer

25  goes with a directly downloaded app, there would be, in the

1  words of your colleague, a large hurdle to distribute because

2  of a limited number of devices with unknown sources turned off,

3  correct?

4  **A.**   Yeah, that's what he said.

5  **Q.**   Okay.  And Google's analysis was that 85 percent of

6  android users in the United States do not have unknown sources

7  turned on, right?

8  **A.**   Yeah, that is an analysis, I suppose so, yes.

9  **Q.**   Well, let's see if I can help with that.

10       So let's go to Trial Exhibit 917.  917.  And you recognize

11  this as a document that was put together in response to

12  Mr. Rosenberg's request to put together fleshed-out thinking

13  and talking points on Epic's decision to launch off Play,

14  right?

15  **A.**   Yes.

16           **MR. HUESTON:**  Okay.  We move to admit it at this time.

17           **MS. CHIU:**  No objections.

18           **THE COURT:**  It's admitted.

19                          (Trial Exhibit 917 received in

20                           evidence.)

21  **BY MR. HUESTON:**

22  **Q.**   And you were both an author and a contributor on this

23  document, right?

24  **A.**   Yes.

25  **Q.**   Okay.  So let's go to the bottom of the first page with

1  the section starting Android Reach, and it states:  Android

2  Reach without Play store - significantly lower, correct?

3  **A.**    Yes.

4  **Q.**    Approximately 20 percent of viable devices have unknown

5  sources turned on.

6       Do you see that?

7  **A.**    Yes.

8  **Q.**    All right.  Now we go to the second page, second bullet

9  point, and this addresses the situation in the United States.

10 It lists the percentage of devices with unknown sources enabled

11 in the United States is even lower, just 15 percent.

12      Do you see that, the first bullet point?

13 **A.**    Yes.

14 **Q.**    So 85 percent did not have unknown sources enabled, right?

15 **A.**    Yes.

16 **Q.**    Okay.  And so the point here, and we can take that down,

17 was that Epic was not going to be able to reach as many users

18 through directly downloading as it would for Google Play,

19 right?

20 **A.**    Or like an OEM store, but we were making the case for

21 Google Play.

22 **Q.**    Right.  And so let's go to the section in the document

23 called User Experience.

24 **A.**    Could you give me the page number, please?

25 **Q.**    Do you see it on the screen in front of you?

1    **A.**    Oh, I see it.  Okay.  Yes.  Thank you.

2    **Q.**    And on the side you see comment 3?

3    **A.**    Comment 3, yes.

4    **Q.**    All right.  And if we go to number 1, it states, quote:

5    The install friction is not only a bad experience, but we know

6    from our data that it will drastically limit their reach.  This

7    is a way to frame an impaired reach stat without sharing

8    anything sensitive.

9         Do you see that language?

10   **A.**    Yes.

11   **Q.**    Okay.  And "install friction," you understand that refers

12   to the extra steps that a user has to take to install an app

13   from a developer's website through direct download, right?

14   **A.**    Yes.

15   **Q.**    Okay.  And this comment is stating that this install

16   friction creates a bad user experience, right?

17   **A.**    Yeah, that's what it says here.

18   **Q.**    Right.  And that's because the process of direct

19   downloading takes longer and involves more steps than

20   downloading directly from Google Play, correct?

21   **A.**    Yeah, or the OEM App Store, yeah.

22   **Q.**    Okay.  And specifically the number of steps that we

23   discussed earlier that are required to have an app or store

24   downloaded outside of Google Play makes it a bad user

25   experience, right?

1    **A.**   We -- I know you want to focus on Google Play, but we do

2    have OEM app stores, so outside of preloaded stores maybe are

3    the right way to think about it.

4    **Q.**   Okay.  Let's just go quickly to your deposition page 77,

5    lines 11 to 17.

6              **THE COURT:**  77?

7              **MR. HUESTON:**  Yes, page 77, lines 11 to 17.

8              **THE COURT:**  Go ahead.

9    **BY MR. HUESTON:**

10   **Q.**   Okay.  Let's put it up.

11        "**Q.**  Well, setting aside why you think those warning

12        screens are appropriate, what he's saying here is that the

13        number of steps that are required to have an app

14        downloaded makes it a bad user experience, right?"

15        And your answer was:

16        "**A.**  Yes."

17        Correct?  Correct?

18   **A.**   Yes.

19   **Q.**   And because the number -- we can take that down.

