**Volume 5**

**Pages 789 - 1036**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE                )
ANTITRUST LITIGATION,                   )
                                        )   **NO. 21-md-02981-JD**
_____        )
THIS DOCUMENT RELATES TO:              )
                                        )
EPIC GAMES, INC.,                      )
                                        )
            Plaintiff,                  )
                                        )
  VS.                                   )   **NO. 3:20-cv-05671-JD**
                                        )
GOOGLE, LLC., et al.,                  )
                                        )
            Defendants.                 )
_____        )

San Francisco, California
Thursday, November 9, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Rhonda Aquilina, CSR 9956, RMR, CRR
Official United States Reporter

**APPEARANCES**:

For Plaintiff:

              CRAVATH, SWAINE & MOORE LLP
              825 Eighth Avenue
              New York, New York  10019
     BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
          **YONATAN EVEN, ATTORNEY AT LAW**
          **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
          **MICHAEL ZAKEN, ATTORNEY AT LAW**
          **ANDREW WIKTOR, ATTORNEY AT LAW**

              HUESTON HENNIGAN LLP
              523 W 6th Street, Suite 400
              Los Angeles, CA 90014
     BY:  **SOURABH MISHRA, ATTORNEY AT LAW**

For Defendants:

              MUNGER, TOLLES & OLSON LLP
              350 South Grand Avenue - 50th Floor
              Los Angeles, California  90071
     BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**

              MUNGER, TOLLES & OLSON LLP
              601 Massachusetts Avenue NW
              Suite 500 East
              Washington, DC  20001
     BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
          **LAUREN BELL, ATTORNEY AT LAW**
          **JUSTIN RAPHAEL, ATTORNEY AT LAW**

              MORGAN, LEWIS & BOCKIUS LLP
              One Market - Spear Street Tower
              San Francisco, California  94105
     BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**

For Spotify USA:

              SULLIVAN AND CROMWELL LLP
              125 Broad Street
              New York, NY 10004
     BY:  **SVERKER HOGBERG, ATTORNEY AT LAW**

1                          <u>I N D E X</u>

2    Thursday, November 9, 2023 - Volume 5

3    <u>PLAINTIFFS' WITNESSES</u>                            <u>PAGE</u>   <u>VOL.</u>

4    <u>KOCHIKAR, PURNIMA (RECALLED)</u>
      (PREVIOUSLY SWORN)                                 800    5
5    Direct Examination resumed by Mr. Hueston           800    5
     Cross-Examination by Ms. Chiu                       831    5
6    Redirect Examination by Mr. Hueston                 908    5
     ReCross-Examination by Ms. Chiu                     954    5
7
     <u>GARBER, EMILY</u>
8     (SWORN)                                            955    5
     Direct Examination by Mr. Bornstein                 956    5
9    Cross-Examination by Ms. Chiu                       974    5
     Redirect Examination by Mr. Bornstein               975    5
10
     <u>LAM, MARGARET</u>
11    (SWORN)                                            976    5
     Direct Examination by Ms. Moskowitz                 977    5
12   Cross-Examination by Ms. Chiu                      1027    5
     Redirect Examination by Ms. Moskowitz              1029    5
13
     <u>PERRYMAN, PAUL</u>
14   By Videotaped Deposition                           1033    5

15                       <u>E X H I B I T S</u>

16   <u>TRIAL EXHIBITS</u>                          <u>IDEN</u>   <u>EVID</u>   <u>VOL.</u>

17   713                                               1033    5

18   1410                                               819    5

19   1478                                               811    5

20   1522                                               803    5

21   1524                                               858    5

22   1530                                               922    5

23   1545                                               825    5

24   1546                                               823    5

25

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1549 | | 822 | 5 |
| 2050 | | 1033 | 5 |
| 2051 | | 1033 | 5 |
| 2052 | | 1033 | 5 |
| 2054 | | 1033 | 5 |
| 5653 | | 873 | 5 |
| 5696 | | 840 | 5 |
| 5714 | | 850 | 5 |
| 5816 | | 877 | 5 |
| 5911 | | 901 | 5 |
| 5941, cover page, page 10 and page 11 only | | 907 | 5 |
| 6044 | | 902 | 5 |
| 6390 | | 843 | 5 |
| 6454 | | 1023 | 5 |
| 6462 | | 1007 | 5 |
| 6464 | | 993 | 5 |
| 6465 | | 1018 | 5 |
| 6479 | | 1021 | 5 |
| 6487 | | 960 | 5 |
| 6488 | | 969 | 5 |
| 8020 | | 1005 | 5 |
| 8021 | | 1014 | 5 |
| 8024 | | 985 | 5 |

# **E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| 8025 | | 829 | 5 |
| 8519 | | 952 | 5 |
| 8520 | | 910 | 5 |
| 8522 | | 950 | 5 |
| 8523 | | 920 | 5 |
| 8526 | | 947 | 5 |
| 10883 | | 889 | 5 |
| 10928 | | 885 | 5 |

1    <u>**Thursday - November 9, 2023**</u>                          <u>**9:04 a.m.**</u>

2                             P R O C E E D I N G S

3                                 ---000---

4        **THE CLERK:**  Calling Civil 20-5671, Epic Games Inc.

5    versus Google LLC, and Multi-District Litigation 21-2981, In Re

6    Google Play Store Antitrust Litigation.

7            Counsel?

8        **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

9    Bornstein for Epic Games.  I am joined today at counsel table

10   by Michael Zaken, Sourabh Mishra, Lauren Moskowitz, Andrew

11   Wiktor, John Hueston, and Yonatan Even.

12       **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn

13   Pomerantz on behalf of Google.  With me is Lauren Bell, Brian

14   Smith, Jonathan Kravis, Michelle Park Chiu, and Rebecca

15   Sciarrino.

16       **THE COURT:**  Okay.  Is that it?

17       **MR. BORNSTEIN:**  Just a few housekeeping things, Your

18   Honor, before we get started.

19            One is, I just wanted to alert the Court that we

20     intend to file an opposition brief on the Spotify sealing

21     issue, which we'll get in shortly, just so Your Honor has the

22     benefit of perspective on both sides.

23       **THE COURT:**  Don't do that yet.

24       **MR. BORNSTEIN:**  Okay.

25       **THE COURT:**  If I need one, I'll tell you on Monday.

1          **MR. BORNSTEIN:**  Very good.  We'll hold off.

2              And then two other quick things.  One --

3          **THE COURT:**  Well, actually, you know what?  Can you

4    file it tomorrow?

5          **MR. BORNSTEIN:**  Sure.

6          **THE COURT:**  Just do it by 5:00 p.m. tomorrow.

7          **MR. BORNSTEIN:**  We'll do that.

8          **THE COURT:**  Now, remember, you don't get to file

9    anything unless I say so first.  So 5:00 p.m. tomorrow is fine.

10         **MR. POMERANTZ:**  Your Honor, may we file a response on

11   Monday?

12         **THE COURT:**  You or Spotify?  It's Spotify's

13   information, isn't it?

14         **MR. POMERANTZ:**  It's both of ours.  It's both.

15         **THE COURT:**  Yeah.  File it by -- can you do Saturday,

16   if you can?  If you can't, Monday is fine, 9:00 a.m. Monday,

17   but it would be better --

18         **MR. POMERANTZ:**  We'll get it filed on Sunday, Your

19   Honor, if that's okay.

20         **THE COURT:**  That will be great, yes.  By noon on

21   Sunday.  All right?

22         **MR. POMERANTZ:**  Thank you, Your Honor.

23         **MR. BORNSTEIN:**  One other thing, Your Honor.  The

24   parties have conferred about trying to find a way to facilitate

25   the presentation of any evidentiary or sealing objections to

1   the Court without taking up the time of the jury.

2          So we wanted to request, if we have anything that is

3   urgent that needs to be addressed that day's testimony, we

4   would let the Court know.  Hopefully, that all would have been

5   presented to Your Honor a day or two in advance so you would

6   know about it.

7          We do have matters that have kind of piled up.  We

8   haven't presented them to Your Honor.  We've been working very

9   cooperatively to address everything, but there are one or two

10  things, none of which is for today.

11         But we wanted to suggest that if there were things

12  like that, after the jury is excused, perhaps we could take a

13  few minutes to clear things off so we could start fresh the

14  next morning.

15         **THE COURT:**  Possibly.  Let's see how it goes.

16         **MR. BORNSTEIN:**  It doesn't have to be today either,

17  Your Honor.  Just as a procedure.

18         **THE COURT:**  It's not going to be today.

19         **MR. BORNSTEIN:**  Very good.

20         **THE COURT:**  But possibly.  Okay?

21         **MR. BORNSTEIN:**  Okay.  Thank you.

22         **THE COURT:**  All right.  Go ahead.  Anything else?

23         **MR. BORNSTEIN:**  Last thing is, Your Honor had asked us

24  a question about time.  And, again, the parties have been

25  conferring overnight and this morning about the progress of

1    trial.  If it's okay with the Court, both sides intend to take

2    a hard look this weekend at the evidence that has come in and

3    sharpen our pencils and try to get things down.

4         **THE COURT:**  There is a lot of it.  And, for example,

5    it's going to get cumulative soon on a number of your main

6    themes.  A little extra is fine.  You have to make sure people

7    get the point.  But, you know, I think everybody gets

8    Project Hug.

9         **MR. BORNSTEIN:**  Right.

10        **THE COURT:**  So I'll leave it up to you.  It's your

11   case.  But that's a good thing to do.

12        **MR. BORNSTEIN:**  I understand, Your Honor.  So that's

13   our plan.

14            And then after we've done that, we would intend to

15    come back to Your Honor and just give you an update on where we

16    all are and where we think things are going.

17        **THE COURT:**  I actually think we're going to be

18   December, whatever that was, 4th, 11th.  We'll definitely be

19   the 11th.  I think we're going to be the 4th.

20        **MR. BORNSTEIN:**  Okay.  We had intended to at least put

21   on Your Honor's radar the possibility of trying to use next

22   Friday as a date for evidence.

23        **THE COURT:**  We'll see.  Next week, in addition to the

24   economic conference, which is a major headache for

25   transportation, apparently our first El Nino river is coming

1    in.  So I don't know.  We'll see how Friday looks.

2              **MR. BORNSTEIN:**  Okay.  Understood.

3              **THE COURT:**  All right.  Good.

4              **MR. BORNSTEIN:**  Thank you, Your Honor.  That was it

5    for us.

6              **MR. POMERANTZ:**  Just one issue on our side.

7              I'd like to have an opportunity to just briefly

8      address the instruction -- jury instruction that we had asked

9      for yesterday.  We submitted something.  You may not have seen

10     it.

11             **THE COURT:**  Well, no, I didn't ask for it.  I asked

12   you to negotiate something.  You wanted to do it.

13             **MR. POMERANTZ:**  Well, so let me tell -- we did.  And

14   we did talk last night, exchange emails last night.

15             If I could just briefly, Your Honor.  Just so Your

16     Honor is -- so it's clear what we're asking about.  On page 743

17     of yesterday's transcript, starting at line 16, this is the

18     question and answer that raises concerns for us:

19             "Q.  And Google refuses to distribute third

20        party app stores on Google Play, right?

21             "A.  We have real security concerns for our

22        users so there's a policy that describes it.

23             "Q.  That is correct, that they don't -- they

24        refuse to distribute third party app stores on Google

25        Play, right?  Yes or no?

1              "A.  To keep users safe, yes.

2              "Q.  Okay.  In fact, we're going to get to

3        this so-called safety reason.  Try to, if you can,

4        focus on my questions."

5              Now, the summary judgment order that Your Honor --

6         **THE COURT:**  Look, I understand all this.  I wrote it.

7    Okay?  I know *Trinco*.  I understand what you're saying.

8              So why are we going to go back to the safety issue,

9      security issue?

10        **MR. BORNSTEIN:**  Well, there are two things, Your

11   Honor.  One --

12        **THE COURT:**  So Google can not put third party apps on.

13   That's perfectly fine.  So why are we going to go back into the

14   reasons, the ostensible reason for that?

15        **MR. BORNSTEIN:**  We don't intend to touch that issue

16   again, Your Honor.  We are going to have security issues on

17   other things, not on this issue, on other things.

18        **THE COURT:**  All right.

19        **MR. POMERANTZ:**  Your Honor, the prejudice exists

20   because of the way the questions were asked.  And they get

21   exactly what your order says not to do:  to suggest that we

22   couldn't -- that we had -- that it was improper to not

23   distribute third party stores.

24        **THE COURT:**  Listen --

25        **MR. POMERANTZ:**  And this is a suggestion.

 1          **THE COURT:** -- I have been here taking exquisitely

 2    detailed notes and paying tremendously deep attention.

 3          I am far less worried about prejudice than you appear

 4    to be.  I will consider giving one at the end of the case, just

 5    for clarity.  Okay?  But a little marker on the table about,

 6    you know, a couple questions, as I said yesterday, it was a

 7    wavelet in a tidal wave of information.  So I'm not terribly

 8    worried about it.  But I'll leave the door open to considering

 9    it at the end.

10          But no more of the:  You don't have third party

11    stores.

12          **MR. BORNSTEIN:**  Understood, Your Honor.

13          **THE COURT:**  The facts there.  You've done what you can

14    do with it.  Now, no more mention of it.  Okay?

15          Okay.  Let's bring the jury out.

16          Oh, let's put the witness back up first, please.

17       (Proceedings were heard in the presence of the jury:)

18          **THE COURT:**  Okay.  Ready to resume with our witness

19    from yesterday, please.

20          **MR. HUESTON:**  Thank you, Your Honor.

21                       **PURNIMA KOCHIKAR**,

22    Called as a witness for the PLAINTIFFS, having been previously

23    duly sworn, testified further as follows:

24                  **DIRECT EXAMINATION**  (resumed)

25    \\\

KOCHIKAR - DIRECT / HUESTON

1    BY MR. HUESTON:

2    Q.   Good morning, Ms. Kochikar.

3    A.   Good morning.

4    Q.   I want to start with something that you said in your

5    testimony yesterday.

6         You'll recall you testified yesterday that Android has

7    OEM stores on all our devices; do you remember saying that?

8    A.   Most of our devices.

9    Q.   Okay.  So I want to clarify that.  You said "all of our

10   devices."  Today you're saying "most"?

11   A.   I may have.

12   Q.   Okay.  And just so we're clear, OEM means original equipment

13   manufacturer, right?  Or in other words, the manufacturer of the

14   phone, correct?

15   A.   Yes.

16   Q.   And, you know, as an example -- this is a demonstrative --

17   I'm holding up a Motorola phone.  And you know that Motorola uses

18   an Android operating system, right?

19   A.   Yes.

20   Q.   And there's no Motorola App Store preloaded on Motorola

21   phones in the United States, right?

22   A.   Maybe, yeah.

23   Q.   Okay.  You want to take a look at the phone, or you think

24   I'm right?

25   A.   No.  I'll take your word for it.

1   Q.   Okay.  And then as another example, I'm holding up a OnePlus

2   phone as a demonstrative.  And you've heard of the OnePlus phone,

3   right?

4   A.   Yes.

5   Q.   And that uses an Android operating system, right?

6   A.   Yes.

7   Q.   And there's no OnePlus App Store preload on the OnePlus

8   phone in the United States, correct?

9   A.   I'll take your word for it, yes.

10  Q.   Okay.  So when you said yesterday "We do have OEM stores on

11  all of our devices," that wasn't correct, right?

12  A.   I might have overstated it, but most of our devices would

13  be correct.

14  Q.   Okay.  Let's go to a different topic now.  I want to address

15  a little bit more on Project Hug.

16          That was originally targeted to about 22 large game

17   developers, right?

18  A.   21.

19  Q.   Okay.  Well, let's go to Trial Exhibit 1522 in your binder.

20  This is an email from you; do you see that?

21  A.   Yes.

22          MR. HUESTON:  We'd move it into evidence at this time,

23  Your Honor.

24          MS. CHIU:  No objections.

25          THE COURT:  It is admitted.

1                          (Trial Exhibit 1522 received in

2                          evidence.)

3    BY MR. HUESTON:

4    Q.   Okay.  And it's now up on the screen.

5              And you'll see that the subject here is "Risk,"

6      correct?

7    A.   Yes.

8    Q.   All right.  And the risk referred to in the subject line

9    refers to Activision Blizzard King, or ABK, and Project Hug deal

10   negotiations, right?

11   A.   Yes.

12   Q.   And ABK, that's the maker of popular games like Candy Crush

13   and Call of Duty, right?

14   A.   Yes.

15   Q.   One of the biggest game developers in the world, right?

16   A.   Yes.

17   Q.   So let's go to the top of the second page.  This is an email

18   from Marc Theermann.  And you knew he was the director of global

19   partnerships at Google at this time, right?

20   A.   Yes.

21   Q.   Okay.  And he writes:  "Hi friends.  So if our official

22   answer is:  The risk is low, let's say 20 percent, we will get

23   significant pushback from the financial planning team, and

24   perhaps BC."

25              You see that, right?

KOCHIKAR - DIRECT / HUESTON

1   A.   Yes.

2   Q.   And BC, that refers to Google's Business Counsel?

3   A.   Yes.

4   Q.   And the proposed Project Hug deal with ABK required business

5   council approval, right?

6   A.   Yes, it did.

7   Q.   Okay.  And this 20 percent risk Mr. Theermann refers to,

8   that's the risk that ABK would launch its own Android App Store,

9   right?

10  A.   Correct.

11  Q.   All right.  And Mr. Theermann then writes:  "They are

12  saying:  This deal construct, which cost $150 million more than a

13  regular Hug deal, is only worth it if it saves Play."

14           You see that, right?

15  A.   Yes.

16  Q.   And so the deal on the table with ABK was going to cost

17  Google, if I'm understanding this right, $150,000,000 more than

18  an ordinary Project Hug deal, according to Mr. Theermann, right?

19  A.   In this calculation, yes.

20  Q.   Okay.  And you understood "saves Play" to mean lowering or

21  eliminating the risk that ABK would launch a competing Android

22  App Store, right?

23  A.   That's what Mr. Theermann says.

24  Q.   Right.  And one concern that was discussed at this time is

25  that if ABK launched an alternative App Store, that could lead to

1  other developers launching their own app stores, right?

2  **A.**   It's not said here.   Perhaps.

3  **Q.**   Okay.   But that was something that was being discussed at

4  that time.   You remember that, right?

5  **A.**   Yes.

6  **Q.**   Okay.   The risk that this could lead to other developers

7  launching their own App Store, that's contagion again, right?

8  **A.**   We were thinking also about web stores, not just app

9  stores, but we can go into that detail later.

10  **Q.**   Right.   I didn't ask you about that.

11        But this risk that Google folks are talking about,

12   that this could lead to other developers launching their own

13   app store, that's the contagion concept again, right?

14  **A.**   Going off Play doesn't always mean launching an app store.

15      **MR. HUESTON:**   Okay.   Let's go to, Your Honor,

16  deposition page 139, lines 8 to 14, Tab 1.

17      **THE COURT:**   Okay.

18      **MR. HUESTON:**   Let's put it up.

19      "Q.   Well, the concern that was discussed at

20      the time was that if ABK launched an alternative

21      Android App Store, that could lead to other

22      developers either launching their own app store or

23      launching their titles through ABKs alternative app

24      store, correct?

25      "A.   It was discussed."

1    BY MR. HUESTON:

2    Q.    That was your testimony, right?

3    A.    Yes.

4    Q.    Okay.  And the other concern discussed at this time was that

5    if ABK launched an alternative Android App Store, that could lead

6    to other developers launching their titles through ABK's

7    alternative app store, right?

8    A.    Which line are you looking at?

9    Q.    It's not a document.  Let's put that down.

10   A.    Oh, I see.

11   Q.    You recall -- let me ask the question again.

12   A.    Yes, please.

13   Q.    The other concern discussed at this time was that if ABK

14   launched an alternative Android App Store, that could lead to

15   other developers launching their titles through ABK's alternative

16   App Store, right?

17   A.    I don't recall.

18   Q.    Okay.  Let's move to another question.  If Google was

19   successful with Project Hug, you expected that ABK would not

20   spend their time and money investing in an alternative app store,

21   right?

22   A.    There was nothing that stopped them from launching another

23   app store.  All we asked was for them to simship, which means

24   ship the title at the same time on Google Play when they could

25   ship in any other store, sideload, or to a web store.

1           **MR. HUESTON:**  Your Honor, if we go to page 139,

2     line 24, to 140, line 5, tab 1.

3           **THE COURT:**  129?

4           **MR. HUESTON:**  139, line 24 to 140, line 5.

5           **THE COURT:**  That's fine.

6           **MR. HUESTON:**  Okay.  Let's put it up.

7           "Q.  But your expectation was that if you

8        could secure their launch on Play, that Activision

9        Blizzard King would not spend their time and money

10       investing on an alternative app store, correct?

11           "A.  That they would see the value of building

12       games versus -- yes."

13    BY MR. HUESTON:

14    **Q.**  That was your answer, right?

15    **A.**  Yeah, that's what I said there.

16    **Q.**  Okay.  Now, let's go back to the Exhibit 1522, top of the

17    first page.  And you respond here that, quote, If we don't do a

18    deal, ABK will continue to try different ways to get revenues off

19    of Play.  Building a stronger relationship, and we need to

20    believe this will -- deal will lead to that, will preclude

21    investments in alternative ways of monetizing off Play.  A store

22    is one of many options that could be explored.

23           You wrote that, right?

24    **A.**  Yes.

25    **Q.**  Okay.  And the reference to store there, that is to an

 1  alternative Android App Store that ABK was exploring, correct?

 2  **A.**   Also the web store.  The web store is an equally important

 3  alternative.

 4  **Q.**   Right.  But that was, in part, a reference to an alternative

 5  Android App Store, right?

 6  **A.**   Probably.

 7  **Q.**   Okay.  In fact, ABK told you that they were considering

 8  working on an Android App Store to compete with the Google Play

 9  Store, correct?

10  **A.**   They claimed it --

11  **Q.**   Okay.  And other --

12  **A.**   -- as part of a negotiation.

13  **Q.**   They said they were considering it, didn't they?

14  **A.**   Yes.  They claimed it.

15  **Q.**   Okay.  And other options ABK was considering, including

16  direct downloads or launching on preexisting alternative app

17  stores, they told you they were considering that too, right?

18  **A.**   I don't recall that.

19       **MR. HUESTON:**  Okay.  Let's go to, Your Honor,

20  page 141, lines 3 to 7.

21       **THE COURT:**  That's fine.

22       **MR. HUESTON:**  Okay.  Let's put it up.

23            "Q.  Another option was directly downloading,

24       offering their apps for direct download, right?

25            "A.  Yes, or going through other app stores

1          that are currently on.  They have recently launched

2          titles through one store in Korea, for example."

3  BY MR. HUESTON:

4  Q.    That was your testimony, right?

5  A.    Yes.  That's what I said earlier as well.

6  Q.    All right.  But you thought if you could get ABK into a Hug

7  deal, even if it costs $150,000,000 more than a typical Hug deal,

8  that would disincentivize ABK from finding other ways to

9  distribute their apps on Android, correct?

10 A.    We thought they would understand the value of Play and

11 make a business decision that was right for them.  A deal is a

12 proposal.  They can decide whether they want it or not.

13          MR. HUESTON:  Okay.  Your Honor, I would like to --

14 page 141, line 25, to 142, line 12.

15          THE COURT:  Yes, that's fine.

16          MR. HUESTON:  Let's play that clip, please.

17                    (Video clip played:)

18          "Q.  But you say here that you thought that if

19      you could get them into a Hug deal -- and we already

20      discussed that all Hug deals require simship on

21      Google Play?

22          "A.  Correct.

23          "Q.  That that would preclude their

24      investments, that would disincentivize them to make

25      investments in finding alternative ways to distribute

1              their apps on to Android?

2                   "A.  That is what partnerships believe in that

3          they value the partnership.

4                   "Q.  So that's a yes?

5                   "A.  Yes."

6      BY MR. HUESTON:

7      Q.   Okay.  And, Ms. Kochikar, in fact, as we just played there

8      in your testimony, you thought it would "preclude investments in

9      alternative ways of monetizing off Play."  Those were the words

10     we just heard from you, right?

11     A.   Yeah.

12     Q.   All right.  And the plan worked, didn't it?

13     A.   Not really.

14     Q.   Well, after signing Project Hug, ABK did not launch a

15     competing app store, right?

16     A.   They do have a web store.  They sell a bunch of their

17     in-app items on the web store.  They have launched on one store

18     in Korea.  They distribute in different ways.

19     Q.   They don't have their --

20     A.   They have the options.

21     Q.   Okay.  They don't have their own competing app store, right?

22     A.   They do not.

23     Q.   Right.  Let's now talk about Riot Games.  That is one of the

24     other developers Google targeted with Project Hug, right?

25     A.   Yes.

 1  Q.   And Riot Games makes some big-name games too, right?

 2  A.   Yes.

 3  Q.   Okay.  One of the risks, again, that Riot presented was that

 4  Riot would also launch its game outside of Google Play, right?

 5  A.   They claimed, yes.

 6  Q.   Okay.  And so Google signed a Project Hug deal with Riot to

 7  stop it from launching its own competing Android App Store,

 8  correct?

 9  A.   No.

10  Q.   Let's go to Trial Exhibit 1478 in your binder.  And it is

11  the Riot GVP deal, the Riot Hug deal, correct?

12  A.   Yes.

13          MR. HUESTON:  Okay.  We'd move it into evidence at

14  this time.

15          MS. CHIU:  No objections.

16          THE COURT:  It is admitted.

17                          (Trial Exhibit 1478 received in

18                          evidence.)

19  BY MR. HUESTON:

20  Q.   In fact, you would have been involved in creating this

21  document, right?

22  A.   Yes.

23  Q.   All right.  And, Ms. Kochikar, this document actually

24  provides the rationale for the Project Hug deal that was offered

25  to Riot Games, right?

1   **A.**   Yes.

2   **Q.**   Let's go to the section that starts with context.  We'll

3   pull it up.

4   **A.**   Yeah.

5   **Q.**   And it states, quote, A year ago, we pulled all the stops,

6   promised them $10 million co-marketing for before they signed

7   GVP, for example, to get Riot Games to stop their in-house app

8   store effort.

9           That's what it says, right?

10  **A.**   Yes.

11  **Q.**   That's a Google document you worked on, right?

12  **A.**   Yes.

13  **Q.**   Okay.  And again, your plan worked, right?

14  **A.**   Well, Riot -- when we got closer, from the outside, it

15  looked like they were planning.  When we got closer, we

16  realized they were a PC game maker that didn't have many mobile

17  gaming skills.  The "all stops" was us working with them to

18  understand how to build a mobile game.  As you know, their

19  games were not very successful.  It's a bet we made because it

20  was a very attractive game on PC.

21  **Q.**   Okay.  You just said we pulled all stops, and you just said

22  something different here in court from the words I read, which

23  were:

24           "We pulled all the stops to get Riot to

25           stop their in-house app store effort."

 1                 That's what was written at the time, right?  Correct?

 2    **A.**    Yes.  I'm explaining what "all stops" means.

 3    **Q.**    Okay.  I'm just -- the words on the page and what was said

 4    there, that's what you said, right?

 5    **A.**    Yes.

 6    **Q.**    Okay.  And, in fact, Riot did not launch a competing Android

 7    App Store, right?

 8    **A.**    Yes.

 9    **Q.**    Okay.  Let's talk about Supercell.  I don't think anybody

10    has heard about that yet.

11                 Supercell is the maker of popular games like Clash of

12      Clans and Clash Royale, right?

13    **A.**    Correct.

14    **Q.**    And you know that Supercell has been vocal about Google's

15    30 percent revenue share, right?

16    **A.**    We have discussed.

17    **Q.**    Okay.  And Supercell, in fact, originally declined to sign a

18    Hug deal, right?

19    **A.**    Correct.

20    **Q.**    And they declined to sign a Hug deal due to the low

21    perceived value, right?

22    **A.**    Yes.

23    **Q.**    Another reason Supercell declined to sign a Hug deal was

24    because they wanted an actual reduction to the 30 percent revenue

25    share, right, which Project Hug did not offer?  Correct?

1   A.   That was their proposal.  We had a different way of

2   looking at it.  That's how businesses negotiate.

3   Q.   Okay.  But to be clear, Supercell did not accept the Project

4   Hug offer, at least in part because they wanted an actual

5   reduction to the 30 percent revenue share, correct?

6   A.   The Hug deal --

7   Q.   Yes or no?

8   A.   It wasn't the "yes" or "no."  It's two different

9   discussions that were happening.

10          MR. HUESTON:  Okay.  Let's go, Your Honor, 174,

11   lines 7 to 11.

12          THE COURT:  That's fine.

13          MR. HUESTON:  Let's put it up, please.

14              "Q.  And Supercell did not accept the Project

15       Hug offer, at least in part because they wanted an

16       actual reduction to their 30 percent revenue share,

17       correct?

18              "A.  Yes."

19          THE WITNESS:  Yeah, because this question said --

20   BY MR. HUESTON:

21   Q.   I'm sorry.  I'm going to -- that's your answer and the

22   testimony, right?  I'm not asking for a commentary, Ms. Kochikar.

23   A.   I understand, sir.

24   Q.   Thank you.

25   A.   You said "at least in part."

**KOCHIKAR - DIRECT / HUESTON**

1   Q.   Let's focus on the questions.   Your counsel will have plenty

2   of time --

3   A.   Thank you.

4   Q.   -- to talk to you.   Okay?

5   A.   Okay.

6   Q.   Now.   Supercell informed Google that it was working on

7   launching a web store, right?

8   A.   Yes.

9   Q.   Okay.   And the web store was going to offer digital items

10  for purchase that could be used inside its app on Android,

11  correct?

12  A.   Yes.

13  Q.   And Google would not make money on purchases made on

14  Supercell's web store, right?

15  A.   Correct.

16  Q.   All right.   And Google was concerned that Supercell's

17  decision to create a web store could attract the attention of

18  other large developers to follow suit, right?

19  A.   Every time there's a competitive thing, we have to pay

20  attention.   We are in a business.   And, yes.

21  Q.   Okay.   So the answer is yes, Google was concerned that

22  Supercell's decision to create a web store could attract the

23  attention of other large developers that followed suit, right?

24  A.   Yes.

25  Q.   Okay.   Contagion once again, right, ma'am?

1    **A.**    Attention of other developers.

2    **Q.**    Right.  Which has been described in the same context as

3    contagion.  We went over that, right?

4    **A.**    Yes.

5    **Q.**    Okay.  So one of the gives that Google proposed to make to

6    Supercell was to give them up to $24,000,000 in cash incentives,

7    right?

8    **A.**    No.  There is much bigger context to that.

9    **Q.**    Let me -- listen to my question.

10   **A.**    Yes.

11   **Q.**    One of the gives that Google would make would be up to

12   $24,000,000 in cash incentives; you understood that, right?

13   **A.**    Yes.

14   **Q.**    Okay.

15   **A.**    For investing in emerging markets.

16   **Q.**    Okay.  And none of Google's deals with other developers at

17   the time involved cash incentives, correct?

18   **A.**    Oh --

19   **Q.**    Yes or no?

20   **A.**    That was the -- the GVP, which is the Games Velocity

21   Program, or called Hug, was one construct.  This was a

22   completely different, independent deal.  They're not connected.

23   **Q.**    Okay.  Let me see if I can -- I'll try it one more time.

24   **A.**    Okay.

25   **Q.**    None of Google's deals with other developers at the time

 1  involved cash incentives, correct?

 2  **A.**   They had call marketing, which was cash.  I don't know how

 3  to explain these things --

 4  **Q.**   Sure.

 5  **A.**   -- shortly with a "yes" and "no."

 6  **Q.**   Let's see how you did in your deposition.

 7  **A.**   Okay.

 8          **MR. HUESTON:**  Your Honor, page 180, lines 12 to 18.

 9          **THE COURT:**  Yes, that's fine.

10          **MR. HUESTON:**  Let's put it up.

11          "Q.  But it was pointed out in connection with

12      getting approvals that none of the other deals that

13      Google was entering into with other developers

14      involved cash incentives?

15          "A.  Yes."

16  **BY MR. HUESTON:**

17  **Q.**   Right?

18  **A.**   With the rest of it.

19          **MS. CHIU:**  Objection, Your Honor.  That's not the

20  complete answer.

21          **THE WITNESS:**  Yes.

22          **THE COURT:**  Go ahead.  Just read the whole answer,

23  will you?

24          **MR. HUESTON:**  (As read):

25          "A.  Yes, we had to point out why emerging

1        markets required prefunding because the business

2        opportunity was more nascent."

3    BY MR. HUESTON:

4    Q.    Your answer there starts with a "yes," right?

5    A.    Just as it did now because it required investments in

6    emerging markets which are important to Android users.

7    Q.    Okay.  And then after that $24,000,000 cash incentive offer,

8    Supercell, in fact, gave in and signed a deal with Google, right?

9    A.    And launched their web store.

10   Q.    And just like every other Hug deal, one of the requirements

11   that Supercell agreed to as part of this deal was simship, right?

12   A.    Correct.  That means only ship alongside all other

13   alternatives.

14   Q.    And you're not aware of Supercell ever launching their own

15   web store for Android, right?

16   A.    They absolutely have.  You can Google it.

17   Q.    Not at the time, though, right?

18   A.    No, no.  They did.

19   Q.    Let me talk a bit about Facebook.

20            Around 2016, Google became concerned that Facebook

21      could use its relationships with phone carriers to create a

22      standalone app store, right?

23   A.    I have no idea.

24   Q.    Okay.  Let's go to Trial Exhibit 1410.  And this is titled

25   Project Wichita Update and Discussion Guide.

1              Do you see this?

2   A.   Yes.

3            MR. HUESTON:  Okay.  We move to admit this at this

4   time.

5            MS. CHIU:  No objections, Your Honor.

6            THE COURT:  It's admitted.

7                       (Trial Exhibit 1410 received in

8                        evidence.)

9   BY MR. HUESTON:

10  Q.   Okay.  Let's go to the second page of the exhibit.

11  A.   Yes.

12  Q.   In the executive summary, in the section named "Issue," it

13  states in the first bullet point:

14              "Facebook has preloaded at least three

15              Facebook apps on Samsung S7 devices; one or

16              more of the apps likely has install packages

17              permission."

18          Do you see that?

19  A.   Yes.

20  Q.   And the second bullet states:

21              "Facebook is actively using these preloaded

22              apps to install and update the core Facebook

23              app, circumventing Play in some cases."

24          Right?

25  A.   Correct.

1   Q.   Okay.  So I want to talk a little bit about what that means.

2           So Facebook offers its own apps, which are sometimes

3   referred to as first party apps, right?

