Volume 11

Pages 2104 - 2291

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE          )
ANTITRUST LITIGATION,            )
                                 )   NO. 21-md-02981-JD
_____  )
THIS DOCUMENT RELATES TO:        )
                                 )
EPIC GAMES, INC.,                )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   NO. 3:20-cv-05671-JD
                                 )
GOOGLE, LLC., et al.,            )
                                 )
          Defendants.            )
_____  )

San Francisco, California
Tuesday, November 21, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**<u>APPEARANCES</u>**:

For Plaintiff:

                CRAVATH, SWAINE & MOORE LLP
                825 Eighth Avenue
                New York, New York  10019
      BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
           **YONATAN EVEN, ATTORNEY AT LAW**
           **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
           **MICHAEL ZAKEN, ATTORNEY AT LAW**
           **BRENT BYARS, ATTORNEY AT LAW**
           **ANDREW WIKTOR, ATTORNEY AT LAW**

For Defendants:

                MUNGER, TOLLES & OLSON LLP
                350 South Grand Avenue - 50th Floor
                Los Angeles, California  90071
      BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**
           **KURUVILLA J. OLASA, ATTORNEY AT LAW**
           **NICK R. SIDNEY, ATTORNEY AT LAW**

                MUNGER, TOLLES & OLSON LLP
                601 Massachusetts Avenue NW
                Suite 500 East
                Washington, DC  20001
      BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
           **LAUREN BELL, ATTORNEY AT LAW**

                MORGAN, LEWIS & BOCKIUS LLP
                One Market - Spear Street Tower
                San Francisco, California  94105
      BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**

## <u>I N D E X</u>

Tuesday, November 21, 2023 - Volume 11

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **MORRILL, DONN** | | |
| By Video Deposition (resumed) | 2108 | 11 |
| **ALZETTA, SANDRA** | | |
| By Video Deposition | 2110 | 11 |
| **MICKENS, JAMES WILLIAMSON** | | |
| (SWORN) | 2111 | 11 |
| Direct Examination by Mr. Clarke | 2111 | 11 |
| Cross-Examination by Mr. Olasa | 2164 | 11 |
| Redirect Examination by Mr. Clarke | 2207 | 11 |
| Jury Question | 2214 | 11 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **QIAN, ZHIYUN** | | |
| (SWORN) | 2216 | 11 |
| Direct Examination by Mr. Olasa | 2216 | 11 |
| Cross-Examination by Mr. Clarke | 2251 | 11 |

## <u>E X H I B I T S</u>

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1532 | | 2110 | 11 |
| 2062 | | 2110 | 11 |

1   **Tuesday - November 21, 2023**                    **9:08 a.m.**

2                    P R O C E E D I N G S

3                        ---000---

4       (Proceedings were heard out of the presence of the jury:)

5           **THE COURT:**  We're all set.  Bring them out.

6       (Proceedings were heard in the presence of the jury:)

7           **THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc.

8   vs. Google LLC, and Multidistrict Litigation 21-2981, In re

9   Google Play Store Antitrust Litigation.

10      Counsel.

11          **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

12  Bornstein for Epic Games.  Today I have Brent Byars, Michael

13  Zaken, Andrew Wiktor, Lauren Moskowitz, and Yonatan Even.

14          **MR. POMERANTZ:**  Good morning, Your Honor.

15  Glenn Pomerantz on behalf of Google, and with me today is

16  Michelle Park Chiu, Lauren Bell, Lara Kollios, Nick Sidney,

17  Jonathan Kravis, and Kuru Olasa.

18          **THE COURT:**  Okay.  So let's talk a little bit about

19  long-range planning.  All right?  We're making excellent

20  progress.

21      Fact witnesses are going to end today for Epic; right?

22          **MR. BORNSTEIN:**  Correct, Your Honor.

23          **THE COURT:**  Okay.  And then we're going to do the

24  experts.

25      Now, we have been talking internally here about having

1   court on December 1st, a week from Friday.  Let's plan on that

2   because I want to get this done.

3       And remember, I said this during jury selection but let me

4   remind you, we're going to be dark the week of the 5th.  So if

5   anybody has anything happening the week of the 5th, you'll

6   probably be okay, but we're not going to be here the week of

7   the 5th.  All right?

8       So it will be December -- sorry -- the week of the 4th.  I

9   guess it's Monday the 4th.  So the 4th through the 9th,

10  whatever those four days are, five days are, we'll be done --

11  not in.  So if you have something to do, you can probably do

12  it.

13      And then on the 11th we'll be back, and then we'll be very

14  close to closing and deliberations at that point.  Okay?

15      All right.  Okay.  Go ahead.  Who -- oh, we have the

16  Amazon fellow?

17          MR. BORNSTEIN:  Yes, Your Honor.  We'll continue with

18  Mr. Morrill.

19          THE COURT:  Okay.

20              (Video was played but not reported.)

21          THE COURT:  Okay.  Who's next?

22          MR. BORNSTEIN:  Your Honor, we have one more

23  deposition to play.  This is the Spotify witness.  And we have

24  an agreed method, subject to your approval, just to implement

25  Your Honor's rulings on confidentiality.

1           **THE COURT:**  Okay.

2           **MR. BORNSTEIN:**  There are three Q and As where we

3    propose to just mute the video and turn off the transcript, and

4    we have handouts for Your Honor and for the jury just to read

5    those three Q and As when they come up.

6           **THE COURT:**  All right.

7           **MR. BORNSTEIN:**  Thank you, Your Honor.

8       And we have just two exhibits to move into evidence as

9    well as to which there's no objection.

10          **THE COURT:**  So we're a courtroom of the people of the

11   United States.  We do our business in the sunshine so everyone

12   can see what's going on, particularly in antitrust cases which

13   affect a broad variety of people.

14      There are some very limited occasions when there's a

15   compelling reason to protect some information.  I think this is

16   the first time -- it might be the second time -- we're doing it

17   in this case.  So you will see it.  It just won't be broadcast

18   to the rest of the courtroom.  Okay?  That's what we're talking

19   about.

20      Thank you.

21          **MR. BORNSTEIN:**  And for the record while things are

22   being passed out, the witness' name is Sandra Alzetta,

23   A-L-Z-E-T-T-A.

24          **THE COURT:**  Okay.  Go ahead.

25          **MR. BORNSTEIN:**  Your Honor, we would move the

 1   admission of Exhibits 1532 and 2062.

 2          **MR. KRAVIS:**  No objection.

 3          **THE COURT:**  All right.  They're admitted.

 4      (Trial Exhibits 1532 and 2062 received in evidence.)

 5          **MR. BORNSTEIN:**  Thank you.

 6              (Video was played but not reported.)

 7          **THE COURT:**  Stop.

 8      Did that work out?  Yeah?

 9      Okay.  Go ahead.

10          (Video continuing playing but not reported.)

11          **THE COURT:**  Okay.  We'll take our morning break and

12   come back at 10:45.

13          **THE CLERK:**  All rise.

14                  (Recess taken at 10:28 a.m)

15                  (Proceedings resumed at 10:47 a.m)

16      (Proceedings were heard out of the presence of the jury:)

17          **THE COURT:**  Bring them in.

18      (Proceedings were heard in the presence of the jury:)

19          **MR. CLARKE:**  Your Honor, my name is Justin Clarke on

20   behalf of Epic Games, and Epic calls Professor James Mickens.

21          **THE COURT:**  Oh, is this an expert?  No other fact

22   witnesses?

23          **MR. BORNSTEIN:**  Your Honor, we have two video

24   deposition fact witnesses together about a half an hour.  We

25   have some matters we're working out with Google to finalize

 1    those so they can be played without issue --

 2            THE COURT:  Oh, okay.

 3            MR. BORNSTEIN:  -- and we're going to do them right

 4    before the accountants because they'll go together with the

 5    accounting testimony to facilitate everything.

 6            THE COURT:  Okay.  Our first expert witness.

 7            THE CLERK:  Please stand and raise your right hand.

 8                    **JAMES WILLIAMSON MICKENS**,

 9    called as a witness for the Plaintiff, having been duly sworn,

10    testified as follows:

11            THE WITNESS:  I do.

12            THE CLERK:  Thank you.  Please be seated.

13            THE WITNESS:  Thank you.

14            THE CLERK:  Please state your full name for the Court

15    and spell your last name.

16            THE WITNESS:  My full name is James Williamson

17    Mickens, and my last name is spelled M-I-C-K-E-N-S.

18            THE CLERK:  Thank you.

19                    **DIRECT EXAMINATION**

20    BY MR. CLARKE:

21    Q.   Good morning, Professor Mickens.

22    A.   Good morning.

23    Q.   What is your profession?

24    A.   I'm a professor of computer science at Harvard University.

25    Q.   And what subjects do you teach at Harvard?

1    **A.**    I teach a class on operating systems, and I teach a class

2    on computer security.

3         And, by the way, I've prepared some slides which will

4    discuss my qualifications among other things.  I'm not sure if

5    people can see them.  Okay.  There they are.

6    **Q.**    Thank you.

7         Could you tell us a little bit about your educational

8    background?

9    **A.**    Sure.  So I got my bachelor's of computer science at

10   Georgia Tech, and then I went to the University of Michigan

11   also in computer science.

12   **Q.**    Mr. Mickens, what did you do before you were teaching at

13   Harvard?

14   **A.**    Before I came to Harvard, I was a researcher in the

15   Distributed Systems Research Group at Microsoft Research.  So I

16   did that for seven years.  And I was also a visiting professor

17   at MIT in their parallel and distributed operating systems

18   group.

19   **Q.**    Have you published any articles related to your research?

20   **A.**    I have, yes.  I try to publish in top-tier venues that

21   discuss computer security, as well as the construction in the

22   evaluation of large-scale software systems.

23   **Q.**    Do you have any experience related to the area of mobile

24   device security?

25   **A.**    I do.  So I've published several papers that look

MICKENS - DIRECT / CLARKE

1  specifically at issues of mobile security, for example, looking

2  at the propagation of malware on mobile devices, as well as

3  different secure ways to expose smartphone hardware devices,

4  like GPS units or cameras to mobile web pages.

5       **MR. CLARKE:**  Your Honor, Epic Games would like to

6  offer Professor James Mickens as an expert in the area of

7  mobile device security.

8       **MR. OLASA:**  No objection, Your Honor.

9       **THE COURT:**  He is qualified to testify on that topic.

10  BY MR. CLARKE:

11  **Q.**  So, Professor Mickens, what were you asked to do in this

12  case?

13  **A.**  So if we go to the next slide, I discuss my assignment in

14  this case.  So my assignment was to evaluate Android security

15  as it relates to app distribution mechanisms.  And in

16  particular, I was asked to examine whether the friction that

17  Android imposes on non-Google Play Store app installation is

18  justified by legitimate security concerns.

19  **Q.**  And, Professor Mickens, when you use the term "friction,"

20  what do you mean by that?

21  **A.**  By "friction" I just mean the screens, the dialogues, the

22  warnings that an operating system is going to put up and show

23  to users and sort of force the user to click through or

24  interact with before the user can actually accomplish the

25  intended task.

1    **Q.**    And could you summarize your conclusions?

2    **A.**    Sure.  So if we go to the next slide.

3          So here I show a summary of my three conclusions, and so

4    the first conclusion is that the friction that's imposed by an

5    operating system during app installation should be proportional

6    to the likelihood that the app is harmful.  And the way that we

7    would determine the likelihood that an app is harmful is by

8    subjecting that app to a high-quality security review.

9    **Q.**    What was your second conclusion?

10   **A.**    So my second conclusion was that if you look at how

11   friction is imposed on the Android system today, well, the

12   friction that Google currently imposes to installing apps via

13   third-party channels is unwarranted, and it's unwarranted

14   because it's disproportionate to the security risks that are

15   involved during those app installations.

16   **Q.**    And, Professor Mickens, when you use the term "third-party

17   channels," what do you mean by "third-party channels"?

18   **A.**    Oh, so by that I just mean sort of non-preinstalled app

19   stores.

20   **Q.**    Okay.  And did you reach any other conclusions?

21   **A.**    I did.  As we see up there on the slide, I reached a third

22   and final conclusion, which is the following:

23          I think that by making small changes to the way that

24   Android currently works, Google could actually reduce that

25   unwarranted friction that users experience during the app

1  installation process while preserving or even strengthening the

2  status quo of security on Android today.

3  **Q.**   Thank you.

4      So could you preview for us the bases for those

5  conclusions that you reached?

6  **A.**   Sure.  And so if we go to the next slide.

7      And so here I'm showing the bases for my conclusions.  And

8  so the first basis is an observation, and it's the observation

9  that if you look at how Android is designed, apps from both

10  first-party stores and third-party channels are subject to the

11  same on-phone security measures.  And that's important because

12  that means regardless of where a user gets their apps from, the

13  OS is still going to be there trying to protect the user.

14  **Q.**   Okay.  What were your other bases for your conclusions?

15  **A.**   So if we look at that second basis, that's also another

16  observation, and it's the observation that if you look at

17  Google's own self-stated security goals -- right? -- according

18  to their own security experts, those security goals do not

19  treat installation from third-party channels as inherently more

20  dangerous than installation from first-party channels.  And

21  that's important because if that's true, then we shouldn't be

22  putting unnecessarily disproportionate friction on the

23  installation of apps via third-party channels.

24  **Q.**   Are there any other bases for your conclusions?

25  **A.**   Yes.  So we see that up on the slide.

1       So my third basis is another observation.  So it's an

2   observation that if you look at the machine-learning tools that

3   Google uses to detect malware -- these are kind of like

4   artificial-intelligence-type things that look at an app and try

5   to tell if it's malicious -- well those machine-learning tools,

6   they don't actually use the app's distribution channel when

7   calculating the maliciousness score for that app.  And that

8   makes sense because the reason why an app would be malicious is

9   not the distribution channel it came from, but whether what it

10  tries to do to the user's phone.

11  **Q.**   And when you say "distribution channel," what are you

12  referring to?

13       **THE COURT:**  You need to -- just pull that thing

14  towards you.

15       **MR. CLARKE:**  The microphone?

16       **THE COURT:**  Yeah.  Don't crane down.  Just move it to

17  you.  Don't bring yourself to the soup.  Bring the soup to you.

18  Okay?

19       **MR. CLARKE:**  Thanks, Your Honor.

20       **THE COURT:**  Closer.  I can tell it's not close enough.

21       **MR. CLARKE:**  Is that better, Your Honor?

22       **THE COURT:**  You're craning.  Move it toward you like

23  4 inches.  Yeah.  A little more.

24       All right.  Boom it out.

25       **MR. CLARKE:**  How's that?

1          **THE COURT:**  Yeah.

2      And, Professor, if you just slow down.  We have a realtime

3  court reporter, and just 20 percent slower, if you could.

4          **THE WITNESS:**  Yes, Your Honor.

5          **THE COURT:**  Okay.  Go ahead.

6          **MR. CLARKE:**  Thank you, Your Honor.

7  **BY MR. CLARKE:**

8  **Q.**   So, Professor Mickens, I was asking you what you mean when

9  you use the term "distribution channel."

10 **A.**   Right.  So when I talk about a distribution channel, I

11 just mean a mechanism by which a user installs an app on their

12 phone.  So an app store via direct installation, so on and so

13 forth.

14 **Q.**   Can you describe your next basis for your conclusions?

15 **A.**   Sure.  So that's also up there on the screen.

16     So the fourth basis for my conclusions, it's another

17 observation.  And the observation is that according to Google's

18 own employees, according to documents that are in production,

19 we'll see that Google has actually underresourced its security

20 monitoring of off-Play distribution channels.  And that's

21 really important because that means that when Google talks

22 about the sort of larger risks of installation via these

23 third-party channels, well, they've actually under resourced

24 the policing of those channels.

25 **Q.**   And did you have any other bases for your conclusions?

1  **A.**   Yes.   I had a fifth and final basis, which we also see up

2  there on the screen.

3       So it's another observation.   Once again, it's the

4  observation that Google has the ability to identify and review

5  apps at the point of installation.

6       And why is that important?   That's important because, once

7  again, it means that regardless of the installation channel by

8  which apps arise on the user's -- arrive on the user's phone,

9  Google can still determine whether those apps are malicious or

10  not.

11  **Q.**   So, Professor Mickens, what sources did you consider when

12  you were preparing these opinions?

13  **A.**   I list those sources on the next slide, so if we could go

14  there.

15       So here are the five high-level types of sources that I

16  relied upon when sort of handling my assignment.

17       The first source was Google's own source code.   So you can

18  think of these as sort of the instructions that Google

19  developers generate when they're trying to make software like

20  Android.   So I looked at a variety of Google-provided source

21  code.

22       I also looked at a variety of documents from Google that

23  came out of the production process.

24       I looked at some deposition transcripts of Google

25  employees.

1       I also examined Google's public statements to see, you

2   know, sort of what they're telling users and developers just

3   out there in the wild.

4       And, finally, I looked at academic articles where

5   appropriate.

6   **Q.**   Professor Mickens, you mentioned source code.  Which

7   specific types of source code did you look at?

8   **A.**   So on the next slide I enumerate the specific source code

9   that I looked at.

10      So there are three high-level categories of source code I

11  looked at.  The first involves the automated scanning of mobile

12  apps.  So this is the on-device malware scanner that's going to

13  look for evidence that an app is trying to harm your machine.

14      I also looked at Google documentation involving how

15  Android shows notifications to users.

16      I also looked at documentation about how Android handles

17  signatures.  So signatures are a cryptographic idea.  They

18  basically allow us to determine that a particular party saw a

19  particular digital file, and they also allow us to make sure

20  that nobody has tampered with that file.

21      And then the final piece of a source code that I looked at

22  is the AOSP code.  AOSP stands for Android Open-Source Project.

23  You can think of AOSP as forming a big chunk of the Android

24  operating system and, among other things, it provides important

25  security properties.

**MICKENS - DIRECT / CLARKE**

1  **Q.**   Okay.  Thanks.

2       So you referred to the Android operating system.  Could we

3  start by explaining to the jury what the components of the

4  Android operating system are?

5  **A.**   Sure.  So if we go to the next slide.

6       So what I'm showing you here is sort of a high-level

7  overview of what an Android phone looks like.  So all the way

8  at the bottom we have the hardware.  So these are the physical

9  circuits and components like the touchscreen, the storage

10  device, and so on and so forth.

11       Now, up at the top you have the user apps.  So these are

12  the apps that you engage with directly.  This is your e-mail

13  client.  This is a game or something like that.

14       And then in the middle we have the actual Android

15  operating system itself.

16  **Q.**   Okay.  And so there's a bar at the bottom here that says

17  "AOSP Kernel."  Do you see that?

18  **A.**   I do.

19  **Q.**   What is that?

20  **A.**   So AOSP, once again, that stands for Android Open-Source

21  Project.  So this is code that is written and developed by

22  Google.  It forms sort of the bedrock of the Android operating

23  system; and for the purposes of this case, probably the most

24  important thing is that it implements a lot of the key security

25  features that keep users safe.

1   Q.   And above it in the upper left-hand corner there's a

2   square that says "AOSP Middleware."  Do you see that?

3   A.   I do.

4   Q.   And what's that?

5   A.   So at a high level, middleware is kind of like the

6   executive assistant for the kernel.  So apps oftentimes don't

7   submit requests directly to the kernel; they submit it to

8   middleware.  And so that middleware acts as that assistant.

9        So the AOSP middleware, those are sort of helpful

10  functions that are part of AOSP, the project.  So this is also

11  code that is written and developed by Google.

12  Q.   So on the right-hand side there's a square that says "OEM

13  and SOC Middleware."  Do you see that?

14  A.   I do.

15  Q.   And what does that refer to?

16  A.   So that just refers to middleware that is written and

17  developed by either the OEM, so that's basically the person who

18  sells you the phone; and then the SOC, that stands for system

19  on a chip, you can basically think of this as like the hardware

20  vendor.  So there's middleware that's provided by both the OEM

21  and the hardware vendor.

22  Q.   Okay.  And, lastly, in the middle there's a square that

23  says "GMS Middleware."  Do you see that?

24  A.   Correct.

25  Q.   And what is the GMS middleware?

1   **A.**   So GMS middleware, so what does GMS stand for?  It stands

2   for Google Mobile Services.  So this is middleware that is also

3   written and developed by Google.  Unlike the AOSP contents of

4   Android, GMS is closed source.  Okay?  So you can't just go out

5   there and look and see what its contents are.  So GMS

6   middleware is distinct from that open-source AOSP middleware.

7   **Q.**   And does GMS also include any user-facing apps that would

8   appear kind of in that top row there?

9   **A.**   It does.  So it includes a couple different user-facing

10   apps; and, actually, if we go to the next slide, I can sort of

11   show you the breakdown of both the middleware and the

12   user-facing apps that are shown.

13   So --

14   **Q.**   Okay.  Could you explain to us the left-hand column of

15   this slide?

16   **A.**   Yes.  So on the left-hand column of the slide we're

17   showing the middleware that is present inside of GMS.  And so

18   you'll see that there's middleware called Google Play Protect.

19   You'll oftentimes see that abbreviated GPP.  That is the

20   on-device malware scanner.  Okay?  So that's what Google Play

21   Protect is.

22   You'll also see "Package Installer" in that left-hand

23   side.  That's very important with respect to this case.

24   Package Installer is Google-provided middleware that is going

25   to orchestrate the process of installing an app and, in

1  particular, orchestrate that showing of friction screen.  So

2  Package Installer is a very important part of the GMS

3  middleware.

4  **Q.**   Great.  Thank you.

5      And you referenced that there are some user-facing apps as

6  well.  What are those?

7  **A.**   That's right.  So if we look sort of in the little image

8  of the touchscreen, we'll see a bunch of icons for apps,

9  user-facing apps, that are part of GMS.  These are just apps

10  that correspond to popular Google services like Gmail, like

11  YouTube.  You'll also see the Play Store is there as well.  So

12  that's part of the GMS suite as well.

13  **Q.**   So is it possible to market a phone that doesn't use any

14  of the GMS functionality and relies only on AOSP functionality?

15  **A.**   In theory, that's possible, and that's sort of what we're

16  showing off to the right where we show a phone that only uses

17  the AOSP middleware.  It will still use Package Installer

18  because that's part of the AOSP middleware and the GMS

19  middleware; but if you look sort of in the touchscreen area,

20  you'll see that the AOSP-only phone, it can't have Google apps

21  like Chrome, it can't have Google apps like the Play Store

22  because those are part of the GMS services.

23  **Q.**   And do you have a general sense of how many phones out

24  there, generally speaking, use GMS as opposed to AOSP only?

25  **A.**   Yes.  To the best of my knowledge, outside of the Chinese

1  market, all of the popular Android phones that we would all be

2  familiar with in this courtroom, all of those are GMS-licensed

3  phones, to the best of my knowledge.

4  **Q.**   So if you're an OEM that wants to market some sort of a

5  GMS phone, is there anything you need to do from a contractual

6  perspective, to your knowledge?

7  **A.**   There is.  And so I explain this in the next slide.

8      So an OEM can't just take the GMS suite and just put that

9  on the OEM's phone.  Instead, the OEM has to engage in a bunch

10  of contractual arrangements with Google.

11      In the upper right-hand corner we see two examples of

12  those:  The Mobile Application Distribution Agreement,

13  sometimes called the MADA, and also the GMS requirements.

14      For the purposes of this case, probably the most important

15  sort of contractual stipulation here is that the OEM is locked

16  into using the Package Installer middleware.  Remember, that's

17  code written and developed by Google.  The OEM is locked into

18  using that middleware to orchestrate the app installation

19  process on the phone.  So that means that the OEM is locked

20  into using that Google-mandated friction flow.

21  **Q.**   Is there anything that the OEM has to do from a technical

22  perspective in order to comply with the MADA and the GMS

23  requirements?

24  **A.**   Yes.  So Google provides a series of automated tests or

25  tools that verify whether the OEM's version of Android actually

1  satisfies requirements like, you know, using the right version

2  of a Package Installer.  That's what we see in the lower

3  left-hand corner of the screen, Google Test Suites.  So those

4  are just automated pieces of code that look at the OEMs variant

5  of Android and says "Have you satisfied, you know, the various

6  contractual requirements?"

7  **Q.**   So in the upper right-hand corner here there's something

8  that says "Compatibility Definition Document."  Do you see

9  that?

10  **A.**   I do.

11  **Q.**   What is that?

12  **A.**   So that is another example of a requirement that an OEM

13  has to satisfy if they want to sell these GMS-licensed phones.

14  That document, the CDD, Compatibility Definition Document, it

15  enumerates other important characteristics of an Android phone.

16       Among other things, and perhaps most importantly at least

17  for my assignment, that document defines the security

18  properties, the sort of protections that an OEM's version of

19  Android has to implement to keep users safe from potentially

20  harmful apps.

21  **Q.**   And is there anything technically that OEMs have to do in

22  order to comply with the CDD?

23  **A.**   Yes.  So if we look in the lower right-hand corner, we see

24  this Compatibility Test Suite or CTS.  This is another set of

25  automated tests that Google provides and which it will run on

1   an OEM's version of Android to make sure that that variant of

2   Android actually satisfies the security properties and other

3   properties specified by the CDD.

4   **Q.**   So what is your understanding of the significance of all

5   of this for security from Google's perspective?

6   **A.**   Well, here I want to sort of present a quote that's from

7   actual Google security engineers.  So if we go to the next

8   slide.

9       So this is a quote that's taken from an academic paper

10  about security.  It's a paper that is written by Google

11  security engineers.  And so what this paper says in that quote

12  there, it says "Security is a compatibility requirement."

13      And so, you know, what does that mean?  That means that as

14  a result of all those requirements and tests that OEMs have to

15  satisfy, any phone that claims that it is Android licensed and

16  GMS certified has to implement a core set of security

17  properties to prevent users from harm from malicious apps.

18  **Q.**   So, Professor Mickens, I'd like to walk through how it is

19  that apps can come to be on an Android phone.

20      Could you walk through the distribution channels for us?

21  **A.**   Sure.  So let's go to the next slide.

22      So, yeah, let's look at the different types of

23  distribution channels, the different ways that apps can arrive

24  on a user's phone.

25      So the first broad category of distribution channels

1    represents preinstalled app stores.  So these are app stores

2    that are sort of on the phone, you know, by the time that you

3    buy it from whoever it is that sells the phone.

4         And so we see that the Play Store is an example of a

5    preinstalled store, the first-party store in this case, and

6    that's going to be mandatory on GMS devices.  So that has to be

7    on a GMS device.

