Volume 14

Pages 2764 - 2854

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE          )
ANTITRUST LITIGATION,            )
                                 )   NO. 21-md-02981-JD
_____ )
THIS DOCUMENT RELATES TO:        )
                                 )
EPIC GAMES, INC.,                )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   NO. 3:20-cv-05671-JD
                                 )
GOOGLE, LLC., et al.,            )
                                 )
          Defendants.            )
_____ )

San Francisco, California

Wednesday, November 29, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**<u>APPEARANCES</u>**:

For Plaintiff:

                  CRAVATH, SWAINE & MOORE LLP
                  825 Eighth Avenue
                  New York, New York  10019
     BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
          **YONATAN EVEN, ATTORNEY AT LAW**
          **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
          **MICHAEL ZAKEN, ATTORNEY AT LAW**
          **BRENT BYARS, ATTORNEY AT LAW**
          **ANDREW WIKTOR, ATTORNEY AT LAW**

For Defendants:

                  MUNGER, TOLLES & OLSON LLP
                  350 South Grand Avenue - 50th Floor
                  Los Angeles, California  90071
     BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**

                  MUNGER, TOLLES & OLSON LLP
                  601 Massachusetts Avenue NW
                  Suite 500 East
                  Washington, DC  20001
     BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
          **LAUREN BELL, ATTORNEY AT LAW**

                  MORGAN, LEWIS & BOCKIUS LLP
                  One Market - Spear Street Tower
                  San Francisco, California  94105
     BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**

### I N D E X

Wednesday, November 29, 2023 - Volume 14

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **TUCKER, CATHERINE ELIZABETH (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 2782 | 14 |
| Cross-Examination by Mr. Bornstein | 2782 | 14 |
| Redirect Examination by Mr. Rocca | 2808 | 14 |
| **ZERZA, ARMIN** | | |
| By Video Deposition | 2812 | 14 |
| **SOTTOSANTI, MARK** | | |
| By Video Deposition | 2813 | 14 |
| **MINER, RICHARD ALAN** | | |
| (SWORN) | 2819 | 14 |
| Direct Examination by Mr. Kravis | 2820 | 14 |
| Cross-Examination by Mr. Even | 2835 | 14 |
| Redirect Examination by Mr. Kravis | 2843 | 14 |
| **CHRISTENSEN, ERIC** | | |
| By Video Deposition | 2845 | 14 |

### E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1231 | | 2845 | 14 |
| 1232 | | 2845 | 14 |
| 1977 | | 2811 | 14 |
| 1978 | | 2811 | 14 |
| 1979 | | 2811 | 14 |
| 1980 | | 2811 | 14 |
| 8054 | | 2836 | 14 |
| 10811 | | 2811 | 14 |
| 11221 | | 2813 | 14 |

## **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 11222 | | 2813 | 14 |
| 11226 | | 2813 | 14 |
| 11227 | | 2813 | 14 |
| 11229 | | 2813 | 14 |

 1   <u>**Wednesday - November 29, 2023**</u>                    <u>**9:05 a.m.**</u>

 2                        **P R O C E E D I N G S**

 3                            **---oOo---**

 4        (Proceedings were heard out of the presence of the jury:)

 5        **THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc.

 6   vs. Google LLC, and Multidistrict Litigation 21-2981, In re

 7   Google Play Store Antitrust Litigation.

 8        **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

 9   Bornstein for Epic Games.

10        **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn

11   Pomerantz on behalf of Google.

12        **THE COURT:**  Okay.

13        **MR. POMERANTZ:**  Thank you, Your Honor.  A few issues.

14   Thank you for the time.

15        **THE COURT:**  Yes.

16        **MR. POMERANTZ:**  First, we have a JMOL motion that we

17   want to file after the close of evidence.

18        **THE COURT:**  No, not file it.  Make it orally.

19        **MR. POMERANTZ:**  Sorry?

20        **THE COURT:**  Make it orally, not filed.

21        **MR. POMERANTZ:**  Okay.

22        **THE COURT:**  Don't file anything.  Just make an oral

23   motion when you're ready.

24        **MR. POMERANTZ:**  Okay.  So the evidence is going to

25   close on Friday.

PROCEEDINGS

1          **THE COURT:**  Then you'll make it on Friday.

2          **MR. POMERANTZ:**  Friday at the close of day?

3          **THE COURT:**  Yeah.  Plan on, you know, 10 minutes or

4    less for the motion.  Okay?

5          **MR. POMERANTZ:**  Okay.

6          **THE COURT:**  What else?

7          **MR. POMERANTZ:**  So the second is Your Honor had said

8    you wanted to have a discussion on jury instructions.  We just

9    want --

10         **THE COURT:**  Tomorrow at 3:30.

11         Here's what you're going to do for me:  I need by noon

12   today, noon today, the 35 disputed ones.  Just the 35 in

13   dispute.  Take -- I sound a little loud, Lisa.  Can you turn me

14   down?

15         Yeah.  Thank you.

16         Take Epic's set of the 35 and you, defendants, redline

17   your changes.  Okay?  So Epic's will be treated as the core

18   set, and you give me the redlines.  But have that by noon,

19   please.  Just hand it to me.  Don't file it.  Just hand it to

20   me.  All right?

21         We'll have our charge conference tomorrow at 3:30.  I

22   don't think it will take more than an hour, hour and a half.

23         Did you-all file that verdict form?

24         **MR. BORNSTEIN:**  We exchanged a verdict form.  I don't

25   believe it's been filed yet, Your Honor.

PROCEEDINGS

 1          **MR. POMERANTZ:**  But they're due today, Your Honor.

 2          **MR. BORNSTEIN:**  We'll file today.

 3          **THE COURT:**  Can you file it soon?  I want to get --

 4   I've got to get all this done.  I do not want to have a

 5   Saturday morning conference, but I'm reserving that

 6   possibility.

 7          **MR. POMERANTZ:**  Noon today?

 8          **THE COURT:**  Noon today would be great, yeah.  Okay?

 9      Now, please, I'm sure you've already thought this through,

10   but make it a coherent, flowing verdict form.  All right?  I've

11   seen a number of surprisingly not well thought-out verdict

12   forms.  So it should have a natural flow.  Okay?  You know,

13   what I mean?

14          **MR. BORNSTEIN:**  I do, Your Honor.

15          **THE COURT:**  All right.

16          **MR. BORNSTEIN:**  And just so it's clear, I think

17   Your Honor knows this, but we do have competing forms.  We have

18   some different perspectives.

19          **THE COURT:**  Well, just do the same thing then.  Give

20   me both competing forms, but take Epic's and redline it.  Okay?

21   So that will just make things easier for me.

22      All right.  Now, aside from the 35 instructions, you-all

23   have agreed on everything else; is that right, Mr. Bornstein?

24          **MR. BORNSTEIN:**  We have agreed.  I confess I don't

25   know the number 35 precisely, but we have flagged them

 1  separately as disputed and undisputed.  There are a large

 2  number that are undisputed.

 3      THE COURT:  All right.  So you've all agreed on the

 4  undisputed; is that right?

 5      MR. BORNSTEIN:  That's right.

 6      THE COURT:  Mr. Pomerantz.

 7      MR. POMERANTZ:  Yes, that's right.

 8      THE COURT:  We're not going to go over those.

 9  Typically I do go over each one.  There are just too many.

10  Okay?  So those will be deemed by agreement of the parties as

11  undisputed and will be given as is.  I may fiddle a little bit

12  with the language but very tiny things which, of course, you'll

13  see, but I may not.  I don't know.  So we're going to focus

14  just on those 35.  It is 35.  I have counted them.

15      Okay.  Oh, now, also for your settlement meeting, you are

16  going to serve a demand on Google.  All right?  And the demand

17  is going to be all inclusive, detailed, and specific.  Okay?

18  And you're going to do that by, let's say, 9:00 a.m. Saturday

19  morning.  Okay?

20      And, Google, you are going to serve a detailed,

21  all-inclusive response, a counteroffer, whatever you -- however

22  you want to style it, by 9:00 a.m. on Monday morning.  All

23  right?

24      And then you will have your in-person meeting.  I want the

25  principles to drive the meeting.  You two can be there.  I want

PROCEEDINGS

1   it to be you, Mr. Bornstein, and your client and you,

2   Mr. Pomerantz, and -- is it Mr. Harris?

3           **MR. POMERANTZ:**  Harrison.

4           **THE COURT:**  Harrison.

5       And that's it.  All right?  Just the four of you, and let

6   the principles handle the discussions.  You can do what you

7   want to do while they're there, but I want them to be the lead.

8           **MR. BORNSTEIN:**  One observation, Your Honor.

9   Mr. Pomerantz and I have been talking.  We have discussed and

10  proposed it may be somebody more senior than Mr. Harrison at

11  Google.  We have had some discussions about that.

12          **THE COURT:**  That's fine.  That's fine.

13      Whoever, Mr. Pomerantz, you think is the right person to

14  actually sign an enforceable deal.  Okay?

15          **MR. POMERANTZ:**  Yes.

16          **THE COURT:**  And doesn't have to go all the rigmarole

17  of checking with the home office in Omaha.  I don't want to do

18  all that.  All right?

19      Okay.  So clear?

20          **MR. BORNSTEIN:**  Yes, Your Honor.

21          **THE COURT:**  All inclusive, detailed.  All right?  Not

22  just surrender.  Okay?

23          **MR. BORNSTEIN:**  We have something largely prepared

24  that we have discussed already.

25          **THE COURT:**  All right.  Good.

**PROCEEDINGS**

1    And a detailed counter.  Regardless of whatever you think

2    of their offer, you need to make your own offer.  So it's

3    basically I shouldn't even say a response.  It's just you're

4    going to share your demands.  All right?

5        Okay.  Is there anything else?

6        **MR. BORNSTEIN:**  Yes, Your Honor.  We had one other

7    thing on our side, which is there was an expert that Google had

8    disclosed in the case when there were more plaintiffs relating

9    to damages issues.  You may remember Dr. Leonard.  He appeared

10   in the class certification proceedings.

11       **THE COURT:**  Oh, yes.  Yeah.

12       **MR. BORNSTEIN:**  So he was disclosed in the merits

13   proceedings by Google as an expert to respond to the damages

14   claims that --

15       **THE COURT:**  I only saw Dr. Leonard in the other case.

16   I didn't see him in your case.

17       **MR. BORNSTEIN:**  That is exactly the point, Your Honor.

18   So he was disclosed in the other case for the class

19   certification issues as well as merits damages issues, which

20   now obviously are --

21       **THE COURT:**  For the other case?

22       **MR. BORNSTEIN:**  Correct.  And those are obviously now

23   gone.  He's also been disclosed on the counterclaim damages

24   issues against Epic.

25       **THE COURT:**  By Google?

1          **MR. BORNSTEIN:**  Exactly.

2          **THE COURT:**  Okay.

3          **MR. BORNSTEIN:**  The issue is Google told us just

4     before the holiday weekend they would like to have

5     Mr. Leonard -- Dr. Leonard also testify about issues of

6     pass-through and consumer harm.

7          **THE COURT:**  Pass-through?

8          **MR. BORNSTEIN:**  These are undisclosed opinions in this

9     case, and they are late and we have not had the opportunity to

10    depose him on them.  I understand that Google's position is

11    that we have opened the door on this, but both Dr. Bernheim --

12         **THE COURT:**  How did you open the door?

13         **MR. POMERANTZ:**  Your Honor --

14         **MR. BORNSTEIN:**  We haven't, Your Honor.  Both

15    Dr. Bernheim and Dr. Tadelis in their opening expert reports,

16    each had about six paragraphs in writing on consumer harm and

17    pass-through.  There was an opportunity --

18         **THE COURT:**  I actually -- I asked Dr. Bernheim about

19    that.

20         **MR. BORNSTEIN:**  Dr. Tadelis I believe it was; but,

21    yes, I agree.

22         **THE COURT:**  Was it Dr. Bernheim?

23         **MR. BORNSTEIN:**  It was the pancake example, you may

24    remember he gave, with flour and the milk and the eggs.  That

25    was Professor Tadelis yesterday morning.

1          **THE COURT:**  Hmm, okay.

2            **MR. POMERANTZ:**  Your Honor, if I may respond.

3       So in his opening, Mr. Bornstein said that Google's

4    behavior has harmed consumers who have less choice and pay

5    more.  So before the experts testified, we went to Epic and

6    said, "Look, if your experts testify that Google's conduct is

7    going to increase the" -- I'm sorry -- "if they rule for Epic,

8    it's going to decrease the price to the consumer."  We said,

9    "If you do that, we reserve the right to call Dr. Leonard."

10   Because we all know the same data that Dr. Leonard reviewed was

11   produced to Epic as it was produced to everybody in this MDL.

12          **THE COURT:**  When did you tell -- when did you have

13   this conversation?

14          **MR. POMERANTZ:**  I think that -- I trust what

15   Mr. Bornstein said, that it was before the Thanksgiving

16   holiday, before the experts testified.

17       And so in Dr. Tadelis' testimony, he was asked the

18   following question, not by Your Honor but by Epic's counsel (as

19   read):

20            "What would you expect to happen to the price to

21       consumers if the tie were severed?"

22       And he said (as read):

23            "My expectation would be that prices of, say, digital

24       content to consumers would go down because some of the

25       savings from the reduced fees would naturally be passed on

1      to the users."

2          Dr. Leonard looked at the data; and based on his analysis,

3      he said there would be no pass-through to consumers when --

4      because he looked at data when the service fee was reduced from

5      30 percent to 15 percent, and he found that the data showed no

6      pass-through.

7          So they were -- you know, we put them on notice that if

8      they elicited that testimony, it was our view that they had

9      opened the door.

