**Volume 16**

**Pages 3066 - 3293**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| IN RE GOOGLE PLAY STORE<br>ANTITRUST LITIGATION, | )<br>)<br>)   **NO. 21-md-02981-JD** |
| _____ | ) |
| THIS DOCUMENT RELATES TO: | )<br>) |
| EPIC GAMES, INC., | )<br>) |
|        Plaintiff, | )<br>) |
|   VS. | )   **NO. 3:20-cv-05671-JD**<br>) |
| GOOGLE, LLC., et al., | )<br>) |
|        Defendants. | )<br>) |
| _____ | ) |

San Francisco, California

Friday, December 1, 2023

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**APPEARANCES**:

For Plaintiff:

        CRAVATH, SWAINE & MOORE LLP
        825 Eighth Avenue
        New York, New York  10019
  BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
        **YONATAN EVEN, ATTORNEY AT LAW**
        **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
        **MICHAEL ZAKEN, ATTORNEY AT LAW**
        **BRENT BYARS, ATTORNEY AT LAW**
        **ANDREW WIKTOR, ATTORNEY AT LAW**
        **TIMOTHY G. CAMERON, ATTORNEY AT LAW**

For Defendants:

        MUNGER, TOLLES & OLSON LLP
        350 South Grand Avenue - 50th Floor
        Los Angeles, California  90071
  BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**
        **JAMIE LUGURI, ATTORNEY AT LAW**
        **KURUVILLA J. OLASA, ATTORNEY AT LAW**
        **NICK R. SIDNEY, ATTORNEY AT LAW**

        MUNGER, TOLLES & OLSON LLP
        601 Massachusetts Avenue NW
        Suite 500 East
        Washington, DC  20001
  BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
        **LAUREN BELL, ATTORNEY AT LAW**

        MORGAN, LEWIS & BOCKIUS LLP
        One Market - Spear Street Tower
        San Francisco, California  94105
  BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**
        **LEIGHA BECKMAN, ATTORNEY AT LAW**
        **REBECCA L. SCIARRINO, ATTORNEY AT LAW**
        **BRIAN ROCCA, ATTORNEY AT LAW**

        MUNGER, TOLLES & OLSON LLP
        560 Mission Street - 27th Floor
        San Francisco, California  94105
  BY:  **JUSTIN P. RAPHAEL, ATTORNEY AT LAW**
        **KYLE W. MACH, ATTORNEY AT LAW**
        **DANE P. SHIKMAN, ATTORNEY AT LAW**

## I N D E X

Friday, December 1, 2023 - Volume 16

|                        | **PAGE** | **VOL.** |
|------------------------|----------|----------|
| Plaintiff Rests        | 3213     | 16       |
| Defendant Rests        | 3213     | 16       |
| Charging Conference    | 3214     | 16       |

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---------------------------|----------|----------|

**BERNHEIM, BERT DOUGLAS (IN REBUTTAL)**
| (SWORN)                                   | 3175 | 16 |
|-------------------------------------------|------|----|
| Direct Examination by Mr. Bornstein       | 3176 | 16 |
| Cross-Examination by Mr. Raphael          | 3199 | 16 |
| Redirect Examination by Mr. Bornstein     | 3211 | 16 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---------------------------|----------|----------|

**OLIVER, CARSON**
| (SWORN)                               | 3070 | 16 |
|---------------------------------------|------|----|
| Direct Examination by Ms. Bell        | 3071 | 16 |
| Cross-Examination by Mr. Cameron      | 3093 | 16 |
| Redirect Examination by Ms. Bell      | 3108 | 16 |

**GELBER, RANDY**
| By Video Deposition | 3110 | 16 |
|---------------------|------|----|

**LEONARD, GREGORY**
| (SWORN)                             | 3110 | 16 |
|-------------------------------------|------|----|
| Direct Examination by Ms. Beckman   | 3111 | 16 |
| Cross-Examination by Mr. Zaken      | 3116 | 16 |

**BURAK, ASI**
| By Video Deposition | 3117 | 16 |
|---------------------|------|----|

**BEATY, ROBERT**
| By Video Deposition | 3118 | 16 |
|---------------------|------|----|

**LOEW, MRINALINI**
| (SWORN)                               | 3119 | 16 |
|---------------------------------------|------|----|
| Direct Examination by Ms. Bell        | 3119 | 16 |
| Cross-Examination by Mr. Cameron      | 3150 | 16 |
| Redirect Examination by Ms. Bell      | 3171 | 16 |

## E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|--------------------|----------|----------|----------|

| | | |
|---|---|---|
| 1710 | 3164 | 16 |
| 6178, pages 112 and 132 | 3135 | 16 |
| 6288 | 3169 | 16 |
| 6485 | 3103 | 16 |
| 6691 | 3090 | 16 |
| 6836 | 3073 | 16 |
| 6839 | 3083 | 16 |
| 6840 | 3085 | 16 |
| 6848 | 3081 | 16 |
| 6849 | 3084 | 16 |
| 6853 | 3074 | 16 |
| 8594 | 3160 | 16 |
| 9500 | 3115 | 16 |
| 9900 | 3077 | 16 |
| 10692 | 3110 | 16 |
| 10694 | 3110 | 16 |
| 10708 | 3110 | 16 |
| 11373 | 3117 | 16 |

 1    <u>**Friday - December 1, 2023**</u>                          <u>**9:08 a.m.**</u>

 2                        **P R O C E E D I N G S**

 3                           **---oOo---**

 4         (Proceedings were heard in the presence of the jury:)

 5         **THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc.

 6    vs. Google LLC, and Multidistrict Litigation 21-2981, In re

 7    Google Play Store Antitrust Litigation.

 8         **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

 9    Bornstein for Epic Games.  Today I have with me Ben Wiley,

10    Yonatan Even, Michael Zaken, Andrew Wiktor, Lauren Moskowitz,

11    and Tim Cameron.

12         **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn

13    Pomerantz on behalf of Google, and with me are Leigha Beckman,

14    Dane Shikman, Brian Smith, Michelle Park Chiu, Jonathan Kravis,

15    and Lauren Bell.

16         **THE COURT:**  Okay.  Who do we have next?

17         **MS. BELL:**  Your Honor, Google calls Carson Oliver.

18         **THE COURT:**  All right.

19                      (Pause in proceedings.)

20         **THE CLERK:**  Raise your right hand.

21                      <u>**CARSON OLIVER**</u>,

22    called as a witness for the Defendant, having been duly sworn,

23    testified as follows:

24         **THE WITNESS:**  I do.

25         **THE CLERK:**  Thank you.  Please be seated.

OLIVER - DIRECT / BELL

1    Please state your full name for the Court and spell your

2 last name.

3         THE WITNESS:  My name is Carson Oliver, O-L-I-V-E-R.

4         THE CLERK:  Thank you.

5         THE COURT:  Please.

6         MS. BELL:  Thank you.

7                   **DIRECT EXAMINATION**

8 BY MS. BELL:

9 **Q.**   Mr. Oliver, where are you currently employed?

10 **A.**   Apple.

11 **Q.**   And what is your role at Apple?

12 **A.**   My role at Apple is the senior director of business

13 management for the app store.

14 **Q.**   Is that the team that effectively runs the Apple App

15 Store?

16 **A.**   We are part of a number of different teams that work to

17 run the app store.

18 **Q.**   And how long have you worked for the app store team at

19 Apple?

20 **A.**   Approximately 11 years.

21 **Q.**   What are your general responsibilities in that role?

22 **A.**   My team has a variety of functional responsibilities, but

23 at a very high level, my team is responsible for helping

24 developers to build and grow their businesses on the app store.

25 **Q.**   And you're testifying here today pursuant to a subpoena

**OLIVER - DIRECT / BELL**

1  that requires you to testify; right?

2  **A.**  Correct.

3  **Q.**  Does your team at Apple consider the Google Play Store to

4  be a competitor to the Apple App Store?

5  **A.**  We do, yes.

6  **Q.**  In what ways?

7  **A.**  We, as an app store, are responsible for creating a place

8  where customers can discover and download apps and spend within

9  those apps; and when we do work with developers, we often hear

10  about other places where they are able to do a similar thing,

11  and Google Play is one of the stores that we hear about as

12  well.

13  **Q.**  Has the Apple App Store competed with the Google Play

14  Store during the entire time that you've worked at Apple?

15  **A.**  Yes.

16  **Q.**  And does that competition continue to today?

17  **A.**  It does.

18  **Q.**  As part of your job, do you stay informed about the

19  features of the Google Play Store?

20  **A.**  We do our best to stay informed, yes.

21  **Q.**  And if you could please turn in your binder to

22  Exhibit 6836.

23  **A.**  (Witness examines document.)

24  **Q.**  Is this an e-mail from February 2019 that you received as

25  part of your work at Apple?

 1   **A.**     Yes, it looks like it is.

 2          **MS. BELL:**  Your Honor, I move to admit Exhibit 6836.

 3          **MR. CAMERON:**  No objection.

 4          **THE COURT:**  What was that?

 5          **MR. CAMERON:**  No objection, Your Honor.

 6          **THE COURT:**  Oh, okay.  It's admitted.

 7       (Trial Exhibit 6836 received in evidence.)

 8   **BY MS. BELL:**

 9   **Q.**    Mr. Oliver, this is your name at the -- in the recipient

10   line on the screen?  If you look at the screen, you'll see

11   which part's highlighted.

12   **A.**     Yes.  Thank you.

13   **Q.**    And if we look at the bottom of the e-mail, do you see the

14   part that says (as read):

15          "Matt has asked that the product team provide a brief

16       competitive analysis of Google Play at his off-site next

17       week"?

18       Do you see that?

19   **A.**     Yes, I do.

20   **Q.**    Does "Matt" refer to Matt Fischer, who is the head of the

21   Apple App Store?

22   **A.**     Yes, I would assume it does.

23   **Q.**    And so this is the head of the Apple App Store asking for

24   a competitive analysis of Google Play in 2019?

25   **A.**     Yes, it appears so.

OLIVER - DIRECT / BELL

```
 1   Q.   Does the Apple App Store compete with Google for -- Google
 2   Play Store for consumers?
 3   A.   Yes, it does.
 4   Q.   And if you could please turn in your binder to
 5   Exhibit 6853.
 6   A.   (Witness examines document.)
 7   Q.   Is this an e-mail exchange in which you participated as
 8   part of your job at Apple in November 2017?
 9   A.   Yes, it looks like it is.
10        MS. BELL:   Your Honor, I'd move to admit Exhibit 6853.
11        MR. CAMERON:   No objection.
12        THE COURT:   It is admitted.
13   (Trial Exhibit 6853 received in evidence.)
14   BY MS. BELL:
15   Q.   And so if we look in the middle of the page, do you see an
16   e-mail that a colleague at Apple sent to you that says (as
17   read):
18        "Carson,
19        "Below and attached is a summary of price differences
20        for various content types on iTunes/App Store versus
21        Google Play"?
22        Do you see that?
23   A.   Yes, I do.
24   Q.   And to clarify something, is the reference to iTunes here,
25   is the App Store sometimes incorrectly referred to as iTunes?
```

1    **A.**   It can sometimes be incorrectly referred to as iTunes

2    especially early on in the time of the App Store, but I believe

3    that this is referring to analysis that looks across both

4    iTunes, which includes video and music, as well as the app

5    store.

6    **Q.**   Thank you for that clarification.

7         Does the summary that's being sent by Ms. Ng here include

8    a comparison of app prices on the Apple App Store and

9    Google Play for content?

10             **MR. CAMERON:**   Objection.   Leading.

11             **THE COURT:**   I am not understanding a word you're

12   saying, and I don't know why.

13             **MR. CAMERON:**   Oh, I'm so sorry.

14        Objection.   Leading, Your Honor.

15             **THE COURT:**   Is he cross -- are you crossing?   Is he a

16   hostile witness?   I can't tell what -- you have been leading,

17   but I'm assuming it's cross.   Is it cross?

18             **MS. BELL:**   No, Your Honor.   He has not been adverse.

19             **THE COURT:**   If it's not cross, stop leading.   Ask

20   again.

21   **BY MS. BELL:**

22   **Q.**   What is this a summary of, sir?

23   **A.**   Based on what I'm reading in the e-mail, it looks like

24   this is a summary of the price differences for different

25   content types across both the app store and iTunes, and that is

OLIVER - DIRECT / BELL

1  being compared with similar content from Google Play.

2  **Q.**   And who sets the prices for the content on the app?  Is it

3  the Apple App Store or the developers?

4  **A.**   On the App Store specifically is developers that set the

5  prices for their paid apps and in-app purchases.

6  **Q.**   Did you use this information that's in this document in

7  any way as part of your job?

8  **A.**   I don't have any memory of how this information was used.

9  **Q.**   Is this the type of information that you and your team use

10 in the ordinary course of your job?

11 **A.**   It really depends, but I don't have any memory of this

12 specific type of analysis being used within my role.

13         **THE COURT:**  Okay.  Take it down.

14         **MS. BELL:**  Yes, Your Honor.

15 BY MS. BELL:

16 **Q.**   Let's switch to a different topic then.

17         Is there competition between the Apple App Store and the

18 Google Play Store for developers?

19 **A.**   Yes.

20 **Q.**   And are you aware of any times in which developers

21 launched first on one platform versus the other?

22 **A.**   Yes, I am.

23 **Q.**   Let's look at one example, please.

24         If you could -- well, first, do you recall a game called

25 Super Mario Run?

1   **A.**   I do, yes.

2   **Q.**   And was that a popular game when it came out?

3   **A.**   Yes.  There were a lot of downloads of that game when it

4   was launched.

5   **Q.**   Which app store did it launch on first?

6   **A.**   It launched on the Apple App Store first.

7   **Q.**   And if you could please look in your binder at

8   Exhibit 9900.

9   **A.**   (Witness examines document.)  All right.

10   **Q.**   Do you recognize this as a screenshot from your Twitter

11   account?

12   **A.**   It looks to be a screenshot from my Twitter account.

13          **MS. BELL:**  Your Honor, at this time we move to admit

14   Exhibit 9900.

15          **MR. CAMERON:**  No objection.

16          **THE COURT:**  Okay.  It's in.

17   (Trial Exhibit 9900 received in evidence.)

18   **BY MS. BELL:**

19   **Q.**   And, sir, the Carson Oliver at the top, that's you?

20   **A.**   Yes.

21   **Q.**   And looking at your tweet where it says "#Super Mario

22   Run," do you see the words "Only on the App Store"?

23   **A.**   I do, yes.

24   **Q.**   Why did you emphasize in your tweet that this game was

25   available only on the App Store?

1    **A.**   Well, I would note that this is a reposting of a tweet

2    that was made by the App Store account.  So I was merely

3    retweeting that same post.

4    **Q.**   Thank you.

5        Why did the Apple App Store account mention that this was

6    only available in the App Store?

7              **MR. CAMERON:**  Objection.

8              **THE COURT:**  What's the objection?

9              **MR. CAMERON:**  Foundation, Your Honor.

10             **THE COURT:**  Oh, okay.  Just one second.

11       Okay.  The question was:  Why did the Apple App Store

12   account mention...  Okay.

13       Do you know why?

14             **THE WITNESS:**  I have a good sense of why, yes.

15             **THE COURT:**  Okay.  Go ahead.  Overruled.

16             **THE WITNESS:**  We were very excited about this game

17   launching on the App Store because it was one of the first

18   times that this incredibly popular intellectual property and

19   games from Nintendo was launching on a mobile device, and we

20   wanted to highlight that to the world.

21   **BY MS. BELL:**

22   **Q.**   We've been talking about -- we can take that down, please.

23       We've been talking about apps that launch on the Apple App

24   Store, but do you see the competition for developers as only

25   about when a developer launches on one store versus the other?

1    **A.**    No, absolutely not.

2    **Q.**    Why not?

3    **A.**    We are constantly working to make the App Store a great

4    business opportunity for all developers, and there is a variety

5    of work that we do with developers throughout their life cycle

6    to make sure that they are investing their limited resources

7    towards the App Store and towards Apple's platforms.

8    **Q.**    Now, when a developer does launch on both Apple App Store

9    and Google Play Store, what are some of the ways in which your

10   team competes for that developer's attention?

11   **A.**    So are we talking specifically about the launch period?

12   **Q.**    Why don't we start there.

13   **A.**    Sure.  When a game or app is launching on the App Store,

14   we do a significant amount of work to make sure that that app

15   is taking all -- full advantage of the technologies and tools

16   that we provide, both from the App Store but also from an

17   Apple-platform perspective.  So we do a lot of work from

18   technology evangelism perspective to make sure that they're

19   aware of unique technologies that may be available to them on

20   Apple's platforms and that they're integrating those into their

21   app.

22        And then we also do a significant amount of work to help

23   them prepare for the launch.  And once they are launching on

24   the store, we do a lot of work on the store and off the store

25   to raise awareness and drive discovery and downloads of that

1   new app or game.

2   **Q.**   And so that was the launch.  Are there ways after the

3   launch in which your team competes for developer's attention?

4   **A.**   We continue to drive discovery and downloads and

5   reengagement to existing apps and games for many years after

6   they've launched.

7       Many of our most popular apps and games have actually been

8   on the App Store for years, if not close to a decade, and so we

9   are continuously trying to bring customers back into those apps

10  or games but also to drive new customers around the world to

11  those apps and games.

12      In addition, we are constantly working with those

13  developers to make them aware of new tools and technologies

14  that we are offering as a platform and as a store to make sure

15  that their businesses are being run as efficiently as possible

16  on our platforms.

17  **Q.**   Separate from getting the game or not getting the app --

18  excuse me -- what about the quality of the app?  Does your team

19  compete for developers to put the same quality of apps on your

20  store versus others?

21  **A.**   Well, as I mentioned, we are always trying to make sure

22  that developers are taking full advantage of all of the

23  technology that Apple has, and many of those technologies are

24  rolling out on an annual basis, and so we want to make sure

25  that even existing apps and games are taking advantage of new

1    technologies that may make their games or apps even better.

2    And so we want to make sure that even those existing apps and

3    games are incorporating those technologies and that we can

4    highlight those to customers because they expect that apps that

5    are being distributed through the App Store are taking

6    advantage of the latest and greatest technologies.

7    **Q.**   Let's turn to talking about public announcements.

8         Does the Apple App Store team pay attention to the

9    announcements made by the Google Play Store team?

10   **A.**   Yes, we do.

11   **Q.**   And let's go through some specific examples, please.

12        If you could look in your binder at Exhibit 6848.

13   **A.**   (Witness examines document.)

14   **Q.**   Is this an e-mail exchange in which you were involved in

15   February 2016?

16   **A.**   Yes, it does look like that.

17        **MS. BELL:**  Your Honor, I'd move to admit Exhibit 6848.

18        **MR. CAMERON:**  No objection.

19        **THE COURT:**  It is admitted.

20        (Trial Exhibit 6848 received in evidence.)

21        **MS. BELL:**  Now if we could turn to page 2, please.

22   BY MS. BELL:

23   **Q.**   Mr. Oliver, do you see on page 2, is this an e-mail in

24   which an Apple employee is forwarding along a new feature in

25   the Google Play -- that Google Play just announced.

1   **A.**   Yes, it looks to be that.

2   **Q.**   And what was that feature?

3   **A.**   I don't have all the details, but it looks like there's

4   some additional enhancements that Google Play made in their

5   Developer Console which allows developers to understand more

6   details about ratings and reviews that are happening through

7   Google Play.

8   **Q.**   And if we turn back to the bottom of the first page,

9   there's an e-mail at the bottom from an Apple employee named

10  David Hopkins, and he said (as read):

11        "We've been talking about doing something like this

12        in Crossfire in addition to highlighting other insights

13        from our data."

14  Do you see that?

15  **A.**   Yes, I do.

16  **Q.**   Was Apple considering doing something similar from what --

17  as what Google was doing?

18  **A.**   At the time we were working on a new set of developer

19  analytics tools that we were preparing to launch and we were

20  considering a variety of different potential components of

21  those tools, and this was one that had been discussed as part

22  of that process.

23  **Q.**   Let's turn to Exhibit 6839, please.

24  **A.**   (Witness examines document.)

25  **Q.**   And now we're in February 2017.  Is this an e-mail

1    exchange in which you participated?

2    **A.**   Yes.

3           **MS. BELL:**  Your Honor, I move to admit Exhibit 6839.

4           **MR. CAMERON:**  No objection.

5           **THE COURT:**  Okay.  It's admitted.

6           (Trial Exhibit 6839 received in evidence.)

7    **BY MS. BELL:**

8    **Q.**   And in this e-mail is a different Apple employee

9    forwarding you an article about a new feature that Google Play

10   just announced?

11   **A.**   It looks like he's forwarding it to an e-mail alias, but I

12   was on that e-mail alias, yes.

13   **Q.**   And what was the feature that the Apple app team was

14   focused on?

15   **A.**   Again, I don't know if I recall all of the details here,

16   but it looks as though this was a feature that allowed paid

17   apps that were offered for sale by a developer to be

18   highlighted in a different way than they had been previously on

19   the Google Play Store.

20   **Q.**   And if we go to the top of the page, do you see your

21   response to receiving this e-mail?

22   **A.**   I do, yes.

23   **Q.**   And what was your response?

24   **A.**   (as read):

25           "We should have done this two years ago."

OLIVER - DIRECT / BELL

1   **Q.**   Now, let's turn to Exhibit 6849, please.

2   **A.**   (Witness examines document.)  Okay.

3   **Q.**   We jumped ahead to May 2019.  Is this an e-mail you

4   participated in in your job?

5   **A.**   Yes.

6        **MS. BELL:**  Your Honor, I'd move to admit Exhibit 6849.

7        **MR. CAMERON:**  No objection.

8        **THE COURT:**  Okay.  It's admitted.

9   (Trial Exhibit 6849 received in evidence.)

10  **BY MS. BELL:**

11  **Q.**   At the bottom of the page, do you see an Apple employee

12  named James Goodrum sends a link from the Android developers

13  blog regarding some new features in the Play Store?

14  **A.**   Yes.

15  **Q.**   And then let's focus at the -- on the top e-mail from Ryan

16  Olson.  He wrote (as read):

17      "Additionally, they made some interesting

18     announcements related to an upcoming feature that will let

19     developers create variants on their products page that

20     appear to users based on their state."

21     Do you see that?

22  **A.**   I do, yes.

23  **Q.**   And then he briefly says (as read):

24      "Latika and I talked briefly about it and how it

25     might inform our own thoughts on proposed product page

 1           improvements on the App Store."

 2           Is that right?

 3   A.    That's what it says.

 4   Q.    And let's look at one last example.  If you could turn to

 5   Exhibit 6840.

 6   A.    (Witness examines document.)

 7   Q.    This is in September 2019.  Is this an e-mail that you

 8   participated in?

 9   A.    Yes.

10           MS. BELL:  Your Honor, I move to admit Exhibit 6840.

11           MR. CAMERON:  No objection, Your Honor.

12           THE COURT:  Okay.  It's admitted.

13           (Trial Exhibit 6840 received in evidence.)

14   BY MS. BELL:

15   Q.    Do you see the bottom e-mail from Matt Fischer?

16   A.    Yes.

17   Q.    And Matt Fischer is the same Matt Fischer that we talked

18   about earlier who's the head of the Apple App Store?

19   A.    That's correct, yes.

20   Q.    In this bottom e-mail, is Mr. Fischer forwarding an

21   article about a new offering by the Play Store?

22   A.    Yes, it looks like he is.

23   Q.    And what was the new offering?

24   A.    So this looks like it is a new feature or service called

25   the Google Play Pass, which is -- again, I'm reading here --

1  ad-free Android offering that includes games and other apps

2  that's charged as a monthly subscription.

3  **Q.**   And what's the title of the article?

4  **A.**   "Google just confirmed its competitor to Apple Arcade."

5  **Q.**   What is Apple Arcade?

6  **A.**   Apple Arcade is a game subscription service that is part

7  of the App Store.

8  **Q.**   And looking near the top of the e-mail on that same day,

9  do you see where you sent an e-mail to a different group?

10  **A.**   Yes.

11  **Q.**   What were you asking in your e-mail?

12  **A.**   As I mentioned earlier, we often get feedback from

13  developers on new features or offerings from other stores or

14  platforms, and so I reached out to a number of team members on

15  my team who may have gotten feedback about this announcement

16  from some of the developers.

17  **Q.**   We can take that down, please.

18     Let's quickly talk about Apple's service fee for apps.

19     What is Apple's in-app purchase?

20  **A.**   Apple's in-app purchase is an integrated commerce system

21  that we use to do a couple of different things.

22     First, it allows us to offer seamless and safe payments

23  for users all around the world in 175 different markets, and it

24  also allows us to easily track and collect our commission for

25  the App Store.

**OLIVER - DIRECT / BELL**

1  **Q.**   Is the Apple App Store roughly the same thing as the

2  Google Play Store is in -- the Google Play Billing is in the

3  Google Play Store?

4  **A.**   That's my general understanding, yes.

5  **Q.**   When did Apple launch in-app purchase?

6  **A.**   Apple launched in-app purchase in approximately 2009.

7  **Q.**   Does Apple permit developers to use their own billing

8  system for the processing of in-app purchases of digital

9  content in the Apple App Store?

10 **A.**   Generally, Apple requires developers to use the Apple's

11 in-app purchase system for the sale of paid apps and digital

12 content in apps.

13 **Q.**   And when Apple launched in-app purchase back in 2009, what

14 service fee did it charge developers for revenue generated from

15 the sale of digital goods and services purchased inside an app?

16 **A.**   The commission that we offered at the time of the launch

17 of in-app purchase was 30 percent.

18 **Q.**   When subscriptions were introduced into the Apple App

19 Store, what did Apple initially charge developers for

20 subscriptions sold within an app?

21 **A.**   When we launched subscriptions, which I believe was in

22 2011, we used the same commission rate as other in-app

23 purchases, which was 30 percent.

24 **Q.**   Over the years, has Apple changed its service fee for

25 different types of in-app purchases?

1  **A.**   Yes, we have.

2  **Q.**   And let's start with media developers.  Did Apple change

3  the service fee that applies to media developers, such as video

4  partners?

5  **A.**   Yes.  We have a couple of different programs that apply to

6  specific categories of developers, including both premium video

7  entertainment developers as well as news developers.

8  **Q.**   And what's the service fee that Apple now charges to those

9  media and -- videos and news partners?

10  **A.**   The commission that we charge for in-app purchases for

11  developers in both the news and video partner program is a

12  discounted commission rate of 15 percent.

13  **Q.**   At some point did Apple lower its service fee for all

14  subscription purchases even if they weren't in the news or

15  video partner program?

16  **A.**   Yes, we did.

17  **Q.**   And today how does Apple currently charge developers for

18  subscriptions sold within an app?

19  **A.**   So for all digital subscriptions sold within an app and

20  that use in-app purchase, we charge 30 percent for the first

21  year and then we charge 15 percent for all users in their

22  second year or beyond for that same subscription.

23  **Q.**   What is Apple's Small Business Program?

24  **A.**   The App Store Small Business Program is a program that we

25  launched in early 2021 that provides a reduced commission of

1    15 percent for developers that earn less than a million dollars

2    on an annual basis from the Apple App Store.

3    Q.   And when is that fee calculated, whether or not they

4    earned a million dollars in a year?

5    A.   Sorry.  Can you clarify what you mean by that?

6    Q.   How logistically does Apple determine if a developer falls

7    within the Small Business Program?

8    A.   Sure.  As we mentioned, we track and measure the billings

9    that are generated through in-app purchase as part of the

10   in-app purchase system, and so we use that same system to

11   understand whether a developer has remained under the 1-million

12   proceeds threshold to remain eligible for the Small Business

13   Program.

14   Q.   Is a developer eligible for the small -- or eligible to

15   only pay 15 percent the first year of the program?

16   A.   They are eligible as long as they remain under the

17   threshold and align with other requirements of the program.

18   Q.   And even with all these programs, does Apple still charge

19   game developers the 30 percent service fee that you talked

20   about was the initial fee?

21   A.   Well, the vast majority of developers, including game

22   developers, are eligible for the Small Business Program.  So

23   for any developer that is eligible for the Small Business

24   Program, they would be able to pay 15 percent.  For developers,

25   including game developers that are not eligible for the Small

1  Business Program, their commission would be dependent on

2  whether or not they would be including subscriptions or not.

3  **Q.**   Let's quickly talk about how the App Store markets itself.

4  So if you could turn in your binder to Exhibit 6691.

5       Sir, are you familiar with the Apple's web page for the

6  Apple App Store?

7  **A.**   I'm generally aware of it, yes.

8  **Q.**   And is this Exhibit 6691 an accurate -- a true and

9  accurate copy of the Apple App Store's web page?

10  **A.**   It looks to be, yes.

11          **MS. BELL:**  Your Honor, we move to admit Exhibit 6691.

12          **MR. CAMERON:**  No objection.

13          **THE COURT:**  It's admitted.

14       (Trial Exhibit 6691 received in evidence.)

15  **BY MS. BELL:**

16  **Q.**   Sir, on the first page, what is the part that's the

17  biggest and the most in bold?

18  **A.**   On the first page the bold letters read "The apps you love

19  from a place you can trust."

20  **Q.**   And underneath there do you see the paragraph?

21       If we look at the third sentence and highlight that

22  perhaps.

23       The third sentence says (as read):

24          "And a big part of those experiences is ensuring that

25       the apps we offer are held to the highest standards for

OLIVER - DIRECT / BELL

1      privacy, security, and content."

2      Do you see that?

3  **A.**   I do, yes.

4  **Q.**   And if we turn to page 5.

5      Again, what's the biggest and boldest part on this page?

6  **A.**   "Privacy and security built into everything we do."

7  **Q.**   And if we turn to the next page, page 6, please.

8      What's the first thing on the page in the blue box?

9  **A.**   "100 percent of apps are automatically screened for known

10  malware."

11  **Q.**   Turn to page 11, please.

12      What's the bold part in the middle of the page?

13  **A.**   "Download with confidence."

14  **Q.**   All these statements we looked at, what's the purpose of

15  these statements being on Apple's web page for the Apple App

16  Store?

17  **A.**   A key focus area for Apple from the very beginning of the

18  App Store has been to ensure that customers trust the App Store

19  as a place where they can simply and seamlessly download apps,

20  and then use those apps in a variety of different ways in their

21  life, including spending and buying services and content within

22  those apps.

23      So we've invested heavily from the very beginning of the

24  store in making sure that from the tools and technologies that

25  we offer, to the way that we evaluate and review apps, to the

1    way that those apps are distributed, to the policies that we

2    apply to those apps, that we ultimately are offering customers

3    the safest experience possible, which is what we believe helps

4    to differentiate the App Store.

5    **Q.**   And is focusing on the safety and security of the Apple

6    App Store something that Apple views is important for selling

7    the iPhone?

8    **A.**   It's a critical part of everything that Apple does.  It's

9    important for our iPhone and other hardware businesses, and

10   it's also important for our services business, including the

11   app store.

12   **Q.**   Let's quickly wrap up.

13       Do the Apple App Store and the Google Play Store compete

14   on the price that they charge for developers?

15   **A.**   Are you referring to the commission?

16   **Q.**   Yes.

17   **A.**   Yes, I believe we do.

18   **Q.**   And let's clarify something.  For game developers who are

19   not a part of the Small Business Program and do not sell

20   subscriptions, what is the service fee that those game

21   developers, like Epic, would be charged on the Apple App Store?

22   **A.**   Again, the vast majority of developers would be eligible

23   for the Small Business Program; but for those developers who

24   are not, they would be charged a commission of 30 percent.

25   **Q.**   And do the Apple App Store and the Google Play Store

1   compete for the highest quality apps?

2   **A.**   I believe we do, yes.

3   **Q.**   Do the two stores compete to provide users a high-quality

4   experience in the stores?

5   **A.**   Yes.

6   **Q.**   And do the Apple App Store and the Google Play Store

7   compete on the safety and security of the user experience?

8   **A.**   Yes.

9          **MS. BELL:**   Thank you.   I pass the witness.

10          **THE COURT:**   Okay.

11          **MR. CAMERON:**   Good morning, Your Honor.   May I

12   proceed?

13          **THE COURT:**   Yes.

14                    <u>**CROSS-EXAMINATION**</u>

15   BY MR. CAMERON:

16   **Q.**   Mr. Oliver, good morning.

17          You testified that you are the senior director of business

18   management at the Apple App Store; is that correct?

19   **A.**   Yes.

20   **Q.**   But you're not the head of the Apple App Store, are you?

21   **A.**   No, I'm not.

22   **Q.**   That's Matt Fischer, I believe; is that right?

23   **A.**   That's correct.

24   **Q.**   And Matt Fischer is your boss?

25   **A.**   Correct.

1   Q.   And Google did not bring Mr. Fischer to testify today in

2   this case, did they?

3        MS. BELL:   Objection, Your Honor.

4        THE COURT:   Well, he doesn't know that.

5   Next question.

6   BY MR. CAMERON:

7   Q.   So let me ask you to turn to the Google Play Store, which

8   you've talked about a little bit.

9        Sir, it's true that you don't know whether the Google Play

10  Store is the most popular Android app store in the world,

11  excluding China?

12  A.   I know it's one of the largest stores on Android, but I

13  don't know if it's specifically the most popular.

