UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | MDL Case No. 21-md-02981-JD<br>Member Case No. 20-cv-05671-JD<br><br>**FINAL JURY INSTRUCTIONS FOR** ***EPIC* TRIAL** |

The Court will give these final instructions to the jury in the *Epic* trial, Case No. 20-cv-5671, on the morning of December 11, 2023, before the parties' closing arguments.  They are based on the parties' proposed instructions, Dkt. Nos. 806, 833, the discussion at the jury charge conference on December 1, 2023, and the Court's practices.

For Google's request for a judgment on its breach of contract counterclaim, Dkt. No. 833 at 2 n.2, the Court will decide Epic's illegality defense after the jury returns its verdict, and will treat the parties' stipulated facts, *id.* at 1-2, as proved.

For Instruction Nos. 23 (Willful Acquisition or Maintenance of Monopoly Power Through Anticompetitive Acts), 29 (Evidence of Competitive Benefits), and 38 (Business Justification Defense), the Court will give the additional language requested by Google that "to qualify as 'substantially less restrictive,' an alternative means must be virtually as effective in serving the defendant's procompetitive purpose without significantly increased cost."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) (cleaned up).

Epic's request to add a balancing step at the end of Instruction No. 38 (Business Justification Defense) is denied.  The Court will give the instruction consistent with the formulation in the ABA Model Civil Antitrust Instruction 2E.11.  The Court will add a reference

1   to the "Rule of Reason" in the title of Instruction No. 38 (Tying **Under the Rule of Reason** --

2   Business Justification Defense), to remind the jury that the analysis for the tying claim is similar to

3   the rule of reason analysis they are instructed on for Epic's other Sherman Act claims.

4          Neither side proposed separate instructions for Epic's California Cartwright Act claims.

5   Both sides agreed to simply say "California state law" as a reference in the instructions, with

6   nothing more.  Consequently, the Court will refer to "California state law" in the verdict form, and

7   will not ask separate verdict questions with respect to the Cartwright Act, or provide separate

8   instructions for it.

9          The parties are directed to prepare and bring to court on the morning of December 11,

10   eleven copies of the jury instructions for distribution to the jury.  The copies for the jury should be

11   double-sided and three-hole-punched, and should not include these cover comments or the ECF

12   stamp header on each page.

13          **IT IS SO ORDERED.**

14   Dated:  December 6, 2023

15

16

17   _____
     JAMES DONATO
17   United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION

MDL Case No. 21-md-02981-JD
Member Case No. 20-cv-05671-JD

**FINAL JURY INSTRUCTIONS**

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

<u>INSTRUCTION NO. 1</u>

DUTY OF JURY

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  You will each be given a copy of these instructions to refer to during your deliberations.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you, whether you agree with it or not.  You must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy.  You should also not be influenced by any person's race, color, religion, national ancestry, or gender.

All of this means that you must decide the case solely on the evidence before you.  Please keep in mind that you took an oath to do so.

Do not read into these instructions or anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.  That is for you to decide.

INSTRUCTION NO. 2

CLAIMS AND DEFENSES

I will give you a brief summary of the positions of the parties.

The plaintiff is Epic Games, Inc. ("Epic").

The defendants are Google LLC and certain of its affiliates ("Google").

Epic contends that defendant Google has violated federal and state antitrust laws through a variety of means that foreclose competition in an alleged market for Android app distribution and in an alleged market for in-app billing services on Android devices. Epic alleges that Google's conduct harms mobile app developers and consumers by increasing prices and reducing quality and innovation.

Google denies Epic's claims. Google contends that the relevant market is not limited to Android, but also includes Apple's iOS and other platforms where users and developers can engage in transactions for digital content. Google also contends that its conduct has not foreclosed competition, but rather has promoted competition by enabling Android to compete with iOS and other platforms. Google contends that its conduct benefited users and developers.

Google also brought a counterclaim against Epic alleging that Epic breached the Developer Distribution Agreement ("DDA"). Epic and Google have now stipulated to the following:

1. Epic incorporated its own payment solution into Fortnite on Google Play as an alternative to Google Play Billing, which violated the terms of the DDA.

2. Epic did not pay Google $398,931.23 in fees that Google would have received if transactions processed using Epic's payment solution were instead processed through Google Play Billing.

On the basis of these stipulations, you will no longer be asked to address Google's counterclaim.

INSTRUCTION NO. 3

CORPORATIONS -- FAIR TREATMENT

The parties in this case are corporations.  All parties are equal before the law, and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers, performed within the scope of their authority.  An act is within the scope of a person's authority if it is within the range of reasonable and foreseeable activities that an employee, agent, director, or officer engages in while carrying out that person's business.

