*(Privileged and Confidential)*

# MOBILE APPLICATION DISTRIBUTION AGREEMENT
## (ANDROID)

|  | Google Inc.<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043 | Android Partnership: Ashish Pimplapure<br>Android Partner Engineering: Jongyeong Lee<br>Google Legal Contact: Helen Tsao |
|---|---|---|

**COMPANY: Samsung Electronics Co., Ltd.**

| | Company Contact Information: | Company Technical Contact: | Company Legal Notices to: |
|---|---|---|---|
| Attention: | Technology Strategy Group | San Jose Lab. | Mobile Legal Support |
| Title: | - | - | - |
| Address, City, State, Postal Code, Country: | ▮ | ▮ | ▮ |
| Phone: | | | |
| Email: | Jiy Park@samsung.com | | HJ Park@samsung.com |

**Effective Date:** March 1, 2017 (must be start of calendar month)

**Term:** Starting on the Effective Date and continuing through February 28, 2019 (inclusive) ("**Term**")

**Renewal Term:** None.

This Mobile Application Distribution Agreement, (referred to as the "**Agreement**"), effective as of the date noted above (the "**Effective Date**"), is made by and between Samsung Electronics Co., Ltd., a Korean corporation with offices at the address noted above ("**Company**"), and Google Inc., for itself and its Affiliates, (which, with its Affiliates, shall be referred to herein as "**Google**") with offices at the address noted above.

1. **Definitions.** The following capitalized terms shall have the meanings set forth below:

   1.1. **"Actively Promote" or "Actively Promoting"** means the proactive promotion of a Google Application on any Device as a key value proposition of the device, including point of sale promotion, media advertising, and general consumer-focused promotion of a Google Application or Google services on any Device.

   1.2. **"Incompatible Android Design Around"** means portion(s) of Android, wherein: (i) Company may propose modifications to avoid allegations of infringement directed to said portion(s); (ii) said modifications proposed by Company would render Android Compatible Devices incompatible with either CTS or CDD; and (iii) Google has declined to grant Company either a CTS or CDD waiver, as applicable, for said proposed modifications.

   1.2. **"Affiliate(s)"** shall mean any company controlling, controlled by or under common control with a party, where "control" shall mean ownership, directly or indirectly, of the shares of a company representing fifty percent (50%) or more of the voting rights in this company.

   1.3. **"Android"** means the open-source application framework, libraries, runtime, and kernel which are published at

Confidential



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-004552342

EXHIBIT 5255

EXHIBIT 5255-001

http://source.android.com (or successor sites), and any software development kits made available at http://developer.android.com (or successor sites).

1.4. **"Android Compatible Device(s)"** means a Company's phones or tablets that: (i) comply with the Android Compatibility Definition document (which may be updated from time to time), which can be found at the Android compatibility website (http://source.android.com/compatibility); and (ii) successfully pass the Android Compatibility Test Suite (CTS).

1.5. **"Android Products"** means software, content and digital materials designed for use on Android-based devices.

1.6. **"Assert"** means to bring, threaten to bring, or continue Litigation. For purposes of this definition, the term **"Litigation"** means any legal proceeding brought in any forum to enforce a right, whether created by a claim or a counterclaim or otherwise, and whether administrative, judicial, arbitral or otherwise, including any proceeding before the United States International Trade Commission.

1.7. **"Basic Applications"** means a Samsung-specified set of eleven apps that are essential functions of the mobile phone, which are, as of the Effective Date, dialer, message, contacts, camera, gallery, clock, calendar, calculator, files, notes, and settings. If Company decides (in its sole discretion) to change or add a Basic Application, it will provide Google with at least 60 days prior notice of such change or addition (which may be by email), and Google may request to have good faith discussions to understand the impact of such change or addition. Nothing in this section will restrict Company's ability to alter the list of Basic Applications under this Agreement.

1.8. **"Client ID"** means unique alphanumeric code(s) provided by Google to Company to be used to identify Google Applications usage on Company Devices, as such Client IDs may be modified by Google from time to time in its sole discretion upon notice to Company.

1.9. **"Core Applications"** means the following Google Applications: Search, Chrome, Gmail, Maps, YouTube, and Play.

1.10. **"CTS Report"** means the report that is generated after the CTS is completed.

1.11. **"Default Home Screen"** means the default display of a Device, including the lock screen and/or the notification tray, prior to any changes made by End Users, that appears without scrolling (i) after initial boot-up, (ii) after each subsequent power-up, or (iii) after an End User selects the "home" icon.

1.12. **"Device"** means each phone or tablet with brands owned or licensed by Company with a unique build fingerprint that (i) runs Android (and no alternative software platform), (ii) is preloaded with the Google Applications, (iii) is approved by Google pursuant to Section 4.3 (Google Approval and Launch), and (iv) is used by an End User to access the Wireless Service. For Company devices running Android other than phones or tablets, Google may (x) require Company to enter into separate terms and conditions to license Google Applications, (y) approve such device (such approval may be provided over email) as a Device, or (z) reject such device for the preload of Google Applications.

1.13. **"End User(s)"** means an end user of a Device.

1.14. **"Final Embed Date"** means the latest possible date Company can accept updated Google Applications from Google for a specific Device deployment.

Confidential



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY       GOOG-PLAY-004552343

EXHIBIT 5255-002

1.15. **"Flexible Applications"** means the Google Applications that are designated as "flexible" in the Google Product Geo Availability Chart as of the Effective Date.

1.16. **"Google Applications"** means the machine-readable binary code version of the Google applications including Core Applications, Flexible Applications and others listed in the Google Product Geo Availability Chart, including any modifications or updates to such applications. If Google decides (in its sole discretion) to change a Core Application or change or add a new Flexible Application to the Google Product Geo Availability Chart, it will provide Company with at least 60 days prior notice of such addition (which may be by email), and Company may request to have good faith discussions to understand the impact of such addition. Nothing in this section will restrict Google's ability to alter the list of Google Applications under this Agreement.

1.17. **"Google GNSS Assistance Information"** means information that is transmitted by Google to a SUPL Enabled Terminal in response to a request received by Google as described in Section 3.9(b).

1.18. **"Google Hotword Engine"** means Google-developed software components, which may include software that runs on the digital signal processor of a Device (if available), which allow End Users to use the Google Hotword functionality.

1.19. **"Google Mobile Branding Guidelines"** means Google's brand treatment guidelines for mobile in effect from time to time (and any content contained or referenced therein), which are located at http://www.google.com/wssynd/mobile_guidelines.html and http://www.google.com/permissions/guidelines.html (or such other URLs as may be provided by Google from time to time), together with such additional brand treatment guidelines for mobile as Google may make available to Company from time to time.

