
**EXHIBIT 5399**

# MOBILE APPLICATION DISTRIBUTION AGREEMENT (MADA)

| | | |
|---|---|---|
| 1. "Company" | Full legal name: Motorola Mobility LLC and its Affiliates<br>*Address for legal notices:* Street Address:<br>███████████████████<br>Attn: Legal Department<br>Fax:<br>Email: Comm Law @motorola.com | |
| F2. "Google" | Google LLC<br>*Address for legal notices:*<br>Google LLC<br>███████████████████<br>Attn: Legal Department<br>Fax: ████████<br>Email: Legal Notices @google.com | |
| 3. State of Incorporation/ Organization | Company:      Delaware<br>Google LLC:   Delaware | |
| 4. "Effective Date" | January 1, 2018 (must be start of calendar month) | |
| 5. "Term" | Starting on the Effective Date and continuing through December 31, 2019 (inclusive) | |

The parties agree to the terms of this Agreement and have caused this Agreement to be signed by their duly authorized representatives.

| Google LLC | Motorola Mobility LLC: |
|---|---|
| *[signature]* 2018.01.05 10:19:56 08'00'<br>Jamie Rosenberg<br>Authorized Signatory | *[signature]*<br>**(Authorized Signature)** |
| **(Name)** | SANJAY VANJANI<br>**(Name)** |
| **(Title)** | CFO<br>**(Title)** |
| **(Date)** | JAN 5 2018<br>**(Date)** |



1

062617
Google Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

## BACKGROUND

WHEREAS:

A.      Google offers an integrated suite of mobile services on a non-exclusive, royalty-free basis to Android device manufacturers that have executed an Android Compatibility Commitment;

B.      Company desires to license Google's suite of mobile services to provide a consistent high-quality out-of-the-box user experience on Company's Android Compatible Devices;

C.      Nothing in this Agreement is intended to restrict Company or end users from installing third-party services on devices with Google's suite of mobile services, including services with similar functionality; and

D.  Company is under no obligation to install Google Applications on any of its Android devices.

## AGREEMENT

### TERMS AND CONDITIONS

1.  **DEFINITIONS.**

1.1     **"Affiliate(s)"** means any company controlling, controlled by or under common control with a party, where "control" will mean ownership, directly or indirectly, of the shares of a company representing fifty percent (50%) or more of the voting rights in this company.

1.2     **"Android"** means the open-source application framework, libraries, runtime, and kernel which are published at http://source.android.com (or successor sites), and any software development kits made available at http://developer.android.com (or successor sites).

1.3     **"Android Compatible Device(s)"** means, for each version of the Android platform, a Company phone or tablet that complies with the Android Compatibility Definition Document ("CDD"), which can be found at the Android compatibility website (http://source.android.com/compatibility), as updated from time to time.

1.4     **"Android Content"** means software, content and digital materials designed for use on Android devices.

1.5     **"Assert"** means to bring, threaten to bring, or continue any legal proceeding in any forum to enforce a right, whether created by a claim or a counterclaim or otherwise, and whether administrative, judicial, arbitral or otherwise, including any proceeding before the United States International Trade Commission.



2

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406596

EXHIBIT 5399-002

1.6 **"Assist App"** means an Android system application that an End User may use to obtain information and perform actions.

1.7 **"Basic Applications"** means a set of applications specified by Company in a list of which Company will provide to Google at least 60 days prior notice and must obtain Google's written approval if it decides to change or add a Basic Application.

1.8 **"Client ID"** means unique alphanumeric code(s) that Google provides to Company that is used to identify Devices.

1.9 **"Compatibility Test Suite" or "CTS"** means an automated testing program to test devices using Android for compliance with the CDD that is published at http://source.android.com.

1.10 **"Compliance Target"** means that as measured on the 28th day of a particular calendar month, Security Updates have been performed with a security patch level no more than 90 days old on the following: at least 50% of Security Mandatory Device Models as of January 31, 2018; at least 75% of Security Mandatory Device Models as of October 31, 2018; and 100% of Security Mandatory Device Models after January 31, 2019. Google will determine whether the Security Update obligation is fulfilled when at least 5% of End Users on each Security Mandatory Device Model is up to date using a security patch level defined by Google in an Android Security Bulletin published at http://source.android.com/security/bulletin/ (the url link might be changed from time to time by Google) within the prior 90 days.

1.11 **"Confidential Information"** means information that one party (or an Affiliate) discloses to the other party under this Agreement that is marked as confidential or would normally be considered confidential information under the circumstances. It does not include information that becomes public through no fault of the recipient, that is independently developed by the recipient, or that is rightfully given to the recipient by a third party without confidentiality obligations.

1.12 **"Core Applications"** means the following Google Applications: Search, Chrome, Gmail, Maps, YouTube, and Play.

1.13 **"CTS Report"** means the complete, unaltered report that is generated after the CTS is completed.

1.14 **"Default Home Screen"** means the default display of a Device, including the lock screen and/or the notification tray, prior to any changes made by End Users that appears without scrolling (i) after initial boot-up, (ii) after each subsequent power-up, or (iii) after an End User selects the "home" icon.

1.15 **"Device"** means each Android Compatible Device branded or marketed with Company or third party Trademarks (in each case as listed in Exhibit A, which may be updated from time to time via an email) with a unique build fingerprint that (i) runs Android only (and no alternative software platform) and has a screen size no greater than 18 inches, (ii) is distributed with Google Applications (as described in this Agreement), (iii) is approved by Google pursuant to Section 4.9 (Google Approval and Launch), and (iv) is intended for use by End Users. For Company devices



3

062617
Google Confidential

running Android other than phones or tablets, Google may (x) require Company to enter into separate terms and conditions to license Google Applications, (y) approve such device (such approval may be provided over email) as a Device, or (z) reject such device for the distribution of Google Applications.

