Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 13th St. NW
Washington, D.C. 20001
Telephone: (202) 637-5600

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. #336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B) OR FOR A NEW TRIAL UNDER RULE 59** |
| *Epic Games Inc. v. Google LLC et al.,* Case No. 3:20-cv-05671-JD | |
| | Judge: Hon. James Donato |

**NOTICE OF MOTION & MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

   NOTICE OF MOTION AND MOTION RE GOOGLE'S RENEWED MOTION FOR

JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL:

   PLEASE TAKE NOTICE that on a date to be set by the Court, in Courtroom 11, 19th

Floor, 450 Golden Gate Avenue, before the Honorable James Donato, Defendants Alphabet, Inc.,

Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific PTE, and

Google Payment Corp. (collectively, "Google"), will and do hereby move this Court for judgment

as a matter of law under Rule 50(b) or for a new trial under Rule 59(e).

   Google seeks a ruling under Federal Rules of Civil Procedure 50(b) or 59(e) that: (1) Issue

preclusion barred Epic from contesting that Apple and Google compete in the relevant markets;

(2) Epic's relevant markets limited to Android devices were flawed as a matter of law and Epic

failed to present a legally sufficient basis for any reasonable jury to find that Epic proved any

relevant market found by the jury;  (3) The jury was improperly instructed on Step 1 of the Rule

of Reason analysis because it was not instructed that it had to consider whether each category of

challenged conduct had substantial anticompetitive effects;  (4) The jury was improperly

instructed on Step 2 of the Rule of Reason analysis because it was not instructed to consider

procompetitive benefits in related product markets beyond the relevant product markets;  (5) The

jury was improperly invited to balance competitive effects as part of the Rule of Reason analysis;

(6) Epic did not present a legally sufficient basis for any reasonable jury to find that Epic had

satisfied its burden to establish:  (a) product markets limited to Android devices, (b) a product

market for in-app payments or a nearly global market, (c) that Google's conduct was

anticompetitive as a matter of law, (d) its tying claim, or (e) substantially less restrictive

alternatives for the challenged conduct;  (7) Google is entitled to a new trial based on erroneous

evidentiary rulings:  (a) relating to Google employees' use of attorney client privilege, (b)

precluding Google from referencing the outcome of *Epic v. Apple*, and (c) relating to the adverse

inference instruction.

1    Epic has been fully heard and has not presented sufficient evidence for the jury to find in

2  its favor on any of these issues.  Google's motion is based on this notice of motion and motion, the

3  memorandum of points and authorities that follows, all pleadings on file in this matter, all

4  testimony and evidence at trial, and such argument as the Court may consider.

6  DATED:  February 1, 2024                   Respectfully submitted,

8                                    By:  _____/s/ Glenn D. Pomerantz_____

                                          Glenn D. Pomerantz

10                                       **MUNGER TOLLES & OLSON LLP**
                                          Glenn D. Pomerantz
11                                        Kuruvilla Olasa
                                          Emily C. Curran-Huberty
12                                        Jonathan I. Kravis
                                          Justin P. Raphael
13                                        Dane Shikman
                                          Rebecca L. Sciarrino
14                                        Jamie B. Luguri
                                          Lauren N. Beck

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   LEGAL STANDARDS .................................................................................................1

II.   ARGUMENT .............................................................................................................1

A.   The Jury Verdict Depends on Legally Flawed Market Definitions. ........................1

1.   Issue preclusion should have barred Epic from contesting that Apple and Google compete in the relevant markets. ....................................1

2.   Google is entitled to judgment as a matter of law or a new trial because Epic's theory of market definition was legally erroneous. ..............5

B.   Google Is Entitled to a New Trial Because Legal Errors Compromised the Jury Instructions on Each Step of the Rule of Reason. ................................................7

1.   The Court failed to instruct the jury that the Step 2 analysis is not limited to procompetitive benefits in the relevant product markets. .............7

2.   The Court failed to instruct the jury that it must consider at Step 1 whether each category of challenged conduct has substantial anticompetitive effects. ..............................................................................10

3.   The jury was improperly invited to balance competitive effects. ...............11

C.   Google Is Entitled to Judgment As a Matter of Law or a New Trial Because the Jury's Verdict Is Unsupported by Legally Sufficient Evidence. .......................11

1.   No reasonable jury could conclude that Epic established a product market for Android in-app payments or a nearly global geographic market. .............................................................................................................11

(a)   The evidence does not support the jury's decision to exclude out-of-app payment systems from the relevant product market. ....................................................................................................11

(b)   The evidence does not support the jury's decision to extend the relevant geographic markets beyond the United States. .............13

2.   No reasonable jury could have found that Google's conduct was anticompetitive as a matter of law ...............................................................14

(a)   Epic failed to offer direct evidence of anticompetitive effects. ......................................................................................................14

(b)   Epic failed to offer indirect proof of anticompetitive effects. ..........16

3.   No reasonable jury could have found for Epic on its tying claim. ...............23

GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

**<u>TABLE OF CONTENTS</u>**
<u>(cont'd)</u>

<u>Page</u>

4.   No reasonable jury could conclude that Epic satisfied its burden to identify substantially less restrictive alternatives for the challenged conduct. ...........................................................................................24

D.   Google Is Entitled to a New Trial Based on Erroneous Evidentiary Rulings. .........27

1.   The jury was improperly permitted to draw inferences from Google employees' use of attorney-client privilege. ................................................27

2.   The Court improperly precluded Google from referencing the outcome of *Epic v. Apple*. .........................................................................28

3.   Google is entitled to a new trial based on the adverse inference instruction. ....................................................................................................28

E.   The Court Should Treat the Jury Verdict As Advisory, and Any New Trial the Court Orders Should Be a Bench Trial. ..............................................29

GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Aerotec International, Inc. v. Honeywell International, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) .................................................................................................18

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*,
  592 F.3d 991 (9th Cir. 2010) ...........................................................................................19, 21

*Anti-Monopoly, Inc. v. General Mills Fun Group*,
  611 F.2d 296 (9th Cir. 1979) .................................................................................................29

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) .................................................................................................15

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ...............................................................................................................18

*Cabellero v. City of Concord*,
  956 F.2d 204 (9th Cir. 1992) ..............................................................................................9, 10

*Chicago Pro. Sports Ltd. Partnership v. NBA*,
  95 F.3d 593 (7th Cir. 1996) ...................................................................................................16

*Clements v. Airport Authority of Washoe County*,
  69 F.3d 321 (9th Cir. 1995) .....................................................................................................2

*Coronavirus Reporter v. Apple Inc.*,
  85 F.4th 948 (9th Cir. 2023) .......................................................................................... *passim*

*Dang v. Cross*,
  422 F.3d 800 (9th Cir. 2005) ..............................................................................................9, 10

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) .................................................................................................29

*Droplets, Inc. v. Yahoo! Inc.*,
  658 F. Supp. 3d 754 (N.D. Cal. 2023) .....................................................................................1

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) .................................................................................................................8

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) .......................................................................2, 3, 4, 6

*Epic Games Inc. v. Apple Inc.*,
  67 F.4th 946 (9th Cir. 2023) .......................................................................................... *passim*

*In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust
  Litig.*, 44 F.4th 959 (10th Cir. 2022) ....................................................................................20

1

## <u>TABLE OF AUTHORITIES</u>
(cont'd)

2

3
**Page(s)**

4
*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
762 F.3d 829 (9th Cir. 2014)............................................................................................1, 24

5
*Federal Trade Commission v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)......................................................................................... *passim*

6

7
*Feitelson v. Google, Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ......................................................................................20

8
*FN Herstal SA v. Clyde Armory Inc.*,
838 F.3d 1071 (11th Cir. 2016)..............................................................................................30

9

10
*Harrison Aire, Inc. v. Aerostar International, Inc.*,
423 F.3d 374 (3d Cir. 2005) ...................................................................................................15

11
*Hilson v. Lopez*,
No. 12-cv-06016-JD, 2014 WL 4380674 (N.D. Cal. Sept. 4, 2014) .........................................2

12

13
*Hunter v. County of Sacramento*,
652 F.3d 1225 (9th Cir. 2011)................................................................................................10

14
*Jack Walters & Sons Corp. v. Morton Building, Inc.*,
737 F.2d 698 (7th Cir. 1984)..................................................................................................18

15

16
*Jefferson Parish Hospital District No. 2 v. Hyde*,
466 U.S. 2 (1984) ...................................................................................................................23

17
*Kramer v. Banc of America Securities, LLC*,
355 F.3d 961 (7th Cir. 2004)..................................................................................................30

18

19
*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ............................................................................................................8, 9

20
*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..........................................................................................................17, 22

21

22
*NCAA v. Alston*,
141 S. Ct. 2141 (2021) ..............................................................................................11, 16, 28

23
*NCAA v. Board of Regents of University of Oklahoma*,
468 U.S. 85 (1984) ..................................................................................................................8

24

25
*Newcal Industries, Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008)...............................................................................................3, 6

26
*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007)..................................................................................................18

27

28
*O'Bannon v. NCAA*,
802 F.3d 1049 (9th Cir. 2015)..................................................................................................8

-iv-

1

**TABLE OF AUTHORITIES**
(cont'd)

2

Page(s)

3

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ........................................................................... *passim*

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
    797 F.2d 370 (7th Cir. 1986) .................................................................18

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) .................................................16, 19, 20

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co.*,
    20 F.4th 466 (9th Cir. 2021) .................................................................11

*Pacific Bell Telephone Co. v. LinkLine Communications, Inc.*,
    555 U.S. 438 (2009) ...................................................................10, 17, 19

*Pacific Steel Group v. Commercial Metals Co.*,
    600 F. Supp. 3d 1056 (N.D. Cal. 2022) .................................................20

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ...............................................................23

*Pau v. Yosemite Park & Curry Co.*,
    928 F.2d 880 (9th Cir. 1991) .................................................................27

*PLS.Com, LLC v. National Association of Realtors*,
    32 F.4th 824 (9th Cir. 2022) .................................................................14

*Plummer v. Western International Hotels Co.*,
    656 F.2d 502 (9th Cir. 1981) .................................................................27

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...........................................................13, 16

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
    532 F.3d 963 (9th Cir. 2008) .................................................................23

*SEC v. Stein*,
    906 F.3d 823 (9th Cir. 2018) ...................................................................2

