Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Attorneys for Plaintiff Epic Games, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**EPIC GAMES, INC.'S OPPOSITION TO GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B) OR FOR A NEW TRIAL UNDER RULE 59** |

1

**Table of Contents**

2
**Page**

3   I.           Introduction ................................................................................................... 1

4   II.         Legal Standards ............................................................................................. 2

5   III.        Argument ...................................................................................................... 3

6         A.    The Relevant Markets Found by the Jury Were Legally Supported. ............. 3

7            i.      The Court Was Correct in Declining To Give the Market Definition
                            Analysis in the *Apple* Litigation Preclusive Effect. ........................ 3

8            ii.     The Jury's Market Findings Were Not Legally Erroneous. ................ 4

9         B.    The Jury Instructions Correctly Described the Rule of Reason Analysis. ..... 6

10            i.      The Step 1 Instructions Were Appropriate. ...................................... 6

11            ii.     The Step 2 Instructions Were Appropriate. ...................................... 7

12            iii.    The Step 4 Balancing Instruction Was Appropriate. ........................ 8

13         C.    The Jury's Verdict Is Supported by the Evidence. ....................................... 8

14            i.      The Jury's Finding that Android In-App Billing Services Is a Relevant
                            Product Market Is Supported by the Evidence. ............................... 9

15            ii.     The Jury's Determination of the Geographic Scope of Both Relevant
16                            Product Markets Is Supported by the Evidence. ............................. 10

17            iii.    Epic Offered Direct and Indirect Evidence of Anticompetitive Effects of
18                            Google's Conduct. ........................................................................ 11

19            iv.    The Jury's Finding that Google Tied the Use of Google Play to the Use
20                            of GPB Is Well Supported by the Evidence ................................... 20

21            v.      Google Failed To Prove Procompetitive Justifications *and* Epic Offered
                            Evidence of Less Restrictive Alternatives to Google's Conduct. ...... 22

22         D.    The Court's Adverse Inference and Evidentiary Rulings Were Correct. ...... 25

23            i.      The Court Properly Granted an Adverse Inference Instruction. ........ 25

24             ii.     The Court Properly Permitted Evidence Regarding "Fake Privilege" ............. 27

25            iii.    The Court Properly Precluded Reference to the Outcome of *Epic v.*
                            *Apple*. .......................................................................................... 28

26         E.    The Court Correctly Seated a Non-Advisory Jury, and Its Verdict Is Binding. ........... 29

27   IV.        Conclusion .................................................................................................. 30

28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772 (5th Cir. 1999) ...................................... 30

*Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132 (N.D. Cal. 2012) ........................... 27

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ................................. 13

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992) ...................................... 7

*Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321 (9th Cir. 1995) ................................ 4

*Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040 (S.D. Cal. 2015) ............. 26

*Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948 (2023) ........................................................ 5

*Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336 (9th Cir. 1984) ................................... 3

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ................................... 5

*Engquist v. Or. Dep't of Agric.*, 478 F.3d 985 (9th Cir. 2007)................................................. 29

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021) ............................. 6, 13

*Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946 (9th Cir. 2023).........................................*passim*

*Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ................................... 21

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015).................. 3

*FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071 (11th Cir. 2016) ................................... 30

*Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992)................................................................. 3

*Glover v. BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993)........................................................... 25, 27

*Hilson v. Lopez*, 2014 WL 4380674 (N.D. Cal. Sept. 4, 2014) .............................................. 4

*Io Group, Inc. v. GLBT, Ltd.*, 2011 WL 4974337 (N.D. Cal. Oct. 19, 2011)........................ 26

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ............................................. 20

*Johnson v. Wells Fargo Home Mortg., Inc.*, 635 F.3d 401 (9th Cir. 2011)........................... 25

*Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*,
    315 F. Supp. 3d 1130 (N.D. Cal. 2018)............................................................................ 12

*Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961 (7th Cir. 2004).......................................... 30

*Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352 (9th Cir. 1985) .................................... 4

*Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381 (9th Cir. 1974).................... 10

1 *Ohio House LLC v. City of Costa Mesa*, 2022 WL 2189541 (C.D. Cal. Mar. 28, 2022) ...................... 29

2 *Mondragon v. Fernandez*, 2012 WL 2590185 (N.D. Cal. July 3, 2012) ................................................ 30

3 *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021) .............................................................. 23

4 *Newcal Indus. Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) ...................................... 5, 6

5 *Ohio v. Am. Express Corp.*, 585 U.S. 529 (2018) ................................................................................ 16

6 *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997) ................................................... 18

7 *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) ................................... 9

8 *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
9  967 F. Supp. 2d 1347 (N.D. Cal. 2013) ............................................................................................ 7

 *Pavao v. Pagay*, 307 F.3d 915 (9th Cir. 2002) ................................................................................... 2, 8
10

11 *People of Territory of Guam v. Gill*, 61 F.3d 688 (9th Cir. 1995) .......................................... 27, 28, 29

 *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ............................ 16
12

13 *Pradier v. Elespuru*, 641 F.2d 808 (9th Cir. 1981) ............................................................................ 30

14 *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) .................................................. 12

 *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323 (9th Cir. 1995) .......................................................... 3
15

16 *SEC v. Stein*, 906 F.3d 823 (9th Cir. 2018) .......................................................................................... 4

17 *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001) ........................ 3

18 *Skidmore v. Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) .......................................................................... 5

19 *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1978) ............................................................... 7

 *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853 (9th Cir. 2021) .................................................. 4
20

21 *Sullivan v. Nat'l Football League*, 34 F.3d 1091 (1st Cir. 1994) ......................................................... 7

22 *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) .............................................................. 16

23 *United States v. Google, LLC,* 2023 WL 4999901 (D.D.C. Aug. 4, 2023) ............................................ 7

24 *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ......................................................................... 10

 *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ............................................... 14, 15, 17
25

26 *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) .................................................................... 7

27 *United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
  143 F. Supp. 3d 982 (N.D. Cal. 2015) ........................................................................................... 10

28 *Van v. Language Line Servs., Inc.*, 2016 WL 3566980 (N.D. Cal. June 30, 2016) ............................... 28

1  *Venegas v. Wagner*, 831 F.2d 1514 (9th Cir. 1987) ............................................................ 3, 9

2  *Visa U.S.A. Inc. v. First Data Corp.*, 369 F. Supp. 2d 1121 (N.D. Cal. 2005) ......................................... 4

3  *Waymo LLC v. Uber Tech.*, 2018 WL 646701 (N.D. Cal. Jan. 30, 2018) ............................................. 28

4  *Yue v. Chordiant Software, Inc.*, 2010 WL 11575579 (N.D. Cal. Apr. 22, 2010) ................................. 28

5  **Statutes & Rules**

6  Federal Rule of Civil Procedure 37 ............................................................................................. 25, 26

7  Federal Rule of Civil Procedure 39(c)(2) .......................................................................................... 30

8  Federal Rule of Civil Procedure Rule 50(b) ........................................................................................ 2

9  Federal Rule of Civil Procedure 59 .............................................................................................. 3, 8

10 Federal Rule of Evidence 402 ............................................................................................................ 28

11 Federal Rule of Evidence 403 ............................................................................................................ 28

12 Sherman Act § 1 ..................................................................................................................... 8, 20

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.     **INTRODUCTION**

Plaintiff Epic Games, Inc. ("Epic") hereby opposes Defendants Google LLC, Google Ireland Limited, Google Commerce Limited and Google Asia Pacific Pte. Limited's (collectively, "Google") renewed motion for judgment as a matter of law or motion for a new trial.

The trial in this case followed years of discovery, motion practice and hearings.  Over the course of 15 trial days, the jury heard testimony from 45 witnesses and received more than three hundred exhibits—leading the Court to observe that there was "an abundance of evidence" for the jury to reach a finding of liability.  (Tr. 1864:8-14.)  After the close of the evidence, the jury came to a definitive conclusion:  Google willfully acquired and/or maintained monopoly power in the markets for Android app distribution and Android in-app billing services for digital goods and services transactions, entered into a variety of agreements that unreasonably restrained trade in those markets, and unlawfully tied the use of the Google Play Store ("Google Play") to the use of Google Play Billing ("GPB").  Google now asks the Court to discard the jury's verdict and give it a do-over.  Each of Google's five bases for judgment as a matter of law or a new trial should be denied.

*First*, Google seeks a new trial or judgment in its favor on the theory that the market definition adopted by the court in the *Apple* litigation should have precluded Epic from presenting a different market definition here and that Epic did not prove a single-brand aftermarket.  Google is wrong.  This case involved distinct conduct and market definition questions from the *Apple* litigation—which is why the facts, evidence and economic theories presented to the jury by both sides in this case were not the same as those in the *Apple* litigation.  Moreover, Epic was not required to prove, and the jury was not required to consider, a single-brand aftermarket theory—and even Google's economists did not advocate for such an approach.

*Second*, Google argues that the instructions on the rule of reason analysis were incorrect, but the instructions were consistent with prevailing law.  And Google has not demonstrated any prejudice—let alone the requisite substantial prejudice—from the instructions provided to the jury.

*Third*, Google argues that there was insufficient evidence to support the jury's verdict on almost every element of Epic's claims.  That is without merit.  As this Court has already noted, the jury's verdict was supported by ample evidence.  Google's laundry list of sufficiency-of-the-evidence

arguments is nothing more than a request for the Court to weigh the evidence anew.

*Fourth*, Google argues that it is entitled to a new trial based on certain rulings before and during trial. Google challenges the permissive adverse inference instruction given to the jury, but this instruction did not prejudice Google. To the contrary, it reflected a *conservative* approach by the Court given the extensive testimony and documentary evidence, both before and during trial, which showed Google engaged in what the Court called "the most serious and disturbing evidence I have ever seen in my decade on the bench with respect to a party intentionally suppressing potentially relevant evidence in litigation." (Tr. 3228:19-23.) Google also challenges the admission of evidence regarding Google's improper use of privilege designations, but the Court allowed the jury to hear about Google's misuse of privilege only in limited circumstances, where the record already clearly reflected that privilege was used improperly. Google also argues that it is entitled to a new trial because the Court ruled *in limine* that the jury was not allowed to hear about the outcome of the *Apple* litigation. But Google provides no basis for why that information would have been relevant, much less why it would not have been prejudicial to allow the jury to hear it—and Google completely ignores the fact that, at Google's urging, the Court likewise prevented Epic from presenting the jury with evidence of multiple regulatory investigations and adverse findings *against Google*.

