UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br><br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>Judge: Hon. James Donato |

STATEMENT OF
# STEVEN TADELIS

ON BEHALF OF
# EPIC GAMES, INC.

APRIL 11, 2024

CONTENTS

I. Google's unlawful tie harms competition and consumers ...................................................1

II. The Proposed Injunction is necessary to restore competition to the market for Android In-App Payment Solutions ........................................................................................................7
    A. No anti-steering ...........................................................................................................7
    B. No tying of distribution to payments ..........................................................................9
    C. No discrimination on the basis of payment solution choice ......................................11
    D. Google is allowed to compete on the merits .............................................................13

# I. GOOGLE'S UNLAWFUL TIE HARMS COMPETITION AND CONSUMERS

1. The jury found that Google "unlawfully tied the use of the Google Play Store to the use of Google Play Billing" and "willfully acquired or maintained monopoly power by engaging in anticompetitive conduct" in the market for Android in-app billing services for digital goods and services transactions ("Android In-App Payment Solutions").[1]

2. I testified at trial that if the tie were severed, one would expect to see entry, reduced fees, and increased innovation in the market for Android In-App Payment Solutions.[2] However, this outcome depends on robust competition in the market for Android app distribution, where Google's power to coerce the tie originates.[3] An effective remedy for Google's tie must therefore address the tie not only directly but also indirectly, by creating conditions necessary for meaningful competition in Android app distribution and preventing Google from playing a game of "whack-a-mole" where it uses its power in the market for Android app distribution to achieve through other means many of the same ends as the tie does.

3. In his statement, Dr. Bernheim describes remedies that address Google's unlawful conduct in the market for Android app distribution.[4] My analysis here complements Dr. Bernheim's by focusing on remedies that directly address the tie. Dr. Bernheim prefaces his analysis with principles that any effective remedy must embody: it must prevent Google from continuing to engage in the anticompetitive conduct found to have been unlawful, preclude related conduct that could have substantially similar anticompetitive effects, and undo the effects of Google's past anticompetitive conduct.[5] In addition, it should avoid inhibiting Google's ability to compete on

---

[1] Jury Verdict, *In re Google Play Store Antitrust Litigation.*, No. 21-md-02981-JD (N.D. Cal. December 11, 2023) ("Jury Verdict"), 3:1-25; 7:3-8. The jury found the geographic market for each of these markets to be "worldwide, excluding China." Jury Verdict, 3:2-15.
[2] Tadelis Testimony, Tr. 2566:1-8.
[3] Statement of B. Douglas Bernheim, *In re Google Play Store Antitrust Litigation.*, No. 21-md-02981-JD (N.D. Cal., April 11, 2024) ("Bernheim Statement"), Section II.
[4] Bernheim Statement, Section III.
[5] Bernheim Statement, Section II.D.

the merits by improving its products or pricing, or addressing legitimate security concerns.[6] These principles apply equally to remedies for the tie.

4. At trial, I focused my testimony on how Google imposes a coercive tie through the Developer Distribution Agreement ("DDA") and the associated Google Play Payments Policy: Google forces Android app developers ("Developers") who wish to distribute their apps through the Google Play Store to use Google Play Billing for all in-app purchases of digital goods.[7] The nature of a coercive tie is that people who are subject to it would rather not have the tie and would rather not have to purchase the tied product from the seller of the tying product.[8] The source of Google's power to coerce the tie is its market power in the market for Android app distribution.[9]

5. As I explained in my trial testimony, Google's tie harms competition and consumers in the market for Android In-App Payment Solutions.[10] The tie prevents other providers of payment

---

[6] Bernheim Statement, Section II.

[7] Tadelis Testimony, Tr. 2526:17-25, 2531:6-15; Exhibit 10883 (example of a developer distribution agreement); Exhibit 8022-039 (Google Play Payments Policy); Simon Testimony, Tr. 291:10-16 (Google permits app developer Down Dog to use only Google Play Billing for its app distributed through Google Play).

