Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 13th St. NW
Washington, D.C. 20001
Telephone: (202) 637-5600

*Counsel for Defendants*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. #336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.,* Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**GOOGLE'S OBJECTIONS TO EPIC'S PROPOSED INJUNCTION**<br><br>Judge: Hon. James Donato |

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

I.      GENERAL OBJECTIONS ...........................................................................................2

II.     PART II - ANDROID APP DISTRIBUTION MARKET ....................................................12

    A.      Part II.A.1 - Placement & Pre-Installation Terms for Third Party App Stores ........12

    B.      Part II.A.2 - Agreements with Actual or Potential Competing Distributors ............16

    C.      Part II.A.3 - No Exclusivity .......................................................................21

    D.      Part II.A.4 - No MFNs or Limits on Differentiated Content...............................23

    E.      Part II.A.5 - No Restrictions on Removal of Developer Apps from the
        Google Play Store ....................................................................................26

    F.      Part II.B.1 & B.2 - Parity of Install Flow Regardless of Source ...........................27

    G.      Part II.C.1 - Parity of Access to Android Functionality Regardless of Source........41

    H.      Part II.C.2 – No Access Restrictions to Other Google Products or Services ..........45

    I.      Part II.D.1 - Google Play Store Catalog Access and Library Porting .....................47

    J.      Part II.D.2 - Google Play Store Distributing Third-Party Apps Stores ...................57

    K.      Part II.D.3 - Mandating Placement of the Google Play Store .................................63

III.    PART III - ANDROID IN-APP PAYMENT SOLUTIONS MARKET.............................65

    A.      Epic Lacks Standing to Obtain an Injunction Relating to Billing Remedies ...........65

    B.      Parts III.A.3 & A.4 and III.B.2 & B.3 – Price Regulation of Service Fees .............66

    C.      Parts III.A.1 and A.2 - Free Flow of Information Regarding Out of App
        Purchasing Options (Steering) ....................................................................74

    D.      Part III.B.1  - No Tying of Distribution to Payments.............................................77

    E.      Part III.C.3 and C.4 - No Discrimination on the Basis of Payment Solution...........81

IV.     PART IV - COMPLIANCE ........................................................................................82

V.      PART V - ANTI-RETALIATION ................................................................................84

VI.     GEOGRAPHIC SCOPE............................................................................................86

**PRELIMINARY STATEMENT**

As requested by Epic at the January 18, 2024 status conference, MDL ECF 909 ("1/18/24 Hr'g Tr.") 22:7–17, and as authorized by the Court's March 21, 2024 Minute Order, ECF 951, Google submits the following objections to Epic's proposed injunction.[1]  Google's specific objections to each of the 14 different remedies requested by Epic are set forth below.  To assist the Court in its consideration of those objections, Google sets forth the following summary.

Epic's proposed injunction strays far beyond the trial record.  As Epic's own expert admits, much of the conduct that Epic asks the Court to enjoin was never presented to the jury and is purely hypothetical.  Rather than a judicial injunction against alleged violations of law, Epic asks this Court to create a new global regulatory regime that would set prices, impose ongoing duties to deal, and require the Court to micromanage on an ongoing basis a highly complex and dynamic ecosystem that is used by billions of consumers and millions of app developers and that supports the business of hundreds of OEMs and carriers around the world.  Epic's proposed injunction would benefit Epic while harming other developers and OEMs by depriving them of choices and reducing competition for their business and while undermining the security and privacy of Android users.  And the cumulative effect of Epic's various proposed remedies–such as requiring Google to distribute other app stores and make its entire app catalog available to every other app store, prohibiting Google from negotiating with OEMs for non-exclusive placement and with developers for differentiated content, and chilling Google's business relationships by restricting conduct that "incentivizes" or "disincentivizes" third parties–would effectively prevent Google from competing to the detriment of consumers, Android users, OEMs, and developers.  Epic does not even attempt to explain why it is entitled to such a sweeping injunction under the rules governing equitable relief.

To the extent that Epic's goal is to promote competition rather than create an unfair, Court-supervised advantage for itself, Epic need look no further than the remedies in the State

---

[1] Unless otherwise specified, references to "ECF" are to the docket for No. 3:21-md-02981-JD and references to "Tr." are to the trial transcript.

Settlement.  Those remedies—endorsed by all 50 States, the District of Columbia, and two territories—span nearly every topic covered by Epic's proposed injunction and fully address the alleged anticompetitive conduct and effects that Epic presented to the jury at trial.  Those remedies would further promote competition among app stores, ensure that competing app stores can enter preload agreements with OEMs, simplify direct installation, and allow developers to choose among billing systems.  As the States argued in their brief in support of the agreement, the settlement "strikes an appropriate balance between the concerns the States and Consumer Counsel raised about Google's conduct without prohibiting Google from protecting the legitimate interests of consumers who use Android devices."  Case No. 3:21-cv-05227-JD, ECF 548 at 7.  By contrast, Epic's proposed injunction seeks to tilt competition in its favor to the detriment of other developers, OEMs, consumers, and Android users.  Google objects to each provision of Epic's proposed injunction on the grounds that it is unnecessary to further promote competition in light of the State Settlement and that Epic's proposed remedies will harm competition.  Google's further General Objections are set forth below, followed by Google's specific objections to each provision of the proposed injunction.

## I.  <u>GENERAL OBJECTIONS</u>

Google respectfully submits the following General Objections to Epic's proposed injunction.  The application of these General Objections to the specific provisions of the proposed injunction is discussed in the sections below.  For ease of reference and brevity, the legal authorities for Google's objections set forth in the General Objections have not been repeated each time an objection is raised to a specific provision.

1.      Epic's proposed injunction seeks remedies to which it is not entitled.  "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Under the Clayton Act, a private plaintiff like Epic is entitled to an injunction only "under the same conditions and principles" applied by courts of equity.  *See* 15 U.S.C. § 26.  Epic must therefore show:  "(1) that it [faces a significant threat of] irreparable [antitrust] injury; (2) that remedies available at law, such as monetary damages, are inadequate to

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 719 (4th Cir. 2021); *see Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023) (*Apple II*), *cert. denied*, 144 S. Ct. 681 (2024). Epic has not demonstrated–and its experts do not attempt to demonstrate–that Epic's proposed injunction satisfies any of these factors, let alone all of them. In particular, Epic has not even tried to explain how *Epic* faces a significant threat of irreparable antitrust injury that would warrant the wide-ranging remedies it asks the Court to impose. Instead, Epic merely purports that the goal of its proposed injunction is "to open up to competition the two markets found by the jury," ECF 952 at 1, a standard far from the well-established factors it's required to show.

2.      The proposed injunction does not serve the public interest, as required by *eBay*. *See Apple II*, 67 F.4th at 1002 (to issue an injunction, the court must find that "the public interest would not be disserved by a permanent injunction"); *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1211 (D.C. Cir. 2004) (rejecting an injunction that would be "likely to harm consumers," by dampening Microsoft's incentive to innovate); *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 694 (9th Cir. 1976) (reversing injunction that failed to consider incidental effects on the market and on consumers); *Bray v. Safeway Stores, Inc.*, 392 F. Supp. 851, 868 (N.D. Cal. Mar. 4, 1975) (rejecting remedy as against the public interest where injunction regulated activities that were not inherently illegal, may result in higher prices to consumers, and benefitted a different group of market participants rather than competition as a whole). Both parties' experts testified at trial that Android is a platform or ecosystem. To maintain Android as a competitive platform, Google must balance the interests of the platform's various stakeholders, including Android users, app developers, carriers, and the OEMs who manufacture Android phones. As discussed further below, numerous provisions in Epic's proposed injunction would benefit Epic while harming other stakeholders in the Android ecosystem and competition in general by (among other things) creating security and privacy risks, imposing costs on developers, depriving developers of control over distribution of their apps, and depriving developers and OEMs of the opportunity to seek

-3-

competitive offers from Google.  Indeed, Epic's proposed injunction would deprive developers of the right to control distribution of their own apps and to seek distribution incentives from app stores by requiring Google to make its entire catalog of apps available to every other Android app store.  An injunction that harms downstream consumers is not "an appropriate way to remedy an antitrust violation." *Microsoft*, 373 F.3d at 1211; *see Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1009 (9th Cir. 2008) ("[A] district court might appropriately deny a motion for injunctive relief where the injunction would hinder, rather than promote, competition in the market.").

      3.     The vagueness of the proposed injunction would require repeated and ongoing judicial intervention.  An injunction must be specific and definite enough to put parties on notice of what conduct is prohibited.  *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086–87 (9th Cir. 2004) (noting that Rule 65(d) reflects the "basic principle" that "those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits") (quotation and citation omitted); *Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (injunction must be "sufficiently precise" such that the defendant "receive[s] fair and precisely drawn notice of what [it] actually prohibits" in order to avoid "uncertainty and confusion." (quotation and citations omitted)); *see also Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 452 (2009) ("We have repeatedly emphasized the importance of clear rules in antitrust law.").  In particular, the provisions in the proposed injunction that would prohibit Google from "incentivizing" or "disincentivizing" certain conduct by third parties do not provide Google with fair notice of the prohibited conduct and will entangle the Court in ongoing disputes between the parties about whether particular actions "incentivize" or "disincentivize" third parties (*e.g.*, ECF 952 ("Proposed Injunction") II.A.1, II.A.2, II.A.3, II.B.1, II.D.3).  Many of these provisions require Google to treat *every* app developer and OEM as a potential competitor, depriving those partners of the opportunity to enter into a variety of beneficial agreements with Google and requiring the Court to intervene repeatedly to govern Google's relationships with those partners.  *See* ECF 956-1, Statement of Matthew Gentzkow ("Gentzkow") ¶¶ 35, 39.  Epic's expert concedes that the purpose of many of these vague prohibitions is to "prevent Google from

-4-

using its control of Android to impair competing app stores in other ways" beyond the conduct presented at trial.   Bernheim Statement, ECF 952-2 ("Bernheim") ¶ 11.  This is precisely the sort of "[a]nticipatory injunction[]" that the Court has made clear is "not going to happen."  Tr. 2757:11-12; *see also* Tr. 2757:14-15 ("I'm not going to write a menu of hypothetical options that may or may not happen.").

4.      The proposed injunction would require the Court to micromanage Google's business activities and contractual relationships, contrary to Supreme Court precedent.  *See NCAA v. Alston*, 594 U.S. 69, 102 (2021) (noting that judges must be sensitive to the possibility that the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition because "the decrees themselves may unintentionally suppress procompetitive innovation and even facilitate collusion."); *linkLine* , 555 U.S. at 452–53 ("Courts are ill-suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'"); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, *LLP*, 540 U.S. 398, 408 (2004) (same). For example, Epic's request that the Court order Google to create a "distribution-channel-agnostic notarization-like process" for apps downloaded from websites or other app stores would require the Court to oversee the creation and implementation of standards, policies, and practices governing the "notarization" of mobile apps.  Similarly, Epic's request that the Court order Google to distribute every other Android app store through the Play store would require the Court to oversee the creation and implementation of the technical infrastructure, product redesign, and policies and procedures necessary to transform the Play store from a store that distributes apps into a store that also distributes other app stores.  Epic's proposed injunction ignores these administrability issues by wrongly assuming that all third-party app distribution sources are equally trustworthy.

5.      The proposed injunction is legally improper because it would impose duties on Google to deal with its competitors that would be impossible to administer.  "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *linkLine*, 555 U.S. at 448.  Courts, moreover, routinely decline to impose duties to deal on the ground that they are not readily administrable by the judiciary.

1    *Trinko*, 540 U.S. at 407–08 (declining to enforce a duty to deal because "[e]nforced sharing also

2    requires antitrust courts to act as central planners, identifying the proper price, quantity, and other

3    terms of dealing—a role for which they are ill suited"); *see also Novell, Inc. v. Microsoft Corp.*,

4    731 F.3d 1064, 1073 (10th Cir. 2013) (warning that "forced sharing" requires courts to "pick and

5    choose the applicable terms and conditions," which "would not only risk judicial complicity in

6    collusion and dampened price competition," but would "also require us to become 'central

7    planners'").  Epic's proposed injunction imposes on Google numerous duties to deal that are not

8    necessary to promote competition and are not judicially administrable.  For example, the proposed

9    injunction mandates that Google provide distribution for competitors through the Play store

10   without explaining how this forced access would be administered and notwithstanding the Court's

11   summary judgment ruling that Google has no such obligation.  *See* ECF 700 (granting summary

12   judgment for Google on "plaintiffs' claims that Google unlawfully prohibits the distribution of

13   other app stores on Google Play") (quoting ECF 483 at 6); *see also* ECF 569, 8/3/23 Hr'g Tr. at

14   6:18-19 ("There's no duty to deal.").  Indeed, the proposed injunction appears to contemplate that

15   Google must do so *for free*.  And the proposed injunction would require Google to provide other

16   app stores with access to its catalog and to distribute other app stores through the Play store,

17   without specifying the terms under which Google would be required to enter into these

18   arrangements.

19        6.    The proposed injunction would impermissibly require Google to give away for free

20   its intellectual property, including proprietary Application Programming Interfaces, to non-

21   customers, dampening Google's incentives to innovate and improve the Play store and harming

22   developers, users, and OEMs.  *See Apple II*, 67 F.4th at 986 ("IP-compensation is a cognizable

23   procompetitive rationale").  In most instances, this forced sharing of intellectual property is

24   intended to address hypothetical future conduct that was not actually presented at trial.

25        7.    The proposed injunction would improperly regulate Google's prices.  *See generally*

26   ECF 956-2, Statement of Gregory K. Leonard ("Leonard").  The evidence at trial showed that the

27   Play store provides many benefits to app developers.  The Play store gives developers a safe,

28   secure, reliable platform to distribute their apps to billions of Android users around the world.

-6-

The Play store also provides developers with tools to build and then test, release, and continue to grow and monetize their apps.  Epic's proposed injunction would regulate the fee that Google can charge for those services when a user chooses a different billing system as well as the price that Google can charge when users choose Google Play Billing.  Epic's proposed injunction would also override the careful balance struck by the State Settlement regarding developer communication with users about alternative payment methods and prices.  As the States put it in their settlement motion, "[u]nder the settlement, Google must allow developers to steer consumers away from the Google Play Store and toward alternative billing systems."  *State of Utah. v. Google LLC*, No. 3:21-cv-05227-JD, ECF 522 at 7.  At the same time, the settlement preserves Google's ability to impose narrow restrictions to prevent developers from free-riding on the Play store through external links in their apps and to protect users from pop-up ads.  Epic's proposal prohibits Google from imposing even these targeted protections, violating the rule that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448; *see also Alston*, 594 U.S. at 102 ("Judges must be wary, too, of the temptation to specify the proper price, quantity, and other terms of dealing—cognizant that they are neither economic nor industry experts.") (internal quotations marks and citation omitted); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997) (rejecting provision of antitrust injunction that limited Kodak to charging "reasonable" prices).

8.     The proposed injunction is unduly burdensome and not "necessary to provide complete relief to the plaintiff."  *Apple II*, 67 F.4th at 1002 (quoting *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)).  For example, Epic's request that the Court order Google to create the first-ever "distribution-channel-agnostic notarization-like process" for mobile apps would require enormous investment by Google while creating no discernible benefit to competition beyond the provisions in the State Settlement that further simplify the sideloading process.  Similarly, Epic's request that the Court order the Play store to distribute other app stores would require Google to develop new technology, redesign its store, and write new policies and procedures to govern this novel arrangement.

9.      The proposed injunction impermissibly extends well beyond the evidence of anticompetitive conduct presented at trial.  *See, e.g.*, *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 109 (D.D.C. 2002) (antitrust remedy can only reach otherwise-legal conduct that is "the same or similar" to the conduct found illegal in order for the court to enjoin them); *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (injunctive relief, including relief going beyond anticompetitive conduct proven at trial, "must be based on a 'clear indication of a significant causal connection'" to "the violation found").  For example, Epic's proposal that Google be required to provide access to its entire catalog of apps to every other app store has absolutely no basis in the trial record and is not consistent with Epic's trial presentation. At trial, Epic argued that the key to competition in the alleged relevant markets was for app stores to provide unique content, not the same content as the Play store.  Epic never argued that the Play store's large app catalog was the product of anticompetitive conduct, and in fact the evidence showed that the large catalog was a "first-mover" advantage that Google obtained long before virtually any of the challenged conduct was in place by building Android and launching the first Android app store.  *See* Gentzkow ¶ 20.  The existing trial record cannot support Epic's requested injunction.  "A hearing on the merits—*i.e.*, a trial on liability—does not substitute for a relief-specific evidentiary hearing unless the matter of relief was part of the trial on liability, or unless there are no disputed factual issues regarding the matter of relief."  *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001).

10.      The proposed injunction's stated goal–to "open up" the markets to competition–is erroneously broad.  The goal of the injunction instead should be to address the conduct found to be unlawful and, if necessary to redress harm to the plaintiff, to reverse the competition-reducing effects of that unlawful conduct.  Epic's generic statement of the injunction's purpose does not account for advantages that Google has earned through efforts that were not found unlawful, including through innovation, product quality improvements, and first-mover status.  For example, the evidence at trial established that Google developed a large catalog of apps by building Android and launching the first Android app store with the goal of luring developers to the platform. Epic's expert admitted that this conduct occurred before Google acquired any monopoly power,

and the jury was not asked to find this conduct unlawful.  Yet Epic's proposed remedies–including the remedy that Google be forced to provide access to its app catalog to any party claiming to be an Android app store–seek to punish Google for pro-competitive conduct and to prevent Google from benefiting from that pro-competitive conduct going forward.  Courts reject injunctions that block firms from lawfully competing because such injunctions harm competition.  *See Kodak*, 125 F. 3d at 1225–26 (striking injunction that failed to preserve Kodak's ability to charge "monopoly prices" for its IP, noting that Kodak was entitled to charge "any nondiscriminatory price that the market will bear," and that limiting Kodak's prices would reduce its incentive to innovate); *see also Microsoft Corp*., 224 F. Supp. 2d at 110 (antitrust injunction should not block violator from competing); *see also Bray*, 392 F. Supp. at 868 (rejecting injunction that, "by preventing the defendant from engaging in activities that are not inherently illegal," would "place it at a serious disadvantage in the marketplace," and risk raising consumer prices).

11.    The proposed injunction is overly broad to the extent it seeks to enjoin enforcement of entire agreements, like MADAs and RSAs, which reflect broader value exchanges between Google and its partners, rather than enforcement of the specific contractual obligations or provisions that the proposed injunction addresses.  Any injunction barring enforcement of contractual obligations or provisions should be limited to those specific obligations or provisions, and should not extend to the enforcement of the entire agreement, which may not be at issue in this litigation.

12.    Several provisions in the proposed injunction would apply permanently, rather than for a limited period of time.  Permanent injunctive relief is unwarranted in this case in light of the "substantial uncertainty" about the future of a rapidly evolving mobile app industry.  *Microsoft*, 224 F. Supp. 2d at 183–84.  Microsoft's December 2023 announcement that it intends to launch an Android gaming app store is just one example of the dynamic nature of the industry.  *See* Gentzkow ¶ 19.  Even more recently, on March 20, 2024, Epic announced that the Epic Games Store would be coming to Android.  *See id.*  Moreover, ongoing regulatory developments impacting the industry (such as the European Union's Digital Market Act and South Korea's Telecommunications Business Act) could significantly alter the relationship among app

-9-

1    distribution channels like Google Play, developers, and users.

2         13.    The proposed injunction's worldwide scope (excluding China) impermissibly

3    enjoins wholly foreign conduct in violation of the FTAIA.  15 U.S.C. § 6a; *see also F. Hoffman-*

4    *La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158–59 (2004) (conduct that "involves" foreign

5    commerce is presumptively outside the scope of the antitrust laws).  "U.S. antitrust laws concern

6    the protection of '*American* consumers and *American* exporters, not foreign consumers or

7    producers.'"  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 986

8    (9th Cir. 2008) (citation omitted); *see also Empagran*, 542 U.S. at 165 (FTAIA prevents the "risk

9    of interference with a foreign nation's ability independently to regulate its own commercial

10   affairs" by limiting the application of U.S. "remedies.").  Under the FTAIA, the antitrust laws do

11   not apply to foreign commerce unless the conduct has a "direct, substantial, and reasonably

12   foreseeable effect" on domestic commerce, import commerce, or export commerce.  15 U.S.C. §

13   6a.  Developers outside of the U.S. transact with users outside of the U.S. via versions of the Play

14   store designed for countries outside of the U.S.  Epic has made no showing that Google's conduct

15   as to those transactions has a direct, substantial, and reasonably foreseeable effect on U.S.

16   commerce, or import or export commerce.  Moreover, a global injunction would be inconsistent

17   with international comity by interfering with foreign jurisdictions' application of their own

18   competition laws and regulations.  *Empagran*, 542 U.S. at 156, 165–67 ("other nations have not in

19   all areas adopted antitrust laws similar to this country's and," even if those different "nations agree

20   about" the anticompetitive conduct at issue, "they disagree dramatically about appropriate

21   remedies").  As explained below, a global injunction threatens conflicts and interference with the

22   results of ongoing litigation between Epic and Google in Australia and the United Kingdom,

23   emerging regulatory regimes such as the Digital Markets Act in the European Union, and ongoing

24   investigations and regulatory proceedings in other countries.

25         14.    Epic does not have standing to request many of the remedies it seeks.  *See City of*

26   *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("standing to seek an injunction" requires a

27   showing that the plaintiff "was likely to suffer *future* injury" from the challenged conduct

28   (emphasis added)).  Epic's apps are not listed in the Play store as a result of Epic's intentional

-10-

breach of the Developer Distribution Agreement, and therefore Epic is not subject to any of the Play prices or policies it asks the Court to regulate.  Epic uses its own billing system, Epic Direct Pay, for in-app purchases, and therefore would not benefit from remedies intended to promote competition from third-party billing services.  Nor would such remedies benefit Epic as a competitor in the in-app billing market because Epic has presented no evidence that it intends to offer Epic Direct Pay as a billing option for third parties.

15.    Epic's proposed injunction would apply not only to Google and its employees, but also to "all other persons acting in concert with Google and with actual notice of this Order."  To the extent this language is intended to sweep more broadly than the scope of Federal Rule of Civil Procedure 65(d), it is impermissibly vague and exceeds the Court's jurisdiction.  *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13 (1945) (concluding that court may not punish "the conduct of persons who act independently and whose rights have not been adjudged" in the proceedings). As written, Epic's proposed language could be read to apply to an OEM, carrier, or developer that has merely entered into a contract with Google and is aware of the injunction.  To remedy this ambiguity, Google requests that any injunction issued in this case clarify that its scope is limited to the categories set forth in Rule 65(d)(2).

16.    Taken as a whole, Epic's proposed remedies have the cumulative effect of preventing Google from competing to the detriment of consumers, developers, OEMs, and carriers across the Android ecosystem and beyond.  The impact of the proposed remedies in combination, requiring Google to distribute third party app stores and to make its entire app catalog available to third party app stores, while simultaneously prohibiting Google from negotiating with OEMs for non-exclusive placement and with developers for differentiated content, as well as chilling Google's pro-competitive agreements with OEMs and developers by restricting conduct that "incentivizes" or "disincentivizes" the behavior of third parties, would make it nearly impossible for Google to compete.

