# EXHIBIT 14

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | **Case No. 3:21-md-02981-JD**<br><br>**REPLY EXPERT REPORT OF STEVEN TADELIS**<br><br>**Judge: Hon. James Donato** |

REPLY EXPERT REPORT OF

## STEVEN TADELIS

ON BEHALF OF

## EPIC GAMES, INC.

**DECEMBER 23, 2022**

would lower prices in the Android In-App Payment Solutions market was based on basic economic logic that competitive forces would bring costs down in the market,[297] which is directly supported by Google's own documents that predicted entry by Android in-app payment solution services providers could result in lower costs of payment solution services.[298]

132. I do not disagree with Dr. Gentzkow's assertion that the relevant but-for world is one where the billing system requirement is absent, but where Google "would have the option to set a separate service fee for the services of Google Play in cases where a developer opts not to use Google Play's billing system."[299] Importantly, Google has that option today, including with respect to developers who currently pay Google no fees (*e.g.*, those who sell physical goods in-app). In any event, the prices that Google charges for its unbundled in-app payment solution services and whatever "separate service fee" it may or may not decide to impose for other services such as app distribution must be unencumbered by the exclusionary billing restriction *and any anticompetitive conduct* affecting the complementary Android app distribution services. That is, a properly applied but-for world with unbundled pricing would be a world where competition would drive down Google's charges for its payment solution services. The same would hold separately for Google's charges for its app distribution services. In such a world (that does not apply today), in which Google's artificial restraints were removed, candidate billing competitors would enter if they could provide billing services more efficiently, at a lower cost, or if they could offer differentiated payment solution services that were preferred by certain developers. As discussed in Section VIII of my Initial Report and in Section V.A of this report, there is significant evidence that entry would likely occur but-for Google's billing restriction.

133. Section III.C.5 of this report provides a detailed response to Dr. Gentzkow's third assertion—that I "mistake evidence that some developers wish to evade Google's service fee for evidence that developers have positive demand for alternative billing systems."[300] In Section III.C.5, I provide

---

[297] Tadelis Initial Report, ¶ 199, citing Perloff, Jeffrey M., and Dennis W. Carlton, *Modern Industrial Organization*, 4th Global Ed., Pearson (Boston, MA, 2015), at 752-753.

[298] Tadelis Initial Report, ¶ 199, citing GOOG-PLAY-000542516 (PX 0354), at -532 and GOOG-PLAY-009292321, at -329.

[299] Gentzkow Report, ¶ 553.

[300] Gentzkow Report, ¶ 558.

NON-PARTY HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

Respectfully submitted,

_____
Steven Tadelis, Ph.D.
December 23, 2022