Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Leigha Beckman, Bar No. 334611
leigha.beckman@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
Reedy C. Swanson, *pro hac vice*
reedy.swanson@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 13th St. NW
Washington, D.C. 20004
Telephone: (202) 637-5600

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Dane P. Shikman, Bar No. 313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**DECLARATION OF CHRIS IANNUCCILLI IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT INJUNCTION PENDING APPEAL**<br><br>Judge: Hon. James Donato |

**DECLARATION OF CHRIS IANNUCCILLI**

1. I am the Senior Director and Global Head of Marketing for the Play store at Google. My job responsibilities include overseeing product, go-to-market, and brand marketing for Google Play, across all audiences including users and developers. I have over 30 years of experience in marketing, including over 13 years at Google working on products such as Google Maps, Google Photos, and Google Messages, among others. Prior to Google, I worked closely with classic brands such as McDonald's and Budweiser, and the University of Chicago.

2. I have reviewed the District Court's injunction as well as the declarations of David Kleidermacher and Vitor Baccetti. The facts and opinions set forth herein are based on my impressions of the subsequent harm that may impact user trust in the Android ecosystem and Google's reputation if required to implement the mandates of the injunction on the timeline that the Court has ordered. The facts and opinions are within my personal knowledge and if called as a witness, I could and would competently testify to them.

3. Google Play works hard to build a strong brand reputation and trust among OEMs and carriers, app developers, and users. Our brand—and trust in it—is a critical part of a healthy Android and Play ecosystem, where consumers trust that they can safely choose the Play store for their app downloads, and developers feel confident that their apps will be displayed and promoted properly, consistent with their brands, with a strong return for the resource investment they make in the platform.

4. From my experience, I can confirm that the Play store has performed very well in terms of earning consumer trust. Google regularly conducts and reviews surveys relating to how consumers view Android and the Play store. Survey data consistently shows that users seek out apps from the Play store, in part, because of our commitment to safety and security. For example, internal Google survey data from 2020 that was discussed at trial indicated that 75% of

Android owners believed that the Play store is a safe place to get apps, and only 13% of Android owners expressed concern that apps downloaded from the Play store are not secure. Trial Ex. 1768, at 16-17. Implementing the injunction threatens to harm Google's hard-earned reputation with consumers in multiple ways.

5. My understanding is that the injunction will require changes to Play's business that will create certain incentives and opportunities that may allow third-parties to harm Google's reputation for protecting users' safety and security. Two areas of particular concern are the injunction's requirement that Google grant third-party app stores access to the Play store's app catalog and the mandate that the Play store distribute third-party app stores through the Play interface. And these concerns exist for both the consumers and developers involved.

6. The injunction requires Google to distribute its competitors' app stores through the Play store. As a result, the Play store will be providing users a way to download apps contained in those app stores that may not be in the Play store. In the past, Google has invested substantial resources to ensure that users feel they trust Google to protect them from malicious, deceptive, and inappropriate content in the Play store. Google has communicated that message to users in a variety of ways. For example, Android has advertised Google Play Protect—Google's process to ensure that apps users download are safe and free of malware, scanning 200 billion apps on devices worldwide every day—on social media.[1]

7. Although the injunction permits Google to review the catalogs of third party app stores that request distribution through the Play store, the injunction limits that review to measures that are "strictly necessary and narrowly tailored." (¶ 12). I understand this raises questions about whether Google must conduct a less thorough review on the catalogs of app

---

[1] *See, e.g.*, @Android, X (June 29, 2023, 2:15 PM), https://x.com/Android/status/1674481673508122624.

stores distributed through Play and that these third-party app stores might be exempt from some of the normal, rigorous quality checks that any app in the Play store is subject to.

8. I also understand that the injunction does not discuss whether Google may conduct vetting of third-party app stores participating in catalog sharing, which can expose users to malicious or pirated apps that would not otherwise be available on the Play store. Further, I believe that apps will be added to those third-party app stores continually, making it difficult if not impossible for Google to assess the quality and validity of the third-party app store because of the constantly shifting set of apps in its catalog.

9. Based on my experience, I expect that if users experience harm from an app or app store which they downloaded directly from the Play store or through the catalog sharing program, with an opt out delivered by Google and the continued presence of the Play store on their devices, they are likely to be confused about whether Google, the app developer, or the third-party app store is to blame. That confusion will make it difficult for users to know who to contact in the event of a problem and thus create substantial frustration.

10. Because of that confusion, some users are likely to misattribute any harms they experience at least in part to the Play store and to Google. That harm will deteriorate user trust in the broader Android ecosystem and erode Google's reputation amongst consumers at large. Trust is the cornerstone of a digital ecosystem; once trust is lost, it is very difficult to win back.

11. If users attribute harms caused by third parties to the Play store, users are likely to stop using the Play store and may even switch away from Android devices to iPhones. My concerns are based on information that I know and have learned in my role at Google as the Senior Director and Global Head of Marketing for Google Play.

a. Apple aggressively markets iOS as a more secure ecosystem than Android. For example, as was discussed at trial, Apple launched a series of advertisements in which Apple successfully fends off a dramatized thief that otherwise glides easily

through Android's defenses. Trial Ex. 6695. In each advertisement, the side-by-side comparisons explicitly pit Apple's logo and security system against Android's. *Id.*

b. Marketing surveys, including from within the last year, indicate that users consistently rank security as one of the most important considerations when selecting smart devices.

c. Switching is already a common practice, and the statistics do not favor Android. Data discussed at trial indicate that approximately 17% of Android users actively consider switching to iOS. Trial Ex. 1766, at 8. There's already a quantifiable and significant trend of users switching from the Android ecosystem to Apple's iOS—a phenomenon that industry professionals call "churn." One way to measure churn is through "net switching rates"—or the number of switchers to Android less the number of switchers to iOS expressed as a share of the total number of users replacing devices. In a typical year, more switchers already move from Android smartphones to iOS smartphones than vice versa. Trial Ex. 1766, at 8. The switching disparity is particularly important because it can be difficult to persuade Android users who switch to Apple devices to switch back.

d. Based on this data and my professional experience, I expect that increased exposure to harmful content from third-party app stores that a user downloaded to their device from the Play store will make switching from Android to iOS even more likely.

