Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
Two Manhattan West
375 Ninth Ave
New York, New York 10001
Telephone: (212) 474-1000

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.*,<br>Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**PLAINTIFF EPIC GAMES, INC.'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>Judge:      Hon. James Donato<br>Hearing Date: January 15, 2026<br>Time:      10 A.M.<br>Place:     Courtroom 11, 19th Floor |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 15, 2026, in Courtroom 11 in the District Court for the Northern District of California, San Francisco Division, before the Honorable James Donato, Plaintiff Epic Games, Inc. ("Epic") will and hereby does respectfully bring this Motion for an award of Epic's reasonable attorneys' fees and costs under 15 U.S.C. § 26, Fed. R. Civ. P. 54(d), and Civil Local Rules 54-1 and 54-5.

On December 11, 2023, a jury unanimously found that Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited and Google Payment Corp. (collectively, "Google") violated the Sherman Act and the Cartwright Act. (Dkt. 606.) On October 7, 2024, this Court entered a permanent injunction to address those violations, as well as violations of the California Unfair Competition Law found by the Court. (Dkts. 701, 702.) Pursuant to 15 U.S.C. § 26, the Court ruled that Epic is entitled to recover its attorneys' fees and costs. (Dkt. 701 at 17.) On January 9, 2025, this Court entered judgment in favor of Epic. (Dkt. 716.) As discussed in the accompanying Memorandum of Points and Authorities, and as established in the accompanying Declaration of Gary A. Bornstein in Support of Plaintiff's Motion for Attorneys' Fees and Costs (the "Bornstein Decl."), Declaration of John D. O'Connor In Support of Plaintiffs' Motion for Attorneys' Fees and Costs ("O'Connor Decl."), Declaration of Jessica Medina in Support of Plaintiffs' Motion for Attorneys' Fees and Costs ("Medina Decl."), Declaration of Benjamin H. Diessel in Support of Plaintiffs' Motion for Attorneys' Fees and Costs ("Diessel Decl."), Declaration of Paul J. Riehle in Support of Plaintiff's Motion for Fees and Costs ("Riehle Decl."), and the accompanying exhibits thereto, the amount Epic paid to its counsel, including the law firms of Cravath, Swaine & Moore LLP, Faegre Drinker Biddle & Reath LLP; Clifford Chance LLP; Wiggin and Dana LLP; and Zuckerman Gore Brandeis & Crossman LLP, and for which Epic seeks recovery, is in the aggregate $170,500,000. In addition, recoverable costs pursuant to 15 U.S.C. § 26 are $10,273,909.18. Epic also seeks appropriate interest on those amounts.

Epic respectfully requests that it also recover the reasonable fees and expenses incurred in preparing and litigating this Motion. *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 981

(9th Cir. 2008) (holding that attorneys' fee awards should include the time spent preparing and litigating a party's attorneys' fee motion).

This Motion is based upon this Notice of Motion and Motion, the points and authorities in the accompanying Memorandum of Points and Authorities, Bornstein Declaration, O'Connor Declaration, Medina Declaration, Diessel Declaration and Riehle Declaration, and the accompanying exhibits thereto, the complete files and records in this action, oral argument of counsel, authorities that may be presented at or before the hearing, and such other and further matters as this Court may consider.

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................ 2

TABLE OF CONTENTS.......................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.      INTRODUCTION ....................................................................................... 1

II.     FACTUAL BACKGROUND ....................................................................... 2

    **A.**      Epic's Complaint ................................................................................. 2

    **B.**      Pre-Trial Proceedings........................................................................... 2

    **C.**      Google's Intentional Destruction and Concealment of Relevant Evidence.................... 5

    **D.**      Trial ..................................................................................................... 6

    **E.**      Post-Trial:  Remedies Proceedings and Appeal..................................... 7

    **F.**      Procedural History for This Motion........................................................ 7

III.    ARGUMENT ............................................................................................... 8

    **A.**      Epic's Request for Reasonable Attorneys' Fees Should Be Granted. ........... 8

        1.      Epic is Entitled to Attorneys' Fees. ........................................ 8

        2.      Epic's Attorneys' Fees Are Reasonable. ................................. 9

            a.      Epic's Attorneys' Fee Award is Supported by a Lodestar Analysis.................9

                i.      Epic's Lodestar Figure is Presumptively Reasonable Because It Reflects Fees Actually and Contemporaneously Paid by Epic. ...........................10

                ii.     Epic's Lodestar Figure Reflects Reasonable Hourly Rates and Total Hours.......................................................................................11

            b.      Epic's Attorneys' Fee Award Is Supported by The Kerr Factors. .................... 16

    **B.**      Epic's Request for Reasonable Costs and Expenses Should Be Granted. .................... 23

    **C.**      Epic's Award Should Reflect Compensation for the Time Value of Money. .............. 24

CONCLUSION.......................................................................................................... 24

i

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR ATTORNEYS' FEES AND COSTS
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahanchian v. Xenon Pictures, Inc.*, 2008 WL 11411621 (C.D. Cal. Dec. 29, 2008) ............................ 10

*Bal Theatre Corp. v. Paramount Film Distrib. Corp.*, 206 F. Supp. 708 (N.D. Cal. 1962) ................... 9

*Banas v. Volcano Corp.*, 47 F. Supp. 3d 957 (N.D. Cal. 2014) .............................................................. 13

*Blackwell v. Foley*, 724 F. Supp. 2d 1068 (N.D. Cal. 2010) ........................................................... 20, 23

*Blum v. Stenson*, 465 U.S. 886 (1984) .................................................................................................. 10

*Bolden v. J&R Inc.*, 135 F. Supp. 2d 177 (D.D.C. 2001) ...................................................................... 11

*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973 (9th Cir. 2008) .......................................................... 12

*Chalmers v. City of Los Angeles*, 796 F.2d 1205 (9th Cir. 1986) ..................................................... 12, 16

*Chinn v. Blankenship*, 2010 WL 2595217 (W.D. Wash. June 23, 2010) ............................................... 17

*Cosby v. Autozone, Inc.*, 2016 WL 1626997 (E.D. Cal. Apr. 25, 2016) ............................................... 19

*Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Breeders' & Exhibitors' Ass'n of Am.*, 393 F.2d 75 (9th Cir. 1968) ....................................................................................................... 9

*Cunningham v. Cnty. of Los Angeles,* 879 F.2d 481 (9th Cir. 1988) ..................................................... 10

*Del Mar Seafoods Inc. v. Cohen*, 2008 WL 11456258 (N.D. Cal. Dec. 22, 2008) ............................... 17

*E.R.K. by R.K. v. Dep't of Educ.*, 2022 WL 2761467 (D. Haw. Apr. 28, 2022) .................................... 20

*Energy Transfer, LP v. Williams Cos., Inc.*, 2023 WL 6561767 (Del. Oct. 10, 2023) .......................... 14

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A.,* 915 F. Supp. 2d 1179 (D. Nev. 2013) ........................... 20

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023)................................. 14, 22

*Friend v. Kolodzieczak,* 72 F.3d 1386 (9th Cir.1995) ........................................................................... 20

*Gonzalez v. City of Maywood*, 729 F.3d 1196 (9th Cir. 2013) ............................................................... 14

*Hefler v. Wells Fargo & Co.*, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ....................................... 13

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) .................................................................................... 14, 20

*In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485 (W.D. La. 2017).......................... 14

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070 (11th Cir. 2023).................... 22

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir.2011)........................................ 9, 10

ii

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR ATTORNEYS' FEES AND COSTS
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

*In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 U.S. Dist. LEXIS 1734 (N.D. Ill. Feb. 9, 2000) .......................................................................................................... 22

*In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) ..................................... 22

*In re Dell Techs. Inc. Class V S'holders Litig.*, 326 A.3d 686 (Del. 2024) ............................ 21

*In re Diet Drugs,* 582 F.3d 524 (3d Cir. 2009) ........................................................................ 22

*In re Enron Corp. Securities., Derivative & ERISA Litigation,* 586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................................................................................... 22

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94 (D.D.C. 2013) ........................................................................................................................ 15

*In re Heritage Bond Litig.*, 2005 WL 1594389 (C.D. Cal. June 10, 2005) .......................... 20

*In re Heritage Bond Litig.*, 2005 WL 1594403 (C.D. Cal. June 10, 2005) .......................... 17

*In re Initial Pub. Offering Sec. Litig.,* 671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...................... 21

*In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ................... 15

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014) .............................................................................................. 14, 15, 21, 22

*In re TFT-LCD (Flat Panel)Antitrust Litigation,* 2012 WL 13209696 .......................... 14, 22

*In re Tyco International, Ltd. Multidistrict Litigation,* 535 F. Supp. 2d 249 (D.N.H. 2007) ................. 22

*In re Vitamins Antitrust Litig.*, 2001 WL 34312839 (D.D.C. July 16, 2001) ...................... 21

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) .......................................................................... 12

