**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.*,<br>Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS** |

I, John D. O'Connor, do hereby declare as follows:

## I.    EDUCATION, EXPERIENCE, AND WORK HISTORY

1.    I am an attorney licensed to practice law in the State of California and have been so licensed since December 1972.  I am currently the principal of O'Connor and Associates, a law firm that specializes in commercial litigation.  I have fifty-two years of significant trial experience, including jury trial experience.  In addition to my litigation practice, I have been retained as an attorneys' fee expert on approximately three hundred occasions and have served as a consulting expert on many more occasions.  My most prominent expertise is lodestar calculation for complex litigation.

2.    The following is a summary of my background and qualifications.

3.    I attended The University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1968.  In 1972, I graduated *cum laude* from the University of Michigan Law School, where I was a member of the *Order of the Coif* and Associate Editor of the Michigan Law Review.  I was admitted to the California bar in 1972.

4.    I have held numerous positions at private law firms where my practice focused on trial litigation.  In 1972 and 1973, I was an associate with the trial firm of Belli, Ashe, and Choulos, where I assisted in the trial of several large cases and tried three cases on my own. From January 1974 through December 1979, I was an Assistant United States Attorney for the

Northern District of California in San Francisco where I tried white-collar criminal cases as well as a variety of civil matters. Much of my civil work with the U.S. Attorney's Office involved employment discrimination cases brought against Government facilities, including one class action race and discrimination case, which involved negotiating fees for thirteen lawyers. In 1980 and 1981, I was a senior associate at the prominent San Francisco firm of Brobeck, Phleger, and Harrison.

5. From 1982 through 2001, I was a principal and managing partner of the law firm of Tarkington, O'Connor & O'Neill, where our clients were mainly insurance companies, corporate risk management departments, and governmental entities, such as the FDIC, FSLIC, RTC, NCUA, and the United States government.

6. In 1982, I began managing the Tarkington office, and as our firm quickly grew to over eighty lawyers, I regularly kept abreast of billing standards in the community and regularly subscribed to specialized publications geared to law firm management, such as the Altman and Weil annual reports and the monthly published Partners' Report. I also reviewed periodically more widely published legal periodicals.

7. During this time, I participated heavily in working with our institutional clients in government, insurance, and other large businesses to establish and implement practical billing standards. I regularly consulted with these clients about their perception of the positives and negatives in our billing practices and, where appropriate, modified such practices in light of such client feedback.

8. Because our practice at the Tarkington firm often involved coverage, legal malpractice, and reinsurance and excess monitoring work, we reviewed the billings of a wide variety of firms in our regular practice, including premium-rate billings, highly negotiated insurance defense charges, and standard business litigation charges with rates falling between these two groups. I also became immersed in the auditing practices of insurers as they evolved in the late 1980s and early 1990s.

DECLARATION OF JOHN D. O'CONNOR IN SUPPORT    2
OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS

9.      Due to my growing expertise in legal fees and auditing issues, during the years 1991 through 2001, I consulted with numerous law firms throughout the country who were seeking my advice on audit criticisms leveled against their practices, almost invariably involving large fee disputes.  I also consulted on numerous occasions with fee payors in fee disputes.  I continue this work as a subspecialty of my litigation practice to the present.

10.      From 2001 through 2006, I was Special Counsel and a Director (equivalent in a legal corporation to a partner) for the Howard Rice firm, now merged with Arnold & Porter, practicing within the litigation department.  At Howard Rice, I pursued a high-stakes litigation practice, including the defense of R. J. Reynolds Tobacco Company and litigation involving intellectual property disputes.  I was designated as chief trial counsel in two major IP litigations, each involving the scope of rights transferred under specific contractual arrangements.  In one case, I represented an e-commerce platform provider, and in the other I represented Vivendi regarding the scope of rights to license video games in internet café settings.

11.      Since July 2006, I have practiced on my own with several associates under the name of O'Connor and Associates.  My practice continues to focus on complex business litigation, with some personal injury work for both plaintiff and defense, including an active trial practice, presently decreasing as my expert work increases.

12.      In my career, I have tried over seventy civil and criminal cases in state and federal jurisdictions throughout the country.

13.      I have been retained as an attorney fee expert on approximately three hundred occasions and have served as a consulting expert on many more occasions.  A significant portion of those cases have been large and complex, including those in which attorneys' fees are sought under the lodestar method on the basis of hourly billings contemporaneously paid by a prevailing client.

14.      I have opined in a large number of high-fee cases, including approximately twenty class actions.  My experience as a litigator includes defending fee claims on behalf of

government entities and negotiating fees with prevailing party attorneys.

15. I have experience in developing and litigating antitrust actions. In 1972, I litigated an antitrust action focused on the Martindale-Hubbell system of peer rankings, which led to the expansion of the criteria for inclusion of attorneys in the listing directory. I also worked on other antitrust plaintiff actions at the Belli office.

16. When employed with the Brobeck office I did extensive deposition work on an antitrust action brought against the major oil companies for alleged conspiracy to keep artificially low the posted prices paid for oil pumped on municipal land.

17. At the Tarkington office I represented a foreign reinsurer in the *In re Insurance Antitrust Litigation* brought before Hon. Willian Schwarzer in the Northern District of California. I tried to a jury a Sherman Act, Section 2 claim in the Eastern District of California before Hon. Milton Schwartz and won a directed verdict.

18. Approximately eighty percent of my time in recent years has been spent as a consultant and expert witness in attorney fee disputes. In such disputes, I have assisted parties seeking fees and those seeking to oppose or reduce them.

19. In total, I have testified as an expert or handled litigation in approximately twenty states. I regularly review published rate surveys, which are generally broken down by location, field of practice, firm size, and lawyer status. For the past several years, I have also been consulting and lecturing nationwide through the National Association of Legal Fee Analysis ("NALFA"). In addition to lecturing myself, I have attended numerous lectures of legal fee analysts, expert witnesses, and general counsel on fee matters. I have had the honor of being named by NALFA a "nation's top attorney fee expert" since 2017.

20. My *Curriculum Vitae* is attached hereto as **Exhibit A**.

21. The documents I have reviewed are identified in **Exhibit B,** and the last four years of prior testimony and all legal fee prior publications are identified in **Exhibit C.**

## II.     **<u>SUMMARY OF OPINIONS</u>**

22.     I have been asked to examine and analyze the billings of the law firms employed by the prevailing Plaintiff Epic Games, Inc. ("Epic") in this litigation to determine the amounts reasonably assessed against Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited and Google Payment Corp. (collectively, "Google") and in favor of Epic.

23.     Courts that award attorneys' fees pursuant to a fee-shifting statute consult the lodestar method, wherein the number of hours reasonably expended on the litigation are multiplied by a reasonable hourly rate.  *See Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1261-62 (9th Cir. 1987).  In assessing the reasonableness of attorneys' fees under the lodestar method, "[t]he operative question isn't the dollar amount, the question is whether the rates charged and the hours spent are reasonable in light of the totality of the litigation."  *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2015 U.S.Dist.LEXIS 54063, at *86 (C.D. Cal. Mar. 24, 2015).

24.     Requested hourly rates are reasonable if they "are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

25.     After calculating a reasonable lodestar, "the district court then assesses whether it is necessary to adjust the presumptively reasonable lodestar figure on the basis of the *Kerr* factors."  *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).

26.     I have reviewed Epic's invoices and have prepared exhibits to assist the Court in its assessment of a reasonable lodestar.  All of the calculations made herein incorporate the discounts negotiated by Epic when applicable.  This Declaration calculates these historically paid fees over the past five years attributable to the *Google* litigation as ▮▮▮▮▮▮.[1]  With a yearly adjustment using prime rates compounding annually before this court ruled Epic is

---

[1] Epic's requested lodestar does not include all fees incurred to date and will be supplemented on Reply. (Bornstein Decl. ¶ 2.)

entitled to attorneys' fees on October 7, 2024 (Dkt. 701) and federal post-judgment interest rates thereafter (applied after adjusting the total fees for any margin of error), the total amount of fees requested is $205,482,027.99.

27.    One complication that I encountered when reviewing the invoices is that a portion of these billings was generated while Epic was simultaneously prosecuting an antitrust action against Apple, *Epic Games, Inc. v. Apple, Inc.* ("*Apple*"), Case No. 4:20-cv-05640-YGR (N.D. Cal.), and the instant case against Google.  Epic's lead counsel in both matters was Cravath, Swaine & Moore LLP ("CSM"), and for a portion of this litigation, spanning approximately seventeen months, Cravath billed Epic for its time on both cases under a single client billing number.  This "joint billing period" lasted from Cravath's initial retention in April 2020 through September 9, 2021, following the district court's post-trial decision in the *Apple* case, when Cravath created a new number to track subsequent *Apple* work.

28.    CSM attorneys acting under my supervision analyzed the invoices for work performed in the joint billing period to segregate out fees attributable solely to the *Apple* litigation.  The *Apple* case was tried in May 2021, and a substantial amount of work during the joint billing period involved the *Apple* trial and preparation for that trial.  I and those working under my supervision have treated that trial and trial preparation work as unrelated to the *Google* litigation and have excluded it entirely from the fees claimed on this Motion.  For the most part, based on the identity of the billing timekeepers and the descriptions of the work performed, the *Apple* trial and trial preparation time entries were easily segregated, within only a minimal margin of uncertainty.  For work not directly involving trial and trial preparation in the *Apple* litigation, attorneys at CSM carefully analyzed, identified and excluded work done for the *Apple* litigation.  After accounting for these exclusions, which are described further below, the amount of CSM's Google-attributable fees in the joint billing period for which recovery is sought on this Motion is ███████████.

29.    Beginning on September 10, 2021, CSM's fees on the *Apple* matter were billed to a separate client billing number, allowing more straightforward analysis of the fees incurred from that date forward, which constituted the majority of the time period in which this litigation occurred.  The majority of the CSM fees sought to be recovered are consequently from that period.  This segment of billings totals ▮▮▮▮▮▮ in CSM fees.[2]  Adding these phases together results in a total CSM lodestar of ▮▮▮▮▮▮.

30.    Epic employed other law firms for particular services, which were performed economically, and typically at lower cost than the rates charged by CSM.  Epic retained Faegre Drinker Biddle & Reath LLP ("Faegre") as California counsel; Wiggin and Dana LLP ("Wiggin") to focus on third-party discovery and trial witness preparation; Clifford Chance LLP ("Clifford Chance") as conflict counsel; Zukerman Gore Brandeis & Crossman LLP ("Zukerman") as discovery counsel with a focus on privilege review; Hueston Hennigan LLP ("Hueston") to handle two witnesses at trial; and a contract document review vendor, Update, Inc. ("Update") (collectively the "Ancillary Firms").  The Ancillary Firms collectively billed ▮▮▮▮▮▮ for work throughout the entirety of the *Google* litigation.

