**Pages 1 - 50**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| EPIC GAMES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) **NO. 3:20-CV-05671-JD** |
| | ) |
| GOOGLE LLC., et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| IN RE GOOGLE PLAY CONSUMER | ) |
| ANTITRUST LITIGATION | ) **NO. 3:21-CV-05761-JD** |
| _____ | ) |
| | ) |
| IN RE GOOGLE PLAY STORE | ) |
| ANTITRUST LITIGATION | ) **NO. 3:21-MD-02981-JD** |
| _____ | ) |
| | ) |
| STATE OF UTAH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) **NO. 3:21-CV-05227-JD** |
| | ) |
| GOOGLE LLC, et al., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| | ) |
| CAPTION CONTINUED ON NEXT PAGE | ) |
| _____ | ) |

San Francisco, California
Thursday, November 6, 2025

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

EPIC GAMES, INC.,                    )
                                     )
          Plaintiff,                 )
                                     )
  VS.                                )   **NO. 3:24-CV-06843-JD**
                                     )
SAMSUNG ELECTRONICS CO. LTD.;        )
SAMSUNG ELECTRONICS AMERICA,         )
INC.; and GOOGLE LLC,                )
                                     )
          Defendants.                )
_____)

San Francisco, California
Thursday, November 6, 2025


**TRANSCRIPT OF PROCEEDINGS**


For Plaintiff Epic Games, Inc.:
                    CRAVATH, SWAINE & MOORE LLP
                    Two Manhattan West
                    375 Ninth Avenue
                    New York, New York 10001
               BY:  **GARY A. BORNSTEIN, ATTORNEY AT LAW**
                    **YONATAN EVEN, ATTORNEY AT LAW**
                    **LAUREN A. MOSKOWITZ, ATTORNEY AT LAW**
                    **MICHAEL J. ZAKEN, ATTORNEY AT LAW**
                    **PHIL DUGGAN, ATTORNEY AT LAW**
                    **GAIA L. MATTIACE, ATTORNEY AT LAW**

For the Plaintiff State of Utah in Case No. 3:21-CV-05227-JD:
                    OFFICE OF THE UTAH ATTORNEY GENERAL
                    350 North State Street
                    Salt Lake City, Utah 84114
               BY:  **MARIE W.L. MARTIN**
                    **DEPUTY ATTORNEY GENERAL**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES**:   (CONTINUED)

For Plaintiff State of Arizona in Case No. 3:21-CV-05227-JD:
                              OFFICE OF THE ATTORNEY GENERAL
                              State of Arizona
                              1275 West Washington
                              Phoenix, Arizona  85007
                      BY:   **JAYME L. WEBER, DEPUTY ATTORNEY GENERAL**


For Plaintiff State of California in Case No. 3:21-CV-05227-JD:
                              CALIFORNIA DEPARTMENT OF JUSTICE
                              OFFICE OF THE ATTORNEY GENERAL
                              ROB BONTA, ATTORNEY GENERAL
                              455 Golden Gate Avenue, Room 11000
                              San Francisco, California 94102
                      BY:   **BRIAN WANG, DEPUTY ATTORNEY GENERAL**
                            **MICHAEL W. JORGENSON**
                            **DEPUTY ATTORNEY GENERAL**

For the Consumers in Case No. 3:21-CV-05227-JD:
                              BARTLIT BECK LLP
                              1801 Wewatta Street, Suite 1200
                              Denver, Colorado 80202
                      BY:   **KARMA M. GIULIANELLI, ATTORNEY AT LAW**

For Defendants:
                              MUNGER, TOLLES & OLSON LLP
                              350 South Grand Avenue, 50th Floor
                              Los Angeles, California  90071-3426
                      BY:   **GLENN D. POMERANTZ, ATTORNEY AT LAW**
                            **LAUREN N. BECK, ATTORNEY AT LAW**
                            **KURUVILLA J. OLASA, ATTORNEY AT LAW**
                            **JUSTIN P. RAPHAEL, ATTORNEY AT LAW**

                              MORGAN, LEWIS & BOCKIUS LLP
                              One Market Street
                              Spear Street Tower, 28th Floor
                              San Francisco, California  94105-1596
                      BY:   **SUJAL J. SHAH, ATTORNEY AT LAW**


For Defendant Google LLC in Case No. 3:24-CV-06843-JD:
                              DUNN ISAACSON RHEE
                              401 9th Street, NW
                              Washington, D.C. 20004
                      BY:   **JESSICA PHILLIPS, ATTORNEY AT LAW**

**Thursday - November 6, 2025**                                    **10:08 a.m.**

                               **P R O C E E D I N G S**

                                       ---o0o---

          **THE COURTROOM DEPUTY:**  Calling Civil 20-5671, Epic

Games, Inc. versus Google LLC; Civil 20-5761, In Re Google Play

Consumer Antitrust Litigation; and Multidistrict Litigation

21-2981, In Re Google Play Store Antitrust Litigation.

     Counsel for those cases, please state your appearances for

the record.

          **THE COURT:**  So really, all I want are Google and Epic

lawyers at the table right now.  Okay?

     Thank you.

          **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

Bornstein for Epic Games, and I have with me today Lauren

Moskowitz, Michael Zaken, and Yonatan Even.

          **MR. EVEN:**  Good morning, Your Honor.

          **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn

Pomerantz on behalf of Google, and with me at the table here

are Jessica Phillips, Sujal Shah, Justin Raphael, Lauren Beck,

and Kuru Olasa.

          **MR. BORNSTEIN:**  And, Your Honor, I have late additions

to the table:  Phil Duggan and Gaia Mattiace.

          **THE COURT:**  Okay.  Mr. Bornstein, you would like to

modify the injunction that has yet to go into effect.

          **MR. BORNSTEIN:**  Well, Your Honor, the injunction,

happily, went into effect on Wednesday of last week, given the schedule that was set following the decision of the Court of Appeals and Your Honor's one-week extension that you granted.

That said, yes, we have jointly moved to modify the injunction in light of the settlement that we have -- that we have reached, contingent on the two contingencies described in the papers.  And happy to talk through any questions Your Honor has about the reasons for our request.

**THE COURT:**  Okay.  I do have many questions and comments.

But, Mr. Pomerantz, is there anything you'd like to add?

**MR. POMERANTZ:**  No, Your Honor.  I agree with Mr. Bornstein.

**THE COURT:**  All right.  So this did just land recently on my docket.  I have read it quite carefully, and of course, it's in the context of my five-plus-year deep immersion into this litigation.

The proposed modifications, as I understand it, are based on Federal Rule of Civil Procedure 60(b), as in boy, (5), which indicates that the Court may relieve a party from a final judgment if applying it prospectively is no longer equitable.

And the standard for that is there needs to be evidence of a, quote, "significant change in fact or law that warrants revision of the decree," closed quote, and, quote, "The proposed modification is suitably tailored to the changed

circumstance," closed quote.  That's from *Bellevue Manor Associates vs. United States*, 165 F.3d 1249, pin page 1255, Ninth Circuit 1999.

