# EXHIBIT 6



Marc P. Miles (SBN: 197741)
Kristy A. Schlesinger (SBN: 221850)
Janet L. Hickson (SBN: 198849)
Gabriel S. Spooner (SNB: 263010)
SHOOK, HARDY & BACON L.L.P.
5 Park Plaza, Suite 1600
Irvine, California 92614
Telephone: 949-475-1500

Attorneys for Defendants
THE COCA-COLA COMPANY, MONSTER BEVERAGE
CORPORATION, MONSTER ENERGY COMPANY and
NEXSTEP BEVERAGES, LLC

Steven Nataupsky (SBN: 155913)
Lynda Zadra-Symes (SBN: 156511)
Jacob Rosenbaum (SBN: 313190)
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, California 92614
Telephone: 949-760-0404

Attorneys for Defendants
MONSTER BEVERAGE CORPORATION and
MONSTER ENERGY COMPANY

*previous case*

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN DIEGO

| | |
|---|---|
| HUBERT HANSEN INTELLECTUAL PROPERTY TRUST, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>THE COCA-COLA COMPANY, *et al.*,<br><br>Defendants. | Case No.: 37-2016-00021046-CU-MC-CTL<br><br>Judge: Hon. Timothy B. Taylor<br>Dept.: 72<br><br>**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR ATTORNEYS' FEES**<br><br>Complaint: June 22, 2016<br>Trial Date: January 6, 2020 |

**DECLARATION OF JOHN D. O'CONNOR**

I, John D. O'Connor, hereby declare and state as follows:

**I.    EDUCATION & EXPERIENCE**

1.    I am an attorney licensed to practice law in all courts in the State of California and have been so licensed since December 1972. I am currently the principal of O'Connor and Associates, a law firm consisting of myself and three associates that specializes in commercial litigation. I have forty-seven years of significant trial experience, including current jury trial experience.

2.    In addition to my litigation practice, I have been retained as an attorneys' fee expert on approximately two hundred occasions and have served as a consulting expert on many more occasions.

3.    My *Curriculum Vitae* is attached hereto as **Exhibit 7**.

**Education and Brief Summary of Work Experience**

4.    I attended The University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1968. In 1972, I graduated *cum laude* from the University of Michigan Law School, where I was a member of the Order of the Coif and Associate Editor of the Michigan Law Review. I was admitted to the California bar in 1972.

5.    After being admitted to the California bar, I held numerous positions where my practice focused on trial litigation. In 1972 and 1973, I was an associate with the trial firm of Belli, Ashe, and Choulos, where I assisted Mr. Melvin Belli in the trial of several large cases and tried three cases on my own. From January 1974 through December 1979, I was an Assistant United States Attorney for the Northern District of California in San Francisco. In that capacity, I tried white-collar criminal cases as well as a variety of civil matters. Much of my civil work with the U.S. Attorney's office involved large claims brought against the government, including one class action, energy pricing and regulatory disputes, and a variety of tort claims. In 1980 and 1981, I was a senior associate at the prominent San Francisco firm of Brobeck, Phleger and Harrison. At Brobeck, I worked on several trade secret and unfair

1  competition cases, one patent litigation, and assistance on a large antitrust case. On two of the

2  IP cases, I represented the client as first chair.

3       6.    From 1982 through 2001, I was a principal and managing partner of the law firm

4  of Tarkington, O'Connor & O'Neill, where our clients were mainly insurance companies, self-

5  insured entities, corporate risk management departments, numerous local governmental entities,

6  and federal entities such as the FDIC, FSLIC, RTC, NCUA, and the United States government.

7  At Tarkington I defended several trade secret cases, obtaining a defense verdict in U.S. District

8  Court in San Francisco.

9       7.    From 2001 through 2006, I was Special Counsel and a Director (equivalent in a

10  legal corporation to a partner) for the Howard Rice firm, now merged with Arnold and Porter.

11  At Howard Rice, I pursued a high-stakes litigation practice, including defense of R. J. Reynolds

12  Tobacco Company and intellectual property disputes. At Howard Rice, I was designated as

13  chief trial counsel in two major "soft IP" litigations, each case involving the scope of rights

14  transferred under certain contractual arrangements, one representing an e-commerce platform

15  provider and another representing Vivendi regarding the scope of rights to license video games

16  in internet café settings.

17       8.    In late 2006, I formed O'Connor and Associates, a litigation boutique firm

18  engaging in both business and tort litigation, as well as expert work in attorney fee analysis. I

19  have been counsel in several significant IP cases, my latest being a major trade secret claim

20  brought by Alta Devices, Inc. against LG Electronics in Korea, in U.S. District Court in the

21  Northern District of California. With O'Connor and Associates, I defended a patent case to

22  verdict in U.S. District Court in Seattle.

23           **Experience in Attorney Fee Analysis**

24       9.    In 1977, I began evaluating and litigating fee petitions filed against the United

25  States government and its agencies. In 1982, I began managing the Tarkington office and as our

26  firm quickly grew to over eighty lawyers, I regularly kept abreast of billing standards in the

27  community, and regularly subscribed to specialized publications geared to law firm

28

DECLARATION OF JOHN D. O'CONNOR              2

1  management, such as the Altman and Weil annual reports and the monthly published Partners'
2  Report. I also regularly reviewed more widely published legal periodicals.
3      10.    As written billing guidelines became in vogue for institutional clients in the mid-
4  eighties, I participated heavily in working with our institutional clients in government and
5  insurance, and other large businesses to establish and implement practical billing standards. I
6  regularly consulted with these clients about their perception of the positive and negative in our
7  billings, and where appropriate, remedied the same.
8      11.    I have kept abreast of the billing rates throughout the country since 1982 when I
9  managed the Tarkington firm. Because we represented clientele in different business and
10  governmental sectors, it was important for me to be conversant about rates throughout the
11  litigation field ranging from premium to lower, more commoditized rates.
12     12.    Because our practice at the Tarkington firm often involved coverage, legal
13  malpractice, and reinsurance and excess monitoring work, we reviewed the billings of a wide
14  variety of firms in our regular practice, including premium-rate billings, lower, highly
15  negotiated insurance defense charges, and standard business litigation charges with rates falling
16  between these two groups.
17     13.    My involvement in legal fee dispute work increased significantly in 1989. In
18  that year, I was the Tarkington partner in charge of our work with failed and failing financial
19  institutions on behalf of the FDIC, FSLIC, RTC, and NCUA. At that time, we had performed
20  extensive work in connection with the failed Golden Valley Bank, Turlock, California, then in
21  Receivership under the aegis of the FDIC. The insurance carrier for the bank insisted that we
22  advise the government to release the insurance carrier from its defense obligations with a
23  nominal payment. After our refusal, the insurance company subjected the Receiver and our
24  firm to numerous audits in an unsuccessful attempt to force the government to release the carrier
25  from its obligations. At this point I necessarily became immersed in the various billing
26  standards prevalent in the community.
27     14.    During these years of legal fee disputes, I spent the majority of my time dealing
28  with the developing field of legal "auditing" and related litigation. As a result, I gained a wide

DECLARATION OF JOHN D. O'CONNOR                                                    3

1  knowledge of auditing practices, prevailing billing standards, and approaches employed by legal

2  fee experts, auditors, and litigators.

