**Pages 1 - 164**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE         )
ANTITRUST LITIGATION,           )
                                )   **NO. 21-md-02981-JD**
_____  )
                                )
EPIC GAMES, INC.,               )
                                )
            Plaintiff,          )
                                )
   VS.                          )   **NO. 3:20-cv-05671-JD**
                                )
GOOGLE, LLC., et al.,           )
                                )
            Defendants.         )
_____  )


                        San Francisco, California
                        Thursday, January 22, 2026


                  **TRANSCRIPT OF PROCEEDINGS**
APPEARANCES:

For Plaintiff:
                        CRAVATH, SWAINE & MOORE LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   **BY:  GARY BORNSTEIN, ATTORNEY AT LAW
                        YONATAN EVEN, ATTORNEY AT LAW
                        LAUREN MOSKOWITZ, ATTORNEY AT LAW
                        MICHAEL ZAKEN, ATTORNEY AT LAW**


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)



Reported by:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              CSR No. 12219 Official United States Reporter

**APPEARANCES**:

For Defendants:

MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue - 50th Floor
Los Angeles, California 90071
BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**
**KURUVILLA J. OLASA, ATTORNEY AT LAW**
**LAUREN N. BECK, ATTORNEY AT LAW**

MORGAN, LEWIS & BOCKIUS LLP
One Market - Spear Street Tower
San Francisco, California 94105
BY:  **BRIAN C. ROCCA, ATTORNEY AT LAW**

# I N D E X

Thursday, January 22, 2026

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **BERNHEIM, BERT DOUGLAS** | | |
| (SWORN) | 5 | |
| Direct Examination by Mr. Even | 6 | |
| **SWEENEY, TIMOTHY** | | |
| (SWORN) | 64 | |
| Direct Examination by Mr. Bornstein | 64 | |

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **SAMAT, SAMEER** | | |
| (SWORN) | 96 | |
| Direct Examination by Mr. Pomerantz | 97 | |

| COURT WITNESSES | PAGE |
|---|---|
| **ROSE, NANCY** | |
| (SWORN) | 111 |
| Cross-Examination by Mr. Bornstein | 127 |

**Thursday - January 22, 2026**                    **11:02 a.m.**

P R O C E E D I N G S

--o0o--

THE COURTROOM DEPUTY:  All rise.  This court is now in session, the Honorable James Donato presiding.

THE COURT:  Together again.  Good morning.

ALL:  Good morning Your Honor.

THE COURTROOM DEPUTY:  Please be seated.

Calling Civil 25-671, Epic Games, Inc. versus Google LLC and Multi-district Litigation 21-2981, In Re: Google Play Store Antitrust Litigation.

Counsel.

MR. BORNSTEIN:  Good morning, Your Honor. Gary Bornstein for Epic Games.

At counsel table with me today are Lauren Moskowitz.

MS. MOSKOWITZ:  Good morning, Your Honor.

MR. BORNSTEIN:  Yonatan Even.

MR. EVEN:  Good morning, Your Honor.

MR. BORNSTEIN:  Michael Zaken.

MR. ZAKEN:  Good morning, Your Honor.

MR. BORNSTEIN:  Tina Seidman, and Michael Lyon, who is assisting us with the technical screens and things today.  And also in the courtroom is Professor Bernheim and Mr. Sweeney.

THE COURT:  Okay.  Thank you.

MR. POMERANTZ:  Good morning, Your Honor.  Glenn

Pomerantz on behalf of Google.  With me is Mr. Kuru Olasa, Ms. Lauren Beck, and Mr. Brian Loper.  And with me also in the courtroom is Mr. Sameer Samat, the head of Android, and Ms. Lara Kollios, an in-house lawyer for Google.

THE COURT:  Okay.  So today we are taking evidence and fact-finding with respect to the suggestion of changed circumstances that might warrant a revision of the injunction.

So who would you like to call first, Mr. Bornstein?

MR. BORNSTEIN:  We are going to call Professor Bernheim first, Your Honor.

THE COURT:  Okay.  That's fine.  And we'll talk at the end of the day -- remind me if I forget to ask -- about what we're going to do after this.

All right.  Come on up.

(Bert Douglas Bernheim steps forward to be sworn.) cobbing will you, please raise you're right hand.

**BERT DOUGLAS BERNHEIM**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Please be seated.  State your full name for the Court and spell your last name.

THE WITNESS:  My name is Bert --

THE COURTROOM DEPUTY:  Use the microphone.

THE COURT:  Is it on?

THE WITNESS:  I'm not sure.  Is it on?

THE COURT:  We'll check.

THE WITNESS:  Okay.

THE COURT:  What do you think, Lisa?

You can give him the binder while we're fiddling.

THE COURTROOM DEPUTY:  Speaks into it.

THE WITNESS:  Yes, now it's on for sure.

My name is Bert Douglas Bernheim.  The last name is spelled B as in boy, E-R-N as in Nancy, H-E-I-M as in Mary.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Thank you.  Okay.  Go ahead.

MR. EVEN:  Thank you, Your Honor.

### DIRECT EXAMINATION

BY MR. EVEN:

Q.   Good morning, Professor Bernheim.

What are you going to be testifying about today?

A.   I was asked to evaluate the proposed modified injunction combined with the settlement in comparison with the existing injunction from the perspective of evaluating their relevant relative merits in terms of promoting competition in Android app distribution and payment solutions.

Q.   And did you prepare a set of slides to assist you with your testimony today?

A.   Yes, I did.

MR. EVEN:  And those slides, Your Honor, are found

behind Tab 1, I believe, of the binder.

THE COURT:  Okay.  Are you using these as demonstratives?

MR. EVEN:  I am, Your Honor.

THE COURT:  Go ahead.  Do you want to put them up?

MR. EVEN:  I am as we speak.

THE COURT:  Okay.

MR. EVEN:  Does your monitor not work?

THE COURT:  Okay.  Go ahead.

MR. EVEN:  Thank you.

BY MR. EVEN:

Q.  Professor Bernheim, how did you go about evaluating the relative effectiveness of the two injunctions?

A.  Well, my analysis has two components.  The first is a direct evaluation, and what I mean by that is I examined the terms of each of the injunctions -- and by the way, when I use the phrase "modified injunction," that's just shorthand.  By that, I mean the proposed modified injunction combined with the settlement, which is a mouthful, so I'm just going to shorten it.

In any case, I looked at the terms of both of the alternatives in order to evaluate their likely effects on competition.  That's the first part, direct evaluation.

The second is an indirect evaluation, and the indirect evaluation focuses on the parties' incentives for entering into

the agreement.

And in particular, there I was more focused on Epic, the question being whether there's any indication that there has been side payment, sweetheart deal, other kinds of consideration that would constitute Google buying off Epic.

I also looked to some extent at Google's incentives because I wanted to know whether Google had a reason for entering the agreement besides lessening competition; is there an innocuous explanation for why they would do this.

Q.   So the FTC filed an amicus brief in this case last night suggesting that the Court should be suspicious of the proposed settlement, that it review all the relevant circumstances, that it should pay close attention to whether the modified injunction and settlement serve the public interest as opposed to the interest of Epic and Google.

What's your view of the FTC's position on that?

A.   Well, I generally agree.  I think I would use the word "healthy" -- the phrase "healthy skepticism" rather than "suspicion," and I certainly approach this myself with healthy skepticism.  In fact, I think the first question I asked was whether there was a payment from Google to Epic.

But beyond that, the FTC is basically saying that this is a difficult set of issues; it has to be evaluated carefully; it has to be weighed carefully, vetted thoroughly.  I completely agree with all of that.

**Q.** And do you feel that you've done that careful vetting?

**A.** Yes, I think I have.

**Q.** So at a high level --

**THE COURT:** I'm sorry. I'm just going to jump in. And this will happen the rest of the day.

So you said "payment," you're concerned about a payment that might have bought off Epic. I'm more interested in a larger -- what I might call a quid pro quo, which is business deals, side factors that may not involve cutting a check but may involve putting Epic and Epic alone, unlike any other developer or app provider, in a special relationship vis-a-vis Google.

Is that what you -- did you look at that?

**THE WITNESS:** That's exactly what I meant. I think that that's a better way to phrase it.

**THE COURT:** All right.

**THE WITNESS:** We're looking for some sort of quid pro quo that would be, I think, in this context problematic.

**THE COURT:** Okay. Go ahead.

**MR. EVEN:** Thank you.

BY MR. EVEN:

**Q.** At a high level, what is your opinion as to the relative effectiveness of the two injunctions at issue?

**A.** Well, first of all, I think the right way to think about this is that are pluses and minuses, and they're both

important.  There are some very important pluses; there are some very important minuses, and so a balancing has to be -- has to be made here, the comparison of these two.

And that's -- it's difficult.  It's complicated.  I think I've testified previously that extrapolating what's likely to happen under any given remedy or set of remedies is not an exact science.

However, all of that said, my preference is for the modified injunction on the grounds that I think that it has a better model for achieving sustainable competition, and I'll explain what I mean by that as we go along.

Q.   Okay.  So you mentioned that there are pluses; there are minuses.  Those have to be weighed.  Have you identified what are at least the major pluses and minuses that you thought you should focus your analysis on?

A.   Yes, I have.  And I have a demonstrative that I think will help with this.  At least this is where I want to begin in answering this question.

I think that this particular slide, I intend it as a useful resource because it summarizes the relevant provisions and shows how they're related to things that you're trying to accomplish here.

So just to give the layout of this, the first column is the issue area.  There are three main issue areas:  Barriers to installation on users' devices, mechanisms behind network

externalities, and issues involving billing.

And then the second column is describing the objective of the various remedies that Epic sought.

The third column is Epic's recommendations, what we recommended at the -- at the injunction hearing. Those are largely recommendations that represent my recommendations and for billing represent Steve Tadelis' recommendations.

The fourth column lists what the existing injunction did.

And the final column indicates what the modified injunction and settlement do that's different from what the existing injunction did.

And you can see that I've used color-coding here. Green indicates a plus. Red indicates a minus.

Now, this -- this figure is not completely comprehensive because there are some bells and whistles in the settlement agreement that I consider small pluses that were not included.

These are the things that I think it's important to focus on. And you can see that there's both red and green here. There are things that the modified injunction achieves that the existing injunction did not and vice versa.

Now, if we could -- this -- by the way, I have it as -- in my binder, I asked to have it as a separate sheet so I could look at it at any time. I find this really useful as a resource for just thinking about how everything fits together. And, you know, just going forward, I would hope that this,

Your Honor, would be a resource for you to use, because it's a good summary of what's going on without opinions about what's more important.  It just tries to summarize the issues.

So the next slide focuses on what I consider to be the major pluses and minuses.

So to start with the pluses, there are a series of key remedies that are either new or improved, and one -- two features of these that are important to keep in mind is that they are global as opposed to only being for the United States, and they are for a period of six years rather than for three years.

The first of them is the registered App Store program, the purpose of which is to offer a low-friction path for getting stores onto users' phones.

The second is a commitment from Google not to impose fees on competing app stores or on the apps they distribute, which is not explicitly mentioned in the existing injunction.

And the third concerns the steering and alternative payment solution.  And what's new here is that this becomes global, and in addition to that, there are capped fees.

So those are the pluses.  And then I've listed what I consider the main minuses.

The first of those is that it removes the catalog access remedy.  This is what I consider to be one of the jump-start provisions.  This is not something you would imagine would be a

permanent part of competition but is intended to help competitors get over the hump.

The second --

THE COURT: If I may, Doctor, you are underplaying your testimony to the jury and to me during the remedy hearing. You called catalog access the critical, quote/unquote, remedy to overcome the network effects and the entrenched problem of Google's dominance, and you very extensively testified at the remedies hearing about the utter need for that.

I will also remind you -- I'm sure you remember -- I questioned you about the need for the duration period, and you said it's such an important remedy you advocated for a period twice as long as the one that I ultimately entered, which I mention because it underscores how crystal clear and firm you were in telling me that catalog access was the sine qua non of overcoming the network effects problem.

So I'll just tell you now, and I hope you can address this: I was taken aback, for lack of a better phrase, by your retreat from that.

THE WITNESS: Okay. Your Honor, I did not intend in what I just said to be retreating from my previous testimony. The only thing that I was saying -- the only qualification that I had is that this was intended to get competition going, and I did testify that it's very important for getting competition going.

THE COURT:  You said critical.

THE WITNESS:  Critical.

THE COURT:  Yes.

THE WITNESS:  Okay.  And one of the things I was going to say at the end of the slide --

THE COURT:  Your word, not mine.  Critical.

THE WITNESS:  Well, I agree.  There are other things that I said were critical as well.  And this is why this is hard.  There are a bunch of provisions here that I think are great provisions, all of them.  Okay?  All of these things are things that I recommended.

If you look at the summary slide, you know, it has the column for Epic recommendations, which were my recommendations, and on each one of those lines, I said that these were extremely important.  And you'll see on one of the other ones I actually used the word "critical" as well.  And we're going to come back to that one.

So what we have here, the thing that makes this hard, is I love all these provisions.  Right?  I would love to have all of them.  But what's in front of me is two alternatives, one of which has certain provisions that I think are really great, critical in some respects, absolutely; and then one of them has other things that I think are also critical, and it's a trade-off between the two.

So I am absolutely not trying to downplay the importance

of any of these things.  What I'm saying is that there's a difficult trade-off.  And I'm going to run through the trade-off and explain why I think that, you know, given this as a binary choice, the proposed modified injunction is going to do a better job in the long run.  So that's --

THE COURT:  Okay.  That's fine.  Go ahead.

THE WITNESS:  Okay.

MR. EVEN:  Thank you.

BY MR. EVEN:

Q.   Let's finish off the other minuses if you may.

A.   Yeah.

So the first one was the catalog access remedy.

The second, also a jump-start provision, is the store distribution remedy.  This is the requirement that Google distribute the stores through the Google Play Store -- the competing app stores through the Google Play Store.  And just to be clear, I certainly said that that was very important as well.

And the final one of these is that the modified injunction allows Google to insist on side-by-side presentation of billing options.

Q.   And I'm -- we'll speak about it, obviously, more, but to address the Court's question just now, why is it that even though, as you said, you were giving up some remedies that you thought of as critical, gaining some others, why is it that on

balance you believe that the modified injunction is actually better, as you called it, in achieving a long-term solution here?

**A.** Well, we'll talk about this in a little bit, but what I'm very worried about under the existing injunction and have been worried about since the -- since the hearing is the question is: What happens after three years?

And after three years, I'm concerned that there isn't a model for sustainable competition and that the anticipation that there won't be sustainable competition after three years will undermine the incentives to act on these opportunities within the first three years.

That's basically where we're headed.

**THE COURT:** Why would not just coming to me in three years and asking to extend the terms for an additional three years not solve all those problems?

**THE WITNESS:** That -- if that's an option on the table, that's an interesting option.

**THE COURT:** Of course. I mean, you can ask. You can ask. I won't necessarily say yes.

But when I say "you," by the way, I'm obviously talking about Epic, not you personally.

But why wouldn't just asking me to extend the term by three years solve all those problems without rewriting this injunction?

THE WITNESS:  If we go down the direction of the existing injunction, preserving that, I do hope that that's what happens.  But there is an issue of uncertainty from the point of view of the developers who might be entering with app stores.  They won't have clarity about what the future environment looks like.  And in some sense, what that would do in any case is push the problem down the road.

At some point, that remedy is going to end, and when it ends, the developers are going to be highly dependent on off-Google Play distribution.

Under the current -- under the existing injunction, that would be through some sort of download flow that resembles the unknown sources flow that currently exists.

To the extent those frictions are still in place, that's a problem at that point in time.  They're going to be reliant on a distribution process at that point in time that has already been shown to not work well.

I'll give you the example:  We know -- hang on one sec.

Amazon had an app store.  Amazon was -- because they were Amazon, they were able to attract developers, and they built a very large catalog, but they weren't successful.  And they weren't successful because -- two reasons:

One is that they couldn't get preload deals.  The other is that they were reliant on the direct downloading option, and the direct downloading option put them into the unknown sources

flow and basically made it not a viable business proposition.

So even when they had the complete catalog, they were not successful, and that was Amazon.

This is what I'm worried about with the existing injunction. This is why I'm torn when we're talking about these provisions which, yes, I agree they're really important, but if you don't have something after the three years, or after the six years if you extend it, that ensures relatively frictionless download on par with Google Play, I worry the competition isn't going to survive and that anticipating that, competing app store providers aren't going to invest in the shorter term.

**THE COURT:** All right. Go ahead.

**MR. EVEN:** Thank you, Your Honor.

**BY MR. EVEN:**

**Q.** So before we go back to the rest of the issues of how this balancing, I just wanted to ask a quick question.

Is there a daylight that you found between the catalog access remedy that you recommended and that Epic asked for and the catalog access in the existing injunction? Are they identical in terms of scope, reach, et cetera?

**A.** Yeah. The one that's in the existing injunction is more limited than what I asked for in two important respects. One is that I suggested that it be global, rather than just for the United States. In the existing injunction, it is only the

United States, and we're going to be talking about this in a little bit -- or I can just say it now.

If you look at the world, excluding China, the United States accounts for about 5.5 percent of Android users.  So the version of this that I had proposed was substantially broader in geographic scope.  And then the other piece is the duration, the six years versus three years.

The geographic scope is important because scale is required to make these operations viable, and it's just much easier to achieve that scale if you have a global operation than if you have a U.S. operation.

Q.   So with that, I want to drill down a little bit into these analyses that you've done and get it a more orderly fashion as to how we got to the balancing.

Let's start with the basic premise.  What is it that you believe that the injunction that this Court ultimately orders ought to achieve?

A.   I think we have a slide that lists two principles that I articulated in earlier testimony.

The first is that the remedy should prevent Google from engaging in anticompetitive conduct in the future.

The second is that it should address the barriers to entry that might otherwise sustain Google's market power, the barriers that come from its past conduct.

Q.   And was one of these barriers to entry what the Court has

now alluded to and what's referred to as externalities or network effects?

**A.**   Yes, that's correct.

**Q.**   And can you remind the Court what is the challenge that you identified with respect to overcoming network effect?

**A.**   So the network effects -- the way I think of it is it has two components.  One is -- well, just -- just to, you know, remind -- remind us all what we're talking about, the network affects are about the chicken and egg problem, that you can't get the users before you have the apps; you can't get the apps before you have the users.

So there are two ways to approach it.  One way is to make it possible to get the users before you have a complete app catalog.  The other is to make it possible to get the apps before you have the users.

And so one remedy that I propose was aimed at the first of those.  The other remedy that I proposed was aimed at the second.  So they're both listed here.

The first was the no-SIM ship or exclusivity agreements with developers.  This provision facilitates the process of competing app stores getting distinctive content so that they can --

**THE COURT:**   That's part of the injunction right now.

**THE WITNESS:**   And that is part of the injunction right now, absolutely.  That was done.  That's, by the way, shown on

the -- on the grid slide that I gave you.  It tracks every one of these to show what happens with each one of those.

And I had described this in the remedies statement that I submitted as the -- as -- well, the quote here is "The best strategy for overcoming network externalities is usually to offer something distinctive."

This remedy makes that possible.  And, yes, it is in the existing injunction.

The second thing that I proposed is the catalog access for six years on a global basis, and that's doing this the other way around.  It's focusing on getting the app before you have the users; right?  And that is in the existing injunction for the U.S., three years, but is dropped from the modified injunction.

**BY MR. EVEN:**

**Q.**  So talking about barriers to entry, as you said, were network effects the only barriers to the successful entry of new stores into the space?

**A.**  No.  We know that they're not the only barriers.  There was a lot of testimony at trial about one of the major -- well, one of the major categories of barriers is just having viable ways to get competing app stores onto users' phones, which Google was making difficult in several ways.  It was blocking preload opportunities through deals with OEMs and creating frictions for direct downloading.

Q.   And how did you propose to address the issue of download frictions during the remedies phase?

A.   So there I made three proposals.  The first was to achieve friction parity with the Play Store for off-play downloads, and that's -- I -- just to mention it, this is something that I also described as critical.

