# EXHIBIT A

Joshua Luke Rushing (SBN 350521)
lrushing@huthreynolds.com
**HUTH REYNOLDS LLP**
41 Cannon Court
Huntington, NY 11743
Tel: (202) 420-9628
Fax: (646) 664-1512

*Counsel for Proposed* Amicus Curiae
*Digital Content Next*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **[PROPOSED] BRIEF OF *AMICUS CURIAE* DIGITAL CONTENT NEXT IN OPPOSITION TO RENEWED JOINT MOTION TO MODIFY PERMANENT INJUNCTION** |
| *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD. | Judge:    Hon. James Donato |

Digital Content Next ("DCN") hereby submits this brief as *amicus curiae* in opposition to Plaintiff Epic Games, Inc.'s ("Epic") and Defendants Google LLC et al.'s ("Google" and together with Epic, the "Parties") Renewed Joint Motion to Modify Permanent Injunction, Dkt. 1179 (the "Motion").[1]

## INTEREST OF *AMICUS CURIAE*

Founded in 2001, DCN is the leading trade organization that represents digital content companies. DCN members[2], the corporate logos of which are displayed on the next page, include many of the most trusted and well-respected publishing brands in the United States. Together, DCN members have an unduplicated audience of 259 million unique visitors and reach 95 percent of the U.S. online population. Consumers seek out DCN member brands because they value trustworthy information that has gone through a rigorous editorial process, and publishers are held to account for the quality and trustworthiness of their news and entertainment by audiences who have high expectations.

DCN has an interest in ensuring its members can continue to reach a wide audience. Millions of Americans rely on news and entertainment published by DCN members to stay informed, engage in public debate, or simply to cure boredom. Many DCN members create content and disseminate information, like news articles and videos, out of a deep sense of mission—recognizing, as the Constitution does, that a free press is indispensable in a free society. But unless publishers can reach an audience, their efforts serve no purpose. Accordingly, DCN has a strong interest in preventing burdens from being placed on its members' speech and expression.

---

[1] DCN is a non-profit, tax-exempt business association organized under Section 501(c)(6) of the Internal Revenue Code and based in New York, New York. DCN has no parent corporation, and no publicly held corporation has 10% or greater ownership in DCN. DCN affirms that no counsel for a party authored this brief in whole or in part, and no person other than DCN contributed any money to fund its preparation or submission.

[2] *See* https://digitalcontentnext.org/membership/members/ for a listing of current DCN members.

1

**DCN Member Organizations**



**INTRODUCTION**

Since Johannes Gutenberg invented his printing press, technological innovation has expanded access to ideas. DCN members themselves have embraced technology and developed innovative ways to reach users and deepen their relationships with their audience. But it would be a mistake to assume that technology can only ever positively encourage the dissemination of information to the public. It can also be used to impose barriers to access. After all, tech platforms like Android are digital gatekeepers: content creators must go through them to reach consumers. DCN member companies have no choice but to work with and through Google to promote and distribute their original content and apps, engage with existing subscribers and audiences, and find new audiences. DCN is concerned that Google might exploit its gatekeeper position and enormous market power to extract unreasonable fees or otherwise limit the consumer's access to content published by DCN members.

Barriers to digital content have serious consequences for free speech. Media has evolved to be digitally native and accessible from mobile devices. But this digital evolution does not lessen the importance of the First Amendment activities that publishing

2

organizations engage in. *See* Richard A. Epstein, *Property, Speech, and the Politics of Distrust*, 59 U. Chi. L. Rev. 41, 60 (1992) ("[T]he modern media . . . are as strongly protected by the First Amendment as the traditional printing press"). As disseminators of ideas and speech, DCN members play an important democratic function in promoting free speech and thought. "Without freedom of thought, there can be no such thing as wisdom, and no such thing as public liberty, without freedom of speech." Benjamin Franklin, *Silence Dogood*, No. 8 (July 9, 1722); *see also United States v. Schwimmer*, 279 U.S. 644, 654–55 (1929) (Holmes, J., dissenting) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought").

