# Declaration of Prof. Nancy L. Rose

## July 10, 2026

**Table of Contents**

I. Introduction and Assignment..................................................................................... 3

II. The Evaluative Standard and What the Record Established .......................................... 5

III. The Contested Changes to the Current Injunction......................................................... 7

    III.A. Replacing Distribution Through Google Play with the Registered App Store

    Program...................................................................................................................... 8

    III.B. OEM or Carrier App Store Placement ................................................................ 27

    III.C. Download Links and Link-Out Fees .................................................................. 32

    III.D. Migration of the Fee Structure into the Private Settlement ................................ 43

    III.E. Settlement Structure, Epic's Role, and Changed Circumstances......................... 44

IV. Net Assessment....................................................................................................... 46

    IV.A. Replacing Distribution Through Google Play with the RAS Program............... 46

    IV.B. OEM or Carrier App Store Placement ................................................................ 48

    IV.C. Download Links and Link-Out Fees.................................................................... 48

    IV.D. Collective Impact on the Redress of Network Effects......................................... 49

## I. Introduction and Assignment

1.      My name is Nancy L. Rose, and I am the Charles P. Kindleberger Professor of
Economics and former department head at the MIT Department of Economics and a
Visiting Scholar at the Mossavar-Rahmani Center for Business and Government at the
Harvard Kennedy School.  I have been appointed to "assist the Court in evaluating
whether the joint request to modify the injunction…is consistent with the jury verdict and
the public interest in free and unfettered competition," and to "independently evaluate the
economic and antitrust effects of the proposed modifications," and "opine on the
testimony and opinions provided by Dr. Douglas Bernheim and others with respect to the
proposed modifications."[1] My present assignment is to assist the Court in assessing the
economics and antitrust issues raised by the parties' March 4, 2026 Renewed Joint
Motion to Modify Permanent Injunction[2] (referred to below as the "Revised Proposed
Modified Injunction," or "RPMI").

2.      I have neither been asked nor resourced to collect independent evidence or
provide empirical data analysis.  My analysis is grounded in economic principles and the
strength of the evidence in the record, including the parties' and amici submissions
subsequent to the RPMI.  To conduct that analysis, I draw upon the record, as well as on
the expertise developed over forty years as an MIT faculty member engaged in teaching
and research on industrial organization, competition policy, and economic regulation; two
decades directing the National Bureau of Economic Research program in Industrial

---

[1] Order re Court-Appointment of Expert Witness (Dec. 5, 2025), Dkt. 1131, 1:12-14, 1:21-24.
[2] Renewed Joint Motion to Modify Permanent Injunction (Mar. 4, 2026), Dkt. 800 ("Renewed Joint
Motion")

Organization; and my experience as a Deputy Assistant Attorney General for Economic Analysis at the Department of Justice Antitrust Division.

3.      I understand the central question for this hearing to be whether the RPMI performs at least as well as the current injunction in remedying the conduct the jury found unlawful and in restoring competition for the benefit of consumers, developers, and rival distributors, and not merely whether it serves the two parties before the Court. The Court has framed the second hearing around six numbered topics[3] that are focused on assessing whether the proposed changes will reduce the injunction's redress of the network effects of Google's anticompetitive conduct and whether they will raise barriers to entry, particularly for smaller rivals.

4.      This report is organized around the changes the RPMI would make to the current injunction. Part II states the standard I apply and provides a brief assessment of what the prior record established, because the changes can be assessed only against the harms the remedy was designed to cure. After an overview, Part III takes up the contested changes one at a time. For each, I identify the proposed change; reproduce the Court's relevant topic question(s) on that change; weigh the evidence on the change and answers to the Court's topics contained in the record;[4] and offer my assessment. Part IV gives my overall assessment.

---

[3] Order re Second Evidentiary Hearing (Apr. 21, 2026), Dkt. 1212
[4] To the extent feasible, I review evidence in the trial and remedies record, the amici submissions, the parties' Renewed Joint Motion, and Dr. Leonard's proffer.

4

## II. The Evaluative Standard and What the Record Established

5.    **The standard.** I understand that an effective antitrust remedy must eliminate the illegal behavior, deny the defendant the fruits of its statutory violation, ensure that no practices likely to result in monopolization remain, and avoid impeding lawful competition on the merits. The Court applied that standard in entering the current injunction, describing its object as to "pry open to competition a market that has been closed by defendant's illegal restraints" and to "deny to the defendant the fruits of its statutory violation."[5] Because this is "a network effect case," the Court recognized that the remedy "must … be more than just 'I'm going to stop paying people to not compete with me,'" it must affirmatively "account for" the network effects that Google's illegal conduct entrenched.[6]

6.    To that standard I add a distinction I drew at the January hearing. A settlement generally establishes that each party prefers its terms to continued litigation; it does not establish that the terms serve the public interest. After liability has been found, the ordinary reasons to favor settlement are attenuated, and a different risk emerges: the prevailing plaintiff and the adjudicated monopolist may each earn more as a protected duopoly than under open competition, and therefore may share an interest in terms that divide monopoly rents rather than dissipate them through entry. This is the concern the Supreme Court identified in a different setting in *FTC v. Actavis* (570 U.S. 136). It does

---

[5] Remedies Hr'g Tr. (May 23, 2024), Dkt. 977, 6:1–8 (quoting Justice Douglas in *Ford Motor Co v US,* 405 US 562 at 577, 578), 6:12–19 (quoting Optronic Technologies, Inc v. Ningbo Sunny Electronic Co, 20 F.4th 466 at 486); see also, Remedies Hr'g Tr. (Aug. 14, 2024), Dkt. 1000, 122:16–23 ("The only way to do that is to open up that construct.")
[6] Remedies Hr'g Tr. (Aug. 14, 2024), 121:5–11.

not presume bad faith; it means only that the agreement of these two parties cannot substitute for independent judgment about effects on those who are not at the table.

7.      **What the record established.** The jury found that Google unlawfully acquired and maintained a monopoly in Android app distribution, and the Ninth Circuit affirmed both the verdict and the resulting injunction. The economic mechanism at the center of the case is the indirect network effect between users and developers, what has been referred to as the "chicken-and-egg" dynamic in which users gravitate to the store with more apps and developers to the store with more users.  Raising barriers to entry on either side can serve to entrench a dominant firm and make rival entry quite difficult.[7] The injunction's provisions for catalog access and distribution of rival stores through Google Play were designed to address that dynamic by giving a rival immediate and *actual* access to users and to a competitive catalog rather than the mere *potential* to reach both sides of the market.[8] The distinction between actual access to a market and the potential to reach it recurs throughout the analysis that follows and is, in my view, the single most important lens for evaluating the proposed substitutions.

---

[7] Remedies Hr'g Tr. (May 23, 2024), Dkt. 977, 27:20–28:15 (Bernheim: "As an app store I need users to get developers.  I need developers to get users.  If I'm the dominant app store and I have both, both are kind of going to stay there.  If I don't have either, it's hard to get the ball rolling."); Statement of B. Douglas Bernheim (Apr. 11, 2024), Dkt. 952-1, ("Bernheim Remedies Stmt.") ¶ 13 ("the vast majority of consumers use the Google Play Store because virtually all developers distribute their apps through it, and virtually all developers distribute their apps through the Google Play Store because the vast majority of consumers use it").

[8] Bernheim Remedies Stmt, ¶26 ("Google's years of imposing frictions on direct downloads have trained users to rely on the Google Play Store to the exclusion of direct downloads, and as a result it will likely take some time to make them comfortable with direct downloading."); ¶63 (catalog access "jump-starts the competitive process by decoupling the user side of the market from the developer side"), ¶67 (distribution through Google Play "would give third-party app stores a degree of visibility that Google's past anticompetitive conduct would otherwise deny them, and thereby assist them in competing immediately and more effectively"); Remedies Hr'g Tr. (May 23, 2024) 31:8–14 (catalog access removes "the disadvantage they would have been at as a competitor from having a smaller catalog"), 71:15–72:10 ("And the thing about downloads is everybody--all the Google Android users are kind of trained at this point to go to Google Play, and it's going to take a while to undo that.")

8.    **The posture of the motion.** As the Court observed in January, the market itself has not changed.  Rather, the asserted basis for reopening the decree is the parties' settlement and, most recently, Google's decision to deploy a Registered App Store (RAS) program globally.[9] I take no position on the legal sufficiency of that basis under Rule 60 or the injunction's own good-cause provision. I note only, as an economic matter, that Google's global rollout does not depend on modifying the United States decree: the parties have made the out-of-U.S. commitments unconditional, and the current injunction's catalog access and Play distribution provisions could continue to operate in the United States alongside a global RAS program. Indeed, as I discuss below, the existence of a global RAS program appears to mediate if not nullify many of the scale concerns that were expressed by Mr. Sweeney in the January 22, 2026 hearing before the court.[10]

## III. The Contested Changes to the Current Injunction

The March RPMI proposes a number of changes in the current injunction, and several are the subject of the Court's six topics:[11] the replacement of distribution through Google Play with the Registered App Store program (discussed in section III.A); the Google Play pay-for-placement rule (III.B); the removal of the download-link right and the link-out fee (III.C); the migration of the fee structure into the private settlement (III.D); and the settlement's structure and Epic's altered role (III.E).

---

[9] Jan. 22, 2026 Hr'g Tr., Dkt. 1166, 143:14–18, 24:10–12 (the Court); Renewed Joint Motion, 5:9-16
[10] Jan. 22, 2026 Hr'g Tr., 69:14-70:13 ("Every store will be able to do a much better job of serving U.S. users if it can attract developers by having a worldwide audience." Sweeney).
[11] Order re Second Evidentiary Hearing.

## III.A. Replacing Distribution Through Google Play with the Registered App Store Program

9.    **The change.** Under the current injunction, Google "may not prohibit the distribution of third-party Android app distribution platforms or stores through the Google Play Store"; it may take "reasonable measures" to ensure such stores are safe and lawful, but those "review measures must be comparable to the measures Google is currently taking for apps proposed to be listed in the Google Play Store," Google "will bear the burden of proving that its technical and content requirements and determinations are strictly necessary and narrowly tailored," and any fee "must be based on Google's actual costs."[12] A companion provision requires that Google "permit third-party Android app stores to access the Google Play Store's catalog of apps so that they may offer the Play Store apps to users," while giving *developers,* not Google, and not the rival store, "a mechanism for opting out of inclusion in catalog access for any particular third-party Android app store."[13]

10.   The RPMI eliminates the requirement to allow distribution through Google Play and substitutes the "Registered App Store" program. Under the RPMI, Google will "continue to permit third-party app stores to operate on Android free of charge" and to permit "direct downloading of apps from developer websites and third-party stores without any fees being imposed for those downloads unless the downloads originate from linkouts from apps installed/updated by Google Play," and will "develop and release a

---

[12] Permanent Injunction (Oct. 7, 2024), Dkt. 1017, ¶ 12
[13] Id. ¶ 11

process to certify an Android app store as a 'Registered App Store'" and maintain this feature through September 30, 2032.[14] A user "can install a Registered App Store from a website by clicking on a single store install screen using neutral language," which will "also grant the permission to the store to install apps."[15] Certification is administered by "Google's Android team," and Google may charge "reasonable fees to cover the operational costs associated with the review and certification process," which "may not be revenue proportionate."[16] The most important net change in this provision is therefore the removal of the current injunction's distribution channel, which provides for placement of a rival store *inside* Google Play, and its replacement with a streamlined path for installing a rival store *from the web*.

11.    **The Court's questions.** The Court's order framing the second hearing directs the following questions to this change:[17]

> **Topic 1.** "Will the replacement of the provision requiring distribution of alternative app stores on Google Play Store (GPS) with the proposed 'Registered App Store' program cause anticompetitive effects or barriers to entry of rival app store providers, particularly for, but not limited to, smaller rivals? How will this proposed modification remediate anticompetitive effects in light of prior testimony that users have been conditioned by Google's monopolization of app distribution to look only at GPS for app distribution?"