20        Because the number of steps makes for a bad user

21   experience, users usually fall out at various steps of the

22   direct downloading process simply because there are extra

23   steps; you've recognized that, right?

24   **A.**   Oh, I suppose so, that's true for user experience.

25   **Q.**   Okay.  And so where there's friction, people fall out and

 1   don't complete purchases, right?  That often happens?

 2   **A.**    I suppose so, yes.

 3   **Q.**    Yes.  And as we discussed before, there can be up to, we

 4   showed the Google's example of the app, the Amazon App Store,

 5   up to 18 different places for users to fall out and not

 6   complete the direct downloading, right?

 7   **A.**    Yeah, that's what you demonstrated.

 8   **Q.**    Okay.  Great.  Let me just quickly go to Exhibit 1704,

 9   just for you to look at --

10   **A.**    17 --

11   **Q.**    1704.  And once again, once you get there I'm going to ask

12   you to just go to the last page of the exhibit to the list of

13   custodians.

14        And just confirm with me that you're on the list of

15   custodians.

16   **A.**    Oh, yes.

17            **MR. HUESTON:**  Okay.  We'd move this exhibit into

18   evidence at this time.

19            **MS. CHIU:**  No objections.

20            **THE COURT:**  It's admitted.

21                          (Trial Exhibit 1704 received in

22                            evidence.)

23   **BY MR. HUESTON:**

24   **Q.**    Okay.  Let me go on to a different topic, Ms. Kochikar.

25   Companies like Epic have complained about Google's decision to

1  require so many steps to directly download, right?

2  A.   Yeah.

3  Q.   Okay.  And Google was additionally concerned about Epic

4  influencing other developers into launching their popular apps

5  outside of the Google Play -- of Google Play, right?

6  A.   We just wanted developers to choose Play.

7  Q.   Well, you were -- you and your colleagues were concerned

8  about Epic possibly influencing other developers into launching

9  their apps outside of Google Play.  That was a concern, you

10  remember that, right?

11  A.   Yes.

12  Q.   Okay.  Thank you.

13       Now, in addition to creating up to 18 steps in the direct

14  download process, Google tried to payoff Epic with $147 million

15  to eliminate Epic's influence on other developers, correct?

16  A.   That wasn't how it was done.

17  Q.   Okay.  Well, let's walk through it.

18  A.   Sure.

19  Q.   As we discussed earlier, Epic planned to launch Fortnite

20  on Android outside of Google Play, right?

21  A.   Yes.

22  Q.   Okay.  And you helped plan the strategy for Google's

23  outreach to Epic, right?

24  A.   Yes.

25  Q.   And, in fact, in July of 2018, Google decided to offer

KOCHIKAR - DIRECT / HUESTON

 1   Epic a special deal, right?

 2   **A.**   Yes, I may be in the wrong exhibit.  Could you tell me the

 3   number?

 4   **Q.**   No, no, just put that exhibit -- we're not talking about

 5   the exhibit.

 6   **A.**   I see.

 7   **Q.**   No worries.  There's a lot of paper up there.

 8   **A.**   Okay.

 9   **Q.**   Now, let's -- as part of that proposed deal with Epic,

10   there was a requirement that Epic launch Fortnite on Google

11   Play, correct?  That was part of it?

12   **A.**   That's what partnerships are about.  We work together.

13   **Q.**   I'm just asking if that was part of the deal.  Epic was to

14   launch Fortnite on Google Play, right?

15   **A.**   Yes.

16   **Q.**   Okay.  And Fortnite launching on Google Play would have

17   ensured you understood that most Fortnite downloads would

18   happen through Google Play, right?

19   **A.**   Probably.  We just knew that it would happen through us,

20   at least some of them.

21   **Q.**   Yeah, most, probably most of the downloads would happen

22   through Google Play, if they launched on Google Play, right,

23   ma'am?

24   **A.**   Yes.

25   **Q.**   Okay.  And that was important because when Fortnite

 1  downloads happen on other app stores, Google doesn't receive

 2  revenue when users make purchases there, right?

 3  **A.**   Yes.

 4  **Q.**   Okay.  So one of the key purposes of the deal was to

 5  address the risk that other developers would follow Epic off

 6  Google Play threatening at least 10 percent of Google Play's

 7  business, right?

 8  **A.**   That was part of it, but the big part of it is to get

 9  Fortnite on Play.

10  **Q.**   That was one of the -- sorry, just to be -- so we're on

11  the same page.  That was one of the concerns, right?