4   A.   Correct.

5   Q.   Okay.  And Facebook, the Facebook app, that's an example of

6   a first party app, right?

7   A.   Correct.

8   Q.   Okay.  And as opposed to first party apps, third party apps,

9   they're apps developed by someone else other than Facebook,

10  right?

11  A.   Correct.

12  Q.   So an example of a third party app compared to Facebook

13  would be the Walmart app, right?

14  A.   Yes.

15  Q.   Okay.  So these install permissions from phone manufacturers

16  gave Facebook the capability to install third party apps, right?

17  A.   Yeah, they could.

18  Q.   Okay.  So let's go to page 10 on the slide titled

19  Implications.  Here it is.

20           And on the third bullet point titled 1P App

21  Management -- that's first party app?

22  A.   Correct.

23  Q.   -- it states, quote, Facebook may decide to manage updates

24  to all of its 1P or first party apps, right?  You see that?

25  A.   Yes.

1   Q.   Okay.  And it continues:

2               "As other developers notice, they may begin

3          to do the same."

4          Right?

5   A.   Yes.

6   Q.   So in writing here, once again, Google's concerned about

7   contagion, right?  That Facebook's actions could influence others

8   to do the same, right?

9   A.   Oh.  Yes.

10  Q.   Okay.  Now, on the right-hand side, under the section named

11  Longer Term, you see there's just one bullet there; do you see

12  that?

13  A.   Yes.

14  Q.   And this is 3P or Third Party App Distribution, correct?

15  A.   Yes.

16  Q.   (As read):

17              "One or more preloaded Facebook apps may

18          have install packages permission.  If so,

19          Facebook could distribute 3P apps, possibly to

20          support direct fulfillment on Facebook ads or

21          to create a standalone app store."

22          That's what was written in this Google document,

23    right?

24  A.   Correct.

25  Q.   Okay.  In fact, Google's leadership had significant concerns

1  about Facebook's ability to distribute third party apps, right?

2  **A.**   From a user security perspective, yes.

3  **Q.**   Well, let's look at that.  Let's go to Trial Exhibit 1549.

4  This is an email from you.  If you can quickly identify that.

5  **A.**   1549.  One moment, please.

6  **Q.**   Sure.

7  **A.**   Yes.

8         **MR. HUESTON:**  And we'd move to admit this at this

9  time, Your Honor.

10         **MS. CHIU:**  No objections.

11         **THE COURT:**  It's admitted.

12                        (Trial Exhibit 1549 received in

13                         evidence.)

14  **BY MR. HUESTON:**

15  **Q.**   Let's go to your email at the bottom of the second page, top

16  of the third page.  And this is an email from you to

17  Marc Shedroff at Facebook, correct.

18         Do you see that there on the screen?

19  **A.**   Yes.

20  **Q.**   Okay.  And you state on the third page to Mr. Shedroff:

21         "The reference to 3P" --

22         That's third party, right?  Do you see that?

23  **A.**   Yes.

24  **Q.**   (As read):

25                "The reference to third party installs in

1                 your email has caused significant concern among

2                 Android leadership."

3                 Those are your words, right?

4    **A.**    Yes.

5    **Q.**    Now let's go to Trial Exhibit 1546.  And you'll recognize

6    this as a set of meeting notes for discussions you were involved

7    with, with Facebook, correct?

8    **A.**    Yes.

9            **MR. HUESTON:**  Move this into evidence at this time.

10           **MS. CHIU:**  No objections.

11           **THE COURT:**  It is admitted.

12                     (Trial Exhibit 1546 received in

13                      evidence.)

14   **BY MR. HUESTON:**

15   **Q.**    Okay.  And it's up on the screen.

16           And you attended this meeting on behalf of Google,

17    right?

18   **A.**    Yes.

19   **Q.**    Let's go to the second page of the document, seventh bullet

20   point, starting with, quote, "still is some confusion."

21           And then it states fully here:

22              "Still is some confusion on the OEM side as

23              they are coming into FB, Facebook, saying

24              Google has put this piece of paper in front of

25              us."

 1              Do you see those words?

 2    **A.**   Yes.

 3    **Q.**   And you agree that Facebook's understanding, based on

 4    conversations with OEMs, is that install restrictions on Facebook

 5    was coming from Google, right?

 6    **A.**   That's their understanding.

 7    **Q.**   Right.  Now, let's go to the third page.  We're going to

 8    pull this up, second to last section.  It says "FB."  That's

 9    Facebook, right?

10    **A.**   Yes.

11    **Q.**   (As read):

12              "Facebook execs are very frustrated,

13              including Zuck, for a few reasons."

14              You see that?

15    **A.**   Yes.

16    **Q.**   And you understood Zuck, that referred to Facebook's CEO

17    Mark Zuckerberg, right?

18    **A.**   Yes.

19    **Q.**   And it continues, quote:

20              "Their perception, Google is overreaching,

21              interjecting involvement.  This is our own

22              program that we have between OEM and carriers."

23              Right?

24    **A.**   That's their perception.

25    **Q.**   Okay.  And let's go to the second bullet there.

1              "Google is switching positions.  There have

2          been extensive discussions between Hiroshi and

3          Dan, Rose and John L. where apparently

4          alignment Google was okay for Facebook and to

5          update one and three apps.  We share we had a

6          different historical impression."

7          That's what's written there, right?

8   A.   Yes, it says we had a different historical impression.

9   Q.   And, in fact, around early 2020, Google was specifically

10  negotiating new contracts with OEMs to bar Facebook's install

11  permissions, correct?

12  A.   I wasn't involved.  I just got to learn from here.

13  Q.   Well, let's look.  Let's go to Trial Exhibit 1545.  And this

14  is an email that you're a recipient of, correct?

15  A.   Yes.

16          MR. HUESTON:  Okay.  We move this in at this time.

17          MS. CHIU:  No objections.

18          THE COURT:  It's admitted.

19                     (Trial Exhibit 1545 received in

20                          evidence.)

21  BY MR. HUESTON:

22  Q.   And this is an email from Mary Liz McCurdy on March of 2020,

23  right?

24  A.   Yes.

25  Q.   And she writes: "FB," Facebook, "reached out this weekend

1    with an urgent request to get an exemption from reported

2    negotiations the Android BD team is driving, offering a premium

3    tier to not allow OEM installers."

4              Right?

5    A.   Yes.

6    Q.   Okay.  And the proposal by Google to phone manufacturers to

7    no longer allow installers, that was referred to as RSA 3.0,

8    right?

9    A.   Yes.

10   Q.   Okay.  And Facebook wanted an exemption from that, right?

11   A.   That's what they are claiming here.

12   Q.   Yeah.

13   A.   Yes.

14   Q.   But they didn't get an exemption, did they?

15   A.   A lot happened.  It's much bigger than that.

16   Q.   The answer is no, they didn't get an exemption, right?

17   A.   We changed how we looked at RSA, so the exemption wasn't

18   material.

19   Q.   Okay.  Well, faced with what they were describing as

20   interference, Facebook agreed to focus on just first party

21   installations, right?

22   A.   There's much bigger context here.  I can go over it later

23   perhaps.

24   Q.   Well, Facebook did agree to focus on first party

25   installations, right?

1    **A.**   They agreed with our concerns on security.  We had a

2    discussion.  And that's how they made their decision

3    independently.

4    **Q.**   And faced with that interference, Facebook additionally

5    agreed to allow for Google's own solution for third party

6    installations, right?

7    **A.**   Facebook AB tested solutions.  That's what they do.

8    They're a very big company.

9    **Q.**   They agreed to allow for Google's own solutions on third

10   party installations, right, ultimately?

11   **A.**   They were willing to try a pilot with Google's own

12   solution.

13   **Q.**   And so at the end, Ms. Kochikar, Facebook is not using its

14   permissions to install third party apps in the United States,

15   correct?

16   **A.**   Yes.

17   **Q.**   Okay.

18   **A.**   Oh.  Well, I have no way to prove it.  You know, since I'm

19   under oath, I have no way to prove it.  They have the

20   permissions.  They may be doing it.  I have no way to prove it.

21   **Q.**   At the time of your deposition, you recall that your

22   understanding was that they were, in fact, not using permissions

23   to install third party apps in the U.S., right?

24   **A.**   That is what they've assured us; they've said.

25   **Q.**   Now, Ms. Kochikar, you testified yesterday that all apps can

1   offer their own billing solution as part of User Choice Billing,

2   correct?

3   **A.**   Apps can in markets where User Choice Billing is

4   available.

5   **Q.**   Yeah.  But you admit that games are not eligible for User

6   Choice Billing, right?

7   **A.**   Except in Korea, yes.

8   **Q.**   Right.  And games, they constitute at least 80 percent of

9   Google Play transaction revenues, right?

10  **A.**   Correct.

11  **Q.**   Right.  So Google does not provide any billing choice, real

12  or fake, for games that provide the vast majority of Google Play

13  revenues, right?

14  **A.**   Not yet.

15  **Q.**   Okay.  Not through today, right?

16  **A.**   Yes.

17  **Q.**   All right.  Now, you were talking about games and apps

18  yesterday.  Despite drawing a distinction between games and apps

19  and Google's policies like User Choice Billing, you agree that

20  that apps/games distinction, that doesn't make any sense in the

21  real world, right?

22  **A.**   I don't think so.  I think everybody would identify there

23  are apps, and games are a type of app.  Like, there are

24  non-gaming apps and games.

25  **Q.**   So you think it does make sense in the real world; is that

 1   right?

 2   **A.**   Yes.

 3   **Q.**   Okay.  Well, let's look at that.  Let's go to Trial

 4   Exhibit 8025 in binder 2.

 5           And this is a slide presentation titled Play Payments

 6     Policy.

 7   **A.**   Sorry.  Binder 2.  I was in the wrong place.

 8   **Q.**   Yeah.  Okay.

 9   **A.**   Yes.

10   **Q.**   Do you see that?

11   **A.**   Yes.

12          **MR. HUESTON:**  And we'd move this into evidence at this

13   time.

14          **MS. CHIU:**  No objections.

15          **THE COURT:**  It is admitted.

16                          (Trial Exhibit 8025 received in

17                           evidence.)

18   **BY MR. HUESTON:**

19   **Q.**   And, in fact, you contributed to this document, correct?

20   **A.**   I don't -- I don't know.  Did I?

21   **Q.**   You're a co-author of this document, right?

22   **A.**   Okay.

23   **Q.**   Let's look at this.  This is called Play Payments Policy,

24   right?

25   **A.**   Oh, I'm maybe in the wrong place.

1                    Oh, yes, of course.

2    **Q.**   Okay.  You recognize it now, right?

3    **A.**   Yes, I do.

4    **Q.**   Okay.  And, in fact, you were a co-author of this document,

5    right?

6    **A.**   Yes.

7    **Q.**   Okay.  Thank you.  And it's called Play Payments Policy,

8    dated June 17, 2020, right?  Do you see?  It's on the screen.

9    **A.**   Yes.  Thank you.

10   **Q.**   Let's go to the third page of the document, also on the

11   screen.  You see a number of comments on this page, correct?

12   **A.**   Yes.

13   **Q.**   Okay.  I'm going to draw your attention to the fourth

14   comment down.  I'm pulling it out here in the fifth row.  And

15   this one dates June 17th, 2020, with the time listed as 19:40.

16   **A.**   Yes.

17   **Q.**   And that's your comment, right?

18   **A.**   Yes, I think so.

19   **Q.**   Yes.  And in the second paragraph, it states, quote:

20                    "We have successfully done this across

21              various verticals, apps and games."

22              You see that, right?

23   **A.**   Yeah.

24   **Q.**   And then you say, quote:

25                    "I am not sure Sundar thinks about the

1              world as apps and games, to be honest."

2              Right?  You see that language?

3    A.   Yes.

4    Q.   Okay.  And Sundar, that refers to Google's CEO Sundar

5    Pichai, right?

6    A.   Yes.

7    Q.   And then you continue referring to Mr. Pichai, quote:

8              "I think he views our partners as part of

9              various verticals.  That's how Don thinks about

10             them as well."

11             Right?  You see that?

12   A.   Yes.

13   Q.   And then you conclude this comment by writing, quote:

14             "Apps and games is our classification that

15             does not make much sense in the real world."

16             End quote.

17             Your words, right, ma'am?

18   A.   Yes.

19        MR. HUESTON:  Thank you.

20        Pass the witness.

21        THE COURT:  Okay.

22                        **CROSS-EXAMINATION**

23   BY MS. CHIU:

24   Q.   Good morning, Ms. Kochikar.

25   A.   Good morning.

1   Q.   Ms. Kochikar, you were asked some questions about agreements

2   that Google entered into with various developers; do you remember

3   that?

4   A.   Yes.

5   Q.   Did Google ever bribe any developer not to open its own app

6   store?

7   A.   No.

8   Q.   And counsel asked you some questions about agreements with

9   Riot Games, ABK, and Supercell.

10  A.   Yes.

11  Q.   I just wanted to talk to you about those agreements in a

12  little bit more detail.

13            Let's start with Riot Games.

14  A.   Okay.

15  Q.   Why was Google interested in offering Riot a Games Velocity

16  Program deal?

17  A.   Riot is one of the biggest and most impressive game

18  developers.  League of Legends is legendary.  We were excited

19  about the possibility of a very legendary game that has made

20  more than a billion dollars -- could make more than a billion

21  dollars on mobile to come to our platform.

22  Q.   Did you participate in the discussion with Riot Games?

23  A.   Yes.

24  Q.   And what were the discussions like?

25  A.   It started off very aggressive, you know, like

1  negotiations do; and then we said why don't we come and sit

2  together and have a conversation.

3          We took all our experts across technology, marketing,

4  user experience to Riot for a three-day workshop, and we had a

5  conversation about what it takes to build a mobile game and

6  make it successful.

7          Riot realized that it's very different from building a

8  PC game and marketing a PC game and asked for more engagement,

9  deeper engagement to understand how to launch on mobile.

10 Q.   Now, Ms. Kochikar, was this the first time that Riot Games

11 was launching its titles on mobile devices?

12 A.   Yes.

13 Q.   Were you aware when you were having these discussions with

14 Riot Games if they had other options for launching their titles

15 on mobile?

16 A.   Yes.

17 Q.   And what were those options?

18 A.   Well, there are other app stores, they could sideload, and

19 they could, you know, decide to -- or sideload.

20 Q.   Now, Riot mentioned to you they were interested in opening

21 their own store.  Do you remember that testimony that you gave?

22 A.   Yes, on the very first call, which was very aggressive.

23 Q.   And can you explain what your understanding of that meant?

24 A.   It meant that they -- you know, Riot has always done

25 everything in-house.  Coming to mobile was new and actually

1  quite disconcerting for them.  And so somehow, part of it

2  meant:  This is how we've done it before.  Part of it meant:

3  I'm here to negotiate with you.

4          And mobile works differently, so we had to have a

5    conversation with them.

6  Q.   Now, when you say they've done it themselves before, what do

7  you mean by that for their PC games?

8  A.   In PC games, Riot has built everything in-house.  They do

9  even their video production in-house.  They do all their

10  marketing in-house.  They are not used to partnering in a way

11  that requires building trust and working together.  Not that

12  they don't do it.  They're a fantastic partner, a fabulous

13  company.  It was just, mobile works differently, and so they

14  had to learn how mobile works.

15  Q.   And specifically, do they have their own platform for

16  distributing their PC games, Ms. Kochikar?

17  A.   Yes, of course, and they still do.  They have a store with

18  which they can distribute on the -- on a PC as well as on the

19  web.

20  Q.   Ms. Kochikar, does Riot distribute content that's developed

21  by anybody else besides Riot on that PC store?

22  A.   I don't think so.

23  Q.   Now, how did you react when you heard that Riot thought

24  about going it alone on mobile?

25  A.   Like I react to any partner who talks to me.  I try to

1  find middle ground.  I want to understand why they want to do

2  it, understand how we can pitch what we can do for them, and

3  give them the choice.  That's what partnerships is about.

4  **Q.**   So, I want to turn your attention to a document that counsel

5  showed you this morning.  It's Number 1478.  It's in the first

6  binder that you would have looked at.

7  **A.**   Too many papers.

8  **Q.**   I know.  I believe it's in a white binder, Ms. Kochikar.

9  **A.**   Yes, I got it.  Thank you.

10  **Q.**   So counsel asked you about the context on this document,

11  which was describing the Riot Games Velocity Program deal; do you

12  remember that?

13  **A.**   Yes.

14  **Q.**   Could you explain to the jury what you meant about the

15  context -- about pulling out all the stops to get Riot to stop

16  their in-house app store efforts?

17  **A.**   We took all experts for three days down to L.A. to meet

18  them in person.  It was a big investment.  We truly wanted to

19  show them how much we cared about the games and how much we

20  wanted to partner with them.  They had a choice after that.

21  **Q.**   And, Ms. Kochikar, did Google ever ask Riot not to open its

22  own store as part of their mobile distribution strategy?

23  **A.**   No.

24  **Q.**   Did Google ever suggest in negotiations with Riot that they

25  should not open their own store as part of their mobile

1    distribution strategy?

2    **A.**    No.

3    **Q.**    So Google and Riot signed a Games Velocity Program

4    agreement; is that correct?

5    **A.**    Yes.

6    **Q.**    Those are written contracts; is that right?

7    **A.**    Yes.

8    **Q.**    Were there any promises or commitments made by either Riot

9    or Google that were not reflected in the written agreements?

10   **A.**    No.

11   **Q.**    Ms. Kochikar, as part of the Riot GVP agreement -- and by

12   "GVP," I mean Games Velocity Program -- was Riot prohibited from

13   opening its own store?

14   **A.**    No.

15   **Q.**    As part of the Games Velocity Program agreement with Riot,

16   was Riot prevented from distributing its games on any other

17   mobile platform?

18   **A.**    No.

19   **Q.**    And as part of Games Velocity agreement with Riot, were they

20   prohibited from distributing their games on any other Android App

21   Store?

22   **A.**    No.

23   **Q.**    Was Riot prohibited from distributing its games on the Apple

24   App Store as part of the Games Velocity Program agreement?

25   **A.**    No.

1   Q.   So let's talk about ABK, or Activision Blizzard, another

2   agreement that counsel asked you about this morning.

3           So Google also entered into a Games Velocity Program

4    deal with ABK; is that right?

5   A.   Yes.

6   Q.   Can you explain to the jury why Google was interested in

7   offering a Games Velocity Program deal to ABK?

8   A.   Again, Activision Blizzard, storied game developer.

9   Call of Duty.  I'm sure everybody has heard Diablo.  Big

10  titles, very attractive for the users.

11          Me, personally, I was excited about bringing them to

12   kids in India, which never had an option to Play on a PC, for

13   example.  And King, one of the biggest casual games that is on

14   tens of millions of devices -- or users.

15  Q.   Do you -- what are the titles that the jury might have heard

16  of that Activision Blizzard King develops?

17  A.   Candy Crush.

18  Q.   Now, you testified earlier that Google needed to request

19  approval from the business counsel for the deal that was offered

20  to ABK; do you remember that?

21  A.   Yes.

22  Q.   Can you explain to the jury why that was necessary?

23  A.   Yeah.  The business council gives us guidelines on how to

24  do certain kinds of deals.  The Games Velocity Program had very

25  clear guidelines.  Activision Blizzard was going to be one

1    of -- needed more investment because they're going to be one of

2    our biggest investors in cloud.

3              And cloud, as you know, is a big area of investment

4      for Google; and therefore, we needed to go back to the business

5      council.

6    Q.    Now, Ms. Kochikar, I think you mentioned that ABK claimed

7    that they were going to open their own mobile Android App Store.

8    Did I hear that right?

9    A.    Yes.

10   Q.    Can you tell the jury what those discussions were like?

11   A.    It was part of, in the middle of a very strong negotiation

12   across cloud and ads and Play.  And during negotiations, lots

13   of claims get made.  Our job is to put the best offer forward,

14   and very complex, important business people on the other side

15   will decide whether that is right for them or not.

16   Q.    Now, counsel asked you about an email exchange describing

17   the negotiations with ABK.  If, in the same binder you were

18   looking at, I could direct your attention to Exhibit 1522.

19   A.    Yes.

20   Q.    And so counsel asked you earlier about your email that

21   appears at the top of the first page, and I just wanted to see if

22   you could explain to the jury what you were trying to communicate

23   in your email there.

24   A.    Yes.  Blizzard has a web store through which Blizzard

25   sells in-app items.  Those items, when people pay for, Play

1  doesn't make any money, but people can use it on the game on

2  mobile because it's an item that you bought.  You own it.  You

3  can use it inside a mobile.

4        So we honestly knew that Activision Blizzard would be

5  evaluating different distribution channels.  We wanted Play to

6  be one of those channels that they would evaluate.

7  **Q.**   Ms. Kochikar, while you were negotiating with ABK, did you

8  personally believe that they were going to open their own mobile

9  app store?

10  **A.**   I did not.

11  **Q.**   And I'm going to do a little bit of binder switching.  If

12  you could look at the black binder that we just handed up to you.

13  **A.**   I'm going to make sure I don't drop things.  All right.

14  **Q.**   And let's take a look at Exhibit 5696.

15  **A.**   5696.  Okay.

16  **Q.**   And this is an email that reflects Google comments and a

17  Google document that's dated December 6, 2019; do you see that?

18  **A.**   Yes.

19  **Q.**   Do you recall commenting on this document around

20  December 2019?

21  **A.**   Yes.

22  **Q.**   And you would have done that in the normal course of your

23  duties at Google?

24  **A.**   Yes.

25        **MS. CHIU:**  We move this into evidence Your Honor.

1              MR. HUESTON:  No objection.

2              THE COURT:  It's admitted.

3                           (Trial Exhibit 5696 received in

4                             evidence.)

5   BY MS. CHIU:

6   Q.   So I'd like to direct your attention to the top of the

7   email.  There is a line of text that starts "Activision has told

8   us."

9            Do you see that?

10  A.   Yes.

11  Q.   And if I understand this correctly, this is text in a

12  document and, below it, are some comments that people made; is

13  that correct?

14  A.   Correct.  This was in the middle of our discuss- -- deal

15  negotiations.

16  Q.   That's right.  So could you read aloud to the jury the line

17  that's highlighted?  That's the text that was in the document.

18  A.   (As read):

19            "Activision has told us that they will

20            build their own Mobile Store.  Tencent has

21            opened up a dialogue with Sameer, Sundar, Don.

22            Tencent Company, Epic, has done sideloading and

23            turned their Fortnite launcher into an Epic

24            game store."

25            This is from my colleague Marc Theermann.

1    **Q.**   Now, it appears that you commented regarding that line of

2    text from Mr. Theermann; is that right?

3    **A.**   Yes.

4    **Q.**   Okay.  So if you look a couple of lines below, it's your

5    comment underneath your name.

6              Do you see that?

7    **A.**   Yes.

8    **Q.**   Could you please read aloud for the jury what your comment

9    was on December 6th, 2019?

10   **A.**   (As read):

11                "This risk is not real.  Launching off Play

12           is not a big risk."

13   **Q.**   And what did you mean by that?

14   **A.**   I truly believed in our partnership.  They were very big

15   on Play, and we had worked very strongly together.  I didn't

16   think it was a really big risk.

17   **Q.**   Ms. Kochikar, did Google ever ask ABK not to open its own

18   store?

19   **A.**   No.

20   **Q.**   Did Google ever suggest to ABK that they should not open

21   their own store?

22   **A.**   No.

23   **Q.**   Now, Google and ABK signed a Games Velocity Program deal; is

24   that correct?

25   **A.**   Yes.

1   **Q.**   Those are written contracts?

2   **A.**   Yes.

3   **Q.**   Were there any promises or commitments made by either ABK or

4   Google that were not reflected in those written agreements?

5   **A.**   No.

6   **Q.**   And as part of the Games Velocity Program agreement, was ABK

7   prevented from opening its own store?

8   **A.**   No.

9   **Q.**   As part of the Games Velocity Program agreement, was ABK

10  prevented from distributing its games on any other mobile

11  platform?

12  **A.**   No.

13  **Q.**   And as part of the Games Velocity Program agreement, was ABK

14  prohibited from distributing its titles on any other Android

15  store?

16  **A.**   No.

17  **Q.**   As part of the Games Velocity Program agreement, was ABK

18  prohibited from distributing its games on the Apple App Store?

19  **A.**   No.

20  **Q.**   Ms. Kochikar, did you consider the Games Velocity Program

21  deal with ABK to be a success?

22  **A.**   Yes.

23  **Q.**   And are you aware whether ABK was pleased with the results

24  of that contract?

25  **A.**   Yes, they are very pleased.  They wanted a renewal.

1   **Q.**   So let's go again into the black binder to Exhibit 6390.

2   **A.**   Give me one second.

3         Yes.

4   **Q.**   What is this document?

5   **A.**   With all our top partners, we have something called as

6   business reviews, sometimes quarterly, sometimes half yearly,

7   where partners come and share with us their impressions of

8   different activities or initiatives or programs we've done

9   together.

10        This is a presentation from Activision Blizzard at one

11   of the QBRs, we call them, quarterly business reviews.

12   **Q.**   And did you attend this QBR with Activision?

13   **A.**   Yes.

14   **Q.**   And you received this in the normal course of your

15   responsibilities at Google.

16   **A.**   Yes.

17        **MS. CHIU:**  We would move this into evidence, Your

18   Honor.

19        **MR. HUESTON:**  No objection.

20        **THE COURT:**  It's admitted.

21                  (Trial Exhibit 6390 received in

22                  evidence.)

23   BY MS. CHIU:

24   **Q.**   So, Ms. Kochikar, I'd like to look at the second page of

25   this exhibit.  It says Executive Summary.

1   **A.**   Yes.

2   **Q.**   Can you read the first bullet point under the Executive

3   Summary title?

4   **A.**   (As read):

5                    "Current partnership drove Google Play

6               ecosystem growth across several key metrics

7               versus your competitor, including."

8   **Q.**   And then there's some information that appears below that.

9               Before we get to that, can you describe -- or can you

10   explain to me what the reference to "your competitor" means

11   here?

12  **A.**   Apple App Store and the iOS platform.

13  **Q.**   And what was ABK telling you about the results of the deal,

14  the Games Velocity Program deal, in this slide?

15  **A.**   Saying that working together has been beneficial for them

16  on Android and it has actually helped them grow their business.

17  **Q.**   So let's turn to another page, which is 63904 of this

18  document.

19               Can you read what this slide title is?

20  **A.**   Partnership Led to Higher Paid Installs Versus Competitor.

21  **Q.**   And what is being communicated on this slide?

22  **A.**   It's being communicated that one of the components of the

23  GVP program was that we were co-investing in marketing to

24  acquire users.  So they're saying partnership led to it being

25  effective, more paid installs, that is, more user acquisition

1    happened as a consequence versus competitor.

2    **Q.**   Now, Ms. Kochikar, I just want to be clear.  Who prepared

3    this document?

4    **A.**   ABK.

5    **Q.**   And they presented it to you at a meeting; is that right?

6    **A.**   Yes.

7    **Q.**   Okay.  Did the deal with ABK provide any business benefits

8    to Google?

9    **A.**   Yeah, significant.

10   **Q.**   And what were those benefits?

11   **A.**   They are one of our biggest cloud customers.  When we

12   started the GVP program, very few of the top game developers

13   even knew Google Cloud, and we were coming from behind.  And so

14   ABK became an anchor customer that allowed for other game

15   developers to also consider Google Cloud.  So that was

16   important.

17              The marketing, as you pointed out, led to more; and of

18     course, their business on Play has grown significantly; and

19     together, we have helped them grow.

20   **Q.**   Now, Ms. Kochikar, let's turn to the Supercell agreement

21   that counsel was talking about.  That was not a Games Velocity

22   Program agreement; is that right?

23   **A.**   Correct.

24   **Q.**   And why did Supercell tell Google they weren't interested in

25   a Games Velocity Program agreement?

 1   **A.**   Because what we offered them didn't have value for them.

 2          If I could take a moment.  The Games Velocity Program

 3     offered four things:  an ability to invest in Cloud, an

 4     ability to invest in our Ads, an ability to invest in YouTube,

 5     as well as the -- some co-marketing.

 6          Supercell already had a commitment to a different

 7     cloud customer.

 8          **THE COURT:**  All right.  We need to break this -- these

 9   long narrative answers aren't flying.  So just ask some

10   questions to break this up, please.

11          **MS. CHIU:**  Yes, Your Honor.

12   **BY MS. CHIU:**

13   **Q.**   Ms. Kochikar, let's just focus right now on the Supercell

14   agreement.

15   **A.**   Yes.

16   **Q.**   You mentioned that they already had a commitment in cloud;

17   is that correct?

18   **A.**   Yes, they had a commitment in cloud, and they were not

19   using our Ads product.  And so they did not find the GVP offer

20   attractive.

21   **Q.**   But you continued to negotiate with Supercell; is that

22   correct?

23   **A.**   Yes.

24   **Q.**   Now, when you were having the Games Velocity Program

25   agreement discussions with Supercell, did they tell you they were

1   planning to launch their own web store?

2   **A.**   Yes.

3   **Q.**   And how did you know that?

4   **A.**   Because they're a good partner.  We discussed these

5   things.

6   **Q.**   And did you continue having negotiations with them, despite

7   them telling you about the web store?

8   **A.**   Absolutely.  We even discussed what their web store would

9   do.

10  **Q.**   Now, after they decided that the GVP benefits didn't really

11  fit for their business needs, did the -- did the discussions

12  continue with Supercell?

13  **A.**   Yes, of course.

14  **Q.**   And what did you discuss with them?

15  **A.**   Everything from new game launches, their investing

16  companies, as well as where we could partner together with

17  their current games.

18  **Q.**   And counsel asked you about whether Supercell wanted a

19  reduction in the service fee as part of their discussions with

20  Google; do you remember that?

21  **A.**   Yes.

22  **Q.**   Can you explain what those discussions involved in more

23  detail?

24  **A.**   Yeah.  With any game that has become big, people try to

25  figure out whether the channel is providing value and whether

KOCHIKAR - CROSS / CHIU

1    the fees are right.

2              Our goal is to find out how we can continue to invest

3      in their business and know that our fees are okay.

4    Q.   Now, you did -- Google did enter into an agreement with

5    Supercell; is that right?

6    A.   Yes.

7    Q.   What were the components of that agreement?

8    A.   We -- we wanted them to invest in emerging markets, which

9    is very important.  Billions of Android users are in emerging

10   markets.

11             Those markets are difficult to monetize, and so we

12     needed Supercell to make a bet, so we are going to put skin in

13     the game, put money in so that they put -- they do development

14     of the game and we target emerging markets.

15   Q.   And, Ms. Kochikar, could you explain to the jury what

16   exactly you mean by "emerging markets"?

17   A.   These are markets like India and Brazil and Indonesia,

18   several parts of the -- like, Turkey, Middle East, Africa, some

19   of the earlier markets where Android is still quite an

20   attractive platform.

21   Q.   Now, counsel described a component of the Supercell

22   agreement as a $24,000,000 cash payment.  Is that true?

23   A.   They were an investment for them to make changes in their

24   game and pricing to make their product attractive for emerging

25   markets.  So it's not a cash payment.  It was a co-investment.

1   Q.   Ms. Kochikar, did Google enter into any agreement with

2   Supercell that prevented them from opening their own store?

3   A.   No, not at all.

4   Q.   And did Google enter into any agreement with Supercell that

5   prevented Supercell from distributing their titles on any other

6   mobile platform?

7   A.   No.

8   Q.   So, Ms. Kochikar, I know we've been talking about the Games

9   Velocity Program or Project Hug for a while.  Let's step back and

10  talk about the program at a higher level.

11           What was Google's goal for the Games Velocity Program?

12  A.   Make sure that the best games launch on Play on the same

13  day and date while they're launching anywhere else.

14  Q.   And why was this important to Google?

15  A.   Because these are important -- we have a commitment to our

16  users.  If great apps and games don't launch on day and date on

17  a device, then chance are people will move to a competing

18  platform.  And it's an important thing for our business.

19  Q.   Now, Ms. Kochikar, was the goal of the Games Velocity

20  Program to pay off game developers not to open their own app

21  stores?

22  A.   No.

23  Q.   And, in fact, what were the only commitments that Google

24  asked of developers who signed a Games Velocity Program deal?

25  A.   Just to simship, means launch your title on the same day

 1  and date on Play as any other store or any other platform.

 2  **Q.**   So let's look at a document that might help walk through how

 3  the Games Velocity Program worked.  If you could look in the

 4  black binder at Exhibit 5714.

 5  **A.**   Yes.

 6  **Q.**   What is this document?

 7  **A.**   This is a document which is -- describes the project for a

 8  review, the Games Velocity Program for a review.

 9          **MS. CHIU:**  Your Honor, we would move this document

10  into evidence.

11          **MR. HUESTON:**  No objection.

12          **THE COURT:**  It's admitted.

13                            (Trial Exhibit 5714 received in

14                            evidence.)

15  **BY MS. CHIU:**

16  **Q.**   So, Ms. Kochikar, I'd like to turn your attention to page 4.

17          I believe you were mentioning the four service packs

18   that were part of Games Velocity Program.  Could you just

19   briefly describe how the Games Velocity Program structure

20   worked?

21  **A.**   Yes.  So we looked at the end-to-end life cycle of

22  building a game; so, too, and what Google products could help.

23  So we brought together Android and Cloud.  You can see the

24  logos on the top.  Play and Ads and YouTube.  And all of them

25  could help a game developer.

 1              We created service packs, because we didn't think it

 2      should be all or nothing.  So a game developer could pick one

 3      or the other.  So we took these five products, created four

 4      service packs.

 5              The first one, build and test, is about investing in

 6      Cloud.

 7              Second, launch and grow, is what we can do on the

 8      store, in terms of promoting the app on the store, doing -- you

 9      know, giving them some consulting services to figure out how to

10      take it to different markets.

11              The third is about working with our Ads to do paid

12      acquisition.

13              And the fourth is about using YouTube to build a

14      community around their games.

15      Q.   So let's look at a few of these examples to understand them

16      a little bit better.

17              You mentioned Cloud.  How did the Cloud credits

18      component work for Games Velocity Program?

19      A.   We took 2 percent of the fees that a developer pays us and

20      gave it as a credit to invest in Cloud.  However, they had to

21      invest significantly more in Cloud to get it.

22      Q.   And why would Cloud credits help a game developer?

23      A.   Cloud infrastructure is an important decision for game

24      developers.  Google Cloud was not understood.  We were coming

25      from behind.  The credits give them an opportunity to test it.

1             We always wanted to put skin in the game to help them

2       try it out, and then they can invest more.