8         Sometimes you will see other preinstalled stores.  So, for

9    example, on Samsung devices, you may see the Galaxy Store but

10   those are not mandatory, and Google sometimes engages in sort

11   of contractual disincentives to prevent those stores from

12   showing up.

13        So long story short, on a GMS device, you're always going

14   to see the Play Store preinstalled.

15   **Q.**   Thank you.

16        And are there any other distribution channels available on

17   the Android phones?

18   **A.**   There are.  So if we go to the next slide.

19        So here we see third-party app stores.  Okay?  And I'm

20   specifically referring here to third-party app stores that are

21   installed after the fact.  So after you purchase the phone.

22        I just give two examples here.  F-Droid is an example of

23   one of them.  Amazon Appstore is an example of one of them as

24   well.

25   **Q.**   Any other distribution channels that are available?

1    **A.**    Yes.  So if we hit next slide.

2         So here we see instances of what we call a direct

3    installation.  Sometimes you'll hear that referred to as

4    sideloading.  So direct installation just means that you are

5    going to, as a user, find an app via a mechanism that is not

6    billing itself purely as an app store.

7         So, for example, you might go to a developer's website via

8    a browser like Chrome or Mozilla and find the app to install

9    there.  You might also find that in a file manager, something

10   like that.

11        So that's what I mean when I say "direct installation."

12   **Q.**    So, Professor Mickens, if a user wants to directly install

13   an app from a website, how can they tell whether they're

14   actually on the correct website and not some sort of a fake

15   website?

16   **A.**    So as it turns out, web browsers have a variety of

17   mechanisms to try to make sure that users don't accidentally

18   end up at a bad website.  And so I give an example of this on

19   the next slide.  So if we can click through there.

20        So here what we're talking about is https.  So you may

21   have noticed that when you type in a URL.  What does S stand

22   for?  It stands for secure.

23        And, among other things, what the browser is going to do

24   when you go to a site, it's going to look and see:  Is this

25   site implementing that secure version of http?  And if it

1  claims to do so, are there any problems with the way that that

2  site keeps your data safe in terms of encrypting the network

3  traffic?

4       And so here I just give you three examples of warning

5  screens that you might get from three different browsers if you

6  go to a site that isn't properly encrypting the data exchange

7  between your browser and the server.

8       So this is just one example of how web browsers try to

9  prevent issues with users going to harmful sites.

10 **Q.**   So, Professor Mickens, you mentioned three different

11 distribution channels.  Can you tell us what Google's security

12 goals indicate about those different distribution channels?

13 **A.**   Right.  So we talked about those three channels:

14 Preinstalled app stores, postinstalled third-party app stores,

15 and direct installation.

16      And if we go to the next slide, we can see what Google

17 security engineers, from that paper that I mentioned earlier,

18 think about this open ecosystem.

19      They say in this paper, which lays out the security goals

20 for the Android platform, they say, quote (as read):

21           "Both users and developers are part of an open

22      ecosystem that is not limited to a single-application

23      store."

24      So that's interesting; right?  Because it says that, you

25 know, Google security engineers responsible for designing the

1  security mechanisms in Android, they understand that

2  open-ecosystem access is important and they understand that the

3  security mechanisms they build into Android must protect users

4  regardless of the distribution channel by which apps arrive on

5  a user's phone.

6  **Q.**   So I want to talk about the sorts of protections that

7  Android phones have against malware.

8      Could you walk us through what sorts of security

9  protections exist on the device itself?

10 **A.**   Sure.  So if we go to the next slide.

11     So what I'm showing you here are some of the security

12 mechanisms that a phone provides at the hardware level.  So,

13 for example, there's this thing called encrypted data storage.

14 This basically just means that your sensitive information on

15 your device is kept in encrypted or scrambled form.  So if some

16 attacker takes your phone and later on wants to look at it,

17 well, the thief isn't going to see anything reasonable.

18 They'll see garbled data.

19     There's also a technique called verified booting, which

20 prevents malware from tampering with the operating system or

21 other important low-level pieces of software.

22 **Q.**   Does the operating system itself provide any sorts of

23 security protections against malware?

24 **A.**   It does.  And if we go to the next slide.

25     So here we see a bunch of different security mechanisms

1    that the Android OS itself provides.  And so this is not an

2    exhaustive list.  There are a bunch of other security

3    mechanisms that OS provides as well.

4        You know, just looking at a handful of the mechanisms on

5    this slide:  Storage sandboxing prevents one app from stealing

6    data that belongs to another app.

7        If you look at device permissions, that means that if an

8    app wants to use a sensitive piece of hardware on your phone,

9    like the GPS unit or the camera, the OS forces the app to ask

10   for permission, to ask for consent, before that app can access

11   that device.

12       And so there's a bunch of other mechanisms there.  I just

13   want to point out that all of these mechanisms here, they're

14   enforced regardless of whether user apps come from first-party

15   or third-party distribution channels.

16   **Q.**   Do Android phones do any sort of on-device malware scan?

17   **A.**   They do.  So if you go to the next slide.

18       So here you see Google Play Protect.  So that's GPP, the

19   GPP that I called out earlier.  That is the on-device malware

20   scanner, which is going to try to find harmful apps that are on

21   your phone.

22   **Q.**   So what is the relevance of these security mechanisms to

23   the conclusions that you outlined at the beginning of your

24   testimony this morning?

25   **A.**   Well, if we go back to those conclusions, then as sort of

1    a key theme throughout all of those conclusions is that

2    regardless of how an app gets on a user's phone, there are

3    going to be very strong security protections that are applied

4    by the hardware and particularly by the operating system, as

5    well as by Play Protect as well.

6         And so what we see is that, from the perspective of

7    security, regardless of where I get my apps from, first-party

8    channels or third-party channels, there's this wide fleet of

9    protections that are going to be applied regardless of those

10   sources where I get apps from.

11   **Q.**   And does the operating system treat some apps as more

12   trusted than others based on where the apps came from?

13   **A.**   No, it does not.

14   **Q.**   Sundar Pichai, Google's CEO, testified last week that,

15   quote (as read):

16        "If users install by chance the wrong application, it

17        gives full access to your operating system, all your data

18        on the phone."

19        As a mobile device security expert, do you agree with that

20   statement?

21   **A.**   I do not agree with that statement.

22   **Q.**   Why not?

23   **A.**   Well, the reason is because of all of these security

24   mechanisms that I just discussed.  So even if a user does have

25   the misfortunate to download a potentially harmful app on their

**MICKENS - DIRECT / CLARKE**

1  phone, there is still going to be all of these mechanisms in

2  place trying to keep the user safe.

3      And so unless the malware is a particular type of malware

4  that can somehow do, you know, what's called like a sandbox

5  escape or a privilege escalation, unless the malware can do

6  that, all of these mechanisms are still in place keeping the

7  user safe.

8      So it's not as if somehow you install a piece of malware

9  and, in general, all of a sudden all of your contacts are

10  available or all of your data on your phone is suddenly

11  available to the attacker.

12  **Q.**   Does Android offer any sorts of security protections that

13  are not on the phone itself?

14  **A.**   Yes, it does.

15  **Q.**   And what are those?

16  **A.**   Well, if we look on the next slide, what I show off to the

17  right is the review process that apps go through if they are

18  submitted to the Play Store.  So that's the first-party

19  Google Store.

20      And so there are two components to that review process.

21  The first is an automated review.  So that's a review that is

22  conducted by algorithms by these machine-learning pieces of

23  software, and they're going to examine the app to look for

24  signs of malicious behavior, you know, attempts to harm the

25  users.

1          A subset of apps are also subject to a human review.  So,

2    for example, to maybe look for objectionable or obscene content

3    or maybe to try to help the automated review out if the

4    automated review couldn't issue a firm verdict about app

5    maliciousness.

6    **Q.**   Does Google's app review prevent all malicious apps from

7    making its way onto the Google Play Store?

8    **A.**   It does not, no.

9    **Q.**   And are there any examples of apps that have made their

10   way onto the Google Play Store that were malicious?

11   **A.**   Yes.  There have been various examples of this.  There

12   have been examples of sort of scam apps, for example, on the

13   Play Store where you have apps that pretend to be a very

14   well-known app, like Word or something like this, but actually

15   are not that legitimate app; and as a result, users get tricked

16   into installing that inappropriate app.

17   **Q.**   So who is the reviewing entity for that review that you

18   just described in the right-hand column here?

19   **A.**   So the reviewing entity there is Google itself.

20   **Q.**   And does an app that's reviewed by Google have to be

21   distributed through the Google Play Store?

22   **A.**   The answer is no.  Because from a technical perspective,

23   we can think about the reviewing process for an app as separate

24   from the distribution process for an app.

25   **Q.**   Are there third parties that can also conduct any sort of

1  app review?

2  **A.**   Yes, third parties can do that and in many cases there are

3  examples of that.  So there are other app stores that conduct

4  app review.  There are also companies, like malware scanning

5  companies, like Norton, for example, that also review apps for

6  signs of maliciousness.

7  **Q.**   Does Google do anything to review apps that are

8  distributed outside of the Play Store?

9  **A.**   It does.  And so that's what I show kind of in that

10  leftmost column that says "Off-Play App Review."  And so at a

11  high level, the review process there looks similar to the one

12  that you see for Play Store apps.  There is an automated

13  review.  There is also a human-driven review as well.

14  **Q.**   Does Google dedicate the same resources to the off-Play

15  review that it dedicates to the Play Store review?

16  **A.**   It does not, and that's not just my opinion.  There are in

17  the production documents examples of Google's own security

18  employees saying that off-Play app review has been

19  underresourced to a pretty severe extent.

20  **Q.**   So earlier, Professor Mickens, you said Google's

21  machine-learning tools for detecting malware do not use

22  installation source as an indication of maliciousness.  What

23  did you mean by that?

24  **A.**   So by that I mean, think about what a machine-learning

25  model does when it tries to determine whether an app is

1   malicious.  That model is going to look at the app and try

2   to -- and try to extract observations or characteristics.  So

3   it will look at the structure of the code.  It might look at

4   different types of data that the app contains, all these

5   different sort of features.

6       And after looking at all those features, it will then say,

7   "Well, do those features, you know, indicate that this app is

8   going to be malicious?"

9       And so when I observed that Google's models don't look at

10  the distribution channel as an important feature, that's

11  important because it's saying that the models aren't really

12  thinking that the distribution channel by which an app came

13  from is a strong indicator of maliciousness.

14      And that makes sense; right?  Because what does it mean

15  for an app to hurt you?  It means that it tries to steal your

16  data or it tries to crash your phone.  That's what it means for

17  an app to be malicious, not what channel did it came from.

18  **Q.**   So, Professor Mickens, I'd like to walk through some of

19  the friction steps that you analyzeed for purposes of your

20  opinion.

21      Could we start by taking a look at the friction steps

22  involved in downloading something from the Galaxy Store?  What

23  would be the first --

24          **THE COURT:**  Let me just point out, we have heard a lot

25  about these steps.  So let's focus on something knew and fresh.

 1   How about that?  Okay?

 2         **MR. CLARKE:**  So, Your Honor, in order to sort of

 3   expedite this, maybe I could just let Professor Mickens quickly

 4   walk through, and I'll follow along with the clicker so that we

 5   can get to kind of the comparison at the end, which I think is

 6   the salient point.

 7         **THE COURT:**  Okay.

 8         Professor, we have heard a lot about the steps.  So

 9   anything that's new, meaning not literally what you have to do,

10   would be the best thing to do, and let's not dwell on it.  If

11   it's taking too long, I'll jump in.  Okay?  But you take it

12   from here.

13         **THE WITNESS:**  Okay.  I'll try.

14   **BY MR. CLARKE:**

15   **Q.**   So could you just quickly summarize for us the friction

16   that's associated with a download from the Google Play Store?

17   **A.**   Sure.  So let's go to the next slide.

18         So in this case, the user is trying to install Wikipedia

19   through the Play Store.  There's an install button that they're

20   going to see.  They click on that install button.

21         Next slide.

22         And then they launch the app.  So that's what happens in

23   the Play Store.

24   **Q.**   Okay.  So it's a single-click installation process

25   essentially; is that fair?

1    **A.**   Essentially, that's right.

2    **Q.**   Okay.  So I'd like to turn to the process for third-party

3    stores, and perhaps you could walk us through the first sort of

4    four steps of that process.

5    **A.**   Sure.  So if we go to the next slide.

6         So we've already -- so what we can see here, even though

7    it's grayed out, there's a lot more steps; right?  And so

8    what's the most salient thing with respect to this part of sort

9    of my testimony?

10        Well, let's sort of click through.  So we go to the next

11   slide.

12        Okay.  So here is a warning screen we didn't see before.

13   And so that warning screen has some text there that, in theory

14   at least, is trying to inform the user and allow them to make

15   an important choice.  And this is where I think sort of the

16   novel part is that I want to try to tease out here.

17        Now, we saw from Mr. Kleidermacher last week a version of

18   these videos.  So it is -- it is true that the jury has seen

19   these videos, but those videos are very -- they went -- he went

20   through that process very quickly.  Okay?  And so an important

21   aspect of security is users not only giving consent but giving

22   informed consent.

23        So what I want to do very quickly is just walk through

24   those warning screens and just make sure that the jury can

25   understand what it would mean to give informed consent in this

1  case.

2      So, you know, for this screen right here, it says (as

3  read):

4          "So for your security, your phone currently isn't

5      allowed to install unknown apps from this source."

6      Okay.  One thing I'll quickly flag here, calling Wikipedia

7  unknown is a bit weird.  Right?  It's not clear that the user

8  is actually being educated about the relevant security decision

9  here by calling Wikipedia unknown.

10     Okay.  So let's click through.

11     Okay.  So now we see this install unknown apps setting

12 screen here.  So here, you know, what did the prompt say?

13 Maybe you've seen this screen before, but let's see what the

14 prompts say.  So the prompt says (as read):

15         "Your phone and personal data are more vulnerable to

16     attack by unknown apps."

17     Okay.  Let me point out here that your phone is also

18 vulnerable to attack by apps that are installed via the

19 Play Store too.  So this is not somehow a unique danger that

20 this screen is talking about with respect to what can happen to

21 you install when you apps.  It can happen via third-party

22 channels or first-party ones.

23 **Q.**  Professor --

24         **THE COURT:**  Can I just jump in?

25     So on that point, if you're downloading an app from the

1 Play Store, do you get this same warn?

2          **THE WITNESS:**  No, you do not see this warning.  In

3 fact, we're using the same app both that initial Play Store

4 walk-through we went through a couple seconds ago and here.  So

5 it's the same app.  Its just Wikipedia.  Right?  So it's not

6 like somehow the nature of its potential maliciousness has

7 changed.

8      And, yet, here in this walk-through we're seeing this

9 warning, and that's a problem.  Right?  And that's, in fact, a

10 reason why it's important to look at these warning screens

11 because we can tease out this dissonance in terms of, like,

12 what Google is claiming these screens are doing for you, the

13 user, versus what they're actually communicating to you.

14 **BY MR. CLARKE:**

15 **Q.**   So one quick question on this screen.

16      Up until this point in the process, has the operating

17 system actually looked at the identity of the app that's being

18 downloaded to determine whether it's something that could

19 potentially be risky?

20 **A.**   No.  And this sort of Plays off of the judge's question as

21 well.

22      So all of this friction that's being imposed is based

23 purely on the installation channel.  Right?  The fact that,

24 like in this case, we're installing via the F-Droid third-party

25 store.

1          **THE COURT:**  If I may.

2          **THE WITNESS:**  Please.

3          **THE COURT:**  If it's on Play -- okay? -- if the app is

4    on Play, has Google done any prescreening to vet it in a way

5    that an unknown app would not have been prescreened for

6    security?

7          **THE WITNESS:**  So -- so it's a good question.  So I

8    think what we want to disentangle is the notion of reviewing

9    from distribution.

10         So, for example, on the Play Store, all apps have to go

11   through that review process.  That's what I was kind of

12   describing a couple slides earlier.

13         So if an app comes to the Play Store, it will have been

14   reviewed.  Now, what happens with, you know, other distribution

15   channels?  Let's say they're direct installation or a

16   third-party app store in this case.  It's entirely possible

17   that the app has, in fact, been subject to a high-quality

18   review.

19         In fact, like in this case, we're looking at the exact

20   same app -- right? -- that the Play Store has reviewed and

21   found it to be fine.

22         The problem is that right now, Android doesn't sort of

23   reflect the fact that apps which come from non-Play Store

24   channels may, in fact, have been subject to high-quality

25   review.

MICKENS - DIRECT / CLARKE

1          And that's one of the key aspects of my expert opinion,

2     which is that it's entirely possible that these non-Play Store

3     distribution channels are distributing reviewed apps, but

4     Android doesn't really have affordances that would sort of

5     inform the user and make that clear to them.  Instead, it's

6     just putting up these friction screens about, you know,

7     installation channels.

8          Thank you.

9     BY MR. CLARKE:

10    Q.   Thank you, Professor.

11         Could you walk us through the rest of these steps in this

12    friction flow?

13    A.   Great.  So if we just go to the next slide.

14         So let's assume that the user clicks over, gets to this

15    next screen.  And let me point out, by the way, it's not

16    guaranteed that all users will even make it this far in the

17    workflow -- right? -- because there's actually abandonment that

18    may happen.  Because users might get frustrated.  They might

19    say "I'm tired of having to click through all these screens."

20    So it's a big assumption that the user's actually gotten to

21    this point in the flow.

22         Anyway, let's assume they have.  The user sees the screen

23    "Do you want to install this app?"  And let's assume that the

24    user clicks "Yes."

25         And so here at this point, this is the first time in this

1  whole flow that Android has actually tried to look and see

2  whether the app to install is actually malicious or not.

3       So what we're seeing here, you see how in 4B it says "GPP

4  Prompt"?  Okay?  So "GPP" stands for Google Play Protect.

5       So once you've clicked, "Yes, I do want to install," now

6  the malware scanner is going to run, and it's going to look and

7  see if the app that you're trying to install is malicious.

8       Now, for the case of the Wikipedia app, the answer would

9  be no.  And so you would not see this friction screen I'm

10 showing you here.  I'm just showing you this just so you can

11 kind of get an intuitive feel of what would happen if the app

12 you were trying to install were malicious.

13 **Q.**  So just to clarify, if the app was not flagged as

14 malicious, would there be any kind of a warning screen or a

15 warning prompt at this step?

16 **A.**  There would not be.  Similar to how like if you would

17 install via Play, you know it's already been reviewed and

18 you're not going to see like an extra screen there because it's

19 been reviewed.

20 **Q.**  Okay.  So what happens for the rest of this download

21 process?

22 **A.**  Okay.  So let's assume that the malware scan found no

23 problems with the app to install.

24      So if we go to the next slide.

25      So the user is kind of presented back with this friction

MICKENS - DIRECT / CLARKE

1    screen we saw in step three.  Let -- so now the user has to

2    navigate out of that screen, so they click in the upper

3    left-hand corner.

4         So if you go to the next slide.

5         And then, finally, the user can launch the app.  And as I

6    mentioned, there's going to be nontrivial abandonment through

7    this process, so not all users are going to make it this far.

8    **Q.**   Okay.  Now, could we walk through, again expeditiously,

9    how this process looks for a direct download?

10   **A.**   Of course.  So if we go to the next -- oh, here, we're

11   already there.  Sorry.

12        So now we're going to look at installation via direct

13   installation, and in particular via a web browser.  So we're

14   going to download and install the exact same app that we were

15   looking at before.  Okay?  So this is the Wikipedia app.  So

16   same app in all three cases.

17        So we go to the website.  We find out where the app is.

18   We click install.

19        Next slide.

20        Then we're going to see a warning saying "Do you want to

21   download this app anyway?"  To be clear, this is coming from

22   the browser.  Okay?  So this is not coming from Android.  It's

23   not coming from the platform.  This is a browser warning.

24        So let's click through.

25        The user sees the file download in that upper part of the

1   screen.  The user clicks open.  This is also a screen that's

2   coming from the browser.  It's not coming from the platform.

3        Next screen.

4        Okay.  So now we see this sort of friction flow that we

5   were examining before.  Now, I've already read you these

6   warnings here before, so I'm not going to do it again; but

7   suffice it to say, that they are the same problems that we have

8   here that we had with that other flow.  Right?  Why is it that

9   Wikipedia is being claimed to be an unknown app?  Why are we

10  getting these complaints just because we're using a particular

11  installation channel?

12       So if you click through to the next slide.

13       We've seen this screen before.  There's a bunch of scary

14  language here about your phone and personal data are more

15  vulnerable to attack by unknown apps.

16       It's vulnerable from any app regardless of the

17  distribution channel.  And if you look at this sort of language

18  at the end where it says that you agree that you are somehow

19  responsible for any damage to your phone, is that -- I mean,

20  Android has never presented you with some notion like a

21  warranty that you're voiding if you are to install from this

22  point, so this language is also not helping to inform users.

23       So let's assume the user hasn't abandoned the workflow.

24       Next slide.

25       You slide that slider over.  Then we come to this confirm

1  installation prompt.  Let's assume we click on that.

2      Here's where GPP runs again.  Once again, the thing to

3  call out here is that this is the first part of this entire

4  workflow where the platform has actually tried to evaluate "Is

5  this app actually malicious or not?"

6      All of this other stuff that you were seeing in terms of

7  friction, it was based on what distribution channel are you

8  trying to install the app through.

9  **Q.**  Professor Mickens, one question, if I may.

10     Which of these steps that you just walked through so far

11 would be most effective in protecting users from malware like

12 FluBot?

13 **A.**  So the step that would be the most effective in protecting

14 users from malware is the step that we're looking at right now.

15 That's the malware scanning step that is specifically looking

16 at the app and trying to determine whether it's malicious or

17 not.

18 **Q.**  So there are a couple of steps above --

19     **THE COURT:**  I'm just going to jump in.

20     So, okay, going to this GPP prompt that we're looking at

21 here --

22     **THE WITNESS:**  Yes.

23     **THE COURT:**  -- you said this is the first time an

24 actual security check happens; right?

25     **THE WITNESS:**  Yes.

1    **THE COURT:**  So could all those other steps that you've

2    described as friction be skipped and could a user go directly

3    from "I'd like to install this" to this GPP stage?

4    **THE WITNESS:**  So I don't think they should be skipped;

5    however, I think that those steps can be compressed, and I

6    actually plan on addressing that exact point in a couple

7    slides.

8    **THE COURT:**  Okay.  That's fine.

9    Go ahead.

10   **MR. CLARKE:**  Thank you.

11   BY MR. CLARKE:

12   **Q.**  So just the steps that are immediately above the GPP

13   prompt, so the, for example, "Step 5:  Allow install of unknown

14   apps," how effective do you view that step as preventing

15   installation of malware like FluBot?

16   **A.**  It's a very, very crude hammer and I think a very

17   ineffective hammer.  So the FluBot that my counsel is referring

18   to, that's something that Kleidermacher had brought up about

19   being an app that's sort of distributed via direct

20   installation.  And he said that, you know, these types of

21   friction screens help users because they will help them to

22   abandon installs that may be risky.

23   Well, it's true that, you know, some users will abandon

24   this workflow, let's say, when they're installing malware; and

25   then, you know, a good thing would happen so the user wouldn't

1  install malware.

2      But in this case, this example I'm walking you through

3  here, it's not malware that's being installed; its Wikipedia

4  that's being installed.  And so if you have people who drop out

5  of that installation workflow, who abandon it because of that

6  extra friction, that's a harm to users.

7      And it's a security problem too because it's not, you

8  know, sort of giving users a calibrated understanding of what

9  the risk is when they install apps from non-first-party

10  sources.

11  **Q.**  So, Professor Mickens, could you just sort of quickly walk

12  us through the end of this download process?

13  **A.**  Yes.  So assuming that the GPP scan doesn't find any

14  problems, the user clicks through -- or sorry -- doesn't click

15  through.  Excuse me.  So there's no extra friction screen if

16  there's no problems with the malware scan.  So we go to the

17  next step, and then we just launch the app.

18  **Q.**  Thank you.

19      So, Professor Mickens, Mr. Pichai, Google's CEO, when he

20  was here also testified, quote (as read):

21          "We add steps just to make sure users are

22      understanding their choice.  You know, and friction

23      sometimes in a security context is beneficial because you

24      don't want to accidentally click on something which could

25      completely compromise your phone."

1        Do you agree with that statement?

2  **A.**   Well, I agree at a high level that friction when it is

3  commensurate and proportional to risk is helpful for allowing

4  users to make informed decisions.  However, I do not think that

5  the way that Android currently implements these friction

6  screens are actually following this sort of security guidance

7  that friction be commensurate and proportional with risk.

8  **Q.**   What are the core decisions that users should be making

9  with respect to installing apps on Android phones?

10 **A.**   So I show those decisions on the next slide.

11       And, Your Honor, this is starting to speak directly to

12 some of the questions that you were asking about what can be

13 skipped, and so on and so forth.

14       So what I'm showing here are the two core decisions that

15 require user consent during the process of installing an app.

16       So that first core decision is:  Do I want to allow this

17 app that I'm using as an installation mechanism, do I want to

18 allow it to actually install things?  So you can think of this

19 as being like:  Do I consent to this particular installer, the

20 browser or, you know, a third-party store?  Do I, as the user,

21 feel comfortable allowing that installer to actually install

22 things?

23 **Q.**   And what's the second core choice?

24 **A.**   The second core choice is that the user has to be able to

25 ascertain:  Well, has the app that I want to install, has it

1    been scanned?  Has it been subject to a high-quality review for

2    maliciousness?

3         And that's an important decision because, you know, the

4    user, you know, most likely will not want to install an app

5    that hasn't been reviewed or will at least want to be informed

6    about that fact so that they can make their own decision, for

7    example, based on their own research, about whether the

8    developer of the app is reasonable.

9    **Q.**   So, Professor Mickens, the steps that we just looked

10   through a moment ago, at which point in that process does the

11   user make the first decision that you described?

12   **A.**   Right.  So if we go to the next slide.

13        And so -- so, once again, Your Honor, now we're going to

14   look more directly at the question that you were asking, so

15   which steps can be removed or condensed, so on and so forth.

16        So the first security decision is:  Does the user consent

17   to allowing an installer to act as an installer?

18        Well, if we see in, let's say, the third-party store

19   column, that's sort of the middle column, those sort of rows

20   that are highlighted yellow there, at a high level what those

21   rows are doing is they're asking that question that I just

22   mentioned:  Do I as the user want this particular installer to

23   actually be able to install apps?

24        Now, what we see, though -- and this is why it was

25   important for us to walk through that language -- is that the

1   security question being asked here is quite straightforward:

2   Do I, as the user, want this app to act as an installer?  But

3   that clear, crisp language isn't described in those friction

4   prompts, for example, those yellow ones that we see in that

5   second column there.