10          And putting aside Your Honor's question, Mr. Bornstein's

11      question, which was specifically about what would happen to

12      price to consumers, was answered by Dr. Tadelis in a way that

13      we believe opened the door to pass-through evidence, which

14      they've all known about.  It wasn't disclosed in their case,

15      but it was certainly something they knew about because it was

16      fully disclosed to all parties in this MDL and discussed in

17      this courtroom.

18          **MR. BORNSTEIN:**  Your Honor, all of this is in

19      Professor Tadelis' report.

20          **THE COURT:**  I asked what would -- would the decrease

21      in fees be passed on to consumers, and he said -- it was

22      Dr. Tadelis -- said he assumed it would be based on

23      microeconomic principles, which teach that lower costs

24      typically result in lower prices in an effort to capture

25      greater volume.  So that was me.

**PROCEEDINGS**

1    Now, these reports are old.  They've been out forever.

2  You should have -- why didn't you designate Dr. Leonard

3  earlier?  Why did you wait till Wednesday before Thanksgiving?

4    **MR. POMERANTZ:**  Because we did not understand that

5  they were going to put in front of the jury through an

6  economist that there was going to be pass-through harm to the

7  consumer; and we, therefore, told them in advance if they did

8  that, we were going to come to Your Honor and ask Your Honor to

9  allow us to put Mr. Leonard on.  It would be for 20 minutes.

10    **THE COURT:**  Well, you say "in advance," but it was in

11  week three of the trial before a four-day break.  That's not

12  really in advance.  That's actually *in medias res*, in the

13  middle of the thing.

14    So advance is saying in August, if anybody says anything

15  about this in November, we're going to wheel out Dr. Leonard.

16  I take it that didn't happen.

17    **MR. BORNSTEIN:**  No, Your Honor.  And we disclosed this

18  in October of 2022.  If you're interested, I can read to the

19  Court from Professor Tadelis' expert report.

20    **THE COURT:**  That's okay.

21    **MR. BORNSTEIN:**  Thank you.

22    **THE COURT:**  All right.  So if I were to consider this,

23  how long would this take?

24    **MR. POMERANTZ:**  20 minutes, Your Honor.

25    By the way, we are calling Dr. Leonard anyway on damages

PROCEEDINGS

1  to our counterclaim, so it's not an additional witness.  It's

2  additional 20 minutes to a witness.

3      **THE COURT:**  I don't see -- what is he going to say?

4  Take it from me, it's not going to get passed through?

5      **MR. POMERANTZ:**  He's going to say "I looked at data

6  when the fee was reduced from 30 to 15 percent, and I found

7  zero evidence showing any pass-through of -- to the consumer in

8  the form of lower prices for digital goods."

9      **THE COURT:**  What's the horizon?  It's like a year's

10  worth of data?  I mean --

11      **MR. POMERANTZ:**  It's hundreds of thousands of data

12  points.

13      **THE COURT:**  Yeah, but over 12 months or less; right?

14      **MR. POMERANTZ:**  Whatever -- I don't recall the time

15  period.  Your Honor may be correct, but --

16      **THE COURT:**  I hardly -- I mean, okay.

17      **MR. BORNSTEIN:**  Your Honor, this is deeply

18  prejudicial.  We've had no opportunity to depose him on this.

19  This is, as Your Honor said, last minute.  They've known about

20  our opinions for over a year.  This is sandbagging of the

21  highest order.

22      **THE COURT:**  You never asked Dr. Leonard about these

23  things?

24      **MR. BORNSTEIN:**  We didn't even depose him on this

25  because we had no point of coming.  He was disclosed as a

**PROCEEDINGS**

1   damages expert.  He has expressed no opinion on liability.  He

2   expressly says in his report that he has been asked to respond

3   to the damages opinions of the other plaintiffs.

4           **THE COURT:**  Where is that --

5           **MR. BORNSTEIN:**  That's it.

6           **THE COURT:**  Where is that disclosure?

7           **MR. BORNSTEIN:**  That disclosure is in his expert

8   report.  It's paragraph 8.  I can read that one if Your Honor

9   would like to hear it.

10          **MR. POMERANTZ:**  Your Honor, I believe, and I don't

11  have it in front of me, but I believe it's damages and injury;

12  and as Your Honor knows, antitrust injury is a part of the

13  liability case.

14          **MR. BORNSTEIN:**  Again, Your Honor, with respect to the

15  other --

16          **THE COURT:**  Do you have his report?

17          **MR. BORNSTEIN:**  I do have it.  And obviously we had

18  the opportunity to do rebuttal reports, which, of course, we

19  didn't address his opinion at all because he was not disclosed

20  in our case.

21      And Mr. Pomerantz is actually incorrect.  The disclosure

22  is on paragraph 8.

23          **THE COURT:**  Paragraph 8?  Okay.

24          **MR. BORNSTEIN:**  Paragraph 8 of Dr. Leonard's report.

25          **THE COURT:**  All right.  This is the November 8th,

PROCEEDINGS

1   2022, opening report -- expert report of Gregory Leonard.

2            **MR. BORNSTEIN:**  Correct, Your Honor.

3            **THE COURT:**  Paragraph 8 (as read):

4            "I, Dr. Leonard, states 'I have been asked by counsel

5       for Google to review and respond to the damages analyses

6       contained in the expert reports of Dr. Singer, Dr. Rysman,

7       Saul Solomon, Dr. Schwartz.'"

8       And that's it, not even --

9            **MR. BORNSTEIN:**  If you look at paragraph 9, he says --

10           **THE COURT:**  Not even Dr. Tadelis.  Nothing about

11  Dr. Tadelis or Dr. Bernheim.

12           **MR. BORNSTEIN:**  That is correct, Your Honor.  And he

13  assumes liabilities as you can see in the very next paragraph.

14           **THE COURT:**  Okay.  He is excluded.

15           **MR. POMERANTZ:**  On this topic, Your Honor; right?

16           **THE COURT:**  On that topic, yeah.  A day late and a

17  dollar short, Mr. Pomerantz.

18      Okay.

19           **MR. POMERANTZ:**  One other issue.

20           **THE COURT:**  Yes.

21           **MR. POMERANTZ:**  More just by way of notification.

22  I'll turn it over to Ms. Chiu.

23           **THE COURT:**  Yeah.

24           **MS. CHIU:**  Your Honor, Google intends to play the

25  video deposition of Mark Sottosanti.  That's the employee from

**PROCEEDINGS**

 1  Riot Games that you provided the ruling regarding the sealing

 2  request that they made.

 3      We just wanted to alert Your Honor that based on the

 4  sealing positions that Riot's counsel provided, about

 5  29 minutes of testimony will be muted for the jury.

 6          **THE COURT:**  Oh, that's ridiculous.  I gave you the

 7  formula.

 8          **MS. CHIU:**  We understand that, Your Honor.

 9          **THE COURT:**  It should be three lines, one number.

10  We're not doing that.

11      **MS. CHIU:**  So, Your Honor, we understand that.  We are

12  prepared to play the deposition testimony in full.

13          **THE COURT:**  29 minutes?

14      **MS. CHIU:**  Yes.

15          **THE COURT:**  Okay.  Someone did not do the right thing.

16  Who was that?  You or --

17      **MS. CHIU:**  No.  No.  This is counsel for Riot.  We did

18  not make a position on sealing and neither did Epic,

19  Your Honor.

20          **THE COURT:**  You play it.

21          **MS. CHIU:**  Thank you.

22          **THE COURT:**  Anything else?  No?

23      Okay.  Let's bring the jury out.

24      (Proceedings were heard in the presence of the jury:)

25          **THE CLERK:**  Please be seated.

1          **THE COURT:**  Okay.  Let me give you a morning --

2   Wednesday morning update.  We are almost certainly going to

3   close evidence on Friday.  The parties have been working very

4   hard towards that.  Okay?  So that will be the end of evidence.

5          Next -- oh, cross-examination.

6          **MR. BORNSTEIN:**  Thank you, Your Honor.

7                    **CATHERINE ELIZABETH TUCKER**,

8   called as a witness for the Defendant, having been previously

9   duly sworn, testified further as follows:

10                       **CROSS-EXAMINATION**

11  **BY MR. BORNSTEIN:**

12  **Q.**   Professor Tucker, good morning.

13  **A.**   Good morning.

14  **Q.**   You would agree with me, as a starting point I hope, that

15  when defining an antitrust market, the key issue to understand

16  is the substitutability of different products; yes?

17  **A.**   Absolutely, yes.

18  **Q.**   And whether products are substitutes is evaluated from the

19  perspective of the consumer or the buyer; correct?

20  **A.**   Yes.  The two consumer groups, yeah.

21  **Q.**   And when you are defining a market, you are trying to

22  understand what the reasonable substitutes that a consumer or

23  buyer might turn to are; correct?

24  **A.**   Yes, that's right.

25  **Q.**   And in analyzing challenged conduct, an economist -- an

**TUCKER - CROSS / BORNSTEIN**

1  economist should use the smallest relevant market that meets

2  that market definition test; correct?

3  **A.**   Yes, that's right.  We look at reasonable substitutes.

4  **Q.**   Right.  And that constitutes the smallest relevant market

5  that meets that reasonable-substitutes test; right?

6  **A.**   Yes.

7  **Q.**   Okay.  Now I want to talk about whether your market

8  definition meets that agreed test.

9      Now, you define a market for the facilitation of digital

10  content transactions between developers and users; correct?

11  **A.**   Yes.

12  **Q.**   And to address a question that arose yesterday about what

13  digital content transactions are, they may include, for

14  example, the downloading of an app; correct?

15  **A.**   Yes.

16  **Q.**   And they may include the purchasing of content in an app,

17  like in-game currency or subscription; yes?

18  **A.**   Yes.  Digital content, yes.

19  **Q.**   And digital content transactions may also include

20  consuming content in an app, like reading the news or watching

21  a movie on Netflix; correct?

22  **A.**   Yes, that's correct.

23  **Q.**   So your market includes the facilitation of the

24  downloading of an app; correct?

25  **A.**   Yes, that's right.

**TUCKER - CROSS / BORNSTEIN**

1  **Q.**   And it includes the facilitation of the purchasing of

2  digital content in apps; correct?

3  **A.**   Yes, that's right.

4  **Q.**   And it includes the facilitation of the consuming of

5  content in apps; correct?

6  **A.**   Yes, that's right.

7  **Q.**   And by "facilitation," what you mean is making sure that

8  those various interactions are going well; yes?

9  **A.**   Yes, that's correct.

10  **Q.**   So you have defined a market for the making sure that

11  downloading an app, purchasing content in an app, and consuming

12  content in an app are all going well; yes?

13  **A.**   Yes, that's right.

14  **Q.**   Let's talk about how you got there.

15      You started your market definition process by focusing on

16  what you called the focal product, which in this case was the

17  focal product of Epic's allegations, Google Play; correct?

18  **A.**   Yes, that's right, the start of the conduct.

19  **Q.**   And that's not the product that you then used to do your

20  market definition analysis.  You didn't use the Google Play

21  Store; correct?

22  **A.**   So I used Android and the Play Store.

23  **Q.**   Let's go back and be sure we have this right.

24      In your view, the focal product of Epic's allegations is

25  the Google Play Store; correct?

**TUCKER - CROSS / BORNSTEIN**

1   **A.**   So, yes, that's correct.

2   **Q.**   All right.  And then when you went about deciding what the

3   product market definition is, you did not use the Google Play

4   Store; right?

5   **A.**   So I used -- so, no.  I was focused on Android and the

6   Play Store.

7   **Q.**   What you used as the product for your market definition

8   analysis was the facilitation of digital content transactions;

9   am I right?  That's the product that you used.

10  **A.**   Yes, that's right.

11  **Q.**   Right.  And you did that because your view is that that's

12  what the Google Play Store does; right?

13  **A.**   Yes.  That's the need it fulfills.

14  **Q.**   Right.  You called it the Google Play Store's job to

15  facilitate digital content transactions; yes?

16  **A.**   Yes, that's exactly what I said.  Job is a way we express

17  needs when we're teaching.

18  **Q.**   Right.  Now, we can agree, I think, that the phrase "the

19  facilitation of digital content transactions" is not a phrase

20  that you saw in Google documents in those words; right?

21  **A.**   No.  No.  That's economist language.

22  **Q.**   And you didn't hear anyone during the course of the trial

23  from Google use that phrase or use those words?

24  **A.**   No.  As I say, that's economist language.

25  **Q.**   And just to be clear, you didn't see anybody from Apple,

**TUCKER - CROSS / BORNSTEIN**

1  for example, in the documents you reviewed from Apple talk

2  about the market in those terms; right?

3  **A.**  No, they didn't use my economist language.

4  **Q.**  Right.  So this is your economist's view, your

5  interpretation of what the job of Google Play is; correct?

6  **A.**  Yes.  That's how I describe it as an economist.

7  **Q.**  Okay.  You are aware, however, that when people at Google

8  describe what Google Play does, they call it app distribution;

9  correct?

10  **A.**  Yes, they do on occasions.

11  **Q.**  Right.  So, for example, in discussing Project Hug and

12  Project Banyan, you remember Google posed what it called an

13  existential question of "How do we continue to keep Play as the

14  preeminent distribution platform for Android?"  Do you recall

15  that?

16  **A.**  So I don't recall those exact words, but I'm sure that's

17  right.

18  **Q.**  All right.  And do you recall, again, in discussing

19  Project Hug and discussing Project Banyan, Google said that

20  "Major developers are increasingly considering distribution off

21  of Play"?

22  **A.**  Yes, I'm sure they said that.  I don't recall the exact

23  words.