14  Q.   You also don't know whether, excluding China, more

15  consumers worldwide use the Google Play Store than any other

16  Android app store; correct?

17  A.   Can you repeat that question?

18  Q.   Sure.

19       You also don't know whether, excluding China, more

20  consumers worldwide use the Google Play Store than any other

21  Android app store; correct?

22  A.   I certainly know it's one of the largest, but I don't know

23  exactly how many consumers are using the Google Play Store.

24  Q.   You also don't know whether, excluding China, more app

25  developers worldwide use the Google Play Store than any other

**OLIVER - CROSS / CAMERON**

1    Android app store; right?

2    **A.**    I don't know.

3    **Q.**    And you also don't know whether the Google Play Store is

4    preloaded onto every official Android device in the world,

5    excluding China; correct?

6    **A.**    No, I don't know that.

7    **Q.**    And you're not familiar with the term "Google Play

8    Billing"; correct?

9    **A.**    I'm not sure.

10    **Q.**    Well, let's be clear.  You're not familiar with the term

11    "Google Play Billing"; correct?

12    **A.**    Are we referring to Google Play's in-app billing?

13    **Q.**    I'm referring to the term "Google Play Billing."

14    **A.**    I'm not sure I understand what term you're specifically

15    referring to --

16    **Q.**    Well --

17    **A.**    -- but I do understand Google Play in-app billing, which

18    is similar to the in-app purchase system that I talked about

19    earlier.

20    **Q.**    Let me ask you very clearly, sir.  You're not aware of the

21    term "Google Play Billing"; is that correct?

22    **A.**    I'm not exactly clear on what that term refers to.

23    **Q.**    You testified briefly about Super Mario Run and I think a

24    tweet regarding the issue of that game back in 2016.  Do you

25    recall that testimony?

1   **A.**   Yes.

2   **Q.**   So that was about seven years ago; correct?  2016?

3   **A.**   Yes.

4   **Q.**   Super Mario Run was made available on the Apple App Store

5   around December 15 of 2016; is that correct?

6   **A.**   That sounds about right.

7   **Q.**   And you're aware that the game was made available on

8   Android barely three months later; is that right?

9   **A.**   Yes, that sounds about right.

10  **Q.**   Also, this is the only example, I believe, that Google's

11  counsel showed you of a game or app that was available on the

12  Apple App Store before it was available on Android; correct?

13  **A.**   Yes.

14  **Q.**   Now, Google's counsel also showed you, I think, a couple

15  of random documents from Apple personnel referencing the Google

16  Play Store, and I'd like to come back to those for a second.

17      The first is Exhibit 6836.

18  **A.**   Is that in the first binder?

19  **Q.**   It's certainly in the first binder and I think probably in

20  the second as well.  And it's on the screen for you in front of

21  you.

22  **A.**   Great.

23  **Q.**   So Google's counsel asked you about this document.  This

24  is a document from 2019; correct?

25  **A.**   Yes.

**OLIVER - CROSS / CAMERON**

1  **Q.**   And this is a request that apparently was being made for a

2  brief competitive analysis of Google Play.  Do you see that?

3  **A.**   Yes.

4  **Q.**   So this request is four years old; correct?

5  **A.**   Yes.

6  **Q.**   And Google's counsel never showed you whether any analysis

7  was ever generated pursuant to this request, did they?

8  **A.**   No.

9  **Q.**   No.

10     We don't know if any analysis was, in fact, generated, do

11  we?

12  **A.**   I don't know.

13  **Q.**   We don't know the purpose of it, do we?

14  **A.**   I -- only from what I can read here, but I don't recall

15  the analysis.

16  **Q.**   And we don't know whether that analysis, in fact, referred

17  to Google Play or any other entities at all, do we?

18  **A.**   Again, I don't recall the specific analysis.

19  **Q.**   Now, Google's counsel also asked you about another

20  exhibit, 6853.  And this is an e-mail exchange from 2017.  Do

21  you see that?

22  **A.**   I do, yes.

23  **Q.**   Yes.  And this is an e-mail from Jennifer Ng referring to

24  a comparison of prices that was prepared apparently on one day

25  in November of 2017.  Do you see that?

**OLIVER - CROSS / CAMERON**

1  **A.**    I do, yes.

2  **Q.**    This is the only comparison of this type that Google's

3  counsel showed you; is that correct?

4  **A.**    Of this type, yes.

5  **Q.**    Yes.  And, in fact, I think you said that you didn't find

6  this sort of analysis helpful or didn't use it yourself; is

7  that right?

8  **A.**    I just can't recall similar analyses that we've done.

9  **Q.**    Right.  And, in fact, this comparison is from seven years

10  ago; is that right?

11  **A.**    From 2017.

12  **Q.**    Yes.  One instance from seven years ago; correct?

13  **A.**    Yes.

14  **Q.**    I think you noted also that Ms. Ng -- in response to

15  questions from Google's counsel, you confirmed that the prices

16  that are being discussed in this e-mail are set by developers,

17  not by the Apple App Store or by the Google Play Store;

18  correct?

19  **A.**    So just to clarify, specifically to apps in the App Store,

20  those I know are set by developers.  I don't want to speak for

21  the other content types that I'm not responsible for.

22  **Q.**    Now, you also answered some questions about digital

23  subscriptions and the prices or the commission fee that's

24  charged by Apple for those.  Do you recall that?

25  **A.**    Yes.

**OLIVER - CROSS / CAMERON**

1    **Q.**   And I think you made clear that for digital subscriptions

2    through Apple's in-app purchasing system, Apple charges

3    30 percent for the first year and then 15 percent in the second

4    year and beyond; is that correct?

5    **A.**   That's true.  But I do want to clarify that for developers

6    who are eligible for the Small Business Program, again, they

7    would qualify for a 15 percent commission.

8    **Q.**   Understood.

9        And you recall that Apple made that change whereby they

10   implemented the 15 percent for the second year and afterwards

11   back in mid-2016.  Does that ring a bell?

12   **A.**   That sounds correct, yes.

13   **Q.**   And you're aware, are you not, that Google did not

14   implement a similar policy until about a year and a half after

15   that?

16   **A.**   That sounds about correct, yes.

17   **Q.**   You're also aware, are you not, that Google announced in

18   2021 that with effect from January 2022, it was going to charge

19   15 percent for subscription transactions starting in year one

20   of the subscription?  Are you aware of that?

21   **A.**   I do recall that announcement, yes.

22   **Q.**   Apple still has not adopted that policy itself, has it?

23   **A.**   Again, for the vast majority of developers, they are

24   eligible for a 15 percent commission whether or not they're

25   subscription or nonsubscription developers.

1   **Q.**   Putting aside the Small Business Program, Apple has not

2   adopted a flat 15 percent fee across the board for all

3   subscription transactions starting in year one, have they?

4   **A.**   That's correct.

5   **Q.**   I also want to talk about features between the Apple App

6   Store and the Google Play Store.  You talked about that a

7   little bit with counsel for Google.

8       It's true, is it not, that Apple does not always implement

9   products or features that Google implements in the Google Play

10  Store?

11  **A.**   That's correct.

12  **Q.**   So let's walk through a couple of examples.

13      I think you were asked about Exhibit 6849.  So let's put

14  that up.

15      Do you recall being asked about this, sir?

16  **A.**   One second.

17  **Q.**   6849.  And it's also on the screen in front of you.

18  **A.**   Yes, I do.

19  **Q.**   Okay.  So this is an e-mail at the end from Ryan Olson to

20  you and others at Apple, and the subject is "Google Play

21  Consult Data Benchmark Enhancements."  Do you see that?

22  **A.**   I do, yes.

23  **Q.**   And the original e-mail in this thread at the bottom of

24  the page is from James Goodrum who provides a link to an

25  external website and writes (as read):

1           "Catching up on IO announcements, so excuse me if

2      this is old news, but these new benchmarking

3      compatibilities in GP console are very good."

4      Do you see that?

5  **A.**   I do.

6  **Q.**   And the reference to "GP console" in his e-mail is the

7  Google Play console; is that correct?

8  **A.**   Yes.

9  **Q.**   And do you understand that the Google Play console is the

10 interface that app developers use to build and test Android

11 apps?

12 **A.**   That's my understanding, yes.

13 **Q.**   Now, Apple eventually launched its own benchmarking

14 capabilities through its similar product called In-app

15 Analytics; is that right?

16 **A.**   That's true, yes.

17      Sorry.  Just to clarify.  It's App Analytics not In-app

18 Analytics, but...

19 **Q.**   Okay.  App Analytics.  Thank you for the clarification.

20      But Apple's benchmarking capabilities were not made

21 available until March of 2023; correct?

22 **A.**   That is correct, yes.

23 **Q.**   So this e-mail is dated May of 2019 referring to the

24 Google Play console, and Apple's benchmarking capabilities were

25 made available in March of 2023; correct?

1  **A.**   That's correct, yes.

2  **Q.**   And that is nearly four years after this particular

3  feature was announced in the Apple developer blog article that

4  we just looked at that Mr. Goodrum was reporting; correct?

5  **A.**   Yes, that's approximately correct.

6  **Q.**   All right.  Let's look at the next example, which I think

7  you were also asked about, which is Exhibit 6845.

8       Actually, I apologize.  I don't think the same, in fact,

9  was raised.

10      So can I take you to 6845, please, sir.

11 **A.**   Sure.

12 **Q.**   Let me know when you're there.  It's in the tab at the

13 back of your binder.

14 **A.**   (Witness examines document.)  Yes.

15 **Q.**   And Exhibit 6485 is an e-mail dated August 30, 2018, from

16 Matt Fischer at Apple to you and others at Apple with the

17 subject line "Google Play Store shows you the streaming apps

18 that have the movie or show you're searching for."  Do you see

19 that?

20 **A.**   I do, yes.

21 **Q.**   And you're a recipient of that e-mail; correct?

22 **A.**   I am, yes.

23      **MR. CAMERON:**  Your Honor, we move to admit

24 Exhibit 6485 into evidence.

25      **MS. BELL:**  No objection.

1              **THE COURT:**  It's admitted.

2         (Trial Exhibit 6485 received in evidence.)

3    **BY MR. CAMERON:**

4    **Q.**   Okay.  So let's put that on the screen.

5         The first e-mail in this chain towards the top of the

6    first page of the document, do you see that?

7         And this is an e-mail that I'm referring to from Steve

8    McGuigan -- if I pronounced that correctly -- who forwards an

9    article from androidpolice.com with the title that I just read,

10   "Google Play Store shows you streaming apps that have the movie

11   or show you're searching for."  Do you see that?

12   **A.**   I do, yes.

13   **Q.**   And then halfway through the first paragraph in the

14   article it states that (as read):

15            "In March" --

16        And this article is dated in 2018.  Do you see that?

17   **A.**   I do, yes.

18   **Q.**   Yes.  And the article says (as read):

19            "In March Google started displaying the streaming

20        services any show or movie is available on after you

21        search for them in Google Play movies.  Back then, it said

22        the same would come to the Play Store and now it has."

23        Do you see that?

24   **A.**   I do, yes.

25   **Q.**   And the head of the Apple App Store, Matt Fischer,

1    responds to this e-mail above saying (as read):

2           "I've always wanted the ability to search for content

3       within apps and show the relevant apps and search

4       results."

5       Do you see that?

6    **A.**   I do, yes.

7    **Q.**   So, again, these e-mails are all from August of 2018;

8    right?

9    **A.**   Yes.

10   **Q.**   They're now over five years old; correct?

11   **A.**   Yes.

12   **Q.**   And today you don't know if Apple has ever implemented

13   that capability on the Apple App Store; correct?

14   **A.**   Well, this is referring to some specific capabilities for

15   search on the Google Play Store.  So I do know we've

16   implemented a number of different capabilities, including the

17   launch of our in-app events feature on the app store that allow

18   developers to showcase the in-app content and similar --

19   similar types of events that are happening within the search

20   results of the App Store, but I am not sure whether the

21   implementation was similar to what was done here by

22   Google Play.

23   **Q.**   Right.  In fact, you don't know, sir, whether the products

24   that Apple offers to developers are similar or different to

25   what this article describes that Google has been doing for the

OLIVER - CROSS / CAMERON

1    past five years?

2    **A.**   Again, the specifics of the technical implementation I'm

3    not aware of, but I do know we have been able to offer some of

4    those same search capabilities to users.

5    **Q.**   Well, let me be clear.  You don't know, you don't want to

6    guess, as to whether or not the products that Apple offers to

7    developers offer the same capability or a similar or different

8    to what Google is referencing or doing in this article;

9    correct?

10   **A.**   That's true from a technical-capabilities perspective.

11   **Q.**   Now, let me move to another document that you were shown

12   about -- that you were asked about in your direct examination.

13   It's Exhibit 6839.

14       Let me know when you have that, sir.  And it will be on

15   the screen in front of you.

16   **A.**   Yes, thank you.

17   **Q.**   So I think you were asked about this exhibit by Google's

18   counsel.  Do you recall that?

19   **A.**   I do, yes.

20   **Q.**   So Exhibit 6839 is an e-mail from February of 2017 --

21   again, now six years ago -- that you participated in, and the

22   subject of the article is "Google now lets apps display sales

23   prices in the Play Store," and it's an article from *The Verge*.

24   Do you see that?

25   **A.**   I do, yes.

**OLIVER - CROSS / CAMERON**

1   **Q.**   And, in fact, the first e-mail here is an e-mail from

2   John Wu forwarding that article, you know, to the App Store

3   team.  Do you see that?

4   **A.**   I do.

5   **Q.**   The first line of the article, which is at the bottom of

6   the first page of this document, says (as read):

7           "Google is now providing a fuller way for developers

8       to offer a sale on their apps letting potential buyers

9       know exactly how much of a discount they're getting and

10      how long the sale is going to run for."

11  Do you see that?

12  **A.**   I do.

13  **Q.**   And then if you go to the next page, page 2, the

14  second-to-last line of the article says (as read):

15          "This is a small update overall, but it really ought

16      to be handy for both developers and consumers."

17  Do you see that?

18  **A.**   I do, yes.

19  **Q.**   And it says (as read):

20          "Developers get a new way to promote their apps and

21      consumers get clarity and lower pricing."

22  Do you see that?

23  **A.**   I do, yes.

24  **Q.**   And the final line of the article says (as read):

25          "If we're lucky, maybe Apple will bring this feature

1          to the iTunes Store one of these years."

2          Do you see that?

3     A.   Yes.

4     Q.   Going back to the first page of the document, you

5     forwarded this article to Alex Rofman; right?

6     A.   Yes.

7     Q.   And Alex Rofman was the head of business management and

8     your boss at Apple at the time of this e-mail; is that correct?

9     A.   That's correct.

10    Q.   And when you forwarded the e-mail, you say (as read):

11              "We should have done this two years ago."

12         Do you see that?

13    A.   That's true, yes.

14    Q.   And when you say "done this," you're referring to

15    implementing the sales price feature in the Apple App Store

16    that apparently Google had already adopted; right?

17    A.   Yes, or something similar.

18    Q.   So you say "We should have done this two years ago";

19    right?

20    A.   Yes.

21    Q.   And Mr. Rofman responds simply by saying "Seven."  Do you

22    see that?

23    A.   I do.

24    Q.   What he's saying is that Apple actually should have done

25    this seven years ago; correct?

**OLIVER - REDIRECT / BELL**

1   **A.**   I'm not sure I read it exactly that way.

2   **Q.**   The e-mails are from February 2017; right?

3   **A.**   Yes.

4   **Q.**   You know, which means they're, you know, six years old;

5   correct?  Almost seven?

6   **A.**   Yes.

7   **Q.**   And even today, seven years later, seven years later Apple

8   has still not implemented this feature for the Apple App Store,

9   has it?

10  **A.**   No, they have not, but I believe that this is specific to

11  paid app downloads, which are --

12  **Q.**   The question is:  Have they implemented this feature or

13  not?  Yes or no?

14  **A.**   No.

15  **Q.**   Okay.  Thank you very much.

16          **MR. CAMERON:**  No further questions.

17          **THE COURT:**  Okay.  Any brief redirect?

18          **MS. BELL:**  Yes, Your Honor.

19                    <u>**REDIRECT EXAMINATION**</u>

20  BY MS. BELL:

21  **Q.**   Mr. Carson, Epic's counsel asked you about the fact that

22  there's sometimes time between the announcement of a new

23  feature and the implementation by the other company.  Do you

24  remember that?

25  **A.**   Yes.

**PROCEEDINGS**

1  **Q.**   Does technology sometimes take time to build and implement

2  correctly?

3  **A.**   Yes, especially when you're trying to make sure that

4  everything you do takes into account the principles that we

5  have around safety, security, and privacy.  It also takes a

6  significant amount of time to make sure that we are building

7  new features and new products for customers and developers in a

8  way that we think is great for them.

9  **Q.**   And Epic's counsel also asked you about the fact that I

10  only showed you Super Mario Run as the only game that was

11  available on iOS before Android.  Do you remember that

12  question?

13  **A.**   Yes.

14  **Q.**   Was the game Fortnite also available on iOS before the

15  Google Play Store?

16  **A.**   Yes.

17        **MS. BELL:**  Thank you.  No more questions.

18        **THE COURT:**  Okay.  You may step down.

19              (Witness excused.)

20        **THE COURT:**  Who's next?

21        **MS. CHIU:**  Your Honor, Google will be playing a very

22  short deposition video of Randy Gelber.

23        **THE COURT:**  Okay.

24        **MS. CHIU:**  We have a few exhibits we would like to

25  move into admission over no -- or with no objections.  Those

 1   are Exhibits 10692, 10694, and 10708.

 2          **MR. BORNSTEIN:**  There's no objection, Your Honor.

 3          **THE COURT:**  Okay.  Those are admitted.

 4      (Trial Exhibits 10692, 10694, and 10708 received in

 5       evidence.)

 6              (Video was played but not reported.)

 7          **THE COURT:**  Okay.  Who's next?

 8          **MS. BECKMAN:**  Your Honor, I'm Leigha Beckman on behalf

 9   of Google.

10      Google calls as its next witness Dr. Gregory Leonard.

11          **THE COURT:**  All right.

12          **THE CLERK:**  Please raise your right hand.

13                  **<u>GREGORY LEONARD</u>,**

14   called as a witness for the Defendant, having been duly sworn,

15   testified as follows:

16          **THE WITNESS:**  I do.

17          **THE CLERK:**  Thank you.  Please be seated.

18      Please state your full name for the Court and spell your

19   last name.

20          **THE WITNESS:**  Gregory Leonard, and that's

21   L-E-O-N-A-R-D.

22          **THE CLERK:**  Thank you.

23          **MS. BECKMAN:**  May I proceed, Your Honor?

24          **THE COURT:**  Yes.

25   \\\

LEONARD - DIRECT / BECKMAN

1          <u>DIRECT EXAMINATION</u>

2    BY MS. BECKMAN:

3    **Q.**   Can you please introduce yourself to the jury?

4    **A.**   Sure.  My name is Greg Leonard.

5    **Q.**   And may I refer to you as Dr. Leonard?

6    **A.**   You may, sure.

7    **Q.**   Dr. Leonard, can you please tell the jury why you're here

8    today?

9    **A.**   Yes.  I'm here today to discuss the service fees that

10   Google lost following Epic's implementation of the Hotfix

11   version of Fortnite.

12   **Q.**   What is your current profession?

13   **A.**   I'm an economist.

14   **Q.**   And where are you employed?

15   **A.**   I'm employed at a consulting firm called Charles River

16   Associates.

17   **Q.**   What is Charles River Associates?

18   **A.**   It's an economic consulting firm.  We're a group of

19   economists and other professionals who provide economic

20   analysis and economic advice to our clients to help them solve

21   problems.

22   **Q.**   And where are you based?

23   **A.**   I'm based in Oakland, in the Bay Area generally.

24   **Q.**   Can you briefly describe your educational background?

25   **A.**   Yes.  I received a Bachelor of Science degree in applied

1  math and economics from Brown University; and then after that,

2  I went to the Massachusetts Institute of Technology where I got

3  my Ph.D. in economics.

4  **Q.**   And since obtaining your Ph.D. in economics from MIT, have

5  you been employed as an economist?

6  **A.**   Yes, I have.

7  **Q.**   Approximately how long have you been employed as an

8  economist?

9  **A.**   About 35 years I've been doing economic analysis.

10  **Q.**   And has any of your work involved providing opinions on

11  questions of damages in legal disputes?

12  **A.**   Yes, it has.

13  **Q.**   Have you testified as an expert in prior cases?

14  **A.**   Yes, I have.

15  **Q.**   Have you been retained as Google previously?

16  **A.**   Yes, I've done some work for Google in the past.

17  **Q.**   Have you testified as an expert on damages specifically?

18  **A.**   I have, yes.

19  **Q.**   Approximately how many times have you testified or

20  provided expert testimony on damages?

21  **A.**   Probably in about -- around 30 occasions.

22         **MS. BECKMAN:**  Your Honor, Google offers Dr. Leonard as

23  an expert in damages.

24         **MR. ZAKEN:**  No objection.

25         **THE COURT:**  He is qualified on that topic.

1   BY MS. BECKMAN:

2   **Q.**   Dr. Leonard, can you please describe your assignment in

3   this case?

4   **A.**   As I mentioned, I was asked to calculate the service fees

5   that Google lost after Epic implemented the Hotfix version of

6   Fortnite.

7   **Q.**   And have you relied on any assumptions as part of

8   calculating damages in this case?

9   **A.**   Well, the major assumption I would say is simply you don't

10  get to damages unless liability has already been established.

11  So I'm assuming that Google has established Epic's liability

12  for damages.

13  **Q.**   And, by the way, are you being compensated for your work

14  on this case?

15  **A.**   Yes, I am.

16  **Q.**   Let's turn to your opinion.

17       The jury has heard a lot about the Hotfix Epic implemented

18  on Fortnite on Google.  Can you briefly explain your method for

19  calculating damages relating to the Hotfix?

20  **A.**   So I looked at the revenue for in-app purchases that went

21  through the Epic Direct Pay system.  So after the Hotfix, what

22  happened was when a user went to make an in-app purchase, they

23  would have the option of using the Epic Direct Pay billing

24  system as opposed to Google Play Billing; and when -- for users

25  who did choose that, then Epic avoided paying any service fee

1    to Google.

2        So what I was asked to do is to say for those transactions

3    that went through Epic Direct Pay, what would the service fees

4    have been had they gone through Google Play Billing instead.

5    **Q.**   So to be clear, did Epic pay Google a service fee on sales

6    that went through Epic Direct Pay?

7    **A.**   No, they didn't, and that's the issue.

8    **Q.**   And returning to your damages calculation on lost service

9    fees, is that a straightforward calculation?

10   **A.**   Yeah, it probably would be considered pretty

11   straightforward.

12   **Q.**   Okay.  Now, I understand you have a demonstrative to

13   explain this calculation.

14       If we can please pull that up.

15       Dr. Leonard, can you please explain what is on this slide?

16   **A.**   Yeah, so the first line that's titled "Epic Direct Pay

17   Revenue on Fortnite Distributed Through Google Play or About

18   $1.3 million," that's the revenue of in-app purchases, again,

19   that went through the Epic Direct Pay system on the Hotfix

20   version of Fortnite.

21       So if instead that had gone -- that revenue had gone

22   through Google Play Billing, Epic would have paid a service fee

23   on that, and for Epic that service fee rate was 30 percent.  So

24   it's the second line here.

25       And then I just multiplied the first line by the second

1   line, and that gives us the third line, which are the lost

2   service fees, and the total there is $398,931.

3   **Q.**   And to be clear, the third row of lost service fees of

4   $398,931, are these the service fees Epic avoided paying Google

5   by implementing the Hotfix on the Fortnite app distributed

6   through Google Play?

7   **A.**   Yes.  It was the fact that the Epic Direct Pay was

8   available to users and users might have chosen that; and when

9   they did, again, there would not be a service fee collected by

10  Google on those transactions.

11          **MS. BECKMAN:**  Google moves this demonstrative into

12  evidence.  I understand the next exhibit number is 9500.

13          **MR. ZAKEN:**  The demonstrative shouldn't be moved into

14  evidence.

15          **THE COURT:**  Just this chart.  Do you have a problem

16  with it?

17      Okay.  It's in.

18      (Trial Exhibit 9500 received in evidence.)

19          **THE COURT:**  Go ahead.

20          **MS. BECKMAN:**  Thank you, Dr. Leonard.

21      I pass the witness.

22          **THE COURT:**  Okay.  Go ahead.

23          **MR. ZAKEN:**  Your Honor, may I proceed?

24          **THE COURT:**  Please.

25  \\\

<u>**CROSS-EXAMINATION**</u>

**BY MR. ZAKEN:**

**Q.**   Good morning, Dr. Leonard.  My name is Michael Zaken, and I represent Epic Games.

**A.**   Good morning.

**Q.**   In arriving at your damages number, did you substract the payment processing fees that Google would pay as a part of processing payments on Google Play Billing?

**A.**   Well, it wasn't -- if you read the chart, it says that it's the lost service fees.  That's what I was asked to calculate, and that's the number I've given here today.

**Q.**   That's right.  So you didn't substract any payment processing fee that Google would have paid?

**A.**   I did not.  I wasn't asked to do that.

**Q.**   And in arriving at your damages number, you didn't factor in any of the money that Epic paid to Google when Fortnite was available on the Google Play Store; correct?

**A.**   Sorry.  Could you repeat the question just so I'm --

**Q.**   Sure.  In arriving at your damages number, you did not factor in any of the money that Epic paid to Google when Fortnite was available on the Google Play Store and using Google Play Billing; right?

**A.**   Yes.  Any money that went through Google Play Billing, Google would have received the service fee on.  So, of course, those wouldn't be lost service fees, that's correct.

1   **Q.**   And would you be surprised to learn that Epic paid Google

2   $3.3 million during that period?

3   **A.**   No.   I wouldn't be surprised, no.

4           **MR. ZAKEN:**   No further questions.

5           **THE COURT:**   Okay.   You may --

6           **MS. BECKMAN:**   Nothing on redirect.

7           **THE COURT:**   Okay.   You may step down.   Thank you.

8                           (Witness excused.)

9           **THE COURT:**   Who's next?

10          **MS. CHIU:**   Your Honor, Google will be playing another

11  video deposition of Asi Burak from Tilting Point.   It's about

12  20 minutes.

13          **THE COURT:**   Okay.   We'll take our break after that.

14          **MS. CHIU:**   Your Honor, we just have one exhibit to

15  admit.   It's Exhibit 11373.

16          **MR. BORNSTEIN:**   No objection, Your Honor.

17          **THE COURT:**   Okay.   It is admitted.

18      (Trial Exhibit 11373 received in evidence.)

19              (Video was played but not reported.)

20          **THE COURT:**   Okay.   Let's take our break.   We'll be

21  back at, let's say, 10 to 11:00.

22          **THE CLERK:**   All rise.

23                  (Recess taken at 10:36 a.m)

24              (Proceedings resumed at 10:53 a.m)

25      (Proceedings were heard out of the presence of the jury:)

 1          THE COURT:  Mr. Pomerantz, I'm sensing we're ending

 2    earlier.  Yes?  We'll go right into jury instructions.

 3        Let me ask you a question.  Can we just dump the contract

 4    damages?  You-all aren't even fighting that amount, are you?

 5    It's all subject to illegality later, but why are we even going

 6    to -- you're not putting on any contrary evidence.

 7          MR. BORNSTEIN:  The only issue is the one that

 8    Mr. Zaken raised about the delta for the processing fee.

 9          THE COURT:  He didn't give a number.  You asked the

10    question, but he didn't say "Here's a different number."

11        All right.

12        (Proceedings were heard in the presence of the jury:)

13          THE COURT:  Okay.  Who's next?

14          MS. CHIU:  Your Honor, Google will be playing one last

15    deposition video of Robert Beaty from OCV.

16          THE COURT:  All right.

17          MS. CHIU:  And there are no exhibits with this

18    deposition.

19          THE COURT:  Oh, okay.

20              (Video was played but not reported.)

21          THE COURT:  Okay.  Who's next?

22          MS. BELL:  Your Honor, Google calls Mrinalini Loew.

23          THE COURT:  Okay.

24              (Pause in proceedings.)

25          THE CLERK:  Hi.  Will you please stand and raise your

**LOEW - DIRECT / BELL**

1  right hand.

2               **<u>MRINALINI LOEW</u>,**

3  called as a witness for the Defendant, having been duly sworn,

4  testified as follows:

5               **THE WITNESS:**  I do.

6               **THE CLERK:**  Thank you.  Please be seated.

7               **THE WITNESS:**  Thank you.

8               **THE CLERK:**  Please state your full name for Court and

9  spell your last name.

10              **THE WITNESS:**  Mrinalini Loew, L-O-E-W.

11              **THE CLERK:**  Thank you.

12              **MS. BELL:**  Your Honor, may I proceed?

13              **THE COURT:**  Yes, please.

14              **MS. BELL:**  Thank you.

15                    **<u>DIRECT EXAMINATION</u>**

16  BY MS. BELL:

17  **Q.**   Ms. Loew, where are you currently employed?

18  **A.**   Google.

19  **Q.**   And how long have you been employed at Google?

20  **A.**   Almost six years.

21  **Q.**   What was your position when you first joined the company?

22  **A.**   I was head of product management for Google Play commerce.

23  **Q.**   And did you stay in the Google Play commerce team for

24  several years after that?

25  **A.**   I did.

1    **Q.**   Did your responsibilities change over the time while you

2    were in Google Play commerce team?

3    **A.**   They expanded a few times, yes.

4    **Q.**   Did you at some point leave the commerce team?

5    **A.**   Yes.

6    **Q.**   And when was that?

7    **A.**   That was the summer in June.

8    **Q.**   I'm sorry, which year?

9    **A.**   Oh, sorry.  June of 2023.

10   **Q.**   And going back even before you joined Google, where did

11   you work before you joined Google?

12   **A.**   At eBay.

13   **Q.**   And did you obtain any experience with apps and

14   monetization while you were working at eBay?

15   **A.**   I did.

16   **Q.**   Did you have other jobs besides eBay in which you had

17   experience with apps and monetization?

18   **A.**   I did.

19   **Q.**   And please explain what those were.

20   **A.**   Sure.  So I -- prior to eBay, I worked at Weight Watchers

21   International, and I ran their mobile app and eventually their

22   digital products team.

23        And then before that, I was at Citibank and played around

24   a little bit with mobile there as well.

25   **Q.**   Now let's focus on your time at Google, please.

```
 1        The jury's heard a lot about Google Play Billing already,
 2   so I just want to briefly cover a few points.
 3        Does Google Play support a two-sided market?
 4   A.   Yes, we do.
 5   Q.   And what are the two sides of that marketplace?
 6   A.   Our developers and our users.
 7   Q.   Are the Google Play Store and Google Play Billing separate
 8   products?
 9   A.   No, they're not.
10   Q.   Why do you say that?
11   A.   Google Play Billing is just a part of the Google Play
12   Store experience that we offer to developers and users.
13   Q.   Is user trust an important goal for Google Play Billing?
14   A.   Very.
15   Q.   Why is that?
16   A.   Several reasons.  Most importantly, trust is a very
17   important part we build into every Google product, but actually
18   we believe that having a strong user trust also helps our
19   developers.
20   Q.   And if you -- if it helps your developers, does that
21   benefit Google in any way?
22   A.   Absolutely.
23   Q.   How so?
24   A.   Well, if our developers are successful and they're able to
25   monetize and be successful, that's how we make -- that's how we
```

**LOEW - DIRECT / BELL**

1   are successful.

2   **Q.**   Does Google Play Billing do anything to make purchasing

3   digital items in an app more streamlined for the users of the

4   app?

5   **A.**   Yes.

6   **Q.**   How so?

7   **A.**   Well, we have a single purchase flow that users become

8   really familiar with.  It's branded with Google, which users

9   trust a lot.  So when users go through and do in-app purchases,

10  they see the same cart every time, they can use the same form

11  of payment every time, and they're just really comfortable with

12  the Google brandying for security and privacy.

13  **Q.**   And does the streamlined process benefit the users?

14  **A.**   I believe so, yes.

15  **Q.**   How so?

16  **A.**   Well, they're familiar.  They know when they're actually

17  purchasing something with real money, so that's helpful for

18  users as an indication.  And then we have a number of user

19  trust features built in that is very useful during the purchase

20  flow as well as after.

21  **Q.**   Now let's talk about some of the additional features that

22  Google Play Billing provides to users.

23       And if we could please look at Demonstrative Exhibit

24  Slide 1.

25       Ms. Loew, does Google Play Billing provide any special

1  features or options to help users have control over their

2  experience while on Play?

3  **A.**   Yes, several.

4  **Q.**   And what are the features that are shown here?

5  **A.**   So I see about three features shown here.  One of them is

6  our budgeting tool.  So users can set an optional budget just

7  to make sure they don't spend more than they were planning to

8  for the month, and then we put something into the cart if they

9  get close to or over their budget.

10      We also have an order history here.  So you can see

11  everything you've purchased in an app in a single place.

12      And then the third thing is that we just like to show you

13  how much you've spent regardless if you've done a budget or

14  not.

15  **Q.**   Does Google Play charge the users for these services?

16  **A.**   No.

17  **Q.**   Let's turn to the next slide of the demonstrative, please.

18      What family controls does Google Play Billing offer to

19  users?

20  **A.**   We offer several family controls that are similar to what

21  are displayed here.

22  **Q.**   Focusing on content, how do parental controls work related

23  to content?