United States District Court
Northern District of California

## INSTRUCTION NO. 4

## WHAT IS EVIDENCE

The evidence you are to consider in deciding what the facts are consists of:

      1.    the sworn testimony of any witness;

      2.    the exhibits that are admitted into evidence;

      3.    any facts to which the lawyers have agreed; and

      4.    any facts that I may instruct you to accept as proved.

## INSTRUCTION NO. 5

### WHAT IS NOT EVIDENCE

In reaching your verdict, you may consider only the testimony and exhibits received into evidence, any facts to which the lawyers have agreed, and any facts that I may instruct you to accept as proved.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

1.  Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.  Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.

3.  Testimony that was excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

4.  Anything you may have seen or heard when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

United States District Court
Northern District of California

INSTRUCTION NO. 6

DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

United States District Court
Northern District of California

1

<u>INSTRUCTION NO. 7</u>

2

RULING ON OBJECTIONS

3       There are rules of evidence that control what can be received into evidence.  When a

4   lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought

5   that it was not permitted by the rules of evidence, that lawyer objected.  If I overruled the

6   objection, the question was answered, or the exhibit received.  If I sustained the objection, the

7   question was not answered, or the exhibit was not received.  Whenever I sustained an objection to

8   a question, you must ignore the question and must not guess what the answer might have been.

9       Sometimes I ordered that you disregard or ignore that evidence.  That means that when you

10   are deciding the case, you must not consider the stricken evidence for any purpose.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

INSTRUCTION NO. 8

DEPOSITION IN LIEU OF LIVE TESTIMONY

During the trial, you heard testimony by witnesses in the form of previously recorded trial and deposition testimony, rather than live here in court. A deposition is the sworn testimony of a witness taken before trial. The witness was placed under oath to tell the truth, and lawyers for each side asked questions. The questions and answers were recorded.

Insofar as possible, you should consider deposition testimony presented to you in court in lieu of live testimony, in the same way as if the witnesses had been present to testify.

INSTRUCTION NO. 9

CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness said, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.  the opportunity and ability of the witness to see or hear or know the things testified to;

2.  the witness's memory;

3.  the witness's manner while testifying;

4.  the witness's interest in the outcome of the case, if any;

5.  the witness's bias or prejudice, if any;

6.  whether other evidence contradicted the witness's testimony;

7.  the reasonableness of the witness's testimony in light of all the evidence; and

8.  any other factors that bear on believability.

Sometimes a witness may have said something that is not consistent with something else he or she said.  Sometimes different witnesses gave different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

United States District Court
Northern District of California

INSTRUCTION NO. 10

EXPERT OPINION

You have heard testimony from expert witnesses who testified to opinions and the reasons for their opinions.  This opinion testimony was allowed because of the education or experience of the expert witness.

Such opinion testimony should be judged like any other testimony.  You may accept it, reject it, or give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

INSTRUCTION NO. 11

CHARTS AND SUMMARIES

During trial, certain charts and summaries were shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  Some of those charts or summaries may have been admitted into evidence, while others were not.

Charts and summaries are only as good as the evidence that supports them.  You should, therefore, give them only such weight as you think the evidence supporting them deserves.

INSTRUCTION NO. 12

STIPULATIONS OF FACT

The parties have agreed to certain facts that I will now read to you.  You must treat these facts as having been proved.

1.     Google LLC is a wholly-owned subsidiary of Alphabet Inc.

2.     Google offers various products and services, including Android OS, Chrome, Gmail, Drive, Maps, Play, Search, YouTube, Google Cloud, and Search Ads 360.

3.     A mobile operating system ("OS") provides multi-purpose computing functionality to a mobile device such as a smartphone or a tablet.

4.     To be useful to consumers, a mobile OS must be able to run software applications or "apps."

5.     A mobile OS facilitates the use of apps through code, such as application programming interfaces ("APIs"), which app developers use to create apps that are compatible with the OS.

6.     An "app" is software separate from the mobile OS that runs on a mobile device and adds specific functionalities to a mobile device.

7.     Consumers use apps to perform a variety of tasks on their mobile devices.

8.     Entities that manufacture mobile devices -- such as Samsung or Motorola -- are referred to as original equipment manufacturers ("OEMs").

9.     OEMs pre-install an OS on the mobile devices that they manufacture and sell.

10.    Instead of developing their own OS, almost all OEMs today license a third party's OS for their devices.

11.    Apple does not license iOS to other OEMs.

12.    The Google Play Store is an app store owned by Google that distributes apps on devices running the Android OS.

13.    To distribute an app on the Google Play Store, app developers must first enter into Google's Developer Distribution Agreement, referred to as the DDA.

United States District Court
Northern District of California

1      14.     The predecessor to the Play Store was called Android Market.