1.20. **"Google Play"** means the marketplace Google has created and operates which allows registered Google Play developers to distribute Android Products.

1.21. **"Google Product Geo Availability Chart"** means the list of Google Applications and associated information (including geo-availability) set out at https://docs.google.com/spreadsheets/u/1/d/1QBuk5_WvXXd0pQKOTkkb8SFntAZSPESCfLCLVrXRdxs/preview (as such URL may be changed or replaced by Google at its sole discretion from time to time).

1.22. **"Google Search"** means the search and advertising services offered by Google that may be accessed from an Android Compatible Device.

1.23. **"Hotword"** means a voice-activated trigger that enables voice commands on the Device, which can be provided by Google (a "Google Hotword"), Company (a "Company Hotword") or a third party.

1.24. **"Intellectual Property Rights"** means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, database rights law, and any and all other intellectual property rights (registered or unregistered) throughout the world.

1.25. **"Launch"** means the initial distribution of a Device in accordance with the terms of this Agreement.

1.26. **"Location ID"** means a unique alphanumeric identifier as defined in the OMA SUPL Internal Location Protocol specification.

1.27. **"RSA"** means the Google Search Revenue Share Agreement between the parties.

1.28. **"SUPL Enabled Terminal"** means a Device which is capable of communicating with a SUPL (Secure User

Confidential



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY            GOOG-PLAY-004552344

EXHIBIT 5255-003

Plane Location) network to aid in the process of obtaining its location.

1.29. **"SUPL Request"** means a request for Google GNSS Assistance Information sent to Google and originating from a SUPL Enabled Terminal.

1.30. **"Telecom Operator"** means a company that provides Wireless Service.

1.31. **"Territories"** means the country or countries in which distribution of Google Applications is permitted under the conditions as provided by Google to Company upon execution of this Agreement, which may be updated by Google from time to time.

1.32. **"Third Party Legal Proceeding"** means any formal legal proceeding filed before a court or government tribunal (including any civil, administrative, investigative or appellate proceeding) by a third party that is not affiliated with Google or Company.

1.33. **"Trademarks"** means the trade names, trademarks, service marks, logos, domain names and other distinctive brand features of each party as owned by such party from time to time.

1.34. **"Wireless Service"** means the wireless telephony, data, and messaging service owned and/or operated by Telecom Operator.

2. **Google Applications.**

    2.1. **License Grant.** Subject to the terms and conditions of this Agreement (including Section 2.7), Google hereby grants to Company a nontransferable, nonsublicensable (except Company may sublicense to Telecom Operators and other resellers and distributors with whom Company has a written agreement that is no less protective of Google than this Agreement, solely for use with Devices), nonexclusive license during the Term under Intellectual Property Rights that Google or its Affiliates own or Control to: (a) reproduce, display, perform, or use the Google Applications and/or integrate or have integrated the Google Applications into Device to the extent necessary to exercise the right granted in (b); and (b) distribute the Google Applications for no cost directly to End Users only in the Territories specifically authorized by Google via the distribution methods specified by Google. For purposes of this Section 2.1, **"Control"** of Intellectual Property Rights includes the ownership of Intellectual Property Rights, right to license Intellectual Property Rights, or ability to cause others to license Intellectual Property Rights. For Company to distribute Devices with Google Applications, Company will preload each Device with all Core Applications and Flexible Applications authorized for distribution in the applicable Territory, unless otherwise approved by Google in writing. Initial distribution in each individual Territory, and the appearance and implementation of Google Applications, shall be subject to Google's prior written approval, and shall adhere to the terms and conditions of this Agreement, including but not limited to the Google Mobile Branding Guidelines. Additionally, where Google specifies a specific version of a Google Application to be distributed in a certain Territory, Company shall distribute only such version within such Territory. Company may also sublicense the Google Applications to its contractors for testing, evaluation and development purposes only (not distribution) and only with contractors with which Company has a written agreement that is no less protective of the Google Applications as set forth in this Agreement. Distribution of Google Applications, products or services outside of the Territories is prohibited. If Company is not in compliance with the Anti-Fragmentation Agreement (or its successor) then in effect, Google may terminate this Agreement so long as Google has first provided Company with sixty (60) days prior written notice of its intent to terminate, and the top management of both companies have undertaken good faith negotiations to reach a resolution.

    2.2. **License Grant Restrictions.** The foregoing licenses set forth in Section 2.1 are granted on the condition that, Company shall not, and shall not assist, instruct or encourage any third party to: (a) disassemble, de-compile

**Confidential**



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY   GOOG-PLAY-004552345

EXHIBIT 5255-004

or otherwise reverse engineer the Google Applications or otherwise attempt to learn the source code or algorithms underlying the Google Applications; (b) create derivative works from or based on the Google Applications; (c) except as expressly set forth in this Agreement, provide, sell, license, distribute, lease, lend, or disclose the Google Applications to any third party; (d) exceed the scope of any license granted to Company hereunder; or (e) ship, divert, transship, transfer, export or re-export the Google Applications, or any component thereof, into any country or use it in any manner prohibited by any export control laws, restrictions, or regulations administered by the U.S. Commerce Department's Bureau of Export Administration, the U.S. Department of Treasury's Office of Foreign Assets Control or any other applicable government agency.

2.3.  **Delivery.** Upon availability, Google shall deliver the Google Applications to Company. For the sake of clarity, the parties acknowledge and agree that Google has no obligation to develop or deliver any Google Application, and any such development or delivery is at Google's sole discretion. Company shall commence distribution of updated versions of Google Applications promptly after such updated versions of Google Applications are made available by Google, but no more than 60 days after availability.

2.4.  **Form of Distribution Offering.**

(a) During the Term, upon Google's approval as described in Section 4.3, Company shall make the Google Applications available to End Users on the Device as described in this Agreement. The form of any such offering shall be as set forth in this Agreement, and shall adhere to the Google Mobile Branding Guidelines. Without limiting the foregoing sentence, except for End Users as expressly set forth in this Agreement, Company shall not offer or distribute the Google Applications to any third party (except as set forth in Section 2.1).

(b) Company shall not and shall not assist, instruct or encourage a third party to: (i) serve or otherwise place any advertisements during the launch process of the Google Applications; (ii) offer, download or install, or allow any third party to offer, download or install, any additional products during the launch process of the Google Applications; (iii) preload, install or launch any Google Application (or otherwise act or fail to act) such that an End User is denied the opportunity to review and accept (or reject) the relevant Google terms of service; or (iv) sublicense the license granted in Section 2.1 to any reseller, distributor or retailer for a Device if such reseller, distributor or retailer (x) has included any of its own branding on the Device, or (y) has influenced Company in the development or manufacturing of the Device.