1.16 **"Device Model"** means the name of a Device as it is sold and marketed to the End User.

1.17 **"End User(s)"** means a human end user of a Device.

1.18 **"Final Embed Date"** means the latest possible date Company can accept updated Google Applications from Google for a specific Device deployment.

1.19 **"Flexible Applications"** means the Google Applications that are designated as "Flexible" in the Google Product Geo Availability Chart or any documents provided by Google as of the Effective Date, which Google may change in its sole discretion.

1.20 **"GMS Requirements"** means the list of requirements specified at https://sites.google.com/a/google.com/gms_distribution/gms (as such URL may be changed or replaced by Google at its sole discretion from time to time).

1.21 **"Google Applications"** means the machine-readable binary code version of the Google applications, including Core Applications, Flexible Applications and others listed in the Google Product Geo Availability Chart, and any modifications or updates to such applications.

1.22 **"Google GNSS Assistance Information"** means information that is transmitted by Google to a SUPL Enabled Terminal in response to a request received by Google as described in Section 4.11(b).

1.23 **"Google Hotword Engine"** means Google-developed software components, which may include software that runs on the digital signal processor of a Device (if available), which allow End Users to use the Google Hotword functionality.

1.24 **"Google Mobile Branding Guidelines"** means Google's mobile brand treatment guidelines (and any content contained or referenced therein), which are located at https://sites.google.com/site/mobilebrandguide/ and http://www.google.com/permissions/guidelines.html (as such URLs may be changed or replaced by Google at its sole discretion from time to time), together with such additional brand treatment guidelines Google may make available to Company from time to time.

1.25 **"Google Play"** means the marketplace created and operated by Google, through which Android Content is distributed.

1.26 **"Google Product Geo Availability Chart"** means the list of Google Applications and associated information (including geo-availability) set out at https://sites.google.com/a/google.com/gms_distribution/gms/resources (as such URL may be changed or replaced by Google at its sole discretion from time to time).



4

062617
Google Confidential

GOOG-PLAY4-005406598

EXHIBIT 5399-004

1.27 **"Hotword"** means a voice-activated trigger that enables voice commands on the Device, which can be provided by either Google (a "Google Hotword"), Company (a "Company Hotword"), or a third party.

1.28 **"Intellectual Property Rights"** means all patent rights, copyrights, semiconductor chip protection rights, moral rights, rights in trade secrets, trademark rights, database rights, and any other intellectual property rights (registered or unregistered) throughout the world.

1.29 **"Launch"** means the initial distribution of a Device in accordance with the terms of this Agreement.

1.30 **"Location ID"** means a unique alphanumeric identifier as defined in the OMA SUPL Internal Location Protocol specification.

1.31 **"Security Updates"** means the installation of a Google-provided security patch on a Device such that all Common Vulnerabilities and Exposures ("CVE") posted in the public security bulletin for the date of the update are fixed, unless otherwise approved by Google in writing.

1.32 **"Security Mandatory Device Model"** means a Device Model that has been launched after January 31, 2018 and has more than 100,000 End User activations.

1.33 **"SUPL Enabled Terminal"** means a Device which is capable of communicating with a SUPL (Secure User Plane Location) network to aid in the process of obtaining its location.

1.34 **"SUPL Request"** means a request for Google GNSS Assistance Information sent to Google and originating from a SUPL Enabled Terminal.

1.35 **"Telecom Operator"** means a company that provides wireless service that allows End Users to access the Internet on a Device.

1.36 **"Territories"** means the country or countries in which distribution of Google Applications is permitted as set forth in the Google Product Geo Availability Chart, which Google may update in its sole discretion.

1.37 **"Third-Party Legal Proceeding"** means any formal legal proceeding filed before a court or government tribunal (including any civil, administrative, investigative or appellate proceeding) by a third party that is not affiliated with Google or Company.

1.38 **"Trademarks"** means the trade names, trademarks, service marks, logos, domain names and other distinctive brand features of each party as owned by such party from time to time.

2. **GOOGLE APPLICATIONS.**

2.1 **License to the Google Applications.** Subject to the terms and conditions of this Agreement (including compliance with Section 2.3) and the GMS Requirements, and subject to Company being in compliance with a valid and effective Android



5

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406599

EXHIBIT 5399-005

Compatibility Commitment, Google grants to Company a nontransferable, nonexclusive, no cost license during the Term (under Google's Intellectual Property Rights) to (a) distribute the Google Applications on Devices in the Territories, and (b) reproduce the Google Applications to the extent necessary to exercise the license granted in this Section 2.1. Company may only distribute a Device with Google Applications if it makes all Core Applications and Flexible Applications authorized for distribution in the applicable Territory available on such Device, unless otherwise approved by Google in writing. For the avoidance of doubt, Google may license such Google Applications under Intellectual Property Rights that Google owns or has the right to license without payment to or consent from a third party.

2.2   **Sublicense**.  Company may sublicense the license granted in Section 2.1 to the following entities listed below provided that Company has entered into a written agreement with each such entity that contains obligations and restrictions that are no less protective of Google than the obligations and restrictions applicable to Company set out in this Agreement and makes Google a third-party beneficiary:

(a)   Company Affiliates, Telecom Operators, resellers, distributors, and retailers only for purposes of distributing Devices and only when Google Applications are pre-installed on Devices; and

(b)   Company's Affiliates and contractors solely for internal testing, evaluation, manufacturing and development purposes (i.e. not commercial distribution) with respect to Devices.