*Skillsky v. Lucky Stores, Inc.*,
    893 F.2d 1088 (9th Cir. 1990) .................................................................5

*Snoqualmie Indian Tribe v. Washington*,
    8 F.4th 853 (9th Cir. 2021) ..................................................................2, 4

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) .................................................................14

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ....................................................................................9

-v-

1

## **TABLE OF AUTHORITIES**
(cont'd)

Page(s)

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004) ......................................................................................20

*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989).............................................................................11, 12

*United States v. Google, LLC*,
   — F. Supp. 3d —, 2023 WL 4999901 (D.D.C. Aug. 4, 2023) ...............................10

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.D. Cir. 2001) ..............................................................................10, 23

*Van v. Language Line Services, Inc.*,
   No. 14-CV-03791-LHK, 2016 WL 3566980 (N.D. Cal. June 30, 2016)..................28

*Waymo LLC v. Uber Technologies, Inc.*,
   No. C 17-00939 WHA, 2018 WL 646701 (N.D. Cal. Jan. 30, 2018) ......................27

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007) ...............................................................................................19

*Yue v. Chordiant Software, Inc.*,
   No. C 08-00019 JW, 2010 WL 11575579 (N.D. Cal. Apr. 22, 2010) .....................27

**FEDERAL STATUTES**

Sherman Act § 1 ...........................................................................................14, 23, 24

Sherman Act § 2 ......................................................................................................14

**FEDERAL RULES**

Fed. R. Civ. P. 50 .......................................................................................................5

Fed. R. Civ. P. 50(a)...................................................................................................1

Fed. R. Civ. P. 50(b)...................................................................................................1

Fed. R. Civ. P. 52 .....................................................................................................29

Fed. R. Civ. P. 59 .......................................................................................................1

Fed. R. Civ. 59(a)(1) ..................................................................................................1

Fed. R. Evid. 103(c) ..................................................................................................27

**TREATISES**

10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. (4th ed.) ...........5

1    Google respectfully submits this memorandum in support of its renewed motion for

2    judgment as a matter of law under Rule 50(b) and for a new trial under Rule of 59(e).

3    **I.      LEGAL STANDARDS**

4            A court must grant a motion for judgment as a matter of law against the nonmoving party

5    if there is no "legally sufficient evidentiary basis" for "a reasonable jury . . . to find for th[at] party

6    on that issue." Fed. R. Civ. P. 50(a). Rule 59 permits courts to "grant a new trial on all or some of

7    the issues," Fed. R. Civ. 59(a)(1), including when there is "[an] incorrect jury instruction[]" that

8    "affects the jury's decision." *Droplets, Inc. v. Yahoo! Inc.*, 658 F. Supp. 3d 754, 770 (N.D. Cal.

9    2023). A court may also grant a new trial when the verdict is "contrary to the clear weight of the

10   evidence," and in evaluating that question, the court "is not required to view the trial evidence in

11   the light most favorable to the verdict." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,

12   762 F.3d 829, 842, 846–47 (9th Cir. 2014).

13   **II.     ARGUMENT**

14           **A.      The Jury Verdict Depends on Legally Flawed Market Definitions.**

15           The jury's verdict on all claims it resolved turns on the finding that the relevant markets

16   are limited to Android devices.[1] These market definitions allowed Epic to gerrymander one of

17   Google's leading competitors—Apple—out of the market in two legally flawed ways. *First*, these

18   definitions contradict preclusive findings about the markets from Epic's parallel suit against

19   Apple. *Second*, they fail to account for a legal "prerequisite[]" of single-brand aftermarkets,

20   *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948, 956 (9th Cir. 2023): whether limitations on

21   accessing other app stores, including Apple's, are "'not generally known' when consumers make

22   their foremarket purchase" of an Android device, *Epic Games Inc. v. Apple Inc.* ("*Apple II*"), 67

23   F.4th 946, 977 (9th Cir. 2023), *cert. denied*, No. 23-337, 2024 WL 156473 (Jan. 16, 2024).

24           **1.      Issue preclusion should have barred Epic from contesting that Apple
25                    and Google compete in the relevant markets.**

26           In *Epic v. Apple*, as here, Epic argued that Google and Apple do not compete for app

27   _____

28   [1] The parties have consistently treated the state law claims in this cases as parallel to the federal
     claims, and the jury instructions did not suggest a different standard applies to those claims.

distribution or in-app purchases.  The *Apple* court rejected that argument after a bench trial and was affirmed on appeal.  Issue preclusion applies and should have barred Epic from seeking a different result here.

Issue preclusion, or collateral estoppel, "bars parties from relitigating an issue if the same issue was adjudicated in prior litigation."  *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018).  Issue preclusion applies when "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide on the merits."  *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021) (citation omitted).  The doctrine's purpose includes "avoiding inconsistent results."  *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 330 (9th Cir. 1995).  "[O]nce an issue has been resolved in a prior proceeding, there is no further fact-finding function to be performed."  *Hilson v. Lopez*, No. 12-cv-06016-JD, 2014 WL 4380674, at *2 (N.D. Cal. Sept. 4, 2014) (citation omitted).

These principles should have been fatal to Epic's proposed market definitions in this case.  The same day it filed this case, Epic filed a parallel suit against Apple.  *See Apple II*, 67 F.4th at 969 n.3.  In that case, as here, Epic argued that Google Play and the Apple App Store do not compete for app distribution or in-app purchases.  *See, e.g.*, *Epic Games, Inc. v. Apple Inc.* ("*Apple I*"), 559 F. Supp. 3d 898, 921 (N.D. Cal. 2021), *aff'd in part, rev'd in part, Apple II*, 67 F.4th 946 ("Epic Games structured its lawsuit to argue that Apple does not compete with anyone; it is a monopoly of one"); Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc. ("Epic Trial Br.") at 72 ¶ 144, 93–95 ¶¶ 175–177, 131–32 ¶¶ 225–228, *Apple I*, No. 4:20-cv-5640-YGR (N.D. Cal. May 28, 2021), ECF 777-3.  Central to Epic's argument in *Apple* was the premise that "Android apps and iOS apps are not substitutes for each other" because users "must switch devices in order to access Android apps and app distribution channels."  Epic Trial Br. 131 ¶ 227.

The *Apple* court rejected Epic's arguments, concluding that Google is Apple's "main competitor."  *Apple I*, 559 F. Supp. 3d at 1024, 1030, 1036; *accord id.* at 977.  In finding a market for mobile game transactions in which both Google and Apple competed, the court specifically rejected Epic's claim that a single-brand market existed for App Store transactions, finding that

1    Epic had not proven—as required by controlling precedent—"that consumers *are unaware* that the

2    App Store is the sole means of digital distribution on the iOS platform." *Id.* at 1025; *see also infra*

3    Part I.A.2 (discussing this legal requirement further). After defining the market to account for

4    competition between Apple and Google, the court found that Apple's market share was slightly

5    over 50%. *Apple I*, 559 F. Supp. 3d at 988–89. The market definition and market share figures

6    were necessary to and a critical factor in the court's ultimate judgment that Apple was not liable.

7    *Id.* at 1014–58. *Cf. Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("courts usually cannot

8    properly apply the rule of reason without an accurate definition of the relevant market").

9         The Ninth Circuit affirmed, including the critical findings related to market definition. *See*

10   *Apple II*, 67 F.4th at 973–81.[2] In particular, the Court upheld the finding that Epic had offered "no

11   evidence" that consumers fail to "make a knowing choice to restrict their aftermarket options

12   when they decide in the initial (competitive) market" to purchase an iPhone. *Id.* at 980–81

13   (quoting *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1050 (9th Cir. 2008)). The

14   court therefore concluded that the district court's "market of mobile-games transaction[s] thus

15   stands on appeal." *Id.* at 981.

16        Because Epic already litigated and lost the exact issue of competition between Apple's

17   App Store and Google Play, the Court should have rejected its effort to relitigate that issue here.

18   Indeed, Epic's presentation to the jury in this case closely tracks its submission in the Apple case.

19   *Compare, e.g.*, *supra* p 2:14-24 (collecting citations from Epic's trial presentation in *Apple*); *with*

20   Tr.[3] 3376:7-14, 3378:18-20 (Epic's closing); Tr. 2428:5-6, 2433:14-16, 2425:11-13 (Bernheim).

21   For example, in the Apple case, Epic asserted that "Android apps and iOS apps are not

22   substitutes" because users "must switch devices in order to access Android apps and app

23   distribution channels." Epic Trial Br. 131 ¶ 227. In this case, Epic's expert, Dr. Bernheim,

24   testified that "[t]he ability to substitute is very indirect" because "You can't use the Apple App

25

26   ───────────────

     [2] The Ninth Circuit rejected some of the *Apple I* district court's legal conclusions related to market
27   definition, *see Apple II*, 67 F.4th at 978–80, and Google does not rely on those aspects of the
     district court's opinion here.
28   [3] Unless otherwise specified, references to "Tr." are to the trial transcript.

GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

1   Store on the Android" device, "so you have to change phones." Tr. 2425:3-13.  To be sure, the

2   *Apple I* market comprised "mobile gaming transactions" instead of *all* types of apps. *Apple I*, 559

3   F. Supp. 3d at 1043.  But the *Apple I* court found that mobile games and associated transactions

4   are just a "submarket" of *all* apps and transactions. *Id.* at 987.  The jury's finding here that there is

5   *no* competition between Google and Apple regarding app distribution and in-app transactions

6   therefore contradicts *Apple I*.  Plainly, Epic had a full and fair opportunity to litigate these issues

7   in its prior case and every incentive to do so vigorously.  The *Apple I* court recognized that market

8   definition was "[c]entral" to its decision on the merits of the case, and the case was litigated to

9   judgment after trial. 559 F. Supp. 3d at 921.  Preclusion therefore applies. *Snowqualmie Indian*

10  *Tribe*, 8 F.4th at 864.

11      Google is thus entitled to judgment as a matter of law on all claims submitted to the jury

12  based on the preclusive judgment in *Epic v. Apple*.  Failure to prove a proposed market definition

13  in a jury trial is fatal to an antitrust case. *See Coronavirus Reporter*, 85 F.4th at 955–56.