*Fifth*, Google argues that the jury verdict should be treated as advisory because Google changed its mind about wanting a jury trial two court days before trial and months after it had consented to a jury trial on all issues. Google's request is improper, especially because when it ultimately changed its mind on the eve of trial, it still maintained its request for a jury trial on its breach of contract counterclaims. This clear attempt at gamesmanship should be rejected. The Court should deny Google's motion in full.

## II.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure Rule 50(b), a motion for judgment as a matter of law should be rejected unless "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). The moving party must show that the verdict is not supported by "substantial evidence", meaning "relevant evidence . . . [that] a reasonable mind would

1  accept as adequate to support a conclusion". *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).

2  The Court is required to "draw all reasonable inferences in the favor of the non-mover, and disregard

3  all evidence favorable to the moving party that the jury is not required to believe." *Fifty-Six Hope Rd.*

4  *Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1069 (9th Cir. 2015).

5         Under Federal Rule of Civil Procedure 59, a motion for a new trial should be denied unless "the

6  verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to

7  prevent, in the sound discretion of the trial court, a miscarriage of justice." *Silver Sage Partners, Ltd.*

8  *v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) (quotation omitted).  Where the

9  motion for a new trial is based on insufficiency of the evidence, "a stringent standard applies", and the

10 motion should be denied unless the verdict is "against the 'great weight' of the evidence or 'it is quite

11 clear that the jury has reached a seriously erroneous result.'" *Venegas v. Wagner*, 831 F.2d 1514, 1519

12 (9th Cir. 1987) (quoting *Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984)).

13 Where the motion is based on a district court's admission of evidence or its instructions to the jury, a

14 new trial is not warranted unless the error substantially prejudiced the moving party.  *See Ruvalcaba v.*

15 *City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

16 **III.   ARGUMENT**

17        Google's motion throws a myriad of baseless arguments for overturning the jury's verdict

18 against the wall to see if any will stick.  But none does.  The relevant markets found by the jury were

19 legally supported (Section A); the instructions to the jury on the rule of reason analysis were correct

20 (Section B); the jury's verdict is supported by legally sufficient evidence (Section C); there were no

21 erroneous rulings entitling Google to a new trial (Section D); and there is no basis to treat the jury's

22 verdict as anything but binding and conclusive (Section E).  Google's Motion should be denied.

23     **A.   The Relevant Markets Found by the Jury Were Legally Supported.**

24           **i.   The Court Was Correct in Declining To Give the Market Definition Analysis in the *Apple* Litigation Preclusive Effect.**

25        Google asks this Court to find that market definition should have been taken away from the

26 jury because another court in a different case, involving a different defendant and different conduct,

27 found different markets.  (Mot. 2-5.)  This Court already correctly declined to give the market

28

definition analysis in the *Apple* litigation preclusive effect (Dkt. 700 at 2), and it should do so again here.[1]  Google has failed to show that the market definition issues were "identical" and that the relevant questions presented to the jury in this case were "actually litigated" in the prior proceeding.  *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1357 (9th Cir. 1985) (*en banc*); *see also Visa U.S.A. Inc. v. First Data Corp.*, 369 F. Supp. 2d 1121, 1124 (N.D. Cal. 2005).  The issue litigated in the *Apple* litigation was the proper antitrust market in which to evaluate the effects of *Apple's* conduct, whereas the issue litigated in the present case is the proper antitrust market in which to evaluate the effects of *Google's* conduct.  Google's conduct here and the conduct challenged in the *Apple* litigation differ significantly, as Google itself argued at length to the jury.  (*See, e.g.*, Tr. 183:15-189:4.)

The cases cited by Google are inapposite.  Two involve preclusion in cases involving the same parties and nearly the same claims as in prior cases.  *See Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021); *Hilson v. Lopez*, 2014 WL 4380674, at *3 (N.D. Cal. Sept. 4, 2014).  In the other two cases, the issue to be precluded involved the same conduct by the same party.  *See SEC v. Stein*, 906 F.3d 823, 830 (9th Cir. 2018); *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 330 (9th Cir. 1995).

Nothing in Google's Motion warrants reaching a different conclusion than this Court already reached.  The market definition analysis in the *Apple* litigation should not have preclusive effect here, and Google's request for judgment as a matter of law or a new trial on this ground should be denied.

### ii.    The Jury's Market Findings Were Not Legally Erroneous.

Google claims that the jury's market determination should be overturned because Epic purportedly "argues for single-brand aftermarkets" but did not present sufficient evidence to prove such aftermarkets.  (Mot. 5-7.)  Google's argument mischaracterizes Epic's case and is contrary to its own defense.

---

[1] Epic incorporates herein its arguments on this issue from Section I of its opposition to Google's motion *in limine* No. 1 briefing.  (Dkt. 637 at 4-5.)  Google claims "[t]his Court rejected Google's preclusion argument at the motion in limine stage primarily on timeliness grounds".  (Mot. 4.)  These were appropriate grounds for denial, but regardless, the Court also denied Google's motion *in limine* on substantive grounds—namely because Google failed to "adequately establish each of the elements of estoppel".  (Dkt. 700 at 2.)

*First*, Epic never argued for single-brand aftermarkets in this case, and explicitly stated that its proposed markets were *not* aftermarkets.  (*See, e.g.*, Dkt. 679 at 50; Dkt. 806 at 41-42.)  As the Court noted, this differs from the *Apple* litigation, where "Epic expressly . . . represented to the judge that their theory of the case was that there was a [foremarket] and an [aftermarket], neither of which has happened here".[2]  (Tr. 3216:4-8.)

*Second*, neither party presented any evidence that the proper markets in this case were aftermarkets.  Epic disclaimed this theory and, as the Court recognized, Google never presented any evidence that Epic's proposed markets should be analyzed as aftermarkets.  (Tr. 3216:20-24.)  Google was "not entitled to an instruction based on a legal theory that was not presented to the jury".  *See Skidmore v. Zeppelin*, 952 F.3d 1051, 1076 (9th Cir. 2020); *see also* Tr. 3216:25-3217:7.

*Third*, as the Court agreed, "[t]he evidence in this case does not at all indicate an [aftermarket]/[foremarket] structure".  (Tr. 3216:17-18.)  An aftermarket exists where "demand for a good is entirely dependent on the prior purchase of a durable good in a *foremarket*".  *Epic Games, Inc. v. Apple Inc.* ("*Apple II*"), 67 F.4th 946, 976 (9th Cir. 2023).  That is because the purchase of the durable good in the foremarket places the monopolist in a "unique position" with customers "to gain monopoly power in a derivative aftermarket".  *Newcal Indus. Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1050 (9th Cir. 2008); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992).  In the *Apple* litigation, Epic argued that participation in the relevant markets hinged on the purchase by a consumer of an iOS device—an iPhone—which invariably was made directly from Apple, the sole maker of iPhones.  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 922-23 (N.D. Cal. 2021) ("*Apple I*"); *see also id.* at 1024 (noting that "[i]n light of the technical restrictions on iOS devices, Apple's market power flows from its relationship with its consumers").  Here, by contrast, neither consumers nor developers are required to buy anything *from Google* to participate in the Android app distribution market or the Android in-app billing services market.  The vast majority of Android phones are manufactured and sold by OEMs other than Google, such as Samsung and

---

[2] This also differs from *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023), where the question of whether an alleged market should be characterized as an aftermarket was not even addressed.  As this Court explained, "*Coronavirus* is completely inapposite" since in *Coronavirus*, "the plaintiffs were so at sea they never even alleged a relevant market".  (Tr. 3215:24-3216:3.)

OnePlus (*see, e.g.*, Tr. 2507:25-2508:2 (Bernheim)); and Google's market power in the markets at issue derives not from its sale of a durable good to end customers, but from leveraging its power vis-à-vis OEMs to enter into a web of agreements that allow it to maintain monopolies in separate markets. These disparate commercial realities were never disputed at trial and clearly distinguish this case from the *Apple* litigation.

*Fourth*, even if the relevant product markets here were treated as aftermarkets (and they should not be), that would not require disturbing the jury's verdict.  Google argues that Epic did not offer evidence that would rebut the "economic presumption" that Android smartphone consumers make a "knowing choice to restrict their aftermarket options" as to Android app distribution and Android in-app payment solutions.  (Mot. 6 (quoting *Newcal*, 513 F.3d at 1050).)  That is wrong.  Ample evidence at trial showed that Google touted Android as an "open-source operating system" that gives users choices, including the choice of where to obtain apps.  (*See* Tr. 184:11-19; *see also* Tr. 188:15-18; Tr. 1146:6-1147:12 (Kolotouros); Tr. 2825:22-2827:5 (Miner)).  And it was never suggested at trial that users knew of Google's Project Hug agreements, RSA 3.0 agreements or the MADA placement requirements, for example.  Similarly, a Google witness testified that users are not even aware of what a payment processor is, let alone that their choice in a smartphone would restrict which payment processor they may use.  (Tr. 1581:10-11 (Rasanen).)  It is disingenuous, and contrary to the evidence, for Google now to claim that consumers know they are locked in to using Google Play and GPB when they purchase an Android smartphone.

### B.  The Jury Instructions Correctly Described the Rule of Reason Analysis.

Google attacks the Court's instructions at nearly every step of the rule of reason analysis.  Each of these attacks fails on the law and fails to clear the high bar set for such challenges.

### i.  The Step 1 Instructions Were Appropriate.

Google asserts that the Court's instructions on Step 1 of the rule of reason analysis were erroneous because they did not instruct the jury that it was required to evaluate each type of conduct independently for anticompetitive effects.  (Mot. 10.)  But Google's proposed instruction is not required and is not consistent with the law.  Indeed, the Ninth Circuit has held that "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their

EPIC'S OPPOSITION TO GOOGLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

6

1    overall combined effect." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).

2    For that reason, both the Ninth Circuit and Supreme Court have allowed the aggregation of multiple

3    contracts when evaluating the legality of an individual contract.  *See Orchard Supply Hardware LLC v.*

4    *Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1362 (N.D. Cal. 2013).[3]

5                    **ii.        The Step 2 Instructions Were Appropriate.**

6            Google argues that the jury should have been instructed to consider cross-market justifications

7    for Google's conduct and that the Court "affirmatively prevented the jury from considering such

8    justifications".  (Mot. 8.)  Google is wrong.  Any analysis of procompetitive effects *outside* of the

9    relevant market conflicts with the fundamental purpose of market definition, which is to define the

10   areas of competition that the Court will analyze.  *See United States v. Topco Assocs., Inc.*, 405 U.S.