[8] Tadelis Testimony, Tr. 2530:4-9; 2531:16-2533:20; 2565:22-25 (discussing evidence, including Exhibit 1391, that developers, when given the choice, have used alternatives to Google Play Billing); Simon Testimony, Tr. 303:2-10 (Down Dog would use Stripe or PayPal if permitted).

[9] Tadelis Testimony, Tr. 2528:17-2529:4. Dr. Bernheim testified to the existence and sources of Google's monopoly power in the market for Android app distribution. Bernheim Testimony, Tr. 2412:4-2413:19, 2447:14-2452:3. *See also,* Bernheim Statement, Section II.

[10] Tadelis Testimony, Tr. 2533:21-2534:1. *See also*, Expert Report of Steven Tadelis on Behalf of Epic Games, Inc., October 3, 2022 ("Tadelis Opening Report"), Section VIII.A.

solutions from competing in this market.[11] Fees in the market are higher than they would be without the tie.[12] And with the tie, Google lacks the incentive to offer needed innovations.[13]

6. As I also testified at trial, Google's tie reinforces Google's Android app distribution monopoly, by preventing a process Google has internally referred to as the threat of "laddering up".[14] The laddering up threat identified by Google is that if large Alternative In-App Payment Solutions providers such as Stripe or PayPal could replace Google Play Billing for many thousands of Developers, they could "ladder up" the scope of services they offer Developers by offering these Developers distribution services, thereby threatening the dominance of the Google Play Store in the distribution space.[15]

7. Finally, Google's tie is reinforced by the Google Play Payments Policy's anti-steering provision: "apps may not lead users to a payment method other than Google Play's billing system"—for example, to a developer's web-based store, where the developer is free to use another billing solution.[16] The anti-steering provision makes it more difficult for Developers to effectively use web purchases, where Developers offer other payment methods, as alternatives to in-app purchases using Google Play Billing.[17] As I discussed at trial, web-based purchases using

---

[11] Tadelis Testimony, Tr. 2534:5-9. Google identified Square, Stripe, PayPal, and others as entrants into the market if the tie were removed. Between 2011 and 2020, some developers used these other providers or created their own solutions. Tadelis Testimony, Tr. 2535:1-11; Exhibit 388-098. If permitted, Paddle would offer a competing solution; its services are largely comparable to Google Play Billing's and are substantially cheaper. Owens Testimony, 666:1-667:8.

[12] Google's fee is higher than other providers' fees at their posted prices. Tadelis Testimony, Tr. 2535:15-2540:10; Tadelis Opening Report, Table 2; Owens Testimony, Tr. 675:4-8. Google estimated that it could charge only 10% without the tie. Tadelis Testimony, Tr. 2541:10-2542:4; Exhibit 360-024. During the period when some developers were exempted from using Google Play Billing, Google offered fees below its normal rates to the developers who took advantage of the exemption. Tadelis Testimony, Tr. 2540:23-2541:9. If Google's fees to developers went down, microeconomic analysis shows that some of that savings would be passed on to consumers. Tadelis Testimony, Tr. 2543:12-2544:22.

[13] Tadelis Testimony, Tr. 2534:14-17. Google Play Billing lacks features that developers have demanded or would value. Tadelis Testimony, Tr. 2544:25-2547:15; Tadelis Opening Report, ¶ 211. YouTube's former CEO wrote that using Google Play Billing instead of its own solution was "damaging for [YouTube's] business" and would "hurt [YouTube] competitively." Exhibit 1391-001.

[14] Tadelis Testimony, Tr. 2547:16-2552:8; Exhibit 388-098.

[15] *Id.*

[16] Exhibit 8022-039; Tadelis Testimony, Tr. 2557:19-2558:18.