Google respectfully renews its request for the opportunity to submit further briefing following the evidentiary hearing to elaborate upon the legal deficiencies in the proposed injunction, address the record from the evidentiary hearing, and submit any additional evidence

1   relevant to illustrating the flaws in the proposed injunction.  Once the Court has ruled on the scope

2   of any injunction, Google further requests the opportunity to be heard on the effective date given

3   any technical and other considerations that may apply.

### II.     PART II - ANDROID APP DISTRIBUTION MARKET

### A.     Part II.A.1 - Placement & Pre-Installation Terms for Third Party App Stores

6        Epic's proposed injunction would permanently enjoin Google from engaging in conduct

7   that "prohibits, limits or disincentivizes the placement of, preinstallation of, and/or grant of

8   installation permissions" by a mobile carrier or OEM "to any Android app or Third-Party App

9   Store."  Proposed Injunction § II.A.1.  The proposal would also permanently enjoin "requir[ing] or

10  incentiviz[ing] a carrier or OEM to introduce any additional steps for a User to enable or access a

11  preinstalled Third-Party App Store beyond the steps required to access the Google Play Store

12  when it is preinstalled."  Proposed Injunction § II.A.1.i.

13  **Objection 1:**       **Epic's proposed remedy is unnecessary to promote competition in light of
                          the provisions in the State Settlement ensuring that third-party app stores**
14                        **can obtain preinstallation or placement agreements.**

15       1.    In the State Settlement, Google has already agreed to remedies that would prevent

16  Google from limiting the pre-installation or home screen placement of third-party app stores.

17  Google has agreed that for a period of five years it will not enter into or enforce agreements "with

18  the purpose or effect of securing preload exclusivity or home screen exclusivity of Google Play on

19  a Mobile Device."  No. 3:21-cv-05227-JD, ECF 522-2 ("State Settlement") § 6.6.1.  Google has

20  also agreed that for a period of four years, it will not enter into or enforce agreements "under

21  which an OEM would be prevented from granting installer rights . . . to preloaded applications . . .

22  with or without Google's consent."  State Settlement § 6.7.1.  Epic's expert Dr. Bernheim is

23  therefore incorrect in his contention that the State Settlement "does not prevent Google" from

24  signing agreements like "the RSA 3.0 revenue sharing provisions."  Bernheim ¶ 30.  Section 6.6.1

25  *would* prevent Google from signing such agreements, since those revenue sharing agreements

26  were expressly in exchange for preload exclusivity for Play.

27       2.    The agreement also provides that Google may still enforce "generally applicable"

28  policies relating to content and functionality–such as illegal content–and may adopt requirements

that apply equally to all preinstalled apps to protect the user experience.  State Settlement § 6.7.2(a)-(b).  Under Sections 6.6.1 and 6.7.1 of the State Settlement, OEMs will be free to preinstall legitimate third-party app stores without obtaining consent from Google, and Google will still be able to take basic steps to protect the user experience and user security and privacy.  As the States noted in their supplemental brief, these provisions "will enable third-party app stores to enter the market by being preloaded on devices and able to install apps as seamlessly and effectively as the Google Play Store."  ECF 953 at 8.  Epic's further proposed remedy is unnecessary to promote competition and in fact would harm competition for the reasons set forth below.  *See* Gentzkow ¶¶ 24-30.

3.   Epic's expert contends that a broad prohibition on conduct that "disincentivizes" OEMs from preinstalling other app stores is necessary to "prevent Google from using its control of Android to impair competing app stores in other ways" beyond the conduct presented at trial.  Bernheim ¶ 11.  But this kind of anticipatory relief is not the purpose of an injunction.  As this Court has explained, "Anticipatory injunctions are not going to happen. . . . I'm not going to write a menu of hypothetical options that may or may not happen."  Tr. 2757:11-15.

**Objection 2:**     **The proposed remedy would harm the security, privacy, and user experience of Android users.**

1.   The proposed remedy would harm Android users because it contains no exceptions to protect user privacy and security and overall user experience.  The evidence at trial—including the testimony of Epic's own security expert—established that preventing the installation of malicious apps is critical to protecting the security of Android users.  *See* Tr. 2147:1-7 (Mickens); Tr. 2227:9–2229:11, 2230:11-24, 2231:4-19 (Qian); Tr. 1753:19–1756:23 (Kleidermacher).  The testimony at trial, including from Epic's security expert, also established that the "permission to install other apps has pretty significant security implications."  Tr. 2197:5-10 (Mickens); Tr. 1765:11-12 (Kleidermacher) ("The privilege to install apps is one of the most powerful and dangerous permissions on the operating system.").  As the States have noted, "Because Google is the developer of the Android operating system, it is reasonable to permit Google to protect user privacy and security where applications are preloaded on an Android device and then enabled to

-13-

install other applications."  ECF 953 at 8.

2.      Under Epic's proposal, Google would be unable to adopt reasonable policies to protect users from harmful pre-installed apps or app installers—apps that have the powerful permission to install other apps.  For example, under Epic's proposal, Google would not be able to ask an OEM not to pre-install an app store that tracked a user's location without consent or installed software that the user did not want.  Epic's proposal could also be interpreted to prohibit Google from requiring through the MADA that preinstalled apps be screened for malware.  Preserving flexibility to adopt reasonable policies that protect users is important to users and the Android ecosystem generally.  *See* Declaration of David Kleidermacher in Support of Google's Objections to Proposed Injunction ("Kleidermacher Declaration") ¶ 26.  An OEM, particularly a smaller OEM, may have a financial incentive to accept a lucrative deal to pre-install an app that harms users or that users do not want on their devices, leading to a poor user experience that hurts the Android brand generally.  The State Settlement appropriately permits Google to adopt reasonable policies that address these concerns.

3.      The need to protect users from harmful pre-installed applications is not a theoretical problem.  In 2020, a group of more than 50 privacy-focused organizations, including the ACLU, Amnesty International, and the Electronic Frontier Foundation, sent an open letter to Google asking it to do more to protect users from harmful pre-installed apps.  *See id.* ¶¶ 27-28, Ex. I.  The letter noted that OEMs "who use the Android trademark and branding" are "manufacturing devices that contain pre-installed apps that . . . can leave users vulnerable to their data being collected, shared and exposed without their knowledge or consent."  *Id.*, Ex. I.  The letter urged Google to provide more scrutiny to pre-installed apps and to "refuse to certify a device on privacy grounds, where manufacturers or vendors have attempted to exploit users in this way."  *Id.*  Other independent third parties have also identified the risk of "unwanted and potentially harmful software preloaded onto new devices."[2]  As noted above, Google has taken steps to address these

---

[2]  Declaration of Dane P. Shikman ("Shikman Decl."), Ex. 1, Clare Stouffer, *Bloatware: What it is + how to spot and remove it*, Norton (Nov. 28, 2022), https://us.norton.com/blog/online-scams/bloatware.

kinds of concerns, for example by implementing policies requiring that devices subject to the MADA scan all preinstalled apps for malware.  Google's efforts to protect users from harmful pre-installed apps and app stores requires continuous investment and innovation to combat threats as they arise.  Epic's proposal would harm users and the Android ecosystem generally by preventing Google from adopting these kinds of reasonable policies to address new threats in this area.  By contrast, the provisions in the State Settlement ensure that legitimate third party stores and apps can obtain pre-installation deals while safeguarding Google's ability to adopt and enforce pro-consumer policies.

**Objection 3:**       **The proposed remedy is overly vague and would require repeated judicial intervention.**

1.       Epic's proposed prohibition on conduct that "disincentivizes" or "incentivize[s]" carriers or OEMs is overly vague and will likely require repeated judicial determinations regarding the effect that particular actions are likely to have on third parties.  Under Epic's proposed formulation, Google would be forced to guess whether any action it takes might "disincentivize" an OEM or carrier from preinstalling other app stores.  Epic's expert says that the proposed injunction would not prohibit Google from entering into agreements with OEMs to preload Play, presumably including agreements that offered financial incentives for OEMs to preload Play.  *See* Bernheim ¶ 42.  But it is unclear how that assurance could be squared with the text of the proposed injunction that prohibits disincentivizing OEMs from pre-installing other app stores, since OEMs may prefer to limit the number of app stores pre-installed on their phones.  Indeed, for the same reason, *any* efforts by Google to persuade OEMs to pre-install the Play store could be construed as disincentivizing OEMs from pre-installing other app stores.  This vague standard would deter Google from entering into such agreements.  This harms OEMs, who would be deprived of the opportunity to receive benefits from Google.  *See* Gentzkow ¶¶ 26-29.  This also harms users, who would end up paying higher prices for Android devices.  *See id.* ¶ 29.  In addition, this vague standard would require the Court to rule repeatedly on how particular actions are likely to affect third parties.

**Objection 4:**        **A permanent injunction is unwarranted.**

1.        Permanently enjoining Google's ability to negotiate for exclusive distribution agreements—especially when Google's competitors face no such restrictions—would unfairly prevent Google and OEMs from responding to newly developed competitive conditions and could potentially result in an overly punitive remedy that does not promote competition in the market.

### B.        Part II.A.2 - Agreements with Actual or Potential Competing Distributors

Epic's proposed injunction would permanently enjoin Google from engaging in any conduct that "requires" or "incentivizes" any "potential or actual" provider of an alternative app store (a "Competing Distributor") to "scale back, refrain from increasing investment into, or abandon its distribution of Android apps or its entry into the distribution of Android apps." Proposed Injunction § II.A.2.

In addition, the proposed injunction would also specifically prohibit Google from offering "any Competing Distributor" (i) "a share of revenues from, or related to, the Google Play Store" or (ii) "any share of revenues, from any source, that is tied to, related to, or conditioned on the development, preinstallation, launch or placement of any Alternative Android App Distribution Channel." Proposed Injunction § II.A.2(i)-(ii).

Finally, Google would be required to include, in any agreement with a Competing Distributor, a statement that nothing in the agreement is "conditional on the Competing Distributor's" activities with respect to an Alternative Android App Distribution Channel. Proposed Injunction § II.A.2(i)-(iii).

**Objection 1:**        **Epic's proposed remedy is unnecessary in light of the provisions in the State Settlement addressing pre-installation agreements.**

1.        As noted above, the State Settlement already includes several remedies addressing preinstallation restrictions.  In the State Settlement, Google has agreed that for a period of five years it will not enter into or enforce agreements "with the purpose or effect of securing preload exclusivity or home screen exclusivity of Google Play on a Mobile Device."  State Settlement § 6.6.1.  Likewise, Google has agreed that, for a period of four years, it will not enter into or enforce agreements "under which an OEM would be prevented from granting installer rights . . . to

1  preloaded applications . . . with or without Google's consent." State Settlement § 6.7.1. These

2  provisions "will enable third-party app stores to enter the market by being preloaded on devices

3  and able to install apps as seamlessly and effectively as the Google Play Store." ECF 953 at 8.

4  Epic's further proposed remedy is unnecessary in light of these provisions.

5       2.    Epic's expert contends that a broad prohibition on conduct that "incentivizes"

6  potential competitors is necessary to "preclude Google from circumventing" other provisions of

7  the proposed injunction "by creating other disincentives for OEMs to launch their own app stores"

8  beyond the conduct presented at trial. Bernheim ¶ 11. But this kind of anticipatory relief is not

9  the purpose of an injunction. As this Court has explained, "[a]nticipatory injunctions are not

10  going to happen . . . . I'm not going to write a menu of hypothetical options that may or may not

11  happen." Tr. 2757:11-15.

12  **Objection 2:**    **The proposed remedy is overly vague and would, as a result, require**

13      **repeated judicial intervention and chill competition to the detriment of OEMs and developers.**

14       1.    Epic's proposal does not provide sufficient detail for Google to understand what

15  conduct will be enjoined. Describing the prohibited conduct in terms of any actions that

16  "incentivize" particular behavior by any "potential or actual" "Competing Distributor" renders the

17  bounds of the prohibited conduct unclear. Epic has argued that OEMs and large app developers

18  could build their own Android app distribution channels. But OEMs and app developers are also

19  customers of Google. When it comes to app distribution, they face a choice of whether to buy

20  Google's services or make their own competing services. *See* Gentzkow ¶ 37. The evidence at

21  trial showed that many developers would prefer not to expand their own business to take on the

22  challenges of direct distribution themselves. *See* ECF 915-1 at 206–207 (Zerza Trial Designations

23  237:17-239:11). There are a variety of reasons for that decision, including the cost and time

24  associated with building an app distribution channel and the strategic priorities of the developer or

25  OEM. Any offer that makes it more attractive to buy Google's distribution services by definition

26  makes the alternative choice to launch competing services comparatively less attractive. *See*

27  Gentzkow ¶¶ 37-38. Therefore, any competitive offer by Google that could "incentivize" any

28  OEM to pre-install the Play store, or "incentivize" a large developer to list its apps in the Play

store, could potentially be construed, simultaneously, as an incentive for that OEM or developer to "abandon…its entry into the distribution of Android apps" by choosing Play instead of creating their own app store. *See* Gentzkow ¶ 39.

2. This possibility renders Epic's proposed injunction hopelessly vague. For example, would Google violate the proposed injunction if a large games developer asked Google for promotional or advertising credit in connection with the launch of a new title on Play, since providing a game developer with an advertising credit could convince that developer to distribute on Play rather than develop its own Android distribution channel? Epic's proposed injunction calls into question Google's ability to offer such incentives even to those developers who, for the reasons discussed above, have no intention of launching their own app store. Similarly, would Google violate this provision if it enters into an agreement with an OEM in which the OEM agrees to preload and distribute Play on the OEM's devices in exchange for some form of compensation? Because some OEMs may prefer to limit the number of stores preloaded on their devices, Epic's proposed injunction could be construed to prohibit an agreement offering an OEM a better deal to preinstall Play, even if the OEM had no intention of developing its own store. The vagueness of Epic's proposed remedy would deter Google from entering into these kinds of agreements, to the detriment of developers and OEMs and ultimately users. And because the line between permissible and prohibited conduct depends on whether and to what extent that conduct "incentivizes" third parties, Epic's proposed remedy would require repeated rulings by the Court on these and similar questions.

3. The carveout in Epic's proposed injunction for "bona fide competition on the merits," *see* Proposed Injunction at 8, does not cure the vagueness of this provision. "Bona fide" competition is not defined, and the examples provided in the injunction are narrowly circumscribed. Specifically, Google is limited to making certain specified improvements to the Play store and communicating about the benefits of the Play store. But the carveout says nothing about other types of improvements to the Play store, nor about providing incentives to OEMs and developers to choose Play.

4. Finally, Epic's proposed injunction prohibits Google offering a share of revenue

-18-

"from" or "related to" the Google Play store.  The term "related to" is broad and unduly vague in this context.  Epic has not identified the circumstances under which revenue would not be "from" the Play store but would be "related to" the Play store.

**Objection 3:**        **The proposed remedy would harm OEMs, consumers, developers, and competition.**

1.        In addition to deterring Google from entering into agreements that would benefit OEMs and developers, the proposed remedy further harms OEMs, consumers, and developers by expressly prohibiting Google from offering certain incentives, including a share of revenues "related" to the Play store.  By limiting Google's ability to offer OEMs value to preinstall Play, this proposed remedy would reduce the value that OEMs can earn from preinstallation and placement on their devices.  *See* Gentzkow ¶¶ 26-29, 39-40.  This would harm not only OEMs but also consumers of Android devices.  *See id.* ¶ 29.  The evidence at trial showed that OEMs have very narrow margins, *see* ECF 915-1 at 264 (Christiansen Designations 43:9-44:5), and a number of Android OEMs have exited the market.  *See* Gentzkow ¶ 29 & n.46.  If OEMs' revenue from placement goes down, then their margins will fall and they will face pressure to increase device prices, which in turn would harm consumers.  *See* Gentzkow ¶ 29.  An injunction that harms downstream consumers is not "an appropriate way to remedy an antitrust violation."  *Microsoft*, 373 F.3d at 1211.  Moreover, if Android devices become more expensive, that would impair Android's ability to compete with iOS, which would enable Apple to raise prices of its devices as well.  *See* Gentzkow ¶¶ 29, 120.

2.        At the same time, Google's competitors will remain free to offer OEMs incentives, including revenue share, to promote their stores.  For example, Epic could offer an OEM an incentive based on sharing revenues from its forthcoming Android app store–or even from its multi-billion dollar *Fortnite* franchise on gaming consoles and desktops–but Google would be prevented from matching such an offer, harming Google's ability to compete.  *See* Gentzkow ¶¶ 39-40.  This proposed remedy would obviously benefit Epic, which would not have to compete with Google in its negotiations with OEMs, but would harm the OEMs themselves, as well as developers, consumers, and Android users.  *See id.*  To take an extreme example, Epic could offer

an OEM a share of its revenue *not* to preinstall the Play store, and the plain language of the proposed injunction could be read to prevent Google from responding to that offer.

3.      Likewise, because Epic has argued that large developers can be "Competing Distributors," the proposed remedy limits Google's ability to offer incentives to large developers, which will harm competition for the business of these developers.  At the same time, Google's competitors would be able to offer incentives to app developers to distribute on their stores.  Here again, this proposed remedy would benefit Epic, which would not have to compete with Google in its offers to developers, but would harm the developers themselves.

**<u>Objection 4</u>:**        **The remedy is overbroad.**

1.      This proposed remedy is overbroad in that it would prevent Google from offering to OEMs under any circumstances a revenue share that is "related" to Google Play.  As discussed above, Google has agreed as part of the State Settlement not to enter into agreements (akin to the RSA 3.0 agreements discussed at trial) under which OEMs would preinstall the Play store exclusively in exchange for a share of Play revenue.  But Epic does not explain why Google should be prevented from entering into revenue sharing agreements with no exclusivity provision—for example, an agreement that an OEM will preinstall the Play store in exchange for a share of Play revenue, while preserving the ability to preinstall other app stores on its phones.  As noted, OEMs have very narrow margins, *see* ECF 915-1 at 264 (Christiansen Designations 43:9-44:5), and a number of Android OEMs have exited the market.  *See* Gentzkow ¶ 29 & n.46. Limiting Google's ability to bid for preinstallation on OEM devices will further pressure OEM margins.  As noted above, if OEMs' revenue from placement goes down, then their margins will fall and they will face pressure to increase device prices, which in turn would harm consumers. *See* Gentzkow ¶ 29.

**<u>Objection 5</u>:**        **A permanent injunction is unwarranted.**

1.      Permanently enjoining Google's ability to offer developers or OEMs revenue shares and other incentives to select Google Play as a non-exclusive or exclusive app store would unfairly prevent Google from responding to newly developed competitive conditions and could result in an overly punitive remedy that does not promote competition in the market.

1

### C.   Part II.A.3 - No Exclusivity

2   Epic's proposed injunction would prohibit Google from entering into agreements or

3   otherwise engaging in conduct that "incentivizes" exclusive distribution of individual Android

4   apps on the Google Play store.  Epic's proposed injunction purports to prohibit both the exclusive

5   distribution of Android apps and Google's ability to offer exclusive content via the Google Play

6   version of an Android app.

7   **Objection 1:**      **Epic's proposed remedy is unnecessary in light of the provisions in the**
                          **State Settlement addressing exclusivity.**

8

9   1.   The State Settlement already prohibits Google from entering into exclusivity

10   agreements with developers on a catalog-wide basis.  *See* State Settlement § 6.5.  This provision

11   allows other app stores to compete with Google for exclusivity rights on an app-by-app basis, but

12   without having to outbid Google for exclusivity rights to a developer's entire catalog.  Moreover,

     the State Settlement allows other app stores to negotiate catalog-wide exclusivity deals with

13   developers even though Google cannot, giving other app stores an advantage in the competition

14   with Google for developer agreements.  Epic's proposed further remedy is unnecessary in light of

15   this provision.

16
     **Objection 2:**      **Epic's proposed remedy is not supported by the trial record.**

17

18   1.   Epic presented no evidence at trial regarding exclusive agreements with developers.

     *See* Bernheim ¶ 46.  Accordingly, there is no basis to prevent Google from entering into

19   exclusivity deals with developers on an app-by-app basis. As Epic acknowledges, the Project Hug

20   agreements did not require any developer to distribute their apps or content exclusively through

21   the Play Store.  Bernheim ¶ 46.  Instead, Epic seeks to enjoin conduct that "go[es] beyond"

22   conduct that the jury examined in order to "prevent Google from adopting alternative strategies" to

23   maintain its market position.  Bernheim ¶ 46.  It is inappropriate for Epic to restrain conduct that

24   the jury never even considered, and without any evidence to support that such a restriction is

25   necessary, *see Microsoft*, 224 F. Supp. 2d at 146, or that it bears any "causal connection" to the

26   violations found at trial, *Optronic Techs.*, 20 F.4th at 486.

27

28

**Objection 3:**       **Epic's proposed injunction is overly vague and would require repeated judicial intervention.**

1.        Epic's proposed prohibition on conduct that "incentivizes" developers to behave in a certain way is impermissibly vague.  Suppose, for example, that Google offers financial incentives to a developer to distribute their app on Play without any request for exclusivity, and the developer then decides to distribute only through the Play store because it meets all of the developer's needs at an attractive price. Would that offer violate this vague injunction by "incentivizing" exclusive distribution through Play?  If so, the proposed injunction risks chilling competitive offers that benefit developers.  *See* Gentzkow ¶¶ 39, 51.  Dr. Bernheim highlights the ambiguity in his report, saying that this provision "does not prevent developers from distributing solely through Google Play Store if they choose, as long as Google does not elicit that exclusivity through financial incentives."  Bernheim ¶ 47.  Dr. Bernheim never explains what he means by "elicit," leaving Google to guess what it can do to attract developers to its store, even if they are free to choose whether to distribute solely through Google Play or through multiple stores.  Distinguishing incentives that result in exclusivity for procompetitive reasons from anticompetitive incentives for exclusivity would be unmanageable and would require the Court to examine agreements between Google and developers regarding specific apps (including app updates and/or app versions) and adjudicate disputes indefinitely.

**Objection 4:**       **Epic's proposed remedy would harm developers and consumers.**

1.        This proposed remedy would harm developers by preventing them from negotiating beneficial terms for exclusive distribution of their apps or exclusive content within their apps.  *See* Gentzkow ¶¶ 51-54.  Under Epic's proposal, competing Android app stores (including Epic) would be permitted to negotiate such exclusive deals, but Google would not be allowed to negotiate *any*.  Accordingly, rival app stores could win exclusivity by offering developers less favorable terms knowing that Google cannot make any competing offer, which would result in less valuable deals for developers.  *See* Gentzkow ¶¶ 46-47; *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain . . . are favorably affected by

the free opportunity to select among alternative offers."); *see*, *e.g.*, ECF 915-1 at 198 (Zerza Designations 213:20-23; 214:4-16) (describing negotiations with Google).  For example, if the Amazon App Store offered a developer an exclusive deal for a new game, the developer would be unable to ask Google for a more lucrative offer, which the developer could accept or counter-propose to the Amazon App Store to increase the value the developer would receive from Amazon.  Restraining Google in this way would reduce the amount that Amazon would have to bid for exclusive distribution, benefitting Amazon, but harming the developer and the competitive process.