12. I also expect that catalog sharing will have a similar effect. Because the Court's remedy does not discuss whether Google must share the entire Play store catalog with third-party app stores regardless of what other apps are carried in those stores, catalog sharing may appear to legitimize app stores that contain malicious, deceptive, pirated, or inappropriate content by

making it appear that those stores have the support of the entire catalog of legitimate app developers whose products are available through the Play store. Users who have a bad experience with an app store that appears legitimate because it is populated with apps from the Play store may attribute those problems to Google.

13. The catalog sharing remedy will also likely threaten developers' continued participation in the Play store.

a. In my extensive experience working with developers, I have found that developers put tremendous thought into which stores are allowed to carry their apps—app stores require continual investment of finite developer resources, they may require custom versions of their apps to best fit the audience of the app store, and they require constant monitoring of performance to maintain strong user experience and return on investment.

b. One of the top concerns we hear from developers when they are choosing where to distribute their apps is whether pirated apps will be present. If an app store carries knock-off versions of an app purporting to offer similar content for a lower price, then users may be enticed to download the knock-off versions, depriving developers of the value of their intellectual property.

c. In my experience, developers also care deeply about their brand image—just as Google does. Many developers do not want their apps to be featured alongside content that they find objectionable—for instance, apps with explicit or pornographic content or that promote hateful or discriminatory ideas.

14. I do not believe the opt-out provision will be sufficient to assuage developers' concerns regarding the dangers of catalog sharing for multiple reasons.

a. For one thing, even developers who choose to opt out face significant risk of harm with catalog sharing. A developer's opt out just means that *its app* will not be

listed in a particular store. But the store will still appear to be a legitimate store offering millions of apps to users because it will carry the rest of Play's catalog. Consumers may not have an easy way to know which developers have opted out. As a result, they may not know that when they search for an app to download that has opted out, the search results will actually be apps that look similar or have similar names but are in fact fake, pirated, or knock-off versions–because the real version is not available there. The opt out will not protect developers from the harm of users being led to fake, pirated, or knock-off versions of the developer's app as a result of the veneer of safety and legitimacy provided to third-party app stores through Play catalog sharing. If anything, when a developer opts out, it may create a stronger economic incentive for the affected app store to push a knockoff or pirated version of the app, so that users who search for the app that has opted out will receive a result and are more likely to download something.

b. In addition, I understand that Google's ability to control access to catalog sharing data is imperfect and that once data has been released it is difficult to claw back. Based on Google's experience in working with developers and knowing developers' sensitivities, some developers will likely choose not to run the risk that their apps may appear alongside objectionable content and will pull their apps from the Play store entirely as a result.

c. The opt-out mechanism also burdens developers, who will need to monitor which stores are participating and whether they want to offer their apps through those stores. That decision may change from day to day, both as new stores are added and as the participating stores constantly change their own content. Many developers prefer to minimize ongoing investment in their apps once they have launched, and these developers may not be well-positioned to engage in the

monitoring required by the catalog sharing provision. We know of many developers of older, much-loved apps that are in maintenance mode from developers who will likely not pay attention to the opt out. They trust that their app is in the Play store, but will now be faced with the burden of their app being downloaded from third-party stores they are unfamiliar with, or do not trust.

d. The added burden on developers is particularly concerning because Android and the Play store face constant competition from iOS and Apple's App Store for developer attention and resources. We consistently receive feedback that offering apps on the Play store and Android comes at higher investment—and sometimes lower return, due to our wider, more economically diverse user base—than offering apps on iOS and the App Store. Because the injunction imposes additional burdens on developers who choose to offer apps on Android and Play—including potentially frequent monitoring required to manage the opt-out system—I am concerned that some developers may conclude that the additional burdens are not worth it and stop offering their apps on Play or Android altogether.

e. The accelerated timeline would also put an undue burden on developers. Developers will be faced with resourcing decisions for their presence on third party app stores on an ongoing basis, and need time to determine if those are warranted. Developers will confront similar decisions each time a new app store joins the program.

f. Finally, by requiring Google to communicate to developers that they will be opted into the catalog sharing program by default, developers might interpret the opt-in program as a choice that Google has made and therefore understand it as an

endorsement of the participating app stores. Developers who go on to have a bad experience in the program may in turn blame Google for these problems.

15. I understand that the injunction's accelerated timeline increases the risk of security breaches or technical failures in any one component of the Android ecosystem. Critically, loss of trust at any level—apps, app stores, OEMs, the Play store, Android, Google—will corrode user trust in the ecosystem more broadly because it disrupts the entire experience for the user. That, in turn, makes it more likely that the user will switch out of the Android ecosystem in favor of competing operating systems, including iOS. Further, a loss of trust in the security of the ecosystem will erode developer trust in that system, causing them to pull or pause updates to their apps, further weakening the user experience.

16. In my experience, these kinds of harms to a company's brand, reputation, and trust are exceptionally difficult—if not impossible—to reverse.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of October 2024 in Mountain View, California.




Chris Iannuccilli