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994) ................... 24

*Jones v. Cnty. of Sacramento*, 2011 WL 3584332 (E.D. Cal. Aug. 12, 2011) ..................... 21

*Joseph S. v. Kijakazi*, No. 2023 WL 2628243 (C.D. Cal. Jan. 23, 2023) ............................. 13

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975) ........................................ 1, 16

*Kilopass Tech., Inc. v. Sidense Corp.*, 82 F. Supp. 3d 1154 (N.D. Cal. 2015) ..................... 10

*Mays v. Cnty. of Sacramento*, 2019 WL 6696668 (E.D. Cal. Dec. 9, 2019) ....................... 17

*McGary v. FCA US LLC*, 2021 WL 6126965 (N.D. Cal. Dec. 28, 2021) .............................. 11

*Moore v. James H. Mathews & Co.,* 682 F.2d 830 (9th Cir. 1982) ................................... 9, 16

*Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996) .............................................. 9, 20

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 2016 WL 1255454 (N.D. Cal. Mar. 31, 2016) .............. 23

iii

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 739 F. App'x 890 (9th Cir. 2018).....................................9

*Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646 (7th Cir. 1985)..............................................24

*Optronic Techs, Inc v. Ningbo Sunny Elec. Co., Ltd.*, 612 F. Supp. 3d 899 (N.D. Cal. 2020),.............23

*Oracle USA, Inc., et al. v. SAP AG, et al.*, 07-cv-1658-PJH (EDL), Dkt. 1213 (N.D. Cal.
        Aug. 3, 2012) ..........................................................................................................................21

*Palacios v. DBI Beverage Inc.*, 2017 WL 6383408 (E.D. Cal. Dec. 14, 2017).......................................10

*Polee v. Cent. Contra Costa Transit Auth.*, 516 F. Supp. 3d 993 (N.D. Cal. 2021)...............................11

*Quesada v. Thomason*, 850 F.2d 537 (9th Cir. 1988).................................................................................9

*Robinson v. Delgado*, 2011 WL 672628 (N.D. Cal. Feb. 17, 2011)........................................................20

*Safety Dynamics, Inc. v. Gen. Star Indem. Co.*, 2013 WL 11299004 (9th Cir. Sept. 9, 2013)..............11

*SAS v. Sawabeh Info. Servs. Co.*, 2015 WL 12763541 (C.D. Cal. June 22, 2015)................................17

*Schweiger v. China Doll Rest.*, 673 P.2d 927 (Ariz. Ct. App. 1983)......................................................11

*Theme Promotions, Inc. rt  Am. Mktg. FSI, Inc.*, 731 F. Supp. 2d 937, 949 (N.D. Cal. 2010)..............24

*Senne v. Kansas City Royals Baseball Corp.*, 2023 WL 2699972 (N.D. Cal. Mar. 29, 2023),.............19

*Stern v. Does*, 2011 WL 13124449 (C.D. Cal. May 4, 2011) ..................................................................16

*Stetson v. Grissom*, 821 F.3d 1157 (9th Cir. 2016)..................................................................................16

*Stonebrae, L.P. v. Toll Bros., Inc.*, 2011 WL 1334444 (N.D. Cal. Apr. 7, 2011) .................................10

*Trendsettah USA Inc. v. Swisher Int'l Inc.*, 2023 WL 8263365 (C.D. Cal. Nov. 17, 2023)..................13

*Trosper v. Stryker Corp.*, 2015 WL 5915360 (N.D. Cal. Oct. 9, 2015) ..................................................19

*Trs. of the Constr. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d
        1253 (9th Cir. 2006)................................................................................................................23

*Union Oil Co. of California v. Chevron U.S.A., Inc.*, 34 F. Supp. 2d 1222 (C.D. Cal. 1998),..............19

*Villasenor v. Cmty. Child Care Council of Santa Clara Cnty., Inc.*, 2021 WL 242924 (N.D.
        Cal. Jan. 25, 2021) .................................................................................................................10

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)..................................................................16

*Wall Prods. Co. v. Nat'l Gypsum Co.*, 367 F. Supp. 972 (N.D. Cal. 1973)............................................17

*Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942 (9th Cir. 2007)........................................................24

*Williams Cos., Inc. v. Energy Transfer LP*, 2022 WL 3650176 (Del. Ch. Aug. 25, 2022)...................13

*Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536 (9th Cir. 2016)......................................................9

iv

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR ATTORNEYS' FEES AND COSTS
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

1

**Statutes & Rules**

2    15 U.S.C. § 26 ................................................................................................................. 1, 8

3    28 U.S.C. § 1821 ............................................................................................................... 23

4    28 U.S.C. § 1920 ............................................................................................................... 23

5    Fed. R. of Civ. Procedure 54(d) ....................................................................................... 23

6    Local Rule 54-5(b)(2),(3) .................................................................................................. 15

7

8

**Other Authorities**

9    *LexisNexis CounselLink Releases 2025 Trends Report Showing Large Law Command of*
*Partner Rates, Share of Wallet*, Lexis Press Room (Apr. 22, 2025),
https://www.lexisnexis.com/community/pressroom/b/news/posts/lexisnexis-
counsellink-releases-2025-trends-report-showing-large-law-command-of-partner-rates-
share-of-wallet ................................................................................................................... 13

12    U.S. Bureau of Labor Statistics, CPI Inflation Calculator,
https://www.bls.gov/data/inflation_calculator.htm (last visited Aug. 21, 2025) .............. 21

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2      Plaintiff Epic Games, Inc. ("Epic") respectfully submits this Memorandum of Points and

3  Authorities in Support of its Motion for Reasonable Attorneys' Fees and Costs ("Motion").

4  **I.    INTRODUCTION**

5      After a years-long litigation culminating in a 15-day jury trial, a jury ruled in favor of Epic on

6  all counts in its action seeking to end Google's decade-long suppression of competition in the markets

7  for Android app distribution and Android in-app payment solutions.  Following months of remedy

8  proceedings, this Court entered an injunction that prohibits Google's illegal conduct and takes steps to

9  remedy that conduct's continuing adverse effects.  Both the jury verdict and the injunction were

10  affirmed in full on appeal.  In its order granting the injunction, this Court found that Epic is entitled to

11  recover its attorneys' fees and costs under Section 16 of the Clayton Act, 15 U.S.C. § 26.  (Dkt. 701 at

12  17.)  Through this Motion, Epic seeks to recover fees and costs that were billed to and carefully vetted

13  by Epic, and that Epic actually paid to its attorneys and vendors.  These fees and costs are reasonable

14  and should be awarded by the Court.

15      Crucially, unlike in a class action—where courts are forced to determine what would

16  hypothetically have been an appropriate fee for a client to pay—Epic's attorneys' fees were negotiated,

17  reviewed and actually paid by a sophisticated client that had no guarantee of recovering that (or any)

18  money.  As such, those fees presumptively reflect commercially reasonable hourly rates and the time

19  that Epic and its attorneys reasonably determined was needed to litigate this extraordinarily complex

20  case with an uncertain outcome.

21      The reasonableness of Epic's requested fees is also confirmed by the standard methods for

22  assessing attorneys' fees awards.  *First*, the two components of a lodestar analysis—rates and hours—

23  are reasonable.  The hourly rates charged are comparable to those charged by other firms engaged in

24  similar work in this jurisdiction, and the hours expended by Epic's attorneys were reasonably

25  necessary and (to the extent comparisons are feasible) well in line with the hours expended in

26  comparable cases.

27      *Second*, Epic's requested fees are reasonable under the factors identified in *Kerr v. Screen*

28  *Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975): the hours expended, customary rate, complexity of

1

Notice of Motion, Motion and Memorandum of Points and Authorities for Attorneys' Fees and Costs
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

1    the case, results obtained, experience of counsel, duration of the relationship between counsel and Epic

2    and other similar awards in complex matters.  This litigation was incredibly complex and hard-fought.

3    It involved millions of pages of discovery, dozens of depositions, thousands of pages of expert reports,

4    extensive briefing of multiple issues, a 15-day jury trial and a thorough remedies proceeding, including

5    two hearings.  It required Epic to uncover and address egregious document destruction and the

6    deliberate misuse of privilege.  Epic faced a tenacious adversary whose "modus operandi throughout

7    the case" was to "object[] to just about everything".  (MDL Dkt. 984 at 4, 12.)  And the results

8    obtained by Epic are excellent by any measure—Epic prevailed on every claim presented to the jury,

9    and the Court issued a significant injunction to restore much-needed competition.

10          Epic is therefore entitled to recover the attorneys' fees it expended on this action, plus its actual

11    out-of-pocket costs, with appropriate interest on both amounts.