31.    The fees from CSM and the Ancillary Firms together total ▮▮▮▮▮▮ for work on this matter at the district court level.  I have attached hereto as **Exhibit D** a chart summarizing Epic's lodestar by firm.  With a total of 392,582.92 hours, Epic's overall blended rate is ▮▮▮▮, an unusually low blended rate that reflects the cost-saving retention of lower-rate Ancillary Firms to assist with discovery.  I have attached hereto as **Exhibit E** a series of charts reflecting each timekeeper's position, experience, rates, hours, and fees for CSM (**Exhibit E-1**), Wiggin (**Exhibit E-2**), Zukerman (**Exhibit E-3**), Faegre (**Exhibit E-4**), Hueston (**Exhibit E-5**), Clifford Chance (**Exhibit E-6**), and Update (**Exhibit E-7**).

32.    To account for marginal uncertainty in various allocations, I reduce Epic's ▮▮▮▮▮▮ lodestar to $170.5 million.

---

[2] This total includes CSM fees for work performed through June 30, 2025, and will be supplemented on Reply for subsequent work.

33. This lodestar was contemporaneously paid by Epic at counsel's historical rates. Because some of these payments were rendered as long as five years ago, recovery of this amount would not make Epic whole because it would not account for the time value of money. Case law encourages time-delay adjustment for lower historical billing rates to conform to current rates; or interest accrued on fees incurred in the past; or alternatively, for inflation. *See e.g*, *Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc.*, 731 F. Supp. 2d 937, 948 (N.D. Cal. 2010) ("To compensate plaintiffs' attorneys for the delay in payment of the attorney fees, district courts have the discretion to either apply the attorneys' current rates to all hours billed during the course of the litigation or use the attorneys' historical rates to which is added a prime rate enhancement."). Such an adjustment can be achieved through application of a multiplier, an inflation adjustment, or a prime rate adjustment. I have addressed this issue by using the prime rate compounded annually for the fees through October 7, 2024, when the court issued its order noting Epic's entitlement to attorneys' fees (Dkt. 701), and using the federal post-judgment interest rate thereafter. The total adjusted lodestar is $205,482,027.99 million (**Exhibit M-1**).

34. In contingent fee-shifting cases, "[t]he number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). Here, such an exercise is unnecessary as all hours were reasonably billed to and paid by a private client. "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Id.* at 1112. This is especially so here given Google's "modus operandi throughout the case" of "fir[ing] a barrage of objections and allegations" that "often result[ed] in headline-style arguments that lack useful development." (Dkt. 674 at 4.).

35. Further, Epic regularly reviewed the invoices and closely monitored the litigation to avoid unnecessary charges. The bills were paid by Epic, while negotiating significant concessions and adjustments with CSM and other firms, not based on perceived excessive

billing, but rather on the simple and overwhelming cost to a party without unlimited resources. In short, these billings constituted market transactions, which were executed without any certainty of third-party reimbursement. On that basis alone, they constitute reasonable fees.

36. To buttress this conclusion, this Declaration analyzes the rates, hours and total fees paid by Epic and finds them to be reasonable. In doing so, I have assessed the following factors.

37. First, I reviewed the hourly rates charged by Epic's counsel and find them to be reasonable in light of the rates charged by other similarly situated firms in this District.

38. Second, I assessed the hours expended by Epic's counsel and find that they are reasonable in light of the unique challenges and complexity of this case. Staffing on this matter was both efficient and well-suited to the complicated nature of this litigation, including the fact that Epic was litigating this case alongside four other coordinated actions. Google's conduct in this litigation, including efforts to conceal relevant evidence, contributed to the time that Epic needed to expend litigating the matter.

39. Because there are very few complex antitrust cases that result in a fee award, it is difficult to make direct comparisons for the fees generated here. However, I note that large class actions fees are comparable and that courts have awarded fees in large litigations in excess of those sought here. The total hours expended here when viewed in the appropriate context, are similarly unremarkable. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M: 07-CV-01827-SI, 2012 U.S. Dist. LEXIS 207376, at *76 (N.D. Cal. Nov. 9, 2012) (awarding fees for over 300,000 hours of work over six years); *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 724-25 (2d Cir. 2023) (awarding fees for 630,000 hours of work over an approximately decade-long litigation); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, 2024 U.S. Dist. LEXIS 213062, at *33 (D.S.C. Nov. 22, 2024) (approving approximately 480,000 hours billed by 650 timekeepers); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 529 (W.D. La. 2017) (awarding fees for over 200,000

hours of work over four years of litigation); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 439 (E.D.N.Y. 2014) (awarding fees for 500,000 hours of work over seven years of litigation); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & ERISA Litig.*, 4 F. Supp. 3d 94, 112 (D.D.C. 2013) (awarding fees for nearly 300,000 hours of work over nine years of litigation); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding fees for nearly 117,199.9 attorney hours and 12,428.8 paralegal hours of work over four years of litigation).

40.    Epic risked over ▮▮▮▮▮▮▮ to address anticompetitive behavior, without seeking damages and without certainty of success. In my opinion, its requested attorneys' fee award is reasonable.

**III.    EPIC'S FEES ARE PRESUMPTIVELY REASONABLE**

41.    In my opinion, because the fees paid by Epic were negotiated and paid without the expectation of being recovered, they reflect what a client would pay for the services provided—indeed, they *are* what a client *did* pay for the services provided—and are therefore presumptively reasonable.

42.    Under the circumstances of this litigation, Epic had the incentive to negotiate its fees and to ensure efficient staffing by its counsel.

43.    Epic had every reason to believe that this litigation would be hard fought and proceed to trial. This litigation was significant and had the potential to profoundly affect the business model of the Google Play Store and aspects of the Android ecosystem. Rather than seeking monetary relief, Epic sought injunctive relief that would change Google's business model. Because Epic sought only injunctive relief, Google could not settle with Epic without significantly altering its economic model. This made settlement prior to trial significantly less likely than in cases where a monetary award is sought.

44.    In addition, given the size and corporate wealth of Google, and the high stakes, there was no motive on the part of Google to economize, to leave any stone unturned, or to omit

any argument. Google had every incentive to engage in aggressive litigation tactics. Indeed, Google's incentive was to drive up the costs on all plaintiffs, including Epic.

45.    On the other hand, while it likely knew it would proceed to trial, Epic had no incentive to run up its own costs unnecessarily or to inflict any unnecessary costs on Google. In fact, given Google's abundant resources, incurring litigation costs would be unlikely to cause significant impact or deterrence.

46.    Epic knew that the litigation, with all its component parts, would require a significant amount of risk and expense on its part and considerable effort on the part of its lawyers. At the same time, as confirmed by the post-trial decision in *Apple* in September 2021, Epic would, in the event of a loss of its antitrust claims, have to pay its own fees. Indeed, in the *Apple* matter, the Ninth Circuit ultimately concluded that, under a contractual fee-shifting provision, Epic was obligated to reimburse a portion of the fees incurred by Apple. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003-04 & n.24 (9th Cir. 2023).

47.    Epic also had to litigate this case alongside a diverse group of plaintiffs that were seeking damages, which in turn affected certain strategies and complexities of the litigation. (Bornstein Decl. ¶¶ 55-57.)

48.    Epic was required to coordinate with, and/or seek consistency regarding the positions of, the other plaintiff groups on all substantive aspects of this litigation. This process not only took significant time throughout the litigation, but it also often required additional substantive work. (*Id.* ¶ 57.) Google was persistent in seeking compromise or coordination by and between all plaintiffs on numerous procedural matters, which further increased the amount of coordination work between Epic and its co-plaintiffs. The requisite coordination among co-plaintiffs and Google's corresponding gamesmanship also lengthened deposition time. (*Id.*)

49.    As a result of these factors, Epic was highly proactive in controlling the cost of this litigation, most prominently with its main firm, CSM. These efforts included securing substantial discounts on CSM bills, with a ▮ discount applied to CSM's standard hourly rates



up to ███████.  A retroactive ███ discount was then applied to ███████████████████████, followed by a ███████████ on all fees thereafter.  (Bornstein Decl. ¶ 17; Medina Decl. ¶ 6.)

50.    Because the retroactive discount was applied as a credit to a subsequent invoice after the ███████████ in fees were billed, CSM applied the additional ██ discount to the ██ ███████ in fees in its supporting billing records herein to more accurately reflect the negotiated agreement.  I have examined a series of substantial adjustments and conclude that through its then-current cuts and/or retroactive discounts, the bills in total were decreased by approximately ███████████████, with only ███████████ decreased by ███.  This is a critical aspect of Epic's fee request, which strongly favors the reasonableness of the amounts Epic seeks.[3]

51.    Epic also negotiated discounts and accommodations with Ancillary Firms: Faegre's hourly rates were discounted between ███████████ from its standard hourly rates (Riehle Decl. ¶ 6); Wiggin's hourly rates were discounted upon retention (Diessel Decl. ¶ 5); Clifford Chance's hourly rates were discounted ███ (Medina Decl. ¶ 9); and Zukerman did not apply annual increases to the hourly rates charged to Epic.

52.    In my opinion, the uncertainty of the outcome in this case, the regular examination of billings by the client, the obvious efforts by Epic to control costs, and the responsiveness of CSM to client cost-control initiatives demonstrate that, to my observation, there appeared to be no incentive either to over-litigate or overbill in this litigation.

53.    In contingent fee litigation, where the prevailing counsel has not been regularly billing the client, it is fairly common for the prevailing counsel to offer in its fee motion a five percent (5%) across-the-board reduction in its lodestar, to assure the Court that the effects of any problematic billing entries have been ameliorated.

---

[3] I note that for a portion of the case, the ███████████ was applied to fees at the invoice level.  More recently, the ███████████ has applied directly to the hourly rates that CSM charges.  Mathematically, these two discounting methods work out the same.

54.     In contrast, in a case of periodically submitted and paid invoices, the generally proffered rationale supporting reasonableness is that a supervising, paying client would either impose discipline to prevent loose billing practices or seek adjustment as the case proceeded for any irregularities it notes on the bills.  A commercially sensible law firm, knowing of its client's cost-consciousness and scrutiny, would both discipline its work and also review and adjust its pre-bills, so as to avoid the embarrassment of improper billing or inefficient work.  For these reasons, there is a body of both federal and California case law holding that fees billed under such a regimen are presumptively reasonable.