I have a lot of questions about both of those factors. I'm going to tell you at a very high level what those questions are.  Then I'm going to tell you how we're going to resolve those questions, which is going to require some significant additional hearings down the line.

To start, the background for all of this is, this is a lot more than just a private settlement between two parties.  This is a settlement under the antitrust laws, which have a public interest component and a consumer protection component that cannot be slighted in the injunction that is going to be enforced on the basis of the jury's verdict.  And *Bellevue* has recognized and a number of other cases have recognized that when there is that extra "plus" factor that distinguishes the case from a purely commercial and private dispute, the public interest has to be taken into account.

Now, you have heard me say this before, in this case and possibly others.  The antitrust statutes are the civil rights law of the economy.  The Supreme Court, as I have quoted in my order entering the injunction -- I think that's Docket Number 1016.  The Supreme Court itself has called the antitrust laws the Magna Carta of free enterprise.

Now, the goal of all of that is to ensure that there is

free and fair competition that ultimately benefits consumers and the public.

So the first thing I want to talk with you about is, just going back to the basic provisions of Rule 60(b)(5), it is not at all clear to me -- this is something you're going to have a chance to answer. You don't have to do it now, but I'm just going to tell you what my concerns are. It is not at all clear to me that there is a material change in circumstances, fact, or law that would even warrant a modification of the injunction at this time.

You know, the fact is, for the last year, the injunction has basically been in stasis and unacted on while Google pursued, unsuccessfully, its appeals and stays. That's fine. That's our system. But the net effect of that has been the injunction has not been imposed and Google has had yet another year of harvesting its ill-gotten gains from the predatory and anticompetitive conduct that the jury found in its verdict.

The only changed circumstance that you represented to me has nothing to do with changes in market conditions or in competition or in Google's conduct, none of the things you typically would see as a changed circumstance. The only changed circumstance that I can see right now is Epic and Google, two mortal enemies who pounded each other relentlessly in this courtroom for many years, are suddenly BFFs. That's it. I don't think that's enough, but I'm going to give you an

opportunity to help me understand why that should be enough of a changed circumstance under Rule 60(b)(5).

The second concern -- and this is even more pressing, in my view -- is it's just not at all clear to me what these proposed changes are going to do to be an adequate remedy for the predatory and anticompetitive conduct that Google has engaged in.  I'm particularly concerned about whether the proposed changes are going to adequately address the network effects of Google's conduct, both to correct the historical illegal conduct it engaged in, also to ensure that those network effects are adequately addressed going forward.

We spent a lot of time on that.  And all of my concerns about the substance of this proposed change are based on a very highly developed evidentiary record, both at trial and in my injunction proceedings with Professor Bernheim and others -- Dr. Bernheim and others, establishing that the network effects and the other consequences of Google's illegal conduct have been significant and need to be changed.

Now, I did not take a lot of what the plaintiffs wanted me to do.  I thought it was too much.  But at the same time, my concern here is that these proposed modifications are going to go even further in the wrong direction of not providing an adequate remedy for Google's wrongdoing.

So that's just -- don't focus just on network effects. You're going to have to walk me through all of this.

So here's what I want to do.  We're going to have an evidentiary proceeding.  All right?  I very much want to hear again from Dr. Bernheim, and I'm very happy to hear from anyone else.  I'll leave it up to you to write the guest list.  Okay?  Now, but we're going to set this for -- I'm going to let you two decide a date.  You can pick a Tuesday or a Wednesday.  I can do it as early as the first or second -- second or third week of December and any time in January.  Okay?  So I'll leave it up to you.  I cannot do it any time before the end of November.  I just can't.  And you're going to need some time to get people available.

So in terms of witnesses, really, I would very much like you to invite Dr. Bernheim and anybody else you want me to hear from.  And it's going to be an evidentiary proceeding, so these are witnesses.  Okay?  So all the usual rules about -- I'm not saying either of you are going to do this, but let me remind everyone, all the usual rules about no coaching, no pointers on what to say, are in effect.  Okay?  I don't want to have testimony that sounds like it's a canned presentation for buying a timeshare in Kona.  I don't want that.  This is not SellKnow.  This is people giving me objective, independent advice about the substantive impact of this injunction as a remedy for Google's illegal conduct that is pro consumer and pro public interest, just as the initial injunction is.

I'm also going to invite the Federal Trade Commission, who

submitted a very useful amicus brief to me, to provide its views on the proposed modifications.  I'm going to invite, generally, people who wish to submit a brief.  There are a number of public interest groups and antitrust groups, and so on, trade groups who submitted briefs.  I'm going to allow them to do the same thing.  I mean, I'll take all of them, but I'm going to invite them, and then I'll decide later whether I accept them as amicus briefs.

And I want you to give me a redline of Docket Number 1017 -- that's the permanent injunction -- that shows exactly how you intend to modify it, for me to consider.  In other words, I want it to look exactly like the document you would propose that I sign if I decide to go forward with this.

Now, that will be filed on the public docket.  I want everyone to see that.  I want you to do that about a week from today.  Can you do that?  Because I want people to have plenty of time before the hearing to see it.  All right?

**MR. BORNSTEIN:**  I think we already have that document ready to go, Your Honor.  We can do that promptly.

**THE COURT:**  All right.  You can just file it as "Proposed Permanent" -- "Proposed Order Re Permanent Injunction."  So, literally, take the Docket Number 1017 and redline it.  Show everything you want to cut and everything you want to add in a typical redline.  You should be able to read it and know exactly what you're asking me to sign.

Now --

**MR. BORNSTEIN:**  Yes.  And, Your Honor, we have -- I think Your Honor knows this, but we have our proposed permanent -- proposed modified injunction on the docket already.  So we'll add to it the redline that Your Honor is requesting.

**THE COURT:**  I just want one freestanding redline that shows exactly how -- what you intend to take out and what you intend to add.

Now, the settlement agreement, you-all have asked it to be sealed.  Of course it's true that in private disputes, you typically don't see the settlement agreement unless it's a class action, but I just -- I don't want to do this in the dark.  There's too much of a public interest component and consumer component to these antitrust cases.  It makes me uncomfortable to do it in the dark.  So why do we need to seal that?

Mr. Bornstein?

**MR. BORNSTEIN:**  I will speak to part of it, Your Honor.  I'll let Mr. Pomerantz speak to part of it.

As Your Honor may have seen -- and I realize Your Honor has not had a lot of time with the document.  That was not anything other than a function of when we were able to reach a deal --

**THE COURT:**  I understand.

**MR. BORNSTEIN:** -- and get the papers together, but I appreciate that Your Honor is coming into this with not a tremendous amount of time to have studied this.

But there are a few pieces of the settlement agreement that are what I would characterize as truly private arrangements in the sense of ongoing commercial business arrangements.