3      15.    Due to my growing expertise in the legal fee and auditing issues, during the years

4  1991 through 2001, I consulted with numerous law firms throughout the country who were

5  seeking my advice on audit criticisms leveled against their practices, almost invariably involved

6  in large fee disputes. I also consulted on numerous occasions with fee payors in fee disputes. I

7  continue this work as a subspecialty of my litigation practice through the present time.

8      16.    While at Howard Rice from late 2001 through July 2006, we kept informed

9  about both premium rates in the area and rates charged by the wider sector of more market-

10  driven business firms, so that we could in turn appropriately set ours on an annual basis.

11  Because we did work throughout California, our surveys involved both Northern California and

12  Southern California, as well as national firm rates. At Howard Rice, I served as a JAMS

13  arbitrator in a multimillion-dollar asbestos litigation fee dispute involving hundreds of cases

14  defended under an insurance policy.

15      17.    Since July 2006, I have practiced on my own with several associates under the

16  name of O'Connor and Associates. My practice continues to focus on complex business

17  litigation, including an active trial practice, with consistent work as well as a litigation fee

18  expert.

19      18.    In total, I have testified as an expert or handled litigation in approximately

20  twenty states. I regularly review published rate surveys, generally broken down by location,

21  fields of practice, size of firm, and status of lawyer. I have also been for the past several years

22  consulting and lecturing nationwide through the auspices of the National Association of Legal

23  Fee Analysis ("NALFA"). In addition to lecturing myself, I have attended numerous lectures of

24  legal fee analysts, expert witnesses, and general counsel on fee matters. I have had the honor of

25  being named by NALFA the "nation's top attorney fee expert" since 2017.

26      19.    I have tried in forty-eight years of my career over seventy cases, divided roughly

27  equally between state and federal courts. Perhaps a dozen of these lasted a month or longer; one

28  in Alameda County extended over four months; a case in District Court in San Francisco lasted

1  over three months; and a case in which I second-chaired as a junior lawyer in Marin County

2  took approximately two months.  I have tried numerous cases, perhaps the bulk of them, taking

3  seven to twenty court days.

4      20.    I as well have prepared hundreds of cases for trial that reached the expert witness

5  stage and were settled or motioned out prior to trial.

6      21.    My first case in which I questioned witnesses I prepared for my supervisor Mr.

7  Melvin Belli, an experienced trial lawyer.  The trial took place in San Francisco while I was

8  being sworn into the Bar forty-eight years ago.  I have been doing this work ever since.

9      22.    In addition to preparing for and trying cases in which I was the assigned trial

10  lawyer, I have also supervised lawyers preparing for and trying cases.

11      23.    In preparing tobacco cases for trial, I participated in mock trial exercises with

12  some of the nation's best trial lawyers.  As a young Assistant U.S. Attorney with offices the

13  floor below the courtroom in the San Francisco Federal Building, I took advantage of the

14  opportunity to observe some of the country's finest lawyers, as our office encouraged young

15  lawyers to observe key examinations and arguments.

16      24.    In the Tarkington firm, I trained a number of young trial lawyers, and part of my

17  job was being available to advise lawyers in their preparation both before and during trial.

18      25.    I know from my own experience both in my own trial preparation and in

19  advising others, that the most difficult tasks in a case of even modest complexity are honing

20  discovery requests, then culling lay documents, and focusing the ultimate presentation.  I have

21  empathy for the anxiety of a young lawyer who must do this on his or her own in a complex

22  case.  The natural tendency is to leave no stone unturned.

23      26.    I believe that I can be helpful to the Court in analyzing the instant fee request,

24  but offer opinions here with the realization that the Court has not only managed many trials

25  while on the bench, but also has significant experience in private practice.  Moreover, the Court

26  has spent months with this case and the issues here involved.

27

28

DECLARATION OF JOHN D. O'CONNOR          5

27.    So while offering my analysis here, I do so with the realization that I will likely not be telling the Court anything the Court does not already know.  It is my hope that my analysis will help the Court determine the reasonableness of the fees here sought.

28.    As a result of the foregoing education and experience, I believe that I am qualified to render an opinion on the fees requested by Plaintiffs in this case.

## II.    ANALYSIS & OPINION

29.    I have reviewed the following documents: all of the submissions before this Court regarding the issue of attorneys fees; the Second Amended Complaint; Plaintiffs' Combined Motion to Compel Further Responses to Plaintiffs' Second Set of Special Interrogatories and Second Set of Requests for Production of Documents against Defendants The Coca-Cola Company and Nexstep Beverages and Request for Monetary Sanctions filed on December 28, 2018; Defendants' Motion for Summary Judgment, Plaintiffs' Opposition thereto, Defendants' Reply, the transcript of the February 15, 2019, proceedings, and the Court's Order; Plaintiffs' Motion for Evidentiary and/or Issue Sanctions Against Defendants and Request for Monetary Sanctions Against Defendants filed on April 26, 2019, and Plaintiffs' Reply; Plaintiffs' Combined Motion For Evidentiary And Or Issue Sanctions Against Defendants and Request For Monetary Sanctions Against Defendants filed on July 11, 2109, and Plaintiffs' Reply; Defendants' Motion for Summary Judgment, Plaintiffs' Opposition thereto, Defendants' Reply, and the Court's Order; the transcript from the November 18, 2019 proceedings regarding Plaintiffs' Motion to Bifurcate; Plaintiffs' Trail Brief and Defendant's Trial Brief; Plaintiffs' 18 motions in limine and defendants' oppositions thereto; Defendant's 13 motions in limine and Plaintiffs' oppositions thereto; Plaintiff's Closing Brief and Defendants' Closing Brief; Judge Taylor's Statement of Decision following Bench Trial on Phase One; and Defendants' Motion for Judgment not withstanding the Verdict/Motion for New Trial, Plaintiffs' Opposition thereto, and Defendants' Reply; charts summarizing attorneys attending, examining and defending witnesses at deposition and trial; JGT discovery plan and calendar of April 3, 2019; deposition excerpts of witness David J. Franklyn.