Second, I said that there should be prohibition on any interference with OEM preinstallation agreements so that the competing app stores could get onto phones through those agreements.

And then, third, I proposed that Google be required to distribute competing app stores through Google Play for a limited period of time, six years, on a global basis.

Q.   And how does the existing injunction address this issue of frictions?  Which of these remedies did it adopt?

A.   The existing injunction deals with the second and the third.  So it has no first -- first-launch or exclusivity agreements with developers.  It is more limited in time than I had proposed, three years; and it's also for the U.S. rather than global.  And then, as we've already discussed, it has catalog access for three years for the U.S.

It does not have any provision that directly addresses the frictions for direct downloading.

THE COURT:  It has an app store distribution requirement for three years.

THE WITNESS:  I'm sorry.  It has --

THE COURT:  App store distribution requirement on Google Play.

THE WITNESS:  Yeah.  I'm sorry.  I said this wrong.  I read the --

THE COURT:  You're shortchanging the injunction.

THE WITNESS:  I know.  It's on the slide and I just said the wrong thing.

THE COURT:  All right.

THE WITNESS:  But --

THE COURT:  Can I just jump in for a second?

THE WITNESS:  Yeah.

THE COURT:  Let me ask you a question, and then we can get back.  I don't want to interrupt this too much.

But we had a verdict entered in this case, and that verdict entered -- just one second -- I've got too many papers.  Oh, here it is.

The verdict was entered on December 11th, 2023, more than two years ago.  The jury found -- based in no small pat on your testimony and a number of other facts -- that the world as it stood in December 2023 showed that Google had illegally monopolized the world of Android app distribution and Android in-app billing.

Now, here we are in January of 2026, and the world hasn't changed, has it, Doctor?

THE WITNESS:  That's correct, as far as I know.

THE COURT:  Okay.  So Google still monopolizes today, in January 2026, the Android app distribution market?

THE WITNESS:  Well, with the qualification that I haven't done any data analysis, that is my understanding.

THE COURT:  And the same goes for in-app billing? Google still monopolizes in-app billing services for digital goods and transactions?

THE WITNESS:  As far as I know, absolutely.

THE COURT:  Okay.  So there are no changed material facts that would say to me there's an urgent need to take a look at changing the injunction.

So I'm wondering:  What is it that has changed, in your view, that makes sense for me to pick up my pen and rewrite this injunction that we spent so much effort and time crafting two-years ago?

THE WITNESS:  So this is getting into an issue that -- that I'm not sure I'm the right person to speak to, because it's a question of whether there's a material change, which I guess is a legal standard here.

THE COURT:  Well, that's a sharp point.  I'm asking you purely as an economist.  I appreciate you're not a lawyer. Nobody's perfect.  You're very successful in your craft, but I understand that.

But my point is:  From an economist point of view, what

has changed such that it makes sense to drastically revise the injunction that I entered?

THE WITNESS:  In -- in fairness, I haven't tried to think about the answer to that question in advance, so -- because I wasn't focused on the issue of what the material change is.

As I sit here, I'm not thinking about anything that's changed in the market.  One thing that has changed is that Google and Epic have brought forth a settlement to which they agreed.  Now, I don't know whether that qualifies as a material change or not, but that puts something on the table that wasn't on the table before.  And --

THE COURT:  But nothing, as you understand it, has changed with respect to users or developers in the Android apps market; right?

THE WITNESS:  As I sit here, I'm not thinking of anything, no.

THE COURT:  Okay.  And that's our focus because, as you know, that's what the purpose of the antitrust laws is to do.

THE WITNESS:  Yes.

THE COURT:  I wrote about this extensively.  It's the Magna Carta, the charter of free rights to protect the consumers and the competitors from illegal conduct of the sort that Google was found guilty of by the jury.

So I'm not hearing any evidence on that.

Let me ask you this:  You had a wide open field on which to run when you came to me and -- with your injunction ideas. So you crafted these requests.  You're coming in now with a whole new set, and it's not clear to me:  Why didn't you say this to me in the first instance?  Why did you advocate so critically for catalog access, for example, if you've now determined, oh, that's just not going to work and we need a Plan B?  Why didn't you give me a Plan B in the first instance?

**THE WITNESS:**  Well, Your Honor, in fairness, what I gave you -- again, if you look at this sheet, is -- there's a column that is Epic recommendations, and what I gave you was all of those things.

Now, what's in the final column, what the modified injunction does, is a subset of that.  It's a subset of the things that I argued for, just as the existing injunction is a subset of things that I argued for.  And --

**THE COURT:**  Let me just step in.

I did my own decision-making with respect to duration. That's certainly clear.

**THE WITNESS:**  Yes.

**THE COURT:**  And also geographic scope, for reasons I won't bore you with, but there are some legal issues there, *U.S. versus Worldwide*.

But my point is different:  Why did you press so hard for

catalog access if you're willing to throw it out the window today?

THE WITNESS:  Honestly, I don't want to throw it out the window.  I would love to keep it.

THE COURT:  But the settlement does that.

THE WITNESS:  Because there's a trade-off, and the trade-off is -- if you look -- you know, at least one of the trade-offs -- if you look at the first issue, which is eliminating barriers to installation on users' devices, the first category there is to reduce download frictions, which I have said on -- I don't remember whether I specifically used the word "critical," but I said it was extremely important in various ways.

And my concern is that the existing injunction does not accomplish that in a sustainable way.  It does give the distribution through the -- through the Google Play Store for three years and that eliminates the friction for that period of time, but beyond that, it doesn't.

And my proposal at the time was actually that the provisions that create friction parity between Google Play and direct downloading, that that -- that those parity provisions I had proposed be made permanent.

So my thinking at the time, to put it together, was what I've called the jump-start provisions, which are the provisions that were time-limited in my original proposal, which were

extraordinary provisions to get things going, catalog access, and the distribution through Google Play.

My proposal was:  Use those as the mechanism in the short term to get competition started and now have these other provisions that are going to make it possible for competition to survive once the first set of provisions expires.

Now, part of the latter had been preserved.  But a very important part of that, the part having to do with download frictions, has not been preserved.

THE COURT:  Let me ask you this.  I'm looking at your report --

THE WITNESS:  Yeah.

THE COURT:  -- which you filed in support of the injunction request.  It's Docket Number 952-1.

You say on page 11 of your report, quote (as read):

"Google's years of imposing frictions on direct downloads have trained users to rely on the Google Play Store to the exclusion of direct downloads, and as a result, it will likely take some time to make them comfortable with direct downloading."

Close quote.

THE WITNESS:  Yes.

THE COURT:  This is why I considered and ultimately accepted -- for other reasons, but in part because of your conclusion -- that app store distribution on Google Play was

violative in addition to catalog access.

By the way, it's on that same page that you use the word "critical" to describe the importance of catalog access for solving, as you put it (as read):

"This is," quote, "critical because it ameliorates the chicken-and-egg problem by uncoupling the two sides of the market."  close quote.

So I am puzzled by where you are coming out today in light of all these statement.

There are so many more.  I mean, you know that.

Look, my point here is not to just parade out contradictions.  I'm really struggling to understand how, in my view, you've done a 180 in your thinking about catalog access and app store distribution.  And I just don't find the idea that we're going to take a preload -- download and preloading restrictions, that's going to solve all of our problems because it's going to happen in Italy and be six years from now.  I'm just not finding that consistent at all with your prior opinions.

**THE WITNESS:**  Okay.  I don't think it's inconsistent. My prior opinions were that -- and I continue to affirm these would be great provisions.  I think that they're very important.  If you want to get competition going in a hurry and if, as a complement to that, you have a remedy that will ensure the competition, once it develops, will continue, that it has a

path for continuing, then those remedies that you're describing -- they're extremely effective.

The potential entrants know that down the road, competition will be sustainable, and so they're willing to invest, and now they have these short-term expedience for three years that allow them to get a leg up in terms of overcoming the -- the network externalities.

It works very well when you do those things in a complementary way. And I had proposed both. And what I'm saying is that by taking away one part of what I proposed, the effectiveness of the other part declines.

So now, to me, the choice was presented to me if you want the provisions that -- you know, which of these provisions do you want? Do you want the ones that are going to provide for better opportunities for competition to survive, which were in my proposals, or alternatively, want the provisions that allow competition to get jump-started, which were also in my original proposals? Which of those do you pick?

**THE COURT:** Well, we had a long colloquy at the remedies hearing in May 2024, and the transcript is at Docket Number 977. And just to take one example of that, not to exclude others, but on page 31 and 32, you agreed that there's no science between -- behind picking three years versus six years, and it's a judgment call.

So now you're telling me, well, you're unhappy with the

fact that the Court picked three years rather than six.  But isn't the better remedy to come back and ask me to do six years because you've thought it over and really want to renew your request and there's some additional information, as opposed to hacking out what was the very core of the network effects chicken-and-egg solution of catalog access and app store distribution?

I mean, if the only issue is you really wish it had been six years instead of three, that's a simple problem.

THE WITNESS:  No, but that's not the only issue.  And this is really important to understand.

Whatever that number is -- three, six, nine -- whatever that number is, there's going to come a time when that -- that initial crutch is not there anymore, and the question is:  Will competition work at that point in time?

And it will work if there is a model in place for it to work.  And that model needs to eliminate the off-Google Play download frictions, which is what I -- part of what I proposed, and which I also described as critical.

THE COURT:  Well, the model -- your word, not mine -- but the model is if anybody wants to compete, they're going to have a full, fair, and open playing field for at least three years to get up and running as an app store, and the best -- best way to do that, you told me, was to have catalog access for these competitors and let their storefronts be

distributed on the Google Play Store.

Now, my view, as I said in my injunction ruling, was three years is a good long time.  If you haven't put your marker on the table and won a couple of bets with it, it's just not going to happen.

And I don't recall clearly about this -- I'm not going to tie my hands or yours -- but I think you kind of agree with me that at some point you're either going to win or lose, and you can't keep things going on ad infinitum.

So -- anyway.  Go ahead, Mr. Even.

**MR. EVEN:**  Thank you, Your Honor.

**BY MR. EVEN:**

**Q.**  Let me try and clarify some of these things with you, Professor, if I may.

One is did you testify or did you address at the remedies hearing whether -- which element is more important, frictions or catalog access?

**A.**  I don't recall making any statement about which was more important.

**Q.**  And so now that we have these remedies that are for three years and in the U.S., what is it your view that is going to happen after three years and a day?

**A.**  Well, the -- the Google Play distribution remedy.  Google has to distribute other stores on Google Play.

I don't think anybody expects that Google is going to

continue that after the three years.  Google has objected to it very strenuously.  And it is an exceptional provision in the sense that under normal competitive conditions, we wouldn't expect a store to be promoting competitors' stores.  So this is something that exists in the short run to help competitors get over the hump.

Now, you get to the three years, you've got some competitors that took advantage of these provisions.  They're up and running.

Now, three years and a day, the Google Play distribution is gone, and that means that those stores are now reliant on direct downloading for their business model.  I mean, they'll pick up some through preloading, but they're reliant on direct downloading.

And what does the direct downloading look like?  Is there a solution for that?  And I had proposed a solution, the friction parity solution.  It isn't part of the existing injunction.

So they get to three years.  They've got a store that's operating, but now it has become much more difficult for users to get that phone on their -- to get that -- that store on their phone.

And that's why I gave the example of Amazon.  Amazon had overcome the network externalities in terms of building a big catalog, but there was this other barrier, and that made it so

that Amazon couldn't be successful.

So this is what I'm worried about.  Three years and a day, what's going to happen?

And if the developers who are building the app stores are thinking forward to three years and a day, they may be going, "Possibly it's not worth it.  We could get killed off."

So part of the remedy needs to be extending some sort of assurance that the frictions aren't going to be there, and that's --

THE COURT:  I have to say I'm not -- I'm not getting the drift of what you're saying in this respect.

You've got three years to set up your competing app store. That means Amazon, Microsoft, Meta.  I'm just picking large companies that can spend relentlessly to do that.

You don't have to direct download.  You're just going to be on the Amazon marketplace, and people can get your app that way because Amazon is going to give you a 2 percent fee deal versus whatever Google is going to charge.

And if you write it for three years and you try to set up an alternative app store market and it's not working -- you know, businesses flourish and die all the time; it's just the natural cycle of life.  You didn't do a good job.  You didn't attract the user base that you wanted to do and you've had this opportunity to do it.  That's not -- I mean, an injunction isn't intended to be a safety net for all risks in business.

It's just to give you a fair chance to make sure that when you start the race, everybody's starting block is at the same place proportionate to each other.

And the problem we have now is the blocks have already been rigged terribly by Google's anticompetitive, illegal conduct so that they're way ahead.  And now we're going to get everybody to catch up?  You run your race after that.  You either win or lose because of who you are.  You can't blame market circumstances after a certain period of time.

THE WITNESS:  No, I agree with that, but there's a premise in what you just described that I don't think is factually correct.

So you've got Amazon.  It's three years, Amazon has developed their store; right?

Now it's after three years.  You've said they can have Amazon marketplace.  Okay.  But people need to get that onto their phone.  If they're going to download apps onto their phone, they have to have a way of getting if onto their phone --

THE COURT:  Yes.

THE WITNESS:  -- which means that the Amazon store has to be on their phone.  Now, some people will have that already, and maybe --

THE COURT:  Every Prime member of Amazon will have access to the Amazon app store because it will be part of their

little icon for Amazon on their phone.

**THE WITNESS:**  No, they won't all have a -- well, they may have Amazon Prime on their phone, but they won't necessarily be able to have an app at that point that downloads apps through -- through that unless they download something new.  Google at that point in time is going to say:  You can't have an app that downloads things directly that -- that downloads things.

Okay.  Imagine you are a user and you don't have that app on your phone yet.  Now, how are you going to get that app on your phone, the Amazon app?  Google is going to say, That's an app that's in the app store.  It downloads other apps.  We're not going to have that through Google Play anymore.  You can't get it through Google Play.

So how are you going to get the Amazon app on your phone?  Amazon is going to put a link on its site that says "Click this link and you can download the Amazon app."  But that's going to send you through something like the unknown sources flow, which we know killed Amazon's proposition to begin when it did it before.  That was one of the things that killed it.  They couldn't make a go of that.

So the alternative under the modified injunction is this registered app store remedy that basically has a collection of requirements that if a competitor satisfies, they are now a competing registered app store, and they get basically

frictionless downloading on parity with Google.  So people can go to the Amazon site, click the button, download Amazon's version of the store, do that frictionlessly, download apps through that frictionlessly.

And that's why that's a sustainable mode of competition, because even when Google says, "We're now clamping down; we're not promoting competing stores.  We're not letting folks like Amazon sneak an app store through the apps that you're getting through Google Play," once they say that, Amazon goes, "That's okay.  People are now using our store.  They know about our store.  They like our store.  They want our store.  And all you have to do is go to our website, do one or two clicks, and you get the store onto your phone."

That's the difference.  And that's the difference in sustainability over the long term.

That's what I like.  It's one of the things, but probably the most important thing that I like about the modified injunction is that it has in that option going forward, and that helps to make the competition sustainable.  It means that Google by virtue of saying:  Okay, now that these three-year terms -- or if you extend them, six-year terms -- have expired, they can't kill off the competitor by just saying, "Well, there are frictions if you download off Google Play, and those are required for security reasons and, you know, we're going to maintain them."

**BY MR. EVEN:**

**Q.**   So you touched on Google can say that.  What is your expectation is going to happen to the remedies about friction at the end of the six-year term?

**A.**   So the friction remedies, the -- so the registered app store.

**Q.**   Yeah.

**A.**   Okay.  So you could be worried about the same kind of thing.  The six years ends under the modified injunction, and Google says:  Well, we're done with the registered app store.

That would be the same kind of problem.

But I think that that's much less likely to happen.  The reason is that the argument that Google has made in the past has been security; right?  If they allowed something like that, there would be a security problem.

Now imagine over the next six years, you have operating app stores, registered app stores, and they're loading, you know, apps onto people's phones.  You're going to have a long track record.  If Google raises the security argument and everything works as, you know, it is intended to work, there's going to be direct proof that there's no security justification for eliminating this.  So Google, in ending that at that point in time, I think would be very vulnerable to an antitrust challenge, and they would know it.

The other thing that will go on is over the six years, as

the registered app stores -- which, by the way, that's a nice feature of this is that by virtue of being a registered app store, they now have, you know, the seal of legitimacy from Google for use on Android.

You have the registered app stores becoming an accustomed portion, an accustomed part of the Android landscape. Users at that point, if they're used to using these things, are going to be upset if all of a sudden the registered app stores are killed off.

So I think that both of these things are going to work in favor of preserving that remedy. That's why I consider it a sustainable remedy, and I don't think that the sustainability in that case requires coming back to the Court.

THE COURT: You know, there was quite a bit of testimony on the plaintiffs' side about the problem of putting Google in charge of the -- as the fox guarding the henhouse. In other words, you can't trust them -- this was actual testimony; I don't remember if it was from you or someone else -- but you can't trust Google not to exploit the discretionary functions of judging security and other requirements to suppress competition -- as it had, as the evidence at trial showed that it actually had done.

But you seem quite comfortable now to let Google be the arbiter of who an official competing play store is.

What is giving you the comfort that they now are beyond

their record of manipulating these considerations for their own ends and will become fair and neutral arbiters of who can be on the Android system?

THE WITNESS:  Right.  So I think that's a very fair question.

The -- the modified injunction doesn't simply say that Google will decide.  It lays out -- I think it's in my binder -- registered app store policies.  It's under Tab 5.

So the idea is to have a framework that constrains what Google can do in terms of approving app stores.  The intent of the agreement is supposed to be that there are a set of clear standards that competing app stores, once they meet those standards, they are then approved to operate on Android.

Now, could there be abuse of that in principle?  Yeah, there could be abuse of that.

And the part of this that I don't feel I have the expertise to evaluate is kind of the technicalities of whether it's possible to be sufficiently precise about what a registered app store requires.

THE COURT:  Well, that's why I set up the three-person commission under the current injunction to address security issues along those lines.

Is it -- is it your vision, Attorneys, that I'm going to write the criteria for the registered app store?

I can't just say in an injunction "registered app store,"

period.  There's no standard by which to police Google's conduct.

MR. EVEN:  No, Your Honor.  In fact, I think the parties have documented this in pretty great detail, and there is the technical committee that will remain in place under the modified injunction to oversee what that's like.

And obviously, Your Honor is going to hear from Mr. Sweeney and Mr. Samat about what the thinking is about that.

But that part of the driving -- driving motivation here, I think, is, in fact, to get more clarity up front as to what it is that Google can do and --

THE COURT:  Why did you not ask for all of this when you had a blank slate on which to write?

You could have asked for any or all of this.  You did not raise a peep about it, and you pressed a much different set of remedies that I ultimately adopted.

Why did you not -- why are the scales suddenly falling from your eyes only after a settlement agreement is reached?

MR. EVEN:  So, Your Honor, I will let Mr. Bornstein answer.  I'm sure he will have better and longer answers to that and -- as will the other fact witnesses.

But on this particular issue -- so to paraphrase what Dr. Bernheim has already said, I believe we did ask for all these remedies.  We asked for all of them to be global and for

either perpetual or for six years.

**THE COURT:**  I have no dispute with that, and I'm perfectly fine with my limitation of it to the United States; and I'm perfectly fine with my choice of three years subject to your coming back and asking for more time.

It's always okay to say:  You know what, Your Honor?  More work needs to be done.  We've got to extend the runway.

That's fine.  I'm not talking about that, and you know I'm not talking about that.

You had every right to come in and not say a peep about catalog access, not say a peep about posting rival app stores on Google Play.  You chose to press those two points as your main remedy for network effects.

Now you want to throw them out the window and tell me:  Oh, we have this registered app store and preloading and now.  That's the ticket.  Now we got it.  We finally figured it out.

You had every opportunity, Mr. Even, to pitch all of this to me at a time when I was writing the injunction to protect the public from the consequences of Google's monopolistic conduct, and you did not do it.

So I just would like a very short, plain, and simple explanation about why.