The Parties have fiercely litigated this case for years, leading the Court to order the original Injunction against Google (the "Existing Injunction"). Now, the Parties have agreed to a settlement that resulted in Epic joining both Google's earlier request (later withdrawn following a Court-ordered evidentiary hearing) that the Court approve a modified injunction (the original "PMI") and current request to approve the Motion. In order to ensure that the settlement is in the public interest, the Court is rightly scrutinizing the arguments advanced by the Parties in favor of modifying the Existing Injunction. DCN welcomes the Court's call to participate in that process and submits this brief as *amicus curiae* to aid the Court in its work. As the Court well knows, the Parties' Revised Proposed Modified Injunction ("RPMI") purports to alter Google's relationship with the entire universe of Google Play Store users. (Mot. Ex. B, MDL Dkt. 1179-3.) Like the original PMI, the RPMI is not limited to Google's relationship with Epic. Indeed, the RPMI has vast implications for Americans' access to information, news, and creative works.

DCN is focused on two ways the RPMI may limit Americans' access to published media—*first*, by enabling Google to limit DCN members' editorial independence and the integrity of the content they publish; and *second*, by allowing Google to impose unreasonable fees that upend the economic underpinnings of content-provider businesses, reducing the "Fourth Estate" into a money-losing venture and sapping it of its vitality.

3

**ARGUMENT**

At issue here, DCN and its members have grave concerns regarding (1) Google and Epic's RPMI, specifically as to Google's development and release of "a process to certify an Android app store as a 'Registered App Store'", (RPMI § 12) (the "Registered App Store")[3]; and (2) the institution of anticompetitive fees for in-app purchases and purchases made via external links.

**I.      The Registered App Store remedy jeopardizes public access to uncensored digital content.**

As part of Epic and Google's bilateral pact, the RPMI's so-called Registered App Store appears to give Google tools to undermine DCN members' editorial independence and limit their access to audiences. Google and Epic contend that this compromise allows Google to "create reasonable requirements for certification as a Registered App Store, including but not limited to review of the app store by Google's Android team and the payment of reasonable fees to cover the operational costs associated with the review and certification process." (RPMI ¶ 12(b).) This provision reinforces Google's position as a gatekeeper between digital content publishers and audiences. And while the requirement that Google's certification rules be "reasonable" puts some limits on Google, the provision falls short of adequately protecting DCN members.

DCN is concerned that, under the proposed compromise language, Google would enjoy broad discretion to create certification requirements that Google deems "reasonable" but which, in practice, hamper DCN members' independence and public access to digital content. Notably, the RPMI would remove critical language in the Existing Injunction that (a) limits the "reasonable measures" Google could take with respect to third-party app stores to measures to ensure the stores are "safe from a computer systems and security

---

[3] As to the Registered App Store, the RPMI also provides that, "Google may create ***reasonable requirements*** for certification as a Registered App Store, including but not limited to review of the app store by Google's Android team and the payment of ***reasonable fees*** to cover the operational costs associated with the review and certification process. Such fees may not be revenue proportionate." RPMI § 12.b (emphasis added).

BRIEF OF DCN AS *AMICUS CURIAE* | CASE NOS. 3:21-MD-02981-JD, 3:20-CV-05671-JD

standpoint . . . do not offer illegal goods or services . . . or violate Google's content standards" and (b) explicitly provides that, if challenged, "Google will bear the burden of proving that its technical and content requirements are ***strictly necessary and narrowly tailored***" to the Technical Committee with "***the Court serving as the final word*** when necessary." (RPMI, Ex. D § 12, Dkt. 1179-5 at 4-5) (emphasis added).[4] By eliminating this language, including the explicit provision for the Court's oversight, the RPMI inverts the design of the Existing Injunction by placing the burden on *developers* in challenging certification rules that Google (unilaterally) deems "reasonable".[5]