---

[14] Revised Modified Injunction (Mar. 4, 2026) Dkt. 1179-3, ¶ 12
[15] Id. ¶ 12(a)
[16] Id. ¶ 12(b)
[17] Order re Second Evidentiary Hearing, 1:14-24

**Topic 2.** "What are the estimated costs of rivals to reach users via store downloads on the internet versus a download via GPS? What scale of operations would likely be needed to make an app store based solely on internet downloads profitable given those costs? Will such costs exclude all rivals other than rivals with the scale of Amazon, Microsoft, and the like?"

12. The Court's concluding Topic 6, whether the modifications "taken individually or collectively, reduce the injunction's redress of the network effects of Google's anticompetitive conduct,"[18] bears on this change as well, and I address it in the assessment below and in Part IV.

13. **What the trial and remedies record established.** The mechanism at the center of the liability case, and of the remedy, is the indirect network effect between users and developers. As Dr. Bernheim explained in the remedies hot tub, "as an app store I need users to get developers. I need developers to get users. If I'm the dominant app store and I have both, both are kind of going to stay there. If I don't have either, it's hard to get the ball rolling," and the resulting disadvantage "exist[s] in significant part because of past conduct."[19] The catalog access and Google Play distribution provisions were designed to attack that dynamic from both sides. Catalog access removes "the disadvantage that they would have been at as a competitor from having a smaller catalog, which is the source of the network externality issues"[20], allowing a rival "to offer comprehensive catalogs on day one".[21]  Distribution through Google Play addresses the user side, precisely because

---

[18] Id., 2:9-10
[19] Remedies Hr'g Tr.(May 23, 2024), 27:20–28:15 (Bernheim), see also 55:11–16 (Gentzkow, describing the same "chicken-and-egg" two-sided dynamic)
[20] Id. 31:8–14 (Bernheim)
[21] Bernheim Remedies Stmt. ¶ 25, see also ¶ 63 ("immediate scale on the developer side")

reducing sideloading friction does not, by itself, reach it: "Google's years of imposing frictions on direct downloads have trained users to rely on the Google Play Store to the exclusion of direct downloads, and as a result it will likely take some time to make them comfortable with direct downloading."[22] Requiring Google to carry rival stores "for a limited period of time … offset[s] the advantage that Google Play has acquired by virtue of its past anticompetitive conduct as the dominant go-to provider of app store distributions."[23]

14.     The record establishes the distinction that distribution through Google Play gives a rival *actual* access to the installed base of users who have been conditioned to look to Play, whereas making sideloading easier offers only the *potential* to reach those users if the rival can first draw them away from Google Play. As Dr. Bernheim explained, "[i]f third-party app stores were not available through Google Play, many users would not know where to find them or even to look for them at all"; distribution through Play "would give third-party app stores a degree of visibility that Google's past anticompetitive conduct would otherwise deny them."[24] The Court's own framing of the remedy was to the same effect: the object is to "unfetter a market from anticompetitive conduct and pry open to competition a market that has been closed" and to "deny to the defendant the fruits of its statutory violation,"[25] not merely to reduce installation friction. As the Court observed, "I have to do something to overcome the network effects."[26]

---

[22] Bernheim Remedies Stmt. ¶ 26
[23] Remedies Hr'g Tr. (May 23, 2024), 72:1-10 (Bernheim)
[24] Bernheim Remedies Stmt. ¶ 67
[25] Remedies Hr'g Tr. (May 23, 2024), 6:1–8, 6:12–19 (the Court)
[26] Id. 50:3–4 (the Court)

15.      **The Registered App Store program.** The Registered App Store program addresses a real problem: the friction Google deliberately built into sideloading, which the Court described from the trial evidence as "12 to 18 screens … telling the user over and over again, 'This is all on you. Proceed at your own risk,'" friction that "was intentionally done to discourage sideloading."[27] Reducing that friction is important, and the program has genuinely attractive features: a single neutral install screen, published qualification criteria, and certification administered by Google's Android team rather than by the Play Store organization that competes with the applicants.[28] These are significant improvements over the unstructured sideloading process, and I credit them.

16.      One might interpret the RAS program to codify a version of what the Court built the Technical Committee to supervise. In fashioning the current decree the Court declined to "micromanage" Google's security review and instead created a three-person Technical Committee with a "dual function: [p]roblem solving and compliance monitoring," charged to work out "the … nuts-and-bolts issues about what should the [process] look like" and to resolve disputes, with the Court as final arbiter.[29] A standardized certification with published criteria and a single neutral install screen appears to me a concrete instance of the nondiscriminatory, administrable process the Committee was meant to help mediate, and seems welcome evidence that the parties have found it more straightforward than expected to address many of the security concerns

---

[27] Id. 74:22–75:1, 82:15–19 (the Court); see id. 83:6–12 (Google's own witness calling the number of security screens "abysmal")

[28] RPMI ¶ 12(a)–(b)

[29] Remedies Hr'g Tr. (Aug. 14, 2024), Dkt. 1000, 85:18–86:7; see id. 8:9–14, 35:5–9; Permanent Injunction ¶¶ 12–13

Google raised with respect to alternative app store distribution in the remedies proceedings.[30]

17.    Given the Court's insistence on nondiscriminatory processes for reviewing alternative app stores,[31] the availability of the RAS program would seem to provide a simplified and predictable basis for the *security* vetting of app stores distributed through Google Play.  This would provide alternative app stores distributed through Google Play with more predictability and clarity, and reduce the burden on the Technical Committee by resolving in advance much of the app store review problem-solving and dispute-resolution the Committee is envisioned to oversee.  The parties suggest that Google will not voluntarily extend the simplified vetting process for an RAS to app stores that opt for distribution through Google Play under the current injunction, particularly with respect to vetting all apps within an alternative app store against Google Play content standards.[32] While the parties have signaled that app *content* vetting may continue to be a source of friction, it is unclear how substantial that would be for most alternative app stores, as presumably the only apps that need to be independently vetted for content are those that are not already distributed through Google Play some place in the world.

18.    I credit a comparative point in the RAS program's favor. Because a RAS is certified against neutral security criteria and Google performs no content review of the individual apps within it, the program leaves Google less discretionary control over what

---

[30] Remedies Hr'g Tr. (Aug. 14, 2024), 73:14-74:4, 121:12–15, 139:7–10
[31] Id., 87:12-14, 88:13-14.
[32] Renewed Joint Motion, 10:4-12 ("Google has indicated that Play will review these stores [distributed *inside* the Google Play store] to ensure that they—and the apps they distribute—are consistent with Google Play's content standards. In Google's view, this review step—which it believes is necessary for apps or app stores distributed in the Google Play store—will inevitably create friction between Google Play and rival app stores. The Registered App Store remedy will minimize that friction.")

a rival store may carry than distribution through Play, under which Google has said it would review the store's apps against Play's content policies.[33] That is a genuine advantage of the program on the dimension of Google's gatekeeping. But it does not offset the difference that drives this section: the program trades some measure of gatekeeping for the loss of actual access to Play's conditioned user base, and it is that access, not app-level content review, that the affirmative provision was designed to secure.

19.    **Friction reduction and network effects.** The difficulty is that the RAS program gives rivals a cleaner path to *potential* access — the ability to install from the web if the rival can bring a user to the point of installation — but not the *actual* access that distribution through Google Play provides. The Court's first question, which asks how the modification will "remediate anticompetitive effects in light of prior testimony that users have been conditioned … to look only at GPS for app distribution"[34], goes precisely to this gap. The RAS program lowers the user's cost of *completing* an installation she has already decided to make; it does not address the user who has been trained to look only to Google Play. The discovery mechanism under the current injunction is concrete: a user who opens Google Play and searches for "app store," or for the name of a particular rival store, will find the registered rivals that have taken catalog access there, whereas web-based installation has no comparable point of discovery within the Google Play

---

[33] Renewed Joint Motion 7; Declaration of Dr. Gregory K. Leonard (June 16, 2026), Dkt. 1225-1 ("Leonard Decl.") ¶ 21
[34] Order Re Second Evidentiary Hearing, 1

environment. That gap reflects the user conditioning the affirmative provision was designed to overcome, and reducing installation friction does not reach it.

20.     The parties argue that "the evidence shows that both Amazon and Epic, through marketing and incentives, were able to get users to *try* to download their stores—and Epic submits that the main hurdle they faced was their inability to get enough users to *complete* the process."[35] And both Amazon's and Epic's experiences may not bear on potential app store entrants without a marquee app or large installed base of app users.

21.     **Dr. Leonard's proffer.** Dr. Leonard addresses this change in several parts, which I take in turn.

22.     *On conditioning*, Dr. Leonard contends that "even if users are conditioned to download apps from the Google Play Store, that does not mean they are conditioned to download third-party app stores from the Google Play Store," and that "any user conditioning may have similar impacts regardless of whether the Court imposes the original injunction or the modified injunction."[36] The first, "even if.. does not mean," statement is logically reasonable but not dispositive on the questions posed by the Court. Dr. Leonard offers no record support for the second, "may have similar impacts regardless," conclusory statement.  He speculates that "a user conditioned to download apps from the Google Play Store may, because of that conditioning, be less likely to seek out and download a third-party app store…because that user is not looking for an alternative app store." [37] That may or may not be the case, but the question before the

---

[35] Renewed Joint Motion 10:15-18 (referencing the January 22, 2026 Hr'g Tr., 17:19–18:3, 52:13–53:8, 94:20–95:6.)
[36] Leonard Decl. ¶¶ 11–12
[37] Leonard Decl. ¶12

Court is the *relative* impact of the availability through Google Play v. web-based download on that propensity. Dr. Leonard does not engage with the evidence presented at trial on precisely this point (see paragraphs 13 and 14, *infra*), nor does he provide any new evidence. On this record I find the argument unpersuasive.

23.    Dr. Leonard argues that merely being available within Google Play would not generate awareness or demand, so a rival must differentiate and market its store regardless of the distribution channel. I do not disagree that some marketing is almost certainly required for a new entrant. But in Dr. Leonard's view, distribution through Play adds little that web installation does not provide.[38] This understates what distribution through Play provides, however. An entrant marketing an app store through web download must persuade the user to leave the mobile environment she knows, navigate to a possibly unfamiliar site, and complete an installation there. An app store available within Play converts the same marketing into an installation inside the store the user already uses, and also, through in-Play search, supplies a point of discovery the open web does not. The question the Court posed is not whether marketing is necessary in both cases (it plainly is), but what is the likely relative cost of acquiring an actual user under each.

24.    On the question of likely relative acquisition cost, the trial evidence the parties invoke addresses user drop-off during the installation process, the steps between clicking to download and successfully completing the install. The parties acknowledge that both the RAS and Google Play distribution remedies "require Google to take steps to make it

---

[38] Leonard Decl. ¶¶ 7–8, 12

easier for users to download third-party app stores."[39] The record shows that a streamlined flow may more than double the completion rate.[40] I credited that evidence in January as "compelling."[41] But it is important to be clear for what it is a compelling measure, and that is the experience of users who have already decided to obtain the store and begun the process of installation.  These data are silent on the likely far larger population never motivated even to attempt a download because that population has been conditioned to look only to Play. Reducing installation friction raises successful conversion among the first group, but does not tell us anything about the behavior of the second.  The parties' framing "the main hurdle" as the "inability to get enough users to complete the process,"[42] is thus an answer to only half of what the provision mandating access to distribution through Google Play was designed by the Court to solve.