12  **A.**   It was just a risk assessment, yeah.

13  **Q.**   Let's go to the words then.  Let's go to Exhibit 805.  If

14  you go to Exhibit 805, once again go to the last page of the

15  exhibit, and you're listed as a custodian on it; do you see

16  that?

17  **A.**   Yes.

18          **MR. HUESTON:**  We'd move it, Your Honor.

19          **MS. CHIU:**  No objections.

20          **THE COURT:**  It is admitted.

21                          (Trial Exhibit 805 received in

22                           evidence.)

23          **MR. HUESTON:**  Okay. let's publish, please.

24  BY MR. HUESTON:

25  **Q.**   And the title of this presentation is Epic/Fortnite BC

KOCHIKAR - DIRECT / HUESTON

1    Deal Review, dated July 19, 2018.

2        Do you see that?

3    **A.**    Yes.

4    **Q.**    And if you go to the second page of this exhibit.

5    **A.**    Yes.

6    **Q.**    And look at Objective?

7    **A.**    Yeah.

8    **Q.**    Objective listed here as, quote:  Partner with Epic to

9    secure Fortnite's launch on Play and help them achieve their

10   goals in the gaming industry, right?

11   **A.**    Yes.

12   **Q.**    So we're going to go down to the third section on the page

13   starting with "Not having..."

14       It's just been highlighted; do you see that?

15   **A.**    Yes.

16   **Q.**    And it says, "Not having Fortnite on Play creates

17   significant risks for Android ecosystem and Play business."

18       That's what it says, right?

19   **A.**    Yes.

20   **Q.**    And then the first sub bullet there states:  "Fortnite's

21   absence could result in 130 million, up to 250 million direct

22   revenue loss for Play," right?

23   **A.**    Yes.

24   **Q.**    And then it says, "Downstream impact of 550 million up to

25   3.6B."

1      That's $3.6 billion right?

2  **A.**   Yes.

3  **Q.**   "...Of potential revenue loss if broad contagion to other

4  developers."

5      Do you see that?

6  **A.**   Yes.

7  **Q.**   And contagion, you know that word refers to the risk that

8  Epic would influence other consumers, right, that this would

9  get contagious?

10  **A.**   Yeah.  Yeah.

11  **Q.**   Okay.  And so Google calculated that Epic's decision could

12  influence other developers as well and cause a total loss to

13  Google Play of $3.6 billion, right, ma'am?

14  **A.**   That's what it says here.

15  **Q.**   Now, let's go to page 11.  And the title here says:

16  Invest 147 million in incremental funding over three years

17  through 2021 in an X-PA effort to convince Epic to launch

18  Fortnite on Play.

19      Do you see that?

20  **A.**   Yes.

21  **Q.**   And so Google proposed spending $147 million to convince

22  Epic to launch Fortnite on Google Play, and in part avoid

23  losing what was assessed as potentially $3.6 billion if there

24  was contagion, right?

25  **A.**   Yeah, but mostly get Fortnite on Play.

1   Q.   Okay.  Well, the words in your document just talked about

2   a contagion risk of $3.6 billion, right?

3   A.   Yes.

4   Q.   Okay.  And Google's business counsel approved this deal

5   for $147 million to be offered to Epic, right?

6   A.   Yes.

7   Q.   But Epic didn't accept this deal, did it?

8   A.   No.

9   Q.   We can take this exhibit down.

10        Ms. Kochikar, Epic was not the only developer that Google

11   tried to pay to prevent them from launching off of Google Play,

12   right?

13   A.   I don't -- there was -- I don't know where you're going

14   with this.

15   Q.   All right.  We'll take it one step at a time.

16   A.   Yeah.

17   Q.   Google was concerned -- we've talked about this, right --

18   the contagion, with the risks that developers would distribute

19   their apps through means other than Google Play, right?

20   A.   At that point, yes.

21   Q.   Okay.  And it was important for Google to control how apps

22   were distributed because distribution was where the real money

23   was to be made, right?

24   A.   We just wanted to have good -- we just wanted to have good

25   apps on our store.

1  **Q.**   Okay.  Those words aren't ringing a bell for you, that

2  distribution was where the real money was to be made; do you

3  remember those words?

4  **A.**   Have I said it?

5  **Q.**   Let's go to Trial Exhibit 1519.  And here's an email from

6  you, if you can identify it quickly as an email from you.

7       Do you see it?

8  **A.**   1519, yes.