3       **Q.**   And what about Ads?  Could you describe how the Ads credit

4       worked?

5       **A.**   All businesses spend on Ads to acquire users.  We said we

6       would put one dollar for every $3 that the developer puts in.

7       So, again, co-invest to grow their business.

8       **Q.**   I'd like to turn your attention to slide number 5,

9       Ms. Kochikar, which is titled Project Hug Goals and Non-Goals.

10            Do you see that?

11      **A.**   Yes.

12      **Q.**   Can you explain -- or read out what the three goals, as

13      depicted on this slide, are?

14      **A.**   The three goals are to prioritize Play, that is by

15      simshipping.  The second is to invest in Google products and

16      grow their business.  And the third is to improve developer

17      sentiment, which is build closer partnerships.

18      **Q.**   Now, why is simship so important to Google Play?

19      **A.**   Because our users would -- we want our users to be treated

20      the same as anybody else's users.

21      **Q.**   And when you say "anybody else's users," what are you

22      referring to specifically?

23      **A.**   Apple App Store.

24      **Q.**   So I believe yesterday counsel asked you about a document.

25      It's Exhibit Number 1520 in the other binder if you need to take

1   a look at it.  But it was talking about high-potential, high-risk

2   game developers; do you remember that?

3   **A.**   Yes.

4   **Q.**   Can you explain what your discussion was in this email about

5   launching on -- the importance of launching on -- within the --

6   addressing fragmentation within the Android ecosystem?

7   **A.**   Yes.  The Android mission has been to bring computing to

8   the world.  That means not all devices have the same

9   capabilities.  Very sophisticated games, like Fortnite or what

10  I'm saying here, Civilization VI, can't work on all Android

11  devices.

12          Android fragmentation means not all devices have the

13   same capabilities.  So I am coaching my team to think about

14   which games will actually work on Android.

15  **Q.**   But you weren't worried just about high-fidelity AAA games

16  as part of games developer program; is that right -- or Games

17  Velocity Program?

18  **A.**   Yes.  But I want to make sure it is games that can

19  actually work on Android.

20  **Q.**   So let's go back to Exhibit 5714.  You mentioned that

21  simship is important because you don't want content to launch on

22  Apple before it's on Google Play.  Why is that a concern for

23  Google Play?

24  **A.**   Google Play is only as successful as people are using

25  Android devices, and Apple is a very formidable competitor.

1  **Q.**   Can you remember any examples of games that launched on

2  Apple before they were available on Google Play?

3  **A.**   Many.  Clash of Clans from Supercell took 14 months of

4  work by me and my team to bring them to Android, and Fortnite,

5  of course, launched first on iOS.

6  **Q.**   And, Ms. Kochikar, why is it problematic for Google Play if

7  these games don't launch at the same time as Google Play?

8  **A.**   Our users feel like their less important.  Android users

9  feel that they're less important.

10  **Q.**   Now, under the -- on 5714, "Goal 1:  Prioritize Play," it

11  also says "Maintain game parity across platforms."

12         Do you see that?

13  **A.**   Yes.

14  **Q.**   Can you explain to the jury what that means?

15  **A.**   Sometimes people will launch an app on Android and Apple

16  at the same time.  However, the app on Android has fewer

17  features or are not of the same quality as Apple.  So this was

18  saying launch on same day and date, but please also take care

19  of quality.

20  **Q.**   And why is it a problem for Google Play if the game that is

21  available on the Play Store doesn't have the same quality as

22  available on the Apple App Store?

23  **A.**   Obviously users get frustrated, but we are also finding

24  sometimes the missing features causes bullying and other things

25  for our users.

1   Q.    What do you mean by that?

2   A.    We recently had a -- found out, in surveying some of our

3   young users, that turns out a very important social media app

4   has rounded edges when a creator posts using an iOS device and

5   square edges when somebody posts using an Android device.  And

6   whenever a creator posts using square edges, they get bullied.

7   And so then they leave and go and join an iOS, pick an iOS

8   device.  That's just one of many examples.

9   Q.    Thank you.  Now, Ms. Kochikar, let's look at the slide.  At

10  the bottom, there's a box that says Non-Goals; do you see that?

11  A.    Yes.

12  Q.    And can you read that for the jury?

13  A.    The non-goal of a platform means that these are not goals

14  of this platform.  It says, "Stop launch on other Android

15  stores, example Galaxy Store.  Drive additional cross PA

16  integration."  That is, we are only focusing on these products

17  which we believe are useful for the user, not Stadia, which was

18  one of our more nascent gaming products.

19         And "Close commercial deals beyond defined scope."

20    There is nothing beyond the terms that have been defined here.

21  Q.    So, Ms. Kochikar, I just want to make very clear, so it was

22  a non-goal to stop launch on other Android stores; is that right?

23  A.    Yes.

24  Q.    I'd like to look at the speaker notes on this slide.

25  There's some additional text that says "Four Non-Goals."  Do you

1  see that?

2  A.    Yes.

3  Q.    And it reads:

4              "It is important to note that this is not

5         an exclusivity program."

6  A.    Yes.

7  Q.    What do you understand that to mean?

8  A.    That means there are no restrictions.  The developer can

9  launch anywhere else using any other means.

10  Q.    And why doesn't Google pursue exclusivity?

11  A.    It's bad for the developers and bad for games.

12  Q.    Why is that?

13  A.    Most games are multi player, multi platform today.

14  Developers should have a choice to go to as many places where

15  the users are, and that's how games actually grow.

16  Q.    I'd like to turn your attention to page 12 of this deck.

17              Now, does this slide identify the developers that

18    Google approached to participate in the Games Velocity Program?

19  A.    Yes.

20  Q.    And how did Google identify these partners?

21  A.    We identified partners that were most important to our

22  users by looking at time spent and dollars spent on these

23  games.

24  Q.    And did Google enter into Games Velocity Program deals with

25  these developers?

1   **A.**   Most of them.  You know, this list was modified a bit

2   later on, but 20 out of the 21.  It got slightly shortened, but

3   20 out of the 21.

4   **Q.**   And did every developer get the same Games Velocity Program

5   deal?

6   **A.**   They were offered the same service packs, and different

7   ones picked different -- picked those that were important to

8   them.  Some didn't pick out Cloud.  Some didn't pick out Ads.

9   But if they picked a pack, they got the same deal.

10   **Q.**   Now, did Google get any benefits, business benefits from the

11   Games Velocity Program?

12   **A.**   Yes, significant.

13   **Q.**   And what were those benefits?

14   **A.**   More investment across our products, more revenues for our

15   Ads, more content for YouTube, and of course, you know, more

16   user and time spent on Google Play.

17   **Q.**   So let's go to another document that might help explain some

18   of this.

19            Can you turn to Exhibit 1524.

20   **A.**   Yes.

21   **Q.**   Have you seen this document before?

22   **A.**   Yes.

23   **Q.**   And what is it?

24   **A.**   Every program gets reviewed periodically to know whether

25   it is meeting its goals and non-goals.

1          MS. CHIU:  And, Your Honor, at this time I would move

2   this exhibit into evidence, although I'm not sure if it was

3   already moved.

4          THE CLERK:  No, it wasn't.

5          MR. HUESTON:  No objection.

6          THE COURT:  Okay.  It's admitted.

7                         (Trial Exhibit 1524 received in

8                          evidence.)

9   BY MS. CHIU:

10  Q.  So let's look at page 2 of this slide, Ms. Kochikar.  This

11  is the executive summary for this deck.

12          Do you see that?

13  A.  Yes.

14  Q.  Can you read the heading on the box on the left side of this

15  page?

16  A.  It says:

17               "Games Velocity Program GVP worked and is

18               meeting its objectives."

19  Q.  And can you explain to the jury how the GVP worked and was

20  meeting its objectives?

21  A.  20 out of the 21 developers had signed.  Hundred percent

22  of the titles were simultaneously shipped on Play.  Partnership

23  sentiment on the fees had shifted to say the we're jointly

24  creating value, and we created a lot of investment across

25  Google.

1   **Q.**   So let's look a couple pages farther onto page 5.

2   **A.**   Yes.

3   **Q.**   Can you read what this slide title says?

4   **A.**   It says that GVP 2019 Developers Drove 1.7 percent of

5   Alphabet's Revenue.

6          You know, Alphabet is large, so this is really

7   significant.

8   **Q.**   And you mentioned that the Games Velocity Program was a

9   success because it created a lot of investment across Google.

10   Does this slide show that?

11   **A.**   Yes.  I think there's also another slide that describes

12   it, next slide.

13   **Q.**   So you mentioned that 1.7 is a significant percentage

14   because that's for Alphabet; is that right?

15   **A.**   Yes.

16   **Q.**   Okay.  So let's turn to slide 6.

17   **A.**   Okay.

18   **Q.**   And does this slide provide any information about the

19   investment to Google that was a result from the Games Velocity

20   Program?

21   **A.**   Yes.  You can look at column 3.

22   **Q.**   And what does that say?

23   **A.**   It says it boosted cross PA, which means cross product

24   area, think of it as across departments, value, that is money

25   made.

1   **Q.**   And what kind of money did Google make in other product

2   areas as a result of the Games Velocity Program?

3   **A.**   At this particular time, we're saying it's 191 million

4   incremental Cloud commits.   That means committing to buy Cloud.

5   That number has grown significantly since.   10 percent lift in

6   our Ads spend, and 150 percent lift in the content that

7   developers have uploaded to YouTube.   And you know YouTube

8   business is based on how much content is there on YouTube.

9   **Q.**   Now, Ms. Kochikar, I'd like to talk a little bit in a

10  different topic which is why --

11          **THE COURT:**   We'll take our morning break, and we'll

12  come back at a little bit before 10:45.

13          **THE CLERK:**   All rise.

14                  (Recess taken at 10:25 a.m.)

15              (Proceedings resumed at 10:41 a.m.)

16          (Proceedings were heard out of the presence of the

17   jury:)

18          **THE COURT:**   All right.   Somebody wanted to discuss

19  something.

20          **MR. BORNSTEIN:**   Yes, Your Honor.   We have one issue

21  which we think would be more appropriately discussed outside

22  the presence of the witness.

23          **THE COURT:**   Oh, okay.

24          All right.   The witness is graciously stepping out.

25              (The witness exits the courtroom.)

 1          **MR. BORNSTEIN:**  Apologies.

 2          **THE COURT:**  Yes.

 3          **MR. BORNSTEIN:**  Thank you, Your Honor.

 4          During the testimony that took place before the break,

 5     counsel elicited some testimony from the witness regarding a

 6     document that referred to -- it's Exhibit Number 5714.

 7          **THE COURT:**  5714.  Okay.  Yes.

 8          **MR. BORNSTEIN:**  There was testimony elicited regarding

 9     the reasons why Google was not seeking exclusivity from these

10     developers.

11          **THE COURT:**  Okay.

12          **MR. BORNSTEIN:**  And Ms. Kochikar testified that it was

13     because that's bad for developers to have exclusivity and they

14     want to grow on various platforms and so forth.

15          There was a document that was produced to us during

16     discovery.  We alerted counsel that the document contained

17     privileged information regarding advice on this very document.

18     The document, by the way, is a video file of Ms. Kochikar

19     speaking about this document --

20          **THE COURT:**  Okay.

21          **MR. BORNSTEIN:**  -- in which she told people at Google

22     the reason -- and I'm going from memory here.  We got rid of

23     the document.  We followed the requirements of the protective

24     order.

25          She told people on video that the reason that this

1    said non-goal is because legal had instructed them that they

2    could not ask for exclusivity explicitly.

3         **MS. CHIU:**  Your Honor --

4         **MR. BORNSTEIN:**  And that is why this was here.

5         So we would like Your Honor to review the document

6    *in camera*.

7         **THE COURT:**  So this is a video snippet?

8         **MR. BORNSTEIN:**  Correct.  It's a video of Ms. Kochikar

9    speaking to others at Google which was produced to us.  We saw

10   it.  We alerted counsel that there was privileged information.

11        **THE COURT:**  Why was that videotaped?

12        **MR. BORNSTEIN:**  The video was produced to us, Your

13   Honor.  We saw it.  We said this is privileged, we believe.  We

14   alerted Google.  They clawed it back.

15        **THE COURT:**  Okay.  Do you have it?

16        **MR. BORNSTEIN:**  I don't, Your Honor, because we

17   returned it.  We may have one sequestered copy, but we

18   obviously complied with the protective order once we alerted

19   them to the potential privilege issue and they asserted it.

20        **MS. CHIU:**  Your Honor, I just wanted to note that

21   counsel has basically divulged the privileged information, or

22   some of it.  And we would ask him to refrain from doing so

23   going forward.

24        But they alerted us to the privilege.  They agreed

25    that it was privileged, and we clawed it back, and they agreed

1          to destroy it.  So it's improper to discuss the context here.

2                    We don't know what the Bates number of that document

3          is or what it says.

4               **THE COURT:**  Well, if your witness has said, you know,

5          "Oh, no, exclusivity, we didn't ask because developers don't

6          like it" and there's evidence that she asked -- they didn't ask

7          for a completely different reason, you've opened the door to

8          that.  Okay?

9                    You elicited that testimony.  You didn't have to do

10         that.  You did.  You got her to say there's one reason and one

11         reason only why these are non-exclusive, and that's because our

12         customers don't like them.

13                    And your colleague here is saying:  Well, that's not

14         true at all because she was told by legal -- which would make

15         some sense to me -- don't ever ask for an exclusive dealing

16         contract, which is kind of what a lawyer would probably say.

17                    So if she says that, I'm definitely going to consider

18         impeachment.  So you bring that to me today.  I want that --

19         how do I play it?  Can I play it on 1980s government

20         technology?

21                                (Laughter)

22              **MS. CHIU:**  Your Honor --

23              **THE COURT:**  All I have access to is that, you know,

24         media player.  We'll work on that?

25              **MR. BORNSTEIN:**  Yes, Your Honor, we'll --

 1              **THE COURT:**  No, you're not going to do it.  Google is

 2    going to give me the document, not you.  Don't worry about it.

 3              **MR. BORNSTEIN:**  Yes, that's right.

 4          **MS. CHIU:**  Your Honor, I just want to clarify.

 5          **THE COURT:**  You give that to me by noon.

 6          **MS. CHIU:**  We will, Your Honor.

 7              I just wanted to clarify, she did not say that was the

 8      only reason, so that would not be --

 9          **THE COURT:**  Don't quibble with me, Counsel.  I've been

10    here every minute of this trial.  I heard the testimony, and I

11    heard your question, and I saw the document.

12          **MS. CHIU:**  Thank you, Your Honor.

13          **THE COURT:**  You're not talking me out of it.

14              And you get that thing to me by noon, 12:00 p.m., so I

15      can look at it over the lunch break and have her be here.

16              How much longer do you have?

17          **MS. CHIU:**  Your Honor, I don't have an exact time, but

18    at least half an hour, 45 minutes.

19          **THE COURT:**  That will barely work.

20              Do you have any redirect?

21          **MR. HUESTON:**  I do, Your Honor, but that's very

22    important.  Maybe when she finishes, we could do our lunch

23    break then and consider this.

24          **THE COURT:**  No, I'm not going to do that.  I'm not

25    going to take this out on the jury.

1            MR. HUESTON:  I can start on redirect.

2            THE COURT:  All right.  45 minutes would be 11:30.

3     Can you stretch it to 12:00?

4            MR. HUESTON:  Absolutely.

5            THE COURT:  All right.  If you have to stop a few

6     minutes early, but you have that in my hands no later than

7     noon, preferably earlier.  All right?

8            MS. CHIU:  Yes, Your Honor.

9            THE COURT:  All right.  Okay.  Let's call the jury in

10    and the witness, please.

11            Oh, before we do that, Mr. Bornstein, am I going to

12     just see this right away?  This is not, like, a 45-minute thing

13     right, the video clip?

14            MR. BORNSTEIN:  We have, Your Honor -- because we

15    communicated to counsel the specific time when the language

16    begins, so Your Honor ought to be able to --

17            THE COURT:  You need to make sure I know that.  Okay.

18            MR. BORNSTEIN:  Fast forward to the time, yeah.

19    That's in our correspondence when we alerted them to the

20    privilege issue.

21            THE COURT:  You just have to tell me when the jury

22    leaves at noon.

23            Okay.  Thank you.

24        (Proceedings were heard in the presence of the jury:)

25            THE COURT:  Go ahead.

KOCHIKAR - CROSS / CHIU

1    BY MS. CHIU:

2    Q.   Ms. Kochikar, Epic Games didn't initially launch Fortnite on

3    Android through Google Play; is that right?

4    A.   Yes.

5    Q.   And when did Fortnite first launch on mobile?

6    A.   Oh.  2017, I think.

7    Q.   And what platform did they first launch on?

8    A.   On iOS, Apple's operating system.

9    Q.   And when did they first launch on Android?

10   A.   Several months later.

11   Q.   And where did they launch on Android, if not through the

12   Play Store?

13   A.   Exclusively on Samsung Galaxy Store for a few days and

14   then through sideloading.

15   Q.   So prior to Fortnite launching on Android through the Galaxy

16   Store and sideloading, did Google engage in discussions with Epic

17   about potentially having Fortnite on the Play Store?

18   A.   Absolutely.

19   Q.   And why was Google interested in having Fortnite on the Play

20   Store?

21   A.   Fortnite is an amazing game.

22   Q.   And was it popular at the time, Ms. Kochikar?

23   A.   Very popular, making several millions dollars a day -- I

24   mean, maybe a million dollar a day on iOS platform.  I don't

25   remember the exact numbers, but lots of money on iOS as well.

1    But very, very attractive.  My nieces and nephews were asking

2    for it.

3    Q.    Now, Ms. Kochikar, what kinds of discussions was Google

4    having with Epic about launching on Google Play?

5    A.    Everything from technical to how to launch and what kind

6    of support we would find.

7              Fortnite is a very big game, very sophisticated.  So

8      we worried that it wouldn't work on enough of Android devices.

9      So we had our best technical people working with Epic to make

10     sure that it will be successful.

11   Q.    Now, when you say Fortnite is a big game, are you referring

12   to the technical size of the game?

13   A.    Size, sophistication, beautiful graphics, all of the

14   above.

15   Q.    And you said that you weren't sure that Fortnite would work

16   on all Android devices.  Why was that?

17   A.    Android is built for the masses.  We do have very high-end

18   devices and very low-end devices.  And Fortnite required a

19   certain level of capability on the device to be able to work.

20   Q.    At the time you were having the discussions with Epic, do

21   you have an estimate of how many Android devices you believe

22   Fortnite could be played on?

23   A.    We assumed that it will work on maybe somewhere between 10

24   and 30 percent.  We were not hundred percent sure.

25   Q.    And did Google meet in person with Epic to try and figure

1  out if Fortnite could come to Google Play?

2  **A.**   Yes.

3  **Q.**   And how so?

4  **A.**   You know, my team, which is a partnerships team, was very

5  involved.  My developer relations team was very involved.  My

6  technical team was very involved.

7  **Q.**   Now, Ms. Kochikar, after Epic decided -- or told Google that

8  they were going to launch Fortnite outside of the Play Store, did

9  Google continue discussions with Epic about potentially bringing

10  Fortnite on to Play?

11  **A.**   Yes.

12  **Q.**   And what were those discussions like?

13  **A.**   Initially, as was pointed out, we had a conversation to

14  try to bring Fortnite to Play; but then it was just continuing,

15  just like we did with Riot.  How can we work technically

16  together?  How can we make Play Store work for you better?  Can

17  we help you understand our devices?

18         We actually bought almost hundred devices and assigned

19   a big team to test Fortnite so we can give feedback on what's

20   working, what's not working.

21  **Q.**   Now, Ms. Kochikar, I think counsel showed you Document 805,

22  which would be in the first binder, the white binder.  I just

23  wanted to direct your attention to that.

24  **A.**   Yes.

25  **Q.**   So let's look at page 2.  Can you read out loud what it

1   reads next to "Objective"?

2   A.   Yes.

3              "Partner with Epic to secure Fortnite's

4              launch on Play and help them achieve their

5              goals in the gaming industry."

6   Q.   So you've already explained to us why it was important to

7   have Fortnite launch on the Play Store.

8              Can you explain to the jury why it was important for

9     Google to help Epic achieve their goals in the gaming industry?

10  A.   Yes.  Because if Fortnite was going to be successful, it

11  means we had made the Android platform better; and overall, I

12  think it's important for a good game to reach all our users.

13  Q.   Now, yesterday, counsel looked at the third heading on the

14  slide:

15             "Not having Fortnite on Play creates

16             significant risks for Android ecosystems and

17             Play business."

18             Do you remember that?

19  A.   Yes.

20  Q.   And he read out with you the first bullet point talking

21  about potential revenue loss; do you recall that?

22  A.   Yes.

23  Q.   And he talked about the term contagion; do you recall that?

24  A.   Yes.

25  Q.   Can you explain what you understand contagion to mean?

1  **A.**   It means that somebody else making a decision would think

2  Android is not attractive, because people are making decisions

3  on which platform to build.

4  **Q.**   And why would that be a problem for Google Play and Android?

5  **A.**   If there are no Android devices, there's no Play; and if

6  there is, that means we don't meet our goal of keeping devices

7  in hands of people.

8  **Q.**   Now, I just wanted to look at a bullet point on that section

9  that counsel didn't ask you about, the fourth one.  It says:

10              "Longer term, this could damage Play

11              business model an Android ecosystem."

12              Do you see that?

13  **A.**   Yes.

14  **Q.**   What do you understand that to mean?

15  **A.**   There are many different things -- if great games don't

16  come to a platform, then the platform becomes less important.

17  We needed to understand what the obstacles were and fix them so

18  that we can help more games to come to our users.

19  **Q.**   So let's look at that in a little bit more detail.  Let's

20  look at slide 5 of this deck.

21              So this is another slide I don't believe counsel

22    looked at with you yesterday.  On the right side of the slide,

23    it says "Indirect impact."

24              Do you see that?

25  **A.**   Yes.

1   Q.   And there's a heading at the bottom that says "Android Brand

2   Impact."

3           Do you see that?

4   A.   Yes.  In the second column, yeah.

5   Q.   Can you read what those two sub bullet points are under

6   "Android Brand Impact"?

7   A.   (As read):

8               "Inconsistent access to AAA games and

9           increases perception gap with iOS ecosystem."

10  Q.   Can you explain to the jury what those concerns were?

11  A.   On the iOS app ecosystem, there was a very easy way to get

12  these games.  On Android, if it was inconsistent, there would

13  be -- people would prefer an Apple device.

14  Q.   So counsel asked you some questions yesterday about

15  slide 11.  If I could just ask you to turn to that page.

16  A.   Yes.

17  Q.   And this is where the proposal was to invest $147,000,000 in

18  incremental funding.

19          This was a deal that was being proposed to Epic; is

20   that right?

21  A.   Yes.

22  Q.   So I'd just like to turn your attention to one slide just

23  before that, which is slide 10.

24  A.   Yes.

25  Q.   And counsel didn't ask you about this one.

1          Can you read the title of this slide to the jury?

2     **A.**   (As read):

3               "Demonstrating Opportunities to Co-Invest

4               in Strengthening the Fortnite Brand and to

5               Enrich the Ecosystem Could Convince Epic to

6               Launch Fortnite on Play."

7               We were really working hard to bring Fortnite on Play.

8     **Q.**   And there's some strategic value that appears on the slide;

9     do you see that?

10    **A.**   Yes.

11    **Q.**   What is the strategic value and to who is the strategic

12    value?

13    **A.**   To the Play platform as well as other parts of Google.

14    **Q.**   Now, was Google trying to bribe Epic by offering them this

15    deal?

16    **A.**   Of course not.

17    **Q.**   Now, we've talked a lot about gaming developers,

18    Ms. Kochikar.  Is gaming an important part of Google Play's

19    business?

20    **A.**   Yes.

21    **Q.**   So let's turn to another document that might help us with

22    that.  It's going to be in the black binder, Exhibit 5653.

23    **A.**   Yes.

24    **Q.**   What is this document?

25    **A.**   This is an internal document where our product team is

```
 1    looking at a longer-term game strategy, product strategy --
 2              MS. CHIU:  We'd move this --
 3              THE WITNESS:  -- and market strategy.
 4              MS. CHIU:  Sorry.  We'd move this into evidence, Your
 5    Honor.
 6              MR. HUESTON:  No objection.
 7              THE COURT:  It's admitted.
 8                              (Trial Exhibit 5653 received in
 9                               evidence.)
10    BY MS. CHIU:
11    Q.   Now, this is a document that's dated June 2018, correct?
12    A.   Yes.
13    Q.   Now, let's look at page 4.  This reads (as read):
14              "Gaming has grown into a $130 billion
15              industry, larger than music and movies
16              combined."
17              Can you explain to the jury what this means?
18    A.   It means that gaming is an attractive business, lots of
19    users who are willing to pay, which means a good place to
20    invest.
21    Q.   Let's look a couple pages ahead at slide number 6.
22              What does it mean when it says "This accelerated
23     growth of games has led to a complex gaming ecosystem"?
24    A.   It means when there is an attractive business space, lots
25    of people want to come in.  So folks who are console game
```

1    developers, PC game developers were all coming to invest in

2    mobile.  So our competition was getting more fierce.

3    **Q.**   If you look at the next slide on page 7, the first bullet

4    point reads:

5              "AAA console devs are rapidly moving to

6              mobile, as console and PC users expected to

7              spend more time on mobile."

8              Do you see that?

9    **A.**   Yes.

10   **Q.**   Can you explain to the jury what that means to you?

11   **A.**   Mobile gaming has been a super attractive business.  It is

12   bigger than console and PC put together.

13             The fact that mobile devices are in hands of people

14    everywhere and they can play and the business model has been

15    very good for the industry, and so PC and console gaming

16    developers were coming actively into mobile.

17   **Q.**   And a couple of bullet points down, it says:

18             "With increased concentration of revenues

19             and higher cost of release, developers may look

20             at disintermediating Play and go direct to

21             consumer."

22             Do you see that?

23   **A.**   Yes.

24   **Q.**   What does that mean?

25   **A.**   It means that Play has to continue to work hard to be

1    valuable for developers.

2    **Q.**   And is the concern that there will be additional app stores

3    or that content will not be available on Google Play?

4    **A.**   That content will not be available on Google Play.

5    **Q.**   And why would that happen?

6    **A.**   Because Play is not going to be viewed as attractive if

7    you don't invest the right way.

8    **Q.**   So I'd like to turn your attention to slide 27, a little bit

9    farther in this deck.

10            What's reflected on this slide?

11   **A.**   The different types of companies where you may not

12   actually think are competing in gaming who are competitors.

13   Amazon, Facebook, Snap.  Valve is a big PC store on PCs.

14   Tencent, Apple, Microsoft.  So a large group of competitors.

15   **Q.**   And if you look a couple slides later to slide 29 is an

16   example of one of those competitors, Microsoft, right?

17   **A.**   Yes.

18   **Q.**   And what does this slide show?

19   **A.**   This slide shows that our competitors are investing in

20   many different capabilities, and therefore, it requires

21   significant, you know, investment from Google to compete.

22            So Microsoft is investing in hardware and discovery

23    and events, working with developers.  So the list on the left

24    is a list of capabilities that you need to invest in to even be

25    able to compete in gaming.

1    **Q.**    So if we look a little bit further at page 36, can you

2    explain to the jury what's represented on this slide?

3    **A.**    That our competitors are investing actively.  It's a very

4    busy slide, as you can see.  And that Google has assets that we

5    need to bring together to be viable.

6    **Q.**    Ms. Kochikar, does the Games Velocity Program fit into the

7    strategy or discussion that we're looking at in this deck?

8    **A.**    Yes.

9    **Q.**    How so?

10   **A.**    This is how we identified the assets we have at Google to

11   compete in gaming.  As I told before, it was Cloud and Ads and

12   YouTube and Play.

13   **Q.**    Now, Ms. Kochikar, I'd like to step back for a minute.  I

14   know we've been talking about the Google Play Store a lot with

15   you.  I thought it might be helpful for the jury to understand

16   exactly what the Google Play Store is.

17            So could you tell the jury what it is?

18   **A.**    Yeah.  It's a place where, you know, people can find great

19   apps and games.

20            We do many things to make that possible.  We put the

21    right app in front of the right person at the right time, which

22    is what we call discovery distribution.  But to be able to do

23    that, we make sure that those apps are safe.  That means

24    there's a lot of investment that goes into screening the apps,

25    making sure they're safe.

1          We also invest in making sure that the apps can be

2     successful, which means investing in a commerce platform that

3     people can buy using the form of payment that's most

4     comfortable for them.  For example, Germans like PayPal and

5     Japanese like gift cards, et cetera.  So we invest in a very

6     comprehensive platform.

7          And we work very hard to build an audience so there is

8     a group of people who are there, waiting for your content.

9          There are many other features that I can go into.

10    **Q.**   So let's look at a document that might help us walk us

11    through some of that.

12          If you could turn to Exhibit 5816, please.  What is

13     this document, Ms. Kochikar?

14    **A.**   This is a document that we wrote to describe how Play

15    works.

16         **MS. CHIU:**  At this time, we move this into evidence

17    Your Honor.

18         **MR. HUESTON:**  No objection.

19         **THE COURT:**  It's admitted.

20                        (Trial Exhibit 5816 received in

21                         evidence.)

22    **BY MS. CHIU:**

23    **Q.**   So let's look at slide number 4.  On the right side, there's

24    some bullet points that describe what Google Play provides to

25    developers.

1              Can you walk through a couple of those with the jury?

2   **A.**   Yes.  So I think there's a few.  The security features,

3   which I've talked about.

4              We can talk about the tools for building, which is an

5     important one, and the training and services that we provide.

6              There's also the search functionality, that people can

7     go and look for apps.

8              We have -- we have done a bunch of store investments.

9              And there is Google Play Academy.  For example, we

10    provide free training for anybody who wants to build an app.

11  **Q.**   So I'd like to turn your attention to slide 006, titled

12  Finding Success on Google Play.

13             Do you see that?

14  **A.**   Yes.

15  **Q.**   And so the slide reads:

16             "We empower developers to do their best

17             work and help them to succeed by investing in

18             tools and resources that support their growth."

19             Do you see that?

20  **A.**   Yes.

21  **Q.**   Do you agree with that statement, Ms. Kochikar?

22  **A.**   Yes.

23  **Q.**   And what are some of the things that Google Play does to

24  empower developers to do their best work?

25  **A.**   Providing the tools, providing the training.  We provide

1  consulting.  We provide a lot of data to enable them to

2  understand where to invest, how to invest, both technically and

3  from a business perspective, as well as obviously provide the

4  store infrastructure, security, as well as customer service.

5          If somebody wants to do a return, they have a problem,

6    they call and we take care of a lot of it.

7  Q.   Now, Ms. Kochikar, how many users access Google Play Store?

8  A.   2.5 billion monthly active users.

9  Q.   And do you know approximately how many developers publish

10  their content on the Google Play Store?

11  A.   More than a couple million.  I think 3.  You know, that

12  number changes every day because there are more coming in.

13  Q.   And, Ms. Kochikar, are there different types of developers

14  that are publishing on the Google Play Store?

15  A.   Yes.

16  Q.   And how is that -- what -- can you describe some of those

17  different kinds of developers?

18  A.   Yeah.  Broadly, we think about them as app and game

19  developers.  And the app developers have different verticals,

20  like productivity, health, like meditation apps, you know,

21  lifestyle apps, et cetera.  That is, there are more segments,

22  media, apps, et cetera.

23  Q.   And what about the size or the sophistication of the

24  developers that are publishing onto Google Play?  Is that also

25  varied?

1    **A.**   Very varied.   We have everybody from single entrepreneur

2    to multi-trillion-dollar companies.

3    **Q.**   Now, Ms. Kochikar, we've been discussing the benefits or

4    some of the benefits that Google Play provides to its users and

5    developers.   I'd like to talk to you now about how Google Play

6    charges for those benefits.

7               Yesterday, I believe counsel showed you some documents

8      where some Google colleagues used the words "arbitrary" or

9      "random" to describe the service fee.   Do you recall that?

10   **A.**   Yes.

11   **Q.**   Those weren't your words though, right?

12   **A.**   No.

13   **Q.**   Do you believe that the service fee that Google Play

14   collects is arbitrary or random?

15   **A.**   No.

16   **Q.**   Why not?

17   **A.**   I believe in the value we provide.   I have seen what it

18   was like before and after.

19               Previously, the business models were very difficult

20     for developers to distribute their apps.   And this makes it

21     simple, and we have built a very attractive business on mobile.

22   **Q.**   Now, you said you've seen this before.   What experience are

23   you referring to, Ms. Kochikar?

24   **A.**   I worked for Nokia previously.   And at that time, if you

25   had to distribute an app, you had to go to Helsinki, knock on

1   the door and say, "Could you please preload," or go to

2   individual carriers or OEMs to say, "Can you please distribute

3   my app."

4              And in doing so, most developers got 20 cents on the

5   dollar.  That means 80 percent went into, they had to build

6   sales teams; they had to take care of all the marketing, all

7   the testing.  And you could only update once in 18 months

8   because it got on the device.

9              Now developers update their apps -- I don't know --

10  couple times a day if they need to, and we take care of all of

11  that.

12  **Q.**   Now, Ms. Kochikar, I believe you testified that Google only

13  makes money when the developer makes money; do you recall that?

14  **A.**   Yes.

15  **Q.**   And what is the service fee that Google Play collects when

16  that happens?

17  **A.**   It varies significantly.  For game developers who use

18  in-app purchases -- game developers who use in-app purchases,

19  the fee is 30 percent.  App developers, the fee is based on the

20  vertical.  Like, for example, we have something called as a

21  Media Experiences Program.  So app developers on subscription,

22  it's 15 percent.  But if you're a book developer, it can be as

23  low as 10 percent.  So it depends on the vertical and the

24  business model.

25  **Q.**   Ms. Kochikar, why did Google adopt this business model for

1    Google Play?

2    **A.**    It felt right because of all the value we provide and what

3    we are seeing how the business grows.

4            So, for example, in game developers, as you know, most

5    people don't pay.  These are free-to-play games.  So a very

6    small number of people pay, and everybody else plays for free.

7    And yet mobile gaming has become a very big and attractive

8    business.  It's bigger than PC and console gaming.  So that

9    felt -- and we have all the services we provide.

10           And on app developers, there was cost of content that

11   was there.  Like, for example, you can't give 10 books away for

12   free so that the 11th person pays for 10 books.  So there was

13   cost of content, so we --

14           **THE COURT:**  Okay.  You really need to focus.