6        And also there's multiple friction screens when really you

7   only need one that directly addresses that question, and we see

8   similar problems in the direct installation column as well.

9   **Q.**   And so at what point in these processes does the user make

10  the second decision that you described?

11  **A.**   So recall that the second decision is:  Can I, as the

12  user, ascertain whether an app to install has been reviewed

13  and, therefore, declared to be likely nonmalicious?  That is

14  being accomplished in those sort of purple GPP prompt steps

15  that we see.  So, like, 4B in the case of a third-party store

16  and then 6B in the case of direct installation.

17  **Q.**   And, Professor Mickens, what is your opinion of the

18  friction that we are seeing on this screen here?

19  **A.**   Well, this comes back to one of my core conclusions.  I

20  think that the friction that we're seeing in the second and

21  third columns of this diagram, it's not proportionate to the

22  risk, and the warnings that users are being shown are not

23  informative with respect to helping them making an informed

24  decision.

25  **Q.**   Is there a way to empower users to answer those two core

1    questions with less friction on Android?

2    **A.**    I think so.  And so if we go to next slide, I can give you

3    an example of what I call proportionate friction flow.

4        So reducing the number of friction screens while still

5    allowing users to make informed decisions, an informed consent

6    about app installation.

7        So here we're imagining a new world.  Okay?  So this is a

8    proposal.  This is not something that, you know, is out in the

9    world right now.  So let's imagine that we are installing an

10   app via a third-party app store, and we're going to use

11   Wikipedia app, once again.  So we're keeping that app

12   consistent in the examples.

13       So we go to this third-party store.  There's that blue

14   install button.  The user clicks that.

15       So if we go to the next slide.

16       And so what we see here, let's assume that this is the

17   first time that the user is installing via this third-party

18   store.  So in this case it's the F-Droid store.  So in my

19   proposed flow, my proposed friction flow, the user would see --

20            **THE COURT:**  If I may jump in.

21            **THE WITNESS:**  Yeah, go for it.

22            **THE COURT:**  So the user is on a store called F-Droid.

23   That's the app store?

24            **THE WITNESS:**  Yes, Your Honor.

25            **THE COURT:**  And they're downloading the Wikipedia app

1    from F-Droid?

2         **THE WITNESS:**  Yes, Your Honor.  That's right.

3         So the user decides to click "Install," and so now in this

4    walk-through, we're assuming it's the first time that the user

5    has installed via this third-party store, and you see the

6    warning that we see here.  So what does it say.  It says "Allow

7    Installation."  That's sort of the title of the warning.  And

8    it says "Do you want F-Droid to be able to install other apps?"

9    That directly answers the salient security question that users

10   should be thinking about.

11        And now, finally, we've sort of gotten to the part where I

12   directly address your question.

13        This is what I think those yellow rows that we were seeing

14   before can be condensed to.  This asks sort of the essence of

15   the question.  So that's what this screen is going to show.

16   **BY MR. CLARKE:**

17   **Q.**   Okay.  Any other steps in this process?

18   **A.**   Yeah.  So then let's say the user clicks on "Allow."  So

19   then at this point, there would be a verification of review.

20   So that's basically just saying:  At this point Android is

21   going to ask "Has this app received a high-quality review?  And

22   if so, was it deemed to be safe by that review?"  And so this

23   is similar sort of to the GPP steps that we saw before.

24        If the app does not have a review, then the user will see

25   this warning here which says "The app to install has not been

1   reviewed.  Are you sure that you want to install it?"

2       Okay.  Once again, the language here is very crisp, and it

3   allows the user to give informed consent with respect to the

4   decision to install a nonreviewed app.

5       Now, just as with the GPP step, if during this step

6   Android determines that the app has been reviewed, you know, it

7   has been marked as safe to install, you don't see this extra

8   friction screen here.  Okay?  So this is only shown if the app

9   hasn't been reviewed.

10  **Q.**  Thank you.

11      And then what would the final steps here be?

12  **A.**  So assuming that there's no problems with the malware

13  scan, then the user will go to the next screen, and then they

14  will just open the app.

15  **Q.**  So how does this compare to the other friction steps that

16  we looked at a minute ago?

17  **A.**  Well, if we go to the next slide, this is sort of the

18  comparison.

19      So in all of the three -- sorry -- in the second, third,

20  and fourth columns, so in the third-party store installation,

21  the direct installation and proportionate friction examples,

22  that one off to the right, that's the hypothesized world I was

23  talking about, we see that in all three of those cases there is

24  a review that is sort of checked.  In other words, like there

25  will be a point where in all three cases Android is going to

1    say "Has this app been declared nonmalicious by a review

2    process?"

3         The big difference is what we see with those yellow rows.

4    Those are the rows that are asking that first security

5    question:  Do I, as the user, consent to allowing the installer

6    to act as an installer?  And so we see that -- once again, to

7    the judge's question -- we've condensed those three screens,

8    let's say, in the third-party store case, down to one screen.

9    And we've actually tightened the language so that users can

10   make that informed consent.

11   **Q.**   And just to be clear, Professor Mickens, these are

12   first-time installation friction flows just so that it's --

13   **A.**   That is correct.  That is correct.

14        And so after, for example, a user has consented to

15   allowing an installer to act as an installer, the user is not

16   going to continually get prompted to allow that installation to

17   take place.

18   **Q.**   And that's true for each of these columns; is that

19   correct?

20   **A.**   Yes, sir.

21   **Q.**   Okay.  Thank you.

22        So in a world with proportionate friction, which of these

23   steps that are appearing in the second and third column would

24   fall away?

25   **A.**   So in the second and third column, basically -- so let's

1   look at the second column, for example.  So in the second

2   column showing the third-party app store workflow, if you look

3   at steps two, three, and five, so "Proceed to settings," "Allow

4   unknown apps," "Navigate out of settings," those would all be

5   sort of condensed to a single permission prompt, which is

6   essentially:  Do you want to allow this installer to act as an

7   installer?

8   Q.   Professor Mickens, why don't we see any highlighting in

9   the left-hand column here?

10  A.   The reason that you don't see any highlighting in the

11  left-hand column, it's twofold.  So, first of all, there's no

12  verify review row because for apps that are coming to the

13  Play Store, the sort of Play Store app on the user's phone

14  knows that those apps have already been reviewed, so it doesn't

15  have to do an explicit step there.

16      And the reason why you don't see the yellow highlighting

17  is that basically the Play Store is assuming that the user has

18  already consented to allowing the Play Store to act as an

19  installer.

20  Q.   So in the far right-hand column, your proportionate

21  friction column -- do you see that?

22  A.   Yes.

23  Q.   -- there's a step that says "2B, Verify Review"?

24  A.   Yes.

25  Q.   Could you explain what you have in mind with verify

1  review?

2  **A.**    Sure.  So that's the part where the platform is going to

3  determine whether the app to install is actually malicious or

4  not, and so it will do that by trying to see if the app has

5  been reviewed by a high-quality review service.

6  **Q.**    And who actually is going to review those apps in the

7  scenario that you have in mind?

8  **A.**    So it could be Google.  It could also be Google plus

9  certified third parties.

10  **Q.**    Does an app have to be reviewed by the same entity that's

11  distributing the app?

12  **A.**    It does not, and this gets back to a point I made earlier

13  about the review process for an app.  That can be decoupled

14  from the distribution process for an app; in other words, how

15  it gets onto users phones.

16  **Q.**    So how could Google review apps that are being distributed

17  outside of the Google Play Store?

18  **A.**    Well, I show how that might take place on the next slide.

19        So here we're going to examine a proposal that I call

20  centralized notarization.  You can think of notarization as

21  just being shorthand for trying to determine whether an app

22  bears a stamp of approval, whether it's been notarized by a

23  reviewing entity and declared to be safe by that reviewing

24  entity.

25        So in this proposed world, you've got the developer who

1   works on an app, and then that developer is going to submit --

2   next slide -- the app to Google for review.  And then assuming

3   that the app is reviewed successfully, then Google is going to

4   return back a notarized version of the app.

5        And so I show that little checkmark there.  That's sort of

6   the notarization seal of approval.  That's basically sort of a

7   cryptographically signed statement that says Google has

8   reviewed this app and found it to be nonmalicious.

9   Q.   And what happens next in this process?

10  A.   And so next what will happen is that the developer can

11  actually distribute this app through whatever channel a

12  developer pleases.

13       And so if we go to next slide, we see that the developer

14  might actually distribute the app through the Play Store; the

15  developer might also/or distribute the app through a

16  third-party app store; or make it available through direct

17  installation, for example, via web browser.

18       And note that in all three cases, the app that the

19  developer distributes bears that notarization seal, that sort

20  of signed statement that indicates that Google has found the

21  app to be nonmalicious.

22  Q.   And what's the next step in this process?

23  A.   So then the next step is just that the user locates the

24  app in some way and then tries to install it.  And then at the

25  point of installation, this is where we see that 2B step, the

**MICKENS - DIRECT / CLARKE**

 1   verify review.

 2        So we can see up on the slide it says that Android

 3   confirms the signature at the point of installation.  That

 4   means that Android is going to check to see if the app bears

 5   that notarization sort of stamp of approval.  If so, Android

 6   does not show that friction screen that I mentioned before that

 7   says, "Hey, this app has not been reviewed.  Are you sure that

 8   you want to install it?"  But if the app has been reviewed,

 9   then you won't see that friction step in 2B.

10   **Q.**   Are there any companies out there that use a model like

11   this?

12   **A.**   Yes.  So at a high level, if you look at Mac OS, Mac OS

13   has this notion of notarization as well.  So as some you may

14   know, on a Mac OS machine there's a first-party Mac OS store,

15   but there's also this ability for a developer who doesn't want

16   to distribute through that first-party store to instead just

17   submit the app to Apple.  Apple will scan that app looking for

18   malware; and if no malware is found, essentially the app will

19   get a notarization stamp of approval just like we have here.

20   **Q.**   And how difficult would it be to modify Android to support

21   this sort of an approach?

22   **A.**   Not difficult, and the reason is because most of the

23   machinery that you would need inside of Android to make this

24   work, so, for example, the checking of signatures, that's

25   already there in the code.  So you wouldn't have to reimplement

1   a lot of stuff.

2   **Q.**   So if Google didn't want to review all of these apps

3   itself, are there any other alternative models that it might be

4   able to adopt?

5   **A.**   Yes.  So I've thought about a proposal for that as well,

6   and I've called it decentralized notarization.

7          So if we can go to the next slide.

8          And so what do we see here?  Well, this workflow looks a

9   lot like the centralized notarization workflow that we saw

10  earlier.  The only real difference is what we see sort of in

11  the bottom left-hand side of the slide.

12         So the developer has their app.  They upload it to a

13  reviewing entity.  Now the reviewing entity might be Google,

14  but it might be some third-party reviewing entity that Google

15  has certified as being, you know, capable of providing

16  high-quality reviews.

17         So the developer submits their app to one of these

18  reviewing entities.  If the review succeeds, the notarized

19  version comes back, and then the workflow looks exactly like it

20  looks before.  So the developer can distribute their app

21  through whatever distribution channel they want.  The user

22  finds it.  And then at the time of installation, Android is

23  going to look to confirm the signature, to confirm whether or

24  not that review has actually been performed for that app.

25  **Q.**   So were you present when Mr. Kleidermacher testified last

**MICKENS - DIRECT / CLARKE**

1    week?

2    **A.**   I was.

3    **Q.**   And did he provide any testimony that changed your opinion

4    on this topic in any way?

5    **A.**   No, he did not.  And, in fact, he talked about this group

6    called the App Defense Alliance, which is a group of

7    third-party security companies that Google is already working

8    with to try to analyze various aspects of app security.  So I

9    think this proposal is quite imminently implementable.

10   **Q.**   Did you hear Mr. Kleidermacher testify that Google can't

11   make the Internet safe?

12   **A.**   I did hear that testimony, yes.

13   **Q.**   Would your proposals require Google to police the entire

14   Internet?

15   **A.**   They would not.  And so if you look at this workflow,

16   Google is -- sorry.  Let me back up a little bit.

17        In the centralized proposal for notarization, Google is

18   only responsible for reviewing those apps which were submitted

19   to it directly.  Not all developers are required to do so, and

20   Google wouldn't have an obligation to look at them.

21        In the decentralized approach, if Google for whatever

22   reason were worried about scaling up that reviewing load, well,

23   here we've got a bunch of third parties that can help shoulder

24   some of that reviewing load for Google.

25   **Q.**   And are there any other platforms out there that use sort

MICKENS - DIRECT / CLARKE

1  of a decentralized security verification scheme?

2  **A.**   There are.  And perhaps the most sort of well-known

3  example of this is the web.

4       So if we go to the next slide.

5       So if you go to the web and, once again, you go to one of

6  these https sites, so what is the S giving you?  Among other

7  things, it's giving you, the user, sort of a guarantee that the

8  site that you're talking to is actually run by whoever you

9  think that the owner of the site should be.

10      So if you go to apple.com, that little lock icon that we

11  see in the bottom right, that's saying that an identity

12  verifier has guaranteed that this web server is actually owned

13  and operated by Apple and can speak with the authority of

14  Apple.

15      And so who performs this type of identity verification for

16  websites?  Like on the current web, it's not the future web,

17  the current web.  Well, already if you look at the browsers

18  that are made by popular vendors -- like Google Chrome, for

19  example, like Microsoft Edge -- they already trust a

20  decentralized set of identity verifiers for the web.  So Google

21  is an example of one of those.  So is Verisign.  So is GoDaddy,

22  so on and so forth.

23      So this decentralized way of verifying identities, this

24  underlies the security of the web.  And Google already trusts

25  it because they made a browser which trusts it, and they run a

1   bunch of web properties, web services, like Gmail, that rely on

2   the safety of https and decentralized verification.

3   **Q.**   So, Professor Mickens, would any of these proposals that

4   you're outlining undermine the device level security of Android

5   phones?

6   **A.**   They would not.  None of the proposals that I mentioned

7   touch those device-level security mechanisms at all.  So the OS

8   still provides, for example, all those security mechanisms I

9   mentioned earlier.

10  **Q.**   If Google were to adopt any of these proposals, would it

11  make Android less secure for users?

12  **A.**   No.  And, in fact, it might actually make Android more

13  secure.  Because let's think about the two separate proposals

14  I've made for centralized versus decentralized notarization.

15        In the centralized approach, who is the entity that's

16  doing all of the reviews?  It's Google; right?  And so Google

17  still gets to set all of those review standards.

18        Now, in the decentralized world, it's possible that there

19  are these third parties who would also perform reviews in

20  addition to Google; but, importantly, Google is the one who's

21  certifying those third parties.  Google is setting the minimum

22  quality bar for those reviews.

23        And so at worst, security would stay the same, but it's

24  also possible that some of those third-party reviewing entities

25  would do a better job than Google and actually keep users more

 1  safe.

 2  **Q.**    Thank you.

 3          **MR. CLARKE:**  Your Honor, I pass the witness.

 4          **THE COURT:**  Okay.  Let's take our lunch break.  I have

 5  something I have to attend to at 12:15.  So we'll come back at

 6  12:40.  Okay?  A little extra lunch.

 7      Okay.  So I'll see you at 12:40.

 8              (Luncheon recess was taken at 11:58 a.m.)

 9  <u>**AFTERNOON SESSION**</u>                                      <u>**12:46 p.m.**</u>

10      (Proceedings were heard out of the presence of the jury:)

11          **THE COURT:**  Who do we have after this witness?

12          **THE CLERK:**  All rise.

13      (Proceedings were heard in the presence of the jury:)

14          **MR. BORNSTEIN:**  Next, Your Honor?

15          **THE COURT:**  Yeah, who's next?

16          **MR. BORNSTEIN:**  We're doing back to back.  So we'll

17  have a security expert from Google.

18          **THE COURT:**  Oh, okay.

19      Okay.  Please, go ahead.

20          **MR. OLASA:**  Good afternoon, Your Honor.  Kuru Olasa

21  for Google.

22                       <u>**CROSS-EXAMINATION**</u>

23  **BY MR. OLASA:**

24  **Q.**   Good afternoon, Professor Mickens.

25  **A.**   Good afternoon.

1  **Q.**   So, Professor Mickens, let's start with your

2  Demonstrative 44.

3        Can we have that put on the screen?

4        Now, the left hand of this slide, the left-hand column,

5  shows the installation from the Google Play Store; is that

6  right?

7  **A.**   That's correct.

8  **Q.**   And all apps on the Google Play Store have been reviewed

9  by Google; right?

10  **A.**   That's correct.

11  **Q.**   Okay.  And looking all the way over to the right, that's

12  one of your proposals in this case, the proportionate friction

13  proposal for third-party stores; right?

14  **A.**   That's correct.

15  **Q.**   And in that rightmost column, there's a step click,

16  install; another step grant, install permissions; and then a

17  step called 2B, verify review; correct?

18  **A.**   Correct.

19  **Q.**   And the verify review step is where a check will be done

20  to see whether the app had been reviewed; is that right?

21  **A.**   That's correct.

22  **Q.**   And you have two proposals in this case to verify whether

23  an app had actually received any review; correct?

24  **A.**   I believe you're referring to the centralized and

25  decentralized notarization proposals.

1   **Q.**   That's right.  And those are your two proposals in this

2   case; right?

3   **A.**   That's correct.

4   **Q.**   Okay.  So let's talk about those two proposals, and begin

5   with centralized notarization.

6        And can we put Demonstrative 20 up, please?

7        So with centralized notarization, Google would become the

8   only entity that the Android operating system trusts to review

9   apps; correct?

10  **A.**   I wouldn't say become.  I mean, it would be similar to the

11  status quo that you have now on Android.

12  **Q.**   Well, Google would be the only entity that Android would

13  look to to determine whether an app had been reviewed; right?

14  **A.**   That's correct.

15  **Q.**   Okay.  And under this proposal, Google would carry the

16  entire burden for reviewing all apps on Android; right?

17  **A.**   Well, it would bear the entire burden in terms of

18  performing the reviews that the Android OS would sort of know

19  or the ones to look for at app installation time.

20  **Q.**   Right.  And so Google would be the only entity that

21  reviews apps and would have the entire burden for reviewing all

22  apps on Android; correct?

23  **A.**   No.  So there could be other entities that could review

24  apps on Android; but purely with respect to what reviewing

25  entities would Android be aware of, Google would bear that

 1   burden.

 2           **MR. OLASA:**  Your Honor, may I put up a portion of the

 3   expert report?  This is Tab 2, page 115, paragraph 253.

 4           **THE COURT:**  253?

 5           **MR. OLASA:**  Paragraph 253 on page 115 of Tab 2.

 6           **THE COURT:**  Just the first sentence?

 7           **MR. OLASA:**  Can we put it up?

 8           **THE COURT:**  Just the first sentence?

 9           **MR. OLASA:**  Just the first sentence, yeah.

10           **THE COURT:**  You can do the second sentence up to

11   "tokens" comma.

12           **MR. OLASA:**  Tokens comma.  Thank you, Your Honor.

13       Mr. Nickels, can we put up the sentence beginning "I

14   describe" until "tokens" comma.

15   **BY MR. OLASA:**

16   **Q.**   This is an excerpt from your expert report; right,

17   Professor Mickens?

18   **A.**   That's correct.

19   **Q.**   And you signed this expert report; correct?

20   **A.**   I did.

21   **Q.**   And you believe everything in this expert report was

22   accurate; correct?

23   **A.**   I do.

24   **Q.**   And you wrote in this expert report that under your

25   centralized notarization proposal, Google carries the entire

1   burden for reviewing apps; correct?

2   **A.**   For the apps that will be receiving that low-friction

3   experience on Android, yes.

4   **Q.**   Okay.  So let's break down how this would work.

5        If an app passes Google's review under your proposal, it

6   will get a special token; correct?

7   **A.**   Yes.

8   **Q.**   And the operating system will then check for that token

9   when the user tries to install the app; right?

10  **A.**   Correct.

11  **Q.**   And if the app has a token, then it won't get any warning

12  under your proposal; correct?

13  **A.**   It would not receive the, you know, "Warning:  You're

14  about to install an unreviewed app."

15  **Q.**   And you call that a low-friction installation experience;

16  right?

17  **A.**   It is low friction compared to the current workflows, yes.

18  **Q.**   But if the app doesn't have a token, it would still get a

19  warning; correct?

20  **A.**   Correct.

21  **Q.**   If an app hadn't been reviewed by Google, there would

22  still be warnings; right?

23  **A.**   Correct.

24  **Q.**   Okay.  Now, under your proposal, Google will be the only

25  entity that can hand out these tokens; right?

1   **A.**   In the centralized approach, yes.

2   **Q.**   Right.  We're talking about your centralized approach now;

3   right?

4        So under your centralized approach, Google is the only

5   entity that can hand anyone these tokens; right?

6   **A.**   Correct.

7   **Q.**   No one else can hand out the tokens, just to be clear;

8   right?

9   **A.**   In the centralized approach, correct.

10  **Q.**   And the only way an app developer can get a token would be

11  to submit their app to Google for a prepublication review;

12  right?

13  **A.**   That is correct.

14  **Q.**   And Google would set all the standards for this review;

15  right?

16  **A.**   Correct.

17  **Q.**   Okay.  And your proposal in effect would actually hand

18  Google a lot more authority over app review; right?

19  **A.**   I don't believe that's true.

20  **Q.**   All right.  Let's walk through how this would work.

21       So you understand that on a Samsung Galaxy -- on a Samsung

22  phone, the Samsung Galaxy Store comes preinstalled; right?

23  **A.**   That's often the case, yes.

24  **Q.**   Right.  And in a world without your proposal, an app

25  installed from the Samsung Galaxy Store on a Samsung phone

1    won't get the warnings we were talking about earlier; right?

2    **A.**    If it's preinstalled, that's correct.

3    **Q.**    Okay.  It would give a low-friction install experience;

4    right?

5    **A.**    If it's preinstalled, yes.

6    **Q.**    Right.  And so let's use another example.  Epic Games,

7    they make the Epic Games Launcher; right?

8    **A.**    Correct.

9    **Q.**    And that's an app that you can then download Epic's

10   Fortnite app and Epic's other games; right?

11   **A.**    Correct.

12   **Q.**    And in today's world, if the Epic Games Launcher is

13   installed from a Samsung Galaxy Store, it won't get any

14   warnings; right?

15   **A.**    That is accurate, yes.

16   **Q.**    They'd get this low-friction experience that you

17   described; correct?

18   **A.**    It won't receive any warnings, yes.

19   **Q.**    And that's regardless whether Google has or has not

20   reviewed the Epic Games Launcher; right?

21   **A.**    That is correct.

22   **Q.**    All right.  But in your proposal, Epic would need to come

23   to Google and get a token in order to get this low-friction

24   install experience; right?

25   **A.**    That's correct.

1   **Q.**   And that's true even on a Samsung Galaxy phone; correct?

2   **A.**   Correct.

3   **Q.**   All right.  So let's put that point on the screen.

4        And the next one too.  Sorry.

5        And, in fact, in 2018, Epic actually put its Epic Games

6   Launcher in the Samsung Galaxy Store; right?

7   **A.**   Yes.

8   **Q.**   And it didn't have to submit that app to Google for

9   review; right?

10  **A.**   That is correct.

11  **Q.**   And Epic, in fact, did get this low-friction install

12  experience from Samsung; right?

13  **A.**   Correct.

14  **Q.**   And to this day, Epic still gets that low-friction

15  experience?

16  **A.**   Yes.

17  **Q.**   But under your proposal, under your centralized

18  notarization proposal, Epic would have had to submit its app to

19  Google to get a low-friction experience; right?

20  **A.**   That is correct.  To get that malware review, yes.

21  **Q.**   Right.  And in today's world, preinstalled stores, like

22  the Samsung Galaxy Store, they can choose to give companies

23  like Epic a low-friction install experience on their devices;

24  right?

25  **A.**   They can choose to.

1   Q.   Right.  Now, you didn't check with Samsung about this

2   centralized notarization proposal; right?

3   A.   No, although such checking wouldn't be necessary to make

4   the proposal.

5   Q.   Right.  In fact, you didn't check with any OEM about it;

6   right?

7   A.   No, but that's not necessary to evaluate its feasibility.

8   Q.   Right.  And you didn't ask any OEM if they would be

9   willing to accept this change to the way Android works; right?

10  A.   I didn't do that type of survey, no.

11  Q.   And you have no proof either way as to whether an OEM like

12  Samsung would be willing to accept this change; right?

13  A.   I think it's reasonable that they would, but I don't have

14  proof that they would.

15  Q.   And you actually can't predict whether an OEM would demand

16  financial payment from Google to agree to your proposal; right?

17  A.   They may or may not.

18  Q.   And you don't know one way or the other; right?

19  A.   I can't predict the future with perfect clarity, no.

20  Q.   And you didn't analyze that in your report; correct?

21  A.   No, but that wasn't a relevant thing to do, to evaluate

22  the reasonableness of the proposals from the security

23  perspective.

24  Q.   And, in fact, your reports in this case, they don't

25  address at all whether OEMs would push back on your proposal;

1  right?

2  **A.**   Well, the proposals were evaluated with respect to whether

3  they would impose any undue burdens technically on OEMs or

4  other people on the Android ecosystem.

5  **Q.**   Professor Mickens, that wasn't my question.  My question

6  was pretty specific.

7       Do your reports in this case address whether OEMs would

8  push back on your proposal?

9  **A.**   So the proposals are designed in a way that I don't think

10  such pushback would be likely.  So, yes, in a sense, I have

11  considered that, but there is no line in the report which says,

12  you know, "Section 8B, Pushback."

13  **Q.**   Your report does not explicitly address the issue of OEM

14  pushback; correct?

15  **A.**   Not explicitly, no.

16  **Q.**   Now, you also didn't put a dollar amount on how much it

17  would cost for Google to implement centralized notarization;

18  right?

19  **A.**   Correct.

20  **Q.**   And you can't tell the jury, therefore, how much it would

21  cost Google; right?

22  **A.**   I can talk about it in scalability terms, but I can't talk

23  about it in terms of a raw dollar amount.

24  **Q.**   And, in fact, your centralized notarization approach would

25  require Google to scale up its Cloud infrastructure to handle a

1   larger volume of reviewing requests; right?

2   **A.**   That's a possibility, yes.

3   **Q.**   And that's a possibility you outlined in your report;

4   correct?

5   **A.**   Yes.  It might also reduce Google's burden.

6   **Q.**   In your report you explained that the centralized approach

7   would require Google to scale up its Cloud infrastructure;

8   correct?