24  **Q.**  All right.  And what you chose to do is, rather than

25  focusing on the specific words that people at Google used to

TUCKER - CROSS / BORNSTEIN

1    describe their business, is you applied your assessment as an

2    economist of what it is that was really going on; correct?

3    A.   So, no, I don't think that's quite correct.  I'm sorry.

4    Q.   All right.  Well, you did apply your assessment as an

5    economist of what you believe the job of the Google Play Store

6    was regardless of the fact that folks at Google use different

7    terminology; correct?

8    A.   Oh, yes.  So I used my terminology as an economist, which

9    I know is very economist of me --

10   Q.   Right.

11   A.   -- but it's not the case that that was divorced from how

12   people at Google were describing the job they were doing.

13   Q.   Right.  You saw other things you thought supported your

14   description of the product; right?

15   A.   Yes, that's right.

16   Q.   Right.  So you chose the things that you thought supported

17   your description of the project and ignored the things that you

18   thought supported Professor Bernheim's description of the

19   product; correct?

20   A.   I don't think that's quite fair, but --

21   Q.   Right.  And what an economist does when it reviews

22   materials is an economist makes a decision about what's really

23   going on from an economic perspective; right?  That's what you

24   did?

25   A.   So, again, when I read the documents, I read them through

1    the lens of someone who studies platform economics.  I mean,

2    that's what I do.

3    **Q.**   Right.  And so you --

4          **THE COURT:**  If I may, can I just jump in?

5          I'd just like to go back for a moment, Dr. Tucker.

6          So you've defined the relevant product as -- in your view,

7    as the facilitation of digital content interactions; right?

8          **THE WITNESS:**  I think I used specifically the word

9    "transactions," but I tend to use "interactions" because that's

10   how I teach it.

11         **THE COURT:**  Which one do you prefer?  "Interactions"

12   or "transactions"?

13         **THE WITNESS:**  I prefer "interactions" because I think

14   it describes better for people who are not in this field what's

15   going on, but I am aware that in antitrust economics the term

16   "transaction" --

17         **THE COURT:**  Well, you're here now.  Just whatever you

18   prefer.  You prefer --

19         **THE WITNESS:**  I prefer --

20         **THE COURT:**  You prefer "interaction."  Okay.

21         **THE WITNESS:**  -- the word "interaction," honestly.

22         **THE COURT:**  All right.  So in your opinion, the

23   relevant product is the facilitation of digital content

24   interactions.  Would that include a browser, for example?

25         **THE WITNESS:**  So, no.  This is how I would think of

1    that.  If you think about what I'm trying to get across with

2    the word "transaction," if that makes sense, is that you're

3    usually thinking about an instance where a platform can

4    actually add value and make things go well.  That's what I'm

5    thinking about.

6        THE COURT:  Well, a browser -- I think a browser -- I

7    don't want to derail the counsel's examination.

8        What -- in the online world, what is within your

9    definition of the relevant product market?  Are browsers

10   included?

11       THE WITNESS:  Yes, in the sense that I think of them

12   as an alternative for self-distribution for a developer wherein

13   some sense they're taking on a lot of the burden of making sure

14   the interactions with their app consumers are going well.

15       THE COURT:  All right.  So browsers --

16       THE WITNESS:  So in -- I'm sorry to interrupt.

17       But in more traditional IO language it's sort of the

18   ability to self-distribute, if that makes sense.

19       THE COURT:  All right.  So you would include browsers

20   in the relevant product market?

21       THE WITNESS:  Yes.

22       THE COURT:  Okay.

23       Okay.  Go ahead.

24   BY MR. BORNSTEIN:

25   Q.   And just to be clear on some of the terminology, in your

1    report that you provided in this action, you define the product

2    market as the facilitation of digital content transactions;

3    correct?

4    **A.**    Yes, that's right.   I was using the more technical term

5    from -- I don't want to bore everyone, but I think you know

6    where it comes from and why it was that I was using it; but

7    commonly when I'm teaching it, I use the word "interactions"

8    because I think it's more descriptive of what's going on.   Does

9    that make sense?

10   **Q.**    Thank you, Professor.

11        Now let's go back to this question of the narrowest

12   relevant market.

13        So you just explained to the Court your opinion with

14   respect to browsers.   You also believe that your market

15   includes Android operating system; correct?

16   **A.**    Yes.   I mean, as I explain, Play is a feature of the

17   Android operating system that allows this, yes.

18   **Q.**    Right.   Okay.   So the Android operating system, browsers.

19   You also have in your market the Google Play Store; correct?

20   **A.**    So, yes, I do, that's correct.

21   **Q.**    And in your view, in fact, the Google Play Store and the

22   Android operating system are not naturally pulled apart or

23   separable; correct?

24   **A.**    No.   I describe them as layers.

25   **Q.**    Right.   So that -- but to be clear, they are not naturally

1  separate products in your view; correct?

2  **A.**   So, no, but with nuance.

3  **Q.**   All right.

4         **MR. BORNSTEIN:**  Your Honor, may I please turn to the

5  Tucker deposition?  It should be Tab 1 in the binder that you

6  have.  Page 142.  It's the big binder, Your Honor.

7         **THE COURT:**  Yeah.  142?

8         **MR. BORNSTEIN:**  Yes, Your Honor.  It starts at line 20

9  and it continues on to page 143, line 7.

10                    (Pause in proceedings.)

11         **THE COURT:**  That's fine.

12         **MR. BORNSTEIN:**  Thank you.

13  **BY MR. BORNSTEIN:**

14  **Q.**   And we've talked a little bit, Professor Tucker, but you

15  do remember that you gave a deposition in this case; correct?

16  **A.**   Yes.

17  **Q.**   And in that deposition you did your best to tell the truth

18  and be as accurate as you possibly could; correct?

19  **A.**   Yes, that's right.

20  **Q.**   And in your deposition, you were asked the question (as

21  read):

22         "So are you able to say one way or the other whether

23      they are separate products, part of the same product?"

24      And you were talking here about the Google Play Store and

25  Android.

TUCKER - CROSS / BORNSTEIN

1    And you answered (as read):

2          "I don't know if I can do -- say it any more clearly

3     than I just have.  I mean, they -- obviously one is an

4     operating system, one is an app store; but the app store

5     is a key way that the operating system competes, and so

6     they're not naturally separable as products.  You wouldn't

7     really want to have one without the other."

8     I read that correctly?

9  **A.**   Yes, you did.

10 **Q.**   Okay.  And you do recognize, as you said here, the Android

11 operating system and the Google Play Store serve different

12 purposes; correct?

13 **A.**   So certainly there are elements of the operating system

14 which do serve a different purpose from what I'm analyzing.

15 **Q.**   No, they serve different purposes from each other; right?

16 The Android operating system and the Google Play Store serve

17 different purposes from each other?  They have different roles

18 within the Android ecosystem; correct?

19 **A.**   I'm sorry.  I can't answer that cleanly.

20 **Q.**   All right.

21       **MR. BORNSTEIN:**  Your Honor, I'd ask again to turn to

22 the deposition.  Same page, 142.  And now I'm on pages --

23 excuse me -- lines 5 through 19, Your Honor.

24          **THE COURT:**  5 through 19.  Let's see...

25                    (Pause in proceedings.)

1          **THE COURT:**  That's fine.

2          **MR. BORNSTEIN:**  All right.  I'm going to have that on

3   the screen.

4          Thank you.

5   **BY MR. BORNSTEIN:**

6   **Q.**  At your deposition you were asked the question, Professor

7   (as read):

8          "Are Android and the Google Play Store separate

9          products in your understanding?"

10  You gave a two-paragraph answer (as read):

11          "So I don't think they're easily separable in

12          purpose, in that if I'm a mobile operating system, which

13          is what Android is, as a key feature, I need to have a

14          great app store to compete.  And so though Android and

15          Google Play have different purposes within the Android

16          ecosystem, essentially the Google Play Store is a key way

17          that Android can do its job by making sure the

18          interactions between app developers and app users go

19          well."

20          I read that correctly, Professor?

21  **A.**  Yes, that's right.

22  **Q.**  All right.  So --

23  **A.**  In fact, that's what I would have said if it wasn't a

24  yes-no answer.

25  **Q.**  All right, Professor.

**TUCKER - CROSS / BORNSTEIN**

1          What you do is, although one is an operating system and

2    one is an app store, you put the two of them together in your

3    market for the facilitation of digital content transactions;

4    correct?

5    **A.**    Yes, for the reasons I describe there.

6    **Q.**    Okay.  And the Samsung Galaxy Store, that's also in your

7    market along with all these other things that we've talked

8    about; correct?

9    **A.**    Yes, that's right.

10   **Q.**    Now, you do agree the Samsung Galaxy Store is a separate

11   product from the Android operating system; right?

12   **A.**    So, yes, and it's certainly operated by a different

13   company, but with a bit of nuance.

14   **Q.**    Right.  But they are separate products, Professor;

15   correct?

16   **A.**    Yes.  I mean, in the sense owned by different companies,

17   yes, of course.

18   **Q.**    Okay.  Aside from the fact they are owned by separate

19   companies, these are separate products from one another;

20   correct, Professor?

21   **A.**    We're talking about --

22   **Q.**    We're talking -- the Samsung Galaxy Store and the Android

23   operating system, they're not the same product; right?

24   **A.**    So I'm hoping you'll put up my deposition about what I

25   said there because it's difficult with a yes-no here.

TUCKER - CROSS / BORNSTEIN

1   Q.   All right.  Let's do that.

2          MR. BORNSTEIN:  Your Honor, it's page 186.

3          THE COURT:  186?

4          MR. BORNSTEIN:  Yes.  Starting at line 15 going

5   through line 20.

6                    (Pause in proceedings.)

7          THE COURT:  Go ahead.

8   BY MR. BORNSTEIN:

9   Q.   And you were asked the question (as read):

10          "Are the Samsung Galaxy Store and the Android

11       operating system separate products?"

12       You answered (as read):

13          "So they're -- I mean, they're separate products.

14       One is layered on top of the other."

15       Did I read that correctly?

16   A.   Yes.  That's what I would have said if it wasn't yes-no.

17   Q.   That's what you would have said?

18   A.   Yeah.  I didn't --

19   Q.   Right.  So you have defined a market that includes the

20   Android operating system, the Google Play Store, the Samsung

21   Galaxy Store, as you told the Court, browsers.  There are

22   separate products in here that's all in your market; right?

23   A.   Yes.  I mean, the separate way you can achieve the same

24   job for the consumers in this market.

25   Q.   Those things are all in your market; right, Professor?

1  **A.**   Yes, that's right.

2  **Q.**   Okay.  Now, we can agree I hope --

3          **THE COURT:**  Can I just jump in?

4          **MR. BORNSTEIN:**  Of course, Your Honor.

5          **THE COURT:**  I just want to make sure I understand

6  which is why I'm asking.

7          So, I mean, isn't everything on the Internet designed to

8  facilitate the delivery of digital content?  So I'm wondering,

9  what is your outer boundary of what's not in your vision or

10 understanding of the relevant product market?  What's not in

11 it?

12         **THE WITNESS:**  Okay.  That's a really good question.

13         So, first of all -- you know, so outside the product

14 market would be, of course, things which aren't reasonable

15 substitutes.  So things which are sort of cumbersome,

16 burdensome, not easy ways of delivering digital content.

17         **THE COURT:**  Can you name a couple for me -- for us?

18         **THE WITNESS:**  Yes.  I mean, of course.  Maybe if I use

19 sort of gaming examples, that might be helpful.

20         **THE COURT:**  It's up to you.

21         **THE WITNESS:**  Okay.  So, you know, say, for example,

22 if I'm Epic, you know, I produce digital content, and so, yes,

23 there's many ways I can share it with app users.  I also showed

24 those.  But, you know, there are other ways I could deliver

25 that digital content, you know, which wouldn't work so well.

1      So, for example, if I was requiring people to go to

2  GameStop, that wouldn't be a good alternative.  I mean, that's

3  a bit like Dr. Bernheim's you have to go to a movie theater

4  leaving your -- leaving your house to go and consume digital

5  content.

6          THE COURT:  Okay.  So when you say going to GameStop,

7  you mean going to like a physical brick-and-mortar store to buy

8  a CD or a physical version of the game?

9          THE WITNESS:  Yeah.  So something -- if you're making

10  something for the Nintendo Switch, a cartridge like that, that

11  would be -- it's digital content --

12          THE COURT:  All right.

13          THE WITNESS:  -- but it's cumbersome and difficult in

14  the same way that the movie theater would be difficult and

15  cumbersome.

16          THE COURT:  Okay.  So what I hear you saying is you're

17  clearly excluding anything that's not online.  But is there

18  anything online that is not in the relevant product market as

19  you define it?  Anything online at all?

20          THE WITNESS:  Well --

21          THE COURT:  We've covered browsers, stores, operating

22  systems.  Is there anything online that is not part of your

23  definition of the relevant product market?

24          THE WITNESS:  So, I mean, I think because I'm

25  including the ability to self-distribute -- right? -- you know,

1    if you're Disney Plus, there's many ways I can get that app

2    content to you.  I'm including all the ways that you could do

3    that, and so that would include subscribing on my PC through a

4    website or even subscribing through my -- you know, we didn't

5    talk about it -- through a Smart TV would be another way.

6         So I would include all those ways just because we're

7    allowing for the possibility of self-distribution.

8              **THE COURT:**  Okay.

9         All right.  Please, go ahead.

10             **MR. BORNSTEIN:**  Thank you, Your Honor.

11   **BY MR. BORNSTEIN:**

12   **Q.**   I'll move to a new topic, Professor.

13        You criticized Professor Bernheim yesterday for defining a

14   market for third-party smartphone operating systems; right?

15   **A.**   Yes, that's right.