24  **A.**   Sure.  If a parent sets up an account for their child,

25  then they can kind of control the content based on, for

1   example, here it's like movie ratings.  So "I don't want my kid

2   to download or access any content that is above PG-13" in this

3   example.

4   **Q.**   How about budgeting?  Does Google Play provide budgeting

5   controls for parents?

6   **A.**   We provide purchase controls, which means a parent can

7   decide if they want their children to purchase or not on

8   Google Play Billing; and if they do, they can have access to a

9   form of payment or they can set up Ask to Pay for their kids so

10  if their kids want to buy something, it sends a notification to

11  the parent every time and they can approve it or not.

12  **Q.**   Let's please turn to the next slide.

13       And focusing on subscriptions, what is shown here?

14  **A.**   This is showing our subscription center in Google Play.

15  **Q.**   And the jury's heard some about this center, but at a high

16  level, do subscriptions present issues that are not present

17  when you're talking about a one-time purchase?

18  **A.**   I believe so, yes.

19  **Q.**   And how so?

20  **A.**   Well, when a user signs up for a subscription with a

21  developer, they're having an ongoing billing relationship that

22  includes a lot of payments that happen kind of on a regular

23  basis outside the purchase flow.  So just a very different kind

24  of relationship.

25  **Q.**   What does Google Play do to notify users about

1    subscription renewals?

2    **A.**   We do several things depending on the subscription and
3    when the renewal happens.

4          So, for example, we want to let a user know when their
5    free trial is expiring before renewal, so we'll send a
6    notification and e-mail before we do that; or if there's longer
7    subscriptions, then we give a notification even before like an
8    annual subscription renews.

9    **Q.**   Why does Play provide this type of notice on renewals?

10   **A.**   Well, we really want to make sure that all payments are
11   very intentional, and so we just want to make sure that users
12   know what's happening with the subscription, both in the cart
13   and out of the cart, and it's really good for user trust that
14   way.

15   **Q.**   Has the Google Play team heard feedback from users about
16   developers making it difficult to cancel subscriptions in an
17   app?

18   **A.**   Yes, we've heard that.

19   **Q.**   We can take down this slide.

20         Let's turn and talk about refunds for a minute.

21         What does Play do if a user has a problem with a digital
22   good that they purchased inside of Play Billing?

23   **A.**   So --

24   **Q.**   Or purchased using Play Billing.  Excuse me.

25   **A.**   So if a user has an issue purchasing something in Play

1   Billing, we actually always encourage them to talk to the

2   developer.  The developer information is there; but if not,

3   they can contact Google Play customer service.

4   **Q.**   Does Google Play offer refunds to users?

5   **A.**   In some case we do offer refunds to users.

6   **Q.**   And why does Google Play provide this type of customer

7   service and refunds for users?

8   **A.**   We really believe in creating a very trusted and safe

9   ecosystem for our users because we think that benefits the

10  entire developer and user base.

11  **Q.**   We've been talking about users.  Let's switch gears to

12  talk about developers, please.

13      And let's first just start with the logistical steps.  How

14  do developers get access to Google Play Billing in order to use

15  it?

16  **A.**   Sure.  Once a developer is a registered Google Play

17  developer, if they would like to start selling digital

18  services -- goods and services in their app, they have to then

19  apply for a payments profile.  So we can just do basic

20  trust-and-safety checks that they're not a fraudulent developer

21  trying to sell something.  After they pass that and set up

22  their payments profile, then they can just access our APIs and

23  features in the Developer Console.

24  **Q.**   If you could, please, turn to your binder 6629.

25  **A.**   (Witness examines document.)

LOEW - DIRECT / BELL

1    **Q.**   Ms. Loew, do you recognize this document?

2    **A.**   I do.

3    **Q.**   And was it prepared in the ordinary course of

4    Google Play's business?

5    **A.**   It was.

6         **MS. BELL:**  Your Honor, I believe we have an agreement

7    just to publish this document without admitting it into

8    evidence.

9         **THE COURT:**  Oh, okay.

10        **MR. CAMERON:**  That's correct, Your Honor.

11        **THE COURT:**  All right.  Go ahead.

12   So you're just going to see it just this once.  All right,

13   jury.

14   Okay.

15   **BY MS. BELL:**

16   **Q.**   If we could please turn to page 10.

17        And, Ms. Loew, it's also on your monitor if you want to

18   follow along with it.

19   **A.**   Oh, thank you.  Lovely.

20   **Q.**   Does this slide show at a high level the major categories

21   of features that Play Billing provides to developers over the

22   life cycle the time an app is on the Play Store?

23   **A.**   Yeah.  At a high level, certainly.

24   **Q.**   What is Play Billing's goal in providing these types of

25   services to developers?

**A.**   We want developers to successfully be able to sell their

goods and services.

**Q.**   Let's start with the first column, which says "Set Up."

What kinds of features does Google Play Billing provide

developers for this set up?

**A.**   Yeah, so just a few examples here.  I'll hone in on some

of them.

    We just want developers to be able to set up and be able

to test their app before they actually sell goods and services

to the users.

    So the second line here says "New test instruments."  We

offer, like, a lot of form of payments across the world, and

developers don't have access to every type of form of payment

across the world, so we would give them the ability to test the

different forms of payment we have without actually having to

have the different forms of payment, and that just makes sure

the app is working well.

**Q.**   And the first line says "Play Billing Library."  What is

the library?

**A.**   Sure.  The Play Billing library is a set of APIs that

allows the developer to communicate with users and us to render

Play Billing in their app.

**Q.**   What services -- turning to the next column,

"Acquisition," what services does Google Play Billing provide

app developers to acquire users?

**LOEW - DIRECT / BELL**

1  **A.**   Sure.  So this column is about how when users are in a

2  cart, what do they see that might -- that helps them make their

3  purchasing decision.

4      So we supply a number of things to help users in the cart.

5  So, for example, we have lots of forms of payment available, so

6  the user can pay with their preferred payment method; or we

7  even help developers do localized pricing so they don't have to

8  figure out a price for 190 countries.

9  **Q.**   And you just mentioned how many countries?  Sorry.

10  **A.**   Oh, sorry.  We're in about 190 countries, Play Billing.

11  **Q.**   Let's talk about the global payment then.  Let's turn to

12  Slide 3, please -- or page 3 of this document.

13      It's also on your screen.

14  **A.**   Oh, thank you.

15  **Q.**   What does this slide depict?

16  **A.**   So this is just a general overview of some of the forms of

17  payment that we support.

18  **Q.**   And the number of countries on this slide is slightly

19  different than what you just mentioned.  Can you explain that

20  discrepancy?

21  **A.**   Yeah.  I think this slide deck was prepared a few years

22  ago, and so I think that we just increased the markets and also

23  increased the forms of payment we support.

24  **Q.**   And as we talk about forms of payment, what forms of

25  payment does Play Billing accept?

1    **A.**    We accept lots of different types of forms of payment.

2    Some of them illustrated here, like credit cards, DCB, gift

3    cards, PayPal, among others.  As I mentioned, we've launched a

4    few more.

5    **Q.**    On this slide, is one of the forms of payment an e-wallet?

6    **A.**    Yes, one of -- yes.

7    **Q.**    And what is an e-wallet?

8    **A.**    An e-wallet is kind of like PayPal.  It's just different

9    brands across the world.  But essentially it's a kind of

10   digital wallet where a user kind of has a user name and

11   password, and that stores a bunch of other kinds of payments

12   within the account.  So it could be a credit card, a debit

13   card, or a balance or something.

14   **Q.**    And the third picture on their mentions gift cards.  What

15   do gift cards mean in this context?

16   **A.**    In this context, we're speaking specifically about

17   Google Play gift cards, which only work on Google Play Billing.

18   **Q.**    And why does Google Play offer gift cards in addition to

19   something like credit cards and debit cards?

20   **A.**    Yeah, it's interesting.  Gift cards actually support a

21   cash economy.  So a lot of people, especially in some of our

22   non-U.S. countries, can't afford credit cards, and so what they

23   can do is they can buy a gift card with cash, and that allows

24   them to use cash on the online world.

25   **Q.**    You mentioned DCB, and that's the second -- that's under

1  the second picture here.  What does "DCB" stand here?

2  **A.**   It stands for direct carrier billing.

3  **Q.**   And what is that?

4  **A.**   It's when you charge your purchase to your cell phone

5  bill.

6  **Q.**   And approximately how many carriers -- cell phone carriers

7  does Google Play Billing partner with to allow this direct

8  carrier billing?

9  **A.**   It looks about 180 here.  I'd say a little bit more now

10  since it's been a few years.

11  **Q.**   Does Google Play incur payment fees for all the various

12  forms of payment we were just talking about?

13  **A.**   We do.

14  **Q.**   And what are some of the payment fees that Google Play

15  incurs -- lets start with credit cards.  What does it incur for

16  credit cards?

17  **A.**   So for credit cards, there's a few different kind of fees

18  we incur with the payment vendor.  There's obviously the

19  processing fee at the time of payment, but there's also fees

20  that come afterwards.  So, for example, if a user disputes the

21  charge with their credit card bill, that's called chargeback,

22  and chargebacks are quite expensive, and we incur those kinds

23  of fees as well.

24  **Q.**   How about for the Google Play gift cards?  Does

25  Google Play incur fees for the gift cards?

**LOEW - DIRECT / BELL**

1  **A.**   Yeah.  We incur a lot of fees for a gift card.  I mean,

2  just think, like, you have to print the gift card, distribute

3  it to the all the retail stores, like 7-Eleven and Target, you

4  know, have them merchandised in the aisle; and then, of course,

5  the processing fee.

6  **Q.**   How about the direct carrier billing we were just talking

7  about?  What payment fees does Google Play pay for that?

8  **A.**   Yeah, direct carrier billing is a different kind of fee

9  because we work with a lot of the carriers.  So we incur a fee

10  to work with the carriers, and then they cover -- and that

11  covers their processing fee as well.

12  **Q.**   Is that higher than credit card fees?

13  **A.**   For us, yes.

14  **Q.**   Let's, please, turn back to the demonstrative exhibit and

15  this time go to Slide 4.

16      Are different forms of payment equally popular across all

17  countries?

18  **A.**   No.  It varies by country.

19  **Q.**   And so, for example, in the United States, what form of

20  payment is popular in the U.S.?

21  **A.**   In the U.S., credit cards are very popular.

22  **Q.**   And can you give an example of a country where gift cards

23  are a more popular form of payment?

24  **A.**   Brazil, actually, gift cards are very popular.

25  **Q.**   And how about an example of where direct carrier billing

LOEW - DIRECT / BELL

1    is popular?

2    **A.**    A lot of the Asian countries, so Japan could be a good

3    example.

4    **Q.**    How does Play Billing's decision to provide this global

5    payment coverage benefit its developers?

6    **A.**    So we work really hard to support all the local and

7    popular and trending forms of payment working really closely

8    with users and developers and kind of keeping an eye on the

9    payment's ecosystem.  We do this so the developers don't have

10   to worry about it.  We want them to be able to focus on

11   building a good app, and then we're just trying to take care of

12   everything else so it's really easy for them to be successful

13   in these countries.

14   **Q.**    And talking about things developers might need to worry

15   about, does Play Billing provide any help to developers for tax

16   compliance?

17   **A.**    Oh, yes, a lot.

18   **Q.**    And what is that?

19   **A.**    So in all these different countries that we're there, we

20   try to make sure -- pardon me -- we try to make sure that we're

21   up to date on local tax changes, increases, decreases, how the

22   government wants to collect it, as well as other regulatory and

23   compliance related to commerce in these markets.

24   **Q.**    How about compliance with other local laws?  Does

25   Google Play Billing help with that?

1   **A.**   Yes.  We do Play -- Google Play Billing specifically, we

2   monitor a bunch of local laws that could be at the kind of

3   continent level, the federal level, the state level, even a

4   city level sometimes.

5       So, for example, subscriptions, there's a lot of different

6   types of laws we have to abide by.  The tax could be different

7   in a city depending by ZIP code, or the state of Vermont has,

8   like, a very specific tax rule for subscriptions.  We try to

9   keep track of all these laws and just build it into Google Play

10  Billing.

11  **Q.**   Does Google Play charge developers for each of these

12  individual services it provides?

13  **A.**   No.

14  **Q.**   You mentioned earlier that developing user trust was

15  important for Play Billing.  Does Google Play do anything to

16  combat fraud and abuse on the Play Store?

17  **A.**   Yes.

18  **Q.**   And please turn in your binder to Exhibit 6178, please.

19      This is a long document so we're just going to look at

20  three pages and ask to admit those couple of pages.

21      Do you recognize the title slide on this page -- or on

22  this slide?

23  **A.**   Yeah, I do.

24  **Q.**   And what is it?

25  **A.**   So we conduct, like, a generic onboarding for people who

**LOEW - DIRECT / BELL**

 1    are joining Google Play every few quarters, and this is

 2    probably one of those decks.

 3    **Q.**   And was this created in the ordinary course of Google's

 4    business?

 5    **A.**   Yes.

 6    **Q.**   If you could please turn to page 112.

 7    **A.**   Oh, 112.

 8         (Witness examines document.)  Okay.

 9    **Q.**   Do you recognize this section?

10    **A.**   I do.

11    **Q.**   Is this your team's section?

12    **A.**   Yes, it is.

13    **Q.**   And, finally, if you could turn to page 132.

14    **A.**   (Witness examines document.)

15    **Q.**   Do you recognize page 132?

16    **A.**   I do.

17    **Q.**   And is this slide on 132 something that you and your team

18    helped create?

19    **A.**   Yes.

20         **MS. BELL:**  Your Honor, at this time I move to admit

21    Exhibit 6178 just pages 112 and 132.

22         **MR. CAMERON:**  No objection, Your Honor.

23         **THE COURT:**  Okay.  Those pages are in.

24      (Trial Exhibit 6178, pages 112 and 132, received in

25       evidence.)

1          **MS. BELL:**  If we could publish, please, page 132.

2     **BY MS. BELL:**

3     **Q.**   So, Ms. Loew, we were talking about fraud that developers

4     face on Google Play.

5          Can you explain -- we'll just talk a couple of these.  The

6     first one is gift card scams.  What are gift card scams?

7     **A.**   So gift card scams are an unfortunate thing that happen

8     when a scammer, they call a victim, just kind of someplace in

9     the U.S., and they either trick or threaten them into buying a

10    gift card and then reading the gift card number or e-mailing

11    the gift card number back to the scammer so the scammer can

12    steal that value.

13    **Q.**   And what does Google Play do to try to combat this type of

14    scam on Play?

15    **A.**   We do a lot of things.  We work with local law

16    enforcement.  We try to build algorithms into our cart to

17    better identify if a scammer is trying to use a gift card

18    rather than a real person, and then we have customer service to

19    call in if they feel like they've been scammed.

20    **Q.**   And what does Google Play provide to the victim if they

21    call in and feel that they have been scammed?

22    **A.**   Yeah, actually, if someone calls in and they have proven

23    that they were scammed through a Google Play gift card, we have

24    a fund and we try to reimburse them.

25    **Q.**   Turning to the next one, it says "Refund Abuse."  What is

**LOEW - DIRECT / BELL**

1   refund abuse?

2   **A.**   So refund abuse is actually a kind of abuse that users do

3   sometimes to abuse developer refund policies.

4   **Q.**   And how does that work?

5   **A.**   So it's, like, when you, like, buy a toaster at Target and

6   you get a refund for it, you have to give the toaster back.

7   For digital items, sometimes users say that they didn't get the

8   thing, the toaster, and they try to get a refund for it but

9   they don't give it back, and that's called refund abuse.

10  **Q.**   And what does Google Play do to try and combat this type

11  of fraud?

12  **A.**   Again, we do a number of things here.  What we try to do

13  is, again, in the cart when someone presses "Purchase," we just

14  try to make sure they're not an abuser and they're not trying

15  to defraud the developer.

16      But if a user calls in for a refund, we have a number of

17  rules that we use to help identify if it's a real claim or a

18  fraudulent claim.  And then we have also published a number of

19  APIs to work with developers to see if we can together jointly

20  identify abusers versus real refund claims.

21  **Q.**   Does the scale of Google help it detect and combat fraud

22  and abuse on Play?

23  **A.**   Yes, absolutely.

24  **Q.**   And does Google charge developers separately for all of

25  these services and fees that are available for on Google Play

**LOEW - DIRECT / BELL**

1   Billing?

2   **A.**   No.

3   **Q.**   You've mentioned -- we've just talked about these services

4   that are available for developers.  Is this related any way to

5   the Apple's app store?

6   **A.**   Could you repeat the question?

7   **Q.**   Sure.

8        We were just talking about the benefits that were going

9   for -- we were just talking about the benefits for developers

10  on Google Play Billing.  Does Google Play's decision to provide

11  these benefits affect -- impact -- impact it by Apple's app

12  store?

13  **A.**   Yes.

14  **Q.**   How so?

15  **A.**   Well, there's a few things.  One is that we're always

16  competing for time and investment against the app store.  So

17  even if developers have two apps, they're trying to keep the

18  apps together at the same -- they're trying to make the app

19  work the same on Apple and Android, but they don't always

20  invest the same amount of time and effort in each app.  So we

21  really want the Android apps and Play apps to shine, so we're

22  always trying to add a lot of benefits to really reward

23  developers for building great Android and Play apps.

24  **Q.**   Okay.  Let's go back to Exhibit 6229, which we are just

25  publishing and not admitting, and turn to Slide 10 again,

LOEW - DIRECT / BELL

 1   please.

 2   **A.**   6229?

 3   **Q.**   Yes.

 4   **A.**   (Witness examines document.)   Okay.

 5   **Q.**   And we talked about the first two columns.  Let's now talk

 6   about retention.

 7       What does Google Play Billing provide to developers

 8   related to retention?

 9   **A.**   We do a number of things.  Some of the user experience we

10   just do on Google Play helps retain users on the ecosystem in

11   general, and then some -- we do a lot in particular for

12   subscription retention, which is something we've heard from

13   developers.

14   **Q.**   How about a rewards program?  Does Google Play have a

15   rewards program?

16   **A.**   We do.

17   **Q.**   And what is that?

18   **A.**   It's called Google Play Points where users can earn points

19   on any purchase they have through Google Play.

20   **Q.**   And I'm sorry, you mentioned subscriptions and I didn't

21   followup.

22       What does Google Play do to provide developers with help

23   on subscription retention?

24   **A.**   We focus in two areas of subscription retention.  One is

25   called involuntary churn, which is like if by mistake the

1  former payment is charged and for some reason the payment

2  vendor declined it, not that the user canceled, so we work with

3  users and developers to minimize those kind of, like,

4  unexpected hiccups.  And then voluntary is when a user hits

5  "Cancel," we just try to give developers options.  Sometimes

6  users cancel for different reasons, so they can -- the

7  developer can use some of our options to offer them to their

8  users if they would like.

9  **Q.**  And outside -- even outside the subscription context, does

10  Google Play Billing offer Play promotional credits?

11  **A.**  Oh, we do.

12  **Q.**  What are Play promotional credits and how do they work?

13  **A.**  Play promotional credits are kind of like coupons that

14  Play offers.  So we give these coupons called play credits to

15  our users to encourage them, incentivize them, to try spending

16  in a developer's app.  So like a dollar off.

17  **Q.**  Does Play Billing allow for developers to offer sales

18  within Play?

19  **A.**  We do.

20  **Q.**  And how does that work?

21  **A.**  It depends how the developer is monetizing their app.  So,

22  for example, if they have a paid download, they can publish a

23  sale to say it was $5, now it's $4; or for in-app purchases,

24  they can use the Developer Console to use sales in their app as

25  well.

**LOEW - DIRECT / BELL**

1   **Q.**   And on top of the sales, does Google Play offer

2   merchandising to developers during these sales that they're

3   offering?

4   **A.**   Yeah.  We often merchandise the sales that are happening

5   within the app themselves in the Google Play app.

6   **Q.**   What does it mean to merchandise the sale?

7   **A.**   It's kind of like a circular.  So it's like the things

8   that are happening in a user's app or things that we think are

9   interesting, we put it on the home screen of the Google Play

10   Store.  So it's like:  50 percent off App A, or App B is having

11   an event.

12   **Q.**   And is that separate from advertising that developers can

13   pay for with Google Play?

14   **A.**   It is separate.

15   **Q.**   Focusing on the last column here, "Insights," what

16   features does Play Billing provide to developers?

17   **A.**   We offer a number of reports to the developer on the

18   Developer Console.  They can see how their monetization kind of

19   metrics are doing, and we hope that that can give them the

20   insights to adjust and help their users more.

21   **Q.**   And can you give an example of an insights feature that

22   Google Play provides to developers?

23   **A.**   Yeah.  So, for example, the last one here, "User Cancel

24   Survey," when a user cancels their subscription in the

25   Subscription Center, we put an optional survey up for them.

LOEW - DIRECT / BELL

1   And so what we do is we aggregate that and tell the developer:

2   Hey, it looks like people are canceling because it's too

3   expensive; or, hey, it looks like people are canceling because

4   they're not really finding enough value.  So you hope those

5   insights can help the developer retain more users.

6   **Q.**   Let's switch gears and talk about Play's business model.

7       What are the two primary ways that Google Play earns

8   money?

9   **A.**   Through our service fee and through advertising.

10  **Q.**   And let's look at Demonstrative Exhibit Number 5, please.

11      So the jury's heard a lot about the service fee that Play

12  collects for in-app purchases from developers.  So can you just

13  briefly walk us through the various amounts that Google Play

14  charges for the apps in the Play Store?

15  **A.**   Yeah, sure.  So for the first million of revenue, no

16  matter what, 15 percent; and then if you're using

17  subscriptions, it's 15 percent unless you're part of our media

18  experience program.  Then it could be a little bit less than

19  15 percent.  If you're doing one-time purchases, after your

20  first million, it's 30 percent.

21  **Q.**   Do developers -- for the first million that you mentioned,

22  do developers need to wait a year before they qualify for that

23  first million reduction?

24  **A.**   It just resets every year.  So it's the first million

25  every year.

**LOEW - DIRECT / BELL**

1  **Q.**   Is this different than the Apple App Store?

2  **A.**   I believe so.

3  **Q.**   How so?

4  **A.**   I don't remember the exact mechanics, but I believe that

5  the Apple App Store has a qualifier for how much you did in the

6  prior year that changes your eligibility in the next year.

7  **Q.**   And so in addition to the service fees, which are a

8  percentage, does Google Play Billing also charge a one-time fee

9  to developers?

10  **A.**   Oh, yes, we do.

11  **Q.**   And what is that one-time fee?

12  **A.**   It's a $25.00 one-time fee.

13  **Q.**   We see here the number of different service fee amounts.

14  Do 100 percent of developers pay service fees?

15  **A.**   No.

16  **Q.**   What percentage of developers on the Play Store do not pay

17  any service fee at all?

18  **A.**   Last I checked, I think about 97 percent of developers

19  don't pay a service fee.

20  **Q.**   And does that mean that they're able to distribute their

21  apps through Google Play for free?

22  **A.**   Yes.

23  **Q.**   For developers who do pay a service fee, what service fee

24  do most of them pay?

25  **A.**   I believe 99 percent pay 15 percent or less.

**LOEW - DIRECT / BELL**

1  Q.  And what percentage of developers pay this 30 percent fee

2  that's in the last row here?

3  A.  I guess that 1 percent, closer to the 1 percent.

4  Q.  Let's turn to talk about logistics of it.

5      When a developer does make money, an in-app purchase of a

6  digital good, how does Google Play Billing actually collect

7  that fee?

8  A.  Yeah, so basically when a user goes through a purchase

9  flow and they purchase something, the money gets remitted to

10  Google; and then what we do is we deduct any applicable taxes

11  and our service fee, and then we give the rest to the developer

12  on a monthly basis.

13  Q.  And why does Google Play structure the collection process

14  in this way?

15  A.  We find this to be the most efficient model to collect our

16  service fee.

17  Q.  Have you assessed any other models?

18  A.  Yes.

19  Q.  And why did you not switch to other models at a high

20  level?

21  A.  Yeah, at a high level, we've examined lots of different

22  types of models; and what we want to do, though, is really

23  incentivize, like, users to try lots of apps in the store so

24  that more developers can reach more users.

25      So we didn't want to do things like charge per download

**LOEW - DIRECT / BELL**

1  because developers might not want to have a lot of users

2  download and try their app or things like that.  Or if we

3  charged the developer afterwards to pay us a service fee, then

4  we have to invest in an invoicing system and a collection

5  system.  We don't know if everyone is going to pay us.  This

6  way, when a user pays, like, everyone just gets paid.

7  **Q.**  Does the service fee that's charged here, this percentage

8  fee, does it pay for the services and features that we just

9  described?

10  **A.**  It does.

11  **Q.**  And do developers have to use Google Play Billing in order

12  to offer apps in the Play Store?

13  **A.**  No.

14  **Q.**  What other ways can they offer purchase -- what other ways

15  can they offer their apps?

16  **A.**  So if a developer is selling digital goods and services --

17  if a developer is just selling physical goods, they don't have

18  to use Google Play Billing.  If they're selling digital goods

19  and services, they can either use Google Play Billing or they

20  can choose to go consumption only, which means they're just

21  choosing not to sell it in the app.

22  **Q.**  Are there large developers that do choose to do that?

23  **A.**  Yes, there are.

24  **Q.**  Can you give an example of one?

25  **A.**  Netflix.

LOEW - DIRECT / BELL

1  Q.   Does the Apple App Store offer the consumption-only option

2  to developers?

3  A.   They offer a variant of our consumption-only policy.

4  Q.   And how does it differ?

5  A.   I believe they call it Reader Apps, and so they allow only

6  certain categories of apps to go consumption only but not all

7  categories.

8  Q.   Are both games and apps allowed to be consumption only in

9  Google Play?

10  A.   In Google Play, they are both allowed.

11  Q.   Other than the efficiencies that you identified in

12  collecting the service fee in this way, are there other reasons

13  related to user safety that -- for why Google Play requires

14  developers to use Google Play Billing when they're selling

15  digital content in the app?

16  A.   Yes.

17  Q.   What is that?

18  A.   So I think that we have tens and thousands of developers

19  on our store.  We really believe by having a streamlined

20  Google-led purchase flow, we're keeping all the users'

21  information safe.  It allows users to kind of safely try

22  unknown apps that they're not -- you know, that they haven't

23  heard about that aren't as big as Netflix.  And that way if a

24  user has a bad experience with a little bit of a lesser-known

25  app, we can help intervene and make sure that they get all set.

LOEW - DIRECT / BELL

1  Q.   And what risk is -- what risk to user trust is Google Play

2  trying to mitigate by making developers use Google Play Billing

3  in these circumstances?

4  A.   Yeah, I think the big thing for user trust is just like

5  making sure the whole ecosystem can be successful.  We're

6  always worried about a bad-apple scenario where a user has

7  really one bad experience with a digital app, and then they

8  don't want to try anything else in the store.  We want the

9  store to feel really safe so that all apps in our store have a

10  really good chance at succeeding.

11  Q.   Let's turn to one last topic.  Can users make purchases

12  for digital content, like a subscription, outside of an app

13  that was downloaded on the Play Store and then access the app

14  itself -- let me rephrase.  I think I...

15       Can users download an app from the Play Store but make

16  purchases outside of the app?

17  A.   Yes.

18  Q.   And does -- when a user downloads an app through the

19  Play Store, does Google Play have policies about how the

20  developer can communicate with the users inside the app itself?

21  A.   Yes.

22  Q.   What are those policies?

23  A.   Inside the app, the developer can't communicate about how

24  to purchase outside the app.

25  Q.   Why is that Google Play's policy?

LOEW - DIRECT / BELL

1    **A.**    For numerous reasons.  Both for developer and user and

2    Google benefits.

3    **Q.**    Are there other ways that developers can communicate with

4    the users who download it through the Play Store?

5    **A.**    Yes.

6    **Q.**    And what are those other ways?

7    **A.**    Outside the app, the developer can communicate any way

8    they want.  So they can use social media.  They can e-mail the

9    user.  They can do SMS or WhatsApp, or, you know, they can do a

10   TV commercial.  They can communicate whatever they want outside

11   the app.

12   **Q.**    Does Google Play put any limitations on how developers can

13   use any of those methods you just listed?

14   **A.**    No.

15   **Q.**    I'd like to show you an example.

16         And if we could look at Exhibit 8028, which has already

17   been admitted into evidence.

18         Ms. Loew, this is a screenshot from an app called Down Dog

19   that's distributed on Google Play.  Do you see that?

20   **A.**    I do.

21   **Q.**    Would this -- what we see on the screen, would this

22   violate Google Play's policies?

23   **A.**    It would.

24   **Q.**    And which part of it would violate that?

25   **A.**    The white button at the bottom that says "33 percent off.

**LOEW - DIRECT / BELL**

1  Pay on our website."

2  **Q.**   How does that violate the Google Play policy?

3  **A.**   As I mentioned, within the app, we don't -- developers are

4  not allowed to communicate how to pay off the app.

5  **Q.**   Is there any benefit to developers for Google Play having

6  this policy?

7  **A.**   We do think so.

8  **Q.**   And what benefits?

9  **A.**   Well, if a user is having a purchase intent, they're ready

10  to pay, it actually -- we believe that you'll convert

11  quicker -- "convert" means for user to paid user -- if they can

12  do it in the moment without friction.  So by keeping them in

13  the app, we think they'll have higher conversion.

14  **Q.**   And last question.  Does this policy benefit

15  Google Play -- or Google?

16  **A.**   It does.

17  **Q.**   How so?

18  **A.**   Well, we worked really hard to build an app store that

19  reaches billions of users and give developers tools to put apps

20  in that app store; and so if we're doing all this work and the

21  user is finding value in the app that they want to purchase, we

22  think it would be unfair if the developer sent them someplace

23  else after we did all that work.  So it does value -- so it

24  does benefit Google to keep them in the app.

25          **MS. BELL:**  Thank you.  I pass the witness.

 1          **THE COURT:**  Okay.  Cross.

 2          **MR. CAMERON:**  May I proceed, Your Honor?

 3          **THE COURT:**  Get this done in 20 minutes.

 4          **MR. CAMERON:**  I'm sorry, Your Honor?

 5          **THE COURT:**  Get this done in 20 minutes or less.

 6   That's your boundary.

 7       All right.  Go ahead.

 8          **MR. CAMERON:**  Understood, Your Honor.  Thank you.

 9                      <u>**CROSS-EXAMINATION**</u>

10   **BY MR. CAMERON:**

11   **Q.**  Ms. Loew, good morning barely.

12   **A.**  Hi.  Good morning.

13   **Q.**  Now, Ms. Loew, you joined Google in 2018, I think you

14   said; right?

15   **A.**  Yes.

16   **Q.**  So you've only been at Google for six years; correct?

17   **A.**  Almost six.

18   **Q.**  And you weren't around then when the original version of

19   the Google Play Store, which is known as Android Market, was

20   launched in 2008; correct?

21   **A.**  No, I was not there.

22   **Q.**  And so you don't have any firsthand knowledge of how the

23   Google Play Store business ran prior to 2018 when you joined

24   Google; correct?

25   **A.**  Correct.

1    **Q.**   You don't have any firsthand knowledge of the reasons why

2    Google established any of the policies that were created prior

3    to 2018; correct?

4    **A.**   Correct.

5    **Q.**   You're aware that Google's policy requiring developers to

6    use Google Play Billing for purchases of digital goods was

7    implemented in 2011; right?

8    **A.**   I didn't know that.

9    **Q.**   You weren't at Google when it was implemented, were you?

10   **A.**   That's correct.

11   **Q.**   You're aware that the policy when Google began charging a

12   service fee for in-app purchases of digital goods was also

13   implemented in 2011; correct?

14   **A.**   Correct.

15       I'm having a little trouble hearing you.

16   **Q.**   Oh, I'm so sorry.  I'll try and speak up.

17   **A.**   Thank you.

18   **Q.**   I think you answered my question.

19       You're aware that the policy when Google began charging a

20   service fee for in-app purchases of digital goods was also

21   implemented in 2011; correct?

22   **A.**   I didn't know that, but okay.

23   **Q.**   But, again, that was before you, at the time, joined

24   Google; right?

25   **A.**   Correct.

**LOEW - CROSS / CAMERON**

1   **Q.**   And you were not at Google when Google decided also in

2   2011 that the fee charged to the developers for in-app

3   purchases would be 30 percent; correct?

4   **A.**   I was not at Google, correct.

5   **Q.**   Now, you testified that the Google Play Billing is not

6   separate from the Google Play Store; correct?

7   **A.**   Correct.

8   **Q.**   But Google Play Billing is required to be used only by

9   developers that sell digital content in the app; isn't that

10  right?

11  **A.**   That's right.

12  **Q.**   Developers that sell physical content, for example, in the

13  real world do not use Google Play Billing; right?

14  **A.**   That's correct.

15  **Q.**   And, on the other hand, some developers who do sell

16  digital content can use a billing system other than Google Play

17  Billing if they are in the pilot program for User Choice

18  Billing; correct?

19  **A.**   That's correct.

20  **Q.**   Just to be clear, you talked a little bit about a trusted

21  and safe experience for users on the Google Play Store.  You

22  personally have no familiarity with how security for the Google

23  Play Store works; correct?

24  **A.**   That's not my firsthand experience, correct.

25  **Q.**   Right.  So the answer is no?

1   **A.**   No.