2      15.     Google acquired the Android mobile operating system in 2005.

3      16.     Google launched Android Market in October 2008.

4      17.     Google launched its in-app billing service in 2011.

5      18.     Google's Android Market app store was rebranded as the Google Play Store

6 in March 2012.

7      19.     Timothy Sweeney is Epic Games, Inc.'s ("Epic") controlling shareholder,

8 CEO, and board chairman.

9      20.     In April 2020, Epic made the decision to make Fortnite available for

10 download through the Play Store.

11      21.     Epic executed Google's DDA.

12      22.     Epic incorporated its own payment solution into Fortnite on Google Play as

13 an alternative to Google Play Billing, which violated the terms of the DDA.

14      23.     Epic did not pay Google $398,931.23 in fees that Google would have

15 received if transactions processed using Epic's payment solution were instead processed through

16 Google Play Billing.

17      24.     On August 13, 2020, Epic filed its complaint against Google.

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

INSTRUCTION NO. 13

PERMISSIVE INFERENCE

You have seen evidence that Google Chat communications were deleted with the intent to prevent their use in litigation.  You may infer that the deleted Chat messages contained evidence that would have been unfavorable to Google in this case.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## INSTRUCTION NO. 14

BURDEN OF PROOF -- PREPONDERANCE OF THE EVIDENCE

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

INSTRUCTION NO. 15

ANTITRUST LAWS -- PURPOSE

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.  The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

INSTRUCTION NO. 16

SECTION 2 OF THE SHERMAN ACT -- MONOPOLIZATION -- ELEMENTS

Epic brings two types of antitrust claims, which I will now explain.  First, the antitrust laws prohibit companies from willfully acquiring or maintaining monopolies in relevant markets through anticompetitive conduct.  Second, the antitrust laws prohibit contracts or agreements that unreasonably restrain competition.

I will first explain Epic's monopolization claims under Section 2 of the federal Sherman Antitrust Act.  Epic alleges that it was injured by Google's unlawful monopolization of two alleged markets.  Epic alleges that those markets are:  (1) an Android app distribution market, and (2) a market for Android in-app billing services for digital goods and services transactions.

To prevail on a claim that Google has monopolized an alleged relevant market, Epic must prove each of the following elements by a preponderance of the evidence for that market:

1.    that the alleged relevant market is a valid antitrust market;

2.    that Google possesses monopoly power in the alleged relevant market;

3.    that Google willfully acquired or maintained its monopoly power in the alleged relevant market by engaging in anticompetitive conduct; and

4.    that Epic was injured in its business or property because of Google's anticompetitive conduct.

If you find that Epic has failed to prove any of these elements with respect to either market, then you must find for Google and against Epic on the claim for unlawfully monopolizing that market.  If you find that Epic has proven each of these elements by a preponderance of the evidence for either market, then you must find for Epic and against Google on the claim for unlawfully monopolizing that market.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

<u>INSTRUCTION NO. 17</u>

MONOPOLIZATION -- MONOPOLY POWER DEFINED

To prove its monopolization claims, Epic must prove that Google has monopoly power in a relevant antitrust market.  Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above (or reduce or maintain quality substantially below) the competitive level for a significant period of time.  However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether Epic has met its burden of proving monopoly power in a relevant market.

United States District Court
Northern District of California

INSTRUCTION NO. 18

MONOPOLIZATION -- RELEVANT PRODUCT MARKET

In this case, Epic contends that there are two different relevant product markets:  an Android app distribution market, and a market for Android in-app billing services for digital goods and services transactions.  You should consider whether Epic has proven by a preponderance of the evidence either or both of the markets it has alleged.

In determining the relevant market, the "area of effective competition" must be determined by reference to (1) a product market, and (2) a geographic market.

In determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view.  This does not mean two products must be identical to be in the same relevant market.  It means they must be, as a matter of practical fact and the actual behavior of consumers (meaning users and developers), substantially or reasonably interchangeable to fill the same consumer needs or purposes.  Two products are within a single market if one item could suit buyers' needs substantially as well as the other.  What you are being asked to do is to decide which products compete with each other.

The parties contend that one or more markets alleged in this case are markets for two-sided platforms.  In a two-sided platform market, a platform offers products or services to two different groups who both depend on the platform to intermediate between them.  For example, an app store connects app developers who wish to sell their apps and the consumers that wish to buy those apps.  In this example, app developers may be one side of the market, and consumers may be the other side of the market, and each are receiving services from the app store.  In order to define a relevant market involving a two-sided platform, you must take into account consumers on both sides of the market -- in this case, both users and developers.