2.5.  **Accurate Reproduction.** Company agrees that in connection with its exercise of the rights granted in Section 2.1 of this Agreement, it will accurately reproduce the Google Applications (including any legal notices and marks contained therein) and will not insert into the Google Applications any viruses, worms, date bombs, time bombs, or other code that is specifically designed to cause the Google Applications to cease operating, or to damage, interrupt, allow access to or interfere with any Google Applications or End User data.

2.6.  **Open Devices.** The parties will create an open environment for the Devices by making all Android Products and Android Application Programming Interfaces available and open on the Devices and will take no action to limit or restrict the Android platform.

2.7.  **Authorization to Distribute Google Applications on the Devices & Compatibility.**

The license to distribute Google Applications in Section 2.1 is contingent upon the Android Compatible Device becoming a Device. Each Device must become an Android Compatible Device at least 30 days prior to the Final Embed Date of the Device. The final software build on Devices must pass the Compatibility Test Suite prior to Launch. In addition, other devices developed specifically to run on Android, including those that do not have preloaded Google Applications, must pass the Compatibility Test Suite prior to Company's commercial distribution of such device, unless Google agrees otherwise. Company agrees as follows:

Confidential



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY              GOOG-PLAY-004552346

EXHIBIT 5255-005

- (a) each of its employees that are designated by Company in an email to the Google-designated partner manager is authorized to submit and upload CTS Reports on behalf of Company.

- (b) the CTS has not been modified or altered by Company or its employees or agents.

- (c) Company will execute the CTS completely.

- (d) no CTS Reports have been altered.

- (e) the contents of each CTS Report are true to the best of Company's knowledge.

- (f) Google and its Affiliates may include Android Compatible Devices and Company's name in presentations, marketing materials, press releases, and customer lists (which includes, without limitation, customer lists posted on Google websites) for marketing purposes. Google may publish the results of each CTS Report after the applicable Device is Launched.

**2.8. Other Agreements.** Unless the parties otherwise agree in writing, this Agreement will supersede any agreements between the parties regarding the licensing of Google Applications on Android-powered devices, and will have no affect on any other agreements between the parties regarding other devices or Google services or applications.

**2.9. Open Source Licenses.** Portions of the Google Applications or Android may be provided with notices and open source licenses from third parties that govern the use of those portions, and any licenses granted hereunder do not alter any rights and obligations Company may have under such open source licenses.

## 3. Device Distribution Requirements.

**3.1.** Company agrees that it will be solely responsible for the distribution of the Devices and managing its inventory.

**3.2.** Company understands and agrees that it shall not Actively Promote, and shall use its best efforts to prevent any third party (including its Affiliates, resellers, distributors and Telecom Operators) from Actively Promoting Google Applications or any Google services except in those Territories in which such Google Applications or services are expressly authorized by Google in this Agreement. Specific information regarding Territories will be provided to Company after Company's acceptance of this Agreement.

**3.3. Placement Requirements; Device Set-Up.** Unless otherwise approved by Google in writing, for each Device, Company will: (1) preload all Core Applications and Flexible Applications approved in the applicable Territory or Territories in accordance with the Google Product Geo Availability Chart; (2) preload on the Default Home Screen (excluding the lock and notification screens): (a) the Google Search widget, (b) an icon clearly labeled or branded "Google" that provides direct access to the Core Applications and Flexible Applications, and (c) the Google Play Client; (3) ensure that, where applicable, any preloaded Google Application that is not a Core Application or a Flexible Application, is placed no more than one level below the Default Home Screen; (4) set Google as the default provider for the assist intent (currently android.intent.action.assist),but if a non-Google app uses the assist intent, the parties agree to discuss whether Google should be the default provider; (5) ensure that any and all long press and long touch activities of the "Home" button on Devices with physical or soft navigation buttons will directly access Google. Notwithstanding the foregoing, (i) if Company uses the "Home" button area for fingerprint authentication, then during the authentication process, Samsung may reassign long touch and/or long press to fingerprint authentication (provided any non-reassigned activities continue to directly access Google) and then reassign such activity or activities to Google after authentication,

Confidential



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY    GOOG-PLAY-004552347

EXHIBIT 5255-006

and (ii) the parties may mutually agree in writing to reassign one of either long press or long touch activity on the "Home" button to another functionality; (6) with respect to initial Device set-up, initiate Google account login via the Set-Up Wizard, Google account setup must be the first account for the End User to sign into after establishing network connectivity (b) present End User with both Google location and Google Backup and Restore settings, neither of which Company may modify, unless the parties mutually agree a privacy issue must be addressed, (c) follow Google's provided guidelines, and (d) allow End User to skip all account logins, including Google, Company and third-party logins; (7) display the Google Trademark (of which Google will determine in its sole discretion) on the initial screen during the Device boot sequence for each Device shipped during the Term. Company's use and display of the Google Trademark must be approved in accordance with Section 7.2; (8) preload Devices with Android WebView as the default provider for the webpage-rendering APIs as defined in the Android SDK; and (9) within the Device settings, ensure that the settings for Google accounts and services are not modified and are as discoverable as those of Company or any third party. Other than the placement and set-up requirements set forth in this Section 3.3, this Agreement does not restrict or limit Company from preloading or determining the placement of its own or third party applications or services on its Android devices.

3.4. **Preload Parity.** If the Company chooses to make any of the Flexible preloads deletable by the End User, the proportion of Google Applications that are made deletable will not exceed the corresponding proportion of deletable preloads from Company. For the avoidance of doubt, Basic Applications are not considered part of the equation as preload parity between the Parties. If for any reason, the Device is reset, all preloaded Google Applications must be restored to the Device's original factory setting.

3.5. **Distribution.** Company shall preload the Google Applications on the Devices so that, after preload, an icon representing each Google Application shall appear on the Device as specified in the above Placement Requirements. In addition, preload by Company of a Google Application is limited to installation by Company of the Google Application, and the Google Application will not launch without an explicit action from an End User.

3.6. **Support**. Each party is solely responsible for customer care and support of its users. Google will provide support for Google Applications as made generally available to users of Google Applications.

3.7. **Branding.** Branding on the hardware of the Devices will be determined by Company, but shall not include any Google branding or Google Trademarks without Google's prior written approval.

3.8. **Network Location Provider.** The following requirements apply to Network Location Provider:

   (a) Company shall ensure Network Location Provider will be turned off by default.

   (b) Company shall ensure that the appropriate prompts are displayed to the End User seeking the End User's consent to use Network Location Provider as provided by Google. Company shall not prevent the End User from providing consent prior to enabling Network Location Provider or any application making use of Network Location Provider.

   (c) Company shall configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices.