2.3   **License Limitations**.  Company may not, and may not allow or encourage any Affiliate or third party to:

(a)   disassemble, de-compile, or otherwise reverse engineer the Google Applications or obtain the source code or algorithms underlying the Google Applications;

(b)   create derivative works from or based on the Google Applications;

(c)   provide, sell, license, distribute, lease, lend, or disclose the Google Applications to any third party, except as expressly permitted in this Agreement;

(d)   ship, divert, transship, transfer, export, or re-export the Google Applications, or any component thereof, into any country or use it in any manner prohibited by any applicable export control laws, restrictions, or regulations;

(e)   distribute a Device in a Territory unless the subset of Google Applications required for distribution in that Territory are pre-installed on that Device, except as otherwise approved by Google in writing;

(f)   distribute a Device in a Territory without Google's prior written approval pursuant to Section 4.9 (Google Approval and Launch);



6

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

(g)   distribute a version of a Google Application in a Territory other than the specific version of that Google Application authorized by Google for that Territory;

(h)   serve or otherwise place any advertisements during the launch process of a Google Application;

(i)   offer, download, or install any additional products during the launch process of a Google Application;

(j)   interfere with or limit the display or acceptance of the applicable Google Terms of Service for a Google Application;

(k)   redirect an End User away from, block access to, frame, modify, or change the look or feel of any web page or web site accessed via a Google Application, or place anything on or near any web site page that in any way implies that Google is responsible for the contents of such page unless Google indicates otherwise;

(l)   insert into a Google Application any viruses, worms, date bombs, time bombs, or other code that causes the Google Application to cease operating, or to damage, interrupt, allow access to, or interfere with any Google Application or End User data;

(m)   modify, or interfere with the operation of, the Google Applications unless necessary to incorporate and integrate a Google Application into a Device upon Google's approval;

(n)   direct, instruct or encourage the End User to change the out-of-box settings of a Device unless initiated by the End User; or

(o)   interfere with Google's over-the-air updates of Google Applications.

2.4   **Delivery**.  Google will develop and deliver the Google Applications to Company and may update such Google Applications from time to time.  Company will only distribute the then-current versions of Google Applications on Devices and will promptly update all versions of Google Applications intended for distribution on Devices no later than sixty (60) days after such update is made available.

2.5   **App Updates**.  Google may auto-update Google Applications on Devices over-the-air.

3.   **INTELLECTUAL PROPERTY & OTHER PROPRIETARY RIGHTS.**

3.1   **Ownership**.  Each party (and its licensors) retains all right, title and interest in its Intellectual Property Rights, including its Trademarks.  Neither party obtains any Intellectual Property Rights pursuant to this Agreement (including implied licenses), except those rights expressly licensed and subject to all of the terms and conditions of this Agreement.



7

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

(a)     Google (and/or its licensors) retains all right, title and interest, including all Intellectual Property Rights, in and to the Google Applications, Google GNSS Assistance Information and the Google Trademarks.   Examples of Google Trademarks are located at: http://www.google.com/permissions/trademarks.html (or such other URLs Google may provide from time to time).   Google is not restricted from selling, licensing, modifying, or otherwise distributing the Google Applications, Google GNSS Assistance Information and/or the Google Trademarks to any third party.

(b)     Company (and/or its licensors) retains all right, title and interest, including all Intellectual Property Rights, in and to the Devices (excluding Google Applications and Android) and the Company Trademarks.   Company is not restricted from selling, licensing, modifying, or otherwise distributing the Devices with Google Applications and/or the Company Trademarks to any third party except as otherwise set forth in this Agreement.

(c)     All use by Google of Company Trademarks (including any goodwill associated therewith) will inure to the benefit of Company, and all use by Company of Google Trademarks (including any goodwill associated therewith) will inure to the benefit of Google.   Neither party may challenge or assist others to challenge the Trademarks of the other party (except to protect such party's rights with respect to its own Trademarks) or the registration thereof by the other party, nor will either party attempt to register any Trademarks or domain names that are confusingly similar to those of the other party.

3.2     **License to Google Trademarks**.   Subject to Google's prior written approval for each use of a Google Trademark and to the terms and conditions of this Agreement, Google grants to Company a limited, non-exclusive and non-sublicensable license during the Term to display those Google Trademarks solely for the purposes of this Agreement.   Google may revoke the license granted in this Section upon providing Company written notice and a reasonable period of time to cease such usage. Company's use of Google Trademarks is subject to the Google Mobile Branding Guidelines.

3.3     **License to Company Trademarks**.   Subject to the terms and conditions of this Agreement, Company grants to Google a limited, non-exclusive and non-sublicensable license during the Term to display those Company Trademarks solely for the purposes of this Agreement.   Company may revoke the license granted in this Section upon providing Google written notice and a reasonable period of time to cease such usage.   Google's use of Company Trademarks is subject to Company's prior approval.

3.4     **Packaging**.   Company may not, and may not direct, instruct or encourage any third party to produce any consumer packaging or materials for the Device that identifies or suggests that Google is the manufacturer of the Device.   For any Device packaging or user guide produced by Company, Company will identify itself as the manufacturer of the Device and provide contact details in the applicable Territories where the Device is distributed.



8

062617
Google Confidential

3.5   **Open Source Licenses.** Portions of the Google Applications or Android may be provided with notices and open source licenses from third parties that govern the use of those portions, and any licenses granted hereunder do not alter any rights and obligations Company may have under such open source licenses.

## 4.   DEVICE IMPLEMENTATION REQUIREMENTS.

4.1   As between the parties, Company is solely responsible for the distribution of the Devices and managing its inventory. Company is under no obligation to install Google Applications on any of its Android devices.

4.2   **Geo-Availability of Google Applications.** Company agrees not to, and not to encourage any third party to, distribute or actively promote Google Applications, Google products or Google services outside of the Territories. If Google updates the Google Product Geo Availability Chart, Company will implement the relevant changes on devices yet to be manufactured in compliance with such updated chart within sixty (60) days after such update is made available.