14  Especially here:  Epic did not even attempt to offer evidence that it would prevail even if Apple

15  were included as a competitor in the relevant markets. *Cf.* Tr. 2745:22, 2746:9 (Tucker's

16  unrebutted testimony that Google's market share by app revenue is under 40% against just Apple).

17      While there is no reason to give Epic yet another bite at the apple on this issue, the Court

18  should at least order a new trial where Epic is precluded from arguing for market definitions that

19  contradict the settled findings from *Epic v. Apple*.  At that new trial, Epic should be precluded

20  from disputing that Google and Apple compete in either of its proposed markets, which the court

21  in the *Apple* litigation found.  At a bare minimum, however, Epic cannot argue for markets that

22  contradict the court's ultimate and necessary finding that Google and Apple compete with respect

23  to mobile game distribution and transactions.  To the extent Epic seeks to prove here that Apple

24  and Google do not compete regarding non-gaming apps, Epic should have been required to justify

25  that differing outcome—another showing Epic did not even attempt to make.

26      This Court rejected Google's preclusion argument at the motion in limine stage primarily

27  on timeliness grounds, stating it should have been filed as a summary judgment motion. *See*

28

-4-

10/19/23 Hr'g Tr. 23:18–24:8.[4]  But Circuit law permits preclusion to be raised by motion in

limine.  *See Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1095–96 (9th Cir. 1990) (affirming

preclusion argument raised for the first time at motion-in-limine stage).[5]  That is particularly true

here, where the Court resolved summary judgment motions at the same hearing where it resolved

motions in limine.  *See* 10/19/23 Hr'g Tr. 4:13–17:16.  And, regardless, Google properly presented

the issue in a timely Rule 50 motion, ECF[6] 826 at 3, and there is no requirement that a party raise

an issue at summary judgment to preserve it for a Rule 50 motion.  *See* 10A Charles Alan Wright

& Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2713.1 (4th ed.) (noting that a Rule 50 motion

during trial serves essentially the same function as a summary judgment motion before trial).

> **2.**    **Google is entitled to judgment as a matter of law or a new trial because Epic's theory of market definition was legally erroneous.**

Even aside from preclusion, Epic's market definitions fail because Epic did not attempt to

establish that consumers are unaware that choosing an Android device means they will not have

access to Apple's App Store or other Play store competitors.

Epic's theory is that app distribution and in-app transactions on Android devices constitute

a market unto themselves.  This fits squarely within the "single-brand aftermarket" theory of

market definition.  *Apple II*, 67 F.4th at 977.  According to the Ninth Circuit, a single-brand

aftermarket exists "where demand for a good is entirely dependent on the prior purchase of a

durable good in a foremarket."  *Id.* at 976; *accord Coronavirus Reporter*, 85 F.4th at 955.

Here, demand for app distribution and in-app transactions on Android mobile devices

"depends entirely" on whether a consumer has *already* purchased a durable Android device.

*Coronavirus Reporter*, 85 F.4th at 955.  Epic's counsel recognized as much at trial.  *See, e.g.*, Tr.

---

[4] The Court also stated that the motion in limine "does not provide anything close to a sufficiently clear demonstration of the elements of collateral estoppel."  10/19/23 Hr'g Tr. 24:9-14.  But that motion, like this one, walked through each element of preclusion and explained how it was satisfied.  *See* ECF 640 at 4–6.

[5] If the Court accepts Epic's argument that failure to prove market definition is not automatically fatal to an antitrust case tried to a jury, then it makes even less sense to require preclusion to be raised through summary judgment.

[6] Unless otherwise specified, references to "ECF" are to the docket for No. 3:21-md-02981-JD.

908:13–909:6 (counsel questioning of Kochikar).  So did Epic's market-definition expert.  Tr. 2425:12-13 (Bernheim testifying "You can't use the Apple App Store on the Android store, so you have to change phones"); Tr. 2456:16-17 (Bernheim agreeing that choosing a smartphone means "choosing the set of apps that are available on that platform").  Similarly, in the *Apple* litigation, Epic acknowledged that "[a] 'foremarket' is a market where there is competition for a long-lasting product and from which demand for a second product is derived," Epic Trial Br. 68 ¶ 139, and that "the consumer's choice of a smartphone operating system determines her demand for apps," *id.* at 69 ¶ 139.  Epic thus recognized that arguing the App Store constituted "an antitrust market of one" meant arguing that the App Store is an "aftermarket," *Apple I*, 559 F. Supp. 3d at 921, 954.

Because Epic argues for single-brand aftermarkets, it "must show," among other things, that "the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase." *Apple II*, 67 F.4th at 977.  This requirement rests on "the economic presumption that . . . consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive)" foremarket.  *Newcal*, 513 F.3d at 1050.  This showing is one of four "[prerequisites for] a single-brand aftermarket," *Coronavirus Reporter*, 85 F.4th at 956, and failing to make this showing suffices to defeat a claim that a single-brand aftermarket exists, as it did in the Apple case, *see Apple II*, 67 F.4th at 980.

Epic did not even attempt to show that consumers are unaware that buying an Android device limits their options as to app distribution and in-app payment solutions.  *See, e.g.*, Tr. 2846:12–2847:5 (Epic's counsel arguing it does not need to make this showing).  Epic had every incentive to try, as the Court did not resolve until the charge conference whether this element would appear in the instructions.  Epic's failure is thus grounds for judgment as a matter of law.

At minimum, Google is entitled to a new trial.  Over Google's objection, the Court refused to instruct the jury that Epic must show that the "technical limits on what products work on mobile devices are not generally known when consumers purchase those devices."  ECF 806 at 40; *see also* Tr. 3215:7–3217:11.  The Court thus excused Epic from a critical element of its burden of proof.  That omission was clearly prejudicial—indeed, this very element proved fatal to Epic's proposed single-brand aftermarket claims against Apple.  *See Apple II*, 67 F.4th at 980–81.

1    The Court rejected the argument that Epic's theory triggers the legal requirements for

2    establishing single-brand aftermarkets because it believed that the "evidence in this case does not

3    at all indicate an" aftermarket/foremarket "structure."  Tr. 3216:17-18.  The Court relied on the

4    fact that the parties had not used the words "aftermarket" and "foremarket" at trial.  *See* Tr.

5    3055:9-11; 3216:20-21.  This put form over substance in ways that the Ninth Circuit has warned

6    against.  *Apple II*, 67 F.4th at 979.  As Epic's own questioning, evidence, and briefing in the *Apple*

7    litigation indicate, Epic's theory falls cleanly within the bounds of how the Ninth Circuit has

8    defined the concept.  *Supra* pp. 5-6.  Indeed, Epic walked its own expert through all the elements

9    of a single-brand aftermarket *except* consumer knowledge—further demonstrating that the

10   underlying legal and economic principles apply here.  *Compare Apple II*, 67 F.4th at 977 (listing

11   the four elements as consumer knowledge, information costs, switching costs, and lack of cross-

12   elasticity of demand), *with* Tr. 2428:5-6 (Bernheim on switching costs), Tr. 2433:14-16 (Bernheim

13   on information costs), Tr. 2425:11-13 (Bernheim on cross-elasticity).

14   The Court also suggested that it would confuse the jury to introduce "a concept . . . that

15   they have not heard a word about until" the charge.  Tr. 3217:2-3.  As Google has demonstrated,

16   *supra* pp. 5-6, that concern was unwarranted.  The parties had discussed the underlying concepts

17   extensively.  And, in any event, a court's final instructions are designed to—and frequently do—

18   give the jury the legal labels for practical concepts they have heard.  That is a feature, not a bug, of

19   the final charge.

20   Finally, the Court alluded to evidence "that people never even look at the app store when

21   they make their phone choice."  Tr. 3056:6-8.  But Dr. Bernheim conceded "that the quality and

22   variety of apps is an important factor for what devices users buy."  Tr. 2457:7-11.  His testimony

23   that app store "prices" and "costs" receive little "attention," Tr. 2433:7-8, 2433:14-16, *at most*

24   created an issue for the jury to resolve.  *See, e.g.*, Tr. 854:1–855:8 (Kochikar); ECF 887-62, Ex.

25   5911 at 1–5 (App Quality Gap Deck).  The incorrect instruction deprived them of that opportunity.

**B.    Google Is Entitled to a New Trial Because Legal Errors Compromised the Jury Instructions on Each Step of the Rule of Reason.**

**1.    The Court failed to instruct the jury that the Step 2 analysis is not limited to procompetitive benefits in the relevant product markets.**

If Epic established that Google's conduct had anticompetitive effects (it did not, *infra* pp. 14-22), Google was entitled to offer procompetitive justifications for that conduct. *Apple II*, 67 F.4th at 986. As to this Step 2, Google twice requested a jury instruction that the jury could consider procompetitive effects of Google's conduct in product markets that were outside of, but related to, the relevant product markets. ECF 806 at 183:1–184:25; Tr. 3257:22–3258:4. The Court rejected those proposals. ECF 850 at 31; Tr. 3258:21-25. The Step 2 instructions the Court adopted instead said nothing about cross-market justifications and in fact affirmatively *prevented* the jury from considering such justifications, Tr. 3328:11-16 (telling the jury to consider benefits created "in th[e] relevant market"); *see also* Tr. 3332:22–3333:1.

The jury should have been instructed to consider cross-market justifications. For decades, the Supreme Court has "considered cross-market rationales in Rule of Reason and monopolization cases." *Apple II*, 67 F.4th at 989 (collecting cases). *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–84 (1992) (considering procompetitive effects in interbrand photocopier market when relevant product market was for companies that service Kodak machines); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104–08, 115–17 (1984) (considering procompetitive effects in market for college football tickets when relevant market was college football television); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889–92 (2007) (recognizing that interbrand competition may offset anticompetitive effects on intrabrand market). The Ninth Circuit has followed suit. *See, e.g.*, *O'Bannon v. NCAA*, 802 F.3d 1049, 1070, 1072–73 (9th Cir. 2015) (considering benefit of preserving "amateur nature of collegiate sports" when relevant product market was the "college education market").