11   596, 610 (1972); *see also Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994); *Smith*

12   *v. Pro Football, Inc.*, 593 F.2d 1173, 1186 (D.C. Cir. 1978).

13          Google's reliance on *Apple II* to support its argument that a jury *must* be instructed to consider

14   cross-market justification is misplaced.  The Ninth Circuit did not take a position on whether it is even

15   *permissible* to consider procompetitive justifications outside the market, let alone hold that it is

16   *required* to do so.  67 F.4th at 989.  And Google's suggestion that in this case its conduct was intended

17   to sacrifice intrabrand competition to foster interbrand competition against Apple is clearly incorrect;

18   the competition the jury found Google to have harmed was not intrabrand—it was competition

19   between Google and *other firms* offering competing app distribution and payment solution services.

20   There is nothing "intrabrand" about competition between Google and Amazon, Samsung or PayPal.

21          Google also cannot show substantial prejudice because the instructions provided to the jury did

22   not "prevent" it from considering justifications outside of the relevant market.  In summarizing the rule

23

24          [3] Google's reliance on the district court decision in *United States v. Google, LLC*, —F. Supp. 3d—,
     2023 WL 4999901, at *12 (D.D.C . Aug. 4, 2023), is misplaced.  (Mot. 10.)  That case, which was
25   decided on summary judgment, addressed the question of whether the court "must combine the
     anticompetitive effects across different types of monopolistic behavior".  The court held that while
26   plaintiffs may not "lump together exclusionary and non-exclusionary conduct", courts may "aggregate
     conduct that is itself deemed anticompetitive (even if only minimally so)".  *Id.* at *12.  Here, the jury
27   "deemed anticompetitive" Google's DDA, Project Hug agreements, and agreements with OEMs
     including MADA and RSA agreements, and aggregation of all these agreements would therefore have
28   been allowed even under *U.S. v. Google*.  (Dkt. 866 at 5.)

1    of reason, the Court instructed the jury that if it found substantial harm to competition in a relevant

2    market, it should consider "whether Google has justified its conduct by proving that its conduct was

3    reasonably necessary to achieve competitive benefits for consumers in that relevant market."

4    (Tr. 3328: 11-16.)  But the Court never told the jury that consideration of competitive benefits in other

5    markets was off limits.  For example, in describing the Section 1 rule of reason analysis, the Court

6    instructed the jury to consider "whether Google has proven that the restraints produced countervailing

7    competitive benefits", without reference to any particular market.  (Tr. 3332:22-3333:1.)  And in the

8    portion of the instructions explaining Step 2 in more detail, the Court instructed the jury to "determine

9    whether Google has proven that the restraint also benefits competition *in other ways*", without

10   limitation.  (Tr. 3336:8-12 (emphasis added).)  Given that open articulation of the jury's task at Step 2,

11   the jury was not "prevented" from considering justifications outside of the relevant market.  There is

12   no prejudice; the jury considered Google's claim that its practices facilitated competition against Apple

13   and rejected it.

14                        **iii.    The Step 4 Balancing Instruction Was Appropriate.**

15       Google argues that the jury was improperly instructed to "balance any competitive harms that

16   [it] found against any competitive benefits", regardless of whether Epic met its burden to prove less

17   restrictive alternatives.  (Mot. 11.)  As Google acknowledges (*id.*), however, the Court's instruction

18   follows binding Ninth Circuit precedent in *Apple II*, which held that even "where a plaintiff's case

19   comes up short at step three, the district court must proceed to step four and balance the restriction's

20   anticompetitive harms against its procompetitive benefits."  67 F.4th at 994.  The Court instructed the

21   jury consistent with binding precedent.

22            **C.    The Jury's Verdict Is Supported by the Evidence.**

23       In its Motion, Google argues that the jury did not have sufficient evidence to make many of its

24   findings.  (Mot. 11-23.)  But Google has not come close to meeting its burden under Rule 50 to show

25   that "the evidence, construed in the light most favorable to the nonmoving party, permits only one

26   reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Pavao*, 307 F.3d at 918.

27   Nor has Google shown under the "stringent standard" that applies under Rule 59 when a motion is

28   based on the insufficiency of evidence that the verdict is against the "great weight of the evidence or it

1    is quite clear that the jury has reached a seriously erroneous result".  *Venegas*, 831 F.2d at 1519

2    (omitting quotation).  Google's motion should be denied.

3                    **i.**     **The Jury's Finding that Android In-App Billing Services Is a Relevant**
                              **Product Market Is Supported by the Evidence.**

4

5           Google argues that no reasonable jury could have found a market for Android in-app billing

     services that excluded "out-of-app payment systems" for web purchases.  (Mot. 11-12.)  Not so.

6

7           A relevant product market is made up of the products "reasonably interchangeable by

8    consumers for the same purpose".  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482

9    (9th Cir. 2021) (quotation omitted).  Dr. Steven Tadelis, Epic's economic expert, testified that he

10   evaluated the service provided by GPB, determined what products offered a similar service and

11   evaluated whether those offerings were reasonable alternatives to GPB for developers.  (Tr. 2553:1-

12   2554:9.)  Dr. Tadelis testified that "any product that could do what [GPB] does", *i.e.*, support the

13   processing of in-app purchases—such as "the PayPals and the Squares"—would be within the relevant

14   market.  (Tr. 2553:1-6.)  However, he testified that that was not the case for web purchases (or

15   payment solutions for web purchases) due to the "friction" associated with making payments outside of

16   an app.  (Tr. 2553:7-2557:2.)[4]  Multiple fact witnesses corroborated Dr. Tadelis's description of

17   "friction" related to web purchasing, including Google's CEO, Sundar Pichai (Tr. 1372:18-22); Eric

18   Chu, formerly an engineering director for YouTube commerce (Dep. Tr. 259:12-25[5]); and Paul

19   Perryman, Netflix Vice President (Dep. Tr. 69:21-70:02).  Because of these frictions, developers do

20   not consider payment systems for out-of-app purchases to be a reasonable substitute for in-app

21   payment solutions.  (Tr. 2556:16-2557:3 (Tadelis).)

22          Rather than dispute the existence of these frictions at trial, Google acknowledged them.

23   (Tr. 1372:12-20 (Pichai) (agreeing that the experience of "having to leave an app to make a [web]

24

25        [4] Google did not cross-examine Dr. Tadelis about his opinion that payment systems for web
     purchasing should be excluded from the relevant product market, nor did it offer evidence to rebut the
26   frictions that users experience when making a web purchase initiated in an app.

27        [5] "Dep. Tr." refers to a portion of a witness's deposition transcript for which the corresponding
     video was played for the jury at trial.  Designated portions of depositions were not separately
28   transcribed into the trial record but are part of the trial evidence and were filed on the docket with the
     reflected pagination shown herein.  (Dkt. 915.)

1    purchase breaks the experience for the user").)  Google asserts that these frictions are irrelevant

2    because users do not "predominantly initiate purchases when using a mobile app" but can instead make

3    purchases "before using mobile apps".  (Mot. 12 (emphasis omitted).)  That argument is newly minted;

4    it was never made by Google at trial, and Google did not present the jury with any evidence showing

5    the relative prevalence of users making purchases *before* opening an Android app.  Moreover, that

6    argument completely misconceives the market, in which the buyers are developers looking for a means

7    to facilitate in-app purchases and the sellers are providers of payment solutions for integration into an

8    app.  (Tr.  2527:2-22 (Tadelis).)  Whether *users* make purchases on the web "before using mobile

9    apps" is irrelevant, except to the extent that relying on such purchases is a reasonable substitute, from

10   *developers'* perspective, to including an in-app purchasing mechanism in their apps.  The evidence at

11   trial was clear that purchases initiated outside an app (before or after the user opened the app) are not

12   such a reasonable substitute.  Instead, consumers prefer to make purchases in the same location where

13   they are already using a developer's services to play a game or view content—in an app.  (*See*, *e.g.*,

14   Dep. Tr. 150:22-151:3, 151:5-9 (Alzetta) (Spotify users preferred to make payments in the app, where

15   the majority of content is consumed); Dep. Tr. 28:25-29:04, 29:18-20 (Watts) (less than 10% of

16   Bumble revenue comes from web purchases and an even smaller percentage of user time is spent

17   consuming Bumble's services on the web).  And contrary to Google's suggestion (Mot. 12), the mere

18   availability of web-based subscriptions for *some* developers does not contradict voluminous evidence

19   presented by Epic's experts and fact witnesses explaining why that option generally is not a reasonable

20   substitute for in-app purchases for the vast majority of developers.  (Tr. 2553:7-2557:2 (Tadelis); Tr.

21   1372:18-22 (Pichai); Dep. Tr. 259:12-25 (Chu); Dep. Tr. 69:21-70:02 (Perryman).)

22          ii.    **The Jury's Determination of the Geographic Scope of Both Relevant**
              **Product Markets Is Supported by the Evidence.**

23          Google's argument that no reasonable jury could have found that the relevant geographic

24   market was worldwide, excluding China, is baseless.  (Mot. 13.)  The relevant geographic market is

25   "the area where the competition in the relevant product market takes place".  *United Tactical Sys., LLC*

26   *v. Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 1018 (N.D. Cal. 2015) (citing *Los Angeles Mem'l*

27   *Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1392 (9th Cir. 1974)); *United States v. Grinnell Corp.*, 384

28

U.S. 563, 576 (1966) (affirming relevant geographic market for the area that "reflects the reality of the way in which [the defendant] built and conduct[s] their business").  At trial, Epic showed that the area affected by Google's challenged conduct, and where Google faces competition for app distribution, is worldwide excluding China.  For example, the MADA preinstallation and placement requirements for Google Play apply to every Android device outside of China (Tr. 1070:18-1071:2 (Kolotouros)), and Google's revenue agreements with OEMs pursuant to RSA 3.0 are likewise available globally outside of China.  (Tr. 1084:14-1086:21, 1089:6-20, 1092:4-15 (Kolotouros).)  Evidence from Google's witnesses and documents reflect that this is the area where Google believes it faces competition from alternative Android app stores.  (*See, e.g.*, Tr. 1079:5-1080:21 (Kolotouros); Ex. 624 at 5.)  By contrast, China "is very dissimilar".  (Tr. 2445:13-2446:23 (Bernheim).)  "Google Play is actually not permitted in China" and "most contracts between Google and OEMs . . . exclude China".  (Tr. 1070:7-13 (Kolotouros).)  Epic's economics expert, Dr. Douglas Bernheim, testified that the relevant geographic market for Android app distribution is a global market, excluding China, because Google's challenged "conduct is global, excluding China" and "[c]ompetitive conditions are largely similar" worldwide excluding China—and Dr. Bernheim explained that in such circumstances, economists often treat multiple jurisdictions as a single market.  (Tr. 2445:13-2446:23.)  Dr. Tadelis testified that the relevant geographic market for Android in-app billing services is worldwide excluding China for similar reasons.  (Tr. 2560:7-16; 2588:20-2589:2, 2586:17-20.)  For example, the DDA applies worldwide excluding China (Tr.  2588:20-2589:2 (Tadelis)), and GPB is not available in China (*See* Tr. 1070:7-21 (Kolotorous); Tr. 2588:20-2589:2 (Tadelis)).  And competitors to GPB like PayPal, Square and Braintree compete far beyond the United States.  (Tr. 2588:1-19 (Tadelis).)