[17] Tadelis Testimony, Tr. 2554:2-2558:18.

alternative payment methods are not viable substitutes to in-app purchases that use Google Play Billing because of the user frictions that they involve.[18]

8. I have analyzed whether the settlement between plaintiff States and the consumer class and Google ("States' Settlement")[19] is an effective remedy for the anticompetitive harms identified at trial. Dr. Bernheim has explained ways in which the States' Settlement falls short of an effective remedy relating to Android app distribution.[20] The States' Settlement also fails to address the tie effectively because it does not sever the tie, in the sense that it does not allow apps distributed via the Google Play Store to forego Google Play Billing for in-app purchases. Instead, under the States' Settlement, such apps can only offer an alternative billing system alongside Google Play Billing, through Google's existing User Choice Billing program.[21]

9. Google's User Choice Billing program does not restore competition to the Android In-App Payment Solutions market,[22] for several reasons. First, as noted above, it does not sever the tie; Developers must still integrate Google Play Billing.[23] Since Developers—not users of Android mobile devices ("Users")—are the customers in the market for Android In-App Payment Solutions,[24] and since User Choice Billing does not allow Developers to freely choose their payment solution, it cannot be a valid remedy for the tie.

10. Second, even the limited choice that Google supposedly offers to Developers under User Choice Billing is not a real choice in an economic sense.[25] Examination of the structure of User Choice Billing reveals a template for how Google could exploit its control of multiple markets to retain

---

[18] Tadelis Testimony, Tr. 2554:2-9.
[19] Settlement Agreement and Release, In re: Google Play Store Antitrust Litigation, No. 3:21-md-02981-JD (ND Cal, December 18, 2023) ("States' Settlement").
[20] Bernheim Statement, Section II.E.
[21] States' Settlement, Section 6.3. User Choice Billing allows some developers (excluding game developers) to offer users the choice of another billing system alongside, but not instead of, Google Play Billing. Loew Testimony, Tr. 3162:9-23. Google first offered User Choice Billing in 2022, after this litigation began. Kochikar Testimony, Tr. 718:13-18. By May 2023, only 75 or 80 of the millions of Android developers had signed up for User Choice Billing. Kochikar Testimony, Tr. 720:4-11.
[22] Tadelis Testimony, Tr. 2561:5-11.
[23] Tadelis Testimony, Tr. 2561:22-2562:2.
[24] Tadelis Testimony, Tr. 2527:17-22.
[25] Tadelis Testimony, Tr. 2563:12-14.

the tie. The design of User Choice Billing incentivized Developers to stick with Google Play Billing as the exclusive payment solution for in-app purchases despite the apparent choice.[26] Namely, Google designed the User Choice Billing pricing structure such that it would deter people from actually going into the program.[27] As I explained at trial, with reference to Figure 1 below, Google set the 4% "billing optionality discount" for User Choice Billing (vertical red dashed line) well below the level that, according to Google's estimates, would give Developers the financial incentive to de-integrate Google Play Billing (green shaded region).[28]

---

[26] Kochikar Testimony, Tr. 724:2-11. Under User Choice Billing, Google charges its typical service fee minus 4% on transactions processed through the developer's alternative system. Google documents and testimony established that the weighted average cost of transaction processing is between 4% and 6%. *See* Exhibit 360-024; Kochikar Testimony, Tr. 726:8-22. Developers therefore pay the same or higher effective service fee with or without User Choice Billing. Kochikar Testimony, Tr. 728:9-22.

[27] Tadelis Testimony, Tr. 2563:15-2565:21, Exhibit 388-046. *See also*, Tadelis Testimony, Tr. 2562:3-2563:14 (the User Choice Billing fees were designed in a way that it would not be profitable to adopt User Choice Billing). Google initially considered "pric[ing] the service fee for developers not using Google Play Billing at 5% less than those using Google Play Billing, essentially replacement value." Kochikar Testimony, Tr. 724:12-17, Exhibit 2698-046 (estimating Google's global payment processing cost at 5.6%). In 2019, Google estimated its break-even fee for Google Play Billing to be 6%. Tadelis Testimony, Tr. 2541:10-21; Exhibit 360-024. The current pricing structure for User Choice Billing (a 4% reduction for developers not using Google Play Billing) would require developers to obtain Android In-App Payment Solutions at a price below these estimates of Google's cost in order to pay lower overall processing fees for in-app transactions than they would by using Google Play Billing exclusively.