2.      Epic's remedy would also prevent Google from working with developers to provide any exclusive *content* through apps distributed in the Play Store, even though competing app stores can enter deals to offer their own exclusive content.  For example, a game developer may want to offer an exclusive character outfit (e.g., "skin") on Play and a different "skin" on the Galaxy Store, as promotional offers to increase engagement with their users.  Epic's remedy would prevent Google from competing for users by working with developers to create such promotional offers in Play, a common retail practice, meaning developers would lose the opportunity to receive the benefits of such promotions from Play.[3]

**Objection 5:**      **A permanent injunction is unwarranted and unnecessary.**

1.      Permanently enjoining Google's ability to negotiate for exclusivity arrangements would unfairly prevent Google and developers from responding to newly developed competitive conditions and could potentially result in an overly punitive remedy that does not promote competition in the market.

D.      **Part II.A.4 - No MFNs or Limits on Differentiated Content**

Epic's proposed injunction would prohibit Google from negotiating any agreements with developers that include sim-ship, content parity, or price parity provisions, or even to offer any incentives that could encourage developers to launch an app on Play at the same time they launch

---

[3] Notably, Google's Project Hug agreements never prevented developers from working with other app stores on this type of exclusive content or offers since the feature parity provision in those agreements was limited to "core game content or quality." *See e.g.*, ECF 886-9, Trial Ex. 153-004.

1    that Android app elsewhere.

2    **Objection 1:**          **Epic's proposed remedy is unnecessary to promote competition in light of the provisions in the State Settlement addressing sim-ship and parity agreements.**

3

4          1.          Google has already agreed to certain restrictions on sim-ship and parity agreements

5    as part of the State Settlement.  Under the State Settlement (Section 6.5), Google is prohibited

6    from entering into catalog-wide sim-ship or parity agreements regarding Android apps, *i.e.*,

7    agreements that require developers to launch all of their apps and features for all of those apps on

8    Google Play at the same time as they are launched on any other Android app store, for at least four

9    years.  Google is permitted to negotiate sim-ship or parity agreements on an app-by-app basis, and

10   further may negotiate catalog-wide agreements after two years, if the alternative app stores at issue

11   are well resourced (*i.e.*, annual revenue over $100 billion).  This means that other app stores could

12   negotiate first release (or exclusive) deals for all of a developer's apps, but Play generally would

13   be limited to negotiating such deals on an app-by-app basis.  Thus, contrary to Epic expert's

14   contention, Bernheim ¶ 31, the State Settlement makes it easier for other Android app stores to

15   partner with developers to launch unique content in Android apps outside of the Play store,

16   because those other app stores will not have to match bids from Google offering developers

17   incentives to launch *all* of their apps, content, or features on the Play store at the same time.

18   However, the State Settlement makes clear that Google can compete for sim-ship or parity

19   provisions for specific apps (or content in those apps), which preserves a developer's ability to

20   benefit from competition between Play and other Android app stores with respect to the

21   developer's individual apps.  In light of this provision in the State Settlement, Epic's proposed

22   further remedy is unnecessary.

23   **Objection 2:**          **Epic's proposed remedy would harm developers.**

24          1.          Epic's proposal that Google be prohibited from entering into *any* agreements with

25   developers that include sim-ship, content parity, or price parity provisions, even on an app-by-app

26   basis, would harm developers.  For example, absent Epic's proposal and consistent with the State

27   Settlement provisions, if a competing app store such as OPPO offered a developer an incentive to

28   launch a core feature or content in a single app exclusively through the OPPO app store, then

-24-

1  Google could respond with a competing offer to entice the developer to launch that core feature or

2  content on the Play store at the same time.  *See* Gentzkow ¶¶ 43, 46.  As a result, to win an

3  exclusive arrangement for that feature or content, OPPO would have to offer the developer even

4  more than it would have otherwise.  This allows rival app stores to pursue "opportunities to

5  engage users through the provision of unique content," while allowing the competitive bidding

6  process to continue, which benefits developers.  *See* Bernheim ¶ 49.  Under Epic's proposal,

7  however, Google would not be able to make a competing offer to developers, meaning (in this

8  example) that OPPO would not have to improve its terms to obtain unique content and the

9  developer would end up worse off.  *See* Gentzkow ¶47.  Accordingly, this proposed remedy would

10  be a handout to well-funded rivals at the expense of developers.  *See Microsoft*, 373 F.3d at 1230

11  ("[T]o have addressed itself narrowly to aiding specific competitors . . . could well have put the

12  remedy in opposition to the purpose of the antitrust laws.") (citing *Brooke Grp. Ltd. v. Brown &*

13  *Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (antitrust laws designed to protect

14  "competition, not competitors")).

15        2.      Similarly, developers would also be harmed if Google is permanently prevented

16  from competing against well-resourced Android app stores for sim-ship or parity deals with

17  developers on a catalog-wide basis.  *See* Gentzkow ¶¶ 48-50.  The State Settlement appropriately

18  permits Google to pursue those deals after two years when the alternative app stores in question

19  are "owned or controlled by a company with annual revenues exceeding $100 billion."  State

20  Settlement § 6.5.2(b).  Epic's expert claims, without any evidence or support, that such an

21  exemption is "ill-conceived," because "vulnerability to network externalities is not primarily a

22  function of a rival's resources."  Bernheim ¶ 31.  There is no evidence to support this assertion,

23  and it makes no sense.  An Android app store run by a company with more than $100 billion in

24  revenues (such as Microsoft) will be able to devote greater resources to combating network effects

25  by offering developers substantial money or other benefits to list their apps or exclusive content in

26  its store.  *See* Gentzkow ¶ 50.  As Epic's expert testified at trial, this is an important "way that

27  companies often successfully break into markets."  Tr. 2400:20–2401:15 (Bernheim).  And in any

28  case, developers will be harmed if Google is prohibited from competing with well-resourced

Android app stores to offer catalog-wide deals because those rival app stores will bid less if they do not have to bid against offers from Google Play.  *See* Gentzkow ¶ 47.

**Objection 3:**        **A permanent injunction is unwarranted and unnecessary.**

1.        Google further objects to this proposed remedy on the ground that a permanent injunction is unwarranted in light of the "substantial uncertainty" about the future of a rapidly evolving mobile app industry.  *New York v. Microsoft*, 224 F. Supp. 2d 76, 183 (D.D.C. 2002).  The announcements by Microsoft and Epic regarding their intentions to launch Android games stores are just some examples of the dynamic nature of the industry.  *See* Gentzkow ¶ 19.  Permanently enjoining Google's ability to negotiate for parity or timing arrangements would unfairly prevent Google from responding to newly developed competitive conditions and could potentially result in an overly punitive remedy that does not promote competition in the market, including the development of well-resourced app stores after two years.  The State Settlement appropriately recognizes the dynamic nature of the industry, as the restrictions on parity provisions are limited to a time period of at least four years.

**E.**        **Part II.A.5 - No Restrictions on Removal of Developer Apps from the Google Play Store**

Epic's proposed injunction would prohibit Google from requiring "Google's consent" to withdraw an app from the Play store.

**Objection:**        **Epic's proposed remedy would harm developers.**

1.        This proposed remedy would harm developers by preventing Google from entering into any agreement that provides an incentive for a developer to distribute their apps in the Play store, even in the absence of an exclusivity provision.  The evidence at trial established that, as a general matter, the Developer Distribution Agreement allows developers to remove their apps from the Play store at their own discretion and without Google's consent.  *See* ECF 888-84, Trial Ex. 10883-002 § 8.1 ("You may remove Your Products from future distribution via Google Play at any time.").  The only effect of this proposed remedy would be to prevent Google from entering into *any* agreements that provide incentives to developers to distribute their apps in the Play store, including non-exclusive agreements and agreements with no parity provisions.  For example, a

1   simple agreement providing incentives to Developer A to list its app in the Play store–with no

2   exclusivity and no parity requirements–must include a provision that prohibits Developer A from

3   removing their app from the Play store during the pendency of the agreement.  Otherwise, Google

4   would have no way to ensure that it obtained the benefit of the bargain.  *See, e.g.*, Tr. 469:8-12

5   (Koh).  Epic fails to acknowledge that the only evidence at trial regarding the removal of apps

6   from Play confirms that such provisions were limited to developers who were otherwise receiving

7   benefits and incentives from Google in exchange for distributing their app on Play, and was not a

8   blanket restriction.  Bernheim ¶ 50.  On this record, Epic cannot show that it faces a significant

9   threat of irreparable injury as required to have standing to seek injunctive relief, nor could it as

10  Epic's apps are not even available in the Play store today.

       2.      Epic presented no evidence at trial that a non-exclusive incentive without any

12  parity term would harm competition.  Yet this proposed remedy would effectively foreclose

13  Google from entering into such agreements, and therefore would deprive developers of the

14  opportunity to receive any incentives from Google in exchange for listing their apps in the Play

15  store.  This will, in turn, reduce the value that developers are able to receive from agreements to

16  distribute their apps on Android.  *See* Gentzkow ¶¶ 48-50.

### F.      **Part II.B.1 & B.2 - Parity of Install Flow Regardless of Source**

18        Epic's proposal regarding the "install flow" is complex and difficult to understand, so

19  Google's description below reflects its best understanding of the proposal.

20        Under paragraph II.B.I, Google would be permanently enjoined from conduct that

21  "prohibits or disincentivizes" a user from installing, downloading or "granting [] permissions" of

22  an app through any alternative distribution channel, including sideloading (*i.e.*, direct downloading

23  of apps from the internet).  To implement that general standard, Google must comply with the

24  following:

25        *First*, for Third-Party App Stores, including stores downloaded from the internet, Google

26  cannot require any "friction"—such as prompts, warnings, and reminders—beyond the "friction"

27  associated with the Google Play store.

28        *Second*, for other methods of app distribution (*e.g.* direct downloading from a web

browser, an email app, or a peer-to-peer file sharing app), Google cannot require any "friction" other than "a single one-tap screen asking in neutral language that the user confirm intent to proceed with app installation."

*Third*, on any given device, Google must impose the same "friction" to downloads from the Google Play store as the "friction" that applies to any downloads from other sources—*even if the friction that applies to other sources was imposed by an OEM or Carrier and not Google.* So, for example, if an OEM or cell carrier sought to warn users about downloading apps from the internet, Google might be required to provide that same warning in the Google Play store.

Notwithstanding the above requirements, Epic has proposed two exceptions in paragraph II.B.2: (1) Google may include a single one-tap screen asking the user to allow a web browser or third-party app store to install other apps upon the first installation attempt and (2) Google may also include additional "friction" in the case of apps or stores that are "known malware" or that fail to submit themselves to a "generally available, distribution-channel-agnostic notarization-like process." Google does not have such a process today, and Epic does not identify any existing "generally available, distribution-channel-agnostic notarization-like process," so Google's best understanding of this provision is that, in order to provide any sideloading warnings, Google would have to create and administer this "notarization-like process" itself. Proposed Injunction § II.B.2.

Taken together—and as best as Google can understand them—these provisions would have the following cumulative effect: Apps that are installed from any website (regardless of the website) or from any app that purports to be an "app store" must receive the same installation experience as on the Google Play store, except that (1) Google may stop the installation of known malware (but not suspected malware), (2) Google may create a "notarization-like" process and then warn the user about apps that fail to go through that process, and (3) Google may ask the user for consent one time before permitting an app to begin installing other apps. Google would not be permitted to take any other action that would "disincentivize" a user from sideloading apps, regardless of the security risks. For example, Google would not be able to warn users about the risks of sideloading.

**Objection 1:** **Epic's proposed remedy would severely harm Android users by making them less secure and is unnecessary in light of the provisions of the State Settlement.**

1. Epic's proposed remedy is a significant threat to the basic security of Android and its users because it would severely curtail Google's ability to protect users from malicious apps. *See* Declaration of David Kleidermacher in Support of Google's Objections to Proposed Injunction ("Kleidermacher Declaration") ¶¶ 2-25. The evidence introduced at trial was undisputed that malware is both pervasive and highly damaging to users.  Malware can come from many sources: well known developers, organized criminal gangs, state sponsored attackers, and teenagers just trying to make a point.  Tr. 1754:4-16 (Kleidermacher).  Both Google's expert, Prof. Qian, and David Kleidermacher, the head of Android security, testified regarding the risks of malware and why it is reasonable to warn users about the risks of sideloading.  Tr. 1770:1-18 (Kleidermacher); Tr. 2225:18–2226:24, Tr. 2227:9–2228:2 (Qian).  For example, Mr. Kleidermacher testified about the FluBot virus, which spread to hundreds of millions of devices through sideloading and then attempted to use sensitive permissions to steal the user's financial information and then "completely wipe [the user] out."  Tr. 1755:5–1756:23 (Kleidermacher).  Android's sideloading warnings reduced the harm from this malicious campaign.  *Id.*  Epic's own expert, Dr. Mickens, acknowledged that "sideloading can result in malware infections," that "[a]ll apps on Google Play are reviewed for malware," and that, by contrast, "a sideloaded app may or may not have been reviewed for malware."  Tr. 2186:7-18 (Mickens).  He also admitted that Google's existing sideloading screens should *not* be removed but only "compressed." Tr. 2147:4-7 (Mickens).  Under Epic's proposal, however, Google would not be able to take common-sense actions such as: (1) warning users about the risks of enabling sideloading, (2) warning a user about an app installation if the app is not yet *known* to be malware (itself often a subjective standard) but still raises many red flags, (3) warning a user who is about to install an app about vulnerabilities in the app (e.g. the use of out-of-date software) that could expose the user to harm, and (4) blocking sideloaded apps from accessing certain high risk functionality on Android devices that could put users at risk.  Limiting Google's ability to take these actions would be an extremely poor outcome for users and for the entire Android platform and would impair, rather than promote, competition

-29-

between Android phones and iPhones by making Android less secure.  *See* Kleidermacher Declaration ¶¶ 9, 11.

2.      For example, under Epic's proposal, Google can provide warnings only for "known" malware (unless Google adopts an as-yet non-existent notarization process that is addressed in objections below).  This is a very significant limitation that would degrade user security and privacy.  *See* Kleidermacher Declaration ¶¶ 3-4, 8-9.  When a user attempts to sideload an app, Google will often not "know" that the app is malware.  *Id.*  Instead, Google provides a general warning regarding sideloading when the user enables sideloading, and it may provide additional warnings if it identifies additional risk signals for an app, *see id.*  Epic's proposal will prevent Google from providing commonsense warnings in these scenarios.

3.      Government agencies and industry participants in the United States and internationally have recognized that sideloading creates an elevated risk of malware attacks.  *See* Kleidermacher Declaration ¶¶ 5-6, Ex. A.  Epic's proposal would limit Google's ability to address existing risks flowing from sideloading as well as any new risks that may arise in the future.  *See id.* ¶¶ 8-9.

4.      In the United States, the federal Cybersecurity and  Infrastructure Security Agency warns users: "Reduce the risk of downloading PHAs by limiting your download sources to official app stores, such as your device's manufacturer or operating system app store? . . .  Do not download from unknown sources."[4] Tr. 2183:17–2185:17 (Mickens) (discussing guidance).

5.      Likewise, the California Attorney General's office tells users to avoid sideloading to protect themselves from malware:  "To avoid spyware in the first place, download software only from sites you know and trust.  Make sure apps you install on a mobile device come from the Apple App Store for iPhones or Google Play for Android devices."[5]

6.      Europol's European Cybercrime Center has similarly warned users to "[s]hop at

---

[4] Shikman Decl., Ex. 2, Cybersecurity & Infrastructure Sec. Agency, CISA, Privacy and Mobile Device Apps (Dec. 18, 2022), https://www.cisa.gov/news-events/news/privacy-and-mobile-device-apps.

[5] Shikman Decl., Ex. 3, Off. of Atty. Gen., Cal. Dep't of Justice, Protect Your Computer from Viruses, Hackers, and Spies, https://oag.ca.gov/privacy/facts/online-privacy/protect-your-computer.

reputable app stores" and to be "cautious of links . . . that might trick you into installing apps from third party or unknown sources." Kleidermacher Decl., Ex. A at 1.

7.      In addition, Samsung has warned users that "sideloaded apps from outside sources can be a little like the Wild West—unregulated and potentially hazardous. The reason? They may carry hidden malware designed to compromise your device or even your personal information." *Id.*, Ex. B at 2.

8.      Former national security officials have recognized the risk of sideloading and the risk that malware attacks can post to national security.  *See* Brief of Amici Curiae Former National Security Officials and Scholars at 6-7, 11-12, *Epic Games, Inc. v. Apple, Inc.*, No. 21-16506 (9th Cir. Mar. 31, 2022), ECF 101.

9.      Similarly, outside the United States, some government agencies have asked Google to take additional measures to protect users from the risks of sideloading by blocking sideloading or making it more difficult. *See* Kleidermacher Decl. ¶¶ 15-20. Epic's proposal would jeopardize Google's ability to work with these agencies to protect users. Not only will users in those countries remain at higher risk of abuse, foreign governments' interest in protecting their consumers will be frustrated. *See also* Section VI (Geographic Scope).

10.      In Singapore, for example, Google has collaborated with the government's Cyber Security Agency (CSA) to test and deploy new technology designed to reduce financial fraud from malicious apps by blocking the installation of apps with a high risk of engaging in financial fraud. *See* Kleidermacher Decl. ¶¶ 15-18, Ex. F. This pilot was initiated after the Singaporean CSA contacted Google to express concern about scammers "tricking victims into sideloading mobile apps containing malware" and to propose that Google explore the possibility of "disallow[ing] sideloading or mak[ing] sideloading more difficult." *See id.*, Ex. F,  ¶¶ 17-18.

11.      Other governments have requested that Google consider similar initiatives to make sideloading more difficult in an effort to deter fraud. Thailand's Minister of Digital Economy and Society recently contacted Google to express support for expanding the Singapore pilot in Thailand because "many Thai people have fallen victim to these [financial] scams [and] at least over five hundred million US dollars have been lost." *See id.*, ¶¶ 19-20, Ex. G.

-31-

12.     In Brazil, the Brazilian Federation of Banks has similarly requested that Google "restrict sideloading entirely or make it significantly more difficult" because of "a worrying trend of financial scams utilizing malicious mobile apps" where scammers "trick users into sideloading apps containing malware." *See id.* ¶¶ 21-22, Ex. H.

13.     Users in the United States and around the world will also be put at even greater risks as malware evolves and becomes more sophisticated.  There is "substantial uncertainty" about how malware will behave even a year from now—let alone indefinitely–and it is difficult to predict what effect Epic's proposed injunction will have "a decade from now." *New York v. Microsoft*, 224 F. Supp. 2d 76, 183-84 (D.D.C. 2002) (expressing doubt about long-term injunctive relief in light of "constant and rapid change" in technology). The Court should not tie Google's hands in protecting users by narrowly constraining the types of actions that Google can take to prevent and warn users about malware, and it certainly should not do so for an indefinite duration.

14.     Finally, Epic's proposal is unnecessary in light of the provisions of the State Settlement.  As noted above, Epic's expert, who was also retained by the States, testified at trial that Google should not eliminate Android's sideloading warnings; rather it should "compress[]" them.  Tr. 2147:1-8 (Mickens).  That is exactly what Google has agreed to do in the State Settlement.  Under the State Settlement, a user will be able to enable app installation from a new source on a single screen.  State Settlement § 6.10.1.  That screen will have language that notifies the user, in a neutral way, about the potential risk of sideloading.  State Settlement § 6.10.1. The States have agreed that Google can use the following language, or its equivalent.  "Your phone currently isn't configured to install apps from this source.  Granting this source permission to install apps could place your phone and data at risk." *Id.* § 6.10.1(c). The user will not be required to visit the device's settings to enable sideloading.  *See id.* § 6.10.1(a).  The State Settlement draws an appropriate balance between addressing the risks of sideloading and addressing complaints that sideloading warnings are too burdensome or scary for users to navigate.  In light of these provisions, Epic's proposed further remedy is unnecessary to promote competition.

**Objection 2:**       **The proposed remedy is inconsistent with the trial record and goes beyond the jury verdict.**

1.       At trial, the evidence showed that Android's warnings for sideloading are not difficult-to-navigate 'scare' screens but, instead, are prudent warnings that ensure that users are apprised of the risk of sideloading and can make an informed decision.  *See* ECF Nos. 888-053, 888-054, 888-055, Trial Ex. 9051, 9052, 9053 (videos of actual sideloading process); Tr. 1770:1-18 (Kleidermacher) (describing importance of sideloading warnings from a security perspective); Tr. 2225:18-2226:24, 2227:9-2228:2 (Qian) (same); Tr. 2233:11-2234:7 (Qian) (explaining that more than half of Android devices had enabled sideloading at least once).  Epic's own expert, Prof. James Mickens, acknowledged that "sideloading can result in malware infections," that "[a]ll apps on Google Play are reviewed for malware," and that, by contrast, "a sideloaded app may or may not have been reviewed by malware."  Tr. 2186:7-18 (Mickens).  In response to the Court's questions, Prof. Mickens would not agree that Android's sideloading steps should be "skipped"; he testified that they should be "compressed."  Tr. 2147:1-8 (Mickens).  Nor did Prof. Mickens testify that there is any consensus in the security community that sideloading is safe for users; instead he acknowledged that, in the security community, "there are a variety of opinions on sideloading."  Tr. 2183:6-16 (Mickens).  Indeed, as Prof. Mickens acknowledged at trial, a federal cybersecurity agency warns users against sideloading.  Tr. 2183:17–2185:17 (Mickens).  At the end of trial, no question was submitted to the jury regarding the propriety of Google's sideloading warnings, and there is no finding from the jury that Android's sideloading warnings are anticompetitive, unduly burdensome, or unreasonable.  In light of this record, Epic has no basis to ask the Court to micromanage Android's security warnings.

2.       Separately, the evidence at trial showed that, apart from the sideloading warnings shown by the Android Operating System, some web browsers, including Microsoft's Edge browser and Google's Chrome browser, provide a warning when a user attempts to download an app from the internet.  Tr. 1767:7-22 (Kleidermacher). To the extent Epic's injunction is read to prohibit browser warnings, the trial record does not support such an injunction.  Epic did not present any evidence that this warning is anticompetitive or unreasonable and the jury did not

make any such finding.  To the contrary, in his deposition, Epic's security expert, Prof. Mickens, agreed that browser warnings are reasonable.  Shikman Decl., Ex. 4 (Mickens Dep. 162:6–163:16).  Nor did Prof. Mickens' proposals suggest eliminating browser warnings.  *Id.*, Ex. 4 (Mickens Dep. 166:5-22).  Based on this record, Epic has no basis to ask the Court to enter an injunction that covers any web browser's security warnings, including Google Chrome's warnings.