12    **II.    FACTUAL BACKGROUND**

13          **A.    Epic's Complaint**

14          On August 13, 2020, Epic filed a complaint against Google, seeking injunctive relief and

15    bringing claims under the Sherman Act, the Cartwright Act and California's Unfair Competition Law

16    ("UCL") based on Google's anticompetitive conduct in two markets—the market for the distribution

17    of mobile apps to Android users and the market for processing payments for digital content within

18    Android mobile apps.  (Compl. Dkt. 1, ¶¶ 3-4; *see also* Second Am. Compl. ("SAC") Dkt. 341 ¶¶ 3-4.)

19    Epic's complaint targeted Google's use of a "combination of tactics" to maintain its monopolies in

20    those markets, including requiring smartphone OEMs to preference its app store (Google Play) and

21    "pa[ying] app developers to withhold exclusive content from Google Play's rivals".  (Answering Br.

22    Appellee Epic Games, Inc. Ninth Cir. Dkt. 135.1 at 1.)  The complaint also challenged Google's

23    practice of requiring developers using Google Play to use Google's payment solution for the in-app

24    sale of digital goods and services.  (*Id.*)

25          **B.    Pre-Trial Proceedings**

26          Pre-trial proceedings—from the filing of the complaint to the start of trial—were unusually

27    complex and took over three years.

28

In February 2021, the Judicial Panel on Multidistrict Litigation coordinated Epic's case with a consolidated developer class action, a consolidated consumer class action and six tag-along consumer class actions transferred to the court from other districts courts for pretrial proceedings.[1] (MDL Dkt. 1 at 3.)  The consumer class and the six tag-along consumer actions ultimately proceeded forward as consolidated with the consumer class action complaint.  (MDL Dkt. 8 at 2.)  Two additional lawsuits— one brought by thirty-seven State Attorneys General and the other by Match Group, Inc.—were also coordinated with Epic's case and the consumer and developer classes for pretrial proceedings.[2] (Dkt. 155 at 2; MDL Dkt. 228 at 1.)  Throughout the pre-trial proceedings, Epic worked closely with counsel for these other plaintiffs, which allowed Epic to achieve certain efficiencies but also created coordination workstreams that would not have existed if Epic were litigating alone.

As is typical in antitrust matters, fact discovery was extensive.  Epic's counsel had to aggressively pursue the production of documents from Google.  This was a time-consuming and expensive endeavor.  Epic and its co-plaintiffs crafted 261 RFPs and, in the face of stiff resistance from Google, Epic had to engage in numerous meet and confers and extensive correspondence to obtain the necessary documents from the appropriate custodians.  Once Google began producing documents, Epic carefully reviewed the produced material, identified missing material and areas where supplementation was necessary and followed up to ensure that it obtained a sufficient documentary record to prove its claims.  Ultimately, Epic reviewed over 3.3 million documents produced from over 40 Google custodians, which amounted to more than 22 million pages.  (Bornstein Decl. ¶ 41.)  Epic's counsel took the lead in deposing over 30 Google fact witnesses and questioned numerous additional Google witnesses at depositions where one of the co-plaintiffs took the lead.  (*Id.* ¶ 45.)

---

[1] *Epic Games, Inc. v. Google LLC, et al.*, No. 3:20-05671; *In re Google Play Consumer Antitrust Litig.*, No. 3:20-05761; *In re Google Play Developer Antitrust Litig.*, No. 3:20-05792; *Peekya Services, Inc. v. Google, et al.*, No. 3:20-06772; *Bentley, et al. v. Google LLC, et al.*, No. 3:20-07079;  *McNamara v. Google LLC*, No. 3:20-07361; *Herrera v. Google LLC,* No. 3:20-07365*; Carroll v. Google LLC*, No. 3:20-07379; *Paige v. Google LLC*, No. 1:20-03158.

[2] *State of Utah, et. al. v. Google LLC, et. al.,* Case No. 3:21-cv-5227-JSC; *Match Group, LLC v. Google LLC*, 5:22-cv-02746.

While this case was primarily about Google, Epic also had to defend against aggressive discovery efforts from Google.  In response to Google's discovery requests, Epic's counsel collected and reviewed millions of documents, and ultimately produced over 2.2 million documents (comprising over 5.8 million pages) from over 30 custodians.  (*Id.* ¶ 42.)  Epic's counsel also defended the depositions of more than 20 Epic witnesses.

Litigating this case also required extensive third-party discovery.  To prove its claims, Epic sought discovery from 28 third parties, including Amazon.com, Inc., Netflix, Inc., Spotify Technology S.A., Bumble, Inc., Riot Games, Inc. and Activision Blizzard, Inc.—several of which played important roles at trial.  Ultimately, third parties produced more than 600,000 documents.  Epic also reviewed more than 100,000 documents produced by co-plaintiffs.  (*Id.* ¶ 43.)

Expert discovery was unusually extensive and complex.  Epic disclosed five expert witnesses, who collectively submitted thousands of pages of opening and rebuttal reports.  (*Id.* ¶ 46.)  This included two industrial organization economists (Dr. Douglas Bernheim and Dr. Steven Tadelis), two security experts (Dr. James Mickens and Dr. Douglas Schmidt) and an accounting expert (Ned Barnes), four of whom ultimately testified at trial.  (*Id.* ¶¶ 47-51.)  The other plaintiffs retained experts who submitted yet more expert reports and whose opinions needed to be considered and analyzed.  (*Id.* ¶ 52.)  And Google disclosed seven experts—five of whom testified at trial—who also submitted thousands of pages of opening and rebuttal reports.  (*Id.*)  Epic's counsel defended the depositions of Epic's five expert witnesses and deposed five of Google's expert witnesses.  (*Id.* ¶ 53.)

Pre-trial proceedings involved a number of disputes that required significant briefing and argument.  In particular, Epic's counsel filed over a dozen joint case management statements (*see, e.g.*, Dkts. 112, 141, 148, 154, 167, 173, 200) and took the lead on numerous important issues at case management and status conferences (*see, e.g.*, Dkts. 124, 354, 438), including Google's efforts to delay discovery; the identification of appropriate custodians; search terms and time periods for document discovery; and Google's unwillingness to produce certain categories of documents such as documents relating to certain regulatory matters, certain transactional data and Google's agreements with Apple (*see, e.g.*, Dkts. 55 at 11-14, 125 at 5-6, 135 at 4-5, 196 at 3-4).  As discussed further below, Epic also

took the lead on addressing Google's failure to document destruction and its misuse of attorney-client privilege.  (Dkt. 200 at 6-10, 19-21.)

The Parties also engaged in extensive motion practice. For example:

- Motion to Dismiss:  On November 13, 2020, Google filed a motion to dismiss, which the parties fully briefed.  (Dkts. 91, 111, 117.)

- Summary Judgment:  On April 20, 2023, Google moved for summary judgment. (Dkt. 407.)  The parties fully briefed this motion (Dkts. 412, 416), and Epic argued at the hearing (Dkt. 427).

- Motions in Limine:  Google filed seven motions in limine, covering a variety of topics. (*See* Dkt. 468.)  Epic filed three additional motions in limine.  (Dkt. 462.)

Throughout pre-trial proceedings, Epic had to coordinate all motions, expert disclosures and other pre-trial activities with co-plaintiffs.  (Bornstein Decl. ¶ 57.)

### C.    Google's Intentional Destruction and Concealment of Relevant Evidence

During discovery, Epic uncovered that Google had failed to preserve documents, even after issuing a litigation hold for this matter, as part of a years-long effort to limit the creation and retention of evidence that could be used in court or other legal proceedings.  Specifically, Google employees were encouraged to—and did—use ephemeral, "history off" instant messaging on Google's Chat platform for sensitive business communications.  Google set "history off" Chats to be destroyed after 24 hours—and Google kept Chats as "history off" by default for all employees, even those on a litigation hold and even document custodians.  Google did not disclose this policy to Epic or the Court, instead representing to the Court in an October 2020 case management statement that it had "taken appropriate steps to preserve evidence relevant to the issues reasonably evident in this action", with no mention of the 24-hour default deletion.  (Dkt. 55 at 10; *see also* Dkt. 401 at 16.)  Working with its co-plaintiffs, Epic engaged in extensive discussion and correspondence with Google to uncover the true facts and bring this ongoing document destruction to light.  Epic eventually filed a motion for sanctions on this issue.  (Dkt. 314.)  The Court held two hearings, at which Epic's counsel took the lead, including the examination of multiple Google employees (*see, e.g.*, Dkts. 338, 366, 367 at 51-75,

88-104, 384), after which the Court ordered the production of an additional 210,000 documents (Dkt. 391).  On March 28, 2023, the Court found that "Google intended to subvert the discovery process" and that plaintiffs were prejudiced because "substantive business communications were made on Chat that plaintiffs will never see".  (Dkt. 401 at 18.)