55.     Applicable case law confirms that in cases where a client has regularly paid invoices propounded by its lawyers, those billings are presumptively reasonable.  *See*, *Carson v. Billings Police Dep't*, 470 F.3d 889, 892 (9th Cir. 2006) ("That a lawyer charges a particular hourly rate, and gets it, is evidence bearing on what the market rate is, because the lawyer and his clients are part of the market."); *Stonebrae, L.P. v. Toll Bros.*, No. C-08-0221 EMC, 2011 U.S.Dist.LEXIS 39832, at *19-20 (N.D. Cal. Apr. 7, 2011) (explaining the presumption that the lodestar figure is a reasonable fee "is particularly forceful where, as here, the fees were billed to and actually paid by the plaintiff during the course of the litigation, the relationship between counsel and the plaintiff was a valid business relationship, and the plaintiff, as client, exercise [sic] business judgment in retaining and paying counsel"); *Clark v. Incomm Fin. Servs., Inc.*, No. EDCV 22-1839 JGB, 2024 U.S.Dist.LEXIS 216626, at *6 (C.D. Cal. Nov. 8, 2024) ("A client's payment of the full fee amount 'adds weight to the presumption of reasonableness' of the lodestar."); *Straight Path IP Grp., Inc. v. Cisco Sys.*, No. C 16-03463 WHA, 2020 U.S.Dist.LEXIS 89061, at *19 (N.D. Cal. Mar. 4, 2020) (finding rates reasonably when "they are the rates a sophisticated client actually paid," "[t]hey were generated through a competitive process," and "[t]here is no claim or evidence to suggest that there was any effort to raise these rates collusively").

56.    The above factors suggest that the incentives of party and counsel are aligned with reasonable billing practices and give rise to a presumption of reasonableness.

## IV.    REASONABLENESS OF RATES

57.    An indicator of the appropriateness of the attorneys' fees Epic is seeking is whether the rates charged by Epic's counsel are reasonable.  In my opinion, the rates charged by Epic's counsel are reasonable given the nature of the case.

58.    In assessing the reasonableness of the rates charged to Epic, it is necessary to account for the complexity and stakes of this action.

59.    In my opinion, the complexity and stakes of this litigation justified retention of the finest firms in America.  Lead counsel, CSM, is one of these firms and is reputed to have particular expertise in antitrust litigation.  Its success in this litigation supports that conclusion.

60.    CSM's work on this litigation involved, *inter alia*, highly sophisticated, nuanced disputes over market definition and the anticompetitive effects of Google's practices.  CSM also identified and uncovered various anomalies in Google's document production, which led to successful litigation over the propriety of Google's document destruction policies and privilege invocations.  The extensive evidence that CSM uncovered and put on regarding Google's improper litigation practices, which ultimately led to a permissive adverse inference instruction being given to the jury, underscore the reasonableness of the rates at which CSM billed.

61.    I have reviewed supporting declarations from Epic and counsel, as well as underlying billings, and have prepared a series of charts reflecting the hourly rates Epic paid, which I have attached hereto as **Exhibit F**.  Per **Exhibit F**, across the various firms, Epic paid partner rates ranging from ████████, senior attorney rates ranging from ████████, associate rates ranging from ████████, discovery attorney rates ranging from ████████, contract document review rates ranging from ████████, law clerk rates ranging ████████, paralegal rates ranging from ████████, and other support staff rates ranging from ████████.

62.    Of the various rates charged by CSM and the Ancillary Firms, CSM's and Hueston's are appropriately the highest. Clifford Chance's effective rates are slightly below those of CSM and Hueston, but its role in the litigation was minimal, billing just over ██████. Faegre's, Wiggin's and Zukerman's rates are more in line with median market rates, with Faegre at the top of the median market but below the premium rate market. Epic also directly retained a contract document review vendor, Update. Update's rates are reasonable, in line with similar rates charged by document review vendors and are not marked up or otherwise inflated. This Section analyzes CSM's rates and concludes that they are true market rates, which in turn justify the lower rates of the Ancillary Firms.

63.    All these rates are market rates—*i.e.*, they are set at the indicated level because there are clients willing to pay those amounts for the services provided by CSM and the other Ancillary Firms. The billings at these rates in this matter *are* actual market transactions, and therefore reflect the prevailing market rates. I further note that CSM's standard billing rates are also supported by market transactions in numerous other matters with numerous other clients, such that CSM's substantially discounted effective rates herein are, in fact, *below* market rates.

64.    Two authoritative and widely respected and cited rate surveys support the rates charged here.

65.    In rendering an opinion on reasonable hourly rates, I frequently refer to the "Real Rate Report: Lawyer Rates, Trends and Analysis" published by Wolters Kluwer's ELM Solutions and CEB ("Real Rate Report"). The Real Rate Report examines anonymous data sourced from legal invoices that were actually billed to clients and sets forth hourly rates based on various criteria, including location, experience, position, whether the matter involved litigation, and practice area. The Real Rate Report's data sources include those law firms and corporations that use Wolters Kluwer's ELM Solutions software, as well as non-users who voluntarily contribute data in exchange for complimentary copies of reports for as long as they contribute data.

66.     The Real Rate Report is highly respected and has been recognized by courts as a reliable resource:

> Because the Real Rate Report "identifies attorney rates by location, experience, firm size, areas of expertise and industry, as well as specific practice areas, and is based on actual legal billing, matter information, and paid and processed invoices from more than eighty companies," it provides "a much better reflection of true market rates than self-reported rates in all practice areas."

*Donastorg v. City of Ontario*, No. EDCV 18-992 JGB, 2021 U.S.Dist.LEXIS 246890, at *19-20 (C.D. Cal. Sep. 23, 2021).  I have attached relevant Real Rate Report data sets hereto as **Exhibit G**.

67.     The Real Rate Report reflects the first quartile, median, third quartile, and mean rates for each data set, but not the ceiling of any market segment.  The Real Rate Report includes antitrust litigation in the "Corporate: Other" practice area.  The Real Rate Report also provides a data set focusing on San Francisco, which reports the third quartile rate of "Corporate: Other" law firms with between 501 to 1,000 lawyers (where I understand CSM fits) for the years 2020 through 2024.  Per **Exhibit G**:

| San Francisco Corporate: Other Third Quartile Rates for Firms with 501-1,000 Attorneys | | | | | |
|---|---|---|---|---|---|
| **Position** | **2020** | **2021** | **2022** | **2023** | **2024** |
| Partner | $1,061 | $1,061 | $1,125 | $1,232 | $1,522 |
| Associate | $694 | $808 | $1,014 | N/A | $1,154 |

68.     These rates reflect the rate charged at the 75th percentile of attorneys.  The rates increase from there as one approaches the 99th percentile.  These third quartile rates support the reasonableness of the somewhat higher rates charged by CSM, which along with peer firms would be found closer to or in the 99th percentile for this case.  I further note that these third quartile rates support the rates Epic paid the Ancillary Firms for their services.

69.     Another authoritative and highly reputable rate survey is NALFA, the National Association of Legal Fee Analysis.  The NALFA survey breaks down rates by locality, years of experience, position, practice area/complexity of the case, and law firm size.  While the

aggregated national data is informative concerning general market trends, the relevant data herein is the San Francisco market survey data, which I have attached hereto as **Exhibit H**. The San Francisco market rates are aggregated into four tiers with five strata in each tier, thereby giving twenty total strata of rates, which show their distribution on a percentage of the market. NALFA's rate analysis has the advantage of surveying a broader section of the market, including smaller market-driven firms. Per **Exhibit H**:

| 2020 - 2024 San Francisco NALFA | | |
|---|---|---|
| Year | Top Strata | Percent of SF Attorneys |
| 2020 | $1,001-$1,050 | 1.51% |
| 2021 | Over $1,100 | 1.48% |
| 2022 | Over $1,100 | 3.22% |
| 2023 | Over $1,300 | 1.67% |
| 2024 | Over $1,300 | 3.40% |

70.    Because the most prestigious firms in the country are well within (and at the top portion of) the highest 1%, these cited rates are not indicative of the actual rates charged by the top 1%. CSM is within the top sector of the 1%, so CSM's hourly rates should be expected to materially exceed $1,300 an hour. By contrast, Update, a document review vendor, does not fall anywhere within these categories, including the first quartile median. Its rates are far more modest, as expected given the distinguishable work it performs.

71.    The hourly rates Epic paid CSM and the Ancillary Firms are further supported by prior rate awards in the Northern District of California. However, these prior rate awards must be adjusted for inflation to assess the 2025 rates paid by Epic. It is common practice to adjust hourly rates using the legal services component of the Consumer Price Index. This methodology was applied in the "LSI *Laffey* Matrix" and its successor, the "Fitzpatrick Matrix," both of which were commissioned by the U.S. Attorney's Office of Washington, D.C. The "LSI *Laffey* Matrix" reports the annual legal services inflation ("LSI") adjustment factor beginning in 1994.[4]

---

[4] *The Laffey Matrix*, http://www.laffeymatrix.com/see.html (last visited Aug. 19, 2025).

I have attached hereto as **Exhibit I** a chart reflecting the legal services inflation calculations included below:

- *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,* No. 2672 CRB (JSC), 2017 U.S. Dist. LEXIS 39115, at *732 (N.D. Cal. Mar. 17, 2017):  approving rates ranging from "$275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals," which, adjusted for legal services inflation, equates to $380 to $2,209 for partners, $207 to $1,091 for associates and $110 to $677 for paralegals in 2025.

- *Hefler v. Wells Fargo & Co.,* No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 213045, at *39 (N.D. Cal. Dec. 17, 2018), *aff'd sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020): approving rates ranging from "$650 to $1,250 for partners or senior counsel, from $400 to $650 for associates, and from $245 to $350 for paralegals," which, adjusted for legal services inflation, equates to $843 to $1,622 for partners, $519 to $843 for associates and $318 to $454 for paralegals in 2025.

- *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 965 (N.D. Cal. 2014):  approving "rates ranging from $355 to $1,095 per hour for partners and associates, $260 to $325 per hour for an e-discovery staff attorney, and $245 to $290 per hour for paralegals" as "within the prevailing market rates for similar cases in the Northern District," which, adjusted for legal services inflation, equates to $519 to $1,600 for partners and associates, $380 to $475 for discovery attorneys and $358 to $424 for paralegals in 2025.

- *Glob. Indus. Inv. Ltd. v. 1955 Capital Fund I GP LLC*, No. 21-cv-08924-HSG, 2023 U.S. Dist. LEXIS 173343, at *12 (N.D. Cal. Sep. 27, 2023): approving rates of $1,085 and $1,650 for counsel and partners and between $645 and $960 for associates, which, adjusted for legal services inflation, equates to partner and counsel rates of $1,206.74 to $1,835.14 and associate rates of $717.37 to $1,067.72 in 2025.

72.    The rates Epic paid CSM and Ancillary Firms are also supported rates paid by fee-paying clients in other recent antitrust cases in the Northern District of California.  For

example, in *Pacific Steel Group v. Commercial Metals Company et al.*, No. 4:20-cv-07683-HSG Dkt. No. 548 (N.D. Cal., Feb. 24, 2025), Pacific Steel Group filed its motion for attorneys' fees, disclosing it paid partner and of counsel rates ranging from $725 to $2,169, associate, discovery counsel and contract attorney rates ranging from $325 to $1,278, and paralegal and litigation support specialist rates ranging from $285 to $710. While Pacific Steel Group's motion for attorneys' fees is still pending, the rates it paid to Quinn Emanuel are certainly evidence of San Francisco antitrust market rates paid by a fee-paying client.