There's -- for example, Exhibit 3 to the settlement agreement is a purely commercial ongoing relationship between the parties which has competitive sensitivities on both sides. There are other customers and other providers in the business at issue, and there are financial terms and other terms of the commercial relationship that appear in the document Your Honor has that we think would be --

**THE COURT:** It's just Exhibit 3 you're worried about?

**MR. BORNSTEIN:** Well, Exhibit 3 is the one I'm focusing on right now, Your Honor. There are a couple of others that I can address as well.

**THE COURT:** Okay.

**MR. BORNSTEIN:** So in addition to Exhibit 3, in the settlement agreement itself, as described in Mr. Gelber's declaration that we submitted together with the sealing request, on page 8 of the settlement agreement, the first, kind of, full box there under "Commercial Partnership Terms" relates to a license agreement that would be provided under --

as part of the package of terms of the settlement agreement. And that, too, is a commercial -- a commercial arrangement in a market that both parties participate in where there are financial terms and other terms that would be competitively sensitive vis-à-vis third parties who participate in that market.  We would ask that that too be kept under seal.

**THE COURT:**  Well, let's do this.  I'm not going to grant at this time a blanket sealing of this entire proposed document.

I am going to -- if you would like, you can file a week from today, a sealing motion under our local rules and my practice, and you should attach to that what you consider to be a redacted version that can be publicly filed.  All right?  I will then decide the redactions that you propose and whether they would be sealed or not.  Okay?  And you need to spell that out in clear fashion.

I actually don't need any argument.  I understand. Commercially sensitive, future-looking, ongoing deals.  I get all that.  Just tell me which ones, under that rubric, that you want me to consider sealing.  But do file an unredacted public version of this because I want that to be out at the same time with the redline.

**MR. BORNSTEIN:**  Okay.  And would Your Honor like to receive as well the typical declarations from the businesspeople that provide that backup?

**THE COURT:** Yes.  Yeah, that would be good, yeah.  All I'm saying is I don't need a page and a half of "Courts routinely seal commercially" -- I don't need that.

**MR. BORNSTEIN:** Okay.

**THE COURT:** I know the standards.  You know the standards.  Just tell me what you want to do.  All right?

Okay.  Now, in the meantime, while all this is going on, I am not staying the injunction.  You need to be on it and you need to make it happen.  Now, it's already been a year.  That's fine.  You had processes to go through.  That time is over.  Okay?  Every conceivable court, short of the United Nations, has said, "No stay."  That's not happening here now.  Now, you get on it and you make it happen.

**MR. BORNSTEIN:** Your Honor, we --

**THE COURT:** I don't want to see any evidence of slow-walking, either unilaterally or jointly, or delays or "Let's just see what happens.  Maybe we won't have to do this." You need to be on it.  Okay?

**MR. BORNSTEIN:** Your Honor, we agree with that.  And the injunction has gone into effect already, and the parties are -- well, Google is complying as laid out in the joint statement that we filed on October 30th.

**THE COURT:** All right.

**MR. BORNSTEIN:** And at least in terms of the current compliance practices that Google has identified for us, Epic

does not have an objection to the manner in which compliance is currently happening.  And for that reason, neither party has asked Your Honor to stay the effectiveness of the injunction.  All we've asked is for the modification.

THE COURT:  Okay.  That's fine, and I appreciate that, but I'm not staying anything.  It is full speed ahead unless and until I order something different, and that's not going to happen until after I hear the evidentiary proceeding that we're going to do.

Now, you also nominated your two representatives for the committee.  Get them going.  Have them select their third person.  That's how they're doing it; right?  They're going to select --

MR. BORNSTEIN:  Yes.  And we can report we've identified the third person.

THE COURT:  You have?

MR. BORNSTEIN:  We have.

THE COURT:  That's supposed to be a joint thing.  You both did that?

MR. POMERANTZ:  Well, the two members themselves have selected the third.

THE COURT:  Yes.

MR. POMERANTZ:  And we are aware of that person.  In fact, Mr. Bornstein and I spoke with him this morning just to --

THE COURT:  Okay.

MR. POMERANTZ:  -- work out the terms of the engagement.  But that is all done.

THE COURT:  Has that person agreed?

MR. POMERANTZ:  Yes.

THE COURT:  Okay.  It's all men?  You couldn't divers- --

MR. BORNSTEIN:  We --

THE COURT:  I leave it up to you.

MR. BORNSTEIN:  Yeah.  We didn't make the third pick, Your Honor.

THE COURT:  Okay.  Can you tell me who it is, or is it too early?

MR. BORNSTEIN:  No.  We can.  His name is Michael Reiter.  He's a professor at Duke University in the computer science department.

THE COURT:  Okay.  All right.  So the committee is now up and running?

MR. POMERANTZ:  Yes, Your Honor.

THE COURT:  All right.  Good.  Okay.

Okay.  So that's the disposition on the request to modify the yet-to-be-realized injunction.

Now, anything else on that?

MR. BORNSTEIN:  Yes, Your Honor.  We did have one pending disagreement with Google on the technical committee,

which we had --

THE COURT:  Oh, sure.

MR. BORNSTEIN:  -- put in the joint statement back on October 30th.

I can describe it quickly, which is, the issue that we dispute is whether or not each party is entitled to have ex parte discussions with the member of the committee --

THE COURT:  Oh, yes.

MR. BORNSTEIN:  -- that they designated.

And Google has designated a gentleman who is a Google employee.  And our perspective is, while ex parte communications maybe isn't the ideal process, it's inevitable that they are going to happen with this gentleman, who reports to the person who runs Android and the Play Store.  It's just infeasible to think that he's going to be walled off from such communications and that his incentives will be to keep silent on this.

And so just as a matter of fairness and parity, although I'm not sure the circumstances in which they would arise, we would ask that Epic also be permitted to have those ex parte communications.

THE COURT:  All right.

MR. BORNSTEIN:  Because if the rule is "no," we're going to be disadvantaged as a result.

THE COURT:  You're not asking me to disqualify the

Google designee?

**MR. BORNSTEIN:**  We are not, no.

**THE COURT:**  Okay.  And you want to have a chance to have similar private conversations with your designee?

**MR. BORNSTEIN:**  That's correct.

And he's conveyed to us he may have questions, he may have information that he wants to understand better.  And our perspective is, it makes sense for him to be able to have those communications privately, just as the Google individual undoubtedly will.

**THE COURT:**  So my vision was not that these would be -- my vision -- you know, like, three panel arbitrators; each side gets to pick one and they pick a neutral third.  The idea isn't that arbitrator is in your pocket.  The idea is you just pick that arbitrator because you like that person for whatever reason.  So this is not meant to be party designees where they're just going to reflexively vote on Democrat-Republican lines, so to speak.