30.     Petitioning counsel should be complimented for winning this case. But victory, while giving counsel the right to fees, does not necessarily validate as reasonable all the fees that have been charged.

31.     There are several major failings I have observed in the litigation management, staffing and billing practices employed by petitioning counsel in this case, which in my opinion require downward adjustment of the fees requested to reflect compensation for only time reasonably billed.

### Johnson & Johnson Excessive Billing

32.     My most serious objection to the fees here sought is to the substantial overlitigation I observed in this case, where no stone was left unturned, examined and polished, whether necessary or not.

33.     Although the name partners of Johnson & Johnson appeared to be quite capable, the responsibility for this litigation on the Plaintiff's side fell between these two stools.

34.     Mr. Douglas Johnson was moderately involved as a supervisor through March 2019, at which point, by his own admission, management of the litigation was then turned over to Ms. Thigpen.

35.     Mr. Douglas Johnson came back into the litigation to provide meaningful deposition work in the summer of 2019, but does not appear from his invoices to have been involved in the written discovery clashes, nor was he involved in the litigation management. Mr. Neville Johnson did not appear substantially in this case until trial, having taken one deposition prior to late October 2019. So the great brunt of the litigation effort was left to Ms. Thigpen and Ms. Gonzales, each of them having been assigned responsibility at a level or two higher than their previous experience would suggest. I am sympathetic to their positions, having to consistently make judgments as to what and how to pursue discovery to be used in a trial as to which they had no prior experience.

36.     Without either of them having had significant trial experience, it would be unrealistic to expect either of them to make wise judgments about where to cease discovery efforts and leave well enough alone in any one particular area of interest.

DECLARATION OF JOHN D. O'CONNOR                                    7

37.     There is in litigation, in my experience, an "80/20 rule," that is, that 80% of benefit can be gained from 20% of the effort, while the next 20% of benefit can be gained with 80% of the effort.  Where on that continuum to stop is a matter of wisdom and experience.  Therefore, it is unfair to Ms. Thigpen and Ms. Gonzales to leave those decisions in their hands, especially with the realization that only when a client is paying a bill regularly does a lawyer get criticized for excessive work.

38.     This is especially true in document discovery.  Just because the lawyer can obtain a disputed category of documents, or admissions or interrogatory responses verifying their meaning, does not mean that all efforts should be employed until complete success is gained.

39.     I do not get the sense that Ms. Thigpen and Ms. Gonzales intentionally overlitigated this case, but simply believe that they did not focus on what was truly needed in their discovery.

40.     By making these statements I do not attempt to justify any position taken by the defense in discovery.  But every battle that one *can* win against the defense should not necessarily be fought, or fought in the extreme, paper-intensive way it was in fact fought.  Even as to battles properly joined, I saw little efforts at concision or brevity.  After reviewing the invoices, I became curious as to the advisability of a motion for issue and evidentiary sanctions heard on April 26, 2019.  This is the first of several motions directed toward the same end.

41.     I have reviewed these motion papers, for which Plaintiffs' counsel, in addition to seeking evidentiary and/or issue sanctions, also sought approximately $172,000 in fees for pursuing the motion.  I consider this motion an example of both overkill in the execution of a task, that is, excessive and unnecessary work, and as well an unnecessary and unreasonable task selection, in that this motion need not have been made.

42.     What is helpful about this particular motion is that it not only foreshadows subsequent motions, but also recapitulates past discovery battles.

43.     My main criticism is not that Plaintiffs lost this motion, but that so much effort not only in this motion, but also previously, had been invested in so little potential return.  One

DECLARATION OF JOHN D. O'CONNOR                                    8

1   of the areas at issue in this motion was whether or not the defense had sufficiently and timely

2   named every customer worldwide who had purchased Hubert's Lemonade during a specified

3   time period.

4        44.    Prior to the motion, the defense had provided, after initial objection, documents

5   showing all the customers worldwide. Plaintiffs found some aspect of this wanting and sought

6   sanctions. I question why the names of every customer worldwide who bought Hubert's

7   Lemonade would have any impact on this litigation. Another question that seems to have been

8   the subject of continued motion was the request for the Defendants to describe in detail the

9   process by which they determined that they would increase sales of the lemonade. Again,

10  Plaintiffs were dissatisfied with whatever answers they had received before. This was an

11  extremely vague question, but in any case, I do not see why the Plaintiffs would expect an

12  answer here that would meaningfully advance their case. To the extent which they sought to

13  show that Hubert's story was intended to be play some meaningful role in increasing sales, it

14  would appear that area would be one that should be explored on deposition, as opposed to a

15  vague and general interrogatory. But these interrogatories were the subject of this motion for

16  sanctions. Of what importance would an evidentiary sanction be, other than to allay the anxiety

17  and worrying about a trick from the defense?

18       45.    A good case study of the tendency for both Ms. Thigpen and Ms. Gonzales to

19  excessively prepare is found in this very motion for attorneys fees. Plaintiffs' are asking the

20  Defendants to pay it for 432.6 hours in its assistance of Mr. Richard Pearl in preparing this

21  motion, for a total of $218,215. In several hundred cases in which I have reviewed fee petitions,

22  I have never seen an expenditure of hours this great. And these do not include Mr. Pearl's

23  hours.

24       46.    Ms. Gonzales spent 171.2 hours in helping to prepare for this motion, and Ms.

25  Thigpen 152.6 hours. This is merely one case in point as to the penchant of each for

26  overlitigation of a motion.

27       47.    Out of the 17,000 hours for which counsel here seeks compensation,

28  approximately 9,800 were hours of Ms. Gonzales and Ms. Thigpen. 2,789 hours were those of

DECLARATION OF JOHN D. O'CONNOR                   9

1  Mr. Hamideh, who I believe was of only limited assistance in this case.  The crux of the

2  excessive billing in this case is in my opinion the hours of these three lawyers. I do not opine as

3  to the excessiveness of any other lawyer or paralegal on the case whose fees are sought to be

4  reimbursed.  Even though I have modest criticism, the 5% across the board cut is close enough

5  to cover sound objections.