**MR. EVEN:**  So I think Mr. Bornstein is insisting that he give it.

**THE COURT:**  Tap in, Mr. Bornstein.  All right.

**MR. BORNSTEIN:**  I'm going to take the line of fire, Your Honor.

**THE COURT:**  It's not the line of fire.  I am mystified about why this is suddenly hitting my chambers two and a half, two years after the verdict.

**MR. BORNSTEIN:**  I'll say three things on this, Your Honor.

First of all, the original request from Epic did include the idea of eliminating frictions, as Dr. Bernheim just talked about.  The idea of the original injunction was very much a defense in depth approach.  There were multiple ways that we proposed to deal with the network effects and the other consequences of Google's conduct.

In Your Honor's injunction, for good and sufficient reasons, Your Honor chose to grant some of those remedies -- not all of them -- so the frictions are not eliminated expressly off of the Play Store.  Fully understand there's the app store distribution piece of it, but that's a piece that we did ask for.  This is not new.  We haven't come up with something that's different.

And the global piece of it -- it's more, Your Honor, than just, you know, "It's in Italy."  The reason that we asked for global -- and Mr. Sweeney will testify to this, you know, from a factual perspective better than I can -- it's to ensure that even in the United States, there will be sufficient competition

because there will be sufficient incentives for people like Epic and small companies to make the investment necessary to get the scale that they need to reach a sufficient number of Android users around the world rather than the 5 percent that are here in the United States.

THE COURT: You're nipping at the margins. I really -- whether this happens in Sri Lanka and whether it's six years, I'm not interested in. Those are all small potatoes.

What I'm interested in is why you have jettisoned the very heart of the injunction that you argued so forcefully for of catalog access and Android distribution to solve the network effects problem or the chicken-and-egg problem, as Mr. Bernheim has put it more understandably.

I'm not interested in whether there are some elements that are consistent that I said no to. I'm interested in why you threw that out the door when you didn't have to ask for them in the first place because you didn't think they were going to work. I'm just not getting it.

MR. BORNSTEIN: I'll try to hit this as directly as I can, Your Honor.

We love those remedies. Period, full stop. We asked for them. We like them. We like them the way we asked for them, which is --

THE COURT: I understand that. Why are you trying to

throw them out?

**MR. BORNSTEIN:** Right.  Because now we have another option which is on the table which is the result of a negotiation with Google.  We got something through this negotiation now that was not on the table before.

Your Honor knows we tried to settle multiple times at Your Honor's request, and we made real efforts, and we did not get something that we considered acceptable.  So Epic has fought all the way through trial, the remedies proceedings, the appeal, and the outcome of that was an injunction that was fully defended on appeal.  But it does have limitations as compared to the remedy -- the full set of remedies that Epic was able to secure with that injunction in its pocket.

The only reason Epic is here, Your Honor, is Epic firmly believes that this set of remedies in totality will provide longer-term sustainable competition for all developers and all stores.

That is the sole reason that Epic is here, is the reason Epic didn't take payoffs back in the day.  It's what led to Project Hug on the Google side because Epic didn't accept it.  That is the only reason we're here is because we actually genuinely believe that this package is better than the other package.

Would we like this package plus catalog access plus store distribution?

Sure.

THE COURT:  Well, then, ask for that.

MR. BORNSTEIN:  Well, we did ask for that.  We did ask for that, Your Honor.

THE COURT:  Mr. Bornstein, here's the problem.  This injunction really hasn't even gone into effect until the last eight weeks.  We have no idea what the world's going to look like in June of this year, let alone three years from this year.

It may be, as Dr. Bernheim rather colorfully put it in his report, as a result of the injunction as it currently stands, competition will be bursting out -- those are his words -- bursting out as a result of the catalog access.  We just don't know.

You're asking me to say, "Well, now that we've thought about it, it's possible that in three years maybe some developers might be having a potential" -- it's all -- it's all potentialities and conditionals with no evidence in the record to support that any of this is actually happening -- because it can't; it's in the future -- or even if it's reasonably probable.

So, I mean, if you want to come back and say changed circumstances in three years we've got to let this thing run farther and we need a couple more terms because Google's wrongful conduct has not been adequately addressed, of course.

Injunctions are living documents within reason.  But you can't come in and say, "Hey, good news.  We've reached a private deal, so I think we need to take another look at the injunction provisions" -- which, by the way, the ones that you're jettisoning, catalog access and app store distribution on Google Play, are the very remedies that Google argued most vigorously and vociferously against.

So they've scored a home run.  They've gotten rid of the two things they hated most, and you're trying to sell me on the idea that this is a good thing for competition, users, and developers.

I'm just not buying it.

MR. BORNSTEIN:  Well, I'll try again, Your Honor, because there is no question that Google signed onto this. Google thinks it's a win.

THE COURT:  Of course they do --

MR. BORNSTEIN:  Of course they do.  We think it's a win too.  I couldn't be more clear about this, Your Honor. This is a settlement, not one where, you know, people are -- as you do before trial and one side is asking for a hundred million dollars and the other side is asking for zero and they settle somewhere in the middle, and neither side is happy and they go home, and the judge says:  If neither side is happy, then it's a good settlement.

This is a situation where Epic believes the outcome is

superior for consumers, for developers, for stores.  And I know Your Honor's question is:  Well, how can you get rid of the catalog access and how can you get rid of the store distribution when you told me it's so important?

Right?

The answer is:  We would love to keep it.  We would love to keep it and have both.

Your Honor said, Why didn't you ask for it --

THE COURT:  You don't need to love to keep it.  You have it right now --

(Reporter interruption for clarity of the record.)

THE COURT:  You have it in your hand.  You don't need to love to keep it.  You have it.  You're keeping it.  I'm not throwing anything out right now.  You have it.

MR. BORNSTEIN:  We have it --

THE COURT:  So you want something more than that?  You can come and tell me.  But why is there this tossing out to get what you want?  Why aren't you building on the edifice rather than tearing it down?

MR. BORNSTEIN:  Simple answer, Your Honor -- and we'll have testimony from, you know, the fact witnesses too -- we have a choice at this point in time.  This was the way, I think, Dr. Bernheim, at least, was asked to analyze the question.

The bird in the hand, the existing injunction as it is,

and whatever competition it will foster given its precise metes and bounds -- and I know Your Honor doesn't want me to mention the global piece; Mr. Sweeney will explain to you why it matters.

It really does matter for the effectiveness of the remedy that we requested.  The catalog access and the store distribution has less of a competition-promoting effect given the geographic scope.  And the witnesses can explain that even better than I.

THE COURT:  All right.

MR. BORNSTEIN:  The choice is between the two, Your Honor.

THE COURT:  All right.

BY MR. EVEN:

Q.   So going back for a second to one question that the Court raised with you about the -- Google kind of overseeing the registered app program.

Under the existing injunction, can Google review the -- whatever store and the applications that it offers that want to be distributed through the Google Play Store?

A.   I know there's some sort of review process, but I don't -- I don't recall details about it.

Q.   Okay.  We'll get that elsewhere.

I want to talk quickly to -- first of all, so we kind of covered the term.  I want to talk about the effect of friction

and I want to talk about the global scope, because Mr. Bornstein mentioned it and I think it's important here. So let's maybe start with the friction.

What have you done in this case to analyze how important frictions are to the effectiveness of a remedy?

A.   Yeah, and -- and, you know, just to emphasize, this is my primary concern. What I'm most worried about is having a solution for the off-play downloading, the direct downloading, because that -- that is just -- you know, it's potentially going to prevent competition from continuing after it gets started.

So there is evidence that we saw at trial about the effect of -- of frictions in direct downloading. This is the funnel data that you might remember.

Since then, I've also had the opportunity to actually do an experiment. This is work that I started to do in the context of the *Epic v. Samsung* case, and that experiment has allowed me to quantify precisely the impact of removing the download frictions on download success, on drop-off.

Q.   So let's take this one by one. So maybe we can turn to Slide 12, and can you briefly remind the Court what you've done on the funnel data back at trial?

A.   Sure. So just very briefly, this is what we saw at trial. This is data that tracks what happens to users as they go through the installation process, and the un- -- the unknown

sources flow occurs between steps 2A and 3, and we saw a 35 percent drop-off between those two stages.

Now, that evidence suggests that the frictions are probably driving significant drop-off, but it doesn't give us good quantification.  For example, if the frictions make people nervous, they might make it through that step but then drop off at a subsequent step.

So that was the reason for performing experiments, so that I could measure things more precisely.

Q.   And in what context did you come to actually run that experiment that you mentioned?

A.   Yeah.  As I said, it was in the context of being retained to do damage analysis for the *Epic v. Samsung* matter that was settled.

Q.   Okay.  And so what was the experiment that you did in that context?

A.   So what we discovered is that users, when they go to the Epic website and click the link to download the Epic Games Store, actually go through one of two download flows.

Most users go through the unknown sources flow -- unknown sources flow to download the -- the Epic Games Store.  But it turns out that a minority of users go through an alternative download flow that's associated with a company called Digital Turbine -- which I may say "DT," that would stand for Digital Turbine.  And that download flow is pretty frictionless.  It

involves what they call a one-tap process.

Q.   And so --

THE COURT:   I'm just going to jump in.

We have other witnesses.  I do want to have time for Dr. Rose as well.

Look, this is of minimum use to me.  There's no cross-examination because you have no opponent here.  I don't have any -- just gloss it.  Just get to the punchline:  It's easier to do X because of Y.

That's all I need to hear.

MR. EVEN:   Okay.

BY MR. EVEN:

Q.   So why don't we look at Slide 14, and just explain to us what is it that you saw in terms of the -- how much better is a frictionless flow compared to a -- the unknown sources flow that currently exists?

A.   Sure.  So for each -- there are three panels here.  Each one shows a hundred people.  The one on the left is people who go through the unknown sources flow.  More than half of them drop off.

For people -- when you remove the frictions, that falls to actually under 10 percent, so you're eliminating about 80 percent of the drop-off.

Now, the registered app store solution actually includes one other screen which is a neutral screen, but if you insert

any additional step, you might have drop-off.  So we were able to do that in the experiment, and it and basically causes another 5 percent to drop off, but it's still a huge improvement.

So the point of this experiment is that by eliminating the download flows, you really are eliminating the frictions in the download flows.  You really are materially improving the viability of the off-play distribution channel.

THE COURT:  Okay.

BY MR. EVEN:

Q.   So let's turn quickly to Slide 15, and can you explain what this shows about the importance of the global footprint of a -- of a remedy?

A.   Right.  So we've referred to the global features a few times, and the reason that I'm interested in the global features isn't because I think we're concerned here with competition worldwide.  We are concerned with competition in the U.S.  So the point is that the global footprint helps competition in the U.S.

This slide is just -- it's a purely hypothetical example.  So what it is showing is imagine that a certain scale was required to make an app store viable commercially, and imagine that that app store -- I'm sorry.  Imagine that that scale on a worldwide basis would be 1 percent of users.

Well, if that store is confined to operating in the United

States, which is only about 1/18 of the Android users, instead of needing 1 percent, you're going to need more like 18 percent.

So the point is that by having an accessible market that's global rather than just U.S., you make it much easier for potential competitors to reach that scale that they need for commercial viability.

Q.   So it -- the global scope -- we mentioned that the distribution remedies here have a global scope.  What about the billing remedies?  What is the scope of those under the modified injunction?

A.   It's also global.

Q.   And does that affect both steering and alternative payments?

A.   Yes.  As far as I know, yeah.

Q.   Okay.  So I want to turn to your indirect evaluation because that -- the Court asked you a couple of questions about that.

A.   Sure.

Q.   And can you explain why it was important for you to examine the reasons Epic and -- but mainly Epic, Epic and Google, entered into this -- into this settlement and modified injunction?

A.   Yeah.  I think we all understand that.  We've discussed it.

The question here is whether this agreement includes some sort of consideration being given, some sort of quid pro quo, that Epic is throwing competition under the bus in order to receive some sort of value from Google.  That's the question that we have to address.

Q.   And so you've now heard Mr. Bornstein say that Epic is here simply to -- because it believes that this is a better solution for competition.

Have you seen any evidence to suggest that Epic is getting a sweetheart deal or any kind of preferential treatment under this modified injunction and settlement?

A.   I haven't.  I've gone through --

THE COURT:  Well, that's in the eye of the beholder. Why don't you just talk about the terms.

THE WITNESS:  Yeah, I was going to say --

THE COURT:  I'll decide the sweetheart part.  You talk about the terms.

THE WITNESS:  Agreed.  So I was going to run through the terms, and we'll talk about what they entail.

BY MR. EVEN:

Q.   So what are the terms that you found that you thought were kind of Epic-specific, at least, such that they could be a quid pro quo?

THE COURT:  Can I just jump in?

Look, as you all know, I'm a strong believer, as are my

colleagues, that this is a courtroom of the people and that the bright light of truth is going to shine without suppression for, you know, business issues and so on.

However, just for the expedience today, I'm willing to say things like future business plans, partnerships, and that -- without getting too more specific than that.  Okay?  Just for today.  And I may change that when I reach my order, but just to make this easy today.

**MR. EVEN:**  I appreciate --

**THE COURT:**  I don't know if you were following that, Doctor, but just one level up without -- okay.

**MR. EVEN:**  I appreciate that, Your Honor.

**THE COURT:**  Okay.

**MR. EVEN:**  And, yes, we are getting close to things that, at least for now, are under seal, and so let's be careful as we speak to the terms.

**BY MR. EVEN:**

**Q.**  So at a high level, what do we see?  What are the kind of arrangements that you looked at or scrutinized to make sure that they're -- that you don't believe that they're quid pro quo?

**A.**  There were four types of provisions that jumped out at me as things that could involve quid pro quo.  And without going into the details for the reasons you alluded to, there's a software license agreement.  There is a service agreement.

There is a -- an exploratory partnership provision, and there are attorneys' fees.  These are the provisions that I saw and I marked when I read through the term sheet and, you know, said: Okay, I need to understand each of these terms better.

**Q.**   And what makes you believe that these agreements do not represent Google paying off Epic?

**A.**   So I'll go through them one by one.

The software license agreement is Epic licensing software to Google.  The terms are specified.  And, again, without going into details, it's obvious when you look at the terms that those terms are below market rates.

So in other words, Google -- pardon me -- Epic is giving kind of a sweetheart deal for a software license to Google.  So to me, that looks like a transfer from Epic to Google.

**THE COURT:**   Well, that's -- there are other ways that values are realized other than just the transmission of money.  You know that.  So to be fair --

**THE WITNESS:**   Yes.

**THE COURT:**   -- that software license is in the context of developing jointly with Google a new product, so -- and, more importantly, right now that deal does not exist.

**THE WITNESS:**   Yeah.

**THE COURT:**   Epic and Google do not have an agreement to license Epic's software to Google for joint product development.  They would get that only if -- and I believe the

Case 3:20-cv-05671-JD   Document 786   Filed 01/23/26   Page 58 of 164   58

BERNHEIM - DIRECT / EVEN

settlement is contingent upon my modifying the injunction to throw out the two things Google dislikes most, catalog access and app store distribution.

So just saying, "Well, looks like they're below market so it's all good," that doesn't fly.

**THE WITNESS:** Well, I agree that that isn't -- that isn't where you stop. What I'm saying is in the license agreement itself, there isn't compensation being passed to Google -- to Epic from Google.

So what I was looking for here and what I was saying that I was ruling out is if the agreement provided for licensing of Epic software by Google at some extravagant rates, well, that could be quid pro quo. That's all I'm saying that an examination of those terms rules out.

**THE COURT:** Well, let me see if I can just kind of jump-start this here a little bit, because this is what I'm concerned about.

**THE WITNESS:** Yeah.

**THE COURT:** Right now there is nothing but an adversarial relationship between Google and Epic. This settlement makes Google and Epic partners in terms of software licenses, joint product development, joint marketing commitments, joint commercial partnerships.

It's just very hard for me to see how that is not relevant to the consideration of whether the editing of the injunction

is a fair-and-square, pro-consumer, pro-distributor, pro-competition document.

**THE WITNESS:**  Yeah, and all of those things need to be evaluated, and I think that you're going to get more information on the details of those things from Mr. Sweeney, and --

**THE COURT:**  All right.

**THE WITNESS:**  -- from Mr. Samat.

But when I go through the terms that are on the table in the term sheet, you know, I've already talked about a software license.  There isn't a licensing fee there that's quid pro quo or that could be construed that way for Epic.

When I look at the service agreement, the service agreement is -- it explicitly says "at market rates."  This is service provided from Google to Epic.  It says that it's at market rates.  And my understanding that this is something that Google asked for, so that doesn't sound like quid pro quo flowing to Epic.

The next part of this is the exploratory partnership, which I can't be more specific about.  But the thing that struck me about the partnership that was being proposed is that there aren't any specific terms.  Basically, what it says -- and I -- I was -- I, frankly, was skeptical of that provision as well, and I interviewed both Mr. Sweeney and Mr. Samat each for about an hour and asked them my questions about these

things, which I'm sure you will as well.

And for the partnership, what I heard was that they started with a far-reaching discussion about where the industry might be headed, and there was one particular corner where they said:  Huh, that's interesting.  Let's sort of put down a marker to discuss what we could do -- what we could do together about that.

But when you look at the terms, there aren't any commitments there, and without a commitment, I don't see how it could be quid pro quo.  If you had quid pro quo, somebody would have to make a commitment.  If this deal is done, the fact that it's done -- well, they're going to do what's in their interest subsequently.  So I don't see something there.

The other thing that Mr. Samat said when I asked him about it -- which I encourage you to ask him too -- is that the partnership thing was kind of an incidental thing that came up, and they spent all of 15 minutes talking about it.

I don't know whether that's true.  I wasn't there.  But it's consistent with the interpretation that this was more in the spirit of:  There are interesting possibilities here; we should explore them together, but we're not committing to anything.

And then the last thing I saw was the attorneys' fees, which I believe the Court had ordered.  And I think that provision looks like they kind of split the baby between what

Epic was asking for and what Epic said it was entitled to under the Court order and what Google --

THE COURT:  I've not done attorneys' fees, but we don't need to worry about because they're guaranteed by law, so just forget the attorneys' fees.

Okay.  Anything else for this witness?

BY MR. EVEN:

Q.   The last maybe question in the same vein is:  So going back to the FTC brief that I mentioned earlier, the FTC suggests in the brief that even if the modified injunction doesn't include any kind of sweetheart deal or anything like that for the FTC, that doesn't mean that it's a good deal for all developers.  It may be good just for developers who are similar to Epic, who are large developers, who are well capitalized, who have brand name recognition, while not helping other developers that -- do you -- what's your view on that criticism?

THE COURT:  Can you help me out?  I didn't understand that.

MR. EVEN:  I'm sorry.

THE COURT:  Just try it again.  I want to make sure I'm following what you're saying.

MR. EVEN:  Sure.

BY MR. EVEN:

Q.   So the FDC says that even if on its face the agreement

applies to all developers, the FTC says, well, Epic isn't concerned about things like the catalog access, for instance, because Epic has Fortnite, it has brand name recognition, people will look for it to sideload it or get it directly from the web, whereas a small store may not enjoy the same -- the same kind of advantages.

And so it may be that Epic here helps large, well-financed developers while kind of, you know, leaving behind people who are not similarly situated.

And my question is just:  What is your view of that -- of that point?

**A.**   Well, I have a couple of thoughts about that.  One is that this is raised by the FTC as a possibility without pointing to any specific provision.  The provisions aren't specific to Epic.

The second point is that it seems to me, if you think about the natural entrants -- and I believe, Your Honor, you already said this -- the natural entrants are the ones that are large, that have name recognition, that have catalogs of attractive apps, that are well-financed.

Generally, if we're going to be encouraging competition here, that's the most important area to be encouraging it because it holds the most promise.

But then the last thing that I would say is that it isn't at all obvious to me that the interests of small developers

aren't being looked after here, aren't been served.  In the first place, if competition develops with these larger players providing competitive app stores, they will benefit from that because rates for distribution will come down.