It bears emphasizing that Google's proposed role in certifying registered app stores is ***inherently exclusionary in nature***. The RPMI therefore merits close scrutiny by the Court to ensure Google will not, and cannot, exercise its exclusionary powers in a manner that will harm competition or free expression. Google has already previewed for the Court that it may use pretextual "reputational" or "security" concerns as a fig leaf to justify editorial restrictions on content or app stores. During  the court's Evidentiary Hearing,

---

[4] In addition, the Existing Injunction does not define who exactly is authorized to challenge Google's technical and content requirements while at the same time revised language in the RPMI, discussed below, would remove explicit acknowledgements of the Technical Committee and the Court's oversight authority. The Court should reject the RPMI's proposed obfuscation.

[5] While as discussed here the removal of the Technical Committee's oversight of the Registered App Store is *prima facie* cause for concern, even the original constitution of the Technical Committee is no longer a reasonable check on Google's potential future abuse of the Court's orders and return to anticompetitive conduct because as, will be discussed further below, the Technical Committee would be composed entirely of Google and Epic appointees, whose objectivity is in serious doubt.

The RPMI would redefine the Technical Committee as follows:
"~~Within thirty days of the date of this order, the~~ The parties will recommend to the Court a three-person Technical Committee. Epic and Google will each select one member of the Technical Committee, and those two members will select the third member. After appointment by the Court, the Technical Committee will review disputes or issues relating to the technology and processes required by the preceding ~~provisions~~**Paragraphs**. If the Technical Committee cannot resolve a dispute or issue, a party may ask the Court for a resolution. The Technical Committee may not extend any deadline set in this order~~, but may recommend that the Court accept or deny a request to extend~~. Each party will bear the cost of compensating their respective party-designated committee member for their work on the committee. The third member's fees will be paid by the parties in equal share." RPMI § 13. Note the RPMI's unusual and arbitrary deletion of the Technical Committee's explicit authorization to recommend the Court accept or deny a request to extend deadlines set forth in the Court's order.

5

Google's Head of Android, Sameer Samat, testified that Google believed it could be harmed by being "in the middle" of conversations and complaints that developers have about being associated with third-party app stores that have "racier content". (Jan. 22, 2026 Hearing Tr. 108:1-15 (Jan. 22, 2026) (Samat).) While Samat gave this testimony in response to a question about catalog access, his answer demonstrates that Google's decisions concerning certification of app stores would be colored by Google's self-interested concerns about brand association, brand tarnishment, or controversial content. As Samat noted, "my experience is that [developers] will hold Google accountable for where those apps show up . . ." (Jan. 22, 2026 Hearing Tr. 108:1-4). Google's stated motive to regulate content[6] demonstrates that there is a serious risk that Google could take advantage of the discretion and power of the RPMI's proposed Registered App Store process to limit or censor content that might raise reputational concerns or create bureaucratic headaches for Google, or for other self-serving or pretextual reasons.

Moreover, even if Google did limit its content-chilling policies solely to what Samat termed "racy" content, First Amendment principles apply even to "offensive" or controversial content. "[T]he proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017). The Court should closely scrutinize the Registered App Store remedy to ensure it does not become a stalking horse for censorship or content restrictions.

Similarly, Google might wield "security" justifications as a vague, all-purpose justification to limit the content of the stories that DCN members tell their audiences and how they tell them. For example, certain app store restrictions could limit technologically innovative digital storytelling methods. Google has its own news platform, Google News, and a natural incentive to act in ways that privilege its products over competitors and chill innovation that could take market share from Google.

---

[6] The Court asked Samat: "That's it? The fact that a developer might get upset because there's some confusion in another store that they don't want to be associated with? That's the only minus you can think of?" Samat answered: "Well, I would say that's a ***primary concern***." Jan. 22, 2026, Hearing Tr. 108:19-24 (emphasis added).