25.     Dr. Leonard offers three further arguments to suggest little benefit to Google Play distribution over sideloading; none persuades me on this record. First, he argues that distribution through Play would make a rival dependent on Play and force a disruptive transition to the web when the injunction expires, whereas the Registered App Store program builds durable web-download behavior from the outset.[43] I find this argument cuts the other way.  A rival that has used the injunction period to obtain a base of actual users has something to retain at expiry, while a rival that never reached those users,

---

[39] Renewed Joint Motion, 9:14-15
[40] Renewed Joint Motion 9, n.4, citing to Bernheim in Jan 22, 2026 Hr'g.
[41] Jan. 22, 2026 Hr'g Tr. 153:2–19
[42] Renewed Joint Motion, 10:15-18
[43] Leonard Decl. ¶ 9.  The durability argument also assume that Google would not reinstate substantial download frictions for side-loading after the expiration of its RAS program in six years.

because web installation left it with only potential access, has nothing to transition. The dependency he describes is the mechanism by which the remedy works, not a defect in it.

26.     Second, Dr. Leonard notes that many Android users also use PCs, where applications often are obtained from the web, and suggests a general comfort with web installation.[44] The empirical relevance of that to the present case is unclear, and the record does not help establish that. The conditioning the record establishes specifically addresses training of users to obtain Android apps from Google Play,[45] and familiarity with installing a program on a PC does not establish that a user will more readily think of or accept an open web search and download for an Android app store, which is the behavior the provision was meant to address.

27.     Third, Dr. Leonard suggests that some conditioning would have arisen from Google's lawful first-mover advantage in any event.[46] The premise is supported in the record. Dr. Bernheim acknowledged Google's first-mover advantage on cross-examination, and the Court itself noted Google's "10-, 15-, 20-year first-mover advantage" for the Play Store.[47] But the record shows that advantage did not, by itself, entrench Google Play. Google required Play's preinstallation on essentially every Android device outside China through the MADA.[48]  It paid its OEM partners—Xiaomi, Oppo, and Vivo, each of which had an actual, competitive, preinstalled app store—the

---

[44] Leonard Decl. ¶¶ 13, 22
[45] See also Trial Tr. 302:11-304:17 (Simon) ("we have to reach Android users, and for better or worse, they seem to be trained to look in the Google Play Store as the place where they get and download apps")
[46] Leonard Decl. ¶ 10 n.5
[47] Trial Tr. 2480:11–15 (Bernheim) (Google Play "grew rather rapidly because it and Apple had both come out with revolutionary products, and they kind of had first-mover advantages"); Trial Tr. 3045:19–20 (the Court) ("the 3 million apps on Google and the 10-, 15-, 20-year first-mover advantage that Google has for its Play Store").
[48] Trial Tr. 1069:14–1071:4 (Kolotouros)

most aggressive RSA 3.0 revenue shares specifically to stop those partners from preloading and promoting their own app stores.[49] That Google found this sustained and costly conduct necessary against actual rather than merely potential competitors suggests that the conditioning the injunction is intended to remedy is substantially a product of the conduct, not of a lawful head start.

28.    Whatever its source, the Court asks which remedy is more likely to overcome the conditioning Google's conduct created. Distribution through Play lets an entrant do so in two stages: first drawing users to its store within the marketplace they already trust, and then, as an established store, carrying those users to web-based distribution as the injunction winds down. The record does not quantify that advantage, but if the goal is actual users, the lower initial barrier of the two-stage path should yield greater penetration than requiring users to find and trust an unfamiliar store on the open web from the outset.

29.    *Cost and minimum viable scale (Topic 2)*, Dr. Leonard states that he is "not aware of any evidence in the record about the absolute costs to reach users or otherwise operate third-party app stores … distributed either through the internet or the Google Play Store."[50] This is the central empirical question the Court posed, and the proffer does not answer it. Nor do his prediction that the competitive outcome will be "a few large app stores rather than many small app stores" and assertion that "an outcome where several large stores and some smaller niche stores emerged … should be judged a success"[51]

---

[49] Trial Tr. 2408:16–21 (Bernheim) ("the top of the list are Xiaomi, Oppo, and Vivo. These are the OEMs that had competitive preinstalled app stores … What we see here is aggressive revenue sharing being given not to potential competitors but to actual competitors"), also 2398:5–20.
[50] Leonard Decl. ¶ 18
[51] Id. ¶¶ 16–17, 23

answer the question the Court has asked. Whether such an outcome should be "judged a success" depends on whether such an outcome reflects the fundamental economics of a competitive app distribution market or is instead an artifact of a remedy that disadvantages all but the largest firms.  This is exactly what the Court's first and second topics seek evidence on, in their references to "smaller rivals" and to whether costs "exclude all rivals other than rivals with the scale of Amazon, Microsoft, and the like."[52] Dr. Leonard offers no threshold analysis bearing on that question.

30.    Two smaller points in the proffer do not change this. Dr. Leonard observes that the incremental infrastructure cost of web distribution is small and largely already incurred,[53] which I accept may be true.  But the cost the Court asked about is the cost of reaching and converting users, not of hosting downloads, and on that the proffer is silent. He also urges that the goal is to restore competition, not to guarantee any particular competitor's success,[54] a principle I share. The Court's first two topics, however, ask precisely whether the modification would leave viable only the largest firms, which is a question about the conditions of competition, not about protecting a chosen firm or class of firms, and on that question the proffer leaves us no closer to an answer.

31.    Dr. Leonard's stated belief that large firms "do not … face significantly higher barriers" under the RPMI appears to rest expressly on Epic's preference: he "understand[s] that Epic in particular has expressed a preference for the Registered App Store program."[55] That is the preference of a party to a global settlement.  Dr. Leonard

---

[52] Order re Second Evidentiary Hr'g, at 1
[53] Leonard Decl. ¶ 20
[54] Leonard Decl. ¶ 15
[55] Leonard Decl. ¶ 16 & n.10

does not engage with the arguably comparably situated amici developers, Microsoft, Take-Two, and Supercell, who take the opposite position to Epic on the replacement of Google Play app store distribution with the RAS (see the amici discussed below in this section).

32.   *Marketing efficiencies* Dr. Leonard asserts that "[m]arketing costs per install will likely be lower under the Registered App Store program" because it is global and runs for six rather than three years.[56] The basis for such a claim appears to rest on an assumption that a single global marketing campaign provides a lower cost way to reach and convert potential US users than is a campaign targeted at US users, and an assumption that the duration of returns to a marketing campaign can be measured over years (and are significant in years four through six, given the comparison to six rather than three years).  Neither assumption derives from economic theory; whether they are true is an empirical question that depends on particular facts and circumstances.

33.   On the global reach component, are display or search ads purchased to reach a user based in the US less expensive per user or per click if the company is also showing display or search ads to users in other countries?  Neither Dr. Leonard nor the parties have provided evidence to answer that question.  But the answer may not be relevant in light of Google's commitment to a global RAS program outside the US regardless of the outcome of the RPMI.  This commitment would seem to enable an app store that wishes to run a global campaign to market itself as a RAS, if that were more cost-effective, with separate links for US and non-US users in the ads if the store chooses to use Google

---

[56] Leonard Decl. ¶ 18

Play distribution in the US under the current injunction and web download everywhere else.

34.     The temporal argument (lower costs per install for a six year rather than three year campaign) appears to assume that marketing campaigns generate meaningful returns, such as app store installations, across many years. In the absence of evidence on this point in Dr. Leonard's declaration or in the record, I turned to the marketing literature for any insight into the likely persistence of marketing returns.  The academic marketing literature suggests returns to advertising typically depreciate over a far shorter horizon, usually measured in months, not years.[57]  Google's own advertising products may be further indicative: Google Ads lets Search and Display advertisers track "conversions," such as a click, download, or purchase, in response to being shown an ad, only within a window of one to 90 days after being shown the ad, with a 30-day default.  This suggests that online advertisers themselves do not count on installations generated more than a few months after a campaign, let alone several years later.[58]

35.     I do not rest my conclusions on resolving these questions about marketing efficiencies, which lie outside what the record supports and largely outside my assignment. What matters for the Court is that this was the hearing at which such evidence was to be produced, and none was. Epic markets and promotes its own games across many geographic markets and presumably has developed models of how to

---

[57] For example,  a peer-reviewed meta-analysis of 918 marketing studies over 1962-2015 found that the median time for 90% of the total effect of targeted advertising to be realized was only 2.0 months and for mass media advertising only 3.4 months (Christine Köhler, Murali K. Mantrala, Sönke Albers & Vamsi K. Kanuri, *A Meta-Analysis of Marketing Communication Carryover Effects*, 54 J. Marketing Rsch. 990, 1004–05 (2017)).
[58] Google Ads Help, "About conversion windows," https://support.google.com/google-ads/answer/3123169

deploy its marketing resources most effectively; those models may yield insights into both the rate at which marketing investment returns depreciate and any economies of scope in reaching U.S. and non-U.S. customers together — the very inputs needed for the Court's minimum viable scale question, and for assessing whether the U.S. market alone is too small to support the development of alternative app stores. Such evidence might not resolve how those costs and returns differ between large firms with established apps (such as Epic Games and Microsoft) and smaller firms or new entrants, which is the distinction the Court's first and second questions single out, but it would have at least shed some light on whether there are relevant marketing efficiencies. Yet the joint submission does not supply it.

36.    **What the amici add.** The amici sharpen the remedies choice discussion in several ways the Court may find useful.

37.    The six economists (Heidhues, Kimmelman, Monti, Scott Morton, Podszun, and Schnitzer) frame it most directly: under the RPMI, "Google continues to deny the [rival app] stores access to the Google Play Store, which is by far the most efficient and low cost method of distribution." [59] They reach the conditioning point head-on: "If rival stores must teach users how to sideload and advertise to users to explain where to navigate to in order to find the third party store, entry will be much more difficult than under the Court's original remedy."[60] Moreover, they note that the options are not mutually exclusive: Google may offer the Registered App Store program "in addition to

---

[59] [Proposed] Brief of Economists as *Amici Curiae* Regarding the Parties' Renewed Motion to Modify the Permanent Injunction (Apr. 6, 2026), Dkt. 1196-1 (hereafter "Economists Amicus"), 3:26-4:1
[60] Economists Amicus, 4:4-6

allowing [rival stores] to be downloaded directly from the Google Play Store," giving consumers "an additional method of acquiring competing stores."[61] They recommend rejecting this change and retaining the original remedy.[62]

38.    Microsoft, Take-Two, and Supercell are developers of substantial scale who are not parties to the settlement; for example, many of Supercell's individual titles have more than 500 million Play downloads.[63] These amici reinforce the behavioral lock-in point that anchors the Google Play conditioning analysis: "the significance of access to the Play Store goes beyond avoiding the unnecessary friction that Google built into side-loading. Because Google has preserved its monopoly on app distribution for years, most Android users have been conditioned to understand that the only way to obtain an app on their phones is by using the Play Store…..To have a chance at gaining user awareness and acceptance, an app must be able to reach users through the Play Store, and an app selling other apps is no exception to this rule."[64] Moreover, "persuading users that they should alter their fixed habits and begin to download apps from an alternative app store will be a tall order.  Given the monopoly position of the Play Store, however, the only realistic way for users to discover alternatives to the Play Store is through the Play Store itself," so a Registered App Store program "will not provide as effective a mechanism for overcoming the network effects that the Play Store has built up."[65] They, too, stress that "nothing prevents Google from adding a Registered App Store program … so long

---

[61] Id. at 4:22-5:3

[62] Id. at 4:2

[63] [Proposed] Brief of Microsoft Corp., Take-Two Interactive Software, Inc., and Supercell OY as *Amicus Curiae* in Opposition to Renewed Joint Motion to Modify Permanent Injunction (Apr. 6, 2026), Dkt. 1191-1 (hereafter "Microsoft/Take-Two Amicus"), 4:15-20, 5:3-8, 6:3-8

[64] Id. 9:9-16

[65] Id. 12:24-27, 13:18-23, 8:8-18 (quoting the trial record that "[e]ven a corporate behemoth like Amazon could not compete with the Google Play Store due to network effects.")

as it also continues to comply with the injunction," and that the burden of an "extraordinary" modification rests with the parties, who "have made no serious attempt to demonstrate any changed circumstances."[66] I give these submissions weight precisely because they come from significant app developers whose commercial interests, unlike Epic's, are not aligned with the parties' agreement as they are not participants in the settlement.