9       **MR. HUESTON:**  Okay.  We'd move it into evidence at

10  this time.

11       **MS. CHIU:**  No objections.

12       **THE COURT:**  It is admitted.

13                    (Trial Exhibit 1519 received in

14                     evidence.)

15  **BY MR. HUESTON:**

16  **Q.**   Okay.  It's published.  Let's go to your email at the

17  bottom of the first page.  This was sent on August 2nd, 2013,

18  from you to a Jamie Rosenberg, right?

19  **A.**   Yes.

20  **Q.**   Let's go to the second page, the third paragraph on that

21  page starting with why does this matter.

22       Do you see that?

23  **A.**   Yep.

24  **Q.**   And then you write here, quote:  Well, our key partners

25  were actively talking to people who were promising them better

1   development tools, unity, better discovery and distribution,

2   FB, that's Facebook, right?

3   **A.**   Yes.

4   **Q.**   And analytics, flurry, Distimo.

5        Do you see that?

6   **A.**   Yes.

7   **Q.**   All right.  And in terms of better discovery and

8   distribution, you were pointing out that Google's key ad

9   partners were talking to a potential competitor to Google Play

10  at the time for distributing apps on android, right?

11  **A.**   No, this was just from -- it's likely more complicated

12  than that.

13  **Q.**   Okay.

14  **A.**   It was the ads product that they would just point to Play

15  was distributed to a different store on Android.

16  **Q.**   Okay.

17  **A.**   We were small.  We were just trying to figure out what we

18  need to bill to become competitive.  Play was launched in 2010.

19  We are very small, but saying there are lots of competition, we

20  need to do more.  That's what the email says.

21        **MR. HUESTON:**  All right.  We'll go to your deposition,

22  Your Honor, please, page 96, line 25 to 97, line 5.

23        **THE COURT:**  Which lines?

24        **MR. HUESTON:**  Last line on page 96, line 25 to line 5

25  on the next page, 97, line 5.

1          **THE COURT:**  That's fine.

2     **BY MR. HUESTON:**

3     **Q.**   Okay.  Let's put it up.

4          "**Q.**   In terms of the better discovery and distribution,

5     you were pointing out that your key partners were talking

6     to a potential competitor to Google Play at the time for

7     distributing apps on Android, right?

8          "**A.**   Ad partners."

9          That was your answer right?

10    **A.**   Correct.  Those are the ad partners.  That's for ad space

11    distribution.

12    **Q.**   Okay.  And at this time Google viewed Facebook as

13    competing on Android with Google Play as to app distribution,

14    right?

15    **A.**   On the ads site.

16    **Q.**   On the apps, through apps, correct?

17    **A.**   Yeah, through ads, yeah, user acquisition through ads.

18    **Q.**   Okay.  And then you write, quote:  As the market gets

19    increasingly crowded, the real money will be in distribution.

20         Those are your words, right?

21    **A.**   Yes.

22    **Q.**   Okay.  And let's take the document down.

23         Now, recognizing that distribution is critical, Google

24    then launched a program called Project Hug to eliminate

25    alternative ways to distribute apps on Google Play, right?

1    **A.**   That wasn't the goal of that program at all.

2    **Q.**   Okay.  Well, let's walk through this.

3        Part of your past day-to-day work was a Google program

4    called Project Hug, right?

5    **A.**   Yes.

6    **Q.**   And it was for at least a tiny moment it was called

7    Project Bear Hug, right?

8    **A.**   Maybe for a very tiny moment.

9    **Q.**   Okay.  And you were involved in Project Hug from the

10   beginning, correct?

11   **A.**   Yes.

12   **Q.**   And the goal of Project Hug was to get developers to

13   launch their apps on Google Play rather than direct downloading

14   or any other competing app store available on Android, right?

15   **A.**   No, the goal was to simultaneously ship, they could direct

16   download, they could distribute through anything else.  There

17   was absolutely no constraints.

18   **Q.**   Okay.  Let's go to Trial Exhibit 1520.  And this is an

19   email from you.  Tell me if you recognize this as an email from

20   you.

21   **A.**   Yes.

22       **MR. HUESTON:**  I'd move to admit it at this time, Your

23   Honor.

24       **MS. CHIU:**  No objections.

25       **THE COURT:**  It's admitted.

1                    (Trial Exhibit 1520 received in

2                         evidence.)

3    BY MR. HUESTON:

4    Q.   Okay.  Let's put it up.  Let's go to page 2, and this is

5    an email October 10, 2018.