15           I've given you a lot of leeway on these Ted-talk-style

16   answers.  No more.  Okay?  Ask questions.  This is not a

17   presentation.  This is question and answer in court.  All

18   right?  I've asked you that a couple times now.

19           **MS. CHIU:**  Thank you, Your Honor.

20           **THE COURT:**  Please focus on that.

21   **BY MS. CHIU:**

22   **Q.**   Ms. Kochikar, you said that -- you were talking about app

23   developers.  Can you just describe briefly what the service fee

24   is for app developers?

25   **A.**    15 percent if they're using subscription broadly, but for

1    different categories, it's lesser.  Like books, it's 10.

2    Q.   Now, you mentioned yesterday when counsel was questioning

3    you about the service fee, I believe that they were asking what

4    would happen if a developer was operating in the red, if they

5    still had to pay the service fee.

6            I think you wanted to explain that in a little bit

7      more detail.  Could you briefly let us know what you were

8      thinking?

9    A.   Yeah.  Games get in the red or not because if the game

10   works or not.  The business model itself is very attractive for

11   gaming.

12   Q.   Now, Ms. Kochikar, Google Play only collects a service fee

13   when the developer actually makes money through the app; is that

14   right?

15   A.   Yes.

16   Q.   So if an app developer is not offering in-app purchases,

17   what service fee does Google Play collect?

18   A.   None.

19   Q.   And are there free apps that are on Google Play?

20   A.   Yes, many.

21   Q.   How many?  Can you estimate?

22   A.   Most apps, and even the apps that pay, most users use it

23   for free.

24   Q.   Ms. Kochikar, do the developers get to take advantage of the

25   benefits of Google Play even if Google isn't collecting a service

1   fee because there's no in-app purchase?

2   A.   Yes.

3   Q.   Do you know what percentage of developers don't pay any

4   service fee on Google Play?

5   A.   90-some percent.   Sorry.

6   Q.   It's an estimate?

7   A.   Yes.

8   Q.   Okay.   Now, Ms. Kochikar, to collect the service fee, Google

9   Play uses its own billing system; is that right?

10  A.   Yes.

11  Q.   And is that called Google Play Billing?

12  A.   Yes.

13  Q.   And can you just briefly describe some of the benefits that

14  Google Play Billing provides to users and developers?

15  A.   It's a secure way of paying a breadth of forms of

16  payments.   Everything from credit card, debit cards, culture

17  vouchers in Korea, PayPal, et cetera.   A very broad way of

18  paying, as well as a way for users to cancel payments.

19          One of the biggest user experiences is you are keeping

20   subscriptions on when you don't need it.   So as well as keeping

21   users paying, but also canceling when they need to.

22  Q.   Have you ever discussed with developers how easy it is for

23  Google Play Billing to allow users to cancel subscriptions?

24  A.   Yes.

25  Q.   And have these developers told you if they like that

1    feature?

2    **A.**    Some have and some don't.

3    **Q.**    So let's look at an example.  I'm going to direct your

4    attention to Exhibit 10928 in the black binder.

5             This is an email stream dated June 19th, 2018, between

6     yourself and Adrian Ong at Match.com; do you see that?

7    **A.**    Yes.

8    **Q.**    Do you recall receiving this email previously?

9    **A.**    Yes.

10           **MS. CHIU:**  We'd move this into evidence, Your Honor.

11           **MR. HUESTON:**  No objection.

12           **THE COURT:**  It is admitted.

13                              (Trial Exhibit 10928 received in

14                              evidence.)

15   **BY MS. CHIU:**

16   **Q.**    Who is Adrian Ong, Ms. Kochikar?

17   **A.**    He was the CEO of Match.

18   **Q.**    And I'd like to direct your attention to the top -- the last

19   email at the top of the page from Mr. Ong to you.

20           Can you describe just briefly what Mr. Ong is talking

21    about in, specifically, bullet point number 3?

22   **A.**    He's talking about that retention on the Play Billing

23   system is a problem.

24   **Q.**    And why was it a problem to him?

25   **A.**    Because we are making it easy for people to cancel their

1    subscriptions.

2    Q.   And I'd just like to direct your attention to his words.   He

3    says:

4              "GPB makes it much easier to cancel a

5         subscription."

6         Do you see that?

7    A.   Yes.

8    Q.   And he's also -- and the next sentence says:

9              "Voluntary churn due to switching off

10        renewal is significantly higher."

11        Do you see that?

12   A.   Yes.

13   Q.   What do you understand Mr. Ong to be complaining about to

14   you?

15   A.   In dating apps, when people find a date, then they stop

16   using, and they should stop using the subscription.   He's

17   saying they're making it easy to cancel.

18   Q.   And the reference to GPB here is specifically to Google Play

19   Billing, right?

20   A.   Yes.

21   Q.   So Google Play Billing is making it too easy for Match users

22   to cancel their subscription?

23   A.   Yeah.   I mean, it's an easy way to cancel when they don't

24   need it.

25   Q.   I just wanted to be clear that the Match Group owns Tinder,

1    the dating app; is that right?

2    **A.**    Yes.

3    **Q.**    And they also own a number of brands, like Hinge, OkCupid,

4    et cetera; is that correct?

5    **A.**    Yes.

6    **Q.**    You can set that one aside.

7              Ms. Kochikar, does Google require all developers on

8      the Play Store to use Google Play Billing?

9    **A.**    The ones that sell digital content that are used inside

10   the app, yeah.

11   **Q.**    And so I think yesterday you were saying that it does not

12   apply to physical goods; is that right?

13   **A.**    Yes.

14   **Q.**    Why is that the case?

15   **A.**    Physical goods have -- the cost of the goods is outside

16   and the distribution is outside the app.

17   **Q.**    And I think yesterday you were trying to give an example of

18   Uber.  What is -- can you explain to the jury what that means,

19   the service is outside the app?

20   **A.**    It means the cost of -- what you pay for is an Uber ride,

21   which requires a car, a driver, et cetera.

22   **Q.**    Now, are there business reasons why Google requires its

23   developers to use Google Play Billing for in-app purchases?

24   **A.**    It's our business model.

25   **Q.**    And why did you choose that business model?

1    **A.**   We believed it was the most developer friendly business

2    model and it kept users safe.

3    **Q.**   And does it -- how does it keep users safe?

4    **A.**   We gave an example right now about being able to cancel,

5    as well as our commerce platform is invested in making sure we

6    support fraud management, et cetera.

7    **Q.**   Ms. Kochikar, could Google charge developers an up-front

8    cost for each download of an app?

9    **A.**   We could.  It would be a very bad thing.

10   **Q.**   And why is that?

11   **A.**   Because most users across all apps use it for free.  If

12   the developer had to pay for it, it would be very expensive,

13   and it would stop innovation from happening from small

14   developers.

15   **Q.**   Ms. Kochikar, is the requirement that developers use Google

16   Play Billing a policy of the Google Play Store?

17   **A.**   Yes.

18   **Q.**   And how is that communicated to developers?

19   **A.**   Developers have a very easy way to get on the Play Store.

20   There is something called the Developer Distribution Agreement,

21   which is easy to sign, which is with a click, you could sign

22   the agreement, and then you can create a developer account.

23   **Q.**   And so I'll just turn your attention to Exhibit 10883 in

24   your binder, which is the Google Play Developer Distribution

25   Agreement effective as of November 17th, 2020; do you see that?

1    A.    Yes.

2              MS. CHIU:  We would move this into evidence, Your

3    Honor.

4              MR. HUESTON:  No objection.

5              THE COURT:  It's admitted.

6                        (Trial Exhibit 10883 received in

7                        evidence.)

8    BY MS. CHIU:

9    Q.    And this is the DDA that you were -- excuse me -- the

10   Developer Distribution Agreement that you were referencing,

11   Ms. Kochikar?

12   A.    Yes.

13   Q.    And this -- in section 4.1, is that where the -- excuse

14   me -- Google communicates to its developers that it's required to

15   follow Google Play policies?

16   A.    Yes.

17   Q.    And would that include the Play Billing policy?

18   A.    Yes.

19   Q.    Does every developer have to accept the DDA to be able to

20   publish on the Google Play Store?

21   A.    Yes.

22   Q.    And that would have included Epic too, right?

23   A.    Yes.

24   Q.    Now, yesterday, counsel asked you some questions about a

25   pilot program called User Choice Billing; do you remember that?

**KOCHIKAR - CROSS / CHIU**

1   **A.**   Yes.

2   **Q.**   Could you just briefly explain to the jury how User Choice

3   Billing works?

4   **A.**   User Choice Billing allows a developer to bring their own

5   billing alongside Play, as long as it comply with policy

6   requirements, which is some user experience guidelines as well

7   as security requirements, like being able to cancel easily.

8   **Q.**   And if they take advantage of User Choice Billing, is there

9   a change to the service fee that Google Play collects?

10  **A.**   Yes.   Since we don't process the payment, we don't charge

11  for payment processing.   So it's 4 percent less than what they

12  would pay as the fee.

13         So if you're paying -- your regular fee is 15 percent,

14    it's 11.   If your regular fee is 30 percent, it's 26.

15  **Q.**   Now, what are some of the benefits to a developer if they --

16  that they can take advantage if they use User Choice Billing?

17  **A.**   Developers have a unique perspective what the users need

18  and sometimes have invested in features or forms of payment

19  that work for them.   So it becomes 1 plus 1 is 3 when it's next

20  to each other.

21  **Q.**   Ms. Kochikar, the jury has heard some testimony about an app

22  called Bumble.   Are you familiar with this app?

23  **A.**   Very.

24  **Q.**   And that's a dating app available on Google Play; is that

25  right?

1   **A.**   Yes.

2   **Q.**   If Bumble wanted to offer a one-day subscription within its

3   app, is that the kind of feature that they could have if they

4   took advantage of User Choice Billing?

5   **A.**   Yes.

6   **Q.**   And yesterday, I think counsel was asking you whether

7   pricing was part of the consideration in the User Choice Billing

8   analysis.

9            Do you remember that conversation?

10  **A.**   Yes.

11  **Q.**   And I don't believe that you were really able to finish your

12  answer.  Can you just explain briefly what you were trying to say

13  then?

14  **A.**   Yeah.  Our business model and our pricing is based on all

15  services we provide, transaction processing being one of them.

16  And the reduction in pricing is the reduction in transaction

17  processing pricing.

18  **Q.**   Now, are you aware whether Apple has announced a similar

19  program to User Choice Billing?

20  **A.**   No, they haven't.

21  **Q.**   And, Ms. Kochikar, what types of app developers are

22  available -- or, excuse me.

23            What type of app developers can apply to this pilot

24    program?

25  **A.**   Any app developer.

1   Q.    Yesterday, counsel also asked you some questions about

2   Spotify; do you remember that?

3   A.    Yes.

4   Q.    And I believe that you testified that Google has an

5   agreement with Spotify where the service fee that Spotify pays

6   Google for in-app purchases is different if downloaded from the

7   Play Store; is that right?

8   A.    Yes.

9   Q.    Why did Google enter into this agreement with Spotify?

10  A.    Because Spotify is very important for the bigger strategic

11  investment that we need to make Android successful.

12  Q.    Why is that?

13  A.    We have a very formidable competitor in iOS.  And Apple

14  wins when people buy, say, an iPad for their kid or a watch

15  during Christmas.  Then everybody becomes into an Apple

16  ecosystem.  We need to build a similar ecosystem on Android.

17  Q.    And why is Spotify important for achieving that goal?

18  A.    Spotify is an app that is important across multiple

19  surfaces.  Like you can listen to it when you're running, on

20  your watch and on your tablet, on your phone, in the car with

21  Android Auto.  And Spotify has been excellent in investing with

22  us in nascent platforms, even before they become business

23  critical.  That means they're putting their money much, much

24  earlier to help.

25  Q.    Ms. Kochikar, did Google want to do this deal with Spotify

1  because Spotify was an agitator or because it was important to

2  have it in the Play Store?

3  **A.**   Because Spotify was important, not just in the Play Store,

4  but also across Google.  It's one of the biggest cloud

5  customers.  One of the biggest Ad customers as well.

6  **Q.**   Now, as part of this agreement, Spotify can offer its own

7  billing system alongside Google Play Billing within the app; is

8  that right?

9  **A.**   Yes.

10  **Q.**   Counsel also asked you some questions about Tinder; do you

11  remember that?

12  **A.**   Yes.

13  **Q.**   He showed you some documents suggesting that some people

14  thought the value that Tinder gets from Google Play is less than

15  what they pay in the service fee; do you recall that?

16  **A.**   Yes.

17  **Q.**   I think you were trying to tell us a little bit about the

18  growth of Tinder specifically on Google Play.

19       Could you briefly describe that to the jury?

20  **A.**   Yeah.  Tinder was one of our biggest, most successful apps

21  on Play.  In fact, Tinder believed so much on Google Play and

22  the Google Play Billing that they were on several of our

23  panels, telling other developers how to use it.  So they grew

24  on Play.  The brand grew on Play.

25  **Q.**   And how does that compare to some other Match dating apps,

1  like OkCupid?

2  **A.**   Interestingly, the smaller apps on -- the biggest-growing

3  apps on Match are on Google Play right now, whether you call it

4  Hinge or BLK.  The apps that are actively growing for Match

5  portfolio are on Google Play.

6  **Q.**   And you mentioned yesterday that in some of those documents,

7  you felt at the time it might have reflected in some analysis

8  that Tinder wasn't getting as much value from Google Play as the

9  service fee that it charged.

10         Can you explain what you meant by "at that time"?

11  **A.**   Yes.  When somebody has grown bigger.

12         I would also like to say that whenever a partner gives

13   us input, it's in a moment in time, but we also need to

14   understand what else is going on before we make a decision.

15  **Q.**   And what was going on with Tinder, you think, in those

16  documents?

17  **A.**   Several things.  One, they were -- you know, they were

18  taking a point in time of how much installs they were getting,

19  as well as they were trying to understand how the pricing needs

20  to be for dating apps.

21  **Q.**   And sitting here today, Ms. Kochikar, what is the service

22  fee that Tinder would pay Google Play for subscriptions?

23  **A.**   15 percent.

24  **Q.**   And so that is half the service fee that a developer like

25  Epic would pay for a subscription, right?

1    **A.**   Epic -- if Epic wants to choose subscription, Epic would

2    pay the same fee.

3    **Q.**   But if they were non-subscription, the service fee would be

4    30 percent, right?

5    **A.**   Yes.  If it's an in-app purchase, it's 30 percent.  When

6    Tinder sells in-app purchases, it's also 30 percent.

7    **Q.**   Now, Ms. Kochikar, do you know how Google's service fee for

8    subscriptions compares to Apple?

9    **A.**   In Apple, the first-year fee is 30 percent; and if you

10   hold on to a user for an entire year, then the second-year fee

11   gets to 15 percent.

12   **Q.**   Is Tinder the only app in the Google Play Store that pays a

13   15 percent service fee on subscriptions?

14   **A.**   No.  Everybody who is on subscription pays 15 percent from

15   day one.

16   **Q.**   I believe one of the documents that we looked at yesterday

17   was from Mr. Feng, and he said that the analysis did a nice job

18   of quantifying Tinder's argument.

19              Do you remember that email?

20   **A.**   Yes.

21   **Q.**   And I think you were trying to explain that this was a

22   developer point of view.  Could you explain what you meant by

23   that?

24   **A.**   Yes.  When my team hears feedback from the developer, they

25   try to represent the developer as accurately as possible, and

1  they'll do the analysis to show why -- how a developer could

2  have come to that conclusion.  We need to listen before we can

3  find solutions.

4  Q.  And, Ms. Kochikar, why do you ask your team to evaluate

5  information from the developer's perspective?

6  A.  Because developers are important customers for us.  They

7  are our, you know, most important stakeholder.

8  Q.  Now, Ms. Kochikar, you were asked this morning some

9  questions about Facebook.  I think I heard you mention that there

10  were some security concerns with Facebook updating third party

11  apps.  Did I get that right?

12  A.  Yes.

13  Q.  Could you tell us what those security concerns were?

14  A.  Before an app gets on the Play Store, we do review those

15  apps carefully.  And sometimes, despite that, some things get

16  through, but most apps we do manage to catch before they get.

17          When there is a third party app being installed

18   without the infrastructure to review those apps, chances are

19   those apps will not be safe.

20  Q.  Ms. Kochikar, you were shown some meeting notes this morning

21  with Facebook; do you remember that?

22  A.  Yes.

23  Q.  Okay.  And why did you get involved in that discussion?

24  A.  My team works with Facebook as an app developer, and we

25  get pulled in to bridge the conversations and help the

1  developer.

2  **Q.**   And how did the situation that was described in those

3  meeting notes get resolved?

4  **A.**   We spent time understanding the security issues.  We

5  brought security teams together.  And Facebook acknowledged

6  that the security issues were real.

7  **Q.**   Ms. Kochikar, you just mentioned that developers are one of

8  the most important stakeholders for Google Play; do you remember

9  that?

10 **A.**   Yes.

11 **Q.**   Does Google Play have to compete for developer attention?

12 **A.**   All the time.

13 **Q.**   Who is it competing for for their attention?

14 **A.**   Many platforms.  As we just pointed out, there's lots of

15 competition, but primarily, iOS and the Apple App Store.

16 **Q.**   But there's also competition on the Android ecosystem; is

17 that right?

18 **A.**   Yes.  We have other stores on Android.  And of course,

19 people can sideload and use their own means to distribute.

20 **Q.**   So counsel asked you what an OEM app store is earlier this

21 morning; do you remember that?

22 **A.**   Yes.

23 **Q.**   Could you just briefly explain what that is?

24 **A.**   Yeah.  The OEM app store is an op store that is created by

25 folks who build the device, like Samsung, for example.

1  Q.   And you testified yesterday that Samsung has its own store,

2  the Samsung Galaxy Store; is that right?

3  A.   Yes.

4  Q.   And counsel also asked you about a Motorola Store and a

5  OnePlus Store this morning; do you remember that?

6  A.   Yes.

7  Q.   Do you know which is the largest OEM store on Android?

8  A.   Samsung is the biggest OEM on Android, by far.

9  Q.   And do you know, Ms. Kochikar, on a Samsung Galaxy phone,

10  where that Galaxy Store appears?

11  A.   On the home screen.

12  Q.   You also mentioned that sideloading is available on Android.

13  Do some developers utilize this option on Android?

14  A.   Yes.

15  Q.   I think yesterday counsel showed you some warning messages

16  that are displayed when a user sideloads an app.  I think the

17  example was Amazon; do you remember that?

18  A.   Yes.

19  Q.   Can you just explain to the jury why those messages appear?

20  A.   Keeping users safe is our number one priority.  Unknown

21  sources has been used for malware distribution and defrauding

22  users.  So it's just a cautionary note for the user to pay

23  attention.

24  Q.   And yesterday, counsel asked you about some emails

25  discussing the sideloading process that Epic chose to use; do you

1    remember that?

2    **A.**    Yes.

3    **Q.**    I believe you were trying to explain what the specific

4    sideloading experience was for Fortnite on Android.

5                    Could you just briefly explain to the jury what you

6      meant by that?

7    **A.**    Yes.  If Fortnite was -- if you were trying to just

8    sideload Fortnite, the game, it would be a lot simpler.  Epic

9    was trying to sideload both the launcher and the game, which

10    made it a lot more complicated.

11    **Q.**    And can you just briefly explain, what is a launcher?

12    **A.**    A launcher is -- think of it as an Epic App Store.

13    **Q.**    Now, Ms. Kochikar, you mentioned that Google Play competes

14    with the Apple App Store; is that right?

15    **A.**    Yes.

16    **Q.**    And how exactly does Google Play compete with the Apple App

17    Store?

18    **A.**    iOS devices are attractive.  Most people use them.  Lots

19    of people with money use them, so developers prioritize them.

20    **Q.**    And what do you do as part of your job to get developers to

21    try and prioritize the Google Play Store?

22    **A.**    We spend time describing everything from the business

23    opportunity on Android, helping them build those apps, bringing

24    in technical resources, thinking about helping them test those

25    apps through our Beta programs, supporting the launch and their

 1  global expansion.  So end to end, we spend a lot of time.

 2  **Q.**   Is there something about the Android platform or Android

 3  devices that makes it harder for developers to prioritize the

 4  Google Play Store?

 5  **A.**   The Android devices, as I said, there is a large breadth

 6  of Android devices, and so there is -- it's more complicated to

 7  build on Android.  However, once you find the right way to do

 8  it, you have a great business to build.

 9  **Q.**   And can you just explain for the jury why it's harder for an

10  app developer to make a version for the Play Store that will work

11  on multiple devices?

12  **A.**   There is Android devices that are very sophisticated and

13  capable and very affordable and less capable, and to build an

14  app across all of them takes expertise and effort.

15  **Q.**   Now, Ms. Kochikar, you mentioned that sometimes apps will

16  launch first on the Apple App Store before the Google Play Store.

17  Are there any recent examples in your mind where that has

18  happened?

19  **A.**   Yeah.  Many.  A few months ago, Clubhouse was a very buzzy

20  app for voice communications.  It wasn't there on Android.

21  Caused a lot of attention.

22          And most recently, if you think about all the AI apps,

23   it took us a long time and lot of effort to convince, for

24   example, ChatGPT to come to Android.  And we're still working

25   on the other AI apps.

1    Q.   So let's take a look at an exhibit.   If you could turn to

2    Exhibit 5911 in the black binder.

3            Have you seen this document before, Ms. Kochikar?

4    A.   Yes.

5    Q.   What is it?

6    A.   This is an assessment of app quality gap; that is, when

7    you look at an app that's working on Apple and you look at the

8    same app working on Android, what is the gap.

9            MS. CHIU:   Your Honor, at this time we'd move this

10   exhibit into evidence.

11           MR. HUESTON:   No objection.

12           THE COURT:   It is admitted.

13                              (Trial Exhibit 5911 received in

14                              evidence.)

15   BY MS. CHIU:

16   Q.   I'd like to turn your attention to slide 3.   Could you read

17   the title of this slide?

18   A.   The number one thing we have learned in talking to users

19   is that they perceive a quality gap between iOS and Android.

20   Q.   And why is this a problem for Google Play?

21   A.   Apps are what makes devices useful.   And if they find a

22   gap, they will just go to the other platform.

23   Q.   So let's look ahead a couple slides to slide 6.   And what

24   does this slide communicate?

25   A.   It shows how developers think of Android.   They will

 1  design and build for Apple first, and sort of view this as a

 2  secondary platform and not pay the same attention.

 3  Q.   And why is that a problem for Google Play?

 4  A.   As I described earlier, one, there is gaps in features,

 5  but sometimes even user experience could cause issues for

 6  folks.

 7  Q.   Ms. Kochikar, has Google ever evaluated specific apps and

 8  how they perform on Android versus on Apple iOS?

 9  A.   Yes, absolutely.  We do it constantly.

10  Q.   So let's look at Exhibit 6044.

11            What is the document?

12  A.   This is a document that takes the user insights and then

13  go app by app to find out where the gaps are.

14       MS. CHIU:  Your Honor, at this time we'd move this

15  into evidence.

16       MR. HUESTON:  No objection.

17       THE COURT:  It's admitted.

18                      (Trial Exhibit 6044 received in

19                          evidence.)

20  BY MS. CHIU:

21  Q.   And, Ms. Kochikar, why is a report like this prepared?

22  A.   So that we can identify where the gaps are and then work

23  with developers to help them fix them.

24  Q.   Ms. Kochikar, do you believe that competition with Apple

25  will be a continuing obstacle or challenge for Google Play?

1    **A.**    Absolutely.

2    **Q.**    Let's look at a document that might help explain that.   If

3    you could turn to Exhibit 5941, please.

4    **A.**    Yes.

5    **Q.**    Have you seen this document before, Ms. Kochikar?

6    **A.**    Yes.

7    **Q.**    Do you know who prepared it?

8    **A.**    I don't, but it was shared with me by the Android product

9    team.

10   **Q.**    And why was it shared with you?

11   **A.**    Because this gives us insights on why developers do what

12   they do and how we can work with them to address.

13   **Q.**    And did you use this information as part of your work for

14   Google?

15   **A.**    Yes.

16   **Q.**    And how specifically did you do that?

17   **A.**    We understand the feedback.   So, for example, we try to

18   understand what apps are missing for this very attractive

19   audience and where are the places where they are seeing gaps

20   and what we can do to fix the gaps.

21        **MS. CHIU:**   Your Honor, at this time we move this

22   document into evidence.

23        **MR. HUESTON:**   Objection, Your Honor.   Foundation and

24   803 hearsay.

25        **THE COURT:**   Okay.   Why don't you try a little bit on

1   foundation while I think about the other part.

2   **BY MS. CHIU:**

3   **Q.**   Ms. Kochikar, this is a document that was prepared by the

4   Google Android team; is that right?

5   **A.**   Yes.

6   **Q.**   And you received it as part of your normal course of

7   business at Google?

8   **A.**   Yes.

9   **Q.**   And do you regularly review information that evaluates the

10  Android platform specifically to do your work in develop --

11  assisting developers?

12  **A.**   Yes.

13  **Q.**   And is this one of those documents that you looked at?

14  **A.**   Yes.

15  **Q.**   And do you regularly receive reports like this to help you

16  do your job?

17  **A.**   Yes.

18           **MS. CHIU:**  We'd move --

19           **THE COURT:**  Well, let me ask you, Ms. Kochikar, who

20  prepared the contents of this document?

21           **THE WITNESS:**  I believe it was an external agency, but

22  I received it -- we've referenced this document in many

23  internal discussions, Your Honor.

24           **THE COURT:**  Okay.  But you all didn't put the content

25  into this document; is that right?

1          THE WITNESS:  Yes.

2          THE COURT:  What do you plan to ask?

3          MS. CHIU:  It's not for the truth of the matter, Your

4  Honor, but just to give some context of the information she

5  receives to do her work in competing with Apple, especially

6  specific to comparing the Android and Apple platform.

7          THE COURT:  Let's just try a few.

8             So, members of the jury, this is a document that some

9     outside company prepared.  So whether the contents of the

10    document are true or not, she can't say.  Okay?  She's just

11    going to talk about how she might have responded to what she

12    saw.  All right?  But you cannot treat anything in this

13    documents as a true statement.  You're just going to be

14    focusing on kind of her reaction and her state of mind about

15    it.  Okay?

16             All right.  Just a few questions.

17          MS. CHIU:  Yes.  Thank you, Your Honor.

18  BY MS. CHIU:

19  Q.  Ms. Kochikar, let's look at slide 10.  And this slide is

20  titled iPhone Is an Even Bigger Problem Than You Think.

21             Do you see that?

22  A.  Yes.

23  Q.  Is there some information on this slide specifically that

24  you found very important to understanding how Android needs to

25  compete with Apple?

1    **A.**    Yes.   There are a set of apps that are being called out.

2    There is the -- a big thing we focused on is Apple is thriving

3    in the resale market and mid-market.   We are seeing that being

4    a big issue in emerging markets, as well as some of our bigger

5    markets, as well as the user sentiment.

6              If you do have a phone that's not an iPhone, you're

7     labeled as poor.   We take our user feedback very seriously.

8    **Q.**    And why -- were you concerned when you read the information

9    on this page?

10   **A.**    This is the kind of perception that makes my job hard

11   because developers think about this when they're building and

12   choosing a platform.   So now, I can understand and empathize

13   and figure out how I should work with them.

14   **Q.**    So let's just look at one more slide, which is slide

15   number 11.   The title is Play Isn't Helping Android.

16              Do you see that?

17   **A.**    Yes.   It's hard to see because they're saying I'm not

18   doing a good job.

19   **Q.**    And how did you react to the information on this slide?

20   **A.**    We had teams trying to figure out what are the apps and

21   games that Gen Zers care about most and try to find them.

22   **Q.**    You can set that document aside.

23              **THE COURT:**   That wasn't -- the question was:   How did

24   you react to it?

25              **THE WITNESS:**   Oh.   Yeah.   We took it as a call to

1    action to try to understand what we need to do, what the

2    apps -- I have two roles.  One is to find what apps are missing

3    on Play and bring them in; and, two, how to fix the apps on

4    Play to make them better.  So this was on both sides.

5              THE COURT:  All right.  So I'll admit 5941, cover

6    page, page 10 and page 11 only.

7              MS. CHIU:  Thank you, Your Honor.

8                             (Trial Exhibit 5941, cover page, page 10

9                             and page 11 only, received in evidence.)

10   BY MS. CHIU:

11   Q.   Ms. Kochikar, have you talked with developers who invest

12   more in Apple than in Google Play?

13   A.   Yes, all the time.

14   Q.   And how would you describe those discussions?

15   A.   Very cordial, because we are always working with partners,

16   but also very factual, where they tell us why they cannot

17   invest more on Android at the moment.

18   Q.   And, Ms. Kochikar, what have you done to try and convince

19   these developers that they should invest more in Google Play?

20   A.   We built a consulting practice to help them lower their

21   decision making, like show them where the business is

22   attractive as well as train them on the technology.

23             MS. CHIU:  I have no further questions at this time,

24   Your Honor.

25             THE COURT:  Okay.  Any recross?

1          MR. HUESTON:  Yes, Your Honor.

2          THE COURT:  Just so you know, we'll break at high noon

3     for lunch.  Okay?

4               Go ahead.

5          MR. HUESTON:  May I proceed?

6          THE COURT:  Yes.

7                    **REDIRECT EXAMINATION**

8     BY MR. HUESTON:

9     Q.   Ms. Kochikar, we heard a lot in your examination about the

10    competition between Apple and Android.  I'd like to briefly talk

11    to you about that.  Okay?

12    A.   Yes.

13    Q.   All right.  Now, I think you said customers are making a

14    choice between iPhone with the iOS operating system and competing

15    phones with the Android operating system, right?

16    A.   Yes.

17    Q.   But once customers make that choice between the phones and

18    operating systems and purchase a phone, you agree that the

19    customer is not then choosing between the Apple App Store and

20    Google Play Store, correct?

21    A.   I don't understand the question.

22    Q.   Well, once -- for instance, a consumer can't use the Google

23    Play Store app on an iPhone, right?

24    A.   Yes.

25    Q.   Correct.  And likewise, a customer can't use the Apple App

**KOCHIKAR - REDIRECT / HUESTON**

1  Store on an Android device, right?

2  **A.**   Yes.

3  **Q.**   All right.  So once a customer makes the choice between the

4  operating systems, there's no longer any real competition between

5  the Apple App Store and Google Play Store for those consumers,

6  right?

7  **A.**   People change their phones constantly, every six months.

8  **Q.**   Well, in fact, Google has data showing that once they

9  choose, almost no one switches, right?

10  **A.**   Not at all.  I have -- I would be very surprised.  I mean,

11  we have -- we are losing market share.  You can just walk on

12  the streets to find that out.

13  **Q.**   Your percentages -- instead of walking the streets, you guys

14  have data internally.  Have you looked at that data?

15  **A.**   I don't know what you're referring to, please.

16  **Q.**   Then you don't know that your own data shows a range of only

17  from around 4 percent to a maximum of 12 percent actually switch.

18  You're not aware of that?

19  **A.**   I think that's a -- you know, if you take --

20  **Q.**   Are you aware of that?  Yes or no?

21  **A.**   I'm not aware of that.

22  **Q.**   Thank you.

23  **A.**   But it also --

24  **Q.**   That's fine.  Let me go on.

25       In fact, Ms. Kochikar, with respect to this competitor

1    Apple, Google employees have proposed working with this

2    competitor Apple on significant issues relating to the App

3    Store, correct?

4  **A.**  I don't understand what you're --

5  **Q.**  Sure.  Let me help you with that.  Let's go to Exhibit 8520

6  in the binder that's just been before you.  And if you go to the

7  last page in the binder, you can confirm you're a custodian on

8  that document, correct?

9  **A.**  Okay.

10  **Q.**  Great.  And if you go to the last page, you see your name as

11  a custodian on the document, right?

12  **A.**  Yes.

13          **MR. HUESTON:**  Okay.  Move to admit Your Honor.

14          **MS. CHIU:**  No objections.

15          **THE COURT:**  It's admitted.

16                          (Trial Exhibit 8520 received in

17                           evidence.)

18          **MR. HUESTON:**  Let's put it up, please.

19  **BY MR. HUESTON:**

20  **Q.**  Let's go to page 28 of the document.  It's up on the screen,

21  Ms. Kochikar.  Let's look at the section titled Play-Wide Theme,

22  Play 2022.

23          Do you see that on the screen?

24  **A.**  Yes.

25  **Q.**  Okay.  And under the U.S. section, it states in the second

1    sub bullet point:  "How can Play partner with Apple to change the

2    industry tide around subscriptions and get users accustomed to

3    paying for services outside of entertainment?"

4          You see that?  Do you see that language?

5    **A.**   Yeah.  Yes.

6    **Q.**   Okay.  And that language proposing that Google partner --

7    partner with a company that you're claiming is the biggest

8    competitor of Google, right?

9    **A.**   This is a very junior person adding ideas in a very

10   brainstormy session.  Brook Davis was, like, a very junior

11   person on my team.  I don't even remember this.

12   **Q.**   Okay.  Well, now you've been refreshed because here it is in

13   writing in your Google document at that time, right?

14   **A.**   Yeah.  It's a brainstorm, one person's idea in -- you

15   know, in a very long document of what we can do in terms of

16   strategy.

17   **Q.**   Right.  But you've described internally at Google everybody

18   is just focused on this competitor Apple, right?  That's

19   essentially what you've been saying?

20   **A.**   The Android team is very focused on the competition with

21   Apple.

22   **Q.**   And here, one of the people is writing here in the document

23   about partnering with Apple to get folks -- partnering with them

24   to figure out ways to get folks accustomed to paying for services

25   outside of entertainment.  Partnering with Apple to bring in more

1   money.  That's the idea here, right?

2   A.   One, it's one person's idea; and second, it has never

3   happened.

4   Q.   It's a Google person's idea, right?

5   A.   Yes, one young person's idea.

6   Q.   Okay.  Let's go beyond one young person.

7           In fact, Ms. Kochikar -- we can put this down -- these

8   supposed competitors, Google and Apple, they actually partner

9   together all the time, don't they?

10  A.   Not an Android.

11  Q.   Well, let's explore it all.

12          You're aware that Google pays Apple $18 billion a year

13  to be the default search on iPhones, right?

14  A.   I suppose.

15  Q.   Yeah.  And, in fact -- so let's -- Google is giving its

16  primary competitor $18 billion a year.  You know it's billions,

17  right?  You may not have the exact figure in mind.

18  A.   That is a very different business, right?

19  Q.   They're competitors -- my question to you, given what we've

20  just reviewed, Google and Apple are more like collaborators than

21  competitors; isn't that right?