9   **A.**   That's true in some cases, but the reply report actually

10  provides some more commentary on that.

11  **Q.**   And your centralized approach would also require Google to

12  scale up its human review teams; correct?

13  **A.**   That's a possible outcome, but it also might go down.

14  **Q.**   And you don't say how much it would cost to scale up

15  Google's human review teams for this centralized approach;

16  correct?

17  **A.**   I only talk about it in scalability terms.

18  **Q.**   And you don't put a dollar amount on it; correct?

19  **A.**   I don't put a dollar amount on it.

20  **Q.**   Let's add that to the screen.

21       Now, you didn't express any opinion on how much Google

22  should charge developers for this centralized notarization app

23  review; right?

24  **A.**   I didn't make any commentary about that.

25  **Q.**   Right.  You didn't say how much a developer should have to

1    pay to go through this app review process that you propose;

2    right?

3    **A.**   That's correct.

4    **Q.**   In fact, in your proposal, Google could charge for a

5    review if it chose to; correct?

6    **A.**   Yeah, my report didn't talk to that.

7    **Q.**   Right.  In your proposal, Google could choose to charge

8    for app review based on an app's size; correct?

9    **A.**   It could.  That's a thing that could happen.

10   **Q.**   It could happen; right?

11   **A.**   There's nothing that technically prevents that type of

12   thing from taking place.

13   **Q.**   And, similarly, under your proposal, Google could even

14   charge a developer a percentage of the revenue earned by the

15   app; right?

16   **A.**   That's a thing that could happen from the technical

17   perspective, yes.

18   **Q.**   Right.  So let's add that to the screen.

19        So I just want to make sure I have this right.  Under your

20   proposal, Google would carry the entire burden for Android app

21   review.  There would be a warning screen for any app that was

22   not submitted to Google.  You don't know whether OEMs would

23   agree, you don't know the cost to Google, and you don't know

24   the cost to developers; is that right?

25   **A.**   I would not agree with that characterization.

1    Q.   Well, one more thing about centralized notarization,

2    Professor Mickens.

3         It isn't consistent with the Android platform security

4    model document you showed earlier; correct?

5    A.   How do you mean?

6    Q.   Well, is it consistent?

7    A.   What is "it"?  Sorry.

8    Q.   Your centralized notarization proposal.

9    A.   I believe that it is consistent with that.

10   Q.   Let's take a look at one of your slides.

11        Can we put up Professor Mickens' Slide 16, please?

12        So this is the Android platform security model paper you

13   relied on; right?

14   A.   That is correct.

15   Q.   And you wrote -- and you focused on this open-ecosystem

16   access point that's shown in the black text; right?

17   A.   Correct.

18   Q.   And in the gray text, there's further text that says

19   "Central vetting of developers or registration of users is not

20   required"; correct?

21   A.   I see that text, yes.

22   Q.   That's part of the Android security model; correct?

23   A.   Yes, that's right.

24   Q.   Okay.  And there's more to the Android security model.

25   Could you take a look at Exhibit 11105 in the binder in front

```
1   of you?

2           MR. OLASA:  Your Honor, may I publish 11105 on the

3   screen?

4           THE COURT:  Why don't you ask the witness what it is

5   first.

6           MR. OLASA:  Sure.  I'll lay some foundation,

7   Your Honor.

8   BY MR. OLASA:

9   Q.   Is Exhibit 11105 the Android platform security model paper

10  you relied on and that we looked at a moment ago?

11  A.   It is.

12  Q.   All right.  And --

13          THE COURT:  Is there any objection to this?

14          MR. OLASA:  I'm not offering it, Your Honor.  I'm just

15  going to cross-examine the witness on it.

16          THE COURT:  Is there any objection to showing this?

17          MR. CLARKE:  I have no objection to showing it,

18  Your Honor.

19          THE COURT:  Okay.  This is not in evidence.

20          MR. OLASA:  I'm not offering it, Your Honor.  I just

21  want to ask the witness some questions about it.

22          THE COURT:  Don't just put chunks of it up.  Ask

23  questions; and if you want to impeach him, do it that way.

24          MR. OLASA:  Absolutely.

25  \\\
```

1    BY MR. OLASA:

2    **Q.**   Could you turn to page 5 of Exhibit 11105?

3    **A.**   Okay.

4    **Q.**   Do you see the paragraph in the middle that starts with

5    "Untrusted code is executed on the device"?

6    **A.**   I do see that paragraph.

7    **Q.**   And that paragraph goes on to say (as read):

8            "One fundamental difference to other mobile operating

9        systems is that Android intentionally allows, with

10       explicit consent by end users, installation of application

11       code from arbitrary sources and does not enforce vetting

12       of apps by a central instance."

13       Do you see that?

14   **A.**   I see that text, yes.

15   **Q.**   And that is part of this Android platform security model

16   paper; correct?

17   **A.**   And something that my proposals still allow.

18   **Q.**   Under the Android platform security model, Android does

19   not enforce vetting of apps by a central instance; correct?

20   **A.**   That's correct, and nor does my proposals for

21   notarization.

22   **Q.**   Let's talk about your other proposal, decentralized

23   notarization.

24       And can we put on Professor Mickens' Demonstrative 47,

25   please?

1      Now, decentralized notarization is similar to your

2   centralized notarization proposal except that the tokens we

3   were talking about could be provided by multiple reviewing

4   entities, not just Google; right?

5   **A.**   That's correct.

6   **Q.**   But Google would be in charge of setting the standards for

7   who qualifies as one of these third-party reviewing entities

8   you show at the bottom of the slide; correct?

9   **A.**   Right.  So Google would serve as a certification authority

10  determining which companies meet Google's security bar.

11  **Q.**   And you don't actually have a specific proposal for what

12  standards Google should apply; right?

13  **A.**   Well, I mean, they could be similar to the ones that

14  Google uses currently with the App Defense Alliance, for

15  example.

16  **Q.**   I understand.  But do you have any specific proposals for

17  what standards Google should apply in certifying these

18  third-party entities?

19  **A.**   Well, Google gets to set those standards.  That's true in

20  the centralized and decentralized case.

21  **Q.**   So Google could pick the standards; is that right?

22  **A.**   That's right.

23  **Q.**   And then all of those reviewing entities would then have

24  to apply Google standards; right?

25  **A.**   They have to what?

1   **Q.**   Apply Google standards; right?

2   **A.**   Yes.  So their review processes would have to meet that

3   sort of quality bar that Google set.

4   **Q.**   And Google would have to review and audit these third

5   parties to make sure that they were meeting those standards;

6   right?

7   **A.**   Yeah, similar to what happens today in the browser CA

8   infrastructure, that's right.

9   **Q.**   And, again, you haven't checked with any OEM as to whether

10  they would accept this decentralized notarization proposal;

11  right?

12  **A.**   By "OEM" you mean like a phone OEM?

13  **Q.**   Any OEM.  Like Samsung.

14  **A.**   I have not checked with OEMs, no.

15  **Q.**   So a moment ago you drew an analogy to browser certificate

16  authorities, and you did that in your direct testimony as well.

17  Do you recall that?

18  **A.**   I do.

19  **Q.**   Now, browser certificate authorities, they issue web

20  certificates; right?

21  **A.**   That's correct.

22  **Q.**   And a web certificate doesn't mean that a particular

23  website is safe; right?

24  **A.**   Well, it indicates certain things about the security

25  properties of that website.

1  Q.   Well, a web certificate authority doesn't review whether a

2  website is hosting malware; right?

3  A.   That's correct.

4  Q.   And a web certificate authority isn't even required to

5  review the website's content in any way; right?

6  A.   That's correct.

7  Q.   And your reports don't identify any modern operating

8  system that has implemented decentralized notarization for app

9  review; right?

10  A.   That is correct.

11  Q.   You haven't identified a single modern operating system

12  that implements this proposal; right?

13  A.   Not my exact proposal, but it's similar to other types of

14  technologies that are out in the wild today.

15  Q.   In fact, you agree that no popular consumer operating

16  system has ever implemented decentralize notarization for app

17  review; right?

18  A.   True, but looking at what is and saying --

19  Q.   Is that right, Professor Mickens?  Is that correct?

20  A.   Correct.

21  Q.   And that's because applying decentralized notarization to

22  app review would be a new domain; correct?

23  A.   What do you mean by "new domain"?

24  Q.   Have you used those words to describe the application of

25  decentralized notarization to app review?

1   **A.**   I mean, it would be a new domain in the sense of there

2   would be infrastructure that we'd have to build that doesn't

3   currently exist.

4   **Q.**   And you're proposing that Google should enter this new

5   domain; right?

6   **A.**   I'm proposing that it is a thing that they could do, and

7   it wouldn't have that much cost in terms of additional

8   resources.

9   **Q.**   Now, Epic -- Epic Games, the plaintiff in this case, they

10   haven't entered this new domain; right?

11   **A.**   By "new domain" are you talking about my proposed

12   notarization schemes?

13   **Q.**   Let me break it down.

14        Epic Games operates a game storefront on PCs; right?

15   **A.**   That's right.

16   **Q.**   And users can go to that storefront and they can download

17   games; right?

18   **A.**   That's right.

19   **Q.**   Epic Games does not trust third-party entities to certify

20   the games on its store; right?

21   **A.**   Not to my knowledge.

22   **Q.**   Epic trusts only Epic; right?

23   **A.**   To my knowledge, yes.

24   **Q.**   Professor Mickens, Epic is paying you for your work on

25   this case; correct?

1    **A.**    That is correct.

2    **Q.**    And you are paid about $750 an hour; is that right?

3    **A.**    That's right.

4    **Q.**    How much in total have you earned for this engagement?

5    **A.**    I think roughly $150,000.

6    **Q.**    All right.  Let's turn to sideloading.

7         So would you agree, Professor Mickens, that the computer

8    security community recognizes that sideloading on mobile

9    devices is risky for the average user?

10   **A.**    I think it's more subtle than that, the security

11   community's stance on sideloading.

12   **Q.**    You think many people in the security community recognize

13   that sideloading on mobile devices is risky for the average

14   user?

15   **A.**    I think that there are a variety of opinions on

16   sideloading.

17   **Q.**    All right.  Are you familiar with the Cybersecurity and

18   Infrastructure Security Agency?

19   **A.**    Yes, I am.

20   **Q.**    That's a federal agency; right?

21   **A.**    Yes, that's right.

22   **Q.**    And it goes by the acronyms CISA or CISA?

23   **A.**    That's correct.

24   **Q.**    And CISA hires experts in computer security; right?

25   **A.**    They do.

**MICKENS - CROSS / OLASA**

1  **Q.**   And you're aware that CISA offers guidance on computer

2  security issues; right?

3  **A.**   I am aware of that.

4  **Q.**   And CISA's guidance on sideloading in particular was

5  brought to your attention by Professor Qian, Google's expert in

6  this case; right?

7  **A.**   Correct.

8  **Q.**   All right.  So could you turn to Exhibit 6595 in the

9  binder in front of you?

10 **A.**   (Witness examines document.)  Got it.

11 **Q.**   And Exhibit 6595 is guidance from CISA; correct?

12 **A.**   That is correct.

13 **Q.**   And it's on privacy and mobile device apps; right?

14 **A.**   That is correct.

15 **Q.**   And there's a heading on the first page "How can you avoid

16 malicious apps and limit the information apps collect about

17 you?"  Do you see that?

18 **A.**   I do see that.

19 **Q.**   And below that there's a sentence that says (as read):

20         "Reduce the risk of downloading PHAs by limiting your

21     download sources to official app stores, such as your

22     device's manufacturer or operating system app store."

23     Do you see that?

24 **A.**   Yes.

25 **Q.**   And that was the advice given by CISA; right?

1   **A.**   Well, there's also that second sentence, which says (as

2   read):

3            "Additionally, because malicious apps have been known

4        to slip through the security of even reputable app stores,

5        always read the reviews and research the developer before

6        downloading and installing the app."

7        So that advice is more subtle than I think you would find

8   here.

9   **Q.**   I understand.  But CISA advises users to limit their risk

10  of downloading potentially harmful apps by limiting their

11  downloads to official app sources -- app stores; correct?

12  **A.**   That's part of the guidance.

13  **Q.**   And CISA also says immediately after that sentence (as

14  read):

15           "Do not download from unknown sources."

16       Correct?

17  **A.**   It says that, yes.

18  **Q.**   And this was guidance that, again, Professor Qian brought

19  to your attention in his report; right?

20  **A.**   That's correct.

21  **Q.**   And you submitted a reply report after that; correct?

22  **A.**   I did.

23  **Q.**   And you don't mention this guidance in your reply report;

24  correct?

25  **A.**   I do not.

1  Q.   And Professor Qian brought guidance to your attention from

2  many government agencies and third parties; right?

3  A.   That's correct.

4  Q.   And your report doesn't mention any of those examples;

5  correct?

6  A.   That's correct.

7  Q.   Now, do you agree that sideloading can result in malware

8  infections?

9  A.   It is one way that malware can arrive on a user's device.

10  Q.   And a sideloaded app may not have been reviewed for

11  malware?

12  A.   May or may not have been.

13  Q.   Right.  All apps on Google Play are reviewed for malware;

14  right?

15  A.   Correct.

16  Q.   But a sideloaded app may or may not have been reviewed for

17  malware?

18  A.   Correct.

19  Q.   And would you agree that an app that has been reviewed for

20  malware is safer to install than one that hasn't received such

21  a review?

22  A.   More likely to be safe, yes.

23  Q.   Now, in your report you visited a website called APKFab to

24  test direct downloading from that website; right?

25  A.   Yes.

1   **Q.** All right.  So let's -- so this weekend, you know, I

2   visited APKFab and searched for Netflix.  So I'm going to put a

3   demonstrative up to talk to you about.

4        Could we put up Demonstrative 2?

5        So I visited APKFab and I searched for Netflix, and here

6   are the results I got.

7        Do you know if Netflix actually distributes its

8   through APKFab?

9   **A.** I'm not sure.

10  **Q.** Do you think it's likely?

11  **A.** It's possible.

12  **Q.** Do you think it's likely?

13  **A.** I don't know.  I'd have to do some more research into it.

14  I don't know.

15  **Q.** You have no idea one way or the other whether it's likely

16  that Netflix actually officially distributes its app through

17  APKFab?

18  **A.** In the same way that if I search on the Play Store and see

19  a bunch of copycat apps, I'm not sure which one is real or if

20  the developer actually distributes through there.

21  **Q.** Let's take a look at one example of the apps here.  I'm

22  going to point you to the second icon on the leftmost row and

23  click on that one, and see what it shows us.

24       So that's the app I saw, and there's a little green icon

25  that says "Trusted app."  Do you see that?

1    **A.**   I do.

2    **Q.**   APKFab appears to be saying that this app is a trusted

3    app; right?

4    **A.**   Correct.

5    **Q.**   What does APKFab do to review this app?

6    **A.**   So I'm not aware of the detailed process that APKFab uses.

7    **Q.**   You have no idea if APKFab does any review at all of this

8    app; right?

9    **A.**   I'm not sure.

10   **Q.**   For all you know, that trusted app badge is given to every

11   app; right?

12   **A.**   I don't think it's given to every app, but I don't know

13   what the detailed review process is, no.

14   **Q.**   Do you know one way or the other whether that badge is

15   shown for every app on APKFab?

16   **A.**   I don't believe that it is, no.

17   **Q.**   And either way, you don't know how that badge was put on

18   the app; right?

19   **A.**   That's correct.

20   **Q.**   Do you know who runs APKFab?

21   **A.**   I don't know what company runs it, no.

22   **Q.**   You have no idea; right?

23   **A.**   I don't know.

24   **Q.**   Now, the page for this app shows Netflix screenshots.  Do

25   you see that?

**MICKENS - CROSS / OLASA**

1    **A.**   I do.

2    **Q.**   But the actual packaging for this app appears to be

3    something called com.tveeemobilee.nitflix.  Do you see that?

4    **A.**   I do.

5    **Q.**   This isn't the real Netflix app; right?

6    **A.**   I would imagine it's not.

7    **Q.**   This is probably malware of some type; right?

8    **A.**   I don't know if it's malware, but it's most likely not the

9    legitimate Netflix app.

10   **Q.**   And you know that malware often pretends to be a popular

11   brand; right?

12   **A.**   It appears to be a popular --

13   **Q.**   It masquerades as a popular brand; right?

14   **A.**   That happens, yes.

15   **Q.**   All right.  You testified earlier, Professor Mickens, that

16   the operating system can provide protections to users from

17   malware; right?

18   **A.**   Correct.

19   **Q.**   But the operating system can't protect a mobile device

20   against all malware attacks; right?

21   **A.**   I agree.

22   **Q.**   There's some types of malware that an operating system

23   just can't stop on its own; correct?

24   **A.**   Correct.

25   **Q.**   And you also talked about some defenses built into the

1   operating system, like sandbox.  Do you -- sandboxing.  Do you

2   remember that?

3   **A.**   I do.

4   **Q.**   And despite these defenses, the operating system can't

5   stop all malware on its own; right?

6   **A.**   Correct.

7   **Q.**   For example, users could allow an app outside its sandbox;

8   right?

9   **A.**   Excuse me.  What do you mean?

10  **Q.**   A user could ask -- could give an app permission to escape

11  its sandbox; right?

12  **A.**   A user can grant permissions to an app to, you know,

13  access devices or things like that.

14  **Q.**   And one of those permissions could be to allow an app to

15  access data from another app; right?

16  **A.**   Not quite.  So there are permissions that allow an app to

17  access more data than would be in its private sandbox, but

18  there are no permissions, to my understanding, that would allow

19  it to access all data on the phone.

20  **Q.**   Are you familiar with the accessibility permissions on an

21  Android device?

22  **A.**   I've heard of those, yes.

23  **Q.**   Do you know if the accessibility permissions on an Android

24  device allow an app to access data from another app?

25  **A.**   So my understanding of those permissions is that they

1  allow an app to do things like display screens like over other

2  apps, and things like this.  It doesn't provide a total sandbox

3  jailbreak, though.

4  Q.   In any event, despite those protections we were discussing

5  earlier, the operating system just can't stop all malware on

6  its own; right?

7  A.   On its own, that's correct.

8  Q.   Now, you've heard the term "Defense in Depth" as applied

9  to computer security; correct?

10  A.   I have.

11  Q.   In fact, you teach this concept in your classes?

12  A.   I do.

13  Q.   And the idea behind Defense in Depth is that an attacker's

14  job becomes much more difficult when a device has multiple

15  layers of defense; right?

16  A.   That's the idea, yes.

17  Q.   And there's wide agreement in your field that systems

18  should be designed with Defense in Depth in mind; right?

19  A.   That's right.  Nothing about my proposals are opposed to

20  that principle.

21  Q.   Right.  And you agree that it's a bad idea to rely on just

22  one layer of security to protect users; right?

23  A.   Correct.  I believe in the principle of Defense in Depth.

24  Q.   Right.  And you believe the operating system shouldn't be

25  the only layer of security; right?

1   **A.**   Correct, but I believe this it is the most fundamental

2   one.  It enables other types of Defense in Depth.

3   **Q.**   But it shouldn't be the only one; right?

4   **A.**   Correct.

5   **Q.**   All right.  So let's talk about the sideloading consent

6   screens.

7        **MR. OLASA:**  And, Your Honor, I'll make sure we don't

8   go through them in great detail.  I understand the instruction.

9        So I first want to put up a demonstrative,

10  Demonstrative 6, Mr. Nicols.

11  **BY MR. OLASA:**

12  **Q.**   Is Demonstrative 6 based -- or a reproduction of something

13  out of your expert report, Figure 24?

14  **A.**   Yes, I believe it is.

15  **Q.**   And that was an actual test you and your staff ran;

16  correct?

17  **A.**   That's correct.

18  **Q.**   On an actual Android device; right?

19  **A.**   That's correct.

20  **Q.**   And you put it in your report because you thought it was a

21  fair representation of the sideloading process; right?

22  **A.**   That's right.

23  **Q.**   Okay.  So there aren't 16 or 19 steps to sideload shown

24  here; right?

25  **A.**   In this particular diagram, no.

1  **Q.**   And when you tested this out, you were able to sideload an

2  app from a website with just these steps; right?

3  **A.**   That's correct.

4  **Q.**   And some of these steps aren't consent screens or warning

5  screens at all; right?

6  **A.**   No.  I think that with the exception of Step 6, these are

7  consent or warning screens.

8  **Q.**   So Step 1, navigate to the APK pure website, that's a

9  consent or warning screen?

10  **A.**   So, no, that was not a consent screen.

11  **Q.**   So some of these steps are not consent or warning screens;

12  right?

13  **A.**   Some of them, yes.

14  **Q.**   And some of these steps you actually think are reasonable;

15  right?

16  **A.**   Well, I think that at a high level, to the extent that

17  these screens reflect the two security questions that I

18  mentioned, they are reasonable, but the implementation of these

19  friction screens is not reasonable.

20  **Q.**   Okay.  So let's drill down on that, and we'll make it

21  quick.

22      So the first step you said that's just the user going to

23  the website and clicking somewhere to download an app; right?

24  **A.**   That's correct.

25  **Q.**   Not a warning or consent screen; right?

 1  **A.**    That's correct.

 2  **Q.**    All right.  So we can drop that one.

 3        Let's go on to the next slide.

 4        All right.  Step 2, you testified that's a browser

 5  warning; right?

 6  **A.**    Step 2, that's correct.

 7  **Q.**    And the browser warning is something shown by a web

 8  browser, not the operating system; right?

 9  **A.**    Accurate.

10  **Q.**    You heard Mr. Kleidermacher say that in his testimony;

11  right?

12  **A.**    I did.

13  **Q.**    Yeah.  And you agree that that's not part of what the

14  operating system is doing?

15  **A.**    Correct.

16  **Q.**    All right.  So let's drop Step 2.

17        All right.  So can we go on to the next slide?

18        Okay.  So we'll come back to Steps 3 and 4, but really

19  quick, I want to get your opinion on Step 5.

20        Step 5 here is the user confirming an app install; right?

21  **A.**    That's correct.

22  **Q.**    And you think Step 5 is reasonable; right?

23  **A.**    Yes.  Users should have to give consent to installing an

24  app.

25  **Q.**    Right.  Before an app is installed, a user should have to

1   consent to that; right?

2   **A.**   That's right.

3   **Q.**   So let's drop Step 5.

4       I think you told me earlier that Step 6 is not actually

5   friction.  It's a shortcut to open the app; right?

6   **A.**   Correct.

7   **Q.**   Right.  So it's not -- it's not an additional step the

8   user has to navigate to install an app; correct?

9   **A.**   Correct.

10  **Q.**   All right.  So let's drop Step 6 from this.

11      So that leaves us with Steps 3 and 4.  Now, Steps 3 and 4

12  require the user to consent to giving installer rights to the

13  app that is doing the installation; right?

14  **A.**   That's correct.

15  **Q.**   And in this case the app doing the installation is Chrome;

16  right?

17  **A.**   In this case, yes.

18  **Q.**   And on Android any app can be given the right to install

19  other apps; correct?

20  **A.**   That is correct.

21  **Q.**   For example, even a calculator app that declared the right

22  permissions could become an installer and install apps on

23  Android; right?

24  **A.**   That is right.

25  **Q.**   And if the user slides the toggle we see in Step 4, that

1  effectively authorizes Chrome to become an installer on that

2  device; correct?

3  **A.**   That's accurate.

4  **Q.**   And it's not just the installation of one app.  By

5  flipping that toggle, Chrome can install other apps in the

6  future; correct?

7  **A.**   Correct.

8  **Q.**   So in your example, we were talking about the -- in your

9  testimony, you were talking about the Wikipedia app.  The user

10  may be installing the Wikipedia app here, but in the future the

11  user could be installing other apps; correct?

12  **A.**   Assuming they didn't abandon the flow, which is an

13  important point.

14  **Q.**   Assuming the user didn't abandon the flow and the user

15  enabled Chrome as an installer, it's not just the one app the

16  user was installing at the moment that could be installed, the

17  user can also install any number of apps in the future; right?

18  **A.**   If I understand the setup, yeah.  Once that slider is

19  moved over, then there won't be subsequent prompts to anyone to

20  allow Chrome to be an installer.

21  **Q.**   So, for example, if the user went back to that Nitflix app

22  we were looking at earlier and tried to install it, the user

23  wouldn't see screens 3 and 4 again; right?

24  **A.**   That's correct.

25  **Q.**   And you agree with the concept of asking the user to

1  consent before you allow one app to become an installer on the

2  phone; right?

3  **A.**   Yes.  Users should have to consent before an app can act

4  as an installer.

5  **Q.**   And that's because the permission to install other apps

6  has pretty significant security implications; right?

7  **A.**   That's correct.

8  **Q.**   It's a powerful permission; right?

9  **A.**   Powerful in the sense that, yes, it has security

10  implications.

11  **Q.**   And it's a permission that deserves special attention from

12  the user; right?

13  **A.**   Yeah.  Users should have to give consent for those types

14  of powers to be used.

15  **Q.**   And the reason for this is that an app that has the power

16  to install other apps can later install malware; right?

17  **A.**   That's possible, yes.

18  **Q.**   And an app that can install other apps can give attackers

19  powerful capabilities to corrupt the device; right?

20  **A.**   That's the thing malware can try to do, yes.

21  **Q.**   And that's a thing malware could actually do; right?

22  **A.**   It can try to do that.  Whether or not it succeeds,

23  depends on a variety of factors.

24  **Q.**   And your proposals in this case actually do require a user

25  to give consent before an app becomes an installer of other

1   apps; right?

2   **A.**   Correct.

3   **Q.**   Now, your primary concern with these screens 3 and 4 is

4   that they don't apply to preinstalled apps; right?

5   **A.**   They don't apply to preinstalled apps.

6       Well, I wouldn't quite phrase it that way.  I refer to my

7   original framing in terms of the friction flows need to be

8   proportional.  An aspect of that is that Android's current

9   design privileges preinstalled app stores so they don't have to

10  step through any of these friction screens.

11  **Q.**   Let me ask this a different way.

12      Your primary concern in Steps 3 and 4, is that they are

13  discriminatory in favor of preinstalled apps; right?

14  **A.**   That is one aspect of the problem, yes.

15  **Q.**   And, in fact, at the time you submitted your reports, that

16  was the one and only concern you identified; right?

17  **A.**   Well, as I mentioned, I think the framing is important.

18  **Q.**   Professor Mickens, at the time you submitted your report,

19  that was the one and only concern you identified with Steps 3

20  and 4 here; right?