16   **Q.**   Okay.  But just to level set, you are aware that his

17   opinion is that in his market, the buyers are smartphone OEMs

18   like Samsung; correct?

19   **A.**   Yes.  That's the way he thinks about it.

20   **Q.**   Correct.  That's what I'm asking.

21        And in his market, the sellers are the providers of

22   operating systems like Google who provides Android; correct?

23   **A.**   Yes.  Again, that's how he does it.

24   **Q.**   Correct.  And in his opinion, the only real seller of

25   operating systems for smartphones today for third parties is,

1   in fact, Google selling Android, in his opinion?

2   **A.**   Yes, that's right.

3   **Q.**   Okay.  Now, you disagree with him as you're making very

4   clear; correct?

5   **A.**   Yes, I do.

6   **Q.**   All right.  You believe, in fact, there is no buyer-seller

7   relationship between the smartphone OEMs and Google; right?

8   **A.**   No.  I think they're partners.

9   **Q.**   Okay.  In your view, there are not even transactions

10  between the smartphone OEMs and Google; correct?

11  **A.**   So I don't think there's the kind -- so I don't agree with

12  his value exchange analysis, if that's what you mean by

13  "transactions."

14  **Q.**   I'm asking you, Professor.  Do you think that the license

15  agreements that the smartphone OEMs sign in order to get access

16  to Google Android are transactions?

17  **A.**   So, I mean, as a layperson would use the word, I'm sure

18  they're a transaction, though, it's affalconal (phonetic) to

19  what I'm talking about.

20  **Q.**   So they're transactions to a layperson, but they're not

21  transactions to you?

22  **A.**   Oh, I just meant I don't want you to get confused between

23  my digital content transactions and those transactions.  I just

24  mean, of course, any time you sign a contract, I, as a

25  layperson or an economist, maybe call that a transaction.

1   **Q.**   Okay.  So there are transactions.

2       Let's say -- you did say, however, you disagree that

3   there's an exchange of value that goes on between the

4   smartphone OEMs and Google; correct?

5   **A.**   So I believe that a huge amount of value has been created.

6   I don't agree with the way that Dr. Bernheim, when he does his

7   theoretical test, thought about exchange of value.

8   **Q.**   All right.  Let me just ask you, Professor.  Do you

9   believe that there is an exchange of value that happens from

10  the smartphone OEMs to Google and from Google to the smartphone

11  OEMs?  Is value exchanged?

12  **A.**   They're partners.  They're creating value and --

13  **Q.**   Is value exchanged, Professor?

14  **A.**   Oh, I'm sorry.  Yes, exchange value and created in the

15  process.

16  **Q.**   Right.  So there is a transaction in which one party

17  provides value and the other party provides value back?

18  **A.**   Yes, that's right.

19  **Q.**   But in your view, there is no market for that transaction;

20  is that right?

21  **A.**   Yes, that's right, because they're partners and there's an

22  exchange in what they're doing.  One's providing handsets,

23  one's providing an operating system, and they work together to

24  compete against Apple.

25  **Q.**   Okay.  Let's call up, if we could, Dr. Bernheim's map of

1    the various markets.  I want to make sure we're clear about

2    what we're talking about.  I think -- here we go.

3        You saw this on Monday when Professor Bernheim testified;

4    correct?

5    **A.**   Yes, I did.

6    **Q.**   All right.  And we're talking now, again, his opinion

7    about the market that's been circled in red; correct?

8    **A.**   Yes, that's right.

9    **Q.**   All right.  So we have established, I think now, that

10   there is at least an exchange of value going each way between

11   the smartphone OEM and Google; correct?  One gives something

12   and gets something, the other gives something and gets

13   something; is that right?

14   **A.**   Yes, so I would have a double arrow; right?  I would have

15   we're creating value in that circle.

16   **Q.**   Very good.

17       And the smartphone OEMs are selling something to Google --

18   excuse me -- Google is selling something to the smartphone

19   OEMs, the smartphone OEMs are providing consideration back, and

20   that's the exchange of value that happens?

21   **A.**   That's how Dr. Bernheim describes it.  That's -- I don't

22   agree.

23   **Q.**   You don't agree.

24       Okay.  Let's take a different perspective on this issue.

25       You do agree with Professor Bernheim that when you think

**TUCKER - CROSS / BORNSTEIN**

1  about markets, you think about what the buyers' needs are;

2  correct?

3  **A.**   Yes, that's right.

4  **Q.**   So smartphone OEMs, they have a need for things like

5  touchscreens when they make their product; yes?

6  **A.**   Yes, that's right.

7  **Q.**   And they have a need for things like batteries; right?

8  **A.**   Yes, that's right.

9  **Q.**   Right.  And they have a need for things like modem chips;

10  correct?

11  **A.**   Yes, they do.

12  **Q.**   And they have a need for operating systems too, don't

13  they?

14  **A.**   Yes, they do.

15  **Q.**   All right.  Without an operating system, for example, a

16  smartphone won't function and you can't sell it to consumers;

17  right?

18  **A.**   That's correct, yes.

19  **Q.**   And almost all smartphone makers get their operating

20  systems from Google?

21  **A.**   Yes, with the exception of Apple devices, that's correct.

22  **Q.**   Correct.  But rather than considering the satisfaction of

23  that need that smartphone makers have as a market, you call it

24  a narrow subset of operations within an interconnected system;

25  is that right?

1  **A.**  That sounds exactly like the kind of thing I'd say.

2  **Q.**  It does.  And so as a result of not treating the licensing

3  of Android as occurring in a market, you ignore the possibility

4  that Google could be exercising market power over the

5  smartphone OEMs; correct?  There's no market, so you see no

6  market power?

7  **A.**  So, yes, no, I don't see -- I see a partnership, not

8  market power.

9  **Q.**  Okay.  Let's turn to Apple.

10      Just to level set, if I have an iPhone, I can't use

11  that iPhone to access the Google Play Store; right?

12  **A.**  Yes, that's right.

13  **Q.**  And vice versa?  I recall you have an Android phone, or at

14  least you did.  On your Android phone, you can't access the

15  Apple App Store; correct?

16  **A.**  Yes, that's right.

17  **Q.**  All right.  And most people, the vast majority of people,

18  have either one or the other.  Most people don't have both an

19  Android smartphone and an iPhone; correct?

20  **A.**  No, it's certainly unusual to be that kind of person.

21  **Q.**  And so from the typical user perspective, the only way to

22  switch from using the Google Play Store to using the Apple App

23  Store is to get a new phone; right?

24  **A.**  Yes, that's right.

25  **Q.**  All right.  And that's why you spent some time looking at

TUCKER - CROSS / BORNSTEIN

1   questions relating to switching?

2   **A.**   Yes, that's right, whether or not it's, what we call as

3   economists, switching costs between Apple and Android.

4   **Q.**   But we can agree that the relevant question here to assess

5   whether or not the Apple App Store imposes a competitive

6   constraint on the Google Play Store, the relevant question,

7   it's not whether there is a substantial number of users who

8   switched to iPhones; right?  That's not the relevant

9   question?

10  **A.**   It's a piece of evidence about switching costs, and that's

11  how I use it, but it's not as an economist would think about

12  how to think about reasonable -- it's not exactly the data you

13  want for reasonable substitutes, if that makes sense.

14  **Q.**   Well, let me make clear, see if it makes sense.

15      In your view, the relevant question to assess whether the

16  Google Play Store is constrained competitively by the Apple App

17  Store is not whether there is a substantial amount of switching

18  among users?  That's not the right question; correct?

19  **A.**   I mean, it's evidence about switching costs, but it's not

20  direct evidence of whether or not they're reasonable

21  substitutes.

22  **Q.**   Okay.  Fair enough.

23      You need, in your view, to look at potential switching

24  that might happen if there was an increase in the price of

25  Google Play Store, for example?

**TUCKER - CROSS / BORNSTEIN**

1   **A.**   That's exactly what I would have said, yes.

2   **Q.**   Very good.

3          Because, just to draw this out, if a user were to switch

4   because an iPhone had better battery life -- right? -- that

5   wouldn't tell you anything about the competitive constraints

6   that the Google Play Store faces; correct?

7   **A.**   No, that's right.

8   **Q.**   Right.  And if a user were to switch for any number of

9   other reasons, like they like iMessage and the blue bubbles

10  or they like the way iPhones look or because their sister has

11  an iPhone, none of those things tell you anything about

12  whether the Apple App Store constrains Google Play Store as a

13  competitor; right?

14  **A.**   So, no.  Those are different features of their smartphone.

15  **Q.**   Exactly.  And you have not quantified in any way the

16  extent to which switching either does occur or would occur

17  because of changes in the Google Play Store; right?

18  **A.**   So I have not quantified that.  Instead, I rely on other

19  evidence about it.

20  **Q.**   So just so we have it, you do agree that there are people,

21  and a lot of them, who switch from Android to iOS or the

22  other way around for a whole variety of reasons; right?

23  **A.**   Yes.  I mean, people switch phones for many reasons.

24  **Q.**   Right.  Buying a phone is buying a whole kind of complex

25  product with lots of different features; right?

**TUCKER - CROSS / BORNSTEIN**

1  **A.**   Yes, that's right.

2  **Q.**   And you have not, in fact -- in all of the switching data

3  that you presented on slides yesterday, you have not separated

4  out how much of that switching happens because of the relevant

5  issue and how much of that switching happens because of things

6  that we just established are completely irrelevant; correct?

7  **A.**   No.  It's really about switching costs.

8  **Q.**   Okay.  Very good.

9      And these considerations, by the way, they apply not just

10  to people who are switching, but they apply to new users as

11  well; correct?

12  **A.**   So, yes.  I mean, when people are thinking about buying a

13  phone, yes, there are many features they think about.

14  **Q.**   Right.  Including, for example, whether their family or

15  friends have an iPhone or an Android phone?  That plays into

16  even teenagers' thinking; right?  We talked about teenagers

17  yesterday.

18  **A.**   Yes, I know we did.  Yes.  Yes.  Yes.

19  **Q.**   Okay.

20  **A.**   Yes, teenagers, as I talked about yesterday, are

21  influenced by other teenagers.

22  **Q.**   Now, last point on Apple.

23      You put up a chart yesterday.  I think it was Slide 11 in

24  your presentation -- I'm taking a flyer here -- on pricing

25  issues between Apple and Google.  Ooh, I got the right slide.

**TUCKER - CROSS / BORNSTEIN**

1          Do you remember this chart?

2   **A.**    Yes, I do.

3   **Q.**    Okay.  And you testified that this was one piece of

4   evidence that shows competition between Apple and Google;

5   correct?

6   **A.**    Yes, that's right.

7   **Q.**    But we see when we look at this chart that some of the

8   price changes that happened happened years apart from one

9   another; correct?  Years.

10  **A.**    Yes, that's right.

11  **Q.**    Right.  And you have not identified any developer who left

12  one platform or the other because of the differentials in price

13  that lasted for years; correct?

14  **A.**    So, no, and that's not how I think about the competition

15  for developers' attention.

16  **Q.**    So you have not identified any such developer; correct?

17  **A.**    No, that's right.

18  **Q.**    And you want to talk about competition for developers'

19  attention.  I'll make this my last set of questions, Professor.

20          It is not the case that investment by a developer in the

21  Apple ecosystem is a substitute for investment by a developer

22  in the Google ecosystem, is it?

23  **A.**    So, I'm sorry, I'm confused by your question.  You're

24  saying it's not a substitute, that developer -- you know,

25  bodies of a developer aren't substitutes across the two

1   ecosystems?

2   **Q.**   I'll ask my question again.

3         It is not the case that investment by a developer in the

4   Apple ecosystem is a substitute for investment by a developer

5   in the Android ecosystem?  Those are not substitutes, are they?

6   **A.**   So I'm so sorry.  The negative is throwing me and the word

7   "investment" is throwing me.

8         The way I think about it is engineering bodies, which I

9   believe are substitutes, but maybe you have something else in

10  mind.  I'm sorry, I can't answer the question well.

11         **MR. BORNSTEIN:**  I have no further questions,

12  Your Honor.

13         **THE COURT:**  All right.  Very brief redirect.

14                   <u>**REDIRECT EXAMINATION**</u>

15  BY MR. ROCCA:

16  **Q.**   Hi, Professor Tucker.

17         **MR. ROCCA:**  Let's put up Slide 202, Phil.

18         Ms. Clark, if we could have control.

19         Thank you.

20         Thank you, Phil?

21         **MR. BORNSTEIN:**  Your Honor, this is outside the scope.

22  I object.

23         **MR. ROCCA:**  It's not, Your Honor.  It's directly

24  responsive.  I've not asked a question yet.

25         **THE COURT:**  What's the question?

**TUCKER - REDIRECT / ROCCA**

 1  **BY MR. ROCCA:**

 2  **Q.**   Professor, do these platforms provide services to both

 3  users and developers?

 4          **THE COURT:**  All right.  That's sustained.

 5      Next.

 6  **BY MR. ROCCA:**

 7  **Q.**   Professor, you teach digital-economy-related courses; is

 8  that right?

 9  **A.**   Yes, I do.

10  **Q.**   You teach about digital platforms?

11  **A.**   Yes, I do.

12  **Q.**   Is the economy, in your opinion, evolving in a way where,

13  as the world becomes more digital, there are more options for

14  users to find content from developers?

15          **MR. BORNSTEIN:**  Objection, Your Honor.  Leading and

16  outside the scope.

17          **THE COURT:**  Sustained.

18      Next question.

19  **BY MR. ROCCA:**

20  **Q.**   Professor, are the different ways that users and

21  developers interact, are those sometimes referred to as

22  platforms?

23  **A.**   That's right, yes.

24  **Q.**   Is Google Play a digital platform?