2   **Q.**   You also talked a little bit about how apps are promoted

3   through the Google Play Store and app discovery for users;

4   right?  Do you recall that testimony?

5   **A.**   Yes.

6   **Q.**   And you'd agree with me that some app brands are very well

7   known?

8   **A.**   Yes.

9   **Q.**   And some app brands are much better known than others;

10  correct?

11  **A.**   Correct.

12  **Q.**   So, for example, Candy Crush is extremely well known?

13  **A.**   Yes.

14  **Q.**   And so if I want Candy Crush, and I've heard of it, I go

15  to the Google Play Store, type it in, and download the app;

16  right?

17  **A.**   Yes.

18  **Q.**   And in that case, because I already knew about the app in

19  question, the Google Play Store didn't help me, in fact,

20  discover the app, did it?

21  **A.**   In that case, no.

22  **Q.**   No.  But, nonetheless, Google Play still takes a

23  30 percent cut of Candy Crush's in-app purchase revenue even

24  for those users where it didn't help the user discover the app;

25  correct?

**LOEW - CROSS / CAMERON**

1   **A.**   Correct.

2   **Q.**   Now, Google's counsel showed you a demonstrative showing

3   various features of Google Play and Google Play Billing that

4   are offered to both users and developers.  Do you remember

5   that?

6   **A.**   I do.

7   **Q.**   It's true, is it not, that another Android app store could

8   offer all of those features to both users and developers?

9   **A.**   All except Play Points.

10  **Q.**   But all the rest, and I think you talked about -- for

11  example, some of the things you talked about, parental

12  controls; correct?  Another Android app store could offer

13  parent controls to compete with Google Play; correct?

14  **A.**   Correct.

15  **Q.**   Another Android app store could offer the purchasing

16  controls that you talked about to compete with Google Play;

17  correct?

18  **A.**   Correct.

19  **Q.**   Same with subscription renewals; correct?

20  **A.**   Correct.

21  **Q.**   Same with refunds?

22  **A.**   Correct.

23  **Q.**   You also talked about services for developers.  And

24  another competing Android app store could offer those services

25  to developers also; isn't that true?

**LOEW - CROSS / CAMERON**

1    **A.**   True.

2    **Q.**   And these -- a competing Android app store might be able

3    to offer for all of these categories something different; isn't

4    that fair?

5    **A.**   That's fair.

6    **Q.**   They might be able to offer something better; isn't that

7    fair?

8    **A.**   That's fair.

9    **Q.**   They could choose to lower service fees just to a level

10   below what the Google Play Store charges; correct?

11   **A.**   Correct.

12   **Q.**   And offering lower service fees is one way that Android

13   app stores could then compete with each other; wouldn't you

14   agree?

15   **A.**   I would agree.

16   **Q.**   There could be another -- and, in fact, the interplay

17   could be different.  There could be another Android app store

18   where the subscription center maybe isn't as built out as the

19   Google Play Store's, but they attract developers by charging a

20   lower service fee, say 5 percent; isn't that fair?

21   **A.**   Sure.

22   **Q.**   And another Android app store could do a better job than

23   the Google Play Store helping users discover apps; true?

24   **A.**   True.

25   **Q.**   You talked a little bit about forms of payment.  Another

1    Android in-app payment solution could offer more forms of

2    payment than Google Play Billing; correct?

3    **A.**   Correct.

4    **Q.**   Now, let's just dig into that a little bit.

5        And, in fact, before we get there, some developers have

6    actually told Google, isn't it true, that when catering to

7    certain markets, there were other forms of payment that

8    Google Play Billing did not have that they wanted?  Isn't that

9    true?

10   **A.**   Yes.

11   **Q.**   Now, you talked about forms of payment, and one that you

12   discussed was PayPal.  To be clear, PayPal is an option

13   available to a user when they set up Google Play Billing;

14   right?

15   **A.**   In some markets, yes.

16   **Q.**   Yes.  And it's a payment processer that a user can set up

17   for Google Play Billing, among others; correct?

18   **A.**   Sorry?  What was the first part of that?

19   **Q.**   It's a payment processer.

20   **A.**   Yes.

21   **Q.**   Yes.  And it's just one of the payment vendors that you

22   mentioned, like Visa; correct?

23   **A.**   Yes.

24   **Q.**   But all developers selling digital content on Google Play

25   have to use Google Play Billing and pay the Google Play

**LOEW - CROSS / CAMERON**

1  commission fee; correct?

2  **A.**   Correct.

3  **Q.**   You also testified that the scale of Google Play helps it

4  detect fraud and abuse?  Do you remember?

5  **A.**   I do.

6  **Q.**   Now, when you say "scale," you mean the size of

7  Google Play Billing and the volume of transactions it handles;

8  right?

9  **A.**   That's part of what I meant, correct.

10  **Q.**   So if another payment solution were allowed to thrive on

11  Google Play Billing, then it too could develop that scale;

12  correct?

13  **A.**   Correct.

14  **Q.**   But at the moment, that's not possible, is it?

15  **A.**   Sorry, what's not possible?

16  **Q.**   Allowing a different payment solution other than

17  Google Play Billing.

18  **A.**   On Google Play, correct.

19  **Q.**   Correct.

20       Now, PayPal, for example, has enormous scale; isn't that

21  accurate?

22  **A.**   Yes.

23  **Q.**   I mean, it's bigger than Google Play Billing; yes?

24  **A.**   I don't know.

25  **Q.**   So it too has the scale to detect fraud and abuse?

1   **A.**   Yes.

2   **Q.**   So Google Play Billing is not the only service that can

3   detect fraud and abuse effectively, is it?

4   **A.**   No, it's not.

5   **Q.**   You're not saying that Google is the only company in the

6   world that is capable of offering an app store with all of the

7   features that you've discussed today, are you?

8   **A.**   I'm not saying that, no.

9   **Q.**   No.  Another Android store, app store, could compete with

10   Google in any one of those ways that we've been discussing;

11   correct?

12   **A.**   Yes.

13   **Q.**   And do you understand that no one is arguing that the

14   Google Play Store should be shut down; right?

15   **A.**   Understood.

16   **Q.**   But you do understand that developers, such as Epic, have

17   argued that Android app stores should be given a chance to

18   compete on equal terms with the Google Play Store; correct?

19   **A.**   Yes.

20   **Q.**   Now, ma'am, are you aware of Google Chat?

21   **A.**   Yes.

22   **Q.**   And, Ms. Loew, you use Google Chat for business

23   communications in the course of your work at Google; is that

24   correct?

25   **A.**   Yes.

1  **Q.**  And you understand that Google Chat -- some Google Chats

2  are preserved and some Google Chats are deleted after 24 hours;

3  is that right?

4  **A.**  Yes.

5  **Q.**  Now, Ms. Loew, it's true, is it not, that you were

6  instructed by your superior at Google not to opine on business

7  topics in Google Chat rooms that don't get deleted?

8  **A.**  I'm not sure.

9  **Q.**  Well, can I direct you, please, to Exhibit 8594 in your

10  binder.

11        **MR. CAMERON:**  And, Your Honor, I should note that this

12  exhibit has been redacted in order to comply with an order.

13        **THE COURT:**  Okay.

14  **BY MR. CAMERON:**

15  **Q.**  So, Ms. Loew, Exhibit 8594.

16  **A.**  Sorry, which binder?

17  **Q.**  How is it labeled?  I think it's going to have -- yes, it

18  has a label and it's on the tab.  It will be the one with the

19  white cover, ma'am.

20  **A.**  White cover.  Thank you.

21        (Witness examines documents.)  8594?

22  **Q.**  Yes.

23  **A.**  Okay.  Got it.

24  **Q.**  So, ma'am, let me just explain this.  In the binder that

25  I've given you, you have two copies of this document.  One is

1   redacted and one is not redacted.  And I would ask you, please,

2   not to refer to any of the text that has been blacked out.

3   **A.**   Okay.

4   **Q.**   And so to avoid that, please listen to my questions

5   carefully and just answer what I ask you.

6   **A.**   Got it.

7   **Q.**   Exhibit 8594 is a Google Chat conversation dated

8   August 20, 2021, that includes you, I see your name there, also

9   Tian Lim and others at Google.  Do you see that?

10  **A.**   I do.

11          **MR. CAMERON:**  Your Honor, we move to admit

12  Exhibit 8594 into evidence.

13          **MS. BELL:**  No objection.

14          **THE COURT:**  It's admitted.

15      (Trial Exhibit 8594 received in evidence.)

16  **BY MR. CAMERON:**

17  **Q.**   Now, there are multiple Google people on this Chat,

18  correct?

19  **A.**   Correct.

20  **Q.**   And without disclosing the actual topics that are being

21  discussed here, this document shows you sharing various

22  business-related documents with your colleagues; correct?

23  **A.**   Correct.

24  **Q.**   Just at the bottom of the first page, it shows that you

25  send a link to your colleagues regarding, quote, "tax

**LOEW - CROSS / CAMERON**

1  projects."  Do you see that?

2  **A.**   I do.

3  **Q.**   And on the second page, Mr. Lim responds to a message.  Do

4  you see?

5  **A.**   I do.

6  **Q.**   And that's Tian Lim; is that correct?

7  **A.**   That's correct.

8  **Q.**   At the time of August 2021, he was your superior; correct?

9  **A.**   Correct.

10 **Q.**   He was a vice president for Play product management;

11 correct?

12 **A.**   That's correct.

13 **Q.**   And what he wrote in response to this exchange dealing

14 with things like tax policy was, and pardon my language (as

15 read):

16         "Ah, shit.  Just remembered rooms don't get deleted.

17     Don't opine in here."

18     Did I read that correctly?

19 **A.**   Yes, you did.

20 **Q.**   And you responded Okay"?

21 **A.**   Looks like I did.

22 **Q.**   And then Mr. Lim asked you for access to the documents

23 that you sent him, which you granted him?

24 **A.**   Yes.

25 **Q.**   And then the Chat, or at least the part of the Chat with

1  the history turned on, went silent; correct?

2  **A.**   Correct.

3  **Q.**   All right.  You can put that aside.

4      I think you testified that about 99 percent of developers

5  pay 15 percent for the service fee; is that correct?

6  **A.**   Or less, yes, correct.

7  **Q.**   Are you aware that over 96 percent, you know, of

8  Google Play's -- excuse me.  I'll come back to that.

9      Now, ma'am, are you aware of a program at Google called

10  User Choice Billing?

11  **A.**   I am.

12  **Q.**   Sometimes known as Alternative Billing; correct?

13  **A.**   Correct.

14  **Q.**   And through User Choice Billing, certain developers can

15  offer users the choice to use another payment solution

16  alongside Google Billing?

17  **A.**   Correct.

18  **Q.**   But to be clear, even for User Choice Billing, Google

19  requires that one of the choices always be Google Play Billing;

20  correct?

21  **A.**   Correct.

22  **Q.**   User Choice Billing is not available for games; right?

23  **A.**   In the U.S., correct.

24  **Q.**   So for games distributed through the Google Play Store,

25  the only choice developers and users have for in-app purchases

1  is Google Play Billing; correct?

2  **A.**  Correct.

3  **Q.**  Can you turn in your binder to Exhibit 1710, please?

4  **A.**  (Witness examines document.)  Okay.  Thanks.

5  **Q.**  Okay.  Are you ready?

6      Before we turn to that, let me just complete the sentence

7  that I asked before.

8      You testified that about 99 percent of developers pay the

9  15 percent rate; is that correct?

10 **A.**  So I testified of the -- 97 percent of developers don't

11 really pay; of the ones that do, 99 percent pay 15 percent or

12 less.

13 **Q.**  Okay.  But you're aware that 96 percent of Google Play's

14 billions of dollars of revenue is paid by developers who

15 actually pay the 30 percent fee; correct?

16 **A.**  I don't know the exact number.

17 **Q.**  But do you have any reason to disagree with that?

18 **A.**  I have no reason to disagree.

19 **Q.**  Okay.  Let's go back to Exhibit 1710, please.

20     1710 is a document entitled "2022 Planning Two Pager."  Do

21 you see that in your binder, ma'am?

22 **A.**  I do.

23 **Q.**  And do you see that your name is there just under the

24 heading at the top?  Do you see that?

25 **A.**  I do.

**LOEW - CROSS / CAMERON**

1   **Q.**   And so you're listed as a proposer.  Do you recognize

2   this?

3   **A.**   I do.

4          **MR. CAMERON:**  Your Honor, we would move Exhibit 1710

5   into evidence.

6          **MS. BELL:**  No objection.

7          **THE COURT:**  It's admitted.

8      (Trial Exhibit 1710 received in evidence.)

9   **BY MR. CAMERON:**

10  **Q.**   Okay.  Do you see the header under "Proposal," it says

11  "What problem/opportunity are you after?"

12  **A.**   Yes, I see it.  Thank you.

13  **Q.**   The first bullet after that says (as read):

14          "Developers and users will have more choice in

15      check-out post Heller and Everest.  What are we doing to

16      make Google Play Billing the platform they want to

17      choose?"

18      Do you see that?

19  **A.**   I do.

20  **Q.**   And when that first bullet says "more choice in

21  check-out," that's a reference to alternative billing; correct?

22  **A.**   Correct.

23  **Q.**   And so this is talking about what could happen to User

24  Play -- to Google Play Billing after User Choice Billing goes

25  into effect, at least for the apps that would be affected;

**LOEW - CROSS / CAMERON**

1    correct?

2    **A.**    Correct.

3    **Q.**    The next bullet is saying that (as read):

4           "Some developers are noticing that Google Play

5    Billing doesn't compare to other payment solutions that

6    they've been using."

7    Do you see that?

8    **A.**    I do.

9    **Q.**    And below that there is some subbullets that summarize a

10   few complaints that some developers were making about

11   Google Play Billing, and the first subbullet says (as read):

12          "Not enough local FOP" -- form of payment --

13   "support."

14   Did I get that right?

15   **A.**    You did.

16   **Q.**    The second subbullet says (as read):

17          "Poor platform performance."

18   Did I get that right?

19   **A.**    You did.

20   **Q.**    The third subbullet says (as read):

21          "Missing platform features to support their business

22   models and go-to-market strategy."

23   Did I get that right?

24   **A.**    You did.

25   **Q.**    Towards the bottom of the page, there's a header that says

1  "What does success look like?"  Do you see that?

2  **A.**  I do.

3  **Q.**  And underneath, it says -- the second bullet says (as

4  read):

5          "For digital choice, GPB plus Everest.  GPB supports

6      90 percent of spend."

7      Do you see that?

8  **A.**  I do.

9  **Q.**  And isn't that saying that if there were competition for

10 in-app payment solutions within the Google Play Store apps, you

11 know, the goal here, the ambition, would be that 90 percent or

12 more of users would choose Google Play Billing?

13 **A.**  Yes.

14 **Q.**  And towards the bottom of the page there's a header that

15 says "What is the proposed solution?"  Do you see that?

16 **A.**  I do.

17 **Q.**  And the paragraph says -- the second paragraph says (as

18 read):

19          "In case they" -- meaning developers -- "still choose

20      to supplement Play Billing with third-party billing, we

21      must connect directly with users and give them a

22      compelling case to check-out with Play Billing."

23      Do you see that?

24 **A.**  I do.

25 **Q.**  And, you know, so this is exactly, I think, what we're

1   talking about; right?  If users and developers have a choice

2   among payment solutions within certain Google Play apps, as

3   this document shows, Google Play Billing will need to give them

4   a compelling case to check-out with Google Play Billing;

5   correct?

6   **A.**   Correct.

7   **Q.**   Correct.  In other words, we'll need to compete for their

8   business; correct?

9   **A.**   Correct.

10  **Q.**   Near the bottom of page 2 there is a series of numbered

11  headings discussing ways that Google Play Billing could, in

12  fact, compete.  The document even discusses them.

13      If we go to those, the first one, the first heading is

14  Google saying it could invest more money in the form of local

15  payment support; correct?

16  **A.**   Correct.

17  **Q.**   The second heading in the middle of page 3 is saying that

18  Google could make a much larger investment into the commerce

19  performance metrics that are complained about regularly by

20  developers; right?

21  **A.**   Right.

22  **Q.**   The top of page 4 talks about how Google can invest in

23  providing extra value for buying with Google Play Billing;

24  correct?

25  **A.**   Correct.

1  **Q.**   The point of this list is that you were looking to find

2  out ways in which you could invest and ways that you could

3  stand out against the competition; right?

4  **A.**   Right.

5  **Q.**   Now, I'd like to take you to a new exhibit.  This is

6  Exhibit 6288 in your binder.

7       Now, ma'am, this is the video of a Q1 2020 Play and

8  Friends All Hands Meeting.  You'll see in your binder, because

9  obviously it's a video, what I've included is a slide showing

10  the title of that presentation and a second page that shows a

11  video snip, it's a screenshot, which includes you.  Do you see

12  that?

13  **A.**   I do.

14  **Q.**   Is that you in that photograph, ma'am?

15  **A.**   Yes.

16  **Q.**   And that's Mr. Samat in the video to your left; is that

17  correct?

18  **A.**   Correct.

19  **Q.**   And you're on the right?

20  **A.**   I'm on the right.

21  **Q.**   Right.  And you spoke at that presentation after

22  Mr. Samat.  Do you recall?

23  **A.**   I recall answering a question, correct.

24  **Q.**   Yes.  So you stood up and spoke, you were present at the

25  meeting; is that correct?

1    **A.**   Correct.

2    **Q.**   And you were there when Mr. Samat called on you to speak;

3    correct?

4    **A.**   Correct.

5    **Q.**   Which means you were there listening to him; correct?

6    **A.**   At the time of the question, correct.

7         **MR. CAMERON:**   Your Honor, we move Exhibit 6288 into

8    evidence.

9         **MS. BELL:**   Your Honor, we object.   We understand the

10   portion that Epic intends to play is not the portion that he

11   was just referencing, which happens an hour into the video.

12   They intend to show 9 minutes of video that has not been

13   established that she was present for.

14        **MR. CAMERON:**   Your Honor, we're going to show

15   1-minute, and this is the Google Play All Hands Meeting that

16   Ms. Loew has testified that she was present at.

17        **THE COURT:**   She's in the photograph.

18        **MR. CAMERON:**   And she's in the photograph.   She stood

19   up from the audience.

20        **THE COURT:**   It's admitted.

21      (Trial Exhibit 6288 received in evidence.)

22        **THE COURT:**   Go ahead.

23        **MR. CAMERON:**   Thank you very much.

24   **BY MR. CAMERON:**

25   **Q.**   So during your presentation -- during your questioning,

1  you were asked about the financial performance of the Google

2  Play Store by Google's counsel.  Do you recall that?

3  **A.**   I don't recall.  Sorry.

4  **Q.**   Well, it's true, is it not, that it is well known

5  internally at Google Play that Google Play is remarkably

6  profitable; correct?

7  **A.**   Profitable, yes.

8  **Q.**   In fact, extremely profitable; correct?

9  **A.**   Profitable, yes.

10  **Q.**   In fact, it's known that Google Play's profits are mission

11  critical, mission critical, to the entire Google company;

12  correct?

13  **A.**   I've heard that phrase, yes.

14  **Q.**   Yes.  In fact, Google Play standing alone, Google Play

15  standing alone would almost be the size of a Fortune 100

16  company; correct?

17  **A.**   I've heard that, yes.

18  **Q.**   Yes.  In fact, you've also heard that Google Play is

19  raking in bags of money; right?

20  **A.**   I think I might have heard that, yes.

21  **Q.**   Yes.

22          **MR. CAMERON:**  Can we please play the clip starting at

23  1:07.

24                  (Video was played but not reported.)

25  \\\

LOEW - REDIRECT / BELL

1   BY MR. CAMERON:

2   **Q.**   Ms. Loew, that was Sameer Samat, your boss; correct?

3   **A.**   Correct.

4   **Q.**   And he's the head of the Google Play Store; correct?

5   **A.**   Yes.

6   **Q.**   And Google chose not to bring him to testify at this

7   trial, did they?

8   **A.**   I don't know.

9           **MR. CAMERON:**  Thank you.  No further questions.

10          **THE COURT:**  All right.  Any brief redirect?

11          **MS. BELL:**  Yes, Your Honor.

12                  <u>**REDIRECT EXAMINATION**</u>

13  BY MS. BELL:

14  **Q.**   Ms. Loew, you were asked a lot of questions about other

15  possible payment services.  Do you remember that?

16  **A.**   Yes.

17  **Q.**   And you were asked whether or not other payment services

18  potentially have better services or could develop better

19  services.  Do you remember that?

20  **A.**   Yes.

21  **Q.**   Does Google Play strive to create excellent services for

22  its developers?

23  **A.**   Yes.

24  **Q.**   Does Google Play listen to feedback from developers about

25  what services to offer?

PROCEEDINGS

1  **A.**   Yes.

2  **Q.**   And does Google Play do anything in response to that

3  feedback?

4  **A.**   Yeah.  We take that feedback seriously, we put it

5  together, and that helps actually inform what we build next for

6  developers or users or both.

7  **Q.**   Does Google Play Billing take into account the needs of

8  all the developers when it listens to this feedback?

9  **A.**   Yeah.  We really try to prioritize based on the whole

10  ecosystem to do what's best for the ecosystem, not just one

11  single set of users or developers.

12          **MS. BELL:**  Thank you, Your Honor.  No more questions.

13          **THE COURT:**  Okay.  We'll take our lunch break, and see

14  you back at 12:45.

15      Please stay there.

16      You can go.

17      You stay there.

18          **THE CLERK:**  All rise.

19      (Proceedings were heard out of the presence of the jury:)

20          **THE COURT:**  Put up that Chat exhibit that we admitted,

21  please.

22      It's Ms. Loew?

23          **THE WITNESS:**  Yes.

24          **THE COURT:**  All right.  What was going on in this

25  Chat?  Was this a business-related discussion, in your view?

PROCEEDINGS

1           THE WITNESS:  It looks like it's a business-related

2      discussion, yes.

3           THE COURT:  Well, was it or not?  I'm not asking you

4      what it looks like.

5           THE WITNESS:  Yes, it is.

6           THE COURT:  This is a business-related discussion; is

7      that right?

8           THE WITNESS:  Yes, that's correct.

9           THE COURT:  Okay.  What did you understand -- wait.

10     Who is Mr. Tian Lim?  Or Ms.  Is it Mr. or Ms.?

11          THE WITNESS:  It was a Mr.

12          THE COURT:  All right.  Who is Mr. Tian Lim?

13          THE WITNESS:  He was the vice president of product and

14     user experience.

15          THE COURT:  Okay.  Is he your boss?

16          THE WITNESS:  He was.  He's no longer at the company.

17          THE COURT:  All right.  But at the time of this Chat,

18     he was your boss?

19          THE WITNESS:  Yes.

20          THE COURT:  What did you understand him to mean when

21     he said, quote, "Don't opine in here," close quote, because the

22     rooms don't get deleted?  What was he telling you not to do in

23     your understanding?

24          THE WITNESS:  Whatever question he was asking, which I

25     don't remember the redacted part, it looks like he didn't want

1    us to answer the question in the Chat but in the doc.

2              THE COURT:  Okay.  But do you have any understanding

3    about why he didn't want you to answer the question in the

4    Chat?

5              THE WITNESS:  I don't remember.  I don't know why he

6    wrote it like that, but I took this -- I'm looking at this, I

7    would have taken that to say "Opine in the doc; don't opine in

8    the Chat."

9              THE COURT:  Okay.  But he's referring here to "Don't

10   opine in the Chat because this room will not get deleted."

11   What did you understand that to mean?

12             THE WITNESS:  I mean, I'm not sure what he meant by

13   that.  I just -- I just -- he said don't opine in the Chat.

14             THE COURT:  You said "Okay," Ms. Loew.  You must have

15   understood.  So you clearly --

16             THE WITNESS:  I under --

17             THE COURT:  If I may finish.

18             THE WITNESS:  Yeah, sorry.

19             THE COURT:  You clearly understood his question enough

20   to say "Okay."  What was your understanding of what your boss

21   meant when he told you "Don't opine here because this Chat will

22   not be deleted"?

23             THE WITNESS:  I guess he meant he didn't want it in

24   posterity in the Chat.

25             THE COURT:  Okay.  Thank you.  You may step down.

PROCEEDINGS

1          THE WITNESS:  Thank you.

2                         (Witness excused.)

3          THE CLERK:  All rise.  Court is in recess.

4             (Luncheon recess was taken at 12:15 p.m.)

5    <u>**AFTERNOON SESSION**</u>                                    <u>**12:56 p.m.**</u>

6        (Proceedings were heard out of the presence of the jury:)

7          THE COURT:  Who's next?

8          MR. BORNSTEIN:  We're having Dr. Bernheim back,

9    Your Honor.

10         THE COURT:  All right.  And that's it?

11         MR. POMERANTZ:  Your Honor, before that, I should say

12   Google rests, and we will argue the JMOL later this afternoon.

13         THE COURT:  Okay.  That's it then?

14         MR. BORNSTEIN:  Yes, Your Honor.

15         THE COURT:  All right.

16       (Proceedings were heard in the presence of the jury:)

17         MR. BORNSTEIN:  Your Honor, Epic calls Professor Doug

18   Bernheim back to the stand.

19         THE CLERK:  Will you please stand and raise your right

20   hand?

21                        <u>**DOUGLAS BERNHEIM**</u>,

22   called as a witness for the Plaintiff, having been duly sworn,

23   testified as follows in rebuttal:

24         THE WITNESS:  I do.

25         THE CLERK:  Thank you.  Please be seated.

1     Can you state your full name for Court and spell your last

2  name again please?

3         **THE WITNESS:**  Bert Douglas Bernheim.  Last name is

4  B-E-R-N-H-E-I-M.

5         **THE CLERK:**  Thank you.

6                  <u>**DIRECT EXAMINATION**</u>

7  **BY MR. BORNSTEIN:**

8  **Q.**  Professor Bernheim, welcome back.

9  **A.**  Thank you.

10  **Q.**  Did you have the opportunity to see or read the testimony

11  of the economists that were retained by Google?

12  **A.**  I did.  I attended court on Tuesday, and I also read

13  Professor Tucker's examination from Wednesday morning.

14  **Q.**  Just at a very high level, can you summarize your reaction

15  to and takeaway from their testimony?

16  **A.**  Sure.  I am completely confident in the opinions that I

17  expressed when I testified previously.  The opinions that

18  Professors Gentzkow and Tucker expressed involved some very

19  serious and in some cases very basic errors, which I will be

20  pointing out some of.  I can't respond to everything, there

21  isn't time, but I'll be trying to highlight some of the

22  problems with their analyses.

23  **Q.**  All right.  And we have some slides that I understand you

24  put together to try to make this a little bit more efficient.

25     So I'd like to start by discussing some of the

1  justifications that Professor Gentzkow offered for the conduct

2  that Google has engaged in.

3      And he testified that some of the contracts that are at

4  issue in this case are a way for Google to build and maintain

5  the Android ecosystem to maximize the value for Android.  Do

6  you recall that generally?

7  **A.**   Generally, yes.

8  **Q.**   And can you just articulate, to situate us all, what

9  generally he was saying on that score?

10 **A.**   Professor Gentzkow was saying that there are what

11 economists sometimes call collective action problems that

12 groups of actors can face, and that Google is coordinating all

13 of the actors in the system.

14 **Q.**   And is he correct, that provides a justification for the

15 conduct we've been reviewing in this matter?

16 **A.**   As a matter of economic principles, absolutely not.

17 **Q.**   Can you explain why not?

18 **A.**   Because Google's objectives in taking the actions that

19 affect the way the ecosystem operates have the objective of

20 maximizing Google's value.  They do not have the purpose of

21 maximizing the total value of the platform to all parties.

22 **Q.**   Can you summarize the principle that you just described by

23 reference to the slide that you've put together here?

24 **A.**   Sure.  This is a simple illustration, and here I have two

25 scenarios.  The scenario on the left is one where Google allows

1   competition within its platform.  The scenario on the right is

2   one where Google limits competition within its platform.  And

3   what I'm illustrating here is the competition has two effects.

4       The first effect is that because competition is efficient,

5   it increases the size of the pie.  It's a bigger pie.  There's

6   more total value.

7       But the second effect is that because there's competition,

8   Google can't extract as much.  It gets a smaller share.  So if

9   you compare what's on the left side to what's on the right

10  side, what you're seeing is on the right side where Google

11  limits competition, there's less value being created, but

12  Google is taking a larger share.  And the result of that is if

13  Google, in this example, compared what's on the right to what's

14  on the left, they would say:  Well, 35 is bigger than 10.

15  We're better off restricting competition even though it reduces

16  the total value and, therefore, the benefits to others.

17  **Q.**   Let's talk about a different justification that

18  Professor Gentzkow offered for the conduct.  He said something

19  about preventing fragmentation of app stores.  Do you recall

20  that?

21  **A.**   Yes, I do.

22  **Q.**   And what generally did he say on that front?

23  **A.**   He was suggesting that what he called fragmentation of app

24  stores would reduce the value of the platform, and he gave the

25  example of Symbian, which is a now defunct operating system, as

 1   well as pointed to China.

 2   **Q.**   Do you agree with him that avoiding the fragmentation of

 3   app stores is a good reason for Google's conduct here?

 4   **A.**   No, I don't.  And let me say upfront that I think that

 5   this is a completely astonishing argument for

 6   Professor Gentzkow to be making because what he is saying in

 7   saying that Google's conduct is intended to limit fragmentation

 8   of app stores, think about what fragmentation of app stores

 9   means.  That means having multiple app stores.  Saying that the

10   purpose of conduct is to limit fragmentation is the same as

11   saying that its purpose is to limit competitive app stores.  So

12   it's very odd that he would make that concession and then turn

13   around and say, "No, that doesn't happen."

14   **Q.**   Well, you mentioned one of his justifications being

15   avoiding the problems associated with the Symbian operating

16   system.  Is that a fair comparison?

17   **A.**   Absolutely not.

18   **Q.**   Why not?

19   **A.**   Symbian's -- the nature of Symbian's ecosystem was very

20   different, and I have a couple of slides to show the

21   difference.

22        This is illustrating what was going on with Symbian.  At

23   the bottom, you see Nokia, Sony, Fujitsu.  Okay.  These are

24   companies that had Symbian phones, and each one had their own

25   version of Symbian, and these versions were incompatible with

**BERNHEIM - DIRECT / BORNSTEIN**

1    each other.

2        Because of that, each of the platform -- each of the

3    Symbian platforms had to have a different app store, and app

4    developers had to develop apps separately for each one of these

5    platforms.  That's why I've got these walls in between here on

6    the slide.  This corresponds to the language that

7    Professor Gentzkow used, the "walled gardens."

8        Now, you compare this to what goes on with Android.  With

9    Android on the bottom, you've only got one thing.  There's no

10   fragmentation of the operating system.  There's only one

11   version of Android, and all of the Play Stores have to be

12   compatible with it and all of the apps have to be compatible

13   with it.

14       So the compatibility problems that led to the demise of

15   Symbian are simply not applicable here.  And the same thing, by

16   the way, is true of China.  China has what are called Android

17   forks, the ASOPs that they use to create operating systems.

18   China is not very instructive for a lot of other reasons, and I

19   think Professor Gentzkow admitted that in his testimony, but I

20   think that's a primary reason.

21   **Q.**   All right.  Well, let's turn to the specific comments that

22   Professor Gentzkow had about Google's conduct.

23       Did you do a slide to summarize some of your high-level

24   critiques?

25   **A.**   I did.

1  **Q.**   All right.  So let's turn to the first bullet here that

2  "Google impairs competition without preventing it entirely."

3  What point were you making here to criticize

4  Professor Gentzkow's analysis?

5  **A.**   Well, what I'm doing here is pointing out four mistakes

6  that Professor Gentzkow makes when he analyzes Google's

7  conduct.

8      So the first of those is that he doesn't distinguish -- he

9  doesn't focus on whether Google impairs competition; he focuses

10  instead on whether Google prevents it entirely.

11      Now, just to be clear, at the start of his testimony he

12  said that he understood this distinction and he said he was

13  going to talk about impairment; but when push came to shove, he

14  talked about whether competition is prevented.

15  **Q.**   And what's the distinction you're talking between

16  impairment and prevention?

17  **A.**   "Impairment" means that something is there, it's being

18  used, it just isn't as good.  "Prevented" means you shut it

19  down.

20  **Q.**   And why is it a problem as an economic matter for

21  Professor Gentzkow to be focusing on prevention rather than

22  impairment as the test?

23  **A.**   Because anticompetitive conduct frequently takes the form

24  of impairing competitors rather than preventing them entirely.

25  **Q.**   Do you have any examples of when Professor Gentzkow kind

1   of made this point?

2   **A.**   Yes.   There are a number in this slide.

3       Yeah.   Okay.   So you can see repeatedly he's either being

4   asked about competition being prevented or giving a response

5   about it being prevented.   At the bottom, he's talking about

6   people being unable to use something.

7       This is not the issue.   The issue is whether it's

8   impaired, not whether it's prevented.

9   **Q.**   Can you give a substantive example of when

10  Professor Gentzkow used this analysis incorrectly?

11  **A.**   Sure.   Go to the next slide.

12      You've heard this number over and over again, the number

13  of apps that are downloaded off Google Play.   Right?   And this

14  was kind of a -- this one stood out from his slide deck because

15  over and over again he kept on putting up slides that had

16  shares -- right? -- percentages, pie charts, one pie chart

17  after another.   All of those were about shares.