United States District Court
Northern District of California

INSTRUCTION NO. 19

MONOPOLIZATION -- RELEVANT GEOGRAPHIC MARKET

The relevant geographic market is the area in which Google faces competition from other firms that compete in the relevant product markets and to which customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product quality in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Epic has the burden of proving the relevant geographic market by a preponderance of the evidence. In this case, Epic claims that the relevant geographic market is worldwide, excluding China. In determining whether Epic met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including:

1.  the geographic area in which Google sells and where Google's customers are located;

2.  the geographic area to which Google's customers turn (or can turn) for supply of the product;

3.  the geographic area to which Google's customers have turned or have seriously considered turning;

4.  the geographic areas that Google's customers view as potential sources of competition; and

5.  whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

If you determine that any of Epic's alleged markets are two-sided markets, then you should consider both sides of that market in determining the relevant geographic scope of that two-sided market.

INSTRUCTION NO. 20

MONOPOLIZATION -- EXISTENCE OF MONOPOLY POWER -- TYPES OF PROOF

If you find that Epic has proven a relevant market, then you should determine whether Google has monopoly power in that market.

You can consider two kinds of proof to determine whether Google has monopoly power: (1) direct proof, and (2) indirect proof.  In the following instructions, I will explain to you these two kinds of proof that you can consider.

United States District Court
Northern District of California

INSTRUCTION NO. 21

MONOPOLIZATION -- EXISTENCE OF MONOPOLY POWER -- DIRECT PROOF

There are two ways to provide direct proof of monopoly power, which I will now explain.

Raising or Maintaining Prices Above Competitive Levels

In order to provide direct proof of monopoly power, Epic has the burden of proving that Google has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels, or to reduce or maintain the quality of goods or services in the relevant market below competitive levels.  Epic must prove that Google has the power to do so by itself -- that is, without the assistance of, and despite competition from, any existing or potential competitors.

Epic also has the burden of proving that Google has the power to maintain prices above a competitive level, or quality below the competitive level, for a significant period of time.  If Google attempted to maintain prices above competitive levels, or reduce quality below competitive levels, but would lose so much business to other competitors that the price increase or quality reduction would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

Power to Exclude Competition

In the alternative, in order to provide direct proof of monopoly power, Epic must prove that Google has the ability to exclude competition.  For example, if Google attempted to maintain prices above competitive levels or reduce quality below competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase or quality reduction would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Google has monopoly power.  Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing.  However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long

period of time may be evidence of monopoly power.  By contrast, evidence that Google would lose a substantial amount of sales if it raised prices or reduced quality substantially, or that Google's profit margins were low compared to its competitors, or that Google's margins go up and down or are steadily decreasing, might be evidence that Google does not have monopoly power.

United States District Court
Northern District of California

INSTRUCTION NO. 22

MONOPOLIZATION -- EXISTENCE OF MONOPOLY POWER -- INDIRECT PROOF

Epic may prove Google's monopoly power indirectly.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.  Epic has introduced evidence of the structure of their proposed relevant markets to show that Google has monopoly power.  The evidence presented by the parties includes evidence of Google's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors.  If this evidence establishes that Google has the power to control prices and exclude competition in a relevant antitrust market, then you may conclude that Google has monopoly power in that market.

Market Share

The first factor that you should consider is Google's share of a relevant market.  Based on the evidence that you have heard about Google's market shares, you should determine Google's market share as a percentage of total sales in the relevant market.  Google must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry (that is, how difficult it is for other producers to enter the market and begin competing with Google for sales), the entry and exit by other companies, and the number and size of competitors.  Along with Google's market share, these factors should inform you as to whether Google has monopoly power.  The higher the company's share, the higher the likelihood that a company has monopoly power.

Market Share Trends

The trend in Google's market share is something you may consider.  An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Barriers to Entry

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that Google does not have monopoly power, regardless of Google's market share, because new competitors could enter easily if Google attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Google has monopoly power.

Entry and Exit by Other Companies

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Google lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Google has monopoly power.

Number and Size of Competitors

You may consider whether Google's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Google's ability to price its products. If Google's competitors are vigorous or have large or increasing market shares, this may be evidence that Google lacks monopoly power. On the other hand, if you determine that Google's competitors are weak, or have small or declining market shares, this may support an inference that Google has monopoly power.

Conclusion

If you find that Google has monopoly power in a relevant market, then you must consider the remaining elements of Epic's claim for monopolizing that market. If you find that Google

does not have monopoly power in any relevant market, then you must find for Google and against Epic on the claim for monopolizing that market.

United States District Court
Northern District of California

1

INSTRUCTION NO. 23

MONOPOLIZATION -- WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY
POWER THROUGH ANTICOMPETITIVE ACTS

To prove their monopolization claims, Epic must prove that Google willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.

Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality. In evaluating alleged harm in a market that you have found to be two-sided, you must consider whether there is harm to the two-sided market as a whole.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals -- or the achievement of these goals -- unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Google's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors. In

1   evaluating alleged benefits in a market that you have found to be two-sided, you must consider

2   whether there are benefits to the two-sided market as a whole.

3           The acts or practices that result in the acquisition or maintenance of monopoly power must

4   represent something more than the conduct of business that is part of the normal competitive

5   process or commercial success.  They must represent conduct that has made it very difficult or

6   impossible for competitors to compete and that was taken for no legitimate business reason.  You

7   may not find that a company willfully acquired or maintained monopoly power through

8   anticompetitive means if it has acquired or maintained that power solely through the exercise of

9   superior foresight and skill; or because of natural advantages such as unique geographic access to

10  raw materials or markets; or because of economic or technological efficiency, including efficiency

11  resulting from scientific research; or by obtaining a lawful patent or patents; or because changes in

12  cost or consumer preference have driven out all but one supplier.

13          In summary, you must first determine whether Epic has proven that Google's conduct has

14  caused substantial harm to competition in a relevant market.  If Epic has done so, you must then

15  determine whether Google has justified its conduct by proving that its conduct was reasonably

16  necessary to achieve competitive benefits for consumers in that relevant market.  However, if Epic

17  has proven that Google could have readily achieved the same benefits using reasonably available

18  alternative means that would have created substantially less harm to competition, then those

19  benefits cannot justify Google's conduct.  In other words, if you find that Google has proven a

20  procompetitive rationale, then you must determine if Epic has met its burden to prove the

21  existence of a substantially less restrictive alternative to achieve Google's procompetitive

22  rationale.  To qualify as "substantially less restrictive," an alternative means must be virtually as

23  effective in serving the defendant's procompetitive purpose without significantly increased cost.

24          You must then balance any competitive harms you found against any competitive benefits

25  you found.  In doing so, you must consider any harms and benefits on both sides of the market for

26  any market you have found to be two-sided.  If the harms to competition resulting from Google's

27  conduct substantially outweigh the competitive benefits, then you must find that Google willfully

28  acquired or maintained monopoly power through anticompetitive acts.

United States District Court
Northern District of California

If you find that Google willfully acquired or maintained monopoly power through anticompetitive acts in a relevant market, then you must consider whether Epic has proved the remaining elements of its claim that Google monopolized that market.  If, however, you find that Google did not willfully acquire or maintain monopoly power through anticompetitive acts in a relevant market, then you must find for Google and against Epic on Epic's claim that Google monopolized that market.

INSTRUCTION NO. 24

MONOPOLIZATION -- NO DUTY TO DEAL

As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. You have heard evidence that Google's Developer Distribution Agreement prohibits the distribution of other app stores through the Google Play Store. It is not unlawful for Google to prohibit the distribution of other app stores through the Google Play Store, and you should not infer or conclude that doing so is unlawful in any way.

United States District Court
Northern District of California

INSTRUCTION NO. 25

SECTION 1 -- RESTRAINT OF TRADE

In addition to its monopolization claims, Epic challenges Google's conduct under Section 1 of the Sherman Act and California state law.  Section 1 prohibits contracts, combinations and conspiracies that unreasonably restrain trade.  To establish a violation of Section 1 of the Sherman Act and California state law, Epic must prove the following:

1.  the existence of a contract, combination or conspiracy between or among at least two separate entities;

2.  that the contract, combination or conspiracy unreasonably restrains trade; and

3.  that the restraint caused Epic to suffer an injury to its business or property.

INSTRUCTION NO. 26

AGREEMENT -- DEFINITION, EXISTENCE, AND EVIDENCE

To prove an agreement or contract to restrain trade, Epic must prove both of the following elements by a preponderance of the evidence:

      1.  that an agreement or contract to restrain trade existed; and

      2.  that Google knowingly became a party to that agreement or contract.

To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a contract or agreement is an understanding between two or more persons or entities. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme. To establish the existence of an agreement, the evidence need not show that the persons or entities entered into any formal or written agreement. It is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by Epic were agreed upon to carry out the alleged agreement to restrain trade, nor that all of the means or methods that were agreed upon were actually used or put into operation. It is the agreement or understanding to restrain trade in the way alleged by Epic that constitutes a potential violation of the antitrust laws. Therefore, you may find an agreement to restrain trade existed regardless of whether it succeeded or failed.

Epic may prove the existence of the contract or agreement to restrain trade through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the contract or agreement. Direct evidence of an agreement may not be available, and therefore an agreement also may be shown through circumstantial evidence. You may infer the existence of an agreement from the circumstances, including what you find the persons actually did and the words they used.