   (d) Company will enable all features of Network Location Provider, including network-based location resolution, anonymous network location data collection, and reverse-geocoding.

Confidential



**3.9. Google GNSS Assistance Information.**

**(a)** **License of Google GNSS Assistance Information.** Google grants to Company a non-exclusive, non-sublicensable, worldwide, royalty-free license to use the Google GNSS Assistance Information, as supplied to Company by Google's SUPL server, solely for the purposes of providing location information to either End Users or applications used by End Users on Devices, in accordance with this Agreement.

**(b)** **Google GNSS Assistance Information.** Each time the Google SUPL server receives a SUPL Request that includes the applicable Location ID and complies with the SUPL protocol, Google will transmit Google GNSS Assistance Information to the requesting SUPL Enabled Terminal.

**(c)** **Re-distribution.** Company will not re-distribute, transfer, sell, lease, syndicate, sub-syndicate, lend, or use for co-branding, timesharing, service bureau or other unauthorized purposes any Google GNSS Assistance Information, or access to any Google GNSS Assistance Information, without Google's prior written consent.

**(d)** **Technical Requirements of Accessing Google GNSS Assistance.** Google GNSS Assistance Information is transmitted using the SUPL protocol and secured with SSL. Company will ensure that every SUPL Enabled Terminal using Google GNSS Assistance (i) provides a mechanism to update the list of root certificates via the SUPL certificate injection interface defined in the Android Open Source Project Hardware Abstraction Layer, and (ii) can set up a successful SSL session with Google's SUPL server.

**(e)** The parties agree that Company has no obligation to use Google GNSS Assistance Information, but if it does, it must comply with the terms of this Section.

**3.10. Hotwords.** The following requirements apply to each Device model implementing the Google Hotword:

**(a)** If a Device supports Hotwords, Company will implement Google's Hotword. Implementation of Google's Hotword is subject to Google's approval pursuant to Section 4.3.

**(b)** Company will implement Google's Hotword so that it is equally discoverable and accessible to End User and with the same quality as implementations for other Hotwords, provided that such implementation is conditioned upon compliance with the Device battery performance standards (such standards to be mutually agreed amongst the Parties).

**(c)** Google's Hotword must directly launch Google Search unless otherwise approved by Google in writing.

**(d)** Company may only use the Google Hotword Engine to detect the Google Hotword, and unless the parties mutually agree in writing, only the Google Hotword can invoke Google Search. If Samsung wishes to have Samsung's own apps and/or services invoke Google Search, Google must approve in writing.

**3.11. Prohibited Behavior.** Company may not do any of the following (in each case, as determined by Google in its sole discretion):

**(a)** Preload an application on the Device that intentionally creates, facilitates the creation of, or exploits any security vulnerabilities in an End User's Device.

**(b)** Preload an application on the Device that intentionally interferes with an End User's expected operation and use of the Device.

**(c)** Intentionally preload an application on the Device that engages in an activity that violates any applicable law

Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY            GOOG-PLAY-004552349

EXHIBIT 5255-008

or regulation.

- **(d)** Intentionally preload an application on the Device that contains any viruses, worms, trojan horses, or the like.

- **(e)** Intentionally preload an application on the Device that deceives or otherwise violates the End User's privacy.

- **3.12. Google Legal Terms.** Company shall ensure that the appropriate Google Terms of Service, Privacy Policy and Legal Notices as provided by Google are available to the End User.

4. **General Requirements.**

   - **4.1. Payments.** Unless the parties specifically agree in other agreements (including without limitation the RSA), Company and Google shall each retain any and all revenue generated from provision of their respective products or services. For the sake of clarity, except as expressly set forth in this Agreement, neither party shall be required to account to the other or otherwise make any payment to the other regarding the Applications, Google products or services, the Devices, the Service or any revenue generated therefrom, or any of the licenses granted in this Agreement.

   - **4.2. Reports.** Within thirty (30) days of the end of each calendar quarter during the Term, Company shall provide a written report of the total number of Devices distributed with a preloaded version of a Google Application during such calendar quarter. These reports will be submitted to android-partner-report@google.com.

   - **4.3. Google Approval and Launch.** Company's distribution and implementation of the Google Applications shall be subject to Google's prior approval of each Device model prior to Launch (which should not be unreasonably withheld) and must comply with the Google Product Geo-Availability Chart (as may be updated by Google from time to time). Company shall not Launch any Device until it has obtained Google's approval as set forth in (a), (b) and (c) (as applicable) below:

     - **(a)** For the initial Launch of each Device model, submit all Device-related information (including Device specifications and related information) on the Android Partner Front End (APFE) currently available at https://partner.android.com (as may be updated by Google from time to time) for approval. Company will:

       - (i) notify Google via email (or via a website provided by Google) of that Launch no less than thirty (30) days before the initial Launch;

       - (ii) provide Device samples in accordance with Section 4.4 (Implementation Requirements) below;

       - (iii) submit a CTS Report for that Launch; and

       - (iv) submit the Device's final software build for that Launch.

     - **(b)** For any subsequent Launches of a Device model after the initial Launch of such Device model, only in the event of material software changes for any new Telecom Operator in each new Territory or any software updates for any previously approved Launch, Company will obtain Google's written approval (which may be by way of email) prior to Launch, such approval not to be unreasonably withheld. Company will:

       - (i) notify Google via email (or via a website provided by Google) before each Launch no less than thirty (30) days before each Launch Date;

       - (ii) submit a CTS Report for each Launch; and

**Confidential**



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-004552350

EXHIBIT 5255-009

(iii) submit the Device's final software build for such Launch upon Google's request.

(c) Following receipt of approval by Google for the Initial Launch of a Device under this Section 4.3, Company may begin distribution and implementation in accordance with that approval (each a "**Launch Date**"). Company will provide contact information to facilitate Google's communication regarding approvals to Company. Company will provide Google with electronic confirmation of Launch promptly following each Launch Date.  The restrictions set forth at the Google Mobile Distribution Resources website currently available at https://sites.google.com/a/google.com/gms_distribution/gms/resources (as may be updated by Google from time to time) will apply to all Launches unless otherwise approved by Google in writing. Google reserves the right to make changes to the Google Mobile Distribution Resources website at anytime, however Google may engage in good faith discussions with Company if Company reasonably disputes such changes. Notwithstanding the foregoing, the parties must mutually agree in writing if Google changes the placement requirements.

**4.4.  Implementation Requirements.** The parties shall provide the materials and information listed below:

(a) At least 30 days prior to the Final Embed Date for each initial Launch of each Device model, Company shall deliver to Google no less than four (4) Device samples for such Device model for Google's approval as set out in Section 4.3 (Google Approval and Launch). Google may use such Devices to test the operation and presentation of relevant Google products, services and sites on the Device.  Devices will be sent to a Google address to be provided by Google to Company.