4.3   **Security Update Requirements.** Company agrees to the following security-related requirements for each Security Mandatory Device Model:

(a)   Provide at least four Security Updates within the first 12 months of Launch of a Device;

(b)   Produce Security Updates for at least two years from the Device Launch date;

(c)   Submit each of the produced Security Updates for Google approval pursuant to Section 4.9(a); and

(d)   Make the Google approved Security Updates available to End Users using Google OTA or Company's own solution.

If in any month, the Compliance Target for Security Update Requirements is not met, Company will provide a remedial plan to improve the Compliance Target performance. If Company and Google are unable to agree on such remedial plan in good faith, Google reserves the right to withhold approval of any future Company Devices.

4.4   **Placement Requirements; Device Setup.** In return for Google granting a no cost license to Google Applications for distribution on Devices under this Agreement, unless Google otherwise approves in writing, Company agrees to the following placement and setup requirements with respect to Android Compatible Devices distributed or launched during the Term that it elects to configure as Devices:

(a)   distribute all Core Applications and Flexible Applications approved in the applicable Territory or Territories in accordance with the Google Product Geo Availability Chart;

(b)   distribute on the Default Home Screen (but excluding the lockscreen and notification tray):

(i)   a Google-provided widget;



9

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406603

EXHIBIT 5399-009

     (ii)    the Google Play Store icon; and

     (iii)   an icon clearly labeled or branded "Google" that provides direct access to the Core Applications and Flexible Applications (using the icons and text Google provides or approves in writing).

(c)    ensure that any distributed Google Application that is not a Core Application or a Flexible Application, is placed on the Default Home Screen or in the application menu;

(d)    ensure that the Google Terms of Service, Privacy Policy and Legal Notice (which will be provided to Company by Google) are available as instructed by Google;

(e)    ensure that a Google Application that is distributed will not launch without an explicit action from an End User;

(f)    ensure that an End User's selection of an icon representing a distributed Google Application, or use of a Google Hotword (if any), will launch such Google Application;

(g)    set Google as the default Assist App and follow the Google-provided set-up screen guidelines, which may be updated from time to time; this Section 4.4(g) will not prevent Company from setting an Assist App developed by or for Company as the default Asist App upon Google's prior approval;

(h)    ensure that any and all long press and long touch activities on the "Home" button on Devices with physical or soft navigation buttons will directly access the Assist App ;

(i)    with respect to initial device setup:

     (i)    initiate Google account login via the setup wizard immediately after establishing network connectivity.  Company may present its terms of service after establishing network connectivity but will not insert a Company or third-party account login process until after the Google account login,

     (ii)   present End User with the Google Services page, which Company may not modify,

     (iii)  follow Google's provided guidelines, and

     (iv)  allow End User to skip all account logins, including Google, Company and third-party logins;

(j)    ensure that use of the Google Applications complies with the Google Mobile Branding Guidelines;



10

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406604

EXHIBIT 5399-010

(k)   display a Google Trademark (as identified by Google) on the initial screen during the boot sequence;

(l)   preload Google-provided Android WebView as the default provider for the webpage-rendering APIs as defined in the Android SDK;

(m)  ensure that the settings for Google accounts and services are not modified and are as discoverable as those of Company or any third party;

(n)   configure the appropriate Client ID, if applicable, as provided by Google and implement any modified Client IDs within thirty (30) days of Google's written notice to Company;

(o)   implement the "Home button animation" pursuant to the Google-provided guidelines if the Google Assistant is enabled on the Android Compatible Device and such Android Compatible Device has a soft "Home" button; and

(p)   implement the Google Hotword if the device supports Hotwords (including support when screen is off).

4.5   **Preload Parity.** If Company chooses to make any of the Flexible Applications deletable by the End User, the proportion of Core Applications and Flexible Applications combined that are made deletable will not exceed the corresponding proportion of deletable preloads installed by Company. For the avoidance of doubt, Basic Applications are not considered part of the equation as preload parity between the Parties. If for any reason, the Device is reset, all Core Applications and Flexible Applications must be restored to the Device's original factory configuration by Google's Play Auto Installs or another mechanism approved by Google.

4.6   **No Exclusivity.** Other than the placement and set-up requirements for Google Applications set forth in Section 4.4, this Agreement does not restrict or limit Company from preloading or determining the placement of its own or third party applications or services on its Android devices.

4.7   **No Connectivity Notice.** When an End User launches a Device's web browser or launches a Google Application and there is no data connectivity available, Company will not block, alter or prevent in any way the presentation of any message to such End User indicating lack of data connectivity.

4.8   **Device Samples; Testing.** Company will provide the materials and information listed below:

(a)   At least thirty (30) days prior to the Final Embed Date for each Launch of each Device Model, Company will deliver to Google at least four (4) device samples for such Device Model for Google's approval as set out in Section 4.9 (Google Approval and Launch).

(b)   Company will assist Google with ongoing testing of devices provided under this Section, including running Android Content and tests and providing any

11 

062617
Google Confidential

information, equipment and/or assistance reasonably requested by Google for such purpose in a timely manner.