The Court rejected Google's proposed instruction on the view that *Federal Trade Commission v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), precluded the jury from considering cross-market justifications. Tr. 3258:5-10. That was not correct. *Qualcomm* involved the *plaintiff*'s burden at Step 1 of the Rule of Reason to prove harm to competition, which the district court allowed the FTC to satisfy by identifying harms outside of the relevant antitrust markets. 969 F.3d at 998. The Ninth Circuit reversed, explaining that harm qualifies as "anticompetitive" when it is caused by "restraints on trade or exclusionary conduct in 'the area of effective

-8-

competition.'" *Id.* at 992 (quoting *Am. Express*, 138 S. Ct. at 2285).  The district court had erred by defining the relevant product markets, then looking *beyond* those markets to assess anticompetitive impact, which was "beyond the scope of antitrust law." *Id.* at 992–93.  *Qualcomm* said nothing about the *defendant*'s burden at Step 2 to identify procompetitive justifications.  *See id.* at 996 (declining to consider "procompetitive justifications").

Nor does *Qualcomm*'s limit on Step 1 impliedly narrow the scope of the Step 2 analysis. "[T]he primary purpose of the antitrust laws is to protect *interbrand* competition."  *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) (emphasis added).  Thus, it is well-settled that anticompetitive effects on a market limited to a single brand may be justified when the challenged conduct stimulates competition between brands.  *Leegin*, 551 U.S. at 890.  Prohibiting a factfinder from considering cross-market justifications for anticompetitive effects is inconsistent with that principle.

Because the Court's instruction was wrong as a matter of law, a new trial is warranted. "An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless." *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005) (quoting *Cabellero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992)).  Courts "presume prejudice where civil trial error is concerned" and require the prevailing party to show "that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Id.* (citation omitted).

Epic cannot overcome the presumption of prejudice created here.  Epic argued tooth and nail that the jury could disregard Google's efforts to compete with Apple and that Apple's App Store fell outside of the Android in-app distribution and Android in-app billing markets.  *See, e.g.*, Tr. 157:1-9 (Epic's opening statement); Tr. 2383:19–2386:2 (Bernheim); Tr. 3378:12-24, 3380:17-25 (Epic's closing argument).  But Step 2's allowance for cross-market justifications means that Google's competition with Apple in smartphones was relevant at Step 2 *even if* the jury believed that an app distribution market was limited to Android and excluded Apple.  Google's theory at trial was that app stores help operating systems and smartphones compete, and many of its procompetitive justifications for conduct related to app distribution related to competition with Apple in the markets for operating systems and smartphones.  Thus, jury instructions that failed to explain the relevance of cross-market justifications significantly prejudiced Google by leaving the

jury with the mistaken belief that it need not consider Google's efforts to compete with Apple if it found relevant markets limited to Android.  *See Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1235–36 (9th Cir. 2011).  A new trial is warranted.

### 2. The Court failed to instruct the jury that it must consider at Step 1 whether each category of challenged conduct has substantial anticompetitive effects.

The jury instructions also misstated the law on Step 1 of the Rule of Reason because they did not require considering each category of alleged anticompetitive conduct individually, instead letting the jury conclude that individually lawful acts are unlawful in the aggregate.

Epic argued that its claims arose from six separate categories of conduct.  Tr. 3355:21–3356:6, 3360:11–3370:18 (closing argument); *see infra* pp. 16-22 (discussing each category).  The jury was required to "evaluate whether *each type* of alleged exclusionary practice has the requisite anticompetitive effect."  *United States v. Google, LLC*, — F. Supp. 3d —, 2023 WL 4999901, at *12 (D.D.C. Aug. 4, 2023) (citing *United States v. Microsoft Corp.*, 253 F.3d 34 (D.D. Cir. 2001)); *see also Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009) (rejecting the "amalgamation" of two "meritless" claims of anticompetitive conduct).  Google requested a jury instruction to this effect before trial, ECF 806 at 71, and at the charge conference, Tr. 3261:12-17.

The Court apparently did not disagree with the substance of Google's proposed instruction, and instead rejected it as "amply covered elsewhere."  Tr. 3261:18-19.  That was error.  Nothing in the court's monopolization instructions identified each category of challenged conduct or told the jury that it was required to evaluate each type of conduct independently for anticompetitive effects.  *See* ECF 850 at 20-33.

This legal error creates a presumption of prejudice and Epic cannot overcome it.  *Dang*, 422 F.3d at 811.  Had the instructions guided the jury to consider each category of conduct individually, no reasonable jury could have found that Google's conduct had substantial anticompetitive effects.  *See infra* pp. 16-22.  This would have been fatal to its rule of reason claims.  *Qualcomm*, 969 F.3d at 996.  A new trial is thus warranted.  *Cabellero*, 956 F.2d at 207.

**3.** **The jury was improperly invited to balance competitive effects.**

At Step 3, the Court improperly instructed the jury to "balance any competitive harms that you found against any competitive benefits you found" regardless of whether Epic "met its burden to prove the existence of a substantially less restrictive alternative to achieve Google's pro competitive rationale." Tr. 3329:5-6, 3328:23-25. This is legally incorrect because Step 4 balancing does not occur unless a less restrictive alternative has been proven. And this erroneous instruction was not harmless because, as explained *infra* pp. 24-27. Epic failed to introduce sufficient evidence of any less restrictive alternatives. Under the correct application of the antitrust laws, that failure required judgment for Google as a matter of law.

Although *Apple II* held that Ninth Circuit precedent requires balancing even though the panel was "skeptical of the wisdom" of such a "balancing step," 67 F.4th at 994, Google contends that this is an error and preserves the issue for appellate review as contrary to Supreme Court precedent. *See Amex*, 138 S. Ct. at 2284; *NCAA v. Alston*, 141 S. Ct. 2141, 2161, 2163 (2021).

**C.** **Google Is Entitled to Judgment As a Matter of Law or a New Trial Because the Jury's Verdict Is Unsupported by Legally Sufficient Evidence.**

**1.** **No reasonable jury could conclude that Epic established a product market for Android in-app payments or a nearly global geographic market.**

In addition to the defects in the jury's market definition findings, *supra* pp. 1-7, the jury lacked a legally sufficient evidentiary basis to find in Epic's favor on its proposed market definitions. Because "[f]ailing to define a relevant market alone is fatal to an antitrust claim," *Coronavirus Reporter*, 85 F.4th at 957, Google is entitled to judgment as a matter of law on all counts submitted to the jury. At a minimum, the verdict on these issues is against the great weight of the evidence, entitling Google to a new trial.

**(a)** **The evidence does not support the jury's decision to exclude out-of-app payment systems from the relevant product market.**

A relevant product market is defined as "the commodities reasonably interchangeable by consumers for the same purpose." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021) (quotations and citation omitted); *see also Thurman Indus., Inc. v. Pay 'N Pak*

1    *Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989).  Thus, to accept Epic's alleged product market for

2    Android in-app payment solutions, the jury was required to find that developers and users lacked

3    reasonable substitutes for Google Play Billing.  Here, overwhelming evidence showed that out-of-

4    app payment systems are reasonable substitutes for Google Play Billing.

5           It was undisputed that developers who want to charge users for subscriptions and in-app

6    purchases have multiple ways to do so.  *See* Tr. 2599:4-24 (Tadelis); Tr. 2670:5-20 (Gentzkow).

7    Websites are one prominent example.  Tr. 2670:5-20 (Gentzkow).  As Google's and Epic's

8    witnesses explained, developers can sell subscriptions and add-ons on the web, and use email

9    addresses collected from mobile app users to promote out-of-app sales.  Tr. 314:20–315:10

10   (Simon); Tr. 1651:10–1652:23 (Rasanen).  Several major developers choose this alternative,

11   including the New York Times, Netflix, and Minecraft.  Tr. 2670:12-20 (Gentzow).  In short, it

12   was undisputed that developers sell the exact same products—the same subscriptions and gaming

13   content for the same apps—both inside apps and on websites.  Those products should have been in

14   the same relevant product market as a matter of law.  *See Thurman Indus.*, 875 F.2d at 1374.

15          Epic attempted to exclude out-of-app payment systems from the relevant product market

16   through testimony by Dr. Tadelis that out-of-app payment systems are inadequate substitutes

17   because "[t]here is so much more friction when you have web purchases than there are when you

18   have in-app purchases."  Tr. 2554:7-9.  But as Dr. Tadelis conceded, this theory assumed that

19   users predominantly initiate purchases when using a mobile app.  Tr. 2554:16–2556:23.  Dr.

20   Tadelis provided no basis for such an assumption, which contradicts the obvious fact that

21   consumers can and do purchase subscriptions to apps like Spotify or Netflix *before* using mobile

22   apps.  Indeed, users of Epic's own *Fortnite* game can buy V-Bucks for in-game add-ons before

23   they ever open the *Fortnite* game on an Android device.  Dr. Tadelis's *ipse dixit* regarding

24   consumer behavior was insufficient to define a product market that includes only one of two ways

25   to buy the exact same products.  *See Thurman Indus.*, 875 F.2d at 1374.

26          In short, no reasonable jury could conclude that the relevant product market for Google

27   Play Billing excludes out-of-app billing solutions.  At minimum, the jury's verdict on this issue

28   was against the great weight of the evidence.

1    **(b)      The evidence does not support the jury's decision to extend the**
2    **relevant geographic markets beyond the United States.**

3        The relevant geographic market is "the group of sellers or producers who have the actual

4   or potential ability to deprive each other of significant levels of business." *Rebel Oil Co. v. Atl.*

5   *Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citation omitted).  Here, the evidence cannot

6   sustain the jury's finding that the relevant geographic market for Android app distribution and

7   Android in-app payment solutions was global, excluding only China.

8        To start, Epic failed to show that American users would turn to global alternatives.  It was

9   undisputed at trial that American consumers cannot substitute Google Play for foreign Android

10  app distributors like the One Store, which—as Epic's expert conceded—is one "example of an app

11  store that has significant market share."  Tr. 2594:8-14 (Tadelis).  To use the One Store or its

12  payment solution, users need to know Korean, have a Korean billing address, and own Korean

13  currency.  Tr. 2743:19–2744:9 (Tucker); Tr. 2476:18–2477:9 (Bernheim).  Dr. Bernheim readily

14  conceded that most Americans would not switch to the One Store even if Google Play prices

15  increased.  Tr. 2477:6-9.  Unrefuted evidence also showed that the Play store varies in content and

16  layout from one country to the next—developers choose where to make their apps available and

17  Google Play adjusts the store format to account for differing consumer expectations.  Tr. 2864:3-

18  18 (Gennai).