In its Motion, Google cites to no authority for the proposition that Epic must "show that American *users* would turn to global alternatives" for app distribution (emphasis added), or that Epic must show Google faced the exact *same* competitors for payments (*e.g.*, Braintree, Square) in each and every country in the geographic market.  (Mot. 13.)

### iii.  Epic Offered Direct and Indirect Evidence of Anticompetitive Effects of Google's Conduct.

Google argues that Epic failed to present direct and indirect evidence of anticompetitive effects.

(Mot. 14-23.)  Google's motion on this point is exactly the kind of "threadbare new trial request" that "consist[s] mainly of [the movant] cataloguing the evidence it considers favorable to its case", and should be denied.  *Johnstech Int'l Corp. v. JF Microtechnology SDN BHD*, 315 F. Supp. 3d 1130, 1138 (N.D. Cal. 2018).  Here, Epic went above and beyond on all fronts, offering evidence of multiple types of both direct and indirect evidence of anticompetitive effects.[6]

(1)     *Direct evidence of anticompetitive effects*

"To prove a substantial anticompetitive effect *directly*, the plaintiff must provide proof of actual detrimental effects [on competition], such as reduced output, increased prices, ***or*** decreased quality in the relevant market."  *Apple II*, 67 F.4th at 983 (emphasis added) (quotations omitted).  Only one is required.  *Id.*[7]  Here, Epic offered direct evidence of both reduced output and increased prices.

<u>Reduced Output</u>:  An output reduction can be shown by a reduction in consumer choices for a product or service.  *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999) (holding plaintiff can carry its burden to prove anticompetitive effects by showing "direct evidence that the defendant has . . . excluded competition").

At trial, Epic showed how companies that wanted to offer Android app distribution or in-app payment services were blocked or deterred by Google's conduct.  Steve Allison of Epic testified that Epic was prevented from launching a competing app store on Android that would have offered a fair compensation model and choice of in-app payment solutions because distribution outside of Google Play was too burdened by friction and scare screens to be viable.  (Tr. 238:5-17, 239:24-240:8.)  Donn Morrill of Amazon testified that Amazon was impeded from distributing its app store outside of Google Play due to the number of steps needed to download it—more than 10 in total—leading to a low number of successful installations—less than 11% of attempts.  (Dep. Tr. 161:12-19, 161:24-

---

[6] In addition to showing that individual Google agreements and policies are anticompetitive, Epic showed that Google's conduct as a whole was anticompetitive.  Google created, in essence, "multiple hurdles that a competitor would have to clear to be a meaningful factor in app distribution"—durable protection for Google's market power against competition.  (Tr. 2410:8-21 (Bernheim).)  Google's internal documents showed it viewed agreements like RSA 3.0, Project Hug and Project Banyan as complementary and mutually reinforcing.  (Tr. 2411:5-2412:3 (Bernheim); Ex. 624.)

[7] Collapsing these requirements, the Supreme Court has recognized that charging a supracompetitive price itself "entails a restriction in output".  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993).

EPIC'S OPPOSITION TO GOOGLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

12

1   162:14, 169:11-170:06).[8]  Amazon was further prevented from being able to scale its offerings through

2   preinstallation or placement deals with OEMs.  (Dep. Tr. 140:07-21, 142:13-25, 151:12-152:03,

3   156:16-157:05, 157:08-10 (Morrill).)  Google witnesses confirmed that Google's practices were

4   responsible for this lack of success, testifying, for example, that Google's agreements with OEMs had

5   impeded the pre-installation of competing app stores like Amazon's app store.  (Tr. 1098:24-1099:13,

6   1168:3-23 (Kolotouros); Tr. 1214:16-1216:13 (Rosenberg); Ex. 682.)

7        Companies that wanted to enter or expand in the market for Android in-app billing services

8   encountered similar hurdles.  Executive Chairman for payment services provider Paddle, Christian

9   Owens, testified that his company had developed a solution for Android in-app payments but Android

10  app developers selling digital goods and services via Google Play were prevented from using it to due

11  to the DDA.  (Tr. 652:3-5, 653:1-11.)  Bumble Vice President, Richard Watts, testified that the

12  company would prefer to use its own payment service solution on Android, which offers better features

13  and is less costly than GPB, but is barred from doing so by the DDA.  (Dep. Tr. 24:07-25:04, 25:16-

14  26:05 (Watts).)  Google documents showed that Google believes that allowing consumers to have

15  options for where they download apps and for developers to have payment optionality would increase

16  and enhance competition.  (Ex. 388 at 96.)  Both Drs. Bernheim and Tadelis testified entry would

17  occur but for the challenged conduct in both markets.  (Tr. 2534:19-2535:14 (Tadelis), Tr. 2393:6-19,

18  2396:3-2397:7, 2398:5-20, 2399:6-13, 2401:23-2404:11 (Bernheim).)  Through this evidence alone,

19  Epic overwhelmingly proved a reduction in the number of offerings available for app distribution and

20  in-app payments as a result of Google's conduct.

21       Google's response that Epic has "failed to show that Google's conduct reduced output in any

22  relevant market" because "[o]utput has increased dramatically for years on all dimensions" is

23  inapposite.  (Mot. 16.)  Epic has shown actual exclusion of competitors, and Google has not shown

24  (and has not even attempted to show) that output would not have expanded more rapidly absent

25  Google's exclusionary conduct. *See Apple I*, 559 F. Supp. 3d at 998, 1036-37 (crediting as evidence of

26  direct effects that "high output may have been even higher without Apple's restrictions").  A showing

27

28       [8] Amazon spent $1.4 billion to grow its store, only to attract fewer than 1% of app downloads on
    Android.  (Dep. Tr. 100:05-12 (Morrill); Tr  2412:11-2413:19, 2414:20-23 (Bernheim).)

of increased output, without more, particularly in a technology market like this one, which tend to grow quickly, cannot rebut concrete evidence of harm to competition of the sort the jury heard here. *Id.*; *United States v. Microsoft Corp.*, 253 F.3d 34, 49-50 (D.C. Cir. 2001) (describing how rapid change and increasing output are common in technology markets, irrespective of monopolization). Dr. Bernheim described such an effect as well:  Google's exclusionary conduct and supracompetitive prices reduced output and innovation for Android app distribution relative to expectations but for Google's conduct.  (Tr. 2453:16-2454:10.)

Increased Prices:  To show an anticompetitive effect using pricing evidence, a plaintiff need only show that the price charged by a defendant is a "supracompetitive price", *i.e.*, a "pric[e] above competitive levels".  *Apple II*, 67 F.4th at 984 (quotation omitted).  Epic proved that the price had increased and was a "supracompetitive price".  *Id.  First*, Epic showed that Google raised effective prices for digital distribution.[9]  In 2015, Google collected about 15 cents per download, but by 2021, the amount it collected had increased "dramatically" to more than five times that amount.[10] (Tr. 2448:8-2449:1, 2488:20-2489:1 (Bernheim).)  *Second*, Epic showed that Google charged a "pric[e] above competitive levels", because Google's net commission, after any discounting to specific developers, remained higher than other Android app stores, and because Google had exceedingly high and sustained (indeed, rapidly growing) profit margins.  (Tr. 2449:16-2450:13, 2491:9-20, 2497:12-16, 3196:22-3199:2 (Bernheim); Dep. Tr. 87:15-20, 87:24-25 (Morrill).)

Google's arguments are misplaced.  For example, Google's argument that it "repeatedly lowered prices for many developers" (Mot. 14) is a reference to the percentage fee, which Dr. Bernheim explained was not the right metric for measuring the economic price.  (Tr. 2448:8-2449:1, 2488:20-2489:1, 2489:23-2490:15 (Bernheim).)  Google's argument that "Epic's experts . . . [needed to] calculate the competitive price" (Mot. 15) to prove anticompetitive effects by direct

---

[9] Dr. Bernheim testified that this was the relevant "price" to evaluate because it reflected "the value of consideration" developers provided in return for Google's services.  (Tr. 2489:23-2490:15.)  By contrast, headline "[c]omission rates are not prices", because they do not reflect the value of the consideration that developers give to Google.  (Tr. 2481:9-10.)

[10] Relatedly, whereas the 30% headline commission that Google initially charged to developers remained largely the same over time, the portion of that commission that Google keeps for itself has increased.  (Tr. 2482:5-21 (Bernheim); Dep. Tr. 125:18-126:01, 131:01-06, 132:03-12 (Chu); Ex. 304.)

1   evidence is a misreading of *Apple II*, where the Ninth Circuit held that a plaintiff need only prove

2   evidence of a "pric[e] above competitive levels".  67 F.4th at 984-85.  Epic met its burden by showing

3   that Google charged an effective commission rate significantly higher than alternatives in the market

4   and that Google's profits of about 70% were high, rising and not competed away.  (Tr. 2449:16-

5   2450:13, 2491:9-20, 2497:12-16, 3196:22-3199:2 (Bernheim); Dep. Tr. 87:15-20, 87:24-25 (Morrill).)

6              (2)       *Indirect evidence of anticompetitive effects*

7          Although proving anticompetitive effects with direct evidence was sufficient for Epic to meet

8   its burden (*Apple II*, 67 F.4th at 983), Epic also offered considerable indirect evidence of

9   anticompetitive effects to support the jury's verdict.