[28] Tadelis Testimony, Tr. 2563:12-2565:21. As I explained at trial, the Google document depicted in Figure 1 shows that Google estimated that some Developers, for whom in-app billing was a core strategic asset, would de-integrate Google Play Billing no matter the size of the "billing optionality discount". *Id.*

**FIGURE 1: GOOGLE ANALYSIS OF USER CHOICE BILLING (ANNOTATED)**

![Figure 1: Google Analysis of User Choice Billing - Game theorizing price level chart showing billing optionality discount from 0% to 30%, with annotations at 4% and 26%, showing cost to optimize, core strategic asset, and devs de-integrating curve]

Source: Tadelis Trial Demonstrative, slide 28 (from Exhibit 388-046).

11. Even if the tie were severed, without additional remedies to promote competition in Android app distribution, Google would still be able to frustrate Developers' ability to select Alternative In-App Payment Solutions for in-app purchases. Dr. Bernheim explained at trial and explains in his statement that network externalities protect Google's market dominance in app distribution.[29] If Google were to retain its market power in Android app distribution, it could still design fees like in User Choice Billing that would constitute an economic tie.[30] Accordingly, for the remedies related to the Android In-App Payment Solutions market to be effective, the remedies related to

---

[29] Bernheim Testimony, Tr. 2401:3–7 ("In the context of Google Play, you've got users going to—smartphone users going to Google Play because the apps are there, and you've got developers putting their apps on Google Play because users are going there, and it's all kind of reinforcing."); Bernheim Statement, Section II.D. *See also*, Bernheim Report, ¶¶ 247–48; Bernheim Reply Report, ¶¶ 319–21. At trial, I also explained that it is very difficult to penetrate an incumbent market where such network externalities are present. Tadelis Testimony, Tr. 2547:16-2548:21.

[30] Tadelis Testimony, Tr. 2566:9-17; Reply Expert Report of Steven Tadelis on Behalf of Epic Games, Inc., December 23, 2022 ("Tadelis Reply Report"), ¶ 129.

promotion of competition in Android app distribution discussed by Dr. Bernheim in his statement are necessary.[31]

## II. THE PROPOSED INJUNCTION IS NECESSARY TO RESTORE COMPETITION TO THE MARKET FOR ANDROID IN-APP PAYMENT SOLUTIONS

12. In this section, I explain the elements that are necessary to sever Google's coercive tie, which are found in Section III of Epic's proposed injunction ("Proposed Injunction"). For convenience, I reproduce each set of paragraphs in bold before commenting on why they are appropriate.

### A. NO ANTI-STEERING

**III.A. <u>Free Flow of Information Regarding Out-Of-App Purchasing Options</u>:**
  1. **Google shall not in any way limit, control, or restrict the ways an app can inform Users about out-of-app purchasing options.**
  2. **Google shall not restrict, prohibit, impede, disincentivize or deter Developers from informing Users about out-of-app purchasing options or from offering different prices for in-app purchases using GPB and using out-of-app payment options.**
  3. **Google shall not require Developers to use Google APIs (such as Google's "User Choice Billing" APIs) in order to invoke out-of-app purchasing options.**
  4. **Google shall not impose any Coercive Fees on transactions between a Developer and User made through out-of-payment options to which a User was "steered" by a link within an app.**
     i. **The term "Coercive Fees" means fees that are higher than: Google's fees for a similar transaction utilizing GPB minus Google's average per-transaction total cost for handling in-app transactions in the preceding calendar year.**
     ii. **Google shall disclose its calculation of the average per-transaction total costs for handling in-app transactions in any given year to the Compliance Committee provided for in Section IV, and shall make that total cost public no later than its release of its audited financials for the corresponding calendar year. For the avoidance of doubt, Google will not be required to calculate or disclose publicly its average per-transaction**

---

[31] Bernheim Statement, Section III.