**Objection 3:**        **Epic's proposal would harm competition between iOS Devices and Android Devices.**

1.        At trial, there was no dispute that Android and Apple's iOS compete for users, at least at the device level.  Tr. 2423:23-25 (Bernheim) ("I'm not saying that Apple and Android don't compete."); Tr. 2424:11-13 (Bernheim) (Apple "is competing to satisfy consumers in transactions that involve buying smartphones.").  It also was undisputed at trial that Android competes with Apple's iOS on security and privacy features.  Tr. 1746:13-19 (Kleidermacher).  Apple prohibits sideloading,[6] and Apple uses the availability of sideloading on Android devices as a way to attack Android in the marketplace.  Tr. 2206:11-13 (Mickens); Tr. 1747:6-13 (Kleidermacher); Tr. 1748:6-21 (Kleidermacher). As Epic's expert acknowledged, "media outlets sometimes portray iOS as more advanced than other operating systems," and this belief "is nurtured by Apple's aggressive marketing narrative on security."  Tr. 2205:9-18 (Mickens).  Apple's marketing narrative can influence consumer purchasing decisions.  Tr.t 2205:16-18.  Indeed, the difference between Android and Apple with respect to sideloading has hurt Android's perception in the marketplace.  Tr. 1750:15-1752:2 (Kleidermacher); ECF 887-66, Trial Ex. 5945.  Restricting Google's ability to protect users from sideloading and warn users of the risk of sideloading would harm Android's ability to compete with iOS by degrading Android security and by allowing Apple to further attack Google.

---

[6] Apple has since permitted limited sideloading in Europe to comply with the provisions of a new European law.

-34-

1

**Objection 4:**        **Epic's proposed "notarization-like" process was previously rejected by the Ninth Circuit and should be rejected again here for the same reasons.**

2

3        1.        In *Epic Games, Inc. v. Apple, Inc.*, the Ninth Circuit rejected Epic's notarization

4  proposal because Epic "simply failed to develop how such a model would allow Apple to be

5  compensated for developers' use of its IP. . . . Epic [stated] that 'Apple can charge,' but it offered

6  no concrete guidance on how to do so." 67 F.4th at 992.  As a result, the Court rejected Epic's

7  notarization proposal and its requested injunction. *Id.* ("Nor can we even 'explain' [Epic's

8  proposal], let alone direct the district court to craft an injunction that it could 'adequately and

9  reasonably supervise.'").

10        2.        The same issue exists here.  Google's app review process includes its proprietary

11  intellectual property.  Over 400 Google employees work on Android security, in addition to

12  thousands of other employees who conduct app reviews.  Tr. 1757:4-16 (Kleidermacher). Google

13  has spent many years building its malware scanning technology and considers it to be a

14  competitive advantage of the Play store.  Tr. 1758:23–1759:8 (Kleidermacher).  Epic's proposal

15  would effectively require Google to provide developers with access to this intellectual property,

16  regardless of whether the developer elected to use the Google Play store.

17        3.        Epic's expert testified at trial that Google can "charge" for this notarization

18  process, but it did not provide any details regarding how much Google could charge and how it

19  could structure any fee. Tr. 2174:21-24 (Mickens).

**Objection 5:**        **Epic's proposed "notarization-like process" is not adequately described, would require the Court to micromanage Android security, and would impose significant burdens and costs on Google without creating a benefit to competition.**

20

21

22        1.        As noted above, under Epic's injunction, Android could provide warnings to users

23  regarding the risks of sideloading only if Google adopts a "notarization-like" process for Android.

24  But Epic has not described this "notarization-like" process in its injunction: What would this

25  process entail? Would Google provide the process? Would Google certify others to conduct this

26  process? Could Google charge for this process? How much could Google charge? What standards

27  should Google apply in reviewing apps or developers under this process?  If a developer disagrees

28  with Google's standard is there a challenge procedure? Who would resolve that challenge? If

-35-

Google rejects a developer's app, would the developer have an appeal right? Who would resolve that appeal? Who would pay for that appeal? How long would Google have to review an app under this process?  How many employees would Google be required to retain to conduct this process?  If an app passes this notarization process and is later determined to be malware, what would happen? Would Google have to create different notarization standards for each geographic jurisdiction? Could some jurisdictions require Google to block certain apps? Could Google provide notarization services to apps in countries subject to U.S. sanctions? Could Google refuse to provide notarization services to apps with objectionable content?  Would Google's reviewers be forced to view the content in such apps?   Requiring Google to adopt such a notarization process would effectively require the Court to micromanage Android security and an entire app review apparatus.

2.        To the extent that Epic intends for Google to adopt one of the "notarization" proposals Epic presented at trial, those proposals also did not address the vast majority of the questions listed above.  But it is clear from the few details that Epic did provide that its proposals would impose a massive burden on Google, likely over $100 million in ongoing operational costs per year.  *See* Kleidermacher Decl. ¶ 23.  As Epic's security expert Dr. Mickens admitted at trial, in a "centralized notarization" system Google "would bear the entire burden in terms of performing the reviews" of apps on Android.  Tr. 2166:15-19 (Mickens). Google would be the only entity that can approve apps, and Google would set all the standards for the review.  Tr. 2169:4-16 (Mickens). Even if notarization were "decentralized" and third parties could review apps rather than Google, Dr. Mickens admitted that "Google would serve as a certification authority [to] determin[e] which companies meet Google's security bar" and that Google would have to review and audit the third parties.  Tr. 2179:6-10 (Mickens); *see also* Tr. 2180:4-8 (Mickens). And Google—and its customers—would bear the risks of Android being the first consumer operating system to ever implement decentralized notarization for app review.  *See* Tr. 2181:15-18 (Mickens).  If the notarization process fails to catch a malicious app or if an app cleared by Google later turns malicious, Google would face the reputational and brand risk, even though the app was not distributed by Google and was not available on the Google Play store.

3.      It is also not clear that a notarization system–either centralized or decentralized–would be successful at achieving levels of security and privacy on par with the Play store because no other modern operating system has demonstrated that such a system could achieve high levels of security and privacy. *See* Kleidermacher Decl. ¶¶ 23-25. Nor does Epic's proposed injunction explain how to address new security and privacy risks that would be introduced by notarization, such as signing key theft. *See* Tr. 2249:9–2250:24 (Qian).

4.      Epic's proposal would also not provide any meaningful benefits to competition. To the contrary, Epic's proposal would give Google more authority over app distribution on Android devices, which is directly contrary to Epic's alleged goals in this lawsuit. Under Epic's proposal, Google would be permitted to block any app that chooses not to submit itself to the "notarization" process. As a result, all apps on Android would have to go through a Google-controlled process. As Prof. Mickens, Epic's expert, admitted at trial, under a "notarization" approach, a game developer like Epic would need to seek Google's approval to obtain a notarization token, even if that developer sought to launch on a different app store, like the Samsung Galaxy store. Tr. 2170:9–2171:20 (Mickens). Google would effectively have the authority to approve or block each and every app available on Android devices, regardless of the method of distribution selected by the developer.

**<u>Objection 6</u>:        The "notarization-like process" will impose an improper duty to deal and allow rival app stores to free-ride off Google's intellectual property.**

1.      Epic's proposed notarization system constitutes an improper duty to deal. Epic proposes that any notarization system must be "generally available, distribution-channel-agnostic," meaning that Google would have a duty to deal with developers regardless of their choice of distribution channel. For example, under Epic's proposal Google would need to provide its review services to apps that elect to list on the Epic Games Store, rather than the Google Play store. Google's competitors, like the Epic Games Store, would be free to benefit from the work of over 400 Google employees who work on Android security—and the many more Google would need to hire to implement Epic's proposal—and years of investment in developing Google's intellectual property in the form of malware scanning technology that gives the Play store a

competitive edge in offering a safe experience for users. *See* Tr. 1757:4–16, 1758:23–1759:8 (Kleidermacher).

**Objection 7:**      **The proposed remedy is unreasonably burdensome to the extent that it requires Google to modify past versions of Android.**

1.      Epic's proposed injunction is vague as to which versions of Android it would apply and, specifically, whether Google would be obligated to modify the Android operating system already installed on billions of existing Android devices. To the extent that Epic intends for the injunction to apply to past versions of Android that have already been released and already installed on users' device, the injunction is unreasonably burdensome. Implementing Epic's proposed modifications to Android's sideloading process would require numerous changes to the Android operating system.  Kleidermacher Decl. ¶¶ 33-41.  Developing, testing, and releasing a new version of Android takes a year or more to complete and requires the participation of OEMs, mobile network carriers, and regulatory bodies. *Id.* ¶¶ 37-38.  Once a final version of Android has been publicly released in open source form, Google does not typically update old versions of Android other than to release critical security patches. *Id.* ¶ 41.  Changing the functionality of old versions of Android can cause apps to unexpectedly malfunction if developers did not build their apps to anticipate the new changes. *Id.*.

2.      Moreover, Google does not have any mechanism to force updates to old versions of Andro *Id.*.  OEMs–not Google–are responsible for deciding whether and how to adapt new versions of Android to the OEM's existing devices and to release any such versions to their users' devices. *Id.*.  Epic has not demonstrated that the burden of modifying Android is justified by any improvement to competition.

**Objection 8:**      **The proposed remedy is impermissibly vague in several additional respects.**

1.      Epic's proposed injunction would again improperly enjoin "disincentiviz[ing]" certain conduct by third-parties. Google would be forced to guess whether any particular conduct will be deemed to "disincentivize" a decision by another party. Epic's remedy is therefore impermissibly vague.

2.      Epic's remedy also forbids Google from engaging in "any conduct that prohibits . .

-38-

1   . the . . . granting of permissions . . . of any Android app through any Alternative Android App

2   Distribution Channel."  Google does not understand what this means.

3       3.      Epic's remedy permits Google to impose additional "friction" only where an app or

4   store is (a) known malware or (b) where the developer "declined to subject their apps/stores to a

5   generally available, distribution-channel-agnostic notarization-like process."  As noted, the

6   injunction does not provide any details as to what would count as a "generally available,

7   distribution-channel-agnostic notarization-like process."

8       4.      Epic's remedy does not identify any "neutral" language that would be acceptable to

9   Epic for the limited consent screens proposed in the injunction.

10  **Objection 9:**        **The proposed remedy would harm users and OEMs by preventing OEMs from competing on security.**

11

12      1.      Android OEMs can customize Android's default sideloading screens to add

13  additional security features to protect their users.  Some OEMs have done so.  For example,

    Xiaomi, one of the largest Android OEMs, has included an additional sideloading warning screen.

14  *See* Kleidermacher Decl. ¶¶ 11-12, Ex. C.  Similarly, Samsung has released an Auto Blocker

15  feature.  *See id.* ¶¶ 13-14. According to Samsung, "when enabled, Auto Blocker protects your

16  Galaxy device and data by preventing the installation of applications from unauthorized

17  sources[.]"  *Id.*, Ex. D.

18

19      2.      To the extent Epic's proposed remedy is read to limit Google's ability to approve

20  Android devices that contain customized features relating to sideloading, the remedy would harm

    user security and impair competition among Android OEMs.

21

22  **Objection 10:**       **The proposed remedy could be interpreted to unreasonably require Google Play to implement sideloading warning screens that are independently adopted by OEMs and carriers.**

23

24      1.      Android OEMs and mobile carriers can customize Android to include additional

25  security features not present in the open source Android software or Google Mobile Services. *See*

    *id.* ¶ 11. For example, a mobile network carrier who is concerned about risks to their network if

26  users install malware may independently choose to warn users about sideloading apps from the

27  internet at large or from a particular source with a high risk of malware.  Similarly, an OEM may

28

choose to restrict sideloading or provide additional warnings.  For example, Xiaomi, one of the largest Android OEMs, has included an additional sideloading warning screen. *See id.* ¶¶ 11-12. Similarly, Samsung has released an Auto Blocker feature that blocks sideloading by default after the user has enabled the feature.  *See id.* ¶¶ 13-14.

2. While Epic's proposed injunction is unclear, it states that Google "shall be required to display [warnings] or other "friction" steps in connection with the installation of an app from the Google Play Store that are commensurate with those that are imposed (whether by Google, an OEM or a Carrier)" in connection with a non-Play install.  To the extent this provision would require the Play store to implement sideloading warning screens that OEMs have adopted for their own devices, the injunction would serve only to penalize the Play store without improving security. OEMs were not defendants in this case; and Epic did not introduce any evidence regarding OEM-adopted warning screens.  Nor did Epic introduce any evidence at trial to establish that the Play store presents more risk than other app distribution channels.  Requiring that the Play store implement installation "friction" that is "commensurate" to the friction imposed on the riskiest and most dangerous sources does nothing to restore competition and in fact harms competition by imposing burdens on lawful conduct by Play that would not be borne by Play's competitors.

3. In addition, to the extent Google would be required to impose the same "friction" on the Play store as independently adopted by any OEM for other methods of installation, Epic does not explain how Google could satisfy that obligation.  For example, as discussed above, Samsung has released an Auto Blocker feature that blocks sideloading by default after the user has enabled the feature.  How could Google apply that same "friction" to the Google Play store? Would Google be expected to block all installations from the Play store?  Similarly, as discussed above, Xiaomi devices include an additional sideloading warning screen.  How would Google be able to invoke that screen for installations from Google Play?  And because that screen refers to sideloading, would users understand the screen if it was shown in the context of the Google Play store?  Epic does not say.  The Court would therefore be required to referee endless disputes regarding whether and how warning screens adopted by an OEM could or should apply to the

-40-

1   Google Play store.

2   **G.      Part II.C.1 - Parity of Access to Android Functionality Regardless of Source**

3      Epic's proposed injunction would permanently enjoin Google from engaging in conduct

4   "that denies or impedes any Alternative Android App Distribution Channel, or any Android app

5   that was downloaded through any Alternative Android App Distribution Channel, from having

6   equivalent access to Android functionality and/or APIs and features" that any app downloaded

7   from the Play store can access.  Proposed Injunction § II.C.1.  The proposed injunction further

8   provides that "Google shall grant equal access to Android operating system and platform features .

9   . . without discriminating based on . . . distribution channel" and that "Google may not claim that

10  features which are traditionally part of an operating system or platform are instead part of the

11  Google Play Store."  Proposed Injunction § II.C.1(i).

12  **Objection 1:       Epic's proposed remedy is not supported by the trial record.**

13     1.      At trial, Epic did not present any evidence regarding any harm to competition

14  caused by Google's policies or practices regarding access to Application Programming Interfaces

15  ("APIs") or access to Android functionality.  Nor did Epic present any evidence on the extent to

16  which apps distributed outside of the Play store have any differential access at all to APIs.  At the

17  end of trial, the jury was not asked to find and did not find that any conduct related to this

18  proposed remedy was anticompetitive.  And because Epic failed to raise any competition concerns

19  regarding these issues, including API access, Google did not have the opportunity to identify

20  procompetitive reasons or business justifications regarding any API access or feature access

21  requirements.  Under these circumstances, there is no basis to impose Epic's proposed remedy.

22  **Objection 2:       The proposed remedy is impermissibly vague and would require constant
                       judicial supervision.**

23

24     1.      The crux of Epic's proposed remedy is that Google must provide parity of access to

25  "Android functionality and/or APIs" and "features which are traditionally part of an operating

    system."  Google would have to provide non-Play developers access to these features,
26
    functionality, and APIs on the same terms as it provides access to Play developers.  But Epic's
27
    injunction provides no clear way to identify (a) which features or APIs should be considered
28

1  "traditionally part of an operating system" or part of "Android" and (b) which features or APIs

2  constitute other Google intellectual property that is *not* part of the operating system.  For example,

3  is an email app a "traditional" operating system feature?  A web browser?  A software package

4  that provides apps with enhanced geographical location information?  An AI software package for

5  image processing?  Google would also be left to guess whether existing and new innovations will

6  fall under the terms of the injunction.  The injunction is therefore impermissibly vague.  *See*

7  *Fortyune*, 364 F.3d 1086–87.

8          2.      In particular, there are thousands of proprietary Google APIs that are part of the

9  Google Play Services suite, across dozens of unique services.  *See* Declaration of Kurt Williams in

10  Support of Google's Objections to Proposed Injunction ("Williams Decl.") ¶¶ 2-4.  For example,

11  the Google Play Games Services API allows developers to "enhance games with social

12  leaderboards, achievements, game state, [and] sign-in with Google."  *Id.* ¶ 9. And the Fused

13  Location Provider API uses GPS and WiFi signals to provide enhanced location information to

14  apps.  *See id.* ¶ 5.  Google has intentionally designed Android to avoid dependencies on these and

15  other proprietary APIs in order to provide flexibility to device makers in choosing whether or not

16  to integrate with Google services. Determining whether a particular API should be subject to a

17  parity-of-access rule will lead to endless case-by-case disputes, placing the Court into the role of

18  "central planner[]"—"a role for which [it is] ill suited."  *Trinko*, 540 U.S. at 408.

19  **Objection 3:**      **Epic has not adequately developed how Google would be compensated for**
                         **developers' access to its intellectual property.**

20

21          1.      Epic demands that Google provide "equivalent access" to its proprietary software

22  and technology for developers who do not use the Google Play store as compared to the access

23  provided for developers who do.  Developers that use the Google Play store are subject to the Play

24  store's policies, including, where applicable, Google's service fees, which compensate Google for

25  its intellectual property such as the APIs.  Tr. 3137:24–3138:23, 3145:7-10 (Loew).  Developers

26  who do not use the Google Play store do not pay Google anything. Epic has "failed to develop

27  how [Google] could be compensated in such a model for third-party developers' use of its IP."

28  *Apple II*, 67 F.4th at 992 (rejecting proposed injunction where Epic failed to develop evidence

regarding how Apple would be compensated for use of its IP).

**Objection 4:**        **The proposed remedy will impermissibly require Google to provide access to its products and intellectual property to non-customers, thereby chilling Google's incentives to innovate and make those innovations available to developers.**

1.        Under Epic's proposed injunction, Google could be forced to allow non-customers—developers that do not use the Play store—to access valuable Google technology, including the APIs in Google Play Services, in perpetuity.  *See* Williams Decl. ¶¶ 3-8.  Google has invested millions of dollars per year to build and maintain the Google Play Services APIs.  *See id.* ¶ 4.  Google should not be prohibited from determining to whom it will provide these costly and valuable services, nor should the Court set the terms and prices that Google may charge.  *See linkLine*, 555 U.S. at 448 ("businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing").

2.        If Google were forced to provide access to its valuable intellectual property, including proprietary APIs, to non-customers, it would chill Google's incentives to innovate and improve the Play store.  *See* Gentzkow ¶¶ 77-79.  For example, Google could decide to develop more advanced graphic, mapping, location, or cloud services that can be used by Google Play apps.  This would help Google compete to attract apps and developers to the Google Play store.  But if Epic's proposed remedy were in place, Google would face the risk that it would be forced to share those innovations with apps that elect to use competing app stores.  Other stores operated by sophisticated entities with the resources to invest, such as Microsoft, Samsung, or even Apple, would also have little reason to invest in their own innovations because Google's innovations will be available to developers in their competing store.  *Cf.* Gentzkow ¶ 11.

3.        Epic itself has developed advanced graphics tools for app developers and charges developers a royalty to access these tools based on a percentage of the developer's revenue.  However, Epic provides a 100% royalty discount on revenue earned through the Epic games store.[7]  Under Epic's proposal, Google would be prohibited from attracting developers to the Play

---

[7] Shikman Decl., Ex. 5, Frequently Asked Questions (FAQs), Unreal Engine, https://www.unrealengine.com/en-US/faq (last visited May 1, 2024).

store on the same terms, while Epic remains free to do so.

**Objection 5:**        **The proposed remedy would harm users.**

1.        Epic's proposed injunction would prohibit Google from restricting access to Android APIs and other features "based on the Developers' choice of app distribution channel." Proposed Injunction § II.C.1.i.  If this requirement is interpreted to include preloading an app onto an OEM's device as a "choice of app distribution channel," the proposed injunction raises significant security and privacy risks by preventing Google from maintaining policies that restrict certain Android functionalities to apps approved by OEMs.

2.        Android contains myriad APIs that malicious apps and app stores could use to cause significant harm to users.  For example, the Android operating system contains highly privileged and sensitive APIs that allow apps to delete other apps, reset a device to its factory settings, or connect to nearby Bluetooth devices.  *See* Kleidermacher Decl. ¶ 29.  Many of these APIs have multiple versions, one that allows any app to access the functionality only if the user has approved it, and another that allows access without the user's approval.  *See id.* ¶ 31.  Only OEMs can determine which apps may access this functionality without user approval.  *See id.* This allows OEMs to build advanced functionality for their Android devices while ensuring that malicious apps are not able to access such features without a user's knowledge or authorization. *See id.* ¶ 30.

3.        Epic's proposal would undermine Google's ability to protect users if it is interpreted to require Google to provide apps downloaded from the internet the same level of access to Android APIs as apps preinstalled by the OEM.  For example, under that interpretation, Google would be required to allow any developer–such as Epic–to access functionality that would enable the app or app store to delete other apps on the user's device–including their competitors' apps–without the user's knowledge.  *See id.* ¶ 32.  Undisputed trial evidence also established that relying on user consent to control access to sensitive permissions is risky due to the rise of social engineering attacks, such as the tactics employed by FluBot or a fake Cyberpunk game app, that trick users into granting harmful permissions.  Tr. 1755:16–1756:9 (Kleidermacher); Tr. 2221:18–2222:6 (Qian) (describing Cyberpunk malware).  The Court should not issue an injunction that

1    would put users at risk and harm OEMs by forcing Google to choose between putting users at

2    greater risk of harm by removing restrictions on access to highly sensitive APIs or restricting the

3    flexibility afforded to OEMs today by removing these APIs altogether.  *See Microsoft*, 373 F.3d at

4    1211 ("[A]ddressing the applications barrier to entry in a manner likely to harm consumers is not

5    self-evidently an appropriate way to remedy an antitrust violation.").

6    **Objection 6:**        **A permanent injunction is unwarranted and unnecessary.**

7            1.        A permanent injunction is particularly inappropriate given the inherent uncertainty

8    in how operating systems will evolve in the years to come, such as with the advent of ever more

9    advanced artificial intelligence, or changes to competitors' business models, such as Apple

10   launching an app store for Android.  Permanently enjoining Google's ability to respond to changes

11   in technology and competitive conditions by differentiating between Play and off-Play developers

12   with respect to API access would unfairly prevent Google from competing on the merits,

13   monetizing its intellectual property, and result in an overly punitive remedy that does not promote

14   competition in the market.

15           **H.        Part II.C.2 – No Access Restrictions to Other Google Products or Services**

16           Under Epic's proposed injunction, Google would be permanently enjoined from engaging

17   "in any conduct that conditions or impedes access to, restricts the use of, or conditions the terms of

18   access to any of Google's products or services . . . on the basis of a Developer's actual or intended

19   use of any Alternative Android App Distribution Channel."  Proposed Injunction § II.C.2.  Google

20   would be additionally prohibited from "prohibiting or disincentivizing" links to alternative app

21   distribution channels in ads facilitated by Google Search, Google Ads, or any "similar services."