Epic also unearthed rampant abuse of privilege by Google.  Discovery revealed that Google warned employees that their communications could be used in court or other legal proceedings (Dkt. 401 at 5 (discussing "Communicate with Care" trainings)) and encouraged them to routinely copy lawyers on documents and affix "privileged" labels to try to protect documents from discovery.  At trial, Epic exposed that Google's own attorneys referred to this as "fake privilege".  (Dkt. 580, Trial Tr. 964:21-966:5 (Google in-house attorney admitting that she was being looped into emails because Google officials "believed that including [an in-house lawyer] would make it more likely that the email would be considered privileged"); Dkt. 582, Trial Tr. 1321:17-24 (Google CEO admitting that he "marked e-mails privileged, not because [he was] seeking legal advice but just to indicate that they were confidential").)  The Court has already recognized that this conduct imposed costs on Epic:  "Just getting through bogus privilege assertions alone takes forever.  Somebody has to look at those documents, they have to evaluate it, they have to make a claim, they have to fight about it, and then they have to come to the judge to get it resolved."  (Dkt. 591, Trial Tr. 3329:5-9.)

### D.    Trial

On November 6, 2023, Epic proceeded to trial alone, as the other plaintiffs had by then settled.[3]  Over the course of the 15-day jury trial, Epic examined or cross-examined 36 fact witnesses live or by designation and nine expert witnesses and addressed more than 300 documents that were admitted into evidence.  (*See* Dkts. 622, 623, 624.)  Prior to the jury's deliberations, Google moved for judgment as a matter of law.  (Dkts. 566, 568.)  The Court denied the motion, ruling that it was "completely satisfied that there [wa]s more than enough evidence in the record for the jury to find in favor of plaintiff on each and every one of their claims".  (Dkt. 591, Trial Tr. 3225:25-3226:2.)  The jury then returned a

---

[3] The developer class plaintiffs settled on May 25, 2022 (MDL Dkt. 244), the State AGs and consumer class plaintiffs notified the Court that they had settled on September 5, 2023 (MDL Dkt. 596), and Match settled on October 31, 2023 (MDL Dkt. 725).

1  unanimous verdict for Epic on all counts.  (Dkt. 606.)  Google renewed its motion for judgment as a

2  matter of law, with a motion in the alternative for a new trial.  (Dkt. 642.)  Epic filed extensive briefing

3  in opposition (Dkt. 647), and the Court denied both motions (Dkt. 674).

### E.    Post-Trial:  Remedies Proceedings and Appeal

5  After the jury verdict, Epic moved forward to a multi-month remedies proceeding.  (*See*

6  Dkt. 637).  On January 18, 2024, the Court held a hearing to discuss the remedies process.  (*Id*.)  At the

7  Court's direction, Epic filed a proposed injunction with supporting expert declarations.  (Dkt. 653.)

8  Google responded with two expert declarations, three fact declarations and an unsolicited 90 pages of

9  objections.  (Dkt. 656.)  This Court held an initial hearing in May 2024, at which Epic's and Google's

10  economic experts testified.  (Dkt. 666.)  At the end of that hearing, Google asked for the opportunity to

11  submit a proffer on the technical feasibility and costs of certain of Epic's proposed remedies, which the

12  Court permitted.  Google filed a 25-page proffer accompanied by four fact declarations, totaling over

13  200 pages.  (Dkt. 671.)  Epic took the depositions of Google's witnesses and then rebutted this proffer

14  with a response supported by two expert declarations.  (Dkt. 676.)  At the final hearing, held in August

15  2024, Epic's and Google's technical witnesses testified, and Epic's and Google's counsel presented

16  closing argument.  (Dkt. 690.)

17  On October 7, 2024, the Court issued a permanent injunction and accompanying order.

18  (Dkts. 701, 702.)  On July 31, 2025, the Ninth Circuit affirmed in full.  (Dkt. 722 at 67.)

### F.    Procedural History for This Motion

20  In its October 7, 2024 order, the Court ruled that Epic was entitled to attorneys' fees and costs

21  and that after "attorneys' fees and costs are awarded" it would enter judgment.  (Dkt. 701 at 17.)  To

22  streamline certain procedural issues related to Google's appeal, the parties subsequently submitted a

23  stipulation requesting that this Court enter judgment first, and defer the setting of a briefing schedule

24  on attorneys' fees and costs while the parties met and conferred.  (Dkt. 714.)  The Court accordingly

25  deferred briefing on attorneys' fees and costs to allow the parties to attempt to resolve the issue by

26  agreement.  (Dkt. 717.)

1    The parties met and conferred multiple times but were unable to reach agreement.  On July 31,

2    2025, the parties filed a stipulation proposing a briefing schedule on Epic's motion for attorneys' fees

3    (Dkt. 723), which the Court entered on August 7, 2025 (Dkt. 724).  Epic now timely files this Motion

4    seeking to recover the fees and costs to which it is entitled.

5    **III.    ARGUMENT**

6        As the prevailing party in an antitrust action, Epic is entitled to "the cost of suit, including a

7    reasonable attorney's fee".  15 U.S.C. § 26.  Epic's requested fee award is reasonable under both the

8    lodestar method and the *Kerr* factors.  Epic does not seek a windfall; it seeks recovery *only* of

9    attorneys' fees and costs that Epic actually paid to pursue this litigation, rendering Epic's lodestar

10   presumptively reasonable.  The hourly rates resulted from negotiation between counsel and Epic and

11   are comparable to rates charged by other counsel in this District undertaking cases of comparable

12   complexity.  The hours expended were carefully reviewed by Epic in-house counsel prior to payment.

13   The *Kerr* factors likewise confirm the reasonableness of Epic's fee request:  the complexity and

14   significance of this multi-year case, Epic's counsel's skill against a determined and well-resourced

15   adversary, the extraordinary results that Epic obtained (now affirmed on appeal), the expertise of

16   Epic's counsel, the duration of Epic's relationship with counsel and the fact that Epic's requested

17   award is in line with costs reimbursed in analogous cases, all support Epic's request.  Further, Epic's

18   cost and expense request is limited to Epic's actual out-of-pocket expenditures.  And Epic requests a

19   conservative amount of interest to be awarded on these fees and costs to account for the time value of

20   money.

21       **A.    Epic's Request for Reasonable Attorneys' Fees Should Be Granted.**

22            **1.    Epic is Entitled to Attorneys' Fees.**

23       This Court has already ruled that Epic is entitled to recover its reasonable attorneys' fees.

24   (Dkt. 701 at 17.)  That decision was well-founded in Section 16 of the Clayton Act, 15 U.S.C. § 26,

25   which states that such fees "shall" be awarded to any plaintiff that "substantially prevails" in an

26   antitrust action seeking injunctive relief.  "A plaintiff 'substantially prevails' under § 26 by achieving

27

28

injunctive relief." *O'Bannon v. Nat'l Collegiate Athletic Ass'n* , 739 F. App'x 890, 893 (9th Cir. 2018).  Here, Epic prevailed on all of its antitrust claims and obtained meaningful injunctive relief.

### 2.  Epic's Attorneys' Fees Are Reasonable.

"[T]he question of attorney's fees in anti-trust actions is addressed to the sound discretion of the Court." *Bal Theatre Corp. v. Paramount Film Distrib. Corp.*, 206 F. Supp. 708, 716 (N.D. Cal. 1962).  In exercising that discretion and assessing what is "reasonable", the "object . . . is to allow fair and just compensation for the services rendered, considering the time and skill employed, the experience brought to bear, and the results achieved". *Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Breeders' & Exhibitors' Ass'n of Am.*, 393 F.2d 75, 77 (9th Cir. 1968).

In determining whether attorney's fees are reasonable, the Ninth Circuit counsels courts to "blend" two approaches:  the lodestar analysis and the *Kerr* factors.  *Moore v. James H. Mathews & Co.,* 682 F.2d 830, 840 (9th Cir. 1982).  Courts generally begin by making a lodestar computation and then "assesses whether it is necessary to adjust the presumptively reasonable lodestar figure on the basis of the *Kerr* factors". *Morales v. City of San Rafael*, 96 F.3d 359, 363–64 (9th Cir. 1996), *opinion amended on denial of reh'g*, 108 F.3d 981 (9th Cir. 1997).  In considering the *Kerr* factors, the court may weigh "some or all of twelve relevant criteria".  *Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988) ("The court need not discuss each of the guidelines, so long as it discusses those most relevant to the particular case.").

Epic's requested attorneys' lodestar of $170.5 million is presumptively reasonable, as established by a lodestar analysis and further buttressed by the *Kerr* factors.

### a.  Epic's Attorneys' Fee Award is Supported by a Lodestar Analysis.

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir. 2016) (quoting *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 941 (9th Cir.2011)).

i.    Epic's Lodestar Figure is Presumptively Reasonable Because It
      Reflects Fees Actually and Contemporaneously Paid by Epic.