73.    The rates Epic paid CSM and the Ancillary Firms are also supported by recent rates awarded in the Central District of California, which are largely in line with those found reasonable in the Northern District of California, especially at the segment of the market relevant herein:

- *Trendsettah USA Inc. v. Swisher Int'l Inc.*, No. 8:14-cv-01664-JVS, 2023 U.S. Dist. LEXIS 215670, at *42-45 (C.D. Cal. Nov. 17, 2023): approving rates between $1,080 and $2,180, which, adjusted for legal services inflation, equates to $1,201 and $2,425 in 2025.

- *Joseph S. v. Kijakazi*, No. CV 20-09138-DFM, 2023 U.S. Dist. LEXIS 54610, at *5 (C.D. Cal. Jan. 23, 2023): finding rate in the range of $1,300 to $1,600 to be appropriate, which, adjusted for legal services inflation, equates to $1,550 and $1,908 in 2025.

74.    Based on my own knowledge, usually gained either in confidence or as sensitive information, I know the top-tier rates for the most prestigious firms. In particular, I have personal knowledge, beyond reported cases, of the rates of the nation's top firms, for instance, those of Quinn Emanuel; O'Melveny and Myers; Gibson Dunn; Wilson Sonsini; Willkie, Farr; Arnold & Porter; Wilmer Hale; Keker, Van Nest & Peters; and Williams & Connolly, to name a few. Their rates are similar in their general sweep to those charged by CSM here.

75.    In my experience, firms are also typically disciplined by the rates of other similarly situated firms and avoid charging low relative rates, suggesting inferiority, or charging excessively high rates in comparison to their true peers.

76.    My knowledge is confirmed by a recent publication discussing recent trends on rates for big law firms, which noted that "[b]illing rates for top-tier timekeepers in high-value practices" are "over $2,300 per hour and high-end associates nearing $2,000 per hour in 2024."[5]

77.    Further, the rates Epic paid are also eminently reasonable because, as noted in Section II above, CSM provided a substantial discount to Epic. Once ▮▮▮▮▮▮ in billings was reached, the initial discount of ▮▮ changed retroactively to ▮▮▮▮▮▮▮▮▮. Thereafter, a ▮▮ discount was given. Taken together, these discounts amount to approximately ▮▮▮▮▮▮▮▮ of CSM's billings. Epic also negotiated discounted rates with Wiggin, Faegre, and Clifford Chance, and Zukerman did not increase its hourly rates for the duration of this matter. Accordingly, the fact that the rates paid by Epic here were *below* those the market could bear further underscores their reasonableness.

## V.    <u>REASONABLENESS OF HOURS EXPENDED</u>

78.    In assessing the reasonableness of Epic's fees, I have also looked at the hours expended on this litigation.

79.    Over the life cycle of this matter CSM expended 226,989.82 hours on this matter. The Ancillary Firms collectively expended 165,593.1 hours: Wiggin, 17,458.9 hours; Faegre, 1,722.1 hours, Zukerman, 2,922.7 hours; Hueston, 647.3 hours; Clifford Chance, 93.5 hours; and Update 142,748.6 hours. *See* **Exhibit D**.

80.    Several factors provide a strong indication of the reasonableness of the hours incurred.

81.    As discussed above, the hours claimed by Epic are presumptively reasonable because this matter involved a cost-conscious client who closely monitored and oversaw the work and closely reviewed each firm's invoices before payment, maintaining a constant dialogue with the firms about the hours and fees being expended.

---

[5] Lexis Press Room, *LexisNexis Counsel Link Releases 2025 Trends Report Showing Large Law Command of Partner Rates, Share of Wallet* (Apr. 22, 2025), https://www.lexisnexis.com/community/pressroom/b/news/posts/lexisnexis-counsellink-releases-2025-trends-report-showing-large-law-command-of-partner-rates-share-of-wallet.

82.     I have also reviewed the following additional factors that indicate that the number of hours expended on this matter are reasonable: (a) the challenges and complexities of the litigation; (b) the rationality and discipline of the staffing methods; and (c) the litigation style of opposing counsel, including the litigation-obstructing barriers Google built into its document management policies and Google's destruction of evidence and abuse of privilege.  In light of these factors, I find the hours expended to be reasonable.

### A.  COMPLEXITIES AND CHALLENGES OF THE LITIGATION

83.     In this section of my Declaration I discuss the litigation challenges and complexities facing Epic, which directly bear upon the reasonableness of the hours expended.

84.     I do not undertake to summarize in its entirety the complexity of this litigation, because the Court is already very familiar with the intricacies of this action, as set forth in part in the Court's 42-page opinion denying Google's Motion for Judgment as a Matter of Law (Dkt. 674), the Court's Order on the UCL Claim and Injunctive Relief (Dkt. 701) and the Ninth Circuit's Opinion upholding the liability verdict and the entire injunction (Dkt. 200.1).[6]

85.     Having said that, this was clearly an extraordinarily complex case that involved difficult factual, technical and economic issues.

86.     The market definition questions were difficult and nuanced.  They required examination of transactions between the providers of mobile operating systems and original equipment manufacturers ("OEMs"); transactions among app distributors, app developers and app users; and transactions between app developers and providers of payment solutions, among others.

87.     Google "pressed relentlessly" (Dkt. 674 at 8) that Apple was a competitor in the relevant market(s), or, alternatively, that cross-market procompetitive justifications for its conduct should have been deemed relevant.  Much evidence and argument in this case concerned Apple and iOS, even though Google was generally unsuccessful in its attempt to inject various

---

[6] *Epic Games, Inc. v. Google LLC, et al.,* Case No. 24-6256 (9th Cir. 2025).

Apple-centric elements into the market analysis.  Establishing Android-only app distribution and in-app payment markets in the face of Google's relentless efforts to make the case about Apple made for time-consuming analytical challenges, both as to market definition and cross-market justifications.

88.    The case also required Epic to prove that Google maintained its monopoly power over Android app distribution and Android in-app payment solutions through a complicated web of anticompetitive conduct including, among other things:  OEM agreements through which Google prevented competing stores from being pre-loaded onto Android devices; Project Hug (a/k/a the Games Velocity Program); anti-steering restrictions; and Google's insistence on tying the use of the Google Play Store to Google Play Billing.  (*See*, Dkt. 674 at 16-20 (recounting the "substantial evidence" of Google's anticompetitive conduct that Epic put on at trial).)  Epic also put on evidence of Google's efforts to limit consumers' ability to directly download a competing store, such as the Amazon Appstore, or to directly download other individual apps.

89.    It suffices to say that the Android ecosystem, as designed by Google, was extremely complex and involved a mix of agreements, programs, and barriers that were in turn subject to dispute as to their anti-competitive effects and pro-competitive benefits.

90.    The case also involved complicated technical issues that required discovery and expert testimony.  Counsel had to delve into the way that Android phones, app distribution and payment systems worked.  And Google presented complicated security defenses for its conduct that Epic's counsel had to understand and rebut.  The burden in dealing with these issues was disproportionately on Epic's counsel, who did not have the benefit of Google's internal resources and thus had to understand Google's agreements, products and services through discovery and expert work.

91.    Because of the broad scope of issues, Epic, Google, and other plaintiffs undertook complex discovery and large-scale document production.  (Bornstein Decl. ¶ 39.)  Ultimately, millions of documents were produced by Epic, Google, co-plaintiffs and third parties.  (Bornstein

Decl. ¶¶ 41-43.)  This discovery engendered a great need for internal management, communication, and coordination and involved a large time commitment.  (Bornstein Decl. ¶ 44.)

92.     This document production was approximately six million documents and tens of millions of pages, in total.  (Bornstein Decl. ¶¶ 41-43.)  As I will discuss in the Staffing section (even aside from complications that counsel faced here), the burden on Epic's counsel to produce documents and/or review productions and appropriately manage and categorize them for use was immense.

93.     The nature of the case also underscores the need for extensive efforts by Epic's counsel.  Google had worked for years to develop a web of disincentives and prohibitions that protected its business model.  Epic very clearly bore a burden far heavier than that of Google, to investigate, unearth and illustrate the anticompetitive effects of Google's practices.  Google, instead, could rely on built-in obstruction and pretextual rationales for its anticompetitive conduct, which it had years to develop.

94.     Counsel also had to confer in-depth with Epic's in-house counsel and spend substantial amounts of time conferring with Epic officials and witnesses.  Additionally, CSM coordinated between and among the various Ancillary Firms.

95.     Compounding the complexity of the case, there were other plaintiffs in the litigation who each pursued their own case and interests.  (Bornstein Decl. ¶ 55.)  Epic's counsel was required to work with these parties to agree on a litigation approach.  This required additional efforts to ensure that Epic could successfully present its theory of the case.  (Bornstein Decl. ¶ 57.)  Accordingly, there was a need for constant conferring with counsel for the other plaintiffs, both to coordinate substantive positions on issues and also to efficiently coordinate efforts such as discovery, pre-trial conferences and deposition preparation.

96.     I treat the rationality of the staffing in section V.B. below.  Still, it suffices to say that balancing the needs of each of the plaintiffs required significant effort, as illustrated by the

hours expended on that task.  Had counsel failed to expend these efforts, it would have likely led to inefficiency, disorganization and unsuccessful outcomes.  While there were certainly efficiencies to be gained from the presence of other plaintiffs—and Epic did divide up certain work among the other plaintiffs where feasible, such as by assigning particular plaintiffs to take the lead on particular depositions—those efficiencies were counterbalanced by the burdens of coordination with co-plaintiffs that did not necessarily have common goals or interests.

97.    Further magnifying the litigation burdens on Epic and the reasonableness of the hours expended, Google "willfully failed to preserve relevant, substantive business communications that were made by employees on the Google Chat systems." (Dkt. 674 at 2.) Evidence was ultimately adduced over the course of pre-trial evidentiary hearings and during trial that Google "failed to preserve Chat evidence with the intent of preventing its use in this litigation and with the intent of depriving Epic of the use of that evidence." (Trial Tr. 3227:1-4.) The Court found this evidence to be credible, and found in its Order on Google's Renewed Motion for Judgment as a Matter of Law that "there was an abundance of pretrial and trial evidence demonstrating an ingrained systemic culture of suppression of relevant evidence within Google." (Dkt. 674 at 25 (quotations omitted).)  Additionally, Epic adduced evidence that Google employees improperly invoked attorney-client privilege to try to conceal unprivileged communications by, *inter alia*, copying an in-house attorney even when not seeking legal advice. As the Court later held, the evidence presented revealed "a frankly astonishing abuse of the attorney-client privilege designation to suppress discovery." (Dkt. 674 at 24.)