**MR. BORNSTEIN:**  So that's our understanding as well, Your Honor, of how this was put together.

But once Google has selected someone who is a Google employee, unless he's divesting his 401(k) and he's not going to be reporting to people who --

**THE COURT:**  I understand.  It's a financial/personal/business conflict.

MR. BORNSTEIN:  Right.

THE COURT:  I get it.

MR. BORNSTEIN:  And so in light of that, we just think it's fair for us to be able to have similar communications.

If Google were to change its designee, we would be prepared to reconsider that position, but we're not asking Google to do that.

MR. POMERANTZ:  Your Honor --

THE COURT:  Mr. Pomerantz?

MR. POMERANTZ:  -- we don't feel strongly about this. Whatever Your Honor prefers, we will follow.

Our view, though, is that each of these designees comes in with what somebody could say is a perceived bias.

Mr. Brady, who is a Google employee, obviously, is a Google employee and has a perceived bias.  Their designee is an expert they hired in this case who actually worked on the remedies in this case; and so, therefore, he came in having worked closely with the Epic team.  And they had the right to pick him and that's who they picked, but he comes in with a bias because he actually worked on the remedies that the technical committee will now be overseeing.  He worked on it from the Epic perspective and testified for Epic in the remedies proceeding.

Mr. Brady --

THE COURT:  He'll be well informed.  I'm not

necessarily sure it's biased.

**MR. POMERANTZ:** You know, we have been -- well, I mean, he definitely was putting points that were from the Epic perspective.

That being said, Mr. Bornstein and I have had a number of conversations with Mr. Brady from Google and Professor Ernst, their designee, and I have confidence that they're both going to take this very objectively, from everything I've heard.

And so it's really up to Your Honor as to whether you want us to be able to each talk privately with our own designee or whether you don't, and we will live by whichever --

**THE COURT:** Let me ask you this: What would you envision a possible private conversation to be?

**MR. POMERANTZ:** Well, it actually -- we have no idea until we know the issue that would come up. But let's just say the issue is --

**THE COURT:** Say it's the scare screens. There's a debate about whether -- I'll just make this up -- seven or three scare screens, and there's some technical issues that the committee -- what do you think the private communication might be?

**MR. POMERANTZ:** I guess I would say that I can't imagine what you would say privately that you wouldn't say to all three of them together.

But that being said, I think -- and I know Mr. Brady feels

strongly about this, but he'll follow whatever rules Your Honor says.  He doesn't want to be lobbied and I don't think Mr. Ernst wants to be lobbied behind the scenes.  He'd rather hear exactly what the other two members of the committee hear, everybody hears the same thing, and then the three of them deliberate and decide what they think their view is.

And I think that's what Mr. Brady thought he was getting involved with, which is:  I don't want to hear anything that the other two members of the committee don't also hear so that we're all on the same page, have the same information.

**THE COURT:**  Well, I think Mr. Bornstein's agreeing with that, but he's asking:  How can you enforce that?  He's going to be at the Google cafeteria, the Google business meetings, the Google parking lot, the Google lounge, whatever the Google -- he's going to be in the Google bubble.  How are you going to prevent him from -- someone coming up and saying, "You know, I just want to say, you can't do this because it's going to kill my division"?

**MR. POMERANTZ:**  You know, we have instructed -- up until this point in time, because we didn't know what the rules would be, we have instructed everybody, "Don't talk to Brady," and we told Brady, "Don't talk to anybody about these issues."

He was not involved in the remedies.  He works for the auto part of Android.  He doesn't work for Play.  He's with how Android is used in automobiles.  That's where he works.

So I can't say he's not going to interact with somebody who might also have a role in helping us think through the remedies.  That interaction is definitely possible.  But we've reached out to all of them and said, "Please don't talk to Mr. Brady about these things."

If that -- if Your Honor is not comfortable with that, then I think we would go along with the approach that Mr. Bornstein has proposed, and he can talk to Professor Ernst ex parte and we can talk to Mr. Brady ex parte.  We would prefer not to go that way, but if that's what it takes to move this committee --

**THE COURT:**  How about this?  How about this?  I would prefer not having -- they're not party designees.  Okay?  I would prefer not having any ex parte communications, meaning anything that is discussed substantively with respect to committee work will be presented to all three members in the same time or roughly the same time.

So I'm willing to put some bite into that by just having -- we'll have all three committee members come in.  I will direct them as to the parameters that they can and cannot engage in or that will restrict their communications, and I will periodically ask them to submit a declaration under penalty of perjury attesting to the fact that there have been no what you've been calling private or ex parte communications.  Okay?

I think that's the best we can do.  And I would prefer that than just opening the door to phone calls, emails, chats, and everything else that I'll never see.  Okay?

MR. POMERANTZ:  Your Honor, if I could just --

THE COURT:  Are you okay with that, Mr. Pomerantz?

MR. POMERANTZ:  I'm fine with that.

If I can make one request based on our conversation with Professor Reiter this morning.  He asked if he would have to travel for -- he's at Duke.  He asked if he would have to travel.  And we said, "Oh, no, we don't think there'd be any need to travel."

Would you mind if he, at least, appeared remotely?  Maybe Professor Ernst would want to too.  He's in Washington.

THE COURT:  He's not willing to take an all-expenses-paid-by-Google flight to San Francisco?  Really?

MR. POMERANTZ:  It didn't seem like it was a matter of who would pay for it.

THE COURT:  Oh.

MR. POMERANTZ:  He --

THE COURT:  Between the two of you, I guess you can share it.

MR. POMERANTZ:  Yeah.

MR. BORNSTEIN:  Maybe, Your Honor, the fact that Professor Reiter is not in any way affiliated with either party might excuse him from the obligations that would be --

**THE COURT:**  That's fair.

**MR. BORNSTEIN:**  -- posed to the others.

**THE COURT:**  Yeah, he's the third --

**MR. POMERANTZ:**  He's the neutral.

**THE COURT:**  How about we just leave him out and we'll bring in the two selected people?  Okay?

**MR. POMERANTZ:**  That's fine, Your Honor.

**THE COURT:**  Are you okay with this proposal, Mr. Bornstein?

**MR. BORNSTEIN:**  Look, if it's Your Honor's decision, it's the decision.

I do worry that Mr. Brady reports directly to Mr. Samat, who was the lead negotiator in the settlement agreement that we had, who is in charge of Android as a business.  And it's impossible to believe the two of them won't be talking.  He's his direct superior.

**THE COURT:**  Well, I'm trying to offer -- if you'd like, we could also do periodically -- every quarter, you could do -- we could do an inquiry exam where you can put him up and ask him.  I mean, they can produce all of their -- I mean, you know, you handle Chat well.  Okay?  So I have confidence you'll be able to ferret out anything along those lines. All right?

Now, here's the other thing.  If it turns out, as the committee goes on, you get the sense that something untoward is

happening, just come back and see me.  Okay?  Perfectly fine.

But I think the ex parte path possibility is not acceptable.