6       48.     In my opinion, a large portion of those approximate 12,500 hours are excessively

7  or unnecessarily billed, with a different analysis for Mr. Hamideh versus the analysis for Ms.

8  Thigpen and Ms. Gonzales.

9            **Excessive Hours Billed by Mr. Hamideh**

10       49.     Mr. Hamideh apparently was the referring lawyer on this case, and could, as

11  often happens, billed hours that were of only marginal value at best, while claiming some vague

12  designated area of work, in this case finding experts and assisting in the preparation of them.

13       50.     Mr. Hamideh's value to the case was minimal.  At trial he examined two

14  witnesses, both brief in duration, the only one of substance being Dr. Vanessa Patrick, whose

15  examination took 46 pages of transcript.

16       51.     This examination of Dr. Patrick was not skilled, and Mr. Hamideh had difficulty

17  formulating questions that directed the witness to the proper area without posing an awkward

18  and ineffective leading question.  As the Court well knows, for some witnesses, effective

19  leading is helpful, whereas with one's own expert, leading tends to make the witness less

20  effective, because essentially the lawyer is testifying and not the expert.

21       52.     Prior to the trial, his contributions were minimal.  He was responsible for two

22  witnesses on deposition, and for the only important one, Dr. Jonathan Faber, he came close to

23  having him excluded.  Mr. Hamideh mentions reviewing 200,000 documents, which, if true,

24  added little in value to the case, since he did not use that review to impart value.  No

25  sophisticated purchaser of legal services would agree to hire Mr. Hamideh for these 2,789 hours

26  at his requested rate.

27       53.     His main activities appear to be sitting in on depositions, traveling to the

28  depositions, sitting in on conferences, sitting through two trials, reviewing emails, work

DECLARATION OF JOHN D. O'CONNOR                           10

1  product, and, of course, documents. It appears Mr. Hamideh often served as a driving service,

2  whereby he picked up Johnson attorneys, drove them to events where he did not participate, and

3  then drove the Johnson attorneys back, sometimes dropping each attorney off at their individual

4  houses—all the while billing for the entire time.

5      54.    Mr. Hamideh's time was billed with a sufficiently heavy pen, and it does not

6  appear he stinted on the hours he requests in this motion.

7      55.    It is my opinion that his hours were excessive and unreasonable, not because he

8  did not spend the time, but because he functioned often as a fifth wheel.

9      56.    This case appeared to put little or no burden upon the overhead of Mr.

10  Hamideh's business.  A review of the chart attached hereto as **Exhibit 8** shows that Mr.

11  Hamideh "prepared for," sat in on and traveled to a large number of depositions. For the two

12  depositions he defended, only one of which had meaning, he spent considerable time in

13  preparation, attendance and transcript review a total of 57.50 hours.  See **Exhibit 9** showing Mr.

14  Hamideh's entries and time relating to Mr. Faber and Ms. Krikorian.  What is egregiously

15  wasteful, though, is his expenditure of 534.10 hours on deposition related activities such as

16  preparing, attending, travel, and transcript review not involving these witnesses, usually with no

17  deponent even named in his time estimates.  He also sat through trial and was present during

18  trial preparation but contributed only slightly at trial, as noted.  In any case, I saw little

19  significant contribution made by Mr. Hamideh to the success of this litigation.

20              **Excessive Hours Billed by Ms. Thigpen and Ms. Gonzales**

21      57.    I do give due credit to Ms. Thigpen and Ms. Gonzales for their efforts in the

22  case.  In my opinion each lawyer was hard-working and dedicated sincerely and earnestly to the

23  litigation.  That said, their hours are staggeringly high, in amounts rarely, if ever, seen.

24      58.    In reviewing Plaintiffs' counsel's invoices, I analyzed the number of hours billed

25  each month by timekeepers and have prepared a chart demonstrating the same attached hereto

26  as **Exhibit 10.**  In a fifteen-month period, beginning December 2018 and extending through

27  trial, Ms. Gonzales billed 4,259.3 hours, an average of approximately 284 hours per month.

28

DECLARATION OF JOHN D. O'CONNOR                                          11

1    During an eleven-month period from April 2019 through trial, Ms. Thigpen billed 4,134 hours,
2    an average of approximately 376 hours per month (more than double a normal month).

3        59.    In each case, each lawyer had a number of months in which more than 300 hours
4    were billed. Ms. Thigpen has numerous months with over 400 hours billed, while Ms. Gonzalez
5    has one month over 400 hours and one with 393 hours, while consistently exceeding 300 hours
6    per month.

7        60.    I take issue with a) the accuracy, form and billing judgment of their timekeeping;
8    b) the type of work for which they seek lawyer-level compensation; c) the reasonable necessity
9    of the tasks selected; and d) the efficiency of their execution of the tasks selected.

10        61.    One area of concern is the form of the billings presented to the Court. I first note
11    that there are an incredibly high number of redactions which do not appear to me to be for a
12    proper purpose. See **Exhibit 11**, showing a total of 2,626 redactions. Attorney-client
13    discussions, highly confidential/trade secret matters and perhaps meaningful strategic items
14    could arguably be redacted. But this does not appear to be the case for most of the redactions
15    made, with the resulting invoices looking more like a document prepared by the CIA for release
16    to the public than billing entries for which counsel seeks payment.

17        62.    It is my well-founded suspicion that many of these redactions are meant to hide
18    clerical and administrative time, which is not billable at all, paralegal time, which should be
19    billed at a lower rate, or simply embarrassing wheel-spinning. As the attached chart (**Exhibit
20    12**) shows, there were a few occasions where redactions were neglected which show clerical or
21    paralegal tasks being billed at attorney rates, in entries similar to those that have redactions,
22    causing me to believe that there are many hidden entries showing clerical and paralegal time.
23    There were also instances in which the entire description was redacted, preventing any kind of
24    review or analysis of task at hand.

25        63.    In this case, a competent paralegal did not get involved until the matter was
26    proceeding to trial, and up to that point Ms. Gonzales and Ms. Thigpen, through no fault of their
27    own, were left without paralegal help, and also, I infer, clerical and administrative help.
28    Copying, stapling and ministerial document review all fell to these two lawyers. I further note

DECLARATION OF JOHN D. O'CONNOR            12

that, according to Plaintiffs' exhibits shows hours by billing category, a paralegal only billed 10 hours toward trial preparation. See **Exhibit 13** aggregating Plaintiffs' exhibits showing hours divided among the thirteen categorizes of work

64. While I am sympathetic to these two young lawyers, and feel they were put in a terrible position, the firm should not profit from this forced clerical labor. It is my opinion that the defense should be able to take advantage of presumption or at least an inference that the excessive redactions are concealing that which would be harmful to Plaintiffs on this motion, just as one can make that inference regarding any witness who hides information.