In the second place, there's an option under the proposed modified injunction that doesn't really work under the existing injunction for small developers.  Under the proposed modified injunction, if a small developer -- a smaller developer, if they don't want to deal with Google -- let's say they just want to do what a lot of developers do on PCs, which is to try and rely on people going to their sites and downloading their software, they can basically do that by forming their own registered app store to sell and distribute their own apps and put the link to that on their own website and have people be able to access that without friction.

They don't have that option under the existing injunction because under the existing injunction, if they try that, users are going to encounter the frictions, the unknown sources flow.

So I think in a couple of ways this serves the interests of the smaller developers.

**THE COURT:**  Okay.  Who's next?

**MR. BORNSTEIN:**  Mr. Sweeney.

**THE COURT:**  Careful on the way down.  It's a little steep.  We'll take a short break after this.

(Witness excused.)

THE COURTROOM DEPUTY:  Please stand and raise your right hand.

**TIMOTHY SWEENEY**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

Please state your full name for the Court and spell your last name.

THE WITNESS:  My name is Timothy Dean Sweeney.  That's S-W-E-E-N-E-Y.

THE COURTROOM DEPUTY:  Thank you.

MR. BORNSTEIN:  I just have a binder coming for you, Your Honor.

THE COURT:  Great.  Thanks.

**DIRECT EXAMINATION**

BY MR. BORNSTEIN:

Q.   All right.  Good afternoon, Mr. Sweeney.  The Court knows who you are, so I'll ask the question a little differently than I usually do.

Are you still the CEO of Epic?

A.   Yes.

Q.   Okay.  And what was your role, sir, in negotiating the settlement agreement that's in front of us now?

A.   I negotiated it on behalf of Epic.

Q.   Okay.  And who is your counterpart on the Google side?

A.   Sameer Samat, the head of Android.

Q.   All right.  So after litigating for over five years and winning a verdict at trial, getting an injunction that the Court spent a lot of time on, defending that injunction and the verdict on appeal, you have concluded that it is in Epic's interest to settle; is that right?

A.   Yes.

Q.   Okay.  And what have you concluded about whether it is in the interests of other developers of stores and apps and consumers to settle for the injunction that -- and agreement that are currently on the table as compared to the Court's injunction?

A.   I believe that the settlement terms in the substitute injunction are far better or all developers, consumers, and competing stores than the terms of the existing injunction.

Q.   There are some suggestions in the amicus briefs that have been filed that there may be a -- another Epic-specific benefit to this, and you heard the discussion between the Court and Dr. Bernheim about possible quid pro quo.

Is there any reason that Epic has agreed to this settlement other than what you just testified to about your belief in competition?

A.   No.  The sole reason for Epic's interest in the settlement is to bring a resolution that's better for all developers and

consumers.

Q.   All right.  I'm going to come back a little later to the specific commercial terms that the Court and Dr. Bernheim were talking about, but I want to start with why you believe that this is better for consumers and developers and other rival stores.

And one thing --

MR. BORNSTEIN:  I'm going to just jump around a little bit to hit things, Your Honor, that have been the subject of discussion.

THE COURT:  That's fine.

BY MR. BORNSTEIN:

Q.   So one thing that's been the subject of discussion so far today is the global nature of several of the remedies in the settlement.

Can you explain, as a business matter, why you believe that having the remedies be global as compared to the U.S. reach of the provisions in the injunction is significant for advancing competition?

A.   Yes.  To have a chance at succeeding, a store needs scale. A store needs to reach enough users that it can attract developers to the platform to do bespoke deals that make the store worth coming to.  And the -- building up scale takes time and it takes access to an audience.

The scale that a competing store can achieve viably under

the settlement is roughly, in my calculation, 40 times larger than the scale that we could reach under the existing injunction, because we can reach the entire global audience, 100 percent of the users in the world, excluding China, through direct downloading without the scare screens, and because we have a six-year period where we're guaranteed to be able to have that access and to reach users.

So from Epic's point of view and from the point of view of any competing store, we have four times -- 40 times the reach -- the opportunity over the next six years to get 40 times the reach than we would were we only competing -- or if we only had these opportunities in the United States and only for three years.

Q.  So one of the things that you said near the beginning of your answer was that having this scale would assist a competing store in attracting developers.

Now, we've had discussion this morning about the catalog access remedy.  That's obviously intended to give competing stores access to developers for a period of time.

Can you explain -- do you believe that the three-year U.S.-only catalog access remedy solves the developer access problem that you were talking about as compared to the existing injunction -- excuse me -- as compared to the settlement?

A.  I think that it's -- it would be extremely hard with any U.S.-only effort to actually achieve success there.  Every game

developer and app developer faces the challenge of lots of opportunities competing for their time.  In order for them to support a competing store, ours or somebody else's, they have to judge that the best of use of their developers' times is to go to the weeks of effort to implement a competing store, to do the software engineering work, to do the marketing work, and prepare their marketing materials and presence on the competing store.

And to do this for an audience that's U.S.-only, that will potentially only be accessible for three years is a much, much harder sell for developers than doing it for a worldwide audience that is guaranteed to be addressable for at least six years.

Q.   So to ask you the question you heard the Court ask other people, including, I think, me:  Why did Epic ask for this catalog access remedy in the first place?

A.   Because we thought it would be an -- and it would be an awesome way for a store to populate its offerings with all the apps in the world.

It made the -- there are two sides of the equation; right? There's getting apps and then there's getting users, and the catalog remedy is a dramatic improvement in getting access to apps versus going around and talking to every developer in the world and getting them to put their apps on your store.

Q.   Okay.  And so why does the catalog access remedy, then,

given that, not solve the problem?  Why do -- let me rephrase the question.

Why do you prefer the remedies in the settlement over that catalog access remedy as it's been ordered?

**A.**   Because the value of reaching the entire world, excluding China Android audience, which is roughly 20 times larger than the U.S. audience, vastly outweighs the benefits of having the entire app catalog available.

**Q.**   So focusing on this issue of it being global, should the Court be concerned that this settlement is sacrificing competition here in the United States in order to sort of spread maybe some lesser degree of competition across other countries?

**A.**   No.  Well, there are really two sides to the equation; right?  There's users.  Every user lives in a territory and is in that local market.

But then developers -- all developers make apps and ship them broadly across much of the world, sometimes all of the word.  So competition and efforts for a store to get developers on board are global competition in the global market. Developers in Europe target the global market.  Developers in the U.S. target the global market.

And so our ability to attract developers is critically important in our ability to reach users everywhere.

**Q.**   And you're talking about our ability to reach users.  Is

this a phenomenon that's limited to Epic?

**A.**   No.   This logic applies to every store.   Each store, you know, will have some reason for users to download it.   Some will be a unique selection of apps.   Some will be a unique focus.   Some might be price.   Some might be special deals.

Every app will be able to better reach U.S. users if it can help match developers to a global audience of users.

**Q.**   Okay.   And you said every app will be able to reach users if it can match developers.   You mean every store?

**A.**   I'm sorry.   Every store will be able to do a much better job of serving U.S. users if it can attract developers by having a worldwide audience.

**Q.**   Let me turn to a different subject, which is the duration of the remedies.   A lot of discussion about it this morning.   I won't rehash it all.

But there was one thing that Professor Bernheim said that I wanted to get some factual testimony on, which is you may recall that the judge has raised the possibility of an extension of the injunction for additional time, and one of things that Dr. Bernheim said during that discussion is that developers would not have certainty at the time they were making investments about how long the remedy might last.

Do you remember that discussion?

**A.**   Yes.

**Q.**   Okay.   Do you agree with Dr. Bernheim that developers

would have an uncertainty problem if they didn't know how long the injunction was going to last if it was going to go beyond the three years?

**A.**   Yes, that's right.  While Epic has been willing to invest lavishly in competing with stores even just economically at times, almost every developer in the world is going to be highly constrained and unwilling to make an investment if they're unsure of whether that investment will be viable after three years when the injunction expires.

**THE COURT:**  Let me just jump in, Mr. Sweeney.

When did you start your negotiations with Google for this settlement?

**THE WITNESS:**  I believe that was -- late September.

**THE COURT:**  Of this year?  Of last year?

**THE WITNESS:**  Of last year.  We had initial discussions.

**THE COURT:**  September 2025, you started --

**THE WITNESS:**  Yes.

**THE COURT:**  All right.  And did you reach out to Google or did Google reach out to you to get the ball rolling?

**THE WITNESS:**  I reached out to Google to start the discussion after we had some -- after the Ninth Circuit court had ruled on the case.  I thought there was an opportunity, and I reached out to Google.  And Sameer Samat was willing to discuss.

THE COURT: Why did you reach out to Google? In other words, why did you want to pursue this settlement?

THE WITNESS: I felt that events in the whole world on, you know, *Epic versus Google* and *Epic versus Apple* were starting to go our way. I feared that we were still facing globally a many-year fight, country by country to get to the point where we and other developers could viably compete in payments and stores.

And, you know, this was after years of Apple obstructing and not complying with a Court's injunction and a very bitter, long, long-running fight over that. I feared that the process would be the same with Google in the United States, but also that we'd face a similar fight everywhere in the world.

And we've engaged with regulators in about a dozen countries and considered litigation in several countries. We have litigation in Australia that's ongoing. I felt worried that this struggle would continue for years more and saw the opportunity when it was apparent that events were turning and developers in competition's favor to try to get Google on board with making some radical changes once and giving up with fighting all the regulators and court cases everywhere in the world.

THE COURT: Okay. So you can tell me if this is wrong, but what I'm hearing is your motivation was you wanted to put all the legal fights in the United States and worldwide,

other jurisdictions, between Epic and Google to bed, just get rid of them, stop them, and then go on?

THE WITNESS:  Yes.  If we can get Google to a point of agreeing to good terms for stores, for payments, and there are other areas where they can obstruct competition, we very much wanted to put the fight to rest on a global basis.

THE COURT:  All right.  Now, the deal terms, though, have a lot in it, which is very much like a partnership, to my eye, between Epic and Google.  There's marketing that Epic is going to pay for.  It's two-way marketing.  You're going to be helping Google market Android and they're going to be helping you market Fortnite.  That deal doesn't exist today; is that right?

THE WITNESS:  That's right.

THE COURT:  Okay.  And there's also a lot of stuff -- just trying to keep it at a high level, but a lot of very product -- new product development programs in a variety of spaces using, in part, Epic's core technology.  Those arrangements don't exist between Epic and Google today?

THE WITNESS:  Nothing like -- Epic has some various smaller -- much smaller-scale deals with Google in various areas, but nothing nearly as comprehensive as what's here.

THE COURT:  Okay.  So these are going to be pretty new terms for -- between Epic and Google, as far as you're concerned?

THE WITNESS:  Yes.

THE COURT:  Okay.  So it's a new business day between Epic and Google?

THE WITNESS:  Yes.

THE COURT:  Okay.  Go ahead.

BY MR. BORNSTEIN:

Q.   Just to follow up on few of those questions, Mr. Sweeney.

First of all, in terms of Epic's interest in resolving legal disputes around the world, what was the goal that Epic was trying to achieve through these years of very expensive litigation against multiple companies and multiple jurisdictions?

A.   The goal was to have fair competition on every facet of these platforms.  You know, a lot of -- Google and Apple, we've always complained, have a lot of different products and services, but they tie them together in a way that forces developers to adopt them all.

We've long wanted to see each area of products and services associated with Android operating system be independently contestable by competitors such that stores can compete on their merits, payment services can compete on their merits, and so on and so on.

THE COURT:  Can I jump in -- I'm sorry -- and ask you a question about that?

Do you -- just a second.

Do you consider Android to be a truly open platform?

**THE WITNESS:**  I think it's -- I have called it a fake open platform in the past.  I think it is currently today somewhere in between being as open as Windows and being as closed as iOS.  It's somewhere in between, in which the platform has technical support for competing stores, but it obstructs that, you know, through all of the means that we covered at trial.

**THE COURT:**  I'm just asking because your -- your proposed settlement has you getting pretty closely allied with supporting Android, but you told the jury in December 2023 during your testimony that you had, quote (as read):

"Given up on the idea that Android was an open platform.  I've called it a fake open platform several times.  And we realized in practice for a developer trying to reach users, it was as closed a platform as Apple's platform."

Close quote.

So I'm just kind of wondering how you got from that to being comfortable with doing this business deal with the fake platform people.

**THE WITNESS:**  Well, Your Honor, this really opens it. An open platform, you know -- and the examples are Windows, Mac, and Linux.  Normal people use Windows and Mac, so that's the easiest thing to compare to.  On those platforms, you can

go to any developer's website and install their app.  The operating system asks you if you want to install the app named Fortnite from Epic Games, and it doesn't tell you it might harm your device.  And it gives the user the choice and we see a drop-off rate that's extremely low.  So it's the user and the developer doing business together without obstruction.

The terms in this agreement cement Android as an open platform that's as open as Windows and more open than Mac for competing apps.

THE COURT:  I'm just kind of wondering -- you gave very strong testimony to the jury about two years ago that this was a fake open platform, and now you're kind of, in my view, changing that.  I'm just trying to figure out what changed, in your view, to ameliorate your prior fake platform opinion.

THE WITNESS:  This opens it up, Your Honor, fully and completely.  It was a halfway open platform prior, and now it's a truly open platform.

THE COURT:  Okay.  But how is that different from what you achieved with the injunction?

THE WITNESS:  So the biggest barrier to Android being a real open platform has been when you try to install software from a Google competitor on your Android device, you go through a long series of obstructions.  Like literally, I think, later in this testimony we'll see the 20 screens that a user has to go through to get the Epic Games Store and Fortnite on their

device.  It's wildly obstructive.  Google's version of that caused a 55 percent drop-off of users quitting just in those stages before getting our store installed.

By removing all of that friction for registered stores, we're making it possible for any store -- and -- and by guaranteeing that Google -- Google has never charged fees to competing stores on Android, but nothing explicitly said in the injunction prevents them from doing that in the future.

Google has committed in this agreement for six years to not charge any fees on competing stores.  And that matters to us deeply, because once the European Union forced Apple to allow competing stores on iOS, they introduced this obstructive schedule that competing stores had to pay to Apple to compete with Apple's App Store, many of them designed to be prohibitive competition.  And the settlement here eliminates the entire array of obstructions that Epic has been complaining about.

And we've gone through great detail, Your Honor, in negotiating with Google the specific language of the -- instead of the scare screens, now the informational screens.  We've negotiated word for word.  We've negotiated the precise terms of their store program and we've gotten Google to agree to a lot of things that genuinely do make Google an open platform.

THE COURT:  But isn't it true -- you can tell me if you think it's not, but isn't is true is that the deal has a lot of -- the settlement agreement has a lot of deal terms that

are specific just to Epic and not to any other developers?

**THE WITNESS:** Yes, Your Honor, with the exception of the court costs and the settlement term referencing the Metaverse, all of the terms are specifically Epic paying Google off to make the settlement happen.

**THE COURT:** Okay. And I just -- I'm wondering because one of the other things you said to the jury -- if you don't recall it, it's okay; it's not meant to be a memory test. But you mentioned, I guess, in June, maybe -- sometime in 2018, you had decided at Epic that you all had enough of Google and you were going to launch Fortnite on your own. And you sent an e-mail to Google saying this is going to happen, and you told the jury -- well, you had a meeting at Google headquarters and you said, well, here's what happened. Quote: (as read):

"Rather than changing the Google Play terms to accommodate our view that the fee was too high, they instead offered a series of side deals to compensate Epic in other ways."

Okay. That was your description of the deal.

And then you were asked the question (as read):

"Well, what was your perception of that proposal?"

And you said, quote (as read):

"It seemed like a crooked arrangement to me because Google was just trying to buy us off."

That's not your quote.  Your quote ended with "Seemed like a crooked arrangement to me," and then you kind of went on to summarize it a little bit.

That's all in Docket Number 843 on page 138.

So I am not meaning to be antagonistic in answering this, but you can see how the question might arise:  How is this -- how would Tim Sweeney in 2018 -- would he have called this a crooked arrangement?

**THE WITNESS:**  Well, if Google were paying Epic off to accept a deal that lessened the -- you know, any of the injunction terms, I would think that would be a crooked deal.

I don't see anything -- it's, I agree, strange, but I don't see anything crooked about Epic paying Google off to encourage Google to allow much more robust competition than they've ever allowed in the past.

**THE COURT:**  Okay.  I'm just looking at what you were thinking when you were going through the deal.

Go ahead.

**MR. BORNSTEIN:**  Thank you, Your Honor.

**BY MR. BORNSTEIN:**

**Q.**  Let me just pick up right from there.  It dovetails with the question I asked you right before the Court's questions about your goals in the litigation, which you described.

Were you willing to settle the litigation and achieve this sort of global putting down weapons around the world with

Google without actually achieving those goals?

**A.** No. We have been adamant from the very beginning that we would not settle unless there were a comprehensive solution to restore competition.

**Q.** Okay. And so do you think that that's been achieved through the settlement that's been reached?

**A.** Yes, absolutely.

**Q.** Okay. Let me turn to a little bit on the Epic-specific terms that are in the agreement.

First of all, are there any provisions of the agreement relating to store distribution or payment solutions that are Epic-specific?

**A.** No. They are all generally applicable to any developer who operates a store or any developer who has an app that has in-app payments.

**Q.** Okay. So if I could ask you to turn -- you have a binder, Mr. Sweeney -- to Tab 3 of the binder. This has the term sheet. And I'm going to direct you to page 8. We're not going to put it up on the screen because there are confidential terms here.

**MR. BORNSTEIN:** And just for Your Honor's information, the orange highlighting in the document reflects the things that are at least currently under seal.

**THE COURT:** Well, provisionally, yes.

**MR. BORNSTEIN:** Oh, yes.

**THE COURT:** This is the same as Docket Number 1125-2?

**MR. BORNSTEIN:** Yes, it should be, Your Honor. This is the term sheet.

**THE COURT:** Okay. Go ahead.

**MR. BORNSTEIN:** Thank you. I just wanted to make sure Your Honor knew why this thing was highlighted.

**BY MR. BORNSTEIN:**

**Q.** So there is -- about in the middle of page 8 -- a reference to the software license that was being discussed previously.

Do you view this as a transfer of value from Epic to Google or from Google to Epic?

**A.** This is a substantial transfer of value from Epic to Google. It's a software license of which we've only sold one comparable license in our history for hundreds of millions of dollars.

**Q.** And the Court raised the question about fine, you know, maybe the financial terms of the license are not a payoff to Epic, but maybe there's something else in what the Court referred to as joint product development that constitutes a payoff of some kind.

First of all, is there a joint product development arrangement in here? And keep this at a high level, please.

**A.** No, there's no joint product development ongoing or contemplated or agreed on at all.

**Q.**   Okay.

THE COURT:   I'm having trouble understanding what that bottom box on page 8 means, then.   Isn't that a joint project? We're just all kind of bumbling around without using words, but isn't that a joint project?   It says "Google and Epic will work together..."

Sounds like a joint project to me.

THE WITNESS:   Oh, this is -- well, this is Epic and Google each separately developing our product lines.   Epic -- Epic's technology is used by many company -- companies in the space Google is operating in to train their products.   And so the ability for Google to use a real engine, more fulsome -- I'm sorry; I'm blowing this confidentiality part -- but the ability for Google to use our technology in the further production of their technology.

THE COURT:   Yeah.   So you're working together in mutually beneficial ways on your technology; right?

THE WITNESS:   Well, we're licensing them our technology and we're treating them as a customer, as we do with several of the other leading companies in that space.

THE COURT:   And then on the next page, on page 9 in that upper box, you're agreeing to promote Android.

THE WITNESS:   Yes.   This is Epic agreeing to a significant budget to promote Fortnite on Android.   This is, in my view, Epic transferring marketing value and Fortnite cred

from ourselves to Google in order to entice them to do the things we wanted.

THE COURT:  Yeah, and it also -- sorry.  Going back to page 8 in that last box, the tiniest one, second from the bottom, that says "partnership."  You guys are entering into -- Epic and Google are entering into a, quote, partnership, close quote, with respect to that item; right?

THE WITNESS:  Yes.  This is a partnership in that every company we license our technology to and support on an ongoing basis is a partner, and every company that uses Google's services of this sort, you know, and works with them and gets bespoke support from their engineers is a partner.