BRIEF OF DCN AS *AMICUS CURIAE* | CASE NOS. 3:21-MD-02981-JD, 3:20-CV-05671-JD

Under the RPMI, a three-person "Technical Committee" will "review disputes or issues relating to the technology and processes required" by the RPMI, including the new Registered App Store program. (RPMI ¶ 13.) But at this juncture, it is not clear if the Technical Committee has sufficient authority to stop Google from adopting policies that censor or limit the expression of DCN members. As mentioned above, under the RPMI, the Court is required to appoint members of the Technical Committee exclusively from candidates put forward by either Epic or Google or Epic and Google jointly. (RPMI ¶ 13.) With this appointment structure, it is questionable whether the Technical Committee members will be truly independent and willing to regulate a system created by the two settling Parties. Because the "interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship," *Reno v. ACLU*, 521 U.S. 844, 885 (1997), this Court should proactively strengthen the Committee.[7]

## II.    This Court should not allow Google to reinstate monopolistic service fees.

DCN shares the goal that expanded competition will avoid the need for the judiciary to be involved in rate setting. But in light of the anticompetitive conduct that Google has engaged in and the time it will take for the market to develop, it is appropriate to closely scrutinize any fees for the period of the Existing Injunction.

Supracompetitive fees strike at the heart of media business models. That is true for both in-app purchases and purchases from external links, also known as "linkout purchases". These mobile purchases from digital content consumers are increasingly vital to sustaining the news ecosystem—especially as artificial intelligence has caused web referral traffic to nosedive. *See* Isabella Simonetti & Katherine Blunt, *News Sites Are Getting Crushed by Google's New AI Tools*, WALL ST. J. (June 10, 2025), https://www.wsj.com/tech/ai/google-ai-news-publishers-7e687141. While high service fees are unfair to any developer, inflicting economic damage on DCN members raises special concern. That is because the economic viability of the press is foundational to our

---

[7] For example, the Court might consider itself appointing what would have been Epic's committee member.

7

republic. A "well-functioning sphere of expression" is one "in which citizens have access to information from many sources." *Moody v. NetChoice, LLC*, 603 U.S. 707, 732 (2024). "And the government can take varied measures, *like enforcing competition laws*, to protect that access". *Id.* at 732-33 (emphasis added).

In the RPMI, the Parties eliminated certain references to service fees. (*See* Mot. at 5 ("the RPMI does not contain the provisions regarding service fees about which Dr. Rose raised a concern at the hearing").) But the Parties recently made clear that they have not given up coordinating on such fees. The Parties' March 4, 2026 Status Report announced Google's plans to charge standard fees of *20% on in-app purchases for new installs*, *25% on in-app purchases on "[e]xisting [i]nstalls"*, *20% on linkout purchases made within 24 hours*, and *10% for "Transactions for the first $1M (USD) of total developer earnings annually",* all on top of a *5% charge for Google Play Billing*. (March 4, 2026 Status Report Regarding Permanent Injunction, Ex. A, Dkt. 1181-1.) These fees are in addition to "reasonable fees to cover the operational costs associated with . . . review and certification" that Google seeks to charge for Registered App Store certification. Epic, for its part, stated: "Based on Google's commitments . . . *Epic will not object to these fees*." (March 4, 2026 Status Report Regarding Permanent Injunction, Dkt. 1181, at 2.)

The Parties are of one mind on fees. That contrasts starkly with the situation before the settlement. Back then, Epic informed the Court that it would oppose *any* service fees Google tries to charge. (December 19, 2025 Status Report Regarding Permanent Injunction, Dkt. 776, at 2.). It was only after Google and Epic agreed to a valuable strategic partnership that Epic dropped its objections to Google's fees. Plainly, Epic's position no longer aligns with the public interest or the interests of other developers.