39.     The two developer amici who support the change, Rovio and the Reliance/Miniclip filing, value the program's administrability, security, Google's announced reduction in service fees, the global consistency of the RAS, and, in the Reliance/Miniclip submission, its longer six-year term.[67] The Reliance/Miniclip submission, however, appears to rest in part on a premise the text of the current injunction does not support: that under the existing remedy "third-party app stores would be available to Android users only through the Google Play Store," and that the injunction "places Google in a gatekeeper role" with "discretion to admit or deny competing app stores."[68] Neither is entirely correct. The current injunction's distribution through Play provision is *additive.*  It forbids Google to "prohibit the distribution of third-party … stores through the Google Play Store,"[69] implying that option would be available on top of, not instead of, web installation, which remains available. Reliance does, however, suggest the RAS process would be less intrusive, and "more likely to

[66] Id. at 13:15-18, 12:10-11

[67] [Proposed] Brief of Rovio Entertainment Ltd as *Amicus Curiae* Supporting Renewed Joint Motion to Modify Permanent Injunction, Apr. 6, 2026, Dkt. 1193-1 (hereafter Rovio Amicus), 5:15-6:7, 8:8-19; *Amicus Curiae* Brief of Interested Developers (Apr. 6, 2026), Dkt. 1199-1 (hereafter Reliance/Miniclip Amicus), 4:5-21

[68] Reliance/Miniclip Amicus, 3: 21-4:4

[69] Permanent Injunction ¶ 12

increase adoption of alternative app stores."[70] And control over catalog inclusion rests with developers, not Google: the catalog provision directs Google to give "developers … a mechanism for opting out of inclusion in catalog access for any particular third-party … store."[71] To the extent Google conducts any review under ¶ 12, the decree assigns *Google* the burden of proving its requirements "strictly necessary and narrowly tailored."[72] The RPMI substitution of the Registered App Store program is thus not, as these amici suppose, simply a limitation on the gatekeeping the current injunction allows Google to perform for app stores distributed through Google Play; it is the removal of a distribution channel the current injunction provides. Rovio's brief, by contrast, describes the catalog-access provision accurately, including the developer opt-out,[73] and appear to rest much of its (expressly "tentative") support on the RAS program on global consistency and security administration, as well as features of the current injunction.[74]

40.    **Assessment.** On this record, I am not persuaded that the Registered App Store program will do the work that distribution through Google Play did in rebalancing the network effects the affirmative provisions were designed to correct. The friction evidence is genuine, and the RAS program's design is a real improvement on that front. But friction reduction speaks to only one of the two barriers the remedy addressed; it does not reach the conditioning of users to look only to Google Play. The Court's specific concern for smaller rivals is not addressed by the proffer at all: on the dispositive questions of cost and minimum viable scale, the parties' own expert concedes

---

[70] Reliance/Miniclip Amicus, 4:12-13
[71] Permanent Injunction ¶ 11
[72] Id. ¶ 12
[73] Rovio Amicus, 7:18-21 & n.11
[74] Id. at 8:8-16

there is no record evidence. As several of the amici note, if the reduced friction of the RAS is especially desirable, then, because it is a web-based path that operates globally and independently of the United States decree, it could be ordered *in addition to* — rather than in substitution for — distribution through Google Play and catalog access.

### III.B. OEM or Carrier App Store Placement

41.    **The change.** The current injunction contains a symmetric pair of placement rules. Google "may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an OEM or carrier to preinstall the Google Play Store on any specific location on an Android device,"[75] and it likewise may not condition such payments on an agreement "not to preinstall" a rival store.[76] Neither side of the market can be bought into a fixed placement. The RPMI keeps the second rule but rewrites the first: Google now may not condition payments on an OEM or carrier agreement "to refrain from placing a third party Android app store on any specific location on an Android device."[77] The effect is to lift the bar on Google's paying for its *own* preferred placement while retaining only the prohibition on paying an OEM or carrier to keep a *rival* out. Google may again purchase prime placement for Google Play; it is forbidden only from purchasing an explicit agreement to exclude a competitor.

42.    **The Court's question.** The Court's Topic 3 directs:

---

[75] Permanent Injunction, ¶ 7
[76] Id. ¶ 8
[77] RPMI (Mar. 4, 2026), Dkt. 1179-3, ¶ 7

"What is the competitive effect of deleting the provision that Google cannot condition payment, revenue sharing, or access to Google products on an agreement with an OEM or carrier to preinstall GPS on any specific location on an Android device? Why would allowing those agreements not reinstate the exclusionary placement practices of GPS? What evidence is there that OEMs or carriers are willing to place more than one app store in a prominent position on the home screen?"[78]

43.     **What the trial and remedies record established.** Placement was one of the principal levers of the conduct the jury condemned. The Court described the trial evidence at the remedies stage: "the MADA and RSA agreements … had clauses about not doing business with rivals or putting Google in a position where it always came out first if there was some dealing with a rival, a home screen or priority."[79] Dr. Bernheim gave "a great example … the RSA 3.0 agreements that said to the OEMs, 'Your compensation, your payments are going to be different if you … preload a rival app store.'"[80] Critically, the Court recognized that the harm does not depend on an explicit exclusivity term: "if the practical effect is the revenue sharing is essentially motivating an OEM not to put a rival play store on, you have achieved an anticompetitive goal, even though it may be cloaked in a competitive-phrased way."[81] That argument underpins the current injunction's bar against conditioning payments on placement of Google Play itself, not merely on the explicit exclusion of rivals; and it is the concern

---

[78] Order re Second Evidentiary Hearing, at 1–2
[79] Remedies Hr'g Tr. (May 23, 2024), 13:11–15
[80] Id. 15:20–24; see Remedies Hr'g Tr (Aug. 14, 2024), 101:12–17 (targeting Xiaomi, Oppo, Vivo)
[81] Remedies Hr'g Tr. (May 23, 2024), 21:18–23

the RPMI's narrower rule reopens. The eliminated "preload exclusivity provisions" were, as Google's counsel acknowledged at closing, among the roadblocks "eliminated by Your Honor's injunction."[82]

44.    **Why placement is scarce and contestable.** The record also establishes the economic premise behind the Court's question. Google's own expert explained that "OEMs have scarce real estate on their devices that … app stores are competing for placement on," and that "OEMs benefit from the fact that app stores that are looking for distribution have to compete for their business to try to get preloaded on the phones."[83] Prime placement is thus a scarce, rivalrous asset; whoever can outbid for it can, as a practical matter, foreclose the position. The current rule forecloses Google's use of monopoly proceeds and product access adjudicated unlawful to buy the scarce position to foreclose rivals.

45.    **Dr. Leonard's proffer.** Dr. Leonard's submission shows that Samsung preinstalls its own Galaxy Store alongside Google Play on "57.1% of [GMS] devices … in the US, or approximately 100 million devices," and that "around 65.9% of all Android-branded GMS devices worldwide (excluding China) come preinstalled with alternative app stores."[84] That evidence is responsive to the third part of Topic 3 — that OEMs are willing to preload more than one app store.

46.    **The questions the evidence leaves open.** The evidence does not answer the first two parts of the Court's question. First, the figures concern the OEM's *own* store

---

[82] Remedies Hr'g Tr. (Aug. 14, 2024), 129:24–130:2
[83] Remedies Hr'g Tr. (May 23, 2024), 22:10–19, 76:21–77:6 (Gentzkow)
[84] Leonard Decl. ¶ 29

(Samsung's Galaxy Store, Xiaomi's GetApps), so demonstrate an OEM's willingness to carry its house brand, not its willingness to grant a scarce prime position to an unaffiliated rival; indeed, if Google buys the most-prominent slot, an independent rival would need the OEM to feature a *third* preinstalled store if it maintains its own store as well. At trial, Dr. Bernheim noted that "non-OEM stores have not been able to achieve any success with preinstallation."[85] Second, these data do not engage with the Court's question on why re-permitting paid placement "would not reinstate the exclusionary placement practices of GPS."[86] On that question the amici, not the proffer, engage the point.

47.     The American Economic Liberties Project explains the asymmetry: "Google has so much money that it can simply outspend its rival app stores for the best digital real estate on devices, thereby shrinking the incentive for OEMs to clutter the same home screen with other app stores and effectively pricing out Google's competitors," so that "Google's deep pockets can buy exclusivity even without an explicit ban on competitors."[87] The economists make the complementary point that the rewritten rule enables Google to pay to *require* preinstallation of Google Play.   "While the rival store cannot be barred, the Google Play store can be required," and "[i]f the Google Play Store is the default or must be prominently placed, Google will gain from its past illegal conduct."[88]

---

[85] Trial Tr. 2395:8-9
[86] Order re Second Evidentiary Hr'g, 1 (3)
[87] [Proposed] *Amici Curiae* Brief of American Economic Liberties Project, demand progress Education Fund, and Open Markets Institute (Apr. 2026), Dkt. 1198-1 (hereafter AELP Amicus), 12:1-7
[88] Economists Amicus, 5:4-15.

48.    Two of Dr. Leonard's specific contentions warrant a direct response. He argues that an OEM will add a rival store to the home screen whenever the rival's payment exceeds the OEM's opportunity cost, and that home-screen space is not truly scarce because Google's own applications occupy less than half of the default screen.[89] This argument conflates space with position. What may be scarce is not room for an additional icon but the prime position — the placement that determines which store a user reaches for first — and that position may be sold to only one store. Google's own history of paying to secure exactly that position belies the suggestion that placement is unconstrained. Once the contest is understood to be over the prime position rather than mere presence, Google's ability to fund its bid from the proceeds of the adjudicated monopoly is decisive: a rival financing placement from competitive returns cannot reliably outbid a monopolist financing placement from the very monopoly rents the placement protects. Dr. Leonard also invokes Dr. Bernheim's remedies testimony that agreements should not be "conditional on dealings with a rival" as an endorsement of the modified rule.[90] But that formulation addressed conditioning payments on a rival's conduct; it does not reach Google's purchase of its own prime placement to protect its monopoly, which is the distinct harm the current injunction's rule was written to prevent.

49.    **Assessment.** The change reintroduces the entrenchment risk the current injunction's rule was designed to foreclose. The benefit the parties can claim for it — additional OEM and carrier payments, some of which might be passed through to consumers — must be weighed against that risk, and the proffer does not attempt the

---

[89] Leonard Decl. ¶¶ 26, 30
[90] Leonard Decl. ¶ 27

comparison. The record establishes that prime placement is scarce, that Google historically used payments and revenue share to secure it and to disadvantage rivals, and that the harm can be achieved without any explicit exclusivity term. The OEM evidence, while real, concerns OEMs' own stores and may not suggest a willingness to add a third app store, particularly in a prime location, to Google Play and their own store. On the present record the parties have not shown that the benefit of the modification outweighs the entrenchment risk.

### III.C. Download Links and Link-Out Fees

50.    **The change.** The current injunction's ¶ 10 does two things: it bars Google from prohibiting a developer from "communicating with users about the availability or pricing of an app outside the Google Play Store," and it separately bars Google from prohibiting a developer "from providing a link to download the app outside the Google Play Store."[91] The RPMI keeps the communication right but removes the second protection: its revised ¶ 10 provides that "[t]his paragraph does not require Google to permit a developer to include an in-app link leading to an app or app store download within apps installed or updated on the Google Play Store."[92] Separately, the RPMI's revised ¶ 12 authorizes a fee on downloads that "originate from linkouts from apps installed/updated by Google Play."[93] Two distinct conditions are therefore at issue in this section, and it helps to keep them apart: the *removal of the in-app download-link right* (Topic 4), and a *court-administered sanction of a fee on permitted link-outs* (Topic 5). Both are separate

---

[91] Permanent Injunction (Oct. 7, 2024), Dkt. 1017, ¶ 10
[92] RPMI (Mar. 4, 2026), Dkt. 1179-3, ¶ 10
[93] Id. ¶ 12

from the Google Play Billing anti-tying rule of ¶ 9, which the RPMI retains and which I do not revisit here.