6    A.   Yes.

7    Q.   And this is an email on the screen.  It's sent by a Le

8    Zhang on October 10th, 2018; do you see that?

9    A.   Yes.

10   Q.   And you know Ms. Zhang is a Google employee, right?

11   A.   Yes.

12   Q.   Mr. Zhang.  And he starts his email stating, quote, as you

13   know, a few of us started working on identifying HI-PO/Hi-risk,

14   triple A, and independent developers two months ago.

15        Do you see that language?

16   A.   Yes.

17   Q.   And "hi-po" means high potential, right?

18   A.   Yes.

19   Q.   And by "high potential" Mr. Zhang is referring to

20   developers who were performing well off mobile and were

21   considering launching apps on phones, right?

22   A.   Yes, or had apps on iOS already, and we had to compete.

23   Q.   Okay.  And let's talk about the reference to high risk.

24   Do you see the high risk part of that?

25   A.   Yes.

1    Q.   Let's go to the second bullet point in Mr. Zhang's email.

2    He writes there, quote:  Triple A franchise launches in 2019

3    with significant risk of non-simship or even off Play, and then

4    references Activision, Blizzard and Riot, right?

5    A.   Yes.

6    Q.   Do you see Activision, Blizzard, and Riot beneath them?

7    A.   Yes.

8    Q.   Okay.  And I think you were talking about this earlier,

9    this referenced a non-simship.  Mr. Zhang is referring to the

10   concern that these developers will launch on Android, but not

11   at the same time or at all through Google Play, right?

12   A.   Yeah, that's his point of view.

13   Q.   All right.  Let's go to Adam Gutterman's email at the

14   bottom of the first page now.  He worked at Google, right?

15   A.   Yes.

16   Q.   And it's up on the screen, and at the top of second page

17   in this bullet point he writes:  Increase Play outcomes Bear

18   Hug.

19        Do you see that?

20   A.   Yes.

21   Q.   And one of the risks that was presented to the Google

22   Business Council in connection with Project Bear Hug was the

23   risk that other developers would launch titles outside of

24   Google Play, right?

25   A.   One of the risks.

1    Q.    Okay.  And so one of the requirements of every single Bear

2    Hug deal that you ultimately signed was to require any launches

3    of titles by developers to be launched simultaneously on Google

4    Play with any other app store or method on Android, right?

5    A.    If they choose to participate in the program, then all we

6    needed them is to also consider Google Play.

7    Q.    Okay.  Is that a "yes?"

8    A.    They could launch anywhere else.

9    Q.    Sorry.  Was that a "yes" to my question?

10   A.    If they choose to participate in the program they should

11   also simultaneously ship on Play, yes.

12   Q.    Okay.  And to be clear, Ms. Kochikar, that requirement was

13   in every Bear Hug deal because you wanted to eliminate the risk

14   that developers first launch their titles outside of Google

15   Play, right?

16   A.    That wasn't the -- we just wanted them to be

17   simultaneously shipping on us.

18   Q.    Okay.

19   A.    Just consider Play as a potential channel, that's it.

20          MR. HUESTON:  Your Honor, page 121, lines 13 to 17.

21          THE COURT:  Yes, that's fine.

22          MR. HUESTON:  Okay.  Let's Play the video, please.

23           (video clip played:)

24      "Q.  One of the justifications for the Project Hug deals

25       was the risk that apps would launch -- certain app

1          developers would launch their titles outside of Google

2          Play, right?

3          "A.  It was the -- yes."

4    BY MR. HUESTON:

5    Q.    Okay.  That was your testimony, right?

6    A.    Okay.

7              THE COURT:  All right.  Are you going to wrap -- I'd

8    like to break for the day.

9              MR. HUESTON:  I just have one more question on this,

10   Your Honor, get the last one in.

11             THE COURT:  Go ahead.

12   BY MR. HUESTON:

13   Q.    And if the new game was launched first through Google

14   Play, no other competing app store could get a competitive

15   advantage by exclusively launching that game on their

16   alternative platform, right?

17   A.    That's not how we thought about it at all.

18             MR. HUESTON:  All right.  I'm finished with my

19   questions for today.

20             THE COURT:  Okay.  We will resume in the morning.

21        Now, remember our daily reflection.  I decided to call it

22   a daily affirmation rather than a daily reflection.  This is

23   your daily affirmation:  Put all of this out of your mind,

24   return to whatever you need to do, whatever you want to do,

25   whatever refreshes you.  No thinking about this.  No

 1   reflection.  Certainly no communications.  No media coverage.