22  A.   Well, when two companies are large, you can collaborate

23  and compete.

24  Q.   Sure.

25  A.   We compete on Microsoft with Cloud, and we can collaborate

1    with them on LinkedIn on Google Play.  These things happen all

2    the time.

3    **Q.**  Let's further explore this.

4          Isn't it true that Android is by far the most popular

5      mobile gaming platform?  Yes or no?

6    **A.**  Not on the high end.

7    **Q.**  Overall, Android is by far the most popular mobile gaming

8    platform, right?

9    **A.**  In numbers, not in revenues.

10   **Q.**  Okay.  Well, let's look at that.

11         Let's go to 5653, which you were shown on direct.

12     It's already admitted.  Let's put it up.

13   **A.**  Yes.

14   **Q.**  And this is -- your counsel went through some of this with

15   you, right, Lion Force Strategy?

16         Let's go to slide 14.

17   **A.**  Yes.

18   **Q.**  And by the way, this is something you said you relied on,

19   right?

20   **A.**  Yes.

21   **Q.**  Okay.

22         "Android is by far the most popular mobile

23         gaming platform by users" --

24   **A.**  By users, and not revenues.  That's what I was pointing

25   out.

1  Q.   Right?  Let me finish.  I know you want to get in, you know,

2  some words for the home team, but let me finish, please.

3              -- "while Play accounts for an

4              overwhelmingly majority of downloads."

5              Right?

6  A.   Yes.

7  Q.   That's what it says.  And it's talking about Android and

8  Play, right?

9  A.   Yes.

10  Q.   Right in the title.

11  A.   Yes.

12  Q.   Okay.  And the slide displays three charts here, right?

13  A.   Yes.

14  Q.   And the first one shows that Android had, by your own

15  writing here, about an 84 percent market share in smartphones as

16  of Q1 2018, right?

17  A.   Yes.

18  Q.   And the blue part, you can see there the blue part of each

19  bar represents Android, right?

20  A.   Yes.

21  Q.   And the smaller black part, which relatively gets smaller

22  over time compared to the blue, that's iOS or Apple, right?

23  A.   Yes.

24  Q.   And now let's look at the second chart.  And right here, it

25  says that Play accounts for about 75 percent of all apps and

1    games downloads.

2              That was as of 2017, right?

3    A.   Yes.

4    Q.   Okay.  We can put that down.

5              Now, one of the documents your counsel showed you

6      was -- I want to briefly get to it.  It's Exhibit 6044.

7              It's already in evidence.  Let's put it up.

8              And this is summaries of individual apps, right?

9    A.   Yes.

10   Q.   And I just want to put this in perspective, Ms. Kochikar.

11   Sorry.

12             You don't actually contend that users are comparing

13     versions of apps available on Android when they have an Android

14     phone, for instance, typically with a version of the app on

15     iOS, right?  That's not your contention, is it?

16   A.   They give us feedback because their friends or, you know,

17   family can do something else and they can't do.  So they give

18   us feedback of what annoys them.  They give us feedback about

19   missing features.  People talk to each other.

20   Q.   Okay.  Well, let's -- users are probably not even aware of

21   many of the differences in this document, right?

22   A.   When we talk to them, we get very clear, very good

23   feedback.

24   Q.   Well, let's look.  Let's go, for instance, to slide 87.

25             And this one is called Pregnancy Tracker, right?  Do

KOCHIKAR - REDIRECT / HUESTON

1    you see that?

2  **A.**   Yes.

3  **Q.**   And the slide says:

4              "iOS offered a cleaner and more welcoming

5         introduction to the app."

6         Right?

7  **A.**   Yes.

8  **Q.**   And then it says:

9              "Whereas the Android version was more

10        abrupt in its introduction to the app."

11        You see that?

12 **A.**   Yes.

13 **Q.**   Now, you're not saying a user is making a choice between an

14 Android phone and an Apple phone because one phone has an app

15 with a slightly nicer introduction, right?  You're not making

16 that contention, are you?

17 **A.**   No.  But it's the collective experience across multiple

18 apps.

19 **Q.**   All right.  Let's do one more example.

20        Let's go to slide 105 for Tinder.

21 **A.**   Yes.

22 **Q.**   Okay.  And this slide says:

23              "iOS feels overall more well crafted due

24        to its delightful moments, clear visual, and

25        smooth transitions."

KOCHIKAR - REDIRECT / HUESTON

1              Right?

2    **A.**    Yes.

3    **Q.**    And there were a few discrepancies on default settings and

4    permission requests, right?

5    **A.**    Yes.

6    **Q.**    And again, you're not saying that users are actually making

7    the decision whether to buy an Android phone or an iPhone based

8    on things like smoothness of transition or delightful moments,

9    are you?

10   **A.**    Software transitions and user experience does make a very

11   big difference.  That's what software companies live or die by.

12   **Q.**    Okay.  And your testimony is people are observing this and

13   this is part of the 4 to 10 percent of people who might switch;

14   is that right?

15   **A.**    Collectively, the user experience has been one of the

16   reasons people switch.

17   **Q.**    Okay.  So they're going to see a user experience like this

18   and switch from a $1,500 iPhone to a $500 Android.  That's what

19   they're going to do?

20   **A.**    The other way around.  And go to refurbished phones.  So

21   they would go from a $500 new Android device to a $500

22   refurbished iOS device which actually provides a great user

23   experience.

24   **Q.**    Okay.  So the competition is refurbished Apple phones, not

25   the new release $1,500 Apple phones.  Is that your testimony?

1    **A.**   On the high end, absolutely.   Apple has more than

2    80 percent share on the high end.

3    **Q.**   Right.   But you're not saying that people are going to see

4    something like this:   You know, it's a little more well crafted

5    for delightful moments, so I'm just going to go from my $500

6    Android phone to a $1,500 iPhone.   Right?

7    **A.**   Users are smart, and they understand what they need.

8    **Q.**   Right.

9    **A.**   And they will find the right device.   And they do.   The

10   churn is there in the mid end and the high end.   On the high

11   end, directly; on the mid end, through refurbished, as well as

12   older iOS devices.

13   **Q.**   Yeah.   They are smart.   They're going to consider the amount

14   of money they have to spend and the benefit they're going to get,

15   right?

16   **A.**   On the high end, they are similarly priced.

17   **Q.**   Okay.   Let's bring up one more document in this area.   You

18   were shown an Exhibit 6390.

19             Let's put it up.

20             And your counsel walked you through this document,

21     right?

22   **A.**   Yes.

23   **Q.**   And one thing counsel didn't point out is the date.   Can you

24   read the date into the record?

25   **A.**   Yes.

1    **Q.**   What's the date?

2    **A.**   August 24, 2022.

3    **Q.**   2022.  And you realize that's -- this document was created

4    two years after this lawsuit was filed, right?

5    **A.**   Yeah.

6    **Q.**   Yeah.  And this is the one where, you know, counsel made a

7    show of having you point out it mentions Apple as the competitor,

8    right?

9    **A.**   This was -- this is -- there are many documents.  All our

10   QBRs include figuring out how we think about iOS versus

11   Android.  This is just one example.

12   **Q.**   Okay.  Well, actually, let's look at an example from before

13   the lawsuit was filed.

14            Let's go to 8523.  And if you can flip -- this is

15     entitled Project Banyan; do you see that?

16   **A.**   Yes.

17            **MR. HUESTON:**  Okay.  We'd move this into evidence at

18   this time.

19            **MS. CHIU:**  Your Honor, this is beyond the scope.

20            **THE COURT:**  Overruled.  Any objection to the document?

21            **MS. CHIU:**  Your Honor, I don't believe we laid the

22   foundation that Ms. Kochikar has seen this document.

23            **MR. HUESTON:**  She's a custodian.

24            **THE COURT:**  Why don't you just lay the foundation,

25   please.

1           MR. HUESTON:  Sure.

2    BY MR. HUESTON:

3    Q.   Let's go to the last page of the document.  And please

4    identify yourself as a custodian of this document on that last

5    page.

6    A.   Yes.

7    Q.   Yes?

8    A.   Yes.

9           MR. HUESTON:  We move it in at this time, Your Honor.

10          THE COURT:  Objection?

11          MS. CHIU:  No, Your Honor.

12          THE COURT:  All right.  It's admitted.

13                         (Trial Exhibit 8523 received in

14                          evidence.)

15          MR. HUESTON:  Okay.  Let's put it up.

16   BY MR. HUESTON:

17   Q.   Now, here's a date.  It's February 2019, right?

18   A.   Yes.

19   Q.   Before the lawsuit was filed, right?  You know the lawsuit

20   started in 2020, right?

21   A.   Okay.

22   Q.   Okay.  And there's the Google Play logo on it, right?

23   A.   Yes.

24   Q.   Let's go to page 4 of this document.  There's a caption

25   there at the top.  It says -- the title is Existential Question,

1    right?

2    **A.**    Yes.

3    **Q.**    And existential question, Ms. Kochikar, that means going to

4    the essence of things, right?

5    **A.**    It means the most important question for Play.

6    **Q.**    The most important question.   Thank you.

7              And the question presented is:   How do we continue to

8      keep Play as the preeminent distribution platform for Android?

9              That's what it says, right?

10   **A.**    Just one of the questions, yes.

11   **Q.**    Well, actually, it's just the only question right here on

12   the slide under Existential Question, which you just described as

13   the most important question, right?

14   **A.**    Yeah.

15   **Q.**    Okay.   And there is zero mention here of Apple as an

16   existential threat to Google Play on that slide, right?

17   **A.**    Those are two different questions.   Yes.

18   **Q.**    Not a mention of Apple on this slide Existential Question.

19   Just want a clear answer.   Correct?

20   **A.**    On this slide, it isn't saying, yes.

21   **Q.**    Right.   We can take that down.

22             And, in fact, when Google talks about the market in

23     internal documents about Google Play, it's referring to just

24     the Android Market, right?

25   **A.**    This is on on Android, which is very different than if you

```
 1   look at Android documents that talk about iOS competition.  If

 2   a device is not in hands of people, then it doesn't matter

 3   whether -- whatever Play does.

 4   Q.   Okay.  Let's go to Exhibit 1530, which you'll recognize as

 5   the documents submitted to the Google Business Counsel to approve

 6   the Spotify Google Team.  Let's just take a look and confirm

 7   that.

 8   A.   Yes.

 9        MR. HUESTON:  Yes.  Okay.  We move it into evidence at

10   this time.

11        MS. CHIU:  No objections, Your Honor.

12        THE COURT:  It's admitted.

13                         (Trial Exhibit 1530 received in

14                          evidence.)

15        MR. HUESTON:  Let's put it up.

16   BY MR. HUESTON:

17   Q.   Let's go to page 2 to the section labeled Ask.

18            And the last sentence here states:

19                "The reason we are proposing this bespoke

20            deal with Spotify is because of its

21            unprecedented position and bargaining power in

22            the market."

23            You see that?

24   A.   Yes.

25   Q.   And the term "market" here refers just to Android app
```

1  developers, right?

2  **A.**   Well, in general, I suppose.  Like the app ecosystem.

3  **Q.**   I'm sorry.  The market refers to Android app developers.

4  Yes or no?

5  **A.**   Oh, app ecosystem in general, perhaps.  I -- you know, I

6  don't know how to --

7  **Q.**   Let me help you with --

8        **MR. HUESTON:**  Your Honor, page 257,

9  lines 10 through 12, tab 1.

10        **THE COURT:**  Yes, that's fine.

11        **MR. HUESTON:**  Let's put it up.  257, lines 10

12  through 12.

13          "Q.  The market refers to Android app

14      developers?

15          "A.  Yes."

16  **BY MR. HUESTON:**

17  **Q.**   That was your testimony, right?

18  **A.**   Okay.  Looks like that's what I said.

19  **Q.**   Okay.  I'll take it down.

20          And, in fact, Ms. Kochikar, the purpose of initiatives

21   like Project Hug was to address issues within the Android

22   system, not Apple or the Apple App Store, correct?

23  **A.**   No, not at all.

24  **Q.**   Let's pull back up Exhibit 1520, which was previously

25  admitted during your exam, and let's go to Adam Gutterman's email

1    at the bottom of the first page.

2    **A.**   Yes.

3    **Q.**   And in the last bullet on this page, Mr. Gutterman writes,

4    quote, As has been stated prior, developers are making a sensible

5    economic decision by shipping to iOS and then Android in

6    sequence.  To help drive simship, Android Eng will continue on

7    mitigating the cost side of the equation as noted above, while

8    Play can influence the equation here in two ways.

9          You see that?

10   **A.**   Yes.

11   **Q.**   And let's go to your email, your email at the top of the

12   first page.  And I'm going to go down to the fourth paragraph in

13   your email, which starts with "The Bear Hug effort."

14   **A.**   Yes.

15   **Q.**   Highlight that.  Do you see that?

16   **A.**   Yes.

17   **Q.**   Okay.  And you write, quote:

18          "The Bear Hug effort is to address

19          fragmentation within the Android ecosystem."

20          Those are the words that you wrote, right?

21   **A.**   That is for a very specific set of games.

22   **Q.**   Well, hold on.

23   **A.**   Yes.

24   **Q.**   I just ask.

25          **THE COURT:**  Ms. Kochikar, the question is:  Are those

1    the words you wrote?

2              **THE WITNESS:**  Yes.

3              **THE COURT:**  Go ahead.

4              **MR. HUESTON:**  Thank you.  We can put that down.

5    **BY MR. HUESTON:**

6    **Q.**  And what you were doing there is telling Mr. Gutterman that

7    you should not confuse launching first on iOS to be a risk to

8    Android, right?

9    **A.**  No.

10              **MR. HUESTON:**  Okay.  Let's go to your deposition.

11              Your Honor, page 115, lines 5 to 10.

12              **THE COURT:**  Okay.  Just give the old judge a second

13   here.

14              Which page?

15              **MR. HUESTON:**  115, lines 5 to 10.

16              **THE COURT:**  Yes, that's fine.

17              **MR. HUESTON:**  Okay.

18              "Q.  Right.  And Mr. Gutterman starts talking

19        about Android versus iOS, and you respond to him

20        saying we should not be contemplating launching first

21        on iOS to be a risk to Android.

22              Do you see that in the second paragraph?"

23              You answered:

24              "A.  Yes."

25   \\\

1    BY MR. HUESTON:

2    Q.    Correct?

3    A.    Yeah, that I see that in the second paragraph.

4    Q.    Okay.  And instead, one of the risks that was presented to

5    the Google business council in connection with Project Bear Hug

6    was the risk that other developers would launch titles outside of

7    Google Play on Android, right?

8    A.    Yes, but the competition with iOS also --

9    Q.    That's a "yes," right?

10   A.    Yes.

11   Q.    Thank you.

12          Okay.  Now, you testified in response to Google's

13     counsel's questions that there were various investments, you

14     said, that were made to make sure that Google Play Store is

15     safe; is that right?

16   A.    Play Store --

17          THE COURT:  Oh, new topic, it sounds like?

18          MR. HUESTON:  New topic.

19          THE COURT:  So let's break for lunch and see you

20   back -- you know what?  It's the end of the week.  We're making

21   good time.  So we'll take a five-minute bonus.  I'll see you at

22   12:35.  All right?

23          Okay.

24          THE CLERK:  All rise.

25          THE COURT:  Okay.  You may step down.  You remain

 1   under oath.  No communications of any sort with anyone or look

 2   at any document until you're released from the stand, please.

 3            All right.  Where is that document?

 4        MS. CHIU:  I believe my counsel has it.

 5        THE COURT:  Now, looking back at my transcript, let's

 6   make sure I've got the right testimony.

 7            On the realtime, it looks like it's at 62 -- just one

 8    second -- 62:19 to -- 61:21 to 62:24; is that right?  It's the

 9    numbers on the left-hand side.

10        MR. BORNSTEIN:  Unfortunately, I don't have numbers on

11   my iPad Your Honor.  Oh, I'm being --

12        THE COURT:  Just scroll to the left.

13        MR. BORNSTEIN:  -- apparently told how to do it.

14        THE COURT:  I'm sorry.  Left-hand side.  Scroll to the

15   left.  It's 62:19 through about 62:24.  Is that right?

16        MR. BORNSTEIN:  I don't think we have page and line

17   showing up, Your Honor.  Apologize for that.

18        THE COURT:  You can't scroll to the left?

19            All right.  Well here's the question.  Question at

20    62:19.

21            "Q.  And why doesn't Google

22      pursue exclusivity?

23            "A.  It's bad for the developers and bad for

24      games.

25            "Q.  Why is that?

1              "A.  Most games are multi player, multi

2         platform today.  Developers should have a choice to

3         go to as many places where the users are, and that's

4         how the games usually grow.

5              So that's the testimony you're referring to?

6              **MR. BORNSTEIN:**  That's correct, Your Honor.

7              **THE COURT:**  All right.  Where is that document?

8              **UNIDENTIFIED SPEAKER:**  Your Honor, we have it on a

9    thumb drive video.

10             **THE COURT:**  Well, hand it to me.  I'm going to go look

11   at it.

12             **UNIDENTIFIED SPEAKER:**  May I approach, Your Honor?

13             **THE COURT:**  What's the timing for that, Mr. Bornstein?

14             **MR. BORNSTEIN:**  I understand it's at approximately the

15   16-minute mark of the video, 1-6.

16             **THE COURT:**  16 minute.  Okay.  What's the context of

17   this?  What's happening on this thing?

18             **MR. BORNSTEIN:**  My understanding is, as best we could

19   tell, from Ms. Kochikar is speaking to some of her colleagues

20   about Google about the very document that counsel was examining

21   the witness about in the context of this testimony.

22             **THE COURT:**  Okay.

23             **UNIDENTIFIED SPEAKER:**  Your Honor, if I may, there's

24   two files.  There's a redacted and unredacted.  You should look

25   at the unredacted, which will include, at the 16-minute mark,

1    the reference that Mr. --

2              THE COURT:  All right.  Thank you.

3              THE CLERK:  All rise.

4                   (Luncheon recess was taken at 12:05 p.m.)

1    **AFTERNOON SESSION**                          **12:42 p.m.**

2

3              THE COURT:  Is the witness still outside?

4              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

5              THE COURT:  All right.  After reviewing the tape, it

6    seems pretty plain to me that the statements that were made in

7    the tape were rather broad, generic, legal counsel, and not

8    sufficiently directly intentioned with her courtroom that I'm

9    not going to allow it for impeachment.  I'm not saying you

10   can't try again with other, similar materials.  The

11   attorney-client thing is not the issue.  This is not adequate

12   impeachment, so it's not going to be played on that ground.

13             MR. BORNSTEIN:  Understood, Your Honor.

14             THE COURT:  Okay.  Let's bring everybody in.

15             MR. HUESTON:  There is one other issue.

16             THE COURT:  Oh, yes.

17             MR. HUESTON:  There is one other issue.  With the

18   Spotify testimony of Ms. Kochikar, you'll remember that she --

19   counsel had her very plainly say that the deal was not at all

20   because of agitation.  And what I want to do is introduce a

21   document, and the document says specifically the senses will

22   likely not want to trigger Spotify agitation and associated

23   noise with a policy change.  And there is a chart summarizing

24   the risk, and it continues to say Spotify agitation likelihood

25   and associated noise, and then exacerbated by EU regulatory

1    environment.

2          So I think they have -- this is a key document to

3    impeach her.  Their own document links the agitation to noise

4    and regulatory.  I think I should be able to get into it.  I

5    know there's been a mill in terms of regulatory issues

6    generally, but this is --

7          THE COURT:  Can I just see it?

8          MR. HUESTON:  Yeah.  This is Exhibit 8 --

9          THE COURT:  Oh, I already have it?

10         MR. HUESTON:  8526.

11         THE COURT:  Which binder is this in?  The one you just

12   handed me?  Oh, I see it.  I have it.

13         MR. HUESTON:  And it's the second email on the page.

14   It's down there in bold.

15         THE COURT:  What's the Bates number?

16         MR. HUESTON:  Bates number Google Play 1032R.

17         THE COURT:  Oh, first page.  Okay.  Where is it now,

18   second --

19         MR. HUESTON:  Right down where you see meeting outcome

20   and followups in bold.  And then in their own bolded line there

21   it says the senses will likely not want to trigger Spotify

22   agitation and associated noise with a policy change.

23         THE COURT:  Okay.

24         MR. POMERANTZ:  Your Honor, if I could make a

25   suggestion.  I mean, the issue here is not that long, I think,

1    as Mr. Hueston was suggesting.  It's the next line which makes

2    a reference to EU regulatory environment, which is something

3    that is prohibited by the motion *in limine*.

4              THE COURT:  Well, it's also just--

5              MR. POMERANTZ:  I think there's a way --

6              THE COURT:  It's a big sideshow and we don't need it.

7    You can certainly use the Spotify part.  Just take out the EU

8    and legislation and regulatory, okay?

9              MR. POMERANTZ:  I think, John -- Mr. Hueston, what I

10   would suggest is that if you pull out the sentence that's in

11   bold so the jurors see that, they're not going to see the

12   regulatory reference.

13             MR. HUESTON:  Yeah, we can do that or redact that

14   other --

15             THE COURT:  Well, after -- I mean, I'll admit it

16   subject to our discussion, and I'll just say that.  But then

17   you have to put it in the file with that redacted, okay?

18             MR. POMERANTZ:  Thank you, Your Honor.

19             THE COURT:  You can show it now.  Just blur it or --

20             MR. HUESTON:  So, Your Honor, I can get in the full

21   sentence the senses will likely not want to trigger Spotify

22   agitation and associated noise with a policy change, but then

23   not make reference to the rest of this here about likely

24   agitation may be higher, risk of status quo.  I think that

25   should stay in.  Well, I think that should stay in.  This is

 1    partly due --

 2              THE COURT:  You want to delete the sentence that says

 3    "this is partly?"

 4              MR. HUESTON:  Yes, I can do that.

 5              THE COURT:  Through the close parens period, okay?

 6              MR. HUESTON:  Fine, we can do that.

 7              THE COURT:  And then so just don't show that part, and

 8    then when you file it --

 9              MR. HUESTON:  We're doing that now on the spot okay.

10              THE COURT:  Oh, you can redact it right now?

11              MR. HUESTON:  Yes, in what we will show.

12              THE COURT:  Okay.  Then I'll admit it as redacted

13    okay.  Let's take a look.  Are you going to show me, show me

14    the wonders of your technology?  Go ahead.

15              MR. HUESTON:  Just one second.  I'm being told there

16    may be a second.

17              THE COURT:  Oh, you did it.  You just took it out?

18    That's fine.

19              MR. HUESTON:  Oh, okay, and then on the second page,

20    and just so we'll make a similar redaction on -- let's go to

21    the next page, there's key risk.

22              THE COURT:  Oh, I see.

23              MR. HUESTON:  There's two blocks, one is agitation,

24    we'll leave that.  The other says exacerbated by EU regulatory

25    environment, we'll take that mention out.

1            MR. POMERANTZ:  And one other reference back on the

2   first page here.

3                  (Discussion held off the record.)

4            MR. HUESTON:  We're working it out.  We're good.

5            THE COURT:  That seems fine.  Just take it out on the

6   second page, the right-hand block, okay?

7                  All right.  So bring the witness and the jury in,

8     please.

9                  (Jurors enter courtroom.)

10                 (Proceedings were heard in the presence of the jury:)

11           THE COURT:  All right.  Please.

12           MR. HUESTON:  Thank you, Your Honor.

13  BY MR. HUESTON:

14  Q.   Good afternoon, Ms. Kochikar.

15  A.   Good afternoon.

16  Q.   All right.  One of the things that counsel talked to you

17  about was that Google Play Store has its -- offers some security

18  benefits or features, right?

19  A.   Yes.

20  Q.   Okay.  But Google Play has a history of hosting or having

21  its own serious security issues, right?

22  A.   Some, but very small compared to what we keep out.

23  Q.   Well, let's see how small.

24             You know that Google Play has had a history of hosting

25    malicious apps, right?

1   **A.**   We take them down as soon as we can.

2   **Q.**   Okay.  But you've had a history of them.  Whether you take

3   them down as soon as you can or not, there's been a history of

4   them, right?

5   **A.**   There have been incidents, but they're very small compared

6   to how much we keep out.

7   **Q.**   Okay.  Well, in 2020, reports indicated, and you know this,

8   that 8 percent of all android apps available on the Google Play

9   Store were found to be vulnerable to theft by malicious actors;

10  you know that, right?

11  **A.**   I'm sure there has been written.

12  **Q.**   Okay.  And then a year later in 2021, Google confirmed that

13  millions of users were affected by malicious apps that originated

14  from the Play Store, right?

15  **A.**   Oh, probably.

16  **Q.**   Yep.  And then still later, April of this year, Android

17  Malware named Goldoson infiltrated Google Play through 60 top

18  apps with a hundred million downloads; do you remember that?

19  **A.**   Probably, yes.

20  **Q.**   But despite all of that, Google doesn't show the user a

21  scare screen or a warning before the user opens up Google Play

22  Store, right?

23  **A.**   No, we don't.

24  **Q.**   Right.  And Ms. Kochikar, Google requires, you've testified,

25  that Google requires Google Play Billing in part because of

1  security and other supposed consumer-friendly protections, right?

2  **A.**   Yes.

3  **Q.**   But you agree, and I think you testified, that Google does

4  not require every developer to use Google Play Billing, right?

5  **A.**   If they're using digital content that is consumed in the

6  app, then yes, otherwise no.

7  **Q.**   Right.  In fact, many developers are not required to use

8  Google Play Billing, right, both big and small, correct?

9  **A.**   If it's for physical goods, yes.

10  **Q.**   Yes, you've covered physical goods, but there is more than

11  that.  Developers who are enrolled in User Choice Billing

12  programs are not required to exclusively use Google Play Billing,

13  right?

14  **A.**   They're audited.

15  **Q.**   They are what?

16  **A.**   They're audited.

17  **Q.**   Audited.  But they're not required to exclusively use Google

18  Play Billing, right?

19  **A.**   Yeah, they -- that's what user choice is.

20  **Q.**   Okay.  And you're aware of something Google offers called

21  Developer Only Billing, right?

22  **A.**   Yes.

23  **Q.**   And that means that developers can choose to use only their

24  own billing solutions, right?

25  **A.**   In the EEA countries.

1    Q.    Exactly.  That's only offered by Google in the European

2    Economic Area countries.  That's where Google has chosen to allow

3    it only, right?

4    A.    Yes.

5    Q.    And developers in just the European Economic Area who are

6    enrolled in that program are not required to exclusively use

7    Google Play Billing, right?

8    A.    If they choose to go that way.

9    Q.    Right.  And I think you mentioned developers in South Korea

10   are not required to exclusively use Google Play Billing, right?

11   A.    They have User Choice Billing.

12   Q.    And Spotify, even though it offers digital music, does not

13   have to exclusively use Google Play Billing, right?

14   A.    Yes, that's user choice.

15   Q.    Yeah.  In fact, you testified I think that 90 percent or so

16   of developers do not pay any fees and thus do not use Google Play

17   Billing, right?

18   A.    If they're -- for physical goods, yes.

19   Q.    Well, I think you said -- are you changing the testimony?

20   You said 90 percent overall.  Are you just saying 90 percent of

21   people and physical goods?

22   A.    No, I mean what they pay for and what they use is two

23   different things, but, yes.

24   Q.    All right.  And so despite Google's supposed security

25   concerns from using non-Google billing, in the end it's only

1  requiring a relatively few select apps to use Google Play

2  Billing, right?  The vast majority do not use Google Play

3  Billing, correct?

4  **A.**   That's our business model.

5  **Q.**   Right.  Okay.  Let's talk a little bit about those scare

6  screens.

7         You agree that safety concerns are not particularly

8   significant when a user is downloading an app from a website

9   they know, right?

10 **A.**   It depends on what else is there.

11 **Q.**   Well, let's probe that a little bit.

12        If someone is navigating directly to a developer

13  website to download an app, they know what they're getting,

14  right?

15 **A.**   Yes, I can assume so.

16 **Q.**   Okay.

17 **A.**   I can't speak for something.

18 **Q.**   Yeah.  And so, for example, a user going directly to

19 EpicGames.com, they know who they're getting their app from,

20 right?

21 **A.**   I would assume so.

22 **Q.**   And you're not aware of any pirated fake Fortnite apps

23 available on EpicGames.com, right?

24 **A.**   I don't know.  I haven't spent time.

25 **Q.**   You recall testifying, "And there is no --

1          "Q.  There is no pirated fake Fortnite apps

2      available on EpicGames.com, right?

3          "A.  No."

4          Does that -- do you remember testifying that way?

5  A.  I don't.

6       MR. HUESTON:  Okay.  Let's go to your deposition,

7  page 250, Your Honor, lines 1 to 5.

8       THE COURT:  That's fine.

9  BY MR. HUESTON:

10  Q.  Okay.  Let's put it up.

11          "Q.  And there is no pirated fake Fortnite

12      apps available on EpicGames.com, right?

13          "A.  No.  However, there have been times when

14      people have been given links that may look like

15      Epic.com and it isn't."

16  Q.  That was your testimony, right?

17  A.  That's what it says here.

18  Q.  Okay.  And you'll agree, Amazon, it's a well-known company,

19  right?

20  A.  Yes.

21  Q.  And so is Samsung, right?

22  A.  Yes.

23  Q.  Okay.  And as we've shown with the Google presentation on

24  downloading the Amazon App Store, there were scare screens coming

25  up there, right?

1    **A.**    There were user modifications coming up.

2    **Q.**    Right.  Supposedly for security issues for Amazon, right?

3    **A.**    No, just informing them that they are putting unknown

4    sources, because they could keep it open and go to some other

5    website.  It wasn't because of Amazon, it was about the setting

6    on the device.

7    **Q.**    Unknown sources, even though they've gone directly to the

8    Amazon site through the demonstrative that Google itself laid out

9    and I walked you through, right?

10   **A.**    Yes, but it's a device setting that can be opened for

11   anyone else to use.

12   **Q.**    And once again, so if you try to get it from a download and

13   sideload from the Amazon App Store - scare screens.  But, again,

14   if you're trying to get the Google Play Store - no scare screen,

15   right?

16   **A.**    No notifications unless -- the notification is not for the

17   store, but for the toggle, which is unknown sources.

18   **Q.**    And let's go to the Exhibit 5653 that counsel walked you

19   through.

20           One of the things that you've testified to is that the

21   service fee that Google charges covers benefits including the

22   benefit of discovery, right?

23   **A.**    Yes.

24   **Q.**    Right.  And specifically that Play provides for app

25   developers the ability to get their app discovered, right?

1   A.   Yes.

2   Q.   Okay.  But isn't it true that for games, Social, Ads and PC,

3   for games the primary forms of discovery come outside of the

4   Google Play Store, right?

5   A.   People discover in different ways, but Store is an

6   important place.

7   Q.   Okay.  Well, let's look at a slide that counsel didn't show

8   you here.  Let's go to slide 9.

9        Okay.  And this title is:  With Multiple Trends

10   Happening In Parallel Across The Ecosystem.

11        Do you see that?

12   A.   Yes.

13   Q.   And under Discovery it says, quote, Social, FB -- that's

14   Facebook, right?

15   A.   Yes.

16   Q.   YouTube, et cetera, Ads, and PC/Console stores are the

17   primary forms of discovery, right?

18   A.   That's what it says here.

19   Q.   Okay.  Thank you.  We can put that aside.

20        You also mentioned with counsel -- you made references

21    to Samsung, right?

22   A.   Yes.

23   Q.   And you said that Google Play Store competes with Samsung,

24   right, the Samsung Galaxy App Store, right?

25   A.   Yes.

1  **Q.**   And, now, Google requires games and digital content apps to

2  use Google Play Billing and pay services fees; we've covered that

3  repeatedly, right?

4  **A.**   Yes.

5  **Q.**   But Samsung, you understand, does not require any app

6  developer to pay any service fees if they do not want to use

7  Samsung's payment solutions; you're aware of that, right?

8  **A.**   I suppose so.

9  **Q.**   Well, you don't know?  Samsung is a competitor of Google's,

10  according to your testimony, right?

11  **A.**   Yes.

12  **Q.**   Okay.

13  **A.**   But -- well, it is a competitor.  I know that they had

14  announced certain things.  I don't know whether it's uniformly

15  applied everywhere.

16  **Q.**   Okay.  But just to be clear, you're calling Samsung a real

17  competitor, right?

18  **A.**   Yes, I'm saying that we compete for attention, yes.

19  **Q.**   Okay.  But they're not too much of a competitor, because

20  Google has not matched the competition here, in that Samsung has

21  put out by not requiring any app developer to pay any service

22  fees if they do not want to use Samsung's payment solution,

23  right?  Google hasn't matched the competition there, right?

24  **A.**   I think we have our business model, and developers choose

25  if they want our store with our business model or Samsung's

1  store with Samsung's business model.

2          THE COURT:  Ms. Kochikar, that was not the question.

3          THE WITNESS:  Sorry.

4          THE COURT:  So ask the question again, please.  I know

5  it's been a long two days.  Just take a breath, focus, answer

6  the question.

7  BY MR. HUESTON:

8  Q.    Sure.  So, again, for games, again, Samsung does not require

9  any app developer to pay any service fees if they do not want to

10  use Samsung's payment solution, and Google, with games, does not

11  match that, right?

12  A.    Yes.

13  Q.    Okay.  And, in fact, Google has not made any changes to its

14  service fee in response to Samsung's policies providing developer

15  choice and billing, right?

16  A.    Yes.

17  Q.    Okay.  So let's talk a little bit, you've mentioned it

18  again, about User Choice Billing.

19          Now, let's put back up, if we can, Trial Exhibit 2698

20    previously admitted, seventh slide.

21          Okay.  And you'll remember we went through this,

22    Ms. Kochikar, and you agreed part of what developers want with

23    billing choice is the ability to choose a billing platform with

24    a lower price than 30 percent, right, under the pricing;

25    remember?

1    **A.**   Yes.

2    **Q.**   Okay.  There's the complaint, "30 percent is too high,"

3    right?  That's what it says on the slide?

4    **A.**   Yes.

5    **Q.**   And by the way, under Pricing, that's the only complaint

6    about pricing, "30 percent is too high," right?

7    **A.**   Yes.

8    **Q.**   Okay.  But Google, with its so-called User Choice Billing,

9    made sure that pricing was no reason to switch, right?

10   **A.**   Could you say that again, please?

11   **Q.**   Sure.  Google made sure that pricing would be no reason to

12   switch here, right?

13   **A.**   Switch what?

14   **Q.**   Well, to switch to an alternative platform.

15   **A.**   I don't understand the question.  I'm sorry.

16   **Q.**   Well, let's see if I can help you with that.