21  **A.**   Well, I would say if you look at the report --

22  **Q.**   All right.  Professor Mickens --

23          **MR. OLASA:**  Your Honor, can we take a look at 208:2 to

24  208:19?

25          **THE COURT:**  Of what?

1          MR. OLASA:  Of Tab 1.

2          THE COURT:  Well, you can do it, but I don't find this

3     to be particularly impeaching.

4       Go ahead.

5          MR. OLASA:  We have a clip of this one, Your Honor, to

6     make it faster.  Can we put the clip up?

7                (Video was played but not reported.)

8     BY MR. OLASA:

9     Q.   That was your testimony; right?  Correct,

10    Professor Mickens?

11    A.   That's correct.

12    Q.   Now, treating preinstalled stores differently when it

13    comes to installation rights is very common; correct?

14    A.   Yes, that's common.

15    Q.   Many operating systems trust the preinstall store; right?

16    A.   Correct, in the sense of, like, they don't put up

17    additional friction screens.

18    Q.   Right.  On many operating systems, the preinstall store

19    doesn't see any warning screens; right?

20    A.   Correct.

21    Q.   Like on Apple iOS devices, the Apple App Store doesn't

22    get any warning screens; right?

23    A.   That's right.

24    Q.   And we heard about Fire OS devices by Amazon earlier

25    today.  Do you recall that?

1  **A.**    I do.

2  **Q.**    And on Fire OS devices, the Amazon Appstore is

3  preinstalled; right?

4  **A.**    That's correct.

5  **Q.**    And it doesn't get any warning screens; right?

6  **A.**    That's right.

7  **Q.**    It's trusted by the operating system right out of the box;

8  right?

9  **A.**    In the sense of not generating extra friction screens.

10 **Q.**    And on Apple's Mac OS, the Apple App Store on Mac is also

11 trusted out of the box; right?

12 **A.**    Correct, in the same sense of not displaying any

13 additional friction screens.

14 **Q.**    In fact, your reports don't identify a single popular

15 commercial operating system that does not give the preinstalled

16 app store special installation permissions; right?

17 **A.**    Well, with the same caveat that what is is not always what

18 should be.  That's correct, I don't point that out, yes.

19 **Q.**    All right.  I want to focus on what is.

20        So based on what is, there isn't a single popular

21 commercial operating system that does not give the preinstalled

22 app store special installation permissions; right?

23 **A.**    To my knowledge, that's correct.

24 **Q.**    Now, at the end of the day, Professor Mickens -- can we

25 have Demonstrative 15 up?

1        At the end of the day, Professor Mickens, over a billion

2   users have successfully navigated these screens; right?

3   **A.**   I'm not in a position to know the number of users who've

4   navigated these screens.

5   **Q.**   You know more than half of Android users have navigated

6   these screens; right?

7   **A.**   I'm not in a position to say either which way.

8   **Q.**   Well, Professor Qian's report brought this information to

9   your attention; right?

10  **A.**   That's correct.

11  **Q.**   And your reply report doesn't claim that his

12  interpretation of the data is wrong; correct?

13  **A.**   Correct, although it does talk about internal Google

14  sources who say that friction is a significant barrier.

15  **Q.**   Professor Mickens, I think my question was fairly

16  straightforward.

17       Does your reply report claim that the data on sideloading

18  is wrong?

19  **A.**   It doesn't specifically claim that that observation is

20  incorrect.

21  **Q.**   Understood.

22       And you, yourself, don't have any actual data on how often

23  users go through these screens; right?

24  **A.**   I don't have any raw numbers, no.

25  **Q.**   So we just looked at how Android handles sideloading.

1    Let's look at what some other operating systems do.

2         Can we go to Demonstrative 16?

3         Professor Mickens, you're familiar with the

4    Nintendo Switch; right?

5    **A.**    Correct.

6    **Q.**    The Switch is a mobile gaming device?

7    **A.**    That's right.

8    **Q.**    And Nintendo has a store on the Switch; right?

9    **A.**    Correct.

10   **Q.**    And, in fact, Epic's game Fortnite is available on the

11   Switch; right?

12   **A.**    I believe that's correct, yes.

13   **Q.**    And Nintendo does not support sideloading on the Switch;

14   right?

15   **A.**    Not officially, no.

16   **Q.**    And you're familiar with the Xbox and PlayStation gaming

17   consoles?

18   **A.**    I am.

19   **Q.**    Microsoft makes the Xbox; right?

20   **A.**    Correct.

21   **Q.**    And you actually worked at Microsoft; right?

22   **A.**    I used to.

23   **Q.**    Yeah.  And Sony makes the PlayStation; correct?

24   **A.**    Correct.

25   **Q.**    And Epic makes Fortnite available on both these consoles;

1   right?

2   **A.**   That's right.

3   **Q.**   And neither of these consoles allow any sideloading;

4   right?

5   **A.**   Not officially, no.

6   **Q.**   And, finally, let's talk about Amazon.

7       Amazon has the Fire OS operating system we talked about a

8   moment ago?

9   **A.**   That's correct.

10  **Q.**   Demonstrative 18, please.

11      And Fire OS has Amazon's own app store on it; right?  We

12  talked about that a moment ago?

13  **A.**   That's right.

14  **Q.**   And it doesn't come with Google Play loaded on it; right?

15  **A.**   You mean the Play Store?

16  **Q.**   That's right.

17  **A.**   Correct.

18  **Q.**   And to make Fire OS, Amazon actually started with the

19  Android open-source code that Google makes freely available to

20  anyone; right?

21  **A.**   That's correct.

22  **Q.**   And Amazon made changes to that source code to make

23  Fire OS; right?

24  **A.**   That's accurate.

25  **Q.**   And it didn't have to pay Google anything to do that;

1    right?

2    **A.**    No.  That open-source code is freely available.

3    **Q.**    And, in fact, Amazon made some security changes to Fire OS

4    that are not in Google's Android; right?

5    **A.**    Correct.

6    **Q.**    And if it wanted to, Amazon could have changed those

7    sideloading consent screens we looked at earlier; right?

8    **A.**    If it wanted to, yes.

9    **Q.**    Amazon could have implemented either centralized or

10   decentralized notarization; right?

11   **A.**    That's possible.

12   **Q.**    But, in fact, Amazon has retained the same sideloading

13   screens we saw when we walked through the Google flow; right?

14   **A.**    I believe that's correct, yes.

15   **Q.**    Are these the screens, Professor Mickens?

16        I'll move on to Demonstrative 19.

17        Are these the same screens that Fire OS uses?

18   **A.**    Yes, I believe -- right.  So Silk is the browser that you

19   oftentimes see used on those Amazon devices.

20   **Q.**    And these are -- these are the same consent screens in

21   effect we saw for Google Android; right?

22   **A.**    Yes.  They're very similar, yes.

23   **Q.**    All right.  And, finally, let's talk about Apple's iOS.

24        And we can go to Demonstrative 20.

25        Now, Apple doesn't allow consumers to do any sideloading

1  on the iPhone; right?

2  **A.**   Correct.  That's not officially sanctioned.

3  **Q.**   In fact, Android has much less restrictions when it comes

4  to sideloading than an iPhone; right?

5  **A.**   Comparatively, yes.

6  **Q.**   And you believe that Android and Apple's iOS are roughly

7  equivalent on security; right?

8  **A.**   I do.

9  **Q.**   But you agree that popular media outlets sometimes

10  portray iOS as more advanced than other operating systems;

11  right?

12  **A.**   I'd say that's true.

13  **Q.**   And this belief is nurtured by Apple's aggressive

14  marketing narrative on security; right?

15  **A.**   I agree Apple does have a lot of marketing to that effect.

16  **Q.**   And this marketing by Apple, it influences consumer

17  purchasing decisions; right?

18  **A.**   It can.

19  **Q.**   Security is one thing many consumers care about; right?

20  **A.**   Some consumers, yes.

21  **Q.**   Are you saying there's some consumers that just don't care

22  about security?

23  **A.**   No.  I'm just saying I'm not sort of like a marketing

24  expert.  I haven't done user surveys of how people rank their

25  individual, you know, desired qualities for phones; but, yes,

 1  some people will care about it.

 2  **Q.**   And Apple's marketing narrative attacks Android for

 3  allowing sideloading; correct?

 4  **A.**   Among other things.  Apple attacks Google for a lot of

 5  different reasons.

 6  **Q.**   That's true.  Apple attacks Google all the time; right?

 7  Apple and Google are fierce competitors; right,

 8  Professor Mickens?

 9  **A.**   I mean, in the sense that they both sell phones.  I mean,

10  I don't want to weigh into the antitrust issues but, yeah.

11  **Q.**   Of course.  And Apple's marketing narrative on security

12  attacks Android for permitting sideloading; right?

13  **A.**   That's one of the things that Apple complains about.

14  **Q.**   If Google dropped the sideloading warnings, Apple would

15  have a field day; right, Professor Mickens?

16  **A.**   Well, I mean, nothing in my proposal is setting up such a

17  field day as you describe.

18  **Q.**   You think that Apple might attack Android for dropping

19  these sideloading warnings?

20  **A.**   Well, I'm not -- I mean, are you suggesting that my

21  proposals would drop those sideloading warnings?  I guess I

22  don't understand the context of the question.

23  **Q.**   If Android were to drop the sideloading warnings, do you

24  think Apple would attack Android in the marketplace?

25  **A.**   I think that if Google did not replace those warnings with

1    something that tried to protect users, Apple would make some

2    hay out of that.

3    **Q.**   Thank you, Professor Mickens.

4            **MR. OLASA:**  I pass the witness.

5            **THE WITNESS:**  Thank you.

6            **THE COURT:**  Okay.  Any brief redirect?

7                        <u>**REDIRECT EXAMINATION**</u>

8    **BY MR. CLARKE:**

9    **Q.**   Professor Mickens, can you hear me okay?

10   **A.**   Yes, I can.

11   **Q.**   You were asked some questions at the end there about

12   Apple.  Do you recall that?

13   **A.**   I do.

14   **Q.**   And you were asked whether Apple and Google compete.  Do

15   you recall that?

16   **A.**   I do.

17   **Q.**   What do you understand that term to mean in the context of

18   your testimony here?

19   **A.**   So I'm not an economist and so, you know, I can't talk

20   about what competition means in the antitrust sense.

21        My understanding as a security expert and an engineer is

22   that both Apple and Google, they, you know, have engineers,

23   they have security people who are working on adding various

24   features to their phone.  And so there's sort of like a

25   technical rivalry there, a technical competition.  But, you

 1  know, I can't talk about, you know, sort of the antitrust

 2  definitions of are they competitors.

 3  **Q.**   Professor Mickens, you were asked a series of questions

 4  about centralized notarization.  Do you recall that?

 5  **A.**   I do.

 6  **Q.**   And there were five propositions on a slide that Google

 7  counsel put in front of you.  Do you recall those five

 8  propositions?

 9  **A.**   I do.

10  **Q.**   And you said that you disagree with the way that that was

11  presented on that slide.  Do you recall?

12  **A.**   I do.

13  **Q.**   Why do you disagree with that?

14  **A.**   So let's see, let me see if I can remember the five

15  propositions.

16       So some of the propositions were about cost.  So, you

17  know, what would my notarization proposals cost.  And I was

18  asked whether I'd evaluated the dollar amount of that, and I

19  answered no.  And that's true, I haven't evaluated the dollar

20  amount.

21       But what I did evaluate in both of my reports is how those

22  proposals would scale.  So what does that mean?  Like in

23  computer science terms, something scales when you look at how

24  easy is it to make it bigger to handle more users, things like

25  that.

1    And so I did evaluate how my notarization proposals would

2 scale.  And what I observed is that for a company that operates

3 at the size of Google -- right? -- their mission is to organize

4 all of the world's data.  When we look at sort of how much my

5 proposals would cause Google to have to scale up their

6 reviewing process, for example, to the extent that happened, I

7 think those scaling costs would be minimal.

8    And when I looked at, for example, the cost in terms of

9 implementation of changing Android itself to implement my

10 notarization proposals -- well, I've worked on multiple OSs.

11 When I was in grad school, I worked on Linux.  When I was at

12 Microsoft, I worked on Windows.

13    And so I evaluated the sort of the cost of my proposed

14 changes to Android in the context of that experience, and I

15 found that those costs would be quite small relative to, you

16 know, many other changes Google's made to the rest of their

17 infrastructure.

18    So that was one of the things that was on the slide, and

19 that was one thing that I objected to the characterization of

20 it.  In other words, just because I can't give a dollar value,

21 that doesn't prevent me from saying, "Well, for a company that

22 works at Google's scale, this is a reasonable low-lift effort

23 for them to do."

24 **Q.**  You were also asked -- I believe you were shown Slide 16

25 of your demonstratives, which had a quote from a Google

1    whitepaper.  Do you recall that?

2    **A.**    Yes.

3    **Q.**    And you were asked whether centralized notarization is

4    consistent with aspects of an Android security model.  Do you

5    recall that?

6    **A.**    That's right.  And if I recall correctly, that quote,

7    there is the grayed-out text, this is the quote you're

8    referring to --

9    **Q.**    Correct.

10   **A.**    -- in the grayed-out text -- oh, thank you very much.

11   Whoever did that, thank you.

12        So the grayed-out text says (as read):

13             "A central vetting of developers or registration of

14        users is not required."

15        And so the question was essentially:  Doesn't your

16   centralized notarization proposal violate the ethos, the spirit

17   of that grayed-out sentence.  And the answer is no because in

18   the centralized notarization proposal that I made, there is

19   still no requirement that all app developers have to somehow

20   register with Google and must submit their apps to Google.

21        That requirement's not there in the current way that

22   Android is designed, and that requirement isn't present in

23   either of my notarization proposals, centralized or

24   decentralized.

25   **Q.**    Professor Mickens, do you believe that your centralized

1  notarization model would result in opening or closing the

2  Android ecosystem?

3  **A.**   It certainly doesn't close it.  And, in fact, it may end

4  up opening it even more because now more developers might be

5  inspired to submit their apps for review and distribute them

6  through various mechanisms because now the review process has

7  been opened up.  And so for developers who were afraid of

8  submitting their app to review because they didn't want to only

9  distribute through the Play Store, my centralized notarization

10 proposal provides more openness.

11 **Q.**   You were shown a figure from your expert report that had a

12 series of friction screens.  Do you recall that?

13 **A.**   I do.

14 **Q.**   I think it was Figure 24 from your expert report.

15 **A.**   Yes.

16 **Q.**   Do you recall which Android version you used to create

17 Figure 24?

18 **A.**   I believe that was Android Version 12 that we used in the

19 report.

20 **Q.**   And do you know whether the friction steps in Android 12

21 were the same as they were in earlier Android versions?

22 **A.**   So there's been some slight tweaking there, but they're

23 largely the same.

24 **Q.**   Do you know whether there were any additional steps that

25 were added or steps that were substracted from Android 12 in

1  prior versions?

2  **A.**   I believe there was navigation screen that was removed,

3  like one extra step that a user had to perform.

4  **Q.**   And you were asked whether individual screens you thought

5  were reasonable.  Do you recall that?

6  **A.**   I do recall that.

7  **Q.**   In the aggregate, do you view that friction flow is

8  reasonable?

9  **A.**   Well, I think that's the core point; in the aggregate.  So

10  if we look at that workflow overall and we start sort of

11  discounting this and then this and then this, and then all of a

12  sudden it makes it seem like the friction isn't that much.

13       But, of course, that's not what the user experiences.  The

14  user doesn't experience somehow just that, I think, third and

15  four screen in isolation.  They experience the whole workflow.

16       So I think the way of analyzing that friction flow that

17  was presented wasn't actually representative of what users

18  actually experience.

19       And so, yeah, so when we looked during my direct testimony

20  at my proposed -- my proportionate friction flows, they

21  actually represent something that would really shrink those

22  screens to something that is actually proportional to the

23  amount of risk posed to the user.

24  **Q.**   You were shown a Switch and Xbox and a PlayStation.  Do

25  you recall that slide?

1  **A.**   I do.

2  **Q.**   Are any of those devices general purpose computing

3  devices?

4  **A.**   No.   Those are all gaming devices.

5  **Q.**   Do you consider an Android phone to be a general purpose

6  computing device?

7  **A.**   I do.

8  **Q.**   Do you have an understanding for whether the decision not

9  to support sideloading is driven by security as opposed to

10 other business consideration on these platforms?

11 **A.**   So my understanding is that on gaming platforms, they have

12 certain economic business models such that, for example,

13 sometimes the consoles are sold at a loss; and as a result, the

14 manufacturer of the console wants to make sure they can have

15 certain monetary flows.   And so the sort of use models from the

16 user perspective, as well as sort of the economic models

17 underneath it, are much different.

18 **Q.**   You were asked about guidance from CISA.   Do you recall

19 that?

20 **A.**   Yes.

21 **Q.**   That's a government agency?

22 **A.**   That's right.

23 **Q.**   Do you think that the guidelines issued by government

24 agencies like CISA would be necessary in your alternative

25 scenarios?

1    **A.**   I think the guidance would look a lot different.  I think

2    that the reason why you get guidance like the one that sort of

3    you were presented with is because right now Android is

4    designed in a way that makes it difficult for users to make

5    informed decisions about security.

6         So that's why if you look at the full context of that

7    paragraph that was there, it's important to look not just to

8    that fist sentence but also the last one too.  That paragraph

9    is basically saying:  Well, install via first-party stores.

10   That's important.  But then also you can get malware through

11   those stores so also look at developer reputation.

12        I mean, what a mess; right?  And in part, that's a mess

13   because Android doesn't provide those clear, concise warnings

14   that speak specifically about whether an app has received a

15   strong security review regardless of its app distribution

16   channel.

17        **MR. CLARKE:**  Your Honor, subject to any questions from

18   the jury, I have no questions for the witness.

19        **THE COURT:**  Oh, yes.  Ms. Clark?

20        Is this Number 6?

21        **THE CLERK:**  I think so.

22        **THE COURT:**  Okay.  I will ask this question and here

23   it is.  All right?

24        Taking into consideration third-party stores and direct

25   installation, are there different kinds of malware that apps

1  downloaded or sideloaded through these channels may be subject

2  to that apps downloaded through the Play Store would not be?

3        **THE WITNESS:**  Thank you.

4      So as I understand the question, whoever asked it, I think

5  what they're asking is:  Are there different threats that a

6  user is exposed to in terms of different types of malware

7  depending on the channel, the distribution channel by which

8  that malware would arrive?  And the answer is no.

9      So, in other words, if you look at, you know, different

10  types of malware, ransomware, Rootkits, Trojans, I could list a

11  number of different types of malware, all of those can be

12  distributed via all of the distribution channels that I

13  mentioned.

14      And, in fact, this is a core reason why, from the

15  perspective of the operating system, and, in fact, from the

16  perspective of the malware scanner, you know, this is why you

17  have to be equally as suspicious about all apps and just think

18  about:  What are they going to try to do?  You can't just give

19  them a free pass because they come from a particular

20  distribution channel because all of those distribution channels

21  we talked about, they can all be used as vectors to install the

22  same exact kinds of malicious software.

23        **THE COURT:**  Okay.  Thanks very much.  Careful on the

24  way down.

25      This was Question Number 6.

```
 1                      (Witness excused.)

 2            THE COURT:  Okay.  Who do we have next?

 3            MR. OLASA:  Your Honor, Google calls Dr. Zhiyun Qian.

 4            THE COURT:  Oh, okay.

 5            MR. OLASA:  We're just going to hand out some binders,

 6    Your Honor.

 7            THE CLERK:  Please stand and raise your right hand.

 8                      ZHIYUN QIAN,

 9    called as a witness for the Defendant, having been duly sworn,

10    testified as follows:

11            THE WITNESS:  Yes, I do.

12            THE CLERK:  Please be seated.

13            THE WITNESS:  Thank you.

14            THE CLERK:  Please state your full name for the Court

15    and spell your last name.

16            THE WITNESS:  My full name is Zhiyun Qian.  My last

17    name is spelled as Q-I-A-N.

18            MR. OLASA:  May I proceed, Your Honor.

19            THE COURT:  Please.

20                    DIRECT EXAMINATION

21    BY MR. OLASA:

22    Q.   Professor Qian, what is your occupation?

23    A.   Well, I'm a professor at the University of California at

24    Riverside in the computer science and engineering department.

25    Q.   Do you specialize in any particular area of computer
```

 1  science?

 2  **A.**   Well, I do research in computer security, and a lot of my

 3  research actually focused on Android security specifically.

 4  **Q.**   What subjects do you teach at UC Riverside?

 5  **A.**   Operating systems and computer security.

 6  **Q.**   And do you have any graduate degrees in computer science?

 7  **A.**   Yes.  I have a Ph.D. from the University of Michigan.

 8  **Q.**   Have you published research in the field of computer

 9  science, Professor Qian?

10  **A.**   Yes.  I've published over 100 articles, and over a dozen

11  of them are specifically focused on Android security.

12  **Q.**   And putting aside your research work as a professor, do

13  you have any professional experience with Android?

14  **A.**   Yes.  So before I became a professor, I worked for

15  two years in a research lab called NEC Labs where I was

16  responsible for helping develop an anti-malware solution

17  basically for Android.

18       **MR. OLASA:**  Your Honor, I tender Professor Qian as an

19  expert in computer science, computer security, and Android

20  security.

21       **MR. CLARKE:**  No objection, Your Honor.

22       **THE COURT:**  Okay.  He's qualified on the topic of

23  security.

24       Go ahead.

25  \\\

BY MR. OLASA:

**Q.**   Professor Qian, have you ever received grant funding?

**A.**   Yes, I have.

**Q.**   And did you personally receive this money?

**A.**   No.

**Q.**   What did you do with the grant money that Google has provided to your lab?

**A.**   The grant money is basically provided to the university to sponsor research, and that money is typically paid to my Ph.D. students, you know, in terms of tuition and stipends.

**Q.**   What is the total amount of grant funding you've received?

**A.**   Roughly 270,000.

**Q.**   And taking into account all the time you spent at UC Riverside, what portion are these grants of the total grants you have received?

**A.**   Roughly 5 percent.

**Q.**   Did receiving these grants affect your opinions in this matter in any way?

**A.**   No.

**Q.**   All right.  Professor Qian, did you create some slides to help describe your opinions to the jury?

**A.**   Yes.

**Q.**   All right.  Let's turn to that first slide.

        **MR. OLASA:**  Ms. Clark, can we have control?

\\\

1  BY MR. OLASA:

2  **Q.**   Okay.  Let's go on to the next slide.  I have the

3  controller.

4       So we'll go into these in more detail, but could you

5  please tell the jury, what are your main conclusions in this

6  case?

7  **A.**   Sure.  So I have three main conclusions as you can see on

8  the screen.  First, Android faces significant malware threat.

9       Second, I've looked at Android's sideloading process.

10  We've been talking about it a lot.  And my conclusion is that

11  it's prudent and consistent with industry best practices and

12  security principles that I teach in class.

13       Lastly, I've evaluated Professor Mickens' proposals

14  carefully, and my conclusions are the alternative security

15  models are less flexible, would introduce new security risks,

16  and impose a burden on Google.

17  **Q.**   All right.  Let's turn to the first conclusion,

18  Professor Qian.

19       Is malware a problem for all computers or just mobile

20  devices?

21  **A.**   They're for all computers.

22  **Q.**   Are mobile devices particularly attractive targets for

23  malware?

24  **A.**   Yes, they are, just because the sheer volume of mobile

25  devices.  In fact, now we have many more mobile devices

1   compared to personal computers.

2        And, of course, beyond that, there are several other

3   reasons.  For example, nowadays we have many -- much more

4   sensitive information stored on our phone.  You know, you have

5   your location, for example, and your phone is always on and

6   always with you.  And, you know, malware can use that to, for

7   example, track your physical location, which it wouldn't be

8   able to do in personal computers.

9   **Q.**   And is malware a greater threat to Android devices as

10  compared to other mobile devices?

11  **A.**   Yes.

12  **Q.**   Why is that the case?

13  **A.**   Well, compared to iOS, for example, there's really only

14  one app distribution channel, which is the official app store.

15       Now, in Android, we have multiple app distribution

16  channels.  We've been seeing that, you know, all this time

17  during the trial.  And, you know, malware can get through from

18  any of those app distribution channels.

19  **Q.**   Why does having multiple avenues of app distribution

20  affect the risk of malware?

21  **A.**   Well, it simply means there are multiple doors where

22  malware can slip through.

23  **Q.**   If malware does get on a user's device, what can it do?

24  **A.**   Well, it can do a lot of different things to harm the

25  users or their devices.  You know, they could steal sensitive

1   information.  They could lock up your device, encrypt your

2   files, and demand ransom; or they could, you know, secretly

3   track you.

4   **Q.**   And are there different types or categories of malware?

5   **A.**   Yes, there are.

6   **Q.**   All right.  I want to make sure we go through a few of

7   those.  Not too many.

8        So first, what is adware?

9   **A.**   Well, adware is what you can see on the screen here.  It's

10  pretty obvious; right?  It's malware basically displaying

11  excessive numbers -- number of advertisements to the point

12  where the screen becomes less usable; right?  They're really

13  annoying.  I'm sure some of you have seen this before.

14  **Q.**   And what about ransomware?  What is ransomware?

15  **A.**   Ransomware is where malware would prevent users' access to

16  their devices or their files and unless the user pays some kind

17  of ransom.

18  **Q.**   So this slide shows something called Cyberpunk 2077 Beta.

19  What is this depicting, Professor Qian?

20  **A.**   Well, so Cyberpunk was a very popular game launched on

21  PCs, you know, such as Windows, and somehow the users in this

22  case were tricked into thinking that there's an Android version

23  of Cyberpunk.  Well, there never was Cyberpunk for Android.

24       But, unfortunately, users don't know better; and when they

25  actually download and install such apps, what they get is

1    actually ransomware.  In fact, you know, the screen is probably

2    too small to see, but the right screen is showing, you know,

3    the app, you know, displaying certain instructions and force

4    the users to actually pay ransom, otherwise their files will be

5    forever encrypted and it won't be possible -- users won't be

6    able to get the files back.

7    **Q.**    Okay.  And, finally, what is spyware?

8    **A.**    Well, spyware basically means, you know, you have, like we

9    talked about, a ton of sensitive information nowadays stored on

10   the phone.  You know, you have your chat messages.  You have

11   your browser, you know, search history.  You have, you know,

12   your location.  They can even secretly record video and audio

13   using the camera and microphone on the device.

14   **Q.**    Can spyware steal user banking credentials?

15   **A.**    Yes, they certainly can.

16   **Q.**    And what is being depicted on this slide that the jury's

17   seeing?