25  **A.**   Yes, it is.

1    **Q.**   And in providing services to developers like Epic, do

2    those services provide value to users?

3    **A.**   Yes, they do.

4    **Q.**   And in trying to provide those services to companies like

5    Epic, is Google Play in competition with the different ways

6    that Epic can find its users?

7              **MR. BORNSTEIN:**  Objection, Your Honor.  Leading.

8              **THE COURT:**  Sustained.

9    **BY MR. ROCCA:**

10   **Q.**   Professor, counsel asked you a question about Slide 11,

11   and he was suggesting that there was a long period of time

12   between the price changes.  Do you recall that?

13   **A.**   Yes, I do.

14   **Q.**   It sounded like you wanted to say something in response to

15   that.  You didn't seem concerned about the timing.  Can you

16   please provide that response?

17   **A.**   Oh, of course not, because, number one, I teach pricing so

18   I always know that when you're changing what we call the

19   monetization model, it does take a bit of time.

20        But the other thing is if you look at the evidence, say,

21   for that sort of 15 percent for subscriptions, there was lots

22   and lots of fretting in that time at Google about what to do

23   about this price change and how to respond to Apple.

24        And so, you know, though, of course, it takes time for

25   prices to change, it didn't bother me just because I both saw

 1  the documents and I know how long it changes in the real world.

 2  **Q.**   And during that time period, that lag time, are the

 3  platforms competing on other elements besides price?

 4  **A.**   Yes, of course.

 5  **Q.**   There's a lot of other stuff going on?

 6  **A.**   Yes.

 7        **MR. BORNSTEIN:**  Objection.  Leading.

 8        **MR. ROCCA:**  No further questions, Your Honor.

 9        **THE COURT:**  Okay.  You may step down.  Careful on the

10  way down.  It's a little bit steep.

11                    (Witness excused.)

12        **THE COURT:**  Who do we have next?

13        **MS. CHIU:**  Your Honor, Google will be playing the

14  video deposition of Armin Zerza from Activision Blizzard.

15        **THE COURT:**  Okay.

16        **MS. CHIU:**  Prior to that, there are some exhibits that

17  we would like to admit over no objections.

18        **THE COURT:**  All right.

19        **MS. CHIU:**  Those are Exhibits 1977, 1978, 1979, 1980,

20  and 10811.

21        **MR. BORNSTEIN:**  No objection, Your Honor.

22        **THE COURT:**  Okay.  Those are admitted.

23      (Trial Exhibits 1977, 1978, 1979, 1980, and 10811

24       received in evidence.)

25        **MS. CHIU:**  Your Honor, we have exhibits for the jury.

 1    May I hand them out?

 2                THE COURT:  What are they?

 3                MS. CHIU:  They're copies of the exhibits that were

 4    just admitted.

 5                THE COURT:  You're just going to put them on the

 6    screen; right?

 7                MS. CHIU:  Yes.

 8                THE COURT:  No, no, no.  Just the screen.

 9                     (Video was played but not reported.)

10                THE COURT:  Okay.  Let's stop for our morning break.

11    Come back at 10:45.

12                THE CLERK:  All rise.

13                          (Recess taken at 10:31 a.m)

14                     (Proceedings resumed at 10:48 a.m)

15          (Proceedings were heard in the presence of the jury:)

16                THE COURT:  Okay.  Fire it up.

17                          (Video deposition resumed.)

18                THE COURT:  Okay.  Who's next?

19                MS. CHIU:  Your Honor, Google will be playing one more

20    video of Mark Sottosanti from Riot Games.

21                THE COURT:  Okay.  Go ahead.

22                MS. CHIU:  Your Honor, there are a few exhibits we'll

23    be admitting.  There are no objections.

24                THE COURT:  All right.

25                MS. CHIU:  Those exhibits are 11221.

 1          THE COURT:  One second.

 2          MS. CHIU:  Yes.

 3                      (Pause in proceedings.)

 4          THE COURT:  Okay.

 5          MS. CHIU:  11221, 11222, 11226, 11227, and 11229.

 6          THE CLERK:  You're not admitting Exhibit 163 on here?

 7          MS. CHIU:  That was previously admitted.

 8          MR. BORNSTEIN:  There's no objection, Your Honor.

 9          THE COURT:  Okay.  Those are admitted.

10      (Trial Exhibits 11221, 11222, 11226, 11227, and 11229

11       received in evidence.)

12              (Video was played but not reported.)

13          THE COURT:  Okay.  We'll take an extra five minutes

14  for lunch.  All right?  See you back at 12:30.

15          THE CLERK:  All rise.

16          (Luncheon recess was taken at 11:55 a.m.)

17  **AFTERNOON SESSION**                              **12:42 p.m.**

18      (Proceedings were heard out of the presence of the jury:)

19          THE COURT:  What's happening?

20          MR. POMERANTZ:  Two things.  First, on the JMOL, we

21  would request we could file something brief for preservation

22  purposes.  It would actually also be a useful outline for the

23  10 minutes.  It would only take 10 minutes to discuss; but if

24  we could file something in advance of 3:30 on Friday --

25          THE COURT:  There's just no need to.  I've had many

1    MDL cases.  You get up, you make your JMOL, and we're good.

2    Okay?

3            MR. POMERANTZ:  Can we just file something?

4            THE COURT:  Just say it.  You don't have to write it.

5    Okay?

6            MR. POMERANTZ:  If we -- can we put it in writing,

7    Your Honor, just so that it's preserved?  And it will be our

8    outline for the 10 minutes.  It will be helpful to Your Honor,

9    and we'll stay within the 15-page limit.

10           THE COURT:  Why are you worried about preservation?

11   The record on the transcript is as clear as the docket.  In

12   fact, maybe even more so.

13           MR. POMERANTZ:  I think there was just concern about

14   the record, Your Honor.

15           THE COURT:  What is it you would like to file?

16           MR. POMERANTZ:  15 pages that lays out --

17           THE COURT:  No, absolutely not.  You can make an oral

18   motion.

19           MR. POMERANTZ:  Any pages Your Honor gives us.

20           THE COURT:  If you want to do a two-page bullet point,

21   fine.  I mean, I think it's a useless exercise.  I am not going

22   to deem any reasonable argument to have been waived.  Okay?

23           MR. POMERANTZ:  All right.  Thank you, Your Honor.

24           THE COURT:  So don't -- you know, this isn't a

25   draconian exercise of, you know, parsing the record to see

**SOTTOSANTI - VIDEO TESTIMONY**

1  whether you said the right word or not.  I know what you're

2  going to say if you lose.  If.  We don't know.  Who knows?  If

3  you lose, I know what you're going to say, and that's also why

4  I'm having you do an oral motion.

5          **MR. POMERANTZ:**  I understand, Your Honor.  I

6  understand.

7      The other thing is we just -- I apologize for being a

8  little bit late, but we have handed Your Honor the instructions

9  that you asked for, the verdict forms.  There is one

10  instruction --

11          **THE COURT:**  Oh, do we have them?

12          **MR. POMERANTZ:**  Yes, you have them now in a notebook

13  that we provided to Your Honor.

14          **THE COURT:**  Oh, okay.  Great.  So that's the redline

15  plus --

16          **MR. POMERANTZ:**  Yes, I think so.

17          **THE COURT:**  Okay.  Good.  Thank you.

18          **MR. POMERANTZ:**  The parties worked together on it,

19  Your Honor.

20          **THE COURT:**  Great.  Thank you.

21          **MR. POMERANTZ:**  And then there was one instruction,

22  Instruction 26, where we have a revised version that we have

23  floated.

24          **THE COURT:**  26?

25          **MR. POMERANTZ:**  Yes.  It's not in your book right now,

**SOTTOSANTI - VIDEO TESTIMONY**

 1  and we have a revised version of it that we have floated to the

 2  other side that they have not had a chance to --

 3      **THE COURT:**  This is what you filed previously.  Is it

 4  in Docket Number 806?

 5      **MR. POMERANTZ:**  Yes.

 6      **THE COURT:**  All right.  I have that.  Okay.

 7      **MR. POMERANTZ:**  But we have added a paragraph to that

 8  proposed instruction, and the other side has not yet had a

 9  chance to get back to us on that paragraph.  And so what we

10  were wondering is whether we could submit that proposed -- we

11  can submit it now, but we were going to propose we submit it

12  tomorrow morning so we could have discussions.

13      **THE COURT:**  It's No Duty to Deal?

14      **MR. POMERANTZ:**  Yes, Your Honor.  We have a revised

15  version of that not in your notebook.  I have one here.

16      **THE COURT:**  This seemed fine in the original.  What

17  did you -- I was going to -- this seemed fine to me.

18      **MR. POMERANTZ:**  There's an additional paragraph.  I

19  just wanted to --

20      **THE COURT:**  Another paragraph on No Duty to Deal?

21      **MR. POMERANTZ:**  Yeah, because it's a little broader

22  than the developer distribution agreement, which is what the

23  paragraph is that you have; and so we would like -- and we do

24  think the duty to deal, you know, has been raised and some

25  other issues --

```
1              THE COURT:  Why don't you hand it to Ms. Clark.  We'll
2    do it realtime.  Okay?
3              MR. BORNSTEIN:  I have one.  Thank you.
4              THE COURT:  Okay.  So this is a new.  This is old.
5    And this is new.
6              THE CLERK:  Do you have another copy?
7              MR. POMERANTZ:  I do.
8              THE COURT:  Oh, you added Pacific Bell.  Okay.  I see.
9         Okay.  All right.  Anything else?
10             MR. POMERANTZ:  No, Your Honor.
11             THE COURT:  Great.
12        All right.  Let's bring the jury in.
13        Just one second.  So what happens after this?
14             MR. POMERANTZ:  After this video is over, we will then
15   be bringing Mr. Paul -- I'm sorry -- Mr. Rich Miner, a live
16   witness.  He will testify, and then we have another video or
17   two this afternoon.
18             THE COURT:  How long is that?
19             MR. POMERANTZ:  I think the video -- I think the
20   witness -- you know, to be candid, the witness is going to be
21   fairly short from our end short, probably short from their end
22   as well, and then we have some videos.
23        And what's happening, Your Honor, just so that you know.
24   I realize videos isn't the best way to keep the attention of
25   the jury.
```

1        **THE COURT:**  Just, I mean, we're barely at the halfway

2   mark, and it feels like it's gone on forever.  I understand you

3   have the realities of what you have to deal with, but --

4        **MR. POMERANTZ:**  And what happened also, Your Honor,

5   just to be clear, is that witnesses that we planned to call in

6   our case, they called in their case, and so -- and so -- well,

7   they weren't on their witness list, but they had the right to

8   call them in their case, and so we let them.  You know, they

9   were called.  So we're going to end up today with only one live

10  witness, tomorrow three live witnesses, and Friday three live

11  witnesses.

12       **THE COURT:**  How long will the next depo be?

13       **MR. POMERANTZ:**  Why don't you get up and handle this?

14       **THE COURT:**  Just roughly.  Just roughly, yeah.

15       **MR. POMERANTZ:**  I don't know.

16       **THE COURT:**  How long will it be?

17       **MS. CHIU:**  Your Honor, we have about 30 more minutes

18  of Mr. Sottosanti's deposition.  And then the two witnesses

19  that we will be playing this afternoon is a total of an hour

20  about 10 minutes total.

21       **THE COURT:**  Each?

22       **MS. CHIU:**  No, total.  So 43 minutes for

23  Mr. Christensen and 27 minutes for Mr. Beaty.

24       **THE COURT:**  You have more than a half an hour on this

25  guy because we've already gone almost an hour and you're only

 1   at the halfway point.

 2          MS. CHIU:  I understand that, Your Honor.  There's

 3   about 30 minutes left for him.

 4          THE COURT:  How are the -- okay.  You're at page 23

 5   out of 49.  That's already -- how is the rest of that going to

 6   be half the time of what you did this morning?

 7          MS. MOSKOWITZ:  Your Honor, it's actually only been 30

 8   so far on him.

 9          THE COURT:  Page 30?

10          MS. MOSKOWITZ:  Sorry.  30 minutes.

11          THE COURT:  Really?

12       That's fine.  You're right.  You know better than I do.

13       Okay.  Let's bring the jury in.

14       (Proceedings were heard in the presence of the jury:)

15          THE COURT:  Okay.  Let's resume.

16                  (Video deposition resumed.)

17          THE COURT:  Okay.  Who's next?

18          MR. KRAVIS:  Your Honor, Google calls Rich Miner.

19          THE COURT:  Okay.

20                  (Pause in proceedings.)

21          THE CLERK:  Please raise your right hand.

22                  **RICHARD ALAN BERNHEIM**,

23   called as a witness for the Defendant, having been duly sworn,

24   testified as follows:

25          THE WITNESS:  I do.

 1           THE CLERK:  Thank you.  Please be seated.

 2      Please state your full name for the Court and spell your

 3  last name.

 4           THE WITNESS:  Richard Alan Miner, M-I-N-E-R.

 5           THE CLERK:  Thank you.

 6           MR. KRAVIS:  May I proceed, Your Honor?

 7           THE COURT:  Yes.

 8           MR. KRAVIS:  Thank you, Your Honor.

 9                     DIRECT EXAMINATION

10  BY MR. KRAVIS:

11  Q.   Good afternoon, sir.

12  A.   Good afternoon.

13  Q.   Where do you work?

14  A.   Google.

15  Q.   And how long have you been working at Google?

16  A.   About 19 years.

17  Q.   And how did you come to work at Google?

18  A.   They acquired a company I started called Android.

19  Q.   And I think you said you started the company.  Were you

20  one of the cofounders of Android?