18      He deviated from that here and only here.   Right here he

19  says it's 3.2 billion and that's big.   But the point is that

20  the share is still the relevant thing to be looking at.   I said

21  that the share of this is only about 17 percent, and he did not

22  deny it.

23  **Q.**   And what's the relevance of the share being about

24  17 percent?

25  **A.**   It's showing that this is not a great option for most

1    people.  And I talked about that in my opening testimony; that,

2    in fact, to a large extent, it's used in unusual situations

3    around the world, like in Iran when Google Play is not

4    available.

5    **Q.**   Let's look at another slide from Professor Gentzkow's

6    testimony earlier this week.

7        Can you explain whether this provides any additional

8    evidence of the way that he was approaching the problem of

9    prevention versus impairment?

10   **A.**   Well, I think the interesting thing about this analysis is

11   that Professor Gentzkow missed the fact that it actually proves

12   my point about these alternatives not being very good.  The

13   reason that he missed it is that when he analyzed Android, he

14   grouped Google Play use of Android together with

15   non-Google Play use of Android.

16   **Q.**   Well, let's back up just one second here to situate it.

17       Can you remind everybody what it was he was trying to show

18   or claim to be showing with this slide?

19   **A.**   Yes.  He claimed to be showing that since the drop-off on

20   Android was not as big as the drop-off on iOS, that meant

21   that people had good alternatives on Android.

22   **Q.**   And this was a drop-off when what happened?

23   **A.**   I'm sorry.  When Fortnite was removed from the Apple App

24   Store, when it was removed from Google Play.

25   **Q.**   All right.  So can you explain why you disagree that this

**BERNHEIM - DIRECT / BORNSTEIN**

1   slide shows what Professor Gentzkow claimed it showed?

2   **A.**   Right.  And the reason has to do with the fact that the

3   Android data blends together both Google Play and

4   non-Google Play use.

5       So let's go to the next slide, and I'll show you what's

6   going on.

7       Okay.  This is taking -- what I'm showing you now is usage

8   on Android -- on the left Google Play usage, on the left

9   non-Google Play usage -- before the Fortnite removal event.

10  Okay?

11      And there's a lot of non-Google Play usage relevant to

12  Google Play usage because it hadn't been available on

13  Google Play for very long.

14      Now let's see what happens after the Fortnite removal

15  event.  Look on the left-hand side.  You see that little sliver

16  of green.  That's showing you that just like with Apple, when

17  it was removed, usage of Fortnite on Google Play just cratered;

18  it almost completely disappeared.

19      Now, if off Google Play was a good substitute for

20  Google Play, what you should see is that as that drops, the

21  other one would go up commensurately.  People would go:  Okay.

22  I can't get it on Google Play, but I'll just download it

23  directly or I'll go to the Samsung Galaxy Store.

24      So that green bar on the right should have doubled, but

25  you can see it didn't change.  There's no indication here that

1  any of those people are substituting to off Google Play.

2  **Q.**   And so what do you take away from that analysis?

3  **A.**   Well, Professor Gentzkow is just wrong about these

4  alternatives being good substitute -- good alternatives for

5  people to use on Android.

6  **Q.**   Let me actually go back to Professor Gentzkow's slide for

7  one moment.

8     Can you read what he put on the top of the slide?

9  **A.**   "Was Epic blocked?"

10  **Q.**   And what does that tell you about what he was looking at?

11  **A.**   Well, he's looking at whether it falls to zero.  That's

12  not the point.

13  **Q.**   Let's move to your second critique of Professor Gentzkow's

14  analysis about targeting competition.  Can you explain what you

15  are focusing on here?

16  **A.**   Yes.  One of the themes in my opening testimony was that

17  Google has pursued a strategy of responding to competition as

18  it emerges.  As a general matter, it doesn't have this really

19  broad-based policy, but it responds when it sees competition,

20  and that's a lot of the conduct.  It's very targeted.

21  **Q.**   Can you give an example of that conduct that you described

22  earlier this week?

23  **A.**   Sure.  A great example is RSA 3.0.  These are the Revenue

24  Sharing Agreements with the OEMs.  And as I described before,

25  this was in the context of Google responding to the emergence

1   of the Chinese OEMs -- Xiaomi, Oppo, and Vivo, in particular --

2   who had their own app stores preinstalled on a large number of

3   their phones.

4        And this was the slide that I had showed before.  Just to

5   remind you, the Orange bars are showing you that for Xiaomi,

6   Oppo, and Vivo about 60 percent of their phones were covered

7   under this premier tier exclusion agreement, which basically

8   said you can't put anything but Google Play; you can't

9   preinstall anything but Google Play.  So it was targeted at the

10  ones who were emerging as competitors at that point in time.

11  **Q.**   Was there any targeting of Samsung as you reference in the

12  second bullet here?

13  **A.**   Well, there was, but it was different conduct.  So

14  responding to the RSA 3.0s, the premier tier preinstallation

15  exclusivity, Professor Gentzkow had said, "Well, you ought to

16  lump in Samsung with this," but there was different conduct

17  that was targeted at Samsung.

18       When you talk about a particular aspect of Google's

19  conduct, you have to evaluate it based on what it was

20  targeting.  That conduct wasn't targeting Samsung, so it makes

21  no sense to add Samsung in.

22  **Q.**   And let's talk about your last bullet here about Google

23  not needing to target existing Android phones.

24  **A.**   Right.  So here, you may remember Professor Gentzkow's pie

25  charts.  He had a couple of charts that seem to make the

1   premier tier slice really, really tiny.  Right?  It was

2   7 percent or something like that.  There it is.

3       He got to this by including all phones, not just new

4   activations but all phones.  The thing is, we're talking about

5   preinstallations here; right?  You can't preinstall on a phone

6   that's already been sold.  It's too late.

7       The only thing that a competing app store can do is to try

8   and get preinstalled on the new phones being sold.  The old

9   phones aren't to be available to them.  So to be including

10  those here is really fundamentally misleading.

11  **Q.**   All right.  So stepping back just a minute from the

12  different specific conduct that you were talking about here,

13  taking it all together, can you explain the implications of

14  these errors in Dr. Gentzkow's failure to look at targeting on

15  the validity of his analysis?

16  **A.**   Sure.  He isn't focused on seeing whether the conduct is

17  effective where it applies, and that's the important thing to

18  try and evaluate, and it leads him into other errors.

19      So, for example, a couple times during his presentation he

20  said, "Look, this is how the competitors are doing over time

21  and here's the point in time where the conduct started, and you

22  don't see any change."

23      And the answer to that is:  Of course, you don't see any

24  change.  The competitors are really insignificant; and then you

25  get to the point where somebody starts to do something where

1   they might become significant, Google starts its conduct and

2   then that doesn't happen.  You just stay at this very low

3   level.

4   **Q.**   All right.  Let's go now to your third point regarding

5   Dr. Gentzkow, which says "Google is dominant."  What's the

6   critique here?

7   **A.**   Well, this is an important point, which is that conduct

8   can be anticompetitive when it's undertaken by a dominant firm

9   even if it is not anticompetitive when undertaken by a firm

10  that is not dominant.

11      So let me -- can I -- go ahead.

12  **Q.**   I was going to ask you, why is that?

13  **A.**   Because it's the monopoly power that means that the firm

14  has sufficient control of the market to be able to do the

15  damage to a competitor.  Without monopoly power, you're just

16  not in a position to do that.

17  **Q.**   So are there examples from Professor Gentzkow's testimony

18  that you can provide where he made the mistake of looking at

19  whether or not Google or someone in its position was dominant?

20  **A.**   Yes.  This is where he was talking -- in particular, I

21  give the example of where he was talking about the Project Hug

22  agreements, and he was saying, "No, these are just plain

23  vanilla competition."

24      And you remember he put up slides where he had Macy's and

25  Nike, and he was saying, "You know, Macy's is in a position to

1  just bid against other stores to try and be the one who

2  distributes Nike's products."  What that's missing is two

3  things that are very important.

4      The first thing is, Macy's is not dominant in its market.

5  Okay?  Google is.  So we have to look at the conduct much

6  differently when you have a dominant firm.

7      The second is that the conduct that Google was engaging in

8  was not just plain vanilla bidding for the opportunity to be

9  able to distribute Nike -- distribute a developer's product.

10      What Google has done instead is to put into contracts

11  broad, preemptive provisions, these parity provisions, which

12  broadly prevent developers from doing certain things with

13  competing app stores, before the products are even present.

14      And what that means, to take the most extreme case, is if

15  the developer gets together with another app store, the two of

16  them invest together to create content, Google's contracts say,

17  the Project Hug contracts, say "You have to release that on

18  Google Play too."  Right?  And that discourages investments in

19  the creation of that content, competitive investments.

20  **Q.**  Well, let's turn to the fourth -- I went -- we're already

21  on the fourth point.

22      Can you explain your fourth point here about

23  Google Play -- Google sharing Google Play profits with

24  competitors and how Professor Gentzkow took that into account

25  or not?

**BERNHEIM - DIRECT / BORNSTEIN**

1  **A.**   Sure.  So what Professor Gentzkow said about this was that

2  sharing profits is common.  It's done all the time in the

3  economy.  And he's absolutely right, except it's not generally

4  the case that firms share their profits with their competitors.

5      That's the problem.  It's not that there was profit

6  sharing generally; it's that Google Play shared its profits

7  with Google Play's competitors.  That's what -- the RSA 3.0

8  premier tier with the OEMs that I mentioned, that's what it was

9  doing.

10  **Q.**   Well, why does that matter?

11  **A.**   It matters because of the reasons that I discussed in my

12  opening testimony; that if you are sharing profits with a

13  competitor, you are disincentivizing competition, and that's

14  what the antitrust laws are designed to prevent.

15  **Q.**   Let's talk about market definition for a little bit and

16  Professor Tucker.

17      Did Professor Tucker generally agree with the framework

18  that you had explained on Monday for assessing whether or not

19  the Apple App Store and the Google Play Store compete with one

20  another?

21  **A.**   Yes, generally she agreed with the framework for doing it.

22  **Q.**   Okay.  And what market definition did she come up with

23  using -- using her analysis?

24  **A.**   Well, this just restates her market definition, which is

25  the facilitation of digital content interactions.

1  **Q.**  And is it your view that Professor Tucker actually applied

2  the framework that you described and that she said she agreed

3  with?

4  **A.**  No, she didn't.  What Professor Tucker did for market

5  definition is well outside the boundaries of any reasonable

6  interpretation of what the standard framework for market

7  definition entails.

8  **Q.**  Let's talk a little bit about --

9       **THE COURT:**  Can I just jump in?

10       **MR. BORNSTEIN:**  Of course.

11       **THE COURT:**  Dr. Bernheim, when you say "well outside

12  the boundaries," what do you mean by that?

13       **THE WITNESS:**  Well, I can give you some examples.  So

14  to take an example, I believe you heard Professor Tucker say

15  that operating system transactions licensing is in the same

16  market as app distribution transactions.

17       Now, the buyers in an OS licensing transaction are OEMs,

18  and the need that they are satisfying is to have an operating

19  system on their phone.

20       When we're talking about app distribution, we're talking

21  about completely different types of buyers, satisfying

22  completely different types of needs.  You can't put

23  transactions that satisfy different needs for different buyers

24  in the same market.

25       Now, Professor Tucker's attempt to get around that is to

1    say that the licensing agreement between the OEM and Google is

2    not a transaction.  She said that in her testimony.

3         And I have no idea what to make of that.  I mean, it's --

4    she agrees that there's a product, that the product is changing

5    hands, the value is flowing in both directions, and that is the

6    definition of a transaction.  So there are definitely

7    transactions.

8         For antitrust economics, when you see a transaction, you

9    then say:  Okay, that transaction has to be in a market.  And

10   we can talk about how to define that market, but there's

11   definitely a market that it contains, and it will be a

12   different market for each one of these transactions.

13            **THE COURT:**  Okay.  Thank you.

14        Go ahead.

15            **MR. BORNSTEIN:**  Thank you, Your Honor.

16   **BY MR. BORNSTEIN:**

17   **Q.**   You provided an analysis that focused in on whether or not

18   the Apple App Store constrained the behavior of the Google Play

19   Store, and you had provided this slide in your direct

20   testimony.

21        Did either Professor Tucker or Professor Gentzkow address

22   or criticize this analysis?

23   **A.**   Well, at -- what they did was disagree with certain

24   aspects of the analysis, certain pieces that are over on the

25   right-hand side.

1  Q.   So which specific pieces of the analysis are you referring

2  to?

3  A.   Well, they talked about things associated -- or Professor

4  Tucker talked about considerations associated with switching

5  costs, which are the first several things over on the

6  right-hand side, and this is switching between iPhones and

7  Android smartphones.

8       More interesting is what she did not talk about.

9  Q.   That was my next question.

10      What did they -- Professor Tucker fail to address?

11 A.   Well, remember that what I'm considering here is not

12 substitution between iPhones and Android phones.  What I'm

13 interested in is substitution between the Apple App Store and

14 the Google Play Store, and that is one step removed from the

15 phones.  Okay?

16      So that step, when you take that one step away, several

17 additional considerations come into play, and those are

18 considerations that she did not address.

19      The first is the magnitude of the price increase that you

20 would consider to evaluate substitution.  And I told you in my

21 opening testimony that that's about 50 cents for the average

22 smartphone user over the life of their phone.  Okay?  There's

23 been no dispute on that point.  So far as I can tell,

24 Professor Tucker did not address it.  That's what's on the

25 left-hand side.

1        Now, when you think about the right-hand side, look at the

2   things on the bottom there.  The second one from the bottom is

3   "Inattentiveness to app distribution costs when people buy

4   their phones."

5        I testified, and it is true, this is a well-established

6   principle, there's a large literature on it, that when people

7   buy durable goods, they don't pay that much attention to the

8   costs they'll incur during ownership.  They pay some attention,

9   but generally they significantly understate it and that dampens

10  the effects.

11       Similarly, the fact that people are purchasing apps all

12  the time but they only switch their phones once every 2.7 years

13  means that, you know, if Google raises its prices, there really

14  isn't much of a response for quite a while.

15  **Q.**  So what's the significance of the fact that -- for your

16  analysis of Professor Tucker's not having addressed these

17  different pieces of what's on each side of the scale that

18  you've put here?

19  **A.**  Well, given the ones she did not address, she could be

20  right about the others.  Even if she were right about the rates

21  of switching and things like that, and I don't agree with her,

22  but even if she were right about those points, my conclusion

23  would still be the same because of these other considerations

24  that I've just discussed.

25       You've got, you know, 50-odd cents, more for intense users

 1   but not that much more, weighed against these other things.  It

 2   just is not going to be a significant factor.

 3   **Q.**   And it won't be a significant factor in what, Professor?

 4   **A.**   In people's decisions to switch phones, to switch to a

 5   different platform in response to an increase in the price of

 6   app distribution services on Android, a 5 percent increase.

 7   **Q.**   Let's talk for a minute about developer substitution

 8   between iOS and Android.  Can you remind us briefly what it

 9   was you said on the subject?

10   **A.**   Well, I pointed out that developer substitution on the two

11   platforms is not a functional substitute; that they are --

12   developers are developing their apps for two largely different

13   populations, and that means that the profitability of investing

14   for one of those platforms is not very much affected by

15   investing in the other one.  In fact, it may even go up.  And

16   that means that this is not a functional substitute.

17   **Q.**   And how did Professor Tucker respond to that?

18   **A.**   She didn't agree -- she didn't disagree with that logic.

19   What she did is say, well, she thinks that maybe there are some

20   other considerations here that could create some sort of a

21   substitution in response.

22   **Q.**   And do you agree with her analysis on that front?

23   **A.**   Well, I think that the issue is that she hasn't

24   demonstrated that it matters in practice; and, in fact, there's

25   evidence that she herself presented that points to it not

 1    mattering very much.

 2    **Q.**   What evidence are you referring to?

 3    **A.**   Let's go to -- right -- this slide.

 4        Now I want you to look at the last bar all the way over on

 5    the right.  Okay?

 6        In 2018, Google reduced its commission rate for

 7    subscriptions from 30 percent to 15 percent.  Okay?  That's an

 8    enormous reduction.  It's not one of these 5 percent SSNIPs.

 9    It's an enormous reduction.

10        Apple did not respond until three years later according to

11    her analysis.  So you had a three-year period where there was

12    this enormous difference in commission rates for developers who

13    had subscription products.

14        Now, if developers were responsive -- as responsive as she

15    claims, there should have been a massive rush of developers

16    from the Apple platform, from iOS, to the Android platform

17    during that period.

18        Professor Tucker was asked about that, and she was unable

19    to name a single developer that it switched, and I think that

20    there was also some other testimony that was corroborative of

21    that.

22    **Q.**   Professor Bernheim, I have just one last subject I'd like

23    to address with you, which is there's been some testimony

24    during trial and from the economists from Google that other

25    stores also charge a 30 percent commission like Google Play.

1   Do you remember that testimony?

2   **A.**   I do, yes.

3   **Q.**   Does that have any bearing on your opinion here?

4   **A.**   Well, I don't think it's -- I don't think it's accurate.

5   I don't think it captures the facts accurately.

6   **Q.**   Can you explain why that is?

7   **A.**   Sure.  Skipping ahead to the right slide.  Go back one.

8       Okay.  This is Professor Tucker's slide, and here she was

9   claiming that generally app stores have about the same

10  commission rates as Google Play, and there are several things

11  that are wrong with this slide.

12      The first thing is that it includes app stores on other

13  platforms.  And I said in my opening testimony that the

14  economics of other platforms are not the same.  That, you know,

15  on the game console platforms, when they charge 30 percent,

16  their margins are much, much lower.

17      So you can't -- if you make these -- this is an

18  apples-to-oranges comparison.  You just can't compare that

19  across platforms and have it be meaningful.  You have to take

20  into -- you would have to take into account all the

21  differences, including all the differences in costs, and

22  Professor Tucker hasn't done that.

23      So let's get rid of the ones that are on different

24  platforms.

25      Okay.  Now we're only left with a couple of things.

1    The next thing to realize is that what Professor Tucker

2 has done is to basically use list prices, list commissions.

3 There's evidence in the record about the actual effective

4 commissions that these stores were being charged -- charging

5 their developers.  And I think we have that on the next slide.

6    And in addition to the two that she had, Amazon and

7 Samsung, I've also added One Store and Aptoide.  And these are

8 the numbers that I believe are in the record concerning the

9 effective commissions that were actually charged, and you can

10 see that the effective commissions for the other app stores

11 were in many cases below or significantly below Google Play's.

12 **Q.**  And besides these issues relating to the price and

13 commissions, did you also consider the profits that Google Play

14 had earned?

15 **A.**  I did, absolutely.  And one of the interesting omissions

16 from the testimonies of Professors Gentzkow and Tucker is that

17 neither of them mention profits, neither of them disputed my

18 conclusions about Google's profits.  And high and sustained

19 profitability is the hallmark of monopoly power.

20 **Q.**  How would you expect Google's profits to have changed if

21 Google were actually facing competition for Google Play?

22 **A.**  Google was facing competition.  Then as its margins were

23 rising due to developers making better products that consumers

24 were deriving more value from so the same commission gives them

25 more revenue, competition should have been competing that away.

 1   This is coming from the developers' efforts.  So competition

 2   would have competed that away.  It did not.

 3   **Q.**   Thank you, Professor.

 4         **MR. BORNSTEIN:**  Your Honor, I pass the witness.

 5         **THE COURT:**  Okay.  Cross?

 6         **MR. RAPHAEL:**  I'm just going to hand up a binder,

 7   Your Honor.

 8         **THE COURT:**  Go ahead.

 9         **MR. RAPHAEL:**  Thank you, Your Honor.

10                         <u>**CROSS-EXAMINATION**</u>

11   **BY MR. RAPHAEL:**

12   **Q.**   Nice to see you again, Professor Bernheim.

13   **A.**   Good to see you.

14   **Q.**   Now, you testified about what Professor Gentzkow said

15   about when conduct is anticompetitive; right?

16   **A.**   Yes.

17   **Q.**   And I think you mentioned impairment.  Do I have that

18   right?

19   **A.**   Yes.

20   **Q.**   Would you agree with me that the standard for whether

21   conduct is anticompetitive for an economist is its effect on

22   consumers?

23   **A.**   Through competition, yes.

24   **Q.**   And I think you testified that Professor Gentzkow in your

25   view didn't consider whether Google was dominant.  Do you

1   recall that?

2   **A.**   That's correct.

3   **Q.**   And the reason you said that is because conduct can't be

4   anticompetitive if the firm engaging in it doesn't have market

5   power; right?

6   **A.**   That's correct.

7   **Q.**   And I think you showed a pie chart of his that I think you

8   said was problematic because it wasn't limited to new phones.

9   Do I have that right?

10  **A.**   That's not -- that's not a market share thing, but okay.

11  I talked about that pie chart, yes.

12  **Q.**   Right.   But you, yourself, didn't show the jury an

13  estimate of the percentage of phones in the entire market that

14  were new that were covered by RSA 3.0, did you?

15  **A.**   You're mixing two points together, but that's right, I

16  didn't.

17  **Q.**   And Professor Gentzkow did show a chart of the percentage

18  of new phones sold after RSA 3.0 that were covered by the

19  premier tier, didn't he?

20  **A.**   Sure, he did.

21  **Q.**   And you don't disagree with the figures in those charts as

22  they're calculated; right?

23  **A.**   No.   I just think it misses the point, and I've explained

24  why.

25  **Q.**   Now, I think you talked about Professor Tucker's chart

1  with the time period between when Google changed its service

2  fee and Apple changed its service fee; right?

3  **A.**   Yes.

4  **Q.**   Could we have Bernheim Slide 11, please?

5       So I think you made a point of saying that it was

6  three years from when Google changed its fee to when Apple did;

7  right?

8  **A.**   That's what Professor Tucker's -- what Professor Tucker's

9  slide is showing.

10  **Q.**   But you, yourself, have described examples of price

11  competition where the reaction to one firm's price cut took

12  about three years, haven't you?

13  **A.**   Which one do you have in mind?

14  **Q.**   Well, sir, in your report, you describe that Microsoft cut

15  service fees on its PC game store in response to Epic launching

16  the Epic Game Store, didn't you?

17  **A.**   It did, yes.

18  **Q.**   And Epic launched the Epic Game Store in December of 2018;

19  correct?

20  **A.**   I think that's right.

21  **Q.**   And Microsoft announced it was changing its fee in April

22  of 2021; correct?

23  **A.**   That is probably right.  I don't have it in memory.

24  **Q.**   Right.  And they didn't actually change the fee until

25  August of 2021; correct?

1    **A.**    I don't -- I --

2    **Q.**    That's nearly three years later; correct?

3    **A.**    If all of those dates are right, then, yes that would be

4    three years later.

5    **Q.**    You can take that down.

6         So you showed some data about what happened when the

7    Fortnite app was removed from the Play Store.  Do you remember

8    that?

9    **A.**    Yes.

10   **Q.**    And if we could have Bernheim Slide 14, please.

11        And you showed this chart?

12   **A.**    Yes.

13   **Q.**    And you said that Dr. Gentzkow did not analyze this data

14   correctly; right?

15   **A.**    Correct.

16   **Q.**    And I think you put up a chart which on the left, you

17   didn't mention this, but it said that your data was limited to

18   eight weeks before and eight weeks after the Fortnite app was

19   removed from the Play Store; right?

20   **A.**    That's right.

21   **Q.**    Okay.  So could we have the next slide, please?

22        Oh, sorry.  Could we have our own Demonstrative Slide 4?

23   I apologize.

24        There we go.

25        So in the gray bars, that's roughly the time periods that

**BERNHEIM - CROSS / RAPHAEL**

1  you looked at; right?

2  **A.**   That's correct, yeah.

3  **Q.**   Could we have the next slide?

4  So you left out the time period after the Fortnite app was

5  removed from the Play Store where it saw a big jump in revenue;

6  right?

7  **A.**   As well as the lower ones after that.  I was using

8  contiguous time periods to make a close comparison, which is

9  appropriate.

10  **Q.**   And I think you talked about where consumers went when the

11  Fortnite app was removed from the Play Store; right?

12  **A.**   Yes.

13  **Q.**   Now, were you in the courtroom this morning when

14  Mr. Gelber's testimony was played?

15  **A.**   I was not.

16  **Q.**   Do you know who Mr. Gelber is?

17  **A.**   I do not.

18  **Q.**   Okay.  Well, could we have Exhibit 10708 please, which is

19  in evidence?

20  Now, I think you mentioned a great deal about market

21  definition being based on substitution; is that right,

22  Professor?

23  **A.**   Correct.

24  **Q.**   And the idea is that when you're defining a market, you

25  look at whether consumers are switching or transferring from

1  one product to another; right?

2  A.   Yes.

3  Q.   So, Phil, could we have the paragraph blown up that says

4  "Prior to"?

5      So do you see here that Epic's CFO, Mr. Gelber, is saying

6  that when the Fortnite app was removed from the Apple App Store

7  and the Google Play Store, that 20 to 40 percent of the revenue

8  transferred to other platforms?  Do you see that?

9  A.   I see it.

10  Q.   And you have no reason to doubt that, do you?

11  A.   I've done my own analysis, and I'm not seeing large

12  effects.

13      In any case, even if it was 20 to 40 percent, that means

14  that a clear majority of it did not transfer, so that --

15  Q.   Well, you've never seen this document before, sir; right?

16  A.   I'm just interpreting the document that you've showed me.

17      What it proves, if it's correct, is that between 60 and

18  80 percent do not switch, which means that the alternatives are

19  not very good alternatives.

20  Q.   Sir, you didn't do a SSNIP test with the data that's on

21  this document, did you?

22  A.   I did not, but I can tell you as I sit here that this is

23  not high substitution.  This is in response to basically an

24  infinite price change.  Unavailability means something isn't

25  available; and if 60 to 80 percent doesn't switch, this is not

1   much of a substitute.

2   **Q.**   Now, you talked a bit about RSA 3.0 and how it was

3   targeted at Chinese OEMs; right?

4   **A.**   Yes.

5   **Q.**   And the reason you've emphasized that is that those OEMs

6   have their own app stores; right?

7   **A.**   Correct.

8   **Q.**   And those Chinese OEMs' app stores have gained scale in

9   China; right?

10  **A.**   They have.

11  **Q.**   And your opinion is that the reason Google targeted the

12  Chinese OEMs with RSA 3.0, is that they could expand from their

13  scale in China to challenge Google in the rest of the world;

14  correct?

15  **A.**   Not quite.  What I'm saying is that they were preinstalled

16  on those phones outside of China.  That was the threat.

17  **Q.**   So it's not your opinion that Chinese manufacturers with

18  their own app stores have the potential to expand from China to

19  the rest of the world and challenge Google Play globally?

20  **A.**   No, that is my opinion.  What I'm saying is that the

21  manifestation of that is the fact that stores were actually

22  being preinstalled on their phones outside of China.  We had

23  those statistics up.

24  **Q.**   Could I have Bernheim Slide 27, please?

25       So you showed this slide on direct examination?

**BERNHEIM - CROSS / RAPHAEL**

1   **A.**   I did, yes.

2   **Q.**   And you testified that the 26 percent is Google's average

3   actual commission rate; right?

4   **A.**   Net commission rate, yes.

5   **Q.**   But the figures for One Store and Aptoide, they're not

6   averages, are they?

7   **A.**   They're not averages.  This is the best information on the

8   effective range.

9   **Q.**   So you compared an average to a range; correct, sir?

10  **A.**   Well, when the average is above the top end of the range,

11  you do know that it's higher.

12  **Q.**   I understand, sir.  I'm asking whether you compared an

13  average to a range.

14  **A.**   Quite appropriately, yes.

15  **Q.**   And the range of Google's service fees is from as low as

16  4 percent to 30 percent, isn't it?

17  **A.**   Yes, it is, but the average is higher than the top end of

18  the other ranges.  So you know that the other averages are --

19  **Q.**   And the low end is below the low end of their ranges,

20  isn't it?

21  **A.**   Sure.

22  **Q.**   Now, you know the phrase "You get what you pay for";

23  right?

24  **A.**   Yes.

25  **Q.**   And you testified on Monday that you haven't compared the

1  quality of any of these other app stores to Google Play; right?

2  **A.**   No, because these other app stores are operating within

3  the context of conduct that impairs them.  So, of course, their

4  quality will be lower.

5  **Q.**   Now, Dr. Bernheim, I think you testified about

6  Dr. Tucker's transactions market.  Do you remember that?

7  **A.**   I did, yes.

8  **Q.**   And she testified that in that market, the products bring

9  together app users and app developers for transactions; right?

10  **A.**   That is what she said.

11  **Q.**   And you, yourself, have defined a market in which the

12  products facilitate transactions; right?

13  **A.**   Yes.

14  **Q.**   Right.  And you defined a market for products like credit

15  cards that bring together consumers and merchants for

16  completing the transactions between them?  You've defined that

17  market, haven't you, sir?

18  **A.**   I have.  There's a lot of details to that but, yes.

19  **Q.**   Right.  And that relevant market included transactions

20  that are not substitutes; correct?

21  **A.**   No.  That relevant market included different payment

22  mechanisms that certainly were substitutes.  Visa is a

23  substitute for AmEx.  MasterCard is a substitute for AmEx.

24  Debit cards, which I argued originally were in the market, are

25  substitutes.  So I was very much focused on substitutes.

1  Q.   Well, sir, you can buy different things with a credit card

2  like an American Express card?

3           THE COURT:  We're getting too far afield.  This is

4  cross-examination.  Okay?

5       So do you have any other questions that are on cross?

6  Let's not get into any other markets right now.

7           MR. RAPHAEL:  Well, Your Honor, I'd like to show

8  that --

9           THE COURT:  Let's get the next question, please.

10  BY MR. RAPHAEL:

11  Q.   Dr. Bernheim, you would agree that one thing a firm can do

12  to try to compete is to enter into promotional partnerships;

13  right?

14  A.   Yes.

15  Q.   And I think your opinion was that Samsung is not really

16  trying to compete with its app store; right?

17  A.   Yes.

18  Q.   Did you observe Mr. Weissinger's testimony yesterday from

19  Epic?

20  A.   No, I did not.

21  Q.   So you didn't see him testify that Samsung is an

22  exceptional promotional partner for Epic; right?

23  A.   I didn't see the testimony.

24  Q.   Last topic.  The purpose of market definition in an

25  antitrust analysis is to illuminate the nature of competition;

1   right?

2   **A.**   I agree.

3   **Q.**   And can we also agree that the definition of the relevant

4   market must correspond to the commercial realities of the

5   industry?

6   **A.**   Yes.

7   **Q.**   Now, earlier in the week I asked you about the Apple

8   employees and we had a discussion about the real world.  Do you

9   remember that?

10  **A.**   I do, yeah.

11  **Q.**   I'm not going to repeat the questions about the real

12  world, but were you in the courtroom earlier today when

13  Mr. Oliver, an Apple employee, testified?

14  **A.**   Not today, no.

15  **Q.**   Were you able to observe any of his testimony through a

16  transcript?

17  **A.**   I did not, no.

18  **Q.**   So you didn't see him testify that the Apple App Store

19  competed with the Google Play Store for the more than decade

20  that he's worked at Apple, did you?

21  **A.**   I didn't hear the testimony.  I think that --

22  **Q.**   You didn't hear Mr. Oliver testify that competition

23  continues to this day between the Google Play Store and the

24  Apple App Store, did you?

25  **A.**   The issue is not that there's competition.  It's the

1    degree.  It's the closeness.

2    **Q.**  And you just testified that the purpose of market

3    definition in an antitrust analysis is to illuminate the nature

4    of competition; correct?

5    **A.**  Yes.  Competition --

6              **MR. RAPHAEL:**  No further questions, Your Honor.

7              **THE COURT:**  Hold on.  Finish your answer, please.

8              **THE WITNESS:**  It's to illuminate the nature of

9    competition, but it isn't simply any competition.  It isn't

10   somebody says the word "competing" against another firm,

11   therefore, it's in the same market.

12        Look, any firm will continue to increase its price up to

13   the point where people start doing something else with their

14   money.  Right?  Otherwise they just keep on increasing their

15   price.

16        And so even a monopolist will get to the point where they

17   say "We're competing with someone else."  Because on the

18   margin, people are then substituting to something else at this

19   very high price.

20        Therefore, putting weight on statements like "I compete,"

21   "our firm competes with someone else, another firm," is

22   actually committing a very well-known fallacy in antitrust.

23   You probably know it.  It's the cellophane fallacy.  The

24   cellophane fallacy says exactly this:  That even a monopolist

25   will raise the prices to a point where people will start

1    switching to something else.  And then its business people will

2    say, "Yeah, we're competing," but you're competing at a really

3    high price, a price way above the competitive level, and the

4    antitrust laws are supposed to stop that.

5    **Q.**   Professor Bernheim, there was nothing about quality in the

6    answer you just gave, was there?

7    **A.**   No.  I'd like -- I'm happy to address quality.

8         **MR. RAPHAEL:**  No further questions.

9         **THE COURT:**  Okay.  Very, very briefly, please.

10        **MR. BORNSTEIN:**  Yes, Your Honor.  All I would like to

11   do is to ask one question to correct a factual issue that arose

12   in the questioning.