In determining whether an agreement or understanding between two or more persons to restrain trade has been proved, you must view the evidence as a whole and not piecemeal.

INSTRUCTION NO. 27

RULE OF REASON -- SECTION ONE CLAIMS

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable.  You must determine, therefore, whether any of the restraints challenged here are unreasonable.  The restraints challenged here are the agreements that Google requires mobile app developers to enter as a condition of distributing apps on Google Play (called the DDA agreements); alleged agreements with Google's alleged competitors or potential competitors (including Activision and Riot Games) under Google's Games Velocity Program or Project Hug; and agreements with original equipment manufacturers (OEMs) that sell mobile devices (including the MADA and RSA agreements).

In making this determination, you must first determine whether Epic has proven that a challenged restraint has resulted in a substantial harm to competition in a relevant product and geographic market.  If you find that Epic has proven that the challenged restraints result in a substantial harm to competition in a relevant market, then you must consider whether Google has proven that the restraints produce countervailing competitive benefits.  If you find that they do, then you must balance the competitive harm against the competitive benefit.  However, if you find that the competitive benefits could be achieved through substantially less restrictive alternatives, then you may not consider those benefits when balancing harms against benefits.  The challenged restraints are illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

INSTRUCTION NO. 28

RULE OF REASON -- PROOF OF COMPETITIVE HARM

As I mentioned, to prove that the challenged restraint is unreasonable, Epic first must demonstrate that the restraint has resulted or is likely to result in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of plaintiff is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Epic must also show that the harm to competition occurred in an identified market, known as a relevant market.  As I've described, there are two aspects to a relevant market.   The first aspect is known as the relevant product market.  The second aspect is known as the relevant geographic market.  It is Epic's burden to prove the existence of a relevant market.

If you find that Epic has proven a relevant market, then you must determine whether Epic also has proven that the challenged restraint has or is likely to have a substantial harmful effect on competition in that market.  A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality.  If the challenged conduct has not resulted in, or is not likely to result in, higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced or is likely to produce competitive harm in a market you have found to be two-sided, you must consider harms to the two-sided market as a whole.  In determining whether the challenged restraint has produced or is likely to produce competitive harm, you may look at the following factors:

  1. the effect of the challenged restraint on prices, output, product quality, and service;

  2. the purpose and nature of the challenged restraint;

  3. the nature and structure of the relevant market;

4.   the number of competitors in the relevant market and the level of competition among them, both before and after the challenged restraint was imposed; and

5.   whether Google possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices for a sustained period of time, above those that would be charged in a competitive market. A company that has monopoly power in a relevant market necessarily has market power in that market.  However, a company can have market power in a relevant market even if it does not have monopoly power, because market power requires less than monopoly power.  A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.  The ability to charge higher prices for better products or services, however, is not market power.  An important factor in determining whether Google possesses market power is Google's market share, that is, its percentage of the products or services sold in the relevant market by all competitors.  Other factors that you may consider in determining whether Google has, or at relevant times had, market power include: whether Google is capable of raising or maintaining prices above competitive levels; whether there are barriers to entering the market; and whether Google can exclude or has excluded competition, or prevented competitors or potential competitors from entering the market.

If Google does not possess a substantial market share, it is less likely that Google possesses market power.  If Google does not possess market power, it is less likely that the challenged restraint has resulted or will result in a substantial harmful effect on competition in the market.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

INSTRUCTION NO. 29

RULE OF REASON -- EVIDENCE OF COMPETITIVE BENEFITS

If you find that Epic has proven that a challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether Google has proven that the restraint also benefits competition in other ways. If you find that the challenged restraint does result in competitive benefits, then you also must consider whether those competitive benefits were achievable through substantially less restrictive means. To qualify as "substantially less restrictive," an alternative means must be virtually as effective in serving the defendant's procompetitive purpose without significantly increased cost. If Epic proves that any of the competitive benefits were achievable through substantially less restrictive means, then those benefits cannot be used to justify the restraint.