(b) If at any time the Devices provided under this Section 4.4 are no longer capable of displaying the current implementation of relevant Google products, services or sites, Company will provide Google with replacement Devices as required.

(c) If at any time the software on the Devices as distributed to End Users changes the representation of Google products, services and sites, Company shall make available to Google the new software and / or Devices for approval.

(d) Company agrees to assist Google with ongoing testing of Devices and Android applications.  Google may from time to time provide Company with Android-based applications and tests that should be run on Devices (which may represent families of Devices) on which such applications will be loaded to assure the operation and presentation of such application.  Company will load such applications on Devices and run such test in a timely manner to help assess the operation and presentation of such applications and provide the test results to Google.

(e) Company shall configure the appropriate Client ID for each Device as provided by Google and implement any modified Client IDs within thirty (30) days of Google's notice to Company.

(f) Company shall use its best efforts to provide all other information, equipment and/or assistance reasonably necessary to allow Google to deliver the Google Applications and make the Google Applications (including over-the-air updates thereto) available on the Wireless Service and the Devices.

**4.5.  Over-the-Air Updates.**  Google may auto-update Google Applications over-the-air at Google's discretion. Company shall not prevent such over-the-air auto-updates. In Google's sole discretion, Google may enable Company to provide Device builds to Google for distribution by Google to Devices via an over-the-air update. Company hereby grants Google a non-exclusive, worldwide, license to distribute the Device build during the Term.  Nothing in this Agreement shall require Company to provide Device builds for Google to distribute and

**Confidential**



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-004552351

EXHIBIT 5255-010

Google shall not be obligated to distribute such Device builds.

4.6. **Site Pages.** Company shall not, and shall not allow any third party to, redirect an End User away from, block access to, frame, or modify or change the look or feel of any web page or web site accessed via a Google Application, or place anything on or near any web site page that in any way implies that Google is responsible for the contents of such page.

4.7. **Data Collection and Reporting.** Each party's applicable privacy and security policies shall apply with respect to the user information collected by it. The parties will provide each other reasonable aggregate information about usage of the Devices during the Term, in order to help each party improve End User's experience with the Device, consistent with each party's privacy policies. Such information will not involve any personally identifiable information.

4.8. **Telecom Operator Customer Restrictions.** The parties acknowledge and agree that the placement and distribution obligations contained in Section 3.3 and Section 4.3 are subject to restrictions placed upon Company by its Telecom Operators. However, pursuant to Section 3.3 and Section 4.3, any such placement and distribution, including the appearance of Google Applications, shall be subject to Google's prior written approval, and shall adhere to the terms and conditions of this Agreement, including but not limited to the Google Mobile Branding Guidelines.

4.9. **No Connectivity Notice.** When an End User launches a Device's web browser or launches a Google Application and there is no data connectivity available, Company will not block, alter or prevent in any way the presentation of any message to such End User indicating lack of data connectivity.

4.10. **Points of Contact.** Each party shall appoint a partner manager (the "**Partner Manager**") who shall be the point of contact for all issues concerning this Agreement. Company's primary communication with Google regarding this Agreement will be through email sent to android-partner-support@google.com.

5. **Term and Termination.**

   5.1. **Term.** The term of this Agreement shall begin on the Effective Date and continue for a period of two (2) years after the Effective Date, unless earlier terminated as provided in this Agreement. This Agreement shall not renew unless specifically agreed by the parties in writing.

   5.2. **Termination.** (a) Either party may suspend performance or terminate this Agreement if (i) the other party is in material breach of the Agreement and fails to cure that breach within thirty (30) days after written notice; or (ii) the other party ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within ninety (90) days. (b) Notwithstanding the foregoing, either party may terminate this Agreement immediately upon written notice upon a breach of Section 2.1 (License Grant), Section 2.2 License Grant Restrictions), Section 2.4(b)(iii) (opportunity to review and accept Google terms of service), Section 2.5 (Accurate Reproduction), Section 6.1 (Confidentiality) or Section 7 (Trademarks), or as set forth in Section 12.4 (Change of Control). (c) Notwithstanding anything to the contrary, in the event that the government or controlling body of any country or territory in which the Google Applications are distributed or made available imposes any law, restriction or regulation that makes it illegal to distribute or make available the Google Applications, or any portion thereof, into such country or territory, or if any such law, restriction or regulation places a substantial burden on Google, where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment (such substantial burden, a "**Substantial Burden**") then Google shall have the right to suspend the distribution and/or availability of such Google Applications in such country or territory until such time as such law, restriction or regulation is repealed or nullified or modified such that there it is no longer illegal or a Substantial Burden, as applicable, for the Google Applications to be distributed or made available in such country or

**Confidential**



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY         GOOG-PLAY-004552352

EXHIBIT 5255-011

territory ("**Special Suspension**"). (d) Notwithstanding the foregoing, Google may terminate this Agreement upon written notice in the event Company or its Affiliates Asserts an Intellectual Property Right infringement claim against Google based on the Google Applications. (e) Notwithstanding the foregoing, Google may terminate this Agreement upon written notice in the event Company ceases to be a licensee to all the rights of any open source licenses used in Company's implementation of the Android platform and does not return to being a licensee within thirty (30) days of written notice from Google. With respect to subsection (d) and (e), if Company believes it has a good faith reason to dispute Google's basis for termination, the parties will agree to escalate to both parties' executives to seek an equitable resolution. If the parties cannot mutually agree on a solution within thirty (30) days of such escalation, Google may terminate this Agreement immediately.

**5.3. Effect of Termination.** Upon expiration or termination of this Agreement: (a) all rights and licenses granted hereunder shall immediately cease; (b) Company will immediately stop reproducing, offering or distributing the Google Applications; and (c) each Party shall return or destroy (and a duly appointed officer shall certify to such destruction) all copies of the Google Applications (in the case of Company) and any other Confidential Information in its possession which it is aware and to which it has access and is reasonably able to destroy or delete (which, for the avoidance of doubt, does not include archived backup copies which are not in live working use and which are no longer easily accessible or retrievable), including from all hard disks and memory. Neither party shall be liable to the other for any damages resulting solely from termination of this Agreement as permitted for under this Agreement.