**4.9** **Google Approval and Launch**. Prior to the Launch of each Device Model, Google will have the opportunity to review and approve, in its sole reasonable discretion, the Device and Company's implementation of Google Applications on the Device. Following receipt of approval by Google for the Launch of a Device under this Section 4.9, Company may begin distribution in accordance with that approval.  To facilitate Google's review, Company agrees to:

    (a)    submit for Google approval all Device-related information and test reports required by the Android Partner Front End (**"APFE"**) hosted at https://partner.android.com (or such other URL as Google will provide from time to time), unless forbidden by Company's confidentiality obligations under applicable law, as such requirements may be updated by Google from time to time, by uploading such information to APFE;

    (b)    notify Google via email (or via a website provided by Google) of that Launch no fewer than thirty (30) days before such Launch;

    (c)    have a fix for all security vulnerabilities listed in the security bulletins, 60 days and older, posted on http://source.android.com/security unless otherwise approved by Google in writing;

    (d)    submit the Device's final software build for that Launch; and

    (e)    obtain Google's written approval (which may be by way of email) for any subsequent Launches of a Device Model after the Launch of such Device model, which includes any software changes made to such previously approved Launch, by:

        (i)    notifying Google via email (or via a website provided by Google) before each Launch no less than thirty (30) days before such Launch;

        (ii)    submitting APFE-required test reports to Google; and

        (iii)    submitting to Google the Device's final software build for such Launch.

**4.10** **Telecom Operator Customer Restrictions**.  Notwithstanding Section 2.2, the placement and distribution obligations contained in Section 4.4 (Placement Requirements) and Section 4.9 (Google Approval and Launch) may conflict with restrictions placed upon Company by Telecom Operator customers that obtain Devices from Company.  If a conflict arises, Company will notify Google in writing (including to the Partner Manager designated by Google), and Google may, in its sole discretion, waive its placement and distribution requirements for that particular build and Device, which cannot be unreasonably withheld or delayed.  For the sake of clarity, for any new build or Device intended for a Telecom Operator customer, Company agrees to comply with the Placement Requirements and Google Approval and Launch process.



12

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406606

EXHIBIT 5399-012

**4.11**   __Network Location Provider and Google GNSS Assistance Information__.

    (a)    **Network Location Provider.**  Company agrees to:

        (i)    turn off Network Location Provider by default;

        (ii)    display appropriate prompts to End Users seeking End Users' consent to use Network Location Provider as provided by Google and Company will not prevent the End User from providing consent prior to enabling Network Location Provider or any application making use of Network Location Provider;

        (iii)    configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices; and

        (iv)    enable all features of Network Location Provider, including network-based location resolution, anonymous network location data collection, and reverse-geocoding.

    (b)    **Google GNSS Assistance Information.**

        (i)    **License of Google GNSS Assistance Information.**  Google grants to Company a non-exclusive, non-sublicensable, worldwide, royalty-free license to use the Google GNSS Assistance Information, as supplied to Company by Google's SUPL server, solely for the purposes of providing location information to either End Users or applications used by End Users on Devices, in accordance with this Agreement.

        (ii)    **Google GNSS Assistance Information.**  Each time the Google SUPL server receives a SUPL Request that includes the applicable Location ID and complies with the SUPL protocol, Google will transmit Google GNSS Assistance Information to the requesting SUPL Enabled Terminal.

        (iii)    **Re-distribution.**  Company will not re-distribute, transfer, sell, lease, syndicate, sub-syndicate, lend, or use for co-branding, timesharing, service bureau or other unauthorized purposes any Google GNSS Assistance Information, or access to any Google GNSS Assistance Information, without Google's prior written consent.

        (iv)    **Technical Requirements of Accessing Google GNSS Assistance.**  Google GNSS Assistance Information is transmitted using the SUPL protocol and secured with SSL.  Company will ensure that every SUPL Enabled Terminal using Google GNSS Assistance (a) provides a mechanism to update the list of root certificates via the SUPL certificate injection interface defined in the Android Open Source Project Hardware Abstraction Layer, and (b) can set up a successful SSL session with Google's SUPL server.

**4.12**   __Hotwords__.  Company agrees to the following with respect to Hotwords:



13

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406607

EXHIBIT 5399-013

(a)   Company may only use the Google Hotword Engine to detect the Google Hotword, and unless the parties mutually agree otherwise in writing, only the Google Hotword can invoke Google Search.  If Company wishes to have its own apps and/or services invoke Google Search, Google must approve in writing.

(b)   Company may implement its own or third party Hotword engine(s) for Company Hotword or a third party's Hotword(s).  If Company implements its own Hotword engine(s), Company will work with Google to ensure that all Hotword engines and Hotwords are implemented in a compatible manner on a Device and that each performs its function in the manner intended prior to its approval as a Device.

(c)   To the extent Company or a third party uses voice recognition software loaded on the Digital Signal Processor (DSP) of a Device, Google must be given opportunity to gain the same accessibility to End User for Google Hotword Engine to the extent such Device has the technical capability to support the Google Hotword Engine.   If a Company Device cannot support the Google Hotword Engine on the DSP, and Google does not provide for alternatives, Google will not unreasonably withhold consent or approval of a unique Company-developed DSP solution.

(d)   Google's Hotword will be equally discoverable and accessible to End User and with the same quality implementation as other Hotwords.

**4.13   Prohibited Behavior.**  No application that Company preloads or has installed on the Device will do any of the following:

(a)   intentionally create, facilitate the creation of, or exploit any security vulnerabilities in an End User's Device.

(b)   intentionally interfere with an End User's expected operation and use of the Device.

(c)   engage in an activity that violates any applicable law or regulation.

(d)   contain any viruses, worms, trojan horses, or the like.

(e)   mislead, deceive or otherwise violate the End User's privacy.

**5.   GENERAL REQUIREMENTS.**

**5.1   Payments.**  Unless otherwise agreed in a separate written agreement signed by both parties, the parties will each retain all revenue generated from provision of their respective products or services.  Neither party will be required to account to the other or otherwise make any payment to the other regarding the Google Applications, Google GNSS Assistance Information, Google products or services, the Devices, or any revenue generated therefrom.



14

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                GOOG-PLAY4-005406608

EXHIBIT 5399-014

**5.2**   **Reports**.  Within thirty (30) days of the end of each calendar quarter during the Term, Company will provide a written report of the total number of Devices distributed with a Google Application during such calendar quarter (broken out by Territory and Device model within each Territory).  These reports will be submitted to android-partner-report@google.com.