19       Moreover, Epic's theory for excluding China was logically inconsistent.  Epic excluded

20  China because some prominent payment solutions are not available in China.  Tr. 2586:17-23

21  (Tadelis).  But Dr. Tadelis admitted that his market includes dozens of other countries where

22  major payment solutions are also not available.  Braintree and Square are only available in eight of

23  the 175 countries in Epic's alleged geographic market.  Tr. 2587:21–2588:12.  Even Google Play

24  Billing is unavailable as an option in 46 of the countries in Epic's alleged geographic market.  Tr.

25  2478:25–2479:4 (Bernheim).  No reasonable jury could conclude that Epic proved the existence of

26  a geographic market that extends beyond the U.S.  At minimum, the jury's verdict on this issue

27  was against the great weight of the evidence.

28

**2.** **No reasonable jury could have found that Google's conduct was anticompetitive as a matter of law.**

Epic had "essentially the same" burden to prove its claims under Sections 1 and 2 of the Sherman Act and parallel state law claims. *Qualcomm*, 969 F.3d at 991. For both, Epic had "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Amex*, 138 S. Ct. at 2284; *Qualcomm*, 969 F.3d at 991. Epic had to "establish anticompetitive impact on the 'market as a whole,'" *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022), accounting for impacts on both users and developers, *see Amex*, 138 S. Ct. at 2287. Epic failed to offer either direct or indirect proof.

**(a)** **Epic failed to offer direct evidence of anticompetitive effects.**

"To prove a substantial anticompetitive effect directly, the plaintiff must provide proof of actual detrimental effect [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market." *Apple II*, 67 F.4th at 983 (quotations and citation omitted); *accord Amex*, 138 S. Ct. at 2288. Epic proved none of those direct effects.

**Prices.** It was undisputed that Google repeatedly *lowered* prices for many developers. *See, e.g.*, Tr. 2597:11-13 (Tadelis). For the rest of Google Play's developer customers, Google's prices remained steady. Tr. 2458:10-18 (Bernheim); Tr. 2671:22-25 (Gentzkow). As Epic's expert testified, Google originally set a 30% commission rate to "match[] Apple's service fee" when Play was just a "small entrant," Tr. 2480:22–2481:20 (Benheim), and that headline rate "hasn't changed," Tr. 2482:16-19 (Bernheim). Evidence that Google "continuously charged the same price" since it was a small entrant "renders implausible" Epic's theory that Google charges supracompetitive prices as a matter of law. *See Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) ("The fact that Apple continuously charged the same price for its music irrespective of the absence or presence of a competitor renders implausible [the] conclusory assertion that Apple's software updates affected music prices."); *see also* Tr. 2642:4–2643:24 (Gentzkow).[7]

---

[7] The fact that revenue per download—the total revenue that Google earns from the Play store divided by the number of downloads from the store—has increased is not evidence of a price increase. Dr. Bernheim conceded that this figure does not reflect the price that any developer pays, which for most downloads is nothing. Tr. 2489:18–2491:8.

Epic failed to prove that Google's prices for app distribution were "higher than the price one would expect to find in a competitive market." *Amex*, 138 S. Ct. at 2288. Epic's experts did not even calculate the competitive price and therefore could not have offered competent evidence on this issue. *Apple II*, 67 F.4th at 984. Epic's experts similarly did not compare Google's profits on app distribution to the profits that a firm would be expected to earn in a competitive market—undermining any inference that Google's prices reflect an anticompetitive exercise of market power. Tr. 2320:4-8; 2322:17–2323:17; 2325:6-8 (Barnes).

Far from showing that Google charged "more than its competitors," *Amex*, 138 S. Ct. at 2289, the evidence showed that other Android app stores (as well as Apple and console app stores) generally charge a 30% service fee—what Mr. Sweeney admitted was "the most prevalent rate." Tr. 2032:14-16 (Sweeney); *see also* Tr. 2661:10–2662:7 (Gentzkow); Tr. 2032:17–2037:3 (Sweeney). Epic's own expert conceded that Google's discounted rates were in the same range as other Android app stores' rates. Tr. 3206:2-18 (Bernheim).

Regardless, "[c]ompetitive markets are characterized by both price and quality competition, and a firm's comparatively high price may simply reflect a superior product." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005); *see also* Tr. 2494:21–2495:2 (Bernheim). Dr. Bernheim testified that Google's app store offered far more apps than its rivals and a much larger share of the most popular apps. *See, e.g.*, Tr. 2485:3–2486:4 (Bernheim); *see also* Tr. 2485:19–2488:19. The Play store also enables developers to reach far more users than other Android app stores. Given undisputed evidence that Google offered a better product for users and developers, "a reasonable finder of fact cannot infer monopoly power just from higher prices." *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995); *see also Amex*, 138 S. Ct. at 2288.

**Quality.** Epic failed to offer any evidence that the quality of the Google Play store had declined. Nor could it: the evidence showed that Google is constantly improving the Play store and launching new features. *See* Tr. 2673:5-15 (Gentzkow); Tr. 1405:1-24 (Pichai); Tr. 2861:11–2868:23 (Gennai); Tr. 3130:18-24 (Loew); Tr. 2482:22-25 (Bernheim).

1    **Output.**  Epic failed to show that Google's conduct reduced output in any relevant market.

2    Output has increased dramatically for years on all dimensions, Tr. 2673:16–2674:1 (Gentzkow):

3    (1) developer earnings, *see* Tr. 2497:3-16 (Bernheim), Tr. 2674:2-7 (Gentzkow); (2) Android

4    smartphone sales, Tr. 2673:22–2674:1 (Gentzkow); (3) the number of apps in the Play store; and

5    (4) downloads of Android apps, Tr. 2623:6–2624:5 (Gentzkow).  "Where . . . output is expanding

6    at the same time prices are increasing," even "*rising prices* are equally consistent with growing

7    product demand."  *Amex*, 138 S. Ct. at 2288 (emphasis added).  But where prices were static or

8    *falling*, inferring reduced output is economically illogical.  *Rebel Oil Co.*, 51 F.3d at 1434[8]

9                    **(b)    Epic failed to offer indirect proof of anticompetitive effects.**

10    Epic also did not prove a substantial anticompetitive effect indirectly.  To do so, Epic had

11    to show that Google "has market power and present some evidence that the challenged restraint

12    harms competition."  *Apple II*, 67 F.4th at 983 (quotations and citation omitted).  Epic failed to

13    prove that Google's conduct harmed competition either individually or collectively.

14    Epic could not show harm to competition where the evidence at trial showed that Epic and

15    other companies had means to reach users with apps and reach both users and developers with an

16    app store:  They could pay OEMs to preinstall their stores or apps; they could—as Epic and other

17    developers did—distribute apps and other app stores for download through their websites; and

18    they could—again, as Epic and other developers did—distribute their apps through other app

19    stores.  *See* Tr. 1139:1-19, 1144:20–1145:1 (Kolotouros); Tr. 1350:12-25 (Pichai).  Developers

20    like Epic also have ample means to sell digital content to consumers.  Epic itself sold V-Bucks

21    through its website, on gaming platforms, on iOS, on PCs, and even in brick-and-mortar stores.

22    Tr. 2043:12-19 (Sweeney).  Epic and others may have preferred to distribute apps or app stores on

23    different terms, but a complaint that companies cannot use their "most preferred means" of doing

24    business does not state an antitrust claim.  *Coronavirus Reporter*, 85 F.4th at 957; *see also Omega*

25

---

26    [8] Google preserves the argument that proof of supracompetitive prices requires proof of power to
     reduce marketwide output.  *See Apple II*, 67 F.4th at 983 ("Market power is the ability for a

27    defendant to profitably raise prices by restricting output."); *Chicago Pro. Sports Ltd. P'ship v.
     NBA*, 95 F.3d 593, 597 (7th Cir. 1996) (similar); *Alston*, 141 S. Ct. at 2155 (similar).

28

1   *Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162–63 (9th Cir. 1997) ("If competitors can reach

2   the ultimate consumers of the product by employing existing or potential alternative channels of

3   distribution, it is unclear whether such restrictions foreclose from competition any part of the

4   relevant market.").

5   **Project Hug/Games Velocity Program (GVP).**  Epic failed to prove, and no reasonable

6   jury could have found, that GVP harmed competition.  First, Epic offered no evidence that GVP

7   involved horizontal agreements not to compete between Google and Supercell, Activision, or Riot.

8   Witnesses uniformly testified that there were no such agreements.  Tr. 2502:23–2503:2

9   (Bernheim); Tr. 818:7-16 (Kochikar); ECF 915-1, Zerza Dep. 53:9–54:4, 139:2–140:7, 160:12–

10  161:23; ECF 915-1, Sottosanti Dep. 116:7-20; Tr. 841:17–842:19 (Kochikar re: ABK); Tr.

11  515:11-18 (Koh re: ABK); Tr. 835:21–836:25 (Kochikar re: Riot); Tr. 505:3-20 (Koh, re: Riot);

12  Tr. 502:13-18 (Koh); Tr. 835:21-23 (Kochikar) (same).  In fact, Supercell has opened its own

13  store.  Tr. 818:14-16 (Kochikar).  And even Epic's own CEO, Mr. Sweeney, testified that he

14  believed Activision was just bluffing its way to a better deal.  Tr. 2047:1–2048:10 (Sweeney).

15  Moreover, Epic also failed to introduce evidence that "tends to exclude the possibility that the

16  alleged conspirators acted independently."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

17  U.S. 574, 588 (1986) (quotations and citation omitted).  To the contrary, Dr. Bernheim testified

18  that a developer might not want to incur the expense of opening an app store, Tr. 2505:3-6

19  (Bernheim), which is why Mr. Zerza, the CFO of Activision, testified that Activision did not do

20  so, ECF 915-1, Zerza Dep. 237:17–239:11, 238:10-14.