10         "To prove substantial anticompetitive effects *indirectly*, the plaintiff must prove that the

11  defendant has market power and present some evidence that the challenged restraint harms

12  competition." *Id.* (omitting quotation).  At trial, Epic showed that Google has an 80-85% market share

13  in the market for Android app distribution (Tr. 2420:23-2421:12 (Bernheim)), a strong indication of

14  market power.  *Microsoft*, 253 F.3d at 54.  Dr. Tadelis testified that as a result of Google's tie of GPB

15  to Google Play, a very high percentage of apps on Google Play used GPB.[11]  (Tr. 2528:23-2529:13.)

16  Epic also showed that each of the challenged restraints harmed competition:

17         *Project Hug/Games Velocity Program ("Project Hug")*:  Google's Project Hug agreements

18  include "sim ship" and parity requirements, which mean that a "developer who signed a Project Hug

19  agreement could not launch either first or exclusively on any competing Android distribution

20  platform", nor could they "launch a materially different version of the game that it had on Google Play

21  on a competing Android app distribution platform".  (Tr. 442:23-443:7, 444:10-18 (Koh).)  As

22  Dr. Bernheim testified, Project Hug agreements had "significant anticompetitive effects", as they

23  "block[ed] the main viable entry strategy into this industry".  (Tr. 2403:7-2404:11.)  Project Hug deals

24  also "discourage[d] app developers and competing app stores from developing new content", because

25  when a developer created something unique and interesting with an OEM partner, Google Play "g[ot]

26  the benefit of it too."  (*Id.*)  Trial evidence corroborated that developers including Activision Blizzard

27

28         [11] Epic also showed barriers to entry in both markets.  (Tr. 2448:5-7 (Bernheim); Dep.
    Tr. 100:05-08, 100:11-12 (Morrill); Tr. 2547:19-2549:6 (Tadelis).)

1    King and Riot had considered launching their own app stores or distributing outside of Google Play but

2    abandoned those plans after receiving Project Hug deals.  (Ex. 1978; Tr. 463:5-14 (Koh); Tr. 807:7-15,

3    812:5-12 (Kochikar); Ex. 151.)  Google witnesses confirmed this reduction in competition to Google

4    Play was the intended result of the program.  (*See* Tr. 444:10-18 (Koh); Tr. 1082:19-23 (Kolotouros).)

5           Google's argument that no reasonable jury could have found that Project Hug harmed

6    competition misses the mark.  *First*, contrary to Google's suggestion (Mot. 17), Epic had no obligation

7    to show that any of the Project Hug deals were horizontal restraints of trade, just that they had

8    anticompetitive effects.  *Ohio v. Am. Express Corp.*, 585 U.S. 529, 540-41 (2018).[12]  *Second*, Epic did

9    not need to prove, as Google argues (Mot. 17), that the Project Hug deals required complete

10   exclusivity.  "If the effect of the agreement is to suppress competition, the fact that the agreement does

11   not explicitly mandate exclusivity is of no moment."  *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL

12   1677521, at *4 (N.D. Cal. Apr. 25, 2014); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S.

13   320, 327-30 (1961) (whether a contract violates the antitrust laws is determined based on whether the

14   contract forecloses competition, not if it contains specific terms requiring exclusivity).  *Third*,

15   Google's contention that the Project Hug deals were simply "credits" and "incentives" for developers

16   (Mot. 17) is incorrect.  As Dr. Bernheim and Google's own witnesses explained, the Project Hug

17   agreements *conditioned* the credits and incentives on compliance with restrictive terms that were

18   designed to, and did in fact, deter competition and reduce consumer choices in Android app

19   distribution.  (Tr. 442:23-443:7 (Koh); Tr. 2403:7-2404:11 (Bernheim).)

20          *Mobile Application Distribution Agreement ("MADA"):*  Under the MADA, OEMs that license

21   Android must preload Google Play "on the default home screen of their Android devices".

22   (Tr. 1351:18-21 (Pichai).)  Those preinstallation and placement requirements give Google Play a

23   significant advantage over OEMs' rival app stores, as "[p]lacement on a default home screen of a

24   phone as opposed to being on another screen tends to lead to more usage of those apps".  (Tr. 1352:9-

25   12 (Pichai); Tr. 1066:1-13 (Kolotouros).)  As a result, rival app stores have found it more challenging

26

27          [12] Epic presented evidence of anticompetitive effects by showing that Project Hug targeted
     developers who had agitated against Google's app distribution terms and/or were capable of launching
28   apps outside of Google Play, with the effect of lessening competition for Google Play.  (Tr. 419:20-25,
     422:11-18, 435:1-17, 463:5-14 (Koh); Tr. 807:7-15 (Kochikar); Ex. 136; Ex. 151; Ex. 1978.)

EPIC'S OPPOSITION TO GOOGLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

16

1    to preinstall their own app stores, like Amazon's app store, on OEM home screens in premium

2    locations.  (Dep. Tr. 151:12-152:03 (Morrill).)

3         Google's argument that no reasonable jury could find that the MADA is anticompetitive is

4    without merit.  *First*, Google argues that the MADA cannot be anticompetitive because it is "a free,

5    voluntary, non-exclusive license agreement" (Mot. 20), but that in no way disproves that it is

6    anticompetitive.  Courts have found voluntary, non-exclusive license agreements nonetheless violate

7    the antitrust laws where they contain terms restricting or impeding the preinstallations of rivals.  *See,*

8    *e.g., Microsoft*, 253 F.3d at 61-62.  Tellingly, Google has not cited any caselaw suggesting that "a free,

9    voluntary, non-exclusive license agreement" cannot harm competition, and did not even argue for this

10   in its proposed jury instructions.  Moreover, at trial, Epic proved that OEMs wishing to sell a

11   commercially viable Android smartphone have no reasonable alternative but to sign the MADA—and

12   that all Android OEMs selling phones outside of China sign it—because it is a prerequisite to

13   accessing Google's version of Android and all of the associated APIs and Google apps and services.

14   (Tr. 1356:1-21 (Pichai); Tr. 1069:8-11, 1070:3-6 (Kolotouros).)  *Second*, Google's argument that the

15   MADA is not anticompetitive because some OEMs are free to preinstall a second app store

16   (Mot. 20-21) ignores the ways that Google impairs those stores from meaningfully competing against

17   Google Play, including through placement restrictions.[13]  Epic did not have any obligation to show that

18   channels for app distribution are "completely blocked".  *Microsoft*, 253 F.3d at 64.

19        *Revenue Share Agreements ("RSA"), in particular, RSA 3.0/Premier Tier:*  Under RSA 3.0

20   agreements, Google pays certain OEMs a portion of Google Play revenue in exchange for their

21   agreement not to install any other app stores besides Google Play.  (Tr. 1053:21-24 (Kolotouros);

22   Tr. 980:10-14 (Lam); Tr. 2950:13-18 (Gennai).)  Those terms are facially anticompetitive agreements

23   not to compete.  (Tr. 3188:4-3190:14 (Bernheim).)  Trial evidence showed that RSA 3.0's Premier Tier

24   has blocked developers like Epic from being able to reach agreements with OEMs to preinstall a

25   competing app store.  (Tr. 1099:2-13 (Kolotouros); Tr. 2399:6-13 (Bernheim).)  Contrary to Google's

26

27        ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28        [13] Google Play faces little to no competitive pressure from those rival OEM stores where they are preinstalled, as shown by the very low number of app installations from those stores.  (Tr. 2394:1-2397:7, 2412:7-2413:19 (Bernheim).)

1    argument (Mot. 19-20), Dr. Bernheim did show that a substantial amount of commerce was foreclosed

2    by the provisions of RSA 3.0, as he testified that over 40% of new RSA 3.0 activations were Premier

3    Tier, including higher percentages (over 60%) for OEMs like Xiaomi, Vivo and Oppo, which had their

4    own competing app stores.  (Tr. 2398:5-20, 3185:21-3186:10 (Bernheim).)  Google's expert,

5    Dr. Matthew Gentzkow, testified that in August 2022, a total of approximately 27% of all new phones

6    sold that months were covered by Premier Tier restrictions.  (Tr.  2653:8-12; 2703:16-21 (Gentzkow).)

7    Moreover, Google's conduct must be assessed in terms of the "total market", including ways that

8    Google limits distribution on other app stores or distribution channels. *Omega  Env't, Inc. v. Gilbarco,*

9    *Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).  For example, while not affected by RSA 3.0 agreements,

10    Samsung phones, which make up about 40% of Android devices worldwide (Tr. 2626:15-2627:1

11    (Gentzkow)), were affected by other Google agreements, including a Samsung-specific revenue

12    sharing agreement worth $8 billion, which was "all part of an overall strategy" at Google to deter

13    competition in-app distribution.  (Tr. 1081:3-18 (Kolotouros); Tr. 1110:21-1111:3, 1249:18-1250:23

14    (Rosenberg); Tr. 2416:3-2417:4, 3186:11-21 (Bernheim).)  By Google's own calculations, the RSA 3.0

15    and Samsung agreements together account for approximately 67% of new Android smartphone

16    activations.  (Tr. 2626:15-2627:1, 2653:8-12 (Gentzkow).)

17          Google's remaining arguments to the contrary also fall flat.  *First*, Google's argument that

18    "RSA 3.0 agreements do not require any OEM to preinstall the Play store as the exclusive app store" to

19    obtain a license for the store" misses the point (Mot. 19); OEMs are highly incentivized by a large

20    profit sharing percentage to take this term.  (Tr. 2950:1-25 (Gennai); Tr. 3189:20-3190:14

21    (Bernheim).)  *Second*, the ability to terminate an anticompetitive agreement does not "negat[e]" its

22    anticompetitive effect (Mot. 19), which persists while the agreement is in effect.  Further, even if

23    terminated, a phone user would already have been influenced by the preinstallation and default settings

24    that preference Google Play.  (Tr. 2394:6-17, 2398:21-2399:4, 3186:22-3187:10 (Bernheim).)

25          *Sideloading:*  Epic showed that Google created cumbersome steps and scary warning screens

26    that imposed unnecessary "friction" in the process for downloading an app or app store outside of

27    Google Play.  In doing so, Google "degrad[ed] one of the important competitive alternatives to Google

28    Play; and because it does that, it will enhance Google Play's power in the market for app distribution".

1    (Tr. 2393:6-19 (Bernheim).)  For example, data that showed that over a third of users trying to directly

2    download Fortnite were deterred by Google's warning messages about harm to their phone and

3    abandoned the process.  (Tr. 2390:7-24 (Bernheim); Tr. 2979:21-2980:14 (Weissinger).)  Just 11% of

4    users that attempted to download Amazon's app store successfully did so.  (Dep. Tr. 169:11-170:06

5    (Morrill).)  Other developers like Bumble did not even attempt to distribute their apps outside of

6    Google Play, recognizing that they were unlikely to be successful due to "scale, friction, consumers are

7    used to finding apps within the Play Store".  (Dep. Tr. 27:2-25 (Watts).)