Tadelis Statement    7

**total cost for handling in-app transactions should it decide not to impose any fees on transactions between a Developer and User made through linked out-of-app payment options (as provided for in this Section) and not to impose any fees on in-app transactions using Alternative In-App Payment Solutions (as provided for in Section III.B) in a given year.**

13. Section III.A of the Proposed Injunction prohibits Google from creating barriers to Developers' ability to offer Users the option to complete their would-be in-app transactions outside the app, using payment solutions other than Google Play Billing.

14. As discussed above, the DDA's anti-steering provision makes it more difficult for Developers to effectively offer out-of-app purchases that use non-Google payment methods as alternatives to in-app purchases that use Google Play Billing. Google could continue to dissuade Developers from using those alternatives if it were allowed to limit how Developers can communicate with Users about them; Sections III.A.1-2 address these concerns by prohibiting any limitations on the form of communication or its content.

15. Similarly, Google could limit competition from out-of-app purchasing options if it were allowed to restrict how Developers may invoke those alternatives—e.g., if Google could degrade the user experience of using an out-of-app purchase option. Section III.A.3 of the Proposed Injunction would prohibit such actions by Google.

16. Finally, Section III.A.4 is intended to ensure that Google cannot use its distribution market power to "tax" transactions between a Developer and User made outside of the app at a level that would prevent equally-efficient or more-efficient out-of-app payment options from competing with Google on the merits. Public disclosure of Google's average per-transaction total costs for handling in-app transactions is necessary so that developers and competitors know whether Google is offering them fees that comply with the Injunction, and only by having access to this information can they monitor Google's compliance.

17. The provisions of Section III.A would encourage the development of web-based payment solutions that can be used for out-of-app purchases. As discussed above, such solutions are currently poor substitutes for Android In-App Payment Solutions in part because of Google's

restrictions. As I testified at trial, without those restrictions, Developers could significantly streamline the process of linking an app to a web-based out-of-app purchase option.[32]

18. The provisions of Section III.A do not restrict Google from competing on the merits in the market for Android In-App Payment Solutions. These provisions impose no requirements on Google regarding what features it may offer in Google Play Billing, how it may communicate with Users and Developers about Google Play Billing's relative merits, or how it may price its own services (other than to forbid price structures that prevent equally-efficient or more-efficient out-of-app payment options from competing with Google on the merits). Moreover, these provisions do not require Google to do anything new; instead they require it *not* to do certain things. Therefore, compliance imposes no obvious material costs on Google.

### B. NO TYING OF DISTRIBUTION TO PAYMENTS

**III.B. <u>No Tying of Distribution to Payments (Contractual, Economic or Technical)</u>: Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that requires the implementation of GPB in any Android app, including, but not limited to, enforcing Sections 1 and/or 2 of its Google Play Payments Policy.**
   1. **Google shall not enforce or enter into contractual provisions, guidelines or policies, or impose technical restrictions or financial terms, that (a) restrict, prohibit, impede, disincentivize or deter Developers from integrating any Alternative In-App Payment Solution, whether alongside GPB or in lieu of GPB; or (b) restrict, prohibit, impede, disincentivize or deter Developers from offering different prices for in-app purchases using GPB and any Alternative In-App Payment Solution and/or making that price difference visible to Users.**
   2. **Google shall not require Developers to use Google APIs (such as Google's "User Choice Billing" APIs) in order to invoke Alternative In-App Payment Solutions.**
   3. **Google shall not impose any Coercive Fees on transactions made through Alternative In-App Payment Solutions.**

19. Section III.B of the Proposed Injunction would prohibit Google from coercing Developers into using Google Play Billing by imposing barriers on the use of Alternative In-App Payment Solutions. This section prevents Google from requiring the use of Google Play Billing in any

---

[32] Tadelis Testimony, Tr. 2557:4-18.