22   *Id.* § II.C.2(i).

23   **Objection 1:**        **The proposed remedy is not supported by the trial record.**

24           1.        This proposed remedy is not supported by the trial record.  At trial, Epic failed to

25   introduce any evidence that Google has conditioned access to other Google products and services

26   on a developer's use of Google Play.  Nor is there any evidence that enjoining Google's policies

27   or practices with respect to dozens of its other products and services would do anything to restore

28   competition.  At the end of trial, Epic did not submit this issue to the jury, and the jury did not

-45-

1   issue any finding that Google has acted anticompetitively with respect to access to other Google

2   products and services.  For the same reason, Epic has failed to show any threat of future injury and

3   lacks standing to seek this relief.

4   **Objection 2:**        **The proposed remedy would impose an improper duty to deal on unrelated Google products and services and encourage free riding by competitors.**

5

6       1.      Epic's proposal also includes the improper requirement that Google must display

7   ads for alternative app distribution channels in Google Search, other Google Ads services, and any

8   other "similar services."  Proposed Injunction § II.C.2(i).  Google should not be forced to provide

9   products and services to its competitors.  *See linkLine*, 555 U.S. at 449 (no duty to deal).

10      2.      In addition, and at a minimum, Google should not be required to provide ads for

11  alternative distribution services if those services pose risks to users.  Under Epic's injunction,

12  Google could be required to accept advertising from alternative distribution services that distribute

13  malware, pirated content, or other illegal or harmful content.  Nor should Google be compelled to

14  convey messages to users that are objectionable (such as an app distribution channel dedicated to

    distributing apps for hate groups).

15      3.      The proposed injunction could also serve only to prop-up iOS and other platforms

16  relative to Android because these other platforms would be free to set policies prohibiting harmful

17  content while Google would be prohibited from doing so on Android.  For example, Apple could

18  implement platform policies that prohibit ads that direct users to malicious app stores but Google

19  would be required to display such ads on Android devices.

20      4.      Moreover, to the extent that Epic intends for the vague reference to "similar

21  services" to include the Google Play Store, the proposed remedy is also improper because it would

22  force Google to allow the Play store's competitors to show users ads to lead them away from the

23  Play store while the user is inside the Play store app.  This proposed remedy would create a

24  confusing experience for users who are intending to purchase apps from the Play store and be akin

25  to requiring Walmart to display ads in its store for Target.  *See, e.g.*, *Bray*, 392 F. Supp. at 868

26  (observing that enjoining "activities that are not inherently illegal" and simply benefits a different

27  group of market participants, not competition as a whole, is improper).

28

**Objection 3:**      **The proposed remedy is impermissibly vague and does not detail what conduct would be enjoined.**

1.      As discussed above, Epic's proposed injunction would again improperly enjoin "disincentivizing" conduct by third parties.  Google would be forced to guess whether any particular conduct will be deemed to "disincentivize" a decision by another party.  Accordingly, the proposed injunction is not sufficiently definite to put Google on notice of what conduct is enjoined.

**Objection 4:**      **The proposed remedy, in conjunction with Epic's proposed remedies related to sideloading, would increase security and privacy risks to users.**

1.      Epic's proposed injunction is likely to harm users by requiring Google to allow ads to display links to alternative app distribution channels, irrespective of whether the alternative distribution channel is itself malware or has failed to take steps to prevent itself from distributing other malware.  Epic has also separately proposed that Google be enjoined from warning users of the risks associated with sideloading beyond the "friction" applied to installing apps from the Google Play store or a single, neutrally worded screen.  *See* Section II.F.  Together, these proposals heighten the risk that users may click a link in an ad that leads them to a malicious app distribution channel (because Google would be enjoined from preventing such links in the first place) but will not be warned about the risks of installing apps from that channel (because Google would be enjoined from imposing additional warnings).  At the same time, iOS and other platforms would be free to enforce policies against these harms to their users, which serves only to undermine Android's competitive advantages on security.

## I.      Part II.D.1 - Google Play Store Catalog Access and Library Porting

Epic's proposed injunction would require Google for a period of six years to provide third-party app stores—Google's competitors—with free access to (a) the millions of apps that developers have chosen to distribute through Play and (b) the proprietary technology and services that Play uses to distribute these apps.  Proposed Injunction § II.D.1.  If a third-party app store does not carry a particular app, Google would be required to "have the Google Play Store download and install" that app on behalf of the third-party store.  *Id.*  Epic's proposed injunction further requires that Google allow users to "provide Third-Party App Stores with access to a list of

-47-

apps installed by the Google Play Store" on the user's device.  Google must also provide the ability for users "to change the ownership for any or all of those apps such that the Third-Party App Store becomes the update owner for those apps." *Id.* § II.D.1(ii).

This proposed remedy benefits Epic by providing it with the ability to distribute all of its competitors' games in its own Android app store, but imposes serious and unprecedented harms on other app developers and Android users.  *See* Gentzkow ¶¶ 86-99.  Epic's proposal would deprive developers of the choice whether to list their apps in other app stores and rob them of the opportunity to negotiate placement deals with app stores.  *See* Gentzkow ¶ 88.  Epic's proposal would also harm Android users by making sensitive information about the apps on their phones available to third parties, including bad actors posing as app stores, based on a novel app ownership consent request that is very likely to confuse users.  *See* Gentzkow ¶¶ 96-97.  And Epic's proposed remedy amounts to a forced-access requirement that is akin to requiring Walmart to fulfill orders on behalf of Target in clear violation of the longstanding antitrust principle that a business—even an alleged monopolist—has no duty to aid its competitors.  *See* Gentzkow ¶ 92. In effect, Epic seeks a wholesale product redesign that removes choices for app developers and harms the privacy and security interests of users, and that would require improper micromanagement by the Court of important product decisions and policies, while unduly restricting Google's ability to compete.  This proposed remedy is not remotely supported by the trial record and in fact contradicts the theory of liability that Epic presented at trial.  This proposed remedy is also wholly unnecessary in light of the provisions in the State Settlement that promote app store competition without harming the interests of developers and users.

**Objection 1:**      **This proposed remedy is not supported by the trial record and contradicts Epic's theory of liability.**

1.      This proposed remedy is entirely inconsistent with Epic's trial presentation.  Epic's theory at trial was that rival app stores would "want to differentiate [themselves] from Google Play."  Tr. 2400:20–2403:6.  Epic's expert testified that this was "the main viable entry strategy into this industry," Tr. 2403:18-19, and "a way that companies often successfully break into markets."  Tr. 2401:12-13.  And Epic argued in closing argument: "This is a way that new

companies can compete.  They can have exclusive content.  They can bring people to the store."
Tr. 3367:19-21; *see also* Bernheim ¶¶ 13-14.  Thus, according to Epic's own trial presentation,
eliminating the challenged conduct that supposedly blocked product differentiation should be
sufficient to give rivals an opportunity to compete.  Now, however, Epic's position is that
differentiation alone is not a viable entry strategy and that, instead, rival app stores need access to
all of the *same* apps that Play has in order to compete.  This theory is not supported by the
evidence that Epic introduced at trial—indeed, it squarely contradicts Epic's trial presentation—
and should be rejected for that reason.

> 2.    The trial evidence also shows that taking away Google's advantage in the number
of apps in its store would punish Google for successful competition.  Dr. Bernheim vaguely claims
that Google's "catalog advantage" is derived from past anticompetitive conduct (e.g., Bernheim
¶¶ 25, 46), but he cites no trial evidence connecting Google's robust app catalog with any alleged
anticompetitive conduct.  In fact, the evidence at trial showed that the Play store's catalog was a
first-mover advantage that Google obtained through early investment, innovation and competition,
developing Android and launching the first Android app store–then called Android Market–as part
of its strategy to build Android into a successful platform.  *See* Gentzkow ¶ 20.  The parties
stipulated that Google launched Android Market in October 2008 (Tr. 139:16), Epic's expert
conceded Google was a "small player" at that time (Tr. 2480:9-15), and Google's economics
expert testified that Android Market had a significant catalog of apps just a few years later (by
2011).  Tr. 2631:22–2632:16 (Gentzkow).  Epic's trial presentation focused exclusively on more
recent conduct that Epic alleged restrained competition among Android app stores.  This proposed
remedy thus punishes Google for conduct that is not anti-competitive and that is not remotely
similar to the conduct that the jury was asked to consider.

> 3.    Epic's suggestion that Google provide full catalog access through an "Alley Oop
like mechanism" is also not supported by the trial record and appears to be based on a
misunderstanding of the Alley Oop product by Epic's expert.  Neither the proposed injunction nor
Epic's experts explain what the term "Alley Oop like mechanism" means, and Epic introduced no
evidence about Alley Oop at trial.  In his report, Epic's expert incorrectly asserts that Alley Oop

-49-

"allowed Facebook to install its apps and others' apps outside of Google Play."  Bernheim at 10 n.45.  In fact, as the trial exhibit cited by Epic's expert states, Alley Oop was an "inline install solution *powered by Play*," ECF 887-15, Tr. Ex. 1546-007 (emphasis added), that simplified the process by which a user clicking on an ad for an app in Facebook's news feed could install the app from Play with minimal friction.  Deposition evidence established that Alley Oop was a targeted beta program available to a small number of qualified app developer partners who distributed their apps through Play, agreed to program terms, and collaborated closely on technical integration and product testing.  *See, e.g.*, Shikman Decl., Ex. 6 (Bankhead Dep. 121:5-16) ("it was a beta product, there was a small list of developers that tried it"); *id.* at 134:14-22.  There is no evidence that Alley Oop was ever implemented to share catalog access with another app store or on the massive scale contemplated by Epic's proposed injunction.

**Objection 2:**      **Epic's proposed remedy would harm app developers.**

1.      Epic's proposed remedy deprives developers of control over the app stores in which they choose to make their apps available.  One developer, Epic, asks the Court to *force* all other developers to publish their intellectual property through multiple channels without consent.  Some developers may not want to list their apps in certain app stores, such as stores that develop competing apps, carry pornography, or do not adequately monitor pirated apps.  Other developers may have legitimate reasons (reduction of costs, the need to track user reviews/satisfaction across distribution channels, use of a targeted promotional strategy, etc.) to choose a single-channel launch as a competitive strategy and thus may not want their apps available in multiple stores.  *See* Gentzkow ¶ 88.  Moreover, Epic has asked the Court (over Google's objection) to impose an injunction that would apply worldwide except China.  Developers whose apps were suddenly listed without their consent in app stores based outside the United States would face a host of regulatory and compliance risks.  Developers would also have many legitimate reasons not to want to list their apps in foreign app stores, including concerns about app piracy, the need for translation, local pricing differences, the scope of the developer's intellectual property licenses, and the relevance of their content in foreign countries, to name a few.  Epic's proposed remedy deprives developers of these choices by requiring Google to offer any competing Android app

store access to every app listed in the Play store, regardless of the developer's preferences.  Dr. Bernheim does not and cannot contend that this proposal is without cost to developers; on the contrary, developers would face increased operational costs to monitor how their apps are displayed and are performing in innumerable stores, as each store may have markedly different marketing strategies, user engagement priorities, content policies, security standards, etc.

2.      Epic's proposed remedy also contravenes the terms of Google's agreements with the millions of developers that distribute apps through Play.  Google does not own these developers' apps; Google has a limited license to reproduce and use the apps pursuant to the Developer Distribution Agreement ("DDA").  *See* Shikman Decl., Ex. 8 (operative DDA).  That limited license includes the right to reproduce and use the apps in "the operation and marketing of Google Play," but does not include the right to distribute the apps elsewhere.  DDA § 5.1. Likewise, Google has a limited license to make use of an app developer's trademarks and other intellectual property "in connection with the distribution and sale of Developer's Product via Google Play."  DDA § 6.2.  In other words, the millions of developers distributing their apps through Play have *not* granted Google a license to distribute their apps through, or make use of their intellectual property in, an unknown set of non-Play app stores.  Although Epic contends that app distribution through this "background process" would be "governed by" the DDA (Bernheim at 10 n.46)—in fact, it would *violate* the terms of the DDA.  DDA §§ 5.1, 6.2.  Epic's proposed injunction is tantamount to creating a forced license between millions of developers and all third-party app stores on Android.

3.      This proposed remedy also denies developers the benefits of competition among app stores.  Stores like the Epic Games Store and Play offer incentives to the developers of successful and popular apps to list their apps in the store.  *See* Tr. 849:11-18 (Kochikar); Tr. 491:15–492:3 (Koh).  If Google is required to provide all third-party app stores with access to its catalog, then both Google and these third-party stores will have less reason to offer such incentives to many developers who lists their apps in the Play store.  *See* Gentzkow ¶¶ 87, 98.  *See also Nat'l Soc. of Pro. Eng'rs*, 435 U.S. at 695 ("The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain . . . are favorably

1   affected by the free opportunity to select among alternative offers.").  For example, in December

2   2023, Microsoft announced plans to launch a new Android app store.  As a result of Epic's

3   proposal, Microsoft–as well as any other large company launching a new Android app store, like

4   Epic or even Apple–would have less need to offer developers who put their apps in the Play store

5   an incentive to list their apps (particularly, free apps) in Microsoft's store as well, since Microsoft

6   would automatically get access to all apps that are in the Play store.  *See* Gentzkow ¶¶ 87, 98.

7   **Objection 3:**          **Epic's proposed remedy would harm Android users.**

8          1.          Epic's proposed remedy could harm Android users because it does not account for

9   how users' privacy will be protected.  Epic proposes that third-party app stores be able to request a

10  list of every app that the user installed from Play (i.e., the user's "app library" on their device),

11  without explaining how this would occur or what steps Google would be allowed to take to

12  address the privacy implications of this decision.  The apps on a user's phone can reveal sensitive

13  personal information about the user.  Examples of sensitive apps that are currently available in the

14  Play store include Safe Abortion, Ovulation & Period Tracker, PTSD Coach, Beating Cancer

15  Together, I Am Sober, dating apps, social media apps, and apps that disclose political affiliations.

16  Google's privacy policies provide for user consent before such personal information is shared

17  outside of Google.  The proposed mandatory sharing of user information on a mass scale

18  implicates complex privacy and user consent concerns.   *See* Gentzkow ¶¶ 93, 97.  How would

19  hundreds of millions of users provide consent to this data disclosure in a manner that is consistent

20  with applicable law?  How aggressively could third-party app stores pursue user consent to this

21  disclosure?  What would third party app stores be required to tell users (and what would Google

22  be permitted to tell users) about the implications of the decision when requesting their consent?

23  What would third party app stores be permitted to do with the data once in hand and would there

24  be any recourse if, e.g., the data is resold to others?  What technical process would govern the

25  transfer of user-specific data from Play to countless third-party stores that may be located inside or

26  outside of the United States?  Epic does not answer these questions, leaving the Court to resolve

27  and then micromanage them.

28          2.          Those privacy concerns are heightened by the fact that Epic's proposed injunction

-52-

does not define the term "app store" and does not appear to give Google any discretion to determine whether a particular third party requesting access to users' phones is, in fact, a bona fide and high quality app store, and not (for example) a fraudster or a malware designer or a hate group or an agent of a foreign power.  Such bad actors are rampant throughout the internet economy and could easily exploit user confusion about the requested permission to harm users.  The process contemplated by Epic's proposed injunction—allowing app stores to ask users for authorization to take control of all of the apps on their phones downloaded from another source—has never been implemented before.  It is easy to imagine users granting this authorization without fully realizing or understanding the implications of that decision, and in particular that this authorization means that another app store will now have control over updates to the apps on the user's device. Malicious actors posing as app stores could easily use this confusion to perpetrate fraud or steal data or spread malware to the phones of users who unknowingly granted authorization for the malicious app store to take ownership of their apps.  Tr. 2189:10-14 (Mickens) (admitting that malware often pretends to be a popular brand); Tr. 2236:23–2237:3 (Qian) (explaining that malware often deceives users).

3.      This proposal also raises significant security concerns for Android users.  Providing third parties with a list of apps installed on devices would increase the potential for bad actors to learn which apps exist on a specific user's device, and thus permit targeting of vulnerabilities in those apps installed on specific devices.  Tr. 2220:19–2221:3, 2244:25–2245:13 (Qian).

4.      This proposal also creates a serious risk of user confusion over which store is installing apps on their device, which store is authorized to update those apps, and which store, if any, is responsible for billing and customer service.  For example, under Epic's proposal, a user may: (a) enter a third-party store to find an app; (b) try to install the app from that store only to receive it "in the background" from Play; and (c) later inadvertently switch the updating of that app to a different third-party app store.  If something goes wrong with the user's app experience, which of the three app stores is responsible – the store the user thought they were installing from, the store that provided the actual installation service in the background, or the store who eventually took over updating ownership?  Epic's proposed injunction does not say, leaving the

Court to resolve and micromanage this issue as well.

**Objection 4:**      **Epic's proposed remedy is not judicially administrable as it would impose a duty to deal, require a redesign of Google's products, and require the Court to set prices for Google's services.**

1.      By forcing Google to provide competitor app stores with access to one of Play's primary services—app distribution—this proposed remedy would require Google to deal with its rivals by offering the novel services of mobile app store catalog access and library porting. This forced access is not judicially administrable and would require the Court's repeated intervention. Neither Epic's proposed injunction nor its expert's report explains the terms under which these services would be provided, or the price (if any) that Google could charge for the services it is ordered to provide, or the standards that Google would be permitted to apply in deciding whether an app store maintains sufficient security protections to be a partner.

2.      This proposed remedy would be unmanageable for the additional reason that it would require technical redesigns for which this Court would need to act as a "central planner[]"—"a role for which [it is] ill suited." *Trinko*, 540 U.S. at 408. Epic's proposal would require Google to reconfigure the Android operating system and design an entirely new catalog access and library porting service. *See* Kleidermacher Decl. ¶¶ 42-44. The Court would assume day-to-day supervision of scores of technical decisions and changes to the terms and conditions offered to both developers and users, including those related to user experience, security standards and content restrictions, consuming enormous judicial resources. *See* 1/18/24 Hr'g Tr. 11:18-21 ("A United States district judge, whether me or anyone else or any Article III judge in the federal judiciary, is not going to micromanage Google.").

3.      If Google is not permitted to charge other app stores for catalog access and library porting (and neither the proposed injunction nor Epic's expert says one way or the other), then Epic's proposed remedy also impermissibly sets the price for Google's distribution services and its intellectual property at zero. *See* Gentzkow ¶¶ 91, 98; *linkLine*, 555 U.S. at 452–53 ("Courts are ill-suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'") (quoting *Trinko*, 540 U.S. at 408); *Alston*, 594 U.S. at 102 ("Judges must be wary, too, of the temptation to specify 'the proper price, quantity, and other terms of dealing'—cognizant

1   that they are neither economic nor industry experts.") (quoting *Trinko*, 540 U.S. at 408).  As the

2   Ninth Circuit recognized in the context of assessing remedies in *Kodak*, even a monopolist is

3   entitled to charge prices that "the market will bear."  *Kodak*, 125 F.3d at 1225–26 (striking

4   injunction provision requiring Kodak to furnish parts to rivals at even a "reasonable" price, instead

5   holding that "Kodak should be permitted to charge all of its customers . . . any nondiscriminatory

6   price that the market will bear.").

7   **Objection 5:**       **Epic's proposed remedy is not necessary to promote competition among**
                           **app stores in light of the provisions in the State Settlement and would**
8                          **harm competition.**

9        1.       As part of the State Settlement, Google has already agreed to several remedies that

10   will promote competition among Android app stores.  Most notably, under the State Settlement,

11   Google cannot seek exclusivity for Play, and therefore other app stores are free to compete for the

12   right to offer any app that is listed on Play.  The State Settlement also provides that Google cannot

13   enter agreements with OEMs to prevent the pre-installation of rival app stores, Google must

14   simplify the sideloading flow, and Google must maintain certain technical features that assist

15   third-party app stores.

16       2.       Epic's proposed remedy is unnecessary in light of these provisions.  There was no

17   evidence offered at trial suggesting that Google prevented rival app stores from entering into

18   distribution agreements with app developers.  *See* Bernheim ¶ 46.  In addition, the listing for each

19   app on Play includes the name of the developer as well as contact information for the developer

20   (typically an address).  Nothing prevents a third-party app store from contacting a developer that

21   distributes on Play and trying to obtain a license to distribute that developer's apps.  Nor is there

22   any impediment to a developer on Play contacting third-party app stores to seek alternative

23   options for distribution.

24       3.       Epic's expert proposes a six-year, forced-sharing requirement where Google would

25   be required to supply developers' apps to rival app stores to purportedly "uncoupl[e] the two sides

26   of the market" and solve a "chicken-and-egg" problem.  Bernheim ¶ 25.  The antitrust laws,

27   however, were not designed to equip a hypothetical competitor with a competitive advantage

28   obtained through legitimate conduct.  *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163

(9th Cir. 1997); *see also Novell, Inc.*, 731 F.3d at 1072 (Gorsuch, J.) (noting the Supreme Court has "emphatically rejected" the notion that a "monopolist must lend smaller rivals a helping hand").  Forcing Google to serve its rivals with the entirety of Play's catalog does not help differentiate other app stores in any respect.  To the contrary, Dr. Bernheim testified at trial "that companies often successfully break into markets" by differentiating themselves with "some sort of exclusive content."  Tr. 2401:3-15.  Epic introduced no evidence at trial suggesting that Epic, or any other app store competitor, requires access to the Play store catalog to identify or access exclusive content.

> 4.     The contention of Epic's expert that the remedies in the State Settlement are insufficient because they will take too long to stimulate competition is not supported by the trial record; indeed, it is not supported by any evidence at all.  *See* Gentzkow ¶¶ 14-21, 84-85.  Epic's expert cites no evidence that companies like Microsoft—which just acquired the Activision gaming studio for $68.7 billion—and Samsung could not attract sufficient users and developers if the challenged conduct were eliminated.  *See* Gentzkow ¶ 50.  Although Dr. Bernheim claims that preloading is insufficient to build a user base because "users tend to keep their mobile phones for several years," Bernheim ¶ 23, he has never argued that an app store must reach all or most Android users immediately to stand a chance of success.  To the contrary, he testified at trial that app stores could effectively compete in the absence of RSA 3.0 agreements, even though they applied to only a very small fraction of Android devices worldwide. Tr. 2501:3–2502:12 (Bernheim).  The evidence at trial established that Samsung and Motorola manufacture the majority of Android phones for sale in the United States, with Samsung manufacturing over 100 million devices alone.  Tr. 1063:3-5 (Kleidermacher); Tr. 2626:18-22 (Gentzkow).  Pre-installation deals with these two companies alone—which will now be easier to negotiate as a result of the State Settlement remedies discussed above—could bring a new app store to millions of Android users in the next year.  And in any event, the sideloading remedies in the State Settlement would improve the ability of competitor app stores to reach all those users right away.