The figure a lodestar calculation produces is generally "presumed to be [a] reasonable" amount for the fee award.  *Villasenor v. Cmty. Child Care Council of Santa Clara Cnty., Inc.*, 2021 WL 242924, at *7 (N.D. Cal. Jan. 25, 2021); *see also In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011); *Cunningham v. Cnty. of Los Angeles,* 879 F.2d 481, 488 (9th Cir. 1988). This "presumption is particularly forceful where", as here, "the fees were billed to and actually paid by the plaintiff during the course of the litigation", because, as a sophisticated party engaging in a commercial relationship, the plaintiff "exercise[d] business judgment in retaining and paying counsel". *Stonebrae, L.P. v. Toll Bros., Inc.*, 2011 WL 1334444, at *6 (N.D. Cal. Apr. 7, 2011).  Epic is a sophisticated commercial party that carefully reviewed its bills and negotiated these rates (Medina Decl. ¶ 4), so it is entitled to a strong presumption that its total lodestar-based fees are reasonable.  *See Palacios v. DBI Beverage Inc.*, 2017 WL 6383408, at *2 (E.D. Cal. Dec. 14, 2017) ("The fact that these attorneys' fees and costs were the result of arms-length negotiation further supports the reasonableness of this award."); *Ahanchian v. Xenon Pictures, Inc.*, 2008 WL 11411621, at *2 (C.D. Cal. Dec. 29, 2008) ("[N]egotiated hourly rate with an attorney in private practice is compelling evidence that the negotiated rate fairly represents a reasonable rate for that work." (quoting *Blum v. Stenson*, 465 U.S. 886, 898 n.11 (1984))).  This is because "negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness in the market".  *Kilopass Tech., Inc. v. Sidense Corp.*, 82 F. Supp. 3d 1154, 1167 (N.D. Cal. 2015).

Epic requests only the fees it actually paid, subject only to a reasonable adjustment for the time value of money.  (O'Connor Decl. ¶ 216-25.)  Epic carefully negotiated, reviewed and approved the bills charged by each law firm it hired for this matter.  (*See* Medina Decl. ¶ 4.)  In its negotiation and review, Epic assessed both the reasonableness of the hourly rates charged and the hours expended for each task.  (*See id.*)  Epic carefully reviewed the rates and hours billed by the firms to ensure they were commensurate to the needs of the case.  (*See id.*)  Epic also made strategic business decisions throughout the litigation to minimize costs.  For example, it negotiated a graduated volume discount for work by Cravath.  (*See id.* ¶ 6; Bornstein Decl.¶ 17.)  Epic also delegated certain areas of work to

10

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR ATTORNEYS' FEES AND COSTS
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

other law firms with lower rates than Cravath, which reduced the overall fees expended:  Faegre Drinker Biddle & Reath LLP ("Faegre") acted as California counsel and assisted with providing notices to Epic's contractual counterparties about the production of potentially confidential information; Wiggin and Dana LLP ("Wiggin and Dana") assisted with third-party discovery and with witness preparation for trial; Clifford Chance LLP ("Clifford Chance") worked exclusively on third-party discovery where other counsel was conflicted; Zukerman Gore Brandeis & Crossman LLP ("Zukerman Gore") worked on certain document and privilege review and document discovery; Hueston Hennigan LLP ("Hueston") assisted with examining two Google witnesses during trial; and Update, Inc. supplied contract attorneys for document review.  (Medina Decl. ¶¶ 7-12; Bornstein Decl. ¶ 44.)

          ii. Epic's Lodestar Figure Reflects Reasonable Hourly Rates and Total Hours.

  Separate and apart from the presumptive reasonableness of fees actually paid by a sophisticated commercial party, the requested award is reasonable because it is the product of reasonable hourly rates multiplied by reasonable hours expended.

       (1) The Hourly Rates Charged Are Reasonable.

  Courts frequently consider "an attorney's actual billing rate when determining a reasonable rate".  *Polee v. Cent. Contra Costa Transit Auth.*, 516 F. Supp. 3d 993, 998 (N.D. Cal. 2021); *McGary v. FCA US LLC*, 2021 WL 6126965, at *3 (N.D. Cal. Dec. 28, 2021) (same); *see also Bolden v. J&R Inc.*, 135 F. Supp. 2d 177, 179 (D.D.C. 2001) ("An attorney's actual billing rate is presumptively deemed a reasonable rate, provided that the rate is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'").  In fact, courts have even held that in "corporate and commercial litigation between fee-paying clients, there is no need to determine the reasonable hourly rate prevailing in the community for similar work because the rate charged by the lawyer to the client is the best indication of what is reasonable under the circumstances of the particular case".  *Safety Dynamics, Inc. v. Gen. Star Indem. Co.*, 2013 WL 11299004, at *4 (9th Cir. Sept. 9, 2013) (quoting *Schweiger v. China Doll Rest.*, 673 P.2d 927, 931-32

11

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR ATTORNEYS' FEES AND COSTS
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

(Ariz. Ct. App. 1983)).  As attested by Epic, the rates charged here were carefully negotiated, reviewed and vetted before they were paid.  (Medina Decl. ¶ 4.)

Further, to determine whether an hourly rate is reasonable, district courts usually look to "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation".  *See Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986).  Courts have defined the "relevant community" as "the forum in which the district court sits".  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).

The firms in this matter had reasonable rates.  Over the relevant time period of 2020 to 2025, and taking into account the negotiated discount, Cravath charged Epic the following rates: ███████ ██████ for partners, ███████████ for associates, ██████████ for discovery attorneys, ████████████ for paralegals and █████████████ for other support staff.  (O'Connor Decl. Ex. E.1.)[4]  Cravath's overall blended rate was ████████.  Over the same period, other firms working on the matter typically charged lower rates (for timekeepers with corresponding roles), as reflected in the declaration of Epic's fee expert, John O'Connor.  (O'Connor Decl. ¶ 30.)  Mr. O'Connor, who specializes in attorneys' fees calculations and lodestars in complex litigations, has reviewed each firm's rates and determined that, in his opinion, that they are reasonable and comparable to those of other highly ranked firms practicing in this District.  (O'Connor Decl. ¶¶ 57-77.)

These rates are also supported by precedent in this District, which has upheld comparable rates.  For example, this court approved billing rates ranging from "$275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals" for an action that took place in 2016 to be reasonable and appropriate for use in a lodestar cross check— adjusting for legal services inflation these ranges would be $380 to $2,209 for partners, $207 to $1,091 for associates and $110 to $677 for paralegals today.[5]  *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017).  This Court approved similar rates in other matters.  *See,*

---

[4] Cravath's blended rates over time as calculated via a lodestar analysis are as follows: █████████ for partners, ████████ for associates, █████████ for discovery attorneys, ██████████ for paralegals and █████████ for other support staff.  (O'Connor Decl. Ex. E.1.)

[5] These figures were calculated using the LSI *Laffey* Matrix factor.  (O'Connor Decl. ¶ 71, Ex. I.)

*e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (finding "rates rang[ing] from $650 to $1,250 for partners or senior counsel, from $400 to $650 for associates, and from $245 to $350 for paralegals" to be reasonable and appropriate for a lodestar cross check—accounting for inflation, these ranges are the equivalent of $843 to $1,622 for partners, $519 to $843 for associates and $318 to $454 for paralegals today), *aff'd sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 965 (N.D. Cal. 2014) (finding "rates ranging from $355 to $1,095 per hour for partners and associates, $260 to $325 per hour for an e-discovery staff attorney, and $245 to $290 per hour for paralegals" to be "within the prevailing market rates for similar cases in the Northern District" in 2014—with inflation these rates are the equivalent of $519 to $1,600 for partners and associates, $380 to $475 for discovery attorneys and $358 to $424 for paralegals).

Similar rates have been found appropriate by other courts in this Circuit in comparable cases. *See, e.g., Trendsettah USA Inc. v. Swisher Int'l Inc.*, 2023 WL 8263365, at *13-14 (C.D. Cal. Nov. 17, 2023) (approving rates between $1,080 and $2,180 for a case taking place between 2014 and 2016—with inflation these rates in 2023 would be the equivalent of between $1,201 and $2,425 today); *Joseph S. v. Kijakazi*, No. 2023 WL 2628243, *2 (C.D. Cal. Jan. 23, 2023) ("The Court's own research, as well as Plaintiff's counsel's own recent fee awards, suggest that an effective attorney hourly rate in the range of $1,300-$1,600 is appropriate" or between $1,551 and $1,909 with inflation). In fact, observers reflecting on recent trends in rates for large law firms have noted that "[b]illing rates for top-tier timekeepers in high-value practices" were "over $2,300 per hour and high-end associates nearing $2,000 per hour in 2024".[6]  Epic's counsel's rates are therefore comparable to or lower than those of counsel from law firms of similar rank, size and expertise in the field.  In fact, in a recent decision, the Delaware Court of Chancery found Cravath's hourly rates reasonable, *see Williams Cos., Inc. v. Energy Transfer LP*, 2022 WL 3650176, at *5-6 (Del. Ch. Aug. 25, 2022) (finding average

---

[6] *LexisNexis CounselLink Releases 2025 Trends Report Showing Large Law Command of Partner Rates, Share of Wallet*, Lexis Press Room (Apr. 22, 2025), https://www.lexisnexis.com/community/pressroom/b/news/posts/lexisnexis-counsellink-releases-2025-trends-report-showing-large-law-command-of-partner-rates-share-of-wallet.

blended rate of $624.04 for work beginning in 2016 to be appropriate), and that finding was upheld on appeal, *see Energy Transfer, LP v. Williams Cos., Inc.*, 2023 WL 6561767, at *21 (Del. Oct. 10, 2023).