98.    These issues were revealed only as a result of extensive diligence by CSM to uncover and raise the court's awareness to these violations.  Many hours were necessarily and reasonably expended to expose and sanction Google's litigation misconduct, including on an extensive pre-trial investigation that was accompanied by briefing and an evidentiary hearing, and on presentation of these clear breaches of duty at trial.

99.    In short, the challenges of this litigation were uniquely complicated and support a finding that the hours expended were necessary and reasonable.

### B. STAFFING

100.    As noted above, the complexity of this antitrust case required extensive staffing. In addition to ensuring proper staffing of an antitrust case, the lead firm working on this matter had to ensure seamless inter-firm and intra-firm communication to prevent inefficiencies and facilitate coordination among the multiple assigned professionals.

**(1) Staffing Stability**

101.    Decisions regarding proper staffing most directly implicated lead counsel, CSM, given that they were in charge of overall litigation strategy and the day-to-day running of the case.  The duties of local counsel Faegre and third-party discovery counsel Wiggin, as well as those of other Ancillary Firms, were sufficiently defined that they did not result in significant efficiency challenges.  Therefore, my analysis focuses primarily on CSM's approach to staffing.

102.    Work in the pre-complaint period was necessarily pooled between this matter and work on the complaint in *Epic v. Apple*, given that related (albeit not identical) legal and economic issues were at play in both cases.  After both complaints were filed, there tended to be delineation between staffing for the *Apple* and *Google* matters below the partner and senior counsel level.  But at the more senior levels, attorneys typically worked on both matters, which helped ensure that any duplication of efforts between matters was minimized.

103.    The senior CSM lawyers directing this litigation remained assigned to the case from its inception through its presentation to the jury and beyond.  These primary lawyers included a core partner team of Gary Bornstein, Yonatan Even and Lauren Moskowitz, later joined by Michael Zaken.  These attorneys directed CSM's legal teams and were responsible for making key strategic and tactical decisions.

104.    CSM also staffed a core team of other professionals for a large portion of the matter's lifecycle, including senior attorney Brent Byars; associates Eric Zepp, Daniel Ottaunick,

Allison Tilden, and Andrew Wiktor; and paralegal case manager Justin Kim—all of whom were involved from very early in the case through to trial.

105. This assignment pattern had significant advantages in both efficiency and effectiveness. By keeping more senior counsel and partner staffing consistent, CSM was able to preserve institutional knowledge, thereby avoiding losing any investment Epic had placed in that senior lawyer. Likewise, this practice avoided the expensive practice of bringing partners or senior counsel up to speed on the complex issues and evidentiary development in the matter.

106. Ensuring consistency at the more senior level allowed for some reassignment of junior associates and paralegals without a loss of efficiency and with only minimal "up to speed" time for a new lawyer or paralegal. Even at the more junior level, while some associates were rotated off the litigation after a significant engagement time, certain associates, discovery attorneys, and paralegals assigned to the case remained throughout the majority of the litigation, ensuring stability in the leadership of these positions. Accordingly, efficiency was not lost when certain associates rotated out after two years and new associates took their place.

107. A significant number of "discovery" attorneys were also assigned to this matter. These attorneys were consistently assigned to the case, but did not need to stay on for trial. The billings for these attorneys show that work patterns were consistent until non-expert discovery was complete, which is a sign of efficient staffing. I have attached hereto as **Exhibit J** a series of charts reflecting each timekeeper's billings by year, including a summary chart of each firm's billings by year (Exhibit J-1); a chart of CSM timekeeper billings per year (Exhibit J-2); a chart of Wiggin timekeeper billings per year (Exhibit J-3); a chart of Zukerman timekeeper billings per year (Exhibit J-4); a chart of Hueston timekeeper billings per year (Exhibit J-5); a chart of Faegre timekeeper billings per year (Exhibit J-6); a chart of Clifford Chance timekeeper billings per year (Exhibit J-7); and a chart of Update timekeeper billings per year (Exhibit J-8).

108. As shown in **Exhibit J**, there were not a significant number of senior-level lawyers who left in the middle of the litigation, exhibiting the stability of the litigation team.

**(2) Appropriate Delegation**

109.    CSM's practices also showcase appropriate delegation, both internally and among Ancillary Firms, which illustrates that CSM staffed this matter reasonably and appropriately.  I have attached hereto as **Exhibit K**, a series of charts reflecting each firm's billings by position, as well as an overall summary of billings by position.

110.    The partner level accounted for 22,995.70 hours of total billing, or 10.13% percent of CSM's total hours.  These hours are reflective of lean partner staffing.  In fact, CSM avoided a common problem in complex cases—over-partnered staffing, which leads to excessive fees.  Instead, CSM appropriately delegated less complex tasks—for example, the tremendous amounts of laborious document work—to personnel charging a lower rate.  At the same time, CSM ensured staffing was sufficient at the top levels, such that when the trial came, there were enough seasoned lawyers with deep knowledge of the issues and evidence to properly litigate this case.

111.    The billed hours at the associate level also demonstrated judicious staffing of 41.62% percent of the total hours, leaving less complex work for discovery attorneys and support staff, who charged lower rates.  Discovery attorneys billed approximately 37.74% of CSM's hours and support staff billed approximately 7.78% of CSM's hours.

112.    At all levels, the personnel with the highest billed hours were generally in supervisory or leadership positions.  There was notably, virtually unchanging stability at the top of the entire team, where complex, nuanced development of issues was necessary.

113.    In some cases, having a large number of low-hour billers can be a marker of undisciplined, haphazard staffing.  Here, however, where certain billers were frequently needed for discrete tasks, such as discovery tasks, all-hands-on-deck work and performance of more rote tasks including preparing exhibits, conducting checks, proofreading, and preparing sealing motions, a more robust group of low-billing personnel was invaluable.  In my opinion, CSM staffed a reasonable number of low-hour billers given the nature of work this matter demanded.

114.    CSM also minimized the number of attorneys billing a low amount of overall hours to the matter.  Per **Exhibits E-1** and **J-2**,  there were only 19 timekeepers who billed 50-99 hours for a combined 1,295.45 hours and 66 timekeepers who billed 0-49 hours for a combined 904.36 hours.  These hours added together (approximately 2,200 hours) comprise a minuscule percentage of the overall CSM hours of 226,989.82, less than one percent of the hours billed.

115.    Another gauge of proper staffing is through the calculation of a blended rate.  If the blended rate is high, it can mean that too many partners were assigned to the matter (depending on the specific facts at issue).  With a total of 392,582.92 hours for ▮▮▮▮▮▮ in fees, Epic's blended rate is ▮▮▮▮, well below blended rates award in other complex litigation adjusted for legal services inflation as calculated in **Exhibit I**:

- *Fikes Wholesale*, 62 F.4th at 728 (Jacobs, C.J., concurring): 630,000 hours with overall blended rate of approximately $800 and attorney blended rate over $1,000, which, adjusted for legal services inflation, equates to an overall blended rate of $915.39 and attorney blended rate of $1,144.23 in 2025.
- *In re Aqueous Film-Forming Foams*, 2024 U.S. Dist. LEXIS 213062, at *39: approving blended rates ranging from $725 to $825, which, marginally adjusted for legal services inflation, equates to $754.07 to $858.08 in 2025.
- *Perez v. Rash Curtis & Assocs.*, No. 4:16-cv-03396-YGR, 2020 U.S. Dist. LEXIS 68161, at *58-59 (N.D. Cal. Apr. 17, 2020): finding a blended rate of $634.48 is within a reasonable range for rates charged in for complex, high-stakes litigation in San Francisco, which adjusted for legal service inflation, equates to a blended rate of $805.13 in 2025.
- *In re Volkswagen "Clean Diesel" Mktg.*, 2017 U.S. Dist. LEXIS 39115, at *732: blended rate of $529, which, adjusted for legal services inflation, equates to a blended rate of $730.51 in 2025.

- *In re Telescopes Antitrust Litig.*, No. 5:20-cv-03639-EJD, 2025 U.S. Dist. LEXIS 70066, at *35 (N.D. Cal. Apr. 11, 2025): finding a blended rate of $709 "is within the acceptable range of attorneys' fees in this district."
- *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 U.S. Dist. LEXIS 102408, at *74 (N.D. Cal. Aug. 3, 2016): applying a blended rate of $443, which, adjusted for legal services inflation, equates to a blended rate of $634.32 in 2025.
- *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, No. 3:18-MD-02843-VC, 2023 U.S. Dist. LEXIS 182197, at *25 (N.D. Cal. Oct. 10, 2023): approving blended rate of $609, noting the empirical research filed in support "indicates that counsel's blended rate is somewhat below the mean and median rates for class actions in this District."  The empirical research reflected median blended rates of $744 and a mean blended rate of $728.  Adjusting these blended rates for legal services inflation equates to an awarded blended rate of $677.33, a median blended rate of $827.48 and mean blended rate of $809.69 in 2025.

116.    Epic's overall blended rate of ▮▮▮ is well below these previously approved blended rates, driven in part by the fact that a substantial portion of the hours incurred were from lower-priced attorneys, including 142,748.6 hours of contract document review and 84,104.77 hours of CSM discovery attorney billings, which together amount to approximately 57.18% of the total hours paid by Epic.  If one adds the law clerk, paralegal, and other support staff to these lower-priced attorneys, this figure increases to 63.15%.  Partners amount to a mere 8.76% of the total hours paid by Epic; senior attorneys 1.4%; associates 26.61%.

117.    In this case, the blended rate for all CSM hours is ▮▮▮ per hour, similar to the rates I have seen in far smaller cases with rates significantly lower than those of CSM's partners, and below the adjusted blended rates cited above.  This blended rate shows that the bulk of the work was delegated to lawyers with low billing rates.

118.    The other Ancillary Firms had blended rates consistent with appropriate staffing. The second-highest billing firm, Wiggin, which performed litigation work requiring associate

assistance, had a blended rate of ███. The Zukerman firm, which performed work reviewing documents for responsiveness and privilege, for the most part staffing leanly with one partner and one associate, had a blended rate of ████ per hour.

119.    Hueston's blended rate was ████, reflecting a senior lawyer for Match Group, Inc. ("Match") handling two witnesses at the *Google* trial after Match settled. These blended rates indicate disciplined delegation, with Mr. Hueston billing only 24.1% of the firm's total hours.

120.    Faegre, as local counsel, did not engage in extensive litigation activities beyond communications, strategic advice, and court appearances (and a discrete project to provide contractually required notices to Epic's contractual counterparties of the production of potentially confidential information). Its ████ blended rate indicates that the assigned partner provided the bulk of the services, as would be expected for local counsel, without much work that should be delegated to junior lawyers.

121.    Clifford Chance's blended rate was ████, which again reflects disciplined delegation, with associates and lower rate partner billing approximately 62.5% of the firm's total hours.