Now, after we get into it, who knows?  Maybe three months from now, they're going to say, "We would actually like to have this."  And if the committee, as a whole, votes that they would like to change the communication protocols and you-all want me to consider it, I'll do that too.  But let's just start this way and then we'll see how it goes.  Okay?

MR. BORNSTEIN:  Understood, Your Honor.

THE COURT:  Okay.  Anything else on this part?

MR. BORNSTEIN:  Not that I can think of on this portion of things.  We obviously have the other matter --

THE COURT:  Yes.  We're going to get to --

MR. BORNSTEIN:  -- that's ongoing.

THE COURT:  -- the states and then Sam- -- it's no longer Samsung, I guess.

MR. BORNSTEIN:  Correct, Your Honor.

THE COURT:  Who is it now?

MR. BORNSTEIN:  It's -- well, we're referring to it internally as *Epic v. Google II*.  I don't think that's the docket name.

THE COURT:  Okay.  We'll call it *Epic II*.  How about that?

MR. BORNSTEIN:  Okay.

**THE COURT:** Okay. Anything else for this part, Mr. Pomerantz?

**MR. POMERANTZ:** No, Your Honor.

**THE COURT:** Okay. All right. Let's go to the states. Do you need to call that, Lisa?

**THE COURTROOM DEPUTY:** Calling Civil 21-5227, State of Utah, et al. versus Google, LLC, et al.

Counsel, please state your appearances for the record.

**MS. WEBER:** Good morning. Jayme Weber for the Arizona Attorney General's Office. And also present, Brian Wang and Mike Jorgenson from the State of California and Marie Martin --

**THE COURT:** I'll tell you what. You're all different states. You can all make your own appearance.

**MS. WEBER:** All right.

**MS. MARTIN:** Marie Martin, State of Utah.

**MR. JORGENSON:** Mike Jorgenson, State of California.

**MR. WANG:** Brian Wang, State of California.

**MS. GIULIANELLI:** Karma Giulianelli for the consumers. And we've worked with the states in our part of the settlement agreement as well.

**MR. POMERANTZ:** Good morning again, Your Honor. Glenn Pomerantz on behalf of Google.

**THE COURT:** All right. So I deferred all this until we made sure we had perfect clarity on the jury verdict and the injunction that I entered. We do now.

And so my main concern, as I've said several times in this case, is to ensure that there's no friction between the State proposed -- proposed State settlement and the injunction and jury verdict in the *Epic v. Google* case.

Now, at my request, all of the states and the consumers have jointly assured me, in Docket Number 1067 on page 1, that, quote, "Nothing in the proposed settlement would excuse Google's compliance with any provision of the Epic injunction," closed quote, and, quote, "The parties agree that the Court can confirm in any approval of the proposed settlement that the proposed settlement's terms cannot override Google's obligations under the Epic injunction," closed quote.

So with that understanding, meaning there will be no daylight or room to run whatsoever on any argument that Google can or cannot do something because there is a difference between the Epic settlement and the state settlement, it's proofed.  All right?

So -- and, look, it's a *parens patriae* thing, so I can't do the full Rule 23 review that I would normally do.  Perhaps that's good for you because there are some things that I don't particularly like.  But it's yours now, so consider it done.  I will -- do we have a -- do I have a full signed version --

**MS. WEBER:**  Yes.

**THE COURT:**  -- that I need to sign?

**MS. WEBER:**  Yes.  We gave you a proposed order.

Our --

**THE COURT:**  You have given me that?

**MS. WEBER:**  Yes.  That was filed with the original -- well, it was filed in early 2024.

**THE COURT:**  Yes.

**MS. WEBER:**  Our settlement administrator has --

**THE COURT:**  Here's what I want you to do on that.  Let me just jump in.  Send me -- send a draft, Word draft to my JDPO mailbox.

**MS. WEBER:**  Okay.  We will do that.

**THE COURT:**  I'll take it from there.  Just send me a Word that I can edit.  Just send that to me.

**MS. WEBER:**  Okay.  Perfect.  And I'll just note --

**THE COURT:**  It's "Proposed Order."  Okay?

**MS. WEBER:**  Proposed order, yes.

And our settlement administrator has changed their name, so we will update that in the Word version we send you.

**THE COURT:**  This has gone on so long, they've changed their name?

**MS. WEBER:**  Yes, Your Honor.

**THE COURT:**  All right.  Now, what happens after that?  You give notice and then what?

**MS. WEBER:**  We give notice --

**THE COURT:**  Is this like Rule 23?  There are opt-outs and objections?

**MS. WEBER:**  Yes, exactly.  And the proposed order has all of those time periods laid out.

**THE COURT:**  By the way, put actual dates in there.  Okay?

**MS. WEBER:**  Okay.  I can put actual --

**THE COURT:**  If it's triggered from date of signing, assume I'll sign it by November 17th.

**MS. WEBER:**  Okay.

**THE COURT:**  Yeah.  November 18th.  Assume a November 18th signing date.  Okay?

**MS. WEBER:**  Okay.

**THE COURT:**  You need to do that to -- don't say things like "60 days from entry."

**MS. GIULIANELLI:**  Right.

**THE COURT:**  Just give actual dates.  Okay?

**MS. WEBER:**  Okay.

**THE COURT:**  Yeah.  All right.  Okay.  Now, remember -- You're not getting any fees; right?  States?

**MS. WEBER:**  Not out of the settlement funds.

**THE COURT:**  Yeah.  You're not asking me to award any fees?

**MS. WEBER:**  No, we are not.

**THE COURT:**  So you're not going to be filing a fees motion.  So the people who are reading, consumers and members of your -- citizens of your state, are not going to need to

object to attorneys' fees by the states?

**MS. WEBER:** Right, not by the states because the settlement fund --

**THE COURT:** Okay.

**MS. WEBER:** -- is set aside --

**THE COURT:** All right.

**MS. WEBER:** -- for consumers.

**THE COURT:** Now, I guess the consumers have asked for money, so you need to have at least 60 days before the fees motion will be taken up. Okay? So 60 days for people to think about it. In other words, the deadline to opt out --

**MS. WEBER:** Right.

**THE COURT:** -- and object should be 60 days before I hear the fee motion and at least 30 days after the fee motion is filed.

So, in other words, they need to be able to see it, have a reasonable amount of time to think about it, and then file their opt-out or objections. Okay? So --

**MS. WEBER:** Right.

**THE COURT:** -- 30 and then 30.

**MS. WEBER:** Right. I believe that it was already set up --

**THE COURT:** Or more.

**MS. WEBER:** -- that way, but I'll --

**THE COURT:** If you did more, that's fine.

**MS. WEBER:**  -- confirm.

And the consumers, as you noted, have already filed their fee petition.

**THE COURT:**  Well, we're going to redo that.  Now, I'm going to enter it.  We're going to redo all that.  So, the consumers, you do this as if nothing has happened.  And then I'm going to enter it, and then the consumers -- and then the consumer people file their fee motion as if it hadn't been filed.  Okay?