65. While probably a certain amount of time is unbillable clerical time, I will assume that all non-legal time should be billed at paralegal rates, as opposed to not being billable at all as clerical or administrative work. It is my opinion, based upon my experience in the tasks necessary to prepare and file the great amount of paper in this case, that 33% of Ms. Gonzales's time can be classified as paralegal. This is not a knock on Ms. Gonzales, but if she is spending nights copying, stapling and collating, her firm should not be able to collect for those services at her legal rate, and instead should collect for them at the paralegal rate. Approximately 20% of Ms. Thigpen's time can be classified as paralegal.

66. I note that in some entries not redacted Ms. Gonzales appears to obsessively consult the Register of Actions, retrieving documents, updating the file, handling the calendaring, and preparing what appear to be ministerial timelines, summaries of documents, and exhibits, and otherwise performing paralegal tasks under those descriptions.

67. For this estimated paralegal time, the easiest and most convenient way to account for it would simply be to adjust the hours billed as lawyer time. Since standard paralegal rates are roughly 1/3 of legal rates, and the commonly prevailing paralegal rate, other than for senior and experienced paralegals, is around $150 to $160 per hour (I bill an experienced paralegal at $135), it will be my methodology, that for every three hours of estimated paralegal time, two of those should be excised from the lodestar for purposes of compensation. In other words, if 9 hours of time was spent on paralegal tasks, the compensation should be 3 hours at attorney rates.

68.     In short, there is no doubt but that Ms. Thigpen and Ms. Gonzales have billed a substantial number of hours for tasks which are paralegal (or non-billable clerical) in nature, and the only question is what that amount is, an exact account for which is made impossible by the rampant redactions.

### Lack of Billing Judgment by Ms. Thigpen and Ms. Gonzales

69.     The next observation I make about the stunning amounts of time logged by Ms. Thigpen and Ms. Gonzales is that such recordation shows a lack of billing judgment or, perhaps more appropriately, a lack of periodic scrutiny by a paying client, which enforces reasonableness and discipline.

70.     Every litigator, and I am one, has had long, exhausting days.  But continual 15 and 16 hour days over an extended period also suggest that personal time – such as driving to the office, eating, drinking coffee, going to the restroom – is not being accounted for and time is being billed door-to-door, so to speak.

71.     In addition to this, I note that both Ms. Thigpen and Ms. Gonzales engage in block billing.  I do not reflexively challenge block billing, defined as more than one task description in a single time entry, which can amount to a wealth of description.  I criticize the billing form here not so much because it is blocked. I note that there are attempts to attribute time to each separate task description, but also observe that the time is universally vague, which is the more proper objection to block billing.  That is, as employed by some lawyers, this billing form with a number of vague entries makes it very difficult to discern what activities are being performed and for what purpose.

72.     When a paying client, especially a sophisticated client like a risk manager or a general counsel, is regularly scrutinizing the bills and has a general idea as to the nature and purposes of the tasks undertaken, this block/vague billing is less of a concern.  But in this case, lawyers in the Johnson & Johnson firm knew from the outset that this was a contingent case and that the time they billed would not be scrutinized regularly throughout the litigation, but yet would be sought to be paid at the conclusion of the litigation.  In other words, the lawyers knew that the only check for reasonableness would be made years after the entry made, which, if that

DECLARATION OF JOHN D. O'CONNOR                                    14

1  entry is opaque, would be impossible to analyze meaningfully as to reasonableness. The harm

2  for such vagueness should not be borne by the defense. Here his vagueness is exacerbated by

3  rampant redactions.

4      73.    Put more simply, the Johnson & Johnson lawyers knew that their bills would be

5  scrutinized and had a duty to bill with more clarity than they did. Especially as to the time of

6  Ms. Gonzales and Ms. Thigpen, this deficiency is glaring.

7                    **Billing Inefficiency and Unreasonable Task Selection**

8      74.    My major concern, however, goes far beyond billing form. The major defect in

9  the billings sought to be compensated is inefficiency. To borrow the phraseology of the Court, I

10  agree wholeheartedly that not every rock needed to be turned over, and in every area of

11  litigation there is a sensible stopping point. However, throughout this litigation, counsel had no

12  apparent sense of such a stopping point either as to the priorities of tasks selected or as to the

13  amount of briefing preparation and research needed to support a properly selected task. So

14  there are two aspects to this excessive time.

15      75.    There is unreasonable task selection, for example, making a motion that was not

16  substantially necessary. The second aspect is inefficiency in making a properly conceived

17  motion or litigation initiative, but doing so excessively.

18      76.    I have looked for examples in the billings which would make this point well,

19  while also showing that the inefficiency is not isolated or episodic, but rather pervasive.

20      77.    Probably the best example I can show the Court is the discovery motion for

21  evidentiary and issue sanctions made by Plaintiffs against Defendants, ruled on April 26, 2019,

22  which motion was denied. I have discussed this same motion above.

23      78.    What is instructive and demonstrative about this motion is that it summarizes

24  past discovery disputes as a foundation for seeking sanctions, so that the Court can see the types

25  of things that involved such constant quarreling. I understand that Plaintiffs were so litigious on

26  minor discovery issues that they placed on the discovery calendar sanctions motions before

27  receiving responses. Terminating or strong issue sanctions was always, it seems, a foolhardy

28

DECLARATION OF JOHN D. O'CONNOR                                                    15

1  and expensive goal. I have reviewed Ms. Thigpen's discovery calendar of April 3, 2019,

2  scheduling sanctions motions before depositions had commenced.

3      79.    This motion was entirely unnecessary, as a history of the dispute will attest,

4  since by the time of the motion for sanctions, Plaintiffs had gotten just about everything it

5  would wish regarding these particular areas, if not the desired degree of perfection in responses.

6      80.    This motion for sanctions, by the Plaintiffs' counsel's own accounting, cost

7  approximately $172,000 just for this one motion.  It was later followed up by two more

8  expensive motions of the same ilk, one of which won evidentiary sanctions, which in my view

9  were as meaningless as getting the proverbial ice in the wintertime.