This is not the creation of like a joint venture or something.

THE COURT:  I understand, but then the partnership involves something like $800 million over six years.

THE WITNESS:  I'm sorry, Your Honor.  You are --

THE COURT:  I'm talking about the second-to-the-bottom partnership on page 8.

THE WITNESS:  Yes.

THE COURT:  And then it says "See Exhibit 3," and Exhibit 3 talks about an $800 million spend over six years.

That's a pretty healthy partnership.

THE WITNESS:  Yes.  Your Honor, this is services we buy from companies similar to Google on the open market.

Currently, today, we put about 10 percent of our spending on these services into Google and about 80 percent into a different vendor. Every year when we make the decision who's -- what company's services to use there, we have every year decided against Google.

In this settlement, we're agreeing to use Google's services at market rates. And because we have never independently chosen to use these services and because we're not getting any special discount beyond what is referenced as ordinary rates for this category of customers, we -- we view this as a significant transfer of value from Epic to Google, because they're getting business that they I don't think would have gotten had we made the decision the ordinary way that they ordinarily do.

**THE COURT:** I understand. And just to make sure I understand, please correct me if I'm wrong, but what I see here is with this partnership referred to on page 8, Epic's committing to an $800 million payment to Google over six years.

**THE WITNESS:** Yes.

**THE COURT:** Okay. Now, what is -- okay. So you've mentioned several times there's a transfer from Epic. You're giving -- I'm just paraphrasing. You're giving Google a license to your technology, your -- you just committed to an $800 million spend over six years that you had never done before.

What are you getting out of this?  This is a lot.  This is a good deal for somebody, but what is Epic getting out of this, in your view?

**THE WITNESS:**  We're getting the chance to be a contender in the several markets that we see as the future of our company's growth.

Number one, we see the Epic Games Store as a huge potential growth opportunity.  And if it's unfettered from the, you know, anticompetitive barriers of Google and, you know, over time perhaps others, then it becomes the only store that's on Android and iOS in some parts of the world, on PC and on Mac.  We think this Google allowing competing stores and ceasing blockading them is a great growth opportunity for us.

We also see Google Play with 98 percent market share dominating and a place that we can't necessarily afford to not be at all times in the future, and so the -- Google's concessions to competing payment alternatives and caps on some of their rates for competing payments services gives us the opportunity to have a better business if we choose to distribute our apps through Google Play and for all developers to have the same.

And finally, one part of the trial that was only talked about briefly is Epic's belief that the -- what we have today that's called the open web evolves in the future to be more 3-D and more like that Metaverse from science fiction, and we think

this agreement sets in place certain Google guarantees that have been made, the web browsers, and extends them to the future growth of web browsers into the Metaverse.

THE COURT:  Okay.  So is it fair to say that, in your view, this proposed settlement with Google is an important part of Epic's kind of growth plan for the future?

THE WITNESS:  Yes.  Without worldwide settlement that allows us to complete in all of these areas, our growth is heavily constrained by our inability to compete on the Android platform.

THE COURT:  Okay.

Okay.  Any other questions for this witness?

MR. BORNSTEIN:  I do, Your Honor.  If you don't -- if you'll give me a little bit of indulgence.

THE COURT:  Let's keep it moving, please.

(Reporter interruption.)

THE COURT:  We'll take a break now.  Careful on the way down.  Remember, no talking till you're off the stand. Okay.

THE COURTROOM DEPUTY:  All rise.  Court is in recess.

(Recess taken at 1:03 p.m.)

(Proceedings resumed at 1:24 p.m.)

THE COURTROOM DEPUTY:  All rise.  This court is back in session.

Please be seated.

THE COURT:  Okay.  Go ahead.

MR. BORNSTEIN:  Okay.  Thank you very much, Your Honor.

THE COURT:  And I'm not going to rush you.  We have plenty of time, but I do want to get Dr. Rose on.

MR. BORNSTEIN:  Great.  The break has allowed me to be more efficient, and I will try to live up to that.

THE COURT:  All right.

BY MR. BORNSTEIN:

Q.   I do want to hit one thing we touched on before the break, though, to close it out, which is to a look, if you could, Mr. Sweeney, at Tab 3.

MR. BORNSTEIN:  This is, Your Honor, the term sheet.

THE COURT:  Oh, yes.  Okay.

MR. BORNSTEIN:  And I'm going to go back to that box on the bottom of page 8 that we were discussing.

THE COURT:  The partnership box.

MR. BORNSTEIN:  That's the one.

BY MR. BORNSTEIN:

Q.   Okay.  There was some discussion during Dr. Bernheim's testimony about whether any terms -- what he had heard from you and from Mr. Samat about whether any terms had been agreed.  I just want to cover this with you as well.

I'm going to read a few words from the confidential section here, but if you look at the very bottom of the page,

it says (as read):

          "Subject to terms to be agreed."

     Do you see that?

A.   Yes.

Q.   Okay.  At the time that the settlement agreement was reached, had there been any specific terms agreed about this potential partnership?

A.   No.

Q.   And as we stand -- and sit, respectively -- here now, have there been any terms reached about this potential partnership with Google?

A.   No, nor has any understanding of what the terms would be other than the general collaboration in these two areas.

          THE COURT:  Well, you expect to reach the terms, don't you?  You didn't sign this thinking it will never happen?  You expect there to be terms and it to go forward; right?

          THE WITNESS:  Yes.

          THE COURT:  Okay.  The fact you haven't done it now doesn't mean it's not going to happen.

          THE WITNESS:  That's right, Your Honor.

          THE COURT:  Okay.  Anything to wrap up?

          MR. BORNSTEIN:  Just one thing on that, Your Honor, and then I will wrap up on one other issue that I do want to make sure we get out.

\\\

BY MR. BORNSTEIN:

Q.   On that point, in the future, any terms that you reached will be arm's length; is that right?

A.   Yes.

Q.   Okay.  So let me touch --

MR. BORNSTEIN:  I have two things, Your Honor.  I said one.  I have two --

THE COURT:  That's fine.

MR. BORNSTEIN:  -- if you'll allow me.

Great.

BY MR. BORNSTEIN:

Q.   At the time of trial, was the Epic Games Store available on Android?

A.   No, it wasn't.

Q.   Okay.  Has it become available now?

A.   Yes.  We launched it in August 2024.

Q.   Okay.  Do you have a sense approximately of what the Epic Games Store's market share is currently on Android?

A.   It think it has roughly 0.2 percent the monthly active user of the Google Play Store.

Q.   There is a suggestion in one of the amicus briefs, maybe two, that there is -- that Epic -- the Epic Games Store is now an incumbent and part of a duopoly with the Google Play Store.

What's your reaction to that?

A.   Between Google's 98 percent and our 0.2 percent, I guess

if there's a duopoly it's mostly those guys.

**Q.**   Okay.

**THE COURT:**  You mean it's a monopoly, as the jury found.

**BY MR. BORNSTEIN:**

**Q.**   From the time that you launched the Epic Games Store in August of 2024 through today, has the Epic Games Store gotten any special agreement from Google in terms of installation flow or otherwise on Android?

**A.**   No.

**Q.**   And you were asked by the Court shortly before the break about whether this settlement was useful to Epic's future business plans.

Will the Epic Games Store get any special treatment in terms of installation flow or otherwise from Android in the future under this deal?

**A.**   No.

**Q.**   Okay.  I want to get concrete for a second about the installation flow issue.  If I could ask you to take a look at Demonstrative 5.  We can put that on the screen for you as well.  It's behind Tab Number 1 in the binder if you want a hard copy.

**A.**   Thank you.

**Q.**   Okay.  And this is an exhibit to the settlement agreement. It's Exhibit Number 1.

At a sort of high level, recognizing that we have limited time, can you just explain to the Court what we're looking at here?

**A.** Yes.  This is the combined flow that Epic and Google have agreed to in the settlement for two things:  First of all, installing a third-party store onto your Android device and then installing an app within that store.

And the flow we're seeing here currently comprises, end to end, about 20 screens in the current version of Android, several of which are Epic's own screens.  The agreed settlement collapses all those screens down to these.

THE COURT:  How is this different from the injunction which says that Apple can't prohibit the distribution of third-party Android app distribution platforms or stores through Google Play Store?  They're entitled to reasonable measures for security -- which is all that scare screen stuff we heard so much about at the trial; you remember that -- but Google has to show that it's a minimum to accomplish security goals and nothing more.

I mean, this is just an implementation of what's already in the injunction, isn't it?

THE WITNESS:  Yes, Your Honor.  And there are two ways one could get the Epic Games Store onto your Android device. One is through the store within a store from the Court's current injunction in which Google has to host those stores,

and the other is from the developer's website.

That flow would be as -- from the store within a store would -- unless Google is obstructive -- would -- I would think would be as simple as this, but only in the United States and only for three years.

THE COURT:  That's the only difference is U.S.-only and three years.  Otherwise, it's basically what's already been order in the injunction not to scare people away; right?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. BORNSTEIN:

Q.   Well, Mr. Sweeney, is there -- in the current injunction, would this set of screens appear if you downloaded the second way that you described, from a developer website?

A.   No.  The current injunction only requires Google to host competing stores within their store.  It does not require Google to remove any of these obstruction screens for installing software from the web.

Q.   And do you find that distinction between downloading from the store from the Google Play Store or downloading the store and having this friction flow screen from the web to be important in any way in your assessment of the settlement versus the existing injunction?

A.   For the 95 percent of Android users who are not in the United States, the web is the only currently viable way to get

the Epic Games Store on your device.

Q.   So let me -- since you mentioned outside the United States, let me turn to just a real-world factual circumstance that I want to be sure the Court gets some evidence on.

Is the Epic Games Store available right now in Europe on iOS devices?

A.   Yes.

Q.   And how long has about that been true?

A.   Since August of 2024.

Q.   Have there been any changes since that time in what the installation flow looks like on iOS for the Epic Games Store in Europe?

A.   Yes.  Apple launched with highly obstructive installation flow, and then Europe pressured Apple and they removed that and instead replaced it with a neutral -- an almost neutral information screen.

Q.   All right.  Let's take a look at Demonstrative 6, please.

Can you explain just generally to the Court what we're looking at here in Demonstrative 6?

A.   Yes.  This shows the drop-off rate of users who go to Epic's website, see our store offered to them, and click the install button on our website.  This measures how many users drop off between clicking that install button and actually having the store successfully installed on their device in two different cases.

The purple case is iOS in Europe.  And the second case is Android -- the blue one is Android worldwide.

Q.   All right.  And to the left of the --

Well, first of all, what does that vertical white line represent?

A.   This is the date that Apple released the update to iOS which replaced the horrific series of obstructive screens with a single, almost neutral, information screen.

THE COURT:  Can I just jump in?

I get the point that no scare screens means easy downloads.  I get that.  I understand.

THE WITNESS:  Okay.

THE COURT:  We don't need to spend time on iOS in Europe.  I understand the point.  I'm not arguing with you about that.  I get it.

MR. BORNSTEIN:  I will ask one follow-up question, then, Your Honor, moving to tying it together.

THE COURT:  Yeah.

BY MR. BORNSTEIN:

Q.   Mr. Sweeney, did this data -- did your experience with what happened in iOS in Europe have any impact on your decision to negotiate and reach the settlement here?

A.   Yes.  We saw that users were completely willing and able to go to the web and install our store.  We were able to get large numbers of users in before and after.

But the difference is without the friction -- with the friction screens, we lost 65 percent of users, and with them removed, we're trending towards a 20 percent drop-off rate, which gives us confidence that installing stores from the web is a completely viable solution to reaching users on Android, as we had already found on PC and Mac.

**Q.** Okay. I'm going to cover one last question that the Court had asked a question about the -- being comfortable with the fox guarding the henhouse. I think this question went to Dr. Bernheim, not to you.

In the context of who gets entitled to use this friction-free flow through the registered app store, were you concerned about Google being the fox guarding the henhouse here?

**A.** Yes.

**Q.** And how did you try to address that problem in the settlement agreement?

**A.** The arrangement we reached was to very precisely document the criteria under which Google had to allow competing stores to qualify for the registered stores program.

And we negotiated word for word a number of bullet points governing exactly how Google could do that.

**Q.** Is that in what's Demonstrative 7, that's Exhibit 2 to the settlement agreement?

**A.** Yes.

MR. BORNSTEIN:  Okay.  Great.

I have nothing further, Your Honor.

THE COURT:  Okay.  Careful on the way down.

(Witness excused.)

THE COURT:  Who do we have next?

MR. BORNSTEIN:  Mr. Samat will be next, Your Honor.

MR. POMERANTZ:  Your Honor, Google calls Sameer Samat.

Senate.

THE COURT:  Okay.

(Sameer Samat steps forward to be sworn.)

THE COURTROOM DEPUTY:  Stand and raise your right hand.

**SAMEER SAMAT**,

called as a witness for the Defendants, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Would you like to take down the binder from --

MR. POMERANTZ:  I might refer to one document in there.

THE COURT:  Yeah, that's fine.

THE COURTROOM DEPUTY:  Please state your full name for the Court and spell your last name.

THE WITNESS:  My name is Sameer Samat.  Last name is

spelled S-A-M-A-T.

            **THE COURTROOM DEPUTY:**  Thank you.

                       **DIRECT EXAMINATION**

            **MR. POMERANTZ:**  Your Honor, may I proceed?

            **THE COURT:**  Please, yeah.  Yeah.

**BY MR. POMERANTZ:**

**Q.**   Good afternoon, Mr. Samat.

      What is your current job at Google?

**A.**   My role at Google is president of the Android Ecosystem.

**Q.**   And what's your responsibilities in that position?

**A.**   My responsibility is for the different components of the
Android operating system, including our work on mobile,
tablets, TVs, auto, et cetera, as well the Google Play Store.

**Q.**   Is it fair to say that you head the Android business unit?

**A.**   That's correct.

**Q.**   And Play is part of that unit?

**A.**   Yes.

**Q.**   How long have you held that position?

**A.**   A little over a year and a half.

**Q.**   And are you familiar with the settlement agreement between
Google and Epic?

**A.**   I am.

**Q.**   Are you familiar with the proposed modified injunction
that's an exhibit to that agreement?

**A.**   Yes.

**Q.** What was your role in negotiating the settlement agreement with Epic?

**A.** I led that negotiation on behalf of Google.

**Q.** And who did you negotiate with at Epic?

**A.** With Mr. Sweeney.

**Q.** When did that --

**THE COURT:** Did you do the negotiations?

**THE WITNESS:** I did.

**THE COURT:** Not the lady who signed it?

**MR. POMERANTZ:** As Your Honor can see --

**THE COURT:** She didn't do it?

**MR. POMERANTZ:** She was a lawyer who advised the company. Mr. Samat was on the front line making -- doing the negotiations.

**THE COURT:** So unless you tell me otherwise, I think we can skip her.

**MR. POMERANTZ:** That's what I think too, Your Honor.

**THE COURT:** Yep. Go ahead.

**BY MR. POMERANTZ:**

**Q.** When did these negotiations begin?

**A.** Last fall.

**Q.** And when the negotiations began, how long have you been in this new position as the head of Android?

**A.** At that time, it would have been a little over a year.

**Q.** And did the fact that you had just assumed that new

position as the head of Android affect how you went forward with these settlement negotiations?

A.    Yeah.  It gave me an opportunity to take stock of the general state of Android and where we were doing well and where things could be better.  Fresh eyes on the problem.

Q.    Okay.  And during the negotiations, were you aiming to reach a settlement agreement that focused only on the U.S. or were you looking for something that was broader?

A.    Well, our motivation in general was that these matters that the Court has been dealing with here are also being dealt with by many other jurisdictions around the world simultaneously, and what we've seen happen over a period of time is that there is an emerging -- what I can refer to as a patchwork of solutions that are coming out of different countries.

And from a Google perspective, our motivation would be, and was, if we could arrive at a solution to the concerns that were more global in nature, that would be advantageous in that it would reduce the amount of effort and energy that we needed to put on each of the different solutions in each country.  And we sought to do that.

Q.    So let me make sure that the Court is clear about what we are talking about when it comes to global.

The existing injunction that the Court has issued is limited to the United States; correct?

**A.**   Yes.

**Q.**   The modified injunction that the parties are jointly proposing as part of the settlement is also limited to the United States; correct?

**A.**   Yes.

**Q.**   But the settlement agreement between the parties takes the registered app store remedy and by agreement, Google is going to do that on a global basis; correct?

**A.**   Yes, that's right.

**Q.**   Okay.  Now, Dr. Bernheim and Mr. Sweeney have already come here and testified about their views on why they think the settlement is good for developers and for competition.  I just want to focus on Google.

Why did Google enter into this settlement?

**A.**   Well, as I mentioned earlier, Google looked at this as an opportunity to resolve the disputes that we've had not only with Epic, but that have come up from developers in other parts of the world.  Epic has been, as I think Mr. Sweeney mentioned, bringing these issues up in many different regions as well.

And from our perspective, again, the different solutions that come about in different parts of the world do put an enormous tax, if you will, or burden on our engineering teams and various other teams to specify solutions for each region.

It's also not good for our relationships with developers to have different solutions in different regions.  It makes it

complicated for us to explain, especially when developers are trying to operate in a global market.

So our motivation was to find a resolution that would be global in nature. To do that, however, it was important, very important, that -- that Google and Epic agreed, because Epic is a common thread in these discussions around the world, and I think the developer community, as well as regulators and other courts, see them as an advocate for developers generally. So it was important that we started with a resolution with Epic that we could bring to the rest of the world.

Q.   And so is the idea of this settlement that if the Court were to enter the modified injunction in the United States, then Google and Epic would take this settlement approach to other countries and their regulators?

A.   That's exactly right.

Q.   Okay. All right.

Now, at a high level, why did you like this registered app store approach with a streamlined flow? Why did you like that better than catalog access and Play distributing third-party stores?

A.   Well, I think the goal of -- of this was to break the chicken-and-egg problem, and so we understood that goal. And when we discussed this with Mr. Sweeney, we had a conversation about the different ways, approaches to doing that. The registered app store program presented -- was actually

something that we came up with during our conversation and presented a more elegant solution to that problem because it removed Google from being in the middle of that -- of that process of determining what should be inside the Google Play Store and what apps should be funneled through to these other app stores.  It removed Google from that process while at the same time still turbocharging the user access side of that flywheel that we've heard about earlier today.

And so we were very positive on that, and we were comfortable with that being a solution that we could implement globally.

THE COURT:  You understand that the jury found that Google created the chicken-and-the-egg problem through monopolistic, anticompetitive conduct?  You understand that?

THE WITNESS:  I do understand that, Your Honor.

THE COURT:  Okay.  So I don't really -- I'm not -- what are you talking about Google getting out of the middle of that?  What does that mean?

THE WITNESS:  Not getting out of solving the problem, Your Honor.  Purely -- the question to me was:  Why did we prefer one than the other?

THE COURT:  I mean, it's obvious to me because I heard it in court repeatedly, as did the Ninth Circuit:  Google was adamantly opposed to its very core to share catalog access or to put competing app stores on the Google Play Store.

I understand all that.  But what I'm not -- I really -- it doesn't help me -- the riffing on why is this good for the world, I'm just -- it's not good.

I want to hear more:  What are you getting out of this deal that you did not have before with Epic?

**THE WITNESS:**  Yeah.

**THE COURT:**  I know you want global peace.  I understand that.  You want to buy global peace.  I get that.

But, I mean, there's a lot more in there.  There's all sorts of -- I mean, you were here this morning.  You've heard everything.  So you're getting a lot out of this.  As Mr. Sweeney said, in his view, it's a large transfer of monetary and other -- you know, tech licenses and so on to Google.  That's a pretty big win for Google, isn't it?

**THE WITNESS:**  Well, Your Honor, if I can explain that and we can focus on that.

A big part of the agreement between Google and Epic here and -- was the cap on our fees, and so it's a ceiling of what we can charge.  And that comes into effect immediately when the -- when the proposal -- if the proposal was approved and goes into effect.