## A. Linkout Purchases on "New" Installs

Google's plan for fees on "linkout" purchases is due particular scrutiny. Though the RPMI does not spell out service fee levels, the status report and original PMI make plain that the Parties anticipate substantial fees on these purchases. Fees on linkout purchases for "New Installs" would have been capped at 9% under the original PMI, and 10% on

8

"Transactions for the first $1M (USD) of total developer earnings annually" pursuant to the March 4, 2026 Status Report.

A 9% or 10% fee is disproportionately high for a linkout transaction. Google's role in linkout purchases is minor: because linkout purchases are made in web browsers, unlike in-app purchases, Google merely allows the link to open on the Android system. There is no legitimate basis for transactions made on web browsers via external links to be subjected to anything more than a cost-basis fee. Google has an enormous starting advantage with users who already downloaded apps from the Google Play Store. That head start makes it all the more important that Google is not permitted to charge a substantial 9% or 10% fee on earnings from developers through linkout purchases. DCN members, like other developers, are still in the very early phases of rolling out external links and other court-authorized tools to restore competition. These tools should not be another source of unjustified profits for Google.

## B. Purchases on "Existing" Installed Apps

Additionally, hundreds of thousands of users have already downloaded DCN members' apps on their devices. Given the way that Google defines "new installs" ("installs from users who first install or first update the app or game from the Google Play Store on or after June 30, 2026") and "existing installs" (all "Installs that do not quality as 'New Installs'"), all of these users would appear to be subject to the higher of the two fee levels.[8] (March 4, 2026 Status Report, Ex. A.) Accordingly, many DCN members will continue to pay fees to Google on in-app purchases at an extraordinary 25% commission. Assuming that a large portion of these purchases continue to be made with Google Play Billing, the most convenient payment option, that fee level increases to 30%. This service fee structure far exceeds what is required to compensate Google for its actual costs and intellectual property. Instead, Google will continue to reap the rewards of its past monopolistic behavior.

---

[8] Except if an app was installed prior to June 30, 2026, and never once updated—an unlikely circumstance for popular and frequently-updated apps.

BRIEF OF DCN AS *AMICUS CURIAE* | CASE NOS. 3:21-MD-02981-JD, 3:20-CV-05671-JD

\*                          \*                          \*

In addition to scrutinizing Google's fee levels, this Court should consider enforcing a moratorium period in which Google may not charge service fees beyond a level necessary for Google to recoup actual costs, to provide the time it takes competing app stores to get off the ground and become viable competitors to Google and Apple, with sufficient market share to sustain a competitive marketplace. Fostering real competition in app distribution is likely to foster improved economic conditions for publishers, too. A healthy economic foundation, in turn, will lead to greater investments in journalism and the production of new works. Our democracy puts enormous "faith in the free marketplace of ideas", *Chiles v. Salazar*, No. 24-539, 2026 WL 872307, at \*13 (U.S. Mar. 31, 2026). But preserving this marketplace of ideas requires more than faith: the antitrust laws must be painstakingly enforced.

### CONCLUSION

Recognizing the cardinal importance of public access to independent digital content, this Court should reject the RPMI and any attempts by Google and Epic to impede effective implementation of the Injunction.

Dated: April 6, 2026

Of Counsel:

Karl Huth
Matthew J. Reynolds
J. Lee Hill
Jack Mitchell
huth@huthreynolds.com
reynolds@huthreynolds.com
lhill@huthreynolds.com
jmitchell@huthreynolds.com
HUTH REYNOLDS LLP
41 Cannon Court
Huntington, NY 11743
Tel: (631) 263-3648
Fax: (646) 664-1512

Respectfully submitted,

HUTH REYNOLDS LLP

/s/ J. Luke Rushing
Luke Rushing
lrushing@huthreynolds.com
41 Cannon Court
Huntington, NY 11743
Tel: (202) 420-9628
Fax: (646) 664-1512

*Attorneys for Digital Content Next*

10