51.    **The Court's questions.**

> **Topic 4.** "What is the justification for deleting the provision that Google cannot prohibit a developer from providing a link to download an app outside GPS? If that provision is deleted, what will prevent Google from returning to its prior practice of banning such links?"[94]

> **Topic 5.** "If such links are retained, what will the competitive effects be if Google charged link-outs the same service fee as for distribution through GPS?"[95]

52.    Before turning to the two questions, I address a threshold point the parties press, which is that I did not raise the download-link change in my oral testimony in January. That is correct, and reflects where my attention was then focused.  In the present proceeding the Court has requested an evaluation of the current RPMI, including two explicit questions addressed to these changes.  Removing the ability of apps to include linkouts is problematic on a standalone basis, as I describe below.  Enabling Google to prohibit download links would be even more consequential under the web-based app store download requirement process in the RPMI.

---

[94] Order re Second Evidentiary Hearing, at 2
[95] Id. at 2

53.    **Removing the in-app download-link right (Topic 4).** An in-app link is the most direct and lowest-cost channel through which a developer can route its own existing users to its website, a rival app store, or a direct download. Indeed, that channel takes on even greater importance under the RPMI: if distribution through Google Play were replaced by web-based installation, a link from the developer's own app becomes one of the few effective ways for a rival store or developer to reach the users it already has built a relationship with. Removing the protection therefore exacerbates the network effects concern raised by the RPMI, rather than standing apart from it. Dr. Leonard's principal defense is that "[n]either the trial record nor remedies hearings addressed" download links and that "download linkout functionality did not exist on Google Play, nor was it a specific remedy sought by Epic."[96] Even if true, that would not supply a justification for *deleting* a protection the Court did include in the current decree, which is what Topic 4 asks: an antitrust remedy is forward-looking — its office is to "pry open" the market and "deny … the fruits" of the violation,[97] not merely to re-list the specific practices litigated. Nor does the proffer answer the second half of Topic 4 — what will prevent Google from returning to banning such links once the protection is gone. The proffer does not address reversion at all. And the security rationale Google offers for the deletion is in tension with the parties' own Registered App Store design, which is built on the premise that secure web-based installation is feasible (see § III.A).

54.    Dr. Leonard, and the amicus briefs Google has moved to introduce, add a distinct security rationale: a link from a Play-distributed app to an outside download is said to be

---

[96] Leonard Decl. ¶ 32
[97] Remedies Hr'g Tr. (May 23, 2024) 6:1–19

a vector for malware and phishing, and the risk heightened because users treat Play as a trusted environment.[98] I do not opine on the security questions as such; they lie outside my assignment and my expertise. Two economic observations bear on the weight the rationale can carry here. First, the premise that a secure, streamlined path to web-based installation is feasible is the very premise on which the parties have built the Registered App Store program; a concern that web installation is too dangerous to permit through an in-app link sits uneasily beside a proposal that makes web installation its centerpiece. Moreover, the argument Google makes for reviewing all apps within any app store distributed through the Google Play Store is predicated in part on its interest in app security, which seemingly would address this concern. Second, if the threat is genuine, a tailored remedy is a security standard for such links, of the kind the Technical Committee was created to help design and administer, and preferable to the removal of a developer's most direct channel to its own users. An outright bar appears the response of a party seeking to close a competitive channel, not the narrowest means of managing a security risk, and the decree already supplies the institution for drawing that line.[99]

55.    I would qualify this discussion, however, by noting that if the RPMI provision allowing Google to bar download links applies narrowly only to an in-app link that *directly* initiates a download installation, the practical impact may not be great. For example, does a link that takes a user to a website that describes an app or app store, and

---

[98] Leonard Decl. ¶¶ 32, 35–37; Google's Admin. Motion. to Introduce Supplemental Evidence Regarding Proposed Injunction Modifications (June 16, 2026), Dkt. 1226 (hereafter Google Admin. Motion).
[99] Permanent Injunction ¶¶ 12–13

contains a link users can click on somewhere on that webpage, constitute "an in-app link leading to an app or app store download" envisioned by the RPMI? [100]

56.    **The link-out fee (Topic 5).** My first concern is with the RPMI's provision *explicitly authorizing* fees imposed on "downloads [that] originate from linkouts from apps installed/updated by Google Play."[101] As I testified in January, I was concerned that writing such authorization into an injunction would "codify into law practices we might expect to be set through competitive negotiations, including…explicit permission for Google to collect specified service fees on all revenue ever generated by an app that is downloaded or updated from the Google Play Store, regardless of how those services are provided or paid for."[102] Given the monopoly Google established over app distribution as a result of the behavior at issue in this case, virtually all users' current apps have been installed or updated by Google Play, and that might be expected to persist for a considerable time if alternative app stores are slow to gain traction and to replace apps downloaded from Google Play. Linkouts from apps might be the most efficient way to facilitate that transition from Google Play, as developers could encourage users to link out to re-download apps from their website or an alternative app store. But this RPMI provision ensures that any such purchases would continue to be taxed by Google Play, leaving little or no return for the alternative distributor.  As discussed below, there remains considerable disagreement over the economic and legal basis for Google to continue to profit from the monopoly app distribution position

---

[100] RPMI, ¶ 10
[101] RPMI, ¶ 12 ("permit the direct downloading of apps from developer websites and third-part stores without any fees being imposed for those downloads unless those downloads originate….")
[102] Jan. 22, 2026 Hr'g Tr., Dkt. 1166, 115:22-116:5

enshrined by its previous behavior, as well as over the appropriate level of any such fees.  Given that, I cannot find an economic argument to support a judicial injunction writing such a right into law, even for the temporary duration of the injunction.

57.    Even where a link is permitted, a fee set at or near the level of the Play service fee reproduces the prohibited conduct by price: Google can accomplish through a prohibitive charge what it may not accomplish through an outright ban, and the two have the same effect on behavior. This is not a novel proposition in the record. Prof. Tadelis, in the discussion of the Google Play Billing tie in the remedies proceedings, made this point from the cost side: the fee differential a developer must pay when steering to an outside alternative "should be no less than the cost for Google to deliver those services," as a differential set too low leaves no room for an alternative to compete, because "the costs of a billing solution product are higher than" the margin Google leaves.[103] As the Microsoft amici observe, "charging commissions on linked-out purchases gives [the platform] the power to prohibit them."[104] The economists amici add that when a user completes a transaction on the developer's own website, "the developer incurs the cost of hosting and delivering the content, and its delivery may involve no, or only nominal Google resources," so a fee on that transaction "unduly lower[s] returns to developers," and they "recommend rejecting this change."[105]

58.    The developer Benjamin Simon supplies concrete evidence of the distortionary nature of such a fee, a "baseline transaction" problem. He addresses any linkout from an

---

[103] Remedies Hr'g Tr. (May 23, 2024), 94:14–20, 95:8–23; Tadelis Remedies Stmt. (Apr. 11, 2024) ¶¶ 7, 16
[104] Microsoft/Take-Two Amicus, at 14: 15-16 (quoting Epic Games, Inc. v. Apple Inc., 161 F.4th 1162, 1180–81, 1186 (9th Cir. 2025))
[105] Economists Amicus, 5:16-21

app to a developer's website, not targeted toward generating an app download.  Because the fee "appl[ies] when a user completes any transactions or any app installs within 24 hours of following an external content link," it attaches to every linked transaction, including the substantial share of users who would have reached the developer's website and transacted there in any event. At trial, he testified that when Down Dog included such a link in its app, "approximately 90 percent of users chose to purchase on the website," but after Google forced the link's removal "approximately half of Android users still subscribed on the website — without any in-app communication whatsoever."[106] Those baseline users "would have subscribed on the website anyway," so "[a]t any non-negligible fee rate, the fee on baseline transactions alone exceeds the revenue the link generates," and "[t]he rational response is to remove the link entirely."[107] The fee thus extracts revenue the link did not generate and, above a low threshold, drives the developer to abandon the channel — the outcome an outright prohibition would produce.

59.   **Dr. Leonard's proffer.** Dr. Leonard observes that the charge Google has announced for download link-outs is a *fixed* fee per download — "$3.65 for games and $2.85 for apps" — rather than a percentage of the transaction.[108] He notes that a fixed fee changes developer incentives: because it is a flat dollar amount, it can be economically rational to direct high-value users to an external download while keeping lower-value users on Play billing (on his worked example, $3.65 on ~$100 of expected

[106]  Motion for Leave to File Brief of Amicus Curiae Benjamin Simon in Response to Renewed Joint Motion to Modify Permanent Injunction (Apr. 2026), Dkt. 1192 (hereafter "Simon Amicus"), 13:7-12 (citing Trial Tr. 296:11–16, 300:8–11, 294:21–23)

[107] Id. 13:16-19

[108] Leonard Decl. ¶ 40, referencing "Enrolling in the external content links programs for users in the US" (https://support.google.com/googleplay/android-developer/answer/16470497?hl=en)

spend is an effective rate of 3.65%, against in-app fees "of up to 25%").[109] He goes on to say

> "if, hypothetically, Google were to charge the same service fee for apps downloaded via a download linkout as it does for apps distributed and serviced by the Google Play Store, developers may not choose to offer a linkout to download an app outside of the Google Play Store. The reason is straightforward.  If the Google Play Store fee is the same whether an app is distributed and serviced by the Google Play Store or downloaded outside the Google Play Store via a link, the developer has less incentive to take the extra steps, and potentially incur extra costs, to manage distributing and servicing the app on an ongoing basis outside the Google Play Store. However, a competitive effects analysis of this hypothetical pricing policy is not necessary because the Google Play Store is charging a different type of fee for download linkouts."[110]

60.     If this interpretation of Google's plans were correct, it would partially address Topic 5, which was framed around an equal percentage fee.  But I do not read Google's description of "Enrolling in the external content links programs for users in the US" in the same way that Dr. Leonard reads it.  If one scrolls down the page to "Play Service Fees," the following description appears:[111]

---

[109] Id. ¶ 44
[110] Leonard Decl. ¶¶ 40-41
[111]" Enrolling in the external content links program for users in the US,"
https://support.google.com/googleplay/android-developer/answer/16470497?hl=en (accessed July 10, 2026).

## Play Service Fees

⚠ In the future, Google intends to apply a service fee on successful transactions and downloads completed via external content links. At this time, however, Google is not assessing these fees and is therefore not requiring developers in this program to report these transactions or downloads to Google.

Like our standard service fees, the fees associated with the external content links program reflect the value provided by Android and Play and support our continued investments across Android and Play ☑ . The following fees apply when a user completes any transactions or any app installs **within 24 hours of following an external content link**:

- **In-app item purchases**: The applicable service fee will be determined by whether the transacting user's install is "new" or "existing", with the regional rollout date serving as the effective date:
  - New Installs: A transaction from a user whose first-time install or first update of the app from Google Play occurred on or after June 30, 2026 for users in the US.
  - Existing Installs: A transaction from a user whose first-time install or first update of the app from Google Play occurred before June 30, 2026 for users in the US.

| | Recurring subscriptions | All other offers of in-app digital features or services (new installs) | All other offers of in-app digital features of service (existing installs) |
|---|---|---|---|
| First $1M annual earnings | 10% | 10% | 10% |
| Standard service fees | 10% | 20% | 25% |
| When participating in the Play Games Level Up or the Apps Experience programs | 10% | 15% | 20% |

- **App download event**: A fixed fee (subject to periodic adjustments) per install based on the app category of the linked external app being installed. The linked app category must be declared as part of transaction reporting.
  - Games: $3.65
  - Apps: $2.85

I read "The following fees apply when a user completes any transactions or any app installs **within 24 hours of following an external content link:**" (emphasis in original), followed by the two bullets ("In-app item purchases" and "App download event") to suggest the bulleted items are cumulative, not either/or at the choice of the developer.