 2   Look away, turn it off, don't look at the screen.  If you

 3   happen to see any, clear your mind of all the testimony today,

 4   and we'll see you tomorrow morning at 9:00 a.m.

 5              **THE CLERK:**  All rise.

 6        (Proceedings were heard out of presence of the jury:)

 7              **THE COURT:**  All right.  Ms. Kochikar, you remain under

 8   oath.  No communications with anyone about the substance,

 9   manner, style, presentation, anything at all your testimony,

10   and do not review any documents.

11              **THE WITNESS:**  Yes.

12              **THE COURT:**  All right.  See you in the morning.  You

13   can step down.

14        You can all sit down.

15        Who took that deposition?

16              **MS. MOSKOWITZ:**  The one --

17              **MR. BORNSTEIN:**  The deposition was taken by

18   Mr. Denning, who I think is in the back.

19              **THE COURT:**  Okay.  All right.  How are we doing on

20   time?

21              **MR. BORNSTEIN:**  We are, I think, a little pressed.  We

22   figured we'd be through a few more witnesses at this point than

23   we are.

24              **THE COURT:**  Oh, I had a different impression.  You're

25   feeling behind?

1          **MR. BORNSTEIN:**  We are feeling behind where we thought

2     we would be, yes.

3          **THE COURT:**  Okay.  All right.  What do you want to do

4     about that?

5          **MR. BORNSTEIN:**  I would suggest that maybe

6     Mr. Pomerantz and I can discuss overnight, and we can present

7     some thoughts to Your Honor in the morning.

8          **THE COURT:**  That sounds fine.

9        I thought Hueston Henningan was representing Match.

10    You're here now, too, for Epic?

11         **MR. HUESTON:**  Yeah, we represented Match, and with

12    Match's permission and at the invitation of Epic, we are

13    assisting the Epic trial.

14         **THE COURT:**  I was just curious.  Thank you.

15         **MR. HUESTON:**  No worries.

16         **THE COURT:**  All right.  Anything else before we go

17    till tomorrow morning?

18         **MR. BORNSTEIN:**  Just one question, Your Honor.  With

19    respect to the deposition presentation, I wanted to see if you

20    thought that the way this worked with the documents is

21    acceptable or if you'd rather --

22         **THE COURT:**  That's fine.  So the reason -- I forgot to

23    mention this.  I forgot you haven't been with me before.  But

24    typically the deposition shot and the document don't fit well

25    and you can't see one or the other, so I'd like to have hard

1  copies handed out.  If you're comfortable with it, I'm fine

2  with it.  It looked okay.  The speaker was a little small, but

3  however you want to do it is up to you, okay?

4          **MR. BORNSTEIN:**  Okay.  Thank you, Your Honor.

5          **THE COURT:**  Now, what was I going to say?

6      Oh, so this is a purely provisional mothballing of the

7  Spotify number, all right.  I will work out an order on that

8  later, but I just did it for today for expediency sake.

9          Now, one day in advance.  You're the proponent.  One day

10  in advance, okay?  Whoever the proponent is of the sealing

11  request, at least one full court day in advance, whoever that

12  is.

13          **MR. BORNSTEIN:**  The issue, Your Honor, I think is

14  we'll just need to make sure we understand from the claimant,

15  in other words, the person who is seeking to have

16  confidentiality so that we can raise it.  And we did not have

17  sufficient notice that Spotify had an issue to raise it fairly

18  in advance, but we'll work that out so it doesn't happen again.

19          **THE COURT:**  Okay.  Good.  Okay.  See you in the

20  morning.

21          **MR. POMERANTZ:**  Your Honor, sorry, I do have an issue

22  to raise.

23      In one of -- in a line of Mr. Hueston's questions, he

24  raised an issue that Your Honor has already ruled on in your

25  summary judgment ruling, and that's the Trinco issue where we

1    have an absolute right not to distribute our competitor's

2    product.  Mr. Hueston's line of questioning I think included

3    the word Google "refuses" to allow you to distribute the games

4    to the store.

5         And I'll get the transcript so I'm accurate.  I want to

6    make sure I'm accurate.  I foresaw this, as did Mr. Bornstein,

7    when you issued that ruling.  And we told you at the time that

8    we thought you might need to instruct the jury so that they

9    don't infer anything wrong from the fact that Google Play does

10   not distribute a competing app store.