17          All right.  Let's put that down and go to Kochikar

18   demonstrative number 11 to refresh your recollection.  That was

19   also shown.  Okay.  We can put that up.

20          And what I'm comparing is Google Play Billing with the

21   alternate payment system of so-called Google User Choice

22   Billing, right?  It's up on the screen.

23   **A.**   Yes.

24   **Q.**   Yeah.  And as we went through at some length, if they choose

25   Google Play Billing, their effective rate is going to be

1    30 percent, right?  If it's in-app purchases over a million

2    right?

3    A.    Yes.

4    Q.    And if they take the alternate, the so-called choice, on

5    average it's going to have the same effective rate of 30 percent,

6    right?

7    A.    Yes.

8    Q.    Okay.  And so either so-called choice leads to the same

9    effective rate of 30 percent, right?

10   A.    Yes, because we provide all the other services.

11   Q.    Yes, okay.  And for those developers who care about price as

12   their most important thing, that's no real choice, right?

13   A.    We chained the price for all the apps.

14   Q.    With 30 percent effective rates, either side, if a developer

15   is focused on price, there's no real choice here, right?

16   A.    For one category, one business model.

17   Q.    Okay.  Thank you.  We can take that down.

18          Now, you testified about Spotify, and I believe you

19    said that the deal you came up with Spotify, it wasn't because

20    of agitation, right?

21   A.    We focused on the value on the platform.

22   Q.    Nothing to do with agitation, right?

23   A.    No.

24   Q.    No?  Okay.  So let's take a look at Exhibit 1530.  Let's go

25   through some of the reasons.  Let's turn to your binder, please,

 1   and look at Exhibit 1530.

 2           And you're -- under Representatives, your name is

 3     there, do you see it on the first page, "Kochikar?"

 4   **A.**   Yes.

 5           **MR. HUESTON:**  Okay.  We move it in at this time.

 6           **THE CLERK:**  It's already in evidence.

 7           **MR. HUESTON:**  It's already in evidence.  Excellent.

 8   **BY MR. HUESTON:**

 9   **Q.**   Okay.  Let's flip to page 2, the section called Ask; do you

10   see that?

11   **A.**   Yes.

12   **Q.**   And it explains the proposed deal with Spotify right there,

13   right?

14   **A.**   Yes.

15   **Q.**   And we talked about this earlier.  It offers users a choice

16   to either pay for their subscription via Spotify's own billing

17   channels or via Google Play Billing, right?

18   **A.**   Yes.

19   **Q.**   And it says, "The reason we are proposing this bespoke deal

20   with Spotify is because of its unprecedented position and

21   bargaining power in the market, and we had to offer a creative

22   solution to bring their full value to the Play ecosystem," right?

23   **A.**   Yes, it shows the compete.

24   **Q.**   Okay.  And let's go to page 3 of this document to the

25   section called Financial Summary.

1              Do you see that?

2   **A.**   Yes.

3   **Q.**   And it says, quote, revenues from this deal will not cover

4   all of the costs Play will incur to support Spotify subscribers

5   on Google Play Billing, right?

6   **A.**   Yes.

7   **Q.**   And separately, isn't it true that Google was afraid to

8   trigger Spotify's agitation?

9   **A.**   That's not what it says here.

10  **Q.**   That's not -- well, let's go to Exhibit 8526, and just take

11  a look at that in your binder and tell me you see your name in

12  the first email there.

13  **A.**   Yes.

14          **MR. HUESTON:**   Okay.  We'd move Exhibit 8526 into

15  evidence at this time.

16          **MS. CHIU:**   No objections.

17          **THE COURT:**   It's admitted.

18                          (Trial Exhibit 8526 received in

19                           evidence.)

20  **BY MR. HUESTON:**

21  **Q.**   Okay.  Let's put it up.

22          Now we're going to go to the second email on this

23   page, which is from Sameer Sayigh, correct?

24  **A.**   Yes.

25  **Q.**   And the subject:  Meeting Summary - Play Payment Policy.

1    Right?

2    A.    Yes.

3    Q.    And if we look at the first bullet down he writes:  "Even

4    though we'll have a defensible plan that achieves goals and made

5    progress with many developers impacted, the sense is we'll likely

6    not want to trigger Spotify agitation and associated noise with a

7    policy change."

8              That's what he wrote, right?

9    A.    That's what he's written.

10   Q.    That's specifically the word that this Google employee used,

11   "agitation," right?

12   A.    Yes.

13   Q.    And he goes on to explain:  "I.e., the risk of likely

14   Spotify agitation may be higher than the harder-to-gauge risk of

15   status quo."

16             Right?

17   A.    Yes.

18   Q.    Okay.  And then if we continue, if we look below, there's

19   actually a chart summarizing risks, right?  There it is up on

20   your screen.

21   A.    Yes, I can see it.

22   Q.    And right under "Option" all the way to the right, "Key

23   Risk."

24             Do you see that?

25   A.    Yes.

1    Q.    And I want you to read the only thing there under Key Risk

2    in that box.  Read it into the record.

3    A.    It says, "Google triggers (1) Spotify agitation likelihood

4    and associated noise."

5    Q.    Thank you.  We can put that down.

6          All right.  I want to go back to another exhibit that

7    you were shown in your exam with counsel, Exhibit 5714.  Let's

8    put that up.

9          And specifically on page 5 you testified about this

10   gray block at the bottom, this thing written here about

11   "non-goals?"

12   A.    Oh, yes.

13   Q.    Stop launch and other android stores, right?  Do you see

14   that?

15   A.    Yes.

16   Q.    And, Ms. Kochikar, this is the only document we've seen in

17   all day with something called "non-goals" in the document, right?

18   A.    That's the definition of the program.

19   Q.    Okay.  Well, I'm just asking you --

20   A.    Yes.

21   Q.    There's been no other document shown that says "non-goals,"

22   right?

23   A.    Yes.

24   Q.    Okay.  I want to put this in perspective here.

25          I want to look at the first page and get the date.

1    It's dated June 19th, 2019, right?

2    A.   Yes.

3    Q.   And I want to review a document before and after this

4    document, all right?

5    A.   Okay.

6    Q.   So let's start with Exhibit 8522, which is in your binder.

7    And if you look at the last page of the document you'll see

8    yourself as a custodian, right?

9    A.   Yes.

10        MR. HUESTON:   Okay.  We'd move 8522 into evidence at

11   this time, Your Honor.

12        MS. CHIU:   No objections.

13        THE COURT:   It's admitted.

14                    (Trial Exhibit 8522 received in

15                         evidence.)

16   BY MR. HUESTON:

17   Q.   Let's put it up, and let's go to the second page.

18   A.   Yes.

19   Q.   Now, this presentation is dated March 2019, and it is about

20   Project Hug, right?

21   A.   It is a component.

22   Q.   Okay.  It says in the front title there "Project Hug,"

23   right?

24   A.   Yes.

25   Q.   Okay.

1    **A.**   But this is just the Cloud component of the program.

2    **Q.**   All right.  Well, let's go to page 6, and this has the,

3    quote, expanded program goals and lists 1 as prioritize Play plus

4    Android, correct?

5    **A.**   Yes.

6    **Q.**   So it's a list of expanded program goals.  There's nothing

7    on this slide that says, "Oh, by the way, here are the

8    non-goals," right?

9    **A.**   No.

10   **Q.**   Right.  Let's go to the next slide, and let's look at the

11   bottom right-hand box labeled Increasing Distribution

12   Competition.

13          Do you see that we're popping it out; do you see that?

14   **A.**   Yes.

15   **Q.**   And this specifically mentions, quote, 3P.  That's

16   third-party platform stores, right?

17   **A.**   Yes.

18   **Q.**   For example, Amazon and OEM stores?

19   **A.**   Yes.

20   **Q.**   And developers exploring 1P solutions, for example, Epic,

21   right?

22   **A.**   Yes.

23   **Q.**   Amazon and Epic are both third parties who have or were

24   exploring offering app stores on Android, right?

25   **A.**   Yes.

KOCHIKAR - REDIRECT / HUESTON

1   Q.   And there's no mention here of Apple, right?

2   A.   No.

3   Q.   And let's go to the right side in the first box there, and

4   it says:  "Store rivals aggressively competing for game dev

5   attention exclusive content; for example, Epic Store only taking

6   12 percent rev share versus Play's 30 percent.  Many devs

7   evaluating other distribution options," right?

8   A.   Yes.

9   Q.   And the "aggressively competing" there, that's referring to

10  Android, right?

11  A.   Yes.

12  Q.   No mention of Apple, right?

13  A.   Not here.

14  Q.   Okay.  Let's just quickly go to 8519 after the other

15  presentation that counsel showed you.  Let's go to that quickly,

16  8519.

17          And if you could identify you're listed as a custodian

18   of that document on the last page.

19  A.   Yes.

20          MR. HUESTON:  Okay.  We move to admit 8519.

21          MS. CHIU:  No objections.

22          THE COURT:  It's admitted.

23                         (Trial Exhibit 8519 received in

24                          evidence.)

25  \\\

1  BY MR. HUESTON:

2  Q.   Okay.  Putting it up here.  This is January 2020, later than

3  that other document that mentioned non-goal, right?

4  A.   Yes.

5  Q.   And the subtitle is:  Increase the value of Play to Android

6  developers, right?

7  A.   Yes.

8  Q.   Let's go to page 6.  And you'll recognize this again has the

9  same language we reviewed earlier about increasing distribution

10  competition from third-party platform stores and OEM stores,

11  right?

12  A.   Yes.

13  Q.   And we can see the same language about developer churn risk

14  that developers will stop distributing on Play, right?

15  A.   Yes.

16  Q.   Nothing about a non-goal mentioned here, right?

17  A.   Yes.

18  Q.   Okay.  So despite showing -- counsel showing you one

19  presentation where Google mentioned a non-goal, we have seen

20  presentation and emails, one after another, showing that Google

21  wanted to limit competing App Store competition through Project

22  Hug, correct?

23  A.   Oh, I don't think that's the right characterization.

24  Q.   And what we are still lacking today are your chat messages

25  that you kept on a 24-hour delete during this period of time,

 1   right?

 2   **A.**   Oh, yes, I don't know what to say --

 3            **MR. HUESTON:**   Okay.  Great.  Pass the witness.

 4            **THE COURT:**   I'm sorry, would you ask that question

 5   again, please?

 6   **BY MR. HUESTON:**

 7   **Q.**   Sure.  Ms. Kochikar, what we still don't have today are your

 8   chat messages during this entire period of time, because you had

 9   the setting set for effectively deletion after 24 hours, right?

10   **A.**   I had the default setting, yes.

11            **MR. HUESTON:**   All right.  Thank you.  Pass the

12   witness.

13            **THE COURT:**   Okay.  Very brief redirect.

14                        <u>**CROSS-EXAMINATION**</u>

15   **BY MS. CHIU:**

16   **Q.**   Ms. Kochikar, I just have a few questions for you.

17            Just before the break counsel asked you about some

18    numbers that he represented were the percentage of people who

19    switch from Android to Apple; do you remember that?

20   **A.**   Yes.

21   **Q.**   Did those numbers sound familiar to you?

22   **A.**   No.

23   **Q.**   Okay.  Now, even assuming that those numbers were correct, I

24   believe you said something like 4 to 12 percent; do you remember

25   that?

GARBER - DIRECT / BORNSTEIN

1   A.   Yes.

2   Q.   Would it be a concern to you if 12 percent of Android users

3   switched to Apple?

4   A.   Yes.

5   Q.   Is that a significant amount?

6   A.   Yes.

7          MS. CHIU:  Nothing further, Your Honor.

8          THE COURT:  Okay.  You may step down.  Be careful on

9   the way down.

10          And who do we have next?

11          MR. BORNSTEIN:  Your Honor, Epic calls Emily Garber to

12   the stand.

13          THE CLERK:  Please stand and raise your right hand.

14                          EMILY GARBER,

15   called as a witness for the PLAINTIFFS, having been duly sworn,

16   testified as follows:

17          THE WITNESS:  Yes, I so affirm.

18          THE CLERK:  Please be seated.

19          Please state your name for the Court and spell your

20    last name.

21          THE WITNESS:  My name is Emily Garber, spelled

22   G-A-R-B-E-R.

23          THE CLERK:  Thank you.

24          MR. BORNSTEIN:  May I proceed, Your Honor?  Thank you.

25   \\\

1   <u>**DIRECT EXAMINATION**</u>

2   **BY MR. BORNSTEIN:**

3   **Q.**   Ms. Garber, good afternoon.

4   **A.**   Good afternoon.

5   **Q.**   You are a lawyer; am I right?

6   **A.**   Yes, that's right.

7   **Q.**   And you are a lawyer who works at Google?

8   **A.**   Yes.

9   **Q.**   You're a Google employee?

10  **A.**   Yes.

11  **Q.**   And you've been at Google for a little over 9 years now; is

12  that correct?

13  **A.**   Yes, that's right.

14  **Q.**   And your responsibilities include managing something called

15  the Ads Policy Product Counsel Team; is that right?

16  **A.**   Yes, that's right.

17  **Q.**   And as an attorney you are generally familiar with the

18  concept of attorney-client privilege; am I right about that?

19  **A.**   I'm generally familiar, yes.

20  **Q.**   All right.  So attorney-client privilege is a legal concept

21  that protects confidential communications that clients have with

22  their lawyers about requesting legal advice and receiving legal

23  advice; is that fair?

24  **A.**   I think that's generally correct.

25  **Q.**   And when a communication is privileged, it is protected from

1   being disclosed to the other side in a lawsuit like this one,

2   right?

3   **A.**   In some circumstances.

4   **Q.**   In almost all circumstances, right, a privileged

5   communication is supposed to be kept secret within the company

6   and not disclosed in litigation, right?

7   **A.**   I don't think that's always true, but sometimes.

8   **Q.**   Okay.  I'm not asking about sometimes.  My question,

9   Ms. Garber:  It's almost always the case that privileged

10  communications are supposed to be kept secret and not disclosed

11  to the other side in litigation; fair?

12  **A.**   No, that's not my understanding.

13  **Q.**   It's your understanding that these documents are just freely

14  shared in litigation?

15  **A.**   In some circumstances they're shared.

16  **Q.**   Okay.  Just so the record is clear, your view as a lawyer is

17  that privileged communications are not typically withheld in

18  litigation; is that your testimony under oath?

19  **A.**   No, I didn't say typically.  I think it depends on the

20  circumstances.

21  **Q.**   Okay.  So would you please answer the question, Ms. Garber?

22          Typically, privileged communications are withheld from

23   sharing with the other side in litigation, correct?

24  **A.**   In United States litigation normally.

25          **THE COURT:**  I need you to get a little closer to that

 1   microphone, please.

 2          **THE WITNESS:**  Sorry.

 3          **THE COURT:**  Or you can pull it towards you.

 4          All right.  Go ahead.

 5   **BY MR. BORNSTEIN:**

 6   **Q.**   I'm sorry, could you repeat the answer to the question?

 7   **A.**   I think typically in typical United States litigation.

 8   **Q.**   Fair.  Thank you.

 9          Now, will you agree with me that a document doesn't

10    become privileged just because one of the recipients is a

11    lawyer, yes?

12   **A.**   Yes, I agree.

13   **Q.**   As a lawyer you can be part of communications that are not

14   privileged, correct?

15   **A.**   Yes, that's true.

16   **Q.**   And just labeling a document "privileged" also doesn't make

17   the document actually privileged, correct?

18   **A.**   Yes, I agree.

19   **Q.**   Right.  Like if you have a pint of vanilla ice cream and you

20   put a label on it that says "chocolate," it doesn't actually make

21   the ice cream vanilla; fair?

22   **A.**   I think that's true.

23   **Q.**   Right.  The label is just wrong; correct?

24   **A.**   I think that's right.

25   **Q.**   All right.  So privilege depends on the content of the

1  document rather than the label that somebody puts on it, right?

2  A.   It does depend on more than the label.

3  Q.   Right.  It depends on the content, correct, as well as the

4  fact that a lawyer is involved?

5  A.   And the circumstances of the generation, yeah.

6  Q.   Very good.  Now, you, at Google, you have a colleague named

7  Tristan Ostrowski; is that right?

8  A.   Yes, that's right.

9  Q.   And Mr. Ostrowski is also a lawyer?

10  A.   Yes, that's right.

11  Q.   And his responsibilities include supporting the Google Play

12  Store business; is that right?

13  A.   Yes, that's right.

14  Q.   And you and Mr. Ostrowski have, during your time at Google,

15  regularly communicated with one another as part of your job,

16  right?

17  A.   Yes, that's true.

18  Q.   Okay.  Now, you should have a binder in front of you there,

19  and I would like you, please, to turn to Exhibit 6487 in the

20  binder.  There should be a tab that helps you find it.

21  A.   Okay.  I think I have it.

22  Q.   Great.  And this is a Google Chat communication that you had

23  with Mr. Ostrowski in January of 2021; is that correct?

24  A.   Yes, that looks right.

25       MR. BORNSTEIN:  Your Honor, I move the admission of

1    Exhibit 6487, please.

2           MS. CHIU:  Your Honor, we don't have objections.  We

3    just have -- I just wanted to confirm we have an agreement only

4    certain portions of this document will be shown to the jury.

5           MR. BORNSTEIN:  Correct.

6           MS. CHIU:  No objections.

7           THE COURT:  You know which portions?

8           MR. BORNSTEIN:  We have discussed in advance, Your

9    Honor.  Yes, we have.

10          THE COURT:  Admitted on that basis.  Go ahead.

11                         (Trial Exhibit 6487 received in

12                          evidence.)

13   BY MR. BORNSTEIN:

14   Q.   Thank you.  Now, Ms. Garber, we have this chat to look at

15   because either you or Mr. Ostrowski had your history set to "on"

16   while this conversation was happening, right?

17   A.   That's correct, for this chat, yes.

18   Q.   Right.  Or at least the portions of the chat that we have,

19   right?

20   A.   Yes.

21   Q.   Okay.  And we've heard a lot of discussion about chat in the

22   courtroom, so I'm going to spare people, but just one or two

23   questions.

24          Google Chat is a communication method where you can

25    have substantive business communications with your colleagues,

1    correct?

2    **A.**   Yes, you could have any type of communications.

3    **Q.**   Right.  And you, in fact, do have substantive business

4    communications with your colleagues over Google Chat, right?

5    **A.**   Yes.

6    **Q.**   That said, Google Chat is a forum where people tend to be

7    more candid and informal in their communications, correct?

8    **A.**   I would say informal, but not necessarily more candid.

9    **Q.**   Well, you say things in chat that you may not feel

10   comfortable putting in an email, correct?

11   **A.**   No, that's not really my understanding.

12   **Q.**   All right.  Well, let's take a look at this chat then,

13   Ms. Garber.

14           Can we have that published, please?  I want to look at

15    page 12.  Thank you.

16           And I want to just clear out one administrative thing

17    first.  Do you see, we have on the screen there's a chat from

18    you that ends with something that has a bunch of funny

19    characters in it, an ampersand, a hatch sign, a 39, and a

20    semicolon; do you see that?

21   **A.**   Yes.

22   **Q.**   Okay.  Do you understand that's just kind of supposed to be

23   an apostrophe, and what you were saying there is "Let's get

24   Jonathan to dial in?"

25   **A.**   Yes, I think that's right.

GARBER - DIRECT / BORNSTEIN

1    Q.   Okay.  It comes up this way all through the document, and I
2    want to be sure we're reading it and understanding it the same
3    way, so I appreciate that.
4              So let's take a look, if we can, at the next chat
5        down, which is also from you that says, "Ads team is freaking
6        out about some Play VP escalation."
7              Do you see that?
8    A.   Yes.
9    Q.   Okay.  And the ads team refers to your area of the business,
10   correct?
11   A.   Yes, that's right.
12   Q.   And "Play" refers to the Google Play Store, right?
13   A.   Yes, I think so.
14   Q.   And Play VP means someone who has a vice-president title
15   within the Play organization, correct?
16   A.   Yes, I think that's right.
17   Q.   And you were writing this to Mr. Ostrowski because he had
18   responsibilities in connection with the Play Store, and you
19   wanted to connect with him on this issue, correct?
20   A.   Yes, that's right.
21   Q.   And this idea of escalation that you referenced, that means
22   that somebody was bringing some issue or disagreement or
23   discussion further up the chain for discussion, correct?
24   A.   Yes, that's right.
25   Q.   And you ask Mr. Ostrowski if he wants to discuss this issue

1  with you, right?

2  **A.**   Yes.

3  **Q.**   And so if we can go a little further down in the chat,

4  Mr. Ostrowski responds and he says, "Oh, yeah, I can discuss.

5  What is it?"  He asks you, right?

6  **A.**   Right.  Yes.

7  **Q.**   And you say in response, even further down:  "I haven't been

8  fully looped in either," right?

9  **A.**   Right.  Yes.

10  **Q.**   Okay.  So at this point in time you were not really terribly

11  aware of what the issue was that you had raised with

12  Mr. Ostrowski to discuss, correct?

13  **A.**   Yeah, I was somewhat aware, but I think not fully aware.

14  **Q.**   Okay.  So let's go to the next page, and on the next page of

15  the document you say to Mr. Ostrowski, "so far as I can read it."

16  And then you proceed to explain what the issue was, right?

17  **A.**   Yes.

18  **Q.**   Okay.  And you say, "so far as I can read it," because you

19  were working off of an email that you had been sent without any

20  other context about this issue, correct?

21  **A.**   I, I don't remember fully, but I don't think I had much

22  other context, if any.

23  **Q.**   Okay.  And you go on to describe the issue.  And in the next

24  chat you say that you understood that it related to prohibiting

25  ads leading to non-Play downloads with a couple of exclamation

1    points.

2              Do you see that?

3    **A.**   Yes.

4    **Q.**   All right.  But then it seems that Play and Ads, as you put

5    it, settled for some reasonable intermediate policy, right?

6    **A.**   That's right.

7    **Q.**   And I want to drop down then to the bottom or near the

8    bottom of this page where you say despite that settlement, so to

9    speak, apparently Play was escalating again because they were mad

10   about some things, correct?

11   **A.**   Yes, that looks right.

12   **Q.**   And, again, you say "apparently" because you still -- you

13   didn't know a tremendous amount about what was going on, and you

14   had just received this one email about it, right?

15   **A.**   Yes, I think that's right.

16   **Q.**   And you had not, at this point in time, been consulted for

17   legal advice on this question, correct?

18   **A.**   I can't remember whether or not that's true.

19   **Q.**   Okay.  Well, let's see if I can refresh you by continuing to

20   go down the document a bit.

21              The way that you described at the time the way you had

22     been informed about this is that you had been looped in for

23     "fake privilege," correct?

24   **A.**   Yes, I see I wrote that.

25   **Q.**   Okay.  And what you understood at the time or your belief at

1   the time was that someone had included you on the email because

2   that person knew you were a lawyer, and they believed that

3   including you would make it more likely that the email would be

4   considered privileged, correct?

5   **A.**   I, I think they had a misapprehension about the rules of

6   privilege.

7   **Q.**   Understood.  But your understanding was that this individual

8   who had copied you had a misapprehension about the rules, but

9   copied you for the reasons that I just stated, correct?

10  **A.**   I wasn't sure what the intentions of the person adding me

11  was.

12  **Q.**   Okay.  But you understood that this was a document in which

13  you were copied not for a request for legal advice, but in order

14  to try to establish what you referred to as fake privilege,

15  correct?

16  **A.**   I, I originally wasn't clear on what the request for legal

17  advice was in that email, although when I looked at it more

18  closely I saw there was a --

19          **THE COURT:**  Okay.  Ms. Garber, that's not the

20  question.

21          **THE WITNESS:**  Oh, sorry.  Maybe I misunderstood the

22  question.

23          **THE COURT:**  The question is -- ask it again.

24              Please listen carefully and answer the question that's

25   posed.

1    BY MR. BORNSTEIN:

2    Q.   You believed at the time that you had been copied on this

3    communication because somebody had a misapprehension about the

4    way privilege worked, correct?

5    A.   Yes, that was my initial understanding.

6    Q.   And you referred to that situation, to your colleague

7    Mr. Ostrowski, as an instance of fake privilege, correct?

8    A.   Yes, I did.

9    Q.   And at this point in time you were not even aware of the

10   meeting that had happened that led to the issue that was

11   discussed in this email, right?

12   A.   I don't remember what I was previously aware of.

13   Q.   Well, you say just at the bottom, "So seems like there was a

14   VP meeting yesterday," question mark, right?

15   A.   Yes.

16   Q.   So you were, again, you were intuiting that from this email

17   that you had just been looped in on for fake privilege, correct?

18   A.   I don't recall where I learned about the VP meeting.

19   Q.   All right.  Well, Mr. Ostrowski, let's focus on his response

20   to your email.

21          He doesn't say gosh, what do you mean by "fake

22     privilege," correct?

23   A.   I don't see him saying that.

24   Q.   And he doesn't express any confusion whatsoever about what

25   you meant, right?

1   **A.**   No, I don't see anywhere where he expresses confusion.

2   **Q.**   Right.  And you didn't feel the need to explain to him what

3   you meant, right?  You don't say that anywhere, correct?

4   **A.**   No, that seems correct.

5   **Q.**   Right.  Because you understood that Mr. Ostrowski, in the

6   Play store business, knew full well what fake privilege was,

7   correct?

8   **A.**   I don't think that was my meaning.

9   **Q.**   Well, it was a perfectly well understood concept what fake

10  privilege was, so well understood that you were able to use the

11  term without any explanation to your colleague, and he had no

12  question in response to you about what it meant; fair?

13  **A.**   No, I don't think that's a fair interpretation.

14  **Q.**   Okay.  There are --

15          **THE COURT:**  Ms. Garber, why did you say "fake

16  privilege" in that chat?

17          **THE WITNESS:**  Well, I certainly regret the wording

18  that I used.  I was using --

19          **THE COURT:**  You sure -- okay.  Why did you say -- when

20  you wrote this, why did you say "fake privilege?"

21          **THE WITNESS:**  I meant that I believed privilege had

22  been incorrectly applied by the clients.  What I meant was a

23  mistaken use of privilege.

24          **THE COURT:**  You used the word "fake" rather than

25  "mistaken?"

1          **THE WITNESS:**  Yes, due to the casual nature of the

2    conversation.

3          **THE COURT:**  Go ahead.

4    BY MR. BORNSTEIN:

5    **Q.**   So we can agree chats are indeed more casual conversations,

6    correct?

7    **A.**   In many cases they can be.

8    **Q.**   But this phenomenon of fake privilege that we've been

9    looking at, this was not a one-time event, correct?

10   **A.**   I'm not sure what you mean by that.

11   **Q.**   I mean, you used the words "fake privilege" to describe this

12   situation in other instances, not just in this one chat; am I

13   right?

14   **A.**   I've used those words in other contexts.  I don't know if

15   I was describing the same thing.

16   **Q.**   Sure.  Well, why don't we take a look at Exhibit 6488.

17   That, too, is in your binder.

18   **A.**   Okay.

19   **Q.**   Great.  And this, too, is a chat between you and

20   Mr. Ostrowski, correct?  Same person?

21   **A.**   Yes, that's right.

22   **Q.**   And this chat is dated March 17, 2022, right?

23   **A.**   Yes.

24   **Q.**   So that's a little over a year after the chat that we were

25   just looking at, correct?

1    **A.**   Yes.

2              **MR. BORNSTEIN:**  Your Honor, I'd move the admission of

3    Exhibit 6488, please.

4              **MS. CHIU:**  No objections, pending --

5              **THE COURT:**  Admitted.

6                          (Trial Exhibit 6488 received in

7                          evidence.)

8    **BY MR. BORNSTEIN:**

9    **Q.**   Now, in this chat, you and Mr. Ostrowski are joking around;

10   is that correct?  I'm going to ask you -- sorry.  Let me ask you

11   to look at page 48 of the chat.  And we can put that on the

12   screen, please.

13             And if it helps you for context, you can maybe start

14     reading at 47, but I'm going to ask you about page 48,

15     Ms. Garber.  And my question is just you and Mr. Ostrowski are

16     kind of joking around and being friendly with one another here?

17   **A.**   Yes, I think that's right.

18   **Q.**   Okay.  And you're joking about things like the early morning

19   meetings and the kind of work-from-home situation during the

20   pandemic; is that right?

21   **A.**   Yes, I see us joking about morning meetings.

22   **Q.**   And if we go up a little bit, the second chat in the -- on

23   this page, you say, "I feel like everyone just in 9 hours of

24   meetings a day straight."  Yes?

25   **A.**   Yes.

1   Q.   I know the feeling.  This was a complaint about your

2   workload; fair?

3   A.   Yes.

4   Q.   A good-natured complaint, I acknowledge, but a complaint

5   about your workload?

6   A.   Yes, a complaint about the amount of meetings we had.

7   Q.   Yes, like I said, I sympathize.

8           A little further down you say, "At least ARRIS,

9     A-R-R-I-S, going to take a lot of work off our plate."

10          Do you see that?

11  A.   Yes.

12  Q.   And ARRIS is a group within Google's legal department,

13  correct?

14  A.   I think it sits outside the legal department, but it's a

15  team of lawyers.

16  Q.   Okay.  And they have responsibilities for certain types of

17  things that are within their purview, correct?

18  A.   Yes, that's right.

19  Q.   And you make a joke a little further down.  You say,

20  "They'll do all the counseling, and we'll be on the beach playing

21  bocce," right?

22  A.   Yes.

23  Q.   And Mr. Ostrowski, he understands that this is a joke.  He

24  responds to you a little further down:  "Oh, yeah, they'll do all

25  the hard parts."

1              Right?

2    **A.**   Right.

3    **Q.**   Right.  So meaning the hard parts of the job or the work

4    that they were going to relieve you of doing, this ARRIS group,

5    right?

6    **A.**   Yes, I think that was the substance of the joke.

7    **Q.**   Right.  And then you respond:  "Yeah, like the fake

8    privilege."  Correct?

9    **A.**   That's right.

10   **Q.**   And this was sarcasm, yes?

11   **A.**   Yes.

12   **Q.**   Okay.  But you understood that the ARRIS team was not

13   actually taking over the hard parts of your job, right?

14   **A.**   Sorry.  I'm not totally sure I understand the question.

15   **Q.**   Sure.  I'll back up a little bit.

16             You and Mr. Ostrowski did not think very highly of the

17    ARRIS team; is that fair?

18   **A.**   I don't know if we had a general opinion.

19   **Q.**   Okay.  Well, Mr. Ostrowski says to you, right under the

20   "fake privilege" chat, he says, "definitely not poorly duplicate

21   work and take credit after auditing and indicting."

22             Do you see that?

23   **A.**   Yes.

24   **Q.**   Okay.  That's an unflattering comment he's making about the

25   ARRIS team; is that fair?

1   A.   I think that's fair.

2   Q.   Okay.  And you respond:  "Ha ha, oh my God, that whole thing

3   insane."  Right?

4   A.   It looks like I said that in response to something that's

5   been redacted.

6   Q.   Yes, indeed, I agree, something has been redacted.

7            But you say "Ha ha, oh my God, that whole thing

8    insane."  Correct?

9   A.   Yes.

10  Q.   All right.  So you were at least expressing support or

11  sympathy for Mr. Ostrowski's view about the ARRIS team, correct?

12  A.   I'm not sure if my statement was in response because I'm

13  not sure what's missing.

14  Q.   All right.  Well, let me back up then.

15           Am I right that you did not hold the view that ARRIS

16   was going to be taking over the hard parts of your job?

17  A.   Not fully.

18  Q.   Okay.  And you did not consider the "fake privilege"

19  communications to be a terribly challenging part of your job

20  either; am I right?

21  A.   No, that wasn't part of our job at all.

22  Q.   Indeed.  You were copied on these communications not because

23  your legal advice was being requested, but just because you were

24  a lawyer, correct?

25  A.   I'm not sure which communications you're referring to.

1  Q.   All right.  Well, again, Mr. Ostrowski didn't respond to

2  your second "fake privilege" communication that we have, at least

3  because history is on, again, by asking you any questions about

4  what you meant, correct?

5  A.   Not that I see.

6  Q.   Right.  Because Mr. Ostrowski, who worked in the Play Store

7  Business, was fully aware of the concept at Google of copying

8  lawyers for fake privilege, correct?

9  A.   No, I think it was because that was a sarcastic statement

10  in response to external litigation.

11        THE COURT:  That's not an answer.  Listen to the

12  question and answer it.

13        THE WITNESS:  Okay.  Sorry.  Will you ask it again?

14        THE COURT:  Take the question exactly the same way

15  again.  Put your full attention on it, please, Ms. Garber.

16        THE WITNESS:  Okay.

17  BY MR. BORNSTEIN:

18  Q.   Ms. Garber, Mr. Ostrowski, who worked in the Play Store

19  Business was fully aware of the concept at Google of copying

20  lawyers for fake privilege, correct?

21  A.   No, that's not my understanding.

22  Q.   Your understanding is this was a joke, correct?

23  A.   Yes.

24  Q.   Because fake privilege is funny?

25  A.   No.

1   Q.   Do you know the phrase or the -- I'll do a little

2   Shakespeare if I can:  Many a true word has been spoken in jest?

3   A.   I'm not familiar with that quotation.

4   Q.   I'll take it out of Shakespeare.  In every joke there's a

5   kernel of truth, right, Ms. Garber?

6   A.   I don't think I have an opinion on that.

7          MR. BORNSTEIN:  I'll pass the witness, Your Honor.

8          THE COURT:  What did you mean by "fake privilege" on

9   page 48 of this exhibit?

10         THE WITNESS:  It was a reference to external

11   allegations that had recently been -- become public in other

12   litigation where the litigants in that case had accused Google

13   of improperly using privilege, and it was a sarcastic reference

14   to that allegation which I disagreed with.

15         THE COURT:  Pass the witness.

16                    <u>**CROSS-EXAMINATION**</u>

17   BY MS. CHIU:

18   Q.   Ms. Garber, are you assigned to provide legal counsel

19   regarding the Google Play Store?

20   A.   No, I'm not.

21   Q.   And Ms. Garber, have you provided any legal advice regarding

22   Epic Games?

23   A.   Not that I recall.

24   Q.   Have you ever worked on any issues relating to Fortnite?

25   A.   Not that I recall.

1  Q.   And have you been involved in providing legal advice to

2  anyone at Google regarding this litigation between Google and

3  Epic?

4  A.   No, I haven't.

5  Q.   Ms. Garber, were you deposed in this litigation?

6  A.   No, I wasn't.

7  Q.   Now, the Court just asked you about that second chat that we

8  just looked at.  Could you just explain what you meant when you

9  used "fake privilege" in that second chat?