18   **A.**    So this is showing sort of another example of deception,

19   which, you know, we've seen over and over and over again; and

20   in this case, it's showing a piece of malware disguised as

21   system update app.  And you see that little Google icon there?

22   It's not actually real Google.  In reality, this is malware and

23   it's actually secretly collecting information in the background

24   and sending them to the malicious actor.

25   **Q.**    Now, during Mr. Kleidermacher's testimony, do you recall

1   him testifying about FluBot?

2   **A.**   Yes.

3   **Q.**   And did you review the transcript of his testimony?

4   **A.**   Yes, I did.

5   **Q.**   And the jury's heard a lot about FluBot.  So just briefly,

6   how does this slide relate to FluBot?

7   **A.**   Well, again, this is another example of deception, but in

8   this case we see the screen on the left a user is, again,

9   tricked into thinking that there is this, quote/end quote,

10   FedEx app where users are encouraged to download the FedEx app

11   in order to track their packages.  Lo and behold, when the user

12   actually clicks on the link, it's actually malware.

13       But it's really tricky for the users to figure out because

14   as you can see on the right screen, there is that FedEx icon

15   which looks legitimate.  But, again, when the user actually

16   installs this particular app, it is FluBot malware actually.

17   **Q.**   Did FluBot spread through sideloading?

18   **A.**   Yes, they do, and this is exactly an example of

19   sideloading.

20   **Q.**   All right.  Professor Qian, did you look at the

21   sideloading consent screens in Android?

22   **A.**   Yes, I did.

23   **Q.**   And what were your conclusions as to those consent

24   screens?

25   **A.**   Well, overall, my conclusion is that they're prudent and

1  consistent with industry best practices and the security

2  principles that are well established.

3  **Q.**   Okay.  So before we get to these sideloading screens and

4  your testimony on that, I'd like to first ask you about

5  preinstalled app stores.

6       Can Android devices come with a preinstalled app store?

7  **A.**   Yes, they can.

8  **Q.**   We heard a lot of testimony about this.  What can a

9  preinstalled app store do?

10 **A.**   They can install additional apps or update apps.

11 **Q.**   And who configures a device to have a preinstalled app

12 store?

13 **A.**   Well, it's the OEMs, such as Samsung.

14 **Q.**   And can an Android system come with more than one

15 preinstalled app store?

16 **A.**   They certainly can, and it does happen in practice.

17 **Q.**   I think Professor Mickens covered this, but if a user

18 tries to download an app from a preinstalled app store, will

19 the user get any warnings from the operating system?

20 **A.**   No.

21 **Q.**   Why won't the operating system issue a warning in that

22 situation?

23 **A.**   That's a good question.  So in this case, the user is

24 actually purchasing a device from the OEM, let's say from

25 Samsung, and the user is already trusting the OEM, you know,

1  Samsung, that's placing whatever preinstalled app store is on

2  the phone.  So there is already that trust relationship that's

3  already established -- right? -- if you think about it.

4       And, in fact, if you purchase a Samsung device, you would

5  expect that you'll be able to install applications right out of

6  the box, otherwise it would be very awkward.

7  **Q.**  Now, do other operating systems also have the concept of

8  preinstalled app stores?

9  **A.**  Yes, they do.

10 **Q.**  And for these other operating systems, will the user see

11 any warnings if they attempt to install apps from a

12 preinstalled app store?

13 **A.**  No, none of the other operating systems show a warning for

14 their preinstalled app stores.

15 **Q.**  So is the Android approach to preinstalled app stores

16 consistent with what other platforms do?

17 **A.**  Yes, it is.

18 **Q.**  Now, on Android, if the user wants to install apps from

19 outside a preinstalled app store, we've seen that users can

20 sideload, so I don't want to rehash that ground, but I want to

21 briefly go to the sets of screens and get your testimony on

22 them, Professor Qian.

23      So, first, I want to ask you about -- I want to ask you

24 about this screen, this installation consent screen.  And the

25 jury has seen some videos and demonstratives before.

1        Can you remind the jury, what does this screen show?

2   **A.**    Well, this is -- like you said, it's an installation

3   consent screen.  This is displayed after the user has granted

4   the sideloading permission to a particular app.  This is

5   basically the screen that a user would see after the

6   sideloading permission is granted.

7   **Q.**    So I want to make sure we're clear on this.

8        So if a user downloads a sideloaded app store and consents

9   to that sideloaded app store installing other apps, for future

10  installations, is this the only screen that the operating

11  system shows for an installation?

12  **A.**    Yes, this would be the only screen.

13  **Q.**    And in your opinion, is this consent screen a reasonable

14  security precaution?

15  **A.**    Yes, it is.  And I think Mickens and I agree on this

16  point.

17  **Q.**    Now, why is the screen needed if the user has already

18  granted consent to a particular installation source?

19  **A.**    Well, it's because without the screen, the app, you know,

20  let's say, you know, in this case a third-party app store or

21  any other sideloaded apps, could then install any number of

22  apps subsequently without user knowledge.  And, you know, even

23  a calculator app with this permission can then basically

24  silently install malware.

25  **Q.**    So let's talk about the way a user can set up a store to

1    become an installer.

2         What do these screens show, Professor Qian?

3    **A.**    This is showing basically how the sideloading permission

4    would be granted to a specific app, let's say a third-party app

5    store.

6         And the first screen here shows basically -- we've seen

7    this before -- it's basically directing the user to the

8    settings in order to authorize the sideloading permission.

9    **Q.**    And as a security researcher, do you think it is

10   appropriate to ask user consent before allowing an app to

11   become an installer on a device?

12   **A.**    Yes, I think it's completely reasonable.  And, again, I

13   think Professor Mickens and I agree on this point.

14   **Q.**    So what could happen to users, from a security

15   perspective, without this consent flow?

16   **A.**    Well, this would mean that a user would not have a moment

17   to reflect about the decision that they're about to make, which

18   is sideloading.

19        And we all know sideloading is a dangerous operation, and

20   it is widely accepted in the industry and academia.  In fact,

21   this sideloading permission is not about sideloading a

22   particular app.  It's about enabling a particular source, in

23   this case Google Chrome, to install any number of apps

24   subsequently.

25        You know, you could install, let's say, Wikipedia today

 1   and tomorrow you could be installing malware.  You could be

 2   installing malware from the same exact app source.

 3   **Q.**   You see on the right that there's a toggle that says

 4   "Allow from this source."  And you used the word "source" a

 5   moment ago.  From the Android's operating system perspective,

 6   what is a source?

 7   **A.**   Well, a source is basically an app that can act as an

 8   installer.  Right?  It's able to install other apps.  So in

 9   this case, if you're, let's say, installing Wikipedia from

10   Chrome, well, it's the Chrome that's the source as opposed to

11   Wikipedia.

12   **Q.**   Now, you mentioned a moment ago that installing -- the

13   ability to install apps is a dangerous permission.

14        Does Android ask users for consent for other dangerous

15   permissions?

16   **A.**   Yes.

17   **Q.**   Can you give the jury some examples?

18   **A.**   Well, I think if you've used Android devices before,

19   you'll see things like, you know, when an app is trying to

20   access your GPS location, you would see a warning screen.

21   Right?  Or if the app is trying to access your -- it's a

22   camera -- right? -- you'd be warned as well.

23   **Q.**   And is the ability to install an app more dangerous than

24   these other permissions you've described?

25   **A.**   Yes.  In my view, being able to install additional apps

1    would be considered more a dangerous operation than, let's say,

2    accessing your GPS location.

3        And, in fact, this is consistent with what

4    Professor Mickens has said.  You know, friction should be

5    consistent with the level of risks.  In this case, we're

6    looking at a very dangerous operation of sideloading, which is,

7    again, not about installing one particular app; it's about this

8    app source, in this case Chrome, being able to install any

9    number of apps subsequently.  Right?

10       And given that, it is perfectly reasonable to have more

11   friction compared to a regular permission in Android.

12            THE COURT:  Okay.  Let's take our afternoon break.

13   We'll come back a little bit after 2:15.

14            THE CLERK:  All rise.

15                     (Recess taken at 2:00 p.m.)

16               (Proceedings resumed at 2:16 p.m.)

17       (Proceedings were heard out of the presence of the jury:)

18            THE COURT:  Bring the jury out.

19       (Proceedings were heard in the presence of the jury:)

20   BY MR. OLASA:

21   Q.   Professor Qian, are all apps on the Google Play Store

22   reviewed for malware?

23   A.   Yes, before they're published on Google Play.

24   Q.   Can you briefly explain to the jury what that review

25   process consists of?

QIAN - DIRECT / OLASA

1   **A.**   Well, at a very high level, there's this automated review

2   process, you know, using state of the art, you know, program

3   analysis and machine-learning algorithms.   I won't get into the

4   details.   And there's this complimentary human review process

5   that goes along.

6   **Q.**   And are all new apps on the Google Play Store reviewed by

7   a human?

8   **A.**   Yes.

9   **Q.**   Does the Google Play Store still have malware?

10   **A.**   Yes.

11   **Q.**   But is Google Play Store a relatively safe place for apps?

12   **A.**   Yes, because they have, you know, according to various

13   sources, lower malware rate compared to other app stores or

14   sideloading channels.

15   **Q.**   Are all sideloaded apps reviewed for malware?

16   **A.**   No.

17   **Q.**   And how does that difference affect the risk of

18   sideloading as compared to downloading from the Google Play

19   Store?

20   **A.**   Well, that means by design, sideloaded apps would have a

21   higher chance of being malware because if they're not reviewed

22   by any entity, then it's very likely -- you know, it's likely

23   that some of them would be malware and nobody would have caught

24   them.

25   **Q.**   Does academic research conclude that sideloading is risky?

1    **A.**    Yes.

2    **Q.**    And is there a consensus on this point?

3    **A.**    Yes.

4    **Q.**    And did you also consider the views of industry

5    participants on the risks of sideloading?

6    **A.**    Yes, I did.

7    **Q.**    And why did you consider these views?

8    **A.**    Well, because they are the stakeholders, like OEMs and

9    antivirus companies, that have an interest in the Android

10   users.

11   **Q.**    All right.  So, Professor Qian, what does this slide show?

12   **A.**    This is showing a number of quotes from various segments

13   in the industry.  For example, Verizon is a wireless carrier in

14   the U.S. that sells Android.  Lookout is an antivirus company

15   that specializes in mobile security.  Samsung we all know is an

16   OEM that manufactures Android devices.

17       And in this case, for example, Samsung is telling their

18   users sideloaded apps from outside sources can be a little like

19   the Wild West, unregulated and potentially hazardous.

20   **Q.**    Now, did you analyze any information from the plaintiff,

21   Epic Games, on whether sideloading is risky?

22   **A.**    Yes, I did.

23   **Q.**    What did you find?

24   **A.**    Well, in this case after the Fortnite installer app has

25   been sideloaded successfully through the browser app, we see

1   that it generates a warning to the users saying that, "Oh, your

2   browser has been granted the sideloading permission and please

3   now disable it" because, you know, you want your device to be

4   secure.  You don't want to enable sideloading all the time.

5   **Q.**   And how did this message relate to your opinions in this

6   case?

7   **A.**   Well, it means that there is a general consensus, you

8   know, even from Epic, that sideloading is risky.

9   **Q.**   So turning back to the sideloading warnings.

10      In your opinion as a security researcher, are they unduly

11   difficult?

12   **A.**   No, I don't think so.

13   **Q.**   And have you compared the sideloading screens to how

14   sideloading is handled on other mobile platforms?

15   **A.**   Yes.

16   **Q.**   I think the jury has already heard that iOS doesn't

17   allow sideloading.  So are Android's consent screens less

18   restrictive than what iOS does?

19   **A.**   Yes, because by definition iOS doesn't allow

20   sideloading.

21   **Q.**   And earlier with Professor Mickens we talked about

22   Amazon's Fire OS.  Do you recall that?

23   **A.**   Yes.

24   **Q.**   What is Fire OS?

25   **A.**   Well, Fire OS is an operating system now under Amazon, and

**QIAN - DIRECT / OLASA**

1  that operating system code is taken from the Android

2  open-source and they made, you know, changes to it and now

3  brand it as Amazon -- sorry -- as Fire OS.

4  **Q.**  And is Amazon free to make any changes it wants to the

5  code?

6  **A.**  Yes, they can.  In fact, they do, as we just talked about.

7  **Q.**  And how does Fire OS's approach to sideloading compare to

8  Google's?

9  **A.**  It is basically the same two identical screens that we

10  have seen.

11  **Q.**  And, Professor Qian, have you also looked at any data

12  regarding the proportion of devices that have enabled

13  sideloading?

14  **A.**  Yes, I did.

15  **Q.**  And where did you obtain that data?

16  **A.**  It's from Google's Joint Guard data.

17  **Q.**  And what do the data show?

18  **A.**  Well, it showed, I believe -- yes, next slide -- that

19  globally, this is data actually for November 2021, it's showing

20  that worldwide the percentage of devices was at least one app

21  that has enabled sideloading.

22      So that means over a billion users -- right? -- because

23  This is, again, worldwide data, excluding China, by the way --

24  more than a billion users who have successfully navigated the

25  unknown source flow that we've been talking about all this

**QIAN - DIRECT / OLASA**

1   time.

2   **Q.**   And is it significant to you that more than half of users

3   had enabled sideloading at least once?

4   **A.**   Yes.

5   **Q.**   Why?

6   **A.**   Well, if more than a billion users can navigate through

7   that flow, then it must not be too difficult.

8   **Q.**   All right.  Let's turn to certain security principles.

9       Did you assess Android's consent screens against any

10  computer security principles?

11  **A.**   Yes, I did.

12  **Q.**   Which principles?

13  **A.**   Well, there are three main principles I show here:

14  Defense in Depth, secure defaults, securing the weakest link.

15  And I'm going to explain them in more detail in just a bit.

16  **Q.**   Let's start with Defense in Depth.  What is Defense in

17  Depth?

18  **A.**   Well, Defense in Depth is this idea where you want to

19  introduce multiple layers of defense in case one of the layers

20  is bypassed by the attacker so that you still have these other

21  layers that have a chance to stop the attack.  It's a very

22  simple and well-established security principle in my field.

23      And just like what you see here on the screen, a good

24  analogy to understand this is, you know, if you want to defend

25  your castle, you want to have your wall up, you want to have

 1  your moat, and you also want to have your guards -- right? --

 2  so in case one of those layers of defense fails, you still have

 3  other layers.

 4  **Q.**   Are the sideloading consent screens we're looking at

 5  consistent with this principle of Defense in Depth?

 6  **A.**   Yes, it is.  I can explain.  You know, I think we all

 7  agree.  Professor Mickens and I also agree on this point.

 8       You know, operating system is an important layer of

 9  defense, but it doesn't mean that we should let go these other

10  layers of defense, which in this case, you know, we know

11  sideloading is a very dangerous operation and it warrants a

12  sideloading -- sorry -- a warning.

13  **Q.**   What about the principle of secure defaults?  What is that

14  principle?

15  **A.**   Well, the principle is stating, yes, if you have all of

16  your layers of defense, which is all great, but if you don't

17  enable them by default, then it wouldn't work.

18       And, conversely, if you have dangerous operations that can

19  undermine these layers of defenses, they don't want to enable

20  those dangerous operations by default.  Right?

21       So similar to the same analogy here.  Even if you have all

22  these good layers to defend your castle, but if your drawbridge

23  is down, is open, then attackers can just walk right in --

24  right? -- and bypassing all of your defenses.  That's why we

25  want the drawbridge to be up or closed by default.

1   Q.   Do Google's sideloading consent screens comply with this

2   principle of secure defaults?

3   A.   Yes.

4   Q.   And can you explain why?

5   A.   Well, basically, like I mentioned earlier, sideloading,

6   you know, or granting an app to be able to install other apps

7   in general is a dangerous operation.  I think we all agree.

8   And since that is a dangerous operation, just like any other

9   permissions that Android has, we don't want to grant that

10   permission by default.  We want to grant that permission only

11   when it's necessary.

12   Q.   All right.  Professor Qian, what is securing the weakest

13   link, and why is there a barrel on the screen?

14   A.   Well, I can explain.

15       What the idea of weakest link in the computing system is

16   that attackers will always gravitate towards the weakest part

17   of your system.  Just like water would gravitate towards the

18   lowest hole in the barrel; right?

19       So if you don't secure the weakest part of your system,

20   then it doesn't matter how secure the rest of the system is.

21   That's why we have this principle called securing the weakest

22   link.

23   Q.   And on consumer devices, what is typically the weakest

24   link?

25   A.   Well, oftentimes it is the user, a human being considered

1   the weakest link.  Why?  Well, because humans are often

2   deceived or tricked into doing things that allow malware or

3   attackers an advantage, you know, such as installing malware.

4   **Q.**   Do the sideloading consent screens comply with the

5   principle of securing the weakest link?

6   **A.**   Yes, because it's exactly trying to help give the user an

7   opportunity to think and reflect on this dangerous operation of

8   sideloading or installing additional apps.  That's a very

9   dangerous operation.

10  **Q.**   Now, Professor Mickens testified about another Google

11  security feature called Google Play Protect.  Do you remember

12  that?

13  **A.**   Yes, I did.

14  **Q.**   And Mr. Kleidermacher also testified about that.  Do you

15  recall that?

16  **A.**   Yes.

17  **Q.**   What is Google Play Protect?

18  **A.**   Well, at a high level, it is Google's antivirus or malware

19  scanner.

20  **Q.**   And does Google Play Protect try and protect users who

21  download apps from outside the Play Store?

22  **A.**   They do try to do that.

23  **Q.**   And how does Google Play Protect work for apps that are

24  downloaded from outside the Play Store?

25  **A.**   Well, they're going to be checked against what's called a

1    block list -- right? -- which is curated at the back end of

2    Google, which basically contains a list of known malicious

3    apps.  And if the app that's trying to be installed on the

4    device is on the block list, then the app installation would be

5    denied.

6    **Q.**   Now, do you recall Mr. Kleidermacher testifying about the

7    effectiveness of Google Play Protect versus the Google Play

8    Store?

9    **A.**   Yes.

10   **Q.**   What is your opinion on the effectiveness of Google Play

11   Protect as compared to the Google Play Store?

12   **A.**   Well, Google Play Protect is -- for off-Play apps is

13   inherently less effective compared to Google Play's protection.

14   **Q.**   Can you tell the jury why?

15   **A.**   Well, the simple reason is on Google Play, every single

16   app would have to be vetted or reviewed through a rigorous

17   process before publication.  So if an app is already on

18   Google Play, you know, it has gone through this full-blown app

19   review process; whereas for Play Protect for off-Play apps,

20   it's entirely possible that the app has never been seen by

21   Google before.

22        In fact, malware can use advanced techniques, such as

23   polymorphism, to try and generate a large variance of malware

24   that look different, every single one of them would look

25   different, and yet they're performing the same malicious

1    operation.  It would be very difficult to catch all such

2    malware instances ahead of time and review them.

3    **Q.**   Are there differences in how aggressive the Google Play

4    Store review process is as compared to Google Play Protect's

5    review process?

6    **A.**   Yes.  There is some fundamental difference there.

7    **Q.**   And can you explain that difference to the jury?

8    **A.**   So for the off-Play apps, the system, the AI system, or

9    the machine-learning model would have to be necessarily tuned

10   to be less aggressive in flagging malware.

11       Why is that the case?  Well, because Google doesn't have a

12   relationship with off-Play apps -- right? -- unlike apps that

13   are submitted to Google Play.

14       And if Google somehow, some way made a mistake about

15   flagging a benign app as malicious, what does that mean?  It

16   means that it's giving that app a death sentence.  That app is

17   no longer distributable anywhere else, not just from

18   Google Play.  It won't be distributed -- Google would basically

19   block that app from being installed from any arbitrary

20   distribution channel.

21   **Q.**   Does the Google Play Store also have information about the

22   app developer as part of its review process?

23   **A.**   Yes.

24   **Q.**   Does Google Play Protect have similar levels of

25   information?

1    **A.**    No.   Like I just mentioned, you know, off-Play apps can be

2    any apps, can be malware -- can come from malware authors or

3    come from anonymous developers, and they could be generated

4    even automatically using sophisticated techniques.   And malware

5    can also generate a large number variants of them in just a

6    matter of minutes.

7    **Q.**    In your opinion, is Google Play Protect sufficient to

8    ensure user security for apps outside the Play Store?

9    **A.**    No.

10   **Q.**    And does the existence of Google Play Protect mean that

11   the sideloading consent screens are unnecessary in your

12   opinion?

13   **A.**    No.   It goes back to the security principle that we just

14   talked about:   Defense in Depth.   Right?   You don't want to

15   take away one important layer of defense, especially

16   considering that the other layer of defense is imperfect.

17   **Q.**    All right.   Professor Qian, have you evaluated

18   Professor Mickens' proposals in his expert reports?

19   **A.**    Yes, I did.

20   **Q.**    What was your overall conclusion based on the information

21   that Professor Mickens provided?

22   **A.**    Well, I think the proposal sounds simple, but what's

23   really happening behind the scene is actually a lot more

24   profound than what it looks like.   And after some careful

25   analysis, I've arrived at the conclusion that the proposals are

1  less flexible, would introduce new security risks, and impose

2  burden on Google.

3  **Q.**  So let's start with centralized notarization.  What is

4  centralized notarization?

5  **A.**  Well, as we can see here, now under this model, Google

6  would become the one and only reviewing entity for the entire

7  Android ecosystem for the universe of Android apps.  And

8  basically everybody -- every developer would have to submit

9  their app to Google for review and receive sort of the token

10  that Professor Mickens was talking about.  And the key here

11  represents sort of the approval, the seal that Google is able

12  to sort of give to a particular app.

13  **Q.**  How is the centralized notarization proposal different

14  from what happens today on Android?

15  **A.**  Well, today every app store can review the apps from

16  within its own app store.  Right?  They wouldn't have to go

17  through Google to get them approved.

18      So, for example, if you have Galaxy Store, today all of

19  the apps are reviewed by Samsung within the Galaxy Store; and

20  since they're also preinstalled on Samsung devices, there would

21  not be any warning.

22      But under the new model, if a user would download apps

23  from the Galaxy App Store and those apps are not reviewed by

24  Google, well, then there's going to be a warning.

25  **Q.**  Is this the warning that Professor Mickens proposed in his

1    reports?

2    **A.**    Yes.

3    **Q.**    And would any app not reviewed by Google receive this

4    warning under Professor Mickens' centralized notarization

5    proposal?

6    **A.**    Yes.   Regardless of whether the app is distributed through

7    the Play Store or Galaxy App Store, or anywhere else, as long

8    as that app has not been reviewed and approved by Google, this

9    warning would be displayed.

10   **Q.**    Now, would implementing centralized notarization be a

11   significant change in the design of the Android operating

12   system?

13   **A.**    Yes, it would be a significant change.   Like I mentioned,

14   this may look like a simple change but it's not.   There's

15   actually profound ramifications on the entire Android ecosystem

16   on all the stakeholders.   Right?   It doesn't just affect

17   Google.   It affects also the OEMs, the users, and developers.

18   **Q.**    So how would this centralized notarization proposal affect

19   OEMs?

20   **A.**    Well, I think we talked a little bit about this before.

21   So today OEMs have the freedom to choose which preinstall app

22   stores to include on their devices and which of those

23   preinstalled app stores to trust.

24        In the new model, OEMs would effectively lose that

25   ability.   Right?   Even if they preinstall app stores on their

1  devices, if those apps have not been reviewed by Google, then

2  they're still going to trigger a warning.

3  **Q.**   And based on how Android is designed, as a technical

4  matter, as a technological matter, would Google need OEMs to

5  consent to this proposed change?

6  **A.**   Yes, they would have to agree because, you know, that's

7  basically causing OEMs to lose some abilities.  So I would

8  imagine OEMs would want to negotiate and would want to discuss

9  the change.

10 **Q.**   What about app developers?  How does this proposal of

11 centralized notarization affect app developers?

12 **A.**   Well, it's somewhat similar in the sense that developers,

13 you know, previously they can submit their apps to different

14 app stores, you know, to Google Play, to Galaxy App Store,

15 anywhere else -- right? -- for review.  And, for example, on

16 Galaxy App Store, if the app has been accepted and approved on

17 Galaxy App Store, well, then there would not be any warning.

18      But under the new model, they would all have to submit

19 their apps to Google to get it reviewed and approved in order

20 to enjoy the low-friction installation experience.

21 **Q.**   Now, how would this model affect users?

22 **A.**   Well, it's more or less the same idea.  Users today can

23 choose to download from the trusted app store, such as Galaxy

24 App Store, and enjoy low-friction experience.  And now this

25 change is taking away users' ability to trust certain

1  preinstalled app stores.

2  **Q.**   How would this change affect a user's ability to use a

3  sideloaded app store?

4  **A.**   Well, it's kind of similar.  So previously -- today users

5  are able to sideload any app stores; and as long as they enable

6  sideloading for such an app store, there's going to be no

7  warnings for subsequent installations.

8       However, in the new model, they will see a warning for

9  every single app that has not been approved by Google.  So

10 imagine if it's from the Galaxy App Store again, you know, if

11 you wanted to download 50 apps from the Galaxy App Store, if

12 those 50 apps have not been reviewed by Google and approved,

13 well, a user is going to see 50 different warnings every single

14 time for the app that they wanted to install.

15 **Q.**   And, Professor Qian, are there security risks associated

16 with this proposal of centralized notarization?

17 **A.**   Yes, there are.  And, interestingly, I think

18 Professor Mickens just testified a moment ago that it's going

19 to either maintain security -- that the proposed changes is

20 either going to maintain security or improve security.  I

21 disagree with that assessment.

22 **Q.**   Why do you disagree?

23 **A.**   Well, there are a couple reasons.  I can give two reasons

24 here.

25      First, it's possible that after an app has been approved,

1  it's going to turn malicious at a later point in time.  Okay?

2  And this does happen in practice, by the way.  And it doesn't

3  even -- the app doesn't even have to change its signature.  It

4  would still look like it's the same exact app that has been

5  distributed before.

6  **Q.**   How could an app that's already been distributed change

7  its behavior and become malicious?

8  **A.**   Well, malware -- there are sophisticated malware tactics

9  that can be employed.  One of them, for example, is called

10  Hotfixes.

11  **Q.**   And through Hotfixing could an app that was originally

12  benign update itself to become malicious?

13  **A.**   Yes, exactly.

14  **Q.**   How does this possibility relate to Professor Mickens'

15  centralized notarization proposal?