21  A.   I was.

22  Q.   And how did you come to be a cofounder of Android?

23  A.   Well, I had previously invested in a start-up called

24  Danger, which was started by Andy Rubin who at that time was

25  just starting Android and was the CEO of Android.  So I knew

1  Andy from that very early smartphone start-up having invested

2  in it and liked the vision that he was working on, and thought

3  I could help contribute and so decided to join.

4  **Q.**   I'm going to ask you some questions about that vision in

5  just a few moments; but before we get there, what is the time

6  period that we're talking about?  When did you become a

7  cofounder of Android?

8  **A.**   I started talking to Andy in late 2004 and right around

9  the turn of the year in 2005.

10  **Q.**   What did you do before you became a cofounder of Android?

11  **A.**   So I had a previous start-up that had been acquired by a

12  European mobile phone company called Orange.  That start-up

13  built a voice-based assistant.  Orange was a mobile phone

14  operator very much like an AT&T/Verizon, and I drove innovation

15  there and also helped them start a venture fund.

16  **Q.**   While you were working at Orange, did you work on the

17  launch of the first Microsoft Windows smartphone?

18  **A.**   Yeah, I did.  Orange was the first carrier -- first

19  carrier in the world that agreed to work with Microsoft and

20  launch that very first Microsoft smartphone, and it was my

21  experience helping Orange launch that phone and working with

22  Microsoft that made me a little bit concerned about how the

23  mobile phone space was going to evolve and made me think that

24  we needed more open mobile phone platforms.

25  **Q.**   And that experience that you just described, was that part

**MINER - DIRECT / KRAVIS**

1  of what drove your decision to leave Orange and become a

2  cofounder of Android?

3  **A.**   Absolutely, yeah.  I was pretty concerned that Microsoft's

4  approach, which was a much more closed approach with a

5  proprietary operating system, wouldn't benefit the mobile phone

6  space in that you could see some of the same issues that you

7  had in the PC space where their control of an OS inhibited

8  innovation, and I was very pro innovation and thought a more

9  open OS could help be more pro innovation.

10 **Q.**   Now, at the time that you became a cofounder of Android,

11 were there any Android phones on the market at that point?

12 **A.**   No.  No.  When I joined Android, we were half a dozen, you

13 know, hackers, a couple of dogs in a garage kind of picture of

14 a start-up.  So we hadn't raised any money yet.  We certainly

15 hadn't built a phone yet.  We still had many years of

16 development to go before we would launch our first phone.

17 **Q.**   About when was it that Google acquired your start-up

18 Android?

19 **A.**   July of 2005, which I can always remember because it was

20 the same month my daughter was born.

21 **Q.**   And, briefly, can you tell us, how did it come to be that

22 Google acquired Android?

23 **A.**   Yeah, so we were a very early start-up with a vision to

24 build this phone OS, so we really weren't looking to be

25 acquired.  As I said, we hadn't raised any money yet.  And if

1  you know how start-ups go, you know, first you have your idea,

2  you maybe use your own money out of your pocket to start

3  funding it; and then if it looks like it's something that could

4  be big, you go and talk to venture capitalists about raising

5  money.

6      We had started to talk to VCs and realized that back then

7  kind of mobile phones and phone networks were kind of boring.

8  The Internet was all the rage.  And we thought if a company

9  like Google or a Yahoo! would look at our vision for Android

10 and say, "Oh, that's cool, we might like to imagine an Android

11 phone," we really were just looking for an endorsement from a

12 Google, and that's why we started talking to them.

13 **Q.**   Now, after Google acquired Android, did you continue

14 working on Android at Google?

15 **A.**   I did.  I helped build the very first, you know, versions

16 of Android that we launched and was on the team until sometime

17 around 2009 after the first couple of phones were being

18 launched.

19 **Q.**   And during that time period from 2005 to 2009, what

20 exactly was your role on the team that was building Android?

21 **A.**   Well, we were still operating pretty much like a start-up

22 inside of Google.  So like in a start-up, I was wearing

23 multiple hats.  I was doing -- I had an engineering team

24 building web browser and some other parts of the platform.  I

25 was doing a lot of our BD talking to mobile phone carriers and

**MINER - DIRECT / KRAVIS**

1  handset OEMs.  And I was also helping drive our strategy and

2  go-to-market thinking.

3  **Q.**  About how many years did it take between the time that

4  Google acquired your start-up Android and the time that the

5  first Android phones hit the market?

6  **A.**  Pretty close to four years.  We announced it after about

7  three years and announced the platform, but we didn't ship that

8  first phone until about four years in.

9  **Q.**  And during that time, during those four years, how many

10  people were there at Google working on building Android?

11  **A.**  I don't remember exactly, but about 175 people.  So we

12  grew that team from the 6 to about 175.  It was a lot of work

13  to get that first platform built.

14  **Q.**  And during that time period, those four years, what kind

15  of investments did Google make to build Android?

16  **A.**  Again, I don't know the exact counting, but it was

17  hundreds of millions of dollars.  It wasn't just that team.  We

18  were building a lot of phone prototypes.  We actually built a

19  whole mobile phone network on the Google's campus to test the

20  mobile phone platform.  So it was a pretty significant

21  investment that Google was making.

22  **Q.**  Now, I think you said this a moment ago, did you -- after

23  the first Android phones came out on the market, did you then

24  leave the Android team to work on other projects at Google?

25  **A.**  I did.  Sometime in 2009, Google was looking at starting a

**MINER - DIRECT / KRAVIS**

1   venture fund.  I had started a venture fund at Orange as I

2   mentioned, and so decided to go help build Google ventures.

3   And, again, that was after the first several phones had

4   launched.

5   **Q.**   Now, when you were talking about your experience at

6   Orange, you mentioned a vision that you and your cofounders had

7   for Android.  I'd like to just ask you a few questions about

8   that.

9        During those early years when you were working on

10  developing building Android, what was your vision for Android?

11  **A.**   Well, you know, we started to realize that the phones that

12  people were carrying in their pockets were going to become as

13  powerful as computers, and we thought that if that was really

14  the case -- if that was really the case, that they were going

15  to become these little mobile computers in your pocket, that

16  they really should have not only a powerful OS but one that was

17  open and could help inspire innovation.

18       And, you know, we had a vision that it would be nice if a

19  large percentage of the smartphones that people were going to

20  have had our very open OS to help drive innovation in the

21  mobile space.

22  **Q.**   You just mentioned an open OS.  The jury has heard

23  testimony in this case about Android being an open-source

24  operating system.

25       Why was it important to your vision for Android that

1  Google -- that Android -- excuse me -- be an open-source

2  operating system?

3  **A.**   Well, again, there had been attempts to build platforms

4  for mobile -- Nokia, Microsoft -- and those were closed

5  approaches; and being closed approaches, it was hard to

6  convince a large number of OEMs from adopting those platforms,

7  and that was our vision.  We wanted there to be little friction

8  to adopt Android.  And if we kept it closed, we think there

9  would always be some question about, well, what's inside that

10  closed box; but if it's open, the source code is freely

11  available, we just thought that that would allow us to talk to

12  OEMs and carriers and make them feel a lot more comfortable

13  about adopting a platform that even though Google was helping

14  to develop, it was really being produced and delivered into the

15  open-source community.

16  **Q.**   And you mentioned earlier -- you used the word

17  "innovation."  Was the possibility of innovation part of the

18  importance of Android being an open-source operating system?

19  **A.**   Yeah, absolutely.  Again, you know, when I had been

20  launching that first Windows mobile phone, even though Orange

21  was the only carrier that was agreeing to launch that phone, we

22  would want to put a messaging app on it, and Microsoft would

23  say, "Oh, no, you don't need a messaging app.  We have

24  Microsoft Messenger."  It was clear that they didn't want other

25  apps.  So they were just trying to focus.

**MINER - DIRECT / KRAVIS**

1       And so from my standpoint, if you really wanted to have an

2   open platform that was going to be successful, you wanted to

3   drive innovation and have that innovation come from developers,

4   come from OEMs, and perhaps even from carriers, from the whole

5   ecosystem.

6   **Q.**   You've been talking about openness.  I want to ask you now

7   a little bit about apps and apps distribution.

8       Was it also important to your vision for Android in those

9   early days that Android make it easy for developers to

10  distribute their apps?

11  **A.**   Yeah, absolutely.  You know, again, having been a part of

12  the mobile phone ecosystem for a while, I had seen a lot of the

13  headaches that developers had and carriers had in trying to

14  make apps available, and clearly -- and Andy had that

15  experience with his device Danger that he had built -- so

16  clearly making it really easy for developers to write an app

17  and have that app be available everywhere was part of that

18  vision.

19  **Q.**   So I want to ask you about those developer headaches now.

20      And I've put in front of you two demonstratives.  Instead

21  of binders, I've given you some phones.  I think those are two

22  different versions of the same phone.  Do you recognize that

23  phone?

24  **A.**   Yeah, yeah.  This at the time was one of the most

25  successful what they called feature phones.  It wasn't really a

1    smartphone, but you could have apps on it, phones at the time,

2    the Motorola Razr.

3    **Q.**   And when you say "at the time," you're talking about

4    around the time that you cofounded Android?

5    **A.**   Correct.

6    **Q.**   Now, during that time, who was it that controlled the apps

7    that went on the phone like the one you have in your hand right

8    now?

9    **A.**   Yeah, well, so this app -- this phone has the word

10   "Verizon" on the back.  It's a Verizon phone.  So whoever was

11   selling that phone really controlled the experience.  These

12   were pretty locked-down devices; and even though they could

13   have apps downloaded to them, where those apps came from were

14   always pretty much controlled by who distributed it.  So if it

15   was Verizon shipping this phone or AT&T shipping this phone,

16   they controlled that user experience and what the user saw even

17   if they were the same phones.

18   **Q.**   And you mentioned Verizon and AT&T.  Are those companies

19   that are sometimes referred to as carriers or cell carriers?

20   **A.**   Correct.

21   **Q.**   All right.  So you've got two different versions of the --

22   two copies of the same phone there.

23        Suppose for a moment that the phone in your left hand

24   there was distributed by Verizon and the one in your right hand

25   was distributed by AT&T.  What would an app developer during

**MINER - DIRECT / KRAVIS**

1  this time period have had to do to get their app on each of

2  those two phones?

3  **A.**   You're making me remember some painful experiences.

4      I mean, so, like, literally AT&T and Verizon would have

5  dedicated teams who were responsible for what they called their

6  stack of apps that they would make available on these phones.

7  And, by the way, they might even have different teams for

8  different phones that Verizon had.  So the Motorola Razr from

9  Verizon would have a team; and if you were a developer, you

10 literately had to find the people in Verizon that managed that

11 application stack, you had to convince that your solitaire app

12 or whatever you were building was a great app that they should

13 include on their phone.

14     They might ask you to make changes to that app.  They'd

15 have you sign some long contracts.  And eventually, if you were

16 lucky, you would get your phone -- your app on that phone in

17 their app stack for that particular device.

18 **Q.**   Have you in this context heard the term "walled garden"

19 used to refer to the model that you were just describing?

20 **A.**   Yeah.  Not only had I heard it, but when I was at Orange,

21 we were literally creating what we called the Orange World.

22 The walled garden that you refer to is another phrase for when

23 you want to try and keep your customers in your walled garden.

24 Let me populate a beautiful garden, if I'm Verizon or AT&T,

25 that will compel my users only to consume my content, only use

1  the apps I've approved, and basically discourage them from

2  going off and then oftentimes even limiting and preventing them

3  from going off into the broader web or off of the carrier set

4  of selected apps and experiences.

5  **Q.**   Now, we just heard you talk about some of the challenges

6  that this walled garden model created for app developers.  How

7  about for the consumers or the users, people who are using

8  these phones?  What kind of challenges did the walled garden

9  model create for them?

10 **A.**   Yeah, well, it also created confusion; right?  Because

11 there was this unusual selection of, well, what apps make it to

12 this phone.  So let's say I've got two friends, one has the

13 Verizon version of this phone, one as the AT&T version, they

14 look identical.  Maybe a user has a solitaire app they

15 downloaded or poker app that they downloaded that they want to

16 play poker with their friend on the other phone.  AT&T might

17 have selected a different poker app and decided not to carry

18 the poker app that Verizon carried, maybe specifically because

19 Verizon picked that other app.

20      And so these two friends seeing apps on each other's

21 phones can't actually even run the same apps, can't collaborate

22 together.  I mean, it was a really very confusing world for

23 consumers to understand what apps were, why certain apps are

24 available one place but not another place, yeah.

25 **Q.**   So let me ask you now about the app store.

1    Now, today Google's app store is called the Play Store.

2 When Android first lunched, did it have a different name?

3 **A.**   It did.  It was the Android Market.

4 **Q.**   Now, at the time that you were building Android, how was

5 Android Market intended to address the challenges that you just

6 described for app developers and for phone users with this

7 walled-garden approach?

8 **A.**   Well, it was -- I mean, it was a key challenge, and one of

9 my major jobs at one point was literally spending hours working

10 with the carriers to understand the benefit of having a single

11 place.

12    And this was a hard argument because they all had their

13 own app stores.  They were used to having their app stores and

14 thought that was great, but they eventually realized, you know,

15 and heard us when we talked about the ability to have one place

16 worldwide that was going to be collecting apps and that would

17 be able to be distributed on their network.

18    And so, yeah, I mean, we had to convince the carriers and

19 the handset manufacturers the benefits of having a single place

20 that developers could go to publish their app and then make

21 that app available on any phone no matter what network or who

22 was distributing or selling that Android phone.

23 **Q.**   When you say "a single place to publish their app," was

24 that Android Market?

25 **A.**   Absolutely, yeah, Android Market.