13                    <u>**REDIRECT EXAMINATION**</u>

14   BY MR. BORNSTEIN:

15   **Q.**   You got some questions about the time difference between

16   when the Epic Games store entered and when the Microsoft store

17   lowered its price to 12 percent.  Do you recall those

18   questions?

19   **A.**   I do, yes.

20   **Q.**   Okay.  Two quick things.  Number one, when the Epic Game

21   Store entered in December 2018, do you have any idea how

22   significant it was as a competitor in terms of the share that

23   it had at the beginning?

24   **A.**   Well, initially it was trivial, yeah.

25   **Q.**   And does that have any relevance to the likely price

1   reaction from others?

2   **A.**   Sure.  You know, a large, established firm may not respond

3   to a low price by a new entrant that it hasn't gained traction

4   until that firm does gain traction.

5        You know, contrast that with a case where you've got two

6   large, established firms, they can't ignore each other.

7   **Q.**   All right.  Second thing and last thing.  Can we please

8   call up -- this is testimony from the first day of trial from

9   Mr. Steve Allison, who's the head of the Epic Game Store.

10       Have you seen any of the Mr. Allison's testimony or read

11  any of it?

12  **A.**   Yes.

13  **Q.**   All right.  Can we call up, please, transcript page 237,

14  lines 9 through 13?

15       And Mr. Allison was asked about (as read):

16       **"QUESTION:**  Were there any other stores, the context here,

17       that lowered their price?"

18       And he testified (as read):

19            "The Microsoft or Windows store in about March of

20       2019 changed their rev share from a 70/30 standard to

21       85/15 and then again revised the rev share around April of

22       2021 to match the Epic Game Store's 88/12."

23       So what is your assessment of the fact that only

24  three months went by between the entry of the Epic Game Store

25  in December of 2018 and the competitive response to half the

1  rev share down to 15 percent just three months later by

2  Microsoft?

3  **A.**   Well, that's -- that's a very interesting observation.

4  This is indicating that there was a response very quickly and a

5  response to a very small entrant, which does indicate, you

6  know, a certain urgency about responding to price

7  differentials, which is what you expect to see when firms

8  compete.   They don't take their time and I think Professor

9  Tucker's phrase was fret about it.   They don't have the luxury

10  of fretting about it.   They have to do something.   They have

11  to, you know, match or change their price to stay competitive.

12  **Q.**   Thank you, Professor.

13           **THE COURT:**  You may step down.   Thank you.

14           **THE WITNESS:**  Thank you.

15                     (Witness excused.)

16           **THE COURT:**  All right.   Plaintiff rests?

17       **MR. BORNSTEIN:**  Yes, Your Honor, Epic rests.

18           **THE COURT:**  Defendant rests?

19       **MR. POMERANTZ:**  Yes, Your Honor.

20           **THE COURT:**  Okay.   That concludes the presentation of

21  evidence in the case.   We are going to adjourn for the day.   I

22  will see you again on December 11th as we've discussed.   You

23  will get the final jury instructions and then closing argument

24  and start your deliberations.

25       And remember that will be 9:00 to 5:00 each day starting

1  December 11th until you reach a verdict.  So plan on that.  And

2  lunch will be -- continue to be provided.  Typically we only

3  provide lunch during this phase.  You've had it the whole time,

4  and it will continue in the deliberations phase.

5      Now, make sure you leave all your papers, your notes,

6  anything about the case in the jury room.  Keep your badge with

7  you.

8      Don't do anything in the upcoming week that is in any way

9  related to this case.  Don't think.  Don't ponder.  Don't fret.

10  Don't do any research.  Don't talk to anyone.  Don't do any

11  sleuthing, any Internet investigations, nothing whatsoever.

12      And we will see you on December 11th.

13          THE CLERK:  All rise.

14      (Proceedings were heard out of the presence of the jury:)

15          THE COURT:  All right.  We will come back at 2:15.

16  We'll spend 15 minutes on a Rule 50 motion and then we'll do

17  jury instructions.

18              (Recess taken at 1:51 p.m.)

19            (Proceedings resumed at 2:21 p.m.)

20      (Proceedings were heard out of the presence of the jury:)

21          THE COURT:  Okay.  Mr. Pomerantz.

22          MR. OLASA:  Mr. Pomerantz has elected me, Your Honor.

23          THE COURT:  All right.  Go ahead.

24          MR. OLASA:  Hi, Your Honor.  Kuru Olasa for Google.

25  Google moves under Rule 50(a) for judgment as a matter of

1    law.  Earlier today we filed the two-page document Your Honor

2    allowed us to file.  We understand we should use a different

3    filing event, so we'll refile it, but we have copies in the

4    interim for Your Honor and for counsel.

5            **THE COURT:**  Thank you.

6        Okay.  Go ahead.

7            **MR. OLASA:**  All right, Your Honor.  We're going to

8    begin with market definition.  Our first argument is that Epic

9    has not offered legally sufficient evidence to limit the

10   product markets to services for just Android devices, and this

11   applies to both its relevant markets.

12       Google submits that Epic is alleging a single-brand

13   market.  I understand Your Honor has expressed disagreement

14   with that.

15       In Google's view, Epic has restricted the markets to

16   services for one brand, Android-branded devices; and that Epic

17   has argued that once consumers choose an Android smartphone,

18   they cannot turn to the Apple App Store.  And that's Trial

19   Transcript 175, Epic's opening, and Professor Bernheim's

20   testimony about the choice between devices.

21       And we direct the Court to the law on this issue in

22   *Epic Games v. Apple*, 67 F.4th 946, and *Coronavirus Reporter v.*

23   *Apple*, 85 F.4th 948.

24           **THE COURT:**  You know, *Coronavirus* is completely

25   inapposite.  It didn't even have an adequately alleged --

1   *Coronavirus* said the plaintiffs were so at sea they never even

2   alleged a relevant market.  So *Coronavirus* does nothing for

3   you.

4        In *Epic v. Apple*, Epic expressly represented to the

5   jury -- to the judge, it was not -- it was a bench trial, not a

6   jury trial -- represented to the judge that their theory of the

7   case was that there was a for market and an after market,

8   neither of which has happened here.

9             **MR. OLASA:**  Your Honor, I understand.  I think that

10  whether or not Epic has expressly alleged that it's pursuing a

11  for-market or after-market theory, *Epic v. Apple* does provide

12  the legal framework --

13            **THE COURT:**  That is not true.  You conform jury

14  instructions to the proof on a case-by-case, market-by-market

15  basis.  The market in the *Apple* case is completely different

16  from the market in this case.

17       The evidence in this case does not at all indicate an

18  after market/for market structure based on *Kodak* or *Epic v.*

19  *Apple* or anything else.

20       Nobody in this case, as I said yesterday, has said a word

21  about it, including your own experts.  Neither of your

22  experts -- I should say none of your experts, because you had

23  more than two, said a peep about a proposed relevant market

24  being based on a for-market and after-market theory.

25       So what you're asking me to do -- this is moving into the

 1  jury instructions now, so I don't have to repeat it later --

 2  you're asking me to send a jury instruction on a concept to the

 3  jury that they have not heard a word about until they're alone

 4  in the jury room trying to figure out what to do.  That is the

 5  quintessential definition of an inappropriate jury instruction

 6  that is not based on the evidence in the case, and that's also

 7  why this argument isn't good.

 8          MR. OLASA:  Respectfully, Your Honor, if --

 9          THE COURT:  Just go to your next point.  Okay?  Look,

10  all you're doing here -- look, you understand this is a 50(a)

11  motion.  Okay?

12          MR. OLASA:  I understand.

13          THE COURT:  I'm denying it subject to renewal at Rule

14  50(b), so just roll through it.

15          MR. OLASA:  Understood, Your Honor.

16      So I'll move on to our next argument.  This is on the

17  Android in-app billing market; and with respect to Epic's

18  in-app -- alleged in-app Android billing market, Epic has

19  failed to present legally sufficient evidence that out-of-app

20  payment systems are not reasonable substitutes for in-app

21  payment systems.

22      The law on this, of course, is numerous Ninth Circuit

23  cases, including *Optronic Techs*, 20 F.4th 466 at 482.  The

24  relevant market is defined as commodities reasonably

25  interchangeable by consumers for the same purpose.

 1      Epic's expert, Professor Tadelis, did not dispute that

 2   developers are free to monetize their apps in several ways

 3   beyond in-app billing, such as through a consumption-only model

 4   or through advertising and other payment mechanisms.

 5      Epic's CEO, Tim Sweeney, testified that Epic itself had --

 6      **THE COURT:**  You're going to have the chance.  Just

 7   make the point.  Preserve it.  You're going to have -- as long

 8   as your point is there, you're good.  You can do the details

 9   there later.  All right?

10      So next point.

11      **MR. OLASA:**  The next point is geographic markets,

12   Your Honor.  With respect to the geographic market, Epic failed

13   to present legally sufficient evidence for why the relevant

14   market is worldwide, excluding China.

15      With respect to the app distribution market, the evidence

16   does not support a conclusion that consumers can turn to

17   alternatives all across the world, excluding China.

18      And with respect to in-app billing, Epic's expert conceded

19   that payment processers vary by country, and that many payment

20   processers are only in particular limited countries.

21      I can elaborate further on the evidence, Your Honor.

22      **THE COURT:**  No, no.  You're just putting your

23   placeholder.

24      Next one.

25      **MR. OLASA:**  All right.  The next argument, Your Honor,

1  is on market and monopoly power.  Our first argument, which I

2  think is probably already rejected, is that Epic's market

3  definition was inaccurate due to the *Kodak* issue and,

4  therefore, the market share analysis it provided was

5  inaccurate.

6      Separately, we would argue that even aside from the

7  after-market *Newcal* and *Kodak* issue, Epic has not defined the

8  markets accurately; and, therefore, its attempts to define

9  market or monopoly power here are legally insufficient.  And

10  the citation there is to *Ohio v. American Express*, 138 Supreme

11  Court 2274.

12      Epic has not shown legally sufficient indirect or direct

13  evidence of market power or monopoly power, and Epic failed to

14  show any reduction in output or quality.

15          **THE COURT:**  Okay.  Next.

16          **MR. OLASA:**  The per se tying claim, Your Honor, I know

17  we're going to get to the jury instruction later and we saw the

18  instructions the Court --

19          **THE COURT:**  There is no per se.

20          **MR. OLASA:**  Understood.

21          **THE COURT:**  All rule of reason.

22          **MR. OLASA:**  Okay.  For all claims including --

23          **THE COURT:**  Yes.  We'll talk about Activision in a

24  minute, ABK.  But, yes, it's rule of reason for everything.

25          **MR. OLASA:**  On anticompetitive conduct and effects,

 1    each of Epic's rule-of-reason claims fails because a reasonable

 2    jury would not have a legally sufficient evidentiary basis to

 3    conclude that that conduct is anticompetitive.

 4         I'll begin with the Games Velocity Program agreements.

 5    The antitrust laws do not require a firm not to compete or to

 6    provide discounts or incentives to its customers.

 7         Epic has not offered legally sufficient evidence that this

 8    program involved the below-cost pricing, decreased output,

 9    increased prices, or decreased quality in any relevant market.

10    And to the contrary, above-cost competitive pricing is pro

11    competitive, as a matter of law, and I'd cite *Pacific Bell v.*

12    *Linkline* and *Weyerhaeuser*.

13         Moving to the MADA, epic has not offered legally

14    sufficient evidence that the MADA forecloses competition.  In

15    addition, Epic has not identified a substantially less

16    restrictive alternative to the MADA that Google could have used

17    to provide value to consumers and OEMs.

18         Next, on the RSA 3.0 premier tier, Google has not offered

19    legally -- sorry -- Epic has not offered legally sufficient

20    evidence that the RSA 3.0 premier tier forecloses competition.

21    A market is not foreclosed if suppliers can reach the ultimate

22    consumer through existing or alternative distribution channels.

23    That's *Omega Environmental*, 127 F.3d 1157.

24         The sheriff devices, either all devices or new devices

25    covered by RSA 3.0, does not demonstrate foreclosure.

1      Professor Bernheim also admitted that RSA 3.0 did not

2  apply to Samsung, and there is also the option for sideloading

3  an app store or an app on a device subject to the premier tier.

4      Finally, on the premier tier, the device-by-device nature

5  of RSA 3.0 also negates foreclosure.  A rival can compete with

6  Google on a device-by-device basis by making a better offer.

7  And, again, the citation is to *Omega Environmental*.

8          **THE COURT:**  Okay.  Next.

9          **MR. OLASA:**  Turning to the sideloading warnings,

10  Your Honor, sideloading warnings are justified by the security

11  risk to users.  The evidence from Professor Mickens, also

12  Epic's expert, also acknowledged that malware is a real risk.

13  And Professor Mickens did not suggest that the sideloading

14  warnings should be removed but only compressed.

15      And on his less restrictive alternatives, Epic must show a

16  substantially less restrictive alternative.  This requires

17  showing an alternative that is virtually as effective in

18  serving the pro competitive purposes without significantly

19  increased cost.  That's *Epic Games*, 67 F.4th 990.

20      Epic's notarization proposal is not a less restrictive

21  alternative.  The Ninth Circuit rejected the same proposal in

22  *Epic Games v. Apple*.

23      Google has provided a pro competitive justification for

24  the warnings to protect users from security risks, and Epic

25  failed to show that the risks claimed by Google are nonexistent

 1  or pretextual.

 2      Professor Mickens' alternative would also impose a duty to

 3  deal on Google and require Google to provide app review

 4  services to apps outside -- and app stores outside the Google

 5  Play Store; and, therefore, we think under *Trinko* that's not a

 6  duty that can be imposed on Google.  And *Epic v. Apple* is also

 7  a citation I would direct Your Honor to.

 8      Epic also did not show an element of anticompetitive

 9  conduct from the sideloading warnings.  Again,

10  Professor Mickens admitted there are malware risks, and that

11  the warning should only be compressed, not eliminated.

12      And Professor Bernheim admitted that Google first started

13  these warnings back in 2008 at the time Android was launched

14  and before it had --

15          **THE COURT:**  Okay.  Let's telegraph a little bit more.

16  Okay?  I got to get going on the jury instructions.  So just

17  make the main points on the substance about why you think

18  there's not enough evidence.  Remember, you're just keeping the

19  gate open for posttrial.  Okay?

20          **MR. OLASA:**  Moving on to Google Play Billing,

21  Your Honor.  Google Play Billing, it's not anticompetitive --

22          **THE COURT:**  Which section of your letter are we in

23  now?  What number is this?

24          **MR. OLASA:**  Sure.  We are in Section 5,

25  Anticompetitive Effects.

1          **THE COURT:**  Go ahead.

2          **MR. OLASA:**  So on Google Play Billing, Your Honor, it

3    is not anticompetitive for Google to require developers to use

4    its billing system in order to be compensated for Google's

5    investments.  That's -- I'd cite Your Honor to *Epic Games v.*

6    *Apple*.

7          And as far as a less restrictive alternative goes, Epic

8    has failed to provide a less restrictive alternative to

9    Google Play Billing that is virtually as effective in serving

10   Google's business purposes without significantly increased

11   costs.

12         I'll go on to the Developer Distribution Agreement.  Epic

13   alleged two reasons that the Developer Distribution Agreement

14   was anticompetitive.  First, that it included Google's policy

15   of not distributing another app store.  The Court has already

16   granted summary judgment on that ground.

17         On the other ground, Epic has alleged the DDA requires the

18   use of Google Play Billing for certain in-app transactions.

19   And on that second allegation, it is not anticompetitive for

20   Google to require developers to use its billing system; and

21   I'll refer Your Honor back to the argument I just made on the

22   Google Play Billing tie.

23         On Project Banyan, Project Banyan had no market effect.

24   It was never implemented.  Epic's jury instructions still have

25   a reference to Facebook and wireless carrier agreements.  Epic

1  has not introduced sufficient evidence on agreements with

2  Facebook or with wireless carriers.  Epic's fact witnesses and

3  economists did not testify about these agreements or describe

4  their competitive effects or their terms.

5          THE COURT:  All right.  Number six now?

6          MR. OLASA:  One more, Your Honor, on this one very

7  briefly.

8          THE COURT:  Let's make it quick.  Okay?

9          MR. OLASA:  Yes, Your Honor.

10          THE COURT:  We're getting -- I wanted it in 15

11  minutes.  You're only on number five.  All right?

12          MR. OLASA:  The last point on anticompetitive conduct,

13  Your Honor, is that with respect to the conduct here, Epic

14  cannot aggregate conduct that is lawful under the antitrust

15  laws into a broth.  As the Supreme Court held in *Linkline*, two

16  wrong claims do not make one that's right.  So *Linkline*, *Masimo*

17  *Corp.*, and *United States v. Google*, 2003 Westlaw 4999901.

18      Turning to the rule of reason tying claim, putting aside

19  the rule of reason argument already covered with Your Honor, we

20  have a few other arguments here.

21      First is that, as a matter of law, Google Play and

22  Google Play Billing are not separate products.  We understand

23  Your Honor rejected that argument at summary judgment, but

24  we're raising it again to preserve it.

25      And then, in addition, we think the evidence at trial did

1   not show that Google Play and Google Play Billing are separate

2   products.  There was not sufficient evidence on this issue.  In

3   particular, Epic has not shown the developers demand a product

4   by Google Play Billing that is separate from the Google Play

5   Store.

6        On the element of coercion, Epic has failed to offer

7   legally sufficient evidence of foreclosure because no developer

8   is coerced into using Google Play Billing over an alternative

9   monetization option, such as advertising or consumption-only

10  distribution.

11       Those are our arguments, Your Honor.

12          THE COURT:  Okay.  Epic, I'm prepared to rule.  If you

13  want to say thing, you certainly can.

14          MR. BORNSTEIN:  No, Your Honor, unless you're willing

15  to entertain some argument on the Activision issue.

16          THE COURT:  Well, maybe.  We'll get to that.

17       But with respect to the Rule 50(a) motion, it's denied.

18  As I've mentioned on previous occasions, I have paid great

19  attention to each and every word and document that has been

20  propounded into evidence during the trial, as has the jury.  I

21  really have been watching them closely.  They've been a superb

22  jury; and knock on wood, we haven't anybody really yet except

23  one person very early in the case with special circumstances

24  before any evidence started.

25       I am completely satisfied that there is more than enough

1    evidence in the record for the jury to find in favor of

2    plaintiff on each and every one of their claims; and so for

3    that reason, the Rule 50(a) motion is denied.  That is, of

4    course, subject to renewal as warranted by circumstances under

5    Rule 50(b) -- B, as in boy -- postverdict.

6         That takes care of that.  Let's go to the jury

7    instructions.

8         So let me hit a couple of highlights, then we're going to

9    go through the individual ones in prompt fashion.  I don't

10   think it's going to take forever to get through it.

11        Okay.  So with respect to the ABK agreement, I've looked

12   carefully, Mr. Bornstein, at the evidence that you gave to me

13   the other day and the record as a whole, and I just cannot say

14   that that agreement is, quote, "so plainly anticompetitive and

15   so lacking in any redeeming value such that it can be

16   conclusively presumed illegal and treated as a per se

17   violation."  And I'm quoting from *Epic v. Apple*, 67 F.4th

18   946-997.  So it will be rule of reason.

19        Okay.  Now, with respect to permissive, the permissive

20   inference, it is deeply troubling to me as a judicial officer

21   of the United States, the record that I have seen by Google in

22   this case with respect to the willful and intentionally

23   suppression of relevant evidence.

24        You-all recall that I concluded after a prior evidentiary

25   hearing with testimony from -- and other evidence from Google

1   and its employees, that Google had failed to preserve Chat

2   evidence with the intent of preventing its use in this

3   litigation and with the intent of depriving Epic of the use of

4   that evidence.  That's at Docket Number 469, page 18.

5        The evidence presented during trial most recently in the

6   testimony of Google employee Loew, L-O-E-W, just an hour or two

7   ago has strongly underscored this conclusion.

8        Google's witnesses at trial have testified about making

9   intentional decisions not to preserve Chats with potentially

10  relevant evidence.  Google's witnesses have also -- and I'm

11  referring here namely to in-house attorney Emily Garber -- have

12  also testified or given disturbing testimony about the use of,

13  quote, "fake privilege," close quote, claims with respect to

14  internal Google documents and communications.  As I said

15  previously, I found Attorney Garber's effort to explain this

16  away to be not credible and unpersuasive.

17       I have also noticed an unusually large number of

18  documents, Google documents, labeled "Privileged and

19  Confidential" by Google employees who prepared them.  These

20  documents, which I have looked at quite closely in the course

21  of their presentation in evidence, these documents on their

22  face have typically not included any indicia that the document

23  was, in fact, prepared in connection with an attorney-client

24  communication or with the goal of it soliciting attorney

25  advice.

 1      You will recall that I asked, I think it was yesterday --

 2   was that Paul Gennai? -- yesterday I asked Google witness Paul

 3   Gennai about this very point.  You will recall that he had

 4   labeled as privileged and confidential a document that he,

 5   himself, described as his own personal notes.  This document

 6   lacked any indication that it was privileged in any way.  And

 7   in response to my questions about his assertion of the

 8   privilege, he did not establish any basis whatsoever for a

 9   valid claim that these are privileged and confidential notes.

10      Now, the result of all this, I invited Google's chief

11   legal officer, Kent Walker, to come in and help me understand

12   why all of this was happening and why these evidence games were

13   so rampant at Google.

14      I found his testimony, which was taken outside the

15   presence of the jury, did not do anything to assuage my

16   concerns.  The testimony of Attorney Walker was evasive and was

17   materially inconsistent with testimony given by Google's

18   witnesses at the Chat hearing as described in Docket 469.

19      All of this presents the most serious and disturbing

20   evidence I have ever seen in my decade on the bench with

21   respect to a party intentionally suppressing potentially

22   relevant evidence in litigation.  I have just never seen

23   anything this egregious.

24      And my concern, as every judge's concern would be, is

25   motivated by the fact that this conduct is a frontal assault on

1    the fair administration of justice.  It undercuts due process

2    and it calls into question the just resolution of legal

3    disputes.  It's antithetical to our system.

4        It also imposes tremendous taxes and costs, in terms of

5    time and effort money, on opposing parties.  Just getting

6    through bogus privilege assertions alone takes forever.

7    Somebody has to look at those documents, they have to evaluate

8    it, they have to make a claim, they have to fight about it, and

9    then they have to come to the judge to get it resolved.

10        In addition to that, it imposes completely untenable costs

11    on scarce federal judicial resources having to deal with all of

12    this.  There is nothing I would rather do than not deal with

13    this, but you have forced me to do it because of this rampant

14    and systemic culture of evidence suppression at Google.

15        Now, that's a long line of me saying I'm not going to give

16    a mandatory instruction, and I'm going to tell you why.  There

17    is no doubt in my mind a mandatory inference would be amply

18    warranted in this case given all the evidence we have.

19    However, I have concluded that the best course of action is for

20    the jury itself to decide whether it will make an inference,

21    and I am not going to constrain the jury's discretion by making

22    that inference for them or making that decision for them.  I

23    believe that is most faithful to the right to a jury trial, the

24    Seventh Amendment, and also the fair administration of justice.

25        So even though it would be well within bounds to issue a

1  mandatory inference instruction, I'm going to decline to do

2  that and take the more conservative approach of letting the

3  jury decide for itself.

4      Another reason I'm going to do that is that I can pursue

5  these issues on my own outside of this trial in subsequent

6  proceedings, which I intend to do.  I am going to get to the

7  bottom of who is responsible among outside counsel for allowing

8  this to happen.  I'm going to get to the bottom of who is

9  responsible within Google for tolerating this culture

10  suppression.  That's going to be separate and apart from

11  anything that happens here, but that day is coming.

12      So that's the basis for the permissive inference.

13      Now, we've talked about the after market.  You wanted to

14  add something, Mr. Bornstein?

15      MR. BORNSTEIN:  I'm sorry, Your Honor.  I didn't hear

16  what the question was?

17      THE COURT:  We talked about after market, but you

18  wanted to add something?

19      MR. BORNSTEIN:  Oh, it was not about after market.  We

20  had a -- I absolutely heard the ruling that Your Honor just

21  gave and have no intention of rearguing it --

22      THE COURT:  Oh, okay.

23      MR. BORNSTEIN:  -- but we did have a proposal that we

24  had made to Google on this issue to pair with the permissive

25  adverse inference instruction, and I'm going to cede the floor

1  to my colleague, Ms. Moskowitz.

2          THE COURT:  Please, yes.

3          MS. MOSKOWITZ:  Thank you, Your Honor, and I

4  appreciate everything you just said.

5      I think there are two parts to the instruction --

6          THE COURT:  Let me get the instruction.  Just one

7  second.

8          MS. MOSKOWITZ:  Sure.  And I have it along with a

9  redline if you'd like us to hand it up.

10         THE COURT:  Yeah, give that to Ms. Clark.

11         MS. MOSKOWITZ:  Your Honor, there are two sentences in

12  your instruction, there's two parts.  It's the setup and then

13  the inference portion of it.

14     In terms of --

15         THE COURT:  Let's be clear.  We're looking at Docket

16  Number 823 and Instruction Number 13.

17     Okay.  Go ahead.

18         MS. MOSKOWITZ:  Yes, Your Honor.

19     There are two sentences there.  I'd like to start with the

20  second because I think what Your Honor just said is very clear,

21  that it will be a permissive, and that's the "may."

22     One tweak we would ask to make is to use the word

23  "presume" instead of "infer," which tracks the language in

24  Rule 37.  So "You may presume" instead of "infer."

25     And I want to come back to the word "lost."  That's the

1   only other word that I'd like to take up, and that's going to

2   come up in that first sentence as well.

3        THE COURT:  I don't want to limit this to these three

4   types of agreements.  I know I raised that idea.  I think

5   that's an unfair limitation in light of the abundance of

6   evidence just about how systemic this is.  That's why I

7   intentionally left that out.

8        MS. MOSKOWITZ:  I appreciate that, Your Honor, and --

9        THE COURT:  Now, with that in mind, though, what is it

10  you want to say?  "Google intentionally deleted Chat" --

11  "Google Chat," period.  "You may presume that the Chat messages

12  destroyed by Google contain evidence that would have been

13  unfavorable to Google in this case."

14       MS. MOSKOWITZ:  That is basically what we proposed.  I

15  think we would ask to keep what you said in here in yours, that

16  the intent to prevent their use in litigation.  The reason we

17  don't want the "you've seen evidence" is this really

18  shouldn't -- they shouldn't be deciding that question.  It's

19  written in -- or carved in stone.  It happened.

20       The thing they should decide, and that Your Honor just

21  said you wanted to leave to them, is what they should make of

22  that destruction and what they should presume about it is up to

23  them, but not whether it happened.

24       Google has not established and shouldn't be able to

25  establish, and that comes back to we want to request the Court

1  limit Google from making a single utter of a single word about

2  this in their closing.  They shouldn't be able to say "It

3  doesn't matter."  They shouldn't be able to say "It didn't

4  happen.  They got piles of documents."  All of that stuff is to

5  try to minimize what happened, and we don't think they should

6  be able to do that.

7      We think the jury should be told what happened, and then

8  they can -- may presume, up to them, what that means to them.

9          THE COURT:  Okay.

10         MR. KRAVIS:  Thank you, Your Honor.

11     First, just noting for preservation purposes and purely

12  for the record, that Google objects to the inference

13  instruction.

14     We do think that a preclusion on what we are allowed to

15  argue in closing is wholly unwarranted here.  No one intends to

16  argue leading that it's contrary to the Court's findings on

17  intent and prejudice, but we are allowed to argue to the jury

18  what to make of the evidence that they have heard and how to

19  weigh it in their deliberations.  That is the --

20         THE COURT:  Well, what are you going to say?  Just

21  give me an example.

22         MR. KRAVIS:  Well, for example --

23         THE COURT:  I am not going to accept any statements

24  that Google Chat was not used for business purposes.

25         MR. KRAVIS:  No, no.  That's not the argument.

1    **THE COURT:**  I'm not going to accept any statements

2    that fake privileges were never an issue.

3    **MR. KRAVIS:**  That's not the argument either.

4    **THE COURT:**  Tell me what you're going to say.

5    **MR. KRAVIS:**  The jury has heard conflicting evidence

6    from the parties about the timing of the relevant events here,

7    and the Court's order on Chats was pegged to the date the

8    preservation obligation arose of August 13th of 2020.

9    Google has presented evidence to the jury that much of the

10   conduct challenged by Epic occurred before that date.  Epic has

11   presented contrary evidence to the jury about the ongoing

12   effect of that conduct, the subsequent negotiations with

13   Samsung, and so on and so forth.  That is a point of fair

14   dispute between the parties to argue to the jury about how the

15   timing plays into their consideration of the Chat.

16   **THE COURT:**  So, in effect, you want to say

17   Google cheated before the complaint was filed but you don't

18   have to worry about that?

19   **MR. KRAVIS:**  Well, I would disagree with that

20   characterization.

21   **THE COURT:**  I'm sure you would, but I've already made

22   that finding.  That's basically what you're saying to me, is

23   you want to say, "Okay.  Don't worry about anything before

24   2020.  We shredded and burned to our hearts content, but it's

25   irrelevant."  Okay?  Is that what you're going to say?

1    **MR. KRAVIS:**  Google's preservation obligations arise

2    with the filing of the lawsuit.  It is the lawsuit that

3    triggers the -- that triggers the obligation, that triggers the

4    findings that the Court made.  And to the extent that there

5    were Chat communications that occurred prior to a preservation

6    obligation, it is not appropriate to tell the jury that they

7    can draw adverse inference --

8        **THE COURT:**  No one has said anything about mentioning

9    any Chats before August 2020.

10       **MR. KRAVIS:**  Right.  And so the only point I'm making

11   is that we should be allowed to argue to the jury that to the

12   extent there was conduct -- relevant conduct here that occurred

13   before that preservation obligation arose, that that is

14   something that the jury can take into account in deciding how

15   to weigh the Chats.

16       **THE COURT:**  I don't understand what that means.  Just

17   tell me what you're going to say.

18       **MR. KRAVIS:**  Well, for example, I would say

19   Project Banyan occurred in 2019.  So the idea that Google --

20   that Google's preservation obligations with respect to Chat

21   started on August 13, 2020, means that Chats from 2019 should

22   not affect the jury's consideration of the conduct in 2019.

23   That is an example.

24       **MS. MOSKOWITZ:**  Your Honor, I think that this is a bit

25   cute given the fact that every witness has testified they've

 1   been on holds for years and years and years about every aspect

 2   of their job.  Mr. Lim, who you actually heard about from

 3   Ms. Loew, testified -- in fact, we submitted it in the Chats

 4   hearing -- that he was on 10 holds for basically his entire

 5   time.

 6        So the notion that we're just talking about August 20th,

 7   2020, I get that in a technical matter; but given the scope of

 8   what you've heard about and how long it's been going on and how

 9   sustained it was, I don't think we should be splitting hairs

10   about whether a Chat would have existed or wouldn't have

11   existed if this were just happening just in this case just now.

12        I don't think we intend to talk about the date at all with

13   respect to the Chats.  I don't think there's any reason why

14   they need to.

15             MR. KRAVIS:  With all respect --

16             THE COURT:  Well, for Project Banyan, I mean, was

17   there any evidence of discussions after 2020?  Did it come up

18   in any Google documents, any references?  I know it didn't go

19   through, but --

20             MS. MOSKOWITZ:  Well, our position is that Banyan was

21   just an iteration of the entire evolution of Google's

22   attempt -- you saw 2016 yesterday all the way through later in

23   2020 when they actually signed the RSAs, which are continuing

24   to be enforced and renegotiated, everyone was trying to seal it

25   because they're still subject to negotiations.  This is a

1    continuous story of how they're dealing with Samsung that

2    continues well past August 13th, 2020.

3            THE COURT:  All right.  I can't enforce litigation

4    holds in other cases.  I just can't do that.  So keep it to

5    August 2020 and after.  All right?  And you can do anything you

6    want with that.

7        And there will be no reference to pre-August 2020 unless

8    the door is opened by the plaintiffs.  Okay?

9        All right.  Now, I'm going to stick with my version of

10   this except you wanted -- rather than "lost," you want to say

11   "deleted"?

12           MS. MOSKOWITZ:  Yes, Your Honor, certainly.

13           THE COURT:  As a matter of fact, there's just no

14   question they were deleted.

15           MS. MOSKOWITZ:  That's right, Your Honor.

16           THE COURT:  Okay.

17           MS. MOSKOWITZ:  And if we could, we would delete --

18           THE COURT:  I will substitute "deleted" for "lost" in

19   Instruction Number 13 in Docket 823.

20           MS. MOSKOWITZ:  And, Your Honor, the "potentially" we

21   would like to delete too.  There's no doubt that Chats were

22   relevant -- contained relevant evidence.  They were on RSAs.

23   They were people talking about Hug.  That testimony is in.

24   These were not potentially relevant Chats.

25           THE COURT:  I understand that, and I think that's a

 1   fair point.  It's hard to say -- this is the Catch 22 that you

 2   sadly are in as a result of Google's intentional misconduct,

 3   which is you don't know what you lost.

 4        MS. MOSKOWITZ:  What about deleting --

 5        THE COURT:  I'm just -- I'm a little concerned about

 6   going too far on the contents.

 7        MS. MOSKOWITZ:  What about deleting --

 8        THE COURT:  I know it seems unfair because it is, in a

 9   sense, allowing a wrongdoer more room to run than that

10   wrongdoer should have.  I get that; however, in the interest of

11   a fair verdict, I don't think I can delete "potential."