INSTRUCTION NO. 30

RULE OF REASON -- BALANCING THE COMPETITIVE EFFECTS

If you find that a challenged restraint resulted in competitive benefits in a relevant market that were not achievable through substantially less restrictive means, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable.  If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable.  In conducting this analysis, you must consider the benefits and harm to competition and consumers in the market, not just to a single competitor or group of competitors.  If you have found a market that is two-sided, you must balance the harms and benefits on both sides of the two-sided market as a whole.  Epic bears the burden of proving by a preponderance of the evidence that the anticompetitive effect of the conduct substantially outweighs its benefits.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

INSTRUCTION NO. 31

TYING -- INTRODUCTION

Epic also claims that Google engaged in an unlawful tying arrangement.  A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that the buyer also purchase a separate product or service (referred to as the tied product) from the seller, or at least agrees not to purchase the tied product or service from any other seller.  In this case, Epic claims that Google's app distribution product (the Google Play Store) is the tying product, and its in-app billing service (Google Play Billing) is the tied product.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

INSTRUCTION NO. 32

TYING -- RATIONALE FOR PROHIBITION OF TYING ARRANGEMENTS

Not all tying arrangements are unlawful.  The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product (app distribution services) to force a buyer to purchase the tied product (in-app billing services) that the buyer might have preferred to purchase elsewhere.  I will now instruct you regarding how to determine whether, if there was a tying arrangement, that alleged tying arrangement is unlawful.

INSTRUCTION NO. 33

TYING UNDER THE RULE OF REASON -- ELEMENTS

To prevail on its tying claim, Epic must prove each of the following elements by a preponderance of the evidence:

1. Android app distribution services (like the Google Play Store) and Android in-app billing services (like Google Play Billing) are separate and distinct products;

2. Google will provide Android app distribution services through the Google Play Store only on the condition that app developers also use Google Play Billing for in-app transactions;

3. Google has sufficient market power with respect to the Android app distribution services to enable it to restrain competition as to an alleged market for Android in-app billing services;

4. the alleged tying arrangement has foreclosed a substantial volume of commerce as to an alleged market for Android in-app billing services;

5. the tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition as to an alleged market for Android in-app billing services; and

6. Epic was injured in its business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must consider Google's business justification defense, which I will instruct you on later. If you find for Epic on all six of these elements and against Google on Google's business justification defense, then you must find for Epic and against Google on Epic's tying claim. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Google and against Epic on Epic's tying claim. Alternatively, if you find for Google on Google's business justification defense, then you must find for Google on Epic's tying claim.

United States District Court
Northern District of California

INSTRUCTION NO. 34

TYING -- PRESENCE OF TWO PRODUCTS

To determine whether Google Play Store and Google Play Billing are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately.  If enough Android app developers would want to use Google Play Store alone and Google Play Billing alone, then they are separate products.  On the other hand, if there is very little demand for one of the products by itself, that is, without the other product, then Google Play Store and Google Play Billing are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Products may be separate products even if one of them is useless without the other.  The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

INSTRUCTION NO. 35

TYING -- PROOF OF CONDITIONING

You may find that a tying arrangement exists between the Google Play Store and Google Play Billing if Google refuses to distribute Android apps through the Google Play Store unless Android app developers agree to use Google Play Billing to facilitate the sale of digital goods or services in those apps.  You may also find that a tie exists if Google effectively coerced Android app developers into using only Google Play Billing.  To prove coercion, Epic must prove by a preponderance of the evidence that Google exploited its control over the Google Play Store to force Android app developers to use Google Play Billing, when the app developers either did not want to use Google Play Billing at all, or might have preferred to use Google Play Billing on different terms, and that any appearance of choice was illusory.  Mere sales pressure or persuasion is not coercion.

If Google has made the use of the Google Play Store and Google Play Billing together the only viable economic option, you may find that Google has effectively tied the Google Play Store to Google Play Billing.  However, there is no coercion if the Google Play Store and Google Play Billing are offered separately, and separate use is economically feasible.

INSTRUCTION NO. 36

TYING -- EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT

You must next determine whether Google has market power with respect to the tying product (in an alleged market for Android app distribution services).  I have already instructed you on the meaning of market power.  You must apply that instruction when determining whether Google has market power with respect to the tying product.

United States District Court
Northern District of California

INSTRUCTION NO. 37

TYING -- FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH
RESPECT TO THE TIED PRODUCT

If you determine that the Google Play Store and Google Play Billing are separate products that have been tied to one another and that Google has market power in Android app distribution, then you must determine whether Epic has proven that Google has foreclosed a substantial amount of commerce with respect to Android in-app billing services.

In determining whether Google has foreclosed a substantial amount of commerce with respect to Android in-app billing services, you should first consider the total dollar amount Google earned from Google Play Billing by the tying arrangement in absolute terms.

If the dollar amount Google earned from Google Play Billing was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to Android in-app billing services due to the tying arrangement.  If there was not a substantial adverse effect on competition in Android in-app billing services due to the tying arrangement, then you must find in favor of Google on the tying claim.

There is no substantial foreclosure if only a small percentage of sales in the alleged market for Android in-app billing services was affected by the tying arrangement.  There also is no substantial foreclosure if you find that Android app developers would not have used Android in-app billing services at all in the absence of the tying arrangement.