**5.4. Sell-Off Right.** Notwithstanding the provisions of Section 5.3 above, for a period of six (6) months following expiration or termination of this Agreement ("**Sell-Off Period**"), Company shall have the right to distribute in accordance with the terms and conditions of this Agreement all Google Application(s) actually preloaded on the Device under production and distribution as of the date of expiration or termination of this Agreement ("**Inventory**"), and such party shall have the right to use the Google Trademarks in accordance with this Agreement in connection with such Inventory("**Sell-Off Right**"); provided, however, that Company shall provide no less than thirty (30) days prior to expiration or termination, a written notification to Google of its intent to exercise the Sell-Off Right ("**Sell-Off Right Notice**"). Notwithstanding anything to the contrary, the Sell-Off Right shall not apply in the event that either (a) Company does not provide the Sell-Off Right Notice as set forth above in this Section 5.4, or (b) this Agreement (or any right granted hereunder) is suspended or terminated by Google pursuant to Section 5.2 of this Agreement.

**5.5. Survival.** The provisions of Sections 1 (Definitions), 2.2 (License Grant Restrictions), 5.5 (Survival), 6.1 (Confidentiality), 8 (Proprietary Rights), 9.2 (Disclaimer), 10 (Limitation of Liability), 11 (Third Party Lawsuits or Proceedings) and 12 (General) shall survive expiration or termination of this Agreement. For clarification purposes, the obligations under Section 11, which survive either the expiration or termination of this Agreement shall apply towards the Devices that are commercially shipped to the Company's or its Affiliates' resellers or distributors during the term and/or renewal thereof of this Agreement.

**6. Confidentiality and PR.**

**6.1. Confidentiality.** (a) Definition. "Confidential Information" is information disclosed by one party to the other party under this Agreement that is marked as confidential or would normally under the circumstances be considered confidential information of the disclosing party. For clarity, any communication or information relating to either party's acceptance or denial of an obligation under Section 11.1 or 11.2, or the existence or absence of an obligation under Section 11.1 or 11.2 in any third-party lawsuit or proceeding falls into the definition of Confidential Information. Notwithstanding the foregoing, Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another party. (b) Confidentiality Obligations. The recipient will not disclose the Confidential Information, except to Affiliates, employees, and agents who need to know it and who have agreed in writing to keep it confidential. The

Confidential



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-004552353

EXHIBIT 5255-012

recipient, its Affiliates, employees, and agents may use Confidential Information only to exercise rights and fulfill obligations under this agreement, while using reasonable care to protect it. The recipient may also disclose Confidential Information when required by law after giving reasonable notice to the discloser. Confidential Information relating to any communication or information relating to either party's acceptance or denial of an obligation under Section 11.1 or 11.2, or relating to the existence or absence of an obligation under Section 11.1 or 11.2 in any third-party lawsuit or proceeding may be disclosed if such disclosure is required by (i) an applicable law; or (ii) judicial or governmental order (provided that for both (i) & (ii), the disclosing party gives the other party reasonable notice to enable it to seek a protective order or uses reasonable measures to seek an appropriate protective order) and further provided that the disclosing party in any event shall not unreasonably withhold its consent on the recipient's request for the disclosure of such Confidential Information.

6.2. **Publicity.** Except as set forth in Section 2.7, neither party may make any public statement regarding the relationship contemplated by this Agreement without the other's prior written approval. Requests for marketing, press releases and other publicity issues should be made by submitting a request at http://services.google.com/permissions/application (and selecting the appropriate Android entry in the "Request Type" menu).

7. **Trademarks**.

    7.1. **General.** Each party shall own all right, title and interest, including without limitation all Intellectual Property Rights, relating to its Trademarks. Some, but not all examples of Google Trademarks are located at: http://www.google.com/permissions/trademarks.html (or such other URLs Google may provide from time to time). Except to the limited extent expressly provided in this Agreement, neither party grants, and the other party shall not acquire, any right, title or interest (including, without limitation, any implied license) in or to any Trademarks of the first party; and all rights not expressly granted herein are deemed withheld. All use by Google of Company Trademarks (including any goodwill associated therewith) shall inure to the benefit of Company and all use by Company of Google Trademarks (including any goodwill associated therewith) shall inure to the benefit of Google. No party shall challenge or assist others to challenge the Trademarks of the other party (except to protect such party's rights with respect to its own Trademarks) or the registration thereof by the other party, nor shall either party attempt to register any Trademarks or domain names that are confusingly similar to those of the other party.

    7.2. **License to Google Trademarks.** Subject to Google's written approval prior to each use of a Google Trademark and to the terms and conditions of this Agreement, Google grants to Company a limited, nonexclusive and nonsublicensable license during the Term to display those Google Trademarks expressly authorized for use in this Agreement, solely for the purposes expressly set forth herein. Notwithstanding anything to the contrary, Google may revoke the license granted herein to use Google's Trademarks upon providing Company with written notice thereof and a reasonable period of time to cease such usage. Furthermore, in its use of any Google Trademarks, Company agrees to adhere to the Google Mobile Branding Guidelines.

    Company shall not, and shall not allow any third party to produce any consumer packaging or materials for the Device that identifies or suggests that Google is the manufacturer of the Device. In this regard, Company shall ensure that any Device packaging or user guide produced by the Company identifies Company as the manufacturer of the Device and provides contact details in the applicable Territories in which the Device is distributed.

    7.3. **License to Company Trademarks.** Subject to the terms and conditions of this Agreement, Company grants to Google a limited, nonexclusive and nonsublicensable license during the Term to display those Company

**Confidential**



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY        GOOG-PLAY-004552354

EXHIBIT 5255-013

Trademarks expressly authorized for use in Section 2.7 of this Agreement, solely for the purposes expressly set forth herein. Google must get Company's prior written approval for the use of Company Trademarks not set forth in Section 2.7 of this Agreement.  Notwithstanding anything to the contrary, Company may revoke the license granted herein to use Company's Trademarks upon providing Google with written notice thereof and a reasonable period of time to cease such usage. Furthermore, in its use of any Company Trademarks, Google agrees to adhere to Company's Mobile Branding Guidelines, which Company will provide to Google.

8. **Proprietary Rights.** (a) Company acknowledges that, as between the parties, Google (and/or its licensors) retains all right, title and interest, including without limitation all rights in copyrights, trademarks, trade secrets, patents and know-how, in and to the Google Applications and the Google Trademarks.  Company has, and shall acquire, no rights in the foregoing except those expressly granted by this Agreement.  Google shall not be restricted from selling, licensing, modifying, or otherwise distributing the Google Applications and/or the Google Trademarks to any third party.  (b) Google acknowledges that, as between the parties, Company (and/or its licensors) retains all right, title and interest, including without limitation all rights in copyrights, trademarks, trade secrets, patents and know-how, in and to the Devices and the Company Trademarks.  Google has, and shall acquire, no rights in the foregoing except those expressly granted by this Agreement.  Except as set forth in this Agreement, Company shall not be restricted from selling, licensing, modifying, or otherwise distributing the Devices and/or the Company Trademarks to any third party.