**5.3**   **Data Collection and Reporting**.  Each party's applicable privacy and security policies will apply with respect to End User information collected by such party. The parties will provide each other reasonable aggregate information about usage of the Devices during the Term in order to help each party improve End Users' experience with the Device, consistent with each party's privacy policies. Such aggregate information will not include or involve any personally identifiable information.

**5.4**   **Points of Contact**.  Company and Google will each appoint partner manager (the "**Partner Manager**") who will be the single point of contact for all business and operational activities and a technical account manager(s) (the "**Technical Account Manager**") who will be the single point of contact for all technical and deployment activities. Company and Google will notify the other of the name and contact details for Partner Manager and Technical Account Manager(s) promptly after the Effective Date (which Partner Manager and Technical Account Manager(s) may be changed by either party, upon notice to the other party, from time to time).  Notwithstanding the foregoing, Company will appoint one Partner Manger and one Technical Account Manger respectively for the mobile phone business, tablet business and other special projects that do not fall under either the mobile phone business or tablet business.

**5.5**   **Support**.  As between the parties, Company is solely responsible for customer care and support of Devices of its users (including End Users).  Support for Google Applications may only be provided by Google, and is provided at Google's sole discretion.

**5.6**   **Export Compliance**.  Company will comply with all applicable export and re-export control laws and regulations, including (i) the Export Administration Regulations ("EAR") maintained by the U.S. Department of Commerce, (ii) trade and economic sanctions maintained by the U.S. Treasury Department's Office of Foreign Assets Control, and (iii) the International Traffic in Arms Regulations ("ITAR") maintained by the U.S. Department of State.

**6.**   **TERM AND TERMINATION.**

**6.1**   **Term**.  Unless terminated earlier in accordance with Section 6.2, this Agreement will begin on the Effective Date and continue until the end of the Term.

**6.2**   **Termination**.

   (a)   Either party may suspend performance of its obligations under this Agreement or terminate this Agreement if:



15

062617
Google Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

(i)  the other party is in material breach of this Agreement where the breach can be remedied, but the other party fails to remedy that breach within thirty (30) days after written notice of such breach;

(ii)  the other party is in material breach of this Agreement more than twice regardless of whether such breach can be remedied; or

(iii)  the other party ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within ninety (90) days.

(b)  Either party may terminate this Agreement immediately upon written notice upon a breach by the other party of Section 2 (Google Applications), Sections 3.2 and 3.3 (Trademarks), Section 7.1 (Confidentiality), Section 11.3 (Change of Control), or upon any material breach of this Agreement where the breach cannot be remedied.

(c)  In the event that (i) a government or controlling body of any country or Territory in which the Google Applications are distributed or made available imposes any law, restriction, or regulations that makes it illegal to distribute or make available the Google Applications, or any portion thereof, into such country or Territory, or (ii) if any such law, restriction or regulation places a substantial burden on Google (where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment (such substantial burden, a "**Substantial Burden**")), then Google may immediately suspend the distribution and/or availability of such Google Applications in such country or Territory ("**Special Suspension**").

(d)  Google may terminate this Agreement immediately upon written notice if (i) Company or its Affiliates Asserts an Intellectual Property Right infringement claim based on a Google Application; (ii) Company or its Affiliates ceases to be a licensee to all the rights of any open source licenses used in Company's implementation of Android; or (iii) Company terminates the Android Compatibility Commitment to which Google and Company are a party.

**6.3**  **Effect of Termination**.  Subject to Section 6.4, on expiration or termination of this Agreement:

(a)  all rights and licenses granted hereunder will immediately cease;

(b)  Company will immediately cease reproducing, offering, or distributing the Google Applications; and

(c)  Company will return or destroy all copies of the Google Applications and any other Confidential Information in its possession which it is aware and to which it has access and is reasonably able to destroy or delete, including from all hard disks and memory.



16

062617
Google Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406610

EXHIBIT 5399-016

(d)     Neither party will be liable to the other for any damages resulting solely from termination of this Agreement.

6.4     **Sell-Off Right**.  For a period of thirty (30) days following the end of the Term or termination of this Agreement by Company pursuant to Section 6.2(a) or (b) ("**Sell-Off Period**"), Company may distribute all Google Applications preloaded on the Device inventory ("**Inventory**") as of the last date of the Term or termination date of this Agreement, as the case may be, and may use the Google Trademarks in accordance with this Agreement in connection with the distribution of such Inventory ("**Sell-Off Right**").  For the sake of clarity, the Sell-Off Right will not apply if this Agreement is suspended or terminated by Google pursuant to Section 6.2 (Termination).

6.5     **Survival**.  The following provisions and any other provisions which under their terms or by implication ought to survive, will survive any termination or expiration of this Agreement: the defined terms in the Information Table; and Sections 1 (Definitions), 2.3 (License Limitations), 2.4 (Delivery), 3 (Intellectual Property & Other Proprietary Rights), 4.3. (Security Update Requirement), 6.5 (Survival), 7.1 (Confidentiality Obligations), 8.3 (Disclaimer), 9 (Limitation of Liability), 10 (Defense of Third-Party Legal Proceedings), and 11 (General).

7.     **CONFIDENTIALITY AND PR.**

7.1     **Confidentiality Obligations**.  The recipient of any Confidential Information will not disclose such information, except to Affiliates, employees, agents, or professional advisors ("**Delegates**") who need to know it and who have a legal obligation to keep it confidential.  The recipient will use the Confidential Information only to exercise rights and fulfill obligations under this Agreement.  The recipient will ensure that its Delegates are also subject to the same non-disclosure and use obligations.  The recipient may disclose Confidential Information when required by law after giving reasonable notice to the discloser, if permitted by law.