21          Second, Google's vertical GVP agreements were not anticompetitive as a matter of law.

22  Those agreements did not require developers to use the Play store exclusively.  Tr. 855:9-23

23  (Kochikar); Tr. 465:20–466:8 (Koh).  They simply offered credits to developers for investments in

24  Google businesses if they agreed to make their products available in the Play store as soon as they

25  were released.  Dr. Bernheim conceded that these credits were incentives that effectively gave

26  developers a discount, and that discounts are a form of competition.  Tr. 2505:7-19 (Bernheim);

27  *accord* Tr. 2634:1-7 (Gentzkow).  Under Ninth Circuit and Supreme Court precedent, discounts

28  cannot be anticompetitive as a matter of law unless they are below cost.  *See, e.g.*, *Pac. Bell Tel.*,

1  555 U.S. at 452; *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223

2  (1993).  Epic offered no evidence of below-cost discounts in GVP.

3       Evidence that GVP changed developers' incentives to open app stores does not prove harm

4  to competition as a matter of law.  "Firms constantly face 'make-or-buy' decisions—that is,

5  decisions whether to purchase a good or service in the market or to produce it internally—and

6  ordinarily the decision, whichever way it goes, raises no antitrust question." *Jack Walters & Sons*

7  *Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984) (Posner, J.) (citation omitted).  By

8  definition, offering a better deal makes it more attractive to buy rather than build.  Condemning a

9  supplier for an offer that creates an incentive to buy rather than build would therefore condemn

10  competition itself.

11       It is true that a developer could not launch a game exclusively outside the Play store and

12  still get credits for investing in other businesses under the GVP agreements.  But the fact that

13  offering a better deal makes it harder for competitors to win all of a customer's business does not

14  make the better deal anticompetitive.  Companies have no duty to clear the way for their rivals to

15  win:  "Competitors are not required to engage in a lovefest." *Qualcomm*, 969 F.3d at 993 (quoting

16  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016)); *cf. NicSand, Inc.*

17  *v. 3M Co.*, 507 F.3d 442, 456 (6th Cir. 2007) (even "[w]hen one exclusive dealer is replaced by

18  another exclusive dealer, the victim of the competition does not state an antitrust injury").  To the

19  contrary, "'[a] monopolist, no less than any other competitor, is permitted and indeed encouraged

20  to compete aggressively on the merits . . . .'" *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,

21  797 F.2d 370, 375 (7th Cir. 1986) (citation omitted).  As Dr. Gentzkow explained, any time a

22  company wins some of a customer's business, a rival cannot serve that customer exclusively.  Tr.

23  2634:21–2639:10.  Thus, holding that the antitrust laws prohibit efforts that deny exclusives to

24  competitors would penalize competition itself.

25       **RSA 3.0.**  Google's RSA 3.0 agreements give OEMs the option to exclusively preload the

26  Google Play store on as few or as many Android devices as the OEM desires in exchange for a

27  share of Play's net revenues from those devices.  *See* Tr. 1144:20–1145: 3, 1154:16-22, 1154:23–

28  1155:11, 1182:8-15 (Kolotouros); ECF 886-45, Ex. 626 at -009.  For several reasons, Epic failed

1   to show, and no reasonable jury could have found, that these RSA 3.0 agreements are

2   anticompetitive.  First, the RSA 3.0 agreements do not require any OEM to preinstall the Play

3   store as the exclusive app store in order to obtain a license for the store.  OEMs were free to

4   decline premier tier incentives altogether (as Samsung did) or enroll only some devices in the

5   premier tier (as other OEMs did); either way, OEMs could still preinstall Google Play and the

6   other MADA apps.  *See* Tr. 1144:20–1145: 3, 1154:16-22, 1154:23–1155:11, 1182:8-15

7   (Kolotouros); ECF 886-45, Ex. 626 at -009.

8       Second, the evidence showed that the RSA 3.0 premier tier incentives were effectively a

9   discount to OEMs.  Because OEMs pay Google no monetary price to preload the Play store or

10   other Google apps, or use the Android operating system, the only way for Google to provide

11   OEMs with a discount is to make payments to them.  Discounts cannot be anticompetitive as a

12   matter of law unless they are below cost.  *See, e.g.*, *Pac. Bell Tel.*, 555 U.S. at 452; *Weyerhaeuser*

13   *Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 318–19 (2007).  Epic did not

14   introduce any evidence that the RSA 3.0 agreements were below cost.

15       Third, the RSA 3.0 agreements' premier tier provisions applied on a device-by-device

16   basis.  This meant OEMs could terminate premier tier preinstallation obligations at any time by

17   choosing not to enroll new devices in that tier.  *See* Tr. 1154:16-22 (Kolotouros).  That ability

18   "negates substantially [the] potential to foreclose competition."  *Allied Orthopedic Appliances Inc.*

19   *v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010) (cleaned up and citation omitted).

20       Fourth, even if (contrary to fact) the RSA 3.0 agreements could be considered exclusive,

21   the proportion of devices they affected was too small to foreclose competition as a matter of law.

22   Epic had the burden to prove that the RSA 3.0 agreements foreclose "a substantial share of the

23   relevant market."  *Qualcomm*, 969 F.3d at 1003 (citation omitted).  In that analysis, "exclusive

24   dealing arrangements imposed on distributors rather than end-users"—here, restrictions on OEMs

25   as distributors of app stores to users—"are generally less cause for anticompetitive concern."

26   *Omega*, 127 F.3d at 1162–63.  It was undisputed at trial that the RSA 3.0 premier-tier agreements

27   covered only 4.6% of Android devices in the U.S. and 7.4% of devices in the world outside of

28   China, and only 8.3% and 16%, respectively, in the period after RSA 3.0 went into effect.  Tr.

2656:2–2657:1, 2653:19-23, 2655:10-16 (Gentzkow); *see also* Tr. 1154:23–1155:11 (Kolotouros). These shares of devices are far too low to establish substantial foreclosure as a matter of law.[9]  Dr. Bernheim's calculations failed to include Samsung devices, which account for 57% of Android devices in the U.S. and 40% of devices in the world outside of China.  *See* Tr. 2626:15-22 (Gentzkow); Tr. 2501:4-19 (Bernheim); Tr. 2654:3–2655:24 (Gentzkow).  Those calculations were deficient because a foreclosure analysis must address the "total market."  *Omega*, 127 F.3d at 1162; *see also Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1075 (N.D. Cal. 2022).

**MADA.**  Epic failed to prove, and no reasonable jury could have found, that Google's MADA agreement—a free, voluntary, non-exclusive license agreement to Google's intellectual property ("IP")—is anticompetitive.  Dr. Bernheim conceded that Google introduced the MADA as a small entrant without market power.  *See* Tr. 2479:22–2480:5 (Bernheim).  Dr. Bernheim also testified that there is a "presumption among economists [] that when firms without market power do something, it's pro-competitive."  Tr. 2479:19-21 (Bernheim).  Epic did not rebut this presumption.  It was undisputed that any OEM that enters into a MADA is free to preinstall a competing app store on the home screen of Android devices, and that 68% of Android devices are sold with the Play store and at least one rival app store preinstalled—including over 1 billion Samsung devices.  *See* Tr. 2621:15–2622:18 (Gentzkow); 2626:15–2627:1 (Gentzkow); *see also Omega*, 127 F.3d at 1162–63.  Epic did not introduce any evidence that a rival lacked the resources to pay to have its app store preinstalled on every Android device in the world.

It is true that an OEM that enters into the MADA cannot exclusively preinstall a rival app store.  But Epic did not introduce any evidence that any OEM would have done so if Google did not offer the MADA.  Moreover, again, the antitrust laws do not require Google to use a distribution strategy that ensures that its rivals can enter into exclusive deals.  *Supra* pp. 17-19.

---

[9] *See, e.g.*, *Feitelson v. Google, Inc.*, 80 F. Supp. 3d 1019, 1030 (N.D. Cal. 2015) (at least 40-50% foreclosure threshold); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004) (at least 30-40% threshold); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 988 (10th Cir. 2022) (summary judgment affirmed with at most 31% foreclosure).

1 Antitrust law does not protect a rival's desire to compete "by their most preferred means."

2 *Coronavirus Reporter*, 85 F.4th at 957.

3     **Sideloading.**  Epic failed to prove, and no reasonable jury could have concluded, that the

4 sideloading warnings are anticompetitive.  Like the MADA, and as Epic's expert conceded,

5 Google set the sideloading warnings when it was a small entrant without market power; they are

6 thus presumed not to be anticompetitive.  Tr. 2479:19–2480:8 (Bernheim).  In fact, Epic's security

7 expert admitted that sideloading warnings and consent screens should not be removed because

8 installing apps poses security risks for users.  *See* Tr. 2147:1-7, 2196:25–2197:20 (Mickens).  In

9 other words, the sideloading warnings are an improved product design that benefits users.  Under

10 Ninth Circuit law, "product improvement by itself does not violate Section 2, even if it is

11 performed by a monopolist and harms competitors as a result."  *Allied Orthopedic*, 592 F.3d at

12 999–1000.

13     Regardless, Epic failed to put forward sufficient evidence that the sideloading warnings

14 substantially harmed competition.  *See Apple II*, 67 F.4th at 983.  There was no evidence at trial

15 that warnings stopped any users who wanted to sideload from doing so.  At most, Epic pointed to

16 evidence that some users did not complete the sideloading flow after the warnings, but Epic did

17 not offer any evidence as to *why*.  None of Epic's experts testified as to what proportion of users

18 who did not sideload in the actual world would have done so if Google's sideloading warnings had

19 been different.  *See, e.g.*, Tr. 2500:17-24 (Bernheim).  Epic's security expert testified that some

20 steps could be "compressed," but conceded that his alternative security proposals would

21 contract—not expand—options for sideloading.  *See* Tr. 2147:1-7, 2169:24–2171:25 (Mickens).