8          *Project Banyan:*  Epic agrees that no final agreement was signed between Google and Samsung

9    consummating Project Banyan, but evidence about Project Banyan is nonetheless relevant as "a

10   window on Google's strategies".  (Tr. 2416:14-2417:4 (Bernheim).)  After a period of Samsung

11   attempting to compete more vigorously against Google, and after Google and Samsung failed to sign a

12   Project Banyan deal, Google and Samsung executed an RSA under which Google would share billions

13   in revenue with Samsung.  (Tr. 1081:3-18 (Kolotouros); Tr. 1110:21-1111:3, 1249:18-1250:23

14   (Rosenberg).)  The jury was presented with ample evidence that this deal, which was consummated,

15   harmed competition.  (Tr. 2415:16-2417:4 (Bernheim); Tr. 1239:4-8, 1249:18-1250:23, 1297:25-

16   1298:13 (Rosenberg); Tr. 1109:15-23, 1113:8-19 (Kolotorous); Ex. 652.)

17         *Developer Distribution Agreement ("DDA")*:  The DDA limits the means by which developers

18   can communicate with their customers about making purchases outside of Google Play.  (Tr. 2557:19-

19   2558:9 (Tadelis).)  Also known as "anti-steering" provisions, these provisions bar app developers that

20   would otherwise communicate with their customers about special deals for web purchasing from being

21   able to do so, or force developers to offer web purchasing through a more cumbersome process.

22   (Tr. 294:9-23, 294:24-295:6, 296:7-16 (Simon).)  The Ninth Circuit held that a similar provision in

23   Apple's agreements with developers had an anticompetitive effect.[14]  *See Apple II*, 67 F.4th at 983.

24

25

26         [14] Google's argument that anti-steering provisions in the DDA do not harm competition because
     they affect a payment method outside of the Android in-app payment solutions market is wrong.
27   (Mot. 22-23.)  The anti-steering provisions reinforce the strength of Google's tie of GPB to Google
     Play and prevent out-of-app payment solution options, like those used to facilitate web purchasing,
28   from becoming more viable alternatives to GPB.  (Tr. 2557:11-2558:9 (Tadelis).)

1

2

### iv. The Jury's Finding that Google Tied the Use of Google Play to the Use of GPB Is Well Supported by the Evidence.

3

4

The jury had more than sufficient evidence to conclude that Google unlawfully tied the use of Google Play to the use of GPB.[15]  Epic introduced evidence that Google Play and GPB are separate products, that Google coerced developers to use GPB in order to access Google Play, and that less restrictive alternatives exist for Google to collect fees for its services.

5

6

*First*, Google Play and GPB were created and conceptualized as two separate products.

7

8

Richard Miner, a co-founder of Android, confirmed that the predecessor to GPB, "Google Checkout[, is] a separate product from Android and Android Market".  (Tr. 2839:5-13 (Miner).)  Epic introduced evidence that there is separate demand for Google Play and GPB.  For example, certain app stores do not bundle app distribution with in-app payments. (*See, e.g.*, Tr. 227:5-21 (Allison).)  And developers often used alternative payment solutions when given the opportunity; prominent examples include YouTube and Spotify, which used alternative payment solutions in their apps distributed through Google Play when they were allowed to do so.  (Tr. 1486:12-14 (Lockheimer); *see also* Ex. 799; Dep. Tr. 206:14-19 (Chu); Dep. Tr. 97:22-99:02 (Alzetta).)  Likewise, the CEO of Down Dog testified that it would use an alternative payment solution if it could.  (Dep. Tr. 303:2-10 (Simon).)[16]  And even if that were not the case, Google's decision to exempt certain developers from a tie does not negate the

9

10

11

12

13

14

15

16

17

18

19

[15] Relatedly, Google's argument that the Court erred in instructing the jury to consider the DDA under both the Sherman Act Section 1 and in relation to Epic's tying claim (Mot. 24) is without foundation.  It is commonplace for the same conduct to be assessed under multiple legal lenses.  The only case Google cites, *Apple II*, is not to the contrary.  While the court there found Epic's tying claim on the merits to be "simply a repackaging" of its more general Section 1 claim and resolved the claim on the same basis, the court did not hold that it was in any way improper to pursue both claims.  *Apple II*, 67 F.4th at 998.  In any event, Epic's Section 1 challenge to the DDA and its tying claim do not fully overlap.  Whereas the tying claim is focused on the tie between GPB and Google Play, the Section 1 claim also addresses the DDA's anti-steering provisions.  (*See e.g.*, Tr. 295:12-20 (Simon); Tr. 2557:21-2558:18 (Tadelis).)  Therefore, contrary to Google's contention, the jury was not asked "to evaluate the same claim two times".  (Mot. 24.)

20

21

22

23

24

25

[16] Google cites *Jefferson Parish* for the proposition that Epic was required to prove sufficient demand specifically for *GPB*—and not for any in-app payment solution—that is separate from the demand for Google Play.  (Mot. 23.)  That is incorrect.  In *Jefferson Parish*, the Court determined that "a tying arrangement cannot exist unless *two separate product markets* have been linked."  466 U.S. 2, 20-22 (1984) (emphasis added).  The fact that developers have no desire to procure GPB and only do so due to the tie is not proof that there is no tie, but rather is proof that the tie is coercive.

26

27

28

fact that the tie exists for unexempted developers.  The distinction between transactions for digital and physical goods under the Google Play Payments Policy also supports the jury's conclusion that GPB and Google Play are separate products, as developers who sell physical goods nonetheless are able to use Google Play for app distribution without using GPB.  (Tr. 714: 4-14 (Kochikar).)

*Second*, Epic offered ample evidence that Google coerces the use of the tied product, GPB. Purnima Kochikar confirmed that developers must agree to Google Play's Payments Policy if they wish to distribute their apps on Google Play.  (Tr. 889:9-21 (Kochikar); *see also* Ex. 10883; Ex. 1436.) Google Play's Payments Policy requires that developers offering digital content for sale within the app "must use Google Play In-app Billing as the method of payment".  (Ex. 1436; Tr. 887:7-10 (Kochikar); 1185:18-21 (Rosenberg).)  This testimony is undisputed.  Google contends that the "vast majority" of developers do not use GPB (Mot. 23), but that is a red herring; the tied product market found by the jury was Android in-app billing services for digital goods and services transactions, and it is undisputed that *all* developers seeking to integrate such payment solutions *must* use GPB for apps distributed through Google Play.

*Third*, it was Google's burden to show that its practices were justified by a procompetitive business justification and the jury was entitled to find that the business justification Google put forward was not adequately established or was pretextual.  *See Fed. Trade Comm'n v. Qualcomm Inc.,* 969 F.3d 974, 991 (9th Cir. 2020).  Contrary to Google's suggestion, the fact that the Ninth Circuit in *Apple II* found that the district court in that case did not err in crediting a similar justification regarding the efficient fee collection for Apple's IP and services does not mean that the jury had to credit Google's defenses in this case.  The jury had ample evidence, unique to this case, to find that Google's business justifications were pretextual.  For example, one of the founders of Android testified that Google did not originally contemplate monetizing Google Play (Tr. 2840:4-10 (Miner)) and the evidence showed that Google did not even offer in-app payment processing until years after launching Google Play (Dep Tr. 108:19-109:04 (Chu)).  Evidence also showed that Google did not require developers selling physical goods to use GPB, and indeed, prohibited them from using GPB.  (*See* Ex. 10883; Ex. 1436.)  The jury was free to interpret this inconsistent treatment as evidence that Google's procompetitive justification is merely pretext.

1    *Fourth*, Epic presented evidence of less restrictive alternatives to Google's unlawful tying of

2    GPB and Google Play.  Epic offered evidence that Google could have collected fees and expenses that

3    would allow it to recover for its "valuable IP" without requiring the tie of GPB to Google Play.  Trial

4    evidence showed that Google could earn billions in profits even at a 12% revenue share.  (Tr. 2333:24-

5    2334:2 (Barnes).).[17]  Testimony also showed that at a 12% revenue share, almost all developers

6    distributing their games on the Epic Games Store ("EGS") elect to use Epic Direct Pay rather than an

7    alternative payment solution.  (Tr. 227:8-24 (Allison).)  The jury could have concluded that Google too

8    could sever the tie, charge a 12% fee, win the business of most developers and earn a considerable

9    profit.  Further, Google's internal documents show it has considered monetizing Google Play in other

10   ways in the past.  (Ex. 360; Ex. 388.)  There was, thus, more than sufficient evidence that Google can

11   adequately collect fees and expenses without the tie of GPB to Google Play.

12          *Finally*, under the 'balancing' step of the rule of reason, the jury had sufficient evidence to

13   determine that any benefit from Google's tie was outweighed by the considerable competitive harms

14   caused by the tie, including loss of choice, loss of innovation and exceedingly high prices.

15                    **v.      Google Failed To Prove Procompetitive Justifications *and* Epic Offered**
                              **Evidence of Less Restrictive Alternatives to Google's Conduct.**

16          Google wrongly contends that "the record is replete with uncontroverted procompetitive

17   justifications for Google's conduct" (Mot. 25), and then argues that no reasonable jury could have

18   found that Epic proved less restrictive alternatives to achieve those procompetitive objectives.  In fact,

19   there was ample evidence for the jury to reject Google's proffered justifications for its conduct and to

20   find less restrictive means for achieving any procompetitive benefits that the jury may have credited.

21                                 (1)      *The MADA and revenue sharing agreements*

22          Google's justifications for the MADA and revenue share agreements are unsupported.  Google

23   argues the MADA is procompetitive because it "provides OEMs access to free, high-quality apps",

24   which contribute to increasing sales of Android phones and app downloads, and that its revenue share

25   agreements "give OEMs incentives to work harder, to invest more, to try to make great devices" and

26

27   ───────────────────
     [17] Google's internal documents further confirm it could charge a commission as low as 10%,

28   aligned with the value it estimated it provided to developers, and more than cover its costs.
     (Tr. 569:14-19, 601:25-602:6 (Marchak); Ex. 360; Ex. 388.)