Android app, regardless of the means that Google might use to impose such a requirement: contractual, economic, or technical. As I testified at trial, severing the tie will encourage entry, reduced fees, and increased innovation in the market for Android In-App Payment Solutions.[33]

20. Specifically, Section III.B.1 prohibits Google from imposing barriers to Developers' use of Alternative In-App Payment Solutions alongside or instead of the Google Play Store, whether through contract, guidelines or policies, technical restrictions or financial terms. For example, if Google were to require that digital goods sold through an Alternative In-App Payment Solution must be offered at the same price as goods sold through Google Play Billing—or if Users were not informed of the relative prices until after choosing a payment solution—that would inhibit the competitiveness of Alternative In-App Payment Solutions. Section III.B.1(b) prevents such strategies.

21. Section III.B.2 prohibits Google from requiring the use of Google APIs to implement Alternative In-App Payment Solutions, so as to avoid a situation where Google can degrade the user experience of invoking an Alternative In-App Payment Solution.

22. Section III.B.3 is intended to ensure that Google cannot use its distribution market power to "tax" in-app purchases using Alternative In-App Payment Solutions at a level that would prevent equally-efficient or more-efficient Alternative In-App Payment Solutions from competing with Google on the merits (as Google currently does under User Choice Billing).

23. As discussed above, offering User Choice Billing as Developers' only alternative to using Google Play Billing exclusively (as the States' Settlement allows) is an insufficient remedy to address the coercive tie. User Choice Billing requires that Google Play Billing be offered alongside any alternative payment mechanism.[34] In contrast, the Proposed Injunction would sever the tie by preventing Google from deterring Developers from integrating their chosen in-app payment solution in lieu of GPB.[35]

---

[33] Tadelis Testimony, Tr. 2566:1-8.
[34] Loew Testimony, Tr. 3162:9-23.
[35] Proposed Injunction, III.B.1. *See also* Tadelis Testimony, Tr. 2561:5-2566:17.

24. The provisions of Section III.B do not restrict Google from competing on the merits in the market for Android In-App Payment Solutions. These provisions impose no requirements on Google regarding what features it may offer in Google Play Billing, how it may communicate with Users and Developers about Google Play Billing's relative merits, or how it may price any of its own services (other than to forbid price structures that prevent equally-efficient or more-efficient Alternative In-App Payment Solutions from competing with Google on the merits). Moreover, like the provisions of Section III.A, these provisions specify only what Google may *not* do and therefore impose no obvious material costs on Google.

C. NO DISCRIMINATION ON THE BASIS OF PAYMENT SOLUTION CHOICE

**III.C. <u>No Discrimination on the Basis of Payment Solution</u>:**
   1. **Google shall not reject for distribution, or otherwise disadvantage, any Android app submitted for distribution through the Google Play Store on the basis of the app's actual or intended integration of one or more Alternative In-App Payment Solutions, whether alongside GPB or in lieu of GPB.**
   2. **Google shall not retaliate or threaten to retaliate against any Developer on the basis of such Developer's actual or intended integration of one or more Alternative In-App Payment Solutions into its app(s), whether alongside GPB or to the exclusion of GPB.**
   3. **Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that imposes financial terms, technical limitations or otherwise restricts, prohibits or impedes access to the Android platform, any Android functionality and/or features or APIs, to any Android app (including any Third-Party App Stores) or Developer based on whether or not GPB is used by that app or that Developer as a payment solution exclusively or alongside Alternative In-App Payment Solutions.**
   4. **Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that conditions or impedes access to, restricts the use of, or conditions the terms of access to any of Google's products or services based on whether or not an Android app or a Developer chooses to use GPB as a payment solution exclusively or alongside Alternative In-App Payment Solutions.**

25. Section III.C of the Proposed Injunction would prohibit Google from making Developers' terms of access to Google Play Store app distribution, the Android platform and Android functionality conditional on their use of Google Play Billing.