> 5.     Far from promoting competition, Epic's proposed remedy would harm competition among app stores.  Epic's proposal encourages third-party app stores to free-ride on Play's app

catalog and erodes many developers' incentives to compete directly for app developers' business. *See* Gentzkow ¶ 87.  Rather than dealing with app developers directly, third-party app stores could simply take advantage of Google's investments in building a robust app catalog of both free and paid apps, and in creating advanced distribution technology and services.  This proposal would have the perverse effect of "unnecessarily entrench[ing]" Play as the primary source of developers' apps, undermining price competition in the market.  *See Kodak*, 125 F.3d at 1225–26 (striking injunction provision requiring Kodak to inventory parts produced by third-party parts manufacturers, on the grounds that the measure would "promote[] free-riding by requiring Kodak to pay for keeping a massive inventory of parts" and, by forcing non-Kodak manufacturers to "price replacement parts at levels necessary to attract" away parts-buyers, "unnecessarily entrenches Kodak as the only parts supplier").

6.    Epic's proposal may benefit Epic (e.g., by giving the Epic Games Store access to its competitors' games), but it would also harm certain third-party app stores who may not want to help Epic, or who may already be investing in a robust app catalog.  This proposal would decrease the value of that investment by boosting other stores who have chosen not to invest in attracting desirable and varied apps.

## J.    Part II.D.2 - Google Play Store Distributing Third-Party Apps Stores

Epic's proposed injunction would require Google to distribute competing app stores through Play for six years—and it appears Google would have to provide that distribution to its competitors *for free*.  Proposed Injunction § II.D.2.  Epic's proposal would also require Google to make the download process for third-party stores "identical in all respects to the download process of any other app," except that Google may present users "with a single one-tap screen asking the User to allow the Third Party App Store to install other apps." *Id.* § II.D.2.i

Epic's proposed remedy imposes on Google an impermissible duty to deal with competitors that is contrary to law, inconsistent with the Court's summary judgment ruling, and unnecessary to promote competition in light of the provisions in the State Settlement addressing app stores, *see* Gentzkow ¶¶ 100-111.  Epic's proposal would benefit Epic and other large companies planning to launch Android app stores like Microsoft while harming OEMs and

consumers.  Under Epic's proposed remedy, those companies would be able to bypass preinstallation deals with OEMs and instead free ride on Play for distribution, depriving OEMs of revenue from those deals and thereby increasing the cost of Android phones.  *See* Gentzkow ¶ 105.  Epic's proposal also presents enormous safety and security risks to Android users, as the proposed injunction gives Google no discretion to decide whether to distribute through Play any app that calls itself an app store, including "app stores" that distribute explicit or harmful content, that infringe on the intellectual property of developers, and that have minimal security protections. *See* Gentzkow ¶¶ 103, 104.  This remedy would require Google to redesign the Play store at Google's expense under the Court's supervision, and (if Google is permitted to charge other app stores for distribution) it would require the Court to set Google's prices.  All this is unnecessary in light of the provisions in the State Settlement promoting competition among Android app stores.

**Objection 1:**       **Epic's proposed remedy is inconsistent with the Court's summary judgment ruling and is unnecessary to promote competition in light of the provisions in the State Settlement addressing app stores.**

1.       The Court ruled at summary judgment that the antitrust laws do not require Google to distribute other app stores on Play.  ECF 700 (granting summary judgment for Google on "plaintiffs' claims that Google unlawfully prohibits the distribution of other app stores on Google Play") (quoting ECF 483 at 6).  And Epic's expert concedes that this proposed remedy "goes beyond prohibiting the specific conduct, or substantially similar conduct, that was at issue in the trial."  Bernheim ¶ 68.  Indeed, Epic presented no evidence at trial that would support its expert's assertion that this drastic remedy is necessary to promote competition among Android app stores.

2.       Google obtains distribution for Play by entering into preload agreements with OEMs.  Google's competitors can enter into similar preload deals by negotiating with OEMs themselves.  *See* Gentzkow ¶ 105.  To address allegations that Google's conduct makes it harder for third-party stores to enter such deals, Google has agreed in the State Settlement (i) not to seek preload exclusivity, (ii) not to enter agreements with OEMs that would prevent third-party app stores from being preloaded, and (iii) not to require Google's consent before third-party app stores may be preloaded.  As a result, there is no impediment to Google's competitors negotiating their own distribution deals with OEMs.  Google has also agreed in the State Settlement to streamline

the sideloading flow to make the installation of third-party stores via sideloading more efficient.

**Objection 2:**      **Epic's proposed remedy would harm users.**

1.      Epic's proposed remedy would harm Android users by effectively bypassing the security, content, safety, and privacy standards that Google has maintained for Play.  *See Microsoft*, 373 F.3d at 1211 ("[A]ddressing the applications barrier to entry in a manner likely to harm consumers is not self-evidently an appropriate way to remedy an antitrust violation.").  Google has comprehensive policies that limit the types of apps and content permitted on Play.  For example, in addition to forbidding malware, Play does not distribute apps:  (a) with inappropriate sexual content, hate speech, or content that endangers children, (b) that invade user privacy, (c) that promote illegal activity, and (d) that infringe upon app developer intellectual property. Forcing Google to distribute app stores through Play would allow apps listed on these stores to bypass Google's important policies.  *See* Tr. 3147:1-10 (Loew) ("We're always worried about a bad-apple scenario where a user has really one bad experience with a digital app, and then they don't want to try anything else in the store"); *see also Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 979 n.381 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023) (recognizing problems for users "that may occur when permitting 'stores within stores'" including "disparate guidelines and policies, and the difficulty of reviewing materials hosted by third parties").

2.      Epic's proposed injunction would particularly harm parents.  Play has invested significantly in features that make the Play store safe and usable for parents, including payment-related protections.  Tr. 3122:2–3125:18 (Loew).  Epic's proposed injunction would require Google to distribute third party app stores, even if those stores do not include similar protections for parents.

3.      Epic's proposed injunction would compromise user security on Play.  The undisputed evidence at trial established that user installs are a common way that smartphones are infected by malware.  Tr. 1754:17-20 (Kleidermacher).  Google invests heavily in malware screening to prevent malware from entering Play.  *See* Tr. 1757:10–1761:21 (Kleidermacher) (describing Play's malware detection efforts, and noting that Google's trust and safety team

comprises thousands of employees; that Google has developed intellectual property to screen apps algorithmically; and that security screening requires human review).  Epic's proposed remedy would require Google to distribute third-party app stores through Play even when those stores do not impose the same level of security protection and even when Google has minimal information about the stores and the apps in them, thereby harming the security of Play store users.

**Objection 3:** **Epic's proposed remedy would harm OEMs, consumers and competition.**

1.  Under Epic's proposal, Google's rivals would have no incentive to negotiate with OEMs for preload deals and could instead free-ride on Google's distribution agreements.  For example, this proposed remedy would allow Microsoft–which has announced plans to open an Android app store–to bypass negotiations with OEMs for preinstallation deals and instead free-ride on Google's preinstallation deals by distributing their app store through Play.  This would harm OEMs and consumers.  *See* Gentzkow ¶¶ 19, 105.  To obtain distribution from OEMs, rival app stores must provide value to OEMs–either through monetary payments that reduce the OEMs' costs or through investments in creating a high-quality app store that benefit users and developers.  *See* Gentzkow ¶¶ 105-106.  But if rival app stores did not need to provide value to OEMs to obtain distribution, then they would have no need to make monetary payments to OEMs or investments in creating stores of sufficient quality to attract OEMs.  As a result, OEMs' costs would effectively increase, creating pressure on their thin margins and putting upward pressure on device prices for consumers.  *See* Gentzkow ¶ 29.  Eliminating rivals' need to compete with Play for distribution would have the perverse effect of "unnecessarily entrench[ing]" Play as the primary source of distribution even for third-party app stores.  *See Kodak*, 125 F.3d at 1225–26.  And reducing incentives to create quality stores to attract OEMs would harm users and developers who benefit from those investments in quality.

2.  This proposed remedy also would seriously weaken Google's incentives to compete; if Google could no longer differentiate its store through broad distribution, then obtaining such distribution will be less valuable.  For example, Walmart would have a reduced incentive to open new stores if all of its rivals could sell their wares in any of Walmart's stores.  *See Novell, Inc.*, 731 F.3d at 1073 (Gorsuch, J.) ("Forcing firms to help one another would also

1    risk reducing the incentive both sides have to innovate, invest, and expand—again results

2    inconsistent with the goals of antitrust."); *Kodak*, 125 F.3d at 1225–26 (striking injunction

3    provision requiring Kodak to inventory parts produced by third-party parts manufacturers, on the

4    grounds that the measure would "promot[e] free-riding by requiring Kodak to pay for keeping a

5    massive inventory of parts" and, by forcing non-Kodak manufacturers to "price replacement parts

6    at levels necessary to attract" away parts-buyers, "unnecessarily entrenches Kodak as the only

7    parts supplier").  That is particularly the case if those rivals are not even required to pay Walmart a

8    fee to sell their goods in Walmart stores.

9    <u>**Objection 4:**</u>        **Epic's proposed remedy is not judicially administrable as it would impose
                   a duty to deal, require a redesign of Google's products, and require the
10                 Court to set prices for Google's services.**

11            1.        Epic's proposed remedy forces Google to provide competitor Android app stores

12   with access to one of the Play store's primary services—the distribution of apps—by requiring

13   Google to distribute competitor app stores within Play.  This forced access imposes an

14   impermissible duty to deal that is not judicially administrable and will require the Court's repeated

15   intervention.  Neither Epic's proposed injunction nor its expert's report explains the terms and

16   conditions (if any) that Google could impose on rival app stores that wish to be distributed through

17   Play to address the risks of harm identified above.  Nor do they address the price (if any) that

18   Google could charge for the services it is ordered to provide, or the standards that Google would

19   be permitted to apply in deciding whether an app store maintains sufficient security and privacy

20   protections to warrant distribution through Play.  There are hundreds of third party app stores on

21   Android and potentially more in the future—which of these existing and future stores would

22   qualify for distribution through Play?  Under what circumstances would Google be permitted to

23   remove a rival app store from Play?  Could Google remove an app store that distributes

24   pornographic apps?  What happens if Google is subject to a particular regulation in a non-U.S.

25   country that one of the "stores within a store" does not comply with?  Would Google be required

26   to distribute third party app stores based in other countries?  More broadly, how would Google

27   even obtain information from third party app stores on an ongoing basis about the apps in their

28   stores and their security and privacy policies?  Epic's proposed remedy would require the Court's

-61-

1   repeated intervention to address these and similar questions as they arise.

2          2.       This proposed remedy also would require technical redesigns for which this Court

3   would need to act as a "central planner[]"—"a role for which [it is] ill suited." *Trinko*, 540 U.S. at

4   408.  Epic's proposal would require Google to redesign Play, creating technical infrastructure to

5   distribute other app stores, building new parts of the store, and developing new policies and

6   procedures to govern app store distribution, all at Google's expense.  Each of these decisions

7   would implicate the laws of other jurisdictions, putting Google in the untenable position of having

8   to redesign its product to conform to the laws of those jurisdictions and the strictures of Epic's

9   proposed injunction at the same time.  And the Court would have to supervise all of these new

10  developments to address the inevitable complaints by Epic or others regarding how Google builds

11  the functionality to distribute third party app stores.  *See* 1/18/24 Hr'g Tr. 11:18-21 ("A United

12  States district judge, whether me or anyone else or any Article III judge in the federal judiciary, is

13  not going to micromanage Google.").

14         3.       If Google is not permitted to charge other app stores for distribution through Play

15  (and neither the proposed injunction nor Epic's expert says one way or the other), then Epic's

16  proposed remedy impermissibly sets the price for Google's distribution services and its

17  intellectual property at zero, which is not an economically sustainable position for Google.  *See*

18  Gentzkow ¶ 110; *linkLine*, 555 U.S. at 452–53 ("Courts are ill-suited 'to act as central planners,

19  identifying the proper price, quantity, and other terms of dealing.'") (quoting *Trinko*, 540 U.S. at

20  408); *Alston*, 594 U.S. at 102 ("Judges must be wary, too, of the temptation to specify 'the proper

21  price, quantity, and other terms of dealing'—cognizant that they are neither economic nor industry

22  experts.") (quoting *Trinko*, 540 U.S. at 408).  As the Ninth Circuit recognized in the context of

23  assessing remedies in *Kodak*, even a monopolist is entitled to charge prices that "the market will

24  bear."  *Kodak*, 125 F.3d at 1225–26 (striking injunction provision requiring Kodak to furnish parts

25  to rivals at even a "reasonable" price, instead holding that "Kodak should be permitted to charge

26  all of its customers . . . any nondiscriminatory price that the market will bear.").

27

28

**K.       Part II.D.3 - Mandating Placement of the Google Play Store**

Epic's proposed injunction would, for six years, prohibit Google from "mandat[ing]" or "incentiviz[ing]" "the placement of the Google Play Store in any specific location on an Android device, including but not limited to the default home screen."  Proposed Injunction § II.D.3.

**Objection 1:        Epic's proposed remedy is unnecessary to promote competition.**

1.       In the State Settlement, Google has already agreed not to seek exclusive placement of Play on the "home screen" of an Android device.  This provision ensures that rival app stores can negotiate with any OEM for pre-installation or placement.

2.       Epic's proposal to bar even *non-exclusive* placement agreements is unnecessary to promote competition.  Google obtains placement (e.g. placement on a device's "home screen") for the Google Play store through preload agreements with OEMs.  Google's competitors can enter into similar arrangements by negotiating with OEMs themselves.  *See* Gentzkow ¶¶ 114, 118.  To address allegations that Google's conduct makes it harder for third-party stores to enter such deals, Google has agreed in the State Settlement that, for a period of five years, it will not seek *exclusive* home screen placement (or exclusive preload deals for that matter) or enforce any such exclusivity terms in existing agreements.  State Settlement § 6.6.1. As a result, competing Android app stores will have an unfettered opportunity to negotiate placement agreements with OEMs, including agreements to place competing app stores in an equally prominent location as the Play store.  Such competitors could include Microsoft, Meta, and Epic, all of whom have recently announced plans to explore opening an Android app store and have the resources to pay OEMs for placement on Android devices.  Shikman Decl. Ex. 9, Epic Games Store (@EpicGames), Twitter (Mar. 20, 2024 10:21 AM), https://twitter.com/EpicGames/status/1770500825166545305 ("The Epic Games Store is coming to iOS and Android"); *id.*, Ex. 10, Rachel Gamarski, Dina Bass and Cecilia D'Anastasio, *Xbox Talking to Partners for Mobile Store, CEO Spencer Says*, BNN Bloomberg (Nov. 30, 2023), https://www.bnnbloomberg.ca/xbox-talking-to-partners-for-mobile-store-ceo-spencer-says-1.2005610; *id.*, Ex. 11, Alex Heath, *Meta is planning to let people in the EU download apps through Facebook*, The Verge (June 29, 2023 2:03 PM), https://www.theverge.com/2023/6/29/23778928/meta-eu-facebook-plans-app-install-android-ads.

3.      In fact, Epic's proposal would harm competition.  Under Epic's proposed injunction, Google would be effectively sidelined from competing for any placement anywhere on an Android device, including *non-exclusive* placement alongside other Android app stores.  *See* Gentzkow ¶¶ 118-119.  An antitrust injunction that will exclude one competitor in order to benefit others is inconsistent with the purpose of the antitrust laws.  *See Microsoft*, 373 F.3d at 1230 ("[T]o have addressed itself narrowly to aiding specific competitors . . . could well have put the remedy in opposition to the purpose of the antitrust laws.") (citing *Brooke Grp.*, 509 U.S. at 224 (antitrust laws designed to protect "competition, not competitors")); *see also Theme Promotions, Inc.*, 546 F.3d at 1009 ("[A] district court might appropriately deny a motion for injunctive relief where the injunction would hinder, rather than promote, competition in the market.").

**Objection 2:        Epic's proposed injunction will harm OEMs and consumers.**

1.      The evidence at trial established that OEMs seek incentives from app stores in exchange for home screen placement agreements.  *See* ECF 915-1 at 264-266, 281 (Christiansen Designations 43:9-44:5, 52:4-8, 184:11-16).  Epic's proposed injunction would prohibit Google from making bids to OEMs for placement of the Google Play store; only Google's rivals such as Microsoft, Meta, Epic, and Amazon and others would be able to bid.  This would reduce the value that OEMs can obtain from space on their devices' home screens because rivals could bid less knowing that they would not have to match a bid by Google.  *See* Gentzkow ¶ 119.  Indeed, Epic's proposed remedy would prohibit OEMs from maximizing placement revenue by entering into preinstallation agreements with Play *and* with another app store (since Google's preinstallation agreement is non-exclusive).  The evidence at trial showed that in 2021 approximately 68 percent of all Android phones sold in the United States came with at least one app store other than Play preinstalled on the device.  Tr. 2622:6-18.  *See also* Gentzkow ¶ 114.

2.      By reducing the value that OEMs can earn from placement on their devices, Epic's proposed remedy also would harm consumers of Android devices.  OEMs have very narrow margins.  *See* Gentzkow ¶ 120.  Numerous Android OEMs have exited the market in recent years, including, for example, LG.  *See* Gentzkow ¶ ¶29 & n.47.  If OEMs' revenue from placement goes down (because other app stores will pay less to OEMs if they do not have to bid against Google),

then their margins will fall and they will face pressure to increase device prices, which in turn would harm consumers.  *See* Gentzkow ¶¶ 29, 120.  An injunction that harms downstream consumers is not "an appropriate way to remedy an antitrust violation."  *Microsoft*, 373 F.3d at 1211.  Moreover, if Android device prices increase, that will reduce competitive pressure on Apple in selling iPhones, which also will harm consumers and competition within that related market.  *See* Gentzkow ¶¶ 29, 120.

## III.   PART III - ANDROID IN-APP PAYMENT SOLUTIONS MARKET

### A.   Epic Lacks Standing to Obtain an Injunction Relating to Billing Remedies

Google objects to Epic's proposed remedies relating to Google's billing policies, and prices for its services, on the ground that Epic lacks standing to obtain the requested relief.  "To have standing, a litigant must seek relief for an injury that affects him in a 'personal and individual way.'"  *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (citation omitted).  Epic has the burden to prove this "in the same way as any other matter on which the plaintiff bears the burden of proof."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Epic cannot meet this burden.

Google's billing policies affect only developers of apps available in the Google Play store.  Epic's apps are currently not available in the Play store.  *See, e.g.*, Tr. 530:17-19 (Koh) (Fortnite removed from Play store).  And Google has no obligation to allow Epic's apps into the Google Play store.  *See* Objections to Part __ re Anti-Retaliation.  Accordingly, Epic will not benefit from changes to Google Play's billing policies or prices.  Epic is not paying any fees for the use of the Google Play store or Google Play Billing and therefore would not benefit from provisions of the proposed injunction that would regulate those fees.  *See* Section III.B.  Similarly, Epic would not be able to link outside of, or steer inside of, any apps downloaded from the Play store, so provisions related to links and steering to alternative billing systems will not benefit Epic.  *See* Section III.C.  And because Epic is not using the Play store, Epic could not benefit from any relief related to whether developers can offer in-app billing systems other than Google Play Billing.  *See* Sections III.D and III.E.

To the extent that Epic's proposed injunction is designed to stimulate competition among third-party payment solutions providers, Epic will not benefit from that alleged effect.  First, Epic

1   does not use any third-party providers to handle payments, but instead uses its own "in-house"

2   payments solution called Epic Direct Payment.[8]  There is no evidence that Epic plans to use a

3   third-party provider to replace its own in-house solution.  Second, there is no evidence that Epic

4   has ever offered Epic Direct Payment to third-party developers for use in apps downloaded outside

5   of the PC-based Epic Games Store, or that Epic intends to do so.

6        The Ninth Circuit found that Epic had standing to obtain an anti-steering injunction against

7   Apple because some iPhone users might substitute to pay for an in-app item by accessing the same

8   app on PC through the Epic Games Store, thereby generating revenue for Epic.  *See Apple II*, 67

9   F.4th at 1000.  However, there is no evidence to support that theory in this case.  Epic excluded

10  PC transactions from the alleged relevant markets, and argued that Android users are unlikely to

11  leave the app for digital items they discover in the app, because "leaving the app" causes "a lot

12  more friction and a lot more dropoff."  Tr. 2557:9-10 (Tadelis); *see also* Tr. 2554:2-9 (Tadelis)

13  (opining that "web purchases are not a viable substitute for in-app purchases" because of increased

14  "friction").  In any event, at most, the possibility of substitution to transactions in the PC-based

15  Epic Games Store could only support the provisions of the proposed injunction related to steering

16  and not those related to fees or billing methods available within the Play store.[9]

17        **B.   Parts III.A.3 & A.4 and III.B.2 & B.3 – Price Regulation of Service Fees**

18       Epic's proposed injunction asks the Court to regulate the prices that Google can charge for

19  services in the relevant markets.  It also requires Google to publicly disclose confidential cost data

20  and prohibits Google from collecting information to accurately charge a fee on transactions

21  processed through alternative billing systems.

22       Epic's theory at trial was that Google provides two products in two separate markets:  (1)

23  the Play store in an Android app distribution market, and (2) Google Play Billing in an Android

24  in-app billing services market.  The State Settlement addresses the requirement that developers

25

---

26  [8] Shikman Decl., Ex. 13, The Fortnite Team, *Announcing Epic Direct Payment on Mobile*, Epic
   Games (Aug. 13, 2020),https://www.epicgames.com/fortnite/en-US/news/announcing-epic-direct-
27  payment-on-mobile.
   [9] The Ninth Circuit also found that Epic had standing because its subsidiary company still had
28  apps in the Apple App Store.  *Apple II*, 67 F.4th at 1000.  There is no evidence of the same being
   true with respect to the Play store.

that use the Play store must use Google Play Billing for purchases of digital content inside apps downloaded from Play.  The user choice billing ("UCB") program expanded by the State Settlement allows developers to offer a payment processing option other than Google Play Billing. When a user selects another payment option, Google adjusts the service fee it charges the developer by 4% to reflect the fact that the developer continues to use the many other services of the Play store but not Google Play Billing.

Epic does not dispute (and its experts have admitted) that Google can charge developers for the valuable services of the Play store in the form of fees on in-app transactions and subscriptions regardless of whether developers use Google Play Billing or another billing service to process those transactions.  After all, a developer that processes transactions through an alternative billing option still receives many benefits from the Play store, including services that enable them to develop, launch, grow, update and monetize their app throughout its lifecycle. Epic, however, asks the Court to set a floor on the price Google charges for using Google Play Billing based on Google's average total cost of handling in-app transactions each year.  *See* Leonard ¶¶ 4-7.  A court-imposed price floor that requires calculating a company's costs each year is the very opposite of a proper antitrust remedy for a U.S. district court.

**Objection 1:**       **Epic's proposed remedy amounts to impermissible price regulation.**

1.       The proposed remedy violates the rule that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448.  The Supreme Court has instructed district courts not "to specify 'the proper price, quantity, and other terms of dealing'—cognizant that they are neither economic nor industry experts."  *Alston*, 594 U.S. at 102 (quoting *Trinko*, 540 U.S. at 408).  The Ninth Circuit has thus rejected judicial efforts to regulate prices in antitrust decrees, even when the only limitation was to require "reasonable" prices.  *Kodak Co.*, 125 F.3d at 1225.