(2)    The Lodestar Billed Hours are Reasonable.

A "reasonable" number of hours is "[t]he number of hours ... [which] could reasonably have been billed to a private client."  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013) (alterations in original) (internal quotation and citation omitted).  Courts generally exclude only hours that are deemed strictly administrative in nature or that are "excessive, redundant, or otherwise unnecessary".  *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

The hours expended in this case were reasonable in light of the hours expended in cases of similar complexity and duration.  The Cravath attorneys who worked on this matter expended 226,989.81 hours over the four years in which this matter was actively litigated in the district court. (O'Connor Decl. Ex. E.1.)  The total number of hours expended by the entire attorney team, excluding contract attorneys from Update, was 248,838.31 hours.  These hours were necessitated by the magnitude and complexity of this case, as discussed further below in connection with the *Kerr* factors. (*See infra* Section III.A.2.c.)

Although cases of this complexity are sufficiently individualized to make comparisons difficult, this number of hours is well in line with the number of hours expended in other complex cases, where intricate factual and legal issues are at play.  For example, in *In re TFT-LCD (Flat Panel )Antitrust Litigation*, a special master found plaintiffs' counsel's 300,000 hours on the case over the span of six years to have been reasonable, given that "pleading issues, document production, class certification, discovery issues" and "other potentially dispositive legal issues" were "complicated" and involved complex disputes between the parties.  2012 WL 13209696, at *4-6 (N.D. Cal. Nov. 9, 2012), *supplemented sub nom. In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 12918720 (N.D. Cal. Dec. 18, 2012); *see also Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 723-726 (2d Cir. 2023) (finding reasonable 630,000 hours expended over an approximately decade-long litigation); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 529 (W.D. La. 2017) (compensating plaintiffs' counsel for over 200,000 hours of work over four years, which the court

14

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR ATTORNEYS' FEES AND COSTS
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

found appropriate given the millions of documents, over a hundred depositions and "extremely high level of expertise, collaboration, and agreement" required throughout the MDL); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 439 (E.D.N.Y. 2014) (finding 500,000 hours to be reasonable over the course of a seven-year litigation); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 112 (D.D.C. 2013) (finding reasonable that "[o]ver nine years of litigation, plaintiffs' counsel billed nearly 300,000 . . . hours" because of the "complexity" of the litigation during which "plaintiffs faced significant challenges in defeating defendants' pending summary judgment motions, [and] establishing liability and damages at trial"); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (finding the 117,199.9 hours of attorney time and 12,428.8 hours of paralegal time "reasonable given the magnitude of the litigation", which took place over four years).

**(3)  These Reasonable Rates and Reasonable Hours Support the Expert's Lodestar Analysis.**

Epic's attorneys' fee award amount was calculated through careful consideration by an expert. John D. O'Connor, an attorney who specializes in attorneys' fee consulting and whose practice focuses on lodestar calculations for complex litigation, served as an expert for this Motion and has reviewed each firm's billing records. (O'Connor Decl. ¶¶ 1, 14, 144-210.)[7]  Mr. O'Connor conducted a lodestar analysis reflecting all fees reasonably paid by Epic to each firm over the course of this matter. (*See generally* O'Connor Decl.; *id.* ¶¶ 226-231.)  Mr. O'Connor verified that any hours not fairly attributable to this matter were excluded. (*Id.* ¶¶ 144-210.)  During the life cycle of this matter against Google, some of Epic's counsel also worked on claims against Apple. *See Epic Games Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.) ("*Epic v. Apple*").  Counsel and Mr. O'Connor undertook careful review to exclude any work relevant only to *Epic v. Apple*, such that the requested

---

[7] Appended to this Motion is "a statement of services rendered by each person for whose services fees are claimed, together with a summary of the time spent by each person, and a statement describing the manner in which time records were maintained" and a "brief description of relevant qualifications and experience and a statement of the customary hourly charges" of all personnel for each firm, in accordance with Civil Local Rule 54-5(b)(2),(3). (*See* Bornstein Decl. ¶¶ 5-22, Exs. A, B; Diessel Decl. ¶¶ 5-6; Riehle Decl. ¶¶ 6-9; Medina Decl. 9-12.)

15

fee award relates only to (1) work done solely in support of the case against Google, or (2) work done in support of both cases that would have been done even if the Apple case had not been brought. (Bornstein Decl. ¶¶ 26-34; O'Connor Decl. ¶ 146-178.)

            *b.   Epic's Attorneys' Fee Award Is Supported by The Kerr Factors.*

The Ninth Circuit also relies on the *Kerr* factors to assess the reasonableness of attorneys' fees and to determine whether an adjustment to the lodestar would be appropriate. These factors are "intended to provide district courts with guidance" to confirm the reasonableness of the lodestar figure. *Chalmers v. City of L.A.*, 796 F.2d 1205, 1211 (9th Cir. 1986). The *Kerr* factors include:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relations with the client, and (12) awards in similar cases.

*Kerr*, 526 F.2d at 69-70. As explained below, the *Kerr* factors support the reasonableness of Epic's fees. Where, as here, multiple *Kerr* factors weigh in favor of an attorneys' fee award, the court may at its discretion adjust the lodestar upward via a multiplier. *See Stetson v. Grissom*, 821 F.3d 1157, 1167 (9th Cir. 2016); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (affirming 3.65 multiplier in light of risk, complexity and duration of case). Although Epic believes that the *Kerr* factors would justify a multiplier here, Epic does not seek one and instead limits its request to the fees it actually paid, plus appropriate interest.

**The fees are appropriate given the time and labor required (factor 1) and the customary fee (factor 5).** *Kerr* factors 1 and 5 overlap with the lodestar analysis. The "time and labor" of *Kerr* maps on to the "hours spent" portion of the lodestar approach. *See Moore v. James H. Matthews & Co.*, 682 F.2d 830, 840-841 (9th Cir. 1982); *Stern v. Does*, 2011 WL 13124449, at *5 (C.D. Cal. May 4, 2011), *aff'd sub nom. Stern v. Weinstein*, 512 F. App'x 701 (9th Cir. 2013) ("In calculating the lodestar, the Court has addressed the time and labor required."). Likewise, the "customary fee" factor is subsumed by the lodestar "hourly rate" analysis. *See Del Mar Seafoods Inc. v. Cohen*, 2008 WL

16

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR ATTORNEYS' FEES AND COSTS
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

11456258, at *23 (N.D. Cal. Dec. 22, 2008) ("Th[e customary fee] factor has already been considered in discussing the lodestar hourly rate."), *report and recommendation adopted*, 2008 WL 11456119 (N.D. Cal. Dec. 23, 2008); *see also Chinn v. Blankenship*, 2010 WL 2595217, at *2 (W.D. Wash. June 23, 2010) (same). For the reasons described above, these two factors weigh in favor of Epic's requested attorneys' fee award.

   **The fees are appropriate given the complexity of the case (factor 2).** "Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award." *In re Heritage Bond Litig.*, 2005 WL 1594403, at *20 (C.D. Cal. June 10, 2005); *SAS v. Sawabeh Info. Servs. Co.*, 2015 WL 12763541, at *26 (C.D. Cal. June 22, 2015) (agreeing that "complexity of the litigation weighs in favor of granting" a party's requested attorneys' fees). This factor is particularly important in antitrust cases. *See Wall Prods. Co. v. Nat'l Gypsum Co.*, 367 F. Supp. 972, 974 n.1 (N.D. Cal. 1973). In determining a case's complexity, courts consider the number of parties, the intricacies of the theories of law and how extensive motion practice and discovery were. *In re Heritage Bond*, 2005 WL 1594403 at *20. Furthermore, courts look at the "difficulty of the questions presented". *Mays v. Cnty. of Sacramento*, 2019 WL 6696668, at *1 (E.D. Cal. Dec. 9, 2019), *report and recommendation adopted*, 2020 WL 6787145 (E.D. Cal. Jan. 13, 2020).

   This case was incredibly complex.

   *First*, the nature of the case, which related to anticompetitive conduct lasting over a decade, required extensive discovery. Both Google and Epic produced millions of documents. (Bornstein Decl.. ¶¶ 41-42.) There were over a hundred fact depositions; Epic's counsel took the lead on dozens of depositions. (*Id.* ¶ 45.) Expert discovery was also lengthy and complex, with Epic disclosing five experts who submitted thousands of pages of opening and reply reports. (*Id.* ¶¶ 46-51.) Pre-trial work was complicated by the fact that Epic had to coordinate with multiple other sets of plaintiffs. (*Id.* ¶¶ 55-57.) It took substantial resources to coordinate strategy, discovery, case management schedules and pre-trial motions across these groups. (*Id.* ¶ 57.)