122.    Update's blended rate was ███, which is extremely low even for contract document review attorneys.

**(3) Staffing in Teams**

123.    CSM made consistent efforts to organize the assigned personnel into teams. When there was a task to perform of some duration, CSM would form a team of lawyers to handle that issue. (Bornstein Decl. ¶¶ 76-77.) Doing so prevented the all-too-common problem of duplicating efforts and reassigning tasks, leading to inefficiency.

124.    Staffing in disciplined teams is the best way to avoid inefficiency when, as here, the number of personnel needed exceeded 100 timekeepers. For example, as the *Apple* case

proceeded to trial, CSM assigned a team of lawyers to focus on discovery and pre-trial tasks in the *Google* case.  (Bornstein Decl. ¶ 77.)

125.   The manner in which CSM staffed its trial work was also rational.  For each of the 45 witnesses that Epic was to examine or cross-examine live or by deposition, a team consisting of a witness examiner and one to two support personnel was assigned.  (Bornstein Decl. ¶ 78.) Each team prepared its witnesses as needed, had exhibits at the ready, monitored the relevant testimony adduced, searched for relevant deposition citations, and anticipated other testimony or evidence that might be proffered.  (*Id.*)  This assignment pattern was rational and did much to ensure a well-prepared and executed examination of each of the witnesses at trial, with no overlap of effort between and among the various teams.  (*Id.*)  Lawyers were also assigned to address legal issues as they arose during the trial, to prepare proposed jury instructions, and to perform other trial-related tasks.  (Bornstein Decl. ¶¶ 66, 78.)

126.   After examining the staffing practices of CSM, I determined that there was rationality to the staffing throughout the case and discipline in keeping to those staffing plans.

**(4) Examples of Team Assignments**

127.   I will present here examples of different teams assigned to specific issues.

128.   Discovery was staffed in the following way: (1) Google Offensive Discovery, (2) Expert Discovery, (3) Defensive Document Discovery and Third-Party Confidentiality, (4) Third-Party Discovery.  (Bornstein Decl. ¶ 76.)

129.   Separate team members were assigned to each of these teams (although there was some overlap).  (*Id.*)  One or two partners supervised the teams, which were further staffed with one to three senior associates or practice area attorneys, as well as mid-level and junior associates as needed.  (*Id.*)  Each of these teams met at least weekly during the fact discovery period.  (*Id.*)  The teams coordinated to ensure work was not duplicated and that knowledge was shared across the firm.  (*Id.*)

130.    For pre-trial briefing, briefs would be drafted by associates, with review from more senior attorneys and partners.  (Bornstein Decl. ¶ 77.)  These teams varied in size depending on the complexity of the brief.  (*Id.*)

131.    There were dedicated teams on particular issues of the case, for example, dedicated teams were established for each of the following tasks: (i) pre-trial preparation, including exchanging schedules, exhibit lists, and deposition designations; (ii) third-party notice and sealing issues;  (iii) the opposition to Google's motion for summary judgment; (iv) the opposition to Google's motion for judgment as a matter of law; and (iv) remedies/injunctive relief briefing after the trial.  (*Id.*)

132.    For the trial, dedicated teams were assigned to each witness, comprising one partner and at least one associate.  (Bornstein Decl. ¶ 78.)  Three to four partners attended the trial most days, along with one associate who assisted in keeping exhibits and the trial process running smoothly.  (*Id.*)

133.    A team of paralegals and support staff also assisted with the trial.  (*Id.*)  Other associates rotated on and off the trial as needed, depending on the case's requirements.  (*Id.*)

134.    Other firms were assigned to assist with both discovery and local counsel work; the latter was assigned to Faegre, which in turn lowered costs.  These firms were Zukerman (which focused on document and privilege review, ██████), Clifford Chance (minimal third-party work, ██████), Update (document review, ██████), Faegre (local counsel, ██████), and Wiggin, the most active of these firms ██████).

135.    The work of these firms was monitored and, where appropriate, supervised by CSM, with their billings scrutinized by Epic's in-house counsel.  These billings are presumptively reasonable, and I have encountered no indicia of excess.

**(5) Conclusions Regarding Staffing**

136.    There is no one way of staffing a large case.  The relevant inquiry is whether counsel made a disciplined attempt to promote efficiency, avoid constant shifting of assignments, prevent duplication, and ensure continuity, especially of key personnel.

137.    I conclude based on my experience and my review of the record that CSM has addressed these issues and has done a commendable job of staffing rationally and with continuity in those areas most in need of it.

## C.  <u>GOOGLE LITIGATION STYLE AND LITIGATION BURDENS</u>

138.    A substantial portion of the high cost of this litigation can be attributed to Google's litigation style and the burdens it placed on the parties challenging its model.

139.    The Court has alluded to a style of litigation wherein Google counsel, presumably acting as instructed, was relentless in interposing excessive opposition and contention.  This style certainly added to Epic's cost.  *See Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (explaining that a party "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response").

140.    Both parties produced several million documents.  But the burdens on the parties were not equal, as is the case in many business disputes.

141.    Epic's business model was not directly at issue and, in any case, was easily discernible.  By contrast, the myriad methods Google employed to prohibit and discourage competition were not always easily discernible.  Clearly, the litigation burdens were not equal.

142.    Google's ecosystem required examination of various arrangements with developers, OEMs, and other third parties.  Discovery into these relationships would have been difficult enough without any informational barriers but was made extremely difficult because of widespread corporate practices designed to conceal Google's design and motive.  (*Supra* ¶¶ 97-98.)

143.    Epic had every motive to litigate with only the necessary cost, contention, and difficulty.  In my opinion, Google did not share these motives. In my review of this case, I discerned no "blame" for the high cost of this litigation to be ascribed to Epic.

**VI.    SUMMARY AND ALLOCATION OF FEES BILLED**

144.    This section of this Declaration discusses each firm's total bills and any allocations necessary to determine only fees reasonably attributable to this matter.

145.    CSM served as the primary firm handling this matter.  Several other firms also assisted with this matter, including Wiggin, Faegre, Zukerman, Hueston, Clifford Chance, and Update.  These firms' invoices were reviewed and allocated, where necessary, by each respective firm to include only entries fairly attributable to the *Google* matter.  I have reviewed these invoices and allocations and find them to be reasonably attributable to this matter.

**A.  CSM Billed Entries**

146.    CSM was lead counsel in this matter and involved in all aspects of the case from filing of the complaint to the judgment and remedies award.  (Bornstein Decl. ¶¶ 4, 25, 37.)

147.    Over the life cycle of this matter, CSM's billing can be divided into two core billing periods: a joint billing period that spanned from April 2020 to September 9, 2021, during which time entries for both the *Google* and *Apple* matters were billed to the same matter number ("Joint Billing Period"), and a period wherein time was billed separately to the respective matters ("Google-only Billing Period") beginning September 10, 2021.  (Bornstein Decl. ¶¶ 26, 34.)[7] CSM undertook careful auditing of these bills to ensure that any entries or portions of entries that could not fairly be attributed to the *Google* matter were removed and not requested as part of the attorneys' fee award.  (Bornstein Decl. ¶¶ 28, 30, 33.)  I have reviewed CSM's designations of these fees and find its allocations to be reasonable.

---

[7] Beginning on October 29, 2024, CSM also created a separate billing number for work related to the appeal in the *Google* matter.  (Bornstein Decl. ¶ 36.)  Epic is not currently seeking an award in respect of appellate fees but reserves the right to do so in due course.

148.     I have attached hereto as **Exhibit L**, a chart reflecting CSM's lodestar by billing period and category of Joint Billing Period work.  As noted above, the Google-only Billing Period was clearly devoted solely to the *Google* case, with CSM billing ▇▇▇▇▇▇▇ for work done from September 10, 2021, to June 30, 2025, for work at the district court level.  For work during the Joint Billing Period, CSM billed approximately ▇▇▇▇▇▇ in the aggregate for work on both matters, for which Epic seeks to recover ▇▇▇▇▇▇ in this Motion.  This section of this Declaration summarizes these billing periods and the necessary calculations and allocations to arrive at a *Google*-only figure.

###### a.     Google-Only Billing Period

149.     All fees billed to Epic during the Google-only Billing Period were clearly solely attributable to the *Google* case.  Beginning on September 10, 2021, CSM designated separate billing codes for the *Google* and *Apple* matters.  (Bornstein Decl. ¶ 34.)  All billing entries starting September 10, 2021, that were billed to the *Google* matter number presumptively are fairly allocated to the *Google* matter.  (*Id.*)  As noted above, the Google-Only Billing Period does not include fees incurred on appeal.  With the assistance of associates working under my supervision, I undertook a review to ensure all entries billed to this matter number are fairly attributable to the *Google* matter and were reasonable.

150.     The majority of total time entries was billed during this period, with the bulk of discovery, briefing, trial and remedies proceedings taking place after September 10, 2021.

151.     CSM billed ▇▇▇▇▇▇ for work done from September 10, 2021, to June 30, 2025.  The lodestar is described in **Exhibit L** shows the calculation of these fees.

152.     I find these billings to be reasonable and conclude that Epic is entitled to seek them as part of its attorneys' fee award.

###### b.     Joint Billing Period.

153.     CSM billed approximately ▇▇▇▇▇▇ in the aggregate for work during the Joint Billing Period.  However, only a portion of these joint billings are attributable to *Google*,

and Epic seeks only these fees.  The total fees attributable to *Google* out of this  are , per the below.  The lodestar is described in **Exhibit L**.

154.    CSM carefully reviewed the bills for work done during the Joint Billing Period and identified two categories of bills: "*Google* only" entries and combined billings that needed to be apportioned between the *Google* and *Apple* matters.  (Bornstein Decl. ¶¶ 26-33.)

155.    It is my understanding that CSM attorneys reviewed each entry billed during the Joint Billing Period to make a principled allocation of time reasonably attributed to the *Google* matter, as described more fully below.  This review was done in accordance with my direction.  It is my understanding that the attorneys engaged in this audit were instructed to be conservative in their apportionment and to err on the side of excluding entries that could not easily be identified as attributable to the *Google* matter.  With the assistance of associates working under my supervision, I also reviewed these entries and find the aforementioned allocations not to have indicia of being unreasonable.

**1. Google-Only Work Identified During the Joint Billing Period -**

156.    Considerable time and effort have been spent analyzing the billings to extract those that were clearly solely for the *Google* litigation.

157.    This effort was facilitated by CSM's practice of forming teams for specific areas of work.  For example, during the *Apple* trial preparation and trial, CSM isolated a team of lawyers and paralegals who were only to work on the *Google* case.  (Bornstein Decl. ¶¶ 77.) Work performed by those individuals during that period of time was relatively straightforward to classify as relevant to the *Google* matter, as confirmed by the time entries that those individuals made, which reflected Google-related work.