**MS. WEBER:**  Okay.

**THE COURT:**  All right.

**MS. WEBER:**  Thank you, Your Honor.

**THE COURT:**  Then I'll take it up then.

Okay.  Anything else for the states?

**MS. WEBER:**  No, nothing else.

**THE COURT:**  Or consumers?

Okay.  Good.  All right.  Let's move to *Epic II*.

**THE COURTROOM DEPUTY:**  Calling Civil 24-6843, Epic Games, Inc. versus Samsung Electronics.

Counsel?

**MR. EVEN:**  Yonatan Even for Epic.

**MS. PHILLIPS:**  Jessica Phillips for Google.

**MR. EVEN:**  Good morning, Your Honor.  Maybe I'll start.

**THE COURT:**  Other appearances?

**MR. EVEN:**  I'm sorry?

**THE COURT:**  Your other appearances.  There's more than one person at the table.

**MR. EVEN:**  Thank you.

So, same people.  But Gary Bornstein, Lauren Moskowitz, Michael Zaken, Phil Duggan, and Gaia Mattiace.

**THE COURT:**  Okay.

**MR. EVEN:**  My apologies, Gaia.

**MS. MATTIACE:**  Yeah.

**THE COURT:**  Okay.  Defendants?

**THE COURTROOM DEPUTY:**  Defense counsel?

**MS. PHILLIPS:**  Yeah.  Sorry.

Jessica Phillips on behalf of Google, and I'm by myself, Your Honor.

**THE COURT:**  Okay.  All right.  What's going on?

**MR. EVEN:**  So we have moved for a stay, and I hear Your Honor that it doesn't sound like we are staying this case.

**THE COURT:**  Nothing is being stayed.

**MR. EVEN:**  I hear that loud and clear.

And in that case, Your Honor, I do think that we need Your Honor's assistance with this.  We have been struggling to extract the documents we need from Google.

We were before Your Honor nearly two months ago.  By that point, Google has produced 11,000 documents.  They have leisurely produced about 10,000 or 11,000 more every

three weeks. They're now still at well below 50,000 documents. They are landing this to complete their production at or on the eve of the cutoff date for fact discovery, making sure we can't actually use these documents for anything meaningful.

THE COURT: What's happening with depositions?

MR. EVEN: Well, we have asked for depositions in no small part because one of the things Google said to the Court is that if we designate people for depositions, they will at least prioritize these people's documents for production and will complete the production seven days before the deposition.

We have all kinds of issues with that because that really requires us to name the deponents before we have the documents, and a week before is really tough if we get a load of documents, but we agreed.

We've asked for two people. One of them they gave us was supposed to happen --

THE COURT: Wait. You agreed to that?

MR. EVEN: We did not agree to it, Your Honor, but absent other options, that's what we asked for.

We named two people to be deposed. We also, obviously, briefed before Your Honor -- and that's at Docket 110 -- our issue with substantial compliance and the pace of the discovery. But we did name two deponents.

And what happened was that --

THE COURT: Wait. You're not going to take

400 depositions?  You just want two deponents?  That's it?

**MR. EVEN:**  No, no.  We asked for two deponents as a first tranche, Your Honor, in the hope that in the meantime, we get more documents and can actually make an informed decision on who the deponents should be.

**THE COURT:**  Okay.

**MR. EVEN:**  And so the first one was supposed to happen yesterday.

We wrote to Google and said, "You represented to the Court that you're going to complete everything seven days before.  Please confirm that that is, in fact, what you're going to do."

Google sent back a letter saying, "No, no, no.  It's only going to be substantially complete seven days before."

We told them, "Well, I don't know what 'substantially complete' means; but if that's the case, then we're going to keep the deposition open."

So Google essentially sent us 9,000 documents seven days before.  Said, "This is not going to be complete.  It's substantial completion; and therefore, given your representation, we're taking the deposition off calendar.  See you again late November."

So we haven't taken a single deposition yet.  We are now roughly one month before the current deadline for discovery.  That forced us to agree with Google on a modified -- a proposed modification that we presented to Your Honor for interim dates

without changing the trial date.

Google, within that construct, has agreed to substantial completion dates of its production.  To be clear, we have produced all our documents.

**THE COURT:**  Wait.  What's the date for that?

**MR. EVEN:**  The date for that, I believe, is December 5th.

**THE COURT:**  What does "substantial" mean?

**MR. EVEN:**  So Google asked us the same question.  We gave them some parameters, said we think it needs to be at least 90 percent or so of the documents and the data.

**THE COURT:**  How would they know that, though?

**MR. EVEN:**  They'll know that in the sense that all they have left after that is a little -- a few go-gets and maybe some things that fall off the privilege log, but nothing beyond that.

**THE COURT:**  And what if you get a smoking gun after that?  What are you going to do?

**MR. EVEN:**  Then we're going to have an issue, and we're going to come to Your Honor and ask to reopen a deposition if they won't agree to it, I assume.

But under the new schedule, Your Honor, that at least gives several months of discovery following that date.  And so, obviously, if they can complete in full, which they should be able to do, by December 5th, that would be better.  We expect

to be complete in full substantially ahead of that, this month.

THE COURT:  Epic does?  Epic expects to be?

MR. EVEN:  Yes.  Epic substantially completed in mid-October, and we're now doing the final checkups on privilege logs and things like that and some data that requires more work.  But generally speaking, yes.

THE COURT:  All right.

MR. EVEN:  We have reviewed many more documents because we have agreed to review 2.2 million documents.

They still insist that they only need to review 1.4. They've said no to everything else.  That, too, is part of the letter we submitted to Your Honor at Docket 110.

THE COURT:  All right.  But this schedule, you can live with?

MR. EVEN:  This is a schedule we can live with.  We do need Google to actually abide by it.  And we do need resolution of what --

THE COURT:  You don't need that.

MR. EVEN:  -- is the --

THE COURT:  It's the scheduling order.  Rule 16 requires them to abide by it.

MR. EVEN:  I -- I --

THE COURT:  All right.

MR. EVEN:  So --

THE COURT:  Let me hear from Google.

**MR. EVEN:**  Sure.

**THE COURT:**  Okay.  Yes?

**MS. PHILLIPS:**  Yes.  Thank you, Your Honor.

I do take issue with the representations that we are delaying.  We are actively reviewing documents, QC-ing documents, and producing those.

They've actually asked for five deponents.  We have provided the dates for those a week and a half ago.  I've received no response, including the one for the witness who was going to be deposed yesterday.  We have personally asked for three dates for three deponents on their side, and, again, we have received no response from them.  So we are trying to move things forward expeditiously.

We will, of course, abide by Your Honor's order if you do enter the, we think, minimal requested changes.  And, of course, I want to emphasize that we are not asking for a change in the trial date or the pretrial date.