10     81.    I have explained above that the Plaintiffs sought worldwide production of

11  customer names, and as well answers to questions about processes to increase sales.

12     82.    There were also battles over whether or not the appropriate labels and their

13  printing dates had been identified, in spite of seemingly decent, if imperfect, production of

14  documents indicating when various labels were ordered to be printed.  Let me jump ahead.

15  Eventually in a subsequent motion, Plaintiffs "won" the evidentiary sanction that identified the

16  labels at issue and the dates they were used.  To me this appears to be a very vanilla evidentiary

17  sanction, and one that I would think would not limit the legitimate plans of the defense in any

18  case.  Even worse, it is my understanding that Plaintiffs' expert witness who would have used

19  the list of labels and corresponding use dates (David Franklyn), never used the information at all

20  and does not recall if Plaintiffs' counsel ever even gave it to him.  I have reviewed relevant

21  portions of the Franklyn deposition.

22     83.    In my opinion, this whole matter could have been handled with a very simple,

23  brief Motion in Limine before trial, seeking that the defense be prohibited from relying on

24  labels that had not been produced (which is what the court ultimately ruled in denying the

25  motion for terminating sanctions).  There may be more nuance to this issue than I am giving it,

26  but the point is that a great deal of expense, time and effort went into this expensive kerfuffle.

27     84.    Included, of course, was an extensive Memorandum, multiple exhaustive

28  Declarations, and other lodgements in support of the motion, again, consuming over $172,000

DECLARATION OF JOHN D. O'CONNOR                                          16

1  in time. I concentrate on this motion, because it characterizes the approach these young lawyers

2  took in this litigation.

3      85.    Another case in point is the billing for the work of the Johnson firm on this fee

4  motion. The firm has logged for the instant motion approximately 432 hours, for total requested

5  fees of approximately $218,000, just to prepare for this motion, an amount which does not

6  include any billings of Mr. Pearl. Ms. Gonzales, in typical overkill, billed 171 hours, and Ms.

7  Thigpen billed 152 hours. Ms. Gonzales spent considerable time making redactions, which, I

8  noted above, were counterproductive, and made the billings more opaque. She also billed a

9  considerable time drafting a "case calendar," which provided little additional benefit given the

10 number of hours expended. She also spent time categorizing the various activities in a way that

11 had very little meaning to anyone who would want to analyze the reasonableness of the fees. If

12 anything, the thirteen categories that she selected did more to obscure than reveal.

13     86.    For example, she has placed in one category "pleadings and motions," which

14 presumably encompass mostly discovery motions. Then she has a separate category called

15 "discovery." There is also a considerable amount of time billed to "case management," which

16 near as I can tell likely involved aspects of discovery. These categories that I have just

17 mentioned add up to about 8,500 hours, but it is still and yet difficult to tell what constituent

18 activities were. We are not told how many hours were spent actually in deposition, or how

19 many hours were spent preparing for deposition. We are not told how many hours were spent

20 reviewing documents, or how many hours were spent in intraoffice conferencing and emails.

21 All of these categories would have been helpful in assessing the reasonableness of the fees

22 sought.

23     87.    But the broader point is that this is an example of excessive and

24 counterproductive litigiousness of both Ms. Gonzales and Ms. Thigpen, for whom there is no

25 wise stopping point.

26              **Excessively Long Billing Days**

27     88.    I attached as **Exhibit 14** a chart showing a number of long billing days as broken

28 down by length of days. The number billing days over 15 hours per day is absurdly high, with

DECLARATION OF JOHN D. O'CONNOR                                              17

Ms. Thigpen and Ms. Gonzales combining for 189 days. This has several implications. One of these is that Ms. Thigpen and Ms. Gonzales are extremely dedicated lawyers. On the other hand, I am revulsed, not at them but at the firm, because these long days were not temporary, but were allowed to continue over a year's period without the firm investing in help for these two lawyers. They were forced to punch above their weight, with disastrous results for the economy of this case.

89.     However, from the point of view of firm profitability, there is no downside to allowing Ms. Thigpen and Ms. Gonzales to work their excessive hours with a sense of siege and litigious paranoia. There is no additional cost, presumably, for these two dedicated lawyers to work long hours, but there is potentially great reward for the firm in the event that there is a positive result. Indeed, a positive result might be marginally more likely if lawyers were allowed to work until midnight seven days a week.

90.     I did not see the defense as pursuing "scorched earth" tactics so much as not showing ready, objection-less compliance with discovery demands, therefore resulting in Plaintiffs' counsel's efforts to alleviate their anxiety and all uncertainty.

### Alternate Analysis by Category of Activity

91.     As noted above, the thirteen categories of activity listed by Plaintiffs' counsel in this motion did more to obscure than to enlighten and these categories did not help us assess the reasonableness of the billed time.

92.     In addition, the billing form and descriptions are far below standard, such that it is difficult to discriminate with moderate clarity what task was performed and to what end the activity was directed.

93.     So I have attempted to analyze the time of Plaintiffs' counsel using other modes of analysis, by searching for key words and task descriptions. These searches revealed a large amount of inefficiency and wheel-spinning, likely as a result of two very hard working, determined lawyers who had never tried case. If I put myself in their shoes, I understand the anxieties and uncertainties that these two lawyers encountered. Because of block billing, vagueness and considerable redaction, the charts will sometimes sweep in activities other than

DECLARATION OF JOHN D. O'CONNOR                                                    18

1  the activity analyzed and should not be viewed as a qualification of the showing of

2  unreasonableness.

3       94.    In these analyses, which I will now describe, one can derive a sense of the types

4  of activities performed, with precise or even approximate quantification impossible. For

5  instance, if I wish to quantify "research" time, clear and well-recorded time makes approximate

6  quantification an easy task, and I have done it in many cases I have reviewed. But if "research"

7  is also combined with "review" or "drafting" of documents, such quantification is elusive. So

8  when I offer my analysis of activities, I do so with this caveat noted, and offer this analysis to

9  give the Court some idea of what these lawyers were doing as they recorded staggering high

10  hours.

11       95.    I have prepared a chart demonstrating those entries involving only research,

12  those entries involving only review, and those entries involving both research and review

13  related activities attached hereto as **Exhibit 15**. While instances of block billing preclude a

14  precise calculation of research time, Plaintiffs' counsel expended up to 1,072.8 hours for

15  $477,342.50 in fees on research-included activities, 3,592.60 hours for $1,766,735 in fees on

16  review-related activities, and 1,857.3 hours for $895,217.50 in fees on activities involving both

17  research and review. In total, Plaintiffs' counsel expended up to 6,522.7 hours for $3,139,295

18  in fees for research and review activities.