That's very costly for our business, and we were willing to accept it in the context of a global agreement.

**THE COURT:**  Costly in what sense?  You were charging what are called monopolistic prices.  So it's costly because

you can't charge the monopoly prices anymore?

**THE WITNESS:** Well, Your Honor, I think that the idea behind the Court's injunction, if I understand it correctly, is to restore competition, which would allow prices to be set by that competition.

Mr. Sweeney felt it was very important to pull forward the effect of that competition to day one so that the agreement would be seen positively by all developers across the board, so there would be something very clearly positive.

And so we agreed to do that, but, of course, that is costly from day one for -- for Google.

**THE COURT:** Why is it costly other than you're losing money that you cannot charge by not being a monopolist?

**THE WITNESS:** Well, Your Honor, factually, all I'm saying is that it's costly. I'm not making a comment on --

**THE COURT:** I'm asking you to tell me, Mr. Samat, why is it costly? What does that mean? What is it costing you?

**THE WITNESS:** When we reduce rates from the current rates to --

**THE COURT:** Your monopoly rates.

**THE WITNESS:** When we reduce those rates, Your Honor, there is an immediate --

**THE COURT:** You lose money. I get it.

**THE WITNESS:** That's all.

**THE COURT:** You can't be a monopolist anymore wringing

blood from a turnip, so it's costing you money.  But you're not entitled to that money.  That's what the jury verdict says.  You can't get that money.  It's not a cost to you; you shouldn't have had it in the first place.

So I'm trying to understand:  Is there some other cost?

It's not a cost.  That's making the world right for being a monopolist.

THE WITNESS:  Maybe I'm describing it incorrectly, then, Your Honor.

THE COURT:  Is that all you're talking about, the difference between what you could charge as a monopolist and what you can charge in a competitive market?

THE WITNESS:  And the difference there in terms of fast-forwarding the effect of that competition was -- because I think Your Honor was asking what about the other pats of the deal, and if I could explain that.  So --

THE COURT:  I would like to hear that, so just let me start over.

You're getting a lot, according to Mr. Sweeney.

And by my reading of the deal sheet, you are getting a lot -- not you, Google; Google is getting a lot -- everything from, you know, hundreds of millions of dollars in payments over six years for one partnership to Epic -- who's on record as saying Google is a fake open platform to now championing the Android system to the marketing promotions to the new project

you're going to be working on based on Epic's core technology that you're suddenly getting.

You're getting a lot.  You're getting a big, big bolus of -- you're getting a big present from Epic.

So what are you doing for Epic?

**THE WITNESS:**  Well, Your Honor, when --

**THE COURT:**  You're buying peace.  I get that.  Okay.  That's important.  I'm not gainsaying that.  But is there anything else besides buying peace globally?

**THE WITNESS:**  That we're doing for Epic, Your honor?

**THE COURT:**  Yeah.

**THE WITNESS:**  Yeah.  I think that when we spoke with Epic, I think, as Mr. Sweeney mentioned, one of the things that they wanted was for Android to -- in their -- in Mr. Sweeney's words, become more open, and he felt that was important not only for his business, but for other developers around the world as well.

And -- and his -- his focus and priority in the conversation was:  How can we make Android more open for all developers in the U.S. but also globally?

And so the registered app store program that we've put in our settlement agreement is the manifestation of that.  And our agreement to scale that in the operating system itself across all the billions of phones in the world, it was a -- from our perspective, an elegant solution, but at the same time a big

give.

THE COURT:  Do you believe that -- as head of Android, do you believe that catalog access, as ordered by the injunction, is a plus or a minus for Google?

THE WITNESS:  I think it's a minus for Google, Your Honor.

THE COURT:  Why is that?

THE WITNESS:  I think catalog access is going to result in a lot of complexity whereby, you know, developers come to us and they put their apps in Google Play, and they are very particular about where their IP is displayed and where their downloads are coming from, and they care about the brand and so forth.

And I foresee a situation in the future where those apps are showing up in different stores, which I think is the purpose, and some of those stores may contain content that is not on brand or -- or that the developer may not want to be associated with.

And, of course, they can opt out of that distribution, but I also think that --

THE COURT:  Let me just jump in.

What's Google -- why is it a minus for Google?  You're talking about -- that may be a minus for some poor developer. I'm not interested in that.

Why is it a minus for Google?

THE WITNESS:  Well, when it's a minus for Google because the developers will generally hold -- my experience is that they will hold Google accountable for where those apps show up, and if those apps show up in, for example, a store that has content in it that -- like if you have an app that is a retailer selling clothes to kids, and that app shows up in a store which has racier content than is on brand for that retailer, that retailer would say to Google:  How did you let this happen?  We didn't understand that this was going to happen in that way.

And we would be in the middle of that conversation.  As a competitor of some of these stores, I can foresee that we would be trying to do the thing that was right; but everybody on either side would find reason that we might not be acting in the right way.  So we seek to avoid that kind of a situation.

THE COURT:  Is that the only minus you can think of for catalog access?

THE WITNESS:  From a Google perspective, Your Honor.

THE COURT:  That's it?  The fact that a developer might get upset because there's some confusion in another store that they don't want to be associated with?  That's the only minus you can think of?

THE WITNESS:  Well, I would say that's a primary concern.

Of course, you know, providing our catalog to other app

developers is -- is -- or excuse me -- other app stores, I think you're -- you're referencing that that would help those other app stores, if I understand what you're asking now properly.

And I do think, of course, that's a minus for Google, but it wasn't the primary focus that we had in the conversation.

THE COURT: Minus for Google is that catalog access and hosting rival app stores on Google Play creates competition that did not exist before; isn't that right?

THE WITNESS: I think we were -- yes, Your Honor, it creates competition. We were seeking a different way of achieving that goal without the -- without Google being in the middle.

THE COURT: Okay. Go ahead.

BY MR. POMERANTZ:

Q. So you ended up with the registered app store approach. How does the registered app store approach, in your view, affect competition?

A. The registered app store approach allows anyone, any developer, to create an app store. It would allow that app store to be registered with Google, and then it would be downloadable through a very simple flow that we've already gone through right from the developer's website. So this removes Google from the middle but doesn't decrease access to the store. In fact, with the global nature of this as well the

fact that there's a simplified flow from a website, it actually can increase the access to -- to third-party app stores.

Q.   I'm going to go back if I can to the Court's questions about how much money Google might lose.

The Court's injunction is focused on the United States; correct?

A.   Correct.

Q.   The agreement that Mr. Sweeney asked for with respect to caps on fees, did he want it to be limited to the United States or did he insist that it be global?

A.   Mr. Sweeney was insistent that our settlement be global.

Q.   Including the cap on fees?

A.   Yes.

Q.   So the cap on fees applies everywhere in the world; correct?

A.   Correct.

Q.   And was that financial implications of that cap on fees what led you to ask for some of these other parts of the transaction -- of the settlement?

A.   Yes.  The fee caps are -- outside of the United States as well as in the United States are expensive, and therefore we sought other forms of value that -- for other parts of Google's businesses, not the Play Store, but other parts of Google's businesses that might make up for some of that.

          MR. POMERANTZ:  Your Honor, I don't have any further

questions for Mr. Samat.

THE COURT:  Okay.  Thank you.  Careful on the way down.  It's very steep.

(Witness excused.)

THE COURT:  We will take a short ten-minute break and then we'll be back with Dr. Rose.

THE COURTROOM DEPUTY:  All rise.

(Recess taken at 1:53 p.m.)

(Proceedings resumed at 2:03 p.m.)

THE COURTROOM DEPUTY:  All rise.

You may be seated.

THE COURTROOM DEPUTY:  Please raise your right hand.

**NANCY ROSE**,

called as a witness for the Court, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

Please state your full name for the Court and spell your last name.

THE WITNESS:  My name is Nancy Lin Rose, R-O-S-E.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  We're now going to hear from Dr. Rose, who, as the parties are aware, the Court has retained under Federal Rule of Evidence 706 to provide some independent advice with respect to the proposed injunction modifications.

Just by way of background, I know Dr. Rose is known to many in the courtroom, but by way of background, she holds a Ph.D. in economics from MIT, has been on the Massachusetts Institute of Technology faculty both at the Sloan School of Management, and for most of her career, in the Department of Economics.

She's currently the Charles Kindleberger Professor of Applied Economics and has held that chair since 2010, and she was chair of the Economics Department at MIT between 2017 and 2020.

Among other prestigious engagements, she also was Deputy Assistant Attorney General for Economic Analysis in the United States Department of Justice Antitrust Division from 2014 to 2016, and also was Director of the Research Program in Industrial Organizations at the National Bureau of Economic Research between 1991 and 2014.

That is the nutshell version, but let me ask Dr. Rose to take it from here.

**DR. ROSE:**  Thank you.

So my assignment from the Court was to evaluate the economic and antitrust effects of the proposed modifications of the permanent injunction issued by this Court vis-a-vis the jury verdict and antitrust law.

I want to start by reminding us all of the principles of an effective antitrust remedy, and I think that was very

eloquently described in Dr. Bernheim's Demonstrative Slide 3 in the remedies hearing.

Paraphrasing:  First, in accord with the jury verdict, prohibit the specific anticompetitive practices that Google has used in the past to acquire and maintain monopoly.

Second, preclude pivots to conduct that could be used to obtain substantively similar outcomes.

Third, give rivals an opportunity to compete on the merits with the Google Play Store and Google Play billing despite the ongoing advantages that Google has acquired through its past anticompetitive conduct.

And, finally, avoid inhibiting Google's ability to compete on the merits by improving its product or pricing to a degree possible.

I want to emphasize in particular the third criteria.  The antitrust law is designed to protect competition and the competitive process.  That means that telling Google "Sin no more" after a finding of illegal monopolization is not necessarily sufficient, and in this case, it will fall far short of the objectives.

I want to think about this in the context of a simple analogy.  Suppose there's a market town with a wall around it but doors that allow buyers and sellers to enter and leave for other markets.  The market is an attractive venue, but once everybody is coming to that market, the owner decides to

prevent participants from interacting with other markets by barring and locking those doors and gates.

While everyone is locked in, the ditch outside the market starts to fill with water until it's too deep and too wide for anybody to cross. It's not going to be enough to tell the market owner to unlock the doors. The moat is going to keep anyone from entering or leaving even if the doors are open.

You have to tell the market owner to let down the drawbridge for a while until others have a chance to build boats or bridges and restore the flow of commerce in and out of the market.

The injunction filed by this Court on October 7, 2024, recognized the importance of this principle largely at the urging and explanation of Epic and its experts during the remedies hearing.

Network effects in app distribution are like the water in the moat. This injunction requires Google first to let other markets tell people that they're operating -- that's distribution through the Play Store -- and second, let down the drawbridge for a while, allowing those alternative app stores in this context to get access to the full Google Play Store catalog.

This gives potential competitors a toehold to try to convince users and developers that their app stores offer greater value than the Google Play Store, and if those

competitors succeed, Google will have to compete for business by offering a more attractive marketplace, the benefits of competition that the Sherman Act envisions and embraces.

Listening to the testimony this morning and looking over the evidence that has been presented so far during the trial, at the remedies hearing, and the other documents that have been filed, I observed, first, that the role of network effects and their crucial importance in Android app store -- Android app distribution was a feature all the way through; that Google's exclusionary and illegal conduct deprived rivals of the ability to build networks and enhance the strength of Google's own network; and that providing rivals with temporary access to network effects through catalog access and Play Store distribution of app stores was crucial, as the judge quoted this morning, to solve the so-called chicken-and-egg problem; that is, to jump-start potential entry and try to restore competition.

And yet now, Epic and Google are telling us that eliminating those clauses is, quote, "an appropriate alternative with meaningful benefits."

Second, not only does this modification eliminate important competitive provisions, but it codifies into law practices that we might expect to be set through competitive negotiations, including, for example, requirements that developers offer Google Play billing, explicit permission for

Google to exclude in-app links to downloads, and explicit permission for Google to collect specified service fees on all revenue ever generated by an app that is downloaded or updated from the Google Play Store, regardless of how those services are provided or paid for.

The parties justify opening this injunction due to a significant change in circumstances, which is the settlement. I think it's important to remind ourself that the settlement agreement provides many ways to transfer value, including, as has been discussed, avenues outside the Android app distribution and billing markets, and not only does it raise the possibility of creating a deal that benefits Epic, perhaps even relative to other app developers while at the same time imposing limited competitive restraints on Google, but I think in contrast to a suggestion made earlier today that that possibility is speculative, I think there are some particular places to look at where we would see that being highlighted.

For example, it could be that the 9 percent service fee cap on particular forms of revenue has a particular benefit for Epic, given the nature of its revenue streams relative to, say, other game producers.

Or, as Mr. Sweeney alluded to in testimony that touched on the confidential terms on page 6 to 7 of the settlement agreement, there may be benefits to Epic that are very substantial in terms of its future plans and expectation of how

the future may develop.

So I think it's important to recognize that just because the two parties find value in this settlement, that does not mean that it is beneficial to consumers or to the competitive process.

And, again, I would point us to one of Dr. Bernheim's excellent demonstratives, his Slide 31 from the remedies hearing in May 2004, entitled "Sharing Monopoly Profits to Deter Entry."

That slide reminds us of the principle that a monopolist generally can afford to pay a rival more to stay out of the market than the rival would earn if it entered and competed, if that payoff protects the monopoly and the rents that it generates.

The shorthand we use in industrial organization is "Monopoly profits are generally greater than the sum of duopoly profits."  The monopolist and the rival are both better off paying the entrant to stay out.

The Court heard testimony on this with respect to Google initiatives like Project Hug, but when that happens, consumers and competition are the losers.

The Supreme Court decision in the *FTC versus Activist* is recognition of the potential anticompetitive effects like this is a settlement agreement.

So while Mr. Sweeney says that the settlement is better

for all participants and that's why he's supporting it, I have to say I think we should express some skepticism and caution before we jump to that conclusion.

And I'm going to talk about the places where I think there are significant mismatches between this modified injunction and the goals of opening up the process to competition in four buckets.

The first goes to this elimination of the provisions that were intended to temporarily rebalance network effects to overcome the coordination problem facing potential entrants, what's been called the chicken-and-egg problem.

So Dr. Bernheim has suggested that while he is still in favor of the clauses that were intended to overcome that -- and here I'm talking about the catalog access clauses and the distribution of alternative app stores on Google Play -- that while those are beneficial, that, in fact, it would be better to abandon those provisions, if needed, in order to get a few other provisions that give competitors three more years if they can find a way to overcome the network effects before those additional three years expire.

And here I'm talking about the trade-off that seems to be being made between catalog access and easy distribution through the Google Play Store with registered app stores.

I have to say, given the strength of the testimony on network effects and the fact that the modified injunction seems

to contain no provisions that directly address solving those network effects, they talk about giving, you know, app stores this Google seal of approval through the registration process and simplifying the installation process, but those aren't addressing network effects; those are just reducing the entry barrier that Google has erected.

And I think that that's problematic, because it seems in large part to assume that as soon as the injunction ends, Google is going to go back to the behavior that the jury found violated the antitrust laws. That may be a concern given that the history that Google has undertaken that is reflected in testimony before the Court. I can understand why Epic and others might be concerned about that, but I find that an odd reason to drop the provision that open up network -- that rebalance the network effects in allowing more entry.

So let's go to the second point, which is reducing frictions. Right? So the first goal of the injunction was to rebalance at least temporarily those network effects. The second is to reduce frictions.

So I agree that the specification of the registered app store terms seems to resolve some uncertainty, but I don't really understand why that does much more than what the injunction orders and why, for example, the technical committee that the Court established in the injunction can't just require something like this.

Also, I do feel if parties find that after three years when the injunction ends, Google's reverted to the behavior that it was sanctioned for in this antitrust trial and proceeding that one would not only be in a good position to ask the Court for an extension, but perhaps to bring a case that -- that tells the world that Google has gone back to behavior that it's already been told is illegal.

So I would expect that, moreover, if you think it's really problematic that Google is going to return to this bad behavior after three years, that there's really not much reason to think it wouldn't do the same thing after six years.  Dr. Bernheim suggested that, well, users have three more years to get used to the behavior so they might sanction it if Google tried to revert.  I, frankly, find that much less compelling than saying:  Let's ensure at that app stores can get in from day one, compete, build business, and that the Court will be receptive through the technical committee if Google is trying to impede that.

The third issue that I found with the modified injunction -- and this is something that hasn't come up today but, frankly, concerned me -- was that the injunction eliminates the illegal tie that the jury found between Google Play Store and Google billing.

The modified injunction largely restores that tie.  It does not require that apps only use Google billing, but it

requires that all apps offer Google Play billing side by side with any alternative that they might prefer.

Google condemned the state settlement that gave developers that as an option and now is agreeing to make it required.

This reinstates and writes into law through the codified modified injunction, should the Court accept it, a soft tie that apps must offer and advertise Google Play billing in-app, and they have to use Google Play billing if consumers click on that option, whether or not a payment solution's rival to Google offers developers better terms, better service, or better integrates with the developer's ecosystem.

Behavioral economics -- that featured very prominently at trial -- suggests that default options and mandated promotion may preserve much of the economic effect of the tie despite user choice.  It may also impede or eliminate competitive innovations facilitated by alternative payment solutions.  And Microsoft's amicus brief contains some discussion of that possibility.

Finally, I want to turn to service fees.  The modified injunction enshrines in the injunction Google's right to charge service fees for all revenue that's generated by apps that are purchased or updated on Google Play, resolving any uncertainty about that in favor of Google and writing it into law.

It shifts the focus to service fee caps rather than remedies that are intended to boost potential competition in

app distribution, despite earlier Google antipathy on any price terms being discussed before this Court.

Now, if you think competition is unlikely to develop, I can understand the appeal of price regulation as an alternative to limit the exploitation of monopoly power, and that may be of significant appeal to Epic, which also in some of its filings presaged an ongoing fight over service fees after uncoupling from Google Play billing.

But as reflected in decades of economic analysis of rate regulation in network transport, telecom, and energy industries, price regulation is not competition. It does not necessarily foster competition, and it frequently struggles to provide the benefits of a competitive market even under the direction of an expert agency regulator. And I do not think the Court wants to start treading into those particular waters.

Which, you know, I think, suggests, you know, has Epic now decided that it's either not going to compete against Google or maybe isn't going to be as effective in competition against Google, and so no one else needs to have the opportunity to compete against Google, and in that context, negotiated the best terms that it can extract in exchange for supporting an injunction that leaves Google with relatively few competitive concerns.

This comes to my final point, which is the principle for evaluating the settlement.

We know that each party must find the settlement terms of greater value than the original injunction, since they've signed this settlement agreement without coercion.  Of course, that's subject to whatever their guess was on the ongoing litigation costs and probability of the success of an appeal by Google that each party placed on this.

But it is not accounting for the interests of others in the ecosystem -- users, app developers, potential app stores other than Epic -- and parties have an incentive, as I mentioned before, to reach an agreement that shifts value to Epic while eliminating provisions that most endanger Google's monopoly rents.  That's not necessarily through explicit discussions of monetary transfers; in fact, there are generally much more effective ways to shift value that are unlikely to raise obvious flags for the Court.

In fact, terms in the settlement that advantage Epic over its potential rivals in the app market could require even lower transfers from Google because part of the payment for Epic signing on to the settlement would come from others who weren't present at the table when the settlement was negotiated.

Contrast that to the public interest, which is asking the question:  Does the settlement perform at least as well as the injunction in remedying the illegal conduct and restoring competition to the market?

And to this point, I want to just make -- give you one

example of where I think this may fall short.

The modified injunction establishes two service fee cap levels. Now, much has been made about those lowering the prices that Google can charge, and as best I can tell, it may do that somewhat. Of course, they're just the service fee, and Google is also going to make revenue off of Google Play billing, which will add some additional amount on top of the service fee, but I want to just talk about this structure.

So those caps are set at no more than 9 percent for qualified new installs of in-app or linked purchases of in-game purchases that do not provide game play advantage, app subscriptions, and non-game apps, and a cap of a maximum of 20 percent for all others, including in-app or linked game app purchases that provide a gameplay advantage or random outcome in apps that don't qualify as new installs.