40

That is, service fees apply to all transactions, and there would be an additional fixed fee for an "app download event." This seems consistent with the status report filed March 4, 2026.[112]  Dr. Leonard's subsequent discussion of the economics of Google charges for actions following app linkouts is predicated on the assumption that developers can choose to pay a modest download fee *instead* of the 10%-25% service fees enumerated in the table.  If those fees instead are additive, Dr. Leonard's analysis in his paragraph 40, cited above, suggests Google can indeed discourage or even, as Mr. Simon suggested above, foreclose developers from accessing linkouts, even if the Court preserves that right in the injunction.  Presumably Google can clarify its intent to the Court to resolve this differing interpretation between Dr. Leonard and me.

61.    Regardless of that resolution, it does not engage amicus Mr. Simon's baseline-transaction critique, which applies with equal force to a fixed fee, since the fixed fee attaches to baseline downloads as well as incremental ones. Nor does it address whether the fee is calibrated to anything resembling Google's actual cost of a service it provides. The disclosed United States fee schedule in the March 2026 Status Report gives no reason to think it is: alongside the fixed download fee it sets a 20% charge on link-out transactions,[113] and a 20% fee on a purchase the user completes on the developer's own website seems unmoored from Google's cost, or value-add, of a service it does not perform, as noted by the Economists Amici cited above.

62.    Dr. Leonard defends the fee as remuneration for the ongoing services Google Play provides to the "originating" app, and describes a developer's use of a link to reduce the

---

[112] Status Report  (Ex. A).
[113] Id.

service fee as "fee avoidance."[114] The characterization presupposes its conclusion. Whether Google is entitled to a fee on a transaction the user completes on the developer's own site, using the developer's own billing, and that Google neither distributes nor services, is the contested question; calling the developer's conduct "avoidance" assumes the entitlement rather than establishing it.

63.    **Assessment.** The combination of removing the download link right and authorizing an unconstrained fee on revenue attached to linkouts gives Google the means to recreate, by prohibition and by price, the frictions the injunction was designed to remove, and the proffer does not show otherwise. A path that would preserve the parties' improvements while protecting the core of the remedy would be to restore the developer's right to include download links and to limit any fee Google imposes on link-outs (or on alternative-payment transactions) to Google's demonstrated actual cost of any service it in fact provides, with the burden of justification on Google. I recognize, as I said in January, the Court's reluctance to engage in price-setting. The goal of the injunction is to create conditions for competitive entry that would obviate the need for price oversight, as that could be left to the forces of competition. But in creating those conditions for competitive entry, a temporary actual-cost limitation may be a necessary antitrust boundary that prevents a fee from being used to re-create or perpetuate the violation, which may be administered by placing the burden of justification on the defendant.

---

[114] Leonard Decl. ¶¶ 41–44

### III.D. Migration of the Fee Structure into the Private Settlement

64.     One concern is that including a discussion of such fees in the injunction built into the injunction Google's right to impose such charges.  That concern remains in paragraph 12 of the RPMI, as I discussed in paragraph 55 above.

65.     The fee structure agreement itself was not eliminated but simply relocated. The parties moved the operative fee terms out of the decree and into their private Term Sheet, "outside this Court's supervisory authority."[115] For the United States, Epic agreed it "will not object to these fees" disclosed in the Status Report.[116] Under the Term Sheet, that waiver is explicit and reaches the United States: Epic "agrees that it will not object to fees that are within the pricing caps described in Section 9, including if such fees are assessed in the United States."[117] Outside the United States, the fee schedule and the associated tracking and steering rules likewise reside in the Term Sheet (§§ 8–13) rather than in any decree.

66.     The practical consequence is that the fee terms most likely to determine whether developers actually benefit from the ability to link out are placed beyond the Court's continuing supervision and beyond the reach of the developers whose economics they govern.

67.     Whether this matters turns on a threshold question the parties themselves disputed before they settled, and which should be resolved on the record: did the current

---

[115] AELP Amicus, at 12:15-16
[116] Status Report, Dkt. 802, at 2
[117] Revised Binding Term Sheet (March 4, 2026) Dkt. 1179-2 § 26

injunction already prohibit or constrain these fees? The parties acknowledged in their first joint motion that they "were preparing to dispute the issue of whether (and, if so, to what degree) Google may charge service fees on transactions processed using alternate payment methods."[118] Mr. Simon contends that ¶ 9 "already bars these restrictions," observing that Google's initial compliance beginning October 29, 2025 "imposed no fees" and that Google "announced those restrictions only six weeks later, after settlement negotiations had begun."[119] I took the narrower view in January that the current injunction is silent as to the fees Google may charge.[120] If the current injunction did constrain these fees, moving them into a private agreement removes a protection the decree provided; if it did not, the migration fills a gap the injunction never addressed rather than removing a guarantee.

### III.E. Settlement Structure, Epic's Role, and Changed Circumstances

68.     **Decoupling, and the limits of it.** I do not weigh in on the full impact of decoupling of the settlement's commercial terms from entry of the injunction, as I do not think it is within my assignment.   I would note only that decoupling does not remove the question, raised in January and alluded to in submissions leading up to this hearing, as to whether Epic's support for the current RPMI results from private benefits to Epic rather than the adequacy of the RPMI to remedy the competitive concerns the jury and the Court have identified.  The question is not whether the parties value the settlement — plainly they do — but whether it restores competition for the benefit of those who

---

[118] Joint Motion (Nov. 4, 2025), Dkt. 1119, at 14
[119] Simon Amicus, at 11:25-27, 12:12-18
[120] Jan. 22, 2026 Hr'g Tr. 145:6–7

were not party to the negotiation.  As I put it in January, "just because the two parties find value in this settlement…does not mean that it is beneficial to consumers or to the competitive process."[121]

69.     **The economic concern the decoupling does not dispel.** The deeper concern I described in January is structural: "a monopolist generally can afford to pay a rival more to stay out of the market than the rival would earn if it entered and competed, if that payoff protects the monopoly and the rents that it generates."[122] The risk is not a check changing hands but "business deals, side factors that may … put[] Epic and Epic alone … in a special relationship vis-à-vis Google"[123]; and terms "that advantage Epic over its potential rivals … could require even lower transfers from Google because part of the payment for Epic signing on … would come from others who weren't present at the table."[124] Decoupling may affect the timing of the exchange, but does not establish that the resulting arrangement serves anyone other than the two parties.  That may be sufficient reason to place less weight on Epic's endorsement of the RPMI as evidence that the RPMI serves competition, and correspondingly more weight on the views of other non-settling and disinterested amici.

70.     The parties respond that Epic's agreement to purchase Google services cannot be a quid pro quo because the settlement terms are not depending on the adoption of the RPMI, and because that value flows from Epic to Google, not the reverse.[125] The direction of that single payment does not answer the concern. What matters is the net

---

[121] Jan. 22, 2026 Hr'g Tr.  117:2–5
[122] Jan. 22, 2026 Hr'g Tr.  117:10–18
[123] Jan. 22, 2026 Hr'g Tr. 9:6–18 (the Court)
[124] Jan. 22, 2026 Hr'g Tr.  123:1–24
[125] Joint Motion, Part III, 12:12-13:11

exchange across all of the settlement's terms, not the sign of any one line item: a monopolist can compensate a rival for standing down through fee tiers, commercial arrangements, or a metaverse partnership whose value is hard to observe, even as the rival pays, separately, for unrelated services. That Epic pays Google in one part of the agreement does not establish whether Epic is, on net and across the whole, better off accepting an RPMI that falls short of the criteria the Court has established for an appropriate remedy, the concern I identified in January.

## IV. Net Assessment

71.    **Net assessment.** I find that three sets of changes in the RPMI remain in tension with the purpose of the remedy and do not appear to be supported by evidence the Court requested.

### IV.A. Replacing Distribution Through Google Play with the RAS Program

72.    The proffer supplies no evidence on the relative costs or the minimum viable scale of web-based v. GPS distribution, particularly for the smaller rivals the Court asked about, so I can say little on those questions beyond noting a likely advantage for GPS distribution based on the record without a strong sense of its economic magnitude and significance.  I evaluate the other pluses and minuses as follows.

73.    **Plus for RAS:**  There is broad agreement that the RAS program reduces Google's ability to maintain or create new significant frictions in app store distribution for those that meet the RAS criteria, and it appears that those criteria are relatively clear and

nondiscriminatory, and importantly do not involve Google oversight of the individual apps being distributed within the RAS. This provides potential app store entrants with greater certainty about the process and control over their products. The record suggests that the gain arises primarily from eliminating Google's review, and hence potential friction, of individual apps within the alternative app store for compliance with Google Play content provisions. The RPMI also would extend the global RAS program to the US for six years, rather than the three in the current injunction.

74.    How significant are these advantages likely to be? Two considerations suggest they may be more modest than would first appear. First, on security review, the RAS certification is a straightforward process that could readily be applied to app stores distributed through Google Play as well, and a store that has obtained RAS status elsewhere in the world would carry presumptive evidence that it meets Google's security requirements; on this dimension I would expect the two paths to be close to a wash (see § III.A). The content-vetting advantage the parties emphasize would seem to apply only to apps not already distributed on Google Play somewhere in the world, and its relevance depends on how much unique content alternative stores carry and on whatever frictions Google introduces — the remedies record is unclear on the first and somewhat mixed on the second.

75.    The benefit of extending the RAS program's global reach and longer term to the United States appears limited, because Google has committed to implement the program globally for six years regardless of the RPMI. With RAS available in every market outside the United States, an app store can market global reach to developers and users, even if, at its option, it chooses to distribute through Google Play in the United States

under the current injunction if that is more effective for reaching U.S. users. That would seem to leave little incremental benefit from giving up Google Play distribution for the RAS program in the United States.

76.    **Minus for RAS:**  As described extensively above and in the record, the RAS is a program that reduces friction for potential users but does not explicitly address the network effects disadvantage for actual users that currently face rival app stores.  I continue to view this as a significant disadvantage for the RPMI, for reasons discussed at length in section III.A.

## IV.B. OEM or Carrier App Store Placement

77.    For the reasons developed in § III.B, restoring Google's ability to pay for its own prime placement reintroduces the entrenchment risk the current injunction's rule foreclosed. Prime placement is scarce, OEMs may tend to prefer their own stores, and Google can draw on monopoly profits to outbid rivals for the position that best insulates Google Play from competition. Alternative stores must compete for prominent preinstallation regardless; permitting Google to fund that competition with monopoly profits shared with OEMs and carriers is, in my assessment, a significant disadvantage of the RPMI.

## IV.C. Download Links and Link-Out Fees

78.    As developed in § III.C, removing the download link right lets Google impede if not block what is likely the most efficient and least costly channel through which a developer can tell its users about alternatives to Google Play distribution—and perhaps

billing — a costly unforced error. Preserving that right may not be sufficient on its own: an unrestricted link-out fee enables Google to eliminate this option through price. The current injunction is silent on the fees Google may charge on link-outs and downloads; the RPMI removes any doubt about Google's ability to use them to that end.