11        So I would like to have a -- I would like to submit

12   tomorrow a short instruction for Your Honor to consider so that

13   the jury is not -- does not take from that questioning

14   something that is contrary to Your Honor's ruling.

15        What they had asked for was context, which we raised some

16   concerns about, but that was more than context.  The way those

17   questions were asked was to send a message that Google was

18   doing something improper by not distributing the App Store, and

19   that's not correct, and we would request an instruction, we'll

20   propose one tomorrow morning.

21            THE COURT:  All right.

22            MR. BORNSTEIN:  Your Honor, as we discussed in

23   connection with the summary judgment proceedings, the jury does

24   need to understand the facts that it was not an alternative

25   possibility for competing stores to distribute their stores

1    through the Google Play Store.  Mr. Hueston's questioning

2    brought out that fact from Ms. Kochikar and then moved on to

3    the point of the examination which was the direct distribution

4    process.  It did not linger on, did not make any argumentation,

5    it's the simple fact that Google will not carry other stores on

6    Google Play Store, and then we moved on.

7         I don't think there's any issue around that, and I think

8    it's consistent with the fact the jury needs to understand that

9    that is not an option that is available to developers.

10            THE COURT:  Well, it wasn't raised in opening argument

11   as a point against Google, and it will not be raised in closing

12   argument, and I think a context question is probably okay.

13        But how about this.  This is a thought exercise.  Why

14   don't you work with Mr. Pomerantz on what might be a word to

15   the jury, okay?  Just see if you can jointly fashion something,

16   and I'll take a look at it.

17            MR. POMERANTZ:  Thank you.

18            MR. BORNSTEIN:  Are we talking, Your Honor, about an

19   instruction that would be included in closing instructions or

20   something that would happen right now?  I think having

21   something happen right now would give the subject far more

22   weight than it deserves.

23            THE COURT:  I would probably wait until we get to the

24   end of the case.

25            MR. POMERANTZ:  Your Honor, it's just not fair.  You

 1   know, Mr. Hueston used the word "refused."  They refused -- he

 2   was trying to send a message through his cross-examination.  To

 3   let that linger now for another few weeks is not fair.

 4       This is exactly why --

 5           THE COURT:  You have to understand, Mr. Pomerantz,

 6   there was a lot more in that cross than that passing reference.

 7           MR. POMERANTZ:  And I'm not asking anything about the

 8   rest of that, Your Honor.

 9           THE COURT:  And with good reasons, those were all

10   facts in evidence.  All I'm saying is there was a tidal wave of

11   information.  I'm not sure this little wavelet should be the

12   subject of an enormous amount of scrutiny.

13           MR. POMERANTZ:  There was a second thing that happened

14   during that examination as well, which was there was a motion

15   *in limine* about the fact that neither side should point to the

16   fact that it was a privileged statement on a document, and Your

17   Honor agreed with that.

18           THE COURT:  Oh, yes, and let me just interrupt you.  I

19   do agree, and I think, as I recall, the point of the

20   questioning was consistent with the Chat theme that Epic is

21   raising is that the Google was trying to invoke privileges

22   without a foundation for it.  It wasn't -- it was actually

23   privileged.  It was that it should never have been asserted as

24   privilege, and this is part and parcel of the practice of

25   trying to keep things out of scrutiny.

 1          MR. POMERANTZ:  But, your Honor, there's tons of

 2   documents produced by all the parties in this case which say

 3   "privileged," and then the lawyers handling the case produce

 4   the document.

 5          THE COURT:  No, no, I mentioned that, Mr. Pomerantz,

 6   but the one document we saw was a false invocation of

 7   privilege.  Those are all legitimate invocations.  No one is

 8   going to comment on those.  This was trying to say it's not

 9   just cache that Google didn't preserve.  They also played fast

10   and loose with privilege.  I'm just channeling the --

11          MR. POMERANTZ:  No, I wasn't clear.  There's documents

12   that Epic and other parties produced as to Google which say

13   "privilege."  There's no redactions, because the lawyers who

14   were producing them determined there was no privilege, so the

15   business person wrote "privilege," but then we all determined

16   in the discovery process it wasn't privileged and we produced

17   it.  It happened both ways.

18      Your Honor actually addressed that issue in your ruling,

19   and that was what was supposed to not be pointed out.  That's

20   very different than Chats which is a preservation issue.