10  A.   Yes, it was a reference to litigation that had recently

11  become public at the time in which the other party claimed that

12  Google had been improperly using the concept of attorney-client

13  privilege, and I had recently become familiar with those

14  allegations and I strongly disagreed with them.  And so I was

15  using the concept here in a sarcastic way to indicate my

16  disagreement with how external parties would portray the work

17  that our team was doing.

18       **MS. CHIU:**  Thank you, Ms. Garber.  I have nothing

19  further.

20                        <u>**REDIRECT EXAMINATION**</u>

21  BY MR. BORNSTEIN:

22  Q.   Ms. Garber, a few very, very brief questions.

23          First of all, the litigation you were referring to

24   that you have now testified prompted your comment in

25   Exhibit 6488, that didn't prompt your "fake privilege" reference

GARBER - REDIRECT / BORNSTEIN

1    in 6487, the prior exhibit, did it, Ms. Garber?

2    **A.**    No, I don't think so.

3    **Q.**    Okay.  And you were asked a few questions about whether you

4    have Play Store responsibilities just now, right?

5    **A.**    Yes.

6    **Q.**    But we agree that Mr. Ostrowski, your correspondent on these

7    "fake privilege" communications, did have responsibilities for

8    supporting the Play Store Business, correct?

9    **A.**    He does counsel Play, yes.

10   **Q.**    Right.  And he is, in fact, all over documents that were

11   exchanged by senior Play Store executives who are going to

12   testify in this case or have already testified in this case,

13   right?

14   **A.**    I don't have any awareness of that.

15   **Q.**    Okay.  Well, we will share that with the jury soon.  Thank

16   you, Ms. Garber.

17        **THE COURT:**  Okay.  You may step down.  Careful on the

18   way down.

19            Who do we have next?

20        **MS. MOSKOWITZ:**  Your Honor, Epic calls Margaret Lam to

21   the stand, please.

22        **THE COURT:**  Okay.

23        **THE CLERK:**  Please stand and raise your right hand.

24                        MARGARET LAM,

25   called as a witness for the PLAINTIFFS, having been duly sworn,

LAM - DIRECT / MOSKOWITZ

1   testified as follows:

2           **THE WITNESS:**  I do.

3           **THE CLERK:**  Thank you.  Please be seated.

4               Please state your name for the Court and spell your

5    last name.

6           **THE WITNESS:**  Margaret Lam, L-A-M.

7           **THE CLERK:**  Thank you.

8           **MS. MOSKOWITZ:**  May I proceed?

9                   <u>**DIRECT EXAMINATION**</u>

10  **BY MS. MOSKOWITZ:**

11  **Q.**   Good afternoon, Ms. Lam.

12  **A.**   Good afternoon.

13  **Q.**   My name is Lauren Moskowitz, and I represent Epic.

14          Do you have a binder in front of you?

15  **A.**   I do.

16  **Q.**   Great.  You joined Google in 2019; is that right?

17  **A.**   That's correct.

18  **Q.**   And your title is Head of Platforms and Ecosystems Strategy

19  for Android; is that right?

20  **A.**   It has been my title for this past year.

21  **Q.**   It's currently your title?

22  **A.**   That's correct.

23  **Q.**   And Platforms and Ecosystems is the product area within

24  Google that includes Android and Google Play, right?

25  **A.**   That's correct.

**LAM - DIRECT / MOSKOWITZ**

1   Q.   And you've been in that group for the last several years?

2   A.   I have.

3   Q.   And over the years you have worked with Jamie Rosenberg?

4   A.   I have.

5   Q.   And you've worked with James Kolotouros?

6   A.   I have not.

7   Q.   You have not worked with Jim Kolotouros at all?

8   A.   Jim, yes, I have.

9   Q.   Okay.  He goes by "Jim?"

10  A.   Sorry.

11  Q.   No, I'm just making sure we're talking about the same

12  person.

13           Jim Kolotouros is in your working world, right?

14  A.   That's correct.

15  Q.   And, in fact, Mr. Kolotouros is the executive who managers

16  Google's OEM Partnerships, right?

17  A.   That's correct.

18  Q.   And you've also worked with Purnima Kochikar and her Google

19  Play Developer Partnerships Team in connection with your job,

20  right?

21  A.   I have.

22  Q.   And you were involved in setting Google's strategy relating

23  to its partnerships with Android OEMs, right?

24  A.   I help support the team, yes.

25  Q.   And you work on aspects of Google's agreements with

1  Android's OEMs, right?

2  **A.**   I do.

3  **Q.**   And that includes the MADA, which is the Mobile Application

4  Distribution Agreements, right?

5  **A.**   That's correct.

6  **Q.**   And you also -- the MADA is one of the types of agreements

7  that Google enters into with OEM Partners, right?

8  **A.**   That's correct.

9  **Q.**   And one of the terms of the MADA requires OEMs to preinstall

10  Google Play and place it on the default home screen of all of

11  their smartphones.  You're familiar with that requirement, right?

12  **A.**   Yes.

13  **Q.**   You also work on Google's Revenue Share Agreements, right?

14  **A.**   That's correct.

15  **Q.**   And those are also known as RSAs?

16  **A.**   Yes.

17  **Q.**   You are involved in Google Strategy for RSAs at Google,

18  right?

19  **A.**   Report to team, yes.

20  **Q.**   And that means you are involved in Google Strategy?

21  **A.**   Yes.

22  **Q.**   You are familiar with the program at Google called RSA 3.0,

23  are you not?

24  **A.**   I am.

25  **Q.**   And RSA 3.0 refers to sets of agreements that Google entered

1    into with Android OEMs, right?

2    **A.**   That's correct.

3    **Q.**   And under those RSA 3.0 agreements, you understand that

4    Google pays Google Play revenue share to OEMs who elect their

5    devices into the Premiere Tier of that program, right?

6    **A.**   That's correct.

7    **Q.**   And you yourself have done work relating to the Google Play

8    revenue share payments under the RSA 3.0 agreements, correct?

9    **A.**   That's correct.

10   **Q.**   You were aware that for an OEM to receive any Google Play

11   revenue share payment under that Premiere Tier, they cannot

12   preinstall any app store on their smartphone other than Google

13   Play, correct?

14   **A.**   That's correct.

15   **Q.**   And you have also done work relating to Google's

16   relationship with Samsung, right?

17   **A.**   That's correct.

18   **Q.**   And are you familiar with Project Banyan?

19   **A.**   Not really.

20   **Q.**   Have you heard that term before?

21   **A.**   I have.

22   **Q.**   And you understand that that was a project that was

23   undertaken at Google to negotiate a deal with Samsung?

24   **A.**   That was before my time.  I'm not aware of that project.

25   **Q.**   At any point in time have you become aware of what that

1    project was about even if it happened before your time?

2    **A.**   At a high level, yes.

3    **Q.**   Okay.  And at a high level you understood that Google was

4    negotiating with Samsung to have Samsung stop offering the Galaxy

5    Store and promote Google Play?

6    **A.**   I'm not aware of those details specifically.

7    **Q.**   You received a litigation hold notice in connection with

8    this lawsuit, correct?

9    **A.**   That's correct.

10   **Q.**   And you were aware that this litigation was filed on

11   August 13th, 2020, are you not?

12   **A.**   Yes.

13   **Q.**   And a litigation hold notice, just so we're all on the same

14   page, is a notice from your employer instructing you to preserve

15   documents that may be relevant for a lawsuit, right?

16   **A.**   That's correct.

17   **Q.**   And you knew that because you were under a legal hold you

18   were required to preserve documents that might be relevant to

19   this lawsuit, right?

20   **A.**   Yes.

21   **Q.**   And that includes documents like instant messages or chats,

22   right?

23   **A.**   I did receive a legal hold, but I would not say I fully

24   understood all the details of it.

25   **Q.**   You understand, do you not, that under a legal hold

1    obligation you have to preserve every form of document that you

2    create in the course of your business about issues relevant to

3    this litigation; do you have that understanding?

4    **A.**   Yes, generally.

5    **Q.**   And Google Chat is an instant --

6              **THE COURT:**  If I may, at the time, Ms. Lam, you

7    received that legal hold, did an attorney explain to you your

8    obligations to preserve documents?

9              **THE WITNESS:**  No.

10   **BY MS. MOSKOWITZ:**

11   **Q.**   Google Chat is an instant message app used by Google

12   employees in the course of their business, right?

13   **A.**   That's correct.

14   **Q.**   And you yourself use Google Chat every day in the course of

15   your work at Google, right?

16   **A.**   That's correct.

17   **Q.**   You use Google Chat to talk about various aspects of your

18   job, right?

19   **A.**   That's correct.

20   **Q.**   You use Google Chat to talk about RSAs, for example.

21   **A.**   That's correct.

22   **Q.**   And you use Google Chat to talk about MADAs as well, right?

23   **A.**   That's correct.

24   **Q.**   And you are familiar with the history settings in Google

25   Chat, right?

1    **A.**    I am.

2    **Q.**    And you know that when history is set to off, chats are

3    permanently deleted every 24 hours, right?

4    **A.**    That's correct.

5    **Q.**    And you also know that your, by default, your history

6    setting is in fact set to off, right?

7    **A.**    That's correct.

8    **Q.**    All right.  Let's just put up Exhibit 10104 in evidence,

9    please, just so we can -- this is what a chat looks like to you

10   when you're chatting with your colleagues at Google, right?

11   **A.**    That's correct.

12   **Q.**    And you see here on the top you're reminded:  "History

13   turned off, messages sent with history off are deleted after 24

14   hours."

15             Do you see that?

16   **A.**    I do.

17   **Q.**    And that's what it looks like when you're chatting at work?

18   **A.**    That's correct.

19   **Q.**    You've received training at Google instructing you to

20   communicate with care, correct?

21   **A.**    I have.

22   **Q.**    And Google trained you to be careful about what you say in

23   writing because your communications could end up in court, right?

24   **A.**    Yes.

25   **Q.**    Let's pull up 6056 in evidence.  On page 2 the title of this

 1  training is:  You Said What? - 10 Things to Ensure You're

 2  Communicating With Care.

 3          Do you see that?

 4  **A.**   I do.

 5  **Q.**   And this is Communicating With Care training you received,

 6  right?

 7  **A.**   I may have.  I don't recall this exactly.

 8  **Q.**   You remember receiving the "You Said What?" training, right?

 9  **A.**   Vaguely, but not specifically.

10  **Q.**   All right.  Let's just refresh ourselves.  Page 3, please.

11  This slide states that "Google is constantly in the public eye

12  and the courthouse," right?

13  **A.**   It does.

14  **Q.**   And you've received training telling you that Google is

15  often in the courthouse, right?

16  **A.**   Yes.

17  **Q.**   And this states that "We often have to produce employee

18  communications as evidence, which means your communications can

19  become public at any time."  Right?

20  **A.**   Yes.

21  **Q.**   So you understood through this training that if you said

22  something in writing, that writing could end up produced as

23  evidence in litigation, did you not?

24  **A.**   I received the training, but I'm not sure if I fully

25  remembered the specific training.

**LAM - DIRECT / MOSKOWITZ**

1   Q.  But reading this, you understand that the message here was

2   that if you said something in writing, that writing could be

3   produced as evidence in litigation down the road, right?

4   A.  I see that, yes.

5   Q.  And you know that if you say something in a chat with your

6   history off, that chat can't be produced in litigation, cannot be

7   produced in litigation because those are deleted every 24 hours,

8   right?

9   A.  That's correct.

10  Q.  Let's turn in your binder to 8024.  It will not yet be on

11  the screen.  Let me know when you have it, please.

12  A.  What was the exhibit again?  I'm sorry.

13  Q.  8024, please.

14  A.  I have it in front of me.

15  Q.  This is a Google Chat conversation in which you participated

16  on January 13, 2021, correct?

17  A.  That's correct.

18          MS. MOSKOWITZ:  Your Honor, I move 8024 into evidence.

19          MS. CHIU:  No objections.

20          THE COURT:  It's admitted.

21                      (Trial Exhibit 8024 received in

22                       evidence.)

23          MS. MOSKOWITZ:  Thank you.  Let's put that on the

24  screen, please.

25  \\\

LAM - DIRECT / MOSKOWITZ

```
 1    BY MS. MOSKOWITZ:
 2    Q.   This is a conversation between you and Sophia Lu; is that
 3    correct?
 4    A.   That's correct.
 5    Q.   And Ms. Lu is a Strategic Partnership Manager for Android at
 6    Google; is that right?
 7    A.   That's correct.
 8    Q.   And if you need to take a look, you have it in your binder.
 9    This is a substantive business discussion you were participating
10    in, in this chat, correct?
11    A.   I wouldn't say a substantive.
12    Q.   It involves your work, right?
13    A.   It does.
14    Q.   So by that it's not just friendly chitchat at the
15    watercooler, right?
16    A.   That's correct.
17    Q.   Okay.  So in that sense it's substantive business
18    communication, right?
19    A.   That's correct.
20    Q.   So let's talk about this.  And, again, please feel free to
21    take a look at this.
22         Some of the discussion here is actually relevant to
23     the issues in this case; isn't that right?
24    A.   I'm not sure if it is.
25    Q.   So do you have any information about what this case is
```

1  about?

2  **A.**  Not entirely, no.

3  **Q.**  So you couldn't tell me what sort of topics are or are not

4  relevant to this case?

5  **A.**  My understanding it's related to Epic.

6  **Q.**  Okay.  So you have no understanding about whether it has

7  anything to do with RSAs, MADAs, Google Play, anything like that?

8  **A.**  Not specifically, no.

9  **Q.**  So fair to say that you would not be able to say whether

10  this chat was relevant to this litigation?

11  **A.**  I wouldn't.

12  **Q.**  And if someone left it up to you to decide which of all of

13  your chats to save for this case, you just would not be able to

14  do that, right?

15  **A.**  Sorry.  Can you repeat that question, please?

16  **Q.**  Sure.  So if it were up to you to look through every chat

17  you sent every single day since August 13th, 2020, you would not

18  have the first clue about which of those chats was relevant to

19  this litigation, right?

20  **A.**  My understanding would be anything related to Epic would

21  be related to this case.

22  **Q.**  Okay.  So the only thing you thought you had to preserve for

23  this case was something that mentioned Epic Games?

24  **A.**  That was my understanding.

25  **Q.**  So fair to say that this does not mention Epic Games?

**LAM - DIRECT / MOSKOWITZ**

1   **A.**   That's correct.

2   **Q.**   So if it were up to you, you would have just let this chat

3   get deleted because it wasn't relevant to this case, as you

4   understood it?

5   **A.**   That's my understanding.

6   **Q.**   All right.  Actually, let's talk a little bit about the

7   substance of this discussion we have here.

8              In the middle of the first page, Ms. Lu writes to you

9     that she wanted to check with you if you had done any work on

10    monetization, since you had been super involved in the RSA

11    processes, right?  And it's on the screen, too, if it helps.

12  **A.**   Yes.

13  **Q.**   You understand that monetization refers to how Google makes

14  money from Google's apps on Android, right?

15  **A.**   That's correct.

16  **Q.**   And the RSA reference here is the same Revenue Share

17  Agreements with OEMs, Android OEMs that we just discussed a

18  moment ago, right?

19  **A.**   Yes.

20  **Q.**   And at the top of the second page you wrote:  "More

21  prominent placement for certain services can lead to higher

22  monetization."

23            Do you see that?

24  **A.**   I do.

25  **Q.**   And on the third page you continue on, you wrote near the

1  middle:  "You can generally assume prominent placement," and in

2  parens you have "hotseat/DHS, leads to higher usage, and thereby

3  potential monetization if we were to monetize than the PlusOne

4  screen."

5          Do you see that?

6  **A.**    I do.

7  **Q.**    Okay.  Let's break that down a little.  There's a lot in

8  there.

9          So DHS.  DHS refers to the default home screen of an

10  android device, right?

11  **A.**    That's correct.

12  **Q.**    And the default home screen is the most prominent screen on

13  a phone, right?

14  **A.**    It is a prominent screen, yes.

15  **Q.**    It's the most prominent screen on a phone, right?

16  **A.**    Yes.

17  **Q.**    And it's more prominent than the PlusOne screen, which is

18  the screen a user sees if they swipe to the left from the home

19  screen, right?

20  **A.**    That's correct.

21  **Q.**    And the hotseat that you refer to here is that area on the

22  bottom of a phone that's there all the time no matter which way

23  you're swiping, right?

24  **A.**    That's correct.

25  **Q.**    Now, what you're saying here in this chat that we're looking

1    at is that when apps are preinstalled on the default home screen,

2    as opposed to less prominent screens, those apps will be used

3    more by the phone owners, right?

4    A.   Yes.

5    Q.   And, in turn, if the apps that are preinstalled on the

6    default home screen happen to be apps that sell things, more

7    usage will result in more revenue for the app developer, right?

8    A.   It could, yes.

9    Q.   Well, Google Play is an app that Google monetizes, right?

10   A.   That's correct.

11   Q.   And you were aware, of course, that one of the requirements

12   Google imposes in the MADA is that OEMs must place Google Play on

13   the default home screen of the OEM device, right?

14   A.   That's correct.

15   Q.   They cannot, even if they want to, they cannot place Google

16   Play on the PlusOne screen, correct?

17   A.   That's correct.

18   Q.   So the requirement that Google Play be placed on the default

19   home screen for all OEMs who sign a MADA leads to higher usage

20   and higher monetization for Google Play, correct?

21   A.   I do not know the stats specifically.

22   Q.   That's what your chat is implying, isn't it?

23   A.   That's a general statement, but I'm not sure if it's true

24   exactly for Google Play.

25   Q.   Okay.  So you think it's generally true, but Google Play

1   might be an exception to that general rule?

2   **A.**   I'm not sure.  I don't do the data for it.

3   **Q.**   Okay.  But you understand why it's a requirement in the

4   MADA, do you not?

5   **A.**   I do know it's a requirement in the MADA.

6   **Q.**   Do you know why it's a requirement in the MADA; don't you

7   also know that?

8   **A.**   I was not part of the decision to make that in the MADA.

9   **Q.**   You were being asked about placement in monetization in your

10  capacity as your strategy for Android, right?

11  **A.**   I deferred my colleague to talk to finance.  I do not look

12  at this data.

13  **Q.**   Okay.  But you made this statement, and you just can't tell

14  me right now whether you think it's true for Google Play, right?

15  **A.**   I cannot guarantee it, no.

16  **Q.**   All right.  Let's go back to the second page a little bit

17  more than halfway down.  Ms. Lu writes:  "I'd be interested to

18  know more if you have a document or a summary of how placement

19  impacts monetization."

20          Do you see that?

21  **A.**   I do.

22  **Q.**   And you write:  "Unfortunately, I do not have a specific doc

23  [document] detailing that out."

24          Do you see that?

25  **A.**   I do.

1    Q.   And you give a reason why you don't have that document,

2    don't you?

3            You say the reason why you don't have a document

4     laying all this out was "competition legal might not want us to

5     have a document like that at all," right?

6    A.   I see I wrote that, yes.

7    Q.   And you put a smiley face after that, right?

8    A.   Yes.

9    Q.   So you understood, you were trained well that Google did not

10   want you to create documents and records about how placement

11   impacts monetization and how that may relate to the requirements

12   Google imposed on OEMs; isn't that right?

13   A.   I did not get specific training on that specifically, no.

14   Q.   You didn't get training on this exact thing specifically,

15   but you did get training about not putting documents in writing

16   when it might end up in a courtroom, right?

17   A.   I would not say that's an accurate representation.

18   Q.   That's not in the Communicate With Care training we just

19   looked at?

20   A.   I don't remember exactly the words from it, no.

21   Q.   All right.  We talked about the fact that as of August 13th,

22   2020, you were under a legal obligation to preserve evidence for

23   this lawsuit, right?

24   A.   That's correct.

25   Q.   And, again, that meant that you were under a legal

1  obligation not to destroy evidence related to this case, right?

2  A.   That's correct.

3  Q.   And please turn in your binder to Exhibit 6464, please.

4       Are you there?

5  A.   Yes.

6  Q.   Thank you.  This is a Google Chat conversation that you

7  participated in on February 16, 2021, correct?

8  A.   That's correct.

9       MS. MOSKOWITZ:  Your Honor, I move 6464 into evidence.

10      THE COURT:  It's admitted.

11                        (Trial Exhibit 6464 received in

12                         evidence.)

13 BY MS. MOSKOWITZ:

14 Q.   This is after the legal hold obligation arose for this case,

15 correct?

16 A.   That's correct.

17 Q.   And the chat begins here with "Thanks, Parag;" do you see

18 that?

19 A.   I do.

20 Q.   And that's Parag Ladhawala?

21 A.   That's correct.

22 Q.   And at this time Mr. Ladhawala worked in OEM Partnerships,

23 right?

24 A.   I'm not sure if I remember where he worked.

25 Q.   You were communicating with him in the capacity of your work

**LAM - DIRECT / MOSKOWITZ**

1  at Google?

2  **A.**   I don't work with him normally, no.

3  **Q.**   All right.  But you're communicating with him about work,

4  right?

5  **A.**   Yes.

6  **Q.**   All right.  So whatever Mr. Ladhawala had said to you before

7  you wrote "Thanks" doesn't appear in this document; do you see

8  that?

9  **A.**   I do.

10  **Q.**   So up to this point the chat history had been turned off,

11  correct?

12  **A.**   Yes.

13  **Q.**   So all of the messages, whatever you guys were talking

14  about, was deleted after 24 hours, correct?

15  **A.**   That's correct.

16  **Q.**   So after you said "Thanks," you realized history was turned

17  on.  You say "Would it be too much to ask you to turn history

18  off;" do you see that?

19  **A.**   I do.

20  **Q.**   So you were telling Mr. Ladhawala to flip that switch back

21  to history off, right?

22  **A.**   Yes.

23  **Q.**   You did not want to preserve this conversation, correct?

24  **A.**   Yes.

25  **Q.**   You were discussing the MADA agreements in here.  We see at

 1    least one line that did show up, you see that there, "wanted to

 2    keep the MADA?"

 3    A.    I do see that.

 4    Q.    All right.  So fair to say that you were discussing the MADA

 5    in this chat?

 6    A.    I don't remember exactly, but I see the reference here,

 7    so, yes.

 8    Q.    Your interpretation of that is that MADAs were being

 9    discussed in this chat off the record, right?

10    A.    Yes.

11    Q.    And he said he wanted to keep the MADA info for reference,

12    that's why he turned history on, right?

13    A.    Yes.

14    Q.    So after you asked for history to be turned back off, you

15    wrote, quote, lots of sensitivity with legal these days, and

16    there's that smiley face again; do you see that?

17    A.    I do.

18    Q.    So you were saying that you wanted history to be turned off

19    specifically because of legal sensitivity, right?

20    A.    That's not exactly what I meant.

21    Q.    Well, that's what you said, right?

22    A.    That's correct.

23    Q.    All right.  And so you wanted to keep your chat about the

24    MADA specifically off the record, right?

25    A.    Yes.

LAM - DIRECT / MOSKOWITZ

1 **Q.** So Mr. Ladhawala wrote:  "Okay.  Can do," right?

2 **A.** Yes.

3 **Q.** All right.  Now let's just pull that back to full screen.

4 That's the last message in this document, right?

5 **A.** It is.

6 **Q.** So Mr. Ladhawala did in fact turn history off, correct?

7 **A.** That's correct.

8 **Q.** And everything you chatted about before he turned history on

9 and then again after he turned history off, including everything

10 you discussed about the MADA was permanently deleted, correct?

11 **A.** That's correct.

12 **Q.** We can take that down.

13   Now, the chat we just looked at was not the only time

14 that you've told your co-workers to turn their chat history off,

15 right?

16   **THE COURT:**  Okay.  Let's take our afternoon break, and

17 we'll be back at -- let's do 2:20 so we can wrap up for the day

18 on time, okay?

19   **THE CLERK:**  All rise.

20   (Proceedings were heard out of presence of the jury:)

21   **THE COURT:**  All right.  You're under oath on the

22 break.  You may not speak to anyone about anything you're

23 testifying about, including the manner or style or presentation

24 of your testimony, okay?

25   **THE WITNESS:**  Understood.

1          THE COURT:  You can step down.

2          MR. POMERANTZ:  Your Honor, I'm sorry to bother you.

3    Over here.

4          THE COURT:  Yes.

5          MR. POMERANTZ:  There is one brief document related --

6          THE COURT:  You can --

7          MR. POMERANTZ:  It doesn't concern this witness, Your

8    Honor.

9          THE COURT:  That's okay.  You can just step outside

10   and enjoy your break.  Yes.

11         MR. POMERANTZ:  There's one brief document issue.  I

12   don't know if you want to take it up now.  It's about the next

13   witness, not this one, and it's just a sealing issue.  I hope

14   it's the last one you have to deal with on short notice, but

15   because of the timing of your message yesterday --

16         THE COURT:  Let's have it.

17         MR. POMERANTZ:  All right.  It's Exhibit 1065,

18   Exhibit 1065 and Exhibit 624.  I'll hand it up to Your Honor in

19   a second.  You don't have it.  I'm about to hand it up to you.

20              All right.  Here, I'll just use this.

21              I'm sorry, Your Honor.

22         THE COURT:  That's fine.

23         MR. POMERANTZ:  I'll give Ms --

24         MS. MOSKOWITZ:  I have it.

25         MR. POMERANTZ:  You have it?

1          **MS. MOSKOWITZ:**  Yes.

2          **THE CLERK:**  Thank you.

3          **THE COURT:**  Thank you.

4          **MR. POMERANTZ:**  Your Honor, Exhibit 1065, which is the

5    shorter one on top, this summarizes deal terms between Google

6    and Samsung.  These are active deals, and these are among the

7    most sensitive agreements that are in the Android space.  And

8    the terms of this deal would affect competition involving Apple

9    and other companies like Amazon and Microsoft, and I think it

10   would be harmful to the competitive process to allow these

11   terms.

12         **THE COURT:**  It's almost exactly three years old.  This

13   was created on November 14 -- November 4, 2020, so

14   November-something 2023, so it's three years out of date.

15         **MR. POMERANTZ:**  It's three years out of date only in

16   the sense of when it was created, but it is active deal terms

17   that would affect competition if disclosed.

18          And so we would -- we don't have any problem with

19    the -- with plaintiffs showing it to the jury.  We have hard

20    copies to hand out, but we would ask that the financial deal

21    terms not be disclosed in open court.

22         **THE COURT:**  Well, all right.

23         **MS. MOSKOWITZ:**  Your Honor, I think I was going to

24   start where you did.  I think that the fact that there's --

25   this isn't even a contract.  This is a summary all about the

**LAM - DIRECT / MOSKOWITZ**

 1  gives and the takes.

 2          **THE COURT:**  The TLDR summary.  Go ahead.

 3          **MS. MOSKOWITZ:**  Yes, yes.  We've learned a lot about

 4  that.

 5          **THE COURT:**  Yes.

 6          **MS. MOSKOWITZ:**  And, you know, explaining in here

 7  what's different from when Mr. Pichai last reviewed it, and,

 8  you know, it's cumbersome to try to dance around this in court.

 9          **THE COURT:**  Who is this for?

10          **MS. MOSKOWITZ:**  Mr. Kolotouros, who is the witness

11  right after Ms. Lam?

12          **THE COURT:**  How much longer with her?

13          **MS. MOSKOWITZ:**  I would think ten minutes, less maybe.

14  We will be definitely getting to Mr. Kolotouros today.

15          **MR. POMERANTZ:**  Yeah, and Mr. Kolotouros is very

16  familiar with this.  These do reflect active deal terms, and

17  I'm sure he would be able to explain the very sensitive nature

18  of these terms and how it could affect ongoing competition in

19  this space.

20          **THE COURT:**  Competition with whom?

21          **MR. POMERANTZ:**  Competition with Apple, competition

22  that Amazon or Microsoft or others who deal with both Samsung

23  would -- who deal with Samsung, it would affect them.  And I

24  think it would be harmful to the process of ongoing

25  negotiations and deals that might relate to the same general

 1  value that's reflected in this deal.

 2        **THE COURT:**  How long is that person going to go?

 3        **MS. MOSKOWITZ:**  I think I probably have an hour 15

 4  myself with him, if not a little bit more, depending on if I

 5  get a note to wrap it up.

 6        **THE COURT:**  Well, you're going to have to wait till

 7  Monday, okay?

 8        **MS. MOSKOWITZ:**  Okay.

 9        **THE COURT:**  Just save this one for Monday.

10        **MS. MOSKOWITZ:**  Okay.

11        **THE COURT:**  And I'll see if I can do it Sunday.  I

12  can't guarantee I'll have it done by Monday, but I'll look at

13  it.

14        **MR. POMERANTZ:**  And 624 is another document that has

15  some of the confidential information relating to Samsung and

16  Google on various slides.

17        Ms. -- you know, Ms. Moskowitz has agreed not to use

18  certain pages, but basically the appendix, but the pages before

19  that do contain some confidential deal terms involving Samsung.

20        **THE COURT:**  Which page?

21        **MR. POMERANTZ:**  Most of them.  You know, we are

22  particularly concerned about what's referred to as TAC

23  information, which is on a handful of pages.

24        **MS. MOSKOWITZ:**  And this one, Your Honor, is just

25  absolutely unmanageable.  They've asked for nearly every page

1   in this first 25 pages to be sealed.  I'm using this document

2   extensively.

3          THE COURT:  This is a June 2019 document?

4          MS. MOSKOWITZ:  Presented to the Business Counsel,

5   Your Honor.

6          THE COURT:  So I don't understand the competitive --

7   just give me one concrete example of a competitive risk.

8          MR. POMERANTZ:  So I believe the competition regarding

9   the acquisition costs, for example, on slide 624-04.

10         THE COURT:  Okay.

11         MR. POMERANTZ:  That bottom chart, I don't know that

12  Ms. Moskowitz is intending to ask about it, but the numbers at

13  the bottom there is sensitive information.

14         MS. MOSKOWITZ:  I gotta say, Your Honor, it's

15  frustrating to hear this.  I did specifically ask if there was

16  a one line or something very specific that they wanted to ask

17  me about if I was going to do, I was happy to take that back.

18  I got a list of slides, and it was a long list of slides.  I

19  did try to raise this.

20              I would like to use this document freely with

21   Mr. Kolotouros and not have to modify my entire examination.

22         THE COURT:  Well, what is this going to show, just at

23  a high level?

24         MS. MOSKOWITZ:  This goes through at a high end and a

25  low level exactly what was being presented to the Business

1   Counsel about their motivations, why they were offering, what

2   they were offering, and how that was going to block competition

3   on Android.  Has nothing to do with Apple, that we'll

4   definitely establish, and there are multiple slides to walk

5   through to get to that point.

6          **MR. POMERANTZ:**  And, again, Your Honor, most of the

7   text is not something that we would object to.  It's a lot of

8   the financial information that is interspersed throughout the

9   document.

10         **THE COURT:**  Why do you need the financial information?

11         **MS. MOSKOWITZ:**  I may not need some of it.  The TAC

12  thing is the first I'm hearing about it.  I'd have to go back

13  now to look at every single slide that I'm intending to use.

14  If they wanted to propose redaction of one line here and there,

15  I might absolutely be able to do that, but there's a lot of

16  financials.

17         **THE COURT:**  Okay.  Well, I'm not going to do this

18  right now.  This thing is 40 pages long to begin with.  So what

19  do you want to do?

20         **MR. POMERANTZ:**  Your Honor, if I could suggest, you

21  know, there's probably other -- a lot to her examination that

22  we could get done after this witness is off the stand, and

23  leave these two documents for Monday, and then we can try to

24  work something out.

25         **MS. MOSKOWITZ:**  Your Honor --

1    **THE COURT:**  We're not ending at 2:30 or 2:40 today.

2    **MR. POMERANTZ:**  No, no, no, I'm saying he'll come in.

3    There's a lot of things she can ask him that don't relate to

4    these two documents.

5    **THE COURT:**  How do you know that?  It's her exam.

6    **MR. POMERANTZ:**  Because I have a whole binder of

7    exhibits that they gave to me.

8    **MS. MOSKOWITZ:**  Well, I think Your Honor is properly

9    pointing out that I may be doing this fairly early and it fits

10   in a spot.

11           I think that during the break I'm going to go look and

12    see if I can reshuffle.  I did try to raise these yesterday

13    afternoon to just avoid this exact issue.

14   **THE COURT:**  Is there a deposition or something we can

15   play?

16   **MS. MOSKOWITZ:**  Let us take that back, Your Honor, and

17   see if we can --

18   **THE COURT:**  Maybe -- look, I understand trial flow,

19   but maybe there's something you can just play.  Do you have

20   like a 40-minute one we can do?

21   **MS. MOSKOWITZ:**  I think we do, Your Honor.  Let us

22   look at that.

23   **THE COURT:**  Think of that, okay, and then we can be

24   more deliberative about this, all right?

25   **MS. MOSKOWITZ:**  Thank you, Your Honor.

```
 1              MR. POMERANTZ:  I appreciate it, Your Honor.  Thank
 2    you very much.
 3                    (Recess taken at 2:12 p.m.)
 4               (Proceedings resumed at 2:26 p.m.)
 5              MS. MOSKOWITZ:  Your Honor, I take it we cannot have
 6    anymore conversation about this sealing issue since you're
 7    bringing the jury in?
 8              THE COURT:  No.
 9                 (Proceedings were heard in the presence of the jury:)
10              THE COURT:  Okay.  Go ahead.
11              MS. MOSKOWITZ:  Thank you, Your Honor.
12    BY MS. MOSKOWITZ:
13    Q.   Ms. Lam, the chat we just looked at before the break was not
14    the only time that you instructed your co-workers to turn their
15    chat history off, correct?
16    A.   I may have.  I do not recall.
17    Q.   You did so a number of times, didn't you?
18    A.   I may have.  I don't recall exactly.
19    Q.   All right.  Please turn your binder to 8020, please.
20              8020 is a Google Chat conversation that you
21      participated in on September 22, 2021, right?
22    A.   That's correct.
23              MS. MOSKOWITZ:  Your Honor, I move 8020 into evidence.
24              MS. CHIU:  No objections.
25              THE COURT:  It's admitted.
```

 1                    (Trial Exhibit 8020 received in

 2                    evidence.)

 3          MS. MOSKOWITZ:  Let's publish that, please.

 4   BY MS. MOSKOWITZ:

 5   Q.   So this is a group chat, right?

 6   A.   That's correct.

 7   Q.   And group chats also start with history off by default,

 8   right?

 9   A.   That's correct.

10   Q.   And this group chat starts, at least from what we can see,

11   with updated room membership.