16  **A.**   Well, basically that means, you know, if Google has

17  previously approved an app, generated a token for that app, it

18  doesn't mean that app is going to be safe forever.  It just --

19  it won't be able to make that kind of certification.

20  **Q.**   To address this risk, would Google have to monitor all

21  apps outside of the Play Store?

22  **A.**   Right.  So in order to mitigate that risk, Google would

23  have to continuously monitor all of the apps that it has

24  previously reviewed and approved, including apps that are

25  within the Google Play Store and outside of the Google Play

1  Store.

2  **Q.**   Does centralized notarization raise any other security

3  risks?

4  **A.**   Yes.   There is one other risk.   You know, I think we

5  talked about users sometimes can actually see more warnings

6  under the new model.   Right?

7      For example, I mentioned today when you install apps from

8  the Galaxy Store, you would not see any warning; but in the new

9  model, you might see a lot of different warnings, one warning

10  for every single app that is not been reviewed by Google.

11      Okay.   So under that model, it's possible that a user

12  would become desensitized to those warnings.   And what's going

13  to happen?   Well, the users are going to be trained or

14  self-trained to skip those warnings.   They're just going to

15  click "Yes" and "Yes" and "Yes," "Install."

16      And when that happens, it's going to be very bad for the

17  overall security.   Right?   Because when real malware shows up,

18  it would be that same warning screen and the user would still

19  click "Install," "Install," and it would be infected.

20  **Q.**   Professor Qian, are you aware of any modern operating

21  system that permits sideloading in which one entity assumes

22  responsibility for reviewing all apps on the platform?

23  **A.**   No, I've never seen one.

24  **Q.**   And do you think Professor Mickens' centralized

25  notarization proposal is a sound proposal?

**QIAN - DIRECT / OLASA**

1   **A.**   Well, again, it may sound like a simple and, you know,

2   intuitive proposal, but it's actually a very complicated

3   proposal as I just laid out.

4       I think there are some real issues; right?  Because it's

5   not a simple change.  It affects the entire Android ecosystem.

6   And whenever we make such a systemwide change, you need to do a

7   very careful analysis about the ramifications.

8   **Q.**   Did Professor Mickens do that analysis?

9   **A.**   I don't think so.

10  **Q.**   All right.  Let's turn to decentralized notarization.

11      How does Professor Mickens' decentralized notarization

12  proposal differ from centralized notarization?

13  **A.**   Well, in the decentralized notarization, we see that

14  Google is no longer the reviewing entity approving apps.

15  Instead, now there are these sort of trusted reviewing

16  entities, third-party reviewing entities, that Google would

17  supervise, and it's those third-party reviewing entities that

18  actually go and review those apps.

19  **Q.**   Does decentralized notarization suffer from all the same

20  issues we were talking about with respect to OEMs and users and

21  developers?

22  **A.**   Yes, it's the same idea.

23  **Q.**   Are you aware of any modern operating system that has

24  implemented decentralized notarization for app review?

25  **A.**   No, I have not.

1    Q.    Does that concern you?

2    A.    It does concern me in the sense that, you know, again,

3    this is a systemwide change and it doesn't just affect Google.

4    It affects all the stakeholders in the Android ecosystem.

5          Whenever such a big change is about to be made, we would

6    like to get some more assurance about, you know, what's going

7    to happen, the ramifications, the impact, or any potential

8    negative security consequences.

9    Q.    Would decentralized notarization lead to overall lower

10   security than today?

11   A.    Yes.   There can be a number of issues there.

12   Q.    How could that happen?

13   A.    Well, I can talk about two issues here.   One, it's what's

14   called race to the bottom, which I'll explain what it means,

15   you know, among different reviewing entities; and, two, there

16   is an increased risk of stolen keys when you have multiple

17   reviewing entities.   And, again, I'm going to break down what I

18   mean by that.

19   Q.    Let's first start with the race to the bottom.   What's the

20   concept there?

21   A.    Well, let's imagine if there are 10 reviewing entities.

22   Okay?   If one of the reviewing entities decides to approve an

23   app; whereas, all the other nine entities decide to reject that

24   app, what happens?   Well, the app is still going to get that

25   notarization token where the app can use -- where the app

1  developer can use to distribute that app and potentially harm

2  users.

3  **Q.**   How could that affect user security?

4  **A.**   Well, in this case the reason the other reviewing entities

5  have decided to reject that app is probably because there's

6  something wrong about the app; but now that we have multiple

7  approving -- reviewing entities, as long as one of them

8  approves the app, then the app would be able to get a pass.

9  **Q.**   All right.  Let's turn to this other point of key theft.

10  Can you explain that to the jury and what they're seeing on

11  this slide?

12  **A.**   Okay.  So we briefly talked about the keys here.  All

13  right.  The keys are basically where -- the keys are basically

14  used by the reviewing entities as sort of the mechanism to sign

15  or to attach a token to an app to prove that the app has gone

16  through the app review.  Right?

17      But if that key is stolen, in this case the red key on the

18  screen is stolen, then what's going to happen is the malicious

19  actor can use that stolen key to sign a bunch of other malware

20  and distribute them.

21  **Q.**   And would that malware get a low-friction install

22  experience under Professor Mickens' proposal?

23  **A.**   Yes.  In that case, it would create a false sense of

24  security because users are thinking that, "Oh, these are apps

25  that have been reviewed and, therefore, there's no warning and

1  they must be safe."  Whereas, in practice, these are actually

2  signed or sort of reviewed by the malicious actor and they're

3  just malware.

4  Q.   And would Google know that this key theft had occurred?

5  A.   Presumably at some point when somebody notices this,

6  they're going to go back and realize, "Oh, some key is actually

7  stolen."  But by then, it probably is too late because maybe,

8  you know, lets say millions of apps could have been signed by

9  that stolen key and the harm could have already been done.

10  Q.   Is the risk of key theft just something hypothetical or is

11  it an actual risk in the real world?

12  A.   Interestingly, the key theft issue is actually very

13  common.  I know Professor Mickens has talked about the web

14  certificate domain where it's a decentralized system and, you

15  know, there are multiple signing authorities and so on.  It's

16  in some ways similar to the decentralized notarization and

17  there, key theft is such a common issue.  It happens all the

18  time; and when that happens, you always have security issues.

19       And, in fact, in the app review world, when signing keys

20  are stolen, it could even be worse because we're talking about

21  whether an app has been reviewed or not, whether they're

22  malware or not.  Whereas in the web certificate case, we're

23  just talking about whether -- we're just talking about the

24  identity of the website, which is very different.

25  Q.   Thank you, Professor Qian.

1        **MR. OLASA:**  Your Honor, I pass the witness.

2        **THE COURT:**  Okay.  Cross.

3                       <u>**CROSS-EXAMINATION**</u>

4   BY MR. CLARKE:

5   **Q.**   Good afternoon, Professor Qian.  Can you hear me okay?

6   **A.**   Yes.

7   **Q.**   Great.  Thanks.

8        So, Professor Qian, you're being compensated by Google for

9   your participation in this case; is that right?

10  **A.**   Yes.

11  **Q.**   You're being compensated by $600 an hour?  Is that your

12  hourly rate?

13  **A.**   Yes.

14  **Q.**   And you've worked for approximately 200 hours on this case

15  so far?

16  **A.**   Probably.

17  **Q.**   So you've been compensated in the amount of roughly

18  $120,000 so far in this case?

19  **A.**   I haven't tracked, but could be.

20  **Q.**   At least as of the time of your deposition; is that fair?

21  **A.**   Sounds reasonable.

22  **Q.**   Okay.  I want to ask you some questions about the data

23  that you cited, the 53 percent.  Do you recall that?

24  **A.**   Yes.

25  **Q.**   So I've gone ahead -- you should have a binder in front of

1   you.  If you look at Exhibit 7196 in that binder.  I think it's

2   just the same version of that 53 percent chart that you showed

3   us in your demonstratives.  Let me know if you have it there.

4        You might have two binders.  One's going to be your

5   deposition and your report.  The other is going to be a couple

6   documents.

7   **A.**   Can you say the exhibit number again?

8   **Q.**   Yeah.  It's 7196.

9   **A.**   (Witness examines document.)  Yes.

10  **Q.**   Okay.  You got it?

11  **A.**   Yep.

12  **Q.**   And is that the chart that you showed in your

13  demonstrative a little bit earlier?

14  **A.**   Yes.

15  **Q.**   And you testified this chart indicates that there are over

16  a billion users worldwide who have enabled the unknown sources

17  warning in some way; is that right?

18  **A.**   Correct.

19  **Q.**   Okay.  When you created this chart, did you look into how

20  many countries there are where there's low Internet

21  connectivity prohibiting people from being able to actually

22  download through official stores like the Play Store?

23  **A.**   No, I did not look at that specifically.

24  **Q.**   Did you look into how many countries there are worldwide

25  where the Google Play Store has been banned?

**A.**   Well, I know that the data would exclude China because China has banned Google services.

**Q.**   Are you aware of any other countries where Google Play Store has periodically been banned by the government?

**A.**   If I understand correctly, Iran is another example.

**Q.**   Okay.  And how does that factor into your data here, your 53 percent?  Do you know?

**A.**   Well, my understanding is that, you know, for example, Chinese Android devices would not even show up in the data.  So it would not affect my conclusion.

**Q.**   So there are approximately 100 million people who live in Iran; is that correct?

**A.**   I'm not aware of the exact number.  Sorry.

**Q.**   Some significant percentage of those people own Android devices; is that fair?

**A.**   Probably.

**Q.**   And those individuals are not able to download apps through the Google --

           **THE COURT:**  Well, he doesn't know any of this.  Okay? So let's skip Iran.  This is not his area of expertise.

**BY MR. CLARKE:**

**Q.**   So you didn't look into --

           **THE COURT:**  We're going to finish this witness today, so plan accordingly.  And by "today," meaning 3:30.  Okay?

           **MR. CLARKE:**  Okay.  Understood.

1          **THE COURT:**  All right.  Go ahead.

2    **BY MR. CLARKE:**

3    **Q.**   So did you look into how many people -- when you were

4    preparing this data that you presented, did you look into how

5    many people worldwide are forced to share apps via peer-to-peer

6    networks rather than downloading from some sort of a wireless

7    or Internet connection?

8    **A.**   No, I didn't look at that data specifically.

9    **Q.**   Are you aware that there are large countries where people

10   don't have access to Internet connectivity and are forced to

11   share apps via peer-to-peer networks?

12   **A.**   Possibly.

13   **Q.**   Are you aware that India is one such country that has a

14   large population?

15   **A.**   I've heard of India using peer-to-peer app installations,

16   yes.

17   **Q.**   So people in India who are using peer-to-peer app

18   installation would be included in this 53 percent; is that

19   fair?

20   **A.**   I presume, yes.  If --

21   **Q.**   Do you know whether -- sorry.  Go ahead.

22   **A.**   I'm sorry.

23         If their phones are actually eventually connected to the

24   Internet, because that's how Google is able to collect data,

25   otherwise it would not be counted in the data.

1  Q.   Okay.  But people in India who don't have access to

2  Internet connectivity and are forced to share apps via

3  peer-to-peer installation, they would be included in the

4  50 percent figure that you're including here; is that fair?

5  A.   If those devices eventually connect to the Internet,

6  otherwise they would not be included in this data.

7  Q.   Understood.  And the same would be for another country

8  like Indonesia?

9  A.   Yes.

10  Q.   Okay.  So this data is based on a spreadsheet that Google

11  provided you; is that correct?

12  A.   Yes.

13  Q.   And you called that Droid Guards data; is that right?

14  A.   Correct.

15  Q.   Okay.  I'd like to look at that spreadsheet if we could.

16  Unfortunately, it's too large to print off and put in front of

17  you, so we're going to try and put it up on the screen.

18  Hopefully you're able to see it.

19  A.   Sure.

20  Q.   So this is Exhibit 8607.  Do you see that in front of you?

21  A.   Yep.

22  Q.   And there are a couple of columns here in Exhibit 8607.

23  So there's a Column A, which seems to be "Country Codes"?

24  A.   Yeah, I understand.

25  Q.   Okay.  And there's a Column B, which is "Model."  Do you

QIAN - CROSS / CLARKE

1  see that?

2  **A.**   Yep.

3  **Q.**   And then there's a Column C, which is "Number of Devices

4  with more than zero from unknown sources."  Do you see that?

5  **A.**   Sure.

6  **Q.**   And then there's "Number of devices."  That's the total

7  number of devices for that model; is that right?

8  **A.**   Yes.

9  **Q.**   And then there's a percentage that has been calculated.

10  Do you see that?

11  **A.**   Yep.

12  **Q.**   All right.  I'd like to filter here -- I'd like to start

13  if we can filter by the country.  So we're going to filter this

14  data.

15      And if we scroll down in the filter fields here to the Us,

16  there's a country that's called unknown.  Do you see that?

17  **A.**   Yes.

18  **Q.**   Do you have any idea for what's in that unknown column?

19  **A.**   I'm not sure.

20  **Q.**   So if it would be possible to filter out everything but

21  the unknown, I'd like to see how many devices are showing up as

22  unknown.

23      So if we go ahead and highlight Column D here.  And then

24  in the lower right-hand corner, there should be a sum.  I don't

25  know if you can see that.

1   **A.**    Yes, I do see that.

2   **Q.**    So there are about 880 million devices that are in the

3   unknown column; is that right?

4   **A.**    It appears to be.

5   **Q.**    Do you have any idea where they are?

6   **A.**    I'm not sure.

7   **Q.**    Okay.  That could be countries where people are

8   predominantly using peer-to-peer downloads; is that right?

9   **A.**    I don't know one way or the other.

10  **Q.**    Okay.  If we could unfilter and go back up to the top.

11         So the first country here is AD.  Do you happen to know

12  what "AD" stands for?

13  **A.**    I can't remember.

14  **Q.**    I think that AD might be the Principality of Andorra.

15  It's a small European country.

16         So I just want to kind of go through and see what we see

17  in these models as we go through the rows one by one.

18         So the first thing I notice is you see that row 7 seems to

19  be a Smart TV?

20  **A.**    Yes, I do.

21  **Q.**    Do you have an understanding that your data includes

22  Smart TVs?

23  **A.**    Yes.

24  **Q.**    So if we go a little bit further down into the Bs, you'll

25  see a series of rows here that say Bravia 4K.  Do you recognize

1    Bravia as a Smart TV brand that's made by Sony?

2    **A.**    Yes.

3    **Q.**    So there are going to be Andorra and Smart TVs in this

4    data set as well?

5    **A.**    Yes.

6    **Q.**    Okay.  Do you have any understanding whether car

7    entertainment systems are included in this data set?

8    **A.**    I'm not sure.

9    **Q.**    Do you think we could find some car entertainment systems

10   if we looked?

11   **A.**    Possibly.  I don't know.

12   **Q.**    I want to go a little bit further down into the Cs.  If

13   you stop right there, row 82 there seems to be a Chromecast.

14   Do you see that?

15   **A.**    Yes, I do.

16   **Q.**    A Chromecast is not a mobile device, is it?

17   **A.**    I think it's used for projecting screens onto a Smart TV.

18   **Q.**    Okay.  So it's not a mobile device; is that the answer?

19   **A.**    I guess so.

20   **Q.**    Do you have any understanding for how many Chromecasts are

21   included in your 53 percent data?

22   **A.**    I haven't checked.

23   **Q.**    Do you have any understanding for how many Smart TVs are

24   included in your 53 percent data?

25   **A.**    I haven't checked carefully.

QIAN - CROSS / CLARKE

1  **Q.**   Do you know whether there are any other types of

2  appliances that are included in your data?

3  **A.**   Even if there are, it wouldn't change my conclusion.

4  **Q.**   Your conclusion that over a billion users of devices

5  worldwide have enabled unknown sources?

6  **A.**   Even if it's not 1 billion, let's say it's 500 million, it

7  would still support my conclusion.

8  **Q.**   And what's the basis for that?

9  **A.**   Well, 500 million compared to 1 billion is not a huge

10  difference to me.

11  **Q.**   So, Professor Qian, I'd like to back up a little bit.

12     You had some testimony about friction.  Do you recall

13  that?

14  **A.**   Yes.

15  **Q.**   Now, when you were looking at the unknown sources flow,

16  there was one particular piece of data that you wanted for

17  purposes of your report, but you couldn't get access to it

18  because Google didn't produce it.  Do you recall that?

19  **A.**   Right.  My understanding is Google simply doesn't have the

20  data.

21  **Q.**   Right.  And as a security researcher, you have to go by

22  the data; right?

23  **A.**   Well, we can work with the data that are available to us.

24  The data is nice to have as an additional piece of evidence,

25  but the existing data and the evidence that I have already

1  support my conclusions.

2  **Q.**   When you were deposed, do you recall testifying under oath

3  "As a security researcher, I have to go by the data"?

4  **A.**   Yes.

5  **Q.**   You were interested, in particular, in the exact number of

6  potentially harmful applications or malware that was avoided

7  because of the unknown source warning; right?

8  **A.**   Yes.

9  **Q.**   Okay.  In other words, if a user decides to abandon the

10  unknown source warning, how many instances of that are really

11  successful in the sense that some malware or PHAs have been

12  avoided; right?

13  **A.**   Correct.

14  **Q.**   And you were informed that Google doesn't have that data;

15  right?

16  **A.**   Correct.

17  **Q.**   And that data would have helped you analyze whether the

18  friction from the unknown sources flow is actually

19  proportionate to the risk associated with the malware being

20  downloaded; right?

21  **A.**   I' sorry.  Can you say it again?

22  **Q.**   That data would have helped you analyze whether the

23  frictions associated with the unknown sources flow is actually

24  proportionate to the risk of the malware being presented;

25  right?

**QIAN - CROSS / CLARKE**

1  **A.**   Well, even without the data, I would already say that the

2  current unknown sources flow is already consistent with that.

3  **Q.**   I'm sorry.  Your understanding is that the security

4  warnings and prompts that are displayed for unknown sources

5  during the installation process are designed to protect users

6  from security risks; right?

7  **A.**   Yes.

8  **Q.**   And you asked for data that would have allowed you to

9  compare the friction with the level of risk; right?

10 **A.**   Yes.

11 **Q.**   And you were told Google doesn't have that sort of data?

12 **A.**   That's true, but we have other kinds of data.

13 **Q.**   Okay.  But Google doesn't have data showing how many PHAs

14 are actually being avoided by this unknown sources flow;

15 correct?

16 **A.**   Not that specific data, that's right.

17 **Q.**   Your report actually has some data that's relevant to

18 this.  Do you recall that?

19 **A.**   Yes.

20 **Q.**   Do you recall that your report states that 62 percent of

21 users shown an unknown source warning enable unknown source

22 installations and continue with the installation process?

23 **A.**   Correct.

24 **Q.**   And that means that 38 percent of users who are shown an

25 unknown source warning abandon that process; right?

1    **A.**   Sure.   There could be many reasons that they abandon.

2    **Q.**   So out of every 100 users that go to download something

3    outside of the Play Store who are presented with an unknown

4    source warning, according to the data in your report, 38 of

5    them would abandon that process?

6    **A.**   Yes.   Again, for various reasons.

7    **Q.**   And you don't have any data on how many potentially

8    harmful applications they are avoiding when they abandon that

9    process; is that right?

10   **A.**   Well, the data was not available to us.

11   **Q.**   You don't have any data on how many completely benign

12   applications are being avoided when they are being canceled

13   when they abandon that process; is that right?

14   **A.**   That's right.

15   **Q.**   And you testified a few minutes ago on your direct that

16   users sometimes get fatigue with all of these warnings; right?

17   **A.**   That's right.

18   **Q.**   They'll just start clicking through?

19   **A.**   Yes.

20   **Q.**   And do you think more warnings is going to make people

21   more fatigued?

22   **A.**   Well, not necessarily more warnings, but repetitive

23   warnings.

24   **Q.**   Repetitive warnings.   So a series of warnings that are all

25   intended to achieve consent for the same thing; right?

1  **A.**   No.  I would say the same exact screens shown over and

2  over again would be considered repetitive.

3  **Q.**   And when users are forced to navigate through screens over

4  and over and over again, over time, they'll simply start

5  clicking "Okay"; right?

6  **A.**   Not -- not -- I think the definition is different.  My

7  definition is it's the same exact screen shown over and over

8  again.

9      I think in the current Android security model, you only

10  see the unknown source warning once per source; whereas, in the

11  new model, you're going to see the app has not been reviewed --

12  the app has not been reviewed multiple times even if they're

13  installed from the same source.

14  **Q.**   Okay.  So, Professor Qian, I'll focus on something

15  different then.

16      So you're an Android user; right?

17  **A.**   Yes.

18  **Q.**   You have a Samsung phone?

19  **A.**   I now have a different phone, but I used to own a Samsung

20  phone.

21  **Q.**   What's your new phone?

22  **A.**   Google Pixel 8 Pro.

23  **Q.**   Okay.  And you've installed apps from outside the Google

24  Play Store before; is that right?

25  **A.**   Yes.

1  Q.   You installed some Chinese apps that, for example, don't

2  release their apps on Play or release some sort of a

3  watered-down version on Play; right?

4  A.   That's right.

5  Q.   And when that happens, you go to a Chinese website and you

6  download it from the Chinese website; right?

7  A.   True.

8  Q.   And when you do that, you know which website to go to?

9  You know which is the real authentic website; right?

10  A.   Yes.

11  Q.   And you personally consider the risk to be low when you

12  download apps from those websites; right?

13  A.   I consider it an acceptable risk, yes.

14  Q.   An acceptable risk, right.  Because it's the app's

15  behavior and not its source that determines the security risk;

16  right?

17  A.   Well, I mean, the source does matter; but I agree, in

18  general, yes, it's the behavior that matters.

19  Q.   Yeah, the source matters.  You went to the real authentic

20  website; right?  It's important to go to the real authentic

21  website?  We can agree to that; right?

22  A.   Right.

23  Q.   But it's the app's behavior that is the primary

24  determinant of the risk; right?

25  A.   Sure.

1   **Q.**   So you would agree with me there are automated scans that

2   are out there available that can review app behavior to see

3   whether they're risky?

4   **A.**   Well, automated app reviews are not sufficient; but, yes,

5   they do exist.

6   **Q.**   Malware scanning is not unique to Google.  There are other

7   third parties that can do it; right?

8   **A.**   That's correct.

9   **Q.**   You, yourself, have designed malware scanners in the past?

10  **A.**   Yeah.

11  **Q.**   And Google uses machine learning for this process; right?

12  **A.**   They also have other processes, yeah.

13  **Q.**   So, among other things, it will assign a score to each app

14  telling Google exactly -- or approximately how risky the

15  machine-learning model views the app to be from a malware

16  perspective; right?

17  **A.**   Right.  They'll feed that signal to a human if needed.

18  **Q.**   And then Google determines whether the app should be

19  warned or not essentially; right?

20  **A.**   I'm sorry.  Can you say that again?

21  **Q.**   Google will then determine whether that app should

22  generate some sort of warning in GPP or whether it should be

23  blocked in GPP; is that right?

24  **A.**   Well, I think it's possible that a human would still need

25  to take a look at the signals generated by the automated

1    systems.

2    **Q.**    And if Google determines that an app is seriously

3    problematic, Google is going to warn that app regardless of the

4    source; right?

5    **A.**    Well, they have different -- they have different ways to

6    deal with Play apps versus off-Play apps.

7    **Q.**    Let's start with Play apps.

8         If Google determines that an app on the Play Store is

9    seriously problematic, it is going to reject that regardless of

10   the source; right?

11   **A.**    Well, Google Play is already the source.  So I'm not sure

12   if you can further divide it.

13   **Q.**    If Google determines that an app is seriously problematic

14   when it's going through the app review process, it is going to

15   reject that app regardless of where the app comes from; right?

16   **A.**    You mean whether it's from this developer or that

17   developer?

18             **MR. CLARKE:**  Your Honor, I'd like to show the witness,

19   it's page 163 --

20             **THE COURT:**  163?

21             **MR. CLARKE:**  -- lines 14 through 17.

22             **THE COURT:**  163:14 through 17?

23             **MR. CLARKE:**  163 of his deposition transcript,

24   lines --

25             **THE COURT:**  I'm looking at the one dated July 13.

1    **MR. CLARKE:**  Professor Qian, yes, July...  April 26th,

2    Your Honor.  It's possible you have a different deposition

3    transcript.

4         **THE COURT:**  One second.  163?

5         **MR. CLARKE:**  Lines 14 through 17.

6              (Pause in proceedings.)

7         **THE COURT:**  Okay.  That's fine.

8    BY MR. CLARKE:

9    **Q.**  So, Professor Qian, you testified at your deposition, you

10   were asked (as read):

11       "**QUESTION:**  If the app is seriously problematic, Google

12       will reject it regardless of the source of the app;

13       right?"

14       And you answered (as read):

15            "It is my understanding, that that is right."

16       Is that correct?

17   **A.**  Yeah.  Looking at this sentence, that's what it's saying,

18   yes.

19   **Q.**  You were asked those questions and you gave those answers?

20   **A.**  Yes.

21   **Q.**  And, likewise, if the app passes Google's process, then

22   Google is going to accept it regardless of the source; right?

23   **A.**  Sure.

24   **Q.**  And Google also takes steps to analyze the behavior of

25   apps that users install from off-Play sources; right?

1    **A.**    I'm sorry.  Can you say it again?

2    **Q.**    Google also reviews the behavior of apps from off-Play

3    sources; right?

4    **A.**    Right, but they have a weaker version.

5    **Q.**    And you refer to that as off-Play app review in your

6    report?

7    **A.**    Yes.

8    **Q.**    Once again, that's reviewing the behavior of the app;

9    right?

10   **A.**    True.

11   **Q.**    And once an app's behavior has been reviewed, it's

12   possible to add tags or tokens to indicate that the app has

13   been reviewed; right?

14   **A.**    Well, in principle, yes.

15   **Q.**    Okay.  And when we say "tags or tokens," we're talking

16   about some sort of cryptographic signature?

17   **A.**    Yes.

18   **Q.**    And Mac OS follows this sort of strategy of applying

19   cryptographic signatures to apps that have been reviewed for

20   malware; right?

21   **A.**    Well, it's not reviewed, you know, in the sense that

22   they're reviewed in Google Play Store.  They're reviewed in a

23   sense that it's scanned for any known malware or known

24   malicious behavior without any human reviews.

25   **Q.**    Professor Qian, Mac OS applies cryptographic signatures to

1  apps after those apps have been reviewed for malware; correct?

2  **A.**   I would call it scanned instead of reviewed but, yes.

3  **Q.**   You agree that after applying the cryptographic signature,

4  Google can then turn the app back to the developer for

5  distribution; right?