**MINER - DIRECT / KRAVIS**

1   **Q.**   Now, why was that important?  Why was it important to the

2   success of Android to have that one place where developers

3   could publish their apps in Android Market?

4   **A.**   Well, I mean, as I think we all saw, apps ended up helping

5   to drive a lot of the smartphone sales, and that's because you

6   could get a lot of developers excited to build for your

7   platform.

8       It would have been a really hard sell to tell developers

9   to develop for Android if it was going to be the status quo of

10  travel the world and figure out how to talk to all of these

11  different carriers to get your app enabled.

12      And so, yeah, for us, that idea that a developer no matter

13  where they were, no matter who they were could build an app,

14  push it into the Android Market, now Android -- Google Play,

15  and have that app available on every phone, every carrier,

16  every country, that was a big selling point and important for

17  the success of Android.

18  **Q.**   And just to be clear about this, when you talk about one

19  place to distribute apps, was it part of that original vision

20  that you had for Android that there be one and only one app

21  store on Android?

22  **A.**   Well, we certainly wanted there to be one app store the

23  developers knew they could go to, but that didn't prohibit the

24  ability to have there be other app stores.

25      You know, one of the things about Android's openness is

**MINER - DIRECT / KRAVIS**

1  lots of different phones with lots of different form factors

2  and capabilities were built.  So Samsung built phones that

3  could have a stylus that you could write on.  They built phones

4  that had folding screens.  So in the case of Samsung, it made

5  sense for them to build an app store as they've done to

6  highlight apps which took advantage of very special features of

7  those phones.

8      So there was nothing about the platform that needed to

9  uniquely only have one store.  I think most Samsung phones ship

10  with a Galaxy Store as well as the Play Store.  But you

11  certainly -- it wouldn't have helped consumers for there to be

12  dozens of stores or hundreds of stores.

13  **Q.**  Last topic for you, Mr. Miner.

14      During the time that you were working on building Android

15  at Google, did there come a time when Apple launched the first

16  iPhone?

17  **A.**  Yeah.  It was about three and a half years in.  You know,

18  we still were developing Android, but Apple launched the first

19  iPhone I think 2007.

20  **Q.**  Now, that very, very first model of the iPhone, did that

21  come with an app store on it?

22  **A.**  No, it didn't.  And, in fact, Steve Jobs kind of famously

23  said, "We're not going to have native apps for our phones.  You

24  know, you can develop apps for the web for iPhone."  And, of

25  course, they changed their tune I think in part because we had

**MINER - DIRECT / KRAVIS**

1   started to talk about having an app store for Android, the

2   Android Market.  And so around the time of the second iPhone

3   shipping, they also announced a software developer kit for

4   developers, and they announced the app store.

5   **Q.**   And so subsequent to the first version of the iPhone,

6   were there later versions that did have an app store on them?

7   **A.**   Correct.

8   **Q.**   And was having Android Market important to the ability of

9   Android phones during this time as Android was launching to

10  compete with the iPhone?

11  **A.**   Yeah, absolutely.  I mean, again, there were people kind

12  of almost keeping score of how many apps the iPhone had in

13  the, you know, Android -- in the iPhone app store and how

14  many we had in Android Market.

15          So, you know, for us, it was crucial as a part of a

16  go-to-market strategy for Android and for our partners that we

17  have one place that those apps could go and have a similar

18  story to what Apple had so that developers knew that they could

19  develop Android apps and publish them to all of those devices.

20  **Q.**   Thank you, Mr. Miner.

21          **MR. KRAVIS:**  Pass the witness, Your Honor.

22          **THE COURT:**  Okay.  Cross.

23          **MR. EVEN:**  May I, Your Honor?

24          **THE COURT:**  Yes.

25          **MR. EVEN:**  Thank you.

1        We'll need the screen, Ms. Clark.  Thank you.

2                        **CROSS-EXAMINATION**

3    BY MR. EVEN:

4    Q.   Good afternoon, Mr. Miner.

5    A.   Good afternoon.

6    Q.   Nice meeting you again.

7         I wanted to actually touch base on a couple of things that

8    came up on your direct.

9         One is you mentioned that people were keeping score.  At

10   the time when you were at Android, what was the number of apps

11   that was on the Android store, the Android Market as it was

12   called at the time, versus Apple, if you recall?

13   A.   I don't remember.  I mean, it quickly went to, you know,

14   tens to hundreds of thousands, but I don't remember exactly the

15   numbers.

16   Q.   And at the time you were there, a few months after we were

17   talking hundreds; correct?

18   A.   Well, so we launched a developer challenge a year before

19   we launched the actual phone.  So there were -- there were

20   thousands of apps even when we just first launched.

21   Q.   And you said, I think, that it was important to you to

22   have the store launch essentially globally; correct?  And on

23   all carriers around the world; right?

24   A.   Correct.

25   Q.   That's because you viewed that market as a global market

```
 1   for apps and phones, et cetera; correct?
 2   A.   We thought it was important for the success of Android for
 3   app developers to get their apps to all of those phones, yes.
 4   Q.   Okay.  Now, you mentioned that you joined Android because
 5   you believed in the open mobile phone operating system vision
 6   that Mr. Rubin started and you joined and co-believed in;
 7   correct?
 8   A.   Correct.
 9   Q.   And I want to show a short video clip that shows that
10   vision a little bit, and then I want to talk about it, if I
11   may.
12          MR. EVEN:  And this is Exhibit 8054, Your Honor.  I'm
13   offering it into evidence.
14          MR. KRAVIS:  No objection.
15          THE COURT:  Okay.  It's admitted.
16      (Trial Exhibit 8054 received in evidence.)
17             (Video was played but not reported.)
18   BY MR. EVEN:
19   Q.   That was you; correct?
20   A.   Correct.
21   Q.   And these are things you said back in 2008 at Harvard
22   University; correct?
23   A.   They are.
24   Q.   And so you believed at the time that monopolistic control
25   over a platform is not a good thing; right?
```

 1   **A.**   Correct.

 2   **Q.**   And you believed that the goal was to have a level playing

 3   field; correct?

 4   **A.**   Correct.

 5   **Q.**   And that people should be able to compete with Google;

 6   correct?

 7   **A.**   Correct.

 8   **Q.**   And Google, just like any other developer, would succeed

 9   or fail on the merits based on who built the better app;

10   correct?

11   **A.**   Correct.

12   **Q.**   And in that context, that competition on a level playing

13   field should occur also between Google Play, or the

14   Android Market at the time, and any other store that another

15   developer built; correct?

16   **A.**   No, I don't agree with that.

17          **MR. EVEN:**  Your Honor, if I may go to deposition at

18   page 85, line 24, through 86, line 6.

19                      (Pause in proceedings.)

20          **THE COURT:**  That's fine.

21   BY MR. EVEN:

22   **Q.**   So let me see that.

23          You were deposed in this case; correct?

24   **A.**   Correct.

25   **Q.**   And that was a few -- two or three months ago; correct?

1   **A.**   Correct.

2   **Q.**   And you gave the testimony that was to the best of your

3   ability at the time under oath; correct?

4   **A.**   Correct.

5   **Q.**   And I asked you (as read):

6           "The same competition on a level playing field should

7       occur between Android Market, or later Google Play, and

8       any other store that another developer built; correct?"

9       And you said (as read):

10          "So there I -- I would say certainly the intent was

11      there maybe for that to be the case, sure."

12      Now, Android Market, the predecessor to the Google Play

13  Store, launched in October 2008; right?

14  **A.**   I'm sorry.  Repeat the question.

15  **Q.**   Android Market launched in October 2008; correct?

16  **A.**   That sounds about right.

17  **Q.**   And shortly after Android Market launched, it began

18  selling apps for money; correct?

19  **A.**   Not initially.  We didn't have billing initially, but it

20  took some time for us to implement the billing capabilities;

21  but, yeah, eventually there were paid-for apps.

22  **Q.**   Okay.  It took two or three months before paid apps

23  started being on Android Market; correct?

24  **A.**   Correct.

25  **Q.**   And to enable that, Google integrated into the

1  Android Market place a billing solution called Google Checkout;

2  correct?

3  **A.**   I think that's correct.  I forget exactly what we used for

4  the billing infrastructure.  I know we considered several.

5  **Q.**   Okay.  Google Checkout was developed and launched by a

6  different group within Google; correct?

7  **A.**   Correct.

8  **Q.**   And Google Checkout was a separate product from Android

9  and Android Market; correct?

10  **A.**   Correct.

11  **Q.**   And Google Checkout then evolved into becoming what today

12  is known as Google Play Billing; correct?

13  **A.**   Correct.

14  **Q.**   Now, one of the Android team's requirements for the

15  billing solution at the time was that it should cost less than

16  5 percent for Google to actually handle the payments.  Do you

17  recall that?

18  **A.**   I remember there was definitely overhead for handling the

19  payments.  I don't remember the exact number but, yes.

20  **Q.**   Okay.  But you remember that Google wanted to be able to

21  cover that, and Google announced to the world that the revenue

22  split for developers and others would be 75 to developer -- 70

23  to developers, 25 to carriers, and 5 percent to Google;

24  correct?

25  **A.**   Yeah.  That sounds like what we launched with, correct.

1   Q.   And Google announced that to the world and said Google is

2   not going to take a percentage.  Do you recall that?

3   A.   I do.

4   Q.   And when you left the Android organization in 2009, there

5   was no concrete plan to monetize Android Market; correct?

6   A.   I don't believe so, but I don't recall when.  Yeah, I

7   don't believe so when I left.  I think that was still the case.

8   Q.   Now, Android Market was not thought of as a profit center

9   for Google at the time; correct?

10  A.   I don't believe so, correct.

11  Q.   And you're aware, however, that at some point in time

12  after you left the Android mobile team, carriers began to

13  receive less than 25 percent of the revenue share and

14  Android Market or Google started to collect more; correct?

15  A.   Yeah.  I don't have any direct knowledge of how that

16  changed or when that changed.

17  Q.   But you know it changed; correct?

18  A.   I understand it changed, yeah.

19  Q.   Okay.  You're not aware of Google ever making any public

20  statement correcting the 2008 announcement that Google does not

21  take a percentage of Android Market revenue; correct?

22  A.   I don't -- I guess I'll say correct, but I don't know that

23  that's the right characterization of the question.

24  Q.   You don't remember such a statement saying "We used to not

25  take a cut, now we're taking a cut"?  You don't know of any

1  such announcement?

2  **A.**   I don't know that they've made such a statement.

3  **Q.**   Now, you were not involved, I think you told me, about the

4  decision to start taking more than 5 percent; correct?

5  **A.**   Yeah.  I was not involved in any conversations about

6  changing that.

7  **Q.**   Now, you left the Android mobile organization in 2009 and

8  went on to work in a different role at Google; correct?

9  **A.**   Well, I went off to help start our venture fund.

10  **Q.**   But within Google; correct?

11  **A.**   Initially within Google, and then eventually within

12  Alphabet.

13  **Q.**   Okay.  Alphabet is the parent company of Google; correct?

14  **A.**   Correct.

15  **Q.**   Now, Android Market was rebranded as Google Play a few

16  years after you left the Android organization; right?

17  **A.**   Correct.

18  **Q.**   And in-app billing and in-app purchases were introduced

19  into Android Market after you left the Android organization;

20  correct?

21  **A.**   I think that's correct.

22  **Q.**   And any involvement you had with Android policy ended in

23  2009; correct?

24  **A.**   Correct.

25  **Q.**   And you were never involved in anything related to what's

1    in Google Play itself once it became rebranded as Google Play;

2    correct?

3    **A.**   Again, I left the Android team in 2009.

4    **Q.**   So you had no involvement in what is Google Play; correct?

5    **A.**   Correct.

6    **Q.**   And you have had no involvement in what's called

7    Project Hug; correct?

8    **A.**   Project what?

9    **Q.**   Hug.

10   **A.**   I don't believe so, no.

11   **Q.**   You don't even know what it is; right?

12   **A.**   (No audible response.)

13   **Q.**   And you don't have any involvement in something called

14   RSA 3.0; correct?

15   **A.**   I don't believe so.

16   **Q.**   You don't know what that is.

17           You don't have any involvement in Project Banyan; correct?

18   **A.**   Correct.

19   **Q.**   You don't have any involvement in Google's RSA with

20   Samsung from 2020; correct?

21   **A.**   Correct.

22   **Q.**   And you're not suggesting that because Google had a pro

23   competitive vision for Android back in 2008, that means that

24   Google's conduct in 2018 and beyond is necessarily consistent

25   with that vision because you just don't know; right?

1    **A.**   Restate the question or rephrase -- can you just repeat

2    the question?

3    **Q.**   You're not suggesting to the jury that because Google had

4    pro competitive -- a pro competitive vision for Android back in

5    2008, that means that Google's conduct in 2018 and beyond is

6    necessarily consistent with that vision; correct?

7    **A.**   I haven't seen any behavior that I'd consider

8    inconsistent.

9    **Q.**   Sir, you're not suggesting to this jury that because

10   Google had a pro competitive vision in 2008, that means that

11   what they did in 2018 is pro competitive, are you?

12   **A.**   No.  I couldn't be making that statement.

13          **MR. EVEN:**  Thank you.  I pass the witness.

14          **THE COURT:**  Okay.

15                    <u>**REDIRECT EXAMINATION**</u>

16   **BY MR. KRAVIS:**

17   **Q.**   Mr. Miner, I just wanted to follow up on one topic you

18   were asked about.

19          You were asked about your comments in the video about

20   Google competing on a level playing field.  Do you remember

21   seeing that video?

22   **A.**   Correct.

23   **Q.**   What did you mean by Google competing on a level playing

24   field when you made those statements at that time?