12        MS. MOSKOWITZ:  I have an idea.  What about "Google

13   intentionally deleted Google Chat evidence."  We don't have to

14   say whether it was potentially relevant.  That's what they're

15   going to decide.  They're going to decide what to do with it,

16   whether they presume it was bad for them or not, which means it

17   was relevant.  They might decide it was or may decide it's not,

18   but maybe we don't need that at all.

19      But potentially relevant --

20        THE COURT:  So you want to change the first sentence

21   to "You've seen evidence that Google intentionally deleted

22   Chats with the intent to" -- you want to say "intent" twice?

23   How about --

24        MS. MOSKOWITZ:  "The intent to prevent their use in

25   litigation" from your instruction is fine, Your Honor.

 1   "Deleted with the intent."  You don't need to say the first

 2   "intentionally."

 3          **THE COURT:**  I'm just going to keep it as it is.  Okay?

 4   You can go to town in arguing, but I'm going to keep it as it

 5   is.  You can say all that in argument, but I'm not going to

 6   change things now.

 7          **MS. MOSKOWITZ:**  Thank you, Your Honor.

 8          **MR. KRAVIS:**  Thank you, Your Honor.

 9          **THE COURT:**  All right.  Okay.  Let's just run through

10   these now.

11       I'm just going to go through the number.  If you have

12   anything you want to raise, you need to say something.

13       Number 1 seems fine.

14       Number 2, we need to update that to take out -- oh, I had

15   a -- I asked you a question.  Can we just drop the damages?

16   We're going to drop the contract; right?  You-all didn't put a

17   number in.

18          **MR. EVEN:**  No, we didn't put a number in.  All we did

19   was what happened today with Dr. Leonard.  I don't think we

20   have an issue with that.  If we can just do away with the

21   stipulation and do away with that part of the verdict, we're

22   fine with that and leave it up to Your Honor.

23          **THE COURT:**  Okay.  Well, I mean, there is a

24   counterclaim that the jury's been told about.  So, I mean, the

25   evidence has been quite direct.  Epic's been loud and proud in

 1    saying "We won't pay." I get it. So we might as well just --

 2        MR. EVEN: Correct. The only thing that worries us

 3    there is that if we are stipulating to anything, we want to at

 4    least say that to the extent or if the contract is legal, then

 5    we admit that we breached it.

 6        THE COURT: Well, you don't have to worry about -- I'm

 7    going to take care of that later.

 8        MR. EVEN: Okay.

 9        THE COURT: Okay?

10        MR. EVEN: Thank you.

11        THE COURT: So we're just going to drop -- we're not

12    going to say a word about contracts or damages or any elements

13    or anything else. All right?

14        MR. EVEN: That's fine with us.

15        MR. POMERANTZ: Your Honor, I don't think that's

16    right. We've already told the jury we have this counterclaim.

17        THE COURT: You're going to say -- it's going to be in

18    the stipulation.

19        MR. POMERANTZ: Okay. So there will be a stipulation

20    that there was a breach and the damages --

21        THE COURT: Mr. Pomerantz, that's what I was just

22    saying. I just said the jury heard this counterclaim so they

23    have to hear that.

24        MR. POMERANTZ: I'm sorry. I misunderstood,

25    Your Honor. Thank you.

1      **THE COURT:** Okay. Let's just follow along, please.

2  All right? I want to get this done.

3      So, yes, so that's what's going to happen, but we're not

4  going to give any instructions on any of this.

5      **MR. EVEN:** Understood, Your Honor.

6      **THE COURT:** All right. Now, what that means for

7  Number 2, we need to change that last paragraph. So you two

8  just work on a sentence for that. Okay?

9      **MR. MACH:** We will do that.

10      **THE COURT:** It's no longer alleged and all that. It's

11  done. And you can just say in the amount of 398,000 if you

12  just want to do that. Okay? So you just do that and send me

13  that on Monday.

14      3 --

15      **MR. MACH:** Your Honor, I apologize. If I may on 2, if

16  I may just propose one nit.

17      **THE COURT:** Yeah.

18      **MR. MACH:** This will change now, but you will see at

19  the bottom of the instruction it said "Google has the burden of

20  proving this counterclaim." We noticed that the bottom of the

21  paragraph describing Epic's claims probably inadvertently

22  omitted the same line, which would have --

23      **THE COURT:** We're taking out -- everything from

24  line 16 down is taken out.

25      **MR. MACH:** Right. I'm referring to line 10. We were

1  going to propose the sentence "Epic has the burden of proving

2  these claims" so that it is parallel and the jury understands

3  that.

4         **THE COURT:**  In line 10?

5         **MR. MACH:**  Yes, Your Honor, line 10 at the bottom of

6  the paragraph describing Epic's claims.

7         **MR. EVEN:**  Well, if we do that, we need --

8         **THE COURT:**  I'm looking at Number 2.

9         **MR. MACH:**  Yes, Your Honor.

10         **MR. EVEN:**  If we do that --

11         **THE COURT:**  My line 10 ends with two words, "and

12  innovation."

13         **MR. MACH:**  That's right, Your Honor.  So that

14  paragraph describes Epic's claims, and we were proposing a

15  sentence that would say "Epic has the burden of proving these

16  claims."

17         **MR. EVEN:**  Your Honor, this has not been done

18  throughout with one exception.  Obviously the next paragraph

19  ends with "Google contends that its conduct."  If we are

20  starting to add every time that somebody contends anything,

21  that who has the burden --

22         **THE COURT:**  You know, there's a three-, four-part

23  thing here.  We're just going to leave it as it is.  We're

24  going to get into great detail about all this later.

25      So just send me revised language for 16 to 18.  It should

1    be one sentence I'm imagining.  Okay?

2              MR. MACH:  Thank you, Your Honor.

3              THE COURT:  All right.

4         Okay.  Corporations are People Too, that's fine.

5         What is evidence?  That's fine.

6         Direct and Circumstantial, fine.

7         Ruling on Objections, fine.

8         Depositions, fine.

9         Credibility, fine.

10        Expert opinion, fine.

11        Charts and Summaries in, fine.

12        Oh, stipulations of fact.  So why don't you just add as a

13   Number 22 or 23 -- I don't know how you want to order it, and

14   I'll leave it up to you -- okay? -- just repeat.  Okay?

15             MR. EVEN:  The same thing, Your Honor, yes.

16             THE COURT:  Just repeat that.  Okay?  Get that to me

17   on Monday, please.

18        Number 13 will be modified to replace "lost" with

19   "deleted."  That's supported by evidence in the record.

20        Number 14, Burden of Evidence, Preponderance is fine.

21        15, absolutely fine.

22        16... 16 is fine.

23             MR. EVEN:  Your Honor, on 16, if I may.

24             THE COURT:  Yes.

25             MR. EVEN:  The only thing on 16, and that's going to

 1   come back once we get -- if -- well, when we get to the verdict

 2   form, but this now says on line 11 "To prevail on a claim that

 3   Google has monopolized," it says "an alleged market."

 4           THE COURT:  Yeah.

 5           MR. EVEN:  We think it should be "a relevant market."

 6           THE COURT:  Oh, okay.

 7           MR. EVEN:  The market doesn't need to fully conform to

 8   the allegations necessarily.

 9           THE COURT:  "Monopolize a relevant market."  All

10   right.

11           MR. RAPHAEL:  Your Honor --

12           MR. EVEN:  The same I think happens in 1 and 2 below.

13           THE COURT:  How about "the alleged relevant market"?

14   You are alleging a relevant market.

15           MR. EVEN:  Correct, Your Honor, but our concern is if

16   the jury sits there and, for instance, Google has argued

17   that -- I don't remember, I think they said Iran, I think,

18   should be out of the geographic market, I don't want the jury

19   to start thinking, "Well, we haven't reached consensus on

20   whether the market is global, excluding China and Iran, and,

21   therefore, we can't reach a verdict now."  That's just wrong

22   under *Epic v.* --

23           THE COURT:  Why is that a concern here?

24           MR. EVEN:  It's just a concern because it suggests

25   that it has to be the alleged market with the exact same

 1   contours; whereas, I think *Epic v. Apple* made very clear that

 2   fine or effect can find permutations on that without that

 3   undermining the claim.

 4        **MR. RAPHAEL:**  Your Honor, I think Mr. Even's argument

 5   highlights the issue from our point of view, which is they

 6   alleged certain relevant markets.  They had a burden to prove

 7   them to the jury.  If the jury rejects those markets, we think

 8   that the case should be at an end with respect to that claim.

 9       Mr. Even refers to --

10        **THE COURT:**  That was rejected in *Epic* -- I'm sorry --

11   in -- was it *Epic* or.

12        **MR. EVEN:**  It's *Epic v. Apple*.  That's what the Ninth

13   Circuit called a radical argument.

14        **THE COURT:**  That's not going to happen.

15        **MR. RAPHAEL:**  I understand, Your Honor.  If I just

16   could just make one point on that, which is, that I think as

17   Your Honor is aware of, of course, that is a bench trial and we

18   have concerns about the jury engaging in the same kind of --

19        **THE COURT:**  It's a point of law, which is the case

20   does not collapse on the relevant market definition.  Okay?

21       So, now, the only issue here is your colleague, Mr. Even,

22   has proposed -- what do you want to say?  "A relevant market"?

23        **MR. EVEN:**  Yeah.  I think we can say in line 11 "a

24   relevant market."

25        **THE COURT:**  As opposed to "an alleged market"?

1        MR. EVEN:  Correct.

2        THE COURT:  It seems more precise.  Do you have any

3   problem with that?

4        MR. RAPHAEL:  We would say "the alleged relevant

5   markets," Your Honor, for the reasons I expressed.

6        MR. EVEN:  That's even more precise than it is now,

7   so --

8        THE COURT:  "An alleged relevant market."

9        MR. EVEN:  "An alleged relevant market --"

10       THE COURT:  That's what I said five minutes ago.

11       MR. EVEN:  No, that's back to the problem; right?

12  That reintroduces the problem that --

13       THE COURT:  It is alleged.  I mean, what's the problem

14  with that?

15       MR. EVEN:  The problem is just, as Your Honor just

16  said, it doesn't collapse if we have proof -- if the jury finds

17  that the market is not entirely on the contours of all fours of

18  what we have alleged.

19       THE COURT:  That's more of a verdict-form issue I

20  think and not an instruction issue.  It doesn't say here "Stop

21  your deliberations if X doesn't happen."

22       MR. EVEN:  I think it can be solved, and I don't know

23  where Your Honor is going to land --

24       THE COURT:  I'm going to solve it for you.  We're

25  going to say "an alleged relevant market."  Okay?

1          MR. EVEN:  And the same issue happens in lines 13,

2     14 --

3          THE COURT:  So I will conform.  So that would be also

4     line 13; right?

5          MR. EVEN:  I think 13, 14, 15.

6          THE COURT:  And 15.  And, yeah, we'll conform it.

7          MR. EVEN:  And 19 and 22.

8          THE COURT:  Oh, where?  19?

9          MR. EVEN:  19 and 22.

10         THE COURT:  19.  It just says "with respect to either

11    market"?

12         MR. EVEN:  No.  Sorry.  19 is fine.  So, no, 19 and 22

13    we are fine.

14         THE COURT:  That should be okay; right?

15         MR. EVEN:  Yeah, either is fine.

16         THE COURT:  All right.

17      Okay.  So 16... 17 is fine.

18         MR. RAPHAEL:  Your Honor, just two quick points on 17,

19    if I could.

20         THE COURT:  Okay.

21         MR. RAPHAEL:  We would propose that the instruction be

22    modified to say that "monopoly power is the power to control

23    prices by restricting output" rather than comma "restricting

24    output or exclude competition."  And I just point the Court

25    quickly to the *Rebel Oil* case, which is 51 F.3d --

1      **THE COURT:**  I use the ABA Model Instruction 3A2.

2    So what line are you looking at?

3      **MR. RAPHAEL:**  I am looking at line 4.  There's a list

4  where it says "Control prices, restrict output, or exclude

5  competition."  We think --

6      **THE COURT:**  It's "or."  It's disjunctive.

7      **MR. RAPHAEL:**  Yes, Your Honor.  I think we think it

8  should be conjunctive, "and."

9      **THE COURT:**  No, I disagree with that, so that's

10  rejected.

11      **MR. RAPHAEL:**  And the last --

12      **THE COURT:**  That is not faithful to the Ninth Circuit

13  or Supreme Court case law, and it doesn't conform to the ABA

14  Model Instruction which I think is faithful to Supreme Court

15  case law.

16    Okay.  What's your other point?

17      **MR. RAPHAEL:**  Yeah, so we would propose an instruction

18  that Google does not have monopoly power if it cannot maintain

19  quality below the competitive level.

20      **THE COURT:**  That's denied.

21    Okay.  Instruction 18.  For some reason you-all went to

22  the Federal Jury Practice Manual for this.  You okay with that?

23  I assume you are.

24      **MR. RAPHAEL:**  I do have several objections on my side.

25  I'm not sure about Mr. Even.

1        I apologize to be repeating it, Your Honor, but just for

2   preservation purposes, we do believe that a relevant product

3   market instruction could include the after-market instruction

4   from *Epic vs. Apple*.

5        **THE COURT:**  You can just consider that denied for all

6   purposes.  You don't have to keep repeating it.

7        **MR. RAPHAEL:**  Thank you, Your Honor.

8        The second instruction we would propose would be a

9   sentence saying that Epic does not bring a claim that Google

10  has harmed competition in a licensable operating system market.

11  We believe there was a lot of discussion about that at the

12  trial.

13       **THE COURT:**  You can argue that.  You can argue that.

14  That's not appropriate for an instruction, but you can

15  certainly argue that.

16       **MR. RAPHAEL:**  Understood, Your Honor.

17       The third objection would be that -- or proposal I should

18  say -- is that we request an instruction that the relevant

19  market must reflect commercial realities, which is from *AmEx*,

20  138 Supreme Court 2285, and I think is consistent with the

21  testimony that Dr. Bernheim gave today.

22       **MR. EVEN:**  I think it's just redundant language,

23  Your Honor.  I think market is explained here.  It's consistent

24  with the ABA model.  I don't see why we need now to pick and

25  choose language from different cases.

 1          **THE COURT:**  I agree with that.  That's denied.

 2      Okay.  19.  Oh, this is just a tiny little word -- a tiny

 3  little word thing.

 4      By the way, the whole commercial realities language is not

 5  in the ABA model instruction.

 6      All right.  19.  Okay with that?

 7          **MR. MACH:**  One small -- go ahead, Yonatan.

 8          **MR. EVEN:**  Sorry.  I was just saying, yes, we are fine

 9  with 19, Your Honor.

10          **THE COURT:**  Okay.

11          **MR. MACH:**  We have one small thing, Your Honor.

12          **THE COURT:**  Yes.

13          **MR. MACH:**  Line 20, it's item little four.

14          **THE COURT:**  20, yes.

15          **MR. MACH:**  We would propose to change "app developers"

16  to "Google's customers."  It makes it match the language of 1,

17  2, and 3 above.

18          **THE COURT:**  Oh.  Mr. Even?  It would be nice to have

19  some consistency.

20          **MR. EVEN:**  We are fine with that, Your Honor.

21          **THE COURT:**  Okay.  So we're going to say line 4,

22  "geographic areas that Google's customers view"; right?

23          **MR. MACH:**  That's right, Your Honor.

24          **THE COURT:**  Okay.  All right.  Got that one.

25      20.  Google, you had a ton of editorial comments that I'm

 1  not going use because they're not in the instruction and not

 2  supported by the evidence.

 3       **MR. MACH:**  Understood.

 4       **THE COURT:**  Okay.  So I'm going to give 20.

 5    You okay with that, Plaintiff?

 6       **MR. EVEN:**  Yes, Your Honor.

 7       **THE COURT:**  All right.  21.  I don't think you had too

 8  much different on 21.

 9       **MR. EVEN:**  We are fine with 21, Your Honor.

10       **MR. MACH:**  The one thing we would raise for

11  preservation purposes at minimum, Your Honor, is it raises the

12  same issue of the disjunctive -- what I think you called the

13  disjunctive language as 17.

14       **THE COURT:**  May I read to you from *Grinnell*,

15  G-R-I-N-N-E-L-L, 384 United States at page 571, quote (as

16  read):

17         "Monopoly power is the 'the power to control prices

18      or exclude competition," close quote.

19    That's the basis of my holding.

20    Okay.  Anything else on 21?

21       **MR. MACH:**  Yes, Your Honor.  If I could suggest one

22  other revision on line 12.

23       **THE COURT:**  12, yes.

24       **MR. MACH:**  At the end of the phrase "competitive

25  level," at the beginning of line 12, we would propose the

1  addition "by restricting output."  We would refer Your Honor to

2  the *Rebel Oil* case for that.

3      THE COURT:  So "Epic also has the burden of proving

4  that Google has the power to maintain prices above a

5  competitive level..."  And what do you want to add there?

6      MR. MACH:  "By restricting output," Your Honor.

7      MR. EVEN:  I think what my colleague is trying to do

8  is insert the same language that Your Honor just told him said

9  should be disjunctive and, therefore, wrong.

10     THE COURT:  I agree with that.  That's denied.

11     Okay.  22.  We're not going to include the 50 percent

12  language.  There's no evidence in the case that would warrant

13  that.

14     23 -- otherwise --

15     MR. RAPHAEL:  Your Honor, just a couple things on 22,

16  and I'll be brief because some of them you've already covered.

17  I'd just like to preserve them.

18     THE COURT:  Okay.

19     MR. RAPHAEL:  The first is the "by restricting output"

20  issue that Your Honor just discussed, and I understand you've

21  rejected that, but we would request it.

22     The second is the same sentence I mentioned earlier about

23  Google not having monopoly power if it cannot maintain quality

24  below the competitive level.

25     The third would be that we would request an instruction

1   that even if Epic proves that Google has a substantial share of

2   the market, that it must prove that there are substantial

3   barriers to entry.  There, again, we would propose -- point the

4   Court to the *Rebel Oil* case, 51 F.3d at 1434, as well as the

5   *Coronavirus* case, 85 F.4th 948.

6        **THE COURT:**  *Coronavirus*, that case is not helpful to

7   you.  That was a pleadings in shambles.  There was no adequate

8   relevant market.  All the circuit did in *Coronavirus* was say

9   "We don't know what the market is.  Here are 10 possible

10  definitions" -- I'm exaggerating slightly -- and they don't fit

11  any of them, but none of that is on point for what we're doing

12  here.

13       **MR. RAPHAEL:**  I understand Your Honor's ruling, but I

14  just would point on this issue I think setting aside the

15  particular facts and circumstances of that case, the Ninth

16  Circuit did say that a plaintiff must show that there are

17  significant barriers to entering the market, which is

18  consistent with the *Rebel Oil* case, which --

19       **THE COURT:**  Well, I think this adequately makes it

20  clear that they're going to have to do some barriers of entry.

21     Mr. Even, anything else to add on that?

22       **MR. EVEN:**  I just think, again, this is redundant

23  language to be added.  There's -- we have a thing about

24  barriers to entry in 22.  This is following the model, as far

25  as I can tell, although I don't have a redline before me.

1      **THE COURT:**  It is following the model, yeah.

2   Okay.  That's --

3      **MR. RAPHAEL:**  Last one on this, Your Honor.

4      **THE COURT:**  Yes.

5      **MR. RAPHAEL:**  I apologize.

6   There's a phrase -- let me find a line to point the Court

7   to it.  It refers to the reputation of the companies already

8   participating in the market.

9      **THE COURT:**  Oh.  Which page?

10      **MR. RAPHAEL:**  This is on page 26 --

11      **THE COURT:**  26, yes.

12      **MR. RAPHAEL:**  -- at line 6 through 7, Your Honor.  It

13   indicates that the reputation of the companies already

14   participate in the market or the brand name recognition of

15   their products --

16      **THE COURT:**  Barriers to entry may include property

17   rights, financial investments, and the reputation of the

18   company.  What's the issue?

19      **MR. RAPHAEL:**  The issue is that, Your Honor, in the

20   *American Pro Testing Services* case, 108 F.3d 1147 at 1154, the

21   Ninth Circuit said that reputation alone does not constitute a

22   sufficient entry barrier in this circuit; and the Ninth Circuit

23   in the *United States vs.* --

24      **THE COURT:**  That may be if that's all they argue, but

25   we haven't heard that yet, and I have a strong suspicion

 1   they're not going to be arguing that the only barrier is Google

 2   has a good name.  That's denied.

 3        All right.  23.

 4        **MR. RAPHAEL:**  Regrettably, Your Honor, I have a number

 5   of proposals on this one as well.

 6        Mr. Even, if you had any --

 7        **THE COURT:**  Well, I've already rejected them.  Epic's

 8   version was much more faithful to the ABA model instruction.  I

 9   found Google's proposal to be completely incomprehensible and

10   way too long and improperly mixed Section 2 instructions with

11   Section 1 instructions.

12        I'm going to keep the rule of reason instruction separate

13   so that -- I know it's the same analysis, but it's going to be

14   easier for the jury to get this, and that's the disposition on

15   that one.

16        Anything to add, Mr. Even?

17        **MR. RAPHAEL:**  Your Honor, can I just raise a few

18   particular issues with the instruction that Your Honor has

19   proposed?

20        **THE COURT:**  As long as you don't argue what I just

21   said, yes.

22        **MR. RAPHAEL:**  Yes, I'm going to raise particular

23   issues, Your Honor.

24        First of all, I would just register our objection to

25   having different Section 2 and Section 1 instructions on the

 1   rule of reason under the *Qualcomm* case.

 2       We would request an instruction that Epic must prove that

 3   Google's challenged conduct has a substantial competitive

 4   effect that harms consumers in the relevant market.

 5           **THE COURT:**  Just where in this instruction?  What are

 6   you -- which one?

 7           **MR. RAPHAEL:**  Excuse me, let me find it here,

 8   Your Honor.

 9       This is an additional sentence we would propose.  I

10   would -- I could find --

11           **THE COURT:**  Tell me where.

12           **MR. RAPHAEL:**  We think that's from -- I mean, that

13   language is the from the *AmEx* case, and I think --

14           **THE COURT:**  I'm not asking the source.  Tell me where

15   you want to put it.

16           **MR. RAPHAEL:**  Oh.  I apologize, Your Honor.

17       I guess I would say I'd put it in the second sentence

18   right between the first two sentences there in the instruction.

19           **THE COURT:**  Number 23?

20           **MR. RAPHAEL:**  Yes, Your Honor.

21           **THE COURT:**  So first sentence is "To prove their

22   monopolization claims, Epic must prove that Google willfully

23   acquired or maintained monopoly power through anticompetitive

24   acts or practices."

25       And what do you want to put after that?

1          **MR. RAPHAEL:**  That "Epic proved substantial

2    competitive effect that harms consumers in the relevant

3    market," which comes from the *AmEx* case.  The harm to consumers

4    is the touchstone of anticompetitive conduct.

5          **THE COURT:**  Okay.  Please, this is not the first

6    antitrust case I've done.

7          **MR. RAPHAEL:**  I understand, Your Honor.

8          **THE COURT:**  I know what the touchstone is.

9       I think that's covered somewhere else, isn't it?

10         **MR. EVEN:**  Your Honor, A, I think it's covered

11   somewhere else; B, there are all kinds of -- whole pages of --

12         **THE COURT:**  In fact, it's actually on line 14 (as

13   read):

14              "You must determine whether Epic has proven that

15        Google's conduct has caused substantial harm to

16        competition in the market."

17         **MR. RAPHAEL:**  Your Honor, what we're requesting is

18   that that -- the instruction --

19         **THE COURT:**  I'm not going to do that.  That's

20   editorializing and that's not an adequate or proper statement

21   of the law for jury instruction purposes.  So that's denied.

22         **MR. RAPHAEL:**  The second proposal would be that the

23   instruction limits the competitive benefits for consumers in

24   that market.  That is on page 29, line 16.

25       We would propose the deletion of the phrase "in that

 1   relevant market."  The Supreme Court and the Ninth Circuit in a

 2   number of cases have considered benefits in related markets,

 3   and we would propose that that phrase be deleted to permit

 4   that.

 5         THE COURT:  Have you read *Qualcomm* recently in the

 6   Ninth Circuit?

 7         MR. RAPHAEL:  Your, yes Honor.  Our position --

 8         THE COURT:  A former judge of this court got roundly

 9   reversed for taking into account other markets.  I'm not going

10   to do that.  That's denied.

11         MR. RAPHAEL:  Understood, Your Honor.

12         THE COURT:  Okay.  Let's move on to --

13         MR. RAPHAEL:  Your Honor, there are a couple more

14   points on this.  I apologize.  I will move through them

15   quickly.  I just would like the opportunity to preserve them.

16      We would request an instruction --

17         THE COURT:  You know, you're wanting to win the case

18   by ginning up favorable instructions.  That's not going to

19   happen.

20         MR. RAPHAEL:  I understand.

21         THE COURT:  That is a standing denial of any effort to

22   sort of editorialize, sway, color, spin, which is all that

23   you're pitching.  These are not substantively accurate, correct

24   instructions based either on the law or the evidence in this

25   case.  So keep that in mind on your next set of comments.

1    **MR. RAPHAEL:**  I understand, Your Honor.  I will do

2    that.

3        With respect to the less restrictive alternative, we would

4    request an instruction that to qualify as substantially less

5    restrictive, an alternative means must be virtually as

6    effective in serving the defendant's pro competitive purposes.

7        **THE COURT:**  Where are we?  What page?

8        **MR. RAPHAEL:**  This would be -- this would be added,

9    Your Honor, to the sentence that ends at the middle of line 19

10   on page 29.

11       The issue is that *Epic vs. Apple* following the *O'Bannon*

12   case has indicated that a less restrictive alternative must be

13   one without substantially increased costs and virtually as a --

14       **THE COURT:**  Line 19 on page 29?

15       **MR. RAPHAEL:**  Yes, Your Honor.  There's a reference

16   there to alternative means a less restrictive alternative.  The

17   sentence there ends at line 19, and we would request that some

18   language be added saying that a less restrictive alternative

19   must be virtually as effective in serving the pro competitive

20   purposes and without significantly increased costs, which is a

21   requirement that came from the *Epic vs. Apple* case.

22       **THE COURT:**  All right.  Mr. Even?

23       **MR. EVEN:**  Again, I think this is redundant.  I don't

24   think we need to explain each --

25       **THE COURT:**  Redundant of what?  Where is -- what's

 1  redundant?

 2          **MR. EVEN:**  I think there are places where this is

 3  explained where Your Honor goes to the actual explanation of

 4  the rule of reason.

 5          **THE COURT:**  Which one?

 6          **MR. EVEN:**  Let me get the right one.  It's certainly

 7  in the Section 1 claims.

 8      But here, as well, I'm not sure that --

 9          **THE COURT:**  What page are you looking at?

10          **MR. EVEN:**  I'm sorry.  I believe this is in page -- on

11  page 34.

12          **THE COURT:**  34, okay.

13          **MR. EVEN:**  It talks about line 17 through 19,

14  "Competitive benefits could be achieved through substantially

15  less restrictive alternatives," which explains the rule of

16  reason.

17          **MR. RAPHAEL:**  Your Honor, what we are requesting is

18  the reference to "substantially" -- "without substantially

19  increased costs."  That was, in fact, a decisive issue in the

20  *Epic vs. Apple* case.

21          **THE COURT:**  All right.  I will take a look at it.  I

22  don't -- I actually don't think that's right, but I will take a

23  look at it.

24          **MR. RAPHAEL:**  Thank you, Your Honor.

25          **THE COURT:**  All right.

1        **MR. RAPHAEL:**  We would then object -- I do apologize,

2   Your Honor.  I'll move it through very quickly.

3      We would just object to the reference that -- we would

4   object to the reference that the jury must balance any

5   competitive harms.  We understand the *Epic vs. Apple* decision.

6   We're just preserving the objection to that.

7        **THE COURT:**  *Epic* requires the balance.

8        **MR. RAPHAEL:**  I understand, Your Honor.  We're

9   preserving that for further appellate review.  The issues --

10        **THE COURT:**  That's overruled.

11      Okay.

12        **MR. RAPHAEL:**  And then we would respect -- we would

13   request that the jury be instructed at the end that "You must

14   determine that Epic has proven an anticompetitive effect for

15   each of the acts that Epic alleges were anticompetitive."  We

16   would cite the *Qualcomm* and *Microsoft* cases, as well as the

17   District Court --

18        **THE COURT:**  That's amply covered elsewhere.  So that's

19   denied.

20        **MR. RAPHAEL:**  And, finally, Your Honor, we request an

21   instruction that Google may not be held liable under Section 2

22   for design changes.  Your Honor, has referenced the *Allied*

23   case.  We --

24        **THE COURT:**  Design changes?

25        **MR. RAPHAEL:**  Yes, Your Honor, with respect to the

```
 1    sideloading.
 2          THE COURT:  Is there an argument about design changes?
 3          MR. EVEN:  We're not arguing that, Your Honor.
 4          THE COURT:  That's not supported by the evidence, so
 5    that will not going to be given.
 6          MR. RAPHAEL:  We would point --
 7          THE COURT:  There hasn't been a word about design
 8    changes as anticompetitive conduct.
 9          MR. RAPHAEL:  We would point the Court to Dr. Mickens'
10    testimony about redesigning the sideloading warning.
11          THE COURT:  He may have made a passing reference; but
12    if he did, it flew like a rocket over everybody's head.  Nobody
13    else has talked about it.  It's not supported by the evidence.
14    I will not give that instruction.
15          MR. RAPHAEL:  Thank you, Your Honor.
16          THE COURT:  Okay.  What do we have next?
17          MR. EVEN:  24, Your Honor.
18          THE COURT:  They get to have that one.  You-all
19    mentioned it.  It's just --
20          MR. EVEN:  I think the only request I would have on
21    that one, sir, is that -- sorry, Your Honor -- is that we
22    should not have it as a standalone.  There's a long list of
23    qualifications on -- within 23 --
24          THE COURT:  We're going to keep it.  Okay?
25       All right.
```

1          MR. MACH:  Your Honor --

2          THE COURT:  25, Restraint of Trade.  That seems fine.

3          MR. MACH:  Your Honor, when you're ready, I have one

4    request on 24, if I may.

5          THE COURT:  On 24?

6          MR. MACH:  On the Duty to Deal, Your Honor.

7          THE COURT:  All right.

8          MR. MACH:  We think that it is important under the

9    circumstance of the case that the jury be given the legal

10   principle that under the antitrust laws, there is no duty to

11   aid competitors, and we would propose to put that at the top of

12   the instruction.

13         THE COURT:  That's denied.  This is more than enough

14   for this case.

15       Okay.  25, Restraint of Trade.  That's fine.

16       26.  That's right out of the ABA.

17       Okay.  I'm not going to give A Good Intent is not a

18   Defense.  We don't need it.  Okay?

19         MR. EVEN:  Okay, Your Honor.

20         THE COURT:  Yeah.  There's no per se agreement, so...

21       Okay.  27.

22         MR. RAPHAEL:  Just a few objections on this,

23   Your Honor.

24       The first is with respect to the first paragraph.  So

25   there are some references to agreements here that we don't

 1  think are --

 2       THE COURT:  I've adopted ABA Model 1C3A, and that's

 3  what I used here.

 4       MR. RAPHAEL:  So with respect to the first paragraph,

 5  Your Honor, I think it's some language that's particular to

 6  this case.  There are reference to a number of agreements here

 7  that we don't think have actually been put at issue or not

 8  properly so.

 9       First there's a reference to the DDA agreements.  I think

10  the only agreements there, as my colleague, Mr. Olasa, said

11  earlier, are either, one, the restriction on dealing, which I

12  think we've already been granted summary judgment on; and,

13  second, the billing policy, which is also the subject of the

14  tying claim.

15       THE COURT:  Just, it's too much.  I don't even know

16  what you're talking about.  What is it that you want to change

17  in this?

18       MR. RAPHAEL:  We don't think that the DDA agreements

19  or the Facebook -- reference to a Facebook agreement or

20  agreements with cell phone carriers should be part of the

21  instruction.  I don't think there's any --

22       THE COURT:  These are the contracts that they're

23  saying are unreasonable restraints.

24       MR. RAPHAEL:  But they haven't -- I don't think

25  they've put in any evidence certainly about the last two, the

1   Facebook and carrier agreements.

2       And with respect to the DDA, I think there are two

3   contractual provisions that have come up in the trial,

4   Your Honor.  The first has to do with the restriction on

5   dealing.  That has been the subject of Your Honor's summary

6   judgment order; and, therefore, we don't think that should be

7   in the instruction.

8       The second would be the billing policy, and that billing

9   policy is the subject of the tying claim.  We don't think that

10  Epic should be able to assert a claim for the same agreement

11  under Section 1 under a tying theory as well as under a general

12  rule of reason theory.

13          MR. EVEN:  Your Honor, I have a few on these as well

14  on the same language -- on the same sentence; but with respect

15  to the first proviso about the DDA, we do have claims on that.

16  We have raised, for instance, the antisteering.  That's --

17          THE COURT:  The DDA I'm fine with.  What about

18  Facebook?

19          MR. EVEN:  Then the next one, Your Honor, we think

20  that that one -- we don't -- I don't think we need Facebook.