INSTRUCTION NO. 38

TYING UNDER THE RULE OF REASON -- BUSINESS JUSTIFICATION DEFENSE

Google contends that the alleged tying arrangement is justified.  If you find that Epic has proven all elements of a tying claim, then you should consider whether Google has proven, by a preponderance of the evidence, a business justification for the tying arrangement.  Google has the burden of proof on this issue.

Google contends that the tying arrangement is justified because it enables Google efficiently to collect compensation for the use of its services and intellectual property and ensures that Google can receive compensation for its services and intellectual property.

In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Google.  In making this determination, you should consider whether the justification Google offers is the real reason that it imposed the tying arrangement.

You must also consider whether Google's claimed objective could reasonably have been realized through substantially less restrictive means.  Even if some type of constraint is necessary to promote a legitimate business interest, Google must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

In determining whether Google's claimed legitimate business purpose could reasonably have been achieved through substantially less restrictive means, you may assess such factors as whether other means to achieve Google's objective were more or less expensive and more or less effective than the means chosen by Google.  To qualify as "substantially less restrictive," an alternative means must be virtually as effective in serving the defendant's procompetitive purpose without significantly increased cost.

If you find that Google could reasonably have achieved its claimed legitimate business purpose by substantially less restrictive means, then you may find that there was no business justification and find for Epic on the tying claims.  If you find that the tying arrangement serves a legitimate business purpose of Google, and that there are not substantially less restrictive means

reasonably available to achieve that purpose, then you must find for Google and against Epic on the tying claim.

United States District Court
Northern District of California

1

INSTRUCTION NO. 39

INJURY AND CAUSATION

If you find that Google has violated the antitrust laws as alleged by Epic, then you must consider whether Epic was injured as a result of Google's violations of the antitrust laws by applying the following elements.

Epic is entitled to a verdict that Google is liable if it can establish these elements of injury and causation:

1.  Epic was in fact injured as a result of Google's alleged violations of the antitrust laws;

2.  Google's alleged illegal conduct was a material cause of Epic's injury; and

3.  Epic's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Epic to establish injury in fact or fact of damage, it must prove that it was injured as a result of Google's alleged violations of the antitrust laws. Proving the fact of damage does not require Epic to prove the dollar value of its injury. It requires only that Epic proves that it was in fact injured by Google's antitrust violations.

Second, Epic must offer evidence that establishes by a preponderance of the evidence that Google's alleged illegal conduct was a material cause of Epic's injury. This means that Epic must have proved that some damage occurred to it as a result of Google's alleged antitrust violations, and not some other cause. Epic is not required to prove that Google's alleged antitrust violations were the sole cause of its injury; nor need Epic eliminate all other possible causes of injury. It is enough if Epic has proved that the alleged antitrust violations were a material cause of its injury. You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against -- such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit.

Finally, Epic must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If Epic's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Epic's injuries are antitrust injuries.  On the other hand, if Epic's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Epic's injuries are not antitrust injuries and Epic is not entitled to a verdict that Google has violated the antitrust laws.

In summary, if Epic can establish that it was in fact injured by Google's conduct, that Google's conduct was a material cause of its injury, and that Epic's injury was the type that the antitrust laws were intended to prevent, then Epic is entitled to a verdict that Google has violated the antitrust laws.

INSTRUCTION NO. 40

RELEVANT TIME PERIOD

The relevant time period for the antitrust laws preclude recovery in this case for any injuries caused by conduct that occurred prior to August 13, 2016.  You have heard evidence in this trial about agreements that Google reached before August 13, 2016.  Those agreements may be considered as background to help you understand the claims and counterclaims in this case, but you may not consider those agreements to be part of the conduct that Epic is challenging in this case.  You may consider only Google's conduct that occurred after August 13, 2016, in determining its liability in this case.

INSTRUCTION NO. 41

DUTY TO DELIBERATE

When you begin your deliberations, elect one member of the jury as your presiding juror who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict, whether liable or not liable, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, economic circumstances, or position in life or in the community.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

INSTRUCTION NO. 42

CONSIDERATION OF THE EVIDENCE -- CONDUCT OF THE JURY

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any Internet social media site, blog, website or other feature.  This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the Court immediately.

United States District Court
Northern District of California

INSTRUCTION NO. 43

USE OF NOTES

     Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INSTRUCTION NO. 44

COMMUNICATION WITH THE COURT

If it becomes necessary during your deliberations to communicate with me, you may send a note through Ms. Clark, signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone -- including me or Ms. Clark -- how the jury stands, numerically or otherwise, on any question submitted to you, including the questions of Google's liability or Epic's liability, until after you have reached a unanimous verdict or have been discharged.

INSTRUCTION NO. 45

RETURN OF VERDICT

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise Ms. Clark that you are ready to return to the courtroom.