9. **Representations, Warranties and Disclaimer.**

    9.1. **Representations and Warranties.**  Each party represents and warrants to the other that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its Affiliates are a party.

    9.2. **Disclaimer.**  OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 9.1, THE GOOGLE APPLICATIONS AND THE ANDROID PLATFORM ARE PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND AND GOOGLE EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.  GOOGLE DOES NOT WARRANT THAT THE GOOGLE APPLICATIONS AND/OR ANY OTHER GOOGLE PRODUCTS OR SERVICES PROVIDED HEREUNDER WILL MEET ALL OF COMPANY'S REQUIREMENTS OR THAT PERFORMANCE OF SUCH SERVICES WILL BE UNINTERRUPTED, VIRUS-FREE, SECURE OR ERROR-FREE.  OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 9.1, THE DEVICES ARE PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND AND COMPANY MAKES NO WARRANTY OF ANY KIND TO GOOGLE WITH RESPECT TO THE DEVICES, AND EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

10. **Limitation of Liability.**

    10.1. **Limitations.**   SUBJECT TO SECTION 10.2: (A) LIMITATION ON INDIRECT LIABILITY. NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR ANY DAMAGES OTHER THAN DIRECT DAMAGES, EVEN IF THE PARTY IS AWARE OR SHOULD KNOW THAT SUCH DAMAGES ARE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY.   (B) LIMITATION ON AMOUNT OF LIABILITY.  NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR MORE THAN ONE HUNDRED THOUSAND U.S. DOLLARS ($100,000.00 USD).

    10.2. **Exceptions to Limitations**.   These limitations of liability do not apply to: (a) breaches of confidentiality obligations, violations of Intellectual Property Rights (including without limitation a breach of the license to use

**Confidential**



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-004552355

EXHIBIT 5255-014

Trademarks under Section 7), obligations under Section 11 (Defense of Third Party Legal Proceedings); or (b) breaches by COMPANY of Section 2.1 (License Grant) and Section 2.2 (License Grant Restrictions), Section 2.4(b)(iii) (opportunity to review and accept Google terms of service), or Section 2.5 (Accurate Reproduction).

**10.3. Allocation of Risk.** The parties agree that (a) the mutual agreements made in this Section 10 reflect a reasonable allocation of risk, and (b) that each party would not enter into the Agreement without these limitations on liability.

## 11. Defense of Third Party Legal Proceedings.

### 11.1. By Google.

11.1.1. Google will defend, or at its option settle, any third-party lawsuit or proceeding brought against Company after the Effective Date based upon or otherwise arising out of: (a) any breach or claimed breach of the first sentence of Section 9.1 during the Term or Sell-Off Period; (b) any claim that the use of the Google Applications, Incompatible Android Design Around or Google Trademarks on Devices shipped by Company during the Term and through the Sell-Off Period in accordance with this Agreement infringes any Intellectual Property Right; or (c) any claim, other than a claim of infringement of Intellectual Property Right, arising out of or resulting from an End User's use, during the Term or up to 18 months after completion of the Term, of any Google Application on a Device shipped by Company during the Term. Further, subject to the terms of this Agreement, Google will pay an aggregate amount of damages and settlement capped at USD $100,000,000.00 in its defense of third party lawsuits or proceedings under this Section 11.1.1 if Company owes damages in a final judgment by a competent court or if Google settles.

11.1.2. The parties agree that Google will continue to defend, or at its option, settle, in accordance with the terms of the parties' MADA dated January 1, 2011 ("2011 MADA"), any third-party lawsuit or proceeding brought against Company before, but pending as of, the effective date of 2014 MADA, and after the effective date of the 2011 MADA ("Prior Claim 1") that Google has agreed to defend as of the Effective Date, if the Prior Claim 1 accuses the continued distribution of Google Applications on Devices that Company ships during the Term and through the Sell-Off Period, and Company has notified Google of such Prior Claim 1 as of the Effective Date such that Google is not prejudiced, such as by the inability to defend against the Prior Claim 1 pursuant to the terms of 2011 MADA. The parties further agree that Google will continue to defend, or at its option, settle, and pay an aggregate amount of damages and settlement for, in accordance with the terms of the parties' MADA dated June 1, 2014 ("2014 MADA"), any third-party lawsuit or proceeding brought against Company before, but pending as of, the Effective Date, and after the effective date of the 2014 MADA ("Prior Claim 2") that Google has agreed to defend as of the Effective Date, if the Prior Claim 2 accuses the continued distribution of Google Applications on Devices that Company ships during the Term and through the Sell-Off Period, and Company has notified Google of such Prior Claim 2 as of the Effective Date such that Google is not prejudiced, such as by the inability to defend against the Prior Claim 2 pursuant to the terms of 2014 MADA.

11.1.3. Notwithstanding the foregoing, in no event shall Google have any obligations or liability under this Section 11.1 arising from: (i) modifications of the Google Applications or the Google Trademarks by any party other than and without the written consent from Google or its Affiliates; or (ii) combination of the Google Applications with any other software or products or any other materials unless the essential aspect of the alleged infringement occurs in the Google Application(s) as provided by Google and not in any other software, products or materials (including without limitation the Android platform or any third party products). Google, in its sole and reasonable discretion, reserves the right to terminate Company's continued distribution of or access to the Google Applications or the Google Trademarks which are alleged or believed by Google to infringe the Intellectual Property Rights of a third party. Google shall have no obligations under this Section 11.1 regarding the Android platform or any third party products distributed through Google Play.

Confidential



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-004552356

EXHIBIT 5255-015

11.2. **By Company.** Company will defend, or at its option settle, any third-party lawsuit or proceeding brought against Google after the Effective Date based upon or otherwise arising out of: (a) any breach or claimed breach of Section 9.1; (b) Company's or Company-controlled partners' unauthorized replication, packaging, marketing, distribution, or installation of the Google Applications; (c) any breach or claimed breach of Sections 2.4(b)(iii) or Section 3.2 (Actively Promote), (d) any claim related to Company's advertising, marketing or promotion of any Devices; (e) any claim that any Device (or application installed thereon other than the Google Applications), or any Company Trademark infringes any Intellectual Property Right during the Term and/or Sell-Off Period; or (f) any claim arising out of or resulting from End User's use of any Device (or application installed thereon other than the Google Applications) during the Term, including without limitation any actions or claims in product liability, tort, contract or equity. Additionally, subject to the terms of this Agreement, Company will pay an aggregate amount of damages and settlement capped at USD $100,000,000.00 in its defense of third party lawsuits or proceedings under this Section 11.2 if Google owes damages in a final judgment by a competent court or if Company settles.