7.2     **Publicity**.  Neither party may make any public statement regarding this Agreement without the other party's written approval.  Notwithstanding the foregoing, Google and its Affiliates may include Company's Android Compatible Devices and Company's name in presentations, marketing materials, press releases, and customer lists (which includes, without limitation, customer lists posted on Google websites) for marketing purposes. Google may publish Device information uploaded pursuant to Section 4.9(a) upon providing prior notice to Company, the results of each test report(s) after the applicable Device is Launched.

8.     **REPRESENTATIONS, WARRANTIES, AND DISCLAIMER.**

8.1     Each party represents and warrants that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its Affiliates are a party.

8.2     Company represents and warrants that:



17

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406611

EXHIBIT 5399-017

(a) To the best of its knowledge, it has and will maintain through the Term all rights, authorizations, and licenses that are required with respect to:

    (i) the Devices;

    (ii) any written materials provided by Company to be distributed by Google pursuant to this Agreement (including Company's Device builds); and

    (iii) any Company content or services provided by Company under this Agreement;

(b) the Devices, materials provided by Company to Google (including Company's Device builds), and Company's content or services provided by Company under this Agreement, and their use, distribution, sale and license, do and will continue to comply with all applicable foreign, federal, state, and local laws, rules and regulations;

(c) any written materials provided by Company to be distributed by Google (including Company's Device builds) will comply with all applicable open-source licensing requirements; and

(d) all information submitted by Company to the APFE under Section 4.8(a) is and will remain complete and accurate.

8.3 **Disclaimer**. EXCEPT FOR THE EXPRESS WARRANTIES MADE BY THE PARTIES IN THIS AGREEMENT, THE PARTIES DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

## 9. LIMITATION OF LIABILITY.

9.1 In Section 9, "**Liability**" means any liability, whether under contract, tort, or otherwise, including for negligence.

9.2 Nothing in this Agreement excludes or limits either party's Liability for

(a) death or personal injury resulting from its negligence or the negligence of its employees or agents;

(b) fraud or fraudulent misrepresentation;

(c) breaches by Company of Section 2 (Google Applications) or Section 3 (Intellectual Property & Other Proprietary Rights);

(d) breach of Section 7 (Confidentiality and PR);

(e) defense and settlement obligations pursuant to Section 10; or

(f) matters for which liability cannot be excluded or limited under applicable law.



18

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406612

EXHIBIT 5399-018

**9.3**   Subject to Sections 9.2 and 10.7: (a) neither party will be liable (under any theory or circumstance) for (i) lost revenues; (ii) indirect, special, incidental or consequential damages (whether or not foreseeable or contemplated by the parties as of the Effective Date); or (iii) exemplary or punitive damages; and (b) neither party's aggregate liability for any claim arising out of or related to this Agreement will exceed $100,000 USD.

**9.4**   Subject to Section 9.2, to the maximum extent permitted by law, each party's exclusive remedy for breaches of this Agreement will be monetary damages, except that either party may seek injunctive relief in connection with breaches or potential breaches of confidentiality under Section 7.1.

**9.5**   **Allocation of Risk**.  The parties agree that (a) the mutual agreements made in this Section 9 reflect a reasonable allocation of risk, and (b) that neither party would enter into this Agreement without these limitations on liability.

**10.**   <u>**DEFENSE OF THIRD-PARTY LEGAL PROCEEDINGS.**</u>

**10.1**   <u>**By Google**</u>.  Subject to 10.6 (Conditions), Google will defend (at its own expense), or at its option settle (at its own expense) any Third-Party Legal Proceeding brought against Company after the Effective Date to the extent the Third-Party Legal Proceeding arises from:

  (a)   a breach of Google's representations and warranties; or

  (b)   any claim that (i) Google Applications on Devices shipped by Company in accordance with this Agreement and during the Term, or (ii) Google Trademarks used by Company in accordance with this Agreement and during the Term infringes any patent, copyright, trade secret, or trademark of the third party bringing the Third-Party Legal Proceeding against Company.

**10.2**   <u>**Exceptions**</u>.  Google will have no obligations or liability under Section 10.1 arising from:

  (a)   Company's breach of this Agreement;

  (b)   modifications of the Google Applications or the Google Trademarks by anyone other than Google or at the direction of Google;

  (c)   combination of the Google Applications with any other software or products or any other materials unless the essential aspect of the allegations are directed at the Google Application(s) as provided by Google

  (d)   failure to use the most current, supported version of the Google Applications or Google Trademarks provided under this Agreement;

  (e)   Android or any third party products distributed through Google Play;

  (f)   causes of action that arise outside the Term of this Agreement; or



19

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

(g)     lawsuits or proceedings related to a Third-Party Legal Proceeding brought against Company prior to the Effective Date.

**10.3**  **Reservation of Rights**.  Google, in its sole and reasonable discretion, reserves the right to terminate Company's continued distribution of or access to the Google Applications or the Google Trademarks which are alleged or believed by Google to infringe the rights of a third party.

**10.4**  **By Company**.  Subject to 10.6 (Conditions) Company will defend (at its own expense), or at its option settle (at its own expense), any Third-Party Legal Proceeding brought against Google after the Effective Date to the extent the Third-Party Legal Proceeding arises from:

(a)     a breach of Company's representations and warranties;

(b)     the improper or unauthorized replication, packaging, marketing, distribution, or installation of the Google Applications by Company or any third party within Company's control, including without limitation claims based on representations, warranties, or misrepresentations made by Company under this Agreement;

(c)     any breach or claimed breach of Sections 2.3 (License Restrictions) or 4.2 (Geo-Availability of Google Applications);

(d)     any claim related to Company's advertising, marketing or promotion of any Devices;

(e)     any claim that any Device (or application installed on a Device other than the Google Applications), or any Company Trademark infringes any patent, copyright, trade secret, or trademark of a Third Party; or

(f)     any claim arising from an End User's use of any Device (or application installed on a Device other than the Google Applications), including any actions or claims in product liability, tort, contract or equity.