22     **Project Banyan.**  No reasonable jury could conclude, and Epic did not prove, that Project

23 Banyan was anticompetitive because the Project Banyan deal simply did not happen.  Google and

24 Samsung never reached any agreement to work together on their app stores.  Epic insinuated that

25 there was a "handshake" deal but offered no evidence to support it, and the evidence showed

26 negotiations ceased and Google did not resume them.  Google witnesses flatly denied any

27 agreement with Samsung not to compete, Tr. 1229:10–1230:2; 1294:22-25 (Rosenberg), see also

28 Tr. 1158:1-19 (Kolotorous), and were clear that the revenue-sharing deal Samsung and Google

1  reached in 2021 did not limit Samsung's ability to place the Samsung Galaxy Store on Android

2  phones, Tr. 1267:12-21 (Rosenberg).  Indeed, "the Samsung Galaxy Store" remains "available on

3  Samsung phones" "[t]o this day."  Tr. 2955:2-4 (Gennai).

4      Unrebutted evidence at trial showed that Samsung *does* compete.  Samsung's market share

5  increased and downloads in its store tripled between 2019—when discussions over "Project

6  Banyan" began—and 2021, over a year after Google called off the discussions.  Tr. 2630:4–

7  2631:18 (Gentzkow).  And when Epic revealed in the Spring 2020 that it had decided to launch

8  Fortnite on Google Play, Samsung complained to Epic that it would "need to reassess the existing

9  partnership."  Tr. 2061:12–2065:15 (Sweeney).  Regardless, even if Samsung had decided not to

10  compete with Google, that would not reflect an unlawful agreement.  As noted, the evidence

11  showed that Google has a better app store.  *See supra* pp. 15.  Samsung pulling back on investing

12  in its app store is entirely consistent with Samsung making a lawful decision that it could not build

13  and maintain a better product than Google's.  *Matsushita*, 475 U.S. at 588.

14      **DDA.**  Epic failed to prove, and no reasonable jury could have found, that the anti-steering

15  restrictions in the DDA were anticompetitive because they merely prevent developers who chose

16  to use valuable Google services and intellectual property in the Play store from depriving Google

17  of compensation for that value.  *See, e.g.*, Tr. 1629:24–1631:12, 1632:17–1633:13 (Rasanen); Tr.

18  3144:5-16, 3149:14-24 (Loew).  That is not anticompetitive as a matter of law.  *Qualcomm*, 969

19  F.3d at 999–1001 (policies protecting royalties for IP are not anticompetitive).

20      The DDA also permits developers to communicate with users outside of the Play store to

21  encourage them to purchase content outside of apps downloaded from the Play store.  *See, e.g.*, Tr.

22  1651:5–1652:20 (Rasanen); Tr. 3147:15–3148:14 (Loew).  Epic did not introduce any evidence

23  that these methods would be inadequate, particularly for developers with large marketing budgets

24  like Epic itself.  Moreover, Epic's challenge to the anti-steering provisions was incoherent

25  alongside its market definition.  According to Dr. Tadelis, buying digital content on websites is

26  not in the same relevant market as buying the exact same content inside an app because users

27  prefer to buy content where they are.  *See* Tr. 2553:19–2554:9 (Tadelis).  But if only a

28

1  meaningless fraction of users will leave an app to purchase content, then restricting developers'

2  ability to steer consumers to do that cannot have a substantial effect in the market.

**3.      No reasonable jury could have found for Epic on its tying claim.**

4       Epic failed to prove, and no reasonable jury could have found, that the DDA's requirement

5  to use Google Play Billing for transactions of digital content in apps downloaded from the Play

6  store was an unreasonable restraint of trade under Section 1 or constituted unlawful tying.  *First*,

7  Epic failed to introduce sufficient evidence that the Google Play store and Google Play Billing are

8  separate products.  Epic was required to prove "sufficient demand for the purchase of [the tied

9  product] separate from [the tying product]."  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2,

10  21–22 (1984).  Epic did not introduce *any* evidence that developers demand Google Play Billing

11  separate from Google Play.  Moreover, undisputed evidence established that nearly all platforms

12  have Google's policy requiring use of the platforms' own billing services for transactions that

13  incur platform fees.  *See* Tr. 2032:20–2035:24 (Sweeney); Tr. 2665:20–2668:4 (Gentzkow).

14  Where "competitive firms always bundle the tying and tied goods," then they are not two separate

15  products.  *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 975 (9th Cir. 2008)

16  (citation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001).

17       *Second,* Epic also failed to introduce sufficient evidence that Google "coerced or forced its

18  customer to buy the tied product"—Google Play Billing—"in order to obtain the tying product"—

19  Google Play.  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).

20  It was undisputed that the "vast majority" of developers who distribute apps on Google Play do

21  not use Google Play Billing.  Tr. 937:1–938:4 (Kochikar).

22       Even if Epic had established a valid prima facie tying claim (it did not), no reasonable jury

23  could have rejected Google's business justification defense.  *Apple II*, 67 F.4th at 990.  Undisputed

24  evidence established that requiring developers to use Google Play's billing system for in-app

25  purchases enables Google to efficiently collect fees for providing valuable services and intellectual

26  property.  *See* Tr. 1645:1–1648:14 (Rasanen); Tr. 3144:5–3145:6, 3146:11–3147:10 (Loew).  This

27  enables Google to earn a return on its investment and intellectual property.  *See* Tr. 2659:5–2660:5

28  (Gentzkow); *see also Apple II*, 67 F.4th at 986.  Without this requirement, Google would have to

1  incur additional costs of invoicing developers, collecting fees and monitoring efforts to evade

2  payment.  Tr. 2667:6-23 (Gentzkow); *see also* Tr. 3144:13–3145:6 (Loew); *Apple II*, 67 F.4th at

3  993 (audits were not a less restrictive alternative because they would "impose both increased

4  monetary and time costs").  Unrebutted evidence thus showed that virtually every app store and

5  digital platform requires the use of its own billing system for transactions on the platform that

6  incur platform fees.  Tr. 2666:8–2667:2 (Gentzkow); *see also Qualcomm*, 969 F.3d at 996

7  (licensing policy that avoided "inefficiencies" in collecting royalties and "appear[s] to be

8  reasonable and consistent with current industry practice" was procompetitive).

9          Epic failed to introduce *any* evidence of a less restrictive alternative that would enable

10  Google to efficiently collect its fees for valuable services and IP, which is exactly why Epic lost its

11  parallel tying claim against Apple.  The Ninth Circuit held that "access to competing payment

12  processors" was not a less restrictive alternative given Epic's "failure of proof on how it would

13  achieve Apple's IP-compensation rationale."  *Apple II*, 67 F.4th at 992–93.  Here, Epic's only

14  alternative to Google's billing policy is for developers to pay nothing.  But that is not a less

15  restrictive alternative as a matter of law.  Like Apple, Google is entitled to collect fees for the

16  valuable services and IP it provides.

17          The Court also erred in instructing the jury to consider whether Google's "DDA

18  agreements" were an unreasonable restraint of trade under Sherman Act § 1, *see* ECF 866 at 5

19  (Question 7), ECF 850 at 36 (Instruction 27), *and* whether "Google unlawfully tied the use of the

20  Google Play Store to the use of Google Play Billing."  *See* ECF 866 at 7 (Question 10), ECF 850

21  at 41 (Instruction 31).  The jury should not have been permitted to evaluate the same claim two

22  times.  *See Apple II*, 67 F.4th at 998.

23              **4.      No reasonable jury could find that Epic satisfied its burden to identify
24                      substantially less restrictive alternatives for the challenged conduct.**

25          The jury also lacked sufficient evidence to conclude that Epic met its burden to show

26  substantially less restrictive alternatives existed for any claimed anticompetitive practices (i.e.

27  Step 3 of the Rule of Reason).  At minimum, the jury's verdict on less restrictive alternatives is

28  against the great weight of the evidence.  *Experience Hendrix*, 762 F.3d at 842, 846–47.

1     Further, the record is replete with uncontroverted procompetitive justifications for

2     Google's conduct, including that its policies enhanced the Google Play experience; protected users

3     from malware; incentivized developers to improve the timing and quality of their Android apps;

4     offset the cost of security features for OEMs; and allowed Google to collect compensation for the

5     services and intellectual property it provides to users and developers.

6     For the MADA and Google's revenue sharing agreements, Dr. Gentzkow explained that

7     there *must* be procompetitive justifications because Google began these practices before it even

8     had significant market share in the app distribution market.  Tr. 2642:4–2643:5.  Dr. Bernheim

9     endorsed this premise.  Tr. 2479:19-21 (Bernheim) (the "presumption among economists is that

10    when firms without market power do something, it's procompetitive").

11    The evidence then showed that the MADA and RSA 3.0 are in fact procompetitive.  The

12    MADA provides OEMs access to free, high-quality apps.  Tr. 1134:14–1136:14, 1138:3-9

13    (Kolotouros).  This increases the number of Android phones on the market, thereby increasing the

14    number of apps downloaded on Android.  Tr. 2647:6-23 (Gentzkow).  The RSA 3.0 premier tier

15    has a similar effect.  Its revenue sharing agreements give OEMs incentives "to work harder, to

16    invest more, to try to make great devices."  Tr. 2649:16-22 (Gentzkow).  RSA 3.0 also leads

17    OEMs to better protect user safety by conditioning access to the premier tier on implementing

18    enhanced security features.  Tr. 1147:24–1151:12 (Kolotouros).

19    Sideloading warnings are also procompetitive.  As Epic's own expert acknowledged,

20    sideloading "is one way that malware can arrive on a user's device," and sideloaded apps that have

21    not been reviewed for malware are less likely to be safe.  Tr. 2186:7-22 (Mickens).  Consumers

22    consider security when deciding which phones to buy.  *See* Tr. 2205:19–2206:5 (Mickens); *see*

23    *also Apple II*, 67 F.4th at 987–89 (enhancing security procompetitive).

24    On the DDA, testimony from both sides showed that Google's payments policy is

25    necessary to efficiently collect fees for services and intellectual property, and provides safe, easy

26    options for consumers to manage their purchases.  Tr. 2584:21–2586:3 (Tadelis); Tr. 1645:1–

27    1648:14 (Rasanen); Tr. 3122:2–3126:10, 3144:4–3145:10, 3149:14-24 (Loew).

28

1      And for GVP, the evidence showed that Google's agreements with developers improve the

2   availability and quality of Android apps.  Tr. 849:8–859:12 (Kochikar); Tr. 491:13–492:3 (Koh);

3   Tr. 1918:9–1920:19, 1923:1–1925:8 (Harrison).  Undisputed testimony from Dr. Gentzkow

4   explained that "competition very often involves trying to give incentives to . . . consumers to

5   choose your product."  Tr. 2620:7-9, 2634:18-20 (Gentzkow).  These procompetitive incentives

6   enabled Google "to make sure the biggest, most important, most demanded app developers . . . put

7   their apps in the Google Play Store."  Tr. 2635:5-8 (Gentzkow).