1   "leads OEMs to better protect user safety".  (Mot. 25 (omitting quotation).)  Google has no

2   explanation, however, for why it needed to include terms in each of those agreements that blocked or

3   deterred competition in-app distribution, like the preinstallation and placement requirements in the

4   MADA or an exclusivity requirement for RSA 3.0, in order to further those justifications.  (Mot. 25.)

5   As the Supreme Court has observed, "a legitimate objective that is not promoted by the challenged

6   restraint can be equally served by simply abandoning the restraint, which is surely a less restrictive

7   alternative".  *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 101 (2021) (quoting 7 Areeda &

8   Hovenkamp ¶1505, p. 428).  As a result, Google's exclusionary terms cannot be justified, even if other

9   aspects of the MADA or RSA agreements could be justified.  Moreover, the jury was well within its

10  discretion to determine that Google's justifications were simply not believable.  *See Apple II*, 67 F.4th

11  at 985-86.  Testimony from Google's own fact witnesses and its internal documents, for example,

12  showed that revenue sharing provisions were added to agreements with OEMs in response to

13  competitive pressure (Tr. 2920:19-2921:7 (Gennai); Tr. 1078:8- 1081:5 (Kolotouros); Ex. 136,

14  Ex. 591, Ex. 596, Ex. 624) and with the goal of "disincentiviz[ing] [OEMs] from preloading any app

15  store, including their own, other than Google Play" (Tr. 2950:1-18 (Gennai); *see also* Tr. 1073:2-

16  1076:16, 1084:21-1087:1 (Kolotouros); Ex. 623, Ex. 624), not as part of a broader plan to "enhanc[e]

17  the Google Play experience" or "offset the cost of security features for OEMs" (Mot. 25).

18       Epic also offered evidence that any purported benefits associated with the MADA and RSA 3.0

19  could have been achieved without the exclusionary aspects of those agreements.  For example, under

20  the MADA, Google could have licensed GMS apps and APIs without the preinstallation or placement

21  requirements for Google Play but chose to include those terms as part of its "[n]on monetary barter".

22  (Ex. 624 at -40, Tr. 2387:22-2388:19 (Bernheim).)  Similarly, for RSA 3.0, Google could have shared

23  revenue with OEMs without targeting specific OEMs that had rival stores for more generous payments

24  and without the requirement that OEMs not preinstall rival stores or apps, as it previously did prior to

25  facing increased competitive pressure from OEMs in-app distribution.  (Tr. 2917:6-2919:18, 2920:19-

26  2921:7 (Gennai); Tr. 1086:2-1087:1; (Kolotouros); Ex. 591, Ex. 596, Ex. 624.)

27                           (2)    *Sideloading warnings*

28       Google's justification respecting sideloading warnings is unsupported.  Whereas Google argues

that sideloading warnings as currently implemented are necessary to "protec[t] users from malware" (Mot. 25), trial evidence showed that Google's current warnings deter app downloads and significantly degrade the consumer experience for downloading apps outside of Google Play, with limited to no improvement for deterring malware. (Tr. 2390:7-24 (Bernheim); Tr. 2979:21-2980:9 (Weissinger); Tr. 2148:19-2151:8, 2151:17-2154:14 (Mickens).) The existing warnings also bear no connection to Google's assessment of any security risk associated with an app. (Tr. 1365:2-11 (Pichai) (testifying that the websites "amazonappstore.com" and the fictional "illstealyourinfo.com" would be treated the same way in Google's unknown sources flow); Tr. 1693:16-1694:17 (Kleidermacher).) Given this evidence, the jury was well within its discretion to determine the justification was pretextual or not cognizable. *See Apple II*, 67 F.4th at 985-86.

In any event, there were less restrictive means to achieve any legitimate procompetitive benefit. Dr. Mickens testified that there were less restrictive security warnings that could have been applied and alternative structures such as notarization that could have been implemented. (Tr. 2148:19-2151:8, 2151:17-2154:14, 2160:2-24 (Mickens).)

(3)    *Project Hug*

Google's justification for Project Hug is unsupported. Whereas Google argues that Project Hug "improve[d] the availability and quality of Android apps" (Mot. 26), Google in no way explains why the specific terms that deter competition in-app distribution *on Android*, *i.e.*, the sim ship and parity terms, vis-à-vis other Android stores, are relevant for achieving those objectives. Those terms could, presumably, be stricken from Google's contracts with no change to Google's ability to further its purported justification. Moreover, the jury was well within its discretion to determine that Google's justification is not believable. Testimony from Google's employees and its internal documents showed that the basis for launching Project Hug was to "mitigate" competition in distribution of Android apps (*see e.g.*, Tr. 1081:16-18, 1082:19-23 (Kolotouros), Ex. 591, Ex. 625 at 18), not to "improve the availability and quality of Android apps" (Mot. 26).

Moreover, Epic offered evidence that Google could have provided discounts to developers to distribute their applications on Google Play without requiring sim-ship or parity terms. Google successfully encouraged millions of developers to distribute their apps on Google Play, including

1  major game developers, prior to ever conceiving of Project Hug in 2019.  (Ex. 136, Ex. 805.)  Google

2  could have encouraged developers to distribute on Google Play, the most-used app distribution channel

3  on Android and the way to reach billions of Android users, without exclusionary terms and without

4  targeting specific developers considering distributing off of Google Play for special, restrictive deals.

5  (Tr. 3188:17-3189:14 (Bernheim).)  Indeed, Google has changed its commission on subscriptions in

6  the past (Tr. 621:9-622:8 (Marchak)), and currently offers special deals to certain developers like

7  Spotify (Dep. Tr. 42:10-14, 42:20-43:03, 43:24-44:03 (Alzetta)), without requiring that those

8  developers agree to sim-ship and parity requirements.

9                (4)     *The DDA*

10        As described in Section III.C.iv above, Google's justifications for the challenged provisions of

11  the DDA are unsupported.  Even if the jury did credit them, Epic presented more than sufficient

12  evidence of less restrictive alternatives and that the considerable harm caused by Google's tie and anti-

13  steering provisions far outweighed any marginal benefit Google could point to (if any).

14       **D.**     **The Court's Adverse Inference and Evidentiary Rulings Were Correct.**

15        Google groups together its challenges to three of the Court's rulings as improper evidentiary

16  rulings:  (1) the permissive adverse inference instruction; (2) the admission of certain limited evidence

17  and testimony regarding Google employees' use of "fake privilege"; and (3) the exclusion of evidence

18  regarding the outcome of the *Apple* litigation.  (Mot. 27-29.)  All three challenges should be rejected.

19  *First*, the Court's adverse inference ruling reflected an exceedingly cautious implementation of Federal

20  Rule of Civil Procedure 37 (and is not properly characterized as an evidentiary ruling).  *Second*, the

21  Court's ruling regarding "fake privilege" was proper and did not result in inadmissible evidence being

22  presented to the jury.  And *third*, the Court's ruling on the outcome of the *Apple* litigation prevented

23  inadmissible evidence from being shown to the jury and was balanced with a bar on Epic's ability to

24  show the jury evidence of adverse findings against Google in various antitrust enforcement actions.

25       **i.**     **The Court Properly Granted an Adverse Inference Instruction.**

26       "[A] trial court . . . has the broad discretionary power to permit a jury to draw an adverse

27  inference from the destruction or spoliation against the party or witness responsible for that behavior."

28  *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (citation omitted); *see Johnson v. Wells Fargo*

*Home Mortg., Inc.*, 635 F.3d 401, 422 (9th Cir. 2011).  "[T]he choice of appropriate spoliation sanctions must be determined on a case-by-case basis, and should be commensurate to the spoliation party's motive or degree of fault in destroying the evidence."  *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 992-93 (N.D. Cal. 2012).  A permissive adverse inference instruction is a modest remedy where a party intentionally and prejudicially destroyed an entire category of relevant evidence. *See Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1054 (S.D. Cal. 2015). Courts in this district have given permissive adverse inference instructions as a remedy for spoliation of evidence.  *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp 2d 1132, 1150-51 (N.D. Cal. 2012); *Io Group, Inc. v. GLBT, Ltd.*, 2011 WL 4974337, at *8 (N.D. Cal. Oct. 19, 2011).

On October 13, 2022, Epic filed a motion for sanctions under Rule 37 (Dkt. 349), which resulted in significant briefing (*see, e.g.*, Dkt. 367, 373), two days of evidentiary hearings that included testimony from four Google employees (*see, e.g.*, Dkts. 375, 384, 414, 415, 420, 423, 428, 429, 431, 432, 440), and supplemental discovery (*see, e.g.*, Dkt. 445, 448, 449, 463, 464).  On March 28, 2023, the Court concluded that "Google intended to subvert the discovery process" and that Chat evidence was "lost with the intent to prevent its use in litigation".  (Dkt. 469 at 18.)  Nonetheless, out of an abundance of caution, the Court declined to disclose its adverse findings to the jury, and Google had a second bite at the apple, this time before the jury.  Trial testimony from Google witnesses then confirmed the destruction of hundreds of thousands of Chats.  (*See, e.g.*, Tr. 994:16-996:24, 1006:16-22 (Lam); Tr. 1115:3-1116:2 (Kolotouros); Tr. 1252:3-17 (Rosenberg); Tr. 1323:18-1325:24; 1336:2-1339:25 (Pichai).)  The Court also held a hearing outside the presence of the jury where Google's Chief Legal Officer, Kent Walker (Dkt. 791; Tr. 1801-61), gave "evasive" testimony that "was materially inconsistent with testimony given by Google's witnesses" and "did not do anything to assuage [the Court's] concerns" (Tr. 3228:10-18).  After hearing the witnesses at trial and Mr. Walker's testimony, the Court concluded that "a mandatory adverse inference instruction would be amply warranted", but that it would "take the more conservative approach" and give a permissive instruction.  (Tr. 3229:15-3230:3; Dkt. 850 at 17 ("Instruction No. 13").)  The Court determined that "this presents the most serious and disturbing evidence I have ever seen in my decade on the bench with respect to a party intentionally suppressing potentially relevant evidence in litigation"

1    (Tr. 3228:19-22), and that there was evidence of a "rampant and systemic culture of evidence

2    suppression at Google" (Tr. 3229:13-14).  There was more than substantial evidence to support the

3    Court's decision to issue a permissive adverse instruction.  *Glover*, 6 F.3d at 1329.  Indeed, based on

4    the severity of the evidence, the Court stated it intended to conduct its own independent investigation

5    into "who is responsible within Google for tolerating this culture of suppression".  (Tr. 3230:4-11.)