26. Section III.C.1 prohibits Google from conditioning in any way a Developer's *equal* access to the distribution services offered by the Google Play Store on the basis of that Developer's choice of payment solution for handling in-app sales of digital goods. In other words, under the Proposed Injunction, Google's distribution services must be payment-solution-agnostic.

27. Section III.C.2 prohibits Google from retaliating or threatening to retaliate against a Developer for use of an Alternative In-App Payment Solution, such as by removing or threatening to remove a Developer's apps from the Google Play Store. In other words, under the Proposed Injunction, Google cannot punish Developers for electing to use Alternative In-App Payment Solutions.

28. Dr. Bernheim has explained the importance to Developers of access to APIs generally, and to Google's proprietary Android APIs specifically.[36] Even if Google is prohibited from tying Google Play Billing to the Google Play Store, it could still coerce the use of Google Play Billing by withholding key Android functionality from Developers who do not use Google Play Billing exclusively. Section III.C.3 of the Proposed Injunction addresses that possibility. It will allow Developers to select an Alternative In-App Payment Solution without sacrificing app capabilities. This, in turn, will allow competitors to Google Play Billing to access the market on a more equal footing than they could in the absence of Section III.C's provisions.

29. Dr. Bernheim has also explained the importance to Developers of access to Google's broad suite of apps and services, such as Google Search and Google Ads.[37] Section III.C.4 prevents Google from restricting access or degrading these services if a Developer chooses to use an Alternative In-App Payment Solution. By allowing Developers to select an Alternative In-App Payment Solution without sacrificing these products and services, Section III.C.4 will allow competitors to Google Play Billing to access the market on a more equal footing.

---

[36] Bernheim Statement, Section III.C; Bernheim Report, ¶¶ 33-47.
[37] Bernheim Statement, Section III.C.

30. The provisions of Section III.C do not restrict Google from competing on the merits in the market for Android In-App Payment Solutions. These provisions impose no requirements on Google regarding what features it may offer in Google Play Billing, how it may communicate with Users and Developers about Google Play Billing's relative merits, or how it may price any of its own services (other than to forbid discriminatory treatment of Developers based on their choice of in-app payment solution). Moreover, like the other provisions of Section III that I have already discussed, these provisions specify only what Google may *not* do and therefore impose no obvious material costs on Google.

### D. GOOGLE IS ALLOWED TO COMPETE ON THE MERITS

**Notwithstanding the preceding prohibitions, nothing in this Section III shall prohibit Google from engaging in bona fide competition on the merits with respect to in-app payment solutions for Android apps, such as:**

1. **Making price or quality improvements to GPB to differentiate it from Alternative In-App Payment Solutions.**

2. **Communicating to OEMs, Carriers, Developers and Users regarding any purported quality or price advantages of GPB over Alternative In-App Payment Solutions, or otherwise publicly promoting GPB.**

31. As I testified at trial, Google's tie prevents other providers from fairly competing in the market for Android In-App Payment Solutions; without healthy competition, fees are higher than they would otherwise be, and Google lacks an incentive to offer needed innovations.[38] The conclusion to Section III of the Proposed Injunction reinforces that Epic asks the Court to establish the conditions for healthy competition in this market. Healthy competition implies—contrary to the present reality in this market—that all providers, including Google, are free to offer innovative products at attractive prices. The provisions quoted immediately above emphasize that Section III of the Proposed Injunction in no way limits Google's ability to compete fairly in the market for Android In-App Payment Solutions.

---

[38] Tadelis Testimony, Tr. 2534:2-18.

Respectfully submitted,

_____
Steven Tadelis, Ph.D.
April 11, 2024