2.       The Play store provides developers a platform to showcase their apps to billions of Android users around the world, as well as a wide array of tools and services to help developers build, develop, update, improve, and maximize growth and monetization for their apps.  Before an app is launched, the Play store provides developers with tools to build and test an Android version

-67-

of their app.  After an app is launched, the Play store provides developers with tools and services to measure and improve and enable customer acquisition, retention, engagement, and spending. Epic's CEO Mr. Sweeney testified about the value that developers receive from various services provided by the Play store.  Tr. 2084:25–2086:21.  Testimony at trial also showed the value that Google Play Billing provides.  Tr. 3122:2–3138:2 (Loew).

3.     Epic's proposal seeks to regulate the difference between the service fee a developer pays when Google Play Billing is used and the fee when Google Play Billing is not used.  As Dr. Leonard explains, in economic terms, the difference in service fee a developer pays when Google Play Billing is used and the fee when Google Play Billing is not used is effectively the price of using Google Play Billing.  *See* Leonard ¶ 7.  Epic's proposed injunction seeks to set a floor on this price for Google Play Billing:  it must be at least as much as Google's average total cost of handling in-app transactions.  *See id*.  According to Epic, if Google's price for Google Play Billing is too low and its price for the rest of the services of the Google Play store is too high, then rival billing services will be squeezed:  developers can get Google Play Billing for less than what other billing services could charge.

4.     Both the Supreme Court and the Ninth Circuit have rejected this price "squeeze" theory as improper and inadministrable price regulation.  *linkLine*, 585 U.S. at 454 (rejecting price squeeze theory that antitrust defendant was required to set prices so that rivals could earn a "'fair' or 'adequate' margin"); *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 1000 (9th Cir. 2020), *reh'g en banc denied* (9th Cir. Oct. 28, 2020) (rejecting theory that Qualcomm's patent royalties "impose[d] an anticompetitive surcharge on its rivals' sales" of chipsets "by squeezing their profit margins").  As the Supreme Court has put it, there are "[i]nstitutional concerns" with requiring courts "to police" prices for two different products.  *linkLine*, 555 U.S. at 452–53.

5.     To the extent that Epic's suggestion is that Google should comply with the proposed injunction by increasing the overall fee that developers pay when they use both non-billing services in the Play store and Google Play Billing, the proposed injunction obviously would harm developers.  *See* Leonard ¶ 10.  Increasing prices to developers is exactly the opposite of what Epic argued it was seeking.  Indeed, "discouraging a price cut and forcing firms to

maintain supracompetitive prices, thus depriving consumers of the benefits of lower prices in the interim, does not constitute sound antitrust policy." *Brooke Grp.*, 509 U.S. at 224.  The Supreme Court has advised courts to be very cautious in trying to prevent firms from charging prices that are too low because "cutting prices in order to increase business often is the very essence of competition; thus, mistaken inferences" in trying to prevent low prices "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Id.* at 226.

6. Moreover, to the extent that the proposed remedy is instead designed to avoid a price "squeeze" by capping the fee that Google can charge for the valuable services of the Play store when another billing service is used, the proposed remedy would improperly prevent Google from charging fair value for its products.  *See* Leonard ¶ 12.

7. Capping Google's fees for valuable non-billing services would also raise constitutional concerns under the Takings Clause.  *E.g.*, *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1003–04 (1984) (Fifth Amendment required the government to pay Monsanto when law required it to publish confidential trade secret data).

**Objection 2:**  **Epic's use of average total cost to set Google's fee is legally unsupported, vague, and would be impossible to administer**

1. Epic's proposal to set Google's fees based on average total cost is legally unsound. Rather, under Ninth Circuit law, a below-cost pricing claim must allege prices are below marginal or average variable cost.  *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008) ("the appropriate measure of costs for our cost-based standard [for proving predation] is average variable cost"); *see also Brooke Grp.*, 509 U.S. at 256 n.16 (referring to predatory pricing as below "incremental cost"); *See* Leonard ¶¶ 14-19.  (explaining need to use variable costs, not total costs).

2. Additionally, the term "average total cost for handling in-app transactions" is vague and would require repeated judicial intervention to set Google's prices.  Neither Epic nor its experts explain whether operating costs are included.

3. Nor is it clear one could accurately identify and calculate operating costs for providing Google Play Billing separate from Google Play since billing services are integrated into

the suite of services provided by Google Play.  *See* Leonard ¶ 19.  Any calculation would depend

on an allocation of different operating costs to "handling in-app transactions," which is artificial

and highly disputable.  *See id.*  Indeed, the parties presented dueling accounting experts on that

very issue at trial.  *See id.*  Epic's proposed remedy would require the Court to resolve those sorts

of disputes regularly in the course of setting Google's prices.

**Objection 3:**          **The proposed remedy is not necessary to promote competition.**

1.      Epic did not argue at trial that Google's allegedly inflated service fees were a form

of conduct that harmed competition.  *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d

536, 549 (9th Cir. 1991) ("setting a high price may be a use of monopoly power, but it is not in

itself anticompetitive"); *see also infra* Objection No. 3 (explaining that Epic has not attempted to

prove a predatory pricing claim in this case).  Rather, Epic asserted that Google's service fees

were inflated because Google had used other conduct to block competition.  Thus, regulating

Google's service fees is not necessary to restore competition or stop the conduct that Epic alleged

at trial was anticompetitive.

2.      The proper remedy for any alleged harm to competition is not to set Google's

prices for its services but rather to restore competition that leads to prices at the competitive level.

*Nat'l Soc. of Pro. Eng'rs*, 435 U.S. at 695; *Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951).

As Epic's own expert, Dr. Tadelis, explained, "a properly applied but-for world with unbundled

pricing would be a world where ***competition would drive down Google's charges*** for its payment

solution services" and "app distribution services."  Shikman Decl., Ex. 14, Tadelis Reply Report

¶ 132; *see also* Leonard ¶ 12.  Dr. Bernheim agreed at trial that "*competition* leads to the provision

of high-quality products at low prices."  Tr. 2376:11-12 (emphasis added).

3.      Google's settlement with the States accomplishes this by addressing the conduct

that the jury found to be anticompetitive, including the requirement that developers that use the

Play store must use Google Play Billing for purchases of digital content inside apps downloaded

from Play.  The user choice billing program expanded by the State Settlement allows developers

to offer a payment processing option other than Google Play Billing.  Further, when a user selects

another payment option, Google adjusts the service fee it charges the developer to reflect the fact

1  that the developer continues to use many of the other services of the Play store but not Google

2  Play Billing.

3        4.       As discussed above, Epic and its experts do not explain how Google's fee for non-

4  billing services could coerce developers to choose Google Play's billing system.  Rather, it

5  appears that Epic is claiming that Google's price for Google Play Billing is too low.  Dr. Tadelis

6  claims that "Google set the 4% 'billing optionality discount' for User Choice Billing…well below

7  the level that…would give Developers the financial incentive to de-integrate Google Play Billing."

8  ECF 952-2, Statement of Steven Tadelis ("Tadelis") ¶ 10.  Therefore, Epic's proposal seeks to

9  force Google to *increase* the price it charges for Google Play Billing to a level at or above its

10  "average per-transaction total cost for handling in-app transactions in the preceding calendar

11  year."  *See* Leonard ¶¶ 7, 10.

12        5.       Moreover, even if Google could be required to set its prices to protect rival

13  payment processing services' profits, the facts show that rival payment processors can profitably

14  set prices that would make it economically feasible for developers to choose alternatives to Google

15  Play Billing.  The vast majority of in-app transactions are processed using credit cards or digital

16  wallets like PayPal.  *See* Leonard ¶ 31.  Documents cited in Dr. Tadelis's own expert statement

17  show that Google's average cost of payment processing for these forms of payment is less than

18  3%.  *See, e.g.*, ECF 887-31, Tr. Ex. 2698-046 (cited at Tadelis at 5 n.27) (2.6% average).  Thus, a

19  rival payment processor could profitably charge 3% for the use of its billing system.  This is

20  confirmed by record evidence showing that developers pay less than 4% for payment processing.

21  *See* Leonard ¶ 32.  Further, Google is not in a position to predict what services payment processors

22  may choose to include as a part of the services they may provide, and how they will seek to set the

23  prices for those services, which underscores the reasonableness of evaluating the most used and

24  readily available forms of payment.

25        6.       These numbers show that Epic's price setting remedy is not necessary to promote

26  competition among billing systems.  For example, the evidence at trial showed that the vast

27  majority of developers who offer in-app purchases pay a service fee of 15% or lower.  Tr. 1394:2-

28  13 (Pichai).  A developer that pays a 15% service fee on a digital goods transaction purchased

-71-

through Google Play Billing would currently pay a service fee of 11% on that same digital goods transaction handled by another payment processor.  The few large developers that pay a 30% service fee on a transaction processed through Google Play Billing would pay a 26% service fee on digital goods purchased through another billing system.  Tr. 890:8-14 (Kochikar).  The documents cited by Dr. Tadelis show that competitive billing systems could profitably charge 4% or lower, meaning that developers at any service fee level could use an alternative to Google Play Billing at a similar or lower service fee.  *See* Leonard ¶¶ 5, 30-32.

7.      Dr. Tadelis misleadingly claims that Google's average payment processing costs for Google Play Billing is between 4 and 6%.  Tadelis at n.26.  But this includes Google's costs for processing Google Play branded gift cards, which cannot be used to make purchases on alternative billing systems.  *See* Leonard ¶¶ 21-24, 31.  In certain markets, it also includes direct carrier billing ("DCB"), a high-cost form of payment.  *See id.*  However, both gift cards and DCB involve costs that go beyond handling in-app transactions.  *See* Leonard ¶ 21.  Detailed allocations would be needed to limit gift card and DCB costs to only the costs related to handling in-app transactions.  *See* Leonard ¶ 24.  Moreover, there is no indication that rival billing providers would offer DCB or gift cards.  *See* Leonard ¶ 31.  If Google was required to price Google Play Billing high enough to cover DCB and gift cards—forms of payment which developers may not choose to implement and may reflect costs other than those for processing transactions—it would have a strong economic incentive to drop DCB and gift cards as a form of payment, which would harm consumers by removing them as a payment option.  *See* Leonard ¶ 27.

**Objection 4:**       **Epic's proposed remedy would improperly and unfairly require Google to disclose confidential information about its costs.**

1.      Epic's proposed remedy would also impermissibly require Google to disclose to the public confidential, competitively sensitive information.  As an initial matter, such forced disclosure would raise constitutional concerns under the Takings Clause.  *E.g.*, *Ruckelshaus*, 467 U.S. at 1003–04 (Fifth Amendment required the government to pay Monsanto when law required it to publish confidential trade secret data).

2.      Further, requiring Google to disclose its exact cost structure for payment

processing would give its rivals an unfair advantage in setting their own prices.  Google's rivals would have access to Google's cost structure that would not be available to them in a competitive market, and Google would not have access to the rivals' cost structure.  Google objects to Epic's proposed fee cap in its entirety.  But if that objection were overruled and the Court ordered the requested cap, there is no good reason why the mechanisms for ensuring that Google complies with any injunction would not be sufficient to ensure compliance with the cap on a confidential basis.

**Objection 5:**       **Epic's proposed ban on Google obtaining information regarding transactions processed on alternative billing systems does not remedy any claimed anticompetitive conduct.**

1.       Epic proposes to prohib Google from using APIs or requiring developers to provide financial information on transactions processed through alternative billing systems but fails to explain how this serves any competitive purpose.  *See* Leonard ¶ 34.  Epic's proposal allows Google to collect a fee for non-payment-processing services provided by Play based on the transactions processed through alternative billing systems.  For Google to collect such a fee, developers must be able to report transactions efficiently, and Google must be able to receive those reports, through APIs, which can automatically transfer that information at scale.  *See* Leonard ¶ 35.  Any "contractual right" to charge a service fee on transactions processed through alternative billing systems—*see Apple II*, 67 F.4th at 993—must come with a right to confirm the amount and accuracy of sales processed through those billing systems.  Epic's proposal is designed entirely to frustrate Google's ability to ensure that it is paid fair value for its services.  Neither Epic nor its experts explain how Google would harm competition by using APIs to report transactions on which it indisputably can charge fees.

2.       Under the State Settlement, Google's ability to collect data is not unfettered:  Google may only "require from developers the minimum amount of data necessary to support the offering of an alternative billing system and for collection of its service fee.  Google will not use this data for purposes of competing with those developers' apps."  Settlement Agreement § 6.3.2.

**C.      Parts III.A.1 and A.2 - Free Flow of Information Regarding Out of App Purchasing Options (Steering)**

Epic's proposed injunction prohibits Google from "limit[ing], control[ing], or restrict[ing] the ways an app can inform Users about out-of-app purchasing options" and from "restrict[ing], prohibit[ing], imped[ing], disincentiviz[ing], or deter[ring] Developers from informing Users about out-of-app purchasing options or from offering different prices for in-app purchases using Google Play Billing and using out-of-app payment options."

**Objection 1:        Epic's proposed remedy is unnecessary to promote competition in light of the provisions in the State Settlement addressing developer communication with users.**

1.      Google has already agreed to most of the changes requested by Epic as part of its settlement with the States.  Under the settlement, developers will be able to communicate with users, including steering them to alternative billing systems inside the app. With UCB, developers will be able to offer an alternative billing system alongside Google Play Billing.  State Settlement § 6.11.1.  Developers also will be able to link to the developer's existing web-based billing solution in an embedded web browser that a user can access without leaving the app.  *Id*. Developers will be able to "inform Users within the app about different pricing or promotions that may be available if the User uses the developer's alternative in-app billing system."  *Id*. § 6.11.1(a).  Developers will be able "to use contact information obtained outside the app or in-app" to email or text users about alternative ways to pay for in-app content.  *Id*. § 6.11.2.  Developers will be able to inform users about alternative ways to pay outside the app (but without providing an external link to those methods).  *Id*. §§ 6.11.3, 6.11.4.  Finally, developers will be able to inform users about any service fees (or other fees) associated with Google Play or Google Play's billing system.  *Id*. § 6.11.5.  In short, under the settlement, developers will have many ways to inform users about alternative billing options and payment methods and several ways to  steer users to those options.

2.      These provisions were carefully crafted to give developers many ways to inform users about alternative billing options and payment methods and several ways to steer users to those options, while preserving Google's right to impose some narrow restrictions to preserve the

user experience and ensure the safety and privacy of its users.  *See, e.g.*, State Settlement §§ 6.11.2; 6.11.4(c); 6.11.5.  Such provisions are necessary because steering users outside the app, particularly through links, carries inherent risks (e.g., through links that lead to fraudulent websites[10]) and may be done in ways that degrade the user experience (e.g., through unwanted spam emails or pop-ups).  Epic's proposed remedy upsets this balance by eliminating Google's ability to impose even limited restrictions on in-app communications.  *See* Gentzkow ¶¶ 122-131.  This further restriction is unnecessary in light of the many ways that the State Settlement allows developers to communicate with users about alternative billing systems.

**Objection 2:**     **Epic's proposal is overly vague and will require repeated judicial intervention.**

1.     Epic's proposal to prohibit Google from "restrict[ing], prohibit[ing], imped[ing], disincentiviz[ing] or deter[ring] developers from informing users about out-of-app purchasing options" is overly vague and would require repeated judicial intervention.  *Any* action Google takes to improve or promote Google Play Billing may, in effect, disincentivize developers from steering users to an alternative billing system.  *See* Gentzkow ¶ 127.  Epic's proposal would require repeated Court intervention to determine whether particular actions—including actions intended to promote Google Play Billing or to preserve user experience, safety, and privacy—"disincentivize" developers, and if so whether they are covered by Epic's equally vague carve-out for "price or quality improvements."

**Objection 3:**     **Epic's proposed remedy would harm users and force Google to offer terms and conditions preferred by their rivals, thus preventing it from designing Play in a way that promotes the best user experience.**

1.     Epic's proposal would harm users by prohibiting Google from regulating developers' use of tactics that degrade user experience.  For example, Google would also be forced to distribute apps even if they provided a poor user experience by inundating users with spam pop-ups.  Epic's proposal would also require Google to allow external links (e.g., links to

---

[10] *See* Shikman Decl., Ex. 15, Fed. Trade Comm'n, *How to Recognize and Avoid Phishing Scams* (Sept. 2022), https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams (noting how scammers use email and texts to trick users by asking them to "click on a link to make a payment — but the link has malware").

1   external browsers), which would open a new app—a web browser—to complete the transaction.

2   The user then has to navigate back to the app, which is not a good user experience.  Users may

3   choose to acquire and interact with apps from the Play Store with the expectation that they will not

4   be forced to exit a safe and vetted app environment to make a purchase and then forced to find

5   their way back into the app they left.[11]  As Epic's expert Dr. Tadelis testified, "leaving the app"

6   causes "a lot more friction and a lot more dropoff."  Tr. 2557:9-10 (Tadelis); *see also* Tr. 2554:2-9

7   (Tadelis) (opining that "web purchases are not a viable substitute for in-app purchases" because of

8   increased "friction").

9        2.      Epic's proposal would thus force Google to carry apps that do not comport with

10   how Google wants to design and promote Google Play.  In order to compete as a safe and trusted

11   app store, Google must be able to decide which apps to distribute and what policies they must

12   follow.  Therefore, it has restrictions on everything from content (e.g., no pornographic material)

13   to data access (e.g., prohibiting the sale of personal and sensitive user data from an app).  One

14   aspect in designing and promoting a safe and trusted app store is to ensure that users can operate

15   and transact within a safe and vetted app environment without being inundated with spam or sent

16   outside the app via an external link.  Epic's proposal would prevent Google from offering users

17   that selling point, and thus deprives Google of its unilateral discretion on choosing with whom it

18   can deal and on what terms.  The antitrust laws do not impose such a duty to deal.  *See Trinko*, 540

19   U.S. 398 (2004); *see also* ECF 700.  "As the Supreme Court has repeatedly emphasized, there is

20   'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]'"

21   *Qualcomm*, 969 F.3d at 993–94 (citations omitted).

22

23

24

25

26   _____

27   [11] In contrast, under the States' settlement, Google will allow links to alternative billing systems as
     long as they are in an embedded webview—i.e., an embedded browser page that a user can access
     without leaving the app.  This ensures a good user experience because the user doesn't have to

28   leave the app to complete the transaction.  After the transaction is completed, the user is
     automatically returned to the app.

**Objection 4:**        **A permanent injunction is unwarranted.**

1.        Google further objects to Epic's proposed remedy on the ground that it would harm users by preventing Google from taking reasonable security and privacy precautions in the future. While Google's settlement with the States ensures that developers will be able to communicate with users in various ways for up to six years, Epic's proposal *permanently* bars Google from imposing *any* restrictions on developers "directing or informing" users of payment methods outside of apps.  Allowing developers to steer users outside the app may open up a new vector for fraud or malware.  Epic's proposed remedy goes too far because Google would be unable to respond to emerging security and privacy risks.  *See New York v. Microsoft*, 224 F. Supp. 2d 76, 183–84 (D.D.C. 2002) (Where there is "substantial uncertainty" as to the future demands of a given industry, it can be difficult to predict what effect a given remedy will have "a decade from now."); *see also Alston*, 594 U.S. at 102 ("'An antitrust court is unlikely to be an effective day-to-day enforcer' of a detailed decree, able to keep pace with changing market dynamics alongside a busy docket.'") (citation omitted).

   **D.        Part III.B.1  - No Tying of Distribution to Payments**

As discussed above, under Google's settlement with the States, Google no longer prohibits developers from including an alternative billing system in apps distributed through the Play store, so developers are free to offer alternative in-app payment options *alongside Google Play Billing* under its User Choice Billing ("UCB") offering.  Under Epic's proposed injunction, however, developers would be able to eliminate this choice by offering alternative in-app payment solutions *in lieu of Google Play Billing.*

**Objection 1:**        **Epic's proposed remedy is not reasonably necessary to address Google's tying conduct.**

1.        Epic's proposal goes beyond what is necessary to address Google's tying conduct. Epic's theory at trial was not that Google refuses to permit developers to use the Play store unless they also use Google Play Billing; after all, it was undisputed that 97% of developers that use the Play store do not use Google Play Billing.  Tr. 1394:2-8 (Pichai); Tr. 3143:16-19 (Loew).  Rather,

Epic's theory was that Google engaged in a "negative tie"[12]:  if developers use the Play store, they cannot use alternative billing systems.  By requiring user choice billing ("UCB"), the State Settlement addresses that negative tie because it permits developers to use alternative billing systems in apps installed from the Play store.  State Settlement § 6.3.1.

**Objection 2:        Epic's proposed remedy would harm users and decrease user choice.**

1.        Epic's proposed remedy would deprive users of the ability to choose a single secure billing system *across all of their apps* where they can easily track purchases, manage payment options, exercise parental controls, manage subscriptions, and resolve billing issues for all apps downloaded via the Google Play store.  Google Play Billing provides that functionality across all apps distributed by Google Play, but other payment processing services would not.  Accordingly, if developers do not offer Google Play Billing as an option, then users will not have the ability to use a cross-app billing service.  *See* Gentzkow ¶¶ 136-139.  The State Settlement preserves user choice by ensuring that developers offer Google Play Billing as one option for the user to select for their payment system.

2.        While Google has incentives to provide users a positive cross-app experience in the purchase of digital goods—including by making it easy to obtain refunds, allow parents to exercise control over purchases by their children, and cancel subscriptions—app developers' goals can be more narrow, and driven by an economic incentive to maximize profits from transaction volume.  *See* Gentzkow ¶ 138.  The record is replete with examples of developers taking advantage of users by, for example, making it difficult to cancel subscriptions, refund purchases, or trick minors into making purchases.  ECF 888-85, Trial Ex.10928 (large developer recognizing that making it easy for users to cancel subscriptions has a negative impact on LTV); Tr. 1645:1–1646:2 (Rasanen) (explaining Trial Exhibit 10928 language as large developer wanting to "keep people on their subscriptions because it was hard to cancel them and so they had people continuously paying"); Tr. 3125:15-18 (Loew) ("Q. Has the Google Play team heard feedback

---

[12]  "Under the more traditional positive tie, sale of the desired ("tying") product is conditioned on purchase of another ("tied") product. A negative tie occurs when the customer promises not to take the tied product from the defendant's competitor." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (citations omitted).

from users about developers making it difficult to cancel subscriptions in an app?  A. Yes, we've heard that."); Shikman Decl., Ex. 16, Decision and Order at 1, *In re Epic Games, Inc.*, FTC Docket No. C-4790 (Mar. 13, 2023 (complaint and consent order), https://www.ftc.gov/ system/files/ftc_gov/pdf/1923203epicgamesfinalconsent.pdf (fining Epic Games for using "dark patterns" to get users, including minors, to make purchases).[13]  Google has observed the same concern expressed by users.