*Second*, this case involved a complex subject matter, given the antitrust claims at issue, which implicated platform economics and two-sided markets, as well as complicated factual and technical issues regarding operating systems, app distribution channels and payment systems.  (*See id.* ¶ 65.)

*Third*, this case involved complicated pre-trial proceedings.  Not only did the parties brief a motion to dismiss (Dkts. 91, 111, 117), motion for summary judgment (Dkts. 407, 412, 416) and multiple motions in limine (Dkt. 462, 468), but they also engaged in frequent and complicated disputes on the scope of discovery and disputes over scheduling issues caused by Google's repeated efforts to delay.  (Bornstein Decl. ¶¶ 38-40.)  Google's aggressive tactics increased the costs of litigation at every turn by requiring multiple rounds of meet and confers and lengthy correspondence.  (*Id.* ¶ 40.)  And the coordination of Epic's case with other cases involving class certification and damages issues further complicated the proceedings.  (*Id.* ¶ 57.)

*Fourth*, Epic was required to address Google's document destruction and misuse of attorney-client privilege.  As described above, Google intentionally deleted Chats where substantive business conversations took place and then misrepresented its preservation efforts to Epic and the Court, which required extensive additional proceedings, including an evidentiary hearing and multiple rounds of briefing.  (*Id.* ¶¶ 58-62.)  Further complicating trial and proceedings, Epic also unearthed efforts by Google to shield documents from discovery via what a Google attorney called "fake privilege".  (*Id.* ¶ 63.)

*Fifth*, the trial was extensive and complicated.  Over the course of a 15-day trial, testimony was provided live or via designation by 36 fact witnesses.  (*Id.* ¶¶ 67-68.)  Epic's attorneys had to distill complex legal, factual and technical issues for the jury.  (*Id.* ¶ 65.)  The trial was followed by post-trial briefing, additional discovery and hearings on the appropriate remedy for Google's unlawful conduct.  The remedy proceedings involved expert reports, fact declarations and witness depositions, plus testimony and presentations by counsel before the Court—similar in many ways to a second trial.  (*See supra* Section II.E.)

The complexity of this case supports the lodestar award.

**The fees are appropriate given the skill of counsel (factor 3).**  Courts also frequently consider the level of skill of counsel, taking into account the amount of discovery, and challenges required in overcoming procedural motions.  *See Senne v. Kansas City Royals Baseball Corp.*, 2023 WL 2699972, at *19 (N.D. Cal. Mar. 29, 2023), *aff'd sub nom. Senne v. Concepcion*, 2023 WL 4824938 (9th Cir. June 28, 2023).  An attorney team's work in conducting "extensive discovery" as well as "efforts in investigating [a] case, in engaging in successful motions practice, and in working with various experts" all support the lodestar.  *Trosper v. Stryker Corp.*, 2015 WL 5915360, at *1 (N.D. Cal. Oct. 9, 2015).  Furthermore, if a case is particularly hard-fought or involves unique issues, such factors will also support a lodestar.  *See Cosby v. Autozone, Inc.*, 2016 WL 1626997, at *6 (E.D. Cal. Apr. 25, 2016) (considering "protracted" nature of proceedings in determining reasonable attorneys' fees); *Union Oil Co. of California v. Chevron U.S.A., Inc.*, 34 F. Supp. 2d 1222, 1226 (C.D. Cal. 1998) (taking into account the "vexatious conduct of defense counsel" and "in particular the assertion and withdrawal of various claims and theories and the inconsistent positions taken during trial" in awarding attorneys' fees), *aff'd sub nom. Union Oil Co. of California v. Atl. Richfield Co.*, 208 F.3d 989 (Fed. Cir. 2000).

Epic's counsel was skillful in navigating the extensive procedural and substantive complexities laid out above.  Further, as described, working with the co-plaintiffs, Epic's counsel exposed Google's "conscious decisions to delete or not turn on chat history with respect to evidence that was clearly relevant to the issues in the case".  (Trial Tr. 1044:7-11.)  Counsel also uncovered a "rampant and systemic culture of evidence suppression at Google" (*Id.* 3229:13-14), including "troubling evidence of improper assertions of attorney-client privilege by Google employees, including its CEO" (Dkt. 984 at 2).  Of particular note, of all the litigation that Google has faced around the country regarding its monopolistic practices in various markets, this was the first case in which counsel exposed its misconduct, which the Court has described as a "frontal assault on the fair administration of justice".  (*Id.* 3228:25-3229:1.)  This took not only extensive pre-trial investigation that culminated in extensive briefing and an evidentiary hearing, but also strategic presentation of this evidence during trial.  Epic's counsel also faced a well-resourced and tenacious adversary, who repeatedly sought to delay and to

1   erect procedural and substantive roadblocks to Epic's victory.  This all weighs in favor of finding

2   Epic's requested attorneys' fee award reasonable.

3         **The results obtained (factor 8) weigh in favor of the fees requested.**  "Courts have

4   consistently recognized that the result achieved is a major factor to be considered in making a fee

5   award." *In re Heritage Bond Litig.*, 2005 WL 1594389, at *8 (C.D. Cal. June 10, 2005); *see also*

6   *Hensley*, 461 U.S. at 440 (same).  The Ninth Circuit has held that the "nonmonetary results" of a case,

7   such as a successful jury verdict or injunctive relief, are crucial to determining degree of success.

8   *Morales v. City of San Rafael*, 96 F.3d 359, 364 (9th Cir. 1996), *opinion amended on denial of reh'g*,

9   108 F.3d 981 (9th Cir. 1997); *see also Robinson v. Delgado*, 2011 WL 672628, at *3 (N.D. Cal.

10  Feb. 17, 2011) ("The Ninth Circuit has expressly held that the award of injunctive relief was sufficient

11  to support an award of attorneys' fees." (citing *Friend v. Kolodzieczak,* 72 F.3d 1386, 1390 (9th

12  Cir.1995))).

13        Here, the significance of the case and results achieved weigh heavily in favor of Epic's

14  requested award.  *First*, the jury delivered a unanimous verdict in Epic's favor on its Sherman Act and

15  Cartwright Act claims, finding that Google had willfully acquired or maintained monopoly power

16  through anticompetitive conduct in two separate markets, that Google unlawfully restrained trade in

17  those markets and that Google engaged in unlawful tying.  (Dkt. 606.)  The Court subsequently ruled

18  in favor of Epic on its UCL claim.  (Dkt. 701 at 4.)  *Second*, the Court issued a permanent injunction to

19  prohibit, and remedy the effects of, Google's misconduct.  (*Id.* at 17.; Dkt. 702.)  The Ninth Circuit has

20  affirmed in full.

21        **The experience and reputation of counsel (factor 9) warrant the award of attorneys' fees.**

22  Courts also consider the "experience, reputation, and ability of Plaintiffs' counsel" in determining

23  whether a lodestar amount is reasonable.  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A.*, Inc., 915 F.

24  Supp. 2d 1179, 1190 (D. Nev. 2013), *aff'd*, 778 F.3d 1059 (9th Cir. 2015).  In so doing, courts

25  frequently consider attorneys' "[y]ears of litigation experience", *Blackwell v. Foley*, 724 F. Supp. 2d

26  1068, 1082 (N.D. Cal. 2010), as well as their "prominen[ce]" in the legal field relevant to the case,

27  *E.R.K. by R.K. v. Dep't of Educ.*, 2022 WL 2761467, at *6 (D. Haw. Apr. 28, 2022), *aff'd in part,*

28

*remanded in part*, 2023 WL 4030837 (9th Cir. June 15, 2023).  Epic's counsel are experienced and highly regarded antitrust litigators, further supporting the lodestar calculation.  (Bornstein Decl. ¶¶ 5-16.)

**Other awards made in similar cases (factor 12) support Epic's requested fees.**  The final "*Kerr* factor[] to be considered . . . [is] awards rendered in similar cases".  *Jones v. Cnty. of Sacramento*, 2011 WL 3584332, at *18 (E.D. Cal. Aug. 12, 2011).  Epic's requested fee award is supported by similar fee awards.

While substantial, Epic's requested attorneys' fees are by no means unusual or unprecedented. *See e.g.*, *Oracle USA, Inc., et al. v. SAP AG, et al.*, No. 07-cv-1658-PJH (EDL), Dkt. 1213 at 2 (N.D. Cal. Aug. 3, 2012) (awarding $120 million in attorneys' fees over ten years ago, which would be the equivalent of $168.27 million today given the effects of inflation[8]); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839 at *9 (D.D.C. July 16, 2001) (awarding $123 million in attorneys' fees in 2001 or the equivalent of $223.86 million today); *In re Initial Pub. Offering Sec. Litig.,* 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding $170.1 million in attorneys' fees in 2009, which is the equivalent of $254.04 million today).  In fact, even when fewer attorney work hours are expended than those that have been expended here, there is precedent for a comparable fee award.  *See In re Dell Techs. Inc. Class V S'holders Litig.*, 326 A.3d 686, 692, 696 (Del. 2024) (awarding $266.7 million attorneys' fees to plaintiffs' counsel given the complexity of the issues and challenging matters raised in defense, even though plaintiffs' law firms expended only 53,000 hours over the life of the case).