158.    Furthermore, time entries were identified as being attributable to *Google* based on the task.  (Bornstein Decl. ¶ 27.)  For example, certain discovery matters were clearly identifiable as being pertinent only to the *Google* matter, such as discovery correspondence with

Google, drafting and analyzing responses for requests for production and interrogatories to Google and coordinating Google discovery with co-plaintiffs. (*Id.*)

159.    Furthermore, certain types of briefs were easily attributable to the *Google* matter. For example, because Apple did not file a motion to dismiss in the *Apple* matter, all time entries relating to a motion to dismiss opposition clearly corresponded to the *Google* matter.    (*Id.*)

160.    After these principled allocations, ██████████ in fees are clearly identifiable as Google-only entries during the Joint Billing Period.

**2.    Google Share of Combined *Google-Apple* Billings.** ██████████

161.    Another category of entries during the Joint Billing Period are entries that included both tasks related to the *Apple* matter and tasks related to the *Google* matter.  For these entries, principled allocations and/or measurements to fairly extract the fees related to the *Google* case were required.

162.    My review of the *Google* matter indicates that Google engaged in much discussion regarding Apple and its place in Google's proposed market, underscoring that much of the work performed on Apple-related issues by CSM and other Epic firms contributed to success in the *Google* litigation.  This buttresses the conclusion that much work performed in the pre-complaint stage can reliably be considered as jointly applicable to the development of both cases.  It also makes plain that "defensive" document production in the *Apple* matter was relevant and necessary for re-production in the Google case.

163.    The three categories of mixed *Google-Apple* billings are outlined below.

**a.    Pre-Complaint Activities, Common Google-Apple Billings -** ██████████

164.    According to my interviews with CSM personnel, work during the pre-complaint period involved investigating legal and factual issues related to both Apple's and Google's anticompetitive conduct.  For example, although the matters are not identical, some of the legal

research into antitrust issues and market definition questions were relevant to the complaints in both actions. (Bornstein Decl. ¶ 30.)

165.    It is my understanding that CSM engaged in a granular analysis of entries in the pre-complaint period in order to identify entries where research and preparatory efforts were applicable to Google only or truly applicable to both actions. (*Id.*) The principle applied to this pre-complaint period in allocating work to the *Google* matter for purposes of Epic's Motion was to include (a) the limited amount of pre-complaint work attributable solely to Google (which is included in the ▊▊▊▊▊ figure above), and (b) work attributable to both matters, which would have had to be performed even if the *Apple* matter did not exist.

166.    Any work that could not be reasonably attributed to the Google matter in accordance with these principles was excluded. (Bornstein Decl. ¶ 30.) In my opinion, this approach is a principled and reasonable way to conduct an allocation of this nature. I have reviewed these allocations and agree they are reasonable and appropriate.

167.    Total billings during the pre-complaint period were just under ▊▊▊▊. After the review described above, ▊▊▊▊▊ in fees common to both cases can be attributed to the *Google* matter.

168.    I note that fees for pre-complaint work solely relating to *Google* total ▊▊▊▊, and the *Google* share of the pre-complaint "mixed" *Google-Apple* entries, discussed more fully below, total ▊▊▊▊, such that Epic requests a total of ▊▊▊▊ for CSM's pre-complaint work.

**b.    Defensive Document Discovery -** ▊▊▊▊▊

169.    As discussed above, Epic re-produced to Google all of the documents that it had produced to Apple in the *Apple* case. Given the different schedules on which the two cases proceeded, the original search, collection, and review for production, including privilege review, were initially made in the *Apple* case in response to Apple's various requests, but given the extent to which Apple's defenses encompassed alleged competition between Apple and Google,

the search and the requests had far broader reach than circumscribed Apple issues. (Bornstein Decl. ¶ 31.)

170. In the *Google* case, the parties agreed that the productions Epic made in the *Apple* case should also be produced to Google, which was a rational and time-saving conclusion that reduced the total fees Epic incurred, as compared to performing a *de novo* production. (*Id.*) Because these fees expended on defensive document discovery in *Apple* represent work that was necessary in the *Google* litigation, which would have been done even if the *Apple* case did not exist, I have allocated considered all of these fees as fees incurred to litigate the *Google* case.

171. In calculating these amounts, the method I prescribed and reviewed required that any "meet and confers" with Apple on these productions, as well as any correspondence with Apple, were not included in the calculation. On the contrary, all time spent searching and curating documents for production was included, as was redacting and logging documents for privilege. This work should be considered identical to the work that would have been done solely for *Google*.

172. Because Epic has not collected attorneys' fees in connection with the *Apple* matter, there is additionally no concern of duplicate recovery for these defensive document discovery time entries that involve common productions made in both matters.

173. In short, it is clear that this work would have had to be performed in the *Google* litigation if the *Apple* litigation had not been filed. Accordingly, the work is fairly attributable to the litigation of the *Google* matter, and the full fees for that work should be reimbursed here.

174. Total billings during the Joint Billing Period for defensive document discovery were 29,253.2 hours for ▮▮▮▮▮▮. *See* **Exhibit L**. I note that the blended rate of ▮▮▮ for this work reflects CSM's delegation of this work to low rate discovery attorneys and paralegals.

c.      **"Mixed" Entries,** *Google* **Share-** ███████

175.    Entries that fall under this category include time entries where discrete *Apple* and *Google* related tasks were billed by attorneys "mixed" under a single entry or submission. Analysis of these entries required identifying an appropriate fraction of the time entry that could be attributed to the *Google* matter and allocating only that fraction to the attorneys' fees for this matter.  (Bornstein Decl. ¶ 33.)

176.    CSM attorneys conducted a painstaking and individual review of these entries. (*Id.*)  I reviewed CSM's allocation of these entries and conclude that the fractions assigned to these allocated time entries are principled, reasonable and conservative.

177.    Of the total "mixed" billings of approximately ███████, the amount of fees that can be allocated to the Google matter constitute ███████ in fees.  It is my opinion that any uncertainty—or margin of error—is more than accounted for with the ███████ downward adjustment to Epic's total lodestar.  *See* **Exhibit D.**

**3. Total Fees for Google Work During Joint Period,** ███████

178.    To summarize, during the Joint Billing Period through September 9, 2021, fees for *Google* work were ███████, consisting of ███████ in "Google-only" work, and ███████ in allocations to *Google* services for joint *Apple-Google* work, as described above.

**B.  Billings of Ancillary Firms,** ███████

179.    This Declaration also summarizes the billings of the Ancillary Firms.  In my opinion, these charges are reasonable and appropriate for the work performed.

**1. Faegre,** ███████

180.    Faegre acted as local counsel, generally as a trusted entity committed to case "housekeeping," filings, and communications with the Court.  Faegre maintained communication with numerous parties in this litigation and often worked with CSM to clarify the positions of the multiple Plaintiffs.  Faegre also handled a notice project as to third parties

whose potentially confidential information was contained in trial exhibits or documents produced by Epic during the matter. (Riehle Decl. ¶ 3.) This project involved drafting letters to, and corresponding with, third parties about confidentiality concerns. (Riehle Decl. ¶ 4.)

181.    Faegre's work was generally partner-oriented, since it was not engaged in the laborious aspects of the discovery process. (Riehle Decl. ¶ 4.)

182.    Its blended rate of ███████ reflects appropriate use of partner and senior associate services.

183.    Faegre also billed to both the *Apple* and *Google* matters jointly. Lawyers at Faegre undertook a principled allocation methodology. (Riehle Decl. ¶ 14.) I have reviewed these allocations and find them to be reasonable.

184.    After allocation, Faegre billed a total of ████████ in fees to the *Google* matter. In my opinion, this fee is reasonable in light of the work performed and the duration of the engagement.

**2. Wiggin,** ████████

185.    Wiggin took a primary role in third-party discovery, including taking depositions and trial testimony of various third parties. (Diessel Decl. ¶ 3.) It also assisted with the trial preparation of several Epic witnesses and the preparation of expert discovery. (Diessel Decl. ¶ 3.) Wiggin also assisted with discovery motions and pre-trial motions. (Diessel Decl. ¶ 3.)

186.    Its rates were reasonable for a firm of its size and market segment, with partner rates as low as ████, up to a high of ████.

187.    Wiggin maintained separate billing for the *Google* matter at all times, therefore no allocations had to be undertaken for this firm.

188.    Wiggin's blended rate of █████ demonstrates reasonable staffing.

189.    Wiggin's total billings attributable to this matter were ████████. These billing entries were reasonable and consistent with legal community standards.

**3. Zukerman,** ▮▮▮

190.   Zukerman assisted CSM in the review of documents, including the review of privilege calls.  (Medina Decl. ¶ 10.)

191.   Zukerman staffed one partner and one associate to this case who billed at ▮▮ and ▮▮, respectively.  (Medina Decl. ¶ 10.)  Zukerman's rates are reasonable and were not increased annually during its involvement.  Zukerman staffed only two attorneys to this case, who performed their work efficiently.

192.   Zukerman also billed to both the *Apple* and *Google* matters jointly from 2020 to 2021.  Lawyers at Zukerman undertook a principled allocation methodology, adopting the same approach as CSM.  I have reviewed these allocations and find them to be reasonable.  All 2022 and 2023 bills were billed solely to *Google* and can reasonably attributed to this matter.

193.   Zukerman's blended rate of ▮▮ demonstrates a principled use of attorney resources.

194.   Zukerman's total billings attributable to this matter were ▮▮, which I consider reasonable in light of the work performed.  There was nothing about its billings that required further investigation.

**4. Update,** ▮▮▮

195.   Update is a document review and management vendor.

196.   With close to six million documents produced by Epic, Google, and third parties, there was a need for services in document review, tagging, and organization, in advance of and to support the more advanced services of CSM discovery attorneys.  In an effort to be cost-effective, these basic discovery tasks were delegated to Update.

197.   Update contract document review attorneys billed at ▮▮ per hour, ▮▮ for overtime, and billed over 99% of Update's fees.  The remaining 1% of Update fees were billed by foreign language document review attorneys, billing at higher rates of between ▮▮ and ▮▮ per hour, and contract review services managers, billing at ▮▮ per hour.

198.    Given that Update engaged in both defensive and offensive document review for the *Apple* and *Google* matters at the same time, some principled approach had to be undertaken to allocate Update's fees.  These bills can be divided as follows:

i.  From September 2020 to February 2021, Update's contract attorneys worked on defensive and offensive discovery for the *Apple* matter.  For this time period, I allocated 50 percent of time entries to the *Google* matter.  This is a principled allocation because, as discussed above, defensive document discovery for *Apple* was entirely used in the *Google* matter. Selecting 50 percent effectively treats the work during this period as having been half review of Epic's documents (fully attributable to this case) and half review of Apple's documents (not attributable to this case, even though a portion of Apple's documents were indeed made part of the *Google* record).  This is a conservative estimate, because more defensive than offensive review was undertaken by Update for the *Apple* matter.

ii.  From March to May 2021, most discovery work undertaken by Update was related to the *Google* matter.  During this period, the *Apple* matter was in the lead up to trial or in trial, meaning almost all discovery taking place was *Google*-related.  Nevertheless, in order to ensure a conservative estimate, I allocated only 75 percent of these entries to the *Google* matter.

iii.  From June to October 2021, all discovery work undertaken would be related to the *Google* matter, given that trial in the *Apple* matter had concluded.  I have allocated 100% of these fees to the *Google* matter.