**THE COURT:**  No, but I --

**MS. PHILLIPS:**  Just --

**THE COURT:**  -- get squeezed on the back end.  Now I'm going to get Rule 702 and summary judgment on May 7th.

**MS. PHILLIPS:**  We have ensured that, pursuant to Your Honor's order, that there are still two full months and, actually, more than that pursuant to this order.  So we're hopefully not jamming you up at all with regard to that.

**THE COURT:** Really?  The seven *Daubert* motions you're going to file are not going to jam me up over the space of eight weeks and 300 other cases I have?  How is that not going to happen?

**MS. PHILLIPS:** I certainly hope we will not have seven *Daubert* motions, Your Honor.

**THE COURT:** How many experts are you expecting, Epic?

**MR. EVEN:** Less than seven, Your Honor.

**THE COURT:** More than one?

**MR. EVEN:** More than one.

**THE COURT:** More than three?

**MR. EVEN:** It's probably going to be three or four experts.

**THE COURT:** Okay.  Three or four there and three and four there.  That's eight.

**MR. EVEN:** I understand.

**THE COURT:** That's actually more than I said.  That's what I'm talking about.

There's no doubt in my mind -- because this is what the style is these days for some ridiculous reason.  No expert is qualified to say anything.  Everybody has to get a 702 motion to talk about junk science, even though at least two-thirds of the people I see, particularly in cases like this, are perfectly capable of withstanding cross-examination and letting a jury decide the fate of their theories.

So you are going to give me eight *Daubert* motions on May 7th and expect to go to trial on July 27, while I have 300 other cases that are all clambering for the same degree of attention.  That's not going to work.

**MR. EVEN:**  So, Your Honor, just to correct one thing.

Well, first of all, as to the history, I don't think Epic filed that many *Daubert*s in the prior case.  In fact, I'm not sure we even filed one.

But more to the point, the schedule -- which we never wanted to be at a place where we need more time.  We were hoping that everything will be done.  But we are where we are --

**THE COURT:**  I'm going to jump in here.

I told you this last time.  That's on you.  Okay?  You sat on your hands and came in to me, saying, "Oh, we're having a problem."  You and I had this discussion last time, and that was your fault.  Now, I understand you're trying to fix it, but I'm getting taxed for the parties' convenience.

But, look, I cannot get into the minutia of your disputes. I don't know why this is so much more difficult than the *Epic I* was.  I just don't get it.  I mean, we didn't have -- you know, we had big, explosive things, like spoliation of evidence in the Chats, but we didn't have these kinds of nuts-and-bolts friction.  I don't understand it.  So -- I don't want to understand it either.  I just don't want to hear any more about

it.  You've got to get it done.  All right?

Now, December 5th is the completion date.  Not substantial.  It's the completion date.  That's it.  Okay?  If anything comes in after that, there's a pretty good chance it's going to get excluded, unless there's a good reason for why it's late, as a sanction.  Okay?

Now, if there's something --

**MR. EVEN:**  Understood.

**THE COURT:**  Now, depositions, don't take them until you're ready.  All right?  I don't want to have a million requests for reopening a deposition because something new has come in over the transom.

I'm going to have to move your trial date slightly.  I will take care of that.  It will be in August rather than in late July.  But I will fiddle with that.

I'm probably going to advance your -- almost certainly will advance, meaning move earlier, the dispositive and Rule 702 deadlines for filing, and you're just going to have to deal with that.  Okay?

All right.  But, you know, this is the last call on the discovery, so you've got to get it done.

**MR. EVEN:**  I understand, Your Honor.

There is one thing that is left, which is the search protocol for Google.  We still asked for certain search terms.  They have refused.  They are --

THE COURT:  Remind me -- just one second.  Let me look.

MR. EVEN:  This is on Docket 110.  That's our letter --

THE COURT:  Oh, 110?

MR. EVEN:  -- that we filed on that.

THE COURT:  All right.  Go ahead.

MR. EVEN:  So we have agreed to all the requests from Google.

Google sat on its hands for months and didn't give us any hit reports or anything like that.  They finally gave us that in late -- in early September.

We quickly cut down and gave them a proposal that they say would require them to review 2.4 million documents.  That's in the ballpark of what we had to review.  We agreed to 2.2 based on their requests.  They insist that they can only review 1.4.

I'm not sure why is it that Google cannot do what Epic has done.  And that is something that needs to be resolved just so we understand completion of what happens by December 5th.

THE COURT:  All right.  Google?

MS. PHILLIPS:  Yeah.  Your Honor, we have agreed to review 2.4 million documents.  That is in our papers.  That's been in our letter.

I don't know where you're getting this 1.4 number from.  That is inaccurate.

As for the search terms, we laid those out.  They are nine -- they're just nine, nine search terms.  They're incredibly broad.  They include standalone terms and a single "or" connector with other incredibly broad terms.

That's part of the issue here, is we are reviewing a huge number of documents that are not responsive because of these particular search terms and also because of the date range.

Epic has insisted that we go back to August of 2020, when they have themselves conceded that nothing prior to the date of the operative complaint in *Epic I*, which was November of 2022, is part of this case.  So we are, in addition to reviewing a large number of documents because of their insistence on these very, very broad search terms, but we're also going back an additional two-plus years that are way before the statute of limitations, the two-year statute of limitations that they concede is applicable here.

So we're reviewing a large number of documents in that two-year period, and that is part of the problem here.  We have literally 300 individuals reviewing these documents to get them out in an expeditious manner.

**MR. EVEN:**  So, Your Honor, that's just --

**THE COURT:**  Let me ask you.  Why is there a manual review being done?  I mean --

**MS. PHILLIPS:**  I'm sorry.  What?

**THE COURT:**  -- why is a manual lawyer review being

done?

AI and other protocols are so sophisticated. You know this better than I do. Why are you making 300 contract lawyers plow through this? That's just a choke point. What is it -- I mean, if an occasional irrelevant document gets produced, it's no harm, no foul; and if there's an occasional, very rarely -- because you can really control for this in extremely precise ways. If for some reason an attorney-client thing, you know, gets produced, you can ask to have it clawed back.

So why are we having this choke point of some warehouse full of first-year lawyers paging through these documents?

MS. PHILLIPS: We are utilizing, as I understand it -- and I'm not particularly close to it, but I do --

THE COURT: You said there are 300 lawyers --

MS. PHILLIPS: There are 300 contract reviewers absolutely reviewing those. We are also utilizing AI methods, to the extent that they are available with our review platform. But we do need that. We need that for responsiveness, and we -- particularly given the concerns around privilege, not only do we want to make sure that we're not producing anything privileged, but we want to make sure that we're not withholding anything that is not actually privileged. And we want to make sure to do that with actual attorneys' eyes making right judgment calls for Your Honor.

THE COURT: The way you do that is you call a set, you

call a subset of potentially privileged documents.  If you want to do a second-line review, that's fine.

MS. PHILLIPS:  And we are.

THE COURT:  If you're asking 300 lawyers to look at all -- every page of every document, that is just -- that's ridiculous.  Is that what you're doing?