19       96.    Of note is that Mr. Hamideh spent 1,073 hours for $596,190 in fees researching

20  and review, yet he contributed little to the overall productivity in this case.

21       97.    When we combine Mr. Hamideh's "research and review" time with deposition

22  prep time, previously detailed, the charges of over $900,000 are staggering for activities of so

23  little consequence. This is for a lawyer that did very little in deposition, very little in trial, and

24  very little in motion work. With his deposition work that does not involve two witnesses he

25  defended, Mr. Hamideh totals about 1,600 hours in relatively useless work.

26       98.    Much of his remaining work was trial attendance, where, as we noted, he did

27  little, examining one significant witness in a brief examination.

28       99.    So these charts show much billing, but little useful work.

DECLARATION OF JOHN D. O'CONNOR                         19

100. How much is it worth to defend one witness, Dr. Faber, on deposition, who is so experienced he needed little preparation or defending, one English-as-a-second language, unknowing witness, Ms. Krikorian, and an awkwardly leading, a very capable witness, Dr. Patrick, through direct examination? Mr. Hamideh is seeking approximately $1.4 million for services which amount to nothing of value.

101. This "research and review" chart shows approximately 4,000 hours for $1.9 million dollars just for Ms. Thigpen and Ms. Gonzales, for activities related to these tasks, again, not a quantification of solely research and review.

102. So what this chart demonstrates is not only wasted time by Mr. Hamideh, who in my opinion is simply hanging around, but also unusually frantic and obsessive review of documents by Ms. Thigpen and Ms. Gonzales who are attempting to transmogrify their uncertainty as to Defendants' responses into Court Orders alleviating their litigation anxieties.

103. As the Court noted, they call it litigation, not kissing. It comes with the territory that there is uncertainty. But these lawyers were trying to collapse the inevitable tension of litigation by attempting to attain Court Orders that wisdom dictates were unobtainable, or if obtained, essentially worthless. Courts are not in the business of easily depriving any party of its day in Court.

104. I have also attached the deposition activities chart as **Exhibit 8**. This chart shows a total of 3,269.80 hours for $1,683,851 for deposition-related activities. The two Johnsons logged 483.20 hours for approximately $347,000. These two experienced lawyers were the lead lawyers in 35 of the 66 depositions, most of them important.

105. Most of the remaining deponents, as Plaintiffs so vociferously claim here, were relatively unimportant depositions of beneficiaries and minor figures such as label manufacturers and similarly unimportant witnesses.

106. Yet, the other lawyers, apart from the two Johnsons, mainly the triumvirate of the busy Ms. Thigpen and Ms. Gonzales and the unhelpful Mr. Hamideh, comprise 2,373.3 hours for over $1.2 million for these remaining depositions.

---

DECLARATION OF JOHN D. O'CONNOR                                                20

107.    This chart tells us a story, along with other charts: if the firm had more experienced lawyers on the case, this imbroglio could have been greatly moderated and streamlined.  To ascribe this inefficiency primarily to the claimed "scorched earth" tactics of the defense is not credible.

108.    The final elucidating chart to buttress my opinion is the chart categorizing the long billing days attached as **Exhibit 14**.

109.    There are several aspects to this chart that helps us read the tea leaves.  We know that Ms. Gonzales and Ms. Thigpen spent an inordinate number of long days reviewing documents and preparing for yet another round of discovery motions.  But there are other aspects to this chart that are instructive.

110.    First, we note that Mr. Hamideh has a very large number of +9 hour days.  The fact that he was allowed to bill over 9 hours so frequently, and indeed, more than 12 and 14 hours on many days, suggests that there is very little billing discipline within this litigation team.  The tasks actually performed by Mr. Hamideh were necessary could have been performed in less than 100 hours, yet he has billed 2,789 hours.

111.    But an odd metric is the number of days billed by Mr. Neville Johnson in excess of 9 hours and in excess of 12 hours.  Mr. Johnson had very little substantive duties in the trial of this case.  And his associates, Ms. Thigpen and Ms. Gonzales, and for that matter, Mr. Hamideh, had logged thousands and thousands of hours prior to Mr. Neville Johnson's appearance. What was it that required Mr. Neville Johnson to work 14-hour days?  The only explanation is that Mr. Johnson realized that Ms. Thigpen, Ms. Gonzales and Mr. Hamideh needed guidance. I do not in any way minimize Mr. Neville Johnson's contribution on that score.  But what this indicates is that he was dealing with a number of lawyers who were highly unsure of what they should be doing.  Indeed, I would be stunned if a person with no experience like Ms. Gonzales, and little experience like Ms. Thigpen, were ready to try this case by themselves competently.  They weren't.  The sad and disappointing part of this story is that these lawyers were not guided earlier and better by the senior partners of Johnson & Johnson.

1       112.   So, after the expenditure of well over 10,000 hours prior to trial by just these

2  three lawyers, that Mr. Neville Johnson felt the need to mentor them through trial speaks

3  volumes about the assignment of lawyers not quite ready for the advanced tasks assigned.  So

4  one question presented is how much the defendants should be forced to pay to train trial

5  lawyers.

6       113.   In conclusion, these charts simply show with some quantitative sense the

7  observations that I made qualitatively, to wit, that there was considerable inefficiency both in

8  task selection and task execution by the team assigned to this case.

9                       **Multiplier**

10      114.   As the Court noted in the seminal case of *Ketchum v. Moses*, reasonable

11  attorneys' fees should be adequate incentive here without a multiplier:

> "The factor of extraordinary skill, in particular, appears susceptible to improper double counting; for the most part, the difficulty of a legal question and the quality of representation are already encompassed in the lodestar… Thus, a trial court should award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation. Otherwise, the fee award will result in unfair double counting and be unreasonable. Nor should a fee enhancement be imposed for the purpose of punishing the losing party."

(*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1138-1139 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

115.   Indeed, the case law suggests that recovery of reasonable attorneys' fees, without

multiplier, should be incentive enough for most successful cases under a fee-shifting statute.

116.   I have reviewed the Johnson & Johnson website and see that the firm holds itself

out as highly experienced in right of publicity cases.  There has been no showing made as to

why a multiplier should be awarded for what the firm has done every day for years at billable

rates sought here, or, according to Neville Johnson's Declaration, at lower rates than he seeks

here (he charges some paying clients as low as $750 per hour).

117.   Even though I have criticized Plaintiffs' counsel for being inefficient and

overlitigating this case, I hasten to add that counsel did a fine job of achieving a substantial

verdict for the Plaintiffs.  It has not been disclosed whether Plaintiffs' counsel will also receive

1    some percentage of the award as a contingent fee, in addition to fees awarded here.  I do know

2    that such an arrangement is frequently made with clients in contingent cases with fee-shifting

3    statutes, and such may well provide additional rewards above and beyond the fees awarded

4    here.

5        118.    The Plaintiffs' case had initial review, analysis and preparation by prior counsel,

6    and as well a review by Mr. Hamideh, and then the Johnsons.  So going into the litigation, the

7    Johnson firm, as skilled practitioners in this area, knew that their case had certain strengths that

8    augured success.

9        119.    They knew, for instance, that there was no explicit sale or assignment of

10   "publicity rights," and therefore knew that Defendants would be left to rely as a defense on

11   some form of implied assignment through their purchases of assets and intangibles.

12       120.    So, putting aside the amount awarded, which was substantial and not a foregone

13   conclusion, Plaintiffs had a very good chance of getting to the jury.  Given that the Defendants

14   were large corporations and the Plaintiffs were members of the Hubert Hansen family, counsel

15   knew that the optics would be appealing.  It would be my assessment that the amount of

16   damages would be a big issue, and there was no certainty going into this case that the firm

17   would achieve a substantial award.  However, by the same token, the firm knew also that there

18   was a very good chance of getting some award, however modest, and that such award would

19   give the firm the right to fees.

20       121.    There is some risk in every case that is taken under a fee-shifting statute, but not

21   all cases deserve multipliers.  In most fee-shifting cases, the difficulties of the case are

22   accentuated on the motion for fees, and the claimedly excessive defense tactics are invariably

23   emphasized.

24       122.    It is not at all clear that this award effectuates any public policy objectives.  It is

25   difficult to say that this award will have any far-reaching effect or vindicate some important

26   public policy.

27       123.    In assessing whether or not this case prevented the Johnson & Johnson firm from

28   taking on other litigation, it does appear that this case should have had little effect, because the

DECLARATION OF JOHN D. O'CONNOR                                                    23

"rainmakers," that is, Mr. Douglas Johnson and Mr. Neville Johnson, only participated heavily at certain defined junctures. Indeed, the failure of continued tight supervision is one of the reasons, in my opinion, that the case got out of control in unnecessary litigation.

124.    Mr. Douglas Johnson, Ms. Thigpen and Ms. Gonzales all admitted in their Declarations that Mr. Douglas Johnson supervised the case only through March 2019. To be sure, he was involved that summer in depositions, but from looking at the invoices, he does not appear to have been involved in the blizzard of written discovery work that was transpiring. As noted, Mr. Neville Johnson was not involved until trial.

125.    Had Ms. Thigpen and Ms. Gonzales not spent dramatically unnecessary and excessive amounts of time on this case, they could have had significant time to work on other cases. In my experience, it is rather rare for an attorney to work on only one case for nearly a year, especially one involving a single plaintiff and two causes of action.

126.    That said, the apparent availability of the two Johnsons during the one year of litigation would be more critical to the firm regarding intake of new matters, than would the availability of Ms. Gonzales or Ms. Thigpen.

127.    In short, it is difficult to say that the Johnson & Johnson firm would have turned down any lucrative case that came in the door in 2019. Prior to 2019, there definitely was no preclusion of other work. Each of the Johnsons was involved heavily in this case only for several months each, and they will be rewarded quite handsomely for taking on this case.

128.    The factors involved in the Court's decision regarding multiplier were put forth in *Ketchum v. Moses*:

> Under Serrano III, the lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein,
>
> (1) the novelty and difficulty of the questions involved,
> (2) the skill displayed in presenting them,
> (3) the extent to which the nature of the litigation precluded other employment by the attorneys,
> (4) the contingent nature of the fee award. (Serrano III, supra, 20 Cal. 3d at p. 49.)
>
> (Ketchum v. Moses (2001) 24 Cal.4th 1122, 1132 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

129.    Whether the case here was novel or difficult can be answered by Plaintiffs' counsel's attestations and advertising that they handle these types of cases all the time.

130.    Was there extraordinary skill shown? I compliment Ms. Thigpen for getting through this trial successfully, but there was no unusual skill shown from the documents I reviewed. If anything, the trial presentation dragged to some extent, it appears to me, from reading some colloquy with the Court and reviewing the examination by Ms. Thigpen of Mr. Owens.

131.    Ms. Thigpen had four years' experience with the Cotchett firm, mainly on a team pursuing a Ponzi scheme claim and had spent three years prior to this engagement with Johnson & Johnson. The rates she seeks here are higher than mine, and, by way of comparison, I have been a SuperLawyer for almost twenty years and have tried cases for forty-eight years. So her rate sought rewards her handsomely.

132.    Addressing the third *Ketchum* factor, preclusion of work, discussed partially above, in my opinion this case exploded into inefficiency precisely because the firm would *not* turn down work.

133.    Mr. Douglas Johnson admits in his Declaration, as confirmed by others in their Declarations, to turning over the case to Ms. Thigpen after March 2019, likely so that he could pursue other matters. After reappearing, valuably in my opinion, in the summer of 2019, he was not seen again in this case. Obviously, he was pursuing other work.

134.    An even clearer analysis is made for Mr. Neville Johnson. He was never deeply engaged in the case until late October 2019, right before trial. Certainly, this experienced rainmaker was otherwise engaged during the crucial year of 2019. Even during the four months of Mr. Neville Johnson's active trial participation, two of the months did not require his full attention, and Mr. Douglas Johnson was carrying the firm flag elsewhere during that time. If additional associate support was needed, that employment market is always robust in Southern California.

DECLARATION OF JOHN D. O'CONNOR                                              25

135. The only factor of the four militating in favor of a multiplier is the contingent nature of the fee award. If that factor alone were sufficient, then virtually every fee-shifting case would warrant a multiplier, but it does not, as explained by *Ketchum*.

136. Even as to the contingency factor, the case could have been lost, but, as noted, there was from the outset a decent chance of some amount of award, even if modest.

137. In my opinion, based on the foregoing, Plaintiffs' counsel has not put forth a compelling case for a multiplier.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of June, 2020 in San Francisco, California.

JOHN D. O'CONNOR