So as I said, with Google Play billing on top of this, this may be slightly, although perhaps only slightly, below the 15 percent and 30 percent Google Play Store fee levels that it put in place after Epic filed its suit and before the injunction.

But the Court is being asked to impose this in lieu of conditions that promote competition and might ultimately force even more downward pressure on those fees and without any justification or indeed even discussion of why there's differential treatment or different levels set other than Epic

Games and Google agreed to them.

The structure, in my mind, raises a question of whether this permits value to be transferred to Epic at a relatively low cost to Google, given Epic's revenue profile.  For example, see Epic's public response to its 2022 FTC settlement that affirms that Fortnite had no in-game purchases in what would be described in the settlement as this 20 percent tier.

So overall, I have to say I have considerable concern that many of the things that those of us who looked at this settlement -- looked at this injunction and thought had the potential to really open up the app store market, the Android app distribution market in the U.S. to more competition are going to be quite disappointed if the Court were to agree with the parties to modify the injunction along the lines that they have negotiated.

Thank you.

THE COURT:  Okay.  Thank you.

Any questions for Dr. Rose?

MR. POMERANTZ:  Your Honor, that was a lot, and we all took down notes, but we -- there's a lot there.

What we would request is two things, if we could.

Under Rule 706(b)(2), the parties may -- or the expert appointed by the Court may be deposed by any party.

What we would like to do is take some time to digest what we just heard from Dr. Rose, set up a short deposition.  We can

do it remotely, whatever way is convenient -- we wouldn't make it long -- so that we can more fully flesh out her thoughts.

**THE COURT:**  I'm giving you something better:  You can do an in-court exam right now.

**MR. POMERANTZ:**  But, Your Honor, I just heard all of this.  I'm just not at all --

**THE COURT:**  I just heard all of Dr. Bernheim, Mr. Sweeney, and Mr. Samat myself.  I can do it.  I'm confident you can do it.

**MR. POMERANTZ:**  Well, we would --

**THE COURT:**  What's -- what was so complicated and -- I mean, you were showing me charts with studies he had done and all sorts of evidence.  I saw it for the first time.

I mean, why can't you do the same?

**MR. POMERANTZ:**  I'm just requesting what the rule provides, Your Honor, which is the opportunity --

**THE WITNESS:**  I'm offering you an alternative, which is to do the exam now.

Do you feel you can't do it for some reason?

**MR. POMERANTZ:**  I feel that we are not in a position to do it given the length and complexity of the thoughts that Dr. Rose just provided.

**MR. BORNSTEIN:**  Your Honor, one potential other alternative which -- I have not socialized with the folks behind me, but I know the Court has found it useful in the past

to have a hot tub format.

**THE COURT:**  We're kind of past that.  We've heard the testimony, and we're just not going to do that.

**MR. BORNSTEIN:**  Okay.  I'm happy to ask a few questions.  I --

**THE COURT:**  Please, go ahead.

<u>**CROSS-EXAMINATION**</u>

**BY MR. BORNSTEIN:**

**Q.**   So, Dr. Rose, first of all, nice to meet you.

**A.**   Thank you.  Same.

**Q.**   There were a few -- if I heard properly -- and if I mischaracterize anything, please, just set me straight.  I'm working from memory and my notes here.

But there were a few times when you talked about how the modified injunction would not set up competitive conditions that would help bring prices down, if I understood the gist of what you were saying.

I didn't, during the course of your remarks, hear you address, and I want to understand, whether you had considered the question of the broader geographic scope of this remedy taken in light of the testimony from Dr. Bernheim, from Mr. Sweeney about the importance to competing stores to obtain scale.  And I wonder if you could address that for us, and if you considered it in the course of providing your analysis.  I didn't hear it today.

**A.**   So, like you, I, this morning, heard a lot of testimony that I had to assimilate on the fly.

Here's the foundation for my argument and conclusion, and that is that the testimony at trial, and in particular the discussion in the economics hot tub during the remedy hearings, both established that finding some way to overcome network effects was critical to both encouraging and creating the conditions that might facilitate competition.  And what I see in the modified injunction is nothing that addresses those network effects.

In fact, I think what Dr. Bernheim told us this morning, if my memory serves me right, was that he was faced with this trade-off between jump-starting competition and having a somewhat longer term, a three-year longer term, that would, if competitors came in, would give them some more time under the terms of the agreement to keep going before Google pulled the rug out from under them and reverted to these friction-filled schemes to disadvantage them.

And so I'm really reacting to both the trial record and the discussion, even up through this morning, that if we -- if we can't get competitors started giving them a little more time to run with longer scale and larger scale isn't going to help us very much.

**Q.**   So respectfully --

**THE COURT:**  Can I just jump in?

MR. BORNSTEIN:  Yes, please.

THE COURT:  Six years and -- what I heard Dr. Bernheim say -- and I may have missed it, but I don't think I did.

It was kind of a synergistic effect of six years, plus worldwide equals -- or maybe that little math sign -- better than catalog access plus app store distribution in the United States for three years.

So how does that proposition sound to you?

THE WITNESS:  I think that was his conclusion, but honestly, what I didn't hear, actually, from anyone is that knowing that you're going to have six years to run with this registered app store process is going to be sufficient to overcoming the years and years of network effects that Google has created through its exclusionary behavior, and I think that's really the question that the Court is going to have to grapple with when it thinks about whether to modify the injunction is that if we need to find some way to overcome these network effects, does just telling parties, "Well, you'll have longer to run with worldwide registered app store access," is that going to be enough?

It strikes me as that's not giving you any network effects.  It's just telling you:  If you can get going, you've got longer to build those up on your own.

THE COURT:  Go ahead.

MR. BORNSTEIN:  Thank you, Your Honor.

**BY MR. BORNSTEIN:**

**Q.**   And respectfully, Dr. Rose, I don't remember hearing in your response to my question whether --

**THE COURT:**   I interrupted.  But go ahead.

**MR. BORNSTEIN:**   -- yeah.

**BY MR. BORNSTEIN:**

**Q.**   -- whether you took account of the testimony regarding the importance to an app store of attaining scale.

And I'll put a finer point on it in the context of network effects.

These are my characterizations of the testimony we heard, not specific words that came out of people's mouths, but that having the catalog access and app store distribution remedies limited to the United States were insufficient to overcome network effects and provide an incentive for developers to invest in competing stores.

Did you take account of the idea and have you synthesized this concept that for someone like Epic or some potential developer out there who wants to build a store, having catalog access in the U.S. doesn't give them enough of a kick on network effects because it doesn't solve the scale problem, whereas the view, at least, of the folks who testified is that having scale through the registered app store programming worldwide actually gives them a better shot of overcoming the network effects problem?

**A.**   So I heard Mr. Sweeney assert that.  I don't believe that while Dr. Bernheim asserted that as a potential principle that it was backed by any analysis that suggested that.

And let me try to explain what I see as the distinction between those.

I see the global scope as being a statement about potential market size; right?  I see the catalog access and the Google Play Store access distribution of app stores as statements about the immediate actual market size, so that you can go -- if you're an alternative app store, you can go to users and say, "We have all the apps that you want to see available when you join our app store."

And similarly, you can say to app developers, "We're being distributed on the Google Play Store; we're going to immediately be able to access people -- everyone on the Google Play Store has the ability to see our product." They don't have to find us on a website" -- and to say to app developers, "You know, we're going to have the whole catalog, so we think with our marketing, we're going to be able to attract users."

I see the argument that Mr. Sweeney is making and that Dr. Bernheim is making is about who you could potentially tap, but to say you're going to access all of those users is, of course, you know, a hope, an ambition, but on day one, you're not going to have any of those users.

**Q.**   The question that I think -- that I have in response to

the concept that this provides -- the catalog access provides immediate access with -- I hasten to add -- I agree with that it does provide immediate access to a very small subset of users; right?

And so the question is not a small subset of users have access to those stores; right?  It's just the 4 to 5 percent of Android users who happen to live in this country.

And so --

A.   Do you happen to know what the revenue share is of those users?  I would have thought numbers probably understate their importance, but I haven't studied it.

Q.   I don't have that information.  The -- we can find is it, I'm sure, but I don't have it offhand.

The issue that I still haven't heard addressed squarely -- and I'm sorry if I'm missing it -- is whether having access to that fraction of users through the catalog access program in this country provides sufficient scale to make it worthwhile for companies to invest in this business.

And the testimony, at least that I heard, is the answer to that is no; and I want to know if you took that into account.

A.   The testimony from Mr. Sweeney?

Q.   Correct.  The only testimony we've heard on that subject.

A.   Correct.  I heard him say that.  I wasn't sure what the foundation of it was and whether it represents the judgment of, you know, all competing potential app stores or not.

But I -- yes, I take that into account.

All I'm saying is it strikes me as -- you know, let's remember that Epic is not a necessarily representative firm with respect to, you know, potential entrants into this market. They've got a product that is very distinctive and has a substantial user base outside the Android market, and so they may feel that having these terms gives them what they need to achieve the scale that they want.

But I -- I don't think it solves those fundamental network effect problems that were so eloquently attested to in the remedies and in the -- and in the trial testimony.

**Q.** But the premise of --

**THE COURT:** If I can just jump in.

So you mentioned -- you asked the question, Mr. Bornstein, which she could not answer about, okay, 4 to 5 percent by head count, but what does that mean in terms of revenue?

So, for example, we don't have that data before us. It's not in the record. But if that 4 or 5 percent of U.S. buyers amounted to something like 30 or 40 or 50 percent of Android app revenue, that would be pretty good market to --

**THE WITNESS:** A very different calculation.

**THE COURT:** Yeah.

**THE WITNESS:** I mean, my sense is that the question is not:  Is 4 percent of the global market enough to achieve scale?

It's:  What investments have to be made, and is there a return on those investments?

THE COURT:  Okay.

THE WITNESS:  And Mr. Sweeney is telling us that unless he has the whole world, he doesn't think that there's a return.

If you continue with your injunction as it is, we'll discover are there other developers or potential app store entrants out there who think, in fact, it gives them just what they need to be able to enter.

I think the Microsoft amicus brief suggests that Microsoft is seeing this as a delightful opportunity for them, but they're also a pretty big firm.  So I don't know who else you might get in, but I would be reluctant to think that Epic's calculation is the only relevant calculation for potential entry.

THE COURT:  Okay.  Go ahead.

BY MR. BORNSTEIN:

Q.  So just to put a very fine point on it for a minute, what I believe I heard you just say is you heard the testimony from Mr. Sweeney.  You're not sure that he's right, even though it's the only testimony in the record, and your conclusion about the possibility that some other developer out there who's not in front of us might speculatively in the future find getting access through catalog access to a fraction of the market

outweighs what we've been told about the importance of scale?

That's what I heard.

**A.**   I'm suggesting that the importance of scale, which is the potential size of the market, not the addressable market that you have at hand, is one calculation, but that giving up what was testified to as so important, which was the ability to jump-start this rebalancing of network effects seems to be a very substantial impediment.

So we know that giving that up impedes entry, and we're speculating as to whether Epic's testimony on the importance of global scale applies to everyone else.

**Q.**   Well, we know that giving it up impedes entry if we're talking about a global remedy, which was what was suggested. We don't know whether giving it up, only a U.S. remedy, impedes entry, except we do have testimony in the record that having a U.S.-only remedy is insufficient.

**A.**   No, no.   I think you're misunderstanding.

**THE COURT:**   I disagree.   That's a mischaracterization of the testimony.   I'm sorry.   I reject that premise.   That's not at all.

It was a head count of Android users, nothing more and nothing less.   It didn't account for the other factors that Dr. Rose said in terms of revenue.

I mean, it's the United States, the richest country in the world.   That 4 percent could be buying 80 percent of the

revenue on Androids.  You did not put any evidence on that.  So I would not try to marginalize that as 4 percent because I think that figure is misleading.

MR. BORNSTEIN:  All right.  Your Honor, I can have a witness from Google come back on and talk about the revenue if it would helpful, but --

THE COURT:  In the absence of somebody doing some fact-finding and somebody who's going to do a genuine cross-examination, I can't -- there are limits.

You all are in tag-team mode now, and I don't have a worthy opponent, so it really puts me at a disadvantage.

I'm not saying that person is going to lie, but I'm also not saying it's going to be tested in the crucible of truth, which is cross-examination, because nobody here is doing that for me.

So the answer is no.

MR. BORNSTEIN:  All right.  Well --

THE WITNESS:  I also want to clarify what I just told you is --

MR. BORNSTEIN:  Yes.

THE WITNESS:  -- and I believe this is a correct and true statement -- that eliminating the provisions that rebalance the network effects reduces the ability of the remedy to promote competition.

You're making an argument which may be correct, that

global expansion improves the ability to introduce competition. But now there's a balancing, and we don't know, apart from Mr. Sweeney's testimony saying "We like this remedy, we like this settlement, and we like the modified injunction," that that's, in fact, going to be better.

And I don't think he actually testified about sort of others and how they would view this in terms of the competitive dynamics.

BY MR. BORNSTEIN:

Q.   Right.  So I agree with the concept that there is a balancing, and you heard me say this to the Court earlier that there was a choice between the two things on the table.

And in the course of the remarks that you made a bit ago, you talked about what Dr. Bernheim referred to as the minuses in the modified injunction, and I did not hear much about the various pluses.  And I want to make sure that in this balancing that you have taken into account, for example, the various anti-circumvention provisions that have been built into the modified injunction in order to prevent future misconduct as a starting point.

A.   So I definitely did look at the plus list.  Let me see if I can pull up the -- I probably should have pulled that out, as Dr. Bernheim suggested we do.

And I think that my assessment of those was that in some cases, the pluses seemed to me to be relatively modest with

respect to impact; right?

So when he talks about eliminating frictions, his assumption was that Google will maintain its level of intense friction and 18 scare screens and whatnot, apart from this narrow injunction on -- on the distribution through the Play Store and only for three years.

And I guess my assessment of that was it is true that the modified injunction has more explicit terms for longer and globally applied, though I don't think in this case the friction analysis necessarily from the standpoint of U.S. competition is as relevant, but it could be.

But I'm not sure that the assumption that Google will maintain its level of intense frictions in the U.S. for all other methods, given the jury's antipathy toward that behavior, is a reasonable assumption.

Q.   Well, so, is the underlying premise, then, that you are operating from that Google will not, in fact, be permitted to continue to impose the various frictions that currently exist outside of the Google Play Store?

A.   No.  My assumption is that if I'm thinking about the likely effect that Google will realize it is not in its interest to get hauled back before this Court or another court by continuing the behavior that the jury found anticompetitive.

Q.   Okay.  So --

A.   So there's a benefit.  There's a benefit.  It clarifies

Google's behavior.

Q.   But this is very helpful, because you have now laid a foundation that when you're doing this assessment of the benefits or relative demerits of the modified injunction, you are assuming that either Google will stop this conduct or be forced to stop this conduct and that it won't be in Google's interest to continue to engage in exactly the same conduct that it has engaged in for years and years and that the injunction does not expressly prohibit.

So if the jury had found it to be anticompetitive, that's an issue that, at least as the injunction is expressly written, it doesn't cover off-Play frictions, and it sounds like you're assuming that those would stop.

A.   I'm not assuming that they will stop.  All I'm saying if I'm doing the kind of balancing that you've asked Dr. Bernheim to do in thinking about the pluses and minuses, he attached greater weight to some of the pluses and minuses and less weight to others, and I'm just saying I see that as a definite plus, but I don't know that we should attach an enormous amount of weight to that.

Q.   But why not?

Right now, for a decade, Google has imposed these frictions.

As we sit here now, after a jury has already found Google to be a monopolist and to have violated the antitrust laws and

they've been subject to an injunction that's been affirmed on appeal, they continue to engage in this behavior.

Why in the world would you assume that it wouldn't continue unless it were expressly prohibited?

**A.**   As I said, I'm not assuming that it won't.  I'm just -- I think there's some likelihood that Google may find it in its interest not to.

That being said --

**Q.**   On what basis --

**THE COURT:**  Hold on.  Let the witness finish.  And slow down.

**MR. BORNSTEIN:**  I apologize, Your Honor.

**THE WITNESS:**  I'm not rejecting this as a benefit. I'm just saying when I think about the costs, the minuses, they seem to me first-order effects in terms of opening up the market to competition.  And I'm not convinced by the testimony that I heard today that some of these beneficial terms will be as effective.

**THE COURT:**  As effective with respect to --

**THE WITNESS:**  Opening the market to competition as the current injunction is.

**THE COURT:**  Okay.  And not effective in curing network effects?

**THE WITNESS:**  Correct.  I don't think they're intended -- yes.  Most of those are not directly intended to

correct network effects.  They're intended to either provide scale or reduce frictions.

**BY MR. BORNSTEIN:**

**Q.**   Okay.  And this will be the last question on this subject, but when you do that balancing, you do have to have some expectation, even if it's probabilistic, of what will happen with respect to the frictions in the world in which the existing injunction stays in effect.  And it sounds like you're reaching a different conclusion on that point than was presented by the testimony.  And your conclusion is there's at least some reasonable possibility that in the existing world with the existing injunction that Google will change its behavior.

Is that the premise of your balancing?

**A.**   I want to make clear I am not testifying as to the appropriate balance to be reached between those.  I think that's a decision the Court needs to reach.

What I am trying to do is to elucidate some of the principles that I think the Court needs to consider when it makes that decision about how to balance these pluses and minuses.

**Q.**   Okay.  And one of the things that you're suggesting the Court consider is the possibility that Google might suddenly cease the behavior in which it's engaged for a decade regarding friction?

**A.**   I think the Court will have to consider whether it thinks its injunction and its overview of the injunction could, say, potentially have that effect?

But that's for the Court to decide, not me.

**Q.**   All right.  And in doing this --

THE COURT:  You understand, Mr. Bornstein, we're not talking about the injunction in the first instance.  The injunction is in place.

MR. BORNSTEIN:  Of course.

THE COURT:  Your burden -- and it is your burden -- is to show me that material circumstances and the world have changed so much that I should exercise my equitable discretion to revise that injunction.  It is not a matter of me taking into account an assumption about Google.  That ship has sailed. The injunction is on the books.

You have a mountain to hike, which is to tell me something has so changed in the world that I ought to rewrite that injunction.  I'm not hearing it.

MS. MOSKOWITZ:  All right.  Well, I would, if I could, Your Honor, quibble in one respect with the standard that should be applied here.  I believe, although I do think that we can show the changed circumstances, and I will come to that -- but I do believe the proper standard is the one that Your Honor set forth in paragraph 14 of the injunction, which is that the parties can come and seek modification for good cause.

And what we are suggesting to the Court is that a modified injunction -- that in our view -- and that's the only reason we're here -- that improves the competitive landscape for others is, in fact, good cause for revising the injunction. That's our -- that's our submission.  That is why we have come to Your Honor.

THE COURT:  And you're telling me that you're relying only on good cause, not on materially changed circumstances?

MR. BORNSTEIN:  No.  I'm telling you that we satisfy both, in our view.

THE COURT:  I'm not hearing the first one, and that's the one I'm worried about now.

MR. BORNSTEIN:  All right.

THE COURT:  I haven't seen anything change other than the deal cut between Epic and Google, which is what I said back in November when you first did this.  Otherwise, as I believe the witnesses have confirmed, not a lick of Google's monopolistic posture in the market has changed.

MR. BORNSTEIN:  And I don't gainsay that at all, Your Honor.  It -- I firmly stand on the idea that if we're analyzing this under the changed circumstances analysis, setting aside the good cause provision in the injunction, the change here is, in fact, that there has been an agreement reached and that agreement, in our view -- and we are trying to persuade the Court of this -- is a better outcome, an even

better outcome for consumers to serve the public interest, to serve developers, to serve people who are trying to compete with Google in both of the markets found by the jury on a global basis, which is what the jury found.

That's our position. We're not coming in and saying there's been some development where there's a sudden competitor and AI is changing the landscape or anything like that. That is not the argument. The argument is the costs of the injunction that the Court entered, Epic was able to negotiate a different arrangement that leads to even greater benefits for competition.

THE COURT: Well, it should be obvious by now I'm quite skeptical of that second proposition.

MR. BORNSTEIN: I do recognize that.

THE COURT: Any more questions for Dr. Rose?

MR. BORNSTEIN: If I should switch to a totally different subject, Your Honor, just one or two things?

THE COURT: Yes.

BY MR. BORNSTEIN:

Q. I want to talk about -- because there hasn't been, as you said, Dr. Rose, much discussion on the billing issues today.

And you referenced the uncertainty that might exist in the disputes that the parties have foreshadowed for the Court about whether and how much Google could charge on transactions that happen outside Google Play billing.

Are you -- do you have any assumption that you're making about what the injunction that currently exists -- in the real world, as the judge said -- any assumption about what that injunction currently requires or prohibits about the fees that Google may charge?

**A.** I'm assuming that it does not make any statements about the fees that Google may charge.

**Q.** Okay. And so -- sorry. Let me make sure I understand that.

No, I do understand that.

And you recognize that the parties were expecting to have a dispute over that issue; correct?

**A.** I'm willing to believe that, yes.

**Q.** Are you aware that Google has announced publicly the fees that it intends to charge under the existing injunction?

**A.** I saw reference to that in some one of your documents today.

**Q.** Okay. And you understand that the caps in the proposed injunction would lead to -- even if the caps stayed as caps, would lead to lower fees than what Google has currently announced --

**A.** Correct.

**Q.** -- for developers?

**A.** I saw that, I think, in one of your exhibits, one of your witnesses' exhibits.

Q.   And you referred to the caps at one point as "price regulation" in the course of your remarks this afternoon; correct?

A.   Similar in effect, yes.

Q.   Right.  But it is clear that they are truly just caps. And if the competition does -- as everyone hopes and expects, does come to bear, those caps will come down or those prices will come down to competitive levels?

A.   I would anticipate that, yes.

Q.   Right.  So all that the caps do is they immediately start that process by bringing it down right away from day one and allow in the future, as competition moves forward, the prices to come down as competition demands?

A.   If the modified injunction is at least as successful as the current injunction is at promoting competition in the app store, the Android App Store distribution and Google billing market, then your assertion would seem to be correct.

     But if it's less effective, then while the caps may provide some protection for app developers relative to the announced fees, they don't solve the problem of opening up the market for competition.  In fact, regardless of whether they provide that protection, they don't open the market up to competition.

     They're -- as I think I mentioned, I see them as a substitute and something you might find appealing if you think

competition isn't going to protect users.

MR. BORNSTEIN:  All right.

THE COURT:  One second.

Ruth, do you need a break?

(Discussion off the record.)

MR. BORNSTEIN:  Let's take 10 minutes.  Okay?  Not an opportunity to write out ten questions, but okay.

THE COURTROOM DEPUTY:  All rise.  Court is in recess.

(Recess taken at 2:56 p.m.)

(Proceedings resumed at 3:05 p.m.)

THE COURTROOM DEPUTY:  Remain seated and come to order.

THE COURT:  Okay.  What's next?

MR. BORNSTEIN:  Okay.  Thank you, Your Honor.

BY MR. BORNSTEIN:

Q.  Just a few subjects, Dr. Rose.

One is:  During the course of your initial remarks before the questioning, you observed that the modified injunction, in your assessment, contains no provisions directly addressing network effects.

Did I get that correct?

A.  Addressing the rebalancing of network effects.

Q.  Okay.  Thank you.

This morning Dr. Bernheim testified on that consistent with things he had said during the trial.  It's obvious you've

reviewed the record of trial.  He talked about the importance of unique content for developers and stores to be able to draw users.

Do you disagree with Dr. Bernheim's testimony that these distinct content provisions address the -- are a provision that is intended to help address and rebalance the networks effects?

A.   Are you referring to the injunction against activity like Project Hug or others that were giving Google Play Store exclusive -- I just want to make sure I'm responding to the correct --

Q.   Yes, that is what I had in mind.

Sorry.  I was waiting.  The court reporter admonished me to be careful not to interrupt you.

So yes, that is what I meant.

A.   Yeah.  I see those as a way of drawing users to a store if it's got some particularly attractive content that they can't find elsewhere.

Q.   And that provision from the existing injunction is maintained and strengthened in the current injunction?

A.   I understand your question now.  I'm sorry.

I didn't mean to suggest that the modified injunction has no provisions.  I should have been more clear that the modifications are what I was referring to, that the modifications remove what I see as the two most essential provisions intended to rebalance network effects and do not

replace those with something that's substantively as important.

Q.   Okay.  But you do agree that the modified injunction is not completely bereft of efforts to address the network effect problem; is that fair?

A.   The modified injunction does reserve much of what the original injunction did with respect to those conduct issues, yes.

Q.   And the network effect consequences that flow from those conduct issues?

A.   Right.  It just doesn't rebalance.

Q.   When you say -- yeah, please.

What do you mean by rebalance?

A.   Yeah.  So I mean that it reduces barriers, or eliminates barriers, that Google put up to potential competitors trying to come in with attractive offerings that the Play Store wouldn't be able to match by, say, an exclusive.  But it doesn't give a potential app store competitor access to the same scale that the catalog access or the distribution through the Play Store would give them.

Q.   In the United States?

A.   Correct.

Q.   Okay.  Obviously one of the issues.

Let me look at a couple of -- sorry.

A.   Can I just say -- it doesn't give them access to those anywhere, the modified injunction; correct?

**Q.** No. I mean as compared to the existing injunction where it is limited to the United States, so when you're talking about the difference between the two, you're talking about removing the benefits, which are real, of catalog access and store distribution in the United States only. That's the minus; it's just a one-country minus?

**A.** I would hesitate to call the U.S. "just a one-country minus," but the injunction applies to the U.S., and this removes those provisions in the U.S.; correct.

**Q.** Right. And you recognize, I guess, that it is a point of disagreement, perhaps, between you and Mr. Sweeney about how important that one country is?

**A.** I -- I don't know if I would call that a disagreement. I recognize that Mr. Sweeney attaches great importance to that. What I don't think we know is whether Epic is representative of other potential entrants in making that same assessment.

**Q.** And you don't have or you haven't seen any evidence to suggest that Epic is uniquely situated in terms of its ability to take advantage -- if there is a difference between Epic and others, Epic, as a more highly capitalized company, would be more able to take advantage of a -- and make the investment in a smaller jurisdiction or in a -- sorry -- a smaller addressable market; isn't that right?

**A.** You're saying because you think there are liquidity constraints on companies making investments? Is that what

you're --

THE COURT:  I don't understand your question.  Just do it again.

MR. BORNSTEIN:  Yeah, I'll do it again.

THE COURT:  I didn't follow that at all.

MR. BORNSTEIN:  I accept that was a bad question.

I'll try it again.

**BY MR. BORNSTEIN:**

Q.  If I understood what you just said before my bad question, Dr. Rose, it was that you have a question as to whether or not Dr. -- Mr. Sweeney's assessment is representative of the assessment that other stores might make; is that correct?

A.  Right, I don't know whether other potential app store entrants view the world as as much their market as Mr. Sweeney does with Epic's footprint kind of globally.

Q.  Right.  And, I guess that's my question is you don't know, you don't know one way or the other whether Mr. Sweeney is representative or not.

A.  Correct.

And maybe I should have made more clear at the beginning when I talked about my assignment, I have neither been assigned nor, frankly, resourced with the task of de novo, you know, exploring all of the fundamental economic issues in this.

What I've been asked to do is to assess the modified injunction as compared with the original injunction in light of

the jury's verdict, the goals of antitrust, and the evidence that I've been able to ascertain from the trial.

But I don't want to suggest in any way that I have done a from-scratch analysis of the empirical underpinnings of some of the assertions that have been made --

Q.   I understand --

A.   -- by others.

Q.   I understand that.  And I hope you don't take my questions as criticisms for not having that information readily at hand. But I do think it's important for the Court, in assessing the opinion that you're providing, to understand what the factual foundations are and aren't, and that's the spirit in which --

THE COURT:  I understand --

MR. BORNSTEIN:  -- I'm asking the questions.

Thank you.  I'm just trying to apologize --

THE COURT:  I'm not in the dark about any of that.

BY MR. BORNSTEIN:

Q.   And just to that end, are you aware of any evidence of any store, app store that has ever tried to enter only in the United States on Android?

THE COURT:  That's not what she's here for.

MR. BORNSTEIN:  All right.

THE COURT:  Just skip that.

MR. BORNSTEIN:  I'll move on.

\\\

BY MR. BORNSTEIN:

Q.   I will talk about some real world -- just a couple of real-world things that we did hear evidence about today.  And I want to understand whether and how you took them into account.

There was testimony today, and also in the trial, about Amazon -- a very well capitalized company -- was able to put together a large catalog of apps -- although not as large as others -- and failed as an app store because of these frictions, even though it had made some measurable steps forward in addressing the network effects.

What was your assessment of Dr. Bernheim's testimony on that point?

A.   So I found the original testimony with respect to the Amazon experience at trial that I read and his reminder of that today compelling.  And it seemed to me that the distribution through the Play Store provision of the injunction was, in a large measure, kind of targeted at helping a company like Amazon to overcome the problems that Google has created by that type of friction.

Q.   All right.  Well, I won't go back to the discussion we had about the difference between removing frictions on the Play Store and removing frictions off of the Play Store, but that -- that answer would trigger that whole range of discussions again; right?

You're focusing on Play Store distribution, and it not

taking into account of the frictions that exist off of the Play Store.

A.   Which -- which my understanding is that under the injunction that's currently written, any app store would have access to distribution through the Play Store.

Q.   For the period of time that the injunction is in effect in the jurisdiction in which it is in effect.

A.   Correct.

Q.   The last subject I want to hit is the question of circumvention.

Have you had any exposure to or awareness of the proceedings that are happening between Epic and Apple regarding contempt of the injunction there?  If you haven't, I totally understand --

THE COURT:  She was not asked to look at that, Counsel.

BY MR. BORNSTEIN:

Q.   Do you remember the testimony from Mr. Sweeney this morning about -- and Dr. Bernheim, I think -- about the provision in the settlement agreement that prohibits Google from imposing fees on competing stores?

A.   Yes.

Q.   Okay.  And you're aware there's nothing like that in the current injunction; correct?

A.   Correct.

**Q.**   And can we agree that is one of pluses of the modified injunction to, essentially, plug that hole that Google might take advantage of?

**A.**   That seems like it could be beneficial for potential entrants.

**MR. BORNSTEIN:**  I don't haver any further questions, Your Honor, for Dr. Rose.

**THE COURT:**  Okay.  Google, you sure you don't want to ask anything?

**MR. POMERANTZ:**  At a deposition, yes; but, here today, no.

**THE COURT:**  Well, that may be -- I mean, I'll consider next steps, but there may be an inquiry exam, not a deposition.

Okay.  Thank you.  You can hop down.  Careful on the way down.

(Witness excused.)

**THE COURT:**  All right.  What would you like to do next, Mr. Bornstein?

**MR. BORNSTEIN:**  I have two things on my list, Your Honor.  One is you had reminded us that you wanted to just talk about what comes next.

**THE COURT:**  Yes.

**MR. BORNSTEIN:**  And so that was one thing I had on my list.

**THE COURT:**  Yup.

**MR. BORNSTEIN:** And just the other thing, so I don't lose track of it, is I had one minor administrative thing I wanted to knock off on the stipulation we have in front of Your Honor on timing for our brief on the fee issue. It's a pimple on the dog right now, but I want to make sure it doesn't get lost in the shuffle.

**THE COURT:** Remind me what you said.

**MR. BORNSTEIN:** Sure. We currently, Epic, have a reply brief on the fee motion that is due next Friday.

**THE COURT:** Would you like more time?

**MR. BORNSTEIN:** Well, we reached a stipulation with Google. They're going to get us some documents that we asked for. They're going to produce the documents next week. We asked for a certain amount of time after we get the documents to file --

**THE COURT:** Sure.

**MR. BORNSTEIN:** -- and the stipulation -- can you --

**THE COURT:** Is there really a dispute over the fees?

**MR. BORNSTEIN:** There does continue to be a dispute over the fees.

**THE COURT:** May I ask what -- I mean is it excess charges or overlap; or what's the dispute?

**MR. BORNSTEIN:** To -- high-level summary of Google's papers, Your Honor, the two issues that they challenge are one, a request for interest on the fees.

THE COURT:  Okay.

MR. BORNSTEIN:  And it's a --

THE COURT:  Pre-judgment?

MR. BORNSTEIN:  -- a legal dispute.

THE COURT:  Prejudgment interest.

MR. BORNSTEIN:  Well, it is -- I'm actually not sure whether it's characterized as pre- or post-judgment interest.

There are a set of cases where it's because the fees are expanded -- as Your Honor knows this case started five years ago.  Google actually paid those fees -- excuse me -- Epic actually paid those fees five years ago.  It was out-of-pocket that money --

THE COURT:  Time value of money.

Let me ask you this:  You think that's a legal issue.

MR. BORNSTEIN:  That is one --

THE COURT:  Sounds like a legal issue.  I can do that.

If there are other disputes -- here's what I've done in my multi-district litigation cases:  I have, really, a wonderful accountant who looks at all the records.  And, you know, someone says "You had five timekeepers doing the same thing, so we should only pay for one," or "You had extravagant meals," you know, that kind of a thing, she does all of that.

Is there anything like that we can send to her?

MR. BORNSTEIN:  There are no extravagant meals, Your Honor.

THE COURT:  That's in the eye of the beholder.

MR. BORNSTEIN:  There are disputes that Google has raised about some of the staffing issues.

THE COURT:  How about sending that to that expert that I have?

MR. BORNSTEIN:  I have no objection to having it resolved that way.

THE COURT:  I'm really not in the business of poring over the timekeeper records.

MR. POMERANTZ:  We have -- we have no objection.

THE COURT:  Her name is -- Ms. Ip?  Ms. Yip?

And I used her very successfully in my Capacitors antirust multi-district litigation case on more than one occasion.

MR. BORNSTEIN:  Great.

THE COURT:  Ip, I-P.

So I will designate her for those things.

I'll answer your prejudgment -- your interest question. I'll just do that.

MR. BORNSTEIN:  Okay.  So that's not fully briefed yet.

THE COURT:  All I'm saying is, I think, at this point, you can just brief, for me, maybe just the legal things, and then you'll go to Ms. Ip and fight about the duplicative fees or whatever the allegation is.

MR. BORNSTEIN:  Sure.  So just so Your Honor has the

facts on the ground right now, we filed our opening papers in 2025.  Google responded in December of 2025 with their opposition papers.

THE COURT:  Okay.

MR. BORNSTEIN:  We asked for some documents.  We're waiting for those.  We've negotiated -- agreed on what we will get from them.  That's supposed to come next week, and our reply brief is currently due next Friday.

Yes, we would appreciate some more time --

THE COURT:  Just tell me when.  When would you like to do it?

MR. BORNSTEIN:  The stipulation we reached says March 12.

THE COURT:  March 12, perfect.

MR. BORNSTEIN:  That is Docket 779.

THE COURT:  Granted.

That's for your reply?

MR. BORNSTEIN:  Yes.  Correct.

THE COURT:  And so now it's just going to be the legal issue; right?

MR. BORNSTEIN:  We will narrow it down to address only the legal issues that are in there and save the other issues for Ms. Ip.

THE COURT:  The rest is just accounting; right?

MR. BORNSTEIN:  The only reason I'm being a little

hesitant, Your Honor is I just don't remember if there is any other legal issue buried in the kind of minutia of accounting.

THE COURT:  You're entitled to fees.

MR. BORNSTEIN:  Agreed.

THE COURT:  What else could there be?

MR. BORNSTEIN:  I just don't remember whether Google has raised anything else.

THE COURT:  Nobody here wrote the thing?

All right.

MR. ZAKEN:  I don't remember anything else.

MR. BORNSTEIN:  We will submit our reply brief on the interest issue.

THE COURT:  I've got a trial starting Monday.  Then I've got trials for the rest of the first quarter.

Is there a statute that awards the interest to legal fees or is it a case or what's -- what are you disagreeing about?

MR. BORNSTEIN:  There's cases that interpret the statute.  Do there's obviously the statute -- Your Honor has already addressed it -- that entitles a victorious Sherman Act plaintiff to fees.  And then it's a question of whether interest is awardable under that statute.  There's case law.  It's in our opening papers.  Google has made a response.  We intend to reply on that.

THE COURT:  How much, roughly, are we talking about for interest?

**MR. BORNSTEIN:**  The interest is on the order of $30 million, Your Honor.

**THE COURT:**  That much?

**MR. BORNSTEIN:**  Correct.

**THE COURT:**  All right.  So it's a significant dispute.  Okay.  All right.  I got it.  Good?

**MR. BORNSTEIN:**  Thank you.

**MR. POMERANTZ:**  Your Honor, on the pending motion here for the modified injunction, so -- I have not had a chance to discuss this with Mr. Bornstein, but Your Honor and Dr. Rose have given us some things to think about.  We've heard your views.  We've heard Dr. Rose's views.

What I think would be helpful would be to let us have some time for me to talk to Mr. Samat and my client, for Mr. Bornstein to talk to Mr. Sweeney, and then for us to talk.

The pending -- your injunction is in effect and we are complying --

**THE COURT:**  I hope it is.

**MR. POMERANTZ:**  And we are --

**THE COURT:**  And I'm not being glib.  I hope you're acting -- when I say "you," I mean, your client -- is acting with the haste and propriety of executing the terms of have injunction.

**MR. POMERANTZ:**  And I think if -- Your Honor, we are -- my client is, and we've reported to Your Honor, and we

believe we are in complete compliance with those provisions that are in effect.  And I think Epic has not disputed what we are currently doing.

THE COURT:  Okay.

MR. POMERANTZ:  So because that is in effect -- I think, what I'm asking for is if we could have a few weeks to talk amongst ourselves, if we decide that we want to continue to pursue it exactly the way it is, we would ask to be able to file one more brief that would take into account what Dr. Rose said, what happened today --

THE COURT:  That's perfectly fine.  That's fine.

How long would you like?  Three weeks?

MR. POMERANTZ:  I would say a month.

THE COURT:  Up to you.  Whatever you want is fine.

MR. POMERANTZ:  I would think, you know, end of February.

THE COURT:  Let's do that.  You can beat if you want to.

I'll do March 1st or whatever that first Monday is.  You can beat it if you want to.  That's fine.  If you want more time, that's fine.  Just as long as we are clearly dual-tracked, and the other -- the order is going forward. Okay?  All right.

MR. POMERANTZ:  Understood, Your Honor.

THE COURT:  Let me ask you a question.  I lost track

of this, but is the technical commission now fully up and running?

MR. BORNSTEIN:  The technical committee members have been selected, appointed.  They are in place.

THE COURT:  Okay.

MR. BORNSTEIN:  Yes.

THE COURT:  All right.  So I'm not going to do anything.  I'm going to wait for you to tell me a proposed plan on 3/1 or before -- 3/3 or before.  And I may have you back for a quick in-person chat.  We can fine-tune anything.

MR. BORNSTEIN:  Great.

THE COURT:  And I'll just wait to hear from you. Nothing will happen in between.  Okay?  I will not do anything. You're not -- you're going to caucus and give me a plan.

Okay?  All right.

Now, are the other cases all gone -- what we've been calling Epic II?  All dismissed; right?

MR. BORNSTEIN:  Yes.  That is correct, Your Honor.

THE COURT:  Okay.  All right.

Anything else for today, Mr. Bornstein?

MR. BORNSTEIN:  Not that I can think of.

Thank you.  Thank you, Your Honor.

And thank you, Dr. Rose.

THE COURT:  Mr. Pomerantz?

MR. POMERANTZ:  Same.  Thank you, Your Honor.

PROCEEDINGS

THE COURT:  Okay.  Thanks for coming in.  And I'll wait to hear from you.

THE COURTROOM DEPUTY:  All rise.  Court is in recess.

(Proceedings adjourned at 3:26 p.m.)

---oOo---


## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Friday, January 23, 2026

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court