## IV.D. Collective Impact on the Redress of Network Effects

79.    In Topic 6, the Court asks:

> Will the proposed modifications, taken individually or collectively, reduce the injunction's redress of the network effects of Google's anticompetitive conduct?[126]

80.    Dr. Leonard offers his opinion that the RPMI and original injunction are rough equivalents in this regard ("like the original injunction, the proposed modified injunction would address the network effects problems the Court has identified"), based on his conclusion that streamlining the flow associated with sideloading and prohibiting Google from contracting with OEMs to directly affect placement of third-party app stores is sufficient to "achieve critical mass."[127]

81.    As I have explained (§ III.A), neither sideloading nor banning Google from conditioning placement payoff on rival app store placement is sufficient to redress the network effects Google's conduct reinforced. Reducing sideloading friction, which the RAS program does, matters for leveling the playing field, but it reaches only the

---

[126] Order RE Second Evidentiary Hearing, 2:9-10
[127] Leonard Decl. ¶¶ 50–52

conversion of users already induced to go online for a rival app store, not the far larger installed base conditioned to look to Play. My assessment, after an extensive review of the record, is that the RPMI is unlikely to enable Google Play's potential competitors to overcome their long-standing network-effect disadvantage in a timely manner.

82.    **A word on duration.** Several of the concerns expressed with respect to both the current injunction and RPMI are sharpened by the fact that the injunction is temporary. The premise of a time-limited antitrust decree is that its term is long enough for competition to gain a sufficient foothold in the market such that ordinary competitive constraints can replace the injunction in disciplining the monopolist's conduct once it expires. That premise is what makes the actual v. potential access distinction decisive: a remedy that merely lowers friction, without rebalancing the network effects that entrench Google Play, is less likely to let rivals reach that self-sustaining foothold within the decree's term, so that competition may simply collapse back toward the pre-injunction equilibrium at expiry. A three-year term for the provisions of the current injunction may be an appropriate balancing of interests, particularly if the Court were prepared, were Google to revert at expiry to the conduct the jury found unlawful, to decline to let the market re-monopolize.  But a remedy that never establishes durable rivals in the first place leaves nothing for competition to sustain. I think this counsels considerable caution before substituting potential access for a longer term for the actual access the affirmative provisions were designed to provide.

51

_Nancy L. Rose_ (signature)
_____          <u>July 10, 2026</u>

Nancy L. Rose                                        Date

**CURRICULUM VITAE**

**NANCY LIN ROSE**
*Charles P. Kindleberger Professor of Applied Economics, MIT Department of Economics*
*Visiting Scholar, Mossavar-Rahmani Center for Business & Government, Harvard Kennedy School*

MIT Department of Economics
The Morris and Sophie Chang Building
50 Memorial Drive, E52-420
Cambridge, MA  02142
phone   (617) 253-8956     nrose@mit.edu

## Education

Ph.D. (Economics), MIT, 1985
A.B. (Economics and Government, magna cum laude), Harvard University, 1980

## Employment

| | |
|---|---|
| 2010 - | Charles P. Kindleberger Professor of Applied Economics, MIT Department of Economics |
| 2022- | Visiting Scholar, Mossavar-Rahmani Center for Business & Government, Harvard Kennedy School, Harvard University |
| 2021-22 | Matina S. Horner Distinguished Visiting Professor, Radcliffe Institute for Advanced Study, Harvard University |
| 2017-2020 | Head, MIT Department of Economics |
| 2014 -2016 | Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice |
| 2013 -2014 | Associate Head, MIT Department of Economics |
| 1997-2010 | Professor of Economics, MIT Department of Economics |
| 1995-97 | Professor of Management and Economics, MIT Sloan School of Management and Department of Economics |
| 1994-95 | Associate Professor of Management and Economics, MIT Sloan School of Management and Department of Economics |
| 1990 - 2014 | Director, National Bureau of Economic Research Program on Industrial Organization |
| 1989-94 | Associate Professor of Applied Economics, MIT Sloan School of Management |
| 1985-89 | Assistant Professor of Applied Economics, MIT Sloan School of Management |
| 1980-81 | Staff Economist.  Leva, Hawes, Symington et al. (attorneys), Washington, D.C. |

## Board Service

| | |
|---|---|
| 2009 - 2014 | Whitehead Institute for Biomedical Research, Director, and Chair, Finance Committee (2012-2014) |
| 2004 - 2014 | Charles River Associates, Inc., Independent Director |
| 2003 - 2013 | Sentinel Investments, Sentinel Group Mutual Funds Independent Director, and Chair, Governance Committee (2012-2013) |
| 1994 - 2000 | MIT Medical Management Board |

**Honors and Fellowships**

| | |
|---|---|
| 2025 | Alfred E Kahn Award for Antitrust Achievement, American Antitrust Institute |
| 2024 | MIT Teaching with Digital Technology Award |
| 2023 | Inaugural Rosemary Hale Lecture, Lake Forest College |
| 2022 | Goldman Lecture in Economics, Wellesley College |
| 2021-22 | Matina S. Horner Distinguished Visiting Professor and Fellow, Radcliffe Institute for Advanced Study |
| 2020 | Carolyn Shaw Bell Award, American Economic Association Committee on the Status of Women in the Economics Profession |
| 2019 | Wellington-Burnham Lecturer, Tufts University |
| 2018 | Distinguished Fellow, Industrial Organization Society |
| 2018-- | Member, American Academy of Arts and Sciences |
| 2017 | Bernie Saffran Lecturer, Swarthmore College |
| 2016 | Bernard I. Fain Lecturer, Brown University |
| 2013 | American Economic Association Vice-President |
| 2012- | MacVicar Faculty Fellow, MIT-wide Award for Undergraduate Teaching |
| 2011 | MIT Undergraduate Economics Association Teaching Award |
| 2008 | MIT Graduate Economics "Meta Advisor" Award |
| 2004-2005 | John Simon Guggenheim Foundation Fellowship |
| 2004 | MIT Undergraduate Economics Association Teaching Award |
| 2004 | Visiting Scholar, Hoover Institution |
| 2000-01 | George & Karen McCown Distinguished Visiting Fellow, Hoover Institution |
| 2000 | MIT Undergraduate Economics Association Teaching Award |
| 1993-94 | Fellow, Center for Advanced Study in the Behavioral Sciences |
| 1991-96 | National Science Foundation Faculty Award for Women Scientists, SES-90-24147 |
| 1991-93 | Alfred P. Sloan Faculty Fellowship |
| 1990- | National Bureau of Economic Research, Research Associate |
| 1988-90 | National Science Foundation Grant, "Economic Determinants of Airline Safety," SES-87-21457 |
| 1988 | Visiting Scholar, Center for the Study of the Economy and the State, University of Chicago |
| 1987-90 | National Bureau of Economic Research, Faculty Research Fellow |
| 1987-88 | John M. Olin Faculty Fellowship |
| 1984 | Sloan Foundation Graduate Research Fellowship |
| 1981-85 | National Science Foundation Graduate Fellowship |
| 1980 | Phi Beta Kappa |

**Professional Service**

| | |
|---|---|
| 2026- | Program Committee Co-chair, Competition and Regulatory Economics Summer School (CRESSE) |
| 2025- | Scientific Committee, CRESSE |
| 2024- | Industrial Organization Society Board and Sponsorship Committee |

| | |
|---|---|
| 2024 | Economics Department Program Review Committee, Northwestern University |
| 2024-2025 | President, Western Economics Association International |
| 2023-2024 | President-elect, Western Economics Association International |
| 2022-2023 | Vice President, Western Economics Association International |
| 2022-2023 | President, Industrial Organization Society |
| 2021- | Member, CEPR Competition Policy Research and Policy Network |
| 2020 | Selection Committee for Distinguished Fellow, Industrial Organization Society |
| 2020-2021 | Vice President, Industrial Organization Society |
| 2019- | Advisory Council, The Hamilton Project |
| 2018 - | Advisory Board, American Antitrust Institute |
| 2018 | Selection Committee for Distinguished Fellow, Industrial Organization Society |
| 2017 -2020 | Advisory Council Member, Brookings Institution Center on Regulation and Markets |
| 2014 | AEA Nominations Committee |
| 2014 | Member, AEA Committee on Operations and Publications |
| 2013-2014 | Chair, AEA Ad Hoc Committee on Job Market Systems Design |
| 2013-2014 | Committee Member, National Academy of Sciences/Transportation Research Board Study of Freight Rail Transportation and Regulation |
| 2011 - 2014 | Committee on Economic Education, AEA |
| 2013 | AEA Nominations Committee |
| 2013 | External Review Committee, Resources for the Future |
| 2013 | Board of Advisors, Yale Program on Financial Stability |
| 2012 - 2013 | Vice President, American Economic Association (AEA) |
| 2012 | AEA CSWEP Elaine Bennett Award Committee, Chair |
| 2012 | Program Committee, AEA 2013 annual meeting |
| 2011 | Scientific Advisory Committee, Federal Trade Commission 4th Annual Microeconomics Conference |
| 2009 - 2011 | Project Team Member, MIT Study on *The Future of the Electric Grid* |
| 2010 | Program Committee, AEA 2011 Annual Meeting |
| 2005 - 2008 | Board Member, AEA Committee on the Status of Women in the Economics Profession (CSWEP) |
| 2004, 2009 | Quinquennial Review Committee, Wharton School Business and Public Policy Department |
| 2003 | Nominations Committee, AEA |
| 2002 - 2003 | Program Committee, 2003 International Industrial Organization Conference |
| 2002 | Nominations Committee, AEA |
| 1999 – 2002 | Executive Committee, AEA |
| 1999 – 2002 | Budget Committee, AEA |
| 2001 | Program Committee, Econometric Society North American Winter Meetings |
| 1999 | Program Committee, AEA annual meeting |
| 1998 | University of Pennsylvania Law School External Review Committee |
| 1997 | Nominations Committee, AEA |
| 1996 | Program Committee, American Economic Association (AEA) annual meeting |
| 1989 | Program Committee, Econometric Society North American Winter Meetings |

| | |
|---|---|
| 1988-90 | Assistant Director, National Bureau of Economic Research Project on Regulatory and Legal Institutions |

## Editorial Activities

| | |
|---|---|
| 2025-2026 | Co-editor, Special Issue for the *Journal of Industrial Economics* |
| 2021 -2024 | Associate Editor, *Journal of Economic Perspectives* |
| 1995-97 | Board of Editors, *American Economic Review* |
| 1993-97 | Editorial Board, *Journal of Industrial Economics* |
| 1993-2003 | Associate Editor, *Review of Economics and Statistics* |
| 1990-92 | Associate Editor, *Journal of Industrial Economics* |
| 1989-92 | Associate Editor, *Journal of Financial Intermediation* |
| 1989 -- 2005 | Co-Editor, MIT Press Series on the Regulation of Economic Activity |

## Research and Teaching Interests

Industrial Organization, Competition Policy, Economics of Regulation, Energy Economics, Transportation Markets

## Doctoral Dissertation Committees   Year, Student (Department), Initial Placement

| | |
|---|---|
| In process | Chelsea Mitchell (Economics) |
| 2025 | Rebekah Dix (Economics), Cowles Post-Doctoral Fellowship, Yale; Stanford Economics Department |
| 2023 | Adam Harris (Economics), Cornell University Department of Economics<br>Maggie Yellen (Economics & Harvard Law, J.D.), Attorney, Federal Trade Commission |
| 2020 | Omer Karaduman (Economics), Stanford University Post-Doc |
| 2016 | Gaston Illanes (Economics), Northwestern University Department of Economics |
| 2015 | Sarah Moshary (Economics), eBay Post-doctoral Fellowship, University of Pennsylvania Department of Economics |
| 2014 | Brad Shapiro (Economics), Chicago Booth School of Business |
| 2014 | Maria Polyakova [Breiter] (Economics), Stanford Medical School |
| 2011 | Mar Reguant (Economics), Stanford Graduate School of Business |
| 2011 | Claire Cizaire (Aeronautics & Astronautical Engineering) |
| 2009 | Tom Y. Chang (Economics), University of Southern California, Marshall School |
| 2006 | Antara Dutta (Economics), Georgetown University, Walsh School of Foreign Service |
| 2006 | David Matsa (Economics), Northwestern University, Kellogg School of Management |
| 2005 | Lesley Chiou (Economics), Occidental College Department of Economics |
| 2004 | Thomas Gorin (Aeronautics and Astronautical Engineering), Continental Airlines |
| 2003 | Mara Berman [Lederman] (Economics), University of Toronto, Rotman School of Business |
| 2003 | Silke Januszewski [Forbes] (Economics), University of California, San Diego, Department of Economics |
| 2003 | Terence Fan (Transportation Systems and Policy Analysis), Singapore University |
| 2002 | Astrid Dick (Economics), Federal Reserve Bank of New York |

2002     Michael Noel (Economics), University of California, San Diego
2001     Mark Rainey (Economics), Lexecon
2001     Eric Zitzewitz (Economics), Stanford University, Graduate School of Business
1999     Alan Sorensen (Economics), University of California, San Diego, Department of Economics
1998     Daniel Rodriguez (Economics), Emory University, Graduate School of Business,
1997     Meghan Busse (Economics), Yale University, School of Organization and Management
1996     Catherine Wolfram (Economics), Harvard University, Department of Economics
1994     Fiona Scott Morton (Economics), Stanford University, Graduate School of Business
1993     Gerard McCullough (Civil Engineering), Putnam Hayes Bartlett
1991     Patrick Little (Civil Engineering)
1991     Mark McCabe (Sloan)
1990     Anne Gron (Economics), University of Chicago, Graduate School of Business
1988     Robert Rubinovitz (Economics)


## Publications

"Transmission Impossible?  Prospects for Decarbonizing the US Grid," *Journal of Economic Perspectives*, Vol 37 (Fall 2023):  155-180.  (With L. W. Davis and C. Hausman)

"Ohio v. American Express:  The Exception That Should Not Become a Rule," *Antitrust.* 36 (Summer 2022, 3):  76-82.  (with J. Sallet)

"What Next for the Horizontal Merger Guidelines?"  *Antitrust.* 36 (Spring 2022, 2): 4-13. (with C. Shapiro)

"The Dichotomous Treatment of Efficiencies in Horizontal Mergers: Too Much? Too Little? Getting it Right." *University of Pennsylvania Law Review,* 168 (June 2020):  1941-1984. (with J. Sallet).  Jerry S. Cohen Award for Antitrust Scholarship, American Antitrust Institute (2021).

"Concerns about Competition." In M. S. Kearney and A. Ganz, eds., *Maintaining the Strength of American Capitalism.* Aspen Institute Economic Strategy Group. November 2019.

"Five Principles for Vertical Merger Enforcement Policy." *Antitrust* 33 (Summer 2019): 12-19.  (with J. B. Baker, S. C. Salop, and F. Scott Morton)

"Mergers That Harm Sellers." *Yale Law Journal*, 127 (May 2018): 2078-2109.  (with C. S. Hemphill). Concurrences (2019) and American Antitrust Institute (2019) writing awards.

"Economics at the Antitrust Division 2015-2016:  Household Appliances, Oil Field Services, and Airport Slots."  *Review of Industrial Organization.*  49 (December 2016, 4):  535-556. (with R. Chugh, N. Goldstein, E. Lewis, J. Lien, & D. Minehart)

"Economics at the Antitrust Division 2014–2015: Comcast/Time Warner Cable and Applied Materials/Tokyo Electron."  *Review of Industrial Organization.*  47 (December 2015, 4): 425-435. (with N. Hill and T. Winston)

"Learning from the Past: Insights for the Regulation of Economic Activity."  In N. L. Rose, ed., *Economic Regulation and Its Reform:  What Have We Learned?*  National Bureau of Economic Research and University of Chicago Press.  2014.

"How Airline Markets Work,… or Do They?  Regulatory Reform in the Airline Industry." In N. L. Rose, ed., *Economic Regulation and Its Reform:  What Have We Learned?*  National Bureau of Economic Research and University of Chicago Press.  2014. (with S.  Borenstein)

*Economic Regulation and Its Reform:  What Have We Learned?*  Editor.  Chicago:  NBER and University of Chicago Press.  2014.

"After Airline Deregulation and Alfred E. Kahn." *American Economic Review Papers and Proceedings.* 102 (May 2012):  376-380.

*The Future of the Electric Grid.*  Cambridge, MA: MIT Energy Initiative.  2011.  (Contributor to MIT interdisciplinary study chaired by J. G. Kassakian and R. L. Schmalensee)

"Air Transportation Deregulation:  Comment." In *Better Living Through Economics,* edited by J. J. Siegfried.  Cambridge:  Harvard University Press. 2010.  pp. 203-205.

"airline industry." In *The New Palgrave Dictionary of Economics*. Second Edition. edited by S. N. Durlauf and L. E. Blume. Palgrave MacMillan. 2008.  (with S. Borenstein).   Also at *The New Palgrave Dictionary of Economics Online*. Palgrave  <http //www.dictionaryofeconomics.com/article?id=pde2008_A000226> doi 10.1057/9780230226203.0026 Macmillan.

"Do Markets Reduce Costs?  Assessing the Impact of Regulatory Restructuring on U.S. Electric Generation Efficiency." *American Economic Review* 97 (September 2007): 1250-1277. (with K. R. Fabrizio and C. D. Wolfram).

"The Impact of Bankruptcy on Airline Service Levels." *American Economic Review Papers and Proceedings* 93 (May 2003): 415-419.  (with S. Borenstein)

"Regulating Executive Pay Using the Tax Code to Influence Executive Compensation." *Journal of Labor Economics* 20 (April 2002, part 2): S138-S175.  (with C. Wolfram)

"Regulation, Political Economy of" In N. Smelser and P. Baltes, eds. *International Encyclopedia of the Social and Behavioral Sciences*.  Oxford:  Pergamon. 2001. 19: 12967-12970.

"Regulation, Empirical Analysis." In N. Smelser and P. Baltes, eds. *International Encyclopedia of the Social and Behavioral Sciences*.  Oxford:  Pergamon. 2001.  19: 12957-12963.

"Has the 'Million-Dollar Cap' Affected CEO Pay?" *American Economic Review Papers and Proceedings*  90 (May 2000):  197-202. (with C. Wolfram)

"Airline Deregulation." In P. Newman, ed. *The New Palgrave Dictionary of Economics and the Law*, London:  Macmillan. 1998.  (with S. Borenstein)

"Diversification and Executive Compensation: Ability Premia or Managerial Entrenchment?" *RAND Journal of Economics* 28 (Autumn 1997):  489-514.  (with A. Shepard)

"Political Constraints on Executive Compensation   Evidence from the Electric Utility Industry."  *RAND Journal of Economics* 27 (Spring 1996): 165-182.  (with P. L. Joskow and C. D. Wolfram).  *Reprinted* in K. F. Hallock and K. J. Murphy, eds.  *The Economics of Executive Compensation, Vol. 2*. Northampton, MA:  Edward Elgar Publishing. 1999.

"Bankruptcy and Pricing Behavior in U.S. Airline Markets." *American Economic Review Papers and Proceedings* 85 (May 1995):  397-402.  (with S. Borenstein)

"Competition and Price Dispersion in the U.S. Airline Industry."  *Journal of Political Economy* 102 (August 1994):  653-683.  (with S. Borenstein)

"Regulatory Constraints on CEO Compensation." *Brookings Papers on Economic Activity - Microeconomics* 1993, pp. 1-58.  (with P.L. Joskow and A. Shepard)

"Fear of Flying?  Economic Analyses of Airline Safety." *Journal of Economic Perspectives* 6 (Spring 1992): 75-94.  Reprinted in P. Forsyth, K. Button, and P. Nijkamp, eds. *Classics in Transport Analysis, vol. 2*. Northampton, Mass.: Elgar Publishing. 2002.

"The Diffusion of New Technologies:  Evidence from the Electric Utility Industry." *RAND Journal of Economics* 21 (Autumn 1990):  354-373.  (with P. L. Joskow)

"Profitability and Product Quality:  Economic Determinants of Airline Safety Performance." *Journal of Political Economy* 98 (October 1990): 944-964. Reprinted in H. Mohring, ed. *The Economics of Transport*. Aldershot, England:  Edward Elgar Publishing. 1994. And K. J. Button and R. Stough, eds. *Transport Policy.*  Northampton, MA:  Edward Elgar Publishing. 1998.

"Financial Influences on Airline Safety." In L. Moses and I. Savage, eds. *Transportation Safety in an Age of Deregulation*.  Oxford:  Oxford University Press. 1989, pp. 93-114.

"The Effects of Economic Regulation." In R. Schmalensee and R. Willig, eds. *Handbook of Industrial Organization*.  Amsterdam:  North-Holland. 1989. Volume 2, pp. 1449-1506.  (with P. L. Joskow)

"An Economic Assessment of Surface Freight Transportation Deregulation." In *Economic Deregulation Promise and Performance. Proceedings of the 1987 Donald S. MacNaughton Symposium*. Syracuse:  Syracuse University. 1988, pp. 149-172.

"Economic Analysis of Communications Satellite Policies." Comments in *Proceedings of a Symposium on Space Communications Research and Development*. Space Applications Board, National Research Council.  Washington, D. C. :  National Research Council. 1988, pp. 198-201.

"Labor Rent-Sharing and Regulation: Evidence from the Trucking Industry." *Journal of Political Economy* 95 (December 1987): 1146-1178.   Reprinted in P. L. Joskow, ed. *Economic Regulation*. Northampton, MA: Edward Elgar Publishing. 2000.

"The Government's Role in the Commercialization of New Technologies: Lessons for Space Policy."  In  M. Macauley, ed. *Economics and Technology in U.S. Space Policy*.  Washington, D.C.:  Resources for the Future. 1987, pp. 97-126.

"The Incidence of Regulatory Rents in the Motor Carrier Industry."  *Rand Journal of Economics* 16 (Autumn 1985): 299-318. Reprinted in *Portfolio   International Economic Perspectives*, vol. 13 (4) and in P. L. Joskow, ed. *Economic Regulation*. Northampton, MA: Edward Elgar Publishing.  2000.

"Passing the President's Program: Public Opinion and Presidential Influence in Congress." *American Journal of Political Science* 29 (May 1985): 183-196.  (with D. Rivers)

"The Effects of Technological Change, Experience, and Environmental Regulation on the Construction Costs of Coal-Burning Generating Units." *Rand Journal of Economics* 16 (Spring 1985): 1-27.  (with P. L. Joskow)

**Other**

"What 150 Years of the Telephone Teaches Us About Regulating Digital Communications," Promarket blog post, March 10, 2026 (with John Haigh and Jonathan Sallet)

"Defending the Merger Efficiency Defense:  A Response to Herbert Hovenkamp," Promarket blog post, December 9, 2025 (with Jonathan Sallet)

"Restoring competition in the United States:  A vision for antitrust enforcement for the next administration and Congress."  Washington Center for Equitable Growth.  November 2020.  (with B. Baer, J. B. Baker, M. Kades, F. Scott Morton, C. Shapiro, and T. Wu.)

"Will Competition be Another COVID-19 Casualty?" The Hamilton Project.  Essay 2020-15.  July 2020.

"Joint Response to the House Judiciary Committee on the State of Antitrust Law and the Implications for Protecting Competition in Digital Markets," April 30, 2020. (with J. Baker et al.)  Howard Law Research Paper, posted on SSRN, 2 July 2020, https://ssrn.com/abstract=3632532 .

"Principles and presumptions for U.S. vertical merger enforcement policy," Blog post on Washington Center for Equitable Growth Competitive Edge, May 7, 2019.  (with J. B. Baker, S. C. Salop, and F. Scott Morton)

"Thinking Through Anticompetitive Effects of Mergers on Workers," Continuing Legal Education Material for American Bar Association 2019 Antitrust Spring Meeting, February 2019