21          MR. BORNSTEIN:  Your Honor, there is a difference

22   here, and I think Your Honor put his finger on it.

23      We have a case to be made for the purposes of the adverse

24   instruction at the end of the trial that Google has engaged in

25   a process of seeking to hide evidence from the Court and from

1    the jury.  We have the Chat issue, and we do have this

2    privilege issue.  Your Honor has seen the documents about what

3    one of the lawyers at Google herself called fake privilege, and

4    I believe we are entitled to present that issue to the jury.

5            THE COURT:  I am fine with that.  You can present fake

6    privilege and you can argue about it.  You can't do anything

7    else with privilege.

8        I mean, there were some things that I saw something that

9    was branded privileged and nobody said anything about it

10   because you both, to your joint mutual credit, realized it

11   shouldn't be the object of an assertion of privilege and let it

12   go.  That's perfectly fine.  We'll just call it the fake

13   privilege, the bogus privilege, that's okay.  All right.  And

14   that was backed up by deposition testimony.

15       Now, I wouldn't do it on a wing and a prayer, all right.

16   In other words, if you don't know from prior evidence, either

17   an email or a deposition testimony, that it is in fact a bogus

18   assertion, don't just try to find out in court.

19           MR. BORNSTEIN:  That is not our intent, Your Honor.

20           THE COURT:  That would violate what Mr. Pomerantz is

21   correctly observing was my ruling, okay?

22           MR. BORNSTEIN:  Agreed.

23           THE COURT:  So if you already have it locked in,

24   that's fine.

25           MR. BORNSTEIN:  Agreed.  Thank you, Your Honor.

1      Apparently there is one sealing issue that Ms. Moskowitz

2   is going to raise for tomorrow.

3          THE COURT:  Another sealing issue?

4          MS. MOSKOWITZ:  Your Honor, it's actually not ours,

5   but because I am the proponent of a couple of documents

6   tomorrow during Mr. Kolotouros' examination, Google, I believe,

7   has informed our team that they intend to seal them.  We

8   disagree.  We intend to use them.  We did not want to use them

9   close --

10         THE COURT:  Who is this for.

11         MS. MOSKOWITZ:  Mr. Kolotouros.  James Kolotouros.  He

12  is a witness who will be testifying about the contracts with

13  OEMs, the MADA, the RSA 3.0, Project Banyan, Samsung, and

14  that's what we have, a couple of documents that I certainly

15  plan to use with him that Google is seeking to seal, I

16  understand.

17         THE COURT:  Well, as the proponent of the sealing --

18         MS. MOSKOWITZ:  Ah, okay.  I wanted to make sure,

19  because it's my witness tomorrow.

20         THE COURT:  If you are asking or channeling a sealing

21  request, you have to tell me, not the person who is going to

22  use it, all right?

23      So what is it, Mr. Pomerantz?

24         MR. POMERANTZ:  I believe, Your Honor, these are --

25         THE COURT:  Let me be clear, that's what I mean by

 1    proponent, okay?  The proponent of the sealing request, the

 2    person who wants me to do something has to tell me a full court

 3    day in advance, not the person who wants to use it and someone

 4    else is objecting.  The proponent of the sealing request, okay?

 5    All right.

 6              **MR. POMERANTZ:**  Your Honor, this involves sensitive

 7    information from a third-party Samsung and a deal that --

 8    separate agreements that Google has with Samsung.  These are

 9    current deals, and I think it would be prejudicial to Samsung

10    and to Google to have this disclosed in open court.

11        I think there's very limited information here that the

12    parties want to use.  I think it could be handled in a way that

13    does not divulge the sensitive information in the document.

14              **THE COURT:**  I want you to work something out, okay?

15              **MR. POMERANTZ:**  Thank you, Your Honor.

16              **THE COURT:**  All right.  See you in the morning.

17              **THE CLERK:**  All rise.

18              (Proceedings adjourned at 3:43 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF

CALIFORNIA, 450 GOLDEN GATE AVENUE, 16TH FLOOR, SAN

FRANCISCO, CA 94102, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE,

IS A CORRECT TRANSCRIPT OF MY SHORTHAND NOTES OF THE

RECORD

OF THE PROCEEDINGS HEREINBEFORE ENTITLED, AND REDUCED TO

TYPEWRITING BY COMPUTER TO THE BEST OF MY ABILITY.

November 8, 2023

_____

Rhonda L. Aquilina, RMR, CRR, CSR 9956