12          Do you see that?

13   A.   Yes.

14   Q.   So that means you added someone to the group chat, right?

15   A.   I believe so, yes.

16   Q.   And the person you added had history on, and so turned

17   history on for the group when she was added.  That's your

18   understanding of what's happening here, right?

19   A.   Yes.

20   Q.   And so the first few messages in this chat are from a

21   Ms. Okah?

22   A.   That's correct.

23   Q.   And that's the person you added, right?

24   A.   I don't remember exactly who I added.

25   Q.   All right.  Ms. Okah is a Strategy and Operations Manager

**LAM - DIRECT / MOSKOWITZ**

1    for the Platforms and Ecosystems Business at Google, right?

2    **A.**    That's correct.

3    **Q.**    So Ms. Okah starts talking about various issues including

4    RSAs here; do you see that?

5    **A.**    I do.

6    **Q.**    And this is a substantive business discussion about RSAs,

7    right?

8    **A.**    That's correct.

9    **Q.**    And you respond to her business question; do you see that?

10   **A.**    Yes.

11   **Q.**    So then you send a followup message that says:  "If

12   possible, do you mind turning history off?  Would not like to

13   have a trail of us talking about waivers, et cetera."

14            Do you see that?

15   **A.**    I do.

16   **Q.**    So when you said you "didn't want a trail of us talking

17   about waivers," you meant you did not want to leave a trail, a

18   written record trail of your conversation, correct?

19   **A.**    That's correct.

20   **Q.**    So you wanted your conversation to be deleted after 24

21   hours, right?

22   **A.**    That's correct.

23   **Q.**    Now, after you said that, Ms. Okah wrote:  "Okay, thank

24   you."

25            Do you see that?

1   **A.**   Yes.

2   **Q.**   And she turned history off, right?

3   **A.**   That's correct.

4   **Q.**   All right.  The chats we just looked at are ones where

5   someone other than you turned history on, right?

6   **A.**   That's correct.

7   **Q.**   And the reason the jury can even see those chats is that

8   your history was turned on temporarily, right?

9   **A.**   That's correct.

10  **Q.**   And most of your chats history was turned off the entire

11  time, right?

12  **A.**   I think so.

13  **Q.**   And you talk about RSA-related things all day and you don't

14  have history on for all your chats, right?

15  **A.**   I don't know exactly.

16  **Q.**   All right.  Let's go ahead and look at 6462 in your binder.

17  This is a Google Chat conversation from March 17, 2022 that you

18  participated in, correct?

19  **A.**   That's correct.

20          **MS. MOSKOWITZ:**  Your Honor, I move 6462 into evidence.

21          **MS. CHIU:**  No objections.

22          **THE COURT:**  It's admitted.

23                          (Trial Exhibit 6462 received in

24                          evidence.)

25  \\\

1    BY MS. MOSKOWITZ:

2    **Q.**   All right.  Why don't we, before we walk through this whole

3    thing, do you see where you say one, two, three four -- five

4    lines down:  "I talk about RSA-related things all day and I don't

5    have history on for all of my chats," smiley face, right?

6    **A.**   I see that I have written that, yes.

7    **Q.**   That's the wrong -- five lines down, please.

8              "I talk about" -- five -- there we go.

9              You see where I am:  "I talk about RSA-related things

10    all day and I don't have history on for all of my chats," right?

11    **A.**   Yes.

12    **Q.**   All right.  So for your chats where you had history off, the

13    jury will never see those chats because those conversations were

14    deleted, right?

15    **A.**   That's correct.

16    **Q.**   All right.  Now, let's go back, and we're going to walk

17    through this chat in a little more detail.

18              So right at the top here there's a chat from Ethan

19    Young Chang; do you see that?

20    **A.**   I do.

21    **Q.**   Mr. Chang is a Senior Strategic Partnerships Development

22    Manager at Google, right?

23    **A.**   That's correct.

24    **Q.**   This chat begins with him saying:  "As we are talking about

25    RSA, I've turned on history as per policy."

1              Do you see that?

2    **A.**    I do.

3    **Q.**    So what he was communicating to you was because we are

4    talking about RSAs right now, I am going to turn history on

5    because that's what I'm required to do, right?

6    **A.**    I believe so, yes.

7    **Q.**    But of course, as you can see here, everything that was said

8    about RSAs before this moment are permanently deleted, right?

9    **A.**    That's correct.

10   **Q.**    So you asked Mr. Chang in response to tell you what policy

11   he was referring to that led him to turn history on; do you see

12   that?

13   **A.**    I do.

14   **Q.**    You said, "I'd prefer to have history off."

15             Do you see that?

16   **A.**    I do.

17   **Q.**    So Mr. Chang told you it was his understanding that for

18   anything regarding RSAs, he needed to have history on.

19             Do you see in that next chat there, Legal -- there you

20    go.  Do you see that?

21   **A.**    I do.

22   **Q.**    You told him in response that, what we just looked at:

23   "Well, I talk about RSA-related things all day and I don't have

24   history on for all of my chats," smiley face, right?

25   **A.**    Yes.

1   **Q.**   But he persisted, he said, "We cannot delete it.  I am also

2   on multiple legal holds."

3          Do you see that?

4   **A.**   I do.

5   **Q.**   Well, you write back:  "Okay.  Maybe I take you off this

6   convo," right?

7   **A.**   Yes.

8   **Q.**   So your suggestion or your solution to him wanting to save

9   this document, because he was on a legal hold, was to kick him

10  off of the chat, right?

11  **A.**   That is what I wrote, yes.

12  **Q.**   And you put a laughing emoji by that?

13  **A.**   I did.

14  **Q.**   You told him that you were also on multiple legal holds,

15  didn't you?  You said "As am I," right?

16  **A.**   I did.

17  **Q.**   So you were -- we already know you were on at least one

18  legal hold in connection with this lawsuit as of the date of this

19  conversation, right?

20  **A.**   That's correct.

21  **Q.**   And you had been on that hold -- this hold for at least two

22  years at this point, right?

23  **A.**   I think a little under two years, yeah.

24  **Q.**   All right.  So even though you knew that you were on

25  multiple legal holds, including one for this case, you told

**LAM - DIRECT / MOSKOWITZ**

1  Mr. Chang that you still chatted about RSAs all day with history

2  off, right?

3  **A.**   I did.

4  **Q.**   And Mr. Chang asked you:  "Sorry, why do you prefer to have

5  history off?"  He said, "I think we should have a record of our

6  conversation."

7           Do you see that?

8  **A.**   I do.

9  **Q.**   You disagreed, right?

10  **A.**   I don't recall.

11  **Q.**   Sure.

12  **A.**   I'm trying to read it.

13  **Q.**   You said "Yes," unequivocally, "Yes, I do prefer history

14  off."

15           Do you see that?

16  **A.**   I see that.

17  **Q.**   And at the top of the next page you said you'd "Prefer to

18  move away from this group chat," right?

19  **A.**   Yes, I see that.

20  **Q.**   So by "move away from this group chat," you meant you're

21  going to leave this on-the-record conversation and move to an

22  off-the-record channel that would not be preserved, right?

23  **A.**   That's correct.

24  **Q.**   And you said that "having history on is causing more

25  touchpoints on my end."

1              Do you see that?

2   **A.**   Yes, I do.

3   **Q.**   And you said, "I respect you following your training."

4              Do you see that?

5   **A.**   Yes, I see that.

6   **Q.**   What you were communicating here was that Mr. Chang could

7   follow his legal hold obligations, but you were not going to

8   follow yours; isn't that right?

9   **A.**   I didn't fully understand a legal hold and what it

10  required of me at that time, so I was following what I

11  understood of the legal hold at that time.

12  **Q.**   And your understanding of the legal hold at that time was

13  that even though you were on multiple legal holds, you could

14  still continue to leave on-the-record conversations and go to

15  off-the-record conversations that would be deleted after 24

16  hours.  That was your understanding of the multiple legal holds

17  you were under?

18  **A.**   I would leave history on for the items that I understood

19  to be part of legal hold, I kept those on.

20  **Q.**   Right.  And you really had no idea, in fact, what issues

21  were related to the legal hold you were under, right?

22  **A.**   I had some idea, but not the full idea, no.

23  **Q.**   Right.

24          **THE COURT:**  The prior answer was not clear to me.

25  Would you ask that question again starting with --

 1              **MS. MOSKOWITZ:**  And your understanding?

 2              **THE COURT:**  And your understanding.

 3              Please listen, Ms. Lam, carefully to the question and

 4    try to answer it to the best of your ability.

 5              Yes, just repeat that question.

 6   BY MS. MOSKOWITZ:

 7   **Q.**   And your understanding of a legal hold at that time was that

 8   even though you were on multiple legal holds, you could still

 9   continue to leave on-the-record conversations and go to

10   off-the-record conversations that would be deleted after 24

11   hours.  That was your understanding of the multiple legal holds

12   you were under?

13   **A.**   For the topics not related to legal hold, I could do that.

14   That was my understanding.

15   **Q.**   And on this document someone was telling you that this

16   conversation was relevant to a legal hold, didn't he?

17   **A.**   He did.

18   **Q.**   So you understood that there was a legal hold that covered

19   the matters you were discussing at this time, right?

20   **A.**   I was not entirely clear in this chat on whether or not it

21   was related.

22   **Q.**   Even though someone told you specifically that it was in

23   fact covered by a legal hold?

24   **A.**   That was -- that was Ethan's statement, that's correct.

25   **Q.**   And so he --

1          **THE COURT:**  That wasn't the question.  The question

2     isn't was that Ethan's statement.

3          Ask the question again, please.

4     **BY MS. MOSKOWITZ:**

5     **Q.**  You still understood -- you still didn't understand that

6     that chat was supposed to be preserved even though someone

7     specifically told you that it was in fact covered by a legal

8     hold, right?

9     **A.**  That's correct.

10    **Q.**  Let's turn in your binder to Exhibit 8021, please.

11         8021 is another Google Chat conversation between you

12     and Mr. Chang again, right?

13    **A.**  That's correct.

14         **MS. MOSKOWITZ:**  Your Honor, I move 8021 into evidence.

15         **THE COURT:**  It's admitted.

16                   (Trial Exhibit 8021 received in

17                    evidence.)

18    **BY MS. MOSKOWITZ:**

19    **Q.**  At the top of the sentence -- this is a lengthy chain.  At

20     the top of the second page is a message that you sent on

21     March 18th, 2022.

22         Do you see that?

23    **A.**  I do.

24    **Q.**  This is the day after the conversation we just looked at

25     from March 17?

**LAM - DIRECT / MOSKOWITZ**

1  **A.**   That's correct.

2  **Q.**   You say here that you had been checking on the guidance on

3  history on chats.

4           Do you see that?

5  **A.**   I do.

6  **Q.**   You say, "It sounds like we should preserve history on

7  MADA/RSA/Play-related items versus regular chat."

8           Do you see that?

9  **A.**   I do.

10  **Q.**   And by "regular chat" you mean the off-the-record default

11  chats?

12  **A.**   I meant regular conversation chats.

13  **Q.**   Meaning regular conversations that take place off the record

14  as opposed to being preserved by putting history on, right?

15  **A.**   Do you mind repeating that question?

16  **Q.**   Sure.  By "regular chat," you meant off-the-record chats,

17  which are the default setting, as opposed to specifically putting

18  history on to preserve chats, right?

19  **A.**   I meant the topic of regular chat, meaning if you're

20  chatting about your weekend or anything.

21  **Q.**   Okay.  Let's just be very specific here.

22           You said "It sounds like we should put history on for

23   these subjects versus regular chat," right?

24  **A.**   Mm-hmm.

25  **Q.**   So chats about your weekend have nothing to do with MADA,

**LAM - DIRECT / MOSKOWITZ**

1  RSA, Play, right?

2  **A.**   That's correct.

3  **Q.**   You were drawing a distinction between history on chat for

4  those subjects as opposed to history off chat for those subjects,

5  which you had been doing all day long with your history off, as

6  we just saw, right?

7  **A.**   Do you mind repeating that again?

8  **Q.**   Yes.  You were drawing a distinction here between history on

9  chat for these subjects, MADA, RSA, Play, as opposed to history

10  off chats for those subjects which you had been chatting about

11  all day long with your history off, as we saw in that prior

12  exhibit, right?

13  **A.**   Yes.

14  **Q.**   So you say here "MADA, RSA, Play," you now at least as of

15  this moment understood MADAs, RSAs, and Google Play were covered

16  by your legal hold obligation, right?

17  **A.**   My understanding at that time was the related items, which

18  was -- which was related to Epic in this litigation

19  specifically.

20  **Q.**   I see.  So you still think that you only had to preserve

21  something that said "Epic" even after this -- this chat.  That's

22  your testimony?

23  **A.**   That was my understanding at that time.

24  **Q.**   Okay.  So has Epic signed a MADA?

25  **A.**   I'm not sure.  I don't think so.

1  **Q.**   It's not an OEM, is it?

2  **A.**   No.

3  **Q.**   Right.  So it would not have signed a MADA, right?

4  **A.**   That's correct.

5  **Q.**   And Epic is also not signing RSAs because it's not an OEM,

6  right?

7  **A.**   That's correct.

8  **Q.**   Okay.  And do you have any understanding as to whether Epic

9  was on the Google Play Store at this time?

10  **A.**   I was not aware.

11  **Q.**   Okay.  And you wrote Epic nowhere in this chat, right?

12  **A.**   I did not.

13  **Q.**   All right.  And you continue on to say, because -- that you

14  will, "going forward, ensure that history is on in the event that

15  we chat about MADA/RSA/Play."

16          Do you see that?

17  **A.**   I do.

18  **Q.**   You didn't say "will ensure history is on in the event that

19  we chat about Epic as it relates to the MADA/RSA/Play;" you

20  didn't say that, did you?

21  **A.**   I did not.

22  **Q.**   But your testimony is that that's what you meant?

23  **A.**   That's correct.

24  **Q.**   All right.  Did, after March 18th, 2022, did you start

25  keeping your history on whenever you chatted about RSAs, MADAs or

**LAM - DIRECT / MOSKOWITZ**

1  Google Play?

2  **A.**   I don't recall exactly.

3  **Q.**   Well, you wouldn't have, though, right, unless it mentioned

4  Epic, right?

5  **A.**   That's correct.

6  **Q.**   All right.  Let's turn to 6465, please.  This is a chat

7  conversation in which you participated on March 21, 2022, a few

8  days later, right?

9  **A.**   That's correct.

10         **MS. MOSKOWITZ:**  Your Honor, I move 6465 into evidence.

11         **MS. CHIU:**  No objections.

12         **THE COURT:**  It's admitted.

13                         (Trial Exhibit 6465 received in

14                              evidence.)

15  BY MS. MOSKOWITZ:

16  **Q.**   You received a chat message from Katherine Stolz who works

17  in Strategic Partnerships at Google, correct?

18  **A.**   That's correct.

19  **Q.**   She says here she was "confirming that we are ready to

20  launch with the OEMs," right?

21  **A.**   Yes.

22  **Q.**   And OEMs again are the parties, the counter-parties to MADAs

23  and RSAs, right?

24  **A.**   That's correct.

25  **Q.**   And this conversation is a business conversation, right,

1   about that issue?

2   **A.**   About which issue specifically?

3   **Q.**   About your business.

4   **A.**   That's correct.

5   **Q.**   All right.  And it goes on for a little over a page, right?

6   **A.**   That's correct.

7   **Q.**   On the second and final page of this document you say "That

8   sounds great.  Thanks, Katherine."

9          Do you see that?

10  **A.**   I do.

11  **Q.**   And right after that you have this parenthetical.  It says,

12  "Also, this is pretty silly, but do you mind turning history

13  off?" smiley face.

14         Do you see that?

15  **A.**   I do.

16  **Q.**   And by the way, we'll keep going with that, but I just want

17  to pause here.  Can you also pull up the very next full chat

18  under there next to it.  Yeah.

19         So you see, you wrote "Also, this is pretty silly, but

20   do you mind turning history off?" smiley face.  That's that

21   first line, right?

22  **A.**   That's correct.

23  **Q.**   And then there's this "updated on" line; do you see that?

24  **A.**   I do.

25  **Q.**   And it says "Also, this is pretty silly, but do you mind

**LAM - DIRECT / MOSKOWITZ**

1  turning history off?"  Smiley face; do you see that?

2  **A.**   I do.

3  **Q.**   You added the closed parenthetical, that's the change you

4  made, right?

5  **A.**   That's correct.

6  **Q.**   So you edited the message to make it grammatically correct?

7  **A.**   That's correct.

8  **Q.**   And so what this "updated on" is signaling that there was a

9  change to the prior message, but the system, because history on,

10  saved both the original and the as-edited, correct?

11  **A.**   I see that, yes.

12  **Q.**   Right.  So what this is telling us today is that an action

13  was taken by the user to update the prior chat, and so both

14  appear today, right?

15  **A.**   Yes, I see that.

16  **Q.**   Right.  And if you had hit delete on it, it would have shown

17  up as "deleted on," and it would have contained the same thing,

18  right?

19  **A.**   That's correct.

20  **Q.**   All right.  Now, let's go back to "Sure, happy to."

21          Do you see that?

22  **A.**   I do.

23  **Q.**   All right.  Now, when we scan back out it says -- and

24  then -- well, I guess it doesn't say anything, right?  She turned

25  history off, right?

**LAM - DIRECT / MOSKOWITZ**

1   **A.**   Yes.

2   **Q.**   And the rest of the conversation was deleted, right?

3   **A.**   That's correct.

4   **Q.**   Exhibit 6479 in your binder, please.  That's a Google Chat

5   conversation from September 6th, 2022 that you participated in,

6   correct?

7   **A.**   That's correct.

8        **MS. MOSKOWITZ:**  Your Honor, I move 6479 into evidence.

9        **MS. CHIU:**  No objections.

10        **THE COURT:**  It's admitted.

11                       (Trial Exhibit 6479 received in

12                            evidence.)

13   **BY MS. MOSKOWITZ:**

14   **Q.**   The discussion here is in September 2022, six months or so

15   after that March 18th discussion we looked at earlier; is that

16   right?

17   **A.**   That's correct.

18   **Q.**   You started this conversation with a "Hi" of some sort,

19   right?

20   **A.**   Yes.

21   **Q.**   And this is Shadia Walsh; is that right?

22   **A.**   That's correct.

23   **Q.**   She is -- she?

24   **A.**   She.

25   **Q.**   Thank you.  She is a Design Strategist in the Platforms and

**LAM - DIRECT / MOSKOWITZ**

1  Ecosystems Team; is that right?

2  **A.**   That's correct.

3  **Q.**   And after you send that message you wrote:  "Also, just

4  realized our history is on."

5          Do you see that?

6  **A.**   I do.

7  **Q.**   And you sent an emoji with a monkey with his hands covering

8  his mouth like, "Oh, my."

9  **A.**   I did.

10  **Q.**   And, again, we have another "updated on."  You fixed a typo.

11  You changed it from "is" to "is on," right?

12  **A.**   Yes.

13  **Q.**   And we can see both the original and the one that appeared

14  after you took the action, right?

15  **A.**   That's correct.

16  **Q.**   And then you go on to say, "Can we turn it off, haha,"

17  right?

18  **A.**   I did.

19  **Q.**   And she said, "Yes, let's turn it off," smiley face, right?

20  **A.**   That's correct.

21  **Q.**   And that's the end of this conversation on the record,

22  right?

23  **A.**   That's correct.

24  **Q.**   So whatever you chatted with Ms. Walsh with history off, the

25  jury will never see that, right?

1  A.   That's correct.

2  Q.   646 -- sorry, 6454 in your binder, please.   This is a Google

3  Chat conversation that you participated in on November 9, 2022,

4  correct?

5  A.   That's correct.

6        MS. MOSKOWITZ:   Your Honor, I move 6454 into evidence.

7        MS. CHIU:   No objection.

8        THE COURT:   It's admitted.

9                    (Trial Exhibit 6454 received in

10                    evidence.)

11 BY MS. MOSKOWITZ:

12 Q.   Once again this is after, well after the March 2022 message

13 that you claimed you understood what you needed to do for a legal

14 hold, right?

15 A.   I still did not fully understand what it is after that

16 chat, yes.

17 Q.   Yes, after you said you understood, right?   That's what you

18 said in that March message, that you understood and what you were

19 going to do to ensure compliance?

20 A.   Yes.

21 Q.   Okay.   You received a message from Tim McDowell at Google,

22 right?

23 A.   That's correct.

24 Q.   And Mr. McDowell is a Platform and Ecosystems Strategy

25 Manager who works on Android and Google Play, right?

1    **A.**    Just on Android Play.  Android Strategy, sorry.

2    **Q.**    Okay.  So not involved in Google Play, just Android?

3    **A.**    Just Android.

4    **Q.**    So including OEM Partnerships?

5    **A.**    Not specifically, but on Android Strategy.

6    **Q.**    Okay.  But that includes sort of how to deal with the

7    Android Ecosystem?

8    **A.**    That's correct.

9    **Q.**    And he told you:  "Hey, I turned on history, if it's okay

10   with you."

11             Do you see that?

12   **A.**    Yes.

13   **Q.**    He said he had more RSA questions for you when you had a

14   chance.

15             Do you see that?

16   **A.**    That's correct.

17   **Q.**    So he was turning history on to ask you questions about RSA

18   contracts with OEMs, right?

19   **A.**    That's correct.

20   **Q.**    And, in fact, he includes two questions about RSAs.

21             Do you see that?

22   **A.**    Yes.

23   **Q.**    And you see in this first question there's that waiver

24   concept again that you didn't want a trail of in one of those

25   prior exhibits we looked at, right?

1   **A.**   Waiver, yes, I see it.

2   **Q.**   And that was in one of those earlier documents that you

3   didn't want a trail of waivers, right?

4   **A.**   That's correct.

5   **Q.**   You say, in response:  "Hi, Tim.  If okay, can I ask you to

6   turn history off or turn off history?"  Smiley face.

7          Do you see that?

8   **A.**   I do.

9   **Q.**   And he responded:  "Sure, I understand," right?

10  **A.**   Yes.

11  **Q.**   And, again, like the others, the portion of this

12  conversation that we get to see is over, right?

13  **A.**   That's correct.

14  **Q.**   The entire conversation that you and Mr. McDowell had about

15  the RSAs and his questions permanently was deleted, right?

16  **A.**   That's correct.

17  **Q.**   We can put that away.

18          We've seen a number of times that you've discussed

19   going off the record, and you understand today that you did not

20   comply with your legal obligations to preserve documents, do

21   you not?

22  **A.**   That's correct, my understanding is that I was wrong, yes.

23  **Q.**   And you don't understand that it's funny to destroy evidence

24  that's relevant to a federal antitrust litigation, do you?

25  **A.**   Definitely not, no.

1    Q.   And you know that once your chats are deleted they're gone

2    forever, right?

3    A.   Yes.

4    Q.   And you don't know how many chats that you participated in

5    about issues relevant to this case were deleted, right?

6    A.   I do not recall.

7    Q.   You don't know, right?

8    A.   I don't know.

9    Q.   It could be hundreds or thousands or more, right?

10   A.   I'm not sure how many.

11        MS. MOSKOWITZ:  Pass the witness.

12        THE COURT:  Ms. Lam, just thinking about all your

13   testimony today, do you feel like you got adequate guidance

14   from Google's lawyers about what documents to preserve for this

15   case?

16        THE WITNESS:  From what I know today, no.

17        THE COURT:  Okay.  I asked you earlier if any lawyer

18   ever talked with you about documents that were subject to the

19   litigation hold, and you said no.

20             Let me fine tune that a little bit.  Did any lawyer

21   talk with you specifically about what to do with chats with

22   respect to the litigation hold in this case?

23        THE WITNESS:  Not when I got the legal hold.  I think

24   that was your original question.  When I got the legal hold, no

25   lawyer talked to me then.

1    THE COURT:  Did anybody ever talk to you about whether

2  you should be preserving chats?

3    THE WITNESS:  I'm advised to not speak to privileged

4  conversations with lawyers.

5    THE COURT:  You're talking to the judge.

6    THE WITNESS:  Okay.

7    THE COURT:  And you're going to answer my question.

8    Did anyone ever advise you at any point in this case

9  about whether you should be preserving your chats or not?

10    THE WITNESS:  Yes.

11    THE COURT:  And when did that happen?

12    THE WITNESS:  I don't remember exactly.

13    THE COURT:  Did it happen last week, six months ago, a

14  year ago, what's your best estimate?

15    THE WITNESS:  I honestly don't recall the timing.

16    THE COURT:  You must recall something.  Was it in 2023

17  or 2022?

18    THE WITNESS:  Within the year, probably.

19    THE COURT:  So within the year, but not before then?

20    THE WITNESS:  That's correct.

21    THE COURT:  All right.  Thank you.

22    Okay.

23                    <u>**CROSS-EXAMINATION**</u>

24  BY MS. CHIU:

25  Q.   Ms. Lam, does your work regularly involve making any

1    decisions regarding the Google Play Store?

2    **A.**   It does not.

3    **Q.**   Ms. Lam, were you ever deposed in this litigation?

4    **A.**   No.

5    **Q.**   Now, you received a litigation hold regarding this

6    litigation in September of 2021; is that right?

7    **A.**   That's correct.

8    **Q.**   Oh, excuse me, 2020, I'm sorry.

9    **A.**   2020, yes.

10   **Q.**   And did that litigation hold provide instructions on

11   preserving chat communications?

12   **A.**   That's correct.

13   **Q.**   Now, Ms. Lam, if I could direct you to document 8021 in your

14   binder.  If you look on the second page there is a chat that you

15   sent that counsel showed you just a few minutes ago.

16            Do you see that?

17   **A.**   I do.

18   **Q.**   Does this chat refresh your recollection as to the

19   approximate date when you received additional guidance regarding

20   the litigation hold and preservation of chats?

21   **A.**   It does.

22            **MR. POMERANTZ:**  Your Honor, if I may ask the clerk to

23   let us have access to the technology.  I'm sorry.

24   **BY MS. CHIU:**

25   **Q.**   I'm sorry, Ms. Lam.  Does this chat refresh your

1    recollection of when you received additional guidance regarding

2    the litigation hold and the instructions on preserving chats?

3    **A.**   It does.

4    **Q.**   And when is that date?

5    **A.**   March 18th, 2022.

6           **MS. CHIU:**  Thank you.  Nothing further.

7                    <u>**REDIRECT EXAMINATION**</u>

8    BY MS. MOSKOWITZ:

9    **Q.**   Ms. Lam, you just looked at the document, let's just put it

10   back on the screen, from March 18, 2022, that you were just

11   looking at.  Do you have it open in front of you?

12   **A.**   I do have it.

13   **Q.**   You were just asked if that refreshed your recollection of

14   the date that the judge was asking you about of when you were

15   given guidance on your legal hold?

16   **A.**   That's correct.

17   **Q.**   So did the lawyers tell you that all you had to do was

18   preserve documents if it mentioned Epic?

19          **MS. CHIU:**  Objection, Your Honor.  This calls for the

20   privileged communication.

21          **THE COURT:**  Overruled.  Go ahead.

22          **THE WITNESS:**  Did you mind repeating the question?

23   BY MS. MOSKOWITZ:

24   **Q.**   Sure.  When you were given that guidance from your lawyers

25   that you were referring to and that you said was responsive to

1   the judge's questions, did the lawyers tell you that all you had

2   to do was preserve documents that mentioned Epic?

3   **A.**   No.

4   **Q.**   They didn't tell you that?

5   **A.**   No.

6   **Q.**   But you still had the understanding that all you had to do

7   after getting this guidance was to only preserve documents

8   relating to Epic?

9   **A.**   There was an open question after that call, so it was not

10  confirmed.

11  **Q.**   And it was never confirmed?

12  **A.**   No.

13  **Q.**   So whatever the lawyers told you on that conversation, at no

14  point in time did they ever tell you that you had to preserve

15  more than just documents that contained Epic?

16  **A.**   Do you mind repeating that question one more time?

17  **Q.**   At any point in time did any lawyer for Google, or anyone

18  for that matter, tell you that you were actually under a legal

19  obligation to preserve documents, more documents than just those

20  that contained the word "Epic?"

21  **A.**   There was general guidance, but not a confirmation.

22  **Q.**   The general guidance that you received was what?  I want to

23  know everything that you were told on this call or this

24  discussion.

25  **A.**   It was around MADA, RSA, and Play, and the question was

1  what related things related to that should be held, and there

2  was an open question.  That was not answered to on that, on

3  this day.

4  **Q.**   On any day?

5  **A.**   On any day.

6  **Q.**   You never ever found out that you were supposed to preserve

7  documents about RSAs, MADAs and Plays, even if Epic was nowhere

8  on the page, right?

9  **A.**   I didn't get a confirmed confirmation, no.

10 **Q.**   You got no confirmation whatsoever.  No one told you that,

11 right?

12 **A.**   Not a specific confirmation.

13 **Q.**   Did you get any type of confirmation whatsoever that you had

14 to preserve documents even if they didn't say "Epic?"

15 **A.**   No.

16 **Q.**   You were asked if you were deposed in this case, right?

17 **A.**   That's correct.

18 **Q.**   Do you have any understanding as to why you weren't deposed?

19 **A.**   No.

20 **Q.**   Do you have any understanding about how many documents we

21 got with your name on it?

22 **A.**   No.

23 **Q.**   Would you be surprised we got very few, because you had been

24 destroying your chats every 24 hours with history off, right?

25 **A.**   I'm not sure.

1          **MS. MOSKOWITZ:**  No further questions.

2          **THE COURT:**  Okay.  Step down very carefully.  It's a

3     little bit steep.

4          **THE WITNESS:**  Thank you.

5          **THE COURT:**  All right.  So what do we have next?

6          **MR. BORNSTEIN:**  Your Honor, we were not able to

7     resolve the issue around the document we discussed, and so

8     we'll save that issue.  Instead, we'll have -- instead we have

9     a pre-weekend treat.  We're going to watch some Netflix, and

10    what I mean is we have a deponent who is from Netflix.

11         **THE COURT:**  Okay.  So we're going to round out our

12    half hour.  I want to keep us on track, okay?  I know we got

13    started today and we've been chugging along like a freight

14    train, but it's good.  It's a good thing.  So we're going to

15    have a half hour of one of those video deposition like we saw

16    with the other witness, okay?

17              Thank you.

18         **MR. BORNSTEIN:**  And, Your Honor, would you prefer that

19    we pass out the binders or is it okay if we just use the screen

20    like we did last time?

21         **THE COURT:**  That's fine.

22         **MR. BORNSTEIN:**  Okay.  We do have the binders if it's

23    helpful, but we can use the screen and save the paper.

24              I do have a number of exhibits to move in beforehand

25     when you're ready, Your Honor.

1          **THE COURT:**  Okay.  Does Ms. Clark know?

2          **MR. BORNSTEIN:**  Yes, Ms. Clark has the list.

3          **THE COURT:**  Go ahead and read them.

4          **MR. BORNSTEIN:**  We move the admission of Exhibit 713,

5    2050, 2051, 2052 and 2054.

6          **THE COURT:**  All right.  Any objection?

7          **MR. KRAVIS:**  No objection, Your Honor.

8          **THE COURT:**  All right.  Those are all admitted.

9                         (Trial Exhibits 713, 2050, 2051, 2052,

10                         2054 received in evidence.)

11         **MR. BORNSTEIN:**  And the witness's name is Paul

12   Perryman, P-E-R-R-Y-M-A-N.

13         **THE COURT:**  Netflix, is that right?

14         **MR. BORNSTEIN:**  Yes, Your Honor.

15         **THE COURT:**  Okay.  Go ahead.

16         (Video depo played but not reported)

17         **THE COURT:**  Okay.  That's a wrap for the week.

18         So let's talk a little bit about next week.  The

19   Economic Conference is starting, I think, on Tuesday.  And you

20   may have seen our first atmospheric river is coming in next week

21   as well.

22         So Monday we'll come in at the normal time.  I'm

23   thinking that on Tuesday we might start at 9:30, just to see how

24   it goes, okay?  If it turns out it's no difference in your

25   commute, that will be great, but I don't think that's going to

1   be the case, okay?  So we'll try 9:30 till about 3:45 on

2   Tuesday, because I think getting in earlier is going to be

3   harder than getting out, but we'll see.

4              Now, this is the time when we reflect for a moment, we

5   clear our minds, we put all of this aside, and don't think at

6   all, at all about any of this.  Avoid, as usual, any media

7   coverage whatsoever.  Don't chat with friends, family.  Don't

8   do any research.  Don't do any investigation.  Refresh, relax,

9   get some things done, and I'll see you Monday morning at

10  9:00 o'clock.

11             THE CLERK:  All rise.

12             (Jurors exit courtroom.)

13             (Proceedings were heard out of presence of the jury:)

14        THE COURT:  Okay.  Here is time count.  Plaintiffs

15  have 20 -- 28.5 hours remaining, and defendants have 36.

16             So this is the point where you can start thinking

17  about streamlining.  We've heard a lot, okay?  I'm going to

18  give you some leeway, but I will, if necessary, turn off any

19  cumulative testimony.

20             You have things mapped out for next week.

21             Now, do I have -- there's two Samsung things.  Here

22  they are.  Exhibit 1065 and 624.  Do I have little submissions

23  from everybody on those?

24        MS. MOSKOWITZ:  Not from plaintiffs, Your Honor.

25        THE COURT:  All right.  Well, just file three pages

PERRYMAN - VIDEOTAPED TESTIMONY

1    max, okay?

2         MS. MOSKOWITZ:  Yes, thank you.

3         THE COURT:  You're going to have to do it by tomorrow

4    at 5, all right?

5         MS. MOSKOWITZ:  Will do.

6         THE COURT:  And just three pages.

7            If you've already filed something, Google, and it's

8    more than three pages, I'm not going to read it.  So I'll give

9     you three pages.  You can file it.

10        MR. POMERANTZ:  I would think it's more than three

11   pages, Your Honor.

12        THE COURT:  All right.  If it's three pages or less,

13   don't file anything new, okay?

14           All right.  All set?

15           Okay.  See you Monday.

16        THE CLERK:  All rise.

17               (Proceedings adjourned at 3:36 p.m.)

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF

CALIFORNIA, 450 GOLDEN GATE AVENUE, 16TH FLOOR, SAN

FRANCISCO, CA 94102, DO HEREBY CERTIFY:


        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE,

IS A CORRECT TRANSCRIPT OF MY SHORTHAND NOTES OF THE

RECORD

        OF THE PROCEEDINGS HEREINBEFORE ENTITLED, AND REDUCED TO

TYPEWRITING BY COMPUTER TO THE BEST OF MY ABILITY.


        November 9, 2023


        _____

        Rhonda L. Aquilina, RMR, CRR, CSR 9956