6  **A.**   Yes, in principle.

7  **Q.**   Okay.  So you agree in principle that the process of

8  reviewing an app can be conducted independently of the process

9  of distributing that app; right?

10  **A.**   I agree in principle, although it doesn't mean that it's a

11  good idea to do it.

12  **Q.**   In that answer did you say "I agree"?

13  **A.**   Yes.

14  **Q.**   Okay.  In fact, Google already applies cryptographic

15  tokens to apps which indicate that the app has been reviewed

16  for malware; correct?

17  **A.**   Again, I would not use the reviewed because it doesn't

18  have any human or sophisticated review.  I would say it's

19  scanned but, yes.

20  **Q.**   Okay.  You agree that Google scans apps for malware and

21  then applies cryptographic tokens to indicate that; right?

22  **A.**   Sorry.  Did you say Apple or Google?

23  **Q.**   Google.

24  **A.**   Sorry.  Are you saying Google today does that?

25  **Q.**   Yes.  You agree that Google scans apps for malware and

1   then applies cryptographic tokens to those apps to indicate

2   that they have been scanned; correct?

3   **A.**   For Play apps or off-Play?

4   **Q.**   Play apps; correct?

5   **A.**   For Play apps, yes, they do get reviewed.  They should be

6   reviewed instead of scanned.

7   **Q.**   And then they get tokens to indicate that they've been

8   reviewed; right?

9   **A.**   Yeah.  There will be some tokens, yes.

10  **Q.**   That's called frosting in Android right now?

11  **A.**   Yeah, I've heard of frosting.

12  **Q.**   And frosting allows those apps to then be distributed

13  through peer-to-peer networks outside of the Google Play Store;

14  right?

15  **A.**   Yes, that's my understanding.

16  **Q.**   And once those apps are downloaded onto phones, the phones

17  check to ensure that they have the appropriate cryptographic

18  signature; right?

19  **A.**   That's what -- yes.

20  **Q.**   And that's how the operating system knows that those apps

21  have already been reviewed and that they're safe; right?

22  **A.**   For the limited peer-to-peer scenario, yes.

23  **Q.**   Okay.  So you gave some testimony about Google Play

24  Protect.

25       I would like to show you Exhibit 8007.  It should be there

1    in your binder.

2    **A.**    Yes.

3    **Q.**    This is a blog post that was published about a month ago

4    called "Enhanced Google Play Protect Realtime Scanning For App

5    Installs."  Do you see that?

6    **A.**    The title up there at the top?

7    **Q.**    At the top it says "Security Blog."  So this blog post was

8    retrieved from the Google Play security -- or the Android

9    security blog.  The title of the blog post is "Enhanced

10   Google Play Protect Realtime Scanning For App Installs."  Do

11   you see that?

12   **A.**    Yes, I do.

13          **THE COURT:**  This is not in evidence, so take it down.

14   Okay?  You can't show things to the jury if it's not in

15   evidence.

16          **MR. CLARKE:**  So, Your Honor, this is a recent blog

17   post that we believe has bearing on the opinions that he's

18   reached --

19          **THE COURT:**  You can just say "I'd like to admit," and

20   then we'll see if there's an objection.

21   **BY MR. CLARKE:**

22   **Q.**    Okay.  Do you recognize this blog post, Mr. Qian?

23   **A.**    Yes, I think so.

24   **Q.**    Okay.

25          **MR. CLARKE:**  I'd like to move the blog post into

1  evidence.

2         **MR. OLASA:**  Your Honor, our objection is this

3  postdates the reports.

4         **THE COURT:**  It's sustained.

5      Go ahead.

6  **BY MR. CLARKE:**

7  **Q.**   So, Professor Qian, do you have any understanding for

8  whether going forward Google Play Protect is going to begin

9  conducting realtime app installations at the time -- withdrawn.

10     Do you have an understanding for whether going forward

11  Google Play Protect is going to begin conducting realtime

12  scans, malware scans, for apps at the time that they're

13  installed onto a device?

14  **A.**   I've seen some news about it.

15  **Q.**   Okay.  This is a recent development; right?

16  **A.**   I think it's after the -- after my report was submitted.

17  **Q.**   After your report was submitted, Google announced that

18  going forward, when Google Play Protect checks an app at the

19  point of installation, if the app has never previously been

20  reviewed for malware before, it is now going to do it at the

21  time of installation; right?

22  **A.**   Right.  There will be some kind of realtime scanning,

23  although I don't think human review is included.  It's not the

24  same full app review.

25  **Q.**   But it is going to be scanning all apps that are installed

QIAN - CROSS / CLARKE

1    onto Android devices at the time of installation if they have

2    not previously been reviewed; correct?

3    **A.**   Yes.

4    **Q.**   And one of the reasons that they do that is because that

5    provides better protection against polymorphic malware; right?

6    **A.**   I haven't seen the exact motivation for that, but I think

7    it's a reasonable motivation.

8    **Q.**   Okay.  Now, you provided a little bit of testimony during

9    your direct about the unknown sources warning flow; is that

10   right?

11   **A.**   Uh-huh, yes.

12   **Q.**   Okay.  This is a default warning on GMS devices?

13   **A.**   Yes.

14   **Q.**   You would agree with me that it is something that's

15   completely decoupled from Google's scanning algorithms?

16   **A.**   I'm sorry.  Can you remind me the context here?

17   **Q.**   Yeah.  So the unknown sources warnings that you testified

18   about in your direct examination, do you recall those?

19   **A.**   Yes.

20   **Q.**   Would you agree with me that those warnings are displayed

21   in a manner that's completely decoupled from Google's scanning

22   algorithms?

23   **A.**   I think the unknown source warning is really about the

24   permission to allow an app source to be able to install

25   additional apps.  That's what it's designed for.

1  **Q.**  The unknown source warning doesn't try to distinguish

2  between apps coming from reputable developers and spamming

3  websites; right?

4  **A.**  Right, because that's by design not the intention.

5  **Q.**  It doesn't differentiate between apps that are malware and

6  apps that are not malware; right?

7  **A.**  Right.  Again, that's not the intention.

8  **Q.**  Okay.  So a user that abandoned the workflow at the

9  unknown sources screen, might be abandoning the installation of

10  an app that's harmful; right?

11  **A.**  Well, again, that screen is not about showing what's going

12  to happen when you install that one particular app.  It's about

13  any number of apps that the same source can install

14  subsequently.  So I think there's a big distinction there.

15  **Q.**  A user that abandons the unknown -- that abandons the

16  installation at the unknown sources flow screen might be

17  abandoning the installation of an app that's benign; right?

18  **A.**  Possible.

19  **Q.**  Okay.  Or they might be abandoning the installation of an

20  app that's risky; right?

21  **A.**  Correct.

22  **Q.**  Now, you cited some academic data in your report related

23  to the malware rate of different app stores?  Do you recall

24  that data?

25  **A.**  Yes.

1   **Q.**   And the data used a metric called IDR or the installer

2   detection ratio.  Do you remember that?

3   **A.**   Yes.

4   **Q.**   So an IDR of 1 percent means that out of every 100

5   installations from a given app store, one of them is going to

6   be an unwanted app; right?

7   **A.**   Yeah.

8   **Q.**   Okay.  And when we looked at that data together in your

9   deposition, you agreed that the Amazon Appstore is more or less

10   equivalent to the Google Play Store in terms of malware rates.

11   Do you remember that?

12   **A.**   I don't know the exact number.  I forgot.  Sorry.

13   **Q.**   Do you remember -- do you remember that you agreed that

14   the Amazon Appstore is more or less equivalent to the Google

15   Play Store in terms of malware rates?

16   **A.**   I might have said it.

17        **MR. CLARKE:**  May I refresh the witness with his

18   testimony, Your Honor?

19        **THE COURT:**  Go ahead.

20        **MR. CLARKE:**  I'm sorry?

21        **THE COURT:**  Go ahead.

22        **MR. CLARKE:**  So this is deposition transcript 194,

23   lines 18 through 25.

24      This should be Tab A in your binder, Professor Qian.

25        **THE COURT:**  We've got 15 minutes.

1          **MR. CLARKE:**  Okay.  Thank you, Your Honor.  I'll try

2     and get a move on.

3          **THE COURT:**  Remember, it's an antitrust case.

4          **MR. CLARKE:**  Understood.  Thank you, Your Honor.

5          **THE WITNESS:**  I'm sorry.  Can you remind me again?

6     **BY MR. CLARKE:**

7     **Q.**   So deposition transcript page -- I apologize.  I've now

8     lost my page.

9          Deposition page 195 -- apologies.  It's deposition

10    page 194.

11    **A.**   (Witness examines document.)  Yes, I'm here.

12    **Q.**   Okay.  Do you recall agreeing that the malware rates on

13    the Amazon Appstore are roughly equivalent to the Google Play

14    Store?

15    **A.**   Yes.  I said that that's close, yes.

16    **Q.**   Okay.  And you would agree with me that if you wanted to

17    go through the app installation process to actually download an

18    app onto your phone through the Amazon Appstore, that would

19    take what?  Eight to ten friction steps in order to complete

20    that process?

21    **A.**   If you count the steps where the user's navigating on the

22    Amazon website, yeah, probably.

23    **Q.**   Okay.  And you would agree with me it's a one-click

24    process from the Google Play Store?

25    **A.**   Roughly, yes.

1   **Q.**   Okay.  And those are for two different app stores that

2   have roughly the same risk when it comes to malware; correct?

3   **A.**   According to the data presented in this paper, yes.

4   **Q.**   Okay.  You're familiar -- you testified on your direct

5   about centralized notarization; is that right?

6   **A.**   Yes.

7   **Q.**   And in centralized notarization, Google could open its

8   review service to apps intended for distribution via

9   non-Play Store mechanisms; right?

10  **A.**   I'm sorry.  Can you say it again?

11  **Q.**   In centralized distribution, Google could open up its

12  review service to third parties; right?

13  **A.**   Yes, it could open it up to any developers.

14  **Q.**   And that's an opt-in framework; right?  Developers aren't

15  forced to submit their apps to Google under that scenario?

16  **A.**   That's correct.

17  **Q.**   Okay.  Do you know whether Google has ever actually looked

18  at a system for third parties to submit apps directly to Marmit

19  for review?

20  **A.**   For Marmit, yes, I've heard of that.

21  **Q.**   You have heard of that?

22  **A.**   I believe we talked about it during my deposition.

23        **MR. CLARKE:**  Your Honor, I'd like to show the witness

24  deposition page 177, lines 2 through 6.

25        **THE COURT:**  Let's not rehash depositions.  Okay?

1  Let's just focus on in-court exam.  You can use a deposition to

2  impeach, but let's not talk about a party that none of us are

3  invited to but you two.

4       Okay.  What line is that?

5            **MR. CLARKE:**  So I'd like to impeach the witness with

6  page 177, lines 2 through 6, Your Honor.

7            **THE COURT:**  Okay.

8  **BY MR. CLARKE:**

9  **Q.**  So you were asked (as read):

10     **"QUESTION:**  Do you have any understanding for whether

11     Google has ever looked at a system for third parties to

12     submit apps directly to Marmit for review?"

13     And you said (as read):

14     **"ANSWER:**  I was not aware of that."

15     Correct?

16  **A.**  I'm sorry.  I think I was saying that during the

17  deposition, you brought this up, and that's how I became aware.

18  **Q.**  You learned of it through the course of the deposition, I

19  understand.

20     So you weren't aware of it at the time that you formed

21  your opinions that centralized notarization is inappropriate;

22  right?

23  **A.**  Correct.

24  **Q.**  Because that's not something you looked into when you were

25  formulating your opinions about centralized notarization;

1    right?

2    **A.**    That's correct.

3    **Q.**    Okay.  So you didn't look into this issue, you didn't ask

4    anybody to see any documents related to this question; right?

5    **A.**    No.

6    **Q.**    So I'd like to take a look at Exhibit 8577.  This is a

7    document titled "Third-Party Web App Scanning Service PRD."  Do

8    you see that?

9    **A.**    Yes.

10   **Q.**    Okay.  Have you ever seen this document before?

11   **A.**    Let me take a quick look.

12       (Witness examines document.)  No, I don't think I've seen

13   it before.

14   **Q.**    So this isn't something that you were aware of at the time

15   you formulated your opinions in this case; right?

16   **A.**    That's right.

17   **Q.**    If you look at page 2, there's a paragraph that says (as

18   read):

19           "Solution overview and benefits provide off-market

20       stores, third-party providers, and OEMs with web services

21       where they can submit apps and ROMs to be scanned against

22       a database of known malware signatures and

23       vulnerabilities."

24       Do you see that?

25   **A.**    Yes.

1   **Q.**   So this is a proposal to make Marmit available to third

2   parties; right?

3   **A.**   I guess it didn't mention Marmit specifically in this

4   sentence, but it seems plausible.

5   **Q.**   Well, if you take a look a little bit --

6           **THE COURT:**  Do you know one way or the other?  Do you

7   know?  We're not here for guesses or plausibility.  Do you know

8   for sure one way or the other?  If you don't, you can just say

9   "I don't know."

10          **THE WITNESS:**  I'm not exactly sure.

11          **THE COURT:**  All right.  Next question.

12  **BY MR. CLARKE:**

13  **Q.**   You don't know one way or the other.

14          Do you have any idea why Google might be reluctant to make

15  Marmit available for third parties?

16  **A.**   I believe you showed some internal e-mails during my

17  trans -- during my deposition.

18  **Q.**   And you agreed with me when we looked at those --

19          **THE COURT:**  I really -- we're going to stop here.

20  Don't refer to your deposition.  Okay?  Just, we can only deal

21  with the evidence that's admitted here in court; and these side

22  things that happened before, don't refer to them.  The lawyer

23  may show it to you, that's perfectly fine, otherwise don't

24  refer to it.

25          So let's ask that question again, and try to answer it to

1    the best of your ability without mentioning anything else

2    outside of the courtroom.

3    **BY MR. CLARKE:**

4    **Q.**    Let me -- maybe I can try and ask it a little bit

5    differently.

6         Do you agree with me that competitive reasons might play a

7    role in Google's decision not to make Marmit available to third

8    parties?

9    **A.**    Yes.   I think security is -- you know, you can -- there

10   can be a lot of intellectual property included in, you know,

11   the security technologies.   I think it's reasonable.

12   **Q.**    Okay.   You provided some testimony about scalability of

13   centralized notarization.   Do you recall that?

14   **A.**    Yes.

15   **Q.**    Do you have any understanding -- just yes or no -- for how

16   many reviewers Google actually has assigned to the off-Play

17   review queue?

18   **A.**    No, I don't know the exact number.

19   **Q.**    So if I told you that there was only one reviewer that was

20   assigned to the off-Play review queue in 2019, you wouldn't

21   have any basis to dispute that?

22   **A.**    I don't have any data to say yes or no.

23   **Q.**    Do you have any understanding for what the actual review

24   coverage was that that one reviewer was able to achieve in

25   2019?

1   **A.**   No, I don't have any data.

2   **Q.**   Okay.  You agree with me that if Google only had one

3   reviewer assigned to the off-Play review queue, it could triple

4   or quadruple it's review volume by hiring two or three people;

5   right?

6   **A.**   Potentially.

7   **Q.**   Okay.

8        **THE COURT:**  Okay.  Disregard that.  He doesn't know.

9     Next question, please.  You need to ask something that he

10  actually has some knowledge about.  Okay?

11       **MR. CLARKE:**  Understood, Your Honor.

12       **THE COURT:**  You've got five minutes, and then I'm

13  going to see if there's any redirect.

14       **MR. CLARKE:**  Thank you, Your Honor.

15  **BY MR. CLARKE:**

16  **Q.**   Professor Qian, you were asked some questions about a

17  warning screen that's displayed by Epic; right?

18  **A.**   Yes.

19  **Q.**   Okay.  You recall that; right?

20  **A.**   Yes, I recall.

21  **Q.**   You do have personal knowledge about that warning screen;

22  right?

23  **A.**   I'm sorry?

24  **Q.**   You do have knowledge about that warning screen; right?

25  **A.**   I've seen that screen.

**QIAN - CROSS / CLARKE**

1  Q.   Okay.   That came from your expert report.   Do you recall

2  that?

3        **THE COURT:**   How about this:   Rather than asking what

4  he remembers, just ask a question.   Okay?

5        **MR. CLARKE:**   Okay.   Thank you, Your Honor.

6  **BY MR. CLARKE:**

7  Q.   That image that you created was created on August 2018; is

8  that right?

9  A.   Sounds about right.   I'm not 100 percent sure.

10 Q.   And isn't it true that prior to September of 2018, the

11 permission for installing apps from unknown sources was not

12 controlled on a per-source basis on Android?

13 A.   I don't remember the exact date, but according to that

14 screen, it actually says "Your browser has been granted some

15 special permission."   So it sounds like it's specific to

16 browser.

17 Q.   And at that time, the unknown sources permission was a

18 global permission on Android; right?

19 A.   I don't know for sure.

20 Q.   You don't know one way or the other whether it was a

21 global permission?

22 A.   (No audible response.)

23 Q.   If Epic had decided to display that screen in response to

24 a global permission as opposed to a per-source permission,

25 would that change your opinion with respect to that screen?

1  **A.**    No, because it's still showing that sideloading is risky.

2  **Q.**    Okay.  If there were a unique -- withdrawn.

3          **MR. CLARKE:**  Your Honor, I have no further questions.

4          **THE COURT:**  Okay.  Very brief redirect.

5          **MR. OLASA:**  We have no questions, Your Honor.

6          **THE COURT:**  All right.  Great.

7      You can step down.  Thanks for coming in.  Be careful on

8  the way down.

9                      (Witness excused.)

10         **THE COURT:**  All right.  We're going to adjourn.  We're

11  not coming in tomorrow.  Okay?  You can if you want, but we

12  won't be here.

13     See you Monday morning at 9:00.  Now, remember, next

14  Friday, let's plan on it.  Okay?  I'm going to talk with the

15  lawyers.  Both sides are making efficient good progress.  I'm

16  going to check in with them so I can give a little more of an

17  update on Monday, what the timeline looks like.

18     So this is the perfect time to put everything out of mind.

19  Enjoy the next couple of days.  Whatever you're going to do,

20  quiet reflection, family, whatever it is, just have a good

21  time.  Put all this out of your mind.  No research.  No

22  investigation.  Don't look anybody up.  Don't look anything up.

23  Don't look any concepts up.

24     And I'll see you on Monday morning.

25          **THE CLERK:**  All rise.

**PROCEEDINGS**

```
 1          (Proceedings were heard out of the presence of the jury:)

 2          THE COURT:  Okay.  I think we should be able to finish

 3     by next Friday.

 4          MR. BORNSTEIN:  So on the Epic side, Your Honor, we

 5     have -- and really the both of us, we have two pairs of experts

 6     to come.  After the security experts, we have the accounting

 7     folks --

 8          THE COURT:  The economists and --

 9          MR. BORNSTEIN:  The accounting folks will come first.

10     They should both be very short.

11          We have about a half an hour altogether of fact deposition

12     from finance people that we need to get in before the

13     accountants testify.

14          THE COURT:  All right.

15          MR. BORNSTEIN:  I would expect all of that to be able

16     to be done before the lunch break, if not sooner, on Monday.

17          THE COURT:  Good.  Okay.

18          MR. BORNSTEIN:  And then we have the --

19          THE COURT:  That's it for the experts then; right?

20          MR. BORNSTEIN:  No.  Then we have the economists.

21          THE COURT:  Oh, then economists.  Okay.  Right.

22          MR. BORNSTEIN:  Yeah.

23          THE COURT:  Okay.  That will be Monday afternoon?

24          MR. BORNSTEIN:  It will probably go a little longer

25     than Monday afternoon.
```

1      THE COURT:  They're going to start Monday afternoon.

2      MR. BORNSTEIN:  We should be able to start Monday

3  afternoon, yes.

4      THE COURT:  Okay.  If I may just give you a word,

5  you're all experienced, but this was way too much time on

6  security.  Way too much time.

7      Help your economists focus.  They're usually very good at

8  it, and it's much more antitrusty, so I'm confident.

9      But let's not do this again.  I'm talking about both

10 sides.  This is a bilateral suggestion.  Okay?

11     All right.  Okay.  Let's get this done by Friday, huh?

12     MR. POMERANTZ:  I don't know, Your Honor.  I mean, I

13 don't know how long the economists will take.  We do have some

14 witnesses to put on thereafter.

15     THE COURT:  How many, roughly, are you -- I'm not

16 tying your hands, but how many, roughly, do you expect?

17     MR. POMERANTZ:  I think live witnesses there may be --

18 I'm looking here now -- maybe five or six.

19     THE COURT:  Okay.  Is that mainly on the counterclaims

20 or --

21     MR. POMERANTZ:  No, no.  These are fact witnesses on

22 our side.

23     THE COURT:  Oh.

24     MR. POMERANTZ:  Okay.  So I guess in terms of live

25 witnesses, we're expecting three Google witnesses, two Epic

1  witnesses, and one third party, which is Apple.

2        **THE COURT:**  All right.

3        **MR. POMERANTZ:**  And so those three -- those six live

4  witnesses, and then we'll have some deposition testimony, which

5  will be relatively short.

6        **THE COURT:**  Look, we're at the point now where we have

7  a lot in the hopper.  Okay?  So we do not need someone to say

8  "This is what MADA means."  Okay?  We don't need to go through

9  the 19 screens.  We don't need to go through, you know,

10  "Spotify pays X percent and Amazon pays Y percent, but I pay

11  30 percent."  That's all in.

12      All right.  So I'm going to start -- it's getting quite

13  cumulative, and I've given you -- you've both given each other

14  some leeway, I've given you some leeway, but we've got to get

15  going now.  We're going to start losing some people, and it's

16  just -- we've got to get going.

17      Just be prepared.  I'm going to be a little bit more sharp

18  next week on not going over something we've heard three times

19  before.  All right?

20        **MR. BORNSTEIN:**  Understood, Your Honor.

21      The one thing that we have, which is important to us, is

22  just to make sure after Google finishes its case, we can have

23  the opportunity for a very brief rebuttal, which I think may be

24  necessary from the economists.

25        **THE COURT:**  Well, I don't know.  I'm not making any

**PROCEEDINGS**

1   promises.  All right?

2       Also, you're getting really short on time.

3           **MR. BORNSTEIN:**  I understand, Your Honor.  We are

4   reserving time just for that purpose.

5           **THE COURT:**  Well, shoot, I forgot to ask the final

6   time count.

7       Are you able to do that, Ms. Clark, or is it too much for

8   right now?

9           **THE CLERK:**  I don't have the final.

10          **THE COURT:**  All right.  I'll tell you on Monday

11  morning.  Okay?  But we should be able to accelerate the pace

12  significantly at this point.

13          **MR. BORNSTEIN:**  If I could be --

14          **THE COURT:**  Make everything new and fresh next week.

15  If it's not, I'm probably going to ask you to stop because

16  we've heard a lot about the same stuff.

17          **MR. BORNSTEIN:**  Understood, Your Honor.

18      If I could say one word on the rebuttal, I actually think

19  it would expedite the presentations because we could have our

20  opening presentations not have to anticipate the 600 pages of

21  reports that we have from the defendants -- from Google; and we

22  can have a concise opening presentation without having to talk

23  about all the things that might come up, which Google might not

24  actually present, and then we can have our rebuttal focus just

25  on the things that actually came in evidence.

 1          **THE COURT:**  In theory, that seems promising.

 2          **MR. BORNSTEIN:**  Thank you, Your Honor.

 3          **THE COURT:**  But don't -- that's not a guarantee.

 4   Okay?  All right.  Not judge estoppel.  You can't come back

 5   later and say "You promised me."

 6          **MR. BORNSTEIN:**  I hear Your Honor very clearly.

 7          **THE COURT:**  Okay.  Anything else we need to do before

 8   next week?

 9          **MR. POMERANTZ:**  I don't think so, other than have a

10   Happy Thanksgiving.

11          **THE COURT:**  Yes, that's my line.

12          **MR. POMERANTZ:**  I'm sorry, Your Honor.

13          **THE COURT:**  Just wait for a moment.

14      Anything else for next week?

15          **MR. BORNSTEIN:**  We are working on one issue,

16   Your Honor, that I hope we don't need to bring to you.  Just,

17   it's the matter we talked about on that one finance document

18   where we had believed that we put in appropriate foundation

19   through the CFO.

20          **THE COURT:**  I assume that was the half hour you were

21   mentioning.  It's not?

22          **MR. BORNSTEIN:**  No, we have a little bit of deposition

23   testimony from the CFO and from one of her reports, which is

24   really just to get in the documents.  I mean, if we can find

25   another way to get the documents just so the accountants can

**PROCEEDINGS**

1    talk about them, that would expedite things.

2         THE COURT:  All right.  So are you still chatting

3    about that?

4         MR. POMERANTZ:  Yes, Your Honor.

5         THE COURT:  Okay.  All right.  I'm actually pretty

6    confident we can probably wrap it up by next Friday, and I

7    really would like to target that.  Okay?  I mean, I'm not going

8    to jam anyone, but let's target that.

9         All right.  Everyone is going to go do something?  You're

10   in LA.  You can go home.

11        MR. POMERANTZ:  I am, Your Honor.

12        THE COURT:  New York, what are the New Yorkers going

13   to do?

14        MR. BORNSTEIN:  I have to go home for personal

15   reasons, Your Honor.  We've all got our plans.

16        THE COURT:  All right.  Good.

17        All right.  I'll see you on Monday.  Have a good break.

18        MR. BORNSTEIN:  Thank you, Your Honor.

19        THE CLERK:  All rise.  Court's in recess.

20        THE COURT:  Oh, final jury instructions.  You're

21   filing those tomorrow; right?  And then we're going to have to

22   get cracking on those.

23        Oh, and a new verdict form too.  All right.  You're doing

24   both of those?  If you didn't do the verdict form, you can have

25   until next week; but you're doing the -- you're revising the

**PROCEEDINGS**

1    jury instructions, didn't we talk about tomorrow?

2         **MR. BORNSTEIN:**  We did talk about the jury

3    instructions, Your Honor.

4         **THE COURT:**  Okay.  Good.

5       Okay.  Great.  Thanks.

6              (Proceedings adjourned at 3:31 p.m.)

7                    ---oOo---

8

9

10              <u>**CERTIFICATE OF REPORTER**</u>

11       I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14   DATE:   Tuesday, November 21, 2023

15

16

17

18   _____

19       Kelly Shainline, CSR No. 13476, RPR, CRR
                 U.S. Court Reporter

20

21

22

23

24

25