25   **A.**   Well, again, I meant what I -- you know, what I said.  If

1   we built a maps app, we should be able to -- you know, in the

2   market, other people should be able to build other maps apps.

3   They would be evaluated within the app store, Google market --

4   Android Market or Google Play, and they should compete freely

5   in that app store with other third-party apps.

6   **Q.**   Now, when my colleague asked you whether you believed that

7   statement would apply equally to the app store, like

8   Android Market or Google Play, you said you did not agree.  Can

9   you explain why you did not agree that that level playing field

10  statement wouldn't necessarily apply in the same way to Market

11  or Play?

12       **MR. EVEN:**  Objection.  I think the witness' answer was

13  impeached.  We saw all that, Your Honor.

14       **THE COURT:**  Well, just very quickly and that's it.

15  Okay, quickly.

16       **THE WITNESS:**  Yeah.  I mean, so Android consists of a

17  lot of pieces to make it successful.  I considered the app

18  store largely to be part of that platform which made Android

19  successful.

20       I think, again, as I said, if you didn't have the app

21  store -- the Android Market competing with the Apple App Store,

22  it would have been hard for Android to be successful.  So for

23  me, the marketplace where those developers could publish and

24  anyone could find that app was core to the success of Android;

25  and if you didn't have that as a single place for people to

 1  publish their apps, again, it would have been confusing and

 2  mayhem.

 3          MR. KRAVIS:  Thank you, Mr. Miner.

 4          THE COURT:  Okay.  You can step down.

 5                    (Witness excused.)

 6          THE COURT:  And we'll take our 2:00 o'clock break and

 7  we'll be back at, say, 2:25.

 8          THE CLERK:  All rise.

 9                    (Recess taken at 2:05 p.m.)

10               (Proceedings resumed at 2:26 p.m.)

11      (Proceedings were heard in the presence of the jury:)

12          THE COURT:  All right.  Who is next?

13          MS. CHIU:  Your Honor, Google will be playing the

14  video deposition of Eric Christensen from Motorola.

15          THE COURT:  Where?

16          MR. KRAVIS:  Motorola.

17          THE COURT:  Motorola.  Okay.

18          MS. CHIU:  There are two exhibits that we would like

19  to admit with no objections.  It's Exhibits 1231 and 1232.

20          MR. BORNSTEIN:  No objection, Your Honor.

21          THE COURT:  Okay.  They're admitted.

22      (Trial Exhibits 1231 and 1232 received in evidence.)

23           (Video was played but not reported.)

24          THE COURT:  Okay.  A special bonus, we're going to end

25  now because I'm going to chat with the lawyers.

1       So put all of this out of mind.  No research.  No talking.

2   No thinking.  No communications.

3       See you tomorrow morning at 9:00 a.m.

4       I have been advised the coffee situation will be remedied.

5           **THE CLERK:**  All rise.

6   (Proceedings were heard out of the presence of the jury:)

7           **THE COURT:**  Okay.  I want to have a discussion in

8   advance of our jury instructions tomorrow.

9       Mr. Bornstein, I'm going to start with you.  You were

10  front and center in *Epic v. Apple*, yes.

11          **MR. BORNSTEIN:**  I was there, Your Honor, yes.

12          **THE COURT:**  All right.  Now, tell me how you think the

13  relevant product markets and Apple differ from the ones here.

14          **MR. BORNSTEIN:**  You're putting me on the spot a little

15  bit, Your Honor, but I'll do my best.

16      We had --

17          **THE COURT:**  I'm confident you can do it.

18          **MR. BORNSTEIN:**  We had in that case a theory that was

19  based on *Newcal*.  So it was for market and an after market

20  based on the fact that --

21          **THE COURT:**  And the for market being the Apple phone,

22  the iPhone?

23          **MR. BORNSTEIN:**  Yeah, the phone and the operating

24  system.

25          **THE COURT:**  Right.  Okay.  And then the after market

 1   being the apps?

 2          **MR. BORNSTEIN:**  Being the distribution of the apps.

 3          **THE COURT:**  And here you're not doing that?

 4          **MR. BORNSTEIN:**  We are not doing that here because of

 5   the very different structure of Android.

 6          **THE COURT:**  Okay.  Now, that makes sense to me.

 7          All right.  Now, so I'm not sure after market really plays

 8   in in this case.  Do you agree with that?

 9          **MR. BORNSTEIN:**  I'm sorry.  I didn't hear, Your Honor.

10          **THE COURT:**  I don't think after-market concepts really

11   are in play here.

12          **MR. BORNSTEIN:**  I agree with that, sir, Your Honor.

13          **THE COURT:**  I certainly have not heard any evidence to

14   that effect.

15          On rule of reason, though, there's a fairly strong message

16   in the circuit decision to the effect that both the contracts

17   that you are challenging under Section 1 and the tying claims

18   should all be rule of reason, and I am finding that persuasive

19   for this reason:

20          For the Section 1 claims, as you know, the baseline is

21   unreasonable restraint.  There is a small special subset of

22   agreements that are so egregiously anticompetitive on their

23   face that we are willing to say they are unreasonable per se.

24          That comes with a major caveat as *Jefferson Parish* and a

25   number of other cases have pointed out, which is I believe the

**PROCEEDINGS**

1 words were something along the lines of we should have -- we

2 should be circumspect and have humility before we start

3 declaring in any specific industry that a contract is so

4 egregious of a restraint that it should be per se, and that

5 judgment can only be made after the industry has been around

6 for enough time that we have an adequate baseline to make a

7 very informed decision.

8   Now, the circuit in *Epic*, as the D.C. Circuit did in

9 *Microsoft*, went well out of its way to say, almost as a matter

10 of law, that Section 1 agreements in the software space, the

11 technology space, can't -- typically cannot be treated under

12 the per se standard because they change too much.

13   And I have to say I am, you know, looking at RSA and MADA

14 and the other things, Hugs.  I'm perfectly fine with rule of

15 reason, but I'm having trouble saying that they're so egregious

16 on their face that they should be part of that very special

17 subset of unreasonable per se.

18   **MR. BORNSTEIN:**  The only agreements, Your Honor, that

19 we have challenged under the per se standard are the three Hug

20 agreements with Activision, Riot, and Supercell as to which we

21 believe --

22   **THE COURT:**  Just those three?

23   **MR. BORNSTEIN:**  Correct, Your Honor.

24   **THE COURT:**  So RSA, everything else, is rule of

25 reason?

1          **MR. BORNSTEIN:**  That is correct, Your Honor.  And then

2     we have those three agreements.

3          **THE COURT:**  So let me get that list.  So you're saying

4     who?  Activision?

5          **MR. BORNSTEIN:**  Activision, Riot, and Supercell.

6          **THE COURT:**  Okay.  And what's so special about those

7     three?

8          **MR. BORNSTEIN:**  We identified those three based on the

9     evidence in the record that we believe is sufficient for the

10    jury to conclude there was, in fact, a horizontal agreement

11    between Google as an app store and each of those three

12    companies individually as potential competitors in the app

13    store space that they would not compete, that they would stand

14    down from entering that market in return for payment from

15    Google in the form as set out in the agreement.

16         **THE COURT:**  Here's the problem I'm having, without

17    prejudging any Rule 50 motions, and I'm just going to tell you

18    right now, you should say what you need to say because that's

19    going to box your posttrial arguments, but I'm going to deny

20    it.  I'm not taking this away from the jury.

21         You know, as you have seen, I have compiled over 100 pages

22    of notes in addition to some other recordkeeping.  I've

23    listened with great intensity to the evidence, as have the

24    jury, I might say, as far as I can tell, and I can usually

25    tell.

 1       And there's more than enough fact for the jury -- facts

 2    and evidence for the jury to decide one way or the other.  What

 3    they do, who knows.  Okay?  I'm not making any predictions, of

 4    course, but I'm not going to take it away.

 5       However, on the standard, I don't think there's really

 6    enough for those three agreements to be called per se

 7    anticompetitive.  So tell me why you think they are per se

 8    anticompetitive.

 9            MR. BORNSTEIN:  Sure.  And I've got two pieces to

10    this, Your Honor.  There's the legal piece and the factual

11    piece.

12            THE COURT:  Start with the factual piece.

13            MR. BORNSTEIN:  Sure.  So on the factual piece, let's

14    take Riot as an example.  We have evidence in the documents,

15    Mr. Koh you heard testify as well on the second day of trial, I

16    believe, one of the Google witnesses, Lawrence Koh, who

17    prepared documents internally at Google writing to Ms. Kochikar

18    and his colleagues, and he said, and I'll use the words, "Riot

19    agreed to stand down from their own distribution platform on

20    Android in return for signing up to the agreement with Google."

21       So Riot informed Google that it was intending to launch

22    outside of Google Play; and then there was a discussion, there

23    was an agreement, and Mr. Koh refers to it internally in Google

24    documents that Riot would stand down from doing so.  Riot did

25    stand down from doing so.

1        **THE COURT:**  Well, no.  My push back on that is, that

2   may be Mr. Koh's -- that may be what Mr. Koh heard.  I didn't

3   see much of that in the Riot person that we heard today.  I did

4   not hear anything in that evidence indicating that that was

5   Riot's course of action.

6        **MR. BORNSTEIN:**  So two things on that also,

7   Your Honor.  One is, I don't actually think as a matter of law

8   that Riot's own internal plans are relevant to whether Google

9   has committed a violation of the antitrust laws.  I'll give you

10  an extreme hypothetical to illustrate the point that goes way

11  beyond the facts here.

12       But if Google and Developer X were negotiating and

13  Developer X told Google "We intend to start our own store, we

14  intend to compete with you," and Developer X behind closed

15  doors was saying "We're never going to do that."  Right?  But

16  Google said, "Gee, I believe you."  And internally all the

17  Google people are scurrying around, and they come up with

18  $100 million to pay Developer X to stand down.  I don't think

19  it matters what Developer X was thinking behind closed doors.

20  Google has engaged in that hypothetical in a violation of the

21  antitrust laws that is per se unlawful.

22       **THE COURT:**  You can't have unilateral price setting.

23  You have -- it has to be a combination.  Okay?  This is under

24  Section 1.  There has to be a meeting of the minds.  That's

25  what a combination means.

**PROCEEDINGS**

1     So I thought you were going to say they don't actually --

2   of course, it's true you don't actually have to fix the price.

3   You're still liable for per se price fixing just by having the

4   conversation.

5          **MR. BORNSTEIN:**  Correct.

6          **THE COURT:**  But I didn't see any evidence that Riot --

7   what I'm saying is I didn't see any evidence from the Riot

8   thing we saw today that they were conceiving of an agreement

9   not to compete and were accepting money not to compete.

10    I think you might -- the jury might be able to infer that

11   under the rule of reason, but I don't see so much that I would

12   feel comfortable saying this is a per se restraint of trade.

13   That's what I'm saying.

14    So I'll let that one marinate for a bit.  You can talk a

15   little bit more tomorrow, and you might want to address these

16   three.

17    Now, for tying, the message is loud and clear on Epic.

18   I'm not sure I necessarily agree with it, but I don't have the

19   discretion not to at this point, that the tying claims are rule

20   of reason and not per se.

21          **MR. BORNSTEIN:**  I am with you on both respects,

22   Your Honor.  There is a lot of language in the circuit opinion

23   to that effect.  I don't think it is a complete closing of the

24   door nor do I think it should be, but there certainly is a lot

25   in there that indicates that in this circumstance the circuit

 1   was at least uncomfortable to head in that direction.

 2       **THE COURT:**  I would say it was more than

 3   uncomfortable.  It was pretty clear in saying that tying in

 4   this space -- it was exactly the same arguments you're making

 5   here about in-app billing and app distribution, that tying has

 6   to be rule of reason in that case.

 7       So I'm not sure I would have reached that decision, but it

 8   is what it is, and I don't see much room around it.  So all of

 9   this is a long introduction to I think we're going to do rule

10   of reason for everything.  I will hear more from you about

11   those three contracts.

12       What I would like you to do that would help me most is

13   marshal the evidence.  Now, forget the law.  This is in

14   evidence.  These things are all driven by the facts in the

15   case, and that also includes the relevant product market and

16   geographic market.

17       I know the law.  I need to know what you think, you know,

18   the absolute best statement of facts are for why Activision,

19   Riot, and Supercell ought to be per se and not rule of reason.

20   I'm open to hearing about it.

21       Of course, Mr. Pomerantz, you can tell me whatever you

22   want to do on that as well, but I think that's going to

23   streamline the discussion for tomorrow.

24       Okay.

25       **MR. BORNSTEIN:**  Is Your Honor contemplating a written

PROCEEDINGS

1  submission in advance or just to have that ready to discuss?

2          THE COURT:  Just tell me tomorrow.  Okay?

3          MR. BORNSTEIN:  Okay.

4          THE COURT:  Yeah.  Yeah.  You know, people file too

5  many things.  30 percent of my rulings are from the bench, and

6  every district judge is trending in that direction.  Some

7  district judges do 60.  We're -- you know, oral communicative

8  act is more than enough.  It's on the record.

9          MR. BORNSTEIN:  I can assure you I'm delighted by

10  Your Honor's answer.

11          THE COURT:  Okay.  Anything else for tomorrow?

12          MR. BORNSTEIN:  I don't think so, Your Honor.

13          MR. POMERANTZ:  I don't think so, Your Honor.

14          THE COURT:  Okay.  I'll see you in the morning.

15          THE CLERK:  All rise.  Court's in recess.

16          (Proceedings adjourned at 3:26 p.m.)

17                      ---oOo---

18              **CERTIFICATE OF REPORTER**

19          I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21

22  DATE:   Wednesday, November 29, 2023

23

24  _____

25          Kelly Shainline, CSR No. 13476, RPR, CRR
                      U.S. Court Reporter