21          THE COURT:  I didn't hear much about Facebook.

22          MR. EVEN:  No, I don't think we need Facebook.  I

23  think what we do need is to mention --

24          THE COURT:  All right.  Wait.  So hold on.

25          MR. EVEN:  Sorry.

1    **THE COURT:**  Facebook is out.  Okay.  I'm going to

2    delete Facebook.

3        Activision, Riot Games, Supercell, that's all fine.

4    **MR. EVEN:**  Well, so those were identified specifically

5    for per se.  I think what we need here is something more

6    general that says -- the way I would frame it is "The

7    Project Hug or Games Velocity Program agreements with certain

8    app developers include" --

9    **THE COURT:**  All right.  I'll tell you what, just

10    redraft it.  Okay?  You two work on a redraft for that, and

11    I'll look at that one on -- do that by Monday, though, please.

12    We'll take a look at it.  If you want to recast that one, we

13    can do that.

14    **MR. EVEN:**  Okay.  The other thing on this one,

15    Your Honor, is --

16    **THE COURT:**  But talk with each other and work

17    something out.

18    **MR. EVEN:**  Okay.  The other one I suspect is a point

19    that we'll not come to agreement on, so if I may raise that

20    one.  It's not about the first paragraph.  It's about the

21    second one.

22    **THE COURT:**  Which one?

23    **MR. EVEN:**  This is about lines 16 to 17.

24    **THE COURT:**  16, yes.

25    **MR. EVEN:**  16 and 17.

 1            THE COURT:  Okay.

 2            MR. EVEN:  Which we think it currently says "You must

 3    consider whether the restraints produce countervailing

 4    competitive benefits."  We think it should say "You consider

 5    whether Google has proven that the restraints..."

 6         This is another place typically these say --

 7            THE COURT:  Oh, I think that's fine.  All right.

 8    "Whether Google has proven" -- so it parallels "whether Epic

 9    has proven"; right?

10            MR. EVEN:  Correct, Your Honor.

11            MR. RAPHAEL:  Just two quick things I also suspect

12    Mr. Even won't agree with, if it's all right with Your Honor.

13            THE COURT:  Sure.

14            MR. RAPHAEL:  The first is, again, just our standing

15    objection to the balancing instruction.  I understand

16    Your Honor addressed that earlier.

17         And then in the very end of line 12 into line 13, it

18    refers to "the challenged restraints."  We think that it should

19    say "each challenged restraint has resulted."  I think the

20    current language could permit the jury to impose --

21            THE COURT:  How about "a challenged restraint"?

22            MR. RAPHAEL:  I think I would be okay with that,

23    Your Honor.

24            THE COURT:  Yeah, let's do that.  Let's do "a

25    challenged restraint," and then you can -- it doesn't put any

 1   quantities on.  Okay?

 2          MR. RAPHAEL:  Thank you, Your Honor.

 3          THE COURT:  So just remember that one, "a challenged

 4   restraint."

 5          MR. RAPHAEL:  Yes, Your Honor.  Thank you.

 6          THE COURT:  And then you two are going to fiddle with

 7   that list of contracts.  Okay?

 8          MR. EVEN:  Okay.

 9          THE COURT:  All right.

10          MR. RAPHAEL:  On Number 28, Your Honor, I have a

11   number of requests that Your Honor has already disposed of, so

12   maybe I can list them quickly.

13          THE COURT:  Well, here's the disposition on those:  I

14   already have them.  I followed ABA Model Instruction 1C3 with a

15   couple of modifications supported by the evidence in this case.

16      The decision in *Epic v. Apple* that we've referenced many

17   times suggests strongly that Google's objection under the *NCAA*

18   case is not well taken.

19      At Step 2, the rule of reason analysis, the defendant must

20   offer, quote, "nonpretextual pro competitive rationales," close

21   quote; and Step 3, the plaintiff must prove -- must, quote,

22   "prove the existence of substantially less restrictive

23   alternatives, LRAs, to achieve defendant's pro competitive

24   rationales," close quote.

25      And then under our governing Ninth Circuit precedent,

1  precedent, quote, "requires a court to proceed to this fourth

2  step," close quote, namely, the, quote, "balancing the

3  anticompetitive effects, the defendant's conduct against its

4  pro competitive benefits," period.

5      And if a plaintiff fails to carry its Step 3 burden --

6  where the plaintiff fails to carry its Step 3 burden of

7  establishing viable less restrictive alternatives.  That's all

8  coming from *Apple*, 67 F.4th at pages 985 to 993, a lengthy

9  quote but it's all abstracted from there.

10     So consider all your objections preserved and overruled.

11     All right.  Any word changes here?

12         MR. RAPHAEL:  Yes, Your Honor.  Again, I'm just going

13  to request the after-market instruction.  I know Your Honor has

14  indicated --

15     THE COURT:  It's denied for the previously stated

16  reasons.

17     What's next?

18         MR. RAPHAEL:  And then as with the Section 2 willful

19  acquisition instruction, we would request that Epic --

20         THE COURT:  Okay.  Is this Number 28?

21         MR. RAPHAEL:  It is.  I'm saying I'm just referencing

22  a discussion we had earlier, Your Honor.

23         THE COURT:  Oh.

24         MR. RAPHAEL:  We requested an instruction that Epic be

25  required to prove harm to consumers under the *AmEx* case, and

1    Your Honor denied that earlier.  I'm just preserving it.

2         **THE COURT:**  Oh, okay.  All right. that's fine.

3         **MR. RAPHAEL:**  We would request again in the first

4    sentence of the first paragraph on page --

5         **THE COURT:**  This is all in your papers.  We don't need

6    to regurgitate all this.

7         **MR. RAPHAEL:**  Your Honor, I apologize, but I think

8    under the rule -- under Rule 50, we have to make it --

9         **THE COURT:**  Don't tell me what the rules say.  You're

10   not going to waive anything.  Okay?  It's here.  And when you

11   do your JMOL motion 50(b), you're going to be fine.  All right?

12   You can quote me on this.  All right?

13        **MR. RAPHAEL:**  If I could, I'd just like to list our --

14        **THE COURT:**  All right.  Just finish it up.  Let's get

15   going.  Come on.

16        **MR. RAPHAEL:**  I will get through it, Your Honor.

17        **THE COURT:**  This is taking too much time.

18        **MR. RAPHAEL:**  We would request that -- again, that

19   Epic be required to -- I'm sorry -- that we add "by restricting

20   output" in the first sentence of the first paragraph on

21   page 36.

22        **THE COURT:**  All right.  Denied.

23        **MR. RAPHAEL:**  We would request an instruction that

24   Epic does not bring a claim that Google harmed the competition

25   in a licensable OS market.

1       We would request an instruction, again, that the relevant

2   market must reflect commercial realities.

3           THE COURT:  What do you think a relevant market

4   reflects but commercial realities?  What's the noncommercial

5   realities reflected in any relevant market at issue in this

6   case?

7           MR. RAPHAEL:  Well, Your Honor, I think our position

8   might be that Professor Bernheim's market does not capture the

9   commercial realities.  I think that's an argument we would like

10  to make in the case.

11          THE COURT:  Okay.  Next one.  29.

12          MR. RAPHAEL:  On this one, Your Honor, we would

13  request the --

14          THE COURT:  We just did that one.  I just read my

15  disposition.

16          MR. RAPHAEL:  On 29, Your Honor?

17          THE COURT:  Yeah, Rule of Reason, Evidence of

18  Competitive Benefits.

19          MR. RAPHAEL:  Yes, Your Honor.  On this one, again, we

20  would request the instruction that to qualify as substantially

21  less restrictive, the alternative means must be virtually as

22  effective and without significantly increased costs.

23          THE COURT:  I will look at that.

24          MR. RAPHAEL:  Thank you, Your Honor.

25      I think that's all I had on 29.

1      **THE COURT:**  All right.  30.

2      **MR. RAPHAEL:**  Again, on this one we object to the

3  balancing step, and I think we would request an instruction

4  that if there is to be a balancing step, that the jury should

5  not -- be instructed not to second-guess whether Google's

6  challenged conduct was reasonably necessary as a matter --

7      **THE COURT:**  Both are denied under the *Apple* case that

8  I've cited, 67 F.4th.

9      **MR. RAPHAEL:**  Thank you, Your Honor.

10      **THE COURT:**  Okay.  31.  No problem.

11    32.  No problem.

12    33, Rule of Reason.

13      **MR. OLASA:**  Your Honor, we have a small one on 33.

14      **THE COURT:**  Okay.

15      **MR. OLASA:**  So lines 9 to 10, after "Google Play

16  Billing," there's the language "for in-app transactions."  We

17  think that additional language isn't in the model rule.  Of

18  course, it isn't because it's case specific, but we also think

19  it's not necessary.  The tied -- the claim tied product here is

20  Google Play Billing.  We don't think additional language here

21  is necessary.

22      **THE COURT:**  Oh, I think it's important.  Look, this is

23  a hard-working jury, but they need some help understanding

24  things.  This is a clarifying concept, and I favor its

25  inclusion.

1    Okay.  That's it for 33.

2    34, ABA Model 2E5.  Epic, you wanted to include a couple

3    things, but I don't think that's consistent with the model

4    instructions.

5         **MR. EVEN:**  We're not standing on them, Your Honor.

6    We're good with it.  Thank you.

7         **THE COURT:**  All right.  35.  That follows ABA Model

8    Instruction 2E7.

9         **MR. OLASA:**  Yes, Your Honor.  So this is a similar

10   issue, so I suspect we'll get the same result; but on lines 5

11   to 6 after "Google Play Billing," there is "to facilitate the

12   sale of digital goods or services in those apps."  We would ask

13   that language be removed, but I understand Your Honor's --

14        **THE COURT:**  Oh, no.  Listen, the jurors need some

15   plain English to make sure they understand what they're doing.

16   That's all that that is.  So that's perfectly fine guidance for

17   the jury.

18   36.  Oh, I didn't -- the 30 percent threshold, we don't

19   need that.  It's also not entirely clear to me that that's

20   accurate; but, more importantly, it's unnecessary in light of

21   the evidence in this case.  Okay?

22   37.  Let's see, just some tiny little changes and

23   harmonizing, that seems fine.

24        **MR. OLASA:**  Your Honor, we have a very minor one on

25   37.

1          THE COURT:  Which one?

2          MR. OLASA:  On 37.

3          THE COURT:  Yes.

4          MR. OLASA:  So at line 16, there's a phrase "market

5   for Android in-app billing services."  We just ask the word

6   "allege" to be put below it to be consistent with the rest of

7   the instructions.

8          THE COURT:  All right.  "Alleged."

9          MR. OLASA:  Thank you, Your Honor.

10         THE COURT:  Okay.  38.

11         MR. EVEN:  On 38, Your Honor --

12         THE COURT:  Yeah.

13         MR. EVEN:  -- we just think that we need on that one

14   the same balancing instruction as in other places.

15         THE COURT:  For business justification?

16         MR. EVEN:  Yes, Your Honor.  To say "If the business

17   justification has been found, the next step is you need to

18   balance the overall" --

19         THE COURT:  This is just one defense.  It's not tying

20   as a claim.  This is just one defense.  So why would you put

21   that in here?

22         MR. EVEN:  Well, I think the way it works, this is

23   sort of the specific application of rule of reason to tying, as

24   I understand it.  And so the question is:  What happens if the

25   jury finds that there is a tie, there is harm, there is

1  business justification, is that the final step or do we have a

2  final step after that of balancing?

3       **THE COURT:**  Google?

4       **MR. OLASA:**  Your Honor, we generally object to the

5  balancing instruction, and so we don't think it's appropriate,

6  but we do agree that this is a rule of reason statute.

7       **THE COURT:**  Well, I'm rejecting your objection under

8  that ground --

9       **MR. OLASA:**  Understood, Your Honor.

10      **THE COURT:**  -- under *Apple*, but it's all within the

11 rule -- the balancing is -- this is all rule of reason, and

12 that's sort of the -- this is the quilt over the entire bed.

13 So the balancing is already draped over.  You know what I mean?

14 Do you see what I'm saying?  It's already draped over

15 everything.

16      **MR. EVEN:**  I understand that, Your Honor.

17      **THE COURT:**  Okay.  All right.  I don't think we need

18 to say "balancing" again, so I'm going to decline that.

19    Okay.

20      **MR. OLASA:**  Your Honor, we have a few on this one.  We

21 have a few objections on this one.

22      **THE COURT:**  Oh, yes.  Yeah.

23      **MR. OLASA:**  So, first, Your Honor, this objection is

24 framed as Google's burden, which is appropriate.

25    But further down where it says that "You should consider

 1  whether there's less restrictive alternatives," we think it

 2  should be Epic's burden on those consistent with other

 3  instructions, and so --

 4          **MR. EVEN:**  I'm sorry.  Can you give us a line?

 5          **MR. OLASA:**  Sure.  So on line 17, we would add that

 6  "Epic must prove the existence of substantially less

 7  restrictive means" so it's clear where the burden lies.

 8  Because on this instruction, Google generally otherwise has the

 9  burden.

10          **THE COURT:**  I don't think that says that.  What are

11  you worried about?

12          **MR. OLASA:**  So this instruction, Your Honor, requires

13  Google to come forward with a business justification.  We think

14  that at line 17 it should be clear that once Google has come

15  forward with that, it's Epic's burden to offer a substantially

16  less restrictive means.

17          **THE COURT:**  This is your instruction.  I'm adopting

18  what you gave me.  What is it you want to do?

19          **MR. OLASA:**  We would add here, Your Honor, "Epic must

20  prove the existence of substantially less restrictive means" at

21  line 17 so it's clear it's not Google's burden.

22          **MR. EVEN:**  I actually think it says something

23  different, Your Honor.  I think this --

24          **THE COURT:**  It does, and what Google is proposing is

25  not consistent with the model instruction, so I'm going to

 1  decline that.

 2        MR. OLASA:  Your Honor, the second objection we have

 3  to this is one that Mr. Raphael raised with you and you said

 4  you'd take a look at.  We think that Epic must show that

 5  substantially less restrictive means are virtually --

 6        THE COURT:  Yes, I will look at the cost thing for

 7  every invocation of that.  Okay?

 8        MR. OLASA:  And then one last one on this, Your Honor.

 9        THE COURT:  What line is that, by the way?

10        MR. OLASA:  This comes up in a number of places, but

11  it comes up --

12        THE COURT:  Oh, it's line 26.

13        MR. OLASA:  And the last objection on this one,

14  Your Honor, is on line 7.  It says "Google contends that the

15  tying arrangement is justified because it enables Google..."

16     We would ask that we add -- between "justified because"

17  and "it enables," we would add "among other things" because, as

18  Ms. Loew testified today, there are other justifications and we

19  don't want to be precluded from arguing them to the jury.

20        THE COURT:  Mr. Even?

21        MR. EVEN:  I don't have Ms. Loew's testimony resigned

22  to my memory, but I think this is the only justification I've

23  heard, but I don't -- I can't say that this is wrong.  So I

24  don't -- I just don't know off the top of my head.

25        MR. OLASA:  Your Honor --

1          MR. EVEN:  This is certainly what we heard from the

2    economists, et cetera.

3          MR. OLASA:  We do agree it's a primary justification.

4    There are other justifications.  Ms. Loew testified about

5    shared wallets, tracking of purchase history, subscription

6    management, parental controls.

7          THE COURT:  I don't want to just say one.  It's not

8    useful to tell the jury there's just one and then just say "and

9    Anything else you can think of."  I mean, that's just not

10   useful.

11         MR. OLASA:  Understood, Your Honor.

12         THE COURT:  Look, this is a roadmap for the jury.

13   Okay?  This is helping a bunch of people who aren't lawyers who

14   are smart and hard working and paid attention to the evidence

15   figure out what to do in this case.  So I'm not going to just

16   say, "Well, here's one three-sentence long description, and

17   then here's a grab bag that you can stuff with anything you

18   want."  It's just not right.  That's confusing and misleading

19   for a jury.  So I'm not going to say that.

20         Now, if you two want to work out something that is more

21   structured, I'll consider it, but we're not just going to say,

22   "You know, here's an extremely specific example, and then go

23   nuts on anything else you can think of."  I'm not going to do

24   that.  All right?

25         MR. OLASA:  Appreciate that, Your Honor.

1          THE COURT:  Okay.

2          MR. OLASA:  We will propose something.

3          THE COURT:  All right.

4      Okay.  Injury and Causation.

5          MR. EVEN:  On that one, Your Honor --

6          MR. MACH:  I'm sorry, Yonatan.  I did not hear you.

7          THE COURT:  39.

8          MR. EVEN:  Yeah.  So on this one, Your Honor, we still

9  have some references here to damages that we think should be

10 removed.

11         THE COURT:  Oh.  Where is that?

12         MR. EVEN:  So this is on page 47 at line 13.

13         THE COURT:  Injury -- just say "injury, in fact, or

14 fact of damage"?

15         MR. EVEN:  It says that it is entitled to recover

16 damages.

17         THE COURT:  Oh, you're not doing that.  Okay.

18         MR. EVEN:  Correct.

19         THE COURT:  So how about for Epic to what?  To

20 prevail?  Well, what do you want to say?

21         MR. EVEN:  I think "For Epic to establish injury" --

22         THE COURT:  Oh, okay.

23         MR. EVEN:  -- "or the fact of damage or anything like

24 that..."

25         THE COURT:  Okay.  So "For Epic to establish injury,

1  in fact, or fact of damage."  We'll just repeat it.  How about

2  that?

3          MR. MACH:  We're fine with that one, Your Honor.

4          THE COURT:  Okay.

5          MR. EVEN:  And then on lines 27...

6          THE COURT:  27.  Okay.

7          MR. EVEN:  Yeah.  27, 28 we think the last sentence

8  just should be stricken.

9          THE COURT:  Oh, yeah, okay.  There's no -- we'll take

10  that out.

11          MR. MACH:  May I suggest on that, Your Honor, that

12  it's still a correct statement of law if we were to remove the

13  word "damages"?

14          THE COURT:  Well, no.  It's recover damages for

15  losses.  That's specific to damages.  It's not specific to

16  winning.  They can still win their antitrust claim without

17  proving losses.

18          MR. MACH:  Well, I think they have to prove injury,

19  but certainly don't need to prove damages, Your Honor.  We

20  agree with that.  However, we think it important that the jury

21  be told --

22          THE COURT:  It says right here that they must

23  establish that Epic was injured, in fact.

24          MR. MACH:  Yes.

25          THE COURT:  So we're fine with that.  I'm not going to

 1   add anything else down there.  That's specific to money claims

 2   I'm just going to take that out.

 3        **MR. MACH:**  Your Honor, if I could be heard on that

 4   sentence for a moment.

 5        We think it important that the jury hear that the

 6   antitrust laws would not prevent a verdict for the plaintiff

 7   for any sort of injury that was caused by the competitive

 8   process or conduct that benefits consumers.  We think that's an

 9   important substantive element of the instruction.

10        **THE COURT:**  I don't understand what you're saying.

11        **MR. MACH:**  The last sentence that we're discussing

12   here, I'm referring largely to line 28, the end of line 27,

13   which refers to losses that were caused by the competitive

14   process or conduct that benefits consumers.  In a sense, it's

15   capturing an important aspect of the antitrust injury

16   requirement.  We think it important that the jury understand --

17        **THE COURT:**  What is it?  What is it you want it to

18   say?

19        **MR. MACH:**  Oh.  So we -- I'm not sure I totally

20   understand how that sentence has been modified by my

21   colleague's instruction or request, but I would have it say

22   something like "The antitrust laws do not permit recovery or a

23   verdict" -- or something of that nature -- "for losses that

24   were caused by the competitive process or conduct that benefits

25   consumers."

1    **THE COURT:**  Well, the next page says that "Epic's

2    injuries were caused by a reduction in competition or acts that

3    would otherwise harm consumers.  Epic's injuries are antitrust

4    injuries."

5    **MR. MACH:**  That line is entirely consistent with the

6    proposal that I'm making, Your Honor.  I think this other

7    sentence --

8    **THE COURT:**  I know that, but why would we say it

9    twice?  That's my point.  We don't need to say it five lines

10   later twice.  We don't need that.  That's redundant.

11   **MR. MACH:**  I understand.  I don't view it as saying it

12   twice because I think that the prior sentence on the prior page

13   is an important element of it, which is the instruction that

14   injuries caused by competition are not injuries that the jury

15   should consider as sufficient to justify a verdict for Epic.

16   I think --

17   **THE COURT:**  "On the other hand, if Epic's injuries

18   were caused by competition, the competitive process, Epic's

19   injuries are not anti" -- it's all right there on page -- okay?

20   You don't need it.  That's redundant and confusing.

21   **MR. EVEN:**  Your Honor --

22   **THE COURT:**  Yeah, go ahead.

23   **MR. EVEN:**  -- maybe I can help with that because my

24   colleague jumped into it before --

25   **THE COURT:**  It's all there.

1          MR. EVEN:  -- I got to the last change that we need.

2          MR. MACH:  Let's see.

3          THE COURT:  All right.  It's all there.  You just

4    didn't turn the page far enough to read it.  Okay.

5          MR. EVEN:  So the last change that we need is on

6    page 48.

7          THE COURT:  48.

8          MR. EVEN:  Yes.  And that is in the penultimate

9    paragraph or the top paragraph on the page.

10         THE COURT:  What is it?

11         MR. EVEN:  Then we have on line 6 "then Epic's

12   injuries are not antitrust injuries, and Epic may not recover

13   damages."

14         THE COURT:  "May not recover," how about that?  Just

15   delete "damages"?

16         MR. EVEN:  We think it should be "and Epic is not

17   entitled to a verdict that Google has violated the antitrust

18   laws," or something along those lines.  But anything --

19         THE COURT:  You want to say that?  "Not entitled to a

20   verdict," Google?

21         MR. MACH:  I'm afraid I'm not -- we're on line --

22         THE COURT:  Page 48.  The issue is replacing the word

23   "damages" with -- replacing the phrase "Epic may not recover

24   damages" with -- what?  "Epic may not" --

25         MR. EVEN:  We can just delete "recover damages" and

 1   "for injuries."  And then --

 2           THE COURT:  Well, you said something about you're not

 3   entitled to a verdict?

 4           MR. EVEN:  Yeah, it's the same thing, Your Honor.  So

 5   the sentence I added is "Epic is not entitled to a verdict that

 6   Google has violated the antitrust laws."  That's the same.

 7           THE COURT:  All right.  How does that sound, Google?

 8           MR. MACH:  I think it's fine.  Let me make sure I'm

 9   understanding, Your Honor.

10      The sentence would remain as it is now, and then at the

11   end of line 6 it would say "Epic may not" --

12           THE COURT:  "Epic is not entitled to a verdict," I

13   think, "for those injuries."

14           MR. MACH:  I'm fine with that, Your Honor.

15           THE COURT:  Okay.

16           MR. MACH:  We do have two other small changes that we

17   think are important to conform this to something closer to the

18   instruction, and it is actually consistent with my colleague's

19   earlier proposal, and that is line 6.

20           THE COURT:  On page?

21           MR. MACH:  On page 47.

22           THE COURT:  Page 47, all right.

23           MR. MACH:  We would change the phrase "Epic is

24   entitled to a verdict that Google is liable" to "Epic was

25   injured."  We think that's what the heart of this instruction

1   is about.

2          THE COURT:  "Epic is entitled to a verdict that Google

3   is liable if it can establish these elements of injury."  Why

4   do you want to change that?

5          MR. MACH:  Because we think the instruction is not

6   intended to sort of encapsulate the entire summary of the

7   liability and other standards found in other instructions.

8   That's the implication of the sentence as is.  It is intended

9   to determine --

10          THE COURT:  This is right out of the model.  What is

11   it you want to do in that sentence?  This is right out of the

12   model instruction?

13          MR. MACH:  Your Honor, I don't think this -- I think

14   that --

15          THE COURT:  It's out of ABA6.A.1.  Now what is it that

16   you want to say here in that sentence?

17          MR. MACH:  Your Honor, I don't think that that phrase

18   is out of the model instruction as drafted.  I think the model

19   instruction refers to damages there, which is, I assume, why it

20   was modified and that's logical, but the way that it was

21   modified sort of suggests that the entire instruction here

22   answers the question about liability in a way that we think

23   isn't right.

24      So we would propose that --

25          THE COURT:  It starts off by saying "If you find that

1  Google violated the antitrust laws, then you must determine

2  injury."  So it's already built in.  This is not saying, "Hey,

3  find injury.  We're done."  That's not saying that.  It's

4  saying "If, and only if, you already determined there's an

5  antitrust violation, you have another step."  It's actually

6  saying something favorable to you.  It's saying "Don't stop.

7  You can't stop there.  You need to go another 50 yards and find

8  injury."

9       So that's wrong.  That's denied.

10          MR. MACH:  I would request, Your Honor, in the same

11  vein, at the bottom of the instruction on page 8, line 8 to 11,

12  you will find a similar principle repeated although this does

13  not contain the caveat that Your Honor pointed to.  Instead, it

14  starts with --

15          THE COURT:  It is.  It's all in the same instruction.

16  So it is by definition covered by the same conditional.  "If,

17  and only if, you find already that Google has violated the

18  antitrust law, don't stop.  Go on.  Find injury."  Okay?

19       I'm done with that one.

20       All right.  Statute of Limitations.

21          MR. EVEN:  So, Your Honor, on statute of limitations,

22  our understanding is that statute of limitations doesn't

23  actually apply to --

24          THE COURT:  I think it might help the jury.  They need

25  a start date, so...

1          **MR. EVEN:**  Okay.

2          **THE COURT:**  I mean, some of this stuff went back to

3   2008.  I mean, we have to help them understand "Here's the

4   period that matters."

5          Remember, this is all to help the jury.  We're trying to

6   help the jury.  Okay?  They don't know this case like you do

7   for the last, you know, how many years you've been litigating

8   it.  They need to know -- okay, they saw all this stuff from

9   '07, '08, '11.  They need to know that the time that counts is

10  2016 August on.  So they need to know that, so that one is

11  going to happen.

12         Okay.  Oh, Breach of Contract, out.

13         Damages, out.

14         Contract damages, out.

15         Duty to Deliberate, good.

16         **MR. MACH:**  Your Honor, we do have a couple of small

17  things to take up for instructions that we proposed but were

18  omitted.

19         **THE COURT:**  Which one?

20         **MR. MACH:**  And that was our Proposed Instruction

21  Number 20 concerning the relevant product market.

22         **THE COURT:**  Oh, how about this?  Sorry.  Would you

23  rather say "relevant time period" than "limitations"?  Maybe

24  "relevant time period" might be better.

25         **MR. EVEN:**  I think that would be more consistent with

 1   the law, and we'd be happy to adopt it.

 2       THE COURT:  So "The relevant time period for the

 3   antitrust laws preclude" -- "The relevant time period precludes

 4   recovery."  "Statute of limitations" is a little clumsy for a

 5   jury.  Let's say "relevant time period."

 6       Okay with that, Google?

 7       MR. MACH:  We are.  We think that captures it more

 8   accurately, Your Honor.

 9       THE COURT:  All right.  Okay.  Go ahead.  What were

10   you saying?

11       MR. MACH:  Sure.  We had proposed -- it was our

12   Proposed Instruction Number 20 -- an instruction that is based

13   off the model, though not verbatim, concerning supply

14   substitutability.

15       THE COURT:  Oh, yes.  That just is not going to work

16   in this case.

17       MR. MACH:  If I may, Your Honor, the type of supply

18   substitutability that we're talking about arose actually today

19   again in the testimony of Dr. Bernheim where Dr. Bernheim

20   acknowledged, as he had to, that his analysis of the RSA 3.0

21   agreements was based on the concern that the marketplace in

22   China put certain companies in the position to expand into the

23   marketplace in competition with Google.

24       Given that their own economist has the perspective that

25   that was the motivation for RSA 3.0, we think that there's an

1   entirely solid basis for us to argue and for the jury to

2   conclude that such supply substitutability is possible.

3        THE COURT:  I mean, a one-sided supply instruction is

4   not appropriate for the evidence in this case.

5        Okay.  I think that does it.

6        So I do need -- do I have a verdict form?

7        MR. RAPHAEL:  Your Honor, I apologize.  Just one

8   thing.  You've already addressed it.  I just want to preserve

9   it, and I neglected to do so earlier so I apologize for that.

10       With respect to Instruction 30, I requested an instruction

11  on if there is to be balancing, that the jury be instructed not

12  to second-guess degrees of efficiency.  We would request the

13  same instruction for Instruction 23 on willful acquisition.  I

14  understand Your Honor's ruling before.

15       THE COURT:  23?

16       MR. RAPHAEL:  Yes, 23.  We object there to the

17  balancing instruction; however, we understand Your Honor's

18  rulings on that.  If there is to be a balancing instruction, we

19  would like the jury to be instructed that they should not

20  second-guess degrees of efficiency.

21       THE COURT:  Why would you tell the jury that?

22       MR. RAPHAEL:  Well, Your Honor, we don't --

23       THE COURT:  Why are you possibly thinking anyone is

24  going to second-guess anything they've heard in the evidence?

25  I don't even know what that means.

1    They may not agree with you.  Is that what you're going to

2  consider be second-guessing?  They may say, "No, I don't think

3  that's right," and they're perfectly entitled to do that and

4  that is not second-guessing.  That's saying, "Google, you're

5  wrong.  We don't buy it.  You didn't persuade us."  That's not

6  second-guessing.

7         **MR. RAPHAEL:**  That comes from --

8         **THE COURT:**  How are you ever going to know that?  How

9  are you ever going to know whether the jury is doing that?

10  You're not.  So that's out.  I'm not going to do that.

11    This is all part of your -- you know, you don't win by

12  spin.  Okay?  In jury instructions, you don't win by spin.  You

13  win by the facts.  So this is spin.  This isn't faithful to the

14  evidence in the case.  So that's rejected on that grounds.

15         **MR. RAPHAEL:**  Thank you, Your Honor.

16         **THE COURT:**  Okay.  Now, you've got a big show on

17  Monday.  All right?  Are you going to be ready a week from

18  Monday, December 11th?

19         **MR. BORNSTEIN:**  Yes, Your Honor, of course.

20         **THE COURT:**  All right.  Google?

21         **MR. POMERANTZ:**  Yes, Your Honor, we'll be ready.

22    I just -- do you want to discuss the verdict forms at this

23  point?

24         **THE COURT:**  I don't because I have to spend a little

25  more time with them.  They're -- now, I just -- for the sake of

1  making sure I'm on top of everything, I'll do a little minute

2  order separate and apart from the one I normally do just saying

3  "Here's what we're going to do."  You owe me a couple things.

4  I'm going to look at something.  And I want all of that by

5  Monday.  Okay?  Because we don't have much time to get anything

6  done.

7       I'm going to look at the verdict form -- oh, do we need a

8  new one without damages and all that?  I think now that damages

9  are done --

10          MR. BORNSTEIN:  I do not remember if we took out the

11  damages yet.  No, they're still in there?  Okay.

12          THE COURT:  Because I think I raise that until -- we

13  didn't have that till today.

14          MR. BORNSTEIN:  Right.

15          THE COURT:  So one more time.  Okay?  And both of you.

16  And make sure you send me the Word thing, the Word version, you

17  know, to that box I have, e-mail address.

18          MR. POMERANTZ:  And you want us to get that to you by

19  Monday, is that --

20          THE COURT:  By Monday.  Like by noon on Monday.

21       Now, you have your demand done, settlement demand?

22          MR. BORNSTEIN:  We have sent it ahead of time,

23  Your Honor.  Mr. Pomerantz has it as of this morning.

24          THE COURT:  It's been delivered.

25          MR. BORNSTEIN:  Yes.

**CHARGING CONFERENCE**

1      **THE COURT:**  Okay.  And the counter is being prepared?

2      **MR. POMERANTZ:**  While I've been here, I'm sure people

3 have been working on it.

4      **THE COURT:**  No, I know.  But the counter is being

5 prepared?

6      **MR. POMERANTZ:**  Yes.

7      **THE COURT:**  And what deadline did I set for that?

8      **MR. POMERANTZ:**  Monday morning.

9      **THE COURT:**  All right.  And when are you going to

10 meet?

11      **MR. POMERANTZ:**  We've been discussing two dates next

12 week, but we're going to meet middle of the week probably.

13      **THE COURT:**  Okay.  In person?

14      **MR. POMERANTZ:**  In person.

15      **THE COURT:**  All right.

16      **MR. BORNSTEIN:**  We may precede that with a Zoom call,

17 but we will have the in-person meeting as well.

18      **THE COURT:**  Fine.  But I do want an in-person --

19      **MR. BORNSTEIN:**  Understood.

20      **THE COURT:**  -- you know, face to face.

21   Okay.  The dynamic is important.  Now, if you can't do it,

22 you can't do it, it's fine.  They're ready to rock, but you're

23 going to try.  I'm not going to accept no trying.  Okay?

24   All right.  Okay.  I'll see you then.

25      **MR. BORNSTEIN:**  Thank you, Your Honor.

1          **THE CLERK:**  All rise.  Court's in recess.

2               (Proceedings adjourned at 3:54 p.m.)

3                       ---oOo---

4

5               **<u>CERTIFICATE OF REPORTER</u>**

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8

9     DATE:   Friday, December 1, 2023

10

11

12

13     _____

14          Kelly Shainline, CSR No. 13476, RPR, CRR
                 U.S. Court Reporter
15

16

17

18

19

20

21

22

23

24

25