11.3. **Injunction.** If by reason of an Intellectual Property Right claim, Company or its Affiliate is prevented or is almost certain to be prevented by an injunction or other legal means from using any Google Application(s), Google and Company will discuss the issue in good faith, and Google may, at its expense and at its option:

11.3.1. obtain all rights required to permit Company's and its Affiliates' use of the applicable Google Application(s);

11.3.2. modify or replace the Google Application(s) with non-infringing applications; or

11.3.3. terminate Company's continued distribution of or access to the Google Applications which are alleged or believed by Google to infringe the rights of a third party.

11.4. **Conditions.** As a condition to the provisions in this Section 11, the party seeking defense of a third party lawsuit or proceeding (the "**Defended Party**") must promptly notify the other party of the lawsuit or proceeding (the "**Defending Party**") and cooperate with the Defending Party in defending the lawsuit or proceeding. The Defending Party has full control and authority over the defense including selection of counsel, but the Defended Party may join in the defense with its own counsel at its own expense. THE PROVISIONS OF THIS SECTION 11 ARE THE ONLY APPLICABLE PROVISIONS UNDER THIS AGREEMENT FOR VIOLATION OF A THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.

11.5. **Source Code Modifications.**

11.5.1. Upon a party's request, the parties will designate a committee to meet on an agreed-upon basis to discuss any Company request for source code modifications in connection with third party patent lawsuits or proceedings. The location of such meetings will alternate between the parties' headquarters. This committee will consist of at least one attorney from each party. During these meetings, if Company believes that either (a) an Incompatible Android Design Around or (b) any Google Application may be subject to a foreseeable a risk of an adverse decision (e.g., an infringement judgment) against Company due to a third-party patent infringement lawsuit or proceeding ("**Threat**"), the parties agree to engage in good faith discussions to review the potential Threat and discuss whether a reasonable source code modification in Android or the Google Application(s) is necessary.

11.5.2. After the allegations of infringement and invalidity positions regarding a third-party patent infringement lawsuit or proceeding are known to both parties, the parties will work together to propose a reasonable source code modification that will be implemented within a reasonable period of time. If the parties cannot agree to a reasonable source code modification or timing of such modification within a reasonable period of time after identifying the Threat, or if the parties cannot agree on the existence of a Threat, then the parties will escalate to each party's respective executives. The parties' executives will determine the plan of action for handling the Threat, and such action may include, by way of example only, a potential

Confidential



increase in the cap for aggregate damages and settlement per Section 11.1.1, or removal of Google Application(s) from Devices if they are subject to a Threat. The examples above do not automatically obligate the parties to take such action without the determination by the executives for it, but rather the executives will mutually agree on the correct course of action for each particular instance.

**11.6. Dispute Regarding Obligations.** Both parties will in good faith comply with the obligation under Section 11 and cooperate with the other party to timely respond to the other Party's request under Section 11. If either party believes it has a good faith reason to deny that a defense and settlement obligation exists under this Section 11 and the other party disagrees, the parties' respective in-house counsel agree to engage in good faith discussions to review such denial and discuss whether such denial will be withdrawn. If the parties cannot mutually agree on a solution within thirty (30) days of such discussion, the parties agree to escalate to both parties' executives to seek an equitable resolution. If the parties fail to reach an agreement for a solution during such discussion, such disputes will be finally settled by the arbitration process pursuant to Section 12.6. Notwithstanding the foregoing or anything to the contrary, nothing in this provision will hinder the parties from exercising any of its rights under this Agreement including a right to seek any remedies allowed by the law based on such denial except that neither party has the right to exercise the termination rights under Section 5.2 until a final determination of the arbitration process pursuant to Section 12.6 is made.

## 12. General.

**12.1. Notices.** All notices must be in writing and addressed to the attention of the other party's Legal Department and primary point of contact. Notice will be deemed given (a) when verified by written receipt if sent by personal courier, overnight courier, or mail; or (b) when verified by automated receipt or electronic logs if sent by facsimile or email.

**12.2. Force Majeure.** Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.

**12.3. Assignment.** Neither party may assign or transfer any part of this Agreement without the written consent of the other party, except to an Affiliate but only if (a) the assignee agrees in writing to be bound by the terms of this Agreement and (b) the assigning party remains liable for obligations under the Agreement. Any other attempt to transfer or assign is void.

**12.4. Change of Control.** Upon a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction), (a) the party experiencing the change of control will provide written notice to the other party within 30 days after the change of control, and (b) the other party may immediately terminate this Agreement any time between the change of control and 30 days after it receives the written notice in subsection (a) of this Section 12.4.

**12.5. No Waiver; Severability; No Agency; No Third-Party Beneficiaries.** Failure to enforce any provision will not constitute a waiver. If any provision is found unenforceable, it and any related provisions will be interpreted to best accomplish the unenforceable provision's essential purpose. The parties are independent contractors, and this Agreement does not create an agency, partnership or joint venture. There are no third-party beneficiaries to this Agreement.

**12.6. Controlling Law.** This Agreement, and all matters arising out of or relating to this Agreement, shall be governed by the laws of the State of New York. All disputes, controversies or difference which may arise between the parties out of or relating to or in connection with this Agreement should be settled amicably through friendly negotiation. In the event of any controversy or claim arising out of or relating to any provision of this Agreement or the breach thereof, except as set forth in the last sentence of this Section 12.6, such

Confidential



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY        GOOG-PLAY-004552358

EXHIBIT 5255-017

controversy or claim shall be finally settled in accordance with the Rules of Arbitration of the International Chamber of Commerce by three (3) arbitrators appointed in accordance with the said Rules unless the parties agree on the name of a sole arbitrator. The arbitration shall be held in Singapore, and shall be conducted in the English language. Notwithstanding anything above, such arbitration proceedings shall in no way impair or limit the right of either party to seek injunctive relief without recourse to arbitration, or to otherwise pursue immediate relief needed to prevent the breach of this Agreement. Notwithstanding the foregoing or anything to the contrary, any and all disputes, controversies or claims relating to one party's alleged or actual infringement of the Intellectual Property Rights related to this Agreement of the other party shall be instituted in a state or federal court in the Manhattan borough of New York City, New York, and Google and Company agree to submit to the exclusive jurisdiction of, and agree that venue is proper in, these courts in any such legal action or proceeding.

12.7. **Entire Agreement; Amendments; Counterparts.** This Agreement is the parties' entire agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject except for the Patent Cross License Agreement entered into on January 1, 2014 between Samsung and Google. Any amendment must be in writing and expressly state that it is amending this Agreement. The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

**IN WITNESS WHEREOF**, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

| SAMSUNG ELECTRONICS CO., LTD. | GOOGLE INC. |
|---|---|
| By | By |
| Name | Name |
| Title | Title |
| Date | Date |

**Confidential**



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-004552359

EXHIBIT 5255-018