**10.5**  **Exceptions**.  Company will have no obligations or liability under Section 10.4 arising from:

(a)     Google's breach of this Agreement;

(b)     modifications of the Devices or the Company Trademarks by anyone other than Company or on Company's behalf;

(c)     combination of the Company Trademarks with any other materials;

(d)     failure to use the most current, supported version of Company Trademarks provided under this Agreement;



20

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                GOOG-PLAY4-005406614

EXHIBIT 5399-020

(e)    causes of action that arise outside the Term of this Agreement; or

(f)    lawsuits or proceedings related to a Third-Party Legal Proceeding brought against Google prior to the Effective Date.

**10.6**  <u>Conditions</u>.  The provisions in this Section 10 are conditioned on the following:

(a)    The party seeking defense of a Third-Party Legal Proceeding (the "Defended Party") must promptly notify the other party (the "Defending Party") of the Third-Party Legal Proceeding and cooperate reasonably with the Defending Party to resolve the Third-Party Legal Proceeding.  If a breach of this Subsection (a) prejudices the defense of the Third-Party Legal Proceeding, the Defending Party's obligations under this Section 10 will be reduced in proportion to the prejudice.

(b)    The Defended Party must tender sole control of the Third-Party Legal Proceeding to the Defending Party who then has full control and authority over the defense, including selection of controlling counsel, except that:

    (i)    the Defended Party must deliver a written tender notice in accordance with Section 11.1 (Notices) of this Agreement;

    (ii)    any settlement requiring the Defended Party to admit liability, pay money, or take (or refrain from taking) any action, will require the Defended Party's prior written consent;

    (iii)    the Defended Party may object to the Defending Party's choice of controlling counsel on the basis of any then-existing conflict of interest that cannot be waived under applicable rules of professional responsibility; and

    (iv)    the Defended Party may appoint its own non-controlling counsel at its own expense.

**10.7**  <u>Sole Rights and Obligations</u>.  THE PROVISIONS OF THIS SECTION 10 STATE THE PARTIES' ONLY RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT FOR A VIOLATION OF A THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.  The obligations and liabilities under this Section 10 are not subject to the limitation of liability in Section 9.3.

**10.8**  <u>Monetary Damages.</u> Defending Party will pay any monetary damages finally awarded against Defended Party by a court of competent jurisdiction at the conclusion of Defending Party's defense of a Third Party Legal Proceeding under Section 10.1 or 10.4, respectively, with all appeals exhausted, up to an aggregate cap of three million dollars (US$3,000,000.00), but only to the extent such damages can be attributed to Defending Party's obligations under Section 10.1 or 10.4 respectively.  Defending Party's obligation to pay monetary damages will not apply to any damages arising from: Defended Party's willful infringement of asserted patents, copyrights, trade secrets, or trademarks; punitive damages; costs related to injunctions; or design-around costs.

21 

062617
Google Confidential

## 11.   GENERAL.

**11.1   Notices.**  All notices of termination or breach must be in English, in writing and addressed to the other party's Legal Department.  The address for notices to Google Legal Department is legal-notices@google.com.  All other notices must be in English, in writing and addressed to the other party's primary contact.  Notice will be treated as given on receipt, as verified by written or automated receipt or by electronic log (as applicable).

**11.2   Assignment.**  Neither party may assign any part of this Agreement without the written consent of the other, except to an Affiliate where: (a) the assignee agrees in writing to be bound by the terms of this Agreement; (b) the assigning party remains liable for obligations under this Agreement if the assignee defaults on them; and (c) the assigning party has notified the other party of the assignment.  Any other attempt to assign is void.

**11.3   Change of Control.**  During the Term, if a party experiences a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction): (a) that party will give written notice to the other party within 30 days after the change of control; and (b) the other party may immediately terminate this Agreement any time between the change of control and 30 days after it receives that written notice.

**11.4   Subcontracting.**  Either party may subcontract any of its obligations under this Agreement but will remain liable for all subcontracted obligations and its subcontractors' acts or omissions.

**11.5   Force Majeure.**  Neither party will be liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

**11.6   No Waiver.**  Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

**11.7   No Agency.**  This Agreement does not create any agency, partnership or joint venture between the parties.

**11.8   No Third Party Beneficiaries.**  This Agreement does not confer any benefits on any third party unless it expressly states that it does.

**11.9   Counterparts.**  The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

**11.10  Amendments.**  Any amendment must be in writing, signed by both parties, and expressly state that it is amending this Agreement.

**11.11  Entire Agreement.**  This Agreement states all terms agreed between the parties and supersedes all other agreements between the parties relating to its subject matter.  In entering into this Agreement, neither party has relied on, and neither party will have any right or remedy based on, any representation or warranty



22

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406616

EXHIBIT 5399-022

(whether made negligently or innocently), except those expressly stated in this Agreement.

**11.12** <u>**Severability.**</u>  If any term (or part of a term) of this Agreement is invalid, illegal or unenforceable, the rest of this Agreement will continue in force unaffected.

**11.13** <u>**Governing Law**</u>. This Agreement is governed by California law, excluding California's choice of law rules.  All claims arising out of or relating to the subject matter of this Agreement will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and the parties consent to personal jurisdiction in those courts.



062617
Google Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406617

EXHIBIT 5399-023

**EXHIBIT A**

**Company Brands**

Moto

Motorola

Lenovo

ZUK

Medion

LIFETAB

LIFE



24

062617
Google Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-005406618

EXHIBIT 5399-024