8      Since Google satisfied Step 2 by asserting procompetitive justifications for the challenged

9   conduct, Epic had the burden at Step 3 to identify substantially less restrictive alternatives that

10  would be "virtually as effective" in serving Google's objectives "without significantly increased

11  cost."  *Apple II*, 67 F.4th at 990 (alterations and quotations omitted).  Epic failed to meet its Step 3

12  burden.  Epic did not offer *any* alternatives for most of the challenged conduct—nothing for the

13  MADA, for RSA 3.0, for GVP, or for the DDA.

14     Epic's only evidence of less restrictive alternatives came from Dr. Mickens, who testified

15  that Google could create one of two notarization systems as a substitute for Google's sideloading

16  warnings.  Tr. 2157:18–2163:2, 2165:22–2168:3.  This evidence was legally insufficient.  Less

17  restrictive alternatives must be "virtually as effective" in serving Google's objectives "without

18  significantly increased cost."  *Apple II*, 67 F.4th at 990 (cleaned up).  Dr. Mickens's proposed

19  alternatives satisfied neither requirement—they were instead unprecedented and of unknown cost.

20  Tr. 2157:18–2163:2, 2165:22–2168:3.  No reasonable jury could conclude otherwise.  In fact, Dr.

21  Mickens' alternatives would make some OEMs *worse off* by limiting developers' pre-installation

22  opportunities with OEMs.  Tr. 2169:17–2171:2.

23     Epic may argue that (1) the jury was authorized to make adverse inferences against

24  Google, and (2) the jury could have found Google's conduct unlawful under the Step 4 balancing

25  analysis.  Neither argument has merit.  *First*, the jury was only authorized to make adverse

26  inferences about the contents of deleted chat messages.  *See* ECF 850 at 17 (adverse inference

27  instruction).  That necessarily limited the jury to making adverse inferences about topics that

28  Google employees may have discussed with other Google employees over chat.  The viability of

1   Epic's proposed less restrictive alternatives falls outside that universe.  There is no indication that

2   any chats would have addressed Dr. Mickens' proposed alternatives because they were entirely

3   novel.  *Second*, Step 4's balancing inquiry cannot salvage the jury's verdict.  Even assuming the

4   Rule of Reason includes a Step 4 inquiry (it does not, *supra* pp. 11), that step does little more than

5   "confirm[] the result suggested by a step-three failure: that a business practice without a less

6   restrictive alternative is not, on balance, anticompetitive."  *Apple II*, 67 F.4th at 994.

7            **D.**      **Google Is Entitled to a New Trial Based on Erroneous Evidentiary Rulings.**

8            "Rule 103(c) of the Federal Rules of Evidence admonishes against inadmissible evidence

9   'being suggested to the jury by any means.'"  *Plummer v. W. Int'l Hotels Co.*, 656 F.2d 502, 505

10  (9th Cir. 1981).  A new trial is required unless the "jury's verdict is more probably than not

11  untainted by the error."  *Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880, 888 (9th Cir. 1991).

12
               **1.**      **The jury was improperly permitted to draw inferences from Google**
13                          **employees' use of attorney-client privilege.**

14           Over Google's objection, the Court permitted Epic to question witnesses about markings

15  related to attorney-client privilege on produced documents.  *See* Tr. 784:1–785:24, 785:5-6.  That

16  evidence was irrelevant and unfairly prejudicial.  *See Waymo LLC v. Uber Techs., Inc.,* No. C 17-

17  00939 WHA, 2018 WL 646701, at *21 (N.D. Cal. Jan. 30, 2018) (excluding evidence of Uber's

18  internal markings where litigation counsel "separately assessed whether or not to produce those

19  documents").  Epic did not file any motion challenging Google's assertion of privilege over any

20  document that Google produced in this case, and never argued to the Court—let alone

21  established—that Google had improperly withheld any document on the basis of privilege.  In

22  those circumstances, Epic's questioning of Google witnesses regarding privilege markings on

23  documents gave the jury the incorrect impression that Google had improperly asserted the

24  attorney-client privilege.  *See, e.g.*, Tr. 693:14-15 (Kochikar); Tr. 1321:17-24 (Pichai); *see also* Tr.

25  960:14–974:14 (Garber); *Yue v. Chordiant Software, Inc.*, No. C 08-00019 JW, 2010 WL

26  11575579, at *4 (N.D. Cal. Apr. 22, 2010) ("[A]ny presentation of evidence or line of questioning

27  designed to show Defendant's assertion of the attorney-client privilege would serve no relevant

28  purpose and would unduly prejudice Defendant by allowing the jury to infer that Defendant was

1   improperly withholding evidence."); *Van v. Language Line Servs., Inc.*, No. 14-CV-03791-LHK,

2   2016 WL 3566980, at *4 (N.D. Cal. June 30, 2016) (similar).

3          **2.      The Court improperly precluded Google from referencing the outcome**

4                   **of *Epic v. Apple*.**

5          The Court also abused its discretion by precluding Google from referencing the outcome of

6   Epic's case against Apple.  10/19/23 Hr'g Tr. 19:5–19:18 (granting Epic's motion in limine).

7   "Whether an antitrust violation exists necessarily depends on a careful analysis of market

8   realities."  *Alston*, 141 S. Ct. at 2158.  That the Google Play store's primary competitor is free to

9   use the same basic service fee model explains why it is important for Google to use that same

10  model.  The Court erred by preventing Google from introducing evidence that Apple was unlikely

11  to change its existing model in light of the outcome of *Epic v. Apple*—a market fact that supports

12  Google's procompetitive justifications for that model and the alleged tie.

13         That error was particularly prejudicial in light of Epic's presentation of evidence

14  suggesting that it had challenged Google and Apple on equal terms.  Mr. Sweeney testified that

15  "[w]e called the effort to challenge Google and Apple's distribution policies Project Liberty," Tr.

16  2018:16-17 (Sweeney), that he "wanted to challenge Google and Apple on equal terms, treating

17  them accordingly," Tr. 2020:8-9, and that Epic hired trial counsel in this case "to challenge two of

18  the most powerful companies in history," Tr. 2019:7-14.  Epic portrayed Mr. Sweeney as someone

19  who had repeatedly prevailed against major industry players, including Sony.  Tr. 1992:4–1997:6

20  (Sweeney).  Taken together, that evidence created the prejudicial misimpression that a verdict in

21  Epic's favor against Google could lead to a similar result against Apple.  The jury was entitled to

22  understand that, in fact, Epic has already brought its antitrust case against Apple and lost.

23         **3.      Google is entitled to a new trial based on the adverse inference**

24                   **instruction.**

25         The Court allowed the jury to draw adverse inferences against Google based on its finding

26  that Google intentionally failed to preserve potentially relevant chats.  Google recognizes that the

27  Court has fully resolved this issue, but preserves for appeal its prior arguments that the instruction

28  was erroneous.  *See* ECF 367, 634.  The adverse inference instruction clearly prejudiced Google

by erroneously authorizing the jury to fill in evidentiary gaps in Epic's evidence—including those identified in this motion—and by allowing Epic to paint Google as a bad actor.

Google is further entitled to a new trial because the Court refused to allow Google to argue in closing that the inference could not be drawn for any chats that would have existed before August 2020.  Tr. 3237:7-8.  The Court recognized that it could not extend its inference instruction earlier than August 2020, but still refused to allow Google to make this argument because it did not believe that "the door" had been "opened by the plaintiffs."  Tr. 3237:3-8.  But given the pervasive references to chats throughout trial, Google was entitled to remind the jury of the limitation on the Court's instruction and failure to permit that reminder was thus prejudicial.

### E.    The Court Should Treat the Jury Verdict As Advisory, and Any New Trial the Court Orders Should Be a Bench Trial.

When it became clear that all Plaintiffs seeking damages had settled, Google moved for a bench trial.  From the very beginning of this case, Epic has been clear that it seeks only injunctive relief.  It is therefore not entitled to a jury's verdict on its antitrust claims.  *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001); *Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.*, 611 F.2d 296, 307–08 (9th Cir. 1979).  The Court denied Google's request, primarily because it believed that Google had consented to a jury trial against Epic in a May 2023 filing—before the States, consumer class, and Match group settled—where Google stated that "all claims by all Plaintiffs are triable to a jury."  ECF 505 at 3; *see also* Tr. 6:13–7:16.[10]  At the time, however, the Court did not clarify whether it was going to treat the jury's verdict as binding or advisory.

The Court should treat the jury's verdict as advisory and issue its own findings of fact and conclusions of law under Fed. R. Civ. P. 52.[11]  Google did not consent to a jury trial, but even assuming its May 2023 statement could be construed as consent, a party is entitled to withdraw its

---

[10] The Court also cited Google's breach of contract counterclaim, but the Court subsequently (and correctly) recognized that those claims should not be submitted to the jury after Epic conceded that it breached the DDA.  Tr. 3050:5-14,; 3051:10-24.

[11] For the same reasons, if the Court grants Google a new trial on any of the grounds in this motion, it should hold a bench trial rather than a jury trial.

consent to a jury trial even "days before trial." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d

1071, 1089–90 (11th Cir. 2016); *accord Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 968 (7th

Cir. 2004).  Epic has not explained why switching from a jury to a bench trial would have

prejudiced it—particularly when Epic made the strategic choice to seek only injunctive relief in

the first place.  A jury trial—especially one with a binding verdict—was inappropriate.

DATED:  February 1, 2024

Respectfully submitted,

By:     */s/ Glenn D. Pomerantz*
        Glenn D. Pomerantz

**MUNGER TOLLES & OLSON LLP**
        Glenn D. Pomerantz
        Kuruvilla Olasa
        Emily C. Curran-Huberty
        Jonathan I. Kravis
        Justin P. Raphael
        Dane Shikman
        Rebecca L. Sciarrino
        Jamie B. Luguri
        Lauren N. Beck

**MORGAN, LEWIS & BOCKIUS LLP**
        Minna Lo Naranjo
        Brian C. Rocca
        Sujal J. Shah
        Michelle Park Chiu
        Rishi P. Satia

**HOGAN LOVELLS US LLP**
        Neal Kumar Katyal
        Jessica L. Ellsworth

*Counsel for Defendants*

-30-

## **E-FILING ATTESTATION**

I, Glenn D. Pomerantz, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that counsel for Defendants have concurred in this filing.

*/s/ Glenn D. Pomerantz*
Glenn D. Pomerantz