6              The Court was within its discretion in "refus[ing] to allow Google to argue in closing that the

7    inference could not be drawn for any chats that would have existed before" this litigation was filed in

8    August 2020, as Google claims.  (Mot. 29.)  The Court ordered Epic to keep its argument regarding

9    Google's spoliation of evidence during closing to "August 2020 and after".  (Tr. 3237:4-5.)  The Court

10   then told Google that "there will be no reference to" whether the adverse inference instruction applies

11   "pre-August 2020 unless the door is opened by the plaintiffs".  (Tr. 3237:7-8.)  Epic complied with the

12   Court's instruction, and Google does not make any allegations in its Motion otherwise.  Moreover,

13   Google was not prejudiced by the Court's ruling since Google was still permitted to argue, and

14   ultimately did argue, to the jury in closing that the jury should not consider its suppression of Chats

15   evidence in coming to its verdict.  (Tr. 3422:1-3423:5.)

16             ii.      **The Court Properly Permitted Evidence Regarding "Fake Privilege".**

17             Google trained its non-attorney employees to copy an attorney into sensitive communications

18   and mark such documents as "privileged" even when they were not seeking legal advice.  As this Court

19   recognized, Google's use of such "fake privilege" is "part and parcel of [Google's] chat policy of

20   intentionally not preserving or suppressing relevant evidence".  (10/19/2023 Hr'g Tr. 27:5-7.)

21   Google's challenge to three instances of questioning on this topic (Mot. 27) should be rejected.

22             *First*, Google objects to testimony from Emily Garber, a Google in-house lawyer.  (*See*

23   Mot. 27.)  Google did not contemporaneously object to Ms. Garber's questioning and so waived its

24   objection.  *See People of Territory of Guam v. Gill*, 61 F.3d 688, 693 (9th Cir. 1995).  Moreover,

25   Google's objection is without merit.  Epic neither showed that Ms. Garber produced documents with

26   privilege markings nor asked whether those markings were legitimate.  (Mot. 28).  Instead, Epic

27   questioned Ms. Garber about chat messages she exchanged with another attorney where *she* referenced

28   the use of "fake privilege" by Google employees.  (Tr. 960:14-974:14; Ex. 6487, Ex. 6488.)

*Second*, Google objects to Epic's questioning of Google's CEO Sundar Pichai.  (*See* Mot. 27.)  Google again did not contemporaneously object to this questioning and has therefore waived this objection.  *See Gill*, 61 F.3d at 693.  And again Google's objection is without merit.  Epic did not show Mr. Pichai a produced document and ask him to comment on the privilege markings on that document.  Epic asked Mr. Pichai whether he ever used the words "confidential" and "privileged" when he was not seeking legal advice and whether he understood such markings should only be used when seeking legal advice, both of which he answered in the affirmative.  (Tr. 1321:11-1323:17.)

*Third*, Google objects to the questioning of Purnima Kochikar.  (*See* Mot. 27.)  Ms. Kochikar testified that she witnessed a Google employee add privilege language and copy in a Google lawyer even though there was no legal advice being sought.  (Tr. 694:7-695:18.)  In accordance with the Court's order, Epic only asked about this "bogus assertion" of privilege because Epic knew it was illegitimate from her prior deposition testimony, which was played for the jury as impeachment.  (*Id.*)

Google fails to explain why the above three instances were erroneous or would have unfairly prejudiced Google.  It was well within this Court's discretion to permit questioning regarding Google's internal "fake privilege" practice in order for Epic to prove its claims regarding the suppression of evidence.  (*See supra* Section III.D.i.)  Google also fails to show that three exchanges over 15 trial days affected in any way the jury's verdict.[18]

### iii.   The Court Properly Precluded Reference to the Outcome of *Epic v. Apple*.

Google argues that this Court "abused its discretion by precluding Google from referencing the outcome of Epic's case against Apple" and is therefore entitled to a new trial.  (Mot. 28.)  Not so.  This Court's ruling to exclude argument and evidence regarding the outcome of the *Apple* litigation under Federal Rules of Evidence 402 and 403 was correct and did not substantially prejudice Google.  (Dkt. 700 at 2; 10/12/2023 Hr'g Tr. 19:5-9.)  As Google argued in its motion *in limine* to exclude evidence of foreign antitrust proceedings against Google, "[s]uch evidence is not relevant and would only confuse and mislead the jury and unfairly prejudice [Epic]".  (*See* Dkt. 640 at 58.)  The *Apple* litigation

---

[18] None of Google's cases is on point.  In each, there was no showing of a misuse of privilege to support questions regarding privilege.  *See Waymo LLC v. Uber Tech.,* 2018 WL 646701, at *21 (N.D. Cal. Jan. 30, 2018); *Van v. Language Line Servs., Inc.*, 2016 WL 3566980, at *3-4 (N.D. Cal. June 30, 2016); *Yue v. Chordiant Software, Inc.*, 2010 WL 11575579, at *4 (N.D. Cal. Apr. 22, 2010).

1  involved a different defendant, different facts, a different antitrust market, and different expert

2  evidence.  Judicial findings and rulings from a separate antitrust litigation against Apple do not make it

3  any more or less likely that Google violated the antitrust laws.  *See Ohio House LLC v. City of Costa*

4  *Mesa*, 2022 WL 2189541, at *2 (C.D. Cal. Mar. 28, 2022).  And introduction of that evidence

5  presented "a substantial risk that the jury would import the whole verdict" from the *Apple* litigation,

6  rather than decide this case on its merits.  *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 1010 (9th Cir.

7  2007).  The Court therefore excluded from trial both evidence of other antitrust proceedings against

8  Google and evidence of the *Apple* litigation.  Google suffered no prejudice as a result of this ruling.[19]

9  **E.     The Court Correctly Seated a Non-Advisory Jury, and Its Verdict Is Binding.**

10          The jury in this case sat for 15 trial days, attentively heard testimony from 45 witnesses and

11  hours of opening and closing arguments, and ultimately answered a series of detailed verdict

12  interrogatories.  Now, following the jury's complete verdict for Epic, Google asks this Court to jettison

13  that service, to treat the jury's verdict as merely advisory, and to issue its own Findings and

14  Conclusions of Law.  Google's request is barred by law and must be rejected.

15          This Court already rejected Google's eve-of-trial attempt to convert this matter to a bench trial.

16  (Dkt. 732.)  The Court found that "Google fully embraced a jury trial on several occasions in the years

17  leading up the trial", that "Google called for a single jury trial on plaintiffs' antitrust claims, including

18  Epic's", and that "Google had affirmed on another occasion that 'the parties agree that all claims by all

19  Plaintiffs are triable to a jury'" with the sole exception of the UCL claim.  (*Id.*)  On the basis of this

20  record, along with the fact that "this case has long been organized on the understanding of a single jury

21  trial of plaintiffs' antitrust claims and Google's counterclaims", the Court concluded that "Google

22  expressly consented to a jury trial of all claims, and by its conduct impliedly consented as well".  (*Id.*)

23  Such consent is binding on Google under black-letter law, Rule 39(c)(2), and the Court correctly

24

25          [19] Google's claim that it was prejudiced by the Court's ruling to exclude reference to the outcome of
26  the *Apple* litigation because of testimony by Epic's CEO Mr. Sweeney that Epic sought to challenge
    both Google and Apple's app distribution policies is baseless.  (Mot. 28.)  *First*, Google did not
27  contemporaneously object to Mr. Sweeney's testimony, and so has waived any objection.  *See Gill*, 61
    F.3d at 693.  *Second*, Google is incorrect that Mr. Sweeney's testimony "created the prejudicial
28  misimpression that a verdict in Epic's favor against Google could lead to a similar result against
    Apple".  (Mot. at 28.)  That is pure speculation on Google's part.

1    rejected Google's last-minute attempt to withdraw that consent, which would have been "gravely

2    prejudicial to Epic" and would have "undermine[d] the considerable case management work the Court

3    undertook in anticipation of a jury trial". (*Id*.)  Google offers no reason for the Court to revisit its

4    determination.  The cases Google cites, which permitted the withdrawal of consent only upon a finding

5    that it would not prejudice the other party, are inapposite, as Epic would be prejudiced by the

6    withdrawal of consent.  *See FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1089-90 (11th Cir.

7    2016)*; see also Kramer v. Banc of Am. Sec.*, *LLC,* 355 F.3d 961, 968 (7th Cir. 2004).

8         Google's argument that "the Court did not clarify whether it was going to treat the jury's

9    verdict as binding or advisory" (Mot. 29) is frivolous.  The Court's Order denying Google's request to

10   convert the trial to a bench trial made it crystal clear that the jury's verdict would be binding.  For

11   example, the Court's Minute Entry denied Google's request pursuant to Rule 39(c)(2), which provides

12   that the Court "may, with the parties' consent, try any issue *by a jury whose verdict has the same effect*

13   *as if a jury trial had been a matter of right*".  (Emphasis added.)  Tellingly, Google did not conduct

14   itself according to its newly-asserted belief that it was unclear whether the jury's verdict would be

15   binding; for example, Google did not broach with the Court (or with Epic) the submission of post-trial

16   briefing or of proposed findings of fact and conclusions of law following the jury's verdict.  Google's

17   decision to wait until after an unfavorable jury verdict to assert this argument is clear gamesmanship as

18   Google would have certainly embraced a favorable jury verdict without question.

19        Google's request that the Court treat the jury's verdict as advisory *after trial* would cause *even*

20   *more prejudice* to Epic than seating an advisory jury before the trial.  *See Pradier v. Elespuru*, 641

21   F.2d 808, 811 (9th Cir. 1981) ("There are frequently significant tactical differences in presenting a case

22   to a court, as opposed to a jury.").  For that reason, "parties are entitled to know at the outset of the trial

23   whether the decision will be made by the judge or the jury".  *Mondragon v. Fernandez*, 2012 WL

24   2590185, at *3 (N.D. Cal. July 3, 2012); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 795-96

25   (5th Cir. 1999) ("Courts have held [] that once litigants have consented . . . to a nonadvisory jury, the

26   court must provide them advance notice if it intends to regard the verdict as advisory.").

27   **IV.    CONCLUSION**

28        For the reasons discussed above, the Court should deny Google's motion in its entirety.

Dated:  February 22, 2024

Respectfully submitted,


By:    */s/ Gary Bornstein*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700