**Objection 3:**        **Epic's proposal is overly vague and will require repeated judicial intervention.**

1.       Epic's proposal to prohibit Google from "enforc[ing] . . . guidelines or policies, or impos[ing] technical restrictions or financial terms that . . . disincentivize or deter Developers from integrating any Alternative In-App Payment Solution . . . or from offering different prices for in-app purchases" is overly vague and would require repeated judicial intervention.  *Any* action Google takes to implement or enforce guidelines or policies may, in effect, disincentivize or deter developers from integrating an alternative billing system or offering different prices for in-app purchases.  Epic's proposal would require repeated Court intervention to determine whether particular actions—including actions intended to preserve user experience and safety— "disincentivize or deter" developers, and if so whether they are covered by Epic's equally vague carve out for "quality improvements."

2.       For example, one requirement Google has for UCB is that an alternative billing system must comply with the Payment Card Industry Data Security Standard (PCI-DSS) if handling credit and debit card data.[14]  "PCI DSS provides a baseline of technical and operational

---

[13] Pursuant to Federal Rules of Evidence, Rule 201, Defendant Google requests judicial notice of Decision and Order, *In re Epic Games, Inc.*, FTC Docket No. C-4790 (Mar. 13, 2023 (complaint and consent order),https://www.ftc.gov/system/files/ftc_gov/pdf/1923203epicgames finalconsent.pdf (Shikman Decl., Ex. 16).  The Court may take judicial notice of both documents as matters of public record, and as court documents already filed in other courts.  E.g., *Holder v. Holder*, 305 F.3d 854, 866 (9th Cir. 2002); *Lemoon v. Cal. Forensic Med. Grp., Inc.*, 575 F. Supp. 3d 1212, 1230 (N.D. Cal. 2021).

[14] Shikman Decl., Ex. 17, Play Console Help, *Enrolling in the user choice billing pilot*, https://support.google.com/googleplay/android-developer/answer/12570971?hl=en&ref_topic= 3452890&sjid=962272976662676777-NC.

requirements designed to protect payment account data."[15]  It is not clear whether Epic's proposal, as written, would prohibit Google from enforcing this requirement to protect cardholder data since a developer that does not want to comply with PCI-DSS would be "disincentivized" or "deterred" from offering an alternative billing system.  *See* Gentzkow ¶ 142.

**Objection 4:**  **Epic's proposed remedy would force Google to offer terms and conditions preferred by its rivals, thus preventing it from designing Play in a way that promotes the best user experience.**

1.  Epic's proposal would force Google to carry apps that do not comport with how Google wants to design and promote Google Play.  *See* Gentzkow ¶¶ 136-137.  In order to compete as a safe and trusted app store, Google must be able to decide which apps to distribute and what policies they must follow.  Therefore, it has restrictions on everything from content (e.g., no pornographic material) to data access (e.g., prohibiting the sale of personal and sensitive user data from an app).  One aspect in designing and promoting a safe and trusted app store is to ensure that Google Play Billing is one option in apps that sell digital content.  That way, Google Play users can install apps from Google Play knowing that if they purchase items in the app, they can use Google Play Billing, if they so choose, without giving their payment information to the developer and knowing that they can easily track their purchase, cancel a subscription, or monitor their child's purchases.  Epic's proposal would prevent Google from offering users that selling point, and thus deprives Google of its unilateral discretion on choosing with whom it can deal and on what terms.  The antitrust laws do not impose such a duty to deal.  *See Trinko*, 540 U.S. 398 (2004); *see also* Order on Google's Mot. for Summary Judgment, ECF 700.  "As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]'"  *Qualcomm*, 969 F.3d at 993–94.

---

[15]*See* Shikman Decl., Ex. 18, PCI Sec. Standards Counsil, *PCI DSS v.4.0 Quick Reference Guide* at 8, https://docs-prv.pcisecuritystandards.org/PCI%20DSS/Supporting%20Document/PCI_DSS-QRG-v4_0.pdf.

E.       **Part III.C.3 and C.4 - No Discrimination on the Basis of Payment Solution**

Epic's proposed injunction, among other things, would forbid Google from engaging in "any conduct" that "impedes access" to (1) "the Android platform, any Android functionality and/or features or APIs," or (2) "any of Google's products or services," based on whether the developer integrates Google Play Billing.  Google objects to these remedies for the same reasons outlined in Sections II.G and II.H, where applicable, which address these subjects in greater detail.  For example, some APIs may not be appropriate for developers that are not using Google Play Billing.  In addition, Google objects on the following grounds.

**Objection 1:**       **Epic's proposed remedy is not supported by the trial record.**

1.       At trial, Epic did not present any evidence that Google withholds any aspect of "the Android platform, any Android functionality and/or features or APIs" based on whether the developer integrates Google Play Billing.  Nor did Epic present evidence that Google withholds such access to Google's other "products or services" based on refusal to integrate Google Play Billing.  Epic also did not present evidence regarding any harm to competition caused by Google's policies or practices regarding access to Android functionalities or Google's other products and services.  At the end of trial, the jury was not asked to find and did not find that any conduct related to this proposed remedy was anticompetitive, nor has Epic shown any connection between the conduct found anticompetitive and Google's practices related to APIs.  Under these circumstances, there is no basis to impose Epic's proposed remedy.  Indeed, Epic has failed to show any threat of future injury and lacks standing to seek this relief.

**Objection 2:**       **The proposed remedy is impermissibly vague and would require constant judicial supervision.**

1.       Google further objects that this proposed remedy is impermissibly vague.  As an initial matter, Epic's proposed injunction does not clarify whether Google must make available *all* "features or APIs," or whether such "features or APIs" are limited to those relating to the Android operating system.[16] If the injunction were limited to *Android* "functionalit[ies and/or features or

---

[16] Dr. Tadelis suggests that this remedy would be limited to *Android* functionalities.  Statement of Steven Tadelis, ECF952-2 ("Tadelis") ¶ 28 (stating concern that Google would "withhold[] key Android functionality from Developers who do not use Google Play Billing exclusively).

APIs," the injunction fails to define or specify how to determine such a limitation, including potential functionalities that overlap with Play store features.  This kind of ambiguity cannot be cured without a detailed technical protocol, which would embroil the Court in technical and definitional disputes.  The proposed injunction therefore would risk requiring the "courts to act as" a "central planner[]"—"a role for which [it is] ill suited."  *Trinko*, 540 U.S. at 408; *see Alston*, 594 U.S. at 102 ("Judges must be sensitive to the possibility that the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition" because "the decrees themselves may unintentionally suppress procompetitive innovation and even facilitate collusion.") (internal quotation marks & citations omitted).

## IV.   PART IV - COMPLIANCE

Google objects to Epic's proposed compliance structure on the grounds that it is unnecessary and unduly burdensome in light of the robust compliance protocol in the State Settlement.

**Objection 1:**   **Epic's proposed compliance structure is unnecessary in light of the State Settlement.**

1.   Google objects to Epic's proposed compliance structure on the ground that it is unnecessary in light of the State Settlement.  Epic's proposed compliance structure would require Google to create a Board of Directors committee, including the retention of a compliance officer and collect extensive documentation, all of which is unnecessary, as such measures do not materially advance the goal of evaluating Google's actual compliance with any injunction and seem intended instead to create burdensome administrative obligations for Google.  The State Settlement compliance protocol, which Google already agreed to implement, prioritizes establishing clear documentation of the specific actions Google takes to implement and comply with the conduct provisions (*i.e.* State Settlement § 6) of the State Settlement.  The information Google must provide for this purpose will be reviewed by an independent professional with the authority to request follow up information from Google, and who will perform an independent assessment and evaluation of Google's compliance.  This compliance protocol can easily be

1    expanded to address monitoring of any injunctive relief ordered here.

2          2.      Epic's proposal would have Google adopt a separate compliance protocol in

3    addition to that required by the State Settlement, requiring Google to establish a compliance

4    committee within its Board of Directors, hire a compliance officer, and collect extensive

5    documentation from numerous individuals within the company.  This proposal is unnecessary and

6    unduly burdensome.  There is no basis to require that Google create a committee of the Google

7    Board of Directors, which Epic demands be comprised of at least three independent directors, for

8    the purpose of monitoring Google's compliance with any injunction.  Nor does it make sense to

9    require Google to retain a permanent compliance officer who would report to Google's CEO, in

10   addition to the independent professional who will already be retained as part of the State

11   Settlement, to monitor compliance.  *See, e.g.*, *Conwood Co., L.P., et al. v. United States Tobacco*

12   *Co.*, No. 5:98-CV-108-R, 2000 WL 33176057, at *2 (W.D. Ky. Aug. 10, 2000) (declining to

13   appoint an "independent committee to UST's board of directors to enforce compliance with the

14   [injunction].").  Moreover, demanding that Google restructure its Board of Directors consistent

15   with Epic's demands would require the Court to micromanage Google's business activities in a

16   way that is contrary to Supreme Court precedent.

17         3.      Additionally, forcing a large, vaguely-defined group of employees to participate in

18   annual attestations will not meaningfully advance the goal of monitoring Google's compliance

19   with any injunction.  In addition to being administratively burdensome, the attestations will

20   provide little information that this Court could actually use to evaluate Google's compliance with

21   the injunction.  Instead, the reports that Google will already provide as part of the State

22   Settlement, which require documentation of Google's compliance activities, are a more useful

23   means of assessing the specific actions and conduct Google has performed to ensure compliance

24   with any injunction.

25

26

27

28

# V.    PART V - ANTI-RETALIATION

**Objection 1:**      **Epic's "anti-retaliation" proposal creates an affirmative duty to deal, which violates settled antitrust law.**

1.      Epic's "anti-retaliation" proposal is not anti-retaliation but rather a mandate for Google to distribute Epic's apps through Play despite undisputed evidence at trial that Epic deceived Google by submitting a hot-fix that Epic knew violated Google's policies.  Google objects to this proposed remedy on the ground that it violates the settled legal rule that a party is not required to deal with its rivals.  *See Trinko*, 540 U.S. at 408; *Qualcomm*, 969 F.3d at 993–94.  Google has no duty under the antitrust laws to deal with Epic—whether at all or on terms that Epic prefers.  *Qualcomm*, 969 F.3d at 993 ("'[T]he Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" (quoting *Trinko*, 540 U.S. at 408)).  An injunction requiring Google to permit Epic's apps alone back into Play will also not restore or enhance competition in any of the markets the jury found to have been impaired by Google's conduct.

2.      In addition, the Ninth Circuit recognizes that a party has a "legitimate business reason" for refusing to do business with a company after being sued by that same company:  to "avoid[] future litigation whose costs exceed[] the benefits from doing business."  *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 890 (9th Cir. 1982); *see also id.* at 889–90 ("[W]e have not found any case in which a 'refusal to deal' based on a customer's prosecution of a suit against a manufacturer has been held to constitute an unreasonable restraint of trade.  This when considered is not astonishing, for the relationship between a manufacturer and his customer should be reasonably harmonious; and the bringing of a lawsuit by the customer may provide a sound business reason for the manufacturer to terminate their relation.") (citing *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir. 1962)); *Tyntec Inc. v. Syniverse Techs., LLC*, No. 8:17-CV-591-T-23SPF, 2019 WL 9829361, at *9 (M.D. Fla. Aug. 19, 2019), *report and recommendation adopted*, No. 8:17-CV-591-T-23SPF, 2020 WL 2786873 (M.D. Fla. May 29, 2020) ("An antitrust suit filed against a party is a legitimate reason for that party's refusing to

-84-

1    deal.").

2          3.     At trial, Epic conceded that it secretly incorporated its own payment solution into

3    Fortnite on Play and that doing so violated the terms of the DDA.  *See* Tr. 3004:6-8 (Grant)

4    ("And that's because you understood that releasing the Hotfix would breach your contract with

5    Google; correct?  A.  Yes, we did."); Tr. 3050:5-8 (Court) ("So to my recollection, Epic was open

6    and very public about not paying Google Bit [sic] Play's fees . . . [I]n fact, one of the witnesses

7    here today said, "Yes, we breached the contract.").  Google should not be forced to do business

8    with a company that knowingly and openly violated the terms of its policies.  Epic's conduct

9    ended any "reasonably harmonious" relationship with Google, justifying Google in choosing not

10   to do business with Epic.

11         4.     Google further objects to this proposed remedy on the ground that it is unworkable.

12   Under Epic's proposal, Google has the burden to prove that a decision to not distribute an Epic

13   app through Play is not retaliatory.  Disputes about Google's reasons for deciding not to do

14   business with Epic and on what terms would embroil this Court in the very type of

15   micromanagement that courts are "ill-suited" to handle.  *Epic Games, Inc. v. Apple Inc.*, 559 F.

16   Supp. 3d at 1069 (stating that, consistent with Supreme Court precedent, "courts are not well-

17   suited to" "micromanage business operations"); *see also Alston*, 594 U.S. at 102 ("Judges must be

18   sensitive to the possibility that the 'continuing supervision of a highly detailed decree' could wind

19   up impairing rather than enhancing competition" because "the decrees themselves may

20   unintentionally suppress procompetitive innovation and even facilitate collusion.").  *Cf.* 1/18/24

21   Hr'g Tr. 11:18-21 ("A United States district judge, whether me or anyone else or any Article III

22   judge in the federal judiciary, is not going to micromanage Google.").  For example, if Google

23   rejected Epic's request to do business on particular terms, the Court would have to evaluate

24   whether those terms were reasonable.  That is exactly the inquiry that the Supreme Court has

25   instructed courts to avoid in antitrust cases.  *Alston*, 594 U.S. at 102 ("Judges must be wary, too,

26   of the temptation to specify the 'proper price, quantity, and other terms of dealing'—cognizant

27   that they are neither economic nor industry experts.") (citation omitted); *Kodak*, 125 F.3d at 1225

28   (court erred by limiting Kodak to charging only "reasonable" prices).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.    GEOGRAPHIC SCOPE

**Objection 1:**    **A worldwide injunction would exceed this Court's authority pursuant to the Foreign Trade Antitrust Improvements Act ("FTAIA").**

1.    Epic's proposed worldwide injunction (excluding China) asks this Court to enjoin wholly foreign conduct.  The FTAIA restricts this Court from enjoining such conduct.  15 U.S.C. § 6a; *see also Empagran*, 542 U.S. at 158–59 (conduct that "involves" foreign commerce is presumptively outside the scope of the antitrust laws).

2.    "U.S. antitrust laws concern the protection of '*American* consumers and *American* exporters, not foreign consumers or producers.'"  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d at 986 (citation omitted); *see also Empargran*, 542 U.S. at 165 (FTAIA prevents the "risk of interference with a foreign nation's ability independently to regulate its own commercial affairs" by limiting the application of U.S. "remedies.").  Under the FTAIA, the antitrust laws do not apply to foreign commerce unless the conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, import commerce, or export commerce.  15 U.S.C. § 6a.  Developers outside of the U.S. transact with users outside of the U.S. via versions of the Play store designed for countries outside of the U.S.  Epic has made no showing that Google's conduct as to those transactions has a direct, substantial, and reasonably foreseeable effect on U.S. commerce, or import or export commerce.  Recently, in Order at 6–7, *Societe du Figaro, SAS, et al. v. Apple, Inc.*, No. 4:22-cv-04437-YGR, ECF 84 (N.D. Cal. Sept. 13, 2023), the court dismissed an antitrust complaint under the FTAIA where "[p]laintiffs alleged that French consumers bought apps from French developers in a French iOS App Store front."  Similarly, the Court in this case should not issue an injunction that covers sales from foreign developers (or foreign subsidiaries of developers) to foreign users made through a foreign Play storefront.

**Objection 2:**    **A worldwide injunction would violate fundamental principles of international comity and interfere with foreign states' enforcement of their own laws inside their own borders.**

1.    Even if this Court finds the FTAIA does not prohibit this Court from issuing an injunction against conduct that extends beyond the United States, principles of international comity weigh strongly against doing so in order to avoid interfering with a foreign state's

-86-

enforcement of competition laws within its own borders.  *See Mujica v. AirScan Inc.*, 771 F.3d 580, 605 (9th Cir. 2014) (recognizing the "presumption against extraterritorial application of U.S. law" which "serves to protect against unintended clashes between our laws and those of other nations") (citation omitted).  Under the doctrine of international comity, this Court may "decline to exercise jurisdiction in a case properly adjudicated in a foreign state" in order to avoid interfering with a foreign state's exercise of its own jurisdiction.  *Id.* at 598–99; *see also Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1145 (D. Or. 2018) (even where the FTAIA does not bar the application of the Sherman Act a "[c]ourt may still apply the principles of international comity").

2.      Applying the comity doctrine, the Supreme Court has asked, "Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies?" *Empagran*, 542 U.S. at 165.  After all, "other nations have not in all areas adopted antitrust laws similar to this country's and," even if those different "nations agree about" the anticompetitive conduct at issue, "they disagree dramatically about appropriate remedies."  *Id.* at 157, 165–67.

3.      Consistent with principles of international comity, this Court should reject Epic's request for a worldwide injunction to avoid any unintended conflicts or inconsistencies with legal proceedings and regulatory initiatives in foreign states.

4.      First, Epic has asserted claims against Google based on much of the same conduct presented to the jury in this case under competition laws in both Australia and the United Kingdom.  Epic is requesting that courts in both of those jurisdictions issue injunctions against Google.  Indeed, Epic's claims against Google under Australian competition law are currently being tried jointly with Epic's claims against Apple in a court in Melbourne.  Accordingly, a worldwide injunction could conflict with rulings from courts hearing Epic's cases in Australia and the United Kingdom.  For example, if this Court issues a global injunction requiring Google to eliminate certain contractual provisions related to placement of Play on Android devices, but the court in Australia rules that Google's contracts related to Play placement are lawful under

Australian law, then this Court would require Google to refrain from conduct in Australia that an Australian court has determined is lawful under Australian law.  Limiting any injunctive relief to the U.S. would avoid this risk of interfering with foreign states' enforcement of their own competition laws.

5.      Second, a worldwide injunction could create similar conflicts with foreign regulations that govern the conduct that Epic challenged at trial and seeks to regulate with its proposed injunction.  For example, both the 2021 South Korea Telecommunications Business Act and the Digital Markets Act (DMA) that came into force in the European Union earlier this year regulate billing systems for payments inside Android apps.  As it must, Google has taken steps to comply with these laws.  A worldwide injunction could impose obligations on Google that conflict with its obligations under foreign laws or supplant foreign sovereigns' authority to balance the many competing interests within their borders.

6.      Third, competition authorities around the world are actively investigating the conduct that was litigated at trial in this case, including Google's Google Play Billing requirement, steering policies, and the MADA.  Some of these investigations currently involve initial demands for documents and data while others have proceeded to appeals from certain orders.  A worldwide injunction risks preempting these foreign enforcement officials' ability to enforce their own laws as well as inconsistent orders. That risk is not merely theoretical.  Recently, the Competition Commission of India ("CCI") asserted that it has jurisdiction over whether Google can enforce its Payments policy against Indian developers outside of India, including those located in the United States.  Google is likewise objecting to the CCI's assertion of jurisdiction because it violates the norms of international comity by permitting a foreign antitrust authority to regulate conduct occurring within the U.S.—conduct which would otherwise be subject to the Sherman Act and would be covered by the jurisdiction of this Court.  If the Court orders a worldwide injunction here, it could encourage other nations and their agents—like the CCI—to enforce laws that undermine U.S. sovereignty.  *Mujica*, 771 F.3d at 608 (citations omitted) ("[W]e recognize that there are other legal systems that have effected, in different ways, our constitutional values of separation of powers, due process of law, and the equal protection of the law.  Comity, as the

'golden rule among nations,' compels us to 'give the respect to the laws, policies and interests of others that [we] would have others give to [our] own in the same or similar circumstances.'").

7.       Finally, the conflict between Epic's proposed worldwide injunction and enforcement activity by foreign authorities is not limited to antitrust or competition law.  For example, while Epic's proposed injunction would scale back protections against sideloading, some foreign government agencies have demanded that Google make sideloading *more* restrictive to guard against financial fraud and malware affecting Android users, including "increasingly sophisticated tactics employed by scammers to deceive users into installing malicious apps on their Android devices."  *See* Shikman Decl., Ex. 12 ("Joint Advisory on Malware Scams Affecting Android Users" issued by Singapore Police Force and Cyber Security Agency of Singapore).  The Cyber Security Agency of Singapore (CSA) recently asked Google to "develop[] a custom Android OS/firmware for Singapore as an interim measure, that perhaps disallow sideloading or make sideloading more difficult…."  Kleidermacher Decl., Ex. F (email from CSA to Google dated Aug. 22, 2023).  Google partnered with the CSA to implement a new program to prevent users from sideloading certain apps in Singapore that are known to abuse Android permissions and result in financial scams harming consumers in Singapore.  *Id*. ¶ 15-17.  Similarly, Thailand's Ministry of Digital Economy and Society (MDES) wrote to Google noting that "many Thai people have fallen victim" to "financial scams involving malicious mobile apps" and "at least over five hundred million US dollars have been lost."  *Id*., Ex. G (Letter from MDES to Google dated Feb. 15, 2024).  Because "combating online scams is considered an urgent and top priority on the [Thai] national agenda," Thailand's MDES requested that Google "block[] the installation of Internet-sideloaded apps that may use sensitive permissions frequently abused for financial fraud." *Id*.  If this Court orders a worldwide injunction that requires Google to implement changes to further reduce the security protections around the sideloading of apps on Android devices, such an order would be directly at odds with requests from foreign authorities that Google do more to restrict sideloading in order to protect their citizens.

8.       Even if the Court concludes the doctrine of comity does not formally apply here, these considerations weigh strongly against the issuance of equitable relief outside the United

States under *eBay*. The Supreme Court's warning that district courts should exercise "caution" and "a healthy dose of judicial humility" when fashioning equitable relief applies with particular force to Epic's request that this Court assume the role of a global competition regulator. *Alston*, 594 U.S. at 107.

DATED:  May 2, 2024                                     Respectfully submitted,

                                                       By:     /s/ Glenn D. Pomerantz
                                                                 Glenn D. Pomerantz

                                                       **MUNGER TOLLES & OLSON LLP**
                                                         Glenn D. Pomerantz
                                                         Kuruvilla Olasa
                                                         Jonathan I. Kravis
                                                         Justin P. Raphael
                                                         Nick R. Sidney
                                                         Dane Shikman
                                                         Rebecca L. Sciarrino
                                                         Jamie B. Luguri
                                                         Lauren N. Beck

                                                       **MORGAN, LEWIS & BOCKIUS LLP**
                                                         Brian C. Rocca
                                                         Sujal J. Shah
                                                         Michelle Park Chiu
                                                         Minna Lo Naranjo
                                                         Rishi P. Satia

                                                       **HOGAN LOVELLS US LLP**
                                                         Neal Kumar Katyal
                                                         Jessica L. Ellsworth

                                                       *Counsel for Defendants*

1

## E-FILING ATTESTATION

2      I, Glenn D. Pomerantz, am the ECF User whose ID and password are being used to file

3  this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that counsel for

4  Defendants have concurred in this filing.

5

6                                                                *s/ Glenn D. Pomerantz*

7                                                                Glenn D. Pomerantz

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28