Several courts have approved similar awards in complex antitrust actions.  For example, in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, the court approved an attorneys' fee award of $544.8 million, consisting of a lodestar of $160 million in 2014 (or the equivalent of $220.97 million today given the effects of inflation) and a 3.41 multiplier.  991 F. Supp. 2d at 439-40, 447-48.  The court explained that the complexity of the case, the quality of

---

[8] These approximate figures were calculated using the U.S. Bureau of Labor Statics CPI Inflation Calculator, inputting the money value and using the date of issuance of the decision and inflation to July 2025 as benchmark dates for the calculation. *See* U.S. Bureau of Labor Statistics, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited Aug. 21, 2025).  Throughout this brief, when inflation adjustments are discussed, they are calculated using the same method.

representation, the time spent by counsel and the risk of the action justified the award.  *Id.* at 440-48.

Similarly, in *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.,* the court affirmed the district court's

award of a $215 million lodestar and a 2.45 multiplier, resulting in an award of $523 million.  62 F.4th

at 724; *see also In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1086 (11th Cir.

2023) (affirming an attorneys' fee award of over $600 million in complex Sherman Act action).

　　　　Further, courts both within and outside the Ninth Circuit have supported similar or larger

recoveries than the one at issue, when cases are complex and the stakes are high.  For example, in *In re*

*TFT-LCD (Flat Panel) Antitrust Litigation.*, the court awarded $308.2 million in attorneys' fees to one

set of counsel in 2012, which is the equivalent of $428.17 million today.  2013 WL 1365900, at *7.

The Court reasoned that the award was not only supported by the lodestar calculation, but also

warranted for the six-year litigation that produced "exceptional" results.  *See id.* at *7-8.  Similarly, in

*In re Enron Corp. Securities., Derivative & ERISA Litigation*, the court approved an overall award of

$668 million based on a lodestar of $131.9 million in 2008 (which is the equivalent of $194.76 million

given the effects of inflation).  586 F. Supp. 2d 732, 778, 828 (S.D. Tex. 2008).  The court relied not

just on the reasonableness of the rates but also the time required, the novelty and difficulty of the

issues and the results obtained, among other factors, to determine that a 5.2 multiplier was appropriate.

*Id.* at 786-803.  Likewise, in *In re Tyco International, Ltd. Multidistrict Litigation*, a $172 million

lodestar (or $264.55 million today, with inflation) as well as the "unusual complexity, duration and

risk" of the litigation all weighed in favor of a nearly $450 million dollar award.  535 F. Supp. 2d 249,

268 (D.N.H. 2007).  In *In re Diet Drugs* the court affirmed an award of $567 million based on a

lodestar of $156.8 million or $234.32 million today, with the effects of inflation.  582 F.3d 524, 535-36

(3d Cir. 2009); *see also In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1358-68 (S.D.

Fla. 2011) (awarding $123 million in 2011—the equivalent of $175.64 million today—due to *inter alia*

the time and labor, exceptional skill, excellent result, and difficult questions faced by counsel); *In re*

*Brand Name Prescription Drugs Antitrust Litig.*, 2000 U.S. Dist. LEXIS 1734, *6 (N.D. Ill. Feb. 9,

2000) (awarding $175 million in 2000—the equivalent of $332.4 million today—in part because of the

1  "extraordinary results" obtained).  Therefore, factor 12 of the *Kerr* analysis also supports Epic's

2  requested attorneys' fee award.

3      While many of the matters discussed above were class actions, they are comparable to this

4  matter in terms of complexity, results obtained, skill of counsel, subject matter—large-scale antitrust

5  actions—and/or magnitude .  These cases illustrate that the lodestar figure Epic requests here is by no

6  means disproportionate or unreasonable.  In fact, in many of these cases, class counsel was awarded

7  much higher total fees after accounting for the multipliers.  Here, Epic is requesting an award based

8  strictly on the *actual* hours expended and *actual* rates paid.

9      **B.    Epic's Request for Reasonable Costs and Expenses Should Be Granted.**

10     Epic is also entitled to recover reasonable litigation costs and expenses.  Costs recoverable

11  under the Clayton Act include not just taxable costs under 28 U.S.C. §§ 1821, 1920 and Federal Rule

12  of Civil Procedure 54(d), but also reasonable out-of-pocket litigation expenses that are ordinarily

13  incurred and paid by the client.  *See Optronic Techs, Inc v. Ningbo Sunny Elec. Co., Ltd*., 612

14  F. Supp. 3d 899, 922 (N.D. Cal. 2020), *aff'd in part, vacated in part on other grounds, remanded sub*

15  *nom. Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021).

16     Numerous cases have acknowledged and deemed as "reasonable litigation expenses"

17  commercial clients' costs for attorney lodging and travel, computerized legal research, photocopying

18  and printing, overnight messenger and mail services and document database hosting, among other

19  charges.  *See Trs. of the Constr. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.,* 460 F.3d

20  1253, 1259 (9th Cir. 2006); *Blackwell*, 724 F. Supp. 2d at 1080; *O'Bannon v. Nat'l Collegiate Athletic*

21  *Ass'n*, 2016 WL 1255454, at *13 (N.D. Cal. Mar. 31, 2016), *aff'd*, 739 F. App'x 890 (9th Cir. 2018).

22     Accordingly, and as detailed in Exhibit B to the Bornstein Declaration and Exhibit A to the

23  Medina Declaration, Epic seeks $10,273,909.19 million, relating to computerized legal research

24  charges, filing/printing, attorney travel, document database hosting and processing charges, messenger

25  and mail services, trial graphic preparation and other reasonable expenses.  These costs and expenses

26  are compensable under the Clayton Act, because they are all of the type ordinarily billed to and

27  incurred by clients to advance their interests in the case. *See Optronic Techs.*, 612 F. Supp. 3d at 922.

28

### C.    Epic's Award Should Reflect Compensation for the Time Value of Money.

Because Epic is a fee-paying client that compensated its counsel on a non-contingent basis throughout the duration of this matter, an attorneys' fees award that strictly tracked Epic's historical expenditures would undercompensate Epic, given the time value of money.  In order to remedy this issue, this court has recognized the appropriateness of using an "enhancement to" the lodestar calculation "to compensate for the delay in payment" of attorneys' fees.  *See Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc.*, 731 F. Supp. 2d 937, 949 (N.D. Cal. 2010) (citing *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 947 (9th Cir. 2007)).  Other courts are in accord.  *See e.g.*, *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 663 (7th Cir. 1985) ("Failing to correct for inflation would give the defendant a motive to prolong the fee issue as long as possible, and antitrust cases last long enough as it is.").

In this Circuit, "district courts have the discretion to compensate plaintiffs' attorneys for a delay in payment by either applying the attorneys' current rates to all hours billed during the course of the litigation or using the attorneys' historical rates and adding a prime rate enhancement."  *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 947 (9th Cir. 2007) (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994)).  In this case, where counsel was timely paid by Epic, there is no reason to award fees based on counsel's current rates.  Instead, the goal of the adjustment to the lodestar should be to compensate Epic for its lost time value of money, which may or not correspond with the rate increases that its counsel has chosen to implement over the past five years.  Accordingly, Epic requests an adjustment using the method adopted in *Theme Promotions*, which applied a published prime rate compounded annually through the date of judgment, followed by interest at the federal post-judgment interest rate thereafter.  731 F. Supp. 2d at 949.  Applying that methodology here, using October 7, 2024 as the effective date of judgment because that is when the Court issued its order noting Epic's entitlement to recover fees (Dkt. 701 at 17), leads to adjusted totals of $205,482,027.99 for attorneys' fees and $12,215,644.60 for costs.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Epic's Motion.

24

NOTICE OF MOTION, MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR ATTORNEYS' FEES AND COSTS
Case Nos. 3:21-md-02981-JD; 3:20-CV-05671-JD

DATED:  August 22, 2025

Respectfully submitted,

By: */s/ Gary A. Bornstein*
Gary A. Bornstein


CRAVATH, SWAINE & MOORE LLP
Gary A. Bornstein *(pro hac vice)*
gbornstein@cravath.com
Yonatan Even *(pro hac vice)*
yeven@cravath.com
Lauren A. Moskowitz *(pro hac vice)*
lmoskowitz@cravath.com
Michael J. Zaken *(pro hac vice)*
mzaken@cravath.com
M. Brent Byars *(pro hac vice)*
mbyars@cravath.com

FAEGRE DRINKER BIDDLE & REATH LLP
Paul J. Riehle (SBN 115199)