199.    These allocations are reasonable and conservative.

200.    In total, Epic requests just under 142,748.6 hours of services rendered by Update for ▮▮▮▮▮▮ in fees, for a blended rate of ▮▮▮▮.

201.    It is my opinion that Update provided a necessary service at a reasonable cost.

**5. Hueston,** ▮▮▮▮

202. Hueston acted as counsel for Epic during the jury trial. In particular, John Hueston, who was counsel for co-Plaintiff Match prior to Match's settlement, cross-examined two witnesses at trial. (Medina Decl. ¶ 11.)

203. Epic made an alert and opportunistic decision to obtain the services of Mr. Hueston to assist in the trial. Epic thereby gained an experienced trial lawyer strongly imbued with case knowledge financed by co-Plaintiff Match.

204. The Hueston firm's blended rate of ███████ was, as it should have been, heavily partner-weighted.

205. Given Hueston's assistance was limited to the *Google* trial, none of Hueston's entries required allocation.

206. Hueston's total billings attributable to this matter were ███████. These fees are beyond a doubt reasonable.

**6. Clifford Chance, ███████**

207. Clifford Chance is a highly reputable international firm that undertook a limited amount of third-party discovery work not assigned to CSM or Wiggin, because of conflicts those firms had with the target of the third-party discovery. (Medina Decl. ¶ 9.)

208. Clifford Chance's blended rate of ███████ is reasonable given counsel's experience and limited role in this matter.

209. Clifford Chance's entries required no allocation as they were singularly billed to the *Google* matter.

210. Clifford Chance's total billings attributable to this matter were ███████. These fees are unremarkable and reasonable.

## VII.    ADJUSTMENTS TO LODESTAR BILLINGS

211.    The total lodestar thus far calculated accounting for all of the allocated fees of each aforementioned firm is ███████████.

212.    As discussed above, there is some judgment required in allocating CSM fees during the Joint Billing Period.  Furthermore, as with calculation of any fee award, there is the possibility of some margin of error, notwithstanding Epic's scrutiny of invoices and work performed by each firm and by my team and me in analyzing over 270,000 entries.

213.    In an effort to counteract any possible margin of error, I have reduced the overall lodestar by ███████, which equates to roughly ██ of the ███████ in common and mixed Joint Billing Period fees.  Alternatively, a ██ deduction to CSM's common and mixed Joint Billing period fees would equate to ███████ in fees, leaving a ███████ adjustment to the Ancillary Firms.

214.    This is a reasonable figure because the reduction more than compensates for any vagaries in measurement.

215.    This adjustment more than corrects for any inaccuracy, as in legal billing, there are occasions when all time is not captured, which also counterbalances any minor billing anomalies.

## VIII.    TIME VALUE OF MONEY ADJUSTMENT

216.    Courts recognize the propriety of adjusting upward those billings paid years before the fee motion, to account for inflation, or, alternatively, the time delay in payment, or interest.

217.    CSM's rates, like those of other firms, have risen considerably during this inflationary period.  This is illustrated by annual legal services inflation ("LSI").  Over the five years since the outset of work, LSI ranged from 0.6% to 8.5%, with cumulative LSI of roughly 27% since 2020 and roughly 24% since 2022.  LSI rapidly increased between 2022 and 2024, with annual LSI of 5.9% to 8.5%. *See*, **Exhibit I.**

218.    Because Epic paid for its legal services on a non-contingent basis, the inflation affects Epic, not its counsel.

219.    Courts within and outside this Circuit have held that inflation-based adjustments are an appropriate way of adjusting fees. *See*, *Theme Promotions*, 731 F. Supp. 2d at 949; *Ohio-Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 663 (7th Cir. 1985) ("Failing to correct for inflation would give the defendant a motive to prolong the fee issue as long as possible, and antitrust cases last long enough as it is.").

220.    The typical solution sanctioned by case law and followed by most courts before whom I have provided reports is to award fees based upon counsel's current rates, as opposed to the historical rates actually charged. *See, e.g.*, *Young v. Polo Retail, LLC*, No. C-02-4546 VRW, 2007 U.S. Dist. LEXIS 27269, at *16-17 (N.D. Cal. Mar. 28, 2007) ("For hourly rates, the court uses 2005 hourly rates; doing so simplifies the calculation and accounts for the time value of money in that counsel has not been paid contemporaneously with their work in this case."); *Gates v. Deukmejian*, 987 F.2d 1392, 1406 (9th Cir. 1992) ("We long have recognized that district courts have the discretion to compensate prevailing parties for any delay in the receipt of fees by awarding fees at current rather than historic rates in order to adjust for inflation and loss of the use funds."). By way of example, if a partner charged $1,200 per hour at the beginning of the litigation and $1,600 per hour by the time of the fee motion, the court would award the lawyer's hours all at $1,600 per hour.

221.    If the billings herein were adjusted in this way, the effect on the historical lodestar would be dramatic and would result in a very substantial adjustment. However, I consider that approach to be a better fit in cases with contingent fee arrangements in which counsel was not paid contemporaneously. Here, Epic actually paid its lawyers at their historical rates.

222.    In light of this, the appropriate approach, sanctioned by this Court and the Ninth Circuit, is to apply the "prime rate" compounding yearly through the date on which the Court ruled Epic to be entitled to recover its attorneys' fees. *See, e.g.*, *Welch v. Metro. Life Ins. Co.*,

480 F.3d 942, 947 (9th Cir. 2007) ("District courts have the discretion to compensate plaintiff's attorneys for a delay in payment by either applying the attorneys' current rates to all hours billed during the course of the litigation or using the attorneys' historical rates and adding a prime rate enhancement."); *Theme Promotions*, 731 F. Supp. 2d at 949 (applying an adjustment based on the "prime rate"). This approach compensates Epic for the time value of the fees it expended years ago.

223.    I have calculated an adjustment using weighted average prime rates per year, compounding annually. I apply these average prime rates to the discounted total fee amount I calculated above, which reduces the fee award by a reasonable margin of error (*see supra* ¶ 213). As shown in **Exhibit M-1**, the average prime rates per year were: (i) 2.335% for 2020; (ii) 3.250% for 2021; (iii) 4.862% for 2022; (iv) 8.197% for 2023; and (v) 6.478% for 2024. As illustrated in **Exhibit M**, these rates can be applied to the yearly total amounts of fees paid. To account for the fact that Epic did not lose access to the relevant funds until it actually paid the fees, as opposed to when the work was performed, I have shifted all fees forward by one calendar quarter for purposes of calculating interest. For example, I have treated 75% of the fees incurred in calendar year 2022 as having been paid in that year and the remaining 25% as having been paid in 2023. Applying this adjustment compounding annually, the total adjusted lodestar amount is $196,215,427.90 (**Exhibit M-1**).

224.    I then apply the federal post-judgment interest rate from October 7, 2024 through the date of this declaration. The post-judgment interest rates propounded by the federal courts are weekly average 1-year constant maturity (nominal) Treasury yield rates, as published by the Federal Reserve System.[8] Using these rates from October 7, 2024 to the present leads to a further adjusted amount of $205,482,027.99 (**Exhibit M-1**).

225.    In summary, this adjustment raises the $170.5 million in fees to $205,482,027.99 in inflation-adjusted dollars.

---

[8] United States Courts, *Post-Judgment Interest Rate*, https://www.uscourts.gov/court-programs/fees/post-judgment-interest-rate (last visited Aug. 20, 2025).

226.    This same logic can be applied to costs Epic incurred, as illustrated in **Exhibit M-2**.  I understand that Epic incurred a total of $10,273,909.19 in costs, comprising costs it paid directly and those it reimbursed each respective firm for costs that the firms expended on Epic's behalf throughout the litigation.  With pre-judgment interest these costs amount to $11,324,618.32.  After adjusting for post-judgment interest the total costs amount to $12,215,644.60.

## IX.    SUMMARY OF REASONABLE FEES

227.    Epic's total lodestar for work performed at the district court level is approximately ▮▮▮▮▮.  The fees sought at this time do not include fees incurred on appeal, and CSM has excluded ▮▮▮▮▮ in fees incurred in defending against Google's counterclaim.  (Bornstein Decl. ¶¶ 35-36.)

228.    CSM's fees before inflation/interest adjustment, broken down by category, are as follows:

- Fees for billings under the separate *Google* litigation billing matter, for CSM only for the Google-only Billing Period beginning September 10, 2021: ▮▮▮▮▮.
- During the Joint Billing Period, for CSM only, total fees for *Google* litigation: ▮▮▮▮▮.
    i.    "Google-only" billings during Joint Billing Period, ▮▮▮▮▮;
    ii.    Allocated fees for mixed *Google*/*Apple* entries and common work performed in furtherance of both *Apple* and *Google*, ▮▮▮▮▮;
        1.    Pre-complaint work done jointly in support of both cases, ▮▮▮▮▮;
        2.    Defensive document discovery, including Epic custodian interviews, Epic document collection, review, tagging, and production of Epic files, and preparing of privilege logs for *Apple*—all of which was subsequently produced in *Google*, ▮▮▮▮▮;
        3.    Google portion of mixed entries, ▮▮▮▮▮;

- CSM Summary: ▮▮▮▮▮ *Google*-only period; ▮▮▮▮▮ *Google* fees during Joint Billing Period; total ▮▮▮▮▮. Fees expended on appeal and defending against Google's counterclaim have been excluded from CSM's lodestar calculations. I understand that Epic will separately seek its fees for appeal.

229. Fees for Ancillary Firms before inflation/interest adjustment: ▮▮▮▮▮.

    i.    Wiggin: ▮▮▮▮▮;

    ii.    Faegre: ▮▮▮▮▮;

    iii.    Zukerman: ▮▮▮▮▮;

    iv.    Hueston: ▮▮▮▮▮;

    v.    Clifford Chance: ▮▮▮▮▮.

    vi.    Update: ▮▮▮▮▮;

230. Total fees before inflation/interest adjustment: ▮▮▮▮▮.

231. As described above, I apply a reasonable deduction to account for uncertainty in this lodestar calculation, leading to a lodestar amount of **$170.5 million**.

232. The above fees do not include time-delay adjustments of any kind. As shown above, a reasonable adjustment would bring the total reasonable fees to **$205,482,027.99**.

## X.   CONCLUSION

233. The reasonable lodestar, reduced for a margin of error and adjusted for inflation/interest, is $205,482,027.99 million.

234. With $12,215,644.60 in costs, as adjusted for the time value of money, the total reasonable fee and cost amount is $217,697,672.59.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of August 2025, in Marin County, California.

_____
John D. O'Connor