MS. PHILLIPS:  I mean, you know, more or less, yes; but, again, Your Honor --

THE COURT:  Why?

MS. PHILLIPS:  -- that's really nec- --

THE COURT:  Why would you do that?

MS. PHILLIPS:  Well, because, again, the search terms that we are utilizing are incredibly broad search terms.  So the import of the relevance of the documents is particularly necessary to have --

THE COURT:  It makes zero sense for you to tell me, "Oh, yes, we're using the latest and greatest AI and other sophisticated software, but we're also making each lawyer go through each page of every document."  That makes zero sense to me.

MS. PHILLIPS:  Well, we can certainly go back to the review platform and take a look at any AI tools --

THE COURT:  Well, you need to pick up --

MS. PHILLIPS:  -- we're not using.

THE COURT:  -- the pace.

And, look, it's been 11 years since I've done this, but even I know you can harvest a potential set, as overbroad as you want to make it, of attorney-client documents and you focus on that.  I guarantee you it's going to be 10 percent or less of 2.4 million documents, unless there's a massive misuse of attorney-client privilege within Google, and I did see a little bit of that at trial.

Now, that aside, you should be able to blaze through this thing without saying, "Oh, I have to have a warehouse full of people in Maryland look at each and every page."  That is ridiculous.

Same for you.

**MR. EVEN:**  I understand, Your Honor.

**THE COURT:**  All right.  So --

**MR. EVEN:**  If I may correct one thing.

I'm just looking at Docket 115, and it says that Google has agreed to reviewing 1.4 million documents.  It says that twice.

So if they're now agreeing to 2.4, that's news to me.  I'm happy to hear that.  But it needs to be very clear that that is what they're doing.  They're taking our proposal, which is the 2.4 million, and actually --

**THE COURT:**  I think they probably said 2.4 million.

So that's your operating number.

**MS. PHILLIPS:**  Well, let me be really clear for the

record.

We are reviewing 2.4 right now because that letter has been pending with Your Honor. We don't think that that is what we should be reviewing. We do believe that this is a narrower case. It fundamentally changed four months ago, which is part of this. I think we've made incredible progress in the four months since this was no longer a conspiracy antitrust case about auto blocker and is now a business tort case about unknown sources, which was, of course, litigated extensively in *Epic I*, which was, of course, the subject of our motion to dismiss in front of Your Honor, still pending.

So our view is that we should not be reviewing 2.4 million documents, but that is what we are doing until we get a ruling from Your Honor, just to be clear for the record.

THE COURT: Okay. What is it that you want? How would you reduce that 2.4 million?

MS. PHILLIPS: Again, by the time limitation. If we cut off the time limitation on November 18th, 2022, as Google has submitted is acceptable, should be acceptable, and --

THE COURT: All right. What's wrong with that, Epic?

MR. EVEN: So we have had back-and-forth. We gave them a proposal. It's a reasonable proposal. It's on the same ballpark that we have.

They gave us hit reports. We've looked at the hit reports very carefully. We've narrowed it down to the same ballpark of

what we have done.

THE COURT:  No, no, no.  The date.  I'm only asking about the date.  2020 versus 2022.

MR. EVEN:  Oh.  Very simple, Your Honor.  Sorry.  I misunderstood the question.

The date is -- the fact is that we have all the documents from Google from *Epic I*.  Those end in December 2020.

It seems to us that it makes very little sense to then have a one-and-a-half-year gap and then pick up and we don't know what happened in the gap.

So we agreed with Google, and they agreed back in May 2025, that we're going to go back to August 14, the day after the complaint in *Google I* was -- in *Epic I* was filed, and start the productions and the review from there so that we have a complete record.

They now come back and say, "No.  Your statute of limitations and things" --

THE COURT:  Why does that two years make a difference for the trade liable claim?

MR. EVEN:  That two years makes a difference just because we all of a sudden lose the historic significance of what happened with the screens, with the discussions inside Google.

We understand that we have a limitation in terms of how far back we can look for damages, but that doesn't mean that

that is the cutoff for discovery.  So --

THE COURT:  I understand.

MR. EVEN:  -- we asked for a couple more years.

THE COURT:  All right.

MS. PHILLIPS:  May I respond, Your Honor?

THE COURT:  Yes, briefly.

MS. PHILLIPS:  In their opposition to our motion to dismiss, they made critical concessions about when their claims accrued.  They say it was when users tried to download apps from Epic's website or EGS after the *Google I* complaint, the operative complaint, and with respect to EGS on Android, after the *Google I* verdict.

The operative complaint in *Epic I* is November '22.  The verdict was in December '23.  So we have gone further back to November 18th, 2022, and said that should be the operative date, given the concessions with regard to the accrual date.

Again, what I'll emphasize here, Your Honor, is what this really shows is that this is truly a continuation of *Epic I* and should be barred by res judicata --

THE COURT:  All right.  But I don't want to get into that right now.

MS. PHILLIPS:  -- pursuant to our motion to dismiss.

THE COURT:  Okay.  And what about search terms?  How would you limit the search terms, Google?

MS. PHILLIPS:  We would cut out those nine terms --

actually, we haven't even proposed to cut those out.  We have just required additional connectors:  within five, within ten.  And we've laid those all out for Your Honor on the nine search terms.

THE COURT:  Docket Number 116?

MS. PHILLIPS:  That's correct.

THE COURT:  All right.  I mean, a little range work doesn't seem bad.  Can you do that?  What's wrong with that?  Rather than just saying "or," say "within ten."

MR. EVEN:  So we've done that in many of them, Your Honor.  It took us a long time to do it because Google didn't -- got our search -- our proposal in June and responded to it in September with hit reports.

THE COURT:  You guys are fighting over five versus 15 and five versus ten.

MR. EVEN:  We are -- and because it brings in --

THE COURT:  You know what?  I'm going to pick seven.  Okay?  You can do seven, within seven.  That's the compromise.  All right?

I will let stand the August -- the 2020 date.  You need a ramp-in for a case of this complexity, and there does have to be a narrative background.  It may not be admissible, but it's certainly going to be usable.  Okay?

MR. EVEN:  Thank you, Your Honor.

THE COURT:  So go back to the date you want in 2020.

Change all those connectors to within seven.  All right?

I will enter an amended scheduling order based on the cutoffs that you want me to do, with a little bit of stretching that I referred to earlier.  Okay?

All right.  Anything else for today in *Epic II*?

MR. EVEN:  Nothing from Epic, Your Honor.

THE COURT:  Google?

MS. PHILLIPS:  Not from us.

THE COURT:  Nothing?  Okay.  Good.

All right.  Thanks for coming in.

Thank you, Ana.

THE COURTROOM DEPUTY:  All rise.  Court's in recess.

(Proceedings adjourned at 11:03 a.m.)

---o0o---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, November 10, 2025

_Ana Dub_

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter